**IN THE
UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT**

| | | |
|---|---|---|
| Office of the Ohio Consumers' Counsel, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | |
| | ) | No. 24-2163 |
| Federal Energy Regulatory Commission, | ) | |
| | ) | |
| Respondent. | ) | |

**AMENDED PETITION FOR REVIEW OF THE
OFFICE OF THE OHIO CONSUMERS' COUNSEL**

Pursuant to section 313(b) of the Federal Power Act, 16 U.S.C. § 825*l*(b), Rule 15(a) of the Federal Rules of Appellate Procedure, and Circuit Rules 15(a) and 15(b) of the United States Court of Appeals for the Fourth Circuit, the Office of the Ohio Consumers' Counsel amends its Petition for Review of the following orders of the respondent, Federal Energy Regulatory Commission ("the Commission") to include the Commission's Order on Rehearing and Clarification identified below:

1. *Building for the Future Through Electric Regional Transmission Planning and Cost Allocation*, Order No. 1920, FERC Docket No. RM21-17-000, 187 FERC ¶ 61,068 (May 13, 2024).

2. B*uilding for the Future Through Electric Regional Transmission Planning and Cost Allocation,* Notice of Denial of Rehearing by Operation of Law and Providing for Further Consideration, FERC Docket No. RM21-17-001, 188 FERC ¶ 62,025 (July 15, 2024).

3. B*uilding for the Future Through Electric Regional Transmission Planning and Cost Allocation,* Order on Rehearing and Clarification, FERC Docket No. RM21-17-001, 189 FERC ¶ 62,126 (November 21, 2024).

OCC filed a timely request for rehearing of the Commission's May 13, 2024 Order in Docket No. RM21-17-000, also known as Order No. 1920, jointly with the Consumer Advocate Division of the Public Service Commission of West Virginia. The Commission denied all requests for rehearing of that order by Notice of Denial of Rehearing by Operation of Law on July 15, 2024.

OCC timely filed its appeal of Order No. 1920 and the Notice of Denial of Rehearing by Operation of Law in the United States Court of Appeals for the District of Columbia Circuit, Case No. 24-1295 on September 10, 2024. The District of Columbia Circuit Court transferred OCC's Petition for Review of Order No. 1920 to the Fourth Circuit on November 21, 2024. The Fourth Circuit subsequently assigned OCC's September 10, 2024 Petition as Case No. 24-2163 and consolidated it with other petitions for review filed from FERC Order No. 1920. These consolidated appeals in the Fourth Circuit are styled as Appalachian Voices, et al. v. FERC, Case Nos. 24-1650 *et al.*

Then, on November 21, 2024, the Commission issued its Order on Rehearing and Clarification in the proceeding below, also known as Order No. 1920-A. Order No. 1920-A is the final Commission order on the issues raised in OCC's request for

rehearing of Order No. 1920. This rehearing order renders FERC's rulings rejecting OCC's request final for purposes of appeal under the Federal Power Act.

This Court has subject matter jurisdiction under 16 U.S.C. §825l(b).

A copy of each of the Commission's Orders for which review is sought is appended as Attachment 1. Also appended is a Certificate of Service providing the required information for the Respondent. The required information for the parties to the underlying proceedings is appended as Attachment 2.

Respectfully submitted,

*/s/ Denise C. Goulet*
Denise C. Goulet
McCarter & English, LLP
1301 K Street, N.W., Suite 1000 West
Washington, D.C. 20005
(202) 753-3400

Special Counsel to the Ohio Office of the
Attorney General for the Office of the Ohio
Consumers' Counsel

Denise C. Goulet is Admitted to the United
States Court of Appeals for the Fourth
Circuit

MAUREEN WILLIS
CONSUMERS' COUNSEL

Angela O'Brien, Deputy Consumers'
Counsel
Office of the Ohio Consumers' Counsel
65 East State Street, 7th Floor
Columbus, Ohio 43215

(614) 466-9531 – Telephone
angela.obrien@occ.ohio.gov

Dated:  January 21, 2025.

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT
## CERTIFICATE OF SERVICE
## No. 24-2163

In accordance with Fed. R. App. P. 15(c) and 25, Circuit Rules 25(a) and 25(f), I hereby certify that I have this day electronically served a copy of the foregoing Amended Petition for Review of the Office of the Ohio Consumers' Counsel and the accompanying orders, upon each of the parties or their counsel of record on the official service list maintained for that proceeding by the Secretary of the Commission, as shown on the list appended as Attachment 2. I also hereby certify that I have served by electronic delivery and overnight delivery two (2) copies of the attached Petition for Review and accompanying orders on the Solicitor of the Federal Energy Regulatory Commission, and one (1) copy of these documents on the Secretary of the Federal Energy Regulatory Commission.

Dated at Washington, D.C. this 21st day of January, 2025.

/s/ Denise C. Goulet
Denise C. Goulet
McCarter & English, LLP
1301 K Street, N.W.
Suite 1000 West
Washington, D.C. 20005
(202) 753-3400

**Service on the Solicitor of the Federal Energy Regulatory Commission:**

Mr. Robert Solomon, Solicitor
Office of the Solicitor
Federal Energy Regulatory Commission
888 First Street, N.E.
Washington, D.C. 20426

**Service on the Secretary of the Federal Energy Regulatory Commission:**

Honorable Debbie-Anne A. Reese, Secretary
Federal Energy Regulatory Commission
888 First Street, N.E.
Washington, D.C. 20426

**Service on the official service list in Federal Energy Regulatory Commission Docket No. RM21-17-000**

SEE ATTACHMENT 2

**IN THE
UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT**


Office of the Ohio Consumers' Counsel,   )
          Petitioner,   )
                       )
             v.          )   Case No. 24-2163
                       )
Federal Energy Regulatory Commission,   )
          Respondent   )


### List of Attachments to Amended Petition for Review

## ATTACHMENT 1

1. *Building for the Future Through Electric Regional Transmission Planning and Cost Allocation*, Order No. 1920, FERC Docket No. RM21-17-000, 187 FERC ¶ 61,068 (May 13, 2024).

2. B*uilding for the Future Through Electric Regional Transmission Planning and Cost Allocation,* Notice of Denial of Rehearing by Operation of Law and Providing for Further Consideration, FERC Docket No. RM21-17-001, 188 FERC ¶ 62,025 (July 15, 2024).

3. B*uilding for the Future Through Electric Regional Transmission Planning and Cost Allocation,* Order on Rehearing and Clarification, FERC Docket No. RM21-17-001, 189 FERC ¶ 62,126 (November 21, 2024)


## ATTACHMENT 2

Official FERC Service List in Docket No. RM21-17-000, *et al.*

# ATTACHMENT 1

1. *Building for the Future Through Electric Regional Transmission Planning and Cost Allocation*, Order No. 1920, FERC Docket No. RM21-17-000, 187 FERC ¶ 61,068 (May 13, 2024).

2. B*uilding for the Future Through Electric Regional Transmission Planning and Cost Allocation,* Notice of Denial of Rehearing by Operation of Law and Providing for Further Consideration, FERC Docket No. RM21-17-001, 188 FERC ¶ 62,025 (July 15, 2024).

3. B*uilding for the Future Through Electric Regional Transmission Planning and Cost Allocation,* Order on Rehearing and Clarification, FERC Docket No. RM21-17-001, 189 FERC ¶ 62,126 (November 21, 2024).

187 FERC ¶ 61,068
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

18 CFR Part 35

[Docket No. RM21-17-000; Order No. 1920]

Building for the Future Through Electric
Regional Transmission Planning and Cost Allocation

(Issued May 13, 2024)

**AGENCY**:  Federal Energy Regulatory Commission.

**ACTION**:  Final rule.

**SUMMARY**:  The Federal Energy Regulatory Commission (Commission) revises the *pro forma* Open Access Transmission Tariff (OATT) to remedy deficiencies in the Commission's existing regional and local transmission planning and cost allocation requirements.  In this final rule, the Commission requires transmission providers to conduct Long-Term Regional Transmission Planning that will ensure the identification, evaluation, and selection, as well as the allocation of the costs, of more efficient or cost-effective regional transmission solutions to address Long-Term Transmission Needs. The Commission also directs other reforms to improve coordination of regional transmission planning and generator interconnection processes, require consideration of certain alternative transmission technologies in regional transmission planning processes, and improve transparency of local transmission planning processes and coordination between regional and local transmission planning processes.  These reforms are intended to ensure that existing regional and local transmission planning and cost allocation

Docket No. RM21-17-000

requirements are just, reasonable, and not unduly discriminatory or preferential.

**EFFECTIVE DATE**: This final rule will become effective **[INSERT DATE 60 DAYS**

**AFTER DATE OF PUBLICATION IN THE FEDERAL REGISTER]**

**FOR FURTHER INFORMATION CONTACT**:

David Borden (Technical Information)
Office of Energy Policy and Innovation
888 First Street, NE
Washington, DC 20426
(202) 502-8734
david.borden@ferc.gov

Noah Lichtenstein (Technical Information)
Office of Energy Market Regulation
888 First Street, NE
Washington, DC 20426
(202) 502-8696
noah.lichtenstein@ferc.gov

Michael Kellermann (Legal Information)
Office of the General Counsel
888 First Street, NE
Washington, DC 20426
(202) 502-8491
michael.kellermann@ferc.gov

**SUPPLEMENTARY INFORMATION**:

187 FERC ¶ 61,068
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners:  Willie L. Phillips, Chairman;
                        Allison Clements and Mark C. Christie.

| Building for the Future Through Electric Regional | Docket No. | RM21-17-000 |
| Transmission Planning and Cost Allocation | | |

ORDER NO. 1920

FINAL RULE

(Issued May 13, 2024)

TABLE OF CONTENTS

Paragraph Numbers

I. Introduction and Background ................................................................. 1.
   A. Historical Framework: Order Nos. 888, 890, and 1000 ........................... 14.
   B. ANOPR and Technical Conference................................................... 20.
   C. Joint Federal-State Task Force on Electric Transmission ..................... 22.
   D. Notice of Proposed Rulemaking ................................................... 26.
   E. High-Level Overview of NOPR Comments .......................................... 36.
   F. Use of Terms........................................................................ 37.

II. The Overall Need for Reform................................................................ 47.
    A. NOPR Proposal ..................................................................... 47.
    B. Comments............................................................................. 49.
    C. Commission Determination ........................................................ 85.
       1. The Transmission Investment Landscape Today ............................... 90.
       2. Unjust, Unreasonable, and Unduly Discriminatory or Preferential Commission-
       Jurisdictional Transmission Planning and Cost Allocation Processes ......... 112.
       3. Benefits of Long-Term Regional Transmission Planning and Cost Allocation to
       Identify and Plan for Long-Term Transmission Needs ......................... 134.
       4. Conclusion ...................................................................... 139.

III. Long-Term Regional Transmission Planning ........................................ 140.
     A. Requirement to Participate in Long-Term Regional Transmission Planning ...... 140.
        1. NOPR Proposal.................................................................. 140.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 12 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                    - 2 -

2. Comments ......................................................................................... 145.
   a. General Comments ....................................................................... 145.
   b. Requests for Flexibility in Transmission Planning ..................... 151.
   c. Comments Regarding More Comprehensive Transmission Planning.......... 163.
   d. Concerns Regarding Favoring Renewable Resources.................. 172.
   e. Concerns Regarding Uncertainty, Over-building, and Costs...................... 176.
   f. Concerns Regarding Incentives for Resource Development ...................... 187.
   g. Comments Regarding Definition of Long-Term Regional Transmission
   Facility ............................................................................................. 189.
   h. Challenges to Commission Jurisdiction or Authority.................... 190.
   i. Other Issues .................................................................................. 215.
   j. Miscellaneous Concerns ............................................................. 217.
3. Commission Determination ............................................................. 224.
   a. Participation in Long-Term Regional Transmission Planning.................... 224.
   b. Definition of Long-Term Regional Transmission Facility ......................... 250.
   c. Legal Authority to Adopt Reforms for Long-Term Regional Transmission
   Planning ........................................................................................... 253.
B. Development of Long-Term Scenarios ................................................ 284.
   1. NOPR Proposal................................................................................. 284.
   2. Comments ........................................................................................ 286.
      a. General Comments ....................................................................... 286.
      b. Applying Scenario Planning to Reliability and Economic Planning .......... 296.
   3. Commission Determination................................................................ 298.
C. Long-Term Scenarios Requirements ................................................... 307.
   1. Transmission Planning Horizon ....................................................... 307.
      a. NOPR Proposal............................................................................ 307.
      b. Comments .................................................................................... 309.
      c. Commission Determination .......................................................... 344.
   2. Frequency of Long-Term Scenario Revisions................................... 352.
      a. NOPR Proposal............................................................................ 352.
      b. Comments .................................................................................... 354.
      c. Commission Determination .......................................................... 377.
   3. Categories of Factors........................................................................ 387.
      a. Requirement to Incorporate Categories of Factors...................... 387.
      b. Specific Categories of Factors...................................................... 422.
      c. Treatment of Specific Categories of Factors ............................... 495.
      d. Stakeholder Process and Transparency......................................... 519.
   4. Number and Development of Long-Term Scenarios......................... 538.
      a. NOPR Proposal............................................................................ 538.
      b. Comments .................................................................................... 541.
      c. Commission Determination .......................................................... 559.
   5. Types of Long-Term Scenarios ........................................................ 564.
      a. NOPR Proposal............................................................................ 564.

USCA4 Appeal: 24-1650   Doc: 224   Filed: 01/21/2025   Pg: 13 of 2455
Document Accession #: 20240513-3036   Filed Date: 05/13/2024

Docket No. RM21-17-000                                                    - 3 -

b. Comments.................................................................................... 566.
c. Commission Determination........................................................... 575.
6. Sensitivities for High-Impact, Low-Frequency Events ................... 578.
a. NOPR Proposal............................................................................ 578.
b. Comments.................................................................................... 580.
c. Commission Determination........................................................... 593.
7. Specificity of Data Inputs .............................................................. 602.
a. NOPR Proposal............................................................................ 602.
b. Comments.................................................................................... 606.
c. Commission Determination........................................................... 633.
8. Identification of Geographic Zones ................................................ 645.
a. NOPR Proposal............................................................................ 645.
b. Comments.................................................................................... 650.
c. Commission Determination........................................................... 665.
D. Evaluation of the Benefits of Regional Transmission Facilities ........................ 667.
1. Requirement for Transmission Providers to Use a Set of Seven Required
Benefits............................................................................................... 669.
a. NOPR Proposal............................................................................ 669.
b. Comments.................................................................................... 673.
c. Commission Determination........................................................... 719.
2. Required Benefits............................................................................ 740.
a. The Seven Required Benefits ....................................................... 740.
3. Identification, Measurement, and Evaluation of the Benefits of Long-Term
Regional Transmission Facilities........................................................ 823.
a. NOPR Proposal............................................................................ 823.
b. Comments.................................................................................... 824.
c. Commission Determination........................................................... 837.
4. Evaluation of Transmission Benefits Over a Longer Time Horizon............... 843.
a. NOPR Proposal............................................................................ 843.
b. Comments.................................................................................... 845.
c. Commission Determination........................................................... 859.
5. Evaluation of the Benefits of Portfolios of Transmission Facilities................ 871.
a. NOPR Proposal............................................................................ 871.
b. Comments.................................................................................... 872.
c. Commission Determination........................................................... 889.
6. Issues Related to Use of Benefits ................................................... 891.
a. NOPR Proposal............................................................................ 891.
b. Comments.................................................................................... 892.
c. Commission Determination........................................................... 902.
E. Evaluation and Selection of Long-Term Regional Transmission Facilities ......... 904.
1. Requirement to Adopt an Evaluation Process and Selection Criteria ............. 904.
a. NOPR Proposal............................................................................ 904.
b. Comments.................................................................................... 906.

USCA4 Appeal: 24-1650   Doc: 224   Filed: 01/21/2025   Pg: 14 of 2455
Document Accession #: 20240513-3036   Filed Date: 05/13/2024

Docket No. RM21-17-000                                              - 4 -

    c. Commission Determination ...................................................... 911.
  2. Flexibility ................................................................................ 919.
    a. NOPR Proposal .................................................................... 919.
    b. Comments .......................................................................... 920.
    c. Commission Determination ...................................................... 924.
  3. Minimum Requirements ............................................................. 927.
    a. NOPR Proposal .................................................................... 927.
    b. Comments .......................................................................... 930.
    c. Commission Determination ...................................................... 954.
  4. Role of Relevant State Entities .................................................. 972.
    a. NOPR Proposal .................................................................... 972.
    b. Comments .......................................................................... 973.
    c. Commission Determination ...................................................... 994.
  5. Voluntary Funding Opportunities ................................................ 1003.
    a. NOPR Proposal .................................................................... 1003.
    b. Comments .......................................................................... 1004.
    c. Commission Determination ...................................................... 1012.
  6. No Selection Requirement .......................................................... 1019.
    a. NOPR Proposal .................................................................... 1019.
    b. Comments .......................................................................... 1020.
    c. Commission Determination ...................................................... 1026.
  7. Other Issues ............................................................................ 1029.
    a. Comments .......................................................................... 1029.
    b. Commission Determination ...................................................... 1031.
  8. Reevaluation ........................................................................... 1033.
    a. NOPR Proposal .................................................................... 1033.
    b. Comments .......................................................................... 1035.
    c. Commission Determination ...................................................... 1048.
 F. Implementation of Long-Term Regional Transmission Planning ..................... 1062.
  1. NOPR Proposal ........................................................................ 1062.
  2. Comments .............................................................................. 1064.
    a. Comments on the Initial Timing Sequence ............................... 1064.
    b. Comments on Periodic Forums ............................................... 1067.
  3. Commission Determination ......................................................... 1071.
    a. Initial Timing Sequence Implementation ................................. 1071.
    b. Periodic Forums ................................................................ 1075.

IV. Coordination of Regional Transmission Planning and Generator Interconnection
Processes ......................................................................................... 1076.
 A. Need for Reform and Overall Reform ............................................... 1076.
  1. NOPR Proposal ........................................................................ 1076.
  2. Comments .............................................................................. 1079.
    a. On the Overall Reform ....................................................... 1079.

USCA4 Appeal: 24-1650   Doc: 224   Filed: 01/21/2025   Pg: 15 of 2455
Document Accession #: 20240513-3036   Filed Date: 05/13/2024

Docket No. RM21-17-000                                    - 5 -

    b. Requesting Additional Reform.................................................1081.
    c. Concerns with the Overall Reform ..........................................1085.
    d. Cost Allocation .......................................................................1093.
    e. Interconnection Queue Gaming Considerations......................1095.
    f. Miscellaneous .........................................................................1098.
  3. Need for Reform ..........................................................................1100.
  4. Commission Determination ..........................................................1106.
  B. Transmission Planning Process Evaluation ....................................1122.
  1. NOPR Proposal .............................................................................1122.
  2. Comments ....................................................................................1123.
  3. Commission Determination ..........................................................1126.
  C. Qualifying Criteria...........................................................................1130.
  1. NOPR Proposal .............................................................................1130.
  2. Comments ....................................................................................1134.
  3. Commission Determination ..........................................................1145.

V. Consideration of Dynamic Line Ratings and Advanced Power Flow Control
Devices..................................................................................................1163.
  A. General Proposal .............................................................................1163.
  1. NOPR Proposal .............................................................................1163.
  2. Comments on General Proposal ...................................................1167.
  3. Need for Reform ...........................................................................1194.
  4. Commission Determination ..........................................................1198.
  B. Specific Alternative Transmission Technologies.............................1217.
  1. NOPR Proposal .............................................................................1217.
  2. Comments on Specific Technologies ...........................................1218.
  3. Commission Determination ..........................................................1239.

VI. Regional Transmission Cost Allocation .................................................1248.
  A. Cost Allocation for Long-Term Regional Transmission Facilities....1248.
  1. Cost Allocation Methods for Long-Term Regional Transmission Facilities...1248.
    a. NOPR Proposal.........................................................................1248.
    b. Comments.................................................................................1252.
    c. Commission Determination......................................................1291.
  2. Requirement that Transmission Providers Seek the Agreement of Relevant State
  Entities Regarding the Cost Allocation Method or Methods for Long-Term
  Regional Transmission Facilities.................................................................1308.
    a. NOPR Proposal.........................................................................1308.
    b. Comments.................................................................................1313.
    c. Commission Determination......................................................1354.
  3. Proposals Relating to the Design and Operation of State Agreement
  Processes ...................................................................................................1369.
    a. NOPR Proposal.........................................................................1369.
    b. Comments.................................................................................1371.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 16 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                    - 6 -

    c. Commission Determination ...................................................1402.
  4. Filing Rights Under the FPA ..................................................1422.
    a. Comments ........................................................................1422.
    b. Commission Determination ...............................................1428.
  5. Time Period and Related Issues in the Long-Term Regional Transmission
  Planning Cost Allocation Processes for State-Negotiated Alternate Cost Allocation
  Method......................................................................................1432.
    a. NOPR Proposal ...............................................................1432.
    b. Comments ........................................................................1436.
    c. Commission Determination ...............................................1456.
B. Long-Term Regional Transmission Facility Cost Allocation Compliance with the
Existing Six Order No. 1000 Regional Cost Allocation Principles.......................1458.
  1. NOPR Proposal .....................................................................1458.
  2. Comments .............................................................................1459.
    a. General Proposal ..............................................................1459.
    b. Comments Specific to A State Agreement Process....................1467.
  3. Commission Determination ......................................................1469.
C. Identification of Benefits Considered in Cost Allocation for Long-Term Regional
Transmission Facilities ......................................................................1480.
  1. NOPR Proposal .....................................................................1480.
  2. Comments .............................................................................1482.
    a. Agree with Proposal..........................................................1482.
    b. Requests to reflect the full breadth of benefits in cost allocation methods while
    maintaining flexibility..........................................................1491.
    c. Disagree with Proposal, Mostly Require Benefits....................1492.
    d. Alignment of Benefits between Transmission Planning and Cost
    Allocation .........................................................................1497.
    e. Additional Benefits or Suggestions for Refinement ..................1502.
  3. Commission Determination ......................................................1505.
D. Miscellaneous Cost Allocation Comments and Proposals ...............................1516.
  1. Comments .............................................................................1516.
  2. Commission Determination ......................................................1521.

VII. Construction Work in Progress Incentive .......................................................1524.
A. NOPR Proposal ...............................................................................1524.
B. Comments......................................................................................1525.
  1. Interest in the NOPR Proposal...................................................1525.
  2. Concerns with the NOPR Proposal..............................................1532.
  3. Interaction of the CWIP Incentive with the Abandoned Plant Incentive ........1545.
C. Commission Determination .................................................................1547.

VIII. Exercise of a Federal Right of First Refusal in Commission-Jurisdictional Tariffs
and Agreements....................................................................................1548.
A. NOPR Proposal ...............................................................................1548.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 17 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                              - 7 -

   B. Comments................................................................................1553.
      1. General Perspectives and Approach to Reform..........................1553.
      2. Comments on the NOPR's Joint Ownership Proposal ...................1560.
   C. Commission Determination ................................................1563.

IX. Local Transmission Planning Inputs in the Regional Transmission Planning
Process ..........................................................................1565.
   A. Need for Reform ...........................................................1565.
      1. NOPR .....................................................................1565.
      2. Comments ................................................................1567.
      3. Commission Determination ...............................................1569.
   B. Enhanced Transparency of Local Transmission Planning Inputs in the Regional
   Transmission Planning Process ...............................................1578.
      1. NOPR Proposal ...........................................................1578.
      2. Comments ................................................................1581.
         a. Interest in Enhanced Transparency of Local Transmission Planning
         Inputs.....................................................................1581.
         b. Suggested Modifications to the NOPR Proposal ......................1586.
         c. Concern with the NOPR Proposal ...................................1591.
         d. Specific Stakeholder Meeting Requirements ..........................1601.
         e. Additional Issues......................................................1613.
      3. Commission Determination ...............................................1625.
         a. Specific Stakeholder Meeting Requirements ..........................1638.
         b. Additional Issues......................................................1647.
   C. Identifying Potential Opportunities to Right-Size Replacement Transmission
   Facilities........................................................................1649.
      1. Eligibility .................................................................1649.
         a. NOPR Proposal .......................................................1649.
         b. Comments .............................................................1652.
         c. Commission Determination ...........................................1677.
      2. Right of First Refusal ...................................................1693.
         a. NOPR Proposal .......................................................1693.
         b. Comments .............................................................1694.
         c. Commission Determination ...........................................1702.
      3. Cost Allocation ..........................................................1710.
         a. NOPR Proposal .......................................................1710.
         b. Comments .............................................................1712.
         c. Commission Determination ...........................................1716.
      4. Miscellaneous ...........................................................1723.
         a. Comments .............................................................1723.
         b. Commission Determination ...........................................1735.

X. Interregional Transmission Coordination .......................................1740.
   A. NOPR Proposal ...........................................................1740.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 18 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                    - 8 -

B. Comments ........................................................................................ 1744.
C. Commission Determination ............................................................... 1751.

XI. Compliance Procedures .......................................................................... 1759.
A. NOPR Proposal ................................................................................. 1759.
B. Comments ........................................................................................ 1761.
C. Commission Determination ............................................................... 1768.

XII. Information Collection Statement .......................................................... 1775.

XIII. Environmental Analysis ....................................................................... 1784.

XIV. Regulatory Flexibility Act ................................................................... 1785.

XV. Document Availability ......................................................................... 1789.

XVI. Effective Date and Congressional Notification ..................................... 1792.

Appendix A: Abbreviated Names of Commenters

Appendix B: Pro Forma Open Access Transmission Tariff Attachment K

## I.  **Introduction and Background**

1.      In this final rule, the Commission acts under section 206 of the Federal Power Act

(FPA) to adopt reforms to its electric transmission planning and cost allocation

requirements.[1]  The reforms herein will remedy deficiencies in the Commission's existing

regional and local transmission planning and cost allocation requirements to ensure that

the rates, terms, and conditions for transmission service provided by public utility

transmission providers (transmission providers)[2] remain just and reasonable and not

---

[1] 16 U.S.C. 824e.

[2] Section 201(e) of the FPA, 16 U.S.C. 824(e), defines "public utility" to mean "any person who owns or operates facilities subject to the jurisdiction of the Commission under this subchapter."  As stated in the Order No. 888 *pro forma* Open Access Transmission Tariff (OATT), "transmission provider" is a "public utility (or its Designated Agent) that owns, controls, or operates facilities used for the transmission of electric energy in interstate commerce and provides transmission service under the Tariff."  *Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Servs. by Pub. Utils.; Recovery of Stranded Costs by Pub. Utils. &*

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 19 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                    - 9 -

unduly discriminatory or preferential.  This final rule builds upon Order No. 888, Order

No. 890,[3] and Order No. 1000,[4] in which the Commission incrementally developed the

requirements that govern regional transmission planning and cost allocation processes to

ensure that Commission-jurisdictional rates remain just and reasonable and not unduly

discriminatory or preferential.  Specifically, in this final rule, we find that there is

substantial evidence to support the conclusion that the existing regional transmission

planning and cost allocation processes are unjust, unreasonable, and unduly

discriminatory or preferential because the Commission's existing transmission planning

---

*Transmitting Utils.*, Order No. 888, 61 FR 21540 (May 10, 1996), FERC Stats. & Regs. ¶ 31,036 (1996) (cross-referenced at 75 FERC ¶ 61,080), *order on reh'g*, Order No. 888-A, 62 FR 12274 (Mar. 14, 1997), FERC Stats. & Regs. ¶ 31,048 (cross-referenced at 78 FERC ¶ 61,220), *order on reh'g*, Order No. 888-B, 81 FERC ¶ 61,248 (1997), *order on reh'g*, Order No. 888-C, 82 FERC ¶ 61,046 (1998), *aff'd in relevant part sub nom. Transmission Access Pol'y Study Grp. v. FERC*, 225 F.3d 667 (D.C. Cir. 2000), *aff'd sub nom. N.Y. v. FERC*, 535 U.S. 1 (2002); *Pro forma* OATT section I.1 (Definitions).  The term "transmission provider" includes a public utility transmission owner when the transmission owner is separate from the transmission provider, as is the case in regional transmission organizations (RTO) and independent system operators (ISO).

[3] *Preventing Undue Discrimination & Preference in Transmission Serv.*, Order No. 890, 72 FR 12266 (Mar. 15, 2007), FERC Stats. & Regs. ¶ 31,241, 118 FERC ¶ 61,119 (2007), *order on reh'g,* Order No. 890-A, 73 FR 2984 (Jan. 16, 2008), FERC Stats. & Regs. ¶ 31,261 (2007) (cross-referenced at 118 FERC ¶ 61,119), *order on reh'g and clarification*, Order No. 890-B, 73 FR 39092 (July 8, 2008), 123 FERC ¶ 61,299 (2008), *order on reh'g*, Order No. 890-C, 74 FR 12540 (Mar. 25, 2009), 126 FERC ¶ 61,228 (2009), *order on clarification*, Order No. 890-D, 74 FR 61511 (Nov. 25, 2009), 129 FERC ¶ 61,126 (2009).

[4] *Transmission Plan. & Cost Allocation by Transmission Owning & Operating Pub. Utils.*, Order No. 1000, 76 FR 49842 (Aug. 11, 2011), 136 FERC ¶ 61,051 (2011), Order No. 1000-A, 77 FR 32184 (May 31, 2012), 139 FERC ¶ 61,132 (2012), *order on reh'g & clarification*, Order No. 1000-B, 141 FERC ¶ 61,044 (2012), *aff'd sub nom. S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d 41 (D.C. Cir. 2014).

and cost allocation requirements do not require transmission providers to: (1) perform a

sufficiently long-term assessment of transmission needs that identifies Long-Term

Transmission Needs;[5] (2) adequately account on a forward-looking basis for known

determinants of Long-Term Transmission Needs; and (3) consider the broader set of

benefits of regional transmission facilities planned to meet those Long-Term

Transmission Needs. Accordingly, we believe that it is necessary to revisit existing

transmission planning and cost allocation requirements. We conclude that adopting the

reforms of this final rule, as previously contemplated in the Notice of Proposed

Rulemaking,[6] will remedy the identified deficiencies in existing regional and local

transmission planning and cost allocation requirements, as discussed below, and will

ensure the identification, evaluation, and selection, as well as the allocation of the costs,

of more efficient or cost-effective regional transmission solutions to address Long-Term

Transmission Needs.

2. Specifically, the reforms adopted in this final rule require transmission providers

in each transmission planning region to participate in a regional transmission planning

process that includes Long-Term Regional Transmission Planning.[7] This final rule

---

[5] All capitalized terms are defined below. *Infra* Use of Terms section.

[6] *Bldg. for the Future Through Elec. Reg'l Transmission Planning & Cost Allocation & Generator Interconnection*, 87 FR 26504 (May 4, 2022), 179 FERC ¶ 61,028 (2022) (NOPR); *see also Bldg. for the Future Through Elec. Reg'l Transmission Planning & Cost Allocation & Generator Interconnection*, 86 FR 40266 (July 27, 2021), 176 FERC ¶ 61,024 (2021) (ANOPR).

[7] For purposes of this final rule, and consistent with Order No. 1000, a transmission planning region is one in which transmission providers, in consultation with

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 21 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                    - 11 -

adopts specific requirements regarding how transmission providers must conduct Long-Term Regional Transmission Planning, including, among other things, the use of scenarios to identify Long-Term Transmission Needs and Long-Term Regional Transmission Facilities to meet those needs.

3.      This final rule also requires transmission providers to measure and use at least the seven specified benefits to evaluate Long-Term Regional Transmission Facilities as part of Long-Term Regional Transmission Planning.  In addition, this final rule requires transmission providers to calculate the benefits of Long-Term Regional Transmission Facilities over a time horizon that covers, at a minimum, 20 years starting from the estimated in-service date of the transmission facilities and requires that this minimum 20-year benefit horizon be used both for the evaluation and selection of Long-Term Regional Transmission Facilities in the regional transmission plan for purposes of cost allocation.[8]

4.      This final rule requires transmission providers to include in their OATTs an evaluation process, including selection criteria, that they will use to identify and evaluate

---

stakeholders and affected states, have agreed to participate for purposes of regional transmission planning and development of a single regional transmission plan.  *See* Order No. 1000, 136 FERC ¶ 61,051 at P 160.

[8] We recognize that some transmission planning regions may include Long-Term Regional Transmission Facilities, or a portfolio of such Facilities, in a regional transmission plan, but may not necessarily include these Facilities for purposes of cost allocation.  *See* Order No. 1000, 136 FERC ¶ 61,051 at P 63.  For purposes of this final rule, unless otherwise noted, when referencing Long-Term Regional Transmission Facilities (or a portfolio of such Facilities) that are selected, we intend "selected" to mean that those Facilities are selected in the regional transmission plan for purposes of cost allocation.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 22 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Long-Term Regional Transmission Facilities for potential selection to address Long-Term Transmission Needs.

5.    Further, this final rule requires transmission providers to file one or more *ex ante* Long-Term Regional Transmission Cost Allocation Methods to allocate the costs of Long-Term Regional Transmission Facilities (or a portfolio of such Facilities) that are selected. This final rule further permits, but does not require, transmission providers to adopt a State Agreement Process, wherein Relevant State Entities agree to such a State Agreement Process that would provide up to six months after selection for its participants to determine, and transmission providers to file, a cost allocation method for specific Long-Term Regional Transmission Facilities. This final rule establishes a six-month time period (Engagement Period), during which transmission providers must: (1) provide notice of the starting and end dates for the six-month time period; (2) post contact information that Relevant State Entities may use to communicate with transmission providers about any agreement among Relevant State Entities on a Long-Term Regional Transmission Cost Allocation Method(s) and/or a State Agreement Process, as well as a deadline for communicating such agreement; and (3) provide a forum for negotiation of a Long-Term Regional Transmission Cost Allocation Method(s) and/or a State Agreement Process that enables robust participation by Relevant State Entities.

6.    This final rule also requires transmission providers to include in their OATTs a process to provide Relevant State Entities and interconnection customers the opportunity to voluntarily fund the cost of, or a portion of the cost of, a Long-Term Regional Transmission Facility that otherwise would not meet the transmission providers' selection

USCA4 Appeal: 24-1650    Doc: 224        Filed: 01/21/2025    Pg: 23 of 2455
Document Accession #: 20240513-3036        Filed Date: 05/13/2024

Docket No. RM21-17-000                                                                - 13 -

criteria. This final rule requires transmission providers to include in their OATTs provisions that require transmission providers—in certain circumstances—to reevaluate Long-Term Regional Transmission Facilities that previously were selected.

7.      In addition, this final rule requires that transmission providers evaluate for potential selection in their existing Order No. 1000 regional transmission planning processes regional transmission facilities that will address certain identified interconnection-related transmission needs associated with certain interconnection-related network upgrades[9] originally identified through the generator interconnection process.

8.      This final rule requires transmission providers in each transmission planning region to consider more fully the alternative transmission technologies of dynamic line ratings, advanced power flow control devices, advanced conductors, and transmission switching in Long-Term Regional Transmission Planning and existing Order No. 1000 regional transmission planning and cost allocation processes.

---

[9] The Commission's *pro forma* Large Generator Interconnection Procedures (LGIP) and *pro forma* Large Generator Interconnection Agreement (LGIA) provide that, "Network Upgrades shall mean the additions, modifications, and upgrades to the Transmission Provider's Transmission System required at or beyond the point at which the Interconnection Facilities connect to the Transmission Provider's Transmission System to accommodate the interconnection of the Large Generating Facility to the Transmission Provider's Transmission System." *See Improvements to Generator Interconnection Procedures & Agreements*, Order No. 2023, 88 FR 61014 (Sept. 6, 2023), 184 FERC ¶ 61,054, at P 13 n.23, *order on reh'g*, 185 FERC ¶ 61,063 (2023), *order on reh'g*, Order No. 2023-A, 89 FR 27006 (Apr. 16, 2024), 186 FERC ¶ 61,199 (2024). In this final rule, we refer to network upgrades developed through the generator interconnection process as interconnection-related network upgrades.

9.      This final rule does not finalize the NOPR proposal to not permit transmission providers to take advantage of the recovery of 100% of construction work in progress for Long-Term Regional Transmission Facilities, and the Commission will instead continue to consider transmission incentives issues in other proceedings.  This final rule similarly does not finalize the NOPR proposal with respect to permitting the exercise of federal rights of first refusal for selected transmission facilities, conditioned on the incumbent transmission provider with the federal right of first refusal establishing joint ownership of the transmission facilities, and the Commission will instead continue considering the NOPR proposal and potential federal right of first refusal issues in other proceedings.

10.     This final rule adopts the NOPR proposal to require transmission providers to adopt enhanced transparency requirements for local transmission planning processes and improve coordination between regional and local transmission planning with the aim of identifying potential opportunities to "right-size" replacement transmission facilities.

11.     This final rule requires transmission providers to revise their interregional transmission coordination processes to reflect the Long-Term Regional Transmission Planning reforms adopted in this final rule.  This final rule also requires that transmission providers meet additional information sharing and transparency requirements with respect to their interregional transmission coordination processes.

12.     This final rule requires that each transmission provider submit a compliance filing within ten months of the effective date of this final rule revising its OATT and other document(s) subject to the Commission's jurisdiction to demonstrate that it meets the requirements of this final rule, with the exception of those requirements adopted in the

Docket No. RM21-17-000                                                      - 15 -

Interregional Transmission Coordination section in this final rule.  This final rule requires that each transmission provider submit a compliance filing within 12 months of the effective date of this final rule revising its OATT and other document(s) subject to the Commission's jurisdiction as necessary to demonstrate that it meets the interregional transmission coordination requirements adopted in this final rule.

13.    We recognize that transmission providers have ongoing efforts to address transmission planning and cost allocation.  This final rule is not intended to interfere with the potential progress represented by those efforts, and we encourage transmission providers to continue to innovate to improve their transmission planning and cost allocation processes.

### A.    Historical Framework: Order Nos. 888, 890, and 1000

14.    Over the last several decades, the Commission has taken multiple significant actions on transmission planning and cost allocation, including issuing Order Nos. 888, 890, and 1000.  In 1996, the Commission issued Order No. 888, which implemented open access to transmission facilities owned, operated, or controlled by a public utility and included certain minimum requirements for transmission planning.  In 2007, the Commission issued Order No. 890 to address identified deficiencies in the *pro forma* OATT after more than 10 years of experience since Order No. 888.  Among other OATT reforms, the Commission required all public utility transmission providers' local transmission planning processes to satisfy nine transmission planning principles: (1) coordination; (2) openness; (3) transparency; (4) information exchange;

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 26 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                    - 16 -

(5) comparability; (6) dispute resolution; (7) regional participation; (8) economic

planning studies; and (9) cost allocation for new projects.[10]

15.     In 2011, the Commission recognized the need for further transmission planning

reforms with its issuance of Order No. 1000.  The Commission based the reforms it

adopted in Order No. 1000 on changes in the energy industry, its experience

implementing Order No. 890, and a robust record developed through technical

conferences and comments from a diverse range of stakeholders.[11]  The Commission

stated in Order No. 1000 that "the electric industry is currently facing the possibility of

substantial investment in future transmission facilities to meet the challenge of

maintaining reliable service at a reasonable cost."[12]  In establishing the requirements of

Order No. 1000, the Commission found that the existing requirements of Order No. 890

were not adequate, noting that Order No. 1000 "expands upon the reforms begun in Order

No. 890 by addressing new concerns that have become apparent in the Commission's

ongoing monitoring of these matters."[13]  The Commission then enumerated multiple

concerns that it had regarding existing transmission planning practices, including

concerns about:  (1) the lack of an affirmative obligation to develop a transmission plan

---

[10] Order No. 890, 118 FERC ¶ 61,119 at PP 418-601.

[11] For purposes of this final rule, and consistent with Order No. 1000, a
stakeholder includes any party interested in the transmission planning processes.  *See*
Order No. 1000, 136 FERC ¶ 61,051 at P 151 n.143.

[12] *Id.* P 2.

[13] *Id.* P 21.

Docket No. RM21-17-000                                                                                  - 17 -

evaluating if a regional transmission facility "may be more efficient or cost-effective than

solutions identified in local transmission planning processes"; (2) the lack of a

requirement to address Public Policy Requirements;[14] (3) the federal right of first refusal

for incumbent transmission developers to build upgrades to their existing transmission

facilities; (4) the lack of procedures to identify and evaluate the benefits of interregional

transmission facilities; and (5) cost allocation for regional and interregional transmission

facilities.[15]

16.      Order No. 1000 included reforms intended to ensure that the transmission planning

and cost allocation requirements embodied in the *pro forma* OATT could support the

development of more efficient or cost-effective transmission facilities.[16]  The reforms in

Order No. 1000 included:  (1) regional transmission planning; (2) transmission needs

driven by Public Policy Requirements; (3) nonincumbent transmission developer

reforms; (4) regional and interregional cost allocation, including a set of principles for

each category of cost allocation; and (5) interregional transmission coordination.  The

reforms focused on the process by which transmission providers engage in regional

---

[14] Public Policy Requirements are requirements established by local, state, or federal laws or regulations (i.e., enacted statutes passed by the legislature and signed by the executive and regulations promulgated by a relevant jurisdiction, whether within a state or at the federal level).  *Id.* P 2.  Order No. 1000-A clarified that Public Policy Requirements include local laws or regulations passed by a local governmental entity, such as a municipal or county government.  Order No. 1000-A, 139 FERC ¶ 61,132 at P 319.

[15] Order No. 1000, 136 FERC ¶ 61,051 at P 3.

[16] *Id.* PP 11-12, 42-44; Order No. 1000-A, 139 FERC ¶ 61,132 at PP 3, 4-6.

transmission planning and the associated cost allocation rather than on the outcomes of the process.[17]

17.    Among other regional transmission planning reforms in Order No. 1000, the Commission required that the following Order No. 890 transmission planning principles apply to regional transmission planning processes:  (1) coordination; (2) openness; (3) transparency; (4) information exchange; (5) comparability; (6) dispute resolution; and (7) economic planning studies.[18]

18.    In addition, with respect to the Order No. 1000 reforms, the Commission made a distinction between a transmission facility "included" in a regional transmission plan and a transmission facility "selected."  A transmission facility selected in a regional transmission plan for purposes of cost allocation is a transmission facility that has been selected pursuant to a transmission planning region's Commission-approved regional transmission planning process for inclusion in a regional transmission plan for purposes of cost allocation because it is a more efficient or cost-effective transmission facility needed to meet regional transmission needs.  Both regional transmission facilities and interregional transmission facilities are eligible for potential "selection" in a regional transmission plan for purposes of cost allocation.[19]

---

[17] Order No. 1000, 136 FERC ¶ 61,051 at P 12.

[18] The Commission did not include the regional participation or cost allocation transmission planning principles with respect to regional transmission planning processes because those issues were addressed by other reforms in Order No. 1000.  *Id.* P 151.

[19] *Id.* P 63.  A regional transmission facility and an interregional transmission

19.     Selected transmission facilities often will not comprise all of the transmission facilities that are included in a regional transmission plan.[20]  Some transmission facilities are merely "rolled up" and listed in a regional transmission plan without going through an analysis at the regional level, and/or are merely considered for reliability implications upon a transmission system, and therefore, are not eligible for selection and regional cost allocation.[21]  For example, a local transmission facility is a transmission facility located solely within a transmission provider's retail distribution service territory or footprint that is not selected.[22]  Thus, a local transmission facility may be rolled up and "included" in a regional transmission plan for informational purposes, but it is not "selected."

### B.     ANOPR and Technical Conference

20.     In July 2021, the Commission issued the ANOPR[23] presenting potential reforms to improve the regional transmission planning and cost allocation and generator interconnection processes.  In issuing the ANOPR, the Commission noted that, in part

---

facility are defined below.  *Infra* Use of Terms section.

[20] Order No. 1000, 136 FERC ¶ 61,051 at P 63.

[21] *Id.* PP 7, 226, 318.

[22] *Id.* P 63.  The Commission clarified in Order No. 1000-A that a local transmission facility is one that is located within the geographical boundaries of a public utility transmission provider's retail distribution service territory, if it has one; otherwise, the area is defined by the public utility transmission provider's footprint.  In the case of an RTO/ISO whose footprint covers the entire region, a local transmission facility is defined by reference to the retail distribution service territories or footprints of its underlying transmission owing members.  Order No. 1000-A, 139 FERC ¶ 61,132 at P 429.

[23] ANOPR, 176 FERC ¶ 61,024.

Docket No. RM21-17-000                                                        - 20 -

because more than a decade had passed since Order No. 1000, it was now an appropriate

time to review its regulations governing regional transmission planning and cost

allocation to determine whether reforms are needed to ensure Commission-jurisdictional

rates remain just and reasonable and not unduly discriminatory or preferential.[24]  The

Commission noted that the electricity sector is transforming as the generation fleet shifts

from resources located close to population centers toward resources that may often be

located far from load centers.  The Commission also highlighted the growth of new

resources seeking to interconnect to the transmission system and that the differing

characteristics of those resources are creating new demands on the transmission system.

The Commission explained that ensuring just and reasonable Commission-jurisdictional

rates during these changes, while maintaining grid reliability, remains the Commission's

priority in adopting requirements for the regional transmission planning and cost

allocation and generator interconnection processes.  As a result, the Commission issued

the ANOPR to consider whether there should be changes in the regional transmission

planning and cost allocation and generator interconnection processes and, if so, which

changes are necessary to ensure that Commission-jurisdictional rates remain just and

reasonable and not unduly discriminatory or preferential and that reliability is maintained.

21.     On November 15, 2021, the Commission convened a staff-led technical

conference (November 2021 Technical Conference or Technical Conference) to examine

in detail issues and potential reforms related to regional transmission planning as

---

[24] *Id.* P 3.

Docket No. RM21-17-000                                                    - 21 -

described in the ANOPR.  Specifically, the Technical Conference included three panels

covering issues to consider in long-term scenarios, consideration of long-term scenarios

in regional transmission planning processes, and identifying geographic zones with high

renewable resource potential for use in regional transmission planning processes.[25]

Following the Technical Conference, the Commission invited all interested persons to file

comments to address issues raised during the Technical Conference.

### C.    Joint Federal-State Task Force on Electric Transmission

22.    On June 17, 2021, the Commission established a Joint Federal-State Task Force on

Electric Transmission (Task Force) to formally explore broad categories of transmission-

related topics.[26]  The Commission explained that the development of new transmission

infrastructure implicates a host of different issues, including how to plan and pay for

these facilities.  Given that federal and state regulators each have authority over

transmission-related issues and given the impact of transmission infrastructure

development on numerous different priorities of federal and state regulators, the

Commission determined that the topic was ripe for greater federal-state coordination and

cooperation.[27]  The Task Force was composed of all sitting FERC Commissioners as well

---

[25] *Bldg. for the Future Through Elec. Reg'l Transmission Planning & Cost Allocation & Generator Interconnection*, Further Supplemental Notice of Technical Conference, Docket No. RM21-17-000 (issued Nov. 12, 2021) (attaching agenda).

[26] *Joint Fed.-State Task Force on Elec. Transmission*, 175 FERC ¶ 61,224, at PP 1, 6 (2021).

[27] *Id.* P 2.

USCA4 Appeal: 24-1650   Doc: 224      Filed: 01/21/2025   Pg: 32 of 2455
Document Accession #: 20240513-3036      Filed Date: 05/13/2024

Docket No. RM21-17-000                                                    - 22 -

as representatives from 10 state commissions nominated by the National Association of

Regulatory Utility Commissioners (NARUC), with two originating from each NARUC

region.[28]

23.   The Task Force has convened multiple formal meetings with eight meetings held

thus far to discuss regional transmission planning and cost allocation issues, convening

on November 10, 2021, February 16, 2022, May 6, 2022, July 20, 2022, November 15,

2022, February 15, 2023, July 16, 2023, and February 28, 2024.

24.   The discussion at the November 2021 meeting was focused on incorporating state

perspectives into regional transmission planning.[29]  The February 2022 meeting included

discussion of specific categories and types of transmission benefits that transmission

providers should consider for the purposes of transmission planning and cost allocation.[30]

The May 2022 meeting focused on barriers to the efficient, expeditious, and reliable

interconnection of new resources.[31]  The July 2022 meeting focused on interregional

---

[28] An up-to-date list of Task Force members, as well as additional information on the Task Force, is available on the Commission's website at: https://www.ferc.gov/TFSOET.  Public materials related to the Task Force, including transcripts from public meetings, are available in the Commission's eLibrary in Docket No. AD21-15-000.

[29] *Joint Fed.-State Task Force on Elec. Transmission*, Notice of Meeting, Docket No. AD21-15-000 (issued Oct. 27, 2021) (attaching agenda).

[30] *Joint Fed.-State Task Force on Elec. Transmission*, Notice of Meeting, Docket No. AD21-15-000 (issued Feb. 2, 2022) (attaching agenda).

[31] *Joint Fed.-State Task Force on Elec. Transmission*, Notice of Meeting, Docket No. AD21-15-000 (issued Apr. 22, 2022) (attaching agenda).

USCA4 Appeal: 24-1650   Doc: 224      Filed: 01/21/2025    Pg: 33 of 2455
Document Accession #: 20240513-3036      Filed Date: 05/13/2024

Docket No. RM21-17-000                                                      - 23 -

transmission planning and transmission project development and the NOPR.[32]  The November 2022 meeting focused on regulatory gaps and challenges in oversight of transmission development.[33]  The February 2023 meeting focused on the physical security of the nation's transmission system, and featured guest speakers from the North American Electric Reliability Corporation and US DOE.[34]  The July 2023 meeting focused on grid enhancing technologies, featuring a guest speaker from the Electric Power Research Institute.[35]  The February 2024 meeting focused on transmission siting, featuring guest speakers from US DOE.[36]

25.     In light of the Task Force expiring three years from its first public meeting, i.e., on November 10, 2024,[37] on March 21, 2024, the Commission established the Federal and State Current Issues Collaborative (Collaborative).[38]  The Collaborative will be comprised of all Commissioners, as well as representative from 10 state commissions.

---

[32] *Joint Fed.-State Task Force on Elec. Transmission*, Notice of Meeting, Docket No. AD21-15-000 (issued June 30, 2022) (attaching agenda).

[33] *Joint Fed.-State Task Force on Elec. Transmission*, Notice of Meeting, Docket No. AD21-15-000 (issued Nov. 1, 2022) (attaching agenda).

[34] *Joint Fed.-State Task Force on Elec. Transmission*, Notice of Meeting, Docket No. AD21-15-000 (issued Feb. 1, 2023) (attaching agenda).

[35] *Joint Fed.-State Task Force on Elec. Transmission*, Notice of Meeting, Docket No. AD21-15-000 (issued June 30, 2023) (attaching agenda)

[36] *Joint Fed.-State Task Force on Elec. Transmission*, Notice of Meeting, Docket No. AD21-15-000 (issued Feb. 13, 2024) (attaching agenda)

[37] *Joint Fed.-State Task Force on Elec. Transmission*, 175 FERC ¶ 61,224 at P 4.

[38] *Joint Fed.-State Task Force on Elec. Transmission*, 186 FERC ¶ 61,189 (2024).

Docket No. RM21-17-000                                                          - 24 -

The Collaborative will provide a venue for federal and state regulators to share perspectives, increase understanding, and where appropriate, identify potential solutions regarding challenges and coordination on matters that impact specific state and federal regulatory jurisdiction.[39]

### D.   **Notice of Proposed Rulemaking**

26.     On April 21, 2022, the Commission issued the NOPR, proposing reforms focused on long-term regional transmission planning and cost allocation processes.  In particular, the Commission proposed in the NOPR that transmission providers in each transmission planning region participate in a regional transmission planning process that includes Long-Term Regional Transmission Planning.[40]  The Commission also proposed to require that transmission providers develop Long-Term Scenarios as part of Long-Term Regional Transmission Planning.[41]

27.     The Commission proposed that transmission providers consider, as part of their Long-Term Regional Transmission Planning, regional transmission facilities that address certain interconnection-related transmission needs that the transmission provider has identified multiple times in the generator interconnection process but that have never been constructed due to the withdrawal of the relevant interconnection request(s).[42]

---

[39] *Id.* PP 5-6.

[40] NOPR, 179 FERC ¶ 61,028 at PP 64, 68.

[41] *Id.* P 84.

[42] *Id.* P 166.

Docket No. RM21-17-000                                                      - 25 -

28.    The Commission proposed 12 benefits that transmission providers may consider in Long-Term Regional Transmission Planning and cost allocation processes.[43]  The Commission stated that the list of potential benefits was neither mandatory nor exhaustive, and that pursuant to the proposal, transmission providers would have flexibility to propose which benefits to use as part of their Long-Term Regional Transmission Planning.[44]

29.    The Commission proposed, with regard to the selection of Long-Term Regional Transmission Facilities in the regional transmission plan for purposes of cost allocation, to require that transmission providers, as part of their Long-Term Regional Transmission Planning, include in their OATTs:  (1) transparent and not unduly discriminatory criteria, which seek to maximize benefits to consumers over time without over-building transmission facilities, to identify and evaluate transmission facilities for potential selection that address transmission needs driven by changes in the resource mix and demand; and (2) a process to coordinate with the Relevant State Entities in developing such criteria.[45]

30.    The Commission proposed to require transmission providers to more fully consider the incorporation into transmission facilities of dynamic line ratings and

---

[43] *Id.* P 185.

[44] *Id.* P 184.

[45] *Id.* P 241.

Docket No. RM21-17-000                                                    - 26 -

advanced power flow control devices in regional transmission planning and cost

allocation processes.[46]

31.    The Commission proposed to require, with regard to allocating the costs of Long-

Term Regional Transmission Facilities, transmission providers to revise their OATTs to

include:  (1) a Long-Term Regional Transmission Cost Allocation Method to allocate the

costs of Long-Term Regional Transmission Facilities; (2) a State Agreement Process by

which one or more Relevant State Entities may voluntarily agree to a cost allocation

method; or (3) a combination thereof.[47]  The Commission proposed to require

transmission providers to seek the agreement of Relevant State Entities within the

transmission planning region regarding the Long-Term Regional Transmission Cost

Allocation Method, State Agreement Process, or combination thereof.[48]  The

Commission proposed to require transmission providers to identify on compliance the

benefits they will use in *ex ante* Long-Term Regional Transmission Cost Allocation

Methods associated with Long-Term Regional Transmission Planning, how they will

calculate those benefits, and how the benefits will reasonably reflect the benefits of

regional transmission facilities to meet identified transmission needs driven by changes in

the resource mix and demand.[49]

---

[46] *Id.* P 272.

[47] *Id.* P 302.

[48] *Id.* P 303.

[49] *Id.* P 326.

Docket No. RM21-17-000                                                           - 27 -

32.    The Commission further proposed to not permit transmission providers to take advantage of the allowance for inclusion of 100% of construction work in progress costs in rate base in certain circumstances for Long-Term Regional Transmission Facilities.[50]

33.    Finally, the Commission proposed to permit the exercise of federal rights of first refusal for selected transmission facilities, conditioned on the incumbent transmission provider with the federal right of first refusal for such regional transmission facilities establishing joint ownership of the transmission facilities consistent with certain proposed requirements described in the NOPR.[51]

34.    The Commission also proposed to require transmission providers to revise the regional transmission planning process in their OATTs with additional provisions to enhance transparency of:  (1) the criteria, models, and assumptions that they use in their local transmission planning process; (2) the local transmission needs that they identify through that process; and (3) the potential local or regional transmission facilities that they will evaluate to address those local transmission needs.[52]  The Commission proposed to require transmission providers to evaluate whether transmission facilities operating at or above 230 kV that an individual transmission provider that owns the transmission facility anticipates replacing in-kind with a new transmission facility during the next 10

---

[50] *Id.* P 333.

[51] *Id.* P 351.

[52] *Id.* P 400.

Docket No. RM21-17-000                                               - 28 -

years can be "right-sized" to more efficiently or cost-effectively address regional

transmission needs identified in Long-Term Regional Transmission Planning.[53]

35.     The Commission further proposed to require transmission providers in

neighboring transmission planning regions to revise their existing interregional

transmission coordination procedures (and regional transmission planning processes as

needed) to provide for:  (1) the sharing of information regarding their respective

transmission needs identified in Long-Term Regional Transmission Planning, as well as

potential transmission facilities to meet those needs; and (2) the identification and joint

evaluation of interregional transmission facilities that may be more efficient or cost-

effective transmission facilities to address transmission needs identified through Long-

Term Regional Transmission Planning.[54]  Finally, the Commission proposed to require

transmission providers in neighboring transmission planning regions to revise their

interregional transmission coordination procedures (and regional transmission planning

processes as needed) to allow an entity to propose an interregional transmission facility in

the regional transmission planning process as a potential solution to transmission needs

identified through Long-Term Regional Transmission Planning.[55]

---

[53] *Id.* P 403.

[54] *Id.* P 427.

[55] *Id.* P 428.

### E.    High-Level Overview of NOPR Comments

36.   The Commission received a great many comments from a diverse set of parties in response to the NOPR.[56]  One hundred and ninety-six parties, including federal agencies, state regulatory commissions, state policy makers and other state representatives, ratepayer advocates, municipalities, RTOs/ISOs, RTO/ISO market monitors, transmission providers, transmission-dependent utilities, electric cooperatives, municipal power providers, independent power producers, transmission developers, generation trade associations, transmission trade associations, industry interest groups, consumer interest groups, energy policy and law interest groups, individual businesses, landowners, and individuals, filed initial comments that totaled over 15,000 pages with attachments.  A similarly diverse set of 92 parties filed reply comments that totaled nearly 1,900 pages.

### F.    Use of Terms

37.   Before turning to the detailed requirements of this final rule, we note several of the key terms used herein.  We further address the definitions of these terms, including any modifications to definitions proposed in the NOPR, in the relevant later sections of this final rule.

38.   For purposes of this final rule, Long-Term Regional Transmission Planning means regional transmission planning on a sufficiently long-term, forward-looking, and comprehensive basis to identify Long-Term Transmission Needs, identify transmission

---

[56] *See* Appendix A for a list of commenters and the abbreviated names of commenters that are used in this final rule.

USCA4 Appeal: 24-1650   Doc: 224      Filed: 01/21/2025     Pg: 40 of 2455
Document Accession #: 20240513-3036      Filed Date: 05/13/2024

Docket No. RM21-17-000                                                    - 30 -

facilities that meet such needs, measure the benefits of those transmission facilities, and

evaluate those transmission facilities for potential selection in the regional transmission

plan for purposes of cost allocation as the more efficient or cost-effective regional

transmission facilities to meet Long-Term Transmission Needs.

39.      For purposes of this final rule, Long-Term Transmission Needs are transmission

needs identified through Long-Term Regional Transmission Planning by, among other

things and as discussed in this final rule, running scenarios and considering the

enumerated categories of factors.[57]

40.      For purposes of this final rule, Long-Term Scenarios are scenarios that incorporate

various assumptions using best available data inputs about the future electric power

system over a sufficiently long-term, forward-looking transmission planning horizon to

identify Long-Term Transmission Needs and enable the identification and evaluation of

transmission facilities to meet such transmission needs.

41.      For purposes of this final rule, a Long-Term Regional Transmission Facility is a

regional transmission facility[58] that is identified as part of Long-Term Regional

Transmission Planning to address Long-Term Transmission Needs.

---

[57] Further discussion on Long-Term Transmission Needs can be found below. *Infra* Development of Long-Term Scenarios subsection under the Long-Term Regional Transmission Planning section.

[58] For purposes of this final rule, and consistent with Order No. 1000, a regional transmission facility is a transmission facility located entirely in one transmission planning region. An interregional transmission facility is a transmission facility that is located in two or more transmission planning regions. A local transmission facility is a transmission facility located solely within a transmission provider's retail distribution service territory or footprint that is not selected in the regional transmission plan for

Docket No. RM21-17-000                                        - 31 -

42.     For purposes of this final rule, best available data inputs are data inputs that are timely, developed using best practices and diverse and expert perspectives, and adopted via a process that satisfies the transmission planning principles of Order Nos. 890 and 1000, and reflect the list of factors that transmission providers account for in their Long-Term Scenarios.

43.     For purposes of this final rule, a Long-Term Regional Transmission Cost Allocation Method is an *ex ante* regional cost allocation method for one or more selected Long-Term Regional Transmission Facilities (or a portfolio of such Facilities) that are selected in the regional transmission plan for purposes of cost allocation.

44.     For purposes of this final rule, a Relevant State Entity is any state entity responsible for electric utility regulation or siting electric transmission facilities within the state or portion of a state located in the transmission planning region, including any state entity as may be designated for that purpose by the law of such state.

45.     For purposes of this final rule, a State Agreement Process is a process by which one or more Relevant State Entities may voluntarily agree to a cost allocation method for Long-Term Regional Transmission Facilities (or a portfolio of such Facilities) before or no later than six months after they are selected.

---

purposes of cost allocation.  Order No. 1000, 136 FERC ¶ 61,051 at PP 63, 482 n.374.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 42 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                    - 32 -

46.     For purposes of this final rule, federally-recognized Tribes are those Tribes listed in the most recent notice provided by the Bureau of Indian Affairs and published in the *Federal Register*.[59]

## II.    **The Overall Need for Reform**

### A.    **NOPR Proposal**

47.     The Commission issued the NOPR on April 21, 2022, proposing to reform the *pro forma* OATT and the *pro forma* LGIA to remedy deficiencies in the Commission's existing regional transmission planning and cost allocation requirements.  The Commission stated that, over the last 25 years, it has undertaken a series of significant reforms to ensure that transmission planning and cost allocation processes result in Commission-jurisdictional rates that are just and reasonable and not unduly discriminatory or preferential.[60]  The Commission noted that it has now been more than a decade since Order No. 1000—its last significant regional transmission planning and cost allocation rule—and that there is mounting evidence that its regional transmission planning and cost allocation requirements may be inadequate to ensure that Commission-jurisdictional rates remain just and reasonable and not unduly discriminatory or preferential.[61]

---

[59] *See, e.g.*, *Indian Entities Recognized by and Eligible to Receive Servs. from the U.S. Bureau of Indian Affairs*, *Federal Register*, 89 FR 944 (Jan. 8, 2024).

[60] NOPR, 179 FERC ¶ 61,028 at P 24.

[61] *Id.*

48.     The Commission found that, in particular, although transmission providers are

required to participate in regional transmission planning and cost allocation processes

under Order No. 1000, it was concerned that those processes may not be planning

transmission on a sufficiently long-term, forward-looking basis to meet transmission

needs driven by changes in the resource mix and demand.  The Commission stated that,

as a result, the regional transmission planning and cost allocation processes that

transmission providers adopted to comply with Order No. 1000 may not be identifying

the more efficient or cost-effective transmission facilities.[62]  The Commission stated that

it was concerned that the absence of sufficiently long-term, forward-looking,

comprehensive transmission planning processes appears to be resulting in piecemeal

transmission expansion to address relatively near-term transmission needs, and that

continuing with the status quo approach may cause transmission providers to undertake

relatively inefficient investments in transmission infrastructure, the costs of which are

ultimately recovered through Commission-jurisdictional rates.  The Commission stated

that this dynamic may result in transmission customers paying more than necessary to

meet their transmission needs, customers forgoing benefits that outweigh their costs, or

some combination thereof—either or both of which could potentially render

Commission-jurisdictional rates unjust and unreasonable or unduly discriminatory or

preferential.  Based on the evidence, the Commission preliminarily concluded that

revisions to its existing transmission planning and cost allocation requirements

---

[62] *Id.* PP 24-25.

Docket No. RM21-17-000                                                    - 34 -

established in Order Nos. 890 and 1000 are necessary to ensure that Commission-

jurisdictional services are provided at rates, terms, and conditions that are just and

reasonable and not unduly discriminatory and preferential.[63]

### B.    Comments

49.    A significant majority of commenters, including transmission providers,

transmission developers, transmission customers, members of Congress, states, state

commissions, consumer advocates, trade associations, and public interest organizations,

among others, agree that existing regional transmission planning and cost allocation

processes need to be reformed.[64]    Advanced Energy Buyers note that the electric system

---

[63] *Id.* PP 25, 27, 34-35.

[64] *See, e.g.*, Acadia Center and CLF Initial Comments at 1-2; ACEG Initial Comments at 11-12, 21-22; ACORE Initial Comments at 2-5; ACORE Supplemental Comments at 1; Advanced Energy Buyers Initial Comments at 2-3; AEE Initial Comments at 7-8; AEP Initial Comments at 1-3; Amazon Initial Comments at 1-2; Ameren Initial Comments at 1-2; American Municipal Power Initial Comments at 4; Anbaric Initial Comments at 1; Arizona Commission Initial Comments at 3-4; Avangrid Initial Comments at 5-6; BP Initial Comments at 3; Breakthrough Energy Initial Comments at 5-6; Breakthrough Energy Supplemental Comments at 1; Business Council for Sustainable Energy Initial Comments at 2-3; California Commission Initial Comments at 1-2; California Energy Commission Initial Comments at 1; CAISO Initial Comments at 1; City of New Orleans Council Initial Comments at 4, 7-9; Cross Sector Representatives Supplemental Comments at 1; DC and MD Offices of People's Counsel Initial Comments at 4-5; US Senators Supplemental Comments at 1; EEI Initial Comments at 4-5; ELCON Initial Comments at 4; Enel Initial Comments at 2, 7; ENGIE Initial Comments at 1-2; Entergy Initial Comments at 2-3; Environmental Legislators Caucus Supplemental Comments at 1; Evergreen Action Initial Comments at 1-3; Eversource Initial Comments at 1-2, 5-9; Exelon Initial Comments at 1-2; Grid United Initial Comments at 1-2; Handy Law Initial Comments at 1-7; Harvard ELI Initial Comments at 1; Illinois Commission Initial Comments at 3; Indicted PJM TOs Initial Comments at 1-2; Indicated US Senators and Representatives Initial Comments at 1; Interwest Initial Comments at 2-3; Invenergy Initial Comments at 2, 5; ISO-NE Initial Comments at 2, 8-9; ISO/RTO Council Initial Comments at 2; Kansas Commission

Docket No. RM21-17-000                                                          - 35 -

is presently undergoing one of the most significant transformations in a century.[65]  Other

commenters agree that electric energy supply and demand is evolving quickly.[66]  Clean

Energy Buyers agree with the Commission that there is a need for reform to meet these

drastic changes in the resource mix and load and to ensure continued reliability and cost-

effective transmission service.[67]

---

Initial Comments at 10-11; Massachusetts Attorney General Initial Comments at 3-6; Michigan Commission Initial Comments at 2, 4; Michigan State Entities Initial Comments at 3-4; Minnesota State Entities Initial Comments at 2-3; National Grid Initial Comments at 1, 6; National and State Conservation Organizations Initial Comments at 1; NESCOE Initial Comments at 2, 7, 14-15; New Jersey Commission Initial Comments at 1-2; New York Commission and NYSERDA Initial Comments at 1-3; NextEra Reply Comments at 1; Non-RTO NASUCA Initial Comments at 4-5; NYISO Initial Comments at 2-3; Onward Energy Initial Comments at 1-2; Ørsted Initial Comments at 2-3; Pattern Energy Initial Comments at 1; PacifiCorp and NV Energy Initial Comments at 2, 7-8; Pacific Northwest State Agencies Initial Comments at 1, 8; PG&E Initial Comments at 1; PIOs Initial Comments at 6-7; Policy Integrity Initial Comments at 1-2; Renewable Northwest Initial Comments at 3-4; RMI Supplemental Comments at 1-2; SPP Market Monitor Initial Comments at 3-4; SEIA Initial Comments at 2; Shell Initial Comments at 1, 9; US Senator Barrasso Supplemental Comments at 2; Senator Whitehouse Supplemental Comments at 2; Southeast PIOs Initial Comments at 1; SREA Initial Comments at 1; State Officials Supplemental Comments at 1; TAPS Initial Comments at 1-2; US DOE Initial Comments at 1-4; US DOJ and FTC Initial Comments 1, 5; Vermont State Entities Initial Comments at 2; Western State Representatives Initial Comments at 3-4; WIRES Initial Comments at 2, 5.

[65] Advanced Energy Buyers Initial Comments at 2.

[66] *See, e.g.*, AEE Initial Comments at 1; Cross Sector Representatives Supplemental Comments at 1; Eversource Initial Comments at 5-8 (citing ISO-NE, *2020 Regional Electricity Outlook*, at 35 (2020)); Indicated PJM TOs Initial Comments at 1-2; Kansas Commission Initial Comments at 2; Pattern Energy Initial Comments at 1; PG&E Initial Comments at 1; Policy Integrity Initial Comments at 2; Renewable Northwest Initial Comments at 5; State Agencies Initial Comments at 12-13; WIRES Initial Comments at 3.

[67] Clean Energy Buyers Initial Comments at 7.

50.     Many commenters argue that current regional transmission planning and cost

allocation processes across the country are not ensuring efficient and cost-effective

transmission development, are not satisfying the purposes of Order Nos. 890 and 1000,

and are not meeting transmission needs at a reasonable cost.  For example, several

commenters assert that Order Nos. 890 and 1000 have not solved longstanding problems

with regional transmission planning and cost allocation.[68]  Northwest and Intermountain

claim that Order No. 1000 has been inadequate to meet transmission needs, particularly

in the non-RTO/ISO West.[69]  Michigan State Entities assert that the current lack of long-

term transmission planning has led to significantly higher costs for residential ratepayers,

costs that will increase without reforms.[70]  SREA argues that reform is needed to correct

the unintended consequences of Order No. 1000 in the Southeast, where transmission

planning "has grown into an enormously elaborate and extremely expensive black box,"

without any meaningful review by state regulatory bodies.[71]

---

[68] *See, e.g.*, Acadia Center and CLF Initial Comments at 1; ACEG Initial
Comments at 17-18, 20 (citing Order No. 1000, 136 FERC ¶ 61,051 at P 3; NOPR, 179
FERC ¶ 61,028 at PP 24-25); AEE Initial Comments at 1-2; CARE Coalition Initial
Comments at 3; NERC Initial Comments at 5; Massachusetts Attorney General Initial
Comments at 5-6; Northwest and Intermountain Initial Comments at 6-7; Pine Gate
Initial Comments at 8-10; PIOs Initial Comments at 2-3; Southeast PIOs Initial
Comments at 7-9, 11, 16-17, 43-44; SPP Market Monitor Initial Comments at 3-4; SREA
Reply Comments at 4; US DOE Initial Comments at 3-4, 7-8.

[69] Northwest and Intermountain Initial Comments at 6-7.

[70] Michigan State Entities Initial Comments at 1-2.

[71] SREA Reply Comments at 4.

51.     PIOs assert that transmission owners can evade Order No. 1000 requirements

through investments in local transmission projects, which has led to billions of dollars in

excessive costs.[72]  PIOs explain that financial incentives drive utilities to upgrade their

own systems at the expense of building a more integrated and robust transmission system

to meet the needs and demands of the future.[73]  PIOs observe that, between 2013 and

2017, about one-half of the approximately $70 billion in aggregate transmission

investments by Commission-jurisdictional transmission owners in RTO/ISO regions were

approved outside of regional transmission planning processes or with limited stakeholder

engagement.[74]  Ohio Consumers add that since 2017, less than 25% of new transmission

investments in Ohio have been associated with large regional transmission projects

needed for reliability or economic efficiency.[75]  Competition Coalition argues that

incumbent transmission owners have used reliability designations to justify projects with

higher costs.[76]

---

[72] PIOs Initial Comments at 8 (citing Johannes P. Pfeifenberger et al., The Brattle Group, *Cost Savings Offered by Competition in Electric Transmission: Experience to Date and the Potential for Additional Customer Value*, at 19-20, and Section I (Apr. 2019) (Brattle Apr. 2019 Competition Report), https://www.brattle.com/wp-content/uploads/2021/05/16726_cost_savings_offered_by_competition_in_electric_transmission.pdf).

[73] *Id.* at 6-7.

[74] *Id.* at 9 (citing Brattle Apr. 2019 Competition Report at 4).

[75] Ohio Consumers Initial Comments at 5.

[76] Competition Coalition Initial Comments at 15-16.

52.    Citing to a report from Lawrence Berkeley National Laboratory, US DOE concludes that many existing regional transmission planning approaches are likely understating the economic value of new transmission.  US DOE suggests that the need for increased transmission capacity to address persistent and worsening transmission congestion demonstrates that these processes may not fully anticipate present and future transmission needs.[77]  In addition, US DOE notes the unfair burden on interconnection customers that must bear increasing costs, especially for interconnection-related network upgrades that provide system-wide benefits.[78]  US DOJ and FTC agree that reforms are necessary to encourage needed regional and interregional transmission investment and that a larger, more integrated transmission system would improve resilience, promote competition, and lower costs for consumers.[79]

53.    Many commenters contend that inadequate regional transmission planning and cost allocation processes have resulted in, or are threatening to cause, unjust, unreasonable, and unduly discriminatory or preferential rates.[80]  Michigan State Entities

---

[77] US DOE Initial Comments at 3-4.

[78] *Id.* at 7-8.

[79] US DOJ and FTC Initial Comments at 1, 5 (citing NOPR, 179 FERC ¶ 61,028 at P 6; P. R. Brown & A. Botterud, *The Value of Inter-Regional Coordination and Transmission in Decarbonizing the US Electricity System*, 5 JOULE 115, 115-134 (2021); Eric Larson et al., Princeton Univ., *Net-Zero America: Potential Pathways, Infrastructure, and Impacts*, at 108 (Oct. 2021), https://netzeroamerica.princeton.edu/the-report).

[80] *See, e.g.*, ACORE Initial Comments at 3, AEE Initial Comments at 27 (citing NOPR, 179 FERC ¶ 61,028 at PP 47, 55, 78; *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d at 56); CARE Coalition Initial Comments at 17; Certain TDUs Initial Comments at 2; Clean

Docket No. RM21-17-000                                                        - 39 -

cite renewable energy curtailments, which limit the supply of energy that customers can

access, and the lack of regional and interregional transmission lines, which limit the

transfer of lower-priced power.[81]  New Jersey Commission asserts that better

transmission planning can reduce overall system costs by billions of dollars.[82]  Certain

TDUs add that Commission action is essential now to ensure that necessary transmission

expansion occurs in a way that protects customers from excessive costs and that results in

just and reasonable transmission rates.[83]  CARE Coalition argues that the Commission's

current failure to require transmission planners to internalize siting-related costs and risks

results in unjust, unreasonable, and unduly discriminatory or preferential rates.[84]  In a

similar vein, Ørsted and Massachusetts Attorney General claim that failure to proactively

plan for offshore wind generation buildout could lead to transmission rates that are

unjust, unreasonable, and unduly discriminatory or preferential.[85]

---

Energy Associations Initial Comments at 3, 7; Clean Energy Buyers Initial Comments at
10; Harvard ELI Initial Comments at 1; Massachusetts Attorney General Initial
Comments at 5-6; New Jersey Commission Initial Comments at 1-2; PIOs Initial
Comments at 6; SEIA Initial Comments at 2-3; Southeast PIOs Reply Comments at 2; US
DOE Initial Comments at 2, 6-7.

[81] Michigan State Entities Initial Comments at 3.

[82] New Jersey Commission Initial Comments at 3-9.

[83] Certain TDUs Initial Comments at 2.

[84] CARE Coalition Initial Comments at 17.

[85] Massachusetts Attorney General Initial Comments at 5; Ørsted Initial
Comments at 3-5.

54.     Several commenters agree with the Commission's concerns that the expansion of
the high-voltage transmission system is increasingly occurring outside of the regional
transmission planning process through other mechanisms such as the generator
interconnection process, which results in piecemeal transmission development.[86]  AEE
agrees that limited development of regional transmission facilities, increased spending on
local transmission projects, and backlogged interconnection queues all show that the
existing regional transmission planning requirements are not sufficient to meet
customers' transmission needs.[87]  Likewise, Exelon argues that relying on
interconnection studies as the primary transmission planning method results in piecemeal
and inefficient transmission investment.[88]  PIOs add that many generation developers
have to bear the full costs of transmission upgrades, which leads to interconnection
request withdrawals, inefficiencies, and higher system-wide costs.[89]  In addition, Clean
Energy States note that interconnection queues are extremely large and that the current

---

[86] *See, e.g.*, Acadia Center and CLF Initial Comments at 3-4; Anbaric Initial
Comments at 5; Clean Energy Associations Initial Comments at 4-7; Exelon Initial
Comments at 1-2, 5; Joint Consumer Advocates Initial Comments at 5; Non-RTO
NASUCA Initial Comments at 4; Ørsted Initial Comments at 4-5; Pine Gate Initial
Comments at 8-10; SEIA Initial Comments at 2; *see also* AEP Initial Comments at 8.

[87] AEE Initial Comments at 1-2 (citing NOPR, 179 FERC ¶ 61,028 at PP 47-55).

[88] Exelon Initial Comments at 5.

[89] PIOs Initial Comments at 9-10.

Docket No. RM21-17-000                                                           - 41 -

one-plant-at-a-time approach to transmission upgrades drives up costs and misses

opportunities for improvements to the system as a whole.[90]

55.     Non-RTO NASUCA agrees with the Commission that Long-Term Regional

Transmission Planning is necessary to help alleviate generation interconnection issues.[91]

According to Harvard ELI, current transmission planning processes have failed to address

backlogged interconnection queues and operational challenges that are best addressed at

the regional level, as well as to include inexpensive technologies that can increase

transmission capacity.[92]

56.     ACEG argues that there is no evidence that any regional reliability or economic

transmission planning performed in non-RTO/ISO regions, like the Southeastern

Regional Transmission Planning region (SERTP), is equal to or superior to the

techniques or outcomes in the NOPR.[93]  ACEG further contends that, instead, most new

transmission facilities built since Order No. 1000 have been built for local transmission

needs, thereby resulting in less efficient and cost-effective transmission development that

does not address the larger needs of the transmission system for reliability and

---

[90] Clean Energy States Initial Comments at 2.

[91] Non-RTO NASUCA Initial Comments at 4.

[92] Harvard ELI Initial Comments at 1.

[93] ACEG Reply Comments at 9 (citing Alabama Commission Initial Comments at 2-3; Southern Initial Comments at 5-6, Ex. 2 at 2-3).

resilience.[94]  Relatedly, SREA states that no state fully participates in SERTP, and that instead, each state in the Southeast uses its own state planning process, with no platform for states to collaborate.  As a result, SREA argues that "transmission planning in the Southeast has many holes and is threadbare."[95]  SREA catalogs deficiencies in many Southeastern states' planning processes, including a lack of transparency.[96]

57.    Western PIOs argue that, outside of CAISO, transmission planning in the West is ineffective.[97]  Specifically, Western PIOs assert that Western transmission planning groups have not developed new transmission projects using their Order No. 1000 transmission planning processes, but have instead built transmission projects that their utility members have already proposed.[98]  Relatedly, SEIA argues that "non-RTO areas do not engage in sufficient or transparent transmission planning," and that transmission planning in non-RTO/ISO regions is exclusionary, based on inconsistent and inaccurate data, and disjointed.[99]  More broadly, NRECA contends that incumbent investor-owned utilities control transmission planning, and that some incumbent investor-owned utilities

---

[94] *Id.* at 9-10 (citing PIOs Initial Comments at 7).

[95] SREA Reply Comments at 4.

[96] *Id.* at 5-18.

[97] Western PIOs Initial Comments at 4-28.

[98] *Id.* at 28.

[99] SEIA Reply Comments at 5-6 (citing Southern Initial Comments at 13-14).

Docket No. RM21-17-000                                                      - 43 -

develop transmission without transparency, leading to disparities in transmission rates in different RTO/ISO local zones.[100]

58.    Several commenters specify other reasons that transmission planning reforms are needed.[101]  Americans for Fair Energy Prices agree with PIOs that there is a need for regional transmission planning instead of the balkanized process that currently exists.[102] DC and MD Offices of People's Counsel assert that the NOPR provides a once-in-a-generation opportunity to meet the energy transition in a just, equitable, efficient, reliable, and resilient fashion by recognizing the benefits of long-term transmission planning and developing rules that incorporate those broad benefits.  DC and MD Offices of People's Counsel state that current transmission planning processes do not fully consider all of the benefits of transmission development, including enhanced reliability and resilience that will serve as a necessary bulwark against disruptions caused by extreme weather.[103] ACEG argues that current transmission planning processes have not led to investment in interregional transmission capacity, and that more interregional transmission capacity could have avoided some of the $25 billion to $70 billion in yearly costs caused by severe

---

[100] NRECA Initial Comments at 15-16.

[101] *See, e.g.*, Americans for Fair Energy Prices Reply Comments at 5; SREA Reply Comments at 4.

[102] Americans for Fair Energy Prices Reply Comments at 5 (citing PIOs Initial Comments at 34).

[103] DC and MD Offices of People's Counsel Reply Comments at 1-2.

Docket No. RM21-17-000                                                                      - 44 -

weather events.[104]  EEI states that robust transmission development will provide a host of

benefits for customers, including greater resilience, enhanced system reliability, and cost-

savings from greater access to low-cost resources.[105]  Some commenters emphasize the

importance of the Commission taking prudent action to remedy deficiencies in the

Commission's existing regional transmission planning and cost allocation

requirements,[106] and to strengthen electric reliability and resilience, while controlling

costs.[107]

59.     Several commenters argue that the need to reform transmission planning includes

addressing environmental justice and equity issues.[108]  Center for Biological Diversity

states that energy justice and environmental justice considerations are appropriately

---

[104] ACEG Initial Comments at 21-22 (citing Grid Strategies, LLC, *Transmission Makes the Power System Resilient to Extreme Weather*, at 1-3, 12 (July 2021) (Grid Strategies July 2021 Extreme Weather Report)).

[105] EEI Supplemental Comments at 1.

[106] US Senators Supplemental Comments at 1; Senator Whitehouse Supplemental Comments at 2.

[107] US Senator Barrasso Supplemental Comments at 1-2.

[108] *See, e.g.*, CARE Coalition Initial Comments at 2; Center for Biological Diversity Initial Comments at 20-24; Environmental Groups Supplemental Comments at 2; Environmental Legislators Caucus Supplemental Comments at 1; Grand Rapids NAACP Initial Comments at 20-21; Massachusetts Attorney General Initial Comments at 53-54 (citing Massachusetts Attorney General ANOPR Initial Comments at 32-34); Montclair Congregation Supplemental Comments at 1; NESCOE Reply Comments at 8-9; New England for Offshore Wind Initial Comments at 5; PIOs Reply Comments at 11-17; US DOE Initial Comments at 9; WE ACT Initial Comments at 1-2.

USCA4 Appeal: 24-1650   Doc: 224   Filed: 01/21/2025   Pg: 55 of 2455
Document Accession #: 20240513-3036   Filed Date: 05/13/2024

Docket No. RM21-17-000                                              - 45 -

included in transmission planning.[109]  Center for Biological Diversity further asserts that

it is within the Commission's authority to consider these costs and benefits, as the

benefits of decarbonization and related energy justice objectives will be far greater than

the costs.[110]  Grand Rapids NAACP, CARE Coalition, and PIOs argue that to ensure just,

reasonable, and nondiscriminatory rates, transmission planning must consider energy

equity and environmental justice.[111]  Grand Rapids NAACP further argues that high

energy burdens can be unjust, unreasonable, and unduly discriminatory or preferential.[112]

Grand Rapids NAACP argues that the Commission's duty under the FPA to promote the

public interest requires it to ensure that energy justice and equity considerations are

included in transmission planning processes.[113]  WE ACT relatedly argues that, due to

under-investment, the transmission system is unreliable and vulnerable to extreme

---

[109] Center for Biological Diversity Initial Comments at 20-24 (citing Pacific Northwest National Laboratory & Sandia National Laboratories, *Advancing Energy Equity in Grid Planning* (Apr. 2022), https://netl.doe.gov/sites/default/files/netl-file/Advancing%20Energy%20Equity%20in%20Grid%20Planning.pdf; Office of Energy Justice and Equity, US DOE, *Justice40 Initiative*, https://www.energy.gov/diversity/justice40-initiative).

[110] *Id.* at 23 (citing *Neb. Pub. Power Dist. v. FERC*, 957 F.3d 932, 942 (8th Cir. 2020)).

[111] Grand Rapids NAACP Reply Comments at 4 (citing 16 U.S.C. 824(a); *Re Nat'l Ass'n for the Advancement of Colored People, Inc.*, 95 P.U.R.3d 357 (F.P.C. 1972), *vacated and remanded sub nom. NAACP v. FPC*, 520 F.2d 432 (D.C. Cir. 1975), *aff'd*, 425 U.S. 662 (1976)); CARE Coalition Initial Comments at 2; PIOs Reply Comments at 14.

[112] *Id.* at 20-21.

[113] *Id.* at 17-19.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 56 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                    - 46 -

weather events, which is both a reliability and environmental justice issue because communities of color and low-income communities are more susceptible to power outages during extreme weather.[114]

60.     Advanced Energy Buyers state that failure to prepare the grid for the energy transition would be problematic for three primary reasons:  (1) insufficient transmission investment will leave customer cost savings on the table; (2) lack of available transmission capacity will constrain its members' ability to meet decarbonization and clean energy goals; and (3) failure to plan and build adequate transmission will hamper the transition to a cleaner and more reliable electric grid.[115]  New Jersey Commission contends that the lack of holistic multi-driver transmission planning is inflating consumers' electricity costs by billions of dollars every year.[116]  Northwest and Intermountain explain that due to insufficient transmission capacity from renewable rich zones, utilities must attempt to meet their renewable energy policy targets with new resources that are close to load but more expensive, less reliable, and less efficient than more distant alternatives, even considering the potential costs of transmission expansion.[117]  Clean Energy Associations add that the lack of transmission capacity imposes real and demonstrable costs today, as evidenced by geographic differences in

---

[114] WE ACT Initial Comments at 1-2.

[115] Advanced Energy Buyers Initial Comments at 3.

[116] New Jersey Commission Initial Comments at 2-9.

[117] Northwest and Intermountain Initial Comments at 6.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 57 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                                 - 47 -

real-time power prices, and that the lack of robust and proactive transmission planning rules renders current rates unjust, unreasonable, and unduly discriminatory or preferential.[118]

61.    Southeast PIOs contend that the "snowballing" inefficiencies created by numerous small-scale transmission "band-aids" result in unjust, unreasonable, and unduly discriminatory or preferential rates, and that reforms are particularly needed in the Southeast, where there is minimal utility coordination and a balkanized transmission system.[119]   According to ACEG, short-term, piecemeal transmission planning is unlikely to identify the more efficient or cost-effective solutions to transmission needs and thus will result in unjust, unreasonable, and unduly discriminatory or preferential rates.[120]

62.    Many commenters argue that reforms are necessary to meet state policy goals[121] and that greater state involvement or consideration of state policies is needed to avoid

---

[118] Clean Energy Associations Initial Comments at 5 (citing Dev Millstein et al., Lawrence Berkeley National Laboratory, *Empirical Estimates of Transmission Value Using Locational Marginal Prices*, at 3 (Aug. 2022), https://eta-publications.lbl.gov/sites/default/files/lbnlempirical_transmission_value_study-august_2022.pdf (LBNL Aug. 2022 Transmission Value Study)).

[119] Southeast PIOs Reply Comments at 1-2.

[120] ACEG Initial Comments at 21.

[121] *See, e.g.*, Acadia Center and CLF Initial Comments at 1; ACORE Reply Comments at 1; Breakthrough Energy Initial Comments at 5-6; Business Council for Sustainable Energy Initial Comments 2-3; Illinois Commission Initial Comments at 3-4; ISO-NE Initial Comments at 2; Michigan State Entities Initial Comments at 2-3; National Grid Initial Comments at 6-7; NESCOE Initial Comments at 9-10, 15-16; NextEra Reply Comments at 5, 25; Northwest and Intermountain Initial Comments at 5-6; Ørsted Initial Comments at 1-3; Pacific Northwest State Agencies Initial Comments at 1; PacifiCorp and NV Energy Initial Comments at 10-11; State Agencies Initial Comments at 16-17;

Docket No. RM21-17-000                                              - 48 -

transmission planning inefficiencies.[122]  For example, ACORE cites a recent National

Renewable Energy Laboratory (NREL) report highlighting the need for new transmission

to aid in achieving zero carbon goals.[123]  NextEra opines that the passage of the Inflation

Reduction Act of 2022 will increase the demand for renewables and drive corresponding

demands on the transmission system.[124]  Pacific Northwest State Agencies argue that

reforms are critical to successfully achieving their respective state clean energy laws and

policies and to ensuring that there is sufficient clean, safe, reliable, and affordable

energy.[125]  Michigan State Entities note that some states may pursue aggressive

renewable energy portfolio standards, and others may have no such requirements, but

these policy choices will inevitably affect the price and reliability of energy for all

_____

Vermont Electric and Vermont Transco Initial Comments at 2; Western State
Representatives Initial Comments at 3.

[122] *See, e.g.*, AEE Reply Comments at 3-4; California Democratic Representatives
Supplemental Comments at 1-2; US Senators Supplemental Comments at 1 (citing to
National Academies of Sciences, Engineering, and Medicine, *Accelerating
Decarbonization in the United States: Technology, Policy, and Societal Dimensions*
(2023)); Maryland Energy Admin Initial Comments at 1; North Carolina Commission
and Staff Initial Comments at 2, 4; PJM States Initial Comments at 1; SREA Reply
Comments at 4.

[123] ACORE Reply Comments at 1 (citing Paul Denholm, et al., NREL, *Examining
Supply-Side Options to Achieve 100% Clean Electricity by 2035* (Sept. 2022),
https://www.nrel.gov/docs/fy22osti/81644.pdf).

[124] NextEra Reply Comments at 5, 25.

[125] Pacific Northwest State Agencies at 1.

USCA4 Appeal: 24-1650   Doc: 224   Filed: 01/21/2025   Pg: 59 of 2455
Document Accession #: 20240513-3036   Filed Date: 05/13/2024

Docket No. RM21-17-000                                                    - 49 -

customers across the states in question and that not planning for that reality imposes costs on unwilling customers.[126]

63.     PacifiCorp and NV Energy similarly assert that the need for reform in the West is driven by the diverse policy priorities in its six-state transmission system, and they note that decisions are subject to state oversight and the participation of disparately situated transmission providers without inclination or authority to accept any cost allocation.[127] National Grid asserts that ISO New England's (ISO-NE) 2050 Transmission Study demonstrates a direct connection between state laws and requirements to meet clean energy goals and the need for new and expanded transmission facilities.[128]  Indicated PJM TOs add that maintaining a reliable and resilient transmission system requires forward-looking assessments informed by evolving public policy, changing generation mix and demand patterns, and stakeholder input.[129]

64.     Maryland Energy Administration contends that Maryland has experienced unfair and costly consequences of inadequate consultation with state authorities in regional transmission planning processes.[130]  AEE argues that if current transmission planning

---

[126] Michigan State Entities Initial Comments at 2-3.

[127] PacifiCorp and NV Energy Initial Comments at 10-11.

[128] National Grid Initial Comments at 6-7 (citing the then-preliminary findings from the ISO-NE 2050 Transmission Study).

[129] Indicated PJM TOs Initial Comments at 1.

[130] Maryland Energy Administration Initial Comments at 1 (citing Maryland Energy Administration ANOPR Initial Comments at 2).

Docket No. RM21-17-000                                                    - 50 -

processes fail to incorporate factors such as state laws, corporate targets, and retail

demand, then transmission needs will be unmet, risking unjust, unreasonable, and unduly

discriminatory or preferential rates.[131]

65.     Many commenters argue that, based on the record, the Commission has an

obligation under the FPA to take action to ensure that transmission planning and cost

allocation results in rates that are just and reasonable and not unduly discriminatory.[132]

ACEG states that the Commission's broad authority to remedy unduly discriminatory

behavior pursuant to FPA section 206 applies to transmission planning and cost

allocation, as the U.S. Court of Appeals for the District of Columbia Circuit held in *South

Carolina Public Service Authority v. FERC*.[133]  PIOs contend that the Commission is

required by the FPA to use its authority to address market abuses and undue

discrimination that have led to unjust, unreasonable, and unduly discriminatory or

preferential rates for consumers, who bear the costs of inefficiencies in the current

transmission planning process.[134]

---

[131] AEE Reply Comments at 3-4.

[132] *See, e.g.*, ACEG Initial Comments at 11; Clean Energy Associations Initial Comments at 7-10; Grand Rapids NAACP Initial Comments at 17; Massachusetts Attorney General Initial Comments at 3-4; Pine Gate Initial Comments at 10-14; PIOs Initial Comments at 8.

[133] 762 F.3d at 57.  *See also* ACEG Initial Comments at 13-14; Harvard ELI Initial Comments at 1-2; SEIA Initial Comments at 3.

[134] PIOs Initial Comments at 8.

66.     Southeast PIOs assert that the NOPR adequately demonstrated that existing regional transmission planning processes have intrinsic flaws, making the integrated resource planning and request for proposal processes ill-equipped to efficiently address changes in the resource mix and demand.[135]  Specifically, Southeast PIOs cite the following preliminary findings from the NOPR:  (1) existing transmission planning processes utilize a limited planning horizon; (2) many transmission planning processes provide an inaccurate portrayal of the comparative benefits of different transmission facilities; and (3) rapid changes to the generation fleet and demand are creating increasingly urgent transmission needs.[136]

67.     Southeast PIOs cite the finding in *South Carolina Public Service Authority v. FERC* that the threshold of substantial evidence could be met without "empirical evidence" as long as the Commission provides evidence based on "reasonable economic propositions."[137]  Southeast PIOs also note that *South Carolina Public Service Authority v. FERC* upheld the Commission's findings in Order No. 1000, which were based on (1) a threat to just and reasonable rates from existing regional transmission planning and cost allocation practices, (2) significant changes in the industry driven by increases in

---

[135] Southeast PIOs Reply Comments at 4 (citing Duke Initial Comments at 6-9; SERTP Sponsors Initial Comments at 31-36; Southern Initial Comments at 36-40).

[136] *Id.* at 5-6 (citing NOPR, 179 FERC ¶ 61,028 at PP 45, 47, 49, 53).

[137] *Id.* at 6-7 (citing *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d at 65).

USCA4 Appeal: 24-1650   Doc: 224   Filed: 01/21/2025   Pg: 62 of 2455
Document Accession #: 20240513-3036   Filed Date: 05/13/2024

Docket No. RM21-17-000                                                    - 52 -

renewable energy resources, and (3) recent increases in transmission investment.[138]

Moreover, Southeast PIOs note that findings need not be region-specific, as the

"Commission may rely on generic or general findings of a systemic problem to support

imposition of an industry-wide solution."[139]

68.    ACEG similarly asserts that the Commission has shown the need for transmission

planning reform based on findings that existing transmission planning requirements do

not adequately identify transmission needs driven by changes in the resource mix and

demand, and that failure to identify such needs causes customers to pay for less efficient

or cost-effective transmission investments.[140]  Relatedly, ACEG argues that pursuing

region-specific solutions will lead to siloed and disjunctive transmission planning policies

that will not solve the problems facing the nation's electric transmission system.[141]

69.    Colorado Consumer Advocate and Joint Consumer Advocates aver that the

Commission has a statutory duty under the FPA to reform current regional transmission

planning processes because they lack transparency, coordination, and openness, and

because they create opportunities for monopoly transmission developers to exert

---

[138] *Id.* at 6-7 (citing *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d at 65-66).

[139] *Id.* at 7 (citing *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d at 67).

[140] ACEG Reply Comments at 7-8 (citing Alabama Commission Initial Comments at 2-3; Duke Initial Comments at 6-9; Idaho Power Initial Comments at 2-3; NRECA Initial Comments at 11; North Carolina Commission and Staff Initial Comments at 14; Pacific Northwest Utilities Initial Comments at 9-10; Utah Commission Initial Comments at 9-12).

[141] *Id.* at 17.

dominant influence and promote their own economic self-interest at customers' and other stakeholders' expense.[142]  According to New Jersey Commission, current transmission planning processes are inefficient and unnecessarily burden ratepayers with excessive costs without providing additional benefits.  New Jersey Commission contends that those processes are therefore per se unjust and unreasonable, and that the Commission thus has FPA section 206 authority to require that transmission providers employ practices like long-term, holistic, multi-driver transmission planning.[143]

70.    Similarly, Harvard ELI states that deficient transmission planning threatens the justness and reasonableness of transmission rates, and therefore the Commission has legal authority and jurisdiction to order changes to transmission planning to remedy that deficiency.[144]  Harvard ELI further asserts that the Commission must remedy undue discrimination due to incumbent transmission owners' unduly discriminatory influence in regional transmission planning.[145]  Massachusetts Attorney General also argues that the Commission's proposed reforms are necessary to fulfill the Commission's statutory obligation to ensure that transmission rates are just and reasonable.[146]

---

[142] Colorado Consumer Advocate Initial Comments at 21-23; Joint Consumer Advocates Initial Comments at 18-20.

[143] New Jersey Commission Initial Comments at 3-4.

[144] Harvard ELI Initial Comments at 1-2 (citing *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d 41; Order No.1000-A, 139 FERC ¶ 61,132 at PP 56-75).

[145] *Id.* at 3.

[146] Massachusetts Attorney General Initial Comments at 3-6.

71.    Some commenters argue that there is insufficient evidence for the Commission to

find that existing jurisdictional rates are unjust, unreasonable, and unduly discriminatory

or preferential.[147]  For example, while Idaho Commission recognizes that there are

deficiencies in existing transmission planning and cost allocation processes, Idaho

Commission disagrees with the NOPR's claim that their failure to identify and plan for

transmission needs driven by changes in the resource mix and demand is resulting in

unjust, unreasonable, and unduly discriminatory or preferential Commission-

jurisdictional rates.[148]  Mississippi Commission also disagrees that the lack of long-term

regional transmission planning will result in unjust, unreasonable, and unduly

discriminatory or preferential rates.[149]  ELCON questions a finding of unjust,

unreasonable, and unduly discriminatory or preferential rates, and it states that the

NOPR's focus on Long-Term Regional Transmission Planning solely to address changes

in resource mix and demand, if adopted, could fail to produce better outcomes for

customers and may exceed the Commission's authority under the FPA.[150]

---

[147] *See, e.g.*, ELCON Initial Comments at 7; Idaho Commission Initial Comments at 2; Mississippi Commission Initial Comments at 2, 9; NRECA Initial Comments at 14-16; Undersigned States Reply Comments at 6-7.

[148] Idaho Commission Initial Comments at 2 (citing NOPR, 179 FERC ¶ 61,028 at P 34).

[149] Mississippi Commission Initial Comments at 2.

[150] ELCON Initial Comments at 7.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 65 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000    - 55 -

72. Louisiana Commission states that the Commission's finding that, absent reforms, transmission rates universally are not just and reasonable and are discriminatory is not based on individual analysis of each RTO or region, is not supported, and should be retracted.[151] Mississippi Commission also states that the Commission should, instead, initiate region-specific investigations pursuant to FPA section 206.[152] Southern argues that the Commission has failed to satisfy the first prong of its FPA section 206 burden of proof, noting that the NOPR's preliminary conclusion, that existing regional transmission planning processes are not sufficient to address changes in the resource mix and demand, cannot reasonably be made of Southern or SERTP.[153]

73. Similarly, Industrial Customers argue that the Commission has not satisfied the first prong of FPA section 206, which requires the Commission to find, and provide substantial evidence supporting its finding, that existing rates are unjust, unreasonable, and unduly discriminatory or preferential.[154] Industrial Customers claim that demand growth should be the primary factor in identifying transmission needs, and that demand is growing more slowly than in previous periods. Industrial Customers add that, in contrast, investment in transmission is rising relative to demand, which is the opposite of the

---

[151] Louisiana Commission Reply Comments at 5-6.

[152] Mississippi Commission Reply Comments at 7-9.

[153] Southern Initial Comments at 40; Southern Reply Comments at 1-3.

[154] Industrial Customers Initial Comments at 6-7.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 66 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                      - 56 -

circumstances that prevailed in 2007 when the Commission issued Order No. 890.[155]
According to Industrial Customers, changes in demand are not significant enough in
historical terms to warrant major changes in transmission planning. Moreover, Industrial
Customers state that changes in demand are unpredictable because technological changes
are inherently difficult to forecast and the risks to consumers of making mistakes are too
high. Industrial Customers argue that, if anything, the rapid growth of renewables
indicates that current processes are already facilitating changes in the resource mix.[156]
Similarly, NRG argues that long-term forecasts of important factors are often wrong,
which has real-world impacts on customers.[157]

74.     Further, Industrial Customers contend that the NOPR does not clearly define the
term "changes in the resource mix and demand," despite using such changes as the
justification for the proposals. Industrial Customers argue that transmission should only
be planned in order to maintain reliability and should not be based on the demand for
certain fuel sources or the fuel type of the generation fleet.[158] Industrial Customers argue
that current transmission planning is based on known and measurable factors, and that

---

[155] *Id.* at 8-10.

[156] *Id.* at 10-11.

[157] NRG Initial Comments at 10-12 (noting, for example, that "[p]redictions for
the future price of natural gas and thus the economics of gas generation in long-term
forecasts have been notoriously inaccurate." (citing Lawrence Berkeley National
Laboratory, *Comparison of AEO 2008 Natural Gas Price Forecast to NYMEX Futures
Prices* (Jan. 2008)).

[158] Industrial Customers Initial Comments at 7-8.

any attempt to plan for potential future changes in the resource mix without determining precisely what these changes will be would result in the overbuilding of the system for generation that may not be built. Industrial Customers argue that this outcome would be unjust and unreasonable and would force transmission customers to pay for generation that is non-existent.[159]

75.     Other commenters agree that the Commission lacks a specific record to support the need for reform.[160]  For example, former Kansas Commission Chair Keen avers that there is no analytical or evidentiary basis in the NOPR for a complete and thorough overhaul or revision of transmission planning processes.[161]

76.     Duke asserts that the NOPR does not provide robust and specific support as to how and why current regional transmission planning processes are failing to plan for transmission needs driven by changes in the resource mix and demand, leading to inefficient investment.[162]  Duke asserts that the NOPR does not support the presumption that the absence of significant regional transmission investment is evidence of inefficient

---

[159] *Id.* at 15.

[160] *See, e.g.*, Alabama Commission Initial Comments at 4-5; Duke Initial Comments 6-9; Idaho Commission Initial Comments at 2; Industrial Customers Initial Comments at 1, 6-11, 15; Kansas Commission Chair Keen Initial Comments at 1-2; Nebraska Commission Initial Comments at 1-2; NRECA Initial Comments at 14-16; NRG Initial Comments at 3; Ohio Commission Federal Advocate Initial Comments at 5-6; Potomac Economics Initial Comments at 3-4; Southern Initial Comments at 40.

[161] Kansas Commission Chair Keen Initial Comments at 2.

[162] Duke Initial Comments at 6-7.

Docket No. RM21-17-000                                                                 - 58 -

transmission planning.[163]  Duke also asserts that, to ensure legal durability, the

Commission should identify evidence that justifies a nationwide finding that current

transmission planning processes are failing to plan for transmission needs driven by

changes in the resource mix and demand, leading to inefficient investment and unjust,

unreasonable, and unduly discriminatory or preferential rates.[164]

77.     Undersigned States argue that the Commission does not have evidence in the

record that current rates are unjust, unreasonable, or unduly discriminatory or

preferential, which FPA section 206 requires.[165]  Undersigned States argue that, contrary

to the preliminary findings in the NOPR, the Southeast has developed significant and

sufficient transmission infrastructure and renewable energy from 2015-2020.

Undersigned States further argue that the Commission is supposed to enhance reliability,

and that, because renewables are intermittent and inherently less reliable, forcing

ratepayers to subsidize their use through financing the construction of additional

transmission infrastructure is not consistent with the Commission's mission.

---

[163] *Id.* at 7-8.

[164] *Id.* at 9 (citing *Emera Me. v. FERC*, 854 F.3d 9, 24 (D.C. Cir. 2017)).

[165] Undersigned States Reply Comments at 6-7.  The Undersigned States that
submitted reply comments include the States of Texas, Utah, Alabama, Alaska, Arkansas,
Florida, Georgia, Kansas, Kentucky, Louisiana, Mississippi, Montana, Nebraska, Ohio,
Oklahoma, South Carolina, and West Virginia.  *Id.* at 1.  The Undersigned States that
submitted initial comments include the States of Utah, Alaska, Georgia, Idaho, Indiana,
Kansas, Kentucky, Louisiana, Mississippi, Montana, Nebraska, North Dakota, Ohio,
Oklahoma, South Carolina, Texas, West Virginia, and Wyoming.  Undersigned States
Initial Comments at 5-6.

Undersigned States also argue that the Commission has not justified replacing existing transmission planning processes with a new approach, so the NOPR is arbitrary and capricious.[166]  Further, Undersigned States argue that the Commission has not offered a detailed justification for countering prior precedent in Order No. 1000 that "the regional transmission planning process is not the vehicle by which integrated resource planning is conducted."[167]

78.    Some commenters assert that the intention of the NOPR is to improperly favor certain energy resources.[168]  Consumer Organizations argue that solutions that allow for an equitable transition and make space for advancing technology and smaller energy systems are preferable to a rushed plan that favors certain resources, such as wind, solar, and battery storage, that have already proven to be inadequate.[169]  ELCON adds that Congress did not give the Commission express authority to balance the FPA's just and reasonable rates requirement with the policy goal of connecting renewable resources to the transmission system.[170]  SERTP Sponsors argue that Congress has not clearly provided the Commission with jurisdiction to presuppose generation decisions and

---

[166] Undersigned States Reply Comments at 6-8.

[167] *Id.* at 8 (citing Order No. 1000, 136 FERC ¶ 61,051 at P 154).

[168] *See, e.g.*, Consumers Organizations Initial Comments at 1-3; ELCON Initial Comments at 9-10.

[169] Consumers Organizations Initial Comments at 1-3.

[170] ELCON Initial Comments at 9-10 (citing 16 U.S.C. 824q(b)(4)).

thereby effect particular, substantive transmission outcomes; rather, SERTP Sponsors continue, Congress has expressly and unequivocally reserved generation authority to the states.[171]  Louisiana Commission argues that the FPA does not confer on the Commission authority to engage in wide-scale public policymaking by enacting sweeping energy policy changes with far-reaching, nationwide effects.[172]

79.     Ohio Commission Federal Advocate states that the NOPR may be intended "to establish policies designed to encourage the massive transmission build-out that will doubtless be required to transition to an aspirational renewable future" and "to achieve narrow environmental policy objectives, not to address legitimate requirements under the Federal Power Act like ensuring just and reasonable rates or reliability."[173]  Former Kansas Commission Chair Keen claims that the NOPR encourages an extensive and expensive transmission build-out without considering the impact on state-jurisdictional generation mixes.  He also claims that some of the NOPR proposals impose an accelerated pace for the transition from dispatchable to renewable resources, which could hasten the premature retirement of dispatchable generation and compromise regional and state power reliability.  He also expresses concern that the NOPR proposals would force

---

[171] SERTP Sponsors Initial Comments at 18.

[172] Louisiana Commission Initial Comments at 6 (citing *West Virginia v. EPA*, 597 U.S. 697 (2022)).

[173] Ohio Commission Federal Advocate Initial Comments at 4-5 (citing NOPR, 179 FERC ¶ 61,028, Danly, Comm'r, dissenting, at PP 2-3).

ratepayers in some states to pay for neighboring states' transmission projects to advance public policy goals that they do not share.[174]

80.    Some commenters challenge aspects of the need for reform.  For example, Nebraska Commission believes that the established structures in RTO/ISO regions are generally working and that many aspects of the NOPR are thus unnecessary there.[175] Potomac Economics disagrees with some of the Commission's arguments for requiring Long-Term Regional Transmission Planning, contending that the Commission's proposals are based on anticipated future generation and other speculative factors and seem to be incorrectly premised on a presumption that congestion should not exist or may limit investment in economic generation.  Potomac Economics states that investment should occur only to the extent that the savings of reducing congestion are larger than the investment costs.  According to Potomac Economics, congestion that is caused by generators' siting decisions should be borne by the generation developers, as it will incent them to propose the lowest-cost projects taking transmission costs into account.  Potomac Economics argues that, if transmission is expanded preemptively to facilitate generation investment in a particular location, such costs are equivalent to subsidies for the developer.[176]

---

[174] Kansas Commission Chair Keen Initial Comments at 3.

[175] Nebraska Commission Initial Comments at 1-2.

[176] Potomac Economics Initial Comments at 3-4.

Docket No. RM21-17-000                                                    - 62 -

81.     Mississippi Commission disagrees that too much expansion of high-voltage
transmission has occurred through the generator interconnection process instead of
through regional transmission planning.[177]  Similarly, North Carolina Commission and
Staff disagree with the Commission's conclusion that the growth in interconnection-
related network upgrades demonstrates a failure of regional transmission planning as it
relates to North Carolina.[178]  Southern adds that, contrary to statements in the NOPR, it is
not significantly expanding its transmission system through the generator interconnection
process.[179]

82.     Alabama Commission asserts that Alabama has a resource planning process that
accounts for needed transmission buildout to maintain reliable service, and thus, Alabama
Power plans its transmission system proactively both to maintain deliveries from existing
resources and to accommodate Alabama Commission-certified generation additions.
Alabama Commission claims that the SERTP process builds on the integrated resource
planning efforts of its sponsor states, ensuring that there are no regional transmission
solutions that are more efficient or cost-effective than solutions identified through the
underlying state-jurisdictional processes.[180]

---

[177] Mississippi Commission Initial Comments at 9.

[178] North Carolina Commission and Staff Initial Comments at 5.

[179] Southern Initial Comments at 38-40.

[180] Alabama Commission Initial Comments at 4.

Docket No. RM21-17-000                                               - 63 -

83.    Duke argues that, for certain transmission providers, the local transmission

planning process may more effectively meet transmission needs, especially when

combined with state-regulated integrated resource planning and a bottom-up regional

transmission planning process.  Duke contends that a regional transmission facility may

not fully address local transmission needs such that a local transmission facility would

still be needed, and thus, the regional transmission facility is not necessarily more

efficient or cost-effective than the local transmission facility.[181]

84.    NRECA states that certain of its members in RTOs/ISOs believe that regional

transmission planning is working well to meet long-term needs (e.g., those in MISO) and

that the NOPR proposals would burden transmission providers' limited resources.

NRECA states that other NRECA members in RTOs/ISOs believe that existing RTO/ISO

transmission planning processes contain discrete deficiencies that the NOPR proposals

will not remedy.  According to NRECA, these electric cooperatives believe that some

incumbent investor-owned transmission owners develop local transmission projects

without transparency concerning need or costs, leading to disparities in transmission rates

across RTO/ISO transmission zones, and that incumbent transmission owners control the

transmission planning process such that no regional transmission planning occurs.

NRECA states that, in these cooperatives' view, the criteria to determine the eligibility of

---

[181] Duke Initial Comments at 7-9.

a regional transmission project is the barrier, and that requiring Long-Term Regional

Transmission Planning, by itself, will not solve the problem.[182]

### C.    **Commission Determination**

85.    Based on the record, we find that there is substantial evidence to support the

conclusion that the Commission's existing regional transmission planning and cost

allocation requirements are unjust, unreasonable, and unduly discriminatory or

preferential.  We therefore adopt the preliminary findings in the NOPR concerning the

need for reform.  Specifically, we find that the absence of sufficiently long-term,

forward-looking, and comprehensive transmission planning requirements is causing

transmission providers to fail to adequately anticipate and plan for future system

conditions.  It causes transmission providers to fail to appropriately evaluate the benefits

of transmission infrastructure, and results in piecemeal transmission expansion to address

relatively near-term transmission needs.  We find that this status quo causes transmission

providers to undertake relatively inefficient investments in transmission infrastructure,

the costs of which are ultimately recovered through Commission-jurisdictional rates.

This dynamic results in, among other things, transmission customers paying more than

necessary or appropriate to meet their transmission needs and forgoing benefits that

outweigh their costs, which results in less efficient or cost-effective transmission

investments.  As explained below, we find that these deficiencies render Commission-

---

[182] NRECA Initial Comments at 14-16.

Docket No. RM21-17-000                                                          - 65 -

jurisdictional regional transmission planning and cost allocation processes unjust,

unreasonable, and unduly discriminatory or preferential.

86.     The Commission has authority under FPA section 206 to issue this final rule.

Specifically, FPA section 206 "instructs the Commission to remedy 'any . . . practice'

that 'affect[s]' a rate for interstate electricity service 'demanded' or 'charged' by 'any

public utility' if such practice is 'unjust, unreasonable, unduly discriminatory or

preferential.'"[183]   As the D.C. Circuit has recognized, regional transmission planning and

cost allocation processes are practices affecting rates subject to the Commission's

exclusive jurisdiction.[184]   As the Court explained in *South Carolina Public Service

Authority v. FERC*, transmission providers use those processes to "determine which

transmission facilities will more efficiently or cost-effectively meet" transmission needs,

the development of which directly impacts the rates, terms, and conditions of

Commission-jurisdictional service.[185]   In particular, because these processes identify,

evaluate, and select the regional transmission facilities whose costs will be recovered

through transmission rates, we find that they directly affect those rates.[186]   In addition, as

---

[183] *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d at 55 (quoting 16 U.S.C. 824e(a)).

[184] *Id.* at 55-59, 84 (affirming the Commission's authority to regulate transmission planning and cost allocation as practices affecting rates); *see also* Order No. 1000-A, 139 FERC ¶ 61,132 at P 577 (holding that "requirements regarding transmission planning and cost allocation . . . are practices affecting rates.").

[185] *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d at 56 (citing Order No. 1000, 136 FERC ¶ 61,051 at PP 112, 116); *see also Emera Me. v. FERC*, 854 F.3d at 674.

[186] That is true even if regional transmission planning and cost allocation processes do not result in the development, siting, and construction of every regional transmission

discussed below, such transmission facilities contribute to the development of a more robust transmission system, supporting continuity of service in the face of growing reliability challenges and providing wholesale electric customers greater access to lower-cost generation supplied by a wider range of resources.  Accordingly, regional transmission planning and cost allocation processes, as well as "the rules and practices that determine how those [processes] operate,"[187] have a direct effect on the rates that customers pay for *both* the transmission and sale of electric energy in interstate commerce.[188]  The Commission may act pursuant to FPA section 206 if the Commission first establishes, through substantial evidence,[189] that the existing practices are unjust, unreasonable, or unduly discriminatory or preferential and, second, establishes that the replacement practices are just and reasonable.[190]

---

facility that transmission providers select to more efficiently or cost-effectively meet transmission needs.  *See, e.g.*, *Conn. Dep't of Pub. Util. Control v. FERC*, 569 F.3d 477, 485 (D.C. Cir. 2009) (holding that "even if all [that] the I[nstalled] C[apacity] R[equirement] did was help to find the right [capacity] price," rather than result in the construction or procurement of any new capacity, "it would still amount to a 'practice . . . affecting' rates." (citing 16 U.S.C. 824e(a) (omission in original))).

[187] *FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 279 (2016) (*EPSA*).

[188] 16 U.S.C. 824e(a).

[189] *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d at 54 ("The Commission's factual findings are conclusive if supported by substantial evidence.").  Courts have held that substantial evidence in this context does not necessarily require the Commission to provide *empirical* evidence for every proposition.  Rather, FPA section 206 empowers the Commission to address a mere *threat* of unjust and unreasonable rates.  *See S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d at 64-65, 85.

[190] 16 U.S.C. 824e(a); *see also EPSA*, 577 U.S. at 277 (affirming the Commission "has the authority—and indeed, the duty—to ensure that rules or practices 'affecting'

87.     With regard to the first showing under FPA section 206, we find that, while Order

No. 890 requires transmission providers to satisfy certain principles in their local

transmission planning processes and Order No. 1000 requires transmission providers to

participate in regional transmission planning and cost allocation processes that satisfy the

requirements set forth therein, these existing transmission planning and cost allocation

requirements do not result in regional transmission planning that is conducted on a

sufficiently long-term, forward-looking, and comprehensive basis to plan for Long-Term

Transmission Needs.  As a result, we find that transmission providers are often not

identifying, evaluating, or selecting more efficient or cost-effective regional transmission

solutions to meet Long-Term Transmission Needs.  This gap in existing regional

transmission planning processes results in piecemeal, inefficient, and less cost-effective

transmission planning that imposes real costs on customers, who pay Commission-

jurisdictional transmission rates for less efficient or cost-effective transmission facilities

and do not realize the benefits that would result from long-term, forward-looking, and

more comprehensive regional transmission planning and cost allocation processes that

identify, evaluate, and select more efficient or cost-effective transmission solutions to

Long-Term Transmission Needs.

88.     We find that these deficiencies in the Commission's existing transmission

planning and cost allocation requirements render those requirements unjust,

unreasonable, and unduly discriminatory or preferential in violation of FPA section 206.

---

wholesale rates are just and reasonable").

89.     We also find that the Commission's existing transmission planning and cost

allocation requirements are insufficient to ensure just and reasonable and not unduly

discriminatory or preferential rates.  Given these findings, we are now requiring, pursuant

to FPA section 206, that transmission providers engage in and conduct sufficiently long-

term, forward-looking, and comprehensive transmission planning and cost allocation

processes to identify and plan for Long-Term Transmission Needs.  We find that these

reforms will facilitate a process by which transmission providers can better identify,

evaluate, and select more efficient or cost-effective transmission solutions to meet Long-

Term Transmission Needs, which will ensure that Commission-jurisdictional rates are

just and reasonable and not unduly discriminatory or preferential.

## 1.     <u>The Transmission Investment Landscape Today</u>

90.     As the Commission explained in the NOPR, a robust, well-planned transmission

system is foundational to ensuring an affordable, reliable supply of electricity.[191]  Due to

continuing changes in the industry, ongoing investment in transmission facilities is

necessary to ensure the transmission system continues to serve load in a reliable,[192]

---

[191] NOPR, 179 FERC ¶ 61,028 at P 28 (citing 16 U.S.C. 824, 824d, 824e); *see also* US DOE ANOPR Initial Comments at 2 (stating that "strengthening and expanding existing transmission infrastructure, particularly the development of regional and inter-regional transmission projects, is key to continued access to reliable, resilient, lower-cost, and clean electricity for all").

[192] *See, e.g.*, MISO ANOPR Initial Comments at 40; Testimony of James B. Robb Before the U.S. Senate Energy and Natural Resources Committee, *Reliability, Resiliency, and Affordability of Electric Service in the United States Amid the Changing Energy Mix and Extreme Weather Events*, at 8-9 (Mar. 11, 2021), https://www.energy.senate.gov/ services/files/D47C2B83-A0A7-4E0B-ABF2-9574D9990C11 (testifying that more transmission infrastructure is required to ensure the reliability and resilience of the bulk

affordable, and economically efficient fashion.  Such investments support enhanced reliability, as larger, more integrated transmission systems result in a diversity of supply and demand conditions and a certain degree of redundancy that allows the system to better withstand failures during extreme events.[193]  Proactive, forward-looking transmission planning that considers both evolving reliability needs and other drivers of transmission needs more comprehensively can enable transmission providers to identify potential reliability problems and economic constraints, as well as to evaluate potential transmission solutions, well in advance of these issues affecting the transmission system,[194] which can facilitate the selection of more efficient or cost-effective transmission facilities to meet Long-Term Transmission Needs.

91.    In addition, transmission infrastructure can unlock the forces of competition, changing who can sell to whom, eliminating barriers to entry, and mitigating market

---

power system in light of changing conditions).

[193] ACORE ANOPR Initial Comments Ex. 4, Grid Strategies July 2021 Extreme Weather Report; Mark Chupka & Pearl Donohoo-Vallett, *Recognizing the Role of Transmission in Electric System Resilience* (May 2018), https://wiresgroup.com/wp-content/uploads/2020/06/2018-05-09-Brattle-Group-Recognizing-the-Role-of-Transmission-in-Electric-System-Resilience-.pdf; NERC ANOPR Initial Comments at 17-18; US DOE ANOPR Initial Comments at 18.

[194] MISO's Multi-Value Project (MVP) regional transmission planning process, for example, eliminated the need for approximately $300 million in reliability transmission facilities, resolving reliability violations and mitigating system instability conditions, through a forward-looking approach.  Midcontinent Independent System Operator, *MTEP17 MVP Triennial Review: A 2017 review of the public policy, economic, and qualitative benefits of the Multi-Value Project Portfolio*, at 11, 33 (Sept. 2017) (MTEP2017 Review).

Docket No. RM21-17-000                                                        - 70 -

power.[195]  Increased competition, in turn, can provide a host of benefits for customers,

including cost-savings from greater access to low-cost power and a wider range of

resources.[196]  Transmission infrastructure can also serve as a form of insurance against

future uncertainties because a more robust, integrated transmission system has the

potential to provide consumers with the benefits of competition and enhanced reliability

even if supply and demand fundamentals change over time.[197]

---

[195] Policy Integrity ANOPR Initial Comments at 13 n.40 ("A new transmission project can enhance competition by both increasing the total supply that can be delivered to consumers and the number of suppliers that are available to serve load." (citing Mohamed Awad et al., *The California ISO Transmission Economic Assessment Methodology (TEAM): Principles and Applications to Path 26*, at 3 (2006)); PIOs ANOPR Initial Comments Ex. A, Johannes Pfeifenberger et al., The Brattle Group and Grid Strategies, *Transmission Planning for the 21st Century: Proven Practices that Increase Value and Reduce Costs*, at 48-49 (Oct. 2021) (Brattle-Grid Strategies Oct. 2021 Report), https://www.brattle.com/wp-content/uploads/2021/10/2021-10-12-Brattle-GridStrategies-Transmission-Planning-Report_v2.pdf ("Expansion of the transmission network typically increases the number of independent wholesale electricity suppliers that are able to compete to supply electricity at locations in the transmission network served by the upgrade . . . ." (quoting F.A. Wolak, World Bank, *Managing Unilateral Market Power in Electricity*, Policy Research Working Paper No. 3691, at 8 (2005))).

[196] *See, e.g.*, PJM Interconnection, L.L.C., *PJM Value Proposition*, at 1-2 (2019), https://www.pjm.com/about-pjm/~/media/about-pjm/pjm-value-proposition.ashx (PJM's planning of resource adequacy over a large region is estimated to result in savings of $1.2-1.8 billion.); Midcontinent Independent System Operator, *MISO Value Proposition* (2020), https://www.misoenergy.org/meet-miso/MISO_Strategy/miso-value-proposition/ (MISO estimated $517-572 million in savings from more efficient use of existing assets and $2.5-3.2 billion from reduced need for additional assets.); SPP Transmission Planning, Southwest Power Pool, *SPP's Value of Transmission: 2021 Report and Update* (Mar. 31, 2022) (SPP estimated $382.7 million in adjusted product costs savings in 2020 due to transmission investment.); *see also* ACEG Initial Comments at 3-4 ("The benefits generated by MISO's MVPs and SPP's Priority Projects exceeded the costs by 2.2 to 3.5 times and means that every dollar spent on transmission will enable access to generation that is $3 to $4 cheaper than would otherwise be available.").

[197] US DOE, *National Electric Transmission Congestion Study*, at 11 (Sept. 2015),

92.     With that overview, we again begin with the key facts on the ground.[198]  Since the issuance of Order No. 1000, transmission spending has continued to increase nationwide. A study by US DOE found that "annual investment [in transmission] first exceeded $5 billion per year in 2006 . . . and has increased consistently since that time.  Annual investment [] doubled to more than $10 billion per year by 2010 and then [] doubled again by 2016.  Annual investment has been between $18 billion and $22 billion annually since 2014."[199]  A separate study, noted by the Commission in the NOPR, estimated that transmission developers in the United States invested $20 to $25 billion annually in transmission facilities from 2013 to 2020.[200]  Unsurprisingly, in regions that saw a significant increase in transmission expenditures, transmission costs have also become an

---

https://www.energy.gov/sites/prod/files/2015/09/f26/2015%20National%20Electric%20Transmission%20Congestion%20Study_0.pdf (stating transmission expansion can strengthen and increase the flexibility of the overall network and "create real options to use the transmission system in ways that were not originally envisioned"); Vikram S. Budhraja et al., *Improving Electricity Resource Planning Processes by Considering the Strategic Benefits of Transmission*, 22 ELEC. J. 54 (Mar. 2009) (high voltage transmission affords "mitigation of risks as a form of insurance against extreme events").

[198] NOPR, 179 FERC ¶ 61,028 at P 36.

[199] California Commission Reply Comments at 9 n.27 (quoting US DOE, *National Electric Transmission Congestion Study*, at 9-10 (Sept. 2020), https://www.energy.gov/sites/default/files/2020/10/f79/2020%20Congestion%20Study%20FINAL%2022Sept2020.pdf).

[200] NOPR, 179 FERC ¶ 61,028 at P 39 (citing Brattle-Grid Strategies Oct. 2021 Report at 2); Brattle Apr. 2019 Competition Report at 2-3 & fig.1.

increasing share of customers' overall electricity bills, underscoring the importance of

ensuring that transmission investments are efficient and cost-effective.[201]

93.     Furthermore, the record demonstrates that transmission investment is likely to

substantially increase in coming years. A number of studies project significant and

sustained transmission spending through at least 2050. For example, one projection cited

by the US DOJ and FTC states that "high voltage transmission capacity must expand by

60 percent by 2030 at a capital cost of $330 billion, and must triple by 2050 at a capital

cost of $2.2 trillion."[202] TAPS cites a separate study projecting $750 billion of new

transmission investment between 2023 and 2050.[203] SoCal Edison "estimates that grid

---

[201] Resale Iowa Initial Comments at 3 ("[T]ransmission costs have comprised an increasing percentage of [] total wholesale electric costs [for Resale Iowa's members]. Currently, transmission and ancillary services constitute approximately 43% of such costs, as compared to 18.1% in 2009."); Industrial Customers Initial Comments at 5 (showing that transmission costs made up just 7% of the total PJM electricity bill in 2011 but 27% by 2020); Rob Gramlich and Jay Caspary, Americans for a Clean Energy Grid, *Planning for the Future: FERC's Opportunity to Spur More Cost-Effective Transmission Infrastructure*, at 26-28 (Jan. 2021), https://cleanenergygrid.org/wp-content/uploads/2021/01/ACEG_Planning-for-the-Future1.pdf (ACEG Jan. 2021 Planning Report) (stating that the current approach to transmission planning "results in higher total energy bills for customers than would result from more forward-looking, holistic transmission planning"); *see also* California Municipal Utilities Initial Comments at 10 (projecting that between 2022 and 2040, total high and low-voltage transmission access charges will nearly double and noting that "[g]one are the days when transmission was a *de minimis* portion of the overall bill and increases had little impact on the end consumer"); Public Systems Initial Comments at 5 (noting that "New England's Regional Network Service transmission rate has grown *nine-fold*, from $15.60 per kW-year (in 2003) to $140.98 per kW-year (in 2021)").

[202] US DOJ and FTC Initial Comments at 3 (citing Eric Larson et al., *Net-Zero America: Potential Pathways, Infrastructure, and Impacts*, Princeton Univ., 108 (Oct. 2021), https://netzeroamerica.princeton.edu/the-report).

[203] TAPS Initial Comments at 46 & n.133 (citing Jürgen Weiss et al., The Brattle

Docket No. RM21-17-000                                              - 73 -

investments of up to $75 billion, including transmission upgrades, will be required from

2030 to 2045 *in California alone* to integrate bulk renewable generation and storage and

serve load growth associated with electrification."[204]  And ISO-NE's recently-completed

2050 Transmission Study estimates that transmission investment in New England will

range from $16 billion to $26 billion between 2024 and 2050, depending on the amount

of load growth realized in the region.[205]

94.     The growing need for new transmission infrastructure, particularly over a longer

time horizon, is being driven by a number of factors.  First, longer-term reliability needs

are changing.  The NOPR explained that transmission system operators are increasing

their reliance on regional transmission facilities to ensure operational stability,

particularly because of the growing frequency of extreme weather events and increasing

share of variable resources entering the resource mix.[206]  The comments submitted in

response to the NOPR support that preliminary finding.  The record shows that changing

---

Group, *The Coming Electrification of the North American Economy*, at iii (2019),
https://wiresgroup.com/wp-content/uploads/2020/05/2019-03-06-Brattle-Group-The-
Coming-Electrification-of-the-NA-Economy.pdf)).

[204] SoCal Edison Initial Comments at 2 (citing Southern California Edison,
*Pathway 2045: Update to the Clean Power and Electrification Pathway* (2019),
https://download.newsroom.edison.com/create_memory_file/?f_id=5dc0be0b2cfac24b30
0fe4ca&content_verified=True) (emphasis added)).

[205] ISO-NE, *2050 Transmission Study*, at 55-56 (Feb. 12, 2024), https://www.iso-
ne.com/static-assets/documents/100008/2024_02_14_pac_2050_
transmission_study_final.pdf.

[206] NOPR, 179 FERC ¶ 61,028 at P 45.

Docket No. RM21-17-000                                                      - 74 -

reliability needs are driving a significant shift in demands placed on the transmission

system,[207] and that because extreme weather events are occurring with greater frequency,

transmission is increasingly critical to ensuring system reliability.[208]  For example,

Winter Storm Uri demonstrated that transmission infrastructure can make critical

contributions to system reliability during extreme weather events,[209] as well as how

---

[207] ACEG Initial Comments at 5 (noting that weather-related power outages cost Americans $25-70 billion annually (citing Grid Strategies July 2021 Extreme Weather Report at 1)); *id.* at 52 (explaining that "[c]hanges to the transmission planning processes that would allow for certain transmission upgrades identified in the interconnection process to be addressed and ultimately constructed through the transmission planning process will only serve to increase the resiliency and reliability of the transmission system."); ACEG Reply Comments at 5-6 ("[R]eliability requires long term transmission planning that incorporates known and knowable information about the future resource mix."); NERC Initial Comments at 6 ("Transmission will be the key to support the resource transformation enabling delivery of energy from areas that have surplus energy to areas which are deficient.  The frequency of such occurrences are increasing as extreme weather conditions resulting from climate change impact the fuel sources for variable energy resources.  Regional transmission planning can ensure that sufficient amounts of transmission capacity will be needed to address these more frequent extreme weather conditions.").

[208] *See* DC and Maryland Offices of People's Counsel Reply Comments at 2 (noting that new transmission development has benefits including enhanced reliability and resilience that will serve as a necessary bulwark against disruptions caused by extreme weather); Indicated PJM TOs Initial Comments at 1 (explaining that maintaining a "reliable and resilient" transmission system requires holistic planning); NESCOE Initial Comments at 32-33 ("ISO-NE explains that energy-security risks in New England are well documented, highlighting the importance of conducting comprehensive energy security assessments covering a wide range of operating conditions, including low-probability, high-impact reliability risks (tail risks) related to extreme weather" (internal quotations omitted)); NYISO Initial Comments at 16 (expressing a desire to engage in actionable scenario planning to plan for future reliability challenges that may arise due to extreme weather, including the loss of all generation connected to a pipeline or other fuel sources, loss of an entire transmission line, and impacts from weather events like hurricanes or wildfires).

[209] ACEG Initial Comments at 22 n.63 (During Winter Storm Uri, "[a]n additional

Docket No. RM21-17-000                                                          - 75 -

transmission constraints can prevent operational generation resources from being able to

serve load during tight supply conditions.[210]  Consistent with experience from Winter

Storm Uri, US DOE's Lawrence Berkeley National Laboratory provides further evidence

of the significant value of transmission during unanticipated events, with research

suggesting that 50% of the value created by alleviating transmission system congestion

occurs during only 5% of the hours during which the transmission system is used.[211]

Thus, transmission investment is likely to be more critical, and produce more reliability

benefits, for customers as extreme weather and other system contingencies become more

---

1 gigawatt (GW) of transmission ties between ERCOT and the Southeastern U.S. could
have saved nearly $1 billion and kept power flowing to hundreds of thousands of
Texans." (citing Grid Strategies July 2021 Extreme Weather Report at 1-3, 12)); Grid
Strategies July 2021 Extreme Weather Report at 7-8 ("The value of transmission for
resilience can be seen in the drastically different outcomes of MISO and SPP relative to
ERCOT during [Winter Storm Uri]. . . . In contrast to the 13,000 MW MISO was
importing during the peak of [the] event, ERCOT was only able to import about 800 MW
of power throughout the event."); NARUC Initial Comments at 67 n.192 (During Winter
Storm Uri, SPP's "'relationships and interconnections with neighboring systems were
critical.  Usually a net exporter of energy, SPP relied significantly on imported energy to
serve load during the winter event, with net amounts exceeding 6,000 megawatts (MW)
at times.  This emphasizes the value these relationships and robust transmission
interconnections provide during emergency events and the opportunity to further
strengthen them.'" (quoting Southwest Power Pool, *A Comprehensive Review of
Southwest Power Pool's Response to the February 2021 Winter Storm: Analysis and
Recommendations*, at 9 (July 2021),
https://spp.org/documents/65037/comprehensive%20review%20of%20spp%27s%20resp
onse%20to%20the%20feb.%202021%20winter%20storm%202021%2007%2019.pdf
(brackets omitted))).

   [210] *See* Advanced Energy Buyers Initial Comments at 3.

   [211] ACORE Initial Comments at 10-11 (citing LBNL Aug. 2022 Transmission
Value Study at 33); US DOE Initial Comments at 5-6 & n.13.

frequent.[212]  For some communities who can be more susceptible to the impacts of

extreme weather, like communities of color and low-income communities, transmission

investment has the potential to be even more critical.[213]  Conversely, failure to adequately

plan the transmission system to meet such changing reliability needs will forgo many of

those potential benefits, jeopardize system reliability, and force customers to pay for

transmission facilities that may not efficiently or cost-effectively address urgent

reliability needs.

95.      Second, demand is changing.  After many years of flat or minimal load growth in

regions across the country, demand, on both a national and a regional basis, is projected

to significantly increase in the coming decades, and it will require an increasingly robust

transmission system to reliably serve this load growth.  As stated in the NOPR, changes

in electric demand and associated load profiles are occurring as load-serving entities

work to meet increasing needs due to electrification trends, as well as new large loads

associated with evolving industrial and commercial needs, such as growth in data

centers.[214]  The comments submitted in this record demonstrate that, in regions across the

---

[212] ACORE Initial Comments at 11 (citing LBNL Aug. 2022 Transmission Value Study at 33; *see also* Clean Energy Associations Initial Comments at 5.

[213] *See, e.g.*, WE ACT Initial Comments at 1-2 & n.3 (citing Jeff Turrentine, NRDC, *A Roadmap for Frontline Communities* (Dec. 2019)); *see also* Grand Rapids NAACP Initial Comments at 8 n.20 ("[P]ower outages uniquely burden low-income communities of color 'given that they are unable to 'bounce back' as quickly from events that damage food and medicine supplies'" (citing Shalanda Baker et al., *The Energy Justice Workbook 20* (2019), https://iejusa.org/wp-content/uploads/2019/12/The-Energy-Justice-Workbook-2019-web.pdf)).

[214] NOPR, 179 FERC ¶ 61,028 at PP 45, 51.  The continuation and, in some

Docket No. RM21-17-000                                                                      - 77 -

country, customers are electrifying everything from household appliances to vehicles.[215]

Comments also substantiate the fact that, in many regions, large loads associated with

new and emerging industrial needs, like data centers, are driving rapid load growth.[216]

---

instances, acceleration of these trends identified in the ANOPR and NOPR counters
certain commenters' concerns that changes in demand are inherently unpredictable or that
existing regional transmission planning processes are adequately identifying and
addressing transmission needs. *Compare infra* notes 21515-2188 and accompanying
discussion, *with* Potomac Economics Initial Comments at 3-4 (arguing that Long-Term
Regional Transmission Planning that requires speculating about future uncertainty is not
advisable), *and* Industrial Customers Initial Comments at 10-11 (arguing that changes in
demand are unpredictable).

[215] AEE Initial Comments at 1, 14 (noting that, as of 2022, "[n]ine states have also
taken steps directly to promote electrification of transportation and buildings.  Individuals
and governments are also adopting electric vehicles; for example, light-duty electric
vehicle sales have increased from 10,092 vehicles in 2011 to 459,426 vehicles in 2021,
over a 4400% increase."); Renewable Northwest Initial Comments at 20 (explaining that
heat pumps installed as part of building electrification could add large new weather-
dependent loads, estimated at 20,000 to 40,000 MW of incremental peak capacity by
2050 across the Pacific Northwest); *see also* AMP Initial Comments at 4; ISO-NE,
*Operational Impact of Extreme Weather Events: Final Report on the Probabilistic
Energy Adequacy Tool (PEAT) Framework and 2027/2032 Study Results*, at 190-94
(Nov. 2023) (providing sensitivity that included 15% and 10% increases in peak load and
average hourly loads, respectively, driven by heating and vehicle electrification); U.S.
Energy Info. Admin. (EIA), *Incentives and Lower Costs Drive Electric Vehicle Adoption
in Our Annual Energy Outlook*, (May 15, 2023) (noting that, per 2023 Annual Energy
Outlook Projections, electric vehicles will account for between 13% and 29% of new
light-duty vehicle sales in the United States, and between 11% and 26% of then on-road
light duty vehicle stocks, by 2050).

[216] *See, e.g.*, Transmission Dependent Utilities Initial Comments at 4-5 ("For
example, the PJM Interconnection, L.L.C. Transmission Expansion Advisory Committee
recently posted that Dominion Energy Virginia will need over $603 million in
transmission upgrades through 2025—just three years from now—to accommodate
significant data center load growth in Northern Virginia." (citing PJM Transmission
Advisory Committee, *Reliability Analysis Update*, at 3, 5 (Aug. 9, 2022))).  These trends
are continuing and even accelerating.  *See* PJM Interconnection, L.L.C., *PJM Load
Forecast Report*, at 1 (Jan. 2024), https://www.pjm.com/-/media/library/reports-
notices/load-forecast/2024-load-report.ashx (noting upward adjustments in 2024 load

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 88 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                                  - 78 -

Estimates quantifying the magnitude of this shift show that it is significant, with

nationwide demand for electricity projected to increase by 5% to 15% (200 to 600 TWh)

by 2030.[217]  That trend is projected not just to continue but to accelerate, with nationwide

demand for electricity projected to increase by 25% to 85% (1,100 to 3,700 TWh) by

2050.[218]  Industrial customers in many regions are driving much of this increase; industry

executives have reported that electrification initiatives, through which many of the

nation's largest companies plan to electrify their manufacturing processes, transportation,

---

forecasts for certain zones to account for large, unanticipated load growth driven by data
centers, a chip processing plant, and port electrification, among other factors); *id.* at 78
(projecting increase from 2,333 GWh in 2024 to 130,489 GWh in 2039 due to plug-in
electric vehicles); *id.* at 30 (showing 1.0% higher load growth projection for 2024, 6%
higher load growth projection for 2029, and 10.4% higher load growth projection for
2034, as compared to 2023 Load Forecast Report).

[217] National Grid Initial Comments at 8 (citing Jürgen Weiss et al., The Brattle
Group, *The Coming Electrification of the North American Economy* (Mar. 2019),
https://wiresgroup.com/wp-content/uploads/2020/05/2019-03-06-Brattle-Group-The-
Coming-Electrification-of-the-NA-Economy.pdf).

[218] *Id.*; *see also* John D. Wilson and Zach Zimmerman, Grid Strategies, *The Era of
Flat Power Demand is Over*, at 3 (Dec. 2023), https://gridstrategiesllc.com/wp-
content/uploads/2023/12/National-Load-Growth-Report-2023.pdf ("Over [2023], grid
planners nearly doubled the 5-year load growth forecast.  The nationwide forecast of
electricity demand shot up from 2.6% to 4.7% growth over the next five years, as
reflected in 2023 FERC [Form 714] filings. Grid planners forecast peak demand growth
of 38 gigawatts (GW) through 2028."); N. Amer. Elec. Reliability Corp., *2023 Long-
Term Reliability Assessment*, at 33 (Dec. 2023), https://www.nerc.com/pa/RAPA/
ra/Reliability%20Assessments%20DL/NERC_LTRA_2023.pdf ("Electricity peak
demand and energy growth forecasts over the 10-year assessment period are higher than
at any point in the past decade.  The aggregated assessment area summer peak demand
forecast is expected to rise by 79 GW, and aggregated winter peak demand forecasts are
increasing by nearly 91 GW.  Furthermore, the growth rates of forecasted peak demand
and energy have risen sharply since the *2022* [*Long-Term Reliability Assessment*],
reversing a decades-long trend of falling or flat growth rates.").

Docket No. RM21-17-000                                                                     - 79 -

and heating operations, are well underway or soon to begin.[219]  Importantly, the record

shows that these increases in aggregate demand for electricity will have significant

consequences for the transmission system.  To serve more load, the capacity of the

already-oversubscribed transmission system will need to increase.[220]  Moreover, load

growth driven primarily by electrification can create a load profile that has a higher load

factor and that is thus more challenging to serve.[221]

---

[219] Renewable Northwest Initial Comments at 20 ("A recent study done by
Deloitte showed that 70 percent of executives in industrial manufacturing industries have
plans for the electrification of industrial processes, and 50 percent of the executives who
responded have goals to electrify vehicle fleets and space and water heating within their
companies by 2030." (citing Stanley Porter et al., Deloitte, *Electrification in Industrials*
(Aug. 2020), https://www2.deloitte.com/us/en/insights/industry/power-and-
utilities/electrification-in-industrials.html)).

[220] *See, e.g.*, National Grid Initial Comments at 6 (discussing preliminary findings
of the ISO-NE 2050 Transmission Study, which show "significant new transmission will
be needed to reliably serve" increased future loads assumed in the study (citing ISO-NE,
*2050 Transmission Study* (2023), https://www.iso-ne.com/static-
assets/documents/2023/08/2050_study_ma_cetwg_2023_aug_final.pdf)); Northwest and
Intermountain Initial Comments at 5 n.12 ("For example, Bonneville Power
Administration ('BPA') owns about 75 percent of the transmission lines in the Pacific
Northwest.  In BPA's 2022 Transmission Service Expansion Plan cluster study,
customers submitted 153 separate transmission service requests totaling 11,831 MW of
transmission capacity.  BPA was able to offer service (without requiring detailed studies
and transmission upgrades) to only 275 MWs of those service requests." (citing BPA,
*TSR Study and Expansion Process*, at 12 (Dec. 2021), https://www.bpa.gov/-
/media/Aep/transmission/atc-methodology/2021-22tsep-overview.pdf.)).

[221] MISO Initial Comments at 54 ("In addition, a return to load growth driven
primarily by the electrification of transportation, space heating and water heating is
creating a load profile that has a higher load factor and is more challenging to serve.").
Load factor refers to "[t]he ratio of the average load to peak load during a specified time
interval."  U.S. Energy Info. Admin. (EIA), *Glossary* (last visited Mar. 2024),
https://www.eia.gov/tools/glossary/index.php?id=L.

Docket No. RM21-17-000                                                      - 80 -

96.     Third, supply is changing.  As the NOPR explained, federal, state, and local

policies are incentivizing various forms of generation resources and other technologies,[222]

resulting in changes to the nation's resource mix.  The comments in this record show that

these policies are widespread and now span many regions of the country.  States and

cities in the Northeast,[223] Mid-Atlantic,[224] Midwest,[225] West,[226] and Southeast[227] have

--------

[222] NOPR, 179 FERC ¶ 61,028 at P 45.

[223] National Grid Initial Comments at 6-7 (explaining how all six states in New England have renewable energy standards and how ISO-NE's 2050 Transmission Study demonstrates the demands that meeting those standards will place on New England's transmission system); *id.* at 7 (explaining how the Climate Leadership and Community Protection Act enacted in New York State requires 70% renewable generation by 2030, zero-emissions by 2040, and 85% economy-wide emissions reductions by 2050, and that transmission infrastructure will be critical in meeting those goals); NESCOE Initial Comments at 15 ("Achieving a decarbonized system is required by laws and mandates in Connecticut, Maine, Massachusetts, Rhode Island, and Vermont.").

[224] DC and MD Offices of People's Counsel Initial Comments at 18 (noting that "both Maryland and the District have adopted ambitious jurisdiction-wide decarbonization policies applicable to the [electric distribution companies] regulated by their respective public service commissions.").

[225] Illinois Commission Initial Comments at 5 (explaining that "[i]n Illinois, the Climate and Equitable Jobs Act of 2021 . . . will affect the future resource mix and demand and lead to decarbonization and electrification.  For example, [it] requires Illinois to completely transition to clean energy by 2050 and facilitates electrification through the promotion of electric vehicles.").

[226] Renewable Northwest Initial Comments at 6 (explaining that, "[c]urrently, 80 percent of NorthernGrid's load is subject to state clean energy laws, and by 2040 NorthernGrid will have 65 percent carbon-free energy."); *id.* at 21 (explaining that Washington state's "SB 5974 sets a goal of all vehicles sold in 2030 and beyond to be [electric vehicles], with that goal becoming a mandate in 2035[.]").

[227] SREA Initial Comments at 25 (noting that North Carolina has adopted Renewable Energy and Energy Efficiency Portfolio Standards and enacted the North Carolina Carbon Plan).

Docket No. RM21-17-000                                                        - 81 -

adopted binding state laws requiring emissions reductions.  Moreover, with the passage

of the Inflation Reduction Act in 2022, Congress has enacted legislation that will further

spur investment nationwide in renewable and non-emitting resources.[228]

97.     Customers are also driving changes in the resource mix.  In addition to increasing

their aggregate demand for electricity, the NOPR explained that customers, including

major corporations, in many regions are increasingly demanding that load be served by

renewable or non-emitting resources.[229]  Substantial evidence in the record supports the

existence of this trend.  Since 2014, for example, "commercial and industrial customers

have contracted for more than 52 GW of clean energy[.]"[230]  Furthermore, this trend is

---

[228] ACORE Initial Comments at 1-2 & n.2 (projecting that "annual additions
increasing from 15 GW of wind and 10 GW of utility-scale solar PV in 2020 to an
average of 39 GW/year of wind additions in 2025-2026 (~2x the 2020 pace) and
49 GW/year of solar (~5x the 2020 pace), with solar growth rates increasing thereafter."
(citing REPEAT Project, *Preliminary Report: The Climate and Energy Impacts of the
Inflation Reduction Act of 2022*, at 15 (2022),
https://repeatproject.org/docs/REPEAT_IRA_Prelminary_Report_2022-08-12.pdf));
CARE Coalition Initial Comments at 17 ("Analysis suggests that the [Inflation Reduction
Act] could more than triple clean energy production in the U.S. and lead to $600 billion
in capital investment in clean energy infrastructure." (citing American Clean Power
Ass'n, *It's a Big Deal for Job Growth and for a Clean Energy Future* (2022),
https://cleanpower.org/blog/its-a-big-deal-for-job-growth-and-for-a-clean-energy-
future)); Evergreen Action Initial Comments at 3-4 (discussing model showing that clean
energy could comprise up to 81% of all U.S. generation as a result of increased incentives
in the Inflation Reduction Act (citing John Larsen et al., Rhodium Group, *A Turning
Point for US Climate Progress:  Assessing the Climate and Clean Energy Provisions in
the Inflation Reduction Act* (2022), https://rhg.com/research/climate-clean-energy-
inflation-reduction-act)); NextEra Reply Comments at 5 ("The signing of the Inflation
Reduction Act of 2022 . . . will only increase the demand for renewables in the coming
years and accelerate corresponding demands on the transmission system.").

[229] NOPR, 179 FERC ¶ 61,028 at P 45.

[230] Advanced Energy Buyers Initial Comments at 5 (citing Clean Energy Buyers

Docket No. RM21-17-000                                                              - 82 -

accelerating.  In 2021 alone, energy customers voluntarily contracted for "11.06 GW of

clean energy."[231]  The record demonstrates that, going forward, this shift is projected to

continue, as forecasts show that Fortune 1000 companies will have up to 85 GW of new

demand for renewable energy to meet their public sustainability commitments for

2030.[232]  As also noted in the NOPR, utilities in many regions have made commitments

to procure most or all of their electricity from renewable or non-emitting resources.  For

example, Exelon,[233] Dominion,[234] AEP,[235] and Southern[236] have all committed to achieve

---

Alliance, *State of the Market 2022*, https://cebuyers.org/state-of-the-market/).

[231] Clean Energy Buyers Initial Comments at 7.

[232] Clean Energy Buyers Initial Comments at 7 n.13 (citing Clean Energy Buyers ANOPR Initial Comments at 21-22).

[233] Exelon Initial Comments at 2 ("Exelon has established ambitious targets and aims to be a leader in clean energy by continuing to reduce its own greenhouse gas emissions, including reducing operations-driven emissions 50 percent by 2030, relative to a 2015 baseline, and achieving net-zero operations by 2050." (citing Calvin Butler, Exelon Corporation, *We're on the Path to Clean* (Apr. 2021), https://www.exeloncorp.com/grid/were-on-the-path-to-clean)).

[234] Dominion Initial Comments at 3-4 ("Dominion Energy has committed to achieve net zero greenhouse gas emissions by 2050 and is investing in clean energy resources such as solar and wind.").

[235] AEP Initial Comments at 4 n.12 ("AEP's goal is to reduce carbon emissions from directly owned generation by 80% by 2030 compared to 2000 levels and to achieve net-zero emissions by 2050." (citing AEP, *2022 Corporate Sustainability Report*, at 48 (2022), https://www.aep.com/news/releases/read/8520/AEP-Releases-2022-Corporate-Sustainability-Report)).

[236] Southern Initial Comments at 14 ("By 2019, Southern Companies had already achieved a 44% reduction in greenhouse gas emissions in pursuit of its goals of a 50% reduction by 2030 and net zero by 2050.").

Docket No. RM21-17-000                                                      - 83 -

net-zero emissions by 2050, and each has set an interim goal to significantly reduce

emissions by 2030.  And, although utility commitments vary by utility and by region, the

record shows that many utilities have announced some future emissions target.[237]

98.     Furthermore, as noted in the NOPR,[238] the resource mix is also being affected by

the changing economics of the resources that comprise the resource mix.[239]

---

[237] *See, e.g.*, SREA Initial Comments at 41-42 ("Major utilities in the South, including Entergy, Dominion Energy, Duke Energy, NextEra, Tennessee Valley Authority, and Southern Company have all announced some version of a net zero carbon emission plan or commitment.").

[238] NOPR, 179 FERC ¶ 61,028 at P 45 & n.72 (noting the average levelized cost of wind energy for commercial wind generation has decreased from $90 per MWh in 2009, to $35 per MWh in 2019 (citing Lawrence Berkeley National Laboratory, *Wind Energy Technology Date Update: 2020 Edition*, at 66 (Nov. 2020))); *id.* (noting that the average levelized power purchase agreement price for utility-scale solar generation has decreased from approximately $160 per MWh in 2009, to approximately $40 MWh in 2020 (citing Lawrence Berkeley National Laboratory, *Utility-Scale Solar Data Update: 2020 Edition*, at 32 (Nov. 2020))).

[239] *See* ACORE ANOPR Initial Comments at app. 1, p. 22 (ACEG Jan. 2021 Planning Report) ("Wind and solar energy costs have fallen 70 and 89 percent, respectively, in the last ten years, from 2009 through 2019."); Dominion Initial Comments at 19 (noting how, during the 2010s, the fracking revolution and advanced technology for natural gas combined cycle generation lead to a shift away from coal and nuclear as "baseload" fuels and how, today, renewable energy resources are likewise undergoing a similar expansion); Evergreen Action Initial Comments at 3 ("Rapid innovation has made wind and solar power the lowest-cost resource in many areas of the country[.]" (citing Univ. of Tex. at Austin Energy Inst., *Levelized Cost of Electricity in the United States by County* (2022), http://calculators.energy.utexas.edu/lcoe_map/ #/county/tech); *see also* ACORE Reply Comments at 2 ("In all scenarios, building transmission that enables low-cost wind and other energy resources is often cheaper than the alternatives, such as use of higher-cost but local resources (and potentially additional storage)." (citing Paul Denholm, et al., National Renewable Energy Laboratory, *Examining Supply-Side Options to Achieve 100% Clean Electricity by 2035*, at 47-78 (Sept. 2022))).

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 94 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                    - 84 -

99.     Together, trends in economics, growing demand, and federal, federally-recognized

Tribal, state, and local policies are already resulting in significant changes in the resource

mix.  The record shows that as of 2021, nearly 70% of capacity additions across the

country were from new, utility-scale wind and solar resources.[240]  Meanwhile, most of the

capacity retirements are, and are projected to continue to be, coal resources.[241]  Based on

the record, those trends are projected to continue, with over 1,300 GW of wind, solar, and

storage resources in interconnection queues across the country as of 2021.[242]  With the

---

[240] SREA Initial Comments at 1-2 (citing US Energy Info. Admin., *Today in Energy* (2021), https://www.eia.gov/todayinenergy/detail.php?id=46416#); *see also* AEE Initial Comments at 13 (noting that between 2011 and 2021, "renewable generation nearly doubled, from 12.5% to more than 20%.").

[241] AEE Initial Comments at 12-13 ("From 2011 to 2021, the proportion of U.S. electricity generated by coal plants dropped by almost half, from 42% to under 22%" (citing U.S. Energy Info. Admin., *U.S. Electricity Generation by Major Energy Source, 1950-2021* (2022), https://www.eia.gov/energyexplained//electricity/charts/generation-major-source.csv)); California Commission Initial Comments at 65 (citing FERC, *State of the Markets 2020* (Mar. 2021); Renewable Northwest Initial Comments at 36 (using IRP data to show that utilities in NorthernGrid plan to retire 6,573 MW of coal, 1,476 MW of natural gas, 10 MW of wind, and 18 MW of solar, by 2040).  FERC's State of the Markets 2020 report stated that 9.6 GW of coal capacity retired in 2020, which had a noticeable effect on coal's operating capacity share in most RTOs/ISOs.  FERC, *State of the Markets 2020*, at 10, 12 (Mar. 2021).  FERC's State of the Markets 2023 indicates that this trend is continuing, with coal generation declining 18.8% in 2023.  FERC, *State of the Markets 2023*, at 4 (Mar. 2024).  *See also* US DOE Initial Comments at App. B, pp. 8-9 (Rand et al., Lawrence Berkeley National Laboratory, *Queued Up: Characteristics of Power Plants Seeking Transmission Interconnection as of the End of 2021* (Apr. 2021)).

[242] *See* US DOE Initial Comments app. B, at p. 26 (Lawrence Berkeley National Laboratory, *Queued Up:  Characteristics of Power Plants Seeking Transmission Interconnection As of the End of 2021* (Apr. 2022)) (noting that 676 GW of solar, 246 GW of wind, 213 GW of standalone battery capacity, and ~208 GW of hybrid battery capacity wait in interconnection queues across the U.S.).  On the other hand, the number of coal and, relatedly, natural gas resources waiting to interconnect is limited.  *See id.*;

Docket No. RM21-17-000                                              - 85 -

passage of the Inflation Reduction Act in 2022, many analysts are predicting that the shift

toward renewable resources will accelerate.[243]

100.    In light of these changing demands on the transmission system, the record also

affirms what the Commission has long recognized:  regional transmission planning that

identifies more efficient or cost-effective transmission solutions to needs helps to ensure

cost-effective transmission development for customers and can yield better returns for

every dollar spent than localized or piecemeal transmission solutions.[244]  Conversely,

---

Colorado Consumer Advocates Initial Comments attach. 7, at p. 21 ("No new coal plants
have been built for domestic utility electricity production since 2014[.]"); NESCOE
Initial Comments at 15-16 (noting that new natural gas generation represented nearly
48% of the queue in 2017, but just 3% by March of 2022).  Moreover, the updated
version of the report to which US DOE cites indicates that the capacity of wind, solar,
and storage in interconnection queues is still increasing.  Lawrence Berkeley National
Laboratory, *Queued Up:  Characteristics of Power Plants Seeking Transmission
Interconnection As of the End of 2022* (Apr. 2023) (noting that 947 GW of solar, 300 GW
of wind, 325 GW of standalone battery capacity, and ~358 GW of hybrid storage
capacity, totaling over 1900 GW, wait in interconnection queues across the country).

[243] ACORE Initial Comments at 1-2 & n.2 ("[P]rojecting annual additions
increasing from 15 GW of wind and 10 GW of utility-scale solar PV in 2020 to an
average of 39 GW/year of wind additions in 2025- 2026 (~2x the 2020 pace) and 49
GW/year of solar (~5x the 2020 pace), with solar growth rates increasing thereafter."
(quoting REPEAT Project*, Preliminary Report: The Climate and Energy Impacts of the
Inflation Reduction Act of 2022*, at 15 (2022),
https://repeatproject.org/docs/REPEAT_IRA_Prelminary_Report_2022-08-12.pdf)).

[244] Order No. 1000, 136 FERC ¶ 61,051 at P 55 ("[T]he narrow focus of current
planning requirements and shortcomings of current cost allocation practices create an
environment that fails to promote the more efficient and cost-effective development of
new transmission facilities."); *id.* P 68 (concluding that reforms that require transmission
providers to engage in regional transmission planning and evaluate proposed alternatives
that "may resolve the region's needs more efficiently or cost-effectively than solutions
identified in the local transmission plans . . . will provide assurance that rates for
transmission services on these systems will reflect more efficient or cost-effective
solutions for the region."); Order No. 890, 118 FERC ¶ 61,119 at P 524 ("[C]oordination

Docket No. RM21-17-000                                                          - 86 -

inadequate or poorly designed transmission planning processes can lead to relatively

inefficient or less cost-effective transmission investment, with customers footing the bill

for piecemeal, inefficient, and less cost-effective transmission solutions designed to meet

short-term or small-scale transmission needs.  Given the magnitude of transmission

investment needed to meet customers' changing needs, it is essential that regional

transmission planning be of sufficient scope and duration to help to ensure customers'

money is well-spent on transmission infrastructure that can efficiently and cost-

effectively meet those needs.  Unfortunately, we conclude that this is not the case today

and that existing regional transmission planning processes are inadequate to address the

emerging Long-Term Transmission Needs that are expected to increasingly drive

transmission investment in the coming decades.

101.    Experience with the implementation of Order No. 1000 over the last decade has

highlighted a critical gap in the Commission's existing transmission planning and cost

---

of planning on a regional basis will also increase efficiency through the coordination of
transmission upgrades that have region-wide benefits, as opposed to pursuing
transmission expansion on a piecemeal basis."); *see also* ACORE Initial Comments at 6
(demonstrating that effective regional transmission planning could significantly reduce
total electric system costs compared to electric system costs that result from intrastate
planning (citing Brattle-Grid Strategies Oct. 2021 Report at 12)); R Street Initial
Comments at 8 ("[H]olistic transmission planning could improve economic efficiencies
and save billions of dollars . . . . For example, MISO's 2022 long-range transmission plan
results include $10 billion in transmission projects that support interconnection of 53,000
megawatts of new renewable generation and reduces other costs by $37-$68 billion.  PJM
similarly identified $3 billion in transmission upgrades that would save billions compared
to the current practice of incremental upgrades through the interconnection process."
(citing Johannes Pfeifenberger, Brattle Group, *Planning for Generation Interconnection*,
at 5 (May 31, 2022), https://www.esig.energy/event/special-topic-webinar-
interconnection-study-criteria (citation omitted))).

Docket No. RM21-17-000                                              - 87 -

allocation requirements.  Notwithstanding the broad recognition that additional

transmission infrastructure is needed to address the drivers noted above, regional

transmission planning processes across the country have yielded only limited investments

in regional transmission projects.  As the Commission observed in the NOPR, investment

in regional transmission facilities in some regions has declined compared to prior to

Order No. 1000.[245]  Moreover, across all the non-RTO/ISO regions, there has not yet

been a single transmission facility selected since implementation of Order No. 1000.[246]

The record also demonstrates that within some RTO/ISO regional transmission planning

processes, even where investments through the regional transmission planning process do

occur, much of that investment has been in transmission projects that only address

immediate reliability needs.[247]  We find that this evidence supports our conclusion that

---

[245] NOPR, 179 FERC ¶ 61,028 at P 39 (citing ACEG Jan. 2021 Planning Report at 25 & fig. 8); *see also* ACORE ANOPR Initial Comments at 4 ("Despite the potential benefits, regional transmission investment has not increased and in some regions even has declined over the past decade.") (citing ACEG Jan. 2021 Planning Report at 25)); State Agencies Initial Comments at 23 ("Regionally planned projects have [] declined in RTOs/ISOs . . . ." (citing John C. Gravan and Rob Gramlich, NRRI Insights, *A New State-Federal Cooperation Agenda for Regional and Interregional Transmission*, at 2 (Sept. 2021), https://pubs.naruc.org/pub/FF5D0E68-1866-DAAC-99FB-A31B360DC685)).

[246] NOPR, 179 FERC ¶ 61,028 at P 39 (citing LS Power ANOPR Initial Comments App. I at 18 & n.57); FERC, Staff Report, *2017 Transmission Metrics*, at 19 (Oct. 6, 2017), https://www.ferc.gov/sites/default/files/2020-05/transmission-investment-metrics.pdf); *see also* Western PIOs Initial Comments at 28 ("The Western Regional Planning Groups, with the exception of the CAISO, have not developed new projects from their current Order 1000 transmission planning process.").

[247] Southwestern Power Group Initial Comments at 15; PIOs ANOPR Initial Comments at 93 & n.276; *see also* Ari Peskoe, *Is the Utility Syndicate Forever?*, 42 Energy L.J. 1, 56-57 (2021) (explaining, for example, that in ISO-NE, all but one of the

existing regional transmission planning processes are not of sufficient scope and duration to adequately or consistently identify transmission needs and associated opportunities to more comprehensively evaluate and select more efficient or cost-effective transmission solutions to those needs.

102.    Indeed, in the limited instances in which transmission providers have followed processes that share many of the elements of the long-term, forward-looking, and more comprehensive regional transmission planning this rule requires, customers have seen clear and quantifiable benefits.  For example, as the Commission observed in the NOPR,[248] MISO's Multi-Value Project (MVP) transmission planning process proactively planned over a 20-year period for two key drivers of transmission needs:  the impacts of changing state laws on the resource mix, and a large increase in the number of generator interconnection requests.  To mitigate the uncertainties associated with such long-term projections of transmission needs, MISO relied on scenarios to consider a range of potential future conditions[249] and disclosed the assumptions and inputs underlying each scenario.[250]  The MVP process then identified a portfolio of transmission projects that were projected to provide multiple kinds of reliability and economic benefits under all the

---

transmission projects approved through the regional transmission planning process were immediate-need reliability projects).

[248] NOPR, 179 FERC ¶ 61,028 at PP 30-31 (citing Midcontinent Indep. Sys. Operator, *RGOS: Regional Generation Outlet Study*, at 2 (Nov. 2020)).

[249] *Id.* P 31 (citing MTEP2017 Review at 26-29).

[250] *Id.* (citing MTEP2017 Review at 16).

alternate future scenarios studied.[251]  This process resulted in MISO identifying,

evaluating, and selecting transmission facilities that are estimated to generate $2.20 to

$3.40 of benefit per dollar invested.[252]

103.    The benefits to transmission customers of long-term, forward-looking, and more

comprehensive regional transmission planning, which we discuss further below, are thus

well-documented but realized all too infrequently under existing regional transmission

planning processes.  Relatedly, the record demonstrates that a substantial amount of new

transmission investment is occurring outside of regional transmission planning processes.

Because these other processes—specifically, generator interconnection processes and

local transmission planning processes—are generally designed to address discrete,

shorter-term needs, and do not comprehensively assess either broader transmission needs

or solutions to those needs, overreliance on those processes can result in relatively

inefficient or less cost-effective transmission development for customers,[253] which

contributes to rates for transmission that are unjust and unreasonable.

---

[251] *Id.* (citing MTEP2017 Review at 13).

[252] *Id.* P 30 (citing MTEP2017 Review at 4).

[253] ACORE Initial Comments at 4-5 (citing Brattle-Grid Strategies Oct. 2021 Report at 3); Clean Energy Associations Initial Comments at 5 (explaining that proactive, forward-looking transmission planning processes can reduces costs by nearly half as compared to incremental and reactive transmission planning processes); Ørsted Initial Comments at 5 (explaining that failure to proactively plan for offshore wind results in suboptimal transmission development, which can increase costs to ratepayers); Southeast PIOs Reply Comments at 2 (explaining that in the Southeast, "snowballing inefficiencies created by numerous small-scale transmission band-aids, unfit to address broader generation trends, translate into excessive, unjust, and unreasonable rates borne by an

104.    The record demonstrates that significant expansion of the transmission system is occurring through one-off, piecemeal, interconnection-related network upgrades constructed in response to individual generator interconnection requests.[254]  As the Commission observed in the NOPR, the evidence shows a sharp growth in both the total cost of interconnection-related network upgrades and in the cost of such upgrades relative to generation project costs.[255]  The record indicates that the average cost of interconnection-related network upgrades is increasing over time as the transmission system is fully subscribed and demand for interconnection service outpaces transmission investment.  As highlighted in the NOPR,[256] in 2020, MISO identified the need for nearly $2.5 billion in interconnection-related network upgrades to interconnect just 9.2 GW of generation in MISO South, and MISO expects to need over $3 billion in interconnection-related network upgrades for interconnection in MISO West.[257]  Similarly, SPP identified the need for $4.6 billion in interconnection-related network upgrades to interconnect just 10.4 GW of new generation.[258]

---

already overburdened populace.").

[254] Pine Gate Initial Comments at 6, 8-10; PIOs Initial Comments at 9 (noting how most transmission planning is done through the generator interconnection process or local transmission planning).

[255] NOPR, 179 FERC ¶ 61,028 at P 37.

[256] *Id.* PP 37-38.

[257] ACORE ANOPR Initial Comments at 10 (citing ICF Sept. 2021 Interconnection Report at 2).

[258] *Id.* (citing ICF Sept. 2021 Interconnection Report at 3-4).

Docket No. RM21-17-000                                                    - 91 -

105.    Record evidence also shows that increases in interconnection costs are being

driven, in many cases, by an expansion in the scope and complexity of interconnection-

related network upgrades.[259]  The Commission noted in the NOPR, for example, that

interconnection-related network upgrade costs in MISO West went from approximately

$300/kW in 2016 to nearly $1,000/kW in 2017.[260]  The trend is evident in other parts of

---

[259] *See, e.g.*, US DOE Initial Comments at 8 & n.20 (citing Jay Caspary et al., ACEG, *Disconnected: The Need for a New Generator Interconnection Policy*, at 13-16 (2021), https://cleanenergygrid.org/wp-content/uploads/2021/01/Disconnected-The-Need-for-a-New-Generator-Interconnection-Policy-1.pdf) (ACEG 2021 Interconnection Report); Will Gorman et al., *Improving estimates of transmission capital costs for utility-scale wind and solar projects to inform renewable energy policy*, 135 Energy Policy 110994 (2019), https://www.sciencedirect.com/science/article/pii/S0301421519305816)); ACEG 2021 Interconnection Report at 13 ("[T]he costs for integrating new resources in MISO are rising substantially relative to previous years, indicating that the large-scale network has reached its capacity and needs to expand to connect more generation.  In other words, much more than 'driveway' type facilities are need; larger roads and highways are required to alleviate the traffic. . . . [H]istorically, interconnecting wind projects have incurred interconnection costs of $0.85 per megawatt hour (MWh) or $66 per kilowatt (kW).  However, newly proposed wind projects now face interconnection costs that are nearly five times higher, at $4.05/MWh or $317/kW."); *id.* at 14 ("New solar projects in MISO South have much higher upgrade costs.  The most recent 2019 system impact study for solar projects in MISO South estimated upgrade costs to total $307/kW, with upgrade costs for individual interconnection requests as high as $677/kW."); *id.* ("The same trend of rising network upgrade cost assignments is occurring in PJM.  Historically, the levelized costs for constructed wind and solar projects were $0.25/MWh and $1.72/MWh, respectively, or $19.07 kW and $61.83/kW, respectively . . . costs for newly proposed wind and solar projects, however, have now risen to $0.69/MWh and $3.66/MWh, respectively or $0.54/kW and $131.90/kW, respectively—more than a 100 percent increase.").

[260] NOPR, 179 FERC ¶ 61,028 at P 38 (citing ACEG Jan. 2021 Interconnection Report at 14; NextEra ANOPR Initial Comments at 16 (citing Midcontinent Indep. Sys. Operator, *MISO 2020 Queue Outlook*, at 9 (2020), https://cdn.misoenergy.org/MISO2020InterconnectionQueueOutlook445829.pdf)).

the country as well.[261]  The costs of interconnection-related network upgrades are, in

many cases, an ever-growing percentage of the total capital costs of new generation

projects.  According to one report, interconnection costs for new renewable resources

were less than 10% of total generation project costs until a few years ago, but recently

these costs have risen to as much as 50%-100% of the total generation project costs.[262]

At the same time, interconnection-related network upgrades have frequently transitioned

from primarily small transmission facilities that serve the needs of a limited number of

interconnection customers to the size and scope of what have traditionally been

considered high voltage transmission facilities.  For example, interconnection-related

---

[261] NOPR, 179 FERC ¶ 61,028 at P 38 (showing that, as of 2019, interconnection costs in PJM for constructed wind and solar projects were $19.07/kW and 61.83/kW, respectively, as compared to a greater than 100% increase to $54/kW and $131.90/kW, respectively, for projects newly proposed today) (citing *e.g.*, ACEG Jan. 2021 Interconnection Report at 14 & tbl.2)); NextEra ANOPR Initial Comments at 16-17 (stating that interconnection-related network upgrade cost estimates have nearly tripled for newly proposed wind projects, and more than doubled for solar projects in PJM); *see also* ACEG Jan. 2021 Interconnection Report at 16 (illustrating an increase in average interconnection-related network upgrade costs in NYISO from $67/kW in 2013 to $124/kW in 2019).  *Compare* ACEG Jan. 2021 Interconnection Report at 15 (identifying interconnection-related network upgrade costs in 2013 in SPP as $89/kW), *with* ICF Sept. 2021 Interconnection Report at 2 (citing interconnection-related network upgrade costs of $448/kW for interconnection customers studied in SPP's system impact study published in April 2021)).

[262] NOPR, 179 FERC ¶ 61,028 at P 38 (citing ACEG Jan. 2021 Interconnection Report at 6); *id.* (stating that the rising interconnection costs of wind projects in MISO recently reached approximately 23% of the capital cost of the project) (citing ACEG Jan. 2021 Interconnection Report at 13)); *id.* (identifying the increase in interconnection-related network upgrade costs in SPP between 2013 and 2017 as representing an increase from around 8% to over 43% of the capital cost of wind generation (citing ACEG Jan. 2021 Interconnection Report. at 15)); NextEra ANOPR Initial Comments at 17 (similar)).

network upgrades have recently included demolishing and rebuilding multiple 500 kV

transmission lines[263] and constructing long, double-circuit, 765 kV transmission lines,[264]

all at significant cost to the interconnection customer initially—and ultimately to

consumers.

106.    Unlike regional transmission planning processes, however, the generator

interconnection process is not designed to consider how to address transmission needs

more efficiently or cost-effectively beyond the discrete interconnection request (or

requests) being studied.  Therefore, the generator interconnection process does not look at

time horizons beyond the specific interconnection request(s) being studied,

comprehensively assess any transmission needs beyond those created by the specific

interconnection request(s), or achieve the economies of scale in transmission investment

that long-term, forward-looking, and more comprehensive regional transmission planning

processes can provide.[265]

---

[263] NOPR, 179 FERC ¶ 61,028 at P 38 (describing interconnection-related network upgrades for a 120 MW solar plus storage project in southern Virginia to interconnect to PJM that cost as much as $12,086/kW (citing ACEG Jan. 2021 Interconnection Report at 15)).

[264] NOPR, 179 FERC ¶ 61,028 at P 38 (describing one interconnection-related network upgrade in SPP identified in the system impact study published in April 2021) (citing ACEG Jan. 2021 Interconnection Report at 15)); ICF Sept. 2021 Interconnection Report at 3 (same); NextEra ANOPR Initial Comments at 17 (same).  In 2017, for example, SPP included a 165-mile, $1.34 billion double circuit 765 kV line in its Definitive Interconnection System Impact Study.  *See* ACORE ANOPR Initial Comments Ex. 5, ICF Sept. 2021 Interconnection Report at 4.

[265] Anbaric Initial Comments at 5; Clean Energy Associations Initial Comments at 15 (noting the reactive nature of generator interconnection processes); Exelon Initial Comments at 5 (explaining that the "project-by-project approach of developing

Docket No. RM21-17-000                                                    - 94 -

107.    We acknowledge that the Commission recently issued Order No. 2023, which

requires transmission providers to reform their generator interconnection processes.  But

while Order No. 2023 aims to improve the efficient processing of interconnection queues,

it does not attempt to remedy the discrete deficiency addressed in this final rule:  that

existing regional transmission planning and cost allocation requirements do not require

transmission providers to plan on a sufficiently long-term, forward-looking, and

comprehensive basis.  Instead, Order No. 2023 seeks to ameliorate the fact that existing

generator interconnection procedures and agreements were "insufficient to ensure that

interconnection customers are able to interconnect to the transmission system in a

reliable, efficient, transparent, and timely manner[.]"[266]  The interconnection queue

backlogs and delays that were the Commission's focus in Order No. 2023 have arisen, in

part, due to deficiencies in the existing transmission planning requirements.  But the

Commission found issues regarding the coordination between transmission planning and

_____

[interconnection-related] network upgrades" using the generator interconnection
processes will likely not result in efficient or cost-effective outcomes given the ongoing
changes in the resource mix and demand); Pine Gate Initial Comments at 9 (explaining
how piecemeal approaches to transmission planning, like the generator interconnection
process, result in inefficiently small upgrades (citing ACEG Jan. 2021 Interconnection
Report at 7)); PIOs Initial Comments at 10; SEIA Initial Comments at 2; Southeast PIOs
Initial Comments at 37 ("The lack of any regular, formal proceeding to consider Alabama
Power's comprehensive facility investment plan is troubling and ensures that both
generation and transmission are considered on a project-by-project basis.  This piecemeal
approach to addressing transmission needs for individual generation resource decisions
will cause sticker-shock every time and an institutional aversion to broader transmission
investment, especially when transmission benefits are expressly ignored.").

   [266] Order No. 2023, 184 FERC ¶ 61,054 at P 36.

generator interconnection processes were beyond the scope of Order No. 2023 and, therefore, the Commission addressed only interconnection queue processes rather than also addressing transmission planning requirements.[267]  Consequently, this final rule addresses a root cause of interconnection backlogs and delays that Order No. 2023 did not—the failure of transmission providers to plan on a sufficiently long-term, forward-looking, and comprehensive basis.  Accordingly, the need to reform this deficiency persists despite the Commission's reforms required by Order No. 2023.

108.    While some commenters argue that transmission providers do not rely too heavily on the generator interconnection process to build transmission facilities,[268] we find that the record indicates otherwise.  Specifically, as discussed above, the increase in both the total and average cost of interconnection demonstrates how much transmission investment is occurring on a one-off, incremental basis through generator interconnection processes.[269]  The Commission has consistently and repeatedly found that

---

[267] Order No. 2023, 184 FERC ¶ 61,054 at PP 1741, 1743 (finding that, although "several commenters argue in favor of greater coordination between generator interconnection and transmission planning or identify interconnection as a matter requiring interregional planning," those comments were beyond the scope of that rulemaking proceeding and noting that "the Commission proposed reforms related to coordination between regional transmission planning and cost allocation and generator interconnection in" the docket for this final rule).

[268] Mississippi Commission Initial Comments at 9; North Carolina Commission and Staff Initial Comments at 5; Southern Initial Comments at 38-40.

[269] New Jersey Commission Initial Comments at 6-7 (noting that interconnecting 87.1 GW of capacity, which is needed to meet the PJM states' offshore wind and renewable portfolio standards goals, through the interconnection queue process alone is projected to cost $36 billion); US DOE Initial Comments at 8 (citing ACEG 2021

Docket No. RM21-17-000                                                    - 96 -

interconnection-related network upgrades provide systemwide benefits,[270] a finding

which courts have upheld.[271]   In turn, we find that increasingly relying on interconnection

customers' interconnection-related network upgrades to expand the capacity of the

transmission system is inefficient and leads to less cost-effective transmission

development than would result from long-term, forward-looking, and more

comprehensive regional transmission planning, to the detriment of customers.

109.   Separately, the record here also substantiates the NOPR's preliminary finding that

the majority of investment in transmission facilities since the issuance of Order No. 1000

---

Interconnection Report at 13-16 (2021)).

[270] *See, e.g.*, *Duke Energy Progress, LLC*, 181 FERC ¶ 61,229, at P 17 (2022)
(rejecting Duke's claim that "its customers reap no benefits from network upgrades that
must be constructed on Duke's affected system" because "Duke's characterization
disregards the existence of any benefits to its customers from the network upgrades");
*ISO New England Inc.*, 150 FERC ¶ 61,209, at P 386 (2015) (noting that there "is a
presumption that transmission system enhancements benefit all members of an integrated
transmission system"); *Pac. Gas & Elec. Co.*, 106 FERC ¶ 61,144, at P 22 (2004)
(explaining that "the integrated grid is a single interconnected system serving and
benefitting all transmission customers"); *Pub. Serv. Co. of Colo.*, 62 FERC ¶ 61,013, at
61,061 (1993) ("The Commission has reasoned that, even if a customer can be said to
have caused the addition of a grid facility, the addition represents a *system* expansion
used by and benefitting *all* users due to the integrated nature of the grid." (emphasis in
original)).

[271] *See, e.g.*, *Nat'l. Ass'n of Regul. Util. Comm'rs v. FERC*, 475 F.3d 1277, 1285
(D.C. Cir. 2007) ("We have endorsed the approach of 'assign[ing] the costs of system-
wide benefits to all customers on an integrated transmission grid."); *W. Mass. Elec. Co. v.
FERC*, 165 F.3d 922, 927 (D.C. Cir. 1999) ("When a system is integrated, any system
enhancements are presumed to benefit the entire system."); *City of Holyoke Gas & Elec.
Dep't v. FERC*, 954 F.2d 740, 742-43 (D.C. Cir. 1992); *Me. Pub. Serv. Co. v. FERC*, 964
F.2d 5, 8-9 (D.C. Cir. 1992).

has been in local transmission facilities.[272]  Commenters explain that, in RTO/ISO

regions, one half of the nearly $70 billion in aggregate transmission investments by

Commission-jurisdictional transmission providers between 2013 and 2017 was approved

outside of regional transmission planning processes.[273]  This investment trend is

continuing and accelerating.  For example, in 2019, PJM approved 383 transmission-

owner planned supplemental projects at a total cost of $3.75 billion, compared to only 80

regionally planned baseline projects at a total cost of $1.27 billion.  Then, in 2020, PJM

approved 236 supplemental projects at a total cost of $4.7 billion, compared to only 43

regionally planned baseline projects at a total cost of $413 million.[274]  In MISO, baseline

reliability projects and other local transmission projects have grown dramatically since

2010 and constituted 100% of approved transmission between 2018 and 2020 and 80%

since 2010.[275]  From 2019 to 2021, 63% of transmission investment by the three largest

transmission owners in CAISO was in local transmission projects, and Pacific Gas and

Electric forecasts that of the $13 billion it will spend on capital additions between 2022

---

[272] NOPR, 179 FERC ¶ 61,028 at PP 39-40.

[273] PIOs Initial Comments at 9.

[274] PIOs ANOPR Initial Comments at 31-44; *see also* Ohio Consumers Initial
Comments at 5 ("Since 2017, in Ohio, less than 25% of the new investment in
transmission has been associated with large regional transmission projects needed for
reliability or economic efficiency.").

[275] *See* PIOs Initial Comments at 10 n.31 (citing PIOs ANOPR Initial Comments
at 49 (citing Brattle-Grid Strategies Oct. 2021 Report at iii, 2)).

and 2027, approximately 84% will be on local transmission projects.[276]  In ISO-NE, spending on in-kind transmission replacements, which are not part of the regional transmission planning process, has been significant.  Between 2016 and 2022, over $2.5 billion has been spent on in-kind replacement projects that have entered service and, as of 2022, an additional $3.122 billion of in-kind replacement projects had been proposed, planned, or were under construction.[277]

110.    As with the growing reliance on the generator interconnection process to identify needed transmission system improvements, local transmission planning, with its focus on the needs of individual utility footprints, does not necessarily provide sufficient, comprehensive analysis of broader regional transmission needs.  Similarly, local transmission planning processes and in-kind replacement processes do not generally assess transmission needs based on a forward-looking multi-scenario assessment that more comprehensively accounts for the benefits of transmission infrastructure.[278] Therefore, transmission expansion in this incremental manner also misses the potential for transmission providers to identify, evaluate, and select more efficient or cost-effective transmission facilities to solve transmission needs, as well as to afford system-wide benefits that may not be achieved through piecemeal, one-off local transmission facilities.

---

[276] *See* California Commission Initial Comments at 109-110.

[277] NESCOE Reply Comments at 6.

[278] PIOs ANOPR Initial Comments at 33-34 (citing ACEG Jan. 2021 Planning Report); ACEG Jan. 2021 Planning Report at 98-99.

As stated above, the result is relatively inefficient or less cost-effective transmission

development for customers, which contributes to rates for transmission that are unjust

and unreasonable.

111.    To be clear, our findings here are not intended to call into question the justness

and reasonableness of either generator interconnection processes or local transmission

planning processes, which each serve important roles in ensuring reliability and

integrating new resources onto the transmission system.[279]  Rather, the trends regarding

use of these processes, as well as in-kind replacement processes, provide additional

evidence to support our finding that existing regional transmission planning and cost

allocation requirements are inadequate without reform.  As discussed further in the next

section, we conclude that the record regarding the current and projected transmission

landscape—including the investment trends and changing drivers of that investment

detailed above—highlights critical deficiencies in the Commission's current regional

transmission planning and cost allocation requirements.  In this final rule, we address

those deficiencies to help to ensure that customers receive the benefits of long-term,

forward-looking, and more comprehensive regional transmission planning.

---

[279] As discussed below, we separately find that specific existing requirements
governing transparency in local transmission planning processes and coordination
between local and regional transmission planning processes are unjust, unreasonable, and
unduly discriminatory or preferential.  *See infra* Local Transmission Planning Inputs in
the Regional Transmission Planning Process section.

### 2. Unjust, Unreasonable, and Unduly Discriminatory or Preferential Commission-Jurisdictional Transmission Planning and Cost Allocation Processes

112. Based on the record, including comments submitted in response to the NOPR, as discussed below, we find that there is substantial evidence to support the determination that sufficiently long-term, forward-looking, and comprehensive regional transmission planning and cost allocation to meet Long-Term Transmission Needs is not occurring on a consistent and sufficient basis. We find that the absence of sufficiently long-term, forward-looking, and comprehensive regional transmission planning processes is resulting in piecemeal transmission expansion to address relatively near-term transmission needs. We find that the status quo approach results in transmission providers undertaking investments in relatively inefficient or less cost-effective transmission infrastructure, the costs of which are ultimately recovered through Commission-jurisdictional rates. This dynamic results in, among other things, transmission customers paying more than is necessary or appropriate to meet their transmission needs, customers forgoing benefits that outweigh their costs, or some combination thereof, which results in less efficient or cost-effective transmission investments and, in turn, renders Commission-jurisdictional regional transmission planning and cost allocation processes unjust and unreasonable.

113. We therefore adopt, as modified by the discussion herein, the preliminary findings of the NOPR concerning the need for reform[280] and, pursuant to FPA section 206,

---

[280] NOPR, 179 FERC ¶ 61,028 at PP 28-55.

conclude that revisions to the Commission's regional transmission planning and cost

allocation requirements are necessary to ensure that Commission-jurisdictional rates,

terms, and conditions are just, reasonable, and not unduly discriminatory or preferential.

We find that, as stated in the NOPR,[281] absent the reforms instituted by this final rule,

regional transmission planning processes will continue to fail to identify, evaluate, and

select regional transmission facilities that can more efficiently or cost-effectively meet

Long-Term Transmission Needs, requiring customers to pay for relatively inefficient or

less cost-effective transmission development.

114.    Based on the record, including the comments submitted in response to the NOPR,

we find that there is substantial evidence to support the conclusion that deficiencies in the

Commission's existing regional transmission planning and cost allocation requirements

are resulting in Commission-jurisdictional rates that are unjust, unreasonable, and unduly

discriminatory or preferential.  Specifically, we find that the Commission's regional

transmission planning and cost allocation requirements fail to require transmission

providers to:  (1) perform a sufficiently long-term assessment of transmission needs that

identifies Long-Term Transmission Needs; (2) adequately account on a forward-looking

basis for known determinants of Long-Term Transmission Needs; and (3) consider the

broader set of benefits of regional transmission facilities planned to meet those Long-

Term Transmission Needs.  We find that these deficiencies render Commission-

jurisdictional regional transmission planning and cost allocation processes unjust and

---

[281] NOPR, 179 FERC ¶ 61,028 at P 33.

unreasonable because they result in transmission providers failing to identify Long-Term
Transmission Needs, to evaluate and select more efficient or cost-effective transmission
solutions to meet those transmission needs, and to allocate the costs of transmission
facilities selected to meet those transmission needs in a manner that is at least roughly
commensurate with benefits.  Below, we address each deficiency in turn.

115.    The first deficiency is that the Commission's regional transmission planning and
cost allocation requirements fail to require transmission providers to perform a
sufficiently long-term assessment of transmission needs.  This deficiency is present in
multiple aspects of existing regional transmission planning processes, from the degree to
which planning studies that identify transmission needs are sufficiently forward looking,
to whether forward-looking assessments actually inform the evaluation, selection, and
eventual cost allocation of regional transmission facilities.  The record demonstrates that,
under existing regional transmission planning and cost allocation processes, transmission
providers typically identify and plan for transmission needs using a relatively near-term
transmission planning horizon.  Specifically, commenters have noted that most
transmission planning regions do not plan beyond a 10-year transmission planning
horizon.  For example, commenters point out that ISO-NE, SERTP, and NorthernGrid
plan using a 10-year transmission planning horizon,[282] while PJM notes that it plans using

---

[282] Massachusetts Attorney General Initial Comments at 25 ("For example, the
Commission's proposal to increase the required long-term transmission planning horizon
to at least 20 years with 3-year reassessments would double the current long-term
planning horizon for ISO-NE."); Renewable Northwest Initial Comments at 12 (citing
Brattle-Grid Strategies Oct. 2021 Report at 15); Southeast PIOs Initial Comments at 12
("The 'independent reliability planning studies . . . start with the combined local

two different transmission planning horizons: a 5-year transmission planning horizon for

what it refers to as its short-term transmission planning process and a 6-to-15-year

transmission planning horizon for what it refers to as its intermediate-term transmission

planning process.[283]  While it is reasonable and necessary for regional transmission

planning and cost allocation processes to include a near-term study of the transmission

system, the absence of any consistent and sufficient longer-term assessment of

transmission needs prevents transmission providers from identifying Long-Term

Transmission Needs and considering regional transmission facilities that may be more

efficient or cost-effective solutions to address those needs.[284]

116.   This lack of a longer-term assessment of transmission needs is particularly

problematic for a few reasons.  First, shorter-term transmission planning fails to take

---

transmission plans of participating utilities,' and the results comprise the ten-year regional transmission plan." (citation omitted)); Western PIOs Initial Comments at 8-9 ("NorthernGrid conducts transmission reliability plans on a two-year cycle, with each plan covering a 10-year time horizon."); *see also* ITC Initial Comments at 9 (referring to the "broad use of a 10-year planning horizon in the existing transmission planning processes of many major planning regions[.]").

[283] PJM Initial Comments at 2 n.4.

[284] *See, e.g.*, MISO ANOPR Reply Comments at 5 ("[G]iven long-term needs of an evolving system, additional transmission is necessary to reliably serve customers now and into the future.  These challenges require immediate action and further delay only increases the risk that system enhancements may not be in place in the timeframe needed."); PIOs Initial Comments at 13 ("[A] short-term outlook under-forecasts longer-term transmission needs, preventing the development of more cost-effective transmission facilities, and fails to consider how the needs of the transmission system are shifting[.]"); US DOE ANOPR Initial Comments at 10 (stating that failure to plan transmission far enough ahead results in "adverse implications for system reliability, resilience, consumers' electricity rates, and the achievement of clean energy goals.").

advantage of the potential for efficiencies or economies of scale that regional transmission facilities can provide by allowing fewer or better designed transmission facilities to meet multiple transmission needs.  For example, shorter-term transmission planning fails to provide the opportunity for transmission providers to identify, evaluate, and select regional transmission facilities that could address multiple transmission needs over various time horizons.[285]  Moreover, shorter-term transmission planning fails to create opportunities to "right size" the replacement of aging transmission facilities to address multiple transmission needs over the longer term.[286]  Second, constructing large (e.g., high voltage or long distance) transmission facilities comes with long lead times:

---

[285] ACORE Initial Comments at 4 ("The narrowly focused current approaches [to transmission planning] do not identify opportunities to take advantage of the large economies of scale in transmission that come from 'up-sizing' reliability projects to capture additional benefits, such as congestion relief, reduced transmission losses, and facilitating the more cost-effective interconnection of the renewable and storage resources needed to meet public policy goals." (quoting Brattle-Grid Strategies Oct. 2021 Report at 3)); PIOs ANOPR Initial Comments at 10-11; SEIA ANOPR Initial Comments at 14.

[286] ACORE Initial Comments at 4 ("[I]n-kind replacement of aging existing facilities misses opportunities to better utilize scarce rights-of-way for upsized projects that can meet multiple other needs and provide additional benefits, thus driving up costs and inefficiencies." (quoting Brattle-Grid Strategies Oct. 2021 Report at 3)).  PJM's long-term assessment of the transmission system ostensibly uses a 15-year transmission planning horizon, for example, but does not account for changes to the generation mix beyond a 5-year period.  *See* Concerned Scientists ANOPR Initial Comments at 10 & n.11 ("Generation additions are unchanged in the 15-year study period, as the input assumption has no additional information that would expand the set of generators included in the forecast."); PSEG ANOPR Initial Comments at 11 (stating that "in practice only new resources that are near the end of the interconnection queue process and have signed an Interconnection Service Agreement are considered in the RTEP base case.").

planning, permitting, and building regional transmission facilities can often take more than ten years.[287]  As an example, the MVP initiative in the MISO region took a decade to move from approval by the MISO Board of Directors in 2011 to completion of most of the projects by 2021, and this period of 10 years does not even account for the significant transmission facility development efforts that occurred prior to the MISO Board of Directors' approval.[288]  Finally, the useful life of transmission assets generally far exceeds even 20 years, so a 10-year transmission planning horizon is much too short to capture all of the benefits that regional transmission facilities can provide.[289]

117.    Thus, relying solely on shorter-term transmission planning and studies fails to identify Long-Term Transmission Needs and, consequently, undervalues or entirely ignores the benefits of transmission investments to meet those needs.  Moreover, the likelihood that near-term assessments will fail to identify Long-Term Transmission Needs and more efficient or cost-effective regional transmission facilities to meet those needs is higher during periods of rapid change, as the electric sector is now experiencing,

---

[287] AEP Initial Comments at 11; Nevada Commission Initial Comments at 7 n.24 (noting that it took over seven years between the request to include a transmission line in an Integrated Resource Plan (IRP) and the in-service date, which did not include the lead time for developing the underlying application) PIOs Initial Comments at 14 ("[A] 20-year planning horizon was necessary given the time needed to site, permit, and construct transmission facilities or because states have longer-term public policy goals."); Renewable Northwest Initial Comments at 5; SEIA Initial Comments at 6.

[288] AESL Consulting, *A Transmission Success Story: The MISO MVP Transmission Portfolio*, at 39 (2021).

[289] SEIA Initial Comments at 6; US DOE Initial Comments at 33 (noting that transmission assets can have a useful life of at least 40 years).

during which the need for transmission infrastructure is expected to grow considerably.[290]

We find that continuing with the status quo approach is resulting in transmission

providers undertaking investments in relatively inefficient or less cost-effective

transmission infrastructure, the costs of which are ultimately recovered through

Commission-jurisdictional rates.[291]  As a result, among other things, customers are

paying more than necessary or appropriate to meet their transmission needs, forgoing

benefits that outweigh their costs, or some combination thereof, which results in less

efficient or cost-effective transmission investments and, in turn, renders Commission-

jurisdictional regional transmission planning and cost allocation processes unjust and

unreasonable.

118.    The second deficiency is that the Commission's existing regional transmission

planning and cost allocation requirements fail to require transmission providers to

account adequately on a forward-looking basis for known determinants of Long-Term

---

[290] US DOE ANOPR Initial Comments at 10 ("Relying on successive small transmission expansion projects to meet foreseeable long-term needs may lead to the need for expensive retrofits (at customers' expense) at a later date.  Economies of scale and network economies suggest that an initial larger-scale buildout will often represent a lower-cost solution."); Midcontinent Independent System Operator, *MTEP21 Report Addendum: Long Range Transmission Planning Tranche 1 Portfolio Report*, at 6 (July 28, 2022), https://cdn.misoenergy.org/MTEP21%20Addendum-LRTP%20Tranche%201%20Report%20with%20Executive%20Summary625790.pdf ("While the Tranche 1 Portfolio is the result of MISO's long-range planning process being executed for only the second time, the rapid change within the industry will require that it become a more routine aspect of the MISO planning process going forward.").

[291] *See, e.g.*, *S.C. Pub. Serv. Auth.*, 762 F.3d at 56-59 (explaining that transmission planning processes are practices affecting rates pursuant to Section 206 of the FPA).

Transmission Needs.  This deficiency is related to the first deficiency in the sense that

both relate to the failure of the existing transmission planning requirements to require

transmission providers to adequately plan for the foreseeable future.  We find that, even

following Order Nos. 890 and 1000, transmission providers have adopted widely

divergent approaches to determining the factors that are relevant to identifying

transmission needs within regional transmission planning.[292]  Specifically, as commenters

note, some existing regional transmission planning processes ignore trends in future

generation and the impact of extreme weather.[293]  Other commenters note that certain

regional transmission planning processes ignore state laws or utility goals.[294]  In addition

---

[292] ELCON Initial Comments at 3 ("While regional differences are important to consider, too much flexibility was provided to transmission providers in Order No. 1000 that . . . created a patchwork of planning processes further complicating planning and fostering additional balkanization of the grid[.]"); NOPR, 179 FERC ¶ 61,028 at P 50.

[293] GridLab Initial Comments at 4-5 (noting that SPP does not consider extreme weather events in its transmission plan); Grid Strategies July 2021 Extreme Weather Report at 5 ("[T]ransmission's value for making the grid more resilient against severe weather and other unexpected threats is not typically accounted for in transmission planning and cost allocation analyses.  Grid operator transmission planning processes typically assume normal electricity supply and demand patterns, and in most cases do not account for the value of transmission for increasing resilience."); Renewable Northwest Initial Comments at 4, 8 (explaining that regional transmission planning in the Pacific Northwest does not model extreme weather events and generally does not reflect publicly available data such as utility IRPs or carbon reduction goals); *see also* Brattle-Grid Strategies Oct. 2021 Report at 36 (stating that production cost simulations that are typically used to estimate the economic benefit of regional transmission facilities assume no extreme weather events); SPP Market Monitor ANOPR Initial Comments at 3 & n.5 (describing that even SPP's more forward-looking scenario analysis of an emerging technology case in its Integrated Transmission Plan presently underestimates the actual growth of renewables so much that "[w]ind capacity in service today (29.8 GW) already exceeds wind levels projected in both 2019 ITP futures that go out to 2029").

[294] Acadia Center and CLF Initial Comments at 1 ("Order No. 1000 has failed to

to failing to adequately account for factors that shape the resource mix, commenters also assert that current regional transmission planning processes fail to account for factors that will shape future load, particularly new loads associated with electrification trends like, for example, electric vehicles[295] and data centers.[296]  Although transmission providers in

------

require public utility transmission providers to align their transmission planning and funding processes with state policies and objectives." (citing Regulatory Assistance Project, *FERC Transmission: The Highest-Yield Reforms*, at 4 (July 2022), https://www.raponline.org/wp-content/uploads/2023/09/rap-littell-prause-weston-FERC-transmission-highest-yield-reforms-2022-july.pdf)); Renewable Northwest Initial Comments at 12 (citing Brattle-Grid Strategies Oct. 2021 Report at 15, which states that WestConnect, for example, does not include planning inputs that extend beyond generic, baseline projects nor "knowable information about enacted public policy mandates, publicly stated utility plans, and/or consumer procurement targets[.]"); SREA Initial Comments at 25 (stating that "SERTP relies entirely on member utilities to self-nominate transmission study requests regarding public policy, meaning if utilities do not provide recommendations or requests, no SERTP study is completed.  For instance, in 2021, SERTP stated, '[t]he SERTP did not receive *any input or proposals* for possible transmission needs driven by Public Policy Requirements for the 2021 planning cycle.  Therefore, no possible transmission needs driven by Public Policy Requirements have been identified for further evaluation of potential transmission solutions in the 2021 SERTP planning cycle.'" (emphasis in original)).

[295] *See, e.g.*, Clean Energy Buyers Initial Comments at 7-8; National Grid Initial Comments at 8; *see also* AEE ANOPR Initial Comments at 18 (stating that MISO projects electrification effects on load in its long-term regional transmission planning, but how other transmission providers account for electrification trends is not consistent or transparent).

[296] *See supra* note 2166; Rocky Mountain Institute Supplemental Comments at 1 ("Technology companies have begun requesting large interconnections for data centers that require increased electricity supply to power generative artificial intelligence."); WIRES Supplemental Comments at attach. 1, p. 36 (Rob Gramlich, et al., *Fostering Collaboration Would Help Build Needed Transmission* (Feb. 2024)) ("Load growth is rising in much of the country, and it is happening in a way that is hard for any single entity to assess on their own.  It varies by local area due to factors such as manufacturing plant and data center additions, plus expectations for end-use electrification and penetration of electric vehicles.").

some transmission planning regions account for a wider range of the factors that drive Long-Term Transmission Needs when performing regional transmission planning studies than do others,[297] we find that transmission providers are not consistently or sufficiently accounting on a forward-looking basis for the known determinants of Long-Term Transmission Needs or accounting for such known determinants in a manner that ensures the identification and evaluation of more efficient or cost-effective regional transmission facilities to meet Long-Term Transmission Needs.

119.    We recognize there is inherent uncertainty in forecasting,[298] and we agree with Industrial Customers that current transmission planning is based on known and

---

[297] *See, e.g.*, Renewable Northwest Initial Comments at 11, 14-15 (discussing how the MISO transmission planning process accounts for the future resource mix); Western PIOs Initial Comments at 23-24, 26-27 (explaining forward-looking aspects of the CAISO transmission planning process).

[298] We acknowledge NRG's comment that forecasting is inherently uncertain. NRG Initial Comments at 10-12. Sufficiently long-term, forward-looking, and comprehensive regional transmission planning and cost allocation, however, is better than a lack of planning. The Commission may, by applying its expertise and experience to the record, determine what type and amount of transmission planning results in a just and reasonable rate. *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d at 55 ("[I]n rate-related matters, the court's review of the Commission's determination is particularly deferential because such matters are either fairly technical or 'involve policy judgements that lie at the core of the regulatory mission.'" (citing *Alcoa Inc. v. FERC*, 564 F.3d 1342, 1347 (D.C. Cir. 2009))). "The court owes the Commission 'great deference' in this realm because '[t]he statutory requirement that rates be 'just and reasonable' is obviously incapable of precise judicial definition' and 'the Commission must have considerable latitude in developing a methodology responsive to its regulatory challenge[.]'" *Id.* (citing *Morgan Stanley Cap. Grp. v. Pub. Util. Dist. No. 1*, 554 U.S. 527, 532 (2008); *Am. Pub. Gas Ass'n v. FPC*, 567 F.2d 1016, 1037 (D.C. Cir. 1977)).

Docket No. RM21-17-000                                                    - 110 -

measurable factors.[299]   However, we find, based on this record, that the universe of

known and measurable factors that drive regional transmission needs extends beyond

those that transmission providers currently consider as part of their regional transmission

planning processes.  Specifically, the record demonstrates that a multitude of factors like

reliability needs driven by the impact of extreme weather, trends in future generation

additions and retirements, load growth, federal, federally-recognized Tribal, state, and

local laws, and utility goals increasingly shape Long-Term Transmission Needs, are

known and identifiable, and have reasonably predictable effects, especially in the

aggregate.

120.   As noted above, the record shows that the increasing frequency, duration, and

intensity of extreme weather events are driving changes in Long-Term Transmission

Needs to maintain system reliability.[300]   Additionally, demand growth is a major driver of

---

[299] Industrial Customers Initial Comments at 11.

[300] ACEG Initial Comments at 63 ("[T]he need to improve regional and
interregional planning arises from the transformative changes occurring with respect to
resource diversity, energy market efficiencies, technological changes, operational
innovations and resiliency to withstand severe weather events.  If transmission facilities
are not constructed, these are all benefits that would otherwise be forfeited."); NERC
Initial Comments at 6; Evergreen Action Initial Comments at 2 ("[A]dditional
transmission built under improved planning procedures would [] create large reliability
benefits.  With increasing extreme weather events due to climate change—including
wildfires, winter storms, hurricanes, and more—additional transmission infrastructure
and grid improvements are increasingly necessary for resilience purposes."); WE ACT
Initial Comments at 2 ("Requiring public utility transmission providers to consider
extreme weather events in Long-Term Regional Transmission Planning is a positive step
towards addressing grid reliability in the face of more frequent and intensifying weather
events.").

Long-Term Transmission Needs, and contrary to commenter assertions,[301] the record

shows that evolving trends in load growth due to data centers, electrification, and

industrial growth are driving Long-Term Transmission Needs.[302]  Similarly, state laws,

utility integrated resource plans and resource procurements, and other regulatory actions

necessarily affect Long-Term Transmission Needs for Commission-jurisdictional

transmission services.[303]  Several commenters also support the broader consideration of

anticipated generation retirements and interconnection requests in regional transmission

---

[301] *See, e.g.,* Industrial Customers Initial Comments at 8-10 (arguing that demand is growing more slowly than in previous periods).

[302] *See, e.g.*, Northwest and Intermountain Initial Comments at 5 n.12 ("For example, Bonneville Power Administration ('BPA') owns about 75 percent of the transmission lines in the Pacific Northwest.  In BPA's 2022 Transmission Service Expansion Plan cluster study, customers submitted 153 separate transmission service requests totaling 11,831 MW of transmission capacity.  BPA was able to offer service (without requiring detailed studies and transmission upgrades) to only 275 MWs of those service requests." (citing BPA, *TSR Study and Expansion Process*, at 12 (Dec. 7, 2021), https://www.bpa.gov/-/media/Aep/transmission/atc-methodology/2021-22tsep-overview.pdf.)); John Wilson and Zach Zimmerman, *The Era of Flat Demand is Over,* Grid Strategies, at 3, 6 (Dec. 2023), https://gridstrategiesllc.com/wp-content/uploads/2023/12/National-Load-Growth-Report-2023.pdf (noting the 5-year load growth forecast has nearly doubled from 2.6% to 4.7% and "transmission investments need to increase just to keep up with demand").

[303] *See, e.g.*, Acadia Center and CLF Initial Comments at 8 ("State laws are . . . essential considerations in planning transmission . . . as state laws drive substantial procurements of energy resources along with the concomitant need for additional transmission, as well as repurposed transmission and non-transmission grid solutions."); AEE Initial Comments at 10 (noting that "[a]s of September 2020, 38 states and the District of Columbia had adopted renewable portfolio standards, and 21 states (plus the District of Columbia and Puerto Rico) – representing more than half of the U.S. population – include a target of 100% renewable energy by 2050 or sooner.  Many of these requirements have been enacted in statute and are binding on utilities and retail energy providers.").

planning processes because those factors shape the future resource mix and, therefore, Long-Term Transmission Needs.[304]  Relatedly, many commenters highlight the impact of utility goals on the resource mix because such goals will impact transmission needs.[305]  Yet, as described above, existing regional transmission planning processes frequently undervalue or entirely omit consideration of some or all of these factors.  And while some existing regional transmission planning processes do a better job than others of incorporating different components of long-term, forward-looking, and more comprehensive regional transmission planning, the Commission's existing regional transmission planning requirements do not ensure that factors influencing future transmission will be sufficiently accounted for in that planning.

121.    The failure to adequately consider such factors delays planning for the transmission system's changing operational needs until shortly before those transmission needs manifest.  As a result, existing transmission planning processes are piecemeal and fail to take advantage of economies of scale in transmission investment or opportunities to address multiple transmission needs over multiple time horizons.[306]  We find that

---

[304] *See, e.g.*, Pattern Energy Initial Comments at 26 ("[T]he generation interconnection queues are indicative of the market and should also be a major source for generation assumptions in scenario planning (both near-term and long-term)."); SEIA Initial Comments at 9.

[305] *See, e.g.*, Renewable Northwest Initial Comments at 6; SREA Initial Comments at 41-46 ("The major utility announcements of achieving net zero or some approximation affects the marketplace, especially in the [S]outheast.").

[306] PIOs Initial Comments at 10-11; Renewable Northwest Initial Comments at 8 (citing Brattle-Grid Strategies Oct. 2021 Report at iii, iv).

engaging in regional transmission planning without adequate consideration of such factors leads to transmission investment that is not more efficient or cost-effective and renders Commission-jurisdictional regional transmission planning and cost allocation processes unjust and unreasonable.[307]

122.    Third, the record demonstrates that the Commission's regional transmission planning and cost allocation requirements fail to require transmission providers to adequately consider the broader set of benefits of regional transmission facilities planned to meet Long-Term Transmission Needs.[308]  For example, commenters note that many regional transmission planning processes focus too narrowly only on some benefits.[309]

---

[307] *See, e.g.*, AEE Initial Comments at 10 ("Failing to take any of [the Commission-proposed factors] into consideration in developing long-term scenarios would risk under investment in needed regional transmission projects to meet transmission needs and potential[ly] result in unjust and unreasonable rates for transmission service."); New Jersey Commission Initial Comments at 3-9 (arguing that "[e]nsuring just and reasonable rates requires mandating long-term, multi-value, and portfolio based transmission planning.").

[308] *See* Order No. 1000, 136 FERC ¶ 61,051 at P 624 (declining to prescribe "a particular definition of 'benefits'").

[309] Massachusetts Attorney General ANOPR Initial Comments at 22 ("New England's siloed approach to transmission planning inhibits identification of multi-value solutions."  As part of ISO-NE's Boston 2028 Request for Proposals, "[i]n focusing on cost-effectively solving reliability needs alone, ISO-NE rejected all but one of thirty-six proposals.  While ISO-NE rejected some of these proposals for technical reasons, it eliminated several due to cost considerations alone."); PIOs Initial Comments at 10 ("[T]he vast majority of current transmission projects are focused solely either on network reliability or connecting the next generator in the interconnection queue and ignore any other potential benefits, possible economies of scale or other efficiencies that might occur by considering multiple future needs . . . . [M]ultiple quantifiable benefits to transmission . . . are being ignored in the transmission planning process.").

Docket No. RM21-17-000                                                      - 114 -

For instance, the Brattle-Grid Strategies Report concludes that "most of [the nation's recent transmission] investment addresses individual local asset replacement needs, near-term reliability compliance, and generation-interconnection-related reliability needs without considering a comprehensive set of multiple regional needs and system-wide benefits."[310]  As PIOs argue, the Commission's existing regional transmission planning and cost allocation requirements do not require that transmission providers assess "opportunities to benefit from economies of scale that come from 'right-sizing' and strategic, comprehensive planning of transmission portfolios and projects to capture additional benefits. . . ."[311]  Other regional transmission planning processes fail entirely to consider cost savings associated with certain transmission facilities.[312]

123.    Based on the record, we find that, as with the universe of known and measurable factors driving transmission needs, the benefits that regional transmission facilities provide extend beyond those benefits that transmission providers currently consider as

---

[310] Brattle-Grid Strategies Oct. 2021 Report at 2.

[311] PIOs Initial Comments at 10-11.  The benefits cited by PIOs "include congestion relief, reduced transmission losses, resiliency to extreme weather events, increased flexibility to respond to changing market or system conditions, and facilitating larger regional or interregional solutions for cost effective interconnection of the renewable and storage resources needed to meet public policy goals."  *Id.* at 11.

[312] SREA Initial Comments at 24 ("SERTP participants explained that SERTP is unable to conduct adjusted production cost savings, because none of the utilities involved in SERTP have the software capable of doing so.  In effect, the 'Economic Planning Studies' only evaluate the costs of potential upgrades to the system, but none of the benefits.").

Docket No. RM21-17-000                                                            - 115 -

part of their regional transmission planning and cost allocation processes.[313]  Failing to

adequately identify and consider the benefits of such transmission facilities may lead to

relatively inefficient or less cost-effective transmission development.  In particular, the

cost-benefit analyses that transmission providers often use as part of the evaluation

process may fail to identify more efficient or cost-effective regional transmission

facilities for selection because they provide an inaccurate portrayal of the comparative

benefits of different transmission facilities.  Thus, the failure to adequately consider the

benefits of regional transmission facilities results in, among other things, transmission

customers forgoing benefits that may significantly outweigh their costs, which results in

less efficient or cost-effective transmission investments and, in turn, contributes to

Commission-jurisdictional rates that are unjust and unreasonable.

124.    Given our findings above concerning the deficiencies in existing transmission

planning requirements, and our conclusion that long-term, forward-looking, and more

comprehensive regional transmission planning is needed, we also conclude that existing

cost allocation requirements are deficient and must be modified to properly account for

Long-Term Regional Transmission Planning.  The Commission has long recognized the

---

[313] We disagree with Potomac Economics' arguments that the sole benefit of
transmission is alleviating congestion and that congestion is primarily an economic issue,
so investment in alleviating congestion should not exceed the benefit of doing so.  *See*
Potomac Economics Initial Comments at 3-4.  As discussed *infra* in the Evaluation of the
Benefits of Regional Transmission Facilities section alleviating congestion is just one of
many potential benefits that transmission infrastructure provides, and transmission
benefits beyond solving congestion are considered by transmission providers in regional
transmission planning processes today.

USCA4 Appeal: 24-1650    Doc: 224        Filed: 01/21/2025    Pg: 126 of 2455
Document Accession #: 20240513-3036      Filed Date: 05/13/2024

Docket No. RM21-17-000                                                    - 116 -

"close relationship between transmission planning, which identifies needed transmission facilities, and the allocation of costs of the transmission facilities in the plan,"[314] and that cost allocation issues will often determine whether transmission providers and customers support the construction of new facilities.[315]  Furthermore, experience with Order No. 1000 has reinforced the critical role that states play in the development of new transmission infrastructure, particularly at the regional level, where transmission projects may physically span, and their costs may be allocated across, multiple states.  As the Commission discussed in the NOPR and we continue to find in this final rule, facilitating state regulatory involvement in the cost allocation process could minimize delays and additional costs associated with state and local siting proceedings.[316]

125.    Given the link between cost allocation and transmission planning, it is essential that cost allocation requirements for Long-Term Regional Transmission Facilities are appropriately tailored to the new Long-Term Regional Transmission Planning requirements of this rule, particularly given the anticipated long-lead time for any regional transmission facilities developed and regionally cost allocated through this final rule.  Without proper alignment of the regional transmission planning and cost allocation requirements, it is less likely that transmission facilities selected in Long-Term Regional

---

[314] Order No. 1000, 136 FERC ¶ 61,051 at P 496.

[315] Order No. 890, 118 FERC ¶ 61,119 at P 557; *see also* Order No. 1000, 136 FERC ¶ 61,051 at P 496.

[316] NOPR, 179 FERC ¶ 61,028 at P 301; *infra* Regional Transmission Cost Allocation section.

Transmission Planning will be developed, which would undermine the essential purpose of the regional transmission planning process, namely, the development of more efficient or cost-effective regional transmission facilities.

126.    We find that the Commission's current cost allocation requirements, which were designed and established in the context of existing Order No. 1000 regional transmission planning processes, are insufficient to appropriately allocate costs associated with regional transmission facilities that are selected in accordance with the new Long-Term Regional Transmission Planning requirements that we establish in this final rule.  The Commission's existing Order No. 1000 cost allocation requirements contemplate the application of differing cost allocation methods to different types of transmission facilities.  But we find that Long-Term Regional Transmission Planning, which accounts for multiple drivers of Long-Term Transmission Needs and results in Long-Term Regional Transmission Facilities that produce a broader set of benefits, warrants a different approach to cost allocation for such transmission facilities.  Likewise, existing Order No. 1000 regional transmission planning processes do not mandate the consideration of specific benefits that we believe are appropriately considered as part of Long-Term Regional Transmission Planning.  New information concerning these benefits uncovered through the transmission planning process may be relevant when allocating the costs of Long-Term Regional Transmission Facilities in a manner that is at least roughly commensurate with their benefits.[317]  Importantly, existing cost allocation

---

[317] *Ill. Commerce Comm'n v. FERC*, 576 F.3d 470, 477 (7th Cir. 2009) (*ICC v. FERC I*); Order No. 1000, 136 FERC ¶ 61,051 at PP 622, 639 (requiring costs of regional

Docket No. RM21-17-000                                                    - 118 -

requirements do not provide a dedicated process through which states have an opportunity to participate in the development of regional cost allocation methods.  We conclude such a role is particularly relevant to Long-Term Regional Transmission Planning, given:  (1) the lengthy planning horizon over which transmission projects might be identified, selected, and ultimately constructed; (2) the resultant increased uncertainty for Long-Term Regional Transmission Facilities; and (3) accordingly, the increased importance for state engagement regarding cost allocation to increase the likelihood such facilities obtain needed siting approvals from the states and are thus timely and cost-effectively developed.  We therefore believe that it is both necessary and appropriate to establish specific cost allocation requirements that are tailored to the Long-Term Regional Transmission Planning reforms in this final rule.

127.    Based on the record, including comments submitted in response to the NOPR, we find that there is substantial evidence demonstrating that Long-Term Regional Transmission Planning and cost allocation to identify and plan for Long-Term Transmission Needs does not occur on a consistent and sufficient basis.[318]  We find, in

transmission facilities to be allocated in a manner that is at least roughly commensurate with estimated benefits).

[318] *See* New Jersey Commission Initial Comments at 8 (explaining that, outside of limited circumstances, PJM, Florida, ISO-NE, Southeastern Regional, South Carolina Regional, WestConnect, NorthernGrid, NYISO, SPP, and CAISO do not conduct multi-driver or portfolio transmission planning, which has required ratepayers to pay for tens of billions of dollars in unnecessary transmission projects); NextEra ANOPR Initial Comments at 71 ("While there are examples of longer-term planning currently being utilized by some regions, such as MISO's annual 15-year Futures assessment or SPP's 20-year Integrated Transmission Plan run every five years, there is no standard as to what time horizon long-term planning must study, nor how often this planning should be done.

Docket No. RM21-17-000     - 119 -

large part, that this is because of the deficiencies that we have identified above in the Commission's existing regional transmission planning and cost allocation requirements. In addition, we find that, in the absence of sufficiently long-term, forward-looking, and comprehensive regional transmission planning and cost allocation processes, transmission providers are meeting many transmission needs by identifying transmission solutions and developing transmission facilities through other processes, i.e., outside of the regional transmission planning and cost allocation processes,[319] or, as discussed above, in response to near-term reliability needs,[320] which may not identify the more-efficient or cost-effective solution.

128.    To reiterate, the fact that transmission facilities are being identified and built outside of regional transmission planning processes and in response to near-term reliability needs is not inherently problematic. In many instances, as some commenters

---

Further, no standards or guidelines exist as to what should be included in such long-term planning to ensure that customers are charged just and reasonable rates for the most efficient and cost-effective investments given the most comprehensive and up-to-date information available."); Western PIOs Initial Comments at 4-28 (arguing that in the Western United States transmission planning outside of CAISO is not developed and is ineffective); Brattle-Grid Strategies Oct. 2021 Report at 13-15 & tbl. 2 (documenting inconsistent "use of proactive, scenario-based, multi-value processes" across various planning authorities, including NYISO, CAISO, MISO, PJM, ISO-NE, Florida, Southeast Regional, and South Carolina").

[319] *See, e.g.*, LS Power Initial Comments at 46-50; PIOs Initial Comments at 9-10 (explaining that about half of the approximately $70 billion in aggregate transmission investment by Commission-jurisdictional transmission owners in RTO/ISO regions was approved outside of regional transmission planning processes).

[320] *Supra* note 309.

point out,[321] those processes may be well equipped to identify necessary and appropriate transmission solutions.  Rather, the problem is that incremental and piecemeal expansion of the transmission system outside of regional transmission planning process misses the potential for transmission providers to identify, evaluate, and select more efficient or cost-effective transmission solutions to solve Long-Term Transmission Needs, as well as to afford system-wide benefits that may not be achieved through one-off transmission system upgrades.[322]  To the extent that transmission providers may not be identifying and evaluating the more efficient or cost-effective transmission solutions needed to meet underlying transmission needs, including Long-Term Transmission Needs, over time, consumers will bear the costs of relatively inefficient or less cost-effective piecemeal transmission investment and expansion.[323]

---

[321] *E.g.*, Duke Initial Comments at 7.

[322] *See, e.g.*, ACORE Initial Comments at 8 (("For example, two solutions to address a particular reliability need may offer vastly different total system-wide benefits. Thus, the higher-cost transmission solutions can actually result in significantly lower net cost from a system-wide perspective.") (quoting Brattle-Grid Strategies Oct. 2021 Report at 30)); Clean Energy States Initial Comments at 2 ("[T]he one-plant-at-a-time approach to transmission upgrades results in a patchwork approach that drives up costs and misses opportunities for improvements to the system as a whole."); Exelon Initial Comments at 5.

[323] Michigan State Entities Initial Comments at 1-2 (explaining concerns that the lack of long-term transmission planning has led to significantly higher residential rates and how the problem will worsen if transmission investment does not reflect changes in the resource mix and demand); New Jersey Commission Initial Comments at 6-7 (noting PJM analysis showing transmission upgrades to interconnect 87.1 GW of a variety of resources, including offshore wind, would cost $3.2 billion if done through holistic transmission planning whereas connecting only 15.4 GW of offshore wind would cost $6.4 billion if done through the interconnection queue process, and estimating that the interconnection of 87.1 GW through the interconnection queue would increase the cost to

Docket No. RM21-17-000                                        - 121 -

129.    We find that the concerns arising from the absence of sufficiently long-term,

forward-looking, and comprehensive regional transmission planning and cost allocation

processes and the corresponding failure by transmission providers to identify and

evaluate more efficient or cost-effective transmission solutions to Long-Term

Transmission Needs are exacerbated by the fact that transmission needs in most

transmission planning regions are drastically changing.  Contrary to the claims of some

commenters, we are not promulgating this rule in an attempt to steer the resource mix and

demand[324] based on a preference for certain resources over others.[325]  Instead, the

---

consumers by over $30 billion compared to holistic transmission planning); PIOs Initial
Comments at 8 (noting how deficiencies in the Commission's regional transmission
planning processes have "led to billions of dollars in excessive costs for consumers."
(citing Brattle-Grid Strategies Oct. 2021 Report at 1-13 (Section 1)).

[324] Consumer Organizations Initial Comments at 1-2; ELCON Initial Comments at
9; SERTP Sponsors Initial Comments at 16-20.  *But see* SEIA Reply Comments at 2-3
("The NOPR does make 'repeated references' to the changing resource mix.  But that is
not because the NOPR will 'promote a transition to a more renewables-heavy electric
system.'  The NOPR makes these references because the resource mix is, in fact,
changing.  The question before the Commission is not whether to promote or impede that
change, but how to address the needs of the grid as a result of that inevitable change."
(internal quotations omitted)); New Jersey Commission Reply Comments at 2 ("The
Commission is . . . trying to ensure the electricity system can reliably and efficiently
achieve the generation mix that state policymakers and voluntary consumers—not the
Commission—have chosen.  Ensuring that these customers are served at the lowest
possible cost while maintaining reliability is entirely consistent with and indeed required
in order to meet the dictates of the FPA.  In other words, the Commission is acting to
ensure transmission planning processes account for current realities and meet evolving
consumer needs at a total cost that is just and reasonable." (internal citations omitted)).

[325] *See, e.g.*, Ohio Commission Federal Advocate Initial Comments at 4-6 (arguing
that the Commission's purpose in issuing the NOPR was to promote an aspirational
renewable future and achieve narrow environmental objectives); Undersigned States
Reply Comments at 7 (arguing that the Commission is forcing ratepayers to subsidize

Commission is reacting to well-documented factors, which the record demonstrates are driven by exogenous forces beyond the Commission's jurisdiction or control, including, but not limited to, the increasing frequency of extreme weather events, customer preferences, demand growth, economic and technological trends, and federal, federally-recognized Tribal, state, and local policies.[326]

130.    In response to commenters, we acknowledge that integrated resource planning processes, where they exist, shape the resource mix and can often include forms of proactive transmission planning.  As stated in Order No. 1000, we reiterate that "the regional transmission planning process is not the vehicle by which integrated resource planning is conducted."[327]  Indeed, this final rule does not aim to affect—either facilitate or hinder—any changes or decisions that occur outside of the Commission's jurisdiction. Instead, because practices directly affecting Commission-jurisdictional rates, terms, and conditions of service for interstate transmission and wholesale electricity are the exclusive jurisdiction of the Commission, we must ensure that Commission-jurisdictional processes associated with regional transmission planning and cost allocation result in rates that are just and reasonable and not unduly discriminatory or preferential.  To this

forms of energy by socializing the cost of a transmission build out).

[326] *See* New Jersey Commission Initial Comments at 3 ("The Commission is not proposing to unduly favor, mandate, or subsidize forms of generation but is rather seeking to ensure that the bulk electricity system maintains reliability and satisfies evolving consumer demand . . .").

[327] Order No. 1000, 136 FERC ¶ 61,051 at P 154.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 133 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                           - 123 -

end, this final rule is focused on ensuring that regional transmission planning processes are adequately *accounting for* the changes occurring outside of the Commission's jurisdiction, including the resource decisions that are the exclusive jurisdiction of states.[328]  Additionally, to the extent that integrated resource planning processes include forms of transmission planning, such planning can be complementary to Commission-jurisdictional regional transmission planning processes but cannot take the place of such processes.  This is not to diminish the importance of integrated resource planning processes, which serve a critical role in shaping the generation mix and transmission infrastructure.  In recognition of this role, this final rule requires transmission providers to consider integrated resource planning as a factor when conducting Long-Term Regional Transmission Planning.  But, as discussed below, we conclude that integrated resource planning is appropriately considered as *one of several* categories of factors used to develop Long-Term Scenarios and identify Long-Term Transmission Needs.

131.    In response to commenters that argue regional transmission facilities may not address local transmission needs such that a local transmission facility would still be needed,[329] we acknowledge that regional transmission facilities are not necessarily always

---

[328] *See PJM Power Providers Grp. v. FERC*, 88 F.4th 250, 275 (3d Cir. 2023) (holding that the Commission is "unambiguously authorize[d] . . . to take state policies into account to the extent that such policies affect [the Commission's] statutorily prescribed area of focus . . . ."); *see also Elec. Power Supply Ass'n v. Star*, 904 F.3d 518, 524 (7th Cir. 2018) (approving of the Commission's decision to take state zero-emissions credit systems like that in Illinois "as givens and set out to make the best of the situation [these systems] produce").

[329] *See, e.g.*, Duke Initial Comments at 9 (arguing that there are instances in which

USCA4 Appeal: 24-1650    Doc: 224       Filed: 01/21/2025    Pg: 134 of 2455
Document Accession #: 20240513-3036      Filed Date: 05/13/2024

Docket No. RM21-17-000                                                    - 124 -

a more efficient or cost-effective solution to address local transmission needs, and

nothing in this final rule requires transmission providers to rely on regional transmission

facilities to address exclusively local transmission needs.  Instead, this final rule identifies

deficiencies in existing Commission-jurisdictional regional transmission planning

processes that lead transmission providers to fail to identify Long-Term Transmission

Needs and fail to identify, evaluate, or select more efficient or cost-effective transmission

solutions to meet those transmission needs.  As a result of these deficiencies,

transmission providers may undertake relatively inefficient investments in transmission

infrastructure by missing opportunities to identify regional transmission facilities that

bring economies of scale or address multiple transmission needs over different time

horizons, including local transmission needs.

132.    We disagree with arguments that the Commission cannot promulgate this final

rule because we rely on general findings, rather than individualized analyses of each,

specific transmission planning region.[330]  Relevant precedent, including regarding the

Commission's comparable action in Order No. 1000, is clear that the Commission has

discretion as to the procedural means through which it will apply its substantive

expertise, and we need not make findings that are region specific in every case; rather, we

are empowered to "rely on 'generic' or 'general' findings of a systemic problem to

_____

larger regional transmission projects may not resolve localized transmission needs).

   [330] *See, e.g.*, Louisiana Commission Reply Comments at 5-6; NRECA Initial
Comments at 14-16.

support imposition of an industry-wide solution,"[331] and we do so here.  The fact that

individual transmission planning regions may have different forms of transmission

planning processes, and may experience varying levels of transmission investment, would

be "as unastonishing as it is irrelevant."[332]  Moreover, although transmission planning

practices vary considerably between transmission planning regions and some regions may

engage in transmission planning that shares many of the elements of the more long-term,

forward-looking, comprehensive regional transmission planning required in this rule, the

record demonstrates that this final rule identifies deficiencies that reach well beyond

"isolated pockets[.]"[333]  Rather, the record demonstrates that these deficiencies pervade

large swaths of the country, which include RTO/ISO and non-RTO/ISO transmission

planning regions.[334]  Accordingly, this final rule's remedy does not present an "extreme

'disproportion of remedy to ailment[.]'"[335]  The Commission may reasonably rely on a

rulemaking procedure to address the industry-wide changes to the transmission

landscape, notwithstanding regional variation among regional transmission planning

processes.  As the Commission stated in Order No. 1000, "[i]t is well established that the

---

[331] *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d at 67 (quoting *Interstate Nat. Gas v. FERC*, 285 F.3d 18, 37 (D.C. Cir. 2002)).

[332] *Id.* (quoting *Wis. Gas v. FERC*, 770 F.2d 1144, 1157 (D.C. Cir. 1985)).

[333] *Id.*

[334] *See, e.g.*, *supra* notes 283 and 284 (explaining that ISO-NE, SERTP, Northern Grid, and PJM undergo transmission planning using time horizons shorter than 20 years).

[335] *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d at 67.

Docket No. RM21-17-000                                                    - 126 -

choice between rulemaking and case-by-case adjudication 'lies primarily in the informed discretion of the administrative agency.'"[336]  The Commission also stated that "[i]t is within our discretion to conclude that a generic rulemaking, not case-by-case adjudications, is the most efficient approach to take to resolve the industry wide problems facing us."[337]  Moreover, we agree with ACEG that pursuing region-specific solutions will lead to "siloed and disjunctive transmission planning policies [that] will not solve the problems facing the nation's electric grid."[338]

133.    Furthermore, although not every transmission planning region is experiencing these changes in equal measure, the record shows that significant changes are well underway nationwide, and that failing to adequately account for Long-Term Transmission Needs poses a risk to just and reasonable rates throughout the country.[339] In fact, the record raises a wide range of concerns, and the Commission need not, and should not, wait for systemic problems to undermine regional transmission planning in every region before it acts.[340]  The record in this proceeding confirms that significant investments in new transmission facilities are expected to occur, with substantial impacts

---

[336] Order No. 1000, 136 FERC ¶ 61,051 at P 60.

[337] *Id.*

[338] ACEG Reply Comments at 17.

[339] AEE Reply Comments at 3-4.

[340] *See* Order No. 1000, 136 FERC ¶ 61,051 at P 50.

on the Commission-jurisdictional rates that customers pay.[341]  It is therefore critical, and

it is the Commission's responsibility, to act now to address deficiencies in its regional

transmission planning and cost allocation requirements to ensure that more efficient or

cost-effective transmission investments are made as the industry addresses the changing

landscape.[342]

### 3.      Benefits of Long-Term Regional Transmission Planning and Cost Allocation to Identify and Plan for Long-Term Transmission Needs

134.     Upon consideration of the record, we find that the requirements set forth in this

final rule will address deficiencies in the existing regional transmission planning and cost

allocation requirements and will promote enhanced reliability and more efficient or cost-

effective transmission solutions, which will help to ensure just and reasonable

Commission-jurisdictional rates.

135.     The record demonstrates that long-term, forward-looking, and more

comprehensive regional transmission planning that identifies Long-Term Transmission

Needs will help transmission providers to identify, evaluate, and select more efficient or

cost-effective transmission solutions to those needs.  For example, like the Commission

in the NOPR,[343] commenters cite to the success of MISO's Long-Range Transmission

Plan in delivering more efficient or cost-effective transmission solutions.  By addressing

---

[341] *See supra* P 93.

[342] *See* Order No. 1000, 136 FERC ¶ 61,051 at P 46.

[343] *See, e.g.*, NOPR, 179 FERC ¶ 61,028 at PP 31-32.

USCA4 Appeal: 24-1650    Doc: 224      Filed: 01/21/2025    Pg: 138 of 2455
Document Accession #: 20240513-3036      Filed Date: 05/13/2024

Docket No. RM21-17-000                                                    - 128 -

public policy, economic, and reliability transmission planning needs simultaneously

through its MVP category, MISO "'eliminate[d] the need for $300 million in future

baseline reliability upgrades,' and provided production cost savings that *exceeded the

entire cost of the portfolio by $10 billion*."[344]  Brattle Group and Grid Strategies also

found that "building out piecemeal network upgrades through the interconnection queue

process to integrate the same amount of generation would have cost over 80% more than

the cost of the MVP portfolio."[345]  Similarly, the New Jersey Commission asserts that, by

planning transmission facilities to address a specific set of known and identified

transmission needs through a holistic portfolio, rather than piecemeal through the

generator interconnection process, PJM could save customers more than $30 billion.[346]

136.    We note that the cost-saving results that MISO experienced were the direct

product of more comprehensive, longer-term regional transmission planning.  By

---

[344] New Jersey Commission Initial Comments at 4 (citing MTEP2017 Review at 6, 8) (emphasis in original).

[345] *Id.* at 4-5 (citing Brattle-Grid Strategies Oct. 2021 Report at 7 & nn.13-14); *see id.* at 5 n.9 (noting that the cost of the MVP portfolio divided by the amount of wind capacity it interconnected came to $412 per kilowatt, while interconnection-related network upgrades for new generation in MISO planned through the interconnection queue cost $756 per kilowatt).

[346] *Id.* at 6-7 (citing Brattle-Grid Strategies Oct. 2021 Report at 7); *id.* (explaining that the onshore network upgrades required to interconnect 87.1 GW of resources meeting all of PJM states' current offshore wind goals and total renewable portfolio standards through "piecemeal interconnection queue projects would cost nearly $36 billion in total—*more than eleven times* the $3.2 billion cost of the integrated portfolio approach," or "[p]ut another way, proactive, portfolio-based planning in PJM could ultimately save ratepayers over $30 billion compared to the status quo.").

Docket No. RM21-17-000                                                    - 129 -

expanding the transmission planning horizon and considering factors affecting Long-

Term Transmission Needs, as well as considering a broader list of benefits, transmission

providers will be able to identify, evaluate, and select more efficient or cost-effective

transmission solutions to address Long-Term Transmission Needs.[347]  Such Long-Term

Regional Transmission Planning will:  (1) reduce reliance on transmission solutions that

are relatively inefficient or less cost-effective because they address only short-term

transmission needs; (2) unlock the benefits of economies of scale in transmission

investment;[348] (3) enable opportunities to "right size" replacement transmission

facilities;[349] (4) facilitate the selection of regional transmission facilities that could

address multiple transmission needs over different time horizons; and (5) provide states,

utilities, customers, and other stakeholders with greater insight and transparency into the

costs and benefits of particular transmission solutions to address Long-Term

Transmission Needs.  We conclude that these regional transmission planning and cost

allocation reforms will benefit customers by leading to more efficient or cost-effective

transmission investment, thereby helping to ensure just and reasonable rates.[350]

---

[347] PIOs Initial Comments at 35.

[348] *Id.* at 10 ("[T]he vast majority of current transmission projects are focused solely either on network reliability or connecting the next generator in the interconnection queue and ignore any other potential benefits, possible economies of scale or other efficiencies that might occur by considering multiple future needs.").

[349] ACEG Initial Comments at 53-56; Clean Energy Associations Initial Comments at 25-27; SEIA Initial Comments at 25-26.

[350] *See, e.g.*, Exelon Initial Comments at 5 ("The project-by-project approach of developing [interconnection-related] network upgrades in response to generator

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 140 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                - 130 -

137.   In addition to potentially enhancing the efficiency and cost-effectiveness of transmission investment, we find that sufficiently long-term, forward-looking, and comprehensive regional transmission planning and cost allocation processes will enhance reliability.  In the NOPR, the Commission found that a robust, well-planned transmission system is foundational to ensuring an affordable, reliable supply of electricity.  The record supports this conclusion.  Many commenters agree that, especially in light of continuing changes in both supply and demand, ongoing investment in regional transmission facilities is necessary to ensure that the transmission system continues to serve load in a reliable manner at reasonable cost.[351]  Commenters also agree that regional transmission investments support enhanced reliability because larger, more

---

interconnection requests does not take into account broader, longer-term planning needs and furthermore raises questions about whether it will lead to efficient and cost-effective outcomes as the resource mix rapidly evolves."); PIOs Initial Comments at 8 ("[O]verwhelming evidence indicates that transmission owners are largely able to evade the requirements of Order No. 1000 and . . . have primarily invested in local projects. This has led to . . . billions of dollars in excessive costs for consumers." (citing Brattle-Grid Strategies Oct. 2021 Report at Section 1)); Southeast PIOs Reply Comments at 2 ("All the while, snowballing inefficiencies created by numerous small-scale transmission band-aids, unfit to address broader generation trends, translate into excessive, unjust, and unreasonable rates borne by an already overburdened populace.").

[351] ACORE ANOPR Initial Comments at 21-22 (explaining how additional transmission investments can alleviate billions of dollars in costs caused by extreme weather); EEI Initial Comments at 4 ("Transmission plays and will continue to play a vital role in enabling the energy transition and in ensuring a reliable and resilient energy grid.  A robust transmission system will not only enable electric utilities to integrate more renewable energy resources and deliver more clean energy to customers but will also enhance the reliability and resiliency of the grid and enable the deployment of new technologies." (citing EEI, *Planning and Developing Electric Transmission Projects: The Path to the Grid of the Future* (2022)); NERC Initial Comments at 6 (explaining that transmission will be key to managing a reliable transformation in the resource mix).

integrated transmission systems are better equipped to accommodate a diversity of supply and demand conditions and provide redundancy that allow the system to better withstand unpredictable and extreme weather events, which are occurring with increased frequency and severity.[352]

138.    Moreover, commenters provide examples of how long-term, forward-looking, and more comprehensive regional transmission planning can better identify reliability needs and resolve these needs with more efficient or cost-effective transmission solutions.[353] For example, as noted above, MISO's MVP Portfolio 4 eliminated the need for $300 million in future baseline reliability upgrades.[354]  By comparison, the Reliability Must-Run Agreement for Indian River Unit 4, a 410 MW coal-fired generation unit, highlights the costs of inadequate regional transmission planning.  As NARUC explains, the Indian River Unit 4 was scheduled to retire, but PJM found that retirement would cause

---

[352] NERC Initial Comments at 6 (explaining that regional transmission planning is necessary to ensure sufficient transmission capacity to move energy from areas with a surplus to areas that are deficient).

[353] ITC Initial Comments at 44 ("While local transmission planning continues to serve a critically necessary, valuable function in maintaining the reliability and efficiency of transmission systems, it is nonetheless clear that holistic, long range transmission planning is far more capable of identifying optimal transmission solutions that serve the most needs and deliver the most benefits."); MISO Initial Comments at 88 (explaining that in its Tranche 1 Long Range Transmission Plan, MISO recognizes Avoided Transmission Investment benefits provided by Long Range Transmission Plan facilities in addressing both avoided reliability projects and avoided age and condition replacement projects with the results being avoided costs in local transmission that would have otherwise been incurred to replace existing facilities).

[354] New Jersey Commission Initial Comments at 4.

reliability issues and would necessitate upgrades to transmission facilities that, due to

their age, were already due to be upgraded, and that the Reliability Must-Run Agreement

was needed because those upgrades would take five years to complete.[355]  A long-term,

forward-looking, and more comprehensive regional transmission planning process may

have obviated the need for the Reliability Must-Run Agreement, the individual

transmission facility upgrades, or both.

### 4.  <u>Conclusion</u>

139.    In consideration of the record provided in this proceeding, as well as the related

conclusions stated above, we find that the Commission's existing regional transmission

planning and cost allocation requirements are unjust, unreasonable, and unduly

discriminatory or preferential because they fail to require transmission providers to

adequately plan on a sufficiently long-term, forward-looking, and comprehensive basis.

Specifically, as discussed, we find that the Commission's regional transmission planning

and cost allocation requirements fail to require transmission providers to:  (1) perform a

sufficiently long-term assessment of transmission needs that identifies Long-Term

Transmission Needs; (2) adequately account on a forward-looking basis for known

determinants of Long-Term Transmission Needs; and (3) consider the broader set of

benefits of regional transmission facilities planned to meet those Long-Term

Transmission Needs.  We find that reforms to those requirements are thus necessary to

ensure that Commission-jurisdictional rates are just, reasonable, and not unduly

---

[355] NARUC Initial Comments at 14-15.

discriminatory or preferential.  The failure to plan on a sufficiently long-term, forward-looking, and comprehensive basis results in the potential for relatively inefficient or less cost-effective transmission development for which customers must pay.  The requirements set forth in this final rule will help to ensure that transmission providers plan to address Long-Term Transmission Needs, in turn helping to ensure more efficient or cost-effective transmission development and thus just and reasonable Commission-jurisdictional rates.

## III. **Long-Term Regional Transmission Planning**

### A. **Requirement to Participate in Long-Term Regional Transmission Planning**

#### 1. **NOPR Proposal**

140.   In the NOPR, the Commission proposed to require each transmission provider to participate in a regional transmission planning process that includes Long-Term Regional Transmission Planning,[356] meaning regional transmission planning on a sufficiently long-term, forward-looking, and comprehensive basis to identify transmission needs driven by changes in the resource mix and demand and to identify and evaluate transmission

---

[356] The two features of Long-Term Regional Transmission Planning that the Commission included in the proposed reforms were the development of scenarios with a 20-year transmission planning horizon to be reassessed and revised every three years, with each such re-assessment providing the basis for identification and evaluation of transmission facilities for potential selection.  NOPR, 179 FERC ¶ 61,028 at P 68 n.128.

Docket No. RM21-17-000                                                          - 134 -

facilities for potential selection as the more efficient or cost-effective transmission
facilities to meet such needs.[357]

141.   The Commission proposed that transmission providers may continue to rely on
their existing regional transmission planning and cost allocation processes to comply with
Order No. 1000's requirements related to transmission needs driven by reliability
concerns or economic considerations.[358]

142.   The Commission proposed that transmission providers that comply with the Long-
Term Regional Transmission Planning requirements will comply with the requirement in
Order No. 1000 that they participate in a regional transmission planning process that
considers, and has associated cost allocation provisions related to, transmission needs
driven by Public Policy Requirements.[359]  The Commission further proposed to allow
transmission providers to propose to continue using some or all aspects of the existing
regional transmission planning and cost allocation processes they use to consider
transmission needs driven by Public Policy Requirements.[360]  The Commission stated,
however, that such continued use of existing regional transmission planning and cost
allocation processes would not supplant transmission providers' obligations to comply
with the Long-Term Regional Transmission Planning requirements established in any

---

[357] *See id.* PP 54, 64, 68.

[358] *Id.* P 72.

[359] *Id.* P 73.

[360] *Id.* P 74.

final rule in this proceeding.  Moreover, the Commission proposed that transmission

providers seeking to retain existing regional transmission planning and cost allocation

processes to consider transmission needs driven by Public Policy Requirements would

have to demonstrate that continued use of any such processes does not interfere or

otherwise undermine the Long-Term Regional Transmission Planning proposed in the

NOPR by demonstrating that continued use of such processes is consistent with or

superior to any final rule issued in this proceeding.[361]

143.    The Commission preliminarily found that transmission providers could propose a

regional transmission planning process that plans for reliability needs, economic needs,

transmission needs driven by Public Policy Requirements, and transmission needs driven

by changes in the resource mix and demand simultaneously through a combined

approach.  The Commission stated that transmission providers proposing to address all

such transmission needs in a single regional transmission planning process would bear

the burden of demonstrating continued compliance with Order No. 1000 in addition to

compliance with the requirements of any final rule in this proceeding.[362]

144.    Finally, the Commission proposed to require that Long-Term Regional

Transmission Planning comply with the following existing Order Nos. 890 and 1000

---

[361] *Id.*

[362] *Id.* P 75.

transmission planning principles: (1) coordination; (2) openness; (3) transparency;

(4) information exchange; (5) comparability; and (6) dispute resolution.[363]

### 2.    Comments

#### a.    General Comments

145.    The majority of commenters support the Commission's proposal,[364] with multiple

commenters claiming that Long-Term Regional Transmission Planning is crucial to

---

[363] *Id.* P 76.

[364] Acadia Center and CLF Initial Comments at 2; ACEG Initial Comments at 6, 22-23; ACORE Initial Comments at 2, 17; Advanced Energy Buyers Initial Comments at 4; AEP Initial Comments at 5-7; Amazon Initial Comments at 2; BP Initial Comments at 4-7; Breakthrough Energy Initial Comments at 3; Breakthrough Energy Supplemental Comments at 1; Business Council for Sustainable Energy Initial Comments at 2-4; California Energy Commission Initial Comments at 1; City of New Orleans Council Initial Comments at 4; City of New York Initial Comments at 1, 3; Clean Energy Associations Initial Comments at 10; Conservative Energy Network Supplemental Comments at 1; Conservatives for Clean Energy – Florida Supplemental Comments at 1; Conservatives for Clean Energy – South Carolina; CTC Global Initial Comments at 1; US Senators Supplemental Comments at 1-2; EEI Initial Comments at 10; ELCON Initial Comments at 6-7; NERC Initial Comments at 6-7; ENGIE Initial Comments at 2; Entergy Initial Comments at 7; Environmental Groups Supplement Comments at 2; Evergreen Action Initial Comments at 3; Eversource Initial Comments at 2; Exelon Initial Comments at 4-7; Form Energy Initial Comments at 2-3; Governor of Kansas Laura Kelly Supplemental Comments at 1; Handy Law Initial Comments at 7-8; US House Republicans Supplemental Comments at 1; Indicated PJM TOs Initial Comments at 7-8; Indicated US Senators and Representatives Initial Comments at 1; Michigan Conservative Energy Forum Supplemental Comments at 1; ISO-NE Initial Comments at 2, 8; ITC Initial Comments at 5-9; Joint Consumer Advocates Initial Comments at 5-6; Minnesota State Entities Initial Comments at 4; NARUC Initial Comments at 4; National Grid Initial Comments at 9-11; NEMA Initial Comments at 1-2; NESCOE Initial Comments at 14-16; New England for Offshore Wind Initial Comments at 2; New York Commission and NYSERDA Initial Comments at 8; New York TOs Initial Comments at 1; New York Transco Initial Comments at 1; NextEra Initial Comments at 62; Northwest and Intermountain Initial Comments at 7; Ohio Conservative Energy Forum Supplemental Comments at 1; Pine Gate Initial Comments at 18-19; PIOs Initial Comments at 12-14; Policy Integrity Initial Comments at 5; RMI Supplemental

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 147 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                           - 137 -

ensure that regional transmission planning appropriately identifies transmission needs to meet the changing resource mix and demand.[365]

146.    AEP and Ørsted argue that the Commission's proposal will address deficiencies in the current transmission planning process.[366]  National Grid claims that existing long-term transmission planning processes are sufficient for addressing reliability and economic transmission needs in the near-term but are inadequate for addressing the changing resource mix and demand, as well as for addressing resilience challenges driven by climate change.[367]  ACEG claims that Long-Term Regional Transmission Planning will allow right-sizing of transmission facilities.[368]

147.    Some commenters observe that this proposal may result in cost-savings for consumers.  For example, DC and MD Offices of People's Counsel claim that this

---

Comments at 2; Senator Schumer Supplemental Comments at 1-2; Senator Whitehouse Supplemental Comments at 1-3; SDG&E Initial Comments at 2; Southeast PIOs Initial Comments at 42-49; State Officials Supplemental Comments at 1 (citing US Climate Alliance Initial Comments); US Climate Alliance Initial Comments at 1-2; Vermont Electric and Vermont Transco Initial Comments at 3; Virginia Commission Staff Initial Comments at 2-3; Western PIOs Initial Comments at 28-30, 36; Western Way Colorado Supplemental Comments at 1; Western Way Nevada Supplemental Comments at 1; Western Way Utah Supplemental Comments at 1; Wisconsin Conservative Energy Forum Supplemental Comments at 1.

[365] Breakthrough Energy Initial Comments at 12; EEI Supplemental Comments at 1; Exelon Initial Comments at 5; US House Republicans Supplemental Comments at 1; ITC Initial Comments at 5.

[366] AEP Initial Comments at 8; Ørsted Initial Comments at 4-5.

[367] National Grid Initial Comments at 10.

[368] ACEG Initial Comments at 6.

Docket No. RM21-17-000                                                            - 138 -

proposal could result in significant cost savings to consumers by helping address severe

weather events and reduce the relative cost of decarbonizing the country's resource

fleet.[369]  AEP argues that the NOPR proposal will benefit consumers by establishing a

process that will identify more efficient or cost-effective transmission facilities, capturing

currently missed opportunities and achieving economies of scale.[370]  North Carolina

Commission and Staff argue that Long-Term Regional Transmission Planning can

provide state utility commissions and consumer advocates with useful information to

promote a cost-effective and reliable transmission grid.[371]

148.    NextEra states that Long-Term Regional Transmission Planning can minimize

overall costs to consumers by enabling the lowest-cost generation.[372]  Relatedly, Tabors

Caramanis Rudkevich states that the NOPR proposal would establish a transmission

planning process that coordinates across franchises, states, and regions, which will reduce

the production cost of delivery of energy to consumers.[373]

---

[369] DC and MD Offices of People's Counsel Initial Comments at 8-10 (citing Patrick Brown & Audun Botterud, *The Value of Inter-Regional Coordination and Transmission in Decarbonizing the US Electricity System*, 5 JOULE 115, 115-134 (2020), https://www.sciencedirect.com/science/article/pii/S2542435120305572?dgcid=author%20_blank); *see also* EEI Supplemental Comments at 1 (arguing that robust transmission development will provide cost savings from greater access to low-cost resources).

[370] *See* AEP Initial Comments at 8-12.

[371] North Carolina Commission and Staff Initial Comments at 4.

[372] NextEra Initial Comments at 62.

[373] Tabors Caramanis Rudkevich Initial Comments at 4-5.

Docket No. RM21-17-000                                              - 139 -

149.    PPL notes that Long-Term Regional Transmission Planning may improve some of

the limitations of criteria-based transmission planning, which is currently employed in

RTOs/ISOs.[374]  Ørsted supports the proposed requirements regarding Long-Term

Regional Transmission Planning and argues that existing regional transmission plans fail

to anticipate the size and scale of future offshore wind generation development, leading

to inaccurate plans and insufficient investment in infrastructure needed to integrate

known future offshore wind generation.[375]

150.    State Agencies assert that the Commission's various proposed reforms in the

NOPR collectively would enhance transparency, prevent unnecessary investment in local

transmission projects, and improve the competitive landscape.[376]  US DOJ and FTC

support reforms that address obstacles to transmission development and that are

implemented consistent with principles for competition.[377]

### b.    Requests for Flexibility in Transmission Planning

151.    A number of commenters support the Commission's proposal to require Long-

Term Regional Transmission Planning, but also express reservations or objections

regarding what they perceive as an overly prescriptive approach that may disrupt existing

---

[374] PPL Initial Comments at 4.  PPL claims that, while PJM may perform long-term transmission planning on a 15-year time frame on paper, its long-term transmission planning is effectively undertaken over only 7 to 10 years.  *Id.*

[375] Ørsted Initial Comments at 4-5.

[376] State Agencies Reply Comments at 6.

[377] US DOJ and FTC Initial Comments at 19.

processes that are already working.[378]  For example, multiple commenters express

concerns that the NOPR's allegedly prescriptive requirements for Long-Term Regional

Transmission Planning will significantly limit needed discretion to conduct such

planning, and that, without discretion to adjust the scenario modeling and assumptions to

regional circumstances, the final rule could lead to more delay and conflict.[379]  MISO

TOs contend that the NOPR proposals vary sufficiently from MISO's current approach

that MISO and its stakeholders will need to engage in complex and time-intensive

revisions in order to comply.[380]  Similarly, City of New Orleans Council asks that the

final rule not hinder existing MISO processes.[381]

152.    Multiple commenters recommend that the Commission's final rule establish

principles and objectives for long-term transmission planning that address the

Commission's concerns and provide transmission providers with the flexibility to

develop tailored long-term transmission planning approaches and implementation details

---

[378] *See, e.g.*, Avangrid Initial Comments at 6, 9; CAISO Initial Comments at 1-2, 7-10, 13; California Commission Initial Comments at 6; Duke Initial Comments at 1-2; Indiana Commission Initial Comments at 1, 3; ISO-NE Initial Comments at 20; ISO/RTO Council Initial Comments at 4-5 (citing NOPR, 179 FERC ¶ 61,028 at PP 66, 104); Massachusetts Attorney General Initial Comments at 10-12; Michigan Commission Initial Comments at 4-5; MISO Initial Comments at 23; NEPOOL Initial Comments at 7; NYISO Initial Comments at 11; PG&E Initial Comments at 2; PJM Initial Comments at 54-55; US Chamber of Commerce at 4-5.

[379] Ameren Initial Comments at 8; ISO-NE Initial Comments at 20; ISO/RTO Council Initial Comments at 8-9; MISO TOs Reply Comments at 10-12.

[380] MISO TOs Reply Comments at 10-11.

[381] City of New Orleans Initial Comments at 5-6.

USCA4 Appeal: 24-1650     Doc: 224     Filed: 01/21/2025     Pg: 151 of 2455
Document Accession #: 20240513-3036     Filed Date: 05/13/2024

Docket No. RM21-17-000                                                          - 141 -

accordingly.[382]  MISO recommends that each transmission provider should give the

Commission a report outlining the actions and processes that support the Commission's

principles and guidance, and then the Commission could direct specific changes within

each transmission planning region as it deems necessary.[383]

153.    Multiple commenters argue for flexibility to accommodate local and regional

differences, including differences in public policy goals that affect transmission

planning.[384]  NYISO asks that the final rule give each transmission planning region

discretion to determine, in coordination with state entities and stakeholders, how best to

incorporate the Long-Term Regional Transmission Planning requirements within its

transmission planning framework.[385]  California Municipal Utilities add that a significant

amount of demand in the West is served by publicly-owned utilities and electric

---

[382] ISO-NE Initial Comments at 20; ISO/RTO Council Initial Comments at 4-5, 8-9; MISO Initial Comments at 22-23.

[383] MISO Initial Comments at 22.

[384] APPA Reply Comments at 9-10; California Commission Initial Comments at 5; California Municipal Utilities Reply Comments at 2-4; Industrial Customers Reply Comments at 4; Louisiana Commission Reply Comments at 4-5; Georgia Commission Initial Comments at 2; NARUC Initial Comments at 3; New York Transco Initial Comments at 5; North Dakota Commission Initial Comments at 3; New York Commission and NYSERDA Initial Comments at 3; OMS Initial Comments at 3; PJM States Initial Comments at 2.

[385] NYISO Initial Comments at 13.

cooperatives, which fall outside of state commission regulation, highlighting the need for flexibility in planning.[386]

154.    Dominion asserts that any reforms adopted in this proceeding should align with the purpose of the transmission system, which is to provide reliable, affordable electric service to customers rather than to benefit generators.[387]

155.    APPA agrees with concerns expressed by Commissioner Christie and former Commissioner Danly that overly prescriptive transmission planning requirements have the potential to interfere with existing regional transmission planning processes, and hence argues that adequate flexibility is needed.[388]  Mississippi Commission states that where an RTO/ISO or non-RTO/ISO transmission provider is already engaged in long-term regional transmission planning, the Commission should accept flexibility and regional variations on compliance to address region-specific issues, including the delineation of regional and local transmission facilities through, for example, a voltage threshold (e.g., 100 kV).[389]

---

[386] California Municipal Utilities Reply Comments at 2.

[387] Dominion Initial Comments at 5.

[388] APPA Initial Comments at 23.

[389] Mississippi Commission Reply Comments at 7-8 (citing Entergy Initial Comments at 2-4; Louisiana Commission Initial Comments at 35-36; Michigan State Entities Initial Comments at 2; MISO Initial Comments at 2-3, 19; MISO TOs Initial Comments at 2, 4, 13-15).

156.    CAISO maintains that the Commission should allow it to continue evaluating

transmission needs driven by Public Policy Requirements in its transmission planning

process, in addition to any Long-Term Regional Transmission Planning process, and give

CAISO the flexibility to continue using resource portfolios and geographic zones

identified by state agencies and local regulatory authorities.[390]  Although ACORE urges

the Commission not to grant requests for less stringent transmission planning

requirements in the final rule, ACORE agrees that there may be cases where an

individual RTO's/ISO's existing processes may be superior to the proposed reforms, such

as in the case of CAISO's treatment of public policy projects within its annual

transmission planning process.[391]  California Municipal Utilities note that CAISO has

already begun to implement some of the key reforms that the Commission proposed in

the NOPR, specifically by adopting a 20-year outlook for transmission planning.[392]

157.    MISO requests that a final rule support, rather than detract from, its demonstrated

success in long-term transmission planning.[393]  MISO TOs request that the Commission

revise the NOPR's required parameters for Long-Term Regional Transmission Planning

to accommodate the robust long-term regional transmission planning that some

---

[390] CAISO Reply Comments at 17-18.

[391] ACORE Reply Comments at 4.

[392] California Municipal Utilities Initial Comments at 5.

[393] MISO Reply Comments at 2-3.

Docket No. RM21-17-000                                                    - 144 -

transmission planning regions, like MISO, have already developed.[394]  Similarly, Ameren

contends that the Commission should find that MISO's approved Long Range

Transmission Planning process substantially complies with the proposed reforms.[395]

158.    New York TOs support allowing transmission planning regions with already

successful transmission planning processes to retain those processes while making

incremental enhancements and to demonstrate on compliance that they meet the NOPR's

objectives.[396]  New York Transco asserts that the current NYISO public policy

transmission planning processes already address, at least in part, the proposed reforms

and believes that the Commission should permit regional flexibility.[397]

159.    SPP states that its current transmission planning processes are sufficient to meet

the intent of the Commission's proposed Long-Term Regional Transmission Planning

reforms.[398]  Omaha Public Power states that SPP and other RTOs/ISOs have already

developed long-term planning scenarios and suggests that transmission providers that

already have long-term planning scenarios should be provided with the flexibility to

continue using their previously established processes.[399]

---

[394] MISO TOs Reply Comments at 11-12.

[395] Ameren Initial Comments at 8.

[396] New York TOs Initial Comments at 8-9.

[397] New York Transco Initial Comments at 5.

[398] SPP Initial Comments at 3 (citing NOPR, 179 FERC ¶ 61,028 at P 3).

[399] Omaha Public Power Initial Comments at 4.

160.   In contrast, some commenters argue that the final rule should not provide too much flexibility to transmission providers because that flexibility will undermine Long-Term Regional Transmission Planning.[400]  Many commenters opposing greater flexibility argue that the Commission should establish minimum requirements for Long-Term Regional Transmission Planning.[401]

161.   AEP argues that the Commission must resist requests for excessive regional flexibility that could threaten the development of long-term regional transmission and only permit it in limited instances that exceed minimum requirements.[402]  Onward Energy states that, while flexibility is reasonable, the Commission must clearly identify who will drive regional transmission planning processes and how transmission planners will coordinate, study, and implement Long-Term Scenarios that represent realistic future resource portfolios.[403]  Clean Energy Associations state that without robust and proactive transmission planning rules, the Commission cannot determine that rates remain just and

---

[400] *See, e.g.*, ACORE Reply Comments at 2-4 (citing New Jersey Commission Initial Comments at 7); AEP Reply Comments at 2-5; Clean Energy Associations Reply Comments at 4-6; DC and MD Offices of People's Counsel Reply Comments at 2-3; Hannon Armstrong Reply Comments at 1; Interwest Reply Comments at 3-4; Invenergy Reply Comments at 8-10; PIOs Reply Comments at 5-6.

[401] *See, e.g.*, AEE Reply Comments at 9-13, 16-18, 21-22; AEP Reply Comments at 2-5; Cypress Creek Reply Comments at 4-9; Interwest Reply Comments at 3-4; Invenergy Initial Comments at 2; Kentucky Commission Chair Chandler Reply Comments at 2; PIOs Reply Comments at 2-3; SEIA Reply Comments at 1-3; Southeast PIOs Reply Comments at 21-22; SREA Reply Comments at 26-27.

[402] AEP Reply Comments at 3.

[403] Onward Energy Initial Comments at 4.

reasonable.[404]  DC and MD Offices of People's Counsel state that, while regional

flexibility is critical, long-term transmission planning rules that provide carve-outs and

opt-outs will result in balkanized transmission development.[405]

162.    Hannon Armstrong states that by diluting the proposed requirements or granting

flexibility as some commenters request, the Commission would allow existing

deficiencies to persist, enabling the continued reliance on either the generator

interconnection process or operational planning to resolve or mitigate constraints.[406]

Invenergy rebuts commenters' claims that the NOPR is too prescriptive or that some of

the NOPR requirements should be optional, stating that optional processes and deference

to regional flexibility will not ensure needed transmission is built and that a flexible

approach has already been tried and has failed to produce sufficient results.[407]

> c.    **Comments Regarding More Comprehensive Transmission Planning**

163.    Several commenters contend that Long-Term Regional Transmission Planning

should not interfere with and should not supplant existing shorter-term transmission

---

[404] Clean Energy Associations Reply Comments at 4-5 (citing CAISO Initial Comments at 3; California Commission Initial Comments at 11; ISO-New England Initial Comments at 4; ISO/RTO Council Initial Comments at 8; NYISO Initial Comments at 3; PG&E Initial Comments at 4; PJM States Initial Comments at 4).

[405] DC and MD Offices of People's Counsel Reply Comments at 2.

[406] Hannon Armstrong Reply Comments at 1.

[407] Invenergy Reply Comments at 9-10.

USCA4 Appeal: 24-1650   Doc: 224   Filed: 01/21/2025   Pg: 157 of 2455
Document Accession #: 20240513-3036   Filed Date: 05/13/2024

Docket No. RM21-17-000                                              - 147 -

planning processes.[408]  PJM asks the Commission to confirm that it did not mean for the

NOPR proposals on Long-Term Regional Transmission Planning to modify the existing

reliability and market efficiency transmission planning processes.[409]  Transmission

Dependent Utilities encourage the Commission to ensure that transmission providers do

not focus on long-term objectives to satisfy state renewable energy portfolio requirements

to the detriment of near-term reliability needs, such as end-of-life transmission

planning.[410]  Large Public Power and NEPOOL state that any final rule should clearly

state that the current near-term transmission planning rules and processes, especially cost

allocation, are not changed by the final rule's reforms, except where expressly

indicated.[411]  Ameren argues that the Commission was clear that changes to existing

reliability and economic transmission planning requirements are beyond the scope of the

---

[408] Ameren Reply Comments at 17; CAISO Initial Comments at 2-3, 17-20; Chemistry Council Initial Comments at 5; Dominion Initial Comments at 23; Exelon Initial Comments at 6-7; Indicated PJM TOs Initial Comments at 12; ITC Initial Comments at 8-9; Large Public Power Initial Comments at 14-16; NEPOOL Initial Comments at 8; NESCOE Initial Comments at 21-23; PJM Initial Comments at 55-57; PPL Initial Comments at 4-5; Transmission Dependent Utilities Initial Comments at 4-6; WIRES Initial Comments at 6-7; Xcel Initial Comments at 16.

[409] PJM Initial Comments at 55-57.

[410] Transmission Dependent Utilities Initial Comments at 4-6.

[411] Large Public Power Initial Comments at 16-18; NEPOOL Initial Comments at 7-8.

Docket No. RM21-17-000                                                    - 148 -

NOPR and that the comments filed supporting holistic planning have provided no

compelling basis for the Commission to address them.[412]

164.   Several commenters contend that Long-Term Regional Transmission Planning

should not interfere with and must not supplant existing shorter-term transmission

planning processes for transmission needs driven by Public Policy Requirements.[413]

CAISO states that the NOPR provides no guidance or criteria regarding how a

transmission provider can demonstrate that its existing process for addressing

transmission needs driven by Public Policy Requirements does not interfere with or

undermine Long-Term Regional Transmission Planning.  CAISO contends that it should

not have to re-justify its existing process or demonstrate that its existing process is

consistent with or superior to Long-Term Regional Transmission Planning.[414]

165.   AEP asserts that transmission providers should look at nearer-term reliability and

economic transmission planning processes to determine whether there are needs that can

be incorporated into Long-Term Regional Transmission Planning and addressed by a

Long-Term Regional Transmission Facility.[415]  SEIA recommends that the Commission

require transmission providers to engage in portfolio-based transmission planning that

---

[412] Ameren Reply Comments at 17.

[413] Anbaric Initial Comments at 22-27; CAISO Initial Comments at 2-3, 9-20;
Large Public Power Initial Comments at 14-16.

[414] CAISO Initial Comments at 19.

[415] AEP Initial Comments at 10.

integrates all relevant factors, including near-term needs, into Long-Term Regional

Transmission Planning.[416]  Policy Integrity argues that inclusion of specific requirements

for transmission modeling are needed to fulfill the mandate of ensuring wholesale electric

rates are just and reasonable.[417]  Xcel recommends that the Commission require that

known or expected generation be included in short-term regional transmission planning

assumptions.[418]

166.    PIOs state that, if the two processes continue to exist, the Commission should

mandate that the base cases used in Order No. 1000 regional transmission planning

processes and Long-Term Scenarios in Long-Term Regional Transmission Planning be

defined in the same process.  Otherwise, PIOs contend, inconsistent assumptions between

the two processes could lead to redundant transmission projects and failure to identify

more efficient solutions.  In particular, PIOs argue, if an Order No. 1000 transmission

planning process base case identifies transmission needs that are not anticipated in the

Long-Term Scenarios, the opportunities for more efficient planning created by the long-

term process will be lost.  In addition, PIOs suggest that there may be opportunities for

stakeholders to undermine Long-Term Regional Transmission Planning if they believe

Order No. 1000 transmission planning would produce more favorable results for them.

PIOs further argue that because uncertainty grows the further one looks into the future,

---

[416] SEIA Initial Comments at 20-21.

[417] Policy Integrity Supplemental Comments at 3.

[418] Xcel Initial Comments at 16.

there should not be significant differences in the short-term results of Long-Term

Regional Transmission Planning and Order No. 1000 regional transmission planning

processes.[419]

167.    Several commenters support forward-looking, Long-Term Regional Transmission

Planning but argue for holistic planning using multiple drivers of transmission needs.[420]

They argue that a holistic approach is more efficient, better accounts for long-term

benefits of new transmission, addresses the needs of more stakeholders, and is more

likely to support development of regional transmission facilities, among other benefits.

Competition Advocates support a final rule that reflects the benefits of holistic

modeling,[421] while New Jersey Commission contends that holistic transmission planning

using a competitive process provides significant benefits, including reducing costs.[422]

---

[419] PIOs Initial Comments at 44-46.

[420] *See, e.g.*, Acadia Center and CLF Initial Comments at 4-7; ACEG Initial Comments at 6-7, 30-31; ACORE Initial Comments at 5-7; Anbaric Initial Comments at 5-10; AEE Reply Comments at 2; Business Council for Sustainable Energy Initial Comments at 2; City of New York Initial Comments at 4-6; Competition Coalition Initial Comments at 15-16; Cypress Creek Reply Comments at 4-5; Enel Initial Comments at 3; Pine Gate Initial Comments at 18-19; PIOs Reply Comments at 11; SEIA Reply Comments at 2, 7-8; *see also* Pattern Energy Initial Comments at 16.

[421] Competition Advocates Supplemental Comments at 1; *see also* Policy Integrity Supplemental Comments at 2-3 (citing Jennifer Danis *et al.*, Inst. for Policy Integrity, *Transmission Planning for the Energy Transition: Rethinking Modeling Approaches* (Dec. 2023), https://policyintegrity.org/files/publications/Transmission_Report_2023.pdf).

[422] New Jersey Commission Motion to Lodge at 4-5 (citing *In re Declaring Transmission to Support Offshore Wind a Pub. Policy of the State of N.J.*, Order on the State Agreement Approach SAA Proposals, N.J. BPU Docket No. QO20100630 (Oct. 26, 2022),

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 161 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                    - 151 -

168.    To ensure that reforms are not undermined by existing processes, Clean Energy Buyers recommend that the Commission extend to all existing regional transmission planning processes—not just transmission planning processes to address transmission needs driven by Public Policy Requirements, as proposed in the NOPR—the requirement that, on compliance with any final rule, transmission providers who seek to retain existing regional transmission planning and cost allocation processes must demonstrate that continued use of those processes does not interfere with or undermine Long-Term Regional Transmission Planning.[423]

169.    However, other commenters support the Commission's proposal in the NOPR to *not* apply the proposed reforms to existing Order No. 1000 reliability and near-term economic regional transmission planning processes.[424]  Ohio Consumers support the NOPR's proposal to mostly retain the regional transmission planning processes outlined in Order No. 1000, explaining that PJM stakeholders have reached an effective settlement

---

https://publicaccess.bpu.state.nj.us/DocumentHandler.ashx?document_id=1279919; Johannes P. Pfeifenberger, et al., Brattle Grp., *New Jersey State Agreement Approach for Offshore Wind Transmission: Evaluation Report*, (Oct. 26, 2022), https://publicaccess.bpu.state.nj.us/DocumentHandler.ashx?document_id=1279916; PJM, *Economic Analysis Report: 2021 SAA Proposal Window to Support NJ OSW* (Nov. 4, 2022), https://www.pjm.com/-/media/committees-groups/committees/teac/2022/20221104-special/informationalonly---njosw-economic-analysis-report.ashx).

    [423] Clean Energy Buyers Initial Comments at 9-10.

    [424] Ameren Reply Comments at 17; Exelon Initial Comments at 6-7; ITC Initial Comments at 8-9; WIRES Initial Comments at 6-7.

under that framework in which costs are allocated in a manner that is roughly commensurate with the benefits received.[425]

170.    Some commenters argue that the Commission should require that local transmission projects be evaluated and approved as part of a holistic planning approach.[426]  AEE asserts that, to ensure that transmission providers consider the full range of needs in developing long-term regional transmission plans, the final rule should require them to consider local transmission plans and to determine whether a regional solution would be more efficient or cost-effective.[427]  OMS suggests that the Commission require that all local transmission projects be evaluated and approved as part of regional transmission planning processes with the opportunity for meaningful input from retail regulators, which it argues will enable participation by state regulators while respecting transmission owners' abilities to maintain their systems.[428]

171.    By contrast, WIRES argues that the Commission should maintain the distinction between regional transmission planning and local transmission planning.  WIRES argues that, while the regional transmission planning process is directed toward addressing certain reliability concerns, economic criteria, and public policy initiatives, it is not

---

[425] Ohio Consumers Initial Comments at 7 (citing NOPR, 179 FERC ¶ 61,028 at P 72).

[426] AEE Initial Comments at 3, 38; OMS Initial Comments at 16-17; LS Power and NRG Supplemental Comments at 34-37.

[427] AEE Initial Comments at 3, 38.

[428] OMS Initial Comments at 16-17.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 163 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                   - 153 -

geared toward addressing additional system needs related to resilience, asset

management, customer needs, customer impact, and aging infrastructure replacement that

is typically the focus of local transmission planning.[429]  Similarly, AEP states that if an

RTO/ISO were to make all decisions regarding local transmission projects, they would

also need to assume the accompanying responsibility—and the liability—for such

decisions, which would entail physical inspection and condition assessment of assets, as

well as a determination of when transmission facilities have reached their end of useful

life.[430]  AEP points out that both CAISO and PJM have expressly stated that they do not

wish to undertake these types of activities and assume such obligations.[431]

#### d.    Concerns Regarding Favoring Renewable Resources

172.    ELCON argues that the Commission's proposal could require customers to pay

higher costs to connect distant renewables when a lower-cost transmission project would

provide the same reliability or economic benefits.[432]  Utah Division of Public Utilities

states that Long-Term Scenario requirements favoring renewable generation burden

transmission providers while providing little to no benefit and that developers and

generation utilities should determine which renewable generation should be developed at

---

[429] WIRES Initial Comments at 9.

[430] AEP Reply Comments at 7.

[431] *Id.* (citing *S. Cal. Edison Co.*, 164 FERC ¶ 61,160, at P 18 (2018); PJM
Interconnection, L.L.C., Comments of PJM, Docket No. ER20-2308-000, at attach. A
(July 2, 2020) (citation omitted)).

[432] ELCON Initial Comments at 9-10.

Docket No. RM21-17-000                                                          - 154 -

their respective zones or sites.[433]  Utah Commission further contends that nationwide

mandates for transmission planning add costs, produce confusion, and create conflicts

that could lead to higher utility prices for consumers.[434]  Kansas Ratepayer Advocates

contend that Long-Term Regional Transmission Planning would presume material

additions of renewable energy to serve consumers within a state, coupled with material

additions of transmission to interconnect those renewables to the electric transmission

grid, which do not reflect the unique circumstances of Kansas.[435]

173.    Vistra asserts that the proposed reforms could devolve into the subsidization of

resources chosen to achieve state policy goals, masking the true costs of those remotely

located resources that require extensive transmission development to interconnect to the

grid and leading to market distortions that undermine the objectives of these reforms.[436]

174.    Louisiana Commission states that the NOPR would result in subsidization of the

costs of transmitting remote renewable energy, spreading the costs out broadly based on

an expanded "nebulous concept of 'benefits' and perceived 'public policy,'" thus

ensuring that those transmission projects will pass any economic test.[437]  According to

---

[433] Utah Division of Public Utilities Initial Comments at 7-8.

[434] Utah Commission Initial Comments at 11, 13.

[435] Kansas Ratepayers Advocates Reply Comments at 2.

[436] Vistra Initial Comments at 11.

[437] Louisiana Commission Reply Comments at 12 (citing NOPR, 179 FERC
¶ 61,028 (Christie, Comm'r, concurring at P 2)).

Louisiana Commission, this subsidization would interfere with price signals, thereby distorting the efficient functioning of the wholesale market.[438]  Louisiana Commission states that any Commission policy should be resource and technology neutral and should not impose costs on states that do not benefit from distant renewable power.[439]

175.    Finally, Louisiana Commission contends that the NOPR's long-term transmission planning requirements could threaten the reliability of the transmission grid because the intermittent renewable resources that the NOPR favors do not provide stable output and are not dispatchable.[440]  Similarly, former Kansas Commission Chair Keen argues that the NOPR fails to acknowledge the reliability concerns associated with a generation mix that is too heavily weighted to intermittent renewable generation resources.[441]

**e.    Concerns Regarding Uncertainty, Over-building, and Costs**

176.    A few commenters argue that long-term transmission planning introduces uncertainty or incentivizes speculative transmission development.[442]  While EPSA acknowledges that long-term forecasts can provide valuable information about the

---

[438] Louisiana Commission Initial Comments at 19-21.

[439] *Id.* at 21-24.

[440] *Id.* at 21-23.  *But see* Cypress Creek Reply Comments at 2-4 (disagreeing with Louisiana Commission and claiming that regionally coordinated transmission planning should provide demonstrable system reliability benefits).

[441] Kansas Commission Chair Keen Initial Comments at 1.

[442] EPSA Initial Comments at 7; New England Systems Initial Comments at 22; *see also* NRECA Initial Comments at 28-29.

Docket No. RM21-17-000                                                    - 156 -

potential scale of construction necessary to achieve decarbonization, it argues that using

such forecasts to justify investment shifts the risks to consumers from developers and

facility owners.[443]  California Municipal Utilities state that, as transmission planning

horizons are extended, the changes in resource mix, technology types, the location of

resources, and demand will likely change congestion patterns and therefore the need for

transmission upgrades needed to address them.[444]

177.    Louisiana Commission states that it opposes the NOPR proposal because it would

lead to an inefficient and expensive build-out of the transmission system and could be

used to justify shifting the costs of this build-out to load.[445]  ELCON states that it is

concerned that the Commission's proposal to prioritize Long-Term Regional

Transmission Planning to connect renewable generation over Long-Term Regional

Transmission Planning for economically necessary transmission may exceed the

Commission's authority if it increases transmission rates for the benefit of a few

stakeholders.[446]  Southern states that transmission expansion predicated on hypothetical

resources that might not materialize would not satisfy the fundamental legal requirements

of being used and useful, prudent, and/or otherwise needed for the public use, could harm

---

[443] EPSA Initial Comments at 7.

[444] California Municipal Utilities Initial Comments at 7.

[445] Louisiana Commission Initial Comments at 4-5.

[446] ELCON Initial Comments at 9 (citing NOPR, 179 FERC ¶ 61,028 (Danly, Comm'r, dissenting, at P 2 n.3); NOPR, 179 FERC ¶ 61,028 at P 47).

reliability, and would violate the Commission's duty under the FPA to facilitate transmission planning to meet load-serving entities' obligations.[447]

178.   Industrial Customers argue that the NOPR does not provide evidence that extending the transmission planning horizon would exclude modeling of speculative projects, which would likely result in the over-building of transmission and unnecessary increases in rates.[448]   Industrial Customers cite the D.C. Circuit's finding in *Old Dominion Electric Cooperative v. FERC* that "[w]e are sensitive to the concern . . . that individual utilities should not have free rein to impose unjustified costs on an entire region by unilaterally adopting overly ambitious planning criteria," and argue that the current NOPR proposal would result in the same issues.[449]

179.   NRG urges caution on over-reliance on any 20-year planning study for making transmission investments due to the inherent uncertainty of a study with such a long planning horizon.[450]   NRG argues that the NOPR will increase delivery costs by reducing the value of private investments and replacing such investments with a centrally planned, cost-socialized approach that is founded on at least some incorrect assumptions.[451]   NRG

---

[447] Southern Initial Comments at 32, 34.

[448] Industrial Customers Initial Comments at 6, 15-16, 19-21.

[449] *Id.* at 16 (citing *Old Dominion Elec. Coop. v. FERC*, 898 F.3d 1254, 1263 (D.C. Cir. 2018)).

[450] NRG Initial Comments at 8.

[451] *Id.* at 3.

Docket No. RM21-17-000                                                                 - 158 -

provides several examples of how forecast errors have caused adverse consequences,

including forecasts of natural gas prices, load forecasts, and canceled planned

transmission facilities.[452]

180.    Likewise, Ohio Consumers urge the Commission to avoid adopting proposals

based on long-term projections that justify massive charges to consumers based on

hypothetical scenarios.[453]  Ohio Consumers state that Ohio customers have recently been

saddled with rate increases in part due to transmission investments and that long-term

transmission planning requirements would increase ratepayer burden, which is especially

troublesome if projections turn out to be inaccurate.[454]

181.    As an alternative to Long-Term Regional Transmission Planning, Potomac

Economics states that the Commission could require the transmission planning process to

incorporate a broader array of near-term emerging trends that are less uncertain than the

proposed longer-term factors.[455]  Louisiana Commission states that it shares Potomac

Economics' concerns.  Louisiana Commission urges the Commission to heed testimony

submitted by Potomac Economics arguing that:  (1) there is significant uncertainty about

future technology and a significant risk of investing in transmission projects that will not

ultimately provide value; (2) large transmission projects are often not the most economic,

---

[452] *Id.* at 10-11.

[453] Ohio Consumers Initial Comments at 5.

[454] *Id.*

[455] Potomac Economics Initial Comments at 4.

whereas smaller, targeted projects are more beneficial; and (3) there can and likely would be stranded transmission if transmission planning processes attempt to identify and meet transmission needs 20 to 30 years in the future.[456]

182.    US Chamber of Commerce argues that the Commission should ensure that any Long-Term Regional Transmission Planning reforms do not perpetuate an irrational transmission buildout that undermines competitive advantages of domestic electricity rates.  US Chamber of Commerce asserts that the loss of competitive advantage would lead to lost jobs, lost economic growth, decreased electricity use, and fixed system costs assessed to fewer customers.[457]

183.    Vistra states that the proposed reforms lean toward accounting for regulatory and public policy initiatives that may shape changes in the generation mix without sufficiently incorporating the commercial and markets-related aspects of generation development.[458]  Vistra states that, without a process to assess commercial interest and financial commitment from generation developers, long-term regional transmission plans may under- or over-build transmission facilities or build them in the wrong locations.[459] Relatedly, NRECA states that planning a regional transmission network for generation resources or changes in demand not identified by load-serving entities' forecasts, and

---

[456] Louisiana Commission Reply Comments at 13-14.

[457] US Chamber of Commerce Initial Comments at 8.

[458] Vistra Initial Comments at 7.

[459] *Id.*

instead through unsupported top-down assumptions, may produce uneconomic results from over-building and increase reliability risks.[460]

184.    NRG states that, in light of the uncertainty of variables such as the amount of electrification and resulting load requirements, technology costs for new resources, and viability and repurposing of existing resources, it is not clear whether a "no regrets" option genuinely exists.  NRG also asserts that the centralized planning envisioned in the NOPR sacrifices the ability of market participants to use available information to assess whether their investments will be viable in the future, which is a critical feature of competition.  NRG asserts that the Commission has not contemplated that trade-off or quantified its costs, noting that past long-term transmission planning studies have done a questionable job at forecasting future needs.[461]

185.    Other commenters, however, note that the NOPR proposal includes measures that mitigate the uncertainty inherent in longer-term regional transmission planning.[462]  For example, New Jersey Commission states that the proposed requirements to develop multiple scenarios and perform reassessments mitigates the uncertainty inherently present in a 20-year transmission planning horizon.[463]  Additionally, several commenters rebut

---

[460] NRECA Initial Comments at 18-19.

[461] NRG Initial Comments at 8.

[462] New Jersey Commission Initial Comments at 10-11; PIOs Initial Comments at 15-16.

[463] New Jersey Commission Initial Comments at 10-11.

opposition to Long-Term Regional Transmission Planning based on concerns that it presents unreasonable levels of uncertainty.[464]  For example, SREA and Clean Energy Buyers assert that periodic updates of forecasts and scenarios will help to mitigate uncertainty.[465]

186.    Policy Integrity further explains that future uncertainty is exactly why long-term scenario planning is necessary to ensure just and reasonable rates.  Policy Integrity states that the current transmission planning process uses deterministic modeling that does not account for the changing world, which will not lead to the development of efficient or cost-effective transmission solutions.  Policy Integrity asserts that, in contrast, long-term scenario planning will allow transmission planners to be prepared for changes.[466]  Policy Integrity argues that any forward-looking decision will have a degree of uncertainty, but that the risk posed by uncertainty can be mitigated and managed by using a portfolio evaluation of costs and benefits.[467]  Policy Integrity further argues that ignoring the uncertainty surrounding the energy transition runs its own risk of failing to build transmission that can be useful to meet needs in the short, medium, and long term.[468]

---

[464] Clean Energy Buyers Reply Comments at 8; Policy Integrity Reply Comments at 2; SREA Reply Comments at 21-24.

[465] Clean Energy Buyers Reply Comments at 8; SREA Reply Comments at 23.

[466] Policy Integrity Reply Comments at 2.

[467] *Id.* at 3-4.

[468] *Id.* at 4.

f.    **Concerns Regarding Incentives for Resource Development**

187.    Vistra asserts that it is critical for Commission policy to maintain interconnection cost signals to drive cost-effective generation siting choices.[469]  Vistra also argues that a policy that assigns all interconnection-related network upgrade costs, or even a disproportionately high share, to load undermines the incentive that generation developers currently have to site new projects in locations that minimize the related transmission upgrade costs.[470]

188.    In contrast, New Jersey Commission argues that requiring individual interconnecting generators to pay for piecemeal interconnection-related network upgrades does not necessarily encourage developers to make siting decisions that minimize the overall cost of integrating large amounts of new generation.[471]  Likewise, Clean Energy Associations state that robust, proactive regional transmission planning will better incent efficient siting decisions, because generators will evaluate the likely costs of interconnection facilities that ensure deliverability to the grid, rather than more broadly beneficial transmission facilities.[472]

---

[469] Vistra Initial Comments at 7.

[470] *Id.* at 7-8.

[471] New Jersey Commission Reply Comments at 7.

[472] Clean Energy Associations Reply Comments at 9 (citing ACEG 2021 Interconnection Report at 15).

Docket No. RM21-17-000                                                   - 163 -

### g.  Comments Regarding Definition of Long-Term Regional Transmission Facility

189.    PJM states that the Commission should clarify certain details of the NOPR

proposal, including the meaning of the word "identified" in the proposed definition of

Long-Term Regional Transmission Facility.[473]  In addition, PJM requests that the

Commission clarify that if a transmission project shows up in several Long-Term

Scenarios but is not selected until it reaches one of the shorter-term reliability and market

efficiency transmission planning processes, that project would not be considered a Long-

Term Regional Transmission Facility for selection and cost allocation purposes.[474]

Otherwise, PJM contends, the rules for selection and cost allocation for transmission

projects selected in the shorter-term and intermediate-term reliability and market

efficiency transmission planning processes will be unclear, leading to re-litigation.[475]

### h.  Challenges to Commission Jurisdiction or Authority

### i.  FPA section 201

190.    Some commenters argue that the NOPR proposals exceed the Commission's

jurisdiction or that the Commission otherwise lacks the authority to adopt a final rule in

this proceeding.  Of these commenters, most contend that the NOPR proposal interferes

with authority reserved to the states under FPA section 201.[476]

---

[473] PJM Initial Comments at 8, 98.

[474] *Id.* at 99.

[475] *Id.* at 99, 101.

[476] Alabama Commission Initial Comments at 3-4, 7-8; Kansas Ratepayer
Advocates Reply Comments at 2-3; Louisiana Commission Initial Comments at 5, 8-9,

191.    Some commenters argue that the NOPR proposal intrudes on the authority

reserved to the states under FPA section 201 over integrated resource planning processes

or resource mix decision making.[477]  For example, Alabama Commission states that the

NOPR proposal for Long-Term Regional Transmission Planning would intrude on state

integrated resource planning to the extent that it dictates the construction of facilities

through a top-down regional process or seeks to influence or mandate a substantive

change to the generation resource mix.[478]  Similarly, Nevada Commission argues that the

NOPR may impact states' authority to determine their own mix of generating resources.

Nevada Commission contends that the NOPR may cross the line from regulating

interstate transmission to regulating intrastate processes—particularly because the

Commission has not asserted jurisdiction over bundled retail transmission.[479]  Louisiana

---

27-28; Louisiana Commission Reply Comments at 14-15; Mississippi Commission Initial
Comments at 3, 5-6; Mississippi Commission Reply Comments at 2; Nevada
Commission Initial Comments at 2-3, 6; SERTP Sponsors Initial Comments at 5, 15-19
& n.20; SERTP Sponsors Reply Comments at 12-13; Southern Initial Comments at 3-8,
12-13, 15-24; Southern Reply Comments at 3, 6-7; Utah Commission Initial Comments
at 7-9; Undersigned States Reply Comments at 2, 4-5.

[477] Alabama Commission Initial Comments at 3-4, 7-8; Kansas Ratepayer
Advocates Reply Comments at 2; Louisiana Commission Initial Comments at 8-9, 27-28;
Louisiana Commission Reply Comments at 14-15; Mississippi Commission Initial
Comments at 3 (citing NOPR, 179 FERC ¶ 61,028 (Christie, Comm'r, concurring, at
P 2)); Nevada Commission Initial Comments at 2-3; SERTP Sponsors Initial Comments
at 5, 15-19 & n.20; SERTP Sponsors Reply Comments at 12-13; Southern Initial
Comments at 3-8, 12-13, 15-24; Southern Reply Comments at 3, 6-7; Utah Commission
Initial Comments at 7-9; Undersigned States Reply Comments at 2, 4-5.

[478] Alabama Commission Initial Comments at 3-4, 7-8.

[479] Nevada Commission Initial Comments at 2-3.

Commission argues that the Commission should not override state jurisdiction on resource planning, fuel type, and siting decisions, along with the regulation of retail rates.[480]

192.    Mississippi Commission requests that the Commission acknowledge that it cannot force regional planning entities to indirectly act as a national integrated resource planner.[481]  SERTP Sponsors and Southern argue that the NOPR essentially constitutes a Commission-regulated integrated resource plan/request for proposal process and that, to be workable, Long-Term Regional Transmission Planning instead must be based on state commission-regulated integrated resource planning/request for proposal decisions.[482] SERTP Sponsors and Southern contend that the NOPR proposed to require transmission providers to make independent resource and load decisions because:  (1) state integrated resource plans are just one of many factors to be considered in developing Long-Term Scenarios; and (2) state integrated resource planning or request for proposal processes generally use a 10-year planning horizon such that there are no state-approved resources for the second half of the NOPR's proposed 20-year transmission planning horizon.[483]

---

[480] Louisiana Commission Initial Comments at 27-28; Louisiana Commission Reply Comments at 14-15.

[481] Mississippi Commission Initial Comments at 3 (citing NOPR, 179 FERC ¶ 61,028 (Christie, Comm'r, concurring, at P 2)).

[482] SERTP Sponsors Initial Comments at 15-16; SERTP Sponsors Reply Comments at 12-13; Southern Initial Comments at 4-5, 7, 15-16; Southern Reply Comments at 6-7.

[483] SERTP Sponsors Initial Comments at 16; Southern Initial Comments at 12-13.

SERTP Sponsors and Southern further argue that, in upholding Order No. 1000, the D.C.

Circuit emphasized that the Commission was regulating the transmission planning

process and not mandating any particular outcome, and that, if the Commission

prescribes a process that supplants state decision making, it will have crossed the line into

prescribing substantive outcomes and thus exceeded its jurisdiction.[484]

193.   Ohio Commission Federal Advocate contends that the NOPR appears designed to

target the achievement of narrow environmental policy objectives or the socialization of

transmission costs, not to ensure reliability or foster just and reasonable rates.[485]

Southern and Utah Commission state that the Commission has consistently recognized

that the FPA does not allow the Commission to pick winners and losers when it comes to

generation and argue that the Commission has no authority to favor one generation mix

over another.[486]   Similarly, Louisiana Commission, Kansas Ratepayer Advocates, and

Undersigned States contend that the Commission lacks the statutory authority to dictate

states' generation resource decisions.  They argue instead that each state possesses such

authority and is uniquely qualified to choose the generation resources that are needed to

economically meet ratepayers' electric service needs within their states.[487]

---

[484] SERTP Sponsors Initial Comments at 19; Southern Initial Comments at 23-24 (citing Order No. 1000, 136 FERC ¶ 61,051 at P 154).

[485] Ohio Commission Federal Advocate Initial Comments at 4-6.

[486] Southern Initial Comments at 23 (citing *ISO New England Inc.*, 162 FERC ¶ 61,205, at P 26 (2018)); Utah Commission Initial Comments at 7-9.

[487] Louisiana Commission Initial Comments at 8-10 (citing *Monongahela Power Co.*, 40 FERC ¶ 61,256, at 61,861 (1987); *Pac. Gas & Elec. Co. v. State Energy Res.*

194.    SERTP Sponsors and Southern argue that, even if assumptions about the resource

mix included in Long-Term Scenarios do not bind states, requiring transmission

providers to develop Long-Term Scenarios that are predicated on particular resource

assumptions effectively makes a substantive resource decision because it favors the

assumed resource mix over others.[488]  SERTP Sponsors and Southern contend that this is

akin to the Commission attempting to accomplish indirectly what it could not directly.[489]

SERTP Sponsors argue that the Commission should support the exercise of traditional

state resource and infrastructure planning authority rather than supplant it.[490]  North

Carolina Commission and Staff argue that the use of the production cost savings benefit

in Long-Term Regional Transmission Planning "could conflict with state-jurisdictional

resource decisions."[491]

195.    Other commenters disagree with these contentions and argue that the NOPR

proposal would not intrude on states' reserved authority over resource mix decision

_____

*Conservation & Dev. Comm'n*, 461 U.S. 190, 212 (1983)); Kansas Ratepayer Advocates
Reply Comments at 2; Undersigned States Reply Comments at 2, 4-5 (citing *Pac. Gas &
Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. at 205).

[488] SERTP Sponsors Initial Comments at 17 n.20; Southern Initial Comments
at 19.

[489] SERTP Sponsors Initial Comments at 17 n.20; Southern Initial Comments at
18.

[490] SERTP Sponsors Initial Comments at 17, 19; *see also* Undersigned States
Reply Comments at 5, 8 (citing *Am. Gas Ass'n v. FERC*, 912 F.2d 1496, 1510 (D.C. Cir.
1990)).

[491] North Carolina Commission and Staff Initial Comments at 7.

making or integrated resource plan processes.[492]  Kentucky Commission Chair Chandler

and SEIA argue that the NOPR's stated aim of reforming regional and interregional

transmission planning processes does not foreclose states' decision making on

generation.[493]  ACEG contends that the NOPR does not propose or purport to regulate the

electric supply mix and that the Commission is acting squarely within its authority under

the FPA's cooperative federalism structure.[494]  AEE notes that the Commission included

integrated resource planning and utility load-serving planning as a factor driving

transmission needs and argues that none of the requirements proposed by the

Commission directly conflict with integrated resource planning processes, require that

integrated resource planning be conducted on a different timeline, or override resource

planning efforts.[495]  Likewise, Kentucky Commission Chair Chandler reiterates that

Kentucky's integrated resource plans are not driving transmission planning processes in

the state.  He explains that integrated resource plans/requests for proposals are not the

basis for generation investment decisions, but the state's requests for proposals seek

generation proposals after the integrated resource planning process is complete and a

---

[492] ACEG Reply Comments at 15; AEE Reply Comments at 23; New Jersey
Commission Reply Comments at 2; Kentucky Commission Chair Chandler Reply
Comments at 3; SEIA Reply Comments at 2-3.

[493] Kentucky Commission Chair Chandler Reply Comments at 3; SEIA Reply
Comments at 2-3.

[494] ACEG Reply Comments at 15.

[495] AEE Reply Comments at 23.

need for generation is identified.[496]  In response to Alabama Commission's arguments

that the NOPR's proposed rules have the potential to encroach on state-jurisdictional

integrated resource planning and resource procurement processes overseen by Alabama

Commission, SREA contends that Alabama Commission in fact does not have a formal

integrated resource planning process upon which the Commission could encroach.[497]

196.    New Jersey Commission disagrees with commenters who argue that the

Commission intends to impose a preferred resource mix on the nation by overriding state

choices and contends that such arguments are "profoundly misconstruing" the nature of

the NOPR proposal and what the Commission aims to achieve.[498]  Instead, New Jersey

Commission argues that Long-Term Regional Transmission Planning would address

transmission needs that are being driven by state policies, market decisions, and

technological changes, all of which reflect consumer-driven demand for cleaner

electricity.[499]  New Jersey Commission contends that the NOPR proposal would ensure

that transmission needs are reliably met at a total cost that is just and reasonable, which

New Jersey Commission argues is required—not precluded—by the FPA.[500]

---

[496] Kentucky Commission Chair Chandler Reply Comments at 6.

[497] SREA Reply Comments at 2-3.

[498] New Jersey Commission Reply Comments at 1-2.

[499] *Id.* at 2.

[500] *Id.*

197.   Some commenters argue that the NOPR proposal would intrude on authority over siting and construction of transmission facilities that is reserved to the states under FPA section 201.[501]  For example, Southern argues that the FPA reserves transmission siting authority to the states and that the final rule should not directly or indirectly interfere with this authority.[502]  Alabama Commission argues that Long-Term Regional Transmission Planning would interfere with state authority to the extent it dictates the construction of facilities through a top-down regional process.[503]  Kansas Ratepayer Advocates state that the Commission would exceed its authority and violate states' constitutional rights by ordering states to construct interregional transmission facilities with construction costs paid by retail ratepayers in Kansas.[504]

198.   Nevada Commission explains that Nevada law governs the issuance of permits to construct transmission facilities, and that such facilities—even where their costs are not intended to be recovered through retail rates—must go through and may not bypass that process in favor of regional transmission planning processes.[505]  NARUC contends that state participation in cost allocation for a portfolio of Long-Term Regional Transmission

---

[501] Alabama Commission Initial Comments at 7; Kansas Ratepayer Advocates Reply Comments at 3; NARUC Initial Comments at 29; Nevada Commission Initial Comments at 2-3; Southern Initial Comments at 21-22.

[502] Southern Initial Comments at 21-22.

[503] Alabama Commission Initial Comments at 7.

[504] Kansas Ratepayer Advocates Reply Comments at 3.

[505] Nevada Commission Initial Comments at 2-3.

Facilities does not require a state, in its role as a transmission siting authority, to approve any projects within the portfolio.[506]

199.    A few commenters argue that the NOPR proposal would intrude on the authority over certain transmission planning allegedly reserved to the states under FPA section 201.  For example, Mississippi Commission states that the final rule must respect state jurisdictional authority over planning and approval of transmission facilities used to serve state load.[507]  Nevada Commission states that Nevada will continue to plan for transmission through its integrated resource planning process and that the Commission should allow "bottom up" transmission planning, particularly in non-RTO/ISO transmission planning regions.[508]

200.    In contrast, other commenters express support for the Commission's role in transmission planning.  Ohio Consumers argue that the Commission has authority over transmission planning, even in states like Ohio that allow for retail consumer choice.[509]  SREA explains that states and other jurisdictional regulators will continue to have ultimate control over generation resource planning and transmission planning, regardless

---

[506] NARUC Initial Comments at 29.

[507] Mississippi Commission Initial Comments at 5 (citing Mississippi Commission ANOPR Comments at 2, 17; NOPR, 179 FERC ¶ 61,028 (Christie, Comm'r, concurring at PP 2, 11-14)).

[508] Nevada Commission Initial Comments at 6.

[509] Ohio Consumers Initial Comments at 26 (citing *New York v. FERC*, 535 U.S. at 23-24, 26-28).

of what a regional transmission body proposes. SREA states that, even within RTO/ISO regions, "transmission or generation resource plans are subject to review, update or even cancellation, and those decisions are always determined by the relevant regulatory bodies."[510] Vistra states that any final rule should recognize the legal and practical boundaries on the Commission's role in transmission development and in shaping the generation sector. According to Vistra, the Commission has successfully relied on its general authority under FPA sections 205 and 206 to oversee rates, terms, and conditions of jurisdictional service as the basis for its policies on transmission planning.[511]

201.    Finally, Mississippi Commission argues that the NOPR proposal may infringe upon states' reserved authority under FPA section 201 to make resource adequacy decisions. Mississippi Commission explains that, when an RTO/ISO approves construction to deliver generation output to remote utilities that have failed to agree to purchase the energy, that RTO/ISO infringes on the state's resource adequacy jurisdiction.[512] Mississippi Commission contends that requiring State A to pay for transmission upgrades to rely on energy generated in State B, despite State A having constructed its own generation facilities, would usurp State A's resource adequacy jurisdiction.[513]

---

[510] SREA Reply Comments at 1-2.

[511] Vistra Initial Comments at 4 & n.6.

[512] Mississippi Commission Initial Comments at 5-6.

[513] *Id.* at 13.

Docket No. RM21-17-000                                                                          - 173 -

## ii.    **"Major Questions Doctrine"**

202.    Some commenters argue that the NOPR proposal would not withstand judicial

review under the major questions doctrine.[514]

203.    Louisiana Commission claims that the NOPR proposal violates principles of

"agency law" and the separation of powers doctrine because Congress has not clearly

delegated to the Commission the authority to enact far-reaching, nationwide policy

changes favoring one form of generation over another.[515]  Louisiana Commission

contends that the NOPR proposals exceed the limits of the FPA, which does not provide

clear delegated authority for the Commission to decide types of generating resources.

Louisiana Commission argues that the Commission therefore lacks the authority to

determine whether the country should undergo a clean energy transition.  Drawing

parallels between the NOPR proposal and the U.S. Supreme Court's decision in *West

Virginia v. EPA*, Louisiana Commission avers that the determination of what type of

generating resources should be transmitted from where in the United States qualifies as a

"major question" of public policy that Congress should order.[516]

---

[514] Louisiana Commission Initial Comments at 6, 12-13; Ohio Consumers Reply
Comments at 14; SERTP Sponsors Initial Comments at 17-18; Southern Initial
Comments at 20-21; Utah Commission Initial Comments at 8-9; Undersigned States
Reply Comments at 3-4.

[515] Louisiana Commission Initial Comments at 6.

[516] *Id.* at 12 (citing 597 U.S. 697, 729-30, 735).

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 184 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                          - 174 -

204.    SERTP Sponsors argue that *West Virginia v. EPA* reinforces the need for the

Commission to exercise restraint in expanding its jurisdiction without a clear

Congressional delegation of authority.[517]  According to SERTP Sponsors, *West Virginia*

*v. EPA* makes clear that the nation's energy policy and generation mix is a "major

question" for which the Commission must have direct authorization from Congress to

assert jurisdiction.[518]  SERTP Sponsors contend that Congress has not clearly provided

the Commission with jurisdiction to presuppose generation decisions and thereby effect

particular substantive transmission outcomes.[519]  Rather, SERTP Sponsors argue that

Congress instead expressly and unequivocally reserved generation authority to the

states.[520]

205.    Southern similarly argues that *West Virginia v. EPA* makes clear that the nation's

energy policy and generation mix is a "major question" that requires more than a "merely

plausible textual basis" for a federal agency to assert jurisdiction.[521]  Southern contends

that, as applied to the NOPR proposal's "contemplated foray into [integrated resource

---

[517] SERTP Sponsors Initial Comments at 17 (citing *West Virginia v. EPA*, 597 U.S. at 723); *see also* EEI Initial Comments at 8 (urging the Commission to consider the overlap of the Commission's and state commissions' respective jurisdictions).

[518] SERTP Sponsors Initial Comments at 17-18.

[519] *Id.* at 18.

[520] *Id.*

[521] Southern Initial Comments at 20-21 (citing *West Virginia v. EPA*, 597 U.S. at 723).

Docket No. RM21-17-000                                                      - 175 -

planning] and generation/resource matters," the Commission does not rely upon a

specific and clear grant of congressional authorization but instead relies upon its

"general, gap-filling authorization in FPA Section 206 to regulate a 'practice' affecting a

rate or charge for transmission."[522]  Southern contends that rather than provide clear

congressional authorization, Congress instead reserved authority over integrated resource

plans and generation to the states.[523]

206.    Utah Commission argues that the Commission has no authority to enact any rule

for the purpose of influencing the resource generation mix or expanding development of

any type of generation.  Utah Commission states that the increased development and

integration of renewable generation is a "highly charged political question and a matter of

significant political interest about which state legislatures have made very different

policy choices."  As such, Utah Commission argues that, although courts have given the

Commission "some latitude under FPA Section 206," the U.S. Supreme Court will not

uphold a final rule premised upon the Commission's "claimed authority to prescribe a

single, onerous national regime for transmission planning specifically intended to

pressure transmission providers to select costly expansions into remote areas for the

purpose of realizing [the Commission's] preferred generation mix, a matter specifically

reserved to the states."[524]  Utah Commission explains that the Supreme Court's reasoning

---

[522] *Id.*

[523] *Id.* at 21.

[524] Utah Commission Initial Comments at 8.

Docket No. RM21-17-000                                                                - 176 -

in *West Virginia v. EPA* is applicable to the Commission.  Utah Commission argues that

"imposing a single set of federally mandated, highly prescriptive transmission planning

and cost allocation requirements for the purpose of privileging the selection of costly

transmission projects to serve remote and speculative renewable generation is not a

lawful exercise of [the Commission's] authority under FPA Section 206."[525]

207.    Undersigned States argue that "[n]ational-scale energy grid regulation" is a "major

question" because of the "massive economic consequences" involved and the implication

of a "unique and complex jurisdictional divide between [s]tate and federal regulatory

authority."[526]  According to Undersigned States, the Commission "has no statutory

authority at all—much less 'clear congressional authorization'—to revamp the energy

grid's mix of generation resources writ large."[527]

208.    Harvard ELI and Policy Integrity disagree with Undersigned States.  They argue

that Undersigned States "mischaracterize the NOPR" because the NOPR would not

revamp the energy grid's mix of generation resources.  Rather, according to Harvard ELI

and Policy Integrity, the NOPR would require utilities to amend their existing regional

---

[525] *Id.* at 8-9 (citing *West Virginia v. EPA*, 597 U.S. at 729-30).

[526] Undersigned States Reply Comments at 3 (citing *West Virginia v. EPA*, 597 U.S. 697; *Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 764 (2021)).

[527] *Id.* at 4 (quoting *West Virginia v. EPA*, 597 U.S. at 723).

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 187 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                                  - 177 -

transmission planning processes in response to changes in the resource mix and demand that are occurring because of factors unrelated to the NOPR.[528]

209.    Harvard ELI and Policy Integrity also contend that Undersigned States overlook the major questions doctrine's key requirements.  They assert that application of the major questions doctrine does *not* turn on whether a regulation will have significant economic effects or intrudes on areas traditionally regulated by states.  Instead, Harvard ELI and Policy Integrity assert that the major questions doctrine is triggered only when an agency's action is both unheralded and transformative.[529]

210.    Harvard ELI and Policy Integrity argue that the NOPR is not unheralded.  They explain that Order No. 1000 similarly regulated transmission planning and cost allocation in response to concerns about the generation mix, and that the D.C. Circuit upheld Order No. 1000 while rejecting arguments similar to those that Undersigned States make here.[530]  Moreover, Harvard ELI and Policy Integrity identify provisions in existing tariffs that are similar to those that the NOPR proposes and point to other antecedents for Commission regulation of regional transmission planning.[531]

---

[528] Harvard ELI and Policy Integrity Supplemental Comments at 2.

[529] *Id.* at 2-3.

[530] *Id.* at 4 (citing *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d at 48-49; Order No. 1000, 136 FERC ¶ 61,051 at PP 45, 47).

[531] *Id.* at 4-5; *id.* app. A.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 188 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000    - 178 -

211.    Likewise, Harvard ELI and Policy Integrity argue that the NOPR does not represent a transformative expansion in the Commission's authority nor a "fundamental change to the statutory scheme."[532]  Instead, they assert that the NOPR merely builds on existing regional transmission planning processes to ensure that Commission-jurisdictional rates remain just and reasonable, as the FPA requires.[533]

### iii.    "Equal Sovereignty Doctrine"/Cross-Subsidization

212.    Some commenters argue that the NOPR's cost allocation proposal impermissibly requires states to subsidize other states' public policies.[534]  Undersigned States argue that the NOPR would exceed the Commission's jurisdiction because it violates the Constitution's equal sovereignty doctrine, which provides constitutional equality among the states.[535]  According to Undersigned States, the NOPR "sets up a scheme where one [s]tate can effectively require other [s]tates to subsidize their own vision of what resources should be used in electricity generation—a core, sovereign [s]tate function," which risks "undue discrimination" among states.[536]  Mississippi Commission argues that

---

[532] *Id.* at 6-7 (quoting *West Virginia v. EPA*, 597 U.S. at 723 (internal quotations omitted)).

[533] *Id.*

[534] Alabama Commission Initial Comments at 9; Louisiana Commission Initial Comments at 29; Mississippi Commission Reply Comments at 3; Ohio Commission Federal Advocate  Initial Comments at 4-5; Ohio Consumers Reply Comments at 14.

[535] Undersigned States Reply Comments at 5-6 (citing *Coyle v. Smith*, 221 U.S. 559, 567 (1911)).

[536] *Id.* at 6 (citing NOPR, 179 FERC ¶ 61,028, Danly, Comm'r, dissenting, at PP 4-5).

unanimous agreement, rather than majority agreement, would be required for any *ex ante* default cost allocation method, as each state has sole jurisdiction within its boundaries.[537]

213.    Louisiana Commission asserts that "*group* state oversight" is not equivalent to "state oversight," and that the Commission should not adopt a rule that subjects one state's will to majority override.  Louisiana Commission further argues that the Commission should not enact rules that would "impose costs for projects selected under the proposed long-term planning criteria on unwilling states that do not benefit from those projects, even if those states are in the minority."  Louisiana Commission contends that the Commission should not attempt to override state jurisdiction simply because a majority of states in a region may support imposing costs on unwilling states that do not benefit from transmission projects favored by the majority.[538]  Louisiana Commission argues that states should not be required to cede their jurisdiction by engaging in any "consulting" committee structure required with respect to Long-Term Regional Transmission Planning,[539] because granting each state one vote in a multi-state body cannot replace the meaningful exercise of state jurisdiction within a state's borders.[540]

---

[537] Mississippi Commission Reply Comments at 2-3.

[538] Louisiana Commission Initial Comments at 27-28; Louisiana Commission Reply Comments at 14-16.

[539] Louisiana Commission Initial Comments at 28-29.

[540] Louisiana Commission Reply Comments at 16.

Docket No. RM21-17-000                                                         - 180 -

214.    Conversely, ACEG disputes these claims, which ACEG states are "incorrect and misconstrue the NOPR."[541]  ACEG highlights the fact that the NOPR does not include resource preferences in its proposed planning criteria, factors, or benefits, nor does the NOPR exclude consideration of non-renewable resources from transmission planning.[542]  ACEG further notes that the NOPR proposes to direct transmission planners to plan the system to "meet transmission needs driven by changes in the resource mix and demand," requiring transmission planners to consider the resource mix as a whole, which necessarily requires considering all types of resources.[543]  New Jersey Commission agrees, stating that the Commission did not propose in the NOPR "to unduly favor, mandate, or subsidize forms of generation," but rather "to ensure that the bulk electricity system maintains reliability and satisfies evolving consumer demands, whether driven by public policy requirements or voluntary goals, at the lowest reasonable cost."[544]  Moreover, New Jersey Commission argues, allocating the cost of Long-Term Regional Transmission Facilities only to those states with relevant public policy goals "would allow the remaining states to free ride, and effectively force the states with public policy

---

[541] ACEG Reply Comments at 18.

[542] *Id.* at 18-19.

[543] *Id.* at 19.

[544] New Jersey Commission Initial Comments at 3.

Docket No. RM21-17-000                                                      - 181 -

goals to subsidize the provision of normal electricity service in other states in order to
pursue their own policies."[545]

### i. Other Issues

215.    NRECA requests that the Commission clarify that the final rule, consistent with
the Commission's obligation under FPA section 217(b)(4), "is intended to facilitate and
support 'bottom-up' transmission planning to meet the transmission needs of [load-
serving entities] to provide reliable and economical service to consumers."[546]

216.    Some commenters argue that the final rule will not withstand judicial scrutiny if it
does not permit regional flexibility.[547]  For example, US Chamber of Commerce explains
that the interstate power grid includes investor-owned utilities, publicly-owned utilities,
and electric cooperatives, which can be members of RTOs/ISOs, power pooling
arrangements, joint-ownership agreements, or subject to traditional vertically-integrated
structures.[548]  According to US Chamber of Commerce, imposing a new regional
transmission planning regime on all these various entities would ignore the compromises
and benefits that led to the status quo.[549]  Relatedly, Southern and SERTP Sponsors argue

---

[545] *Id.* at 20.

[546] NRECA Initial Comments at 17-21.

[547] SERTP Sponsors Initial Comments at 1; SERTP Sponsors Reply Comments at
1-2; Southern Initial Comments at 1; Southern Reply Comments at 3; US Chamber of
Commerce Initial Comments at 4.

[548] US Chamber of Commerce Initial Comments at 4.

[549] *Id.*

that the legal viability of the final rule will be threatened if the Commission fails to respect the FPA's fundamental jurisdictional roles by not providing states and transmission providers with the opportunity and flexibility to adapt their planning processes.[550]

### j.    Miscellaneous Concerns

217.    MISO seeks clarification from the Commission that the term "transmission planning region" has the same meaning as in Order No. 1000, where MISO may comprise a single transmission planning region despite including multiple transmission zones or local balancing authorities.[551]

218.    California Municipal Utilities state that transmission planning should not be a vehicle to centralize resource choices, but instead should reflect the choices made by state and local authorities.[552]  Similarly, Mississippi Commission argues that Long-Term Regional Transmission Planning should be driven by state-specific concerns and needs and that regional priorities should be subordinated to state priorities.[553]  Mississippi Commission asks that the Commission not issue a final rule but instead establish proceedings to address specific concerns with certain regional transmission planning

---

[550] Southern Initial Comments at 1; Southern Reply Comments at 3; SERTP Sponsors Initial Comments at 1; SERTP Sponsors Reply Comments at 1-2.

[551] MISO Initial Comments at 24.

[552] California Municipal Utilities Reply Comments at 2.

[553] Mississippi Commission Initial Comments at 3.

Docket No. RM21-17-000                                                    - 183 -

processes on a more limited basis.[554]  Southern argues that Long-Term Regional

Transmission Facilities in non-RTO/ISO transmission planning regions must have the

support of affected states, as these facilities stem from resource and load assumptions that

are not the result of those states' planning and procurement processes.[555]  Southern urges

the Commission to maintain the appropriate transmission planning and state-driven

supply- and demand-side relationships, which Order No. 1000 preserved.[556]  SERTP

Sponsors argue that the Commission should avoid mandates that could largely result in

transmission expansion or infrastructure decisions that lead to investments borne, largely,

by retail electricity consumers that lack the consent and support of the state authorities

vested with the responsibility to protect those consumers.[557]

219.    Several commenters agree with the Commission that any final rule should apply to

transmission providers in both RTO/ISO and non-RTO/ISO transmission planning

regions.[558]  However, several commenters disagree and argue that the final rule, or certain

specified requirements in the final rule, should apply only to RTO/ISO transmission

---

[554] *Id*. at 9.

[555] Southern Initial Comments at 8.

[556] *Id*. at 12.

[557] SERTP Sponsors Initial Comments at 6-7.

[558] *See, e.g.*, AEE Reply Comments at 11; MISO Reply Comments at 3; PIOs
Reply Comments at 2-3; SEIA Reply Comments at 5; SREA Initial Comments at 47;
TAPS Initial Comments at 70.

Docket No. RM21-17-000                                                    - 184 -

planning regions.[559]  Nevada Commission argues that the RTOs/ISOs "may be better

suited" than other regions for the transmission planning that the NOPR proposes.[560]  Utah

Division of Public Utilities stresses the need for regional flexibility, noting that

transmission providers located outside of RTOs/ISOs already coordinate on transmission

planning with many non-Commission-jurisdictional entities.[561]

220.    SEIA rebuts the claims of Southern and Louisiana, Utah, Mississippi, and

Alabama Commissions that state planning processes already interact well with

transmission planning and support customers' transmission needs.[562]  SEIA and SREA

assert that non-RTO/ISO transmission planning regions do not engage in sufficient or

transparent transmission planning.[563]  Specifically, SEIA states, the transmission planning

processes in non-RTO/ISO regions are rife with issues, including the use of inconsistent

and inaccurate data and an exclusionary and insufficiently transparent process.[564]

Further, SEIA states that the end result of an integrated resource planning process may be

---

[559] *See, e.g.*, Mississippi Commission Initial Comments at 16; Utah Division of Public Utilities Reply Comments at 1-2.

[560] Nevada Commission Initial Comments at 2-4.

[561] Utah Division of Public Utilities Reply Comments at 1-2.

[562] SEIA Reply Comments at 5.

[563] *Id*.; SREA Reply Comments at 15-17.

[564] SEIA Reply Comments at 5-6.

based on inconsistent and inaccurate data,[565] the process is "sometimes disjointed,"[566] and the process is a voluntary process in which the planning authority must accept, and not verify, the information provided.[567]

221.     SREA rebuts Southern's contention that Southern's transmission planning processes are adequate, noting that Southern itself has presented testimony to the Georgia Commission conceding that it is unable to perform more robust transmission planning due to limitations in its software and models.[568]  SREA argues that throughout the Southeast, transmission planning is not a priority and that integrated resource planning is not a substitute for robust transmission planning.[569]  SREA explains that the NOPR borrows many of the qualities of integrated resource planning and applies them to transmission planning, including scenario-based evaluation and use of 20-year planning horizons, and that many states have integrated resource planning rules and guidelines that recognize the value of long-term planning.[570]

---

[565] *Id*. at 5 (citing Western PIOs Initial Comments at 10).

[566] *Id.* (citing PacifiCorp and NV Energy Initial Comments at 10).

[567] *Id.* (citing PacifiCorp and NV Energy Initial Comments at 13; Western PIOs Initial Comments at 11).

[568] SREA Reply Comments at 7 (citing SREA Initial Comments, attach. B (Testimony of Georgia Power Witness Robinson) at 282-283).

[569] *Id.* at 5.

[570] *Id*.

222. EPSA states that the Commission should focus not on socializing transmission costs but on reducing transaction costs, accelerating lagging processes, and adopting market-based solutions like open seasons.[571]

223. GridLab states that there is evidence to suggest that changes in resource mix, demand, and weather will lead to significant changes in the value of regional transmission facilities in the 2030s, though GridLab asserts that these changes may increase or decrease the value of regional transmission facilities. Accordingly, GridLab recommends that the Commission and stakeholders resist evaluating the success of this rulemaking based on arbitrary metrics related to each transmission provider's expansion of regional transmission facilities.[572]

### 3.    <u>Commission Determination</u>

#### a.    <u>Participation in Long-Term Regional Transmission Planning</u>

224. We adopt the NOPR proposal to require transmission providers in each transmission planning region to participate in a regional transmission planning process that includes Long-Term Regional Transmission Planning, meaning regional transmission planning on a sufficiently long-term, forward-looking, and comprehensive basis to identify Long-Term Transmission Needs, identify transmission facilities that meet such needs, measure the benefits of those transmission facilities, and evaluate those

---

[571] EPSA Initial Comments at 7-8.

[572] GridLab Initial Comments at 9-10.

transmission facilities for potential selection in the regional transmission plan for purposes of cost allocation as the more efficient or cost-effective transmission facilities to meet Long-Term Transmission Needs.[573]  We also adopt the NOPR proposal to require that Long-Term Regional Transmission Planning comply with the following existing Order Nos. 890 and 1000 transmission planning principles:  (1) coordination; (2) openness; (3) transparency; (4) information exchange; (5) comparability; and (6) dispute resolution.[574]  In developing their compliance filings, transmission providers and stakeholders should review the requirements set forth in Order No. 890 and Order No. 1000, and the Commission's orders on compliance filings submitted by transmission providers, for guidance as to what each of these transmission planning principles requires.  For example, as a starting point, a transmission provider should review the orders addressing its own Order Nos. 890 and 1000 compliance filings and the compliance filings for transmission providers in its transmission planning region.

225.   We also adopt specific requirements regarding how transmission providers must conduct Long-Term Regional Transmission Planning.  Specifically, and as discussed

---

[573] We note that, while we have modified this definition of Long-Term Regional Transmission Planning from the NOPR proposal, the modified definition does not substantively change the steps involved in Long-Term Regional Transmission Planning from those proposed in the NOPR.  Rather, the revised definition merely clarifies the steps that transmission providers must take in conducting Long-Term Regional Transmission Planning.

[574] Order No. 1000, 136 FERC ¶ 61,051 at PP 146, 151.  We do not address these principles in detail here.

further below, we require transmission providers in each transmission planning region[575]

to: (1) identify Long-Term Transmission Needs and Long-Term Regional Transmission

Facilities to meet those needs through the development of Long-Term Scenarios[576] that

satisfy the requirements set forth in this final rule; (2) use and measure, at a minimum, a

set of seven required benefits[577] to evaluate Long-Term Regional Transmission Facilities

over a time horizon that covers, at a minimum, 20 years starting from the estimated in-

service date of each transmission facility; and (3) evaluate Long-Term Regional

Transmission Facilities to determine whether they are more efficient or cost-effective

transmission solutions to meet Long-Term Transmission Needs and use selection criteria

(in collaboration with states and other stakeholders) that provide the opportunity for

transmission providers to select such Long-Term Regional Transmission Facilities.

---

[575] In response to MISO's request, MISO Initial Comments at 24, we clarify that this final rule does not alter the meaning of "transmission planning region" as used in Order No. 1000. A transmission planning region is one in which transmission providers, in consultation with stakeholders and affected states, have agreed to participate for purposes of regional transmission planning and development of a single regional transmission plan. Order No. 1000-A, 139 FERC ¶ 61,132 at P 272; Order No. 1000, 136 FERC ¶ 61,051 at P 160.

[576] The requirements related to Long-Term Scenarios are discussed below.

[577] As discussed further below in the Evaluation of the Benefits of Regional Transmission Facilities section, these seven benefits are: (1) Benefit 1, Avoided or Deferred Reliability Transmission Facilities and Aging Transmission Infrastructure Replacement; (2) Benefit 2(a), Reduced Loss of Load Probability, or Benefit 2(b), Reduced Planning Reserve Margin; (3) Benefit 3, Production Cost Savings; (4) Benefit 4, Reduced Transmission Energy Losses; (5) Benefit 5, Reduced Congestion Due to Transmission Outages; (6) Mitigation of Extreme Weather Events and Unexpected System Conditions; and (7) Capacity Cost Benefits from Reduced Peak Energy Losses.

226.    These requirements together establish a long-term, forward-looking, and more comprehensive approach to regional transmission planning, which will ensure that transmission providers identify, evaluate, and select more efficient or cost-effective transmission solutions to address Long-Term Transmission Needs.  Long-Term Regional Transmission Planning, as set forth in this final rule, requires regional transmission planning based on a multitude of drivers of Long-Term Transmission Needs and provides the opportunity for transmission providers to meet those needs by selecting more efficient or cost-effective Long-Term Regional Transmission Facilities.

227.    In considering the comments received on this proposal, we strike a careful balance.  On the one hand, we believe that there is an inherent risk in transmission providers waiting for the near-term certainty that some commenters appear to believe is necessary[578] before planning to address transmission needs.  As explained in the Overall Need for Reform section above, doing so may result in transmission providers relying on relatively inefficient and less cost-effective piecemeal transmission solutions to address these needs shortly before they manifest, to the detriment of customers.  On the other hand, we acknowledge the inherent uncertainty involved in planning to meet Long-Term Transmission Needs and that this uncertainty means that forward-looking regional transmission planning entails certain risks, including the risk that transmission needs may change over time.  In this final rule, we balance these risks, requiring planning to meet

---

[578] *See, e.g.*, NRG Initial Comments at 8 (arguing that there are unlikely to be any "no regrets" options).

Long-Term Transmission Needs, while imposing requirements on how Long-Term

Regional Transmission Planning is conducted, as discussed further herein, to mitigate

uncertainty. To adequately prepare for the future, transmission providers need to make

decisions in the present that are grounded in a thorough, informed analysis of the factors

that drive Long-Term Transmission Needs.

228.   As discussed in the Overall Need for Reform section, these factors are together

driving rapid changes in the Long-Term Transmission Needs that transmission providers

must plan to meet to continue to provide an affordable, reliable supply of electricity to

customers, but neither transmission infrastructure nor regional transmission planning

processes are keeping pace. Consequently, the Commission's existing regional

transmission planning requirements are no longer just and reasonable, as they

increasingly result in transmission investment decisions occurring outside of regional

transmission planning processes and instead through generator interconnection processes

and local transmission planning processes that typically plan to meet discrete, nearer-term

transmission needs. In addition, the record demonstrates that transmission providers have

made substantial investments in in-kind replacement transmission facilities, which

generally are not identified through more long-term, forward-looking, or comprehensive

transmission planning. This final rule aims to ensure that transmission providers, through

their regional transmission planning processes, identify, evaluate, and select Long-Term

Regional Transmission Facilities that more efficiently or cost-effectively address Long-

Term Transmission Needs, helping to ensure just and reasonable rates.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 201 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

229.    We disagree with arguments that the Commission should not require Long-Term

Regional Transmission Planning because, certain commenters claim, doing so will

introduce excessive uncertainty into regional transmission planning, transmission

providers will make forecasting errors, or the final rule will result in regional

transmission planning that is speculative.[579]  To the contrary, we believe that the reforms

adopted in this final rule account for and seek to reduce the inherent uncertainty in

forward-looking regional transmission planning, while ensuring that transmission

providers, through their regional transmission planning processes, identify, evaluate, and

select Long-Term Regional Transmission Facilities that more efficiently or cost-

effectively address Long-Term Transmission Needs, thus helping to ensure just and

reasonable rates.[580]  In fact, by requiring transmission providers to use Long-Term

Scenarios in Long-Term Regional Transmission Planning, this final rule provides

transmission providers with a critical tool for managing uncertainty, facilitating regional

transmission planning that accounts for a range of potential futures, as well as an

assessment of the likelihood of each scenario manifesting, when identifying, evaluating,

and selecting Long-Term Regional Transmission Facilities.  Further, as discussed in the

Evaluation and Selection of Long-Term Regional Transmission Facilities section below,

we require transmission providers to reevaluate Long-Term Regional Transmission

---

[579] Louisiana Commission Initial Comments at 4-5; NRG Initial Comments at 3-4;
Ohio Consumers Initial Comments at 5.

[580] *See* Policy Integrity Initial Comments at 6 (arguing that future uncertainty
requires scenario planning).

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 202 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Facilities in certain circumstances, which will provide transmission providers with yet another such tool.

230.    Moreover, notwithstanding allegations to the contrary, we believe that Long-Term Regional Transmission Planning is a logical and reasonable extension of current regional transmission planning processes, which also manage uncertainty and plan for future regional transmission needs.  The key difference, which we address through this final rule, is that these existing regional transmission planning processes are conducted in a manner that is not sufficiently long-term, forward-looking, or comprehensive such that transmission providers are not identifying Long-Term Transmission Needs.  As a result, transmission providers are failing to identify or evaluate regional transmission facilities that would more efficiently or cost-effectively address those Long-Term Transmission Needs, and consequently, are missing the opportunity to select such regional transmission facilities.  Our reforms in this final rule remedy these deficiencies.

231.    Further, we believe that Long-Term Regional Transmission Planning as set forth in this final rule provides adequate safeguards against excessive transmission development in response to speculative transmission needs.  For example, this final rule requires transmission providers to develop multiple plausible and diverse Long-Term Scenarios based upon best available data, which will allow transmission providers to better understand how certain categories of factors will give rise to Long-Term Transmission Needs, and requires transmission providers to update their assumptions

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 203 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                                      - 193 -

periodically, as discussed further below.[581]  In developing these Long-Term Scenarios,

transmission providers are required to treat more certain drivers of Long-Term

Transmission Needs differently than less certain drivers, and must provide opportunities

for stakeholder engagement.  Further, the final rule grants substantial flexibility to

transmission providers to develop an evaluation process and selection criteria that will

provide them with the opportunity to select Long-Term Regional Transmission Facilities

in a way that maximizes benefits accounting for costs over time without over-building

transmission facilities.  Consistent with the existing Order No. 1000 regional

transmission planning processes, the final rule does not require transmission providers to

select any regional transmission facilities as part of Long-Term Regional Transmission

Planning.  Finally, we require transmission providers to reevaluate previously selected

Long-Term Regional Transmission Facilities in certain circumstances, as discussed

further below in the Reevaluation section.

232.    The regional transmission planning and cost allocation requirements in this final

rule, like those of Order Nos. 890 and 1000, are focused on the transmission planning

*process*, and do not require any substantive outcomes from this process.[582]  We disagree

with certain commenters' assertions that this final rule favors, promotes, or subsidizes

particular types of generation resources over others, or otherwise engages in generation

---

[581] *See* New Jersey Commission Initial Comments at 10-11.

[582] *See, e.g.*, Order No. 1000, 136 FERC ¶ 61,051 at P 12.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 204 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                           - 194 -

planning.[583]  Instead, this final rule requires transmission providers to participate in Long-Term Regional Transmission Planning through their regional transmission planning process that identifies Long-Term Transmission Needs, evaluates the benefits of Long-Term Regional Transmission Facilities to meet those needs, and provides the opportunity for transmission providers to select Long-Term Regional Transmission Facilities that are more efficient or cost-effective transmission solutions to those needs.  We reiterate that, as discussed below in the Evaluation and Selection of Long-Term Regional Transmission Facilities section, any selected Long-Term Regional Transmission Facilities must satisfy transmission provider-developed selection criteria that maximize benefits accounting for costs over time without over-building transmission facilities, which ensures that the costs of such transmission facilities are outweighed by the benefits they deliver to customers.

233.  We disagree with commenters that argue that the factors giving rise to Long-Term Transmission Needs, such as state laws dictating specific generation resource mixes, are irreconcilable with effective transmission planning.[584]  These changes are occurring independent of any action that we take in this final rule, and they are being driven by a wide variety of factors.  This final rule provides transmission providers with the tools that they need to respond to these factors, requiring that they conduct Long-Term Regional

---

[583] Alabama Commission Initial Comments at 7-8; Louisiana Commission Initial Comments at 12, 19-21; Potomac Economics Initial Comments at 3-4; Utah Division of Public Utilities Initial Comments at 2; Vistra Initial Comments at 11.

[584] *See* ELCON Initial Comments at 9 ("ELCON has always believed that planning for disparate state energy priorities is at odds with market-driven, efficient, and cost-effective transmission planning.").

Docket No. RM21-17-000                                                    - 195 -

Transmission Planning to identify, evaluate, and select Long-Term Regional

Transmission Facilities that are more efficient or cost-effective regional transmission

solutions to the Long-Term Transmission Needs that these factors drive.

234.    We disagree with Louisiana Commission and former Kansas Commission

Chairman Keen's claims that Long-Term Regional Transmission Planning will threaten

the reliability of the transmission system.  We acknowledge that reliability needs are

evolving; for example, the increasing frequency and severity of high-impact extreme

weather events threatens grid reliability.  We believe that Long-Term Regional

Transmission Planning—in addition to existing Order No. 1000 regional transmission

planning and cost allocation requirements—is needed to support the reliable operation of

transmission systems, given these changes.  As the Commission and the North American

Electric Reliability Corporation have noted, the transmission system may not be

adequately prepared for extreme weather events and the increasing frequency of these

events must be planned for to ensure system reliability.[585]  We thus view our action in

this final rule as complementary to other steps that the Commission has taken in recent

years to bolster system reliability.[586]

---

[585] FERC, North American Electric Reliability Corporation, *Winter Storm Elliot Report: Inquiry into Bulk-Power System Operations During December 2022* (Nov. 2023), https://www.ferc.gov/media/winter-storm-elliott-report-inquiry-bulk-power-system-operations-during-december-2022; FERC, North American Electric Reliability Corporation, *The February 2021 Cold Weather Outages in Texas and the South Central United States* (Nov. 2021), https://www.ferc.gov/media/february-2021-cold-weather-outages-texas-and-south-central-united-states-ferc-nerc-and.

[586] *See, e.g.*, *Transmission Sys. Planning Performance Requirements for Extreme Weather*, Order No. 896, 88 FR 41262 (June 23, 2023), 183 FERC ¶ 61,191 (2023); *One-*

235.    Further, we disagree with the contention of Louisiana Commission and Vistra that Long-Term Regional Transmission Planning will distort the efficient functioning of Commission-jurisdictional wholesale markets by subsidizing uneconomic generation or by distorting price signals.  As discussed further below, we require transmission providers, as part of Long-Term Regional Transmission Planning, to assess the costs and measure the benefits of regional transmission facilities that address Long-Term Transmission Needs and to develop evaluation processes and selection criteria that provide the opportunity to select those transmission facilities as more efficient or cost-effective regional transmission solutions to those Needs.  While the addition of any new transmission facility necessarily affects Commission-jurisdictional wholesale markets, the requirements set forth in this final rule ensure that transmission providers will have the opportunity to select more efficient or cost-effective Long-Term Regional Transmission Facilities that provide value to transmission customers and support the efficient functioning of wholesale markets by addressing Long-Term Transmission Needs.

236.    We also disagree with Vistra's contention that Long-Term Regional Transmission Planning somehow will assign all, or a disproportionately high share, of interconnection-related network upgrade costs to load or undermine the incentives for generation developers to site new generation resources in ways that minimize transmission system

---

*Time Info. Reports on Extreme Weather Vulnerability Assessments*, Order No. 897, 88 FR 41447 (June 27,2023), 183 FERC ¶ 61,192 (2023).

upgrade costs.  Rather, because transmission providers will now engage in Long-Term

Regional Transmission Planning to identify, evaluate, and select more efficient or cost-

effective regional transmission facilities to address Long-Term Transmission Needs,

Long-Term Regional Transmission Facilities will be planned in a more efficient and cost-

effective manner than if transmission facilities meeting a narrower set of transmission

needs were left to be identified through the generator interconnection process.  Indeed,

numerous commenters explain that the piecemeal expansion of the transmission system is

highly inefficient and results in higher costs for transmission customers,[587] in part

because the costs of interconnection-related network upgrades ultimately are passed on to

consumers.

237.    We strike another careful balance in this final rule.  On the one hand, we recognize

transmission providers' need for sufficient flexibility to implement Long-Term Regional

Transmission Planning in their transmission planning regions to reflect regional

differences, such as different market structures.[588]  On the other hand, we must ensure

that transmission providers' regional transmission planning processes result in just and

reasonable rates, which, as discussed above in the Overall Need for Reform section,

necessitates that they plan on a sufficiently long-term, forward-looking, and

comprehensive basis such that transmission providers are identifying, evaluating, and

---

[587] *See, e.g.*, NYISO Initial Comments at 30; PIOs Initial Comments at 9-10.

[588] The Commission also recognized the need for sufficient flexibility in regional transmission planning to reflect regional differences in Order No. 1000.  *See* Order No. 1000, 136 FERC ¶ 61,051 at P 61.

selecting more efficient or cost-effective regional transmission facilities to address Long-Term Transmission Needs.  We believe that the balance struck in the final rule will ensure that Commission-jurisdictional rates are just and reasonable and not unduly discriminatory or preferential and, thus, we reject requests for flexibility that exceeds that provided in this final rule.

238.    In particular, we reject requests that, instead of requiring transmission providers to implement Long-Term Regional Transmission Planning in accordance with the requirements adopted in this final rule, we set forth principles and objectives articulating our concerns with existing regional transmission planning processes and give transmission providers the flexibility to propose revisions to their processes to address those concerns.[589]  Having found existing regional transmission planning and cost allocation requirements to be unjust and unreasonable, we have an obligation under FPA section 206 to adopt reforms that remedy the deficiencies identified in this final rule.  We also believe that such an approach would fail to adequately address the deficiencies described above in the Overall Need for Reform section, namely that transmission providers are not currently required to:  (1) perform a sufficiently long-term assessment of transmission needs that identifies Long-Term Transmission Needs; (2) adequately account on a forward-looking basis for known determinants of Long-Term Transmission Needs; and (3) consider the broader set of benefits of regional transmission facilities

---

[589] ISO-NE Initial Comments at 20; ISO RTO Council Initial Comments at 4-5, 8-9; MISO Initial Comments at 22-23.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 209 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                - 199 -

planned to meet those Long-Term Transmission Needs.  We further believe that establishing requirements rather than principles will ensure a sufficiently robust process for Long-Term Regional Transmission Planning while providing sufficient clarity about that process to avert conflict among stakeholders, as noted by AEP.[590]

239.    We also disagree with commenters that argue that this final rule should apply to only RTO/ISO transmission planning regions.  The Commission's existing regional transmission planning requirements, which, as described above in the Overall Need for Reform section, we find to be deficient, apply in RTO/ISO and non-RTO/ISO transmission planning regions alike; without the Long-Term Regional Transmission Planning Requirements adopted herein, transmission providers in both RTO/ISO and non-RTO/ISO transmission planning regions will continue to be at risk of undertaking investments in relatively inefficient or less cost-effective transmission infrastructure, the costs of which are ultimately recovered through Commission-jurisdictional rates.  Accordingly, while we acknowledge differences between RTO/ISO and non-RTO/ISO transmission planning regions, we find that transmission providers in all transmission planning regions must implement Long-Term Regional Transmission Planning as required in this final rule to ensure that Commission-jurisdictional rates are just and reasonable and not unduly discriminatory or preferential.  Additionally, we note that many of the requirements established in this final rule provide for regional flexibility, including, but not limited to, the requirements to develop Long-Term Scenarios,

---

[590] AEP Reply Comments at 2-4.

determine which factors in each required category of factors do not affect Long-Term Transmission Needs and need not be considered, develop methods to measure the benefits of Long-Term Regional Transmission Facilities, design an evaluation process and selection criteria, and establish a Long-Term Regional Transmission Cost Allocation Method.

240.    We acknowledge that certain transmission planning regions already conduct some regional transmission planning on a relatively forward-looking, proactive basis.  We do not intend to undermine progress made in these transmission planning regions, and our goal is to set a floor, not a ceiling.  We decline to prejudge whether any existing regional transmission planning process meets the requirements set forth in this final rule and accordingly reject requests that we do so.[591]  We note that, if a transmission provider believes that it participates in a regional transmission planning process that fulfills the requirements adopted in this final rule, it may describe in its compliance filing how its process meets these requirements.

241.    We expect Long-Term Regional Transmission Planning to enhance the existing regional transmission planning and cost allocation processes required by Order No. 1000.  Except as set forth in this final rule, we do not require that any transmission provider replace or otherwise make changes to its existing Order No. 1000-compliant regional transmission planning processes that plan for reliability or economic transmission needs, or the associated Order No. 1000-compliant regional cost allocation method(s).

---

[591] *See, e.g.*, Ameren Initial Comments at 8.

Transmission providers may continue to rely on their existing regional transmission

planning and cost allocation processes to comply with Order No. 1000's requirements

related to transmission needs driven by reliability concerns or economic considerations.

242.    We also do not alter the existing Order No. 1000 requirement to consider

transmission needs driven by Public Policy Requirements in the regional transmission

planning process.  Instead, we clarify that we will deem transmission providers to be in

compliance with this existing requirement by conducting Long-Term Regional

Transmission Planning in accordance with the requirements set forth in this final rule.  As

discussed below, we require transmission providers to incorporate a variety of factors

into the development of Long-Term Scenarios, which include, among others, certain

federal, state, and local laws and regulations.  Therefore, we find that transmission

providers that implement Long-Term Regional Transmission Planning and satisfy the

requirements set forth in this final rule will comply with the requirement in Order

No. 1000 to participate in a regional transmission planning process that considers, and

has associated cost allocation provisions related to, transmission needs driven by Public

Policy Requirements.

243.    We understand—and acknowledge comments submitted in this proceeding

explaining—that transmission providers in some transmission planning regions have

developed processes to consider transmission needs driven by Public Policy

Requirements through their regional transmission planning processes that they wish to

Docket No. RM21-17-000                                                    - 202 -

retain.[592]  In their filings made to comply with this final rule, transmission providers may propose to continue using some or all aspects of the existing regional transmission planning and cost allocation processes that they use to consider transmission needs driven by Public Policy Requirements.  Transmission providers must nevertheless comply with the Long-Term Regional Transmission Planning requirements set forth in this final rule, such that continued use of existing regional transmission planning and cost allocation processes related to transmission needs driven by Public Policy Requirements will not supplant transmission providers' obligation to comply with this final rule.  In their filing to comply with this final rule, transmission providers that wish to continue to use some or all of their existing regional transmission planning and cost allocation processes to consider transmission needs driven by Public Policy Requirements must demonstrate that continued use of any such processes does not interfere with or otherwise undermine Long-Term Regional Transmission Planning as set forth in this final rule.

244.    Similarly, we allow transmission providers to propose a regional transmission planning process that simultaneously plans for shorter-term reliability and economic transmission needs, as well as Long-Term Transmission Needs, as outlined in this final rule, through a combined process.  Transmission providers proposing to address all of these transmission needs in a single regional transmission planning process must demonstrate that the unified regional transmission planning process continues to comply with Order No. 1000, as well as with the Long-Term Regional Transmission Planning

---

[592] CAISO Reply Comments at 17-18; New York Transco Initial Comments at 5.

Docket No. RM21-17-000                                                   - 203 -

requirements set forth in this final rule, by demonstrating that such a combined process is

consistent with or superior to the requirements of both Order No. 1000 and this final rule.

However, in the case that the requirements of Order No. 1000 and this final rule conflict,

the requirements of this final rule prevail, and transmission providers must demonstrate

that their proposed regional transmission planning process is consistent with or superior

to the applicable requirements in this final rule.

245.    We reject requests to require transmission providers to simultaneously plan for all

such transmission needs through a single regional transmission planning process,

however.[593]  We recognize that such a combined process has potential benefits and do not

prohibit such an approach, but at this time we believe that the benefits of requiring such a

combined process on a generic basis may be outweighed by the difficulty of transitioning

to such a process from existing regional transmission planning processes.  Therefore, we

do not require in this final rule that transmission providers plan for all reliability and

economic transmission needs and Long-Term Transmission Needs through a single

regional transmission planning process.  Further, we believe that Long-Term Regional

Transmission Planning, as set forth in this final rule, meets many of the same objectives

as would such a combined regional transmission planning process because, by identifying

Long-Term Transmission Needs and considering a broad set of benefits when evaluating

Long-Term Regional Transmission Facilities, the existing regional transmission planning

processes for economic and reliability needs may ultimately come to address only

---

[593] *See, e.g.*, ACEG Initial Comments at 30-31.

Docket No. RM21-17-000                                                      - 204 -

residual needs not already addressed through Long-Term Regional Transmission
Planning.

246.    With respect to the request by PIOs to mandate that the base cases used in Order
No. 1000 regional transmission planning processes and Long-Term Scenarios in Long-
Term Regional Transmission Planning be defined in the same process,[594] we decline to
adopt this proposal.  The record is inadequate to assess the impact that such a requirement
would have on existing Order No. 1000 regional transmission planning processes, and
whether this proposal would work across the differing transmission planning processes in
each transmission planning region.  With respect to the proposals by Clean Energy
Buyers, Cypress Creek, and Policy Integrity,[595] these proposals were not among the
proposals included in the NOPR and are beyond the scope of this proceeding, and
therefore we decline to adopt them.

247.    We also reject requests to incorporate local transmission planning into Long-Term
Regional Transmission Planning specifically or regional transmission planning more
generally,[596] as well as requests to require transmission providers to evaluate and approve
local transmission facilities in regional transmission planning.[597]  This final rule sets forth

---

[594] PIOs Initial Comments at 44-46.

[595] Clean Energy Buyers Initial Comments at 9-10; Cypress Creek Reply
Comments at 10-12; Policy Integrity Supplemental Comments at 3.

[596] AEE Initial Comments at 3, 38.

[597] OMS Initial Comments at 16-17.

requirements that will enhance the transparency of local transmission planning and

examine opportunities for right-sizing in-kind replacements of existing  transmission

facilities, including local transmission facilities, but the Commission in the NOPR did not

propose other changes to local transmission planning processes and therefore these

requests are beyond the scope of this final rule.

248.    As discussed in detail below, we require transmission providers to satisfy specific

requirements in implementing Long-Term Regional Transmission Planning, including

requirements to:  (1) use a transmission planning horizon of no less than 20 years into the

future in developing Long-Term Scenarios; (2) reassess and revise those scenarios at least

once every five years; (3) incorporate into the Long-Term Scenarios a set of

Commission-identified categories of factors that give rise to Long-Term Transmission

Needs; (4) develop a plausible and diverse set of at least three Long-Term Scenarios;

(5) perform sensitivity analyses of uncertain operational outcomes during multiple

concurrent and sustained generation and/or transmission outages due to an extreme

weather event across a wide area; and (6) use "best available data" in developing Long-

Term Scenarios.

249.    Before turning to these topics, however, we address two preliminary matters:  the

definition of Long-Term Regional Transmission Facility; and our jurisdiction to adopt

these reforms.

### b.    Definition of Long-Term Regional Transmission Facility

250.    We modify the NOPR proposal and define Long-Term Regional Transmission

Facility for purposes of this final rule as a regional transmission facility, as defined in

Order No. 1000, that is identified as part of Long-Term Regional Transmission Planning to address Long-Term Transmission Needs.[598]  In so doing, we clarify that some Long-Term Regional Transmission Facilities may be selected in a regional transmission plan for purposes of cost allocation, while others may be considered for selection but not be selected.

251.    This modification also clarifies that Long-Term Regional Transmission Facilities are a subset of regional transmission facilities as defined in Order No. 1000.  Further, consistent with Order No. 1000,[599] a selected Long-Term Regional Transmission Facility is a regional transmission facility that has been selected pursuant to a Commission-approved Long-Term Regional Transmission Planning process in a regional transmission plan for purposes of cost allocation because it is a more efficient or cost-effective solution to Long-Term Transmission Needs.

252.    We disagree with PJM that Order No. 1000's requirements related to regional transmission planning processes addressing transmission needs driven by reliability concerns or economic considerations will be unclear given the definition of Long-Term Regional Transmission Facility, and we find unpersuasive PJM's contention that Long-Term Regional Transmission Planning will inadvertently cause the re-litigation of aspects

---

[598] In the NOPR, the Commission proposed to define a Long-Term Regional Transmission Facility as a transmission facility identified as part of Long-Term Regional Transmission Planning and selected in the regional transmission plan for purposes of cost allocation to address transmission needs driven by changes in the resource mix and demand.  NOPR, 179 FERC ¶ 61,028 at P 252 n.398.

[599] Order No. 1000, 136 FERC ¶ 61,051 at P 63.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 217 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

of those existing processes.  If a regional transmission facility is selected in an existing Order No. 1000 regional transmission planning process, the rules of, as well as the regional cost allocation method for, that existing process apply to the selected regional transmission facility.  If a Long-Term Regional Transmission Facility is selected in Long-Term Regional Transmission Planning, then the rules of, and the Long-Term Regional Cost Allocation Method for, Long-Term Regional Transmission Planning apply to that Long-Term Regional Transmission Facility.

### c.  Legal Authority to Adopt Reforms for Long-Term Regional Transmission Planning

253.    We reaffirm our conclusion in the NOPR that we are acting within the Commission's legal authority under FPA section 206 by requiring transmission providers to participate in a regional transmission planning process that includes Long-Term Regional Transmission Planning.  The FPA grants the Commission authority over the transmission of electric energy in interstate commerce, which includes transmission on the interconnected national grids.[600]  FPA section 205 requires that the rates charged by any public utility in connection with such transmission—as well as the rules and regulations affecting such rates—be just and reasonable, and further requires that public utilities file with the Commission the practices affecting such rates.[601]  Under FPA section 206, when the Commission determines that any rate or any practice affecting such

---

[600] *New York v. FERC*, 535 U.S. at 16-17 (citing 16 U.S.C. 824(b)).

[601] 16 U.S.C. 824d.

rate is unjust, unreasonable, or unduly discriminatory or preferential—as we find above with respect to transmission planning practices—the Commission must determine the just and reasonable rate or practice to be followed.[602]  Transmission planning and cost allocation processes are practices affecting the rates charged by public utilities in connection with the Commission-jurisdictional transmission of electric energy in interstate commerce.[603]  No commenter has claimed otherwise.

254.    Despite this, a number of commenters claim that the specific transmission planning requirements we adopt in this final rule infringe on the authority reserved to the states by FPA section 201 or are otherwise barred by certain prudential or constitutional principles.  As a threshold matter, we believe that commenters' concerns with respect to our jurisdiction or authority to adopt this final rule mainly arise from factual misunderstandings or mischaracterizations about what Long-Term Regional Transmission Planning will and will not require transmission providers to do.  As explained above, this final rule requires transmission providers in each transmission planning region to participate in a regional transmission planning process that includes Long-Term Regional Transmission Planning and to conduct Long-Term Regional Transmission Planning in accordance with the requirements set forth in this final rule.  Transmission providers are required to identify Long-Term Transmission Needs, identify

---

[602] 16 U.S.C. 824e.

[603] *See S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d at 55-59; *accord Emera Me. v. FERC*, 854 F.3d at 673-74.

Long-Term Regional Transmission Facilities that meet such needs, measure the benefits of these Long-Term Regional Transmission Facilities, and evaluate these Long-Term Regional Transmission Facilities for potential selection.  As such, this final rule does not regulate, aim at, or otherwise attempt to influence integrated resource planning, the generation mix, decisions related to the siting and construction of transmission facilities or generation resources, or any other matters reserved to states under FPA section 201.

255.    As discussed in the Introduction and Background section above, the requirements of this final rule build upon more than a quarter century of significant actions taken by the Commission on transmission planning and cost allocation, beginning with the Commission's initial open access reforms in Order No. 888.  In 2007, the Commission issued Order No. 890 to address identified deficiencies in the *pro forma* OATT based on more than 10 years of experience since the issuance of Order No. 888.  Most recently, in 2011, the Commission issued Order No. 1000, which required transmission providers to develop a regional transmission plan after evaluating whether regional transmission facilities may be more efficient or cost-effective than transmission facilities identified in local transmission planning processes and to consider transmission needs driven by Public Policy Requirements.  These practices serve as the foundation for regional transmission planning, and this final rule leaves them in place.

256.    As described above, however, we have identified specific gaps in the Order No. 1000 framework—namely, that regional transmission planning practices do not perform a sufficiently long-term assessment of transmission needs, adequately account on a forward-looking basis for known determinants of Long-Term Transmission Needs, or

Docket No. RM21-17-000                                    - 210 -

consider the broader set of benefits of regional transmission facilities.  In this final rule, we direct reforms to close these gaps without otherwise disturbing the regional transmission planning structure required by Order No. 1000, which was fully affirmed on appeal in the face of similar objections to those raised here.[604]

257.    Critically, as in Order No. 1000, our focus continues to be on ensuring that Commission-jurisdictional regional transmission planning processes are just and reasonable and that, as a result of improvements to the regional transmission planning and cost allocation processes, Commission-jurisdictional rates remain just and reasonable.[605]  And, as in Order No. 1000, while the improvements to the regional transmission planning and cost allocation processes will ensure that potentially more efficient or cost-effective regional transmission facilities are evaluated for potential selection and have a cost allocation method available if they are selected, this rule does not mandate development of any particular transmission facility.

258.    Consistent with the regional transmission planning and cost allocation reforms adopted in Order No. 1000, and in response to commenters arguing otherwise,[606] we

---

[604] *See S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d at 55-64 (rejecting arguments that the requirement to engage in regional transmission planning, as prescribed in Order No. 1000, exceeded the Commission's jurisdiction under FPA section 206, interfered with traditional state authority reserved under FPA section 201, or improperly interpreted and applied FPA section 202(a)).

[605] *See id*. at 63-64 (affirming that the Commission was acting within its jurisdiction because its planning mandate "relates wholly to electricity transmission, as opposed to electricity sales" and "is directed at ensuring the proper functioning of the interconnected grid spanning state lines").

[606] Alabama Commission Initial Comments at 7; Kansas Ratepayer Advocates

affirm that this final rule does not authorize or require any entity to adopt a particular

siting plan for Long-Term Regional Transmission Facilities that transmission providers

select; or to forego state-jurisdictional siting proceedings where they are necessary; or to

begin construction on such Long-Term Regional Transmission Facilities.  Even where

transmission providers select a Long-Term Regional Transmission Facility, the relevant

transmission developer typically must secure a variety of other permits and authorizations

before beginning to construct the facility, including those that are subject to state

jurisdiction.  Nothing in this final rule changes otherwise applicable siting laws or

requirements.

259.    Similarly, this final rule does not change existing mechanisms for cost-recovery

through retail rates; authorize or require states or state commissions to change the laws or

regulations that govern the conduct of integrated resource planning or request for

proposal processes; authorize or require transmission providers or transmission

developers to bypass any applicable state-regulated integrated resource planning or

request for proposal processes; or authorize or require states or public utilities to adopt a

different mix of generation resources than would otherwise be the case.  Comments

suggesting otherwise do not accurately represent the Commission's proposed

requirements in the NOPR or the requirements adopted in this final rule,[607] which seeks

---

Reply Comments at 3; NARUC Initial Comments at 29; Nevada Commission Initial
Comments at 2-3; Southern Initial Comments at 3-4, 7, 15-17; Southern Reply Comments
at 6-7.

   [607] Alabama Commission Initial Comments at 3-4, 7-9; Kansas Ratepayer
Advocates Reply Comments at 2; Louisiana Commission Initial Comments at 8-10, 27-

Docket No. RM21-17-000                                                          - 212 -

to ensure that transmission providers plan for Long-Term Transmission Needs, however those needs arise.[608]

260.    We disagree with Southern and SERTP Sponsors' characterization of Long-Term Regional Transmission Planning as a Commission-regulated integrated resource planning/request for proposal process.[609]  Similarly, comments that suggest that this final rule intends to "revamp the energy grid's mix of generation resources writ large"[610] are incorrect.  We understand these comments to argue that the Commission seeks reforms to regional transmission planning and cost allocation processes so that it can direct or influence investments toward particular resources, as would an entity engaged in integrated resource planning.  In this final rule, the Commission neither aims to influence the resource mix, nor, as a practical matter, could the final rule achieve such an outcome.

---

28; Louisiana Commission Reply Comments at 14-15; Mississippi Commission Initial Comments at 3 (citing NOPR, 179 FERC ¶ 61,028 (Christie, Comm'r, concurring, at P 2); Nevada Commission Initial Comments at 2-3; SERTP Sponsors Initial Comments at 5, 16, 17 n.20, 19-20; SERTP Sponsors Reply Comments at 12-13; Southern Initial Comments at 3-4, 7-8, 12-13, 15-17, 23-24; Southern Reply Comments at 3, 6-7; Undersigned States Reply Comments at 2, 4-5, 8; Utah Commission Initial Comments at 7-9.

[608] New Jersey Commission Reply Comments at 1-2.

[609] SERTP Sponsors Initial Comments at 16-17; Southern Initial Comments at 3-4, 7, 15-17.

[610] Undersigned States Reply Comments at 4; *see also* Louisiana Commission Initial Comments at 6, 12-13 (arguing that the FPA does not allow the Commission to "enact[] sweeping energy policy changes that would have far-reaching, nation-wide effects" or to favor one form of generation over another).

261.    Instead, the final rule merely requires transmission providers to account for observable changes affecting the transmission system.  The final rule neither directs those changes, nor does it require any entity, including a state, to approve changes to any subject within its jurisdiction.  As with Order Nos. 890 and 1000, which built on the Commission's open access reforms in Order No. 888, this final rule *responds* to changes in the electric industry that have arisen in the years since the Commission's last regulatory action related to transmission planning.  As discussed above in the Overall Need for Reform section, this final rule responds to evolving reliability concerns, including the increasing frequency of high-impact extreme weather events; changes in electricity demand, including significant load growth that is projected to increase in coming years; changes in supply, including federal, federally-recognized Tribal, state, and local laws and policies that affect the future resource mix; changes in the economics of generation, transmission, and storage technologies; corporate, governmental, and utility commitments to rely on certain generation resources; and other factors as discussed in this final rule.

262.    We emphasize that these changes, which are affecting and will continue to drive transmission needs, are not within the Commission's control and, in many cases, are beyond the Commission's jurisdiction.  We do not aim to influence these drivers of transmission needs through the requirements in this final rule.[611]  However, the

---

[611] *See EPSA*, 577 U.S. 260 at 282 (citing *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 385 (2015)).

Docket No. RM21-17-000                                                                      - 214 -

Commission has an obligation under the FPA to ensure that Commission-jurisdictional

transmission rates remain just and reasonable, and we affirm—consistent with the

Commission's actions in Order Nos. 890 and 1000—that the Commission has the

requisite authority to account for the effects of these changes driving transmission needs

in Commission-jurisdictional transmission planning processes.[612]

263.    We also emphasize, and no commenter contests, that this final rule directly

regulates transmission planning and cost allocation processes, which are practices that

affect the rates for the transmission of electric energy in interstate commerce.

Importantly, it directly regulates *only* those practices, and it *does not* directly regulate any

matter reserved to the states by FPA section 201.  Moreover, in doing so, this final rule is

not aiming to *indirectly* regulate any matter reserved to the states by FPA section 201.

Instead, our aim here is to improve on the Commission's existing transmission planning

and cost allocation processes *for the express purpose* of addressing identified deficiencies

with those processes.

264.    As the U.S. Supreme Court has recognized, it is true that almost any action that the

Commission takes with respect to regulating the practices affecting the rates for the

transmission of or the wholesale sale of electric energy in interstate commerce will have

"*some* effect, in either the short or long term" on matters reserved to the states'

---

[612] *Cf. EPSA*, 577 U.S. at 281-82 ("When FERC regulates what takes place on the wholesale market, as part of carrying out its charge to improve how that market runs, then no matter the effect on retail rates, 824(b) imposes no bar.").

jurisdiction.[613]  But those effects, inevitable as they may be, are "of no legal consequence" to determining whether this final rule infringes on the states' authority under FPA section 201.[614]  Instead, such effects are a "fact of economic life" for the electric industry, given Congress's decision in the FPA to divide jurisdiction over the industry, including both generation and transmission, into spheres of Commission and state jurisdiction that are not "hermetically sealed" from one another.[615]  Accordingly, Commission regulation of Commission-jurisdictional practices affecting transmission may "have natural consequences" for generation.[616]  But, even where that happens, that does not defeat federal jurisdiction.

265.    Rather, as in *EPSA*, what matters is that this final rule aims to regulate and, in fact, does regulate only practices that affect the transmission of electric energy in interstate commerce, which are squarely within the Commission's jurisdiction under the FPA.  As in Order Nos. 890[617] and 1000,[618] this final rule aims to improve Commission-regulated transmission planning *processes*, in this instance by ensuring that they are sufficiently long-term, forward-looking, and comprehensive such that they are capable of identifying

---

[613] *Id*. at 281 (emphasis added).

[614] *Id*.

[615] *Id*.

[616] *Id*.

[617] Order No. 890, 118 FERC ¶ 61,119 at P 3.

[618] Order No. 1000, 136 FERC ¶ 61,051 at P 12.

Docket No. RM21-17-000                                                    - 216 -

and meeting Long-Term Transmission Needs.[619]  Thus, this final rule ensures just and

reasonable Commission-jurisdictional rates and practices by ensuring that transmission

providers have adequate processes to identify Long-Term Transmission Needs and to

identify, evaluate, and select Long-Term Regional Transmission Facilities that more

efficiently or cost-effectively address those needs.

266.    Moreover, as in *EPSA*, what also matters is that "every aspect of the [final rule]

happens exclusively" as part of a process that is subject to the Commission's jurisdiction

and governs exclusively how those processes work.[620]  In aiming to improve transmission

planning processes, this final rule does not require that transmission providers achieve

any particular substantive *outcome* of those processes, including either the selection or

construction of any specific transmission facilities.  The final rule patently does not aim

to alter states' or the nation's generation mix or otherwise regulate matters that are within

state jurisdiction.  Indeed, to the contrary, our rationale in this final rule is "all about, and

only about, improving" the relevant matters under the Commission's jurisdiction.[621]  Nor

is it clear how, under commenters' theory, the final rule could be argued to regulate

matters under states' jurisdiction, given that the final rule does not require investment in

any particular transmission facilities, and could not, even indirectly, ensure investments

in any particular set of generating facilities that may rely on such transmission facilities.

---

[619] *EPSA*, 577 U.S. at 281-83.

[620] *Id*. at 282.

[621] *Id.* (citing *Oneok, Inc. v. Learjet, Inc.*, 575 U.S.at 385).

Docket No. RM21-17-000                                                    - 217 -

267.    Despite some commenters' claims,[622] nothing in this final rule requires states to

subsidize other states' public policies and, indeed, this final rule requires, consistent with

long-established Commission and court precedent, that transmission customers within a

transmission planning region need only pay costs that are "roughly commensurate" with

the benefits that transmission providers estimate they will receive from a regional

transmission facility.[623]   Thus, the final rule ensures that transmission customers

nationwide are not required to pay for Long-Term Regional Transmission Facilities from

which they do not benefit.

268.    The reforms in the final rule require greater transparency regarding the benefits

that would result from the development of Long-Term Regional Transmission Facilities,

but these reforms also continue to allow flexibility, as under Order No. 1000, for the

transmission providers in each transmission planning region to determine the appropriate

method for allocating to transmission customers the costs of any selected Long-Term

Regional Transmission Facility.   Rather than force transmission providers to adopt a

particular cost allocation method that would necessarily result in customers in one state

subsidizing the costs of customers in another state, as these commenters allege, the final

---

[622] Alabama Commission Initial Comments at 8-9; Louisiana Commission Initial
Comments at 6, 9-10; Mississippi Commission Reply Comments at 2-3; Ohio
Commission Federal Advocate Initial Comments at 4-6; Ohio Consumers Reply
Comments at 14.

[623] *See Ill. Com. Comm'n v. FERC*, 756 F.3d 556, 562 (7th Cir. 2014) (*ICC v.
FERC III*); *ICC v. FERC I*, 576 F.3d at 477; *Sw. Power Pool, Inc.*, 182 FERC ¶ 61,141, at
P 12 (2023).

rule affords significant new opportunities for Relevant State Entities to inform the

evaluation process, selection criteria, and cost allocation method adopted by the

transmission providers in a transmission planning region.  We believe that the

requirements for greater transparency regarding the benefits of proposed transmission

facilities, the increased opportunities for state engagement in evaluation, selection, and

cost allocation, the flexibility for transmission providers in each transmission planning

region to determine their own cost allocation methods, and the requirement that any cost

allocation method must ensure costs are allocated in a manner that is at least roughly

commensurate with estimated benefits provide robust assurance that the cost allocation

methods ultimately proposed under the final rule will not result in improper cost

subsidization.  Ultimately, the Commission must review and accept each cost allocation

method proposed under the final rule to ensure that it is just and reasonable and

consistent with the final rule's requirements.

269.    As discussed in the Evaluation of the Benefits of Regional Transmission Facilities

section below, this final rule requires transmission providers to use and measure a set of

seven required benefits to evaluate Long-Term Regional Transmission Facilities.  The

measurement of these benefits represents the value that the transmission providers expect

a particular Long-Term Regional Transmission Facility to provide to transmission

customers in the transmission planning region.  As further discussed in the Regional

Transmission Planning Cost Allocation section below, this final rule requires

transmission providers to provide a forum for Relevant State Entities to negotiate a cost

allocation method and/or a process for determining future cost allocation methods for

Long-Term Regional Transmission Facilities, which enables robust participation by those entities. Moreover, the cost allocation methods required by this final rule are intended to ensure that costs are allocated in a manner that is at least roughly commensurate with the estimated benefits that a Long-Term Regional Transmission Facility provides to transmission customers.

270. The benefits this rule requires to be used and measured—which provide an important source of transparency regarding any resulting allocation of costs to transmission customers—reflect objective, measurable changes in transmission system conditions, rather than achievement of state public policies. For example, even if a state's public policy is one driver of a Long-Term Transmission Need, these benefits of a Long-Term Regional Transmission Facility resolving that need are well understood and measurable, including, for example, reducing the cost of generating electricity by allowing for the increased dispatch of suppliers that have lower incremental costs of production, minimizing energy losses incurred in transmitting electricity, and lowering the number or duration of loss of load events. Transmission providers will evaluate Long-Term Regional Transmission Facilities for selection considering these benefits that these facilities would provide, and these benefits accrue to the transmission customers that fund their construction. In other words, under this final rule, customers pay for a more reliable and economic transmission system as identified through open and transparent Long-Term Regional Transmission Planning, and any state's ratepayers only fund the construction of Long-Term Regional Transmission Facilities that provide them

Docket No. RM21-17-000                                                              - 220 -

with such benefits that are at least roughly commensurate with the costs of those
facilities.

271.   We turn now to commenters' specific jurisdiction arguments.  As an initial matter,
we acknowledge that, in addition to granting authority to the Commission over the
transmission of electric energy in interstate commerce, FPA section 201 also reserves
certain authority to the states.[624]  As such, we agree with Southern that Congress sought
in enacting the FPA to ensure the "continued exercise of state power"[625] over certain
matters.  However, the requirements in this final rule respect and do not unlawfully
infringe on state authority.  Rather, as discussed above, the Commission is acting in an
area squarely within its jurisdiction—transmission planning and cost allocation—by
requiring transmission providers to engage in Long-Term Regional Transmission
Planning to remedy deficiencies in the current transmission planning and cost allocation
processes, which we conclude are unjust and unreasonable.

---

[624] *See* 16 U.S.C. 824(a)-(b)(1); *New York v. FERC*, 535 U.S. at 20-21 ("It is,
however, perfectly clear that the original FPA did a good deal more than close the gap in
state power identified in [*Pub. Utils. Comm'n of R.I. v. Attleboro Steam & Elec. Co.*, 273
U.S. 83 (1927) (*Attleboro*)].  The FPA authorized federal regulation not only of
wholesale sales that had been beyond the reach of state power, but also the regulation of
wholesale sales that had been *previously subject* to state regulation.  More importantly, as
discussed above, the FPA authorized federal regulation of interstate *transmissions* as well
as of interstate wholesale sales, and such transmissions were not of concern in *Attleboro*."
(emphasis in original) (internal citations omitted)).

[625] Southern Initial Comments at 16 (quoting *Oneok, Inc. v. Learjet, Inc.*, 575 U.S.
at 385).

272.    We acknowledge that Long-Term Regional Transmission Planning will affect matters that are within the states' jurisdiction.  As stated, this is inevitable.  Effective transmission planning necessarily involves taking into account assumptions about the generation resources that will be available, because transmission needs arise from the relative amounts, locations, and timing of supply (i.e., generation) and of demand (i.e., load); indeed, existing transmission planning processes also take into account these assumptions.[626]  Our action in this final rule simply modifies the scope and duration of these assumptions to ensure that regional transmission planning processes are conducted on a sufficiently long-term, forward-looking, and comprehensive basis by requiring transmission providers to evaluate factors that give rise to Long-Term Transmission Needs.

273.    Southern and SERTP Sponsors acknowledge that the NOPR proposed to require transmission providers to incorporate the results of state-sanctioned integrated resource planning as factors in developing Long-Term Scenarios, but they insist that Long-Term Regional Transmission Planning will intrude upon state authority if we do not require Long-Term Scenarios to be *limited* to those state-sanctioned resources.[627]  This assertion is incorrect for at least three reasons.  First, the public utilities whose integrated resource

---

[626] *See*, *e.g.*, Xcel Initial Comments at 13, 16 & n.26 (discussing generation resource assumptions made in existing Order No. 1000 regional transmission planning and cost allocation processes).

[627] SERTP Sponsors Initial Comments at 15-17; Southern Initial Comments at 18-19.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 232 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                    - 222 -

plans are approved by state commissions are not the only entities whose decisions may

influence the development of generation resources within a particular transmission

planning region.  For example, a wide variety of private enterprises, publicly-owned

utilities, and electric cooperatives have made commitments to fund the development of

certain generation resources, and transmission providers may reasonably determine that

these procurement decisions give rise to Long-Term Transmission Needs.  Second,

making generation resource assumptions for the purpose of performing transmission

planning does not result in any legally-binding determination on a matter within a state's

jurisdiction, let alone undermine a state's ability to ultimately decide what generation

resources to build, and on what timetable.[628]  Third, as Southern and SERTP Sponsors

concede,[629] many existing integrated resource planning processes do not identify specific

generation resources beyond a particular point in time.  Other integrated resource

planning processes may not result in a set of state-sanctioned generation resources and

---

[628] We disagree with Southern's and SERTP Sponsors' contention that the inclusion of such non-binding assumptions about generation resources in transmission planning will "bias" subsequent state resource decisions.  *See* Southern Initial Comments at 19; SERTP Sponsors Initial Comments at 17 n.20.  As Kentucky Commission Chair Chandler argues, the NOPR's reforms do not foreclose states' decision making on generation.  Kentucky Commission Chair Chandler Reply Comments at 3.  We also disagree with North Carolina Commission and Staff's contention that merely requiring transmission providers to use and measure production cost savings in evaluating Long-Term Regional Transmission Facilities "could conflict with state-jurisdictional resource decisions."  North Carolina Commission and Staff Initial Comments at 7.  If nothing else, Long-Term Regional Transmission Planning will provide public utilities and state commissions the opportunity to develop longer-term, forward-looking, robust assessments that can inform future decision making.

[629] SERTP Sponsors Initial Comments at 16; Southern Initial Comments at 19.

may instead serve merely as a guide for the relevant public utility.[630]  As a result, relying on such integrated resource planning processes exclusively to identify Long-Term Transmission Needs would fail to ensure that regional transmission planning processes are conducted on a sufficiently long-term, forward-looking, and comprehensive basis and therefore would fail to ensure just and reasonable Commission jurisdictional-rates.  To be clear, we are not in this final rule attempting to denigrate or diminish the importance of integrated resource planning.  Rather, in the context of Long-Term Regional Transmission Planning, integrated resource planning is reasonably considered one of several categories of factors used to develop Long-Term Scenarios and identify Long-Term Transmission Needs.

274.    In that light, Southern's and SERTP Sponsors' argument—that we should limit transmission providers to state-approved resources and prohibit non-binding assumptions about the resource mix and demand—does not safeguard but in fact subverts the FPA's division between federal and state authority.  As stated above, were we to require that transmission providers limit their assumptions to only state-sanctioned generation resources, we would be requiring transmission providers to ignore many of the factors that, as demonstrated by this record, transmission providers must reasonably consider to plan on a sufficiently long-term, forward-looking, and comprehensive basis.  Instead, it is

---

[630] *See, e.g.*, SREA Reply Comments at 2-3 (arguing, in response to Alabama Commission, that Alabama has no formal integrated resource plan process upon which the Commission could encroach).

USCA4 Appeal: 24-1650   Doc: 224     Filed: 01/21/2025   Pg: 234 of 2455
Document Accession #: 20240513-3036     Filed Date: 05/13/2024

Docket No. RM21-17-000                                              - 224 -

within our jurisdiction to determine the factors that transmission providers must
incorporate in order to identify Long-Term Transmission Needs.

275.    Commenters' arguments that the final rule would not withstand judicial scrutiny
under the "major questions doctrine" are similarly unfounded.  For example, some
commenters appear to misinterpret *West Virginia v. EPA* as standing for the proposition
that "the nation's energy policy and generation mix is a 'major question' and that an
agency must have direct authorization from Congress to assert jurisdiction" over these
matters.[631]  As an initial matter, as noted above, the aim of this final rule is not to
influence the generation mix or energy policy more broadly, but to ensure that
Commission-jurisdictional transmission providers are planning for Long-Term
Transmission Needs in a manner that is just and reasonable and results in just and
reasonable Commission-jurisdictional rates.

276.    In any case, the Court did not determine that energy policy and the mix of
generation resources are *in every instance* a major question.  Instead, in *West Virginia v.
EPA*, the U.S. Supreme Court considered a specific agency action in light of a specific
statutory provision and concluded that the Environmental Protection Agency's (EPA)
exercise of authority was a "major question" based on a variety of factors specific to that
context—including whether the EPA's administrative action was a "transformative"

---

[631] SERTP Sponsors Initial Comments at 17-18; Southern Initial Comments at 20;
*see also* Undersigned States Reply Comments at 3 ("National-scale energy grid
regulation is a 'major question' because of the massive economic consequences involved
in such regulation.").

USCA4 Appeal: 24-1650   Doc: 224      Filed: 01/21/2025   Pg: 235 of 2455
Document Accession #: 20240513-3036      Filed Date: 05/13/2024

Docket No. RM21-17-000                                                - 225 -

expansion of its power, whether the EPA had relevant technical and policy expertise,

whether the relevant statutory provision was "ancillary" to the broader statutory

construct, and whether the EPA's administrative action implicated significant economic

and political questions.[632]

277.    Commenters have not attempted a similar analysis of whether courts should

construe this final rule as a "major question,"[633] and we find that their contentions that

courts ought to do so are based on the factual mischaracterizations discussed above.  In

any event, this final rule neither transforms nor expands the Commission's authority; it

merely applies existing authority, based on the Commission's expertise and experience,

to identify and remedy deficiencies in existing regional transmission planning and cost

allocation processes.[634]  As with Order Nos. 890 and 1000, the Commission is

promulgating a final rule pursuant to FPA section 206 to address those deficiencies in

order to ensure that transmission planning practices, a subject long-regulated by the

Commission and well within its area of expertise, remain just and reasonable and not

unduly discriminatory or preferential.  To that end, this final rule requires further reforms

---

[632] *West Virginia v. EPA*, 597 U.S. at 710, 724-725, 729, 731-32; *see also Biden v. Nebraska*, 143 S. Ct. 2355, 2372-2374 (2023) (applying *West Virginia v. EPA's* mode of analysis).

[633] *See* Harvard ELI and Policy Integrity Supplemental Comments at 2 (arguing that Undersigned States, for example, "overlook key requirements of the major questions doctrine").

[634] *See, e.g.*, *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d at 68-69.  *Cf. PJM Power Providers Grp. v. FERC*, 88 F.4th at 274.

Docket No. RM21-17-000                                                      - 226 -

to regional transmission planning and cost allocation processes so that they are

sufficiently long-term, forward-looking, and comprehensive.  And while the transmission

planning required in this final rule may be more forward-looking, long-term, and

comprehensive than the status quo, as a matter of the Commission's jurisdiction, it is

fundamentally no different than the regional transmission planning already required by

the Commission and upheld by appellate courts.[635]  In short, the differences in

transmission planning required by this final rule represent differences in degree, not kind,

from the Commission's longstanding regulations.  As such, they are a far cry from the

"transformative expansion" of the EPA's authority on which the Court relied in *West

Virginia v. EPA* to find that the issue presented therein represented a major question not

delegated to the agency to decide.

278.   Just as it is clear that incremental improvements to practices that the courts have

already determined fall squarely within the Commission's jurisdiction do not constitute a

"transformative expansion" or "extraordinary grant" of regulatory authority to which the

major questions doctrine may apply, so too is it clear that the other ancillary factors cited

by the Court are similarly inapplicable.  The final rule's incremental process

improvements, while necessary to ensure just and reasonable Commission-jurisdictional

rates, do not have the "vast economic and political significance" that would implicate the

---

[635] *See, e.g.*, *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d at 48-49; *see also* Harvard
ELI and Policy Integrity Supplemental Comments at 4-7.

major questions doctrine.[636]  The Commission's regulation of interstate transmission rates will have an effect on billions of dollars in customer charges and, in that generic sense, is of political interest to many.  The incremental process improvements required by the final rule, however, do not fundamentally change the economic or political stakes of ensuring that Commission-jurisdictional rates remain just and reasonable.

279.    Likewise, the Commission's continued assertion of authority over regional transmission planning and cost allocation processes does not resemble the EPA's assertion of authority related to the electric system that the Court found to be beyond that agency's expertise.[637]  Here, the Commission undisputedly bears the relevant expertise over the interstate transmission system.[638]  Nor does the Commission rely on a "backwater" statutory provision to achieve its reforms.[639]  The Commission relies on FPA sections 205 and 206, which the Court has held "unambiguously authorize[]" the Commission to assert jurisdiction over interstate transmission[640] and extends an

---

[636] *West Virginia v. EPA*, 597 U.S. at 735 (J. Gorsuch, concurring).

[637] *West Virginia v. EPA*, 597 U.S. at 729 (finding relevant that EPA itself admitted it lacked expertise to project "system-wide trends in areas such as electricity transmission, distribution, and storage").

[638] *Cf. Amerada Hess Pipeline Corp. v. FERC*, 117 F.3d 596, 600-01 (D.C. Cir. 1997) ("[The Federal Energy Regulatory Commission] is entrusted with administering the regulations relating to oil pipelines and has an expertise in the field *based on that jurisdiction*." (emphasis added)).

[639] *West Virginia v. EPA*, 597 U.S. at 729.

[640] *New York v. FERC*, 535 U.S. at 19.

authority—indeed, a duty—to ensure that the practices directly affecting such rates are just and reasonable.[641]  This provision was not ancillary to the statutory scheme but, rather, central to Congress' aim to ensure that the Commission possessed adequate authority to regulate interstate transmission beyond the reach of state power.[642]  Finally, commenters do not point to Congress's "conspicuous[] and repeated[]" rejection of legislation that would enact reforms similar to those adopted in the final rule.[643]

280.    We also disagree with Undersigned States' legal claim that allowing "one [s]tate [to] effectively require other [s]tates to subsidize their own vision of what resources should be used in electricity generation" would violate the Constitution's "equal sovereignty doctrine."[644]  As discussed above, the final rule categorically does not require states to subsidize other states' public policies or generation decisions.  To the contrary, consistent with the cost causation principle, this final rule requires customers to pay for a share of the costs of new Long-Term Regional Transmission Facilities only to the extent that *they* benefit from those facilities and, even then, any share they pay for must be roughly commensurate with the benefits they receive.[645]

---

[641] *EPSA*, 577 U.S. at 277.

[642] *New York v. FERC*, 535 U.S. at 20-21 (discussing enactment of FPA in 1935 as a response to *Attleboro*).

[643] *West Virginia v. EPA*, 597 U.S. at 745 (J. Gorsuch, concurring).

[644] Undersigned States Reply Comments at 5-6.

[645] *See supra* note 623 and accompanying discussion.

USCA4 Appeal: 24-1650   Doc: 224     Filed: 01/21/2025   Pg: 239 of 2455
Document Accession #: 20240513-3036      Filed Date: 05/13/2024

Docket No. RM21-17-000                                                    - 229 -

281.    Moreover, according to Undersigned States, the equal sovereignty doctrine

dictates that the nation "is a union of [s]tates, equal in power, dignity and authority, each

competent to exert that residuum of sovereignty not delegated to the United States by the

Constitution itself."[646]  But, "neither the Supreme Court nor any other court has ever

applied that principle as a limit on the Commerce Clause or other Article I powers."[647]

Instead, Courts have found that "the Constitution does not contain any textual provision

suggesting an equal sovereignty limit on Congress's Article I powers generally or on the

Commerce Clause in particular."[648]  As relevant here, pursuant to the Constitution's

Commerce Clause,[649] Congress duly enacted the FPA, which in turn empowers the

Commission to regulate the rates and practices affecting rates for the transmission of

electricity in interstate commerce.[650]  Under the FPA, the Commission is "unambiguously

authorize[d] . . . to take state policies into account to the extent that such policies affect

[the Commission's] statutorily prescribed area of focus . . . ."[651]

---

[646] Undersigned States Reply Comments at 5 (citing *Coyle v. Smith*, 221 U.S.at 567 ).  *But see Ohio v. EPA*¸ 2024 WL 1515001, at *15 (D.C. Cir. Apr. 9, 2024) (holding that "[t]he equal footing cases," like *Coyle v. Smith*, "do not directly apply either outside of the admission context or to Article I powers like the Commerce Clause.").

[647] *Ohio v. EPA*, 2024 WL 1515001 at *13.

[648] *Id.* at *16.

[649] U.S. Const. art. 1, 8.

[650] 16 U.S.C. 824d.

[651] *PJM Power Providers Grp. v. FERC*, 88 F.4th at 275; *see also Elec. Power Supply Ass'n v. Star*, 904 F.3d at 524 (approving of the Commission's decision to take state zero-emissions credit systems like that in Illinois "as givens and set out to make the

282.    The nature of the interconnected transmission system is such that states naturally affect one another in pursuing policies available to them while exercising the authority reserved to them under FPA section 201.[652]  For the reasons explained in this final rule, we conclude that transmission providers must participate in a regional transmission planning process that includes Long-Term Regional Transmission Planning, and we find that transmission providers must have the opportunity to select Long-Term Regional Transmission Facilities that more efficiently or cost-effectively address Long-Term Transmission Needs.  Our role within our federal system is not to "unreasonably interfere with" nor to "pass judgement on state and local policies and objectives,"[653] including where such policies and objectives have incidental interstate effects.[654]  Nor need we, because even if one state's public policy is a driver of a Long-Term Transmission Need,

---

best of the situation [these systems] produce").

[652] *See Elec. Power Supply Ass'n v. Star*, 904 F.3d at 524 (describing the effects on interstate sales resulting from states' exercise of powers reserved to them under FPA section 201 as "an inevitable consequence of a system in which power is shared between state and national governments" (citing *Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150, 164 (2016)).

[653] *N.J. Bd. Pub. Utils. v. FERC*, 744 F.3d 74, 98 n.24 (3rd Cir. 2014) (quoting *PJM Interconnection, L.L.C.*, 137 FERC ¶ 61,145, at P 3 (2011)); *see also PJM Interconnection, L.L.C.*, 186 FERC ¶ 61,080, at P 186 (2024) (rejecting an argument that the Commission was required to determine whether state-sponsored resources were providing disproportionate benefits to other states in the form of lower capacity market prices).

[654] *See Coal. for Competitive Elec. v. Zibelman*, 906 F.3d 41, 56 (2d Cir. 2018) (collecting Commission orders sanctioning state-jurisdictional programs incidentally affecting wholesale markets).

the costs of a Long-Term Regional Transmission Facility that transmission providers select will be allocated to transmission customers only to the extent that they benefit from that facility and only to a degree that is at least roughly commensurate with the benefits that facility provides to them. That approach is consistent with Commission precedent and commenters have not demonstrated that this framework results in impermissible cross-subsidization among states.[655]

283.    Finally, in response to NRECA's request, we confirm that the final rule is consistent with the Commission's obligation under FPA section 217(b)(4). As articulated in *South Carolina Public Service Authority v. FERC*, FPA section 217(b)(4) requires the Commission to "facilitate the planning of a reliable grid," and we do so by "seek[ing] to ensure that adequate transmission capacity is built to allow load-serving entities to meet their service obligations."[656] This final rule seeks to ensure precisely the same goal, and it therefore satisfies the Commission's obligation under FPA section 217(b)(4).

---

[655] For example, PJM incorporates transmission needs driven by Public Policy Requirements into the assumptions stage of its regional transmission planning process to identify needed reliability and economic regional transmission facilities for potential selection and cost allocation, rather than through a separate and distinct process to identify and allocate the costs of transmission facilities selected to address transmission needs driven by Public Policy Requirements. The Commission found PJM's approach complied with the requirement in Order No. 1000 to consider transmission needs driven by Public Policy Requirements in regional transmission planning and cost allocation processes. *PJM Interconnection, L.L.C.*, 142 FERC ¶ 61,214, at PP 109-120 (2013), *order on reh'g and compliance*, 147 FERC ¶ 61,128, at PP 66-71 (2014).

[656] 762 F.3d at 90.

## B.    Development of Long-Term Scenarios

### 1.    NOPR Proposal

284.    In the NOPR, the Commission proposed to require transmission providers to develop Long-Term Scenarios as part of Long-Term Regional Transmission Planning. The Commission proposed to define Long-Term Scenarios as a tool to identify the transmission planning region's needs driven by changes in the resource mix and demand—and enable the evaluation of transmission facilities to meet such transmission needs—across multiple scenarios that incorporate different assumptions about the future electric power system over a sufficiently long-term, forward-looking transmission planning horizon.  The Commission explained that a scenario is a hypothetical sequence of events that includes assumptions used to forecast transmission needs.  The Commission also stated that assumptions used to forecast transmission needs driven by changes in the resource mix and demand include:  forecasts of the level and pattern (i.e., hourly and seasonal variability) of future electricity demand; the quantity, location, and type of resource additions and retirements; and other relevant forecasts about the electric power system that are used as inputs to the transmission model and determine the need for new transmission facilities over the transmission planning horizon.  In addition, the Commission noted that other relevant assumptions might include forecasts for natural gas prices, increasing outage trends due to extreme weather and climatic trends, and other future events.

285.    The Commission also proposed in the NOPR to require that transmission providers use Long-Term Scenarios to evaluate potential regional transmission facilities

needed to meet transmission needs driven by changes in the resource mix and demand to

identify the more efficient or cost-effective regional transmission facilities.[657]

## 2.    Comments

### a.    General Comments

286.    Of the commenters specifically addressing the proposal to require Long-Term

Scenarios in Long-Term Regional Transmission Planning, the majority support scenario-

based planning.[658]  Clean Energy Buyers state that Long-Term Scenarios are critical to

Long-Term Regional Transmission Planning because its success will depend on the

quality of forecasting.[659]  Form Energy states that long-term scenario review will ensure

that transmission upgrades address future needs in a cost-effective and environmentally

friendly manner.[660]  LADWP asserts that Long-Term Scenarios are critical to developing

---

[657] NOPR, 179 FERC ¶ 61,028 at P 84.

[658] *See* ACEG Initial Comments at 6; AEP Initial Comments at 7-8; Amazon Initial Comments at 2-3; BP Initial Comments at 4; California Commission Initial Comments at 1-2, 5-6, 21; California Energy Commission Initial Comments at 1-2; City of New York Initial Comments at 7; Clean Energy Associations Initial Comments at 10; Clean Energy Buyers Initial Comments at 11; Duke Initial Comments at 10; Eversource Initial Comments at 10; Exelon Initial Comments at 5; Form Energy Initial Comments at 2-3; GridLab Initial Comments at 10; Handy Law Initial Comments at 9-10; Indicated PJM TOs Initial Comments at 7-8; LADWP Initial Comments at 2; NARUC Initial Comments at 4; National Grid Initial Comments at 10-11; PIOs Initial Comments at 14; PPL Initial Comments at 4; SEIA Initial Comments at 4-5; Southeast PIOs Initial Comments at 42; SREA Initial Comments at 39; State Agencies Initial Comments at 14; State Officials Supplemental Comments at 1 (citing US Climate Alliance Initial Comments); US Climate Alliance Initial Comments at 2; WE ACT Initial Comments at 3; WIRES Initial Comments at 6.

[659] Clean Energy Buyers Initial Comments at 11.

[660] Form Energy Initial Comments at 3.

an effective transmission system that ensures reliability, while also providing flexibility to support the delivery of renewable energy.[661]  NARUC states that Long-Term Scenarios are a flexible planning tool for addressing the uncertainty involved in identifying transmission needs driven by changes in the resource mix and demand and that using them will ensure that transmission providers adequately assess the potential benefits of regional transmission facilities.[662]

287.    Southeast PIOs claim that Long-Term Scenarios are essential to improving current transmission planning processes in the Southeast.[663]  SREA argues that Long-Term Regional Transmission Planning is not occurring in MISO South and states that scenario planning is contentious but necessary.[664]

288.    California Energy Commission requests that the Commission clarify that transmission providers may rely on scenarios developed by other agencies, as currently CAISO relies on analyses conducted by California Energy Commission and California Commission.[665]  Relatedly, New York Commission and NYSERDA and ISO-NE highlight the importance of state-led identification of public policy needs and their impact

---

[661] LADWP Initial Comments at 2.

[662] NARUC Initial Comments at 4.

[663] Southeast PIOs Initial Comments at 42, 46.

[664] SREA Initial Comments at 39-41.

[665] California Energy Commission Initial Comments at 2.

Docket No. RM21-17-000                                                          - 235 -

on scenario assumptions.[666]  New York Commission and NYSERDA state that,

especially in a single-state RTO/ISO like NYISO, the state should be afforded a central

role in determining the scenarios to be studied.[667]  ISO-NE also believes that reliance on

states is consistent with prior Commission orders permitting transmission providers to

rely on a committee of state regulators to identify transmission needs driven by Public

Policy Requirements.[668]

289.    PJM States suggest that the Commission's proposal for state involvement in the

development of Long-Term Scenarios could be interpreted as more limited than its

proposal for state involvement with respect to Long-Term Regional Cost Allocation and

ask that the Commission clarify that retail regulators have a primary role in both.  PJM

States warn that, if a retail regulator disagrees with the scenarios or benefits metrics used

to select a transmission project, it is unlikely to receive regulatory approval.[669]

290.    Cypress Creek asserts that the Commission should require the use of a defined and

standardized set of baseline assumptions to ensure that scenario projections are realistic,

---

[666] New York Commission and NYSERDA Initial Comments at 7; ISO-NE Initial
Comments at 25-26.

[667] New York Commission and NYSERDA Initial Comments at 8.

[668] ISO-NE Initial Comments at 25 (citing *ISO New England Inc.*, 143 FERC
¶ 61,150, at P 108 (2013)).

[669] PJM States Initial Comments at 3-4 (citing NOPR, 179 FERC ¶ 61,028 at
P 245).

and that deviation should only be allowed if the proposal is consistent with or superior to the *pro forma*.[670]

291.    Concerned Scientists state that the Commission should reject comments arguing that uncertainty prohibits scenario-based planning, and instead endeavor to create a transmission planning process that properly acknowledges and addresses that uncertainty. Concerned Scientists state that uncertainty does not prohibit long-term transmission planning but rather necessitates the evaluation of multiple plausible scenarios to identify investments that will perform well over a variety of possible future conditions. Concerned Scientists explain that, just as utilities and generator developers do not shy away from an uncertain future when building new generation resources, transmission investments should also be informed by, but not avoided due to, future uncertainty. Concerned Scientists state that the Commission's proposed Long-Term Scenarios requirements are a reasonable minimum for responsible transmission planning.[671]

292.    Other commenters support the NOPR proposal to require Long-Term Scenarios in transmission planning but have reservations.[672]  Many of these commenters argue that the NOPR is too prescriptive and ask for greater flexibility so that the Long-Term Scenario

---

[670] Cypress Creek Reply Comments at 5-8.

[671] Concerned Scientists Reply Comments at 18-19.

[672] Ameren Initial Comments at 7-8; American Municipal Power Initial Comments at 7; APPA Initial Comments at 25; CAISO Initial Comments at 21; Chemistry Council Initial Comments at 5; Michigan Commission Initial Comments at 4-5; MISO TOs Initial Comments at 15-17; Omaha Public Power Initial Comments at 3-4; OMS Initial Comments at 3-5; PJM Initial Comments at 54.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 247 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                    - 237 -

planning already occurring in their respective transmission planning region will comply with any final rule.[673]  For example, OMS points to such flexibility as key to the success of MISO's long-term transmission planning processes.[674]  SERTP Sponsors argue that the Commission should not make Long-Term Scenarios even more prescriptive because such an approach would likely result in litigation and delay.[675]

293.    American Municipal Power believes that transmission providers should conduct Long-Term Scenarios in a highly collaborative way with the full and active participation of all stakeholders.[676]  Similarly, Six Cities recommend that Long-Term Scenarios be coordinated between state and local regulatory authorities to reflect varying policies.  Six Cities recommend that, in CAISO, Long-Term Scenarios should consider the procurement choices of non-jurisdictional utilities, such as Six Cities, as well as policy portfolios provided by California Commission.[677]

294.    Some commenters oppose the NOPR proposal to require Long-Term Scenarios in Long-Term Regional Transmission Planning.[678]  Dominion argues for maximum

---

[673] CAISO Initial Comments at 21; Michigan Commission Initial Comments at 4-5; MISO TOs Initial Comments at 15-16; OMS Initial Comments at 3-4.

[674] OMS Initial Comments at 4-5.

[675] SERTP Sponsors Reply Comments at 13-14.

[676] American Municipal Power Initial Comments at 7.

[677] Six Cities Initial Comments at 4.

[678] Dominion Initial Comments at 10; Idaho Commission Initial Comments at 3; Nebraska Commission Initial Comments at 3; Ohio Consumers Initial Comments at 2, 5; Potomac Economics Initial Comments at 2.

flexibility for planning assumptions to support reliable and affordable transmission service for customers.[679]  Idaho Commission states that any prescription for scenario analysis should be supported by clear evidence of a deficiency.[680]  Instead of specific scenario planning requirements, Nebraska Commission states that the Commission should provide general guidelines and as much flexibility as possible to transmission providers, who—along with state regulatory officials—are best situated to evaluate the needs of each transmission planning region.[681]

295.   Potomac Economics questions the NOPR's proposal to require Long-Term Scenarios, stating that it will force RTOs/ISOs to plan and commit to sizable transmission investment costs based on uncertain factors and unreasonable speculation on factors such as the location of future generation, retirements, grid enhancing technologies, and transmission reconfiguration options.[682]  Potomac Economics also questions the usefulness of Long-Term Scenarios, asserting that future congestion patterns will be increasingly uncertain given that the higher penetration of intermittent resources will cause larger fluctuations in transmission flows, making it more difficult to accurately estimate the benefits of transmission upgrades.[683]  Potomac Economics argues that many

---

[679] Dominion Initial Comments at 10-12.

[680] Idaho Commission Initial Comments at 3.

[681] Nebraska Commission Initial Comments at 3.

[682] Potomac Economics Initial Comments at 2, 4.

[683] *Id*. at 2.

of the most beneficial transmission upgrades address very specific constraints, are smaller in size, can be difficult to identify in advance, and can be very sensitive to modest changes in generation and load.[684]

### b.    Applying Scenario Planning to Reliability and Economic Planning

296.    California Commission and City of New York assert that the Commission should require the use of Long-Term Scenarios in all transmission planning processes—not just Long-Term Regional Transmission Planning.[685]  City of New York argues that such a requirement would enable consideration of a broad range of potential future system conditions across multiple planning categories.[686]  Similarly, NYISO states that the final rule should authorize, but not require, the use of multiple alternative scenarios in existing transmission planning processes.  NYISO states that doing so would enhance its ability to anticipate and solicit more efficient, holistic transmission solutions, which would support system reliability and resilience.[687]

297.    In contrast, certain commenters oppose requiring transmission providers to incorporate some form of scenario analysis into their existing reliability and economic

---

[684] *Id*. at 3.

[685] California Commission Initial Comments at 22-24; City of New York Initial Comments at 7.

[686] City of New York Initial Comments at 7.

[687] NYISO Initial Comments at 14-15.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 250 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

regional transmission planning processes.[688]  Duke contends that the Commission should avoid disrupting existing regional transmission planning processes that work well.[689] MISO notes that, while this type of scenario-based planning has been applied to economic transmission planning processes and could be applied to existing reliability transmission planning processes, such application should be flexible and tailored to the unique needs of each transmission provider, adding that scenario-based planning requires considerable time and resources.[690]

### 3.  Commission Determination

298.    We adopt, with modification, the NOPR proposals to require transmission providers in each transmission planning region to (1) develop and use Long-Term Scenarios as part of Long-Term Regional Transmission Planning and (2) use those Long-Term Scenarios to identify and evaluate Long-Term Regional Transmission Facilities needed to meet Long-Term Transmission Needs.  As further explained in subsequent sections of this final rule, we find that these requirements regarding the development and use of Long-Term Scenarios in Long-Term Regional Transmission Planning strike a reasonable balance between ensuring that Long-Term Regional Transmission Planning reasonably identifies Long-Term Transmission Needs over a sufficiently long-term,

---

[688] Duke Initial Comments at 2, 10-11; Eversource Initial Comments at 19; MISO Initial Comments at 32; NESCOE Initial Comments at 23; PJM Initial Comments at 54-56.

[689] Duke Initial Comments at 2, 10-11.

[690] MISO Initial Comments at 32.

forward-looking transmission planning horizon and providing sufficient flexibility for transmission providers to develop and use Long-Term Scenarios in a way that reflects the unique characteristics of their respective transmission planning regions.

299.    We first address the definition of Long-Term Transmission Needs.  For purposes of this final rule, Long-Term Transmission Needs are transmission needs identified through Long-Term Regional Transmission Planning by, among other things and as discussed in this final rule, running scenarios and considering the enumerated categories of factors.  As explained in the NOPR, the drivers of transmission needs are diverse and include, but are not limited to, evolving reliability concerns, changes in the resource mix, and changes in demand.  For example, as identified in the NOPR, reliability concerns giving rise to Long-Term Transmission Needs include, among other things, the increasing frequency of high-impact extreme weather events, the increasing reliance by transmission system operators on regional integration and coordination to reliably serve load, the operational challenges created by the increasing share of variable resources entering the resource mix, and changes in electric demand patterns such as shifts in load profiles caused by, for example, the emergence of large loads associated with evolving industrial and commercial needs such as the growth in data centers, and increased electrification of energy end uses.[691]

300.    In the NOPR, the Commission referred to transmission needs identified through Long-Term Regional Transmission Planning largely as needs driven by changes in the

---

[691] *See* NOPR, 179 FERC ¶ 61,028 at PP 45, 51.

resource mix and demand.[692]   Nevertheless, we agree with commenters who correctly

note that there are additional drivers of Long-Term Transmission Needs,[693] and, as noted

above, the Commission itself contemplated in the NOPR that Long-Term Regional

Transmission Planning would consider drivers beyond those tied directly to changes in

supply and demand.  We therefore clarify that, although changes in the resource mix and

demand are important drivers of Long-Term Transmission Needs, they represent only a

subset of such drivers.  In addition, we note that Long-Term Transmission Needs are

similar in kind to transmission needs identified through existing regional transmission

planning processes established under Order No. 1000.  Where Long-Term Transmission

Needs differ is their identification through the long-term, forward-looking, and more

comprehensive regional transmission planning and cost allocation processes established

in this final rule.  Accordingly, in this final rule, we refer to the transmission needs that

are identified through Long-Term Regional Transmission Planning as Long-Term

---

[692] *Id.*

[693] *See, e.g.*, AEE Initial Comments at 7-8 (noting that reforms are needed to meet transmission needs driven by "market forces, state policies, and new reliability and resilience imperatives"); ELCON Initial Comments at 4 ("[L]ong term scenario planning should not be limited to anticipated resource mix but also take into consideration impacts on reliability and congestion management."); New Jersey Commission Initial Comments at 2 ("[T]he Board stresses that most of the reforms the Commission is proposing would be necessary even in the absence of 'changes in the resource mix and demand.'") (citing NOPR, 179 FERC ¶ 61,028 at P 24); Renewable Northwest Initial Comments at 8 (noting how current transmission planning processes ignore both "trends in future generation and the impact of extreme weather events") (citing NOPR, 179 FERC ¶ 61,028 at P 51); Southeast PIOs Initial Comments at 7-8 (noting that both intensifying "changes in the generation mix" and "increasingly common extreme weather and high-intensity, low frequency events" burden the existing transmission system).

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 253 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Transmission Needs.  The identification of Long-Term Transmission Needs and Long-

Term Regional Transmission Facilities to potentially meet those needs is accomplished

through the use of Long-Term Scenarios in Long-Term Regional Transmission Planning.

301.    As discussed in the Requirement for Transmission Providers to Use a Set of Seven

Required Benefits section of this final rule, we require transmission providers to measure

and use a set of seven required benefits in Long-Term Regional Transmission Planning.

Transmission providers must use this same set of benefits to help to inform their

identification of Long-Term Transmission Needs.  For example, in this final rule we

require transmission providers to measure and use production cost savings in Long-Term

Regional Transmission Planning.  As such, when transmission providers are working to

identify Long-Term Transmission Needs, areas of significant congestion on the

transmission system—where Long-Term Regional Transmission Facilities could reduce

congestion and in turn facilitate production cost savings—may indicate a Long-Term

Transmission Need.

302.    We adopt the definition of Long-Term Scenarios proposed in the NOPR,[694] with

modification.  We define Long-Term Scenarios as scenarios that incorporate various

assumptions using best available data inputs about the future electric power system over a

---

[694] In the NOPR, the Commission proposed to define Long-Term Scenarios as a
tool to identify transmission needs driven by changes in the resource mix and demand—
and enable the evaluation of transmission facilities to meet such transmission needs—
across multiple scenarios that incorporate different assumptions about the future electric
power system over a sufficiently long-term, forward-looking transmission planning
horizon.  NOPR, 179 FERC ¶ 61,028 at P 84.

sufficiently long-term, forward-looking transmission planning horizon to identify Long-
Term Transmission Needs and enable the identification and evaluation of transmission
facilities to meet such transmission needs.  We make this modification to clarify the
intent of the definition proposed in the NOPR, rather than modify the definition in
substance.

303.    Certain commenters assert that the Commission should not require transmission
providers to develop Long-Term Scenarios due to the inherent uncertainty of forecasting
future transmission needs over a long transmission planning horizon.  We acknowledge
the inherent uncertainty involved in planning to meet Long-Term Transmission Needs.
However, we believe that such uncertainty is mitigated by using Long-Term Scenarios
themselves, as noted by Concerned Scientists and NARUC.[695]  Scenario planning allows
transmission providers to evaluate whether Long-Term Regional Transmission Facilities
are beneficial in more than one scenario.  Transmission providers may also examine
whether Long-Term Transmission Needs appear in one or more scenarios.  Scenario
planning also allows transmission providers to consider a broader range of future
circumstances and be better prepared for changes in the electric power system.[696]  Finally,
transmission providers may use scenario planning to determine whether identified Long-
Term Regional Transmission Facilities provide sufficient benefits across more than one

---

[695] Concerned Scientists Reply Comments at 18-19; NARUC Initial Comments at
4 (citing NOPR, 179 FERC ¶ 61,028 at PP 86, 88).

[696] *See* Policy Integrity Reply Comments at 2.

scenario when considering whether to select such facilities, as also noted by NARUC.[697]

Moreover, we adopt requirements for Long-Term Scenarios, as discussed further below, to ensure they are based on reasonable assumptions and better reflect future transmission system conditions and uncertainties in those future circumstances.  In sum, incorporating Long-Term Scenarios into Long-Term Regional Transmission Planning provides an appropriate approach to ensure just and reasonable rates by accounting for the increasing uncertainty in the accuracy of assumptions over longer (i.e., over 10 years) transmission planning horizons and mitigating the risks of under-building or over-building Long-Term Regional Transmission Facilities.

304.    Further, we disagree with commenters that suggest that the Commission should not establish specific Long-Term Scenario requirements and that imposing general principles is sufficient to ensure just and reasonable rates.  We find that Long-Term Regional Transmission Planning that does not incorporate Long-Term Scenarios that meet the requirements of this final rule would fail to ensure that transmission providers identify Long-Term Transmission Needs, as well as identify and evaluate Long-Term Regional Transmission Facilities to address those needs.  For example, relying on a single forecast of future transmission system conditions may limit transmission providers' and stakeholders' confidence in identified Long-Term Transmission Needs, and accordingly the evaluation of Long-Term Regional Transmission Facilities to address those needs.  Further, failure to incorporate Long-Term Scenarios would increase the

---

[697] NARUC Initial Comments at 4.

likelihood of piecemeal and relatively inefficient or less cost-effective transmission

development. Accordingly, we find that requiring transmission providers to develop and

use Long-Term Scenarios that meet the requirements established in this final rule as part

of Long-Term Regional Transmission Planning will ensure that Commission-

jurisdictional rates are just and reasonable and not unduly discriminatory or preferential.

305.    Additionally, as stated above and in response to commenters that emphasize the

importance of collaboration in developing Long-Term Scenarios, this final rule retains

the requirements for an open, coordinated, and transparent local transmission planning

process established in Order No. 890 and further required for regional transmission

planning in Order No. 1000.[698]  For example, consistent with the transparency

transmission planning principle,[699] transmission providers must make transparent the

methodology, criteria, assumptions, and data used to develop each Long-Term Scenario.

Moreover, as described below, this final rule requires that transmission providers provide

meaningful opportunity for stakeholder input, including from state and local regulators,

as well as non-jurisdictional entities, into the factors used to develop Long-Term

Scenarios.

306.    In response to PJM's request that the Commission clarify that the role of the state

regulator is primary in developing Long-Term Scenarios, we note that, as described in the

---

[698] Order No. 1000, 136 FERC ¶ 61,051 at PP 150-152; Order No. 890, 118 FERC ¶ 61,119 at P 435.

[699] Order No. 890, 118 FERC ¶ 61,119 at P 471.

Docket No. RM21-17-000                                                                    - 247 -

Stakeholder Process and Transparency determination within the Categories of Factors

section, transmission providers retain the ultimate responsibility for transmission

planning.[700]  As such, transmission providers have discretion, subject to the limits

imposed in this final rule, to weigh more heavily one source of information over another,

such as weighing information related to a factor provided by a state regulator more

heavily than information provided by other stakeholders.  In response to California

Energy Commission, we find that the final rule does not preclude transmission providers

from relying on scenarios developed by state agencies, provided that the Commission

finds that the OATT provisions governing those Long-Term Scenarios' development

comply with the Long-Term Scenarios requirements of this final rule (e.g., transmission

planning horizon and stakeholder input requirements).  We decline to require the use of

Long-Term Scenarios in all transmission planning processes, as requested by California

Commission and City of New York.  The record in this proceeding does not demonstrate

that the incorporation of Long-Term Scenarios in existing Order No. 1000 regional

transmission planning processes is necessary to ensure that Long-Term Regional

Transmission Planning is just and reasonable.  In response to NYISO's request that

---

[700] *Id*. P 454 ("In response to the suggestion by some commenters that we require
transmission providers to allow customers to collaboratively develop transmission plans
with transmission providers on a co-equal basis, we clarify that transmission planning is
the tariff obligation of each transmission provider, and the *pro forma* OATT planning
process adopted in this [f]inal [r]ule is the means to see that it is carried out in a
coordinated, open, and transparent manner, in order to ensure that customers are treated
comparably.  Therefore, the ultimate responsibility for planning remains with
transmission providers.").

transmission providers be allowed to use scenario planning in their existing Order

No. 1000 regional transmission planning processes, while we agree that such a practice

may offer benefits, we find that any such request amending existing transmission

planning processes must be submitted in an FPA section 205 filing separate from their

compliance filings to this final rule.[701]

### C. Long-Term Scenarios Requirements

#### 1. Transmission Planning Horizon

##### a. NOPR Proposal

307.   In the NOPR, the Commission proposed to require transmission providers to

develop Long-Term Scenarios as part of Long-Term Regional Transmission Planning

using no less than a 20-year transmission planning horizon.[702]

308.   The Commission preliminarily found that a 20-year transmission planning horizon

requirement strikes a reasonable balance between the current transmission planning

horizons used in many transmission planning regions and the 30-year or longer

transmission planning horizon proposed by some ANOPR commenters.  The

Commission noted that the 30-year or longer transmission planning horizon was

criticized by other commenters as speculative or too uncertain.  The Commission also

---

[701] We note that an exception to the requirement to file a separate FPA section 205 filing applies if transmission providers were to propose a unified transmission planning process, as discussed above.  *See supra* Participation in Long-Term Regional Transmission Planning section.

[702] NOPR, 179 FERC ¶ 61,028 at PP 97-100.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 259 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

stated that a 20-year transmission planning horizon requirement may be reasonable because some transmission providers use a 20-year transmission planning horizon in existing regional transmission planning processes.  In addition, the Commission stated that a 20-year transmission planning horizon would allow for sufficient time to identify, plan, and obtain siting and permitting approval for and to construct regional transmission facilities to meet long-term regional transmission needs, including those that may take longer than the average amount of time to go from the planning stage to in-service. Finally, the Commission stated that a 20-year transmission planning horizon would allow transmission providers to better leverage economies of scale by sizing transmission facilities to meet not only nearer-term transmission needs, but also longer-term transmission needs driven by changes in the resource mix and demand over time.  The Commission preliminarily found that by assessing transmission needs over a longer time horizon—for example, starting in year six[703] through year 20 of the transmission planning horizon—Long-Term Regional Transmission Planning should be able to identify more efficient or cost-effective regional transmission facilities to address these needs.[704]

---

[703] The Commission noted that the North American Electric Reliability Corporation defines the long-term transmission planning horizon as covering year six through year 10 and beyond.  *Id.* P 94 n.160.

[704] *Id.* PP 97-99 (footnotes omitted).

### b.    Comments

### i.    Support for 20-Year Transmission Planning Horizon

309.    Many commenters support the Commission's proposal to require transmission

providers to develop Long-Term Scenarios as part of Long-Term Regional Transmission

Planning using no less than a 20-year transmission planning horizon.[705]  Several

commenters generally consider a 20-year transmission planning horizon to be reasonable,

---

[705] ACORE Initial Comments at 1; Advanced Energy Buyers Initial Comments at 7; AEE Initial Comments at 8; AEP Initial Comments at 5, 8-12; Amazon Initial Comments at 2-3; BP Initial Comments at 4-5; Breakthrough Energy Initial Comments at 12-13; Breakthrough Energy Supplemental Comments at 1; California Water Initial Comments at 14-15; Certain TDUs Initial Comments at 3, 19; Clean Energy Associations Initial Comments at 10; Clean Energy Buyers Initial Comments at 12; Clean Energy States Initial Comments at 2; Concerned Scientists Reply Comments at 18-19; Cypress Creek Reply Comments at 4; DC and MD Offices of People's Counsel Initial Comments at 8; Environmental Groups Supplemental Comments at 2; Eversource Initial Comments at 14; Form Energy Initial Comments at 2; Georgia Commission Initial Comments at 2-3; GridLab Initial Comments at 5; Idaho Power Initial Comments at 4; Illinois Commission Initial Comments at 6; Indicated US Senators and Representatives Initial Comments at 1; Interwest Initial Comments at 4-5; ITC Initial Comments at 9-11; LADWP Initial Comments at 2; Minnesota State Entities Initial Comments at 4; National and State Conservation Organizations Initial Comments at 1; National Grid Initial Comments at 12-13; Nevada Commission Initial Comments at 7; New England for Offshore Wind Initial Comments at 2; New Jersey Commission Initial Comments at 9-10; NextEra Initial Comments at 62; NYISO Initial Comments at 2; Pacific Northwest State Agencies Initial Comments at 2; PG&E Initial Comments at 2; Policy Integrity Initial Comments at 10; PIOs Initial Comments at 15; R Street Initial Comments at 6; SEIA Initial Comments at 6; SoCal Edison Initial Comments at 11-12; Southeast PIOs Initial Comments at 43; SPP Initial Comments at 5-6; SPP Market Monitor Initial Comments at 4-5; State Officials Supplemental Comments at 1 (citing US Climate Alliance Initial Comments at 2); US Climate Alliance Initial Comments at 2; US DOE Initial Comments at 10; Vermont Electric and Vermont Transco Initial Comments at 2; Vermont State Entities Initial Comments at 5; WE ACT Initial Comments at 3.

acceptable, or appropriate.[706]  Some commenters argue that a 20-year transmission planning horizon provides a reasonable balance between shorter- and longer-term transmission planning horizons.[707]  National Grid states that a 20-year transmission planning horizon balances the benefits of prospective transmission planning with the greater uncertainty that comes with forecasting system needs over a longer period.[708]  Numerous commenters argue that a 20-year transmission planning horizon will help to improve the efficiency and cost of developing transmission and to assess future transmission needs.[709]

310.    New Jersey Commission argues that a 20-year transmission planning horizon should help to make long-term multi-driver transmission projects viable by identifying needs and opportunities in a timeframe that allows states to have a meaningful conversation about voluntarily funding such projects.[710]  Policy Integrity argues that it is crucial to model what is going to be needed *over* the next 20 years to ensure that short-

---

[706] CAISO Initial Comments at 21; EEI Initial Comments at 11; Entergy Initial Comments at 9; NARUC Initial Comments at 5; New York TOs Initial Comments at 10; Pine Gate Initial Comments at 19-20; PPL Initial Comments at 6; WIRES Initial Comments at 7.

[707] DC and MD Offices of People's Counsel Initial Comments at 8-9; LADWP Initial Comments at 2-3; National Grid Initial Comments at 12-13.

[708] National Grid Initial Comments at 12-13.

[709] AEP Reply Comments at 4-5 (citing MTEP2017 Review at 33-34); Amazon Initial Comments at 2-3; BP Initial Comments at 5; Certain TDUs Reply Comments at 5; PIOs Initial Comments at 15.

[710] New Jersey Commission Initial Comments at 9-10, 28.

and medium-term transmission projects are built efficiently, stating that a longer

transmission planning horizon is reasonable in the context of long-lived transmission

assets with long lead times.[711]

311.   US DOE asserts that there is sufficient evidence to extend the transmission

planning horizon to a minimum of 20 years for Long-Term Regional Transmission

Planning to capture power sector changes that occur during transmission development.[712]

PIOs note that panelists at the November 2021 Technical Conference suggested a 20-year

transmission planning horizon is necessary, in part, due to long-term public policy

goals.[713]  Acadia Center and CLF similarly argue that transmission planners should plan

over long-term horizons to factor in predictable trends, such as timelines required under

state laws and policies.[714]

312.   Several commenters emphasize that a transmission planning horizon of 20 years is

sufficient to account for the amount of time needed to develop transmission projects,

considering the complexity and challenges of major transmission development.[715]

Eversource states that a long-term perspective is necessary to take advantage of the

---

[711] Policy Integrity Initial Comments at 10.

[712] US DOE Initial Comments at 10.

[713] PIOs Initial Comments at 15 (citing Tr. 129-137 (multiple witnesses)).

[714] Acadia Center and CLF Initial Comments at 4.

[715] Eversource Initial Comments at 14; Illinois Commission Initial Comments at 6;
LADWP Initial Comments at 2; NextEra Initial Comments at 62-63; PG&E Initial
Comments at 2; PIOs Initial Comments at 15.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 263 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

economies of scale that large transmission projects can enable, as well as to incorporate

anticipated changes in generation and load beyond the traditional transmission planning

horizon.[716]  Illinois Commission states that a 20-year transmission planning horizon is

necessary to properly plan and build transmission and generation resources.[717]  LADWP

states that a 20-year transmission planning horizon provides enough time for transmission

projects to be developed and placed in service when such projects require new rights-of-

way without becoming too speculative.[718]  NextEra contends that a 20-year transmission

planning horizon will ensure that transmission planners anticipate and plan transmission

facilities for needs driven by changes in the resource mix and demand.[719]

313.    PIOs state that a 20-year transmission planning horizon should be the minimum

timeframe, explaining that because transmission facilities can take 15 years to plan,

permit, and construct, a 20-year transmission planning horizon can result in just-in-time

planning, where the transmission plan is developed shortly before the process for siting

and permitting must begin.[720]  GridLab asserts that a 20-year transmission planning

horizon might identify regional transmission needs that occur after year 10, as well as

---

[716] Eversource Initial Comments at 14.

[717] Illinois Commission Initial Comments at 6.

[718] LADWP Initial Comments at 2.

[719] NextEra Initial Comments at 62-63.

[720] PIOs Initial Comments at 15.

transmission projects that would be selected and approved in later transmission planning cycles.[721]

314.    Clean Energy States support quick adoption of at least a 20-year planning horizon because many of their member states have established 100% clean energy power sector or zero-carbon goals for their state economies by 2040 or 2050.[722]  California Municipal Utilities, on the other hand, support a 20-year transmission planning horizon, but caution that transmission costs identified can be significant and could rely upon speculative resources that may not come to fruition, namely off-shore wind development.[723]

315.    Many commenters highlight transmission planning regions with existing long-term transmission planning that either does or will conform to the 20-year transmission planning horizon proposed in the NOPR.[724]  MISO commits to continue using its 20-year forecast period under this proposed reform.[725]  SPP states that it currently performs a 20-

---

[721] GridLab Initial Comments at 8-9.

[722] Clean Energy States Initial Comments at 2.

[723] California Municipal Utilities Initial Comments at 6-7.

[724] Acadia and CLF Initial Comments at 3; CAISO Initial Comments at 15; California Municipal Utilities Initial Comments at 5-6; Clean Energy States Initial Comments at 2; ISO/RTO Council Initial Comments at 3-4; MISO Initial Comments at 33; MISO TOs Initial Comments at 17; New York TOs Initial Comments at 2; New York Transco Initial Comments at 5; NextEra Initial Comments at 63-64 (discussing efforts at CAISO, SPP, and MISO); Omaha Public Power Initial Comments at 4; PIOs Initial Comments at 14 (pointing to NYISO and MISO as examples of transmission planning regions already successfully using a 20-year transmission planning horizon); SPP Initial Comments at 5-6.

[725] MISO Initial Comments at 33.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 265 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                    - 255 -

year assessment that incorporates Long-Term Scenarios at least once every five years.[726]

New York Transco notes that NYISO's transmission planning process utilizes multiple

cases and scenarios over a 20-year evaluation horizon.[727]  Acadia Center and CLF note

that ISO-NE recently gained Commission approval for longer-term transmission studies

to undertake long-term transmission planning to 2050.[728]

316.    CAISO states that it currently approves transmission projects in its annual

transmission planning process based on a 10-year outlook, although the CAISO OATT

allows for a longer 20-year transmission horizon outlook to reliably and cost-effectively

account for California's greenhouse gas and renewable energy objectives.[729]  CAISO

explains that its 20-year outlook does not include a process for approving specific

transmission projects, but rather allows considerations beyond 10 years to inform

decisions in its annual transmission planning process.[730]  California Municipal Utilities

also highlight CAISO's existing transmission planning processes, noting that its 20-year

transmission outlook calls for an estimated combined capital cost of $30.5 billion.[731]

---

[726] SPP Initial Comments at 5-6.

[727] New York Transco Initial Comments at 5 (citing NYISO, NYISO Tariffs, NYISO OATT, attach. Y § 31.4a (Public Policy Requirements Planning Process) (23.0.0), § 31.4.6.1).

[728] Acadia Center and CLF Initial Comments at 3.

[729] CAISO Initial Comments at 15.

[730] *Id.* at 15-16.

[731] California Municipal Utilities Initial Comments at 5-6 (citing CAISO, *20-Year Transmission Outlook*, Table ES-1: Cost estimate of transmission development to

NextEra notes that, while many transmission planning regions use or will use a 20-year transmission planning horizon, no requirements exist to ensure that these practices persist.[732]

317.    Several commenters reference existing long-term planning processes as support for the Commission's proposed 20-year transmission planning horizon.[733]  NextEra and ACEG explain that longer time horizons are embedded into existing integrated resource plans, through law or common practice, and extend into and beyond 2040 to meet ambitious resource goals.[734]  R Street argues that, for benchmarking purposes, 20- to 25-year planning horizons have been a best practice for integrated resource planning for decades.[735]

---

integrate resources of SB100 Starting Point scenario (Jan. 31, 2022), http://www.caiso.com/InitiativeDocuments/Draft20-YearTransmissionOutlook.pdf).

[732] NextEra Initial Comments at 64-65.

[733] BP Initial Comments at 5 (citing CAISO's transmission planning process); Idaho Power Initial Comments at 4 (noting NorthernGrid's 20-year transmission planning horizon); Interwest Initial Comments at 5 (noting existing state resource planning processes); Nevada Commission Initial Comments at 7 (noting its integrated resource planning process requiring a minimum of eight years); PIOs Initial Comments at 14 (noting 20-year horizons used by NYISO, MISO, and other transmission planning regions); SPP Market Monitor Initial Comments at 4-5 (noting SPP's existing transmission planning process); Western PIOs Initial Comments at 28-29 (noting Western Electricity Coordinating Council's planning scenarios and the integrated resource planning timelines of western vertically-integrated utilities).

[734] ACEG Reply Comments at 4-5; NextEra Initial Comments at 62-63.

[735] R Street Initial Comments at 6.

318.    LADWP asserts that the proposed 20-year transmission planning horizon is likely the least disruptive horizon because of its current use by many transmission providers. LADWP further argues that a consistent transmission planning horizon will optimize asset investment and minimize public impacts; facilitate planning, coordination, and development of large-scale regional transmission projects; and ensure that transmission providers consider the same end point assessments of the evolving resource mix, environmental requirements that develop beyond a typical 10-year period, and significant maintenance and retirement issues.[736]

### ii.    Requests for Flexibility

319.    Several commenters recommend that the Commission provide transmission providers in each transmission planning region with the flexibility to propose other transmission planning horizons that may be appropriate and beneficial based on their planning processes.[737]  APS states that it is not convinced that a prescriptive approach will yield the benefits that the Commission seeks.[738]

---

[736] LADWP Initial Comments at 2.

[737] Ameren Initial Comments at 13; APPA Initial Comments at 5; California Water Initial Comments at 14-15; EEI Initial Comments at 11; Indicated PJM TOs Initial Comments at 10; ISO-NE Initial Comments at 22-23; MISO TOs Initial Comments at 17; NARUC Initial Comments at 5-6; NESCOE Initial Comments at 25; New York State Department Initial Comments at 3; New York TOs Initial Comments at 10; Pennsylvania Commission Initial Comments at 5; TANC Initial Comments at 10; WIRES Initial Comments at 7; Xcel Initial Comments at 9.

[738] APS Initial Comments at 3.

USCA4 Appeal: 24-1650     Doc: 224     Filed: 01/21/2025     Pg: 268 of 2455
Document Accession #: 20240513-3036     Filed Date: 05/13/2024

320.    NESCOE states that there is not one "right" transmission planning horizon and that it does not support a one-size-fits-all transmission planning horizon requirement.[739] NESCOE requests that the Commission allow transmission providers in each transmission planning region to demonstrate that existing tariff provisions are consistent with or superior to a final rule mandating a minimum transmission planning horizon, explaining—along with ISO-NE—that ISO-NE's Tariff does not provide a prescribed timeframe to request transmission analyses based on state-provided scenarios.[740] Relatedly, California Commission suggests that, instead of mandating a 20-year transmission planning horizon, the Commission should adopt NYISO's recommendation to provide transmission providers with the discretion, up to 20 years, to plan for their needs.[741]

321.    PG&E understands that not every transmission need identified in the latter years of a 20-year transmission planning horizon will require immediate selection resolution, and it therefore asks the Commission to give individual transmission planning regions the flexibility to determine how to allow for monitoring and updating planning assumptions for transmission projects that meet transmission needs beyond 10 years.[742]  ISO-NE

---

[739] NESCOE Initial Comments at 23-24.

[740] ISO-NE Initial Comments at 22-23; NESCOE Initial Comments at 24-25.

[741] California Commission Initial Comments at 11-12 (citing NYISO ANOPR Initial Comments at 37).

[742] PG&E Initial Comments at 4-6.

Docket No. RM21-17-000                                          - 259 -

argues that the Commission should permit an approach that allows (but does not require) a transmission planning horizon beyond 10 years because the 20-year transmission planning horizon could potentially limit the identification of system issues during interim years, inhibit adaptation to evolving policies, and preclude the transmission planning process from considering public policies that may include shorter timeframes, which may limit the ability to adapt to emerging needs or changing laws.[743] NESCOE contends that a rigid 20-year transmission planning horizon may be counterproductive and could divert resources focused on meeting requests under ISO-NE's longer-term transmission planning process to study a time horizon that states, stakeholders, and ISO-NE may not find useful.[744]

322.    OMS argues that the final rule should permit flexibility in transmission planning horizons and enable transmission planning regions to meet objectives through routine scenario-based planning within an appropriate study window.[745] Industrial Customers assert that transmission planning horizons should consider the time to identify, plan, and obtain siting and permitting approval to construct regional transmission facilities, and that timing can vary dramatically by region. Industrial Customers believe a stringent 20-year transmission planning horizon could create more uncertainty, resulting in stranded

---

[743] ISO-NE Initial Comments at 22-23.

[744] NESCOE Initial Comments at 24-25.

[745] OMS Initial Comments at 4-5.

transmission investments and increased transmission rates because it is difficult, if not impossible, to forecast transmission needs and requirements 20 years into the future.[746]

323.    PJM States recommend, and Clean Energy Associations agree, that instead of requiring a transmission planning horizon of a particular length, the Commission should require each transmission provider to demonstrate that the transmission planning horizon it chooses is adequate to achieve the goals of Long-Term Regional Transmission Planning.[747]

324.    New York State Department recommends that the final rule allow states to determine the appropriate transmission planning horizon since New York Public Service Commission has already issued orders directing long-term transmission and distribution planning with undefined terms.[748]  EEI and US Chamber of Commerce explain that state regulators may not appreciate a rigid 20-year transmission planning horizon requirement given that some state resource procurement processes use a 10-year outlook, and the proposed transmission planning process may thus make resource decisions that are not state-sanctioned.[749]  Consistent with their Coordinated Grid Planning Process, New York Commission and NYSERDA assert that the Commission should allow state regulators to

---

[746] Industrial Customers Reply Comments at 4-5.

[747] Clean Energy Associations Reply Comments at 5-6; PJM States Initial Comments at 4.

[748] New York State Department Initial Comments at 3.

[749] EEI Initial Comments at 11; US Chamber of Commerce Initial Comments at 6.

help determine the appropriate transmission planning horizon, especially in a single-state

RTO/ISO such as NYISO.[750]

325.   Louisiana Commission states that a 20-year transmission planning horizon may be

longer than the planning horizon utilized in state integrated resource planning, explaining

that its integrated resource planning rules allow for a 20-year default planning period, but

also for alternative periods, and more importantly, require 5-year action plans.[751]

326.   APPA argues, and TANC concurs, that the Commission should allow transmission

planning regions to incorporate cost and benefit-tracking mechanisms to reduce the risk

of speculative transmission projects.[752]

### iii.   Requests for a Different Transmission Planning Horizon

327.   Several commenters argue that a 20-year transmission planning horizon is too

long.[753]   Indicated PJM TOs contend that the Commission should ensure that

transmission planning horizons result in the identification of transmission facilities that

---

[750] New York Commission and NYSERDA Initial Comments at 10-12.

[751] Louisiana Commission Reply Comments at 8 (citing Corrected General Order Docket No R-30021 (LPSC 3/12/2012)).

[752] APPA Initial Comments at 26, 36; TANC Initial Comments at 10.

[753] Exelon Initial Comments at 4, 7-8; Indicated PJM TOs Initial Comments at 10; Industrial Customers Initial Comments at 18; Louisiana Commission Reply Comments at 13; Mississippi Commission Initial Comments at 12; Nebraska Commission Initial Comments at 3-4; NRECA Initial Comments at 27-28; NRG Initial Comments at 6-9, 14; Ohio Consumers Initial Comments at 20; Omaha Public Power Initial Comments at 3-4; PJM Initial Comments at 5, 58-62; US Chamber of Commerce Initial Comments at 5-6; Utah Commission Initial Comments at 13.

can be realistically planned and developed, and that 20 years may be too long given rapidly changing technology, generation mix, and demand patterns.[754] Mississippi Commission also favors a shorter transmission planning horizon, arguing that there is too much uncertainty to plan 20 to 40 years into the future.[755] NRECA argues that a 20-year transmission planning horizon may allow more alternatives to be considered, but cost efficacy is not guaranteed. Further, NRECA argues that planning beyond 10 years will by necessity devolve into a top-down process that would, at best, relegate actual load-serving entity resource plans and demand forecasts to a secondary status or, at worst, ignore them altogether, violating FPA section 217(b)(4).[756]

328.    PJM Market Monitor states that uncertainty increases significantly as the transmission planning horizon is extended, and the transmission planning process should be both long-term and flexible, allowing transmission planners to change plans as reality changes.[757] Similarly, US Chamber of Commerce asserts that, as the length of the transmission planning horizon increases, the number of assumptions increases and the quality of assumptions decreases, rendering costs and benefits less certain. US Chamber of Commerce states that today's transmission grid was not forecasted at the turn of the

---

[754] Indicated PJM TOs Initial Comments at 10.

[755] Mississippi Commission Initial Comments at 12; *see also* Louisiana Commission Reply Comments at 13 (citing Mississippi Commission Initial Comments at 12).

[756] NRECA Initial Comments at 27-28.

[757] PJM Market Monitor Initial Comments at 3.

Docket No. RM21-17-000                                                                    - 263 -

century, and, thus, forecasts made today for a similar period are likely to under or over-shoot transmission needs due to new and advancing generation technologies with commercial operation timeframes not yet known.[758] Nebraska Commission states that a 20-year transmission planning horizon may reduce the transmission planning process to an academic exercise due to the amount of speculation necessarily involved.[759]

329.   Industrial Customers state that the Commission has not ruled against transmission planning horizons under 15 years and has acknowledged that the average time needed to develop and build a transmission project is 10 years.[760] Industrial Customers assert that, contrary to the Commission's view, most transmission planners use 10-year transmission planning horizons, and transmission investment should be driven by shorter timeframes to plan for economic and reliability needs.[761] Ohio Consumers note that the 5-year timeframe used by PJM's DFAX method is characterized by high uncertainty, so a longer timeframe would exacerbate inaccuracies.[762]

330.   Several commenters argue that a 10-year transmission planning horizon could reduce speculation, such as with respect to the changing resource mix.[763] NRG states that

---

[758] US Chamber of Commerce Initial Comments at 6.

[759] Nebraska Commission Initial Comments at 3.

[760] Industrial Customers Initial Comments at 18.

[761] Industrial Customers Initial Comments at 16-19 (referencing NYISO and the Eastern Interconnection Planning Collaborative planning processes).

[762] Ohio Consumers Initial Comments at 20.

[763] Nebraska Commission Initial Comments at 3-4; NRG Initial Comments at 6-9,

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 274 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                    - 264 -

a shorter, 10-year transmission planning horizon would fit within the time horizon

necessary to make transmission investment decisions and still reflect regional policy

goals.[764]  Utah Commission notes that NorthernGrid's members in 2020 adopted a 10-

year transmission planning horizon and objects to being compelled to abandon that

planning horizon in favor of a one-size-fits-all mandate.[765]

331.    PJM and Exelon advocate for a 15-year transmission planning horizon to reduce

uncertainty and enhance reliability.[766]  Exelon argues that a 15-year transmission

planning horizon may yield less uncertain forecasts that are more likely to be actionable

and better align with target dates in public policies.[767]  PJM argues that its current 15-year

transmission planning horizon is sufficient to plan and develop needed transmission, and

that forecasts of fuel prices, load trends, generation retirement, and other relevant

parameters become more uncertain the further one looks out.  Moreover, PJM asserts, a

longer transmission planning horizon leads to a greater probability that a transmission

provider will commit to a transmission project that will look unfortunate in hindsight.[768]

---

14; Omaha Public Power Initial Comments at 3-4.

[764] NRG Initial Comments at 6-9, 14.

[765] Utah Commission Initial Comments at 13.

[766] Exelon Initial Comments at 4, 7-8; PJM Initial Comments at 5, 58-62.

[767] Exelon Initial Comments at 4, 7-8.

[768] PJM Initial Comments at 59-62 (citing *Promoting Regional Transmission Planning and Expansion to Facilitate Fuel Diversity Including Expanded Uses of Coal-fired Resources*, Notice of Technical Conference, Docket No. AD05-3-000, at 1 (issued Feb. 16, 2005)).

USCA4 Appeal: 24-1650   Doc: 224   Filed: 01/21/2025   Pg: 275 of 2455
Document Accession #: 20240513-3036   Filed Date: 05/13/2024

Docket No. RM21-17-000                                          - 265 -

332.  Some commenters argue that a transmission planning horizon longer than 20 years may be warranted to capture the longer-term benefits of transmission facilities.[769]  ACEG recommends that the Commission consider up to a 40-year transmission planning horizon to match the expected life of most transmission assets.[770]  CARE Coalition argues that a 40-year transmission planning horizon would be consistent with standard practice in economics and public policy of evaluating benefits over the life of the asset, and that the long lead time to develop transmission facilities justifies a longer planning horizon.[771]

### iv.  Opposition to Requests for a Different Transmission Planning Horizon

333.  Several commenters dispute claims that a 20-year transmission planning horizon introduces risks from uncertainty and that a shorter planning horizon is more appropriate.[772]  Southeast PIOs claim that the risk of unaddressed transmission needs grows over time because of long lead times needed for transmission development, and that SERTP's 10-year transmission planning horizon prevented Georgia Power from

---

[769] ACEG Initial Comments at 6-7, 24; CARE Coalition Initial Comments at 40-41; Interwest Initial Comments at 5; National and State Conservation Organizations Initial Comments at 1; Pine Gate Initial Comments at 19-20; PIOs Initial Comments at 15; SEIA Initial Comments at 6.

[770] ACEG Initial Comments at 6, 24.

[771] CARE Coalition Initial Comments at 40-41.

[772] ACORE Reply Comments at 5 (citing EPSA Initial Comments at 7; ITC Initial Comments at 9; Mississippi Commission Initial Comments at 12; PJM Initial Comments at 58-62); Concerned Scientists Reply Comments at 18-19; PJM Initial Comments at 58-62; Southeast PIOs Reply Comments at 23-25 (citing Dominion Initial Comments at 19; Southern Initial Comments at 19, 32-33).

using that process to plan for its long-term North Georgia Reliability & Resilience Plan and its goal to integrate 6,000 MW of renewable resources by 2035.[773]  Southeast PIOs assert that a longer transmission planning horizon will put future transmission needs on the radar for transmission planners and, if updated frequently, allow transmission providers to select transmission facilities conditional on subsequent transmission planning cycles, which affords planners flexibility to determine the need for the facility and whether there are more cost-effective alternatives.[774]  ACORE notes that the NOPR addresses the uncertainty about the future by requiring the use of multiple Long-Term Scenarios that are revised every three years.[775]

334.    Several commenters state that the transmission planning horizon should not extend beyond 20 years to avoid overly speculative long-term forecasts.[776]  Entergy asserts that looking beyond 20 years would increase the likelihood of errors, risk billions of dollars in investments that may prove to be misguided, and amplify the risk of planning a transmission system that poorly aligns with actual future needs.[777]  Illinois Commission

---

[773] Southeast PIOs Reply Comments at 24 (citing Southeast PIOs Initial Comments at 27-28).

[774] *Id*. at 23-25.

[775] ACORE Reply Comments at 5.

[776] Arizona Commission Initial Comments at 3-4; California Commission Initial Comments at 11-13; Entergy Initial Comments at 9-11; Georgia Commission Initial Comments at 2-3; Pennsylvania Commission Initial Comments at 5; US Chamber of Commerce Initial Comments at 4, 6.

[777] Entergy Initial Comments at 9-11.

states that a transmission planning horizon longer than 20 years would make it difficult to accurately predict the factors relevant to transmission planning.[778]  Clean Energy Buyers propose that transmission providers seeking to adopt a transmission planning horizon beyond 20 years should be required to demonstrate the justness and reasonableness of that transmission planning horizon.[779]

335.    Certain TDUs and Louisiana Commission oppose a 40-year transmission planning horizon.[780]  Certain TDUs emphasize that, as evidenced by the Michigan Thumb Loop transmission project, assumptions such as the resource mix can change in as few as seven years.[781]  Louisiana Commission argues that longer periods, such as the 40-year transmission planning horizon proposed by some commenters, will greatly increase the risk for errors and wasted investments.  According to Louisiana Commission, transmission planning horizons should neither exceed the availability of reasonable data and assumptions nor create unnecessary risks that ratepayers will be required to fund transmission facilities that do not deliver expected benefits.[782]

---

[778] Illinois Commission Initial Comments at 6.

[779] Clean Energy Buyers Initial Comments at 12-13.

[780] Certain TDUs Reply Comments at 3-6 (citing ACEG Initial Comments at 24); Louisiana Commission Reply Comments at 8.

[781] Certain TDUs Reply Comments at 3-6.

[782] Louisiana Commission Reply Comments at 8.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 278 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

### v.    **Meaning and Scope of Transmission Planning Horizon**

336.    Several commenters request that the Commission define the 20-year transmission planning horizon as a simple 20-year period, and not a 20-year period starting from the estimated in-service date of the transmission facilities, which would result in forecasting transmission needs beyond 20 years.[783]  Kentucky Commission Chair Chandler states that the usefulness of Long-Term Regional Transmission Planning and measuring benefits 20 years after a transmission project's in-service date will decrease if each project's relative benefits cannot be adequately measured and identified.[784]  PPL argues that tying the transmission planning horizon to the study date rather than the solution in-service date will facilitate a more realistic, certain, and simple transmission planning process and reduce the need for additional analysis.[785]  US Chamber of Commerce adds that beginning at the in-service date of the transmission facilities would extend the effective transmission planning horizon to 25-30 years, thereby further increasing the uncertainty of Long-Term Regional Transmission Planning; thus, US Chamber of Commerce argues the Commission should use the 20-year transmission planning horizon as a ceiling, rather than a floor, consistent with the far end of most state planning horizons, which would

---

[783] Kentucky Commission Chair Chandler Reply Comments at 2; National Grid Initial Comments at 12-13; PJM States Initial Comments at 3; PPL Initial Comments at 6; US Chamber of Commerce Initial Comments at 6.

[784] Kentucky Commission Chair Chandler Reply Comments at 2.

[785] PPL Initial Comments at 6.

Docket No. RM21-17-000                                                  - 269 -

protect transmission planners from being forced to plan beyond the requirements of

applicable state law.[786]

337.    Policy Integrity requests that the Commission clarify the details of the 20-year

time horizon, stating that it is unclear whether the Commission intended the 20-year time

horizon for Long-Term Regional Transmission Planning to be tied to construction

commencing in year 20.[787]  ISO-NE and Policy Integrity seek clarification that, if the

Commission requires that transmission providers must study what is needed over the next

20 years, transmission providers are not precluded from evaluating what needs to be built

in the short and medium terms.[788]  Industrial Customers assert that the proposed 20-year

transmission planning horizon is unclear because some commenters interpret the

Commission's proposal as requiring a 20-year transmission planning horizon for Long-

Term Regional Transmission Planning,[789] while others argue it requires a 20-year

transmission planning horizon in existing regional transmission planning processes.[790]

338.    Several commenters support a 20-year transmission planning horizon if Long-

Term Scenarios are used to inform the development of transmission facilities but not used

---

[786] US Chamber of Commerce Initial Comments at 6.

[787] Policy Integrity Initial Comments at 5.

[788] ISO-NE Initial Comments at 23; Policy Integrity Initial Comments at 5.

[789] Industrial Customers Reply Comments at 5-6 (citing NARUC Initial Comments at 5).

[790] Industrial Customers Reply Comments at 5-6 (citing California Commission Initial Comments at 11).

USCA4 Appeal: 24-1650   Doc: 224   Filed: 01/21/2025   Pg: 280 of 2455
Document Accession #: 20240513-3036   Filed Date: 05/13/2024

Docket No. RM21-17-000                                          - 270 -

to select transmission facilities or to dictate construction.[791]  TANC does not believe that

a 20-year transmission planning horizon should be used for local transmission planning

processes or selection.[792]  Nebraska Commission states that using a 20-year transmission

planning horizon for only research, study, and projections will avoid speculation,

increased costs, and unjust and unreasonable rates.[793]  NRECA asserts that using a 20-

year transmission planning horizon in Long-Term Regional Transmission Planning to

select transmission projects will not produce the granularity and certainty needed to

assign costs to beneficiaries.[794]  Similarly, Ohio Consumers argue that too little is known

about the location of future loads and resources and the direction of power flows over 20

years to use a 20-year transmission planning horizon for cost allocation purposes.[795]

NRG argues that use of a 20-year transmission planning horizon to allocate costs will

lead to unjust and unreasonable outcomes, and instead, a 10-year transmission planning

horizon is appropriate.[796]  New England Systems state that the Commission should adjust

---

[791] NARUC Initial Comments at 5; Nebraska Commission Initial Comments at 3; Northwest and Intermountain Initial Comments at 7, 13; NRECA Initial Comments at 23, 29; NRG Initial Comments at 6-9, 14; Ohio Consumers Initial Comments at 20; *see also* Dominion Reply Comments at 4-5 (citing NARUC Initial Comments at 5); PJM States Reply Comments at 9 (citing NARUC Initial Comments at 5).

[792] TANC Initial Comments at 10.

[793] Nebraska Commission Initial Comments at 3.

[794] NRECA Initial Comments at 23-24 (citing GDS Assocs., Inc., Report, at 10 (Aug. 17, 2022)).

[795] Ohio Consumers Initial Comments at 1, 20.

[796] NRG Initial Comments at 6-9, 14.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 281 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

the NOPR's focus on transmission planning horizons toward an evolutionary and evidence-based transmission planning process aimed at mitigating avoidable costs for operating generation out of economic merit order and at improving the utilization of renewable resources that experience curtailment due to congestion.[797]

339.    Some commenters support a 20-year transmission planning horizon only if the latter portion of the planning horizon is not used to direct the development of transmission facilities.[798]    SERTP Sponsors state that the Commission should not require that regional transmission expansion be based on transmission planning horizons that are incompatible with the planning horizons used for integrated resource planning or supply-side resource plan development, or that involve a degree of speculation that the states comprising a transmission planning region are not willing to accept.[799]    SPP Market Monitor contends that if the Commission requires all RTOs/ISOs to perform a 20-year study, the final rule should also provide guidance on how information determined in that long-term study will be used.    SPP Market Monitor supports a secondary, shorter-term

---

[797] New England Systems Initial Comments at 21-22.

[798] APS Initial Comments at 3-4; Kansas Commission Initial Comments at 13-14; Maryland Energy Administration Initial Comments at 3; SERTP Sponsors Initial Comments at 20; Shell Initial Comments at 21; SPP Market Monitor Initial Comments at 5-6.

[799] SERTP Sponsors Initial Comments at 20.

Docket No. RM21-17-000                                                - 272 -

transmission planning horizon of 10 years that could be based on the results of the

longer-term 20-year studies.[800]

340.    Shell suggests that the 20-year transmission planning horizon include a

developmental "Actionable Period" for the first 10 years, during which developers may

be willing to invest in generation projects, or the RTOs/ISOs or utilities may be willing to

commit to and authorize the construction of new transmission.  Shell proposes that there

would be an "Indicative Period" for the following 10 years, which would be used to drive

the Actionable Period so that the Commission establishes a process that converges and

integrates short, medium, and long-term planning.  Shell asserts that its proposal could

foster more comprehensive and efficient Long-Term Regional Transmission Planning

and inform existing regional transmission planning processes.[801]  To remove speculative

assumptions from Long-Term Regional Transmission Planning, Arizona Commission

similarly suggests that the Commission divide the 20-year transmission planning horizon

into two equal parts: a "more certain" forecast and a "flexible" forecast.[802]  Likewise,

APS recommends that the Commission adopt a 20-year transmission planning horizon for

"potential projects" and a 10-year planning horizon for "planned projects" to provide

greater regional flexibility.[803]

---

[800] SPP Market Monitor Initial Comments at 5-6.

[801] Shell Initial Comments at 19-23.

[802] Arizona Commission Initial Comments at 3-4.

[803] APS Initial Comments at 3-4.

341.    Kansas Commission, Mississippi Commission, and NRECA state that the results

of Long-Term Regional Transmission Planning should be considered informational

only.[804]  Kansas Commission requests that the Commission establish solid evidentiary

and policy bases to support a 20-year transmission planning horizon before imposing

such a requirement.[805]  Mississippi Commission believes that transmission construction

decisions should use a 10-year transmission planning horizon.[806]

342.    Some commenters rebut arguments that Long-Term Regional Transmission

Planning should be performed for informational purposes only.[807]  ACEG contends that

adopting the proposed transmission planning methods is essential to accomplishing the

Commission's responsibilities and that less stringent requirements have not led to much-

needed development of high-capacity transmission throughout the country.  ACEG

further states that providing informational reports will do little to remedy undue

discrimination and achieve actual transmission plans.[808]  DC and MD Offices of People's

Counsel state that the potential benefits to ratepayers and other stakeholders of a 20-year

transmission planning horizon is significantly diminished if transmission planning is

---

[804] Kansas Commission Initial Comments at 13-14; Mississippi Commission Reply Comments at 6; NRECA Initial Comments at 23.

[805] Kansas Commission Initial Comments at 13.

[806] Mississippi Commission Reply Comments at 6.

[807] ACEG Reply Comments at 10; DC and MD Offices of People's Counsel Reply Comments at 5; SEIA Reply Comments at 2.

[808] ACEG Reply Comments at 10.

Docket No. RM21-17-000                                              - 274 -

simply an academic exercise, without actual impact on future transmission

development.[809]  SEIA argues that the Commission should mandate that scenarios

developed under the final rule be used in transmission planning rather than for

informational purposes only or contingent on the approval of state regulators.[810]

343.    Business Council for Sustainable Energy states that transmission planning should

consider the length of time that it takes for transmission assets to be built and the

estimated useful life of those facilities.[811]  California Municipal Utilities argue, and

TANC concurs, that any lengthening of the transmission planning horizon must be

accompanied by consumer protections that guard against speculative siting of generation

and a rigorous re-evaluation of planning assumptions and other relevant factors, such as

commercial viability of transmission projects and the associated resources.[812]

### c.        Commission Determination

344.    We adopt the NOPR proposal to require transmission providers in each

transmission planning region to develop Long-Term Scenarios as part of Long-Term

Regional Transmission Planning using no less than a 20-year transmission planning

horizon.  We further clarify that using a transmission planning horizon of no less than 20

---

[809] DC and MD Offices of People's Counsel Reply Comments at 5.

[810] SEIA Reply Comments at 2.

[811] Business Council for Sustainable Energy Initial Comments at 4.

[812] California Municipal Utilities Initial Comments at 3; TANC Initial Comments at 10.

years means that transmission providers must develop Long-Term Scenarios to identify

Long-Term Transmission Needs that will materialize in the 20 years or more following

the commencement of the Long-Term Regional Transmission Planning cycle.

345.    In requiring a transmission planning horizon of not less than 20 years, we strike a

balance.  On the one hand, a 20-year transmission planning horizon extends far enough

into the future that transmission providers can proactively identify Long-Term

Transmission Needs that could be met with more efficient or cost-effective Long-Term

Regional Transmission Facilities; in contrast, as discussed below, a transmission planning

horizon less than 20 years may limit transmission providers' ability to adequately plan for

Long-Term Transmission Needs.  Specifically, as described in the NOPR, a 20-year

transmission planning horizon allows for more time between when a transmission facility

is identified to meet a future transmission need, and when the transmission need

materializes, allowing for sufficient time to identify, plan, obtain siting and permitting

approval for, and construct Long-Term Regional Transmission Facilities.  Moreover, as

some commenters observe, several transmission providers, including MISO, SPP, and

NYISO, already use a 20-year transmission planning horizon.  On the other hand, based

on the record before us, we find that there may be sufficient uncertainty with regard to

system conditions and transmission needs beyond a 20-year horizon such that it may be

challenging for transmission providers to forecast Long-Term Transmission Needs across

that time period, especially for those transmission providers that do not presently

conduct, and thus do not have experience with, long-term regional transmission planning.

Accordingly, we decline to adopt a requirement to use a transmission planning horizon

that exceeds 20 years.  However, this does not preclude transmission providers from

proposing to use a transmission planning horizon of more than 20 years.

346.    We clarify that transmission providers must plan for the entire duration of the 20-

year transmission planning horizon.  Specifically, transmission providers must, among

other requirements established in this final rule, develop and use Long-Term Scenarios to

identify Long-Term Transmission Needs occurring in any period of the 20-year

transmission planning horizon and to evaluate potential transmission solutions to those

needs.

347.    Certain commenters either misstate aspects of the proposed 20-year transmission

planning horizon or request clarification regarding the horizon.[813]  We specify that the

transmission planning horizon starts at the beginning of the Long-Term Regional

Transmission Planning cycle and ends 20 years from that date.  The transmission

planning horizon is not tied to the in-service date of any identified transmission solution;

rather, potential transmission solutions are identified after identifying Long-Term

Transmission Needs that manifest during the 20-year transmission planning horizon.

348.    We disagree with commenters that assert that a 20-year transmission planning

horizon could result in Long-Term Regional Transmission Planning based on speculative

transmission needs[814] or, relatedly, that a 20-year transmission planning horizon is only

---

[813] Kentucky Commission Chair Chandler Reply Comments at 2; National Grid
Initial Comments at 12-13; PJM States Initial Comments at 3; PPL Initial Comments at 6;
US Chamber of Commerce Initial Comments at 6.

[814] *E.g.*, TANC Initial Comments at 10.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 287 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                    - 277 -

appropriate if Long-Term Scenarios are not used to select Long-Term Regional
Transmission Facilities.[815]  We find these assertions to be unfounded.  In fact, the Long-
Term Regional Transmission Planning requirements adopted in this final rule are
designed to avoid over-building transmission in response to speculative transmission
needs through a series of tools and safeguards, discussed at length above.[816]  To highlight
just one of these safeguards, as discussed in the Evaluation and Selection of Long-Term
Regional Transmission Facilities section of this final rule, we require transmission
providers to reevaluate certain previously selected Long-Term Regional Transmission
Facilities in some circumstances to confirm that the Long-Term Regional Transmission
Facility continues to meet the transmission providers' selection criteria.  This
reevaluation process will help ensure that the continued selection of Long-Term Regional
Transmission Facilities is based on the use of updated information regarding the
existence of a Long-Term Transmission Need and the benefits that transmission
providers expect a Long-Term Regional Transmission Facility to provide.

349.    We disagree with commenters that assert that the Commission should adopt a
shorter transmission planning horizon.[817]  A transmission planning horizon of less than

---

[815] NARUC Initial Comments at 5; Nebraska Commission Initial Comments at 3;
Northwest and Intermountain Initial Comments at 7, 13; NRECA Initial Comments
at 23, 29; NRG Initial Comments at 6-9, 14; Ohio Consumers Initial Comments at 20; *see
also* PJM States Reply Comments at 9 (citing NARUC Initial Comments at 5).

[816] *See supra* Participation in Long-Term Regional Transmission Planning section**.**

[817] Exelon Initial Comments at 4, 7-8; Industrial Customers Initial Comments
at 18; Mississippi Commission Initial Comments at 34; Nebraska Commission Initial
Comments at 3-4; NRECA Initial Comments at 27-28; NRG Initial Comments at 6-9, 14;

Docket No. RM21-17-000                                                    - 278 -

20 years would fail to sufficiently capture Long-Term Transmission Needs given that at

least some of the drivers of such needs extend up to 20 years into the future (e.g., many

state laws include requirements to be met 15 to 20 years in the future).  Additionally, a

shorter minimum transmission planning horizon may not allow for sufficient time to

develop Long-Term Regional Transmission Facilities with long lead-time requirements

or to compare alternative transmission solutions to identify more efficient or cost-

effective transmission solutions to meet Long-Term Transmission Needs.

350.    We disagree with commenters that assert requiring a 20-year transmission

planning horizon is incompatible with planning horizons used with state integrated

resource planning.[818]  In addition to the discussions in the Overall Need for Reform and

Legal Authority to Adopt Reforms for Long-Term Regional Transmission Planning

sections regarding state integrated resource planning, we note that regardless of the

planning horizon used in a state integrated resource planning process, the results of that

process can be incorporated into Long-Term Regional Transmission Planning to identify

Long-Term Transmission Needs.  In fact, as explained in State-Approved Utility

Integrated Resource Plans and Expected Supply Obligations for Load-Serving Entities

(Factor Category Three) section below, integrated resource plans are part of the

Categories of Factors and thus, transmission providers must incorporate information on

---

Omaha Public Power Initial Comments at 3-4; PJM Initial Comments at 5, 58-62; US
Chamber of Commerce Initial Comments at 6; Utah Commission Initial Comments at 13.

[818] SERTP Sponsors Initial Comments at 21.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 289 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                              - 279 -

the load-serving entities' projected loads and resources over the planning horizon.  The

fact that a state integrated resource plan does not extend out a full 20 years—or extends

further into the future—does not change the obligation for transmission providers to

incorporate the information that is available over the 20-year transmission planning

horizon.

351.    In response to ISO-NE, and Policy Integrity,[819] the 20-year transmission planning

horizon is distinct from the requirement to calculate benefits of an identified Long-Term

Regional Transmission Facility over a minimum of 20 years from the estimated in-

service date, as discussed in the Required Benefits section.

### 2. **Frequency of Long-Term Scenario Revisions**

#### a. **NOPR Proposal**

352.    In the NOPR, the Commission proposed to require each transmission provider to

develop Long-Term Scenarios at least every three years, by reassessing whether the data

inputs and factors incorporated in the previously developed Long-Term Scenarios need to

be updated and then revising the Long-Term Scenarios as needed to reflect updated data

inputs and factors.  The Commission also proposed to require that the development of

Long-Term Scenarios be completed within three years, before the next three-year

assessment commences.[820]

---

[819] ISO-NE Initial Comments at 23; Policy Integrity Initial Comments at 5.

[820] NOPR, 179 FERC ¶ 61,028 at P 97.

353.   The Commission preliminarily found that a three-year frequency requirement balances the need of transmission providers to reassess changes in the resource mix and demand, as technology, markets, and policies have the potential to rapidly change, against the burden of developing Long-Term Scenarios that can take a year or longer to produce.  The Commission stated that this three-year frequency requirement would allow transmission providers to identify new transmission needs driven by changes in the resource mix and demand during the interim years of the transmission planning period, and update previously identified transmission needs, if warranted.[821]

**b.    Comments**

**i.    Support for Frequency of Long-Term Scenario Revisions**

354.   Many commenters support the Commission's proposal to require transmission providers in each transmission planning region to develop Long-Term Scenarios at least every three years, by reassessing whether the data inputs and factors incorporated in their previously developed Long-Term Scenarios need to be updated and then revising the Long-Term Scenarios as needed to reflect updated data inputs and factors.[822]  Arizona

---

[821] NOPR, 179 FERC ¶ 61,208 at P 99.

[822] ACORE Initial Comments at 10; Advanced Energy Buyers Initial Comments at 7; AEE Initial Comments at 8-9; AEP Initial Comments at 5, 8, 13-14; Amazon Comments at 3; Arizona Commission Initial Comments at 4; BP Initial Comments at 4; Breakthrough Energy Supplemental Comments at 1; CAISO Initial Comments at 21; California Water Initial Comments at 15; Clean Energy Associations Initial Comments at 10; Clean Energy Buyers Initial Comments at 13; DC and MD Offices of People's Counsel Initial Comments at 8; Entergy Initial Comments at 11; Idaho Power Initial Comments at 4; Interwest Initial Comments at 6-8; Joint Consumer Advocates Initial Comments at 8; Nevada Commission Initial Comments at 7; New England Offshore

Commission and Interwest state that the proposed three-year process aligns with their existing regional transmission planning processes.[823] Several commenters assert that this proposal allows for Long-Term Scenarios to remain accurate and account for material technological, political, environmental, and operational developments in the energy industry,[824] with some commenters indicating that past experience demonstrates that the energy industry is rapidly changing.[825] For example, PIOs share that MISO recently recognized assumptions in its MISO Transmission Expansion Plan did not capture the rate of change for the region's fuel mix.[826]

355. Pennsylvania Commission states that routine reviews could update information and data, justify modifications to transmission plans, and reduce the risk of uneconomic

---

Wind Initial Comments at 2; New Jersey Commission Initial Comments at 11; NYISO Initial Comments at 18; Pacific Northwest State Agencies Initial Comments at 13-14; Pennsylvania Commission Initial Comments at 5; PG&E Initial Comments at 6; PIOs Initial Comments at 16; PJM Initial Comments at 5-6, 63; SEIA Initial Comments at 6; SPP Market Monitor Initial Comments at 6; US DOE Initial Comments at 11; Vermont State Entities Initial Comments at 5; WE ACT Initial Comments at 3.

[823] Arizona Commission Initial Comments at 3; Interwest Initial Comments at 6-8.

[824] Advanced Energy Buyers Initial Comments at 7; California Water Initial Comments at 15; ELCON Initial Comments at 11; Joint Consumer Advocates at 8; PIOs Initial Comments at 17; SPP Market Monitor Initial Comments at 6; US DOE Initial Comments at 11.

[825] Advanced Energy Buyers Initial Comments at 7; ELCON Initial Comments at 11.

[826] PIOs Initial Comments at 16-17 (stating that MISO's prediction for changes in its fuel mix 15 years out in the MISO Transmission Expansion Plan 2020 Report had already materialized before that final report was published).

transmission investments.[827]  ELCON notes that the proposed three-year reassessment provides the opportunity to consult recent data and update the probability of each scenario, which will produce better outcomes in the transmission planning process.[828] Joint Consumer Advocates state that long-term transmission plans must be revisited regularly and with sufficient frequency to ensure that they remain accurate and account for material developments.[829]  AEE states that triennial updates will provide a suitable amount of time for stakeholders to complete comprehensive studies while also ensuring that scenarios do not become stale as advanced energy technology deployment scales more rapidly and policy changes disrupt existing assumptions.[830]

356.    Louisiana Commission avers that the proposed three-year reassessment will prevent transmission providers from ignoring changes that might better reflect future assumptions.[831]  PIOs state that a three-year update will also help address issues that could occur if a transmission provider is too aggressive or conservative when defining

---

[827] Pennsylvania Commission Initial Comments at 5.

[828] ELCON Initial Comments at 11.

[829] Joint Consumer Advocates Initial Comments at 8.

[830] AEE Initial Comments at 8-9.

[831] Louisiana Commission Reply Comments at 9.

scenarios.[832]  DC and MD Offices of People's Counsel recommend that plans be updated every three years.[833]

357.    Entergy and Interwest state that a three-year reassessment cycle balances the need for recent data and the time and resources needed to develop the updates.[834]  LADWP states that a rolling near-term planning horizon provides the long-term transmission planning process with up-to-date information without being too frequent.[835]  New Jersey Commission notes that reassessments more frequent than every three years would be overly burdensome.[836]  Similarly, Nebraska Commission states that a frequency shorter than every three years would require almost constant updates from transmission providers, which would drive up costs, while a frequency longer than three to five years could risk the underlying information becoming stale between revisions.[837]

358.    Certain TDUs suggest that the Commission address concerns that a three-year review period would put significant strain on transmission provider resources by clarifying that three-year assessments would review the key drivers and assumptions behind a transmission plan with updates as needed for material changes rather than a

---

[832] PIOs Initial Comments at 17.

[833] DC and MD Offices of People's Counsel Reply Comments at 2.

[834] Entergy Initial Comments at 11; Interwest Initial Comments at 6.

[835] LADWP Initial Comments at 3.

[836] New Jersey Commission Initial Comments at 11.

[837] Nebraska Commission Initial Comments at 4.

rerun of the full transmission planning process.  In addition, Certain TDUs state that a

three-year reassessment of initial transmission plans would result in more transparency

and consideration of alternatives in the transmission planning process.[838]  In contrast,

PJM requests that the Commission clarify that Long-Term Scenarios would be

completely updated with new data, updated factors, and the best information available at

least every three years, not merely partially reassessed.  PJM also requests that the

Commission clarify that scenario evaluations will not overlap, as re-runs are expensive,

and a predictable three-year clock will make the process run smoothly.[839]

359.    AEP requests that the Commission require all transmission planning regions to

continuously follow the same, consistent three-year transmission planning cycles to align

future efforts and ease burdens on transmission providers and developers operating in

multiple transmission planning regions and to promote better coordination among regions

concerning potential interregional transmission solutions.[840]

360.    Southeast PIOs support the NOPR proposal to require transmission providers to

reassess and revise Long-Term Scenarios every three years, arguing that it would

synchronize with existing state processes and ensure that long-term regional transmission

plans remain an up-to-date resource for state planning.[841]  Similarly, Certain TDUs argue

---

[838] Certain TDUs Reply Comments at 7.

[839] PJM Initial Comments at 6, 63-64.

[840] AEP Initial Comments at 5, 8, 13-14; AEP Reply Comments at 5.

[841] Southeast PIOs Reply Comments at 25.

that a five-year transmission planning cycle is too long and that a three-year transmission planning cycle would be more likely to account for unforeseen changes, helping to prevent inefficient transmission development and balance planning for future needs with the need to quickly identify material changes to planning assumptions.[842]

### ii. Concerns about Frequency of Long-Term Scenario Revisions

361.   Some commenters urge the Commission to provide flexibility for transmission providers to determine the frequency at which they must develop Long-Term Scenarios by reassessing whether the data inputs and factors incorporated in their previously developed Long-Term Scenarios need to be updated and then revising the Long-Term Scenarios as needed to reflect updated data inputs and factors.[843]  EEI requests that the Commission allow transmission providers in each transmission planning region to initiate a new Long-Term Scenario process in lieu of a refresh of old Long-Term Scenarios.[844] California Commission and Omaha Public Power argue that requiring transmission providers to reassess and revise Long-Term Scenarios at least every three years will

---

[842] Certain TDUs Reply Comments at 5-6.

[843] Ameren Initial Comments at 12-13; American Municipal Power Initial Comments at 33; California Commission Initial Comments at 16; Duke Initial Comments at 11; ISO-NE Initial Comments at 24; MISO Initial Comments at 28-29; MISO TOs Initial Comments at 17; NARUC Initial Comments at 6-7; NESCOE Initial Comments at 25-26; OMS Initial Comments at 4-5; Pacific Northwest State Agencies Initial Comments at 15; Vermont State Entities Initial Comments at 5; WIRES Initial Comments at 7.

[844] EEI Initial Comments at 12.

create a significant compliance burden without improving planning outcomes, such as forecast accuracy.[845]

362.    MISO TOs argue that flexibility is warranted because MISO is already implementing Long-Term Regional Transmission Planning, as well as reassessing its data as needed.[846]  MISO states that the NOPR proposal is overly prescriptive, may not reflect stakeholder and regional needs, and could result in a compliance exercise without the prospect of transmission expansion.[847]  NESCOE and OMS suggest that the Commission require transmission providers to reassess Long-Term Scenarios at regular intervals but leave the timing of that reassessment to the transmission planning region.[848]  MISO also recommends that the Commission allow transmission providers to reuse Long-Term Scenarios as long as they update the relevant input data to reflect the latest available information.[849]

363.    Duke asserts that the Commission should allow transmission planning regions to propose their own cycles to reassess and revise Long-Term Scenarios to meet the needs of the region, keep pace with markets and policies across the country, and align their

---

[845] California Commission Initial Comments at 16; Omaha Public Power Initial Comments at 3.

[846] MISO TOs Initial Comments at 17.

[847] MISO Initial Comments at 28.

[848] NESCOE Initial Comments at 25-26; OMS Initial Comments at 4-5.

[849] MISO Initial Comments at 29.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 297 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                    - 287 -

processes with state integrated resource planning processes.[850]  Similarly, WIRES requests a variance to the proposed three-year scenario reassessment requirement because three years may be too short and could potentially be disruptive or increase costs. WIRES further asks that the Commission clarify that transmission providers are not required to reassess previously approved transmission projects as part of their triennial review process.[851]

364.    Pacific Northwest State Agencies state that the Commission should set three years as a minimum and provide transmission planning regions with the flexibility to work with states to determine the appropriate schedule for developing Long-Term Scenarios.[852] Similarly, Vermont State Entities and Pennsylvania Commission argue that transmission planning regions should have the flexibility to conduct reassessments at intervals shorter than every three years.[853]

365.    NYISO recommends that the final rule should allow transmission planning regions to modify or add to their Long-Term Scenarios to account for changes that would significantly affect their analysis when they occur instead of waiting for the next transmission planning cycle.  NYISO further requests that the Commission clarify that, if

---

[850] Duke Initial Comments at 12.

[851] WIRES Initial Comments at 7.

[852] Pacific Northwest State Agencies Initial Comments at 15.

[853] Pennsylvania Commission Initial Comments at 5; Vermont State Entities Initial Comments at 5.

a transmission planning region requires more than three years to complete a given transmission planning cycle, it may extend the three-year time period. In addition, NYISO requests that the Commission permit transmission providers in each transmission planning region to commence the next Long-Term Regional Transmission Planning cycle using current information even if the prior transmission planning cycle is running in parallel. NYISO adds that the Commission should allow transmission planning regions to use their existing Long-Term Scenarios for the duration of a Long-Term Regional Transmission Planning cycle, even if it runs beyond three years, to avoid stopping and re-starting that cycle due to changes in circumstances.[854]

366.    Some commenters raise concerns that the proposal to require development of Long-Term Scenarios at least every three years may create overlapping planning assessments and suggest ways to avoid that situation.[855]  ISO-NE states that the timeframe for Long-Term Regional Transmission Planning should account for all the elements of the process, such as implementing the process for selecting transmission solutions, before the next long-term study begins. ISO-NE indicates that this will allow subsequent Long-Term Regional Transmission Planning studies to account for the

---

[854] NYISO Initial Comments at 19.

[855] Eversource Initial Comments at 15; ISO-NE Initial Comments at 24; NESCOE Initial Comments at 26; PJM Initial Comments at 63.

outcomes of the preceding transmission planning cycle and avoid unnecessary study overlap between cycles.[856]

367.    Eversource suggests that the Commission require completion of project selection before the development of the next set of Long-Term Scenarios, arguing that it would undermine the project selection process if the current three-year Long-Term Scenario cycle fails to include selected transmission facilities from the prior three-year cycle.[857]

368.    Similarly, NESCOE is concerned that the three-year Long-Term Scenario cycle requirement is inflexible and could interfere with existing procedures in New England. NESCOE states that ISO-NE's longer-term transmission planning process requires that a planning process be concluded before a new one can begin, and that a request for a longer-term transmission study may be submitted to ISO-NE no earlier than six months after the conclusion of the prior study.[858]

369.    Some commenters argue that requiring transmission providers to reassess and revise their Long-Term Scenarios every three years may be too frequent and costly, asserting that between every three and five years may be more appropriate.[859]  ITC avers that a three-year transmission planning cycle for Long-Term Regional Transmission

---

[856] ISO-NE Initial Comments at 24.

[857] Eversource Initial Comments at 15.

[858] NESCOE Initial Comments at 26.

[859] ACEG Initial Comments at 7, 25; Breakthrough Energy Initial Comments at 12-13; EEI Initial Comments at 12; Indicated PJM TOs Initial Comments at 11-12; ITC Initial Comments at 5, 9-11; Pine Gate Initial Comments at 19-20.

Planning would exceed the capabilities of the transmission providers administering the process.[860]  Likewise, NRECA asserts that developing multiple Long-Term Scenarios and updating them every three years will require significant time and resources, as well as substantial changes in transmission planning throughout the country.  NRECA asserts that existing power supply and transmission planning models employ different assumptions that cannot be used to prepare 20-year Long-Term Scenarios, much less update them every three years.[861]

### iii.    Support for Different Frequency of Long-Term Scenario Revisions

370.    Western PIOs support mandating a two-year timeframe for revision, as three years may be too long and therefore may miss important updated data inputs.[862]

371.    Shell argues that the Commission should require transmission providers to reassess and revise their Long-Term Scenarios every five years, asserting that the proposal to use three years could create too much uncertainty and delay the development of renewable generation being developed to comply with state climate objectives and resource adequacy requirements in forward-looking capacity markets.[863]  Indicated PJM TOs argue that three years may be insufficient to perform relevant studies and

---

[860] ITC Initial Comments at 10.

[861] NRECA Initial Comments at 23 (citing GDS Assocs., Report, at 8-10 (Aug. 17, 2022)).

[862] Western PIOs Initial Comments at 30.

[863] Shell Initial Comments at 18-19.

recommend that the Commission provide transmission providers with the flexibility to adopt four- or five-year transmission planning cycles.[864]

372.   Exelon argues that a three-year transmission planning cycle is too short, as it is unlikely that transmission needs will surface within three years, and that conducting a study so soon could create uncertainty that recently selected transmission projects will be revisited.  Exelon instead recommends that the final rule adopt a five-year transmission planning cycle requirement with a provision that requires transmission providers to initiate a new cycle sooner, with good reason, to better align with the time needed to permit and construct new transmission infrastructure.[865]

373.   Similarly, PPL argues that a five-year transmission planning cycle will allow sufficient time for one transmission planning cycle to be completed before the subsequent cycle commences.[866]  Pine Gate states that a five-year transmission planning cycle is warranted given the size and complexity of transmission planning regions and the time needed to receive and incorporate stakeholder feedback and to achieve consensus on cost allocation.  Pine Gate further notes that a five-year transmission planning cycle would more closely align the results of Long-Term Regional Transmission Planning with the time horizons for reliability planning and other transmission planning processes.[867]

---

[864] Indicated PJM TOs Initial Comments at 11-12.

[865] Exelon Initial Comments at 9.

[866] PPL Initial Comments at 6.

[867] Pine Gate Initial Comments at 20-21.

374.    SPP argues in favor of the update procedures in its current transmission planning processes rather than the three-year schedule for updating Long-Term Scenarios proposed in the NOPR.  SPP states that it performs a 20-year assessment that incorporates Long-Term Scenarios at least once every five years and that, on an annual basis, SPP assesses data inputs and factors incorporated into the assessment.[868]

### iv.    Miscellaneous Comments

375.    Several commenters state that the Commission should regularly review transmission planning processes and assumptions to account for new developments.[869] Pattern Energy states that the best way to make 20-year transmission plans useful is for their outputs to be fed into near-term (i.e., five-to-seven-year horizon) transmission planning activities.[870]

376.    ELCON recommends that the Commission hold a technical conference after the first three-year reassessment period for Long-Term Scenarios to allow transmission providers to offer their experiences with and best practices for Long-Term Regional Transmission Planning.[871]

---

[868] SPP Initial Comments at 5-6.

[869] Clean Energy Buyers Initial Comments at 13; SREA Reply Comments at 26-27.

[870] Pattern Energy Initial Comments at 22.

[871] ELCON Initial Comments at 11.

Docket No. RM21-17-000                                                    - 293 -

### c.    **Commission Determination**

377.    We modify the NOPR proposal to require transmission providers in each
transmission planning region to reassess and revise the Long-Term Scenarios that they
use in Long-Term Regional Transmission Planning at least once every five years.  In
implementing this requirement, transmission providers in each transmission planning
region must reassess whether the data inputs and factors incorporated in previously
developed Long-Term Scenarios need to be updated and then revise those Long-Term
Scenarios, as needed, to reflect updated data inputs and factors.  At the outset of a Long-
Term Regional Transmission Planning cycle, transmission providers may develop the
new Long-Term Scenarios either by crafting entirely new Long-Term Scenarios, or by
updating the data inputs and factors of previously developed Long-Term Scenarios.

378.    To assist transmission providers in implementing the requirement to reassess and
revise Long-Term Scenarios used in Long-Term Regional Transmission Planning at least
once every five years, we clarify that the process, which begins with the development of
Long-Term Scenarios using best available data inputs, and proceeds to identifying Long-
Term Transmission Needs, measuring the benefits of Long-Term Regional Transmission
Facilities to address those needs, and evaluating and deciding whether to select Long-
Term Regional Transmission Facilities (collectively, the Long-Term Regional
Transmission Planning cycle),[872] must conclude at a date that is no later than five years
after the date that it began.

---

[872] The Long-Term Regional Transmission Planning cycle encompasses all
components of Long-Term Regional Transmission Planning, including each of these

379.    While we find that the record supports a five-year interval before new Long-Term

Scenarios must be developed, we also conclude that transmission providers should not

need the full five-year period to reach the point in Long-Term Regional Transmission

Planning at which they decide whether to select Long-Term Regional Transmission

Facilities that they have evaluated.  Accordingly, we require transmission providers to

complete the steps of the Long-Term Regional Transmission Planning cycle and

determine whether to select Long-Term Regional Transmission Facilities no later than

three years from the date when the Long-Term Regional Transmission Planning cycle

began.[873]  Specifically, we find the record demonstrates that three years provides

sufficient time for transmission providers to develop Long-Term Scenarios, identify

Long-Term Transmission Needs, measure the benefits of Long-Term Regional

Transmission Facilities to address those needs, and evaluate and decide whether to select

Long-Term Regional Transmission Facilities.[874]  At the same time, we are persuaded by

---

foundational steps.

[873] To be clear, nothing in this final rule prevents transmission providers from
evaluating and selecting *additional* Long-Term Regional Transmission Facilities after
year three of the Long-Term Regional Transmission Planning cycle and before the next
five-year Long-Term Regional Transmission Planning cycle begins.  However, if Long-
Term Regional Transmission Facilities are selected at year three of the Long-Term
Regional Transmission Planning cycle, those same Long-Term Regional Transmission
Facilities cannot be de-selected during the remainder of the current five-year planning
cycle.

[874] *See* ACORE Initial Comments at 10; Advanced Energy Buyers Initial
Comments at 7; AEE Initial Comments at 8-9; AEP Initial Comments at 5, 8, 13-14;
Amazon Initial Comments at 3; Arizona Commission Initial Comments at 4; BP Initial
Comments at 4; Breakthrough Energy Supplemental Comments at 1; CAISO Initial
Comments at 21; California Water Initial Comments at 15; Clean Energy Associations

commenters' concerns that requiring the Long-Term Regional Transmission Planning

cycle to repeat at three-year intervals could be administratively burdensome, and that the

benefit of updating Long-Term Scenarios every three years may not outweigh those

additional burdens.[875]  We therefore find that requiring selection decisions to occur within

three years of commencing a Long-Term Regional Transmission Planning cycle, while

allowing as long as five years between the commencement of each planning cycle, strikes

an appropriate balance by ensuring timely identification, evaluation, and selection of

more efficient or cost-effective Long-Term Regional Transmission Facilities, while

balancing the administrative burden associated with updating the Long-Term Scenarios

---

Initial Comments at 10; Clean Energy Buyers Initial Comments at 13; DC and MD
Offices of People's Counsel Initial Comments at 8; Entergy Initial Comments at 11;
Idaho Power Initial Comments at 4; Interwest Initial Comments at 6-8; Joint Consumer
Advocates Initial Comments at 8; Nevada Commission Initial Comments at 7; New
England Offshore Wind Initial Comments at 2; New Jersey Commission Initial
Comments at 11; NYISO Initial Comments at 18; Pacific Northwest State Agencies
Initial Comments at 13-14; Pennsylvania Commission Initial Comments at 5; PG&E
Initial Comments at 6; PIOs Initial Comments at 16; PJM Initial Comments at 5-6, 63;
SEIA Initial Comments at 6; SPP Market Monitor Initial Comments at 6; US DOE Initial
Comments at 11; Vermont State Entities Initial Comments at 5; WE ACT Initial
Comments at 3.

[875] *See* Ameren Initial Comments at 12-13; American Municipal Power Initial
Comments at 33; California Commission Initial Comments at 16; Duke Initial Comments
at 11; ISO-NE Initial Comments at 24; MISO Initial Comments at 28-29; MISO TOs
Initial Comments at 17; NARUC Initial Comments at 6-7; NESCOE Initial Comments
at 25-26; OMS Initial Comments at 4-5; Pacific Northwest State Agencies Initial
Comments at 15; Vermont State Entities Initial Comments at 5; WIRES Initial Comments
at 7.

that form the basis for Long-Term Regional Transmission Planning during each planning cycle.[876]

380.    We find that requiring transmission providers to reassess and revise Long-Term Scenarios used in Long-Term Regional Transmission Planning at least once every five years is necessary to ensure that the Long-Term Scenarios accurately reflect factors that may change over the five-year time span, such as changes in technology, load forecasts, or federal, federally-recognized Tribal, state, or local laws.  Furthermore, regular scenario reassessment and revision may also address some of the uncertainty associated with Long-Term Regional Transmission Planning over a 20-year transmission planning horizon that some commenters assert may result in under-building or over-building transmission facilities.[877]  As discussed below in the Specificity of Data Inputs section, nothing in this final rule prohibits transmission providers from updating the inputs used to inform Long-Term Scenarios during a Long-Term Regional Transmission Planning cycle.

381.    As discussed in the Evaluation and Selection of Long-Term Regional Transmission Facilities section of this final rule, transmission providers must designate a point in the evaluation process at which they will make a decision to either select or not

---

[876] Accordingly, we decline NYISO's request to clarify that the transmission provider may extend the transmission planning cycle.  As explained, we find that three years provides sufficient time to complete the actions necessary to make selection decisions.

[877] Industrial Customers Initial Comments at 15-16, 19-21; NRECA Initial Comments at 18-19, 28; Vistra Initial Comments at 7.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 307 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                    - 297 -

select the relevant Long-Term Regional Transmission Facility (or portfolio of such

Facilities).  Further, we clarify that transmission providers must conclude a Long-Term

Regional Transmission Planning cycle before developing Long-Term Scenarios at the

beginning of the next Long-Term Regional Transmission Planning cycle.  Given that, as

we state directly above, nothing in this final rule prevents transmission providers from

evaluating and selecting additional Long-Term Regional Transmission Facilities after

year three of the Long-Term Regional Transmission Planning cycle and before the next

five-year Long-Term Regional Transmission Planning cycle begins, we further find that

transmission providers must designate the point in time or action that concludes a Long-

Term Regional Transmission Planning cycle.  Such designation will ensure transparency

regarding whether the transmission providers are engaging in the evaluation and selection

of additional Long-Term Regional Transmission Facilities after year three of the Long-

Term Regional Transmission Planning cycle.

382.    Some commenters express concern that the proposal to reassess Long-Term

Scenarios in concurrent Long-Term Regional Transmission Planning cycles would create

uncertainty as to which cycle produced the controlling outcome and would burden

stakeholders (e.g., requiring them to provide input on the development of Long-Term

Scenarios for the next Long-Term Regional Transmission Planning cycle while also

requiring them to provide input on Long-Term Regional Transmission Facilities being

considered for selection from the previous Long-Term Regional Transmission Planning

Docket No. RM21-17-000                                                          - 298 -

cycle).[878]  By providing for a period of up to two years between the date by which

transmission providers are required to make a decision to select or not select Long-Term

Regional Transmission Facilities and the date by which the next Long-Term Regional

Transmission Planning cycle must commence, and by clarifying that transmission

providers must conclude one Long-Term Regional Transmission Planning cycle before

another begins, this final rule will appropriately minimize confusion regarding overlap

between planning assessments.  Specifically, this clarification will allow transmission

providers to use in subsequent Long-Term Regional Transmission Planning cycles

updated base or reference cases that include all Long-Term Regional Transmission

Facilities that were selected in a previous Long-Term Regional Transmission Planning

cycle, including those not yet in service.  We find that including the selected Long-Term

Regional Transmission Facilities in subsequent Long-Term Regional Transmission

Planning cycles will improve the accuracy of Long-Term Regional Transmission

Planning.

383.    In response to WIRES's request,[879] we clarify that transmission providers need not

routinely reevaluate selected Long-Term Regional Transmission Facilities.  However, we

note that, as discussed further in the Evaluation and Selection of Long-Term Regional

Transmission Facilities section below, we require transmission providers to reevaluate

---

[878] Eversource Initial Comments at 15; ISO-NE Initial Comments at 24; NESCOE
Initial Comments at 26.

[879] WIRES Initial Comments at 7.

Docket No. RM21-17-000                                                          - 299 -

previously selected Long-Term Regional Transmission Facilities in certain specified circumstances.

384.    Given that we are requiring transmission providers in each transmission planning region to reassess and revise Long-Term Scenarios used in Long-Term Regional Transmission Planning at least once every five years, thus establishing the maximum length of the Long-Term Regional Transmission Planning cycle, we affirm that to the extent that transmission providers believe that a shorter Long-Term Regional Transmission Planning cycle is appropriate for their transmission planning region and circumstances, they may propose on compliance to conduct Long-Term Regional Transmission Planning more frequently than every five years.

385.    We find AEP's request to require all transmission planning regions to follow the same-length transmission planning cycles is beyond the scope of this proceeding.[880]  In the NOPR, we proposed frequency requirements related to the Long-Term Regional Transmission Planning cycles but did not propose a requirement for transmission providers to align their regional transmission planning cycles with those of the transmission providers in neighboring transmission planning regions.

386.    While we do not establish a technical conference after the first Long-Term Regional Transmission Planning cycle, as ELCON requests,[881] the Commission has discretion to conduct additional proceedings at a future date if it finds they are warranted.

---

[880] AEP Initial Comments at 5, 8, 14; AEP Reply Comments at 5.

[881] ELCON Initial Comments at 11.

### 3.      **Categories of Factors**

#### a.      **Requirement to Incorporate Categories of Factors**

##### i.      **NOPR Proposal**

387.    In the NOPR, the Commission proposed to require transmission providers to incorporate specific categories of factors in the development of Long-Term Scenarios as part of Long-Term Regional Transmission Planning.[882]  Specifically, the Commission proposed to require transmission providers to incorporate, at a minimum, the following categories of factors in the development of Long-Term Scenarios:  (1) federal, state, and local laws and regulations that affect the future resource mix and demand;[883] (2) federal, state, and local laws and regulations on decarbonization and electrification; (3) state-approved utility integrated resource plans and expected supply obligations for load-serving entities; (4) trends in technology and fuel costs within and outside of the electricity supply industry, including shifts toward electrification of buildings and transportation; (5) resource retirements; (6) generator interconnection requests and

---

[882] NOPR, 179 FERC ¶ 61,028 at PP 104-112.

[883] *Id.* P 104 n.189.  The Commission explained that "state or federal laws or regulations" meant "enacted statutes (i.e., passed by the legislature and signed by the executive) and regulations promulgated by a relevant jurisdiction, whether within a state, municipality, or at the federal level."

withdrawals; and (7) utility and corporate commitments and federal, state, and local goals[884] that affect the future resource mix and demand.[885]

388.    The Commission preliminarily found that incorporating, at a minimum, these categories of factors in the development of Long-Term Scenarios is appropriate because these categories of factors affect the future resource mix and demand, and their incorporation in Long-Term Scenarios is therefore essential to identifying transmission needs driven by changes in the resource mix and demand through Long-Term Regional Transmission Planning.[886]  To the extent that transmission providers in a transmission planning region would like to incorporate additional categories of factors in the development of Long-Term Scenarios, the Commission proposed to require that they demonstrate on compliance with any final rule that the incorporation of more than the minimum categories is consistent with or superior to any final rule in this proceeding.[887]

389.    Also, as discussed in the Coordination of Regional Transmission Planning and Generator Interconnection Processes section of the NOPR,[888] the Commission proposed to require that transmission providers consider in their Long-Term Regional

---

[884] *Id.* P 104 n.195.  The Commission explained that "goal" meant "any commitment or statement expressed in writing that is not a law or regulation."

[885] *Id.* P 104.

[886] *Id.* P 105.

[887] *Id.*

[888] *Id.* PP 166-174.

Transmission Planning regional transmission facilities that address interconnection-related transmission needs that the transmission provider has identified multiple times in the generator interconnection process but that have never been constructed due to the withdrawal of the underlying interconnection request(s).  The Commission proposed to require that transmission providers incorporate the specific interconnection-related needs identified through that proposed reform, in addition to one or more factors that more generally characterize generator interconnection withdrawals, as a factor in the generator interconnection requests and withdrawals category of factors in their development of Long-Term Scenarios.[889]

390.   The Commission explained that incorporation of the categories of factors set forth above in developing Long-Term Scenarios would help facilitate the identification of transmission needs driven by changes in the resource mix and demand, which the Commission preliminarily found was necessary to ensure just and reasonable and not unduly discriminatory or preferential Commission-jurisdictional rates.  The Commission explained that absent a requirement to incorporate these categories of factors in the development of Long-Term Scenarios, transmission providers may not incorporate known inputs that likely will affect the future resource mix and demand.  Additionally, the Commission explained that transmission providers may not adequately identify transmission needs driven by changes in the resource mix and demand and evaluate the potential benefits of regional transmission facilities that may more efficiently or cost-

---

[889] *Id.* P 107.

effectively meet such needs.  The Commission stated that, as an additional benefit, this requirement would provide clarity to transmission providers and stakeholders regarding which factors must be considered in scenario development.[890]

### ii.    Comments

### (a)    Requirement to Incorporate Categories of Factors

391.    A number of commenters support the proposal to require transmission providers to incorporate in their development of Long-Term Scenarios the seven specific categories of factors identified in the NOPR.[891]  Georgia Commission asserts that these categories of factors adequately capture the factors expected to drive changes in the resource mix and demand,[892] and APPA states that they reflect potential drivers of the need for new transmission.[893]

---

[890] *Id.* P 111.

[891] ACEG Initial Comments at 7; Advanced Energy Buyers Initial Comments at 5; AEE Initial Comments at 9-10; Breakthrough Energy Initial Comments at 14; Breakthrough Energy Supplemental Comments at 1; City of New York Initial Comments at 7; Clean Energy Associations Initial Comments at 10-11; Clean Energy Buyers Initial Comments at 14-15; ELCON Initial Comments at 12; Eversource Initial Comments at 16-17; Illinois Commission Initial Comments at 4-5; Kansas Commission Initial Comments at 14-15; Nevada Commission Initial Comments at 8; Northwest and Intermountain Initial Comments at 13; NRECA Initial Comments at 30; OMS Initial Comments at 6; Ørsted Initial Comments at 6; Pacific Northwest State Agencies Initial Comments at 14; PG&E Initial Comments at 6; Pine Gate Initial Comments at 22; PIOs Initial Comments at 17-18; PJM Initial Comments at 6, 64; SEIA Initial Comments at 7; Southeast PIOs Initial Comments at 44-45; US DOE Initial Comments at 11-12.

[892] Georgia Commission Initial Comments at 4.

[893] APPA Initial Comments at 27-28.

392.    AEE asks that the Commission clarify that consideration of each factor is mandatory, arguing that failing to take into account any of the seven listed categories of factors would risk under-investment in regional transmission facilities, which could result in unjust and unreasonable rates.[894]  Evergreen Action and Pine Gate assert that the Commission should require that the seven factors are "incorporated" instead of "considered" in order to make clear that incorporation is not optional.[895]  Otherwise, Pine Gate states, transmission providers may ignore certain categories relevant and critical to identifying needed transmission infrastructure.[896]

393.    DC and MD Offices of People's Counsel also urge the Commission to require that all seven factor categories listed in the NOPR be included in Long-Term Scenarios.[897] DC and MD Offices of People's Counsel and ACEG state that the flexibility proposed in the NOPR could give transmission providers the option of not considering the last four factor categories.[898]  SEIA recommends that the Commission establish guidelines on the information used to determine factors in the last four factor categories to ensure some level of certainty in how they are reflected in Long-Term Scenarios.[899]

---

[894] AEE Initial Comments at 10.

[895] Evergreen Action Initial Comments at 4; Pine Gate Initial Comments at 22-23.

[896] Pine Gate Initial Comments at 22.

[897] DC and MD Offices of People's Counsel Initial Comments at 11-12.

[898] ACEG Initial Comments at 28; DC and MD Offices of People's Counsel Initial Comments at 11.

[899] SEIA Initial Comments at 9-10.

Docket No. RM21-17-000                                                      - 305 -

394.    Clean Energy Buyers support the NOPR proposal, arguing that requiring uniform categories of factors across transmission planning regions could promote efficiency and interregional coordination.[900]  Southeast PIOs argue that broader consideration of resource trends and other transmission drivers through comprehensive scenarios will inform the decision-making of state authorities tasked with approving transmission facilities.[901]  Indicated US Senators and Representatives express general support for proactive transmission planning that considers a broad range of factors.[902]

395.    MISO TOs, MISO, and OMS state that existing MISO processes already identify and consider the proposed categories of factors to develop scenarios for transmission planning.[903]  MISO TOs further claim that there is no need to require that MISO consider additional factors.[904]  OMS supports the NOPR's proposed requirements as to the minimum categories of factors and asserts that the categories of factors proposed in the NOPR are all included in MISO's existing transmission planning processes.[905]

---

[900] Clean Energy Buyers Initial Comments at 14-15.

[901] Southeast PIOs Reply Comments at 26.

[902] Indicated US Senators and Representatives Initial Comments at 1.

[903] MISO Initial Comments at 34-35; MISO TOs Initial Comments at 18; OMS Initial Comments at 6.

[904] MISO TOs Initial Comments at 18.

[905] OMS Initial Comments at 6.

Docket No. RM21-17-000                                                    - 306 -

396.   Some commenters support the NOPR proposal because they note that it provides

transmission providers with flexibility as to the specific factors they incorporate into their

development of Long-Term Scenarios, as well as how they incorporate those factors.[906]

397.   A few commenters support the NOPR proposal to allow transmission providers to

incorporate additional categories of factors if they can demonstrate that doing so is

consistent with or superior to the final rule.[907]  Specifically, AEE states that the

Commission should clarify that transmission providers can propose to consider other

categories of factors.[908]

398.   Pattern Energy states that the Commission should provide examples of how the

categories of factors and their associated sensitivities may be modeled to ensure that each

Long-Term Scenario is useful for Long-Term Regional Transmission Planning.  For

example, Pattern Energy asks whether the different scenarios alter the various

assumptions for each (or some) of the factors.  Alternatively, Pattern Energy asks

whether the assumptions remained fixed across scenarios and different scenarios are

designed to evaluate different transmission solutions.[909]

---

[906] Exelon Initial Comments at 10-11; Georgia Commission Initial Comments at 4; Illinois Commission Initial Comments at 7; NEPOOL Initial Comments at 7.

[907] Acadia Center and CLF Initial Comments at 9; Clean Energy Buyers Initial Comments at 14-15; ELCON Initial Comments at 12; NESCOE Initial Comments at 27; US DOE Initial Comments at 11-12.

[908] AEE Initial Comments at 10.

[909] Pattern Energy Initial Comments at 24.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 317 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                    - 307 -

(b)    **Requests for Flexibility**

399.    Some commenters argue that the Commission should give transmission providers more flexibility to determine the appropriate categories of factors or individual factors to include in their development of Long-Term Scenarios.[910]  NESCOE contends that providing flexibility would be consistent with the Commission's approach in Order No. 1000, where it did not require the identification of transmission needs driven by any particular Public Policy Requirements.[911]  PG&E argues that the Commission should allow transmission providers to experiment with how they define scenarios and factors to best reflect the policy and planning environments of their transmission planning regions.[912]  EEI notes that not all of the factors listed in the NOPR may be relevant for all transmission planning regions during every long-term assessment and explains that private sector, federal, state, and local public policy goals may diverge or conflict, especially in multi-state regions.[913]

---

[910] Alabama Commission Initial Comments at 7; APPA Initial Comments at 27-28; Dominion Initial Comments at 25; Indicated PJM TOs Initial Comments at 8-9; MISO Initial Comments at 29; NARUC Initial Comments at 8-9; New York TOs Initial Comments at 11-12; NYISO Initial Comments at 8, 20; Pennsylvania Commission Initial Comments at 5-6; PG&E Initial Comments at 7.

[911] NESCOE Initial Comments at 27-28 (citing Order No. 1000, 136 FERC ¶ 61,051 at P 207).

[912] PG&E Initial Comments at 7.

[913] EEI Initial Comments at 12-13.

400.    ISO-NE requests that the Commission provide transmission providers with flexibility in the consideration of factors for inclusion in each scenario, noting that the factors may vary from study to study depending on the study objectives.  Specifically, ISO-NE argues that the Commission should not require that each Long-Term Scenario account for and consistently reflect the first three categories of factors:  federal, state, and local laws and regulations on the future resource mix, decarbonization and electrification, and state-approved integrated resource plans.  ISO-NE emphasizes that the Commission should not require local laws to be consistently reflected in and accounted for in Long-Term Scenarios.  ISO-NE argues that, in addition to being too prescriptive, such a requirement would introduce unnecessary and substantial administrative burdens and compliance risks with the possibility for inadvertent exclusion of a required law, regulation, or integrated resource plan.  Moreover, ISO-NE contends, it would unnecessarily prevent testing of variations with these categories of factors, limiting the usefulness of scenario analysis.[914]

401.    Idaho Commission and Idaho Power argue that the NOPR proposal is too prescriptive.[915]  PJM advises the Commission not to include too many inflexible details in the implementation of the factors.[916]  However, PJM generally supports the NOPR

---

[914] ISO-NE Initial Comments at 26-27.

[915] Idaho Commission Initial Comments at 3; Idaho Power Initial Comments at 5.

[916] PJM Initial Comments at 67.

Docket No. RM21-17-000                                                          - 309 -

proposal to create seven factors that should guide the development of scenarios with some additions and revisions.[917]

402.    NYISO states that the Commission should not prescribe specific categories of factors that transmission providers must use and instead should allow each transmission planning region, in coordination with state entities and stakeholders, to determine to what extent and how the seven categories of factors should be applied.[918]  SEIA disagrees, asserting that each proposed category of factors is broad enough to reflect regional differences within the category, but suggests that the Commission provide flexibility on implementation details.  SEIA explains that the categories of factors do not set forth specific requirements on how much weight each factor should have in each Long-Term Scenario, what generation mix will result from the mix of factors, or what models to use. SEIA states that the Commission should allow transmission providers to include these implementation details in their manuals.[919]

403.    Some commenters express support for some or all of the proposed categories of factors but request that the Commission provide transmission providers with flexibility in how they incorporate the factors into their development of Long-Term Scenarios.[920]  For

---

[917] *Id.* at 6, 64.

[918] NYISO Initial Comments at 8, 20.

[919] SEIA Reply Comments at 3-4.

[920] Ameren Initial Comments at 9-12; APPA Initial Comments at 27-28; Arizona Commission Initial Comments at 5; Eversource Initial Comments at 16-17; ISO-NE Initial Comments at 26; LADWP Initial Comments at 3; TANC Initial Comments at 9-10.

Docket No. RM21-17-000                                              - 310 -

example, TANC requests that the Commission allow transmission planning regions, in

consultation with stakeholders, to exclude some of the proposed factors (i.e., regulatory

and corporate goals or technology trends) from their development of Long-Term

Scenarios.[921]  TANC also advocates that the Commission should allow transmission

planning regions to determine the manner in which other factors, namely trends, resource

requirements, generator interconnection requests, and withdrawals, are incorporated in

regional transmission planning studies.  Although SPP states that most of the categories

of factors are appropriate, it contends that requiring the listed factors to be incorporated,

rather than considered, in development of Long-Term Scenarios could overburden the

process.[922]

404.  NEPOOL states that the categories of factors identified in the NOPR seem generic

enough to allow implementation despite regional differences or changes in circumstances

over time but contends that the Commission should carefully consider different market

structures and potential changes to state policies to ensure that any requirement

accommodates regional differences.[923]  Pine Gate further requests clarification as to the

degree of flexibility that the Commission will grant to transmission providers in how they

incorporate each factor into Long-Term Scenarios.[924]

---

[921] TANC Initial Comments at 9-10.

[922] SPP Initial Comments at 7-8.

[923] NEPOOL Initial Comments at 7.

[924] Pine Gate Initial Comments at 22-23.

Docket No. RM21-17-000                                                          - 311 -

(c)    **Concerns with the Requirement to
Incorporate Categories of Factors**

405.   Large Public Power argues that the NOPR proposal ignores the Commission's

fundamental responsibility to facilitate planning to meet the needs of load-serving

entities, as well as Congress' recognition that load-serving entities themselves have a

fundamental obligation to build transmission to meet their load.[925]  Large Public Power

asserts that the NOPR proposal to establish factors that look more broadly than the

Commission's core obligations under the FPA threatens to undermine the needs of load-

serving entities and their customers.[926]  Further, Large Public Power contends that the

Commission has no authority to direct the development of transmission facilities.[927]

Similarly, some commenters voice concerns with the use of categories of factors to direct

transmission investment.[928]  Louisiana Commission states that the incorporation of

speculative factors would result in a large-scale transmission build-out to accommodate

the policy preference of some, at the cost of all.[929]

406.   Undersigned States claim that the proposed requirement that each Long-Term

Scenario "incorporate and be consistent" with certain factors does not address potentially

---

[925] Large Public Power Initial Comments at 19-20 (citing 16 U.S.C. 824q, (e)); *see also* NRECA Initial Comments at 17-18 (quoting 16 U.S.C. 824q(b)(4)), 19-20).

[926] Large Public Power Initial Comments at 20-21.

[927] *Id*. at 11 (citing 16 U.S.C. 824o(i)(2)).

[928] Industrial Customers Initial Comments at 11; Louisiana Commission Initial Comments at 17-19

[929] Louisiana Commission Initial Comments at 17-19.

Docket No. RM21-17-000                                                          - 312 -

irresolvable conflicts over how certain factors affect the future resource mix and

demand.[930]  PPL criticizes the NOPR for failing to explain how to translate the proposed

factors into usable assumptions that can feed into transmission planning models, leading

to increased uncertainty for transmission developers and greater difficultly in financing

transmission projects or gaining siting approval.[931]

### (d)  **Alternative Frameworks**

407.    Other commenters propose alternative frameworks for incorporating factors in the

development of Long-Term Scenarios.  PPL believes that the Commission's proposed

categories of factors are largely overlapping and can be summarized and replaced by a

single factor:  reasonable expectations regarding the future resource mix and demand.[932]

ENGIE suggests that, because the Commission's proposed factors may be too numerous

for transmission providers to model, certain factors (i.e., laws, regulations, and

announced retirements) should be fixed while others are varied or studied as sensitivities

(i.e., costs, demand, and resource development trends).[933]  PIOs state that the

Commission must set minimum requirements for some factors, asserting that there is

broad support for minimum requirements.[934]

---

[930] Undersigned States Initial Comments at 3.

[931] PPL Initial Comments at 8.

[932] *Id*. at 7.

[933] ENGIE Initial Comments at 3.

[934] PIOs Reply Comments at 10.

408.    GridLab contends that the Commission's proposal to require that transmission providers incorporate specific categories of factors in the development of Long-Term Scenarios cannot be enforced and that such broad factors will not change investment outcomes.  GridLab states that the proposed list of factors are a helpful minimum standard and recommends that the Commission focus on whether transmission providers have meaningfully incorporated them into Long-Term Regional Transmission Planning.[935]  Further, GridLab avers that local laws and regulations and corporate commitments are difficult to incorporate into Long-Term Regional Transmission Planning in a bottom-up, meaningful way.[936]  As an alternative, GridLab suggests that transmission providers could use aggregate assumptions and indicative scenario design and allow state and local agencies, as well as other stakeholders, to provide inputs into scenario development, and then evaluate whether the resulting scenarios are consistent with state, local, and corporate commitments.[937]

### iii.    Commission Determination

409.    We adopt the NOPR proposal to require transmission providers in each transmission planning region to incorporate the seven specific categories of factors proposed in the NOPR, as modified in this final rule, in the development of Long-Term Scenarios.  Specifically, as discussed in more detail below, transmission providers must

---

[935] GridLab Initial Comments at 21-22.

[936] *Id*. at 22.

[937] *Id*.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 324 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                    - 314 -

incorporate in the development of Long-Term Scenarios: (1) federal, federally-recognized Tribal,[938] state, and local laws and regulations affecting the resource mix and demand; (2) federal, federally-recognized Tribal, state, and local laws and regulations on decarbonization and electrification; (3) state-approved integrated resource plans and expected supply obligations for load-serving entities; (4) trends in fuel costs and in the cost, performance, and availability of generation, electric storage resources, and building and transportation electrification technologies; (5) resource retirements; (6) generator interconnection requests and withdrawals; and (7) utility and corporate commitments and federal, federally-recognized Tribal, state, and local policy goals that affect Long-Term Transmission Needs.[939]  We address each of these categories of factors in the Specific Categories of Factors determination section below.

410.    We find that existing regional transmission planning requirements fail to ensure that transmission providers adequately account on a forward-looking basis for known determinants of Long-Term Transmission Needs.[940]  Many commenters in this proceeding, even some that may oppose the prescriptiveness of the requirement or otherwise request more flexibility in how transmission providers account for factors

---

[938] We emphasize that we are requiring transmission providers to incorporate laws and regulations into Long-Term Scenario development.  As noted earlier, while we are providing this opportunity for federally-recognized Tribes to voluntarily participate, we are not imposing any requirements on them to participate.

[939] Modifications to the title of Factor Categories One, Two, Four, and Seven are discussed in the Specific Categories of Factors determination section.

[940] NOPR, 179 FERC ¶ 61,028 at PP 50-51.

affecting Long-Term Transmission Needs,[941] generally agree that the categories of factors outlined in the NOPR account for many of the known determinants of such needs. We find that incorporating the seven categories of factors in the development of Long-Term Scenarios is necessary because these categories of factors are essential to identifying Long-Term Transmission Needs. Further, we find that requiring transmission providers to incorporate the enumerated categories of factors in Long-Term Regional Transmission Planning will help to ensure that transmission providers are accounting for known and identifiable drivers of Long-Term Transmission Needs.

411. We are not persuaded by commenters' arguments that certain of the categories of factors may not be relevant in certain transmission planning regions and therefore that transmission providers should not be required to incorporate those categories of factors in the development of Long-Term Scenarios.[942] We decline to allow transmission providers to exclude some of the proposed categories of factors from being incorporated in the development of Long-Term Scenarios, as certain commenters request, because we conclude that each category of factors includes important determinants of Long-Term Transmission Needs. We are concerned that not requiring incorporation of all of the proposed categories of factors in Long-Term Scenarios would increase the likelihood that transmission providers will continue to underestimate—or omit entirely—certain known

---

[941] *See, e.g.*, EEI Initial Comments at 12-13; PJM Initial Comments at 64-67.

[942] See, *e.g.*, EEI Initial Comments at 12-13; SPP Initial Comments at 7-8.

USCA4 Appeal: 24-1650   Doc: 224      Filed: 01/21/2025    Pg: 326 of 2455
Document Accession #: 20240513-3036     Filed Date: 05/13/2024

Docket No. RM21-17-000                                        - 316 -

determinants of Long-Term Transmission Needs in their regional transmission planning processes.

412.    In response to AEE's request, we affirm that the seven categories of factors adopted in this final rule are the minimum set of known determinants of Long-Term Transmission Needs that transmission providers must incorporate into the development of their Long-Term Scenarios, and we decline to adopt the NOPR proposal to require transmission providers to demonstrate on compliance that the incorporation of additional categories of factors is consistent with or superior to any final rule in this proceeding.[943] Transmission providers may be aware of additional categories of factors beyond those adopted in this final rule that drive Long-Term Transmission Needs and, thus, should be incorporated into the development of Long-Term Scenarios.  While transmission providers may incorporate additional categories of factors into the development of Long-Term Scenarios, we require in this final rule that each Long-Term Scenario remains plausible, as discussed further below.

413.    We clarify that incorporating each category of factors into the development of Long-Term Scenarios means more than merely considering each category of factors in the development of Long-Term Scenarios.[944]  Incorporating a category of factors in the development of Long-Term Scenarios means that transmission providers must use factors in the category, for each factor individually or collectively, to determine the assumptions

---

[943] AEE Initial Comments at 10.

[944] Evergreen Action Initial Comments at 4; Pine Gate Initial Comments at 22-23.

that will be used in the development of Long-Term Scenarios. Incorporating a category of factors into the development of Long-Term Scenarios does not require exacting precision; transmission providers may generalize how all of the discrete factors in a category of factors will, in the aggregate, affect the development of Long-Term Scenarios.[945] However, we expect that similar factors (or groups of factors) affecting a single assumption used in the development of Long-Term Scenarios will have an additive effect on that assumption.[946] We also expect that incorporating a category of factors into the development of Long-Term Scenarios will result in scenarios that differ from scenarios lacking that specific category of factors; that is, the incorporation of a category of factors should have a measurable impact on the Long-Term Scenario, compared to that same Long-Term Scenario, all else equal, if it had not incorporated that category of factors.

414. We believe that the best-available data requirement, which we adopt and discuss further below, should mitigate concerns that transmission providers may undermine

---

[945] For example, transmission providers could aggregate the effect of corporate goals by leveraging publicly available surveys of corporations' clean energy and electrification goals and then using those surveys to inform the assumptions used to develop Long-Term Scenarios (e.g., 10% more clean energy resources and 10% higher load growth for a Long-Term Scenario that assumes full achievement of those goals than in a Long-Term Scenario that does not consider such goals).

[946] For example, two independent factors that increase the likelihood of future electric storage resource development (e.g., (1) a state law requiring the deployment of at least 5 gigawatts of electric storage resources by 2030 and (2) a federal investment tax credit for the deployment of electric storage resources) would have a combined effect that exceeds the effect of either factor alone.

Long-Term Regional Transmission Planning by not incorporating categories of factors in a meaningful way.[947]  The best-available data requirement will ensure that the data inputs that transmission providers use to incorporate categories of factors are timely, developed using best practices, and diverse and expert perspectives.  We also clarify that, as a consequence of the requirement that all Long-Term Scenarios must be plausible, as well as the requirement that all Long-Term Scenarios must be diverse, both of which we adopt and discuss below, transmission providers must incorporate the categories of factors in the development of Long-Term Scenarios in a way that results in plausible and diverse Long-Term Scenarios.

415.   As to the factors within each category that transmission providers must account for when they incorporate each category of factors in the development of Long-Term Scenarios, we require transmission providers to account for the factors that they have determined are likely to affect Long-Term Transmission Needs.  As explained above, these Long-Term Transmission Needs include, but are not limited to, evolving reliability concerns and changes in the resource mix, and changes in demand.  For each factor (or group of similar factors) within each category of factors that transmission providers identify, in coordination with stakeholders through an open and transparent process as described below, transmission providers must make a determination as to how that factor (or group of similar factors) is likely to affect Long-Term Transmission Needs.  Transmission providers must then account for the factors that they have determined are

---

[947] *E.g.*, ACEG Initial Comments at 28.

likely to affect Long-Term Transmission Needs in the development of the Long-Term Scenarios used in Long-Term Regional Transmission Planning. We clarify, however, that transmission providers in a transmission planning region need not account for a factor, stakeholder-identified or otherwise, if they determine that factor is unlikely to affect Long-Term Transmission Needs.

416.    We also clarify that a category of factors (e.g., Factor Category Two: federal, federally-recognized Tribal, state, and local laws and regulations on decarbonization and electrification) differs from a specific factor (e.g., a specific state law with a decarbonization requirement). We make this distinction because some commenters use only the word "factors" when describing the categories of factors proposed in the NOPR.[948]

417.    We disagree with commenters that the categories of factors requirements are too prescriptive,[949] and we believe that the framework adopted in this final rule requiring transmission providers to incorporate categories of factors into the development of Long-Term Scenarios strikes the right balance between prescriptive requirements and flexibility. Transmission providers have discretion to determine whether specific factors must be accounted for within each category (i.e., if the specific factor will likely affect Long-Term Transmission Needs), how to account for specific factors in the development

---

[948] *E.g.*, AEE Initial Comments at 9; Evergreen Action Initial Comments at 4.

[949] ISO-NE Initial Comments at 26; NYISO Initial Comments at 8, 20; PJM Initial Comments at 67.

of Long-Term Scenarios (e.g., the method and data used to forecast resource retirements), and how to vary the treatment of each category of factors across Long-Term Scenarios (e.g., assume all forecasted resource retirements materialize in some but not all Long-Term Scenarios), so long as transmission providers assume that the laws, regulations, state-approved integrated resource plans, and expected supply obligations for load-serving entities identified in the first three categories of factors—that transmission providers have determined are likely to affect Long-Term Transmission Needs—are fully met (as discussed below). We believe that each proposed category of factors is broad enough to allow the transmission providers in each transmission planning region to reflect regional differences within the category, as noted by SEIA and NEPOOL.[950] In response to PG&E's request that we allow flexibility for transmission providers to use Long-Term Scenarios that best reflect the individual policy and planning environments in their specific transmission planning regions, and to Pattern Energy's questions about how categories of factors may be modeled,[951] we clarify that transmission providers have the flexibility to develop different Long-Term Scenarios specific to their transmission planning region and develop using assumptions based on the categories of factors.

418.    In response to NESCOE, we decline to give transmission providers the flexibility to choose which of the proposed categories of factors to incorporate into Long-Term Scenarios, which NESCOE states would be consistent with the flexibility that the

---

[950] NEPOOL Initial Comments at 7; SEIA Reply Comments at 3-4.

[951] Pattern Energy Initial Comments at 24; PG&E Initial Comments at 7.

Commission provided to transmission providers in Order No. 1000, where it did

"not . . . require the identification of any particular transmission need driven by any

particular Public Policy Requirements."[952]   As noted in The Overall Need for Reform

section, there are deficiencies in the Commission's existing regional transmission

planning requirements, including that they fail to ensure that transmission providers

adequately account on a forward-looking basis for known determinants of Long-Term

Transmission Needs.  We are concerned that, if transmission providers have flexibility to

choose which of the proposed categories of factors to incorporate into the development of

Long-Term Scenarios, they will continue to underestimate—or omit entirely—certain

known determinants of Long-Term Transmission Needs in their regional transmission

planning processes.  Additionally, we note that transmission needs are distinct from

categories of factors: as explained above, categories of factors, and specific factors

therein, form the basis for assumptions that will be used in the development of Long-

Term Scenarios that transmission providers will then use to identify Long-Term

Transmission Needs.

419.    We also disagree with arguments that we are directing the development of specific

transmission facilities.[953]   As an initial matter, transmission providers retain discretion to

---

[952] NESCOE Initial Comments at 27-28 (citing Order No. 1000, 136 FERC
¶ 61,051 at P 207).

[953] *E.g.*, Large Public Power Initial Comments at 20-21; *see also* Alabama
Commission Initial Comments at 4; Industrial Customers Initial Comments at 10;
Louisiana Commission Initial Comments at 17-19; Pennsylvania Commission Initial
Comments at 6.

USCA4 Appeal: 24-1650   Doc: 224   Filed: 01/21/2025   Pg: 332 of 2455
Document Accession #: 20240513-3036   Filed Date: 05/13/2024

Docket No. RM21-17-000                                              - 322 -

determine how specific factors will affect Long-Term Transmission Needs.  Moreover,

the categories of factors requirements adopted in this final rule do not create new

transmission needs that did not previously exist, but rather, they improve regional

transmission planning processes by requiring transmission providers to identify Long-

Term Transmission Needs across a plausible and diverse range of future scenarios and to

identify, evaluate, and select Long-Term Regional Transmission Facilities to address

those needs.  If transmission providers do not account in Long-Term Regional

Transmission Planning for known determinants of Long-Term Transmission Needs, then

those needs would still exist and would likely be resolved, if at all, in a relatively

inefficient or less cost-effective manner (e.g., in a piecemeal fashion through local

transmission planning processes and/or generator interconnection processes).  We are not

requiring that transmission providers select any particular Long-Term Regional

Transmission Facility and therefore are not directing the development of any particular

transmission facilities.  Finally, we clarify that while the requirement for transmission

providers to incorporate the seven categories of factors adopted in this final rule into the

development of Long-Term Scenarios is intended to ensure that Long-Term Regional

Transmission Facilities are identified for selection to more efficiently or cost-effectively

address Long-Term Transmission Needs, we do not believe that concerns over whether a

transmission provider appropriately implemented this requirement represent an

appropriate basis on which to challenge the cost allocation for one or more individual

Long-Term Regional Transmission Facilities.  Rather, whether the allocation of costs is

just and reasonable and not unduly discriminatory is governed by the requirement that

costs be roughly commensurate with benefits, as discussed in the Regional Transmission Cost Allocation section below.

420.    We disagree with Large Public Power's argument that we are ignoring the Commission's fundamental responsibility to facilitate planning to meet the needs of load-serving entities.[954]  As described below, we are requiring all Long-Term Scenarios to be consistent with and fully account for factors in Factor Category Three, which includes state-approved integrated resource plans and the expected supply obligations of load-serving entities.  Therefore, transmission providers are required to plan to meet the needs of load-serving entities.

421.    We decline to adopt more specific minimum requirements than those described herein for incorporating categories of factors in the development of Long-Term Scenarios, as requested by some commenters.[955]  We believe that the requirements adopted herein, coupled with the other Long-Term Scenarios requirements, including the plausible and diverse and best available data requirements, are sufficiently detailed to address the need for reform without limiting regional flexibility.

---

[954] Large Public Power Initial Comments at 19-20 (citing 16 U.S.C. 824q, (e)); *see also* NRECA Initial Comments at 17-18 (quoting 16 U.S.C. 824q(b)(4)), 19-20.

[955] *E.g.*, PIOs Reply Comments at 10.

b. **Specific Categories of Factors**

i. **NOPR Proposal**

422.    In the NOPR, the Commission proposed to require transmission providers to incorporate, at a minimum, the following categories of factors in the development of Long-Term Scenarios:  (1) federal, state, and local laws and regulations that affect the future resource mix and demand;[956] (2) federal, state, and local laws and regulations on decarbonization and electrification; (3) state-approved utility integrated resource plans and expected supply obligations for load-serving entities; (4) trends in technology and fuel costs within and outside of the electricity supply industry, including shifts toward electrification of buildings and transportation; (5) resource retirements; (6) generator interconnection requests and withdrawals; and (7) utility and corporate commitments and federal, state, and local goals that affect the future resource mix and demand.[957]

(a) **Federal, Federally-Recognized Tribal, State, and Local Laws and Regulations That Affect the Future Resource Mix and Demand (Factor Category One)**

(1) **Comments**

423.    Many commenters support the proposed requirement that each Long-Term Scenario incorporate and be consistent with the federal, state, and local laws and

---

[956] NOPR, 179 FERC ¶ 61,028 at P 104 n.189.  The Commission explained that "state or federal laws or regulations" meant "enacted statutes (i.e., passed by the legislature and signed by the executive) and regulations promulgated by a relevant jurisdiction, whether within a state or municipality, or at the federal level."

[957] *Id.* P 104.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 335 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                    - 325 -

regulations that affect the future resource mix and demand.[958]  AEE, Clean Energy States,

and Acadia Center and CLF argue that laws and regulations implementing clean energy

and decarbonization policies will be key drivers in changes to the resource mix and

demand.[959]  Moreover, AEE notes, 38 states and the District of Columbia have adopted

renewable portfolio standards, many of which have been enacted in statute and constitute

binding commitments on utilities and retail energy providers.[960]  Clean Energy States

similarly assert that the 21 states (plus the District of Columbia and Puerto Rico) with

100% clean energy policies account for 42.3% of United States power sales as of 2020,

49.4% of United States customer accounts, and 51% of United States population.[961]

Clean Energy States argue that altogether, these states could see an aggregated demand

for 800 TWh of new energy generation to meet their targets.

---

[958] Acadia Center and CLF Initial Comments at 8; AEE Initial Comments at 9-10; Breakthrough Energy Initial Comments at 14; California Commission Initial Comments at 17; Clean Energy Associations Initial Comments at 10-11; Clean Energy States Initial Comments at 3; Environmental Groups Supplemental Comments at 2; Exelon Initial Comments at 10-11; New England for Offshore Wind Initial Comments at 2; OMS Initial Comments at 6; Pacific Northwest State Agencies at Initial Comments at 14; Pine Gate Initial Comments at 23; PIOs Initial Comments at 17-18; WE ACT Initial Comments at 4-5.

[959] Acadia Center and CLF Initial Comments at 8; AEE Initial Comments at 10; Clean Energy States Initial Comments at 3.

[960] AEE Initial Comments at 10 (citing Energy Info. Admin., *Renewable Energy Explained, Portfolio Standards* (June 29, 2021), https://www.eia.gov/energyexplained/renewable-sources/portfolio-standards.php).

[961] Clean Energy States Initial Comments at 3 (citing Clean Energy States Alliance, *100% Energy Collaborative*, https://www.cesa.org/projects/100-clean-energy-collaborative/).

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 336 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                    - 326 -

424.    AEE, DC and MD Offices of People's Counsel, and SEIA agree that transmission providers should incorporate the effects of federal, state, and local laws and regulations on renewable energy development into development of Long-Term Scenarios.[962]  City of New York states that government action that bears the force of law should be reflected in baseline transmission planning studies and not considered as merely one of multiple factors used to develop Long-Term Scenarios.[963]

425.    Southeast PIOs argue that concerns that requiring the incorporation of local laws and regulations in the development of Long-Term Scenarios is unduly burdensome are misplaced at this stage because the details of how it will be done will be established during compliance proceedings.[964]

426.    PIOs argue that the Commission should require the same level of engagement with Tribal governments as it does with states and that the Commission should clarify that Long-Term Scenarios must incorporate relevant aspects of Tribal policies.[965]

427.    Acadia Center and CLF claim that the Commission should clarify that state laws and regulations that affect the future resource mix and demand include state laws and regulations that affect demand management, such as energy efficiency, distributed

---

[962] AEE Initial Comments at 17-18, 22; DC and MD Offices of People's Counsel Reply Comments at 5-6; SEIA Initial Comments at 7-8.

[963] City of New York Initial Comments at 7.

[964] Southeast PIOs Reply Comments at 26.

[965] PIOs Reply Comments at 15.

generation, flexible load, and demand response because laws and initiatives in this area will also affect transmission needs while providing grid solutions.[966]

428.    Center for Biological Diversity states that the Commission must include all Executive Actions, not just laws and regulations, as factors in Long-Term Regional Transmission Planning.  Center for Biological Diversity states that allowing transmission providers to decide whether to consider Executive Orders fails to provide stakeholders with the type of clarity that is a goal of the NOPR.[967]

429.    As noted above, some commenters oppose the overall categories of factors requirement in this final rule and argue that requiring transmission providers to incorporate certain factors, such as laws and regulations that affect the resource mix, will force transmission providers to settle irresolvable conflicts among state policies and conduct transmission planning that accommodates the policy preferences of some, at the cost of all.[968]

430.    Some commenters acknowledge that state laws and regulations may affect the future resource mix and demand but argue against mandatory inclusion such that they cannot discount certain federal, state, and local laws and regulations.[969]  Idaho Power

---

[966] Acadia Center and CLF Initial Comments at 9.

[967] Center for Biological Diversity Initial Comments at 3, 9-12.

[968] Louisiana Commission Initial Comments at 17-18; Undersigned States Initial Comments at 3.

[969] Ameren Initial Comments at 9-10; NESCOE Initial Comments at 27-28; NYISO Initial Comments at 8, 20.

Docket No. RM21-17-000                                                    - 328 -

states that the NOPR proposal does not provide transmission providers with the flexibility

necessary to create transmission planning regions that span multiple states and could

cause non-jurisdictional entities to opt out of regional transmission planning.[970]  NYISO

states that the final rule should not require transmission providers to assume across all

scenarios the full achievement of all federal, state, and local laws and regulations that

could drive the need for transmission.  NYISO also does not think that the final rule

should require the identification of all federal, state, and local laws and regulations that

may drive the need for transmission over the 20-year transmission planning horizon, but

instead should provide each transmission planning region with flexibility.[971]

431.    Although Duke agrees that many of the categories of factors identified in the

NOPR capture a minimum list of factors that are expected to drive changes in the

resource mix and demand, it does not support the inclusion of local laws and

regulations.[972]

### (2)    <u>Commission Determination</u>

432.    We adopt the NOPR proposal, with modification, to require transmission

providers in each transmission planning region to incorporate Factor Category One:

federal, federally-recognized Tribal, state, and local laws and regulations affecting the

resource mix and demand, in the development of Long-Term Scenarios.  We find that the

---

[970] Idaho Power Initial Comments at 7.

[971] NYISO Initial Comments at 8.

[972] Duke Initial Comments at 13-14.

factors in this category have been, and will continue to be, key drivers of Long-Term Transmission Needs and therefore must be accounted for in Long-Term Regional Transmission Planning.  Accordingly, we find that failing to account for factors in Factor Category One would hamper the identification, evaluation, and selection of Long-Term Regional Transmission Facilities that are potentially more efficient or cost-effective solutions to Long-Term Transmission Needs.

433.    We clarify that factors in Factor Category One include, among other things, legally binding obligations, incentives (e.g., tax credits), and/or restrictions promulgated by policymakers that will affect new or existing generators, or demand.  Further, as discussed in the Additional Categories of Factors section below, we recognize that energy equity and justice laws and regulations are also potential factors within Factor Category One to the extent that they are likely to affect Long-Term Transmission Needs.

434.    As discussed in further detail below in the Additional Categories of Factors section, we modify the NOPR proposal for Factor Category One to include federally-recognized Tribal laws and regulations affecting the resource mix and demand because we are persuaded by commenters that contend that such factors have a similar potential to affect Long-Term Transmission Needs as federal, state, and local laws and regulations. Federally-recognized Tribal laws and regulations mean the legally binding obligations, incentives, and/or restrictions promulgated by federally-recognized Tribes that will affect new or existing generators, or demand.  We make similar modifications to Factor Category Two and Factor Category Seven, as discussed in the Factor Category Two and Factor Category Seven sections below.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 340 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                                - 330 -

435.    We are not persuaded by Louisiana Commission's argument that requiring
transmission providers to incorporate certain factors, such as federal, federally-
recognized Tribal, state, and local laws and regulations affecting the resource mix and
demand, would result in a transmission buildout that only accommodates the policy
preferences of some stakeholders, at the cost of all transmission customers.[973]    Similarly,
we are not persuaded by Undersigned States' contention that policy differences among
states may be irresolvable, and therefore the Commission should not require transmission
providers to account for laws and regulations in their Long-Term Scenarios.[974]    First,
every policy choice—from federal tax incentives and state regulation of generation, down
to local economic development policies—that changes the quantity and location of
generation and load contributes to changes in transmission needs.    Accordingly, all
transmission buildout—whether it occurs through a local or regional transmission plan, or
through a near-term transmission planning process or a more forward-looking one—is a
reflection, at least in part, of federal, federally-recognized Tribal, state, and local laws
and regulations that drive transmission needs.    Rather than a unique feature of Long-
Term Regional Transmission Planning, transmission planning of any kind will inherently
reflect the policy choices of multiple decisionmakers, because the quantity and location
of generation and load are shaped by multiple decisionmakers.

---

[973] Louisiana Commission Initial Comments at 17.

[974] Undersigned States Initial Comments at 3.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 341 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

436.    Second, we find that requiring transmission providers to properly account for known determinants of Long-Term Transmission Needs is necessary to ensure just and reasonable rates.  Specifically, because, as described above, Long-Term Transmission Needs driven by disparate policy decisions would continue to exist, regardless of whether they were identified in Long-Term Regional Transmission Planning, failing to identify, evaluate, and select Long-Term Regional Transmission Facilities to address those needs will result in unjust and unreasonable rates.  We note that some policy decisions are reflected in laws and regulations, which can affect load-serving entities' supply obligations, and in transmission planning regions with vertically integrated utilities, some policy decisions are reflected in the integrated resource plans approved by retail regulators.

437.    We are not endorsing the merits of any specific federal, federally-recognized Tribal, state, or local laws and regulations or of any specific state-approved integrated resource plans.  We emphasize that the Commission's policies are technology neutral, and we are not establishing a preference for certain types of generation or energy end uses.  We acknowledge that, in some instances, a policy choice in one jurisdiction may reduce or negate the effect of a policy choice in another jurisdiction.  However, the fact that certain factors may have conflicting effects on Long-Term Transmission Needs is not a basis to conclude that the effects of laws and regulations or state-approved integrated resource plans should be ignored or discounted.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 342 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                      - 332 -

**(b)** **Federal, Federally-Recognized Tribal, State, and Local Laws and Regulations on Decarbonization and Electrification (Factor Category Two)**

**(1)** **Comments**

438.    Several commenters support the proposed requirement that Long-Term Scenarios incorporate federal, state, and local laws and regulations on decarbonization and electrification.[975]  Illinois Commission notes that, in Illinois, the Climate and Equitable Jobs Act of 2021 will affect future demand and the supply mix and that Long-Term Regional Transmission Planning will be critical to meeting Illinois' policy goals.[976]  New England for Offshore Wind states that electrification to meet New England states' greenhouse gas emissions mandates will dramatically increase electricity load and require massive amounts of clean energy.[977]  Pattern Energy states that federal and state legislative efforts to promote decarbonization should be the basis of scenario modeling for generation and demand.[978]  Center for Biological Diversity states that the Commission should identify decarbonization as an objective in Long-Term Regional Transmission

---

[975] Acadia and CLF Initial Comments at 9; Center for Biological Diversity Initial Comments at 7-9; Clean Energy Associations Initial Comments at 10-11; DC and MD Offices of People's Counsel Reply Comments at 6; Illinois Commission Initial Comments at 4-5; New England for Offshore Wind Initial Comments at 2-3; Pacific Northwest State Agencies at Initial Comments at 14; Pattern Energy Initial Comments at 26; Pine Gate Initial Comments at 23; PIOs Initial Comments at 17-18; Renewable Northwest Initial Comments at 19-22.

[976] Illinois Commission Initial Comments at 4-5.

[977] New England for Offshore Wind Initial Comments at 2-3.

[978] Pattern Energy Initial Comments at 26.

Docket No. RM21-17-000                                          - 333 -

Planning because it has the authority and responsibility to prioritize decarbonization in the transmission planning process since these policies bear directly on the provision of transmission service.[979]

439.    Nevada Commission acknowledges that other state policies and its own integrated resource planning process should be considered in Long-Term Regional Transmission Planning even though it does not support other state policies affecting Nevada ratepayers.[980]  Utah Division of Public Utilities states that the impact of state policies should be part of the Long-Term Regional Transmission Planning scenario analysis.[981] Cypress Creek asserts that the Commission should include state policy requirements in a uniform set of assumptions that are applicable across all Long-Term Scenarios.[982]

### (2)    Commission Determination

440.    We adopt the NOPR proposal, with modification, to require transmission providers in each transmission planning region to incorporate Factor Category Two: federal, federally-recognized Tribal, state, and local laws and regulations on decarbonization and electrification, in the development of Long-Term Scenarios.  Similar to Factor Category One, we find that the factors in this category have been, and will

---

[979] Center for Biological Diversity Initial Comments at 7-9 (citing *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d at 89-93).

[980] Nevada Commission Initial Comments at 8.

[981] Utah Division of Public Utilities Reply Comments at 4.

[982] Cypress Creek Reply Comments at 5-6.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 344 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

continue to be, key drivers of Long-Term Transmission Needs and therefore must be accounted for in Long-Term Regional Transmission Planning. We clarify that this category of factors includes legally binding obligations, incentives, and/or restrictions that affect Long-Term Transmission Needs in different ways than Factor Category One, for example, by limiting the carbon intensity of electricity generation or electrifying energy end uses and thereby significantly increasing electricity use in certain sectors of the economy, such as transportation and building heating and cooling. We acknowledge that there could be overlap between Factor Categories One and Two because a certain law or regulation could reasonably be considered to fit into both categories. In such a circumstance, transmission providers must account for the law or regulation in one of the two categories, not both, to avoid double-counting of that factor's anticipated effect on Long-Term Transmission Needs. Since transmission providers must account for and be consistent with, and not discount, factors in the first three categories of factors equally once the transmission providers have determined that such a factor is likely to affect Long-Term Transmission Needs, we do not believe it is necessary to ensure that a certain factor is considered as part of Factor Category One instead of Factor Category Two (or vice versa), but rather it is only necessary to ensure that these factors are accounted for in the development of Long-Term Scenarios.

441.    In addition, based on the record before us, we modify the NOPR proposal for Factor Category Two to include federally-recognized Tribal laws and regulations on decarbonization and electrification because we are persuaded by commenters that argue

that such factors have the same potential to affect Long-Term Transmission Needs as federal, state, and local laws and regulations on decarbonization and electrification.

442.    Similar to our response in the Factor Category One section to commenters arguing that categories of factors involving federal, federally-recognized Tribal, state, and local laws and regulations would provide preference to some at the cost of all or result in irresolvable conflict,[983] we find that differences in if and how government entities promulgate laws and regulations concerning decarbonization and electrification (i.e., factors in Factor Category Two) do not diminish the effect of such laws and regulations. As such, Long-Term Scenarios must account for these key drivers of Long-Term Transmission Needs so that transmission providers can identify such needs through Long-Term Regional Transmission Planning and can identify, evaluate, and select Long-Term Regional Transmission Facilities to address those needs.

**(c)     State-Approved Utility Integrated Resource Plans and Expected Supply Obligations for Load-Serving Entities (Factor Category Three)**

**(1)     Comments**

443.    Several commenters support the proposed requirement that each Long-Term Scenario incorporate state-approved integrated resource plans and expected supply obligations for load-serving entities.[984]  NRECA and TAPS state that using Long-Term

---

[983] Louisiana Commission Initial Comments at 17-19; Undersigned States Initial Comments at 3.  Comments originally summarized in PP 404-405.

[984] California Commission Initial Comments at 17; NRECA Initial Comments at 30; Pine Gate Initial Comments at 23; PIOs Initial Comments at 17-18; US Chamber of

Scenarios that satisfy expected load-serving entity supply obligations is consistent with FPA section 217(b)(4)'s directive to facilitate the planning and expansion of transmission to meet the reasonable needs of load-serving entities to satisfy their service obligations.[985] NRECA asserts that this category should be moved to the top of the list of categories of factors because state-approved integrated resource plans and load-serving entity supply obligations will incorporate state laws and regulations affecting resource mix, demand, decarbonization, and electrification.  Additionally, NRECA contends that the changing characteristics of the distribution grid, such as distributed energy resources, storage, demand response, energy efficiency, and electrification of demand, will affect load-serving entity needs and should be incorporated in this category of factors.[986]  Clean Energy Associations and ACEG agree.[987]

444.    APPA and ACEG argue that the final rule should focus on the resource plans of load-serving entities and include a requirement for transmission providers to include in their Long-Term Regional Transmission Planning process a requirement to coordinate with load-serving entities.[988]  ACEG argues that such a requirement is necessary because

---

Commerce Initial Comments at 6-7.

[985] NRECA Initial Comments at 30-31; TAPS Initial Comments at 2, 7-8 (citing NOPR, 179 FERC ¶ 61,028 at P 106); *see also* APPA Initial Comments at 28.

[986] NRECA Initial Comments at 30-31 n.85.

[987] ACEG Reply Comments at 22; Clean Energy Associations Reply Comments at 6-7.

[988] ACEG Reply Comments at 22; APPA Initial Comments at 27-28.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 347 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

not all load-serving entities either own generation or are overseen by a state regulator, meaning that they must rely on the Commission to ensure that transmission planning meets their needs.[989]

445.    Several commenters clarify that they support the inclusion of load-serving entity demand as a factor in Long-Term Scenarios.[990]  In addition, some commenters support the inclusion of load-serving entity generation resource planning as a factor in Long-Term Scenarios.[991]  PIOs argue that the Commission should require load-serving entities to provide their generation and demand forecasts to transmission planning entities.[992] ACEG agrees and argues that PIOs' recommendation will decrease the burden on transmission planning entities and provide them with the information they need to determine the future resource mix.[993]

446.    Entergy asserts that the Commission has identified the appropriate factors but explains that not all states conduct commission proceedings related to integrated resource plans and, for those states that do, the timelines are not necessarily the same.  Thus,

---

[989] ACEG Reply Comments at 22-23.

[990] ACEG Reply Comments at 22-23; Clean Energy Associations Reply Comments at 7; DC and MD Offices of People's Counsel Reply Comments at 4; PIOs Initial Comments at 18; PIOs Reply Comments at 10.

[991] ACEG Reply Comments at 22-23; Clean Energy Associations Reply Comments at 7; DC and MD Offices of People's Counsel Reply Comments at 4.

[992] PIOs Initial Comments at 19.

[993] ACEG Reply Comments at 23.

Docket No. RM21-17-000 - 338 -

Entergy requests that the Commission clarify that the term "state-approved utility integrated resource plans" will be construed broadly to include any resource plan developed and reviewed through a retail commission proceeding and submitted to the relevant transmission provider for use in Long-Term Regional Transmission Planning. Entergy asserts that such clarification would result in a range of benefits such as consistency of data with current local, state, and federal laws and expected retirements, additions, and corporate goals.[994]

### (2) Commission Determination

447. We adopt the NOPR proposal to require transmission providers in each transmission planning region to incorporate Factor Category Three: state-approved integrated resource plans and expected supply obligations for load-serving entities, in the development of Long-Term Scenarios. We find it appropriate to require transmission providers to incorporate Factor Category Three because it reflects the outcomes of retail-level regulatory proceedings that will affect Long-Term Transmission Needs. Further, incorporation of Factor Category Three into Long-Term Scenarios will ensure that transmission providers properly account for resource planning and anticipated changes to demand, including increased integration of distributed energy resources. We note that the Commission shares concurrent jurisdiction over the bulk power system with retail regulators,[995] and we agree with commenters that note that FPA section 217(b)(4) directs

---

[994] Entergy Initial Comments at 15-16.

[995] *Compare* 16 U.S.C. 824d(a) (providing the Commission authority to regulate the rates charged by public utilities in connection with the transmission or wholesale sale

the Commission to facilitate the planning and expansion of transmission to meet the reasonable needs of load-serving entities to satisfy their service obligations.[996]

448.    In response to commenters that note some retail regulators may review but not formally approve integrated resource plans, we clarify that, for this category of factors, state-approved integrated resource plans includes resource plans that are developed and reviewed through a retail proceeding in jurisdictions where the retail regulator does not formally approve such plans.[997]  We grant Entergy's clarification request that the term "state-approved utility integrated resource plans" be construed broadly to include any resource plan developed and reviewed through a retail commission proceeding and submitted to the relevant transmission provider for use in Long-Term Regional Transmission Planning because it would enable a more complete consideration of state-approved integrated resource plans and expected supply obligations for load-serving entities.

---

of electric energy), *with id.* 824(a) (reserving certain state authorities).

[996] 16 U.S.C. 824q(b)(4) ("The Commission shall exercise the authority of the Commission under this chapter in a manner that facilitates the planning and expansion of transmission facilities to meet the reasonable needs of load-serving entities to satisfy the service obligations of the load-serving entities, and enables load-serving entities to secure firm transmission rights (or equivalent tradable or financial rights) on a long-term basis for long-term power supply arrangements made, or planned, to meet such needs.").

[997] Entergy Initial Comments at 15-16.

449.    In response to APPA and ACEG's request for the Commission to require

transmission providers to coordinate with load-serving entities,[998] we note that we require

transmission providers, as described in further detail below, to provide an open and

transparent process in their OATT that provides stakeholders, including load-serving

entities, with a meaningful opportunity to propose potential factors and to provide input

on how to account for specific factors in the development of Long-Term Scenarios.[999]

However, in response to PIOs' request that the Commission require load-serving entities

to provide their generation and demand forecast to transmission providers, we agree that

such information will assist transmission providers in developing Long-Term Scenarios.

Therefore, consistent with the information exchange transmission planning principle

established in Order No. 890,[1000] we require load-serving entities that are taking

transmission service pursuant to an OATT to provide transmission providers with

---

[998] ACEG Reply Comments at 22; APPA Initial Comments at 27-28.

[999] *See infra* Stakeholder Process and Transparency section.

[1000] The information exchange transmission planning principle requires network transmission customers to submit information on their projected loads and resources on a comparable basis (e.g., planning horizon and format) as used by transmission providers in planning for their native load. Point-to-point transmission customers are required to submit their projections for need of service over the planning horizon and at what receipt and delivery points. To the extent applicable, transmission customers should also provide information on existing and planned demand resources and their impact on demand and peak demand. Transmission providers, in consultation with their customers and other stakeholders, must develop guidelines and a schedule for the submittal of such customer information. Order No. 890, 118 FERC ¶ 61,119 at PP 486-487.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 351 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                    - 341 -

information on the load-serving entities' projected loads and resources over the planning

horizon.

> **(d)** **Trends in Technology and Fuel Costs Within and Outside of the Electricity Supply Industry, Including Shifts Toward Electrification of Buildings and Transportation (Factor Category Four)**

> **(1)** **Comments**

450.    Several commenters emphasize the importance of incorporating assumptions

regarding shifts towards electrification in Long-Term Scenarios.[1001]  Clean Energy

Buyers assert that regional flexibility should not be used to diminish the representation in

Long-Term Scenarios of significant load growth from the commercial and industrial

sectors and electrification of transportation.[1002]  Likewise, DC and MD Offices of

People's Counsel assert that regional flexibility should be reflected in the actual inputs

for these factors, rather than their inclusion in or exclusion from Long-Term Scenarios,

noting, for example, that electrification forecasts in some areas are increasing load

growth estimates by 30%.[1003]  Clean Energy Associations argue that, to keep pace with

changes in supply and demand, Long-Term Scenarios should incorporate aging

---

[1001] Clean Energy Associations Initial Comments at 11; Clean Energy Buyers Initial Comments at 15-16; DC and MD Offices of People's Counsel Initial Comments at 11-12; ENGIE Initial Comments at 3; PJM Market Monitor Initial Comments at 3.

[1002] Clean Energy Buyers Initial Comments at 15-16.

[1003] DC and MD Offices of People's Counsel Initial Comments at 11-12.

infrastructure and planned replacements, along with load and generation trends informed

by both historical data and applicable policy drivers.[1004]

451.    Other commenters emphasize the trends in specific technology costs, such as long-

duration storage.  ENGIE states that advances in longer-duration storage and advancing

photovoltaic technologies may affect the ability to develop resources in areas previously

considered to be uneconomic, which could affect the resource and demand mix.[1005]  Form

Energy argues that the inclusion of diverse, long-duration electric storage technologies

would require significantly fewer new transmission needs.[1006]

452.    Pine Gate supports the inclusion of trends in technology and fuel costs in Long-

Term Scenarios; however, Pine Gate requests that the Commission clarify what type of

data would constitute a "trend" and how it expects transmission providers to assure that

trend-related input is objective and representative of the "best available data."[1007]

Similarly, US DOE recommends that the Commission clarify whether the term "trends in

technology and fuel costs" refers to trends in fuel cost and trends in technology, or rather

trends in the cost of fuel and trends in the cost of technology.  If the Commission is

referring to the former, US DOE recommends that the Commission consider the phrase

"trends in fuel costs and in the cost, performance, and availability of generation, storage,

---

[1004] Clean Energy Associations Initial Comments at 12.

[1005] ENGIE Initial Comments at 3.

[1006] Form Energy Initial Comments at 2-3.

[1007] Pine Gate Initial Comments at 24.

Docket No. RM21-17-000                                              - 343 -

and transmission technologies." US DOE further recommends that the Commission

provide a non-exhaustive list of examples of cost and technology trends that transmission

planners could consider.[1008]

453.    SEIA recommends that the Commission direct transmission providers to use the

data and models used in NREL's Electrification Futures Study, Solar Futures Study,

Storage Futures Study, and Transportation Futures Study.[1009] PIOs disagree with

granting discretion to transmission providers to define trends in technology and fuel costs

because PIOs state that it could empower them to distort the modeling process and create

Long-Term Scenarios that are meaningless.[1010]

454.    PIOs argue that the Commission should require transmission providers to use

certain values for trends in technology and fuel costs within and outside of the electricity

supply industry.[1011]

455.    New York TOs argue that trends in technology costs are amorphous and therefore

should not be prescribed as a required factor for transmission providers to consider.[1012]

Similarly, PPL criticizes the Commission's proposed requirement that transmission

providers forecast trends in technology without providing concrete assumptions to use, or

---

[1008] US DOE Initial Comments at 12-13.

[1009] SEIA Initial Comments at 10.

[1010] PIOs Initial Comments at 19.

[1011] *Id*. at 17-19.

[1012] New York TOs Initial Comments at 11-12.

without a guarantee for cost recovery for investments that are based on those uncertain forecasts.[1013]

(2)      **Commission Determination**

456.   We adopt the NOPR proposal, with modification, to require transmission providers in each transmission planning region to incorporate Factor Category Four: trends in fuel costs and in the cost, performance, and availability of generation, electric storage resources, and building and transportation electrification technologies, in the development of Long-Term Scenarios.  We find it appropriate to require transmission providers to incorporate Factor Category Four into the development of Long-Term Scenarios because the relative cost of constructing and operating different types of generation or storage resources and the relative cost of electrifying certain energy end uses will affect Long-Term Transmission Needs.  We further find that this requirement is necessary to ensure that transmission providers develop plausible Long-Term Scenarios that account for technological changes expected over the transmission planning horizon, facilitating transmission providers' identification of Long-Term Transmission Needs.

457.   As requested by commenters, including US DOE, we modify this category of factors in the final rule to clarify that this category of factors is meant to capture changes in the cost, as well as the performance and availability, of certain technologies relevant to the electric industry.[1014]  In response to commenters arguing that trends in technology

---

[1013] PPL Initial Comments at 8.

[1014] Pine Gate Initial Comments at 24; US DOE Initial Comments at 12.

costs are amorphous and should not be included in the final rule as a required category of factors, we disagree. However, as discussed above, we grant transmission providers discretion to determine whether specific trends identified in Factor Category Four are likely to affect Long-Term Transmission Needs and how to account for those specific trends in Long-Term Scenarios.[1015] As discussed in further detail below, transmission providers also have some discretion to discount or place more weight on the anticipated effects on Long-Term Transmission Needs due to factors in this category.

458.  In response to comments from US DOE,[1016] we clarify that trends in fuel costs and in the cost, performance, and availability of generation, storage, and building and transportation electrification technologies may include, but are not limited to, cost and technology trends for: utility-scale generation construction costs for different generating technologies; distributed energy resources; storage technologies with differing duration limitations; carbon capture and sequestration; small modular nuclear; light-, medium-, and heavy-duty electric vehicles and electric vehicle supply equipment; and ground- and air-source heat pumps. While we agree with US DOE that transmission providers should consider trends in the cost, performance, and availability of transmission technologies as part of their evaluation of potential solutions to Long-Term Transmission Needs, we do not believe that these trends should be included as factors in this category because trends in the cost, performance, and availability of transmission technologies do not drive Long-

---

[1015] *See* New York TOs Initial Comments at 11-12; PPL Initial Comments at 8.

[1016] US DOE Initial Comments at 12-13.

Term Transmission Needs.  We also agree with commenters that note that the effects of

the factors in this category may vary significantly, such as shifts towards electrification

leading to significant load growth, or cost reductions for emerging technologies, like

long-duration electric storage resources, mitigating some new transmission needs.

### (e)    Resource Retirements (Factor Category Five)

### (1)    Comments

459.    Several commenters support the proposed requirement that each Long-Term

Scenario incorporate resource retirements as a category of factors.[1017]  PJM Market

Monitor states that PJM faces the potential for the retirement of large coal resources and

that the PJM capacity market design and the transmission planning process need to

identify these specific resources well in advance and ensure an efficient response to

obviate the need for nonmarket cost-of-service contracts to retain generation while

transmission is constructed.[1018]

460.    PIOs and NYISO both argue that the Commission should further specify that

transmission providers must incorporate expected trends in resource retirements rather

---

[1017] Breakthrough Energy Initial Comments at 14; NRECA Initial Comments at 31; NYISO Initial Comments at 24; PIOs Initial Comments at 21; SPP Market Monitor Initial Comments at 9; *see also* PJM Market Monitor at 3 ("PJM faces the potential retirement . . . of a significant amount of coal resources in the next five years.  Both the PJM capacity market and design and the transmission planning process need to identify these specific resources well in advance and plan for their retirement in order to ensure an efficient response and to obviate the need for nonmarket cost of service contracts to retain the generation while transmission is constructed.").

[1018] PJM Market Monitor Initial Comments at 3.

Docket No. RM21-17-000                                                          - 347 -

than just announced retirements into Long-Term Scenarios.[1019]  PIOs state the

Commission should require transmission providers to (1) specify how they will use

generator age and condition data to predict retirements, (2) include announced

retirements, and (3) specify how they will reflect trends and incentives for distributed

energy resources, as well as how they will quantify these trends.[1020]

461.   NYISO states that the final rule should confirm that each transmission planning

region has the authority and flexibility to account for likely resource retirements that have

not been announced by the resource based on factors that include the facility's age, its

emission profile, applicable laws and regulations, and other factors.[1021]  Similarly, Pine

Gate asserts that resource retirements should be included at the earliest opportunity as

there is often a significant gap of time between when a public announcement is made and

when the official notice of deactivation is communicated to the transmission provider.[1022]

462.   SEIA states that transmission providers should only be required to include the

retirement of resources that have provided notice of pending retirement pursuant to the

applicable tariff provisions.[1023]  PJM supports engaging in transparent economic impact

analyses of generation resource retirements but asserts that such analyses might disclose

---

[1019] NYISO Initial Comments at 24; PIOs Initial Comments at 21.

[1020] PIOs Initial Comments at 21.

[1021] NYISO Initial Comments at 24.

[1022] Pine Gate Initial Comments at 24.

[1023] SEIA Initial Comments at 10.

confidential information about specific generators.  Therefore, PJM contends that the Commission will need to provide clear direction on how it wishes to address these issues, especially since masking of data is not a practical solution once the transmission case is released.[1024]

### (2)    Commission Determination

463.    We adopt the NOPR proposal to require transmission providers in each transmission planning region to incorporate Factor Category Five: resource retirements, in the development of Long-Term Scenarios.  We find it appropriate to require transmission providers to incorporate Factor Category Five because resource retirements expected over the transmission planning horizon will affect Long-Term Transmission Needs.  Commenters generally support requiring this category of factors, but commenters disagree as to how transmission providers should account for projected resource retirements that have not been publicly announced.[1025]

464.    In response to those commenters, we clarify that, to develop plausible Long-Term Scenarios, transmission providers must, in incorporating Factor Category Five into the development of Long-Term Scenarios, account for likely resource retirements beyond those that have been publicly announced.  The record indicates that resource retirements have significantly influenced the supply of electricity in the past and are expected to do

---

[1024] PJM Initial Comments at 6, 69.

[1025] NYISO Initial Comments at 24; Pine Gate Initial Comments at 24; PIOs Initial Comments at 21.

Docket No. RM21-17-000                                                    - 349 -

so in the coming decades.[1026]  The North American Electric Reliability Corporation's

2021 Long-Term Reliability Assessment reports nearly 50 GW of confirmed thermal

generation resource retirements by 2026 and acknowledges that many more are yet to be

announced.[1027]  In addition, the record reflects that publicly announced resource

retirements are only a fraction of the resource retirements expected over the required 20-

year transmission planning horizon.[1028]  Given the significance of resource retirements,

and the limited scope of publicly announced resource retirements, we find that

transmission providers must account for expected retirements that have not been publicly

---

[1026] *See supra* note 241; Colorado Consumer Advocate Initial Comments, attach. 7 (US DOE, *Staff Report to the Secretary on Electricity Markets and Reliability* (Aug. 2017)) at 13-14 (stating that 132 GW of generation capacity retired between 2002 and 2016 – approximately 15% of the installed capacity in 2002 – due to the advantaged economics of natural gas-fired generation, low electricity demand growth, the deployment of variable energy resources, and regulatory requirements); *see also, e.g.*, AEP Initial Comments at 4 n.12.

[1027] SEIA Initial Comments at 9 (citing North American Electric Reliability Corporation, *2021 Long-Term Reliability Assessment*, at 30, 35 (Dec. 2021)).  The North American Electric Reliability Corporation states that long-range retirement projects based on confirmed retirements could be "significantly understated" because generator retirement announcements can be made as late as 90 days prior to planned deactivation in some areas.  The North American Electric Reliability Corporation's 2021 reported retirements through 2026 increased 126% compared to the North American Electric Reliability Corporation's 2020 estimates; and the North American Electric Reliability Corporation's 2022 reported retirements through 2026 increased compared to the North American Electric Reliability Corporation's 2021 retirements.  *See* North American Electric Reliability Corporation, *2021 Long-Term Reliability Assessment*, at 35 (Dec. 2021); NERC, *2022 Long-Term Reliability Assessment*, at 17 (Dec. 2022).

[1028] For example, announced retirements account for less than half of MISO's projected retirements over a 20-year transmission planning horizon.  *See* MISO Initial Comments at 35 (citing MISO, *MISO Futures Report*, at 14-19, (Dec. 2021), https://cdn.misoenergy.org/MISO%20Futures%20Report538224.pdf).

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 360 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

announced to meet this final rule's requirement that transmission providers develop a

plausible set of Long-Term Scenarios.[1029]

465.    We provide flexibility to transmission providers to propose on compliance with

this final rule how to account for resource retirements that might take place over the

transmission planning horizon, in addition to those that have been publicly announced.

We note, for example, that transmission providers could propose to account for expected

retirements by considering factors such as a generating facility's age, its emissions

profile, its projected costs and revenues, and any applicable laws and regulations that

may affect a generating facility's continued operation over the transmission planning

horizon.[1030] To the extent that certain laws and regulations identified by stakeholders in

Factor Categories One and Two will necessitate the retirement of certain resources, we

reiterate that transmission providers must develop Long-Term Scenarios that are

consistent with such laws and regulations.

466.    In response to PJM's concerns that conducting transparent economic impact

analyses of generation resource retirements could lead to the disclosure of confidential

---

[1029] *See infra* Types of Long-Term Scenarios section.

[1030] For example, MISO assumes age-based resource retirements which vary by
resource type and scenario, over a 20-year transmission planning horizon.  In a 2021
study, MISO assumes coal-fired resources will retire at age 46 in one scenario, and age
36 in another.  MISO assumes utility-scale solar resources will retire at age 25 in every
scenario.  MISO also incorporates resource retirements announced by the resource owner,
stated in an integrated resource plan, or filed in MISO's Attachment Y.  *See* MISO Initial
Comments at 35 (citing MISO, *MISO Futures Report*, at 14-19, (Dec. 2021),
https://cdn.misoenergy.org/MISO%20Futures%20Report538224.pdf).

information about specific generators, we note that the Commission has previously

acknowledged that tension exists between ensuring transparency in transmission planning

processes and protecting confidential information, including commercially sensitive

information.[1031]  We note that we are not specifying how transmission providers must

estimate resource retirements, and we clarify that transmission providers may include

what they believe to be appropriate confidentiality protections in their proposals to

account for resource retirements that might take place over the transmission planning

horizon.  The Commission will evaluate those proposals by using the established

principles in Order No. 890,[1032] as well as precedent on existing confidentiality

protections with respect to transmission planning that the Commission has previously

found comply with the Order No. 890 principles, to guide its findings on whether such

protections are appropriate.

### (f)    **Generator Interconnection Requests and Withdrawals (Factor Category Six)**

### (1)    **Comments**

467.    Several commenters support the proposed requirement that each Long-Term

Scenario incorporate generator interconnection requests and withdrawals.[1033]  Pattern

Energy argues that generation interconnection queues are indicative of the market for

---

[1031] *Sw. Power Pool, Inc.*, 137 FERC ¶ 61,227, at P 20 (2011).

[1032] Order No. 890, 118 FERC ¶ 61,119 at PP 471-476.

[1033] Breakthrough Energy Initial Comments at 14; Cypress Creek Reply Comments at 5-7.

generation capacity additions and should also be a major source for generation assumptions in both near-term and long-term scenario planning.[1034]  SEIA supports the proposed requirement with the caveat that transmission providers should only include interconnection customers that have signed a facilities study agreement, or other applicable study agreement.[1035]  Cypress Creek asserts that the Commission should require transmission providers to include the proposed generator interconnection requests in the queue that have completed a system impact study as part of a uniform set of assumptions applicable across all scenarios.[1036]

468.   CAISO and MISO state that their regional transmission planning processes already include projects in the generator interconnection queue.[1037]  MISO further explains that it considers the generator interconnection queue when determining the location where future generation will interconnect, but MISO also states that transmission providers and their stakeholders need to have flexibility, including how to consider trends in interconnection queue requests.[1038]  Further, MISO argues that "generation interconnection requests and withdrawals" as stated in the NOPR is unclear regarding how the transmission provider must weigh withdrawals differently than requests.

---

[1034] Pattern Energy Initial Comments at 26.

[1035] SEIA Initial Comments at 10.

[1036] Cypress Creek Reply Comments at 5-7.

[1037] CAISO Initial Comments at 34; MISO Initial Comments at 35.

[1038] MISO Initial Comments at 35-36.

Docket No. RM21-17-000                                                    - 353 -

Therefore, MISO requests that the Commission revise the NOPR proposal to require

transmission providers to "consider activity in the generation interconnection queue."[1039]

469.    Nebraska Commission asserts that the Commission should not include

interconnection request withdrawals as a factor because it does not follow the

Commission's cost causation principles and would incentivize additional interconnection

requests.  For example, Nebraska Commission states, most interconnection requests in

SPP are duplicative, and entities compare costs among their requests once they are

analyzed.  Nebraska Commission asserts that such requests could be used to game the

transmission planning process, create additional backlogs in the interconnection queue,

and shift costs from interconnection customers to transmission customers.[1040]

470.    Likewise, Omaha Public Power claims that, until generator interconnection reform

is enacted, the use of interconnection queues and withdrawals as factors will lead to

scenario inaccuracy due to the size of interconnection backlogs and speculative nature of

many queued projects.[1041]  Dominion also opposes using the number and size of

interconnection requests as a basis for transmission planning because speculative

interconnection requests could stimulate transmission development in areas slated for

development by private interests.[1042]

---

[1039] *Id*. at 36.

[1040] Nebraska Commission Initial Comments at 4-5.

[1041] Omaha Public Power Initial Comments at 3.

[1042] Dominion Reply Comments at 7-8.

471.    PJM Market Monitor states that, while there are many comments on the significant renewable resources PJM will connect to its grid, based on historic completion rates and effective load carry capability derate factors, only 5.6% of renewable resources are expected to go into service.[1043]

### (2)    Commission Determination

472.    We adopt the NOPR proposal to require transmission providers in each transmission planning region to incorporate Factor Category Six: generator interconnection requests and withdrawals, in the development of Long-Term Scenarios. We find it appropriate to require transmission providers to incorporate Factor Category Six because generation interconnection queues provide important information about future generation development over the transmission planning horizon and therefore affect Long-Term Transmission Needs.  Multiple RTOs/ISOs explain that their regional transmission planning processes already account for generation projects in the interconnection queue, but MISO notes that transmission providers need flexibility in how to incorporate that data into the development of Long-Term Scenarios.[1044]  In response to MISO's concerns, we reiterate that transmission providers have discretion to determine how to account for all factors, including interconnection requests and withdrawals, in Long-Term Scenarios.

---

[1043] PJM Market Monitor Initial Comments at 4.

[1044] MISO Initial Comments at 35-36

Docket No. RM21-17-000                                                    - 355 -

473.    We disagree with commenters that argue that, because many interconnection

requests are speculative and/or duplicative, requiring transmission providers to

incorporate Factor Category Six into the development of Long-Term Scenarios will

compromise the accuracy of Long-Term Scenarios, shift costs to transmission customers

that should be borne by interconnection customers, or create an incentive for additional

interconnection requests that could slow down interconnection queue processing.[1045]  We

note that over the years, and recently with Order No. 2023, transmission providers and

the Commission have adopted changes to generator interconnection procedures to reduce

the submission of speculative interconnection requests in the interconnection queue.  For

example, interconnection requests require significant financial commitments from the

interconnection customer (e.g., application fees, study deposits, and site control

requirements), which the Commission made more stringent in Order No. 2023.[1046]

Noting that, as discussed above, transmission providers will have discretion as to how

they account for factors in Long-Term Scenarios and may determine whether certain

generator interconnection requests are speculative and/or duplicative, such that the

requests are unlikely to affect Long-Term Transmission Needs, and then make

corresponding adjustments to their Long-Term Scenarios.  As discussed in further detail

below, transmission providers can also account for uncertainty by discounting or putting

---

[1045] Dominion Reply Comments at 7-8; Nebraska Commission Initial Comments
at 4-5; Omaha Public Power Initial Comments at 3.

[1046] Order No. 2023, 184 FERC ¶ 61,054 at P 490.

more weight on the anticipated effects on Long-Term Transmission Needs due to factors
in this category.  Additionally, we believe that the existence of a large number of
interconnection requests in a certain area, even if some of those requests are speculative,
indicates that generation developers have an interest in interconnecting resources in that
area, which Long-Term Scenarios should take into account.

> **(g)** **Utility and Corporate Commitments and
> Federal, Federally-Recognized Tribal, State,
> and Local Policy Goals that Affect Long-
> Term Transmission Needs (Factor Category
> Seven)**
>
> **(1)** **Comments**

474.    Some commenters generally support the proposed requirement to incorporate in
Long-Term Scenarios utility and corporate commitments and federal, state, and local
goals that affect the future resource mix and demand.[1047]  ACEG contends that FPA
section 217(b)(4) supports the Commission's proposed requirement to include public
policies and utility and corporate renewable procurement goals within Long-Term
Scenarios because load-serving entities' service obligations will depend upon both public

---

[1047] ACEG Initial Comments at 26-29; AEE Initial Comments at 10-11; Advanced
Energy Buyers Initial Comments at 5-6; Amazon Initial Comments at 3-4; Center for
Biological Diversity Initial Comments at 9-12; Environmental Groups Supplemental
Comments at 2; Ørsted Initial Comments at 7; Pacific Northwest State Agencies at Initial
Comments at 14; PIOs Initial Comments at 18-19; SEIA Initial Comments at 10; SREA
Initial Comments at 41-46; *see also* Environmental Groups Supplemental Comments at 2
("The electric industry is undergoing a major transformation driven by consumer, utility,
and corporate preferences, state public policies, and the cost competitiveness of
renewable energy.  The Commission's transmission planning and cost allocation
standards must be up to the challenge of enabling this transition while ensuring the
continued provision of reliable and affordable electricity at just and reasonable rates.").

Docket No. RM21-17-000                                                    - 357 -

policies and the resource preferences of their customers.[1048]  AEE highlights the role of

local goals by noting that 29 of the 50 most populous cities in the United States have set

clean or renewable energy targets.[1049]

475.    Advanced Energy Buyers argue that private efforts to use more low- and zero-

carbon electricity are significantly affecting the resource mix and in turn transmission

needs, noting that since 2014, commercial and industrial customers have contracted for

more than 52 GW of clean energy in the United States, with annual increases every year

since 2016.[1050]  Moreover, Advanced Energy Buyers state, corporate and industrial

customer demand for renewable energy in the United States is expected to reach about 85

GW by 2030.[1051]  Advanced Energy Buyers state that, in some markets, corporate

demand is already a dominant driver of renewable energy deployment, as in Illinois,

where corporate procurement accounted for roughly one-third of total renewable

deployment.[1052]  SEIA states that, for corporate commitments, transmission providers

---

[1048] ACEG Initial Comments at 26-29.

[1049] AEE Initial Comments at 10-11 (citing Third Way, *Utilities, Cities, and States with Clean Energy Targets* (July 30, 2021), https://www.thirdway.org/graphic/utilities-cities-and-states-with-clean-energy-targets).

[1050] Advanced Energy Buyers Initial Comments at 5 (citing Clean Energy Buyers Alliance, *State of the Market 2022*, https://cebuyers.org/state-of-the-market/).

[1051] *Id.* at 5-6 (citing Wood Mackenzie, *Corporates Usher in New Wave of US Wind and Solar Growth* (Aug. 2019), https://www.woodmac.com/our-expertise/focus/Power--Renewables/corporates-usher-in-new-wave-of-u.s.-wind-and-solar-growth/).

[1052] *Id.* at 6 (citing Advanced Energy Economy, *Adding it All Up for Voluntary Buyers of Renewable Energy* (Jan. 2021), https://blog.advancedenergyunited.org/adding-

Docket No. RM21-17-000                                                  - 358 -

should include data from the Clean Energy Buyers Association Deal Tracker, and for

utility commitments, transmission providers should include data from state resource plans

and regulatory filings.[1053]

476.    SREA and ACEG argue that the Commission should require transmission

providers to incorporate utilities' generation planning announcements associated with net

zero commitments and publicized utility resource plans, including SEC filings and public

statements, into the development of Long-Term Scenarios.[1054]  SREA contends that such

a requirement would protect the interests of customers and generation developers because

these announcements affect the marketplace.[1055]  Breakthrough Energy suggests that

utility targets and expected consumer demand should also be incorporated into the

development of Long-Term Scenarios because actual demand is often higher than

reflected in utility plans, which do not sufficiently incorporate corporate demand,

including corporate buyer commitments.[1056]

---

it-all-up-for-voluntary-buyers-of-renewable-energy; Microsoft, *Greener datacenters for a brighter future: Microsoft's commitment to renewable energy* (May 2016), https://blogs.microsoft.com/on-the-issues/2016/05/19/greener-datacenters-brighter-future-microsofts-commitment-renewable-energy/).

[1053] SEIA Initial Comments at 10 (citing Clean Energy Buyer Association, CEBA Deal Tracker, https://cebuyers.org/deal-tracker/; Sierra Club, *Check Out Where We Are Ready For 100%*, https://www.sierraclub.org/climate-and-energy/map).

[1054] ACEG Initial Comments at 28-29; SREA Initial Comments at 41-46.

[1055] SREA Initial Comments at 41-46.

[1056] Breakthrough Energy Initial Comments at 14-15.

477.    LADWP, MISO, and NRECA support the inclusion of this category of factors as long as transmission providers are allowed to discount these factors in their analysis by assuming the goals or commitments may not be fully met.[1057]  NRECA is concerned that factor category seven (utility and corporate commitments) carries a distinct risk of stranded transmission costs and therefore supports it being discounted.[1058]  NRECA further states that it is concerned that stakeholders may try to use Long-Term Regional Transmission Planning to impose goals and commitments that lack the force of law.[1059]  LADWP argues that the Commission should allow transmission planners to use discretion when identifying utility commitments and local goals.[1060]  MISO is concerned about the inherent difficulty of modeling corporate commitments given the ambiguous nature of corporate footprints.[1061]

478.    Several commenters oppose including utility and corporate commitments and/or federal, state, and local goals as a category of factors in Long-Term Scenarios.[1062]  For

---

[1057] LADWP Initial Comments at 3; MISO Initial Comments at 36; NRECA Initial Comments at 32-33.

[1058] NRECA Initial Comments at 32 (citing GDS Assocs., Report, at 12 (Aug. 17, 2022)).

[1059] *Id.* at 32-33.

[1060] LADWP Initial Comments at 3.

[1061] MISO Initial Comments at 36.

[1062] Alabama Commission Initial Comments at 6; California Commission Initial Comments at 20; Duke Initial Comments at 13; New York TOs Initial Comments at 11-12; Pennsylvania Commission Initial Comments at 6.

example, California Commission states that it is not clear what purpose would be served by requiring transmission providers to incorporate these commitments or goals into Long-Term Scenarios yet, at the same time, allowing them to discount such commitments or goals to account for their inherent uncertainty.[1063]  New York TOs argue that corporate commitments are amorphous and therefore should not be prescribed as a required factor for transmission providers to consider.  Moreover, New York TOs state that, if a goal is not codified as a law, it is not clear that it is sufficiently solidified and supported to be included as a factor.[1064]

479.    PJM argues that the NOPR proposal to include corporate commitments as a factor in Long-Term Scenarios is vague, inappropriate, and impractical, because even if PJM is able to develop a record of information in the expansive PJM footprint, this information will likely be incomplete.  PJM argues that the burden to ensure that a transmission provider is aware of corporate commitments and goals should be on the corporation or another interested party.[1065]

480.    Illinois Commission states that transmission planning criteria should not include vague terms such as "corporate goals," which could mean multiple things and may already be accounted for.[1066]  Alabama Commission states that corporate commitments

---

[1063] California Commission Initial Comments at 20.

[1064] New York TOs Initial Comments at 11-12.

[1065] PJM Reply Comments at 37-38 (citing PJM Initial Comments at 68).

[1066] Illinois Commission Initial Comments at 7.

and goals are not a sufficient basis for planning decisions as they are not law and accountability for achieving them is limited.[1067]  Similarly, Pennsylvania Commission states that determinants for Long-Term Scenarios should not be based on speculative factors, arguing that factors that include federal, state, and local laws and regulations that affect the future resource mix and demand are preferable to factors that include utility, corporate, federal, state, and local goals or policies that have no enforcement mechanisms.[1068]  PPL states that utility and corporate commitments are unlikely to be sufficiently firm or definitive to pass state siting review.[1069]

### (2) <u>Commission Determination</u>

481.   We adopt the NOPR proposal, with modification, to require transmission providers in each transmission planning region to incorporate Factor Category Seven: utility and corporate commitments and federal, federally-recognized Tribal, state, and local policy goals that affect Long-Term Transmission Needs, in the development of Long-Term Scenarios.  We find it appropriate to require transmission providers to incorporate Factor Category Seven into the development of Long-Term Scenarios because the relevant commitments and goals represent known consumer preferences that have been, and will continue to be, key drivers of Long-Term Transmission Needs.  We agree with commenters that argue that corporate demand for clean energy resources, as

---

[1067] Alabama Commission Initial Comments at 6.

[1068] Pennsylvania Commission Initial Comments at 5-6.

[1069] PPL Initial Comments at 8.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 372 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

demonstrated by the volume of bilateral corporate contracts with renewable energy resources, is already a major driver of changes in the resource mix and demand and that corporate and industrial customer demand for clean energy is projected to increase. We believe that it is necessary for transmission providers to incorporate publicly announced utility commitments in the development of Long-Term Scenarios. Such commitments may be ignored or overlooked in retail-level regulatory proceedings, but they nevertheless may have an impact on future changes in the resource mix and demand that must be accounted for to ensure the development of plausible Long-Term Scenarios.

482.    We modify the NOPR proposal for Factor Category Seven to include federally-recognized Tribal goals that affect the resource mix and demand because we are persuaded by commenters that argue that such factors have the same potential to affect Long-Term Transmission Needs as federal, state, and local goals. We believe that federally-recognized Tribal goals should include publicly announced policy recommendations, such as energy vision reports.[1070]  Further, as discussed under Additional Categories of Factors below, we recognize that energy equity and justice goals are potential factors within Factor Category Seven.

483.    While federal, federally-recognized Tribal, state, and local goals may not have the same durability and binding impact of laws and regulations, we believe that it is appropriate for transmission providers to account for such goals in Long-Term Scenarios

---

[1070] *See, e.g.*, Columbia River Inter-Tribal Fish Comm'n, *Energy Vision for the Columbia River Basin* (Sept. 2022), https://critfc.org/wp-content/uploads/2022/09/CRITFC-Energy-Vision-Full-Report.pdf.

Docket No. RM21-17-000                                                                 - 363 -

because these goals represent known preferences of governmental entities that affect Long-Term Transmission Needs. Such goals may improve or diminish the prospects of deploying certain technologies. For example, as AEE explains, local governments representing some of the most populous cities in the United States have established goals to have their cities' loads served by clean or renewable energy.[1071]

484. We disagree with commenters that argue that transmission providers should not be required to incorporate utility and corporate commitments into the development of Long-Term Scenarios because they may not be significant enough to drive Long-Term Transmission Needs or that accountability for achieving commitments and goals is too limited for these factors to be considered sufficiently firm.[1072] We acknowledge that utility and corporate commitments and governmental goals may be more likely to change over the transmission planning horizon than factors in other required factor categories; however, we are not persuaded that these commitments and goals are so speculative, amorphous, or unreliable that they should not be incorporated into Long-Term Scenarios at all. We emphasize that transmission providers have discretion, as discussed above, in how to account for these factors in the development of Long-Term Scenarios, and we

---

[1071] AEE Initial Comments at 10-11 (citing Third Way, *Utilities, Cities, and States with Clean Energy Targets* (July 30, 2021), https://www.thirdway.org/graphic/utilities-cities-and-states-with-clean-energy-targets).

[1072] Alabama Commission Initial Comments at 6; California Commission Initial Comments at 20; Illinois Commission Initial Comments at 7; New York TOs Initial Comments at 11-12; Pennsylvania Commission Initial Comments at 5-6; PJM Reply Comments at 37-38 (citing PJM Initial Comments at 68); PPL Initial Comments at 8.

note, as discussed in further detail below, that transmission providers can account for the uncertainty associated with the achievement of these commitments and goals by using discounting or putting more weight on the effects of these factors on Long-Term Transmission Needs in each of the required Long-Term Scenarios.  Similarly, transmission providers have discretion to determine how to account for commitments and goals in Long-Term Scenarios if the effects of particular commitments or goals conflict with, negate, or duplicate the effects of other factors.

### (h)    Additional Categories of Factors

### (1)    Comments on Energy Equity and Justice

485.    Some commenters argue that the Commission should include equity and energy justice considerations in Long-Term Regional Transmission Planning.[1073]  Grand Rapids NAACP, agreeing with NASEO, urges the Commission to expand factors considered in Long-Term Regional Transmission Planning to include energy equity and justice.[1074]  Grand Rapids NAACP also states that transmission providers should be required to

---

[1073] *See, e.g.*, California Energy Commission Initial Comments at 2; City of New York Initial Comments at 9; Clean Energy Buyers Initial Comments at 8-9; Grand Rapids NAACP Initial Comments at 12, 15, 21, 23; Grand Rapids NAACP Reply Comments at 2-3, 5; Montclair Congregation Supplemental Comments at 1; NARUC Initial Comments at 3-4; NASEO Initial Comments at 5; PIOs Initial Comments at 35-36; PIOs Reply Comments at 15; Policy Integrity Initial Comments at 28; WE ACT Initial Comments at 4-6.

[1074] Grand Rapids NAACP Reply Comments at 2 (citing NASEO Initial Comments at 5).

follow federal, state, and local laws addressing the need for energy equity and justice.[1075]
In concordance with PIOs, Grand Rapids NAACP urges the Commission to address
equity in the transmission planning process because doing so would encourage
competition and lower consumer costs.[1076]  Finally, Grand Rapids NAACP urges the
Commission to encourage transmission providers to develop metrics that advance
economic equity and environmental justice by facilitating consideration of the impact of
transmission infrastructure on disadvantaged communities.[1077]

486.    US DOE asserts that energy justice considerations will form an integral part of
transmission planning.  Specifically, US DOE states that transmission planning can
identify potential sources, sinks, and locations of transmission expansion facilities and
that identifying locations where frontline communities and historically underserved
communities have faced long-standing impacts may affect the future resource mix.[1078]
NESCOE agrees with US DOE and argues that regional transmission planning processes
should accommodate state efforts to advance equity and environmental justice
concerns.[1079]  New England for Offshore Wind argues that without a transparent and

---

[1075] *Id.*

[1076] *Id.* (citing PIOs Initial Comments at 35, 36).

[1077] *Id.* at 2-3 (citing NARUC Initial Comments at 3-4).

[1078] US DOE Initial Comments at 9.

[1079] NESCOE Reply Comments at 8-9.

inclusive transmission planning process, regional transmission planning efforts will be at odds with state policy on environmental justice.[1080]

487.    PIOs state that the Commission should be clear that Long-Term Regional Transmission Planning complies with and incorporates relevant aspects of applicable federal, federally-recognized Tribal, state, and local environmental and energy justice policies—including future resource mix impacts, assignment of transmission benefits toward disadvantaged communities, and project selection.[1081]

488.    CARE Coalition states that the Commission should consider issues of siting and the granting of permits that cause significant delays in construction of new transmission facilities.[1082]  CARE Coalition emphasizes WE ACT's argument that a final rule should ensure that transmission planners and states "are cognizant about siting and the potential harms of transmission development to environmental justice communities."[1083] Relatedly, CARE Coalition highlights NRECA's argument that rural and poorer areas are

---

[1080] New England for Offshore Wind Initial Comments at 5.

[1081] PIOs Reply Comments at 15 (citing Grand Rapids NAACP Initial Comments at 12-15, 21-23 (listing notable federal, state, and local public policies requiring that equity and energy justice inform decision making processes); WE ACT Initial Comments at 6).

[1082] CARE Coalition Reply Comments at 3.

[1083] *Id.* at 4 (citing WE ACT Initial Comments at 6).

disproportionately burdened under the current regime because "siting decisions are

primarily driven by technical and economic factors."[1084]

### (2)    Comments on Efficiency and Technology

489.    NASEO argues that the Commission should expand its list of factors that

transmission providers should include in Long-Term Regional Transmission Planning

and Long-Term Scenarios to include increased energy efficiency of existing transmission

lines, and the efficient use of existing rights of way.[1085]  Invenergy suggests that the

Commission expressly require consideration of advanced-stage merchant HVDC

transmission as a factor in regional transmission planning scenarios.[1086]  Invenergy

highlights US DOE's proposal that transmission providers consider trends in the

development of HVDC network technology, arguing, however, that such consideration

should include incorporating and accounting for HVDC transmission facilities in

transmission planning models and scenarios.[1087]

### (3)    Comments Regarding Enhanced Reliability and Interregional Transfer Capability

490.    PJM recommends that the Commission require enhanced reliability and

Interregional Transfer Capability as two additional categories of factors that transmission

---

[1084] *Id.* (citing NRECA Initial Comments at 39 n.111).

[1085] NASEO Initial Comments at 5.

[1086] Invenergy Initial Comments at 6-7.

[1087] Invenergy Reply Comments at 11 (citing US DOE Initial Comments at 13).

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 378 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                    - 368 -

providers must incorporate into the development of Long-Term Scenarios.[1088] PJM envisions enhanced reliability to include, but not be limited to, storm hardening of critical facilities, reducing the number of critical CIP-014 facilities through transmission upgrades, coordination of infrastructure development with natural gas pipelines serving generation in the region, and ensuring redundancy of facilities, where appropriate, to address the threat of physical or cyber attacks.[1089] PJM envisions Interregional Transfer Capability to be established in accordance with the methodology that the Commission adopts in a subsequent order.[1090]

491.    Invenergy agrees with the additional categories of factors that PJM proposes.[1091] ELCON supports the consideration of transfer capability between seams, which it asserts would provide transmission providers with the ability to develop and consider solutions that may solve for multiple drivers and offer greater benefits to more consumers.[1092] In contrast, AEE states that it disagrees with the additional categories of factors that PJM proposes, although it agrees with PJM that enhanced reliability planning is an important consideration.[1093]

---

[1088] PJM Initial Comments at 6, 13, 65-67.

[1089] *Id.* at 66.

[1090] *Id.* at 66-67.

[1091] Invenergy Reply Comments at 11.

[1092] ELCON Initial Comments at 8.

[1093] AEE Reply Comments at 20.

Docket No. RM21-17-000                                                              - 369 -

(4)    **Commission Determination**

492.    We recognize that some commenters ask the Commission to require transmission providers to incorporate several categories of factors in addition to those proposed in the NOPR in the development of Long-Term Scenarios.  We decline to include energy equity and justice as a distinct and additional category of factors because we believe that these important energy equity and justice laws and regulations, or goals, that are likely to affect Long-Term Transmission Needs, are accounted for in Factor Category One: federal, federally-recognized Tribal, state, and local laws and regulations affecting the resource mix and demand, or Seven: utility and corporate commitments and federal, federally-recognized Tribal, state, and local policy goals that affect Long-Term Transmission Needs.[1094]  Stakeholders will have a meaningful opportunity to identify any such factors as part of the open and transparent stakeholder process described below in the Stakeholder Process and Transparency section.

493.    We decline to adopt Invenergy's recommendation that the Commission require transmission providers to include advanced-stage merchant HVDC transmission as an additional category of factors.  The Commission did not propose specific requirements in the NOPR regarding merchant HVDC transmission facilities under development, and we are not persuaded by the evidence in the record that the Commission should include advanced-stage HVDC transmission facilities in the minimum set of known determinants

---

[1094] Grand Rapids NAACP Reply Comments at 2 (citing NASEO Initial Comments at 5).

USCA4 Appeal: 24-1650     Doc: 224     Filed: 01/21/2025     Pg: 380 of 2455
Document Accession #: 20240513-3036     Filed Date: 05/13/2024

of Long-Term Transmission Needs.  We reiterate that transmission providers may be aware of additional categories of factors beyond those adopted in this final rule that drive Long-Term Transmission Needs and may incorporate additional categories of factors in the development of Long-Term Scenarios provided that each Long-Term Scenario remains plausible.

494.    In response to PJM's request for the Commission to require enhanced reliability and Interregional Transfer Capability[1095] as additional categories of factors,[1096] we find that the record in this proceeding is insufficient to adequately consider whether to require transmission providers to adopt such categories of factors in this final rule.  As noted in our response to Invenergy just above, transmission providers may incorporate additional categories of factors in the development of Long-Term Scenarios provided that each Long-Term Scenario remains plausible.  We note that, in this final rule, we provide transmission providers with flexibility in how they develop Long-Term Scenarios to identify Long-Term Transmission Needs.  We believe that other parts of this final rule enable transmission providers to account for enhanced reliability and Interregional

---

[1095] We define Interregional Transfer Capability for purposes of this final rule consistent with the definition of total transfer capability in the Commission's regulations as: "the amount of electric power that can be moved or transferred reliably from one area to another area of the interconnected transmission systems by way of all transmission lines (or paths) between those areas under specified system conditions, or such definition as contained in Commission-approved Reliability Standards." 18 CFR 37.6(b)(1)(vi).  In the context of Interregional Transfer Capability, an "area" in the above definition would be a transmission planning region composed of transmission providers.

[1096] PJM Initial Comments at 6, 13, 65-67.

Transfer Capability by modeling sensitivities and using certain transmission benefits.  As

discussed below, we require transmission providers to develop at least one sensitivity

analysis, applied to each Long-Term Scenario, to account for uncertain operational

outcomes during multiple concurrent and sustained generation and/or transmission

outages due to an extreme weather event across a wide area that determine the benefits of

or need for Long-Term Regional Transmission Facilities.  As discussed in the Evaluation

of the Benefits of Regional Transmission Facilities section below, we require

transmission providers to measure, and consider as part of Benefit 6, the benefits

associated with any increase in Interregional Transfer Capability that a Long-Term

Regional Transmission Facility would provide.

### c.    <u>Treatment of Specific Categories of Factors</u>

### i.    <u>NOPR Proposal</u>

495.    The Commission proposed to require that each Long-Term Scenario that

transmission providers use in Long-Term Regional Transmission Planning incorporate

and be consistent with federal, state, and local laws and regulations that affect the future

resource mix and demand; federal, state, and local laws and regulations on

decarbonization and electrification; and state-approved integrated resource plans and

expected supply obligations for load-serving entities.  The Commission preliminarily

found that it is reasonable to require transmission providers to assume that legally

binding obligations and state utility regulator-approved plans will be followed and that

expected supply obligations for load-serving entities will be fully met.  As a result, the

Commission explained that, under the proposal, transmission providers cannot discount

the factors included in the categories of federal, state, and local laws and regulations that affect the future resource mix; federal, state, and local laws and regulations on decarbonization and electrification; and state-approved integrated resource plans and expected supply obligations for load-serving entities.[1097]

496.    In addition, the Commission proposed to require that each Long-Term Scenario that transmission providers use in Long-Term Regional Transmission Planning include trends in technology and fuel costs within and outside the electricity supply industry, including shifts toward electrification of buildings and transportation; resource retirements; and generator interconnection requests and withdrawals.  For these particular categories of factors, the Commission proposed to provide transmission providers with flexibility in how they incorporate each factor into Long-Term Scenarios as long as transmission providers identify and publish specific factors for each of these categories, as further described below.[1098]

497.    Further, the Commission proposed to require that each Long-Term Scenario incorporate utility and corporate goals and federal, state, and local goals that affect the future resource mix and demand.  However, the Commission acknowledged that these categories of factors are less binding and more likely to change over time, and therefore their impact on the future resource mix and demand are less certain, than other categories of factors.  For this reason, the Commission preliminarily found that it may be

---

[1097] NOPR, 179 FERC ¶ 61,028 at P 106.

[1098] *Id.* P 107.

appropriate for transmission providers to discount such goals to account for this uncertainty. The Commission explained that transmission providers would not be required to assume that utility and corporate goals and federal, state, and local goals that affect the future resource mix will be fully met.[1099]

## ii.    **Comments**

498.    Several commenters, that generally support the NOPR proposal, support discounting and rebut arguments opposing discounting.[1100]  NRECA, Exelon, and TAPS argue that the NOPR proposal to allow transmission providers to discount some categories of factors while weighing factors in other categories more heavily strikes an appropriate balance.[1101]  Specifically, Exelon supports the NOPR proposal to allow for variation in the treatment of different categories of factors such as legislated energy policy, which it states should not vary by scenario, and non-binding targets, which it states may be discounted yet are important to consider.[1102]  TAPS also supports the proposed flexibility in how transmission providers incorporate factors that are not federal,

---

[1099] *Id.* P 108.

[1100] Exelon Initial Comments at 10-11; Georgia Commission Initial Comments at 4; Illinois Commission Initial Comments at 7; NEPOOL Initial Comments at 7; NRECA Initial Comments at 32; TAPS Initial Comments at 2-3, 8.

[1101] Exelon Initial Comments at 10-11; NRECA Initial Comments at 32; TAPS Initial Comments at 2-3, 8.

[1102] Exelon Initial Comments at 10-11.

state, and local laws and regulations, state-approved integrated resource plans, and expected supply obligations for load-serving entities.[1103]

499.    Some commenters express concerns that the NOPR proposal would allow transmission providers in each transmission planning region to discount, or not fully incorporate, some factors when developing Long-Term Scenarios.[1104]  Clean Energy Associations state that certain factors (i.e., federal, state, and local policies, utility integrated resource plans, generator retirements, interconnection requests, corporate commitments, and trends in technology and fuel costs) can be quantified and should be reflected in Long-Term Scenarios without discounting.[1105]  Clean Energy Buyers are concerned that the flexibility proposed in the NOPR for transmission providers to incorporate into their Long-Term Scenarios the categories of factors that include trends in fuel costs and technologies both inside and outside the electricity supply industry, including regarding shifts in electrification of transport and buildings, resource retirements, and generator interconnection requests and withdrawals, could delay the transmission build-out.[1106]  ACEG recommends that the Commission presume that all factors are required to be incorporated (and not discounted or only considered) unless the

---

[1103] TAPS Initial Comments at 2-3, 8.

[1104] ACEG Initial Comments at 27-28; Amazon Initial Comments at 4; Clean Energy Associations Initial Comments at 10-11; Pine Gate Initial Comments at 23-25; PIOs Initial Comments at 18-19; SEIA Initial Comments at 8-10.

[1105] Clean Energy Associations Initial Comments at 10-11.

[1106] Clean Energy Buyers Initial Comments at 15-16.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 385 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                      - 375 -

Commission approves a request from the transmission providers in a transmission planning region not to include a factor.[1107]  In response, California Municipal Utilities argue that mandating the use of specific factors would not account for the cost consequences of such mandates, which must be considered for any transmission planning requirements to be just and reasonable.[1108]

500.    Several commenters object to the Commission's proposal to provide transmission providers with the flexibility to discount utility and corporate and federal, state, and local goals that affect the future resource mix and demand.[1109]  Amazon states that transmission providers should not be allowed to discount clean energy goals in their development of Long-Term Scenarios without proving such discounting is just and reasonable by showing evidence that such goals have been unfulfilled in the past, or that those goals have been altered or abandoned.[1110]

501.    PIOs state that the NOPR proposal to discount Factor Category Seven would allow transmission providers to game the results if their incentives are contrary to consumers' goals.[1111]  SEIA urges the Commission to limit the flexibility given to transmission

---

[1107] ACEG Initial Comments at 27.

[1108] California Municipal Utilities Reply Comments at 5-6.

[1109] Amazon Initial Comments at 4; Clean Energy Associations Initial Comments at 10-11; Pine Gate Initial Comments at 24-25; PIOs Initial Comments at 18-19; SEIA Initial Comments at 8.

[1110] Amazon Initial Comments at 4.

[1111] PIOs Initial Comments at 18-19.

Docket No. RM21-17-000                                                    - 376 -

providers regarding this factor because SEIA believes that they would ignore certain

factors if consideration is not mandatory.[1112]  Further, Clean Energy Associations argue

that utility, corporate, and federal, state, and local goals should be fully incorporated,

without discounting targets not enshrined in law or regulation.  If necessary, Clean

Energy Associations contend, changes in non-binding obligations could be treated as a

sensitivity or probabilistic change in one or more scenarios to determine how they might

affect transmission development.[1113]

502.    PIOs state that, when utilities make commitments affecting the future resource mix

and consumer demand, they should be held to them and that granting transmission

providers complete discretion to discount such factors could undermine the goals of the

NOPR proposal.  Thus, PIOs state, the Commission should set minimum requirements

for some factors, including for incorporating corporate commitments into future resource

mix estimates.[1114]  PIOs assert that widespread support exists for these recommendations,

citing ELCON as an example.[1115]

---

[1112] SEIA Initial Comments at 8.

[1113] Clean Energy Associations Initial Comments at 10-11.

[1114] PIOs Initial Comments at 17-18.

[1115] PIOs Reply Comments at 10-11 (citing ELCON Initial Comments at 4).

503.    Pine Gate argues that transmission providers should be required to assume that utility and corporate and federal, state, and local goals that affect the future resource mix will be fully met in at least one of their Long-Term Scenarios.[1116]

504.    In addition, Pattern Energy argues that the Commission should distinguish between generation assumptions and demand assumptions for purposes of 20-year transmission planning so that there is no ambiguity.  For example, Pattern Energy states that transmission providers should not be permitted to utilize their planning for load growth to satisfy the requirement to plan for changing resources and demand.  Pattern Energy asserts that transmission providers should be required to distinguish between modeling a changing resource mix and, separately, a changing demand profile, arguing that both are important and should be considerations in near-term and long-term transmission planning.[1117]

505.    NYISO argues that the final rule should permit transmission providers to appropriately account for, in coordination with state and local entities and stakeholders, the likely effect of applicable laws and regulations on the need for transmission and to realistically appraise achievement of such laws and regulations.[1118]

506.    Some commenters oppose the NOPR proposal to require that transmission providers incorporate applicable local laws and regulations in their development of Long-

---

[1116] Pine Gate Initial Comments at 25.

[1117] Pattern Energy Initial Comments at 26.

[1118] NYISO Initial Comments at 23.

Docket No. RM21-17-000                                                  - 378 -

Term Scenarios.[1119]  Duke explains that although local laws and regulations for

decarbonization and electrification may affect the resource mix and demand at the local

level, it is unclear how such laws would have a material effect on regional transmission

planning that warrants the additional burden of tracking and incorporating them into

Long-Term Scenarios.[1120]  Alabama Commission argues that local laws, regulations, and

goals might change or conflict with the policy perspectives of other states.[1121]  PPL

claims that the NOPR proposal is impractical and will significantly increase uncertainty,

which in turn will invite disagreement and litigation.[1122]  PJM recommends that the

Commission require transmission providers to only consider local laws, local regulations,

and local goals to the extent that such laws, regulations, and goals are brought to their

attention by states, other local regulators, or stakeholders.[1123]

---

[1119] Alabama Commission Initial Comments at 5-6; Ameren Initial Comments at 9-10; Duke Initial Comments at 13-14, 16; ISO-NE Initial Comments at 26-27; ISO/RTO Council Initial Comments at 4-5; NYISO Initial Comments at 21-23.

[1120] Duke Initial Comments at 13.

[1121] Alabama Commission Initial Comments at 5-6.

[1122] PPL Initial Comments at 7-8.

[1123] PJM Reply Comments at 38 (citing PJM Initial Comments at 68).

### iii.    Commission Determination

### (a)    Treatment of Factors in the First Three Categories

507.    With regard to the first three categories of factors,[1124] we require transmission providers in each transmission planning region to assume that legally binding obligations (i.e., federal, federally-recognized Tribal, state, and local laws and regulations) are followed, state-approved integrated resource plans are followed, and expected supply obligations for load-serving entities are fully met.  Therefore, we require that each Long-Term Scenario account for and be consistent with, and not discount, factors in the first three categories of factors once the transmission providers have determined that such a factor is likely to affect Long-Term Transmission Needs.  We believe it is necessary to prohibit discounting of factors in the first three categories of factors because they are more certain drivers of Long-Term Transmission Needs, relative to factors in other factor categories.

508.    We clarify that transmission providers may rely on the open and transparent stakeholder process discussed below to identify the factors in the first three required categories of factors.  More specifically, this final rule does not obligate transmission providers to independently identify all of the factors in the first three categories of

---

[1124] As explained above, the first three categories of factors are:  (1) federal, federally-recognized Tribal, state, and local laws and regulations affecting the resource mix and demand; (2) federal, federally-recognized Tribal, state, and local laws and regulations on decarbonization and electrification; and (3) state-approved integrated resource plans and expected supply obligations for load-serving entities.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 390 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                    - 380 -

factors.  We believe that it would be unduly burdensome and potentially impractical for transmission providers to independently identify all of the potential factors in the first three categories of factors, which will include numerous federal, federally-recognized Tribal, state, and local laws and regulations, as well as integrated resource plans and expected supply obligations for load-serving entities.[1125]  However, transmission providers may, if they choose, independently identify factors in the first three categories of factors as part of the stakeholder process, discussed further in the Stakeholder Process and Transparency section below.

509.    We believe that this clarification addresses PJM's request that we clarify that the burden of making the transmission provider aware of laws, regulations, and goals rests with stakeholders and not with the transmission provider itself.[1126]  We also believe that this clarification mitigates the potential administrative burdens and compliance risks identified by ISO-NE, as well as the burden of incorporating factors identified by SPP.[1127]

---

[1125] The Commission has previously found that transmission providers "cannot later be faulted" for failing to consider projections of a need for service from a point-to-point transmission customer if such projections are not provided by the transmission customer.  Order No. 890, 118 FERC ¶ 61,119 at P 487; *id.* ("We also believe that it is appropriate to require point-to-point customers to submit any projections they have of a need for service over the planning horizon and at what receipt and delivery points. . . . If the point-to-point customers do not submit such projections, then the transmission provider cannot later be faulted for failing to consider planning scenarios that might have taken into account reasonable projections of future system uses that were not the subject of specific service requests.").

[1126] PJM Initial Comments at 68.

[1127] ISO-NE Initial Comments at 26-27; SPP Initial Comments at 7-8.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 391 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                        - 381 -

510.    In addition, as clarified above, transmission providers retain the discretion to determine whether particular factors, including those in the first three categories of factors, that stakeholders identify are likely to affect Long-Term Transmission Needs. Thus, transmission providers may determine, for example, that some stakeholder-identified local laws and regulations that fall within Factor Categories One and Two are unlikely to affect Long-Term Transmission Needs and therefore need not be accounted for in the development of Long-Term Scenarios. We believe that this clarification addresses concerns about the additional burden some commenters identified of tracking and incorporating local laws and regulations into the development of Long-Term Scenarios, as well as concerns that the inclusion of local laws and regulations in the first two categories of factors creates a burden for transmission providers to account for factors that are unlikely to affect Long-Term Transmission Needs.[1128]

511.    We believe that the open and transparent stakeholder process discussed below in the Stakeholder Process and Transparency section will help transmission providers to ensure that each Long-Term Scenario accounts for factors in the first three categories of factors without discounting the effects of those factors on Long-Term Transmission Needs. We expect that transmission providers will rely, at least in part, on information that relevant federal, state, and local government entities, federally-recognized Tribes, utilities, and load-serving entities provide during the required open and transparent stakeholder process to determine if specific factors are likely to affect Long-Term

---

[1128] Duke Initial Comments at 13.

Transmission Needs and how to account for those specific factors in Long-Term

Scenarios.  We agree with NYISO regarding the value of coordination and clarify that

transmission providers may work in coordination with government entities and

stakeholders to determine how applicable laws and regulations may affect Long-Term

Transmission Needs.[1129]

512.    We recognize that some commenters raise concerns as to whether factors in the

first three categories of factors can be fully achieved (e.g., a legislative requirement is

met) or may have various levels of impact on Long-Term Transmission Needs.[1130]  At the

outset, we find it appropriate to assume legally binding obligations are met, unless and

until there is a change in law.  Government entities have an interest and ability to ensure

that the requirements of laws and regulations are fully achieved.  Similarly, utilities and

load-serving entities, as well as the relevant retail regulator, have an interest in

developing accurate integrated resource plans and expected supply obligations that can be

fully achieved.  Even in the limited circumstances in which these factors are not fully

achieved, we expect the targets or requirements associated with these factors will be

informative for purposes of identifying Long-Term Transmission Needs.  We

acknowledge that, for certain factors, there may be insufficient information for

transmission providers to determine, or stakeholder disagreement about, how the factor

will affect Long-Term Transmission Needs.  In such instances, we clarify that

---

[1129] NYISO Initial Comments at 23.

[1130] *Id.*

USCA4 Appeal: 24-1650     Doc: 224     Filed: 01/21/2025     Pg: 393 of 2455
Document Accession #: 20240513-3036     Filed Date: 05/13/2024

transmission providers have discretion over how to account for a factor in the first three categories of factors in their Long-Term Scenarios as long as the assumptions in each Long-Term Scenario are consistent with legally binding obligations, state-approved integrated resource plans, and expected supply obligations of load-serving entities.

513.    For example, when a legally binding obligation sets a minimum requirement or threshold (e.g., a state law requiring the deployment of at least 5 gigawatts of electric storage resources by 2030), transmission providers may develop Long-Term Scenarios assuming either the minimum amount of the requirement or more than the minimum amount of the requirement (e.g., modeling 10 gigawatts of electric storage resources deployed by 2030 instead of the minimum 5 gigawatts) but may not develop any Long-Term Scenarios that are inconsistent with that minimum (e.g., modeling only 2 gigawatts of electric storage resources deployed by 2030).  We believe that these clarifications sufficiently address PPL's concerns regarding the uncertainty associated with how transmission providers are expected to translate factors, including local laws and regulations, into Long-Term Scenarios.[1131]  We note that the requirement, discussed further below, that Long-Term Scenarios be plausible and diverse also clarifies how transmission providers must account for factors in the Long-Term Scenarios.  That is, while transmission providers can model assumptions that exceed the minimum requirements of factors in the first three categories in developing Long-Term Scenarios, they can only exceed those minimum requirements such that each Long-Term Scenario

---

[1131] PPL Initial Comments at 8.

remains plausible.[1132]  Similarly, the requirement that Long-Term Scenarios be diverse ensures that transmission providers will model the effect of factors on Long Term Transmission Needs in different ways, and thus that Long-Term Scenarios help to manage uncertainty over how factors will affect Long-Term Transmission Needs.

514.    We disagree with ISO-NE's claim that requiring that each Long-Term Scenario account for and consistently reflect the first three categories of factors would unnecessarily prevent testing of variations with these categories of factors.  Where a factor's effect is not clear on its face, transmission providers have discretion, within reason, to determine the likely effect of full achievement of the factor and reflect that into development of the Long-Term Scenarios.  Transmission providers also are not limited to assuming only the minimum requirements of a factor are fully achieved in developing the Long-Term Scenarios.

515.    We also are unpersuaded by commenter claims that local laws and regulations might conflict with state laws and regulations and, therefore, we should not include local laws and regulations in the first two categories of factors.[1133]  However, we acknowledge that there may be limited circumstances when two legally binding factors have conflicting or opposite implications for Long-Term Transmission Needs.  We clarify that,

---

[1132] Likewise, as discussed in the Treatment of Factors in the Last Four Categories section, transmission providers may only discount the effect of factors in the last four categories on Long-Term Transmission Needs such that each Long-Term Scenario remains plausible.

[1133] Alabama Commission Initial Comments at 5-6; PJM Initial Comments at 68.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 395 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

in such circumstances, transmission providers shall reconcile this information while giving full effect to the maximum extent possible to all legally binding factors. For example, where two laws have equal and opposite effect, transmission providers may need to incorporate them as negating each other, as necessary to comply with the requirement to produce plausible Long-Term Scenarios. In circumstances when that is not possible because the legally binding factors support alternatives to the same assumption used to develop Long-Term Scenarios, transmission providers could use two or more of the three required Long-Term Scenarios, or develop additional Long-Term Scenarios, to capture the differences implied by each of the conflicting factors.

### (b)    <u>Treatment of Factors in the Last Four Categories</u>

516.    We affirm that transmission providers have additional discretion in how they account for each factor in the last four categories of factors compared to how they account for each factor in the first three categories.[1134] After transmission providers have determined that a specific factor, stakeholder-identified or otherwise, is likely to affect Long-Term Transmission Needs over the transmission planning horizon, transmission providers must then assess the extent to which the anticipated effects on Long-Term Transmission Needs due to that factor are likely to be realized in full, in part, or

---

[1134] As explained above, the last four categories of factors are: (4) trends in fuel costs and in the cost, performance, and availability of generation, electric storage resources and building and transportation electrification technologies; (5) resource retirements; (6) generator interconnection requests and withdrawals; (7) utility and corporate commitments and federal, federally-recognized Tribal, state, and local policy goals that affect Long-Term Transmission Needs.

USCA4 Appeal: 24-1650    Doc: 224        Filed: 01/21/2025      Pg: 396 of 2455
Document Accession #: 20240513-3036      Filed Date: 05/13/2024

Docket No. RM21-17-000                                                    - 386 -

exceeded, for purposes of developing a plausible and diverse set of Long-Term

Scenarios.  For example, for a corporate commitment identified in Factor Category

Seven, transmission providers can make a determination that only a fraction of that

corporate commitment will actually be met, and the transmission providers can

subsequently model more limited effects on Long-Term Transmission Needs due to that

factor, in some or all Long-Term Scenarios.  Likewise, transmission providers may put

more weight on the factor by modeling more than the projected change in some or all

Long-Term Scenarios to reflect the transmission providers' view regarding the likelihood

that the anticipated effects on Long-Term Transmission Needs due to that factor will

occur.  Transmission providers may choose to discount or put more weight on the effects

on Long-Term Transmission Needs due to factors in Factor Categories Four through

Seven to account for uncertainty when developing plausible and diverse Long-Term

Scenarios.

517.    Several commenters generally support this flexibility to treat the last four

categories of factors differently from the first three.[1135]  We believe that requiring

transmission providers to incorporate the last four categories of factors, but allowing

transmission providers to discount the effects of factors within these categories, strikes an

appropriate balance between requiring factors in these categories be given full weight,

and allowing them to be excluded entirely in developing Long-Term Scenarios.  We

---

[1135] APPA Initial Comments at 27-28; Exelon Initial Comments at 10-11 (citing
NOPR, 179 FERC ¶ 61,028 at P 121); NRECA Initial Comments at 29-32; TAPS Initial
Comments at 2-3, 8.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 397 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                        - 387 -

believe that these categories of factors affect Long-Term Transmission Needs, and absent
a requirement to incorporate them, transmission providers may fail to identify, evaluate,
and select more efficient or cost-effective Long-Term Regional Transmission Facilities to
address those Long-Term Transmission Needs.  On the other hand, these categories of
factors are less certain than the first three categories and should not necessarily be given
the same weight in developing Long-Term Scenarios as factors that are legally binding.

518.    We disagree with the concern that this flexibility could allow transmission
providers to ignore the last four factor categories[1136] because the final rule requires
transmission providers to incorporate all categories of factors in each Long-Term
Scenario, even if they discount specific factors within the category, and requires that all
Long-Term Scenarios be plausible.[1137]  We reiterate that transmission providers may only
discount the effects of factors in these categories on Long-Term Transmission Needs
such that each Long-Term Scenario remains plausible.

### d.    **Stakeholder Process and Transparency**

### i.    **NOPR Proposal**

519.    The Commission proposed to require that transmission providers identify and
publish on an Open Access Same-Time Information System (OASIS) or other public

---

[1136] *E.g.*, ACEG Initial Comments at 27-28; Amazon Initial Comments at 4; Clean
Energy Associations Initial Comments at 10-11; Pine Gate Initial Comments at 23-25;
PIOs Initial Comments at 18-19; SEIA Initial Comments at 8-10.

[1137] ACEG Initial Comments at 28; DC and MD Offices of People's Counsel
Initial Comments at 11.

website a list of the factors that fall into each of the required categories of factors that

they will incorporate in their development of Long-Term Scenarios.  The Commission

explained that transmission providers would be responsible for identifying all the factors

they know of and are considering incorporating in the development of Long-Term

Scenarios as part of Long-Term Regional Transmission Planning.  The Commission also

proposed to require transmission providers to revise the regional transmission planning

processes in their OATTs to outline an open and transparent process that provides

stakeholders, including states, with a meaningful opportunity to propose potential factors

that transmission providers must incorporate in their development of Long-Term

Scenarios, such as specific laws, regulations, goals, and commitments, and to provide

input on how to appropriately discount factors that are less certain.[1138]

520.    The Commission noted that, under Order No. 1000, transmission providers must

already have procedures in their OATTs that give stakeholders a meaningful opportunity

to submit proposed transmission needs driven by Public Policy Requirements and that

allow transmission providers to identify, out of the larger set of potential transmission

needs driven by Public Policy Requirements that stakeholders propose, those needs for

which transmission facilities will be evaluated.[1139]  Therefore, the Commission explained

that transmission providers may be able to modify and expand these existing procedures

---

[1138] NOPR, 179 FERC ¶ 61,028 at P 109.

[1139] *Id.* P 110 (citing Order No. 1000, 136 FERC ¶ 61,051 at PP 206-207; Order No. 1000-A, 139 FERC ¶ 61,132 at P 335).

for identifying transmission needs driven by Public Policy Requirements to meet these

proposed requirements regarding the identification of factors for incorporation into Long-

Term Scenarios.[1140]

### ii.    Comments

#### (a)    State Input

521.    Several commenters emphasize the important role of stakeholders, including

states, in identifying or commenting on the factors to be included in the development of

Long-Term Scenarios.[1141]  In addition, Southeast PIOs note that states do not currently

engage in regional transmission planning processes to any meaningful degree, and

therefore, the Commission should encourage their participation in shaping and

conducting Long-Term Regional Transmission Planning.[1142]

522.    Some commenters discuss the important role of states in identifying factors within

specific category of factors.[1143]  DC and MD Offices of People's Counsel assert that the

final rule should explicitly require information on the factors to be provided by

appropriate authorities, such as state agencies.[1144]  New Jersey Commission supports the

---

[1140] *Id.*

[1141] APPA Initial Comments at 27-29; PIOs Initial Comments at 22; PJM Initial Comments at 70; Southeast PIOs Initial Comments at 45, 46-47.

[1142] Southeast PIOs Initial Comments at 45-46; State Officials Supplemental Comments at 1.

[1143] DC and MD Offices of People's Counsel Initial Comments at 12; New Jersey Commission Initial Comments at 14-15.

[1144] DC and MD Offices of People's Counsel Initial Comments at 12.

USCA4 Appeal: 24-1650    Doc: 224      Filed: 01/21/2025    Pg: 400 of 2455
Document Accession #: 20240513-3036      Filed Date: 05/13/2024

Commission's proposal to require that states have a meaningful opportunity to propose potential factors to be incorporated into the development of Long-Term Scenarios and to provide input on appropriately discounting less certain factors.[1145]  NESCOE asserts that, if states do not play a central role in determining the factors, the proposed reforms will likely run into the problem that underlies the Order No. 1000 public policy transmission planning process in New England, where states do not have a decision-making role over project selection even though state laws or policies could be the driver for the project.[1146]

523.    However, other commenters state that their existing processes are adequate for determining the relevant factors to include in Long-Term Regional Transmission Planning.[1147]  PJM states that it currently has processes and standing committees that allow states and stakeholders to participate in discussions of factors to use in its transmission planning processes.  For example, PJM asserts that its Independent State Agencies Committee is set up to receive feedback on transmission planning from states, and it discusses, among other things, assumptions used in the models, relevant regulatory initiatives and their impact, and alternative sensitivities, as well as what was discussed at other committee meetings.  In addition, PJM states, it vets all proposed transmission

---

[1145] New Jersey Commission Initial Comments at 14-15.

[1146] NESCOE Initial Comments at 28-29.

[1147] MISO Initial Comments at 34-35; MISO TOs Initial Comments at 18; OMS Initial Comments at 6; PJM Initial Comments at 6, 64, 70-71.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 401 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

solutions with its Transmission Expansion Advisory Committee before submitting them to the PJM board for approval.[1148]

### (b)        **Transparency, Enforcement, and Accuracy**

524.    Cross Sector Representatives state that Long-Term Regional Transmission Planning processes should provide transparency for impacted stakeholders.[1149]  SEIA argues that the Commission should adopt clear, uniform language that sets forth the specific goals and deliverables from the proposed Long-Term Regional Transmission Planning process for transmission providers to include in their tariffs, including language that mirrors the proposed list of categories of factors the Commission included in the NOPR.[1150]

525.    Several commenters support the NOPR proposal to require transmission providers to post the list of factors that they will incorporate into their Long-Term Scenarios on a public website for stakeholder comment.[1151]  Pine Gate recommends that the Commission further require that transmission providers identify and publish all factors that were considered but not incorporated.[1152]

---

[1148] PJM Initial Comments at 70-71.

[1149] Cross Sector Representatives Supplemental Comments at 1.

[1150] SEIA Reply Comments at 3-4 (citing PJM Initial Comments at 27-28).

[1151] Ameren Initial Comments at 11-12; APPA Initial Comments at 28; NESCOE Initial Comments at 28; Pine Gate Initial Comments at 25; PIOs Initial Comments at 22.

[1152] Pine Gate Initial Comments at 25.

526.   Clean Energy Buyers state that, to ensure transparency and just and reasonable rates, the Commission should require that transmission providers post the details regarding any proposed or adopted discounting of factors on OASIS, including: (1) which factors are to be discounted; (2) the extent of the discounting; and (3) the justification for and derivation of the amount of discounting deemed appropriate.[1153]

527.   GridLab and R Street propose modifications to the NOPR proposal regarding the role of stakeholders.[1154]  GridLab proposes that state agencies, other stakeholders, and independent experts could play a dominant role in enforcing the Commission's requirement to incorporate specific categories of factors, and that the Commission would provide a common framework establishing guidelines on the kinds of factors that transmission providers should consider, at a minimum, in developing Long-Term Scenarios.[1155]  In addition, R Street argues that governance mechanisms should drive the selection of data sets, methods, and assumptions behind these factors to promote objective accuracy.[1156]

### iii.   Commission Determination

528.   We adopt the NOPR proposal, with modification, to require transmission providers in each transmission planning region to revise the regional transmission

---

[1153] Clean Energy Buyers Initial Comments at 16-17.

[1154] GridLab Initial Comments at 20-21; R Street Initial Comments at 7.

[1155] GridLab Initial Comments at 21.

[1156] R Street Initial Comments at 7.

planning processes in their OATTs to outline an open and transparent process that

provides stakeholders, including federally-recognized Tribes and states, with a

meaningful opportunity to propose potential factors and to provide timely input on how

to account for specific factors in the development of Long-Term Scenarios.[1157]  As

discussed below, we also adopt the NOPR proposal, with modification, to require

transmission providers to publish on the public portion of an OASIS or other public

website:  (1) the list of the factors in each of the seven required categories of factors that

they will account for in their Long-Term Scenarios; (2) a description of each factor that

they will account for in their Long-Term Scenarios; (3) a general statement explaining

how they will account for each of those factors in their Long-Term Scenarios; (4) a

description of the extent to which they will discount any factors in Factor Categories Four

through Seven in each Long-Term Scenario; and (5) a list of the factors that they

considered but did not incorporate in their Long-Term Scenarios.

529.    We believe that a robust stakeholder process will ensure that transmission

providers can identify which, and how, specific factors might influence Long-Term

Transmission Needs over the transmission planning horizon.  For this reason, consistent

with Order No. 890's transmission planning principles,[1158] we require transmission

---

[1157] As an example, transmission providers would provide stakeholders with an
opportunity to describe how a specific state law in the first category of factors will result
in the development of new resources of a certain type, the retirement of existing
resources, or changes in demand patterns due to increased electrification.

[1158] *See, e.g.*, Order No. 890, 118 FERC ¶ 61,119 at P 454.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 404 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                    - 394 -

providers to give stakeholders a meaningful opportunity to provide timely input on how and what information to incorporate in Long-Term Scenarios, including how to account for a specific factor in terms of how the factor may affect Long-Term Transmission Needs. We clarify that this meaningful opportunity for stakeholders to provide timely input includes the opportunity to propose factors, provide information and identify sources of best available data, propose how a factor may affect Long-Term Transmission Needs, and explain how that factor could be reflected in the development of Long-Term Scenarios, including the extent to which it is appropriate to discount the effects of certain factors on Long-Term Transmission Needs. We note that some transmission providers have existing processes in place that allow states and stakeholders to participate in discussions of factors, which transmission providers can propose, with any necessary modifications, to comply with this final rule.[1159]

530. We believe that affording stakeholders a meaningful opportunity to propose potential factors and to provide input on how to account for specific factors in the development of Long-Term Scenarios will help transmission providers to develop more accurate assumptions to serve as the basis for their Long-Term Scenarios. Specifically, with stakeholder input, transmission providers will be in a better position to determine which specific factors within each category of factors they should account for in the development of Long-Term Scenarios, as well as how best to incorporate them. Stakeholder input is particularly important for factors in the first three categories of

---

[1159] MISO Initial Comments at 34-35; PJM Initial Comments at 6, 64, 70-71.

Docket No. RM21-17-000                                               - 395 -

factors because federal, state, and local government entities, federally-recognized Tribes, and utilities, load-serving entities, and their retail regulators that participate in the stakeholder process are distinctly positioned to provide transmission providers with vital information on how the factors over which they have authority or govern are likely to influence Long-Term Transmission Needs over the transmission planning horizon. Similarly, utilities, corporations, and governments that participate in the stakeholder process are distinctly positioned to provide transmission providers with vital information regarding factors in Factor Category Seven: utility and corporate commitments and federal, federally-recognized Tribal, state, and local policy goals that affect Long-Term Transmission Needs. The required stakeholder process ensures that all stakeholders, including states, can provide important and useful information concerning factors that they believe will affect Long-Term Transmission Needs.

531.    We recognize that different stakeholders may provide information about the same factor that is contradictory – an issue identified by some commenters.[1160]  Different stakeholders may also provide different analyses showing, for example, how a specific factor will affect resource additions and retirements.  However, as we explain earlier, transmission providers have discretion regarding how to account for specific factors in their development of Long-Term Scenarios.  In reviewing the information provided by stakeholders in the open and transparent stakeholder process, transmission providers may

---

[1160] *E.g.*, Undersigned States Initial Comments at 3 (citing NOPR, 179 FERC ¶ 61,028 at P 106).

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 406 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                    - 396 -

weigh more heavily one source of information over another.  To maintain transparency for stakeholders, transmission providers must include a general statement explaining how they will account for each factor in their Long-Term Scenarios on the public portion of an OASIS or other public website, as further described below.

532.    We also believe that the information provided in the open and transparent stakeholder process will reduce the burden placed on transmission providers to identify and assess the impact of relevant factors for each category.  For example, transmission providers can rely on the open and transparent stakeholder process to identify the multiple relevant local laws and regulations that are likely to influence Long-Term Transmission Needs over the transmission planning horizon.  The same is true for the utility and corporate commitments and federal, federally-recognized Tribal, state, and local policy goals that affect Long-Term Transmission Needs in Factor Category Seven. During the stakeholder process, government entities, utilities, and corporate entities can identify their publicly announced goals and provide feedback on how the transmission providers can account for these publicly announced goals in Long-Term Scenarios. These entities will have an opportunity to provide information to help the transmission providers determine the likelihood that they will achieve their stated goals, which the transmission providers can then use to discount the specific factors in Factor Category Seven, if necessary.

533.    With regard to the information about factors and categories of factors that transmission providers must publish on the public portion of an OASIS or other public website, we modify the proposal in the NOPR.  We require transmission providers to

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 407 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                    - 397 -

publish on the public portion of an OASIS or other public website: (1) the list of the factors in each of the seven required categories of factors that they will account for in their Long-Term Scenarios; (2) a description of each factor that they will account for in their Long-Term Scenarios; (3) a general statement explaining how they will account for each of these factors in their Long-Term Scenarios; (4) a description of the extent to which they will discount any factors in Factor Categories Four through Seven in each Long-Term Scenario; and (5) a list of the factors that they considered but did not incorporate in their Long-Term Scenarios.[1161] Transmission providers must post this information after stakeholders, including states, have had the meaningful opportunity to propose potential factors and to provide input on how to account for specific factors in the development of Long-Term Scenarios.

534. We believe that this transparency is necessary to make clear to stakeholders which specific factors transmission providers incorporate into Long-Term Scenarios and how they incorporate those factors. We believe the posting requirement will also provide greater transparency into how transmission providers develop Long-Term Scenarios (discussed below), as some commenters requested, while still providing transmission providers with flexibility regarding whether, and if so, how they choose to incorporate relevant factors.

---

[1161] As discussed above, transmission providers may not discount factors in Factor Categories One through Three.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 408 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                    - 398 -

535.    In response to commenters requesting additional transparency,[1162] we require transmission providers to publish on the public portion of an OASIS or other public website the factors that were considered but not accounted for in the development of Long-Term Scenarios.  We believe this requirement will help stakeholders understand which factors, either identified in the stakeholder process or independently identified by a transmission provider, the transmission providers in a transmission planning region have determined are unlikely to affect Long-Term Transmission Needs.  This transparency also ensures that stakeholder-proposed factors are reviewed in a fair and non-discriminatory manner.

536.    We decline to require transmission providers to publicly publish the justification for and derivation of the amount of discounting deemed appropriate, as requested by Clean Energy Buyers.[1163]  We believe such a requirement to detail the rationale for the treatment of each factor in Factor Categories Four through Seven, across all Long-Term Scenarios, would create a time-consuming administrative burden for transmission providers that is not justified by the value of the additional information provided to stakeholders.

537.    We decline to adopt modifications to the NOPR proposal that would diminish the role of the transmission providers in developing Long-Term Scenarios.[1164]  Transmission

---

[1162] *E.g.*, Pine Gate Initial Comments at 25.

[1163] Clean Energy Buyers Initial Comments at 16-17.

[1164] *E.g.*, GridLab Initial Comments at 20-21; R Street Initial Comments at 7.

providers must provide stakeholders with a meaningful opportunity to propose potential

factors and to provide input on how to incorporate specific factors in the development of

Long-Term Scenarios, as described above.  However, we reiterate that transmission

providers are not required to incorporate stakeholder-identified factors into their

development of Long-Term Scenarios merely because stakeholders propose them, if

transmission providers determine that the factor is unlikely to influence Long-Term

Transmission Needs over the transmission planning horizon.  Consistent with Order No.

890, the ultimate responsibility for transmission planning remains with the transmission

provider.[1165]

### 4.    Number and Development of Long-Term Scenarios

#### a.    NOPR Proposal

538.    In the NOPR, the Commission proposed to require transmission providers to

develop at least four distinct Long-Term Scenarios as part of Long-Term Regional

Transmission Planning at least once during a transmission planning cycle.[1166]  The

Commission explained that it preliminarily found that using at least four distinct Long-

---

[1165] Order No. 890, 118 FERC ¶ 61,119 at P 454 ("In response to the suggestion by some commenters that we require transmission providers to allow customers to collaboratively develop transmission plans with transmission providers on a co-equal basis, we clarify that transmission planning is the tariff obligation of each transmission provider, and the *pro forma* OATT planning process adopted in this Final Rule is the means to see that it is carried out in a coordinated, open, and transparent manner, in order to ensure that customers are treated comparably. Therefore, the ultimate responsibility for planning remains with transmission providers.").

[1166] NOPR, 179 FERC ¶ 61,028 at PP 121-126.

Docket No. RM21-17-000                                                              - 400 -

Term Scenarios is a reasonable lower bound for the number of Long-Term Scenarios that

transmission providers must evaluate in Long-Term Regional Transmission Planning.

The Commission explained that this minimum number of Long-Term Scenarios would

help to ensure that transmission providers conduct Long-Term Regional Transmission

Planning that identifies more efficient or cost-effective regional transmission facilities to

meet transmission needs driven by changes in the resource mix and demand.  The

Commission explained that to satisfy this requirement, transmission providers could

develop a base case and three alternatives, or a low-, medium-, and high-level assumption

for the factors that transmission providers (and their stakeholders) believe to be important

to conduct Long-Term Regional Transmission Planning to more efficiently or cost-

effectively meet transmission needs driven by changes in the resource mix and demand,

along with a scenario that accounts for a high-impact, low-frequency event (as discussed

below).[1167]

539.    Consistent with the Order No. 890 transparency transmission planning

principle,[1168] the Commission proposed to require transmission providers in each

---

[1167] *Id.* P 122.

[1168] The transparency transmission planning principle requires transmission
providers to reduce to writing and make available the basic methodology, criteria, and
processes used to develop transmission plans.  Transmission providers must make
sufficient information available to enable customers and other stakeholders to replicate
the results of transmission planning studies.  Order No. 890, 118 FERC ¶ 61,119 at P
471.  Order No. 1000 applied this and other Order No. 890 transmission planning
principles to regional transmission planning processes.  Order No. 1000, 136 FERC ¶
61,051 at P 151.

transmission planning region to publicly disclose (subject to any applicable confidentiality protections) information and data inputs they use to create each Long-Term Scenario. The Commission explained that this transparency requirement will allow stakeholders to understand how each scenario differs.

540. Similarly, consistent with the coordination transmission planning principle established in Order No. 890,[1169] the Commission proposed to require that transmission providers in each transmission planning region give stakeholders the opportunity to provide timely and meaningful input into the identification of which Long-Term Scenarios are developed. The Commission proposed to require transmission providers to revise the regional transmission planning processes in their OATTs to outline an open and transparent process that provides stakeholders, including states, with a meaningful opportunity to propose which future outcomes are probable and can be captured through assumptions made in the development of Long-Term Scenarios. Furthermore, the Commission proposed to require transmission providers to explain on compliance how their process will identify a plausible and diverse set of Long-Term Scenarios.[1170]

---

[1169] The coordination transmission planning principle requires transmission providers to provide customers and other stakeholders with the opportunity to participate fully in the transmission planning process. The transmission planning process must provide for the timely and meaningful input and participation of customers and other stakeholders regarding the development of transmission plans, allowing customers and other stakeholders to participate in the early stages of development. Order No. 890, 118 FERC ¶ 61,119 at PP 451-454.

[1170] NOPR, 179 FERC ¶ 61,028 at P 123.

###### b.    **Comments**

541.    Many commenters support requiring transmission providers in each transmission planning region to develop at least four distinct Long-Term Scenarios as part of Long-Term Regional Transmission Planning.[1171]  GridLab and R Street state that this proposed requirement appropriately balances the need to address uncertainty and risk factors associated with long-term transmission planning while limiting the complexity of the transmission planning process.[1172]  PJM says that employing multiple scenarios will ensure that transmission providers' plans reflect changing needs while avoiding the risk of over-building.[1173]  SEIA states that requiring four distinct Long-Term Scenarios will allow transmission providers to reflect the uncertainty inherent in long-term planning.[1174]  AEE states that the Commission should establish a minimum number of scenarios as a

---

[1171] ACORE Initial Comments at 10; Advanced Energy Buyers Initial Comments at 8; AEE Initial Comments at 8, 18; APPA Initial Comments at 29; Arizona Commission Initial Comments at 6; Concerned Scientists Reply Comments at 18-19; ELCON Initial Comments at 12; ENGIE Initial Comments at 4; Evergreen Action Initial Comments at 3; Georgia Commission Initial Comments at 4-5; GridLab Initial Comments at 12; ITC Initial Comments at 12; Nevada Commission Initial Comments at 8-9; New England for Offshore Wind Initial Comments at 2; NextEra Initial Comments at 65; Northwest and Intermountain Initial Comments at 12; NYISO Initial Comments at 25; Ørsted Initial Comments at 7; Southeast PIOs Initial Comments at 46; SPP Market Monitor Initial Comments at 6-7; US Chamber of Commerce Initial Comments at 7; US DOE Initial Comments at 14; Vermont Electric and Vermont Transco Initial Comments at 2.

[1172] GridLab Initial Comments at 12; R Street Initial Comments at 6.

[1173] PJM Initial Comments at 74.

[1174] SEIA Initial Comments at 11.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 413 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

baseline for compliance with any final rule.[1175]  New York TOs support requiring the use of multiple scenarios for Long-Term Regional Transmission Planning, noting that NYISO already incorporates multiple scenarios into its transmission planning processes.[1176]  Nevada Commission notes that information from four scenarios could provide inputs into Nevada's integrated regional planning process and identify both local and regional needs.[1177]

542.    Policy Integrity argues that the Commission should require more than four Long-Term Scenarios.[1178]  Policy Integrity identifies planning efforts that have used more than four scenarios to illustrate that best practice counsels against reducing the number of required Long-Term Scenarios.[1179]  Northwest and Intermountain state that, depending upon the size and characteristics of the transmission planning region, additional scenarios may be necessary to identify the transmission facilities that are most likely to ensure just

---

[1175] AEE Reply Comments at 18.

[1176] New York TOs Initial Comments at 2.

[1177] Nevada Commission Initial Comments at 8-9.

[1178] Policy Integrity Initial Comments at 14-16.

[1179] *Id.* at 15 (citing US DOE et al., Presentation on National Transmission Planning Study at the Modeling Subcommittee Meeting, at slide 21 (June 7, 2022), https://perma.cc/MEJ5-9JE6 (study will use approximately 100 scenarios); ERCOT, Report On Existing and Potential Electric System Constrains and Needs 10 (Dec. 2020), https://perma.cc/JGS4-9VH7 (ERCOT has previously used five scenarios); Mohamed Labib Awad et al., *Using Market Simulations for Economic Assessment of Transmission Upgrades: Application of the California ISO Approach*, in *Restructured Electric Power Systems: Analysis Of Electricity Markets With Equilibrium Models* 241, 255 (Xiao-Ping Zhang ed. 2010) (economists evaluating CAISO have used seventeen scenarios)).

and reasonable rates.[1180]  LADWP states that while developing more than four scenarios will likely be prudent in some instances such as special studies, four scenarios should be adequate for most Long-Term Regional Transmission Planning given the 20-year planning horizon and uncertainties.[1181]

543.   Some commenters stress the importance of considering multiple Long-Term Scenarios and the uncertainty associated with future conditions.[1182]  ACORE suggests that uncertainties in data can be addressed with multiple Long-Term Scenarios that are continuously revised instead of granting flexibility or encouraging discounting of certain factors.[1183]  ENGIE states that a single base-case scenario is not effective at capturing trends in the resource mix and demand.[1184]  New York Commission and NYSERDA state that Long-Term Scenarios should reflect a range of plausible long-term futures that are relevant to the state (or transmission planning region) and should account for the uncertainty associated with looking out over longer time horizons.[1185]  On the other hand, R Street posits that whether scenario planning sufficiently captures information on the

---

[1180] Northwest and Intermountain Initial Comments at 12.

[1181] LADWP Initial Comments at 4.

[1182] ACORE Initial Comments at 10; ENGIE Initial Comments at 3-4; New York Commission and NYSERDA Initial Comments at 8; R Street Initial Comments at 6.

[1183] ACORE Initial Comments at 10.

[1184] ENGIE Initial Comments at 4.

[1185] New York Commission and NYSERDA Initial Comments at 8.

resource mix and demand depends more on the quality of inputs and scenario

construction elements than the total number of scenarios.[1186]

544.    Some commenters generally support requiring Long-Term Scenarios[1187] including

scenarios examining the effects of high energy demand,[1188] and penetration of renewable

resources.[1189]

545.    Other commenters do not oppose this requirement.[1190]

546.    Some commenters support requiring transmission providers to establish Long-

Term Scenarios, but would modify the NOPR proposal to require a lower minimum

number.  AEP, Entergy, NRECA, Pine Gate, and Western PIOs support requiring at least

three Long-Term Scenarios.[1191]  CAISO argues that the Commission should not require

transmission providers to develop a minimum of four Long-Term Scenarios because

---

[1186] R Street Initial Comments at 6.

[1187] Breakthrough Energy Supplemental Comments at 1; Clean Energy Associations Initial Comments at 11-12; Cross Sector Representatives Supplemental Comments at 1; PJM Initial Comments at 6, 71-72; RMI Supplemental Comments at 2; US Climate Alliance Initial Comments at 2; Western PIOs Initial Comments at 29.

[1188] ACORE Supplemental Comments at 1; Environmental Groups Supplemental Comments at 2.

[1189] ACORE Supplemental Comments at 1; Environmental Groups Supplemental Comments at 2.

[1190] Clean Energy Buyers Initial Comments at 17; Dominion Initial Comments at 25; Pine Gate Initial Comments at 26; Utah Division of Public Utilities Initial Comments at 5.

[1191] AEP Initial Comments at 5, 8, 12; Entergy Initial Comments at 13; NRECA Initial Comments 35; Pine Gate Initial Comments at 26-27; Western PIOs Initial Comments at 33.

there is no evidence, rationale, or justification for why four is the appropriate number of scenarios to develop.[1192]  Instead, CAISO asserts that the Commission should grant transmission planners the flexibility to determine the minimum number of Long-Term Scenarios that are appropriate given the specific circumstances in their region and planning cycle.  However, CAISO states that if Commission were to adopt a minimum number of Long-Term Scenarios, three Long-Term Scenarios is appropriate because it allows for a base case scenario and two sensitivity scenarios.[1193]  Entergy and NRECA claim that three Long-Term Scenarios would better balance the burden with the benefit of developing an additional scenario.[1194]  Pine Gate recommends that, instead of requiring a fourth scenario, the Commission should permit transmission providers in each transmission planning region to develop and use no less than three Long-Term Scenarios, and then to conduct either a fourth scenario or a sensitivity analysis on the most likely Long-Term Scenario to "account for uncertain operational outcomes that determine the benefits of or need for transmission facilities during high-impact, low frequency events" as proposed in the NOPR.[1195]

---

[1192] CAISO Initial Comments at 23-24.

[1193] *Id.* at 25-26.

[1194] Entergy Initial Comments at 13; NRECA Initial Comments 35.

[1195] Pine Gate Initial Comments at 26 (citing NOPR, 179 FERC ¶ 61,028 at P 124).

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 417 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

547.    National Grid argues that there is an inherent trade-off between the number of

Long-Term Scenarios, the quality of the data underpinning the assessment, and the

frequency of reassessments.  National Grid concludes that a transmission provider should

not be required to plan for a scenario that is impossible or not supported by its

stakeholders solely to meet the requirement that four distinct Long-Term Scenarios be

developed and studied.[1196]  Xcel supports the use of scenarios but states that the proposed

requirement to use at least four Long-Term Scenarios is too prescriptive.[1197]  Relatedly,

LADWP states that developing more than four Long-Term Scenarios may be prudent in

some instances but that it would be inefficient and a waste of resources to require all

transmission providers in each transmission planning region to do so.[1198]

548.    Some commenters broadly oppose the NOPR proposal to require transmission

providers in each transmission planning region to develop at least a minimum number or

specific number of Long-Term Scenarios.[1199]  California Commission argues that the

NOPR's approach would interfere with regional transmission planning processes, such as

CAISO's, that are closely coordinated with state resource planning and load forecasting

---

[1196] National Grid Initial Comments at 14-15.

[1197] Xcel Initial Comments at 10.

[1198] LADWP Initial Comments at 4.

[1199] California Commission Initial Comments at 21-24; Duke Initial Comments at 15; Indicated PJM TOs Initial Comments at 9-10; ISO-NE Initial Comments at 28; ISO/RTO Council Initial Comments at 9; MISO Initial Comments at 20; NESCOE Initial Comments at 30; OMS Initial Comments at 5; PG&E Initial Comments at 6-7; SPP Initial Comments at 9-10; State Agencies Initial Comments at 14.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 418 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                    - 408 -

and already effectively identify transmission necessary to accommodate changes in the
resource mix and demand.[1200]  Duke argues that requiring a minimum number of Long-
Term Scenarios, while also requiring one capture high-impact, low-frequency events,
places greater importance on developing scenarios purely to satisfy the requirement than
on gaining consensus about what scenarios are in fact plausible or most likely.[1201]  MISO
states that a prescriptive number of Long-Term Scenarios with specific factors included
may introduce a level of granularity and complexity into Long-Term Regional
Transmission Planning that impedes progress.[1202]

549.    Some commenters request that the Commission provide transmission providers in
each transmission planning region with the flexibility to determine how many Long-Term
Scenarios to develop.[1203]  US DOE supports a requirement to identify four scenarios as a
reasonable lower bound, and supports the analysis of additional scenarios, including
sensitivities, but asserts that the development of Long-Term Scenarios should not be
prescriptive but, rather, the Commission should provide guidelines and give transmission

---

[1200] California Commission Initial Comments at 23.

[1201] Duke Initial Comments at 15.

[1202] MISO Initial Comments at 20.

[1203] Ameren Initial Comments at 13-14; Avangrid Initial Comments at 9-10;
CAISO Initial Comments at 25; California Energy Commission Initial Comments at 2;
Clean Energy Associations Initial Comments at 11-12; Dominion Initial Comments at 25;
Entergy Initial Comments at 13; MISO Initial Comments at 16, 20; MISO TOs Initial
Comments at 16-17; National Grid Initial Comments at 14; Nebraska Commission Initial
Comments at 5; PG&E Initial Comments at 7; PJM Initial Comments at 72; SPP Initial
Comments at 9; US DOE Initial Comments at 14; Xcel Initial Comments at 10.

planning regions flexibility to work within those guidelines to capture reasonable sets of scenarios.[1204]

550.    Some commenters propose that, if the Commission does not require a minimum number of Long-Term Scenarios, the Commission should instead require that transmission providers in each transmission planning region demonstrate, on compliance, why their proposed number of Long-Term Scenarios is appropriate.[1205]  Duke asserts that the Commission should direct transmission providers to offer on compliance a process for Long-Term Scenario development that will capture enough sufficiently plausible scenarios with distinct sets of assumptions to adequately capture a consensus view of the most likely future state(s) to occur.[1206]

551.    Other commenters call for the Commission to permit discretion on how transmission providers determine the number of Long-Term Scenarios to use.[1207]  ISO-NE and ISO/RTO Council argue that the number of Long-Term Scenarios is an implementation detail that each transmission planning region should decide.[1208]  NYISO

---

[1204] US DOE Initial Comments at 14.

[1205] CAISO Initial Comments at 25; Duke Initial Comments at 15; Eversource Initial Comments at 17-18; NESCOE Initial Comments at 30-31.

[1206] Duke Initial Comments at 15.

[1207] Indicated PJM TOs Initial Comments at 9-10; ISO-NE Initial Comments at 28; ISO/RTO Council Initial Comments at 9; MISO Initial Comments at 20; NESCOE Initial Comments at 30-31; OMS Initial Comments at 5.

[1208] ISO-NE Initial Comments at 28; ISO/RTO Council Initial Comments at 9.

states that the final rule should permit each transmission planning region to conduct

Long-Term Regional Transmission Planning using multiple Long-Term Scenarios that

account for varying levels of achievement of local laws and regulations.[1209]

552.    MISO opposes requiring transmission providers to evaluate a specific number of

Long-Term Scenarios and proposes, instead, that the Commission require that future

scenarios be developed and implemented for purposes of long-term regional transmission

planning, leaving each transmission planning region to determine what and how many

scenarios are appropriate.  According to MISO, this approach would ensure consistency

across the transmission planning regions in what is required while allowing for any

needed variation within each region.[1210]  Additionally, MISO notes that it developed the

futures that it uses in its Long-Range Transmission Plan through extensive stakeholder

processes and that these futures reflect the specific realities of its member utilities.  MISO

contends that allowing transmission providers to develop the number of Long-Term

Scenarios they need, and at intervals appropriate for them, encourages stakeholder buy-in

and more efficient allocation of planning resources.[1211]

553.    California Municipal Utilities disagree with comments that urge prescriptive

uniformity, arguing that uniformity involves high costs and lacks consumer protection

---

[1209] NYISO Initial Comments at 23.

[1210] MISO Initial Comments at 16, 20.

[1211] MISO Reply Comments at 9-10.

measures against speculative transmission projects.[1212]  For example, California Municipal Utilities argue against the proposal from Western PIOs for the development of three common scenarios to be synchronized across the Western Interconnection because this proposal amounts to central resource planning, which is not consistent with the existing process in which state and local choices drive the planning process.[1213]

554.  Louisiana Commission states that the Commission's proposal is overly prescriptive and that the Commission should provide for a more flexible approach that allows transmission providers, retail regulators, and other stakeholders to develop scenarios with appropriate, realistic, and reasonable assumptions.  Louisiana Commission states that Long-Term Scenarios should be based on reasonable ranges of assumptions for load, and generation type and location.  Louisiana Commission argues that the number of scenarios required is far less important than the quality of the data and assumptions used to develop them.[1214]  MISO TOs agree that the NOPR proposal is overly prescriptive, stating that the Commission should not create unnecessary obstacles, but rather create a rule broad enough to incorporate existing processes.[1215]

555.  Some commenters emphasize the need for an open and transparent process that provides stakeholders, including states, with a meaningful opportunity to provide timely

---

[1212] California Municipal Utilities Reply Comments at 5.

[1213] *Id.* (citing Western PIOs Initial Comments at 32-33).

[1214] Louisiana Commission Reply Comments at 6-7.

[1215] MISO TOs Reply Comments at 13.

and meaningful input into which Long-Term Scenarios are developed.[1216]  For example,

California Commission, NRECA, Concerned Scientists, and US Climate Alliance support

the NOPR proposal to require transmission providers to disclose—subject to any

applicable confidentiality protections—information and data inputs that they use to create

each Long-Term Scenario.[1217]  ELCON states that the Commission should require each

transmission provider to post all methodologies and inputs used in determining Long-

Term Scenarios and factors to its OASIS.[1218]  NRG claims that the NOPR proposes a

central determination of particular actions based on collectively determined assumptions,

which gives up a major advantage of competition – the requirement that market

participants take an individual view based on available information of the future viability

of any investment they might make.[1219]

556.    NESCOE argues that states must play a central role in Long-Term Regional

Transmission Planning.  Specifically, NESCOE agrees with ISO-NE, which calls for the

Commission to explicitly authorize states to have a central decision-making role at all

---

[1216] California Commission Initial Comments at 25; Clean Energy Associations Initial Comments at 12; DC and MD Offices of People's Counsel Initial Comments at 14; ELCON Initial Comments at 12; NRECA Initial Comments at 35; Pacific Northwest State Agencies at 14-15; US Climate Alliance Initial Comments at 2.

[1217] California Commission Initial Comments at 25; NRECA Initial Comments at 35; Concerned Scientists Reply Comments at 15-16; US Climate Alliance Initial Comments at 2.

[1218] ELCON Initial Comments at 12.

[1219] NRG Initial Comments at 8.

aspects of Long-Term Regional Transmission Planning, including "scenario analysis development," to ensure necessary additional investment for a reliable, clean energy future.[1220]  Similarly, Nebraska Commission adds that state regulatory commissions should have a significant role in defining Long-Term Scenarios.[1221]

557.    AEE requests that the Commission clarify the role of states in providing input to the development of Long-Term Scenarios.[1222]

558.    GridLab states that the Commission should be prepared to act as the arbiter of stakeholder concerns about Long-Term Scenario design, similar to the role that state public utility commissions play in the integrated resource planning process, and that this may require new staff, resources, and the development of new expertise at the Commission.[1223]

### c.    Commission Determination

559.    We adopt the NOPR proposal, with modification, to require transmission providers in each transmission planning region to develop at least three distinct Long-Term Scenarios as part of Long-Term Regional Transmission Planning.  In implementing this requirement, transmission providers must develop, at least once during the five-year Long-Term Regional Transmission Planning cycle, at least three distinct Long-Term

---

[1220] NESCOE Reply Comments at 2 (citing ISO-NE Initial Comments at 2-4).

[1221] Nebraska Commission Initial Comments at 5-6.

[1222] AEE Initial Comments at 19.

[1223] GridLab Initial Comments at 11-12.

Scenarios that, at a minimum, incorporate the seven categories of factors listed in the

Categories of Factors section above.  We find that requiring transmission providers to

develop at least three distinct Long-Term Scenarios as part of Long-Term Regional

Transmission Planning strikes the appropriate balance between establishing a sufficient

number of Long-Term Scenarios and the associated burden of developing and using

Long-Term Scenarios in Long-Term Regional Transmission Planning.  We also find that

requiring transmission providers to develop at least three distinct Long-Term Scenarios

instead of four, as proposed in the NOPR, is more consistent with the manner in which

some transmission providers currently employ scenarios in their existing regional

transmission planning process.[1224]  We also reiterate, as stated in the NOPR, that if

transmission providers produce a base-case Long-Term Scenario in Long-Term Regional

Transmission Planning, that base case should be consistent with what the transmission

provider determines is the most likely scenario to occur.[1225]

560.    In addition, we adopt the NOPR proposal to require, consistent with Order No.

890's transparency transmission planning principle, transmission providers in each

---

[1224] *See, e.g.*, CAISO Initial Comments at 26 (explaining that "CAISO typically has utilized three scenarios in its public policy planning process, a base case scenario and two sensitivity scenarios"); Entergy Initial Comments at 13-14 (explaining that MISO currently uses three scenarios in its transmission planning process and arguing that the use of three scenarios enables "transmission providers to 'bookend' plausible outcomes to plan no-regrets additions to meet the grid, and then develop a scenario between those two to better inform the decision making"); NRECA Initial Comments at 35 n.100 (highlighting that MISO uses three scenarios in its transmission planning process).

[1225] NOPR, 179 FERC ¶ 61,028 at P 123.

transmission planning region to publicly disclose (subject to any applicable confidentiality protections) information and data inputs that they use to create each Long-Term Scenario.[1226]  We also adopt the NOPR proposal to require transmission providers in each transmission planning region, consistent with Order No. 890's coordination transmission planning principle, to provide stakeholders an opportunity to provide timely and meaningful input into how Long-Term Scenarios are developed.[1227]  Consistent with Order No. 890 and Order No. 1000's coordination transmission planning principle, we require transmission providers, with the input of their customers and other stakeholders, to craft coordination requirements that work for those transmission providers and their customers and other stakeholders.  Furthermore, we adopt the NOPR proposal to require transmission providers to revise the regional transmission planning process in their OATTs to outline an open and transparent process that provides stakeholders, including

---

[1226] The transparency transmission planning principle requires transmission providers to reduce to writing and make available the basic methodology, criteria, and processes used to develop transmission plans.  Transmission providers must make sufficient information available to enable customers and other stakeholders to replicate the results of transmission planning studies.  Order No. 890, 118 FERC ¶ 61,119 at P 471.  Order No. 1000 applied this and other Order No. 890 transmission planning principles to regional transmission planning processes.  Order No. 1000, 136 FERC ¶ 61,051 at P 151.

[1227] The coordination transmission planning principle requires transmission providers to provide customers and other stakeholders with the opportunity to participate fully in the transmission planning process.  The transmission planning process must provide for the timely and meaningful input and participation of customers and other stakeholders regarding the development of transmission plans, allowing customers and other stakeholders to participate in the early stages of development.  Order No. 890, 118 FERC ¶ 61,119 at P 454.

states, with a meaningful opportunity to propose which future outcomes are probable and

can be captured through assumptions made in the development of Long-Term Scenarios.

We conclude that these requirements will help ensure that transmission providers will

have the necessary information to identify Long-Term Transmission Needs and identify,

evaluate, and select Long-Term Regional Transmission Facilities to address those needs.

Furthermore, by requiring transmission providers to afford stakeholders a meaningful

opportunity to propose future outcomes that are probable, we believe that this

requirement helps to ensure that Long-Term Transmission Needs are being addressed in a

more efficient or cost-effective manner.[1228]

561.    We also note the important role of states in developing Long-Term Scenarios.  As

the Commission stated in Order No. 890 and Order No. 1000, and we reiterate here, our

expectation is that "all transmission providers will respect states' concerns" when

engaging in the regional transmission planning process.[1229]  We strongly encourage states

to participate actively in the development of Long-Term Scenarios, as well as in all other

aspects of Long-Term Regional Transmission Planning.  In response to NESCOE's and

AEE's concerns about the role of state regulators in the development of Long-Term

Scenarios and their use in Long-Term Regional Transmission Planning,[1230] we find that,

---

[1228] Order No. 1000, 136 FERC ¶ 61,051 at P 150.

[1229] *Id.* P 212; Order No. 890, 118 FERC ¶ 61,119 at P 574.

[1230] AEE Initial Comments at 8; NESCOE Reply Comments at 2 (citing ISO-NE Initial Comments at 2-4).

consistent with Order No. 890,[1231] transmission planning must be coordinated with interested stakeholders, including relevant state regulators that wish to participate in the Long-Term Regional Transmission Planning process. As reflected throughout this final rule, we recognize that states have a particularly important role to play in the development of Long-Term Regional Transmission Facilities and encourage transmission providers to work with states in a way that reflects that role in addition to complying with the relevant requirements established herein.

562. In response to commenters that argue that the Commission should require four or more Long-Term Scenarios,[1232] we affirm that nothing in this final rule precludes or prevents transmission providers from proposing to use more than three Long-Term Scenarios in Long-Term Regional Transmission Planning. To the extent that transmission providers, in consultation with stakeholders, conclude that using more than three Long-Term Scenarios is appropriate for Long-Term Regional Transmission

---

[1231] Order No. 890, 118 FERC ¶ 61,119 at P 574.

[1232] ACORE Initial Comments at 10; Advanced Energy Buyers Initial Comments at 8; AEE Initial Comments at 8; APPA Initial Comments at 29; Arizona Commission Initial Comments at 6; Concerned Scientists Reply Comments at 18-19; ELCON Initial Comments at 12; ENGIE Initial Comments at 4; Evergreen Action Initial Comments at 3; Georgia Commission Initial Comments at 4-5; GridLab Initial Comments at 12; ITC Initial Comments at 12; Nevada Commission Initial Comments at 8-9; New England for Offshore Wind Initial Comments at 2; NextEra Initial Comments at 65; Northwest and Intermountain Initial Comments at 12; NYISO Initial Comments at 25; Ørsted Initial Comments at 7; Southeast PIOs Initial Comments at 46; SPP Market Monitor Initial Comments at 7; US Chamber of Commerce Initial Comments at 7; US DOE Initial Comments at 14-15; Vermont Electric and Vermont Transco Initial Comments at 2.

USCA4 Appeal: 24-1650    Doc: 224      Filed: 01/21/2025    Pg: 428 of 2455
Document Accession #: 20240513-3036      Filed Date: 05/13/2024

Docket No. RM21-17-000                                              - 418 -

Planning in their transmission planning region, those transmission providers may propose to use more than three Long-Term Scenarios in their compliance filings.

563.    In response to California Commission's comments about the interaction between the development of Long-Term Scenarios and existing regional transmission planning processes,[1233] we believe the final rule, as modified from the NOPR proposal, addresses this concern and provides transmission providers with sufficient flexibility to tailor the development of Long-Term Scenarios to their transmission planning regions' specific needs or existing practices, as discussed elsewhere in this final rule.[1234]

### 5.    Types of Long-Term Scenarios

#### a.    NOPR Proposal

564.    In the NOPR, the Commission proposed to require that each Long-Term Scenario incorporate, at a minimum, the categories of factors listed in the requirement above.  As discussed in the Factors section of the NOPR,[1235] the Commission proposed that each Long-Term Scenario must be consistent with federal, state, and local laws and regulations that affect the future resource mix; federal, state, and local laws and regulations on decarbonization and electrification; and state-approved integrated resource plans. However, the Commission explained that each Long-Term Scenario may vary according

---

[1233] California Commission Initial Comments at 23.

[1234] *See supra* Categories of Factors, Requirement to Incorporate Categories of Factors section; Categories of Factors, Stakeholder Process and Transparency section.

[1235] NOPR, 179 FERC ¶ 61,028 at PP 104-112.

to assumptions about the remaining categories of factors described in the NOPR, as well as with respect to other characteristics of the future electric power system.  The Commission explained that it neither proposed to require the development of a specific Long-Term Scenario or specific set of Long-Term Scenarios, nor did it propose to require that transmission providers identify the relative likelihood of different Long-Term Scenarios except where transmission providers develop a base case scenario, as described more fully below.[1236]

565.    The Commission proposed to require transmission providers in each transmission planning region to develop a plausible and diverse set of Long-Term Scenarios.[1237]  The Commission explained that the set of at least four Long-Term Scenarios must be:  (1) plausible, that is they must reasonably capture probable future outcomes, and (2) diverse in the sense that transmission providers must be able to distinguish distinct transmission facilities or distinct benefits of similar transmission facilities in each scenario.  The Commission proposed to require that if the transmission providers in a transmission planning region use a base case scenario, that scenario should be consistent with the scenario that the transmission providers determine to be the most likely scenario to occur.

---

[1236] *Id.* P 121.

[1237] The Commission noted that different assumptions about the factors and data inputs used to develop Long-Term Scenarios and other characteristics of the future electric power system determine whether the set of Long-Term Scenarios are plausible and diverse.

b. **Comments**

566.    Some commenters support the Commission's proposal to require transmission providers in each transmission planning region to develop a plausible and diverse set of Long-Term Scenarios.[1238]  For example, GridLab agrees that the Commission should require that transmission providers demonstrate that their Long-Term Scenarios capture a reasonable range of possible futures.  GridLab argues that scenarios that are too conservative will lead to similar load-resource and transmission portfolio scenarios, which limits the value of scenario planning in managing uncertainty and risk.[1239]  Illinois Commission argues that the NOPR's proposed requirement for diverse and plausible scenarios is important, and that Long-Term Scenarios must consider a wide array of conditions.[1240]

567.    Some commenters discuss the need for certain types of Long-Term Scenarios.[1241] Certain TDUs and PIOs argue that, although Long-Term Scenarios should include

---

[1238] APPA Initial Comments at 29; Clean Energy Buyers Initial Comments at 17; DC and MD Offices of People's Counsel Initial Comments at 13; GridLab Initial Comments at 11 & n.12; Illinois Commission Initial Comments at 7; Mississippi Commission Reply Comments at 9; NARUC Initial Comments at 10; NESCOE Initial Comments at 32; New York Commission and NYSERDA Initial Comments at 8; SPP Market Monitor Initial Comments at 7.

[1239] GridLab Initial Comments at 11.

[1240] Illinois Commission Initial Comments at 7.

[1241] ACORE Initial Comments at 10-11; AEE Initial Comments at 8; APPA Initial Comments at 29; Certain TDUs Initial Comments at 18; Clean Energy Associations Initial Comments at 10-11; Evergreen Action Initial Comments at 3; Eversource Initial Comments at 18-19; Georgia Commission Initial Comments at 4-5; NESCOE Initial Comments at 32; NextEra Initial Comments at 65; PIOs Initial Comments at 22-23; PJM

anticipated levels of generation, they should also include "book end" scenarios of high- and low-load growth.[1242]  Clean Energy Associations argue that, because the Inflation Reduction Act provides for significant funding for electrification, at least some scenarios should evaluate transmission needs under higher-than-anticipated load growth.[1243]

568.    PJM describes four scenarios that it might use:  (1) a low uncertainty scenario with known inputs, such as legislative and regulatory laws and announced deactivations and load forecasts; (2) a medium uncertainty scenario that includes state and local goals and economic retirement analysis; (3) a higher uncertainty scenario that adds more speculative and aspirational goals; and (4) a high-impact-low-frequency resilience evaluation scenario that includes low-probability, high-impact events.  PJM states that the scenarios should be:  (1) based on a clearly defined, robust set of factor development criteria grounded in customer needs; (2) capable of adapting to an evolving set of future system conditions; and (3) crafted to produce the appropriate level of transmission.[1244]

569.    Western PIOs state that one scenario should be based on existing policy and assumptions about generation retirements and electrification that are likely to occur.

---

Initial Comments at 73-74; US Climate Alliance Initial Comments at 2; US DOE Initial Comments at 15; Utah Division of Public Utilities Initial Comments at 5-6; Western PIOs Initial Comments at 33.

[1242] Certain TDUs Initial Comments at 18; PIOs Initial Comments at 22-23.

[1243] Clean Energy Associations Initial Comments at 11 (citing Inflation Reduction Act, Pub. L. No. 117-169 (2022)).

[1244] PJM Initial Comments at 73-74.

Western PIOs state that a second scenario would build on that base case scenario by assuming Public Policy Requirements and utility and corporate goals are met or exceeded, as well as high levels of electrification and generation retirements. Western PIOs state that a third scenario should address high-impact, low-frequency extreme weather events. Western PIOs state that the fourth scenario could be reserved for a scenario unique to each of the non-RTO/ISO transmission planning regions.[1245]

570.    ACORE argues that uncertainties in data do not require granting flexibility or encouraging discounting, but instead can be addressed with multiple scenarios that are continuously revised as recommended in the NOPR. For example, one Long-Term Scenario can include a discounted set of goals, while another can add contingency factors for when demand exceeds those goals; and a range of scenarios could be incorporated for the extent of electrification of buildings and transportation. ACORE states that scenario analysis should incorporate a probabilistic-based range of future weather and extreme events which, ACORE asserts, will support the analyses of the benefits of mitigation of those extreme events and system contingencies and mitigation of weather and load uncertainty.[1246]

571.    AEE recommends that the Commission require Long-Term Scenarios that consider anticipated distributed energy resource deployments.[1247] Evergreen Action

---

[1245] Western PIOs Initial Comments at 33.

[1246] ACORE Initial Comments at 10-11.

[1247] AEE Initial Comments at 8.

urges the Commission to require that at least one Long-Term Scenario contemplate a 100% clean-energy grid by 2035, to reflect the Biden Administration's target of 100% carbon-free electricity by 2035.[1248]  Similarly, NextEra argues that the Commission should require that one of the Long-Term Scenarios be based on an economy-wide, net-zero emissions scenario or at least a federal net-zero emissions mandate limited to the power sector.[1249]  In contrast, Utah Division of Public Utilities states that one of the Long-Term Scenarios should consider little or no state renewable energy or decarbonization goals or requirements to assist in determining transmission costs for states that have less onerous goals.[1250]

572.    APPA requests that one of the Long-Term Scenarios represent a base case of business as usual.[1251]  Eversource supports the NOPR proposal to use the "most likely scenario to occur" as the base case for analysis of Long-Term Scenarios.[1252]  Georgia Commission argues that a base case scenario should reflect the expected long-term mix of generating capacity, with additional scenarios reflecting alternative carbon emission constraints, fuel prices, and growth in distributed energy resources.[1253]  US Climate

---

[1248] Evergreen Action Initial Comments at 3.

[1249] NextEra Initial Comments at 65.

[1250] Utah Division of Public Utilities Initial Comments at 5-6.

[1251] APPA Initial Comments at 29.

[1252] Eversource Initial Comments at 19.

[1253] Georgia Commission Initial Comments at 4-5.

Alliance states that business-as-usual cases should be consistent with state and federal policy and used in addition to alternative scenarios that demonstrate a range of factors influencing the changing grid.[1254]

573.    However, PIOs state that the Commission should not use the phrase "business as usual" as it is misleading in a rapidly changing electric industry.[1255]  US DOE argues against identifying the likelihood of any one Long-Term Scenario, including a base case scenario, because identifying a single such scenario as most likely is challenging and discourages the analysis of more scenarios and sensitivities, undermining the value of scenario analysis.  Instead, US DOE argues that transmission facilities that provide high value in multiple scenarios should be identified as more likely to provide value to the future transmission system, because expansion options that provide high value in many future scenarios are flexible, and that flexibility to accommodate multiple future scenarios is more important than trying to characterize the likelihood of any one scenario.[1256]

574.    Senator Schumer supports requiring a high variable energy resource penetration scenario.[1257]

---

[1254] US Climate Alliance Initial Comments at 2.

[1255] PIOs Initial Comments at 22.

[1256] US DOE Initial Comments at 15.

[1257] Senator Schumer Supplemental Comments at 2.

### c.    <u>Commission Determination</u>

575.    We adopt the NOPR proposal to require transmission providers in each transmission planning region to develop a plausible and diverse set of at least three Long-Term Scenarios. Specifically, we find that the set of at least three Long-Term Scenarios must be: (1) plausible, meaning that each scenario must itself be reasonably probable, and collectively that the set of plausible scenarios must reasonably capture probable future outcomes, and (2) diverse, in the sense that transmission providers can distinguish distinct transmission facilities or distinct benefits of similar transmission facilities in each Long-Term Scenario. We find that requiring Long-Term Scenarios to be both plausible and diverse prevents the development of Long-Term Scenarios that may otherwise be too conservative, speculative, or similar for transmission providers to identify Long-Term Transmission Needs and identify, evaluate, and select Long-Term Regional Transmission Facilities to more efficiently or cost-effectively address those needs. Absent a requirement that Long-Term Scenarios be both plausible and diverse, transmission providers could develop Long-Term Scenarios in a manner that undercuts one of the primary benefits of using scenario-based planning practices, which is to help ensure that transmission providers can account for the uncertainty about future conditions when conducting Long-Term Regional Transmission Planning.

576.    Moreover, we also require that each *individual* Long-Term Scenario be plausible (i.e., individually the scenario must be reasonably probable) because, absent such a requirement, we are concerned that the set of Long-Term Scenarios may include a Long-Term Scenario that rests on assumptions about the factors and data inputs that do not

reasonably capture possible future outcomes.  Additionally, we also clarify the term

"diverse" to mean that the *set* of Long-Term Scenarios must represent a reasonable range

of probable future outcomes consistent with the requirement for plausibility, based on

assumptions about the factors and data inputs.

577.    We disagree with commenters that argue that the Commission should modify the

NOPR proposal and prescribe specific types of Long-Term Scenarios for transmission

providers to use in Long-Term Regional Transmission Planning.[1258]  We are not

persuaded that we should require transmission providers to develop either a specific

Long-Term Scenario or a specific set of Long-Term Scenarios because we believe that

transmission providers, with an opportunity for timely and meaningful input from

stakeholders, are in the best position to determine which plausible Long-Term Scenarios

are applicable to their transmission planning region.  Further, we do not find it necessary

to require transmission providers to develop low-, medium-, and high-level assumptions

for the factors that transmission providers believe to be important except where

transmission providers develop a base case scenario, as discussed above.[1259]

---

[1258] ACORE Initial Comments at 10-11; AEE Initial Comments at 8; APPA Initial Comments at 29; Certain TDUs Initial Comments at 18, 22; Clean Energy Associations Initial Comments at 11; Evergreen Action Initial Comments at 3; Eversource Initial Comments at 19; Georgia Commission Initial Comments at 4-5; NESCOE Initial Comments at 32; NextEra Initial Comments at 65; PIOs Initial Comments at 22-23; PJM Initial Comments at 73-74; US Climate Alliance Initial Comments at 2; US DOE Initial Comments at 15; Utah Division of Public Utilities Initial Comments at 5-6; Western PIOs Initial Comments at 33.

[1259] *See supra* Types of Long-Term Scenarios section.

### 6.     **Sensitivities for High-Impact, Low-Frequency Events**

#### a.     **NOPR Proposal**

578.    In the NOPR, the Commission proposed to require that at least one of the four distinct Long-Term Scenarios that transmission providers in each transmission planning region use in Long-Term Regional Transmission Planning account for uncertain operational outcomes that determine the benefits of or need for transmission facilities during high-impact, low-frequency events.  The Commission proposed to allow transmission providers the flexibility to determine which high-impact, low-frequency event should be modeled in this Long-Term Scenario as part of Long-Term Regional Transmission Planning based on the Commission's understanding that each transmission planning region may see a need to evaluate a different type of high-impact, low-frequency event.  The Commission stated that high-impact, low-frequency events may include extreme weather events or events associated with potential cyber-attacks.  The Commission explained that this Long-Term Scenario accounting for a high-impact, low-frequency event can be developed, for example, by assuming greater-than-expected electricity demand and greater-than-expected generation or transmission outages.  The Commission proposed that the use of either probabilistic transmission planning[1260] or

---

[1260] NOPR, 179 FERC ¶ 61,028 at P 124.  The Commission stated that it considers probabilistic transmission planning approaches to include any transmission planning approach that uses a probability distribution to assign probabilities to one or more inputs to the transmission model.  The Commission stated that these inputs can include shorter-term operational inputs (like wind generation or generation outages).  The Commission described stochastic techniques as including adaptive transmission planning techniques that identify transmission facilities that optimize transmission net-benefits over a time

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 438 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

stochastic techniques would be sufficient to satisfy this requirement, but it did not propose to require either approach at this time.[1261]

579.    The Commission noted that transmission providers can develop sensitivities for every Long-Term Scenario to assess how outcomes modeled in Long-Term Scenarios may depend on an assumption about electric power system model inputs that does not vary across scenarios (e.g., higher natural gas prices). The Commission explained that such sensitivities can provide valuable information about the need for and benefits of potential transmission facilities, but also noted that they can be burdensome to develop if applied to every scenario.[1262]

### b.    <u>Comments</u>

580.    Some commenters support the NOPR proposal to require one Long-Term Scenario to account for uncertain operational outcomes that determine the benefits of or need for transmission facilities during high-impact, low-frequency events as part of Long-Term Regional Transmission Planning.[1263] Ameren states that the inclusion of such events in Long-Term Regional Transmission Planning would provide additional information for

---

horizon under market and regulatory uncertainty about the future. *Id.* P 124 n.228.

    [1261] *Id.* P 124.

    [1262] *Id.* P 125.

    [1263] Ameren Initial Comments at 13; Arizona Commission Initial Comments at 6; California Commission Initial Comments at 24; Evergreen Action Initial Comments at 4; Eversource Initial Comments at 18; Grid United Initial Comments at 4; New England for Offshore Wind Initial Comments at 2; Pacific Northwest State Agencies Initial Comments at 14; US DOE Initial Comments at 15.

transmission providers, stakeholders, state regulators, and others to consider when determining the need for regional transmission facilities.[1264]  According to Arizona Commission, including such a scenario, and giving the transmission provider the discretion to determine what this should be for its region, may provide the added benefit of allowing state involvement in identifying the appropriate "high-impact" event to be analyzed.  Arizona Commission additionally asserts that the Commission should require transmission providers to develop sensitivities for each Long-Term Scenario to better understand the range of benefits under each scenario.[1265]

581.    Eversource supports the NOPR proposal given the increasing threat of extreme weather events and potential cyber-attacks.[1266]  Similarly, Illinois Commission states that the inclusion of high-impact, low-frequency events in the transmission planning process is reasonable and should include cyber-security attacks and extreme weather events to strengthen the system's resilience.[1267]  New England for Offshore Wind argues that it is prudent for the Commission to require transmission providers to develop at least one high-impact, low-frequency scenario due to the increased likelihood of extreme weather events due to climate change.[1268]  SoCal Edison states that incorporating probabilistic

---

[1264] Ameren Initial Comments at 13-14.

[1265] Arizona Commission Initial Comments at 6-7.

[1266] Eversource Initial Comments at 18.

[1267] Illinois Commission Initial Comments at 6.

[1268] New England for Offshore Wind Initial Comments at 2.

assumptions about extreme weather in Long-Term Scenarios would be a reasonable, proactive approach to mitigate the impacts of extreme weather when it occurs.[1269]

582.   Likewise, Cypress Creek, City of New Orleans Council, DC and MD Offices of People's Counsel, and PIOs support the inclusion of extreme weather events in Long-Term Scenarios.[1270]  Business Council for Sustainable Energy contends that Long-Term Scenarios must account for the increase in significant climate events, acknowledging that the most salient events to assess may vary regionally.[1271]  US DOE asserts that regional transmission planning should consider the effects of extreme events, including extreme weather events, on the availability and reliability of the transmission system.[1272]  WE ACT comments that requiring transmission providers to consider extreme weather events in Long-Term Regional Transmission Planning is a positive step towards addressing grid reliability in the face of more frequent and intensifying weather events brought on by the climate crisis.[1273]

---

[1269] SoCal Edison Initial Comments at 12.

[1270] City of New Orleans Council Initial Comments at 8; Cypress Creek Reply Comments at 5-6; DC and MD Offices of People's Counsel Reply Comments at 6; PIOs Reply Comments at 10; *see also* RMI Supplemental Comments at 2; Senator Whitehouse Supplemental Comments at 2-3.

[1271] Business Council for Sustainable Energy Initial Comments at 4.

[1272] US DOE Initial Comments at 5.

[1273] WE ACT Initial Comments at 2.

583.    Other commenters express more general support for the study of high-impact, low-frequency events in Long-Term Regional Transmission Planning.[1274]  Clean Energy Associations emphasize that no scenario or sensitivity should assume that historical operating conditions will persist given the unpredictable and increasing impact of climate change.[1275]  Grid United states that high-impact, low-frequency scenarios should not be considered "black swan" events since they occur on a regular, but low-frequency, basis. Moreover, Grid United asks that the Commission define or provide examples of high-impact, low-frequency events that transmission providers could incorporate into Long-Term Scenarios to provide clarity and consistency across transmission planning regions.[1276]

584.    NARUC does not oppose the requirement that one of the Long-Term Scenarios account for high-impact, low-frequency events but notes that states' input is important when developing such scenarios.[1277]  Pattern Energy states that, with respect to low-probability, high-risk event scenarios, the Commission should:  (1) require the North American Electric Reliability Corporation and the Regional Entities to develop the scope

---

[1274] *See* Business Council for Sustainable Energy Initial Comments at 4; Clean Energy Associations Initial Comments at 12; Evergreen Action Initial Comments at 3-4; Grid United Initial Comments at 4-5; NARUC Initial Comments at 11-12; NASUCA Initial Comments at 4-5; NESCOE Initial Comments at 32-33; NRECA Initial Comments at 35-36; Pattern Energy Initial Comments at 25; SoCal Edison Initial Comments at 12.

[1275] Clean Energy Associations Initial Comments at 12.

[1276] Grid United Initial Comments at 5.

[1277] NARUC Initial Comments at 11-12.

of low-probability, high-risk events for each region of the country and then (2) require

transmission providers to model at least one of the events in a rotation of the three-year

review of the 20-year plans to identify vulnerabilities that can be addressed through

transmission solutions that increase resilience.[1278]  Vermont Electric and Vermont

Transco request clarity on what scenarios the Commission would consider sufficiently

high-impact to be analyzed but not so high-impact as to be unable to be mitigated by

effective Long-Term Regional Transmission Planning.[1279]

585.    Some commenters support the Commission's proposal to permit transmission

providers to model high-impact, low-frequency events via probabilistic or stochastic

methods.[1280]  PJM states that it will sometimes use probabilistically-derived parameters

and sometimes use deterministically-derived parameters in its Long-Term Scenarios,

depending on which is more appropriate.[1281]  Policy Integrity asserts that the Commission

should ensure the use of modeling techniques that address uncertainty, such as stochastic

programming and robust optimization models.[1282]  Policy Integrity argues that modeling

that fails to consider uncertainties that arise from various factors could reduce the cost-

---

[1278] Pattern Energy Initial Comments at 25.

[1279] Vermont Electric and Vermont Transco Initial Comments at 3.

[1280] California Commission Initial Comments at 24-25; Eversource Initial
Comments at 18; PJM Initial Comments at 74-75.

[1281] PJM Initial Comments at 75.

[1282] Policy Integrity Initial Comments at 7.

Docket No. RM21-17-000                                              - 433 -

efficacy and efficiency of results and, ultimately, result in unjust and unreasonable rates.[1283]  Policy Integrity cites the European Network of Transmission System Operators' consideration of the interactions between gas and electric systems as an example of best practices for choosing scenarios.[1284]

586.    Some commenters provided views on the Commission's proposal to require transmission providers to develop sensitivities for each Long-Term Scenario.[1285] Business Council for Sustainable Energy states that it is important that scenario planning cover a range of sensitivities, and that the long-term needs of the transmission system as well as long-term policy goals should be incorporated.[1286]  NERC states that studies could more adequately study various sensitivities and extreme conditions (e.g., extreme weather) to ensure a reliable, resilient, and secure bulk power system on a longer time horizon, which could, in turn, help inform transmission expansion plans particularly related to the changing resource mix.[1287]

---

[1283] *Id.* at 6.

[1284] *Id.* at 9 (citing European Commission, Key Cross Border Infrastructure Projects, https://perma.cc/4U6X-Q2WN (last visited Aug. 9, 2022)).

[1285] Business Council for Sustainable Energy Initial Comments at 4; NERC Initial Comments at 7; Exelon Initial Comments 7 & n.7; GridLab Initial Comments at 17-19; Idaho Power Initial Comments at 5; Minnesota State Entities Initial Comments at 5; NYISO Initial Comments at 26; PIOs Initial Comments at 23-24; Policy Integrity Initial Comments at 14-16; PPL Initial Comments at 9; R Street Initial Comments at 6; US DOE Initial Comments at 15-16.

[1286] Business Council for Sustainable Energy Initial Comments at 4.

[1287] NERC Initial Comments at 7.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 444 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                    - 434 -

587.   GridLab recommends that the Commission provide a high-level requirement and guidance on what kinds of factors are more effectively considered in scenario versus sensitivity analysis and how sensitivity analysis might be used in tandem with scenario analysis.[1288]   Policy Integrity states that, instead of mandating only a minimum number of Long-Term Scenarios, the Commission should also require sensitivity analysis of critical drivers of transmission needs.[1289]   In addition, Policy Integrity recommends that the Commission require transmission providers to run a sensitivity for each Long-Term Scenario using a 30-year transmission planning horizon and compare the results with those from the analysis of each Long-Term Scenario using a 20-year transmission planning horizon.[1290]   PIOs state that the Commission should specify that, if any critical variable (e.g., natural gas prices, capital costs of wind and solar, short and long duration storage, and carbon capture and sequestration) is the same in more than two Long-Term Scenarios, then transmission providers must conduct sensitivities that use different values for that variable.[1291]

588.   Although NRECA does not oppose the proposal that at least one Long-Term Scenario account for high-impact, low-frequency events from extreme weather, NRECA states that the Commission should not require any Long-Term Scenarios to account for

---

[1288] GridLab Initial Comments at 17-18.

[1289] Policy Integrity Initial Comments at 15.

[1290] *Id.* at 10-11.

[1291] PIOs Initial Comments at 23-24.

Docket No. RM21-17-000                                                                - 435 -

possible cyber-attacks.  NRECA asserts that modeling cyber-attacks and their effects

would be extraordinarily complex and risk disclosure of non-public Critical Electric

Infrastructure Information (CEII) and that such risks are better addressed in North

American Electric Reliability Corporation standards development, noting that cyber-

attacks may already be evaluated under North American Electric Reliability Corporation

Transmission Planning Reliability Standard TPL-001-4.[1292]

589.    Some commenters oppose requiring one Long-Term Scenario for uncertain

operational outcomes that determine the benefits of or need for transmission facilities

during high-impact, low-frequency events.[1293]  LADWP asserts that a more meaningful

measure of benefits or needs associated with high-impact, low-frequency events may be a

periodic examination of the impacts of large-scale single points of failures.[1294]  US

Chamber of Commerce argues against requiring a Long-Term Scenario for high-impact,

low-frequency events because, it asserts, the scope and impacts of such events on the

transmission system can be infinite in number.[1295]

---

[1292] NRECA Initial Comments at 35-36 (citing GDS Associates, Report, at 13 (Aug. 17, 2022); NERC Reliability Standard TPL-001-4, Table 1 – Steady State, https://www.nerc.com/pa/Stand/Reliability%20Standards/TPL-001-4.pdf).

[1293] LADWP Initial Comments at 3; MISO Initial Comments at 27-28, 38-39; Mississippi Commission Reply Comments at 6; OMS Initial Comments at 6; US Chamber of Commerce Initial Comments at 7.

[1294] LADWP Initial Comments at 3.

[1295] US Chamber of Commerce Initial Comments at 7.

590.    MISO argues that, although the impacts of large-scale generation loss events associated with extreme weather events should be considered in Long-Term Regional Transmission Planning, the Commission should consider requiring analysis or sensitivities of extreme events that are focused on the times or snapshots when the system is potentially impacted by those events instead of requiring a separate extreme event scenario.[1296]  MISO further argues that the Commission should not require a specific number or type of sensitivities, which can vary over time, but instead transmission providers should have flexibility to assess the appropriate sensitivities needed to test scenarios and results at the time those are being developed.[1297]  Similarly, OMS argues that analyzing system performance during extreme weather for all Long-Term Scenarios would result in a better understanding of the benefits of transmission and ensure reliability regardless of future changes in generation and/or load.[1298]  PIOs likewise recommend that the Commission require that transmission providers model extreme weather events as sensitivities in each Long-Term Scenario and, specifically, that they model at least extreme heat or cold over geographic areas that are experiencing these extremes.[1299]

---

[1296] MISO Initial Comments at 27-28.

[1297] *Id.* at 39.

[1298] OMS Initial Comments at 6.

[1299] PIOs Initial Comments at 21.

Docket No. RM21-17-000                                                     - 437 -

591.    NESCOE states that it supports the study of high-impact, low-frequency events;

however, NESCOE argues that the proposal raises questions about whether codifying

such a requirement blurs the line between public policy planning and reliability planning,

contrary to the NOPR's contention that none of the proposals seek to alter the reliability

planning process.  NESCOE contends that making the study of high-impact, low-

frequency events discretionary instead of mandatory under Long-Term Regional

Transmission Planning would avoid such tension.[1300]  Mississippi Commission states that

the Commission should not mandate that transmission planning attempt to predict

extreme weather events and over-build the system, because "predicting where the next

hurricane or tornado will land is speculative."  Mississippi Commission argues that a

better approach is to incorporate construction standards (e.g., North American Electric

Reliability Corporation, IEEE, local reliability criteria) designed to withstand such

events.[1301]

592.    Idaho Power raises concerns that developing multiple sensitivities for multiple

Long-Term Scenarios over a long-term transmission planning horizon introduces too

many variables.[1302]  Minnesota State Entities state that defining specific methods in the

final rule—such as the difference between a "sensitivity" and what is included in a

---

[1300] NESCOE Initial Comments at 32-33.

[1301] Mississippi Commission Reply Comments at 6.

[1302] Idaho Power Initial Comments at 5.

"scenario"—can be unnecessarily confusing and complex.[1303]  US DOE encourages

transmission providers to perform sensitivity analyses but states that the Commission

should only require that one Long-Term Scenario analyze high-impact, low-frequency

events.[1304]

### c.   <u>Commission Determination</u>

593.  We modify the NOPR proposal to require transmission providers in each

transmission planning region to develop at least one sensitivity, applied to each Long-

Term Scenario, to account for uncertain operational outcomes that determine the benefits

of and/or need for transmission facilities during multiple concurrent and sustained

generation and/or transmission outages due to an extreme weather event across a wide

area.[1305]  As discussed below, we acknowledge support in the record for studying high-

impact, low-frequency events as proposed in the NOPR[1306] but also recognize that

requiring a fourth Long-Term Scenario might be a burdensome way to study such events

---

[1303] Minnesota State Entities Initial Comments at 5.

[1304] US DOE Initial Comments at 16.

[1305] The Commission proposed in the NOPR to require that at least one of four Long-Term Scenarios account for uncertain operational outcomes that determine the benefits of or need for transmission facilities during high-impact, low-frequency events. NOPR, 179 FERC ¶ 61,028 at P 124.

[1306] *See, e.g.*, New England for Offshore Wind Initial Comments at 2; *see also* Arizona Commission Initial Comments at 6-7.  We also note that the Commission has previously discussed that "[e]xtreme heat and cold weather events have occurred with greater frequency in recent years, and are projected to occur with even greater frequency in the future."  Order No. 896, 183 FERC ¶ 61,191 at P 2.

as compared to a sensitivity.[1307]  We find that more clearly defining the type of system conditions that transmission providers must model to account for uncertain operational outcomes—in particular, multiple concurrent and sustained generation and/or transmission outages due to an extreme weather event across a wide area—compared to the NOPR proposal, will enable transmission providers to better account for periods when regional transmission facilities may have particularly high value by decreasing the risk of loss of load and/or decreasing the cost to reliably serve load.

594.    Therefore, we require that, after developing at least three Long-Term Scenarios, transmission providers develop a sensitivity for each of the Long-Term Scenarios.[1308]  We provide transmission providers with flexibility to conduct this sensitivity either before or after identifying potential regional transmission solutions to the Long-Term Transmission Needs identified using those Long-Term Scenarios.  Conducting this sensitivity before identifying potential regional transmission solutions can be useful because it may help transmission providers to identify such solutions.  On the other hand, conducting this sensitivity after identifying potential regional transmission solutions to Long-Term Transmission Needs would allow transmission providers to engage in efforts

---

[1307] *See, e.g.*, MISO Initial comments at 27.

[1308] *See* NOPR, 179 FERC ¶ 61,028 at P 125 n.229.  A sensitivity represents a single assumption about a short-term input or factor (some input with a value that may change throughout a day or year).  A scenario represents an assumption about a longer-term input or factor (e.g., resource retirements and additions or public policies).

to develop additional or alternative regional transmission solutions to address such conditions.

595.    In conducting this sensitivity, transmission providers change the data inputs of the underlying Long-Term Scenarios—in terms of load, generation, generator outages, and transmission outages—to account for uncertain operational outcomes that determine the benefits of or need for regional transmission facilities during multiple concurrent and sustained generation and/or transmission outages due to an extreme weather event across a wide area, while maintaining the underlying longer-term determinants of the Long-Term Scenario (e.g., the installed capacity of each generation resource).  The sensitivity can be thought of as a "stress test" for all Long-Term Scenarios.

596.    We find it necessary to require the consideration of a more narrowly defined set of conditions, as compared to the broader high-impact, low-frequency event conditions described in the NOPR, to include multiple concurrent and sustained generation and/or transmission outages due to an extreme weather event across a wide area.[1309]  Extreme weather events have occurred more frequently in recent years,[1310] are periods when regional transmission facilities have particularly high value,[1311] and create system

---

[1309] *See, e.g.*, Grid United Initial Comments at 4-5 (stating that "the Commission should define or provide examples of the low-frequency, high impact events that it would like to be considered for planning purposes").

[1310] *See supra* The Overall Need for Reform section; *see also* NOPR, 179 FERC ¶ 61,028 at P 45; Breakthrough Energy Initial Comments at 8.

[1311] *See* ACEG Initial Comments at 5; PIOs Initial Comments at 21; US DOE Initial Comments at 5-6.

conditions that transmission providers can readily specify compared to contingencies
with an unknown root cause.[1312]  During these extreme weather events, generation and
transmission outages can be widespread, occur at the same time, and persist due to a
common cause like freezing temperatures or limited fuel availability.  This more
narrowly defined set of conditions also gives transmission providers more direct guidance
on how to comply with the requirements of this final rule.[1313]

597.    Although we are only requiring that one sensitivity analysis specific to extreme
weather events be applied to each Long-Term Scenario to comply with this final rule, we
do not preclude transmission providers from considering additional sensitivities.  We
recognize that transmission providers may consider several other sensitivities as
important and helpful in evaluating the benefits of and need for Long-Term Regional
Transmission Facilities.  For example, transmission providers can develop sensitivities to
account for a cyber-attack, significant forecast error, or fuel price volatility.  We
encourage transmission providers to assess the need to develop other sensitivities as part
of Long-Term Regional Transmission Planning.

598.    We find that modeling extreme weather events as sensitivities is appropriate for
Long-Term Regional Transmission Planning.  We first note that extreme weather events

---

[1312] In terms of specifying the system conditions during extreme weather events,
transmission providers can, for example, look at previous severe cold weather events to
identify how load might increase, how load and generation forecasts might be incorrect,
and how generation and transmission outages might occur during a future extreme
weather event.

[1313] See, e.g., Grid United Initial Comments at 4-5.

can occur under any assumed future scenario but do not, by themselves, represent

changes in the way that factors are used in Long-Term Scenarios to determine Long-

Term Transmission Needs.[1314]  Therefore, we believe that applying a sensitivity to each

Long-Term Scenario is a more accurate way to evaluate the effects of high-impact, low-

frequency events than considering such events in a distinct Long-Term Scenario.

Second, although there is a burden associated with conducting sensitivities, the overall

burden of conducting a sensitivity analysis is comparatively lower than that of developing

a new, separate Long-Term Scenario.  This is because sensitivities will be conducted

using the existing Long-Term Scenarios, where most inputs, and the factors and

assumptions used to develop the scenarios, have already been established and mapped.

Adjusting a set of existing inputs to test the impact of the changes on a Long-Term

Scenario through a sensitivity analysis is therefore less burdensome than developing an

entirely new Long-Term Scenario.

599.    In addition, we highlight that transmission providers can use the required

sensitivity analyses to evaluate the need for, or benefits of, increased Interregional

Transfer Capability provided by candidate Long-Term Regional Transmission Facilities.

We recognize that certain Long-Term Regional Transmission Facilities could increase

Interregional Transfer Capability by changing the topology of the transmission system,

even if the specific transmission facility is not directly connected to a neighboring

transmission planning region's transmission system.  We believe that an increase in

---

[1314] *See* MISO Initial Comments at 27-28; OMS Initial Comments at 6.

Interregional Transfer Capability could provide significant benefits during extreme weather events that result in multiple concurrent and sustained generation and/or transmission outages.[1315]  We note that several commenters discuss the need for greater Interregional Transfer Capability because of extreme weather events[1316] and the importance of modeling extreme weather event conditions to capture the benefits of regional transmission facilities.[1317]  As discussed in the Evaluation of the Benefits of Regional Transmission Facilities section below, we require transmission providers to consider increased Interregional Transfer Capability provided by a Long-Term Regional Transmission Facility when measuring Benefit 6.[1318]  We believe that transmission providers can evaluate Benefit 6, including reduced loss of load and reduced production costs during extreme weather events that result in multiple concurrent and sustained generation and/or transmission outages, using this required sensitivity, among other

---

[1315] *See, e.g.*, Order No. 896, 183 FERC ¶ 61,191 at PP 85-88.

[1316] BP Initial Comments at 10; Breakthrough Energy Initial Comments at 2; Kansas Commission Initial Comments at 8-9; NARUC Initial Comments at 23; US DOE Initial Comments at 39-42; *see also* ELCON Initial Comments at 8 (arguing Interregional Transfer Capability should be a driver of transmission needs); PJM Initial Comments at 66-67.

[1317] *See* ACEG Initial Comments at 5; PIOs Initial Comments at 21; US DOE Initial Comments at 5-6.

[1318] *See infra* Evaluation of the Benefits of Regional Transmission Facilities, Required Benefits, Benefit 6: Mitigation of Extreme Weather Events and Unexpected System Conditions section.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 454 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                    - 444 -

sensitivities that transmission providers may develop to capture extreme events and
system contingencies.

600.    We disagree with NESCOE's concern that a requirement to study the impact of
high-impact, low-frequency events might "blur[] the line between public policy planning
and reliability planning."[1319]  Rather, as discussed below in the Evaluation of the Benefits
of Regional Transmission Facilities section, we believe that the requirement
complements Benefit 6 (Mitigation of Extreme Weather Events and Unexpected System
Conditions) given the high probability that extreme weather events will cause unplanned
transmission outages and the likelihood that such events will continue to occur at regular
intervals.[1320]  Although this final rule requires a more comprehensive consideration of
benefits, it does not alter Order No. 1000's requirements for transmission providers to
create a regional transmission plan that will identify transmission facilities that more
efficiently or cost-effectively meet the transmission planning region's reliability and
economic requirements.

601.    We also acknowledge LADWP's concern that a more meaningful measure of
benefits or needs associated with high-impact, low-frequency events may be a periodic
examination of the impacts of large-scale single point failure.[1321]  Although we do not

---

[1319] NESCOE Initial Comments at 33.

[1320] *See infra* Evaluation of the Benefits of Regional Transmission Facilities,
Required Benefits, Benefit 6: Mitigation of Extreme Weather Events and Unexpected
System Conditions section.

[1321] LADWP Initial Comments at 3.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 455 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

preclude transmission providers from conducting such a study, such a study would not

meet the final rule's requirement to conduct a sensitivity, applied to each Long-Term

Scenario, to account for uncertain operational outcomes that determine the benefits of

and/or need for transmission facilities during multiple concurrent and sustained

generation and/or transmission outages due to an extreme weather event across a wide

area.

### 7. **Specificity of Data Inputs**

#### a. **NOPR Proposal**

602.    In the NOPR, the Commission proposed to require transmission providers in each

transmission planning region to use "best available data inputs" when developing Long-

Term Scenarios.[1322]  The Commission stated that, by "best available," the Commission

did not imply that there is a single "best" value for each data input that transmission

providers must use, but rather that best practices are used to develop that data input.[1323]

603.    The Commission proposed to define "best available data inputs" as data inputs that

are timely and developed using diverse and expert perspectives, adopted via a process

that satisfies the Order Nos. 890 and 1000 transparency transmission planning principles

described above, and reflect the list of factors that transmission providers must

incorporate into Long-Term Scenarios.[1324]  The Commission explained that an example

---

[1322] NOPR, 179 FERC ¶ 61,028 at PP 130-134.

[1323] *Id.* P 130.

[1324] *Id.* P 131.

Docket No. RM21-17-000                                                            - 446 -

of data inputs that could meet this requirement are the long-term load forecasts of
demand that RTOs/ISOs currently use for predicting long-term resource adequacy. The
Commission stated that another example of data inputs that could meet this requirement
are the most recent data on renewable energy potential and distributed energy resources
developed by national labs.[1325]

604.    The Commission proposed to require transmission providers in each transmission
planning region to update all data inputs each time they reassess and revise, as necessary,
their Long-Term Scenarios, which, as explained in the NOPR, the Commission proposed
to require that they do at least every three years. As indicated in the Long-Term Regional
Transmission Planning section of the NOPR,[1326] the Commission also proposed to require
that the Order Nos. 890 and 1000 transmission planning principles apply to the process
through which transmission providers determine which data inputs to use in their Long-
Term Scenarios. For example, consistent with the coordination transmission planning
principle established in Order No. 890, the Commission proposed to require that
transmission providers in each transmission planning region give stakeholders the
opportunity to provide timely and meaningful input concerning which data inputs to use
in Long-Term Scenarios.[1327]

---

[1325] *Id.* P 131 n.247.

[1326] *Id.* PP 64-67.

[1327] *Id.* P 132.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 457 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                    - 447 -

605.    The Commission preliminarily found that a requirement to use the best available

data inputs was necessary to ensure that transmission providers are regularly updating

data inputs and then using timely and accurate data inputs to inform Long-Term

Scenarios.  The Commission stated that data inputs can drive the results of Long-Term

Regional Transmission Planning.  As a result, the Commission explained that data inputs

can directly affect which transmission facilities may be selected and, in turn,

Commission-jurisdictional rates.[1328]

### b.    Comments

### i.    Interest in Best Available Data Requirement

606.    Many commenters generally support the NOPR proposal for "best available data,"

but some recommend that the Commission monitor data inputs.[1329]  AEE states that it is

not practical to make a more prescriptive requirement for data inputs than the NOPR

proposal and recommends that the Commission be vigilant in monitoring data inputs.[1330]

Policy Integrity states that the NOPR proposal is crucial in protecting against strategic

---

[1328] *Id.* P 133.

[1329] AEE Initial Comments at 23; Certain TDUs Initial Comments at 16; Clean Energy Buyers Initial Comments at 17-18; DC and MD Offices of People's Counsel Initial Comments at 14; Duke Initial Comments at 16-17; Eversource Initial Comments at 20; Georgia Commission Initial Comments at 5; ITC Initial Comments at 12; NARUC Initial Comments at 13-15; NRECA Initial Comments at 35-36; OMS Initial Comments at 5; Ørsted Initial Comments at 7; Pacific Northwest State Agencies Initial Comments at 13-14; PJM Initial Comments at 7, 76; Policy Integrity Initial Comments at 6; US DOE Initial Comments at 16-17; WATT Coalition Initial Comments at 7.

[1330] AEE Initial Comments at 23.

USCA4 Appeal: 24-1650   Doc: 224   Filed: 01/21/2025   Pg: 458 of 2455
Document Accession #: 20240513-3036   Filed Date: 05/13/2024

modeling behavior.[1331]   WATT Coalition adds that "best available data" on future

generation must be used because demand and energy profiles are inherently uncertain.[1332]

607.   ACEG claims that the FPA supports the Commission's proposed requirement to

plan based on the best available data, noting that section 217(b)(4) requires the

Commission to exercise its authority "in a manner that facilitates the planning and

expansion of transmission facilities to meet the reasonable needs of load-serving entities

to satisfy the service obligation of load-serving entities."[1333]   ACEG argues that load-

serving entities' service obligations will be more accurately predicted by the best

available forecasting methodologies.[1334]

608.   Clean Energy Buyers state that it is important to get stakeholder input on data

inputs, as has been done through MISO's Long-Range Transmission Planning effort.[1335]

Breakthrough Energy states that Long-Term Scenarios should use "best available

data."[1336]

---

[1331] Policy Integrity Initial Comments at 17.

[1332] WATT Coalition Initial Comments at 7.

[1333] ACEG Initial Comments at 26-27 (citing 16 U.S.C. 824q(b)(4)).

[1334] *Id.* at 27.

[1335] Clean Energy Buyers Initial Comments at 18.

[1336] Breakthrough Energy Supplemental Comments at 1.

## ii.   Reservations with the Best Available Data Requirement

609.   Several commenters support the NOPR proposal but nevertheless have suggestions about how to modify the proposal.[1337]  For example, several commenters request that the Commission create a common dataset, publish a database of best available sources of data, or otherwise standardize data inputs.[1338]  Southeast PIOs state that the Commission should publish a regularly updated database of best available data sources and require transmission providers to justify any decision not to use that database, arguing that flexibility in project selection can only work if the selection process utilizes reliable and standardized inputs.[1339]  SEIA urges the Commission to issue standards or guidelines that define what constitutes "best available data inputs" for each of the seven categories of factors.[1340]  R Street contends that intraregional standardization could support internal consistency and transparency and focus scarce stakeholder capital.[1341]

---

[1337] ACEG Initial Comments at 7; ACORE Initial Comments at 8-9; Eversource Initial Comments at 20-21; GridLab Initial Comments at 23; OMS Initial Comments at 5; Pine Gate Initial Comments at 27-29; PIOs Initial Comments at 19-20; Policy Integrity Initial Comments at 6, 16-18; Southeast PIOs Initial Comments at 47-48.

[1338] ACEG Initial Comments at 7; ACORE Initial Comments at 8-9; GridLab Initial Comments at 23; PIOs Initial Comments at 19-20; Southeast PIOs Initial Comments at 47-48.

[1339] Southeast PIOs Initial Comments at 47.

[1340] SEIA Initial Comments at 11; SEIA Reply Comments at 4.

[1341] R Street Initial Comments at 7.

610.    ELCON notes that, as part of the three-year reassessment of Long-Term

Scenarios, the Commission may decide that identifying or standardizing data inputs and

sources may help to ensure that transmission providers are consistently using timely and

widely accepted data.[1342]  Interwest endorses US DOE's proposal in its comments to the

ANOPR to standardize data inputs.[1343]  ACORE states that an identification of certain

common data sets and modeling best practices will reduce uncertainty, improve

transparency, and achieve greater consistency among transmission planning regions.[1344]

611.    ENGIE states that data inputs should be sourced from federal and state agencies

whenever possible.[1345]  Renewable Northwest states that determining a future resource

mix for NorthernGrid is possible with publicly available data.[1346]  GridLab states that the

Commission should consider whether to require that transmission providers either use

unadjusted, publicly available data in Long-Term Regional Transmission Planning or

justify why using proprietary data would provide superior results.

612.    Several commenters state that it is not necessary for the Commission to facilitate

the development of data or standardize inputs.[1347]  PPL, for example, asserts that the task

---

[1342] ELCON Initial Comments at 13.

[1343] Interwest Initial Comments at 8 (citing US DOE ANOPR Initial Comments at 12-15).

[1344] ACORE Reply Comments at 5.

[1345] ENGIE Initial Comments at 3.

[1346] Renewable Northwest Initial Comments at 17.

[1347] Ameren Initial Comments at 14-15; Idaho Power Initial Comments at 5;

of developing data inputs should be left to transmission providers, with the caveat that the entire process should avoid hindsight bias or an inappropriate shift in burden or responsibility to the transmission provider.[1348]  SPP states that the development of data inputs facilitated by the Commission could provide value if implemented in a way that does not create additional burden to the assessment.  SPP suggests that allowing access to recommended data sources or standard information would provide an additional reference for transmission providers to validate their own data, incorporate portions of the data, or utilize all of the data, as appropriate.[1349]

613.    US Climate Alliance and US DOE support transparency requirements for data inputs.[1350]  Similarly, California Commission and NRECA support transparency requirements for data inputs, subject to appropriate confidentiality considerations.[1351]  Colorado Consumer Advocate contends that greater transparency and opportunities for meaningful stakeholder input regarding data inputs for Long-Term Regional

---

NESCOE Initial Comments at 35-36; New York State Department Initial Comments at 8-9; PPL Initial Comments at 10.

[1348] PPL Initial Comments at 10.

[1349] SPP Initial Comments at 11-12.

[1350] US Climate Alliance Initial Comments at 2; US DOE Initial Comments at 17.

[1351] California Commission Initial Comments at 25; NRECA Initial Comments at 35-37 (citing GDS Associates, Report, at 13 (Aug. 17, 2022)).

Transmission Planning will improve the regional transmission planning process and help to ensure that Order No. 890 transmission planning principles are met.[1352]

614.    Concerned Scientists state that the final rule should require transmission providers and load-serving entities to submit to the relevant transmission planner an account of planned investments and retirements over the transmission planning horizon because not doing so ensures a transmission planning process that is less informed than it can and should be.  Concerned Scientists state that excluding these minimum requirements from the final rule will inevitably lead to the exclusion of information needed by regulators, stakeholders, and the transmission providers themselves to make informed investment decisions.[1353]  PJM, which supports the NOPR proposal, states that, while it is important to consider resource retirements when developing planning assumptions, generation retirement forecasts may be interpreted by stakeholders as sending economic signals concerning the viability of existing generating units.  Thus, PJM urges the Commission to provide clear direction on how to balance the heightened transparency and public processes proposed in the NOPR with appropriate safeguards against releasing data that could preempt unit owner economic decisions, as well as decisions by market participants.[1354]

---

[1352] Colorado Consumer Advocate Initial Comments at 26.

[1353] Concerned Scientists Reply Comments at 17.

[1354] PJM Reply Comments at 22.

615.    ITC, PJM, and SEIA support the NOPR proposal, and ITC and SEIA agree with PJM's suggestion that the Commission hold regular forums, workshops, or technical conferences to determine best practices in developing best available data.[1355]

616.    SPP Market Monitor contends that the Commission should further provide guidance in the form of parameters by which transmission providers should define the phrase "best available data," which SPP Market Monitor argues would aid in ensuring that the Long-Term Scenarios studied and transmission projects or facilities planned are consistent and reasonable.[1356]  Relatedly, Pine Gate states that the NOPR's failure to address source accuracy in the definition of best available date inputs may introduce subjectivity into Long-Term Regional Transmission Planning, obscure sources, and inhibit the ability of stakeholders to meaningfully engage in the Long-Term Regional Transmission Planning process.  To remedy these concerns, Pine Gate suggests that the Commission define "best available data inputs" as data inputs that:  (1) are current and developed using diverse and expert perspectives expressed during a stakeholder process; (2) have identified sources; (3) are adopted via a process that satisfies Order No. 890's transparency planning principle; and (4) reflect the list of factors that transmission providers must incorporate into Long-Term Scenarios.[1357]  Policy Integrity states that the

---

[1355] ITC Initial Comments at 12; PJM Initial Comments at 76-77; SEIA Initial Comments at 11; SEIA Reply Comments at 4-5.

[1356] SPP Market Monitor Initial Comments at 8.

[1357] Pine Gate Initial Comments at 28.

Commission should require external vetting of data inputs used by a party without a stake in the outcomes.[1358]

617.    Several commenters state that the final rule should add a requirement that data must be accurate.[1359]  ELCON notes that utilities should consider whether a data source's historical projections ultimately proved to be accurate when identifying "best available" inputs, and Vermont Electric and Vermont Transco agree.[1360]  Arizona Commission supports the use of relevant, timely, and accurate data.[1361]

618.    LADWP asserts that the determination of "best available data" should be changed to "the most accurate data inputs available" at the time of study because "best" is subjective but "most accurate" is clear and objective.  LADWP states that, if data is interpreted differently, as may be the case under the "best available" standard, then results will be inconsistent.  For example, LADWP states that the "most accurate data inputs available" for load inputs for near-term planning and for data for generation and energy storage capacities would be data derived from projections based on actual field measurements, and from in-service equipment (instead of from manufacturing brochures or articles), respectively.  LADWP states that for new technologies, the projected

---

[1358] Policy Integrity Initial Comments at 17-18.

[1359] ELCON Initial Comments at 13; LADWP Initial Comments at 4; Vermont Electric and Vermont Transco Initial Comments at 3.

[1360] ELCON Initial Comments at 13; Vermont Electric and Vermont Transco Initial Comments at 3.

[1361] Arizona Commission Initial Comments at 7.

Docket No. RM21-17-000                                                          - 455 -

availability and performance parameters should be based on actual data when possible.

For example, LADWP states that data derived from field operating experience with

prototypes should be considered "most accurate" as compared to lab test data.  LADWP

contends that transmission providers should be careful not to take "expert perspectives"

at face value, but should seek to use data inputs that show a strong correlation to

scientifically verifiable facts.  Furthermore, LADWP states, projected data based on

administrative law or executed interconnection agreements should be considered more

certain, and hence more accurate, than data based on corporate or government goals.[1362]

619.    GridLab recommends that the Commission request that the national laboratories

and other public agencies work with transmission providers, resource developers, and

others to evaluate the historical accuracy of publicly available data sources.[1363]  However,

Ameren sees no reason to expand the definition of best available data inputs to include an

evaluation of data source entities' historical accuracy identifying and projecting trends

because the open and transparent planning process of diverse stakeholders will identify

any questionable or non-reliable data sources.[1364]

620.    ELCON states that the Commission may need to clarify what data is considered

"timely" and argues, for example, that the Commission should not establish a mandate in

favor of using historical data (e.g., actual data from the previous 12 months) because such

---

[1362] LADWP Initial Comments at 4.

[1363] GridLab Initial Comments at 24.

[1364] Ameren Initial Comments at 15.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 466 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                          - 456 -

data may not reflect current and future operational needs.[1365]  Pine Gate is concerned that the use of the term "timely" in the definition of "best available data inputs" may lead to confusion and inconsistency amongst transmission providers.[1366]

621.   PJM Market Monitor states that both aggregate and very specific locational data on future demand and the future resource mix will be critical for efficient and cost-effective transmission planning.[1367]

### iii.    Concerns with Best Available Data

622.   Several commenters either oppose the NOPR proposal or object to specific aspects of the NOPR proposal.[1368]  Ameren, EEI, and PPL state that the NOPR proposal is unnecessary and too prescriptive.[1369]  Idaho Commission agrees that it is too

---

[1365] ELCON Initial Comments at 13.

[1366] Pine Gate Initial Comments at 28.

[1367] PJM Market Monitor Initial Comments at 4.

[1368] Ameren Initial Comments at 14-15; Dominion Initial Comments at 26-28; EEI Initial Comments at 14; ELCON Initial Comments at 13; Idaho Power Initial Comments at 5; LADWP Initial Comments at 4; MISO Initial Comments at 40-41; MISO TOs Initial Comments at 18-19; National Grid Initial Comments at 14; Nebraska Commission Initial Comments at 6; NESCOE Initial Comments at 35-36; PPL Initial Comments at 9-10; R Street Initial Comments at 7; Vermont Electric and Vermont Transco Initial Comments at 3; Xcel Initial Comments at 10.

[1369] Ameren Initial Comments at 14-15; EEI Initial Comments at 14; PPL Initial Comments at 9.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 467 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

prescriptive.[1370]  EEI states that, while using the best available data inputs when preparing

the Long-Term Scenarios is appropriate, a *pro forma* definition may not be necessary.[1371]

623.   PPL expresses concern that the proposed requirement for data inputs will

unnecessarily burden transmission providers by effectively shifting a burden from data

owners (who are in the best position to control and ensure data accuracy) to the

transmission provider and instead recommends that the Commission strengthen the

requirements applicable to the data owners or data source entities.[1372]  Dominion states

that using best available data inputs should not be a requirement because transmission

providers should be permitted to select the data inputs that are most appropriate for their

own situation, as they know their transmission systems best.  Dominion additionally does

not support defining "best available data inputs" as proposed because it would limit

transmission providers' flexibility to conduct transmission planning that is most

appropriate to their unique system needs.[1373]

624.   MISO, Utah Division of Public Utilities, and Xcel state that the NOPR proposal

on data inputs is a potential source of conflict.[1374]  MISO is concerned that parties

---

[1370] Idaho Commission Initial Comments at 3.

[1371] EEI Initial Comments at 14.

[1372] PPL Initial Comments at 9-10.

[1373] Dominion Initial Comments at 26-27.

[1374] MISO Initial Comments at 29; Utah Division of Public Utilities Initial
Comments at 6; Xcel Initial Comments at 10.

opposing particular long-range transmission planning outcomes could seize on the

proposed language and argue that some other data was the best available data, thereby

delaying the process; and the resulting disputes could potentially slow down the

transmission planning process and ultimately delay much needed transmission.[1375]  Xcel

agrees.[1376]  Utah Division of Public Utilities attests that requiring transmission providers

to use the best data available is not based on evidence showing that data inputs currently

used by transmission providers have led to unjust or discriminatory rates, and may

produce unnecessary and time-consuming disagreements among stakeholders regarding

which data inputs to use.[1377]  National Grid asserts that the term "best available" data is

vague and subjective, which introduces development, regulatory and implementation

inefficiencies.[1378]  Clean Energy Associations argue that transmission providers should be

required to explain the number and the basis for including each input they choose to

include.[1379]

### iv.    **Flexibility Issues**

625.    Several commenters, some that support the NOPR proposal and some that do not,

call for flexibility in allowing transmission providers to determine what constitutes best

---

[1375] MISO Initial Comments at 40.

[1376] Xcel Initial Comments at 10.

[1377] Utah Division of Public Utilities Initial Comments at 6.

[1378] National Grid Initial Comments at 14.

[1379] Clean Energy Associations Initial Comments at 13.

available data.  ISO-NE and NYISO support the NOPR proposal but request that the

Commission provide transmission providers with some flexibility about how to satisfy

this requirement.[1380]  ISO-NE asserts that the Commission should allow flexibility for

ISO-NE to rely on the states to determine the data inputs, with its technical support and

stakeholder input, and NESCOE, which opposes the NOPR proposal, agrees.[1381]

NESCOE is concerned about the prescriptive nature of the NOPR proposal and contends

that data inputs should be determined on a region-by-region basis by transmission

providers with input from states and stakeholders.[1382]  MISO agrees on both points.[1383]

Duke, which generally supports the NOPR proposal to define best available data inputs

and requirement to follow a transparent process to develop the data inputs, states that

because there is not a single "best" value for each input, the emphasis should be on best

practices to develop the data inputs, which should be left to the regions to develop with

their specific stakeholders.[1384]

626.    In addition, NYISO requests that the Commission revise the definition of best

available data to permit flexibility on how it reflects factors considered in the scenarios.

Specifically, NYISO requests that the language in the NOPR specifying that the data

---

[1380] ISO-NE Initial Comments at 28; NYISO Initial Comments at 28.

[1381] ISO-NE Initial Comments at 28; NESCOE Initial Comments at 35-36.

[1382] NESCOE Initial Comments at 36.

[1383] MISO Initial Comments at 40.

[1384] Duke Initial Comments at 16-17.

Docket No. RM21-17-000                                                    - 460 -

inputs must "reflect the list of factors that transmission providers must incorporate into

Long-Term Scenarios" should be modified to "reflect the factors that the transmission

provider considers in the scenarios" to reflect the authority of transmission planning

regions to identify which factors should be used in Long-Term Scenarios.  NYISO adds

that transmission providers should have authority over how to interpolate and employ

their data sets.[1385]

627.    MISO, which opposes the NOPR proposal, contends that the Commission should

allow transmission providers to determine, in consultation with its stakeholders, what

data is most appropriate, but require transmission providers to use the most up-to-date

data from the source that they select.[1386]  MISO recommends that, if the final rule

includes the NOPR proposal for best available data, then the Commission should clarify

that transmission providers may satisfy the requirement by using the most up-to-date data

that they have selected and that reflects practical limitations regarding the precision and

scope of the data.[1387]  MISO TOs suggest that the Commission consider articulating

principles and guidelines and let transmission planning regions develop their own

conception of "best available data" in the interest of flexibility.[1388]  Nevada Commission

states that the definition of "best available data" may need further comment and will

---

[1385] NYISO Initial Comments at 28.

[1386] MISO Initial Comments at 40.

[1387] *Id.* at 29.

[1388] MISO TOs Initial Comments at 19.

likely evolve as the Long-Term Regional Transmission Planning process is
implemented.[1389]

628.    National Grid requests that the Commission clarify that transmission providers
have final and sole responsibility and discretion to determine what is "best available
data" as transmission providers are best situated to make these determinations in
consultation with their stakeholders.  National Grid also seeks clarity from the
Commission as to what "diverse" means as it describes best available data inputs.
National Grid further asserts that the Commission should distinguish between Long-Term
Scenarios based on diverse inputs in each scenario.[1390]

### v.    Best Sources of Data Issues

629.    Several commenters, some that support the NOPR proposal and some that do not,
make suggestions about the best sources of data.  Several commenters state that
transmission providers already have the best available data.[1391]  Nebraska Commission
further states that the current methods used by RTOs/ISOs would meet the NOPR's
proposed requirements.[1392]  PPL states that transmission providers already use a "best
available data inputs" standard in transmission planning but must rely on other entities'

---

[1389] Nevada Commission Initial Comments at 9.

[1390] National Grid Initial Comments at 14.

[1391] EEI Initial Comments at 14; Nebraska Commission Initial Comments at 6;
PJM Initial Comments at 76; PPL Initial Comments at 9-10.

[1392] Nebraska Commission Initial Comments at 6.

data.[1393] EEI states that, if the Commission adopts a definition for best available data, it should acknowledge that transmission providers and load-serving entities often may possess this data.[1394]

630.    Several commenters state that load-serving entities have the best available data.[1395] Eversource recommends that the Commission require the RTOs/ISOs to collaborate with the transmission owners regarding transmission owners' forecast of load localized peak times.[1396] PIOs state that the Commission should require load-serving entities to provide their generation and load forecasts to transmission providers so that they have reasonable information to use and do not have to perform their own estimates.[1397] ACEG and Clean Energy Associations agree.[1398]

631.    Western PIOs state that the Western Electricity Coordinating Council databases on load and generation forecasts and the Western Electricity Coordinating Council Anchor dataset constitute best available data.[1399] NARUC argues that any reasonable, credible source of data should be allowed to supplement more traditional sources like the national

---

[1393] PPL Initial Comments at 9-10.

[1394] EEI Initial Comments at 14.

[1395] *Id.*; Eversource Initial Comments at 20; Xcel Initial Comments at 10.

[1396] Eversource Initial Comments at 20.

[1397] PIOs Initial Comments at 19.

[1398] ACEG Reply Comments at 23; Clean Energy Associations Reply Comments at 7.

[1399] Western PIOs Initial Comments at 31.

laboratories and RTO/ISO-generated data.[1400]  SREA recommends that, to the extent

possible, the Commission should recognize the National Renewable Energy Lab's

Annual Technology Baseline (NREL ATB) as the nation's preferred data set.[1401]  Policy

Integrity states that the Commission should urge transmission providers to engage

independent researchers in the process to ensure inclusion of the latest modeling and

computational developments.[1402]  PIOs state that the Commission could publish a

regularly updated list of databases that meet the "best available data requirement," such

as the following current databases: NREL ATB data, US DOE's Annual Energy Outlook

for fuel costs, and NREL's Electrification Futures Study for electrification trends.  PIOs

suggests that the Commission could additionally partner with the US DOE and National

Laboratories to develop appropriate databases.[1403]

632.    Entergy asserts that integrated resource plans approved by retail commissions

should be considered the best available data, and Louisiana Commission and Mississippi

Commission agree.[1404]  However, Kentucky Commission Chair Chandler disagrees with

---

[1400] NARUC Initial Comments at 13.

[1401] SREA Reply Comments at 26.

[1402] Policy Integrity Initial Comments at 17.

[1403] PIOs Initial Comments at 19.

[1404] Entergy Initial Comments at 18; Louisiana Commission Reply Comments at 7; Mississippi Commission Reply Comments at 9.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 474 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                          - 464 -

the propositions that local data provided by a utility in an integrated resource plan is

superior to other data and that RTOs/ISOs should be required to rely on such data.[1405]

### c.    Commission Determination

633.    We adopt the NOPR proposal, with modification, to require transmission

providers in each transmission planning region to use "best available data inputs" when

developing Long-Term Scenarios.  As the Commission explained in the NOPR, by "best

available," we do not imply that there is a single "best" value for each data input that

transmission providers must use, but rather that best practices will be used to develop

each data input.  We adopt, with modification, the NOPR proposal to define "best

available data inputs" as data inputs that are timely, developed using best practices and

diverse and expert perspectives,[1406] and adopted via a process that satisfies the

transmission planning principles of Order Nos. 890 and 1000.[1407]  We further adopt the

NOPR proposal to require that best available data inputs also reflect the list of factors that

---

[1405] Kentucky Commission Chair Chandler Reply Comments at 3.

[1406] While we largely adopt the definition of "best available data inputs" proposed in the NOPR, we modify it to reflect the requirement that "best available data inputs" are developed using best practices.

[1407] For example, the transparency transmission planning principle requires transmission providers to reduce to writing and make available the basic methodology, criteria, and processes used to develop transmission plans.  Transmission providers must make sufficient information available to enable customers and other stakeholders to replicate the results of transmission planning studies.  Order No. 890, 118 FERC ¶ 61,119 at P 471.  Order No. 1000 applied this and other Order No. 890 transmission planning principles to regional transmission planning processes.  Order No. 1000, 136 FERC ¶ 61,051 at P 151.

transmission providers account for in their Long-Term Scenarios.[1408]  By "reflect the list of factors," we mean the data inputs that correspond to the list of factors that transmission providers have determined might affect Long-Term Transmission Needs.[1409]  We also adopt the NOPR proposal to require transmission providers to update, as necessary, all data inputs each time they reassess and revise their Long-Term Scenarios.

634.    Finally, in addition, we adopt the NOPR proposal to require that the Order Nos. 890 and 1000 transmission planning principles apply to the process through which transmission providers determine which data inputs to use in their Long-Term Scenarios. Consistent with the coordination transmission planning principle established in Order No. 890, we also adopt the NOPR proposal to require transmission providers in each transmission planning region to give stakeholders an opportunity to provide timely and meaningful input during each Long-Term Regional Transmission Planning cycle concerning which data inputs to use in Long-Term Scenarios.[1410]  Also, we clarify that the right to challenge data inputs via dispute resolution as discussed in Order No. 890 is

---

[1408] One example of a data input dataset that would meet the requirement for best available data are the long-term load forecasts of demand that RTOs/ISOs currently use for predicting long-term resource adequacy.  Another example of a data input dataset that would meet the requirement for best available data is the most recent data on renewable energy potential and distributed energy resources developed by national labs.

[1409] For example, a transmission provider might determine that corporate goals for corporations less than $20 million are too small to affect Long-Term Transmission Needs and not include these corporate goals in its Long-Term Scenarios.  This transmission provider does not have any obligation to develop data inputs corresponding to these omitted corporate goals.

[1410] NOPR, 179 FERC ¶ 61,028 at P 132.

available for interested parties with respect to data inputs that transmission providers develop for Long-Term Regional Transmission Planning.[1411]

635.    We agree, in part, with NYISO's suggestion to revise the wording of the NOPR proposal that required best available data to reflect "the list of factors that transmission providers must incorporate into Long-Term Scenarios."[1412]  NYISO states that the NOPR language should be modified to "reflect the factors that the public utility transmission provider considers in the scenarios."[1413]  As discussed in the Categories of Factors section of this final rule, we explain that transmission providers need not account for a factor, stakeholder-identified or otherwise, if they determine that factor is unlikely to affect Long-Term Transmission Needs.  We find that transmission providers must use best available data when determining whether each factor is likely to affect Long-Term Transmission Needs.  Once transmission providers have determined that a factor is likely to affect Long-Term Transmission Needs, they must use the best available data when they then account for that factor in the development of Long-Term Scenarios.

636.    We find that a requirement to use the best available data inputs is warranted to ensure that transmission providers are regularly updating data inputs and using timely and accurate data inputs to inform Long-Term Scenarios.  We further find that data inputs can drive the results of Long-Term Regional Transmission Planning.  As a result, we find that

---

[1411] Order No. 890, 118 FERC ¶ 61,119 at PP 501-503.

[1412] NYISO Initial Comments at 28 (citing NOPR, 179 FERC ¶ 61,028 at P 131).

[1413] *Id.*

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 477 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                    - 467 -

data inputs affect transmission providers' ability to identify Long-Term Transmission Needs and thus affect the ability to identify, evaluate, and select Long-Term Regional Transmission Facilities to more efficiently or cost-effectively address those needs. We note that many commenters share this view and support the NOPR proposal.[1414]

637. We disagree with commenters asserting that the requirements for data inputs would be overly burdensome to transmission providers.[1415] We believe that, because most transmission providers already endeavor to use best available data inputs to ensure credible results in regional transmission planning, this final rule's requirements for data inputs will not impose an unreasonable burden beyond existing practices today. Further, as many commenters note,[1416] any increase in transmission providers' burden from such

---

[1414] ACORE Initial Comments at 8; AEE Initial Comments at 22; Certain TDUs Initial Comments at 16; Clean Energy Buyers Initial Comments at 17-18; DC and MD Offices of People's Counsel Initial Comments at 14; Eversource Initial Comments at 20; Georgia Commission Initial Comments at 5; ISO-NE Initial Comments at 28; ITC Initial Comments at 12; Mississippi Commission Initial Comments at 34-35; NARUC Initial Comments at 13-15; NRECA Initial Comments at 36; OMS Initial Comments at 5; Ørsted Initial Comments at 7; Pacific Northwest State Agencies Initial Comments at 13-14; PJM Initial Comments at 7, 76; Policy Integrity Initial Comments at 16-17; US DOE Initial Comments at 16-18; WATT Coalition Initial Comments at 7.

[1415] Ameren Initial Comments at 14; MISO Initial Comments at 29; PPL Initial Comments at 9-10; Utah Division of Public Utilities Initial Comments at 7; Xcel Initial Comments at 10.

[1416] *See* ACORE Initial Comments at 8; AEE Initial Comments at 23; Certain TDUs Initial Comments at 16; Clean Energy Buyers Initial Comments at 17-18; DC and MD Offices of People's Counsel Initial Comments at 14; Eversource Initial Comments at 20; Georgia Commission Initial Comments at 5; ISO-NE Initial Comments at 28; ITC Initial Comments at 12; Mississippi Commission Initial Comments at 34-35; NARUC Initial Comments at 13-15; NRECA Initial Comments at 36; OMS Initial Comments at 5; Ørsted Initial Comments at 7; Pacific Northwest State Agencies Initial Comments at 13-14; PJM Initial Comments at 7, 76; Policy Integrity Initial Comments at 16-17; US DOE

requirements is outweighed by the benefits of establishing reasonable safeguards for accuracy and confidence in Long-Term Regional Transmission Planning.

638.    We disagree with commenters' arguments that the final rule requirements for data inputs would lead to problems because stakeholders will delay Long-Term Regional Transmission Planning by contesting the data used by transmission providers.[1417] Similarly, we disagree with commenters' arguments that the requirements for data inputs unnecessarily limit transmission providers' flexibility in producing data inputs.[1418]  As discussed above, this final rule establishes requirements for data inputs used in Long-Term Scenarios and requires that stakeholders have an opportunity to provide timely and meaningful input during each Long-Term Regional Transmission Planning cycle concerning those data inputs.  However, transmission providers have significant flexibility about which data inputs they use in Long-Term Scenarios, and no commenters have provided us with convincing or specific arguments that stakeholder input will undermine that flexibility or cause consequential delays to the Long-Term Regional Transmission Planning process.

---

Initial Comments at 16-18; WATT Coalition Initial Comments at 7.

[1417] MISO Initial Comments at 29; Utah Division of Public Utilities Initial Comments at 6; Xcel Initial Comments at 10.

[1418] Dominion Initial Comments at 26-27; Duke Initial Comments at 16-17; MISO Initial Comments at 40; MISO TOs Initial Comments at 19; NESCOE Initial Comments at 35-36.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 479 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

639.    We decline to adopt the suggestion of commenters to standardize data inputs used by transmission providers in Long-Term Regional Transmission Planning.[1419]  Imposing further requirements to enforce uniformity in data is challenging given regional variation in transmission planning approaches.  Further, it might stifle innovation that would improve Long-Term Regional Transmission Planning.

640.    We decline to adopt the modifications of the NOPR proposal suggested by certain commenters to establish specific accuracy standards in addition to requiring that transmission providers use best available data inputs.[1420]  While we agree that transmission providers should strive for data accuracy, including by assessing the historical accuracy of different data sources where appropriate, a specific accuracy standard would be difficult to develop and administer given the diversity of different data inputs.[1421]  As we explain above, transmission providers must use best available data inputs, which include forecasted data, and must develop such inputs using diverse and expert perspectives.  They must use best practices to develop data inputs, and must do so

---

[1419] ACEG Initial Comments at 7; ACORE Initial Comments at 8-9; GridLab Initial Comments at 23; PIOs Initial Comments at 19-20; Southeast PIOs Initial Comments at 47-48.

[1420] ELCON Initial Comments at 13; LADWP Initial Comments at 4; Pine Gate Initial Comments at 27-29; Vermont Electric and Vermont Transco Initial Comments at 3.

[1421] In addition, while we decline to adopt a specific accuracy standard that data must meet in order to be "best available data," we note that a demonstration that a data source has historically proven to be relatively inaccurate would likely constitute evidence that such data is not best available data.

Docket No. RM21-17-000                                                    - 470 -

in an open and transparent stakeholder process.  Taken together, we believe that these
requirements will help ensure that data inputs are as accurate as possible, while also
providing transmission providers with the flexibility to use best practices to develop data
inputs that are appropriate for their transmission planning regions and to recognize the
inherent uncertainty involved in planning transmission on a forward-looking basis.

641.    With respect to the issue raised by PJM about revealing potentially confidential
data to improve accuracy,[1422] we reiterate, as discussed above, that consistent with Order
No. 890's transparency transmission planning principle, transmission providers in each
transmission planning region are required to disclose (subject to appropriate
confidentiality protections) information and data inputs they use to create each Long-
Term Scenario.[1423]  The Commission has recognized that tension exists between ensuring
transparency in transmission planning processes and protecting confidential information,
including commercially sensitive information.[1424]  The Commission has also noted that
using resource-specific data that best reflect actual operations on the transmission system
leads to more precise and effective transmission study results.  In addition, the
Commission has recognized that market participants who provide that information need
to be assured that the confidential information they provide will be used for its intended
purpose in planning the transmission system and will not be disclosed in a manner that

---

[1422] PJM Reply Comments at 22.

[1423] *See supra* Number and Development of Long-Term Scenarios section.

[1424] *Sw. Power Pool, Inc.*, 137 FERC ¶ 61,227 at P 20.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 481 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                    - 471 -

harms them commercially.  However, the Commission has found that, at the same time, the requirement in Order No. 890 for transmission providers to disclose to all customers and other stakeholders the basic methodology, criteria, assumptions, and data that underlie their transmission system plans to enable customers, other stakeholders, or an independent third-party to replicate the results of planning studies is essential to an open and transparent transmission planning process.[1425]  Thus, the Commission has found that, without certain generator dispatch and economic information, for example, it becomes difficult or impossible to conduct meaningful load flow studies for some transmission planning purposes,[1426] and the competitive playing field is tilted toward those who have this information and away from those who do not.[1427]

642.    The Commission therefore required in Order No. 890, and we apply that requirement to Long-Term Regional Transmission Planning in this final rule, disclosure of the methodology, criteria, assumptions, data and other information that underlie transmission plans, including Long-Term Scenarios.  We recognize that no bright line rule exists to determine the appropriate balance between ensuring transparency in the transmission planning processes and ensuring that confidential information is not disclosed inappropriately.  Transmission providers may propose what they believe are appropriate confidentiality protections in their filings to comply with this final rule, and

---

[1425] Order No. 890, 118 FERC ¶ 61,119 at P 471.

[1426] *Id.* P 478.

[1427] *Sw. Power Pool, Inc.*, 137 FERC ¶ 61,227 at P 20.

the Commission will evaluate those proposals by using the established principles in Order
No. 890, as well as precedent on existing confidentiality protections with respect to
transmission planning that the Commission has previously found comply with the Order
No. 890 principles, to guide its findings on whether such protections are appropriate.

643.    With respect to the issue raised by ELCON and Pine Gate about timely data,[1428]
we decline to adopt their suggestion to define precisely what "timely" means with respect
to best available data because we believe flexibility is warranted given the diverse
regional transmission planning processes to which this reform will apply.  That is, we
believe that updating data inputs may require different timelines depending on the
transmission planning region and the specific data input, where each input may change on
a different timeline.  However, given the five-year duration of the Long-Term Regional
Transmission Planning cycle, and the risk of data becoming stale, we require
transmission providers to update their data inputs at least once at the outset of each Long-
Term Regional Transmission Planning cycle.

644.    With respect to National Grid's request to clarify the definition of "diverse" in the
context of the requirement that data inputs must be developed using diverse and expert
perspectives,[1429] we clarify that the term "diverse" specifically used in the context of data
inputs indicates that the data inputs must represent a range of data within the bounds of
plausibility.  We believe that this requirement will ensure that the *set* of Long-Term

---

[1428] ELCON Initial Comments at 13; Pine Gate Initial Comments at 28-29.

[1429] National Grid Initial Comments at 14.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 483 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Scenarios that are developed from these data inputs will represent a reasonable range of probable future outcomes consistent with the requirement for plausibility.

### 8.    Identification of Geographic Zones

### a.    NOPR Proposal

645.    In the NOPR, the Commission proposed to require that each transmission provider, as part of its regional transmission planning process, consider whether to establish geographic zones within the transmission planning region that have the potential for development of large amounts of new generation.  If transmission providers within a transmission planning region choose to establish geographic zones, then the Commission proposed to require the transmission provider to:  (1) identify, with stakeholder input, specific geographic zones within the transmission planning region that have the potential for development of large amounts of new generation; (2) assess generation developers' commercial interest in developing generation within the identified geographic zones; and (3) incorporate designated zones, and the identified commercial interest in each zone, into Long-Term Scenarios.[1430]

646.    The Commission preliminarily found that requiring the consideration and potential identification of geographic zones within Long-Term Scenarios assists transmission providers, transmission developers, and generation developers in coordinating their activities.  The Commission stated that transmission providers would be able to better identify transmission needs driven by changes in the resource mix and demand by

---

[1430] NOPR, 179 FERC ¶ 61,028 at P 145.

Docket No. RM21-17-000 - 474 -

considering geographic zones that have the potential for the development of large

amounts of new generation and where developers have already shown commercial

interest. Further, the Commission stated that, using the information gained through the

process described below to identify such geographic zones, transmission providers in

each transmission planning region could then plan transmission facilities that would serve

large concentrations of new generation in a more efficient or cost-effective manner.[1431]

647.    The Commission proposed to require, as step one of the three-step geographic

zone process, that transmission providers consider whether to establish and include in the

regional transmission planning process outlined in their OATTs the method that they will

use to identify geographic zones within the transmission planning region.  The

Commission also proposed to require that transmission providers in each transmission

planning region use this information to create a set of draft geographic zones, and that

they post on their OASIS or other public website maps of the draft geographic zones, as

well as the information used to create the draft geographic zones, for stakeholders'

input.[1432]

648.    In addition, the Commission proposed to require transmission providers in each

transmission planning region to consider this stakeholder feedback and modify the draft

---

[1431] *Id.* P 146.

[1432] *Id.* PP 147-148.

geographic zones as appropriate to produce a final list of designated geographic zones within the transmission planning region.[1433]

649.    The Commission proposed to require, in step two of the three-step geographic zone process, that transmission providers in each transmission planning region assess generation developers' commercial interest in developing generation within each designated geographic zone.[1434]   The Commission proposed to require, in the final step of the three-step geographic zone process, that transmission providers in each transmission planning region incorporate the information from step one and step two regarding the designated geographic zones into their Long-Term Scenarios.[1435]

### b.    **Comments**

650.    Many commenters support the Commission's proposal to require each transmission provider, as part of its regional transmission planning process, to consider whether to:  (1) identify, with stakeholder input, specific geographic zones within the transmission planning region that have the potential for development of large amounts of new generation; (2) assess generation developers' commercial interest in developing generation within the identified geographic zones; and (3) incorporate designated zones,

---

[1433] The Commission noted that, while it referred to multiple "zones," subsequent to stakeholder feedback, the final list may contain only one designated geographic zone. *Id.* P 149.

[1434] *Id.* P 150.

[1435] *Id.* P 151.

and the identified commercial interest in each zone, into Long-Term Scenarios.[1436]

Commenters assert that, compared to interconnection-related network upgrades identified

on a case-by-case basis in the interconnection process, identifying and incorporating

geographic zones into Long-Term Scenarios would save consumers money by identifying

more efficient or cost-effective transmission facilities to connect areas with the potential

for low cost generation to load centers and reduce congestion and generator

curtailment.[1437]  Further, commenters note the success of previous planning efforts in

ERCOT, MISO, CAISO, and ISO-NE to incorporate geographic zones into their

transmission planning efforts.[1438]

651.    Some commenters highlight the importance of this proposed reform for remotely

located renewable resources generally, and more specifically for offshore wind, which is

---

[1436] Ameren Initial Comments at 15; American Municipal Power Initial Comments at 35; Clean Energy Associations Initial Comments at 13; EEI Initial Comments at 15; ENGIE Initial Comments at 4; Eversource Initial Comments at 21-22; Interwest Reply Comments at 4; ISO-NE Initial Comments at 30; ITC Initial Comments at 5, 13-17; Middle River Power Initial Comments at 3; MISO Initial Comments at 30; NARUC Initial Comments at 16; Nebraska Commission Initial Comments at 6-7; NESCOE Initial Comments at 37; New Jersey Commission Initial Comments at 15; New York TOs Initial Comments at 12; New York Transco Initial Comments at 5-6; Northwest and Intermountain Initial Comments at 5-6; NRECA Initial Comments at 37; New York Commission and NYSERDA Initial Comments at 14-15; NYISO Initial Comments at 29-30; Ørsted Initial Comments at 7; US DOE Initial Comments at 18; Western PIOs Initial Comments at 31-32.

[1437] *See*, *e.g.*, ENGIE Initial Comments at 4; Eversource Initial Comments at 21-22; ITC Initial Comments at 13-17; Northwest and Intermountain Initial Comments at 5-6; NYISO Initial Comments at 29-30.

[1438] *See*, *e.g.*, ENGIE Initial Comments at 4; Eversource Initial Comments at 21-22.

USCA4 Appeal: 24-1650   Doc: 224   Filed: 01/21/2025   Pg: 486 of 2455
Document Accession #: 20240513-3036   Filed Date: 05/13/2024

constrained to lease areas auctioned by the Bureau of Ocean Energy Management.[1439]

For example, Ørsted argues that the location and approximate resource potential of offshore wind is well understood and the failure to proactively plan the necessary transmission would result in higher costs to ratepayers.[1440]  BP further contends that the geographic zones in which National Interest Electric Transmission Corridors are likely to be established also merit inclusion in transmission planning.[1441]

652.    Some commenters support the proposal but urge the Commission to *require* the identification of geographic zones and planning transmission to integrate generation in those zones rather than just requiring transmission providers to *consider* whether to identify geographic zones.[1442]  Acadia Center and CLF argue that the Commission should require the identification and creation of geographic zones in areas where the majority of states have binding greenhouse gas emission reduction or renewables mandates, which could result in fewer transmission corridors being built, thereby reducing costs, siting

---

[1439] *See*, *e.g.*, BP Initial Comments at 4, 7-8; Clean Energy Buyers Initial Comments at 18; New York Transco Initial Comments at 5-6; Ørsted Initial Comments at 7-8.

[1440] *See*, *e.g.*, Ørsted Initial Comments at 7-8.

[1441] BP Initial Comments at 7 (citing 16 U.S.C. 824p).

[1442] Acadia Center and CLF Initial Comments at 13-15; Amazon Initial Comments at 6-7; California Water Initial Comments at 16; Center for Biological Diversity Initial Comments at 13-15; City of New York Initial Comments at 7-8; Handy Law Initial Comments at 12; Invenergy Reply Comments at 9-10; SEIA Initial Comments at 11-12; Shell Initial Comments at 23.

USCA4 Appeal: 24-1650   Doc: 224   Filed: 01/21/2025   Pg: 488 of 2455
Document Accession #: 20240513-3036   Filed Date: 05/13/2024

Docket No. RM21-17-000                                                  - 478 -

challenges, and benthic environmental impacts.[1443] Acadia Center and CLF assert that, without mandatory identification and establishment of geographic zones, there is a significant risk that adequate transmission will not be built to accommodate state emission reduction and renewables mandates in a cost-effective or efficient way.[1444]

653.    In contrast, other commenters emphasize that they support the proposal to require transmission providers to *consider* identifying geographic zones rather than to actually identify such geographic zones.[1445] Such commenters assert that providing the option to identify geographic zones would allow transmission providers to determine, with their stakeholders, what is right for their transmission planning region.[1446]

654.    Other commenters express concerns with the idea of incorporating geographic zones with the potential for large amounts of generation into regional transmission planning, but do not oppose the proposal so long as it is optional.[1447] For example,

---

[1443] Acadia Center and CLF Initial Comments at 13-14.

[1444] *Id.* at 13.

[1445] *See*, *e.g.*, Ameren Initial Comments at 15-16; American Municipal Power Initial Comments at 34-35; Clean Energy Associations Initial Comments at 13; EEI Initial Comments at 15; ISO-NE Initial Comments at 30; ITC Initial Comments at 5, 13-17; MISO Initial Comments at 30; Nebraska Commission Initial Comments at 6-7; NESCOE Initial Comments at 37; NRECA Initial Comments at 37; New York Commission and NYSERDA Initial Comments at 14-15; NYISO Initial Comments at 32; PPL Initial Comments at 11; US Chamber of Commerce Initial Comments at 7.

[1446] *See, e.g.*, EEI Initial Comments at 15; ISO-NE Initial Comments at 30; MISO Initial Comments at 30; New York Commission and NYSERDA Initial Comments at 14-15; NYISO Initial Comments at 32.

[1447] APPA Initial Comments at 29-30; Dominion Initial Comments at 28-29; Georgia Commission Initial Comments at 6; Large Public Power Initial Comments at 22;

NESCOE and National Grid assert that the proposed requirements for each of the three steps is overly prescriptive and could be included in a final rule as guidance, but not as a mandate.[1448]

655.    Several commenters urge the Commission to provide flexibility in any process for considering and potentially identifying geographic zones.[1449]  For example, Michigan Commission states that the proposed three-step process in the NOPR is highly prescriptive and overly burdensome, and instead the Commission should provide greater flexibility to ensure that generation siting assumptions included in Long-Term Scenarios are developed transparently in collaboration with state regulators, generation utilities, and resource planners.[1450]

656.    Several commenters suggest modifications to the NOPR proposal.[1451]  For example, Vistra contends that the NOPR proposal could be improved through the use of

---

National Grid Initial Comments at 16-17; NESCOE Initial Comments at 38; SERTP Sponsors Initial Comments at 27; SPP Market Monitor Initial Comments at 11-12; TANC Initial Comments at 10.

[1448] NESCOE Initial Comments at 38; National Grid Initial Comments at 16.

[1449] *See*, *e.g.*, APS Initial Comments at 5; ISO-NE Initial Comments at 30; Michigan Commission Initial Comments at 6; MISO Initial Comments at 42; MISO TOs Initial Comments at 32; NARUC Initial Comments at 17; New Jersey Commission Initial Comments at 15; NYISO Initial Comments at 3-4.

[1450] Michigan Commission Initial Comments at 6.

[1451] Acadia Center and CLF Initial Comments at 15-16; California Energy Commission Initial Comments at 2-3; Center for Biological Diversity Initial Comments at 13-16; Clean Energy Associations Initial Comments at 24-25; Illinois Commission Initial Comments at 9-11; Large Public Power Initial Comments at 26; Microgrid Resources Coalition Initial Comments at 4-6; New Jersey Commission Initial Comments

open seasons or other comparable tools to elicit concrete commitments from generator developers.[1452]  Other commenters argue that the NOPR proposal should be modified to involve a subscription model in which prospective generation resources within the zone indicate their willingness to pay for transmission to the zone.[1453]  Although PJM opposes the NOPR proposal, PJM argues that these alternative proposals offered by Vistra and New Jersey Commission have merit and are worthy of further dialogue.[1454]

657.    Regarding the specific steps in the NOPR proposal for identifying geographic zones, several commenters support the proposal to provide all stakeholders, including relevant federal and state siting authorities, with a meaningful opportunity to provide input on the draft geographic zones.[1455]  Other commenters, however, assert that the Commission should provide a clearer role for states and other stakeholders to participate earlier in the process of identifying geographic zones.[1456]

---

at 16-17; Vistra Initial Comments at 24.

[1452] Vistra Initial Comments at 24.

[1453] Clean Energy Associations Initial Comments at 24-25; Large Public Power Initial Comments at 26; New Jersey Commission Initial Comments at 16-17.

[1454] PJM Reply Comments at 29-30, 31-32.

[1455] ISO/RTO Council Initial Comments at 8; NARUC Initial Comments at 16-17; National Grid Initial Comments at 17; Nebraska Commission Initial Comments at 7; SEIA Initial Comments at 12-13; Shell Initial Comments at 25.

[1456] Acadia Center and CLF Initial Comments at 12-13; AEE Initial Comments at 24-25; Amazon Initial Comments at 7; CAISO Initial Comments at 4-5, 28-29, 31; DC and MD Offices of People's Counsel Initial Comments at 15-16; Interwest Initial Comments at 9; ISO-NE Initial Comments at 29; National Grid Initial Comments at 17-18; NESCOE Initial Comments at 38-39; Nevada Commission Initial Comments at 9-10;

658.    Some commenters argue that the NOPR proposal regarding what information transmission providers should use to gauge commercial interest in geographic zones is overly prescriptive and that the information would be too speculative to be an accurate indicator of commercial interest.[1457]  Several commenters urge the Commission to increase the transparency of the NOPR proposal.[1458]  For example, US DOE recommends that the Commission specify minimum standards for reporting the attributes of each geographic zone.[1459]

659.    Several commenters oppose the proposal to require transmission providers to consider whether to identify geographic zones with the potential for large amounts of generation.[1460]  For example, APS argues that the proposal may not be appropriate due to the speculative nature of the identification of geographic zones and the long-term nature

---

SERTP Sponsors Initial Comments at 27.

[1457] *See*, *e.g.*, Middle River Power Initial Comments at 3; MISO Initial Comments at 43; PJM Initial Comments at 84.

[1458] Amazon Initial Comments at 8; Shell Initial Comments at 23-24; US DOE Initial Comments at 24-25

[1459] US DOE Initial Comments at 20.

[1460] APS Initial Comments at 5-7; Arizona Commission Initial Comments at 8; CAISO Initial Comments at 27-28; Consumer Organizations Initial Comments at 3-7; Duke Initial Comments at 4, 18-19; Idaho Power Initial Comments at 5; Indicated PJM TOs Initial Comments at 3-4, 12-13; ISO/RTO Council Initial Comments at 7; LADWP Initial Comments at 4; Louisiana Commission Initial Comments at 24-25; Michigan Commission Initial Comments at 5-6; Microgrid Resources Initial Comments at 5; North Carolina Commission and Staff Initial Comments at 8-10; North Dakota Commission Initial Comments at 4-5; Ohio Commission Federal Advocate Initial Comments at 7-8.

of planning and building transmission infrastructure.[1461]  Idaho Power is concerned that the NOPR proposal will create a significant level of work for transmission providers that would outweigh the minor benefits developers would receive from the data.[1462]

660.    PJM opposes the NOPR proposal, which it describes as an arbitrary and inflexible process that fails to account for regional differences and that will require transmission providers to draw lines on a map and commit to these areas for 20 years.[1463]  PJM states that the information from the geographic zones will be poor compared to information in the marketplace, including nearer term decisions of interconnection customers.[1464]  PJM states that an alternative, more case-specific flexible approach that builds on and is better synchronized with the transmission provider's interconnection queue process and market developments, and accommodates topologies as diverse as those in PJM, is a better solution.[1465]  For example, PJM suggests that the PJM State Agreement Approach is a better way to facilitate clusters of renewable energy interconnections by finding states that are willing to sponsor the new transmission to help fulfill a renewable energy policy.[1466]

---

[1461] APS Initial Comments at 6-7.

[1462] Idaho Power Initial Comments at 5.

[1463] PJM Initial Comments at 77-78.

[1464] *Id.* at 77.

[1465] *Id.* at 7.

[1466] *Id.* at 79-82 (citing PJM Operating Agreement, Schedule 6, section 1.5.9).

661.    Several state commissions express concerns that the NOPR proposal would give undue preference to certain kinds of resources.[1467]  For example, North Dakota Commission argues that the NOPR proposal would bias transmission planning towards one type of generation, encourage speculative build-out of transmission, and prevent visibility into the cost of other generation/transmission combinations, which will result in under-utilized transmission and additional costs to ratepayers with little benefit.[1468]

662.    North Carolina Commission and Staff assert that the NOPR proposal is an unwarranted intrusion into state jurisdiction over generation and fails to acknowledge state authority over utility generation, resource portfolios, and integrated resource planning.[1469]  Similarly, Ohio Commission Federal Advocate asserts that the NOPR proposal exceeds the Commission's authority and interferes with Ohio's ability to maintain its competitive retail electric service law.[1470]  Mississippi Commission states that decisions to develop such zones within a state should be left to the state.[1471]

---

[1467] Arizona Commission Initial Comments at 8; Louisiana Commission Initial Comments at 24-25; Louisiana Commission Reply Comments at 11-12; Michigan Commission Initial Comments at 5-6; North Carolina Commission and Staff Initial Comments at 10-13; North Dakota Commission Initial Comments at 4; Ohio Commission Federal Advocate Initial Comments at 7-8; Pennsylvania Commission Initial Comments at 7-8.

[1468] North Dakota Commission Initial Comments at 4.

[1469] North Carolina Commission and Staff Initial Comments at 8.

[1470] Ohio Commission Federal Advocate Initial Comments at 7 (quoting Ohio Commission Federal Advocate ANOPR Comments at 8).

[1471] Mississippi Commission Reply Comments at 10.

Pennsylvania Commission argues that the geographic zones used for Long-Term

Scenarios could frustrate a state's legitimate policy choices in establishing, for example,

economic development zones designed to encourage developers to site generation in

specific areas, by favoring another state's policy choices.[1472]  TAPS opposes any

requirement to undertake a process to consider and identify remote geographic zones

where state or local laws require local generating resources rather than remote

resources.[1473]

663.    Many commenters argue that the NOPR proposal would be duplicative of, or

would interfere with, existing processes.[1474]  AEE states that the consideration of

geography in developing long-term regional transmission plans should occur as a natural

outgrowth of more effective regional transmission planning and that a specific

requirement to identify geographic zones could have unintended consequences.[1475]  AEE

further asserts that some of the factors that the NOPR proposes to require transmission

---

[1472] Pennsylvania Commission Initial Comments at 7-8.

[1473] TAPS Initial Comments 9-10.

[1474] AEE Initial Comments at 8; APS Initial Comments at 5; CAISO Initial Comments at 4-5; Duke Initial Comments at 18-19; Illinois Commission Initial Comments at 9-11; Indicated PJM TOs Initial Comments at 12; ISO-NE Initial Comments at 30; ISO/RTO Council Initial Comments at 7; MISO TOs Initial Comments at 32; Mississippi Commission Reply Comments at 10; Nebraska Commission Initial Comments at 6; NESCOE Initial Comments at 37; Nevada Commission Initial Comments at 10; New York TOs Initial Comments at 12; NYISO Initial Comments at 33; SPP Initial Comments at 12-13; TAPS Initial Comments 8-10; Xcel Initial Comments at 10-11.

[1475] AEE Initial Comments at 8.

providers to incorporate in their Long-Term Scenarios inherently require them to consider what geographic areas are ripe for low-cost generation development but are isolated or otherwise transmission constrained.[1476]  Similarly, Indicated PJM TOs argue that it is unnecessary to require the identification of geographic zones in Long-Term Regional Transmission Planning because transmission providers necessarily will rely on driving factors (e.g., public policy goals) that will determine where renewable resources will be developed.[1477]  According to Duke, the categories of factors proposed in the NOPR already capture generator interconnections, so it is unclear what this additional process will add.[1478]

664.    Several commenters argue that some transmission planning processes already incorporate the identification of geographic zones, and those existing processes should be allowed to continue.[1479]  ISO-NE claims that transmission providers' planning constructs may already include rules that allow for assessing and identifying geographic zones with potential for high renewable development, rendering a separate process redundant or

---

[1476] *Id.* at 23-24.

[1477] Indicated PJM TOs Initial Comments at 12.

[1478] Duke Initial Comments at 18.

[1479] *See, e.g.*, CAISO Initial Comments at 27-33; ISO-NE Initial Comments at 30; MISO TOs Initial Comments at 32; Nebraska Commission Initial Comments at 6; NESCOE Initial Comments at 37; Nevada Commission Initial Comments at 10; New York TOs Initial Comments at 12; NYISO Initial Comments at 33; SPP Initial Comments at 12-13.

Docket No. RM21-17-000                                                                  - 486 -

unnecessary.[1480]  SPP states that the NOPR proposal would duplicate SPP's current

process to some extent and that it would not be practical to do both.[1481]  Similarly,

CAISO argues that the NOPR proposal is overly prescriptive and would interfere with

California's existing processes, which are working effectively.[1482]  New York TOs note

that New York's transmission planning processes already include the evaluation of

geographic zones expected to see significant growth in generation or changes in load and

incorporate state involvement.[1483]  Mississippi Commission asserts that MISO already

considers geographic zones for new generation.[1484]

### c.    Commission Determination

665.   We decline to adopt the proposed requirement that each transmission provider, as

part of its regional transmission planning process, consider whether to establish

geographic zones within the transmission planning region that have the potential for

development of large amounts of new generation.  We are persuaded by commenters that

finalizing and requiring the NOPR proposal is not warranted at this time.  Further, given

the other requirements in this final rule, such as the requirement for transmission

providers to plan for factors affecting supply and demand, we agree with commenters that

---

[1480] ISO-NE Initial Comments at 30.

[1481] SPP Initial Comments at 12-13.

[1482] CAISO Initial Comments at 4-5, 27-33.

[1483] New York TOs Initial Comments at 12.

[1484] Mississippi Commission Reply Comments at 10.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 497 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                    - 487 -

adopting this proposed requirement is not necessary at this time to ensure that Long-Term

Regional Transmission Planning ensures just and reasonable rates. We also agree with

commenters that the prescriptive nature of the proposed three-step process could

unintentionally impede existing efforts to incorporate geographic zones into regional

transmission planning.

666.    Although we are not adopting the NOPR proposal, we encourage transmission

providers to consider geographic zones that have the potential for development of large

amounts of new generation as part of their regional transmission planning process. As

such, transmission providers in a transmission planning region may propose to identify

geographic zones as part of Long-Term Regional Transmission Planning on compliance

with this final rule, provided that they demonstrate that their process for identifying such

geographic zones is consistent with or superior to the Long-Term Regional Transmission

Planning requirements established herein.

### D.    <u>Evaluation of the Benefits of Regional Transmission Facilities</u>

667.    In this final rule, we require transmission providers, as part of Long-Term

Regional Transmission Planning, to measure seven specified benefits that were

enumerated in the NOPR ("set of seven required benefits" or "required benefits") in each

Long-Term Scenario. We also allow transmission providers to propose on compliance to

measure additional benefits as part of Long-Term Regional Transmission Planning. In

addition, we require transmission providers to use those measured benefits when

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 498 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

evaluating Long-Term Regional Transmission Facilities to determine whether they more efficiently or cost-effectively address Long-Term Transmission Needs.[1485]

668.    This section of the final rule discusses the requirements that we adopt governing transmission providers' measurement and use of benefits in Long-Term Regional Transmission Planning.  Specifically, we discuss:  (1) the requirement to use a set of seven required benefits; (2) the required benefits, themselves; (3) the requirement to include a general description of how transmission providers will measure each of the benefits that the final rule requires, as well as any additional benefits that they may propose, in their OATTs; (4) the requirements related to the minimum time horizon over which transmission providers must calculate the benefits of Long-Term Regional Transmission Facilities; (5) the evaluation of the benefits of portfolios of Long-Term Regional Transmission Facilities; and (6) other issues related to benefits.

### 1.    Requirement for Transmission Providers to Use a Set of Seven Required Benefits

#### a.    NOPR Proposal

669.    In the NOPR, the Commission proposed a list of benefits that transmission providers in each transmission planning region may consider in Long-Term Regional Transmission Planning and cost allocation processes, which included:  (1) avoided or deferred reliability transmission projects and aging infrastructure replacement; (2) either

---

[1485] As discussed in the Development of Long-Term Scenarios section *supra*, transmission providers must also use these benefits to inform their identification of Long-Term Transmission Needs.

Docket No. RM21-17-000                                                                - 489 -

reduced loss of load probability or reduced planning reserve margin; (3) production cost

savings; (4) reduced transmission energy losses; (5) reduced congestion due to

transmission outages; (6) mitigation of extreme events and system contingencies;

(7) mitigation of weather and load uncertainty; (8) capacity cost benefits from reduced

peak energy losses; (9) deferred generation capacity investments; (10) access to lower-

cost generation; (11) increased competition; and (12) increased market liquidity.[1486]  The

NOPR provided a description of each of these benefits categories as well as a method to

calculate benefits in each category.[1487]

670.   The Commission explained that it was not proposing to make the list of potential

benefits mandatory or exhaustive and that transmission providers would have flexibility

to propose which benefits to use as part of their Long-Term Regional Transmission

Planning.[1488]

671.   The 12 potential benefits described in the NOPR are:

| No. | Benefit | Description |
|-----|---------|-------------|
| 1 | Avoided or deferred reliability transmission | Reduced costs of avoided or delayed transmission investment otherwise required to |

---

[1486] NOPR, 179 FERC ¶ 61,028 at P 185.  As more fully described below, the Commission is making modifications to the list of benefits in this final rule.  Therefore, we clarify for the reader how we refer to each of those benefits in this section.  We refer to benefits 1-6 as "Benefit 1," "Benefit 2," etc.  We refer to Benefit 7, "mitigation of weather and load uncertainty" as NOPR Benefit 7.  We refer to "(8) capacity cost benefits from reduced peak energy losses" as "NOPR Benefit 8", "Final Rule Benefit 7", and "Benefit 7".  We refer to benefits 9-12 as "Benefit 9," Benefit 10," etc.

[1487] *Id.* PP 189-225.

[1488] *Id.* P 184.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 500 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                          - 490 -

|    | facilities and aging transmission infrastructure replacement | address reliability needs or replace aging transmission facilities |
|----|----|----|
| 2a | Reduced loss of load probability [OR next benefit] | Reduced frequency of loss of load events by providing additional pathways for connecting generation resources with load (if planning reserve margin is constant), resulting in benefit of reduced expected unserved energy by customer value of lost load |
| 2b | Reduced planning reserve margin [OR prior benefit] | While holding loss of load probabilities constant, system operators can reduce their resource adequacy requirements (i.e., planning reserve margins), resulting in a benefit of reduced capital cost of generation needed to meet resource adequacy requirements |
| 3 | Production cost savings | Reduction in production costs, including savings in fuel and other variable operating costs of power generation, that are realized when transmission facilities allow for the increased dispatch of suppliers that have lower incremental costs of production, displacing higher-cost supplies; also, reduction in market prices as lower-cost suppliers set market clearing prices; when adjusted to account for purchases and sales outside the region, called adjusted production cost savings |
| 4 | Reduced transmission energy losses | Reduced energy losses incurred in transmittal of power from generation to loads, thereby reducing total energy necessary to meet demand |
| 5 | Reduced congestion due to transmission outages | Reduced production costs during transmission outages that significantly increase transmission congestion |
| 6 | Mitigation of extreme events and system contingencies | Reduced production costs during extreme events, such as unusual weather conditions, fuel shortages, and multiple or sustained generation and transmission outages, through more robust transmission system reducing high-cost generation and emergency procurements necessary to support the system |
| 7 | Mitigation of weather and load uncertainty | Reduced production costs during higher than normal load conditions or significant shifts in regional weather patterns |

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 501 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                    - 491 -

| 8 | Capacity cost benefits from reduced peak energy losses | Reduced energy losses during peak load reduces generation capacity investment needed to meet the peak load and transmission losses |
| 9 | Deferred generation capacity investments | Reduced costs of needed generation capacity investments through expanded import capability into resource-constrained areas |
| 10 | Access to lower-cost generation | Reduced total cost of generation due to ability to locate units in a more economically efficient location (e.g., low permitting costs, low-cost sites on which plants can be built, access to existing infrastructure, low labor costs, low fuel costs, access to valuable natural resources, locations with high-quality renewable energy resources) |
| 11 | Increased competition | Reduced bid prices in wholesale electricity markets due to increased competition among generators and reduced overall market concentration/market power |
| 12 | Increased market liquidity | Reduced transaction costs (e.g., bid-ask spreads) of bilateral transactions, increased price transparency, increased efficiency of risk management, improved contracting, and better clarity for Long-Term Regional Transmission Planning and investment decisions through increased number of buyers and sellers able to transact with each other as a result of transmission expansion |

672. While the Commission did not propose to require use of any specific benefits in the NOPR, it sought comment on whether transmission providers should be required to use some or all of the potential benefits described in the NOPR as a minimum set of benefits for their Long-Term Regional Transmission Planning process.[1489]

---

[1489] *Id.* P 188.

### b. **Comments**

673.    Many commenters support the NOPR approach of providing illustrative benefits

rather than mandating the use of certain benefits.[1490]   Indicated PJM TOs contend that the

NOPR proposal would advance the Commission's goals better than a more prescriptive

proposal.[1491]   SERTP Sponsors and Southern argue that the Commission should not

impose a minimum set of benefits because existing state-regulated integrated resource

planning processes adequately examine some of the proposed benefits, and that some of

the proposed benefits would harm existing integrated resource planning processes or are

only appropriate for RTO/ISO regions.[1492]   LADWP asserts that some or all of the

---

[1490] Ameren Initial Comments at 19; APPA Initial Comments at 31; APS Initial Comments at 9; Dominion Initial Comments at 34; Duke Initial Comments at 22-23; EEI Initial Comments at 19-20; Eversource Initial Comments at 25; Georgia Commission Initial Comments at 6-7; Idaho Commission Initial Comments at 4; Idaho Power Initial Comments at 7-8; Illinois Commission Initial Comments at 13-14; Indiana Commission Initial Comments at 6; Indicated PJM TOs Initial Comments at 17; ISO-NE Initial Comments at 5, 33-34; LADWP Initial Comments at 5; Louisiana Commission Reply Comments at 9-10; Michigan Commission Initial Comments at 6; MISO Initial Comments at 9, 51-52; Mississippi Commission Initial Comments at 36; NARUC Initial Comments at 20-21; National Grid Initial Comments at 26; North Carolina Commission and Staff Initial Comments at 7; Nebraska Commission Initial Comments at 7; New York TOs Initial Comments at 15; NRECA Initial Comments at 43-45; NYISO Initial Comments at 9, 37-38; OMS Initial Comments at 7-8; Pacific Northwest Utilities Initial Comments at 8; Pennsylvania Commission Initial Comments at 9; SERTP Sponsors Initial Comments 29-30; Southern Initial Comments at 24; TANC Initial Comments at 16; TAPS Initial Comments at 3, 14; US Chamber of Commerce Initial Comments at 7; Vermont State Entities Initial Comments at 7; Virginia Commission Staff Initial Comments at 5; Vistra Initial Comments at 15; Xcel Initial Comments at 12.

[1491] Indicated PJM TOs Initial Comments at 17.

[1492] SERTP Sponsors Initial Comments 29-30; Southern Initial Comments at 25-27.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 503 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

identified benefits will be considered as part of the normal transmission planning process without a requirement. [1493]  Dominion asserts that the question arises of who will judge whether a transmission project addresses the NOPR's proposed list of benefits and that such debates could be time-consuming and further delay projects and drive up costs.[1494] Dominion states that transmission providers should be permitted to identify the benefits that they will consider in conducting Long-Term Regional Transmission Planning but retain flexibility to apply the specific benefits that are most appropriate given each transmission provider's individual circumstances.[1495]

674.    TAPS supports requiring transmission providers to evaluate production cost modeling but opposes requiring transmission providers to consider any other benefits in order to allow for regional flexibility.[1496]  Northwest and Intermountain and NYISO ask that the final rule confirm that the 12 illustrative benefits are neither mandatory nor exhaustive.[1497]  California Municipal Utilities state that requiring the consideration of all 12 benefits proposed in the NOPR would misapprehend the state and local nature of resource portfolio planning and fail to account for the costs of such prescriptive measures

---

[1493] LADWP Initial Comments at 5.

[1494] Dominion Initial Comments at 34.

[1495] *Id.*

[1496] TAPS Initial Comments at 3, 14.

[1497] Northwest and Intermountain Initial Comments at 16; NYISO Initial Comments at 39.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 504 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

and the need for consumer protection measures to guard against speculative transmission projects.[1498]

675.    OMS urges the Commission to clarify that transmission providers will have sufficient flexibility to use different sets of benefit metrics in different transmission planning cycles.[1499]   Relatedly, Xcel states that for any specific study, portfolio, or transmission project, all benefits do not need to be calculated and, in some cases, calculating additional benefits may be costly, time consuming, and contentious and provide little added value.[1500]

676.    Many of the commenters that support an illustrative approach emphasize the importance of regional flexibility.[1501]   US Chamber of Commerce states that flexibility will allow transmission planning regions to consider benefits that best align with their

---

[1498] California Municipal Utilities Reply Comments at 5-6.

[1499] OMS Initial Comments at 8.

[1500] Xcel Initial Comments at 12.

[1501] Ameren Reply Comments at 16-17 (citing MISO Initial Comments at 9); APS Initial Comments at 9; Dominion Initial Comments at 34; Duke Initial Comments at 22-23; EEI Initial Comments at 19-20; Eversource Initial Comments at 25; Entergy Reply Comments at 3; Idaho Commission Initial Comments at 4; Idaho Power Initial Comments at 7-8; Illinois Commission Initial Comments at 13-14; Indiana Commission Initial Comments at 6-7; Large Public Power Initial Comments at 28; ISO-NE Initial Comments at 33-34; Massachusetts Attorney General Initial Comments at 12, 15; MISO Initial Comments at 9; Mississippi Commission Initial Comments at 35-36; NARUC Initial Comments at 20-21; National Grid Initial Comments at 26; Nebraska Commission Initial Comments at 7; New York TOs Initial Comments at 15; Pennsylvania Commission Initial Comments at 9; SPP Initial Comments at 18; US Chamber of Commerce Initial Comments at 7; Vistra Initial Comments at 15; Xcel Initial Comments at 12.

respective market structures.[1502]  MISO states that, without flexibility, it may not be able to move forward with the transmission projects of the greatest benefit and value to MISO and its stakeholders, noting that benefits used to meet criteria for its recent Long-Range Transmission Planning projects are not specified in its OATT.[1503]  MISO, NYISO, and SPP argue that transmission providers and their stakeholders ought to determine what the benefits evaluated for specific transmission projects or sets of projects should be.[1504] NARUC, New York TOs, and Pennsylvania Commission agree, emphasizing consultation with states.[1505]

677.    Entergy urges the Commission to affirm its commitment to providing transmission planning regions with flexibility in terms of how they identify, consider, and calculate benefits.  Entergy further urges the Commission to adopt guiding principles to aid transmission providers in identifying their own benefits.[1506]  Entergy argues that the Commission should recognize that not all benefits are appropriate in all jurisdictions and

---

[1502] US Chamber of Commerce Initial Comments at 7.

[1503] MISO Initial Comments at 9.

[1504] MISO Initial Comments at 9-10; NYISO Initial Comments at 39; SPP Initial Comments at 18.

[1505] NARUC Initial Comments at 21-22; New York TOs Initial Comments at 15; Pennsylvania Commission Initial Comments at 9.

[1506] Entergy Initial Comments at 21.

Docket No. RM21-17-000                                                          - 496 -

that some states will want to prioritize transmission projects that reduce customer bills.[1507]

678.    SPP argues that how and when transmission benefits are calculated and incorporated in any regional transmission planning assessment should be at the discretion of each transmission provider and its stakeholders.  Specifically, SPP argues that the effort required to incorporate additional benefit metrics into its current transmission planning process cannot be accommodated within its current process timeline.[1508]

679.    Mississippi Commission argues that any required benefits would be arbitrary and some metrics may not be applicable at times.[1509]  National Grid argues that flexibility will allow transmission providers to adapt more readily to changes in state policy drivers, prevent the requirements of Long-Term Regional Transmission Planning from becoming dated, and allow benefits and cost allocation discussions to be synchronized.[1510]  Duke contends that allowing regional flexibility may help to mitigate some disputes within transmission planning regions over what benefits to measure and how to measure them.  Moreover, Duke argues that regional flexibility is critical to ensuring that each benefit metric used is relevant and calculable for each transmission planning region, particularly given differences between RTO/ISO and non-RTO/ISO regions.  Duke contends that

---

[1507] *Id.*

[1508] SPP Initial Comments at 18.

[1509] Mississippi Commission Initial Comments at 35-36.

[1510] National Grid Initial Comments at 26-27.

regions must not be forced into accepting and implementing benefits metrics that they

have not vetted or on which they do not have consensus.[1511]

680.    MISO, while stating its preference for flexibility in identifying benefits, also states

that it would support identifying and using a general set of benefit metrics that capture

key areas of transmission value, such as reliability and resilience, production cost

savings, and avoided resource and/or transmission investment, assuming that each

transmission planning region may determine how to calculate each metric and how each

applies during a transmission assessment, as well as allowing for different benefit metrics

not part of that "general set" to be applied when warranted.[1512]

681.    Some commenters offer support for the illustrative benefits without suggesting

that they be required.[1513]  PG&E states that CAISO's transmission planning process

currently evaluates several of the same benefits, either routinely or on a case-specific

basis, and that PG&E supports the continued flexibility the NOPR envisions for

RTO/ISOs.[1514]

682.    In contrast, many commenters support the Commission requiring that transmission

providers consider a minimum list of benefits for Long-Term Regional Transmission

---

[1511] Duke Initial Comments at 22-23.

[1512] MISO Initial Comments at 9.

[1513] Nevada Commission Initial Comments at 10-11; Pattern Energy Initial
Comments at 14; PG&E Initial Comments at 7.

[1514] PG&E Initial Comments at 7.

Planning.[1515]  PIOs argue that most of the benefits outlined in the NOPR have broad

support, even among those commenters that do not support a Commission requirement to

consider a minimum set of benefits.[1516]

683.    Clean Energy Associations and US Senator Schumer assert that the failure to

adopt a minimum list of benefits risks skewing benefit-to-cost ratios against developing

necessary transmission because all costs would be included in an evaluation but not all

benefits would also be included.[1517]  Clean Energy Associations further state that failing

---

[1515] ACORE Initial Comments at 12; ACORE Reply Comments at 6; ACORE Supplemental Comments at 1; AEE Initial Comments at 8, 25; AEP Initial Comments at 6, 23-25; Breakthrough Energy Initial Comments at 4, 21-22; Business Council for Sustainable Energy Initial Comments at 2, 5; Certain TDUs Initial Comments at 11-12; Clean Energy Buyers Reply Comments at 8-9; Concerned Scientists Reply Comments at 7-10; Cypress Creek Reply Comments at 7-8; DC and MD Offices of People's Counsels Reply Comments at 3, 7-8; ELCON Initial Comments at 15; Enel Initial Comments at 3; Environmental Groups Supplemental Comments at 2; Environmental Legislators Caucus Supplemental Comments at 1; Exelon Initial Comments at 16: Grid United Initial Comments at 2; Handy Law Initial Comments at 8; US House Republicans Supplemental Comments at 1; Indicated US Senators and Representatives Initial Comments at 2; ITC Initial Comments at 5, 18-22; Interwest Initial Comments at 12; Interwest Reply Comments at 6-7; Joint Consumer Advocates Initial Comments at 11; Kentucky Commission Chair Chandler Reply Comments at 7; Minnesota State Entities Initial Comments at 6; New England for Offshore Wind Initial Comments at 5; New Jersey Commission Initial Comments at 11-14; Pacific Northwest State Agencies Initial Comments at 16-17; PIOs Initial Comments at 27-28; PIOs Reply Comments at 7-8; Policy Integrity Initial Comments at 27; Policy Integrity Supplemental Comments at 4; R Street Initial Comments at 9; RMI Initial Comments at 1; RMI Supplemental Comments at 2; SEIA Initial Comments at 16-17; Southeast PIOs Initial Comments at 50; Southeast PIOs Reply Comments at 27-28; US DOE Initial Comments at 30-33; US Senator Schumer Supplemental Comments at 1-2; US Senator Whitehouse Supplemental Comments at 2; US Senators Supplemental Comments at 2; WATT Coalition Initial Comments at 7.

[1516] PIOs Initial Comments at 26, 41; PIOs Reply Comments at 7-8.

[1517] Clean Energy Associations Initial Comments at 19; US Senator Schumer

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 509 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000    - 499 -

to require the adoption of a minimum list of benefits could lead to higher costs in the long-term, as larger transmission projects with net benefits would not be selected.[1518] Finally, Clean Energy Associations argue that, without a minimum list of benefits, significant disparities in regional identification of potential Long-Term Regional Transmission Facilities could have harmful spillover effects on coordinated activities such as interregional transmission coordination and affected systems studies.[1519]

684.    Michigan State Entities argue that there must be some prescribed list of benefits, asserting that it would not force differently situated transmission providers to implement any specific policy, but instead would ensure that they take a "fair look" at transmission planning policies, including those using storage, that could produce substantial savings for customers.[1520]  Interwest contends that a standard and comprehensive framework for evaluating benefits is necessary because an ad hoc approach could result in inconsistencies and an incomplete picture of a transmission project's potential benefits.[1521]

---

Supplemental Comments at 1-2.

[1518] Clean Energy Associations Initial Comments at 19-20 (citing The Brattle Group, *Transmission Planning and Benefit-Cost Analyses*, at 26 (Apr. 2021)).

[1519] Clean Energy Associations Initial Comments at 19.

[1520] Michigan State Entities Reply Comments at 2.

[1521] Interwest Reply Comments at 7.

Docket No. RM21-17-000                                                    - 500 -

685.    Southeast PIOs urge the Commission to prescribe a set of benefits for use in

benefit-cost analyses, starting with the entire list of benefits in the NOPR.  Southeast

PIOs argue that the transmission providers in the Southeast exploited the flexibility in

establishing and assessing benefits that the Commission provided in Order No. 1000 to

implement a straight cost comparison.[1522]  Southeast PIOs further state that minimum

standards are necessary to produce actionable results; otherwise, Long-Term Regional

Transmission Planning will devolve into a "box-checking exercise."[1523]  SREA argues

that the Commission needs to set clear guidelines around benefit metrics to avoid

opponents to the NOPR finding easy work-arounds.[1524]

686.    Similarly, R Street states that transmission providers should be required to use a

minimum set of benefits because they lack the incentive to account for all system-wide

benefits.  R Street argues that proposing a benefits list for transmission providers to

consider is the status quo and the Commission should expect little change without a

benefits requirement.[1525]  Concerned Scientists agree, claiming that the experience with

Order No. 1000 implementation and the descriptions in the comments in response to the

NOPR illustrate how transmission planning processes are resistant to changes when the

---

[1522] Southeast PIOs Initial Comments at 50.

[1523] Southeast PIOs Reply Comments at 23, 27.

[1524] SREA Reply Comments at 26 (citing Louisiana Commission Initial Comments at 17; Mississippi Commission Initial Comments at 11; Southern Initial Comments at 12).

[1525] R Street Initial Comments at 9.

Commission provides latitude for discretion.[1526]  Concerned Scientists further contend

that the discretion provided in the NOPR will allow a pattern of undue discrimination and

unjust and unreasonable rates to persist that initially motivated the Commission to act.[1527]

687.    Some commenters assert that requiring the same benefits in different transmission

planning regions will help increase interregional transmission coordination.[1528]  Clean

Energy Associations argue that it is important for transmission planning regions to have a

common starting point in terms of which benefits they evaluate to facilitate greater

interregional transmission coordination.[1529]  Breakthrough Energy notes that load

diversity—and its effect on reducing very expensive generation capacity costs—is a

major and under-appreciated benefit of large-scale interregional transmission

facilities.[1530]  Grid United states that, without a minimum set of benefits criteria, disparate

benefits in neighboring transmission planning regions could balkanize the grid and

disrupt effective interregional transmission planning, emphasizing the need for a set of

principles that outline benefits that are universal and necessary for effective long-term

---

[1526] Concerned Scientists Reply Comments at 7.

[1527] *Id.* at 8-9.

[1528] Breakthrough Energy Initial Comments at 22-23; California Commission Initial Comments at 33; Grid United Initial Comments at 3; Policy Integrity Initial Comments at 27-28; US DOE Initial Comments at 31-32.

[1529] Clean Energy Associations Initial Comments at 19.

[1530] Breakthrough Energy Initial Comments at 22.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 512 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                    - 502 -

transmission planning.[1531]  Policy Integrity asserts that defining a uniform set of

minimum benefits would facilitate better identification and selection of efficient and cost-

effective transmission solutions and would ensure comparability of transmission

expansion projects across different RTOs/ISOs, which will be particularly useful given

the need to improve Interregional Transfer Capability.[1532]

688.    Relatedly, PJM states that, while it agrees that transmission providers should have

flexibility to propose which benefits make sense to consider for their own transmission

planning regions, the Commission should adopt a core set of benefits to be considered

nationwide to ensure consistency.[1533]  SREA notes that, in RTOs/ISOs, seams are

perpetually a problem due to a lack of common national standards on benefits metrics and

data inputs and asserts that the Commission should set minimum standards.[1534]

689.    Some commenters assert that a failure to consider sufficient benefits could result

in higher costs and/or unjust and unreasonable rates.[1535]  According to Enel, without

---

[1531] Grid United Initial Comments at 3.

[1532] Policy Integrity Initial Comments at 3, 27-28.

[1533] PJM Initial Comments at 93 (citing NOPR, 179 FERC ¶ 61,028 at P 186).

[1534] SREA Reply Comments at 26-27.

[1535] Enel Initial Comments at 3; Clean Energy Association Initial Comments at 20;
Conservative Energy Network Supplemental Comments at 1; Conservatives for Clean
Energy – Florida Supplemental Comments at 1; Conservatives for Clean Energy – South
Carolina Supplemental Comments at 1; Indicated US Senators and Representatives Initial
Comments at 2; Michigan Conservative Energy Forum Supplemental Comments at 1;
Ohio Conservative Energy Forum Supplemental Comments at 1; Western Way Colorado
Supplemental Comments at 1; Western Way Nevada Supplemental Comments at 1;
Western Way Utah Supplemental Comments at 1; Wisconsin Conservative Energy

considering a larger number of benefits, transmission projects that would have large net benefits will not be selected if no benefits or even only a small number of potential benefits were compared against the upfront costs.[1536]

690.    Some commenters assert that a failure to require consideration of specific benefits will undermine other aspects of the NOPR's proposed reforms.[1537]  Anbaric, for instance, argues that the NOPR falls far short of requiring comprehensive transmission planning, because it does not propose to mandate the use of any specific set of benefits.[1538]  RMI contends that there is overwhelming evidence that transmission infrastructure provides multiple, diverse benefits, as well as established precedent that transmission costs should be allocated roughly commensurate with benefits.  Therefore, RMI states, it would be illogical to allow transmission providers to ignore any benefits that transmission infrastructure offers, as it would lead to flawed investment decisions and defective cost allocation.  RMI asserts that transmission providers should be required to quantify the full suite of known benefits of transmission infrastructure in Long-Term Regional Transmission Planning and that the list of 12 benefits in the NOPR is conservative and does not double-count benefits.[1539]

---

Forum Supplemental Comments at 1.

[1536] Enel Initial Comments at 3.

[1537] Anbaric Initial Comments at 6-7; RMI Initial Comments at 2.

[1538] Anbaric Initial Comments at 6-7.

[1539] RMI Initial Comments at 2.

691.    AEE argues that several of the listed benefits are indisputably relevant to all

transmission planners and that these benefits should form a core group of minimum

considerations.[1540]  AEE states that the Commission may wish to conduct additional fact-

finding in this docket to consider whether additional benefits cut across all markets and

transmission planning regions or whether it is necessary to require each region to identify

region-specific benefits for inclusion.[1541]  Hannon Armstrong states that the Commission

indicated that each of the 12 benefits listed in the NOPR has the potential to provide a

meaningful contribution to offset the cost of transmission and recommends that, absent

any double-counting in this list, the Commission should require each of these benefits to

be evaluated.[1542]  ITC argues that the Commission should adopt as minimum benefit

criteria for project evaluation those used in the recently approved MISO Long-Range

Transmission Plan process.[1543]

692.    Southeast PIOs claim that the Commission must establish a set of minimum

benefits for transmission providers to incorporate in their assessment of regional

transmission facilities to ensure that regional transmission facilities are accurately

represented in the transmission planning process.[1544]  Southeast PIOs contend that a

---

[1540] AEE Initial Comments at 26.

[1541] *Id.*

[1542] Hannon Armstrong Initial Comments at 2-3.

[1543] ITC Initial Comments at 5, 18-22.

[1544] Southeast PIOs Initial Comments at 50.

Docket No. RM21-17-000                                                    - 505 -

regional transmission planning process that quantifies and fully accounts for benefits of

regional transmission alternatives would provide a measure of assurance to regulators and

stakeholders that such alternatives were evaluated appropriately.[1545]  In response to

Southern and SERTP, Southeast PIOs argue that quantifying the listed benefits does not

itself make resource decisions; the benefits are meant to determine the value proposition

of alternative regional transmission facilities.[1546]

693.   GridLab states that the Commission should require transmission providers to

justify why their transmission solution evaluation frameworks omit any categories of

benefits in relation to a standard list of benefits like those proposed in the NOPR.[1547]

Pattern Energy agrees and notes that a "common starting point" would lower barriers to

entry for market participants that do business in multiple transmission planning regions.

Moreover, Pattern Energy argues that a required set of standardized benefits would

facilitate a more transparent transmission planning process, as developers would have a

baseline knowledge of any single transmission provider's transmission planning process

regardless of where they are located.[1548]

---

[1545] *Id.* at 53.

[1546] Southeast PIOs Reply Comments at 28 (citing Southern Initial Comments at 25-26; SERTP Sponsors Initial Comments at 30).

[1547] GridLab Initial Comments at 25.

[1548] Pattern Energy Reply Comments at 6-8 (citing ACEG Initial Comments at 32; Clean Energy Associations Initial Comments at 21).

694.    Tabors Caramanis Rudkevich states that when transmission planning analyses account for the benefits of capital cost savings, resource adequacy, and resilience, the total benefits of transmission infrastructure well exceed the cost.[1549]  Tabors Caramanis Rudkevich provides an example of multi-value benefit stacking for the transmission line connecting ERCOT and Southern Company and states that the results show total benefits of $390 million, compared to $33 million when considering production cost savings alone.[1550]

695.    Certain TDUs and NESCOE support or are amenable to a requirement for minimum benefits that also allows for flexibility in determination of additional benefits.[1551]  Specifically, NESCOE recommends that the Commission establish a list of benefits that must be considered for a regional discussion on transmission cost allocation and that the benefits list in the NOPR is an appropriate starting point.  However, NESCOE contends, after consulting with the states, transmission providers should have the flexibility to include additional benefits or remove benefits from the list, asserting that such an approach would help facilitate collaboration in determining the appropriate set of benefits for a transmission planning region.[1552]  NESCOE also argues that, because

---

[1549] Tabors Caramanis Rudkevich Initial Comments at 6.

[1550] *Id.*

[1551] Certain TDUs Initial Comments at 2-3, 9-12; NESCOE Initial Comments at 43-44.

[1552] NESCOE Initial Comments at 44.

benefits and the methods of measuring them may change over time, the Commission should clarify in any final rule that transmission providers may modify or add benefits in future FPA section 205 filings.[1553]

696.    Certain TDUs also urge the Commission to allow for regional flexibility and state involvement in determining other measurable and quantifiable benefits to use in evaluating Long-Term Regional Transmission Facilities.[1554]  While arguing for requiring certain benefits, Cypress Creek states that it agrees with Brattle Group that requiring evaluation of all 12 benefits in every scenario would detract from necessary regional flexibility.[1555]  Cypress Creek asserts that the Commission should require two additional project/region-specific benefits in evaluating multi-value projects but does not explain what they should be.[1556]

697.    Exelon supports the Commission's proposal to provide flexibility to each transmission planning region to identify which benefits they will use in Long-Term Regional Transmission Planning.  For instance, Exelon suggests that congestion reduction is more applicable to regions with Locational Marginal Price pricing, while it may be impossible to calculate the benefits of deferred generation capacity investments in

---

[1553] *Id.* at 43-44.

[1554] Certain TDUs Initial Comments at 9.

[1555] Cypress Creek Reply Comments at 7-8 (citing PIOs Initial Comments Ex. A, ¶¶ 8-9).

[1556] *Id.* at 8.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 518 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

a region like PJM where generation capacity is largely market-driven.[1557]  Similarly, the New Jersey Commission recommends providing regional flexibility to include additional benefits that may be harder to quantify and/or do not reduce customers' bills (e.g., resilience benefits and the value of meeting state public policies).[1558]

698.    Clean Energy Buyers state that the proposed set of benefits is generally appropriate and that a common set of benefits would allow for the proper identification of benefits in Long-Term Regional Transmission Planning, accounting for changes in the resource mix and demand, and facilitating stakeholder participation.  Therefore, Clean Energy Buyers argue, the Commission should require transmission providers to adopt a set of Commission-identified benefits that are consistent with the just and reasonable standard or demonstrate on compliance why they should not have to do so.  That said, Clean Energy Buyers state that the Commission should permit transmission providers to propose processes for weighing benefits in accordance with their relative importance in each specific transmission planning region.[1559]

699.    Several commenters recognize that benefits analysis can be resource intensive and therefore recommend that the Commission allow transmission providers to use a screening approach that initially screens benefit categories for significance before

---

[1557] Exelon Initial Comments at 15.

[1558] New Jersey Commission Initial Comments at 14.

[1559] Clean Energy Buyers Initial Comments at 19-21.

investing staff resources and modeling work to provide a detailed quantification.[1560]
Clean Energy Buyers argue that, at a minimum, the Commission should require that
transmission providers screen for all 12 benefits listed in the NOPR and quantify them
accordingly.[1561]  Hannon Armstrong states that while certain benefits may have a zero or
*de minimis* contribution for certain candidate transmission projects, the Commission
should require transmission providers to document each potential benefit by using a high-
level screening analysis or detailed modeling as applicable.[1562]  PIOs assert that screening
tools can be used to reduce analytical burdens, allowing transmission providers to self-
certify compliance and/or provide justifications for when benefits do not apply.[1563]

### i.      List of Benefits Proposed in the NOPR

700.    Some commenters support requiring transmission providers to consider all 12
illustrative benefits enumerated in the NOPR.[1564]  ACORE contends that these categories

---

[1560] ACEG Initial Comments at 7, 33; ACORE Initial Comments at 12;
Breakthrough Energy Initial Comments at 22; CTC Global Initial Comments at 9;
Interwest Initial Comments at 12-13; WATT Coalition Initial Comments at 7.

[1561] Clean Energy Buyers Initial Comments at 20-21.

[1562] Hannon Armstrong Initial Comments at 2-3

[1563] PIOs Initial Comments at 41.

[1564] Acadia Center and CLF Initial Comments at 21-22; ACEG Initial Comments
at 32; ACORE Initial Comments at 12; AEE Reply Comments at 25: Amazon Initial
Comments at 5; Breakthrough Energy Initial Comments at 21-22; Clean Energy
Associations Initial Comments at 19-20; DC and MD Offices of People's Counsel Initial
Comments at 19-20; ENGIE Reply Comments at 3; Hannon Armstrong Initial Comments
at 3; Interwest Initial Comments at 12-14; National and State Conservation Organizations
Initial Comments at 1; Pine Gate Initial Comments at 34-37; PIOs Initial Comments at
38-41; RMI Initial Comments at 1; SEIA Initial Comments at 16; Southeast PIOs Initial

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 520 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                    - 510 -

represent a best practice and track closely with recommended multi-benefit planning approaches.[1565]  Breakthrough Energy notes that some of the Commission-listed benefits can be very significant but are typically ignored in today's transmission planning processes.[1566]  SEIA and Fervo assert that the final rule should account for the full range of transmission benefits and use multi-value planning to comprehensively identify investments that address all categories of needs and benefits.[1567]

701.    PIOs state that there is strong evidence in the record to support the proposed list of benefits, including extensive testimony provided by the Brattle Group and others.  PIOs state that these benefits all correlate with needs and goals associated with Long-Term Regional Transmission Planning and, as such, the Commission should require transmission providers to consider them for most, if not all, regional transmission projects.  Finally, PIOs encourage the Commission to make clear that these benefits should be assessed as part of any transmission planning process—even those conducted for economic purposes.[1568]

---

Comments at 50.

[1565] ACORE Initial Comments at 12 (citing Rob Gramlich, Grid Strategies LLC, *Enabling Low-Cost Clean Energy and Reliable Service Through Better Transmission Benefits Analysis*, at 9 (Aug. 9, 2022)).

[1566] Breakthrough Energy Initial Comments at 22.

[1567] Fervo Reply Comments at 2; SEIA Initial Comments at 16.

[1568] PIOs Initial Comments at 37-38, 41.

702.    Amazon supports the list of benefits set forth in the NOPR and urges the
Commission to make consideration of those benefits mandatory except insofar as a
transmission provider files for waiver and overcomes a strong presumption of their
relevance to transmission planning and cost allocation.[1569]  To facilitate the responsible
construction of transmission facilities, ENGIE recommends that the Commission
incorporate the 12 listed benefits as a minimum set of benefits for analysis but permit
flexibility in how transmission providers conduct their analysis.[1570]

### ii.    Application of the Benefits of Long-Term Regional Transmission Facilities in Non-RTO/ISO Regions

703.    Certain commenters state that all or most of the Commission's proposed benefits
are applicable and appropriate in non-RTO/ISO transmission planning regions.[1571]  For
example, ACEG states the minimum set of benefits should be implemented as universally
as possible across RTOs/ISOs and non-RTO/ISO regions.[1572]  PIOs state that the Brattle-
Grid Strategies Oct. 2021 Report shows the numerous benefits not currently quantified in
RTO/ISO regions to consumers' detriment and that the problem is more dire in non-
RTO/ISO regions.[1573]  Relatedly, MISO states that benefits could be applied in non-

---

[1569] Amazon Initial Comments at 5.

[1570] ENGIE Reply Comments at 3.

[1571] ACEG Initial Comments at 32, 48, 61; PIOs Initial Comments at 42; SEIA Initial Comments at 17.

[1572] ACEG Initial Comments at 32.

[1573] PIOs Initial Comments at 42.

RTO/ISO regions but may be limited or not fully realized due to less coordinated congestion management and transmission planning.[1574]

704.    SEIA comments that the Commission should mandate the consideration of benefits of Long-Term Regional Transmission Facilities in non-RTO/ISO transmission planning regions.  Otherwise, SEIA states, transmission providers could rely on state integrated resource planning processes, which do not incorporate lower cost transmission alternatives to generation procurement, potentially leading to transmission expansion to accommodate higher-cost generation than is needed.  According to SEIA, there is no basis to apply different benefits in non-RTO/ISO transmission planning regions, because many of the proposed benefits of Long-Term Regional Transmission Facilities have already been calculated in non-RTO/ISO regions.[1575]

705.    Southeast PIOs claim that Southeastern transmission providers should not be exempt from quantifying benefits, even if some benefits do not apply in the same manner to non-RTO/ISO transmission planning regions as they do to RTO/ISO regions.[1576] Southeast PIOs advocate for the Commission to establish standardized metrics for both RTO/ISO regions and non-RTO/ISO regions to capture similar benefits.[1577]  Otherwise, Southeast PIOs argue, transmission providers will continue to focus only on costs,

---

[1574] MISO Initial Comments at 51.

[1575] SEIA Initial Comments at 17-18.

[1576] Southeast PIOs Initial Comments at 51.

[1577] *Id.* at 52.

thereby depriving states and stakeholders of a fuller picture of transmission planning

options.[1578]  TAPS contends that no transmission facilities have been selected in a

regional transmission plan for purposes of cost allocation since the implementation of

Order No. 1000 in non-RTO/ISO transmission planning regions partly because of the

narrow factors that most non-RTO/ISO regions consider in evaluating the benefits of

potential transmission projects.[1579]

706.    Other commenters express concern that certain NOPR benefits would be

inapplicable or problematic to apply to non-RTO/ISO transmission planning regions or

argue that the same types of benefits should not be applied to both sets of regions.[1580]

California Municipal Utilities oppose applying the list of benefits to non-RTO/ISO

transmission planning regions, stating that doing so would misapprehend the state and

local nature of resource portfolio planning and would fail to account for the costs of such

prescriptive measures and to provide consumer protection measures to guard against

speculative transmission projects.[1581]  Dominion states that a one-size-fits-all approach to

---

[1578] *Id.* at 52-53.

[1579] TAPS Initial Comments at 15.

[1580] California Municipal Utilities Reply Comments at 5-6; Dominion Reply Comments at 2; Duke Initial Comments at 23; EEI Initial Comments at 19; Idaho Power Initial Comments at 8; North Carolina Commission and Staff Initial Comments at 7; Southern Initial Comments at 25-27.

[1581] California Municipal Utilities Reply Comments at 5-6.

Docket No. RM21-17-000                                                    - 514 -

benefits may be inappropriate, for instance, in locations where some transmission

providers operate outside of an RTO/ISO while others function within an RTO/ISO.[1582]

707.    EEI and Idaho Power state that non-RTO/ISO transmission planning regions may

not be able to calculate reduced congestion or increased market liquidity.[1583]  Likewise,

North Carolina Commission and Staff state that some of the benefits proposed for

consideration are only applicable in RTOs/ISOs (e.g., increased market liquidity) and

argue that some benefits could conflict with state-jurisdictional resource decisions (e.g.,

production cost savings, access to lower-cost generation).[1584]

708.    Southern states that, while certain benefits identified in the NOPR could work for

Southern's non-RTO/ISO footprint, others could harm underlying state integrated

resource planning/request for proposal processes or are suited only for RTO/ISO markets,

such as increased market liquidity.[1585]  For example, Southern states that considering

production cost savings effectively would make generation resource-related decisions

that would intrude into integrated resource plan/request for proposal planning, which

considers the total costs (including both generation and transmission costs) of available

alternatives to customers.[1586]  Similarly, SERTP Sponsors state that, because SERTP

---

[1582] Dominion Reply Comments at 2.

[1583] EEI Initial Comments at 19; Idaho Power Initial Comments at 8.

[1584] North Carolina Commission and Staff Initial Comments at 7.

[1585] Southern Initial Comments at 25-27.

[1586] *Id.* at 26.

Docket No. RM21-17-000                                                                                   - 515 -

Sponsors continue to use integrated resource plan/request for proposal planning to make

their resource and load determinations, some of the benefits that are appropriate for

consideration in RTOs/ISOs are inapplicable for transmission planning or cost allocation

purposes in the Southeast.[1587]  SERTP Sponsors further state that, as the states have

exclusive jurisdiction over such integrated resource plan/generation matters, requiring

consideration of "[integrated resource plan/request for proposal]-related benefits,"

including production cost savings, capacity costs benefits, reduced planning reserve

margins, and reduced peak energy losses, could exceed the Commission's jurisdiction by

infringing on such state processes.[1588]

709.    Kentucky Commission Chair Chandler argues against SERTP Sponsors'

comments that suggest that integrated resource plan/request for proposal processes

already consider four of the proposed categories of benefits included in the NOPR.

Kentucky Commission Chair Chandler contends that the integrated resource

planning/request for proposal process can only address these four categories on a utility-

by-utility basis and, thus, is unable to plan for transmission facilities across utilities or

transmission planning regions by nature.[1589]

710.    Some commenters advocate for or against requiring transmission providers to

consider other specific lists, categories, or combinations of benefits, arguing that such

---

[1587] SERTP Sponsors Initial Comments at 30.

[1588] SERTP Sponsors Initial Comments at 30.

[1589] Kentucky Commission Chair Chandler Reply Comments at 7.

approaches reduce possible duplication of benefits, increase flexibility, and/or focus on benefits they believe are most important.[1590]  PIOs, for example, assert that some commenters who are opposed to the list of benefits in the NOPR nonetheless agree that transmission planners should quantify broad categories of benefits to plan effectively.[1591]  AEP states that some benefits are more difficult to calculate than others and argues that the minimum set of benefits it recommends appropriately balances the significance of each type of benefit with the difficulty of quantifying that benefit.[1592]

711.    AEP and GridLab argue that many of the benefits listed in the NOPR measure or identify the same type of benefit and therefore argue that the Commission should group similar benefits together into categories to avoid double-counting.[1593]  Specifically, AEP and GridLab propose that the production cost savings and access to lower-cost generation benefits be grouped into a required category.[1594]  In addition, AEP states that the reduced loss of load probability, reduced planning reserve margin, capacity cost benefits from

---

[1590] ACEG Reply Comments at 6-7; AEE Reply Comments at 25-26; AEP Initial Comments at 6, 23-25; California Commission Initial Comments at 31-34; Certain TDUs Reply Comments at 1-2; Entergy Initial Comments at 21; GridLab Initial Comments at 27; Joint Consumer Advocates Initial Comments at 11; PIOs Reply Comments at 7-9; PJM Initial Comments at 94-96; PPL Initial Comments at 14.

[1591] PIOs Reply Comments at 7-8 (citing Entergy Initial Comments at 21; Exelon Initial Comments at 15).

[1592] AEP Initial Comments at 23.

[1593] AEP Initial Comments at 23-24; GridLab Initial Comments at 27.

[1594] AEP Initial Comments at 25; GridLab Initial Comments at 27.

reduced peak energy losses, and deferred capacity investments benefits should be combined into one required category.[1595]

712.    GridLab and PJM contend that the Commission should combine the benefits of reduced loss of load probability and deferred generation capacity investment into a single category of benefits.[1596]  PJM further argues that the Commission should combine the benefits of mitigation of extreme events and mitigation of weather and load uncertainty.[1597]

713.    California Commission recommends that to capture the benefits of transmission infrastructure, the Commission should require transmission providers to assess benefits within the following six benefit categories:  (1) production cost benefits; (2) emissions reductions benefits; (3) generation capital cost benefits; (4) risk mitigation benefits; (5) resource adequacy benefits; and (6) resilience benefits.  California Commission states that such a requirement would promote greater uniformity in how the benefits of regional (and interregional) transmission projects are evaluated, reducing potential disputes over cost allocation.[1598]  However, California Commission argues, the Commission should allow transmission providers, in consultation with Relevant State Entities, to define each

---

[1595] AEP Initial Comments at 25.

[1596] GridLab Initial Comments at 27; PJM Initial Comments at 95.

[1597] PJM Initial Comments at 94.

[1598] California Commission Initial Comments at 33.

identified benefit and determine how to quantify it.[1599]  To ensure that customers are
protected from speculative transmission development and unreasonably high costs,
California Commission concludes that the Commission should require transmission
providers to demonstrate on compliance that they identified and defined benefits within
each of the required benefit categories and determined appropriate quantification methods
through a transparent public process.[1600]

714.    Joint Consumer Advocates state that the following categories of benefits should be
included in Long-Term Regional Transmission Planning:  (1) production cost savings; (2)
avoided or deferred reliability transmission facilities; and (3) aging transmission
infrastructure replacement.[1601]

715.    AEE notes that some commenters propose that the Commission adopt a smaller set
of benefit categories.[1602]  AEE states that while there may be value in considering these
proposals, they miss important benefits such as increased competition, market liquidity,
and increased resilience from mitigation of extreme weather events effects and system
contingencies.[1603]  Thus, AEE recommends that the Commission adopt as mandatory the

---

[1599] *Id.* at 28-29.

[1600] *Id.* at 34-35.

[1601] Joint Consumer Advocates Initial Comments at 11.

[1602] AEE Reply Comments at 25-26 (citing PJM Initial Comments at 93-96;
California Commission Initial Comments at 32; New Jersey Commission Initial
Comments at 13-14).

[1603] *Id.*

full set of 12 benefits listed in the NOPR but allow a transmission provider to demonstrate that an alternative set of benefits captures all the benefits of transmission in its transmission planning region.

716.    A few commenters offer categories of benefits while noting the importance of regional flexibility.[1604]  ACEG notes widespread support for the Commission to require certain categories of minimum benefits and requests flexibility for transmission providers to address these categories in accordance with regional needs.  ACEG states that considering categories of benefits will reduce the risk of double-counting or miscalculating benefits and allow flexibility to apply specific benefits best suited to each transmission planning region.[1605]

717.    In addition to concerns expressed by commenters in the context of the combinations of benefits proposed above, other commenters express concern regarding the potential for double-counting of benefits if transmission providers are required to consider certain benefits.[1606]  For example, NRECA asserts that accounting for increased competition and increased market liquidity would risk double-counting benefits,[1607] and

---

[1604] ACEG Reply Comments at 6-7; Entergy Initial Comments at 21.

[1605] ACEG Reply Comments at 6-7 (citing Entergy Initial Comments at 21; AEP Initial Comments at 23-27; Exelon Initial Comments at 15-16).

[1606] *See, e.g.*, APPA Initial Comments at 32; City of New Orleans Council Initial Comments at 10-11; Louisiana Commission Reply Comments at 10; Michigan Commission Initial Comments at 6; Nevada Commission Initial Comments at 10-11; Utah Division of Public Utilities Initial Comments at 8; Vistra Initial Comments at 16-17.

[1607] NRECA Initial Comments at 45 (citing NRECA Initial Comments, attach. at

Docket No. RM21-17-000                                              - 520 -

Utah Division of Public Utilities argues that accounting for both reduction in loss of load probability and mitigation of extreme events and system contingencies would result in double-counting.[1608]  Clean Energy Buyers ask that the Commission require transmission providers to explain how they will avoid double-counting issues,[1609] while ISO-NE seeks more information from the Commission regarding which benefits the Commission believes are redundant.[1610]

718.    A few commenters state that the list of 12 benefits in the NOPR does not risk double-counting.[1611]  DC and MD Offices of People's Counsel concludes that each benefit in this list is mutually exclusive, noting that some transmission providers may wish to mix and match these benefits because their modeling tools may not disaggregate them in exactly the way described in the NOPR.[1612]  MISO notes that there are instances where one benefit can enable other benefits and that adopting a calculation method that recognizes that complementary behavior can yield incremental value.[1613]  For example, MISO states, a calculation approach that distinguishes between the benefit of enabling

---

16-17).

[1608] Utah Division of Public Utilities Initial Comments at 8.

[1609] Clean Energy Buyers Initial Comments at 20-21.

[1610] ISO-NE Initial Comments at 34.

[1611] DC and MD Offices of People's Counsel Initial Comments at 20; MISO Initial Comments at 50.

[1612] DC and MD Offices of People's Counsel Initial Comments at 20.

[1613] MISO Initial Comments at 50.

resource expansion and the benefit of increased transmission capability provided by regional transmission projects would produce unique benefits.[1614]

### c.    Commission Determination

719.    We adopt the NOPR proposal, with modification, to require transmission providers in each transmission planning region to measure a set of seven required benefits (required benefits) for Long-Term Regional Transmission Facilities under each Long-Term Scenario as part of Long-Term Regional Transmission Planning. Furthermore, we adopt the NOPR proposal, with modification, to require transmission providers in each transmission planning region to use these measured benefits to evaluate Long-Term Regional Transmission Facilities, as discussed below in the Evaluation and Selection of Regional Transmission Facilities section. This Evaluation of the Benefits of Regional Transmission Facilities section discusses this final rule's requirements with regard to transmission providers' measurement and use of benefits in evaluating Long-Term Regional Transmission Facilities; however, as discussed in the Development of Long-Term Scenarios section, these same benefits should help to inform transmission providers' identification of Long-Term Transmission Needs.[1615]

720.    The seven required benefits that we require transmission providers to measure and use in Long-Term Regional Transmission Planning, which we describe in greater detail

---

[1614] *Id.*

[1615] *See supra* Long-Term Regional Transmission Planning, Development of Long-Term Scenarios section.

in the discussion of the individual benefits below, are:  (1) avoided or deferred reliability transmission facilities and aging infrastructure replacement; (2) a benefit that can be characterized and measured as either reduced loss of load probability or reduced planning reserve margin; (3) production cost savings; (4) reduced transmission energy losses; (5) reduced congestion due to transmission outages; (6) mitigation of extreme weather events and unexpected system conditions; and (7) capacity cost benefits from reduced peak energy losses.[1616]

721.    We find that these requirements are necessary to ensure that transmission providers can evaluate Long-Term Regional Transmission Facilities to determine whether they more efficiently or cost-effectively address Long-Term Transmission Needs.  Specifically, we find that transmission providers must measure these seven required benefits in each Long-Term Scenario because, as discussed further in the Evaluation and Selection of Regional Transmission Facilities section, evaluating Long-Term Regional Transmission Facilities for potential selection necessarily involves the consideration of the benefits measured in each Long-Term Scenario and sensitivity to help address uncertainty over the 20-year transmission planning horizon and to maximize benefits accounting for costs over time.  As such, we find that, to ensure just and reasonable Commission-jurisdictional rates, transmission providers must measure, at minimum, the set of seven required benefits in Long-Term Regional Transmission

---

[1616] We discuss modifications to Benefit 6 from its description in the NOPR in the Benefit 6 determination section.

Planning and then use them to evaluate Long-Term Regional Transmission Facilities for selection.

722.    Although the Commission did not propose to require the use of any specific benefits in the NOPR, the Commission sought comment on whether it should require transmission providers to use some or all of the potential benefits described in the NOPR as a minimum set of benefits in Long-Term Regional Transmission Planning.  The record in this proceeding shows that, in order to ensure just and reasonable Commission-jurisdictional transmission rates, it is necessary to require transmission providers to measure and use in Long-Term Regional Transmission Planning a set of particular benefits so that they may identify, evaluate, and select regional transmission facilities that are more efficient or cost-effective transmission solutions to Long-Term Transmission Needs.  We find that the benefits that Long-Term Regional Transmission Facilities generally provide extend beyond the benefits that transmission providers currently consider as part of their regional transmission planning and cost allocation processes, and without consideration of such benefits, Long-Term Regional Transmission Planning cannot be reasonably expected to identify, evaluate, and select more efficient or cost-effective regional transmission solutions to address Long-Term Transmission Needs.

723.    By requiring the measurement and use of the seven enumerated benefits in Long-Term Regional Transmission Planning, we ensure that transmission providers will consider a sufficiently broad range of benefits when determining whether to select a Long-Term Regional Transmission Facility as a more efficient or cost-effective regional transmission solution to Long-Term Transmission Needs.  In contrast, adopting the more

flexible approach proposed in the NOPR would not address the identified deficiencies in existing regional transmission planning and cost allocation processes because such an approach would fail to ensure that transmission providers consider the broader set of benefits provided by, and the beneficiaries receiving the benefits of, Long-Term Regional Transmission Facilities, and thus, may fail to identify the potentially more efficient or cost-effective regional transmission solution.  We find that failing to use the set of benefits that we require in this final rule to evaluate Long-Term Regional Transmission Facilities for potential selection could render resulting Commission-jurisdictional rates unjust and unreasonable.  We find that not requiring transmission providers to use certain benefits to evaluate Long-Term Regional Transmission Facilities would be expected to lead to relatively inefficient and less cost-effective transmission development, as Long-Term Regional Transmission Facilities that provide significant net benefits may not be selected.[1617]  In addition, we find that the transparency provided by requiring consideration of a sufficiently broad and common set of benefits will help to ensure the costs of Long-Term Regional Transmission Facilities are allocated to beneficiaries in a manner that is at least roughly commensurate with the benefits they derive from them.[1618]

---

[1617] *See* Clean Energy Associations Initial Comments at 20 (citing The Brattle Group, *Transmission Planning and Benefit-Cost Analyses*, at 26 (Apr. 2021)).

[1618] *ICC v. FERC I*, 576 F.3d at 477; Order No. 1000, 136 FERC ¶ 61,051 at PP 622, 639 (requiring costs of regional transmission facilities to be allocated in a manner that is at least roughly commensurate with estimated benefits).

724.    We appreciate arguments made by certain commenters that failure to incorporate

identifiable benefits risks skewing the evaluation process against developing needed and

beneficial Long-Term Regional Transmission Facilities because transmission providers

would consider all of the costs of such transmission facilities without similarly

considering many important benefits that they may provide.[1619]  However, we are also

cognizant of concerns about duplication of benefits and difficulty of measuring certain

benefits.  In this final rule, rather than requiring transmission providers to measure and

use all 12 benefits enumerated in the NOPR, we only require transmission providers to

measure and use seven specific benefits that have a proven track record, can be discretely

measured, and are unlikely to cause duplication.  We find that the modification to the

NOPR proposal to require the measurement and use of these seven benefits to evaluate

Long-Term Regional Transmission Facilities, as discussed above, resolves concerns

about important benefits being omitted from Long-Term Regional Transmission

Planning, as well as challenges raised concerning duplication and measurement of certain

benefits.

725.    We acknowledge that many commenters do not favor requiring the use of

particular benefits.  In response, we emphasize that a set of common benefits and a

requirement to measure and use those benefits in Long-Term Regional Transmission

Planning will ensure just and reasonable rates, as discussed above.[1620]  Specifically,

---

[1619] *See* Enel Initial Comments at 3.

[1620] *See* ACORE Initial Comments at 12; ACORE Reply Comments at 6; ACORE
Supplemental Comments at 1; AEE Initial Comments at 8, 25; AEP Initial Comments at

unless transmission providers consider a sufficiently broad range of benefits when

determining whether to select a Long-Term Regional Transmission Facility as a more

efficient or cost-effective regional transmission solution to Long-Term Transmission

Needs, they may fail to identify the more efficient or cost-effective regional transmission

solution, resulting in relatively inefficient or less cost-effective transmission

development.

726.    We note that some commenters request flexibility to use different benefits, such as

SPP, which states that the effort required to incorporate additional benefit metrics into its

current regional transmission planning process cannot be accommodated within its

---

6, 23-25; Breakthrough Energy Initial Comments at 4, 21-22; Business Council for
Sustainable Energy Initial Comments at 2, 5; Certain TDUs Initial Comments at 11-12;
Clean Energy Buyers Reply Comments at 8-9; Concerned Scientists Reply Comments at
7-10; Cypress Creek Reply Comments at 7-8; DC and MD Offices of People's Counsels
Reply Comments at 3, 7-8; ELCON Initial Comments at 15; Enel Initial Comments at 3;
Environmental Groups Supplemental Comments at 2; Environmental Legislators Caucus
Supplemental Comments at 1; Exelon Initial Comments at 16: Grid United Initial
Comments at 2; Handy Law Initial Comments at 8; US House Republicans Supplemental
Comments at 1; Indicated US Senators and Representatives Initial Comments at 2; ITC
Initial Comments at 5, 18-22; Interwest Initial Comments at 12; Interwest Reply
Comments at 6-7; Joint Consumer Advocates Initial Comments at 11; Kentucky
Commission Chair Chandler Reply Comments at 7; Minnesota State Entities Initial
Comments at 6; New England for Offshore Wind Initial Comments at 5; New Jersey
Commission Initial Comments at 11-14; Pacific Northwest State Agencies Initial
Comments at 16-17; PIOs Initial Comments at 27-28; PIOs Reply Comments at 7-8;
Policy Integrity Initial Comments at 27; Policy Integrity Supplemental Comments at 4; R
Street Initial Comments at 9; RMI Initial Comments at 1; RMI Supplemental Comments
at 2; SEIA Initial Comments at 16-17; Southeast PIOs Initial Comments at 50; Southeast
PIOs Reply Comments at 27-28; ; US DOE Initial Comments at 30-33; US Senator
Schumer Supplemental Comments at 1-2; US Senator Whitehouse Supplemental
Comments at 2; US Senators Supplemental Comments at 2; WATT Coalition Initial
Comments at 7.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 537 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                          - 527 -

current process timeline.[1621]  As discussed in the Implementation and Compliance

sections of this final rule, we require transmission providers to propose on compliance a

date, no later than one year from the date on which initial filings to comply with this final

rule are due, on which they will commence the first Long-Term Regional Transmission

Planning cycle (unless additional time is needed to align the first Long-Term Regional

Transmission Planning cycle with existing transmission planning cycles), and thus

transmission providers will not be required to immediately implement this reform.

727.    Some commenters argue that the requirement to measure and use these benefits

will increase costs and require additional effort, and that the Commission has presented

insufficient evidence that this requirement will produce the desired benefits.[1622]

Commenters who express such concerns did not provide persuasive evidence to suggest

that requiring the measurement and use of a required set of benefits would be unduly

burdensome.  While measuring these benefits may impose a degree of burden on some

transmission providers, the requirement for transmission providers to measure and use the

seven required benefits in Long-Term Regional Transmission Planning is necessary to

ensure that rates are just and reasonable.  Specifically, absent a requirement that

transmission providers measure and use a sufficiently broad range of benefits of Long-

Term Regional Transmission Facilities when evaluating them for potential selection,

transmission providers may not identify, evaluate, and select more efficient or cost-

---

[1621] SPP Initial Comments at 18.

[1622] *E.g.*, Dominion Initial Comments at 34-35.

Docket No. RM21-17-000                                                - 528 -

effective regional transmission solutions to Long-Term Transmission Needs, which may

lead to relatively inefficient or less cost-effective transmission development. Further, we

believe that experience gained by transmission providers will over time allow them to

perform the necessary measurements more efficiently. Moreover, in our discussion of

each required benefit below, we provide a description, for several of the required

benefits, of at least one manner in which transmission providers could measure each

required benefit. Finally, commenters also did not provide persuasive evidence that the

burdens of measuring and using a required set of benefits outweigh the benefits of using

these benefits in Long-Term Regional Transmission Planning. We therefore find that any

burdens of measuring and using the seven required benefits in Long-Term Regional

Transmission Planning are outweighed by the identification, evaluation, and selection of

more efficient or cost-effective Long-Term Regional Transmission Facilities to address

Long-Term Transmission Needs.[1623]

728. Another common concern expressed by some commenters is that requiring a

minimum set of benefits would undermine regional flexibility.[1624] We conclude that it

would be inappropriate to provide flexibility not to consider this required set of benefits

in Long-Term Regional Transmission Planning because, as described above, requiring

the measurement and use of these benefits ensures that transmission providers are able to

---

[1623] *See* Clean Energy Associations Initial Comments at 20 ("Not requiring
benefits to be evaluated could lead to higher costs in the long-term, and, thus, unjust and
unreasonable rates.").

[1624] *E.g.*, Entergy Initial Comments at 21.

identify, evaluate, and select regional transmission solutions to more efficiently or cost-effectively address Long-Term Transmission Needs, and thereby ensures just and reasonable rates.  We therefore disagree with Dominion that transmission providers should be permitted to identify initial benefits that they will consider in conducting Long-Term Regional Transmission Planning but retain flexibility in applying such benefits to each transmission provider's individual circumstances.[1625]  However, as we discuss further below, we are providing flexibility to transmission providers regarding how they will measure each of the required benefits.

729.    Transmission providers may also propose to measure and use additional benefits in Long-Term Regional Transmission Planning, as discussed below in the Other Benefits section.  This approach provides flexibility to transmission providers in how they implement the requirement to measure and use the required set of benefits in Long-Term Regional Transmission Planning, while maintaining the baseline requirement that they measure and use all seven benefits included in that required set of benefits, in order to ensure that rates remain just and reasonable.  Requiring all transmission providers to measure and use a required set of benefits will help to improve interregional transmission coordination among different transmission planning regions, as noted by commenters.[1626]

---

[1625] Dominion Initial Comments at 34.

[1626] Breakthrough Energy Initial Comments at 22-23; California Commission Initial Comments at 33; Grid United Initial Comments at 3; Policy Integrity Initial Comments at 27-28; US DOE Initial Comments at 31-32.

730.    In addition, as more fully described below, we also find that the seven benefits we require are not overly burdensome to calculate.  We address such concerns for individual benefits in more detail within the determination section on each benefit below.

731.    Some commenters assert that some benefits are only appropriate for use in RTO/ISO transmission planning regions.[1627]  We believe that all seven required benefits can be calculated in both RTO/ISO and non-RTO/ISO transmission planning regions, as noted by ACEG.[1628]  In particular, we note that all seven required benefits have either been approved for use in regional transmission planning in at least one non-RTO/ISO transmission planning region or may be implemented by building upon the modeling or techniques used to measure benefits in RTO/ISO or non-RTO/ISO regions, or both.

732.    As described below, in the NOPR, the Commission noted that it approved the use of production cost savings (i.e., Benefit 3) to evaluate Order No. 1000 economic transmission projects in a non-RTO/ISO transmission planning region.[1629]  We note that, as measurements of reduced production costs outside of normal conditions, the measurement methods for Benefit 5, Reduced Congestion Due to Transmission Outages, and Benefit 6, Mitigation of Extreme Weather Events and Unexpected System Conditions, may be built upon the modeling used to measure Benefit 3.  Separately, the

---

[1627] Pacific Northwest Utilities Initial Comments at 8-10; SERTP Sponsors Initial Comments 29-30; Southern Initial Comments at 25-27.

[1628] ACEG Initial Comments at 48.

[1629] NOPR, 179 FERC ¶ 61,028 at P 201 (citing *Pub. Serv. Co. of Colo.*, 142 FERC ¶ 61,206, at P 314 (2013)).

Commission has accepted use of benefits in evaluating regional transmission facilities in

Order No. 1000 regional transmission planning processes akin to Benefit 2(a), Reduced

Loss of Load Probability,[1630] and Benefit 4, Reduced Transmission Energy Losses, in

non-RTO/ISO transmission planning regions.[1631]   In the NOPR, the Commission likewise

noted that it has accepted accounting for the avoided costs (i.e., Benefit 1) as part of a

method for identifying beneficiaries and allocating costs in almost all the regional cost

allocation methods in non-RTO/ISO transmission planning regions.[1632]  With respect to

Final Rule Benefit 7 (i.e., capacity cost benefits from reduced peak energy losses), the

avoided costs associated with this benefit are comparable across RTO/ISO and non-

RTO/ISO transmission planning regions.  Transmission providers in all transmission

planning regions incur capital costs to meet installed generation requirements and to

maintain reliable operations.  Transmission expansions may help reduce peak energy

losses, and under this benefit, result in capital cost savings associated with the reduction

in installed generation requirements.

733.   We disagree with commenters that express concerns that required benefits would

conflict with state-regulated integrated resource planning processes.[1633]  As discussed in

---

[1630] *PacifiCorp*, 147 FERC ¶ 61,057, at PP 133-134, 141-143 (2014); *Pub. Serv. Co. of Colo.*, 142 FERC ¶ 61,206 at P 314.

[1631] *PacifiCorp*, 147 FERC ¶ 61,057 at PP 132, 134, 141-143.

[1632] NOPR, 179 FERC ¶ 61,028 at PP 189-190 & n.326 (citing Order No. 1000, 136 FERC ¶ 61,051 at P 81).

[1633] SERTP Sponsors Initial Comments at 30; Southern Initial Comments at 24-26.

the Legal Authority to Adopt Reforms for Long-Term Regional Transmission Planning section, nothing in this final rule infringes on the states' reserved authority under FPA section 201.

734.     Entergy argues that the Commission should recognize that not all benefits are created equal for all jurisdictions and that some states will want transmission projects that actually reduce customer bills to have clear priority.[1634]  We believe that the required measurement and use of the required set of benefits can accommodate such preferences. Our requirements ensure that all benefits are measured transparently and considered in selection decisions.  In addition, our required set of benefits captures considerations such as production cost savings that can flow through to customer bills.  PJM, for example, notes that lower production costs will generally also reduce market prices for electricity as lower-cost suppliers will set market clearing prices more frequently than without the transmission project.[1635]  We note that while this final rule requires the measurement and use of the required set of benefits, it is the evaluation process, including selection criteria, that transmission providers propose on compliance that will inform which Long-Term Regional Transmission Facilities are selected.  Transmission providers may propose an evaluation process, including selection criteria, that reflect regional preferences as long as those criteria meet the requirements set forth below in the Evaluation and Selection of Long-Term Regional Transmission Facilities section.

---

[1634] Entergy Initial Comments at 21.

[1635] PJM Initial Comments at 95.

735.    ISO-NE notes that the Commission sought information on potential double-counting of benefits and requests that the Commission clarify which benefits the Commission believes are redundant.[1636]  We believe that the seven benefits that we include in the required set of benefits that transmission providers must measure and use in Long-Term Regional Transmission Planning are distinct enough that they will not overlap in a way that results in double-counting.  Nonetheless, to the extent that transmission providers are concerned that any possibility of double-counting remains, we provide transmission providers with flexibility on the measurement of such benefits and expect that transmission providers can use such flexibility to develop methods for measuring each required benefit that address those concerns.

736.    Some commenters urge the Commission to adopt a combination or categorical approach toward benefits, under which required benefits would be grouped under certain categories or combinations.[1637]  We decline to adopt this approach, largely because our analysis and review of the record suggests that such an approach could reduce transparency regarding the benefits that we are requiring.  For example, in some cases adopting a combination or categories approach could obfuscate individual benefit calculations within a category, making it less clear to interested parties what specific

---

[1636] ISO-NE Initial Comments at 34.

[1637] ACEG Reply Comments at 6-7; AEP Initial Comments at 23-25; California Commission Initial Comments at 33; Entergy Initial Comments at 21; GridLab Initial Comments at 27; Joint Consumer Advocates Initial Comments at 11; PJM Initial Comments at 94-96.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 544 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                               - 534 -

benefits a Long-Term Regional Transmission Facility may provide.  Additionally, we find that these seven benefits merit individual measurement and evaluation.

737.    Northwest and Intermountain and NYISO ask that the final rule confirm that the 12 illustrative benefits described in the NOPR are not exhaustive.[1638]  First, we confirm that the list of 12 illustrative benefits described in the NOPR is not an exhaustive list of the potential benefits of Long-Term Regional Transmission Facilities.  Second, we reiterate that the required set of benefits adopted in this final rule is a subset of the benefits listed in the NOPR, as modified in the discussions below.  Transmission providers may be aware of additional benefits beyond those included in the required set of benefits, or the 12 illustrative benefits described in the NOPR, and we provide them with the flexibility to propose to measure and use additional benefits in Long-Term Regional Transmission Planning so long as they do so in a manner that is consistent with transmission providers' obligations under Order No. 890 and Order No. 1000 transmission planning principles to be open and transparent as to their transmission planning processes.  In particular, the evaluation process must result in a determination that is sufficiently detailed for stakeholders to understand why a particular Long-Term Regional Transmission Facility (or portfolio of such Facilities) was selected or not selected to address Long-Term Transmission Needs.[1639]  This necessarily means that

---

[1638] Northwest and Intermountain Initial Comments at 16; NYISO Initial Comments at 39.

[1639] *See infra* Evaluation and Selection of Long-Term Regional Transmission Facilities section.

stakeholders must understand which benefits transmission providers considered in the evaluation process, including any beyond the seven benefits that we require transmission providers to include in their OATTs.  We find that this transparency strikes an appropriate balance between ensuring that transmission providers measure and use the seven required benefits in Long-Term Regional Transmission Planning and allowing flexibility for transmission providers to use additional benefits that they believe will reasonably reflect the benefits of a Long-Term Regional Transmission Facility or Facilities in their transmission planning regions.

738.    OMS urges the Commission to clarify that transmission providers will have sufficient flexibility to use different sets of benefit metrics in different transmission planning cycles.[1640]  We clarify that transmission providers must use the required set of benefits to evaluate Long-Term Regional Transmission Facilities in every Long-Term Regional Transmission Planning cycle, and we discuss the use of other benefits to evaluate Long-Term Regional Transmission Facilities in the Other Benefits section of this final rule.

739.    Some commenters suggest that the Commission allow transmission providers to use a screening approach that initially screens benefit categories for significance before investing staff resources and modeling work to provide a detailed quantification.[1641]

---

[1640] OMS Initial Comments at 8.

[1641] ACEG Initial Comments at 7, 33; ACORE Initial Comments at 12; Breakthrough Energy Initial Comments at 22; CTC Global Initial Comments at 9;

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 546 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                    - 536 -

Clean Energy Buyers similarly argue that, at a minimum, the Commission should require that transmission providers screen for all 12 benefits described in the NOPR and quantify them accordingly.[1642]  We find such screening approaches, as advocated by some commenters, to be inconsistent with the approach we adopt in this final rule, which requires measurement and use of each of the seven required benefits in Long-Term Regional Transmission Planning, and we are concerned that permitting the use of screens could undermine this requirement.  We therefore do not allow transmission providers to use a screening approach when measuring the seven required benefits.

### 2.     Required Benefits

#### a.     The Seven Required Benefits

##### i.     Benefit 1:  Avoided or Deferred Reliability Transmission Facilities and Aging Transmission Infrastructure Replacement

###### (a)     NOPR Description

740.    The Commission described this benefit in the NOPR as the reduced costs of avoided or delayed transmission investment otherwise required to address reliability needs or replace aging transmission facilities.  The Commission stated that, recognizing that regional transmission planning could lead to the development of transmission facilities that span the service territories of multiple transmission providers, which in turn would obviate the need for transmission facilities that would otherwise be identified in

---

Interwest Initial Comments at 12-13; WATT Coalition Initial Comments at 7.

[1642] Clean Energy Buyers Initial Comments at 20-21.

Docket No. RM21-17-000                                                          - 537 -

multiple local transmission plans, the Commission has accepted accounting for such

"avoided costs" as part of a method for identifying beneficiaries and allocating costs in

almost all the regional cost allocation methods in non-RTO/ISO regions. [1643]  The

Commission noted that, in using this method, transmission providers in a transmission

planning region determine the beneficiaries of a regional transmission facility or portfolio

of facilities by identifying the local and regional transmission facilities that a new

proposed regional transmission facility or portfolio of facilities would displace.  The

Commission described the method as defining the benefits of the regional transmission

facility or facilities as the costs that transmission providers in the transmission planning

region "avoid" because they no longer need to build the displaced local and regional

transmission facilities.  Further, the Commission stated that the method allocates costs

among transmission providers whose local or regional transmission facilities the new

proposed regional transmission facility or facilities would displace in proportion to their

share of the total benefits (i.e., the total avoided costs).  If the new proposed regional

transmission facility or facilities do not displace any local or regional transmission

facilities in existing local or regional transmission plans, the Commission discussed that

the avoided cost method determines the benefits of the applicable facilities by

considering the costs of local or regional transmission facilities that would otherwise be

needed to meet the same need that the new proposed regional transmission facility will

---

[1643] NOPR, 179 FERC ¶ 61,028 at PP 189-190 (citing Order No. 1000, 136 FERC
¶ 61,051 at P 81).

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 548 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

meet.[1644]  The Commission noted that, in calculating this benefit, transmission providers
in each transmission planning region could first identify transmission facilities that could
defer or replace an identified reliability transmission solution.  Avoided cost benefits
could be calculated by comparing the cost of transmission facilities required to address
the reliability need without the proposed regional transmission facility to the cost of
transmission facilities needed to address the reliability need assuming the regional
transmission solution were in place.[1645]

741.    The Commission noted that Benefit 1 could also include the separate benefits
stream caused by a deferral of replacement of other transmission facilities through
identification and selection of a transmission facility or facilities.  This could be
measured through calculation of the present value savings for the period of deferral of
additional replacement transmission facilities multiplied by their estimated capital
cost.[1646]  The Commission also noted that a number of transmission providers already
evaluate the avoided or deferred costs of reliability transmission projects.  For example,
SPP uses a power flow model to analyze the ability of potential economic and Public
Policy Requirements transmission facilities to meet the same thermal reliability needs
addressed by a potential reliability transmission facility.  The costs of these avoided or

---

[1644] NOPR, 179 FERC ¶ 61,028 at P 190 (citing *S.C. Elec. & Gas Co.*, 143 FERC
¶ 61,058, at P 232 (2013)).

[1645] *Id.* P 191 (citing Brattle-Grid Strategies Oct. 2021 Report at 37).

[1646] *Id.* P 192.

delayed reliability transmission facilities are used to determine the reliability benefit of the potential economic or Public Policy Requirements transmission facilities.[1647]  The Commission stated that transmission providers could also use avoided costs to calculate the benefits of replacing aging transmission facilities.  The Commission provided NYISO as an example, which estimates the benefits associated with the replacement of aging transmission facilities by quantifying the savings of not having to refurbish the facilities in the future.[1648]

### (b)    Comments

742.    A number of commenters support mandating consideration of Benefit 1.[1649] ACEG, for example, supports inclusion of this benefit, asserting that reliability considerations and replacing aging assets are responsible for almost all current

---

[1647] *Id.* P 193 (citing SPP, *SPP Benefit Metrics Manual*, SPP Engineering, at 15 (Nov. 6, 2020)).

[1648] *Id.* P 193 (citing The Brattle Group, *Benefit-Cost Analysis of Proposed New York AC Transmission Upgrades*, at 114 (Sept. 15, 2015)).

[1649] Acadia Center and CLF Initial Comments at 21-22; ACEG Initial Comments at 32; ACORE Initial Comments at 12; AEE Reply Comments at 25; AEP Initial Comments at 25 (including Benefit 1 in its recommended minimum set of benefit categories); Amazon Initial Comments at 5; Breakthrough Energy Initial Comments at 21-22; Certain TDUs Reply Comments at 1-2; Clean Energy Associations Initial Comments at 19-20; DC and MD Offices of People's Counsel Initial Comments at 19-20; ENGIE Reply Comments at 3; Hannon Armstrong Initial Comments at 3; Interwest Initial Comments at 12-14; National and State Conservation Organizations Initial Comments at 1; New Jersey Commission Initial Comments at 11-13; Pine Gate Initial Comments at 34-37; PIOs Initial Comments at 38-41; PJM Initial Comments at 96; RMI Initial Comments at 1; SEIA Initial Comments at 16; Southeast PIOs Initial Comments at 50; US DOE Initial Comments at 31-32.

transmission spending.[1650]  However, MISO states that, when capturing avoided transmission investment benefits, care must be exercised to avoid the counting of benefits associated with facility overloads that are identified in reliability studies and directly addressed by regional transmission projects.  MISO indicates that this approach is necessary because the adjusted production cost savings benefits already reflect the congestion associated with these facility overloads.[1651]  Southern states that this benefit would likely prove workable under its non-RTO/ISO construct because SERTP Sponsors' regional and interregional transmission planning and cost allocation processes already incorporate the benefit of "avoided costs."[1652]

743.    Several commenters oppose or express concerns with mandating consideration of Benefit 1.[1653]  West Virginia Commission argues that calculation of this benefit requires evidence based on assumptions that are difficult, if not impossible, to quantify in advance.[1654]  Xcel states that benefit calculations can be different between the short-term regional transmission planning process and Long-Term Regional Transmission Planning and that, for example, it would likely be unreasonable to determine reliability benefits in

---

[1650] ACEG Initial Comments at 34-35.

[1651] MISO Initial Comments at 50.

[1652] Southern Initial Comments at 25.

[1653] Joint Consumer Advocates Initial Comments at 11; NARUC Initial Comments at 22; West Virginia Commission Supplemental Comments at 4; Xcel Initial Comments at 13.

[1654] West Virginia Commission Supplemental Comments at 4.

Long-Term Regional Transmission Planning using the avoided cost of local reliability solutions.[1655]

744.    NARUC states that, while Benefit 1 seems capable of calculation, it carries with it a degree of risk if aging transmission infrastructure continues to be operated.  For instance, NARUC indicates that some wildfires have been linked to deferred transmission maintenance of aging infrastructure.[1656]  AEE responds by stating that the Commission should clarify:  (1) its expectations regarding its calculation; and (2) that regional transmission built for inherently economic or public policy purposes has, when installed, avoided reliability cost benefits.[1657]  AEE argues that calculating the benefits of avoided investment in reliability or replacement facilities should not create an environment for continuously putting "band aid" fixes on aging systems that should instead be replaced to ensure reliability and resilience.[1658]

### (c)    Commission Determination

745.    We adopt the NOPR proposal, with modification, to require transmission providers in each transmission planning region to measure and use Benefit 1, Avoided or Deferred Reliability Transmission Facilities and Aging Transmission Infrastructure Replacement, in Long-Term Regional Transmission Planning.  We adopt the NOPR's

---

[1655] Xcel Initial Comments at 13.

[1656] NARUC Initial Comments at 22.

[1657] AEE Reply Comments at 26 (citing NARUC Initial Comments at 22).

[1658] *Id.*

proposed description of Benefit 1 as the reduced costs due to avoided or delayed
transmission investment otherwise required to address reliability needs or replace aging
transmission facilities.  We find that requiring the measurement and use of Benefit 1, as
described, is necessary because Long-Term Regional Transmission Facilities may obviate
or delay the need for reliability transmission facilities identified in the near term, or the
need for later replacements of aging transmission infrastructure.  Requiring transmission
providers to measure and use the benefits associated with avoiding or delaying such
transmission needs will help to ensure that, when conducting Long-Term Regional
Transmission Planning, transmission providers identify, evaluate, and select Long-Term
Regional Transmission Facilities that more efficiently or cost-effectively address Long-
Term Transmission Needs.

746.    We note that a number of transmission providers already evaluate avoided or
deferred costs of reliability transmission facilities.  ACEG states that Benefit 1 reflects
that reliability considerations and replacing aging assets drive significant investment in
transmission and account for almost all current transmission spending.[1659]  SPP employs a
power flow model to analyze the ability of potential economic and Public Policy
Requirements transmission facilities to meet the same thermal reliability needs addressed
by a potential reliability transmission facility, using the costs of these avoided or delayed
reliability transmission facilities to determine the reliability benefit of the potential

---

[1659] ACEG Initial Comments at 34-35.

economic or Public Policy Requirements transmission facilities.[1660]  Additionally, NYISO estimates the benefits associated with the replacement of aging transmission facilities by quantifying the savings of not having to refurbish the facilities in the future.[1661]  We find that widespread use of this benefit contradicts West Virginia Commission's assertion that calculation of this benefit requires evidence based on assumptions that are difficult, if not impossible, to quantify in advance, as well as similar assertions by Xcel.[1662]

747.    We agree with NARUC and AEE that continued operation of aging infrastructure can carry risks if it is not properly maintained.[1663]  We note that nothing in this final rule restricts an incumbent transmission provider from developing a local transmission facility to meet its reliability needs or service obligations in its own retail distribution service territory or footprint.[1664]  Such a solution would not be subject to approval at the regional or interregional level where the transmission provider does not seek to have it selected as

---

[1660] NOPR, 179 FERC ¶ 61,028 at P 193 (citing SPP, *SPP Benefit Metrics Manual*, SPP Engineering, at 15 (Nov. 6, 2020)).

[1661] *Id.* (citing The Brattle Group, *Benefit-Cost Analysis of Proposed New York AC Transmission Upgrades*, at 114 (Sept. 15, 2015)).

[1662] West Virginia Commission Supplemental Comments at 4; Xcel Initial Comments at 13.

[1663] AEE Reply Comments at 26 (citing NARUC Initial Comments at 22); NARUC Initial Comments at 22.

[1664] Order No. 1000, 136 FERC ¶ 61,051 at PP 262, 329.

a regional transmission facility for purposes of cost allocation.[1665]  Moreover, nothing in this final rule requires transmission providers to keep transmission facilities in operation beyond their useful life.  We emphasize that transmission providers can use Benefit 1 to calculate the costs that are avoided because replacements of local or regional transmission facilities are no longer needed, or may be deferred, when they are displaced by proposed new Long-Term Regional Transmission Facilities.

ii.    **Benefit 2(a):  Reduced Loss of Load Probability or Benefit 2(b): Reduced Planning Reserve Margin**

(a)    **NOPR Description**

748.    The Commission described this benefit in the NOPR as being measured in one of two ways:  (a) using reduced loss of load probability *or* (b) reduced planning reserve margin.  The Commission noted that, because there is an overlap between reduced loss of load probability benefits and reduced planning reserve margin benefits, a single transmission facility can either reduce loss of load events if the planning reserve margin is unchanged or allow for the reduction in planning reserve margins if loss of load events remain constant, but not both simultaneously.[1666]

749.    The Commission described Benefit 2(a) in the NOPR as reduced frequency of loss of load events by providing additional pathways for connecting generation resources with load in regions that can be constrained by weather events and unplanned outages (if the

---

[1665] *Id.* P 384.

[1666] NOPR, 179 FERC ¶ 61,028 at P 194.

planning reserve margin is not changed despite lower loss of load events), as well as

improved physical reliability benefits by reducing the likelihood of load shed events.[1667]

The Commission noted that transmission investments, even those not made to satisfy a

reliability need, generally enhance the reliability of the transmission system by increasing

transfer capability, which, in turn, reduces the likelihood that a transmission provider will

be unable to serve its load due to a shortage of generation over a given period.  This

enhancement in reliability can be measured as a reduction in loss of load probability, or

the likelihood of system demand exceeding generation over a given period.  The

Commission noted that one example of how a reduction of loss of load probability benefit

could be calculated can be found in a report by SPP's Metrics Task Force.  The report

proposes quantifying the incremental increase in system reliability by determining the

reduction in expected unserved energy between the base case and the change case,

obtaining the value of lost load, and multiplying these two values to obtain the monetary

benefit of enhanced reliability associated with a transmission expansion.[1668]

750.    The Commission described Benefit 2(b) in the NOPR as reduced planning reserve

margin, or "the reduction in capital costs of generation needed to meet resource adequacy

requirements (i.e., planning reserve margins) while holding loss of load probability

---

[1667] *Id.*

[1668] *Id.* P 195 & n.331 (citing SPP, *Benefits for the 2013 Regional Cost Allocation Review*, at 25 (Sept. 13, 2012)).

constant."[1669]  The Commission stated that investments in transmission capacity can

reduce the system-wide planning reserve margin requirement or the reserve margin

requirement within individual resource adequacy zones of a transmission planning

region, which can reduce the need for generation capital expenditures.[1670]  The

Commission also stated that it is important to note that, due to the overlap between the

benefit obtained from a reduction in reserve margin requirements and the benefit

associated with loss of load probability, only one of these benefits should be calculated

for a transmission investment, but not both simultaneously.[1671]  The Commission noted

that RTOs/ISOs have calculated the transmission benefits of reduced planning reserve

margins.  MISO, for example, calculated a reduction in planning reserves associated with

its Multi-Value Projects portfolio, which reduced the need for future generation buildout

to meet reserve requirements, by using loss of load expectation reliability simulations.

MISO estimated that its Multi-Value Projects portfolio was expected to reduce the

required planning reserve margin by up to one percentage point, which translated into a

projected savings of $1.0 to $5.1 billion in benefits over 10 years.[1672]

---

[1669] *Id.* P 194.

[1670] *Id.* P 196.

[1671] *Id.*

[1672] *Id.* P 197 (citing Midcontinent Independent System Operator, Inc., *Proposed Multi Value Project Portfolio:  Business Case Workshop*, at 36-38 (Sept. 19 & 29, 2011)).

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 557 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

### (b)     <u>Comments</u>

751.    A number of commenters support mandating consideration of Benefit 2(a).[1673]

Some commenters discuss the manner in which this benefit should be calculated.[1674]

ACEG and DC and MD Offices of People's Counsel note the importance of geographic

diversity between transmission planning regions as an important consideration in

evaluating this benefit.[1675]  Specifically, ACEG states that it can be estimated using the

value of lost load and generation capital cost savings due to lower needed planning

reserve margins.[1676]

752.    However, some commenters oppose or express concerns regarding mandating

consideration of Benefit 2(a).[1677]  NARUC states that transmission planners are likely

already considering loss of load events in their evaluations of system expansions and that

---

[1673] Acadia Center and CLF Initial Comments at 21-22; ACEG Initial Comments at 32; ACORE Initial Comments at 12; AEE Reply Comments at 25; AEP Initial Comments at 25; Amazon Initial Comments at 5; Breakthrough Energy Initial Comments at 21-22; Clean Energy Associations Initial Comments at 19-20; DC and MD Offices of People's Counsel Initial Comments at 19-20; ENGIE Reply Comments at 3; Hannon Armstrong Initial Comments at 3; Interwest Initial Comments at 12-14; National and State Conservation Organizations Initial Comments at 1; Pine Gate Initial Comments at 34-37; PIOs Initial Comments at 38-41; RMI Initial Comments at 1; SEIA Initial Comments at 16; Southeast PIOs Initial Comments at 50; US DOE Initial Comments at 31-32.

[1674] *E.g.*, ACEG Initial Comments at 38-39.

[1675] ACEG Initial Comments at 35-38; DC and MD Offices of People's Counsel Initial Comments at 21-24.

[1676] ACEG Initial Comments at 38.

[1677] NARUC Initial Comments at 23; Pacific Northwest Utilities Initial Comments at 9; West Virginia Commission Supplemental Comments at 4.

whether such benefit, in isolation, is sufficient to recommend construction of a particular transmission project is a question best left to them and their states.[1678]  West Virginia Commission argues that calculation of benefits from reduced loss of load probability requires evidence based on assumptions that are difficult, if not impossible, to quantify in advance.[1679]  R Street states that Benefit 2(a) should be refined to the avoided value of lost load so that it is compatible with an economic assessment, while Illinois Commission asserts that the Commission should consider a more expansive definition of reduced loss of load probability composed of more than one metric, such as value of lost load, expected unserved energy, or a hybrid measure, that can serve as a supplement to loss of load expectation.[1680]

753.    With respect to Benefit 2(b), a number of commenters support mandating consideration of this benefit.[1681]  AEP recommends including Benefit 2(b) as a part of a

---

[1678] NARUC Initial Comments at 23.

[1679] West Virginia Commission Supplemental Comments at 4.

[1680] Illinois Commission Initial Comments at 14; R Street Initial Comments at 9.

[1681] Acadia Center and CLF Initial Comments at 21-22; ACEG Initial Comments at 32; ACORE Initial Comments at 12; AEE Reply Comments at 25; AEP Initial Comments at 25; Amazon Initial Comments at 5; Breakthrough Energy Initial Comments at 21-22; Clean Energy Associations Initial Comments at 19-20; DC and MD Offices of People's Counsel Initial Comments at 20; ENGIE Reply Comments at 3; Hannon Armstrong Initial Comments at 3; Interwest Initial Comments at 12-14; National and State Conservation Organizations Initial Comments at 1; Pine Gate Initial Comments at 34-37; PIOs Initial Comments at 38; RMI Initial Comments at 1; SEIA Initial Comments at 16; Southeast PIOs Initial Comments at 50.

Docket No. RM21-17-000                                                        - 549 -

combination of benefits.[1682]  Pine Gate states that this proposed benefit is critical to

address resource adequacy concerns, particularly where a transmission planning region

relies heavily on a single generation type.[1683]

754.    With respect to comments in opposition to Benefit 2(b), similar to its comments on

Benefit 2(a) above, West Virginia Commission argues that calculation of benefits from

reduced planning reserve margin requires evidence based on assumptions that are

difficult, if not impossible, to quantify in advance.[1684]

### (c)    Commission Determination

755.    We adopt the NOPR proposal, with modification, to require transmission

providers in each transmission planning region to measure and use Benefit 2, in Long-

Term Regional Transmission Planning.  This benefit can be characterized and measured

as Benefit 2(a), Reduced Loss of Load Probability, or as Benefit 2(b), Reduced Planning

Reserve Margin, and we clarify that these are different methods for measuring the same

underlying benefit.  We find that requiring the measurement and use of this benefit is

necessary because it reflects an important category of reliability benefits of Long-Term

Regional Transmission Facilities.  Because there is an overlap between reduced loss of

load probability benefits and reduced planning reserve margin benefits, for purposes of

Long-Term Regional Transmission Planning, transmission providers must either measure

---

[1682] AEP Initial Comments at 25.

[1683] Pine Gate Initial Comments at 37.

[1684] West Virginia Commission Supplemental Comments at 4.

reduced loss of load events by holding the planning reserve margin constant *or* measure the reduction in planning reserve margins by holding loss of load events constant but may not measure both simultaneously for purposes of using and measuring Benefit 2(a) or 2(b).

756.    We adopt the NOPR's proposed description of Benefit 2(a) that describes Benefit 2(a), Reduced Loss of Load Probability, as the reduced frequency of loss of load events by providing additional pathways for connecting generation resources with load in regions that can be constrained by weather events and unplanned outages (if the planning reserve margin is not changed despite lower loss of load events), as well as improved physical reliability benefits by reducing the likelihood of load shed events.  Benefit 2(a) measures reduced loss of load probability for resource adequacy planning, which typically includes the consideration of normal system conditions.  One method of measuring a reduction in loss of load probability benefit is to quantify the incremental increase in system reliability by determining the reduction in expected unserved energy between the base case and the change case, determining the value of lost load, and multiplying these two values to obtain the monetary benefit of enhanced reliability associated with a Long-Term Regional Transmission Facility or a portfolio of Long-Term Regional Transmission Facilities.[1685]

---

[1685] NOPR, 179 FERC ¶ 61,028 at P 195 & n.331 (citing SPP, *Benefits for the 2013 Regional Cost Allocation Review*, at 25 (Sept. 13, 2012)).

USCA4 Appeal: 24-1650     Doc: 224     Filed: 01/21/2025     Pg: 561 of 2455
Document Accession #: 20240513-3036     Filed Date: 05/13/2024

757.    Numerous commenters support mandating Benefit 2(a).[1686]  We recognize commenter suggestions regarding the method for calculating this benefit, with some recommending consideration of geographic diversity between transmission planning regions[1687] and others recommending that the benefit be expressed in terms of the value of lost load.[1688]  We agree that geographic diversity is an important consideration in evaluating the reduced loss of load probability method of calculating this benefit and find that the flexibility in measuring benefits that we provide to transmission providers under this final rule allows for this consideration.  As to the suggestion by Illinois Commission and R Street that Benefit 2(a) should be expressed in terms of the value of lost load so that it can be expressed in terms of cost, we believe that either Benefit 2(a) or Benefit 2(b) are reasonable methods to calculate Benefit 2 and we reiterate that transmission providers can choose either method to calculate this benefit.  We encourage transmission

---

[1686]Acadia Center and CLF Initial Comments at 21-22; ACEG Initial Comments at 32; ACORE Initial Comments at 12; AEE Reply Comments at 25: AEP Initial Comments at 25; Amazon Initial Comments at 5; Breakthrough Energy Initial Comments at 21-22; Clean Energy Associations Initial Comments at 19-20; DC and MD Offices of People's Counsel Initial Comments at 19-20; ENGIE Reply Comments at 3; Hannon Armstrong Initial Comments at 3; Interwest Initial Comments at 12-14; National and State Conservation Organizations Initial Comments at 1; Pine Gate Initial Comments at 34-37; PIOs Initial Comments at 38-41; RMI Initial Comments at 1; SEIA Initial Comments at 16; Southeast PIOs Initial Comments at 50; US DOE Initial Comments at 31-32.

[1687] ACEG Initial Comments at 35-38; DC and MD Offices of People's Counsel Initial Comments at 21-24.

[1688] Illinois Commission Initial Comments at 14 (suggesting alternatively that Benefit 2(a) be expressed in terms of expected unserved energy, or a hybrid measurement composed of more than one metric); R Street Initial Comments at 9 (stating that using value of lost load is compatible with an economic assessment).

providers to consider whether Benefit 2(a) or Benefit 2(b) is the most effective way to

accurately reflect the benefits of a proposed Long-Term Regional Transmission Facility

in their individual regions.  As to NARUC's contention that the benefit of reducing the

probability of loss of load events, in isolation, may be insufficient to support the

development of a particular transmission project, while we are requiring transmission

providers to use Benefit 2(a) or Benefit 2(b) to evaluate Long-Term Regional

Transmission Facilities, we are not requiring transmission providers to base their

evaluation on this single benefit—or any single benefit, for that matter—but rather on at

least the range of benefits included in the required set of benefits that we adopt herein.

Moreover, we are not requiring that transmission providers select any Long-Term

Regional Transmission Facility.

758.   As noted above, the NOPR proposed the following description of Benefit 2(b),

"the reduction in capital costs of generation needed to meet resource adequacy

requirements (i.e., planning reserve margins) while holding loss of load probability

constant."[1689]  We adopt the NOPR description in this final rule.  We find that a lower

planning reserve margin is another way to demonstrate a resource adequacy benefit.  As

we indicate above, due to the relationship between the benefit obtained from a reduction

in reserve margin requirements and the benefit associated with reduced loss of load

probability, only one of these methods for calculating the benefit for a transmission

investment can be used, but not both simultaneously.  We find that Benefit 2(b) is one of

---

[1689] NOPR, 179 FERC ¶ 61,028 at P 194.

Docket No. RM21-17-000                                                          - 553 -

two ways to calculate reduced costs related to resource adequacy because Long-Term

Regional Transmission Facilities can reduce the system-wide planning reserve margin

requirements within individual resource adequacy zones of a transmission planning

region and provide benefits by reducing the need for generation capital expenditures.

759.   Many commenters support mandating consideration of Benefit 2(b).  For example,

DC and MD Offices of People's Counsel note that the benefit of a reduced reserve

planning margin has been used in multiple cases.[1690]  We also find that it is feasible for

transmission providers to calculate the benefit of reduced planning reserve margins.  We

reiterate here the example of MISO, which calculated a reduction in planning reserves

associated with its Multi-Value Projects portfolio, reducing the need for future generation

investments to meet reserve requirements by using loss of load expectation reliability

simulations.  MISO estimated that its Multi-Value Projects portfolio was expected to

reduce the required planning reserve margin by up to one percentage point, which

translated into a projected savings of $1.0 to $5.1 billion in benefits over 10 years.[1691]

---

[1690] DC and MD Offices of People's Counsel at 22-23 (citing Midcontinent
Independent System Operator, Inc., *Proposed Multi Value Project Portfolio: Business
Case Workshop*, at 36-38 (Sept. 19 & 29, 2011); SPP, *Benefits for the 2013 Regional
Cost Allocation Review* (Sept. 13, 2012); *Investigation on Comm'n's Own Motion to
Review18 Percent Planning Reserve Margin Requirement*, Docket No. 5-EI-141 (PSC
REF# 102692), at 5 (Pub. Serv. Comm'n Wis. Oct. 9, 2008); SPP, *The Value of
Transmission*, at 16 (Jan. 26, 2016); Midcontinent Independent System Operator, Inc.,
*MISO Value Proposition 2020: Forward View*, at 20-21 (June 2022); PJM
Interconnection, L.L.C*., PJM Value Proposition*, at 2 (2019); Australian Energy Market
Operator, *2022 Integrated System Plan*, at 64 (June 2022)).

[1691] NOPR, 179 FERC ¶ 61,028 at P 197 (citing Midcontinent Independent System
Operator, Inc., *Proposed Multi Value Project Portfolio:  Business Case Workshop*, at 36-

Docket No. RM21-17-000                                                       - 554 -

We also note that the Commission has accepted benefits for use in evaluating regional

transmission facilities in Order No. 1000 regional transmission planning processes akin to

Benefit 2(a), Reduced Loss of Load Probability,[1692] in non-RTO/ISO transmission

planning regions.[1693]

760.   Finally, we disagree with West Virginia Commission's claim that calculation of

this benefit requires evidence based on assumptions that are difficult, if not impossible, to

quantify in advance.[1694]  As noted above, there are multiple examples in the record of

transmission providers that currently calculate these benefits.  Because we find that

transmission providers will be able to calculate either Benefit 2(a) or 2(b) and recognize

the importance of accounting for Benefit 2 in Long-Term Regional Transmission

Planning, we require transmission providers to measure and use Benefit 2.

### iii.    Benefit 3:  Production Cost Savings

### (a)    NOPR Description

761.   The Commission described Benefit 3 in the NOPR as savings in fuel and other

variable operating costs of power generation that are realized when transmission facilities

allow for displacement of higher-cost supplies through the increased dispatch of suppliers

that have lower incremental costs of production, as well as a reduction in market prices as

---

38 (Sept. 19 & 29, 2011)).

[1692] *PacifiCorp*, 147 FERC ¶ 61,057 at PP 133-134, 141-143; *Pub. Serv. Co. of Colo.*, 142 FERC ¶ 61,206 at P 314.

[1693] *PacifiCorp*, 147 FERC ¶ 61,057 at PP 132, 134, 141-143.

[1694] West Virginia Commission Supplemental Comments at 4.

lower-cost suppliers set market clearing prices.[1695]  The Commission stated that most

regional transmission planning processes currently estimate production cost savings.

Generally, within RTOs/ISOs, security-constrained production cost models simulate the

hourly operations of the electric system and the wholesale electricity market by emulating

how system operators would commit and dispatch generation resources to serve load at

least cost, subject to transmission and operating constraints.  The traditional method for

estimating the changes in adjusted production costs associated with proposed

transmission facilities (or portfolio of facilities) is to compare the adjusted production

costs with and without those facilities.  Analysts typically call the market simulations

without the proposed transmission facilities the "Base Case" and the simulations with

those facilities the "Change Case."[1696]

762.    The Commission further explained that approaches used to calculate production

cost savings vary.  MISO uses production cost savings (adjusted for import costs and

export revenues) to allocate the costs of its Market Efficiency Projects to cost allocation

zones based on each zone's share of the total adjusted production cost savings.[1697]  The

Commission also explained, in contrast, that NYISO and PJM use reductions to load

---

[1695] NOPR, 179 FERC ¶ 61,028 at P 198 & n.333 (proposing to define this as adjusted production cost savings when the calculation is adjusted to account for purchases and sales outside the region).

[1696] NOPR, 179 FERC ¶ 61,028 at P 199.

[1697] NOPR, 179 FERC ¶ 61,028 at P 200 (citing MISO, FERC Electric Tariff, attach. FF, Benefit Metrics § (I)(A)(1) (33.0.0)).

Docket No. RM21-17-000                                                                 - 556 -

energy payments (adjusted to reflect the reduced value of transmission congestion

contracts) to allocate the costs of economic transmission facilities.[1698]

763.    The Commission stated that non-RTO/ISO regions, without centrally organized

energy markets, rely on other tools to perform analyses of production cost savings.  For

example, WestConnect's regional cost allocation method for regional transmission

facilities driven by economic considerations identifies the benefits and beneficiaries of a

proposed regional transmission facility or facilities by modeling the potential of the

transmission facilities to support more economic bilateral transactions between

generators and loads in the region.  Specifically, WestConnect considers the transactions

between loads and lower-cost generation that a proposed regional transmission facility

could support and, accounting for the costs associated with transmission service,

identifies the transactions that are likely to occur.  WestConnect then estimates any

resulting cost savings (in the form of reductions in production costs and reserve sharing

requirements) and allocates the costs of the regional transmission facilities on that

basis.[1699]

---

[1698] NOPR, 179 FERC ¶ 61,028 at P 200 & n.335 (citing *PJM Interconnection L.L.C.*, 142 FERC ¶ 61,214 at P 416; *N.Y. Indep. Sys. Operator Corp.*, 143 FERC ¶ 61,059, at PP 268, 269, n.516 (2013); NYISO, NYISO Tariffs, OATT, attach. Y, § 31.5 (Cost Allocation and Cost Recovery) (30.0.0), § 31.5.4.3.2.) ("For high voltage economic transmission facilities, PJM allocates 50% of the costs in accordance with its economic analysis and allocates the other 50% of the costs on a load-ratio share basis.").

[1699] NOPR, 179 FERC ¶ 61,028 at P 201 (citing *Pub. Serv. Co. of Colo.*, 142 FERC ¶ 61,206 at P 314).

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 567 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

### (b)  Comments

764.    A number of commenters support mandating consideration of this benefit.[1700]

AEP recommends including Benefit 3 as a part of a combination of benefits.[1701]

According to TAPS, all of the RTOs/ISOs already consider production cost savings;

TAPS argues that the Commission should require transmission providers in non-

RTO/ISO transmission planning regions to consider them as well.[1702]  Indicated PJM TOs

state that this benefit is one of the main benefits that will drive the selection of

transmission facilities in PJM.[1703]

765.    Some commenters opine on how to calculate this benefit.[1704]  ACEG states that

production cost savings should include fuel and variable operating cost savings,

---

[1700] Acadia Center and CLF Initial Comments at 21-22; ACEG Initial Comments at 32; ACORE Initial Comments at 12; AEE Reply Comments at 25; AEP Initial Comments at 25; Amazon Initial Comments at 5; Breakthrough Energy Initial Comments at 21-22; Certain TDUs Reply Comments at 1-2; Clean Energy Associations Initial Comments at 19-20; DC and MD Offices of People's Counsel Initial Comments at 19-20; ENGIE Reply Comments at 3; Hannon Armstrong Initial Comments at 3; Interwest Initial Comments at 12-14; National and State Conservation Organizations Initial Comments at 1; Joint Consumer Advocates Initial Comments at 11; New Jersey Commission Initial Comments at 13-14 (including reduced production costs during transmission outages, extreme events, and higher than normal load conditions in Benefit 3); Pine Gate Initial Comments at 34-37; PIOs Initial Comments at 38-41; PJM Initial Comments at 96; RMI Initial Comments at 1; SEIA Initial Comments at 16; Southeast PIOs Initial Comments at 50; TAPS Initial Comments at 14; US DOE Initial Comments at 31-32.

[1701] AEP Initial Comments at 25.

[1702] TAPS Initial Comments at 14.

[1703] Indicated PJM TOs Initial Comments at 17.

[1704] ACEG Initial Comments at 40; DC and MD Offices of People's Counsel

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 568 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                    - 558 -

adjustments for imports from neighboring transmission planning regions, reduced costs of cycling power plants, reduced amounts and costs of operating reserves and other ancillary services, and mitigation of reliability-must-run conditions.[1705]  Likewise, DC and MD Offices of People's Counsel state that production cost savings should include ancillary service cost savings.[1706]  MISO notes that, in addition to evaluating production cost savings under normal patterns of renewable dispatch and load, transmission providers can analyze production cost savings that accrue during transmission outages using historical sampling or statistical modeling of transmission outage patterns.[1707] MISO TOs state that its process to evaluate Multi-Value Projects considers production cost savings that can be realized through reduced transmission congestion and transmission energy losses, capacity loss savings, capacity savings, long-term cost savings, and "any other financially quantifiable benefit."[1708]

766.    Some commenters oppose or express concerns regarding mandating consideration of production cost savings.[1709]  For example, Southern states that considering production

---

Initial Comments at 25; GridLab Initial Comments at 26-27; MISO Initial Comments at 49-50.

[1705] ACEG Initial Comments at 40.

[1706] DC and MD Offices of People's Counsel Initial Comments at 25.

[1707] MISO Initial Comments at 49-50.

[1708] MISO TOs Initial Comments at 21 (citing MISO Open Access Transmission, Energy and Operating Reserve Markets Tariff, attach. FF (90.0.0), § II.C.5).

[1709] Mississippi Commission Initial Comments at 35-36; North Carolina Commission and Staff Initial Comments at 7; Pacific Northwest Utilities Initial

Docket No. RM21-17-000                                                          - 559 -

cost savings could result in the double-counting of benefits in its footprint by, for

example, making generation pricing/cost decisions that have already been made or will

ultimately be made in integrated resource planning or request for proposal processes.[1710]

Relatedly, North Carolina Commission and Staff state that requiring consideration of

production cost savings would conflict with state-jurisdictional resource decisions.[1711]

Mississippi Commission contends that this benefit may not always be applicable, such as

where financial transmission rights fully hedge the cost of congestion.[1712]  PJM Market

Monitor states that in PJM, comparing production cost savings across different gas prices

and different generation resource capacity may not provide meaningful guidance as to the

benefits of a transmission facility beyond that currently provided by satisfying reliability

criteria because of potentially inaccurate forecasts for key values.[1713]  Pacific Northwest

Utilities assert that this benefit is not easily quantifiable.[1714]

---

Comments at 9; PJM Market Monitor Initial Comments at 5; Southern Initial Comments at 26.

[1710] Southern Initial Comments at 26 (citing Southern Initial Comments Ex. 1, ¶¶ 8, 15).

[1711] North Carolina Commission and Staff Initial Comments at 7.

[1712] Mississippi Commission Initial Comments at 36.

[1713] PJM Market Monitor Initial Comments at 5.

[1714] Pacific Northwest Utilities Initial Comments at 9.

### (c)    Commission Determination

767.    We adopt the NOPR proposal, with modification, to require transmission

providers in each transmission planning region to measure and use Benefit 3, Production

Cost Savings, in Long-Term Regional Transmission Planning.  We adopt the NOPR's

proposed description of Benefit 3 as savings in fuel and other variable operating costs of

power generation that are realized when transmission facilities allow for displacement of

higher-cost supplies through the increased dispatch of suppliers that have lower

incremental costs of production, as well as a reduction in market prices as lower-cost

suppliers set market clearing prices.  We find that requiring the use of Benefit 3 is

necessary because Long-Term Regional Transmission Facilities could result in savings in

fuel and other variable operating costs of power generation that are realized when

transmission facilities allow for displacement of higher-cost supplies through the

increased dispatch of suppliers that have lower incremental costs of production.  We

further find that, absent a requirement for transmission providers to measure and use

Benefit 3 in Long-Term Regional Transmission Planning, transmission providers may not

identify, evaluate, and select Long-Term Regional Transmission Facilities that more

efficiently or cost-effectively address Long-Term Transmission Needs.

768.    We do not require a standardized method for measuring production cost savings,

and, consistent with this approach, we decline commenter requests to specify the exact

types of cost savings for which transmission providers must account when measuring this

benefit.[1715]  As the Commission stated in the NOPR,[1716] different transmission planning

regions have different approaches toward the calculation of this benefit, and this final rule

provides flexibility for transmission providers in developing the method that they use to

measure production cost savings, consistent with the requirement to measure and use the

required set of benefits in Long-Term Regional Transmission Planning described above.

769.    We note that Benefit 3 is distinct from other benefits that we require transmission

providers to measure and use in Long-Term Regional Transmission Planning.  Although

Benefit 3 and Benefit 6, as described in this final rule, both measure production cost

savings (including savings that occur during generation outage contingencies), the system

conditions used in calculating each benefit are distinct.  For example, Benefit 6 can

include higher electricity demand, forecast errors, volatile production costs, and a more

expansive set of generation outages such as unplanned generation outages due to extreme

weather.  And as we discuss below in the context of Benefit 5, because Benefit 3,

Production Cost Savings, as described in this rule, does not capture production cost

savings during transmission outages, we require transmission providers to measure and

use Benefit 5 to ensure that they are accounting for reduced production costs during

transmission outages as well.

---

[1715] *See* ACEG Initial Comments at 40; DC and MD Offices of People's Counsel
Initial Comments at 25; GridLab Initial Comments at 26-27; MISO Initial Comments at
49-50.

[1716] NOPR, 179 FERC ¶ 61,028 at PP 200-201.

770.    We also do not believe that requiring transmission providers to measure and use

Benefit 3 in Long-Term Regional Transmission Planning will, as Southern suggests,

result in double-counting of benefits because such benefits are also considered in state

resource planning.  While we acknowledge that integrated resource planning processes,

where they exist, may consider similar benefits compared to those required by this final

rule, the consideration of benefits in a state-jurisdictional process does not result in the

double-counting of benefits within any Commission-jurisdictional transmission planning

process.  Because practices affecting rates, terms, and conditions for interstate

transmission service are the exclusive jurisdiction of the Commission, we must ensure

that Commission-jurisdictional regional transmission planning processes result in rates

that are just and reasonable and not unduly or discriminatory.  To this end, this final rule

is focused on ensuring that, when conducting Long-Term Regional Transmission

Planning, transmission providers consider the broader set of benefits provided by Long-

Term Regional Transmission Facilities so that they may determine whether to select such

facilities as the more efficient or cost-effective regional transmission solution to address

Long-Term Transmission Needs.

771.    Pacific Northwest Utilities assert that production cost savings are not easily

quantifiable.[1717]  We acknowledge that there are some challenges associated with

measuring this benefit, but we conclude that it is nonetheless necessary to require such

measurement in order to ensure that transmission rates are just, reasonable, and not

---

[1717] Pacific Northwest Utilities Initial Comments at 9.

unduly discriminatory or preferential.  We also note that there is an abundance of examples of how transmission providers can measure this benefit.  Production cost savings are used extensively in many transmission planning regions, including MISO, NYISO, PJM, SPP, CAISO, ISO-NE, NorthernGrid, and WestConnect.[1718]  We believe that transmission providers are capable of measuring production cost savings given that this benefit has been used as a metric in transmission planning for decades.

772.    In response to North Carolina Commission and Staff's contention that requiring consideration of production cost savings conflicts with state-jurisdictional resource decisions,[1719] we find that North Carolina Commission and Staff have failed to explain why there may be a conflict.  As noted in the Need for Reform, there are deficiencies in the Commission's existing transmission planning and cost allocation requirements, including that they fail to require transmission providers to adequately consider the

---

[1718] *See* NOPR, 179 FERC ¶ 61,028 at PP 200-201; Brattle-Grid Strategies Oct. 2021 Report at 31; ISO New England, Inc., *Transmission Planning: Maintaining Power System Reliability Amid Change*, https://www.iso-ne.com/system-planning/transmission-planning (last visited Mar. 25, 2024); NorthernGrid, *Study Scope for the 2022-2023 NorthernGrid Planning Cycle*, 2 (Sept. 21, 2022), https://www.northerngrid.net/private-media/documents/NG_Study_Scope_2022-2023_Approved.pdf; The Brattle Group, *The Benefits of Electric Transmission: Identifying and Analyzing the Value of Investments*, 31 (July 2013), https://www.brattle.com/wp-content/uploads/2021/06/The-Benefits-of-Electric-Transmission-Identifying-and-Analyzing-the-Value-of-Investments.pdf (noting that in the Western Electricity Coordinating Council (WECC), whose service area includes one RTO (CAISO) and three non-RTO regions (ColumbiaGrid, Northern Tier Transmission Group (NTTG), and WestConnect) production costs simulations are used to calculate the energy costs savings of transmission projects in WECC's long-term transmission planning studies).

[1719] North Carolina Commission and Staff Initial Comments at 7.

broader set of benefits of regional transmission facilities planned to meet Long-Term

Transmission Needs.  We are concerned that failing to adequately identify and consider

the benefits, including production cost benefits, of such transmission facilities may lead

to relatively inefficient and less cost-effective transmission development.  Additionally,

as described above in the Categories of Factors section, transmission providers must

incorporate, and not discount, state-jurisdictional resource decisions, such as integrated

resource plans, into all Long-Term Scenarios to identify Long-Term Transmission Needs.

Therefore, we believe that requiring transmission providers to measure production cost

savings will not conflict with state-jurisdictional resource decisions, because the effects

of such resource decisions on Long-Term Transmission Needs must be fully accounted

for in all Long-Term Scenarios, which are used to help identify more efficient or cost-

effective regional transmission solutions within the Commission-jurisdictional regional

transmission planning process.  Moreover, as discussed in the Legal Authority to Adopt

Reforms for Long-Term Regional Transmission Planning section of this final rule,

nothing in this final rule conflicts with or infringes on the states' reserved authority under

FPA section 201.

773.    We disagree with Mississippi Commission's assertion that production cost savings

may not always be applicable, such as where financial transmission rights fully hedge the

cost of congestion.[1720]  Financial transmission rights are required in RTO/ISO markets

and allow the market participant that owns the right to mitigate the congestion charge

---

[1720] Mississippi Commission Initial Comments at 36.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 575 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                    - 565 -

along an existing transmission path for the capacity of that path.[1721]  A new transmission

facility could reduce congestion and allow that market participant to purchase more

electricity, exceeding the capacity of the transmission path for the financial transmission

right, at a lower price.  This reduced congestion allows for load to access lower cost

resources, and results in more efficient dispatch of resources and, thus, provides avoided

production cost benefits that are distinct from the avoided congestion charges associated

with financial transmission rights.

774.    We recognize the PJM Market Monitor's concern regarding the potential for

inaccurate forecasts of key inputs to the calculation of production cost savings.[1722]

However, we conclude that this potential concern does not outweigh the value of

measuring and using this benefit, as demonstrated by long-standing use of this benefit

within PJM and other transmission planning regions, including all RTOs/ISOs and some

non-RTO/ISO regions.  Moreover, as noted in the Long-Term Scenarios section of this

final rule, the use of Long-Term Scenarios in Long-Term Regional Transmission

Planning mitigates such uncertainty in transmission planning outcomes.  Specifically,

comparing the production cost savings, as well as the other benefits that we require

transmission providers to measure and use in Long-Term Regional Transmission

---

[1721] *Long-Term Firm Transmission Rights in Organized Elec. Mkts.*, Order No. 681, 116 FERC ¶ 61,077, at PP 5, 19-21, *reh'g denied*, Order No. 681-A, 117 FERC ¶ 61,201 (2006), *order on reh'g & clarification*, Order No. 681-B, 126 FERC ¶ 61,254 (2009).

[1722] PJM Market Monitor Initial Comments at 5.

Docket No. RM21-17-000                                                    - 566 -

Planning, provided by Long-Term Transmission Facilities across three distinct Long-Term Scenarios should help to address the uncertainty noted by the PJM Market Monitor.

### iv.    Benefit 4:  Reduced Transmission Energy Losses

### (a)    NOPR Description

775.    The Commission described this benefit in the NOPR as reduced total energy necessary to meet demand stemming from reduced energy losses incurred in transmittal of power from generation to loads.[1723]

776.    The Commission explained that production cost savings metrics used today typically exclude reduced transmission energy losses and three other production cost savings-related benefits proposed in the NOPR.  The Commission also stated that including those additional proposed benefits can produce a more robust set of congestion and production cost benefits that can be quantified and integrated into the method for calculating production cost savings and, therefore, help to ensure that more efficient or cost-effective transmission facilities are selected through Long-Term Regional Transmission Planning.[1724]

777.    The Commission noted that to measure reduced transmission energy losses, transmission providers could:  (1) simulate losses in production cost models; (2) estimate changes in losses with power flow models for a range of hours; or (3) estimate how the cost of supplying losses will likely change with marginal loss charges.  For example,

---

[1723] NOPR, 179 FERC ¶ 61,028 at P 202.

[1724] *Id.* P 203.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 577 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                    - 567 -

ATC measured reduced transmission energy losses based on changes in marginal loss charges and loss refund estimates using the marginal loss component from the PROMOD[1725] electric market simulation software simulations for the Paddock-Rockdale 345 kV Access Project,[1726] which produced cost reduction benefits using adjusted production cost analysis. Also, SPP's analysis for its Regional Cost Allocation Review process estimated energy loss reductions through post-processing the marginal loss component of the locational marginal prices in PROMOD simulation results.[1727]

### (b)    **Comments**

778.    A number of commenters support mandating consideration of Benefit 4.[1728]  While not favoring a benefits measurement requirement, Southern states that this benefit would

---

[1725] PROMOD is a generator and portfolio modeling system.  Hitachi Energy: PROMOD, https://www.hitachienergy.com/us/en/products-and-solutions/energy-portfolio-management/enterprise/promod (last visited Apr. 2024).

[1726] NOPR, 179 FERC ¶ 61,028 at P 204 & n.338 (citing ATC, Planning Analysis of the Paddock-Rockdale Project, Docket No. 137-CE-149, app. C, Ex. 1, at 34-38 (Wisc. Pub. Serv. Comm'n Apr. 5, 2007)).

[1727] SPP, *SPP Regional Cost Allocation Review Report for RCAR II*, at 56, 64 (July 11, 2016), https://www.spp.org/documents/46235/rcar%202%20report%20final.pdf.

[1728] Acadia Center and CLF Initial Comments at 21-22; ACEG Initial Comments at 32; ACORE Initial Comments at 12; AEE Reply Comments at 25; Amazon Initial Comments at 5; Breakthrough Energy Initial Comments at 21-22; Clean Energy Associations Initial Comments at 19-20; DC and MD Offices of People's Counsel Initial Comments at 19-20; ENGIE Reply Comments at 3; Hannon Armstrong Initial Comments at 3; Interwest Initial Comments at 12-14; National and State Conservation Organizations Initial Comments at 1; New Jersey Commission Initial Comments at 13-14; Pine Gate Initial Comments at 34-37; PIOs Initial Comments at 38-41; RMI Initial Comments at 1; SEIA Initial Comments at 16; Southeast PIOs Initial Comments at 50; US DOE Initial Comments at 31-32.

likely prove workable under Southern's non-RTO/ISO construct because SERTP

Sponsors' regional and interregional transmission planning and cost allocation processes

already incorporate the benefit of reduced transmission energy losses.[1729]

779.    Several commenters comment on the manner in which Benefit 4 should be

calculated.[1730]  ACEG states that this benefit has been calculated in various studies.[1731]

780.    West Virginia Commission opposes the use of Benefit 4, arguing that the

calculation of benefits from reduced transmission losses requires significant evidence

based on assumptions that are difficult, if not impossible, to quantify before the fact.[1732]

### (c)    Commission Determination

781.    We adopt the NOPR proposal, with modification, to require transmission

providers to measure and use Benefit 4, Reduced Transmission Energy Losses, in Long-

Term Regional Transmission Planning.  We adopt the NOPR's proposed description of

Benefit 4, as modified, as the reduced total energy necessary to meet demand stemming

from reduced energy losses incurred in transmittal of power from generation to loads.

---

[1729] Southern Initial Comments at 25.

[1730] ACEG Initial Comments at 41; NARUC Initial Comments at 23 (noting that advanced technologies also provide this benefit and should be preferred over greenfield construction); Utah Division of Public Utilities Initial Comments at 8.

[1731] ACEG Initial Comments at 41 (citing ATC, Planning Analysis of the Paddock-Rockdale Project, app. C Ex. 1, at 34-38 (Wisc. Pub. Serv. Docket No. 137-CE-149); SPP, *Regional Cost Allocation Review Report for RCAR II*, at 5 (July 11, 2016), https://www.spp.org/documents/46235/rcar%202%20report%20final.pdf).

[1732] West Virginia Commission Supplemental Comments at 4.

We find that requiring the measurement and use of Benefit 4 in Long-Term Regional

Transmission Planning is necessary because reduced energy losses are widely understood

to be a benefit of transmission facilities.[1733]  As such, we find that transmission providers

must measure and use this benefit in Long-Term Regional Transmission Planning

because it will help to ensure that they identify, evaluate, and select more efficient or

cost-effective regional transmission solutions to address Long-Term Transmission Needs.

782.    We recognize that there are multiple ways for transmission providers to measure

reduced transmission energy losses.[1734]  We note that this final rule does not require

transmission providers to adopt any single method to measure reduced transmission

energy losses.  As described in the NOPR, transmission providers could:  (1) simulate

losses in production cost models; (2) estimate changes in losses with power flow models

for a range of hours; or (3) estimate how the cost of supplying losses will likely change

with marginal loss charges.[1735]  Transmission providers could also follow the example of

---

[1733] *See* Acadia Center and CLF Initial Comments at 21-22; ACEG Initial Comments at 32; ACORE Initial Comments at 12; AEE Reply Comments at 25; Amazon Initial Comments at 5; Breakthrough Energy Initial Comments at 21-22; Clean Energy Associations Initial Comments at 19-20; DC and MD Offices of People's Counsel Initial Comments at 19-20; ENGIE Reply Comments at 3; Hannon Armstrong Initial Comments at 3; Interwest Initial Comments at 12-14; National and State Conservation Organizations Initial Comments at 1; New Jersey Commission Initial Comments at 11-14; Pine Gate Initial Comments at 34-37; PIOs Initial Comments at 38-41; RMI Initial Comments at 1; SEIA Initial Comments at 16; Southeast PIOs Initial Comments at 50; US DOE Initial Comments at 31-32.

[1734] *See, e.g.*, ACEG Initial Comments at 41 (citing studies in which Benefit 4 has been calculated).

[1735] NOPR, 179 FERC ¶ 61,028 at P 204.

ATC, which measured reduced transmission energy losses based on changes in marginal loss charges and loss refund estimates provided by the PROMOD electric market simulation software.[1736]  Similarly, SPP estimates energy loss reductions through its Regional Cost Allocation Review process by post-processing the marginal loss component of the locational marginal prices in PROMOD simulation results.[1737]

783.    Because we find that transmission providers have multiple ways of calculating the benefit of reduced transmission energy losses, as well as record evidence demonstrating that the calculation of Benefit 4 is either already considered or is feasible in multiple transmission planning regions, we disagree with West Virginia Commission's claim that calculation of this benefit requires evidence based on assumptions that are difficult, if not impossible, to quantify in advance.[1738]  We also note that the Commission has accepted benefits for use in evaluating regional transmission facilities in Order No. 1000 regional transmission planning processes akin to Benefit 4, Reduced Transmission Energy Losses, in non-RTO/ISO transmission planning regions.[1739]

---

[1736] ATC, Planning Analysis of the Paddock-Rockdale Project, Docket No. 137-CE-149, app. C Ex. 1, at 34-38 (Wisc. Pub. Serv. Comm'n Apr. 5, 2007).

[1737] SPP, *Regional Cost Allocation Review Report for RCAR II*, at 56, 64 (July 11, 2016), https://www.spp.org/documents/46235/rcar%202%20report%20final.pdf.

[1738] West Virginia Commission Supplemental Comments at 4.

[1739] *PacifiCorp*, 147 FERC ¶ 61,057 at PP 132, 134, 141-143.

Docket No. RM21-17-000                                                                 - 571 -

v.     **Benefit 5:  Reduced Congestion Due to Transmission Outages**

(a)     **NOPR Description**

784.    The Commission described Benefit 5 in the NOPR as reduced production costs

resulting from avoided congestion during transmission outages.  Such benefits include

reduced production costs during transmission outages that significantly increase

transmission congestion.  Production cost simulations typically consider planned

generation outages and, in most cases, a random distribution of unplanned generation

outages.  In contrast, they do not generally reflect transmission outages, planned or

unplanned.[1740]  The Commission noted that transmission providers could measure this

benefit, for example, by either building a data set of a normalized outage schedule (not

including extreme events) that can be introduced into simulations or by inducing system

constraints more frequently.  One application of this approach is SPP's Regional Cost

Allocation Review process, which, inter alia, measured the benefits of reducing

congestion resulting from transmission outages.  In this process, SPP modeled outage

events and new constraints based on these outages in PROMOD for a 2025 case year, and

then conducted PROMOD simulations to calculate adjusted production cost savings for a

base case and the change case including the transmission line.[1741]

---

[1740] NOPR, 179 FERC ¶ 61,028 at P 205 & n.340 (citing Brattle-Grid Strategies Oct. 2021 Report at 79).

[1741] *Id.* P 205 & n.341 (citing SPP, Inc., *Regional Cost Allocation Review Report for RCAR II*, at 51-52 (July 11, 2016), https://www.spp.org/documents/46235/rcar%202%20report%20final.pdf.  To estimate incremental savings associated with mitigation of transmission outage costs, SPP

(b)    **Comments**

785.    A number of commenters support mandating consideration of Benefit 5.[1742]  While Southern does not support a requirement to use this or other benefits, it states that this benefit—which Southern understands as "operational flexibility"—could be explored for potential adoption in its footprint.[1743]

786.    A few commenters opine on how to calculate the benefit of reduced congestion due to transmission outages.[1744]  ACEG states that most transmission planning models ignore unplanned transmission outages that are likely to occur during extreme weather events, which ACEG claims will underestimate the value of Benefit 5.[1745]  Similarly, DC

---

analyzed outage cases in PROMOD for the 2025 study year.  SPP developed cases based on 12 months of historical SPP transmission data.  SPP said that because of the high volume of historical transmission outage data (approximately 7,000 outage events) and based on the expectation that many outages would not lead to significant increases in congestion, SPP only modeled a subset of outage events.  The events selected were those expected to create significant congestion and met at least one of three conditions.  *Id.* at 51.)

[1742] Acadia Center and CLF Initial Comments at 21-22; ACEG Initial Comments at 32; ACORE Initial Comments at 12; AEE Reply Comments at 25; Amazon Initial Comments at 5; Breakthrough Energy Initial Comments at 21-22; Clean Energy Associations Initial Comments at 18-20; DC and MD Offices of People's Counsel Initial Comments at 20; ENGIE Reply Comments at 2-3; Hannon Armstrong Initial Comments at 2-3; Interwest Initial Comments at 12-14; National and State Conservation Organizations Initial Comments at 1; Pine Gate Initial Comments at 34-37; PIOs Initial Comments at 37-38; RMI Initial Comments at 1; SEIA Initial Comments at 16; Southeast PIOs Initial Comments at 50.

[1743] Southern Initial Comments at 25.

[1744] ACEG Initial Comments at 41-42; DC and MD Offices of People's Counsel Initial Comments at 25-26.

[1745] ACEG Initial Comments at 41.

and MD Offices of People's Counsel argue that, because unplanned transmission outages cause a significant portion of congestion costs, calculation of this benefit should account for such outages.[1746]

787.   Some commenters oppose mandating consideration of Benefit 5.[1747]  AEP argues that reduced congestion due to transmission outages is of lesser importance and does not need to be in the required minimum set of benefits.[1748]  NARUC states that benefits associated with new construction to alleviate congestion is already a planning consideration.[1749]  Pacific Northwest Utilities and West Virginia Commission assert that this benefit is not easily quantifiable.[1750]  Idaho Power states that non-RTO/ISO transmission planning regions may not be able to calculate reduced congestion.[1751]

### (c)      Commission Determination

788.   We adopt the NOPR proposal, with modification, to require transmission providers in each transmission planning region to measure and use Benefit 5, Reduced Congestion Due to Transmission Outages, in Long-Term Regional Transmission

---

[1746] DC and MD Offices of People's Counsel Initial Comments at 25-26.

[1747] AEP Initial Comments at 27-28; NARUC Initial Comments at 23; Pacific Northwest Utilities Initial Comments at 9; West Virginia Commission Supplemental Comments at 4.

[1748] AEP Initial Comments at 27.

[1749] NARUC Initial Comments at 23.

[1750] Pacific Northwest Utilities Initial Comments at 9; West Virginia Commission Supplemental Comments at 4.

[1751] Idaho Power Initial Comments at 8.

Planning.  We adopt the NOPR's proposed description of Benefit 5 as reduced production costs resulting from avoided congestion during transmission outages.  Such benefits include reduced production costs during transmission outages that significantly increase transmission congestion.  We find that requiring the measurement and use of Benefit 5, as described, is necessary because reduced congestion due to transmission outages is widely understood to be a benefit of transmission facilities.[1752]  As such, we find that transmission providers must measure and use this benefit in Long-Term Regional Transmission Planning because it will help to ensure that they identify, evaluate, and select more efficient or cost-effective regional transmission solutions to address Long-Term Transmission Needs.

789.   We also find that consideration of Benefit 5 is necessary because most current production cost simulations only consider generation outages—both planned generation outages and random distributions of unplanned generation outages; by contrast, production cost simulations do not typically address transmission outages, either planned or unplanned.  Given that transmission facilities can provide benefits by reducing production costs during both generation outages and transmission outages, we find that it

---

[1752] *See* Acadia Center and CLF Initial Comments at 21-22; ACEG Initial Comments at 32; ACORE Initial Comments at 12; AEE Reply Comments at 25; Amazon Initial Comments at 5; Breakthrough Energy Initial Comments at 21-22; Clean Energy Associations Initial Comments at 18-20; DC and MD Offices of People's Counsel Initial Comments at 20; ENGIE Reply Comments at 2-3; Hannon Armstrong Initial Comments at 2-3; Interwest Initial Comments at 12-14; National and State Conservation Organizations Initial Comments at 1; Pine Gate Initial Comments at 34-37; PIOs Initial Comments at 37-38; RMI Initial Comments at 1; SEIA Initial Comments at 16; Southeast PIOs Initial Comments at 50.

Docket No. RM21-17-000                                                          - 575 -

is necessary for transmission providers to measure and use production cost savings during

both generation outages and transmission outages in Long-Term Regional Transmission

Planning.  Because Benefit 3, Production Cost Savings, as described in this rule does not

capture production cost savings during transmission outages, we require transmission

providers to measure and use Benefit 5 to ensure that they are accounting for reduced

production costs during transmission outages as well.  We note that Benefit 6 is distinct

from other benefits that we require transmission providers to measure and use in Long-

Term Regional Transmission Planning.  Although Benefit 5 and Benefit 6 both measure

the benefit of reduced congestion due to transmission outages, the system conditions used

to measure Benefit 6 include a more expansive set of transmission outages such as

unplanned outages due to extreme weather.

790.    For the reasons stated above, we disagree with AEP's arguments that reduced

congestion due to transmission outages is less important than other benefits and thus

should not be required.[1753]  And while some commenters object to consideration of

reduced congestion due to transmission outages as a benefit on the grounds that this

benefit is not easily quantifiable,[1754] we believe this benefit is merely another variant in

production cost savings modeling that we already require for other benefits, such as

Benefits 3 and 4.

---

[1753] AEP Initial Comments at 27.

[1754] *See* Pacific Northwest Utilities Initial Comments at 9; West Virginia
Commission Supplemental Comments at 4.

vi.    **Benefit 6:  Mitigation of Extreme Weather Events and Unexpected System Conditions**

(a)    **NOPR Description**

791.    The Commission described the benefit of mitigation of extreme events and system contingencies in the NOPR as reductions in production costs resulting from reduced high-cost generation and emergency procurements necessary to support the transmission system during extreme events (such as unusual weather conditions, fuel shortages, or multiple or sustained generation and transmission outages) and system contingencies.[1755] These benefits include reduced production costs during extreme events facilitated by a more robust transmission system that reduces high-cost generation and emergency procurements necessary to support the system.[1756]  The Commission noted that transmission providers can measure benefits from the mitigation of extreme events and system contingencies by calculating the probability-weighted production cost savings through production cost simulation for a set of extreme historical market conditions.  The Commission provided as one example CAISO's analysis of Devers-Palo Verde Line No. 2, where CAISO modeled several contingencies to determine the value of the line during high-impact, low-probability events and, as another example, ATC's production cost simulation analysis of insurance benefits for the ATC Paddock-Rockdale transmission line.  ATC found that probability-weighted savings from reducing production and power

---

[1755] NOPR, 179 FERC ¶ 61,028 at P 206.

[1756] *Id.*

Docket No. RM21-17-000                                                    - 577 -

purchase costs during a number of simulated extreme events offset 20% of total project costs.[1757]  The Commission also noted that a study found development of an additional 1,000 MW of transmission capacity into Texas would have fully paid for itself over four days during Winter Storm Uri and the same into MISO would have saved $100 million during the same time period.[1758]

792.    Separately, the Commission described the benefit of mitigation of weather and load uncertainty in the NOPR as reduced production costs during higher than normal load conditions or significant shifts in regional weather patterns.[1759]  The Commission stated that this is beyond the effects of extreme weather described above and may account for, for example, regional and sub-regional load variances that will occur due to changing weather patterns.[1760]  The Commission provided, as one example, simulations that ERCOT performed for normal loads, higher-than-normal loads, and lower-than-normal

---

[1757] *Id.* P 207 & n.342 (*Opinion Granting Certificate of Public Convenience and Necessity, In the Matter of the Application of Southern California Edison Company (U 338-E) for a Certificate of Public Convenience and Necessity Concerning the Devers-Palo Verde No. 2 Transmission Line Project*, Application 05-04-015 (Cal. Comm'n Jan. 27, 2007)) & n.343 (ATC, Planning Analysis of the Paddock-Rockdale Project, Docket No. 137-CE-149, app. C, Ex. 1, at 4, 50-53 (Wisc. Pub. Serv. Comm'n Apr. 5, 2007)).

[1758] *Id.* P 207 & n.344 (M. Goggin, Grid Strategies, LLC, *Transmission Makes the Power System Resilient to Extreme Weather* (July 2020)).

[1759] *Id.* P 208.

[1760] *Id.*

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 588 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                              - 578 -

loads for a Houston import project, which showed increased benefits with a probability-weighted average for all three simulated load conditions.[1761]

### (b)    Comments

793.    A number of commenters support mandating consideration of the benefit of mitigation of extreme events and system contingencies.[1762]  For instance, Grid United states that extreme weather conditions significantly affect the electric grid and that requiring transmission providers to consider transmission projects based on their ability to mitigate extreme weather events will enhance resilience.[1763]  ACEG and DC and Maryland Offices of People's Counsel state that consideration of the benefit of mitigation of extreme events and system contingencies is merited given "the hundreds of millions of dollars that would have been saved if transmission capacity had been greater during a

---

[1761] *Id.* P 209 & n.345 (citing ERCOT, *Economic Planning Criteria: Question 1: 1/7/2011 Joint CMWG/PLWG Meeting*, at 10 (Mar. 4, 2011).  The $57.8 million probability-weighted estimate is calculated based on ERCOT's simulation results for three load scenarios and Luminant Energy estimated probabilities for the same scenarios).

[1762] Acadia Center and CLF Initial Comments at 21-22; ACEG Initial Comments at 32; ACORE Initial Comments at 12; ACORE Supplemental Comments at 1; AEE Reply Comments at 25; Amazon Initial Comments at 5; Breakthrough Energy Initial Comments at 21-22; Clean Energy Associations Initial Comments at 18-20; DC and MD Offices of People's Counsel Initial Comments at 20; ENGIE Reply Comments at 2-3; Grid United Initial Comments at 3; Hannon Armstrong Initial Comments at 2-3; Interwest Initial Comments at 12-14; National and State Conservation Organizations Initial Comments at 1; Pine Gate Initial Comments at 34-37; PIOs Initial Comments at 37-38; PJM Initial Comments at 94 (in combination with Benefit 7, noting that significant stakeholder engagement is needed to implement); RMI Initial Comments at 1; SEIA Initial Comments at 16; Southeast PIOs Initial Comments at 50; US DOE Initial Comments at 31-32; US Senator Schumer Supplemental Comments at 2-3.

[1763] Grid United Initial Comments at 3.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 589 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                                    - 579 -

number of actual severe weather episodes."[1764]  Clean Energy Associations assert that

transmission providers should not calculate benefits solely based on average system

conditions, as transmission investments can provide significant benefits during abnormal

or extreme conditions or events.[1765]

794.    Some commenters comment on the manner in which the benefit of mitigation of

extreme events and system contingencies should be calculated.[1766]  ACEG states that the

benefit of mitigation of extreme events and system contingencies can be calculated by

retrospective analysis or probabilistically.  Additionally, ACEG recommends that the

Commission require transmission providers to include avoided scarcity pricing, storm

hardening and wildfire resilience, grid strength, and increased fuel diversity and system

flexibility in addition to production cost savings when calculating the benefit of

mitigation of extreme events and system contingencies.[1767]  Similarly, DC and MD

Offices of People's Counsel assert that the benefit of mitigation of extreme events and

system contingencies should include resilience benefits such as storm and wildfire

---

[1764] ACEG Initial Comments at 43 & n.119; DC and Maryland Offices of People's
Counsel Initial Comments at 26-27 & n.65 (both citing Grid Strategies, LLC,
*Transmission Makes the Power System Resilient to Extreme Weather* (Jul. 2021),
https://acore.org/wp-content/uploads/2021/07/GS_Resilient-Transmission_proof.pdf).

[1765] Clean Energy Associations Initial Comments at 21.

[1766] ACEG Initial Comments at 43; Clean Energy Associations Initial Comments
at 21; DC and MD Offices of People's Counsel Initial Comments at 26-27; MISO Initial
Comments at 51; NARUC Initial Comments at 23; Pacific Northwest Utilities Initial
Comments at 9.

[1767] ACEG Initial Comments at 43-44.

hardening, fuel diversity, and system flexibility, as well as reduced prices to consumers given that many regions set scarcity prices at values higher than generator production costs.[1768]

795.    A number of commenters also support mandating consideration of the benefit of mitigation of weather and load uncertainty.[1769]  Some commenters comment on the manner in which the benefit of mitigation of weather and load uncertainty should be calculated.[1770]  GridLab posits that mitigation of weather and load uncertainty should only be included in the context of planning and operating reserves because "the cost to system operators of mitigating uncertainty is [the same as] the cost of holding additional reserves."[1771]

---

[1768] DC and MD Offices of People's Counsel Initial Comments at 26-27.

[1769] Acadia Center and CLF Initial Comments at 21-22; ACEG Initial Comments at 32; ACORE Initial Comments at 12; AEE Reply Comments at 25; Amazon Initial Comments at 5; Breakthrough Energy Initial Comments at 21-22; Clean Energy Associations Initial Comments at 18-20; DC and MD Offices of People's Counsel Initial Comments at 20; ENGIE Reply Comments at 2-3; Grid United Initial Comments at 3; Hannon Armstrong Initial Comments at 2-3; Interwest Initial Comments at 12-14; National and State Conservation Organizations Initial Comments at 1; Pine Gate Initial Comments at 34-37; PIOs Initial Comments at 37-38; PJM Initial Comments at 94 (in combination with Benefit 6, noting that significant stakeholder engagement would be necessary to implement); RMI Initial Comments at 1; SEIA Initial Comments at 16; Southeast PIOs Initial Comments at 50; US DOE Initial Comments at 31-32.

[1770] ACEG Initial Comments at 44; GridLab Initial Comments at 26; NARUC Initial Comments at 23.

[1771] GridLab Initial Comments at 26.

796.    Other commenters oppose mandating consideration of the benefit of mitigation of extreme events and system contingencies, arguing that it is challenging to quantify and that its calculation entails subjective judgment.[1772]  Louisiana Commission states that the value of mitigating extreme weather events can vary significantly across transmission planning regions and states.  Louisiana Commission opposes any extreme weather benefit category that would result in the assignment of costs of transmission hardening projects to Louisiana ratepayers from which they do not benefit.  Louisiana Commission further states that any analysis of this benefit should be limited to sensitivities.[1773]

797.    Some commenters oppose mandating consideration of the mitigation of weather and load uncertainty.[1774]  AEP states that this benefit should not be included in the minimum set of benefits because it is of lesser importance than other benefits described in the NOPR.[1775]  NRECA argues that quantifying this benefit requires subjective judgment.[1776]  According to Pacific Northwest Utilities, this benefit accrues to generation and load-serving entities, not to transmission providers.[1777]

---

[1772] NRECA Initial Comments at 45; Pacific Northwest Utilities Initial Comments at 9; West Virginia Commission Supplemental Comments at 4.

[1773] Louisiana Commission Initial Comments at 18-19.

[1774] AEP Initial Comments at 27; NARUC Initial Comments at 23; NRECA Initial Comments at 45; Pacific Northwest Utilities Initial Comments at 9.

[1775] AEP Initial Comments at 27.

[1776] NRECA Initial Comments at 45.

[1777] Pacific Northwest Utilities Initial Comments at 9.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 592 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

798.    NARUC states that the benefits of mitigation of extreme events, system contingencies, weather, and load uncertainties may be more appropriate for consideration in interregional transmission planning, depending on the size of the transmission planning region.  While NARUC states that mitigation of such contingencies is among the soundest reasons for Interregional Transfer Capability planning, it also notes that in regions with a large footprint (e.g., PJM, MISO) it may be possible to assess these resilience benefits in the regional transmission planning process.[1778]

799.    MISO states that the treatment of mitigation of extreme events and system contingencies and mitigation of weather and load uncertainty as economic benefits differ only to the degree at which production cost savings are realized.  MISO also states that "mitigation of extreme events" may be represented as a reliability benefit where a value of outage costs can be used to monetize the benefits of mitigating the risk of load shedding.[1779]  PJM suggests that the Commission should consolidate the benefits of mitigation of extreme events and system contingencies and the benefits of mitigation of weather and load uncertainty into a single enhanced reliability benefit that would evaluate the ability of grid enhancements to serve load reliably under extreme events and vulnerabilities.[1780]  MISO and NARUC state that their comments regarding mitigation of

---

[1778] NARUC Initial Comments at 21, 23.

[1779] MISO Initial Comments at 51.

[1780] PJM Initial Comments at 94.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 593 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

extreme events and system contingencies are equally applicable to mitigation of weather and load uncertainty.[1781]

**(c)**    **Commission Determination**

800.    We adopt the NOPR proposal, with modification, to require transmission providers in each transmission planning region to measure and use Final Rule Benefit 6, mitigation of extreme weather events and unexpected system conditions, in Long-Term Regional Transmission Planning.  The revised Final Rule Benefit 6 modifies and combines two of the benefits proposed in the NOPR:  (1) mitigation of extreme events and system contingencies (NOPR Benefit 6) and (2) mitigation of weather and load uncertainty (NOPR Benefit 7).[1782]  In combining these two proposed NOPR benefits, we modify the description of NOPR Benefit 6 and describe Final Rule Benefit 6 as reduced production costs and reduced loss of load (or emergency procurements necessary to support the system), including due to increased Interregional Transfer Capability, during extreme weather events and unexpected system conditions, such as unusual weather conditions or fuel shortages that result in multiple concurrent and sustained generation and/or transmission outages.  The description of Final Rule Benefit 6 that we adopt in this final rule includes three additional modifications to the NOPR proposals describing NOPR Benefit 6 and NOPR Benefit 7.  First, we require transmission providers to

---

[1781] MISO Initial Comments at 51; NARUC Initial Comments at 23.

[1782] NOPR, 179 FERC ¶ 61,028 at PP 206-207 (NOPR Benefit 6), 208-209 (NOPR Benefit 7).

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 594 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                 - 584 -

measure, as part of Benefit 6,[1783] the benefits of reduced loss of load (not only reduced production costs).  Second, we require transmission providers, as part of Benefit 6, to account for both extreme weather events and unexpected system conditions when transmission facilities have particularly high value.  The unexpected system conditions can include, for example, system contingencies in the form of generator and/or transmission outages, extreme or volatile production costs, and generation and/or load forecast errors.  Third, we require transmission providers to measure, as part of Benefit 6, the benefits associated with any increase in Interregional Transfer Capability provided by a Long-Term Regional Transmission Facility during an extreme weather event or unexpected system condition that results in multiple and concurrent sustained generation and/or transmission outages.

801.    We find that requiring the measurement and use of Benefit 6 in Long-Term Regional Transmission Planning is necessary because Long-Term Regional Transmission Facilities could result in reduced production costs and reduced loss of load (or reduced emergency procurements necessary to support the system), including reductions due to increased Interregional Transfer Capability, and improved performance during extreme weather events and unexpected system conditions.  Further, the benefit of mitigation of high production costs resulting from extreme weather events and unexpected system conditions can be economically significant.  A relatively few numbers of hours could

---

[1783] Throughout this final rule, "Benefit 6" refers to "Final Rule Benefit 6" unless preceded by "NOPR."

represent a large share of the total benefit of reduced congestion costs that a Long-Term

Regional Transmission Facility provides.[1784]  We also find that it is critical for

transmission providers to measure and use Benefit 6 given that extreme weather events

and unexpected system conditions have significantly and increasingly affected the

reliable operation of the electric grid.  As the Commission has previously noted, extreme

weather events have occurred with greater frequency in recent years, leading to load shed

events that present an unacceptable risk to life and have an extreme economic impact.[1785]

By requiring the use of Benefit 6, we ensure that transmission providers measure and use

the benefit of Long-Term Regional Transmission Facilities under these conditions when

performing Long Term Regional Transmission Planning.  Further, by requiring use of

Benefit 6, we enable transmission providers to identify, evaluate, and select Long-Term

Regional Transmission Facilities that more efficiently or cost-effectively address Long-

Term Transmission Needs.

802.    Regarding the first modification listed above, we require transmission providers to

measure, as part of Benefit 6, reduced loss of load (or reduced emergency energy

procurement to avoid loss of load), not only reduced production costs.  We find it

necessary to include reduced loss of load because Long-Term Regional Transmission

Facilities can provide benefits by improving reliability during extreme weather events

---

[1784] *E.g.*, ACORE Initial Comments at 11 (citing LBNL Aug. 2022 Transmission Value Study at 33).

[1785] *See* Order No. 896, 183 FERC ¶ 61,191 at P 2; Order No. 897, 183 FERC ¶ 61,192 at PP 21-22.

Docket No. RM21-17-000                                                    - 586 -

and unexpected system conditions,[1786] which can be significant given the high cost and

risk to life during periods with insufficient generation to meet system load.  An example

of how a reduction in loss of load could be measured is by quantifying the reduction in

expected unserved energy but for the Long-Term Regional Transmission Facility during

an extreme weather event or unexpected system conditions, determining the value of lost

load, and multiplying these two values to obtain a monetary value.[1787]

803.    We note that Benefit 6 is distinct from other benefits that we require transmission

providers to measure and use, because transmission providers must model different

system conditions (extreme weather events and unexpected system conditions) when

measuring Benefit 6.  Specifically, Benefit 2(a) measures reduced loss of load probability

in the context of the system conditions used for resource adequacy planning, which

typically includes consideration of normal system conditions and may vary by region.  In

contrast, Benefit 6 measures reduced loss of load for specific extreme weather events and

unexpected system conditions identified by the transmission providers.[1788]  Additionally,

---

[1786] PJM Initial Comments at 94; MISO Initial Comments at 12-13; Order No. 897, 183 FERC ¶ 61,192 at PP 6-12.

[1787] *E.g.*, MISO, *LRTP Tranche 2 Business Case Benefit Metrics*, 6-7 (Aug. 31, 2023), https://cdn.misoenergy.org/20230831%20LRTP%20Workshop%20Item%2002%20Business%20Case%20Metrics%20Development630034.pdf.

[1788] Benefit 2(b), which measures the benefit of reduced planning reserve margin, is also used in the context of resource adequacy planning.  We do not allow transmission providers to measure Benefit 6 in terms of reduced planning reserve margin because system planners do not always model extreme weather events or unexpected system conditions when establishing the planning reserve margin used for resource adequacy purposes.  In contrast, reduced loss of load can be measured for any system condition,

Docket No. RM21-17-000                                                    - 587 -

while Benefit 3 and Benefit 6 both measure production cost savings, the system

conditions used to measure Benefit 6 can include higher electricity demand, volatile

production costs, and a more expansive set of generation outages, such as unplanned

generation outages due to extreme weather.  Similarly, Benefit 5 and Benefit 6 both

measure the benefits of reduced congestion due to transmission outages; however, the

system conditions used to measure Benefit 6 include a more expansive set of

transmission outages, such as unplanned transmission outages due to extreme weather.

804.    Regarding the second modification listed above, we require transmission

providers, as part of Benefit 6, to account for mitigation of unexpected system conditions

during periods when transmission facilities have particularly high value, not only during

extreme weather events.  We recognize that unexpected system conditions can create

periods when Long-Term Regional Transmission Facilities have particularly high value

because of, for example, generator and/or transmission outages, extreme or volatile

production costs, and generation and/or load forecast errors.[1789]  Limited resource

---

even those conditions that are not used for resource adequacy planning.

[1789] *See, e.g.*, ACEG Initial Comments at 42-45 (citing Pfeifenberger, Ruiz, Van
Horn, *The Value of Diversifying Uncertain Renewable Generation through the
Transmission System* (Oct. 14, 2020), https://open.bu.edu/handle/2144/41451; The Brattle
Group and Grid Strategies, *Transmission Planning for the 21st Century: Proven
Practices that Increase Value and Reduce Costs*, 2, 34, 78, 85-86, 99 (2021),
https://www.brattle.com/wp-content/uploads/2021/10/2021-10-12-Brattle-GridStrategies-
TransmissionPlanning-Report_v2.pdf); DC and MD Offices of People's Counsel Initial
Comments at 28 (citing Pfeifenberger, Ruiz, Van Horn, *The Value of Diversifying
Uncertain Renewable Generation through the Transmission System, BU-ISE* (Oct. 14,
2020), https://open.bu.edu/handle/2144/41451); US Senator Schumer Supplemental
Comments at 2-3 (citing Millstein et al., Lawrence Berkeley National Laboratory, *The
Latest Market Data Show that the Potential Savings of New Electric Transmission was*

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 598 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

availability, or limited system flexibility, can make it challenging for system operators to immediately address these unexpected system conditions, and Long-Term Regional Transmission Facilities that provide benefits under Benefit 6 will equip system operators with more options to manage the worst-case outcomes. These high-value periods of unexpected system conditions, while infrequent and not necessarily during extreme weather events, may account for a large share of the potential value of a Long-Term Regional Transmission Facility.[1790] We require transmission providers to account for circumstances that contribute to these infrequent and high-value periods specific to their transmission planning region when measuring Benefit 6. Transmission providers may, for example, identify historical periods when significant transmission congestion was due to certain conditions (e.g., generators being unavailable due to a forecast error), then model those conditions in each Long-Term Scenario.[1791] Therefore, we require

---

*Higher Last Year than at Any Point in the Last Decade*, 3-6 (Feb. 2023), https://eta-publications.lbl.gov/sites/default/files/lbnl-transmissionvalue-fact_sheet-2022update-20230203.pdf); US Senator Whitehouse Supplemental Comments at 2 (referencing outages related to extreme events having costs, including economic costs of in the billions of dollars from elevated energy costs).

[1790] LBNL Aug. 2022 Transmission Value Study at 33 (stating that the majority of transmission value estimated occurs during "extreme" conditions that fall outside of the 171 designated extreme weather event days between 2012 and 2021); Millstein et al., Lawrence Berkeley National Laboratory, *The Latest Market Data Show that the Potential Savings of New Electric Transmission was Higher Last Year than at Any Point in the Last Decade*, 3-6 (Feb. 2023), https://eta-publications.lbl.gov/sites/default/files/lbnl-transmissionvalue-fact_sheet-2022update-20230203.pdf.

[1791] Alternatively, transmission providers may, for example, use probabilistic transmission planning methods to account for infrequent and high-value periods.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 599 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

transmission providers to use not only information from modeling extreme weather events but also information from additional modeling that accounts for unexpected system conditions, as part of Benefit 6.  To avoid double-counting of similar circumstances, transmission providers must account for extreme weather events and unexpected system conditions that are separate and distinct such that the benefits of mitigating each system condition can be combined into a single benefit measure.

805.    Finally, we require transmission providers to measure, as part of Benefit 6, the benefits associated with any increase in Interregional Transfer Capability that a Long-Term Regional Transmission Facility would provide during an extreme weather event and unexpected system conditions that results in multiple concurrent and sustained generation and/or transmission outages.  As discussed above, we find that Long-Term Regional Transmission Facilities can increase Interregional Transfer Capability by changing the topology of the transmission system.[1792]  Further, we find that the benefits of mitigating extreme weather events and unexpected system conditions due to increased Interregional Transfer Capability provided by Long-Term Regional Transmission Facilities can be significant.[1793]  To comply with this requirement, transmission providers must include in the modeling they use to measure Benefit 6 any increase in Interregional

---

[1792] *Supra* Long-Term Regional Transmission Planning, Long-Term Scenarios Requirements, Sensitivities for High-Impact, Low-Frequency Events section.

[1793] ACEG Initial Comments at 5; ACEG Reply Comments at 3-5; BP Initial Comments at 10; Breakthrough Energy Initial Comments at 2; Clean Energy Associations Initial Comments at 5, 21; Kansas Corporation Commission Initial Comments at 8-9; NARUC Initial Comments at 23; US DOE Initial Comments at 39-42.

Transfer Capability that a Long-Term Regional Transmission Facility would provide during an extreme weather event and unexpected system conditions that results in multiple concurrent and sustained generation and/or transmission outages.

806.    To account for extreme weather events as part of Benefit 6, transmission providers may incorporate information from the sensitivity they must develop and apply to each Long-Term Scenario that includes multiple concurrent and sustained generation and/or transmission outages due to an extreme weather event across a wide area.[1794]  We reiterate that we require transmission providers to measure the required benefits under each Long-Term Scenario.  However, in the case of Benefit 6, transmission providers may measure the benefit of mitigating extreme weather events using the required extreme weather event sensitivity applied to each Long-Term Scenario; we do not require them to separately measure the benefit of mitigating extreme weather events in each scenario without applying that sensitivity.[1795]

---

[1794] *Supra* Long-Term Regional Transmission Planning, Long-Term Scenarios Requirements, Sensitivities for High-Impact, Low-Frequency Events section (stating transmission providers must develop at least one sensitivity, applied to each Long-Term Scenario, to account for uncertain operational outcomes that determine the benefits of and/or need for transmission facilities during multiple concurrent and sustained generation and/or transmission outages due to an extreme weather event across a wide area).  Transmission providers may also incorporate analyses from an Extreme Weather Vulnerability Assessment as generally described in Order No. 897.

[1795] We recognize that transmission providers may not use an extreme weather event sensitivity that includes system conditions that allow transmission providers to measure the benefit of mitigating unexpected system conditions in every Long-Term Scenario.  In such cases, transmission providers must measure the benefit of mitigating unexpected system conditions in each Long-Term Scenario even without an extreme weather event sensitivity applied to those scenarios or must apply a separate sensitivity

807.   Consistent with all other benefits that we require transmission providers to measure, we do not require a standardized method for measuring Benefit 6 subject to measuring the components described above.[1796]  As the Commission stated in the NOPR, there are different approaches to calculating components of this benefit,[1797] and this final rule provides transmission providers with flexibility in developing the method that they will use to measure this benefit.

808.   We disagree with commenters who express general concerns regarding the difficulty of measuring this benefit.[1798]  In the NOPR, the Commission identified studies that measured benefits of a transmission facility in a manner similar to the requirements in Benefit 6.[1799]  Because we allow flexibility as far as the method transmission providers use to measure each benefit included in the required set of benefits, including Benefit 6, we believe that transmission providers should be able to tailor a method for measuring Benefit 6 that fits their circumstances.  Further, transmission providers can build on

---

that allows for the measurement of Benefit 6 to each Long-Term Scenario.

[1796] *E.g.*, ACEG Initial Comments at 42-44; DC and MD Offices of People's Counsel Initial Comments at 26-27.

[1797] NOPR, 179 FERC ¶ 61,028 at P 207 (providing examples of CAISO's analysis of Devers-Palo Verde Line No. 2, ATC's production cost simulation analysis of insurance benefits for the ATC Paddock-Rockdale transmission line, and a Grid Strategies study).

[1798] NRECA Initial Comments at 45; Pacific Northwest Utilities Initial Comments at 9; West Virginia Commission Supplemental Comments at 4.

[1799] NOPR, 179 FERC ¶ 61,028 at PP 207, 209.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 602 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                                    - 592 -

methods that they use to measure the other benefits required by this final rule to measure

Benefit 6.  For example, transmission providers can use the same method to measure

reduced production costs in accordance with Benefit 6 as they do to measure Benefit 3,

Production Costs Savings, but modify the model inputs to capture reduced production

costs during extreme weather events and unexpected system conditions.  Moreover, we

recognize that there is a balance between requiring transmission providers to measure the

benefits of Long-Term Regional Transmission Facilities that are most readily measured

and ensuring that transmission providers are appropriately capturing the value of Long-

Term Regional Transmission Facilities when evaluating them for selection.  Even to the

extent to which Benefit 6 may be more difficult to measure than the other benefits that we

require, we nonetheless find that requiring transmission providers to measure Benefit 6 is

necessary because Benefit 6 is significant.[1800]

809.    We are unpersuaded by general arguments that transmission providers should not

consider this benefit because it varies by transmission planning region or it only accrues

to certain entities.[1801]  We are not requiring transmission providers to model a specific

extreme weather event or unexpected system condition; transmission providers may

decide what extreme weather event and unexpected system conditions to model, allowing

them to ensure that the conditions modeled are relevant to circumstances in their

---

[1800] *Supra* P 797.

[1801] Louisiana Commission Initial Comments at 18-19; Pacific Northwest Utilities
Initial Comments at 9.

transmission planning region.  In response to NRECA's argument that this benefit

requires subjective judgement,[1802] we conclude that transmission providers have

sufficient expertise to identify and model extreme weather events and unexpected system

conditions when evaluating Long-Term Regional Transmission Facilities.[1803]  In response

to AEP's argument that NOPR Benefit 7 (mitigation of weather and load uncertainty) is

of lesser importance compared to other benefits described in the NOPR and should be

optional for transmission providers to measure and use,[1804] we disagree because the

evidence in the record demonstrates that Final Rule Benefit 6 (which includes NOPR

Benefit 7) is significant.[1805]

810.    NARUC states that the benefit of mitigation of extreme weather events may need

to be more fully considered only in large transmission planning regions or in

interregional transmission planning.[1806]  Although transmission providers could also

consider the benefits of mitigation of extreme weather events as part of interregional

transmission coordination, we believe transmission providers can measure and use the

benefit of mitigation of extreme weather events in regional transmission planning

---

[1802] NRECA Initial Comments at 45.

[1803] NESCOE Initial Comments at 42.

[1804] AEP Initial Comments at 27.

[1805] *Supra* note 1769; *see also* ACORE Initial Comments at 11 (citing LBNL Aug. 2022 Transmission Value Study at 33).

[1806] NARUC Initial Comments at 21, 23.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 604 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

processes regardless of the size of the transmission planning region, because extreme

weather events can occur and affect the transmission system in any region.  If the size of

the extreme weather event is larger than the transmission planning region, transmission

providers can consider the extent to which they can rely on interregional flows from other

transmission planning regions during the extreme weather event.  We note that

transmission providers in each transmission planning region must coordinate and share

information with the transmission providers in each neighboring transmission planning

region and must identify and jointly evaluate interregional transmission facilities that

may be more efficient or cost-effective transmission facilities to address Long-Term

Transmission Needs, as described in more detail in the Interregional Transmission

Coordination section of this final rule.  Better measurement of the benefits of mitigation

of extreme weather events as part of regional transmission planning can only help

facilitate such efforts.  We encourage transmission providers in neighboring transmission

planning regions to share information with one another that would be useful to measure

Benefit 6 more accurately through their interregional transmission coordination

procedures.

811.    Some commenters state that the benefits of mitigation of extreme events and

system contingencies and mitigation of weather and load uncertainty overlap, or should

be combined.[1807]  We note that Benefit 6, as described above, modifies and combines the

benefits proposed in the NOPR of (1) mitigation of extreme events and system

---

[1807] MISO Initial Comments at 51; PJM Initial Comments at 94.

contingencies and (2) mitigation of weather and load uncertainty, which should address

concerns of separately requiring transmission providers to use two similar benefits that

some argue could overlap.

### vii.　Final Rule Benefit 7:  Capacity Cost Benefits from Reduced Peak Energy Losses

#### (a)　NOPR Description

812.　The Commission described this benefit, NOPR Benefit 8 (renumbered in this final

rule as Final Rule Benefit 7), in the NOPR as reduced generation capacity investment

needed to meet peak load.[1808]  The Commission noted that capacity cost savings from

reduced peak energy losses benefits refer to the ability of proposed transmission facilities

to lessen the amount of transmission system energy losses during peak-load conditions

which, over time, would decrease the need for new generation capacity installations or

purchases.  To the extent that new transmission facilities result in changes to generation

dispatch and flows, transmission system energy losses will also change.  If transmission

system losses are reduced via the new transmission facilities, transmission providers will

not have to construct or procure additional generation to satisfy installed capacity

requirements for peak-load conditions.  If there is a reduction in energy losses during

peak conditions, this would result in, presumably, lowered investments for generation

capacity resources to meet the peak load.  For example, Entergy found that potential

transmission facilities in its footprint could reduce peak-load transmission losses and

---

[1808] NOPR, 179 FERC ¶ 61,028 at P 210.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 606 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                    - 596 -

associated needed generation investment by 2% of total transmission facility costs.[1809]

The Commission noted that capacity cost savings from reduced peak energy losses only

attempt to evaluate benefits for peak-load conditions.

813.    The Commission stated that one potential way to calculate capacity cost savings

from reduced peak energy losses is to calculate the present value of capital cost savings

associated with the reduction in installed generation requirements.[1810]  To arrive at the

value of associated capital cost savings, the estimated net cost of new entry (Net CONE)

(i.e., the cost of new peaking generating capacity net of operating margins earned in

energy and ancillary services markets when the region is resource constrained) would be

multiplied by the reduction in installed generation capacity requirements.  The resulting

value would represent the avoided cost of procuring more generation to cover

transmission system losses during peak-load conditions that would be passed on to

consumers via lowered generation capacity costs.[1811]

### (b)    Comments

814.    A number of commenters support mandating consideration of NOPR Benefit 8.[1812]

ACEG and DC and MD People's Counsel state that NOPR Benefit 8 is a distinct benefit

---

[1809] *Id.* P 211 & n.346 (citing ITC, Joint Application, Docket No. EC12-145-000, Ex. ITC-600 (Testimony of Pfeifenberger), at 77-78 (filed Sept. 24, 2012)).

[1810] *Id.* P 212.

[1811] *Id.*

[1812] Acadia Center and CLF Initial Comments at 21-22; ACEG Initial Comments at 32, 45; ACORE Initial Comments at 12; AEE Reply Comments at 25; Amazon Initial Comments at 5; Breakthrough Energy Initial Comments at 21-22; Clean Energy

category that has been measured before.[1813]  PIOs state that SPP quantified NOPR

Benefit 8 in its 2016 Regional Cost Allocation Review and that "leav[ing] these cost

savings on the cutting room floor will ultimately raise costs for consumers and result in

an inefficient transmission plan."[1814]

815.    Other commenters, such as NARUC, oppose mandating consideration of NOPR

Benefit 8.  NARUC contends that this benefit is a subset of the lowered system reserve

margins benefit.  NARUC states that NOPR Benefit 8 is unlikely to occur within

organized, competitive generation markets because additional transmission will not deter

the installation of new generation under current federal open access policies.  However,

NARUC argues, this benefit may be attainable in transmission planning regions served

by vertically integrated utilities where transmission can substitute for new generation

construction.  NARUC asserts that hundreds of thousands of megawatts of generation

---

Associations Initial Comments at 18-20; DC and MD Offices of People's Counsel Initial
Comments at 20; ENGIE Reply Comments at 2-3; Hannon Armstrong Initial Comments
at 2-3; Interwest Initial Comments at 12-14; National and State Conservation
Organizations Initial Comments at 1; Pine Gate Initial Comments at 34-37; PIOs Initial
Comments at 37-38; RMI Initial Comments at 1; SEIA Initial Comments at 16; Southeast
PIOs Initial Comments at 50.

[1813] ACEG Initial Comments at 48; DC and MD People's Counsel Initial
Comments at 28 (both citing ITC, Joint Application, Docket No. EC12-145-000, Ex.
ITC-600 (Testimony of Pfeifenberger), at 77-78 (filed Sept. 24, 2012); SPP, SPP Priority
Projects Phase II Report, Rev. 1, April 27, 2010, at 26; ATC, Planning Analysis of the
Paddock-Rockdale Project, April 5, 2007 (filed in PSCW Docket 137-CE-149, PSC
Reference # 75598), at 4, 63; and MISO, Proposed Multi Value Project Portfolio,
Technical Study Task Force and Business Case Workshop, August 22, 2011, at 25, 27)).

[1814] PIOs Initial Comments at 42.

Docket No. RM21-17-000                                         - 598 -

currently await interconnection studies in the various RTOs/ISOs and non-RTO/ISO

transmission planning regions, and it is difficult to see how construction of new

transmission facilities can remove any of this demand for additional generator

interconnection.[1815]

816.   West Virginia Commission also opposes a requirement to use NOPR Benefit 8,

arguing that the calculation requires significant evidence based on assumptions that are

difficult, if not impossible, to quantify before the fact.[1816]

### (c)      Commission Determination

817.   As an initial matter, we renumber NOPR Benefit 8 and refer to it in this

determination section as Final Rule Benefit 7.  We adopt the NOPR proposal, with

modification, to require transmission providers in each transmission planning region to

measure and use Final Rule Benefit 7, Capacity Cost Benefits from Reduced Peak Energy

Losses, in Long-Term Regional Transmission Planning.  We adopt the NOPR's proposed

description of Final Rule Benefit 7 as reduced generation capacity investment needed to

meet peak load.[1817]  We find that requiring the use and measurement of Final Rule

Benefit 7, as described, is necessary to ensure that capacity cost benefits from reduced

peak energy losses are not excluded from Long-Term Regional Transmission Planning

---

[1815] NARUC Initial Comments at 24.

[1816] West Virginia Commission Supplemental Comments at 4.

[1817] We note that in the NOPR, this benefit was designated as Benefit 8.  We have revised the ordering designation of this benefit in this final rule.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 609 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

because standard production cost modeling and the other benefits that this final rule

requires transmission providers to measure and use will not capture this benefit.  Absent a

requirement for transmission providers to measure and use Final Rule Benefit 7 in Long-

Term Regional Transmission Planning, transmission providers may not identify, evaluate,

and select Long-Term Regional Transmission Facilities that more efficiently or cost-

effectively address Long-Term Transmission Needs.

818.    One potential way to measure capacity cost savings from reduced peak energy

losses is to calculate the present value of capital cost savings associated with the

reduction in installed generation requirements.  To arrive at the value of capital cost

savings, the estimated net cost of new entry (i.e., the cost of new peaking generating

capacity net of operating margins earned in energy and ancillary services markets when

the region is resource constrained) could be multiplied by the reduction in installed

generation capacity requirements.  The resulting value would represent the avoided cost

of procuring more generation to cover transmission system losses during peak-load

conditions, savings that would be passed on to customers via lowered generation capacity

costs.

819.    We disagree with NARUC's contention that this benefit is a subset of the lowered

system reserve margins benefit and that it is unlikely to occur within organized,

competitive generation markets.[1818]  ACEG and DC and MD People's Counsel both

indicate that Final Rule Benefit 7 is a distinct benefit category that has been measured

---

[1818] NARUC Initial Comments at 24.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 610 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                          - 600 -

before, citing MISO's Multi-Value Project portfolio, among other examples of its use,
which measures capacity cost savings from reduced peak energy losses as an independent
benefit.[1819]  While we acknowledge that this benefit may have the effect of lowering
system reserve margins, we agree with PIOs that these cost savings are distinct from
Benefit 2 and that failing to specifically evaluate potential cost savings related to reduced
peak energy losses may result in higher capacity costs and relatively inefficient or less
cost-effective transmission development.  As discussed above, Benefit 2 recognizes
potential cost savings of providing additional pathways for connecting generation
resources with load.  Here, we are assessing the benefits of limiting transmission losses
along those pathways.  We also note that this approach is consistent with Benefits 3 and 4
above that separately recognize potential cost savings associated with lower production
costs and reduced transmission energy losses in energy markets.  In light of the evidence
that multiple transmission providers have successfully measured this benefit, as well as
the example that we provide above describing how a transmission provider may be able
to calculate this benefit, we further disagree with West Virginia Commission's argument
that calculation of this benefit is based on assumptions that are difficult to quantify in
advance.

---

[1819] ACEG Initial Comments at 48; DC and MD People's Counsel Initial
Comments at 28 (both citing ITC, Joint Application, Docket No. EC12-145-000, Ex.
ITC-600 (Testimony of Pfeifenberger), at 77-78 (filed Sept. 24, 2012); SPP, SPP Priority
Projects Phase II Report, Rev. 1, April 27, 2010, at 26; ATC, Planning Analysis of the
Paddock-Rockdale Project, April 5, 2007 (filed in PSCW Docket 137-CE-149, PSC
Reference # 75598), at 4, 63; and MISO, Proposed Multi Value Project Portfolio,
Technical Study Task Force and Business Case Workshop, August 22, 2011, at 25, 27)).

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 611 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                           - 601 -

### viii.    Other Benefits

### (a)    Comments

820.    Numerous commenters address in various ways the other five benefits that the

Commission described in the NOPR but that we do not require transmission providers to

measure and use in Long-Term Regional Transmission Planning in this final rule:

mitigation of weather and load uncertainty,[1820] deferred generation capacity investments,

access to lower cost generation, increased competition, and increased market liquidity.[1821]

Other commenters address in various ways benefits not listed in the NOPR for

transmission providers to consider for use in evaluating Long-Term Regional

Transmission Facilities.[1822]

---

[1820] We note that elements of this benefit are now contained in Benefit 6, the description of which has been revised from the NOPR.

[1821] Acadia Center and CLF Initial Comments at 21-22; ACEG Initial Comments at 32, 45-48; ACORE Initial Comments at 12; AEE Reply Comments at 25; AEP Initial Comments at 25-27; Amazon Initial Comments at 5; Breakthrough Energy Initial Comments at 21-22; Clean Energy Associations Initial Comments at 18-20; DC and MD Offices of People's Counsel Initial Comments at 20, 28-30; ENGIE Reply Comments at 2-3; Hannon Armstrong Initial Comments at 2-3; Idaho Power Initial Comments at 7-8; Interwest Initial Comments at 12-14; ISO-NE Initial Comments at 34; Joint Consumer Advocates Initial Comments at 11-12; MISO Initial Comments at 50-51; NARUC Initial Comments at 21, 24-25; National and State Conservation Organizations Initial Comments at 1; New Jersey Commission Initial Comments at 11-14; North Carolina Commission and Staff Initial Comments at 6-7; NRECA Initial Comments at 45; Pacific Northwest Utilities Initial Comments at 9; Pine Gate Initial Comments at 34-37; PIOs Initial Comments at 37-38; PJM Initial Comments at 94; PJM Market Monitor Initial Comments at 5-6; PPL Initial Comments at 13-15; RMI Initial Comments at 1; SEIA Initial Comments at 16; Southeast PIOs Initial Comments at 50; Southeast PIOs Reply Comments at 27-28; Southern Initial Comments at 25-27; West Virginia Commission Supplemental Comments at 4; US DOE Initial Comments at 31-32.

[1822] ACEG Initial Comments at 6-8; AEE Reply Comments at 25-26; AEP Initial

Docket No. RM21-17-000                                                      - 602 -

**(b)**        **Commission Determination**

821.    We decline to require transmission providers to measure and use the remaining

five benefits described in the NOPR in Long-Term Regional Transmission Planning (i.e.,

mitigation of weather and load uncertainty, generation capacity investments, access to

lower-cost generation, increased competition, and increased market liquidity).  We find

that the required set of benefits that we adopt herein is a sufficiently broad range of

benefits to ensure that transmission providers are identifying, evaluating, and selecting

Long-Term Regional Transmission Facilities that more efficiently or cost-effectively

address Long-Term Transmission Needs.  As such, we find that the measurement and use

of additional benefits in Long-Term Regional Transmission Planning is not necessary to

ensure that rates remain just and reasonable.

---

Comments at 6, 23-27; Amazon Initial Comments at 5; Breakthrough Energy Initial
Comments at 21-23; California Commission Initial Comments at 31-34; California
Energy Commission Initial Comments at 3; CARE Coalition Initial Comments at 32-33;
Certain TDUs Reply Comments at 1-3; Clean Energy Associations Initial Comments at
19-20; Clean Energy Buyers Initial Comments at 20-21; Clean Energy States Initial
Comments at 6-8; DC and MD Offices of People's Counsel Initial Comments at 18-19;
Entergy Initial Comments at 21; Environmental Groups Supplemental Comments at 2-3;
Grand Rapids NAACP Initial Comments at 21-23; GridLab Initial Comments at 25-28;
Interwest Initial Comments at 13-14; ITC Initial Comments at 21-22; Joint Consumer
Advocates Initial Comments at 11-12; Large Public Power Initial Comments at 28-29;
Michigan Commission Initial Comments at 7; Nevada Commission Initial Comments at
10-11; Northwest and Intermountain Initial Comments at 15-16; NYISO Initial
Comments at 39; Pattern Energy Reply Comments at 8-9; PIOs Initial Comments at 43-
44; PIOs Reply Comments at 7-8; PJM Initial Comments at 94-96; Policy Integrity Initial
Comments at 28; Policy Integrity Supplemental Comments at 4-8; PPL Initial Comments
at 14-15; R Street Initial Comments at 9-10; Rail Electrification Initial Comments at 6-7;
RMI Initial Comments at 2; SEIA Initial Comments at 16-17; Shell Initial Comments at
14-16; Tabors Caramanis Rudkevich Initial Comments at 6; US DOE Initial Comments at
33-34; Vistra Initial Comments at 15-16; WE ACT Initial Comments at 2-3.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 613 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

822.    However, we recognize that Long-Term Regional Transmission Facilities may provide additional benefits that may merit consideration when transmission providers are identifying, evaluating, and selecting such facilities to address Long-Term Transmission Needs more efficiently or cost-effectively.  Therefore, transmission providers may measure and use additional benefits beyond those included in the required set of benefits in Long-Term Regional Transmission Planning, including on a transmission facility or plan-specific basis, subject to the requirement that they do so in a manner that is consistent with their obligations under Order No. 890 and Order No. 1000 transmission planning principles to be open and transparent as to their transmission planning processes.

### 3.    Identification, Measurement, and Evaluation of the Benefits of Long-Term Regional Transmission Facilities

#### a.    NOPR Proposal

823.    The Commission proposed to require transmission providers in each transmission planning region to identify on compliance the benefits that they will use in Long-Term Regional Transmission Planning, how they will calculate those benefits, and how the benefits will reasonably reflect the benefits of regional transmission facilities to meet identified transmission needs driven by changes in the resource mix and demand.  The Commission proposed that as part of this compliance obligation, transmission providers would be required to explain the rationale for using the benefits identified.[1823]

---

[1823] NOPR, 179 FERC ¶ 61,028 at P 183.

### b.    **Comments**

824.    Many commenters support requiring identification of, and transparency regarding,

the benefits that transmission providers will use in Long-Term Regional Transmission

Planning.[1824]  For example, Nebraska Commission states that the NOPR proposal will

foster the necessary flexibility to accommodate varying needs and approaches of different

transmission planning regions.[1825]

825.    Certain TDUs and Michigan Commission state that transmission providers must

clearly articulate their methods for calculating identified benefits.[1826]  Certain TDUs

further state that benefits should be evaluated with consistent reference cases to ensure

consistency across scenarios.[1827]  Certain TDUs and Entergy state that transmission

providers should incorporate their benefit calculation methods, as well as, according to

Entergy, their role in selection, into the OATT.[1828]  Entergy argues that the Commission

---

[1824] APPA Initial Comments at 5; Avangrid Initial Comments at 7, 29; Business Council for Sustainable Energy Initial Comments at 5; California Commission Initial Comments at 28-30; California Energy Commission Initial Comments at 3; ENGIE Reply Comments at 3; Handy Law Initial Comments at 8; Massachusetts Attorney General Initial Comments at 3; Michigan Commission Initial Comments at 6; Nebraska Commission Initial Comments at 7; NESCOE Initial Comments at 44 (citing NOPR, 179 FERC ¶ 61,028 at PP 183, 186); NRECA Initial Comments at 46; NYISO Initial Comments at 37-38; Pennsylvania Commission Initial Comments at 9; PJM Initial Comments at 7; Vermont State Entities Initial Comments at 6.

[1825] Nebraska Commission Initial Comments at 7.

[1826] Certain TDUs Initial Comments at 13; Michigan Commission Initial Comments at 6.

[1827] Certain TDUs Initial Comments at 13-14.

[1828] Certain TDUs Initial Comments at 14-15; Entergy Reply Comments at 4-5

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 615 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

should allow transmission providers to use different benefits on a regional or subregional level, but that benefits should not change from one transmission project or portfolio to the next without an OATT amendment.[1829]

826.    MISO TOs state that MISO already meets the NOPR's proposed requirement to identify benefits used in Long-Term Regional Transmission Planning and explain how they will be calculated.[1830]

827.    Some commenters express concerns with the Commission's proposed benefit identification requirement,[1831] including concerns over perceived excessive quantification[1832] or requirements to calculate benefits individually.[1833]  Duke asserts that the Commission should clarify that it will not force transmission providers to assign

---

(citing *City & Cnty. of San Francisco v.  FERC*, 24 F.4th 652, 661 (D.C. Cir. 2022); *Sw. Power Pool, Inc.*, 180 FERC ¶ 61,074, at PP 24-31 (2022), *order on reh'g and setting aside*, 182 FERC ¶ 61,100 (2023)).

[1829] Entergy Reply Comments at 5.

[1830] MISO TOs Initial Comments at 19-22 (citing MISO, Electric Tariff, attach. FF §§ II.C.2, II.C.5; MISO, *LRTP Tranche 1 Portfolio Detailed Business Case*, at 15-49, 60 (June 25, 2022), https://cdn.misoenergy.org/LRTP%20Tranche%201%20Detailed%20Business%20Case625789.pdf).

[1831] DC and MD Offices of People's Counsel Initial Comments at 19; Duke Initial Comments at 24; EEI Initial Comments at 20; Entergy Initial Comments at 22; Illinois Commission Initial Comments at 13-14; Louisiana Commission Initial Comments at 18; Michigan Commission Initial Comments at 6; US Chamber of Commerce Initial Comments at 7-8.  Further detail on the basis for these commenters' concerns is provided *infra*.

[1832] *See, e.g.*, Duke Initial Comments at 24.

[1833] *See, e.g.*, EEI Initial Comments at 20.

Docket No. RM21-17-000                                                    - 606 -

dollar values for every benefit because some benefits' quantification is subjective.[1834]

EEI asserts that transmission providers should not have to calculate all of the benefits for

a transmission project but states that those benefits used for cost allocation purposes

should be quantifiable.[1835]  NYISO requests that the final rule confirm that it does not

prescribe how benefits must be calculated and, more specifically, that transmission

providers are not required to calculate the listed benefits in the exact manner described in

the NOPR.[1836]

828.    MISO notes that the benefits it currently uses in regional transmission planning are

not all specified in the Tariff itself but were developed as part of the review process with

MISO stakeholders.  MISO adds that the flexibility to look for relevant benefits and

apply them in long-term planning scenarios is important in the process to identify long-

term regional solutions that reflect the needs and value-drivers of the MISO footprint.[1837]

MISO states that if limited to a prescriptive set of benefits, MISO may not be in the same

position to move forward the transmission projects of the greatest benefit and value to

MISO and its stakeholders.[1838]

---

[1834] Duke Initial Comments at 24.

[1835] EEI Initial Comments at 20.

[1836] NYISO Initial Comments at 36-40.

[1837] MISO Initial Comments at 9-10.

[1838] *Id.* at 9.

829.    Some commenters opine on requirements or best practices for identifying,

measuring, and combining benefits.[1839]  For example, some commenters comment on the

measurement and/or calculation of benefits.[1840]  Entergy argues that the Commission

should require all benefits to be reasonably achievable in real-time operations.[1841]  SPP

Market Monitor states that assumptions into benefit calculations should be improved to

ensure that they result in just and reasonable rates.[1842]  Large Public Power emphasizes

that the Commission should clarify that benefits must reflect load-serving entities' actual

use of proposed transmission facilities, measured by anticipated power flows.[1843]

---

[1839] Acadia Center and CLF Initial Comments at 23; ACORE Reply Comments at 3; ACEG Initial Comments at 32; AEP Initial Comments at 21-24; APPA Initial Comments at 32; City of New Orleans Council Initial Comments at 11; Clean Energy Associations Initial Comments at 20-21; DC and MD Offices of People's Counsel Initial Comments at 19; Duke Initial Comments at 24; EEI Initial Comments at 20; Entergy Initial Comments at 22; Illinois Commission Initial Comments at 13-14; Large Public Power Initial Comments at 28; Louisiana Commission Initial Comments at 18; Michigan State Entities Initial Comments at 5-7; NARUC Initial Comments at 20-26; NASUCA Initial Comments at 10; NRECA Initial Comments at 45; NYISO Initial Comments at 37; PJM Market Monitor Initial Comments at 4; SEIA Initial Comments at 18-19; Six Cities Initial Comments at 2-3; Southern Initial Comments at 31; SPP Market Monitor Initial Comments at 11; US Chamber of Commerce Initial Comments at 7-8; US DOE Initial Comments at 31; Vermont State Entities Initial Comments at 6.

[1840] AEP Initial Comments at 21-24; Clean Energy Associations Initial Comments at 21; Large Public Power Initial Comments at 28; SEIA Initial Comments at 18-19; SPP Market Monitor Initial Comments at 11.

[1841] Entergy Initial Comments at 22.

[1842] SPP Market Monitor Initial Comments at 11.

[1843] Large Public Power Initial Comments at 28.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 618 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

830.    SEIA suggests that there are many resources to inform methods for the calculation

of benefits, including MISO's Long Range Transmission Plan Tranche 1 portfolio.[1844]

Also referencing MISO's process, AEP contends that the benefits of regional

transmission facilities should be evaluated collectively, through a multi-value analysis,

and cites MISO's existing process as an example.[1845]

831.    Some commenters opine on the need for quantification and/or specificity of

benefits.[1846]  DC and MD Offices of People's Counsel assert that any benefit used should

be pre-defined and its measurement accurate and transparent.[1847]  PIOs also state that the

Brattle-Grid Strategies Oct. 2021 Report provides evidence that benefits from

transmission facilities are not difficult to quantify despite claims to the contrary.[1848]

NASUCA asserts that the methods for calculating and assigning benefits should be based

on objective, measurable, clear, and specific metrics.[1849]  Similarly, Illinois Commission,

---

[1844] SEIA Initial Comments at 18-19 (citing Rob Gramlich, *Enabling Low-Cost Clean Energy & Reliable Service Through Better Transmission Benefits Analysis*, at 17, https://acore.org/wp-content/uploads/2022/08/ACORE-Enabling-Low-Cost-Clean-Energy-and-Reliable-Service-Through-Better-Transmission-Analysis.pdf).

[1845] AEP Initial Comments at 21-24.

[1846] ACORE Reply Comments at 3 (citing US DOE Initial Comments at 31); Concerned Scientists Reply Comments at 8-10; DC and MD Offices of People's Counsel Initial Comments at 19; Entergy Initial Comments at 22; NASUCA Initial Comments at 10; US DOE Initial Comments at 31.

[1847] DC and MD Offices of People's Counsel Initial Comments at 19.

[1848] PIOs Initial Comments at 42-44.

[1849] NASUCA Initial Comments at 10.

Pacific Northwest Utilities, and NARUC assert that transmission benefits must be verifiable and quantifiable.[1850]

832.    A few commenters address the ease of quantification of the benefits listed in the NOPR.  NARUC states that NOPR Benefits 1-5 and 8-10 seem somewhat capable of quantification.[1851]  NRECA asserts that the benefits at the top of the list in the NOPR are reasonably quantifiable, while those farther down the list require more subjective judgements.[1852]  APPA agrees that some of the benefits listed in the NOPR would be more challenging to quantify and therefore would be more difficult to justify as a just and reasonable way to allocate costs.[1853]

833.    Some commenters support the use of benefit-cost analysis frameworks.[1854] Michigan State Entities express that having a prescribed benefit-cost analysis framework can help ensure appropriate quantification of benefits, adding that there is less transparency when individual transmission providers may determine how these benefits stack up against each other.[1855]  Therefore, Michigan State Entities recommend that the

---

[1850] Illinois Commission Initial Comments at 13-14; NARUC Initial Comments at 20-25; Pacific Northwest Utilities Initial Comments at 8-9.

[1851] NARUC Initial Comments at 21.

[1852] NRECA Initial Comments at 45.

[1853] APPA Initial Comments at 32.

[1854] Michigan State Entities Initial Comments at 5-7; Six Cities Initial Comments at 2-3; Southern Initial Comments at 31; Vermont State Entities Initial Comments at 6-7.

[1855] Michigan State Entities Initial Comments at 5.

Commission adopt the cost-benefit analysis framework already used throughout the federal government.  According to Michigan State Entities, the Commission's legal authority to do so is well-established by court decisions and it would help to ensure sufficient regional transmission cooperation to achieve just and reasonable rates.[1856]

834.    Six Cities argues that transmission planning should assess both project benefits and costs.[1857]  Vermont State Entities agree that a comprehensive benefit-cost analysis would lead to better and more cost-effective transmission planning.[1858]  Southern also states that the burdens associated with proposed transmission projects should be recognized, including not only immediate cost and rate impacts, but also effects on local communities and landowners and issues of equity and environmental justice.[1859]

835.    Likewise, certain commenters state that they support the adoption of benefit-cost analysis using quantifiable, replicable, non-duplicative, and forward-looking metrics.[1860] US Chamber of Commerce contends that the objective nature of such metrics should limit uncertainty otherwise present in projections spanning multiple decades and reduce

---

[1856] *Id.* at 6-7.

[1857] Six Cities Initial Comments at 2-3.

[1858] Vermont State Entities Initial Comments at 6-7.

[1859] Southern Initial Comments at 31.

[1860] City of New Orleans Council Initial Comments at 11; Entergy Initial Comments at 22; Louisiana Commission Initial Comments at 18; US Chamber of Commerce Initial Comments at 7-8.

the variability and error in benefit calculations.[1861]  Acadia Center and CLF and ACEG
argue that an unbiased analysis of both benefits and costs is essential for ensuring just
and reasonable rates and that the Commission should seek to ensure that a minimum set
of benefits is applied consistently across RTO/ISO and non-RTO/ISO transmission
planning regions.[1862]  ACORE agrees with US DOE that consistency in benefit
quantification could facilitate improved interregional transmission planning.[1863]

836.    Other commenters state that the NOPR's proposed reforms will help improve
transmission providers' existing benefit-cost analyses.[1864]  GridLab states that the
NOPR's approach balances regional flexibility with federal standardization in benefit
categories across transmission providers and more accountability by transmission
providers in their benefit-cost analysis.[1865]  PJM Market Monitor states that PJM's current
benefit-cost analysis does not accurately measure the costs and benefits of transmission
projects because it does not account for the fact that benefits are uncertain and sensitive
to modeling assumptions or that costs may exceed estimates.[1866]  Illinois Commission

---

[1861] US Chamber of Commerce Initial Comments at 8.

[1862] Acadia Center and CLF Initial Comments at 23; ACEG Initial Comments at 32.

[1863] ACORE Reply Comments at 3 (citing US DOE Initial Comments at 31).

[1864] GridLab Initial Comments at 25; PJM Market Monitor Initial Comments at 4-5; Southeast PIOs Initial Comments at 49-50.

[1865] GridLab Initial Comments at 25.

[1866] PJM Market Monitor Initial Comments at 4-5.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 622 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

states that the use of too many metrics could lead to the evaluation of transmission projects based on the margins and inequitable cost allocation.[1867]  Illinois Commission further states that some metrics may be most relevant for interregional and regional transmission projects identified in the Long-Term Regional Transmission Planning process and that the Commission can aid transmission planning regions in putting together a shorter list of these metrics.[1868]

### c.    Commission Determination

837.   We adopt the NOPR proposal, with modification, and require transmission providers in each transmission planning region to include in their OATTs a general description of how they will measure each of the seven benefits included in the required set of benefits that we require them to measure and use in Long-Term Regional Transmission Planning.  As discussed above, we clarify that transmission providers may use and measure additional benefits, beyond the seven required by this final rule.[1869]

838.   We find that requiring such a description in transmission providers' OATTs for the seven required benefits is necessary to ensure that all stakeholders have transparency

---

[1867] Illinois Commission Initial Comments at 13.

[1868] *Id.* at 14.

[1869] While we conclude that it is important for transmission providers to at minimum use and measure the required seven benefits, we agree with MISO that the flexibility to look for relevant benefits and apply them in long-term planning scenarios can be important in the process to identify long-term regional solutions that reflect region-specific needs and value-drivers.  MISO Initial Comments at 9.  We therefore afford flexibility to transmission planners in identifying and measuring benefits that go beyond the core set of seven required here.

USCA4 Appeal: 24-1650     Doc: 224     Filed: 01/21/2025     Pg: 623 of 2455
Document Accession #: 20240513-3036     Filed Date: 05/13/2024

regarding the benefits that transmission providers use to identify, evaluate, and select

Long-Term Regional Transmission Facilities that more efficiently or cost-effectively

address Long-Term Transmission Needs.  We further conclude that requiring inclusion of

this information in the OATT will better ensure transmission providers measure and use

the set of benefits required in the final rule in Long-Term Regional Transmission

Planning.

839.    Some commenters express concerns regarding excessive quantification of

benefits.[1870]  But the approach adopted in this final rule—of requiring transmission

providers to measure and use a required set of benefits in Long-Term Regional

Transmission Planning and requiring transmission providers to include in their OATTs a

general description of the method they will use to measure each of those benefits—

represents a reasonable balance between specificity and flexibility.  As discussed above,

we provide flexibility to transmission providers to specify the method for measuring each

of the seven required benefits.  However, because our requirement that transmission

providers measure and use these benefits in Long-Term Regional Transmission Planning

is necessary to address the identified deficiencies in existing regional transmission

planning and cost allocation processes, we find that it is also necessary for transmission

providers to include in their OATTs a general description of how they will measure each

of these benefits.  Such a requirement will ensure that transmission providers consider a

sufficiently broad range of benefits when determining whether to select a Long-Term

---

[1870] *See, e.g.*, Duke Initial Comments at 24.

Regional Transmission Facility as a more efficient or cost-effective regional transmission solution to Long-Term Transmission Needs.

840.    In response to some commenters, such as MISO, that urge that requiring details on measurement of benefits to be incorporated into the OATT could impede development and use of new transmission metrics, we clarify that the description for each required benefit in the OATT must only be sufficient to enable stakeholders to understand the manner by which transmission providers will measure these benefits.  We do not require further details on measurement of the benefits to be included in the OATT.

841.    Large Public Power asks that the Commission clarify that any acceptable list of benefits detailed in compliance filings must emphasize load-serving entities' actual use of the proposed transmission facilities, which should be measured by anticipated power flows that occur across these facilities.[1871]  We decline to adopt Large Public Power's suggested clarification as we are not mandating any particular method for measuring the seven benefits included in the required set of benefits.

842.    We decline certain commenters' requests to require that transmission providers justify why they omit any categories of benefits.[1872]  Such a requirement is unnecessary because of our modifications to the NOPR proposal, which now require transmission

---

[1871] Large Public Power Initial Comments at 28.

[1872] GridLab Initial Comments at 25; NYISO Initial Comments at 37-38; Vermont State Entities Initial Comments at 6-7.

Docket No. RM21-17-000                                                    - 615 -

providers to measure and use the required set of benefits in Long-Term Regional

Transmission Planning.

### 4.    Evaluation of Transmission Benefits Over a Longer Time Horizon

#### a.    NOPR Proposal

843.    In the NOPR, the Commission proposed to require transmission providers in each

transmission planning region to evaluate, as part of Long-Term Regional Transmission

Planning, the benefits of regional transmission facilities over a time horizon that covers,

at a minimum, 20 years starting from the estimated in-service date of the regional

transmission facilities.[1873]

844.    The Commission proposed to require transmission providers to evaluate benefits

over this time horizon in all stages of Long-Term Regional Transmission Planning, which

includes evaluating regional transmission facilities, selecting more efficient or cost-

effective regional transmission facilities in the regional transmission plan for purposes of

cost allocation, and allocating the costs of such regional transmission facilities in a

manner that is at least roughly commensurate with estimated benefits.  The Commission

proposed that for consistency and a matching comparison of benefits and costs over time,

to the extent that transmission providers estimate the costs of transmission facilities

beyond the in-service date of the transmission facilities, that transmission providers

---

[1873] NOPR, 179 FERC ¶ 61,028 at P 227.

Docket No. RM21-17-000                                                      - 616 -

should estimate those future costs over the same time horizon as the estimated benefit.[1874]

The Commission proposed that approaches may exceed this minimum requirement, but

transmission providers must demonstrate that their proposal is consistent with or superior

to any final rule in this proceeding.

### b.    **Comments**

#### i.    **Requirement for a Benefits Evaluation Time Horizon of a Minimum of 20 Years from the In-Service Date**

845.    Several commenters support the Commission's proposal to require that

transmission providers in each transmission planning region evaluate, as part of Long-

Term Regional Transmission Planning, the benefits of regional transmission facilities

over a time horizon that covers, at a minimum, 20 years starting from the estimated in-

service date of the transmission facilities.[1875]  NARUC, for example, states that

transmission planning must strike a reasonable balance between considering benefits only

through the end of the transmission planning horizon regardless of the transmission

facility's in-service date and considering benefits over its full expected life, which

NARUC states that the NOPR proposal achieves.[1876]  Northwest and Intermountain state

that they cautiously support the Commission's proposal to establish a minimum 20-year

---

[1874] *Id.* P 228.

[1875] ACEG Initial Comments at 24; California Commission Initial Comments at 36; Certain TDUs Reply Comments at 3; ITC Initial Comments at 22-23; NARUC Initial Comments at 26-27; NYISO Initial Comments at 40; OMS Initial Comments at 8-9; Pacific Northwest State Agencies Initial Comments at 16-19.

[1876] NARUC Initial Comments at 26.

horizon for the calculation of benefits, noting that their concerns are mitigated by the

NOPR proposal to allow flexibility within each transmission planning region to tailor

cost allocation criteria to that region's needs.[1877]  Similarly, Vermont State Entities and

NESCOE state that a rigid one-size-fits-all rule could be counterproductive and would

not necessarily lead to just and reasonable transmission rates.[1878]  NARUC states that,

while it supports the NOPR proposal, transmission providers should be allowed

independent entity variations to deviate above or below the 20-year horizon after gaining

experience with Long-Term Regional Transmission Planning.[1879]  NYISO contends that it

already employs a 30-year study period in evaluating the benefits of transmission projects

in its public policy transmission planning process.[1880]

846.    MISO supports the Commission's proposal, stating that a minimum period of 20

years is adequate to assess the benefits of regional transmission facilities.[1881]  MISO

cautions, however, that the benefits determined over this time horizon represent the

minimum benefits that a regional transmission facility provides and that the analysis

should recognize that additional benefits would be realized over the life of the investment

---

[1877] Northwest and Intermountain Initial Comments at 8.

[1878] NESCOE Initial Comments at 45; Vermont State Entities Initial Comments at 6.

[1879] NARUC Initial Comments at 39-40.

[1880] NYISO Initial Comments at 40.

[1881] MISO Initial Comments at 52.

even if changing system conditions create uncertainty as to the precise value of those benefits.[1882]

847.    Other commenters suggest that the time horizon for the evaluation of benefits in Long-Term Regional Transmission Planning should align with the useful life of the transmission asset.[1883]  Breakthrough Energy and CARE Coalition contend that the proper time horizon for evaluation of benefits in standard economics and public policy is the life of the transmission asset, noting that transmission assets can often last 40 years or longer.[1884]  ACEG agrees, noting that, while it supports use of a 20-year minimum horizon to evaluate benefits, standard regulatory practice for a benefit-cost analysis is typically the life of the asset.[1885]  Likewise, PIOs contend that, while they agree with the NOPR proposal, it would be preferable to align the time horizon for evaluating benefits with the useful life of the transmission project.[1886]  PIOs state that calculating the benefits and costs of a transmission project over a shorter timespan can understate the benefit-cost

---

[1882] *Id.*

[1883] ACEG Initial Comments at 24; Breakthrough Energy Initial Comments at 23; CARE Coalition Initial Comments at 40-41; Clean Energy Associations Initial Comments at 21; CTC Global Initial Comments at 16-17; ENGIE Initial Comments at 2; ENGIE Reply Comments at 2; Indicated PJM TOs Initial Comments at 17-18; Interwest Initial Comments at 14; Interwest Reply Comments at 6-7; Pine Gate Initial Comments at 35; PIOs Initial Comments at 40-41; US DOE Initial Comments at 33-34; WIRES Initial Comments at 7.

[1884] Breakthrough Energy Initial Comments at 23; CARE Coalition Initial Comments at 40-41.

[1885] ACEG Initial Comments at 24.

[1886] PIOs Initial Comments at 40 (citing PIOs Initial Comments Ex. A, ¶¶ 24-29).

ratio because benefits tend to grow over time, while transmission revenue requirements will decline over time as the asset is depreciated.[1887]

848.    CTC Global states that while it supports the NOPR proposal, it argues that it would be more appropriate to align the timeline for evaluating benefits with the asset life, because while advanced conductors are almost always more expensive than legacy conductors initially, their costs are offset by efficiency and resilience benefits decades into the future.[1888]  Indicated PJM TOs state that benefits "should be calculated on the same time horizon as the project that is being assessed to allow for the ability to properly compare projects."[1889]

849.    Given that transmission assets often have a useful life of at least 40 years, US DOE encourages the Commission to require transmission providers to evaluate costs and benefits over a minimum of 30 years after the in-service date of a transmission facility rather than the proposed 20 years.  According to US DOE, doing so would better align with the useful life assumptions that generation developers make.[1890]

850.    Clean Energy Buyers and PG&E suggest that benefits should be evaluated over the same 20-year horizon as the proposed Long-Term Regional Transmission Planning transmission planning horizon.[1891]  Similarly, PPL states that, while it supports the

---

[1887] *Id.* (citing PIOs Initial Comments Ex. A, ¶ 28).

[1888] CTC Global Initial Comments at 16-17.

[1889] Indicated PJM TOs Initial Comments at 18.

[1890] US DOE Initial Comments at 33-34.

[1891] Clean Energy Buyers Initial Comments at 20; PG&E Initial Comments at 7.

Docket No. RM21-17-000                                                                 - 620 -

proposed 20-year minimum duration to evaluate benefits in Long-Term Regional

Transmission Planning, the Commission should require transmission providers to

measure benefits from the study date rather than the proposed in-service date of the

Long-Term Regional Transmission Facility.  PPL contends that the NOPR proposal

would introduce significant variability that will make it challenging to align the outcome

with the long-term need and would incentivize transmission developers to delay or adjust

the timing of transmission projects to maximize the demonstrated benefit.[1892]

851.    In contrast, GridLab contends that the 20-year Long-Term Regional Transmission

Planning transmission planning horizon need not correspond with the time horizon over

which transmission providers evaluate the benefits and costs of potential transmission

investments.  GridLab recommends that the Commission clarify the distinction between

the requirement for a 20-year transmission planning horizon and for a 20-year period to

evaluate benefits, while keeping both requirements.[1893]

852.    Many commenters assert that evaluating benefits over a 20-year time horizon is

difficult or speculative.[1894]  Ohio Consumers and Dominion argue that, since transmission

providers would be required to plan for potential transmission needs in 20 years and

evaluate benefits over a 20-year project life span, the requirement effectively amounts to

---

[1892] PPL Initial Comments at 15-17.

[1893] GridLab Initial Comments at 6-8.

[1894] APPA Initial Comments at 32; Dominion Initial Comments at 17; Louisiana
Commission Initial Comments at 18; NRECA Initial Comments at 46; Ohio Consumers
Initial Comments at 8; PJM Initial Comments at 97.

a 40-year cost allocation process and will be particularly challenging.[1895]  APS agrees,

stating that calculating benefits over a potential 40 years may lead to benefit calculations

that are overstated or yield unreasonable or unrealistic results.[1896]

853.    Some commenters request certain clarifications or modifications to address that

uncertainty.[1897]  For example, Exelon states that benefits should tie back to customer

value and suggests that the Commission should give transmission providers flexibility to

assign more weight to nearer-term benefits tied to specific savings that are more

certain.[1898]  SERTP Sponsors and Duke agree, and Duke requests that the Commission

clarify that transmission providers are permitted to discount benefits based on increased

uncertainty in later years for purposes of evaluating, selecting, and allocating the costs of

Long-Term Regional Transmission Facilities.[1899]

854.    Several commenters oppose requiring a minimum 20-year horizon for evaluating

benefits of Long-Term Regional Transmission Facilities.[1900]  For example, Idaho

Commission argues that the NOPR proposal is founded on benefits that are not

---

[1895] Ohio Consumers Initial Comments at 8.

[1896] APS Initial Comments at 8-9.

[1897] Duke Initial Comments at 23-24; Exelon Initial Comments at 16; SERTP Sponsors Initial Comments at 31.

[1898] Exelon Initial Comments at 16.

[1899] Duke Initial Comments at 23-24; SERTP Sponsors Initial Comments at 31.

[1900] Dominion Reply Comments at 4-5; Idaho Commission Initial Comments at 4; NARUC Initial Comments at 5-6; NESCOE Initial Comments at 44-45; Pacific Northwest Utilities Initial Comments at 6-7; Pennsylvania Commission Initial Comments at 4-5.

"generally accepted or regionally flexible" and may not be beneficial for regional transmission planning benefit evaluation.[1901] Furthermore, Idaho Commission argues, it is difficult to accurately predict and quantify benefits over a 20-year period for purposes of cost allocation.[1902]

855.    Similarly, Dominion requests that the Commission decline to adopt the NOPR proposal or provide clarification that the Commission did not intend to propose that benefits would need to be evaluated over a potential 40-year period. Dominion states that it would be unreasonable for the Commission to require transmission providers to consider benefits over a 40-year period, because identifying benefits and beneficiaries that far into the future would involve too much speculation.

856.    Pennsylvania Commission requests that the Commission revise the NOPR proposal to set a long-term horizon of no longer than 20 years for planning and benefit-cost analysis. Pennsylvania Commission argues that as the planning and benefit-cost analysis horizons lengthen, uncertainty in predictions of load growth, costs, and benefits will increase, potentially leading to uneconomic transmission projects.[1903] Pacific Northwest Utilities oppose the NOPR proposal because, they argue, beneficiaries and benefits cannot be identified or quantified with any reasonable certainty over a 20-year transmission planning horizon. Specifically, Pacific Northwest Utilities contend that

---

[1901] Idaho Commission Initial Comments at 4.

[1902] *Id.*

[1903] Pennsylvania Commission Initial Comments at 4-5.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 633 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                                      - 623 -

there is no plausible reason to believe that such speculative benefits would be roughly

commensurate with the costs that are allocated to identified beneficiaries.[1904]

ii.    **Applicability of Benefits Evaluation Horizon to Long-Term Regional Transmission Planning Stages (Evaluation of Facilities, Selection, and Cost Allocation)**

857.    Pacific Northwest State Agencies supports the Commission's proposal to require

that transmission providers evaluate benefits over a consistent time horizon in all stages

of Long-Term Regional Transmission Planning, which includes evaluating regional

transmission facilities, selecting more efficient or cost-effective regional transmission

facilities in the regional transmission plan for purposes of cost allocation, and allocating

the costs of such transmission facilities in a manner that is roughly commensurate with

estimated benefits.[1905]

858.    Several commenters also support the Commission's proposal that, to the extent

that transmission providers estimate the costs of transmission facilities beyond the in-

service date of the transmission facilities, they should estimate those future costs over the

same time horizon as the estimated benefits.[1906]  For instance, MISO states that costs and

benefits for regional transmission investments should be evaluated using the same time

---

[1904] Pacific Northwest Utilities Initial Comments at 7 (citing *ICC v. FERC I*, 576 F.3d 470).

[1905] Pacific Northwest State Agencies Initial Comments at 18.

[1906] Certain TDUs Reply Comments at 3 (citing MISO Initial Comments at 53); MISO Initial Comments at 53; NARUC Initial Comments at 27; OMS Initial Comments at 8-9; Pacific Northwest State Agencies Initial Comments at 18.

horizon to ensure there is consistency in accounting for the effects of time in the
calculations.[1907]  MISO attests that since benefits are only realized once a transmission
project or portfolio of projects is in service, transmission providers should assess the
benefits over the period of time starting with the in-service date to align with costs.[1908]
Pacific Northwest State Agencies and Certain TDUs agree.[1909]

### c.    Commission Determination

859.    We adopt the NOPR proposal, with modification, to require transmission
providers in each transmission planning region, as part of Long-Term Regional
Transmission Planning, to calculate the benefits of Long-Term Regional Transmission
Facilities over a time horizon that covers, at a minimum, 20 years starting from the
estimated in-service date of the transmission facilities, and we require that this minimum
20-year benefit horizon be used both for the evaluation and selection of Long-Term
Regional Transmission Facilities.[1910]  However, we do not adopt the NOPR proposal to
require a minimum 20-year horizon to calculate benefits for purposes of cost allocation.

---

[1907] MISO Initial Comments at 53.

[1908] *Id.*

[1909] Certain TDUs Reply Comments at 3 (citing MISO Initial Comments at 53);
Pacific Northwest State Agencies Initial Comments at 18.

[1910] In the NOPR, the Commission used the term "regional transmission facilities";
however, as this reform only concerns Long-Term Regional Transmission Planning, we
clarify that the Commission's intent was to refer only to Long-Term Regional
Transmission Facilities.  As discussed in the Development of Long-Term Scenarios
section, transmission providers also use these benefits to help to inform their
identification of Long-Term Transmission Needs that manifest during the 20-year
transmission planning horizon.

As described in the Identification of Benefits Considered in Cost Allocation for Long-Term Regional Transmission Facilities section of this final rule, requiring transmission providers to adopt this provision for purposes of cost allocation would unduly complicate development and review of Long-Term Regional Transmission Cost Allocation Methods, with little incremental gain.  Lastly, for consistency and a matching comparison of costs over time, we adopt the NOPR proposal to require that, to the extent that transmission providers estimate the costs of Long-Term Regional Transmission Facilities beyond the in-service date of the transmission facilities, they must estimate those future costs over the same time horizon as the estimated benefits.

860.    We find that calculating benefits both for the evaluation and selection of Long-Term Regional Transmission Facilities over a timeline that covers, at a minimum, 20 years starting from the estimated in-service date of the Long-Term Regional Transmission Facility, strikes an appropriate balance.  This balance reasonably reflects the benefits that a Long-Term Regional Transmission Facility is likely to provide over its useful life, a time period that can exceed 40 years,[1911] while recognizing the inherent difficulties in attempting to predict system conditions too far into the future.  As described in the Long-Term Regional Transmission Planning section of this final rule, the

_____

[1911] ACEG Initial Comments at 24; Breakthrough Energy Initial Comments at 23; CARE Coalition Initial Comments at 40-41; Clean Energy Associations Initial Comments at 21; CTC Global Initial Comments at 16-17; ENGIE Initial Comments at 2; ENGIE Reply Comments at 2; Indicated PJM TOs Initial Comments at 18; Interwest Initial Comments at 14; Interwest Reply Comments at 7; Pine Gate Initial Comments at 35; PIOs Initial Comments at 40-41; US DOE Initial Comments at 33-34; WIRES Initial Comments at 7.

uncertainty associated with forecasting future transmission needs over a long-term transmission planning horizon can be mitigated through the use of multiple Long-Term Scenarios and sensitivities.

861.    Specifically, this final rule requires transmission providers to develop multiple plausible and diverse Long-Term Scenarios, which will allow transmission providers to better understand how certain categories of factors will give rise to Long-Term Transmission Needs, and also requires transmission providers to update their assumptions periodically.  Additionally, transmission providers are permitted to assess the extent to which the projected change to Long-Term Transmission Needs due to factors in Factor Categories Four through Seven is likely to be realized in full, in part, or exceeded, for purposes of developing a plausible and diverse set of Long-Term Scenarios.[1912]  Because of these reforms, we believe that transmission providers will be able to identify Long-Term Transmission Needs with a higher likelihood of occurrence, and, therefore, the benefits resulting from Long-Term Regional Transmission Facilities to more efficiently or cost-effectively address these Long-Term Transmission Needs will similarly be more certain.

862.    Moreover, as described in the Evaluation and Selection of Regional Transmission Facilities section of this final rule, we provide transmission providers with considerable flexibility to develop an evaluation process and selection criteria that will provide them

---

[1912] *Supra* Long-Term Regional Transmission Planning, Long-Term Scenarios Requirements, Categories of Factors section.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 637 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

the opportunity to select Long-Term Regional Transmission Facilities in a way that
maximizes benefits accounting for costs over time without over-building transmission
facilities.  In particular, transmission providers have the flexibility to evaluate Long-Term
Regional Transmission Facilities and their measured benefits across the different Long-
Term Scenarios and sensitivities in a manner that addresses the inherent uncertainty in
Long-Term Regional Transmission Planning, for example through the use of a least-
regrets or a weighted-benefits approach.  Lastly, as is the case under the existing Order
No. 1000 regional transmission planning processes, the final rule does not require
transmission providers to select any transmission facilities as part of Long-Term
Regional Transmission Planning.  Taken together, the aspects of the final rule described
above offer transmission providers meaningful tools to address uncertainty in Long-Term
Regional Transmission Planning, including the calculation of benefits.

863.    We disagree with NESCOE and Vermont State Entities, who argue that a
requirement to calculate benefits over a minimum of 20 years from the estimated in-
service date is overly rigid and may not lead to transmission rates that are just and
reasonable.  As discussed above, this requirement strikes a reasonable balance between
the benefits that a Long-Term Regional Transmission Facility is likely to provide over its
useful life, while recognizing the inherent difficulties in attempting to forecast system
conditions too far into the future.  Further, allowing transmission providers to calculate
benefits over a shorter period would more likely undervalue the total benefits that Long-
Term Regional Transmission Facilities can provide and could therefore lead to relatively
inefficient and less cost-effective transmission development, as Long-Term Regional

USCA4 Appeal: 24-1650   Doc: 224   Filed: 01/21/2025   Pg: 638 of 2455
Document Accession #: 20240513-3036   Filed Date: 05/13/2024

Transmission Facilities that provide significant net benefits may not be selected to address Long-Term Transmission Needs.  Lastly, and as stated above, we are not requiring transmission providers to use a minimum 20-year horizon to calculate benefits for purposes of cost allocation.

864.    Similarly, we also disagree with commenters that suggest that the results of the benefits evaluation would not be accurate or dependable enough for transmission providers to use in making the decision to select Long-Term Regional Transmission Facilities.[1913]  We further note that transmission providers in multiple transmission planning regions already evaluate the benefits of transmission facilities over a 20-year time horizon as part of their regional transmission planning processes.[1914]  For example, NYISO states that it employs a 30-year study period in evaluating the benefits of transmission projects in its public policy transmission planning process.[1915]

---

[1913] APPA Initial Comments at 32; APS Initial Comments at 8-9; Dominion Initial Comments at 17; Idaho Commission Initial Comments at 4; Louisiana Commission Initial Comments at 18; NRECA Initial Comments at 46; Ohio Consumers Initial Comments at 8; Pacific Northwest Utilities Initial Comments at 7; PJM Initial Comments at 97.

[1914] MISO Initial Comments at 52; NYISO Initial Comments at 40; *see also* MISO, *LRTP Business Case*, Long Range Transmission Planning Workshop, at 7 (Jan. 21, 2022, revised Feb. 2, 2022), https://cdn.misoenergy.org/20220121%20LRTP%20Workshop%20Item%2004%20Business%20Case%20Presentation619895.pdf; CAISO, *20-Year Transmission Outlook* (Jan. 31, 2022), http://www.caiso.com/InitiativeDocuments/Draft20-YearTransmissionOutlook.pdf; SPP Engineering, *2021 SPP Transmission Expansion Plan Report* (Jan. 11, 2021), https://spp.org/documents/56611/2021%20step%20report.pdf.

[1915] NYISO Initial Comments at 40.

865.    Some commenters suggest that the Commission should provide additional flexibility to account for uncertainty in calculating benefits over a minimum 20-year time horizon, including that the Commission make clear that transmission providers may discount or weight the calculated benefits based on the relative certainty throughout the benefits horizon.[1916]  As we described above, this final rule affords transmission providers considerable flexibility in how to address uncertainty in Long-Term Regional Transmission Planning, including by allowing transmission providers to assess the extent to which the projected change to Long-Term Transmission Needs due to factors in factor Categories Four through Seven is likely to be realized in full, in part, or exceeded, for purposes of developing a plausible and diverse set of Long-Term Scenarios.  Given these flexibilities, we find that while transmission providers may discount the benefits calculated for purposes of determining a present value of those benefits, they may not further discount those benefits to reflect uncertainty over the minimum 20-year time horizon for calculating benefits.

866.    In response to Dominion's request for clarification that the Commission did not intend to propose that benefits would need to be evaluated over a potential 40-year period, we reiterate that transmission providers must calculate the benefits of Long-Term Regional Transmission Facilities over a minimum of 20 years from their estimated in-service date, even if the estimated in-service date is 20 years into the future.  The failure

---

[1916] Duke Initial Comments at 23-24; Exelon Initial Comments at 16; SERTP Sponsors Initial Comments at 31.

Docket No. RM21-17-000                                                    - 630 -

to take such an approach could result in transmission providers' consideration of a Long-Term Regional Transmission Facility's cost but not the facility's corresponding benefits.

867.    We also decline to modify the proposal, as requested by Pennsylvania Commission,[1917] to require a benefits horizon of no longer than 20 years as a means of reducing speculation and uncertainty in calculating benefits of Long-Term Regional Transmission Facilities, as well as NARUC's request that the Commission permit transmission providers to deviate below the 20-year benefit evaluation horizon.  As explained above, a minimum of 20 years strikes a reasonable balance for calculating the benefits of Long-Term Regional Transmission Facilities.  In addition, as indicated by many commenters, calculating the benefits of a Long-Term Transmission Facility over a time horizon longer than 20 years is consistent with the long life of transmission facilities—which generally exceeds 20 years by a substantial margin—and also consistent with the fact that transmission facilities may provide significant benefits over their entire useful life.  While we reiterate that transmission providers must calculate the benefits of Long-Term Regional Transmission Facilities over a time horizon that covers, at a minimum, 20 years starting from the estimated in-service date of the transmission facilities, to the extent that transmission providers would like to consider a longer time horizon for the evaluation of benefits, they may propose to do so on compliance.

868.    In response to Pacific Northwest Utilities' argument that transmission providers will be unable to identify the beneficiaries of Long-Term Regional Transmission

---

[1917] Pennsylvania Commission Initial Comments at 4-5.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 641 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Facilities over a 20-year time horizon, and therefore that the costs of Long-Term

Regional Transmission Facilities will not be allocated in a manner that is roughly

commensurate with the benefits received,[1918] we note that this final rule modifies the

NOPR proposal and transmission providers are not required to use a benefits time

horizon of 20 years for purposes of cost allocation.  We find this modification to the final

rule moots Pacific Northwest Utilities' argument.

869.    We disagree with PPL's comments arguing that calculating benefits from the

estimated in-service date of a Long-Term Regional Transmission Facility will present

challenges to align the outcome with the actual needs in Long-Term Regional

Transmission Planning or otherwise create perverse incentives for transmission

developers to delay or adjust the timing of certain transmission projects to maximize

benefits.[1919]  To the contrary, establishing a minimum benefits horizon of 20 years

starting from the estimated in-service date of Long-Term Regional Transmission

Facilities will allow for a comparable evaluation of benefits that identified Long-Term

Regional Transmission Facilities may provide, even when such facilities may be placed

in service at different times during the transmission planning horizon.  We therefore

decline PPL's request that the Commission modify the proposal to require that

transmission providers measure benefits for a minimum of 20 years starting from the

---

[1918] Pacific Northwest Utilities Initial Comments at 7 (citing *ICC v. FERC I*, 576 F.3d 470).

[1919] PPL Initial Comments at 15-17.

study date, rather than the estimated in-service date of the Long-Term Regional

Transmission Facility.

870.    In response to GridLab's request that the Commission clarify the distinction

between the requirements for a minimum 20-year transmission planning horizon and a

minimum 20-year benefits evaluation period,[1920] we reiterate the example provided in the

NOPR whereby, if the Long-Term Regional Transmission Planning process identifies a

Long-Term Regional Transmission Facility that is estimated to be in service in year 10 of

the 20-year Long-Term Regional Transmission Planning horizon, then the estimate of

benefits for that same facility will commence at year 10 and cover an additional 20 years.

Thus, the requirement to use a 20-year transmission planning horizon is separate and

distinct from the requirement to calculate benefits of an identified Long-Term Regional

Transmission Facility over a minimum of 20 years from its estimated in-service date.

### 5.    Evaluation of the Benefits of Portfolios of Transmission Facilities

#### a.    NOPR Proposal

871.    In the NOPR, the Commission proposed to provide transmission providers in each

transmission planning region with the flexibility to propose to use a portfolio approach in

the evaluation of benefits of regional transmission facilities through their Long-Term

Regional Transmission Planning.  Rather than mandating its use, the Commission

---

[1920] GridLab Initial Comments at 6-8.

encouraged the use of this approach by transmission providers.[1921]  The Commission

proposed to require transmission providers that propose to use a portfolio approach to

include in their OATTs provisions describing how they would analyze the benefits of

regional transmission facilities under such an approach and whether the portfolio

approach would be used for Long-Term Regional Transmission Planning universally or

would be used only in certain specified instances.[1922]

### b.    Comments

#### i.    General Interest in the Use of Portfolios

872.    Most commenters who addressed the issue support the use of a portfolio approach

to the evaluation of the benefits of regional transmission facilities in Long-Term Regional

Transmission Planning, under which transmission providers would evaluate multiple

transmission facilities in an aggregated, integrated fashion rather than doing so on a

facility-by-facility basis.[1923]  Exelon states that benefits assessments for portfolios are

likely to be more robust and less sensitive to changes in study assumptions than project-

---

[1921] NOPR, 179 FERC ¶ 61,028 at PP 233-234.

[1922] *Id.* P 234.

[1923] *See, e.g.*, Acadia Center and CLF Initial Comments at 10; ACEG Initial
Comments at 49; ACORE Initial Comments at 2; AEP Initial Comments at 6, 27-28;
Ameren Initial Comments at 19; Clean Energy Associations Initial Comments at 10;
Eversource Initial Comments at 25; Exelon Initial Comments at 15-16; Joint Consumer
Advocates Initial Comments at 11; Massachusetts Attorney General Initial Comments at
15-16; Pacific Northwest State Agencies Initial Comments at 7; PG&E Initial Comments
at 8; PJM Reply Comments at 23; PIOs Initial Comments at 28; TANC Initial Comments
at 16; US DOE Initial Comments at 34-35.

USCA4 Appeal: 24-1650   Doc: 224   Filed: 01/21/2025   Pg: 644 of 2455
Document Accession #: 20240513-3036   Filed Date: 05/13/2024

Docket No. RM21-17-000                                                      - 634 -

by-project analyses, tend to have widely distributed benefits, which can help garner

stakeholder support, and may provide for administrative efficiencies in transmission

planning.[1924]  ACEG states that portfolio planning more accurately evaluates the benefits

that new transmission provides to the system.[1925]  Georgia Commission states that

evaluating transmission facilities collectively, rather than on a facility-by-facility basis,

may provide a better picture of the benefits to each state or transmission planning region

and result in a more robust selection of transmission facilities.[1926]

873.    Renewable Northwest states that using portfolios in transmission planning is a best

practice because it more completely captures systems benefits and leads to cost

efficiencies.[1927]  Renewable Northwest also comments that singularly focused planning

processes often fail to identify the most cost-effective and efficient investments and

instead have led to a bottom-up approach that has created a patchwork of transmission

projects with high costs largely borne by ratepayers.[1928]  EEI explains that the portfolio

approach comprehensively addresses a number of transmission needs while ensuring a

---

[1924] Exelon Initial Comments at 15-16, 18 (citing NOPR, 179 FERC ¶ 61,028 at P 233).

[1925] ACEG Initial Comments at 49.

[1926] Georgia Commission Initial Comments at 7.

[1927] Renewable Northwest Initial Comments at 9-10 (citing Brattle-Grid Strategies Oct. 2021 Report at 23).

[1928] *Id.* at 9.

USCA4 Appeal: 24-1650     Doc: 224     Filed: 01/21/2025     Pg: 645 of 2455
Document Accession #: 20240513-3036     Filed Date: 05/13/2024

"no regrets" set of beneficial regional transmission projects.[1929]  Eversource states that a portfolio approach can allow transmission providers to devise a set of transmission solutions that collectively create the most value compared to a piecemeal process.[1930]

874.    AEP states that the portfolio approach offers three advantages:  (1) it enables transmission planning regions to identify transmission projects with synergistic benefits across transmission planning regions because regions will be able to recognize the efficiencies of a collection of transmission projects that provide greater overall value to the grid together than they each provide on an individual basis; (2) there are administrative efficiencies; and (3) a portfolio approach best incorporates consideration of non-transmission alternatives and grid-enhancing technologies.[1931]

875.    Numerous commenters point to the MISO Multi-Value Project process as an example of the successful use of portfolios.[1932]  Clean Energy Associations state that the Multi-Value Project process has resulted in lower interconnection costs for generators as compared to transmission upgrades planned in response to interconnection requests.[1933] US DOE suggests the Multi-Value Project process is an example of the use of portfolios

---

[1929] EEI Initial Comments at 15.

[1930] Eversource Initial Comments at 25.

[1931] AEP Initial Comments at 27-28.

[1932] *See, e.g.*, EEI Initial Comments at 15; Clean Energy Associations Initial Comments at 10; MISO Initial Comments at 14; US DOE Initial Comments at 34-35 (citing Brattle-Grid Strategies Oct. 2021 Report at 65-66).

[1933] Clean Energy Associations Initial Comments at 10.

to generate benefits that exceed costs.[1934]  MISO states that it has worked with stakeholders to apply broad benefit metrics in the evaluation of Multi-Value Projects to identify portfolios of projects with benefits spread broadly throughout the region.[1935]

876.    Some commenters believe that the Commission should require the use of portfolios in the evaluation of benefits of regional transmission facilities.[1936]  US DOE supports requiring transmission planners to evaluate the benefits of proposed transmission facilities as a portfolio, rather than as individual investments, to reduce the uncertainty of estimating system-level benefits, to simplify cost allocation, and to reduce administrative burden.[1937]  US DOE states that if the portfolio approach is inappropriate in a particular circumstance, the impacted entities could petition the Commission, on a case-by-case basis, to describe their proposed alternative approach.[1938]

877.    New Jersey Commission states that the evidence from multiple studies of and experiences with long-term multi-driver and portfolio-based transmission planning

---

[1934] US DOE Initial Comments at 35 (citing Brattle-Grid Strategies Oct. 2021 Report at 65-66).

[1935] MISO Initial Comments at 14.

[1936] Acadia Center and CLF Initial Comments at 4-5; ACEG Initial Comments at 31, 48-49; Cypress Creek Reply Comments at 8-9; ITC Initial Comments at 6, 23-24; Pattern Energy Initial Comments at 15-17; Pine Gate Initial Comments at 38-39; PIOs Initial Comments at 28; SEIA Initial Comments at 20-21; US DOE Initial Comments at 34-35; WATT Initial Comments at 8-9.

[1937] US DOE Initial Comments at 34-35.

[1938] *Id.* at 35.

proves that these approaches save ratepayers billions of dollars and failure to use them is *per se* unjust and unreasonable.[1939]  Cypress Creek argues that a portfolio approach is essential to optimize benefits and reduce the likelihood of a state or agency derailing a transmission project with proven regional benefits.[1940]

878.    PIOs state that the costs of a transmission project in a rural area that enhances access to renewable resources may exceed its benefits when evaluated alone, but, if evaluated with another project that relieves congestion, the two projects may support power flows that would not otherwise be possible.[1941]  PIOs further state that portfolio planning can reduce the risk that transmission projects are underutilized because they were built for a single resource that is no longer used or only a narrow set of users were considered.[1942]

879.    ITC argues that the Commission should mandate the use of a portfolio approach in RTO/ISOs to ensure that the most efficient, cost-effective, and broadly beneficial set of transmission projects are selected in each transmission planning cycle.[1943]  ITC states that the use of a portfolio approach ensures that the greatest number of subregions within a transmission planning region receive benefits from each transmission planning cycle and

---

[1939] New Jersey Commission Initial Comments at 7.

[1940] Cypress Creek Reply Comments at 9.

[1941] PIOs Initial Comments at 31-32.

[1942] *Id.* at 36.

[1943] ITC Initial Comments at 6, 23-24.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 648 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

provides significant efficiency gains because transmission providers can examine the whole portfolio to ensure that benefits exceed costs.[1944]

880.   Pattern Energy urges the Commission to require transmission providers to adopt portfolio approaches and explain why a portfolio approach was not (or could not be) identified in any Long-Term Regional Transmission Plan when an incremental transmission solution is proposed.[1945]  Pattern Energy suggests that, if the Commission does not require portfolios, it should set a voltage threshold to identify portfolio solutions and require that transmission providers must explain why a portfolio approach was not taken when proposing incremental transmission facilities at voltage levels above 100 kV.[1946]  Similarly, Shell states that if the Commission does not require a portfolio approach, it should require transmission providers to explain why portfolios are not being used.[1947]

### ii.    Interest in Flexibility in the Use of Portfolios

881.   Many other commenters assert that the Commission should only permit, not require, the use of portfolios in the evaluation of benefits.[1948]  For example, Duke states

---

[1944] *Id.* at 23.

[1945] Pattern Energy Initial Comments at 15-17.

[1946] *Id.* at 17.

[1947] Shell Initial Comments at 16.

[1948] APPA Initial Comments at 32; Arizona Commission Initial Comments at 8; California Commission Initial Comments at 36-37; Dominion Initial Comments at 36; Duke Initial Comments at 25; Georgia Commission Initial Comments at 25; Michigan Commission Initial Comments at 8; MISO Initial Comments at 54; NARUC Initial

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 649 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

that a facility-by-facility approach may be better suited if Long-Term Scenarios reveal the same or nearly identical constraints in discrete and isolated areas of the transmission grid where upgrades would be beneficial, whereas if Long-Term Scenarios reveal more disparate issues in different scenarios a portfolio approach may be better suited to gaining consensus and allowing for more even distribution of benefits.[1949]  Duke asks the Commission to provide that, on compliance, a transmission provider may document processes for switching between or using both a facility-by-facility analysis and a portfolio approach.[1950]

882.    Dominion Energy states that some transmission providers may not have a portfolio of transmission projects to examine.  NYISO asserts that transmission providers should not be required to mix and match components of different transmission developers' proposed transmission solutions to develop a portfolio to address a single transmission need.[1951]  APPA and TANC urge the Commission to allow regional flexibility to use a portfolio approach to evaluate benefits.[1952]

---

Comments at 27-29; Nebraska Commission Initial Comments at 7-8; NESCOE Initial Comments at 45; NYISO Initial Comments at 9, 41-42; PPL Initial Comments at 16-17; SDG&E Initial Comments at 3; SPP Initial Comments at 10; TANC Initial Comments at 16; TAPS Initial Comments at 14; Vermont State Entities Initial Comments at 7; Xcel Initial Comments at 12.

[1949] Duke Initial Comments at 25-26.

[1950] *Id.* at 25.

[1951] NYISO Initial Comments at 41.

[1952] APPA Initial Comments at 32; TANC Initial Comments at 16.

Docket No. RM21-17-000                                                          - 640 -

883.    PPL argues that a portfolio approach should not be mandated because one-size-fits-all portfolio-based planning may have downsides and may not be applicable in all circumstances or transmission planning regions.[1953]  PPL further states that relying on portfolios could lead to complications in siting and cost allocation.[1954]  Relatedly, Michigan Commission argues that requiring portfolios could cause unnecessary delays for transmission projects that have strong stakeholder buy-in and incentivize including transmission projects less deserving of regional cost allocation purely to bolster assertions that all zones in multi-state RTOs/ISOs will benefit.[1955]

884.    CAISO states that portfolio planning should be optional, arguing that CAISO's sequential transmission planning approach achieves multi-benefit and holistic objectives without requiring a portfolio approach.[1956]  CAISO explains that a project-by-project review does not mean examining only one transmission need at a time or failing to consider transmission projects that meet multiple needs or deliver multiple benefits.[1957]

### iii.    Interest in Including the Portfolio Approach in a Transmission Provider's OATT

885.    In response to the Commission's proposal that a transmission provider that proposes a portfolio approach must include in its OATT a description of when it would

---

[1953] PPL Initial Comments at 16-17.

[1954] *Id.* at 17.

[1955] Michigan Commission Initial Comments at 8.

[1956] CAISO Reply Comments at 22.

[1957] *Id.* at 21-22.

use the approach and how it would analyze benefits, some commenters agree that even if use of portfolios is flexible, the Commission should have such a requirement.[1958] Vermont State Entities suggest that if a transmission provider elects to use a portfolio approach, it must include in its OATT a description of how it would use such an approach and whether that approach would be used universally or only in certain specified instances.[1959]

### iv.    Integrating Economic and Reliability Planning with Long-Term Regional Transmission Planning

886.    PIOs state that portfolio planning is necessary and that the use of portfolios should incorporate long-term reliability and economic needs and benefits along with long-term Public Policy Requirements, because doing so allows transmission providers to select transmission projects with the higher benefit-to-cost ratios that resolve needs at least cost.[1960]  PIOs state that by assessing all transmission needs at once and evaluating potential solutions, stakeholders will be able to find more efficient solutions that address multiple transmission needs that affect different jurisdictions simultaneously.[1961]  PIOs ask that the final rule allow transmission providers to continue to address unforeseen short-term local reliability needs but establish a rebuttable requirement that all long-term

---

[1958] Clean Energy Associates Initial Comments at 14; NESCOE Initial Comments at 45; Vermont State Entities Initial Comments at 7.

[1959] Vermont State Entities Initial Comments at 7.

[1960] PIOs Initial Comments at 30-32.

[1961] *Id.* at 35.

economic, public policy, and regional reliability needs and benefits will be assessed on a portfolio basis in Long-Term Regional Transmission Planning.[1962]

887.    SEPA states that the portfolio approach can be further enhanced by considering all categories of benefits:  reliability, economic, public policy, and resilience.[1963]  Likewise, SEIA states that the Commission should require portfolio-based planning that integrates all relevant factors, reliability, economic, and public policy, into Long-Term Regional Transmission Planning.[1964]  Acadia Center and CLF discuss portfolio planning as integrating Long-Term Regional Transmission Planning with economic and reliability planning and state that the final rule should require portfolio-based planning that assesses economic, reliability, and other needs at the same time.[1965]

### v.    **Concerns with the Portfolio Approach**

888.    A few commenters express apprehension about the portfolio approach, including concerns that the use of portfolios may mask bad individual transmission projects in a portfolio or result in good transmission projects not being approved because of difficulties in obtaining multiple state approvals that may be necessary for a portfolio.[1966]

---

[1962] PIOs Initial Comments at 32.

[1963] SEPA Initial Comments at 1.

[1964] SEIA Initial Comments at 20-21.

[1965] Acadia Center and CLF Initial Comments at 4-5.

[1966] CAISO Reply Comments at 24; Duke Initial Comments at 25-26; Idaho Commission Initial Comments at 4; Louisiana Commission Initial Comments at 26; NARUC Initial Comments at 28; Pennsylvania Commission Initial Comments at 10; PPL Initial Comments at 17.

For example, Pennsylvania Commission states that a portfolio approach may cause siting concerns if a single transmission project in a portfolio is found by a state siting authority to be inconsistent with its state's public interest and siting regulations.[1967]  Idaho Commission opposes requiring the use of a portfolio under any circumstances, stating that flexibility is necessary in transmission planning.  It further states that a Commission requirement to use a portfolio approach under certain circumstances without specifying what these circumstances are could result in unjust and unreasonable rates.[1968]  Louisiana Commission also opposes any requirement to use a portfolio approach and disagrees with the NOPR's encouragement of such an approach.[1969]

### c.    <u>Commission Determination</u>

889.    We adopt the NOPR proposal to allow, but not require, transmission providers in each transmission planning region to use a portfolio approach when evaluating the benefits of Long-Term Regional Transmission Facilities.  Further, we adopt with modification the NOPR proposal to require transmission providers that propose to use a portfolio approach when evaluating the benefits of Long-Term Regional Transmission Facilities to include provisions in their OATTs regarding their use of the portfolio approach.  While we adopt the NOPR proposal to require transmission providers to include provisions in their OATTs regarding their use of a portfolio approach, we do not

---

[1967] Pennsylvania Commission Initial Comments at 10.

[1968] Idaho Commission Initial Comments at 4.

[1969] Louisiana Commission Initial Comments at 26.

adopt the other proposed requirements.  Specifically, we decline to adopt the NOPR

proposal to require transmission providers to indicate whether a portfolio approach will

be used universally or only in certain specified instances or to describe how they will

analyze the benefits of regional transmission facilities under a portfolio approach.  These

requirements could impede transmission provider consideration and development of

portfolio approaches.  In response to Duke's request that the final rule provide

transmission providers with the flexibility to switch between or use both facility-by-

facility and portfolio approaches,[1970] we clarify that transmission providers may use

either or both facility-by-facility and portfolio approaches within the same Long-Term

Regional Transmission Planning cycle.

890.   We find that there are numerous advantages to a portfolio approach to evaluating

benefits, including administrative efficiencies related to economies of scale and a more

stable or even distribution of benefits that may result from a portfolio evaluation, which

is likely to facilitate agreement on regional cost allocation.  However, these advantages

must be balanced against other considerations, and we therefore find that providing

transmission providers in each transmission planning region with flexibility as to whether

to use a portfolio approach is appropriate.  Accordingly, we decline the request of some

commenters[1971] to require transmission providers to use a portfolio approach.

---

[1970] Duke Initial Comments at 25-26.

[1971] Acadia Center and CLF Initial Comments at 4-5; ACEG Initial Comments at 31, 48-49; Cypress Creek Reply Comments at 8-9; ITC Initial Comments at 6, 23-24; Pattern Energy Initial Comments at 16-18; Pine Gate Initial Comments at 38-39; PIOs Initial Comments at 28; SEIA Initial Comments at 20-21; US DOE Initial Comments at

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 655 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                    - 645 -

### 6.    Issues Related to Use of Benefits

#### a.    NOPR Proposal

891.    The Commission in the NOPR declined, consistent with Order No. 1000, to propose to prescribe any particular definition of "benefits" or "beneficiaries."[1972]

#### b.    Comments

892.    Some commenters request specific definitions for the terms "benefits" or "beneficiaries" or offer guidance on definitions.[1973]  NASUCA urges the Commission not to define benefits so broadly that every transmission project would qualify to be built, stating that overly broad benefit definitions reduce any rational relationship between cost allocation and identifiable beneficiaries.[1974]

893.    In contrast, other commenters agree with the Commission's proposal not to define "benefits" or "beneficiaries."[1975]  For example, OMS and the Indiana Commission express support for the NOPR proposal to allow for flexibility in determining the

---

34-35; WATT Initial Comments at 8-9.

[1972] NOPR, 179 FERC ¶ 61,028 at P 183 & n.324 (citing Order No. 1000, 136 FERC ¶ 61,051 at PP 624-625).

[1973] ELCON Initial Comments at 14-15; NASUCA Initial Comments at 10.

[1974] NASUCA Initial Comments at 10.

[1975] APPA Initial Comments at 31-33; Clean Energy Buyers Reply Comments at 9; Georgia Commission Initial Comments at 6-7; Indiana Commission Initial Comments at 6-7; Louisiana Commission Reply Comments at 9-10; Nebraska Commission Initial Comments at 7; TANC Initial Comments at 16; US Chamber of Commerce Initial Comments at 7-8.

Docket No. RM21-17-000                                                                    - 646 -

definitions of benefits and beneficiaries for the purpose of selecting transmission

facilities in Long-Term Regional Transmission Planning.[1976]

894.    Some commenters call for a state role in identifying benefits or metrics for use in

Long-Term Regional Transmission Planning.[1977]  California Commission states that the

Commission should require transmission providers to demonstrate that they consulted

with the Relevant State Entities in their transmission planning region regarding benefits

metrics.[1978]  California Commission further states that the Commission should require

transmission providers to indicate in their compliance filings whether their proposed

benefits and metrics are supported by the Relevant State Entities, as well as to explain

any points of disagreement.[1979]  Likewise, New York Commission and NYSERDA state

that, especially in single-state RTOs/ISOs, the state should be afforded a central role in

determining the benefits that transmission providers will consider and the metrics for

quantifying them.[1980]

---

[1976] Indiana Commission Initial Comments at 6-7; OMS Initial Comments at 13.

[1977] California Commission Initial Comments at 35; Massachusetts Attorney General Initial Comments at 14; Michigan Commission Initial Comments at 7-8; NESCOE Initial Comments at 41-43; North Carolina Commission and Staff Initial Comments at 6; PJM Market Monitor Initial Comments at 4.

[1978] California Commission Initial Comments at 35.

[1979] *Id.*

[1980] New York Commission and NYSERDA Initial Comments at 8.

895.    North Carolina Commission and Staff state that, given the focus of the NOPR on transmission needs driven by changes in the generation mix and demand, which are areas of state jurisdiction, the Commission should require state agreement at every stage of the Long-Term Regional Transmission Planning process from identification of transmission needs, to the evaluation of the benefits of regional transmission facilities to meet those needs, to establishment of selection criteria, and finally to establishment of a cost allocation method.[1981]    Similarly, NESCOE explains that, while transmission providers have the technical expertise to identify, calculate, and explain the benefits that a given transmission facility may provide, states must be involved where state laws and policies are the project drivers.[1982]    As such, NESCOE requests that the Commission require that transmission providers either elevate and codify the states' role in all four phases of Long-Term Regional Transmission Planning or explain how and why, following consultation with the Relevant State Entities, the transmission provider developed a different approach.[1983]    NESCOE asserts that this requirement would ensure that states, if they so elect, have a defined role in the evaluation phase of Long-Term Regional Transmission Planning.[1984]

---

[1981] North Carolina Commission and Staff Initial Comments at 6.

[1982] NESCOE Initial Comments at 41-43.

[1983] *Id.* at 9-10, 41-43.

[1984] *Id.* at 41-43.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 658 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

896.    Virginia Commission Staff contends that the NOPR-identified benefits should be used only if affected states agree to their use.[1985]  PJM Market Monitor agrees that it makes sense to attempt an evaluation of a broad set of benefits and beneficiaries through increased state involvement.[1986]

897.    Michigan Commission asserts that state regulators should be afforded substantial deference in identifying what benefit metrics and calculation methods should be used to justify long-term transmission plans, arguing that states with objections or concerns that an approved benefit metric is too speculative or otherwise inappropriate may find it more challenging to justify ratepayer investments and land condemnation in state siting proceedings.[1987]  Massachusetts Attorney General states that the Commission should require that transmission providers establish an open and transparent process that provides states and other stakeholders with a meaningful opportunity to participate in the process of identifying the benefits to be used in Long-Term Regional Transmission Planning and determining how such benefits will be calculated.[1988]  Several commenters state that decisions regarding benefit determination, metrics, and implementation of metrics should be made in coordination with all stakeholders.[1989]  NRECA and Vermont

---

[1985] Virginia Commission Staff Initial Comments at 5.

[1986] PJM Market Monitor Initial Comments at 4.

[1987] Michigan Commission Initial Comments at 7-8.

[1988] Massachusetts Attorney General Initial Comments at 14.

[1989] NYISO Initial Comments at 37; NRECA Initial Comments at 46; Vermont

Docket No. RM21-17-000                                          - 649 -

State Entities assert that transmission providers should be required to demonstrate that all stakeholders are provided an opportunity to become fully aware of the analytic framework for incorporating benefits that will be used in Long-Term Regional Transmission Planning.[1990]

898.    PPL stresses the important role that states play in siting transmission facilities and the significance of benefits from transmission facilities in this process, cautioning that differences between states' and the Commission's delineation and evaluation of benefits will result in great uncertainty.  PPL asserts that this uncertainty could lead to abandoned projects, costly litigation, and a largely underutilized planning tool, akin to transmission projects driven by public policy needs under Order No. 1000.[1991]

899.    In contrast, ACORE notes that the benefits of transmission facilities are often spread out among states regardless of the state policies contributing to the need for such transmission facilities.[1992]

900.    SoCal Edison urges the Commission not to decouple policy projects from reliability and economic projects in transmission planning, so as to reduce barriers to

---

State Entities Initial Comments at 6.

[1990] NRECA Initial Comments at 46; Vermont State Entities Initial Comments at 6.

[1991] PPL Initial Comments at 14-15.

[1992] ACORE Initial Comments at 12; ACORE Reply Comments at 6.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 660 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

regional coordination and ensure analysis of all potential benefits of a transmission project.[1993]

901.    Indiana Commission states that it supports the NOPR proposal as long as the final rule provides for an equitable cost allocation method that allocates costs to the cost causer and beneficiaries of regional transmission development.[1994]

### c.    Commission Determination

902.    Consistent with the NOPR, we continue to decline to define "benefits" or "beneficiaries." We discuss above descriptions of the seven required benefits, and we further require transmission providers to propose a method to measure each of those benefits. These descriptions and requirements for these seven benefits will facilitate transparency regarding the use of benefits in Long-Term Regional Transmission Planning and represent an improvement in this respect over Order No. 1000, which lacked such descriptions.[1995] However, we do not believe that establishing a definition of "benefits" or "beneficiaries" would significantly improve upon these descriptions and we are concerned that any such definition could inadvertently exclude benefits and beneficiaries.

903.    We acknowledge comments requesting greater clarity regarding states' roles in determining benefits in their transmission planning regions and regarding the benefits

---

[1993] SoCal Edison Initial Comments at 12-13.

[1994] Indiana Commission Initial Comments at 6-7.

[1995] As noted above, we do not require transmission providers to include additional benefits that they use for purposes of evaluation and selection of Long-Term Regional Transmission Facilities in their OATTs.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 661 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

that will be used by transmission providers in Long-Term Regional Transmission Planning, including NRECA's and Vermont State Entities' assertions that transmission providers should be required to demonstrate that all stakeholders (including state entities and load-serving entities) are provided an opportunity to become fully aware of the analytic framework for incorporating benefits that will be used in Long-Term Regional Transmission Planning.[1996]  In response, we note this final rule provides transmission providers with flexibility as to how they measure the seven required benefits, as well as flexibility to use additional benefits beyond the seven that we require.  Consistent with other reforms in this final rule incorporating an inclusive role for states in transmission planning, we encourage transmission providers to consult with states as they develop proposals to comply with the requirements of this final rule and consider whether, and if so, how, to use additional benefits in Long-Term Regional Transmission Planning.[1997]

### E.    Evaluation and Selection of Long-Term Regional Transmission Facilities

#### 1.    Requirement to Adopt an Evaluation Process and Selection Criteria

##### a.    NOPR Proposal

904.    In the NOPR, the Commission proposed to require that transmission providers, as part of their Long-Term Regional Transmission Planning, include in their OATTs a transparent and not unduly discriminatory evaluation process and criteria to identify and

---

[1996] NRECA Initial Comments at 46; Vermont State Entities Initial Comments at 6.

[1997] *See supra* Other Benefits section.

Docket No. RM21-17-000                                                    - 652 -

evaluate transmission facilities (or portfolios of transmission facilities) for potential

selection that address transmission needs driven by changes in the resource mix and

demand.[1998]  The Commission preliminarily found that the development and analysis of

Long-Term Scenarios cannot remedy the deficiencies in the Commission's existing

regional transmission planning requirements without the inclusion of such an evaluation

process and selection criteria because, without them, transmission providers'

Commission-jurisdictional rates may be unjust and unreasonable and unduly

discriminatory and preferential.[1999]

905.    The Commission further proposed in the NOPR that, consistent with Order

No. 1000, the developer of a transmission facility selected through Long-Term Regional

Transmission Planning to address transmission needs driven by changes in the resource

mix and demand would be eligible to use the applicable cost allocation method for the

Long-Term Regional Transmission Facility.

### b.    Comments

906.    Many commenters support the Commission's proposal to require transmission

providers to include in their OATTs provisions providing criteria that they will use to

identify and evaluate transmission facilities for potential selection to address transmission

needs driven by changes in the resource mix and demand.[2000]  For example, Pacific

---

[1998] *See* NOPR, 179 FERC ¶ 61,028 at PP 241-242.

[1999] *Id.* P 250.

[2000] ACEG Initial Comments at 9; ACORE Initial Comments at 14; Amazon Initial Comments at 9; Ameren Initial Comments at 20; APPA Initial Comments at 33; CARE

Northwest State Agencies argue that this reform is critical to ensuring that Long-Term

Regional Transmission Planning results in appropriate modeling and evaluation of Long-

Term Regional Transmission Facilities.[2001]  ACEG contends that transparent selection

processes are key to reducing conflict (including costly litigation), developing legally

sustainable long-term regional transmission plans, and maximizing benefits over time to

consumers without over-building transmission facilities.[2002]

907.    Other commenters oppose the Commission's proposal.  Many of these

commenters argue that Long-Term Regional Transmission Planning should be for

informational purposes only and that the Commission should not require transmission

providers to include selection criteria in their OATTs.[2003]  Alabama Commission

contends that Long-Term Regional Transmission Planning should not involve selection

---

Coalition Initial Comments at 11-12; Clean Energy Buyers Initial Comments at 22;
Exelon Initial Comments at 17; GridLab Initial Comments at 19; NRECA Initial
Comments at 25; Ørsted Initial Comments at 5-6; Pacific Northwest State Agencies
Initial Comments at 19; PPL Initial Comments at 18; Resale Iowa Initial Comments at 7-
8.

[2001] Pacific Northwest State Agencies Initial Comments at 19.

[2002] ACEG Initial Comments at 9, 58.

[2003] Alabama Commission Initial Comments at 3; ELCON Initial Comments at 10;
Kansas Commission Initial Comments at 14; NRECA Initial Comments at 23-24; NRG
Initial Comments at 6, 14; Ohio Consumers Initial Comments at 20; *see also* NARUC
Initial Comments at 5 ("Long-Term Regional Transmission Planning [should] be used as
a planning tool and not a construction requirement."); TANC Initial Comments at 10
(commenting that TANC "requests that the Commission clarify[] that the Commission is
not proposing to require use of a 20-year planning horizon for . . . selecting Long-Term
Regional Transmission Facilities").

or construction obligations unless the affected state regulators support such actions.[2004]

ELCON argues that selection should occur in "nearer-term planning (*i.e.* 10-15 years)"

when there is greater certainty that there is a specific transmission need.[2005]

908.    Some commenters argue that it is unnecessary for the Commission to require that

transmission providers include additional selection criteria in their OATTs.  For example,

Dominion contends that Order No. 1000 already requires transmission providers to

include selection criteria in their OATTs, and that the final rule should allow, but not

require, them to add to those existing selection criteria.[2006]  Idaho Commission also

believes that Order No. 1000's requirements are adequate and argues that the

Commission has not demonstrated that there is a need to modify them.[2007]  Similarly,

Idaho Power argues that selection criteria specific to Long-Term Regional Transmission

Planning are unnecessary in light of existing processes to identify and evaluate

transmission facilities in the NorthernGrid transmission planning region.[2008]  NYISO

requests that the Commission confirm that the final rule will not require changes to or the

---

[2004] Alabama Commission Initial Comments at 3.  Relatedly, Avangrid argues that the Commission should more clearly articulate how selection affects the actual construction of the transmission facility.  Avangrid Initial Comments at 17.

[2005] ELCON Initial Comments at 10-11.

[2006] Dominion Initial Comments at 37 (citing NOPR, 179 FERC ¶ 61,028 at P 236).

[2007] Idaho Commission Initial Comments at 4-5.

[2008] Idaho Power Initial Comments at 8.

replacement of existing selection criteria.[2009]  Chemistry Council argues that the

Commission should affirm that transmission providers must continue addressing nearer-

term regional transmission needs, giving significant weight to transmission facilities that

meet customer and end-user needs, ensure grid reliability and energy security, and

prevent abandonment of needed resources.[2010]

909.   Clean Energy Buyers state that they support the NOPR proposal to grant eligibility

to use the applicable cost allocation method to the developer of a Long-Term Regional

Transmission Facility selected, subject to applicable development schedules.  Clean

Energy Buyers argue that this proposal could provide a more stable source of revenue and

help resolve the "first-mover problem," which in turn could support additional

transmission development.[2011]

910.   Finally, SPP contends that allowing transmission providers to include selection

criteria in business practice manuals rather than their OATTs would give them more

flexibility if they need to adjust study approaches.[2012]

---

[2009] NYISO Initial Comments at 43.

[2010] Chemistry Council Initial Comments at 6-7.

[2011] Clean Energy Buyers Initial Comments at 21-22 (citing NOPR, 179 FERC ¶ 61,028 at P 247).

[2012] SPP Initial Comments at 21-22.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 666 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

### c.    **Commission Determination**

911.    We adopt the NOPR proposal to require transmission providers in each transmission planning region to include in their OATTs an evaluation process, including selection criteria, that they will use to identify and evaluate Long-Term Regional Transmission Facilities for potential selection to address Long-Term Transmission Needs.  We set forth requirements with respect to the evaluation process and selection criteria in the following sections.

912.    We also adopt the NOPR proposal that, consistent with Order No. 1000, the transmission developer of a Long-Term Regional Transmission Facility that is selected, whether incumbent or nonincumbent, will be eligible to use the applicable cost allocation method for the Long-Term Regional Transmission Facility.

913.    As explained above, transmission providers currently are not identifying or evaluating Long-Term Regional Transmission Facilities that might more efficiently or cost-effectively address Long-Term Transmission Needs and, therefore, do not have the opportunity to select such transmission facilities.  We find that remedying these deficiencies in the Commission's existing regional transmission planning requirements requires the inclusion in transmission providers' OATTs of an evaluation process and selection criteria for Long-Term Regional Transmission Facilities, as outlined below, which, together with other aspects of this final rule, will help to ensure that transmission providers' Commission-jurisdictional rates are just and reasonable and not unduly discriminatory or preferential.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 667 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

914.    We find that the inclusion in transmission providers' OATTs of an evaluation

process and selection criteria for Long-Term Regional Transmission Facilities is essential

to the reforms that we adopt in this final rule.  Without these essential components, Long-

Term Regional Transmission Planning would merely inform the existing regional

transmission planning processes rather than solving the deficiencies in the Commission's

existing regional transmission planning requirements that we identify in this final rule.

The complete set of reforms that we adopt here are fundamental to resolving these

deficiencies and to ensuring that transmission providers have the opportunity to select

more efficient or cost-effective Long-Term Regional Transmission Facilities to meet

Long-Term Transmission Needs.  Therefore, we disagree with commenters who suggest

that an evaluation process or selection criteria are unnecessary or inappropriate for the

Long-Term Regional Transmission Planning[2013] reforms that we adopt in this final rule.

915.    We understand that transmission providers might propose to re-purpose existing

evaluation processes or selection criteria (with or without modifications thereto) to use in

Long-Term Regional Transmission Planning.  In their compliance filings, transmission

providers must propose the evaluation process and selection criteria that they will use in

Long-Term Regional Transmission Planning, and they must demonstrate that they meet

---

[2013] *See, e.g.*, Alabama Commission Initial Comments at 3; Dominion Initial
Comments at 37; ELCON Initial Comments at 10-11; Idaho Commission Initial
Comments at 4-5; Idaho Power Initial Comments at 8; Kansas Commission Initial
Comments at 14; NRECA Initial Comments at 23-24; NRG Initial Comments at 6, 14;
TANC Initial Comments at 10; *see also* Ohio Consumers Initial Comments at 20 (arguing
that a 20-year transmission planning horizon is inappropriate for constructing or
allocating the costs of transmission facilities).

Docket No. RM21-17-000                                                          - 658 -

the final rule requirements.  In response to NYISO's request,[2014] however, we clarify that

nothing in this final rule requires transmission providers to modify or replace selection

criteria used in their existing reliability and economic Order No. 1000 regional

transmission planning processes.

916.   As discussed below, to meet the requirements of this final rule, transmission

providers in each transmission planning region must establish a Long-Term Regional

Transmission Planning evaluation process that:  (1) identifies Long-Term Regional

Transmission Facilities that address Long-Term Transmission Needs; (2) measures the

benefits of the identified Long-Term Regional Transmission Facilities consistent with the

final rule requirements; and (3) designates a point in the evaluation process at which

transmission providers will determine whether to select or not select identified Long-

Term Regional Transmission Facilities in the regional transmission plan for purposes of

cost allocation.[2015]  We recognize the inherent uncertainty involved in identifying Long-

Term Transmission Needs over the minimum transmission planning horizon adopted in

this final rule and in measuring the benefits that could be provided by Long-Term

---

[2014] NYISO Initial Comments at 43.  We reiterate that, as discussed above in the Participation in Long-Term Regional Transmission Planning section, transmission providers may propose to continue using some or all aspects of the existing regional transmission planning and cost allocation processes that they use to consider transmission needs driven by Public Policy Requirements, provided that transmission providers demonstrate that continued use of any such processes does not interfere with or otherwise undermine Long-Term Regional Transmission Planning as set forth in this final rule.

[2015] *See, e.g.*, NOPR, 179 FERC ¶ 61,028 at P 56 (setting forth requirements for Long-Term Regional Transmission Planning).

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 669 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Regional Transmission Facilities.  However, we continue to believe that there are

selection criteria that transmission providers could adopt, following consultation with

stakeholders and with Relevant State Entities in their transmission planning region's

footprint, that minimize these risks while allowing for selection of Long-Term Regional

Transmission Facilities that more efficiently or cost-effectively meet Long-Term

Transmission Needs.  We emphasize that we do not require transmission providers to

select any particular Long-Term Regional Transmission Facilities but rather to adopt an

evaluation process and selection criteria that meet the final rule requirements.  This

evaluation process will ensure that Long-Term Regional Transmission Planning will

provide transmission providers with a framework that allows for the selection of Long-

Term Regional Transmission Facilities that more efficiently or cost-effectively address

Long-Term Transmission Needs.[2016]

917.    We reiterate that, consistent with Order No. 1000,[2017] selection in the regional

transmission plan does not entitle the transmission developer of a selected Long-Term

Regional Transmission Facility to site or construct that transmission facility, nor does it

obviate the need for the transmission developer to obtain other state, local, and/or federal

---

[2016] For these reasons, in addition to those discussed above, we disagree with
ELCON that transmission providers should only select transmission facilities in "near-
term planning (*i.e.* 10-15 years)."  ELCON Initial Comments at 10-11.

[2017] *E.g.*, Order No. 1000-A, 139 FERC ¶ 61,132 at P 191.

permits or authorizations.  For this reason, we disagree with comments suggesting that the Commission proposed to do otherwise in the NOPR.[2018]

918.    Finally, we find that, consistent with the Commission's rule of reason,[2019] transmission providers' evaluation processes and selection criteria significantly affect rates, are reasonably susceptible to specification, and are not otherwise so generally understood as to render their recitation superfluous and therefore must be included in their OATTs.  As such, we reject SPP's request that we allow transmission providers to instead maintain evaluation processes and selection criteria in their business practice manuals.[2020]

## 2.    **Flexibility**

### a.    **NOPR Proposal**

919.    Subject to certain minimum requirements, the Commission proposed in the NOPR to provide transmission providers with the flexibility to propose the selection criteria that they, in consultation with their stakeholders, believe will ensure that more efficient or cost-effective regional transmission facilities to address the region's transmission needs

---

[2018] *See, e.g.*, Alabama Commission Initial Comments at 3; Dominion Reply Comments at 8 (citing PIOs Initial Comments at 28; NARUC Initial Comments at 5-6, 39); NARUC Initial Comments at 5, 39.

[2019] *See Cal. Indep. Sys. Operator Corp.*, 185 FERC ¶ 61,210, at P 183 (2023) (citing *Hecate Energy Greene Cnty. 3 LLC v. FERC*, 72 F.4th 1307, 1314 (D.C. Cir. 2023); *City of Cleveland v. FERC*, 773 F.2d 1368, 1376 (D.C. Cir. 1985)).

[2020] SPP Initial Comments at 21-22.

driven by changes in the resource mix and demand ultimately are selected.[2021]  The
Commission stated that this proposed flexibility would help accommodate regional
differences, such as differences in transmission needs, factors driving those needs, and
market structures.[2022]  The Commission stated that providing flexibility to propose
evaluation processes and selection criteria would allow transmission providers, in
consultation with their stakeholders, to determine criteria for assessing the efficiency or
cost-effectiveness of various regional transmission facilities, whether by reference, for
example, to a benefit-cost ratio or by aggregate net benefits.[2023]  The Commission stated
that it further believed this proposed flexibility would allow transmission providers in
each transmission planning region to develop selection criteria that could sufficiently
balance individual state interests within each transmission planning region.[2024]

### b.    Comments

920.    Many commenters support the Commission's proposal to provide transmission
providers with the flexibility to propose an evaluation process and selection criteria that
they, in consultation with their stakeholders, believe will ensure that more efficient or
cost-effective Long-Term Regional Transmission Facilities to address the transmission

---

[2021] NOPR, 179 FERC ¶ 61,028 at P 242.

[2022] *Id.* P 243.

[2023] *Id.* P 243.

[2024] *Id.* P 244.

planning region's transmission needs driven by changes in the resource mix and demand ultimately are selected.[2025]

921.    For example, Nebraska Commission asserts that this flexibility will allow transmission providers to develop selection criteria that balance individual states' interests.[2026]  Eversource argues that flexibility will foster investments in cost-effective regional transmission facilities, accommodate differences in transmission needs between transmission planning regions, and encourage stakeholder engagement.[2027]  While NEPOOL supports flexibility as a general matter, it asserts that the Commission should articulate guiding principles for how selection decisions will be made and by whom, and guidelines regarding when transmission solutions should be selected to address long-term transmission needs.[2028]

922.    By contrast, some commenters argue that the Commission should establish *pro forma* selection criteria.[2029]  Clean Energy Associations argues that doing so would

---

[2025] APPA Initial Comments at 33-34; Avangrid Initial Comments at 17; California Commission Initial Comments at 37; Chemistry Council Initial Comments at 6; Duke Initial Comments at 26; Eversource Initial Comments at 26; GridLab Initial Comments at 19; ISO-NE Initial Comments at 35; MISO Initial Comments at 54; Nebraska Commission Initial Comments at 8; TAPS Initial Comments at 16; US Chamber of Commerce Initial Comments at 8.

[2026] Nebraska Commission Initial Comments at 8 (citing NOPR, 179 FERC ¶ 61,028 at P 244).

[2027] Eversource Initial Comments at 26 (citing NOPR, 179 FERC ¶ 61,028 at PP 242-243).

[2028] NEPOOL Initial Comments at 7-8.

[2029] *See, e.g.*, ACORE Reply Comments at 5-6 (citing Policy Integrity Initial

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 673 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

enhance transparency, minimize differences across seams, and enable state regulators, consumers, and other market participants to evaluate transmission projects that result from Long-Term Regional Transmission Planning on an apples-to-apples basis.[2030] Similarly, SEIA urges the Commission to establish a set of minimum requirements for selecting transmission facilities in Long-Term Regional Transmission Planning, arguing that transmission planning regions otherwise may fail to select transmission facilities that provide significant regional benefits.[2031]  For its part, Clean Energy Buyers contends that adopting *pro forma* selection criteria would provide greater transparency and consistency across transmission planning regions, hopefully help to avoid disputes, and allow for consultation with states and other stakeholders.[2032]

923.    Acadia Center and CLF argue that requiring a minimum set of selection criteria will provide critical information to transmission providers who rely on the Commission to make clear what considerations they may weigh in Long-Term Regional Transmission Planning, facilitating more productive conversations at the regional level.[2033]

---

Comments at 2-3); Policy Integrity Initial Comments at 2-3.

[2030] Clean Energy Associations Initial Comments at 22-23.

[2031] SEIA Initial Comments at 5, 19.

[2032] Clean Energy Buyers Initial Comments at 22-23.

[2033] Acadia Center and CLF Initial Comments at 10-11.

c.    **Commission Determination**

924.    Subject to the requirements described further below, we adopt the NOPR proposal to require transmission providers in each transmission planning region to propose, after consultation with Relevant State Entities and other stakeholders, evaluation processes, including selection criteria, that they believe will ensure that more efficient or cost-effective Long-Term Regional Transmission Facilities are selected to address the transmission planning region's Long-Term Transmission Needs.  We believe that providing transmission providers with this flexibility will allow them to design evaluation processes and selection criteria that can accommodate regional differences.

925.    We reject requests that, instead of providing transmission providers with flexibility, we set forth standard evaluation processes and selection criteria in this final rule that transmission providers would be required to adopt.[2034]  While we recognize that there may be some benefits to doing so, we also find that transmission planning regions have different transmission needs and market structures that make designing a standard evaluation process and selection criteria difficult.

926.    In response to NEPOOL,[2035] we clarify that transmission providers make the selection decisions in Long-Term Regional Transmission Planning.  Although we do not require transmission providers to select any particular Long-Term Regional Transmission

---

[2034] Acadia Center and CLF Initial Comments at 10-11; Clean Energy Associations Initial Comments at 22-23; SEIA Initial Comments at 5, 19.

[2035] NEPOOL Initial Comments at 8.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 675 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Facility to address Long-Term Transmission Needs, as discussed below in the No

Selection Requirement section, we do set forth minimum requirements with respect to the

evaluation process and selection criteria, which will help to ensure that transmission

providers select Long-Term Regional Transmission Facilities to more efficiently or cost-

effectively address Long-Term Transmission Needs.

### 3. Minimum Requirements

#### a. NOPR Proposal

927.    In the NOPR, the Commission proposed certain minimum requirements such that

transmission providers' selection criteria must (1) be transparent and not unduly

discriminatory; (2) aim to ensure that more efficient or cost-effective transmission

facilities are selected in the regional transmission plan for purposes of cost allocation;

and (3) seek to maximize benefits to consumers over time without over-building

transmission facilities.[2036]  The Commission noted that, to comply with the Order Nos.

890 and 1000 transmission planning principles, the evaluation process must result in a

determination that is sufficiently detailed for stakeholders to understand why a particular

transmission facility was selected or not selected in the regional transmission plan for

purposes of cost allocation to address transmission needs driven by changes in the

resource mix and demand.[2037]  The Commission stated that the evaluation process and,

---

[2036] NOPR, 179 FERC ¶ 61,028 at PP 241-242, 245.

[2037] *Id.* P 242 (citing Order No. 1000, 136 FERC ¶ 61,051 at P 328).

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 676 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

specifically, the selection criteria, must seek to maximize benefits to consumers over time without over-building transmission facilities.[2038]

928.    The Commission stated that providing flexibility to propose selection criteria would allow transmission providers, in consultation with their stakeholders, to determine criteria for assessing the efficiency or cost-effectiveness of various regional transmission facilities, whether by reference, for example, to a benefit-cost ratio or by aggregate net benefits.[2039]  The Commission also stated that transmission providers would have the flexibility to propose to use a portfolio approach in selecting regional transmission facilities that address transmission needs driven by changes in the resource mix and demand.[2040]  The Commission proposed to require transmission providers that propose such an approach to include in their OATTs provisions describing whether the selection criteria would apply to one proposed regional transmission facility or to a portfolio of regional transmission facilities, as well as whether the portfolio approach would be used for Long-Term Regional Transmission Planning universally to address transmission needs driven by changes in the resource mix and demand or would be used only in certain specified instances.[2041]

---

[2038] *Id.*

[2039] *Id.* P 243.

[2040] *Id.* P 249.

[2041] *Id.*

929.    The Commission recognized the inherent uncertainty involved in predicting future

transmission needs, including those driven by changes in the resource mix and demand,

as well as the concerns that many commenters expressed in response to the ANOPR that

imperfect information may lead to selecting transmission facilities that become stranded

assets.[2042]   The Commission also stated that there are selection criteria that transmission

providers could adopt, following consultation with stakeholders and with Relevant State

Entities in their transmission planning region's footprint, that could minimize these risks

while allowing for investment in transmission facilities that more efficiently or cost-

effectively meet transmission needs driven by changes in the resource mix and

demand.[2043]   The Commission noted that under a "least-regrets" approach, for example,

transmission providers in a transmission planning region would select a transmission

facility (or portfolio of transmission facilities) that is net-beneficial in most or all Long-

Term Scenarios, even if other transmission facilities have more net benefits or a higher

benefit-cost ratio in a single Long-Term Scenario.  The Commission stated that another

approach is a "weighted-benefits approach," in accordance with which transmission

providers in a transmission planning region would select a transmission facility (or

portfolio of regional transmission facilities) based on its probability-weighted average

benefits, where probabilities have been assigned to each Long-Term Scenario studied.[2044]

---

[2042] *Id.* P 251.

[2043] *Id.*

[2044] *Id.* (citing Brattle-Grid Strategies Oct. 2021 Report at 59-60).

Docket No. RM21-17-000                                            - 668 -

### b.    Comments

930.    Commenters make a wide variety of arguments with respect to the minimum

requirements that the Commission should impose with respect to evaluation processes

and selection criteria.  Many commenters support the Commission's proposal to require

that selection criteria:  (1) be transparent and not unduly discriminatory; (2) aim to ensure

that more efficient or cost-effective transmission facilities are selected in the regional

transmission plan for purposes of cost allocation to address transmission needs driven by

changes in the resource mix and demand; and (3) seek to maximize benefits to consumers

over time without over-building transmission facilities.[2045]

931.    Some commenters generally support the Commission's proposal with certain

modifications.  For example, Ameren argues that requiring selection criteria to maximize

benefits to consumers over time without over-building transmission facilities is highly

subjective, because such a requirement could refer to maximizing gross or net benefits

and because certain interpretations could override the consideration of costs.[2046]  Vistra

likewise argues that the directive to maximize benefits to consumers over time without

over-building transmission facilities is unhelpfully vague and that maximizing benefits

---

[2045] *See* ACEG Initial Comments at 58-59; ACORE Initial Comments at 14; Amazon Initial Comments at 9; APPA Initial Comments at 33-34; CARE Coalition Initial Comments at 11-12; NESCOE Initial Comments at 46; NRECA Initial Comments at 25; Ørsted Initial Comments at 5-6; Pacific Northwest State Agencies Initial Comments at 19; PPL Initial Comments at 17-18; TAPS Initial Comments at 16.

[2046] Ameren Initial Comments at 20 (citing NOPR, 179 FERC ¶ 61,028 at P 243 n.390).

should not be understood to disregard costs.[2047]  WATT Coalition states that the

Commission should require maximization of net benefits and cautions that it would be

unjust and unreasonable to ignore benefits or costs in the assessment of options.[2048]

932.   GridLab argues that selection criteria should seek to manage uncertainty and risk,

stating that the Commission should clarify that the criteria must address not only the risk

of over-building but also of under-building transmission.[2049]  In contrast, New York State

Department argues that selection criteria should be designed to minimize the financial

risk to ratepayers of over-building the transmission system.[2050]  NYISO requests

clarification on the definition of over-building and argues that the final rule should

provide additional guidance on how transmission planning regions should address this

risk.  NYISO contends that the final rule should treat the risk of over-building as an

additional qualitative criterion that transmission planning regions should consider, as

informed by open and transparent stakeholder review.[2051]

933.   EEI contends that it is appropriate for the Commission to provide guidance by

providing non-mandatory factors for transmission planning regions to consider.[2052]

---

[2047] Vistra Initial Comments at 17-18.

[2048] WATT Coalition Initial Comments at 9.

[2049] GridLab Initial Comments at 19.

[2050] New York State Department Initial Comments at 4.

[2051] NYISO Initial Comments at 43.

[2052] EEI Initial Comments at 45-46.

ELCON argues that transparency with respect to selection criteria requires that the criteria and their proper weighting must be clear and easily accessible to consumers through transmission providers' OASIS and OATT.[2053]

934.    Commenters make several arguments with respect to the metrics that the Commission should allow or require transmission providers to use when evaluating whether to select Long-Term Regional Transmission Facilities.  For example, some commenters argue that transmission providers should select transmission facilities by using metrics that seek to maximize net benefits instead of ones that rely on benefit-cost ratios.[2054]  ACEG argues that the Commission can require metrics that seek to maximize net benefits using the same authority it relied upon in promulgating Order No. 1000.[2055]

935.    Breakthrough Energy states that, while metrics such as benefit-cost ratios are useful indicators, the efficient solution is the one that maximizes net benefits.[2056]  WATT Coalition contends that, in Australia, the transmission planner lists all transmission facility alternatives ranked by the net present value of the consumer benefits that the

---

[2053] ELCON Initial Comments at 17.

[2054] ACEG Initial Comments at 49-50; Breakthrough Energy Initial Comments at 23; Clean Energy Associations Initial Comments at 22; DC and MD Offices of People's Counsel Initial Comments at 33; Evergreen Action Initial Comments at 4; ITC Initial Comments at 25; WATT Coalition Initial Comments at 9.

[2055] *See* ACEG Initial Comments at 49-50 (citing *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d at 58).

[2056] Breakthrough Energy Initial Comments at 23.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 681 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

alternatives would provide, and selects the option that provides the most benefits in the absence of a compelling reason not to do so.[2057]

936.    MISO argues that selection criteria should maximize long-term transmission value, defined as the difference between total benefits and total costs on a present value basis over a pre-determined transmission planning horizon.[2058]  MISO contends that using such a metric is important when benefit-cost ratios are high and transmission expansion is substantial, as many of the benefits provided by new transmission facilities are difficult to quantify in terms of dollars despite providing significant qualitative benefits.[2059] Relatedly, CTC Global argues that selecting transmission facilities with the lowest capital costs is no longer a best practice, in light of increased debate in many RTOs/ISOs about issues such as mandated resource mixes, compensation in capacity markets, transmission planning criteria and cost allocation, and carbon taxes.[2060]  CTC Global asserts that, if a transmission project is selected with least capital cost as a selection criterion, consumers will pay higher energy costs and higher total costs than what they would pay if the

---

[2057] WATT Coalition Initial Comments at 9.

[2058] MISO Initial Comments at 55-56.

[2059] *Id.*

[2060] CTC Global Initial Comments at 6-7 (citing *State Voluntary Agreements to Plan and Pay for Transmission Facilities*, 175 FERC ¶ 61,225 (2021) (Christie, Comm'r, concurring at PP 4-5)).

Commission were to require transmission providers to evaluate the NOPR's proposed benefits as well as cost.[2061]

937.    Commenters also offer a variety of perspectives regarding benefit-cost ratios. Clean Energy Associations recommend that, if the Commission continues to allow benefit-cost ratios, such ratios not exceed Order No. 1000's maximum allowable benefit-cost ratio of 1.25-to-1.00.[2062]  ITC argues that, if the Commission allows transmission providers to use benefit-cost ratios, it should require the use of a 1.00-to-1.00 benefit-cost ratio for the evaluation of candidate portfolios.[2063]  Cypress Creek asserts that the Commission should retain the maximum permitted benefit-cost ratio of 1.25-to-1.00 and consider lowering that threshold to 1.00-to-1.00 because a transmission facility with a benefit-cost ratio of at least 1.00-to-1.00 is beneficial.[2064]

938.    Pattern Energy argues that the existing maximum 1.25-to-1.00 allowable benefit-cost ratio is too high for purposes of Long-Term Regional Transmission Planning. Pattern Energy explains that scenarios and sensitivities typically are created to bookend what the future may look like, and those bookends are often weighted lower than a "business as usual" scenario.  In this context, Pattern Energy argues that a lower benefit-

---

[2061] *Id.* at 9.

[2062] Clean Energy Associations Initial Comments at 22.

[2063] ITC Initial Comments at 25-26.

[2064] *See* Cypress Creek Reply Comments at 8 & n.14 (citing Order No. 1000, 136 FERC ¶ 61,051 at P 646).

to-cost ratio is necessary because the standard to approve transmission facilities is so high that transmission ratepayers are not receiving an appropriate opportunity to realize the value of new transmission infrastructure.  Pattern Energy suggests that a more reasonable benefit-cost ratio would be 1.10-to-1.00 but notes that a higher benefit-to-cost ratio may be appropriate to evaluate a portfolio of transmission facilities (e.g., 1.15 – 1.25).[2065]

939.   By contrast, New York State Department asserts that transmission providers should not select a transmission facility unless benefits in the long term greatly exceed costs and that adopting a much higher benefit-cost ratio than the existing 1.25 standard may be required (e.g., 2.25-to-1.00).[2066]

940.   Some commenters express support for least-regrets[2067] or weighted-benefits approaches[2068] to selecting transmission facilities in Long-Term Regional Transmission

---

[2065] Pattern Energy Initial Comments at 14-15.

[2066] New York State Department Initial Comments, Montalvo Aff. at 14-15.

[2067] *See* Avangrid Initial Comments at 10-11; Eversource Initial Comments at 26-27; Exelon Initial Comments at 18; GridLab Initial Comments at 19-20; National Grid Initial Comments at 11-12; NRECA Initial Comments at 48; PG&E Initial Comments at 6.

[2068] *See* ACORE Initial Comments at 14 (citing Brattle-Grid Strategies Oct. 2021 Report at 59-60; Derek Stenclik and Ryan Deyoe, *Multi-Value Transmission Planning for a Clean Energy Future:  A Report of the Transmission Benefits Valuation Task Force*, Energy Systems Integration Group, 37 (June 2022), https://www.esig.energy/wp-content/uploads/2022/07/ESIG-Multi-Value-Transmission-Planning-report-2022a.pdf) (Energy Systems Integration Group June 2022 Report)); Clean Energy Associations Initial Comments at 22 (citing NOPR, 179 FERC ¶ 61,028 at P 251).

USCA4 Appeal: 24-1650     Doc: 224     Filed: 01/21/2025     Pg: 684 of 2455
Document Accession #: 20240513-3036     Filed Date: 05/13/2024

Planning.  For example, National Grid argues that identifying least-regrets transmission facilities should be the goal of Long-Term Regional Transmission Planning.[2069]

941.   Avangrid explains that "no regrets" or "low regrets" transmission facilities are those that likely will be needed under multiple scenarios and a broad range of assumptions.[2070]  PG&E agrees and argues that these transmission facilities are most likely to realize projected benefits.[2071]  PG&E states that transmission facilities that provide more limited benefits or benefits under a limited number of scenarios may require additional study and should not be selected until there is more certainty that their benefits will be realized.[2072]

942.   Exelon also advocates for a least-regrets approach, arguing that it minimizes risk and maximizes value for customers and transmission owners.[2073]  Eversource contends that a least-regrets approach is most likely to build the consensus among stakeholders that can support transmission facilities through planning, financing, siting, and cost

---

[2069] National Grid Initial Comments at 11-12 (citing National Grid ANOPR Initial Comments at 16).

[2070] Avangrid Initial Comments at 10-11.

[2071] PG&E Initial Comments at 6.

[2072] *Id.*

[2073] Exelon Initial Comments at 18.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 685 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                      - 675 -

allocation.[2074]  NRECA argues that a least-regrets approach will help mitigate the risk that consumers will pay for unnecessary transmission facilities.[2075]

943.  ACORE recommends the use of a weighted-benefits approach, which ACORE argues has been endorsed in recent expert reports on transmission planning.[2076] Dominion sees promise in both least-regrets and weighted-benefits approaches but argues that requiring transmission providers to propose specific selection criteria may result in litigation, delay, and increased costs.[2077]

944.  New England for Offshore Wind argues that the Commission should require transmission providers to give preference to transmission facilities that perform well under a range of scenarios.[2078]  A number of commenters caution, however, that the Commission should allow transmission providers to select transmission facilities even where they are not net-beneficial in every Long-Term Scenario.[2079]

---

[2074] Eversource Initial Comments at 26-27.

[2075] NRECA Initial Comments at 48.

[2076] ACORE Initial Comments at 14 (citing Brattle-Grid Strategies Oct. 2021 Report at 59-60; Energy Systems Integration Group June 2022 Report at 37).

[2077] *See* Dominion Initial Comments at 38.

[2078] New England for Offshore Wind Initial Comments at 2; *see also* Clean Energy Associations Initial Comments at 22 (arguing for selecting transmission facilities that maximize net benefits across multiple scenarios).

[2079] ACEG Initial Comments at 7, 30; ACORE Initial Comments at 14; Evergreen Action Initial Comments at 4; Pine Gate Initial Comments at 37-38.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 686 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

945.    A number of commenters recommend accounting for siting considerations in various ways in the selection of transmission facilities.  For example, CARE Coalition recommends that the Commission require transmission providers to work with state authorities and other stakeholders to develop environmental- and energy justice-based siting criteria to guide transmission project selection and cost allocation.[2080]  CARE Coalition also states that the Commission should allow RTOs/ISOs to take a flexible approach to identifying siting-based criteria that consider local and regional impacts, local and regional energy justice impacts (including use of existing transmission corridors and investment flow to disadvantaged communities as defined by the President's Justice40 Initiative), integration with plans for energy storage, and integration with major infrastructure development plans (e.g., highways, rail corridors).[2081]  CARE Coalition states that planners and stakeholders should consider the economic, environmental, and other impacts associated with the full expected useful lives of proposed transmission and associated facilities.[2082]

946.    Similarly, ACEG recommends selection criteria that account for whether potential transmission facilities use existing rights-of-way, contribute to equitable energy service, alleviate environmental justice concerns, or impact employment and economic

---

[2080] CARE Coalition Initial Comments at 7-8.

[2081] *Id.* at 10.

[2082] *Id.*

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 687 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

development.[2083]  Exelon also recommends giving preference to approaches that prioritize existing rights-of-way, given that they are more readily accomplished and have fewer environmental impacts than greenfield transmission projects.[2084]

947.    Acadia Center and CLF urge the Commission to provide transmission providers clear guidance, by adopting minimum selection criteria in the final rule, on their ability to consider factors such as environmental justice, mitigating environmental impacts, use of existing transmission facilities, and non-transmission alternatives, which have community and environmental benefits.  Acadia Center and CLF contend that the consideration of these issues is consistent with NEPA, the FPA, and state law, and that, in the absence of such guidance, transmission providers may continue to exclude consideration of these issues given concerns regarding their authority and jurisdiction to do so.[2085]  Grand Rapids NAACP also argues that the Commission has the authority to require that transmission providers explicitly incorporate energy equity and justice concerns into selection criteria, and that the Commission should do so in a final rule.[2086]  WE ACT states that equity considerations and other non-energy benefits (e.g., pollution reduction, health, jobs, and local economic development) should be among the benefits that

---

[2083] ACEG Initial Comments at 59.

[2084] Exelon Initial Comments at 18.

[2085] Acadia Center and CLF Initial Comments at 11-12.

[2086] Grand Rapids NAACP Initial Comments at 17-23 (citations omitted).

transmission providers could use in selecting transmission facilities.[2087]  PIOs assert that

the Commission should require transmission providers to consider equity impacts when

determining which transmission facilities to select, including whether construction of

such facilities will impact environmental justice communities and what the cumulative

impacts of the facilities will be.[2088]

948.    DC and MD Offices of People's Counsel suggest that transmission providers

should select transmission facilities that optimize the interconnection of portfolios of

generation resources, including those that deliver benefits arising from grid

decarbonization and the benefits set forth in the NOPR.[2089]  Eversource argues that the

Commission should consider requiring transmission providers to address needs identified

in high-impact, low-frequency event scenarios, such that selection criteria would

accommodate worst-case scenarios like Winter Storm Uri.[2090]  Exelon urges that selection

criteria be tied to well-established and defined needs, like reliability and market

economics, such as reduced production costs, congestion, or capacity costs.[2091]

---

[2087] WE ACT Initial Comments at 5.

[2088] PIOs Reply Comments at 17 (citations omitted).

[2089] DC and MD Offices of People's Counsel Initial Comments at 38-39.

[2090] Eversource Initial Comments at 26-27 (citing FERC, North American Electric Reliability Corporation, Regional Entity Staff Report, *The February 2021 Cold Weather Outages in Texas, and the South-Central United States* (Nov. 2021), https://www.ferc.gov/media/february-2021-cold-weather-outages-texas-and-south-central-united-states-ferc-nerc-and).

[2091] Exelon Initial Comments at 18.

949.    Duke asserts that selection of a transmission facility in the absence of clear consensus from load-serving entities, states, and/or customers would be problematic and thwart the Commission's objectives, especially where certain transmission facilities will not be supported by state commissions in siting decisions or by consumer advocates in cost recovery proceedings.[2092]    As such, Duke argues that the Commission should allow transmission providers to include a qualitative selection criterion of whether there is state and consumer support for a particular Long-Term Regional Transmission Facility or portfolio of facilities.[2093]    New York TOs state that New York Commission should retain its flexibility under NYISO's public policy transmission planning process such that, when the New York Commission identifies a transmission need driven by Public Policy Requirements, it can also require certain selection criteria in addition to those in NYISO's OATT.[2094]

950.    NYISO contends that the final rule should continue to allow transmission providers to use a range of qualitative and quantitative criteria to rank and select transmission projects as the more efficient or cost-effective transmission facility.[2095] ACEG encourages the Commission to provide guidance in the final rule as to selection

---

[2092] Duke Initial Comments at 26-27.

[2093] *Id.* at 4, 26-27.

[2094] New York TOs Initial Comments at 9, 11-12, 15.

[2095] NYISO Initial Comments at 39-40.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 690 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

criteria that meet its requirements, arguing that doing so would facilitate efficient compliance proceedings.[2096]

951.    Maine Public Advocate also argues that the Commission should require transmission providers to select non-transmission alternatives when they meet an identified transmission need at the same or lower cost.[2097]

952.    TAPS asserts that the Commission should require transmission providers to explain how their selection criteria would account for the uncertainty involved in predicting future transmission needs and to report "Affordability Metrics" that disclose the impact that selection of a particular transmission facility would have on transmission rates.[2098]  TAPS argues that these "Affordability Metrics" would enhance the transparency of stakeholder processes in Long-Term Regional Transmission Planning and assist states in discussions about cost allocation and in considering whether to voluntarily fund a particular transmission facility or portfolio of transmission facilities.[2099]

953.    ELCON states that, given the potential for massive transmission investment in the next 10 to 25 years, it is vitally important that consumers be protected from any

---

[2096] ACEG Initial Comments at 59.

[2097] Maine Public Advocate Initial Comments at 1-2.

[2098] TAPS Initial Comments at 16-17.

[2099] *Id.* at 19-20 (citing Alliant Energy, et al., ANOPR Initial Comments at 14; Alliant Energy, et al., ANOPR Reply Comments at 2-3).

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 691 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                          - 681 -

unnecessary costs.[2100]  As such, ELCON argues that selection criteria must incorporate

metrics for reliability and economic efficiency, incorporate all potential drivers of

transmission needs, and afford greater weight to those transmission facilities that produce

benefits in more than one category.[2101]

### c. **Commission Determination**

#### i. **Transparent and Not Unduly Discriminatory; More Efficient or Cost-Effective Transmission Facilities**

954.    We adopt the NOPR proposal, with modification, to require transmission

providers in each transmission planning region to propose evaluation processes, including

selection criteria, that are transparent and not unduly discriminatory.  Consistent with

Order No. 1000,[2102] we adopt the NOPR proposal to establish a requirement that

transmission providers' evaluation of transmission facilities must culminate in a

determination that is sufficiently detailed for stakeholders to understand why a particular

Long-Term Regional Transmission Facility (or portfolio of such Facilities) was selected

or not selected.  As discussed further below, we modify the NOPR proposal to include a

requirement that the determination of why a particular Long-Term Regional

Transmission Facility (or portfolio of such Facilities) was selected or not selected must

---

[2100] ELCON Initial Comments at 16 (citing Eric Larson et al., *Net-Zero America: Potential Pathways, Infrastructure, and Impacts*, Net Zero America, 108 (Oct. 29, 2021), https://www.dropbox.com/s/ptp92f65lgds5n2/Princeton%20NZA%20FINAL%20REPO RT%20%2829Oct2021%29.pdf?dl=0).

[2101] *Id.*

[2102] Order No. 1000, 136 FERC ¶ 61,051 at P 328.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 692 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

include the measured benefits for each alternative Long-Term Regional Transmission
Facility (or portfolio of such Facilities) considered in the Long-Term Regional
Transmission Planning process.

955.    We also adopt the NOPR proposal, with modification, to require transmission
providers to propose on compliance evaluation processes, including selection criteria, that
aim to ensure that more efficient or cost-effective Long-Term Regional Transmission
Facilities are selected to address Long-Term Transmission Needs.  We modify the NOPR
proposal to provide additional clarity as to how transmission providers' evaluation
processes must aim to ensure the selection of more efficient or cost-effective Long-Term
Regional Transmission Facilities to address Long-Term Transmission Needs by adopting
several requirements.  First, transmission providers in a transmission planning region
must identify one or more Long-Term Regional Transmission Facilities (or portfolio of
such Facilities) that address the Long-Term Transmission Needs that the transmission
providers have identified through Long-Term Regional Transmission Planning.  As part
of this identification, consistent with Order Nos. 890 and 1000,[2103] nonincumbent
transmission developers must be able to propose transmission facilities in Long-Term
Regional Transmission Planning.  Thus, we clarify that transmission providers in each
transmission planning region must make clear in their OATTs the point in the Long-Term
Regional Transmission Planning evaluation process at which they will accept Long-Term

---

[2103] *See id.* P 315 (citing Order No. 890, 118 FERC ¶ 61,119 at P 494; Order
No. 890-A, 121 FERC ¶ 61,297 at PP 215-216).

Regional Transmission Facility proposals from stakeholders, including nonincumbent transmission developers.  Second, transmission providers' evaluation processes must estimate the costs and measure the benefits of the Long-Term Regional Transmission Facilities (or portfolio of such Facilities) that are identified or proposed for potential selection, in addition to evaluating the identified Long-Term Regional Transmission Facilities (or portfolio of such Facilities) using any qualitative or other quantitative selection criteria that the transmission providers in a transmission planning region propose to apply.  Third, transmission providers must designate a point in the evaluation process at which transmission providers will determine whether to select or not select identified Long-Term Regional Transmission Facilities (or portfolio of such Facilities).[2104]  This point must be no later than three years following the beginning of the Long-Term Regional Transmission Planning cycle.[2105]  Finally, the evaluation process must culminate in determinations that are sufficiently detailed for stakeholders to understand why a particular Long-Term Regional Transmission Facility (or portfolio of such Facilities) was selected or not selected.  We reiterate, however, that, as discussed

---

[2104] As described further below in the Voluntary Funding Opportunities section, transmission providers must also provide Relevant State Entities with the opportunity to fund the cost of, or part of the cost of, the Long-Term Regional Transmission Facility (or portfolio of such Facilities) to ensure that it meets the transmission providers' selection criteria.

[2105] We note, however, consistent with the discussion above in the Frequency of Long-Term Scenario Revisions section, that transmission providers may evaluate and select additional Long-Term Regional Transmission Facilities during the period of the Long-Term Regional Transmission Planning cycle after this point and before the commencement of the next such cycle.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 694 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                    - 684 -

further below in the No Selection Requirement section, this final rule does not require

transmission providers to select any particular Long-Term Regional Transmission

Facility (or portfolio of such Facilities) to address Long-Term Transmission Needs.

956.    As discussed earlier, this final rule requires transmission providers to develop and

use at least three Long-Term Scenarios, and one sensitivity analysis applied to each

Long-Term Scenario, when conducting Long-Term Regional Transmission Planning.

Each Long-Term Scenario or sensitivity analysis may suggest that different Long-Term

Transmission Needs exist, that different Long-Term Regional Transmission Facilities

would resolve those needs, or that such Long-Term Regional Transmission Facilities

would provide different benefits for transmission customers.  We clarify that, in the

context of Long-Term Regional Transmission Planning, Order No. 890's requirements

that transmission providers conduct coordinated, open, and transparent transmission

planning on the regional level[2106] requires that transmission providers make transparent

the methods that they used to analyze each individual Long-Term Scenario and the

sensitivity or sensitivities applied to each scenario to determine the Long-Term

Transmission Needs that exist in the transmission planning region, the Long-Term

Regional Transmission Facilities that would resolve those needs, and the benefits of those

Long-Term Regional Transmission Facilities for purposes of selection.[2107]

---

[2106] Order No. 890, 118 FERC ¶ 61,119 at P 435.

[2107] For example, transmission providers might weigh specific Long-Term
Scenarios and sensitivities based on the probability that the analyses reflect future system
conditions (which the Commission referred to in the NOPR as a "weighted-benefits
approach").  NOPR, 179 FERC ¶ 61,028 at P 251 (citing Brattle-Grid Strategies Oct.

957.    Consistent with the Order No. 1000 regional transmission planning

requirements,**2108** the Long-Term Regional Transmission Planning process must result in

a regional transmission plan that identifies the Long-Term Regional Transmission

Facilities that more efficiently or cost-effectively meet the transmission planning region's

Long-Term Transmission Needs.  To effectuate this requirement, we clarify that

transmission providers have an affirmative obligation to identify Long-Term Regional

Transmission Facilities that more efficiently or cost-effectively address Long-Term

Transmission Needs, regardless of whether any stakeholder proposes potential Long-

Term Regional Transmission Facilities for consideration in Long-Term Regional

Transmission Planning.  In this section, we enumerate specific requirements for how

transmission providers conduct their Long-Term Regional Transmission Planning with

the aim to ensure that more efficient or cost-effective Long-Term Regional Transmission

Facilities are selected.  By clearly enumerating their evaluation processes and selection

criteria in their OATTs, transmission providers will provide significant transparency to

stakeholders to understand how Long-Term Transmission Needs will be addressed,

whether there are more efficient or cost-effective Long-Term Regional Transmission

Facilities that may meet those needs, and their benefits.

---

2021 Report at 59-60).

   **2108** Order No. 1000, 136 FERC ¶ 61,051 at PP 55, 146-148; *see Louisville Gas & Elec. Co.*, 144 FERC ¶ 61,054, at PP 61-62 (2013), *on reh'g sub nom.*, *Duke Energy Carolinas LLC*, 147 FERC ¶ 61,241, at PP 82-83 (2014).

958.    Provided that transmission providers' evaluation processes and selection criteria comply with the requirements that we adopt here, we provide transmission providers with flexibility to determine how they will evaluate whether Long-Term Regional Transmission Facilities more efficiently or cost-effectively address Long-Term Transmission Needs, including by using benefit-cost ratios, assessing their net benefits and selecting the Long-Term Regional Transmission Facilities that maximize those benefits, and/or using some other method.[2109]    Consistent with Order No. 1000 regional cost allocation principle (3), and as further discussed below in the Regional Transmission Cost Allocation section, transmission providers may not impose as a selection criterion a minimum benefit-cost ratio that is higher than 1.25-to-1.00.[2110]    We decline to reduce or increase the maximum benefit-cost ratio that transmission providers may use as a selection criterion in Long-Term Regional Transmission Planning.    As the Commission found in Order No. 1000,[2111] requiring that a benefit-cost ratio, if adopted, not exceed

---

[2109] Nothing in this final rule requires the use of any particular approach, and we clarify that transmission providers may use more than one approach complementarily. *Compare, e.g.*, MISO Initial Comments at 54-56 (explaining MISO's approach to selecting transmission facilities with the goal of maximizing "long-term transmission value"), *with* MISO, FERC Electric Tariff, MISO OATT, attach. FF, Transmission Expansion Planning Protocol (90.0.0), §§ II.B.1.c, II.C.2.b (setting forth as a minimum selection criterion a benefit-cost ratio of 1.25 or 1.00 for Market Efficiency Projects and Multi-Value Projects, respectively).

[2110] NOPR, 179 FERC ¶ 61,028 at P 243 n.390; Order No. 1000, 136 FERC ¶ 61,051 at P 646.

[2111] Order No. 1000, 136 FERC ¶ 61,051 at P 648.

1.25-to-1.00 ensures that the ratio is not so high as to exclude Long-Term Regional

Transmission Facilities with significant positive net benefits from selection.

959.    We decline to require transmission providers to account for siting considerations

in their evaluation process and selection criteria.[2112]  We acknowledge that siting

considerations (e.g., use of existing rights-of-way) may affect the costs, timeline, or

feasibility of developing a Long-Term Regional Transmission Facility.  While such siting

considerations may inform the evaluation process and selection criteria, we do not require

transmission providers to account for such considerations in this final rule.  We note,

however, that, as discussed below in the Role of Relevant State Entities section, this final

rule requires that transmission providers consult with and seek the support of Relevant

State Entities[2113] regarding the evaluation process and selection criteria that transmission

providers propose to use to evaluate Long-Term Regional Transmission Facilities for

selection.

960.    We also do not require transmission providers to include environmental justice or

equity considerations in their evaluation process or selection criteria.  While several

commenters recommend that we impose such requirements,[2114] none provides any

---

[2112]CARE Coalition Initial Comments at 7-8; *see also* ACEG Initial Comments at 59; Exelon Initial Comments at 18.

[2113] Many Relevant State Entities exercise their state's authority over the siting of transmission facilities.

[2114] *See, e.g.*, Acadia Center and CLF Initial Comments at 11-12; Grand Rapids NAACP Initial Comments at 17-23 (citations omitted); PIOs Reply Comments at 17 (citations omitted).

approach for how these concerns would be incorporated into transmission providers'
evaluation process and selection criteria on a generic basis. We acknowledge that the
selection of Long-Term Regional Transmission Facilities represents a substantial step in
the development of new electric transmission infrastructure, which may impact
environmental justice communities or raise equity concerns. We further recognize that
such environmental justice or equity considerations may affect the costs, timeline, or
feasibility of developing a Long-Term Regional Transmission Facility, particularly in
regions where legal frameworks provide for consideration of environmental justice and
equity. Nothing in this final rule precludes transmission providers from proposing on
compliance to include environmental justice considerations within their evaluation
process and selection criteria.

961.    NYISO requests that the Commission clarify that transmission providers may
continue to use qualitative and quantitative measures in the Long-Term Regional
Transmission Planning process.[2115]  We clarify that nothing in this final rule prohibits
transmission providers from proposing to use qualitative factors in their evaluation
processes and/or selection criteria. Accordingly, transmission providers may propose to
use qualitative factors in their evaluation processes and/or qualitative selection criteria,
provided that they demonstrate on compliance that their proposals comply with the
evaluation process and selection criteria requirements of this final rule.

---

[2115] NYISO Initial Comments at 39-40.

962.    In response to Duke's request to allow transmission providers to include a

selection criterion that is a qualitative evaluation of whether there is state and consumer

support for a particular Long-Term Regional Transmission Facility or portfolio of such

Facilities,[2116] we find that transmission providers may not include in their evaluation

process or selection criteria any prohibition on the selection of a Long-Term Regional

Transmission Facility based on the transmission providers' anticipated response of a state

public utility commission or consumer advocates to particular Long-Term Regional

Transmission Facilities.  Rather than address this issue via selection criteria regarding a

*transmission provider's* anticipation of such an entity's response, we conclude that the

requirement discussed below to consult with and seek support from Relevant State

Entities regarding the evaluation process and selection criteria is a more appropriate

mechanism to account for the Relevant State Entity's views.  We also note that beyond

this consultative process, state public utility commissions and consumer advocates have

numerous opportunities to express their views on transmission development, including

through state- and Commission-jurisdictional proceedings.  Further, allowing such

features in evaluation processes or selection criteria could amount to a requirement that

transmission providers obtain the consent of Relevant State Entities, which, as discussed

below in the Role of Relevant State Entities section, we do not believe is necessary or

appropriate to resolve the deficiencies identified in this final rule.[2117]

---

[2116] Duke Initial Comments at 4, 26-27.

[2117] *See New York v. FERC*, 535 U.S.at 26-28 (upholding Commission's decision

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 700 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                              - 690 -

963.    In response to New York TOs,[2118] we decline to require that transmission

providers include selection criteria requested by state public utility commissions.  As

discussed further below in the Role of Relevant State Entities section, transmission

providers must propose on compliance an evaluation process and selection criteria that

comply with the requirements of this final rule after consulting with and seeking the

support of Relevant State Entities.  To the extent that a transmission provider believes

that a selection criterion proposed by a Relevant State Entity would comply with the final

rule requirements, they may propose to include that criterion in their compliance filings,

and the Commission will determine if it complies with these requirements.

##                              ii.      <u>Maximize Benefits</u>

964.    We adopt the NOPR proposal, with modification, to require that transmission

providers in each transmission planning region propose evaluation processes, including

selection criteria, that seek to maximize benefits accounting for costs over time without

over-building transmission facilities.  In the NOPR, the Commission proposed that the

evaluation processes and selection criteria seek to maximize benefits to consumers over

time without over-building transmission facilities.  However, we believe that it is

appropriate to modify that proposal for clarity.  We modify the requirement to require

that transmission providers' evaluation processes and selection criteria seek to maximize

benefits *accounting for costs*.  Some commenters have interpreted the NOPR as

---

not to assert jurisdiction over bundled retail transmission).

[2118] New York TOs Initial Comments at 9, 11-12, 15.

proposing to allow transmission providers to disregard costs and simply maximize benefits.[2119]  We clarify that was not the Commission's intent, and we modify the NOPR proposal in this final rule to make that clear.  Further, we note that while we omit reference "to consumers" in the requirement for brevity, we do not view this change as substantive.  As discussed above, this requirement, together with other aspects of this final rule, helps to ensure transmission providers identify, evaluate, and select Long-Term Regional Transmission Facilities that more efficiently or cost-effectively address Long-Term Transmission Needs in order to ensure just and reasonable Commission-jurisdictional rates, which ultimately benefits ratepayers.

965.    As discussed in the Requirement for Transmission Providers to Use a Set of Seven Required Benefits section, transmission providers conducting Long-Term Regional Transmission Planning must use and measure a set of benefits to evaluate Long-Term Regional Transmission Facilities.  In setting forth an evaluation process and selection criteria, we clarify, consistent with the directive to seek to maximize benefits accounting for costs over time without over-building transmission facilities, that transmission providers may not disregard benefits that we require them to use and measure when implementing their approved evaluation process and selection criteria.[2120]  We further clarify that transmission providers may not disregard benefits even where those benefits

---

[2119] *See, e.g.*, Ameren Initial Comments at 20 (citing NOPR, 179 FERC ¶ 61,028 at P 242); Vistra Initial Comments at 17-18; WATT Coalition Initial Comments at 9.

are only measured in certain transmission system conditions, such as may be the case

with Benefit 6, Mitigation of Extreme Weather Events and Unexpected System

Conditions, and therefore are captured only under certain Long-Term Scenarios or

sensitivities thereto.  While transmission providers may not disregard such benefits,

transmission providers' evaluation processes and selection criteria may account for the

fact that certain benefits are only measured under certain conditions by, for example,

weighting how likely certain conditions expressed in specific Long-Term Scenarios or

sensitivities are to occur.

966.    As discussed further below, transmission providers have the discretion to select or

not select any Long-Term Regional Transmission Facility that they identify through

Long-Term Regional Transmission Planning, even a facility that otherwise meets the

selection criteria.  However, as noted above, the evaluation process must culminate in a

determination that is sufficiently detailed for stakeholders to understand why a particular

Long-Term Regional Transmission Facility was selected or not selected to address Long-

Term Transmission Needs.  We clarify that this determination must include the estimated

costs and measured benefits of each alternative Long-Term Regional Transmission

Facility (or portfolio of such Facilities) evaluated by the transmission providers, whether

or not the Long-Term Regional Transmission Facility (or portfolio of such Facilities) is

selected.[2121]

---

[2121] Where transmission providers employ a portfolio approach to evaluating and
selecting Long-Term Regional Transmission Facilities, we require only that they include
in such a determination the measured benefits for the portfolio of Long-Term Regional

967.    We acknowledge commenters' concerns that there is inherent uncertainty in Long-Term Regional Transmission Planning.[2122]  This final rule adopts provisions that allow for significant flexibility for transmission providers to address that uncertainty.  As stated above in the Participation in Long-Term Regional Transmission Planning section, we require transmission providers to develop and use Long-Term Scenarios, which are a critical tool for managing uncertainty and facilitating regional transmission planning that account for a range of potential futures, as well as an assessment of the likelihood of each scenario manifesting, when identifying, evaluating, and selecting Long-Term Regional Transmission Facilities.  Further, transmission providers could adopt evaluation processes and selection criteria that would allow transmission providers to make selection decisions while minimizing the future risk of developing a previously selected Long-Term Regional Transmission Facility that is not the more efficient or cost-effective regional transmission solution to Long-Term Transmission Needs.  For example, transmission providers might develop a least-regrets approach under which they would select Long-Term Regional Transmission Facilities in the regional transmission plan for purposes of cost allocation if those Long-Term Regional Transmission Facilities are net beneficial in more than one Long-Term Scenario and sensitivity analyses even if other transmission facilities have a higher benefit-cost ratio or provide more net benefits in a single Long-Term Scenario or particular sensitivity.  Transmission providers might also

---

Transmission Facilities on an aggregate basis.

    [2122] *See, e.g.*, GridLab Initial Comments at 19; TAPS Initial Comments at 16-17.

Docket No. RM21-17-000                                                          - 694 -

adopt a weighted-benefits approach under which they would select a Long-Term

Regional Transmission Facility based on its probability-weighted average benefits, where

probabilities have been assigned to each Long-Term Scenario or sensitivity thereof that is

studied.  Under either approach, to maximize benefits accounting for costs over time

without over-building transmission facilities, transmission providers must consider not

only the risk that changing conditions might produce fewer benefits than originally

anticipated, but also that they might produce *more* benefits than originally anticipated.

Finally, as discussed below in the Reevaluation section, we require transmission

providers to reevaluate certain selected Long-Term Regional Transmission Facilities to

determine whether they continue to meet the transmission providers' selection criteria.

968.   While we acknowledge commenters' wide support for least-regrets and weighted-

benefits approaches to selecting Long-Term Regional Transmission Facilities in Long-

Term Regional Transmission Planning, we decline to require transmission providers to

use either approach.  However, we clarify that transmission providers may not adopt an

approach under which they would not select a Long-Term Regional Transmission

Facility unless it meets their selection criteria in every Long-Term Scenario and

sensitivity.  We are concerned that such an approach could impose a threshold for

selection that is so onerous it limits selection of most or all Long-Term Regional

Transmission Facilities, and, as such, is inconsistent with the requirement that selection

criteria seek to maximize benefits accounting for costs over time without over-building

transmission facilities.  We find that such an approach would not ensure that transmission

providers have the opportunity to select Long-Term Regional Transmission Facilities to

Docket No. RM21-17-000                                                    - 695 -

more efficiently or cost-effectively address Long-Term Transmission Needs, an

opportunity that we find, as described in the Transparent and Not Unduly Discriminatory;

More Efficient or Cost-Effective Transmission Facilities section above, is necessary to

ensure just and reasonable Commission-jurisdictional rates.

969.    Again, we emphasize that this final rule does not require that transmission

providers select any particular Long-Term Regional Transmission Facility (or portfolio of

such Facilities).  Rather, this final rule simply requires transmission providers to adopt an

evaluation process and selection criteria that meet the minimum requirements set forth in

this final rule, including that they aim to maximize benefits accounting for costs over

time without over-building transmission facilities.  In response to NYISO,[2123] however,

we decline to clarify the definition of "over-building," because doing so would limit

transmission providers' flexibility to assess what constitutes over-building in their

transmission planning region.  Transmission planning regions have a wide variety of

market structures, and numerous factors drive transmission needs, which may require

evaluation processes and selection criteria that maximize benefits accounting for costs or

guard against over-building in different ways.  We expect that evaluation processes and

selection criteria that maximize benefits accounting for costs over time without over-

building transmission facilities will include a variety of features, based on their regional

circumstances, that combine to ensure that transmission providers give careful, informed

consideration to Long-Term Regional Transmission Facilities that more efficiently or

---

[2123] NYISO Initial Comments at 43.

cost-effectively address Long-Term Transmission Needs.  We also note that, in response to CTC Global's concerns about the selection criteria being limited to considering regional transmission facilities with the least capital costs,[2124] we clarify that both estimated benefits and costs must be disclosed when evaluating a Long-Term Regional Transmission Facility for selection and that transmission providers must adopt selection criteria that seek to maximize benefits accounting for costs over time without over-building transmission facilities.

970.    In response to Maine Public Advocate,[2125] we decline to require transmission providers to select non-transmission alternatives where such non-transmission alternatives meet a Long-Term Transmission Need at a lower cost than an alternative Long-Term Regional Transmission Facility.  The Commission did not propose to require transmission providers to consider non-transmission alternatives for potential selection in the NOPR, and we are not persuaded to do so in this final rule.  We note, however, that transmission providers already are required to consider non-transmission alternatives on a comparable basis in regional transmission planning.[2126]

971.    Finally, in response to TAPS,[2127] we decline to require transmission providers to develop affordability metrics to provide along with other information about a particular

---

[2124] CTC Global Initial Comments at 9.

[2125] Maine Public Advocate Initial Comments at 1-2.

[2126] Order No. 1000, 136 FERC ¶ 61,051 at P 148.

[2127] TAPS Initial Comments at 16-17, 19-20 (citations omitted).

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 707 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Long-Term Regional Transmission Facility.  The Commission did not propose such a requirement in the NOPR, and we are not persuaded to adopt a requirement for such metrics in this final rule.

### 4.    Role of Relevant State Entities

#### a.    NOPR Proposal

972.    In the NOPR, the Commission proposed to require that transmission providers, as part of their Long-Term Regional Transmission Planning, include in their OATTs a process to coordinate with the Relevant State Entities in developing selection criteria.[2128] Regarding this requirement, the Commission proposed to require transmission providers to demonstrate on compliance that they consulted with and sought support from the Relevant State Entities in their transmission planning region's footprint to develop their proposed selection criteria.[2129]

#### b.    Comments

##### i.    Support/Oppose

973.    Many commenters support the Commission's proposal to require transmission providers to consult with and seek support from Relevant State Entities[2130] and include in

---

[2128] NOPR, 179 FERC ¶ 61,028 at P 241.

[2129] *Id.* P 246.

[2130] *See* ACEG Initial Comments at 59-60; Ameren Initial Comments at 20; American Municipal Power Initial Comments at 12; California Commission Initial Comments at 37; ELCON Initial Comments at 17; Nebraska Commission Initial Comments at 8-9; North Carolina Commission and Staff Initial Comments at 4-5; Pennsylvania Commission Initial Comments at 10; PJM States Initial Comments at 3.

their OATTs a process to coordinate with the Relevant State Entities[2131] in developing selection criteria. For example, ELCON argues that coordination with Relevant State Entities in identifying selection criteria is critical because it will promote cooperation and could result in more efficient state siting and permitting processes.[2132] Pennsylvania Commission asserts that requiring consultation will provide states the opportunity to influence regional transmission planning and cost allocation, thereby promoting the public interest and reducing conflicts and disputes on these matters.[2133]

974.    ISO-NE supports the proposal to provide states with a greater role in the selection of transmission facilities.[2134] Further, ISO-NE argues that, in the context of policy-based planning, states should be responsible for determining whether to select transmission facilities, with ISO-NE playing a supporting, technical role.[2135] While NESCOE supports the proposal that transmission providers must consult with and seek support from Relevant State Entities within their transmission planning region's footprint to develop selection criteria, NESCOE requests that the Commission provide Relevant State Entities

---

[2131] *See* NARUC Initial Comments at 44; NESCOE Initial Comments at 9-10, 46; Pacific Northwest State Agencies Initial Comments at 19; PJM States Initial Comments at 3.

[2132] ELCON Initial Comments at 17.

[2133] Pennsylvania Commission Initial Comments at 10.

[2134] ISO-NE Initial Comments at 35.

[2135] *Id.* NESCOE supports ISO-NE's position. NESCOE Reply Comments at 5 & n.16.

an expanded role in the selection of transmission projects where the project is identified as needed in response to state laws or policy goals and require transmission providers to include such a role in their OATTs.[2136]

975.    PJM states that it also supports providing additional opportunity for involvement by states and stakeholders in Long-Term Regional Transmission Planning; however, in response to ISO-NE, PJM urges the Commission to make clear that transmission providers retain authority to select transmission facilities and argues that such role is more than a "technical supporting role."[2137]  PJM States contend that an upfront and transparent process, with substantive state involvement, will ensure that selection criteria are thoroughly discussed by stakeholders and are consistent with the rest of Long-Term Regional Transmission Planning.[2138]

976.    New York Commission and NYSERDA state that the Commission should allow Relevant State Entities to be part of the decision-making process regarding the appropriate timeframe for selecting a transmission facility.[2139]

977.    California Commission urges the Commission to require that transmission providers indicate in their compliance filings whether the selection criteria they propose are supported by the Relevant State Entities and, if not, to explain any points of

---

[2136] NESCOE Initial Comments at 9-10, 48-49.

[2137] PJM Reply Comments at 35-36 (citing ISO-NE Initial Comments at 16).

[2138] PJM States Reply Comments at 8.

[2139] New York Commission and NYSERDA Initial Comments at 12.

disagreement.[2140]  PJM States argue that the Commission should, without dictating any

substantive outcomes, "recognize the primacy of the role for retail regulators" in the final

rule.[2141]  By contrast, ACEG cautions that transmission providers must balance all states'

interests when developing selection criteria instead of maximizing one state's interest

over another's.[2142]  NYISO states that each transmission planning region should have

flexibility to determine how it will consult with and seek support from Relevant State

Entities regarding selection criteria.[2143]

978.    To ensure that consultation is successful, NARUC recommends that the

Commission require transmission providers to take two steps:  (1) communicate with the

Relevant State Entities promptly following issuance of a final rule in a manner that is

reasonably calculated to be received by the Relevant State Entities; and (2) establish a

forum for negotiation that enables full and robust participation by both transmission

providers and Relevant State Entities during the period allotted for making compliance

filings.[2144]

---

[2140] California Commission Initial Comments at 37-38.

[2141] PJM States Initial Comments at 3-4 (citing NOPR, 179 FERC ¶ 61,028 at P 245).

[2142] ACEG Initial Comments at 59-60.

[2143] NYISO Initial Comments at 44.

[2144] NARUC Initial Comments at 44.

Docket No. RM21-17-000                                                                 - 701 -

979.    Some commenters oppose the Commission's NOPR proposal.[2145]  Dominion

argues that mandating involvement by Relevant State Entities would unnecessarily

burden transmission providers.[2146]  Louisiana Commission argues that the proposal would

represent "superficial state involvement" and serve as "window dressing" for the erosion

of state authority due to Long-Term Regional Transmission Planning.  Louisiana

Commission argues that collective oversight by the states within an RTO/ISO is not

equivalent to state oversight of its own retail electric service companies, particularly in

circumstances where states are subject to the decisions of the majority.[2147]

980.    APPA opposes any requirement for transmission providers to consult with, and/or

seek the support of, Relevant State Entities in identifying selection criteria.[2148]  APPA

contends that Relevant State Entities should be considered in the same manner as other

stakeholders under the requirements of Order Nos. 890 and 1000.[2149]  DC and MD

Offices of People's Counsel disagree with APPA, arguing that the Commission should

afford Relevant State Entities an expansive role in the selection of transmission facilities

---

[2145] *See, e.g.*, Clean Energy Associations Initial Comments at 22-23 (arguing that, while state involvement should play a role, the Commission should set forth *pro forma* selection criteria).

[2146] Dominion Initial Comments at 37-38.

[2147] Louisiana Commission Initial Comments at 27.

[2148] APPA Initial Comments at 34.

[2149] *Id.*

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 712 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                    - 702 -

in Long-Term Regional Transmission Planning.[2150]  DC and MD Offices of People's

Counsel contend that Relevant State Entities can reach agreement quickly and have

access to the best available data used for baseline planning and scenario analysis of

transmission facilities.[2151]

981.   MISO takes no position but argues that its existing processes already entail

extensive stakeholder engagement, including consulting with state regulatory

commissions individually and through OMS, to determine the selection criteria that

should be used to maximize long-term transmission value and to ensure an adequate,

reliable, and resilient transmission system.[2152]

### ii.   **Obtaining/Not Obtaining Consent**

982.   Several commenters discuss whether transmission providers need only consult

with and seek support from Relevant State Entities in the development of selection

criteria, or whether they also must obtain their consent.[2153]  For example, Indicated PJM

TOs support the NOPR proposal but argue that the Commission should not require

transmission providers to obtain the agreement of Relevant State Entities in determining

---

[2150] DC and MD Offices of People's Counsel Reply Comments at 9 (citing APPA Initial Comments at 35).

[2151] *Id.*

[2152] MISO Initial Comments at 55.

[2153] *See, e.g.*, Acadia Center and CLF Initial Comments at 27-28 (arguing that states should have veto authority over transmission providers' selection criteria in certain circumstances).

USCA4 Appeal: 24-1650   Doc: 224    Filed: 01/21/2025   Pg: 713 of 2455
Document Accession #: 20240513-3036   Filed Date: 05/13/2024

Docket No. RM21-17-000                                                     - 703 -

selection criteria.[2154]  AEP agrees and argues that state input should be only one factor

and that engineering considerations should drive the establishment of selection criteria.

AEP also expresses skepticism that requiring transmission providers to consult with

Relevant State Entities will increase the chances that states will site the transmission

facilities that transmission providers select, because transmission line siting processes

will occur years after the establishment of selection criteria, will likely be performed by

different personnel, and will address considerations separate from those in establishing

selection criteria.[2155]

983.    Southeast PIOs argue that, while they do not oppose factoring state and consumer

support into the selection of transmission facilities, the Commission should not require

transmission providers to obtain the approval of Relevant State Entities prior to selection

of transmission facilities, because doing so would risk indefinitely delaying Long-Term

Regional Transmission Planning.[2156]

984.    PJM argues that it should be able to develop selection criteria in the event that

Relevant State Entities do not agree on the establishment of selection criteria.  PJM

recommends that the Commission clarify that any requirement to demonstrate that

transmission providers have consulted with and sought support from Relevant State

---

[2154] Indicated PJM TOs Initial Comments at 18 (citing NOPR 179, FERC ¶61,028 at PP 244, 246).

[2155] AEP Initial Comments at 29-30.

[2156] Southeast PIOs Reply Comments at 27.

Entities could be satisfied even if the transmission provider is unable to secure the agreement of Relevant State Entities.[2157]

985.    By contrast, NARUC opposes a process in which transmission providers consult with and seek support from Relevant State Entities but are empowered to override or ignore selection criteria proposed and supported by Relevant State Entities.  NARUC seeks clarification as to what recourse will be available to Relevant State Entities in the event that there is not agreement on selection criteria.[2158]  Nebraska Commission argues that the Commission should require transmission providers to demonstrate to the greatest extent possible that they gained the support of Relevant State Entities, because otherwise the process of consulting with and seeking support from Relevant State Entities could become a mere exercise.[2159]

986.    Mississippi Commission suggests that the Commission require transmission providers to obtain the agreement of Relevant State Entities on selection criteria for Long-Term Regional Transmission Planning.[2160]  Southern goes further, arguing that the Commission should allow Relevant State Entities to use the State Agreement Process not only to allocate the costs of Long-Term Regional Transmission Facilities, but also to

---

[2157] PJM Initial Comments at 104.

[2158] NARUC Initial Comments at 45.

[2159] Nebraska Commission Initial Comments at 8-9.

[2160] Mississippi Commission Initial Comments at 3-4 (citing NOPR, 179 FERC ¶ 61,028 (Christie, Comm'r, concurring at P 11)).

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 715 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

select such transmission facilities in the first instance. Southern contends that, if the
Commission does not allow states to select transmission facilities, the Commission will
unlawfully intrude into state jurisdiction over resource planning.[2161]

987.    Acadia Center and CLF assert that states should have the authority to propose
selection criteria, arguing that this will ensure that transmission providers do not refuse to
consider states' interests and goals regarding transmission needs. Acadia Center and
CLF further contend that states should have veto authority over transmission providers'
selection criteria in certain scenarios, such as ISO-NE, where a majority of states in a
transmission planning region have decarbonization goals but the ISO/RTO continues to
apply business-as-usual selection criteria that prioritize reliability and economic
considerations.[2162]

988.    AEE argues that the final rule should clearly provide an opportunity for states to
suggest selection criteria and inputs for analyzing transmission projects, noting that such
a process may need to be continually developed following issuance of a final rule.[2163]

### iii.    Consultation with Other Entities

989.    A number of commenters argue that transmission providers should consult with
and seek support from other entities in addition to Relevant State Entities. Large Public
Power does not object to the NOPR proposal but argues that it is essential that municipal

---

[2161] Southern Initial Comments at 6-10 & n.12 (citations omitted).

[2162] Acadia Center and CLF Initial Comments at 27-28.

[2163] AEE Initial Comments at 30-32 (citations omitted).

utilities also be included as participants in the consultative process.[2164]  American

Municipal Power urges the Commission to recognize that publicly-owned utilities play a

role analogous to state commissions, in that they are publicly accountable, operate

through open and transparent procedures, and adopt policies reflecting the consensus of

communities that own and support them.  American Municipal Power argues that FPA

section 217(b)(4) requires the Commission to revise the NOPR proposal such that load-

serving entities, including publicly-owned utilities, are on a par with Relevant State

Entities.[2165]  NRECA agrees, arguing that Relevant State Entities may not have regulatory

authority over electric cooperatives, and therefore the Commission must modify its

proposal to include consultation with load-serving entities to conform with FPA section

217(b)(4) and Order No. 1000's transmission planning principles.[2166]

990.    Relatedly, NARUC argues that nothing in the final rule should inhibit states from

permitting the participation of certain quasi-public/private state and federal entities or

other state entities in addition to Relevant State Entities.[2167]  NEPOOL states that the

selection of any transmission facilities should be made with substantial input from both

market participant stakeholders and the transmission planning region's states.[2168]

---

[2164] Large Public Power Initial Comments at 30.

[2165] American Municipal Power Initial Comments at 12-13.

[2166] NRECA Initial Comments at 50.

[2167] NARUC Initial Comments at 29-30 (citation omitted).

[2168] NEPOOL Initial Comments at 8.

#### iv.    **Practical Implementation Issues**

991.    Several commenters discuss practical issues with the requirement that transmission providers consult with and seek the support of Relevant State Entities in developing selection criteria.  For example, PPL generally supports the Commission's proposal but contends that some states may find it difficult to fulfill the role described in the NOPR.  PPL therefore argues that the Commission should allow transmission providers flexibility in developing consultative processes.[2169]  AEP argues that some states will be unable to participate effectively given a lack of resources or statutory limitations, such that the consultative process may result in selection criteria "that unfairly or unreasonably emphasize certain values."[2170]  NESCOE states that the Commission should provide flexibility as to how states elect to engage in the transmission planning process, noting that a state official's role in siting electric infrastructure may make it preferable for a different state official to provide that state's view on certain aspects of Long-Term Regional Transmission Planning, such as transmission project selection.[2171]

---

[2169] PPL Initial Comments at 18-19.

[2170] AEP Initial Comments at 30 (quoting NOPR, 179 FERC ¶ 61,028 at P 290).

[2171] NESCOE Initial Comments at 9 n.16.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 718 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                    - 708 -

992.    NEPOOL requests that the Commission articulate principles for who should make selection decisions when a Long-Term Regional Transmission Facility may address transmission needs driven by reliability, economics, and public policy.[2172]

993.    Michigan State Entities argue that the success of the Commission's proposed reforms depends on transmission providers meaningfully engaging with stakeholders, which requires that stakeholders have the time and capability to participate in a stakeholder review process.  Michigan State Entities further assert that stakeholders representing diffuse and broad interests (e.g., residential ratepayers), as opposed to concentrated interests, tend to have fewer resources with which to fund participation in these processes, noting that many states have created consumer advocacy agencies to correct this imbalance.  Michigan State Entities assert that the Commission should require that transmission providers include RTO/ISO-level, publicly funded consumer advocates in the stakeholder processes that are empowered to participate in approving selection criteria.[2173]

### c.    Commission Determination

994.    We adopt the NOPR proposal, with modification, to require transmission providers in each transmission planning region to consult with and seek support from Relevant State Entities regarding the evaluation process, including selection criteria, that transmission providers propose to use to identify and evaluate Long-Term Regional

---

[2172] NEPOOL Initial Comments at 8.

[2173] Michigan State Entities Initial Comments at 4-5.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 719 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Transmission Facilities for selection.  Specifically, we require transmission providers to demonstrate on compliance that they made good faith efforts to consult with and seek support from Relevant State Entities in their transmission planning region's footprint when developing the evaluation process and selection criteria that they propose to include in their OATTs.[2174]

995.    We decline to adopt the NOPR proposal to require transmission providers to include in their OATTs a process for coordinating with Relevant State Entities.  We believe that the requirement adopted in this final rule will simplify compliance efforts without sacrificing the benefits of consulting with and seeking the support of Relevant State Entities.  We disagree with Dominion that requiring transmission providers to consult with and seek support from Relevant State Entities will prove burdensome, and we believe that our decision not to require transmission providers to include a process for such consultation in their OATTs will further reduce any administrative burden of this requirement.[2175]

996.    We clarify that we require transmission providers to seek support from Relevant State Entities, but do not require transmission providers to obtain their support, before proposing an evaluation process and selection criteria on compliance.[2176]  In response to

---

[2174] In response to New York Commission and NYSERDA, we note that such consultation may include discussion of the appropriate timeframe for selecting a Long-Term Regional Transmission Facility.  New York Commission and NYSERDA Initial Comments at 12.

[2175] *See* Dominion Initial Comments at 37-38.

[2176] *See, e.g.*, PJM Initial Comments at 104 (requesting clarification that

Acadia Center and CLF, we note that Relevant State Entities may propose selection criteria to transmission providers, but ultimately, it is transmission providers who must propose on compliance an evaluation process and selection criteria that comply with the requirements of this final rule.  We further note that providing states with veto authority over transmission providers' proposed selection criteria would be akin to requiring transmission providers to obtain the support of Relevant State Entities, and therefore we do not adopt Acadia Center and CLF's recommendation.[2177]  While we believe that Long-Term Regional Transmission Planning is more likely to be successful where transmission providers, Relevant State Entities, and other stakeholders collaborate to develop an evaluation process and selection criteria, we reiterate that transmission planning is the tariff obligation of each transmission provider and transmission providers retain ultimate responsibility for regional transmission planning, including Long-Term Regional Transmission Planning, as well as complying with the obligations of this final rule.[2178]  Moreover, we acknowledge that achieving consensus may not be possible in every instance.

---

transmission providers are permitted to submit an evaluation process and selection criteria on compliance in the absence of obtaining the support of Relevant State Entities).

[2177] *See* Acadia Center and CLF Initial Comments at 27-28.

[2178] *See* Order No. 1000, 136 FERC ¶ 61,051 at P 153 ("[T]he ultimate responsibility for transmission planning remains with public utility transmission providers." (citing Order No. 890, 118 FERC ¶ 61,119 at P 454)).

997.    We disagree with NARUC that, in the absence of a requirement that transmission providers obtain the support of Relevant State Entities, transmission providers will be empowered to ignore the input of Relevant State Entities.  In this final rule, we require transmission providers to make good faith efforts to consult with and seek the support of Relevant State Entities.  We do not agree that the failure to obtain the support of Relevant State Entities is necessarily evidence that transmission providers did not exercise good faith efforts to seek their support.

998.    For similar reasons, we also disagree with Louisiana Commission when it argues that requiring transmission providers to simply consult with and seek support from Relevant State Entities will amount to only superficial state involvement in the development of an evaluation process and selection criteria.[2179]  In response to Louisiana Commission's additional contention that collective oversight of regional transmission planning processes by the transmission planning region's states is not equivalent to state oversight of its own retail electric service companies, we reiterate that this final rule requires transmission providers to engage in and conduct sufficiently long-term, forward-looking, and comprehensive transmission planning and cost allocation processes to identify and plan for Long-Term Transmission Needs in order to ensure *Commission-jurisdictional* rates are just and reasonable.  As discussed in the Legal Authority to Adopt Reforms for Long-Term Regional Transmission Planning section, the final rule neither aims at nor conflicts with state authority over retail rates.

---

[2179] Louisiana Commission Initial Comments at 27.

999.    We do not believe that it is necessary to adopt California Commission's proposal to require transmission providers to indicate in their compliance filings whether Relevant State Entities support the proposal or explain any points of disagreement that they may have with Relevant State Entities.  Relevant State Entities may intervene in compliance filing proceedings and provide this information for the Commission's consideration as it determines whether transmission providers have met the requirements that we adopt in this final rule.  Nor do we adopt NARUC's request that we impose specific requirements dictating how transmission providers should consult with and seek the support of Relevant State Entities beyond the requirement that they demonstrate good faith efforts to do so.  We believe that it is appropriate to provide transmission providers with flexibility in how to consult with and seek support of Relevant State Entities based on the specific needs and makeup of their transmission planning region.  Further, we acknowledge, as argued by some commenters,[2180] that practical or legal limitations may limit the extent to which some Relevant State Entities may participate in such processes, reinforcing the need for flexibility.

1000.   We clarify that nothing in this final rule diminishes the role of stakeholders that are not Relevant State Entities, nor absolves transmission providers of any existing obligations that they may have to provide opportunities for stakeholder input.[2181]  That

---

[2180] *See* AEP Initial Comments at 30 (quoting NOPR, 179 FERC ¶ 61,028 at P 290); NESCOE Initial Comments at 9 n.16; PPL Initial Comments at 18-19.

[2181] In response to NARUC and NEPOOL, *see* NARUC Initial Comments at 29-30; NEPOOL Initial Comments at 9, we reiterate that this may include other state entities in addition to Relevant State Entities, such as federal entities, market participants, and

said, we decline to require transmission providers to consult with or seek support from entities in addition to Relevant State Entities, including load-serving entities.[2182]  This final rule recognizes that Relevant State Entities play a unique role in representing the interests of states, which retain a variety of authorities, including those under FPA section 201, that are integral to the success of Long-Term Regional Transmission Planning.

1001.  Further, we disagree with American Municipal Power that FPA section 217(b)(4) requires that this final rule treat load-serving entities on par with Relevant State Entities. Through the requirements of this final rule, we seek to ensure that adequate transmission capacity is built to allow load-serving entities to meet their service obligations and facilitate the planning of a reliable grid, consistent with FPA section 217(b)(4).  Nothing in our determination to require transmission providers to consult with and seek support from Relevant State Entities (but not load-serving entities) changes that aim or undercuts the ability of Long-Term Regional Transmission Planning to achieve it.  We continue to find that other requirements in the final rule, including the requirement to incorporate state-approved integrated resource plans and expected supply obligations for load-serving entities in the development of Long-Term Scenarios, ensure load-serving entities'

other stakeholders.

---

[2182] *See, e.g.*, American Municipal Power Initial Comments at 12-13; Large Public Power Initial Comments at 30.

USCA4 Appeal: 24-1650   Doc: 224      Filed: 01/21/2025   Pg: 724 of 2455
Document Accession #: 20240513-3036      Filed Date: 05/13/2024

Docket No. RM21-17-000                                              - 714 -

reasonable needs for transmission capacity to meet their service obligations are

incorporated into Long-Term Regional Transmission Planning.

1002.  Finally, in response to commenters,[2183] we clarify that transmission providers, not

Relevant State Entities, must determine whether or not to select Long-Term Transmission

Facilities to meet Long-Term Transmission Needs.  Under the FPA, the Commission has

jurisdiction over transmission providers, and those entities, not Relevant State Entities,

are subject to the requirements of this final rule.  As discussed above in the Transparent

and Not Unduly Discriminatory; More Efficient or Cost-Effective Transmission Facilities

section, we require herein that transmission providers designate a point in the evaluation

process at which they will determine whether to select or not select identified Long-Term

Regional Transmission Facilities (or portfolio of such Facilities).

## 5.    **Voluntary Funding Opportunities**

### a.    **NOPR Proposal**

1003.  In the NOPR, the Commission sought comment on whether Relevant State Entities

should have the opportunity to voluntarily fund the cost of, or a portion of the cost of, a

Long-Term Regional Transmission Facility to enable such facility to meet transmission

---

[2183] *See, e.g.*, ISO-NE Initial Comments at 35 (arguing that states should be
responsible for determining whether to select transmission facilities and that transmission
providers should play a supportive, technical role); NEPOOL Initial Comments at 8
(requesting that the Commission articulate principles for who should select multi-value
transmission facilities); NESCOE Initial Comments at 9,48-49 (requesting that the
Commission require transmission providers to include a role in their OATTs for Relevant
State Entities in the selection of Long-Term Regional Transmission Facilities); PJM
Reply Comments at 36 (requesting that the Commission clarify that transmission
providers retain the authority to select transmission facilities).

providers' selection criteria (e.g., any benefit-cost threshold), and if so, what mechanism

would be appropriate to document such voluntary funding agreements, how transmission

providers would be assured that commitments to provide funding would be sufficiently

binding, and what the most appropriate point would be in the process for such voluntary

commitments.[2184]  The Commission also sought comment on whether such a voluntary

funding opportunity should be extended to other entities, such as interconnection

customers.[2185]

### b.    Comments

1004.  Of commenters that address the question posed in the NOPR regarding whether

Relevant State Entities should have the opportunity to voluntarily fund the cost of, or a

portion of the cost of, a Long-Term Regional Transmission Facility, nearly all argue that

the Commission should allow such an opportunity.[2186]  ISO-NE argues that the

---

[2184] NOPR, 179 FERC ¶ 61,028 at P 252.  The Commission stated that, for Long-Term Regional Transmission Facilities, such an opportunity for the Relevant State Entities could enable them to assign a value to achieving their particular policy goals while ensuring that their customers bear the corresponding costs.  *Id.* P 252 n.399.

[2185] *Id.*

[2186] *See* Ameren Initial Comments at 21; APPA Initial Comments at 34-35; Clean Energy Associations Initial Comments at 23; Duke Initial Comments at 28-29; Grid United Initial Comments at 6; Idaho Commission Initial Comments at 5; ISO-NE Initial Comments at 36; Louisiana Commission Initial Comments at 29; NARUC Initial Comments at 31-32 (citing *MISO-SPP Joint Targeted Interconnection Queue Study (JTIQ)*, MISO, https://www.misoenergy.org/engage/committees/miso-spp-joint-targeted-interconnection-queue-study/); New Jersey Commission Initial Comments at 25; PPL Initial Comments at 19; SDG&E Initial Comments at 4; WATT Coalition Initial Comments at 11; Xcel Initial Comments at 14 (stating that neither the FPA nor the Commission's rules and regulations categorically preclude voluntary agreement to plan and pay for new transmission facilities (citing Order No. 1000, 136 FERC ¶ 61,051 at

Docket No. RM21-17-000                                                                                         - 716 -

Commission should provide flexibility to transmission providers to determine the specific means for documenting the state's agreement to provide such funding.[2187]  APPA argues that the Commission should require the filing under FPA section 205 of agreements to fund the cost of, or a portion of the cost of, a transmission facility so that affected parties have an opportunity to comment.[2188]

1005.  Grid United argues that, while it supports *ex ante* cost allocation methods, the Commission also should continue to permit alternative cost recovery arrangements, including participant funding agreements and voluntary agreements entered into by generation developers and Relevant State Entities.[2189]  Duke asserts that the Commission should avoid prescriptive rules that discourage or undervalue voluntary funding from transmission providers, states, Relevant State Entities, or interconnection customers.[2190]  Xcel argues that the Commission should state in a final rule that neither the FPA nor the Commission's rules and regulations forbid voluntary arrangements for planning and paying for transmission facilities.[2191]

---

PP 146, 561, 724; *State Voluntary Agreements to Plan & Pay for Transmission Facilities*, 175 FERC ¶ 61,225 at P 3)).

[2187] ISO-NE Initial Comments at 36.

[2188] APPA Initial Comments at 34-35 (citing *PJM Interconnection, L.L.C.*, 179 FERC ¶ 61,024 (2022)).

[2189] Grid United Initial Comments at 6.

[2190] Duke Initial Comments at 28-29.

[2191] Xcel Initial Comments at 14.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 727 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

1006.  NARUC argues that the final rule should not inhibit the flexibility of Relevant
State Entities in developing approaches to such voluntary funding commitments.[2192]
NARUC argues that the final rule should be as flexible as possible in providing voluntary
funding opportunities to account for the variety of state laws enabling such authority and
to allow for the possibility of sharing the costs of such transmission facilities between
load and generator developers.[2193]

1007.  Louisiana Commission supports the NOPR proposal and argues that voluntary
agreement is the only fair, reasonable, and just way to allocate the costs of transmission
facilities selected in Long-Term Regional Transmission Planning.[2194]  Ameren believes
that Relevant State Entities should have the opportunity to fund a portion of the cost of a
transmission facility that otherwise would not meet the OATT selection criteria but
requests that the Commission clarify that this decision "is referring to cost allocation."[2195]
Ameren argues that without this clarification, Relevant State Entities could fund part of
the transmission facility while imposing on a transmission owner the obligation to
operate and maintain that facility and assure regulatory compliance without adequate

---

[2192] NARUC Initial Comments at 31-32; *accord* Idaho Commission Initial
Comments at 5.

[2193] NARUC Initial Comments at 32.

[2194] Louisiana Commission Initial Comments at 29.

[2195] Ameren Initial Comments at 21-22 (citing NOPR, 179 FERC ¶ 61,028 at
P 252).

compensation, in violation of the D.C. Circuit's determination in *Ameren Services Co. v.*

*FERC* that transmission owners "should not be forced to operate as a non-profit."[2196]

1008.  Clean Energy Associations suggest two mechanisms to provide opportunities for

states and interconnection customers to ensure that necessary transmission facilities are

built.  First, Clean Energy Associations would provide a "Transmission Alternative

Right," through which states or interconnection customers could pay the difference

between evaluated benefits and the level of benefits necessary to meet the applicable

benefits threshold.  Second, Clean Energy Associations would provide a "Transmission

Expansion Right," which would allow states or interconnection customers to provide

funding to expand transmission facilities beyond those identified in Long-Term Regional

Transmission Planning.  With respect to this second right, Clean Energy Associations

contend that the funding parties should receive time-limited priority usage of additional

transmission expansion that they fund and retain incremental capacity attributes

associated with the expanded capability.[2197]  Clean Energy Associations also suggest that

the portion of the expanded Long-Term Regional Transmission Facility originally

---

[2196] *Id.* (citing *Ameren Servs. Co. v. FERC*, 880 F.3d 571 (D.C. Cir. 2018)).

[2197] Clean Energy Associations Initial Comments at 23-24 (citing Clean Energy Associations ANOPR Initial Comments at 76).  Clean Energy Associations assert this would be consistent with Order No. 807.  *Id.* (citing Clean Energy Associations ANOPR Initial Comments at 76-78; *Open Access & Priority Rights on Interconnection Customer's Interconnection Facilities*, Order No. 807, 150 FERC ¶ 61,211, at P 109, *order on reh'g*, Order No. 807-A, 153 FERC ¶ 61,047 (2015)).

identified in the regional transmission plan would receive the applicable regional cost allocation.[2198]

1009.  New Jersey Commission argues that allowing Relevant State Entities the opportunity to fund the cost of or part of the cost of transmission facilities would provide a way to value a transmission facility's public policy benefits and a mechanism for co-optimizing reliability and economic benefits while meeting public policy needs. However, New Jersey Commission states that, while the proposed 20-year transmission planning horizon should ensure that transmission providers identify opportunities for multi-driver transmission projects in sufficient time for states to provide funding, the Commission should mandate that transmission providers reach out to Relevant State Entities to inform them of such opportunities on a timely basis.[2199]

1010.  SPP takes no position on the voluntary funding issue but states that its Regional State Committee developed a cost allocation framework that includes the option for entities to sponsor specific transmission projects, assuming cost responsibility without imposing burdens on others through the general rate structure.  SPP states that this mechanism could be used by a state or states to fund projects that SPP otherwise would not select.[2200]

---

[2198] *See id.*

[2199] New Jersey Commission Initial Comments at 28.

[2200] SPP Initial Comments at 22 (citing SPP, Governing Documents Tariff, Bylaws, First Revised Volume No. 4 (0.0.0), § 7.2).

Docket No. RM21-17-000                                           - 720 -

1011.  While PPL supports the ability of states to fund the cost of, or a portion of the

costs of, transmission facilities that otherwise would not meet selection criteria, PPL

argues that the final rule should not require transmission providers to facilitate such an

opportunity with states.[2201]  APS contends that it is not appropriate for a Relevant State

Entity to volunteer its ratepayers to fund, and APS to build, a transmission facility.  APS

explains that Arizona is a diverse state with several non-jurisdictional entities; as such,

APS contends that the state would not have the authority to volunteer all the state's

ratepayers to fund the transmission facility, which ultimately may burden transmission

providers with additional costs and responsibilities.[2202]

### c.    <u>Commission Determination</u>

1012.  We modify the NOPR proposal and require transmission providers in each

transmission planning region to include in their OATTs a process to provide Relevant

State Entities and interconnection customers with the opportunity to voluntarily fund the

cost of, or a portion of the cost of, a Long-Term Regional Transmission Facility that

otherwise would not meet the transmission providers' selection criteria.  We provide

transmission providers with the flexibility to propose certain features of such a voluntary

funding process in their compliance filings.[2203]  However, this voluntary funding process

---

[2201] PPL Initial Comments at 19.

[2202] APS Initial Comments at 10.

[2203] *See* ISO-NE Initial Comments at 36; NARUC Initial Comments at 31-32
(requesting flexibility to design voluntary funding processes).

must be transparent and not unduly discriminatory or preferential and provide for the four

components discussed below.  Further, as with other aspects of the evaluation process

and selection criteria, transmission providers must consult with and seek support from

Relevant State Entities when developing a process to provide Relevant State Entities and

interconnection customers with the opportunity to voluntarily fund the cost of, or a

portion of the cost of, a Long-Term Regional Transmission Facility that they propose to

include in their OATTs.

1013.  In setting forth the requirement that transmission providers include in their OATTs

a process to provide Relevant State Entities and interconnection customers with the

opportunity to voluntarily fund the cost of, or a portion of the cost of, a Long-Term

Regional Transmission Facility that otherwise would not meet the transmission

providers' selection criteria, we direct transmission providers to propose OATT

provisions on compliance that describe:  (1) the process by which the transmission

providers will make voluntary funding opportunities available to Relevant State Entities

and interconnection customers, which must ensure that Relevant State Entities and

interconnection customers receive timely notice of such opportunities and provide a

meaningful opportunity for Relevant State Entities and interconnection customers; (2) the

period during which Relevant State Entities and interconnection customers may exercise

the option to provide voluntary funding; (3) the method that transmission providers will

use to determine the amount of voluntary funding required to ensure that the Long-Term

Regional Transmission Facility meets the transmission providers' selection criteria; and

(4) the mechanism through which transmission providers and Relevant State Entities or

interconnection customers will memorialize any voluntary funding agreement, e.g., a *pro forma* agreement in the OATT. We clarify that, for any portion of the costs of a selected Long-Term Regional Transmission Facility that is *not* voluntarily funded by a Relevant State Entity (or Entities) or interconnection customers, those remaining costs must be allocated according to the applicable Long-Term Regional Transmission Cost Allocation Method (or cost allocation method resulting from a State Agreement Process, if such a process is adopted by the transmission providers in the associated transmission planning region).

1014. We believe that requiring transmission providers to include a voluntary funding process in their OATTs ultimately may increase the number of Long-Term Regional Transmission Facilities that are selected. The voluntary funding processes that we are requiring transmission providers to include in their OATTs will allow Relevant State Entities and interconnection customers to voluntarily fund the cost of, or a portion of the cost of, a Long-Term Regional Transmission Facility, with any remaining costs allocated to beneficiaries in a manner that is at least roughly commensurate with the estimated benefits that they will receive. As such, a voluntary funding process will allow the development of Long-Term Regional Transmission Facilities that Relevant State Entities or interconnection customers believe are beneficial but that might not otherwise be selected.[2204] We also believe that such a voluntary funding process could help

---

[2204] *See, e.g.*, New Jersey Commission Initial Comments at 25-26 (arguing that voluntary funding would provide a way to value a transmission facility's public policy benefits and a mechanism for co-optimizing reliability and economic benefits while

Docket No. RM21-17-000                                                          - 723 -

transmission providers to avoid, manage, or resolve otherwise difficult disputes among

stakeholders in their transmission planning regions, such as those arising from situations

in which Relevant State Entities or interconnection customers value the development of

certain Long-Term Regional Transmission Facilities differently.

1015.  We acknowledge, consistent with APS's comments, that in certain states Relevant

State Entities may not have the necessary authority to require all of that state's ratepayers

to provide the funding needed to take advantage of voluntary funding opportunities.[2205]

We do note, however, nothing in this final rule is intended to limit, preempt, or otherwise

affect state or local laws or regulations with respect to the ability of any Relevant State

Entity to voluntarily fund any costs of a Long-Term Regional Transmission Facility.

Whether and to what extent a Relevant State Entity chooses to take advantage of an

opportunity to voluntarily fund the costs of a Long-Term Regional Transmission Facility

is dependent on whether that entity has the requisite authority to do so.

1016.  In response to Ameren,[2206] we decline to determine at this point what effect

*Ameren Services Co. v. FERC* may have on voluntary funding arrangements or the

allocation of the costs of a transmission facility net of that voluntary funding, which may

depend on how transmission providers propose to allow for voluntary funding

opportunities.

---

meeting public policy needs).

[2205] APS Initial Comments at 10.

[2206] Ameren Initial Comments at 21-22.

1017.  We decline Clean Energy Associations' request that we require transmission providers to allow voluntary funding opportunities to expand a Long-Term Regional Transmission Facility beyond what was identified through Long-Term Regional Transmission Planning (e.g., voluntarily funding the construction of a 500 kV transmission line where a 345 kV transmission line was identified through Long-Term Regional Transmission Planning).[2207]  While we recognize that there may be interest in providing additional opportunities for voluntary funding, we find that there is insufficient record evidence to support imposing this modification to the voluntary funding opportunity we require in this final rule.  We note, however, that nothing in this final rule prohibits this type of voluntary funding approach and transmission providers may either seek to demonstrate that a proposal including such an approach is consistent with or superior to what is required by this rule, or else submit a filing under FPA section 205 to propose the inclusion in their OATTs of voluntary funding opportunities that go beyond those required in this final rule.

1018.  Finally, in response to APPA,[2208] we decline to impose any specific requirement for transmission providers to file agreements that memorialize voluntary funding arrangements under FPA section 205.  The Commission will evaluate on compliance the mechanism that transmission providers propose for memorializing voluntary funding

---

[2207] Clean Energy Associations Initial Comments at 23-24 (citations omitted).

[2208] APPA Initial Comments at 34-35 (citing *PJM Interconnection, L.L.C.*, 179 FERC ¶ 61,024).

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 735 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

agreements between transmission providers and Relevant State Entities or

interconnection customers, as applicable.

### 6. No Selection Requirement

#### a. NOPR Proposal

1019.  The Commission did not propose in the NOPR to require that transmission

providers select transmission facilities, even in the event that a transmission facility

meets the selection criteria established by the transmission providers.[2209]

#### b. Comments

1020.  Many commenters express opposition to any potential requirement under which

the Commission would require transmission providers to select Long-Term Regional

Transmission Facilities.[2210]  For example, ISO-NE states that the final rule should be

clear that transmission providers are not required to select any identified Long-Term

Regional Transmission Facilities for inclusion in system plans or cost allocation

---

[2209] *See* NOPR, 179 FERC ¶ 61,028 at P 9 (noting that the proposed reforms related to regional transmission planning and cost allocation requirements, like those of Order Nos. 890 and 1000, are focused on the transmission planning process, and not on any substantive outcomes that may result from this process); *see also id.* P 241 (requiring transmission providers to propose selection criteria to identify and evaluate transmission facilities for *potential selection*).

[2210] *See, e.g.*, California Water Initial Comments at 14-15; Dominion Initial Comments at 18; Dominion Reply Comments at 8 (citing NARUC Initial Comments at 5-6, 39); ISO-NE Initial Comments at 35-36 (citing NOPR, 179 FERC ¶ 61,028 (Christie, Comm'r, concurring at P 10)); NESCOE Initial Comments at 46-47; NRECA Initial Comments at 48; NRECA Reply Comments at 4-8 (citations omitted); NYISO Initial Comments at 44 (citing *N.Y. Indep. Sys. Operator, Inc.*, 148 FERC ¶ 61,044, at P 125 (2014)); TANC Initial Comments at 10.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 736 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                          - 726 -

purposes, and NESCOE agrees.[2211]  Ameren contends that a mandate to select any

transmission facility may result in over-building the transmission system.[2212]  Xcel makes

a similar point, arguing that it would result in a loss of confidence in the transmission

planning process.  Furthermore, Xcel argues, transmission planning is subjective and

removing all discretion from transmission planners would result in bad outcomes.[2213]

1021.  SERTP Sponsors urge the Commission to make clear that there is no requirement

for transmission providers to select Long-Term Regional Transmission Facilities based

on long-term studies without specific express support and agreement of the relevant

regulatory authorities and policy makers.[2214]  NRECA asserts that transmission planning

using a 20-year transmission planning horizon is an exercise fraught with uncertainty,

and requests that the Commission clarify that it is not mandating that transmission

providers select Long-Term Regional Transmission Facilities 20 years in advance.[2215]

NRECA states that other commenters also expressed concerns about risks to consumers

---

[2211] ISO-NE Initial Comments at 35-36 (citing NOPR, 179 FERC ¶ 61,028 (Christie, Comm'r, concurring at P 10)); NESCOE Reply Comments at 5 (citing ISO-NE Initial Comments at 35-36).

[2212] Ameren Initial Comments at 13 (citing Large Public Power Initial Comments at 10).

[2213] Xcel Initial Comments at 13-14.

[2214] SERTP Sponsors Initial Comments at 5; *see also* Alabama Commission Initial Comments at 3 (contending that Long-Term Regional Transmission Planning should not involve selection or construction obligations unless the affected state regulators support such actions).

[2215] NRECA Initial Comments at 27, 48.

associated with selecting transmission projects in the regional transmission plan for purposes of cost allocation 20 years before they may be needed.[2216]

1022.  Dominion claims that Long-Term Regional Transmission Planning should not be a mandated development and construction plan of transmission facilities and argues that it should instead merely be a tool to help transmission providers understand where transmission needs may exist now and in the future.[2217]

1023.  PJM requests that the Commission clarify that transmission providers can identify trends across multiple Long-Term Regional Transmission Planning cycles without needing to select specific transmission facilities, arguing that it should have the flexibility to open solicitations for transmission facilities as system needs arise.[2218]

1024.  A few commenters favor selection mandates in at least some circumstances.  For example, Eversource argues that the Commission should consider requiring transmission providers to address transmission needs that are identified in multiple Long-Term Scenarios or in the "high-impact, low-frequency event" scenario.  Eversource contends

---

[2216] NRECA Reply Comments at 4-8 (citing APPA Initial Comments at 22, 24-36; California Municipal Utilities Initial Comments at 2-3, 5-7, 15; ELCON Initial Comments at 10; Large Public Power Initial Comments at 6–8, 11-13; Nebraska Commission Initial Comments at 2; New York Commission and NYSERDA Initial Comments at 8, 11-12; Pennsylvania Commission Initial Comments at 4-5; PJM Initial Comments at 59–62; TANC Initial Comments at 10).

[2217] Dominion Reply Comments at 8 (citing PIOs Initial Comments at 13, 28; NARUC Initial Comments at 5-6, 39).

[2218] PJM Reply Comments at 36-37.

that transmission providers otherwise risk failing to select transmission facilities that will greatly increase reliability, resiliency, and affordability.[2219]

1025.  PIOs state that experience with Order No. 1000 demonstrates that some transmission providers may only do the bare minimum to comply and therefore may fail to select, allocate the costs of, or construct much needed transmission.  As such, PIOs state, the Commission should require transmission providers to use good faith efforts to select recommended transmission facilities.[2220]

### c.    <u>Commission Determination</u>

1026.  The Commission did not propose in the NOPR, and we will not require in this final rule, that transmission providers select any particular Long-Term Regional Transmission Facility—even where a particular transmission facility meets the transmission providers' selection criteria in their OATTs.[2221]  This final rule improves regional transmission planning processes by ensuring that transmission providers identify Long-Term Transmission Needs, identify Long-Term Regional Transmission Facilities that resolve those needs and assess the benefits thereof, and provide the opportunity for transmission providers to select such Long-Term Regional Transmission Facilities.  In

---

[2219] Eversource Initial Comments at 26 (citing NOPR, 179 FERC ¶ 61,028 at P 124).

[2220] PIOs Initial Comments at 12-13.

[2221] *See, e.g.*, ISO-NE Initial Comments at 35-36 (citing NOPR, 179 FERC ¶ 61,028 (Christie, Comm'r, concurring at P 10)); NESCOE Reply Comments at 5 (citing ISO-NE Initial Comments at 35-36); SERTP Sponsors Initial Comments at 5.

other words, as in Order No. 1000, our focus is on ensuring that regional transmission planning processes result in just and reasonable rates, and not on requiring that these processes achieve any particular substantive outcome.

1027.  We believe that transmission providers implementing Long-Term Regional Transmission Planning and developing regional transmission plans require the flexibility to balance competing interests in the transmission planning region and to exercise engineering judgment to ensure the reliable operation of the transmission system and compliance with a variety of regulatory requirements.

1028.  We clarify that nothing in this final rule prohibits transmission providers from proposing to impose upon themselves a requirement to select a Long-Term Regional Transmission Facility in certain circumstances.  For example, transmission providers might propose selection criteria that would require them to select a Long-Term Regional Transmission Facility if it would meet a Long-Term Transmission Need that appears in multiple Long-Term Scenarios, or if it exceeded selection criteria by a pre-set margin.

### 7.      Other Issues

#### a.      Comments

1029.  Clean Energy Associations argue that any transmission projects that are approved at the end of a transmission planning cycle should be included in updated models in the next transmission planning cycle, as well as in generation interconnection studies.[2222]

---

[2222] Clean Energy Associations Initial Comments at 10.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 740 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

1030.  R Street argues that the status quo selection process undermines the NOPR's
objective of advancing efficient and cost-effective transmission expansion and that many
transmission projects, especially reliability projects, are not subject to economic scrutiny.
Therefore, R Street argues that the Commission should require that all transmission
projects pass a cost-benefit analysis under the purview of an independent transmission
planner and/or monitor across all Order No. 1000 transmission planning regions.[2223]

### b.    Commission Determination

1031.  In response to Clean Energy Associations, we clarify that we are not imposing
specific requirements regarding the treatment of selected Long-Term Regional
Transmission Facilities in subsequent Long-Term Regional Transmission Planning
cycles, beyond the overall requirements discussed in the Development of Long-Term
Scenarios section of this final rule.  As we explain above, selection is only one of a
number of steps in the transmission development process, and we believe that it is
appropriate to provide transmission providers flexibility on how to update their planning
models in a manner that most effectively addresses the specifics of their regional
transmission planning processes, consistent with the requirements of this final rule.

1032.  Finally, we note that this final rule generally does not require transmission
providers to replace or otherwise make changes to existing Order No. 1000 regional
reliability and economic transmission planning and cost allocation processes.  As such,

---

[2223] R Street Initial Comments at 10.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 741 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                           - 731 -

we decline to adopt R Street's proposal to require that all transmission projects pass a cost-benefit analysis.

### 8.    Reevaluation

#### a.    NOPR Proposal

1033.  The Commission proposed in the NOPR that, consistent with Order No. 1000, the developer of a transmission facility selected through Long-Term Regional Transmission Planning to address transmission needs driven by changes in the resource mix and demand would be eligible to use the applicable cost allocation method for the Long-Term Regional Transmission Facility.  The Commission proposed that the existing transmission developer requirements would apply, including that the developer of the selected regional transmission facility must submit a development schedule that indicates the required steps, such as the granting of state approvals necessary to develop and construct the transmission facility such that it meets the transmission needs of the transmission planning region.[2224]  The Commission proposed that, to the extent the Relevant State Entities in a transmission planning region agree to a State Agreement

---

[2224] NOPR, 179 FERC ¶ 61,028 at P 247 (citing Order No. 1000-A, 139 FERC ¶ 61,132 at P 442).  The Commission also stated in Order No. 1000-A that, as part of the ongoing monitoring of the progress of a transmission facility once it is selected, the transmission providers in a transmission planning region must establish a date by which state approvals to construct must have been achieved that is tied to when construction must begin to timely meet the need that the facility is selected to address.  If such critical steps have not been achieved by that date, then the transmission providers in a transmission planning region may "remove the transmission project from the selected category and proceed with reevaluating the regional transmission plan to seek an alternative solution."  Order 1000-A, 139 FERC ¶ 61,132 at P 442.

Process, as described in the Regional Transmission Cost Allocation section, the development schedule should also include relevant steps related to that process.[2225]

1034.  The Commission noted that, given the longer-term nature of transmission needs driven by changes in the resource mix and demand, the required development schedule for a transmission facility selected may make it unnecessary for the developer to take actions or incur expenses in the near-term if the transmission facility will not need to be in service in the near-term.  The Commission also noted that a transmission provider may make that Long-Term Regional Transmission Facility's selection status subject to the outcomes of subsequent Long-Term Regional Transmission Planning cycles, such that the previously selected transmission facility is no longer needed.  The Commission proposed that transmission providers include in their selection criteria how they will address the selection status of a previously selected transmission facility based on the outcomes of subsequent Long-Term Regional Transmission Planning cycles.[2226]

### b.    Comments

1035.  Some commenters argue that the Commission should allow or require transmission providers to make the selection of a Long-Term Regional Transmission Facility subject to the outcomes of subsequent Long-Term Regional Transmission Planning cycles.[2227]  For example, Kansas Commission contends that transmission

---

[2225] NOPR, 179 FERC ¶ 61,028 at P 247.

[2226] *Id.* P 248.

[2227] *See, e.g.*, Ameren Initial Comments at 20-21 (citing NOPR, 179 FERC

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 743 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

providers should be able to de-select any transmission facility selected through Long-Term Regional Transmission Planning if other regional transmission planning processes do not establish a need for that transmission facility.[2228]  Illinois Commission argues that periodic review and revision of the underlying modeling assumptions incorporated in Long-Term Scenarios will help to ensure that Long-Term Regional Transmission Planning allows transmission providers the opportunity to modify regional transmission plans.[2229]

1036.  APPA supports the NOPR proposal, stating that "off ramps" from Long-Term Regional Transmission Planning are necessary to protect customers from the costs of transmission facilities that are rendered unneeded or inefficient by material changes in available resources, technology, load characteristics, or laws.[2230]  APPA continues that the Commission should also require transmission providers to include in their selection criteria how they will address the selection status of previously selected transmission facilities in subsequent transmission planning cycles.  APPA further argues that, to facilitate such review, the Commission should require transmission providers to have clear mechanisms for tracking costs and benefits of Long-Term Regional Transmission

---

¶ 61,028 at P 248).

[2228] Kansas Commission Initial Comments at 14.

[2229] Illinois Commission Initial Comments at 6.

[2230] APPA Initial Comments at 22 (citing APPA ANOPR Initial Comments at 9-10; APPA ANOPR Reply Comments at 4; APPA, et al., Statement of Bryce Nielsen, Docket No. RM21-17-000, at 2 (filed Nov. 12, 2021)).

Facilities and to file periodic cost tracking reports with the Commission so that stakeholders have an opportunity to comment.[2231]

1037.  LS Power argues that transmission providers should perform "variance analyses" of all previously selected regional transmission facilities.[2232]  LS Power contends that all variations in costs, from the initial regional planning estimate through project completion, should be maintained in a single publicly available database.[2233]

1038.  Certain TDUs argue that the Commission should require each transmission provider, at the time it selects a transmission facility that is expected to be in service more than three years later, (1) to identify the key assumptions that drove its inclusion in the regional transmission plan and (2) to review triennially whether those key assumptions remain valid or have materially changed.  To promote customer affordability by avoiding over-building or under-building transmission facilities, Certain TDUs contend that if these key assumptions have materially changed, the Commission should require transmission providers to evaluate whether any revisions are necessary with respect to such transmission facilities.[2234]

1039.  Large Public Power argues that, following selection of transmission facilities in Long-Term Regional Transmission Planning, the Commission should require

---

[2231] *Id.* at 35-36.

[2232] LS Power Supplemental Comments at 13-15.

[2233] *Id.* at 13.

[2234] Certain TDUs Initial Comments at 20.

transmission providers to create a cost and risk management framework.  Specifically,

Large Public Power argues that the Commission should require transmission providers to

develop and implement protocols requiring the developer of a transmission facility to file

periodic reports with the Commission tracking anticipated project costs against cost

projections and updating benefits information.  In the period before construction begins,

if such reports indicate that anticipated costs have exceeded an identified threshold, or

that benefit-cost ratios have declined by an identified percentage, Large Public Power

states that stakeholders could consider remedial action and the transmission developer

could present stakeholders with mitigation plans.  Further, if stakeholders do not reach

consensus on the developer's mitigation plan, Large Public Power argues that

stakeholders could petition the Commission to disallow regional cost allocation for the

transmission facility.  Finally, under Large Public Power's proposal, if the Commission

disallowed regional cost allocation, the transmission developer would be eligible for

abandoned plant cost recovery in the absence of imprudence.[2235]

1040.  Large Public Power argues that its proposal would provide more protection to

consumers than did Order No. 1000.  Large Public Power further contends that its

proposal is similar to, but more expansive than, MISO's existing variance analysis

process, and that it would work together with the Commission's proposal to allow

transmission providers to make the selection of a Long-Term Regional Transmission

Facility subject to the outcome of subsequent Long-Term Regional Transmission

---

[2235] Large Public Power Initial Comments at 11-12.

Docket No. RM21-17-000                                                          - 736 -

Planning cycles.[2236]  APPA agrees with Large Public Power's proposal and argues that all

interested stakeholders should have the opportunity to participate in any process to

reassess previously approved transmission projects.[2237]

1041.  New York Commission and NYSERDA state that, while transmission providers

can identify transmission needs using a 20-year transmission planning horizon,

transmission facilities should be selected closer in time to when the need is anticipated to

materialize.  New York Commission and NYSERDA state the final rule should direct

transmission providers to develop "off ramps" in Long-Term Regional Transmission

Planning so that previously identified Long-Term Regional Transmission Facilities can

be reevaluated as the facility's needed-by date approaches.  New York Commission and

NYSERDA state that conducting ongoing review can help reduce the risk of stranded

costs.[2238]

1042.  NRECA contends that selecting transmission projects 20 years in advance is not

necessary or even workable.  NRECA contends that under the Commission's proposal,

transmission providers would select Long-Term Regional Transmission Facilities

conditionally and wait until a subsequent Long-Term Regional Transmission Planning

---

[2236] *Id.* (citing NOPR, 179 FERC ¶ 61,028 at P 248; Order No. 1000, 136 FERC ¶ 61,051 at PP 7, 263, 329; MISO, FERC Electric Tariff, MISO OATT, attach. FF (Transmission Expansion Planning Protocol) (90.0.0)).

[2237] APPA Reply Comments at 11-12 (citing Large Public Power Initial Comments at 11-12).

[2238] New York Commission and NYSERDA Initial Comments at 12.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 747 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                    - 737 -

cycle to confirm that selection decision, at which point the transmission developer would

become eligible to use the applicable regional cost allocation method.  NRECA argues

that the Commission should allow a transmission provider during such a subsequent cycle

to find that a previously selected transmission facility is no longer needed, either because

the transmission need no longer exists or because the facility is no longer the most

efficient or cost-effective solution to meet the need.[2239]

1043.  ISO-NE takes no position on the Commission's proposal but argues that the

Commission should allow transmission providers the flexibility to determine the

treatment of previously selected transmission projects based on outcomes of subsequent

Long-Term Regional Transmission Planning cycles.[2240]

1044.  A number of commenters oppose or express concerns with the Commission's

proposal to allow transmission providers to make the selection of a Long-Term Regional

Transmission Facility subject to the outcome of subsequent Long-Term Regional

Transmission Planning cycles.  For example, AEP argues that, once selected through

Long-Term Regional Transmission Planning, transmission providers should include

transmission facilities in future scenario analysis except where a new study raises serious

doubt that the transmission facilities continue to provide net benefits.  AEP contends that

re-studying such transmission facilities will lead to an endless cycle of study and

---

[2239] NRECA Initial Comments at 25-26 (citing NOPR, 179 FERC ¶ 61,028 at
P 248).

[2240] ISO-NE Initial Comments at 36.

ultimately underinvestment in necessary transmission infrastructure, as well as increased

costs for customers.[2241]  Similarly, Indicated PJM TOs argue that, once selected,

transmission facilities should remain in the regional transmission plan unless there is

serious doubt a transmission facility would provide net benefits.[2242]

1045.  Avangrid argues that there must be a high bar in subsequent Long-Term Regional

Transmission Planning cycles for removing a previously selected transmission facility

from the regional transmission plan because transmission developers must have

confidence that selection in Long-Term Regional Transmission Planning represents a

"definitive directive[] to invest capital."[2243]  Avangrid states that transmission facilities

should not be de-selected unless there are changed circumstances that would make

continued development of the project materially detrimental.  Avangrid argues that

otherwise, Long-Term Regional Transmission Planning effectively will be an

informational exercise on which investors cannot rely.[2244]

1046.  Eversource recommends that the Commission clarify that once transmission

facilities are selected in a Long-Term Regional Transmission Planning cycle, they will

not be subject to reevaluation, because such reevaluation would undermine the

transmission planning process and deter transmission investment that the Commission is

---

[2241] AEP Initial Comments at 13-14.

[2242] Indicated PJM TOs Initial Comments at 11.

[2243] Avangrid Initial Comments at 11.

[2244] *Id.*

seeking to encourage.[2245]  Similarly, Exelon argues that the Commission should clarify that the selection of transmission facilities identified in Long-Term Regional Transmission Planning should be a conclusive action that is reasonably final and on which transmission developers can rely.  Exelon explains that Long-Term Regional Transmission Facilities are likely to be high-voltage backbone facilities that meaningfully impact power flows on the transmission system and argues that restudy or reconsideration should be the exception and not the rule, allowing for their inclusion in system planning models used for other purposes (e.g., regional transmission planning addressing reliability and economic transmission needs and generator interconnection studies).[2246]

1047.  WIRES contends that the Commission should clarify that transmission providers need not reevaluate previously selected Long-Term Regional Transmission Facilities after updating Long-Term Scenarios.  WIRES claims that doing so would disrupt transmission facility development and raise costs.[2247]  Similarly, PPL argues that the Commission should exempt transmission facilities that are under construction or for which equipment has been purchased from any reevaluation in subsequent Long-Term Regional Transmission Planning cycles.[2248]  Invenergy argues that while Long-Term Scenarios should be regularly reassessed and updated, these updates should apply only to

---

[2245] Eversource Initial Comments at 15-16.

[2246] Exelon Initial Comments at 17-18.

[2247] WIRES Initial Comments at 7.

[2248] PPL Initial Comments at 6.

USCA4 Appeal: 24-1650   Doc: 224   Filed: 01/21/2025   Pg: 750 of 2455
Document Accession #: 20240513-3036   Filed Date: 05/13/2024

future Long-Term Regional Transmission Planning cycles and should not result in re-assessment of previously selected transmission facilities.[2249]

### c.    Commission Determination

1048.  We adopt the NOPR proposal, with modification, to require transmission providers in each transmission planning region to include in their OATTs provisions that require them—in certain circumstances—to reevaluate Long-Term Regional Transmission Facilities that previously were selected.  These OATT provisions must meet the requirements set forth below, as well as the minimum requirements for transmission providers' broader evaluation process and selection criteria described above in the Minimum Requirements section.

1049.  Specifically, we direct transmission providers to revise their OATTs to require reevaluation of any selected Long-Term Regional Transmission Facilities in the following three situations, subject to limitations that we set forth below:  (1) delays in the development of a previously selected Long-Term Regional Transmission Facility would jeopardize a transmission provider's ability to meet its reliability needs or reliability-related service obligations;[2250] (2) the actual or projected costs of a previously selected Long-Term Regional Transmission Facility significantly exceed cost estimates used in

---

[2249] Invenergy Initial Comments at 4-5 (citing NOPR, 179 FERC ¶ 61,028 at app. B).

[2250] We note that this is the same as the requirement adopted in Order No. 1000. *See* Order No. 1000, 136 FERC ¶ 61,051 at P 329; Order No. 1000-A, 139 FERC ¶ 61,132 at P 442; NOPR, 179 FERC ¶ 61,028 at P 247 & n.395.

the selection of a Long-Term Regional Transmission Facility; or (3) significant changes in federal, federally-recognized Tribal, state, or local laws or regulations cause reasonable concern that a previously selected Long-Term Regional Transmission Facility may no longer meet the transmission providers' selection criteria.[2251]

1050. In addition, we require transmission providers to include specific criteria in their OATTs that they will use to determine when one of these three situations occurs, thereby triggering the reevaluation of a previously selected Long-Term Regional Transmission Facility. For example, with respect to exceeding cost estimates (the second situation listed above), transmission providers may propose a specific threshold of cost escalation (e.g., a percent of total facility cost) above which the transmission providers would reevaluate a previously selected Long-Term Regional Transmission Facility. As another example, with respect to delays (the first situation listed above), transmission providers may propose specific development milestones that, if missed, may jeopardize the transmission developer's schedule and ultimately a transmission provider's ability to meet its reliability needs or reliability-related service obligations. We provide transmission providers with flexibility to propose these criteria on compliance, subject to the requirement that, as with the transmission providers' selection criteria, the reevaluation criteria must seek to maximize benefits accounting for costs over time without over-building transmission facilities. As such, in establishing such criteria, we expect transmission providers will balance the need to provide transmission developers

---

[2251] NOPR, 179 FERC ¶ 61,028 at P 248.

with adequate investment certainty, absent which more efficient or cost-effective Long-

Term Regional Transmission Facilities will not be developed, against the risk that, due to

significant changes in circumstances, failing to reevaluate a selected Long-Term

Regional Transmission Facility may result in the over-building of transmission.  In

addition, transmission providers must designate a point after which all selected Long-

Term Regional Transmission Facilities will no longer be subject to reevaluation, such

that the transmission developer of the selected Long-Term Regional Transmission

Facility has adequate certainty to make investment decisions, e.g., when the facility's

transmission developer has secured all relevant permits and authorizations for the Long-

Term Regional Transmission Facility.

1051.  Further, as discussed further below, transmission providers may not reevaluate any

selected Long-Term Regional Transmission Facility on the basis of significant changes in

federal, federally recognized-Tribal, state, or local laws or regulations unless, during the

Long-Term Regional Transmission Planning cycle in which transmission providers

selected the Long-Term Regional Transmission Facility, the Long-Term Regional

Transmission Facility's targeted in-service date was in the latter half of the 20-year

transmission planning horizon for Long-Term Regional Transmission Planning.

1052.  We also require transmission providers to include in the reevaluation provisions in

their OATTs the process and procedures that they will use to reevaluate a previously

selected Long-Term Regional Transmission Facility, including the potential outcomes of

reevaluation (e.g., taking no action, imposing a mitigation plan, reassigning the Long-

Term Regional Transmission Facility to a different transmission developer, modifying

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 753 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

the Long-Term Regional Transmission Facility, removing the Long-Term Regional Transmission Facility from the regional transmission plan).[2252]  In particular, transmission providers must describe the conditions under which they would remove a previously selected Long-Term Regional Transmission Facility from the regional transmission plan.[2253]  We provide flexibility to transmission providers to propose such processes and procedures, subject to the following requirements.  First, reevaluation on the basis of cost increases or significant changes in federal, federally-recognized Tribal, state, or local laws or regulations must be part of a subsequent Long-Term Regional Transmission Planning cycle following selection and must take into account not only the updated costs but also the updated benefits of the Long-Term Regional Transmission Facility.[2254]  Second, in order to allow for reevaluation to occur, these processes and

---

[2252] *See, e.g.*, MISO, FERC Electric Tariff, MISO OATT, attach. FF (Transmission Expansion Planning Protocol) (90.0.0), § IX.E (setting forth potential outcomes of MISO's variance analysis procedures).  Mitigation plans would provide to transmission developers the opportunity to address the cause of the reevaluation.  For example, where reevaluation occurs because there are delays in the development of a previously selected Long-Term Regional Transmission Facility, transmission providers might require the transmission developer to develop an operating procedure to ensure that the transmission providers are able to address the reliability need or meet the reliability-related service obligation in the period before the Long-Term Regional Transmission Facility will be placed in service.

[2253] We note that, in the event that the Long-Term Regional Transmission Facility was subject to competitive processes when it was selected, we do not require transmission providers to re-conduct these competitive processes in the event that the reevaluation process results in a change to the scope of the Long-Term Regional Transmission Facility.  Instead, transmission providers have the flexibility to propose on compliance and explain whether, and if so when, they will re-run the competitive transmission development process as part of the reevaluation process.

[2254] Further, to perform the reevaluation analysis, we expect that transmission

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 754 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                        - 744 -

procedures must include mechanisms for tracking costs so that transmission providers have an accurate way to determine if the actual or projected costs of the previously selected Long-Term Regional Transmission Facility exceed cost estimates by the relevant threshold, therefore requiring transmission providers to reevaluate that Long-Term Regional Transmission Facility. Third, the reevaluation processes and procedures must seek to maximize benefits accounting for costs over time without over-building transmission facilities. Again, we expect transmission providers in establishing these processes and procedures, including potential mitigation measures, to consider outcomes that enable more efficient or cost-effective Long-Term Regional Transmission Facilities to be developed, while addressing the risk of over-building.

1053. We note that in setting forth these requirements, we have carefully reviewed the record developed here and weighed commenters' countervailing arguments. We believe that the reevaluation requirements set forth above strike a careful balance between two broad objectives of Long-Term Regional Transmission Planning. On the one hand, we believe that transmission providers must have the opportunity to select more efficient or cost-effective Long-Term Regional Transmission Facilities, which requires sufficiently long-term, forward-looking, and comprehensive regional transmission planning practices. Moreover, for selection to meaningfully result in the development of such more efficient

---

providers will use the updated Long-Term Scenarios and associated transmission system models that are developed for the Long-Term Regional Transmission Planning cycle in which the transmission provider reevaluates the selected Long-Term Regional Transmission Facility.

or cost-effective Long-Term Regional Transmission Facilities, it must provide adequate certainty to transmission developers to support capital investment.

1054.  On the other hand, we also acknowledge the inherent uncertainty involved in predicting future transmission needs, and the continued selection of Long-Term Regional Transmission Facilities that no longer meet the transmission providers' selection criteria closer to the time that those facilities are expected to go into service could be costly for consumers.  Where transmission providers have selected Long-Term Regional Transmission Facilities further out in the transmission planning horizon, and where transmission providers timely obtain updated information about significant changes to the costs or benefits of such facilities, we believe that transmission providers must, consistent with the requirements in this final rule, reevaluate a selected Long-Term Regional Transmission Facility in order to ensure that the facility continues to meet the transmission providers' selection criteria.

1055.  In the NOPR, the Commission attempted to balance these objectives by proposing that, because the required development schedule of a previously selected Long-Term Regional Transmission Facility may not require its transmission developer to take actions or incur expenses in the near-term, transmission providers might be able to make the selection status of a previously selected Long-Term Regional Transmission Facility subject to the outcome of subsequent Long-Term Regional Transmission Planning cycles.[2255]  On further reflection, however, and after reviewing comments submitted in

---

[2255]  NOPR, 179 FERC ¶ 61,028 at P 248.

response to the NOPR,[2256] we find that conditioning the selection of a Long-Term

Regional Transmission Facility in this manner and on a routine basis may introduce too

much uncertainty into transmission providers' evaluation and selection of Long-Term

Regional Transmission Facilities.[2257]  We agree with AEP that routine reevaluation would

require repeated studies and ultimately could lead to underinvestment in Long-Term

Regional Transmission Facilities that more efficiently or cost-effectively address Long-

Term Transmission Needs.[2258]  Therefore, we do not adopt the NOPR proposal to allow

transmission providers to make the selection status of a previously selected Long-Term

Regional Transmission Facility subject to the outcome of subsequent Long-Term

Regional Transmission Planning cycles.

1056.  Nevertheless, we continue to believe that transmission providers may be reticent to

select—and Relevant State Entities and other stakeholders may not support the selection

of—certain Long-Term Regional Transmission Facilities in the absence of a requirement

for transmission providers to reevaluate the selection of such facilities should significant

new information become available that could give rise to concerns that those facilities no

---

[2256] *See, e.g.*, Exelon Initial Comments at 17-18 (arguing that selection should be "reasonably final" and that routine reevaluation would harm the certainty required for developing Long-Term Regional Transmission Facilities, inhibit efficient interconnection queue processing, and undermine system reliability as a whole).

[2257] For this reason, we are unpersuaded by NRECA's argument that transmission providers should conditionally select Long-Term Regional Transmission Facilities subject to confirmation in a subsequent Long-Term Regional Transmission Planning cycle.  NRECA Initial Comments at 25-26 (citing NOPR, 179 FERC ¶ 61,028 at P 248).

[2258] *See* AEP Initial Comments at 13-14.

USCA4 Appeal: 24-1650   Doc: 224      Filed: 01/21/2025   Pg: 757 of 2455
Document Accession #: 20240513-3036      Filed Date: 05/13/2024

Docket No. RM21-17-000                                                    - 747 -

longer meet the transmission providers' selection criteria.[2259]  Further, as is required for

regional transmission planning processes under Order No. 1000, transmission providers

also must have the ability to take action when delays in developing a Long-Term

Regional Transmission Facility risk jeopardizing a transmission provider's ability to meet

its reliability needs or reliability-related service obligations.[2260]

1057.  As discussed above, selection of a Long-Term Regional Transmission Facility is

only one step in the process of developing, constructing, and placing that facility in

service for the benefit of customers.  Given the risks involved in transmission

development, it is necessary to provide sufficient certainty to transmission developers and

their financing partners that reevaluation will not lead to endless studies and protracted

dispute.  Therefore, we require transmission providers to set forth in their OATTs a

reevaluation process, as outlined above, that ensures that any reevaluation of Long-Term

Regional Transmission Facilities that have been selected will occur only in the

circumstances that we have described.

1058.  We agree with APPA that reevaluation—and in particular any determination of

whether a Long-Term Transmission Need continues to exist or whether a Long-Term

Regional Transmission Facility continues to meet the transmission providers' selection

---

[2259] *See, e.g.*, APPA Initial Comments at 22 (arguing that there should be "off ramps" protecting transmission customers from Long-Term Regional Transmission Facilities that, following selection, are rendered unnecessary or inefficient by intervening changes (citations omitted)).

[2260] Order No. 1000, 136 FERC ¶ 61,051 at P 329; Order No. 1000-A, 139 FERC ¶ 61,132 at P 442.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 758 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                              - 748 -

criteria—will require transmission providers to be able to track the costs of developing Long-Term Regional Transmission Facilities.[2261]  We note above that transmission providers must propose on compliance the mechanism that they will use to track the costs of selected Long-Term Regional Transmission Facilities.

1059.  As discussed above, however, we note that, when conducting a reevaluation of a selected Long-Term Regional Transmission Facility, transmission providers must update not only actual and projected costs but also their calculation of the benefits of the selected Long-Term Regional Transmission Facility.  Such a requirement will ensure that transmission providers are comparing the relevant costs and benefits, i.e., the updated costs and benefits of the selected Long-Term Regional Transmission Facility, to determine whether the Long-Term Regional Transmission Facility continues to be a more efficient or cost-effective regional transmission solution to Long-Term Transmission Needs.  Because updating the calculation of the benefits of a Long-Term Regional Transmission Facility is not as straightforward as tracking costs, we require reevaluation on the basis of cost escalations or of changes in federal, federally-recognized Tribal, state, or local laws and regulations to occur as part of a subsequent Long-Term Regional Transmission Planning cycle.  We find that this requirement is appropriate given the substantial time and resources that we expect will be necessary to update the underlying assumptions used in the transmission planning models, which must take place in order to update the calculation of the benefits of selected Long-Term Regional Transmission

---

[2261] APPA Initial Comments at 36.

Facilities for purposes of such reevaluations.  Requiring transmission providers to update

these assumptions and their transmission planning models, including all Long-Term

Scenarios and any associated sensitivities, beyond a subsequent Long-Term Regional

Transmission Planning cycle would introduce unnecessary disruptions and potentially

impede the efficient conduct of the next Long-Term Regional Transmission Planning

cycle.

1060.  In response to Kansas Commission, we decline to allow transmission providers to

remove a Long-Term Regional Transmission Facility from a regional transmission plan

for purposes of cost allocation solely because other regional transmission planning

processes do not establish a need for that transmission facility.[2262]  Long-Term Regional

Transmission Planning and existing Order No. 1000 regional transmission planning

processes identify transmission needs differently, and we do not agree based on the

requirements that we establish in this final rule for Long-Term Regional Transmission

Planning that reevaluation based solely on transmission needs identified through existing

Order No. 1000 regional transmission planning processes is appropriate.  We also decline

Certain TDUs' request that the Commission require transmission providers to identify

certain key assumptions driving the selection of Long-Term Regional Transmission

Facilities and to review these assumptions in subsequent Long-Term Regional

Transmission Planning cycles.  Long-Term Regional Transmission Planning will

necessitate that transmission providers compile a wide range of information from

---

[2262] *See* Kansas Commission Initial Comments at 14.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 760 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                          - 750 -

multiple data sources, analyze the effect of that information, develop Long-Term
Scenarios that provide a view into what Long-Term Transmission Needs may be, and
evaluate Long-Term Regional Transmission Facilities in light of these multiple different
scenarios.  In this light, we believe that Certain TDUs' suggested approach would not
capture the complex interactions of the various factors giving rise to Long-Term
Transmission Needs.

1061.  Finally, we note that a coalition of diverse interests, including transmission
developer, utility, and consumer interests, jointly expressed support for a framework that
would provide for reconsideration of a Long-Term Regional Transmission Facility where
cost and benefit projections deviate substantially from those at the time of selection.[2263]
We appreciate such efforts to bridge divergent interests to find common ground in a
compromise proposal, and believe that the reevaluation requirements adopted here, like
that widely supported compromise, strike a balance between competing interests.

### F.      Implementation of Long-Term Regional Transmission Planning

#### 1.      NOPR Proposal

1062.  In the NOPR, the Commission proposed to require transmission providers to
explain on compliance how the initial timing sequence for Long-Term Regional
Transmission Planning interacts with existing regional transmission planning efforts.

---

[2263] *See Advocates Advance Transmission Planning Cost Management Proposal At
FERC*, Large Public Power Council (Mar. 6, 2024), https://www.lppc.org/news/lppc-and-advocacy-groups-advance-transmission-planning-cost-management-proposal-at-ferc
(describing endorsements by LPPC, ACEG, CEBA, and NASUCA).

The Commission stated that it recognized the possibility that there may be overlap in the time horizon for the proposed Long-Term Regional Transmission Planning and existing near-term regional transmission planning processes and that they will likely inform each other.[2264]  The Commission also stated that it is possible that, in some cases, transmission facilities selected to address transmission needs driven by changes in the resource mix and demand may provide near-term reliability or economic benefits, and thus potentially displace regional transmission facilities that are under consideration as part of existing regional transmission planning processes.

1063.  In the NOPR, the Commission also sought comment on whether the Commission should host a periodic forum for transmission providers, transmission experts, relevant federal and state agencies, and other stakeholders to share best practices in implementing Long-Term Regional Transmission Planning.[2265]

### 2.    <u>Comments</u>

#### a.    <u>Comments on the Initial Timing Sequence</u>

1064.  Several commenters support requiring transmission providers to explain on compliance how Long-Term Regional Transmission Planning will interact with existing Order No. 1000 regional transmission planning processes.[2266]  Several commenters urge

---

[2264] NOPR, 179 FERC ¶ 61,028 at P 253.

[2265] *Id.* P 255.

[2266] Ameren Initial Comments at 22-23; APPA Initial Comments at 5, 24-25; Idaho Commission Initial Comments at 5; National Grid Initial Comments at 19; NYISO Initial Comments at 13.

the Commission to allow regional flexibility with respect to coordination between existing Order No. 1000 regional transmission planning processes and Long-Term Regional Transmission Planning.[2267] NESCOE argues that it could be counterproductive and unnecessary for the Commission to dictate the initial timing of new processes to coordinate them with existing Order No. 1000 regional transmission planning processes.[2268] PPL stresses the need for clarity on how the existing Order No. 1000 regional transmission planning processes interacts with Long-Term Regional Transmission Planning and states that each transmission planning region will need to address how planned reliability and economic projects should or should not be reflected in, evaluated against, and affected by long-term studies.[2269]

1065. R Street states that the NOPR correctly identifies challenges in harmonizing existing Order No. 1000 and Long-Term Regional Transmission Planning. R Street argues that the two processes should use different time frames and assumptions, with timing optimized to account for uncertainty. R Street maintains that existing Order No. 1000 transmission planning should be conducted annually over a transmission planning horizon of up to five years and should account for only those generators that are existing,

---

[2267] Ameren Initial Comments at 22-23; Duke Initial Comments at 29; NARUC Initial Comments at 33; National Grid Initial Comments at 19; NESCOE Initial Comments at 51-52; NYISO Initial Comments at 13; Pacific Northwest State Agencies Initial Comments at 20.

[2268] NESCOE Initial Comments at 51-52.

[2269] PPL Initial Comments at 4.

under construction, or have interconnection agreements.  R Street states that Long-Term

Regional Transmission Planning should be conducted every two or three years over a 20-

year transmission planning horizon and should account for representative generation

development expectations and longer-term load growth.  R Street posits that the long-

term process should then feed into the near-term process, and transmission projects

failing a cost-benefit test in one transmission planning cycle can roll over to the next in-

kind cycle.[2270]

1066.  PIOs contend that the different timing for Order No. 1000 transmission planning

process cycles across transmission planning regions can create inconsistent assumptions,

uncoordinated project identification between the two processes, confusion, and

administrative burden.[2271]  To address this concern, PIOs assert that the Commission

should:  (1) mandate Order No. 1000 regional transmission planning process cycles be no

longer than Long-Term Regional Transmission Planning cycles and if shorter, divide

Long-Term Regional Transmission Planning cycles evenly;[2272] (2) synchronize

assumptions so that assumptions are identical for years where both a Long-Term

Regional Transmission Planning cycle and an existing Order No. 1000 regional

transmission planning cycle start; (3) clarify the time period for existing Order No. 1000

---

[2270] R Street Initial Comments at 10-11.

[2271] PIOs Initial Comments at 47.

[2272] As an example, if a transmission provider uses a 36-month Long-Term Regional Transmission Planning cycle, its Order No. 1000 transmission planning cycles should be 36, 18, or 12 months.  *Id.*

regional transmission planning for economic and reliability needs; and (4) require

transmission providers to clarify when results of one transmission planning process are

incorporated into another, and require reasonable efforts to avoid one process disrupting

the other.[2273]

### b.    **Comments on Periodic Forums**

1067.  Several commenters support the Commission's proposal to host a periodic forum

for transmission providers, transmission experts, relevant federal and state agencies, and

other stakeholders to share best practices in implementing Long-Term Regional

Transmission Planning.[2274]  For example, AEP states that periodic forums would allow

stakeholders to discuss best available data, modeling inputs, and techniques for

calculating benefits.[2275]  GridLab states that a periodic forum, along with follow-on

technical conferences and a periodic forum, could promote greater convergence in

planning methods among transmission providers.[2276]

---

[2273] *Id.* at 48-49.

[2274] ACORE Initial Comments at 15; AEP Initial Comments 6, 31; Arizona Commission Initial Comments at 9; GridLab Initial Comments at 3, 5, 19-20; Idaho Commission Initial Comments at 5; NARUC Initial Comments at 34; NESCOE Initial Comments at 52; Nevada Commission Initial Comments at 12; Northwest and Intermountain Initial Comments at 9, 17; NYISO Initial Comments at 14; Pacific Northwest State Agencies Initial Comments at 20; PJM Initial Comments at 7, 77; R Street Initial Comments at 11; SDG&E Initial Comments at 4; SPP Initial Comments at 24; US DOE Initial Comments at 35-36.

[2275] AEP Initial Comments at 31.

[2276] GridLab Initial Comments at 5.

1068. Pacific Northwest State Agencies suggest that the Commission could hold technical conferences or regional sessions similar to the Federal State Task Force on Electric Transmission.[2277]  In contrast, PJM states that the periodic forum should be less formal than the technical conference format and that the Commission should consider using existing interconnection-wide organizations to host some of these forums.[2278]  SPP also notes that there are existing forums that could be leveraged, such as the Eastern Interconnection Planning Collaborative.[2279]

1069. Some commenters recommend that the forums be held on an annual or a triennial schedule.[2280]  MISO notes that, while the current pace of change might warrant multiple technical discussions to understand emerging trends, over the long term such technical forums may only be necessary when new industry trends are identified.[2281]  Nevada Commission and Northwest and Intermountain suggest that the forum could be structured into two parts, separated by policy and technical discussion, by RTOs/ISOs and OATT transmission planning regions, or by Eastern and Western Interconnection.[2282]

---

[2277] Pacific Northwest State Agencies Initial Comments at 20.

[2278] PJM Initial Comments at 77.

[2279] SPP Initial Comments at 24.

[2280] AEP Initial Comments at 31; Arizona Commission Initial Comments at 9; Nevada Commission Initial Comments at 12.

[2281] MISO Initial Comments at 57.

[2282] Nevada Commission Initial Comments at 12; Northwest and Intermountain Initial Comments at 9, 17.

1070.  Dominion and Idaho Power oppose the Commission hosting additional periodic

forums.[2283]  Dominion recommends that the Commission use the existing Joint Federal-

State Task Force on Electric Transmission instead.[2284]  Idaho Power asserts that the most

useful approach would be to allow transmission planning regions the time necessary to

formulate processes that meet the Commission's requirements, and additional time for

implementation and integration of those processes into current transmission planning

processes.[2285]

### 3.    Commission Determination

#### a.    Initial Timing Sequence Implementation

1071.  We adopt the NOPR proposal to require transmission providers to explain on

compliance how the initial timing sequence for Long-Term Regional Transmission

Planning interacts with existing regional transmission planning processes.  Transmission

providers must provide in their explanations any information necessary to ensure that

stakeholders understand this interaction, including at least the following two components.

First, we find that transmission providers must address the possible interaction between

the transmission planning cycle for Long-Term Regional Transmission Planning and

existing Order No. 1000 regional transmission planning processes.  As the Commission

stated in the NOPR, we recognize the possibility that there may be overlap in the time

---

[2283] Dominion Initial Comments at 15-16; Idaho Power Initial Comments at 8-9.

[2284] Dominion Initial Comments at 15-16.

[2285] Idaho Power Initial Comments at 8-9.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 767 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

horizon for Long-Term Regional Transmission Planning and existing Order No. 1000

regional transmission planning processes and that these processes will likely inform each

other.  Second, we find that transmission providers must address the possible

displacement of regional transmission facilities from the existing regional transmission

planning processes.  As the Commission noted in the NOPR, it is possible that, in some

cases, Long-Term Regional Transmission Facilities selected to address Long-Term

Transmission Needs may provide near-term reliability or economic benefits, and thus

could displace regional transmission facilities that are under consideration as part of

existing regional transmission planning processes.[2286]

1072.  We find that transmission providers should have the flexibility to integrate the

existing regional transmission planning processes with Long-Term Regional

Transmission Planning in a manner that mitigates the potential for disruption of the

existing regional transmission planning processes, and we note the agreement of some

commenters on this point.[2287]  However, we are also concerned that too much flexibility

for transmission providers with respect to the date by which they must begin the first

Long-Term Regional Transmission Planning cycle could lead to unnecessary delay in

---

[2286] NOPR, 179 FERC ¶ 61,028 at P 253.

[2287] Ameren Initial Comments at 22-23; Anbaric Initial Comments at 4-5, 22-27; CAISO Initial Comments at 2-3, 9, 17-20; Duke Initial Comments at 29; Indicated PJM TOs Initial Comments at 12; Large Public Power Initial Comments at 14-16; NARUC Initial Comments at 33; National Grid Initial Comments at 19; NESCOE Initial Comments at 51-52; NYISO Initial Comments at 13; PPL Initial Comments at 4; Pacific Northwest State Agencies Initial Comments at 20; Transmission Dependent Utilities Initial Comments at 4-5.

realizing these beneficial reforms for customers.  Thus, we require transmission providers

in each transmission planning region to propose on compliance a date, no later than one

year from the date on which initial filings to comply with this final rule are due, on which

they will commence the first Long-Term Regional Transmission Planning cycle.

However, we understand that it will likely be useful to align in some manner the Long-

Term Regional Transmission Planning cycle with existing transmission planning cycles.

In some cases, such alignment may not be possible to do within this one-year deadline.

Therefore, transmission providers in a transmission planning region may propose to start

the first Long-Term Regional Transmission Planning cycle on a date later than one year

from the initial compliance filing due date, only to the extent needed to align

transmission planning cycles.  While we encourage transmission providers to align

transmission planning cycles if useful, to ensure that there is no inappropriate delay to

starting Long-Term Regional Transmission Planning, transmission providers in a

transmission planning region that propose a commencement date of later than one year

from the compliance due date must include adequate support explaining how the

proposed date to begin the first Long-Term Regional Transmission Planning cycle is

necessary and appropriately tailored for their transmission planning region.

1073.  In addition, we recognize commenters' concerns regarding the coordination of

Long-Term Regional Transmission Planning and the existing Order No. 1000 regional

transmission planning processes, and we encourage transmission providers to address in

their explanation how their proposed Long-Term Regional Transmission Planning would

facilitate moving beyond piecemeal transmission expansion to address relatively near-term transmission needs and toward a more robust, well-planned transmission system.[2288]

1074.  With respect to the argument by NESCOE that it would be counterproductive and unnecessary for the Commission to dictate the initial timing of new processes,[2289] we disagree.  We find that it is necessary to establish a requirement for transmission providers to propose on compliance a date, no later than one year from the date on which initial filings to comply with this final rule are due (subject to the limited exception described above), on which they will commence the first Long-Term Regional Transmission Planning Cycle, in order to guarantee that implementation will not be subject to unreasonable or unnecessary delay.  With regard to the proposals made by PIOs and R Street,[2290] we decline to adopt these proposals because we lack the record to assess the impacts that these more prescriptive proposed requirements would have on existing transmission planning processes, and whether these proposals would work effectively across the differing transmission planning processes in each transmission planning region.

## b.    Periodic Forums

1075.  We believe that it will be beneficial for the Commission to host a periodic forum for transmission providers, transmission experts, relevant federal and state agencies, and

---

[2288] *See supra* Need for Reform section.

[2289] NESCOE Initial Comments at 51-52.

[2290] PIOs Initial Comments at 44-48; R Street Initial Comments at 10-11.

other stakeholders to share best practices in implementing Long-Term Regional

Transmission Planning, and note commenters' agreement on this point.**2291**  Accordingly,

the Commission will organize forums to share best practices in implementing Long-Term

Regional Transmission Planning and provide notice and relevant details in advance of the

forums.

## IV.    **Coordination of Regional Transmission Planning and Generator Interconnection Processes**

### A.    **Need for Reform and Overall Reform**

#### 1.    **NOPR Proposal**

1076.  In the NOPR, the Commission proposed to require that transmission providers

consider, as part of their Long-Term Regional Transmission Planning, regional

transmission facilities that address certain interconnection-related transmission needs that

the transmission provider has identified multiple times in the generator interconnection

process but that have never been constructed due to the withdrawal of the underlying

interconnection request(s).**2292**

---

**2291** ACORE Initial Comments at 15; AEP Initial Comments 6, 31; Arizona
Commission Initial Comments at 9; GridLab Initial Comments at 3, 5, 19-20; Idaho
Commission Initial Comments at 5; NARUC Initial Comments at 34; NESCOE Initial
Comments at 52; Nevada Commission Initial Comments at 12; Northwest and
Intermountain Initial Comments at 9, 17; NYISO Initial Comments at 14; Pacific
Northwest State Agencies Initial Comments at 20; PJM Initial Comments at 7, 77;
R Street Initial Comments at 11; SDG&E Initial Comments at 4; SPP Initial Comments at
24; US DOE Initial Comments at 35-36.

**2292** NOPR, 179 FERC ¶ 61,028 at P 166.

1077.  The Commission preliminarily found that this requirement will support the establishment of just and reasonable and not unduly discriminatory or preferential Commission-jurisdictional rates by addressing a potential barrier to integrating new sources of generation that may otherwise continue to exist absent such requirement in the regional transmission planning process.[2293]  As the Commission explained in the NOPR, the interaction between regional transmission planning and cost allocation processes and the generator interconnection process is limited—the baseline regional transmission planning models generally only incorporate interconnection projects that have completed an interconnection facilities study and are therefore near the end of the generator interconnection process.[2294]  The Commission stated, however, that where transmission system needs are repeatedly identified through generator interconnection processes, more efficient or cost-effective transmission expansion could be achieved through regional transmission planning and cost allocation that allocates costs in a manner that is at least roughly commensurate with estimated benefits and eliminates a potential barrier to entry for new generation resources.[2295]

---

[2293] *Id*. P 168.

[2294] *Id.* P 155 (citing ANOPR, 176 FERC ¶ 61,024 at P 23).

[2295] *Id.* P 161.

1078.  Additionally, the Commission sought comment on how the proposed requirement to evaluate such facilities for selection should interact with existing regional transmission planning processes and Long-Term Regional Transmission Planning.[2296]

### 2.    Comments

#### a.    On the Overall Reform

1079.  Multiple commenters express support for the general notion of coordinating the transmission planning and generator interconnection processes.[2297]  Other commenters explicitly support the coordination proposal laid out in the NOPR,[2298] with some of these commenters arguing that the NOPR proposal does not go far enough (as described below).[2299]

1080.  Other commenters offer more qualified support for the NOPR proposal.  APPA and Exelon see value in the proposal but emphasize that any interconnection-related network upgrades that meet the specified criteria must independently satisfy any other

---

[2296] *Id.* P 174.

[2297] ACEG Initial Comments at 51-53; Clean Energy Buyers Initial Comments at 19; DC and Maryland Office of People's Counsel Initial Comments at 16; Fervo Reply Comments at 1; Handy Law Initial Comments at 8-9; Interwest Initial Comments at 10-11; Invenergy Initial Comments at 2; Ohio Commission Federal Advocate Initial Comments at 8; PIOs Initial Comments at 72-73; R Street Initial Comments at 7-8.

[2298] ACEG Initial Comments at 51-53; California Commission Initial Comments at 27; SDG&E Initial Comments at 3.

[2299] Acadia Center and CLF Initial Comments at 25-26; ACORE Initial Comments at 13.

applicable criteria for selection.[2300]  Similarly, NRECA requests that the Commission

clarify that interconnection-related network upgrades associated with withdrawn

interconnection requests will not receive preferential treatment in Long-Term Regional

Transmission Planning.[2301]  Clean Energy Associations and ENGIE support the proposal

but argue that the Commission's concern could be more efficiently addressed with better

regional transmission planning.[2302]

### b.    Requesting Additional Reform

1081.  Some commenters suggest that the NOPR proposal does not go far enough to

integrate the transmission planning and generator interconnection processes or to improve

interconnection-related network upgrade cost allocation.[2303]  ACORE argues that more

dramatic reforms are necessary.[2304]  Anbaric contends that a planning assessment should

be conducted whenever an interconnection request triggers interconnection-related

network upgrades on the larger transmission system beyond the interconnection

---

[2300] APPA Initial Comments at 31; Exelon Initial Comments at 11-13.

[2301] NRECA Reply Comments at 10-11.

[2302] Clean Energy Associations Initial Comments at 15; ENGIE Initial Comments at 5.

[2303] Anbaric Initial Comments at 7-9; Clean Energy Associations Initial Comments at 25-26; Concerned Scientists Initial Comments at 21-22; ELCON Initial Comments at 13-14; Enel Initial Comments at 4-5; Invenergy Initial Comments at 10-13; Invenergy Reply Comments at 12-13; PIOs Initial Comments at 72-73; Shell Reply Comments at 3-7.

[2304] ACORE Initial Comments at 13.

substation and associated facilities.[2305]  ELCON states that Long-Term Regional

Transmission Planning should be integrated with the generator interconnection queue.[2306]

It suggests that the Commission hold regular workshops to review best practices for

coordinating the interconnection queue, current regional transmission planning, and

Long-Term Regional Transmission Planning to reduce interconnection queue backlogs,

leading to larger regional transmission projects that would both incorporate

interconnection-related transmission needs and be eligible for competitive bidding.[2307]

1082.  Similarly, Enel urges the Commission to consolidate the generator interconnection

process into the regional transmission planning process to allow transmission providers to

jointly assess the benefits, and allocate the costs, of transmission projects that benefit

system loads and new generation.[2308]  Likewise, Shell suggests that the Commission

integrate Long-Term Regional Transmission Planning and generator interconnection

processes, requiring the use of the same benefits analysis under the same criteria,

including reliability, economic, and public policy needs.  Shell asserts that this approach

would:  increase opportunities to reduce costs to produce power and deliver it to load,

---

[2305] Anbaric Initial Comments at 7-8.

[2306] ELCON Initial Comments at 13-14.

[2307] *Id.* at 14-15.

[2308] Enel Initial Comments at 4-5 (citing Enel, *Plugging In: A Roadmap for Modernizing & Integrating Interconnection and Transmission Planning*, https://www.enelgreenpower.com/content/dam/enel-egp/documenti/share/working-paper.pdf (last visited Apr. 2024)).

USCA4 Appeal: 24-1650   Doc: 224      Filed: 01/21/2025    Pg: 775 of 2455
Document Accession #: 20240513-3036     Filed Date: 05/13/2024

Docket No. RM21-17-000                                              - 765 -

unlock economies of scale and scope, improve processing times for generator

interconnection requests, address first mover and free-rider risk, and potentially increase

states' willingness to participate in cost allocation.[2309]

1083.  Acadia Center and CLF argue that the proposal does not fully address shortfalls

with the current method for cost allocation associated with interconnection-related

network upgrades.[2310]  They also express concern that the NOPR proposal would address

a limited subset of generator interconnection needs and call for additional changes to

better allocate the costs of interconnection-related network upgrades (especially those

related to offshore wind development) to regional beneficiaries.[2311]  Similarly, PIOs state

the current cost allocation for interconnection-related network upgrades violates settled

law that requires costs to be allocated both to cost causers and beneficiaries.[2312]

Relatedly, Invenergy argues that the most significant factor influencing an

interconnection customer's decision to leave the interconnection queue is typically the

cost of assigned interconnection-related network upgrades.[2313]

1084.  Invenergy also argues that interconnection-related network upgrades would

remedy existing issues and should thus be addressed through the regional transmission

---

[2309] Shell Reply Comments at 3, 5, 6-7.

[2310] Acadia Center and CLF Initial Comments at 25-26.

[2311] *Id.* at 25.

[2312] PIOs Initial Comments at 72.

[2313] Invenergy Reply Comments at 14.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 776 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                          - 766 -

planning process.[2314]  Invenergy asserts that some regions use different dispatch and other

assumptions in the regional transmission planning and generator interconnection

processes, which can result in persistent system overloads not being addressed through

the regional transmission planning process.[2315]  Similarly, Concerned Scientists aver that

generator interconnection requests could be 10 years old when the NOPR proposal

designates the related interconnection-related network upgrades as suitable for

consideration in future Long-Term Scenarios.[2316]  Concerned Scientists argue that the

Commission should require the inclusion in Long-Term Scenarios of interconnection-

related transmission needs that the generator interconnection process identified multiple

times.[2317]

### c.    Concerns with the Overall Reform

1085.  Some commenters oppose the Commission's proposal.[2318]  AEP, Ameren, CAISO,

and Utah Division of Public Utilities argue that the proposal is unnecessary.[2319]  Duke

---

[2314] *Id.* at 12.

[2315] *Id.*

[2316] Concerned Scientists Reply Comments at 22.

[2317] *Id.*

[2318] AEP Initial Comments at 6, 18; Ameren Initial Comments at 17; CAISO Initial Comments at 34; Duke Initial Comments at 4; Illinois Commission Initial Comments at 8-9; MISO Initial Comments at 44-47; PJM Initial Comments at 7, 85-86; PPL Initial Comments at 12.

[2319] AEP Initial Comments at 18-20; Ameren Initial Comments at 18; CAISO Initial Comments at 6, 34-35; Utah Division of Public Utilities Initial Comments at 7.

argues that the Commission's proposal is unnecessarily prescriptive, difficult to implement, and risks introducing significant subjectivity and complex administration into the transmission planning process.[2320]  Ameren claims the proposal will result in inefficient regional transmission planning because it will not minimize total cost to end-use customers.[2321]

1086.  Vistra argues that the NOPR proposal does not address how the newly created interconnection capacity will be allocated and how the timing and implementation of such upgrades would work.[2322]

1087.  MISO contends that the Commission should not adopt prescriptive rules for integrating the generator interconnection and regional transmission planning processes, but instead continue to allow the RTOs/ISOs to develop those processes that best fit their footprint.[2323]  MISO argues that expanding the generator interconnection process beyond its current five-year outlook would slow the generator interconnection process.[2324]  MISO requests that if the Commission does not eliminate the NOPR proposal, as MISO would prefer, then the requirement should be altered so that transmission providers would only

---

[2320] Duke Initial Comments at 4, 20.

[2321] Ameren Initial Comments at 18.

[2322] Vistra Initial Comments at 33-34.

[2323] MISO Initial Comments at 44; MISO Reply Comments at 28.

[2324] MISO Reply Comments at 29.

be required to post a list of generator interconnection upgrades that met the defined criteria.[2325]

1088.  CAISO disagrees with California Commission's comments that the NOPR proposal could improve CAISO's existing interconnection-related network upgrade provisions because the two processes have significantly different eligibility requirements, purposes, and impacts.[2326]  CAISO further argues that the NOPR proposal could require transmission planners to study only outdated interconnection-related network upgrades.[2327]

1089.  Mississippi Commission states that interconnection-related network upgrades should focus on reducing costs and providing price signals and not be included in Long-Term Regional Transmission Planning.[2328]

1090.  Some commenters argue that it is incorrect to assume that interconnection customers withdraw from the interconnection queue due solely to high interconnection-related network upgrade costs instead of other reasons[2329] such as the project being

---

[2325] MISO Initial Comments at 45.

[2326] CAISO Reply Comments at 28-29 (citing California Commission Initial Comments at 27).

[2327] *Id.* at 32.

[2328] Mississippi Commission Reply Comments at 9.

[2329] CAISO Reply Comments at 29; NRECA Reply Comments at 9; PJM Initial Comments at 87.

uneconomic,[2330] the project having insufficient site control or permitting delays,[2331] the project being speculative,[2332] or some other regulatory or economic factor.[2333]

1091.  PJM recommends an alternative proposal for funding generation interconnections in which states play the major role.[2334]  Under the PJM proposal, states that want to incent generation interconnections, perhaps to support a renewable portfolio standard, could fund a backbone transmission system to help facilitate these interconnections.[2335]

1092.  Invenergy asks the Commission not to consider certain alternative proposals advanced by other commenters.[2336]

### d.    Cost Allocation

1093.  Some commenters oppose the NOPR proposal on the assumption that it could shift the cost for interconnection-related network upgrades from interconnection customers to load.[2337]  In addition, PJM states that the Commission's proposal could lead to undue

---

[2330] American Municipal Power Initial Comments at 33-34; Indicated PJM TOs Initial Comments at 13-14; Pennsylvania Commission Initial Comments at 8; Vistra Initial Comments at 20.

[2331] Duke Initial Comments at 20-21; Idaho Power Initial Comments at 6; Pennsylvania Commission Initial Comments at 8; PJM Initial Comments at 88-89.

[2332] Entergy Initial Comments at 25.

[2333] PJM Initial Comments at 89.

[2334] *Id.* at 89-90.

[2335] *Id.* at 90.

[2336] Invenergy Reply Comments at 15 (citing MISO Initial Comments at 45; PJM Initial Comments 85, 90-92).

[2337] APPA Initial Comments at 31; Industrial Customers Initial Comments at 13;

discrimination and would distort the price signal that generator developers should see to make reasonable investment decisions.[2338]  Industrial Customers state that generators should be able to recover the costs of interconnection through market revenues if their projects are competitive.[2339]  Industrial Customers further argue that under the cost causation principle, a new generator should pay for interconnection-related network upgrades if such upgrades are only required because of the generator's interconnection.[2340]  Vistra asserts that, although the proposal shifts costs indirectly, the Commission still must rationally explain its decision to depart from the existing just and reasonable "but-for" policy of Order No. 2003.[2341]

1094.  Other commenters oppose the Commission's proposed reform because it will increase the cost to serve load.  AEP asserts that such a proposal would possibly result in the development of unnecessary transmission infrastructure, which would lead to increased transmission customer costs for no benefit.[2342]  Dominion argues that this

---

NRECA Initial Comments at 41-42 (citation omitted); NRECA Reply Comments at 8-9; PJM Initial Comments at 89-90; Vistra Initial Comments at 8; Xcel Initial Comments at 15.

[2338] PJM Initial Comments at 89.

[2339] Industrial Customers Initial Comments at 13-14.

[2340] *Id.* at 21-22.

[2341] Vistra Initial Comments at 9 (citation omitted).

[2342] AEP Initial Comments at 20.

proposal could result in over-building and excessive rates for transmission customers.[2343]
TAPS asks the Commission to clarify that consideration of interconnection-related
transmission needs would not foreclose transmission providers from proposing a cost
allocation method that is different from the cost allocation for other types of Long-Term
Regional Transmission Facilities.[2344]

### e.    Interconnection Queue Gaming Considerations

1095.  Several commenters express concerns that the NOPR proposal would incentivize
gaming by interconnection customers to promote development of interconnection-related
network upgrades through the regional transmission planning process.[2345]  Some
commenters claim that the Commission's proposal could create a perverse incentive for
interconnection customers to submit and withdraw multiple interconnection requests so
that interconnection-related network upgrades can be considered for regional cost

---

[2343] Dominion Initial Comments at 32.

[2344] TAPS Initial Comments at 13-14.

[2345] Ameren Initial Comments at 18-19; American Municipal Power Initial
Comments at 34; Dominion Initial Comments at 32; Dominion Reply Comments at 7-8;
EEI Initial Comments at 18; Eversource Initial Comments at 23-24; Idaho Power Initial
Comments at 6; Pennsylvania Commission Initial Comments at 9; PJM Initial Comments
at 89; PPL Initial Comments at 12-13; Shell Initial Comments at 29-30; SPP Initial
Comments at 16; Xcel Initial Comments at 16.

allocation,[2346] especially in transmission planning regions with lower thresholds for entering and maintaining a position in the interconnection queue.[2347]

1096.  Pennsylvania Commission, Shell, Eversource, and US DOE recommend the Commission modify the NOPR proposal to limit or prevent gaming.  Pennsylvania Commission argues that adding more commitments on the part of the interconnection customer or requiring a more thorough analysis of the reasons for withdrawal is an appropriate way of addressing the concern.[2348]  Shell states that, to prevent gaming, the Commission should revise its proposal so that an upgrade is only eligible for inclusion in the Long-Term Regional Transmission Plan if it appears in one generator interconnection study cycle over a five-year period.[2349]  Eversource asks the Commission to find that submitting and withdrawing interconnection requests simply so that the required interconnection-related network upgrades would be identified twice in the operative period, for example, would violate the Commission's regulations, including but not limited to the duty of candor and the prohibition of market manipulation.[2350]  US DOE states that the Commission should strive to ensure that the reforms do not create the

---

[2346] Ameren Initial Comments at 18; American Municipal Power Initial Comments at 33-34; EEI Initial Comments at 18; Idaho Power Initial Comments at 6; PJM Initial Comments at 89.

[2347] EEI Initial Comments at 18.

[2348] Pennsylvania Commission Initial Comments at 9.

[2349] Shell Initial Comments at 30.

[2350] Eversource Initial Comments at 23-24 (citing 18 CFR 35.41; 18 CFR 1c.2)

potential for gaming by generators, which, absent mitigation, could increase delays and backlogs in the interconnection queue.[2351]

1097.  In response, Interwest argues that suggestions that increased coordination would result in gaming assumes that developers know in advance what interconnection-related network upgrades they will be assigned through the interconnection process.[2352] Interwest argues that, given the uncertainty about whether, and when, such a process could apply and result in selection and construction of facilities under Long-Term Regional Transmission Planning, it would not incentivize gaming.[2353]  Similarly, Invenergy argues that developers would have no reasonable expectation that any interconnection-related network upgrade meeting the NOPR criteria ultimately would be selected through the multi-year regional transmission planning process and actually constructed on a timeline that accommodates the developer's generation facility.[2354]  If the Commission is concerned about possible gaming, however, Invenergy urges the Commission to revise the proposal to require that withdrawn interconnection requests must have been submitted by unaffiliated entities.[2355]

---

[2351] US DOE Initial Comments at 27-28.

[2352] Interwest Reply Comments at 5-6 (citing EEI Initial Comments at 18).

[2353] *Id.* at 6.

[2354] Invenergy Reply Comments at 14.

[2355] *Id.* at 14-15.

USCA4 Appeal: 24-1650    Doc: 224        Filed: 01/21/2025      Pg: 784 of 2455
Document Accession #: 20240513-3036        Filed Date: 05/13/2024

Docket No. RM21-17-000                                                - 774 -

#### f.    **Miscellaneous**

1098.  SEIA asks the Commission to clarify that the phrase "interconnection-related transmission needs" would allow transmission providers to include either individual or aggregated transmission solutions that address specific needs.[2356]  SEIA asks the Commission to require transmission providers to assume that these interconnection-related network upgrades will be built and include the interconnection-related network upgrades in their Long-Term Regional Transmission Planning.[2357]

1099.  Several commenters argue that the reforms issued under Order No. 2023, Improvements to Generator Interconnection Procedures and Agreements, will address interconnection-related issues more appropriately than the NOPR proposal.[2358]  Some commenters argue that the Commission should defer consideration of the NOPR proposal until the reforms issued under Order No. 2023 are implemented.[2359]

### 3.    **Need for Reform**

1100.  Based on the record, we find that there is substantial evidence to support the conclusion that the Commission's existing regional transmission planning requirements

---

[2356] SEIA Initial Comments at 14 (citing SPP, *2020 Integrated Transmission Planning Assessment Report*, at 87 (Oct. 27, 2020)).

[2357] *Id.*

[2358] Dominion Reply Comments at 8; Idaho Power Initial Comments at 6-7; Illinois Commission Initial Comments at 9; Pacific Northwest Utilities Initial Comments at 15.

[2359] Duke Initial Comments at 20; EEI Initial Comments at 18; Entergy Initial Comments at 24-25.

are unjust, unreasonable, and unduly discriminatory or preferential because they do not

adequately consider certain interconnection-related transmission needs that the

transmission provider has identified multiple times in the generator interconnection

process but that have never been resolved due to the withdrawal of the underlying

interconnection request(s).  We therefore adopt the preliminary findings in the NOPR

concerning the need for reform.  Specifically, we find that there is insufficient

coordination between the Commission's existing generator interconnection processes and

regional transmission planning and cost allocation processes regarding interconnection-

related transmission needs that are repeatedly identified in the generator interconnection

process.  As a result of this deficiency, transmission providers do not currently consider

those identified interconnection-related transmission needs in their regional transmission

planning processes, nor do they evaluate whether more efficient or cost-effective regional

transmission solutions to these needs could be achieved through regional transmission

planning processes and cost allocation.  Accordingly, we find that existing regional

transmission planning and cost allocation processes are insufficient to ensure just and

reasonable rates, and we direct the reforms discussed below to address this deficiency.

1101.  As explained in the NOPR,[2360] we are concerned about the prevalence of

interconnection-related network upgrades being repeatedly identified in the generator

interconnection process in multiple interconnection queue cycles during a short period of

time (e.g., five years) but not being developed because the interconnection request(s)

---

[2360] NOPR, 179 FERC ¶ 61,028 at PP 161-165.

driving the need for the upgrade are withdrawn.  The record indicates that the level of

spending on interconnection-related network upgrades has dramatically increased in

recent years, escalating the cost of interconnecting new generation to the transmission

system.[2361]  The evidence also suggests that this trend is leading to more and more

interconnection customers withdrawing their interconnection requests in the face of

significant costs associated with interconnection-related network upgrades.[2362]  For

example, between January 2016 and July 2020, 245 generation projects in advanced

stages in the MISO generator interconnection process withdrew from the queue, with the

project developers citing high interconnection-related network upgrade costs as the

primary reason for their withdrawal.[2363]  While interconnection customers may choose to

withdraw from the interconnection queue for a number of reasons, in recent years, the

deciding factor has increasingly become the interconnection customer's "sticker shock"

at its cost responsibility for interconnection-related network upgrades.[2364]

---

[2361] *See* ICF Resources, LLC, *Just and Reasonable? Transmission Upgrades Charged to Interconnecting Generators Are Delivering System-Wide Benefits*, 2 (Sept. 9, 2021), https://acore.org/wp-content/uploads/2021/09/Just-Reasonable-Transmission-Upgrades-Charged-to-Interconnecting-Generators-Are-Delivering-System-Wide-Benefits.pdf (ICF Sept. 2021 Interconnection Report); Jay Caspary et al., ACEG, *Disconnected: The Need for a New Generator Interconnection Policy*, 14 (2021)), https://cleanenergygrid.org/wp-content/uploads/2021/01/Disconnected-The-Need-for-a-New-Generator-Interconnection-Policy-1.pdf (ACEG 2021 Interconnection Report).

[2362] ACEG 2021 Interconnection Report at 17.

[2363] *Id.* (naming the high cost of interconnection-related network upgrades as the fundamental problem that interconnection queue reform has failed to address thus far).

[2364] *See* ACORE ANOPR Comments at 12; DC and Maryland Office of People's Counsel Initial Comments at 16; Invenergy Reply Comments at 14; Northwest and

1102.  When interconnection customers withdraw from the interconnection queue, the identified interconnection-related network upgrades associated with those interconnection customers remain unbuilt and the underlying interconnection-related transmission needs go unaddressed.  In many cases, when the interconnection-related transmission need is not addressed via development of interconnection-related network upgrades in one interconnection queue cycle, the same interconnection-related transmission need—and oftentimes the same or a substantially similar interconnection-related network upgrade— will appear in subsequent interconnection queue cycles.  One study, which analyzed 12 specific interconnection-related network upgrades identified by MISO and SPP, found that SPP identified three of the upgrades in two interconnection queue cycles and one in three interconnection queue cycles, and MISO identified three of the upgrades in two interconnection queue cycles and two in three interconnection queue cycles.[2365]  In other words, both SPP and MISO were repeatedly identifying the same interconnection-related network upgrades as interconnection customers withdrew from the interconnection queue, leaving later-in-time interconnection customers to address the same interconnection-related transmission needs.

1103.  Where interconnection-related transmission needs are repeatedly identified in interconnection studies, the implication may be that the area, despite the potentially

---

Intermountain Initial Comments at 14; *see also* Order No. 2023, 184 FERC ¶ 61,054 at P 41; Order No. 2023-A, 186 FERC ¶ 61,199 at P 14.

[2365] ICF Sept. 2021 Interconnection Report at 25-26.

USCA4 Appeal: 24-1650   Doc: 224   Filed: 01/21/2025   Pg: 788 of 2455
Document Accession #: 20240513-3036   Filed Date: 05/13/2024

prohibitive interconnection costs if borne by one or a small number of interconnection customers, is otherwise desirable for generators to locate (e.g., it is located close to fuel sources). This repeated interest in accessing the transmission system, combined with the lack of available transmission capacity and prohibitive costs of interconnection-related network upgrades, together create a barrier to accessing the transmission system and establish a known interconnection-related transmission need. We find that this barrier to entry can hinder the timely development of new generation, thereby stifling competition in wholesale electricity markets and limiting access to lower-cost generation.[2366] We find that existing regional transmission planning processes do not adequately consider or account for this specific set of interconnection-related transmission needs that go unaddressed in the generator interconnection processes. By failing to consider such interconnection-related transmission needs, the regional transmission planning process is unable to identify the more efficient or cost-effective regional transmission solutions.

1104. Moreover, the Commission has long recognized that interconnection-related network upgrades provide transmission benefits that extend beyond the interconnection

---

[2366] The Commission has previously found that policies eliminating barriers to entry for generation resources can enhance competition in bulk power markets. *Standardization of Generator Interconnection Agreements & Procs*., Order No. 2003, 68 FR 49846 (Aug. 19, 2003), 104 FERC ¶ 61,103, at PP 694 (2003), *order on reh'g*, Order No. 2003-A, 69 FR 15932 (Mar. 26, 2004), 106 FERC ¶ 61,220 at P 579, *order on reh'g*, Order No. 2003-B, 70 FR 265 (Jan. 4, 2005), 109 FERC ¶ 61,287 (2004), *order on reh'g*, Order No. 2003-C, 70 FR 37661 (June 30, 2005), 111 FERC ¶ 61,401 (2005), *aff'd sub nom. Nat'l Ass'n of Regul. Util. Comm'rs v. FERC*, 475 F.3d 1277 (D.C. Cir. 2007); Order No. 2023, 184 FERC ¶ 61,054 at P 44. Limited access to new and more competitive supplies of generation can increase the energy rates paid by wholesale customers. Order No. 2023, 184 FERC ¶ 61,054 at P 43.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 789 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                    - 779 -

customer.[2367]  By upgrading the transmission system in a piecemeal fashion through the

generator interconnection process, as described above, the current regional transmission

planning paradigm can impose costs on interconnection customers for transmission

facilities that provide benefits beyond those received by the interconnection customer.

This paradigm allocates transmission costs in a way that may not be roughly

commensurate with the distribution of benefits, a result that can lead to unjust and

unreasonable rates.  The reform adopted below requires the consideration of regional

transmission facilities to meet interconnection-related transmission needs repeatedly

identified in the generator interconnection process in the Order No. 1000 regional

transmission planning and cost allocation processes, which we believe will result in more

efficient or cost-effective regional transmission expansion, cost allocation for such

regional transmission facilities that is at least roughly commensurate with estimated

benefits, and elimination of a barrier to entry for new generation resources (which can

enhance competition in wholesale electricity markets and facilitate access to lower-cost

generation).  In turn, we expect that these reforms will ensure just and reasonable and not

unduly discriminatory or preferential Commission-jurisdictional rates.

1105.  Additionally, as discussed further below, we disagree with commenters that

question the necessity of this reform.  In addition to our findings that this reform will help

ensure just and reasonable rates, we find that the specific purpose of this reform—to

---

[2367] *See, e.g.*, Order No. 2003, 104 FERC ¶ 61,103 at P 65 (stating that "[f]acilities
beyond the Point of Interconnection [(i.e., interconnection-related network upgrades)] are
part of the Transmission Provider's Transmission System and benefit all users").

require transmission providers to evaluate certain interconnection-related transmission needs—is not a requirement of any existing process. Additionally, we find that the qualifying criteria established by this reform will ensure that the reform avoids placing an onerous burden on transmission providers. Finally, we disagree that this reform is overly prescriptive; it does not dictate a specific result or require that transmission providers select a regional transmission facility to address identified interconnection-related transmission needs. This reform merely requires consideration of these interconnection-related transmission needs in the regional transmission planning process.

### 4.    **Commission Determination**

1106. We adopt the NOPR proposal, with modification, to require transmission providers in each transmission planning region to revise the regional transmission planning processes in their OATTs, consistent with the requirements in this final rule, to evaluate for selection regional transmission facilities that address certain identified interconnection-related transmission needs associated with certain interconnection-related network upgrades originally identified through the generator interconnection process, as more fully described below. We find that this requirement will ensure that more efficient or cost-effective transmission expansion can be effectuated through regional transmission planning processes and will eliminate a potential barrier to entry for new generation resources, thereby enhancing competition in wholesale electricity markets and facilitating access to lower-cost generation. As a result, this reform will ensure just and reasonable and not unduly discriminatory or preferential Commission-jurisdictional rates.

USCA4 Appeal: 24-1650     Doc: 224     Filed: 01/21/2025     Pg: 791 of 2455
Document Accession #: 20240513-3036     Filed Date: 05/13/2024

1107.  In this final rule, we adopt the NOPR proposal with modification.  First, we require transmission providers to evaluate for selection regional transmission facilities to address certain identified interconnection-related transmission needs in their existing Order No. 1000 regional transmission planning and cost allocation processes, rather than in Long-Term Regional Transmission Planning.  Second, we modify the NOPR proposal to require that an interconnection-related network upgrade associated with identified interconnection-related transmission needs must satisfy *both* the minimum cost and voltage criteria proposed in the NOPR to qualify for evaluation for selection.

1108.  In recent years, spending on interconnection-related network upgrades has increased dramatically, and the high cost of interconnection is increasing the rate at which generators withdraw from the interconnection queue.[2368]  While interconnection customers may withdraw for multiple reasons, the record in this proceeding shows that, in recent years, the deciding factor in many cases of withdrawal has become the interconnection customer's cost responsibility for expensive interconnection-related network upgrades.[2369]  Consequently, interconnection customers are unlikely to resolve these interconnection-related transmission needs through the generator interconnection process.

---

[2368] ACEG 2021 Interconnection Report at 17.

[2369] NOPR, 179 FERC ¶ 61,028 at P 162; DC and Maryland Office of People's Counsel Initial Comments at 16; Invenergy Reply Comments at 14; Northwest and Intermountain Initial Comments at 14.

USCA4 Appeal: 24-1650   Doc: 224   Filed: 01/21/2025   Pg: 792 of 2455
Document Accession #: 20240513-3036   Filed Date: 05/13/2024

1109.  Where interconnection-related transmission needs are repeatedly identified but not constructed, the implication is that, despite the potentially prohibitive interconnection costs if borne by one or a small number of interconnection customers, there are compelling reasons, such as proximity to fuel sources, why generators seek to locate a point of interconnection at a specific location or locations associated with transmission constraints.  When interconnection customers that have invested time and resources in engaging in the generator interconnection process choose to withdraw rather than fund interconnection-related network upgrades, it becomes increasingly apparent that interconnection customer(s) are unlikely to resolve interconnection-related transmission needs through the generator interconnection process.

1110.  At the same time, the Commission has found, and courts have affirmed, that interconnection-related network upgrades identified in the generator interconnection process can provide widespread transmission benefits that extend beyond the interconnection customer.[2370]  As a result, planning these types of upgrades to the transmission system in a piecemeal fashion, exclusively through the generator interconnection process, limits the development of transmission facilities that would

---

[2370] *See, e.g.*, *Entergy Svs., Inc. v. FERC*, 391 F.3d 1240, 1247-48 (2004); Order No. 2003, 104 FERC ¶ 61,103 at P 65 (stating that "[f]acilities beyond the Point of Interconnection [(i.e., interconnection-related network upgrades)] are part of the Transmission Provider's Transmission System and benefit all users"); *see also* ACORE ANOPR Comments, Ex. 5 at 4-7; CAISO ANOPR Comments at 53-54 (stating that in CAISO "transmission facilities at 200 kV and above are eligible for regional cost allocation," including location-constrained resources interconnection facilities, because "this voltage threshold . . . recognizes that high voltage transmission facilities support and provide benefits to all customers to the CAISO grid").

provide benefits to the transmission system beyond those received by the interconnection customer. This is the case where interconnection-related network upgrades of substantial cost are repeatedly identified to address interconnection-related transmission needs, but those needs continue to go unresolved through the generator interconnection process. In such cases, it may be more efficient or cost-effective to address such needs through the regional transmission planning and cost allocation process. Therefore, reforms are necessary to require interconnection-related transmission needs associated with interconnection-related network upgrades that are repeatedly identified in the generator interconnection process to be evaluated through the regional transmission planning and cost allocation process. We believe that this approach will result in selection of more efficient or cost-effective regional transmission solutions that will provide benefits to the transmission system, cost allocation for such regional transmission facilities that is at least roughly commensurate with estimated benefits, and elimination of a barrier to entry for new generation resources (which will enhance competition in wholesale electricity markets and facilitate access to lower-cost generation).[2371]  As a result, these reforms will ensure just and reasonable and not unduly discriminatory or preferential Commission-jurisdictional rates.

---

[2371] While in this portion of the final rule we discuss the requirement that transmission providers evaluate in their existing regional transmission planning and cost allocation processes regional transmission facilities that address certain interconnection-related needs, we also expect that many of the other reforms in this final rule regarding Long-Term Regional Transmission Planning will address the difficulties generators face in interconnecting to the transmission system and the cost allocation mismatch described here, including required Factor Category Six, interconnection requests and withdrawals.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 794 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                               - 784 -

1111.  While we require transmission providers to evaluate regional transmission facilities that address certain interconnection-related transmission needs identified by this reform in the existing Order No. 1000 regional transmission planning and cost allocation processes, we allow for flexibility in how transmission providers evaluate such facilities for selection.  Transmission providers may adopt the evaluation method and selection criteria from any of their existing Order No. 1000 regional transmission planning and cost allocation processes (e.g., economic or reliability processes) to evaluate and potentially select these types of transmission facilities.  By not requiring a specific process, we permit transmission providers to propose the best method to incorporate this requirement within their existing regional transmission planning processes.  We also encourage transmission providers to consider, as part of the evaluation process, whether regional transmission facilities that address certain identified interconnection-related transmission needs may also address other regional transmission needs more efficiently or cost-effectively.

1112.  Several commenters suggest alternative reforms to coordinate or consolidate regional transmission planning and generator interconnection processes or to modify existing cost allocation criteria.[2372]  We find these requests to be outside the scope of this proceeding and lacking in record support to adequately consider whether to adopt them in this final rule.  In this final rule, we are addressing the narrow issue of interconnection-related transmission needs being repeatedly identified yet continuing to go unresolved

---

[2372] *E.g.*, Enel Initial Comments at 4-5.

through the generator interconnection process, even though it may be more efficient and cost-effective to evaluate such needs through the regional transmission planning and cost allocation process.

1113.  We find uncompelling general arguments from commenters that oppose the Commission's proposal because the reform addresses a deficiency in existing regional transmission planning and cost allocation processes, will ensure just and reasonable and not unduly discriminatory or preferential Commission-jurisdictional rates, is not unduly burdensome, and does not dictate a particular outcome.  The level of prescriptiveness of this reform strikes the right balance between an open-ended requirement, which might not address the need for reform, and a very prescriptive requirement that could be overly burdensome to transmission providers.

1114.  We are unpersuaded by Ameren's argument that this reform will result in inefficient regional transmission planning because it will not minimize the total cost to end-use customers.[2373]  As explained above, this reform will enable transmission providers to identify through regional transmission planning the more efficient or cost-effective transmission solution to address an interconnection-related transmission need.

1115.  We clarify in response to Vistra that transmission providers must make the newly created interconnection capacity equally available to all interconnection and transmission customers consistent with the Commission's open access policy.[2374]  Any interconnection

---

[2373] Ameren Initial Comments at 18.

[2374] Vistra Initial Comments at 33-34.

Docket No. RM21-17-000                                                                    - 786 -

customers whose interconnection requests related to the initial identification of the

interconnection-related transmission need would not have any priority rights to that

newly created interconnection or transmission capacity.  Additionally, we clarify, in

response to NRECA's request, that we are not requiring interconnection-related network

upgrades associated with withdrawn interconnection requests to be given preferential

treatment in regional transmission planning.[2375]

1116.  In response to commenters arguing that it is incorrect to assume that

interconnection customers withdraw from the interconnection queue due solely to high

interconnection-related network upgrade costs,[2376] we explain that we are not requiring

transmission providers to evaluate regional transmission facilities that address

interconnection-related transmission needs for every withdrawn interconnection request.

Instead, this reform is focused only on certain interconnection-related transmission needs

that meet the specific qualifying criteria detailed below.  We do not assume that where

these criteria are met, the relevant interconnection customers have necessarily withdrawn

from the interconnection queue solely due to high interconnection-related network

upgrade costs.  Rather, we determine that these criteria only suggest that high costs were

*likely* a factor prompting, or at least contributing to, the relevant withdrawals.  We

conclude that where the criteria are met, there may be an opportunity for a more efficient

---

[2375] NRECA Reply Comments at 10-11.

[2376] CAISO Reply Comments at 29; NRECA Reply Comments at 9; PJM Initial
Comments at 87.

or cost-effective regional transmission solution, such that an evaluation of the relevant

interconnection-related transmission need(s) is appropriate.

1117.  We are not persuaded to reject this reform based on commenters' assertions that

this reform will shift the costs of interconnection-related network upgrades from

interconnection customers to load.[2377]  This final rule requires transmission providers to

evaluate in their existing Order No. 1000 regional transmission planning and cost

allocation processes regional transmission facilities that address certain identified

interconnection-related transmission needs associated with certain interconnection-related

network upgrades originally identified through the generator interconnection process.

Transmission providers will still have to evaluate and select any regional transmission

facilities that address the interconnection-related transmission needs as the more efficient

or cost-effective regional transmission solution as part of the regional transmission

planning process in order for any regional cost allocation method to apply, and this final

rule does not alter the existing cost allocation methods in either the generator

interconnection or existing Order No. 1000 regional transmission planning process.  If a

regional transmission facility that addresses identified interconnection-related

transmission needs is not selected as part of the regional transmission planning process,

then the associated regional cost allocation method would not apply; however, if the

---

[2377] APPA Initial Comments at 31; Industrial Customers Initial Comments at 13;
NRECA Initial Comments at 41-42 (citation omitted); NRECA Reply Comments at 8-9;
PJM Initial Comments at 89-90; Vistra Initial Comments at 8; Xcel Initial Comments at
15.

facility is selected, then the regional transmission planning process has determined that the regional transmission facility is a more efficient or cost-effective regional transmission solution. Additionally, if such a facility is selected, the Commission-approved *ex ante* regional cost allocation method for that facility would allocate its costs at least roughly commensurate with its estimated benefits.

1118. In response to TAPS' request that the Commission clarify that regions may propose differing cost allocation methods for transmission facilities selected to address interconnection-related transmission needs versus transmission facilities selected to address other types of transmission needs,[2378] we clarify that the requirements adopted here merely create an obligation for transmission providers to evaluate regional transmission facilities that address certain identified interconnection-related transmission needs in the existing regional transmission planning and cost allocation processes. As such, to the extent that transmission providers wish to propose further changes to their Order No. 1000 regional transmission planning cost allocation method(s) because of this requirement, they would need to do so in separate FPA section 205 filings rather than on compliance with this final rule.

1119. We disagree with commenters that the requirements adopted herein will incentivize gaming by interconnection customers to include interconnection-related network upgrades in the regional transmission planning process.[2379] We also disagree

---

[2378] TAPS Initial Comments at 13-14.

[2379] Ameren Initial Comments at 18-19; American Municipal Power Initial Comments at 34; Dominion Initial Comments at 32; Dominion Reply Comments at 7-8;

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 799 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                    - 789 -

with commenters that claim that interconnection customers will submit spurious

interconnection requests.[2380]  Interconnection requests require significant financial

commitments from the interconnection customer (e.g., application fees, study deposits,

and site control requirements), which the Commission made more stringent in Order No.

2023,[2381] and therefore we find it unlikely that an interconnection customer would submit

multiple interconnection requests (in multiple queue cycles) in order to trigger this

requirement because of the possibility that transmission providers may eventually

develop an interconnection-related network upgrade by selecting it in a regional

transmission plan for purposes of cost allocation.  An interconnection customer would

face several risks in pursuing such a strategy, including the risk that the regional

transmission solution for the interconnection-related transmission need is not selected,

and the risk that the newly created interconnection or transmission capacity is allocated to

a different transmission or interconnection customer.  For these reasons, we decline to

---

EEI Initial Comments at 18; Eversource Initial Comments at 23-24; Idaho Power Initial Comments at 6; Pennsylvania Commission Initial Comments at 9; PJM Initial Comments at 89; PPL Initial Comments at 12-13; Shell Initial Comments at 29-30; SPP Initial Comments at 16; Xcel Initial Comments at 16.

[2380] Ameren Initial Comments at 18; American Municipal Power Initial Comments at 33-34; EEI Initial Comments at 18; Idaho Power Initial Comments at 6; PJM Initial Comments at 89.

[2381] *See, e.g.*, Order No. 2023, 184 FERC ¶ 61,054 at P 502.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 800 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                    - 790 -

adopt Invenergy's request to modify the proposal to require that withdrawn

interconnection requests must have been submitted by unaffiliated entities.[2382]

1120.  In response to Eversource's request that the Commission clarify that submitting

and withdrawing interconnection requests with the intent of requiring transmission

providers to evaluate the associated interconnection-related transmission needs in their

regional transmission planning process is in violation of the Commission's regulations,

including but not limited to the duty of candor and prohibition of market

manipulation,[2383] as noted above, the generator interconnection process requires

significant financial commitments for interconnection requests to enter and proceed in the

queue, and many transmission providers have imposed additional readiness requirements

to encourage early withdrawal of non-viable interconnection requests.  For these reasons,

we disagree with the gaming concerns raised by Eversource.[2384]

1121.  We also grant SEIA's request to clarify that the phrase "interconnection-related

transmission needs" allows transmission providers to identify individual regional

transmission solutions to address each identified interconnection-related transmission

need, or an aggregate regional transmission solution to address multiple interconnection-

---

[2382]  Invenergy Reply Comments at 14-15.

[2383]  Eversource Initial Comments at 23-24 (citing 18 CFR 35.41; 18 CFR 1c.2).

[2384]  While we are not concerned about gaming here, to the extent that there is
evidence of a false representation or gaming of the market rules, a referral to the Office
of Enforcement may be appropriate to determine whether a violation of the Commission's
regulations has occurred.

related transmission needs.  In response to commenters arguing that the reforms issued

under Order No. 2023 will address interconnection-related issues more appropriately than

the NOPR proposal,[2385] we explain that the reforms in this rulemaking are intended to

address situations when interconnection-related network upgrades are repeatedly

identified but not constructed and instances when regional transmission solutions to

address the needs that would have been addressed by those interconnection-related

network upgrades would provide widespread transmission benefits that extend beyond

the interconnection customer, which are not addressed in Order No. 2023.

### B.    Transmission Planning Process Evaluation

#### 1.    NOPR Proposal

1122.  In the NOPR, the Commission proposed to require the transmission providers in

each transmission planning region to consider regional transmission facilities that address

interconnection-related transmission needs pursuant to the proposed coordination reform

through the Long-Term Regional Transmission Planning process proposed in the NOPR.

Specifically, the Commission proposed to require that transmission providers in each

transmission planning region incorporate the specific interconnection-related

transmission needs identified through the coordination reform as a factor used to develop

---

[2385] Dominion Reply Comments at 8; Idaho Power Initial Comments at 6-7; Illinois Commission Initial Comments at 8; Pacific Northwest Utilities Initial Comments at 15.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 802 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Long-Term Scenarios in the Long-Term Regional Transmission Planning proposed in the NOPR.[2386]

## 2. **Comments**

1123.  Several commenters assert that the NOPR proposal is unnecessary because well-executed Long-Term Regional Transmission Planning will identify the transmission needed to support interconnections.[2387]  For example, Xcel argues that Long-Term Scenarios will be driven by the same factors that cause interconnection customers to make interconnection requests, such as optimal geographic locations for generation development.[2388]  Similarly, EEI states that Long-Term Regional Transmission Planning, if properly implemented, already takes into account factors that support generator interconnection.[2389]

1124.  Some of these commenters further claim that the Commission's coordination proposal's reliance on backward-looking interconnection needs would be less effective than planning on future system interconnection needs.  CAISO argues that the Commission's proposal is backward-looking and therefore will not promote productive,

---

[2386] NOPR, 179 FERC ¶ 61,028 at P 167.

[2387] AEP Initial Comments at 19; EEI Initial Comments at 18; ENGIE Initial Comments at 5; Illinois Commission Initial Comments at 8-9; Vistra Initial Comments at 33; Xcel Initial Comments at 15.

[2388] Xcel Initial Comments at 15.

[2389] EEI Initial Comments at 18.

USCA4 Appeal: 24-1650   Doc: 224   Filed: 01/21/2025   Pg: 803 of 2455
Document Accession #: 20240513-3036   Filed Date: 05/13/2024

forward-looking transmission planning.[2390]  Vistra claims that an effective transmission

planning process will identify interconnection needs and provide solutions within the

context of a future system, rather than relying on prior interconnection studies addressing

a specific generator interconnection request.[2391]  Similarly, ISO/RTO Council

recommends that the Commission direct transmission planners to consider generator

interconnection as a driver of Long-Term Transmission Needs on a forward-looking

basis, rather than the coordination proposal's backwards-looking process.[2392]

1125.  MISO states that because the generator interconnection process is designed to

identify the minimum amount of interconnection-related network upgrades to

interconnect new resources, Long-Term Regional Transmission Planning is the proper

avenue to holistically evaluate system needs.  MISO notes that it already has a

mechanism in place to include interconnection-related network upgrades in its Long-

Range Transmission Plan process if the interconnection-related network upgrade is found

to have region-wide benefits.[2393]

### 3.   Commission Determination

1126.  We adopt the NOPR proposal, with modification, to require transmission

providers in each transmission planning region to evaluate regional transmission facilities

---

[2390] CAISO Initial Comments at 6, 34-35.

[2391] Vistra Initial Comments at 33.

[2392] ISO/RTO Council Initial Comments at 9.

[2393] MISO Initial Comments at 44, 46-47; MISO Reply Comments at 29.

that address certain interconnection-related transmission needs in their existing Order No. 1000 regional transmission planning and cost allocation processes instead of in Long-Term Regional Transmission Planning. We find that this modification will better alleviate transmission limitations by providing a starting point for identifying and evaluating regional transmission solutions that are more efficient or cost-effective when analyzed in the near term.[2394] Specifically, requiring transmission providers to evaluate identified interconnection-related transmission needs in existing Order No. 1000 regional transmission planning and cost allocation processes will allow such needs to be addressed within a timeframe that is relevant for identifying more efficient or cost-effective near-term regional transmission solutions. Evaluation of interconnection-related transmission needs in the existing Order No. 1000 regional transmission planning and cost allocation processes is most appropriate because such evaluation would occur at shorter intervals and would likely result in more expeditious development of regional transmission facilities to address the nearer-term interconnection-related transmission needs identified through the generator interconnection process.

1127. We agree with commenters that future interconnection-related transmission needs will be considered as part of Long-Term Regional Transmission Planning and incorporated in the development of Long-Term Scenarios. Nonetheless, for the reasons described above, we find that current interconnection-related transmission needs can be considered more effectively through the nearer-term existing Order No. 1000 regional

---

[2394] *See* NOPR, 179 FERC ¶ 61,028 at P 165.

transmission planning and cost allocation processes. As such, we disagree with commenters that assert that the Commission's proposal is unnecessary because well-executed Long-Term Regional Transmission Planning will identify the transmission needed to support generator interconnections.[2395] That said, we emphasize that, as transmission providers gain experience with Long-Term Regional Transmission Planning, we anticipate that they will identify fewer interconnection-related transmission needs associated with certain interconnection-related network upgrades originally identified through the generator interconnection process because transmission providers will plan to address Long-Term Transmission Needs, including those driven by Factor Category One: federal, federally-recognized Tribal, state, and local laws and regulations that affect the future resource mix and demand; Factor Category Two: federal, federally-recognized Tribal, state, and local laws and regulations on decarbonization and electrification; Factor Category Six: generator interconnection requests and withdrawals, and Factory Category Seven: utility and corporate commitments and federal, federally-recognized Tribal, state, and local policy goals that affect Long-Term Transmission Needs, through Long-Term Regional Transmission Planning.

1128. Some commenters, including Vistra and ISO/RTO Council, claim that the NOPR proposal to rely on needs identified in prior interconnection studies would be less effective at planning for interconnection-related transmission needs compared to more

---

[2395] AEP Initial Comments at 18-19; EEI Initial Comments at 18; ENGIE Initial Comments at 5; Illinois Commission Initial Comments at 8-9; Vistra Initial Comments at 33; Xcel Initial Comments at 15.

future-oriented approaches. We agree that an effective regional transmission planning process will identify interconnection-related transmission needs and evaluate regional transmission solutions to those needs within the context of a future system. We further agree that transmission providers should consider generator interconnection as a driver of Long-Term Transmission Needs on a forward-looking basis. For these reasons, we require transmission providers to incorporate seven specific categories of factors in their development of Long-Term Scenarios used in Long-Term Regional Transmission Planning, including Factory Category Six: generator interconnection requests and withdrawals. However, we disagree that the coordination proposal should not rely on past results from the generator interconnection process or specific interconnection requests in determining what interconnection-related transmission needs should be evaluated in the existing Order No. 1000 regional transmission planning and cost allocation processes. Interconnection-related network upgrades repeatedly identified in past interconnection studies are strongly indicative that a location (despite presenting potentially prohibitive interconnection costs if borne by one or a small number of interconnection customers) is otherwise valuable for location of new generation.

1129. Finally, because we are modifying the NOPR proposal to no longer apply to Long-Term Regional Transmission Planning, commenters' specific concerns that this proposal is duplicative to the categories of factors requirements in the development of Long-Term Scenarios are moot.

C.     **Qualifying Criteria**

1.     **NOPR Proposal**

1130.  In the NOPR, the Commission proposed to require that transmission providers

evaluate for selection regional transmission facilities to address interconnection-related

transmission needs that have been identified in the generator interconnection process as

requiring interconnection-related network upgrades where:  (1) the transmission provider

has identified interconnection-related network upgrades in interconnection studies to

address those interconnection-related transmission needs in at least two interconnection

queue cycles during the preceding five years (beginning at the time of the withdrawal of

the first underlying interconnection request); (2) the interconnection-related network

upgrade identified to meet those interconnection-related transmission needs has a voltage

of at least 200 kV and/or an estimated cost of at least $30 million; (3) those

interconnection-related network upgrades have not been developed and are not currently

planned to be developed because the interconnection request(s) driving the need for the

upgrade has been withdrawn; and (4) the transmission provider has not identified an

interconnection-related network upgrade to address the relevant interconnection-related

transmission need in an executed generator interconnection agreement or in a generator

interconnection agreement that the interconnection customer requested that the

transmission provider file unexecuted with the Commission.[2396]

---

[2396] NOPR, 179 FERC ¶ 61,028 at P 166.

1131.  The Commission proposed that the initial five-year time period begin five calendar years prior to the initial effective date of the Commission-accepted tariff provisions proposed to comply with this reform such that, upon the Commission's acceptance of such tariff provisions, the transmission provider would consider interconnection-related network upgrades identified to address the same interconnection-related transmission need in at least two interconnection queue cycles in the five calendar years prior to the effective date established in the order accepting those tariff revisions.[2397]  The Commission also proposed to require that transmission providers in each transmission planning region consider whether the interconnection-related transmission need for which the transmission provider identified the interconnection-related network upgrade is the same in multiple interconnection queue cycles.[2398]  That is, if an interconnection-related transmission need is driving the identification of an interconnection-related network upgrade on the transmission system in one interconnection queue cycle and an interconnection-related network upgrade with, for example, a different voltage, starting point, or ending point is identified in the next interconnection queue cycle to address the same interconnection-related transmission need, then the first criterion of the proposed coordination reform would be satisfied.[2399]  The Commission stated that it believes that this approach will appropriately account for differences in technology, study

---

[2397] *Id*. P 170.

[2398] *Id*. P 171.

[2399] *Id*.

assumptions, system topology, and/or interconnection requests that may occur over time that may result in different interconnection-related network upgrades to address the same interconnection-related need.[2400]

1132.  The Commission stated that it believes that the proposed criteria the transmission provider must use to identify the interconnection-related transmission needs that should be considered in the regional transmission planning process will help to ensure that the associated interconnection-related network upgrades are likely to have produced benefits beyond those provided to the interconnection customers whose interconnection requests the interconnection-related network upgrades are needed to accommodate.[2401]

1133.  To avoid shifting costs inappropriately from generators in the generator interconnection process to transmission customers through the regional transmission planning process, the Commission further proposed to limit the scope of interconnection-related transmission needs to be considered in the regional transmission planning process to those interconnection-related transmission needs not addressed by interconnection-related network upgrades memorialized in an executed generator interconnection agreement (or in a generator interconnection agreement that the interconnection customer requested to be filed unexecuted with the Commission).[2402]

---

[2400] *Id.*

[2401] *Id.* P 168.

[2402] *Id.* P 173.

USCA4 Appeal: 24-1650   Doc: 224   Filed: 01/21/2025   Pg: 810 of 2455
Document Accession #: 20240513-3036   Filed Date: 05/13/2024

2.    **Comments**

1134.  Multiple commenters generally support the NOPR proposal but express concerns about the eligibility criteria proposed in the NOPR and request modification.[2403]  SDG&E states that the criteria defined in the NOPR strike an appropriate balance to cover many situations in which generation is needed, while also protecting ratepayers from unnecessary costs.[2404]

1135.  Avangrid argues that, while the NOPR proposal has merit, the Commission should allow transmission providers to determine the most appropriate thresholds.[2405]  SEIA asks the Commission to allow each transmission planning region to determine its own threshold, which may include lower voltage lines and substations.[2406]  Indicated PJM TOs further argue that the proposed criteria may not be appropriate in all transmission planning regions.[2407]

1136.  MISO argues that transmission planning regions should be able to develop their own cost and voltage criteria.  MISO explains that it may be difficult to implement the requirement that interconnection-related network upgrades that qualify must "not

---

[2403] NARUC Initial Comments at 19-20; Pattern Energy Initial Comments at 28; Pine Gate Initial Comments 31-33; SEIA Initial Comments at 14-15; Shell Initial Comments at 30; TAPS Initial Comments at 13; US DOE Initial Comments at 28.

[2404] SDG&E Initial Comments at 3.

[2405] Avangrid Initial Comments at 12.

[2406] SEIA Initial Comments at 15.

[2407] Indicated PJM TOs Initial Comments at 15-16.

currently be planned to be developed" in the interconnection process because in MISO's experience interconnection-related network upgrades shift from queue cycle to queue cycle as withdrawals occur, and as a result MISO suggests deleting this requirement. MISO opposes the requirement to identify any interconnection-related network upgrade that is identified in multiple generator interconnection studies as it would require the review and comparison of numerous studies to comply with no increased benefit.[2408]

1137.  Multiple commenters that generally support the NOPR proposal suggest modification to the NOPR's proposed cost and voltage eligibility criteria.  Pattern Energy suggests that the Commission should allow consideration of interconnection-related network upgrades that would meet either a voltage or a cost threshold because, for example, lower voltage lines that cost more than $30 million can often satisfy an interconnection need.[2409]  Pattern Energy and Pine Gate argue that the Commission should lower the voltage threshold to 100 kV.[2410]  Shell asks the Commission to lower the 200 kV threshold to 115 kV or to remove it entirely in favor of a cost threshold that is updated regularly based on inflation or some other Commission-approved indicator.[2411]

---

[2408] MISO Initial Comments at 45-46.

[2409] Pattern Energy Initial Comments at 28.

[2410] Pattern Energy Initial Comments at 28; Pine Gate Initial Comments at 32.

[2411] Shell Initial Comments at 30.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 812 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

1138.  Pine Gate argues that the Commission should reduce the cost threshold to $10 million.[2412]  SEIA argues that the cost threshold should be replaced with a $100,000/MW threshold.[2413]  US DOE argues that a $30 million cost threshold may not be appropriate because some interconnection-related network upgrades that meet this eligibility factor may only benefit a limited number of interconnection customers.  As an alternative, US DOE adds that the Commission should consider interconnection-related network upgrades "that would provide benefits beyond the local interconnection level or that would improve interconnection efficiencies across a wider geographic area and not substations, voltage support devices, or other local connection upgrades."[2414]

1139.  Dominion states that the relatively low voltage and cost thresholds in the Commission's proposal invites interconnection customers to seek bigger investments than needed or select a location that increases the cost of interconnection.[2415]  Dominion further argues that the number, size, or frequency of interconnection requests should not be used as a basis for planning transmission projects, because the process could be subject to gaming, where speculative interconnection requests could result in

---

[2412] Pine Gate Initial Comments at 32.

[2413] SEIA Initial Comments at 15.

[2414] US DOE Initial Comments at 28.

[2415] Dominion Initial Comments at 32.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 813 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

transmission buildouts and spending that are not justified by actual grid needs or economics.[2416]

1140.  Some commenters take issue with the NOPR's proposed criteria.  Indicated PJM TOs argue that there is no record evidence to support the proposed 200 kV and $30 million cost threshold criteria.[2417]  PJM states that few interconnection studies have identified the need for interconnection-related network upgrades in excess of $30 million.[2418]  Illinois Commission contends that many projects in the interconnection queue are associated with interconnection-related network upgrades that meet the repeatedly-identified and 200 kV thresholds and that simply folding interconnection costs into transmission planning may expedite the queue at the expense of efficiency and cost-effectiveness.[2419]  Indicated PJM TOs argue that limiting consideration to only generating facilities that have not yet signed (or had filed) an interconnection agreement will result in studying only uneconomic projects, which would run afoul of the cost causation principle.[2420]

1141.  Interwest argues that the Commission should not require the identification of the interconnection-related network upgrade in two queue cycles over the five-year lookback

---

[2416] Dominion Reply Comments at 7-8.

[2417] Indicated PJM TOs Initial Comments at 15.

[2418] PJM Initial Comments at 88.

[2419] Illinois Commission Initial Comments at 8-9.

[2420] Indicated PJM TOs Initial Comments at 16.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 814 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                              - 804 -

period because such a requirement would limit the number of identified interconnection-related network upgrades that would trigger this newly proposed process.[2421]  Pine Gate states that the Commission's look-back period should be at least the two immediately preceding interconnection queue cycles, or, where serial studies have been performed, during the preceding five years beginning at the time of the withdrawal of the first underlying interconnection request.[2422]  Pine Gate argues that this revision will ensure that study results will be available for use in identifying interconnection-related network upgrades to evaluate.[2423]  SEIA argues that once a transmission provider identifies the same interconnection-related network upgrade in two interconnection cycles, that line should be included in the next Long-Term Regional Transmission Planning update cycle even if five years have not passed since initial identification.[2424]  Pattern Energy supports SEIA's requests.[2425]

1142.  EEI and Eversource are unsure of the stage of the generator interconnection process at which a project would meet the proposed criteria.[2426]  Eversource requests that

---

[2421] Interwest Initial Comments at 3, 11.

[2422] Pine Gate Initial Comments at 31.

[2423] *Id.*

[2424] SEIA Initial Comments at 15.

[2425] Pattern Energy Reply Comments at 10-11.

[2426] EEI Initial Comments at 17-18; Eversource Initial Comments at 24.

the Commission require transmission providers to specify the stage in the interconnection process that an interconnection-related network upgrade is identified.[2427]

1143.  Pine Gate asks the Commission to combine the third and fourth criteria into one criterion:  those interconnection-related network upgrades that are not developed or in development and not currently committed to be built under an interconnection service agreement or any related construction agreement.[2428]

1144.  Some commenters argue that the Commission's proposed criteria create too simplistic of a method for determining which interconnection-related network upgrades should be evaluated in Long-Term Regional Transmission Planning.[2429]  Pennsylvania Commission argues that, without a rigorous examination of why an interconnection application failed, there is no proof that there exists a need for building interconnection-related network upgrades as part of Long-Term Regional Transmission Planning.[2430] NARUC argues that the meaning of the term "multiple times" should be informed by a process that also examines the reasons why the previous interconnection requests were withdrawn, including generation developer land acquisition decisions or the identification

---

[2427] Eversource Initial Comments at 24.

[2428] Pine Gate Initial Comments at 32-33.

[2429] NARUC Initial Comments at 19; Pennsylvania Commission Initial Comments at 8; Vistra Initial Comments at 20.

[2430] Pennsylvania Commission Initial Comments at 8.

USCA4 Appeal: 24-1650   Doc: 224   Filed: 01/21/2025   Pg: 816 of 2455
Document Accession #: 20240513-3036   Filed Date: 05/13/2024

of more economic transmission design alternatives.[2431]  Vistra takes issue with the fact that the Commission does not distinguish between situations when developers simply sought to develop in an uneconomic area versus when a more efficient or cost-effective transmission project would have been identified as part of the regional transmission planning process.[2432]

### 3.  Commission Determination

1145.  We adopt the NOPR proposal, with modification, to require that, for a regional transmission facility to address an interconnection-related transmission need to qualify for evaluation through the regional transmission planning process for selection under this reform, any interconnection-related network upgrade identified to meet that interconnection-related transmission need must meet both the proposed voltage *and* cost criteria.  Thus, we require transmission providers to evaluate for selection in their existing Order No 1000 regional transmission planning processes regional transmission facilities to address interconnection-related transmission needs that have been identified in the generator interconnection process as requiring interconnection-related network upgrades where:  (1) the transmission provider has identified interconnection-related network upgrades in interconnection studies to address those interconnection-related transmission needs in at least two interconnection queue cycles during the preceding five years (looking back from the effective date of the Commission-accepted tariff provisions

---

[2431] NARUC Initial Comments at 19.

[2432] Vistra Initial Comments at 20.

proposed to comply with this reform, and the later-in-time withdrawn interconnection
request occurring after the effective date of the Commission-accepted tariff provisions);
(2) an interconnection-related network upgrade identified to meet those interconnection-
related transmission needs has a voltage of at least 200 kV *and* an estimated cost of at
least $30 million; (3) such interconnection-related network upgrade(s) have not been
developed and are not currently planned to be developed because the interconnection
request(s) driving the need for the network upgrade(s) has been withdrawn; and (4) the
transmission provider has not identified an interconnection-related network upgrade to
address the relevant interconnection-related transmission need in an executed generator
interconnection agreement or in a generator interconnection agreement that the
interconnection customer requested that the transmission provider file unexecuted with
the Commission.

1146.  We find it necessary to establish these criteria to limit the scope of the requirement
for transmission providers to evaluate regional transmission facilities to address
interconnection-related transmission needs in their regional transmission planning
processes to those interconnection-related transmission needs that are likely to persist, are
not unique to a single interconnection request, and might be addressed by regional
transmission facilities that have the potential to provide more widespread benefits to
transmission customers.  We find that each of the four criteria are necessary to identify
the appropriate set of interconnection-related transmission needs.  Moreover, we find that
the modification to require that an interconnection-related network upgrade identified to
meet an interconnection-related transmission need must satisfy both the voltage and cost

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 818 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

thresholds better limits the scope of this reform by ensuring that any regional

transmission facilities evaluated to address such interconnection-related transmission

needs are more likely to provide widespread benefits to transmission customers.[2433]

1147.  We further find that these criteria strike a reasonable balance between precision

and workability.  Our reforms here are intended to ensure that transmission providers

must identify interconnection-related transmission needs for evaluation in their regional

transmission planning processes that are likely to persist, are not unique to a single

interconnection request, and might be addressed by regional transmission facilities that

have the potential to provide more widespread benefits to transmission customers.

Requiring in-depth qualitative analysis of individual interconnection requests, including

consideration of why they were withdrawn, as some commenters suggest, would

undermine these goals.  Furthermore, these criteria simply determine whether

transmission providers must *evaluate* regional transmission facilities to address any given

---

[2433] The Commission has previously found that network upgrades can benefit all transmission customers.  *See* Order No. 2003, 104 FERC ¶ 61,103 at PP 21, 65 (stating "[m]ost improvements to the Transmission System, including Network Upgrades, benefit all transmission customers" and "the definition of Network Upgrade [includes] the phrase 'at or beyond the Point of Interconnection,' . . . [f]acilities beyond the Point of Interconnection are part of the Transmission Provider's Transmission System and benefit all users"); Order No. 2003-A, 106 FERC ¶ 61,220 at P 584 (citing *Entergy Servs., Inc. v. FERC*, 319 F.3d 536, 543-544 (D.C. Cir. 2003)).  The Commission has also previously found, and the record demonstrates, that higher-voltage transmission facilities are more likely to provide widespread benefits to transmission customers.  *See* NOPR, 179 FERC ¶ 61,028 at PP 32 (citing Order No. 1000, 136 FERC ¶ 61,051 at P 486), 168; *Sw. Power Pool, Inc.*, 131 FERC ¶ 61,252, at P 73 (2010); *Midwest Indep. Trans. Sys. Operator, Inc.*, 129 FERC ¶ 61,060, at P 8 (2009).  *See also, e.g.*, CAISO ANOPR Comments at 54; Invenergy Initial Comments at 14; Southeast PIOs Initial Comments at 24.

interconnection-related transmission need for potential selection; transmission providers may still separately assess whether any particular regional transmission facility qualifies for selection in the relevant existing regional transmission planning process(es). Therefore, we disagree with commenters that argue that the proposed criteria create too simplistic a method for determining which interconnection-related transmission needs should be evaluated in regional transmission planning and cost allocation processes.[2434]

1148.  We decline to allow transmission providers to determine appropriate qualifying criteria,[2435] because the record supports our adoption of the qualifying criteria established by this rule.  As described directly above, we find that these specific criteria ensure that the interconnection-related transmission needs that we require transmission providers to evaluate through their regional transmission planning processes are likely to persist, are not unique to a single interconnection request, and might be addressed by regional transmission facilities that have the potential to provide more widespread benefits to transmission customers.  Furthermore, transmission providers retain the flexibility to determine whether to select a regional transmission facility, and these criteria will simply determine whether transmission providers, pursuant to this final rule, must evaluate interconnection-related transmission needs in the Order No. 1000 regional transmission planning and cost allocation processes.

---

[2434] *See* NARUC Initial Comments at 19; Pennsylvania Commission Initial Comments at 8; Vistra Initial Comments at 20.

[2435] *See* Avangrid Initial Comments at 12; MISO Initial Comments at 45-46; SEIA Initial Comments at 15.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 820 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

1149.  We also disagree with Indicated PJM TOs' argument that the proposed criteria may not be appropriate in all transmission planning regions because of the differences in scales, topology, and economics.[2436]  While each transmission planning region is unique, we find that the criteria that we establish here are broad enough to capture interconnection-related network upgrades that are likely to produce benefits beyond the interconnection customer across transmission planning regions despite their differences. Furthermore, as stated above, transmission providers in each transmission planning region retain the flexibility to select regional transmission facilities, and the criteria that we adopt here do not mandate that the transmission providers in any transmission planning region select any particular regional transmission facilities to address interconnection-related transmission needs.

1150.  Additionally, we find that the qualifying criteria that we establish here that an interconnection-related need must be repeated twice and meet both voltage and cost thresholds are just and reasonable.  We disagree with commenters that argue for the adoption of different criteria or for the elimination of one or both criteria.[2437]  We find that the purpose of the criteria established here is precisely to limit the number of interconnection-related transmission needs that transmission providers must evaluate to those that merit consideration in the existing Order No. 1000 regional transmission

---

[2436] *See* Indicated PJM TOs Initial Comments at 15-16.

[2437] *See* Dominion Initial Comments at 32; Indicated PJM TOs Initial Comments at 15; Interwest Initial Comments at 3, 11; Pattern Energy Initial Comments at 28; Pine Gate Initial Comments at 32; SEIA Initial Comments at 15; Shell Initial Comments at 30.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 821 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

planning and cost allocation processes.  The requirement of the repeat identification of an
interconnection-related need in at least two interconnection queue cycles during the
preceding five years criterion provides an important limit on the extent to which
evaluation is required.  Namely, this and the other criteria together indicate that it is
likely that the relevant interconnection-related transmission needs will persist but were
not resolved because the high associated interconnection-related network upgrade costs
drove the withdrawal of the underlying interconnection requests.  The repeat
identification of interconnection-related network upgrades driven by a common
interconnection-related transmission need also indicates that the constraint that the
interconnection-related network upgrades were identified to address is not unique to a
single interconnection request at a single point in time.  Additionally, relaxing this repeat
identification requirement may be overburdensome to transmission providers because it
could increase the number of interconnection-related transmission needs that
transmission providers must evaluate in their regional transmission planning and cost
allocation processes.

1151.  We find that it is necessary to establish a cost threshold criterion that is stringent
enough to capture those interconnection-related network upgrades that are likely to have
caused the underlying interconnection requests to withdraw.  Additionally, we find that it
is necessary to establish a voltage criterion that is high enough so that any regional
transmission facility evaluated to address the underlying interconnection-related
transmission need(s) is likely to produce benefits that extend beyond the interconnection
customer.  We further believe that these criteria are important to limit the number of

interconnection-related transmission needs that transmission providers must evaluate to a practical set so that transmission providers do not have to evaluate numerous regional transmission facilities to address those needs that are unlikely to be selected.

1152.  Consequently, the modification adopted here to require that an interconnection-related network upgrade identified to meet an interconnection-related transmission need satisfies both the voltage and cost criteria will achieve these results.  In particular, this modification will prevent transmission providers from evaluating interconnection-related transmission needs associated with interconnection-related network upgrades that are either above 200 kV but lower-cost or cost more than $30 million but are less than 200 kV, which means that they are less likely to provide more widespread benefits to transmission customers.

1153.  The change to the voltage and cost criteria also address commenters' concerns.[2438] For example, as US DOE notes, in some instances, network upgrades that cost $30 million or more may only benefit a limited number of interconnection customers.[2439] Consequently, the change that we adopt to require that an interconnection-related network upgrade identified to meet an interconnection-related transmission need satisfy both the voltage and cost criteria will more narrowly define a set of interconnection-

---

[2438] Pine Gate Initial Comments at 32; SEIA Initial Comments at 15; US DOE Initial Comments at 28.

[2439] US DOE Initial Comments at 28.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 823 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                    - 813 -

related transmission needs that the transmission provider must evaluate in the regional

transmission planning process.

1154.  The record supports a 200 kV threshold.  For example, as noted in the NOPR, the

Commission has previously found CAISO's use of a 200 kV threshold was just and

reasonable for determining eligibility for evaluating interconnection-related network

upgrades in the regional transmission planning process.  The Commission found that

CAISO's proposed threshold "strikes a reasonable balance between . . . accommodating

the generators' need to interconnect . . . in a timely manner, and the benefits that can flow

from evaluating the larger projects in the comprehensive transmission planning

process."[2440]  As such, we continue to believe that a 200 kV voltage threshold is

sufficiently high such that the interconnection-related network upgrades can more

reasonably be expected to produce regional benefits to transmission customers than

lower-voltage transmission facilities.

1155.  We also continue to believe that $30 million is an appropriate threshold for the

cost criteria related to this requirement.  We find that the $30 million threshold is

consistent with the record established in this proceeding regarding how the costs of

interconnection-related network upgrades lead to interconnection customers withdrawing

from the queue.[2441]  A lower cost criterion may require transmission providers to evaluate

---

[2440] *Cal Indep. Sys. Operator Corp.*, 133 FERC ¶ 61,224, at P 103 (2010); *see also* NOPR, 179 FERC ¶ 61,028 at P 165 n.300 & P 172 n.302.

[2441] NOPR, 179 FERC ¶ 61,028 at P 172 n.303.

in the regional transmission planning process interconnection-related transmission needs

associated with interconnection-related network upgrades that have a greater likelihood to

be affordable for interconnection customers.  Additionally, we are concerned that the

$/kW cost threshold proposed by SEIA may not capture interconnection-related network

upgrades that are more likely to provide regional benefits to transmission customers

beyond the interconnection customer.  Further, transmission providers may face practical

challenges in identifying the specific kW size corresponding to the interconnection-

related transmission need associated with an interconnection-related network upgrade

because the same interconnection-related network upgrade can be identified as needed for

multiple interconnection requests (or groups of requests) of different kW sizes.

1156.  Additionally, we reiterate that the criteria adopted herein do not require

transmission providers to select any particular regional transmission facility to address

interconnection-related transmission needs.  Instead, we require transmission providers to

simply evaluate regional transmission facilities to address interconnection-related

transmission needs that meet these criteria for potential selection, recognizing that

transmission providers may ultimately determine through their regional transmission

planning processes that such regional transmission facilities are not eligible or

sufficiently beneficial to be selected.

1157.  We disagree with Indicated PJM TOs' argument that limiting evaluation to

exclude interconnection-related network upgrades identified in generator interconnection

requests that have executed (or requested to be filed unexecuted) an interconnection

agreement will result in studying only uneconomic projects.[2442]  This criterion ensures that transmission providers are not required to evaluate in their regional transmission planning process interconnection-related transmission needs associated with interconnection-related network upgrades for which an interconnection customer has already agreed to pay.[2443]  Furthermore, in response to MISO's suggestion to delete this limiting aspect, we clarify that this criterion excludes instances in which an interconnection-related network upgrade is identified in an executed generator interconnection agreement (or in a generator interconnection agreement that the interconnection customer requested to be filed unexecuted with the Commission),[2444] not instances where an interconnection-related network upgrade that meets the criteria in this section is identified as needed for an interconnection request that has not proceeded to the generator interconnection agreement phase of the interconnection study process.

1158.  The criterion requiring that interconnection-related transmission needs are identified in at least two interconnection queue cycles during the preceding five years will help to ensure that an interconnection-related transmission need is likely to persist and is not unique to a single interconnection request before requiring transmission providers to evaluate a regional transmission facility to address that need for potential

---

[2442] Indicated PJM TOs Initial Comments at 16.

[2443] NOPR, 179 FERC ¶ 61,028 at P 173.

[2444] MISO Initial Comments at 46.

selection.[2445]  We recognize that, in limited circumstances, it is possible that there may be only one interconnection queue cycle during a five-year period.  We clarify that if more than five years pass between interconnection queue cycles, then this criterion should be read to include the interconnection queue cycle that immediately preceded the current interconnection queue where the interconnection-related transmission need is identified.[2446]

1159.  We adopt the NOPR proposal that the initial five-year period will begin five calendar years prior to the effective date of the Commission-accepted tariff provisions proposed to comply with this final rule.  Thus, transmission providers must evaluate an interconnection-related transmission need that has been previously identified multiple times within the five years prior to the effective date of the Commission-accepted tariff provisions, but never been resolved due to the withdrawal of the underlying interconnection request(s).  This assumes that the other qualifying criteria are met for the interconnection-related transmission need.  The evaluation for selection of regional transmission facilities that address certain identified interconnection-related transmission needs must occur in the first Order No. 1000 regional transmission planning and cost allocation processes cycle that commences after the later-in-time withdrawn interconnection request occurring after the effective date of the accepted tariff provisions.

---

[2445] Pattern Energy Reply Comments at 10-11; Pine Gate Initial Comments at 31; SEIA Initial Comments at 14-15.

[2446] *See* Pine Gate Initial Comments at 31.

Docket No. RM21-17-000                                                                    - 817 -

1160.  Additionally, we clarify that if there are no queue cycles in the preceding five-year period because the transmission provider uses a first-come, first-served serial interconnection process, then this criterion will be met based on the identification of interconnection-related transmission needs in individual interconnection studies.  That is, if the interconnection-related transmission need is identified in at least two individual interconnection studies during the preceding five-year period for interconnection customers that subsequently withdrew from the interconnection queue, then this criterion is met.  We further clarify, as discussed immediately above, that if a transmission provider identifies the same interconnection-related transmission need in two interconnection queue cycles during a five-year period or less, the transmission provider must evaluate that interconnection-related transmission need even if five years have not yet passed since the initial identification.[2447]

1161.  In response to Eversource's request that we require transmission providers to specify the stage in the generator interconnection process that an interconnection-related network upgrade is identified,[2448] we clarify that the criterion discussed herein applies no matter the stage in which the upgrades are identified, because we are concerned with interconnection-related transmission needs going unaddressed due to withdrawals regardless of the stage of the generator interconnection process.

---

[2447] *See* Pattern Energy Reply Comments at 10-11; SEIA Initial Comments 15.

[2448] *See* EEI Initial Comments at 17-18; Eversource Initial Comments at 24.

Docket No. RM21-17-000                                                      - 818 -

1162.  Finally, we decline to combine the third and fourth criteria into one criterion as Pine Gate suggests, because we find that it is unnecessary.[2449]  This reform creates a process for the evaluation of interconnection-related transmission needs in regional transmission planning and cost allocation processes if those needs have not been addressed and are unlikely to be addressed through the development of an interconnection-related network upgrade in the generator interconnection process.  The purpose of the third criterion is to limit the reform to those interconnection-related transmission needs where the associated interconnection requests have been withdrawn; that is, this criterion requires the repeat withdrawal.  The fourth criterion, that the interconnection-related network upgrade not be identified in a generator interconnection agreement, ensures that the interconnection-related network upgrade has not been developed and is not planned to be developed because a generator interconnection agreement memorializes the transmission owner's obligation to develop an identified interconnection-related network upgrade.[2450]

---

[2449] *See* Pine Gate Initial Comments at 32-33.

[2450] *See Pro forma* LGIA art. 11.3 ("Transmission Provider or Transmission Owner shall design, procure, construct, install, and own the Network Upgrades . . . described in Appendix B.").

USCA4 Appeal: 24-1650 Doc: 224 Filed: 01/21/2025 Pg: 829 of 2455
Document Accession #: 20240513-3036 Filed Date: 05/13/2024

Docket No. RM21-17-000 - 819 -

## V. Consideration of Dynamic Line Ratings and Advanced Power Flow Control Devices

### A. General Proposal

#### 1. NOPR Proposal

1163. In the NOPR, the Commission proposed to require transmission providers in each transmission planning region to consider two specific technologies more fully in regional transmission planning and cost allocation processes: dynamic line ratings and advanced power flow control devices. The Commission recognized that selecting transmission facilities that incorporate such technologies serving a transmission function in the regional transmission plan for purposes of cost allocation could be more efficient or cost-effective than a proposed regional transmission facility that does not use such technologies.[2451]

1164. More specifically, the Commission proposed to require transmission providers in each transmission planning region to consider for each identified regional transmission need whether selecting transmission facilities that incorporate dynamic line ratings or advanced power flow control devices would be more efficient or cost-effective than selecting transmission facilities that do not incorporate these technologies. The Commission proposed that such consideration should first address whether incorporating dynamic line ratings or advanced power flow control devices into existing transmission facilities could meet the same regional transmission need more efficiently or cost-

---

[2451] NOPR, 179 FERC ¶ 61,028 at PP 272-273.

Docket No. RM21-17-000                                           - 820 -

effectively than other transmission facilities that are being considered for potential

selection.  Second, the Commission proposed that, when evaluating transmission

facilities for potential selection, transmission providers in each transmission planning

region must also consider whether incorporating dynamic line ratings and advanced

power flow control devices as part of any potential regional transmission facility would

be more efficient or cost-effective than potential regional transmission facilities that do

not incorporate such technologies.  The Commission proposed to apply this requirement

in all aspects of the regional transmission planning processes, including the existing

regional transmission planning process for near-term regional transmission needs and

Long-Term Regional Transmission Planning.  As is the case for any other transmission

facility selected, the Commission proposed that the costs to incorporate dynamic line

ratings or advanced power flow control devices selected, whether as an addition to an

existing transmission facility or as part of a new regional transmission facility, be

allocated using the applicable regional cost allocation method.[2452]

1165.  The Commission noted that, as required by Order No. 1000, the evaluation process

must culminate in a determination that is sufficiently detailed for stakeholders to

understand why a particular transmission facility was selected or not selected.[2453]  The

Commission proposed to extend this requirement such that transmission providers must

---

[2452] *Id.* P 274.

[2453] *Id.* P 275 (citing Order No. 1000, 136 FERC ¶ 61,051 at P 328; Order No. 1000-A, 139 FERC ¶ 61,132 at P 267).

ensure that the determination of whether to incorporate dynamic line ratings and advanced power flow control devices is sufficiently detailed for stakeholders to understand why they were or were not incorporated into selected regional transmission facilities.[2454]

1166. The Commission also sought comment on whether non-RTO/ISO transmission planning regions should be required to update their energy management systems or make other similar changes if dynamic line ratings are identified as a more efficient or cost-effective transmission facility.[2455]

## 2. Comments on General Proposal

1167. Many commenters, including technology developers, environmental advocates, ratepayer advocates, and independent market monitors, support the NOPR proposal.[2456]

---

[2454] *Id.*

[2455] *Id.* P 277.

[2456] ACEG Initial Comments at 31; ACORE Initial Comments at 15-16; ACORE Supplemental Comments at 1; Advanced Energy Buyers Initial Comments at 4; AEE Initial Comments at 27-28; CARE Coalition Initial Comments at 2-3; Certain TDUs Reply Comments at 7-9; Clean Energy Associations Initial Comments at 28; Clean Energy Associations Reply Comments at 7-8; Conservative Energy Network Supplemental Comments at 1-2; Conservatives for Clean Energy – Florida Supplemental Comments at 1-2; Conservatives for Clean Energy – South Carolina Supplemental Comments at 1; Cross Sector Representatives Supplemental Comments at 1; DC and MD Offices of People's Counsel Initial Comments at 36; DC and MD Offices of People's Counsel Reply Comments at 8-9; Evergreen Action Initial Comments at 4; Hannon Armstrong Reply Comments at 2; Illinois Commission Initial Comments at 11-13; Indicated US Senators and Representatives Initial Comments at 2; Joint Consumer Advocates Initial Comments at 13; Massachusetts Attorney General Initial Comments at 16-18; Michigan Conservative Energy Forum Supplemental Comments at 1; Michigan State Entities Initial Comments at 10; NARUC Initial Comments at 35; NASEO Initial Comments at 6; NASUCA Initial Comments at 7-8; NESCOE Initial Comments at 53;

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 832 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                      - 822 -

For example, many commenters state that these technologies provide significant annual

cost savings[2457] or affect both the capital investment and consumer benefits of cost

allocation.[2458]  Additionally, some federal legislators support the NOPR proposal.[2459]

CARE Coalition asserts that the Commission should use all available tools and

technologies to increase the efficiency and capacity of the transmission network.[2460]

ELCON states that transmission planning processes should ascertain whether current

infrastructure can be improved before reviewing costlier or slower options like greenfield

Nevada Commission Initial Comments at 13; Ohio Conservative Energy Forum
Supplemental Comments at 1; Pennsylvania Commission Initial Comments at 11; PIOs
Initial Comments at 22; PJM Market Monitor Initial Comments at 6; Potomac Economics
Initial Comments at 5; Prysmian Initial Comments at 1; Smart Wires Initial Comments at
1; SPP Market Monitor Initial Comments at 9; US DOE Initial Comments at 36-37;
WATT Coalition Initial Comments at 2; WATT Coalition Supplemental Comments at 2-
3; Western Way Colorado Supplemental Comments at 1-2; Western Way Nevada
Supplemental Comments at 2; Wisconsin Conservative Energy Forum Supplemental
Comments at 1.

[2457] Cross Sector Representatives Supplemental Comments at 1; WATT Coalition
Supplemental Comments at 2-3.

[2458] Conservative Energy Network Supplemental Comments at 1-2; Conservatives
for Clean Energy – Florida Supplemental Comments at 1-2; Conservatives for Clean
Energy – South Carolina Supplemental Comments at 1; Michigan Conservative Energy
Forum Supplemental Comments at 1; Ohio Conservative Energy Forum at 1; Western
Way Colorado Supplemental Comments at 2; Western Way Nevada Supplemental
Comments at 2; Western Way Utah Supplemental Comments at 2; Wisconsin
Conservative Energy Forum Supplemental Comments at 1.

[2459] Environmental Legislators Caucus Supplemental Comments at 2; Senator
Schumer Supplemental Comments at 2; Senator Whitehouse Supplemental Comments at
3.

[2460] CARE Coalition Initial Comments at 3.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 833 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                    - 823 -

transmission, and greater weight should be given to those transmission projects that incorporate grid enhancing technologies.[2461]  Certain TDUs state that they participate actively in the MISO transmission planning process, and that they have observed that grid enhancing technologies and other non-transmission alternatives do not receive the attention that they deserve.[2462]  AEE contends that the Commission has an obligation to promote the adoption of alternative transmission technologies, as directed by Congress in the Energy Policy Act of 2005, and AEE states that the Commission has not made explicit efforts to implement this mandate beyond offering rate incentives for alternative transmission technologies.[2463]

1168.  Industrial Customers assert that requiring dynamic line ratings, advanced power flow control devices, and other grid enhancing technologies will require transmission utilities to deploy capital where it is needed most to maintain reliability, which will reduce transmission costs to consumers because dynamic line ratings extend the useful life of existing transmission infrastructure and optimize existing grid capabilities.[2464]  ENGIE claims that deploying grid enhancing technologies could help to contain costs and support efficient, advanced projects.[2465]  Invenergy argues that, even if there may be

---

[2461] ELCON Initial Comments at 5, 20.

[2462] Certain TDUs Reply Comments at 8.

[2463] AEE Initial Comments at 29 (citing 42 U.S.C. 16422).

[2464] Industrial Customers Reply Comments at 13-14.

[2465] ENGIE Reply Comments at 3-4.

instances where dynamic line ratings and advanced power flow control devices do not provide the best option with respect to cost, transmission providers should still undertake the analysis.[2466]  Potomac Economics observes that incorporating grid enhancing technologies in the transmission planning process will help ensure that transmission owners do not incur inefficient transmission upgrade costs to mitigate congestion that can be reduced more cost-effectively by grid enhancing technologies.[2467]

1169.  Individual state governmental entities as well as NASEO, NASUCA, and NESCOE emphasize the importance of considering more efficient or cost-effective alternatives.[2468]  Some state commissions and US DOE cite the benefits of cost containment for customers.[2469]  DC and MD Offices of People's Counsel and Clean Energy Associations assert that grid enhancing technologies provide value beyond lowering transmission costs, as they can be deployed quickly, are modular, have low environmental and geographic footprints, and can be developed at low risk.[2470]  NARUC

---

[2466] Invenergy Reply Comments at 17.

[2467] Potomac Economics Initial Comments at 5.

[2468] Massachusetts Attorney General Initial Comments at 16-18; Michigan State Entities Initial Comments at 10 (citing Institute for Policy Integrity ANOPR Reply Comments at 8); NASEO Initial Comments at 6; NASUCA Initial Comments at 7-8; NESCOE Initial Comments at 53.

[2469] Illinois Commission Initial Comments at 11-13; NARUC Initial Comments at 35-36; Nevada Commission Initial Comments at 13; Pennsylvania Commission Initial Comments at 11; US DOE Initial Comments at 36-37.

[2470] Clean Energy Associations Initial Comments at 27; DC and MD Offices of People's Counsel Reply Comments at 8.

asserts that an effective transmission planning process should maximize the use of existing transmission and allow for building new transmission only where necessary or economic.[2471]  Indicated US Senators and Representatives support the use of advanced transmission technologies to increase the efficiency and resilience of the electric grid.[2472]

1170.  Many commenters support the consideration of alternative transmission technologies in transmission planning.  For example, Certain TDUs argue that the Commission must protect ratepayers and consider all alternatives to ensure safe, reliable, and cost-effective transmission solutions, including the use of alternative transmission technologies.[2473]  Invenergy avers that there may be instances where better using these technologies may require certain foundational investments (e.g., appropriate software), but that only reinforces the need to establish a requirement to drive change.[2474]  Industrial Customers state that transmission providers should have to consider grid enhancing technologies whenever additional transmission investment is the alternative because the cost of installing them will almost always be nominal compared to the benefits of reduced congestion, lower energy and capacity costs, and reduced need for increases in transmission system capability.[2475]

---

[2471] Industrial Customers Reply Comments at 12; NARUC Initial Comments at 35.

[2472] Indicated US Senators and Representatives Initial Comments at 2.

[2473] Certain TDUs Reply Comments at 8.

[2474] Invenergy Reply Comments at 17.

[2475] Industrial Customers Reply Comments at 16.

1171.  WATT Coalition asserts that alternative transmission technologies and new transmission capacity are complementary.[2476]  WATT Coalition and Industrial Customers further assert that there is substantial value in considering dynamic line ratings in Long-Term Regional Transmission Planning because they can provide data to strengthen assumptions made in the planning process.[2477]  Specifically, WATT Coalition explains that historical data sets of dynamic transmission line ratings can be analyzed to create probabilistic line ratings on a seasonal, monthly, or more granular level to inform the transmission planning process, helping to maximize its efficiency.[2478]  Finally, WATT Coalition states that the use of forecasted ambient-adjusted ratings (Ambient Adjusted Ratings) demonstrates that more granular data inputs can and should be captured to increase the value of new transmission investment, as well as increased reliability and market efficiency.[2479]

1172.  Invenergy states that, if there are concerns about the burden associated with evaluating alternative transmission technologies, the Commission could adopt a

---

[2476] WATT Coalition Reply Comments at 2.

[2477] Industrial Customers Reply Comments at 18; WATT Coalition Reply Comments at 1-3 (citing Appendix B of its Reply Comments).

[2478] WATT Coalition Reply Comments Appendix B at 12.  For example, WATT Coalition reports that ERCOT uses historical dynamic line rating data in its regional transmission plan.  *Id.* (citing ERCOT 2021 Regional Transmission Plan Report, section 1.2, https://www.ercot.com/files/docs/2021/12/23/2021_Regional_Transmission_Plan_Report_Public.zip).

[2479] *Id.* Appendix B at 13.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 837 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

reasonable threshold under which transmission providers are required to consider whether dynamic line ratings, advanced power flow control devices, and other grid enhancing technologies may be more efficient or cost-effective.  For example, Invenergy suggests that, if an overload is identified and the relevant facilities are overloaded by 20% or less, the transmission provider should be required to consider grid enhancing technologies as a solution.  Invenergy urges the Commission to reject calls to make the proposal an optional process, noting that transmission providers can already consider these technologies, but many do not.[2480]

1173.  Some commenters express partial support for the NOPR proposal but raise concerns about certain aspects.[2481]  California Water supports consideration of dynamic line ratings and advanced power flow control devices in Long-Term Regional Transmission Planning but recommends that any final rule clarify that such technologies should be adopted only if they are considered in the regional transmission planning process as the Commission proposes, serve the purpose of cost containment, and are found to be efficient and cost-effective.[2482]  TAPS states that while it supports the implementation of grid enhancing technologies, they may be better suited for

---

[2480] Invenergy Reply Comments at 16-17.

[2481] CAISO Initial Comments at 37-39, California Water Initial Comments at 20; ENGIE Initial Comments at 6; Invenergy Initial Comments at 14-16; Ohio Consumers Initial Comments at 32-33; Pattern Energy Initial Comments at 29; SEIA Initial Comments at 21-22; SPP Initial Comments at 25-26, TAPS Initial Comments at 4, 21-22.

[2482] California Water Initial Comments at 20.

consideration on a shorter regional transmission planning horizon.[2483]  While Pattern

Energy supports the consideration of grid enhancing technologies in Long-Term Regional

Transmission Planning, it similarly notes that dynamic line ratings and advanced power

flow control devices are shorter-term transmission solutions—helping to "squeeze more"

out of the infrastructure that is operating or planned to be constructed.[2484]

1174.  While ENGIE supports the Commission's proposal to require the evaluation and

deployment of dynamic line ratings and advanced power flow control devices where

beneficial in Long-Term Regional Transmission Planning, it notes that the operational

data used by such devices are not yet easily incorporated into the transmission planning

framework.[2485]  Similarly, SEIA and Invenergy raise concerns that utilities struggle to

consider, evaluate, and select these technologies as transmission solutions due to a lack of

information about how they might be integrated into the transmission planning

process.[2486]

1175.  Finally, National Grid generally supports the notion that transmission providers

should consider whether and how alternative transmission technologies can be

incorporated into transmission planning and states that such technologies, in certain

instances, may offer a more efficient or cost-effective alternative to other regional

---

[2483] TAPS Initial Comments at 4, 21-22.

[2484] Pattern Energy Initial Comments at 29.

[2485] ENGIE Initial Comments at 6.

[2486] Invenergy Initial Comments at 14-16; SEIA Initial Comments at 21-22.

transmission facilities.[2487]   However, National Grid states that, if the Commission adopts in a final rule the requirement to fully consider dynamic line ratings and advanced power flow control devices, it should explain how it expects RTOs/ISOs to implement the first step of the consideration process articulated in the NOPR, i.e., that the alternative transmission technologies being incorporated into existing transmission facilities "could meet the same regional transmission need more efficiently or cost-effectively than other potential transmission facilities." [2488]   According to National Grid, such a requirement would exceed the RTO/ISO's authority as the independent administrator of the competitive solicitation process.[2489]

1176.  Many commenters oppose the NOPR proposal.[2490]   Some commenters warn the Commission of the potential reliability and operational impacts of the widespread use of

---

[2487] National Grid Initial Comments at 21.

[2488] *Id.* at 23 (quoting NOPR, 179 FERC ¶ 61,028 at P 274).

[2489] *Id.*

[2490] AEP Initial Comments at 33; Ameren Initial Comments at 23-24; APPA Initial Comments at 37; ATC Initial Comments at 7-8; Avangrid Initial Comments at 31; DATA Initial Comments at 17; Dominion Initial Comments at 40; Duke Initial Comments at 29-32; EEI Initial Comments at 20-22; Entergy Initial Comments at 26-28; Eversource Initial Comments at 27-28; Exelon Initial Comments at 18-23; Georgia Commission Initial Comments at 7-8; Idaho Power Initial Comments at 9; Indicated PJM TOs Initial Comments at 19-20; ITC Initial Comments at 26-28; ITC Reply Comments at 27; LADWP Initial Comments at 5; Large Public Power Initial Comments at 31-34; MISO TOs Initial Comments at 23-24; Mississippi Commission Reply Comments at 8; New York TOs Initial Comments at 22-23; NRECA Initial Comments at 52; NYISO Initial Comments at 45, 47; OMS Initial Comments at 9; Pacific Northwest Utilities Initial Comments at 15-16; PJM Initial Comments at 105-109; PPL Initial Comments at 22-23; Southern Initial Comments at 35; SERTP Sponsors Initial Comments at 36-37; US

dynamic line ratings and advanced power flow control devices.[2491]  APPA asserts that

transmission dynamic line ratings and advanced power flow control devices should not be

required until the industry has further experience with Ambient-Adjusted Ratings

deployment.[2492]  Exelon asserts that transmission providers already consider grid

enhancing technologies and notes that, in many instances, the selection and deployment

of grid enhancing technologies are fundamentally incompatible with the competitive

transmission requirements in Order No. 1000, particularly in the context of development

of new transmission facilities, where grid enhancing technologies are unlikely to be the

lower cost solution, and may be considerably more expensive than traditional

transmission technologies.[2493]

1177.  Some commenters argue that further support is needed to justify any mandate to

consider alternative transmission technologies in transmission planning.[2494]  Kansas

Commission asserts that any new requirements should be based on a data-driven, robust

analysis demonstrating ratepayer benefits; it also cautions against using such technologies

as a short-term fix.[2495]  ATC states that the Commission should develop a record of the

---

Chamber of Commerce Initial Comments at 9.

[2491] Duke Initial Comments at 31-32; Entergy Initial Comments at 27-28; MISO
Initial Comments at 59-60.

[2492] APPA Initial Comments at 5.

[2493] Exelon Initial Comments at 21.

[2494] ATC Reply Comments at 3; Kansas Commission Initial Comments at 19-20.

[2495] Kansas Commission Initial Comments at 19-20.

Docket No. RM21-17-000                                                    - 831 -

costs, risks, and potential impacts of widespread implementation of dynamic line ratings before mandating further action.[2496]

1178.  Some commenters raise concerns about the costs of alternative transmission technologies.  Mississippi Commission argues that mandating the use of technologies without considering their cost is not just and reasonable.[2497]  ATC asserts that the costs of implementing dynamic line ratings system wide would not be nominal.[2498]  US Chamber of Commerce asserts that dynamic line ratings are not a way to obtain "free" transmission capacity because there are costs associated with monitoring the ratings.[2499]

1179.  Other commenters argue that the Commission should favor flexibility and not mandate that dynamic line ratings and advanced power flow control devices be considered.[2500]  Georgia Commission states that it is reasonable for the Commission to encourage, rather than require, consideration of dynamic line ratings and advanced power flow control devices in Long-Term Regional Transmission Planning.[2501]  LADWP

---

[2496] ATC Reply Comments at 3.

[2497] Mississippi Commission Reply Comments at 8.

[2498] ATC Reply Comments at 3 (citing Pattern Energy Initial Comments at 30; Pine Gate Initial Comments at 40-41).

[2499] US Chamber of Commerce Initial Comments at 9.

[2500] Avangrid Initial Comments at 31; Clean Energy Buyers Initial Comments at 25; Eversource Initial Comments at 27; Georgia Commission Initial Comments at 7-8; Idaho Power Initial Comments at 9; New York TOs Initial Comments at 23; OMS Comments at 9; PPL Initial Comments at 23.

[2501] Georgia Commission Initial Comments at 7.

suggests that instead of mandating consideration of specific technologies that become obsolete, the Commission should require transmission providers to use Good Utility Practice to identify and use technologies that maximize the use of transmission assets in order to minimize impacts to ratepayers and the public.[2502]

1180.   Similarly, National Grid argues that the Commission should not favor the deployment of the two proposed technologies over more efficient or cost-effective transmission facilities, and that focusing on specific technologies is likely to stifle innovation and will not lead to the identification of the more efficient or cost-effective transmission facilities.[2503]   ATC disagrees with commenters that state that utilities are reluctant to implement these technologies,[2504] noting that it advocates for and uses advanced power flow control devices and other advanced technologies on its system.[2505] However, ATC describes widespread dynamic line rating deployment as costly.[2506]

1181.   Other commenters urge the Commission to complete its consideration of the record in the Notice of Inquiry on the Implementation of Dynamic Line Ratings[2507] and/or wait for transmission providers to comply with Order No. 881[2508] before

---

[2502] LADWP Initial Comments at 5.

[2503] National Grid Initial Comments at 22-23.

[2504] ATC Reply Comments at 2 (citing Invenergy Initial Comments at 15).

[2505] *Id.* (citing ATC Initial Comments at 7).

[2506] *Id.* at 3.

[2507] *Implementation of Dynamic Line Ratings*, 178 FERC ¶ 61,110 (2022).

[2508] *Managing Transmission Line Ratings*, Order No. 881, 177 FERC ¶ 61,179

implementing the NOPR proposal on dynamic line ratings.[2509]  Large Public Power states

that the Commission appears to sidestep the record in the Notice of Inquiry on the

Implementation of Dynamic Line Ratings, especially the technical and cybersecurity-

related concerns in that docket.[2510]  MISO TOs state that imposing a mandate in this

proceeding would complicate the issue.[2511]  ATC argues that a more prudent course of

action would be to gain experience with Ambient-Adjusted Ratings before moving on to

consideration of the use of dynamic line ratings.[2512]  ITC asserts that dynamic line ratings

and advanced power flow control devices should be implemented on an operational basis

through existing Commission proceedings addressing such technologies.[2513]

1182.  Several commenters specifically support the NOPR proposal of requiring

consideration of both:  (1) whether incorporating dynamic line ratings or advanced power

flow control devices into existing transmission facilities could meet the same regional

transmission need more efficiently or cost-effectively than other transmission facilities

that are being considered for potential selection; and (2) whether incorporating dynamic

line ratings and advanced power flow control devices as part of any potential regional

---

(2021).

[2509] ATC Reply Comments at 4-5; Dominion Initial Comments at 40; Large Public Power Initial Comments at 5, 32-33; MISO TOs Initial Comments at 23-24.

[2510] Large Public Power Initial Comments at 32.

[2511] MISO TOs Initial Comments at 23.

[2512] ATC Initial Comments at 10.

[2513] ITC Reply Comments at 27.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 844 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

transmission facility would be more efficient or cost-effective than those without incorporating such technologies.[2514]  Ohio Consumers emphasize the importance of considering dynamic line ratings and advanced power flow control devices for both proposed and existing projects, noting that the goal of using these technologies is to lower overall costs of new transmission for consumers, and citing to a DOE study that found that these technologies can defer or reduce the need for significant investment in new infrastructure projects, and increase the use of renewables by maximizing the capacity of current infrastructure.[2515]

1183.  Others oppose the consideration of alternative transmission technologies on new transmission facilities.[2516]  CAISO contends that a requirement to consider whether to incorporate dynamic line ratings and advanced power flow control devices as part of every new regional transmission facility identified to meet a reliability need would create more work without yielding significant benefits because incorporating such measures

---

[2514] ACORE Initial Comments at 15; Clean Energy Associations Initial Comments at 28; DC and MD Offices of People's Counsel Initial Comments at 36; Industrial Customers Initial Comments at 32-34; Michigan State Entities Initial Comments at 11; NASEO Initial Comments at 6; Ohio Consumers Initial Comments at 34; State Agencies Initial Comments at 17-18.

[2515] Ohio Consumers Initial Comments at 32-34 (citing US DOE, *Grid-Enhancing Technologies:  A Case Study on Ratepayer Impact* (Feb. 2022), https://www.energy.gov/sites/default/files/2022-04/Grid%20Enhancing%20Technologies%20-%20A%20Case%20Study%20on%20Ratepayer%20Impact%20-%20February%202022%20CLEAN%20as%20of%20032322.pdf).

[2516] CAISO Initial Comments at 6; LADWP Initial Comments at 5.

would not alter the scope of the underlying transmission facilities that are necessary to meet the reliability need.[2517]  LADWP states that identification of specific technologies in a rulemaking seems inappropriate and asserts a transmission line that is not yet built has no operating history, and it should therefore be at the discretion of the transmission planner to consider and implement dynamic line ratings, as it would slow down the design and construction of the transmission line.[2518]  Exelon states that, particularly in the context of new transmission facilities, grid enhancing technologies are very unlikely to be the lower cost solution relative to traditional transmission technologies, and for many technologies, they should be expected to be considerably more expensive than traditional transmission technologies (notwithstanding any additional benefits they may offer).[2519]

1184.  Clean Energy Associations, Industrial Customers, and WATT Coalition support the implementation of a requirement for non-RTO/ISO regions to update their energy management systems if dynamic line ratings are identified as a more efficient or cost-effective transmission facility selected.[2520]  ELCON agrees, asserting that the Commission's requirement for dynamic line ratings and advanced power flow control

---

[2517] CAISO Initial Comments at 6.  CAISO, however, supports considering these technologies in connection with new transmission facilities intended to meet economic or public policy needs.  *Id.*

[2518] LADWP Initial Comments at 5.

[2519] Exelon Initial Comments at 21-22.

[2520] Clean Energy Associations Initial Comments at 28; Industrial Customers Initial Comments at 32-33; Industrial Customers Reply Comments at 11; WATT Coalition Initial Comments at 7.

devices should apply to all Commission-jurisdictional transmission utilities, regardless of whether they are RTOs/ISOs.[2521] WATT Coalition adds that all transmission providers should be required to upgrade their energy management systems and keep them consistent across all transmission providers to accommodate the latest technologies.[2522] WATT Coalition further states that advanced power flow control devices and topology optimization do not require modifications to existing energy management systems, but that the implementation of such technologies would benefit from the increased flexibility of dynamic line rating-enabled energy management systems.[2523]

1185. Pattern Energy states that energy management systems and other equipment will need upgrades to integrate readouts from the dynamic line ratings equipment to minimize operator intervention and enhance operational awareness. Pattern Energy surmises, however, that any upgrades necessitated by a final rule in this proceeding may be nominal given that dynamic line ratings and advanced power flow control devices should already be readily integrated with upgrades to energy management systems needed to comply with Order No. 881.[2524]

---

[2521] ELCON Initial Comments at 21.

[2522] WATT Coalition Initial Comments at 7.

[2523] *Id.*

[2524] Pattern Energy Initial Comments at 30 (citing Order No. 881, 177 FERC ¶ 61,179).

1186.  Some commenters suggest alternative approaches to incorporating alternative transmission technologies into the transmission system.  Vistra asserts that the Commission should modify the NOPR proposal to require:  (1) the long-term transmission planning evaluation to include a generation capacity expansion scenario that incorporates the potential for enhanced capability through new market services; (2) early input during the transmission planning cycle from independent market monitors and stakeholders on market improvements that could enhance grid operations; and (3) all solicitations for long-term solutions to equally consider non-transmissions solutions that may include generation, technology, or market design changes that could more efficiently or cost-effectively address a need that otherwise would require construction or modification of transmission facilities.[2525]

1187.  Some commenters request that the Commission establish more prescriptive requirements regarding the evaluation of the alternative transmission technologies than those proposed in the NOPR.  Invenergy asserts that the NOPR proposal should be expanded to include other technologies and require transmission providers to select alternative transmission technologies when they provide the most efficient option.[2526]

1188.  WATT Coalition urges the Commission to include an operational planning timeframe for topology optimization, dynamic line ratings, and modular advanced power

---

[2525] Vistra Initial Comments at 32.

[2526] Invenergy Reply Comments at 16 (citing Invenergy Initial Comments at 14-17).

flow control devices, which can all be deployed quickly.  WATT Coalition states that the Commission could require consideration of these technologies for the top 5 or 10 most costly or critical constraints on a quarterly basis.[2527]  WATT Coalition states that market participants should be able to request the use of grid enhancing technologies, and receive an answer from the transmission provider within a defined period of time, to be evaluated against alternatives used by the transmission provider.[2528]  WATT Coalition also asserts that grid enhancing technologies should be required in appropriate instances and encouraged through incentives because utilities have little incentive to deploy them under standard cost-of-service regulation,[2529] and after implementing this rule, the Commission should develop transmission incentives to complement a congestion threshold requirement, driving other creative applications of grid enhancing technologies where they would create the most value to consumers.[2530]

1189.  Some commenters request more requirements regarding evaluation and/or deployment of alternative transmission technologies to meet transmission needs.  WATT Coalition states that there are certain transmission technologies that are faster to deploy than traditional lines and urges the Commission to require an annual review of the Long-Term Regional Transmission Planning process and establish a fast track process for

---

[2527] WATT Coalition Initial Comments at 5.

[2528] *Id.* at 5-6.

[2529] WATT Coalition Reply Comments at 3.

[2530] WATT Coalition Supplemental Comments at 3.

solutions with a lead time of less than 12 months and a capital cost of less than $50 million.[2531]  WATT Coalition further states that the requirement to consider dynamic line ratings and advanced power flow control devices should also apply in any case where transmission capacity is valuable but the costs of a new line are not justified.[2532]

1190.  Smart Wires and WATT Coalition argue that the Commission should direct transmission providers to:  (1) designate advanced power flow control devices as the default solution for projects requiring a series capacitor; (2) "require evaluation of advanced power flow control devices for thermal overloads that fall within 50% of the line rating," which they argue is when such devices are often most economically advantageous; (3) require evaluation of advanced power flow control devices for interconnection-related network upgrades associated with new load connections, given that these technologies can be used to rebalance flows quickly and adjusted to mirror actual growth; and (4) mandate deployment of advanced power flow control devices as the default solution for voltage stability management on 100-plus mile AC transmission lines.[2533]

1191.  Some commenters suggest that the Commission should collect additional data and require reporting on the deployment of alternative transmission technologies.  PIOs and

---

[2531] WATT Coalition Initial Comments at 8.

[2532] *Id.* at 4.

[2533] Smart Wires Initial Comments at 1, 3-5; WATT Coalition Initial Comments at 3-4.

DC and MD Offices of People's Counsel ask the Commission to require that transmission providers explain how they considered alternative transmission technologies in the transmission planning process and if they were not used, why.[2534]  DC and MD Offices of People's Counsel assert that data collected from dynamic line ratings should be shared with stakeholders to provide transparency as to the necessity or economic efficiency of certain transmission upgrades, and a mechanism should be implemented to independently review the projected costs and benefits of advanced transmission technologies from an efficiency and cost-allocation perspective.[2535]  NASEO states that the Commission should include a requirement for those seeking to make changes to RTOs/ISOs' facilities to provide an analysis of the new technologies and how they meet present and expected future challenges, suggesting that RTOs/ISOs be required to consult with US DOE, the DOE national laboratories, and state energy offices to ensure new technologies are incorporated into Long-Term Regional Transmission Planning.[2536]  Certain TDUs argue that the Commission should require transmission planners to document their evaluation of alternative transmission solutions in the transmission planning process, which should include the methods used to integrate grid enhancing technologies alone or in combination with transmission upgrades.[2537]

---

[2534] DC and MD Offices of People's Counsel Initial Comments at 36; PIOs Initial Comments at 22.

[2535] DC and MD Offices of People's Counsel Initial Comments at 36.

[2536] NASEO Initial Comments at 6-7.

[2537] Certain TDUs Reply Comments at 8-9 (citing OMS Initial Comments at 9;

1192.  ENGIE recommends that the Commission require transmission providers to provide a report to the Commission every five years on the deployment and operational analysis of grid enhancing technologies to ensure these technologies are being properly evaluated in Long-Term Regional Transmission Planning.[2538]  R Street suggests that the Commission require the incorporation, not just consideration, of advanced transmission technologies, and should require the inclusion of commercially viable technologies on a rolling basis as informed by a regularly updated list of qualifying technologies through, for example, a periodic forum with technology experts from US DOE.[2539]  SEIA states that the Commission should host regular technical conferences to discuss improvements and innovations in grid enhancing technologies as experience with these technologies grows.[2540]  SEIA states that to determine whether such technologies are feasible, transmission providers should provide the following information to market participants: modeling assumptions, contingency analysis results, asset age, and environmental and footprint constraints.[2541]

1193.  Pattern Energy states that the Commission should be mindful that limited supplies of dynamic line ratings, advanced power flow control devices, and SCADA-based

---

Certain TDUs Initial Comments at 24).

[2538] ENGIE Initial Comments at 6.

[2539] R Street Initial Comments at 4.

[2540] SEIA Initial Comments at 21.

[2541] *Id.* at 22.

Docket No. RM21-17-000                                                         - 842 -

implementation equipment (and service providers thereto) may cause shortages that will constrain transmission facility developers and owners.[2542]  Pattern Energy adds that, when evaluating the costs to implement such devices, transmission providers may need to assume cost parameters (e.g., cost per mile or cost per installation) for such devices in order to have an "apples-to-apples comparison."[2543]

### 3.    Need for Reform

1194.  Based on the record, we find that there is substantial evidence to support the conclusion that the Commission's existing regional transmission planning requirements are unjust, unreasonable, and unduly discriminatory or preferential because they do not require consideration of alternative transmission technologies in the regional transmission planning process.  We therefore adopt the preliminary findings in the NOPR concerning the need for reform.  Specifically, we find that the Commission's existing regional transmission planning requirements fail to ensure that transmission providers consider whether to incorporate alternative transmission technologies into regional transmission facilities as part of their regional transmission planning processes and, consequently, fail to ensure that transmission providers are identifying more efficient or cost-effective regional transmission solutions through those processes.  As a result, transmission providers overlook or undervalue the benefits of certain alternative transmission technologies and, in turn, undertake relatively inefficient and less cost-effective

---

[2542] Pattern Energy Initial Comments at 29-30.

[2543] *Id.* at 30.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 853 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

investments in transmission infrastructure, the costs of which are ultimately recovered through Commission-jurisdictional rates.  Accordingly, we find that existing regional transmission planning requirements are insufficient to ensure just and reasonable and not unduly discriminatory or preferential rates.

1195.  In the NOPR, the Commission stated that commercially available alternative transmission technologies have the potential to improve the operation of new and existing transmission facilities and defer or mitigate the need for new transmission investments.[2544]  However, existing regional transmission planning processes are not necessarily designed to consider the benefits that alternative transmission technologies can provide.[2545]  Commenters state that some transmission providers are reluctant to implement alternative transmission technologies or that alternative transmission technologies are not consistently evaluated in regional transmission planning in a manner commensurate with the benefits that they can provide.[2546]  The failure to consistently consider these technologies in regional transmission planning prevents them from being identified, evaluated, and selected as a more efficient or cost-effective solution to transmission needs, to the detriment of customers that can benefit from their deployment.

---

[2544] NOPR, 179 FERC ¶ 61,028 at P 267.

[2545] *See, e.g.*, AEE Initial Comments at 29.

[2546] Certain TDUs Initial Comments at 22-23; Invenergy Initial Comments at 15-16; NASUCA Initial Comments at 7; WATT Coalition Initial Comments at 4.

1196. The record demonstrates that alternative transmission technologies can provide significant capacity increases when incorporated into transmission facilities, and that such incorporation may provide benefits that outweigh its costs.[2547] For example, a white paper prepared by the Brattle Group highlights several recent examples in which dynamic line ratings, transmission switching, and advanced power flow control devices were deployed to cost-effectively meet transmission needs in SPP, MISO, and other utility service territories.[2548] Additionally, a recent US DOE case study on dynamic line ratings and advanced power flow control devices estimates that these alternative transmission technologies can provide significant production cost savings, net import savings, and avoided curtailment savings.[2549]

1197. We find that the failure to require transmission providers to consider alternative transmission technologies renders the Commission's existing regional transmission planning requirements insufficient to ensure just and reasonable and not unduly discriminatory or preferential rates, we are now requiring, pursuant to FPA section 206,

---

[2547] *See, e.g.*, WATT Coalition Supplemental Comments at 2-3.

[2548] The Brattle Group, *Building a Better Grid: How Grid-Enhancing Technologies Complement Transmission Buildouts* 12-15 (Apr. 20, 2023), https://watt-transmission.org/wp-content/uploads/2023/04/Building-a-Better-Grid-How-Grid-Enhancing-Technologies-Complement-Transmission-Buildouts.pdf.

[2549] US DOE, *Grid-Enhancing Technologies:  A Case Study on Ratepayer Impact* v-x (Feb. 2022), https://www.energy.gov/sites/default/files/2022-04/Grid%20Enhancing%20Technologies%20-%20A%20Case%20Study%20on%20Ratepayer%20Impact%20-%20February%202022%20CLEAN%20as%20of%20032322.pdf.

that transmission providers consider in Long-Term Regional Transmission Planning and their existing Order No. 1000 regional transmission planning process the alternative transmission technologies discussed below.  While the record indicates that some of the alternative transmission technologies enumerated in this final rule are sometimes considered in certain transmission planning regions as solutions to specific transmission needs,[2550] we find that inconsistent consideration of alternative transmission technologies in regional transmission planning results in transmission providers overlooking or undervaluing the benefits that these technologies can provide.  We find that the reforms concerning the consideration of alternative transmission technologies that we adopt in this final rule will render the Commission's existing regional transmission planning requirements just and reasonable, because they will result in transmission providers identifying, evaluating, and selecting regional transmission facilities that are more efficient or cost-effective, which will ensure that Commission-jurisdictional rates are just and reasonable.

### 4.    Commission Determination

1198.  We adopt the NOPR proposal, with modification, to require transmission providers in each transmission planning region to consider, in Long-Term Regional Transmission Planning and existing Order No. 1000 regional transmission planning processes, dynamic line ratings and advanced power flow control devices for each identified transmission need.  We modify the NOPR proposal to require that, in addition

---

[2550] *See* Exelon Initial Comments at 21-23.

to dynamic line ratings and advanced power flow control devices, transmission providers

must consider in Long-Term Regional Transmission Planning and existing Order No.

1000 regional transmission planning processes advanced conductors and transmission

switching.  Thus, under this modification, transmission providers must consider:  (1)

dynamic line ratings;[2551] (2) advanced power flow control devices;[2552] (3) advanced

conductors;[2553] and (4) transmission switching.[2554]  We clarify that transmission providers

must consider each of these enumerated technologies when evaluating new regional

transmission facilities, as well as upgrades to existing transmission facilities.[2555]  Thus,

---

[2551] A dynamic line rating is "a transmission line rating that applies to a time period of not greater than one hour and reflects up-to-date forecasts of inputs such as (but not limited to) ambient air temperature, wind, solar heating, transmission line tension, or transmission line sag."  NOPR, 179 FERC ¶ 61,028 at P 259 n.408 (citations omitted); *see also* Order No. 881, 177 FERC ¶ 61,179 at P 7; *Implementation of Dynamic Line Ratings*, 178 FERC ¶ 61,110 at P 1.

[2552] Advanced power flow control devices serve a transmission function.  These devices can help the system operator control power flows over a given path and can include phase shifting transformers (also known as phase angle regulators) and devices or systems necessary for implementing optimal transmission switching.  Advanced power flow control devices allow power to be pushed and pulled to alternate lines with spare capacity leading to maximum utilization of existing transmission capacity.  NOPR, 179 FERC ¶ 61,028 at P 270 n.437.

[2553] Advanced conductors include present and future transmission line technologies whose power flow capacities exceed the power flow capacities of conventional aluminum conductor steel reinforced conductors.  *See* Order No. 2023-A, 186 FERC ¶ 61,199 at 631.

[2554] Transmission switching is the opening or closing of transmission elements to safely route power and direct flows away from congestion, based on pre-existing forward analysis.

[2555] We note that upgrades to existing transmission facilities include both:  (1) the incorporation of an alternative transmission technology into an existing transmission

for each identified transmission need, when evaluating regional transmission facilities for potential selection, transmission providers must consider whether regional transmission facilities that incorporate, or solely consist of, any of the enumerated list of alternative transmission technologies would be more efficient or cost-effective than selecting new regional transmission facilities or upgrades to existing transmission facilities that do not incorporate these technologies.

1199.  However, transmission providers' evaluation of the enumerated alternative transmission technologies must be consistent with the requirements in their OATTs for other transmission solutions.  This means that, for the purposes of Long Term Regional Transmission Planning, transmission providers must evaluate the benefits of incorporating the enumerated alternative transmission technologies into Long-Term Regional Transmission Facilities in the same manner that they evaluate any Long-Term Regional Transmission Facility, and in a manner consistent with the requirements in the Evaluation of Benefits of Regional Transmission Facilities and Evaluation and Selection of Long-Term Regional Transmission Facilities sections of this final rule.  Accordingly, we require transmission providers to measure the required benefits and any additional benefits the transmission providers elect to measure, as discussed in detail in the

_____

facility with no additional changes to the underlying transmission facility (e.g., adding dynamic line ratings to an existing transmission facility); and (2) the incorporation of an alternative transmission technology into an existing transmission facility as part of a larger set of upgrades (e.g., adding dynamic line ratings to a transmission facility that is also being reconductored with a conventional aluminum conductor steel reinforced conductor).

Docket No. RM21-17-000                                                                 - 848 -

Required Benefits section,[2556] and use those measured benefits in their evaluation

processes to determine if a regional transmission facility that incorporates, or solely

consists of, any of the enumerated list of alternative transmission technologies would

more efficiently or cost-effectively address Long-Term Transmission Needs.  As

discussed in detail in the Evaluation and Selection of Long-Term Regional Transmission

Facilities section,[2557] that determination would involve applying the transmission

providers' selection criteria, which must, among other things, seek to maximize benefits

accounting for costs over time without over-building transmission facilities.  Similarly,

for the purposes of existing Order No. 1000 regional transmission planning processes,

transmission providers must consider the benefits of incorporating the enumerated

alternative transmission technologies into transmission facilities in the same way that

they currently evaluate regional transmission facilities in those existing processes to

determine if a regional transmission facility incorporating any of the enumerated

transmission technologies would be a more efficient or cost-effective regional

transmission solution.

1200.  In response to concerns regarding the mandatory consideration of the enumerated

alternative transmission technologies for new regional transmission facilities,[2558] and the

---

[2556] *Supra* Required Benefits section.

[2557] *Supra* Evaluation and Selection of Long-Term Regional Transmission
Facilities section.

[2558] CAISO Initial Comments at 6; Exelon Initial Comments at 21-22.

incremental increase in costs associated with incorporating an alternative transmission

technology into new regional transmission facilities or upgrades to existing transmission

facilities,[2559] we reiterate that transmission providers must follow the evaluation process

and selection criteria in their tariffs.  As explained in the Evaluation and Selection of

Long-Term Regional Transmission Facilities section of this final rule, this does not

require transmission providers to select any particular Long-Term Regional Transmission

Facility to address Long-Term Transmission Needs (i.e., in this case it does not require

the selection and deployment of any particular alternative transmission technology with

regard to any particular Long-Term Transmission Need).[2560]  We recognize that, in

addition to considering the costs and benefits associated with incorporating alternative

transmission technologies into transmission facilities, transmission providers must

continue to follow Good Utility Practice with regard to planning, evaluating, selecting,

constructing, operating, and maintaining all transmission facilities, whether such

transmission facilities are considered and implemented through existing regional

transmission planning processes or as part of Long-Term Regional Transmission

Planning as set forth in this final rule.[2561]

---

[2559] Exelon Initial Comments at 19-20.

[2560] *Supra* Evaluation and Selection of Long-Term Regional Transmission
Facilities section.

[2561] *See pro forma* OATT § 28.2 (Transmission Provider Responsibilities) ("The
Transmission Provider will plan, construct, operate and maintain its Transmission System
in accordance with Good Utility Practice and its planning obligations in Attachment K in
order to provide the Network Customer with Network Integration Transmission Service

1201.  We find that it is appropriate to require transmission providers to consider whether

it may be more efficient or cost-effective to incorporate the enumerated alternative

transmission technologies into both new regional transmission facilities and upgrades to

existing transmission facilities because the record indicates that such technologies can

provide benefits by improving the efficiency of transmission facilities, regardless of

whether the facilities are already in-service or yet to be deployed.[2562]  We find that

incorporating the enumerated alternative transmission technologies as upgrades to

existing transmission facilities has the potential to make the use of existing transmission

infrastructure more efficient and optimize the performance of such infrastructure,

mitigating or deferring the need for development of new regional transmission

facilities.[2563]  Adding alternative transmission technologies to new regional transmission

facilities may provide cost savings by improving operational efficiency of transmission

facilities.  Further, incorporating alternative transmission technologies into new

transmission facilities may present more benefits and cost less than incorporating such

technologies as retrofits after the regional transmission facility is deployed.  We further

find that requiring transmission providers to consider the enumerated alternative

transmission technologies in Long-Term Regional Transmission Planning and existing

regional transmission planning processes will ensure that transmission providers more

---

over the Transmission Provider's Transmission System.").

[2562] *See* WATT Coalition Supplemental Comments at 2-3.

[2563] Pattern Energy Initial Comments at 29.

fully consider a broader set of technologies that can address transmission needs more efficiently or cost-effectively.

1202.  We clarify that the selection and use any of the enumerated alternative transmission technologies that are incorporated into an existing transmission facility should be treated as an upgrade to an existing transmission facility.  Order No. 1000's elimination of any federal right of right of first refusal for selected transmission facilities does not apply to upgrades to an existing transmission facility.[2564]  Therefore, an incumbent transmission provider would be designated to develop any alternative transmission technology that is selected for incorporation into that incumbent transmission provider's existing transmission facilities as the more efficient or cost-effective solution.

---

[2564] The Commission stated in Order No. 1000 that the non-incumbent transmission developer reforms:

> do not affect the right of an incumbent transmission provider to build, own and recover costs for upgrades to its own transmission facilities, such as in the case of tower change outs or reconductoring, regardless of whether or not an upgrade has been selected in the regional transmission plan for purposes of cost allocation.  In other words, an incumbent transmission provider would be permitted to maintain a federal right of first refusal for upgrades to its own transmission facilities.

Order No. 1000, 136 FERC ¶ 61,051 at P 319 (footnote omitted).  The Commission clarified that "the term upgrade means an improvement to, addition to, or replacement of a part of, an existing transmission facility.  The term upgrades does not refer to an entirely new transmission facility."  Order No. 1000-A, 139 FERC ¶ 61,132 at P 426.  The Commission further clarified that the requirement to eliminate a federal right of first refusal does not apply to any upgrade, even where the upgrade requires the expansion of an existing right-of-way.  *Id.* P 427.

USCA4 Appeal: 24-1650     Doc: 224          Filed: 01/21/2025      Pg: 862 of 2455
Document Accession #: 20240513-3036          Filed Date: 05/13/2024

1203.  With respect to alternative transmission technologies added or deployed on a *new*
selected regional transmission facility, we clarify that the transmission developer that is
designated to develop the underlying selected regional transmission facility, whether that
developer is an incumbent transmission provider or a nonincumbent transmission
developer, must also be designated to develop any alternative transmission technologies
selected to be incorporated into the regional transmission facility, and thus, would be
eligible to use the applicable regional cost allocation method.[2565]  For example, in a
competitive bidding model, the transmission developer that submits the winning bid for a
selected new regional transmission facility that includes an alternative transmission
technology would be eligible to use the regional cost allocation method for that facility,
including for the costs of any alternative transmission technologies.  Similarly, in a
sponsorship model, the transmission developer that sponsors a new regional transmission
facility that includes any alternative transmission technologies would be eligible to use
the regional cost allocation method for that facility, including for the costs of any
alternative transmission technologies, consistent with the selection.

1204.  We further clarify that, under a sponsorship model, transmission providers'
addition of an alternative transmission technology to a sponsored regional transmission
facility proposal that is ultimately selected must not lead to the original sponsored

---

[2565] *See* FERC, Staff Report, *2017 Transmission Metrics* 8 (Oct. 6, 2017),
https://www.ferc.gov/sites/default/files/2020-05/transmission-investment-metrics.pdf
(describing the two general types of competitive transmission development processes, the
"competitive bidding model" and the "sponsorship model").

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 863 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

regional transmission facility being labeled as an unsponsored regional transmission facility.  Therefore, the sponsoring developer would be eligible to use the regional cost allocation method for the selected new regional transmission facility, as modified with the alternative transmission technology.

1205.  We also clarify that, for every competitive transmission development process in a given transmission planning region, transmission providers must identify with sufficient detail in their OATTs the point or points in a given process at which the transmission providers in the transmission planning region will consider the potential use of alternative transmission technologies, including the point at which qualified transmission developers must submit any proposal to incorporate alternative transmission technologies.  This clarification is meant to ensure transparency for competing transmission developers and other stakeholders.[2566]

1206.  In response to comments that transmission providers should not be required to consider the enumerated alternative transmission technologies in regional transmission planning processes due to the costs and challenges associated with implementation,[2567] we find that the examples in the record of implementation of dynamic line ratings,

---

[2566] For example, in a competitive bidding model, transmission providers must make clear whether, and if so when, a qualified transmission developer can propose to incorporate alternative transmission technologies into a bid for a selected Long-Term Regional Transmission Facility.  This transparency requirement ensures that competing transmission developers will be treated comparably because they will know whether and when they can propose to incorporate any additional alternative transmission technologies into a bid for a regional transmission facility that has been selected.

[2567] *See, e.g.*, ATC Reply Comments at 3.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 864 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

including ERCOT's experience with dynamic line ratings since 2005 and data from Oncor from 2011 to 2013,[2568] and overall support for the consideration of advanced power flow control devices in transmission planning,[2569] sufficiently demonstrate that transmission providers are capable of considering the enumerated alternative transmission technologies in Long-Term Regional Transmission Planning and existing regional transmission planning processes. Kansas Commission's position that consideration of alternative transmission technologies in regional transmission planning processes should be data-driven and supported by robust analysis demonstrating benefits is consistent with our determinations here.[2570] Therefore, transmission providers must consider the incorporation of these enumerated alternative transmission technologies consistent with the specific requirements for analysis and evaluation of benefits in their OATTs, including those applicable to existing regional transmission planning processes and those required in this final rule for Long-Term Regional Transmission Planning.[2571] We acknowledge Mississippi Commission's concerns about deploying alternative transmission technologies without consideration of their costs and note that, to the extent

---

[2568] Hannon Armstrong Reply Comments at 2-3; WATT Coalition Reply Comments at app. B.

[2569] Ameren Initial Comments at 24-25; EEI Initial Comments at 20-21; Entergy Initial Comments at 29; Exelon Initial Comments at 23.

[2570] Kansas Commission Initial Comments at 19-20.

[2571] *See supra* Evaluation of the Benefits of Regional Transmission Facilities section.

that a transmission provider selects a regional transmission facility that incorporates an enumerated alternative transmission technology, the transmission provider would only do so after evaluating the costs and benefits of that transmission facility, including the incorporation of the alternative transmission technology.[2572]

1207.  We disagree with commenter assertions that alternative transmission technologies are only operational tools and that transmission providers cannot rely on any additional capacity created by these technologies for the purpose of meeting transmission needs.[2573] We note that Long-Term Regional Transmission Planning and existing regional transmission planning processes are designed to address a variety of needs, including not only reliability needs but also Long-Term Transmission Needs and economic needs. These processes are well-suited to evaluate the economic benefits of the enumerated alternative transmission technologies, which are relevant to assessing whether a regional transmission facility that incorporates such technologies is more efficient or cost-effective than a proposed regional transmission facility that does not use such technologies.  We believe that the particular benefit measurement methods that transmission providers must develop, pursuant to requirements discussed below, to evaluate proposed Long-Term Regional Transmission Facilities can be used to measure

---

[2572] Mississippi Commission Reply Comments at 8.

[2573] AEP Initial Comments at 6, 33; Indicated PJM TOs Initial Comments at 19; ITC Initial Comments at 6, 26-28; Louisiana Commission Initial Comments at 14 (citing Potomac Economics Initial Comments at 2); PJM Initial Comments at 8, 106, 108; PPL Initial Comments at 22; SERTP Sponsors Initial Comments at 36-37.

the economic benefits of incorporating the enumerated alternative transmission technologies into transmission facilities.[2574]  As more fully described above in the Required Benefits section, these benefits include, but are not limited to, methods to measure production cost savings, reduced congestion due to fewer transmission outages, and capacity cost benefits from reduced peak energy losses.  Similarly, we find that the enumerated alternative transmission technologies can provide those economic benefits that are already evaluated in existing regional transmission planning processes.  Finally, contrary to commenters' concerns, the record here demonstrates that certain alternative transmission technologies are in some cases capable of enhancing reliability and providing additional capacity.[2575]

1208.  In response to concerns about administrative burden and assertions that predictions about benefits are speculative,[2576] we find that the potential advantages associated with adopting this reform (i.e., identifying more efficient or cost-effective regional

---

[2574] *See supra* Evaluation of the Benefits of Regional Transmission Facilities section.

[2575] *See infra* P 1241 for a more detailed discussion of the reliability benefits of dynamic line ratings and advanced power flow control devices; *see also* Ameren Initial Comments at 24; Bekaert Supplemental Comments at 1-2; CTC Global Initial Comments at 15.

[2576] ATC Initial Comments at 10; Duke Initial Comments at 30-31 (citing attach. A, Robert Pierce Aff. ¶¶ 8-9); ISO-NE Initial Comments at 40-41; ITC Initial Comments at 26; Kansas Commission Initial Comments at 19-20; Large Public Power Initial Comments at 32-33; MISO Initial Comments at 58; MISO TOs Initial Comments at 24; New York TOs Initial Comments at 22; Pacific Northwest Utilities Initial Comments at 15-16; SERTP Sponsors Initial Comments at 36-37; Southern Initial Comments at 35, Ex. 2, Daryl C. McGee at ¶ 16; US Chamber of Commerce Initial Comments at 9.

transmission solutions) outweigh the potential administrative and analytical burden.  As it

pertains to dynamic line ratings, the information needed to inform the calculation of

dynamic line ratings should be widely available.  For example, NREL has published data

on annual averages of windspeeds at 10 meters above the ground that could inform

predictions for future wind conditions to facilitate calculations of economic benefits.[2577]

For the calculation of the economic benefits associated with dynamic lines ratings, it is

appropriate for such calculations to use historical average wind speed and direction data

to calculate average increases to transmission line transfer limits for use in benefit

calculations.  Average predicted wind speeds and direction should be sufficient to inform

the transmission provider as to whether the implementation of dynamic line ratings on a

specific transmission line may render that line a more efficient or cost-effective regional

transmission solution, and such data are widely available.[2578]  We acknowledge that there

is uncertainty with projections of any kind; however, it is not necessary to understand the

---

[2577] Data on annual averages of windspeeds at 10 meters above the ground is published by NREL in the form of both maps and tabular data.  *See* NREL, *Wind Resource Maps and Data*, https://www.nrel.gov/gis/wind-resource-maps.html.  As another example, data on monthly prevailing wind direction is published by the U.S. Department of Agriculture for various cities in all U.S. states in the form of graphical "wind roses."  *See* U.S. Dep't. of Agric., National. Weather and Climate Center, https://www.wcc.nrcs.usda.gov/ftpref/downloads/climate/windrose/.

[2578] *See, e.g.*, NREL, *Wind Resource Maps and Data*, https://www.nrel.gov/gis/wind-resource-maps.html; U.S. Dep't of Agric., National Weather and Climate Center, https://www.wcc.nrcs.usda.gov/ftpref/downloads/climate/windrose/.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 868 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

precise future wind conditions at a specific future period to assess the expected economic

benefits associated with the implementation of dynamic line ratings.

1209.  In response to arguments that the Commission should favor transmission provider

flexibility with respect to consideration of alternative transmission technologies,[2579] we

note that the reforms adopted in this final rule provide transmission providers with an

appropriate amount of flexibility and do not require the selection of any particular

enumerated alternative transmission technology to address any particular transmission

need.  As previously discussed, this requirement will ensure that transmission providers

more consistently consider the costs and benefits associated with incorporating the

enumerated alternative transmission technologies into regional transmission facilities.

However, we recognize that transmission providers must also continue to follow Good

Utility Practice when planning, evaluating, selecting, constructing, operating, and

maintaining transmission facilities.

1210.  Moreover, we decline to mandate further details on how transmission providers

should evaluate the enumerated list of alternative transmission technologies as more

efficient or cost-effective solutions to transmission needs, beyond the requirements

adopted in this final rule.  Thus, in response to comments from Smart Wires and WATT

Coalition proposing that the Commission mandate either consideration or deployment of

---

[2579] Avangrid Initial Comments at 31; Clean Energy Buyers Initial Comments at
25; Eversource Initial Comments at 27; Georgia Commission Initial Comments at 7-8;
Idaho Power Initial Comments at 9; New York TOs Initial Comments at 23; OMS Initial
Comments at 9; PPL Initial Comments at 23.

advanced power flow control devices in specific situations,[2580] we find that transmission

providers are the appropriate entity to identify, evaluate, and select specific solutions to

specific transmission needs.[2581]

1211.  In response to commenters urging the Commission to wait for transmission

providers to comply with Order No. 881 before implementing the NOPR proposal,[2582]

such concerns are unpersuasive.  Public utility transmission providers subject to Order

No. 881 are required to implement these requirements by July 12, 2025.[2583]  As the

Compliance Procedures section of the final rule states, the date that transmission

providers are required to begin considering the enumerated alternative transmission

technologies will be the effective date of the applicable tariff provisions submitted to

comply with this final rule requirement.  The final rule also states that transmission

providers must submit their compliance filings within ten months of the effective date of

this final rule, which is 60 days from the date of publication in the Federal Register.

---

[2580] Smart Wires Initial Comments at 1, 3-5; WATT Coalition Initial Comments at 3-4.

[2581] *See* Order No. 1000, 136 FERC ¶ 61,051 at P 153 (noting that transmission providers retain the ultimate responsibility for transmission planning).  As Entergy and Exelon attest, advanced power flow control devices are already considered in some transmission planning processes.  *See* Entergy Initial Comments at 29; Exelon Initial Comments at 23.

[2582] ATC Reply Comments at 4-5; Dominion Initial Comments at 40; Large Public Power Initial Comments at 5, 32-33; MISO TOs Initial Comments at 23-24.

[2583] *See MATL LLP*, 185 FERC ¶ 61,028, at P 10 (2023) (stating that July 12, 2025 is the implementation date of Order No. 881(citing Order No. 881, 177 FERC ¶ 61,179 at P 361)).

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 870 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Moreover, even if the compliance submission deadline falls shortly before Order No. 881's implementation deadline, the operative date here is the date that the tariff revisions proposed in a transmission provider's compliance filing to this final rule become effective, which is the effective date requested by the submitting transmission provider and accepted by the Commission.[2584]  Consequently, the transmission provider would not need to implement this final rule requirement prior to the implementation of Order No. 881 on July 12, 2025 unless it requests, and the Commission accepts, an earlier effective date for its tariff revisions.

1212.  Moreover, we find that concerns raised by commenters with respect to the interactions between the requirements that we establish in this final rule and Order No. 881 to be speculative.  We believe that the requirements to consider the enumerated alternative transmission technologies are separate from (but complementary to) the Commission's requirements in Order No. 881.  In Order No. 881, as most relevant here, the Commission required the use of more accurate transmission line ratings using up-to-date forecasts of ambient air temperatures in transmission line ratings.  By contrast, regarding the requirement to consider dynamic line ratings in this final rule, transmission providers must consider the benefits associated with additional up-to-date transmission line rating input assumptions, specifically wind speed and direction and solar heating intensity.

---

[2584] *See infra* Compliance Procedures section.

1213.  We disagree with concerns that any mandate to consider dynamic line ratings in
this proceeding might complicate the dynamic line ratings notice of inquiry (NOI)
proceeding,[2585] or that a mandate to consider dynamic line ratings in this proceeding
ignores the record, and the technical challenges identified in, the dynamic line ratings
NOI proceeding.[2586]  We find such concerns unpersuasive.  Any potential future
Commission action in the dynamic line ratings NOI proceeding remains hypothetical.
Moreover, we expect transmission providers to consider both the benefits of dynamic line
rating implementation and the challenges and costs associated with dynamic line rating
implementation as part of their consideration of the technology in Long-Term Regional
Transmission Planning and their existing regional transmission planning processes.

1214.  In response to requests for additional transparency,[2587] we also adopt the NOPR
proposal to expand the existing requirement established in Order No. 1000 for
transmission providers' evaluation processes to culminate in a determination that is
sufficiently detailed for stakeholders to understand why a particular transmission facility
was selected or not selected.  Specifically, we adopt the NOPR proposal to require that
the determination include an explanation that is sufficiently detailed for stakeholders to
understand why dynamic line ratings, advanced power flow control devices, advanced

---

[2585] MISO TOs Initial Comments at 23-24.

[2586] Large Public Power Initial Comments at 32.

[2587] Certain TDUs Reply Comments at 8-9; DC and MD Offices of People's
Counsel Initial Comments at 36; ENGIE Initial Comments at 6; PIOs Initial Comments at
22.

conductors, and/or transmission switching were or were not incorporated into selected regional transmission facilities.

1215.  With regard to the Commission's request for comment on whether to require non-RTO/ISO transmission planning regions to update their energy management systems or make other similar changes if dynamic line ratings are selected as a more efficient or cost-effective regional transmission facility, we require transmission providers to update their energy management systems, if needed to implement dynamic line ratings or any of the alternative transmission technologies.  We note that some transmission providers in non-RTO/ISO transmission planning regions may already be able to implement the alternative transmission technologies, and, as a result of the Commission's Ambient-Adjusted Rating requirements in Order No. 881,[2588] may have already updated their energy management systems, and therefore may not need further updates to their energy management systems.  However, if a transmission provider must upgrade its energy management systems to implement any of the alternative transmission technologies, then consistent with other requirements in this final rule, we require transmission providers to consider any possible energy management system upgrade costs needed to implement the selected alternative transmission technologies as part of their broader consideration of whether transmission facilities that incorporate alternative transmission technologies are more efficient or cost-effective regional transmission solutions.  We further reiterate that transmission providers must provide an explanation that is sufficiently detailed for

---

[2588] Order No. 881, 177 FERC ¶ 61,179 at P 84.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 873 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

stakeholders to understand why any of the enumerated alternative transmission technologies were, or were not, incorporated into transmission facilities selected in the regional transmission plan for purposes of cost allocation.  Moreover, we clarify that this explanation must be sufficiently clear to demonstrate whether the transmission provider did not select transmission facilities that incorporate any of the enumerated alternative transmission technologies, in part or primarily, due to concerns over the costs of upgrading energy management systems.

1216.  Finally, we find that WATT Coalition's request to consider incentives for deploying alternative transmission technologies is outside the scope of this proceeding.

### B.  **Specific Alternative Transmission Technologies**

#### 1.  **NOPR Proposal**

1217.  The Commission sought comment on whether there are other transmission technologies serving a transmission function that should be considered in regional transmission planning and cost allocation processes.  The following section discusses comments on specific alternative transmission technologies that transmission providers are required to consider pursuant to the requirements of this final rule.

#### 2.  **Comments on Specific Technologies**

1218.  AEE notes that dynamic line ratings implementation will increase capacity and provide significant benefits to customers.[2589]  Michigan State Entities state that dynamic

---

[2589] AEE Reply Comments at 29 (citing US DOE, *Dynamic Line Ratings Report to Congress 2019* 26 (June 2022), https://www.energy.gov/sites/prod/files/2019/08/f66/Congressional_DLR_Report_June2

Docket No. RM21-17-000                                                                      - 864 -

line ratings hold tremendous value for states like Michigan with cold, cloudy winters,

during which there is a greater reliance on transmission to move distant wind

generation.[2590]

1219.  AEE states that dynamic line ratings and similar technologies are so useful

because they improve predictability.[2591]  AEE further contends that, in the longer-term,

changing conditions will necessitate greater transmission deployment and the need for

more transmission capacity, but without considering complementary technologies, the

transmission buildout may be less efficient.[2592]

1220.  Hannon Armstrong contends that ERCOT's experience with dynamic line ratings

since 2005, as well as data from Oncor from 2011 to 2013, demonstrates that this

technology can provide significant savings through reduced congestion costs, allow for

granular congestion management, and furnish congestion data.  According to Hannon

Armstrong, real-time dynamic ratings and reliability analysis improve transmission

system operation and planning, provide opportunities for congestion mitigation, and

could justify the cancellation of planned transmission upgrades.  Hannon Armstrong

---

019_final_508_0.pdf).

[2590] Michigan State Entities Initial Comments at 10.

[2591] AEE Reply Comments at 30 (citing MISO Initial Comments at 57-58).

[2592] *Id.*

concludes that dynamic line ratings can promote just and reasonable rates without compromising reliability.[2593]

1221.  As mentioned above, some commenters warn the Commission of potential reliability and operational impacts of the widespread use of dynamic line ratings.[2594] Entergy explains that it has experienced significantly different weather readings at nearby weather sensors and cautions that the 2003 blackout was partially caused by overestimating the wind in transmission line ratings.[2595]

1222.  Some commenters that oppose the use of dynamic line ratings in transmission planning raise concerns about the reliability risks presented by dynamic line ratings.[2596] PJM argues that dynamic line ratings are inappropriate for addressing reliability needs and may introduce operational risk because, for example, forecasted wind might not materialize and the actual real-time ratings would be lower than forecasted.[2597]  Southern

---

[2593] Hannon Armstrong Reply Comments at 2.

[2594] Duke Initial Comments at 31-32 (citing attach. A, Robert Pierce Aff. ¶ 11); Entergy Initial Comments at 27-28; MISO Initial Comments at 59-60.

[2595] Entergy Initial Comments at 27-28 (citing U.S. Canada Power System Outage Task Force, *Final Report on the August 14, 2003 Blackout in the United States and Canada:  Causes and Recommendations* 58 (Apr. 2004)).

[2596] ATC Initial Comments at 7, 10; Duke Initial Comments at 31; Exelon Initial Comments at 22; Indicated PJM TOs Initial Comments at 19; LADWP Initial Comments at 5; NRECA Initial Comments at 53; PJM Initial Comments at 108-109; Southern Initial Comments at 35 (citing Ex. 2, Daryl C. McGee at ¶ 17); SERTP Sponsors Initial Comments at 36-37.

[2597] PJM Initial Comments at 108-109.

USCA4 Appeal: 24-1650   Doc: 224      Filed: 01/21/2025   Pg: 876 of 2455
Document Accession #: 20240513-3036      Filed Date: 05/13/2024

Docket No. RM21-17-000                                              - 866 -

argues that the assumption of dynamic line ratings leading to additional capacity will likely result in reduced system expansion, which could cause reliability problems in the long run.[2598]  Large Public Power and LADWP maintain that there is meaningful cybersecurity risk associated with the communications equipment needed to support dynamic line ratings.[2599]  However, WATT Coalition states that both traditional transmission solutions and grid enhancing technologies can result in problems, so the impact of solutions should be evaluated carefully to ensure that a solution to one problem does not create another.[2600]

1223.  Some commenters argue that dynamic line ratings are operational in nature and do not belong in the transmission planning process.[2601]  Dominion and Exelon state that a transmission provider must plan and build its system for worst case scenarios, which limits the usefulness of dynamic line ratings in transmission planning.[2602]  ITC asserts

---

[2598] Southern Initial Comments at 35, Ex. 2, Daryl McGee at ¶ 17.

[2599] LADWP Initial Comments at 5; Large Public Power Initial Comments at 35.

[2600] WATT Coalition Reply Comments at 4-5.

[2601] AEP Initial Comments at 33; Dominion Initial Comments at 40; Duke Initial Comments at 5; EEI Initial Comments at 21-22; Entergy Initial Comments at 5-6; Exelon Initial Comments at 22; Indicated PJM TOs Initial Comments at 19; ISO-NE Initial Comments at 40-41; ITC Initial Comments at 6, 26-28; Louisiana Commission Initial Comments at 14 (citing Potomac Economics Initial Comments at 2); MISO Initial Comments at 57; MISO TOs Initial Comments at 23; NRECA Initial Comments at 52; Pacific Northwest Utilities Initial Comments at 15-16; PJM Initial Comments at 8, 106, 108; PPL Initial Comments at 22; Southern Initial Comments at 35; SERTP Sponsors Initial Comments at 36-37; US Chamber of Commerce Initial Comments at 9.

[2602] Dominion Initial Comments at 40; Exelon Initial Comments at 22.

USCA4 Appeal: 24-1650     Doc: 224          Filed: 01/21/2025     Pg: 877 of 2455
Document Accession #: 20240513-3036     Filed Date: 05/13/2024

that transmission systems must be planned based on actual transfer capacity under the worst-case scenario, and not on contingent, variable capacity of the type that dynamic line ratings provide.[2603] EEI and Entergy note that the inherent variability and unpredictability associated with wind speed, solar heating intensity, and transmission line tension make dynamic line ratings inappropriate for addressing longer-term system planning objectives.[2604] MISO adds that for transmission planning horizons of five to 20 years or more into the future, it is impossible to predict the real-time conditions on which dynamic line ratings are based.[2605] NRECA explains that dynamic line ratings are not a substitute for an upgraded or new transmission facility.[2606]

1224. Many opposing commenters argue that the benefits of dynamic line ratings are too speculative.[2607] MISO states that dynamic line ratings may not always produce the benefits anticipated, explaining that static ratings are typically based on conservative wind speeds and best-case wind direction, so the assumptions used to develop static

---

[2603] ITC Initial Comments at 26.

[2604] EEI Initial Comments at 21; Entergy Initial Comments at 27.

[2605] MISO Initial Comments at 57-58.

[2606] NRECA Initial Comments at 52.

[2607] ATC Initial Comments at 10; Duke Initial Comments at 30 (citing attach. A, Robert Pierce Aff. ¶ 8); ISO-NE Initial Comments at 40-41; ITC Initial Comments at 26; Kansas Commission Initial Comments at 19-20; Large Public Power Initial Comments at 32-33; MISO Initial Comments at 58; MISO TOs Initial Comments at 24; New York TOs Initial Comments at 22; Pacific Northwest Utilities Initial Comments at 15-16; SERTP Sponsors Initial Comments at 36-37; Southern Initial Comments at 35, Ex. 2, Daryl C. McGee at ¶¶ 16-17; US Chamber of Commerce Initial Comments at 9.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 878 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

ratings are not always worst-case.[2608]  ISO-NE asserts that, for example, under summer peak load conditions, the dynamic line rating would be the same as that assumed in the planning study.[2609]  Southern cautions that including dynamic line ratings in transmission planning would likely assume additional capacity that may not materialize in real time, increasing congestion.[2610]  Large Public Power and MISO TOs argue that dynamic line ratings do not provide sufficient incremental benefits over Ambient Adjusted Ratings to justify the additional expense.[2611]

1225.  Some commenters argue that advanced power flow control devices are appropriate technologies to consider in transmission planning, contrasting them with dynamic line ratings.[2612]  Southern states that it generally supports consideration of advanced power flow control devices, and Ameren argues that they may be appropriate in certain circumstances for regional transmission planning.[2613]  Additionally, while WATT Coalition agrees that conductor-mounted advanced power flow control devices are

---

[2608] MISO Initial Comments at 58.

[2609] ISO-NE Initial Comments at 40-41.

[2610] Southern Initial Comments at 35, Ex. 2, Daryl C. McGee at ¶¶ 16-17.

[2611] Large Public Power Initial Comments at 32-33; MISO TOs Initial Comments at 24.

[2612] EEI Initial Comments at 20-21; Entergy Initial Comments at 29; Exelon Initial Comments at 23-24.

[2613] Ameren Initial Comments at 24-25; Southern Initial Comments, Ex. 2, Daryl C. McGee at ¶ 15.

limited in impact, it contends that today's ground-mounted versions can significantly

increase transfer capacity and integration of renewables.[2614]

1226.  Industrial Customers assert that the Commission should compel the use of

advanced power flow control devices because they are instrumental to ensuring that

transmission lines are fully used to their safest and most efficient potential.[2615]  Industrial

Customers further argue that the use of advanced power flow control devices will allow

for the optimization of transmission lines under various weather conditions.[2616]  Smart

Wires states that advanced power flow control devices can provide a more affordable

means of servicing the type of load growth driving Long-Term Regional Transmission

Facilities.[2617]  In addition, Smart Wires argues that several system studies have verified

that advanced power flow control devices avoid sub-synchronous resonance events on

long radial transmission lines, which can result in extensive damage.[2618]

1227.  In response to the administrative burden of considering advanced power flow

control devices specifically, WATT Coalition states that it provides guidance and

evidence of successful modeling schemes for such devices.[2619]  WATT Coalition argues

---

[2614] WATT Coalition Reply Comments at 4.

[2615] Industrial Customers Reply Comments at 13-14.

[2616] *Id.* at 18-19 (citing PPL, Initial Comments, Docket No. AD22-5-000, at 3 (filed Apr. 25, 2022)).

[2617] Smart Wires Initial Comments at 3-4.

[2618] *Id.* at 1, 4.

[2619] WATT Coalition Reply Comments at 3 (citing app. C).

Docket No. RM21-17-000                                                                 - 870 -

that advanced power flow control devices are a valuable solution to limitations of power

system studies because they can be adjusted by grid operators for unforeseen grid

challenges.[2620]  WATT Coalition adds that advanced power flow control devices have a

granular dispatchability that can also support real-time operational needs, which may

differ from those identified in the transmission planning timeframe.[2621]

1228.  Similar to dynamic line ratings, many commenters argue that advanced power

flow control devices are not appropriate in the transmission planning context and are

more appropriate for operational timeframes.[2622]  Duke and MISO caution against

widespread deployment of advanced power flow control devices.[2623]  Duke argues that

they should be applied judiciously, and that increased deployment creates a greater risk of

wide area cascading events by increasing the probability of the system being in a

previously unanalyzed state.[2624]  MISO states that, while advanced power flow control

devices work best to address specific isolated issues, it is not feasible to coordinate the

operation and deployment of these devices en masse, either manually or automatically.

---

[2620] *Id.* at 4.

[2621] *Id.*

[2622] AEP Initial Comments at 6; Indicated PJM TOs Initial Comments at 19; ITC
Initial Comments at 6, 26-28; Louisiana Commission Initial Comments at 14 (citing
Potomac Economics Initial Comments at 2); PJM Initial Comments at 8, 106, 108; PPL
Initial Comments at 22; SERTP Sponsors Initial Comments at 36-37.

[2623] Duke Initial Comments at 31-32; MISO Initial Comments at 59-60.

[2624] Duke Initial Comments at 31-32.

According to MISO, deployment of these devices could create other issues, and thus their operation and deployment must be managed on a holistic basis.[2625]  MISO further states that advanced power flow control devices could result in continued cascading issues across the system because of the potential widespread impact of adjusting line impedances that may get pushed to other facilities.[2626]

1229.  A number of commenters assert that the Commission should expand the list of alternative transmission technologies that must be considered.[2627]  Several commenters suggest that the Commission should require transmission providers to consider specific additional technologies in Long-Term Regional Transmission Planning, including storage that performs a transmission function, advanced conductors, transmission switching, topology optimization, and dynamic reactive power devices.[2628]  Some federal legislators

---

[2625] MISO Initial Comments at 59.

[2626] *Id.* at 60.

[2627] ACEG Initial Comments at 31; ACORE Initial Comments at 16; ACORE Supplemental Comments at 1; AEE Reply Comments at 27-28; Bekaert Supplemental Comments at 1; Breakthrough Energy Initial Comments at 16; CARE Coalition Initial Comments at 2-3; CARE Coalition Reply Comments at 5; Certain TDUs Reply Comments at 8-9; City of New York Reply Comments at 4 (citing PIOs Initial Comments at 84); Clean Energy Associations Initial Comments at 27-28; Clean Energy Associations Reply Comments at 7; CTC Global Initial Comments at 14-15; Industrial Customers Reply Comments at 11; Invenergy Initial Comments at 16; Vermont State Entities Initial Comments at 9.

[2628] Dynamic reactive power is produced from equipment that can quickly change the Mvar level independent of the voltage level.  Thus, the equipment can increase its reactive power production level when voltage drops and prevent a voltage collapse. Static VAR compensators, synchronous condensers, and generators provide dynamic reactive power.  FERC, Staff Report, *Principles for Efficient and Reliable Reactive Power Supply and Consumption* 7 (Feb. 4, 2005),

USCA4 Appeal: 24-1650   Doc: 224   Filed: 01/21/2025   Pg: 882 of 2455
Document Accession #: 20240513-3036   Filed Date: 05/13/2024

agree, offering support for a requirement to consider energy storage, reconductoring using advanced conductors,[2629] and topology optimization.[2630]  AEE argues that expanding the list of technologies that must be considered in transmission planning would fulfill the Commission's obligations under the FPA to encourage the adoption of advanced transmission technologies.[2631]

1230.  Several commenters urge the Commission to require that storage be considered.[2632]  CARE Coalition states that utilities can use storage to defer investments

---

https://www.ferc.gov/sites/default/files/2020-04/20050310144430-02-04-05-reactive-power.pdf.

[2629] Environmental Legislators Caucus Supplemental Comments at 2; Senator Schumer Supplemental Comments at 2.

[2630] Environmental Legislators Caucus Supplemental Comments at 2.

[2631] AEE Reply Comments at 27-28, 34 (citing 42 USC 16422(b)).

[2632] Advanced Energy Buyers Initial Comments at 4; AEP Initial Comments at 33-34; CAISO Initial Comments at 38; California Commission Initial Comments at 38-40 (citing Jennifer Chen & Devin Hartmann, *Transmission Reform Strategy From A Customer Perspective:  Optimizing Net Benefits And Procedural Vehicles R Street Policy Study* 7 (May 2022), https://www.rstreet.org/wp-content/uploads/2022/05/RSTREET257.pdf); CARE Coalition Initial Comments at 2-3; Clean Energy Associations Initial Comments at 30-31; Conservative Energy Network Supplemental Comments at 1-2; Conservatives for Clean Energy – Florida Supplemental Comments at 1-2; Conservatives for Clean Energy – South Carolina Supplemental Comments at 1; DC and MD Offices of People's Counsel Initial Comments at 36-37; Illinois Commission Initial Comments at 12; Industrial Customers Reply Comments at 11; Joint Consumer Advocates Initial Comments at 13; Michigan Conservative Energy Forum Supplemental Comments at 1; NARUC Initial Comments at 36; National Grid Initial Comments at 3-4; Ohio Conservative Energy Forum Supplemental Comments at 1; OMS Initial Comments at 9; Western Way Colorado Supplemental Comments at 2; Western Way Nevada Supplemental Comments at 2; Western Way Utah Supplemental Comments at 2; Wisconsin Conservative Energy Forum Supplemental Comments at 1.

as supply and demand patterns change, allowing them to avoid all-in, 50-year investments in favor of shorter-term flexibility.[2633]  CARE Coalition cites a number of ways that storage can improve transmission, including providing voltage support in a transmission-constrained zone, ensuring reliability while repairs are executed, reducing peak loads, increasing capacity on congested lines, directing power flow away from lower capacity transmission lines, and controlling the timing of power flows to remain under thresholds.[2634]

1231.  AEP states that the Commission should require better consideration of storage, noting that the technology has advanced significantly in the past several years, yet is still not being deployed as a transmission alternative.  AEP cites two reasons for this:  (1) despite the multiple uses and benefits of storage, it is currently categorized as only one of the following – transmission, generation, or distribution, and (2) there is no traditional approach that assesses the viability of storage proposals to solve reliability problems. AEP states that, to solve these problems, the Commission should provide more certainty around these questions, including how to schedule, dispatch, and charge storage, as well as guidance on how to assess the value of storage beyond reliability if, for example, the resource is only needed during certain times of year.[2635]

---

[2633] CARE Coalition Initial Comments at 42-43.

[2634] *Id.* at 42.

[2635] AEP Initial Comments at 33-34.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 884 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

1232.  Some commenters suggest that the Commission should require consideration of advanced conductors in Long-Term Regional Transmission Planning.[2636]  CTC Global asserts that advanced conductors should be required to be considered because of their ease of installation onto existing structures, cost savings, lower line sag, and power flow increase.[2637]  CTC Global adds that even in the case of a total rebuild, advanced conductors can generate more capacity, efficiency, resilience, and reliability than rebuilds using standard conductors.[2638]  VEIR notes that if the final rule requires the consideration of advanced conductors, the Commission should define advanced conductors to include all advanced conductor technologies, including superconductors.[2639]  Bekaert states that the definition of advanced conductors should extend beyond carbon fiber core technologies to also include steel core technologies, which it contends can raise ampacity, reduce line losses, and withstand extreme weather conditions, all while offering a cost-effective solution.[2640]

---

[2636] ACEG Initial Comments at 31; ACORE Initial Comments at 16; Breakthrough Energy Initial Comments at 15-19; CTC Global Initial Comments at 15-16; DC and MD Offices of People's Counsel Initial Comments at 36-37; Indicated US Senators and Representatives Initial Comments at 2; NASEO Initial Comments at 6; Prysmian Initial Comments at 1; VEIR Initial Comments at 5-6.

[2637] CTC Global Initial Comments at 14-15.

[2638] *Id.* at 15.

[2639] VEIR Reply Comments at 5.

[2640] Bekaert Supplemental Comments at 1-2.

Docket No. RM21-17-000                                                    - 875 -

1233.  Some commenters suggest that the Commission should require consideration of

transmission switching in Long-Term Regional Transmission Planning.[2641]  For example,

Illinois Commission states that line switching is a tool to make better use of the extant

transmission system.[2642]  NASEO states that the use of alternative transmission

technologies, including transmission switching, is increasing.[2643]  However, MISO argues

that grid enhancing technologies that introduce automatic topology changes are not

appropriate for consideration over transmission planning horizons of 20 years or more

because they would be considered remedial action schemes, which MISO and its

transmission owners have attempted to reduce as a matter of Good Utility Practice.[2644]

1234.  A number of commenters suggest that the Commission should require

consideration of topology optimization in Long-Term Regional Transmission

Planning.[2645]  Potomac Economics states that network optimization can allow a

---

[2641] Illinois Commission Initial Comments at 12; NASEO Initial Comments at 6;
Potomac Economics Initial Comments at 5.

[2642] Illinois Commission Initial Comments at 12 (citing Pablo A. Ruiz, The Brattle
Group, *Transmission Topology Optimization* (Aug. 21, 2017)
https://www.brattle.com/wp-
content/uploads/2017/10/7204_transmission_topology_optimization.pdf (Brattle Group
Aug. 2017 Report)).

[2643] NASEO Initial Comments at 6.

[2644] MISO Initial Comments at 60.

[2645] ACORE Initial Comments at 16; CARE Coalition Initial Comments at 2-3;
ENGIE Initial Comments at 5-6; Illinois Commission Initial Comments at 11-13 (citing
Brattle Group Aug. 2017 Report); Indicated US Senators and Representatives Initial
Comments at 2; Potomac Economics Initial Comments at 5; R Street Initial Comments at
4; Tabors Caramanis Rudkevich Initial Comments at 5; WATT Coalition Initial

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 886 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

transmission operator to circumvent a limiting transmission facility and substantially mitigate the associated congestion, averting transmission upgrades that could prove wasteful and inefficient.[2646]  With respect to topology optimization, WATT Coalition recommends that the information provided in the evaluation process should include modeling assumptions, contingency analysis results, asset age and condition, environmental and footprint constraints, etc.[2647]  In contrast, SPP states that technologies that optimize transmission system operation should be considered short-term solutions and not a replacement for long-term transmission capacity.[2648]

1235.  ITC argues that the Commission should encourage transmission providers to modernize transmission planning criteria to better consider dynamic reactive power devices such as static VAR compensators, static synchronous compensators, and unified power flower controllers.  ITC asserts that such technologies provide faster response times to changes in voltage and power factor, relative to capacitor banks and mechanically switched compensation schemes.[2649]

1236.  Industrial Customers and Ohio Consumers suggest that the Commission should require the consideration of distributed energy resources in Long-Term Regional

---

Comments at 6.

[2646] Potomac Economics Initial Comments at 5.

[2647] WATT Coalition Initial Comments at 6.

[2648] SPP Initial Comments at 26.

[2649] ITC Initial Comments at 28.

USCA4 Appeal: 24-1650     Doc: 224     Filed: 01/21/2025     Pg: 887 of 2455
Document Accession #: 20240513-3036     Filed Date: 05/13/2024

Transmission Planning.[2650]  Industrial Customers contend that demand response and load-limiting devices should be considered as a way of optimizing the current transmission system, claiming that they are less costly than transmission expansions.[2651]  QCo states that the Commission should consider the use of the thermal mass of major buildings as a low-cost method to store energy and provide flexibility to the grid.[2652]

1237.  ENGIE asserts that the Commission should require consideration of dynamic transformer rating technology in Long-Term Regional Transmission Planning.[2653]

1238.  Exelon is concerned that making a list of technologies to consider in transmission planning will result in a "time-consuming check-the-box exercise," increasing costs and creating litigation opportunities.[2654]

### 3.    **Commission Determination**

1239.  As stated above, we adopt the NOPR proposal, with modification, to require transmission providers in each transmission planning region to consider dynamic line ratings and advanced power flow control devices in Long-Term Regional Transmission Planning and existing Order No. 1000 regional transmission planning processes.

---

[2650] Industrial Customers Initial Comments at 35; Ohio Consumers Initial Comments at 34.

[2651] Industrial Customers Reply Comments at 11.

[2652] QCo Initial Comments at 1-3.

[2653] ENGIE Initial Comments at 5-6.

[2654] Exelon Initial Comments at 23-24.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 888 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

1240.  In response to comments that dynamic line ratings are operational in nature and are inappropriate in transmission planning, we continue to believe that there is enough real-world operational experience with dynamic line ratings for transmission providers to be able to reasonably project their likely operations and, as such, the benefits that regional transmission facilities that incorporate dynamic line ratings can provide over the transmission planning horizon.[2655]  Dynamic line ratings have the ability to increase transmission line ratings, and thus permit more economic energy transfers in most intervals,[2656] which, in turn, could result in benefits (including, but not limited to, production cost savings, reduced congestion due to fewer transmission outages resulting from improved situational awareness, and capacity cost benefits from reduced peak energy losses) that we require transmission providers to evaluate in Long-Term Regional Transmission Planning, [2657] and in their existing regional transmission planning processes.

1241.  We acknowledge commenter concerns about the potential effects that the widespread use of dynamic line ratings or advanced power flow control devices could have on reliability.[2658]  But while these technologies cannot solve all reliability needs, as noted above, the record here demonstrates that alternative transmission technologies are

---

[2655] NOPR, 179 FERC ¶ 61,028 at P 276.

[2656] Hannon Armstrong Reply Comments at 1-3.

[2657] *See supra* Required Benefits section.

[2658] *See, e.g.*, CAISO Initial Comments at 41-42.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 889 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                    - 879 -

in certain circumstances capable of enhancing reliability and providing additional capacity.[2659]  We recognize that, either dynamic line ratings or advanced power flow control devices, on their own, may be unlikely to resolve certain reliability needs that are assessed based on worst case conditions.[2660]  We also reiterate that nothing in this final rule changes transmission providers' obligations to conduct transmission planning in a manner that ensures the long-term reliability of the bulk electric system.[2661]  However, we find that dynamic line ratings and advanced power flow control devices can also confer reliability benefits.  For example, in Order No. 881, the Commission found that, by accounting for ambient air temperatures in transmission line ratings, transmission providers can reliably increase power transfer capability, which results in significant reliability benefits.[2662]  Such reliability benefits also apply to dynamic line ratings.  Specifically, by accounting for actual wind conditions, dynamic line ratings can also reliably increase transfer capability and thereby provide reliability benefits.  Similarly, as

---

[2659] *See supra* P 1206 of this section.

[2660] For example, as ISO-NE explains, the dynamic line rating may be the same as the rating already assumed in the planning study as transmission providers may need to assume worst case weather inputs to transmission line ratings. ISO-NE Initial Comments at 40-41.

[2661] See, for example, TPL-001-5.1, Transmission System Planning Performance Requirements, which establishes transmission system planning performance requirements within the planning horizon to develop a bulk electric system that will operate reliably over a broad spectrum of system conditions and following a wide range of probable contingencies.

[2662] Order No. 881, 177 FERC ¶ 61,179 at P 85.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 890 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Ameren describes, it may be more efficient to use advanced power flow control devices, which can address stability limitations by allowing for greater use of a transmission facility.[2663]

1242.  Additionally, Long-Term Regional Transmission Planning evaluates Long-Term Regional Transmission Facilities based on multiple benefits, and some existing regional transmission planning processes focus on economic benefits, while others may consider multiple benefits, including economic benefits.  At a minimum, regional transmission solutions incorporating dynamic line ratings are appropriately considered as part of these processes.  Given the potentially substantial economic benefits of dynamic line ratings, we find that it is important for transmission providers to consider dynamic line ratings in Long-Term Regional Transmission Planning and their existing regional transmission planning processes so as to ensure that they identify more efficient or cost-effective regional transmission facilities for selection.

1243.  We also disagree with commenters that argue that advanced power flow control devices are not appropriate in the transmission planning context and are more appropriate for operational timeframes.  We find that the potential benefits of using advanced power flow control devices are sufficient to merit their consideration in Long-Term Regional Transmission Planning and existing regional transmission planning processes.  For example, as Ameren states, where a transmission line is stability-limited from carrying more power, the use of advanced power flow controls may address the limitation and

---

[2663] Ameren Initial Comments at 24.

allow greater use of the line.  Ameren also notes that advanced power flow controls may be beneficial in a situation where a transmission line that needs to be upgraded traverses sensitive environmental areas.[2664]  Moreover, as Entergy and Exelon attest, advanced power flow control devices are already considered in some transmission planning processes.[2665]  As discussed above, we modify the NOPR proposal to add two additional alternative transmission technologies to the list of enumerated alternative transmission technologies required to be considered in Long-Term Regional Transmission Planning and existing regional transmission planning:  advanced conductors and transmission switching.  We find that advanced conductors may greatly increase the capacity of transmission facilities, and thus a new regional transmission facility or upgrade to an existing transmission facility that incorporates advanced conductors may be a more efficient or cost-effective alternative than a proposed regional transmission facility that does not incorporate such technologies.  Consistent with Order No. 2023, we note that advanced conductors can increase transmission line ratings, providing more "headroom" on the system to address normal and contingency conditions.[2666]  We clarify that the definition of advanced conductors that we adopt in this final rule constitutes a range of permissible present and future technologies, and is defined relative to conventional aluminum conductor steel reinforced conductors.  Therefore, advanced conductors

---

[2664] *Id.*

[2665] Entergy Initial Comments at 29; Exelon Initial Comments at 23.

[2666] Order No. 2023, 184 FERC ¶ 61,054 at P 1597.

include, but are not limited to, superconducting cables, advanced composite conductors, advanced steel cores, high temperature low-sag conductors, fiber optic temperature sensing conductors, and advanced overhead conductors.  We find that such advanced conductors can result in lower line sag and increased power flow and can be installed on existing transmission structures, thereby offering ease of installation.[2667]

1244.  We agree with commenters that suggest that transmission switching should be added to the list of alternative transmission technologies that must be considered in Long-Term Regional Transmission Planning and existing regional transmission planning processes.[2668]  We clarify that, in this final rule, we define transmission switching as the opening or closing of transmission elements to safely route power and direct flows away from congestion, based on pre-existing forward analysis.  Transmission switching can be used to route energy around areas with high congestion and improve the overall transfer capability of the system.  In doing so, transmission switching may provide additional economic or reliability benefits, which could therefore render a transmission facility that uses transmission switching a more efficient or cost-effective alternative than a regional transmission facility that does not use transmission switching.  In response to MISO's concern that automatic topology changes are not appropriate for consideration over transmission planning horizons of 20 years or more because they would be considered

---

[2667] CTC Global Initial Comments at 14-15.

[2668] Illinois Commission Initial Comments at 12; NASEO Initial Comments at 6; Potomac Economics Initial Comments at 5.

remedial action schemes, [2669] we note that there are appropriate applications for transmission switching that offer the potential to be a more efficient or cost-effective alternative than a proposed regional transmission facility that does not use one of the enumerated alternative transmission technologies. For example, the record indicates that network optimization can allow a transmission operator to circumvent a limiting transmission facility and substantially mitigate the associated congestion, averting transmission upgrades that could prove wasteful and inefficient.[2670]

1245. We decline to add storage that performs a transmission function to the list of enumerated alternative transmission technologies. The Commission has determined that the evaluation of whether an electric storage resource performs a transmission function requires a case-by-case analysis of either how a particular electric storage resource would be operated or the requirements set forth in an OATT governing selection of such electric storage resources.[2671] In the context of regional transmission planning, we continue to find that the evaluation of whether an electric storage resource performs a transmission function requires a case-by-case analysis, and therefore decline to generically require the consideration of storage that performs a transmission function in regional transmission planning processes.

---

[2669] MISO Initial Comments at 60.

[2670] Potomac Economics Initial Comments at 5.

[2671] Order No. 2023, 184 FERC ¶ 61,054 at P 1599.

1246. For the following reasons, we also decline to add topology optimization to the list of enumerated alternative transmission technologies because it is technically much more challenging to implement. We clarify that topology optimization is not specific to individual transmission facilities but instead is the act of determining the optimal use of the transmission system, which may involve many different transmission facilities. Additionally, the optimal use of the transmission system may frequently change depending on system conditions throughout the operating day. By contrast, transmission switching focuses on opening or closing transmission elements in pre-determined circumstances based on prior analyses well in advance of the operational time horizon.[2672] We do not find that it is necessary to require the consideration of topology optimization in regional transmission planning processes currently. While topology optimization software has been used to identify potential system reconfiguration actions that could result in a reduction in real-time congestion, it has not yet been deployed due to computational complexity. Specifically, given the size and complexity of the power grid and the large number of potential optimization solutions, finding optimization solutions in the necessary real-time timelines is extremely difficult and doing so risks poor model performance and lower quality solutions, which, in turn, could adversely impact

---

[2672] *See supra* P 1243 of this section on transmission switching. We recognize that there may be overlap between the concepts of transmission switching and topology optimization. As noted below, nothing in this final rule precludes transmission providers from considering topology optimization solutions as an alternative transmission technology, if they so choose.

reliability.  While simplifications might be possible, such simplifications risk oversimplifying, which, in turn, could also jeopardize reliability.[2673]

1247.  Finally, we decline to add further additional alternative transmission technologies suggested by commenters.[2674]  We note that, while commenters express support for the concept of considering additional alternative transmission technologies, in general, we do not believe that the record is sufficient to include these additional technologies on the enumerated list of alternative transmission technologies that transmission providers must consider in Long-Term Regional Transmission Planning and existing regional transmission planning processes at this time.  However, we note that nothing in this final rule precludes transmission providers from considering other alternative transmission technologies or other potential solutions in their Long-Term Regional Transmission Planning and existing regional transmission planning processes.

## VI.   Regional Transmission Cost Allocation

### A.   Cost Allocation for Long-Term Regional Transmission Facilities

#### 1.   Cost Allocation Methods for Long-Term Regional Transmission Facilities

##### a.   NOPR Proposal

1248.  In the NOPR, the Commission proposed to require transmission providers in each transmission planning region to revise their OATTs to include:  (1) a Long-Term

---

[2673] US DOE, *Advanced Transmission Technologies* 11-15 (Dec. 2020), https://www.energy.gov/oe/articles/advanced-transmission-technologies-report.

[2674] *See supra* PP 1235-1237.

Regional Transmission Cost Allocation Method to allocate the costs of Long-Term

Regional Transmission Facilities; (2) a State Agreement Process by which one or more

Relevant State Entities[2675] may voluntarily agree to a cost allocation method; or (3) a

combination thereof.[2676]

1249.  The Commission proposed to define a Long-Term Regional Transmission Cost

Allocation Method as an *ex ante* regional cost allocation method that would be included

in each transmission provider's OATT as part of Long-Term Regional Transmission

Planning.  The developer of a Long-Term Regional Transmission Facility would be

entitled to use the Long-Term Regional Transmission Cost Allocation Method if it is the

applicable method.[2677]  The Commission proposed to define a State Agreement Process as

an *ex post* cost allocation process that would be included in each transmission provider's

OATT as part of Long-Term Regional Transmission Planning, which may apply to an

individual Long-Term Regional Transmission Facility or a portfolio of such Facilities

---

[2675] The definition of Relevant State Entities is discussed below.  *See infra*
Requirement that Transmission Providers Seek the Agreement of Relevant State Entities
Regarding the Cost Allocation Method or Methods for Long-Term Regional
Transmission Facilities section.

[2676] NOPR, 179 FERC ¶ 61,028 at P 302.  The Commission explained that, for
example, a "combination" approach may entail:  (1) providing a Long-Term Regional
Transmission Cost Allocation Method for certain types of Long-Term Regional
Transmission Facilities and providing a State Agreement Process for others; or (2)
providing for cost allocation for a Long-Term Regional Transmission Facility, portfolio,
or type of such facilities partially based on a Long-Term Regional Transmission Cost
Allocation Method and partially based on funding contributions in accordance with a
State Agreement Process.  *Id.* P 302 n.510.

[2677] *Id.* P 302 n.508.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 897 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

grouped together for purposes of cost allocation.  After a Long-Term Regional

Transmission Facility is selected, the State Agreement Process would be followed to

establish a cost allocation method for that facility (if agreement can be reached).  If the

Commission approves the cost allocation method that results from the State Agreement

Process, the developer of the Long-Term Regional Transmission Facility would be

entitled to use that cost allocation method if it is the applicable method.[2678]

1250.  The Commission also proposed to apply the cost allocation reforms only to new

Long-Term Regional Transmission Facilities.  Therefore, these proposed reforms would

neither provide grounds for re-litigation of cost allocation decisions for transmission

facilities that are selected prior to the effective date of any final rule in this proceeding,

nor would they apply to the cost allocation methods associated with regional transmission

facilities that address shorter-term transmission needs driven by reliability and/or

economic considerations.[2679]

1251.  In addition, the Commission stated that, to the extent transmission providers

believe that their existing cost allocation approaches comply with the requirements

adopted in any final rule in this proceeding, including those related to the agreement of

Relevant State Entities, they could make such demonstration in their compliance filings

in response to any final rule.[2680]

---

[2678] *Id.* P 302 n.509.

[2679] *Id.* P 314.

[2680] *Id.*

## b. **Comments**

### i. **Interest in the Proposed Cost Allocation Reforms**

1252.  Some commenters offer general support for the cost allocation reforms proposed in the NOPR.**2681**

1253.  Several commenters indicate support for the proposal to require transmission providers to revise their OATTs to include:  (1) a Long-Term Regional Transmission Cost Allocation Method to allocate the costs of Long-Term Regional Transmission Facilities; (2) a State Agreement Process by which one or more Relevant State Entities may voluntarily agree to a cost allocation method; or (3) a combination thereof.**2682**  Clean Energy Buyers state that this proposal will provide certainty in the cost allocation process, lessening disputes that may delay transmission development.**2683**  ITC suggests

---

**2681** *E.g.*, Breakthrough Energy Initial Comments at 6; Business Council for Sustainable Energy Initial Comments at 2; California Democratic Representatives Supplemental Comments at 2; Joint Consumer Advocates Initial Comments at 13; OMS Initial Comments at 9; Pine Gate Initial Comments at 45; WE ACT Initial Comments at 5.

**2682** Certain TDUs Initial Comments at 2, 7; City of New Orleans Council Initial Comments at 9-10; Entergy Initial Comments at 29-30; Eversource Initial Comments at 29-30; ISO-NE Initial Comments at 37; ITC Initial Comments at 28; Kentucky Commission Chair Chandler Initial Comments at 3 (citing NOPR, 179 FERC ¶ 61,028 at PP 302-303); Michigan Commission Initial Comments at 8; NARUC Initial Comments at 51; NESCOE Initial Comments at 10; New York Commission and NYSERDA Initial Comments at 12-13; New York TOs Initial Comments at 18; North Carolina Commission and Staff Initial Comments at 15-16; NYISO Initial Comments at 48-49; OMS Initial Comments at 10; Pacific Northwest State Agencies Initial Comments at 27; Pattern Energy Initial Comments at 18; PIOs Initial Comments at 64; PJM States Initial Comments at 9-10; Resale Iowa Initial Comments at 2, 12.

**2683** Clean Energy Buyers Initial Comments at 26-27.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 899 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                    - 889 -

that the Commission look to OMS' role in State Agreement Processes as a guide for how other transmission planning regions can foster state participation in Long-Term Regional Transmission Planning.[2684]  AEP asserts that clear rules set in advance provide the regulatory certainty necessary to support large, long-term transmission investments and ensure customers and developers know how the associated costs will be allocated.[2685]

1254.  New Jersey Commission states that a hybrid method that allocates costs partially *ex ante*, based on reliability and economic benefits, and partially *ex post*, through a State Agreement Process/negotiated participant funding approach, could have value, arguing that negotiated cost allocations could reduce litigation and make it easier to construct beneficial transmission facilities.[2686]  SEIA supports a combination of a Long-Term Regional Transmission Cost Allocation Method and a State Agreement Process, asserting that states should be allowed to assume the costs of new transmission facilities to serve their needs.[2687]

### ii.    Requested Clarifications and Concerns Related to the Proposed Cost Allocation Reforms

1255.  Some commenters raise concerns and request clarifications on the proposed reforms.  For example, BP contends that, in the case of a multi-value project, it is unclear

---

[2684] ITC Reply Comments at 28-29.

[2685] AEP Initial Comments at 35.

[2686] New Jersey Commission Initial Comments at 17, 25.

[2687] SEIA Initial Comments at 24.

Docket No. RM21-17-000                                                - 890 -

whether only a part of the cost of a transmission project associated with meeting changes in the resource mix and demand will be allocated under a Long-Term Regional Transmission Cost Allocation Method, as opposed to all of the costs.[2688]  NARUC requests that the Commission provide a mechanism for future review of cost allocation methods for Long-Term Regional Transmission Facilities.[2689]

1256.  Other commenters urge flexibility with respect to cost allocation methods and state involvement,[2690] citing regional differences,[2691] to improve the likelihood of achieving consensus between affected states.[2692]  OMS stresses the need for flexibility with respect to cost allocation methods to realize the NOPR's overall objectives of cost-effective regional transmission expansion.[2693]  Louisiana Commission, however, asserts that, whichever cost allocation method is adopted, it should not allow a majority to impose costs upon non-consenting states.[2694]

---

[2688] BP Initial Comments at 12.

[2689] NARUC Initial Comments at 49-50.

[2690] *See, e.g.*, Entergy Initial Comments at 29-30; Eversource Initial Comments at 29-30; Idaho Power Initial Comments at 10; NESCOE Reply Comments at 5; Pacific Northwest Utilities Initial Comments at 5-6, 11, 13.

[2691] *See, e.g.*, Dominion Initial Comments at 45; Ohio Commission Federal Advocate Initial Comments at 11.

[2692] New York TOs Initial Comments at 18; *see also* Northwest and Intermountain Initial Comments at 18.

[2693] OMS Initial Comments at 10.

[2694] Louisiana Commission Initial Comments at 33-34.

1257.  Shell states that the Commission should require coastal transmission providers to explain how their Long-Term Regional Transmission Planning processes facilitate transmission planning and cost allocation for offshore wind.[2695]  Shell further asserts that the Commission should require all transmission providers to account for the risk of free-ridership in their OATTs, arguing that regardless of the cost allocation method applied, the Commission should ensure that first-movers are protected from free-ridership.[2696]

1258.  Some commenters express concerns about the proposed State Agreement Process.[2697]  Dominion states that a practical challenge in implementing the proposed reforms will be whether having an *ex ante* cost allocation method combined with alternative proposals or some combination thereof creates an additional opportunity to debate and challenge a transmission project, resulting in delays and increased costs.[2698]

### iii.     Concerns with the Proposed Cost Allocation Reforms

1259.  Some commenters generally oppose the proposed reforms.  For example, Southern states that the proposal to establish a specific cost allocation process before Long-Term Regional Transmission Planning has identified actual transmission projects is too abstract

---

[2695] Shell Initial Comments at 17.

[2696] *Id.* at 25, 28.

[2697] We also address comments regarding the State Agreement Process in more detail below.  *See infra* Proposals Relating to the Design and Operation of State Agreement Processes section.

[2698] Dominion Initial Comments at 52.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 902 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                    - 892 -

to work in practice and will most likely fail to attract requisite state support.[2699]  Southern

further asserts that the NOPR's proposed cost allocation processes do not satisfy the

second prong of the Commission's FPA section 206 burden of proof to establish a just

and reasonable replacement rate.[2700]  Pacific Northwest State Agencies oppose the option

in the NOPR proposal that allows transmission providers to propose a Long-Term

Regional Transmission Cost Allocation Method without involving states in its

development.[2701]

### iv.    Comments on Specific Aspects of the Proposed Cost Allocation Reforms

### (a)    Use of Existing Cost Allocation Methods for Long-Term Regional Transmission Facilities

1260.  Some commenters assert that they should be able to use existing cost allocation

methods for Long-Term Regional Transmission Planning, with some RTOs/ISOs[2702] and

RTO/ISO stakeholders[2703] supporting these arguments.  Other commenters support the

Commission permitting transmission providers to keep their existing processes that

---

[2699] Southern Initial Comments at 6-7.

[2700] *Id.* at 7 n.7.

[2701] Pacific Northwest State Agencies Initial Comments at 24-25.

[2702] *See, e.g.*, MISO Initial Comments at 61, 68; PJM Initial Comments at 116; SPP Initial Comments at 28-29.

[2703] *See, e.g.*, Ameren Initial Comments at 25-27; Avangrid Initial Comments at 28; Dominion Initial Comments at 3, 45; Ohio Commission Federal Advocate Initial Comments at 2, 13; Omaha Public Power Initial Comments at 4; Pennsylvania Commission Initial Comments at 13-14; PJM States Initial Comments at 11-12; Virginia Commission Staff Initial Comments at 6.

involve states in cost allocation decisions.[2704]  PPL supports using the existing regional

cost allocation structures as a default.  PPL asserts that any change to the existing cost

allocation method will require an FPA section 205 filing, and interested parties, including

the states, may intervene and provide testimony and evidence regarding the

appropriateness of any benefit used.[2705]

1261.  APS states that it agrees with the Commission that collaboration with Relevant

State Entities is a positive approach to transmission planning, but it believes that the

current cost allocation process is appropriate and should not be altered.  APS, noting that

the Commission has determined that additional complexities and contentiousness may

result from expanding the transmission planning horizon to 20 years, argues that

underlying cost causation principles will apply, and, therefore, existing cost allocation

processes remain appropriate.[2706]

1262.  Similarly, PJM contends that the need for new or expanded transmission facilities

identified through Long-Term Regional Transmission Planning would fall under the

reliability or market efficiency studies that it performs today, and, therefore, the

Commission should permit it to use its existing *ex ante* cost allocation methods as the

default cost allocation method for transmission facilities selected through Long-Term

---

[2704] Avangrid Initial Comments at 28; Dominion Reply Comments at 11; Omaha Public Power Initial Comments at 4.

[2705] PPL Initial Comments at 28-29.

[2706] APS Initial Comments at 11-12.

Docket No. RM21-17-000                                                    - 894 -

Regional Transmission Planning (absent agreement by all affected states on an alternate

method). PJM states that using its existing *ex ante* approaches will provide consistency

and certainty in assigning cost responsibility.[2707] PJM States disagree, arguing that the

Commission should not presume that existing cost allocation methods are just and

reasonable without a full examination and input from retail regulators. According to PJM

States, the factors that make PJM's existing cost allocation methods just and reasonable

in the short term may not exist in the long term.[2708]

1263. PJM further requests that the Commission clarify that if a transmission provider

proposes to use an existing cost allocation method for regional transmission facilities

selected through Long-Term Regional Transmission Planning, such a proposal may not

be a cause for relitigating the use of that method for transmission projects selected prior

to the issuance of the final rule.[2709] MISO states that if existing cost allocation methods

previously were determined to comply with the Order No. 1000 regional cost allocation

principles, the Commission should not require another demonstration and should clarify

that its proposals do not require transmission providers to modify or set aside any existing

regional cost allocation method.[2710] Relatedly, ITC argues that the Commission should

---

[2707] PJM Initial Comments at 115.

[2708] PJM States Reply Comments at 5.

[2709] PJM Initial Comments at 115 (citing NOPR, 179 FERC ¶ 61,028 at P 314).

[2710] MISO Initial Comments at 61.

allow for streamlined compliance plans from transmission providers that already have substantial long-range planning processes in place.[2711]

1264.  PIOs proffer that having two distinct cost allocation methods can be unjust, unreasonable, and unduly discriminatory even if those methods are reasonable on their own, and that multiple cost allocation methods may create uncertainty, which the Commission has recognized can be a barrier to transmission development.[2712]  PIOs therefore request that the Commission:  (1) require transmission providers to identify and justify differences between Long-Term Regional Transmission Planning and near-term cost allocation; (2) find that compliance filings that create opportunities for "cost allocation arbitrage" may not be approved; and (3) require transmission providers to demonstrate that their current Order No. 1000 cost allocation methods are just, reasonable, and not unduly discriminatory or preferential.[2713]

1265.  Dominion requests that the Commission clarify that any cost allocation method directed through this rulemaking proceeding is:  (1) limited to Long-Term Regional Transmission Facilities; and (2) limited to Order No. 1000 transmission planning regions.[2714]

---

[2711] ITC Initial Comments at 29-30.

[2712] PIOs Initial Comments at 71 (citing NOPR, 179 FERC ¶ 61,028 at P 297).

[2713] *Id.* at 72.

[2714] Dominion Initial Comments at 49-50.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 906 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

1266.  Clean Energy Associations request that the Commission adopt *pro forma* cost allocation provisions that would allow for regional variation where cost allocation practices are consistent with or superior to the requirements adopted in any final rule. For example, Clean Energy Associations state, if vertically integrated public utilities subject to state-jurisdictional integrated resource planning can demonstrate that the state planning process appropriately identifies needs and assigns costs based on future planned generation consistent with state policies, certain requirements may not be applicable.[2715]

### (b)    Comments on Whether Filing an *Ex Ante* Cost Allocation Method Should be Required

1267.  Some commenters support a requirement that transmission providers submit an *ex ante* cost allocation method or methods that would apply to all Long-Term Regional Transmission Facilities either in place of, or as a backstop for, a State Agreement Process.[2716]  For example, Grid United suggests that the Commission mandate that transmission providers develop *ex ante* cost allocation methods for selected Long-Term Regional Transmission Facilities to remove development and financial uncertainty, provide transparency in how benefits are calculated, and ensure that cost allocation is roughly commensurate with the distribution of benefits.[2717]

---

[2715] Clean Energy Associations Initial Comments at 36.

[2716] *See, e.g.*, Grid United Initial Comments at 6; Illinois Commission Initial Comments at 16-17; Minnesota State Entities Initial Comments at 6; MISO TOs Initial Comments at 45-48; PIOs Initial Comments at 70; RMI Supplemental Comments at 2-3.

[2717] Grid United Initial Comments at 6.

Docket No. RM21-17-000                                                    - 897 -

1268.  MISO TOs state that *ex ante* cost allocation provides upfront certainty, explaining

that MISO's *ex ante* processes work well and align with past Commission findings

regarding the difficulty of supporting new construction without knowing who will pay for

it and the importance of working out cost allocation up front, rather than "relitigating it"

each time a transmission project is proposed.[2718]  MISO TOs do not oppose states

voluntarily agreeing to assume cost responsibility for regional transmission projects,

which Commission policy already permits via participant funding, but argue that states

that want to voluntarily assume cost responsibility for part or all of a transmission project

should do so during the transmission planning process (i.e., when considering potential

transmission projects) rather than after projects have been selected, so that those

approving such projects can know how costs will be allocated.[2719]

1269.  New Jersey Commission states that the Commission should not allow transmission

providers to use cost allocation methods that rely solely on participant funding, such as

PJM's State Agreement Approach.  New Jersey Commission explains that such

mechanisms are an unjust and unreasonable method for allocating the costs of holistically

planned multi-driver projects and portfolios because if transmission projects can only be

built if one or more states agree to assume 100% of the resulting costs, more expensive

---

[2718] MISO TOs Initial Comments at 45-48 (citing Order No. 890, 118 FERC ¶ 61,119 at PP 557, 561; Order No. 1000, 136 FERC ¶ 61,051 at P 499).

[2719] *Id.* at 48-49.

projects or portfolios that maximize net benefits to the transmission planning region will go unbuilt, ultimately driving up system-wide costs.[2720]

1270.  Illinois Commission states that *ex ante* approaches should be the primary cost allocation method and include state input and approval, and that the State Agreement Process should only be used for exceptions in which public policy goals fall outside of the scope of Long-Term Regional Transmission Planning.  Illinois Commission expresses concerns because it understands the NOPR to state that transmission projects without an *ex ante* cost allocation method would not be funded unless states decide to pay for them through a State Agreement Process, which could create more expensive and siloed transmission planning that does not meet future transmission needs.[2721]

1271.  Many commenters express concerns about the optionality of the proposal and argue that it is necessary to have a default *ex ante* cost allocation method where agreement cannot be reached among states and to preserve FPA section 205 filing rights.[2722]  Numerous entities support an *ex ante* cost allocation method for Long-Term

---

[2720] New Jersey Commission Initial Comments at 24.

[2721] Illinois Commission Initial Comments at 16-17.

[2722] ACORE Supplemental Comments at 1; APPA Initial Comments at 6, 44-45; Environmental Groups Supplemental Comments at 2-3; Evergreen Action Initial Comments at 6; Georgia Commission Initial Comments at 9; ITC Initial Comments at 30-31; Massachusetts Attorney General Initial Comments at 18-21; TAPS Initial Comments at 4-5, 24-26; WIRES Initial Comments at 12-13.

Docket No. RM21-17-000                                                              - 899 -

Regional Transmission Facilities to be used in the event a State Agreement Process does

not result in an agreed-upon cost allocation method.[2723]

1272.  For example, Minnesota State Entities contend that an *ex ante* process that

allocates costs at least roughly proportional to benefits should be required as the default

cost allocation method unless states can agree on an *ex post* cost allocation method within

90 days.  Minnesota State Entities also recommend that the Commission require

RTOs/ISOs to use postage stamp cost allocation as the default cost allocation method for

Long-Term Regional Transmission Facilities (or portfolios of such Facilities) unless the

RTO/ISO can develop an alternate cost allocation method that all affected states agree on

within 90 days following RTO/ISO approval.[2724]

1273.  PIOs argue that without a default cost allocation method, transmission may be

held up in stakeholder processes or by project-by-project litigation to assign costs.[2725]

PIOs further caution that the Long-Term Regional Transmission Planning framework is

at risk without an *ex ante* cost allocation method because successful negotiation of a State

Agreement Process for each transmission project would be unwieldy and create

---

[2723] Evergreen Action Initial Comments at 6; Exelon Initial Comments at 24, 26; Georgia Commission Initial Comments at 8-9; ITC Initial Comments at 30-31; Massachusetts Attorney General Initial Comments at 18-20, 22-23; MISO Initial Comments at 67-68; Northwest and Intermountain Initial Comments at 18; Pine Gate Initial Comments at 7; PIOs Initial Comments at 67; TAPS Initial Comments at 4-5, 24-25; WIRES Initial Comments at 12-13.

[2724] Minnesota State Entities Initial Comments at 6-7.

[2725] PIOs Initial Comments at 70.

opportunities for free-ridership and obstructionism.[2726]  Similarly, AEE argues that relying on a State Agreement Process would not be just and reasonable and likely would stall the transmission planning and cost allocation process.[2727]  Acadia Center and CLF assert that where the Commission anticipates that states will fail to agree, it should establish the Long-Term Regional Transmission Cost Allocation Method because, otherwise, ineffective regional transmission planning processes will remain in place.[2728]

1274.  SEIA argues that having a default cost allocation method will ensure that transmission that promotes public policy will be built even in the face of disagreement.[2729]  R Street states that the Commission should require schedule discipline and a default cost allocation provision for circumstances where states cannot agree, which can include an accelerated Commission-led arbitration process or Commission application of preestablished criteria.[2730]

1275.  Georgia Commission asserts that, if Relevant State Entities cannot reach agreement, or if a Relevant State Entity forgoes its opportunity to participate in the State Agreement Process, there should be a default Long-Term Regional Transmission Cost

---

[2726] *Id.* at 67.

[2727] AEE Reply Comments at 15, 34.

[2728] Acadia Center and CLF Initial Comments at 31 (citing NOPR, 179 FERC ¶ 61,028 at P 310).

[2729] SEIA Initial Comments at 25 (citing 16 U.S.C. 824p(b)).

[2730] R Street Initial Comments at 4, 12.

Allocation Method when clear benefits have been identified for a specific transmission facility or portfolio of facilities.[2731]

1276.  NYISO does not object to the final rule directing each transmission provider to adopt an *ex ante* cost allocation method for transmission projects selected through Long-Term Regional Transmission Planning for use when an alternative method is not identified in a process that involves the state.  NYISO references, as an example, the process cited in the NOPR whereby the New York Commission plays a role in determining the cost allocation method for public policy transmission projects.[2732]

1277.  Exelon supports requiring a default *ex ante* cost allocation method that would act as a backstop cost allocation method should the states in a transmission planning region fail to negotiate an alternative cost allocation method for a transmission project or portfolio of projects.  Exelon states that failure to reach an agreement on cost allocation should not act as a barrier to needed transmission, and whatever mechanism is developed for receiving state input should not allow one or more states to thwart the goals of other states and stakeholders.[2733]

1278.  PPL asserts that the proposal to require a Long-Term Regional Transmission Cost Allocation Method may not solve the problem of states refusing to site transmission

---

[2731] Georgia Commission Initial Comments at 9.

[2732] NYISO Initial Comments at 49 (citing NOPR, 179 FERC ¶ 61,028 at P 300 & n.500).

[2733] Exelon Initial Comments at 26.

projects where they do not agree on cost allocation, but in some transmission planning regions, it may nevertheless be helpful to have a default cost allocation method.[2734]

1279.  Some commenters oppose requiring a default *ex ante* cost allocation method, whether on its own or in combination with a State Agreement Process.[2735]  For example, California Commission asserts that the Commission should not mandate an *ex ante* cost allocation method if states cannot agree to a cost allocation method by a certain date.[2736] NRG states that the Commission should focus on voluntary cost allocation and should not use involuntary cost allocation as a substitute to participant-funded interconnection and transmission expansion.[2737]  NRG states that it would be unrealistic to expect productive negotiation among states if recourse to an *ex ante* cost allocation method is an option for any objecting state.[2738]

1280.  SERTP Sponsors express concern that requiring state agreements or an *ex ante* cost allocation method before transmission projects are identified is unworkable because regulators in the Southeast will likely insist that the projects first be identified and their benefits and costs determined before the projects are selected and cost allocation

---

[2734] PPL Initial Comments at 26.

[2735] *See, e.g.*, Louisiana Commission Initial Comments at 30, 34; NRG Initial Comments at 6; SERTP Sponsors Initial Comments at 28; US Chamber of Commerce Initial Comments at 9-10.

[2736] California Commission Initial Comments at 57.

[2737] NRG Initial Comments at 6, 16.

[2738] *Id.* at 20.

commitments are made.[2739]  SERTP Sponsors state that expecting states to accept a cost allocation for transmission projects that they do not support, based on a process they have not chosen, and to which they do not assign value or benefit for retail ratepayers, will not succeed.[2740]  Alabama Commission agrees with SERTP Sponsors, stating that the State Agreement Process is a more appropriate and equitable mechanism for allocating the costs of Long-Term Regional Transmission Facilities and should be the sole cost allocation method.[2741]  Similarly, US Chamber of Commerce contends that state utility regulators would risk not adequately protecting their constituents if they were to agree to an *ex ante* cost allocation method that assessed a fixed level of costs on ratepayers regardless of the design and/or benefits of a proposed regional transmission facility.[2742]

1281.  EPSA argues that because long-term transmission planning horizons introduce uncertainty risk that customers must bear, cost allocation should be voluntary to the maximum degree possible.[2743]  Louisiana Commission opposes proceeding with any transmission projects selected in Long-Term Regional Transmission Planning without the voluntary cost allocation agreement of all impacted states.[2744]  Mississippi Commission

---

[2739] SERTP Sponsors Initial Comments at 3, 28.

[2740] *Id.* at 20.

[2741] Alabama Commission Initial Comments at 9.

[2742] US Chamber of Commerce Initial Comments at 9-10.

[2743] EPSA Initial Comments at 7.

[2744] Louisiana Commission Initial Comments at 17-18, 30.

asserts that the Commission should not require a default *ex ante* cost allocation method because doing so would bias and undermine cost allocation negotiations between states.[2745]  Mississippi Commission further argues that the Commission should clarify that state agreement on cost allocation for each transmission facility, or portfolio of facilities, is what is required, not simply involvement in the stakeholder process.[2746]

1282.  Xcel opposes a mandated *ex ante* cost allocation method, stating that the industry engaged in more effective long-term transmission planning before Order No. 1000, and that the Commission should give transmission planning regions flexibility to identify potential solutions before identifying the cost allocation for those solutions.  In addition, Xcel supports allowing transmission planning regions flexibility to tailor the benefits evaluated to the purpose of the study and project, citing MISO's experience with Long-Range Transmission Planning.[2747]  Similarly, Southern states that the Commission should not require an *ex ante* cost allocation process, but if it does, it should adopt the NOPR proposal to allow transmission providers to determine the appropriate benefits.[2748]

1283.  Duke asserts that the Commission has provided no support other than pointing to Order No. 1000 as to why Long-Term Regional Transmission Facilities should have a

---

[2745] Mississippi Commission Initial Comments at 27; Mississippi Commission Reply Comments at 3.

[2746] Mississippi Commission Initial Comments at 28.

[2747] Xcel Initial Comments at 11-12.

[2748] Southern Initial Comments at 27.

default *ex ante* cost allocation method.[2749]  Duke explains that if states disagree with the need, benefits, and cost allocation determined in Commission-jurisdictional transmission planning processes, then states are likely to exercise their jurisdiction over siting and retail cost allocation to thwart development of a Long-Term Regional Transmission Facility.[2750]  Duke asks that the Commission clarify that transmission providers may rely solely on a State Agreement Process and are not required to adopt an *ex ante* default Long-Term Regional Transmission Cost Allocation Method.[2751]  Duke argues that an *ex post* cost allocation method from a fully litigated Commission proceeding is a more durable solution than a default *ex ante* cost allocation, which may be similarly litigated but also delay siting approvals.[2752]

1284.  NESCOE requests that the Commission confirm that if a transmission provider files a State Agreement Process, the transmission provider does not need to file an *ex ante* cost allocation method, and the time period for a state-negotiated alternate cost allocation method would not apply.[2753]

---

[2749] Duke Initial Comments at 37.

[2750] *Id.* at 3, 35-36.

[2751] *Id.* at 33.

[2752] *Id.* at 3, 36-37.

[2753] NESCOE Initial Comments at 66-67.

USCA4 Appeal: 24-1650    Doc: 224        Filed: 01/21/2025    Pg: 916 of 2455
Document Accession #: 20240513-3036        Filed Date: 05/13/2024

Docket No. RM21-17-000                                                          - 906 -

### v.    __Other Cost Allocation Method Proposals__

1285.  ACEG recommends having a threshold level of voltage or capacity above which a transmission facility would receive regional cost allocation because the benefits of transmission depend directly on having a robust grid capable not only of receiving diverse generation but also of withstanding extreme weather.[2754]

1286.  Shell argues that the Commission should be open to non-traditional cost allocation methods, such as the sharing of benefits when a defined benefit/cost ratio threshold is exceeded, to achieve the goal of minimizing first-mover risk.  Shell contends that sharing the cost of interconnection-related network upgrades between first movers and subsequent customers is common in the industry and points to ISO-NE, PJM, and MISO as examples of RTOs/ISOs that have revised their OATTs to attempt to address this concern.[2755]

1287.  ELCON notes that regardless of the funding mechanism or approved cost allocation method, benefits and risks may change over time as Long-Term Scenarios are updated and needs and solutions are reassessed.  Therefore, ELCON states that the three-year reexamination of Long-Term Scenarios should also review cost allocation to ensure that cost causers and willing beneficiaries continue to be assessed the costs of a transmission project over its lifetime.[2756]

---

[2754] ACEG Initial Comments at 63.

[2755] Shell Initial Comments at 25-28.

[2756] ELCON Initial Comments at 19.

Docket No. RM21-17-000                                                    - 907 -

1288.  Xcel proposes that transmission planning regions rely on scenario-based studies that reflect load-serving entity inputs regarding projected generation expansion, expected types and locations of generators, and expected load.  Xcel states that the load-serving entities could then adjust their resource plans in light of the resulting costs and benefits. Xcel asserts that this flexibility would result in consensus-based cost allocation tied to the transmission that load-serving entities actually need and would reduce the reluctance to participate in planning as the outcomes could be adjusted to accommodate adjustments in load-serving entity needs and expectations.[2757]  Xcel also argues that the Commission should make clear that it is sometimes appropriate to allocate costs to generators, and that transmission access rights allocation should follow cost allocation.[2758]

1289.  Certain TDUs argue that the Commission should require any *ex ante* cost allocation method to follow a "beneficiary pays" approach, as opposed to the default, postage stamp load ratio share model.[2759]  Certain TDUs claim that the advantages of adopting a beneficiary-pays cost allocation approach are well documented, as the circumstances appropriate for a postage stamp allocation are not necessarily present when allocating costs for Long-Term Regional Transmission Facilities.[2760]  R Street similarly

---

[2757] Xcel Initial Comments at 18.

[2758] *Id.* at 12-13.

[2759] Certain TDUs Initial Comments at 2, 7.

[2760] *Id.* at 8-9.

Docket No. RM21-17-000                                                    - 908 -

asserts that the final rule should adhere to the beneficiary-pays principle to allocate the costs of both transmission and interconnection-related network upgrades.[2761]

1290.  Cypress Creek contends that where "cost allocation would hamper the use of contingent needs as a driver for multi-value projects," there should be a hybrid approach. Specifically, Cypress Creek suggests allocating costs up to the lesser of:  (1) the cost of necessary reliability improvements and (2) the benefit-cost threshold ratio of the multi-value project to the party that needs the improvements.  Cypress Creek suggests that the remaining costs be allocated according to multi-value project rules.[2762]

**c.      Commission Determination**

1291.  We adopt the NOPR proposal, with modification, to require transmission providers in each transmission planning region to file one or more *ex ante* cost allocation methods that apply to selected Long-Term Regional Transmission Facilities. Specifically, we modify the NOPR proposal to require, instead of just permit, transmission providers in each transmission planning region to revise their OATTs to include one or more Long-Term Regional Transmission Cost Allocation Methods for Long-Term Regional Transmission Facilities that are selected.  We adopt the NOPR's proposed definition, with modification, of Long-Term Regional Transmission Cost Allocation Method as an *ex ante* regional cost allocation method for one or more Long-Term Regional Transmission Facilities (or a portfolio of such Facilities) that are selected

---

[2761] R Street Initial Comments at 4, 12.

[2762] Cypress Creek Reply Comments at 12.

in the regional transmission plan for purposes of cost allocation.  In addition to this required Long-Term Regional Transmission Cost Allocation Method, we also permit transmission providers to revise their OATTs to include a State Agreement Process, if Relevant State Entities indicate that they have agreed to such a process.  Any State Agreement Process that transmission providers voluntarily propose to include in their OATTs would not comply with the requirements of this final rule unless Relevant State Entities indicate to the transmission providers that Relevant State Entities have agreed to that process during the Engagement Period (which we discuss further below).[2763]

1292.  While we permit transmission providers to include a State Agreement Process in their OATTs to determine cost allocation methods for selected Long-Term Regional Transmission Facilities if the process is agreed to by Relevant State Entities, it cannot be the sole method filed for cost allocation for Long-Term Regional Transmission Facilities.  As discussed below, we find that sole reliance on a State Agreement Process to determine a cost allocation method for selected Long-Term Regional Transmission Facilities will not achieve the objectives of this final rule.  Additionally, we modify the NOPR proposal to require that, if a State Agreement Process fails to result in a cost allocation method agreed to by Relevant State Entities and any other authorized entities, or if the Commission ultimately finds that the cost allocation method that results from a State

---

[2763] We discuss the definition of Relevant State Entities below.  *See infra* the Requirement that Transmission Providers Seek the Agreement of Relevant State Entities Regarding the Cost Allocation Method or Methods for Long-Term Regional Transmission Facilities section.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 920 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                    - 910 -

Agreement Process is unjust, unreasonable, or unduly discriminatory or preferential, then

the relevant Long-Term Regional Transmission Cost Allocation Method on file would

apply as a backstop.  In other words, if a Long-Term Regional Transmission Facility or

portfolio of such Facilities is selected but a State Agreement Process fails to result in a

Commission-accepted cost allocation method for that facility or facilities, then their costs

must be allocated through the Long-Term Regional Transmission Cost Allocation

Method or Methods that would otherwise apply in the absence of a State Agreement

Process (i.e., the backstop Long-Term Regional Transmission Cost Allocation

Method).[2764]  We clarify that, if the transmission providers have more than one Long-

Term Regional Transmission Cost Allocation Method on file, then the method that would

otherwise apply to the specific selected Long-Term Regional Transmission Facility

would serve as the backstop Long-Term Regional Transmission Cost Allocation Method.

1293.  We continue to find that facilitating state regulatory involvement in the cost

allocation process could minimize delays and additional costs associated with state and

local siting proceedings.[2765]  Nevertheless, we find that the requirement for transmission

---

[2764] For example, transmission providers could file two Long-Term Regional Transmission Cost Allocation Methods, A and B.  In this example, Method A would apply only to Long-Term Regional Transmission Facilities under 300 kV.  Method B would apply to Long-Term Regional Transmission Facilities at or above 300 kV only if an agreed-upon State Agreement Process fails to result in a Commission-accepted cost allocation method.  If, on compliance, transmission providers propose more than one Long-Term Regional Transmission Cost Allocation Method, they must specify to which Long-Term Regional Transmission Facilities each Long-Term Regional Transmission Cost Allocation Method applies.

[2765] NOPR, 179 FERC ¶ 61,028 at P 301.

providers to include a Long-Term Regional Transmission Cost Allocation Method in

their OATTs is necessary because, if transmission providers were to rely solely on a State

Agreement Process to determine the cost allocation for Long-Term Regional

Transmission Facilities and that process fails to result in agreement, there would be no

cost allocation method for Long-Term Regional Transmission Facilities selected as the

more efficient or cost-effective solutions to Long-Term Transmission Needs.  As a result,

such selected Long-Term Regional Transmission Facilities would be less likely to be

developed, and the benefits that these facilities would provide would not be realized.

Moreover, transmission providers would likely rely on relatively inefficient or less cost-

effective transmission facilities to address the identified Long-Term Transmission Needs,

or they may not even address these needs at all, leading to unjust and unreasonable

Commission-jurisdictional rates.  We further find that reliance solely on a State

Agreement Process would suffer from the same flaws that led the Commission to require

*ex ante* cost allocation for selected regional transmission facilities in Order No. 1000, as

the allocation of transmission costs can be contentious and prone to litigation in multi-

state transmission planning regions.[2766]  Requiring a Long-Term Regional Transmission

---

[2766] Order No. 1000, 136 FERC ¶ 61,051 at PP 498-499; *see also S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d at 70 (finding that the Commission reasonably balanced the benefits and claimed burdens of Order No. 1000's reforms in concluding that the requirement that each transmission provider include in its OATT a method(s) for allocating *ex ante* the costs of new regional transmission facilities "would reduce conflicts and 'aid in the development and construction of new transmission'" and allow stakeholders "to determine *ex ante* 'that the benefits associated with [a particular] set of transmission facilities outweigh the costs'" (citing Order No. 1000, 136 FERC ¶ 61,051 at PP 499, 669)).

Cost Allocation Method, even when transmission providers also have a <u>State Agreement</u> <u>Process in effect</u>, provides a level of certainty critical to the development of needed Long-Term Regional Transmission Facilities.

1294.  As noted above, the relevant Long-Term Regional Transmission Cost Allocation Method on file would serve as a backstop if the State Agreement Process does not result in a Commission-accepted cost allocation method for the selected Long-Term Regional Transmission Facility or portfolio of such Facilities subject to the State Agreement Process.  This outcome could occur for several reasons.  For instance, Relevant State Entities may not reach agreement on a cost allocation method pursuant to the terms of a State Agreement Process and the transmission providers may choose not to file any cost allocation method.  In another instance, transmission providers may choose not to file a cost allocation method agreed to pursuant to a State Agreement Process and also choose not to file any alternative cost allocation method.  And finally, the Commission might not accept a cost allocation method that results from a State Agreement Process and that transmission providers submit to the Commission for filing under FPA section 205 to the extent that it does not satisfy the requirement to allocate costs at least roughly commensurate with estimated benefits or is otherwise unjust or unreasonable.[2767]

---

[2767] *See PPL Elec. Utils. Corp.*, 181 FERC ¶ 61,178, at P 33 (2022) ("In light of the New Jersey state law, the New Jersey [State Agreement Approach] Projects will benefit customers throughout New Jersey, and thus we find that allocating the costs of the New Jersey [State Agreement Approach] Projects on a load-ratio share basis to all New Jersey customers is roughly commensurate with the benefits provided by those projects.") (footnote omitted).

1295.  In response to NRG's and Mississippi Commission's concerns that a Long-Term

Regional Transmission Cost Allocation Method could undermine productive negotiation

among states if recourse to an *ex ante* cost allocation method is an option for any

objecting state,[2768] on balance, we find that this possibility is outweighed by the risk that

Long-Term Regional Transmission Facilities selected as the more efficient or cost-

effective solution to Long-Term Transmission Needs may not have an associated cost

allocation method absent this requirement, and thus would be unlikely to be

developed.[2769]  As we explain above, the lack of a cost allocation method for selected

Long-Term Regional Transmission Facilities would likely result in transmission

providers relying on relatively inefficient or less cost-effective transmission facilities to

address identified Long-Term Transmission Needs, or they may not even address these

needs at all, leading to unjust and unreasonable Commission-jurisdictional rates.  We

further note that a Long-Term Regional Transmission Cost Allocation Method provides

certainty that the costs of Long-Term Regional Transmission Facilities for which a State

Agreement Process does not result in a Commission-approved cost allocation method

---

[2768] Mississippi Commission Initial Comments at 27; Mississippi Commission
Reply Comments at 3; NRG Initial Comments at 20.

[2769] As discussed below in the Requirement that Transmission Providers Seek
Agreement of Relevant State Entities Regarding the Cost Allocation Method or Methods
for Long-Term Regional Transmission Facilities section, we decline to define what
constitutes agreement among Relevant State Entities and, as such, we do not require
unanimous agreement of Relevant State Entities participating in the Engagement Period
on a Long-Term Regional Transmission Cost Allocation Method(s) and/or State
Agreement Process.

Docket No. RM21-17-000                                                    - 914 -

will be allocated in a manner that the Commission has found to be just and reasonable and not unduly discriminatory or preferential.

1296.  In response to the arguments by SERTP Sponsors, Alabama Commission, and Louisiana Commission emphasizing the importance of voluntary cost allocation among states,[2770] along with Mississippi Commission's request for clarification that state agreement to a cost allocation method be required for any Long-Term Regional Transmission Facility under this final rule,[2771] we note that Relevant State Entities will have the opportunity to provide their views on cost allocation methods during the Engagement Period, as discussed further below.  Following this Engagement Period, Relevant State Entities may agree to, and ask the transmission providers to file, a State Agreement Process, which, if accepted by the Commission, would be the cost allocation process used by the transmission providers in the transmission planning region prior to the use of the relevant Long-Term Regional Transmission Cost Allocation Method as a backstop.  Further, as discussed in the Proposals Relating to the Design and Operation of State Agreement Processes section below, during the Engagement Period or State Agreement Process, Relevant State Entities will have an opportunity to agree to and ask transmission providers to file a Long-Term Regional Transmission Cost Allocation

---

[2770] SERTP Sponsors Initial Comments at 3, 20, 28; Alabama Commission Initial Comments at 9; Louisiana Commission Initial Comments at 17-18, 30.

[2771] Mississippi Commission Initial Comments at 28.

Method.  Thus, there are multiple opportunities for Relevant State Entities to voluntarily negotiate a cost allocation method for Long-Term Regional Transmission Facilities.

1297.  We find that US Chamber of Commerce's concern, that state utility regulators might fail to protect constituents if they were to agree to an *ex ante* cost allocation method that assessed a fixed level of costs on ratepayers regardless of the design or benefits of a proposed regional transmission facility, is misplaced.[2772]  Any cost allocation method(s) that transmission providers propose, be it as a result of a State Agreement Process or a Long-Term Regional Transmission Cost Allocation Method, must allocate costs in a manner that is at least roughly commensurate with estimated benefits, as discussed further below.[2773]  For the same reasons, we disagree with EPSA's contention that, because Long-Term Regional Transmission Planning introduces uncertainty risk that customers must bear, all the relevant cost allocation methods on file should be voluntary.[2774]

1298.  We also acknowledge Duke's concerns that a default *ex ante* cost allocation method could delay siting approvals and Xcel's concerns associated with a mandated *ex ante* cost allocation method claiming that the industry engaged more effectively in long-

---

[2772] US Chamber of Commerce Initial Comments at 9-10.

[2773] *See infra* Identification of Benefits Considered in Cost Allocation for Long-Term Regional Transmission Facilities.

[2774] EPSA Initial Comments at 7.

term transmission planning before Order No. 1000.[2775]  We note that another

modification to the NOPR proposal that we adopt, as described below, allows State

Agreement Processes to occur before, as well as up to six months after, selection of

Long-Term Regional Transmission Facilities.  This modification helps to address Duke's

and Xcel's concerns by providing Relevant State Entities with an opportunity to agree on

a cost allocation method  for a particular Long-Term Regional Transmission Facility (or

portfolio of such Facilities) after selection.  However, we find that, even if such an

agreement on a State Agreement Process cost allocation method cannot be achieved, on

balance, the greater certainty that *ex ante* cost allocation methods provide to allow the

development of Long-Term Regional Transmission Facilities outweighs the concerns that

Duke and Xcel express.

1299.  Furthermore, we find that allowing the use of a State Agreement Process in

addition to a Long-Term Regional Transmission Cost Allocation method will assist in the

development of Long-Term Regional Transmission Facilities by taking into account state

preferences.  SEIA and New Jersey Commission support such flexibility.[2776]  We agree

with New Jersey Commission that negotiated cost allocation methods may reduce

litigation and make it easier to construct needed transmission facilities.[2777]  We recognize

---

[2775] Duke Initial Comments at 36; Xcel Initial Comments at 12.

[2776] New Jersey Commission Initial Comments at 25; SEIA Initial Comments at 24.

[2777] New Jersey Commission Initial Comments at 17.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 927 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Dominion's concerns that implementing a State Agreement Process with an *ex ante* approach could lead to delays;[2778] however, we find that both the backstop Long-Term Regional Transmission Cost Allocation Method, combined with a six-month limit after selection for deliberations under any State Agreement Process and the filing of any resulting cost allocation method, as detailed below, should limit such delays.

1300.  Next, we adopt the NOPR proposal to apply the cost allocation reforms in this final rule only to new Long-Term Regional Transmission Facilities.  We find that this reform does not apply to regional reliability and economic transmission facilities that are selected pursuant to the existing Order No. 1000 regional transmission planning processes.  We find, instead, that the existing Commission-accepted *ex ante* regional cost allocation methods adopted pursuant to Order No. 1000 should continue to apply to those regional reliability and economic transmission facilities.  We find no basis in the record to conclude that these existing regional cost allocation methods should change, given that this final rule does not alter existing regional reliability and economic transmission planning processes.  We believe that this distinction between cost allocation methods for regional reliability and economic transmission projects selected under existing Order No. 1000 regional transmission planning processes and those for new Long-Term Regional Transmission Facilities selected through Long-Term Regional Transmission Planning will prevent the re-litigation of cost allocation decisions for transmission facilities that are selected prior to the effective date of this final rule.  In addition, we find

---

[2778] Dominion Initial Comments at 52.

this distinction to be consistent with our decision not to apply Long-Term Regional

Transmission Cost Allocation Methods to transmission facilities other than new Long-

Term Regional Transmission Facilities.[2779]

1301.  We disagree with PIOs that allowing different cost allocation methods to apply to

different regional transmission planning processes is unjust and unreasonable.[2780]  We

find that because Long-Term Regional Transmission Planning is a more long-term,

forward-looking, and comprehensive transmission planning process than existing Order

No. 1000 regional transmission planning processes, it is appropriate for transmission

providers to consider, following the Engagement Period, whether different cost allocation

methods should apply to selected Long-Term Regional Transmission Facilities.

1302.  With respect to the potential use of existing regional cost allocation methods as

Long-Term Regional Transmission Cost Allocation Methods, as well as assertions that

existing cost allocation methods or current existing processes for state involvement in

cost allocation decisions could be used for Long-Term Regional Transmission

Planning,[2781] we adopt the NOPR proposal that, to the extent transmission providers

---

[2779] As the Commission noted in the NOPR, the Commission took a similar approach with respect to its cost allocation reforms in Order No. 1000.  *See* NOPR, 179 FERC ¶ 61,028 at P 314 n.517 (citing Order No. 1000, 136 FERC ¶ 61,051 at P 565).

[2780] PIOs Initial Comments at 71.

[2781] *See, e.g.*, Ameren Initial Comments at 25-27; APS Initial Comments at 11-12; Avangrid Initial Comments at 28;Dominion Initial Comments at 3, 45; Dominion Reply Comments at 11; MISO Initial Comments at 61, 68; NYISO Initial Comments at 9, 50; Ohio Commission Federal Advocate Initial Comments at 2, 13; Omaha Public Power Initial Comments at 4; Pennsylvania Commission Initial Comments at 13-14; PJM Initial Comments at 116; PJM States Initial Comments at 11-12; SPP Initial Comments at 28-

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 929 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                    - 919 -

believe that their existing cost allocation methods comply with the requirements adopted in this final rule, they may demonstrate in their compliance filings that such methods, as applied to Long-Term Regional Transmission Facilities, would comply with the requirements of this final rule. This approach is consistent with the approach that the Commission took in Order No. 1000, in which the Commission declined commenter requests to decide in the rule itself whether existing cost allocation methods complied with the requirements of Order No. 1000 and instead required transmission providers to demonstrate on compliance that their existing cost allocation methods met the rule's requirements.[2782]

1303. We disagree with PPL's contention that existing regional cost allocation methods accepted by the Commission should be considered the "default." The Commission accepted such *ex ante* regional cost allocation methods based on demonstrations of how they met the six Order No. 1000 regional cost allocation principles. We appreciate, as the Commission has recognized, that some existing regional cost allocation methods are complex, stakeholder-approved constructs and that some are specifically designed to apply to broad portfolios of transmission projects, such as MISO's regional cost allocation method for Multi-Value Projects.[2783] However, as described above, to the

---

29; Virginia Commission Staff Initial Comments at 6.

[2782] *See* Order No. 1000, 136 FERC ¶ 61,051 at P 565; Order No. 1000-A, 139 FERC ¶ 61,132 at P 747.

[2783] *See, e.g.*, *Midwest Indep. Transmission Sys. Operator, Inc.*, 142 FERC ¶ 61,215, at P 434 (2013); *Sw. Power Pool, Inc.*, 144 FERC ¶ 61,059, at P 347 (2013).

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 930 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

extent that transmission providers propose on compliance to use an existing regional cost allocation method as a Long-Term Regional Transmission Cost Allocation Method, the transmission providers must demonstrate that such existing regional cost allocation method, as applied to Long-Term Regional Transmission Facilities, would comply with the requirements of this final rule.  We disagree with ITC's contention that the Commission should allow for streamlined compliance plans for transmission providers that already have long-range transmission planning processes; we reiterate that we require transmission providers to submit proposed cost allocation processes on compliance with this rule so that the Commission may evaluate whether those processes comply with the requirements of this final rule.

1304.  BP raises a concern that it is not clear, in the case of a multi-value project, whether only a part of the cost of a transmission project associated with meeting changes in the resource mix and demand will be allocated under a Long-Term Regional Transmission Cost Allocation Method as opposed to all of the costs.  With the exception of Long-Term Regional Transmission Facilities that one or more Relevant State Entities or interconnection customers agree to voluntarily fund, we clarify that all costs associated with a selected Long-Term Regional Transmission Facility must be allocated using the applicable Long-Term Regional Transmission Cost Allocation Method or Methods, or an applicable Commission-accepted cost allocation method that results from a State Agreement Process.[2784]

---

[2784] *See supra* Evaluation and Selection of Long-Term Regional Transmission Facilities section.  Moreover, in the Local Transmission Planning Inputs in the Regional

1305.  In response to requests that a beneficiary-pays approach be used rather than a postage stamp load ratio share model for cost allocation methods,[2785] we reiterate that any cost allocation method applied to a Long-Term Regional Transmission Facility must ensure that costs are allocated in a manner that is at least roughly commensurate with the estimated benefits of the facility, consistent with cost causation and court precedent.[2786] Load ratio share, which charges transmission customers in proportion to their use of the transmission system as measured by their relative share of load, is a cost allocation method that may be consistent with the beneficiary-pays approach.  The Commission will evaluate whether a proposed cost allocation method allocates costs in a manner that is at least roughly commensurate with estimated benefits on a fact-specific basis, relying on the record in a given proceeding.

---

Transmission Planning Process section below, we provide flexibility to transmission providers to propose a cost allocation method for right-sized replacement transmission facilities.

[2785] *See* Certain TDUs Initial Comments at 2, 7, 8-9; R Street Initial Comments at 4, 12.

[2786] The cost causation principle requires costs to be allocated to those who cause the costs to be incurred and reap the resulting benefits.  *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d at 87 (citing *Nat'l Ass'n of Regul. Util. Comm'rs v. FERC*, 475 F.3d at 1285); *see also* Order No. 1000, 136 FERC ¶ 61,051 at P 10 ("[T]he principles-based approach requires that all regional and interregional cost allocation methods allocate costs for new transmission facilities in a manner that is at least roughly commensurate with the benefits received by those who will pay those costs.  Costs may not be involuntarily allocated to entities that do not receive benefits."); *ICC v. FERC I*, 576 F.3d at 476 ("To the extent that a utility benefits from the costs of new facilities, it may be said to have 'caused' a part of those costs to be incurred, as without the expectation of its contributions the facilities might not have been built, or might have been delayed.").

Docket No. RM21-17-000                                                    - 922 -

1306.  In response to commenters that request flexibility in cost allocation,[2787] we believe

that the approach to cost allocation for Long-Term Regional Transmission Facilities that

we adopt in this final rule provides transmission providers and their stakeholders, and in

particular Relevant State Entities, with the flexibility needed to address regional

differences.  Specifically, we find that the flexibility to submit one *or more* Long-Term

Regional Transmission Cost Allocation Methods, as well as the flexibility to submit an

additional State Agreement Process, accommodate regional differences.

1307.  We decline to adopt additional requirements with respect to cost allocation that we

did not propose in the NOPR, such as Shell's request to require coastal transmission

providers to explain how their Long-Term Regional Transmission Planning facilitates

cost allocation for offshore wind.[2788]  We find that the record in this proceeding does not

support imposing this or other additional requirements.  Regarding certain cost allocation

requirements suggested by commenters,[2789] including ACEG's suggestion for

implementing a voltage threshold level above which a transmission facility would receive

---

[2787] *See, e.g.*, Entergy Initial Comments at 29-30; Eversource Initial Comments at 29-30; Idaho Power Initial Comments at 10; NESCOE Reply Comments at 5; Pacific Northwest Utilities Initial Comments at 5-6, 11, 13.

[2788] Shell Initial Comments at 17.

[2789] Cypress Creek Reply Comments at 12; ELCON Initial Comments at 19; R Street Initial Comments at 4, 12; Shell Initial Comments at 25-28; Xcel Initial Comments at 12-13, 18.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 933 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

regional cost allocation,[2790] we find such proposals to be beyond the scope of this

proceeding.  The Commission did not make such proposals in the NOPR.

### 2.  Requirement that Transmission Providers Seek the Agreement of Relevant State Entities Regarding the Cost Allocation Method or Methods for Long-Term Regional Transmission Facilities

#### a.  NOPR Proposal

1308.  The Commission proposed to require transmission providers in each transmission

planning region to seek the agreement of Relevant State Entities within the transmission

planning region regarding the Long-Term Regional Transmission Cost Allocation

Method, State Agreement Process, or combination thereof.[2791]  The Commission

proposed to require transmission providers in each transmission planning region to:  (1)

explain how the proposed Long-Term Regional Transmission Cost Allocation Method,

State Agreement Process, or combination thereof reflects the agreement of Relevant State

Entities; or (2) to the extent agreement of Relevant State Entities cannot be obtained,

explain the good faith efforts by the relevant transmission provider(s) to seek agreement

from such entities before proposing a Long-Term Regional Transmission Cost Allocation

Method, State Agreement Process, or combination thereof.[2792]

1309.  The Commission proposed to define Relevant State Entities for purposes of the

Long-Term Regional Transmission Planning cost allocation requirements as "any state

---

[2790] ACEG Initial Comments at 63.

[2791] NOPR, 179 FERC ¶ 61,028 at P 303.

[2792] *Id.* P 303.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 934 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

entity responsible for utility regulation or siting electric transmission facilities within the state or portion of a state located in the transmission planning region, including any state entity as may be designated for that purpose by the law of such state."[2793]

1310.  The Commission proposed to require transmission providers in each transmission planning region to seek to determine whether, for all or a subset of Long-Term Regional Transmission Facilities, Relevant State Entities agree to:  (1) a Long-Term Regional Transmission Cost Allocation Method; (2) a State Agreement Process; (3) forgo a role in determining the cost allocation approach for Long-Term Regional Transmission Facilities; or (4) some combination thereof.[2794]

1311.  The Commission proposed to afford transmission providers in each transmission planning region flexibility in the process by which they seek agreement from Relevant State Entities and to require transmission providers to provide the state entities with flexibility with regard to defining what constitutes "agreement" among the Relevant State Entities on the cost allocation approach for Long-Term Regional Transmission Facilities.[2795]  Although the Commission proposed to provide transmission providers flexibility in determining what constitutes state agreement, the Commission preliminarily found that, for each state, a single entity should be designated as the voting or

---

[2793] *Id.* P 304.

[2794] *Id.* P 305.

[2795] *Id.* P 306.

representative entity to avoid confusion or over-representation by a single state in a

multi-state voting process.[2796]

1312.  Noting that the Relevant State Entities may forgo a role in determining the cost

allocation approach for all or a subset of Long-Term Regional Transmission Facilities,

the Commission proposed that in the event that the Relevant State Entities do so, the

Commission would require transmission providers to propose a Long-Term Regional

Transmission Cost Allocation Method consistent with the requirements of Order No.

1000, including the prohibition on relying on voluntary agreement among states or

participant funding.[2797]  The Commission explained that it was not proposing to impose

any requirements on states to participate in processes to establish regional cost allocation

methods for Long-Term Regional Transmission Facilities.[2798]

### b.    **Comments**

### i.    **State Involvement in Cost Allocation Proposals**

1313.  Many commenters generally support states having a role negotiating proposed cost

allocation methods.[2799]  However, some commenters emphasize the importance of

---

[2796] *Id.* P 304.

[2797] *Id.* P 307.

[2798] *Id.* P 308.

[2799] *See, e.g.*, AEP Initial Comments at 35; Ameren Initial Comments at 25;
American Municipal Power Initial Comments at 12; Arizona Commission Initial
Comments at 11; Clean Energy Associations Initial Comments at 35; Clean Energy
Buyers Initial Comments at 28-29; Clean Energy States Initial Comments at 7; Cross
Sector Representatives Supplemental Comments at 1; Duke Initial Comments at 35;
ELCON Initial Comments at 17; ISO-NE Initial Comments at 2; Georgia Commission

involving all stakeholders, and not just Relevant State Entities, in this reform.  Clean

Energy Buyers argue that the Commission should require transmission providers to allow

all stakeholders (not just states) to participate in, or at least comment on, the development

of the Long-Term Regional Transmission Cost Allocation Method and to recognize the

importance of states and all other stakeholders.[2800]  Similarly, NEPOOL asserts that state

involvement should not diminish the opportunity for stakeholder involvement from all

market participants in the electric industry.[2801]  APPA asserts that while coordination with

state regulators in cost allocation may aid in developing beneficial and cost-effective

transmission projects, the perspectives of state regulators on cost allocation should not be

elevated above those of other stakeholders.[2802]

---

Initial Comments at 8-9; US House Republicans Supplemental Comments at 1; ITC Initial Comments at 28; Joint Consumer Advocates Initial Comments at 13; Maryland Energy Administration Initial Comments at 2; Massachusetts Attorney General Initial Comments at 19; Michigan Commission Initial Comments at 8; MISO Initial Comments at 61; NARUC Initial Comments at 45 (citing NOPR, 179 FERC ¶ 61,028 at PP 303-308), 46; New York Commission and NYSERDA Initial Comments at1; NESCOE Initial Comments at 54; North Carolina Commission and Staff Initial Comments at 2; North Dakota Commission Initial Comments at 4; NRG Initial Comments at 6; NYISO Initial Comments at 49; OMS Initial Comments at 10; PacifiCorp and NV Energy Initial Comments at 15; PIOs Initial Comments at 64; Resale Iowa Initial Comments at 2; US Chamber of Commerce Initial Comments at 9 (citing NOPR, 179 FERC ¶ 61,028 at P 288); Virginia Commission Staff Initial Comments at 2; WIRES Initial Comments at 12.

[2800] Clean Energy Buyers Initial Comments at 29.

[2801] NEPOOL Initial Comments at 9.

[2802] APPA Initial Comments at 42.

USCA4 Appeal: 24-1650   Doc: 224   Filed: 01/21/2025   Pg: 937 of 2455
Document Accession #: 20240513-3036   Filed Date: 05/13/2024

Docket No. RM21-17-000                                                    - 927 -

1314.  Idaho Power states that the Commission should continue to allow flexibility for transmission planning regions to determine the appropriate level of state involvement.[2803] Pacific Northwest Utilities agree, stating that mandating additional state participation could be burdensome and problematic.[2804]

1315.  MISO states that the Commission should not extend any state involvement that may be adopted pursuant to the final rule to near-term reliability and economic regional transmission planning processes, which are beyond the scope of the final rule.[2805]  MISO Coops state that MISO provides a stakeholder forum where states' voices are heard, and the final rule should not diminish stakeholder processes that are effective today.[2806]

1316.  Other commenters raise concerns about increased state involvement in cost allocation decisions.  For example, Vistra asserts that a prioritized role for states in cost allocation is more likely to create new challenges than ease development, and observes that it may be difficult to coordinate state interests in multi-state transmission planning regions versus single-state transmission planning regions.[2807]  Six Cities opposes enhanced roles for Relevant State Entities, suggesting that the proposed reforms represent

---

[2803] Idaho Power Initial Comments at 10.

[2804] Pacific Northwest Utilities Initial Comments at 13.

[2805] MISO Initial Comments at 71.

[2806] MISO Coops Initial Comments at 2.

[2807] Vistra Initial Comments at 2, 27-28.

neither an appropriate oversight role for states under the FPA, nor a logical extension of

Order No. 890 and Order No. 1000 policies.[2808]

1317.  ACEG and Georgia Commission agree with the Commission's proposed definition

of Relevant State Entities.[2809]  ACEG and Dominion also support the proposal to have a

single entity designated as the voting representative for the state.[2810]  MISO agrees that

having a single entity designated for each state and/or applicable jurisdiction as the

voting or representative entity for that state/jurisdiction makes sense, but notes that the

City of New Orleans is an independent member of OMS separate from the Louisiana

Commission and therefore may need to be considered a separate jurisdiction.[2811]

Louisiana Commission voices similar concerns.[2812]  North Carolina Commission and

Staff state that it may be appropriate for different state entities to be designated for

different roles,[2813] and Duke asserts that the Commission should clarify that within a state

there may be multiple Relevant State Entities.[2814]

---

[2808] Six Cities Initial Comments at 7.

[2809] ACEG Initial Comments at 65-66; Georgia Commission Initial Comments at 8.

[2810] ACEG Initial Comments at 65-66; Dominion Initial Comments at 48 n.99.

[2811] MISO Initial Comments at 66.

[2812] Louisiana Commission Initial Comments at 33.

[2813] North Carolina Commission and Staff Initial Comments at 17.

[2814] Duke Initial Comments at 38-39.

1318.  Some commenters generally agree with the Commission's proposed definition of Relevant State Entities but request that the definition be expanded or clarified to include self-regulated public power utilities and cooperatives.[2815]  TAPS argues that a multi-state voting process, as proposed, could fail to represent public power and cooperatives' interests.[2816]  NRECA contends that a more inclusive approach would be to use "relevant electric regulatory authority," which includes a state public utility commission and the governing board of a cooperative or public power utility.[2817]  Large Public Power proposes to grant state and municipal utilities representation on a load ratio share basis.[2818]

1319.  NASUCA urges the Commission to clarify that where applicable, an approved state cost allocation process should include agreement by a state's utility consumer advocate.[2819]  California Energy Commission recommends expanding the definition of Relevant State Entities to include any groups directly or indirectly affected by the construction of a project, such as Native American Tribes,[2820] and NESCOE requests that

---

[2815] American Municipal Power Initial Comments at 5; APPA Initial Comments at 3, 42-43 (citing 16 U.S.C. 796(7), (15)); California Municipal Utilities Initial Comments at 17; MISO Coops Initial Comments at 3-4; Six Cities Initial Comments at 10.

[2816] TAPS Initial Comments at 5, 26-27.

[2817] NRECA Initial Comments at 56-57.

[2818] Large Public Power Initial Comments at 41.

[2819] NASUCA Initial Comments at 10-11.

[2820] California Energy Commission Initial Comments at 3.

the definition of Relevant State Entity be amended to accommodate individual

transmission planning regions' particular approaches toward state involvement in cost

allocation requirements, such as NESCOE managers designated by each New England

Governor to represent that state's interests.[2821]

1320.  Nevada Commission requests flexibility in the term Relevant State Entity.[2822]

New Mexico RETA urges flexibility to account for state involvement of other entities not

accounted for in the definition of Relevant State Entities, including state authorities

specifically designated to assist in developing new electric transmission facilities (like

New Mexico RETA).[2823]

1321.  ACEG recommends that the Commission clarify that existing processes, such as

SPP's Regional State Committee, MISO's OMS, and ISO-NE's New England States

Committee, should be used to determine the Relevant State Entity for each state, unless

another process is demonstrated to be superior.[2824]

1322.  SERTP Sponsors assert that which Relevant State Entity or Entities would be

appropriate for a particular state will be a function of state law.[2825]  Pennsylvania

---

[2821] NESCOE Initial Comments at 57.

[2822] Nevada Commission Initial Comments at 13.

[2823] New Mexico RETA Initial Comments at 8-9 (citing NOPR 179 FERC ¶ 61,028 at P 304).

[2824] ACEG Initial Comments at 66.

[2825] SERTP Sponsors Initial Comments at 28-29.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 941 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                    - 931 -

Commission states that the Commission's proposed definition of Relevant State Entity is imperfect and may result in multiple entities within a single state being a Relevant State Entity, given that the Commission refers to utility regulation or siting authority in the definition, but a state's legislature could have delegated this different authority among different administrative agencies.[2826]

### ii.    Requirement to Seek Agreement

1323.  Many commenters generally support requiring transmission providers in each transmission planning region to seek the agreement of Relevant State Entities within the transmission planning region regarding the Long-Term Regional Transmission Cost Allocation Method, State Agreement Process, or combination thereof.[2827]

1324.  Avangrid states that state input and collaboration is crucial to the transmission planning process, and that intensive state (and other stakeholder) participation and

---

[2826] Pennsylvania Commission Initial Comments at 15.

[2827] *See, e.g.*, Acadia Center and CLF Initial Comments at 29-30; Avangrid Initial Comments at 28; City of New Orleans Council Initial Comments at 9;  Entergy Initial Comments at 29-30; Georgia Commission Initial Comments at 8-9; ISO-NE Initial Comments at 37-38; Louisiana Commission Initial Comments at 30; Michigan Commission Initial Comments at 8; NARUC Initial Comments at 45, 47; Nebraska Commission Initial Comments at 9; NESCOE Initial Comments at 54 (citing NOPR, 179 FERC ¶ 61,028 at PP 303, 305); North Carolina Commission and Staff Initial Comments at 15-16; Ohio Commission Federal Advocate Initial Comments at 11; Pacific Northwest State Agencies Initial Comments at 27; PJM States Initial Comments at 9; SoCal Edison Initial Comments at 3; Southeast PIOs Initial Comments at 55 (citing NOPR, 179 FERC ¶ 61,028 at P 303); US Climate Alliance Initial Comments at 2; WIRES Initial Comments at 12.

consensus-building will help to ensure that transmission will not be overbuilt.[2828]  SoCal Edison contends that without agreement among states on the respective benefits and share of related costs, the development of multi-state transmission projects will be nearly non-existent.[2829]  PPL supports transmission providers seeking agreement with the states on cost allocation methods, as well as voluntary coordination with states, which PPL argues will make public policy projects more likely to succeed.[2830]

1325.  NYISO and ISO-NE support state entities playing a role in determining the cost allocation method for transmission solutions to Long-Term Transmission Needs.[2831] ISO-NE contends that states should be responsible for determining the cost allocation mechanism for policy-based, long-term transmission facility investments because they are uniquely situated to balance the benefits and costs of transmission investments intended to advance their policy goals.[2832]

1326.  Mississippi Commission argues that opponents of state involvement in Long-Term Regional Transmission Planning fail to recognize the existing state regulatory role in siting electricity generation, transmission, and distribution facilities.[2833]

---

[2828] Avangrid Initial Comments at 28.

[2829] SoCal Edison Initial Comments at 3.

[2830] PPL Initial Comments at 29.

[2831] NYISO Initial Comments at 49; ISO-NE Initial Comments at 37.

[2832] ISO-NE Initial Comments at 37.

[2833] Mississippi Commission Reply Comments at 5.

1327.  In addition, some commenters support the agreement of states when determining a Long-Term Regional Transmission Cost Allocation Method.  City of New Orleans Council comments that it is essential that state and local regulators agree to any Long-Term Regional Transmission Cost Allocation Method to ensure that the costs borne by retail customers are just and reasonable and not unduly discriminatory or preferential.[2834] SoCal Edison concurs on the necessity for states to reach agreement.[2835]  Southern argues that unless state regulators agree to transmission project selection and cost allocation, transmission projects that result from the Commission's proposed Long-Term Regional Transmission Planning are not likely to come to fruition.[2836]

### iii.  **Seek Changes to, Raise Concerns About, or Oppose the Requirement to Seek Agreement**

1328.  Some commenters support requiring transmission providers to seek agreement with Relevant State Entities regarding the Long-Term Regional Transmission Cost Allocation Method, State Agreement Process, or a combination thereof, but propose changes to the proposal.  For example, Kentucky Commission Chair Chandler asserts that states should not be permanently bound by their agreement on an initial cost allocation method, and that the Commission should clarify that transmission providers should continue to seek agreement from states prior to seeking Commission approval for any

---

[2834] City of New Orleans Council Initial Comments at 9.

[2835] SoCal Edison Initial Comments at 3, 13.

[2836] Southern Initial Comments at 9-10.

Docket No. RM21-17-000                                                    - 934 -

change to the cost allocation method filed on compliance.[2837]  Similarly, PJM States

request that the Commission require transmission providers to show they sought support

of retail regulators for subsequent revisions of the initial cost allocation method.[2838]  PJM

States ask that the Commission also require a regular check-in with retail regulators

regarding the appropriateness of any existing cost allocation method.[2839]

1329.  Resale Iowa states that it is concerned that large, multi-state transmission projects

may increase the number of participants to the point that agreement is difficult to achieve

and suggests that multi-state organizations may provide an avenue for conveying state

interests to transmission providers and reaching agreements.[2840]  DC and MD Offices of

People's Counsel support giving state entities a "defined and expansive role" in the

regional transmission selection and cost allocation processes but argue that this role must

be anchored by their ability to timely agree on cost allocation.[2841]

1330.  Other commenters offered modified versions of the NOPR proposal.  California

Commission states that the Commission should require that transmission providers use

their FPA section 205 filing rights to submit the *ex post* cost allocation method (and/or

combined method) agreed on by states even if the transmission providers in a

---

[2837] Kentucky Commission Chair Chandler Initial Comments at 3.

[2838] PJM States Initial Comments at 10.

[2839] *Id.* at 10-11.

[2840] Resale Iowa Initial Comments at 2, 12.

[2841] DC and MD Offices of People's Counsel Initial Comments at 37.

Docket No. RM21-17-000                                                    - 935 -

transmission planning region determine that they will propose an *ex ante* cost allocation method for the Commission's consideration.[2842]

1331.  Dominion states that it may be nearly impossible to achieve state consensus in multi-state RTOs/ISOs and that if the states in a transmission planning region are unable to agree on the proper cost allocation method, the transmission providers should be able to file their own proposed cost allocation method.[2843]

1332.  Some commenters oppose the proposed requirement to seek agreement.  For example, Minnesota State Entities state that the term "seeking state agreement" is too vague and may lead to disputes over the rights and responsibilities of individual states or state commissions to veto or otherwise hold up needed region-wide transmission plans. Minnesota State Entities suggest replacing the term "seeking state agreement" with "take into account" or "evaluating and incorporating" state concerns in the regional cost allocation approaches as regularly happens at MISO and other RTOs/ISOs.[2844]  MISO Coops state that the NOPR proposal for a transmission provider to seek agreement with Relevant State Entities is unnecessary and would be inferior to current stakeholder processes, setting up redundant and potentially conflicted processes.[2845]

---

[2842] California Commission Initial Comments at 55-56.

[2843] Dominion Initial Comments at 48.

[2844] Minnesota State Entities Initial Comments at 7.

[2845] MISO Coops Initial Comments at 4.

1333.  Kansas Commission questions the necessity of a requirement to seek the

agreement of Relevant State Entities within a transmission planning region like SPP,

where the SPP Regional State Committee has substantial influence over cost

allocation.[2846]  PacifiCorp and NV Energy oppose a requirement for transmission

providers to seek state agreement on a cost allocation method, contending that such a

requirement would add complexity and significant process and time.[2847]  NRG states that

under the proposal for transmission providers to seek the agreement of Relevant State

Entities on cost allocation, customers that ultimately pay the cost of Long-Term Regional

Transmission Facilities are left out of the cost allocation process.  NRG suggests that the

proposal be limited to transmission projects included in regional transmission plans that

would not exist but for state public policy, as it is reasonable for states to fill this

negotiating role as described in the NOPR.[2848]

1334.  MISO TOs contend that MISO and MISO TOs have already afforded

opportunities for states to participate in the development of cost allocation methods,[2849]

and argue that the NOPR requirements as drafted are unnecessary for the MISO

region.[2850]  MISO TOs argue that the Commission should find compelling the fact that

---

[2846] Kansas Commission Initial Comments at 15-16.

[2847] PacifiCorp and NV Energy Initial Comments at 16.

[2848] NRG Initial Comments at 19.

[2849] MISO TOs Initial Comments at 45.

[2850] MISO TOs Reply Comments at 3.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 947 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                    - 937 -

MISO, MISO TOs, and OMS all support the existing collaborative process for cost allocation in MISO, and request that the Commission not impose changes on this process, but instead afford regional flexibility.[2851]

1335.  MISO TOs disagree with commenters that argue that the NOPR provided too much discretion and deference to transmission providers,[2852] or that the Commission should require transmission providers to add a mechanism that ensures compliance with the requirements to include Relevant State Entities in cost allocation.[2853]  MISO TOs state that these proposals are contrary to the FPA because they attempt to usurp the statutory rights of transmission providers and point to similar sentiments expressed by the Indicated PJM TOs.[2854]

### iv.    Requirements Associated with Seeking Agreement of Relevant State Entities

1336.  ACEG, ACORE, and NESCOE support the NOPR proposal to require transmission providers to demonstrate their good faith efforts to seek agreement from Relevant State Entities before proposing a Long-Term Regional Transmission Cost

---

[2851] *Id.* at 9 (citing APS Initial Comments at 10-11; MISO Initial Comments at 55-69; MISO TOs Initial Comments at 41-45; OMS Initial Comments at 10-13).

[2852] *Id.* at 4 (citing California Commission Initial Comments at 51-54).

[2853] *Id.* at 4-5 (citing NARUC Initial Comments at 49; NESCOE Initial Comments at 16-19, 46 (requesting that the Commission either require codification of states' roles for cost allocation of long-term regional transmission facilities in OATTs or require explanation following consultation with states of a different approach)).

[2854] *Id.* at 5, 8 (citing Indicated PJM TOs Initial Comments at 23).

USCA4 Appeal: 24-1650   Doc: 224   Filed: 01/21/2025   Pg: 948 of 2455
Document Accession #: 20240513-3036   Filed Date: 05/13/2024

Docket No. RM21-17-000                                                    - 938 -

Allocation Method, State Agreement Process, or combination thereof.[2855]  AEE states that the final rule should better define what constitutes "good faith effort" to seek agreement on cost allocation from states, including the Commission's minimum expectations concerning the time that transmission providers must allow states to reach agreement, the need to hold meetings, and related topics.[2856]  OMS, on the other hand, urges the Commission to not require a formal process in which transmission providers must demonstrate how they sought the agreement of state entities.[2857]

1337.  NARUC recommends that the Commission require, at a minimum, that transmission providers:  (1) communicate with Relevant State Entities promptly in a manner that is reasonably calculated to be received by the Relevant State Entities and (2) establish a forum for negotiation that enables robust participation from Relevant State Entities and transmission providers.[2858]  PacifiCorp and NV Energy urge the Commission to clarify that a transmission provider's obligation under any final rule is only to provide state regulators an opportunity to participate in the process of establishing a cost allocation method, should they so choose.[2859]  NESCOE asserts that the Commission

---

[2855] ACEG Initial Comments at 65; ACORE Initial Comments at 18 (citing NOPR, 179 FERC ¶ 61,028 at PP 306, 308); NESCOE Initial Comments at 59 (citing NOPR, 179 FERC ¶ 61,028 at P 308).

[2856] AEE Initial Comments at 33-34.

[2857] OMS Initial Comments at 11.

[2858] NARUC Initial Comments at 44.

[2859] PacifiCorp and NV Energy Initial Comments at 17.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 949 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                                    - 939 -

should require transmission providers to afford Relevant State Entities sufficient time to agree on a cost allocation approach. NESCOE advocates for the Commission to give states six months from the effective date of a final rule to agree on a cost allocation method, which NESCOE argues is needed due to the complexity involved.[2860]

1338. Some commenters support the NOPR proposal to provide states flexibility in determining what constitutes agreement among Relevant State Entities on the cost allocation approach for Long-Term Regional Transmission Facilities.[2861] Alabama Commission contends that the Commission should not establish any specific timeline for negotiation to allow sufficient time for states to reach such agreement.[2862] In contrast, ACEG argues that there must be a firm time frame for any negotiations, because allowing Relevant State Entities more time to reach agreement could unnecessarily delay the process.[2863] Likewise, Pine Gate and PIOs support requiring a firm deadline, arguing that

---

[2860] NESCOE Initial Comments at 60.

[2861] *See, e.g.*, ACORE Initial Comments at 18 (citing NOPR, 179 FERC ¶ 61,028 at PP 306, 308); Georgia Commission Initial Comments at 8; Massachusetts Attorney General Initial Comments at 20 (citing NOPR, 179 FERC ¶ 61,028 at PP 306, 308); NARUC Initial Comments at 47-48 (citing NOPR, 179 FERC ¶ 61,028 at P 306); Nebraska Commission Initial Comments at 10; NESCOE Initial Comments at 58; Pacific Northwest State Agencies Initial Comments at 24-25 (citing NOPR, 179 FERC ¶ 61,028 at PP 309, 318).

[2862] Alabama Commission Initial Comments at 9.

[2863] ACEG Initial Comments at 64-65.

Docket No. RM21-17-000                                                    - 940 -

absent such a requirement, a single state or a handful of states could significantly delay

transmission development.[2864]

1339.  While ACEG supports the NOPR proposal, ACEG cautions that this flexibility

should not grant states veto power over the agreement.[2865]  Similarly, PJM States argue

that the Commission should not require unanimity in determining an initial Long-Term

Regional Transmission Cost Allocation Method, and instead, retain the proposal in the

NOPR to allow states to determine how they will come to agreement on a Long-Term

Regional Transmission Facility cost allocation approach.[2866]  New Jersey Commission

further asserts that the Commission must ensure that transmission providers cannot

unilaterally veto proposals that result from states' negotiations on a cost allocation

approach.[2867]

1340.  Nebraska Commission asserts that the Commission should allow RTOs/ISOs that

have an existing decision-making process that includes state entity participation to

continue using it, citing SPP's Regional State Committee and MISO's OMS as well-

established processes developed over many years with stakeholder input.  Nebraska

Commission adds that providing flexibility in this process for transmission providers

---

[2864] Pine Gate Initial Comments at 46; PIOs Initial Comments at 69-70.

[2865] ACEG Initial Comments at 66.

[2866] PJM States Reply Comments at 4 (citing NOPR, 179 FERC ¶ 61,028 at PP 304, 319).

[2867] New Jersey Commission Initial Comments at 17.

would be the least disruptive and most useful approach.[2868]  Relatedly, ACORE states that where agreements on cost allocation have already been reached with state entities for transmission projects with multiple benefits, the Commission should not require transmission providers to revisit those agreements.[2869]

1341.  ISO-NE also supports the Commission's proposal to afford transmission providers flexibility in determining what constitutes state agreement, as well as the process by which they seek agreement from the states.  ISO-NE argues that if state agreement cannot be reached, the Commission should allow the transmission planning region to develop a fallback cost allocation method for use in the event that the states agree to move forward with a long-term transmission facility to advance public policy, but do not agree on a cost allocation method.  ISO-NE requests that a final rule be clear that the OATT will be the means by which the states will communicate the agreed cost allocation method to the transmission provider, but the OATT should not dictate the process by which states engage to achieve consensus.[2870]

1342.  Some commenters favor mandating what constitutes agreement among Relevant State Entities.  Pine Gate states that the Commission should establish a minimum set of criteria outlining when it will consider there to be such agreement.  Pine Gate also asks for clarification as to whether unanimity is necessary for states to reach agreement on a

---

[2868] Nebraska Commission Initial Comments at 10.

[2869] ACORE Initial Comments at 18 (NOPR, 179 FERC ¶ 61,028 at P 314).

[2870] ISO-NE Initial Comments at 37-38.

cost allocation method.[2871]  Similarly, AEE requests additional guidance on what it means for states to "agree" to cost allocation approaches.[2872]  Shell states that an OATT mechanism that clearly delineates the process and timing for state input will facilitate the participation of Relevant States Entities.  However, Shell further states, the OATT provision could provide flexibility for stakeholders to identify the relevant agency for each state as the voting entity for cost allocation decisions.[2873]

1343.  Acadia Center and CLF assert that the Commission should clarify that states within a given transmission planning region need not unanimously agree on a cost allocation method and can define agreement as necessary when a majority of states in such region approve a cost allocation method for transmission facilities.[2874]  Acadia Center and CLF explain that such an approach is consistent with NESCOE's memorandum of understanding in ISO-NE,[2875] and similarly, New England for Offshore Wind argues that the Commission should not require agreement to be unanimous among states in a multi-state transmission planning region.[2876]

---

[2871] Pine Gate Initial Comments at 45-46.

[2872] AEE Initial Comments at 32-33 (citing NOPR, 179 FERC ¶ 61,028 at P 306).

[2873] Shell Initial Comments at 16-17.

[2874] Acadia Center and CLF Initial Comments at 30.

[2875] *Id.* at 31 (citing Memorandum of Understanding Among ISO-NE, NEPOOL, and NESCOE, at 3, 9 (Nov. 21, 2007), https://www.iso-ne.com/static-assets/documents/regulatory/part_agree/mou_final.pdf).

[2876] New England for Offshore Wind Initial Comments at 4-5.

1344.  PIOs also argue that the Commission should not require that states in a particular

transmission planning region unanimously approve an *ex ante* cost allocation method.

PIOs assert, rather, that the Commission should allow transmission providers to adopt a

cost allocation method that is otherwise just and reasonable with agreement among a

majority of states.  PIOs state that each RTO/ISO has an organization of states that

operates as a committee and that most of these committees require a simple majority vote

(for example, the SPP Regional State Committee, OPSI, and OMS) and that the

experience with the RTO/ISO regional state committees can be extrapolated and applied

to the non-RTO/ISO transmission planning regions as well.[2877]  Pattern Energy proposes

that a reasonable threshold for "agreement" would be for one-half of the Relevant State

Entities to agree to the Long-Term Regional Transmission Cost Allocation Method, State

Agreement Process, or combination thereof.[2878]

1345.  In contrast, Southeast PIOs propose that state agreement should require unanimous

acceptance by the states in the relevant transmission planning region.  Southeast PIOs

state that in the event transmission providers are unable to achieve unanimity, the

Commission could presumptively impose the cost allocation mechanism approved by a

plurality of the transmission planning region's states.[2879]

---

[2877] PIOs Initial Comments at 66-67.

[2878] Pattern Energy Initial Comments at 19.

[2879] Southeast PIOs Initial Comments at 56.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 954 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                    - 944 -

### v.    <u>Outcome if Relevant State Entities Forgo a Role in Determining a Long-Term Regional Transmission Cost Allocation Method</u>

1346.  Some commenters support the Commission's proposal that, in the event that states forgo a role in determining the cost allocation approach for all or a subset of Long-Term Regional Transmission Facilities, transmission providers must propose a Long-Term Regional Transmission Cost Allocation Method.[2880]

### vi.   <u>Outcome if Relevant State Entities Fail to Reach Agreement on a Cost Allocation Method</u>

1347.  Several commenters agree with the proposal that, in the event that Relevant State Entities fail to reach an agreement on a cost allocation method, transmission providers must file a cost allocation method with the Commission.[2881]  NARUC recommends that if Relevant State Entities are unable to reach agreement on cost allocation, the Commission should require transmission providers to file changes to their OATTs that reflect as much consensus as was reached.[2882]

1348.  PIOs state that when cost allocation disputes occur, the Commission could use its authority to convene a joint board with affected states to consider issues and make

---

[2880] MISO Initial Comments at 67; NESCOE Initial Comments at 59; Pennsylvania Commission Initial Comments at 13; PIOs Initial Comments at 67.

[2881] ACEG Initial Comments at 64; Entergy Initial Comments at 31; Pacific Northwest State Agencies Initial Comments at 29; PacifiCorp and NV Energy Initial Comments at 16; Pattern Energy Initial Comments at 19; TAPS Initial Comments at 4, 23-24.

[2882] NARUC Initial Comments at 48-49.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 955 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

decisions.[2883] PIOs further state that if states cannot agree to an *ex ante* cost allocation method by the compliance deadline for the final rule, the Commission should institute a default cost allocation method.[2884]

1349. Similarly, Eversource and Vermont Electric and Vermont Transco state that when Relevant State Entities fail to agree on a cost allocation method, the Commission should establish the Long-Term Regional Transmission Cost Allocation Method.[2885] To improve transparency and certainty, Clean Energy Associations state that the Commission should establish a cost allocation method upfront for situations where "state concurrence on either an *ex ante* or *ex post* approach" cannot be reached, submitting that a 90-day period would be reasonable for the Commission to determine a cost allocation method in the absence of state concurrence on either type of approach.[2886]

1350. In contrast, Pacific Northwest State Agencies oppose the Commission establishing a Long-Term Regional Transmission Cost Allocation Method on its own initiative.[2887] NESCOE states that having the transmission provider file a cost allocation method when states cannot agree is preferable to the Commission establishing the cost allocation

---

[2883] PIOs Initial Comments at 67 (citing 16 U.S.C. 824h; 18 CFR 385.1304).

[2884] *Id.* at 69.

[2885] Eversource Initial Comments at 30 (citing NOPR, 179 FERC ¶ 61,028 at P 310 (citation omitted)); Vermont Electric and Vermont Transco Initial Comments at 4.

[2886] Clean Energy Associations Initial Comments at 36.

[2887] Pacific Northwest State Agencies Initial Comments at 29.

method. Specifically, NESCOE asserts that a more appropriate role for the Commission is to establish general principles under a final rule and evaluate compliance filings made by transmission providers (or subsequent FPA section 205 proposals down the road) for adherence to those principles.[2888]

1351.  NESCOE further suggests that if the states cannot reach agreement within the first four months after the effective date of a final rule, they should be provided the opportunity to request that the Commission appoint one or more senior staff members to facilitate agreement.[2889]

1352.  In contrast, where agreement is not reached in the established timeframe, ACEG states that the Commission should permit transmission providers to explain their good faith efforts undertaken to seek agreement.[2890]

1353.  Clean Energy Associations, some state legislators, and some US Senators state that the final rule should provide clarity around how disagreements among states or transmission providers regarding cost allocation will be handled.[2891]  Clean Energy Associations recommend, and Ørsted agrees, that in the absence of such agreement, the

---

[2888] NESCOE Initial Comments at 61 (citing NOPR, 179 FERC ¶ 61,028 at P 314).

[2889] *Id.* at 60.

[2890] ACEG Initial Comments at 64-65.

[2891] Clean Energy Associations Initial Comments at 35-36 (citing NOPR, 179 FERC ¶ 61,028 at P 310); Environmental Legislators Caucus Supplemental Comments at 2; Senator Schumer Supplemental Comments at 2; US Senators Supplemental Comments at 2.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 957 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Commission should require cost allocation to track the identified and quantifiable benefits of Long-Term Regional Transmission Facilities.[2892]  Senator Schumer supports providing guidance when there is no state agreement on cost allocation to prevent state vetoes of cost allocation methods and to prevent states being incentivized to free ride on transmission planning and avoid costs.[2893]

### c.    Commission Determination

1354.  We decline to adopt the NOPR proposal to require transmission providers to seek the agreement of Relevant State Entities within the transmission planning region regarding the relevant cost allocation method to be applied to Long-Term Regional Transmission Facilities.  Instead, we modify the NOPR proposal to establish a six-month time period (Engagement Period), during which transmission providers must:  (1) provide notice of the starting and end dates for the six-month time period; (2) post contact information that Relevant State Entities may use to communicate with transmission providers about any agreement among Relevant State Entities on a Long-Term Regional Transmission Cost Allocation Method(s) and/or a State Agreement Process, as well as a deadline for communicating such agreement; and (3) provide a forum for negotiation of a Long-Term Regional Transmission Cost Allocation Method(s) and/or a State Agreement Process that enables meaningful participation by Relevant State Entities.

---

[2892] Clean Energy Associations Initial Comments at 35-36; Ørsted Initial Comments at 9.

[2893] Senator Schumer Supplemental Comments at 2.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 958 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                          - 948 -

1355.  We adopt the NOPR proposal, with modification, to define Relevant State Entities as any state entity responsible for electric utility regulation or siting electric transmission facilities within the state or portion of a state located in the transmission planning region, including any state entity as may be designated for that purpose by the law of such state.[2894]  We modify the definition to add the word "electric" before "utility regulation" to make clear that Relevant State Entities are those state agencies responsible for *electric* utility regulation, and not other types of utility regulation.

1356.  Specifically, with respect to the mechanics of the Engagement Period, we require that transmission providers in each transmission planning region provide notice, such as on its OASIS page or public website, of the opportunity for any Relevant State Entity to participate in, and the starting and end dates of, the Engagement Period.  The notice must include contact information for a single point of contact in the transmission planning region that the Relevant State Entities can use to communicate any agreement among Relevant State Entities on a Long-Term Regional Transmission Cost Allocation Method(s) and/or a State Agreement Process, as well as a deadline for communicating such agreement.[2895]  Such deadline must be no earlier than the end date of the Engagement Period.

---

[2894] *See* NOPR, 179 FERC ¶ 61,028 at P 304.

[2895] As we discuss above in the Cost Allocation for Long-Term Regional Transmission Facilities section, Relevant State Entities must indicate that they have agreed to any State Agreement Process in order for any such process to be eligible for acceptance by the Commission in compliance with this final rule.  Consistent with FPA section 205, however, transmission providers have the right to not file a State Agreement Process.  *See infra* Filing Rights Under the FPA section for a further discussion.  *See also*

1357.  We require transmission providers in each transmission planning region to provide

a forum for negotiation that enables meaningful participation by Relevant State Entities

during the Engagement Period, consistent with NARUC's suggestion.[2896]  We require

transmission providers to explain on compliance how they complied with the requirement

to establish and provide notice of an Engagement Period for Relevant State Entities to

negotiate a Long-Term Regional Transmission Cost Allocation Method(s) and/or State

Agreement Process, as well as how they complied with the requirement to provide a

forum for such negotiation.  In response to commenters that argue that their transmission

planning regions already have mechanisms for state involvement in regional transmission

planning and cost allocation processes,[2897] we note that Relevant State Entities can

choose to use existing mechanisms for state involvement in regional transmission

planning and cost allocation processes, such as the SPP Regional State Committee and

the Organization of MISO States, to negotiate a Long-Term Regional Transmission Cost

Allocation Method(s) and/or a State Agreement Process.  However, even where Relevant

State Entities indicate to the transmission providers in a transmission planning region that

they will use such existing mechanisms as the forum for their negotiations, transmission

providers must still demonstrate on compliance that, consistent with the requirements of

---

*Atl. City Elec. Co. v. FERC*, 295 F.3d 1, 9 (D.C. Cir. 2002) (finding that the Commission
may not require utility owners to give up statutory rights under FPA section 205).

[2896] NARUC Initial Comments at 44.

[2897] *E.g.*, MISO Initial Comments at 61; SPP Initial Comments at 28-30; PJM
Initial Comments at 116.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 960 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                    - 950 -

this final rule, they provided notice of the starting and end dates for the six-month time

period and posted contact information that Relevant State Entities may use to

communicate with transmission providers about their proposed Long-Term Regional

Transmission Cost Allocation Method(s) and/or a State Agreement Process to which

Relevant State Entities have agreed, as well as a deadline for communicating such

agreement.

1358.  As described above, we adopt a six-month time period for the Engagement Period.

While the NOPR did not propose a particular time period for the Engagement Period, we

believe that the six-month time period that we adopt here balances the need to ensure that

Relevant State Entities have sufficient time to negotiate a Long-Term Regional

Transmission Cost Allocation Method(s) and/or State Agreement Process if they choose

to do so, particularly given the complexity that such negotiations may involve, with the

need to ensure that an extended Engagement Period does not unduly delay the

implementation of the reforms that we adopt in this final rule.  We appreciate Alabama

Commission's concerns about establishing a specific time period for negotiations, but we

find that limiting the Engagement Period to six months is necessary to ensure that

transmission providers have sufficient time to prepare their compliance filings in advance

of the compliance deadlines that we establish in this final rule.[2898]

1359.  If the Relevant State Entities participating in an Engagement Period agree on a

Long-Term Regional Transmission Cost Allocation Method(s) and/or State Agreement

---

[2898] Alabama Commission Initial Comments at 9.

Process and provide that Method or Methods and/or State Agreement Process to the transmission providers no later than the deadline for communicating agreement, which must be no earlier than the end date of the Engagement Period, the transmission providers may file the agreed-to Long-Term Regional Transmission Cost Allocation Method(s) and/or State Agreement Process on compliance. We note, however, that the ultimate decision as to whether to file a Long-Term Regional Transmission Cost Allocation Method(s) and/or State Agreement Process to which Relevant State Entities have agreed will continue to lie with the transmission providers.

1360. We do not adopt the NOPR proposal that for each state, a single entity should be designated as the voting or representative entity. In light of the fact that we now require an Engagement Period, rather than mandating that transmission providers seek agreement with Relevant Sate Entities on the relevant cost allocation method or process, we decline to adopt a requirement that a single entity be designated for each state as the voting or representative entity. In addition, we decline to define what constitutes agreement among Relevant State Entities, how such agreement is reached, and which Relevant State Entities must reach such agreement during the Engagement Period. Instead, we leave such matters, including whether to use existing state processes as a forum for negotiations, as Nebraska Commission advocates,[2899] to the Relevant State Entities participating in the Engagement Period to determine. The requirements that we establish in the final rule are that transmission providers must demonstrate on compliance that they

---

[2899] Nebraska Commission Initial Comments at 10.

established and provided notice of an Engagement Period for Relevant State Entities to negotiate a Long-Term Regional Transmission Cost Allocation Method(s) and/or State Agreement Process, as well as that they provided a forum for such negotiation.

1361.  Likewise, we do not agree with commenters, like Pine Gate, that the Commission should establish a minimum set of criteria for a state agreement.[2900]  Instead, we find that the criteria for agreement are more appropriately determined by the Relevant State Entities participating in the Engagement Period.  Whether agreement should require a majority,[2901] a threshold of one-half of the participating Relevant State Entities,[2902] or unanimity (Southeast PIOs)[2903] is a decision for the Relevant State Entities participating in the Engagement Period.  We find that this approach also addresses many of the issues commenters raised relating to the potential difficulties associated with mandating agreement on a Long-Term Regional Transmission Cost Allocation Method(s), including ACEG's concern that requiring agreement could lead to certain states holding a veto power over the agreement.[2904]  Moreover, we reiterate that, as discussed in the Cost Allocation Methods for Long-Term Regional Transmission Facilities section above,

---

[2900] Pine Gate Initial Comments at 45-46.

[2901] Acadia Center and CLF Initial Comments at 30; PIOs Initial Comments at 66-67.

[2902] Pattern Energy Initial Comments at 19.

[2903] Southeast PIOs Initial Comments at 56.

[2904] ACEG Initial Comments at 66.

transmission providers must file a Long-Term Regional Transmission Cost Allocation
Method on compliance with this final rule; a State Agreement Process cannot be the sole
method filed for cost allocation for Long-Term Regional Transmission Facilities.

1362.  We acknowledge commenters' support of the NOPR proposal to require
transmission providers to seek the agreement of Relevant State Entities regarding the
relevant cost allocation method or process to be applied to Long-Term Regional
Transmission Facilities, based upon the rationale that states play a critical role in
transmission planning, and that facilitating their engagement in cost allocation may
minimize delays and additional costs that can be associated with associated transmission
siting proceedings. [2905]  We find that requiring an Engagement Period provides the same
opportunity for robust engagement in the cost allocation process as the NOPR proposal,
and thus has the potential to achieve the same important benefits, but will reduce the
practical challenges associated with requiring transmission providers to seek the
agreement of Relevant State Entities.[2906]

1363.  While we agree with commenters regarding the value of an opportunity for state
engagement regarding cost allocation, and accordingly adopt the Engagement Period, we

---

[2905] NOPR, 179 FERC ¶ 61,028 at P 301 (footnote omitted); *see, e.g.*, Avangrid
Initial Comments at 28; City of New Orleans Council Initial Comments at 9; SoCal
Edison Initial Comments at 3, 13.

[2906] *See, e.g.*, Minnesota State Entities Initial Comments at 7 (claiming that a
requirement to seek agreement could lead to disputes over the rights and responsibilities
of individual states or state commissions to veto or otherwise hold up needed region-wide
transmission plans).

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 964 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

do not agree that the views of state regulators regarding the appropriate cost allocation approach are dispositive.[2907]  Transmission providers retain the ultimate responsibility for transmission planning, and, as discussed below, they have FPA section 205 filing rights to propose tariff changes to rates, which the Commission cannot deprive them of via this final rule.[2908]  The Commission has a statutory responsibility to review such filings to ensure that any proposed cost allocation is just and reasonable and not unduly discriminatory or preferential.  Robust state engagement can valuably inform a cost allocation approach, but it cannot supplant these distinct, statutorily defined roles.

1364.  We appreciate that certain commenters request to expand or clarify the NOPR's proposed definition of Relevant State Entities to include additional entities, or to otherwise allow the participation of other entities in the Engagement Period.  For example, some commenters request that the definition be expanded to include Native American Tribes, self-regulated public power utilities, cooperatives, non-jurisdictional transmission providers, customer interests, state utility consumer advocates, non-traditional state agencies, and local regulatory bodies.[2909]  However, we decline to expand

---

[2907] *See, e.g.*, Southern Initial Comments at 9.

[2908] *See, e.g.*, *Atl. City Elec. Co. v. FERC*, 295 F.3d at 9 (noting that section 205 of the FPA gives utilities the right to file rates and terms for services rendered, and finding that the Commission cannot require that utility owners give up those statutory rights under FPA section 205); *infra* Filing Rights Under the FPA section.

[2909] American Municipal Power Initial Comments at 5; APPA Initial Comments at 3, 42-43 (citing 16 U.S.C. 796(7), (15)); California Energy Commission Initial Comments at 3; California Municipal Utilities Initial Comments at 16-17; Large Public Power Initial Comments at 41; MISO Coops Initial Comments at 3-4; Northwest and Intermountain Initial Comments at 18; NRECA Initial Comments at 56-57; Six Cities

Docket No. RM21-17-000                                                                - 955 -

participation in the Engagement Period beyond Relevant State Entities.  As discussed in

the NOPR, "regional transmission facilities face significant uncertainty and risk of not

reaching construction if certain stakeholders – in particular, a state regulator responsible

for permitting transmission facilities – do not perceive the regional transmission

facilities' value as commensurate with their costs."[2910]  The Commission further stated,

and we continue to believe, that "providing state regulators with a formal opportunity to

develop a cost allocation method for [Long-Term Regional Transmission Facilities]

selected through Long-Term Regional Transmission Planning could help increase

stakeholder – and state – support for those facilities, which, in turn, may increase the

likelihood that those facilities are sited and ultimately developed with fewer costly delays

and better ensure just and reasonable Commission-jurisdictional rates."[2911]  For the same

reasons, we also do not find it necessary to allow other stakeholders to participate in the

Engagement Period, as some commenters advocate.[2912]  In response to Nevada

Commission's request for additional flexibility in the term Relevant State Entity,[2913] and

NESCOE's request to amend the definition to accommodate individual transmission

planning regions' particular approaches to cost allocation requirements, we find that the

---

Initial Comments at 10.

[2910] NOPR, 179 FERC ¶ 61,028 at P 297 (footnote omitted).

[2911] *Id.* at P 299.

[2912] *See, e.g.*, Clean Energy Buyers Initial Comments at 29.

[2913] Nevada Commission Initial Comments at 13.

definition of Relevant State Entities, as amended, recognizes the important role of states while providing sufficient regional flexibility for effective Engagement Period participation.[2914]

1365.  We acknowledge SERTP Sponsors' concern that determining which Relevant State Entities would be appropriate to participate will be a function of state law,[2915] and, as Pennsylvania Commission points out, a state's legislature could have divided utility regulation and siting authority among different state agencies.[2916]  In response to these concerns and Duke's clarification request,[2917] and as we note above, we provide flexibility on how Relevant State Entities reach agreement during the Engagement Period and decline to adopt the requirement that, for each state, a single entity should be designated as the voting or representative entity.  We clarify that there may be multiple Relevant State Entities for each state, so long as each Relevant State Entity meets the definition as provided in this final rule.  As noted above, the definition of Relevant State Entity provides sufficient flexibility for participation in the Engagement Period.

---

[2914] NESCOE Initial Comments at 57.  As discussed below in the Proposals Relating to the Design and Operation of State Agreement Process section, we will permit other participants beyond Relevant State Entities to participate in the State Agreement Process, if agreed to by Relevant State Entities.

[2915] SERTP Sponsors Initial Comments at 28-29.

[2916] Pennsylvania Commission Initial Comments at 15.

[2917] Duke Initial Comments at 38-39.

USCA4 Appeal: 24-1650     Doc: 224     Filed: 01/21/2025     Pg: 967 of 2455
Document Accession #: 20240513-3036     Filed Date: 05/13/2024

1366.  We find that the decision to modify the NOPR proposal, which would have required transmission providers to seek agreement of Relevant State Entities, to instead require transmission providers to establish a six-month Engagement Period largely moots several other reforms proposed in the NOPR.  We therefore decline to adopt other proposed reforms that detailed the requirements associated with transmission providers seeking agreement of Relevant State Entities.

1367.  We note that transmission providers' compliance with this final rule is not contingent on Relevant State Entities' participation in the Engagement Period.  Transmission providers' compliance with this final rule is also not contingent on Relevant State Entities reaching an agreement on a Long-Term Regional Transmission Cost Allocation Method(s) and/or State Agreement Process.  If Relevant State Entities fail to reach agreement on a Long-Term Regional Transmission Cost Allocation Method(s) and/or State Agreement Process, transmission providers must still file one or more Long-Term Regional Transmission Cost Allocation Methods in compliance with this final rule.  We acknowledge commenters' recommendations on action we should take in the event Relevant State Entities fail to reach an agreement.  But we decline to convene a joint board of affected states if Relevant State Entities cannot agree, as suggested by PIOs,[2918] and the Commission will not establish a Long-Term Regional Transmission Cost Allocation Method in the event that Relevant State Entities fail to

---

[2918]  PIOs Initial Comments at 67.

Docket No. RM21-17-000                                        - 958 -

agree, as proposed by Eversource and Vermont Electric and Vermont Transco.[2919]

Because this final rule requires transmission providers to file a Long-Term Regional

Transmission Cost Allocation Method, these additional steps are not necessary to ensure

that there will be a cost allocation method for Long-Term Regional Transmission

Facilities that are selected as the more efficient or cost-effective regional transmission

solutions to Long-Term Transmission Needs.

1368.  Furthermore, we decline to adopt NARUC's request that the Commission provide

a mechanism for future review of cost allocation methods for Long-Term Regional

Transmission Facilities.[2920]  This final rule requires that transmission providers establish

a one-time Engagement Period for purposes of compliance with this final rule;

transmission providers may file subsequent changes to their cost allocation methods for

Long-Term Regional Transmission Facilities pursuant to their filing rights under FPA

section 205, at which point parties may file comments in support of or protests to such

filings.  We note, however, that some RTOs/ISOs have stakeholder processes that occur

prior to making FPA section 205 filings on cost allocation, which could provide an

additional opportunity for stakeholders to present their views on a proposed cost

allocation method for Long-Term Regional Transmission Facilities.  We decline to

require future Engagement Periods beyond the initial Engagement Period but note that

---

[2919] Eversource Initial Comments at 30; Vermont Electric and Vermont Transco
Initial Comments at 4.

[2920] NARUC Initial Comments at 49-50.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 969 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

transmission providers may hold future Engagement Periods if they believe such periods would be beneficial.

### 3.     Proposals Relating to the Design and Operation of State Agreement Processes

#### a.     NOPR Proposal

1369.  The Commission preliminarily found that a State Agreement Process by which one or more Relevant State Entities voluntarily agree to a cost allocation method for Long-Term Regional Transmission Facilities (or a portfolio of such Facilities) after they are selected may be a just and reasonable approach to cost allocation for such regional transmission facilities and that the State Agreement Process could apply to all Long-Term Regional Transmission Facilities or only to a subset thereof.[2921]

1370.  The Commission proposed to require that if the Relevant State Entities agree on a State Agreement Process, then the transmission providers in each transmission planning region must describe in their OATTs the process by which Relevant State Entities would reach voluntary agreement pursuant to that State Agreement Process regarding the cost allocation for Long-Term Regional Transmission Facilities, including the timeline for such processes.  The Commission noted that, for example, the transmission providers in each transmission planning region could specify in their OATTs the procedures by which such voluntary agreements by the Relevant State Entities may be filed with the Commission for consideration under FPA section 205.  The Commission proposed to

---

[2921] NOPR, 179 FERC ¶ 61,028 at P 311.

require that such procedures include a process by which Relevant State Entities would agree to funding contributions and the mechanism by which such costs would be allocated (e.g., through a *pro forma* contract).[2922]

### b.    Comments

#### i.    Support for State Agreement Process

1371.  Several commenters generally support the Commission's proposal to permit transmission providers to submit a State Agreement Process as a Long-Term Regional Transmission Cost Allocation Method.[2923]  NARUC supports allowing Relevant State Entities to agree to using the State Agreement Process to commit their customers to fund all or a portion of the costs of a Long-Term Regional Transmission Facility as a means of meeting a transmission planning region's selection criteria.[2924]

1372.  Mississippi Commission contends that the State Agreement Process will likely promote transmission construction because authority over transmission construction and

---

[2922] *Id.* P 313.

[2923] American Municipal Power Initial Comments at 12; City of New Orleans Initial Comments at 9-10; Entergy Initial Comments at 34-35; Georgia Commission Initial Comments at 8-9; ISO-NE Initial Comments at 37; ITC Initial Comments at 28-32; Louisiana Commission Initial Comments at 33: Mississippi Commission Initial Comments at 6; NARUC Initial Comments at 53-54; NESCOE Initial Comments at 62; North Carolina Commission and Staff Initial Comments at 15-16; Ohio Commission Federal Advocate Initial Comments at 12; Pacific Northwest State Agencies Initial Comments at 27, Pennsylvania Commission Initial Comments at 12-13; PIOs Initial Comments at 64; TAPS Initial Comments at 4-5, 24-26; Resale Iowa Initial Comments at 2, 12; Southern Initial Comments at 9; SERTP Sponsors Initial Comments at 28-29.

[2924] NARUC Initial Comments at 53-54 (citing NOPR, 179 FERC ¶ 61,028 at P 252).

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 971 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                            - 961 -

siting rests with the states.[2925]  Mississippi Commission asserts that the State Agreement

Process is particularly suited to transmission facilities that promote state policies, noting

that Long-Term Regional Transmission Planning should address state laws and utility

integrated resource plans that affect the resource mix, but the cost of the transmission

facilities needed to address those issues must be borne by the states and utilities whose

laws and integrated resource plans require those facilities.[2926]  Likewise, Ohio

Commission Federal Advocate asserts that a State Agreement Process is a just and

reasonable way of allocating costs for public policy projects.[2927]  Relatedly, ELCON

states that the Commission should emphasize that one state's public policy goals cannot

supplant the cost causation principle or be used to impose costs on customers in states

that do not have the same goals.[2928]

1373.  Southern also notes that state support for transmission projects is crucial as the

states retain primary jurisdiction over transmission siting and certification.[2929]  Southern

---

[2925] Mississippi Commission Initial Comments at 22.

[2926] Mississippi Commission Reply Comments at 3, 24 (citing Alabama
Commission Initial Comments at 4; Illinois Commission at 4, 7-8).

[2927] Ohio Commission Federal Advocate Initial Comments at 12.

[2928] ELCON Initial Comments at 17-18.  Under the cost causation principle, the
cost of transmission facilities must be allocated to those who benefit from those facilities
in a manner that is at least roughly commensurate with estimated benefits.  *See S.C. Pub.
Serv. Auth. v. FERC*, 762 F.3d at 53 (quoting Order No. 1000, 136 FERC ¶ 61,051 at
P 586); *see also ICC v. FERC I*, 576 F.3d at 476.

[2929] Southern Initial Comments at 9.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 972 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                    - 962 -

asserts that states should generally be allowed to make transmission project selection and cost allocation decisions pursuant to the State Agreement Process after the planning is performed and specific costs and benefits are identified.[2930]  North Carolina Commission and Staff agree that the Commission should allow states to negotiate a cost allocation method after a transmission facility has been selected through Long-Term Regional Transmission Planning.[2931]  Similarly, Pennsylvania Commission states that having the State Agreement Process occur after project selection will put planning in the driver's seat, and state negotiation will be centered around a transmission project already selected, which will ensure that project planning and selection run smoothly while not frustrating the fulfillment of a state's need during the state negotiation process.[2932]

1374.  Massachusetts Attorney General states that, due to the range and complexity of benefits and the uncertainty associated with using a long transmission planning horizon, permitting states to diverge from *ex ante* cost allocation requirements for particular transmission projects or portfolios of projects may increase the likelihood that those facilities are sited and developed with fewer costly delays and will better ensure just and reasonable rates.  Massachusetts Attorney General states that the potential benefits of the State Agreement Process outweigh any concerns about free ridership.[2933]  R Street agrees

---

[2930] *Id.* at 27.

[2931] North Carolina Commission and Staff Initial Comments at 15-16.

[2932] Pennsylvania Commission Initial Comments at 12-13.

[2933] Massachusetts Attorney General Initial Comments at 19 (citing NOPR, 179

that the proposal for a State Agreement Process could reduce cost allocation and siting disputes, but asserts that states lack the jurisdiction and resources to serve an economic oversight role and thus that state participation is not a substitute for the Commission's economic oversight or for competitive mechanisms.[2934]

1375.  NESCOE supports the proposal that the State Agreement Process may apply to all, or a subset of, Long-Term Regional Transmission Facilities.  NESCOE contends that, depending on the circumstances, Relevant State Entities may find it unnecessary to have the State Agreement Process apply to all such facilities, and having the flexibility to apply the State Agreement Process to a subset of facilities is a reasonable approach.[2935]

### ii.    Concerns and Conditions for Support Regarding State Agreement Process

1376.  Some commenters qualified their support for the State Agreement Process and/or suggest that the Commission impose conditions upon the process, including those that advocated for flexibility and deference to existing efforts to incorporate state involvement.[2936]  US DOE, on behalf of its federal power marketing administrations, notes that, to the extent that state agreements may involve the participation of federal power marketing administrations, the process will need to accommodate the jurisdictional

---

FERC ¶ 61,028 at PP 299, 314).

[2934] R Street Initial Comments at 4, 12.

[2935] NESCOE Initial Comments at 62-63 (citing NOPR, 179 FERC ¶ 61,028 at P 311).

[2936] *Supra* note 2923.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 974 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                          - 964 -

implications of the parties involved and that any agreements federal power marketing administrations execute must be consistent with their statutory authorities.[2937]

1377.  Entergy states its understanding that state agreements will not bind retail commissions in exercising other authorities like siting and permitting.[2938]  Likewise, Pennsylvania Commission states that any State Agreement Process cannot serve to waive or diminish the state's siting authority over transmission facilities.[2939]

1378.  Mississippi Commission states that involving state regulators in cost allocation ensures that one state's policy choices are not imposed on another state's consumers without their consent and that no state should be forced to subsidize implementation of another state's laws and policies.[2940]  Likewise, Avangrid states that one state should not be required to fund public policies of another state, as this could derail clean energy efforts and allow states to avoid paying their fair share.[2941]  NRG supports a role for states on transmission projects that would not exist but for state public policy.[2942]  Virginia

---

[2937] US DOE Initial Comments at 50.

[2938] Entergy Initial Comments at 29-30 (citing NOPR, 179 FERC ¶ 61,028 at PP 302-309, 314).

[2939] Pennsylvania Commission Initial Comments at 14.

[2940] Mississippi Commission Reply Comments at 2-3.

[2941] Avangrid Initial Comments at 29.

[2942] NRG Initial Comments at 6.

Commission Staff avers that state entities should retain the right to assume cost responsibility for transmission projects intended to advance their public policy goals.[2943]

1379.  Pennsylvania Commission argues that the terms *ex ante* and *ex post* used in the definitions of the Long-Term Regional Transmission Cost Allocation Method and State Agreement Process are vague and that instead, the Commission should include in the definitions that the Long-Term Regional Transmission Cost Allocation Method and State Agreement Process are determined either before or after a transmission facility is selected.[2944]

1380.  Entergy asserts that the Commission should permit flexibility as to when a State Agreement Process occurs despite the NOPR's reference to the State Agreement Process as "an *ex post* cost allocation process" because in some transmission planning regions, it may be appropriate for the State Agreement Process to begin before transmission projects are selected.[2945]  Entergy states that any State Agreement Process should be finalized before a portfolio is submitted to the MISO Board of Directors because it will provide certainty to stakeholders as to how costs will be allocated and ensure that the MISO Board of Directors understands how the cost allocation for the portfolio is consistent with the law and capable of withstanding legal challenges.[2946]  Relately, Mississippi

---

[2943] Virginia Commission Staff Initial Comments at 6.

[2944] Pennsylvania Commission Initial Comments at 14-15.

[2945] Entergy Initial Comments at 34-35.

[2946] *Id.* at 35.

Docket No. RM21-17-000                                                    - 966 -

Commission argues that Long-Term Regional Transmission Facilities should not be

presented to an RTO/ISO governing board until states have reached agreement on cost

allocation.[2947]

1381.  Similarly, MISO asserts that the *ex post* nature of the State Agreement Process

renders it unsuitable as the sole cost allocation method for Long-Term Regional

Transmission Facilities.  As such, MISO contends, cost allocation should be available

only during a defined time set forth in the OATT, after the approval of the transmission

projects, to avoid delays in the competitive transmission development process.  MISO

further states that failure to conclude the State Agreement Process in that timeframe

should result in the transmission provider reverting to its default Long-Term Regional

Transmission Cost Allocation Method.  Finally, MISO asks that the Commission clarify

that transmission providers can make changes to their competitive transmission

development process to accommodate the State Agreement Process.[2948]

1382.  DC and MD Offices of People's Counsel recommend that the State Agreement

Process afford an opportunity for state entities to participate in transmission project

evaluation and selection.  They recommend this approach because of regional grid

expansions that optimize the interconnection of portfolios of resources that likely result

from power supply commitments made in conformity with state policies, and because

state entity participation in cost allocation after a transmission project has already been

---

[2947] Mississippi Commission Initial Comments at 25-26.

[2948] MISO Initial Comments at 69.

selected may foreclose the consideration of state-specific benefits of grid decarbonization during project evaluation and selection.[2949]

1383.  Alabama Commission contends that the Commission should provide for flexibility in the form and substance of any state agreement.  Specifically, Alabama Commission explains that under Alabama law, it is unclear how the Alabama Commission would enter into such agreement and that its agreement may instead have to take the form of an order directed to Alabama Power.[2950]  SERTP Sponsors also state that the Commission should recognize the importance of flexibility in the development and structure of state agreements, agreeing that a state public service commission may not have authority to enter into binding state agreements.  SERTP Sponsors offer that a state agreement for a state public service commission could be an endorsement of a voluntary participant funding agreement among its jurisdictional transmission providers.[2951]  Southeast PIOs state that the applicable cost allocation method should account for regional preferences and adds that an *ex ante* method is likely a non-starter in the Southeast, but that a State Agreement Process has real potential.[2952]

---

[2949] DC and MD Offices of People's Counsel Initial Comments at 37-38.

[2950] Alabama Commission Initial Comments at 10 n.8.

[2951] SERTP Sponsors Initial Comments at 28-29.

[2952] Southeast PIOs Reply Comments at 22-23 (citing Dominion Initial Comments at 50-52; Duke Initial Comments at 35-37; SERTP Sponsors Initial Comments at 28-29; Southern Initial Comments at 27-28).

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 978 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

1384.  Acadia Center and CLF state that voluntary state agreements relating to offshore wind could result in more efficient and cost-effective Long-Term Regional Transmission Facilities but request further clarity on voluntary agreements to assist states in understanding how these agreements allocate costs of transmission upgrades necessary for increased interconnection of renewable projects.[2953]  New England Systems states that the Commission should clarify that any State Agreement Process cannot increase the costs paid by a non-consenting transmission customer under an existing cost allocation method.[2954]  Pennsylvania Commission seeks clarification that a state that is not a party to a cost allocation agreement developed through the State Agreement Process cannot be required to pay for a selected transmission project.[2955]

1385.  Cypress Creek states that the involvement of states in Long-Term Regional Transmission Planning is important but that a State Agreement Process should not be required.[2956]  MISO requests that the State Agreement Process be optional so as not to disrupt current frameworks of state collaboration or delay transmission expansion.[2957]  MISO further asserts that the proposed cost allocation reforms may undermine existing

---

[2953] Acadia Center and CLF Initial Comments at 32 & n.93.

[2954] New England Systems Initial Comments at 23.

[2955] Pennsylvania Commission Initial Comments at 12.

[2956] Cypress Creek Reply Comments at 14 (citing Clean Energy Associations Initial Comments at 34).

[2957] MISO Reply Comments at 19.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 979 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                    - 969 -

cost allocation methods and that the Commission should not extend any requirements
regarding state involvement to near-term reliability and economic regional transmission
planning processes, which are beyond the scope of the final rule.[2958]

1386.  In addition, MISO argues that there should be no requirement for unanimous
agreement under the State Agreement Process, particularly if the decision to adopt it rests
with Relevant State Entities.[2959]  MISO states that some flexibility as to what constitutes
agreement of Relevant State Entities may be justified.[2960]  While Interwest supports
increased state engagement, it argues that state entities should not be authorized to limit
regional transmission plans by veto or by using unjust and unreasonable cost allocation
principles that are subjective or fail to comprehensively consider benefits.[2961]

1387.  Chemistry Council contends that consultation with affected states should not give
individual states the power to "hijack" the transmission planning process by rejecting
necessary investments, withholding consent, or delaying the decision-making process.
Chemistry Council asserts that the Commission should clarify that in requiring
transmission providers to "seek agreement" from states in transmission project selection,

---

[2958] MISO Initial Comments at 60, 71.

[2959] *Id.* at 66-67; MISO Reply Comments at 19.

[2960] MISO Initial Comments at 66.

[2961] Interwest Initial Comments at 16.

it is not suggesting that individual states would have a veto in the process or the ability to

unduly influence the timing or outcome of decision-making.[2962]

1388.  Evergreen Action encourages the Commission to prohibit one state or stakeholder

from vetoing transmission projects or cost allocation decisions.  Evergreen Action further

states that if consensus is not reached under a State Agreement Process, transmission

providers should not extend the time allotted to reach agreement, because this would

allow individual parties to delay the approval of needed transmission and remove the

time pressure on Relevant State Entities to reach agreement.  Evergreen Action avers that

instead transmission providers should simply explain that they conducted a good-faith

effort to reach agreement.[2963]

1389.  SEIA also urges the Commission to limit the opportunity for any single state to

veto a transmission line and to use its backstop authority under section 216 of the FPA if

parties are unable to reach an agreement and a relevant state authority withholds or denies

the siting permit for the transmission facility.[2964]  US Climate Alliance agrees that the

process should encourage states to engage in good faith discussions to realize common

benefits without over-leveraging a single state's power over a regional transmission

project.[2965]  National Grid suggests that if states cannot agree within a reasonable period

---

[2962] Chemistry Council Initial Comments at 7.

[2963] Evergreen Action Initial Comments at 6.

[2964] SEIA Initial Comments at 25 (citing 16 U.S.C. 824p(b)).

[2965] US Climate Alliance Initial Comments at 2.

on a proposed cost allocation method for a specific set of Long-Term Regional

Transmission Facilities, then the transmission providers or developers building those

facilities should be required to file a proposed cost allocation method for them.[2966]  In

contrast, NRG states that without recourse to an *ex ante* cost allocation method,

negotiations under the State Agreement Process would be more productive.[2967]

1390.  California Commission is concerned that the NOPR proposal grants too much

deference to transmission providers and will enable them to exercise veto power over

state-negotiated cost allocation agreements.[2968]  California Municipal Utilities and TANC

ask that the Commission require that local regulatory authorities be included in any State

Agreement Process, stating that the jurisdictional implications of the NOPR proposal are

unclear given that public power entities are not generally subject to the jurisdiction of

their respective state commissions.[2969]  Mississippi Commission and Northwest and

Intermountain support expanding a State Agreement Process to include non-jurisdictional

utilities.[2970]  California Municipal Utilities further assert that, if any state body is created

---

[2966] National Grid Initial Comments at 25-26.

[2967] NRG Initial Comments at 20-21.

[2968] California Commission Initial Comments at 51, 54-55 (citing NOPR, 179 FERC ¶ 61,028 at P 319).

[2969] California Municipal Utilities Initial Comments at 16; TANC Initial Comments at 17.

[2970] Mississippi Commission Reply Comments at 5 (citing MISO Coops Initial Comments at 3-4); Northwest and Intermountain Initial Comments at 18.

to examine transmission planning issues, it must include public power entities.[2971]

Because the written comment process is not sufficient to facilitate a constructive

dialogue, California Municipal Utilities urge the Commission to refrain from adopting

any specific proposals from the NOPR until such a dialogue between states and public

power can occur.[2972]

1391.   Some commenters are concerned about the reliance on voluntary contributions

that may occur under a State Agreement Process.  Clean Energy Associations states that

while *ex post* frameworks that rely on voluntary contributions from states or

interconnection customers may be useful in some circumstances, they may not

appropriately acknowledge system-wide benefits of high-voltage elements, which under

the State Agreement Process could be treated as benefitting only a single state.

According to Clean Energy Associations, courts have found such an outcome improper,

and this approach is unlikely to yield agreement in practice.[2973]  Likewise, Cypress Creek

asserts that any *ex post* cost allocation method should acknowledge wide-spread benefits

without imposing new restrictions.[2974]  AEE contends that the State Agreement Process,

and more broadly the requirement to seek agreement of states regarding applicable cost

---

[2971] California Municipal Utilities Initial Comments at 4.

[2972] California Municipal Utilities Reply Comments at 10.

[2973] Clean Energy Associations Initial Comments at 35 (citing *Old Dominion Elec. Coop. v. FERC*, 898 F.3d at 1261).

[2974] Cypress Creek Reply Comments at 14.

Docket No. RM21-17-000                                                          - 973 -

allocation methods, should not substitute for allocating costs to all beneficiaries based on the broad set of benefits that regional transmission investment can provide.  AEE states that reliance on voluntary state agreement should allow all states to consider the broad benefits that additional regional transmission facilities provide and the legal obligation to allocate costs commensurate with benefits received.[2975]

1392.  DC and MD Offices of People's Counsel suggest that cost allocation should be based on the NOPR's defined benefits to all appropriate beneficiaries, with a further cost allocation to states that opt to submit additional transmission needs.  DC and MD Offices of People's Counsel state that this approach would be more expansive than the existing State Agreement Approach in PJM because it would allow for a parallel default allocation of costs to the state entities not opting in, but narrowed to align with the NOPR-listed benefits, and a second round of cost allocation after the participating Relevant State Entities have shared costs aligned with the broader measure of benefits, which would help avoid the free-rider problem.[2976]

1393.  Avangrid states that a fair approach to cost allocation under the State Agreement Process could be payments and benefits based on tiers, providing the example that if states A and B have public policies supported by new transmission while state C does not, then only states A and B should pay the cost of public policy benefits while all three

---

[2975] AEE Reply Comments at 15-16.

[2976] DC and MD Offices of People's Counsel Initial Comments at 38-39 (citing *PJM Interconnection, L.L.C.*, 179 FERC ¶ 61,024).

states should be responsible for the cost associated with economic and reliability benefits.[2977]  Similarly, PIOs assert that under the State Agreement Process, costs identified in Long-Term Regional Transmission Planning should first be allocated to transmission customers as the primary beneficiaries, and then states and/or interconnection customers can voluntarily accept cost allocation for the alternative or expanded transmission projects compared to projects identified in the regional base case plan.[2978]

1394.  AEE asks that the Commission provide additional guardrails for the State Agreement Process to ensure that there are not transmission project delays.[2979] According to AEE, the Commission must ensure that excessive reliance on the State Agreement Process does not exacerbate free-ridership problems where states outside of those agreements receive benefits from transmission projects developed under state agreements but are not expected to contribute to the costs.[2980]

1395.  Duke argues that any tariff language memorializing the State Agreement Process must specify that the transmission provider "will not be obligated to accept cost

---

[2977] Avangrid Initial Comments at 29-30.

[2978] PIOs Initial Comments at 68 (citing NOPR, 179 FERC ¶ 61,028 at PP 75-76).

[2979] AEE Initial Comments at 33 (citing NOPR, 179 FERC ¶ 61,028 at PP 311-318).

[2980] *Id.*

Docket No. RM21-17-000                                                                              - 975 -

allocation methods proposed by Relevant State Entities."[2981]  Duke also asks that the

Commission clarify that if transmission providers only adopt a State Agreement Process,

and that fails, then transmission providers are free to make an FPA section 205 filing to

implement an *ex post* cost allocation method.[2982]  Further, Duke asks that the Commission

clarify that the regulatory text's reference to "transmission provider" is "the entity with

the section 205 rights to initiate rate changes, which depending upon the applicable

governance and OATT structures, may be the transmission owner, but not the

transmission provider."[2983]

1396.  Some commenters support requiring state involvement in cost allocation.  For

example, New York Commission and NYSERDA state that state-led cost allocation

should be a requirement in any final rule and that cost allocation for public policy-driven

transmission projects should be subject to state review and approval.[2984]  Pacific

Northwest State Agencies support requiring transmission providers to have an *ex post*

State Agreement Process as an alternative to an *ex ante* cost allocation method.[2985]

---

[2981] Duke Initial Comments at 39-40.

[2982] *Id.* at 3.

[2983] *Id.* at 40 n.77.

[2984] New York Commission and NYSERDA Initial Comments at 12, 14.

[2985] Pacific Northwest State Agencies Initial Comments at 27.

USCA4 Appeal: 24-1650     Doc: 224     Filed: 01/21/2025     Pg: 986 of 2455
Document Accession #: 20240513-3036     Filed Date: 05/13/2024

### iii.    <u>Opposition to a State Agreement Process</u>

1397.  Some commenters express concern that a State Agreement Process may not be a just and reasonable approach to cost allocation for regional transmission facilities.[2986]  R Street contends that states do not represent all beneficiaries who may be assigned costs and, as such, cost allocation predicated on state agreement may be unjust and unreasonable.  R Street states, however, that a state advisory or partial approval mechanism could be structured to give state agreement pivotal influence over cost allocation decisions.[2987]

1398.  APPA claims that the proposed State Agreement Process is unworkable and creates significant uncertainty and potential for litigation.[2988]  APPA further asserts that providing state regulators with an exclusive role in determining cost allocation methods will not likely result in a broad consensus across stakeholders.[2989]  MISO Coops add that it is unjust and unreasonable, arguing that, because cooperatives are often not jurisdictional to a state entity, it is unclear how cooperatives would be represented.  Thus, MISO Coops state, the State Agreement Process would reduce the involvement of cooperatives in regional transmission planning processes while granting states authority

---

[2986] APPA Initial Comments at 40, 44; MISO Coops Initial Comments at 2; R Street Initial Comments at 12.

[2987] R Street Initial Comments at 12.

[2988] APPA Initial Comments at 40, 44.

[2989] *Id.* at 43.

over entities outside their jurisdiction.  MISO Coops further state that the proposed State

Agreement Process is unnecessary because the current MISO stakeholder process is

superior.[2990]  MISO TOs oppose any provision that would mandate a State Agreement

Process.[2991]

### iv.    Requirement to Document State Agreement Process in OATT

1399.  Some commenters agree with the NOPR proposal that for any State Agreement

Process, transmission providers in each transmission planning region must detail in their

OATTs the process by which Relevant State Entities would reach agreement regarding

the cost allocation for Long-Term Regional Transmission Facilities pursuant to the State

Agreement Process, including the timeline for such processes.[2992]  NESCOE contends

that if the State Agreement Process is chosen by the Relevant State Entities, the details of

how the state entities would agree to funding contributions and the mechanisms by which

the costs would be allocated should be mostly informed by states and then filed by the

transmission provider.[2993]  NESCOE suggests that the Commission be open to variations

---

[2990] MISO Coops Initial Comments at 2-4.

[2991] MISO TOs Initial Comments at 5, 46.

[2992] Louisiana Commission Initial Comments at 33; NESCOE Initial Comments at 63; SDG&E Initial Comments at 5; TAPS Initial Comments at 24.

[2993] NESCOE Initial Comments at 63.

Docket No. RM21-17-000                                                        - 978 -

in the State Agreement Process as long as the details of all those variations are filed with the Commission.[2994]

1400.  Northwest and Intermountain state that the Commission should review negotiated cost allocation methods.[2995]  Likewise, APPA argues that the Commission should require that any state agreement to voluntarily fund transmission facilities must be filed with the Commission for approval, in order to afford parties the opportunity to comment.[2996]

1401.  Some commenters disagree that the Commission should require transmission providers in each transmission planning region to detail such processes in their OATTs. For example, OMS argues that it is unnecessary for transmission providers to explicitly define such a process in their OATTs.[2997]  Mississippi Commission argues that the Commission should clarify that OATT language describing the process by which states reach agreement should not be prescriptive or limiting and, instead, should provide only a general discussion of a process.[2998]

###       c.       <u>Commission Determination</u>

1402.  We adopt the NOPR proposal, with modification, to allow, but not require, transmission providers in each transmission planning region to adopt a State Agreement

---

[2994] NESCOE Reply Comments at 5.

[2995] Northwest and Intermountain Initial Comments at 18-19.

[2996] APPA Initial Comments at 34-35.

[2997] OMS Initial Comments at 12-13.

[2998] Mississippi Commission Initial Comments at 27-28.

Process for allocating the costs of all, or a subset of, Long-Term Regional Transmission Facilities.  We also modify the definition of State Agreement Process to be a process by which one or more Relevant State Entities may voluntarily agree to a cost allocation method for Long-Term Regional Transmission Facilities (or a portfolio of such Facilities) either before or no later than six months after the facilities are selected in the regional transmission plan for purposes of cost allocation.  We note that Relevant State Entities have the option to include the participation of other entities in a State Agreement Process.

1403.  As discussed in more detail below, we also adopt the NOPR proposal to require transmission providers that choose to file any State Agreement Process agreed to by Relevant State Entities to describe the State Agreement Process in proposed tariff provisions in their OATTs.  The tariff provisions must describe key information on how the State Agreement Process will result in a cost allocation being filed, including which entities can participate in the State Agreement Process; what constitutes an agreement on cost allocation in that process; how agreement is communicated to the transmission providers; and the circumstances under which, or the information necessary for, transmission providers to file or to consider filing the agreed cost allocation method.[2999]

1404.  Consistent with the NOPR, we find that a State Agreement Process can be a just and reasonable approach to allocate costs for Long-Term Regional Transmission Facilities.  We also find that State Agreement Processes may apply to all Long-Term

---

[2999] NOPR, 179 FERC ¶ 61,028 at P 313.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 990 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Regional Transmission Facilities or only to a subset thereof.[3000]  We believe that allowing

State Agreement Processes will help to address some commenters' request for a stronger

state role in the cost allocation of Long-Term Regional Transmission Facilities,[3001]

increasing the likelihood that more efficient or cost-effective Long-Term Regional

Transmission Facilities that are selected will be developed.  However, as discussed in

Cost Allocation Methods for Long-Term Regional Transmission Facilities section above,

a State Agreement Process cannot be the sole method filed for cost allocation for Long-

Term Regional Transmission Facilities; we also require transmission providers to file a

Long-Term Regional Transmission Cost Allocation Method on compliance with this final

rule so that if the State Agreement Process on file fails to result in a Commission-

accepted cost allocation method, there will still be a cost allocation method for Long-

Term Regional Transmission Facilities that are selected as the more efficient or cost-

effective regional transmission solutions to Long-Term Transmission Needs.

1405.  We note that this final rule provides significant flexibility to Relevant State

Entities with respect to the design and implementation of any State Agreement Process.

Such flexibility includes, for example, the opportunity to decide which entities beyond

Relevant State Entities will participate in the State Agreement Process, the ability to

---

[3000] *Id.* P 311.

[3001] *See, e.g.,* Mississippi Commission Initial Comments at 22; Southern Initial
Comments at 9.

identify the Long-Term Regional Transmission Facilities to which the State Agreement

Process will apply, and how agreement as to a cost allocation method will be reached.

1406.  We further expand these flexibilities by modifying the NOPR proposal to clarify

that a State Agreement Process can occur either before or no later than six months after a

Long-Term Regional Transmission Facility (or portfolio of such Facilities) is selected.

We believe that providing flexibility for a State Agreement Process to occur (and thus for

the Relevant State Entities to agree on a cost allocation method) before Long-Term

Regional Transmission Facilities (or a portfolio of such Facilities) are selected will

increase the likelihood that Regional State Entities support their selection and future

development.  We note that this flexibility with regard to the timing of a State Agreement

Process should accommodate the timing preferences expressed by certain

commenters.[3002]  However, we also require that any State Agreement Process must be

completed, i.e., any resulting cost allocation method must be filed with the Commission,

no later than six months after selection of the applicable Long-Term Regional

Transmission Facility (or portfolio of such Facilities).[3003]

1407.  As the Commission has previously noted, agreements outside of the context of

Order No. 1000 regional cost allocation methods, such as PJM's State Agreement

Approach, can result in cost allocations that are just and reasonable.[3004]  We also note that

---

[3002] *See, e.g.*, Pennsylvania Commission Initial Comments at 12-13; Entergy Initial Comments at 35.

[3003] We discuss this duration requirement *infra* at P 1413.

[3004] *See PJM Interconnection, L.L.C.*, 142 FERC ¶ 61,214 at P 142; *PJM*

Docket No. RM21-17-000                                                    - 982 -

Order No. 1000 allows market participants to negotiate alternative cost sharing

arrangements voluntarily and separately from the regional cost allocation method or set

of methods, and nothing in this final rule would prohibit such voluntary cost sharing

arrangements.[3005]  Moreover, as the Commission noted in the NOPR, the Commission

recently issued a Policy Statement addressing state efforts to develop transmission

facilities through voluntary agreements to plan and pay for those facilities, recognizing

that such voluntary agreements may allow state-prioritized transmission facilities to be

planned and built more quickly than would comparable facilities that are through the

regional transmission planning process.[3006]  Further, while we require in this final rule

that transmission providers have a Long-Term Regional Transmission Cost Allocation

Method for selected Long-Term Regional Transmission Facilities, we note that nothing in

this final rule limits a transmission provider's ability to propose under FPA section 205

any other cost allocation methods in addition to the cost allocation method used to

comply with this final rule.

1408.  In the NOPR, the Commission noted that it has previously expressed concern

regarding participant funding, which shares some similarities with State Agreement

---

*Interconnection, L.L.C.*, 179 FERC ¶ 61,024 at PP 40-43.

[3005] *See* Order No. 1000, 136 FERC ¶ 61,051 at P 561.

[3006] NOPR, 179 FERC ¶ 61,028 at P 300 (citing *State Voluntary Agreements to Plan & Pay for Transmission Facilities*, 175 FERC ¶ 61,225 at PP 2, 6).

Processes.[3007]  In Order No. 1000, for example, the Commission explained that reliance

on participant funding as a regional cost allocation method "increases the incentive of

any individual beneficiary to defer investment in the hopes that other beneficiaries will

value a transmission project enough to fund its development" and would therefore not

comply with the Order No. 1000 regional cost allocation principles.[3008]  The Commission

declined to allow transmission providers to file participant funding cost allocation

approaches as their *ex ante* cost allocation methods for selected regional transmission

facilities.[3009]  We take a similar approach here: we require transmission providers to

include in their OATTs one or more Long-Term Regional Transmission Cost Allocation

Methods (i.e., their *ex ante* cost allocation method(s)) that can be used to allocate the

costs of selected Long-Term Regional Transmission Facilities.  As in Order No. 1000, the

Long-Term Regional Transmission Cost Allocation Method cannot be participant

funding.  We find that requiring a Long-Term Regional Transmission Cost Allocation

Method or Methods that will apply to any selected Long-Term Regional Transmission

Facility reduces the incentive for project beneficiaries to defer investment.

---

[3007] *See id.* P 316 (citing Order No. 1000, 136 FERC ¶ 61,051 at P 723).

[3008] *Id.* P 316 (quoting Order No. 1000, 136 FERC ¶ 61,051 at P 723).  Under a participant funding approach to cost allocation, the costs of a transmission facility are allocated only to those entities that volunteer to bear those costs.  *Id.* P 316 n.519 (citing Order No. 1000, 136 FERC ¶ 61,051 at P 486 n.375).

[3009] *See* Order No. 1000, 136 FERC ¶ 61,051 at P 723.

USCA4 Appeal: 24-1650   Doc: 224   Filed: 01/21/2025   Pg: 994 of 2455
Document Accession #: 20240513-3036   Filed Date: 05/13/2024

1409.  However, in addition to requiring a Long-Term Regional Transmission Cost

Allocation Method, we also provide flexibility to Relevant State Entities to agree to a

State Agreement Process, which transmission providers may choose to file as part of their

compliance filings.  We conclude that allowing such an approach as an option is

reasonable despite the Commission's previously-stated concerns with participant funding,

because a State Agreement Process is an established process, agreed to in advance and

described in transmission providers' OATTs, through which Relevant State Entities agree

to a cost allocation method.  We find that, for the purposes of Long-Term Regional

Transmission Planning, a State Agreement Process will help to facilitate agreement and

cooperation among Relevant State Entities.  We find that this approach balances the need

for the certainty with respect to cost allocation provided by an *ex ante* cost allocation

method with the flexibility of allowing for a State Agreement Process-derived cost

allocation method for selected Long-Term Regional Transmission Facilities (or portfolios

of such Facilities).  We emphasize, however, that the Commission will still review any

cost allocation method that results from a State Agreement Process to ensure that it is just

and reasonable and not unduly discriminatory or preferential, and that it allocates costs in

a manner that is at least roughly commensurate with estimated benefits.

1410.  In the context of Long-Term Regional Transmission Planning, we believe that

allowing the use of State Agreement Processes to derive a cost allocation method for

selected Long-Term Regional Transmission Facilities will provide states with an

opportunity to be more involved in cost allocation for these transmission facilities,

leading to an increased likelihood that such facilities are developed.  Specifically, the

engagement of Relevant State Entities in cost allocation discussions could reduce

instances in which a Long-Term Regional Transmission Facility is selected and has an

established *ex ante* cost allocation method that applies to it, but ultimately is not

developed because it does not receive a necessary state approval.[3010]  We also find that a

State Agreement Process could provide greater confidence to Relevant State Entities that

customers are receiving benefits in a manner that is at least roughly commensurate with

the costs they are paying for Long-Term Regional Transmission Facilities.

1411.  We acknowledge commenters' concerns that a State Agreement Process could

present free-ridership issues.[3011]  For example, there could be free-ridership concerns if

the Relevant State Entities in certain states agree to be allocated all of the costs for a

particular Long-Term Regional Transmission Facility but that facility also benefits other

entities in other states that are not similarly allocated costs under the cost allocation

method arrived at through the State Agreement Process.  However, we continue to find

that allowing a State Agreement Process for Long-Term Regional Transmission

Facilities, where agreed to by the Relevant State Entities, appropriately balances free-

ridership concerns with the benefit of greater state involvement in determining the cost

allocation method for Long-Term Regional Transmission Facilities and the increased

likelihood that such facilities will be built.[3012]  Additionally, nothing in this final rule

---

[3010] NOPR, 179 FERC ¶ 61,028 at P 314.

[3011] *See, e.g.*, R Street Initial Comments at 12.

[3012] NOPR, 179 FERC ¶ 61,028 at P 317.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 996 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                    - 986 -

changes the requirements for all cost allocation methods, including those that result from

a State Agreement Process, to allocate costs in a manner that is at least roughly

commensurate with estimated benefits, and we believe that Commission review to ensure

that cost allocation methods meet that standard will act to prevent free ridership.

1412.  As noted above, there is significant commenter support for a State Agreement

Process, particularly among state entities.  In addition, we believe that many of the

concerns expressed about the State Agreement Process proposal appear to be based on a

lack of sufficient explanation in the NOPR regarding the implications of the proposal,

which we clarify here.  Contrary to some comments, we do not require transmission

providers to adopt a State Agreement Process; rather, as discussed in the Filing Rights

Under the FPA section, transmission providers may choose to file a State Agreement

Process for all, or a subset of, Long-Term Regional Transmission Facilities on

compliance.  Also, we neither impose an obligation on a state or states to agree to a cost

allocation method for Long-Term Regional Transmission Facilities, nor do we create any

obligation that transmission providers file a cost allocation method resulting from a State

Agreement Process, unless the transmission providers had clearly indicated assent to do

so in their OATTs.[3013]  As we note in the discussion of transmission provider filing rights

in the Filing Rights Under the FPA section below, we believe that the applicable statute

---

[3013] For example, transmission providers may voluntarily agree as part of a State Agreement Process in their OATTs that transmission providers shall file any cost allocation method that meets the requirements of their State Agreement Process, even if those transmission providers do not agree with that method.

and precedent require us to preserve the right of transmission providers to file with the Commission their preferred cost allocation method for Long-Term Regional Transmission Facilities to comply with the requirements of this final rule.

1413.  However, as noted earlier in this section, we establish a deadline of no later than six months after selection of a Long-Term Regional Transmission Facility (or portfolio of such Facilities) by which transmission providers must file any cost allocation method that results from a State Agreement Process.  We believe that the State Agreement Process can only be effective if there is a limit on the time to reach agreement before defaulting to the Long-Term Regional Transmission Cost Allocation Method that we require transmission providers include in their OATTs.  The lack of such a deadline could cause delay and increase uncertainty regarding selected Long-Term Regional Transmission Facilities.  In addition, we agree with some commenters[3014] that a deadline, bolstered by a default Long-Term Regional Transmission Cost Allocation Method, may increase the incentive for Relevant State Entities to reach agreement on cost allocation for a particular Long-Term Regional Transmission Facility through a State Agreement Process.

1414.  We find that six months is a reasonable period for State Agreement Process deliberations on a cost allocation method because it balances the need for adequate time for negotiations with transmission providers' need for finality in their Long-Term Regional Transmission Planning.  While few commenters directly addressed the time

---

[3014] *See* Evergreen Action Initial Comments at 6; MISO Initial Comments at 67-68; National Grid Initial Comments at 25-26.

period for negotiation under a State Agreement Process for a particular Long-Term

Regional Transmission Facility (or portfolio of such Facilities), many commenters

favored this duration for the NOPR proposed reform of a post-selection time period for

states to negotiate an alternate cost allocation method for selected Long-Term Regional

Transmission Facilities (or portfolios of such Facilities) when an *ex ante* cost allocation

method would otherwise apply.[3015]

1415.  We clarify that, if the Relevant State Entities indicate to transmission providers, as

part of the required Engagement Period outlined above, that the Relevant State Entities

have agreed to a State Agreement Process, and the transmission providers decide to

include that State Agreement Process in their final rule compliance filings, then the

transmission providers must also detail the State Agreement Process in proposed tariff

provisions to their OATTs.  The tariff provisions must describe how agreement would be

reached regarding the cost allocation method for Long-Term Regional Transmission

Facilities pursuant to the State Agreement Process, which also necessarily requires that it

be clear which entities can participate in the specific State Agreement Process.[3016]  This

requirement is in furtherance of one of the goals of the final rule, which is to allow a

---

[3015] California Commission Initial Comments at 56; Kentucky Commission Chair Chandler Initial Comments at 4; Louisiana Commission Initial Comments at 34-35; NARUC Initial Comments at 52-53; NRG Initial Comments at 21; Pacific Northwest State Agencies Initial Comments at 27-28.

[3016] NOPR, 179 FERC ¶ 61,028 at P 313.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 999 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

greater role for states in establishing a cost allocation method for Long-Term Regional

Transmission Facilities (or portfolios of such Facilities).

1416.  As noted above, after the required initial Engagement Period, a State Agreement

Process could include other entities beyond Relevant State Entities, and those entities

would need to be enumerated in the State Agreement Process included in the OATT.

Transmission providers must first specify in their OATTs a description of how such

voluntary agreements by the Relevant State Entities may be shared with transmission

providers, as well as whether the transmission providers voluntarily agree to undertake an

obligation to file the agreed-upon cost allocation method with the Commission for

consideration under FPA section 205 (in other words, whether the transmission providers

voluntarily waive their FPA section 205 filing rights such that they commit themselves to

file with the Commission any cost allocation method that results from the State

Agreement Process).  Their OATT provisions must, at a minimum, also include the event

triggering the beginning of the State Agreement Process, the duration of the State

Agreement Process (not to exceed six months after selection), and a description of the

Long-Term Regional Transmission Facilities to which the process applies.  Further, the

State Agreement Process procedures outlined in transmission providers' OATTs must set

forth the manner in which a transmission provider would file a section 205 filing to seek

Commission acceptance of a cost allocation method resulting from a State Agreement

Process.  We note that Relevant State Entities that participate in a State Agreement

Process may need to provide relevant information to transmission providers to enable

them to demonstrate that any cost allocation method that results from a State Agreement

Process is just, reasonable, and not unduly discriminatory or preferential, and allocates cost in a manner that is at least roughly commensurate with estimated benefits.

1417.  We do not agree with the commenters that recommend against memorializing and filing cost allocation methods resulting from a State Agreement Process with the Commission.[3017]  To fulfill the Commission's statutory obligations, any cost allocation method that results from a State Agreement Process must be filed for review by the Commission and determined to be just, reasonable, and not unduly discriminatory or preferential.  In addition, we believe that transparency regarding such cost allocation methods and the opportunity for stakeholders, particularly those that will be responsible for paying the costs of Long-Term Regional Transmission Facilities, to comment on them are an important safeguard to ensure that costs are allocated in a manner that is at least roughly commensurate with estimated benefits.

1418.  We will not specify the level of agreement among Relevant State Entities or other entities that is necessary before a transmission provider files a cost allocation method derived from a State Agreement Process.  As a state-led process, we believe that Relevant State Entities should have the ability to determine this important facet of their State Agreement Process.  To this end, we decline to require unanimity or a set minimum threshold for agreement of Relevant State Entities to participate in the State Agreement Process.

---

[3017] Mississippi Commission Initial Comments at 27-28; OMS Initial Comments at 12-13.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1001 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                    - 991 -

1419.  Some commenters request that the Commission clarify whether and to what extent a cost allocation method that results from a State Agreement Process can impose costs on entities that do not agree to that cost allocation method.  However, we decline to prejudge any State Agreement Process or any cost allocation method that may result from a State Agreement Process.  Any cost allocation method for a Long-Term Regional Transmission Facility (or portfolio of such Facilities) that results from a State Agreement Process must be filed with the Commission pursuant to FPA section 205, and the Commission must make a finding as to whether that cost allocation method is just, reasonable, and not unduly discriminatory or preferential.  And, as noted above, we reiterate that all cost allocation methods, including those resulting from a State Agreement Process, must allocate costs in a manner that is at least roughly commensurate with estimated benefits.[3018]  Parties are free to raise any concerns about the costs that they may be allocated under a State Agreement Process-derived cost allocation method if and when that method is filed with the Commission.[3019]

1420.  MISO asks that the final rule make clear that transmission providers can make necessary changes to the competitive transmission developer selection process to accommodate the State Agreement Process.[3020]  We clarify that the Commission will

---

[3018] *See ICC v. FERC I*, 576 F.3d at 477; *ICC v. FERC III*, 756 F.3d at 564.

[3019] *E.g.*, New England Systems Initial Comments at 23; Pennsylvania Commission Initial Comments at 12; Mississippi Commission Reply Comments at 3.

[3020] MISO Initial Comments at 68-70.

USCA4 Appeal: 24-1650     Doc: 224     Filed: 01/21/2025     Pg: 1002 of 2455
Document Accession #: 20240513-3036     Filed Date: 05/13/2024

review any proposed changes to transmission providers' competitive transmission

developer selection processes to accommodate State Agreement Processes as part of their

compliance filings to this final rule.

1421.  With respect to California Municipal Utilities' and TANC's requests that the

Commission require that local regulatory authorities be included in any State Agreement

Process, the Mississippi Commission's statement that it would support expanding the

State Agreement Approach to include non-jurisdictional utilities, we do not proscribe in

this final rule that the State Agreement Processes include other entities beyond Relevant

State Entities.  However, as noted above, Relevant State Entities have the option to

include the participation of other entities in a State Agreement Process.  Finally, with

respect to US DOE's comments related to the jurisdictional implications of federal power

marketing administrations participating in State Agreement Processes, we do not

establish any specific requirements for how State Agreement Processes will be designed.

To the extent that a federal power marketing administration does participate in such a

process, it may advocate that such process facilitates its participation in a manner that is

consistent with its statutory authority.[3021]

### 4.    Filing Rights Under the FPA

### a.    Comments

1422.  A number of commenters express concerns that a requirement to seek agreement

from Relevant State Entities regarding a cost allocation approach could conflict with

---

[3021] US DOE Initial Comments at 50.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1003 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                             - 993 -

transmission providers' filing rights under the FPA.[3022]  For example, AEP contends that

in at least one region where AEP operates, such a requirement would deprive

transmission owners of their exclusive right to file tariffs governing the rates and terms of

their transmission service under section 205 of the FPA.  AEP states that in *Atlantic City*

*Electric Company v. FERC*, the D.C. Circuit, held that "[w]hen FERC attempts to deprive

the utilities of their rights to initiate rate design changes with respect to services provided

by their own assets, FERC has exceeded its jurisdiction."[3023]

1423.  Similarly, Dominion reminds the Commission that the transmission provider has

FPA section 205 rights, and that those rights cannot be ceded to the state through this

proceeding.[3024]  National Grid asserts that the FPA gives transmission providers the

ability to make section 205 filings on cost allocation, and that the State Agreement

---

[3022] AEP Initial Comments at 6, 36 (citing *Atl. City Elec. Co. v. FERC*, 295 F.3d at 9-11 ("[T]his Court, among others, has stressed that the power to initiate rate changes rests with the utility and cannot be appropriated by FERC in the absence of a finding that the existing rate was unlawful."); *Atl. City Elec. Co. v. FERC*, 329 F.3d 856, 858-59 (D.C. Cir. 2003) (per curiam)); MISO Initial Comments at 63-64 (citing *Atl. City Elec. Co. v. FERC*, 295 F.3d at 9-11); MISO TOs Initial Comments at 37, 39-40 (citing 16 U.S.C. 824d; *Atl. City Elec. Co. v. FERC*, 295 F.3d at 9-11; *Sw. Power Pool, Inc.*, 132 FERC ¶ 61,042, at P 107 (2010); *Mass. Dep't of Pub. Utils. v. FERC*, 729 F.2d 886, 887-88 (1st Cir. 1984)); PPL Initial Comments at 25 & n.66 ("[T]he *Atlantic City* case makes clear that the transmission owners are able to make Section 205 filings regarding cost allocation without additional conditions and the Commission cannot compel the transmission owners to cede these rights.").

[3023] AEP Initial Comments at 36 (quoting *Atl. City Elec. Co. v. FERC*, 329 F.3d at 859); *accord* MISO Initial Comments at 63; MISO TOs Initial Comments at 40; PPL Initial Comments at 25 n.66.

[3024] Dominion Initial Comments at 48-49 (citing *Atl. City Elec. Co. v. FERC*, 295 F.3d 1; *Atl. City Elec. Co. v. FERC*, 329 F.3d 856).

Process should be based on transmission providers voluntarily affording a role for states.[3025]

1424.  APPA contends that requiring public utilities to file rate terms dictated by non-public utility entities raises jurisdictional issues under the FPA.  APPA does not believe it is reasonable to provide to state regulators exclusive authority over the proposed cost allocation method in the absence of agreement by relevant stakeholders, and argues that if the Commission requires public utilities to file cost allocation methods agreed to by Relevant State Entities, public power utilities should be considered Relevant State Entities have a formal voting role in agreeing on the cost allocation method(s) for Long-Term Regional Transmission Facilities.[3026]  Six Cities and Large Public Power argue that the Commission's proposal is an unlawful delegation of the Commission's exclusive statutory authority over rates under the FPA.[3027]

1425.  Some commenters seek clarification on the Commission's proposal.  MISO and Vistra request that the Commission clarify that nothing in the final rule should be read to override or diminish the filing rights held, jointly and/or individually, by the RTOs/ISOs

---

[3025] National Grid Initial Comments at 25.

[3026] APPA Initial Comments at 42-45.

[3027] Large Public Power Initial Comments at 37-38 (citing *City of Tacoma v. FERC*, 331 F.3d 106, 115 (D.C. Cir. 2002) (finding that the Commission unlawfully delegated its responsibility to assess annual charges imposed under the FPA against hydroelectric utilities licenses to other federal agencies) (additional citations omitted)); Six Cities Initial Comments at 8-9 (citing 16 U.S.C. 824d(a), 824e; *Nantahala Power & Light Co. v. Thornburg*, 476 U.S. 953, 965-66 (1986); *EPSA*, 577 U.S. at 277).

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1005 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                                    - 995 -

and their transmission owning members.[3028]  Indicated PJM TOs argue that, while

*seeking* the agreement of Relevant State Entities is appropriate, the Commission does not

have the authority to require that transmission providers *obtain* their agreement.[3029]

Similarly, WIRES states that the Commission should clarify that transmission providers

are only required to *seek* agreement of Relevant State Entities and that they are not

required to achieve such agreement.[3030]  Duke asserts that the Commission should clarify

and revise the proposed State Agreement Process to ensure that it does not conflict with

transmission providers' FPA section 205 rights to initiate rate changes.[3031]

1426.  PJM States propose that if retail regulators reach an agreement on cost allocation,

transmission providers should be required to file it for consideration under section 205 of

the FPA.[3032]  PJM States recommend that if the transmission providers in a transmission

planning region prefer a different cost allocation method, they can file their preferred

alternative while also presenting the method agreed on by the Relevant State Entities.[3033]

---

[3028] MISO Initial Comments at 64; Vistra Initial Comments at 29-30.

[3029] Indicated PJM TOs Initial Comments at 20 (citing *Atl. City Elec. Co. v. FERC*, 295 F.3d at 10-11).

[3030] WIRES Initial Comments at 12 (citing 16 U.S.C. 824d; *Atl. City Elec. Co. v. FERC*, 295 F.3d at 9-11; *Atl. City Elec. Co. v. FERC*, 329 F.3d at 858-59).

[3031] Duke Initial Comments at 39 (citing *Atl. City Elec. Co. v. FERC*, 329 F.3d at 858-59).

[3032] PJM States Initial Comments at 10 (citing NOPR, 179 FERC ¶ 61,028 at P 303).

[3033] *Id.* at 10.

PJM States add that these proposals should be "balanced" and explain how the retail regulators' preferences were considered.[3034]  Similarly, NESCOE states that in cases of disagreement between state entities and transmission providers, they would prefer that the transmission providers file a state-preferred cost allocation method alongside their own preferred method, arguing that such an approach would respect the FPA section 205 rights that public utilities hold.[3035]  Similarly, New Jersey Commission recommends that in the event that the transmission provider disagrees with the approach desired by states, the Commission should require them to submit the states' approach as well as their own in their section 205 filing.  New Jersey Commission proposes that the Commission would then decide which OATT filing to accept.[3036]

1427.  Entergy contends that the proposal is within the Commission's authority because the Commission's proposal allows transmission providers to retain their filing rights consistent with *Atlantic City*.  Entergy argues that the NOPR proposal does not conflict with *Atlantic City* because it would only establish a process where states are consulted on designing a cost allocation method, and that transmission providers still must make a cost allocation filing, even if there is no agreement.[3037]

---

[3034] *Id.* at 10.

[3035] NESCOE Reply Comments at 4.

[3036] New Jersey Commission Initial Comments at 17-18.

[3037] Entergy Initial Comments at 31-33 (citing *Atl. City Elec. Co. v. FERC*, 295 F.3d at 11).

USCA4 Appeal: 24-1650   Doc: 224   Filed: 01/21/2025   Pg: 1007 of 2455
Document Accession #: 20240513-3036   Filed Date: 05/13/2024

Docket No. RM21-17-000                                                                    - 997 -

## b.     **Commission Determination**

1428.  As a threshold matter, we note that the Commission is acting pursuant to FPA section 206 in this final rule.  Under FPA section 206, the Commission has determined that existing regional transmission planning and cost allocation requirements are unjust, unreasonable, unduly discriminatory or preferential, and thus has both the authority and responsibility to establish a just and reasonable replacement rate consistent with the final rule's requirements.[3038]

1429.  As to commenters' FPA section 205 arguments, we find that our directives in this final rule regarding the development of a State Agreement Process and any cost allocation methods to which the Relevant State Entities agree pursuant to that process do not alter existing FPA section 205 filing rights.[3039]  Specifically, we clarify that, after the required Engagement Period, transmission providers in each transmission planning region will decide what Long-Term Regional Transmission Cost Allocation Method(s) and any State Agreement Process to file as part of their compliance filings.[3040]  Therefore, transmission providers in a transmission planning region could elect to propose on compliance a Long-Term Regional Transmission Cost Allocation Method and not file a

---

[3038] 16 U.S.C. 824e(a) ( "[T]he *Commission* shall determine the just and reasonable . . . practice . . . to be thereafter observed and in force, and shall fix the same by order." (emphasis added)).

[3039] *See* Dominion Initial Comments at 48-49 (citing *Atl. City Elec. Co. v. FERC*, 295 F.3d 1; *Atl. City Elec. Co. v. FERC*, 329 F.3d 856).

[3040] We note that the filing must include a Long-Term Regional Transmission Cost Allocation Method (i.e., an *ex ante* cost allocation method).

Docket No. RM21-17-000                                                    - 998 -

State Agreement Process or other *ex ante* cost allocation method to which Relevant State

Entities agreed.  In addition, we do not impose any obligation on transmission providers

to file a cost allocation method for Long-Term Regional Transmission Facilities with

which they disagree, even if such a method were proposed to the transmission providers

pursuant to a Commission-approved State Agreement Process, unless the transmission

providers have clearly indicated their assent to do so as part of a Commission-approved

State Agreement Process in their OATTs.  In the same vein, we decline to require, as

PJM States, NESCOE, and New Jersey Commission suggest, that transmission providers

file two cost allocation methods – the transmission providers' preferred cost allocation

method and the cost allocation method agreed to by the Relevant State Entities – if the

transmission providers disagree with a proposed cost allocation method to which the

Relevant State Entities agree.[3041]  Entities that oppose or prefer a different cost allocation

method than the transmission providers' preferred cost allocation method can provide

their comments if and when such cost allocation method is filed with the Commission.

1430.  We further clarify that unless voluntarily waived, a transmission provider retains

its FPA section 205 filing rights to submit an *ex ante* cost allocation method for Long-

Term Regional Transmission Facilities at any time,[3042] consistent with any limitations a

transmission provider may have agreed to, for example, as part of its membership in an

---

[3041] PJM States Initial Comments at 10; NESCOE Reply Comments at 4; New Jersey Commission Initial Comments at 17-18.

[3042] *See Atl. City Elec. Co. v. FERC*, 295 F.3d at 9-11; *Atl. City Elec. Co. v. FERC*, 329 F.3d at 858-859.

RTO/ISO.  In response to MISO and Vistra,[3043] we also clarify that nothing in this final rule should be read to override or diminish the filing rights held, jointly or individually, by RTOs/ISOs and their transmission owning members.

1431.  In response to commenters arguing that the NOPR proposal to require transmission providers to seek agreement of Relevant State Entities regarding the Long-Term Regional Transmission Cost Allocation Method, State Agreement Process, or combination thereof would interfere with transmission providers' filing rights under FPA section 205,[3044] those concerns are moot, as we decline to adopt this NOPR proposal, as discussed above.  We reiterate that transmission providers retain their right to decide what Long-Term Regional Transmission Cost Allocation Method(s) and any State Agreement Process to file in compliance with this final rule after the Engagement Period.

**5.      Time Period and Related Issues in the Long-Term Regional Transmission Planning Cost Allocation Processes for State-Negotiated Alternate Cost Allocation Method**

### a.      NOPR Proposal

1432.  In the NOPR, the Commission proposed to require transmission providers to detail in their OATTs a process to provide a state or states (in multi-state transmission planning regions) with a time period to negotiate a cost allocation method for a transmission facility (or portfolio of facilities) selected through Long-Term Regional Transmission

---

[3043] MISO Initial Comments at 64; Vistra Initial Comments at 29-30.

[3044] AEP Initial Comments at 36; APPA Initial Comments at 42; Dominion Initial Comments at 48-49; MISO Initial Comments at 63-64; MISO TOs Initial Comments at 37, 39-40; MISO TOs Reply Comments at 5-7; PPL Initial Comments at 25 & n.66.

Docket No. RM21-17-000                                                                    - 1000 -

Planning that is different than any *ex ante* regional cost allocation method (i.e., Long-Term Regional Transmission Cost Allocation Method) that would otherwise apply. During this time period, if a state or all states within the transmission planning region in which the selected regional transmission facility will be located unanimously agree on an alternate cost allocation method, the transmission provider may elect to file that method with the Commission for consideration under FPA section 205. The Commission explained that the transmission provider may elect to file an alternate cost allocation method because doing so increases the likelihood that relevant stakeholders perceive the cost allocation as fair and that the needed regional transmission facilities will actually be constructed.[3045]

1433. If the relevant state or states cannot agree on an alternate cost allocation method memorialized in writing within the specified timeframe after a transmission developer's transmission facility is selected through Long-Term Regional Transmission Planning (e.g., 90 days), the Commission proposed that then the transmission developer would be entitled to use any *ex ante* Long-Term Regional Transmission Cost Allocation Method that would otherwise apply for that Long-Term Regional Transmission Facility.[3046]

1434. In particular, the Commission proposed to require that the OATT provisions that describe the state-negotiated alternate cost allocation method include when this time period will occur, what its duration will be, and an affirmation that any alternate cost

---

[3045] NOPR, 179 FERC ¶ 61,028 at P 319.

[3046] *Id.* P 320.

Docket No. RM21-17-000                                                         - 1001 -

allocation method must be submitted to the Commission for review and approval under

FPA section 205 prior to taking effect.  Under this proposal, when filed, the Commission

would evaluate the alternate cost allocation method to ensure that it is just and reasonable

and allocates costs in a manner that is at least roughly commensurate with estimated

benefits.  If the Commission rejects a state-negotiated alternate cost allocation method,

the transmission developer of the Long-Term Regional Transmission Facility would be

entitled to use the applicable *ex ante* regional cost allocation method that would have

applied to it in the absence of the proposed alternative cost allocation method.[3047]  The

Commission proposed to prescribe a 90-day time period for a state-negotiated cost

allocation method to be memorialized in writing.[3048]

1435.  Finally, the Commission sought comment on whether to establish a requirement

for a time period for state involvement in regional cost allocation for transmission

facilities selected in existing near-term reliability and economic regional transmission

planning processes.[3049]

### b.    Comments

1436.  Several commenters support the Commission's proposal to require transmission

providers to detail in their OATTs a process to provide a state or states with a time period

to negotiate a cost allocation method for a transmission facility (or portfolio of facilities)

---

[3047] *Id.* P 322.

[3048] *Id.* P 323.

[3049] *Id.* P 324.

selected through Long-Term Regional Transmission Planning that is different than any *ex ante* regional cost allocation method (i.e., Long-Term Regional Transmission Cost Allocation Method).[3050]  NESCOE, Pennsylvania Commission, and PJM States support a requirement for transmission providers to detail in their OATT provisions that describe the state-negotiated cost allocation method.[3051]  Clean Energy Buyers, Dominion, and PIOs agree that any alternate cost allocation method must be submitted to the Commission for review and approval under FPA section 205 prior to taking effect.[3052]

1437.  PJM and Nebraska Commission support the proposal to require a time period for state-negotiated alternate cost allocation with suggested modifications.  Nebraska Commission states that a process that builds consensus is important for contentious issues such as cost allocation and suggests adoption of a model similar to SPP's Regional State Committee, which it contends has a proven track record for achieving consensus among stakeholders.[3053]  PJM recommends that the Commission provide clear direction as to the circumstances under which a process for states to negotiate an alternate cost allocation

---

[3050] Entergy Initial Comments at 29-30; Nebraska Commission Initial Comments at 9; New England for Offshore Wind Initial Comments at 5; Northwest and Intermountain Initial Comments at 18-19; NRG Initial Comments at 21; Pacific Northwest State Agencies Initial Comments at 27-28; PIOs Initial Comments at 69; SEIA Initial Comments at 24.

[3051] NESCOE Initial Comments at 71; Pennsylvania Commission Initial Comments at 16; PJM States Initial Comments at 12-13.

[3052] Clean Energy Buyers Initial Comments at 29-30; Dominion Initial Comments at 52; PIOs Initial Comments at 71.

[3053] Nebraska Commission Initial Comments at 9.

method would be appropriate.  PJM also proposes that states seeking a state-negotiated alternate cost allocation method should be required to explain why the *ex ante* cost allocation method is not appropriate for the identified transmission facility or facilities.[3054]

1438.  PJM States disagree, arguing that there is no proposed requirement that retail regulators show why an *ex ante* approach is inappropriate before agreeing to and advocating for an alternate.  PJM States further assert that allowing states to agree on an alternate cost allocation approach after seeing what transmission projects are selected may be beneficial since states will have more information on specific projects.[3055]

1439.  Some commenters seek clarification on the NOPR proposal.  Pennsylvania Commission explains that because this negotiation would occur after transmission facility selection, it is an *ex post* "State Agreement Process."  As such, Pennsylvania Commission contends, it could create confusion if the Commission does not clarify that different rules apply to the 90-day "renegotiation" process.[3056]  Similarly, MISO states that it is not clear whether the proposed requirements are intended as an alternative to the State Agreement Process or to define how the State Agreement Process would be implemented.[3057]

---

[3054] PJM Initial Comments at 117.

[3055] PJM States Reply Comments at 6.

[3056] Pennsylvania Commission Initial Comments at 15.

[3057] MISO Initial Comments at 71.

Docket No. RM21-17-000                                                                - 1004 -

1440.  Some commenters oppose a requirement to provide a time period for a state or

states to negotiate a cost allocation method for a transmission facility (or portfolio of

facilities) selected in the regional transmission plan that is different than any *ex ante*

regional cost allocation method (i.e., Long-Term Regional Transmission Cost Allocation

Method) that would otherwise apply.[3058]  Dominion and Idaho Power argue that the

Commission should permit regional flexibility as to whether to adopt such a time

period.[3059]  Idaho Power further contends that the Commission's transmission planning

processes are not the primary barriers to transmission development; instead, federal

permitting and siting processes and coordination with stakeholders are greater

barriers.[3060]

1441.  MISO recommends that rather than requiring the specific process and *ex post*

opportunities for states to negotiate an alternate cost allocation method, the Commission

should identify the opportunity for state involvement in the development of cost

allocation and leave the details for that involvement to each transmission planning

region.[3061]  Pennsylvania Commission states that it does not view the time period for

---

[3058] Dominion Initial Comments at 51; Idaho Power Initial Comments at 10-11; PPL Initial Comments at 27.

[3059] Dominion Initial Comments at 51; Idaho Power Initial Comments at 10-11.

[3060] Idaho Power Initial Comments at 11 (noting National Environmental Policy Act review and siting decisions with the Bureau of Land Management as examples of federal permitting and siting processes).

[3061] MISO Initial Comments at 71.

Docket No. RM21-17-000                                                          - 1005 -

state-negotiated alternate cost allocation as a principal negotiation method for cost

allocation and asserts that more appropriate processes are the proposed State Agreement

Process or PJM's existing State Agreement Approach.[3062]

1442.  Dominion supports allowing but not requiring that *ex ante* processes be coupled

with an option for states to propose an alternate method, stating that the process for

establishing an alternative cost allocation method could become cumbersome as the

NOPR proposes to require it to comply with the six Order No. 1000 regional cost

allocation principles.[3063]  Exelon recommends allowing states the opportunity to propose

an alternative cost allocation method to the *ex ante* method after transmission project

selection, but states that FPA section 205 rights holders should be able to accept, modify,

or reject the proposed alternative cost allocation method.  Exelon claims that this

approach would respect the legal rights of transmission owners, pointing to PJM's State

Agreement Approach as an example.[3064]  NESCOE urges the Commission to reject

Exelon's request that transmission providers be free to accept or reject cost allocation

methods proposed by state entities.[3065]

---

[3062] Pennsylvania Commission Initial Comments at 16.

[3063] Dominion Initial Comments at 51.

[3064] Exelon Initial Comments at 26-27.

[3065] NESCOE Reply Comments at 3-4.

i.    **Permissive Right of Transmission Provider to File Alternate Cost Allocation Method with the Commission upon Unanimous State Agreement**

1443.  NARUC and NESCOE argue that if states unanimously agree on an alternate cost allocation method, then the transmission provider should be obligated to file it.[3066] NARUC states that the transmission provider may also file the cost allocation method that would otherwise apply if it concludes that the negotiated cost allocation method does not comply with the six Order No. 1000 regional cost allocation principles or is otherwise deficient.  NARUC contends that this approach would not violate the transmission providers' FPA section 205 filing rights.[3067]  Similarly, NESCOE asserts that the Commission should allow the transmission provider to file its preferred approach, but also require that the transmission provider file the state-negotiated alternate cost allocation method, an approach that could be modeled after existing provisions in NYISO and SPP.[3068]

1444.  NESCOE also requests that the Commission clarify whether unanimity means that each opting-in state has agreed to fund the Long-Term Regional Transmission Facility or that all the states in the transmission planning region have agreed that a subset of states will fund the Long-Term Regional Transmission Facility.[3069]  NESCOE further requests

---

[3066] NARUC Initial Comments at 53; NESCOE Initial Comments at 68.

[3067] NARUC Initial Comments at 53.

[3068] NESCOE Initial Comments at 68-70.

[3069] *Id.* at 10, 67-68.

that the Commission clarify how it intends to reconcile the unanimous agreement
requirement in this proposal with the other NOPR proposal that gives states the ability to
choose the definition of state agreement for purposes of a cost allocation method and
where the NOPR expressed a willingness to abide by the bylaws of an individual regional
state committee, which may not define agreement as full unanimity.[3070]

1445.  Indiana Commission expresses concern that the requirement to obtain unanimous
state approval regarding an *ex post* cost allocation process might prove unworkable.
Indiana Commission argues that it may be unrealistic to expect that states can reach
unanimity on something as contentious as cost allocation.  Moreover, Indiana
Commission is concerned that states may use the requirement for unanimous agreement
to leverage their vote and to gain ground in other areas of contention.[3071]

1446.  PIOs seek clarification on the intent behind the NOPR language that "the public
utility transmission provider *may elect* to file [a state-negotiated alternate cost allocation
method] with the Commission for consideration under FPA section 205."[3072]  Similarly,
Pennsylvania Commission and PJM States request clarification regarding whether
transmission providers could choose not to file an alternative cost allocation method to
which the states in a transmission planning region have unanimously agreed.[3073]

---

[3070] *Id.* at 68 (citing NOPR, 179 FERC ¶ 61,028 at P 306 & n.512).

[3071] Indiana Commission Initial Comments at 5.

[3072] PIOs Initial Comments at 71 (citing NOPR, 179 FERC ¶ 61,028 at P 319).

[3073] Pennsylvania Commission Initial Comments at 16-17; PJM States Reply

Pennsylvania Commission asserts that it sees no reason why a transmission provider should be able to override the unanimous agreement of affected states.[3074]

1447.  In addition, PJM States recommend that to address the inability for states to voice their cost allocation concerns, the Commission should consider how it can afford retail regulators greater participation status in the FPA section 205 filing process.[3075]  Further, PJM States note that other regional states committees have varying processes, including the ability to request that a transmission provider file a cost allocation method on their behalf.[3076]

ii.      **Duration for the Time Period for State-negotiated Cost Allocation**

1448.  A few commenters agree with the Commission's proposal to require a 90-day time period for a state-negotiated cost allocation method to be memorialized in writing.[3077] For example, New England for Offshore Wind states that it is essential that deadlines are imposed to prevent delays caused by disagreements over cost allocation.[3078]  PIOs assert

---

Comments at 6.

[3074] Pennsylvania Commission Initial Comments at 17.

[3075] PJM States Reply Comments at 6-7.

[3076] *Id.* at 7.

[3077] New England for Offshore Wind Initial Comments at 5; Northwest and Intermountain Initial Comments at 18; PIOs Initial Comments at 69; SEIA Initial Comments at 24.

[3078] New England for Offshore Wind Initial Comments at 5.

that the 90-day time period should begin when the transmission project or portfolio of projects is selected.[3079]

1449.  Many commenters, however, argue that the 90-day time period is too short.  For example, NARUC, National Grid, and Southern contend that 90 days may be insufficient time for the states in large, multi-state transmission planning regions to negotiate a cost allocation method.[3080]  Similarly, NRG argues that the Commission might consider alternative timelines for multi-state collaboration versus where there is a single state entity responsible for the cost allocation.[3081]  US Chamber of Commerce contends that the 90-day timeline for state-negotiated cost allocation agreements is unreasonably tight and may undermine the potential for agreement.[3082]

1450.  Several commenters, including state commissions, propose longer time periods. For example, California Commission, Kentucky Commission Chair Chandler, Louisiana Commission, NARUC, NRG, and Pacific Northwest State Agencies propose at least six months (180 days) as a more appropriate time period for state negotiation.[3083]  California

---

[3079] PIOs Initial Comments at 70.

[3080] NARUC Initial Comments at 52-53; National Grid Initial Comments at 24-25; Southern Initial Comments at 7-8.

[3081] NRG Initial Comments at 21.

[3082] US Chamber of Commerce Initial Comments at 10.

[3083] California Commission Initial Comments at 56; Kentucky Commission Chair Chandler Initial Comments at 4; Louisiana Commission Initial Comments at 34-35; NARUC Initial Comments at 52-53; NRG Initial Comments at 21; Pacific Northwest State Agencies Initial Comments at 27-28.

Commission and Louisiana Commission request that states should be provided with the opportunity to request extensions if they fail to agree on a cost allocation method after six months (180 days).[3084] OMS recommends that the Commission establish periodic reporting requirements for transmission providers during the 90-day period with an option to extend the deliberations for good cause.[3085]

1451. Several other commenters contend that it should be left to the transmission planning regions, with input from states, to determine the appropriate time period.[3086] For example, Dominion states that the Commission should not dictate any particular timetable and should instead evaluate proposals on a case-by-case basis.[3087] Similarly, Nevada Commission proposes that the Commission require relevant state agencies to be involved in the process as early as possible, but to provide no less than 120 days to allow for appropriate notice and review of any state-negotiated agreement.[3088] Exelon, Indiana Commission, and SERTP Sponsors recommend allowing flexibility in determining the

---

[3084] California Commission Initial Comments at 56; Louisiana Commission Initial Comments at 35.

[3085] OMS Initial Comments at 13.

[3086] Dominion Initial Comments at 51-52; Exelon Initial Comments at 28-29; Indiana Commission Initial Comments at 5-6; National Grid Initial Comments at 24-25; NESCOE Initial Comments at 71; Pennsylvania Commission Initial Comments at 16; PJM States Initial Comments at 12-13; SERTP Sponsors Initial Comments at 15.

[3087] Dominion Initial Comments at 51-52.

[3088] Nevada Commission Initial Comments at 13-14.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1021 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                              - 1011 -

appropriate time period to reflect regional differences.[3089]  Idaho Power agrees but

cautions that any process should not extend the length of transmission planning processes

or development.[3090]  Pennsylvania Commission also supports flexibility in determining

the appropriate time period given that this process is new and there is little knowledge

and experience with respect to how it will function in practice.[3091]

1452.  NESCOE and PJM States assert that NYISO's process referenced by the

Commission can last longer than the 90-day time period for state-negotiated cost

allocation proposed in the NOPR.[3092]  Further, NESCOE emphasizes that the NYISO

process involves only one state entity, whereas other transmission planning regions have

multiple states.  Thus, NESCOE and PJM States argue, the Commission should allow

transmission planning regions to determine what time period is appropriate.[3093]

1453.  A few other commenters contend that state negotiation on an alternate cost

allocation method should not be limited by any time period.  For example, PPL asserts

that limiting the timeframe merely lowers the chance of state agreement, and thus the

---

[3089] Exelon Initial Comments at 28-29; Indiana Commission Initial Comments at
5-6; SERTP Sponsors Initial Comments at 15.

[3090] Idaho Power Initial Comments at 10-11.

[3091] Pennsylvania Commission Initial Comments at 16.

[3092] NESCOE Initial Comments at 70-71 (citing NOPR, 179 FERC ¶ 61,028 at
P 323); PJM States Initial Comments at 12-13 (citing *N.Y. Indep. Sys. Operator, Inc.*, 151
FERC ¶ 61,040, at PP 119-121 (2015)).

[3093] NESCOE Initial Comments at 71; PJM States Initial Comments at 12-13.

Docket No. RM21-17-000                                                          - 1012 -

prospects for the underlying transmission project to be constructed.[3094]  Southern states

that the Commission should allow transmission planning regions to develop a process

that has state support.[3095]  Similarly, Xcel contends that transmission planning regions

should have as much time as needed to negotiate and identify cost allocation methods.[3096]

### iii.    Other Issues

1454.  NESCOE, Northwest and Intermountain, PJM, and SEIA agree with the proposal

that if states cannot unanimously agree on an alternate cost allocation method within the

specified timeframe, then the transmission developer would be entitled to use the cost

allocation method that would otherwise apply for that Long-Term Regional Transmission

Facility.[3097]  In contrast, NRG recommends that in the case where states do not agree, the

Commission could either require the transmission provider to make a filing or subject

rival state filings to "jump ball" treatment.  NRG contends that either of these approaches

would encourage comity and resolution of states' differences.[3098]

1455.  MISO and PPL oppose establishing a requirement for a time period for state

involvement in regional cost allocation for transmission facilities selected in existing

near-term reliability and economic regional transmission planning processes.  MISO

---

[3094] PPL Initial Comments at 27.

[3095] Southern Initial Comments at 7-8.

[3096] Xcel Initial Comments at 11-12.

[3097] NESCOE Initial Comments at 70; Northwest and Intermountain Initial Comments at 19; PJM Initial Comments at 117-118; SEIA Initial Comments at 24.

[3098] NRG Initial Comments at 21.

states that there is no evidence in the record of this proceeding to support extending the

state involvement proposed in the NOPR to existing near-term transmission planning

processes.[3099]  PPL argues that departures from an *ex ante* cost allocation method would

lead to uncertainty, delay, and costly litigation.[3100]

### c.    Commission Determination

1456.  We decline to adopt the NOPR proposal to require transmission providers to

provide a time period after selection of Long-Term Regional Transmission Facilities for

states to negotiate an alternate cost allocation that is different than any *ex ante* regional

cost allocation method that would otherwise apply.  We find that requiring a time period

after selection for states to negotiate an alternate *ex post* cost allocation method is largely

duplicative given our decision above to allow the use of a State Agreement Process

before or after the selection of a Long-Term Regional Transmission Facility (or a

portfolio of such Facilities).  Furthermore, having two separate processes that serve

similar functions could add unnecessary complexity and create confusion in the cost

allocation process.[3101]  Relevant State Entities will have an opportunity to provide input

---

[3099] MISO Initial Comments at 71.

[3100] PPL Initial Comments at 27-28.

[3101] *See, e.g.*, MISO Initial Comments at 71 (seeking clarification as to whether
the proposed time period for states to negotiate cost allocation is an alternative to the
State Agreement Process); Pennsylvania Commission Initial Comments at 16 (stating that
it does not view the proposed time period as the principal method for negotiating cost
allocation and that the more appropriate process is the proposed State Agreement
Process).

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1024 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

on and to potentially agree to a Long-Term Regional Transmission Cost Allocation Method(s) and/or a State Agreement Process as part of the Engagement Period that we require transmission providers to establish. We are also concerned that the burden associated with the NOPR proposal would have been significant, as it would have created a requirement to allow for such negotiations for all Long-Term Regional Transmission Facilities.

1457. Because we are declining to require that transmission providers establish a time period after selection of Long-Term Regional Transmission Facilities to allow states to negotiate an alternate *ex post* cost allocation method, we need not address the comments on the duration of such a time period and the requests for clarification by MISO, Pennsylvania Commission, PIOs, and PJM States.[3102]

### B.    Long-Term Regional Transmission Facility Cost Allocation Compliance with the Existing Six Order No. 1000 Regional Cost Allocation Principles

#### 1.    NOPR Proposal

1458. The Commission proposed to require that the Long-Term Regional Transmission Cost Allocation Method and any cost allocation method resulting from the State Agreement Process for Long-Term Regional Transmission Facilities comply with the existing six Order No. 1000 regional cost allocation principles.[3103] The six regional

---

[3102] MISO Initial Comments at 71; Pennsylvania Commission Initial Comments at 15; PIOs Initial Comments at 71 (citing NOPR, 179 FERC ¶ 61,028 at P 319); PJM States Reply Comments at 6.

[3103] NOPR, 179 FERC ¶ 61,028 at P 302.

Docket No. RM21-17-000                                                          - 1015 -

transmission cost allocation principles adopted in Order No. 1000 are: (1) the costs of selected transmission facilities must be allocated to those within the transmission planning region that benefit from those facilities in a manner that is at least roughly commensurate with estimated benefits; (2) those that receive no benefit from transmission facilities, either at present or in a likely future scenario, must not be involuntarily allocated any of the costs of those transmission facilities; (3) a benefit to cost threshold ratio, if adopted, cannot exceed 1.25 to 1; (4) costs must be allocated solely within the transmission planning region unless another entity outside the region voluntarily assumes a portion of those costs; (5) the method for determining benefits and identifying beneficiaries must be transparent; and (6) there may be different regional cost allocation methods for different types of transmission facilities, such as those needed for reliability, congestion relief, or to achieve Public Policy Requirements.[3104]

### 2.    **Comments**

### a.    **General Proposal**

1459.  Some commenters agree with the Commission's proposal that any Long-Term Regional Transmission Cost Allocation Method and any cost allocation method resulting from the State Agreement Process for Long-Term Regional Transmission Facilities must comply with the existing six Order No. 1000 regional cost allocation principles.[3105]

---

[3104] Order No. 1000, 136 FERC ¶ 61,051 at PP 622, 637, 646, 657, 668, 685.

[3105] APPA Initial Comments at 40; Dominion Initial Comments at 45; Kentucky Commission Chair Chandler Initial Comments at 3; NESCOE Initial Comments at 56; NRECA Initial Comments at 56; Ohio Consumers Initial Comments at 12-13.

Docket No. RM21-17-000                                                                  - 1016 -

APPA requests that the Commission clarify that it is not requiring changes to existing Commission-approved Order No. 1000 regional cost allocation principles.[3106]

1460.  New Jersey Commission supports requiring that any negotiated cost allocation method, whether *ex ante* or *ex post*, comply with the Order No. 1000 regional cost allocation principles, except for Principle 4.[3107]  New Jersey Commission opines that requiring that cost allocation methods be consistent with the beneficiary-pays principle is particularly necessary in a State Agreement Process to avoid potential free ridership.[3108]

1461.  Industrial Customers argue that, regardless of the cost allocation method that is chosen, the Commission should explicitly state that the cost causation principle must apply, as compliance with Order No. 1000 may not ensure compliance with cost causation principles on its own.[3109]  Large Public Power argues that the Commission must hew closely to the first two principles governing cost allocation articulated in Order No. 1000:  (1) that costs must be allocated in a way that is roughly commensurate with benefits; and (2) that there will be no involuntary allocation of costs to non-

---

[3106] APPA Initial Comments at 5.

[3107] New Jersey Commission Initial Comments at 18 (citing New Jersey Commission ANOPR Comments at 7-8 (explaining why it opposes Principle 4's policy of allowing beneficiaries in other transmission planning regions to evade all cost allocation for transmission projects that provide them with substantial benefits)).

[3108] *Id.*

[3109] Industrial Customers Initial Comments at 23-24.

beneficiaries.[3110]  Pine Gate asserts that transmission providers must be required to propose cost allocation methods that comport with the well-established "roughly commensurate" principle.[3111]  City of New Orleans Council and Ohio Commission Federal Advocate state that cost allocation must adhere to cost causation and beneficiary-pays principles.[3112]

1462.  OMS states that it developed its own principles through a committee of regulators focused on cost allocation for long-range transmission projects in response to the NOPR, which include:  (1) costs of new transmission projects should be allocated to cost causers and beneficiaries in a manner roughly commensurate with the costs caused and benefits of those projects; (2) cost allocation should be as granular and accurate as possible such that benefit-cost analysis uses metrics that are quantifiable, capable of replication, non-duplicative, and forward-looking; (3) costs should not be allocated to parties that receive negligible or negative benefits; and (4) generators and load each can be considered cost causers, beneficiaries, or both and should be allocated costs accordingly.[3113]  Louisiana Commission supports OMS' position on benefit metrics as articulated in OMS' second

---

[3110] Large Public Power Initial Comments at 29.

[3111] Pine Gate Initial Comments at 42-44.

[3112] City of New Orleans Council Initial Comments at 10; Ohio Commission Federal Advocate Initial Comments at 14.

[3113] OMS Initial Comments at 12.

Docket No. RM21-17-000                                                    - 1018 -

principle.[3114]  OMS highlights that regional flexibility must be preserved, pointing to

MISO's Targeted Market Efficiency Projects process as an example of a process that did

not strictly comply with Order No. 1000 but was effective and widely supported.[3115]

1463.  Ohio Consumers argue that the Commission should espouse three fundamental

principles when considering the benefits and cost allocations associated with any Long-

Term Regional Transmission Facilities:  (1) costs should be allocated to those who

caused the costs to be incurred; (2) subsidies are bad for competitive markets, because

they result in noncompetitive outcomes and inaccurate price signals; and (3) consumers

should not be charged until transmission projects are found to be used and useful.[3116]

Also, Ohio Consumers assert, cost allocations to consumers should adhere to the

Commission's current ratemaking standards in PJM.[3117]

1464.  PIOs assert that the Commission should require that transmission providers

demonstrate on compliance that the cost allocation method complies with the beneficiary-

pays principle by considering all quantifiable benefits.[3118]  ELCON states that cost

allocation proposals must comply with the cost causation principle "by comparing the

costs assessed against a party to the burdens imposed or benefits drawn by that party."

---

[3114] Louisiana Commission Reply Comments at 10.

[3115] OMS Initial Comments at 13.

[3116] Ohio Consumers Initial Comments at 6-7, 12-14.

[3117] *Id.* at 1.

[3118] PIOs Initial Comments at 68.

ELCON remains concerned that, in an effort to reach public policy goals, costs will be socialized among all consumers without consideration of the cost causers, and states that cost allocation must evaluate the drivers of the specific transmission need and the party that caused the need for the additional transmission.[3119]  Utah Division of Public Utilities asks that when states or other stakeholders disagree on the cost allocation method due to differing renewable goals, the Long-Term Regional Transmission Cost Allocation Method be required to use cost causation principles to determine what portion of the proposed transmission projects are due to state policies.[3120]

1465.  West Virginia Commission states that it supports retention of the cost-causation principles in Order No. 1000, noting that the Order No. 1000 cost allocation principles are grounded in the beneficiary-pays principle that the costs of transmission facilities should be allocated commensurate with the benefits of those facilities.  However, West Virginia Commission contends that the beneficiary-pays principle cannot and should not be applied on a presumptive regional basis when new transmission is identified as needed to accommodate one or more states' public policy decisions.[3121]  West Virginia Commission states that longstanding legal precedent on cost causation and ratemaking principles require that rates remain just and reasonable, that customers pay for

---

[3119] ELCON Initial Comments at 15.

[3120] Utah Division of Public Utilities Initial Comments at 9-10.

[3121] West Virginia Commission Reply Comments at 3; West Virginia Commission Supplemental Comments at 3-4.

Docket No. RM21-17-000                                                    - 1020 -

transmission upgrades based upon their roughly commensurate benefits, and that new

generators, or the willing and voluntary benefactors of new generators, pay the costs for

the interconnection-related network upgrades if such upgrades would not be needed but

for the new generators.[3122]  West Virginia Commission contends that to adopt a cost

allocation that requires any non-volunteering state to pay costs caused by another state's

public policies would depart from years of Commission precedent and would be unjust

and unreasonable.[3123]

1466.  Vermont Electric and Vermont Transco encourage the Commission to ensure that

any cost allocation approach ensures that the benefits of transmission facilities are

roughly commensurate with the costs thereof for both small rural states and larger, more

populated states.  Vermont Electric and Vermont Transco argue that the final rule should

reflect equitable principles in accordance with which the significant investments made by

Vermont prior to the issuance of the final rule are taken into account in cost allocation

processes.[3124]  MISO states that the final rule should not preclude applying different cost

allocation methods to transmission projects of the same type, noting that Order No. 2000

---

[3122] West Virginia Commission Reply Comments at 6 (citing *K N Energy, Inc. v. FERC*, 968 F.2d 1295, 1300 (D.C. Cir. 1992); *ICC v. FERC I*, 576 F.3d at 477; *ISO New England, Inc.*, 115 FERC ¶ 61,145, at P 13 (2006), *aff'd, TransCanada Power Mktg. Ltd. v. FERC*, 811 F.3d 1 (D.C. Cir. 2015); *El Paso Elec. Co. v. FERC*, 832 F.3d 495, 499-500 & n.10 (5th Cir. 2016); *Midcontinent Indep. Sys. Operator, Inc.*, 159 FERC ¶ 63,016, at P 138 (2017), *aff'd*, 164 FERC ¶ 61,194 (2018); Order No. 1000, 136 FERC ¶ 61,051 at P 622); West Virginia Commission Supplemental Comments at 5-6.

[3123] West Virginia Commission Reply Comments at 6-7.

[3124] Vermont Electric and Vermont Transco Initial Comments at 3-4.

contemplated "the potential for different cost allocation methodologies" as RTO/ISO footprints grew.[3125]

## b. Comments Specific to A State Agreement Process

1467. Certain commenters discuss the interaction between the Order No. 1000 regional cost allocation principles and any cost allocation methods resulting from the State Agreement Process. Pennsylvania Commission supports the proposed requirement while also contending that the Commission should defer to unanimous agreement by affected states.[3126] Avangrid argues that the Commission should relax this requirement and defer to the balance achieved via state agreement.[3127] Mississippi Commission argues that the proposed requirement is unnecessary because the State Agreement Process will result in voluntary assumption of costs.[3128] Likewise, PacifiCorp and NV Energy argue that the Order No. 1000 regional cost allocation principles should not apply to the State Agreement Process because there will be no involuntary cost allocation given that states have already agreed. They further contend that beneficiary analyses and minimum cost-benefit ratios will foreclose state-favored cost allocation solutions.[3129] PacifiCorp and

---

[3125] MISO Reply Comments at 17-19.

[3126] Pennsylvania Commission Initial Comments at 13.

[3127] Avangrid Initial Comments at 30.

[3128] Mississippi Commission Initial Comments at 25.

[3129] PacifiCorp and NV Energy Initial Comments at 17.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1032 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                    - 1022 -

NV Energy argue that agreeing to cost allocation will be a difficult task for states, and the Commission should not further dictate the type of agreement.[3130]

1468.  PJM States ask the Commission not to preclude or limit the availability of the PJM State Agreement Approach, which they assert is not required to comply with the Order No. 1000 regional cost allocation principles.[3131]  Similarly, Exelon notes that the Commission has indicated that voluntary state cost allocation agreements need not comply with Order No. 1000.[3132]  Therefore, Exelon asks the Commission to clarify that the proposed State Agreement Process is supplementary to any previously accepted provisions for state agreement-based cost allocation.[3133]

### 3.   Commission Determination

1469.  We adopt the NOPR proposal, with modification, to require Long-Term Regional Transmission Cost Allocation Methods to comply with five of the six existing Order No. 1000 regional cost allocation principles.  Specifically, we require transmission providers in each transmission planning region to demonstrate on compliance with this final rule that any Long-Term Regional Transmission Cost Allocation Methods, that they propose

---

[3130] *Id.*

[3131] PJM States Initial Comments at 11-12 (citing *PJM Interconnection, L.L.C.,* 142 FERC ¶ 61,214 at P 142).

[3132] Exelon Initial Comments at 27-28 (citing *State Voluntary Agreements to Plan & Pay for Transmission Facilities*, 175 FERC ¶ 61,225 at P 4).

[3133] Exelon Initial Comments at 27-28 (citing *PJM Interconnection, L.L.C.*, 142 FERC ¶ 61,214).

that Relevant State Entities have *not* indicated that they agree to, comply with Order No. 1000 regional cost allocation principles (1) through (5).  However, we do not require transmission providers to demonstrate that any Long-Term Regional Transmission Cost Allocation Methods that they propose complies with Order No. 1000 regional cost allocation principle (6), and, as a result, unlike under Order No. 1000, transmission providers cannot adopt different Long-Term Regional Transmission Cost allocation Methods for different types of Long-Term Regional Transmission Facilities, such as those needed for reliability, congestion relief, or to achieve Public Policy Requirements.

1470.  However, as discussed further below, we do not adopt the NOPR proposal to require compliance with the Order No. 1000 regional cost allocation principles in two situations.  First, we do not require a Long-Term Regional Transmission Cost Allocation Method to comply with any of the Order No. 1000 regional cost allocation principles *if* Relevant State Entities indicate that they agreed to that method as part of the Engagement Period.  Second, we do not require a cost allocation method resulting from a State Agreement Process to comply with the Order No. 1000 regional cost allocation principles.

1471.  The first five Order No. 1000 regional transmission cost allocation principles are: (1) the costs of selected transmission facilities must be allocated to those within the transmission planning region that benefit from those facilities in a manner that is at least roughly commensurate with estimated benefits;[3134] (2) those that receive no benefit from

---

[3134] Order No. 1000, 136 FERC ¶ 61,051 at P 622.

Docket No. RM21-17-000                                              - 1024 -

transmission facilities, either at present or in a likely future scenario, must not be

involuntarily allocated any of the costs of those transmission facilities;[3135] (3) a benefit to

cost threshold ratio, if adopted, cannot exceed 1.25 to 1;[3136] (4) costs must be allocated

solely within the transmission planning region unless another entity outside the region

voluntarily assumes a portion of those costs;[3137] and (5) the method for determining

benefits and identifying beneficiaries must be transparent.[3138]

1472.  We find that Order No. 1000 regional cost allocation principles (1) through (5)

remain relevant for *ex ante* cost allocation methods for Long-Term Regional

Transmission Facilities that transmission providers propose on compliance but with

which Relevant State Entities have *not* indicated their agreement.  In Order No. 1000,

regarding regional cost allocation principle (1), the Commission stated that "[r]equiring a

beneficiaries pay cost allocation method or methods is fully consistent with the cost

causation principle as recognized by the Commission and the courts."[3139]  Since making

that statement, the Commission and the courts have only further strengthened this

---

[3135] *Id.* P 637.

[3136] *Id.* P 646.

[3137] *Id.* P 657.

[3138] *Id.* P 668.

[3139] *Id.* P 623.  *See also id.* P 586 & n.453 (citing *ICC v. FERC I*, 576 F.3d at 476-77; *Midwest ISO Transmission Owners v. FERC*, 373 F.3d 1361, 1369 (D.C. Cir. 2004); *Sithe/Indep. Power Partners, L.P. v. FERC*, 285 F.3d 1, 5 (D.C. Cir. 2002)).

Docket No. RM21-17-000                                                    - 1025 -

connection between beneficiaries-pay cost allocation and the cost causation principle.[3140]

Similarly, principle (2) continues to "express[] a central tenet of cost causation" and is

"thus essential to proper cost allocation."[3141]

1473.  Concerning regional cost allocation principle (3), as noted in Order No. 1000,

transmission providers may choose to establish such a threshold to mitigate against

uncertainty in the measurement of benefits and costs, and this principle limits the

threshold to one that is not so high as to block inclusion of many worthwhile transmission

projects in the regional transmission plan.[3142]  As to regional cost allocation principle (4),

this final rule maintains the close link established by Order No. 1000 between regional

transmission planning and cost allocation to the region being planned for.[3143]  Further, we

find, similar to the Commission's findings in Order No. 1000, that removing regional cost

allocation principle (4) would be tantamount to interconnection-wide transmission

planning because unilateral allocation of costs from one transmission planning region to

another would require stakeholders to actively monitor regional transmission planning

processes in numerous other regions.[3144]  Lastly, we find, similar to Order No. 1000, that

---

[3140] *Long Island Power Auth. v. FERC*, 27 F.4th 705, 713–14 (D.C. Cir. 2022); *Old Dominion Elec. Coop. v. FERC*, 898 F.3d at 1261-63.

[3141] Order No. 1000, 136 FERC ¶ 61,051 at P 637.

[3142] *Id.* PP 647-648.

[3143] *Id.* P 660.  *See also S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d at 87-88.

[3144] Order No. 1000, 136 FERC ¶ 61,051 at P 660.  *See also S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d at 87-88.

regional cost allocation principle (5) will ensure that Long-Term Regional Transmission

Cost Allocation Methods are just and reasonable and not unduly discriminatory or

preferential, will help aid in development and construction of new transmission, and may

avoid contentious litigation or prolonged debate among stakeholders.[3145]

1474.  In contrast to the first five regional cost allocation principles, Order No. 1000

regional cost allocation principle (6) is inconsistent with Long-Term Regional

Transmission Planning as directed in this final rule.  Order No. 1000 Regional cost

allocation principle (6) provides that there may be different regional cost allocation

methods for different types of transmission facilities in the regional transmission plan but

that there can be only one cost allocation method for each type of facility, and that

method must be determined in advance.[3146]  As we explain below, however, transmission

providers may not establish reliability, economic, or public policy transmission facility

types as part of Long-Term Regional Transmission Planning and, therefore, may not

establish Long-Term Regional Transmission Cost Allocation Methods based on

reliability, economic, or public policy transmission facility types.  Permitting such

project-type-limited Long-Term Regional Transmission Cost Allocation Methods would

be inconsistent with the long-term, forward-looking, more comprehensive regional

transmission planning that we require in this final rule.  Accordingly, in declining to

require that Long-Term Regional Transmission Cost Allocation Methods comply with

---

[3145] Order No. 1000, 136 FERC ¶ 61,051 at P 669.

[3146] *Id.* P 685.

Order No. 1000 regional cost allocation principle (6), consistent with the request of some commenters,**3147** we find that reliability, economic, or public policy transmission facility types reflect a more siloed approach to regional transmission planning that is misaligned with our Long-Term Regional Transmission Planning reforms and would likely lead to the allocation of the costs of Long-Term Regional Transmission Facilities in a manner that is not at least roughly commensurate with estimated benefits.

1475.  We clarify that this final rule does not preclude the adoption of multiple Long-Term Regional Transmission Cost Allocation Methods, provided that the Long-Term Regional Transmission Cost Allocation Method that will apply to a Long-Term Regional Transmission Facility (or portfolio of such Facilities) is known before selection, i.e., is an *ex ante* cost allocation method, and does not allocate costs by project type.  We find that knowing the applicability of a Long-Term Regional Transmission Cost Allocation Method in advance is inherent to the definition of, and one of the primary reasons for, requiring transmission providers to include an *ex ante* cost allocation method in their OATTs.  As such, transmission providers that choose to propose more than one Long-Term Regional Transmission Cost Allocation Method on compliance are required to make clear in their OATTs which Long-Term Regional Transmission Cost Allocation Method applies to which Long-Term Regional Transmission Facilities (e.g., cost allocation methods that apply to Long-Term Regional Transmission Facilities above a

---

**3147** *Massachusetts Attorney General Initial Comments* at 15, 21; Ørsted Initial Comments at 9.

certain voltage threshold or to Long-Term Regional Transmission Facilities located within a specific portion of a transmission planning region's footprint).[3148]  However, we emphasize that any Long-Term Regional Transmission Cost Allocation Method that transmission providers propose, except for those that Relevant State Entities indicate that they agreed to and asked the transmission providers in their transmission planning region to file, must comply with Order No. 1000 regional cost allocation principles (1) through (5) and the other requirements of this final rule.

1476.  Regarding cost allocation methods resulting from a State Agreement Process and Long-Term Regional Transmission Cost Allocation Methods that Relevant State Entities indicate that they have agreed to and asked transmission providers to file after the Engagement Period, the Commission has previously found that "Order No. 1000 allows market participants, including states, to negotiate voluntarily alternative cost sharing arrangements that are distinct from the relevant regional cost allocation method(s)."[3149] Additionally, where transmission providers have proposed cost allocation methods corresponding to such voluntary arrangements, the Commission has held that it need not find that those cost allocation methods comply with Order No. 1000.[3150]  Consistent with

---

[3148] We believe that this finding should address MISO's request that the final rule not preclude applying different cost allocation methods to projects of the same type.

[3149] *State Voluntary Agreements to Plan & Pay for Transmission Facilities*, 175 FERC ¶ 61,225 at P 3 (citing Order No. 1000, 136 FERC ¶ 61,051 at PP 561, 724; Order No. 1000-A, 139 FERC ¶ 61,132 at PP 728-729).

[3150] *See PJM Interconnection, L.L.C.*, 142 FERC ¶ 61,214 at PP 142-143, *order on reh'g and compliance*, 147 FERC ¶ 61,128 at P 92; *ISO New England Inc.*, 143 FERC ¶ 61,150 at P 121; *Consol. Edison Co. of N.Y., Inc.*, 180 FERC ¶ 61,106, at PP 48-50

this precedent, we find that cost allocation methods resulting from a State Agreement Process and Long-Term Regional Transmission Cost Allocation Methods that Relevant State Entities indicate that they have agreed to and have asked transmission providers to file also qualify as voluntary alternative cost sharing arrangements and, accordingly, we decline to require those methods to adhere to the six Order No. 1000 regional cost allocation principles.  However, those methods must still comply with the cost causation principle and any other legal requirements for cost allocation.

1477.  We decline to adopt the NOPR proposal that required adherence to the six Order No. 1000 regional cost allocation principles because cost allocation methods resulting from a State Agreement Process and Long-Term Regional Transmission Cost Allocation Methods that Relevant State Entities indicate that they have agreed to are likely to facilitate agreement over development of such Long-Term Regional Transmission Facilities by, for example, making the Relevant State Entities more confident that customers in the state are receiving benefits at least roughly commensurate with their share of the cost of such facilities and by reducing the likelihood that selected Long-Term Regional Transmission Facilities cannot be constructed because they do not receive necessary state regulatory approvals.  Affording additional flexibility for these methods may encourage their use, which would facilitate the selection of more efficient or cost-effective Long-Term Regional Transmission Facilities.  However, as described in the next section, we note that cost allocation methods resulting from a State Agreement

_____

(2022).

Process and Long-Term Regional Transmission Cost Allocation Methods that Relevant State Entities indicate that they have agreed to must be just and reasonable and not unduly discriminatory or preferential and must allocate costs in a manner that is at least roughly commensurate with estimated benefits.[3151]

1478.  ELCON and West Virginia Commission express concern that the NOPR's proposals for cost allocation methods, including requiring compliance with the six Order No. 1000 regional cost allocation principles, might not sufficiently recognize specific Public Policy Requirements as driving the needs for specific Long-Term Regional Transmission Facilities and, therefore, allow cost allocation methods that contradict precedent on cost causation.  Similarly, Utah Division of Public Utilities asks that the Long-Term Regional Transmission Cost Allocation Method be required to use cost causation principles to determine what portion of Long-Term Regional Transmission Facilities are due to state policies when states or other stakeholders disagree on the cost allocation method due to differing renewable goals.  We believe these concerns are misplaced and no further requirements are necessary.  First, while state laws, regulations, and goals make up some of the drivers of Long-Term Transmission Needs, they do not comprise the entirety of those needs, as described in the Development of Long-Term Scenarios section of this final rule.  Second, as described below, all cost allocation methods for Long-Term Regional Transmission Facilities must allocate costs to transmission customers in a manner that is at least roughly commensurate with their

---

[3151] *See, e.g.*, *PPL Elec. Utils. Corp.*, 181 FERC ¶ 61,178 at P 33.

estimated benefits.  Third, for Long-Term Regional Transmission Cost Allocation

Methods, except for those that Relevant State Entities indicate that they agreed to and

asked the transmission providers in their transmission planning region to file, compliance

with five of the Order No. 1000 regional cost allocation principles further safeguards

against cost causation concerns; notably, principles (1) and (2) require that benefits

received are at least roughly commensurate with costs paid and that costs may not be

involuntarily allocated to those that do not benefit, respectively.  Further, Order No. 1000

regional cost allocation principle (5), as well as the requirements in this final rule to

disclose estimates of the benefits of selected Long-Term Regional Transmission

Facilities, ensures sufficient transparency for stakeholders to understand how the costs of

selected Long-Term Regional Transmission Facilities will be allocated to transmission

customers in relation to the benefits that they are forecasted to provide.  Lastly, for cost

allocation methods resulting from a State Agreement Process and Long-Term Regional

Transmission Cost Allocation Methods that Relevant State Entities have agreed to and

asked transmission providers to file, we believe that states will have an opportunity to

come to consensus on cost allocation methods that they perceive as allocating costs in a

manner that is at least roughly commensurate with estimated benefits.

1479.  Regarding Vermont Electric and Vermont Transco's concern regarding possible

discrepancies between benefits received by small rural states and larger, more populated

states, we believe that our requirement that all cost allocation methods for Long-Term

Regional Transmission Facilities must allocate costs in a manner that is at least roughly

commensurate with estimated benefits addresses this concern.  Regarding OMS's,

Louisiana Commission's, and Ohio Consumers' requests that the Commission adopt certain cost allocation principles distinct from the six Order No. 1000 regional cost allocation principles, the Commission did not propose adoption of any additional principles or that the six Order No. 1000 regional cost allocation principles be substituted for others.  Accordingly, we find these requests beyond the scope of this final rule.  Additionally, in response to Exelon's request that the Commission clarify that the proposed State Agreement Process is supplementary to any previously accepted provisions for state agreement-based cost allocation,[3152] we clarify that any State Agreement Process that the Commission accepts in compliance with this final rule will apply to only Long-Term Regional Transmission Facilities, while any existing voluntary state cost allocation processes that the Commission has previously accepted apply to other transmission facilities and, thus, are unaltered by this final rule.

### C.     Identification of Benefits Considered in Cost Allocation for Long-Term Regional Transmission Facilities

#### 1.     NOPR Proposal

1480.  The Commission proposed to require transmission providers in each transmission planning region to identify on compliance the benefits they will use in *ex ante* Long-Term Regional Transmission Cost Allocation Methods associated with Long-Term Regional Transmission Planning, how they will calculate those benefits, and how the benefits will reasonably reflect the benefits of regional transmission facilities to meet

---

[3152] Exelon Initial Comments at 27-28.

identified transmission needs driven by changes in the resource mix and demand. The

Commission proposed that as part of this compliance obligation, transmission providers

must explain the rationale for using the benefits identified.[3153]  The Commission also

requested comment on whether the Commission should require that transmission

providers account for the full list of benefits, as described in the Evaluation of the

Benefits of Regional Transmission Facilities section above, in Long-Term Regional

Transmission Planning, or whether no change to the benefits currently used in existing

regional transmission planning processes is needed.[3154]

1481.  The Commission also proposed, for purposes of cost allocation, to require that

transmission providers in each transmission planning region evaluate, as part of Long-

Term Regional Transmission Planning, the benefits of regional transmission facilities

over a time horizon that covers, at a minimum, 20 years starting from the estimated in-

service date of the transmission facilities.[3155]

---

[3153] NOPR, 179 FERC ¶ 61,028 at P 326.

[3154] *Id.* P 327.

[3155] *Id.* P 228.

Docket No. RM21-17-000                                                                        - 1034 -

## 2.  **Comments**

### a.   **Agree with Proposal**

1482.  Some commenters agree with the NOPR proposal.[3156]  NESCOE contends that it is

critical that costs as well as benefits be clearly identified in connection with project

evaluation.[3157]

1483.  Many commenters supporting the proposal emphasize the importance of flexibility

and the lack of a proposed requirement in the NOPR to require that specific benefits be

accounted for in cost allocation.[3158]  Dominion opposes making the NOPR's listed

benefits mandatory for cost allocation because identifying and measuring them would be

difficult and lead to disputes and litigation that would add to the costs, borne by

consumers, of transmission development.[3159]  NYISO states that considering the list of

benefits in the NOPR in cost allocation would introduce significant complexity and create

---

[3156] Avangrid Initial Comments at 29; California Energy Commission Initial Comments at 3; Idaho Power Initial Comments at 11; ITC Initial Comments at 30; NESCOE Initial Comments at 72; Northwest and Intermountain Initial Comments at 18-19.

[3157] NESCOE Initial Comments at 72.

[3158] APPA Initial Comments at 46; Dominion Initial Comments at 45-46; Dominion Reply Comments at 6, 9; Exelon Initial Comments at 29-30 (citing NOPR, 179 FERC ¶ 61,028 at P 312 & n.516; *Midwest ISO Transmission Owners*, 373 F.3d at 1369); Louisiana Commission Initial Comments at 35-36; NARUC Initial Comments at 38; National Grid Initial Comments at 26-27; NYISO Initial Comments at 51-52; Pacific Northwest Utilities Initial Comments at 8-9; PPL Initial Comments at 28; SERTP Sponsors Initial Comments at 30-31; Southern Initial Comments at 27; Xcel Initial Comments at 12.

[3159] Dominion Reply Comments at 6-7.

a burdensome and perhaps infeasible process.[3160]  Xcel states that not all benefits need to be studied given that such study can be costly and add little value, and that the analysis of future benefits should balance uncertainties to ensure that it is not too speculative.[3161]

1484.  Pacific Northwest Utilities and SERTP Sponsors argue that many of the NOPR's proposed benefits would work only in RTO/ISO transmission planning regions and are not appropriate in non-RTO/ISO regions.[3162]  Pacific Northwest Utilities state that several of the benefits listed in the NOPR do not benefit transmission providers and argue that— in non-RTO/ISO transmission planning regions, like NorthernGrid, where there is neither a single independent transmission system operator nor any single independent transmission provider through which to affect transmission rate impacts due to cost allocation—costs allocated to transmission providers must be based on benefits to the transmission provider, not benefits realized by others, such as generators and load-serving entities.[3163]  California Municipal Utilities argue that requiring consideration of the list of benefits in the NOPR would not reflect the state and local nature of resource portfolio planning and would fail to account for the costs of such prescriptive measures and consumer protection against speculative projects.[3164]  Louisiana Commission states

---

[3160] NYISO Initial Comments at 52.

[3161] Xcel Initial Comments at 12.

[3162] Pacific Northwest Utilities Initial Comments at 8-10; SERTP Sponsors Initial Comments at 29-30.

[3163] Pacific Northwest Utilities Initial Comments at 9-10.

[3164] California Municipal Utilities Reply Comments at 5-6 (citing ACEG Initial

Docket No. RM21-17-000                                                    - 1036 -

that transmission providers and retail regulators should be allowed to develop and agree

on an appropriate set of metrics to be used for cost allocation.[3165]

1485.  APPA argues that regional flexibility should include allowing transmission

providers to demonstrate on compliance that the benefits that they use to allocate the

costs of transmission projects identified through their existing regional transmission

planning processes are sufficient for Long-Term Regional Transmission Planning.[3166]

National Grid asserts that flexibility avoids the risk of a static list of benefits becoming

outdated, citing as an example the growing numbers of distributed resources in New

England driving the need for transmission-level upgrades in New England.  National Grid

claims that more granular (state-specific or even direct assignment) cost allocation is

appropriate for such upgrades.[3167]

1486.  City of New Orleans Council, OMS, Louisiana Commission, and Michigan

Commission argue that any benefit metrics should comply with OMS Cost Allocation

Principle Committee Principle No. 2, which states that "[c]ost allocation should be as

granular and accurate as possible.  Benefit-cost analysis should use metrics that are

quantifiable, capable of replication, non-duplicative, and forward-looking."[3168]  NARUC

---

Comments at 26-48, 50-51, 60-63).

[3165] Louisiana Commission Initial Comments at 35.

[3166] APPA Initial Comments at 46.

[3167] National Grid Initial Comments at 26-27.

[3168] City of New Orleans Council Initial Comments at 11; Louisiana Commission
Initial Comments at 35-36; Michigan Commission Initial Comments at 9; OMS Initial

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1047 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

similarly asserts that transmission benefits must be verifiable and quantifiable to justify allocating costs to ratepayers.[3169]  Likewise, Idaho Power, Pacific Northwest Utilities, and West Virginia Commission state that benefits must be quantifiable and justified, arguing that many benefits in the NOPR proposal would be difficult to quantify, a difficulty, Idaho Power and Pacific Northwest Utilities argue, exacerbated by the proposed 20-year transmission planning horizon.[3170]

1487.  West Virginia Commission argues that use of these benefits allows for unfettered discretion by transmission providers to adopt cost allocation methods that do not meet the cost causation principle.[3171]

1488.  Southern states that a cost allocation premised on an overly broad, non-quantifiable construction of benefits would likely exceed the Commission's authority because there must be a correlation between the charges proposed and the expected benefits, as articulated by the courts.[3172]  Southern states that the Commission must apply

---

Comments at 7-8, 14 (citing Organization of MISO States, Inc., *Organization of MISO States Statement of Principles: Cost Allocation for Long Range Transmission Planning Projects*, https://www.misostates.org/images/PositionStatements/OMS_Position_Statement_of_Principles_Cost_Allocation_for_LRTPs.pdf).

[3169] NARUC Initial Comments at 25, 38.

[3170] Idaho Power Initial Comments at 11; Pacific Northwest Utilities Initial Comments at 6-9; West Virginia Commission Reply Comments at 4.

[3171] West Virginia Commission Reply Comments at 4.

[3172] Southern Initial Comments at 28-30 (citing *Pac. Gas & Elec. Co. v. FERC*, 373 F.3d 1315, 1321 (D.C. Cir. 2004)).

USCA4 Appeal: 24-1650   Doc: 224   Filed: 01/21/2025   Pg: 1048 of 2455
Document Accession #: 20240513-3036   Filed Date: 05/13/2024

the roughly commensurate standard by determining whether the benefits to the intended beneficiaries are quantifiable and spread evenly across a transmission planning region. Otherwise, Southern states, the Commission must compile a record based on substantial evidence to support the proposed allocation of costs.[3173] Dominion similarly cautions that assignment of costs requires more than generalized articulation of benefits and that the list of benefits in the NOPR are broadly defined and generalized.[3174]

1489. Ohio Consumers state that the Commission should base the benefits attributable to Long-Term Regional Transmission Planning on the electrons to be delivered from generating facilities. Ohio Consumers point out that state consumer advocates disagree as to which benefits should be considered in cost allocation.[3175] Ohio Consumers argue that adopting a broad definition of benefits that includes state decarbonization plans and socialization of some portion of the associated costs across a transmission planning region would violate the Order No. 1000 regional cost allocation principles and the cost causation principle.[3176]

---

[3173] *Id.* at 29-30 (citing *ICC v. FERC I*, 576 F.3d at 476–77; *Ill. Com. Comm'n v. FERC*, 721 F.3d 764, 777 (7th Cir. 2013) (*ICC v. FERC II*); *ICC v. FERC III*, 756 F.3d at 564-565).

[3174] Dominion Initial Comments at 43-44.

[3175] Ohio Consumers Reply Comments at 10.

[3176] Ohio Consumers Reply Comments at 11 (citing DC and MD Offices of People's Counsel Initial Comments at 31, 34, 38-39).

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1049 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                    - 1039 -

1490.  Pennsylvania Commission takes no position on requiring certain benefits to be accounted for in cost allocation, but states that the need for objective, well-defined, and measurable benefits applies not only to transmission planning but also to cost allocation, noting that it is important that customers who pay the costs allocated to them agree that they are paying for real and appreciable benefits.[3177]

> **b.**    **Requests to reflect the full breadth of benefits in cost allocation methods while maintaining flexibility**

1491.  Some commenters request that transmission providers reflect the full breadth of benefits in cost allocation methods for Long-Term Regional Transmission Facilities while also supporting flexibility.[3178]  Vistra asserts that benefits considered in cost allocation should not be confined to a prescriptive list.[3179]  NESCOE argues that the Commission should include a list of benefits in the final rule as a required starting point and allow transmission providers to add or subtract benefits from the list on compliance following consultation with states in their transmission planning region.[3180]

> **c.**    **Disagree with Proposal, Mostly Require Benefits**

1492.  Some commenters disagree with the Commission's proposal, arguing that the Commission should require transmission providers to account for a minimum set of

---

[3177] Pennsylvania Commission Initial Comments at 11.

[3178] APPA Initial Comments at 45-46; Massachusetts Attorney General Initial Comments at 21; NESCOE Initial Comments at 72; Vistra Initial Comments at 15.

[3179] Vistra Initial Comments at 15.

[3180] NESCOE Initial Comments at 43, 72.

benefits in cost allocation.[3181]  Indicated US Senators and Representatives argue that unless all benefits and costs are incorporated into transmission planning and cost allocation, the result will be biased, resulting in unjust and unreasonable costs and cost allocation.[3182]  Acadia Center and CLF contend that failure to consider a minimum set of benefits could result in the failure to select transmission projects that would have benefited customers.[3183]  Certain TDUs argue that guardrails should be put in place to require transmission providers to adequately define quantifiable benefits and to make transparent their method for identifying benefits; however, Certain TDUs contend that the Commission should require transmission providers to account for, at minimum, production cost savings and avoided or deferred reliability transmission facilities and aging transmission infrastructure replacement, as may be refined by transmission planning regions as necessary.[3184]  US Climate Alliance states that each transmission planning region could determine additional categories of benefits most relevant to them.[3185]

---

[3181] Acadia Center and CLF Initial Comments at 16-19; Certain TDUs Reply Comments at 2-3; Indicated US Senators and Representatives Initial Comments at 2; US Climate Alliance Initial Comments at 2; US Senators Supplemental Comments at 2.

[3182] Indicated US Senators and Representatives Initial Comments at 2.

[3183] Acadia Center and CLF Initial Comments at 16-19.

[3184] Certain TDUs Reply Comments at 2-3.

[3185] US Climate Alliance Initial Comments at 2.

Docket No. RM21-17-000                                                          - 1041 -

1493.  Other commenters that disagree with the Commission's proposal similarly argue for a required minimum set of benefits, but argue that the Commission should require transmission providers to account for the full list of 12 benefits in the NOPR.**3186**  ACEG and PIOs state that it would be unjust and unreasonable for transmission providers to allocate costs in a manner that ignores certain benefits or fails to provide a full accounting of those benefits, including, PIOs assert, cost allocation agreed to by states.**3187**  PIOs further argue that allowing transmission providers to agree to a cost allocation method that does not reflect all quantifiable benefits would re-introduce the risk of free ridership.**3188**

1494.  Clean Energy Buyers state that they support the Commission requiring each transmission provider to either adopt the benefits identified by the Commission to be used for cost allocation for Long-Term Regional Transmission Facilities or demonstrate why the exclusion of any such benefit(s) is just and reasonable.  However, Clean Energy Buyers also recommend that the Commission consider how the factors required for Long-

---

**3186** ACEG Initial Comments at 60; Clean Energy Associations Initial Comments at 20-21, 34; DC and MD Offices of People's Counsel Initial Comments at 20, 34; PIOs Initial Comments at 64-65.

**3187** ACEG Initial Comments at 60-61 (citing *ICC v. FERC I*, 576 F.3d at 477); PIOs Initial Comments at 65; PIOs Reply Comments at 3.

**3188** PIOs Initial Comments at 65.

Docket No. RM21-17-000                                                           - 1042 -

Term Scenarios will translate into benefits and ensure that there is no double-counting of benefits.[3189]

1495.  Southwestern Power Group states that existing regional cost allocation methods do not account for the range of benefits that regional transmission expansion can provide. Consequently, Southwestern Power Group argues, the costs of regional transmission projects are allocated to too few of the beneficiaries, discouraging the development of regional transmission projects.[3190]  Environmental Groups argue that the Commission must ensure that any cost allocation method agreed to by states complies with the beneficiary-pays principle by showing that the method considers all quantifiable benefits of transmission.[3191]

1496.  SPP states that its regional cost allocation method does not quantify the specific benefits of transmission facilities within each planning assessment but instead analyzes the benefits and costs of facilities approved in multiple assessments in a comprehensive manner.  SPP states that potential inequities are not appropriately quantified in a single regional planning assessment cycle because potential imbalances in one cycle may be offset in later cycles or changed because of topology.  SPP emphasizes that quantification of whether benefits of transmission facilities are roughly commensurate with allocated costs should be performed through multiple transmission planning cycles that evaluate

---

[3189] Clean Energy Buyers Initial Comments at 30.

[3190] Southwestern Power Group Initial Comments at 14-15.

[3191] Environmental Groups Supplemental Comments at 2.

Docket No. RM21-17-000                                                                    - 1043 -

project portfolios, citing SPP's Highway-Byway cost allocation method as an

example.[3192]

> **d.** **Alignment of Benefits between Transmission Planning and Cost Allocation**

1497.  Various commenters proffer arguments as to whether benefits used in the

evaluation and selection of Long-Term Regional Transmission Facilities must align with

the benefits used in cost allocation.  For example, SERTP Sponsors state that there could

be differences between the types of benefits used for evaluation and selection and those

used for cost allocation, asserting that benefits used in cost allocation must be measured

in a consistent and objective manner to limit disputes.[3193]

1498.  Some commenters argue that the benefits used in the evaluation and selection of

Long-Term Regional Transmission Facilities should closely align with, but need not be

the same as, those used in cost allocation.[3194]  For example, Clean Energy Associations

state that close alignment does not preclude regional variation and points to MISO's

Multi-Value Projects' and SPP's Highway/Byway projects' cost allocation methods.[3195]

---

[3192] SPP Initial Comments at 31.

[3193] SERTP Sponsors Initial Comments at 30-31.

[3194] Clean Energy Associations Initial Comments at 34; Cypress Creek Reply Comments at 14-15; Ørsted Initial Comments at 9.

[3195] Clean Energy Associations Initial Comments at 34-35.

Docket No. RM21-17-000                                                    - 1044 -

1499.  Some commenters argue that the same set of benefits used in transmission

planning should be used in cost allocation.[3196]  DC and MD Offices of People's Counsel

and the New Jersey Commission link such a requirement with the beneficiary-pays

principle.[3197]  New Jersey Commission states that enforcing the beneficiary-pays

principle based on all of a transmission project's quantified benefits is necessary to avoid

free-rider problems that could arise, especially in the State Agreement Process.[3198]

Additionally, New Jersey Commission states, the policy of preventing states from

involuntarily bearing the costs of others' policies must not require states to always pay

the full cost of any transmission solution that supports their public policies or prevent

states from committing to paying more than what they perceive to be their fair share to

overcome disagreements over who will benefit.[3199]  Similarly, BP recommends requiring

that those benefitting from transmission facilities that meet policy objectives, but without

---

[3196] DC and MD Offices of People's Counsel Initial Comments at 34; Fervo Reply Comments at 2-3; New Jersey Commission Initial Comments at 18-23; SEIA Initial Comments at 24; Vermont Electric and Vermont Transco Initial Comments at 4; WATT Coalition Initial Comments at 8.

[3197] DC and MD Offices of People's Counsel Initial Comments at 34 (citing *ICC v. FERC I*, 576 F.3d 470; *ICC v. FERC II*, 721 F.3d 764; *ICC v. FERC III*, 756 F.3d 556); New Jersey Commission Initial Comments at 18-23 (citing *Old Dominion Elec. Coop. v. FERC*, 898 F.3d at 1262-63; *Entergy Ark. v. FERC*, 40 F.4th 689, 701 (D.C. Cir. 2022)).

[3198] New Jersey Commission Initial Comments at 18.

[3199] *Id.* at 21-23.

Docket No. RM21-17-000                                                    - 1045 -

similar policies themselves, be allocated an appropriate share of costs to avoid free ridership.[3200]

1500.  Massachusetts Attorney General states that *ex ante* cost allocation methods should reflect the same benefits considered in Long-Term Regional Transmission Planning and not consider benefits in silos.[3201]  Ørsted similarly supports a requirement that transmission providers adopt cost allocation methods that recognize the full breadth of benefits that transmission facilities provide.[3202]

1501.  PIOs argue that cost allocation is necessarily implicated in the NOPR's preliminary finding that failure to consider a broader set of benefits and beneficiaries of transmission facilities may result in unjust, unreasonable, and unduly discriminatory or preferential rates, reasoning that cost allocation cannot be based on unlawful identification of benefits and beneficiaries.[3203]

### e.    Additional Benefits or Suggestions for Refinement

1502.  DC and MD Offices of People's Counsel recommend that the Commission allow Relevant State Entities to propose additional benefit categories for evaluation and to consent to the allocation of costs that align with these additional benefits.  At a minimum,

---

[3200] BP Initial Comments at 9-12.

[3201] Massachusetts Attorney General Initial Comments at 21.

[3202] Ørsted Initial Comments at 9.

[3203] PIOs Initial Comments at 71.

DC and MD Offices of People's Counsel argue, costs should be allocated to the benefitting Relevant State Entities.[3204]

1503.  California Energy Commission recommends that transmission providers be required to consider equity and environmental justice in the calculation of benefits, including economic, health, and social benefits to disadvantaged communities.[3205]  WE ACT recommends that the Commission include non-energy benefits like pollution reduction, health, jobs, and local economic development in the list of benefits that transmission providers should be required to utilize in identifying and evaluating Long-Term Regional Transmission Facility need, selection, and cost allocation.[3206]

1504.  Louisiana Commission states that the Commission should permit transmission providers to consider allocations to all cost causers and beneficiaries, including generators.[3207]  Vistra argues that if achieving voluntary corporate and utility clean energy goals is factored into demand driving the need for an upgrade, then the costs of such upgrades should not be assigned to regional load.[3208]

---

[3204] DC and MD Offices of People's Counsel Initial Comments at 34.

[3205] California Energy Commission Initial Comments at 3.

[3206] WE ACT Initial Comments at 5.

[3207] Louisiana Commission Initial Comments at 32.

[3208] Vistra Initial Comments at 21-22.

USCA4 Appeal: 24-1650     Doc: 224          Filed: 01/21/2025      Pg: 1057 of 2455
Document Accession #: 20240513-3036       Filed Date: 05/13/2024

Docket No. RM21-17-000                                                    - 1047 -

### 3.    **Commission Determination**

1505.  We decline to adopt the NOPR proposal to require transmission providers to

identify on compliance the benefits that they will use in Long-Term Regional

Transmission Cost Allocation Methods, how they will calculate those benefits, and how

the benefits will reasonably reflect the benefits of regional transmission facilities to meet

identified transmission needs driven by changes in the resource mix and demand.

1506.  Instead, as we discuss above in the Long-Term Regional Transmission Facility

Cost Allocation Compliance with the Existing Six Order No. 1000 Regional Cost

Allocation Principles section, we require transmission providers in each transmission

planning region to demonstrate on compliance that the required Long-Term Regional

Transmission Cost Allocation Method(s) that Relevant State Entities have *not* indicated

that they agree to comply with Order No. 1000 regional transmission cost allocation

principles (1) through (5) and do not allocate costs by project type (i.e., reliability,

economic, or transmission needs driven by Public Policy Requirements).  While we do

not require that cost allocation methods resulting from State Agreement Processes or

Long-Term Regional Transmission Cost Allocation Methods that Relevant States Entities

indicate they agreed to, must comply with any of the Order No. 1000 regional cost

allocation principles, if filed with the Commission, transmission providers must

nonetheless demonstrate that either of these types of cost allocation methods will allocate

costs in a manner at least roughly commensurate with estimated benefits.[3209]  We do not

---

[3209] *See ICC v. FERC I*, 576 F.3d at 477; *ICC v. FERC III*, 756 F.3d at 564.

require that any particular benefit used in the evaluation and selection of Long-Term

Regional Transmission Facilities be reflected in a Long-Term Regional Transmission

Cost Allocation Method filed with the Commission. We adopt this modified approach to

the relationship of benefits used in Long-Term Regional Transmission Planning and

Long-Term Regional Transmission Cost Allocation Methods because it provides

transmission providers with flexibility to propose a Long-Term Regional Transmission

Cost Allocation Method(s), allowing for negotiation in the Engagement Period, which we

believe will increase the chances that Long-Term Regional Transmission Facilities

selected as the more efficient or cost-effective regional transmission solution will be

developed. At the same time, the requirements in this final rule to disclose estimates of

the benefits of selected Long-Term Regional Transmission Facilities will provide

transparency and help to ensure a cost allocation is just and reasonable.

1507. We note that this flexible approach is consistent with the approach that the

Commission took in Order No. 1000 and in subsequent orders on transmission providers'

Order No. 1000 compliance filings, where the Commission allowed a wide variety of cost

allocation methods and did not require that such methods specifically account for all

benefits used in evaluation and selection processes.[3210] The cost allocation method for

MISO's Multi-Value Projects and the SPP Highway/Byway cost allocation method are

examples that reflect the flexibility that transmission providers have had in adopting cost

---

[3210] Order No. 1000, 136 FERC ¶ 61,051 at PP 560, 624.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1059 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                          - 1049 -

allocation methods suited to their circumstances and that may not have been possible under a less flexible approach.

1508. The one exception to that flexibility, however, is the second component of our compliance requirement, that transmission providers must not allocate costs based on project types; namely, reliability, economic, or Public Policy Requirements needs-driven cost allocation methods. As described in the Long-Term Regional Transmission Facility Cost Allocation Compliance with Existing Six Order No. 1000 Regional Cost Allocation Principles section, we adopt this requirement because permitting such project-type-limited cost allocation methods for Long-Term Regional Transmission Facilities would be inconsistent with the long-term, forward-looking, more comprehensive regional transmission planning that we require in this final rule. As we note above in the Need for Reform section, allocating costs based on these project types would result in transmission providers undertaking investments in relatively inefficient or less cost-effective transmission infrastructure, the costs of which are ultimately recovered through Commission-jurisdictional rates. Allocating costs based on these project types could, for example, encourage the selection of transmission facilities based on either their economic or reliability benefits alone rather than based on an evaluation of the wider range of benefits that they may provide. This dynamic results in, among other things, transmission customers paying more than is necessary or appropriate to meet their transmission needs, customers forgoing benefits that outweigh their costs, or some combination thereof, which results in less efficient or cost-effective transmission investments. We further find that permitting the use of such project-type-limited cost

allocation methods for Long-Term Transmission Facilities would not allocate costs in a manner that is at least roughly commensurate to estimated benefits.

1509.  We decline to adopt the NOPR proposal to require transmission providers to evaluate benefits over a 20-year time horizon for Long-Term Regional Transmission Planning for purposes of cost allocation.  Given our decision to not require transmission providers to explain the benefits that they are using in cost allocation for Long-Term Regional Transmission Facilities, we believe this proposal is moot.

1510.  We acknowledge New Jersey Commission's concern that permissive state-negotiated cost allocation could result in free riders.  However, we note that, even for cost allocation methods filed pursuant to a State Agreement Process and Long-Term Regional Transmission Cost Allocation Methods that Relevant State Entities indicate that they have agreed, the costs allocated in accordance with such methods must be, as noted above, at least roughly commensurate with estimated benefits consistent with legal precedent.  On compliance with this final rule, the Commission will evaluate whether any cost allocation method agreed to pursuant to a State Agreement Process, or Long-Term Regional Transmission Cost Allocation Methods that Relevant State Entities indicate that they have agreed to, and filed with the Commission, allocates the costs of Long-Term Regional Transmission Facilities in a manner that is at least roughly commensurate with the estimated benefits.  Further, we believe that New Jersey Commission's concern is reduced by our modification to the NOPR proposal to require transmission providers to file a Long-Term Regional Transmission Cost Allocation Method that must be used where a State Agreement Process fails to result in agreement; to the extent Relevant State

Entities do not agree to a cost allocation method through the State Agreement Process, the transmission provider's ex ante Long-Term Regional Transmission Cost Allocation Method will apply.

1511.  Given our modification to the NOPR proposal to not require transmission providers to identify on compliance the benefits that they will use in Long-Term Regional Transmission Cost Allocation Methods, we find moot APPA's request that regional flexibility should include allowing transmission providers to demonstrate on compliance that their existing benefits used for cost allocation of transmission projects identified through their existing regional transmission planning processes are sufficient for Long-Term Regional Transmission Planning.[3211]

1512.  With respect to the comments of City of New Orleans Council, OMS, Louisiana Commission, and Michigan Commission arguing that any benefit metrics should comply with OMS Cost Allocation Principle Committee Principle No. 2,[3212] which states that "[c]ost allocation should be as granular and accurate as possible,"[3213] we note that the flexibility we provide as to the consideration of benefits in cost allocation does not

---

[3211] APPA Initial Comments at 46.  We also discuss related concerns in the Cost Allocation for Long-Term Transmission Facilities section, above.

[3212] City of New Orleans Council Initial Comments at 11; Louisiana Commission Initial Comments at 35-36; Michigan Commission Initial Comments at 9; OMS Initial Comments at 7-8, 14.

[3213] OMS Initial Comments at 7-8.

Docket No. RM21-17-000                                                          - 1052 -

prevent transmission providers in a particular transmission planning region from adopting a more granular approach.

1513.  With respect to Southern and Dominion's assertions that the Commission must ensure that costs are allocated in a manner that is at least roughly commensurate with benefits by conducting its evaluation of proposed cost allocation methods in a particular manner,[3214] we reiterate that we will apply existing Commission and judicial precedent, including that cited by Dominion and Southern, in our evaluation of any proposed cost allocation methods for Long-Term Regional Transmission Facilities.  With respect to Louisiana Commission's assertion that the cost allocation process should be allowed to consider allocations to all cost causers and beneficiaries, including generators,[3215] we continue to adhere to the flexibility we provided in Order No. 1000-A.  In that order, we found that:

> With respect to generators being identified as beneficiaries and ultimately responsible for costs, . . . just as each transmission planning region retains the flexibility to define benefit and beneficiary, the public utility transmission providers in each transmission planning region, in consultation with their stakeholders, may consider proposals to allocate costs directly to generators as beneficiaries that could be subject to regional or interregional cost allocation.  However, . . . any effort to do so must not be inconsistent with the generator interconnection process under Order No. 2003 because, as [the Commission] stated in Order No. 1000, the generator interconnection process and

---

[3214] Southern Initial Comments at 29-30 (citing *ICC v. FERC I*, 576 F.3d at 476–77; *ICC v. FERC II*, 721 F.3d at 777; *ICC v. FERC III*, 756 F.3d at 564-565); Dominion Initial Comments at 43-44 (citing *ICC v. FERC I*, 576 F.3d at 477).

[3215] Louisiana Commission Initial Comments at 32.

Docket No. RM21-17-000                                                      - 1053 -

interconnection cost recovery are outside the scope of this
rulemaking.[3216]

1514. We find Pacific Northwest Utilities' assertion that costs allocated to transmission

providers in non-RTO/ISO transmission planning regions, like NorthernGrid, must be

based on benefits to the transmission provider, not benefits realized by others, such as

generators and load-serving entities,[3217] to be misplaced, as nothing in this final rule

requires that only transmission providers in non-RTO/ISO transmission planning regions

bear the ultimate responsibility for the costs of Long-Term Regional Transmission

Facilities. We recognize that, in the absence of a single regional transmission provider

who can recover the costs of Long-Term Regional Transmission Facilities on behalf of its

transmission-owning members from all of its transmission customers in its transmission

planning region, transmission providers in non-RTO/ISO regions require alternative

arrangements to allocate and recover the costs of Long-Term Regional Transmission

Facilities from the transmission customers that benefit from them. We expect that in

non-RTO/ISO transmission planning regions, as is the case with Order No. 1000 regional

transmission planning and cost allocation processes today,[3218] transmission providers will

---

[3216] Order No. 1000-A, 139 FERC ¶ 61,132 at P 680. While interconnection
customers may voluntarily fund the cost of, or a portion of the cost of, a Long-Term
Regional Transmission Facility as discussed in the Evaluation and Selection of Long-
Term Regional Transmission Facilities section, this process is distinct from allocating
costs to generators under the Long-Term Regional Transmission Cost Allocation Method,
as the Louisiana Commission appears to contemplate.

[3217] Pacific Northwest Utilities Initial Comments at 9-10.

[3218] *See e.g., Duke Energy Carolinas, LLC*, 147 FERC ¶ 61,241 at P 453; *Pub.*

Docket No. RM21-17-000                                                  - 1054 -

establish arrangements to implement the cost allocation methods for Long-Term Regional

Facilities and recover the costs of such facilities from the transmission customers that

benefit from them.

1515.  Some commenters advocate for accounting for public policy benefits in cost

allocation methods for Long-Term Regional Transmission Facilities.[3219]  Although we are

not requiring transmission providers to account for public policy benefits in cost

allocation methods for Long-Term Regional Transmission Facilities, we are also not

foreclosing the possibility that transmission providers and stakeholders may seek to

account for certain public policy benefits when developing Long-Term Regional

Transmission Cost Allocation Methods.  We believe that states are well-positioned to

value the benefits of achieving their respective public policy goals, consistent with past

precedent in which we have affirmed the use of public policy benefits in regional

transmission planning cost allocation,[3220] and they or other stakeholders can similarly do

---

*Serv. Co. of Colo*., 142 FERC ¶ 61,206 at P 314.

[3219] *See e.g.*, California Energy Commission Initial Comments at 3 (recommending that equity and environmental justice benefits be accounted for in cost allocation, including economic, health, and social benefits to disadvantaged communities); WE ACT Initial Comments at 5 (recommending the following benefits be accounted for in cost allocation:  pollution reduction, health, jobs, and local economic development).

[3220] As noted in the Evaluation of the Benefits of Regional Transmission Facilities section, RTOs/ISOs that have used some form of public policy benefit in regional transmission planning include PJM and NYISO. Although explicitly *not* part of PJM's Order No. 1000 regional transmission planning, PJM uses a State Agreement Approach to allow the development of public policy projects.  *See PPL Elec. Utils. Corp*., 181 FERC ¶ 61,178 at P 33 (finding that "allocating the costs of the New Jersey [State Agreement Approach] Projects on a load-ratio share basis to all New Jersey customers is roughly commensurate with the benefits provided by those projects"). NYISO provides

so through engagement with transmission providers in their efforts to develop Long-Term

Regional Transmission Cost Allocation Methods.  In addition, to the extent states believe

that a particular Long-Term Regional Transmission Facility would help achieve their

public policy goals, we note our adoption in the Evaluation and Selection of Long-Term

Regional Transmission Facilities section of this final rule of opportunities for Relevant

State Entities to voluntarily fund a portion of the cost of a Long-Term Regional

Transmission Facility so that the facility can qualify for selection.[3221]  The rule, consistent

with the cost causation principle, does not allow allocation of costs based on benefits to

entities that do not receive benefits or receive only trivial benefits in relationship to costs

of those transmission facilities.[3222]

---

for cost allocations developed by the New York State Public Service Commission for
transmission projects developed to meet public policy needs. *See Consol. Edison Co. of
N.Y., Inc.*, 180 FERC ¶ 61,106 at P 50 (finding that a volumetric load-ratio share cost
allocation for certain local transmission upgrades was appropriate because the projects
"benefit customers throughout the state insofar as they facilitate compliance with the
New York State climate and renewable energy goals as required by New York State law
and have been determined by the NYPSC to be necessary to meet such obligation").

[3221] *Supra* Evaluation and Selection of Long-Term Regional Transmission
Facilities section.

[3222] *See Coal. of MISO Transmission Customers v. FERC*, 45 F.4th 1004, 1009
(D.C. Cir. 2022) ("The cost-causation principle requires that 'the cost of transmission
facilities be allocated to those within the transmission planning region that benefit from
those facilities in a manner that is at least roughly commensurate with estimated
benefits.'") (cleaned up) (quoting *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d at 53); *ICC v.
FERC I*, 576 F.3d at 477.

Docket No. RM21-17-000                                                      - 1056 -

D.    **Miscellaneous Cost Allocation Comments and Proposals**

1.    **Comments**

1516.  Some commenters discuss the appropriate time frame for cost allocation for Long-Term Regional Transmission Facilities.  Dominion states that costs should not be allocated until closer in time to when a transmission project will be built and beneficiaries identified rather than when the Long-Term Regional Transmission Facilities are identified.[3223]  Ohio Consumers state that cost allocation decisions must be made on the basis of current or near-term transmission needs, and the Commission should not require subsidization for transmission lines on the theory that the line may be needed to serve future generation.[3224]  OMS supports a requirement that transmission providers identify beneficiaries of transmission projects before any costs are allocated.[3225]

1517.  Acadia Center and CLF state that the Commission should expand its cost allocation proposals to encompass interregional transmission planning and the generator interconnection processes.[3226]

1518.  Some commenters stress the importance of cost containment oversight by the Commission.  Joint Commenters support a cost management framework overseen by the Commission ensuring that the costs and benefits on which transmission projects are

---

[3223] Dominion Initial Comments at 42.

[3224] Ohio Consumers Initial Comments at 19.

[3225] OMS Initial Comments at 9.

[3226] Acadia Center and CLF Initial Comments at 17.

Docket No. RM21-17-000                                                    - 1057 -

initially approved for cost allocation remain within initially contemplated parameters.[3227]

State Water Contractors assert that the need for cost containment is acute for consumers

in California, asserting that the CAISO high voltage transmission access charge has

increased nearly 136% over the last decade.  State Water Contractors argue that as

increases in transmission costs have a direct impact on the cost of water delivery and

treatment and given that water and energy are particularly intertwined in California, cost

containment and regional flexibility are essential components to the justness and

reasonableness of any final rule.[3228]

1519.  Ohio Consumers state that the Commission should require that the transmission

providers implementing any Long-Term Regional Transmission Planning requirements

give appropriate consideration to public grants and other external sources of funding in

any cost allocation processes, adding that transmission providers should first seek public

grants prior to charging customers, because infrastructure funds must be accounted for, or

else they would distort cost allocation processes.[3229]

1520.  NextEra renews its request for the Commission to initiate a new rulemaking to

prohibit regional allocation of the costs of transmission projects developed pursuant to an

incumbent transmission owner's exercise of state right-of-first-refusal rights and require

---

[3227] Joint Commenters Reply Comments at 1.

[3228] State Water Contractors Reply Comments at 2-3.

[3229] Ohio Consumers Reply Comments at 15 (citing Infrastructure Investment and Jobs Act of 2021, Pub. L. No. 117-58, 135 Stat 429).

Docket No. RM21-17-000                                                    - 1058 -

the direct assignment of such costs to customers in the incumbent transmission owner's

zone.[3230]

## 2.    Commission Determination

1521.  We decline to adopt a particular time frame for determining the cost allocation for

a Long-Term Regional Transmission Facility, as requested by Dominion, Ohio

Consumers, and OMS.  We believe that imposing a standardized time frame to determine

cost allocation is unnecessary and could impede the regional flexibility that we provide to

transmission providers under this final rule.  However, as discussed above in the Long-

Term Regional Transmission Facility Cost Allocation Compliance with the Existing Six

Regional Cost Allocation Principles section, if only a Long-Term Regional Transmission

Cost Allocation Method is available for a particular Long-Term Regional Transmission

Facility (or portfolio of such Facilities), the determination of the applicable cost

allocation must occur by or before its selection.

1522.  We find Acadia Center and CLF's assertion that the Commission should expand

its cost allocation proposals to encompass interregional transmission planning and the

generator interconnection processes to be outside the scope of this proceeding, as is

NextEra's request for the Commission to initiate a new rulemaking to prohibit regional

allocation of the costs of transmission projects developed pursuant to an incumbent

transmission owner's exercise of a state right of first refusal and require the direct

assignment of such costs to customers in the incumbent transmission owner's zone.

---

[3230] NextEra Reply Comments at 26.

Docket No. RM21-17-000                                                              - 1059 -

These suggestions are beyond the scope of the Commission's NOPR proposals and we
believe that the record in this proceeding is insufficient to proceed with them.

1523.  We also find outside the scope of this proceeding various commenters' statements
regarding cost containment.  We note that the Commission is examining issues related to
transmission planning and cost containment in other proceedings.[3231]

## VII.   **Construction Work in Progress Incentive**

### A.   **NOPR Proposal**

1524.  In the NOPR, the Commission proposed to not permit transmission providers to
take advantage of the allowance for inclusion of 100% of Construction Work In Progress
(CWIP) costs in rate base (CWIP Incentive) for Long-Term Regional Transmission
Facilities.[3232]  The Commission noted that transmission providers may still accrue
carrying costs incurred during the pre-construction or construction phase as Allowance
for Funds Used During Construction (AFUDC) and only recover those costs from
customers after the project is in service, in accordance with generally accepted utility

---

[3231] *See, e.g.*, Supplemental Notice of Technical Conference, Transmission
Planning and Cost Management, Docket No. AD22-8-000 (Oct. 4, 2022).

[3232] NOPR, 179 FERC ¶ 61,028 at PP 328-329 n.522-523, 525-527 (citing Order
No. 679, 71 FR 43294 (July 31, 2006), 116 FERC ¶ 61,057 at PP 9, 116-117, n.70).  The
Commission stated that the Commission has also provided that any public utility engaged
in the sale of electric power for resale can file to include in rate base up to 50% of CWIP,
subject to limitations.  *Construction Work in Progress for Pub. Utils.; Inclusion of Costs
in Rate Base*, Order No. 298, 48 FR 24323 (June 1, 1983), FERC Stats. & Regs. ¶ 30,455
(1983) (cross-referenced at 23 FERC ¶ 61,224), *order on reh'g*, 25 FERC ¶ 61,023
(1983).  NOPR, 179 FERC ¶ 61,028 at P 329 n.524.

accounting principles for AFUDC.[3233]  The Commission explained that this proposal

would not affect Commission policy and regulations established before Order No.

679.[3234]

B.    **Comments**

1.    **Interest in the NOPR Proposal**

1525.  Many commenters support the Commission's NOPR proposal to prohibit Long-

Term Regional Transmission Facilities from being eligible for the CWIP Incentive and

generally support permitting cost recovery instead through AFUDC, agreeing that

extending the CWIP Incentive to Long-Term Regional Transmission Facilities would

expose ratepayers to risks and cost burdens by requiring them to pay for Long-Term

Regional Transmission Facilities that receive the incentive prior to those facilities being

placed into service.[3235]

---

[3233] NOPR, 179 FERC ¶ 61,028 at P 333.

[3234] *Id.* P 333 n.530. The Commission stated:

> [P]ublic utility transmission providers would still be allowed
> to request 50% CWIP in rate base, as is permitted pursuant to
> 18 CFR 35.25(c)(3), subject to an FPA section 205 filing
> detailing how the request meets the requirements of Order No.
> 298.  We believe that the ability to include 50% CWIP in rate
> base, if requested and granted, reflects a more reasonable
> sharing of risks and benefits than the CWIP Incentive for
> Long-Term Regional Transmission Facilities given the greater
> uncertainty inherent in Long-Term Regional Transmission
> Planning, as proposed in this NOPR.

[3235] American Municipal Power Initial Comments at 34; APPA Initial Comments
at 6, 46-47; California Commission Initial Comments at 58; California Water Initial
Comments at 19-20; Clean Energy Buyers Initial Comments at 30-31; ELCON Initial

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1071 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                              - 1061 -

1526.  California Commission and New England Systems argue that there is no evidence

that any of the incentives established under FPA section 219, including the CWIP

Incentive, have spurred investment in transmission infrastructure.[3236]  California

Commission argues that there was a great need to develop new transmission to bolster

reliability and alleviate congestion when the CWIP Incentive was first introduced in

Order No. 679, but that the prior decline in transmission investment has since been

reversed.[3237]  Further, California Commission argues that an inability to receive the

CWIP Incentive would not present a barrier to entry for transmission development,[3238]

stating that disallowing the CWIP Incentive for Long-Term Regional Transmission

---

Comments at 19; Industrial Customers Initial Comments at 24-26; Joint Consumer
Advocates Initial Comments at 14; Kentucky Commission Chair Chandler Initial
Comments at 4; Large Public Power Initial Comments at 41-42; Louisiana Commission
Initial Comments at 36; Massachusetts Attorney General Initial Comments at 23;
NARUC Initial Comments at 54-55; NASUCA Initial Comments at 8-9; NESCOE Initial
Comments at 73; Nevada Commission Initial Comments at 14; North Carolina
Commission and Staff Initial Comments at 17-18; NRG Initial Comments at 21-22; Ohio
Commission Federal Advocate Initial Comments at 15-16; Ohio Consumers Initial
Comments at 29; Pennsylvania Commission Initial Comments at 17; PJM States Initial
Comments at 13; Resale Iowa Initial Comments at 2, 12-13; Six Cities Initial Comments
at 11; State Agencies Initial Comments at 24; TAPS Initial Comments at 5, 27-29;
Transmission Dependent Utilities Initial Comments at 2-4; Virginia Attorney General
Initial Comments at 4-6.

[3236] California Commission Reply Comments at 11-12; New England Systems
Reply Comments at 15-16.

[3237] California Commission Reply Comments at 8-10 (citing US DOE, *National
Electric Transmission Congestion Study*, at 21(Sept. 2020),
https://www.energy.gov/sites/default/files/2020/10/f79/2020%20Congestion%20Study%
20FINAL%2022Sept2020.pdf).

[3238] *Id.* at 19-20 (citing CAISO Initial Comments at 44).

Facilities would affect incumbent and nonincumbent transmission developers equally, and that developers could continue to seek the CWIP Incentive for economic and reliability transmission projects.[3239]  Louisiana Commission states that if an independent transmission developer or utility has won a competitive bidding process to construct transmission facilities, that entity should have the financial wherewithal to finance the project without a loan from ratepayers.[3240]

1527.  Several commenters assert that the CWIP Incentive shifts risks to customers.[3241] Pennsylvania Commission, Large Public Power, and Resale Iowa argue that allowing the CWIP Incentive could substantially increase the risk of customers paying for transmission facilities that are never built and from which they derive no benefit, leading to rates that are unjust and unreasonable.[3242]  NARUC, New England Systems, and Virginia Attorney General agree with the proposed reform because it better aligns risk

---

[3239] *Id.*

[3240] Louisiana Commission Initial Comments at 36.

[3241] California Commission Reply Comments at 14; Large Public Power Initial Comments at 41; Louisiana Commission Initial Comments at 36; NARUC Initial Comments at 55-56; New England Systems Reply Comments at 15; Ohio Commission Federal Advocate Initial Comments at 16; Pennsylvania Commission Initial Comments at 17; Resale Iowa Initial Comments at 12-13; Virginia Attorney General Reply Comments at 2.

[3242] Large Public Power Initial Comments at 41; Pennsylvania Commission Initial Comments at 17; Resale Iowa Initial Comments at 12-13.

and reward between shareholders and customers with respect to Long-Term Regional Transmission Facilities.[3243]

1528.   Several other commenters state that the longer the transmission planning horizon, the higher the risk that resulting transmission facilities will not be needed, which may result in stranded costs.[3244]   For this reason, Industrial Customers state that shifting risks from transmission developers to customers is particularly problematic for Long-Term Regional Transmission Facilities.[3245]   Dominion states that it does not take a position on the proposal to prohibit Long-Term Regional Transmission Facilities from being eligible for the CWIP Incentive, but nevertheless asserts that shifting the risk for long-term transmission projects to transmission providers will help ensure that only those long-term projects that are "confidently needed" will be developed.   However, for states that may allow or require the inclusion of the CWIP Incentive in rate base, Dominion states that the Commission should allow for deference to the state cost recovery structure.[3246]

---

[3243] NARUC Initial Comments at 55-56; New England Systems Reply Comments at 15 (citing NARUC Initial Comments at 56); Virginia Attorney General Reply Comments at 2 (citing NARUC Initial Comments at 55).

[3244] Clean Energy Buyers Reply Comments at 10-11; Dominion Initial Comments at 53-54; Industrial Customers Reply Comments at 9; Transmission Dependent Utilities Reply Comments at 4; Virginia Attorney General Reply Comments at 3.

[3245] Industrial Customers Reply Comments at 9.

[3246] Dominion Initial Comments at 53.

1529.  Several commenters suggest that such reform may mitigate certain risks of the

transmission provider over-building the system.[3247]  For example, Massachusetts

Attorney General and North Dakota Commission state that the Commission's proposed

limit on the CWIP Incentive would provide ratepayers greater protection from financing

inefficient or over-built regional transmission projects.[3248]  New England Systems argue

that entities in favor of continuing the CWIP Incentive gain financially from the

incentive.[3249]  Industrial Customers state that the alleged benefits of the CWIP Incentive

to customers are tenuous at best.[3250]

1530.  Multiple commenters suggest that prohibiting Long-Term Regional Transmission

Facilities from being eligible for the CWIP Incentive may improve the planning and

building of new transmission facilities.[3251]  New England Systems, PJM States, and North

Carolina Commission and Staff assert that removing the CWIP Incentive will

---

[3247] Massachusetts Attorney General Initial Comments at 24-25; North Carolina
Commission and Staff Initial Comments at 18; North Dakota Commission Initial
Comments at 6; Pennsylvania Commission Initial Comments at 17-18; PJM States Initial
Comments at 13; US Climate Alliance Initial Comments at 2.

[3248] Massachusetts Attorney General Initial Comments at 24-25; North Dakota
Commission Initial Comments at 6.

[3249] New England Systems Reply Comments at 15-16 (citing Avangrid Initial
Comments at 26).

[3250] Industrial Customers Reply Comments at 9-10.

[3251] North Carolina Commission and Staff Initial Comments at 18; Pennsylvania
Commission Initial Comments at 17; PJM States Initial Comments at 13; US Climate
Alliance Initial Comments at 2.

appropriately reduce incentives to over-build transmission, which could lead to rates being unjust and unreasonable.[3252]  Similarly, US Climate Alliance supports prohibiting Long-Term Regional Transmission Facilities from being eligible for the CWIP Incentive, as doing so would align incentives for transmission providers to deliver transmission projects on time and within budget.[3253]

1531.  California Commission argues that money paid earlier as CWIP is more valuable than money paid later and that comparisons of savings under the CWIP Incentive and under AFUDC are only meaningful if an interest adjustment is made to account for the time in which payments are made.[3254]  Industrial Customers explain that, to customers, the difference between the AFUDC and CWIP approaches is primarily the time value of money.[3255]  Kentucky Commission Chair Chandler, NASUCA, and California Commission express concern that today's ratepayers are forced to pay for tomorrow's transmission projects, which they refer to as intergenerational inequity, and they are especially concerned if a project will not provide service until a much later date.[3256]

---

[3252] New England Systems Reply Comments at 14-15; North Carolina Commission and Staff Initial Comments at 18; PJM States Initial Comments at 13.

[3253] US Climate Alliance Initial Comments at 2.

[3254] California Commission Reply Comments at 13.

[3255] Industrial Customers Reply Comments at 9.

[3256] Kentucky Commission Chair Chandler Initial Comments at 8; NASUCA Initial Comments at 9; California Commission Reply Comments at 17 (citing NASUCA Initial Comments at 9).

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1076 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

## 2.  **Concerns with the NOPR Proposal**

1532.  Many commenters oppose the NOPR proposal to prohibit Long-Term Regional Transmission Facilities from being eligible for the CWIP Incentive.[3257]  Several commenters cite the Commission's findings in Order No. 679 explaining that the CWIP Incentive can help remove a disincentive to construct new transmission infrastructure, which can involve very long lead times and considerable risk to the utility that the project may not go forward.[3258]  National Grid and Avangrid, for example, argue that Long-Term Regional Transmission Facilities will likely have very long lead times and place even greater risk on transmission providers relative to transmission facilities planned and

---

[3257] AEP Initial Comments at 38-40; Ameren Initial Comments at 48-51; Avangrid Initial Comments at 24-28; CAISO Initial Comments at 43-45; Consumer Organizations Initial Comments at 7-10; Duke Initial Comments at 44-45; Duquesne Light Initial Comments at 2-6; EEI Initial Comments at 42-45; EEI Reply Comments at 17-18; Entergy Initial Comments at 35-37; Eversource Initial Comments at 31-35; Eversource Reply Comments at 2; Harvard ELI Initial Comments at 7-10; Indicated PJM TOs Initial Comments at 26-28; MISO TOs Initial Comments at 65-66; National Grid Initial Comments at 27-30; New York TOs Initial Comments at 23-24; New York Transco Initial Comments at 13-16; Pattern Energy Initial Comments at 34-36; PG&E Initial Comments at 18-20; PPL Initial Comments at 29-30; SoCal Edison Initial Comments at 13-14; Transource Initial Comments at 3; WIRES Initial Comments at 17-19.

[3258] Ameren Initial Comments at 49; EEI Initial Comments at 42-43; EEI Reply Comments at 17-18; Eversource Reply Comments at 2; MISO TOs Initial Comments at 66; National Grid Initial Comments at 28-29; WIRES Initial Comments at 17-18 (all citing Order No. 679, 116 FERC ¶ 61,057 at P 115).

Docket No. RM21-17-000                                           - 1067 -

developed on a more typical timeframe.[3259]  Similarly, WIRES argues that the rationale

underlying the CWIP Incentive remains valid today.[3260]

1533.  Some commenters also cite the Commission's 2012 Transmission Incentive Policy

Statement as support for the CWIP Incentive as a risk-reducing mechanism to

transmission providers, which these commenters state can increase credit ratings and

lower capital costs.[3261]  In addition, several commenters reference Commission findings

in numerous prior incentive proceedings where the Commission has affirmed the benefits

that the CWIP Incentive provides to customers and transmission providers, attesting that

the NOPR proposal is in direct opposition to such findings.[3262]

---

[3259] Avangrid Reply Comments at 6-7; National Grid Initial Comments at 28-29.

[3260] WIRES Initial Comments at 17-18.

[3261] Ameren Initial Comments at 49; EEI Initial Comments at 42; Eversource Initial Comments at 32 (all citing *Promoting Transmission Investment Through Pricing Reform*, Policy Statement, 141 FERC ¶ 61,129, at P 12 (2012)).

[3262] AEP Initial Comments at 38 (citing *Ne. Utils. Serv. Co. & Nat'l Grid USA*, 125 FERC ¶ 61,183, at P 89 (2008)); Ameren Initial Comments at 49 (citing *United Illuminating*, 119 FERC ¶ 61,182, at P 63 (2007)); Duquesne Light Initial Comments at 3 (citing *Xcel Energy Servs., Inc.*, 121 FERC ¶ 61,284, at P 58 (2007); *Am. Elec. Power Service Corp.*, 116 FERC ¶ 61,059, at P 3 (2006)); EEI Initial Comments at 44 (citing *PPL Elec. Utils. Corp.*, 123 FERC ¶ 61,068, at PP 42-43 (2008), *reh'g denied*, 124 FERC ¶ 61,229 (2008)); National Grid Initial Comments at 29 (citing *Tucson Elec. Power Co.*, 174 FERC ¶ 61,223, at P 25 (2021); *S. Cal. Edison Co.*, 172 FERC ¶ 61,241, at P 31 (2020); *United Illuminating Co.*, 167 FERC ¶ 61,126, at P 36 (2019)); MISO TOs Initial Comments at 66-67 (citing *PJM Interconnection, L.L.C.*, 135 FERC ¶ 61,229, at P 78 (2011); *Duquesne Light Co.*, 166 FERC ¶ 61,074, at P 32 (2019); *United Illuminating, Co.*, 167 FERC ¶ 61,126 at P 36; *GridLiance W. Transco LLC*, 164 FERC ¶ 61,049, at P 25 (2018); *NextEra Energy Transmission N.Y., Inc.*, 162 FERC ¶ 61,196, at P 64 (2018); *PJM Interconnection, L.L.C.*, 158 FERC ¶ 61,089, at P 33 (2017); *Duquesne Light Co.*, 179 FERC ¶ 61,218, at P 17 (2022)); New York TOs Initial Comments at 23 (citing *Okla. Gas & Elec. Co.*, 133 FERC ¶ 61,274, at P 48 (2010); *Pepco Holdings, Inc.*, 125 FERC ¶

Docket No. RM21-17-000                                                    - 1068 -

1534.  Some commenters assert that the NOPR proposal runs counter to obligations established in the Energy Policy Act of 2005 and FPA section 219 to facilitate capital investment in transmission infrastructure and would likely impede the development of regional transmission facilities identified to meet changes in the resource mix and demand.[3263]

1535.  Numerous commenters argue that the proposal runs counter to the objectives of the NOPR that seek to encourage the development and completion of regional transmission facilities needed to address changes in the resource mix or demand over a longer time horizon.[3264]  For example, CAISO, MISO TOs, and Avangrid suggest that it is counterintuitive for the Commission to acknowledge a lack of regional transmission facilities in the NOPR, yet propose to undo the most reasonable tool that aids cash flow and reduces uncertainty associated with building those facilities.[3265]  Certain commenters

---

61,130, at P 63 (2008)).

[3263] Ameren Initial Comments at 48; CAISO Initial Comments at 43-44; EEI Initial Comments at 42-43; Indicated PJM TOs Initial Comments at 26-28; MISO TOs Initial Comments at 71-72; National Grid Initial Comments at 28; PPL Initial Comments at 29-30; WIRES Initial Comments at 17-18.

[3264] AEP Initial Comments at 39; Ameren Initial Comments at 50-51; Avangrid Initial Comments at 25; Avangrid Reply Comments at 6-8; Eversource Initial Comments at 2, 31-32; MISO TOs Initial Comments at 70-76; Pattern Energy Initial Comments at 35-36; PG&E Initial Comments at 18-19.

[3265] Avangrid Reply Comments at 7 (citing CAISO Initial Comments at 45; MISO TOs Initial Comments at 71-72, 74-75); CAISO Initial Comments at 45; MISO TOs Initial Comments at 74-76 (citing NOPR, 179 FERC ¶ 61,028 at PP 1, 9, 25, 35, 47, 330-331).

state that the CWIP Incentive assists with getting needed transmission projects built.[3266] AEP and Avangrid state that the CWIP Incentive is particularly well-suited to incentivizing the type of large, regional transmission projects that the Commission hopes to increase through the NOPR, which often present higher costs, longer lead times, an increase in possible rate shock, and present cash flow difficulties.[3267]

1536. Several commenters point to cash flow benefits enabled through the CWIP Incentive and associated benefits to customers.[3268] For example, New York TOs and PG&E contend that the cash flow benefits from the CWIP Incentive allow a utility to reduce the need for external financing and instead allocate capital to other projects that benefit additional ratepayers.[3269]

1537. Several commenters contend that the Commission has failed to adequately justify the NOPR proposal, asserting that the rationale is weak or arguing that the Commission has not shown that its existing policy is unjust and unreasonable.[3270] MISO TOs argue

---

[3266] AEP Initial Comments at 39; Ameren Initial Comments at 50; Avangrid Initial Comments at 26; MISO TOs Initial Comments at 69.

[3267] AEP Initial Comments at 39; Avangrid Reply Comments at 10.

[3268] AEP Initial Comments at 38-39; Ameren Initial Comments at 49; Avangrid Initial Comments at 25; EEI Initial Comments at 44-45; EEI Reply Comments at 17; Entergy Initial Comments at 37; Eversource Initial Comments at 31; Indicated PJM TOs Initial Comments at 26-28; MISO TOs Initial Comments at 66-67, 71, 74-76; National Grid Initial Comments at 28-29; New York TOs Initial Comments at 23-24; New York Transco Initial Comments at 13; Pattern Energy Initial Comments at 35; PG&E Initial Comments at 19; Transource Initial Comments at 3; WIRES Initial Comments at 17-18.

[3269] New York TOs Initial Comments at 23-24; PG&E Initial Comments at 19.

[3270] Ameren Initial Comments at 50-51; Duke Initial Comments at 44-45;

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1080 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                    - 1070 -

that the Commission's claim that ratepayers do not receive benefits from the regional

transmission facilities during the construction period is unsupported by precedent or

analysis and is contrary to longstanding Commission policy.  Further, they observe that a

transmission facility cannot be developed and placed into service overnight, so artificially

dividing up the customer benefits to pre-operation and post-operation ignores the realities

of transmission development.[3271]  Where the proposal identified that additional ratepayer

protections may be necessary to balance customers' interest in just and reasonable rates

against investors' interest in earning a return on invested capital or mitigating against

over-investment in regional transmission facilities, MISO TOs reiterate that the CWIP

Incentive's benefits promote just and reasonable rates by providing incentives

encouraging transmission construction consistent with the Commission's FPA mandate

and assert that an investor's rate of return is set in unrelated proceedings.[3272]

1538.  Pattern Energy states that the Commission has provided no policy justification or

factual basis to distinguish the risk incurred during the planning phase from other risk

---

Duquesne Light Initial Comments at 2-3; EEI Initial Comments at 44-45; Eversource
Initial Comments at 33-34; MISO TOs Initial Comments at 66-67 (citing NOPR, 179
FERC ¶ 61,028 at P 331); Pattern Energy Initial Comments at 35.

[3271] MISO TOs Initial Comments at 69 (citing NOPR, 179 FERC ¶ 61,028 at P
331).

[3272] *Id.* at 72-73 (citing NOPR, 179 FERC ¶ 61,028 at P 331).

factors, such as size, scope, or cost, which it asserts is a departure from the Order No. 679 policy on the CWIP Incentive.[3273]

1539.  Many commenters also argue that, while the NOPR proposal to prohibit Long-Term Regional Transmission Facilities from being eligible for the CWIP Incentive is intended to mitigate shifting too much risk to customers, the proposal ignores many of the benefits that the current CWIP Incentive policy providers to customers.[3274]  EEI argues that commenters that support the proposal also fail to recognize these benefits and the important role that this incentive serves in facilitating new transmission investment.[3275]  Many commenters that oppose the NOPR proposal tout such benefits, such as improved cash flow and the ability for transmission providers to secure better financing through higher credit ratings, resulting in lower interest expense costs that benefit customers.[3276]  Consumer Organizations and Eversource contend that carrying a

---

[3273] Pattern Energy Initial Comments at 35.

[3274] AEP Initial Comments at 38-39; Ameren Initial Comments at 48-51; Avangrid Initial Comments at 27-28; Duke Initial Comments at 45; Duquesne Light Initial Comments at 3-5; EEI Initial Comments at 44-45; EEI Reply Comments at 18; Eversource Initial Comments at 31-34; Indicated PJM TOs Initial Comments at 26; MISO TOs Initial Comments at 66-76; National Grid Initial Comments at 29; New York TOs Initial Comments at 23-24; New York Transco Initial Comments at 13-14; PG&E Initial Comments at 19-20; SoCal Edison Initial Comments at 3, 13-14; WIRES Initial Comments at 18-19.

[3275] EEI Reply Comments at 18 (citing NASUCA Initial Comments at 8-9; Transmission Dependent Utilities Initial Comments at 2-4).

[3276] Ameren Initial Comments at 42, 50; Avangrid Initial Comments at 27; Duke Initial Comments at 45; Duquesne Light Initial Comments at 4-6; EEI Initial Comments at 44-45; MISO TOs Initial Comments at 66-67; PG&E Initial Comments at 19.

Docket No. RM21-17-000                                                          - 1072 -

significant amount of debt in AFUDC rather than being recovered through the CWIP

Incentive can result in lower credit ratings and higher capital costs, which are passed

through to customers, and assert that "with AFUDC, consumers are likely to pay more in

the long run."[3277]

1540.  Some commenters state that the CWIP Incentive helps to avoid rate shock and

provides other cost savings relative to AFUDC.[3278]  Avangrid states that arguments about

the sharing of risk between utilities and customers that the Commission used to support

the NOPR proposal fail to consider the budgeting risk to customers under the AFUDC

approach, and claims that these arguments ignore the benefit of price stability.[3279]

1541.  Several commenters state that the Commission can take more targeted action to

address concerns of uncertainty in Long-Term Regional Transmission Planning rather

than prohibiting Long-Term Regional Transmission Facilities from being eligible for the

CWIP Incentive, for instance, by ensuring sufficiently robust selection criteria, project

---

[3277] Consumer Organizations Initial Comments at 7-8; Eversource Reply Comments at 4 (quoting Consumer Organizations Initial Comments at 7).

[3278] AEP Initial Comments at 38-39; Ameren Initial Comments at 50; Avangrid Initial Comments at 27-28; Avangrid Reply Comments at 10 (citing Kentucky Commission Chair Chandler Initial Comments at 4-9); Consumer Organizations Initial Comments at 7-10; Duquesne Light Initial Comments at 4; EEI Initial Comments at 44; EEI Reply Comments at 17-18; Eversource Initial Comments at 31-32; Eversource Reply Comments at 4-5; Indicated PJM TOs Initial Comments at 26; MISO TOs Initial Comments at 66-76; National Grid Initial Comments at 28-29; New York TOs Initial Comments at 23-24; PG&E Initial Comments at 19; PG&E Reply Comments at 13-14; SoCal Edison Initial Comments at 13-14; WIRES Initial Comments at 19.

[3279] Avangrid Reply Comments at 10 (citing Kentucky Commission Chair Chandler Initial Comments at 4-9).

Docket No. RM21-17-000                                                    - 1073 -

review, and approval processes.[3280]  CAISO contends that these measures are more

appropriate ways to account for the root cause of the risk of over-building and to ensure

that customers are protected from the costs of transmission facilities that may be less

certain.[3281]  R Street states that the NOPR's proposal to remove the CWIP Incentive by

itself will not thwart increasing transmission costs, and the Commission must recognize

preserving and expanding competition as a way to contain costs.[3282]

1542.  Eversource and New York Transco assert that case-by-case evaluation for any

request for transmission incentives, including the CWIP Incentive, affords interested

parties the opportunity to intervene and provide comments, culminating in a Commission

determination of whether the incentive is just and reasonable, thereby protecting

customer interests.[3283]

1543.  Eversource, Harvard ELI, and National Grid state that it would be best to make

changes in incentives policy in a comprehensive transmission incentives rulemaking

instead of in this final rule.[3284]  Eversource and National Grid argue that, at a minimum,

---

[3280] Avangrid Reply Comments at 8 (citing CAISO Initial Comments at 45);
CAISO Initial Comments at 45; EEI Reply Comments at 18; PG&E Reply Comments at
13-14.

[3281] CAISO Initial Comments at 6-7, 45.

[3282] R Street Reply Comments at 2.

[3283] Eversource Reply Comments at 4-5; New York Transco Reply Comments at
7-8.

[3284] Eversource Initial Comments at 33; Harvard ELI Initial Comments at 4-5, 7-8,
10; National Grid Initial Comments at 27.

the Commission should defer a decision on the CWIP Incentive to the rulemaking
proceeding on transmission incentives in Docket No. RM20-10-000, where the
Commission has already established a full and complete record.[3285]  Harvard ELI
suggests that any action on the CWIP Incentive be deferred to another proceeding to
develop a holistic package of incentives, penalties, and oversight mechanisms after the
Commission has established the full goals and procedural rules for Long-Term Regional
Transmission Planning.[3286]

1544.  Certain commenters raise concerns of unintended consequences of the proposal.
CAISO and Transource state that new transmission developers may be disadvantaged if
the Commission prohibits Long-Term Regional Transmission Facilities from being
eligible for the CWIP Incentive.[3287]  Specifically, CAISO notes that the Commission
approved a provision in its OATT that permits a nonincumbent transmission developer
within CAISO to recover Commission-authorized transmission revenue requirements
associated with transmission projects under construction before the facilities are turned
over to CAISO operational control, which CAISO contends is a way that it addresses
barriers to transmission development by nonincumbent transmission developers.[3288]

---

[3285] Eversource Initial Comments at 33; National Grid Initial Comments at 27.

[3286] Harvard ELI Initial Comments at 4-5, 7-8, 10.

[3287] CAISO Initial Comments at 43-45; Transource Initial Comments at 3.

[3288] CAISO Initial Comments at 43-44 (citing *Cal. Indep. Sys. Operator Corp.*,
146 FERC ¶ 61,237 (2014)).

Docket No. RM21-17-000                                                      - 1075 -

CAISO contends that the Commission should not preclude transmission developers from

using the CWIP Incentive for Long-Term Regional Transmission Facilities, especially

because the Commission would continue to allow the CWIP Incentive for reliability and

economic transmission projects.[3289]

### 3.    Interaction of the CWIP Incentive with the Abandoned Plant Incentive

1545.  Many commenters raise concerns with the interaction between the CWIP Incentive

and the transmission incentive that allows applicants to request 100% of prudently-

incurred costs associated with abandoned transmission projects be included in

transmission rates if such abandonment is outside the control of management

(Abandoned Plant Incentive).[3290]  APPA, California Commission, Industrial Customers,

NARUC, and Virginia Attorney General suggest that unless and until the Commission

reconsiders the Abandoned Plant Incentive, customers will continue to face risks

associated with Long-Term Regional Transmission Facilities.[3291]  Specifically, APPA

states that the proposal to prohibit Long-Term Regional Transmission Facilities from

being eligible for the CWIP Incentive will not necessarily protect customers from the

---

[3289] *Id.* at 44-45.

[3290] Order No. 679, 116 FERC ¶ 61,057 at P 163.

[3291] APPA Initial Comments at 46-47; California Commission Reply Comments at 19 (citing Industrial Customers Initial Comments at 27); Industrial Customers Initial Comments at 24-27; Industrial Customers Reply Comments at 9; NARUC Initial Comments at 55; Virginia Attorney General Initial Comments at 6-7; Virginia Attorney General Reply Comments at 5-6.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1086 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                    - 1076 -

costs of potentially unneeded facilities identified through Long-Term Regional

Transmission Planning, given the Commission's policies on recovery of abandoned plant

costs (including the Abandoned Plant Incentive under Order No. 679).[3292]  Similarly,

NARUC, Virginia Attorney General, and Industrial Customers request that the

Commission review the current abandoned plant policy to ensure that customer benefits

from the adoption of the NOPR proposal with respect to the CWIP Incentive do not

disappear if those costs are still recovered from customers as abandoned plant.[3293]

1546.  Industrial Customers suggest that, without additional reforms limiting the recovery

of abandoned plant costs, customers will continue to face the possibility of paying for

transmission that is never built.[3294]  Further, Industrial Customers and California

Commission state that AFUDC could be a superior approach for customers, but only in a

final rule that adopts certain protections to ensure that customers do not pay for

abandoned plant costs.[3295]  Industrial Customers argue that the Commission should adopt

---

[3292] APPA Initial Comments at 46-47.

[3293] Industrial Customers Reply Comments at 10 (citing MISO States Initial
Comments at 14; NARUC Initial Comments at 55); NARUC Initial Comments at 55;
Virginia Attorney General Reply Comments at 5 (citing NARUC Initial Comments at
55).

[3294] Industrial Customers Initial Comments at 25-26.

[3295] California Commission Reply Comments at 19 (citing Industrial Customers
Initial Comments at 27); Industrial Customers Initial Comments at 26-27.

customer safeguards for transmission projects that are abandoned, including a more

thorough review of whether costs were prudently incurred prior to abandonment.[3296]

### C.    Commission Determination

1547.  We decline to act at this time to finalize the NOPR proposal to limit the

availability of the CWIP Incentive for Long-Term Regional Transmission Facilities.  We

agree with commenters[3297] that any action on the CWIP Incentive is more appropriately

considered in a separate proceeding to allow for a holistic approach to transmission

incentives after the Commission has finalized its Long-Term Regional Transmission

Planning reforms.  In particular, we conclude that whether the Commission's

transmission incentives are appropriately "benefitting consumers by ensuring reliability

and reducing the cost of delivered power"[3298] is a question better evaluated by

considering the Commission's transmission incentives comprehensively for all regional

transmission facilities.

### VIII.  Exercise of a Federal Right of First Refusal in Commission-Jurisdictional Tariffs and Agreements

### A.    NOPR Proposal

1548.  In the NOPR, the Commission proposed to use the discretion afforded by FPA

section 309 to amend Order No. 1000's findings and nonincumbent transmission

---

[3296] Industrial Customers Reply Comments at 9.

[3297] Eversource Initial Comments at 33; Harvard ELI Initial Comments at 4-5, 7-8, 10; National Grid Initial Comments at 27.

[3298] 16 U.S.C. 824s(a).

Docket No. RM21-17-000                                                                          - 1078 -

developer reforms in part, so as to permit the exercise of federal rights of first refusal for

selected transmission facilities, conditioned on the incumbent transmission provider with

the federal right of first refusal for such regional transmission facilities establishing joint

ownership of the transmission facilities consistent with certain proposed requirements

described in the NOPR.[3299]  The Commission reasoned that given the investment trends

observed since Order No. 1000's implementation, it is possible that the Commission's

Order No. 1000 nonincumbent transmission developer reforms may be inadvertently

discouraging investment in and development of regional transmission facilities to some

extent.[3300]  Specifically, the Commission posited that incumbent transmission providers,

as a result of those reforms, may be presented with perverse investment incentives that do

not adequately encourage those incumbent transmission providers to develop and

advocate for transmission facilities that benefit more than just their own local retail

distribution service territory or footprint.[3301]

1549.  The Commission preliminarily found that, while the *unconditional* exercise of

federal rights of first refusal for entirely new selected transmission facilities remains

unjust and unreasonable, Order No. 1000's remedy—requiring the elimination of *all*

federal rights of first refusal for entirely new selected transmission facilities—was overly

---

[3299] *See* NOPR, 179 FERC ¶ 61,028 at P 351.

[3300] *Id.* P 350.

[3301] *Id.*

Docket No. RM21-17-000                                                     - 1079 -

broad.[3302]  The Commission further preliminarily found that, while Order No. 1000's

reforms have a sound theoretical basis, the remedy prescribed by Order No. 1000 failed

to recognize that some of the expected benefits from the competitive transmission

development processes could be achieved or at least reasonably approximated through

other means.[3303]

1550.  Accordingly, the Commission proposed to allow transmission providers to

propose, pursuant to FPA section 205, new federal rights of first refusal for incumbent

transmission providers, conditioned on the incumbent transmission provider with the

federal right of first refusal for such regional transmission facilities establishing joint

ownership of the transmission facilities consistent with certain requirements described in

the NOPR.[3304]  The Commission asserted that if the NOPR proposal was adopted, Order

No. 1000's findings and mandates would be amended such that joint ownership

conditions would presumptively be found to ensure just and reasonable Commission-

jurisdictional rates and limit opportunities for undue discrimination by transmission

providers, if imposed upon the exercise of an incumbent transmission provider's federal

right of first refusal for selected transmission facilities.

1551.  The Commission explained that an incumbent transmission provider could

establish qualifying joint ownership with unaffiliated nonincumbent transmission

---

[3302] *Id.* PP 351-352, 354.

[3303] *Id.* P 353.

[3304] *Id.* P 354.

Docket No. RM21-17-000                                             - 1080 -

developers as defined in Order No. 1000, or another unaffiliated entity, including another

incumbent transmission provider.[3305]  However, the Commission also proposed that to

qualify for the presumption, incumbent transmission providers with a conditional federal

right of first refusal would not be allowed to structure joint-ownership arrangements such

that unaffiliated entities were offered less than a meaningful level of participation and

investment in the proposed regional transmission facility.[3306]  The Commission further

explained that an incumbent transmission provider's conditional federal right of first

refusal should not significantly delay the regional transmission planning process or result

in prolonged uncertainty regarding which transmission facilities will (or, alternatively,

will not) be subject to competitive transmission development processes.[3307]

1552.  The Commission noted that proposals for jointly owned regional transmission

facilities would still need to be evaluated by transmission providers in the transmission

planning region and would not be exempt from selection requirements.  However, the

Commission also explained that the evaluation process for such jointly owned regional

transmission facility proposals would not involve running the region's competitive

transmission development process.[3308]

---

[3305] *Id.* P 365.

[3306] *Id.* P 371.

[3307] *Id.* P 366.

[3308] *Id.* P 370.

Docket No. RM21-17-000                                                           - 1081 -

B.    **Comments**

1.    **General Perspectives and Approach to Reform**

1553.  Commenters share a variety of perspectives on the track record of competitive

transmission development processes, the wisdom of the nonincumbent transmission

developer reforms adopted in Order No. 1000, and the steps they believe the Commission

should take in response to the concerns identified in the NOPR.  Several state entities,

customer-affiliated groups, and nonincumbent transmission developers, such as LS

Power, NextEra, and the US DOJ and FTC, defend competitive transmission

development processes as beneficial and argue for their expansion.**3309**  Some US

Senators agree, arguing that allowing for a conditional federal right of first refusal would

be anti-competitive, could hinder development of new transmission, and could cause

excessive costs to consumers.**3310**  On the other hand, representatives of incumbent

---

**3309** *See, e.g.*, American Municipal Power Reply Comments at 3-4; Anbaric Initial Comments at 4-5; California Commission Initial Comments at 100, 103-104; Competition Advocates Supplemental Comments at 1-3 & n.17 (citing Jennifer Chen & Devin Hartman, R Street Institute, *Transmission Reform Strategy from a Customer Perspective: Optimizing Net Benefits and Procedural Vehicles* (May 2022), http://www.rstreet.org/research/transmission-reform-strategy-from-a-customer-perspective-optimizing-net-benefits-and-procedural-vehicles); Competition Coalition Initial Comments at 16-22, 68-70; LS Power Initial Comments at 38-39, 44; LS Power Partial Reply Comments at 20-23; LS Power and NRG Supplemental Comments at 38-39; NextEra Initial Comments at 18-19, 24-27, 29; Ohio Consumers Reply Comments at 16-18; Resale Iowa Reply Comments at 5-6; US DOJ and FTC Initial Comments at 7-8, 10-11, 13, 22.

**3310** US Senators Heinrich and Lee Supplemental Comments at 1-2.  *See also* Freeport-McMoRan Supplemental Comments at 6 (asserting that the federal right of first refusal is anticompetitive and would enrich transmission owning utility shareholders).

Docket No. RM21-17-000                                                    - 1082 -

transmission providers and others (e.g., EEI, WIRES, DATA, the MISO TOs) critique

such processes and many call for the Commission to restore unconditional federal rights

of first refusal.[3311]  Each side of the debate offers consultant reports to substantiate their

position, with pro-competition advocates relying on studies by the Brattle Group (Brattle)

that present competitive transmission development processes in a largely favorable

light,[3312] and advocates for federal rights of first refusal relying on contrasting studies by

Concentric Energy Advisors (Concentric).[3313]  In general, pro-competition advocates,

---

[3311] *See, e.g.*, DATA Initial Comments at 3-7 (detailing experiences by
transmission planning regions and concluding that "competitive processes have become a
distraction from, and an impediment to, the larger goal of expanding the transmission
system to support current and future needs"); EEI Initial Comments at 24, 26, 27-31; EEI
Supplemental Comments at 1-3 (citing Concentric Energy Advisors, *Competitive
Transmission: Experience To-Date Shows Order No. 1000 Solicitations Fail to Show
Benefits*, at 1 (Aug. 2022) (2022 Concentric Report); DATA Supplemental Comments at
4); MISO TOs Initial Comments at 53-56; National Grid Initial Comments at 4-5, 31
(doubting that Order No. 1000 competitive transmission development processes have
broadly produced beneficial outcomes); PJM Initial Comments at 47-48 (enumerating the
challenges faced in and resources required to complete competitive transmission
development processes); Vermont Electric and Vermont Transco Initial Comments at 4-5
(referencing "a number of unintended consequences that have not benefited the regional
grid"); WIRES Initial Comments at 14-15; WIRES Reply Comments at 4-8; Xcel Initial
Comments at 5 ("[Right of first refusal] elimination was a policy experiment that did not
bring about the desired result.").

[3312] In general, Brattle's analysis has found that competitive transmission
development processes have yielded "cost savings averaging between 20% and 30%"
once historical levels of cost escalation in transmission development were taken into
account.  *See* Brattle Apr. 2019 Competition Report at 39-43.  US DOJ and FTC also
contend that there are many instances in which competitive transmission development
processes have benefitted consumers.  *See* US DOJ & FTC Initial Comments at 13-16
(collecting examples); *but see* DATA Initial Comments at 7-9 (critiquing Brattle's
analyses); WIRES Reply Comments at 5 (same).

[3313] In addition to citations to past Concentric reports, DATA attaches to its initial
comments a 2022 Concentric report, which DATA characterizes as showing that

such as LS Power, contend that competitive transmission development processes are essential to just and reasonable rates, while representatives of incumbent transmission providers counter that just and reasonable transmission rates are separately and independently ensured by and through FPA section 205 rate proceedings.[3314]

1554.  At a high level, pro-competition commenters express concern that the NOPR proposal could divert regional transmission facility development opportunities to incumbent transmission providers, opportunities that would otherwise be subject to competitive transmission development processes.  For example, US DOJ and FTC argue

---

competitive transmission development processes add significant time, delay customer benefits, and do not produce clear evidence of customer savings given cost cap exclusions and delays.  DATA Initial Comments at 1-2, 7-11, 14-15; *id.* at attach. A (2022 Concentric Report).  DATA also attaches to its comments a whitepaper that DATA alleges updates the Brattle Apr. 2019 Competition Report, and which DATA contends shows that Order No. 1000-mandated competition resulted in exceeding cost baselines by at least six percent.  DATA Supplemental Comments at 3-4; *id.* at attach.: Whitepaper (DATA, *Revisiting the Evidence on Cost Savings from Transmission Competition* (Dec. 2023) (2023 DATA Whitepaper)).  *But see* Massachusetts Attorney General Reply Comments at 8-9 (critiquing the 2022 Concentric Report); NextEra Reply Comments at 3, 7-17 (same); *see also* Competition Coalition Supplemental Comments at 2-7 (arguing that, in addition to DATA lacking good cause and failing to file a motion to lodge new evidence, the 2023 DATA Whitepaper fails to, among other things, demonstrate that cost-of-service regulation is as effective as competition in establishing just and reasonable transmission rates).

[3314] *Compare* LS Power Initial Comments at 32-37, *with* Ameren Initial Comments at 36-37, and DATA Initial Comments at 13-14, and MISO TOs Initial Comments at 60-61.  Several commenters argue at length about the NOPR proposal's invocation of FPA sections 309 and 206 as legal authority and explore various alternatives.  *See, e.g.*, Ameren Initial Comments at 38-39; California Commission Initial Comments at 101-103; DATA Initial Comments at 17-18 & n.43; Eversource Initial Comments at 39-42; Indicated PJM TOs Initial Comments at 34-35; ITC Initial Comments at 36; LS Power Initial Comments at 14, 19-20, 24, 57-61; MISO TOs Initial Comments at 50-53; NextEra Initial Comments at 51-53.

Docket No. RM21-17-000                                                    - 1084 -

that relying on federal rights of first refusal to address the problems the Commission has

identified would eliminate or distort the benefits of competitive transmission

development processes, which generally "make transmission development less costly,

more resilient, and more innovative."**3315**  NESCOE "implores the Commission to

maintain flexibility that enables ISO-NE to issue competitive solicitations to identify

projects in furtherance of state laws."**3316**  Some pro-competition commenters believe that

states and state commissions are best positioned to determine whether competition

between nonincumbent transmission developers and incumbent transmission providers is

beneficial.**3317**

1555.  Meanwhile, commenters that generally support federal rights of first refusal

express skepticism that the NOPR proposal would be sufficient to address the identified

problems, or offer only qualified support for the NOPR proposal as an inferior alternative

to the Commission fully restoring unconditional federal rights of first refusal.**3318**  In

---

**3315** *See* US DOJ & FTC Initial Comments at 22.

**3316** NESCOE Supplemental Comments at 6-7.

**3317** *E.g.*, California Commission Initial Comments at 104-105; Harvard ELI Initial
Comments at 5-6, 31-33; *see also* Minnesota State Entities Initial Comments at 9;
Mississippi Commission Reply Comments at 8 & n.31; New Jersey Commission Initial
Comments at 37; PIOs Initial Comments at 85; PJM States Initial Comments at 13-14.
*But see* NextEra Reply Comments at 23-25 (questioning whether allowing states to
dictate the terms of a filed rate would be legally sound); PJM Reply Comments at 25-29
(raising potential legal ambiguities and practical issues).

**3318** *E.g.*, Avangrid Initial Comments at 18-24; DATA Initial Comments at 20-22;
Eversource Initial Comments at 35-36, 42-45; Indicated PJM TOs Reply Comments at 2,
13-14; ITC Initial Comments at 32-43; Xcel Initial Comments at 5.

Docket No. RM21-17-000                                                - 1085 -

addition, if adopted, several incumbent transmission providers advocate for requiring

transmission providers to implement the NOPR proposal instead of permitting them to

decide whether to implement it.[3319]

1556.   While commenters offer numerous variations on these high-level opposing views,

several commenters argue that there are problems with the basic structure of competitive

transmission development processes and express concerns that generally align with those

expressed by the Commission in the NOPR.  For example, while not agreeing with the

NOPR proposal, ELCON expresses concern that "current competition regimes have led

eligible developers to retreat to their various corners, which reduces transparency,

information sharing, and open dialogue in the planning process[,]" and contends that both

incumbent transmission owners and nonincumbent transmission developers have adopted

a zero-sum posture to transmission planning that leads to a patchwork of planning and

lack of innovation.[3320]  Similarly, WIRES, citing a report by Grid Strategies, suggests that

---

[3319] *See, e.g.*, DATA Initial Comments at 19-21; Exelon Initial Comments at 49-51; National Grid Initial Comments at 36-37; PG&E Initial Comments at 2, 11; PPL Initial Comments at 34; SoCal Edison Initial Comments at 2; WIRES Initial Comments at 16; *see also* LS Power Initial Comments at 74-76 (discussing FPA section 205 rights in various regions); PJM Initial Comments at 30 (questioning whether there are any "regional differences" on this policy issue).  *But see* Idaho Power Initial Comments at 12 (urging the Commission to ensure that any proposed reforms provide sufficient flexibility to tailor transmission planning and cost allocation processes to accommodate unique regional characteristics).

[3320] ELCON Initial Comments at 21-22; *see also* DATA Reply Comments at 14 (arguing that "the Order No. 1000 status quo creates an inexorable drive towards minimalist, short-term solutions").  Despite its opposition to the NOPR proposal, ELCON sees some potential benefit of encouraging joint ownership and cooperation-based approaches, which ELCON thinks may help remedy the "'us versus them' problems with

reforms under Order No. 1000 often prevent information sharing about transmission needs and available solutions, and lead to less cooperation and coordination within transmission planning regions.[3321]  Harvard ELI disagrees, however, arguing that the report cited by WIRES provides evidence that information asymmetry, secrecy, and utilities' incentives demonstrate undue discrimination.[3322]

1557.  Though it does not support the NOPR proposal, Cypress Creek contends that Order No. 1000 led to misaligned incentives such that "competition today has not necessarily fostered just and reasonable rates."[3323]  Similarly, American Municipal Power states that many municipal electric systems are located on the fringe of an incumbent transmission provider's system and would significantly benefit from regional transmission projects that improve reliability, although because such projects require coordination between two incumbent transmission providers, they are "largely ignored."[3324]  American Municipal Power also states that another disincentive to incumbent transmission provider regional transmission facility development is the

---

the current regional planning process."  ELCON Initial Comments at 23-24.

[3321] WIRES Supplemental Comments at 4 (citing Rob Gramlich, Richard Doying, & Zach Zimmerman, Grid Strategies, *Fostering Collaboration Would Help Build Needed Transmission* (Feb. 2024)).

[3322] Harvard ELI Supplemental Comments at 5.

[3323] Cypress Creek Reply Comments at 16.

[3324] American Municipal Power Initial Comments at 31-32.

Docket No. RM21-17-000                                            - 1087 -

possibility of losing the project to another developer through the competitive process.[3325]

While not taking a position on competitive transmission development processes, Indiana

Commission agrees that Order No. 1000 has produced unintended consequences,

including that transmission development now mostly takes the form of transmission

facilities not subject to competitive transmission development processes,[3326] and states

that little region-wide economic transmission development is occurring.[3327]

1558.  But some commenters, such as NextEra, contend that if regional transmission

investment has lagged behind expectations under Order No. 1000, that is a planning

issue, not an incentives issue, and that some of the NOPR's proposed transmission

planning reforms will help lead to greater investment in regional transmission

facilities.[3328]  LS Power argues that the NOPR only generally observed that there have

---

[3325] *Id.* at 32.  However, American Municipal Power states that because regional
transmission facilities typically traverse more than one incumbent transmission
provider's service territory, allowing individual incumbent transmission providers to
exercise a federal right of first refusal without other reforms also designed to promote
coordination and cooperation between such providers would not "result in a shift from
local to regional projects."  *Id.* (referencing the "interzonal nature of regional projects").

[3326] Indiana Commission Initial Comments at 12 (referring to "'immediate need
reliability' or 'end of life replacement' or 'supplemental' or 'other'" types of
transmission facility projects).

[3327] *Id.*

[3328] *See* NextEra Initial Comments at 18-19, 25; *see also id.* at 43 (arguing that the
NOPR proposal is insufficiently based on speculation about potentially flawed
investment incentives); Americans for Fair Energy Prices Reply Comments at 5-6;
Northwest and Intermountain Initial Comments at 19-20 (arguing that even a limited or
conditional right of first refusal eliminates any incentive for the incumbent transmission
provider to reduce costs or delays); Ohio Commission Federal Advocate Initial
Comments at 18 (arguing that adopting the NOPR proposal would further misalign

been increases in local transmission facility investment and static or declining investment in regional transmission facilities, and did not specify particular transmission planning regions in which this problem is occurring or which incumbent transmission providers face perverse investment incentives.[3329]  However, other commenters, such as WIRES, contend that the elimination of federal rights of first refusal may be connected to flat or declining regional transmission investment,[3330] as suggested by the NOPR.

1559.  Finally, several commenters argue that the Commission should not adopt federal right of first refusal reforms in this docket, but rather explore those and related issues in another forum.  Advanced Energy United, Advanced Energy Buyers, State Agencies, and California Commission, for example, urge the Commission to consider these issues either in a different proceeding or at a technical conference.[3331]  Competition Advocates support alternative reforms that they argue can better address the problem of perverse incentives,

---

incentives for incumbent transmission providers, not improve them).

[3329] LS Power Initial Comments at 73-74.  *But see* PJM Initial Comments at 30 (questioning whether there are any "regional differences" on this policy issue).

[3330] WIRES Reply Comments at 2 (citing WIRES Initial Comments at 13-14).

[3331] Advanced Energy Buyers Initial Comments at 4 n.6; AEE Initial Comments at 4, 35-37; AEE Reply Comments at 31-33; California Commission Initial Comments at 103-104; State Agencies Initial Comments at 11; State Agencies Reply Comments at 6; *see also* Chemistry Council Initial Comments at 8; Enel Initial Comments at 3; Harvard ELI Initial Comments at 7-10; NESCOE Initial Comments at 11, 74-77.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1099 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                  - 1089 -

including better enforcement of existing orders or taking action to reduce Order No. 1000

exemptions, and establishing an independent transmission monitor.[3332]

## 2. Comments on the NOPR's Joint Ownership Proposal

1560. Some commenters, including TAPS, highlight various ways in which the

Commission's joint ownership proposal would alleviate challenges associated with

current regional transmission planning processes.[3333] Some commenters, such as ELCON

and the Omaha Public Power District, argue that the Commission's joint ownership

proposal would benefit customers or encourage incumbent transmission providers to

pursue larger and more comprehensive transmission solutions to the benefit of customers,

and create incentives for transmission providers to find beneficial opportunities and

investments for joint ownership partners and customers.[3334] Other commenters agree that

---

[3332] Competition Advocates Supplemental Comments at 3-4.

[3333] *See* TAPS Initial Comments at 29-30 (stating that joint ownership
arrangements provide benefits such as "improving transmission planning to produce a
more efficient build-out; facilitating state siting; making it easier for [load-serving
entities] to accept cost increases associated with new transmission by providing a hedge;
and reducing the costs of needed facilities"), *id.* at 34-37; *see also* Eversource Initial
Comments at 36-39; Pattern Energy Initial Comments at 37; PPL Initial Comments at 32-
33; Vermont Electric and Vermont Transco Initial Comments at 4.

[3334] *See* ELCON Initial Comments at 23-24; *see also* Cross Sector Representatives
Supplemental Comments at 1 (arguing that the provisions are appropriately tied to
collaborative and holistic planning outcomes that provide clear benefits to customers and
would benefit the goals enunciated by the Commission throughout this rulemaking
process); Omaha Public Power Initial Comments at 5 (suggesting that the joint ownership
proposal will likely encourage neighboring incumbent transmission providers to develop
facilities that benefit multiple transmission providers under certain conditions); Pattern
Energy Initial Comments at 37 (asserting that joint ownership arrangements will open the
market to additional investment opportunities for all parties).

USCA4 Appeal: 24-1650   Doc: 224   Filed: 01/21/2025   Pg: 1100 of 2455
Document Accession #: 20240513-3036   Filed Date: 05/13/2024

Docket No. RM21-17-000                                                      - 1090 -

adopting the NOPR proposal may incentivize incumbent transmission providers to "look beyond the provincial" needs and consider regional and interregional solutions to transmission needs.[3335]

1561.   However, numerous commenters criticize the NOPR proposal and its approach to joint ownership partner selection, especially its inclusion of another incumbent transmission provider as a potential joint ownership partner.[3336]  In general, these commenters contend that incumbent transmission providers would be free to only team up with fellow incumbent transmission providers with the same interests and exclude others, leading to results that would be contrary to the goals of Order No. 1000.  As Anbaric states, two incumbent transmission providers (or their affiliates) could "team up and swap a portion of their respective projects as a means to satisfy the joint ownership requirement" and thereby "maintain the status quo"[3337] rather than advance innovation, cost savings, or new entry.  NextEra and others decry this potential outcome, which could

---

[3335] Tabors Caramanis Rudkevich Initial Comments at 2; *see also* Citizens Energy Initial Comments at 9-10; PG&E Initial Comments at 11 (arguing that a conditional federal right of first refusal will help mitigate development challenges by promoting collaboration between partners).

[3336] *E.g.*, Anbaric Initial Comments at 18; *see also, e.g.*, APPA Initial Comments at 11-12; California Commission Initial Comments at 80-88;  Competition Coalition Initial Comments at 49-50; LS Power Initial Comments at 92-94; Massachusetts Attorney General Initial Comments at 48-49; New Jersey Commission Initial Comments at 31-33; NextEra Initial Comments at 49-51; NRECA Initial Comments at 58, 61; PJM States Initial Comments at 14; Policy Integrity Initial Comments at 21-22; TANC Initial Comments at 13; TAPS Initial Comments at 48-51; TAPS Reply Comments at 5-6 & n.25.

[3337] Anbaric Initial Comments at 18.

Docket No. RM21-17-000                                                 - 1091 -

keep nonincumbent transmission developers from obtaining investment opportunities.[3338]

Relatedly, several commenters argue that the NOPR proposal would raise antitrust and

competition concerns,[3339] including US DOJ and FTC, which argue that because the joint

venture will not be facing pressure to compete, the conditional federal right of first

refusal does not create the incentive for incumbent transmission providers to seek out the

best partner.[3340]  In other words, US DOJ and FTC argue, the mere existence of a joint

venture partner does not bring competition to a project, nor does it necessarily result in

the best partner for a project being selected, in terms of skill, cost, or innovation.[3341]

1562.  Commenters also highlight the potential for uncertainty, litigation, and delays in

attempting to implement the NOPR proposal.  Anbaric asserts that a conditional federal

right of first refusal could add delays due to litigation over whether incumbent

transmission providers provided meaningful opportunities to third parties.[3342]  EEI

---

[3338] *See* Harvard ELI Initial Comments at 35; NextEra Initial Comments at 49-51.
In contrast, some commenters such as APPA urge the Commission to adopt a
requirement that incumbent transmission providers offer joint ownership on reasonable
terms at a load ratio share level to all unaffiliated load-serving entities in the incumbent
transmission provider's footprint.  *See* APPA Reply Comments at 5-6; TAPS Initial
Comments at 30-32 (advocating for a similar proposal).

[3339] *See, e.g.*, Competition Coalition Initial Comments at 59-62; LS Power Initial
Comments at 122-125, 131-134; US DOJ & FTC Initial Comments at 17-18.

[3340] US DOJ & FTC Initial Comments at 17.

[3341] *Id.* at 17-18; *see also* LS Power Initial Comments at 93 (arguing that the
NOPR proposal would not require any independent check that the incumbent
transmission provider is partnering with the entity that offers the most benefits).

[3342] Anbaric Initial Comments at 16; *see also* Avangrid Initial Comments at 18
(noting that establishing a conditional federal right of first refusal adds a layer of

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1102 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                    - 1092 -

cautions against putting transmission providers in a position where they must adjudicate what constitutes meaningful ownership of jointly owned transmission facilities on a case-by-case basis, recommending instead that the Commission provide guidance on the types of ownership rights or operational obligations that will qualify and establish a process for seeking Commission approval in a timely manner for other arrangements.[3343]  MISO asserts that the process envisioned by the NOPR would be time-consuming, as would developing a joint ownership proposal, and asks that the Commission adopt clearly defined criteria for joint ownership, such as a *pro forma* agreement, in order not to impede transmission development.[3344]  National Grid calls for planning authorities to be given the authority to determine the appropriate criteria and conditions that constitute a valid joint ownership arrangement, though it also asks for guidance regarding particular types of combinations of potential joint owners.[3345]

---

complexity to the development of transmission); NYISO Initial Comments at 55-56 (asking the Commission to consider the complications, disputes, and delays that may arise from attempting to implement a conditional federal right of first refusal and other practical issues).

[3343] EEI Initial Comments at 36-37; *see also* Ameren Initial Comments at 44; DATA Initial Comments at 21-22; PJM Initial Comments at 4-5, 51-52, 53-54.

[3344] MISO Initial Comments at 80-83; *see also* APPA Initial Comments at 4-7, 20-22 (outlining a detailed proposed implementation process by which APPA believes incumbent transmission providers and load-serving entities could work together and help avoid disputes and delay); Invenergy Reply Comments at 7-8 (calling for the adoption of *pro forma* agreements to ease implementation); TAPS Initial Comments at 53-54 (expressing concern that the NOPR proposal's anticipated period for formulation of joint ownership agreements is too short).

[3345] *See* National Grid Initial Comments at 37.

Docket No. RM21-17-000                                                              - 1093 -

### C.    Commission Determination

1563.  We decline to act at this time to finalize the NOPR proposal.  Rather, we will continue to consider the NOPR proposal and potential federal right of first refusal issues in other proceedings.  We do not adopt in this final rule any changes to Order No. 1000's nonincumbent transmission developer reforms.

1564.  As summarized above, commenters raise substantial concerns about whether incumbent transmission providers, as a result of Order No. 1000's reforms, face perverse investment incentives that do not adequately encourage those incumbent transmission providers to develop and advocate for transmission facilities that benefit more than just their own local retail distribution service territory or footprint.  To the extent that incumbent transmission providers face perverse investment incentives, commenters also raise substantial concerns about whether the NOPR proposal adequately and appropriately addresses those incentives and whether adopting the proposal is necessary or appropriate in carrying out the provisions of the FPA.  Therefore, after careful consideration of the record, we decline to finalize the NOPR proposal at this time.  The Commission will continue to consider potential federal right of first refusal reforms along with other transmission reforms in the future.[3346]

---

[3346] We note, for example, the ongoing proceeding in Docket No. AD22-8 on Transmission Planning and Cost Management.

## IX.    **Local Transmission Planning Inputs in the Regional Transmission Planning Process**

### A.    **Need for Reform**

#### 1.    **NOPR**

1565.  In the NOPR, the Commission explained that it was concerned that local transmission planning processes may lack adequate provisions for transparency and meaningful input from stakeholders, and that regional transmission planning processes may not adequately coordinate with local transmission planning processes.[3347]  The Commission stated in the NOPR that it was concerned that the lack of minimal standards or specified procedures may contribute to inadequate transparency and opportunities for stakeholders to engage in local transmission planning processes.[3348]  Accordingly, the Commission stated that it believed reforms to better ensure transparency and opportunities for stakeholder engagement may be timely and important in light of the significant investments in transmission that now occur through local transmission planning processes.[3349]

---

[3347] NOPR, 179 FERC ¶ 61,028 at P 398 & n. 639 (providing that regional transmission planning processes should identify "alternative transmission solutions that might meet the needs of the transmission planning region more efficiently or cost-effectively than solutions identified by individual utility transmission providers in their local transmission planning process" (quoting Order No. 1000, 136 FERC ¶ 61,051 at P 148)).

[3348] *Id.*

[3349] *See supra* The Overall Need for Reform section.

USCA4 Appeal: 24-1650    Doc: 224      Filed: 01/21/2025    Pg: 1105 of 2455
Document Accession #: 20240513-3036      Filed Date: 05/13/2024

Docket No. RM21-17-000                                           - 1095 -

1566.  In addition, the Commission explained in the NOPR that it was concerned that,

given the age of the nation's transmission infrastructure, many incumbent transmission

providers are replacing aging transmission infrastructure as it reaches the end of its useful

life without evaluating whether those replacement transmission facilities could be

modified (i.e., right-sized) to more efficiently or cost-effectively address regional

transmission needs, and, more generally, that transmission providers developing regional

transmission plans may lack the information necessary to identify the benefits that

regional transmission facilities may provide in deferring or eliminating the need for in-

kind replacements.  Specifically, the NOPR stated that in-kind replacements of existing

transmission facilities are managed by individual incumbent transmission providers

according to their company practices, and that there is no requirement that transmission

providers plan these in-kind replacement transmission facilities through an Order

No. 890-compliant transmission planning process.[3350]  The Commission stated that,

because in-kind replacement of existing transmission facilities is not subject to any

transmission planning process, it was concerned that, absent reform, there may be a lack

of coordination between regional transmission planning processes and in-kind

replacement of existing transmission facilities to identify whether these replacement

transmission facilities could be modified to more efficiently or cost-effectively address

---

[3350] NOPR, 179 FERC ¶ 61,028 at P 399 (citing *S. Cal. Edison Co.*, 164 FERC ¶ 61,160 at P 33; *Cal. Pub. Utils. Comm'n v. Pac. Gas & Elec. Co.*, 164 FERC ¶ 61,161, at P 68 (2018); *PJM Interconnection, L.L.C.*, 172 FERC ¶ 61,136, at PP 12, 89 (2020); *PJM Interconnection, L.L.C.*, 173 FERC ¶ 61,242, at P 54 (2020)).

USCA4 Appeal: 24-1650     Doc: 224       Filed: 01/21/2025     Pg: 1106 of 2455
Document Accession #: 20240513-3036     Filed Date: 05/13/2024

Docket No. RM21-17-000                                          - 1096 -

transmission needs identified through Long-Term Regional Transmission Planning.  The

Commission explained that this lack of coordination may result in a regional transmission

planning process that fails to identify opportunities to right size planned in-kind

replacement transmission facilities and may result in the development of duplicative or

unnecessary transmission facilities that increase costs to customers and render

Commission-jurisdictional rates unjust and unreasonable.[3351]

### 2.    Comments

1567.  Some commenters argue that the NOPR proposal regarding improved

transparency in local transmission planning processes is not justified.[3352]  EEI argues that

the Commission has not found that any of the approved transmission planning processes

under Order Nos. 890 and 1000 are unjust and unreasonable or unduly discriminatory or

preferential and that, absent such a finding, the Commission should not move forward

with changes to local transmission planning processes.[3353]  Idaho Power states that the

Commission should not use a general rulemaking to address localized problems.[3354]  On

the other hand, Indicated PJM TOs state that the NOPR proposal to enhance transparency

---

[3351] *Id*.

[3352] Dominion Initial Comments at 76 (citing NOPR, 179 FERC ¶ 61,028 at P 395 n.634); EEI Initial Comments at 40; Idaho Power Initial Comments at 12-13.

[3353] EEI Initial Comments at 40; *see also* Dominion Initial Comments at 76.

[3354] Idaho Power Initial Comments at 12-13.

in the local transmission planning processes is needed in each transmission planning region to satisfy the requirements set forth by Order No. 890.[3355]

1568.  With respect to the Commission's proposed right-sizing reforms, LS Power and NextEra argue that the NOPR fails to make findings required under FPA section 206 to permit a right of first refusal for right-sized projects.  LS Power and NextEra assert that the NOPR does not satisfy the first prong of FPA section 206, as it fails to make an affirmative finding that either the regional transmission planning process or the local transmission planning process are unjust and unreasonable such that abandonment of the existing tariff provisions is warranted.[3356]  Competition Coalition also asserts that the Commission failed to demonstrate the alleged need for reform on any section 206 finding.[3357]

### 3.      Commission Determination

1569.  Based on the record, we find that there is substantial evidence to support the conclusion that existing requirements governing transparency in local transmission planning processes and coordination between local and regional transmission planning

---

[3355] Indicated PJM TOs Initial Comments at 41 (citing Order No. 890, 118 FERC ¶ 61,119 at PP 426-561).

[3356] LS Power Initial Comments at 50-53 (citations omitted); NextEra Initial Comments at 54-56 (citations omitted). A number of commenters challenge the NOPR right-sizing proposal, including the proposal to permit a federal right of first refusal for certain replacement facilities.  We address those arguments below in the Identifying Potential Opportunities to Right-Size Replacement Transmission Facilities section below.

[3357] Competition Coalition Initial Comments at 64.

processes are unjust, unreasonable, and unduly discriminatory or preferential. We therefore adopt the preliminary findings in the NOPR concerning the need for reform of the local transmission planning process and coordination between the local and regional transmission planning processes, including the evaluation of whether replacement transmission facilities could be modified (i.e., right-sized) to more efficiently or cost-effectively address transmission needs.[3358]

1570. Local and regional transmission planning processes serve essential and complementary roles in ensuring that customers' transmission needs are identified and met at a just and reasonable cost, including through the identification, evaluation, and selection of more efficient or cost-effective transmission solutions through regional transmission planning. Information and transmission solutions developed through local transmission planning serve as a foundation for regional transmission planning, and it is therefore critical that the processes are appropriately designed and aligned to ensure that transmission providers and stakeholders have the information needed, including from the local transmission planning process, to conduct effective regional transmission planning. While the broader reforms directed in this final rule are focused on improving the regional transmission planning process, we nonetheless have identified discrete deficiencies in the local transmission planning process and its coordination with the

---

[3358] Below, we clarify that the new transparency requirements do not apply to transmission facilities that are otherwise exempt from Order No. 890's transparency requirements, such as asset management projects. *See infra* Enhanced Transparency of Local Transmission Planning Inputs in the Regional Transmission Planning Process section.

regional transmission planning process that also must be addressed to ensure that Commission-jurisdictional rates are just and reasonable.

1571. First, we find that local transmission planning processes lack adequate provisions for transparency and meaningful input from stakeholders. The Commission has recognized the critical role that stakeholders serve in effective transmission planning,[3359] and in Order Nos. 890 and 1000, directed reforms to facilitate their meaningful participation in both local and regional transmission planning.[3360] However, the record demonstrates that existing transparency and coordination requirements in local transmission planning do not consistently provide stakeholders with sufficient information regarding the development of local transmission plans.[3361] We further find that the absence of minimal standards or specified procedures to implement the

---

[3359] *See, e.g.*, Order No. 890, 118 FERC ¶ 61,119 at P 454 ("[C]ustomers must be included at the early stages of the development of the transmission plan and not merely given an opportunity to comment on transmission plans that were developed in the first instance without their input."); Order No. 1000, 136 FERC ¶ 61,051 at P 152 ("[A]bsent timely and meaningful participation by all stakeholders, the regional transmission planning process will not determine which transmission project or group of transmission projects could satisfy local and regional needs more efficiently or cost-effectively.").

[3360] *See, e.g.*, Order No. 890, 118 FERC ¶ 61,119 at PP 454, 488, 557; Order No. 1000, 136 FERC ¶ 61,051 at P 152.

[3361] *E.g.*, OMS Initial Comments at 15 ("OMS members have varying levels of oversight and visibility into the utility-driven, local planning processes that are incorporated into the overall MISO transmission expansion plan."); Concerned Scientists ANOPR Initial Comments at 24-31 (discussing challenges obtaining information to assess projects developed through local transmission planning processes) (citations omitted); New Jersey Commission ANOPR Initial Comments at 6-7 (discussing limited information and analysis provided regarding projects considered in local transmission planning) (citations omitted).

transmission planning principles required by Order No. 890 contributes to inadequate transparency and opportunities for stakeholders to engage in local transmission planning processes.

1572.  The combined effect of these deficiencies is that stakeholders who wish to participate in transmission planning, at both the local and regional level, may not be able to effectively do so.  More specifically, we find that, when engaging in the regional transmission planning process, stakeholders lack sufficient information about underlying local transmission needs and potential solutions that is necessary to ensure that the more efficient or cost-effective regional transmission solutions are identified, evaluated, and selected.  Given the recognized importance of stakeholder participation in effective transmission planning, we find that reforms are needed to ensure that Commission-jurisdictional local and regional transmission planning processes remain just, reasonable, and not unduly discriminatory or preferential.  Furthermore, we believe that reforms to better ensure more consistent implementation of the Order No. 890 transmission planning principles are timely and important in light of the significant investments in transmission infrastructure that now occur through local transmission planning processes.[3362]

1573.  Second, we find that additional coordination between the local and regional transmission planning processes regarding replacement of aging infrastructure is needed.  The record shows that many incumbent transmission providers are replacing aging transmission infrastructure as it reaches the end of its useful life.  For example, we note

---

[3362] *See supra* The Overall Need for Reform section.

that PJM estimated that roughly two-thirds of all PJM transmission system assets are more than 40 years old, with some transmission facilities approaching 90 years old.[3363] NYISO highlights that 80 percent of transmission lines in its footprint are at least 50 years old and are either being replaced or will soon need to be replaced.[3364]  Replacing these transmission facilities will require substantial investment, which will directly affect Commission-jurisdictional transmission rates.  For example, the California Commission notes that PG&E anticipates spending roughly $11 billion between 2022 and 2027 to address aging transmission infrastructure.[3365]

1574.  However, because the Commission's existing requirements do not obligate transmission providers to share sufficient information regarding these replacement projects, transmission providers in the regional transmission planning process are not consistently evaluating whether those replacement transmission facilities could be modified (i.e., right-sized) to more efficiently or cost-effectively address transmission needs.  We therefore find that the lack of a requirement for transmission providers in each

---

[3363] *See* PJM Interconnection, L.L.C., *The Benefits of the PJM Transmission System* 5 (2019), https://www.pjm.com/-/media/library/reports-notices/special-reports/2019/the-benefits-of-the-pjm-transmission-system.pdf.  Moreover, AEP estimates that approximately 30 percent of its line miles and circuit breakers will need to be replaced over the next 10 years.  *See* AEP, *Wolfe Utilities, Midstream, & Clean Energy Conference* 40 (Sept. 30, 2021), https://www.aep.com/Assets/docs/investors/eventspresentationsandwebcasts/WolfeConferencePresentation093021.pdf.

[3364] NYISO Initial Comments at 58.

[3365] California Commission Initial Comments at 110.

Docket No. RM21-17-000                                                          - 1102 -

transmission planning region to evaluate whether those replacement transmission

facilities could be modified (i.e., right-sized) to more efficiently or cost-effectively

address Long-Term Transmission Needs results in a regional transmission planning

process that fails to identify opportunities to right-size planned in-kind replacement

transmission facilities and may result in the development of inefficiently sized or

designed, duplicative, or unnecessary transmission facilities that increase costs to

customers and render Commission-jurisdictional rates unjust and unreasonable.

1575.  With respect to the claim by commenters that the Commission lacks jurisdiction to

impose the proposed transparency and coordination requirements or that the Commission

has not justified the requirements,[3366] we disagree.  Consistent with Order Nos. 890 and

1000, the Commission has authority to establish requirements related to local

transmission planning processes and the inputs to regional transmission planning

processes.[3367]  Our findings above are supported by substantial evidence in the record,

and we address any concerns regarding our remedy to address the transparency and

coordination deficiencies below.

---

[3366] Dominion Initial Comments at 76; EEI Initial Comments at 40; Idaho Power
Initial Comments at 12-13.

[3367] *See, e.g.*, Order No. 890, 118 FERC ¶ 61,119 at P 435 ("In order to limit the
opportunities for undue discrimination . . . and to ensure that comparable transmission
service is provided by all public utility transmission providers, including RTOs and ISOs,
the Commission concludes that it is necessary to amend the existing *pro forma* OATT to
require coordinated, open, and transparent transmission planning on both a local and
regional level."); Order No. 1000, 136 FERC ¶ 61,051 at PP 68, 148, 152.

1576.  We also disagree with LS Power, Competition Coalition, and NextEra's arguments regarding whether the Commission properly demonstrated under FPA section 206 that existing rates are unjust, unreasonable, or unduly discriminatory or preferential in instituting a federal right of first refusal for right-sized replacement transmission facilities.[3368]  First, we clarify that the Commission is not finding that existing transmission planning processes are unjust, unreasonable, or unduly discriminatory or preferential due to a lack of a federal right of first refusal for these facilities.  Rather, we find here that transmission providers' OATTs are unjust and unreasonable due to the lack of right-sizing requirements that may lead to the identification, evaluation, and selection of more efficient or cost-effective Long-Term Regional Transmission Facilities.  As discussed above, the record demonstrates that many incumbent transmission providers are replacing aging transmission infrastructure as it reaches the end of its useful life without evaluating, through the regional transmission planning process, whether those replacement transmission facilities could be modified (i.e., right-sized) to more efficiently or cost-effectively address transmission needs.  As a result of this identified deficiency, we find that transmission providers' OATTs are unjust and unreasonable.  We address LS Power, NextEra, and other commenters' concerns regarding the Commission's proposed replacement rate, including our findings regarding a federal right of first refusal for right-sized replacement transmission facilities, below.

---

[3368] Competition Coalition Initial Comments at 64; LS Power Initial Comments at 51-53; NextEra Initial Comments at 54-56.

USCA4 Appeal: 24-1650     Doc: 224        Filed: 01/21/2025     Pg: 1114 of 2455
Document Accession #: 20240513-3036     Filed Date: 05/13/2024

Docket No. RM21-17-000                                                  - 1104 -

1577.  Because we find that the Commission's existing requirements governing transparency in local transmission planning processes and coordination between local and regional transmission planning processes are insufficient to ensure just and reasonable and not unduly discriminatory or preferential rates, we are now requiring, pursuant to FPA section 206, that transmission providers adopt, with certain modifications, the two reforms that the Commission identified in the NOPR:  (1) enhance the transparency of local transmission planning processes; and (2) require transmission providers to evaluate whether transmission facilities that need replacing can be "right-sized" to more efficiently or cost-effectively address Long-Term Transmission Needs identified in Long-Term Regional Transmission Planning.[3369]  We find that the first reform will result in transmission providers providing enhanced transparency for stakeholders while providing those same stakeholders with opportunities to more effectively engage in local and regional transmission planning processes.  We find that the second reform will result in transmission providers identifying, evaluating, and selecting replacement transmission facilities that more efficiently or cost-effectively address Long-Term Transmission Needs.  Taken together, we find that these reforms will ensure that Commission-jurisdictional rates are just and reasonable and not unduly discriminatory or preferential.

---

[3369] NOPR, 179 FERC ¶ 61,028 at PP 400-403.

Docket No. RM21-17-000                                          - 1105 -

B.    **Enhanced Transparency of Local Transmission Planning Inputs in the Regional Transmission Planning Process**

1.    **NOPR Proposal**

1578.  In the NOPR, the Commission proposed to require transmission providers in each transmission planning region to revise the regional transmission planning process in their OATTs with additional provisions to enhance transparency of:  (1) the criteria, models, and assumptions that they use in their local transmission planning process; (2) the local transmission needs that they identify through that process; and (3) the potential local or regional transmission facilities that they will evaluate to address those local transmission needs.[3370]  The Commission explained that transmission providers would be required to establish an iterative process that would provide stakeholders with meaningful opportunities to participate and provide feedback on local transmission planning throughout the regional transmission planning process.[3371]  The Commission proposed to require that the regional transmission planning process include at least three publicly-noticed stakeholder meetings concerning the local transmission planning process of each transmission provider that is a member of the transmission planning region before a transmission provider's local transmission plan can be incorporated into the transmission planning region's planning models.[3372]

---

[3370] NOPR, 179 FERC ¶ 61,028 at P 400.

[3371] *Id.*

[3372] *Id.*

1579.  Specifically, the Commission proposed to require transmission providers in each transmission planning region, prior to the submission of local transmission planning information to the transmission planning region for inclusion in the regional transmission planning process, to convene, collectively, as part of the regional transmission planning process, a stakeholder meeting to review the criteria, assumptions, and models related to each transmission provider's local transmission planning (Assumptions Meeting).  Next, no fewer than 25 calendar days after the Assumptions Meeting, transmission providers that are members of the transmission planning region would be required to convene, collectively, as part of the regional transmission planning process, a stakeholder meeting to review identified reliability criteria violations and other transmission needs that drive the need for local transmission facilities (Needs Meeting).  Finally, the Commission proposed to require that, no fewer than 25 calendar days after the Needs Meeting, transmission providers that are members of the transmission planning region convene, collectively, as part of the regional transmission planning process, a stakeholder meeting to review potential solutions to those reliability criteria violations and other transmission needs (Solutions Meeting).  The Commission also proposed to require that all materials for stakeholder review during these three meetings be publicly posted and that stakeholders have opportunities before and after each meeting to submit comments.[3373]

---

[3373] *Id.* P 401.

Docket No. RM21-17-000                                                    - 1107 -

1580.  The Commission preliminarily found that these proposed requirements will result in needed additional transparency into local transmission planning processes, which inform the regional transmission planning process in a transmission planning region.[3374]

### 2.  **Comments**

#### a.  **Interest in Enhanced Transparency of Local Transmission Planning Inputs**

1581.  Many commenters support the NOPR proposal.[3375]  ITC argues that the Commission's proposed transparency requirements strike an appropriate balance between the need for oversight and the need to timely address asset management needs.[3376]  Southeast PIOs state that closer coordination between the regional and local transmission planning processes would help to ensure that the local process does not dull the

---

[3374] *Id.* P 402.

[3375] *See* AEE Initial Comments at 3; AEP Reply Comments at 10; APPA Initial Comments at 47; Breakthrough Energy Initial Comments at 19; Center for Biological Diversity Initial Comments at 28; Certain TDUs Initial Comments at 13; City of New Orleans Council Initial Comments at 11; Clean Energy Associations Initial Comments at 36; Clean Energy Buyers Initial Comments at 33; Colorado Consumer Advocates Initial Comments at 30-31; Cross Sector Representatives Supplemental Comments at 1; Exelon Initial Comments at 3, 51-52; Indicated PJM TOs Initial Comments at 40; Interwest Initial Comments at 17-18; ITC Initial Comments at 45-47; National and State Conservation Organizations Initial Comments at 2; New York Transco Initial Comments at 1; NextEra Initial Comments at 66-67; Northwest and Intermountain Initial Comments at 20; OMS Initial Comments at 16; PJM States Initial Comments at 4-6; Resale Iowa Initial Comments at 8; Resale Iowa Reply Comments at 5; SEIA Initial Comments at 25-26; Shell Initial Comments at 34; Southeast PIOs Initial Comments at 54-55; Vermont State Entities Initial Comments at 10.

[3376] ITC Initial Comments at 45-47 (citations omitted).

effectiveness of the regional process.[3377]  Vermont State Entities support enhancing

transparency and visibility of local transmission planning processes and coordinating

with Long-Term Regional Transmission Planning and other processes, including the

generator interconnection process.[3378]  City of New Orleans Council states that increased

transparency, collaboration, and coordination between the regional and local transmission

planning processes will result in more efficient local transmission development.[3379]  OMS

asserts that enhanced transparency will enable retail regulators to more effectively

participate in identifying the best set of projects to meet both local and regional needs.[3380]

1582.  Colorado Consumer Advocates state that the Commission must ensure that

transmission providers maintain coordinated, open, and transparent transmission planning

processes on both a local and regional level that meet stakeholder needs.[3381]  Interwest

asserts that the NOPR proposal is needed to incentivize the coordination of generation

and resource planning and transmission planning beyond state lines, adding that

transparency measures, such as a process for information sharing, could allow customers

---

[3377] Southeast PIOs Initial Comments at 54-55.

[3378] Vermont State Entities Initial Comments at 10 (citing NOPR, 179 FERC ¶ 61,028 at P 400).

[3379] City of New Orleans Council Initial Comments at 11.

[3380] OMS Initial Comments at 16.

[3381] Colorado Consumer Advocates Initial Comments at 17, 20-21.

Docket No. RM21-17-000                                                              - 1109 -

or stakeholders to evaluate or replicate the findings from transmission providers and

reduce after-the-fact disputes regarding allocated costs.[3382]

1583.  Exelon and Indicated PJM TOs note that the NOPR proposal mirrors PJM TOs'

local transmission planning process.[3383]  Indicated PJM TOs state that the NOPR proposal

will help to ensure the coordination of local and regional transmission planning while

preserving transmission owner responsibility for local transmission planning.[3384]

Indicated PJM TOs state that the PJM Attachment M-3 process avoids duplication of

projects between local and regional transmission planning processes.[3385]  Clean Energy

Associations state that each transmission planning region should have the opportunity to

regularly review local transmission planning criteria for consistency with regional

transmission planning, as PJM's manuals require.[3386]

1584.  Clean Energy Buyers state that existing local transmission planning has not met

expectations for openness, coordination, and transparency, and that the NOPR proposal

will help remedy such deficiencies and better identify cost-effective transmission

---

[3382] Interwest Initial Comments at 17-18.  As an example, Interwest cites
WestConnect's Colorado Coordinated Planning Group, which conducts transmission
planning through task forces and work groups consisting of stakeholders.  *Id.*

[3383] Exelon Initial Comments at 3-4, 51-52 (citing PJM, Intra-PJM Tariffs, OATT,
attach. M-3 (1.0.0)); *see* Indicated PJM TOs Initial Comments at 42-43.

[3384] Indicated PJM TOs Initial Comments at 42-43.

[3385] *Id.* at 42.

[3386] Clean Energy Associations Initial Comments at 37 (citing PJM Manual 14B,
section 1.1 Planning Process Work Flow).

projects.[3387]  Northwest and Intermountain agree that the Commission should reform local transmission planning processes to enhance transparency and provide meaningful opportunities for public input.[3388]  Similarly, Resale Iowa asserts that MISO's stakeholder processes do not address local transmission planning issues, especially those related to asset management, end-of-life, and other forms of local transmission planning that are exempt from Order No. 890's transmission planning requirements.  Thus, Resale Iowa contends, its members believe they must bear the cost of new or upgraded transmission facilities without the opportunity to discuss less costly alternatives.[3389]

1585.  National and State Conservation Organizations suggest that early and consistent community engagement are key elements to successful development and timely completion of transmission projects, as the voices and concerns of affected local communities must be heard and acted upon to prevent environmental injustices and environmental damage.[3390]  WE ACT states that, in addition to coordination with state entities, there must also be meaningful engagement and robust input from affected and overburdened communities so that states and transmission providers are aware of the potential harms of siting transmission projects in environmental justice communities.  WE ACT recommends that the Commission, its Office of Public Participation, state

---

[3387] Clean Energy Buyers Initial Comments at 33.

[3388] Northwest and Intermountain Initial Comments at 20.

[3389] Resale Iowa Reply Comments at 4-5.

[3390] National and State Conservation Organizations Initial Comments at 2.

Docket No. RM21-17-000                                                      - 1111 -

officials, and transmission providers familiarize themselves with several key documents

relating to environmental justice to ensure meaningful community engagement and to

inform comprehensive environmental justice analyses to reduce or eliminate undue

burdens.[3391]

### b.    Suggested Modifications to the NOPR Proposal

1586.  Some commenters support the NOPR proposal, but also suggest modifications to

make it more effective or request that the Commission provide flexibility for transmission

planning regions to determine the best manner to meet the requirements.[3392]  NARUC

requests flexibility for transmission planning regions to determine the timeline for

stakeholder processes.[3393]  NRECA requests that the Commission allow transmission

planning regions that currently have transparent processes to maintain them.[3394]

---

[3391] WE ACT Initial Comments at 5-6 (citing U.S. Env't Prot. Agency, *Promising Practices for EJ Methodologies in NEPA Reviews* (Mar. 2016), https://www.epa.gov/environmentaljustice/ej-iwg-promising-practices-ej-methodologies-nepa-reviews; U.S. Env't Prot. Agency, *Technical Guidance for Assessing Environmental Justice in Regulatory Analysis* (June 2016), https://www.epa.gov/sites/default/files/2016-06/documents/ejtg_5_6_16_v5.1.pdf; *The Principles of Environmental Justice (EJ)*, Energy Justice Network, https://www.ejnet.org/ej/principles.pdf; *Jemez Principles of Democratic Organizing*, Energy Justice Network, https://www.ejnet.org/ej/jemez.pdf).

[3392] *See* ACORE Initial Comments at 18-19; AEP Initial Comments at 7, 40-41, 43-44; Ameren Initial Comments at 46-47; NARUC Initial Comments at 58-59; NESCOE Initial Comments at 77-78; North Carolina Commission and Staff Initial Comments at 18-20; NRECA Initial Comments at 65-66; NYISO Initial Comments at 9, 57-58; TANC Initial Comments at 11; WE ACT Initial Comments at 5-6; WIRES Initial Comments at 8-10.

[3393] NARUC Initial Comments at 58-59 (citing NOPR, 179 FERC ¶ 61,028 at PP 400-401).

[3394] NRECA Initial Comments at 65-66; *see also* Ameren Initial Comments at 46

Docket No. RM21-17-000                                      - 1112 -

1587.  TANC encourages the Commission to provide regional flexibility by allowing

transmission providers to propose on compliance alternative frameworks for

consideration of local transmission plans in the regional transmission planning process

and allow transmission planning regions to consider the burden versus benefit of such as

a requirement to maximize transparency and project efficiencies.[3395]

1588.  NESCOE contends that aspects of the proposal are too prescriptive, such as the

Commission dictating the number of stakeholder meetings.  However, NESCOE states

that enhanced transparency could help states and ratepayers better understand proposed

transmission facilities and the costs associated with them.[3396]  NESCOE states that

stakeholders should have meaningful opportunities to participate and provide feedback on

local transmission planning throughout the regional transmission planning process,

asserting that transmission owners in ISO-NE currently do little more than present their

proposals for in-kind replacements of existing transmission infrastructure to ISO-NE's

Planning Advisory Committee.[3397]

1589.  ACORE states that the proposed stakeholder involvement in local transmission

planning is beneficial but that the NOPR proposal lacks clarity on whether transmission

---

(citing Ameren ANOPR Initial Comments at 20-21).

[3395] TANC Initial Comments at 11 (citing NOPR, 179 FERC ¶ 61,028 at PP 400, 402).

[3396] NESCOE Initial Comments at 77-78 (citing NOPR, 179 FERC ¶ 61,028 at P 400).

[3397] *Id.*; NESCOE Reply Comments at 6 (citation omitted).

Docket No. RM21-17-000                                                    - 1113 -

providers must consider local transmission projects alongside other options in Long-Term

Regional Transmission Planning.

1590.  Joint Consumer Advocates argue that, while the NOPR proposal will increase

transparency, it will not address the inability of consumer advocates to meaningfully

review planning inputs or models because the inputs are not maintained in a format that

enables stakeholders to review them, understand the assumptions, or replicate the

transmission planning results, as contemplated in Order No. 890.[3398]  Pine Gate

recommends that the Commission require that transmission providers make available to

stakeholders information about the local transmission planning process for review and

comment prior to the finalization or approval of the local transmission plan.[3399]

### c.      Concern with the NOPR Proposal

1591.  Several commenters state that they oppose or have concerns with the NOPR

proposal.[3400]  Ohio Commission Federal Advocate argues that the NOPR proposal is of

limited value given that it does not require a more comprehensive review of local

---

[3398] Joint Consumer Advocates Initial Comments at 21-22.

[3399] Pine Gate Initial Comments at 49-50.

[3400] *See* American Municipal Power Initial Comments at 13-25; APS Initial
Comments at 12-13; Avangrid Initial Comments at 13-15; CAISO Initial Comments at 7,
47-51; California Water Initial Comments at 5-8; DC and MD Offices of People's
Counsel Initial Comments at 6-7; Dominion Initial Comments at 69-70; EEI Initial
Comments at 40; Eversource Initial Comments at 47-49; Idaho Power Initial Comments
at 12-13; MISO Initial Comments at 84-86; MISO TOs Initial Comments at 28-31;
National Grid Initial Comments at 39-40; New York TOs Initial Comments at 16-17;
Pennsylvania Commission Initial Comments at 20; PG&E Initial Comments at 15-18;
PPL Initial Comments at 35-36; Xcel Initial Comments at 16-17.

transmission projects; instead, these projects will continue to be chosen, designed, and approved by the transmission owner.[3401]  Similarly, American Municipal Power states that new transmission projects that expand or enhance the transmission grid and have regional benefits should be planned by the regional transmission entity and not by individual transmission owners.  Further, American Municipal Power asserts that use of the PJM Attachment M-3 process, which American Municipal Power contends the NOPR "essentially" proposes to require nationwide, has resulted in additional balkanization of the transmission planning process, has increased the problem of planning based on individual transmission owners' criteria for determining need, and has disenfranchised PJM as the regional transmission planner.[3402]

1592.  Relatedly, Pennsylvania Commission states that enhancing transparency in local transmission planning is a laudable goal but notes that the proposal will not enhance PJM's process because the NOPR proposal adopts the existing PJM Attachment M-3 process.[3403]

1593.  Several commenters argue that the existing regional transmission planning process in their transmission planning region is already transparent and therefore oppose the

---

[3401] *See* Ohio Commission Federal Advocate Initial Comments at 20-21 (citing NOPR, 179 FERC ¶ 61,028 (Christie, Comm'r, concurring at P 16)).

[3402] American Municipal Power Initial Comments at 17; *see* American Municipal Power Supplemental Comments at 1, 6 (citations omitted).

[3403] Pennsylvania Commission Initial Comments at 20-21 (citing NOPR, 179 FERC ¶ 61,028 at PP 399-400).

Docket No. RM21-17-000                                             - 1115 -

NOPR proposal.[3404]  New York TOs assert that New York's regional and local

transmission planning processes almost fully satisfy the proposed requirements and, as

such, the Commission should allow NYISO to retain these processes.[3405]  MISO argues

that the additional requirements proposed in the NOPR are not needed in an RTO such as

MISO with a fully developed, open, and transparent transmission planning process in

effect.[3406]  MISO TOs agree, stating that MISO's existing processes provide for

transparency in local transmission planning through subregional planning meetings,

published materials, and workshops throughout the transmission planning process.[3407]

1594.  CAISO states that the Commission should not disrupt existing processes that are

working efficiently, arguing that its transmission planning process already considers both

local and regional assumptions, needs, and solutions as part of a single integrated

---

[3404] APS Initial Comments at 12-13; Avangrid Initial Comments at 13-15; CAISO Initial Comments at 46-50; Dominion Initial Comments at 69; Eversource Initial Comments at 46-49; MISO Initial Comments at 84-86; MISO TOs Initial Comments at 29-31; National Grid Initial Comments at 39; New York TOs Initial Comments at 16-17; Pennsylvania Commission Initial Comments at 20; PG&E Initial Comments at 16-18.

[3405] New York TOs Initial Comments at 7.

[3406] MISO Initial Comments at 84-85.

[3407] MISO TOs Initial Comments at 29-31 (citing MISO Business Practice Manual, Transmission Planning, BPM-20, section 4.1; MISO, FERC Electric Tariff, MISO OATT, attach. FF (Transmission Expansion Planning Protocol) (90.0.0), § I.C.9; MISO, *Subregional Planning Meeting*, https://www.misoenergy.org/engage/committees/subregional-planning-meeting/; *Midwest Indep. Transmission Sys. Operator, Inc.*, 142 FERC ¶ 61,215, at PP 80, 114 (2013), *order on reh'g*, 144 FERC ¶ 61,020 (2013), *order on reh'g & compliance*, 147 FERC ¶ 61,127 (2014), *aff'd sub nom. MISO Transmission Owners v. FERC*, 819 F.3d 329 (7th Cir. 2016)).

process.[3408]  PG&E agrees that the NOPR proposal is unnecessary for California utilities

and CAISO because many CAISO transmission owners already have extensive

stakeholder programs.  Therefore, PG&E states, the Commission should clarify that

transmission providers are not required to enhance the transparency of local transmission

planning processes where such transparent processes already exist.[3409]

1595.  In addition, PG&E argues that the Commission should revise the NOPR proposal

to state that the proposed enhancements to the local transmission planning process should

not apply to asset management projects, including in-kind replacements, that are outside

the scope of Order No. 890.[3410]  PG&E asserts that including asset management projects

would significantly increase the volume and complexity of regional and local

transmission planning and potentially delay needed repairs and maintenance.  PG&E

further states that all of PG&E's asset replacement projects are already scrutinized

through the annual update to its formula transmission rate.[3411]

1596.  Eversource contends that the current local transmission planning process in New

England, which is based on the principles in Order No. 890, is largely consistent with the

Commission's proposed transparency principles and has worked well.[3412]  Similarly, APS

---

[3408] CAISO Initial Comments at 47-50 (citations omitted).

[3409] PG&E Initial Comments at 15-18.

[3410] *Id.* at 15-16 (citing *Cal. Pub. Utils. Comm'n v. Pac. Gas & Elec.*, 164 FERC ¶ 61,161 at P 66).

[3411] PG&E Reply Comments at 6-7.

[3412] Eversource Initial Comments at 46-47 (citing *ISO New England, Inc.*,

Docket No. RM21-17-000                                                      - 1117 -

states that it currently uses its local transmission plans in the base model assumptions for

its regional transmission planning process and provides stakeholders with an opportunity

for input twice a year in public meetings as required by Order No. 890.[3413]

1597.  Some commenters request that the Commission adopt a less prescriptive reform

that outlines principles or goals for transparency and allow each transmission provider to

either explain how its existing local transmission planning process already complies with

those principles or propose targeted modifications to bring its existing process into

compliance with the new requirements.[3414]  New York TOs note that efforts to improve

transparency between local and regional transmission planning are beginning in NYISO,

and they recommend that the Commission allow NYISO and New York TOs to

demonstrate on compliance how any resulting enhancements will meet or exceed any

new requirements.[3415]  Vermont Electric and Vermont Transco suggest that the

Commission adopt a performance-based approach under which the Commission would

specify expectations for transparency in local transmission planning processes and then

---

Transmittal, Docket No. OA08-58 (filed Dec. 7, 2007)).

[3413] APS Initial Comments at 12 (citing Order No. 890, 118 FERC ¶ 61,119 at PP 257-258, 451).

[3414] *See* Avangrid Initial Comments at 15; EEI Initial Comments at 40; Eversource Initial Comments at 48; Kansas Commission Initial Comments at 17; MISO Initial Comments at 84; MISO TOs Initial Comments at 31; National Grid Initial Comments at 39; New York TOs Initial Comments at 7, 16-17; Xcel Initial Comments at 17.

[3415] *See* New York TOs Initial Comments at 6-7, 16-17 (citations omitted).

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1128 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

allow transmission providers to determine how they will achieve those goals within longer timelines.[3416]

1598.  Several commenters argue that the NOPR proposal is too prescriptive or may interfere with existing processes.[3417]  Eversource states that, if the Commission adopts a more prescriptive approach to local transmission planning, it could conflict with existing, state-jurisdictional planning processes for local transmission projects, creating barriers to distribution facility upgrades that are needed to support expanded use of distributed energy resources and load growth from electrification.[3418]  Dominion cautions against adding more process when transmission providers already participate in extensive local transmission planning processes that consider Long-Term Regional Transmission Planning and stakeholder positions.[3419]  Avangrid agrees, asserting that the NOPR proposal could override existing processes that have been established over years of stakeholder consensus building.[3420]  PPL and American Municipal Power state that the

---

[3416] Vermont Electric and Vermont Transco Initial Comments at 5.

[3417] Avangrid Initial Comments at 13; CAISO Initial Comments at 7-8, 47, 50; Dominion Initial Comments at 70; Eversource Initial Comments at 47-48; MISO Initial Comments at 86; PG&E Initial Comments at 17-18; PPL Initial Comments at 36; Xcel Initial Comments at 16-17.

[3418] Eversource Initial Comments at 49.

[3419] Dominion Initial Comments at 69-70.

[3420] Avangrid Initial Comments at 13.

Docket No. RM21-17-000                                                    - 1119 -

NOPR proposal may not be appropriate for all transmission planning regions and may

interfere with efficient and well-functioning local transmission planning.[3421]

1599.  Certain commenters also argue that the NOPR proposal is unduly burdensome.[3422]

APS argues that the NOPR proposal could delay local transmission planning and prevent

APS from providing necessary services.[3423]  National Grid asserts that the NOPR

proposal ignores the reality that local transmission planning processes address different

needs than the regional transmission planning process.  National Grid argues that the

proposal will introduce delay and uncertainty in both the local and regional transmission

planning processes, disrupting currently effective procedures at a time when participants

in the regional transmission planning process should be focused on Long-Term Regional

Transmission Planning.[3424]

1600.  In addition, National Grid argues that the NOPR proposal will complicate

transmission planning because individual transmission providers in each transmission

planning region will need to integrate their local transmission planning efforts into the

regional transmission planning process.  Further, National Grid states that in multi-state

RTO/ISO transmission planning regions, it could also lead to second guessing individual

---

[3421] American Municipal Power Initial Comments at 16; PPL Initial Comments at
36.

[3422] *See* Dominion Initial Comments at 68; Eversource Initial Comments at 49;
National Grid Initial Comments at 39-40; Xcel Initial Comments at 16-17.

[3423] APS Initial Comments at 13.

[3424] National Grid Initial Comments at 39-40.

state policies as part of the regional transmission planning process.  National Grid also avers that regional transmission planners, such as NYISO and ISO-NE, may not have visibility into the operation of lower voltage local transmission facilities and therefore may not have the expertise that is needed to consider local transmission needs as part of the regional transmission planning process.[3425]

### d.        Specific Stakeholder Meeting Requirements

1601.  With respect to the length of time between stakeholder meetings, some commenters state that the 25-day minimum period between meetings in the NOPR proposal is too short.[3426]  PIOs state the Commission should require transmission providers to submit local transmission planning information, including information concerning planned local transmission projects, with enough time for the regional transmission planning process to effectively find, propose, approve, and construct cost-effective and beneficial regional alternatives where appropriate.[3427]

1602.  American Municipal Power contends that the NOPR proposal fails to identify whether and when transmission providers must provide information in advance of the three meetings.  Moreover, American Municipal Power argues, 25 days between

---

[3425] *Id.*

[3426] American Municipal Power Initial Comments at 24; Northwest and Intermountain Initial Comments at 21; PIOs Initial Comments at 51-54; TAPS Initial Comments at 6, 62.

[3427] PIOs Initial Comments at 51-52, 54 (citing PIOs ANOPR Initial Comments at 92-94; Concerned Scientists ANOPR Initial Comments at 24-31).

Docket No. RM21-17-000                                                      - 1121 -

meetings is too short, even assuming all of the models, criteria, and needs are shared with stakeholders sufficiently in advance.  Further, American Municipal Power states that the time between the Needs and Solutions Meetings should be based on the time required for transmission providers to incorporate comments received during the Needs Meeting and develop responses.[3428]

1603.  Eversource argues that the proposed meeting schedules are not workable in New England, where regional transmission planning studies focus on sub-areas of the transmission system and proceed on different timelines.  Moreover, Eversource contends that it is not feasible in New England to have a three-meeting process that aligns with ISO-NE's annual transmission planning cycle because no such annual planning cycle exists.[3429]

1604.  Dominion, Eversource, and Xcel state that the three separate stakeholder meetings to review assumptions, needs, and solutions are unnecessary and will increase workload without any benefit.[3430]  Xcel contends that a single meeting that addresses the transparency requirements of Order Nos. 890 and 1000, as well as any requirements from the final rule, would be more efficient than the NOPR proposal.[3431]  NESCOE asserts that

---

[3428] American Municipal Power Initial Comments at 24.

[3429] Eversource Initial Comments at 47.

[3430] Dominion Initial Comments at 68; Eversource Initial Comments at 47-48; Xcel Initial Comments at 17.

[3431] Xcel Initial Comments at 16-17.

the final rule should not dictate the number of stakeholder meetings.[3432]  MISO states that the Commission should allow each transmission planning region to determine the timing of the iterative meetings, as well as the specific information to be covered at the meetings.[3433]

1605.  TAPS states that the Commission should require transmission providers to post their criteria, models, and assumptions so that stakeholders can evaluate or replicate their findings.  Moreover, TAPS argues, the Commission should require that transmission providers distribute this information "sufficiently in advance" (and not just "in advance," as the NOPR proposed) of each meeting to allow stakeholders to review and evaluate the information.[3434]  Finally, TAPS states that a second Solutions Meeting would provide a meaningful opportunity to consider alternatives.[3435]

1606.  Likewise, American Municipal Power recommends that the Commission require a minimum of two Solutions Meetings, with the transmission provider presenting the solutions at the first meeting and the final solution, including alternatives considered, at the second.  Further, American Municipal Power recommends that the first Solutions Meeting be no sooner than 90 days after the Needs Meeting and the second Solutions Meeting no sooner than 30 days after the first Solutions Meeting.  To the extent the

---

[3432] NESCOE Initial Comments at 78 (citation omitted).

[3433] MISO Initial Comments at 84.

[3434] TAPS Initial Comments at 61 (citing NOPR, 179 FERC ¶ 61,028 at P 402).

[3435] *Id.* at 62.

Docket No. RM21-17-000                                                          - 1123 -

Commission does not require a second Solutions Meeting, American Municipal Power

recommends that it require transmission providers to provide additional clarity regarding

how alternatives were developed and why they were not selected during the single

Solutions Meeting.[3436]

1607.   While PJM States support requiring Assumptions, Needs, and Solutions Meetings

as part of local transmission planning processes, similar to PJM's existing Attachment M-

3 process, they express concern that PJM's process is not sufficiently responsive and that

the growth of transmission-related costs in PJM is occurring without effective

oversight.[3437]   PJM States reference PJM's requirement that transmission providers

provide information on their local transmission plan and consider any comments

received, but state that they are not required to "meaningfully respond to, engage with, or

incorporate" these comments.[3438]

1608.   California Commission notes that the key elements of the California stakeholder

processes that may be relevant for the Commission to consider including in a final rule to

increase transparency into local transmission planning include:  (1) detailed project and

capital expenditure data; (2) ample time to review proposed capital forecasts; (3) the

---

[3436] American Municipal Power Initial Comments at 24-25.

[3437] PJM States Initial Comments at 4-5 (citing PJM, *2021 Regional Transmission Planning Expansion Plan* 290 (Mar. 2022), https://www.pjm.com/-/media/library/reports-notices/2021-rtep/2021-rtep-report.ashx).

[3438] *Id.* at 6 (citing PJM, Intra-PJM Tariffs, OATT, attach. M-3 (1.0.0), § (c) 1-6).

ability for stakeholders to issue data requests and receive responses; (4) in-depth stakeholder meetings; and (5) consideration of stakeholder comments.[3439]

1609.  New England for Offshore Wind argues that all transmission planning processes should include transparency into the evaluation of alternative options that could optimize the performance of renewable energy, as well as justification of proposed transmission projects based on how they compare to no action alternatives.[3440]  NRG encourages the Commission to require that the local transmission planning process produce an estimated rate impact for each year if the local transmission plan were to be executed.[3441]

1610.  Several commenters contend that transmission providers should be required to respond to comments and questions submitted by stakeholders in the local transmission planning process.[3442]  PJM States raise the same issue but look to the relevant RTOs/ISOs to resolve them.[3443]

1611.  American Municipal Power and DC and MD Offices of People's Counsel state that transmission providers are not obligated to respond to stakeholder questions, which,

---

[3439] California Commission Initial Comments at 112-113.

[3440] New England for Offshore Wind Initial Comments at 6.

[3441] NRG Initial Comments at 7, 36.

[3442] *See* American Municipal Power Initial Comments at 18-19; California Commission Initial Comments at 112-113; DC and MD Offices of People's Counsel Initial Comments at 6; Kentucky Commission Chair Chandler Initial Comments at 22; Northwest and Intermountain Initial Comments at 20-21; TAPS Initial Comments at 62.

[3443] PJM States Initial Comments at 6.

when considered alongside the other barriers to effective participation, creates unnecessary barriers to open communication, is not just and reasonable, and is unduly discriminatory.[3444]  American Municipal Power further asserts that comparability principles require transmission providers to consider transmission customers' comments in order to meet their needs and to treat similarly situated customers comparably while conducting transmission system planning.[3445]  However, PJM and Indicated PJM TOs disagree that stakeholder comments are being ignored in PJM's Attachment M-3 process.[3446]

1612.  TAPS states that dispute resolution on criteria, assumptions, needs, and proposed solutions should be available if stakeholder comments are ignored.[3447]  TAPS asserts that the Commission should include such provisions in any final rule or clarify that they are already encompassed in the Commission's transparency proposal.[3448]

### e.    Additional Issues

1613.  Pattern Energy and American Municipal Power state that the NOPR proposal does not go far enough in ensuring stakeholder access to transmission planning data from the

---

[3444] *See* American Municipal Power Initial Comments at 19-20; DC and MD Offices of People's Counsel Initial Comments at 6-7.

[3445] American Municipal Power Initial Comments at 19.

[3446] Indicated PJM TOs Reply Comments at 4, 18-19 (citations omitted); PJM Reply Comments at 13-15 (citing American Municipal Power Initial Comments at 19).

[3447] TAPS Initial Comments at 62 (citing Order No. 890, 118 FERC ¶ 61,119 at PP 501-503).

[3448] *Id.*

Docket No. RM21-17-000                                                    - 1126 -

local transmission planning processes and propose additional requirements to make

certain information more readily available, subject to execution of a CEII non-disclosure

agreement.[3449]  Similarly, Pattern Energy states that continued stakeholder access to the

source data used in transmission modeling by transmission providers is essential to

ensure fair and reasonable outcomes in any transmission planning process.[3450]  PPL

requests that the Commission clarify that confidential or sensitive information will be

protected under the NOPR proposal in the local transmission planning processes as they

currently are in PJM.[3451]

1614.  Certain TDUs state that the Commission should require transmission providers to

coordinate with load-serving entities to transfer data and information and increase

transparency in the stakeholder process.[3452]  ACEG recommends that the Commission

require minimum data transparency standards in the local transmission planning

processes, drawing on MISO's and SPP's cost recording and tracking processes for

transmission projects approved through their regional transmission planning

processes.[3453]  Maryland Energy Administration asserts that additional reforms beyond

---

[3449] *See* American Municipal Power Initial Comments at 22; Pattern Energy Initial
Comments at 30-31.

[3450] Pattern Energy Initial Comments at 30-31.

[3451] PPL Initial Comments at 36.

[3452] Certain TDUs Initial Comments at 18.

[3453] ACEG Initial Comments at 56 (citing Johannes Pfeifenberger et al., The
Brattle Group, *Cost Savings Offered by Competition in Electric Transmission:*

Docket No. RM21-17-000                                                    - 1127 -

those proposed in the NOPR are needed to support transparency and better incorporate

stakeholder contributions in local transmission planning processes.[3454]  California Water

recommends that the Commission allow data requests, similar to the opportunity for data

requests in the SoCal Edison and PG&E stakeholder review processes, which ensure that

stakeholders can participate and that transmission providers exercise good faith efforts to

respond.[3455]

1615.  American Municipal Power requests that the Commission direct transmission

providers to provide detailed information consisting of more than generic or high-level

network models, along with power flow models and power system analyses used in their

local transmission planning.[3456]  According to American Municipal Power, to allow

stakeholders to evaluate the outputs of transmission providers' studies—i.e., the

identified transmission needs—on their own, transmission providers must be required to

provide the models.[3457]  Furthermore, American Municipal Power argues, the

Commission should require transmission providers to provide information on how assets

_____

*Experience to Date and the Potential for Additional Customer Value* 26 (Apr. 2019)).

[3454] *See* Maryland Energy Administration Reply Comments at 2-3 (citations omitted).

[3455] California Water Initial Comments at 7-8 (citing *S. Cal. Edison*, Filing, App. XII, ER19-1553-000, at section 2.2 (filed July 2, 2020); *Pac. Gas & Elec. Co.*, Filing, App. IX, ER19-13-001, at section 3.2 (filed Mar. 31, 2020)).

[3456] American Municipal Power Initial Comments at 20-21.

[3457] *Id.* at 21.

Docket No. RM21-17-000                                              - 1128 -

have been prioritized for replacement, how the replacement versus maintenance decision

is made, how assets rank relative to other assets on the system, and the system average

values.[3458]

1616.  Several commenters state that the NOPR proposal does not go far enough to

protect customers' interests and suggest the addition of more process, more oversight,

more monitoring (including establishing an independent transmission monitor), or more

prudence reviews.[3459]  According to PIOs, transmission providers have incentives to

avoid independent transmission planning processes because local transmission projects

are presumed to be prudent, avoid competition, and receive high rates of return.  PIOs

state that the Commission should reduce the rate of return for local transmission projects

and issue a rule or policy statement that puts the burden of proof on transmission

providers to demonstrate that the cost of a proposed transmission project is just and

reasonable.[3460]

1617.  Joint Consumer Advocates state that, while the NOPR proposal is an

improvement, more needs to be done to address the imbalance between consumer

---

[3458] *Id.* at 22-23.

[3459] California Commission Initial Comments at 111-112 & n.401; Colorado
Consumer Advocates Initial Comments at 31; Joint Consumer Advocates Initial
Comments at 25-29; NRG Initial Comments at 7, 36; Ohio Consumers Initial Comments
at 23-24; OMS Initial Comments at 16-17; Pattern Energy Initial Comments at 31-34;
Pine Gate Initial Comments at 49-50; PIOs Initial Comments at 51-52; PJM States Initial
Comments at 4-6; TAPS Initial Comments at 61-62; US DOJ and FTC Initial Comments
at 20-21.

[3460] PIOs Initial Comments at 52-53.

advocates and incumbent transmission owners.  Therefore, Joint Consumer Advocates assert, the Commission should authorize the creation of an independent transmission monitor to evaluate the effective coordination of local transmission projects with more holistic transmission planning to identify the most efficient or cost-effective approach to meeting local, regional, and interregional transmission needs.[3461]  Relatedly, California Commission and Colorado Consumer Advocates suggest that the Commission give independent transmission monitors the responsibility to evaluate stakeholder comments, independently analyze whether there are potentially more efficient and cost-effective alternative transmission solutions to meet identified transmission needs, and make a recommendation.[3462]  Potomac Economics argues that the Commission's transparency goals likely cannot be met without an independent transmission monitor.[3463]

1618.  Some commenters opine on whether the regional transmission planning process should assume an expanded role in reviewing or approving identified local transmission projects.[3464]  In addition, NARUC recommends that the Commission allow the proposed stakeholder review process to apply to repair and replacement projects that do not expand

---

[3461] Joint Consumer Advocates Initial Comments at 26-29 (citations omitted).

[3462] California Commission Initial Comments at 111-112; Colorado Consumer Advocates Initial Comments at 31.

[3463] *See* Potomac Economics Initial Comments at 6.

[3464] *See* American Municipal Power Reply Comments at 3-7; California Commission Initial Comments at 108-110; DC and MD Offices of People's Counsel Initial Comments at 7; NARUC Initial Comments at 60-61; Ohio Consumers Reply Comments at 17-18; PJM States Initial Comments at 6-7.

Docket No. RM21-17-000                                                          - 1130 -

the capacity of the transmission system, or do so only incidentally, in particular those that
are forecast to cost $3 million or more. NARUC asserts that, limiting the reforms to local
transmission planning may exclude review of these projects, which currently comprise
half of investor-owned utilities' transmission spending in the RTOs/ISOs. Further,
NARUC urges the Commission to allow these projects, along with local transmission
projects, to be reviewed and approved as part of the regional transmission planning
process.[3465] California Commission agrees, stating that there should be more external
scrutiny of such projects to reduce incumbent utilities' existing perverse incentive to
overinvest in these types of projects due to their lack of external review.[3466]

1619. PJM States call on RTOs/ISOs to go beyond evaluating whether local transmission
projects "do no harm" by actively taking a stance on such projects, discussing how this
stance was reached, and by proposing transmission projects that may be the most cost-
effective.[3467] However, PJM States ask the Commission to explicitly avoid impinging on
state-jurisdictional processes.[3468]

1620. DC and MD Offices of People's Counsel and American Municipal Power assert
that the remedy for the current lack of a requirement to incorporate or respond to
stakeholder feedback in the local transmission planning process is an empowered

---

[3465] NARUC Initial Comments at 60-63 (citations omitted).

[3466] California Commission Initial Comments at 109-110 (citations omitted).

[3467] PJM States Initial Comments at 6-7 (citation omitted).

[3468] *Id.* at 7.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1141 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                        - 1131 -

regional transmission planner that is independent and incorporates meaningful

participation from all stakeholders beginning with the determination of any transmission

needs through the project selection phase.[3469]  Relatedly, Ohio Consumers state that the

NOPR proposal leaves sole discretion in selection of transmission projects and the costs

of the projects to transmission providers.[3470]

1621.  However, some commenters defend the separation between local and regional

transmission planning processes.[3471]  For instance, AEP disagrees that transmission

providers seek to build local transmission projects to circumvent the regional

transmission planning process.[3472]  According to AEP, local and regional transmission

planning processes are not interchangeable because most local transmission facilities

directly serve load and local utilities must address local needs when those needs are not

addressed by a regional transmission facility in a cost-effective manner.[3473]  Nevertheless,

AEP states, there can be an effective and efficient intersection between local and regional

transmission planning, citing PJM's open and transparent local transmission planning

---

[3469] American Municipal Power Reply Comments at 3-7 (citations omitted); DC and MD Offices of People's Counsel Initial Comments at 7.

[3470] Ohio Consumers Reply Comments at 18.

[3471] AEP Reply Comments at 6-7; MISO Reply Comments at 27; PG&E Reply Comments at 4-9; WIRES Initial Comments at 9.

[3472] AEP Reply Comments at 6-7 (citing AEE Initial Comments at 38; PIOs Initial Comments at 8-9; Resale Iowa Initial Comments at 7-8; US DOJ and FTC Initial Comments at 7).

[3473] *Id.* at 2-3.

Docket No. RM21-17-000                                                      - 1132 -

process that requires coordination with the regional transmission planning process and in
which PJM is an active participant.[3474]   Similarly, WIRES states that there are good
reasons for maintaining a distinction between regional and local transmission planning,
noting that the regional transmission planning process is directed toward addressing
certain reliability, economic criteria, and public policy initiatives, not the additional
system needs related to resilience, asset management, customer needs, customer impact,
and aging infrastructure replacement that are the focus of local transmission planning.[3475]

1622.  Eversource states that, if the Commission decides to require a more prescriptive
local transmission planning process, it should clarify that the process applies only to
upgrades that are developed primarily to increase the capacity of the local transmission
system, and not to upgrades that are incidental to state-jurisdictional distribution system
planning or other unique local requirements.[3476]

1623.  MISO defends the transparency of local transmission planning in MISO by stating
that commenters who criticize existing local transmission planning processes "ignore the
open, transparent process in effect, and fail to recognize the ongoing need for near-term

---

[3474] *Id.* at 8 (citing PJM, Intra-PJM Tariffs, OATT, attach. M-3 (1.0.0)).

[3475] WIRES Initial Comments at 9 (citing Charles River Associates, *The Value of Local Transmission Planning* 9, 13 (Dec. 2021), https://wiresgroup.com/wp-content/uploads/2021/12/Value-of-Local-Transmission-Planning-report-WIRES-CRA.pdf).

[3476] Eversource Initial Comments at 49.

planning."[3477]  MISO states that local and regional transmission planning are complementary and that "near-, mid- and long-term planning work in concert."[3478]  MISO contends that its existing process includes extensive stakeholder involvement that ensures that issues are identified and alternatives are considered.[3479]

1624.  PG&E opposes comments in favor of removing the role of local transmission planning from local transmission owners, as well as requests to expand the NOPR proposal to apply to asset management projects.  PG&E notes that California Commission has not provided any evidence that RTOs/ISOs are currently unable to adequately handle the regional and local transmission planning processes.[3480]

### 3. <u>Commission Determination</u>

1625.  We adopt the NOPR proposal, with modification, to require transmission providers in each transmission planning region to revise the regional transmission planning process in their OATTs to enhance the transparency of:  (1) the criteria, models, and assumptions that they use in their local transmission planning process; (2) the local transmission needs that they identify through the local transmission planning process; and (3) the potential local or regional transmission facilities that they will evaluate to address those local transmission needs.  For each of these three categories of local transmission

---

[3477] MISO Reply Comments at 27 (citing PIOs Initial Comments at 32).

[3478] *Id*.

[3479] *Id*.

[3480] PG&E Reply Comments at 4-9 (citations omitted).

Docket No. RM21-17-000                                                           - 1134 -

planning information, and as discussed further below, transmission providers must

identify and publicly post the information identified below, then conduct publicly-noticed

stakeholder meetings to provide an opportunity for comment on the information both

before and after the stakeholder meetings, as part of the regional transmission planning

process.  In response to comments from PG&E,[3481] we clarify that this requirement

applies only to local transmission planning that is within the scope of Order No. 890 and

is therefore already subject to Order No. 890 transparency requirements.  As such, this

requirement does not apply to asset management projects.[3482]  However, nothing in this

final rule prevents transmission providers from choosing to apply these requirements to

asset management projects.

1626.  In complying with this requirement, transmission providers must establish an

iterative process that ensures that stakeholders have meaningful opportunities to

participate in and provide feedback on local transmission planning throughout the

regional transmission planning process.  To provide the needed transparency and

opportunities for stakeholder participation, we require that the regional transmission

planning process include at least three publicly-noticed stakeholder meetings per regional

transmission planning cycle concerning the local transmission planning process of each

---

[3481] PG&E Initial Comments at 17 (citing *Cal. Pub. Utils. Comm'n v. Pac. Gas & Elec.*, 164 FERC ¶ 61,161 at P 66).

[3482] *See S. Cal. Edison Co.*, 164 FERC ¶ 61,160 at PP 30-40; *Cal. Pub. Utils. Comm'n v. Pac. Gas. & Elec. Co.*, 164 FERC ¶ 61,161 at PP 65-74 (finding that Order No. 890's local transmission planning requirements do not apply to asset management projects that do not increase capacity or do so incidentally).

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1145 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

transmission provider that is a member of the transmission planning region before each transmission provider's local transmission plan can be incorporated into the transmission planning region's planning models.

1627. Specifically, we adopt the NOPR proposal to require that, prior to the submission of local transmission planning information to the transmission planning region for inclusion in the regional transmission planning process, transmission providers in each transmission planning region must convene, collectively, as part of the regional transmission planning process, a stakeholder meeting to review the criteria, assumptions, and models related to each transmission provider's local transmission planning (Assumptions Meeting). Next, no fewer than 25 calendar days after the Assumptions Meeting, transmission providers in each transmission planning region must convene, collectively, as part of the regional transmission planning process, a stakeholder meeting to review identified reliability criteria violations and other transmission needs that drive the need for local transmission facilities (Needs Meeting). Finally, no fewer than 25 calendar days after the Needs Meeting, transmission providers in each transmission planning region must convene, collectively, as part of the regional transmission planning process, a stakeholder meeting to review potential solutions to those reliability criteria violations and other transmission needs (Solutions Meeting). Additionally, we require that all materials for stakeholder review during these three meetings be publicly posted and that stakeholders have opportunities before and after each meeting to submit comments.

Docket No. RM21-17-000                                                    - 1136 -

1628.  In addition to these requirements, we modify the NOPR proposal to also require transmission providers to publicly post the meeting materials no fewer than five calendar days prior to each of the three publicly-noticed stakeholder meetings to allow time for stakeholders to review materials in advance of each meeting.  Also, we require that transmission providers allow for a period of no fewer than 25 calendar days following the Solutions Meeting to review and consider stakeholder feedback on the local transmission solutions identified to meet the local transmission needs before the local transmission plan can be incorporated in the transmission planning region's planning models. Requiring this minimum 25 calendar day period is consistent with Order No. 1000, where the Commission stated that the Commission intends that the regional transmission planning processes provide for the timely and meaningful input and participation of stakeholders in the development of regional transmission plans.[3483]  Lastly, we require that transmission providers must respond to questions or comments from stakeholders such that it allows stakeholders to meaningfully participate in these three required stakeholder meetings.

1629.  We find that establishing a standard baseline of transparency into transmission providers' local transmission planning processes will ensure that stakeholders have an opportunity to review and provide feedback on local transmission planning assumptions, needs, and solutions that are used as inputs to the regional transmission planning process.

---

[3483] Order No. 1000, 136 FERC ¶ 61,051 at P 153 (citing Order No. 890, 118 FERC ¶ 61,119 at P 454).

We expect that this additional transparency will help reduce the possibility that transmission providers will develop local transmission facilities without adequately considering whether there is a more efficient or cost-effective regional transmission solution that could address their local transmission needs.  This additional transparency will enable transmission providers to satisfy their requirements for regional transmission planning under Order No. 1000.[3484]

1630.  We believe that the local transmission planning information provided pursuant to the enhanced transparency requirements that we adopt in this final rule will better facilitate the identification through the regional transmission planning process of regional transmission facilities that may be more efficient or cost-effective than proposed local transmission facilities.[3485]  Specifically, transmission providers' local transmission planning information will be subject to review and comment by stakeholders that may provide additional information or identify considerations that could inform the criteria, models, and assumptions used in local transmission planning, the identification of local transmission needs, and the identification of transmission facilities to address those local transmission needs.  Because local transmission planning information serves as an input to the regional transmission planning process, these improvements will, in turn, facilitate the identification of more efficient or cost-effective transmission facilities in the regional

---

[3484] *Id.* PP 78-84.

[3485] NOPR, 179 FERC ¶ 61,028 at P 402.

Docket No. RM21-17-000                                                    - 1138 -

transmission planning process, resulting in Commission-jurisdictional rates that are just

and reasonable and not unduly discriminatory or preferential.

1631.  With respect to the comments from National and State Conservation Organizations

and WE ACT[3486] that robust input from affected and overburdened communities in the

local transmission planning process is important, we believe that the added transparency

requirements that require transmission providers to identify and publicly post the

information and then conduct stakeholder meetings as part of the regional transmission

planning process, provides an opportunity for interested parties to engage and comment

on the information.

1632.  With regard to commenters that suggest that the additional transparency

requirements proposed in the NOPR will not be effective because they do not go far

enough in making changes to local transmission planning processes,[3487] we find that the

enhanced transparency requirements that we adopt in this final rule are specifically

designed to provide needed transparency to ensure that Commission-jurisdictional rates

are just and reasonable and not unduly discriminatory or preferential.  In addition, we

find that other commenters' suggestions for changes to local transmission planning

processes were not proposed in the NOPR and therefore are outside the scope of this

proceeding.  We conclude that the replacement rate set forth herein is just and reasonable

---

[3486] National and State Conservation Organizations Initial Comments at 2; WE
ACT Initial Comments at 5-6.

[3487] *See* American Municipal Power Initial Comments at 17-18; Ohio Commission
Federal Advocate Initial Comments at 19-20.

Docket No. RM21-17-000                                                      - 1139 -

and addresses the deficiencies identified herein.[3488]  We note that the Commission

continues to examine a suite of related issues in its Transmission Planning and Cost

Management proceeding.[3489]

1633.  In response to American Municipal Power's assertion that the PJM Attachment M-

3 process has increased the problem of planning based on individual transmission

owners' criteria and the balkanization of the transmission planning process,[3490] we find

that American Municipal Power has not persuasively explained why these concerns are

the result of increasing the *transparency* of local transmission planning, rather than other

factors associated with the PJM Attachment M-3 process.  Based on the record before us,

we do not expect that requiring enhanced transparency in local transmission planning, in

the manner directed in this final rule, will result in greater incentives for transmission

providers to develop local transmission facilities in lieu of regional transmission

facilities.  Instead, we expect that additional opportunities for stakeholder review of and

comment on local transmission planning inputs into the regional transmission planning

process will help to facilitate the identification of regional transmission facilities that are

more efficient or cost-effective compared to transmission facilities identified in the local

transmission planning process.

---

[3488] *See New York v. FERC*, 535 U.S.at 26-28 (upholding Commission's decision not to assert jurisdiction over bundled retail transmission).

[3489] *See* Transmission Planning and Cost Management, Notice of Technical Conference, Docket No. AD22-8-000 (Apr. 21, 2022).

[3490] American Municipal Power Initial Comments at 17.

1634.  We disagree with commenters that state that the NOPR proposal is not needed in their transmission planning region because their local transmission planning process is already sufficiently transparent.[3491]  The reforms that we adopt here are necessary to ensure just and reasonable rates, as more fully explained above.  Additionally, we believe that these reforms to enhance the transparency of local transmission planning inputs into the regional transmission planning process are necessary to ensure that interested stakeholders have an opportunity to meaningfully participate in the review of the local transmission planning assumptions, needs, and solutions before each transmission provider's local transmission plan can be incorporated into the transmission planning region's planning models.

1635.  Similarly, we disagree with commenters that oppose the proposal because it may interfere with existing transmission planning processes.[3492]  As we explain above, the enhanced transparency and opportunities for stakeholder participation are needed to ensure just and reasonable Commission-jurisdictional rates.  Although we appreciate that there may be differences in how transmission providers currently conduct local

---

[3491] APS Initial Comments at 12-13; Avangrid Initial Comments at 13-15; CAISO Initial Comments at 46-50; Dominion Initial Comments at 69-70; Eversource Initial Comments at 46-49; MISO Initial Comments at 84-86; MISO TOs Initial Comments at 29-31; National Grid Initial Comments at 39; New York TOs Initial Comments at 16; Pennsylvania Commission Initial Comments at 20; PG&E Initial Comments at 16-18.

[3492] Avangrid Initial Comments at 13; CAISO Initial Comments at 7, 47; Dominion Initial Comments at 70; Eversource Initial Comments at 47-48; MISO Initial Comments at 86; PG&E Initial Comments at 17-18; PPL Initial Comments at 36; Xcel Initial Comments at 16-17.

Docket No. RM21-17-000                                                        - 1141 -

transmission planning, we believe that the standard baseline of transparency established

by the requirements adopted in this final rule is needed to ensure that stakeholders have

an opportunity to review and provide feedback on local transmission planning inputs that

go into the regional transmission planning process and to ensure that the regional

transmission planning process can identify regional transmission facilities that address

transmission needs more efficiently or cost-effectively than local transmission facilities.

The fact that transmission providers may need to adjust their existing processes to

comply with these requirements is not a sufficient reason for the Commission to decline

to adopt them.

1636.  We also disagree with commenters that argue that the proposal is too

prescriptive.[3493]  We believe that these requirements strike a reasonable balance between

the need for transparency of local transmission planning inputs that are used in regional

transmission planning and providing transmission providers with flexibility in how they

conduct their local transmission planning processes.  In fact, experience with the PJM

Attachment M-3 process, which includes similar requirements to those adopted in this

final rule, provides evidence that it is possible to satisfy these requirements with a

process that allows transmission providers to produce their local transmission plans on a

---

[3493] *See* Avangrid Initial Comments at 13-15; EEI Initial Comments at 40;
Eversource Initial Comments at 47-48; Kansas Commission Initial Comments at 17;
MISO Initial Comments at 84-86; MISO TOs Initial Comments at 29-31; National Grid
Initial Comments at 39-41; New York TOs Initial Comments at 7, 16-17; Xcel Initial
Comments at 17.

Docket No. RM21-17-000                                                          - 1142 -

timely basis.[3494]  In response to National Grid's concern that the NOPR proposal would

impose a new requirement to integrate their local transmission planning with regional

transmission planning,[3495] the final rule imposes no new requirements beyond the three

meetings and associated opportunities for comment described above.  We believe that

these requirements add only a small but manageable burden for transmission providers,

which is outweighed by the transparency benefits that would accrue to stakeholders

participating in the local and regional transmission planning processes.

1637.  With respect to the comments of APS and National Grid that local transmission

planning cycles might be delayed by the new transparency requirements,[3496] we reiterate

that the final rule strikes a reasonable balance between the need for transparency of local

transmission planning inputs that are used in regional transmission planning and

providing transmission providers with flexibility in how they conduct their local

transmission planning processes.  We believe that, even with the additional requirements

that we establish here, it is possible for transmission providers to produce local

transmission plans within a 12-month period, especially given that when scheduling the

three required meetings, transmission providers need not leave more than 25 calendar

days between each meeting.  The experience of PJM TOs, whose local transmission

---

[3494] *See* Indicated PJM TOs Initial Comments at 42-43 (citations omitted).

[3495] National Grid Initial Comments at 39-40.

[3496] APS Initial Comments at 13; National Grid Initial Comments at 39-40.

planning processes are subject to similar requirements, demonstrates that it is possible to satisfy these requirements in a timely manner.[3497]

### a.    Specific Stakeholder Meeting Requirements

1638.  We address in this section the requirements specific to the implementation details associated with the three publicly-noticed stakeholder meetings that transmission providers are required to conduct: the Assumptions Meeting, the Needs Meeting, and the Solutions Meeting, that were discussed above.  We believe that these requirements strike a reasonable balance between providing adequate time to allow interested stakeholders to review and comment on local transmission planning inputs that are used in regional transmission planning and allowing the efficient and timely execution of the local transmission planning process.  In our view, allowing transmission providers to limit the length of time between the three required meetings accomplishes this balance.

1639.  With respect to commenters who argue that a minimum of 25 calendar days between publicly-noticed stakeholder meetings is too short,[3498] we disagree.  The minimum period between stakeholder meetings is just that, a minimum, and we expect that transmission providers and their stakeholders will, in practice, implement a schedule for the required stakeholder meetings that best meets the needs of their transmission planning region.  However, we find that a minimum of less than 25 calendar days

---

[3497] Exelon Initial Comments at 3-4, 51-52 (citing PJM, Intra-PJM Tariffs, OATT, attach. M-3 (1.0.0)); Indicated PJM TOs Initial Comments at 42-43.

[3498] American Municipal Power Initial Comments at 24; Northwest and Intermountain Initial Comments at 21; TAPS Initial Comments at 6, 62.

USCA4 Appeal: 24-1650   Doc: 224      Filed: 01/21/2025   Pg: 1154 of 2455
Document Accession #: 20240513-3036      Filed Date: 05/13/2024

Docket No. RM21-17-000                                          - 1144 -

between stakeholder meetings would not allow stakeholders to participate in a

meaningful way, and we therefore adopt this minimum period as an appropriate baseline

for providing stakeholders with a meaningful opportunity to review and comment on

local transmission planning inputs that are used in regional transmission planning.  And,

in fact, at least some transmission providers have adopted this minimum duration

between stakeholder meetings.[3499]

1640.  We clarify that transmission providers are required to provide information at least

five calendar days prior to each of the three publicly-noticed stakeholder meetings.  As

stated above, transmission providers must publicly notice each meeting and publicly post

all materials for stakeholder review during the three meetings and provide opportunities

for stakeholders to submit comments before and after each meeting.  We believe that

providing this information at least five calendar days prior to each of the three

stakeholder meetings strikes a balance between giving stakeholders meaningful

opportunity to review the meeting materials ahead of each meeting and limiting the

burden to transmission providers in posting the materials ahead of time.  Furthermore, the

information that we require transmission providers to share is information that they use in

---

[3499] See PJM, Intra-PJM Tariffs, OATT, attach. M-3 (1.0.0.), which, briefly, refers to the additional transparency and stakeholder input rules around transmission facilities that are not eligible for selection, but, though classified as local transmission facilities, nonetheless impact the identification and selection of regional transmission facilities. *See also Duke Energy Carolinas, LLC*, 186 FERC ¶ 61,178, at PP 13, 27 (2024) (accepting Duke's OATT revisions to adopt a stakeholder meeting process that includes an Assumptions Meeting, Needs Meeting, and Solutions Meeting, each no fewer than 25 calendar days apart).

their local transmission planning processes and, thus, is information that they generally already possess.

1641.  We disagree with commenters that argue that three separate publicly-noticed stakeholder meetings are unnecessary and will increase workload without any benefit, or that a single meeting would address the Commission's transparency concerns more efficiently, or request that the Commission not dictate the number of stakeholder meetings.[3500]  We note that Indicated PJM TOs state that the PJM Attachment M-3 process has the benefit of avoiding duplication of projects between local and regional transmission planning processes.[3501]  We also disagree with MISO's argument that we should allow each transmission planning region to have complete discretion over the timing of the meetings, as well as the specific information to be covered at the meetings.[3502]  While we allow flexibility in certain aspects of the transmission planning processes, we find that the requirement to hold three separate stakeholder meetings a minimum of 25 calendar days apart and prescribing the type of information that transmission providers must share at each meeting is necessary to ensure that Commission-jurisdictional rates remain just and reasonable and not unduly discriminatory or preferential.  We balance the increased burden imposed on transmission

---

[3500] Dominion Initial Comments at 68; Eversource Initial Comments at 47-48; NESCOE Initial Comments at 78; Xcel Initial Comments at 17.

[3501] Indicated PJM TOs Initial Comments at 42.

[3502] MISO Initial Comments at 84.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1156 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

providers with the benefits associated with providing increased information and opportunities for stakeholder review of and comment on the local transmission planning inputs that are used in the regional transmission planning process. In addition, as discussed above, we believe that these reforms will reduce after-the-fact disputes and will help facilitate the identification of regional transmission facilities that may be more efficient or cost-effective than proposed local transmission facilities. As a result, the incremental burden of having to hold three stakeholder meetings to share this information and to consider input from stakeholders in response to this information is outweighed by the benefits that the increased transparency will provide.

1642. We also find unconvincing Eversource's assertion that the reforms will not work where there is not a precisely defined regional transmission planning cycle, such as is the case in ISO-NE.[3503] The requirement to hold three publicly-noticed stakeholder meetings is triggered by the submission of local transmission planning information to the transmission planning region for inclusion in the regional transmission planning process and is not tied to a particular transmission planning cycle. Nevertheless, we recognize that these reforms may require transmission providers to propose adjustments to their existing processes. But as explained above, we believe that the need for transparency and stakeholder involvement requires these changes to ensure that Commission-jurisdictional rates are just and reasonable and not unduly discriminatory or preferential.

---

[3503] Eversource Initial Comments at 47.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1157 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                          - 1147 -

1643.  In response to TAPS' request that transmission providers be required to post their transmission planning criteria, models, and assumptions,[3504] we reiterate that transmission providers must provide this information as part of the Assumptions Meeting.  We further note that the requirement for transmission providers to disclose to all customers and other stakeholders the basic criteria, assumptions, and data that underlie their transmission systems is an existing requirement of Order No. 890.  This information must enable customers, other stakeholders, or an independent third party to replicate the results of planning studies and thereby reduce the incidence of after-the-fact disputes regarding whether planning has been conducted in an unduly discriminatory fashion.[3505]  The Commission recognized in Order No. 890 that safeguards must be put in place to ensure that confidentiality and CEII concerns are adequately addressed in transmission planning activities and, therefore, requires that transmission providers have mechanisms in place in their OATTs to manage confidentiality and CEII concerns, such as confidentiality agreements and password-protected access to information.[3506]  However, we reiterate that information must be disclosed, under applicable confidentiality provisions, if the information is needed to participate in the transmission planning process and to replicate transmission planning studies, which necessarily includes access to the models that underlie transmission planning processes.

---

[3504] TAPS Initial Comments at 61.

[3505] Order No. 890, 118 FERC ¶ 61,119 at P 471.

[3506] *Id.* P 460.

Docket No. RM21-17-000                                                      - 1148 -

1644.  We decline to require, as requested by American Municipal Power and TAPS, that transmission providers hold two Solutions Meetings.[3507]  While a transmission provider may determine that additional stakeholder meetings are appropriate or necessary, we only require transmission providers to conduct the three publicly-noticed stakeholder meetings discussed above.  However, there is nothing in this final rule that prohibits transmission providers from holding additional meetings, beyond those required here.  We find NRG's request that the Commission require the local transmission planning process include an estimated rate impact for each year if the local transmission plan were to be executed to be beyond the scope of the proposal, although transmission providers may choose to provide this information outside of the context of this rule.

1645.  In response to commenters that request that the Commission require transmission providers to respond to all comments and questions submitted by stakeholders in the local transmission planning process,[3508] we clarify that such a requirement could be too prescriptive in certain circumstances and thus we decline to set a bright-line rule that transmission providers must respond to each and every question or comment received through the stakeholder process.  Nevertheless, we require transmission providers to respond to questions or comments in a manner that allows stakeholders to meaningfully

---

[3507] American Municipal Power Initial Comments at 24-25; TAPS Initial Comments at 62 (citing NOPR, 179 FERC ¶ 61,028 at P 402).

[3508] *See* American Municipal Power Initial Comments at 18-19; California Commission Initial Comments at 112-113; DC and MD Offices of People's Counsel Initial Comments at 6; Kentucky Commission Chair Chandler Initial Comments at 21-22; Northwest and Intermountain Initial Comments at 20-21; TAPS Initial Comments at 62.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1159 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

participate in these stakeholder meetings.  For example, in the context of live discussions in any of the three required publicly-noticed stakeholder meetings, we expect transmission providers to offer stakeholders an opportunity to speak, engage, and ask questions, as well as receive reasonable responses at the meeting consistent with meaningful participation.  Overall, we encourage transmission providers to be as responsive as possible to stakeholder comments and questions.  However, we recognize that not all comments or questions require an answer or a response, or that some responses may be unduly burdensome to the transmission provider.  To the extent that there are disagreements, we note that stakeholders have dispute resolution procedures available, as required under Order No. 890.[3509]  Some commenters have asked the Commission to require transmission providers to provide "additional clarity" regarding how alternatives were developed and why they were not selected during the Solutions Meeting, as requested by American Municipal Power.[3510]  In balancing the need for transparency and the burden for transmission providers, we find that a meaningful participation standard regarding sharing of local transmission planning inputs that are used in the regional transmission planning process that are established by the Commission is reasonable.

---

[3509] Order No. 890, 118 FERC ¶ 61,119 at PP 501-503.

[3510] American Municipal Power Initial Comments at 24-25.

1646.  In addition, in response to TAPS' request regarding disputes over local transmission planning inputs,[3511] we clarify that where disputes arise regarding transparency into the local transmission planning inputs, the transmission provider's existing dispute resolution process, as established in Order No. 890, governing the transmission planning process should be used.[3512]  Further, affected entities retain any rights that they may have under FPA section 206 to file complaints with the Commission.

### b.    <u>Additional Issues</u>

1647.  As it pertains to PPL's request that the Commission clarify that confidential or sensitive information will be protected,[3513] we clarify that transmission providers must continue to apply the same safeguards to protect sensitive or critical information, such as confidentiality agreements and password protected access to information, as the Commission required in Order No. 890 and that transmission providers currently apply to the sharing of transmission planning information to protect against inappropriate disclosure of confidential information.[3514]

1648.  Many commenters suggest additional reforms because these commenters find the NOPR proposal insufficient.  These suggested reforms include additional measures to

---

[3511] TAPS Initial Comments at 62 (citing Order No. 890, 118 FERC ¶ 61,119 at PP 501-503).

[3512] Order No. 890, 118 FERC ¶ 61,119 at P 501.

[3513] PPL Initial Comments at 36.

[3514] Order No. 890, 118 FERC ¶ 61,119 at PP 460, 471.

Docket No. RM21-17-000                                               - 1151 -

protect customers' interests and additional process, more oversight, more monitoring (including establishing an independent transmission monitor), or prudence reviews;[3515] requiring RTOs/ISOs to assume a larger role in reviewing or approving identified local transmission projects;[3516] requiring a performance-based method of enhancing transparency in local transmission planning processes;[3517] and requiring transmission providers to make available additional transmission planning data,[3518] improve formatting of transmission planning inputs,[3519] or otherwise coordinate with load-serving entities to transfer data and information.[3520]  The Commission did not make such proposals in the NOPR and, as a result, we find these requests to be beyond the scope of this proceeding and decline to adopt them.  We note, however, that several of these issues may be

---

[3515] California Commission Initial Comments at 111-112 &n.401; Colorado Consumer Advocates Initial Comments at 31; Joint Consumer Advocates Initial Comments at 25-29; NRG Initial Comments at 7, 36; Ohio Consumers Initial Comments at 23-24; OMS Initial Comments at 16-17; Pattern Energy Initial Comments at 31-34; Pine Gate Initial Comments at 49-50; PIOs Initial Comments at 51-52; PJM States Initial Comments at 4-6; TAPS Initial Comments at 61-62; US DOJ and FTC Initial Comments at 20-21.

[3516] *See* American Municipal Power Reply Comments at 3-7; California Commission Initial Comments at 108-110; DC and MD Offices of People's Counsel Initial Comments at 7; NARUC Initial Comments at 60-61; Ohio Consumers Reply Comments at 17-18; PJM States Initial Comments at 6-7.

[3517] Vermont Electric and Vermont Transco Initial Comments at 5.

[3518] American Municipal Power Initial Comments at 21-24 (citations omitted); Pattern Energy Initial Comments at 30-34.

[3519] Joint Consumer Advocates Initial Comments at 21-22.

[3520] Certain TDUs Initial Comments at 18.

examined in the Commission's ongoing Transmission Planning and Cost Management proceeding.[3521]

### C.     Identifying Potential Opportunities to Right-Size Replacement Transmission Facilities

#### 1.     Eligibility

##### a.     NOPR Proposal

1649.  The Commission proposed to require, as part of each Long-Term Regional Transmission Planning cycle, transmission providers in each transmission planning region to evaluate whether transmission facilities operating at or above 230 kV that an individual transmission provider that owns the transmission facility anticipates replacing in-kind with a new transmission facility during the next 10 years can be "right-sized" to more efficiently or cost-effectively address regional transmission needs identified in Long-Term Regional Transmission Planning.  The Commission proposed to define "right-sizing" as the process of modifying a transmission provider's in-kind replacement of an existing transmission facility to increase that facility's transfer capability.[3522]

1650.  The Commission described the process under this proposed reform as entailing the following steps.  First, sufficiently early in each Long-Term Regional Transmission Planning cycle, each transmission provider would submit its in-kind replacement estimates for use in Long-Term Regional Transmission Planning.  Then, if a right-sized

---

[3521] Transmission Planning and Cost Management, Notice of Technical Conference, Docket No. AD22-8-000 (Apr. 21, 2022).

[3522] NOPR, 179 FERC ¶ 61,028 at P 403.

replacement transmission facility is identified as a potential solution to a Long-Term Regional Transmission Planning need, that right-sized replacement transmission facility would be evaluated in the same manner as any other proposed transmission facility to determine whether it is the more efficient or cost-effective transmission facility to address the transmission need. If a right-sized replacement transmission facility addresses the transmission provider's need to replace an existing transmission facility, meets all of the applicable selection criteria included in Long-Term Regional Transmission Planning, and is found to be the more efficient or cost-effective solution to a transmission need identified through Long-Term Regional Transmission Planning, then the right-sized replacement transmission facility may be selected in the regional transmission plan for purposes of cost allocation.[3523]

1651. The Commission explained that nothing in the reforms proposed in the NOPR would alter a transmission provider's existing rights and responsibilities under existing laws with respect to maintaining, and when necessary, replacing, existing transmission facilities. Further, as the Commission explained, it may be possible for an in-kind replacement transmission facility to be *included* in the regional transmission plan for informational purposes, but not be *selected*.[3524]

---

[3523] *Id.* P 407.

[3524] *Id.* PP 412-413.

b.    **Comments**

1652.  Several commenters support the NOPR's proposals related to right-sizing.[3525]  ITC

states that the NOPR proposal will result in better use of existing facilities and rights-of-

way to quickly deliver additional transmission capacity.  ITC maintains that increasing

the transfer capability of existing transmission facilities lessens the impacts on

communities and other land users, in addition to raising fewer environmental

considerations.[3526]  ITC adds that right-sizing will form a critical input to transmission

planning and state siting processes by encouraging designs that meet future needs.[3527]

1653.  OMS also supports the Commission's proposed realignment of incentives to

ensure that transmission providers are not incentivized through right-sizing to rebuild and

replace facilities before considering other opportunities, instead providing a level playing

field to consider other solutions.[3528]  PJM states that right-sizing allows transmission

owners to meet their reliability obligations while transmission providers have the

---

[3525] ACORE Initial Comments at 19; Ameren Initial Comments at 46-47; APPA Initial Comments at 48; California Energy Commission Initial Comments at 3; CTC Global Initial Comments at 18; ELCON Initial Comments at 27; Evergreen Action Initial Comments at 4; ITC Initial Comments at 45; ITC Reply Comments at 29; New York Commission and NYSERDA Initial Comments at 15; Northwest and Intermountain Initial Comments at 21; OMS Initial Comments at 17; PJM Initial Comments at 9, 121-122; SEIA Initial Comments at 26; US Chamber of Commerce Initial Comments at 11; Vermont Electric and Vermont Transco Initial Comments at 5.

[3526] ITC Initial Comments at 45.

[3527] ITC Reply Comments at 29.

[3528] OMS Initial Comments at 17.

Docket No. RM21-17-000                                                          - 1155 -

opportunity to find more efficient solutions to regional transmission needs and avoid

duplicative transmission development.[3529]

1654.  AEP supports applying the right-sizing evaluation to transmission facilities

operating at or above 230 kV because replacement transmission facilities that will operate

at or above 230 kV are most susceptible to modification to meet long-term regional

transmission needs.[3530]  PG&E also supports the proposed voltage threshold, claiming

that the inclusion of lower voltage transmission projects would substantially expand the

number of projects that would need to be evaluated for right-sizing while offering little

benefit.  Specifically, PG&E contends that lower voltage transmission projects are

typically needed for specific, local purposes and thus do not need to be right-sized, and

that a requirement that they be evaluated for right-sizing would burden the RTO/ISO

process.[3531]

1655.  APPA supports the NOPR proposal's use of a 10-year timeframe for the right-

sizing reform.[3532]  AEP also supports a 10-year horizon for identifying in-kind

replacements, so long as the list of transmission facilities is non-binding and may be

---

[3529] PJM Initial Comments at 121-122 (citing NOPR, 179 FERC ¶ 61,028 at PP 406, 408).

[3530] AEP Initial Comments at 44-45 (citing NOPR, 179 FERC ¶ 61,028 at P 406).

[3531] PG&E Reply Comments at 14-15.

[3532] APPA Initial Comments at 48 (citing NOPR, 179 FERC ¶ 61,028 at P 403).

modified as transmission projects mature or expected facility lives can be extended through other means.[3533]

1656.  CAISO requests that the Commission clarify that the NOPR does not preclude it from continuing to consider modifications to in-kind replacements for transmission facilities below 230 kV in its annual transmission planning process.[3534]

1657.  Several commenters support the NOPR's right-sizing proposal but with certain conditions.[3535]  Further, some commenters argue that if the Commission adopts the NOPR proposal, the Commission must ensure that the proposal does not disrupt or impair existing local transmission planning processes.[3536]  For example, AEP asserts that the Commission must ensure that the NOPR proposal does not undermine the local

---

[3533] AEP Initial Comments at 44-45.

[3534] CAISO Initial Comments at 50.

[3535] ACEG Initial Comments at 8-9, 56-58; AEP Initial Comments at 43-44; Avangrid Initial Comments at 15-16; Breakthrough Energy Initial Comments at 3, 19; California Commission Initial Comments at 113-118; California Water Initial Comments at 8-9; Clean Energy Associations Initial Comments at 36-37; EEI Initial Comments at 41; Eversource Initial Comments at 52; Exelon Initial Comments at 3, 51; ISO-NE Initial Comments at 39; MISO Initial Comments at 87; NARUC Initial Comments at 58-59, 63-64; NESCOE Initial Comments at 21-22, 78-79; NESCOE Reply Comments at 6-8; NESCOE Supplemental Comments at 7-9; NextEra Initial Comments at 66-67; NRECA Initial Comments at 67; NYISO Initial Comments at 58-60; PG&E Initial Comments at 12-14; Pine Gate Initial Comments at 46-50; PIOs Initial Comments at 57-58; State Agencies Initial Comments at 20-22; TAPS Initial Comments at 6-7, 64; VEIR Initial Comments at 6; Vermont State Entities Initial Comments at 11-13; WIRES Initial Comments at 10.

[3536] *See* AEP Initial Comments at 43-44; CAISO Initial Comments at 50; Mississippi Commission Initial Comments at 30-31; Mississippi Commission Reply Comments at 9-10; PJM States Initial Comments at 8; WIRES Initial Comments at 10.

Docket No. RM21-17-000                                    - 1157 -

transmission planning process or transmission owners' rights to build transmission projects that address local needs.[3537]  Mississippi Commission asserts that, if the NOPR proposal is adopted, the ultimate decision as to which local transmission project is constructed must rest with the states that have transmission siting authority and the incumbent transmission owners.[3538]  PJM States ask for clarification on how the NOPR proposal will interact with existing processes, noting that in PJM, any need that appears both on a five-year end-of-life needs list and in PJM's regional transmission plan is eligible for competition (as compared to the NOPR proposal, under which transmission projects to address 10-year-out needs would not be eligible for competition).[3539]

1658.  NESCOE states that ISO-NE lacks the clear standards required to support right-sizing, citing an Eversource transmission project that improved grid reliability but was ineligible for regional cost allocation because it did not meet the standards to qualify as a right-sized project.[3540]  NESCOE argues that more transparency into the right-sizing processes is necessary to ensure that the results are disciplined, cost-conscious investments.[3541]

---

[3537] AEP Initial Comments at 43-44.

[3538] Mississippi Commission Initial Comments at 30-31.

[3539] PJM States Initial Comments at 8 (citing PJM, Intra-PJM Tariffs, OATT, attach. M-3 (1.0.0), § (d)1.iii).

[3540] NESCOE Reply Comments at 6-8.

[3541] NESCO Supplemental Comments at 9.

Docket No. RM21-17-000                                                                 - 1158 -

1659.  Several commenters oppose the NOPR's right-sizing proposal.[3542]  Competition

Coalition asserts that the NOPR proposal would result in over-building the transmission

system now for speculative future transmission needs, leaving customers with the bill for

any stranded costs.[3543]  Louisiana Commission claims that the NOPR right-sizing

proposal should not be adopted because it will intrude on its retail authority.[3544]

1660.  Other commenters argue that the proposed 230 kV threshold is inappropriate.[3545]

For example, Avangrid contends that it is overly prescriptive and does not reflect regional

conditions, needs, and stakeholder interests.[3546]  Avangrid states that, in ISO-NE, a 230

kV threshold would result in in-kind replacement of lower voltage transmission facilities

rather than right-sizing facilities to most efficiently meet transmission needs identified

through Long-Term Regional Transmission Planning.

---

[3542] Anbaric Initial Comments at 7; Competition Coalition Initial Comments at 62-63; DC and MD Offices of People's Counsel Initial Comments at 47-48; Idaho Power Initial Comments at 13; Kentucky Commission Chair Chandler Initial Comments at 16-19; Louisiana Commission Initial Comments at 39; LS Power Initial Comments at 135-136, 138, 141-142, 145-146; Massachusetts Attorney General Initial Comments at 51-52; Ohio Consumers Initial Comments at 23; Resale Iowa Initial Comments at 8-9.

[3543] Competition Coalition Initial Comments at 62-63.

[3544] Louisiana Commission Initial Comments at 39.

[3545] Avangrid Initial Comments at 15-16; California Commission Initial Comments at 117-118; Kentucky Commission Chair Chandler Initial Comments at 18-19; New York TOs Initial Comments at 17-18; NYISO Initial Comments at 59; Ohio Consumers Initial Comments at 23; PJM Initial Comments at 9, 121-122; State Agencies Initial Comments at 20-21; TAPS Initial Comments at 6, 66.

[3546] Avangrid Initial Comments at 15-16.

Docket No. RM21-17-000                                           - 1159 -

1661.  Kentucky Commission Chair Chandler argues that 200 kV or 230 kV are no longer adequate rules of thumb to delineate local versus regional transmission facilities, as transmission facilities that may have been formerly classified as local are likely to be regional in the future.  Rather, Kentucky Commission Chair Chandler states that transmission facilities rated between 100 kV and 200 kV will play a greater role in the regional delivery of energy.[3547]  Ohio Consumers argue that the Commission should lower the threshold to 69 kV because many end-of-life transmission facilities in the PJM transmission planning process are expensive rebuilds of transmission facilities that are rated below 230 kV.[3548]  TAPS argues that excluding lower voltage facilities prevents transmission planning regions from being able to consider more efficient and cost-effective alternatives.[3549]

1662.  LS Power asserts that the Commission should not limit its right-sizing proposal to facilities above 230 kV and that such reforms should apply to lower voltage transmission facilities as well.[3550]  Specifically, LS Power argues that transmission facilities that

---

[3547] Kentucky Commission Chair Chandler Initial Comments at 18-19.

[3548] Ohio Consumers Initial Comments at 23.

[3549] TAPS Initial Comments at 6, 66.

[3550] *See* LS Power Partial Reply Comments at 61-64 (citing California Commission Initial Comments at 117; Eversource Initial Comments at 38; ISO-NE Initial Comments at 39; Kentucky Commission Chair Chandler Initial Comments at 19; LS Power Initial Comments at 142; NARUC Initial Comments at 64; Ohio Consumers Initial Comments at 23; State Agencies Initial Comments at 21).

Docket No. RM21-17-000                                                    - 1160 -

operate at or above 100 kV (and sometimes facilities operating at a lower voltage) are

regional in nature and should be subject to exclusively regional transmission planning.[3551]

1663.  Shell states that the Commission should consider lowering the proposed voltage

threshold to 115 kV, but notes that doing so may include lower voltage facilities that

predominantly serve sub-transmission, wholesale distribution, or retail distribution

purposes and have only local benefits.[3552]  To ensure that the costs of sub-transmission,

wholesale distribution, or retail distribution facilities are not rolled into transmission

rates, Shell argues that the Commission should reexamine its standards for rolling the

costs of transmission facilities into rates, its application of the Seven Factor test for

functionalizing facilities as distribution or transmission, and its *Mansfield* integration

analysis.[3553]  Western Utilities contend that the Commission should not adopt Shell's

proposal to lower the right-sizing threshold to 115 kV because whether or not a facility is

a transmission facility is a fact-specific question.[3554]

---

[3551] *Id.* at 64.

[3552] Shell Reply Comments at 10 (citing Shell Initial Comments at 34).

[3553] Shell Initial Comments at 34-36; Shell Reply Comments at 10-11 (citing
*Commonwealth Edison Co.*, 167 FERC ¶ 61,173, at P 12 n.23 (2019); *Buckeye Power,
Inc. v. Am. Transmission Sys. Inc.*, Opinion No. 533, 148 FERC ¶ 61,174, at PP 12, 41,
69 (2014), *order on reh'g*, 151 FERC ¶ 61,091 (2015); *Mansfield Mun. Elec. Dep't v.
New England Power Co.*, Opinion No. 454, 97 FERC ¶ 61,134 (2001), *order on reh'g*,
Opinion No. 454-A, 98 FERC ¶ 61,115 (2002)).

[3554] *See* Western Utilities Reply Comments at 2 (citing Shell Initial Comments at
34-35).

1664.  Pine Gate recommends against the Commission adopting the bright-line voltage threshold specified in the NOPR, but urges the Commission require each transmission provider to:  (1) list and evaluate existing transmission facilities operating at or above 230 kV that it owns and estimates may need to be replaced with a new in-kind transmission facility over the next 10 years; and (2) establish criteria by which it will identify lower-voltage facilities that could potentially be right-sized through Long-Term Regional Transmission Planning.[3555]  Relatedly, WIRES states that the Commission should either: (1) clarify that transmission providers would not be prohibited from considering right-sizing transmission facilities at a lower voltage threshold if existing transmission planning processes already do so; or (2) provide flexibility for transmission planning regions to justify the use of a different voltage threshold.[3556]

1665.  Some commenters oppose the NOPR proposal's use of a 10-year timeframe for the right-sizing reform.[3557]  Exelon states that the Commission's proposed requirement to have a 10-year time horizon for identifying a list of potential end-of-useful life needs is infeasible and inconsistent with utility practices.  Specifically, Exelon states that it does not develop a concrete plan for transmission projects to meet end-of-useful life needs five years in advance – let alone 10 years – but instead maintains a "dynamic list" of older

---

[3555] Pine Gate Initial Comments at 48.

[3556] WIRES Initial Comments at 10.

[3557] Eversource Initial Comments at 53; Exelon Initial Comments at 54-55; Indicated PJM TOs Initial Comments at 46-47; Kentucky Commission Chair Chandler Initial Comments at 17-18; SERTP Sponsors Initial Comments at 38-39.

Docket No. RM21-17-000                                        - 1162 -

assets, the condition of which is evaluated on a rolling basis, based on numerous factors

such as equipment inspection and testing, maintenance history, historical performance,

obsolescence, operational experience, asset criticality, equipment failure data, and

age.[3558]

1666.  Some commenters argue that the NOPR proposal is not applicable to their

transmission planning regions or that their existing processes are sufficient.[3559]  For

example, CAISO explains that it plans all upgrades and expansions of transmission

facilities under its operational control, which include transmission facilities at all voltage

levels and at all locations on the system.  Further, CAISO states that, if an asset

management, maintenance, or in-kind replacement project can be expanded or modified

to address a CAISO-identified transmission need in a local area (or system wide), CAISO

can order such expansion or modification in its regional transmission planning

process.[3560]

---

[3558] Exelon Initial Comments at 54-55 (*Exelon Utilities Asset Management Guidelines and Practices* 3 (Nov. 18, 2020), https://pjm.com/-/media/committees-groups/committees/srrtep-ma/2020/20201216/20201216-exelon-final-end-eol-guidelines.ashx).

[3559] CAISO Initial Comments at 47-48; Dominion Initial Comments at 69-70, 72; Duke Initial Comments at 46; MISO Initial Comments at 87-88; MISO Reply Comments at 28; New York TOs Initial Comments at 17; SERTP Sponsors Initial Comments at 38-39; SPP Initial Comments at 34-35.

[3560] CAISO Initial Comments at 47-48 (citing CAISO ANOPR Initial Comments at 73; *Cal. Pub. Utils. Comm'n v. Pac. Gas and Elec. Co.*, 164 FERC ¶ 61,161 at PP 35-37, 69).

Docket No. RM21-17-000                                          - 1163 -

1667.  MISO asserts that right-sizing is fundamental to transmission planning and should always be considered as part of Good Utility Practice, but that right-sizing decisions are best made on a case-by-case basis, as there are both quantitative and qualitative considerations that must be taken into account.[3561]  MISO contends that its existing local transmission planning achieves the Commission's objectives, as the MISO process provides for right-sizing where MISO selects the most robust solution.  Accordingly, MISO states that, for its footprint, no changes are needed.[3562]

1668.  SERTP Sponsors argue that replacement decisions for particular equipment may be triggered more by the conditions of a particular facility than its age.  SERTP Sponsors argue that a process like right-sizing already occurs in SERTP's regional transmission planning, which requires that the SERTP Sponsors affirmatively look to determine if there are regional transmission alternatives that would be more efficient or cost-effective than the transmission solutions otherwise included in SERTP's regional transmission plan, including projects to replace aging infrastructure.[3563]

1669.  Several commenters argue that the Commission should adopt alternative or additional requirements that apply when transmission providers evaluate transmission facilities for right-sizing.[3564]  For example, Ameren requests that the Commission require

---

[3561] MISO Initial Comments at 87.

[3562] MISO Reply Comments at 28 (citing OMS Initial Comments at 15-17).

[3563] SERTP Sponsors Initial Comments at 38-39 (citations omitted).

[3564] ACEG Initial Comments at 58; Ameren Initial Comments at 46-47; American Municipal Power Initial Comments at 27; Breakthrough Energy Initial Comments at 18-

Docket No. RM21-17-000                                                          - 1164 -

transmission providers to consider the following additional criteria when determining

whether a transmission facility is eligible for right-sizing: (1) whether a transmission line

is in the top 10 limiting elements on an import or transfer study; (2) whether a line has

shown up as a real-time binding constraint in the last two years; or (3) whether a line

shows up as a binding constraint in future security constrained economic dispatch

simulations.[3565]  California Energy Commission argues that the Commission should

develop a definition of "right-sizing," possibly tied to a specified planning reserve margin

as well as an expected level of demand growth.[3566]  Furthermore, ACEG and PG&E both

request that the Commission consider the use of existing transmission facility rights-of-

way as an eligibility threshold for potentially right-sized replacement transmission

facilities.[3567]

1670. Eversource asserts that it would be more efficient to evaluate potential right-

sizing: (1) through a review of the transmission facilities that could be upgraded to

address identified long-term transmission needs, including an evaluation of whether an

_____

19; California Energy Commission Initial Comments at 3; Competition Coalition Initial
Comments at 68; CTC Global Initial Comments at 18; Eversource Initial Comments at
53; Exelon Initial Comments at 56-58; Grid United Initial Comments at 3-4;
Pennsylvania Commission Initial Comments at 21; PG&E Initial Comments at 13-14;
Pine Gate Initial Comments at 48; PIOs Initial Comments at 57-58; PJM Initial
Comments at 9, 121-122; PPL Initial Comments at 36-37; Shell Initial Comments at 34.

[3565] Ameren Initial Comments at 46-47.

[3566] California Energy Commission Initial Comments at 3.

[3567] ACEG Initial Comments at 57-58; PG&E Initial Comments at 13.

in-kind replacement is likely to occur during the planning horizon; or (2) through transmission owner identification of right-sizing options that align with needs identified in the longer-term study as they perform their normal asset condition projects.[3568]

1671.  Entergy asserts that the Commission should clarify that storm-hardening transmission projects are not subject to a right-sizing requirement because it would add complications and delays to the right-sizing process.[3569]  Pennsylvania Commission argues that a transmission facility should not be right-sized if its total cost exceeds the total cost of the local transmission project and a competitively procured transmission project to address the regional need.[3570]

1672.  Some commenters call for the Commission to expand the right-sizing reform to other categories of transmission facilities.[3571]  Eversource argues that the Commission should encourage transmission providers to incorporate right-sizing considerations into other transmission planning processes, such as the reliability planning process, as appropriate.[3572]  Similarly, ACORE and American Municipal Power request that the

---

[3568] Eversource Initial Comments at 53.

[3569] Entergy Initial Comments at 38.

[3570] Pennsylvania Commission Initial Comments at 21.

[3571] American Municipal Power Initial Comments at 27; Avangrid Initial Comments at 16; Clean Energy Associations Initial Comments at 26-27, 37; Eversource Initial Comments at 54; MISO Initial Comments at 88; NYISO Initial Comments at 59-60; PIOs Initial Comments at 57-58; TAPS Initial Comments at 6, 64-65.

[3572] Eversource Initial Comments at 54.

Commission clarify that right-sizing also applies in any short-term transmission planning for reliability and economic transmission projects.[3573]  Grid United states that the Commission should require Long-Term Regional Transmission Planning to assess and allow for up-sizing transmission projects, such as building a single circuit transmission line that is double-circuit ready.[3574]

1673.  Several commenters argue that the Commission should allow flexibility on the thresholds for evaluating transmission facilities for right-sizing.[3575]  To prevent needless litigation that will cause delays and cost increases for customers, Dominion states that any final rule should be clear that transmission providers will not be penalized if a replacement project arises that was not previously identified.[3576]

1674.  NYISO contends that the final rule should permit transmission providers, with input from state entities and stakeholders, to integrate planning for right-sizing

---

[3573] ACORE Initial Comments at 19; American Municipal Power Initial Comments at 27.

[3574] Grid United Initial Comments at 4.

[3575] American Municipal Power Initial Comments at 27; APPA Initial Comments at 48; Avangrid Initial Comments at 15-16; California Commission Initial Comments at 117; Clean Energy Associations Initial Comments at 36-37; Dominion Initial Comments at 72-73; EEI Initial Comments at 41; Eversource Initial Comments at 52-53; ISO-NE Initial Comments at 39; NARUC Initial Comments at 58-59, 63-64; National Grid Initial Comments at 40-41; NESCOE Initial Comments at 80; New York TOs Initial Comments at 18; NRECA Initial Comments at 67; NYISO Initial Comments at 9, 60; PG&E Reply Comments at 14-15; PPL Initial Comments at 37; US DOE Initial Comments at 48; Vermont State Entities Initial Comments at 13; WIRES Initial Comments at 10.

[3576] Dominion Initial Comments at 73.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1177 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                                    - 1167 -

transmission replacements into existing transmission planning processes, including by considering transmission facilities that they anticipate will be replaced in-kind when identifying transmission needs in short-term or long-term transmission planning.[3577]

1675.  US DOE encourages the Commission to provide sufficient flexibility to ensure that the proposed reforms are cost-effective and do not overburden the transmission planning process.  US DOE asserts that transmission providers should not be required to submit every in-kind replacement for all equipment above 230 kV for consideration for right-sizing and that regional transmission planning processes should not be required to consider each piece of equipment provided by each member of a transmission planning region.[3578]

1676.  PG&E argues that the Commission should allow for flexibility in any right-sizing-related requirements, noting that a transmission provider may need to replace an aging or failing transmission facility sooner than a right-sized transmission project can be developed.  In that case, PG&E states that the transmission owner would need to proceed with the replacement project to ensure reliability or protect public safety even if the RTO/ISO had determined that a transmission facility would benefit from being right-sized.[3579]

---

[3577] NYISO Initial Comments at 9, 60.

[3578] US DOE Initial Comments at 48.

[3579] PG&E Reply Comments at 15.

Docket No. RM21-17-000                                           - 1168 -

c.    **Commission Determination**

1677.  We adopt the NOPR proposal, with modification, to require that, as part of each

Long-Term Regional Transmission Planning cycle, transmission providers in each

transmission planning region evaluate whether transmission facilities (1) operating above

a specified kV threshold and (2) that an individual transmission provider that owns the

transmission facility anticipates replacing in-kind with a new transmission facility during

the next 10 years can be "right-sized" to more efficiently or cost-effectively address a

Long-Term Transmission Need.  To effectuate this reform, we also adopt the NOPR

proposal, with modification, to require that, sufficiently early in each Long-Term

Regional Transmission Planning cycle, each transmission provider submit its in-kind

replacement estimates (i.e., estimates of the transmission facilities operating at and above

the specified kV threshold that an individual transmission provider that owns the

transmission facility anticipates replacing in-kind with a new transmission facility during

the next 10 years) for use in Long-Term Regional Transmission Planning.  With respect

to the specified kV threshold, transmission providers must propose on compliance a

threshold that does not exceed 200 kV (e.g., 115 kV and above).  In adopting the right-

sizing reform in this final rule, we recognize that a transmission provider may have

existing rights and responsibilities with respect to maintaining and, when necessary,

replacing existing transmission facilities.  We also adopt the NOPR proposals regarding a

federal right of first refusal and cost allocation method for right-sized replacement

transmission facilities, as discussed below.

1678.  We adopt the NOPR proposal to define "right-sizing" as the process of modifying a transmission provider's in-kind replacement of an existing transmission facility to increase that facility's transfer capability.[3580]  Additionally, we clarify that, for purposes of this right-sizing reform, an "in-kind replacement transmission facility" is a new transmission facility that: (1) would replace an existing transmission facility that a transmission provider has identified in its in-kind replacement estimate as needing to be replaced; (2) would result in no more than an incidental increase in capacity over the existing transmission facility identified as needing to be replaced;[3581] and (3) is located in the same general route as, and/or uses the existing rights-of-way of, the existing transmission facility identified as needing to be replaced.

1679.  Further, we clarify that a "right-sized replacement transmission facility" is a new transmission facility that: (1) would meet the need to replace an existing transmission facility that a transmission provider has identified in its in-kind replacement estimate as one that it plans to replace with an in-kind replacement transmission facility while also

---

[3580] NOPR, 179 FERC ¶ 61,028 at P 403 ("Right-sizing could include, for example, increasing the transmission facility's voltage level, adding circuits to the towers (e.g., redesigning a single-circuit line as a double-circuit line), or incorporating advanced technologies (such as advanced conductor technologies).").

[3581] The Commission has addressed the meaning of an incidental increase in the context of a replacement transmission facility in several orders.  *See, e.g.*, *S. Cal. Edison Co.*, 164 FERC ¶ 61,160 at P 33, *order on reh'g*, 168 FERC ¶ 61,170 (2019); *Cal. Pub. Utils. Comm'n v. Pac. Gas & Elec. Co.*, 164 FERC ¶ 61,161 at P 68; *see also PJM Interconnection, L.L.C.*, 172 FERC ¶ 61,136 at P 84, *order on reh'g*, 173 FERC ¶ 61,225 (2020); *PJM Interconnection, L.L.C.*, 173 FERC ¶ 61,242 at P 54, *order on reh'g*, 176 FERC ¶ 61,053 (2021).

addressing a Long-Term Transmission Need; (2) results in more than an incidental

increase in the capacity of an existing transmission facility that a transmission provider

has identified for replacement in its in-kind replacement estimate; and (3) is located in the

same general route as, and/or uses or expands the existing rights-of-way of, the existing

transmission facility that a transmission provider has identified for replacement in its in-

kind replacement estimate.  We believe these clarifications are necessary to ensure that

use of the right-sizing reform addresses *replacement* transmission facilities and not

entirely new transmission facilities.

1680.  As an example, assume that transmission providers determine that an existing

transmission facility included in a transmission provider's in-kind replacement estimate

can be right-sized (Segment 1) and, together with a separate new transmission facility

(Segment 2), is the more efficient or cost-effective solution to a Long-Term Transmission

Need.  In this example, Segment 1 is a new 50-mile, 345 kV transmission facility

between interconnection points A and B that requires the expansion of an existing right-

of-way, and replaces an existing 50-mile, 230 kV transmission facility between

interconnection points A and B.  Segment 2 in this example is a new 25-mile, 345 kV

transmission facility requiring entirely new rights-of-way from interconnection points B

to C.  If both Segment 1 and Segment 2 are selected to address a Long-Term

Transmission Need, then, for purposes of the requirements of this final rule, only

Segment 1 would be considered a right-sized replacement transmission facility.

1681.  Consistent with the NOPR proposal, and as discussed further below, the process

under this proposed right-sizing reform entails taking the following steps, which

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1181 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                                      - 1171 -

transmission providers must describe in their OATTs.  The transmission providers in each transmission planning region must propose a point sufficiently early in each Long-Term Regional Transmission Planning cycle at which each individual transmission provider in the transmission planning region will submit its in-kind replacement estimates for use in Long-Term Regional Transmission Planning.  Then, if transmission providers identify a right-sized replacement transmission facility as a potential solution to a Long-Term Transmission Need as part of Long-Term Regional Transmission Planning, that right-sized replacement transmission facility must be evaluated in the same manner as any other proposed Long-Term Regional Transmission Facility to determine whether it is the more efficient or cost-effective transmission facility to address the transmission need.  More specifically, it is at this stage of the right-sizing reform where transmission providers must use the in-kind replacement estimates to determine if in-kind replacement transmission facilities could be right-sized to more efficiently or cost-effectively address a Long-Term Transmission Need(s).  If a right-sized replacement transmission facility addresses the transmission provider's need to replace an existing transmission facility, meets the applicable selection criteria included in Long-Term Regional Transmission Planning, and is found to be the more efficient or cost-effective solution to a Long-Term Transmission Need, then the right-sized replacement transmission facility must be considered for selection.

1682.  We find that a right-sized replacement transmission facility has the potential to both meet an individual transmission provider's responsibility to maintain the reliability of its existing transmission system and address a Long-Term Transmission Need more

efficiently or cost-effectively than an in-kind replacement transmission facility or another Long-Term Regional Transmission Facility.[3582]  Further, we find that, if opportunities for right-sized replacement transmission facilities are not considered, the Long-Term Regional Transmission Planning process may not select the more efficient or cost-effective transmission facilities to meet Long-Term Transmission Needs, potentially rendering Commission-jurisdictional rates unjust and unreasonable.[3583]

1683.  As noted above, for purposes of implementing the right-sizing requirements that we adopt in this final rule, transmission providers must propose on compliance a threshold that does not exceed 200 kV that is used in identifying the transmission facilities that an individual transmission provider anticipates replacing in-kind with a new transmission facility during the next 10 years, which it must then include in its in-kind replacement estimates.  In other words, each transmission provider in the transmission planning region must include in its in-kind replacement estimates the transmission facilities operating at and above 200 kV, or at and above a lower proposed threshold, that it owns and anticipates replacing in-kind with a new transmission facility during the next 10 years.[3584]  We find that this threshold strikes a reasonable balance between capturing

---

[3582] NOPR, 179 FERC ¶ 61,028 at P 406.

[3583] *Id*.

[3584] We note that while transmission providers may not propose a kV threshold that exceeds 200 kV, they may propose a lower kV threshold (e.g., 100 kV or 115 kV), which would require transmission providers in that transmission planning region to include in their in-kind replacement estimates a wider range of transmission facilities that they own and anticipate replacing in-kind with a new transmission facility during the next

Docket No. RM21-17-000                                                    - 1173 -

the transmission facilities that are the most likely candidates for right-sizing without

overburdening transmission providers by requiring them to identify all transmission

facilities planned for in-kind replacement, including lower voltage transmission facilities

that may be less likely to provide regional benefits, and therefore potentially less likely to

be more efficient or cost-effective transmission solutions to Long-Term Transmission

Needs.  Specifically, we believe adopting the 230 kV threshold proposed in the NOPR

could have excluded from consideration some transmission facilities planned for in-kind

replacement that are likely to provide regional benefits.[3585]  In adopting a specified kV

threshold (so long as that threshold does not exceed 200 kV), as opposed to the 230 kV

threshold proposed in the NOPR, we note that the Commission "has wide discretion to

determine where to draw administrative lines."[3586]

1684.  We find that the requirement for transmission providers to identify a kV threshold

not to exceed 200 kV to identify in-kind replacements recognizes that the NOPR proposal

---

10 years.

[3585] For example, the maximum 200 kV threshold that we adopt here mirrors existing processes (e.g., CAISO) for determining whether a transmission facility provides regional benefits or more localized benefits.  Appendix A of CAISO's OATT defines a "Large Project" as "[a] transmission upgrade or addition that exceeds $200 million in capital costs and consists of a proposed transmission line or substation facilities capable of operating at voltage levels greater than 200 kV."  CAISO, CAISO eTariff, app. A, Definitions (0.0.0), § Large Project.  Moreover, we note that a 200 kV threshold aligns with the 200 kV threshold for interconnection reforms discussed in the Coordination of Regional Transmission Planning and Generator Interconnection Process section of this final rule.

[3586] *ExxonMobil Gas Mktg. Co. v. FERC*, 297 F.3d 1071, 1085 (D.C. Cir. 2002) (quoting *AT&T Corp. v. FCC*, 220 F.3d 607, 627 (D.C. Cir. 2000)).

Docket No. RM21-17-000                                                        - 1174 -

did not align with the region-specific characteristics outlined by some transmission

providers.  For example, as ISO-NE notes, a large portion of ISO-NE's transmission

system consists of 115 kV transmission facilities.[3587]  We find that the maximum kV

threshold that we adopt allows flexibility for transmission providers, like ISO-NE, to

tailor their proposed kV threshold to their specific transmission planning regions (as long

as the threshold they apply is equal or lower than 200 kV), while ensuring that the in-kind

replacement transmission facilities that are most susceptible to modification that could

more efficiently or cost-effectively address Long-Term Transmission Needs are

considered for right-sizing.

1685.  With regard to the 10-year timeframe for in-kind replacement estimates, we

believe that 10 years is an appropriate timeframe to evaluate potential in-kind

replacement transmission facilities for right-sizing because it balances the long lead times

associated with developing certain transmission facilities with the uncertainty associated

with the exact timing of when aging transmission facilities may need to be replaced.[3588]

We also clarify that the 10-year timeframe for in-kind replacement estimates should

reflect a transmission provider's estimates of the transmission facilities operating at and

above the specified kV threshold that an individual transmission provider that owns the

transmission facility anticipates replacing in-kind with a new transmission facility during

the next 10 years beginning at the start of each Long-Term Regional Transmission

---

[3587] ISO-NE Initial Comments at 39.

[3588] NOPR, 179 FERC ¶ 61,028 at P 406.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1185 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Planning cycle. Furthermore, we believe that a 10-year timeframe is more likely to capture a larger pool of potential in-kind replacement transmission facilities that would be eligible for right-sizing. We recognize, however, that transmission providers may obtain better information about a transmission facility's condition as the anticipated replacement date approaches and may also identify additional transmission facilities that require replacement in fewer than 10 years based on updated assessments of their condition. As such, we clarify that transmission providers may update the lists of transmission facilities that they anticipate replacing in subsequent transmission planning cycles if they believe that an anticipated in-kind replacement transmission facility is more urgently needed than previously thought or if existing transmission facilities do not deteriorate as quickly as previously expected.

1686. Several commenters oppose the right-sizing reform. They suggest that adopting the reform would harm competition or existing transmission planning processes that already evaluate whether replacement transmission facilities can be increased in transfer capability. We are unpersuaded by these arguments. We adopt the right-sizing reform because it captures certain transmission planning efficiencies by addressing aging transmission infrastructure issues while also providing an opportunity to increase transfer capability (i.e., develop the right-sized replacement transmission facility) to address Long-Term Transmission Needs more efficiently or cost-effectively. With respect to concerns about the right-sizing reform's impact on competition, we address that issue below under the section on Rights of First Refusal. Regarding commenters' arguments that existing transmission planning processes already evaluate whether replacement

Docket No. RM21-17-000                                                    - 1176 -

transmission facilities can be right-sized, we note that we require transmission providers

to consider right-sizing as part of Long-Term Regional Transmission Planning.  If

transmission providers wish to continue to consider right-sizing opportunities in some or

all of their existing transmission planning processes in addition to Long-Term Regional

Transmission Planning, this reform does not address those processes, and they may

continue to adhere to existing practices that are not modified by this final rule.  Further,

we emphasize that transmission providers may propose compliance approaches that are

consistent with or superior to these requirements, and as such, depending on their

individual circumstances and approaches, may be able to demonstrate that a method akin

to their existing practice is also appropriate for right-sizing in Long-Term Regional

Transmission Planning.

1687.  In response to PJM States' request for clarification regarding the interaction

between existing processes and whether the right-sizing reform necessitates competitive

transmission development processes, we recognize that a transmission provider may have

existing rights and responsibilities with respect to maintaining and, when necessary,

replacing existing transmission facilities.  Regarding PJM States' request for clarification

on competitive transmission development processes, we refer to the Right of First

Refusal section below.

1688.  In response to Exelon's concerns regarding the timing of replacement transmission

facilities, we clarify that the 10-year timeframe associated with the right-sizing reform

applies to transmission facilities that a transmission provider *anticipates* replacing.  In

other words, the requirement for a transmission provider to include in its in-kind

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1187 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

replacement estimates any transmission facilities that it anticipates replacing in-kind during the next 10 years does not create an obligation for the transmission provider to change any existing process that it has to identify which transmission facilities it anticipates replacing.  However, a transmission provider must include in its in-kind replacement estimates any transmission facilities it anticipates replacing during the next 10 years beginning at the start of each Long-Term Regional Transmission Planning cycle, regardless of the process it uses to identify the facilities.

1689.  In response to SERTP Sponsors and PG&E's arguments that replacement decisions may be triggered more by the conditions of a particular transmission facility than its age, we reiterate, consistent with the statement the Commission made in the NOPR, we recognize that a transmission provider may have existing rights and responsibilities with respect to maintaining, and when necessary, replacing existing transmission facilities.  We recognize that, as SERTP Sponsors note, replacement decisions may be triggered by other conditions than a transmission facility's age or condition, and since we recognize that a transmission provider may have existing rights and responsibilities under existing laws with respect to maintaining and, when necessary, replacing transmission facilities, we note that SERTP Sponsors, as well as any other transmission providers, may address such replacements of existing transmission facilities according to their existing processes.

1690.  In response to Entergy's request for clarification regarding storm-hardening, we reiterate that the right-sizing reform we adopt here pertains to transmission facilities that a transmission provider anticipates replacing with an in-kind replacement transmission

facility.  To the extent that storm-hardening transmission projects do not encompass the replacement of existing transmission facilities with an in-kind replacement transmission facility, those storm-hardening transmission projects need not be included on a transmission provider's list of in-kind replacement estimates.

1691.  In response to US DOE's argument that transmission providers should not be required to submit every in-kind replacement for all equipment, we clarify that the right-sizing reform we adopt here requires transmission providers to list in their in-kind replacement estimates *only* the transmission facilities operating at and above the specified kV threshold that they own and anticipate replacing in-kind with a new transmission facility during the next 10 years, provided transmission providers may not propose a specified kV threshold higher than 200 kV.

1692.  WIRES requests that the Commission clarify that transmission providers would not be prohibited from considering right-sizing transmission facilities lower than 230 kV if existing transmission planning processes already do so.  We clarify that, given our modification to the NOPR proposal, transmission providers may propose on compliance a threshold lower than 200 kV for considering right-sizing transmission facilities.  We reiterate that the 200 kV threshold is a maximum threshold (i.e., transmission providers may not propose a right-sizing threshold higher than 200 kV).

## 2.  <u>Right of First Refusal</u>

### a.  <u>NOPR Proposal</u>

1693.  In the NOPR, the Commission proposed, for any right-sized replacement transmission facility that is selected to meet transmission needs identified through Long-

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1189 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                    - 1179 -

Term Regional Transmission Planning, to require the establishment of a federal right of
first refusal for the transmission provider that includes the in-kind replacement
transmission facility in its in-kind replacement estimates, which would extend to any
portion of such a transmission facility located within the applicable transmission
provider's retail distribution service territory or footprint.[3589]

### b.    Comments

1694.  Some commenters support the proposed federal right of first refusal for right-sized
replacement transmission facilities.[3590]  AEP argues that without it, transmission
providers may develop an in-kind replacement facility instead of the right-sized
transmission facility identified in the regional transmission planning process.[3591]
Similarly, PG&E states that providing a federal right of first refusal for right-sized
replacement transmission facilities will provide an incentive for transmission providers to
develop such projects, where appropriate.[3592]

---

[3589] *Id.* PP 408-409.

[3590] AEP Initial Comments at 46-47; Ameren Reply Comments at 14-15;
Dominion Initial Comments at 75; EEI Initial Comments at 41; Exelon Initial Comments
at 58; MISO TOs Initial Comments at 27-28; PG&E Reply Comments at 15-16; US
Chamber of Commerce Initial Comments at 11; Vermont Electric and Vermont Transco
Initial Comments at 5.

[3591] AEP Initial Comments at 46-47 (citing NOPR, 179 FERC ¶ 61,028 at PP 408-
409).

[3592] PG&E Reply Comments at 16.

Docket No. RM21-17-000                                                      - 1180 -

1695.  MISO TOs argue that, whether through in-kind replacement or right-sized
replacement, "what is being done is an upgrade of an existing transmission facility," for
which the Commission has afforded transmission owners federal rights of first refusal
through Order No. 1000 (and prior actions).[3593]  US Chamber of Commerce states that a
federal right of first refusal for right-sized replacement transmission facilities should also
apply to right-sized transmission facilities, as it would eliminate incentives to withhold
in-kind replacements from the regional transmission planning process.[3594]

1696.  Ameren states that critics of the NOPR's proposal to provide transmission
providers a federal right of first refusal for right-sizing projects question whether the
Commission has met its FPA section 206 burden to demonstrate that the regional
transmission planning tariffs are currently unjust and unreasonable or unduly
discriminatory in order to justify this proposal.[3595]  Ameren contends that this argument
misses a critical point because, currently, replacement of transmission facilities in-kind is
generally not subject to the regional transmission planning process or competitive
transmission development processes.  Ameren asserts that the Commission need not find
any existing rate unjust and unreasonable in order to signal an intent to approve such

---

[3593] MISO TOs Initial Comments at 27-28.

[3594] US Chamber of Commerce Initial Comments at 11 (citing NOPR, 179 FERC
¶ 61,028 at P 409).

[3595] Ameren Reply Comments at 14 (citing LS Power Initial Comments at 50).

right of first refusals for right-sizing projects when filed with the Commission under FPA section 205.[3596]

1697. Several commenters oppose the proposed federal right of first refusal for right-sized replacement transmission facilities.[3597]  Massachusetts Attorney General argues that the Commission has not demonstrated a "rational connection" between the Commission's findings and the right-sizing reform.  Massachusetts Attorney General adds that the NOPR proposal is directly at odds with the Commission's findings in Order Nos. 890 and 1000 and that the Commission fails to provide "good reasons" for departing from those prior findings.[3598]  American Municipal Power argues that, even if incumbent transmission owners currently have a right of first refusal for local transmission facilities, that right should be limited to maintenance (i.e., in-kind replacements) and not situations

---

[3596] *Id.*

[3597] AEE Reply Comments at 31; American Municipal Power Initial Comments at 28-29; Anbaric Initial Comments at 7; California Commission Initial Comments at 115-117; California Water Initial Comments at 8-9; City of New York Initial Comments at 11-13; Competition Coalition Initial Comments at 64; Competition Coalition Reply Comments at 2; Industrial Customers Initial Comments at 4; Kentucky Commission Chair Chandler Initial Comments at 19; LS Power Initial Comments at 22, 25-26, 84-85; Massachusetts Attorney General Initial Comments at 51-53; NextEra Initial Comments at 54-61; Northwest and Intermountain Initial Comments at 21-22; Pennsylvania Commission Initial Comments at 22-23; R Street Initial Comments at 3-4, 12-21; Resale Iowa Initial Comments at 8-9; TAPS Initial Comments at 68.

[3598] Massachusetts Attorney General Initial Comments at 40, 51 (citing 5 U.S.C. 706(2); 16 U.S.C. 825*l*(b); *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009); *Motor Vehicle Mfrs. Ass'n of the U. S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

Docket No. RM21-17-000                                                          - 1182 -

where a transmission facility would expand or enhance the transmission system.[3599]  LS

Power argues that the right-sizing proposal changes definitions in Order No. 1000,

including the definitions of an upgrade and a local transmission facility, and allows a

federal right of first refusal for transmission facilities located on an existing right-of-way

instead of leaving the issue to state law.[3600]  LS Power asserts that, even if the

Commission could meet the first prong of its section 206 analysis and find that the

existing transmission planning process is unjust and unreasonable, the Commission must

still establish that the entirety of the replacement rate is just and reasonable which, LS

Power argues, the Commission cannot because of the tie to a federal right of first refusal.

Taken together, LS Power argues that the NOPR proposal, if adopted, would fail as a

replacement rate.[3601]  Furthermore, LS Power argues that the federal right of first refusal

for right-sized replacement transmission facilities would essentially provide a federal

franchise, mandating that transmission customers accept the ownership right of the

existing transmission owners to continue in perpetuity.[3602]

1698.  Northwest and Intermountain support clarifying that a federal right of first refusal

for right-sized replacement transmission facilities does not apply to any facilities that

---

[3599] American Municipal Power Initial Comments at 28.

[3600] LS Power Initial Comments at 22.

[3601] *Id.* at 147-48 (citing *Nat'l Fuel Gas Supply Corp. v. FERC*, 468 F.3d 831, 845 (D.C. Cir. 2006); *SEC v. Chenery Corp.,* 318 U.S. 80, 95 (1943)).

[3602] *Id.* at 84-85.

Docket No. RM21-17-000                                                          - 1183 -

replace equipment that has reached the end of its useful life.  Moreover, Northwest and

Intermountain contend that the Commission should require a competitive solicitation for

any right-sized transmission projects that meet regional transmission needs.[3603]  AEE

contends that the record does not support further action on the proposed federal right of

first refusal for right-sized replacement transmission facilities, and instead reflects the

complexity of the issues involved and the need for a holistic review of competitive

transmission development processes and options for improving them.[3604]

1699.  Several commenters raise concerns about the incentives that the proposed federal

right of first refusal for right-sized replacement transmission facilities would

introduce.[3605]  Pennsylvania Commission argues that incumbent transmission owners may

use it as a new tool to avoid competition by displacing other regional transmission

facilities.[3606]  Given that transmission providers may not secure cost recovery for

imprudently incurred expenses, NextEra disagrees that, without a federal right of first

---

[3603] Northwest and Intermountain Initial Comments at 21-22.

[3604] AEE Reply Comments at 31.

[3605] Anbaric Initial Comments at 7; California Commission Initial Comments at
114-115; Competition Coalition Initial Comments at 65-67; LS Power Initial Comments
at 81-82; Massachusetts Attorney General Initial Comments at 51-52; NextEra Initial
Comments at 58; Pennsylvania Commission Initial Comments at 22; Resale Iowa Initial
Comments at 8-9.

[3606] Pennsylvania Commission Initial Comments at 22.

Docket No. RM21-17-000                                                    - 1184 -

refusal for right-sized replacement transmission facilities, incumbent transmission owners

may engage in duplicative or inefficient transmission development.[3607]

1700.  Some commenters oppose the proposed federal right of first refusal for right-sized

replacement transmission facilities because they argue that it would increase costs for

customers.[3608]  California Water argues that allowing a federal right of first refusal for

right-sized replacement transmission facilities would permit incumbent transmission

owners to construct right-sized transmission facilities without any cost guardrails, which

could end up being more expensive than the in-kind replacements.[3609]  Alternatively,

some commenters argue that their existing transmission planning processes already

consider "right-sizing" replacement transmission facilities and may not include a federal

right of first refusal.[3610]

1701.  In response to claims that there is no logical basis for a federal right of first refusal

for right-sized replacement transmission facilities, MISO TOs state that the proposal

applies to upgrades of an existing transmission facility and that in Order No. 1000, the

---

[3607] NextEra Initial Comments at 59-61 (citations omitted).

[3608] *See* California Commission Initial Comments at 117; California Water Initial
Comments at 9; Competition Coalition Initial Comments at 66-67; DC and MD Offices
of People's Counsel Initial Comments at 47-48; R Street Reply Comments at 5-6; State
Agencies Initial Comments at 21-22.

[3609] California Water Initial Comments at 9.

[3610] CAISO Initial Comments at 47-49; New York Commission and NYSERDA
Initial Comments at 15-16; New York TOs Initial Comments at 17-18; NYISO Initial
Comments at 58-59.

Docket No. RM21-17-000                                            - 1185 -

Commission expressly reserved a federal right of first refusal for an individual utility to

upgrade its own property.  As such, MISO TOs argue, a right-sizing requirement should

neither deprive a transmission owner of its rights regarding its own property or its right to

construct and own upgrades to its own system, nor should it implement an

unconstitutional taking of such owner's property.[3611]  Therefore, MISO TOs state that the

final rule should clarify that nothing in the right-sizing proposal eliminates an incumbent

transmission owner's federal right of first refusal for any transmission facilities selected

through a right-sizing process.[3612]

### c.    Commission Determination

1702.  We adopt the NOPR proposal to require the establishment of a federal right of first

refusal for a right-sized replacement transmission facility[3613] that is selected to meet

---

[3611] MISO TOs Reply Comments at 33 (citing Order No. 1000, 136 FERC ¶ 61,051 at PP 226, 319; Order No. 1000-A, 139 FERC ¶ 61,132 at P 426; *N.Y. Indep. Sys. Operator, Inc.*, 175 FERC ¶ 61,038, at PP 30, 33 (2021)).

[3612] MISO TOs Reply Comments at 33 (citing MISO TOs Initial Comments at 25-28).

[3613] As noted above, right-sizing could include, for example, increasing the transmission facility's voltage level, adding circuits to the towers (e.g., redesigning a single-circuit line as a double-circuit line), or incorporating advanced technologies (e.g., advanced conductor technologies).  Additionally, we reiterate that, as noted above, a right-sized replacement transmission facility is, for purposes of this right-sizing reform, a new transmission facility that:  (1) would meet the need to replace an existing transmission facility that a transmission provider has identified in its in-kind replacement estimate as one that it plans to replace with an in-kind replacement transmission facility while also addressing a Long-Term Transmission Need; (2) results in more than an incidental increase in the capacity of an existing transmission facility that a transmission provider has identified for replacement in its in-kind replacement estimate; and (3) is located in the same general route as, and/or uses or expands the existing rights-of-way of, the existing transmission facility that a transmission provider has identified for

Long-Term Transmission Needs.  This federal right of first refusal will apply to the transmission provider that included in its in-kind replacement estimate the existing transmission facility that the right-sized replacement transmission facility would replace, and extends to any portion of the right-sized replacement facility located within that transmission provider's retail distribution service territory or footprint, recognizing that any such portion must satisfy the definition of a right-sized replacement facility, as revised by this final rule, including that the right-sized replacement transmission facility is located in the same general route as, and/or uses or expands the existing rights-of-way of, the existing transmission facility.

1703.  In adopting the NOPR proposal to require the establishment of a federal right of first refusal for a right-sized replacement transmission facility, we find that permitting a federal right of first refusal for right-sized replacement transmission facilities will encourage transmission providers to provide their best in-kind replacement estimates, because they will have certainty that they will not lose the opportunity to invest in any in-kind replacement transmission facility that is then selected as a right-sized replacement transmission facility.  As such, we find that a federal right of first refusal will remove a disincentive for transmission providers to consider right-sizing in Long-Term Regional Transmission Planning, helping to ensure that the more efficient or cost-effective regional transmission solution to Long-Term Transmission Needs is selected and likely built, and therefore that Commission-jurisdictional rates are just and reasonable.  Moreover, we

_____

replacement in its in-kind replacement estimate.

Docket No. RM21-17-000                                               - 1187 -

note that the definitions of "in-kind replacement transmission facility" and "right-sized

replacement transmission facility" that we adopt, as discussed above, are necessary to

ensure that use of the right-sizing reform addresses *replacement* transmission facilities

and not entirely new transmission facilities.[3614]

1704.  We note that the establishment of a federal right of first refusal for right-sized

replacement transmission facilities is an exception to Order No. 1000's general

requirement for transmission providers to eliminate any federal right of first refusal for

regional transmission facilities selected in a regional transmission plan.[3615]  In response to

comments challenging this approach as violating the precedent set in Order No. 1000,

which eliminated federal rights of first refusal for new selected transmission facilities,[3616]

we find that requiring a federal right of first refusal for right-sized replacement

transmission facilities aligns with Order No. 1000.

1705.  In Order No. 1000, the Commission required transmission providers to remove

federal rights of first refusal from their OATTs because they undermined the

consideration of more efficient or cost-effective potential transmission solutions proposed

at the regional level, which could lead to unjust and unreasonable rates for Commission-

jurisdictional services.[3617]  The Commission found that federal rights of first refusal

---

[3614] *See supra* PP 1681-1683.

[3615] *See supra* P 1576.

[3616] Order No. 1000, 136 FERC ¶ 61,051 at P 313.

[3617] *Id.* PP 253, 256.

Docket No. RM21-17-000                                           - 1188 -

created a barrier to entry that discouraged nonincumbent transmission developers from proposing alternative solutions for consideration at the regional level.[3618]  The Commission did not require the elimination of federal rights of first refusal for local transmission facilities,[3619] and did not alter the rights of incumbent transmission providers to build, own, and recover costs for upgrades to its own transmission facilities, regardless of whether the upgrade is selected.[3620]

1706.  We find that the Commission's reasons for removing federal rights of first refusal in Order No. 1000 do not apply to right-sized replacement transmission facilities. Specifically, requiring a federal right of first refusal for right-sized replacement transmission facilities does not undermine the consideration of more efficient or cost-effective potential transmission solutions proposed at the regional level; rather, we find that it will *promote* the consideration of more efficient or cost-effective potential regional transmission solutions to address Long-Term Transmission Needs.  When compared against the alternative of piecemeal development of in-kind replacement transmission facilities, a federal right of first refusal for right-sized transmission facilities does not frustrate the goals of Order No. 1000 or lead to inefficiency in transmission development because the right-sized replacement transmission facility represents the more efficient or cost-effective regional transmission solution to address Long-Term Transmission Needs

---

[3618] *Id.* P 257.

[3619] *Id.* P 318.

[3620] *Id.* P 319 (citation omitted).

Docket No. RM21-17-000                                                    - 1189 -

(otherwise it would not be selected).  We recognize that a transmission provider may

have existing rights and responsibilities with respect to maintaining and, when necessary,

replacing their transmission facilities. Because the right-sizing reform does not alter

existing laws related to an individual transmission provider's ability to proceed with an

in-kind replacement transmission facility, absent a federal right of first refusal, we

believe the incumbent transmission provider whose in-kind replacement transmission

facility is selected to be right-sized would likely proceed to develop the less efficient or

cost-effective in-kind replacement transmission facility.  We find that the transmission

provider would prefer the assurance of a federal right of first refusal for the in-kind

replacement transmission facility over the uncertainty of subjecting a right-sized

replacement transmission facility to the Order No. 1000 competitive transmission

development process.  Because of this incentive structure and the fact that the

transmission provider holds the leverage as to whether to build a right-sized replacement

transmission facility or a less efficient in-kind replacement transmission facility, the

establishment of the federal right of first refusal is necessary to effectuate this reform and

ensure that Commission-jurisdictional rates are just and reasonable.[3621]

1707.  By establishing a process that requires transmission providers to evaluate

opportunities to right-size in-kind replacement transmission facilities to meet Long-Term

Transmission Needs, and by establishing a federal right of first refusal for such right-

sized replacement transmission facilities, we believe that the right-sizing reform in this

---

[3621] *See* NOPR, 179 FERC ¶ 61,028 at P 408 & n.652.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1200 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                    - 1190 -

final rule will encourage transmission providers to provide their best in-kind replacement estimates, as they will have certainty that they will not lose the opportunity to invest in any in-kind replacement transmission facility that is then selected as a right-sized replacement transmission facility. Moreover, permitting a federal right of first refusal for right-sized replacement transmission facilities will enable transmission providers to ensure that the more efficient or cost-effective regional transmission solution to Long-Term Transmission Needs is selected and that Commission-jurisdictional rates are consequently just and reasonable.[3622]

1708. In response to MISO TOs' request regarding upgrades to existing transmission facilities, we reiterate that nothing in the right-sizing reform affects the right of an incumbent transmission provider to build, own, and recover the costs for upgrades to its own transmission facilities, regardless of whether an upgrade to an existing transmission facility has been identified through a right-sizing process and selected to address Long-Term Transmission Needs.

1709. We deny Northwest and Intermountain's request to clarify that the right-sizing reform excludes transmission facilities that replace equipment that has reached the end of

---

[3622] In response to those commenters who argue that their existing transmission planning processes already consider "right-sizing" replacement transmission facilities without the inclusion of a federal right of first refusal, we note that, separate from compliance with this final rule, transmission providers in each transmission planning region can agree to participant funding arrangements for right-sized replacement transmission facilities that are not selected through Long-Term Regional Transmission Planning, in which case the requirement to establish a federal right of first refusal for right-sized replacement transmission facilities selected to meet Long-Term Transmission Needs would not apply.

its useful life.  As explained above, the federal right of first refusal will apply to selected right-sized replacement transmission facilities, including those that are intended to replace transmission facilities that have reached the end of their useful life.

### 3.   Cost Allocation

#### a.   NOPR Proposal

1710.  With respect to cost allocation, the Commission proposed that if a right-sized replacement transmission facility is selected, only the incremental costs of right-sizing the transmission facility would be eligible to use the applicable Long-Term Regional Transmission Cost Allocation Method.  The Commission proposed that the costs the incumbent transmission provider would have otherwise incurred to construct the in-kind replacement transmission facility be allocated in a manner consistent with the allocation that would have otherwise occurred for the in-kind replacement.  The Commission preliminarily found that it is just and reasonable and not unduly discriminatory or preferential for only the portion of the costs associated with a right-sized replacement transmission facility that is selected to be eligible to use the Long-Term Regional Transmission Cost Allocation Method because it is the right-sizing of the in-kind replacement transmission facility that allows the transmission facility to meet the transmission needs identified in Long-Term Regional Transmission Planning.[3623]

1711.  The Commission also proposed to require transmission providers in each transmission planning region to amend their regional transmission planning processes to

---

[3623] NOPR, 179 FERC ¶ 61,028 at P 410.

provide transparency with respect to which right-sized replacement transmission facilities have been selected (and thus found to be a more efficient or cost-effective transmission facility to meet regional transmission needs) and which transmission facilities are simply included in the regional transmission plan for informational (and not cost allocation) purposes.[3624]

### b.  Comments

1712.  Some commenters support the NOPR proposal that the incremental costs of right-sizing a transmission facility that is selected would be eligible to use the applicable Long-Term Regional Transmission Cost Allocation Method.[3625]  ACEG contends that without it, a large amount of new transmission investment—directed solely at replacement facilities—will be outside of Long-Term Regional Transmission Planning and thus not given an opportunity to contribute to the grid's overall efficiency and cost-effectiveness.[3626]  Eversource asserts that, in New England, asset condition projects receive regional cost allocation, and requests clarification that the Commission is not proposing to disturb the existing cost allocation method for asset condition projects in ISO-NE that are not selected for right-sizing in Long-Term Regional Transmission

---

[3624] *Id.* P 413.

[3625] ACEG Initial Comments at 57-58; Eversource Initial Comments at 54; NARUC Initial Comments at 65; NESCOE Initial Comments at 81.

[3626] ACEG Initial Comments at 57-58.

Docket No. RM21-17-000                                              - 1193 -

Planning.[3627]  NESCOE recommends that the Commission require transmission providers

to explain on compliance the method that they will use to determine the incremental costs

of right-sizing a replacement transmission facility.  In addition, NESCOE supports the

proposal to require transmission providers to amend their regional transmission planning

processes to provide transparency with respect to which right-sized replacement

transmission facilities have been selected.[3628]

1713.  Other commenters support the proposed cost allocation for right-sized replacement

transmission facilities, but express reservations.[3629]  Entergy asserts that the Commission

should clarify that costs incurred absent right-sizing will be allocated under the cost

allocation method(s) that otherwise would apply to such costs, which may include

regional cost allocation.[3630]  With regard to incremental costs, CTC Global urges the

Commission to require the transmission planning process to be based on future needs,

future benefits, total lifecycle costs, and total benefits for the life of the resource.  More

specifically, CTC Global suggests that when considering incremental costs, the

Commission should consider including energy savings, generating capacity reduction

---

[3627] Eversource Initial Comments at 54.

[3628] NESCOE Initial Comments at 81.

[3629] CTC Global Initial Comments at 19; Dominion Initial Comments at 75-76;
Entergy Initial Comments at 39; MISO Initial Comments at 87; NRG Initial Comments at
36-37.

[3630] Entergy Initial Comments at 39.

Docket No. RM21-17-000                                          - 1194 -

benefits, and resulting reductions in greenhouse gas emissions as benefits associated with the right-sized replacement transmission facility.[3631]

1714.  Dominion states that it may be difficult to quantify and allocate the incremental costs of right-sizing a replacement transmission facility.[3632]  MISO agrees, stating that it will be challenging to identify the portion of costs that should be recovered as part of the age and condition upgrade using one cost allocation method and a different cost allocation for the portion of the right-sized upgrade identified as part of Long-Term Regional Transmission Planning.  MISO argues that this complexity will continue going forward given that the accounting for two types of cost allocation to different customers will have to be tracked for each right-sized replacement transmission facility.[3633]

1715.  Some commenters oppose the NOPR proposal.[3634]  LS Power argues that the proposal violates cost causation principles as it would limit regional cost allocation to the incremental portion of the right-sized replacement transmission facilities, regardless of beneficiary analysis.[3635]  Indicated PJM TOs state that the Commission should not impose any requirements with respect to the cost allocation of right-sized replacement

---

[3631] CTC Global Initial Comments at 19.

[3632] Dominion Initial Comments at 75-76.

[3633] MISO Initial Comments at 87.

[3634] Exelon Initial Comments at 59; Indicated PJM TOs Initial Comments at 47; LS Power Initial Comments at 86-87.

[3635] LS Power Initial Comments at 86-87 (citing *Old Dominion Elec. Coop. v. FERC*, 898 F.3d 1254, *reh'g denied*, 905 F.3d 671 (D.C. Cir. 2018)).

transmission facilities and instead should provide transmission providers with the flexibility to determine a cost allocation method.[3636]  Exelon agrees, adding that the Commission's proposed approach creates unnecessary complications and adds a further variable (base versus incremental cost) to the already complex and often contentious cost allocation process.  According to Exelon, the proposal (1) incorrectly assumes that a transmission owner has identified an in-kind replacement transmission facility and its cost; (2) incorrectly assumes that a perfect overlap exists between the displaced transmission facility (or need) and the right-sized replacement transmission facility; and (3) fails to address adjustments for cost savings or overruns on the right-sized portion of the transmission facility.[3637]

### c.    Commission Determination

1716.  We decline to adopt the NOPR proposal to require that, if a right-sized replacement transmission facility is selected, only the incremental costs of right-sizing the transmission facility will be eligible to use the applicable Long-Term Regional Transmission Cost Allocation Method, while the costs that the transmission provider would otherwise have incurred to construct the in-kind replacement transmission facility must be allocated in a manner consistent with the allocation that would have otherwise occurred for the in-kind replacement transmission facility.  This is because we find persuasive comments that identify the complexities and challenges associated with

---

[3636] Indicated PJM TOs Initial Comments at 47 (citation omitted).

[3637] *See* Exelon Initial Comments at 59 & n.103.

Docket No. RM21-17-000                                                    - 1196 -

tracking portions of costs of two different transmission projects through time, as well as

allocating the costs of a right-sized replacement transmission facility pursuant to two

separate cost allocation methods.[3638]  While the approach that the NOPR proposed to

require may still be a just and reasonable cost allocation approach for right-sized

replacement transmission facilities, should the relevant transmission providers *choose* to

take on these challenges and address them adequately, we find it appropriate to provide

flexibility to transmission providers to propose a cost allocation method for selected

right-sized replacement transmission facilities.  However, in providing such flexibility,

transmission providers must nevertheless demonstrate on compliance that the cost

allocation method for selected right-sized replacement transmission facilities is just and

reasonable and not unduly discriminatory or preferential and, consistent with cost

causation, allocates costs in a manner that is at least roughly commensurate with the

estimated benefits of such facilities.[3639]

1717.  Further, we also require transmission providers in each transmission planning

region to amend their regional transmission planning processes to provide transparency

with respect to which right-sized replacement transmission facilities have been selected,

---

[3638] Dominion Initial Comments at 75-76; Exelon Initial Comments at 59; MISO Initial Comments at 87.

[3639] *See ICC v. FERC I*, 576 F.3d at 477; Order No. 1000, 136 FERC ¶ 61,051 at PP 622, 639 (requiring costs of regional transmission facilities to be allocated in a manner that is at least roughly commensurate with estimated benefits).

Docket No. RM21-17-000                                                      - 1197 -

as well as which transmission facilities are simply included in the regional transmission
plan for informational (and not cost allocation) purposes.

1718.  We disagree with LS Power's assertion that the right-sizing cost allocation method
proposed in the NOPR violates cost causation principles because it would limit regional
cost allocation to the incremental portion of the right-sized replacement transmission
facilities, regardless of other potential beneficiaries.[3640]  The customers of the
transmission provider that would be allocated the costs associated with the original in-
kind replacement transmission facility would have otherwise been responsible for paying
those costs had the in-kind replacement transmission facility not been right-sized.
Further, we find that it is not unjust, unreasonable, or unduly discriminatory or
preferential that, for a right-sized replacement transmission facility selected, only the
portion of the costs associated with right-sizing be eligible to use the Long-Term
Regional Transmission Cost Allocation Method.  Specifically, we find that it is the right-
sizing of the in-kind replacement transmission facility that allows the transmission
facility to meet Long-Term Transmission Needs identified in Long-Term Regional
Transmission Planning.  As such, we disagree that allowing only the incremental costs of
right-sizing the right-sized replacement transmission facility to be eligible to use the
applicable Long-Term Regional Transmission Cost Allocation Method would violate cost
causation principles.

---

[3640] LS Power Initial Comments at 86-87 (citing *Old Dominion Elec. Coop. v. FERC*, 898 F.3d 1254).

1719.  As we note above, we find merit with respect to commenters' concerns about the

difficulty in determining the portion of the costs of a right-sized replacement transmission

facility attributable to right-sizing and the complexity in tracking portions of differing

cost allocation methods through time.  For this reason, to the extent that transmission

providers propose to allocate the costs of right-sized replacement transmission facilities

pursuant to the cost allocation method described in the NOPR, we require the

transmission providers to explain on compliance (1) the method that they will use to

determine the portion of the costs of a right-sized replacement transmission facility that is

incremental to the costs that would have been incurred for the underlying in-kind

replacement transmission facility, and (2) the method by which they will track the portion

of costs over time that are allocated in accordance with the Long-Term Regional

Transmission Cost Allocation Method (or, if adopted, subject to a State Agreement

Process), as well as the portion of costs that would have been allocated pursuant to the

cost allocation method that otherwise would have applied to the in-kind replacement

transmission facility.  We believe that transmission providers are best positioned to

determine both the portion of the costs of a right-sized replacement transmission facility

that is incremental to the costs that would have been incurred for the underlying in-kind

replacement transmission facility, as well as how to best track these costs over time for

purposes of cost allocation.

1720.  In response to Eversource and Entergy's requests that the Commission clarify the

cost allocation method for in-kind replacement transmission facilities that are not selected

for right-sizing,**3641** we clarify that we are not requiring any changes pursuant to this right-sizing requirement that would affect the existing cost allocation method(s) for in-kind replacement transmission facilities that are not identified for right-sizing, or for the costs of the underlying in-kind replacement transmission facilities that would have been incurred absent right-sizing.  Similarly, in response to Entergy's request for clarification that costs incurred absent right-sizing will be allocated under the cost allocation method(s) that otherwise would apply to such costs, which may include regional cost allocation, we clarify that the costs that the transmission provider would otherwise have incurred to construct the in-kind replacement transmission facility must be allocated in a manner consistent with the cost allocation method that would have otherwise applied to that facility, which could include a regional cost allocation method.

1721.  We also confirm, in response to comments from CTC Global, that benefits associated with a potential right-sized replacement transmission facility to address Long-Term Transmission Needs should be evaluated in the same manner as for any potential regional transmission facility that could address those needs, which includes evaluating all of the costs of, and all of the benefits provided by, the right-sized replacement transmission facility consistent with reforms outlined in this final rule.

1722.  In response to Exelon's comments that the NOPR proposal relies on incorrect assumptions regarding the transmission provider identifying an in-kind replacement transmission facility and its cost, as well as there being an overlap between the displaced

---

**3641** Entergy Initial Comments at 39; Eversource Initial Comments at 54.

transmission facility and the right-sized replacement transmission facility, we disagree and note that these conditions are prerequisites that serve as the foundation for the right-sizing requirement.  Where a transmission provider has not identified an in-kind replacement transmission facility that could be right-sized to address Long-Term Transmission Needs more efficiently or cost-effectively, no basis exists to select a right-sized replacement transmission facility.

### 4.    Miscellaneous

#### a.    Comments

1723.  Some commenters recommend that the Commission adopt confidentiality safeguards.[3642]  AEP and Indicated PJM TOs contend that the Commission must adopt confidentiality provisions to ensure that information related to right-sizing is not shared beyond the regional planning entity because identification of end-of-life transmission facilities demonstrates potential vulnerabilities that could create security and reliability risks and could also provide advantages to competitors.[3643]  WIRES argues that the Commission should allow for the transmission owner to provide to the transmission provider a non-public, confidential, non-binding list of transmission facilities that may need to be replaced based on an appropriate time horizon as determined by the

---

[3642] AEP Initial Comments at 46; Exelon Initial Comments at 57-58; Indicated PJM TOs Initial Comments at 45-46; SERTP Sponsors Initial Comments at 39; WIRES Initial Comments at 10.

[3643] AEP Initial Comments at 46; Indicated PJM TOs Initial Comments at 45.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1211 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                    - 1201 -

transmission provider.[3644]  SERTP Sponsors request that the Commission protect CEII

information for transmission facilities that are anticipated to be replaced.[3645]

1724.  Conversely, PJM States request that the Commission require the information on

the in-kind replacement estimate list to be non-confidential to the greatest extent possible

or to require justification as to why confidentiality is merited.[3646]

1725.  Several commenters call for the Commission to increase scrutiny on, or alter the

presumption of prudence for, transmission projects related to the right-sizing reform.[3647]

American Municipal Power argues that if an incumbent transmission owner replaces

local transmission facilities at the end of their useful lives despite a determination that a

right-sized replacement transmission facility is the more efficient or cost-effective

transmission solution, the incumbent transmission owner's in-kind replacement should be

presumed to be unjust and unreasonable for purposes of cost recovery.[3648]

---

[3644] WIRES Initial Comments at 10.

[3645] SERTP Sponsors Initial Comments at 39.

[3646] PJM States Initial Comments at 7-8.

[3647] American Municipal Power Initial Comments at 29-30; California
Commission Initial Comments at 114-115; California Water Initial Comments at 9;
Harvard ELI Initial Comments at 5; Massachusetts Attorney General Initial Comments at
52; Ohio Consumers Initial Comments at 23-24; Pine Gate Initial Comments at 49-50;
PIOs Initial Comments at 58; Resale Iowa Initial Comments at 9; TAPS Initial
Comments at 6-7, 67-68.

[3648] American Municipal Power Initial Comments at 29.

Docket No. RM21-17-000                                                      - 1202 -

1726.  ACEG asserts that the Commission has the authority under FPA section 205 to
review replacement transmission facility projects and address problems in the local
transmission planning process.[3649]  LS Power argues that the Commission should use its
existing authority to confirm through show cause orders that transmission providers are
evaluating whether local transmission solutions can be displaced by a regional
transmission solution that is more efficient or cost-effective.[3650]

1727.  Similarly, TAPS asserts that the NOPR imposes no consequences on transmission
owners that proceed with in-kind replacement projects even when the transmission
planning region has selected more efficient and cost-effective alternatives for regional
cost allocation.  TAPS argues that the Commission should exclude cost recovery for such
facilities from the scope of formula rates and require transmission owners to make a
separate filing pursuant to FPA section 205.  Alternatively, TAPS states that the
Commission should impose a presumption of imprudence and require such transmission
owners to demonstrate that the proposed replacement is more cost-effective and efficient
than the alternative selected by the transmission planning region.[3651]

1728.  On the other hand, PG&E argues that the Commission should clarify that a
transmission owner's right to decline to proceed with a selected right-sized replacement

---

[3649] ACEG Initial Comments at 57.

[3650] LS Power Initial Comments at 145 (citing LS Power ANOPR Initial
Comments at 134-135).

[3651] TAPS Initial Comments at 6-7, 67-68 (citations omitted).

transmission facility does not justify disallowance of cost recovery for the in-kind replacement transmission facility.[3652]

1729.  Several commenters support consideration of alternative transmission technologies and grid enhancing technologies when evaluating right-sized replacement transmission facilities.[3653]  CTC Global urges the Commission to require all transmission owners with a line requiring in-kind replacement within 10 years to analyze whether a transmission line's conductor should be replaced with an advanced conductor through rebuild or reconductoring.[3654]  PIOs argue that right-sizing opportunities should include increasing voltage, adding circuits, and utilizing advanced technologies, and further argue that right-sized replacement transmission facilities that use grid enhancing technologies can create economies of scale to capture public policy and economic benefits in addition to reliability.[3655]  VEIR agrees with the Commission's proposal to include advanced conductors in its definition of right-sizing, explaining that superconductors can enable a five-fold increase in the power flow capacity of an existing transmission corridor.  VEIR

---

[3652] PG&E Initial Comments at 14.

[3653] CTC Global Initial Comments at 18, 20; Maryland Energy Administration Reply Comments at 5-6; NARUC Initial Comments at 58-59; PIOs Initial Comments at 57-58; VEIR Initial Comments at 6.

[3654] CTC Global Initial Comments at 18.

[3655] PIOs Initial Comments at 57-58 (citing PIOs ANOPR Initial Comments at 50).

therefore urges the Commission to explicitly affirm that the deployment of advanced conductors would constitute right-sizing.[3656]

1730. Some commenters argue that the NOPR's right-sizing proposal is insufficient and call upon the Commission to take further action.[3657] For example, ACEG, American Municipal Power, and California Commission argue that the Commission should expand the scope of the right-sizing proposal.[3658] American Municipal Power argues that the Commission should require RTOs/ISOs to plan for all new transmission facilities that have regional impacts, including: (1) transmission facilities that meet the North American Electric Reliability Corporation Bulk Electric System definition; and (2) transmission projects that will replace an existing transmission facility that was turned over to the RTO/ISO irrespective of the voltage.[3659] Similarly, LS Power argues that the Commission has the authority to require regional transmission planning for existing

---

[3656] VEIR Initial Comments at 6.

[3657] ACEG Initial Comments at 57; American Municipal Power Initial Comments at 25-26; American Municipal Power Reply Comments at 5; California Commission Initial Comments at 106-108; California Water Initial Comments at 10; Competition Coalition Initial Comments at 68-70; Grid United Initial Comments at 3-4; Harvard ELI Initial Comments at 4-5; LS Power Initial Comments at 136, 138, 141-142, 145-146; Ohio Consumers Initial Comments at 24; PIOs Initial Comments at 53; TAPS Initial Comments at 6, 64-65.

[3658] *See* ACEG Initial Comments at 57-58; American Municipal Power Initial Comments at 25-26; American Municipal Power Reply Comments at 5; California Commission Initial Comments at 113-118.

[3659] American Municipal Power Reply Comments at 5.

transmission facilities reaching the end of operational life, and that such transmission planning should be performed by an independent transmission planner.[3660]

1731.  Massachusetts Attorney General asserts that all right-sized replacement transmission facilities should be subject to cost containment, stating that transmission owners may present transmission projects that look like good opportunities for right-sizing at low cost, but without cost containment and competition, the final cost could be much higher.[3661]  ACEG argues that the Commission could issue policy guidance regarding its scope and process for review of new replacement transmission facilities in transmission rate cases.[3662]

1732.  Competition Coalition and LS Power argue that the Commission should protect customers by expanding the benefits of regional transmission planning and competition to all transmission projects 100 kV and above.[3663]  Ameren responds that this request by LS Power to expand the range of transmission projects subject to competition is outside the scope of the NOPR.[3664]

---

[3660] LS Power Initial Comments at 83-84, 141 (citations omitted).

[3661] Massachusetts Attorney General Initial Comments at 52.

[3662] ACEG Initial Comments at 57 (citation omitted).

[3663] Competition Coalition Initial Comments at 68-69; LS Power Initial Comments at 136, 141 (citations omitted); LS Power and NRG Post-Technical Conference Comments at 10 & n.17 (noting that its comment on this issue is attributed to LS Power only).

[3664] Ameren Reply Comments at 15 (citing LS Power Initial Comments at 116).

Docket No. RM21-17-000                                                    - 1206 -

1733.   Harvard ELI favors additional scrutiny of right-sized replacement transmission facilities.  Harvard ELI states generally that the Commission could address the perverse incentives of current rules leading to a focus on local transmission development by subjecting local transmission planning to heightened scrutiny.[3665]

1734.   PIOs claim that the Commission should consider an "ROE subtractor" analogous to an ROE adder that automatically reduces ROE with certain criteria.[3666]

### b.   <u>Commission Determination</u>

1735.  We decline to adopt ACEG's and LS Power's requests that the Commission *itself* review in-kind replacement transmission facilities, via section 205 or 206 authority or through policy guidance, to ensure that they cannot be displaced by a regional transmission solution that is more efficient or cost-effective.[3667]  These arguments are outside the scope of this proceeding because the Commission did not propose in the NOPR that the Commission review in-kind replacement transmission facilities or local transmission facilities.

1736.  We decline to adopt commenters' requests for additional confidentiality safeguards related to right-sizing.[3668]  We note that a transmission provider's list of in-

---

[3665] Harvard ELI Initial Comments at 4.

[3666] PIOs Initial Comments at 53.

[3667] ACEG Initial Comments at 57 (citations omitted); LS Power Initial Comments at 145-146 (citing LS Power ANOPR Initial Comments at 134-135).

[3668] AEP Initial Comments at 46; Exelon Initial Comments at 57-58; Indicated PJM TOs Initial Comments at 45-46; SERTP Sponsors Initial Comments at 39; WIRES

Docket No. RM21-17-000                                          - 1207 -

kind replacement estimates (i.e., estimates of the transmission facilities operating at and

above the specified kV threshold that an individual transmission provider that owns the

transmission facility anticipates replacing in-kind with a new transmission facility during

the next 10 years) is a non-binding estimate and does not require that transmission

provider to undertake replacement work.  To the extent that customers or stakeholders

request access to a transmission provider's list of in-kind replacement estimates, that

transmission provider may subject access to that list of in-kind replacement estimates to

confidentiality provisions.  However, once the transmission providers have determined,

as part of Long-Term Regional Transmission Planning, that an in-kind replacement

transmission facility can be right-sized to constitute a right-sized replacement

transmission facility, we find that the transmission providers must make public the

underlying in-kind replacement transmission facility.

1737.  We decline to adopt commenter requests for increased scrutiny of, or altering the

presumption of prudence for, transmission projects related to right-sizing.[3669]  We reject

these requests as outside the scope of this proceeding because the Commission did not

propose in the NOPR to increase scrutiny of in-kind replacement transmission facilities

_____

Initial Comments at 10.

[3669] American Municipal Power Initial Comments at 29-30; California
Commission Initial Comments at 114-115; California Water Initial Comments at 9;
Harvard ELI Initial Comments at 4; Massachusetts Attorney General Initial Comments at
52; Mississippi Commission Initial Comments at 30; Ohio Consumers Initial Comments
at 23; Pine Gate Initial Comments at 49-50; PIOs Initial Comments at 58; Resale Iowa
Initial Comments at 9; TAPS Initial Comments at 6-7, 67.

beyond the right-sizing proposal and did not propose to alter existing Commission policy

on prudence.  Likewise, in response to PG&E's request for clarification that a

transmission provider's declining to proceed with a right-sized replacement transmission

facility does not justify disallowance of cost recovery for the in-kind replacement

transmission facility, nothing in the reforms we adopt here alters existing Commission

policy on cost recovery for transmission facilities.[3670]

1738.  We acknowledge commenter support for the consideration of alternative

transmission technologies with regard to right-sizing.[3671]  However, we find that adopting

additional requirements for consideration of alternative transmission technologies with

respect to right-sizing are unnecessary.  This is because, as discussed in the Consideration

of Dynamic Line Ratings and Advanced Power Flow Control Devices section of this final

rule, we require transmission providers in each transmission planning region to more

fully consider, in Long-Term Regional Transmission Planning and existing Order No.

1000 regional transmission planning, dynamic line ratings, advanced power flow control

devices, advanced conductors, and transmission switching.[3672]  We believe that the

---

[3670] *New England Power Co.*, 31 FERC ¶ 61,047, at 61,084 (1985) (explaining that the Commission evaluates "prudence of the utility's actions and the costs resulting therefrom based on the particular circumstances existing either at the time the challenged costs were actually incurred, or the time the utility became committed to incur those expenses").

[3671] CTC Global Initial Comments at 18, 20; Maryland Energy Administration Reply Comments at 5-6; NARUC Initial Comments at 58-59, 63-64; PIOs Initial Comments at 57-58; VEIR Initial Comments at 6.

[3672] *See* Consideration of Dynamic Line Ratings and Advanced Power Flow

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1219 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                          - 1209 -

requirements in the Consideration of Dynamic Line Ratings and Advanced Power Flow

Control Devices section of this final rule adequately address consideration of alternative

transmission technologies in the regional transmission planning process, including when

considering right-sizing.

1739.  Some commenters request that the Commission take other actions and suggest

alternative reforms to the Commission's proposal related to right-sizing.[3673]  We find

these requests to be outside the scope of this proceeding and lacking in record support to

adequately consider whether to adopt them in this final rule.

## X.    **Interregional Transmission Coordination**

### A.    **NOPR Proposal**

1740.  In the NOPR, the Commission proposed to require each transmission provider to

revise its existing interregional transmission coordination procedures to reflect the Long-

Term Regional Transmission Planning reforms proposed in the NOPR.[3674]

1741.  Specifically, the Commission proposed to require transmission providers in

neighboring transmission planning regions to revise their existing interregional

_____

Control Devices section.

[3673] ACEG Initial Comments at 57; American Municipal Power Initial Comments
at 5, 25; American Municipal Power Reply Comments at 5; California Commission
Initial Comments at 106-108; California Water Initial Comments at 10; Competition
Coalition Initial Comments at 68-69; Grid United Initial Comments at 3-4; Harvard ELI
Initial Comments at 4; LS Power Initial Comments at 83, 136, 138, 141-142, 145-146;
Massachusetts Attorney General Initial Comments at 52; Ohio Consumers Initial
Comments at 24; PIOs Initial Comments at 53; TAPS Initial Comments at 6, 64-65.

[3674] NOPR, 179 FERC ¶ 61,028 at P 426.

transmission coordination procedures (and regional transmission planning processes as needed) to provide for: (1) the sharing of information regarding their respective transmission needs identified in Long-Term Regional Transmission Planning, as well as potential transmission facilities to meet those needs; and (2) the identification and joint evaluation of interregional transmission facilities that may be more efficient or cost-effective transmission facilities to address transmission needs identified through Long-Term Regional Transmission Planning.[3675]

1742. The Commission also proposed to require transmission providers in neighboring transmission planning regions to revise their interregional transmission coordination procedures (and regional transmission planning processes as needed) to allow an entity to propose an interregional transmission facility in the regional transmission planning process as a potential solution to transmission needs identified through Long-Term Regional Transmission Planning.[3676] The Commission noted that this proposal would align the existing requirement for an entity to propose an interregional transmission facility in the regional transmission planning processes of each of the neighboring transmission planning regions in which the transmission facility is proposed to be located with the proposed requirement for transmission providers to conduct Long-Term Regional Transmission Planning as part of their regional transmission planning processes.

---

[3675] *Id.* P 427.

[3676] *Id.* P 428.

Docket No. RM21-17-000                                                          - 1211 -

1743.  The Commission stated that this proposed reform aims to ensure that transmission

needs driven by changes in the resource mix and demand identified through Long-Term

Regional Transmission Planning can be considered in existing interregional transmission

coordination and cost allocation processes.[3677]  The Commission preliminarily concluded

that the proposed interregional transmission coordination reforms will also ensure that

there is an opportunity for the transmission providers in neighboring transmission

planning regions to consider whether there are interregional transmission facilities that

could more efficiently or cost-effectively meet the transmission needs identified through

Long-Term Regional Transmission Planning, in turn helping to ensure just and

reasonable Commission-jurisdictional rates.

### B.    **Comments**

1744.  Many commenters support the Commission's proposal to require transmission

providers to revise their existing interregional transmission coordination procedures to

reflect the Long-Term Regional Transmission Planning reforms proposed in the

NOPR.[3678]  Such commenters assert that this proposed reform would give transmission

---

[3677] *Id.* P 429.

[3678] Acadia Center and CLF Initial Comments at 23-24; ACEG Initial Comments
at 74; Ameren Initial Comments at 47; Arizona Commission Initial Comments at 10; BP
Initial Comments at 13-14; Breakthrough Energy Initial Comments at 2; California
Commission Initial Comments at 118-121; California Energy Commission Initial
Comments at 4; California Water Initial Comments at 20-21; Clean Energy Associations
Initial Comments at 40-42; EEI Initial Comments at 48; Enel Initial Comments at 4-5;
Eversource Initial Comments at 55-56; Exelon Initial Comments at 60-61; Grid United
Initial Comments at 7-9; Idaho Power Initial Comments at 13; Indiana Commission
Initial Comments at 7-9; Interwest Initial Comments at 18-20; MISO Initial Comments at
88-89; NARUC Initial Comments at 67-70; National and State Conservation

providers in neighboring transmission planning regions the opportunity to consider

whether interregional transmission facilities could meet the transmission needs identified

through Long-Term Regional Transmission Planning in a more efficient or cost-effective

manner than separate regional transmission facilities, which would help to ensure just and

reasonable rates.

1745.   Some commenters condition their support on the Commission providing

transmission providers with flexibility.  For example, EEI asserts that providing

transmission providers with flexibility in developing Long-Term Regional Transmission

Planning will help ensure that transmission planning regions can determine the processes

that work for them and collaborate with neighboring regions.[3679]   Idaho Power requests

that the Commission allow flexibility in the methods used to determine transmission

benefits.[3680]  Pennsylvania Commission conditions its support on the Commission

maintaining flexibility for transmission providers to define criteria for considering and

---

Organizations Initial Comments at 1-2; Northwest and Intermountain Initial Comments at
10, 22; OMS Initial Comments at 18-20; Pennsylvania Commission Initial Comments at
23-25; Pine Gate Initial Comments at 50-51; PIOs Initial Comments at 75-79; PJM Initial
Comments at 9-10, 123-125; R Street Initial Comments at 4-5; State Agencies Initial
Comments at 22-23; State Officials Supplemental Comments at 1 (citing US Climate
Alliance Initial Comments at 3); US Climate Alliance Initial Comments at 3; US DOE
Initial Comments at 38-40; US DOJ and FTC Initial Comments at 19-20.

[3679] EEI Initial Comments at 48.

[3680] Idaho Power Initial Comments at 13.

Docket No. RM21-17-000                                                    - 1213 -

selecting transmission facilities, including criteria that permit the selection of proposed

regional transmission facilities over a proposed interregional transmission facility.[3681]

1746.  Other commenters suggest that the Commission could improve the proposed

reforms to interregional transmission coordination by requiring additional information

sharing.  For example, US DOE recommends that the Commission require neighboring

transmission planning regions to share information with one another about their

geographic zones.[3682]  California Energy Commission recommends that transmission

providers be required to share with neighboring transmission planning regions how other

planning processes, such as integrated resource plans, resource adequacy, and state

requirements, are considered in regional transmission planning.[3683]  State Agencies

suggest that transmission providers should provide an annual report to the Commission

on their interregional transmission coordination activities, including the number of

interregional transmission projects identified, the results of the cost/benefit evaluation

overall and to each transmission planning region, whether other regions have been or

should be included to maximize the value of the project, and any barriers to development

of interregional transmission projects.[3684]  NARUC urges the Commission to encourage

---

[3681] Pennsylvania Commission Initial Comments at 24-25.

[3682] US DOE Initial Comments at 18-20.

[3683] California Energy Commission Initial Comments at 4.

[3684] State Agencies Initial Comments at 23.

additional coordination and information sharing between non-RTO/ISO transmission planning regions like NorthernGrid and WestConnect.[3685]

1747.  Pattern Energy asserts that the Commission should require neighboring transmission planning regions to hold forums for stakeholders to discuss right-sizing or expanding proposed regional transmission facilities in consideration of the needs of both regions.[3686]  Further, Pattern Energy argues that if no interregional transmission facilities are approved in a Long-Term Regional Transmission Planning cycle, the Commission should require transmission planning regions to provide transparent reasoning to help stakeholders and regulators understand whether interregional transmission coordination requires reform.[3687]

1748.  MISO asserts that the Commission should institute a separate and longer compliance period for the interregional transmission coordination requirements than for the regional transmission planning requirements proposed in this rulemaking.[3688]  Further, to reduce the compliance burden on transmission providers, MISO requests that the Commission include all interregional transmission coordination and planning

---

[3685] NARUC Initial Comments at 69-70.

[3686] Pattern Energy Reply Comments at 14.

[3687] *Id.* at 14-15.

[3688] MISO Initial Comments at 89.

requirements in a single rulemaking rather than require interregional compliance in multiple, separate proceedings.[3689]

1749. Many commenters assert that the Commission's proposals with respect to interregional transmission coordination do not go far enough.[3690] Several commenters urge the Commission to require holistic interregional transmission planning and cost allocation.[3691] Some commenters encourage the Commission to require a minimum amount of Interregional Transfer Capability between neighboring transmission planning regions.[3692] Several commenters urge the Commission to require neighboring

---

[3689] *Id.* at 88-89.

[3690] *See, e.g.*, ACEG Initial Comments at 76-78; Breakthrough Energy Initial Comments at 2; Clean Energy Associations Initial Comments at 41-42; Enel Initial Comments at 4-5; Evergreen Action Initial Comments at 5-6; Eversource Initial Comments at 56; Grid United Initial Comments at 7-8; Indiana Commission Initial Comments at 9; Interwest Initial Comments at 18-19; Invenergy Reply Comments at 18; National Grid Initial Comments at 20; OMS Initial Comments at 18; Pattern Energy Reply Comments at 12-15; Pine Gate Initial Comments at 50-51; PIOs Initial Comments at 75-77; PJM Initial Comments at 9-10, 123-124; Rail Electrification Initial Comments at 2, 8-11; RMI Initial Comments at 1-2; State Agencies Initial Comments at 23; Transmission Dependent Utilities Initial Comments at 6-7; US DOE Initial Comments at 38-39; Xcel Initial Comments at 17.

[3691] *See, e.g.*, ACEG Initial Comments at 76-78; Clean Energy Associations Initial Comments at 41-42; Enel Initial Comments at 4-5; Evergreen Action Initial Comments at 5-6; Grid United Initial Comments at 7-8; Indiana Commission Initial Comments at 9; Interwest Initial Comments at 18-19; Invenergy Reply Comments at 18; National Grid Initial Comments at 20; OMS Initial Comments at 18; Pattern Energy Reply Comments at 12-15; Pine Gate Initial Comments at 50-51; PIOs Initial Comments at 75-77; PJM Initial Comments at 9-10, 123-124; Rail Electrification Initial Comments at 2, 8-11; RMI Initial Comments at 1-2; Shell Reply Comments at 8-9; US DOE Initial Comments at 38-39; Xcel Initial Comments at 17.

[3692] *See, e.g.*, ACEG Initial Comments at 70-76; AEP Initial Comments at 17-18; Breakthrough Energy Initial Comments at 2; Evergreen Action Initial Comments at 5-6;

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1226 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                      - 1216 -

transmission planning regions to adopt a common system model and planning assumptions, common Long-Term Scenarios, and consistent data inputs.[3693]  AEP argues that the Commission should require consistency across transmission planning regions in terms of the transmission planning horizon, planning frequency, and minimum set of benefits considered.[3694]

1750.  MISO encourages the Commission to examine interregional transmission planning, including analysis of the assumptions related to transfer capacity and the effectiveness of collaboration between RTO and non-RTO neighbors, in a separate docket.[3695]  Eversource and State Agencies suggest that the Commission encourage RTOs/ISOs to increase staffing to address interregional transmission planning.[3696]  National Grid suggests that the Commission provide appropriate rate incentives for interregional transmission facilities.[3697]  Rail Electrification urges the Commission to

---

Eversource Initial Comments at 55-56; Interwest Initial Comments at 18-20; Invenergy Initial Comments at 20-27; Invenergy Reply Comments at 19-22; Kansas Commission Initial Comments at 4-10; PJM Initial Comments at 9-10, 123-125.

[3693] Hannon Armstrong Reply Comments at 1; Invenergy Reply Comments at 19-22; National Grid Initial Comments at 19-20; Transmission Dependent Utilities Initial Comments at 6-7; US DOE Initial Comments at 18-21.

[3694] AEP Reply Comments at 3-5.

[3695] MISO Reply Comments at 29-30.

[3696] Eversource Initial Comments at 55-56; State Agencies Initial Comments at 23.

[3697] National Grid Initial Comments at 20.

support the siting of large interregional transmission facilities along available interstate

transportation rights-of-way to advance the grid of the future more quickly.[3698]

### C.    **Commission Determination**

1751.  We adopt, with modification, the NOPR proposal to require transmission

providers in each transmission planning region to revise their existing interregional

transmission coordination procedures to reflect the Long-Term Regional Transmission

Planning reforms adopted in this final rule.  Specifically, we adopt the NOPR proposal to

require transmission providers in neighboring transmission planning regions to revise

their existing interregional transmission coordination procedures (and regional

transmission planning processes, as needed) to provide for:  (1) the sharing of

information regarding their respective Long-Term Transmission Needs, as well as Long-

Term Regional Transmission Facilities to meet those needs; and (2) the identification and

joint evaluation of interregional transmission facilities that may be more efficient or cost-

effective transmission facilities to address Long-Term Transmission Needs.

1752.  Additionally, we adopt the NOPR proposal to require transmission providers in

neighboring transmission planning regions to revise their interregional transmission

coordination procedures (and regional transmission planning processes, as needed) to

allow an entity to propose an interregional transmission facility in the regional

transmission planning process as a potential solution to Long-Term Transmission Needs.

We find that this requirement will align the existing requirement, for an entity to propose

---

[3698] Rail Electrification Initial Comments at 8-12.

an interregional transmission facility in the regional transmission planning processes of
each of the neighboring transmission planning regions in which the transmission facility
is proposed to be located, with the new requirement in this final rule for transmission
providers to conduct Long-Term Regional Transmission Planning as part of their regional
transmission planning processes.

1753.  In response to commenter requests for additional information sharing and
transparency of the interregional transmission coordination process, we find that
additional transparency as applied to Long-Term Regional Transmission Planning is
warranted.[3699]  Order No. 1000 requires that transmission providers in neighboring
transmission planning regions maintain a website or e-mail list for the communication of
information related to interregional transmission coordination procedures.[3700]  We modify
the NOPR proposal, and require transmission providers in each transmission planning
region to provide the following additional information concerning Long-Term Regional
Transmission Planning on their public website or through the email list used for
communication of information related to interregional transmission coordination
procedures:  (1) the Long-Term Transmission Needs discussed in the interregional
transmission coordination meetings; (2) any interregional transmission facilities proposed
or identified in response to Long-Term Transmission Needs; (3) the voltage level,

---

[3699] *See, e.g.*, California Energy Commission Initial Comments at 4; NARUC
Initial Comments at 69-70; Pattern Energy Reply Comments at 14-15; State Agencies
Initial Comments at 23.

[3700] Order No. 1000, 136 FERC ¶ 61,051 at PP 345, 458.

estimated cost, and estimated in-service date of the interregional transmission facilities

proposed or identified as part of Long-Term Regional Transmission Planning; (4) the

results of any cost-benefit evaluation of such interregional transmission facilities, with

such results including both any overall benefits identified (which may occur across

multiple transmission planning regions), as well as any benefits particular to each

transmission planning region; and (5) the interregional transmission facilities, if any,

selected to meet Long-Term Transmission Needs.  We find that this modification will

enhance transparency and facilitate stakeholder engagement in the interregional

transmission coordination procedures as applied to Long-Term Regional Transmission

Planning, thereby ensuring just and reasonable rates.  We believe that this requirement to

make this information publicly available will not create a significant burden because

transmission providers will already share or develop such information with the

transmission providers in neighboring transmission planning regions to comply with the

requirement in this final rule to revise their existing interregional transmission

coordination procedures to reflect the Long-Term Regional Transmission Planning

reforms.

1754.  Taken together, we find that these reforms will ensure that Long-Term

Transmission Needs identified through Long-Term Regional Transmission Planning can

be considered in existing interregional transmission coordination and cost allocation

processes.  Further, doing so will ensure that there is an opportunity for the transmission

providers in neighboring transmission planning regions to consider whether there are

interregional transmission facilities that could more efficiently or cost-effectively address

Docket No. RM21-17-000                                                    - 1220 -

the identified Long-Term Transmission Needs, in turn helping to ensure just and reasonable Commission-jurisdictional rates.

1755.  We decline to require the transmission providers in neighboring transmission planning regions to hold forums for stakeholders to discuss right-sizing or expanding proposed regional transmission facilities in consideration of the transmission needs of both regions, as requested by Pattern Energy.  The Commission did not propose such a reform in the NOPR, and we decline to require it here.

1756.  Regarding Idaho Power's request that the Commission provide transmission providers with flexibility in the methods used to determine the benefits of interregional transmission facilities, we note that this issue is addressed above in the Evaluation of the Benefits of Regional Transmission Facilities section of this final rule.[3701]  Regarding Pennsylvania Commission's comment that its support for the interregional transmission coordination reforms proposed in the NOPR are conditioned on the Commission maintaining flexibility for transmission providers to define criteria for considering and selecting transmission facilities, we note that the requirements regarding selection criteria are addressed in the section above on the Evaluation and Selection of Long-Term Regional Transmission Facilities.[3702]

---

[3701] *See supra* Evaluation of the Benefits of Regional Transmission Facilities section.

[3702] *See supra* Evaluation and Selection of Long-Term Regional Transmission Facilities section.

1757.  Regarding MISO's request for a longer compliance period for transmission providers to comply with the interregional transmission coordination requirements of this final rule, we address MISO's request in the Compliance section below.[3703]

1758.  With respect to commenter requests for the Commission to:  (1) require holistic interregional transmission planning and cost allocation; (2) require a minimum amount of Interregional Transfer Capability between neighboring transmission planning regions; (3) require neighboring transmission planning regions to adopt a common system model, consistent data inputs, and a uniform transmission planning horizon and transmission planning frequency; (4) encourage RTOs/ISOs to increase staffing to address interregional transmission planning; (5) adopt new rate incentives for interregional transmission facilities; and (6) support the siting of large interregional transmission facilities along available transportation rights-of-way, we find such requests to be outside the scope of this proceeding.  We recognize that one or more of these reforms hold the potential to enhance system reliability or provide significant consumer benefits. However, the Commission did not propose such reforms in the NOPR, and we decline to adopt them in the final rule.  However, we note that the Commission currently has an open proceeding in Docket No. AD23-3-000 to consider whether and how to establish a minimum requirement for Interregional Transfer Capability, and may consider further reforms in other proceedings, as appropriate.[3704]

---

[3703] *See infra* Compliance Procedures section.

[3704] *See* Supplemental Notice of Staff-Led Workshop, *Establishing Interregional Transfer Capability Transmission Planning and Cost Allocation Requirements*, Docket

XI.    **Compliance Procedures**

   A.    **NOPR Proposal**

1759.  In the NOPR, the Commission proposed to require each transmission provider to submit a compliance filing within eight months of the effective date of any final rule in this proceeding revising its OATT and other document(s) subject to the Commission's jurisdiction as necessary to demonstrate that it meets the requirements adopted in any final rule in this proceeding.[3705]  The Commission proposed that transmission providers that are not public utilities would have to adopt the requirements adopted in any final rule in this proceeding as a condition of maintaining the status of their safe harbor tariff or otherwise satisfying the reciprocity requirement of Order No. 888.[3706]

1760.  Additionally, in the NOPR, the Commission proposed to require transmission providers to demonstrate on compliance that proposed variations from the requirements in the final rule are consistent with or superior to the final rule.[3707]

   B.    **Comments**

1761.  Several commenters support a compliance period of eight months or more to allow stakeholders, including Relevant State Entities, sufficient time to negotiate and agree on proposals to comply with this rulemaking.[3708]  PJM states that while an eight-month

---

No. AD23-3-000 (Nov. 30, 2022).

[3705] NOPR, 179 FERC ¶ 61,028 at P 430.

[3706] *Id.* P 432 (citing Order No. 888, FERC Stats. & Regs. ¶ 31,036 at 31,760-63).

[3707] *Id*. PP 74-75, 105, 229.

[3708] Idaho Power Initial Comments at 14; ISO-NE Initial Comments at 41; MISO

period to submit compliance filings is reasonable, the Commission should thereafter allow time for transmission planners to develop the tools and hire the employees they will need to implement the final rule.[3709]  NEPOOL states that the Commission should be flexible in considering requests for extensions of time.[3710]  Pacific Northwest State Agencies urge the Commission to provide flexibility rather than a rigid time period of eight months to comply with the final rule.[3711]

1762.  Certain TDUs argue that the Commission should require transmission providers to submit compliance filings no later than 270 days after the final rule becomes effective to reflect the requirements to include an *ex ante* Long-Term Regional Transmission Cost Allocation Method, define benefits, and identify the method by which benefits are selected.[3712]

1763.  Some commenters request that the Commission provide longer than eight months to comply with the final rule.  For example, NARUC argues that eight months is unlikely

---

Initial Comments at 90; NARUC Initial Comments at 50-51; NEPOOL Initial Comments at 10; NESCOE Reply Comments at 9 (citing ISO-NE Initial Comments at 41); North Carolina Commission and Staff Initial Comments at 17; Northwest and Intermountain Initial Comments at 22-23; Pacific Northwest State Agencies Initial Comments at 28; PJM Initial Comments at 10, 129.

[3709] PJM Initial Comments at 10, 129.

[3710] NEPOOL Initial Comments at 10.

[3711] Pacific Northwest State Agencies Initial Comments at 28.

[3712] Certain TDUs Initial Comments at 16.

to allow sufficient time for Relevant State Entities to meaningfully engage.[3713]  Given the complexity of the proposals and the need to coordinate with stakeholders, Idaho Power and ISO-NE propose that the Commission allow at least one year for transmission providers to comply with the final rule.[3714]  For similar reasons, MISO urges the Commission to provide a compliance period of at least 18 months.  In addition, to avoid interfering with ongoing transmission expansion efforts in some transmission planning regions, MISO argues that the Commission should allow such regions to propose their own compliance date or instead should state that the final rule would not apply to any such ongoing transmission expansion efforts, including MISO's Long-Range Transmission Planning initiative.[3715]  Additionally, MISO requests that the new rule and tariff revisions complying with the final rule be made effective upon the Commission's acceptance of the filing party's compliance filing.[3716]

1764.  PJM states that it would be more efficient and less confusing if PJM could first build the long-term model and then comply with the selection and cost allocation requirements at a later date.  PJM therefore requests that the Commission clarify whether it is necessary for transmission providers to develop compliance procedures with respect to selection and cost allocation of transmission projects to be selected through Long-

---

[3713] NARUC Initial Comments at 50-51.

[3714] Idaho Power Initial Comments at 14; ISO-NE Initial Comments at 41.

[3715] MISO Initial Comments at 90-92.

[3716] *Id.* at 90-91; MISO Reply Comments at 32.

Docket No. RM21-17-000                                                    - 1225 -

Term Regional Transmission Planning before they have had a chance to create and

finalize their long-term transmission planning processes.[3717]

1765.  MISO asserts that the Commission should allow a separate and longer compliance

period for the interregional transmission coordination requirements.[3718]

1766.  Separately, MISO states that while the NOPR indicates that the Commission might

permit regional flexibility in some areas, it adopts the "consistent with or superior to"

legal standard for evaluating proposed deviations on compliance.[3719]  MISO argues that

this standard is too inflexible to achieve the Commission's objectives because it neither

recognizes the independent nature of RTOs/ISOs nor has a built-in mechanism to

acknowledge legitimate regional differences.[3720]  Therefore, MISO recommends that the

Commission instead apply a version of the "independent entity" variation standard to

RTOs/ISOs or otherwise make clear that the proposed reforms contemplate regional

flexibility to allow RTOs to retain their best transmission planning practices, particularly

those RTOs that are "early movers" of the types of reforms in the NOPR.[3721]  If the

---

[3717] PJM Initial Comments at 98-104.

[3718] MISO Initial Comments at 89.

[3719] MISO Reply Comments at 4 (citing NOPR, 179 FERC ¶ 61,028 at PP 74-75).

[3720] MISO Initial Comments at 21-22; MISO Reply Comments at 5.

[3721] MISO Reply Comments at 4.  For example, MISO states that its MVP and
Long-Range Transmission Plan processes are broadly consistent with the principles and
goals of the NOPR and some of its specific proposals, including development of multiple
futures, review of various benefit metrics, and use of a 20-year transmission planning
horizon.  MISO states that repeating the extensive stakeholder effort involved in
developing these processes to comply with the new requirements would stall its

Docket No. RM21-17-000                                                    - 1226 -

Commission decides not to adopt the independent entity variation standard for this final

rule, MISO urges the Commission to clarify that it will recognize as "consistent with or

superior to" any existing regional transmission planning processes that are substantially

equivalent to the proposed requirements to avoid impeding progress already made, while

compelling reform in transmission planning regions where needed.[3722]

1767.  ISO-NE and ISO RTO Council argue that flexibility should extend to determining

the rules for inclusion in the tariff, with implementation details in planning procedures or

guides, consistent with the Commission's "rule of reason" standard.[3723]

### C.    Commission Determination

1768.  We adopt the NOPR proposal, with modification, and require each transmission

provider to submit a compliance filing within ten months of the effective date of this final

rule revising its OATT and other document(s) subject to the Commission's jurisdiction as

necessary to demonstrate that it meets all of the requirements adopted in this final rule,

except those adopted in the Interregional Transmission Coordination section of this final

rule.  In response to comments from NARUC, Idaho Power, ISO-NE, and MISO

requesting a longer compliance timeline, we find that requiring a ten-month compliance

period instead of the eight-month compliance period proposed in the NOPR will allow

transmission providers to fully develop proposals to comply with this final rule and allow

---

momentum.  MISO Initial Comments at 10.

[3722] MISO Initial Comments at 25; MISO Reply Comments at 8-9.

[3723] ISO-NE Initial Comments at 20; ISO/RTO Council Initial Comments at 8-9
(citing *City of Cleveland v. FERC*, 773 F.2d. at 1376).

stakeholders, including Relevant State Entities, to meaningfully engage in the process of developing such proposals. As discussed in the Implementation of Long-Term Regional Transmission Planning section, we require transmission providers in each transmission planning region to propose on compliance a date, no later than one year from the date on which initial filings to comply with this final rule are due, on which they will commence the first Long-Term Regional Transmission Planning cycle (unless additional time is needed to align the first Long-Term Regional Transmission Planning cycle with existing transmission planning cycles). Therefore, transmission providers in each transmission planning region must propose an effective date for the OATT revisions necessary to comply with this final rule that is no later than the date on which they will commence the first Long-Term Regional Transmission Planning cycle. However, transmission providers may propose an earlier effective date for some or all parts of their revised OATTs to allow them to begin implementing any aspects of the required reforms sooner than the one-year deadline to commence the first Long-Term Regional Transmission Planning cycle.

1769. We deny PJM's request for clarification to allow a later compliance deadline for the selection and cost allocation requirements of this final rule and find it appropriate to require that transmission providers submit a compliance filing that addresses all the requirements of this final rule within ten months of the effective date of this final rule, with the exception of the requirements related to interregional transmission coordination, as previously noted.

Docket No. RM21-17-000                                                    - 1228 -

1770.  In response to MISO's request for a separate, longer compliance timeline for the interregional transmission coordination requirements, we also modify the NOPR proposal and require each transmission provider to submit a separate compliance filing within 12 months of the effective date of this final rule revising its OATT and other document(s) subject to the Commission's jurisdiction as necessary to demonstrate that it meets the interregional transmission coordination requirements adopted in this final rule.[3724]  We find that the additional time to comply with the interregional transmission coordination requirements will allow transmission providers to coordinate with the transmission providers in each of their neighboring transmission planning regions to develop interregional transmission coordination proposals.

1771.  Additionally, we adopt the proposed requirement that transmission providers that are not public utilities must adopt the requirements of this final rule as a condition of maintaining the status of their safe harbor tariff or otherwise satisfying the reciprocity requirement of Order No. 888.[3725]

1772.  In this final rule, we make no changes to the standards used to judge requested variations, as described in Order Nos. 888, 2000, 890, and 1000.[3726]  Accordingly, we

---

[3724] *See supra* Interregional Transmission Coordination section.

[3725] NOPR, 179 FERC ¶ 61,028 at P 432 (citing Order No. 888, FERC Stats. & Regs. ¶ 31,036 at 31,760-63).

[3726] Order No. 1000, 136 FERC ¶ 61,051 at P 815; Order No. 890, 118 FERC ¶ 61,119 at P 109; Order No. 2000, FERC Stats. & Regs. ¶ 31,089 at 31,164; Order No. 888, FERC Stats. & Regs. ¶ 31,036, at 31,769-70.

decline to grant MISO's request that the Commission apply the independent entity
variation standard, rather than the "consistent with or superior to" standard, for proposed
deviations from the requirements in this final rule on compliance.  Consistent with the
Commission's findings in Order No. 890, we will continue to apply the "consistent with
or superior to" standard in the context of transmission planning.[3727]

1773.  Regarding MISO's request for clarification, we decline to clarify as part of this
final rule that any existing transmission planning processes are consistent with or superior
to the requirements in this final rule.  Rather, it is more appropriate for a transmission
provider to submit such a request as part of its compliance filing, in which the
transmission provider must demonstrate that any deviation from the requirements of this
final rule, including any existing processes and/or OATT provisions, are consistent with
or superior to the requirements of this final rule.  Similarly, to the extent that a
transmission provider believes that it already complies with any of the requirements of
this final rule, it should describe in its compliance filing how the relevant requirements
are satisfied, including by referencing specific tariff sheets already on file with the
Commission.

1774.  In response to ISO-NE's and ISO RTO Council's comment that the final rule
should provide flexibility as to which implementation details should be included in
planning procedures or guides consistent with the Commission's "rule of reason"
standard, we note that the Commission has broad discretion in applying the rule of reason

---

[3727] Order No. 890, 118 FERC ¶ 61,119 at P 160.

policy,[3728] under which provisions that "significantly affect rates, terms, and conditions"

of service, are realistically susceptible of specification, and are not generally understood

in a contractual agreement, must be included in the tariff.  The tariff need not include

"mere implementation details,"[3729] which instead may be included only in the business

practice manuals.  "[E]ven specifiable practices that significantly affect rates need not be

included if they are clearly implied by the tariff's express terms."[3730]  The final rule

specifies with respect to each requirement the information that must be incorporated into

the transmission provider's OATT.  We find that the requirements in this final rule

regarding what information transmission providers must specify in their tariff on

compliance is consistent with the Commission's rule of reason policy.

## XII.    **Information Collection Statement**

1775.  The information collection requirements contained in this final rule are subject to

review by the Office of Management and Budget (OMB) under section 3507(d) of the

Paperwork Reduction Act of 1995.[3731]  OMB's regulations require approval of certain

information collection requirements imposed by agency rules.[3732]  Upon approval of a

---

[3728] *Hecate Energy Greene Cnty. 3 LLC v. FERC,* 72 F.4th at 1314 (citing *City of Cleveland v. FERC*, 773 F.2d at 1376 (the FPA's "amorphous" requirement that tariffs include "practices affecting rates" means that the Commission has "broad discretion" in giving the act "concrete application.")).

[3729] *Id.* at 1312.

[3730] *Id.* at 1314 (citing *City of Cleveland v. FERC*, 773 F.2d at 1376).

[3731] 44 U.S.C. 3507(d).

[3732] 5 CFR 1320.11.

collection of information, OMB will assign an OMB control number and expiration date.

Respondents subject to the filing requirements of this final rule will not be penalized for

failing to respond to these collections of information unless the collections of information

display a valid OMB control number.

1776.  The reforms adopted in this final rule revise the Commission's *pro forma* OATT

to remedy deficiencies in the Commission's existing regional transmission planning and

cost allocation and local transmission planning requirements to ensure that Commission-

jurisdictional rates and practices are just and reasonable and not unduly discriminatory or

preferential.

1777.  In the NOPR, the Commission solicited comments on:  the Commission's need for

this information; whether the information will have practical utility; the accuracy of the

burden estimates; ways to enhance the quality, utility, and clarity of the information to be

collected or retained; and any suggested methods for minimizing respondents' burden,

including the use of automated information techniques.  The Commission received one

comment from PJM specifically about the time and effort required to comply with the

information collection requirement.[3733]

1778.  PJM claims that the Commission significantly underestimates the cost for PJM

and other transmission providers to comply with the final rule.  PJM states that its

compliance will require additional staff of between seven to 14 new staff members and

that the added cost will be at least $2.1 million per year.  However, PJM adds that it

---

[3733] PJM Initial Comments at 10, 125-29.

generally supports the proposed reforms in the NOPR and provides this information only to give the Commission a better understanding of the time and costs associated with implementing the final rule.[3734]

1779.  In response to PJM's comments on the NOPR, we note that this information collection statement estimates the burdens[3735] to generate, maintain, retain, or disclose or provide information to or for a federal agency.  In light of the information that PJM supplied, we have revised the table below to increase the estimated amount of labor required for a transmission provider to perform Long-Term Regional Transmission Planning.[3736]  We expect that the information collection requirements associated with updating these datasets for subsequent cycles will entail substantially less effort than the initial Long-Term Regional Transmission Planning cycle.

1780.  Summary of the Revisions to the Collection of Information due to the final rule in Docket No. RM21-17-000:

- Title:  Electric Transmission Facilities (FERC-917).[3737]

---

[3734] Id. at 128-29.

[3735] "Burden" is the total time, effort, or financial resources expended by persons to generate, maintain, retain, or disclose or provide information to or for a federal agency. For further explanation of what is included in the information collection burden, refer to 5 CFR 1320.3(b)(1).

[3736] For example, for an entire transmission planning region, we anticipate that 10 people each working 2,000 hours per year would spend 20,000 hours per year to develop these datasets.

[3737] In the NOPR, in addition to proposing to revise the FERC-917 information collection, the Commission proposed to revise the *pro forma* LGIP and, therefore, to revise the FERC-516 information collection (Reform of Generator Interconnection

- <u>Action</u>:  Revision of collections of information in accordance with Docket No. RM21-17-000.

- <u>OMB Control Nos.</u>:  1902-0233 (FERC-917).

- <u>Respondents</u>:  Transmission providers, including RTOs/ISOs.

- <u>Frequency of Information Collection</u>:  One time during Year 1.  Occasional times during subsequent years, at least once every five years.

- <u>Necessity of Information</u>:  The reforms in this final rule will correct deficiencies in the Commission's existing regional transmission planning and cost allocation requirements to ensure that Commission-jurisdictional rates remain just and reasonable and not unduly discriminatory or preferential.

- <u>Internal Review</u>:  We have reviewed the reforms and have determined that such reforms are necessary.  These reforms conform to the Commission's need for efficient information collection, communication, and management within the energy industry.  We have specific, objective support for the burden estimates associated with the information collection requirements.

- <u>Public Reporting Burden</u>:  The burden and cost estimates below are based on the need for applicable entities to revise documentation, already required by the Commission's *pro forma* OATT.  Our estimates are based on the North American Electric Reliability Corporation Compliance Registry as of January 11, 2024,

---

Procedures and Agreements).  In this final rule, we decline to revise the *pro forma* LGIP, and therefore we are not revising the FERC-516 information collection.

Docket No. RM21-17-000                                                          - 1234 -

which indicates that there are 48 transmission service providers[3738] with OATTs
and 118 transmission owners that are registered within the United States and are
subject to this rulemaking.[3739]  Because 41 of the 118 transmission owners are also
included in the count of 48 transmission service providers, there are 125 distinct
entities (i.e., 125 distinct transmission providers[3740]) in total that must comply this
final rule.  We note that, for the purposes of regional transmission planning, these
125 entities are grouped into 11 transmission planning regions.

1781.  We estimate that the final rule would affect the burden and cost of FERC-917 as
follows:

| Changes Due to Final Rule in Docket No. RM21-17-000[3741] | | | | |
|---|---|---|---|---|
| A.<br>Area of Modification | B.<br>Annual Number of Respondents | C.<br>Total Annual Estimated Number | D.<br>Average Burden Hours & Cost[3742] per Response | E.<br>Total Estimated Burden Hours & Total Estimated Cost |

---

[3738] The transmission service provider (TSP) function is a North American Electric Reliability Corporation registration function, which is similar to the transmission provider that is referenced in the *pro forma* OATT.  The TSP function is being used as a proxy to estimate the number of transmission providers that are impacted by this proposed rulemaking.

[3739] The number of entities listed from the North American Electric Reliability Corporation Compliance Registry reflects the omission of the Texas registered entities. Note that the 48 transmission providers with OATTs do not include non-public utility transmission providers with reciprocity tariffs.

[3740] *See supra* note 2.

[3741] In the table, Year 1 figures are one-time implementation hours and cost. "Subsequent years" show ongoing burdens and costs starting in Year 2.

[3742] The hourly cost (for salary plus benefits) uses the figures from the Bureau of

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1245 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                    - 1235 -

| | | of Responses | | (Column C x Column D) |
|---|---|---|---|---|
| **FERC-917, Electric Transmission Facilities (OMB Control No. 1902-0233)** | | | | |
| Draft OATT revisions to comply with the requirements of the final rule | 48 transmission providers with OATTs | 48 | One Time: 770 hours; $71,683<br><br>Ongoing: 0 hours per year; $0 per year | One Time: 36,960 hours; $3,440,783<br><br>Ongoing: 0 hours per year; $0 per year |
| Establish a six-month time period during which transmission providers must, among other things, provide a forum for negotiation that enables participation by Relevant State Entities and to discuss potential Long-Term Regional Transmission Cost Allocation Methods and/or a State Agreement Process. | 48 transmission providers with OATTs | 48 | One Time: 390 hours; $36,307<br><br>Ongoing: 0 hours per year; $0 per year | One Time: 18,720 hours; $1,742,734<br><br>Ongoing: 0 hours per year; $0 per year |
| Participate in Long-Term Regional Transmission Planning, which includes creating and updating datasets, developing Long-Term Scenarios, evaluating the benefits of Long-Term Regional Transmission Facilities, | 48 transmission providers with OATTs | 48 | One Time: 0 hours; $0<br><br>Ongoing: 4,500 hours per year; $418,926 per year | One Time: 0 hours; $0<br><br>Ongoing: 216,000 hours per year; $20,108,471 per year |

Labor Statistics (BLS) for three positions involved in the reporting and recordkeeping requirements. These figures include salary (based on BLS data for May 2022, issued April 25, 2023, http://bls.gov/oes/current/naics2_22.htm) and benefits (based on BLS data for September 2023; issued December 15, 2023, http://www.bls.gov/news.release/ecec.nr0.htm) and are Manager (Occupation Code 11-0000, $122.48/hour), Electrical Engineer (Occupation Code 17-2071, $89.04/hour), and File Clerk (Occupation Code 43-4071, $42.43/hour). The hourly cost for the reporting requirements ($105.76) is an average of the hourly cost (wages plus benefits) of a manager and engineer. The hourly cost for recordkeeping requirements uses the cost of a file clerk.

| and establishing criteria in consultation with Relevant State Entities and stakeholders to select Long-Term Regional Transmission Facilities in the regional transmission plan for purposes of cost allocation. | 77 transmission providers without OATTs | 77 | One Time: 0 hours; $0<br><br>Ongoing: 200 hours per year; $18,619 | One Time: 0 hours; $0<br><br>Ongoing: 15,400 hours per year; $1,433,659 per year |
|---|---|---|---|---|
| Revise the regional transmission planning process to enhance transparency of local transmission planning and identifying potential opportunities to right-size replacement transmission facilities. | 48 transmission providers with OATTs | 48 | One Time: 30 hours; $2,793<br><br>Ongoing: 120 hours per year; $11,172 per year | One Time: 1,440 hours; $134,056<br><br>Ongoing: 5,760 hours per year; $536,226 per year |
| | 77 transmission providers without OATTs | 77 | One Time: 20 hours; $1,862<br><br>Ongoing: 40 hours per year; $3,724 per year | One Time: 1,540 hours; $143,366<br><br>Ongoing: 3,080 hours per year; $286,732 per year |
| Evaluate whether certain alternative transmission technologies can meet the transmission needs identified in Order No. 1000 regional transmission planning processes and in Long-Term Regional Transmission Planning process more efficiently or cost-effectively than transmission facilities without such alternative transmission technologies. | 48 transmission providers with OATTs | 48 | One Time: 0 hours; $0<br><br>Ongoing: 100 hours per year; $9,309 per year | One Time: 0 hours; $0<br><br>Ongoing: 4,800 hours per year; $446,855 per year |
| | 77 transmission providers without OATTs | 77 | One Time: 0 hours; $0<br><br>Ongoing: 20 hours per year; $1,862 per year | One Time: 0 hours; $0<br><br>Ongoing: 1540 hours per year; $143,366 per year |
| Consider in the Order No. 1000 regional transmission planning processes regional transmission facilities that address certain | 48 transmission providers with OATTs | 48 | One Time: 0 hours; $0<br><br>Ongoing: 50 hours per year; $4,655 per year | One Time: 0 hours; $0<br><br>Ongoing: 2,400 hours per year; $223,427 per year |

Docket No. RM21-17-000                                                    - 1237 -

| | | | | |
|---|---|---|---|---|
| interconnection-related needs. | | | | |
| Share with the transmission providers in neighboring transmission planning regions information regarding Long-Term Transmission Needs and potential transmission facilities to meet those needs; identify and jointly evaluate interregional transmission facilities with the transmission providers in neighboring transmission planning regions; and publicly post certain information regarding interregional coordination processes applied to Long-Term Regional Transmission Planning. | 48 transmission providers with OATTs | 48 | One Time: 0 hours; $0

Ongoing: 25 hours per year; $2,327 per year | One Time: 0 hours; $0

Ongoing: 1,200 hours per year; $111,714 per year |
| **Total burden for the revisions of FERC 917 due to RM21-17** | 48 transmission providers with OATTs | 48 | One Time: 1,190 hours; $110,783

Ongoing: 4,795 hours per year; $446,390 per year | One Time: 57,120 hours; $5,317,573

Ongoing: 230,160 hours per year; $21,426,693 per year |
| | 77 transmission providers without OATTs | 77 | One Time: 20 hours; $1,862

Ongoing: 260 hours per year; $24,205 per year | One Time: 1,540 hours; $143,366

Ongoing: 20,020 hours per year; $1,863,757 per year |
| | Totals for all 125 transmission providers | | | One Time: 58,660 hours; $5,460,939

Ongoing: 250,180 hours per year; $23,290,450 per year |

Docket No. RM21-17-000                                                    - 1238 -

1782.  Our estimates conservatively assume the maximum number of respondents and burdens.  We acknowledge that the actual burdens for some respondents may be lower than estimated and that other respondents may incur the maximum burdens.

1783.  Interested persons may obtain information on the reporting requirements by contacting Jean Sonneman, Office of the Executive Director, Federal Energy Regulatory Commission, 888 First Street, NE, Washington, DC 20426 via email (DataClearance@ferc.gov) or telephone (202) 502-8663.

## XIII.  <u>Environmental Analysis</u>

1784.  The Commission is required to prepare an Environmental Assessment or an Environmental Impact Statement for any action that may have a significant adverse effect on the human environment.[3743]  We conclude that neither an Environmental Assessment nor an Environmental Impact Statement is required for this final rule under § 380.4(a)(15) of the Commission's regulations, which provides a categorical exemption for approval of actions under sections 205 and 206 of the FPA relating to the filing of schedules containing all rates and charges for the transmission or sale of electric energy subject to the Commission's jurisdiction, plus the classification, practices, contracts and regulations that affect rates, charges, classifications, and services.[3744]

---

[3743] *Regulations Implementing the Nat'l Env'l Pol'y Act*, Order No. 486, 52 FR 47897 (Dec. 17, 1987), FERC Stats. & Regs. Preambles 1986-1990 ¶ 30,783 (1987) (cross-referenced at 41 FERC ¶ 61,284).

[3744] 18 CFR 380.4(a)(15).

## XIV.  **Regulatory Flexibility Act**

1785.  The Regulatory Flexibility Act of 1980 (RFA)[3745] generally requires a description and analysis of final rules that will have significant economic impact on a substantial number of small entities.  The Small Business Administration (SBA) sets the threshold for what constitutes a small business.  Under SBA's size standards,[3746] RTOs/ISOs, transmission planning regions, and transmission owners all fall under the category of Electric Bulk Power Transmission and Control (NAICS code 221121), with a size threshold of 950 employees (including the entity and its associates).[3747]

1786.  We have determined that the entities impacted by this final rule are transmission providers in transmission planning regions that span across the United States.[3748]

1787.  To identify small firms among the transmission providers that comprise the transmission planning regions, we created a list of transmission service providers and transmission owners from the North American Electric Reliability Corporation Registry (dated January 11, 2024), totaling 125 entities.  We conducted research using both open-

---

[3745] 5 U.S.C. 601-612.

[3746] 13 CFR 121.201.

[3747] The RFA definition of "small entity" refers to the definition provided in the Small Business Act, which defines a "small business concern" as a business that is independently owned and operated and that is not dominant in its field of operation.  The SBA's regulations define the threshold for a small Electric Bulk Power Transmission and Control entity (NAICS code 221121) to be 950 employees.  13 CFR 121.201; *see* 5 U.S.C. 601(3) (citing section 3 of the Small Business Act, 15 U.S.C. 632).

[3748] *See* FERC, *Regions Map Printable Version Order No. 1000* (Nov. 9, 2021), https://www.ferc.gov/media/regions-map-printable-version-order-no-1000.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1250 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                                - 1240 -

source information and data from paid services such as Dunn & Bradstreet. We find that, out of the population of 125 transmission providers, 18 would be considered small using the SBA threshold (14% rounded). Therefore, we do not consider this number of small entities to be substantial.

1788. As shown in the table above, we estimate the one-time costs associated with the final rule to be $110,783 per transmission provider with an OATT and $1,862 per transmission provider without an OATT. We estimate the ongoing costs in subsequent years to be $446,390 per year for transmission providers with an OATT and $24,205 per year for transmission providers without an OATT. Further, we note that Commission regulations allow for transmission providers to fully recover the costs of participating in the regional transmission planning process.[3749] Therefore, we do not believe that this cost is economically significant. Accordingly, we certify that the reforms in this final rule will not have a significant economic impact on a substantial number of small entities.

## XV.   **Document Availability**

1789. In addition to publishing the full text of this document in the *Federal Register*, the Commission provides all interested persons an opportunity to view and/or print the contents of this document via the Internet through the Commission's Home Page (http://www.ferc.gov).

1790. From the Commission's Home Page on the Internet, this information is available on eLibrary. The full text of this document is available on eLibrary in PDF and

---

[3749] Order No. 890, 118 FERC ¶ 61,119 at P 586.

Docket No. RM21-17-000                                          - 1241 -

Microsoft Word format for viewing, printing, and/or downloading.  To access this document in eLibrary, type the docket number excluding the last three digits of this document in the docket number field.

1791.  User assistance is available for eLibrary and the Commission's website during normal business hours from FERC Online Support at 202-502-6652 (toll free at 1-866-208-3676) or email at ferconlinesupport@ferc.gov, or the Public Reference Room at (202) 502-8371, TTY (202)502-8659.  E-mail the Public Reference Room at public.referenceroom@ferc.gov.

**XVI.**  **Effective Date and Congressional Notification**

1792.  These regulations are effective **[INSERT DATE 60 DAYS AFTER DATE OF PUBLICATION IN THE FEDERAL REGISTER]**.  The Commission has determined, with the concurrence of the Administrator of the Office of Information and Regulatory Affairs of OMB, that this rule is a "major rule" as defined in section 351 of the Small Business Regulatory Enforcement Fairness Act of 1996.

List of subjects in 18 CFR Part 35

Electric power rates, Electric utilities, Reporting and recordkeeping requirements.

By the Commission.  Chairman Phillips and Commissioner Clements are concurring with a joint separate statement attached.
Commissioner Christie is dissenting with a separate statement attached.

( S E A L )

Debbie-Anne A. Reese,
Acting Secretary.

**NOTE:** The following appendices will not appear in the Code of Federal Regulations.

<u>**Appendix A: Abbreviated Names of Commenters**</u>

**Abbreviated Names of Commenters**

| Abbreviation | Commenter(s) |
|---|---|
| Acadia Center and CLF | Acadia Center and Conservation Law Foundation |
| ACEG | Americans for a Clean Energy Grid |
| ACORE | American Council on Renewable Energy |
| Advanced Energy Buyers | Advanced Energy Buyers Group |
| AEE | Advanced Energy Economy |
| AEP | American Electric Power Service Corporation |
| Alabama Commission | Alabama Public Service Commission |
| Amazon | Amazon Energy LLC |
| Ameren | Ameren Services Company |
| American Municipal Power | American Municipal Power, Inc. |
| Americans for Fair Energy Prices | Americans for Fair Energy Prices, Inc. |
| Anbaric | Anbaric Development Partners, LLC |
| APPA | American Public Power Association |
| APS | Arizona Public Service Company |
| Arizona Commission | Arizona Corporation Commission |
| ATC | American Transmission Company LLC |
| Avangrid | Avangrid, Inc. |
| Bekaert | Bekaert Corporation |
| BP | bp America |
| Breakthrough Energy | Breakthrough Energy |
| Business Council for Sustainable Energy | Business Council for Sustainable Energy |
| CAISO | California Independent System Operator Corporation |
| California Commission | California Public Utilities Commission |
| California Democratic Representatives | US Representatives Jared Huffman; Mike Levin; Nanette Diaz Barragán; Grace F. Napolitano; Anna G. Eshoo; Katie Porter; Judy Chu; Mike Thompson; Ted W. Lieu; Julia Brownley; Mark DeSaulnier; and Juan Vargas |
| California Energy Commission | California Energy Commission |

USCA4 Appeal: 24-1650   Doc: 224   Filed: 01/21/2025   Pg: 1253 of 2455
Document Accession #: 20240513-3036   Filed Date: 05/13/2024

Docket No. RM21-17-000                                          - 1243 -

| California Municipal Utilities | California Municipal Utilities Association |
| California Water | California Department of Water Resources State Water Project |
| CARE Coalition | The National Audubon Society; Defenders of Wildlife; Environmental Law & Policy Center; National Wildlife Federation; The Nature Conservancy; Center for Renewables Integration; and Vote Solar, jointly the Conservation and Renewable Energy Coalition |
| Center for Biological Diversity | The Center for Biological Diversity |
| Ceres | Ceres |
| Certain TDUs | Alliant Energy Corporate Services, Inc.; Consumers Energy Company; and DTE Electric Company |
| Chemistry Council | American Chemistry Council |
| Citizens Energy | Citizens Energy Corporation |
| City of New Orleans Council | Council of the City of New Orleans |
| City of New York | City of New York |
| Clean Energy Associations | The American Clean Power Association; Alliance for Clean Energy-New York; Clean Grid Alliance; the Mid-Atlantic Renewable Energy Council Action; and the New York Offshore Wind Alliance, collectively Clean Energy Associations |
| Clean Energy Buyers | Clean Energy Buyers Association |
| Clean Energy States | Clean Energy States Alliance |
| Colorado Consumer Advocate | Colorado Office of the Utility Consumer Advocate |
| Competition Advocates | Niskanen Center; R Street Institute; Institute for Local Self Reliance; Public Citizen, Inc.; Center for Biological Diversity; and Open Markets Institute |
| Competition Coalition | Electricity Transmission Competition Coalition |
| Concerned Scientists | The Union of Concerned Scientists |
| Conservative Energy Network | Conservative Energy Network |
| Conservatives for Clean Energy – Florida | Conservatives for Clean Energy – Florida |
| Conservatives for Clean Energy – SC | Conservatives for Clean Energy - South Carolina |
| Consumer Organizations | NJ Charge, Inc.; Keryn Newman (Stop Path WV); Illinois Landowners Alliance; Block Grain Belt Express-Missouri; Citizens to Stop Transource - York; Coalition for Rural Property Rights; Eastern Missouri Landowners Alliance; Missouri Landowners Association; Protect Sudbury Inc.; Say No to |

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1254 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                          - 1244 -

| | |
|---|---|
| Cross Sector Representatives | NECEC; Stop B2H Coalition; Eastern Missouri Landowners Alliance; SOUL of Wisconsin; Block RICL; Matthew Stallbaumer; Vickie Husbands; Elena Guardincerri; Martha Peine; Kerry Beheler; Barron Shaw; and STOP Transource Power Lines MD, Inc. Ameren Transmission; Blue-Green Alliance; Consolidated Edison Company of New York, Inc.; Edison International; Exelon Corporation; Greater Warren County Economic Development Council; International Brotherhood of Electric Workers IBEW 1245; IBEW Illinois State Conference; IBEW International; IBEW Sixth District; ITC Holdings Corp.; National Audubon Society; Pacific Gas & Electric Co.; The Permitting Institute; Public Service Electric and Gas Company; WEG Transformers USA; and Xcel Energy |
| CTC Global | CTC Global Corporation |
| Cypress Creek | Cypress Creek Renewables, LLC |
| DATA | Ameren Services Company; Eversource Energy; Exelon Corporation; ITC Holdings Corp.; National Grid USA; Public Service Electric and Gas Company; and Xcel Energy; collectively Developers Advocating Transmission Advancements (DATA) |
| DC and MD Offices of People's Counsel | The Office of the People's Counsel for the District of Columbia and the Maryland Office of People's Counsel |
| Dominion | Dominion Energy Services, Inc |
| Duke | Duke Energy Corporation |
| Duquesne Light | Duquesne Light Company |
| EEI | Edison Electric Institute |
| ELCON | Electricity Consumers Resource Council |
| Enel | Enel North America, Inc. |
| ENGIE | ENGIE North America, Inc. |
| Entergy | Entergy Services, LLC |
| Environmental Groups | Advanced Energy United; American Clean Power Association; Clean Air Task Force; Earthjustice; Environmental Defense Fund; Evergreen Action; Fresh Energy; Interwest Energy Alliance; League of Conservation Voters; National Wildlife Federation; Natural Resources Defense Council; Northwest Energy Coalition; Rewiring America; Sierra Club; |

| | Southern Environmental Law Center; The Environmental Law & Policy Center; Union of Concerned Scientists; WE ACT for Environmental Justice; and Western Resource Advocates |
|---|---|
| Environmental Legislators Caucus | National Caucus of Environmental Legislators |
| EPSA | Electric Power Supply Association |
| Evergreen Action | Evergreen Action and 4,440 Individual Signers |
| Eversource | Eversource Energy Service Company |
| Exelon | Exelon Corporation |
| Fervo | Fervo Energy Company |
| Form Energy | Form Energy, Inc. |
| Freeport-McMoRan | Freeport-McMoRan, Inc. |
| Georgia Commission | Georgia Public Service Commission |
| Governor of Kansas Laura Kelly | Governor of the State of Kansas Laura Kelly |
| Grand Rapids NAACP | Greater Grand Rapids Chapter of The National Association for the Advancement of Colored People |
| Grid United | Grid United LLC |
| GridLab | GridLab |
| Handy Law | Seth Handy, Handy Law, LLC |
| Hannon Armstrong | Hannon Armstrong Sustainable Infrastructure Capital, Inc. |
| Harvard ELI | Harvard Electricity Law Initiative |
| Idaho Commission | The Idaho Public Utilities Commission |
| Idaho Power | Idaho Power Company |
| Illinois Commission | The Illinois Commerce Commission |
| Indiana Commission | Indiana Utility Regulatory Commission |
| Indicated PJM TOs | The Dayton Power and Light Company; Dominion Energy Services, Inc. on behalf of Virginia Electric and Power Company; Duke Energy Corporation on behalf of its affiliates Duke Energy Ohio, Inc., Duke Energy Kentucky, Inc., and Duke Energy Business Services LLC; Duquesne Light Company; East Kentucky Power Cooperative; Exelon Corporation; FirstEnergy Service Company, on behalf of its affiliates American Transmission Systems, Incorporated, Jersey Central Power & Light Company, Mid-Atlantic Interstate Transmission LLC, West Penn Power Company, The Potomac Edison Company, Monongahela Power Company, Keystone |

USCA4 Appeal: 24-1650     Doc: 224     Filed: 01/21/2025     Pg: 1256 of 2455
Document Accession #: 20240513-3036     Filed Date: 05/13/2024

Docket No. RM21-17-000                                              - 1246 -

| | |
|---|---|
| | Appalachian Transmission Company, and Trans-Allegheny Interstate Line Company; PPL Electric Utilities Corporation; Public Service Electric and Gas Company; Rockland Electric Company; and UGI Utilities Inc. |
| Indicated US Senators and Representatives | US Senators Tina Smith; Edward J. Markey; and Sheldon Whitehouse; US Representatives Kathy Castor; Bobby L. Rush; Paul Tonko; Sean Casten; Raja Krishnamoorthi; Jared Huffman; Veronica Escobar; and Julia Brownley |
| Industrial Customers | American Forest & Paper Association; the PJM Industrial Customer Coalition; and the Coalition of MISO Transmission Customers, collectively the Industrial Customer Organizations |
| Interwest | Interwest Energy Alliance |
| Invenergy | Invenergy Solar Development North America LLC; Invenergy Thermal Development LLC; Invenergy Wind Development North America LLC; and Invenergy Transmission LLC |
| Iowa Commission | Iowa Utilities Board |
| ISO/RTO Council | The ISO/RTO Council |
| ISO-NE | ISO New England Inc. |
| ITC | International Transmission Company; Michigan Electric Transmission Company, LLC; ITC Midwest LLC; and ITC Great Plains, LLC |
| Joint Commenters | American Public Power Association; Electricity Consumers Resource Council; Indiana Office of Utility Consumer Counselor; Large Public Power Council; National Association of State Utility Consumer Advocates; Office of People's Counsel for the District of Columbia; Public Advocate for the State of Delaware; and Solar Energy Industries Association |
| Joint Consumer Advocates | Iowa Office of Consumer Advocate and Indiana Office of Utility Consumer Counselor |
| Kansas Commission | Kansas Corporation Commission |
| Kansas Commission Chair Keen | Kansas Corporation Commission Chairman Dwight D. Keen |
| Kansas Ratepayers Advocates | Kansas Industrial Consumers Group, Inc. and Kansans for Lower Electric Rates, Inc. |
| Kentucky Commission Chair Chandler | Kentucky Public Service Commission Chairman and |

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1257 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                    - 1247 -

|  | Commissioner Kent A. Chandler |
|---|---|
| LADWP | Los Angeles Department of Water & Power |
| Large Energy Customers | Akamai Technologies, Inc.; Amazon.com, Inc.; Amy's Kitchen, Inc.; Apple, Inc.; Applied Materials, Inc.; ARC Homes; Atlassian Corporation; Autodesk, Inc.; BASF Corporation; Best Buy Co., Inc.; Brookfield Properties; Budderfly, Inc.; Build Efficiently, LLC.; Cargill, Inc.; Clean Energy Buyers Association; Eastman Chemical Company; eBay, Inc.; Equinix, Inc.; Freeport-McMoRan, Inc.; General Motors LLC; Google LLC; Green Impact Technologies; Hewlett Packard Enterprise Company; Humanscale Corporation; IHG Hotels & Resorts; Marriott International, Inc.; Mars, Inc.; Meta Platforms, Inc.; Microsoft Corporation; Monarch Energy; Nike, Inc.; Nucor Corporation; Oatly Group AB; PepsiCo, Inc.; Prologis, Inc.; Rivian Automotive, Inc.; Saint-Gobain North America; Salesforce, Inc.; Schneider Electric SE; Target Corporation; Thermo Fisher Scientific, Inc.; The STAAC Group; LLC., Walmart, Inc.; Workday, Inc.; and World Energy, LLC. |
| Large Public Power | The Large Public Power Council |
| Louisiana Commission | Louisiana Public Service Commission |
| LS Power | LS Power Grid, LLC |
| Maine Public Advocate | The Maine Office of the Public Advocate |
| Maryland Energy Administration | Maryland Energy Administration |
| Massachusetts Attorney General | Massachusetts Attorney General Maura Healey |
| Michigan Commission | Michigan Public Service Commission |
| Michigan Conservative Energy Forum | Michigan Conservative Energy Forum |
| Michigan State Entities | Michigan Attorney General and the Citizens Utility Board of Michigan |
| Microgrid Resources | Microgrid Resources Coalition |
| Middle River Power | Middle River Power LLC |
| Minnesota State Entities | The Minnesota Public Utilities Commission and The Minnesota Department of Commerce |
| MISO | Midcontinent Independent System Operator, Inc. |
| MISO Coops | The Coalition of MISO Generation and Transmission Cooperatives |
| MISO TOs | Ameren Services Company, as agent for Union |

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1258 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                    - 1248 -

|  | Electric Company, Ameren Illinois Company, and Ameren Transmission Company of Illinois; American Transmission Company LLC; Big Rivers Electric Corporation; Central Minnesota Municipal Power Agency; City Water, Light & Power (Springfield, IL); Cleco Power LLC; Cooperative Energy; Dairyland Power Cooperative; Duke Energy Business Services, LLC for Duke Energy Indiana, LLC; East Texas Electric Cooperative; Great River Energy; Hoosier Energy Rural Electric Cooperative, Inc.; Indiana Municipal Power Agency; Indianapolis Power & Light Company; International Transmission Company; ITC Midwest LLC; Lafayette Utilities System; Michigan Electric Transmission Company, LLC; MidAmerican Energy Company; Minnesota Power (and its subsidiary Superior Water, L&P); Montana-Dakota Utilities Co.; Northern Indiana Public Service Company LLC; Northern States Power Company, a Minnesota corporation, and Northern States Power Company, a Wisconsin corporation, subsidiaries of Xcel Energy Inc.; Northwestern Wisconsin Electric Company; Otter Tail Power Company; Prairie Power, Inc.; Southern Illinois Power Cooperative; Southern Indiana Gas & Electric Company; Southern Minnesota Municipal Power Agency; Wabash Valley Power Association, Inc.; and Wolverine Power Supply Cooperative, Inc. |
|---|---|
| Mississippi Commission | The Mississippi Public Service Commission |
| Montana QF Developers | Clēnera, LLC and Greenfields Irrigation District |
| Montclair Congregation | 40 Undersigned Congregants of Montclair Presbyterian Church |
| NARUC | The National Association of Regulatory Utility Commissioners |
| NASEO | The National Association of State Energy Officials |
| NASUCA | The National Association of State Utility Consumer Advocates |
| National and State Conservation Organizations | National Wildlife Federation; Conservation Coalition of Oklahoma; Environment Council of Rhode Island; Environmental League of Massachusetts; Idaho Wildlife Federation; Iowa Wildlife Federation; Kentucky Waterways Alliance; Natural Resources Council of Maine; Nevada Wildlife Federation; New |

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1259 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                              - 1249 -

| | Jersey Audubon; Southeast Alaska Conservation Council; Texas Conservation Alliance; Utah Wildlife Federation; WV Rivers Coalition; and Wyoming Wildlife Federation |
|---|---|
| National Grid | National Grid Plc |
| Nebraska Commission | The Nebraska Power Review Board |
| NEMA | National Electrical Manufacturers Association |
| NEPOOL | The New England Power Pool Participants Committee |
| NERC | North American Electric Reliability Corporation; Midwest Reliability Organization; Northeast Power Coordinating Council, Inc.; ReliabilityFirst Corporation; SERC Reliability Corporation, Texas Reliability Entity, Inc., and Western Electricity Coordinating Council |
| NESCOE | The New England States Committee on Electricity |
| Nevada Commission | The Public Utilities Commission of Nevada |
| New England for Offshore Wind | New England for Offshore Wind |
| New England Systems | Belmont Municipal Light Department; Block Island Utility District; Braintree Electric Light Department; Chicopee Municipal Light Department; Georgetown Municipal Light Department; Hingham Municipal Lighting Plant; Littleton Electric Light & Water Department; Middleborough Gas & Electric Department; Middleton Electric Light Department; North Attleborough Electric Department; Norwood Municipal Light Department; Pascoag Utility District; Reading Municipal Light Department; Stowe Electric Department; Taunton Municipal Lighting Plant; Wallingford Electric Division; and Westfield Gas & Electric Light Department |
| New Jersey Commission | The New Jersey Board of Public Utilities |
| New Mexico RETA | The New Mexico Renewable Energy Transmission Authority |
| New York Commission and NYSERDA | New York Public Service Commission and New York State Energy Research and Development Authority |
| New York State Department | New York State Department of State Utility Intervention Unit |
| New York TOs | Central Hudson Gas & Electric Corporation; Consolidated Edison Company of New York, Inc.; |

Docket No. RM21-17-000                                                    - 1250 -

| | Niagara Mohawk Power Corporation; New York Power Authority; New York State Electric & Gas Corporation; Orange and Rockland Utilities, Inc.; Long Island Power Authority; and Rochester Gas and Electric Corporation |
|---|---|
| New York Transco | New York Transco, LLC |
| NextEra | NextEra Energy, Inc |
| Non-RTO NASUCA | North Carolina Utilities Commission Public Staff; the Utah Office of Consumer Service; the South Carolina Office of Regulatory Staff; and the Wyoming Office of Consumer Advocate |
| North Carolina Commission and Staff | The North Carolina Utilities Commission and the North Carolina Utilities Commission Public Staff |
| North Dakota Commission | North Dakota Public Service Commission Public Utilities Division |
| Northwest and Intermountain | Northwest & Intermountain Power Producers Coalition |
| NRECA | National Rural Electric Cooperative Association |
| NRG | NRG Energy, Inc |
| NYISO | New York Independent System Operator, Inc. |
| NYPA | New York Power Authority |
| Ohio Commission Federal Advocate | The Public Utilities Commission of Ohio's Office of the Federal Energy Advocate |
| Ohio Conservative Energy Forum | Ohio Conservative Energy Forum |
| Ohio Consumers | Office of The Ohio Consumers' Counsel |
| Omaha Public Power | The Omaha Public Power District |
| OMS | The Organization of Midcontinent Independent System Operator States, Inc. |
| Onward Energy | Onward Energy Holdings, LLC |
| Ørsted | Ørsted North America |
| Pacific Northwest State Agencies | The Washington Utilities and Transportation Commission; Oregon Public Utility Commission; Washington State Department Of Commerce; and Oregon Department Of Energy |
| Pacific Northwest Utilities | Avista Corporation; Portland General Electric; Puget Sound Energy, Inc.; and Tacoma Power |
| PacifiCorp and NV Energy | PacifiCorp; Nevada Power Company and Sierra Pacific Power Company (together, NV Energy) |
| Pattern Energy | Pattern Energy Group LP |
| Payton Alaama | Payton Alaama |

Docket No. RM21-17-000                                          - 1251 -

| | |
|---|---|
| Pennsylvania Commission | The Pennsylvania Public Utility Commission |
| PG&E | Pacific Gas and Electric Company |
| Pine Gate | Pine Gate Renewables, LLC |
| PIOs | Sustainable FERC Project; Natural Resources Defense Council; Sierra Club; Environmental Defense Fund; Southern Environmental Law Center; Conservation Law Foundation; Western Resource Advocates; Acadia Center; NW Energy Coalition; Southface Institute; and Fresh Energy, jointly Public Interest Organizations |
| PJM | PJM Interconnection, L.L.C. |
| PJM Market Monitor | The Independent Market Monitor of PJM Interconnection, L.L.C. |
| PJM States | The Organization of PJM States, Inc. (OPSI) |
| Policy Integrity | The Institute for Policy Integrity at New York University School of Law |
| Potomac Economics | Potomac Economics, Ltd. |
| PPL | PPL Electric Utilities Corporation; Louisville Gas & Electric and Kentucky Utilities (collectively LG&E/KU); and The Narragansett Electric Company |
| Prysmian | The Prysmian Group |
| Public Systems | Massachusetts Municipal Wholesale Electric Company; New Hampshire Electric Cooperative, Inc.; Connecticut Municipal Electric Energy Cooperative; and Vermont Public Power Supply Authority |
| QCo | QCoefficient, Inc. |
| R Street | R Street Institute |
| Rail Electrification | The Rail Electrification Council |
| Renewable Northwest | Renewable Northwest |
| Resale Iowa | Resale Power Group of Iowa |
| RMI | RMI |
| SDG&E | San Diego Gas & Electric Company |
| SEIA | The Solar Energy Industries Association |
| SEPA | The Smart Electric Power Alliance |
| SERTP Sponsors | Associated Electric Cooperative, Inc.; Dalton Utilities; Duke Energy Carolinas, LLC and Duke Energy Progress, LLC; Georgia Transmission Corporation; Louisville Gas and Electric Company and Kentucky Utilities Company; the Municipal |

Docket No. RM21-17-000                                    - 1252 -

| | Electric Authority of Georgia; PowerSouth Energy Cooperative; Southern Company Services, Inc., acting as agent for Alabama Power Company, Georgia Power Company, and Mississippi Power Company; the Tennessee Valley Authority; and Gulf Power Company, collectively Sponsors of the Southeastern Regional Transmission Planning Process (SERTP) |
|---|---|
| Shell | Shell Energy North America (US), L.P.; Shell New Energies US, LLC; and Savion L.L.C. |
| Signatories | American Council on Renewable Energy; Americans for a Clean Energy Grid; American Clean Power Association; AES Corporation; Advance Energy Economy; Center for Rural Affairs; Clean Air Task Force; Clean Energy Buyers Alliance; Conservative Energy Network; ConEd Transmission, Inc.; Enel North America, Inc.; Exelon Corporation; GE Renewables; Grid United LLC; Google; Holy Cross Energy; Invenergy; ITC Holdings Corp.; Land & Liberty Coalition; Macro Grid Initiative; National Audubon Society; National Electrical Manufacturer Association; National Wildlife Federation; Natural Resources Defense Council; NextEra Energy, Inc.; Northwest & Intermountain Power Producers Coalition; Pattern Energy; Rail Electrification Council; Rocky Mountain Institute (RMI); Sierra Club; Solar Energy Industries of America; and Southern Renewable Energy Association |
| Six Cities | The Cities of Anaheim, Azusa, Banning, Colton, Pasadena, and Riverside, California |
| Smart Wires | Smart Wires |
| SoCal Edison | Southern California Edison Company |
| Southeast PIOs | Southern Environmental Law Center; Energy Alabama; North Carolina Sustainable Energy Association; South Carolina Coastal Conservation League; Southface Energy Institute; and Southern Alliance for Clean Energy, jointly Southeast Public Interest Groups |
| Southern | Southern Company Services, Inc. |
| Southwester Power Group | Southwestern Power Group |
| SPP | Southwest Power Pool Inc. |

| SPP Market Monitor | The Southwest Power Pool Market Monitoring Unit |
| SREA | Southern Renewable Energy Association |
| State Agencies | Connecticut Department of Energy and Environmental Protection; Connecticut Attorney General; Connecticut Office of Consumer Counsel; Connecticut Public Utilities Regulatory Authority; California Energy Commission; Delaware Division of the Public Advocate; Attorney General of the District of Columbia; Maine Office of the Public Advocate; Maryland Attorney General; Massachusetts Attorney General; Michigan Attorney General; Pennsylvania Office of The Consumer Advocate; and the Rhode Island Attorney General |
| State of Tennessee | State of Tennessee |
| State Officials | Maine Governor's Energy Office; Washington State Department of Commerce; Arizona Governor's Office of Resiliency; California Natural Resources Agency; Colorado Energy Office; Deputy Governor of Illinois; Maryland Energy Administration; Michigan Department of Environment, Great Lakes, and Energy; New Mexico Energy Minerals and Natural Resources Department; Office of New York Governor Kathy Hochul; and Office of North Carolina Governor Roy Cooper |
| State Water Contractors | State Water Contractors |
| Tabors Caramanis Rudkevich | Tabors Caramanis & Rudkevich |
| TANC | Transmission Agency of Northern California |
| TAPS | Transmission Access Policy Study Group |
| Transmission Dependent Utilities | Golden Spread Electric Cooperative, Inc.; North Carolina Electric Membership Corporation; and Seminole Electric Cooperative, Inc., collectively, Transmission Dependent Utility Systems |
| Transource | Transource Energy, LLC |
| Undersigned States [Initial Comments] | Utah Attorney General; Alaska Attorney General; Georgia Attorney General; Idaho Attorney General; Indiana Attorney General; Kansas Attorney General; Kentucky Attorney General; Louisiana Attorney General; Mississippi Attorney General; Montana Attorney General; Nebraska Attorney General; North Dakota Attorney General; Ohio Attorney General; Oklahoma Attorney General; South Carolina |

Docket No. RM21-17-000                                        - 1254 -

| | Attorney General; Texas Attorney General; West Virginia Attorney General; and Wyoming Attorney General |
|---|---|
| Undersigned States [Reply Comments] | Utah Attorney General; Alabama Attorney General; Alaska Attorney General; Arkansas Attorney General; Florida Attorney General; Georgia Attorney General; Kansas Attorney General; Kentucky Attorney General; Louisiana Attorney General; Mississippi Attorney General; Montana Attorney General; Nebraska Attorney General; Ohio Attorney General; Oklahoma Attorney General; South Carolina Attorney General; Texas Attorney General; and West Virginia Attorney General |
| US Chamber of Commerce | U.S. Chamber of Commerce |
| US Climate Alliance | United States Climate Alliance |
| US Democratic Representatives | US Representatives Paul D. Tonko and 112 additional US Representatives |
| US DOE | United States Department of Energy |
| US DOJ and FTC | United States Department of Justice and the Federal Trade Commission |
| US House Republicans | US Representatives Andrew R. Garbarino; Anthony D'Espositio; Nicholas A. Langworthy; and Brandon Williams |
| US Senator Barrasso | US Senator John Barrasso |
| US Senator Heinrich | US Senator Martin Heinrich |
| US Senators | US Senators Martin Heinrich; Edward J. Markey; Peter Welch; John Hickenlooper; Angus S. King, Jr.; Ron Wyden; Robert P. Casey, Jr.; Sheldon Whitehouse; Tina Smith; Ben Ray Luján; Chris Van Hollen; Mazie K. Hirono; Jeffrey A. Merkley; Brian Schatz; Thomas R. Carper; Bernard Sanders; Patty Murray; John Fetterman; Michael F. Bennet; Elizabeth Warren; and Alex Padilla |
| US Senators Heinrich and Lee | US Senators Martin Heinrich and Mike Lee |
| US Senators Hickenlooper and King | US Senators John Hickenlooper and Angus S. King, Jr. |
| US Senator Schumer | US Senator Charles E. Schumer |
| US Senator Whitehouse | US Senator Sheldon Whitehouse |
| Utah Commission | The Utah Public Service Commission |
| Utah Division of Public Utilities | Utah Department of Commerce, Division of Public Utilities |

| | |
|---|---|
| VEIR | VEIR Inc. |
| Vermont Electric and Vermont Transco | Vermont Electric Power Company, Inc., and Vermont Transco LLC |
| Vermont State Entities | The Vermont Public Utility Commission and the Vermont Department of Public Service |
| Virginia Attorney General | Virginia Office of the Attorney General, Division of Consumer Counsel |
| Virginia Commission Staff | The Staff of the Virginia State Corporation Commission |
| Vistra | Vistra Corp. |
| WATT Coalition | The Working for Advanced Transmission Technologies (WATT) Coalition |
| WE ACT | WE ACT for Environmental Justice |
| West Virginia Commission | The Public Service Commission of West Virginia |
| Western PIOs | Center for Energy Efficiency and Renewable Technologies; NW Energy Coalition; Western Resource Advocates; and Renewable Northwest; collectively, Western Public Interest Organizations |
| Western State Representatives | Agency Representatives from the states of Arizona; California; Idaho; Montana; Nevada; Oregon; South Dakota; Utah; Washington; and Wyoming |
| Western Way Colorado | Western Way Colorado |
| Western Way Nevada | Western Way Nevada |
| Western Way Utah | Western Way Utah |
| Wildlife Federation Action Fund Supporters | 8,610 Supporters of the National Wildlife Federation Action Fund |
| WIRES | WIRES |
| Wisconsin Conservative Energy Forum | Wisconsin Conservative Energy Forum |
| Wisconsin Legislators | Wisconsin State Senator Julian Bradley and Wisconsin State Representative David Steffen |
| Wisconsin Senator Cowles | Wisconsin State Senator Robert L. Cowles |
| Xcel | Xcel Energy Services Inc. |

USCA4 Appeal: 24-1650     Doc: 224     Filed: 01/21/2025     Pg: 1266 of 2455
Document Accession #: 20240513-3036     Filed Date: 05/13/2024

**Appendix B:  *Pro Forma* Open Access Transmission Tariff Attachment K**

Note: Proposed deletions are in brackets and proposed additions are in italics.

**ATTACHMENT K**

**Transmission Planning Process**

**Local Transmission Planning**

The Transmission Provider shall establish a coordinated, open, and transparent *local transmission* planning process with its Network and Firm Point-to-Point Transmission Customers and other interested parties to ensure that the Transmission System is planned to meet the needs of both the Transmission Provider and its Network and Firm Point-to-Point Transmission Customers on a comparable and not unduly discriminatory basis.  The Transmission Provider's coordinated, open, and transparent *local transmission* planning process shall be provided as an attachment to the Transmission Provider's Tariff.  The Transmission Provider's *local transmission* planning process shall *provide stakeholders with meaningful opportunities to participate and provide feedback, and shall* satisfy the following nine principles, as defined in Order No. 890:  coordination, openness, transparency, information exchange, comparability, dispute resolution, regional participation, economic planning studies, and cost allocation for new *transmission* projects.  The *local transmission* planning process also shall include the procedures and mechanisms for considering transmission needs driven by Public Policy Requirements consistent with Order No. 1000.  The *local transmission* planning process also shall provide a mechanism for the recovery and allocation of *transmission*

planning costs consistent with Order No. 890. The description of the Transmission

Provider's *local transmission* planning process must include sufficient detail to enable

Transmission Customers to understand:

(i)     The process for consulting with customers;

(ii)    The notice procedures and anticipated frequency of meetings;

(iii)   The methodology, criteria, and processes used to develop a transmission plan;

(iv)    The method of disclosure of criteria, assumptions, and data underlying a

transmission plan;

(v)     The obligations of and methods for Transmission Customers to submit data to the

Transmission Provider;

(vi)    The dispute resolution process;

(vii)   The Transmission Provider's study procedures for economic upgrades to address

congestion or the integration of new resources;

(viii)  The Transmission Provider's procedures and mechanisms for considering

transmission needs driven by Public Policy Requirements, consistent with Order

No. 1000; and

(ix)    The relevant cost allocation method or methods.

**Regional Transmission Planning**

The Transmission Provider shall participate in a regional transmission planning

Docket No. RM21-17-000                                                        - 1258 -

process through which transmission facilities and non-transmission alternatives may be proposed and evaluated.  The regional transmission planning process also shall develop a regional transmission plan that identifies the transmission facilities necessary to meet the needs of transmission providers and transmission customers in the transmission planning region.  The regional transmission planning process must be consistent with the provision of Commission-jurisdictional services at rates, terms, and conditions that are just and reasonable and not unduly discriminatory or preferential, as described in Order No*s*. 1000 *and 1920*.  The regional transmission planning process shall be described in an attachment to the Transmission Provider's Tariff.

The Transmission Provider's regional transmission planning process shall satisfy the following seven principles, as [set out and explained]*established* in Order Nos. 890 and 1000:  coordination, openness, transparency, information exchange, comparability, dispute resolution, and economic planning studies.  The *description of the* regional transmission planning process *in the Tariff* also shall include the procedures and mechanisms for considering transmission needs driven by Public Policy Requirements, consistent with Order No. 1000.  The regional transmission planning process shall provide a mechanism for the recovery and allocation of "*transmission* planning costs" consistent with Order No*s*. 890 and *1000*.

The regional transmission planning process shall include a clear enrollment process for public and non-public utility transmission providers that make the choice to become part of a transmission planning region.  The regional transmission planning

Docket No. RM21-17-000                                              - 1259 -

process shall be clear that enrollment will subject enrollees to cost allocation if they are found to be beneficiaries of new transmission facilities selected in the regional transmission plan for purposes of cost allocation. Each Transmission Provider shall maintain a list of enrolled entities in the Transmission Provider's Tariff.

*The regional transmission planning process must include at least three stakeholder meetings concerning the local transmission planning process of each Transmission Provider that is a member of the transmission planning region. The three meetings must occur before each Transmission Provider's local transmission planning information can be incorporated into the transmission planning region's transmission planning models. The three stakeholder meetings for local transmission planning information are the Assumptions Meeting, the Needs Meeting, and the Solutions Meeting, and the three stakeholder meetings must meet the requirements in Order No. 1920.*

*As part of the regional transmission planning process, the Transmission Providers in each transmission planning region shall conduct Long-Term Regional Transmission Planning, meaning regional transmission planning on a sufficiently long-term, forward-looking, and comprehensive basis to identify Long-Term Transmission Needs, identify transmission facilities that meet such needs, measure the benefits of those transmission facilities, and evaluate those transmission facilities for potential selection in the regional transmission plan for purposes of cost allocation as the more efficient or cost-effective regional transmission facilities to meet Long-Term Transmission Needs. As part of this Long-Term Regional Transmission Planning, the Transmission Providers in each*

*transmission planning region shall meet the requirements set forth in Order No. 1920,*

*including: (1) identifying Long-Term Transmission Needs and Long-Term Regional*

*Transmission Facilities to meet those needs through the development of Long-Term*

*Scenarios that satisfy the requirements set forth in Order No. 1920; (2) measuring the*

*required seven benefits consistent with the requirements set forth in Order No. 1920;*

*(3) using the measured benefits to evaluate Long-Term Regional Transmission Facilities;*

*and (4) using selection criteria consistent with the requirements set forth in Order No.*

*1920 that provide the opportunity for Transmission Providers to select Long-Term*

*Regional Transmission Facilities in the regional transmission plan for purposes of cost*

*allocation that more efficiently or cost-effectively address Long-Term Transmission*

*Needs.*

*The process through which the Transmission Providers in each transmission*

*planning region develop Long-Term Scenarios must comply with the following six*

*transmission planning principles established in Order No. 890: coordination; openness;*

*transparency; information exchange; comparability; and dispute resolution. The*

*Transmission Providers in each transmission planning region shall outline in their*

*Tariffs an open and transparent process that provides stakeholders, including states, with*

*a meaningful opportunity to propose potential factors and to provide input on how to*

*account for specific factors in the development of Long-Term Scenarios. The*

*Transmission Providers in each transmission planning region shall also outline in their*

*Tariffs an open and transparent process that provides stakeholders, including states, with*

*a meaningful opportunity to propose which future outcomes are probable and can be*

USCA4 Appeal: 24-1650   Doc: 224   Filed: 01/21/2025   Pg: 1271 of 2455
Document Accession #: 20240513-3036   Filed Date: 05/13/2024

*captured through assumptions made in the development of Long-Term Scenarios.*

*The Transmission Providers in each transmission planning region shall include in their Tariffs a general description of how they will measure each of the seven required benefits used to evaluate Long-Term Regional Transmission Facilities. The Transmission Providers in each transmission planning region shall measure and use the seven benefits, as described in Order No. 1920, in Long-Term Regional Transmission Planning.*

*As part of Long-Term Regional Transmission Planning, the Transmission Providers in each transmission planning region shall include in their Tariffs an evaluation process, including selection criteria, that: (1) is transparent and not unduly discriminatory; (2) aims to ensure that more efficient or cost-effective transmission facilities are selected in the regional transmission plan for purposes of cost allocation; (3) seeks to maximize benefits accounting for costs over time without over-building transmission facilities; and (4) otherwise satisfies the requirements set forth in Order No. 1920.*

*The Transmission Providers in each transmission planning region shall include in their Tariffs one or more Long-Term Regional Transmission Cost Allocation Methods, which is an ex ante regional cost allocation method for one or more Long-Term Regional Transmission Facilities (or portfolio of such Facilities) that are selected in the regional transmission plan for purposes of cost allocation and that complies with the requirements set forth in Order No. 1920. The Transmission Providers in each transmission planning*

USCA4 Appeal: 24-1650   Doc: 224   Filed: 01/21/2025   Pg: 1272 of 2455
Document Accession #: 20240513-3036   Filed Date: 05/13/2024

*region may also, subject to (1) the agreement of Relevant State Entities and (2) Commission acceptance, include in their Tariffs a State Agreement Process. A State Agreement Process is a process by which one or more Relevant State Entities may voluntarily agree to a cost allocation method for Long-Term Regional Transmission Facilities (or a portfolio of such Facilities) either before or no later than six months after the facilities are selected in the regional transmission plan for purposes of cost allocation. The Tariff must describe how the State Agreement Process will result in a cost allocation being filed, including which entities can participate in the State Agreement Process; what constitutes an agreement on cost allocation in that process; how agreement is communicated to the transmission provider; and the circumstances under which, or the information necessary for, a transmission provider to file or to consider filing the agreed cost allocation.*

*As part of evaluating new regional transmission facilities, as well as upgrades to existing transmission facilities, the Transmission Providers in each transmission planning region shall consider in all of their regional transmission planning and cost allocation processes whether selecting transmission facilities that incorporate the following technologies would be more efficient or cost-effective than selecting new regional transmission facilities or upgrades to existing transmission facilities that do not incorporate these technologies: dynamic line ratings, as defined in 18 CFR § 35.28(b)(14), advanced power flow control devices, advanced conductors, and/or transmission switching. Specifically, such consideration must include both: (1) whether incorporating dynamic line ratings, advanced power flow control devices, advanced*

*conductors, and/or transmission switching into existing transmission facilities could meet the same regional transmission need more efficiently or cost-effectively than other potential transmission facilities; and (2) when evaluating transmission facilities for potential selection in the regional transmission plan for purposes of cost allocation, whether incorporating dynamic line ratings, advanced power flow control devices, advanced conductors, and/or transmission switching as part of any potential regional transmission facility would be more efficient or cost-effective. Transmission providers must evaluate the benefits of incorporating the enumerated alternative transmission technologies into Long-Term Regional Transmission Facilities in a manner consistent with the requirements in the Evaluation of Benefits of Regional Transmission Facilities and Evaluation and Selection of Long-Term Regional Transmission Facilities sections of Order No. 1920.*

*The Transmission Providers in each transmission planning region shall evaluate for potential selection in the regional transmission plan for purposes of cost allocation regional transmission facilities that address interconnection-related transmission needs originally identified through the generator interconnection process. This requirement applies in the existing Order No. 1000 regional transmission planning processes. The Transmission Providers must modify their Tariffs to include these requirements. The interconnection-related transmission needs that Transmission Providers must evaluate in the existing Order No. 1000 regional transmission planning process are those for which:*

*(1) Transmission Providers in the transmission planning region have identified the relevant interconnection-related transmission need in interconnection studies*

Docket No. RM21-17-000 - 1264 -

*in at least two interconnection queue cycles during the preceding five years (looking back from the effective date of the accepted tariff provisions proposed to comply with this reform in Order No. 1920, and the later-in-time withdrawn interconnection request occurring after the effective date of the accepted tariff provisions);*

*(2) the interconnection-related Network Upgrade identified through the generator interconnection process to meet the relevant interconnection-related transmission need has a voltage of at least 200 kV and an estimated cost of at least $30 million;*

*(3) the interconnection-related Network Upgrade identified through the generator interconnection process to meet the relevant interconnection-related transmission need is not currently planned to be developed because the interconnection request(s) that led to the identification of the interconnection-related transmission need has been withdrawn; and*

*(4) the Transmission Providers have not identified a different interconnection-related Network Upgrade to meet the relevant interconnection-related transmission need in an executed Generator Interconnection Agreement or in a Generator Interconnection Agreement that the interconnection customer requested that the Transmission Provider file unexecuted with the Commission.*

The description of the regional transmission planning process must include sufficient detail to enable Transmission Customers to understand:

(i)      The process for enrollment in the regional transmission planning process;

(ii)     The process for consulting with customers;

(iii)    The notice procedures and anticipated frequency of meetings;

(iv)    The methodology, criteria, and processes used to develop a transmission plan;

(v)     The method of disclosure of criteria, assumptions, and data underlying a

         transmission plan;

(vi)    The obligations of and methods for transmission customers to submit data;

(vii)   The process for submission of data by nonincumbent developers of transmission

         projects that wish to participate in the *regional* transmission planning process and

         seek regional cost allocation;

(viii)  The process for submission of data by merchant transmission developers that wish

         to participate in the *regional* transmission planning process;

(ix)    The dispute resolution process;

(x)     The study procedures for economic upgrades to address congestion or the
         integration of new resources; *and*

         [The procedures and mechanisms for considering transmission needs driven by
         Public Policy Requirements, consistent with Order Nos. 1000; and]

(xi)    The relevant cost allocation method or methods.

The regional transmission planning process must include [a ]cost allocation method*s* [or

methods ]that satisfy the [six regional cost allocation principles]*requirements* set forth in

Docket No. RM21-17-000                                                    - 1266 -

Order No*s*. 1000 *and 1920*.

**Identifying Potential Opportunities to Right-Size Replacement Transmission Facilities**

As part of each Long-Term Regional Transmission Planning cycle, Transmission Providers in each transmission planning region shall evaluate whether transmission facilities operating at or above a voltage threshold not to exceed 200 kV that an individual Transmission Provider that owns the transmission facility anticipates replacing in-kind with a new transmission facility during the next 10 years can be "right-sized" to more efficiently or cost-effectively address Long-Term Transmission Needs, as discussed in Order No. 1920. The process to identify potential opportunities to right-size replacement transmission facilities must follow the process outlined in Order No. 1920. The Transmission Providers in each transmission planning region shall include in their Tariffs a cost allocation method for right-sized replacement transmission facilities that are selected in the regional transmission plan for purposes of cost allocation.

## Interregional Transmission Coordination

The Transmission Provider, through its regional transmission planning process, must coordinate with the public utility transmission providers in each neighboring transmission planning region within its interconnection to address transmission planning coordination issues related to interregional transmission facilities. The interregional transmission coordination procedures must include a detailed description of the process for coordination between public utility transmission providers in neighboring transmission planning regions (i) with respect to each interregional transmission facility that is proposed to be located in both transmission planning regions and (ii) to identify possible interregional transmission facilities that could address transmission needs more efficiently or cost-effectively than separate regional transmission facilities. The interregional transmission coordination procedures shall be described in an attachment to the Transmission Provider's Tariff.

The Transmission Provider must ensure that the following requirements are included in any applicable interregional transmission coordination procedures:

(1) A commitment to coordinate and share the results of each transmission planning region's regional transmission plans *(including information regarding the Long-Term Transmission Needs and potential transmission facilities to meet those needs)* to identify possible interregional transmission facilities that could address transmission needs more efficiently or cost-effectively than separate regional transmission facilities, as well as a procedure for doing so;

(2) A formal procedure to identify and jointly evaluate transmission facilities that are

proposed to be located in both transmission planning regions, *including those that may be more efficient or cost-effective transmission solutions to Long-Term Transmission Needs*;

(3) An agreement to exchange, at least annually, planning data and information; and

(4) A commitment to maintain a website or e-mail list for the communication of information related to the coordinated planning process, *including:*

> *(a) the Long-Term Transmission Needs discussed in the interregional transmission coordination meetings;*

> *(b) any interregional transmission facilities proposed or identified in response to the Long-Term Transmission Needs;*

> *(c) the voltage level, estimated cost, and estimated in-service date of the interregional transmission facilities proposed or identified as part of Long-Term Regional Transmission Planning;*

> *(d) the results of any cost-benefit evaluation of such interregional transmission facilities, with results including both any overall benefits identified, as well as any benefits particular to each transmission planning region; and*

> *(e) the interregional transmission facilities, if any, selected in the regional transmission plan for purposes of cost allocation to meet Long-Term Transmission Needs.*

The Transmission Provider must work with transmission providers located in neighboring transmission planning regions to develop a mutually agreeable method or methods for allocating between the two transmission planning regions the costs of a new interregional transmission facility that is located within both transmission planning

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1279 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

regions. Such cost allocation method or methods must satisfy the six interregional cost

allocation principles set forth in Order No. 1000 and must be included in the

Transmission Provider's Tariff.

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Building for the Future Through Electric Regional            Docket No.  RM21-17-000
Transmission Planning and Cost Allocation

(Issued May 13, 2024)

PHILLIPS, Chairman, CLEMENTS, Commissioner, *concurring*:

1.      The electric transmission grid is the backbone of the American economy and
essential to the national security of our country.  The mission of this agency is to ensure
reliable, safe, secure, and economically efficient energy for consumers at a reasonable
cost.  Ensuring we have a robust, well-planned electric transmission grid is the single
most important step that this Commission can take to fulfill that statutory mandate.  It is a
*reliability imperative*.  The transmission grid ultimately allows consumers to have access
to the electricity they need—when they need it—to power their homes and businesses.  It
is equally an *affordability imperative*.  The transmission grid gives those same consumers
access to diverse, low-cost sources of electricity that help ensure energy bills remain just
and reasonable.  All told, a strong electric transmission grid is the foundation for how this
Commission meets its most important statutory responsibilities under the Federal Power
Act (FPA).

2.      That has never been more true than it is today.  We are in the midst of a pivotal
moment for the electricity system.  As a nation, we are seeing unprecedented demands on
the grid from extreme weather, increasing and rapidly changing patterns of electricity
use, and fundamental shifts in the resource mix.  And there is every reason to believe
those trends will continue, and, indeed, accelerate, in the years ahead.

3.      At the same time, our transmission grid is old.  More than 70 percent of the grid
was built over 25 years ago and much of it was put into service in the 1960s and 1970s,
when this agency was still the Federal Power Commission.  Our country cannot meet the
challenges of today, let alone tomorrow, with yesterday's transmission system.  And
being unprepared to meet those increased demands jeopardizes the safety and security of
our grid.  Nevertheless, as a country, we have so far failed to make the investments in the
types of transmission facilities needed to ensure continued reliability and affordability at
anywhere near the scale or speed needed to meet this pivotal moment.

4.      The cost of continued inaction is immeasurable.  Failure to act now would hamper
the reliability and resilience of our electric grid while leaving customers holding the bag
for the inevitably more costly upgrades in the future.  Indeed, under the status quo, with
its de facto emphasis on the piecemeal, just-in-time development of the grid to meet near-
term reliability and economic needs, customers are being forced to fund investments that

Docket No. RM21-17-000                                                    - 2 -

could have been more beneficial, less costly, or both had they been better planned from the start. That result undermines our economy and leaves customers less safe and secure, with enormous costs for both our grid and our country.

5.      Avoiding those costs requires a forward-looking, comprehensive, and holistic transmission planning and cost allocation framework. That framework must consider the diverse challenges facing the transmission grid, identify the solutions that will address those challenges, and ensure only customers who benefit from those facilities pay their share of the cost, while ensuring that customers who do not benefit do not pay. Period.

6.      We must conduct this planning and cost allocation on a regional basis and with an aperture consistent with the scope and scale of the challenges we face. That is, after all, why Congress enacted Title II of the FPA: To provide a coherent regional and national regulatory regime and avoid the harms and costs that come from a balkanized electricity system in which every state is its own regulatory island.[1]

7.      Today's final rule does just that. We are requiring transmission planners to plan Long-Term Regional Transmission Facilities using the factors we know drive the transmission needs of tomorrow and consider the reliability and affordability benefits those facilities will provide. At the same time, we are giving transmission planners discretion regarding whether and how to select which transmission facilities to build, recognizing no two regions of the country are alike and a one-size-fits-all solution simply will not produce the infrastructure we so badly need.

8.      When it comes to the critical question of "who pays," we are providing transmission planners with the maximum flexibility we can legally allow in order to facilitate negotiated, regionally appropriate solutions. And, as part of a multi-pronged approach to protecting customers, we are requiring transmission planners to reevaluate any previously selected Long-Term Regional Transmission Facility when the actual or projected costs of that facility significantly exceed the cost estimates used during selection. Finally, we are also providing states with unprecedented, expanded

_____

[1] *New York v. FERC*, 535 U.S. 1, 6 (2002) ("When it enacted the FPA in 1935, Congress authorized federal regulation of electricity in areas beyond the reach of state power," tasking the Commission's predecessor with "effective federal regulation of the expanding business of transmitting and selling electric power in interstate commerce." (quoting *Gulf States Utils. Co. v. F.P.C.*, 411 U.S. 747, 758 (1973))); *FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 265-66 (2016) (*EPSA*) (same); *cf. First Iowa Hydro-Elec. Co-op v. F.P.C.*, 328 U.S. 152, 180 (1946) (The Federal Water Power Act of 1920 was "a complete scheme of national regulation which would promote the comprehensive development of the water resources of the Nation, in so far as it was within the reach of the federal power to do so, instead of the piecemeal, restrictive, negative approach of the River and Harbor Acts and other federal laws previously enacted.").

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1282 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                    - 3 -

opportunities to work with transmission providers to shape the cost allocation approaches of their regions, while meeting the beneficiary pays requirement that is the foundation of cost causation under the FPA's just and reasonable standard.

## I.    **The Dissent's Approach Would Not Result in the Energy Infrastructure Buildout We Need**

9.      Commissioner Christie provides a stark alternative vision in his dissent, one that would violate the cost causation principle and harm electric reliability. While we agree with his emphasis on the importance of cooperation with states—and have created unprecedented opportunities for such cooperation throughout this final rule—his radical new approach would permit a state to receive economic, resilience, and reliability benefits from new energy infrastructure, but not be charged a single cent unless they expressly agree to pay. That myopic view does not satisfy the requirements of the FPA and would not adequately facilitate the development of transmission we desperately need to ensure reliability and affordability. Contrary to the dissent's assertion that this final rule is the product of a political agenda, failing to act based on the dissent's flawed reading of the circumstances through the lens of politics would abdicate the Commission's duty.

10.     The dissent's approach would necessarily require the Commission to ignore evidence about which consumers benefit from the increased reliability, resilience, and affordability due to grid expansion. Instead, backbone regional transmission could not be built unless every state unanimously opted into an agreed cost allocation. But for the same reason that passing around a hat is no way to fund the fire department, roads, or bridges, such an approach to building critical, public interest infrastructure that relies entirely on the voluntary contributions of individual states (or could even be defeated by the refusal to contribute by a single state) will not beget the transmission infrastructure needed to maintain reliability and affordability.

11.     Put another way, there is little reason to believe that we, as a country, would build the infrastructure needed to power the world's largest economy if individual states that benefit from that infrastructure could simply decline to pay. Instead, Commissioner Christie's approach would be far more likely to result in a failure to make needed investments entirely, or else to down-size those investments in a way that results in exactly the type of piecemeal transmission development that led us to conclude existing transmission planning practices are rendering transmission rates unjust and unreasonable. That result would leave America far worse off. Just as the Articles of Confederation were not a sufficient platform to develop and sustain a national economy, so too would a wholly voluntary approach to paying for the needed infrastructure be inadequate to develop a transmission grid capable of powering the world's largest economy. That alone is a reason to reject Commissioner Christie's dissenting views.

12.    In addition, the dissent's approach would result in subpar transmission planning. Our nation needs transmission planning that looks ahead on the decades-long timeframe that is relevant to building backbone transmission facilities that will likely last a half-century or more. And transmission needs can best be predicted by considering many factors to discern their aggregate effect. Those include economics and technology fundamentals, changing demand patterns across customers of all types (including corporations), the full panoply of federal, Tribal, state, and local policy contributions, and even the changing weather patterns, which pose increasing challenges to maintaining a reliable and resilient electric grid. Rather than reflect that integrated reality, Commissioner Christie's approach asks planners to isolate select state public policies and focus on how each individually shapes the grid. That too is a recipe for down-sizing needed infrastructure in a way that will result in less efficient or cost-effective investments that fail to meet this critical moment.

## II.    **The Dissent Misrepresents the Final Rule**

13.    Commissioner Christie's dissent responds to a strawman of his own making, not the final rule. And, even so, the dissent's critique of the final rule ultimately boils down to one principal issue: the failure of the rule (in his view) to give every state an absolute right to veto the costs of a transmission facility, even one from which the state's consumers would derive economic and reliability benefits. Although we respect his perspective, we disagree that the changes he seeks are legal—much less legally required—or that a final rule premised on his vision would beget the energy infrastructure needed to maintain reliability and affordability. In any case, his statement mischaracterizes critical aspects of the final rule, the most fundamental of which we address below.

14.    First and foremost, Commissioner Christie asserts that Long-Term Regional Transmission Facilities are public policy projects whose purpose is to facilitate state efforts to shape the resource mix. He is wrong. This final rule requires transmission providers to comprehensively consider the factors that will shape the transmission needs of tomorrow. Although state efforts to shape the resource mix are one of many factors transmission planners are required to consider under this final rule, Commissioner Christie's narrow focus on them misses the forest for a couple trees. The requirement to consider state public policies is part of the much broader requirement to comprehensively consider *all* significant factors shaping future transmission needs, where other factors, including the fundamental economic and reliability drivers, play a much bigger role. That Commissioner Christie is focused overwhelmingly on the state public policies with which he disagrees does not mean that the same is true of Long-Term Regional Transmission Facilities.

15.    In any case, Commissioner Christie's proposal is arbitrary and capricious in its lack of any limiting principle. Transmission needs of all sorts—economic or reliability, near-term or long-term—are shaped by all manner of state public policy choices.

Fundamental state decisions, such as tax rates, zoning and land use laws, and almost every use of the police power more generally, inevitably shape the supply and demand of electricity.  No transmission need is unaffected by those basic exercises of state power, which means that no transmission need can be fairly or accurately described as entirely divorced from the effects or consequences of state policy decisions.

16.    While taking issue with some state policy choices, Commissioner Christie's vision contains no method for determining which state policies must be considered and which might escape scrutiny even though they too contribute to underlying transmission needs.  Similarly, it contains no rubric for determining how to evaluate the cumulative effects of state public policies—such as taxation and land use laws—that are, in many cases, far in excess of those derived from the public policies on which he chooses to focus.  Nor does it contain any explanation for subjecting Long-Term Regional Transmission Facilities to this suite of planning and cost allocation requirements, but not economic and reliability projects—which are, for the reasons noted above, inevitably at least in part the product of public policies.  That sort of unexplained, arbitrary line drawing is exactly what the APA prohibits.[2]

17.    Let us be clear:  These are reliability and affordability projects.  As the final rule explains, the minimum standards we establish provide that Long-Term Regional Transmission Facilities are to be identified and evaluated based on their reliability and economic benefits.  To call them anything else—no matter how many times—is a misnomer, plain and simple.

18.    Similarly, Commissioner Christie's claim that states will be forced to subsidize other states' public policy choices could not be further from the truth.  A bedrock requirement of this final rule is that customers will only be required to pay for a share of a Long-Term Regional Transmission Facility to the extent they benefit from that facility.  That is cost causation 101.  While we provide transmission planners, in cooperation with their state regulators, ample flexibility to determine how to satisfy that bedrock requirement, any cost allocation methodology that causes customers to pay for projects from which they do not benefit—or to pay a cost share out of proportion to the benefits they draw from the project—would be patently unjust and unreasonable.  That is black

---

[2] *See, e.g.*, *Prometheus Radio Project v. F.C.C.*, 373 F.3d 372, 390 (3rd. Cir. 2004) (explaining that when an agency has engaged in line-drawing, "its decisions may not be 'patently unreasonable' or run counter to the evidence before the agency" (citations omitted)); *Sinclair Broadcast Grp., Inc. v. F.C.C.*, 284 F.3d 148, 162 (D.C. Cir. 2002) (explaining that lines drawn cannot be "patently unreasonable, having no relationship to the underlying regulatory problem" (citing *Cassell v. F.C.C.*, 154 F.3d 478, 485 (D.C. Cir. 1998)); *Am. Trucking Assocs., Inc. v. I.C.C.*, 697 F.2d 1146, 1151 (D.C. Cir. 1983) ("The arbitrariness which the [Administrative Procedure Act] proscribes is the failure to draw reasoned distinctions where reasoned distinctions are required.").

Docket No. RM21-17-000                                                      - 6 -

letter law under the FPA,[3] which we have expressly incorporated into the requirements of this final rule.[4]

19.     The dissent is equally wrong to suggest that anything less than a unilateral right to veto cost responsibility for a regional transmission project is unfair to states.  To the contrary, both courts and the Commission have long recognized that the just and reasonable standard of the FPA requires that customers pay for infrastructure they use and benefit from.[5]  The dissent's approach, by contrast, would permit free ridership,

---

[3] *See City of Lincoln v. FERC*, 89 F.4th 926, 930 (D.C. Cir. 2024) ("The FPA's just and reasonable standard incorporates a cost-causation principle."); *Old Dominion Elec. Coop. v. FERC*, 898 F.3d 1254, 1255 (D.C. Cir. 2018) ("Under the [FPA], electric utilities must charge just and reasonable rates.  For decades, the Commission and the courts have understood this requirement to incorporate a cost-causation principle—the rates charged for electricity should reflect the costs of providing it." (citations omitted)); *see also BNP Paribas Energy Trading GP v. FERC*, 743 F.3d 264, 268 (D.C. Cir. 2014) ("[T]he cost causation principle itself manifests a kind of equity.  This is most obvious when we frame the principle (as we and the Commission often do) as a matter of making sure that burden is matched with benefit.").

[4] *Bldg. for the Future Through Elec. Reg'l Transmission Planning & Cost Allocation & Generator Interconnection*, Order No. 1920, 187 FERC ¶ 61,068, at P 1305 & n.2786 (2024).

[5] Beneficiary pays is founded on a recognition, grounded in the unbreakable laws of physics, that "the nature of power flows over an interconnected transmission system does not permit a public utility transmission provider to withhold service from those who benefit from those services but have not agreed to pay for them."  Order No. 1000, 136 FERC ¶ 61,051 at P 534; *see also id* P 535 ("the cost causation principle provides that costs should be allocated to those who cause them to be incurred and those that otherwise benefit from them"); *Ill. Commerce Comm'n v. FERC*, 576 F.3d 470, 476-77 (7th Cir. 2009) (*ICC v. FERC I*) ("All approved rates must reflect to some degree the costs actually caused by the customer who must pay them . . . To the extent that a utility benefits from the costs of new facilities, it may be said to have caused a part of those costs to be incurred, as without the expectation of its contributions the facilities might not have been built, or might have been delayed." (internal citations omitted)); *K N Energy, Inc. v. FERC*, 968 F.2d 1295, 1300 (D.C. Cir. 1992) ("FERC and the courts have added flesh to these bare statutory bones, establishing what has become known in Commission parlance as the 'cost-causation' principle.  Simply put, it has been traditionally required that all approved rates reflect to some degree the costs actually caused by the customer who must pay them."); *see, e.g.*, *Sw. Power Pool*, 182 FERC ¶ 61,141, at PP 12, 99-103 (2023).

Docket No. RM21-17-000                                                                    - 7 -

allowing states to avoid paying by withholding their approval, while still receiving the substantial benefits of a more integrated, robust transmission system.  Here too, both the Commission and the courts have expressly rejected that approach as inconsistent with cost causation.[6]  Rather than ensure fairness, the dissent's approach would create perverse incentives, rewarding states that decline to pay for infrastructure development that demonstrably provides reliability and economic benefits to those states, while penalizing those who roll up their sleeves to get those projects built.  That is a recipe for inaction, not for building the energy infrastructure we so badly need to maintain reliability and affordability.

20.     We agree with Commissioner Christie that transmission development works best when states are key partners in the process.  That is why we take the unprecedented steps described in the final rule to give them a central role.  But partnership and collaboration are not the same thing as giving every state the right to veto cost responsibility for transmission projects thus allowing their residents to reap a windfall by benefitting from transmission facilities for which they did not pay their legally required share.

21.     Commissioner Christie also asserts that the final rule deprives states of their long-standing authority.  That is categorically false.  Let us again be clear:  States retain all the same authorities over retail rates and transmission siting they held prior to the final rule.  Rather than deprive states of authority, the final rule *empowers* them with unprecedented opportunities to engage with transmission providers in developing a cost allocation framework.

22.     Commissioner Christie's objection is to the structure of the FPA, and long-established, court-upheld Commission regulation of regional transmission planning under Order No. 1000, not the final rule.  He objects to the transmission provider's role in deciding, without state approval, whether to invest in a transmission project and determine, subject to Commission oversight, which consumers must pay for it.  But that basic structure is not new to the final rule—it is how transmission planning occurs today, consistent with the FPA and Commission precedent, including Order No. 1000.  At Congress's direction, public utilities, not states, have the right to propose to the

---

[6] Order No. 890, 118 FERC ¶ 61,119 at P 561 ("there are free rider problems associated with new transmission investment, such that customers who do not agree to support a particular project may nonetheless receive substantial benefits from it"); Order No. 1000, 136 FERC ¶ 61,051 at P 535 ("[if] the Commission could not address free rider problems associated with new transmission investment, [] it could not ensure that rates, terms and conditions of jurisdictional service are just and reasonable and not unduly discriminatory"); *El Paso Elec. Co. v. FERC*, 76 F.4th 352, 363 (5th Cir. 2023) ("No amount of emphasizing other competing interests permits FERC to sacrifice the foundational principle of cost-causation by refusing to allocate costs to those who cause the costs to be incurred and who reap the resulting benefits." (citations omitted)).

Docket No. RM21-17-000                                                          - 8 -

Commission rates and practices affecting those rates and we cannot deprive them of those rights.[7]  Neither states' siting authority nor their exclusive jurisdiction over retail rates give them the unilateral right to dictate matters subject to the Commission's exclusive jurisdiction, such as the transmission rates and practices affecting those rates that are the subject of this final rule.[8]  For example, a state could reject siting or other approvals for the portion of a regional transmission project located within its jurisdiction, provided that its determination was consistent with relevant state and federal law.  But states cannot stymie needed regional transmission projects by simply declining to pay for them.  Nor is that concept new to this final rule.  Under established economic and reliability planning, state policies are contributing factors to needed transmission, and states have never held a veto authority over costs for such facilities under Order No. 1000.[9]  Nothing in this final rule changes those basic facts.

23.     What has changed is that states now, *as a result of this final rule*, have an unprecedented opportunity to shape transmission planning and cost allocation, elevating our system of cooperative federalism with the states to a degree not previously seen in the history of this Commission.  Most significantly, we are requiring transmission providers to host a dedicated forum for meaningful state participation in proposing cost allocation methods and processes.  And the rule also permits a State Agreement Process for allocating the costs of all, or a subset of, Long-Term Transmission Facilities.  Beyond cost allocation, states will have an opportunity to provide input on how to account for specific factors in Long-Term Scenarios, and states can provide information on how their own policies and planning affect Long-Term Transmission Needs.  The rule also requires transmission providers to consult with and seek the support of states regarding how Long-Term Regional Transmission Facilities are evaluated and selected.  We expect that where states come together to articulate workable, legal frameworks for planning and paying for needed infrastructure, their transmission providers will listen.

24.     Indeed, under the State Agreement Process provided in the final rule, states very well could agree to, and transmission planners could adopt, a version of Commissioner

---

[7] 16 U.S.C. § 824d; *Atl. City Elec. Co. v. FERC*, 295 F.3d 1, 9 (D.C. Cir. 2002) ("Section 205 of the Federal Power Act gives a utility the right to file rates and terms for services rendered with its assets.").

[8] *See* Order No. 1920, 187 FERC ¶ 61,068 at PP 253-83 (affirming Commission's legal authority to require participation in Long-Term Regional Transmission Planning).

[9] Indeed, Commissioner Christie recently approved, over the objection of other states, PJM's plan to regionally allocate the costs of transmission to address reliability concerns driven, at least in part, by Virginia's policy to incent siting of data centers in that state.  *See PJM Interconnection, L.L.C.*, 187 FERC ¶ 61,012 (2024).

Docket No. RM21-17-000                                                    - 9 -

Christie's preferred cost allocation approach.[10]  So long as those expected to use the Long-Term Regional Transmission Facilities pay a share of the cost that is roughly commensurate with the benefits they will receive, nothing in this final rule prohibits states in a transmission planning region from adopting Commissioner Christie's preferred approach for funding the transmission facilities they need to ensure reliability and affordability.

25.     Commissioner Christie also asserts that this final rule breaks with Order No. 1000 by mandating outcomes rather than regulating transmission planning processes.  Here, too, he is wrong.  The rule is clear that no transmission provider is required to select any particular project.[11]  Instead, just as in Order No. 1000, the obligation on the transmission provider is to plan for the world as we expect it to be and then make its own business decisions after having conducted that planning process.  The final rule's minimum planning standards do not un-do that core discretion.  Requiring planning to be based upon documented drivers of transmission needs and to incorporate objective measures of how potential investments pay off improves the planning *process*, it does not mandate any particular outcome.[12]  In short, in recasting the rule to fit his narrative, Commissioner Christie conveniently ignores one of its core elements:  that it imposes no obligation to develop any regional transmission project.

---

        [10] We find Commissioner Christie's contention that the final rule would end PJM's use of its existing State Agreement Approach, and MISO and SPP's respective regional state committees, puzzling.  Order No. 1920, 187 FERC ¶ 61,068 (2024) (Christie, Comm'r, dissenting, at P 11).  The final rule enhances states' role and relaxes certain Order No. 1000 requirements for state-approved cost allocations.  It is inexplicable that these additional flexibilities would result in transmission providers rolling back opportunities for state engagement in existing Order No. 1000 processes, where that is the opposite of the thrust of the final rule.  Moreover, PJM's State Agreement Approach was approved outside of compliance with Order No. 1000 and has never served as PJM's exclusive *ex ante* cost allocation method, as Commissioner Christie suggests.

        [11] Order No. 1920, 187 FERC ¶ 61,068 at P 1026 ("The Commission did not propose in the NOPR, and we will not require in this final rule, that transmission providers select any particular Long-Term Regional Transmission Facility—even where a particular transmission facility meets the transmission providers' selection criteria in their OATTs.").

        [12] *Id.* ("In other words, as in Order No. 1000, our focus is on ensuring that regional transmission planning processes result in just and reasonable rates, and not on requiring that these processes achieve any particular substantive outcome.").

26.     Finally, Commissioner Christie is also incorrect in arguing that this final rule violates the Major Questions Doctrine.  He asserts two bases for that argument, neither of which hold water.

27.     First, he contends that our *intention* in issuing this final rule is to elicit trillions in spending on transmission.  As an initial matter, the goal of this final rule is to facilitate the development of transmission infrastructure *needed* to maintain reliability and affordability.  That is the case no matter how many times or in how many ways Commissioner Christie purports to ascribe our 'true' intentions.  In any case, his trillion-dollar estimates are nothing more than a sleight of hand that is unsupported by the record before us.  To support his claim that this final rule will cause "literally trillions" in transmission investment, he cites to one academic study and one news article stating that in order to achieve a "net-zero" emissions level by 2050, trillions will need to be spent on transmission.[13]  Putting aside whether that figure is accurate and whether "net zero" is an appropriate policy goal for the country—a question which we agree is not for this Commission to resolve—it is an astounding logical leap to say that because certain individuals believe a certain amount of investment is necessary to achieve a certain policy goal, that this rule will necessary cause customers to spend that amount of money.  In any case, as the dissent points out, significant investments in transmission are already being made by public utilities around the country regardless of anything we do—or do not do—here today.  This final rule regulates the process by which those investments are identified, evaluated and, where appropriate, selected in order to help ensure that they reflect the most efficient and cost-effective options available.  That is what the Commission has been doing for decades; the fact that transmission has become a more politically salient topic does not transform our longstanding practice into a major question.

28.     Second, he contends that our statement that the Commission has exclusive jurisdiction over the transmission planning practices that directly affect wholesale rates means that this Commission has crossed the major questions Rubicon.  But it was the courts, not this Commission, that took that step.  As he observes in his dissent, *South Carolina* concluded that the transmission planning practices regulated by Order No. 1000—which are the same practices addressed by this final rule—were practices that directly affected wholesale rates and thus fall squarely within the Commission's jurisdiction.[14]  And as the courts have explained, where a practice meets that directly

---

[13] *Id.* (Christie, Comm'r, dissenting at P 3 & n.7.

[14] In *South Carolina*, it was undisputed that transmission planning generally was a practice that directly affected wholesale rates, but the court further held that the absence of regional transmission planning was itself such a practice.  *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d 41, 56-59 (D.C. Cir. 2014).

affecting standard, it falls within the Commission's exclusive jurisdiction.[15]  This long-settled law in no way alters or dilutes the significant and critical role for states to play under their jurisdiction and, as noted above, we have significantly expanded that role in this final rule.  Rather it means that the specific practices in the tariffs on file with this Commission, as required by this final rule, are within the Commission's exclusive jurisdiction, not that of the states.  The final rule's recitation of black letter law hardly runs afoul of the major questions doctrine.

## III.    We Encourage Transmission Providers to Facilitate Joint Ownership Structures

29.    Finally, we would be remiss not to mention one policy priority that is not finalized in this rule:  The creation of a federal right of first refusal for certain transmission facilities developed through a joint ownership structure.  As the final rule explains, we find that proposal is better considered as part of our generic proceeding on Transmission Planning and Cost Management, where it can be evaluated alongside other proposals for ensuring that transmission facilities are developed as efficiently and cost-effectively as possible.[16]

30.    Nevertheless, we underscore that our decision today should not be construed as a lack of support for the concept of joint ownership or the potential for a federal ROFR to effectively encourage its use.  Indeed, joint ownership structures that partner transmission owners with other load-serving entities in their footprint, such as public power or non-profit cooperatives, can provide many benefits and should be encouraged.

31.    In these arrangements, the load-serving entity partner's participation can reduce costs for customers in the footprint.  Such joint ownership structures bring together diverse parties, allowing the participating entities to better allocate risks and responsibilities, capture efficiencies, and promote innovation, all to customers' ultimate benefit.[17]  Moreover, by bringing a wider range of entities into the transmission

---

[15] *See, e.g.*, *Nat'l Ass'n of Regul. Util. Comm'rs v. FERC*, 964 F.3d 1177, 1181 (D.C. Cir. 2020) ("Congress g[ave] the Federal Energy Regulatory Commission . . . exclusive authority over the regulation of the sale of electric energy at wholesale in interstate commerce, including both wholesale electricity rates and any rule or practice affecting such rates." (cleaned up)).

[16] Order No. 1920, 187 FERC ¶ 61,068 at PP 1563-64 & n.3346.

[17] *See, e.g.*, TAPS Initial Comments at 33-34 ("As explained in the TAPS 2021 White Paper, inclusive joint transmission ownership arrangements—whether structured as an inclusive transco, a shared system, or joint ownership of new transmission facilities—result in collaborative and inclusive planning, development, and siting of transmission, and have proven highly effective in getting transmission built to meet the

development fold, joint ownership can leverage additional sources of capital, including those that do not typically invest in transmission facilities, which can itself have significant benefits for customers.[18]

32.    For example, TAPS highlights specific instances of joint ownership arrangements with tax-exempt public power entities providing significant savings to customers.[19]  TAPS and APPA estimate these kinds of joint ownership arrangements can typically yield a "more than a 5% annual cost reduction in ratepayer-funded return and associated tax costs," which could produce billions of dollars in savings when applied to reasonable transmission investment forecasts.[20]  Relatedly, NRECA highlights examples of joint ownership arrangements with electric cooperatives yielding reliability and efficiency benefits, including, among others, leveraging electric cooperative's ability to provide increased operations and maintenance support and access to lower cost financing through the Rural Utilities Service.[21]

---

needs of all LSEs." (citing TAPS, *Inclusive Joint Transmission Ownership Arrangements: An Effective Means to Site and Build Transmission Need to Support Our Changing Resource Mix* (June 2021), https://www.tapsgroup.org/wp-content/uploads/2021/09/TAPS-Inclusive-Joint-Ownership-White-Paper.pdf)); *see also* Rob Gramlich et al., Grid Strategies, *Fostering Collaboration Would Help Build Needed Transmission*, at 11-30 (Feb. 2024) (attached to WIRES Supplemental Comments) (highlighting specific examples of large regional transmission projects that resulted from diverse partnerships, including with public power entities and cooperatives, and which met many transmission needs and produced a wide range of benefits).

[18] *See, e.g.*, APPA Initial Comments, attach. at 4-10 (Declaration of James Pardikes) (listing advantages in equity ratio, debt cost, and income tax expense, and opportunities for risk diversification as potential benefits of joint ownership arrangements with public power utilities); NRECA Reply Comments at 15-16; Citizens Energy Reply Comments at 2-4 (describing how its unique joint ownership business model enables Citizens to provide direct support to low-income ratepayers and disadvantaged communities, addresses multiple concerns that arise in transmission development, and advances multiple Commission policy goals).

[19] TAPS Initial Comments at 45 (examining savings across Vermont Transco, ATCLLC, Fargo Project, and SE Missouri Project).

[20] TAPS Initial Comments at 45-46 & nn.133-135; APPA Reply Comments at 4.

[21] GDS Assocs., *National Rural Electric Cooperative Association*, at 25-27 (Aug. 17, 2021) (attached to NRECA Initial Comments).

Docket No. RM21-17-000                                                            - 13 -

33.    In light of those substantial benefits, we clarify that nothing in this final rule should be interpreted to prohibit or impair joint ownership arrangements.  To the contrary, we encourage transmission providers, in compliance with this rule and elsewhere, to find ways to encourage these arrangements.  For example, in compliance with this rule, transmission planners could use joint ownership as a factor to be considered in evaluating and selecting the more efficient or cost-effective solution to meet a long-term transmission need.  Similarly, we note that the developers of a jointly owned transmission facility can consider seeking transmission incentives under section 205 of the FPA that reflect the risks and challenges associated with developing such facilities.[22]  In addition, the Commission will continue to evaluate other potential actions to incentivize joint ownership, including considering in the Commission's cost management proceeding whether to provide a right of first refusal or other mechanisms to encourage its use.

*       *       *

34.    Our electric transmission grid is at a crossroads.  Our nation is facing down an extended period of unprecedented change in demand, supply, and the myriad other factors that fundamentally shape our energy needs.  And we do so with a network of transmission infrastructure that was overwhelmingly built in the last century and in the face of a very different reality.

35.    We have a choice:  We can take consequential action to build the infrastructure needed to ensure reliability and affordability.  Or we can pursue half-measures, which may help on the margins, but will ultimately leave us lacking the infrastructure we need to keep the lights on at a price that customers can afford.  With this final rule, we emphatically choose the former path.

36.    But we are not going down this road alone.  As discussed above, we have opened the door for our state partners to play a leading role in shaping the next generation of energy infrastructure.  We urge them to walk through it and deploy their unique

---

[22] *See Promoting Transmission Investment Through Pricing Reform*, 141 FERC ¶ 61,129, at P 24 (2012) ("The Commission encourages incentives applicants to participate in joint ownership arrangements and agrees with commenters to the NOI that such arrangements can be beneficial by diversifying financial risk across multiple owners and minimizing siting risks."); *Promoting Transmission Investment Through Pricing Reform*, Order No. 679, 116 FERC 61,057, at P 354 (2006) ("[T]o the extent our jurisdiction allows, the Commission will entertain appropriate requests for incentive ratemaking for investment in new transmission projects when public power participates with jurisdictional entities as part of a proposal for incentives for a particular joint project.  Encouraging public power participation in such projects is consistent with the goals of section 219 by encouraging a deep pool of participants.").

perspectives as regulators and siting authorities of electric infrastructure to develop regionally tailored solutions.  Together, we can forge a process that will serve customers for generations to come.  This is the moment to step up, to develop both processes and physical infrastructure to withstand the changes and challenges ahead.  This is the moment to build an electric transmission grid for the 21st century.


For these reasons, we respectfully concur.


_____          _____
Willie L. Phillips                                            Allison Clements
Chairman                                                     Commissioner

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Building for the Future Through Electric Regional          Docket No.   RM21-17-000
Transmission Planning and Cost Allocation

(Issued May 13, 2024)

CHRISTIE, Commissioner, *dissenting*:

I.      **The Final Rule Is a Pretext for Enacting a Sweeping Policy Agenda Never
        Passed by Congress, Denies the States the Authority Promised by the NOPR,
        and Fails the Commission's Consumer Protection Duty under the Federal
        Power Act**

1.      The Federal Power Act (FPA) is, at its core, a consumer protection statute.[1]  In
FPA section 206, which today's final rule purports to be based on, Congress explicitly
directed this Commission to protect consumers from public utility "rates" that are
"unjust, unreasonable, unduly discriminatory or preferential."[2]  This final rule, however,

---

        [1] *E.g.*, *Towns of Alexandria, Minn. v. FPC*, 555 F.2d 1020, 1028 (D.C. Cir. 1977)
(explaining that the FPA's "'primary aim is the protection of consumers from excessive
rates and charges'") (quoting *Mun. Light Bds. v. FPC,* 450 F.2d 1341, 1348 (D.C. Cir.
1971)); *see also Elec. Dist. No. 1 v. FERC*, 774 F.2d 490, 492 (D.C. Cir. 1985)
(recognizing that the benefits of rate predictability, which are the "whole purpose" of the
filed rate doctrine, ought to be considered in light of the FPA's "primary purpose of
protecting the utility's customers").

        [2] 16 U.S.C. 824e.  Under the FPA, the Commission is a regulator of wholesale
public utility *rates*, not a national integrated resource planner (known in the lingo as an
"IRP") of generation and/or transmission*.  See, e.g.*, *Entergy Nuclear Vt. Yankee, LLC v.
Shumlin*, 733 F.3d 393, 417 (2d Cir. 2013) (quoting *S. Cal. Edison Co. San Diego Gas &
Elec. Co.*, 71 FERC ¶ 61,269, at 62,080 (1995) ("[S]tates have broad powers under state
law to direct the planning and resource decisions of utilities under their jurisdiction.
States may, for example, order utilities to build renewable generators themselves,
or . . . order utilities to purchase renewable generation.").  Further, FPA section 215,
pertaining to electric reliability, explicitly leaves the construction of generation and
transmission assets to state regulatory authority.  16 U.S.C. 824o(i)(2).  Section 215
makes clear congressional intent to leave integrated resource planning to the states.
Indeed, the overall statutory framework of the FPA—consistent with America's federal
constitutional structure—makes it clear that *states* are the primary regulators of which

fails to fulfill the Commission's consumer protection duty required by the statute. The final rule should be seen for what it is: a pretext to enact, through administrative action, a sweeping legislative and policy agenda that Congress never passed.[3] The final rule claims statutory authority the Commission does not have to issue an absurdly complex bureaucratic blizzard of mandates and micromanagement[4] to be imposed on every transmission provider in the United States for the transparent goal of spending trillions of consumers' dollars on transmission *not* to serve consumers in accordance with the FPA, but instead to serve political, corporate, and other special-interest agendas that were never enacted into law.[5] The rates for transmission that will result from the final rule will not

---

utility assets get planned and built, both generation and transmission, not FERC.

[3] *See, e.g.*, *W. Va. v. EPA*, 597 U.S. 697 (2022) (*West Virginia v. EPA*); *Dept. of Commerce v. N.Y.*, 139 S. Ct. 2551 (2019).

[4] In truly Kafkaesque fashion, the final rule is a doorstopper weighing in at just below 1300 pages, likely one of the longest, most complicated, and confusing orders the Commission has ever issued. Regulated entities—it applies to *all* public utility transmission providers in the United States, RTO and non-RTO—will need weeks just to read through it, much less decipher it, and then months of figuring out how to comply. Its very complexity raises the prospect of multiple rounds of compliance filings, no doubt punctuated by multiple deficiency letters, in order to push the transmission provider towards the outcomes the Commission wants to achieve. The final rule's very complexity renders it, if not arbitrary and capricious on its face, likely to be arbitrary and capricious in its enforcement.

[5] *See, e.g.*, Heather Richards, Zach Bright, Christian Robles, *3 energy issues to watch this spring at DOE, Interior and FERC*, Energywire, Mar. 18, 2024 ("FERC has promised a closely watched rule this spring on transmission that could be *key to President Joe Biden's ambitious aim to decarbonize the electricity grid by 2035*. . . . 'The sooner we get a final rule, the better. . . ,' said Caitlin Marquis [of] Advanced Energy United, a pro-clean-energy group. . . . [T]he Biden administration is in a race . . . until roughly midyear to finalize rules *before they are subject to the Congressional Review Act (CRA)* . . . . The Biden administration has said [today's final rule] will facilitate a build-out of interregional lines and grid interconnections needed to . . . *allow more wind and solar power to come online*. . . .") (emphases added) https://www.eenews.net/articles/3-energy-issues-to-watch-this-spring-at-doe-interior-and-ferc/; *see also* Peter Behr, *EPA power plant rule targets coal. Does that spell trouble for the grid?* Climatewire, May 3, 2024 ("But climate activists will not give up the 'zero by 2035' goal without a fight. President Biden made that steep commitment at a critical point in his 2020 candidacy to win the support of primary rival Sen. Bernie Sanders (I-Vt.) and his climate action activists. . . . [T]he hard road to a zero-carbon grid in 2035 is real *precisely because the Biden administration has pursued it*. . . . [Study authors] highlighted estimates that the

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1296 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                    - 3 -

only be unjust, unreasonable, unduly discriminatory and preferential, but grossly unfair to tens of millions of American consumers already burdened with rapidly growing monthly power bills.

2.      The fundamental principle historically embedded in utility regulation in the United States is to provide consumers with *reliable* power at the *least* cost under applicable law. This principle is fair and compelling because the vast majority of American utility consumers are captive customers who pay a monopoly utility for a vital public service—

---

rate of high-voltage transmission line construction *must double to deliver the necessary new wind and solar energy. . . .* The [Biden] administration . . . is putting a strategy for big new lines in place. *FERC, with the support of Biden appointees, is preparing new policy to support big wires projects. . . .* 'You can't get around the fact that *you're going to need tens of thousands of miles of new transmission lines if you want to build the hundreds of gigawatts of wind and solar and batteries that many of us predict are needed to achieve decarbonization goals,*' said [former Obama energy secretary Ernest] Moniz.") (emphases added), https://www.eenews.net/articles/epa-power-plant-rule-targets-coal-does-that-spell-trouble-for-the-grid-2/; *see also* Zach Bright, *FERC sets date for landmark transmission rule*, Energywire, Apr. 19, 2024 ("FERC said it plans to hold a special May 13 meeting to consider its . . . transmission planning and cost-allocation proposal that's been a focus of *[lobbying] for expanding the grid to . . . move more renewable energy. . . . The Biden administration's goal of [net zero] by 2035 hinges on expanding the transmission system by two-thirds, the Energy Department said last year.*") (emphases added), https://www.eenews.net/articles/ferc-sets-date-for-landmark-transmission-rule/; *It's raining rules: Why the Biden administration is rushing to produce regulations*, The Economist, May 4, 2024, at 19 ("More regulations, big and small, are expected soon. *The Federal Energy Regulatory Commission is planning to rewrite the rules governing interstate electricity transmission, which is critical to President Joe Biden's decarbonisation plans. . . . Why the sudden spate? A previously obscure law, the [CRA], helps explain the rush.* It allows Congress, for a limited period, to pass resolutions of disapproval against finalised administrative regulations with which it disagrees. If both chambers of Congress pass such a resolution, and the president signs it, the rule is cancelled, short-circuiting the usual drawn-out process of litigation or a subsequent administration beginning a whole new rule-making effort. So once a regulation is properly created the clock starts ticking: the cancellation procedure is allowed for up to 60 days that the Senate is in session—including the last 60 days of an administration that loses a presidential election.") (emphasis added), https://www.economist.com/united-states/2024/05/02/why-the-biden-administration-is-rushing-to-produce-regulations; *see infra* nn.8, 10, 13, 15, 16, 67.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1297 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                    - 4 -

electrical power—which no one can live without in modern society. Transmission is an essential component of this vital public service,[6] so necessary transmission must be built.

3.    Today's final rule, however, is not about providing reliable power to consumers at least cost through just and reasonable rates as required by the FPA, despite the final rule's claim. And it is certainly not about being fair. On the contrary, the final rule inflicts staggering costs on consumers by promoting the construction of trillions of dollars of transmission projects,[7] not to serve consumers in accordance with the FPA, but to serve a

---

[6] The transmission component of utility service has typically been provided by the incumbent monopoly utility at the load-serving local level, and local transmission planning and/or construction is generally subject to state-regulated IRP or permitting processes, especially in non-RTO regions. The final rule imposes numerous additional requirements for local transmission planning, including even micromanaging how local "stakeholder" meetings are supposed to be conducted, which may conflict with state IRP proceedings and represent yet another FERC encroachment into areas of traditional state authority. *See Bldg. for the Future Through Elec. Reg'l Transmission Planning & Cost Allocation & Generator Interconnection*, Order No. 1920, 187 FERC ¶ 61,068, at Section IX.B.3.a (2024) (Final Rule). It is highly doubtful that the micromanagement of stakeholder meetings in local planning would pass judicial review under *CAISO v. FERC*, in which FERC's attempted micromanagement of an ISO's governing board appointments was rejected as not sufficiently grounded in FERC's rate-setting authority under the FPA. *See Cal. Indep. Sys. Operator Corp. v. FERC*, 372 F.3d 395, 400 (D.C. Cir 2004) (*CAISO v. FERC*).

[7] The Princeton Net Zero study is often cited, but it is only one of many estimates of the trillions of dollars in additional costs to be imposed on consumers. Using the Princeton study, the cost estimates of the transmission buildout necessary to achieve "net zero" range across different scenarios, with one scenario calling for transmission capacity to *quintuple (5x)* between 2020 and 2050, which is predicted to cost *$3.56 trillion*. *See* Princeton University Net Zero America Final Report Summary, Slide 29, https://netzeroamerica.princeton.edu/img/Princeton%20NZA%20FINAL%20REPORT%20SUMMARY%20(29Oct2021).pdf. I would emphasize that the sticker price of a utility asset is only a fraction of the ultimate cost to consumers, because the "going in" price will increase by a multiple of many times the original cost over the life of the asset, because the cost of capital, both a profit to the utility (known as Return on Equity, or ROE) and the cost of debt, will be paid by consumers. So, if Princeton gives an estimate of $3.56 trillion for new utility assets needed to reach the "net zero" goal, the *actual* cost to consumers over the life of the assets will be many times more than that estimate. *See also* Diana DiGangi, *US won't reach net zero emissions without transmission buildout: DNV*, Utility Dive, Sept. 25, 2023 ("*$12 trillion* will be spent on clean energy in North America by 2050 . . . to meet . . . net zero emissions targets . . . . Some of the biggest barriers to net zero in the U.S. include the *lack of transmission buildout . . . .*) (emphases

Docket No. RM21-17-000                                                                  - 5 -

major policy agenda never passed by Congress, to serve the profit-making interests of developers of politically preferred generation, primarily wind and solar, and to serve corporate "green energy" preferential purchasing policies.[8]  As such, the final rule does not deserve a shred of deference under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*[9] in any form.  Today's final rule is much less the product of reasoned decision-making or the agency's specialized expertise, as of political pressure

---

added), https://www.utilitydive.com/news/net-zero-transition-clean-energy-north-america-transmission-buildout/694621/.

[8] *See, e.g.*, Peter Behr, *DOE unveils critical grid corridors for Biden climate goals*, Energywire, May 8, 2024 ("'*To meet our climate goals we have to more than double our transmission capacity*,' said top White House clean energy adviser John Podesta, who has led a Cabinet-level push to get long-delayed transmission projects under construction.") (emphasis added), https://www.eenews.net/articles/doe-unveils-critical-grid-corridors-for-biden-climate-goals/; Peter Behr, *More, More, More:  Biden's clean grid hinges on power lines*, Energywire, May 23, 2022 (stating that "the Biden administration is seeking an *unprecedented expansion of high-voltage electric lines to open new paths to wind and solar energy.*  'We obviously need *more, more, more transmission to run on 100 percent clean energy. . .* ,' Energy Secretary Jennifer Granholm said in February.") (emphasis added), https://subscriber.politicopro.com/article/eenews/2022/05/23/more-more-more-bidens-clean-grid-hinges-on-power-lines-00030117; *see also supra* n.5 and *infra* nn.10, 13, 15, 16, 67.

[9] 467 U.S. 837 (1984) (*Chevron*).

Docket No. RM21-17-000                                                        - 6 -

and special interest lobbying.[10]  In the chapter on "regulatory capture"[11] in future
economics textbooks, today's final rule should be a featured case study.

4.    The final rule orders *all* transmission providers, RTO and non-RTO, to plan costly
regional transmission for some *allegedly predictable* generation mix 20 years in the
future (a generation mix which, as a practical matter, is impossible to predict so far into
the future).[12]  The obviously pretextual agenda of the final rule, however, is not to *predict*

_____

[10] *See* Catherine Morehouse, *FERC to tackle "historic" transmission planning
rule in May*, PoliticoPRO, Apr. 18, 2024 ("FERC has been *under enormous pressure
from lawmakers, clean energy developers, environmentalists and others* to finalize the
rule that Chair Willie Phillips has promised will be 'historic' and the 'greatest
development regarding electric transmission rules in the country in over a generation.'")
(emphases added), https://subscriber.politicopro.com/article/2024/04/ferc-to-tackle-
massive-transmission-planning-rule-next-month-00153191; *see also, e.g.*, Sen. Charles E.
Schumer July 24, 2023 Comments at 1-2 (urging the Commission to ensure that "any
final rule *must . . . prescribe* a set of benefits" to be used in transmission planning and
that "it will be necessary that either" [the transmission provider, or FERC *shall impose*
cost allocation] "when any state withholds support on a cost allocation method" [which
risks] "*states that benefit from a transmission line" [acting as] "free riders [to] avoid
any costs*.") (emphases added); Sen. Martin Heinrich, et al. (consisting of 20 additional
Senators) Jan. 19, 2024 Comments at 2 (urging the Commission that "the final rule *must
require* consideration of a . . . specific set of transmission benefits for . . . *cost allocation*
processes") (emphases added); Sen. Sheldon Whitehouse Nov. 7, 2023 Comments at 2
(stating that "FERC should include [a list of required benefits] in its final rule").  As
explained extensively herein, mandating benefits is a device for imposing costs on
consumers in states that never agreed to the selection criteria or cost allocation.  The
deeply granular nature of the instructions to the Commission in these letters is more
evidence that this final rule is a pretext to use an administrative agency to enact
legislation that Congress never passed.  *See also supra* nn.5, 8 and *infra* nn.13, 15, 16, 67.

[11] Luigi Zingales, *Preventing Economists' Capture*, University of Chicago Booth
School of Business Review, July 1, 2014 ("In simple words, regulatory capture exists
when a regulatory agency, created to act in the public interest, ends up advancing
interests of the industry it is charged with regulating."),
https://www.chicagobooth.edu/review/preventing-economists-capture.

[12] The example of the Potomac-Appalachian Transmission Highline (PATH)
fiasco is a strong warning about the folly of spending billions of consumers' dollars to
build transmission based on predictions of a generation mix in 20 years.  *Potomac-
Appalachian Transmission Highline, LLC*, 185 FERC ¶ 61,198 (2023) (Christie,
Comm'r, concurring at P 3) (PATH Concurrence) ("[C]onsumers have paid roughly *$250
million* for a project that was never built nor found needed by a single state regulator.")

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1300 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                           - 7 -

the generation mix 20 years forward, but to *produce* the *preferred* generation mix that the current presidential administration, some huge multinational corporations,[13] some members of Congress, and other special interests want *now*.  In fact, the final rule is not even about planning *transmission,* but is about planning *policy*, and it is very preferential about the policies it wants to promote.  As with the Great Oz,[14] pulling back the curtain exposes the final rule for what it really is:  An essential component in a comprehensive plan by the current presidential administration to push what the media describe as "green policies" designed to prefer and promote the wind and solar generation it favors while simultaneously *forcing* the shutdown of the fossil fuel generation it disfavors,[15] both

---

(emphasis in original), https://www.ferc.gov/news-events/news/e-4-commissioner-christies-concurrence-letter-order-approving-path-settlement-er12; *see also* PJM Initial Comments at 62 ("In short, the volatility of input parameters cancelled the need for a $1.8 billion transmission line identified in 2007, that was confirmed to be needed five years out in 2012, but by 2012 was no longer needed for at least another 15 years, if at all.").  Rather than wind or solar—which the final rule implicitly presumes will be the predominant generating resource in 20 years—it is just as foreseeable that the predominant share of generation in the U.S. could be nuclear, an essential dispatchable resource, as small modular reactor technology matures and economies of scale produce lower costs, or it could be green hydrogen.  It could even be fusion or some new technology currently either nascent or unknown.  *No one knows today*.  Building trillions of dollars of transmission on a *prediction* that intermittent wind and solar will be the predominant generating resource in 20 years is just a costly guess.

[13] *See, e.g.*, Clean Energy Buyers Jan. 22, 2024 Comments ("Many of our businesses cannot grow without more *clean generation* resources . . . .  States may miss out on economic growth opportunities without . . . access to the *types of generation resources* needed to attract growing and innovative industries.") (emphases added).  Among the signers of these comments were Amazon, Apple, eBay, Google, Green Impact Technologies, Meta, Microsoft, Nike, Rivian, Salesforce, Target, Walmart and several other multinational corporations.  The FPA gives FERC no authority whatsoever to use the "green energy" purchasing preferences of privately owned, for-profit multinational corporations as the basis to impose a *mandatory* transmission planning and cost allocation rule that will cost consumers trillions of dollars.  The FPA does not recognize such corporate preferences; indeed, the FPA *forbids* preferences.  *See also supra* nn.5, 8, 10 and *infra* nn.15, 16, 67.

[14] *The Wizard of Oz* (Metro-Goldwyn-Mayer 1939).

[15] *See, e.g.*, Catherine Morehouse, *DOE launches effort to cut federal permitting for new power lines in half*, PoliticoPRO, Apr. 25, 2024 ("The [U.S. Dept. of Energy] program is the *latest move by the Biden administration to speed up the . . . process for new transmission lines deemed critical to carrying dispersed wind and solar*

needed to meet its political commitment.  Let me emphasize:  Whether the policies being promoted in this final rule can be described as "green, purple, red or blue" is irrelevant. The point is that FERC, as an *independent* agency, has no business promoting the policies of any one party or presidential administration, especially when, as here, the effort to do so goes far beyond FERC's legal authority and fails to perform our consumer protection function under the FPA.

---

resources . . . .  *It also comes on the heels of an announcement from the EPA to tighten emissions standards for fossil-fueled power plants* — a move that will necessitate bringing more low-carbon resources onto the power grid to meet growing demand *as [fossil fuel] resources are forced offline.*  'DOE's work complements *what our partners across the administration are doing* . . . to deliver cleaner power . . . ,'  Energy Secretary Jennifer Granholm told reporters . . . .") (emphases added), https://subscriber.politicopro.com/article/2024/04/doe-launches-effort-to-cut-federal-permitting-for-new-power-lines-in-half-00154189; *see also* Catherine Morehouse, *Energy regulator's exit may flummox Biden's green plans*, Politico, Feb. 9, 2024 ("[FERC] is poised to lose its biggest climate advocate and potentially shut down one of the White House's *best avenues to push its green policies. . . .*  That buildout is needed to accommodate . . . *wind and solar projects that are critical to meeting the Biden administration's climate and clean energy goals.*") (emphases added), https://subscriber.politicopro.com/article/2024/02/energy-regulators-exit-may-flummox-bidens-green-plans-00140774; Molly Christian, *US transmission "in desperate need of an upgrade," Vice President Harris says*, Megawatt Daily, Jan. 20, 2023 ("Achieving lofty US climate goals will *require* '*thousands of miles of new high-voltage transmission lines all across our country*,' US Vice President Kamala Harris said. . . .  '*To create our clean energy future, we must construct thousands of miles of new high-voltage transmission lines all across our country*,' [Harris said].") (emphases added), https://www.spglobal.com/commodityinsights/en/market-insights/latest-news/electric-power/012023-us-transmission-in-desperate-need-of-an-upgrade-vice-president-harris-says; Alex Guillén, Ben Lefebvre, Annie Snider, Kelsey Tamborrino, Catherine Morehouse, James Bikales, *Biden administration eyes spring to finalize key climate regulations*, PoliticoPro, Dec. 6, 2023 ("The Biden administration is planning to finalize several major energy and environmental regulations in the first half of 2024 . . . .  *That timeframe would help cement many of President Joe Biden's policy priorities in the event he does not win reelection. . . .*  One of the top [FERC] priorities . . . has been to finalize a rule on power line planning and cost allocation . . . . *that is considered critical to unlocking new wind and solar resources.*") (emphases added), https://subscriber.politicopro.com/article/2023/12/biden-administration-plots-busy-spring-finalizing-key-climate-regulations-00130496.  *See also supra* nn.5, 8, 10, 13 and *infra* nn.16, 67.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1302 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                    - 9 -

5.     Yet here's the legal rub with the final rule's pretextual agenda:  *Congress never voted to amend the FPA to direct* or even *allow* FERC (which is supposed to be *independent*) to be what Energy Secretary Granholm describes as one of "our partners across the administration" in implementing this "green energy" transformation agenda.[16] Such a sweeping policy agenda, which involves the transfer of literally *trillions* of dollars of wealth from consumers to special interests, is the epitome of a major question of public policy under *West Virginia v. EPA*.  The final rule clearly intends to socialize trillions of dollars of costs for the transmission necessary to pursue this transformational agenda, and unlike the NOPR,[17] the final rule removes the principle that the states must consent to how and whether these massive costs are imposed on their consumers.  The final rule goes to great lengths to use "nothing to see here" rhetoric,[18] but looking behind the curtain at what is really going on makes it obvious that the final rule is pretextual and a blatant violation of the major questions doctrine.[19]  In its transparent effort to plan and

---

[16] *See* Brad Plumer, *Energy Dept. Aims to Speed Up Permits for Power Lines*, The New York Times, Apr. 25, 2024 ("[Biden] Administration officials are increasingly worried that their plans to fight climate change could falter unless the nation can quickly add *vast amounts of grid capacity to handle more wind and solar power* . . . .  But experts say a rapid, large-scale expansion *may ultimately depend on Congress*.") (emphases added), https://www.nytimes.com/2024/04/25/climate/energy-dept-speed-transmission.html.  *See also supra* nn.5, 8, 10, 13, 15 and *infra* n.67.

[17] *Bldg. for the Future Through Elec. Reg'l Transmission Planning & Cost Allocation & Generator Interconnection*, Notice of Proposed Rulemaking, 87 FR 26504 (May 4, 2022), 179 FERC ¶ 61,028, at P 303 (2022) (NOPR).

[18] *See, e.g.*, Final Rule, 187 FERC ¶ 61,068 at P 265 ("[W]hat matters is that this final rule aims to regulate and, in fact, does regulate only practices that affect the transmission of electric energy in interstate commerce, which are squarely within the Commission's jurisdiction under the FPA.").

[19] *See infra* Section III.C.  The final rule insists that it most assuredly does *not* implicate a major question of public policy, Final Rule, 187 FERC ¶ 61,068 at PP 275-279, much like Captain Renault in *Casablanca* is "shocked, *shocked* to find gambling going on in here" as he pockets his winnings.  *Casablanca* (Warner Bros. Pictures 1942); *but see* Brad Plumer, *Energy Dept. Aims to Speed Up Permits for Power Lines*, Apr. 25, 2024 (quoting Rob Gramlich, the president of the consulting group Grid Strategies, "'I've called [the final] rule the *biggest energy policy in the country*.'") (emphasis added), https://www.nytimes.com/2024/04/25/climate/energy-dept-speed-transmission.html.  *See* Catherine Morehouse, *FERC to tackle "historic" transmission planning rule in May*, PoliticoPRO, Apr. 18, 2024 (quoting Chairman Phillips describing the final rule as "*historic*" and the "*greatest development regarding electric transmission rules in the*

fund trillions of dollars' worth of transmission to facilitate a *preferred* generation mix predominantly of wind and solar, both for public policies as well as corporate purchasing preferences, it is also "preferential" and thus a clear violation of FPA section 206.

6.    Put most simply, the final rule is a shell game that plays this way:

*Step One:*  For planning and cost allocation purposes, throw transmission projects that solve specific reliability problems or reduce congestion costs into the same bucket as projects designed to promote public policies or corporate "green energy" preferences and disguise the purpose of very different projects by re-labeling *all* projects in the new bucket with the innocuous-sounding name "Long-Term Regional Transmission Facilities."

*Step Two:*  Mandate planning inputs that must be used in determining which projects get selected for regional plans, which starts the money flowing from consumers to developers before any state has even evaluated the need for, or cost of, the projects.

*Step Three:*  Mandate benefits that will ultimately affect the allocation of costs to consumers across a multi-state region.  Combined with Steps One and Two, this makes consumers involuntary "beneficiaries" who will then be forced to pay for projects that promote another state's public policy or corporate "green power" commitments.

*Step Four:*  Order all transmission providers to develop and file a cost allocation formula that will automatically be the default applicable to the entire bucket of Long-Term Regional Transmission Facilities.

*Step Five:*  Remove the NOPR's requirement that states must consent to the details of Steps One through Four before their consumers can be burdened with costs.

7.    Let's drill down on the details of the final rule's shell game.  The final rule seeks to shift the costs of transmission projects whose purpose is to implement state or local public policies promoting wind and solar generation (commonly referred to as "public policy projects" or "policy-driven projects") and big corporation "green energy" preferences by putting those projects into the same regulatory bucket—both for planning *and* cost-allocation purposes—with fundamentally different types of projects, those designed either to solve identified *reliability* problems (an engineering purpose, not a political or corporate purpose) or to provide quantifiable congestion cost savings (*economic* projects).[20]  The final rule labels *all* projects thrown into the new bucket as

---

*country in over a generation. . . .*") (emphases added).

[20]  *See, e.g.*, Final Rule, 187 FERC ¶ 61,068 at PP 1474 ("[T]ransmission providers

Docket No. RM21-17-000                                                        - 11 -

"Long-Term Regional Transmission Facilities."[21]  Lumping policy-driven projects with
the other very different types of projects is a sleight-of-hand move to disguise the costs of
the policy-driven and corporate-driven projects that the final rule is promoting.[22]  Put
most simply, reliability projects are driven by engineering, economic projects by
economics, public policy projects by politicians, and corporate "green energy" policies
by management and investors looking to maximize their returns or satisfy investment
goals not recognized by the FPA.

8.      Then to further promote its preferred policy projects, the final rule mandates
planning criteria to be used in the planning of Long-Term Regional Transmission
Facilities,[23] including the "categories of factors" that must be used in developing long-

_____

may not establish reliability, economic, or public policy transmission facility types as part
of Long-Term Regional Transmission Planning and, therefore, may not establish Long-
Term Regional Transmission Cost Allocation Methods based on reliability, economic, or
public policy transmission facility types.").

[21] *Id.*; *see also id.* PP 41, 250-251.  In terms of labeling, at least Order No. 1000
described public policy projects honestly, as those that address "transmission needs
driven by Public Policy Requirements."  *See, e.g.*, *Transmission Plan. & Cost Allocation
by Transmission Owning & Operating Pub. Utils.*, Order No. 1000, 136 FERC ¶ 61,051,
at PP 2, 6 (2011), *order on reh'g*, Order No. 1000-A, 139 FERC ¶ 61,132, *order on reh'g
& clarification*, Order No. 1000-B, 141 FERC ¶ 61,044 (2012), *aff'd sub nom. S.C. Pub.
Serv. Auth. v. FERC*, 762 F.3d 41 (D.C. Cir. 2014) (*South Carolina*); *see also id.* PP 11,
47.

[22] *See PJM Interconnection, L.L.C.*, 187 FERC ¶ 61,012 (2024) (Christie,
Comm'r, concurring at P 6 n.12) ("I note too that in PJM's [Regional Transmission
Expansion Plan (RTEP)] review it offers a good example of how components of two
different types of projects, a specific reliability solution and [State Agreement Approach
(SAA)] Project, can be combined into one project that meets both needs.  PJM describes
in its filing how it solved a Window 3 specific reliability problem by combining that
solution with an SAA project into an Incremental Multi-Driver Project. . . .  This is a
good example of how a multi-driver project should work:  The reliability need is specific
and would require a specific reliability solution that would, on its own, merit inclusion in
the RTEP as a reliability project, and the SAA project, which is a supplemental – not a
reliability – project, if feasible as it is in this specific case, can be planned in a way to
meet the specific reliability need.  Costs are allocated by PJM proportionately to each
component of the project, one percentage allocated as a reliability project under PJM's
formula, the other percentage wholly allocated to New Jersey for the SAA project.")
(internal citation omitted).

[23] Final Rule, 187 FERC ¶ 61,068 at Section III.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1305 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                    - 12 -

term planning scenarios[24] and the list of benefits that must be used by planners in cost-benefit analyses.[25]  All of these mandatory features are transparently intended to "pre-cook" outcomes by manipulating the planning and evaluations that determine which projects are selected for regional transmission plans.  (It is emblematic of the entire final rule that it did *not* include "saves retail customers money" as one of its mandatory benefits for evaluating projects.)[26]  The shell game's purpose is to ensure that preferential policy and corporate-driven projects are selected for regional transmission plans, which conveniently ensures that such projects are eligible for cost recovery through FERC's very generous (to developers, not consumers) formula rate mechanism.  As further proof of the nature of the shell game, the final rule does not require transmission providers to identify the benefits used (other than those mandated), or how those benefits were specifically calculated, for cost allocation purposes.[27]  While the final rule insists that it is not mandating *outcomes*, when you manipulate the *inputs* of transmission planning, you are effectively mandating outputs.[28]

9.    But that's not all; here comes the worst part of the shell game.  The final rule then requires every transmission provider in America to file an *ex ante* cost allocation formula that is applicable to the whole bucket of projects,[29] which now includes public and corporate-driven policy projects, *in order to socialize the costs of these projects across the entire region, even when states in a region have never consented for their consumers to bear the costs of such projects*.  The final rule seeks to justify this imposition of costs on non-consenting states by treating their consumers as "cost causers" or "beneficiaries,"[30] which is justified by—now circle back to earlier in the shell game—the

---

[24] *Id.* P 409.  Among the *mandatory* categories of factors that the final rule dictates must be used to drive long-term planning throughout the entire country are, *inter alia*:  (i) *state and local laws affecting the resource mix*, (ii) state and local laws on *decarbonization*, (iii) generator interconnection requests and withdrawals (another way to subsidize and prefer wind and solar developers which dominate the queues), and (iv) *corporate*, state and local government commitments to *purchase "green" energy*. Let me emphasize:  these planning factors are *mandatory* for transmission providers to use, exposing the final rule's pretextual agenda for what it really is.

[25] *Id.* PP 3, 269, 719-720.

[26] *See, e.g.*, *id.* P 720.

[27] *Id.* PP 1505-1511.

[28] *Id.* P 965.

[29] *Id.* P 1291.

[30] *See, e.g.*, *id.* P 1305 n.2786 ("The cost causation principle requires costs to be

final rule's imposition of mandatory factors and benefits that must be used in the evaluations of projects.[31]  By lumping reliability and economic projects into the same planning bucket as public and corporate-driven policy projects, the final rule seeks to affix the tags of "cost causer" and "beneficiary" to *all* consumers in a multi-state region, to justify sticking them with costs even if their state officials never consented.  So despite the final rule's disingenuous claims to the contrary,[32] the intent and effect of this shell game is to enable the costs of corporate and public policy-driven projects to be socialized across an entire multi-state region and thus shifted onto consumers in states that never agreed to bear such costs.  The *explicit* promise of the NOPR, that states would have to *consent* for their consumers to bear such costs, has been broken in this final rule.

10.     When I voted for the NOPR, I made it absolutely clear I was voting for it because it reflected a *compromise* in which public and corporate policy-driven projects could be

---

allocated to those who *cause* the costs to be incurred and *reap the resulting benefits*.") (emphasis added).  A true statement on its face, but utterly disingenuous here.  By mandating its preferred factors to be used in long-term planning, by mandating certain benefits to be used in evaluating projects, and by denying transparency as to what other benefits are used to evaluate projects and *how* benefits are being calculated, which drives cost allocation, the final rule effectively will hide the specific costs of policy and corporate-driven projects and essential information as to how costs are being calculated and allocated across a multi-state region.  *See also supra* n.10.

[31] These key elements of the shell game respond almost precisely to the lobbying demands of various interest groups.  *See, e.g.*, Environmental Groups Dec. 8, 2023 Comments ("Transmission providers *must* perform long-term (at least 20-year), forward-looking assessments. . . .  They *must* . . . [include] planning for *state clean energy laws and policies, [and] scenarios with high renewable penetration* . . . .  Scenarios *must* evaluate all benefits that transmission projects would deliver and *use these assessed benefits as a basis for project selection*. . . .  The Commission also should create a *default cost allocation* policy that meets this same standard . . . .") (emphases added).  Among others, the signers of this letter include:  Advanced Energy United, American Clean Power Association, Clean Air Task Force, Earthjustice, Environmental Defense Fund, Evergreen Action, League of Conservation Voters, National Wildlife Federation, Natural Resources Defense Council (NRDC), Sierra Club, Union of Concerned Scientists, and WE ACT for Environmental Justice.  *See also supra* nn.8, 10.

[32] Final Rule, 187 FERC ¶ 61,068 at P 267 ("[N]othing in this final rule requires states to subsidize other states' public policies and, indeed, this final rule requires . . . that transmission customers within a transmission planning region need only pay costs that are 'roughly commensurate' with the benefits that *transmission providers estimate* they will receive from a transmission facility.") (emphasis added).

Docket No. RM21-17-000                                                                        - 14 -

incorporated into long-term planning, but *only if* the states had the authority to consent *both* to planning criteria, including benefits used in cost-benefit analyses to evaluate projects and selection criteria, as well as to cost allocation.[33]  In my concurrence to the NOPR I wrote:

> Even more importantly though, for these [long-term] projects, the NOPR proposes to *require* the regional planning entities to consult with and *seek the agreement of the relevant states to both the selection criteria for these projects and to the regional cost allocation arrangements.  State approval is especially important in a multi-state region, where different states have different policies.*  The NOPR proposes to provide the maximum opportunity for creativity and flexibility to the states and regional entities in developing the process for designing and approving regional selection criteria and cost allocation arrangements.  States can agree to an *ex ante* formula for regional cost allocation of these types of projects — such as, for example, the "highway-byway" formula approved by the SPP Regional State Committee — or states can agree to a process for a project-by-project agreement on cost allocation among one or several states — such as, for example, the State Agreement Approach in PJM — or states may choose some combination of both.[34]

> And let me emphasize . . . *no individual state's consumers can be forced to bear the costs of another state's policy-driven project or element of a project against its consent.*[35]

> The bottom line for me is this:  I believe that elevating the role in planning and cost allocation of state regulators — *who are, as a group, deeply concerned about the monthly bills paid by consumers, of which transmission is a rapidly growing component* — will make it *more likely, not less*, that necessary transmission can get built *while ensuring that rates resulting from these types of policy-driven projects will not be*

---

[33] NOPR, 179 FERC ¶ 61,028 (Christie, Comm'r, concurring at PP 11-12, 14) (NOPR Concurrence); *see also id.* P 5.

[34] *Id.* P 11 (emphasis in original and added).

[35] *Id.* P 12 (emphasis added).

> *unjust and unreasonable, which they clearly have the*
> *potential to be.*[36]

The other members of the Commission, including the then-Chairman and both other

members of today's Commission, also recognized the NOPR as a compromise.[37]

---

[36] *Id.* P 14 (emphasis in original and added).

[37] From the Transcript of Apr. 21, 2022 Commission Open Meeting (April 2022
Open Meeting Tr.):

"CHAIRMAN GLICK: And I also want to finally thank my colleagues. I think this
[NOPR] is a *really good product.* It is a product of a lot of discussion, *a lot of
compromise*—which is what *the Commission is all about*—and I think *all of us can say
we did not get everything in there, in the document, that we would like, but I think we all
got enough in there and I think we achieved a significant and really remarkable level of
consensus.* And I think that is very notable today." April 2022 Open Meeting Tr. 44:17-
24 (emphases added).

"COMMISSIONER CLEMENTS: As the Chairman [stated] that reaching agreement on
this proposal was not easy. I can say with confidence that *none of us voting for it would
have written it this way if we were writing on our own. But I am proud that it is a
bipartisan effort,* and I am thankful to my colleagues for proactively engaging and for
thinking creatively to find alignment." *Id.* at 55:17-23 (emphasis added).

"COMMISSIONER CHRISTIE: But I think on balance the positive aspects of this
[NOPR], *particularly for state regulators at the heart of planning and cost allocation for
these types of projects*, changing [CWIP] to AFUDC[,] I think those are *positive, big
steps forward for me on balance and it makes it worth voting for this [NOPR].*" *Id.* at
67:15-20 (emphasis added).

"COMMISSIONER PHILLIPS: I would first like to thank my colleagues for working
collaboratively with me on this. . . . I don't think I have ever been a part of a process
more collaborative than this process that we had in this NOPR." *Id.* at 67:24-25, 68:6-8.

To those who say that many elements of this final rule were also in the NOPR for
which I voted, such as, for example, the mandatory categories of factors, I would
respond: If I agree to get a root canal with anesthetic, but learn upon arrival at the
dentist's office that I can still get the root canal but with no anesthetic, that is not the
original deal.

Docket No. RM21-17-000                                                           - 16 -

11.     Yet the many fundamental changes made in this final rule[38] subvert and violate
that compromise.  Of particular importance to my willingness—and that of many state
regulator organizations—to support the compromise NOPR, was the explicit principle of
state agreement to planning and selection criteria and cost allocation embodied in the
NOPR.  The final rule, however, *denies what the NOPR promised*:  it denies state
agreement to selection criteria,[39] it denies state agreement to the benefits to be used in
evaluating projects for selection in regional plans and ultimate selection (which can start
the money flowing from consumers to developers before a state siting or construction
permit has even been issued),[40] and most importantly, it denies state agreement to cost
allocation for public policy and corporate-driven projects.[41]  The State Agreement
Approach, used successfully in PJM for over a decade, is effectively terminated by the
final rule.  The final rule says that, *even if states in a planning region agree*, a "State
Agreement Process" *cannot* be the sole chosen method for allocating costs of these
projects; the transmission provider's own *ex ante* formula *must* be the default method,
regardless of whether states have agreed to it.[42]  In addition to a *de facto* termination of
the PJM State Agreement Approach, the final rule could call into question mechanisms to
facilitate the states' role in cost allocation that have been used in other RTOs and ISOs
for years, including in SPP and MISO.[43]

12.     And let's get real:  Telling the states to negotiate for an alternative cost allocation
when the transmission provider's *ex ante* formula has already been designated as the
default is no real negotiation at all.  The final rule points a regulatory gun at states' heads
redolent of *The Godfather*:[44]  "Here's an offer you can't refuse."  And contrary to
NARUC's eminently reasonable and practical request,[45] the final rule even requires only

---

[38] *See infra* Section II.

[39] Final Rule, 187 FERC ¶ 61,068 at P 996.

[40] *Id.* PP 3, 269, 719-720, 903.

[41] *Id.* PP 1291-1292, 1294, 1354, 1356 n.2895, 1359, 1367, 1429.

[42] *Id.*  To be clear, even if the states agreed on an alternative *ex ante* cost allocation
method, or if they agreed on a cost allocation method under the State Agreement Process,
the transmission provider could choose to file it but also *could ignore it.  See infra* n.195.

[43] *See* Final Rule, 187 FERC ¶ 61,068 at PP 1291-1292, 1294, 1354, 1356 n.2895,
1359, 1367, 1429.

[44] *The Godfather* (Paramount 1972).

[45] Final Rule, 187 FERC ¶ 61,068 at P 1255 ("NARUC requests that the
Commission provide a mechanism for future review of cost allocation methods for Long-

one Engagement Period for states to negotiate a different cost allocation from the transmission providers' *ex ante* cost allocation before that *ex ante* cost allocation becomes the default.[46]  It is obvious that the final rule intends to lock in each transmission provider's own *ex ante* formula for many years to come and to deny states any avenue to challenge it even as times and circumstances change, no matter how high their consumers' power bills escalate due to rising transmission costs.

13.     Essentially, the final rule replaces the NOPR's principle of requiring state agreement to selection criteria, benefits, and cost allocation with a charade of suggesting to transmission providers that they "consult with and seek support" from the states—while paradoxically "clarifying" that transmission providers do not actually need to obtain state consent—and the final rule uses other empty phrases such as allowing states to "inform" or "provide input on" the evaluation process and cost allocation.[47]  But the final rule's real attitude towards the states and state regulators is embodied in this airily regal but perhaps unintentionally straightforward pronouncement:  "[W]e do not agree that the views of state regulators regarding the appropriate cost allocation approach are dispositive."[48]

14.     The principle of cost allocation that was described in my concurrence to the NOPR—that states must consent to regional cost allocation of corporate and public policy-driven projects—reflects a core principle of American democracy:  *fairness*.  In this ratemaking context, fairness means that the people have the right to choose the policymakers who impose costs on them, so they can hold them accountable.  This final rule is *unfair* because it gives FERC and the transmission providers it regulates the power to *impose* costs on consumers to pay for transmission driven by huge corporations and politicians in states other than theirs, and for whom they never voted.  The final rule truly subverts the principle that the people, through their state's policymakers, must consent to bear the costs of another state's politicians and their policy choices, or the energy purchasing preferences of corporate managers and investors.

---

Term Regional Facilities." (citing NARUC Initial Comments at 49-50)).

[46] *Id.* P 1368; *see also id.* P 1291.

[47] *See, e.g.*, *id.* PP 268, 959, 994, 996-997, 1456.

[48] *Id.* P 1363 (citation omitted).  A different attitude towards state regulators was apparent in the NOPR.  *See* April 2022 Open Meeting Tr. 46:10-16 ("CHAIRMAN GLICK:  [This] NOPR proposes to give the states a much more significant role in addressing cost allocation.  I think it helps to have Commissioner Christie and Commissioner Phillips, two of our five Commissioners are former state regulators, and I think that really helps to have their background and their interest.").

Docket No. RM21-17-000                                                                 - 18 -

15.     And from the consumer standpoint, the timing of this rule could not be worse. American residential customers will pay about 16.23 cents per kWh next year, the *highest retail power cost for consumers in almost three decades*.[49]  Unlike in years past, fuel costs are not the primary driver of these mounting prices to consumers; rather, transmission is.  Transmission costs are rising rapidly, becoming an ever more burdensome part of consumers' power bills.[50]  To cite just one major example, in PJM, the largest RTO by load in the country, the transmission component of wholesale power costs has essentially *tripled* over the past decade, from just $5.65/MWh in 2013 to $16.54/MWh last year.  Transmission now constitutes almost a third of wholesale power costs, up from approximately 10% just a decade earlier.[51]  In 2020, the PJM Market

---

[49] *See* Robert Walton, *U.S. electricity prices outpace annual inflation*, Utility Dive, Mar. 13, 2024 ("U.S. electricity prices rose 3.6% over the last 12 months, outstripping the broader inflation rate of 3.2%, the Bureau of Labor Statistics reported Tuesday.  And experts say *there is little chance for near-term consumer relief*. . . .  And *federal policies aimed at electrifying end uses and reducing emissions could lead to even higher prices*, Travis Fisher, director of energy and environmental policy studies at the Cato Institute, told a House subcommittee Wednesday.") (emphasis added), https://www.utilitydive.com/news/us-electricity-prices-rise-customer-eia-outlook/710113/.

[50] *See, e.g.*, Zach Bright, *Electricity prices rise faster than inflation*, *EnergyWire*, Apr. 12, 2024 ("The Bureau of Labor Statistics found that electricity prices rose 5 percent over the past year.  *That's higher than the overall consumer price index (3.5 percent) and any other single commodity, like food . . . and gasoline* . . . .") (emphases added), https://www.eenews.net/articles/electricity-prices-rise-faster-than-inflation/; *Electricity Inflation 30% Higher Than CPI Over Last 12 Months*" Electricity Transmission Competition Coalition, Apr. 10, 2024 ("Electricity inflation remains the highest consumer goods cost among the items in the Consumer Price Index according to the latest release of data by the Bureau of Labor Statistics. . . .  The price of electricity has soared because of the *accelerating cost of transmission* . . . .") (emphasis added), https://electricitytransmissioncompetitioncoalition.org/electricity-inflation-30-higher-than-cpi-over-last-12-months/.

[51] State of the Market Report 2023, PJM Market Monitor, Vol. II, Section 1, at 18, Table 1-9, https://www.monitoringanalytics.com/reports/PJM_State_of_the_Market/2023.shtml; State of the Market Report 2014, PJM Market Monitor, Vol. II, Section 1, at 16, Table 1-9, https://www.monitoringanalytics.com/reports/PJM_State_of_the_Market/2014/2014-som-pjm-volume2-sec1.pdf; State of the Market Report 2013, PJM Market Monitor, Vol. II, Section 1, at 12, Table 1-9, https://www.monitoringanalytics.com/reports/PJM_State_of_the_Market/2013/2013-som-pjm-volume2-sec1.pdf; *see also* State of the Market Report 2019, PJM Market

Docket No. RM21-17-000                                                                                        - 19 -

Monitor reported that the cost of transmission exceeded the cost of capacity for the first time.[52]  Nationally, transmission rate base nearly tripled in a decade,[53] and—assuming an 8.2% year-over-year growth rate, which occurred in 2022—is on track to double again in the next nine years, even without this rule's intent to spend trillions more on transmission.  According to the U.S. Energy Information Administration, already one in three American households reports difficulty in paying their power bills.[54]

16.    Don't fall for the absurd claim that this rule will somehow save consumers money through more holistic or efficient planning, a vacuous bureaucratic argument divorced from reality.[55]  The sheer amount of new transmission costs that the final rule inflicts on consumers—and special interest groups want—is staggering, measured in the *trillions*,[56] not 'merely' hundreds of billions, of dollars.[57]  And these staggering costs will not be

_____

Monitor, Vol. II, Section 1, at 18, Table 1-10, https://www.monitoringanalytics.com/reports/PJM_State_of_the_Market/2019/2019-som-pjm-sec1.pdf.

[52] State of the Market Report 2020, PJM Market Monitor, Vol. I, at 17, Table 8, https://www.monitoringanalytics.com/reports/PJM_State_of_the_Market/2020/2020-som-pjm-vol1.pdf.

[53] *See* Jim O'Reilly, *Led by AEP and Duke, transmission growth poised to rebound from dip in 2022*, S&P Global Market Intelligence, Nov. 15, 2023 (showing bar graph providing that aggregate transmission rate base grew from $61.4 billion in 2012 to $163.1 billion in 2022), https://www.spglobal.com/marketintelligence/en/news-insights/research/led-by-aep-and-duke-transmission-growth-poised-to-rebound-from-dip-in-2022.  Under this Commission's rate recovery protocols, the transmission owner gets to collect the annual costs of transmission depreciation from rate base, plus a profit, known as Return on Equity, or "ROE," often inflated by the many incentives the Commission typically approves, as well as operations and maintenance costs.  As any utility regulator knows, "what goes into rate base comes out in customers' bills."  So a rapidly rising rate base means rapidly growing consumers bills.

[54] Amanda Durish Cook & Tom Kleckner, *Overheard at 10th Annual GCPA MISO-SPP Forum*, RTO Insider, Mar. 12, 2024, https://www.rtoinsider.com/73311-overheard-10th-annual-gcpa-miso-spp-forum/.

[55] *See, e.g.*, Final Rule, 187 FERC ¶ 61,068 at P 89.

[56] *See supra* n.7.

[57] Illinois Senator Everett Dirksen is said to have once quipped, "In Washington, a billion here, a billion there, and pretty soon you're talking about real money."  The final

Docket No. RM21-17-000                                                      - 20 -

incurred to provide consumers with reliable power, but to serve political and corporate agendas.[58]  It is truly Orwellian newspeak[58] to claim that adding multiple trillions of dollars in transmission costs to consumer's bills will somehow "save" consumers money (even Orwell would be impressed at the sheer audacity of such a claim).

17.    If FERC were seriously interested in saving consumers' money, it would be acting to rein in the wide array of transmission incentives regularly handed out to transmission developers that are direct transfers of wealth from consumers to developers (long known as "FERC candy"),[59] and acting to reform the automatic awarding of the presumption of prudence in formula rate proceedings.  Literally *nothing* is being done about these forms of consumer exploitation in this final rule; instead, the final rule goes in the exact opposite direction.

18.    To add further insult to consumers' injury, the final rule *walks back* the NOPR proposal that would have denied transmission developers the Construction Work in Progress (CWIP) incentive.[60]  I have written many times that CWIP is simply unfair. CWIP is unfair because it makes consumers the unwilling "bank" for developers, but unlike a real bank, consumers don't get paid any interest and this Commission forces them to make involuntary loans.[61]  Removing CWIP was strongly supported by those

---

rule updates his quip to a "trillion here, a trillion there . . . ."

[58] George Orwell, *1984* (first published by Secker & Warburg 1949).

[59] *See, e.g.*, *Office of Ohio Consumers' Counsel v. Am. Elec. Power Serv. Corp.*, 181 FERC ¶ 61,214 (2022) (Christie, Comm'r, concurring at P 2), https://www.ferc.gov/news-events/news/commissioner-christies-concurrence-addressing-rto-adders-related-e-2-ohio; *MISO*, 181 FERC ¶ 61,094 (2022) (Christie, Comm'r, concurring at P 2), https://www.ferc.gov/news-events/news/commissioner-christies-concurrence-urging-action-re-rto-participation-adder-docket; Mary O'Driscoll, *FERC approves incentives for AEP, Allegheny grid projects*, Greenwire, July 21, 2006 ("The approvals came as the commission finalized rules intended to promote transmission-grid additions that outline specific rate and other incentives that FERC will consider for future construction projects — the *'FERC candy'* that critics contend gives the utilities incentives but not much in the way of corresponding requirements.") (emphasis added), https://subscriber.politicopro.com/article/eenews/2006/07/21/ferc-approves-incentives-for-aep-allegheny-grid-projects-234508.

[60] Final Rule, 187 FERC ¶ 61,068 at P 1547.

[61] *Baltimore Gas & Elec. Co.*, 187 FERC ¶ 61,030 (2024) (Christie, Comm'r, dissenting at P 7), https://www.ferc.gov/news-events/news/commissioner-christies-dissent-award-incentives-exelon-er24-1313; *PJM Interconnection, L.L.C.*, 185 FERC ¶ 61,200 (2023) (Christie, Comm'r, concurring at P 3), https://www.ferc.gov/news-

Docket No. RM21-17-000                                                      - 21 -

concerned with protecting consumers:  by state regulators, by public power providers, and by state consumer advocates.

19.    In my concurrence to the NOPR, I wrote:

> CWIP is the award of cost recovery of construction costs
> during the pre-construction and construction phases to the

events/news/e-7-commissioner-christies-concurrence-exelons-application-abandoned-plant; *The Potomac Edison Co.*, 185 FERC ¶ 61,083 (2023) (Christie, Comm'r, concurring at P 3), https://www.ferc.gov/news-events/news/commissioner-christies-concurrence-concerning-potomac-edisons-abandoned-plant; *Montana-Dakota Utils. Co.*, 185 FERC ¶ 61,015 (2023) (Christie, Comm'r, concurring at P 3), https://www.ferc.gov/news-events/news/commissioner-christies-concurrence-montana-dakota-utilities-co-regarding; *Midcontinent Indep. Sys. Operator, Inc.*, 184 FERC ¶ 61,136 (2023) (Christie, Comm'r, concurring at P 3), https://www.ferc.gov/news-events/news/commissioner-christies-concurrence-midcontinent-independent-system-operator-inc-0; *GridLiance W. LLC*, 184 FERC ¶ 61,129 (2023) (Christie, Comm'r, concurring at P 3), https://www.ferc.gov/news-events/news/commissioner-christies-concurrence-gridliance-west-regarding-transmission; *Midcontinent Indep. Sys. Operator, Inc.*, 184 FERC ¶ 61,034 (2023) (Christie, Comm'r, dissenting at P 8), https://www.ferc.gov/news-events/news/commissioner-christies-dissent-award-transmission-incentives-nipsco-er23-1904; *Otter Tail Power Co.*, 183 FERC ¶ 61,121 (2023) (Christie, Comm'r, concurring at P 8), https://www.ferc.gov/news-events/news/e-18-commissioner-christies-concurrence-otter-tail-power-company-regarding; *LS Power Grid Cal., LLC*, 182 FERC ¶ 61,201 (2023) (Christie, Comm'r, concurring at P 3), https://www.ferc.gov/news-events/news/commissioner-christies-concurrence-ls-power-grid-regarding-transmission-incentives; *Nev. Power Co.*, 182 FERC ¶ 61,186 (2023) (Christie, Comm'r, concurring at P 3), https://www.ferc.gov/news-events/news/commissioner-christies-concurrence-nv-energy-regarding-transmission-incentives; *The Dayton Power and Light Co.*, 182 FERC ¶ 61,147 (2023) (Christie, Comm'r, concurring at P 3), https://www.ferc.gov/news-events/news/commissioner-christies-concurrence-dayton-power-and-light-company-regarding; *Midcontinent Indep. Sys. Operator, Inc.*, 182 FERC ¶ 61,039 (2023) (Christie, Comm'r, concurring at P 3), https://www.ferc.gov/news-events/news/commissioner-christies-concurrence-midcontinent-independent-system-operator-inc; *NextEra Energy Transmission Sw., LLC*, 180 FERC ¶ 61,032 (2022) (Christie, Comm'r, concurring at P 3) (July 2022 Concurrence), https://www.ferc.gov/news-events/news/commissioner-christies-concurrence-nextera-energy-transmission-southwest-llc; *NextEra Energy Transmission Sw., LLC*, 178 FERC ¶ 61,082 (2022) (Christie, Comm'r, concurring at P 3) (February 2022 Concurrence), https://www.ferc.gov/news-events/news/commissioner-mark-c-christie-concurrence-nextera-energy-transmission-southwest-llc.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1315 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                    - 22 -

> developer.  CWIP is, of course, passed through as a cost to
> consumers, making consumers effectively an involuntary
> lender to the developer. . . .  Consumers should be protected
> from paying CWIP costs during this potentially long period
> before a project actually enters service, if it ever does.  *This
> NOPR proposal represents a major step forward in consumer
> protection and is a big reason I am voting for it.*[62]

By walking back the proposed CWIP denial, the final rule results in a *major step
backwards* for consumers.[63]

20.    In yet another major slap at consumers, the final rule seeks to shift the substantial
costs caused by generation developers' interconnection requests from developers to
consumers.[64]  It does this by ordering transmission providers to revise their regional
transmission planning processes to evaluate for selection regional transmission facilities
that address identified interconnection-related transmission needs, and the final rule
specifies that if such a facility is selected, *its costs will be regionally allocated*.[65]  It also
does this by ordering transmission providers to incorporate generator interconnection

---

[62] NOPR Concurrence at P 15.

[63] By doing nothing about the consumer-paid "FERC candy" incentives that this
Commission regularly hands out to developers, and even removing the provisions dialing
back the CWIP incentive—and with its overall aim to pile trillions of dollars of additional
costs for big corporate and politically-driven transmission on consumers, which will
largely flow to the increased profits of wind, solar and transmission developers—the final
rule could be the inspiration for one of the great country and western songs "Lord Have
Mercy on the Working Man."  Warner Bros. Nashville 1992 ("Why's the rich man busy
dancing while the poor man pays the band?  Oh they're billing me for killing me, Lord
have mercy on the working man!").

[64] Final Rule, 187 FERC ¶ 61,068 at PP 472, 1106-1107, 1126, 1145.

[65] *Id.* PP 125, 1106-1107, 1126, 1145.  Under "participant funding" mechanisms
the generation developer pays the costs of the network upgrades costs it causes and
consumers do not pay, which is only fair.  The Commission's Order No. 2023 did not
violate this principle.  *See generally Improvements to Generator Interconnection Procs.
& Agreements*, Order No. 2023, 88 FR 61014 (Sept. 6, 2023), 184 FERC ¶ 61,054, *order
on reh'g*, 185 FERC ¶ 61,063 (2023), *order on reh'g*, Order No. 2023-A, 89 FR 27006
(Apr. 16, 2024), 186 FERC ¶ 61,199 (2024).  This final rule clearly intends to undermine
this principle by moving interconnection costs into regional transmission planning and
cost allocation, so consumers get stuck with the costs of interconnection, even though it is
developers who profit from interconnection.

Docket No. RM21-17-000                                                          - 23 -

requests and withdrawals in their long-term transmission planning.[66]  These are only schemes to shift interconnection costs from developers to consumers and will result in rates that are blatantly unjust, unreasonable, unduly discriminatory and preferential.  Similarly, the final rule also inappropriately shifts preferential corporate-driven project costs onto *all* other consumers, who may disagree with, or even compete against, the corporate customers imposing their preferences.  These provisions alone render the final rule's replacement rate unlawful under FPA section 206.

21.    This Commission is, by statute, supposed to be *independent* of any presidential administration, but it has failed to defend that independence in this final rule, which is a naked pretext to enact the current administration's "net zero 2035" policy agenda, as well as to serve corporate agendas, and those of other profit-seeking special interests.[67]  In failing to act independently,[68] this Commission has broken faith with state regulators and, even more importantly, broken faith with tens of millions of American consumers, who could be forced to bear literally trillions of dollars in costs for transmission lines to serve political, corporate and other special-interest agendas.  This will not produce just and reasonable rates and is grossly unfair.  This final rule is a dereliction of the Commission's duty under the FPA to protect consumers and far exceeds its authority under that statute.

## II.    <u>The Final Rule Is Fundamentally Different from the NOPR</u>

22.    The very essence of due process is notice and opportunity to be heard.  Given the large number of fundamental changes to the NOPR, the final rule should be viewed as effectively a second NOPR and clearly should have been put out for additional public

---

[66] Final Rule, 187 FERC ¶ 61,068 at P 472.

[67] *See* Miranda Willson, Heather Richards, Brian Dabbs, *Biden regulatory plan set to shake up energy sector*, Energywire, Dec. 7, 2023 ("The White House released a regulatory plan Wednesday that could shape President Joe Biden's energy legacy . . . . *[T]wo of the Federal Energy Regulatory Commission's most high-profile proposed transmission rules are listed on the [White House] agenda . . . .*  One of those FERC rules would *change how large electric power lines are planned and paid for . . . .*") (emphases added), https://www.eenews.net/articles/biden-regulatory-plan-set-to-shake-up-energy-sector/; *see also supra* nn.5, 8, 10, 13, 15, 16.

[68] In the very recent past, this Commission stood up for its independence despite intense pressure from a presidential administration.  *See, e.g.*, Steven Mufson, *Trump-appointed regulators reject plan to rescue coal and nuclear plants*, The Washington Post, Jan. 8, 2018 (explaining that "[t]he independent five-member commission [that rejected the president's proposal] includes four people appointed by President Trump"), https://www.washingtonpost.com/news/energy-environment/wp/2018/01/08/trump-appointed-regulators-reject-plan-to-rescue-coal-and-nuclear-plants/.

Docket No. RM21-17-000                                                                    - 24 -

comment on the many fundamental changes. Because it was not, deliberately so, this final rule invites a court to remand with instructions for the Commission to give the public an opportunity to comment on the many fundamental changes from the NOPR.

23.      The final rule issuing today is not the NOPR for which I voted. This pretextual final rule is fundamentally different in numerous ways, yet these fundamental changes were never put out for additional public comment.[69] These fundamental changes include, but are not limited to, the following:

24.      *The Final Rule Imposes Preferential Policy and Corporate-Driven Project Costs on Consumers in Non-Consenting States*:  Contrary to the NOPR, the final rule requires the filing of one or more *ex ante* cost allocation methods to apply to selected Long-Term Regional Transmission Facilities, setting up a mechanism to impose a regional cost allocation for preferential policy and corporate-driven projects when states do not consent, either by approving a cost allocation proposed by transmission owners, by RTOs, or one directly imposed by the Commission itself.[70]  This is a fundamental change from the NOPR.

25.      *The Final Rule Mandates Planning Criteria and Purported Benefits*:  Contrary to the NOPR, the final rule mandates a specific set of planning criteria, and specifically purported benefits, that must be used by transmission providers for these preferential policy and corporate-driven projects.[71]  Mandating the planning criteria and benefits is simply a way of "pre-cooking" outcomes and is directly contrary to the NOPR's explicit language that said it was *not* mandating outcomes, only a planning process.[72]  This is a fundamental change from the NOPR.

26.      *The Final Rule Abandons Regional Cost Allocation Principle (6)*:  Contrary to the NOPR,[73] the final rule abandons the regional cost allocation principle[74] that would allow

---

[69] The process leading to the adoption of Order No. 1000, the final rule's direct predecessor but one not nearly as sweeping in its application, was described in paragraphs 22 through 24 of that order. Order No. 1000, 136 FERC ¶ 61,051 at PP 22-24.

[70] Final Rule, 187 FERC ¶ 61,068 at PP 1291-1292.

[71] *Id.* PP 3, 269, 719-720.

[72] *See* NOPR, 179 FERC ¶ 61,028 at PP 9, 245.

[73] *See id.* P 302.

[74] *See* Order No. 1000, 136 FERC ¶ 61,051 at P 685.

Docket No. RM21-17-000                                                  - 25 -

a transmission planning region to use different cost allocation methods for different types of facilities in a regional transmission plan. The final rule replaces this flexibility with a one-size-fits-all model.[75] This is a fundamental change from the NOPR.

27.     *The Final Rule Effectively Eliminates a Voluntary State Agreement Process*: Contrary to the NOPR, the final rule effectively eliminates the use of a voluntary State Agreement Process, such as the one that has been used by PJM since Order No. 1000.[76] Not only is this directly contrary to comments filed by state regulators,[77] but it represents a fundamental change from the NOPR.

28.     *The Final Rule Leaves the CWIP Incentive Intact*: Contrary to the NOPR, the final rule walks back the proposal not to allow use of the CWIP incentive.[78] This NOPR provision was one of the strongest consumer protection features.[79] Instead, the Commission leaves the CWIP incentive intact and that consumer protection has been removed. This is a fundamental change from the NOPR.

29.     *The Final Rule Makes Local Transmission Planning Less Transparent*: Contrary to the NOPR,[80] the final rule makes fundamental changes to the NOPR's section on Local Transmission Planning.[81] Local Transmission Planning disclosure and transparency requirements no longer apply to asset management projects. This is a fundamental change from the NOPR.

---

[75] Final Rule, 187 FERC ¶ 61,068 at P 1469 ("[U]nlike under Order No. 1000, transmission providers *cannot* adopt different Long-Term Regional Transmission Cost [A]llocation Methods for different types of Long-Term Regional Transmission Facilities, such as those needed for reliability, congestion relief, or to achieve Public Policy Requirements.") (emphasis added); *see also id.* P 1474.

[76] *See, e.g.*, *id.* PP 1291-1292. A more detailed discussion on how the final rule effectively guts the State Agreement Process is in *infra* Section IV.B.1.b.

[77] *See* Final Rule, 187 FERC ¶ 61,068 at P 1323 (citations omitted).

[78] *Id.* P 1547.

[79] *See* NOPR, 179 FERC ¶ 61,028 at P 333; NOPR Concurrence at P 15.

[80] *See* NOPR, 179 FERC ¶ 61,028 at PP 400-413.

[81] Final Rule, 187 FERC ¶ 61,068 at P 1625.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1319 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                    - 26 -

### III.    The Final Rule Exceeds FERC's Authority under the FPA

30.    The final rule's determination that its reforms are within the Commission's legal authority under section 206 is flat wrong.[82]  The final rule is just a pretext for enacting the current presidential administration's "net zero 2035" policy agenda, as well as that of large corporate buyers of preferential power and other special interests.[83]  As such, the final rule goes far beyond the scope of Order No. 1000, as affirmed by *South Carolina*,[84] and exceeds FERC's authority under the FPA.  Specifically, the final rule requires transmission providers to incorporate into their transmission planning seven categories of factors and a set of seven required benefits to drive the construction of projects to achieve the final rule's preferred substantive outcomes:  namely, the development and purchase of certain preferred generation resources.  In so doing, the final rule seeks to recast FERC as a national IRP planner with extraordinary powers to oversee and dictate to all public utility transmission providers in the country, in RTO and non-RTO regions, detailed instructions on planning transmission that fulfills the current administration's preferred policies as to the types of generation it wants to build, and to charge consumers trillions of dollars for this transmission.  This transformation of FERC into a national IRP planner violates FPA section 201 by infringing on the authority of the states, and it reflects a tremendous expansion of the agency's power not permitted under the major questions doctrine.

### A.    *South Carolina* Does Not Provide a Legal Justification for the Commission's Actions in the Final Rule

31.    In arguing that the Commission is acting within its legal authority under section 206 to adopt its reforms for Long-Term Regional Transmission Planning, today's final rule heavily relies on *South Carolina*.[85]  However, given the significant differences between Order No. 1000 and the final rule, that reliance is grossly misplaced.

32.    Order No. 1000 included reforms intended to ensure that the transmission planning and cost allocation requirements embodied in the Commission's *pro forma* open access transmission tariff could support the development of more efficient or cost-effective

---

[82] *See id.* PP 86, 253.

[83] *See supra* Section I.

[84] 762 F.3d 41.

[85] *E.g.*, Final Rule, 187 FERC ¶ 61,068 at PP 86, 253, 256 & n.604, 257 & n.605, 277.

transmission facilities.[86] Such reforms included, *inter alia*, the requirement for transmission providers to participate in regional planning processes; the requirement that such regional transmission planning processes must consider transmission needs that are driven by public policy requirements; and the requirement that transmission providers develop a regional cost allocation method for new transmission facilities selected in the regional transmission plan for purposes of cost allocation, with such method having to satisfy six regional cost allocation principles.

33.    But Order No. 1000 was built on what may be a foundation of sand known as "*Chevron* deference." As the D.C. Circuit explained in *South Carolina*, "[t]he court reviews challenges to the Commission's interpretation of the FPA under the familiar two-step framework of [*Chevron*]."[87] The D.C. Circuit further explained that, "[i]f the court determines 'Congress has directly spoken to the precise question at issue,' and 'the intent of Congress is clear, that is the end of the matter.'"[88] This is often referred to as "*Chevron* step one."[89] The court stated, in contrast, that "[i]f . . . 'the statute is silent or ambiguous with respect to the specific issue,' then the court must determine 'whether the agency's answer is based on a permissible construction of the statute.'"[90] This is often referred to as "*Chevron* step two."[91] The D.C. Circuit explained that "*Chevron* step two . . . requires [the court] to uphold an agency's reasonable interpretation of a statute it administers."[92] That is, the court applies *Chevron* deference.[93]

34.    In *South Carolina*, the D.C. Circuit applied *Chevron* deference to the Commission's interpretation of FPA section 206 in affirming many aspects of Order No.

---

[86] *Id.* P 16 (citing Order No. 1000, 136 FERC ¶ 61,051 at P 3).

[87] *South Carolina*, 762 F.3d at 54 (citing *Chevron*, 467 U.S. 837).

[88] *Id.* (quoting *Chevron*, 467 U.S. at 842).

[89] *See, e.g.*, *id.* at 84.

[90] *Id.* at 54 (quoting *Chevron*, 467 U.S. at 843).

[91] *See, e.g.*, *id.* at 58-59 (citing *Chevron*, 467 U.S. at 843), 84.

[92] *Id.* at 76 (citing *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 982 (2005)).

[93] Note, however, that the U.S. Supreme Court is revisiting the 40-year-old doctrine and has indicated that it may narrow or overturn it in the pending cases, *Loper Bright Enterprises v. Raimondo*, No. 22-451 (argued Jan. 17, 2024) and *Relentless v. Dep't of Commerce*, No. 22-1219 (argued Jan. 17, 2024).

Docket No. RM21-17-000                                                              - 28 -

1000, including its planning mandates.[94]  In affirming the planning mandates, the court
emphasized that Order No. 1000 focused on process and *not* substantive outcomes:

> In Order No. 1000, the Commission expressly "decline[d] to
> impose obligations to build or mandatory processes to obtain
> commitments to construct transmission facilities in the
> regional transmission plan."  More generally, the Commission
> disavowed that it was purporting to "determine what needs to
> be built, where it needs to be built, and who needs to build it."
> As the Commission explained on rehearing, "*Order No.
> 1000's transmission planning reforms are concerned with
> process" and "are not intended to dictate substantive
> outcomes."  The substance of a regional transmission plan
> and any subsequent formation of agreements to construct or
> operate regional transmission facilities remain within the
> discretion of the decision-makers in each planning region.*[95]

35.     Similarly, in determining that Order No. 1000's public policy mandate fell within
the Commission's authority under section 206, the D.C. Circuit noted the mandate did not
promote any particular public policy:

> [Petitioners] seem to argue that the Commission can only
> exercise authority to promote goals specified in the FPA and
> that the public policy mandate cannot be justified with respect
> to any of those goals.  This argument misunderstands the
> nature of the mandate.  *It does not promote any particular
> public policy* or even the public welfare generally.  The
> mandate simply recognizes that state and federal policies
> might affect the transmission market and directs transmission
> providers to consider that impact in their planning
> decisions. . . .   This fits comfortably within the
> Commission's authority under Section 206. . . .  [T]he public
> policy mandate bears directly on the provision of
> transmission service.[96]

---

[94] *See South Carolina*, 762 F.3d at 56-59 (internal citations omitted).

[95] *Id.* at 57-58 (emphasis added; internal citations omitted).

[96] *Id.* at 89-90 (citation omitted).

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1322 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                                    - 29 -

Just as with Order No. 1000's planning mandates, the court again emphasized Order No.

1000's public policy mandate required the establishment of processes:

> But petitioners' attack is once again based on a
> misunderstanding of the orders.  The orders merely require
> regions to establish *processes* for identifying and evaluating
> public policies that might affect transmission needs.  The
> regions are free to choose their own manner of determining
> how best to identify and accommodate these policies.[97]

36.    Finally, in affirming Order No. 1000's requirements pertaining to cost allocation, the court again applied *Chevron* deference to its interpretation of section 206.[98]  The court noted that Order No. 1000 used a "light touch" in its cost allocation reforms:

> In keeping with the overall approach of the transmission
> planning reforms, [Order No. 1000] uses a light touch:  it
> does not dictate how costs are to be allocated.  Rather, [Order
> No. 1000] provides for general cost allocation principles and
> leaves the details to transmission providers to determine in
> the planning processes.[99]

37.    While Order No. 1000 used a "light touch," this pretextual final rule is heavy handed.  To ensure that policy and corporate-driven projects are ultimately built so that the preferred generation is built, the final rule seeks to promote particular public policies and to dictate substantive outcomes through its reforms to the Commission's transmission planning and cost allocation processes.[100]  If Order No. 1000 was upheld precisely because it was only mandating *processes*, not *outcomes*, then this final rule cannot stand on *South Carolina* because it nakedly intends to produce very specific outcomes.

38.    How does it intend to do this?  First, in contrast to Order No. 1000, which mandated consideration of public policies in transmission planning but *not* a particular policy,[101] the final rule *requires* transmission providers in their Long-Term Regional

---

[97] *Id.* at 91 (emphasis in original; internal citations omitted).

[98] *Id.* at 84-86.

[99] *Id.* at 81.

[100] In so doing, the final rule violates section 201 as well.  *See infra* Section III.B.

[101] *See South Carolina*, 762 F.3d at 89-90.

Docket No. RM21-17-000                                                    - 30 -

Transmission Planning to incorporate seven categories of factors—*i.e.*, specific policies, as I have emphasized.  Most of these mandatory categories of factors, which drive long-term transmission planning, specifically relate to the development and purchase of "green energy," including, *inter alia*:  (i) *state and local laws affecting the resource mix*, (ii) state and local laws on *decarbonization*, (iii) generator interconnection requests and withdrawals,[102] and (iv) *corporate*, state and local government commitments to *purchase "green energy."*

39.      The final rule describes the relationship between the categories of factors, transmission needs, and benefits, among other terms:

> For purposes of this final rule, Long-Term Regional Transmission Planning means regional transmission planning on a sufficiently long-term, forward-looking, and comprehensive basis to identify Long-Term Transmission Needs, identify transmission facilities that meet such needs, measure the benefits of those transmission facilities, and evaluate those transmission facilities for potential selection in the regional transmission plan for purposes of cost allocation as the more efficient or cost-effective regional transmission facilities to meet Long-Term Transmission Needs.

> For purposes of this final rule, Long-Term Transmission Needs are transmission needs identified through Long-Term Regional Transmission Planning, which, as discussed in this final rule, includes running scenarios and *considering the enumerated categories of factors*.[103]

Thus, categories of factors clearly shape the identification of transmission needs. Demonstrating this causal relationship, the final rule explains that "best available data inputs are data inputs that . . . reflect the *list of factors* that transmission providers account for in their Long-Term Scenarios,"[104] and, in turn, "Long-Term Scenarios . . . incorporate various assumptions using best available data inputs about the future electric

---

[102] This factor category is another way to subsidize and prefer wind and solar developers, which dominate the interconnection queues.

[103] Final Rule, 187 FERC ¶ 61,068 at PP 38-39 (emphasis added).

[104] *Id.* PP 42, 633 (emphasis added).

Docket No. RM21-17-000                                                          - 31 -

power system . . . *to identify Long-Term Transmission Needs* and enable the identification
and evaluation of transmission facilities to meet such transmission needs."[105]

40.    And, as we know, the identification of needs leads to the identification of
transmission facilities that meet such needs; the identification of transmission facilities in
turn leads to the measure of the benefits associated with those facilities; and the measure
of benefits informs the evaluation of those transmission facilities for potential selection in
the regional transmission plan for purposes of cost allocation.  Thus, as the categories of
factors are slanted toward transmission to facilitate preferred generation, the resulting
output of the transmission planning process will inevitably have a similar bent.  In other
words, the final rule's mandate of the categories of factors starts the domino effect
toward the final rule's agenda, an agenda that goes far beyond Order No. 1000.

41.    Second, in contrast to Order No. 1000, whose reforms "[were] concerned with
process" and "[were] not intended to dictate substantive outcomes,"[106] the final rule
requires transmission providers to measure a set of seven required benefits in their long-
term transmission planning so that the pretextual agenda will be realized.  By mandating
minimum benefits that the transmission providers must use to evaluate potential
transmission facilities,[107] the final rule is doing the opposite of using a "light touch;"
rather, the final rule is putting its thumb on the scale, seeking to dictate outcomes of the
transmission planning process.  As I must continue to emphasize, by mandating benefits,
the final rule makes consumers into involuntary "beneficiaries," who, through regional
cost allocation, will be forced to pay for transmission projects that support the
development and purchase of preferential power.  Accordingly, as with the final rule's
mandated categories of factors, the mandatory minimum benefits serve to advance the
final rule's specific policy objectives regarding the resource mix.  Such favoritism is
blatantly unduly discriminatory and preferential in contravention of section 206, and
therefore, the final rule is, simply put, not entitled to *Chevron* deference in any form.

**B.**    **The Final Rule Violates FPA Section 201**

42.    The final rule also infringes on the states' authority over electric generation
reserved to them by FPA section 201 and is thus *ultra vires*.

43.    As relevant here, FPA section 201(b) provides:

---

[105] *Id.* PP 40 and 302 (emphasis added).

[106] *See South Carolina*, 762 F.3d at 58 (internal citation omitted).

[107] Final Rule, 187 FERC ¶ 61,068 at P 965.

> The Commission shall have jurisdiction over all facilities for such transmission or sale of electric energy, *but shall not have jurisdiction*, except as specifically provided in this subchapter and subchapter III of this chapter, *over facilities used for the generation of electric energy* or over facilities used in local distribution or only for the transmission of electric energy in intrastate commerce, or over facilities for the transmission of electric energy consumed wholly by the transmitter.[108]

Further, section 201(a) also specifies that "such Federal regulation . . . extend[s] only to those matters which are not subject to regulation by the States." Courts have found that "states have broad powers under state law to direct the planning and resource decisions of utilities under their jurisdiction. States may, for example, order utilities to build renewable generators themselves, or . . . order utilities to purchase renewable generation."[109] These powers are reserved to the states under section 201.

44.    In *South Carolina*, the D.C. Circuit rejected the argument that section 201 prohibited Order No. 1000's transmission planning mandate.[110] The D.C. Circuit emphasized that "because the planning mandate relates wholly to electricity transmission, *as opposed to electricity sales*, it involves a subject matter over which the Commission has relatively broader authority."[111] The court also reasoned that "because [Order No. 1000's] planning mandate is directed at ensuring the proper functioning of the interconnected grid spanning state lines, . . . the mandate fits comfortably within Section 201(b)'s grant of jurisdiction over 'the transmission of electric energy in interstate commerce.'"[112] The court thus concluded that "Section 201 [did] not preclude the Commission's regulation of transmission planning in [Order No. 1000]" and that Order No. 1000 "[did] not interfere with the traditional state authority that is preserved by Section 201."[113]

---

[108] 16 U.S.C. 824(b)(1) (emphases added).

[109] *See, e.g.*, *Entergy Nuclear Vt. Yankee, LLC v. Shumlin*, 733 F.3d at 417 (quoting *S. Cal. Edison Co. San Diego Gas & Elec. Co.*, 71 FERC at 62,080).

[110] 762 F.3d at 62-64.

[111] *Id.* at 63 (emphasis added) (footnote omitted)

[112] *Id.* (internal citations omitted).

[113] *Id.* at 64.

45.      However, in contrast to Order No. 1000, the final rule absolutely does "interfere with the traditional state authority that is preserved by Section 201" to ensure that its preferential policy and corporate-driven projects get built.  By mandating, *inter alia*, categories of factors that drive the transmission planning process and by mandating minimum benefits to be used in the evaluation of potential Long-Term Regional Transmission Facilities, the final rule seeks to spur the building of transmission so as to promote a specific policy objective:  the development and purchase of preferential generation.  Accordingly, although the final rule strenuously insists that it is not mandating *outcomes*,[114] it is doing so by manipulating the *inputs* of transmission planning (*i.e.*, "pre-cooking").[115]  In other words, the final rule seeks to do indirectly what it may not do directly.

46.      As I explained in my concurrence to the NOPR:

> States can prefer, mandate or subsidize specific types of generation resources, but the Commission cannot use its authority over transmission to pressure, steer or require regional planning entities to act as the Commission's agents and do indirectly what the Commission cannot do directly.  The Commission is not a national integrated resource planner.  Order No. 1000, to its credit, recognized this clear delineation between federal and state authority.[116]

I also explained that "the Commission cannot *impose* a preference for certain types of generation *nor require* regional entities to plan transmission designed to prefer or facilitate one type of generation over another."[117]

47.      The text of the FPA gives this Commission *no* authority whatsoever to act as a national IRP planner for the purpose of promoting its preferred generation resource mix.  Pulling back the curtain, that is exactly what this pretextual final rule seeks to do.  By extending FERC's control over every public utility transmission planner in the country,

---

[114] *See* Final Rule, 187 FERC ¶ 61,068 at PP 954-955, 1026-1028.

[115] *Id.* P 965.

[116] NOPR Concurrence at P 2; *see also id.* n.4 (quoting Order No. 1000, 136 FERC ¶ 61,051 at P 154 ("*[T]he regional transmission planning process is not the vehicle by which integrated resource planning is conducted*; that may be a separate obligation imposed on many public utility transmission providers and *under the purview of the states*.") (emphases added in NOPR Concurrence)).

[117] *Id.* P 12 (emphases in original).

Docket No. RM21-17-000                                                    - 34 -

RTO or non-RTO, and ordering them to plan transmission lines intended to advance preferred policy and corporate goals, the Commission is stepping into the role of national IRP planner. FERC's authority under the FPA is limited to matters that *directly* affect *rates*, not practices that may theoretically have some tangential, indirect effect on rates,[118] especially improper purposes such as ordering transmission planning to promote one or more states' public policies or corporate goals as to preferred generation resources. Congress intended FERC to be a rate regulator, not a planner of generation *or transmission designed to bring about the construction of preferred types of generation.* Indeed, FPA section 215 explicitly states that FERC may *not* order the construction of any generation or transmission asset.[119] FERC cannot order transmission providers to do what FERC itself has no authority to do, yet that is exactly what this final rule aims to do.

48.     The final rule purports to order transmission planners to plan for a "predicted" generation mix in a distant future 20 years away, but the exact generation mix in 20 years is impossible to predict.[120] The real goal of this pretextual final rule is not to try the

---

[118] *See, e.g.*, *CAISO v. FERC*, 372 F.3d at 400 (holding that FERC cannot prescribe the membership of the CAISO board, as FERC has authority over only "rates, charges, classifications, and closely related matters"); *see also Ari Peskoe*, *Replacing the Utility Transmission Syndicate's Control*, Energy Law Journal, Vol. 44.3 547, 578 (2023) (Peskoe Article) ("FERC's authority over utility 'practices' is best understood as referring to 'actions habitually being taken by a utility in connection with a rate found to be unjust and unreasonable.'") (footnote omitted), https://www.eba-net.org/wp-content/uploads/2023/11/8-Peskoe547-618.pdf.

[119] FERC regulates RTOs and RTO markets to ensure just and reasonable rates to consumers, but FERC has no authority to order a load-serving public utility to build a specific generation facility, only states can. *See* 16 U.S.C. 824(b)(1); *see also Hughes v. Talen Energy Mktg.*, 578 U.S. 150, 154 (2016) ("The States' reserved authority includes control over in-state 'facilities used for the generation of electric energy.'" (quoting 16 U.S.C. 824(b)(1))); *see also* 16 U.S.C.824o(i)(2) ("[Section 215 of the FPA] does not authorize the [Electric Reliability Organization, *i.e.*, NERC] or the Commission to order the construction of additional generation or transmission capacity or to set and enforce compliance with standards for adequacy or safety of electric facilities or service."). Congress recently gave FERC a narrowly limited form of "backstop" siting authority for certain designated transmission lines, but that authority is not implicated in this final rule.

[120] PATH Concurrence at P 4 ("PATH graphically illustrates the inherent dangers in approving for regional cost allocation long-distance projects based on a prediction (*i.e.*, a guess) of what the generation mix will be in 20 years or more. PATH was originally part of the huge "Project Mountaineer" scheme—announced with great fanfare right here at the Commission itself – to build *three* high-voltage lines across hundreds of miles from West Virginia to East Coast load centers. The vast majority of the power to be delivered

Docket No. RM21-17-000                                                                     - 35 -

impossible by predicting the generation mix in 20 years. Instead, the final rule is an attempt to become a national IRP planner and *bring about* a preferred generation mix through transmission planning by manipulating and shaping the future generation mix the special interests supporting this final rule want now.

49.    The final rule denies that it is infringing on state authority reserved under FPA section 201, arguing, *inter alia*, that it directly regulates only those practices that affect the rates for the transmission of electric energy in interstate commerce and that it is not aiming to indirectly regulate any matter reserved to the states by FPA section 201.[121]  The final rule is chock-full of "nothing to see here" rhetoric asserting that it does not seek to shape the generation resource mix, but merely responds to changes in the electric industry.[122]  "Pay no attention to the [agenda] behind the [green] curtain!"[123] the final rule insists across 1300 pages.  But it should be obvious by now that the final rule is just a pretext for enacting this administration's "net zero 2035" policy agenda, as well those of corporate and other special interests.[124]  The true intent of the final rule is revealed by mandated categories of factors and minimum benefits, which drive the transmission development necessary to achieve the final rule's preferred generation resource mix.  Any honest account of the final rule cannot ignore the monetary windfall it would shower

_____

along these lines was to be *coal*-generated.  After running into a firestorm of opposition in both the states in the path (no pun intended), as well as the end-user load states, Project Mountaineer was abandoned except for the PATH project, which represented a segment of one of the proposed Project Mountaineer lines.  That segment was never built either.  Yet, consumers have been paying for it ever since.  The lesson here is clear:  For policy-driven long-distance, regional transmission projects affecting consumers in multiple states, it is absolutely essential that state regulators have the authority to approve – or disapprove – the construction of these lines *and* how they are selected for regional cost allocation *and* what that cost allocation formula is, if their consumers are going to be hit with the costs.") (emphasis in original).

   [121] Final Rule, 187 FERC ¶ 61,068 at P 263; *see also, e.g.*, *id.* P 271 ("[T]he requirements in this final rule respect and do not unlawfully infringe on state authority. Rather . . . the Commission is acting in an area squarely within its jurisdiction—transmission planning and cost allocation—by requiring transmission providers to engage in Long-Term Regional Transmission Planning to remedy deficiencies in the current transmission planning and cost allocation processes.").

   [122] *E.g.*, *id.* PP 129, 130, 254, 259-263, 266, 271, 275.

   [123] You can decide for yourself whether the "green curtain" represents "green energy" or something else that's green.

   [124] *See supra* Sections I, III.B.

Docket No. RM21-17-000                                                                          - 36 -

on generation and transmission developers; it is no wonder, therefore, why they were among the strongest supporters for the final rule. Nor can any rational individual—unless living in the Land of Oz—reasonably deny the role the final rule plays in furthering this pretextual agenda.[125] In light of this backdrop, the final rule's repeated assertions that it does not seek to shape the country's resource mix are simply not credible. Contrary to the final rule's claims, in violation of FPA section 201, the final rule transforms the Commission into a national IRP planner to promote the construction of transmission lines to further the development of the final rule's preferred generation resources.

### C.    The Final Rule Violates the Major Questions Doctrine

50.    Courts generally look with suspicion on "cryptic" delegations of authority,[126] and they are generally skeptical of agencies that seek to find "elephants in mouseholes," or otherwise seek to rely on tiny grants of authority to justify major actions.[127] As the Supreme Court explained in *West Virginia v. EPA*:

> Where the statute at issue is one that confers authority upon an administrative agency, that inquiry must be "shaped, at least in some measure, by the nature of the question presented"—whether Congress in fact meant to confer the power the agency has asserted. In the ordinary case, that context has no great effect on the appropriate analysis. Nonetheless, our precedent teaches that there are "extraordinary cases" that call for a different approach—cases in which the "history and the breadth of the authority that [the agency] has asserted," and the "economic and political significance" of that assertion, provide a "reason to hesitate before concluding that Congress" meant to confer such authority.[128]

51.    I invoked the major questions doctrine in my dissent to the proposed changes to the Commission's certificate policy, even before *West Virginia v. EPA* was handed down. In my dissent, I wrote that:

---

[125] *See supra* nn.5, 8, 10, 13, 15, 16, 67.

[126] *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000).

[127] *See West Virginia v. EPA*, 597 U.S. at 746-47 (Gorsuch, J., concurring) (quoting *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001)).

[128] *Id.* at 700 (internal citations omitted).

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1330 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                                - 37 -

> "The federal government's powers . . . are not general[] but limited and divided. Not only must the federal government properly invoke a constitutionally enumerated source of authority to regulate in this area or any other, it must also act consistently with the Constitution's separation of powers. And when it comes to that obligation, this Court has established at least one firm rule: 'We expect Congress to speak clearly' if it wishes to assign to an executive agency decisions 'of vast economic and political significance.' We sometimes call this the major questions doctrine."

> In short, the major questions doctrine presumes that Congress reserves major issues to itself, so unless a grant of authority to address a major issue is explicit in a statute administered by an agency, it cannot be inferred to have been granted.

> . . .

> Yet the Supreme Court has made it clear that broad deference to administrative agencies on major questions of public policy is not in order when statutes are lacking in any explicit statutory grant of authority. "*When much is sought from a statute, much must be shown*. . . . [B]road assertions of administrative power demand *unmistakable legislative* support."**129**

52.    The final rule's actions clearly implicate the major questions doctrine. If imposing a final rule intended to cost consumers literally trillions of dollars to build transmission projects designed to implement a sweeping policy agenda never passed by Congress is *not* a major question of public policy, then there is no such thing.**130**

---

**129** *Certification of New Interstate Nat. Gas Facilities*, 178 FERC ¶ 61,107 (2022) (Christie, Comm'r, dissenting at P 22-23 (quoting *Nat'l Fed'n of Indep. Bus. v. Dep't of Labor, OSHA*, 595 U.S. 109, 121-22 (2022) (Gorsuch, J., concurring); *In re MCP No. 165*, 20 F.4th 264, 267-68 (6th Cir. 2021) (Sutton, C.J., dissenting (emphases added)) (internal citations omitted) (Certificate Dissent), https://www.ferc.gov/news-events/news/items-c-1-and-c-2-commissioner-christies-dissent-certificate-policy-and-interim.

**130** *See* Brad Plumer, *Energy Dept. Aims to Speed Up Permits for Power Lines*, The New York Times, Apr. 25, 2024 (quoting Rob Gramlich, the president of the consulting group Grid Strategies, "'I've called [the final] rule the *biggest energy policy in the country*.'" (emphasis added)), https://www.nytimes.com/2024/04/25/climate/energy-

Docket No. RM21-17-000                                                                      - 38 -

53.     Yet the final rule brushes aside arguments that it would not withstand scrutiny under the major questions doctrine.[131]   Against these arguments, the final rule denies that its aim is to influence the generation mix;[132] asserts that it "neither transforms nor expands the Commission's authority; it merely applies existing authority;"[133] asserts that "the differences in transmission planning required by this final rule represent differences in degree, not kind, from the Commission's longstanding regulations;"[134] and asserts that its "incremental process improvements [from Order No. 1000], while necessary to ensure just and reasonable Commission-jurisdictional rates, do not have the 'vast economic and political significance' that would implicate the major questions doctrine."[135]  None of these assertions are credible.

54.     This final rule violates the major questions doctrine.  As discussed above, it is axiomatic that Congress has not intended for the Commission to be a national IRP planner.  On the contrary, it has left both the siting of transmission and the development of generation to the states.[136]  Yet the final rule encroaches on these traditional state prerogatives in the absence of any explicit Congressional authorization to do so.

55.     The final rule seeks to shape specific policy outcomes by mandating categories of factors and minimum benefits.  In addition, the final rule does something else that also arguably makes it transformative.  Citing, *inter alia*, *South Carolina*, the final rule declares that the Commission has exclusive jurisdiction over regional transmission planning and cost allocation processes:

---

dept-speed-transmission.html.

[131] Final Rule, 187 FERC ¶ 61,068 at P 275.

[132] *Id.*

[133] *Id.* P 277.

[134] *Id.*

[135] *Id.* P 278 (quoting *West Virginia v. EPA*, 597 U.S. at 735 (J. Gorsuch, concurring)).

[136] *See supra* Section III.B.  Since 2005, FERC has had very limited backstop siting authority for certain transmission projects that has never been used.  *See generally Applications for Permits to Site Interstate Elec. Transmission Facilities*, Order No. 1977, 187 FERC ¶ 61,069 (2024).

As the D.C. Circuit has recognized, regional transmission planning and cost allocation processes are practices affecting rates subject to the Commission's *exclusive* jurisdiction.[137]

In fact, the *South Carolina* court did *not* state that the Commission has *exclusive* jurisdiction over regional transmission planning and cost allocation. In fact, that court noted, for example, that the Florida Public Service Commission is statutorily vested with authority to "plan[], develop[], and main[tain] . . . a coordinated electric power grid" throughout the state.[138]

56. Whether the Commission can exclusively supplant the states in transmission planning and cost allocation is a major question—particularly considering the enormous breadth of the transmission grid, the importance of electricity in everyday life, and the trillions of dollars in transmission investment (read, cost increases) this final rule intends to impose on consumers.[139] The final rule's conclusion that regional transmission planning and cost allocation processes are subject to the Commission's exclusive

---

[137] Final Rule, 187 FERC ¶ 61,068 at P 86 & n.184 (emphasis added) (citing *South Carolina*, 762 F.3d at 55-59, 84 (affirming the Commission's authority to regulate transmission planning and cost allocation as practices affecting rates); Order No. 1000-A, 139 FERC ¶ 61,132 at P 577 (holding that "requirements regarding transmission planning and cost allocation . . . are practices affecting rates.")); *see also id.* P 130 ("Instead, because practices directly affecting Commission-jurisdictional rates, terms, and conditions of service for interstate transmission and wholesale electricity *are the exclusive jurisdiction of the Commission*, we must ensure that Commission-jurisdictional processes associated with regional transmission planning and cost allocation result in rates that are just and reasonable and not unduly discriminatory or preferential.") (emphasis added); *id.* P 770.

[138] *See, e.g.*, *South Carolina*, 762 F.3d at 62 n.3.

[139] *See FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 281 (2016) ("It is a fact of economic life that the wholesale and retail markets in electricity, as in every other known product, are not hermetically sealed from each other. To the contrary, transactions that occur on the wholesale market have natural consequences at the retail level.").

Docket No. RM21-17-000                                                                      - 40 -

jurisdiction suggests that the Commission "occupies the field"[140] in these areas.[141]  But this is wrong.  This pretextual final rule erodes the states' authority, which is inconsistent with the principle of cooperative federalism reflected in the FPA.  Under the major questions doctrine, absent an act of Congress, the Commission may not usurp the powers of the states in this manner.

## IV.    The Final Rule Fails Under Both Prongs of FPA Section 206

57.    I cannot support the final rule because it has been fundamentally changed from the NOPR.  In jettisoning essential components of the NOPR, the final rule has been reduced to a mere pretext for this supposedly *independent* Commission's effort to implement the current administration's "net zero 2035" policies.  It will not produce rates that are just and reasonable and not unduly discriminatory or preferential.  This final rule does not satisfy either of the requirements of FPA section 206.  Under section 206, the Commission must first find that the rate on file is no longer just and reasonable and not unduly discriminatory or preferential.  Then the Commission must find that a particular replacement rate would be just and reasonable and not unduly discriminatory or preferential.[142]  The final rule fails on both counts.

58.    Although the current regional transmission planning processes could be improved—they are certainly not in need of the final rule's *solutions*.  Even if these solutions were the only way forward to reform regional transmission planning, an act of Congress would be necessary first because the final rule is far beyond the reach of the FPA.  While the Commission might *prefer* a different rate, that preference alone does not make all the filed rates of every transmission provider unjust and unreasonable.

---

[140]  *See Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 248 (1984) ("If Congress evidences an intent to occupy a given field, any state law falling within that field is preempted." (citation omitted)); *PPL EnergyPlus, LLC v. Nazarian*, 753 F.3d 467, 475-476 (4th Cir. 2014) ("Even where state regulation operates within its own field, it may not intrude indirectly on areas of exclusive federal authority." (quoting *Pub. Utils. Comm'n of State of Cal. v. FERC*, 900 F.2d 269, 274 n.2 (D.C. Cir.1990) (internal quotation marks omitted))).

[141]  The final rule's determination here aligns with the final rule's complete gutting of the roles of the states in transmission planning and cost allocation.  *See infra* Section IV.B.1.

[142]  16 U.S.C. 824e.

### A.    The Final Rule Fails to Justify its Action Under Section 206

59.    The final rule presents no justification for taking action *in this proceeding* against *all* of the filed transmission rates pursuant to FPA section 206. The record, while consisting of thousands of pages of comments, simply does not contain substantial evidence sufficient to make a generic showing that the existing filed rates of all transmission providers are unjust, unreasonable, unduly discriminatory or preferential.[143] In *South Carolina*, the D.C. Circuit explained that "the substantial evidence test" for a rulemaking proceeding "'requires the Commission to specify the evidence on which it relied and to explain how that evidence supports the conclusion it reached.'"[144] Here, the final rule's "rel[iance] on 'generic' or 'general' findings of a systemic problem to support imposition of an industry-wide solution"[145] fails because it relies on cherry-picked special interest comments to support the pre-baked and pretextual findings needed to enact the administration's preferential, and *discriminatory*, policy agenda as well those of corporate and other special interests.

### 1.    The Record Is Not Sufficient to Make a Generic Showing That Every Transmission Providers' Regional Transmission Planning and Cost Allocation Processes Are Unjust, Unreasonable, and Unduly Discriminatory or Preferential

60.    The evidence in the record that is used to support the final rule's section 206 finding consists largely of comments from special interests that will profit from the final rule. The final rule also signals that there has been limited regional transmission development since Order No. 1000. This evidence should not be used to mean that every transmission provider in the country has transmission practices that are unjust and unreasonable.

61.    The final rule declines to analyze the "justness and reasonableness of either generator interconnection processes or local transmission planning processes" in its survey of issues in regional transmission planning.[146] The final rule identifies benefits of

---

[143] *See South Carolina*, 762 F.3d at 64-65 (citations omitted).

[144] *Id.* at 54 (quoting *Wis. Gas Co. v. FERC*, 770 F.2d 1114, 1156) (alterations in the original)).

[145] *See* Final Rule, 187 FERC ¶ 61,068 at P 132 (citing *South Carolina*, 762 F.3d at 67) (additional citation omitted).

[146] *Id.* P 111.

transmission planning.[147]   The final rule states that "transmission planning that considers both evolving reliability needs and other drivers of transmission needs more comprehensively can enable transmission providers to identify potential reliability problems and economic constraints."[148]   The final rule states that transmission spending has increased, which turns into higher customer bills.[149]   The final rule identifies projections are necessary for growing future transmission needs, including load growth[150] and changing reliability needs.[151]   And supply is changing due to state policies, customer preferences, and utility preferences (the latter two can also be driven by state policies or by activist investor preferences).[152]

62.    Translating FERC-speak, we are left with bland statements of the obvious: Transmission is expensive to build; transmission spending is up; generators front a lot of the needed money; consumers eventually pay them back; lack of regional integrated planning results in piecemeal transmission construction; this is inefficient and costs consumers more.  Yet simply because a rate could be more efficient, that alone is not enough to make the filed rate unjust and unreasonable.

63.    Many of the special interest commenters point to studies, projections, and reports that show that regional transmission planning could be done more efficiently.[153]   When

---

[147] *Id.* PP 90-91.

[148] *Id.* P 90.

[149] *Id.* P 92.

[150] *Id.* P 95.

[151] *Id.* PP 93-94.

[152] *Id.* PP 96-97.

[153] *See, e.g.*, Johannes Pfeifenberger, et al., The Brattle Group and Grid Strategies, *Transmission Planning for the 21st Century: Proven Practices that Increase Value and Reduce Costs*, at 48-49 (Oct. 2021), https://www.brattle.com/wp-content/uploads/2021/10/2021-10-12-Brattle-GridStrategies-Transmission-Planning-Report_v2.pdf; Rob Gramlich and Jay Caspary, Americans for a Clean Energy Grid, *Planning for the Future: FERC's Opportunity to Spur More Cost-Effective Transmission Infrastructure*, at 26-28 (Jan. 2021), https://cleanenergygrid.org/wp-content/uploads/2021/01/ACEG_Planning-for-the-Future1.pdf; Johannes P. Pfeifenberger, et al., The Brattle Group, *Cost Savings Offered by Competition in Electric Transmission: Experience to Date and the Potential for Additional Customer Value* (Apr. 2019), https://www.brattle.com/wp-content/uploads/2021/05/16726_cost_savings_offered_by_competition_in_electric_trans

Docket No. RM21-17-000                                                    - 43 -

we peel back the "green curtain" shrouding this final rule, however, we see that these comments are almost exclusively from self-interested entities which would gain substantially from the very Commission action that they support.[154]  Indeed, the record being used to support the section 206 finding consists of special interests who are going to profit monetarily from the final rule, including generation developers, transmission developers, and corporate purchasers of preferred power.[155]  None of these comments (individually or taken together) are sufficient to meet the high burden of proof that all transmission providers' tariffs are unjust and unreasonable due to the profit-seeking motivations behind them.

64.    In addition, the final rule looks back over the period following Order No. 1000 and states that regional transmission planning processes have yielded only "limited investments in regional transmission planning projects."[156]  Let's suppose that over the last decade a transmission developer had instead proposed massively expanding transmission while the load growth projections remained flat.  Consumers commenting on that aggressive plan would have challenged it as gold-plating.  Regulators would have rejected it as imprudent.  The so-called "limited investments" were instead a sign of responsiveness to projections made during that era.  Rather than seeing this outcome as a feature of considered ratemaking during a period of low load growth, the final rule attributes this lack of investment to the shortcomings of the existing regional transmission planning processes—meaning the tariff changes mandated by Order No. 1000.[157]  For these reasons, the final rule's reliance on a lack of regional transmission development post-Order No. 1000 is not persuasive, especially to support the finding that all transmission providers' tariffs are unjust and unreasonable.

## 2. The Record Shows That Regional Planning Deficiencies Exist *Only* in Isolated Pockets

65.    The evidence in this record does not demonstrate a single nationwide systemic problem.  Rather, the record shows that the "deficiencies identified by the Commission 'exist[] only in isolated pockets.'"[158]  The final rule even recognizes the many regions

---

mission.pdf.

[154] Such commenters include ACORE, PIOs, ACEG, Advanced Energy Buyers, AEE, Renewable Northwest, SREA, and Clean Energy Buyers.

[155] *See* Final Rule, 187 FERC ¶ 61,068 at P 96.

[156] *Id.* P 101.

[157] *Id.*

[158] *See South Carolina*, 762 F.3d at 67 (quoting *Associated Gas Distribs. V. FERC*,

Docket No. RM21-17-000                                              - 44 -

representing a substantial percentage of consumers where regional transmission planning is working.[159]  The final rule points to the MISO Multi-Value Project transmission planning process as an effective example of regional transmission planning.[160]  From this, it could be concluded that the final rule suggests that regional transmission planning is working in MISO, including on a long-term basis.  It is logical to conclude similarly regarding CAISO's[161] and New York's regional transmission planning.[162]  Vertically integrated monopoly public utilities have expanded their transmission capacity by engaging in integrated resource planning that is reviewed and approved by their state regulators.[163]  NRECA, an organization representing both transmission providers and transmission-dependent entities, highlights that its members have observed regional transmission planning processes that range from successful to broken.[164]  According to NRECA, some RTO regions are working, and others are not.  NRECA similarly states that some non-RTO regions are working, and others are not.

66.     This is hardly ironclad evidence sufficient to support a generic finding that the regional transmission planning processes are no longer just and reasonable.  The record here shows that regional and multistate regional planning is happening in significant and large swaths of the country subject to our rate jurisdiction, including on longer-term

---

824 F.2d 981, 1019 (D.C. Cir. 1987)) (alteration in the original).

[159] *See generally* Final Rule, 187 FERC ¶ 61,068 at PP 71-77.

[160] *Id.* P 102; *see* OMS Initial Comments at 2 (stating that "it is critically important to note at the outset that MISO's regional planning process already reflects many of the elements and features contained in the [NOPR], and it should be looked to as a model for other regions to emulate."); MISO Initial Comments at 1-2.

[161] CAISO Initial Comments at 3 ("The CAISO already engages in long-term planning, and its existing transmission planning process is consistent with the direction of the NOPR."); CAISO Reply Comments at 1-2 (stating that "the Commission should not unduly disrupt or undo existing planning processes and approaches that are functioning well and enabling transmission providers to plan for system needs efficiently and cost-effectively.").

[162] New York Commission and NYSERDA Initial Comments at 5.

[163] *See, e.g.*, Southern Companies Initial Comments at 13-15 (stating that its "IRP/RFP-driven transmission planning is successfully expanding their electric grid to address the changing resource mix and load"); Undersigned States Reply Comments at 6-7.

[164] NRECA Initial Comments at 14-16.

horizons, and that other regions have room for improvement. These circumstances are entirely different than those facing the Commission when it issued Order No. 1000. The factual justification for a single, national FPA section 206 finding is simply not present in the way it was for Order No. 1000. No amount of hand waving or misdirection can change the lack of sufficient evidentiary support for this Commission to take the sweeping national action pursuant to FPA section 206 in this rule. This significant deficiency leaves this *entire* exercise open to meaningful challenge.

## B.    The Replacement Rate Is Not Just and Reasonable

67.    Not only does the final rule fail to meet its evidentiary burden, but the replacement rate that the final rule imposes is not just and reasonable and has no basis in law. The final rule has removed any serious state role in agreeing to the final rule's planning and cost allocation processes, and the final rule fails to protect consumers as FERC is required to do under the FPA. Further, the cost causation principle cannot, and should not, extend as far as the today's final rule suggests, and should not require that the ratepayers of a non-consenting state pay costs of other states' public policies where there is mismatch between planning criteria and benefits.

### 1.    The Final Rule Reverses the States' Roles in Transmission Planning and Cost Allocation Promised by the NOPR

68.    The main reason I supported the NOPR was that it "*formally* put the states — for the first time — at the center of regional transmission planning and cost allocation decision-making for policy-driven projects in *all* regional transmission entities, if the states choose."[165] Specifically, I explained:

> [F]or these [Long-Term Regional Transmission Facilities] the NOPR propose[d] to require the regional planning entities to consult with *and seek the agreement of* the relevant states to *both* the selection criteria for these projects *and* to the regional cost allocation arrangements. State approval is especially important in a multi-state region, where different states have different policies. The NOPR proposes to provide the maximum opportunity for creativity and flexibility to the states and regional entities in developing the process for designing and approving regional selection criteria and cost allocation arrangements. States can agree to an *ex ante* formula for regional cost allocation of these types of projects — such as, for example, the "highway-byway" formula approved by the SPP Regional State Committee — or states

---

[165] NOPR Concurrence at P 5 (emphases in original) (footnote omitted).

can agree to a process for a project-by-project agreement on cost allocation among one or several states — such as, for example, the State Agreement Approach in PJM — or states may choose some combination of both. States in a multi-state RTO or ISO can even agree to defer the decision on cost allocation to the governing board of the RTO/ISO. The result is, while we are proposing to require regional planning entities to study and evaluate a broad, forward-looking array of information — including information addressing states' individual energy policies and goals — any projects identified through this new process will not be built, or more importantly, paid for by consumers, until the states representing such consumers have agreed that such projects are indeed needed and wanted by those same consumers.[166]

I wrote about the advantages of elevating the role of the states:

[E]levating the role in planning and cost allocation of state regulators — who are, as a group, deeply concerned about the monthly bills paid by consumers, of which transmission is a rapidly growing component — will make it more likely, not less, that necessary transmission can get built while ensuring that rates resulting from these types of policy-driven projects will not be unjust and unreasonable, which they clearly have the potential to be.[167]

The day the Commission issued the NOPR, some of my colleagues expressed similar sentiments.[168]

69.    Unfortunately—perhaps emanating from the final rule's erroneous legal conclusion that the Commission has exclusive jurisdiction over regional transmission

---

[166] *Id.* P 11 (emphases in original) (footnotes omitted).

[167] *Id.* P 14 (emphasis in original).

[168] *See supra* n.48; NOPR, 179 FERC ¶ 61,028 (Phillips, Comm'r, concurring at P 4) ("I support the proposal to require transmission providers to consult with and incorporate states' views in project selection and cost allocation. I invite comment on the value of such state involvement for increasing the likelihood that those facilities are sited and ultimately developed with fewer costly delays."), https://www.ferc.gov/news-events/news/item-e-1-commissioner-phillips-concurrence-building-future-through-electric.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1340 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                                - 47 -

planning and cost allocation[169]—the final rule completely eviscerates the states' role in the NOPR in both the transmission planning and cost allocation processes. Other than a few cosmetic gestures, the final role essentially treats the state regulators like other stakeholders in the RTO/ISO. But states are not mere "stakeholders:"

> State regulators have the duty to act in the *public interest* and states alone are sovereign authorities with inherent police powers to regulate utilities through their designated state officers. The FPA itself explicitly recognizes state authority. So it is perfectly fitting for state regulators to have the important roles proposed in this NOPR, without preempting the regional planning entities from seeking additional input through their existing stakeholder processes.[170]

The evisceration of the states' role in transmission planning and cost allocation and the relegation of state regulators to mere "stakeholder" status is alone reason enough for me to dissent.

### a. The Final Rule Undercuts the States' Role in the Transmission Planning Process

70. A major example of the final rule's undercutting of the states' role in the transmission planning process is with respect to the selection criteria. As a reminder, the selection criteria are a key component of the planning process because once a project is selected, money starts to flow from the ratepayers to transmission developers. Recognizing the states' important role in the planning process, the NOPR required that the states *approve* the selection criteria that transmission providers use in the planning process:

> Given the important role states play and the wide variety of potential approaches to selection criteria, we propose, as part of this requirement, that public utility transmission providers must consult with and seek support from the relevant state entities, as defined below, within their transmission planning region's footprint to develop the selection criteria.[171]

---

[169] *See supra* Section III.C.

[170] NOPR Concurrence at P 13 (emphasis in original).

[171] NOPR, 179 FERC ¶ 61,028 at P 244; *see also* NOPR Concurrence at P 11 ("State approval is especially important in a multi-state region, where different states

Docket No. RM21-17-000                                                    - 48 -

To implement this requirement, the NOPR proposed "to require that public utility
transmission providers demonstrate on compliance that they developed their proposed
selection criteria in consultation with the relevant state entities in their transmission
planning region's footprint."[172]  And it was clear at that time exactly what that meant—
*agreement, nothing less*.[173]  However, the final rule outright undermines these
requirements—and the states' role as a whole—by "clarifying" that state approval of the
evaluation process and selection criteria is *not actually required*:

> We clarify that we require transmission providers to *seek
> support* from Relevant State Entities, but *do not require
> transmission providers to obtain their support*, before
> proposing an evaluation process and selection criteria on
> compliance.[174]

Starkly demonstrating how milquetoast the requirement for transmission providers to
"consult with and seek support from" the states has now become under the final rule, the
final rule even fails to require that transmission providers indicate in their compliance
filings whether the states agree with their selection criteria proposal.[175]  So, from the
NOPR requiring state agreement, the final rule does not even require the states' views to
merit mere mention.  Adding insult to injury, the final rule specifies that "transmission
providers *may not* include in their evaluation process or selection criteria any prohibition
on the selection of a Long-Term Regional Transmission Facility based on the
transmission providers' anticipated response of a state public utility commission or
consumer advocates to particular Long-Term Regional Transmission Facilities."[176]

71.     The final rule acknowledges that "Long-Term Regional Transmission Planning is
more likely to be successful where transmission providers, Relevant State Entities, and

---

have different policies.  The NOPR proposes to provide the maximum opportunity for
creativity and flexibility to the states and regional entities in developing the process for
designing and approving regional selection criteria and cost allocation arrangements.").

[172] NOPR, 179 FERC ¶ 61,028 at P 246.

[173] *See* NOPR Concurrence at P 11; *see also supra* n.48.

[174] Final Rule, 187 FERC ¶ 61,068 at P 996 (emphases added).

[175] *Id.* P 999.

[176] *Id.* P 962 (emphasis added).

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1342 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                    - 49 -

other stakeholders collaborate to develop an evaluation process and selection criteria."[177]
But the final rule emphasizes that transmission providers are ultimately the only ones
responsible for transmission planning and complying with the obligations of the final
rule, and it notes that achieving consensus may simply not be possible in every
instance.[178]   Neither explanation provides a sufficient rationale to justify undercutting the
requirement for state approval when states alone have the inherent police power to
regulate the utilities within their states.  One cannot help but see this as part of the larger
pretextual shell game the final rule seeks to accomplish.  Sadly, this is one of many
examples where the final rule provides for a little extra process involving the states to
demonstrate ostensibly that the Commission is committed to the principle of cooperative
federalism, but in substance, states are relegated back to mere stakeholders, whose input
can simply be disregarded if inconvenient.[179]

72.    Unfortunately, not only the states' role with respect to the selection criteria has
been gutted.  As I must continue emphasize,[180] by mandating categories of factors and
minimum benefits, the final rule seeks to shape specific policies and outcomes, regardless
of the consent of the states.[181]  The goal of this pretextual final rule is to plan preferential
policy and corporate-driven projects regardless of states' support.  One must also ask
whether the extent to which this final rule requires prescriptive planning processes also
limits the states' role to participate meaningfully when most are resource-strapped.

---

[177] *Id.* P 996.

[178] *Id.*

[179] *See supra* P 69.

[180] *See supra* Section I.  Another example, of course, is micromanaging how local
"stakeholder" meetings must be conducted, which, as noted, runs a strong risk of
conflicting with state IRP proceedings and state authority.  *See* Final Rule, 187 FERC
¶ 61,068 at PP 1625-1646.  As above, I question whether prescriptive requirements to this
degree can truly pass muster under court precedent.

[181] And transmission providers themselves cannot even voluntarily account for
states' input in the planning.  Today's final rule requires that transmission providers *may
not* include in their evaluation process or selection criteria any prohibition on the
selection of a Long-Term Regional Transmission Facility based on the transmission
providers' anticipated response of a state public utility commission or consumer
advocates to particular Long-Term Regional Transmission Facilities.  Final Rule,
187 FERC ¶ 61,068 at P 962.

73.     States did not join RTOs[182] to pay for these preferential policy and corporate-driven projects.  Rather, as I wrote in my concurrence to the NOPR, "States joined to provide their retail consumers with the promised benefits of lower transmission costs and strengthened reliability through regional planning of core Reliability projects."[183]  I speak from personal experience.  When I was a Commissioner at the Virginia State Corporation Commission, my colleagues and I considered applications to permit Virginia's major utilities to join PJM.  The Virginia Commission's rules required us to examine "among other things, an [RTO's] reliability practices, pricing and access policies, and independent governance."[184]  When we voted to approve the applications, PJM's planning for public policy projects that would be cost allocated regionally was not even on our radar.

### b.    The Final Rule Guts the States' Role in Cost Allocation as Proposed in the NOPR

74.     Given the pretextual nature of this rule, it should not be surprising that it eviscerates the states' role in deciding cost allocation matters.  NARUC strongly supported the NOPR's proposal to involve states in the cost allocation for Long-Term Regional Transmission Facilities and conversely disagreed with a requirement that transmission providers include a Long-Term Regional Transmission Cost Allocation Method in their OATTs without being obligated to seek agreement from the states.[185]  NARUC explained:

> [S]ince the projects under consideration in the Long-Term Regional Transmission Planning process are largely driven by state public policies, state regulators should have a key role in evaluating the benefits and allocating the costs.  State regulators are attuned to the concerns of the local

---

[182] I am aware that states *qua* states do not join RTOs/ISOs.  Rather, they use their regulatory power to allow or require their regulated transmission-owning utilities to join.

[183] NOPR Concurrence at P 13.

[184] *Commonwealth of Virginia, ex rel. State Corporation Commission, Ex Parte: In the matter concerning the application of Virginia Electric and Power Company d/b/a Dominion Virginia Power for approval of a plan to transfer functional and operational control of certain transmission facilities to a regional transmission entity*, Case No. PUE-2000-00551 (Nov. 10, 2004).  The order included a stipulation in which Dominion agreed that joining PJM would not alter its legal obligation to seek a CPCN from the Virginia Commission to construct generation or transmission assets.  *Id.*, Partial Stip. ¶ 6.

[185] NARUC Initial Comments at 45.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1344 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                          - 51 -

communities where the transmission will be sited and the
retail ratepayers who must, in many instances, foot a large
fraction of the cost.[186]

Of course, to effectuate the pretextual agenda, the final rule simply ignores NARUC's
entreaties and instead cuts the states out of any meaningful role in cost allocation.

75.     First, the final rule essentially terminates the State Agreement Process by making
the *ex ante* cost allocation method the default approach.  While the NOPR proposed to
require transmission providers to revise their OATTs to include *either* (1) an *ex ante* cost
allocation method (*i.e.*, a Long-Term Regional Transmission Cost Allocation Method) to
allocate the costs of Long-Term Regional Transmission Facilities, (2) a State Agreement
Process, or (3) a combination thereof,[187] the final rule substantially modifies the NOPR
proposal to require the use of one or more *ex ante* cost allocation methods.[188]  Although
the final rule permits transmission providers to include a State Agreement Process in their
OATTs if the states agree, the final rule specifies that the State Agreement Process
"cannot be the sole method filed for cost allocation for Long-Term Regional
Transmission Facilities,"[189] and the final rule modifies the NOPR proposal to require an
*ex ante* cost allocation method to apply as a backstop.[190]  The *ex ante* cost allocation
method backstop would apply if a State Agreement Process fails to result in a cost
allocation method agreed to by Relevant State Entities and others *or if the Commission
ultimately finds that the cost allocation method that results from a State Agreement
Process is unjust, unreasonable, or unduly discriminatory or preferential.*[191]

76.     Second, under the final rule, state consent on cost allocation is not required.  The
final rule explicitly declines to adopt the NOPR proposal to require transmission
providers to seek the agreement of the states regarding the relevant cost allocation
method to be applied to Long-Term Regional Transmission Facilities.[192]  Instead, the
final rule merely requires transmission providers to establish a six-month Engagement

---

[186] *Id.* at 46 (citations omitted).

[187] NOPR, 179 FERC ¶ 61,028 at P 302.

[188] Final Rule, 187 FERC ¶ 61,068 at P 1291.

[189] *Id.* PP 1292, 1361, 1404.

[190] *Id.* P 1292.

[191] *Id.* P 1293.

[192] *Id.* P 1354.

Period "to provide a forum" for the states to negotiate an *ex ante* cost allocation method(s) and/or a State Agreement Process.[193]  Under the final rule, if the negotiations fail, transmission providers must still file an *ex ante* cost allocation method(s).[194]  Worse still, the final rule specifies that, even if the states *do* reach an agreement on an *ex ante* cost allocation method(s) and/or a State Agreement Process, the transmission providers *may ignore* it and file their own *ex ante* cost allocation method(s) instead.[195]  Similarly, the final rule declines to require that, if the transmission providers disagree with a proposed cost allocation method agreed on by the states, transmission providers must file both cost allocation methods:  the transmission providers' preferred cost allocation method and the cost allocation method agreed to by the Relevant State Entities.  So to the states, the final rule says, "Heads I win, tails you lose."

77.     Further, under the final rule, at the end of the Engagement Period, the states' role—however small—in shaping an *ex ante* cost allocation formula is effectively over. NARUC argued that the Commission should provide some mechanism for future review of cost allocation methodologies for Long-Term Regional Transmission Facilities given that state public policies may evolve:

> As the name suggests, these transmission facilities are expected to be planned over a longer period of time than projects built for reliability or economic reasons.  States that

---

[193] *Id.* P 1357.

[194] *Id.* P 1367.

[195] *E.g.*, *id.* P 1359 ("[T]he ultimate decision as to whether to file a Long-Term Regional Transmission Cost Allocation Method(s) and/or State Agreement Process to which Relevant State Entities have agreed will continue to lie with the transmission providers."); *id.* P 1429 ("[A]fter the required Engagement Period, transmission providers in each transmission planning region will decide what Long-Term Regional Transmission Cost Allocation Method(s) and any State Agreement Process to file as part of their compliance filings.  Therefore, transmission providers in a transmission planning region could elect to propose on compliance a Long-Term Regional Transmission Cost Allocation Method *and not file a State Agreement Process or other ex ante cost allocation method to which Relevant State Entities agreed*.  In addition*, we do not impose any obligation on transmission providers to file a cost allocation method for Long-Term Regional Transmission Facilities with which they disagree*, even if such a method were proposed to the transmission providers pursuant to a Commission-approved State Agreement Process, unless the transmission providers have clearly indicated their assent to do so as part of a Commission-approved State Agreement Process in their OATTs.") (emphases added; footnote omitted); *see also id.* P 1356 n.2895 (citing *Atl. City Elec. Co. v. FERC*, 295 F.3d 1, 9 (D.C. Cir. 2002) (*Atlantic City*)).

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1346 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                    - 53 -

do not currently have public policies requiring extensive
transmission investments may forego an opportunity to
participate in discussions regarding cost allocation, but their
public policies may evolve over time. For the reforms
proposed in this NOPR to be successful, the positions of
relevant state entities should not be frozen in time.[196]

But the final rule denies this request.[197] Further, the final rule specifies that transmission
providers may file subsequent changes to their cost allocation method(s) *without
establishing future Engagement Periods* beyond the initial one.[198]

78.    As noted above, the upshot of these changes, taken together, is that the states are
simply cut out of any significant role in the cost allocation of the of Long-Term Regional
Transmission Facilities. The final rule completely eviscerates the State Agreement
Process and renders it non-viable. The final rule eliminates the core element of that
approach—that states enter such cost allocation arrangements *voluntarily*. Now—with an
*ex ante* cost allocation method that must serve as a backstop in the event that the states'
negotiations fail, looming over the states' heads like the sword of Damocles—the final
rule gives states "an offer they can't refuse," telling the states that must they agree to a
cost allocation or the transmission providers will impose one on them anyway. In such a
circumstance, fruitful negotiation between the states is virtually impossible, as states
simply cannot say "no." At the risk of stating the obvious, this forced cost allocation on
the states is, of course, contrary to comments of NARUC and many of the individual
states.[199]

---

[196] NARUC Initial Comments at 49.

[197] Final Rule, 187 FERC ¶ 61,068 at P 1368.

[198] *Id.*

[199] *See* NARUC Initial Comments at 45 ("NARUC strongly supports the
Commission's proposal to involve states in cost allocation for Long-Term Regional
Transmission Facilities and conversely explicitly rejects a requirement that public utility
transmission providers include a Long-Term Regional Transmission Cost Allocation
Method in their OATTs without being obligated to seek agreement from relevant state
entities.") (footnotes omitted); *see, e.g.*, Alabama Commission Initial Comments at 9 ("In
other words, states may not force their preferences on their neighbors, or compel them to
subsidize their achievement. Thus, it goes without saying that Alabama ratepayers
should not be required to pay for transmission projects that are designed to promote or
facilitate the public goals of other states, localities, or entities."); West Virginia
Commission Reply Comments at 2-3 ("The [West Virginia Commission] opposes any
changes in transmission cost allocation that would require West Virginia customers, or

Docket No. RM21-17-000                                                      - 54 -

79.    Just as concerning, as I discuss in Sections I and IV.B.2 of this dissent, the final rule will enable the ratepayers of non-consenting states to be assessed the cost of public policy projects of other states, which is anti-democratic and violates the basic principle of fairness.  As NARUC points out, NARUC and individual state commissions supported the State Agreement Process to address this concern:

> NARUC is particularly supportive of the State Agreement Process, which is similar to the PJM State Agreement Approach that has been approved by FERC and that NARUC and state commissions advocated to be included in the final rule.  A state agreement approach allows states to further their public policy goals without burdening the ratepayers of states that have different priorities.[200]

The final rule's gutting of the very State Agreement Process that NARUC supports as part of the final rule's choice to ignore the consent of the states on cost allocation removes this key protection for the states and their ratepayers.

80.    Further, given the final rule's determinations undercutting the states' role, I highly doubt that PJM's State Agreement Approach or other existing mechanisms involving the states in other RTOs will remain viable with respect to the cost allocation of Long-Term Regional Transmission Facilities.[201]  In addition to PJM's State Agreement Approach,

---

customers of any State, to involuntarily pay for new transmission facilities that are needed to support the public policy generation choices of other States."); North Carolina Commission and Staff Initial Comments at 15-16 ("The [North Carolina Commission and Staff] strongly support the NOPR proposals regarding cost allocation for regional transmission facilities developed through the Long-Term Regional Transmission Planning process, as that term is defined in the NOPR, specifically the requirement for transmission providers to seek state agreement on cost allocation methodologies and the requirement to create an opportunity for states to negotiate a cost allocation method after a transmission facility has been selected through the Long-Term Regional Transmission Planning process."); Utah Commission Initial Comments at 9 ("[I]mposing a single set of federally mandated, highly prescriptive transmission planning and cost allocation requirements for the purpose of privileging the selection of costly transmission projects to serve remote and speculative renewable generation is not a lawful exercise of FERC's authority under Section 206.").

[200] NARUC Initial Comments at 51 (footnote omitted).

[201] PJM's State Agreement Approach exemplified the proper way to involve states in decisions regarding cost allocation for public policy projects.  The PJM State Agreement Approach was not directed by Order No. 1000, but rather by PJM's own voluntary act of reaching out to the states in PJM States and asking PJM States to propose

Docket No. RM21-17-000                                                    - 55 -

NARUC notes that the country's other multi-state RTOs have mechanisms in place for the states to participate in regional transmission cost allocation:

> In many regions, state regulators are at the forefront of successful efforts to coordinate regional transmission, including what many understand to be the most challenging issue, cost allocation. For instance, in SPP, the Regional State Committee has the primary authority for setting the basis of any regional cost allocation. In both MISO and ISO-New England, state committees have the ability to propose alternative cost allocation methodologies under some circumstances.[202]

81.    Specifically, SPP has a Regional State Committee (RSC) process by which the RSC has agreed to a "highway-byway" *ex ante* cost allocation and SPP will file it,[203] and MISO's Tariff provides that MISO will file under FPA section 205 OMS's alternative cost allocation to MISO's proposal.[204] Given that the final rule's determination that transmission providers may ignore any agreement or alternative proposed by the states,[205] such mechanisms could be called into question—unless the RTOs *voluntarily* agree to

---

a cost allocation for public policy projects. PJM accepted PJM States' proposal—which became the PJM State Agreement Approach—and submitted it to FERC in its compliance filing. It was accepted by FERC, but as today's final rule shows, only grudgingly and only until the chance came to extinguish it.

[202] NARUC Initial Comments at 46 (citing MISO Transmission Owners Agreement, Appendix K, Article II, Section II.E.3.b (providing regional state committee with the opportunity to develop and request MISO file an alternative cost-allocation methodology under certain circumstances); ISO New England, Agreements and Contracts, Transmission Operating Agreement, Section 3.04 (h)(vi)(A-C) (providing regional state committee with opportunity to provide alternative cost allocation proposal in connection with certain transmission cost allocation provisions in ISO-NE's tariff)).

[203] *See* SPP, Governing Documents Tariff, § 7.2 (Bylaws 7.2 Regional State Committee) (2.0.0); *see also Sw. Power Pool, Inc.*, 106 FERC ¶ 61,110, at P 219, *order on reh'g*, 109 FERC ¶ 61,010, at PP 93-94 (2004); *Entergy Arkansas, Inc.*, 133 FERC ¶ 61,211, at P 15 (2010).

[204] *E.g.*, *Midwest Indep. Transmission Sys. Operator, Inc.*, 143 FERC ¶ 61,165, at PP 30-31 (2013) (citations omitted).

[205] *See, e.g.*, Final Rule, 187 FERC ¶ 61,068 at PP 1359, 1429; *see also id.* P 1356 n.2895 (citation omitted).

Docket No. RM21-17-000                                                          - 56 -

preserve them in their OATTs.[206]  If these mechanisms are weakened, or even eliminated, the only alternatives left for the states to shape the RTOs' cost allocation would be to file comments to the RTOs' cost allocation filings or to file a section 206 complaint—no different than any RTO stakeholder.

82.    The final rule acknowledges that "experience with Order No. 1000 has reinforced the critical role that states play in the development of new transmission infrastructure, particularly at the regional level, where transmission projects may physically span, and their costs may be allocated across, multiple states."[207]  However, the final rule's determinations on cost allocation undercut this critical role.  It appears obvious that the final rule does not in fact view the states as partners in a cooperative federal system, but rather as potential obstacles to its pretextual political, corporate, and ideological agendas.

83.    The final rule sets forth two central arguments for its dramatic reduction of the states' role.  First, the final rule suggests that, per *Atlantic City*,[208] the Commission cannot deprive transmission providers of their FPA section 205 filing rights to propose tariff changes to rates.[209]  And second, the final rule claims that if transmission providers were permitted to rely solely on a State Agreement Process to determine the cost allocation and that process were to fail, "there would be no cost allocation method for Long-Term Regional Transmission Facilities selected as the more efficient or cost-effective solutions to Long-Term Transmission Needs," and "[a]s a result, such selected Long-Term Regional Transmission Facilities would be less likely to be developed, and the benefits that these facilities would provide would not be realized."[210]  Both arguments are without merit.

---

[206] *See, e.g.*, *id.* P 1412 ("[N]or do we create any obligation that transmission providers file a cost allocation method resulting from a State Agreement Process, unless the transmission providers had clearly indicated assent to do so in their OATTs); *id.* n.3013 ("[T]ransmission providers may voluntarily agree as part of a State Agreement Process in their OATTs that transmission providers shall file any cost allocation method that meets the requirements of their State Agreement Process, even if those transmission providers do not agree with that method.").

[207] *Id.* P 124.

[208] 295 F.3d 1.

[209] *E.g.*, Final Rule, 187 FERC ¶ 61,068 at P 1363 & n.2909; *id.* P 1356 n.2895.

[210] *Id.* P 1293.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1350 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

### i.    The Final Rule Takes Far Too Broad a View of *Atlantic City*

84.    *Atlantic City* is often discussed as a bar to FERC's ability to take meaningful action on many issues, including transmission cost allocation.[211]  But *Atlantic City* does not stand for an outright prohibition on Commission action, especially under FPA section 206, under which this pretextual rule purports to act.  All *Atlantic City* stands for is that "transmission-owning utilities have 'filing rights' under section 205 that FERC may not *revoke*."[212]  *Atlantic City* does not prevent FERC from granting additional filing rights to other entities, including *state regulators*, if it determines that existing practices, including RTO independence, are unjust and unreasonable and unduly discriminatory or preferential.[213]

85.    In a similar vein, *Atlantic City* does not require FERC to force non-consenting states to pay for other states' policy projects, as today's final rule implies.[214]  The final rule's reliance on *Atlantic City* in this regard is simply a way for FERC to sidestep action that will truly ensure that needed transmission gets built with the cooperation, support, and assent of the states.  Instead, what we have in today's final rule is a patent instance of

---

[211] 295 F.3d at 9-11.

[212] *See also* Peskoe Article at 572 (emphasis added), a thorough and helpful distillation of the intricacies of FPA sections 205 and 206 as to RTO governance.  *See also id.* at 567.

[213] *See id.* at 614-615 ("To bolster RTO independence, FERC could expand filing rights over regionally significant issues that are currently controlled by the [investor-owned utilities (IOUs)], such as *cost allocation for regional transmission expansion*. . . . State regulators are also potential beneficiaries.  State utility commissions comprehensively regulate IOUs' local service and are familiar with IOUs' local operations and planning.  *State filing rights might serve a consumer protection function, as state regulators are ultimately responsible for ensuring that retail rates, which include costs of RTO-planned transmission projects and RTO-administered markets, appropriately account for consumers' interests.*  As noted, MISO and SPP agreements already provide state regulators with limited filing rights over transmission cost allocation or resource adequacy, two areas where states have overlapping oversight. . . . *Providing states with meaningful roles in RTO processes might mitigate future conflicts between states' priorities and RTO rules and planning processes*.") (emphases added) (footnotes omitted).  Let me add my strong endorsement to granting states section 205 filing rights with respect to cost allocation.  The final rule, of course, goes in the opposite direction.

[214] *See e.g.*, Final Rule, 187 FERC ¶ 61,068 at PP 1356 n.2895, 1429-1431.

regulatory capture with the singular goal to build out preferential policy and corporate-driven projects, steamrolling the states and consumers alike.  And to be clear, nothing meaningfully prevents the NOPR compromise that would have maintained or elevated the states' role in transmission planning and cost allocation even further.  In fact, even accounting for *Atlantic City*, the NOPR compromise was a worthwhile solution to getting the transmission that is *actually* needed to serve organic load built.

### ii.     The Commission Fails Consumers by Unreasonably and Unfairly Socializing Policy- and Corporate-Driven Costs Across Captive Customers

86.     The final rule's claim that the Long-Term Regional Transmission Facilities selected are "the more efficient or cost-effective solutions to Long-Term Transmission Needs"[215] is disingenuous.  As I discuss above in Section I, in a sleight of hand move, the final rule lumps together in one bucket for planning and for cost allocation purposes projects that address policy-driven and corporate-driven needs with those that address reliability and economic needs.  The final rule's goal is to socialize the costs associated with preferential policy and corporate-driven projects across the multi-state regions, even when the states have never consented for their consumers to pay for such projects.  But requiring the ratepayers of a non-consenting state to pay for the public policy projects of another state cannot reasonably be deemed "efficient" or "cost-effective."

### 2.     The Final Rule Requires Consumers in Non-Consenting States to Pay the Costs of Other States' Public Policy Projects

### a.     The Costs of Public Policy-Driven Projects Must Not be Imposed on Non-Consenting Consumers Without State Regulatory Oversight

87.     In my NOPR Concurrence, I noted that "no individual state's consumers can be forced to bear the costs of another state's policy-driven project or element of a project against its consent."[216]  I have adamantly maintained this position in subsequent Statements:

> The costs related to a public policy project . . . should be borne by the sponsoring state and not shifted to consumers in other states without the consent of responsible officials in those states, who can then be held accountable by the voters of that state for their decisions (as can officials in the

---

[215] *Id.* P 1293.

[216] NOPR Concurrence at P 12 (citing NOPR, 179 FERC ¶ 61,028 at PP 302, 312).

Docket No. RM21-17-000                                                    - 59 -

sponsoring state).  That is how democracy is supposed to work.[217]

I have explained that if the people and businesses of the sponsoring state do not like the impacts of their state's public policies, "their recourse is to the ballot box,"[218] but that in contrast, "[c]onsumers in other states do not have such recourse, which is why these costs must be confined to [the sponsoring state]."[219]

88.    I have written before that "imposing the costs of a project driven by one state's public policies onto another state that has not consented to such cost allocation would, in my view, presumably result in unjust and unreasonable rates."[220]  Such imposition would be contrary to basic fairness, a core principle of American democracy:

---

[217] *N.Y. Power Auth.*, 185 FERC ¶ 61,102 (2023) (Christie, Comm'r, concurring at P 2), https://www.ferc.gov/news-events/news/commissioner-christies-concurrence-concerning-nypas-abandoned-plant-incentive-el23; *N.Y. Indep. Sys. Operator, Inc.*, 180 FERC ¶ 61,004 (2022) (Christie, Comm'r, concurring at P 2).

[218] *E.g.*, *N.Y. Indep. Sys. Operator, Inc.*, 178 FERC ¶ 61,101 (2022) (Christie, Comm'r, concurring at P 5), https://www.ferc.gov/news-events/news/item-e-2-commissioner-mark-c-christie-concurrence-regarding-new-york-independent.

[219] *N.Y. Indep. Sys. Operator, Inc.*, 186 FERC ¶ 61,184 (2024) (Christie, Comm'r, concurring at P 2).

[220] *NSTAR Elec Co.*, 179 FERC ¶ 61,200 (2022) (Christie, Comm'r, concurring at P 10), https://www.ferc.gov/media/e-13-er22-1247-000; *see also N.Y. Indep. Sys. Operator, Inc.*, 178 FERC ¶ 61,101 (Christie, Comm'r, concurring at P 6) ("A similar analysis could well lead to a different outcome in a *multi-state* RTO, if the record showed that the RTO was implementing one state's public policies as to preferred resources, and that implementation resulted in impacts being shifted to consumers in one or more other states in the multi-state RTO.  *Such impacts and cost-shifting in multi-state RTOs, if proven by the record, could well be unjust, unreasonable and unduly discriminatory or preferential under the FPA.*") (emphasis in the original and added); *N.Y. Pub. Serv. Comm'n v. N.Y. Indep. Sys. Operator, Inc.*, 174 FERC ¶ 61,110 (2021) (Christie, Comm'r, concurring at P 3) ("I also note that the NYISO is a single-state ISO and I have been able to locate no evidence in the record that the New York policies at issue in today's order are causing cost-shifting onto consumers in other states.  *If consumers in other states were disadvantaged, I may well view this matter differently*.") (emphasis added), https://www.ferc.gov/news-events/news/item-e-2-commissioner-mark-c-christie-concurrence-regarding-new-york-state-public; *cf*. Commissioner Mark C. Christie, Fair RATES Act Statement on PJM Minimum Offer Price Rule (MOPR) Revisions, Docket No. ER21-2582-000 at P 6 (Oct. 19, 2021) ("I would have proposed that PJM formulate a

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1353 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                                 - 60 -

> For if democracy means anything at all, it means that the
> people have an inherent right to choose the legislators to
> whom the people grant the power to decide the major
> questions of public policy that impact how the people live
> their daily lives. . . . That is the basic constitutional
> framework of the United States and it is the same for any
> liberal democracy worth the name.[221]

The final rule subverts this principle.[222]

###    b.    Certain States Are Not "Cost Causers" for Cost Allocation Purposes

89.    Today's final rule provides very little in the way of support for its cost allocation requirements, despite the extensive changes to planning requirements.[223] This final rule simply assumes that it is on sound footing as to cost causation. But that is not the case. While *some* precedent cited by today's final rule sheds some indirect light on the cost allocation issues implicated here,[224] at its core, today's final rule involves a new application of the cost causation principle to justify the final rule's pretextual agenda. It intends to force consumers in one state to pay for the costs of public policies enacted by politicians in another state and corporate purchasing preferences. But those costs and the resulting rates cannot be considered just and reasonable in any universe.

---

replacement for the current MOPR based on three broad principles: (1) a state may designate specific or categorical resources as 'public policy resources' and such designated resources will be funded through a mechanism *chosen by the state* outside of the capacity market . . . and (3) *non-sponsoring state consumers would not be forced to pay for another state's designated public-policy resources*.") (footnotes omitted) (emphasis in the original and added), https://www.ferc.gov/news-events/news/commissioner-christies-fair-rates-act-statement-pjm-mopr.

[221] Certificate Dissent at P 63.

[222] *Infra* Section IV.B.2.b.

[223] *See, e.g.*, Final Rule, 187 FERC ¶ 61,068 at PP 266, 269, 279, 1304, 1478-1479.

[224] As an aside, I question whether some of the precedent cited by today's final rule in support of the cost causation issue is truly apposite when you look at the facts in those cases.

90.     We are at the point where we must argue that not *all* consumers in certain states are "cost causers" simply because they have joined a multi-state RTO or fall within a transmission planning region.  These consumers are not the "but for" cause of many of the Long-Term Transmission Needs required by the consideration of the specified categories of factors in today's policy agenda-driven rule.  Nor are such consumers the intended beneficiaries of public policies in states enacted by politicians for whom they never voted.  Indeed, absent rational limits on the "free rider" concept that the cost causation principle is meant to address, anyone can be deemed a beneficiary of any transmission project anywhere.

91.     That policy-caused costs cannot be attributed to consumers who did *not* cause the policy is consistent with case law.  As articulated mostly clearly by the D.C. Circuit, the cost causation principle means that "all approved rates [must] reflect to some degree the costs *actually caused* by the customer who must pay them."[225]  This has been oft repeated by many courts over the years, including most notably the U.S. Court of Appeals for the Seventh Circuit (Seventh Circuit) in *Illinois Commerce Commission v. FERC*.[226]  The Seventh Circuit expanded on this further to state that, "[t]o the extent that a utility benefits from the costs of new facilities, it may be said to have 'caused' a part of those costs to be incurred, as without the expectation of its contributions the facilities might not have been built, or might have been delayed."[227]

92.     Tied to the cost causation principle is the concept of "free ridership."  As explained by the Commission in Order No. 1000-A, a free rider is an "entity is not required to pay for a benefit it receives"[228] and is the form of "subsidization" against which the cost causation principle is supposed to protect.[229]

93.     As explained in Order No. 1000-A, the Commission treats each transmission customer not as using a single transmission path but rather as usual the entire

---

[225] *KN Energy, Inc. v. FERC*, 968 F.2d 1295, 1300 (D.C. Cir. 1992) (emphasis added).

[226] 576 F.3d 470, 476 (7th Cir. 2009) (*ICC*).

[227] *Id.*

[228] Order No. 1000-A, 139 FERC ¶ 61,132 at P 573.

[229] *Id.* P 578.

Docket No. RM21-17-000    - 62 -

transmission system and views such service as service over the entire grid.[230]  The
Commission explained:

> Given the nature of transmission operations, it is possible that
> an entity that uses part of the transmission grid will obtain
> benefits from transmission facility enlargements and
> improvements in another part of that grid regardless of
> whether they have a contract for service on that part of the
> grid and regardless of whether they pay for those
> benefits.  This is the essence of the "free rider" problem the
> Commission is seeking to address through its cost allocation
> reforms.  Any individual beneficiary of a new transmission
> facility has an incentive to defer investment in the
> anticipation that other beneficiaries in the region will value
> the project enough to fund its development.  This can lead to
> situations in which no developer moves forward, adversely
> affecting development of transmission facilities and, as a
> result, rates for jurisdictional services.[231]

Therefore, the Commission explained that the cost allocation provisions of Order No.
1000 (the failures of which allegedly justify the changes contemplated by today's final
rule), which seek to allocate costs to beneficiaries in a region roughly commensurate with
benefits they receive, were consistent with the statement in *ICC* that "[a]ll approved rates
[must] reflect to some degree the costs actually caused by the customer who must pay
them."[232]  Indeed, all of the precedent relied upon in today's final rule signals that free

---

[230] *Id*. P 560 (citations omitted).

[231] *Id.* P 562 (internal citation omitted).

[232] *Id.* P 565 (citing *ICC*, 576 F.3d 470 at 476) (alterations in the original).  In
Order No. 1000, the Commission also found that "[b]eneficiaries in one state are not
subsidizing anyone in another state when they are allocated costs that are commensurate
with the benefits that accrue to them, even if the transmission facility in question was
built in whole or part as a result of the other state's transmission needs driven by Public
Policy Requirements."  Order No. 1000, 136 FERC ¶ 61,051 at P 545.  "If no benefits
accrue, the cost allocation principles we adopt below would prohibit the allocation of
costs to the non-beneficiaries.  If benefits do accrue, however, there are no less benefits
because Public Policy Requirements played a role in the decision to construct the
transmission facility."  *Id.*  While Order No. 1000 may have successfully established this
to be the case, per *South Carolina*, today's final rule is not similarly situated to Order No.
1000 with its required minimum benefits, selection criteria, and utter disregard of the
states' role in planning and cost allocation.  *See supra* Section III.A.  Today's final rule

Docket No. RM21-17-000                                                        - 63 -

ridership is a concern solely based on the assumptions underlying the transmission planning. And herein lies the deception—the more you plan and account for, the bigger and more regionalized you can argue the cost allocation framework should be. Which makes sense when the goal of today's final rule is to enact a sweeping policy agenda and thus socialize the costs across consumers in a multi-state region.

94.        The main support for the cost causation principle is *ICC*,[233] for the exact quote noted above. However, often omitted from the discussion of *ICC* is the context and outcome of the case. In that case, the Seventh Circuit remanded the Commission's approval of cost allocation concerning "Project Mountaineer"[234] (yes, the same one that prompted PATH) for lack of substantial evidence regarding the FERC-approved cost allocation. In addition to the quote above, the Seventh Circuit also expressed the following: "FERC is not authorized to approve a pricing scheme that requires a group of utilities to pay for facilities from which its members derive no benefits, *or benefits that are trivial in relation to the costs sought to be shifted to its members*."[235] And it merits repeating that "[t]o the extent that a utility benefits from the costs of new facilities, it may be said to have 'caused' a part of those costs to be incurred, *as without the expectation of its contributions the facilities might not have been built, or might have been delay*ed."[236] So, given the extent to which the Long-Term Transmission Needs contemplated by today's final rule factor in state public policies and special interests' goals, you would expect the only beneficiaries for cost allocation purposes to be states with those public policies or other special interest drivers of the transmission.

---

instead creates beneficiaries for projects that are primarily public policy-driven, based on the categories of factors required to be considered in today's final rule's planning requirements.

[233] 576 F.3d 470.

[234] *See* PATH Concurrence at P 4 (providing a history on Project Mountaineer). Relying on a case that remanded the Commission's *approval* of cost allocation associated with a regional transmission project that never came to fruition is nothing short of ironic.

[235] *ICC*, 576 F.3d at 476 (emphasis added).

[236] *Id.* (emphasis added). *See* NARUC Initial Comments at 33-34 ("Long-Term Regional Transmission Planning must recognize that benefits inherently become more speculative as the planning horizon increases. Additionally, planning based on public policy objectives must be transparent about identifying projects that would not be selected but for those public policy objectives. *Benefits assigned to projects must recognize these principles*.") (emphasis added).

95.    Unfortunately, you would be wrong.  Due to the final rule requiring planning for any and every transmission need and mandating minimum reliability and economic benefits as part of the planning process, projects developed primarily for preferential policy and corporate purposes will necessarily have the broadest array of so-called beneficiaries possible, all identified prior to selection.[237]  These so-called beneficiaries will then be forced to pay for these projects, simply because they may receive some trivial benefits due to their participation in a regional transmission system.  These so-called beneficiaries will be treated as "cost causers" even though their contributions *do not* ensure the projects get built nor ensure that the projects are not delayed.  Today's final rule, of course, even emphasizes that, as to why today's final rule does not require the consideration of public policy benefits, it "does not allow allocation of costs based on benefits to entities that do not receive benefits or receive only trivial benefits in relationship to costs of those transmission facilities."[238]  But this is because today's final rule already determined the minimum reliability and economic benefits that all projects contemplated by the final rule must have.  Adding in public policy benefits would shift the resulting cost allocation to show the *actual* beneficiaries—the states with preferred policies and corporate and special interests.  So, through a mismatch in planning criteria and benefits, today's final rule ensures socializing the costs of preferential policy and corporate-driven projects onto states and consumers that will ultimately receive trivial benefits, in violation of *ICC*.  If you find all this confusing, the final rule is intended to be.  That's why it's a shell game.

96.    At its core, *ICC* is simply a baseline regarding the cost causation principle's application.  That is, the Commission cannot require cost allocation to a particular group

---

[237] *See supra* Sections I, III.A; *see also* Final Rule, 187 FERC ¶ 61,068 at P 965.

[238] Final Rule, 187 FERC ¶ 61,068 at P 1515.  This is why I have described this final rule as a shell game with respect to the issue of the benefit mismatch between planning and costs.  By making the minimum required benefits reliability- and economic-focused, today's final rule ensures that the "beneficiaries" are those that are receiving some reliability and economic benefits.  As we know from basic transmission planning, *any* transmission built is going to bring some reliability and economic benefits.  So, any transmission planned through Long-Term Regional Transmission Planning for the identified Long-Term Transmission Needs will necessarily bring some reliability and economic benefits.  And by *not* requiring a matching of benefits to the Long-Term Transmission Needs that are planned for, in this case public policy benefits, the resulting benefits of any one project will be skewed to indicate more "beneficiaries" than there would be if today's final rule accounted for public policy benefits separately.  *See* NARUC Initial Comments at 33-34.  If today's final rule accounted for public policy benefits or corporate goals separately, it would be clear who the *actual* drivers, and *actual* beneficiaries, of any one project are.

of utilities, *i.e.*, consumers, where there is *no* evidence of benefits.  Its findings should not be distorted, as today's final rule suggests through Orwellian newspeak, to support a mismatch of planning criteria to benefits to strongarm a cost allocation regime to get preferential policy and corporate-driven projects built.

97.    Also referenced by today's final rule for cost causation is *South Carolina*.[239]  In the context of cost causation, the D.C. Circuit concluded that "the Commission's adoption of a beneficiary-based cost allocation method is a logical extension of the cost causation principle."[240]  The court added that it had "endorsed the approach of 'assign[ing] the costs of system-wide benefits to all customers on an integrated transmission grid.'"[241]

98.    The final rule does not simply require a beneficiary-based cost allocation, like Order No. 1000.  Instead, as I *must continue to emphasize*, it requires mandating reliability and economic benefits during the planning process to shoehorn the broadest group of beneficiaries possible for projects that do not remotely relate to reliability and economic needs.[242]  This is not a "light touch" that "does not dictate how costs are to be allocated."[243]  Today's final rule may attempt to sequester the beneficiaries of these reliability and congestion benefits from the cost allocation "benefits" by not clearly linking the two,[244] but in what reality will a transmission provider seeking to comply with today's final rule identify *different* beneficiaries from those identified in the planning process?  The result of this shell game is to ensure preferential policy and corporate-driven projects are selected with the widest group of beneficiaries possible, so as to socialize the costs across the widest group of consumers.[245]

---

[239] 762 F.3d 41.

[240] *Id.* at 85.

[241] *Id.* (citations omitted).

[242] *See supra* Sections I, III.A.

[243] *See South Carolina*, 762 F.3d at 81; *see also supra* Section III.A.

[244] *See, e.g.*, Final Rule, 187 FERC ¶ 61,068 at P 1506 ("We do not require that any particular benefit used in the evaluation and selection of Long-Term Regional Transmission Facilities be reflected in a Long-Term Regional Transmission Cost Allocation Method filed with the Commission.").  This provision illustrates the confusing and contradictory nature of the final rule and provides another example of the shell game.

[245] Today's final rule relies on several other cases in support of its oversimplification of the cost causation principle, such as *Old Dominion Electric Coop.*

USCA4 Appeal: 24-1650 Doc: 224 Filed: 01/21/2025 Pg: 1359 of 2455
Document Accession #: 20240513-3036 Filed Date: 05/13/2024

Docket No. RM21-17-000 - 66 -

99.    Today's final rule ultimately presents the wrong solution to the perceived problem of "balkanized" transmission planning.[246]  Unfortunately, today's final rule devises the shell game to ensure that the biggest planning bucket means the biggest pool of potential beneficiaries.  And to carry out the shell game, the final rule walks back cost allocation principle (6) because, without this change, today's final rule's preferred cost allocation framework does not work.[247]

100.    NARUC and many individual states oppose the Commission's imposition of mandatory minimum benefits and would prefer a bottom-up rather than a top-down approach:  "The proposed list of benefits for consideration is a better way to accomplish the objectives of the NOPR than specification of benefits that must always be used in Long-Term Regional Transmission Planning."[248]  Today's final rule blithely brushed these concerns aside.

_____

*v. FERC*, 898 F.3d 1254 (D.C. Cir. 2018), and *Long Island Power Authority v. FERC*, 27 F.4th 705 (D.C. Cir. 2022), among others, but the same is true of these cases—the Commission cannot strong-arm beneficiaries to get transmission built, and override the states to do so.  Of course, this is primarily a problem in multi-state RTOs, but overriding the states with regulation based on a cooperative federalism statute is not in good faith and the result is terrible for consumers everywhere.

[246] *See supra* Section IV.A.

[247] *See* Final Rule, 187 FERC ¶ 61,068 at P 1474.

[248] *See* NARUC Comments at 25; *see also* New York Commission and NYSERDA Initial Comments at 7 ("We urge the Commission to ensure that any final rule in this proceeding is sufficiently flexible to accommodate regional differences and avoid disrupting the processes already in place and otherwise underway in New York that are working well for the region."); SPP Initial Comments at 18 ("How and when transmission benefits are calculated and incorporated in any regional transmission planning assessment should be at the discretion of each public utility transmission provider and its stakeholders. This would allow for agility in process decisions to balance the value the analysis provides with the burden of the effort."); ISO-NE Initial Comments at 5 ("Individual regions should be permitted to determine the benefits that will lead to transmission in the region."); NYISO Initial Comments at 39 ("The final rule should confirm that each planning region is not required to use the specific benefits described in the NOPR . . . . While, in practice, the NYISO already uses most of the 12 illustrative benefits identified in the NOPR, the NYISO should be permitted to retain its flexibility to identify, with input from state entities and stakeholders, the benefits used in its processes and how such benefits are calculated."); *id.* at 11 ("The final rule should not mandate strict requirements concerning how long-term transmission planning must be

Docket No. RM21-17-000                                                    - 67 -

101.    To effectuate purported compliance with the cost causation principle, today's final rule ignores the principle of the *optimal solution* in transmission planning.  For each identified reliability problem, there is an optimal solution that solves the reliability problem at the *least* cost to consumers.   For an economic project, consumers should receive the *maximum* reduction in congestion costs relative to the cost of the project, or put in another way, for a given reduction of congestion costs, consumers should pay the *least* costs for the project.  The final rule, by contrast, claims that a project that is driven by one state's public policies will still provide some reliability and congestion benefits to other states, so consumers in those states *must* be treated as beneficiaries.[249]  But even assuming that consumers in those other states hypothetically receive some marginal reliability or congestion benefits, they are being overcharged for those benefits because the project includes the costs of another state's public policies or costs of projects to meet corporate goals, and the only benefits required to be considered by today's final rule are reliability and economic benefits.  Consumers in the non-policy causing states are not receiving or paying for the optimal solution to an identified reliability problem or maximum congestion relief compared to the costs they are being forced to pay.  As a consequence, the transmission *rates*—let's ignore the planning practices for a moment— they will be forced to pay are clearly unjust and unreasonable under the FPA.

### 3.    The Final Rule Violates the Commission's Consumer Protection Duty Under the FPA

102.    To add to the number of already unjust and unreasonable aspects in today's final rule, today's final rule is patently unfair to consumers.  That much is apparent from its decision, through transmission planning and cost allocation processes:  (1) to shift interconnection costs from generation developers to consumers through transmission planning, and (2) to shift the costs of, *inter alia*, a transmission project accommodating a corporate commitment from corporate consumers to other consumers.  Today's final rule, equally harmful to consumers, walk backs the NOPR proposal to remove the CWIP Incentive, one of the major reasons I supported the NOPR in the first place.  The final rule essentially uses the justification of efficiency and cost-effectiveness to create catastrophic outcomes for consumers.  Such an anti-consumer outcome is simply unjust and unreasonable, and in this case, even unduly discriminatory and preferential.

---

conducted.").

[249] Final Rule, 187 FERC ¶ 61,068 at Section III.D.1.c.

### a.  The Final Rule Unlawfully Shifts Interconnection Costs from Developers to Consumers

103.  In prior statements, I have frequently discussed the basic principle that generation developers should pay the costs to interconnect their generators to the grid:

> [G]eneration developers in RTOs should pay the full "but for" costs of their interconnection, including network upgrades. Consumers (*i.e.*, load) should not pay one nickel. They are not the ones seeking to profit from the interconnection. New generation in RTOs is supposed to be driven by the market, not by integrated resource planning, as in non-RTOs. This is the compelling principle underlying participant funding of interconnection in RTOs.[250]

By requiring the coordination of regional transmission planning and generator interconnection processes and by requiring the incorporation of Factor Category Six: generator interconnection requests and withdrawals in the development of Long-Term Scenarios, the final rule causes consumers to subsidize generation developers and thus subverts this basic principle.

---

[250] *See Midcontinent Indep. Sys. Operator, Inc.*, 184 FERC ¶ 61,190 (2023) (Christie, Comm'r, concurring at P 2), https://www.ferc.gov/news-events/news/commissioner-christies-concurrence-miso-mpfca-order-concerning-funding; *Midcontinent Indep. Sys. Operator, Inc.*, 184 FERC ¶ 61,156 (2023) (Christie, Comm'r, concurring at P 2), https://www.ferc.gov/news-events/news/commissioner-christies-concurrence-miso-gia-order-concerning-funding; *Midcontinent Indep. Sys. Operator, Inc.*, 183 FERC ¶ 61,113 (2023) (Christie, Comm'r, concurring at P 2), https://www.ferc.gov/news-events/news/commissioner-christies-concurrence-miso-fsa-order-concerning-funding; *Midcontinent Independent System Operator, Inc.*, 182 FERC ¶ 61,225 (2023) (Christie, Comm'r, concurring at P 2), https://www.ferc.gov/news-events/news/commissioner-christies-concurrence-miso-mpfca-and-fsa-orders-concerning-funding; *see also Midcontinent Indep. Sys. Operator, Inc.*, 185 FERC ¶ 61,182 (2023), *order on reh'g*, 187 FERC ¶ 61,015 (2024), https://www.ferc.gov/news-events/news/commissioner-christies-concurrence-order-rejecting-miso-gia-concerning-funding. This principle also applies to developers of merchant transmission lines who seek to interconnect. *Midcontinent Indep. Sys. Operator, Inc.*, 181 FERC ¶ 61,218 (2022) (Christie, Comm'r, concurring at P 1), https://www.ferc.gov/news-events/news/commissioner-christies-concurrence-concerning-funding-interconnection-costs-rtos. If state regulators in a multi-state region agreed on a different cost allocation related to interconnection costs that they believed protected consumers from unfair treatment, then such alternative would merit consideration.

USCA4 Appeal: 24-1650   Doc: 224   Filed: 01/21/2025   Pg: 1362 of 2455
Document Accession #: 20240513-3036   Filed Date: 05/13/2024

### i.    Coordination of Regional Transmission Planning and Generator Interconnection Processes Will Result in Unlawful Cost Shifts to Consumers

104.    The final rule requires transmission providers in each transmission planning region to revise their existing Order No. 1000 regional transmission planning processes to evaluate for selection regional transmission facilities that address certain identified interconnection-related transmission needs associated with certain interconnection-related network upgrades originally identified through the generator interconnection process.[251] As a result of this requirement, transmission providers may select in regional transmission plans for purposes of cost allocation transmission facilities designed to address certain interconnection needs and *will allocate the costs of such facilities to the load in that region*. This practice will force consumers to subsidize the interconnection costs of generator developers and in so doing turn them into the banks for the ventures, viable or otherwise, of generation developers — a classic example of the socialization of costs to enable private profit. Of course, this will result in rates that are blatantly unjust, unreasonable, unduly discriminatory and preferential.

105.    The final rule's attempted justifications for this effort to shift interconnection costs to consumers are vacuous and fail to disguise the real agenda, which is to subsidize developers of preferred resources. For example, the final rule asserts that reforms are necessary because "it may be more efficient or cost-effective to address [interconnection-related transmission needs] through the regional transmission planning and cost allocation process."[252] The final rule professes that its requirements "will result in selection of more efficient or cost-effective regional transmission solutions that will provide benefits to the transmission system, cost allocation for such regional transmission facilities that is at least roughly commensurate with estimated benefits, and elimination of a barrier to entry for new generation resources (which will enhance competition in wholesale electricity markets and facilitate access to lower-cost generation)."[253] But more efficient or cost-effective for whom? Certainly not for consumers who will be conscripted to subsidize tens or hundreds of millions of dollars of interconnection costs

---

[251] Final Rule, 187 FERC ¶ 61,068 at PP 1106-1107, 1126, 1145. Specifically, the final rule requires transmission providers to evaluate for selection regional transmission facilities to address interconnection-related transmission needs that have been identified in the generator interconnection process as requiring interconnection-related network upgrades where, *inter alia*, "an interconnection-related network upgrade identified to meet those interconnection-related transmission needs has a voltage of at least 200 kV *and* an estimated cost of at least $30 million." *Id.* P 1145 (emphasis in original).

[252] *Id.* P 1110.

[253] *Id.*

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1363 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                        - 70 -

so that generator developers may more cheaply interconnect and make higher profits (and likely receive government subsidies). The final rule's speculation that extracting such subsidies from consumers will "facilitate access to lower-cost generation" is purely pretextual.

106.    The final rule notes that "the Commission has found, and courts have affirmed, that interconnection-related network upgrades identified in the generator interconnection process can provide widespread transmission benefits that extend beyond the interconnection customer."[254] Further, it asserts that the regional transmission facilities designed to address the interconnection needs "may have the potential to provide more widespread benefits to transmission customers."[255] Today's final rule does not even come close to justifying the enormous cost shifts this will place on consumers.

107.    The final rule summarily brushes aside the concern that its reform will shift interconnection costs from interconnection customers (*i.e.*, generation developers) to load.[256] It explains that "[t]ransmission providers will still have to evaluate and select any regional transmission facilities that address the interconnection-related transmission needs as the more efficient or cost-effective regional transmission solution as part of the regional transmission planning process in order for any regional cost allocation method to apply."[257] The final rule also explains that "if such a facility is selected, the Commission-approved *ex ante* regional cost allocation method for that facility would allocate its costs at least roughly commensurate with its estimated benefits."[258] But the regional cost allocation methods allocate cost only to load, not to generation. So, how could allocating interconnection costs to load enable them to be "roughly commensurate to benefits" when generator developers, the primary beneficiaries of the transmission facilities and *the "but for" cause* of their development be allocated nothing? Here, as elsewhere, the final rule deviates from the FPA's consumer protection purpose: under the final rule, rather than generation existing to serve load, load is being conscripted to serve (the profits) of generation.

108.    Finally, the final rule's conclusion that it will not incentivize gaming by interconnection customers to include interconnection-related network upgrades in the

---

[254] *Id.* (footnote omitted).

[255] *Id.* PP 1146-1148.

[256] *See id.* P 1117.

[257] *Id.*

[258] *Id.*; *see also id.* P 1110.

Docket No. RM21-17-000                                                      - 71 -

regional transmission planning process is detached from reality.[259]  The final rule notes
that interconnection requests require significant financial commitments from the
interconnection customer (*e.g.*, application fees, study deposits, and site control
requirements) and that interconnection customers employing such a strategy would face
several risks.[260]  As with so much FERC does, today's final rule woefully underestimates
at its peril the profit-seeking, and at times, gambling behavior of generator developers.  In
issuing this final rule, the Commission appears to forget that a main driver in issuing
Order No. 2023 was to *reduce* speculative interconnection requests and interconnection
request withdrawals spurred by this behavior.[261]  Despite the significant financial
commitments and risks that the final rule describes, I can foresee generators submitting
speculative or spurious interconnection requests in the efforts to be subsidized by load if
the estimated interconnection costs are high enough.  In any event, I think it obvious that,
*ceteris paribus*, the final rule will encourage more disruptive *withdrawals*—particularly
for requests that necessitate high interconnection costs—as the final rule provides
generator developers dissatisfied with high interconnection costs a chance at another bite
at the apple.  And of course, apples taste sweeter when they're paid for by someone else.

### ii.    Factor Category Six Will Result in Unlawful Cost Shifts to Consumers

109.    For similar reasons, I oppose the final rule's requirement that transmission
providers in each transmission planning region incorporate in the development of Long-
Term Scenarios, Factor Category Six:  interconnection requests and withdrawals.[262]  Such
a requirement would ultimately result in consumers paying for the transmission that
generators need to interconnect to the grid.  This again is a way to cost shift
interconnection costs from generation developers to consumers.

---

[259] *See id.* PP 1119-1120.

[260] *Id.* P 1119.

[261] *See, e.g.*, Order No. 2023, 184 FERC ¶ 61,054 at P 47 (stating that the existing
serial first-come, first-served study process "create[d] incentives for interconnection
customers to submit exploratory or speculative interconnection requests pursuant to
which interconnection customers seek to secure valuable queue positions as early as
possible, even if they are not prepared to move forward with the proposed generating
facility.  Such generating facilities are often not commercially viable and, thus, the
interconnection customers ultimately withdraw from the interconnection queue.").

[262] *See* Final Rule, 187 FERC ¶ 61,068 at P 472.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1365 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

Docket No. RM21-17-000                                                      - 72 -

### b.    Factor Category Seven Forces Some Consumers to Subsidize Others

110.    The Commission's requirement that transmission providers incorporate Factor Category Seven, utility and corporate commitments and federal, federally-recognized Tribal, state, and local goals that affect Long-Term Transmission Needs, in the development of Long-Term Scenarios[263] is unjust and unreasonable because it will unfairly saddle consumers with unnecessary transmission costs that they *did not cause*. In addition, comments on Factor Category Seven identify several additional regulatory and practical obstacles that the final rule attempts to resolve by allowing transmission providers to dial the impact of these commitments and goals up or down.[264]  Further, this provision is yet another count in the final rule's pattern of diminishing the states' role in regional transmission planning by elevating mere *corporate preferences* to have equal if not greater stature as the policy choices of states and federally-recognized Tribes.

111.    It is worth starting the examination of Factor Category Seven simply by pulling the curtain back and highlighting the coalitions of comments that the final rule cites supporting it and opposed to it.[265]  The strongest support for this provision comes from where we would all expect:  the corporate interests with something to gain by shifting the costs that result from their preferential power purchase commitments to others along with the other special interests whose policy preferences have no place in developing a rate that is just and reasonable.[266]  I am similarly unsurprised that the skeptics and opponents of this provision are led by retail rate authorities, load-serving entities from coast to coast,

---

[263] *Id.* PP 481-484.

[264] *Id.* P 484.

[265] Commenters in favor include ACEG, AEE, Advanced Energy Buyers, Amazon, Breakthrough Energy, Center for Biological Diversity, Environmental Groups, Ørsted, PIOs, SEIA, and SREA.  *Id.* PP 474-476.  Commenters expressing qualified support include LADWP, MISO, and NRECA.  *Id.* P 477.  Commenters opposed include the Alabama Commission, California Commission, Duke, Illinois Commission, New York TOs, Pennsylvania Commission, PJM, and PPL.  *Id.* PP 478-480.

[266] *See* James Downing, *FERC Observers, Stakeholders Lay out What is at Stake with Tx Rule Looming*, RTO Insider, Apr. 22, 2024 ("State renewable portfolio standards are not driving as much of the need for new transmission as the corporate renewable energy buyers that [Clean Energy Buyers] represents are, [Clean Energy Buyers Senior Director Bryn Baker] added."), https://www.rtoinsider.com/76831-ferc-experts-what-at-stake-transmission-rule-looming/.

Docket No. RM21-17-000                                                    - 73 -

and large multi-state RTOs.  They understand that adopting Factor Category Seven is unfair, unworkable, and a mistake.

112.    Factor Category Seven is as unlawful as it is unfair because it grossly violates cost causation principles of ratemaking.[267]  Whether a corporate commitment or a state/Tribal policy goal is directly attributed to increased transmission costs, the entities with the self-imposed aspirations are the direct beneficiaries.  Cost causation principles of ratemaking—not to mention reviewing courts—will dictate that those entities, and not any other transmission customer, are the beneficiaries of the resulting transmission built to accommodate the corporate commitments.  As the direct beneficiaries, they will be responsible for the increased transmission costs driven by those commitments, goals, and preferences.  Even worse, if one of these cost causers changes its commitment or goal, all of the transmission provider's customers could still be left paying for the increased costs that are *no longer attributable to any beneficiary*.  This is not how a just or reasonable rate works.

113.    Even if the unfair and unlawful Factor Category Seven is allowed to take effect, it will fail on its own terms for practical reasons.  The final rule acknowledges that the corporate commitment or a state/Tribal policy goal are "more likely to change over the transmission planning horizon than factors in other required factor categories."[268]  As a balm for this uncertainty, the final rule grants the transmission providers the discretion to apply the salve of a discount on the likelihood that any of these aspirations will come to pass.  Nothing in the final rule will prevent transmission providers from discounting these commitments one hundred percent.  This discount is simply an invitation for transmission providers to ignore Factor Category Seven.

114.    Even worse, when a transmission provider expends its limited resources to read the tea leaves of corporate commitments and include them in the Long-Term Scenarios, that inclusion will result in a violation of the FPA.  Applying the costs of one corporation's commitments to all of the transmission provider's customers amounts to undue discrimination against similarly situated customers *without* corporate commitments while bestowing an undue preference for those similarly situated customers *with* corporate commitments.  Further, most utility customers are at a resource and access disadvantage to the deep-pocketed special interests (including the corporate commitments driven by their wealthy and sophisticated investor class) that enjoy influence and power.  Rather than sticking the consumers with any part of the bill for the gold plating necessary for a different customer's corporate preferences, this Commission should not depart from its cost allocation precedent.  Under that precedent, the beneficiaries are required to pay

---

[267] For a reminder on the shell game and how it seeks to use the cost causation principle, *see supra* Sections I, III.A, IV.B.2.b.

[268] Final Rule, 187 FERC ¶ 61,068 at P 484.

for the upgrades they are driving. This Commission should not now saddle less powerful people and small businesses with the costs of the choices made by influential corporations and their managers and investors.[269]

115. Let me be clear about how egregious and unfair this idea is with a hypothetical scenario. Suppose that a Fortune 500 company pressured by its investors commits to a corporate goal that it will only purchase electric power from certain preferred generation sources within a decade. It similarly commits to discriminate against power sourced from non-preferred generation resources. The transmission provider then informs the corporate customer that transmission upgrades will be necessary in order for those favored generation resources to actually deliver power to the corporate customer's facilities and to avoid receiving power from the non-preferred resources. Next, the transmission provider includes those upgrades in Factor Category Seven. Later, the transmission provider builds the necessary upgrades according to its regional transmission plan and incurs significant cost in doing so. Instead of attributing those costs to the corporate customer, the transmission provider socializes the upgrade costs to *all* of its customers. Rather than holding the actual cost causer accountable for the increase, the final rule instead dictates that the costs directly resulting from the customer's corporate commitment benefit *all ratepayers* because there are necessarily reliability and economic benefits that result from all transmission development. Then these increased costs are socialized across all of the transmission provider's customers. This realistic outcome is, to put it mildly, grossly unfair to consumers and a violation of the FPA.

116. Now suppose that a neighboring corporate customer (that receives an identical class of electric service as the customer in the prior hypothetical) announces in response its own corporate goal that it will never consider any factors other than reliability and cost in purchasing electric power because it wants to keep its costs as low as possible no matter what. How is a transmission provider supposed to accommodate that second corporate goal? Do the two commitments simply cancel each other out? Will the transmission provider carve out the second corporate customer? Where would that leave the customers who are silent with respect to these competing corporate goals? The final rule fails to answer these questions.

### c.    The Final Rule Walks Back the NOPR Proposal to Remove the CWIP Incentive

117. Today's final rule also walks back the widely supported proposal to remove the CWIP transmission incentive. As I have discussed above, it is apparent that the

---

[269] I also have grave concerns that the final rule tasks transmission planning engineers to try their hands at becoming Wall Street analysts when they attempt to guess how serious any of the corporate commitments really are.

Docket No. RM21-17-000                                                           - 75 -

pretextual goal of this final rule is to get transmission built to serve political and
corporate goals, no matter the cost and no matter who actually benefits from it.

118.    As I noted on numerous occasions, a core principle of utility law and regulation
for decades is that consumers can be forced to pay costs only for assets that are "used and
useful" to them.  In Order No. 679, the Commission determined that it may be necessary
to depart from this long-standing ratemaking principle to "address the substantial
challenges and risks in constructing new transmission."[270]  And in my prior statements, I
questioned, among other concerns, whether the Commission's determination of whether
"substantial challenges and risks" exist when granting the various transmission incentives
has becoming nothing more than a check-the-box exercise.[271]  In particular, I noted:

> The Commission's incentive policies—particularly the CWIP
> Incentive, which allows recovery of costs *before* a project has
> been put into service—run the risk of making consumers "the
> bank" for the transmission developer; but, unlike a real bank,
> which gets to charge interest for the money it loans, under our
> existing incentives policies the consumer not only effectively
> "loans" the money through the formula rates mechanism, but
> also pays the utility a profit, known as Return on Equity, or
> "ROE," for the privilege of serving as the utility's *de facto*
> lender.[272]

119.    The proposal to remove the CWIP Incentive was a major reason why I supported
the NOPR, despite its flaws, and a massive step in the right direction to remedy the harm
to consumers that these incentives have caused over the years.[273]  However, instead of
adopting the proposal to remove the CWIP Incentive, today's final rule chose to side with

---

[270] *Promoting Transmission Inv. through Pricing Reform*, Order No. 679, 116
FERC ¶ 61,057, at PP 26, 117, *order on reh'g*, Order No. 679-A, 117 FERC ¶ 61,345
(2006), *order on reh'g*, 119 FERC ¶ 61,062 (2007).

[271] *See supra* n.61.

[272] February 2022 Concurrence at P 3 (emphasis in original); July 2022
Concurrence at P 3 (citation omitted); *see also* NOPR Concurrence at P 15 ("CWIP is, of
course, passed through as a cost to consumers, making consumers effectively an
involuntary lender to the developer . . . .  Consumers should be protected from paying
CWIP costs during this potentially long period before a project actually enters service, if
it ever does."), https://www.ferc.gov/news-events/news/commissioner-christies-
concurrence-e-1-regional-transmission-planning-and-cost.

[273] *See supra* PP 18-19.

developers and special interest groups, rather than with consumers. Today's final rule rationalizes the decision to walk back the removal of the CWIP Incentive by finding that any action on the CWIP Incentive is more appropriately considered in a separate proceeding where incentives can be comprehensively evaluated for all regional transmission facilities.[274] I regard that as nothing more than an excuse for a continuing failure to act.

120.    Many commenters share my concerns that the CWIP Incentive inappropriately shifts risks to ratepayers and runs afoul of the core principle of utility law and regulation that consumers should pay costs only for assets that are "used and useful" to them.[275] Others argue that removing the CWIP Incentive may mitigate the risk of overbuilding that may result from the other changes cemented in today's final rule.[276] Today's final rule, however, is astoundingly silent on the consumer impact of retaining the CWIP Incentive.

121.    Unfortunately, this is simply a continuation of the Commission punting on any meaningful reevaluation of transmission incentives. In my three years on the Commission, there has been *no* action to reevaluate the check-the-box award of transmission incentives, and it is far past time for me to begin dissenting from this lack of action on the Commission's part to change this shameful status quo.[277] By walking back the removal of the CWIP Incentive, today's final rule reveals, one again, its failure to protect consumers as required by the FPA.

---

[274] Final Rule, 187 FERC ¶ 61,068 at P 1547.

[275] *See, e.g.*, California Commission Reply Comments at 14; Kentucky Commission Chair Chandler Initial Comments at 4-9; NARUC Initial Comments at 55-56 (referencing PATH and that the Commission granted several transmission incentives, resulting in a 14.3% return on equity); NASUCA Initial Comments at 8-9; North Carolina Commission and Staff Initial Comments at 17-18; North Dakota Commission Initial Comments at 6; Ohio Commission Federal Advocate Initial Comments at 15-16; Ohio Consumers Initial Comments at 29-31; OMS Initial Comments at 14-15; Pennsylvania Commission Initial Comments at 17-18; PJM States Initial Comments at 13; Virginia Attorney General Reply Comments at 3-4.

[276] *See, e.g.*, Massachusetts Attorney General Initial Comments at 24-25; North Carolina Commission and Staff Initial Comments at 17-18; Pennsylvania Commission Initial Comments at 17-18; PJM States Initial Comments at 13.

[277] *See, e.g.*, *Baltimore Gas & Elec. Co.*, 187 FERC ¶ 61,030 (Christie, Comm'r, dissenting at P 6).

Docket No. RM21-17-000                                                    - 77 -

## V.    Conclusion

122.    Had the states been given the authority to protect their consumers, as promised by the NOPR, I would have supported this rule just as I voted for the NOPR, as an imperfect but acceptable compromise.[278]  If transmission projects that are planned to implement public policies—the product of *political* decisions made by politicians—or to implement corporate "green energy" power purchasing preferences—the product of corporate management and investors—are going to be included in long-term planning *mandated* by FERC, then the states must have the authority to consent to (i) the planning criteria (which determines which projects go into regional plans and receive cost recovery from consumers), *and* (ii) the formula for regional cost allocation of such projects.

123.    This role for the states is not only essential but fair:  fair to state policymakers and regulators and fair to the tens of millions of consumers they represent.  The final rule, however, denies states that essential role and that denial renders this order unfair to the states and unfair to tens of millions of consumers.

124.    As has been said before, denial is not just a river in Egypt.  The short-sightedness of the final rule and the special interests who lobbied this Commission to deny states this key role is a denial of the reality of how transmission actually gets built in the union of states that is the United States of America.  As a former state regulator who voted to approve scores of transmission projects, both regional and local, I will testify from experience that to get transmission built—especially the big, controversial regional lines of 500 kV and above—the states should not be dismissed as annoying obstacles that must be pushed out of the way by an omnipotent, omniscient FERC.  Rather, state regulators must be respected as potential partners and, most importantly, *advocates* of such controversial lines, who will be invested in them and work to get them sited and built within their borders.  That will never happen if states are denied the role that I advocated in the NOPR, that of full partners in deciding how, when and whether their consumers are burdened with costs for politically and corporate-driven policy projects.

125.    This final rule could have corrected the single biggest flaw in Order No. 1000:  the exclusion of the states from decision-making roles in FERC-mandated regional transmission planning for public policy projects.  Instead, the final rule doubles down on that error with a blizzard of new planning mandates to serve political, corporate, and ideological agendas, while leaving the states with no real power to protect their consumers from the trillions of dollars of costs that this order brazenly wants to impose on them.  The final rule is nothing but a pretext for enacting a sweeping policy agenda that Congress never passed.  As such, it blatantly violates the major questions doctrine.

---

[278] To reiterate what I said earlier:  If I agree to get a root canal with anesthetic but learn upon arrival at the dentist's office that I still get the root canal but no anesthetic, that is not the original deal.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1371 of 2455
Document Accession #: 20240513-3036    Filed Date: 05/13/2024

In producing rates that will be unjust, unreasonable, and unduly discriminatory and preferential, it violates the actual text of the FPA.  And in that violation, it fails to fulfill our most important duty under the FPA, which is to protect consumers.

For these many reasons, I respectfully dissent.

_____
Mark C. Christie
Commissioner

Document Content(s)

RM21-17-000.docx.......................................................1

188 FERC ¶ 62,025
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Building for the Future Through Electric                    Docket No. RM21-17-001
Regional Transmission Planning and Cost Allocation

NOTICE OF DENIAL OF REHEARING BY OPERATION OF LAW AND
PROVIDING FOR FURTHER CONSIDERATION

(July 15, 2024)

Rehearing has been timely requested of the Commission's order issued on May 13, 2024, in this proceeding. *Bldg. for the Future Through Elec. Reg'l Transmission Planning & Cost Allocation*, 187 FERC ¶ 61,068 (2024). In the absence of Commission action on a request for rehearing within 30 days from the date it is filed, the request for rehearing may be deemed to have been denied. 16 U.S.C. § 825*l*(a); 18 C.F.R. § 385.713 (2023); *Allegheny Def. Project v. FERC*, 964 F.3d 1 (D.C. Cir. 2020) (en banc).

As provided in 16 U.S.C. § 825*l*(a), the requests for rehearing of the above-cited order filed in this proceeding will be addressed in a future order to be issued consistent with the requirements of such section. As also provided in 16 U.S.C. § 825*l*(a), the Commission may modify or set aside its above-cited order, in whole or in part, in such manner as it shall deem proper.

Debbie-Anne A. Reese,
Acting Secretary.

Document Content(s)

RM21-17-001.docx.................................................................1

189 FERC ¶ 61,126
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

18 CFR Part 35

[Docket No. RM21-17-001; Order No. 1920-A]

Building for the Future Through Electric
Regional Transmission Planning and Cost Allocation

(Issued November 21, 2024)

**AGENCY**:  Federal Energy Regulatory Commission.

**ACTION**:  Order on rehearing and clarification.

**SUMMARY**:  In this order, the Federal Energy Regulatory Commission addresses arguments raised on rehearing, sets aside, in part, and clarifies Order No. 1920, which required transmission providers to conduct Long-Term Regional Transmission Planning to ensure the identification, evaluation, and selection, as well as the allocation of the costs, of more efficient or cost-effective regional transmission solutions to address Long-Term Transmission Needs.  Order No. 1920 also directed other reforms to improve coordination of regional transmission planning and generator interconnection processes, require consideration of certain alternative transmission technologies in regional transmission planning processes, and improve transparency of local transmission planning processes and coordination between regional and local transmission planning processes.

**DATES**: The changes to Order No. 1920 made in this order on rehearing and clarification will be effective on  **[INSERT DATE 30 DAYS AFTER DATE OF**

Docket No.  RM21-17-001

ii

**PUBLICATION IN THE FEDERAL REGISTER]**

FOR FURTHER INFORMATION CONTACT:

Michael Kellermann (Legal Information)
Office of the General Counsel
888 First Street, NE
Washington, DC  20426
(202) 502-8491
michael.kellermann@ferc.gov

Patrick T. Metz (Legal Information)
Office of the General Counsel
888 First Street, NE
Washington, DC  20426
(202) 502-8197
patrick.metz@ferc.gov

David Tobenkin (Technical Information)
Office of Energy Policy and Innovation
888 First Street, NE
Washington, DC  20426
(202) 502-6445
david.tobenkin@ferc.gov

Noah Lichtenstein (Technical Information)
Office of Energy Market Regulation
888 First Street, NE
Washington, DC  20426
(202) 502-8696
noah.lichtenstein@ferc.gov

**SUPPLEMENTARY INFORMATION**:

189 FERC ¶ 61,126
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners:  Willie L. Phillips, Chairman;
                        Mark C. Christie, David Rosner,
                        and Judy W. Chang.

| Building for the Future Through Electric Regional Transmission Planning and Cost Allocation | Docket No. | RM21-17-001 |
|---|---|---|

ORDER NO. 1920-A

ORDER ADDRESSING ARGUMENTS RAISED ON REHEARING, SETTING ASIDE
PRIOR ORDER, IN PART, AND GRANTING CLARIFICATION

(Issued November 21, 2024)

TABLE OF CONTENTS

Paragraph Numbers

I. Executive Summary ............................................................................................... 1.

II. Introduction and Background ................................................................................ 20.

III. The Overall Need for Reform ............................................................................. 34.
    A. Order No. 1920 ................................................................................................. 34.
        1. The Transmission Investment Landscape Today ............................................. 38.
        2. Unjust, Unreasonable, and Unduly Discriminatory or Preferential Commission-Jurisdictional Transmission Planning and Cost Allocation Processes ................... 46.
        3. Benefits of Long-Term Regional Transmission Planning and Cost Allocation to Identify and Plan for Long-Term Transmission Needs ....................................... 59.
    B. The Commission Adequately Demonstrated that Existing Rates, or Practices Affecting Rates, Are Unjust and Unreasonable ...................................................... 61.
        1. The Commission Correctly Characterized Its Statutory Burden ...................... 62.
        2. The Commission Adequately Supported Its Determination on Step One of Section 206 ....................................................................................................... 70.
        3. The Commission Identified Deficiencies that Exist beyond Isolated Pockets.... 87.
        4. The Commission Has the Authority to Conduct a Generic Rulemaking............ 98.
    C. The Commission Demonstrated that the Replacement Rate is Just and Reasonable ......................................................................................................... 104.
        1. Requests for Rehearing ................................................................................ 104.
        2. Commission Determination.......................................................................... 107.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1378 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No. RM21-17-001                                                    - 2 -

D. The Commission's Section 206 Findings Were Not Circular ............................ 115.
   1. Requests for Rehearing ......................................................................... 115.
   2. Commission Determination .................................................................... 119.

IV. Statutory Authority ......................................................................................... 125.
   A. Order No. 1920 Determination .................................................................. 125.
   B. Federal/State Division of Authority .......................................................... 132.
      1. Requests for Rehearing ...................................................................... 132.
      2. Commission Determination ................................................................ 135.
   C. Major Questions Doctrine ........................................................................ 166.
      1. Requests for Rehearing ...................................................................... 166.
      2. Commission Determination ................................................................ 171.
   D. Other Issues ............................................................................................. 186.
      1. Requests for Rehearing ...................................................................... 186.
      2. Commission Determination ................................................................ 192.

V. Long-Term Regional Transmission Planning ................................................... 200.
   A. Requirement to Participate in Long-Term Regional Transmission Planning ...... 200.
      1. Order No. 1920 Requirements ............................................................. 200.
      2. Requests for Rehearing and Clarification ............................................ 205.
      3. Commission Determination ................................................................ 210.
   B. Long-Term Scenarios Requirements .......................................................... 218.
      1. Requirement for Transmission Providers To Use the Seven Required Benefits To
      Help To Inform Their Identification of Long-Term Transmission Needs ........... 218.
      2. Transmission Planning Horizon .......................................................... 227.
      3. Frequency of Long-Term Scenario Revisions...................................... 248.
      4. Categories of Factors ......................................................................... 263.
      5. Requests for Additional Flexibility Regarding Long-Term Scenarios
      Requirements ........................................................................................ 351.
   C. Evaluation of the Benefits of Regional Transmission Facilities........................ 369.
      1. Requirement for Transmission Providers to Use and Measure a Set of Seven
      Required Benefits ................................................................................. 369.
      2. Measurement and Use of Other Benefits .............................................. 411.
      3. Identification, Measurement, and Evaluation of Benefits........................ 417.
      4. Benefits Horizon ................................................................................ 421.
      5. Evaluation of the Benefits of Portfolios of Transmission Facilities.............. 428.
   D. Evaluation and Selection of Long-Term Regional Transmission Facilities......... 434.
      1. Minimum Requirements ...................................................................... 434.
      2. Role of Relevant State Entities ........................................................... 452.
      3. Voluntary Funding ............................................................................. 461.
      4. No Selection Requirement ................................................................... 466.
      5. Reevaluation ..................................................................................... 469.
   E. Implementation of Long-Term Regional Transmission Planning...................... 502.
      1. Order No. 1920 Requirements ............................................................. 502.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1379 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No.  RM21-17-001                                                              - 3 -

2. Requests for Rehearing and Clarification ........................................ 505.
3. Commission Determination ........................................................... 507.
VI. Coordination of Regional Transmission Planning and Generator Interconnection
Processes ............................................................................................ 511.
A. Need for Reform and Overall Requirement ...................................... 511.
1. Order No. 1920 Requirements .................................................... 511.
2. Requests for Rehearing ............................................................. 513.
3. Commission Determination ........................................................ 516.
B. Qualifying Criteria ....................................................................... 525.
1. Order No. 1920 Requirements .................................................... 525.
2. Requests for Rehearing and Clarification .................................... 532.
3. Commission Determination ........................................................ 538.
C. Cost Allocation ........................................................................... 557.
1. Order No. 1920 Requirements .................................................... 557.
2. Requests for Rehearing and Clarification .................................... 558.
3. Commission Determination ........................................................ 562.
D. Gaming .................................................................................... 566.
1. Order No. 1920 Requirements .................................................... 566.
2. Requests for Rehearing and Clarification .................................... 567.
3. Commission Determination ........................................................ 570.
E. Transmission Planning Process Evaluation ...................................... 572.
1. Order No. 1920 Requirements .................................................... 572.
2. Requests for Rehearing and Clarification .................................... 574.
3. Commission Determination ........................................................ 582.
VII. Consideration of Dynamic Line Ratings and Advanced Power Flow Control
Devices .............................................................................................. 594.
A. Order No. 1920 Requirements ........................................................ 594.
B. Requests for Rehearing and Clarification ........................................ 596.
1. General Requests for Rehearing and Clarification ......................... 596.
2. Technology Specific Requests for Rehearing and Clarification ....... 601.
VIII. Regional Transmission Cost Allocation ......................................... 610.
A. Obligation to File an *Ex Ante* Long-Term Regional Transmission Cost Allocation
Method and Its Use as a Backstop ...................................................... 610.
1. Logical Outgrowth .................................................................... 610.
2. Substantive Issues .................................................................... 618.
B. Requirements Concerning Relevant State Entities ............................ 635.
1. Requested Requirement to Obtain the Agreement of Relevant State Entities .. 635.
2. Requirements Concerning Relevant State Entities' Preferred Cost Allocation
Methods ...................................................................................... 642.
C. Design and Operation of the Engagement Period .............................. 663.
1. Logical Outgrowth .................................................................... 663.
2. Requests Arguing the Engagement Period is Inferior to a Requirement that

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1380 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No. RM21-17-001                                              - 4 -

Transmission Providers Seek the Agreement of Relevant State Entities ............ 669.
3. Duration of the Engagement Period ................................................ 674.
4. Content of the Engagement Period ................................................. 679.
5. Consultation with Relevant State Entities After the Engagement Period ........ 687.
D. Design and Operation of State Agreement Processes ......................................... 693.
1. Definition of Relevant State Entities ................................................ 693.
2. Extensions of Time for Negotiation of Cost Allocation Methods Under State
Agreement Processes ...................................................................... 705.
E. Use of Existing Cost Allocation Methods in Long-Term Regional Transmission
Planning or Existing Regional Processes ...................................................... 709.
1. Order No. 1920 Requirements .......................................................... 709.
2. Requests for Rehearing and Clarification ........................................... 710.
3. Commission Determination .............................................................. 712.
F. Regional Cost Allocation Principles for Long-Term Regional Transmission
Facilities ......................................................................................... 718.
1. Logical Outgrowth ....................................................................... 718.
2. Omission of Regional Cost Allocation Principle No. 6 and Ability to Allocate
Costs by Type of Project ................................................................. 728.
3. Concerns Regarding Cost Causation ................................................. 753.
G. General Benefits Requirements Related to Cost Allocation ................................ 769.
1. Logical Outgrowth ....................................................................... 769.
2. Substantive Issues ....................................................................... 775.
H. Additional Cost Allocation Issues .............................................................. 781.
1. Order No. 1920 Requirements .......................................................... 781.
2. Requests for Rehearing and Clarification ........................................... 784.
3. Commission Determination .............................................................. 789.

IX. Construction Work in Progress Incentive .......................................................... 794.
A. CWIP ............................................................................................ 794.
1. Order No. 1920 ........................................................................... 794.
2. Requests for Rehearing and Clarification ........................................... 795.
3. Commission Determination .............................................................. 799.

X. Exercise of a Federal Right of First Refusal in Commission-Jurisdictional Tariffs and
Agreements ............................................................................................ 801.
A. Order No. 1920 Requirements ................................................................ 801.
B. Request for Rehearing ......................................................................... 802.
C. Commission Determination ................................................................... 803.

XI. Local Transmission Planning Inputs in the Regional Transmission Planning
Process ................................................................................................. 804.
A. Need for Reform ............................................................................... 804.
1. Order No. 1920 ........................................................................... 804.
2. Analysis under FPA Section 206 ...................................................... 813.
3. Departure from Commission Precedent .............................................. 824.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1381 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No.  RM21-17-001                                                    - 5 -

    4. Commission Authority Under the FPA.............................................828.
    5. Policy Against Anticompetitive Practices......................................840.
    6. Other Arguments.........................................................................843.
  B. Enhanced Transparency of Local Transmission Planning Inputs in the Regional
  Transmission Planning Process ..........................................................847.
    1. Order No. 1920 ...........................................................................847.
    2. Requests for Additional Reforms ................................................851.
    3. Stakeholder Meeting Clarifications ............................................859.
  C. Identifying Potential Opportunities to Right-Size Replacement Transmission
  Facilities...........................................................................................863.
    1. Eligibility ..................................................................................863.
    2. Right of First Refusal for Right-Sized Replacement Transmission Facilities
    Selected to Meet Long-Term Transmission Needs ...........................882.
    3. Confidentiality of In-Kind Replacement Estimates........................895.

XII. Interregional Transmission Coordination...........................................899.
  A. Order No. 1920.................................................................................899.
  B. Comments........................................................................................901.
  C. Commission Determination ..............................................................902.

XIII. Compliance Procedures....................................................................903.
  A. Order No. 1920.................................................................................903.
  B. Requests for Rehearing and Clarification ..........................................907.
  C. Commission Determination ..............................................................914.

XIV. Overarching Logical Outgrowth Challenges .....................................927.
  A. Requests for Rehearing.....................................................................927.
  B. Commission Determination ..............................................................930.

XV. Information Collection Statement......................................................932.

XVI. Environmental Analysis...................................................................950.

XVII. Regulatory Flexibility Act..............................................................951.

XVIII. Document Availability...................................................................953.

XIX. Effective Date.................................................................................956.

Appendix A:  Abbreviated Names of Parties............................................
Appendix B:  Pro Forma Open Access Transmission Tariff Attachment K .......

# I.    Executive Summary

1.    In Order No. 1920,[1] the Federal Energy Regulatory Commission (Commission)

_____

[1] *Bldg. for the Future Through Elec. Reg'l Transmission Planning & Cost*

revised the *pro forma* Open Access Transmission Tariff (OATT) to adopt reforms to its

existing electric transmission planning and cost allocation requirements pursuant to

section 206 of the Federal Power Act (FPA).[2]  The Commission found that existing

regional transmission planning and cost allocation processes are unjust, unreasonable,

and unduly discriminatory or preferential because, *inter alia*, the Commission's existing

transmission planning and cost allocation requirements do not require transmission

providers to:  (1) perform a sufficiently long-term assessment of transmission needs that

identifies Long-Term Transmission Needs;[3] (2) adequately account on a forward-looking

basis for known determinants of Long-Term Transmission Needs; and (3) consider a set

of benefits of regional transmission facilities planned to meet those Long-Term

Transmission Needs.[4]  Order No. 1920 addressed these deficiencies by establishing

requirements to ensure that Commission-jurisdictional rates remain just and reasonable

and not unduly discriminatory or preferential including, *inter alia*, requiring transmission

providers to conduct Long-Term Regional Transmission Planning[5] that will ensure the

identification, evaluation, and selection of more efficient or cost-effective regional

---

*Allocation*, Order No. 1920, 89 FR 49280 (June 11, 2024), 187 FERC ¶ 61,068 (2024).

[2] 16 U.S.C. 824e.

[3]  *See infra* Introduction and Background section (defining "Long-Term Transmission Needs").

[4] Order No. 1920, 187 FERC ¶ 61,068 at P 1.

[5] *See infra* Introduction and Background section (defining "Long-Term Regional Transmission Planning").

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1383 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No.  RM21-17-001                                                    - 7 -

transmission facilities to address Long-Term Transmission Needs, as well as the just and

reasonable allocation of the costs of those facilities.  By expanding the time horizon and

scope of Commission-jurisdictional regional transmission planning processes, Order No.

1920 reflected an evolutionary step in the Commission's ongoing commitment[6] to ensure

that those processes remain just and reasonable and meet the needs of the American

people.

2.      In this order, we refine and improve Long-Term Regional Transmission Planning

by building on the reforms adopted in Order No. 1920, with a particular focus on

ensuring that states have a robust role in Long-Term Regional Transmission Planning and

cost allocation processes established in this rule.  We continue to find, as the Commission

did in the final rule, that the key components of Order No. 1920 together ensure that

transmission providers will conduct sufficiently long-term, forward-looking, and

comprehensive transmission planning and cost allocation processes.  At least once every

five years, transmission providers are required to conduct Long-Term Regional

---

[6] *See Preventing Undue Discrimination & Preference in Transmission Serv.,*
Order No. 890, 72 FR 12266 (Mar. 15, 2007), FERC Stats. & Regs. ¶ 31,241, 118 FERC
¶ 61,119 (2007), *order on reh'g*, Order No. 890-A, 73 FR 2984 (Jan. 16, 2008), FERC
Stats. & Regs. ¶ 31,261 (2007) (cross-referenced at 118 FERC ¶ 61,119), *order on reh'g
and clarification*, Order No. 890-B, 73 FR 39092 (July 8, 2008), 123 FERC ¶ 61,299
(2008), *order on reh'g*, Order No. 890-C, 74 FR 12540 (Mar. 25, 2009), 126 FERC
¶ 61,228 (2009), *order on clarification*, Order No. 890-D, 74 FR 61511 (Nov. 25, 2009),
129 FERC ¶ 61,126 (2009); *Transmission Plan. & Cost Allocation by Transmission
Owning & Operating Pub. Utils.*, Order No. 1000, 76 FR 49842 (Aug. 11, 2011), 136
FERC ¶ 61,051 (2011), Order No. 1000-A, 77 FR 32184 (May 31, 2012), 139 FERC ¶
61,132 (2012), *order on reh'g & clarification*, Order No. 1000-B, 141 FERC ¶ 61,044
(2012), *aff'd sub nom. S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d 41 (D.C. Cir. 2014) (per
curiam).

Docket No.  RM21-17-001                                                                 - 8 -

Transmission Planning, a process that includes looking ahead over a 20-year transmission planning horizon.  This process further requires developing at least three plausible and diverse Long-Term Scenarios[7] that are based upon known drivers of transmission needs and informed by best available data; analyzing the impacts of events like extreme weather under each Long-Term Scenario; and evaluating potential Long-Term Regional Transmission Facilities.[8]  This evaluation includes assessing whether these facilities would yield reliability and economic benefits to transmission customers and, if so, identifying those benefits.  Together, these reforms ensure that transmission providers, state regulators, and stakeholders possess the information necessary for each transmission planning region to identify, evaluate, and select (i.e., determine whether to pursue the development of facilities) more efficient or cost-effective transmission facilities that provide significant benefits for customers.

3.      Here, we adopt a number of modifications and clarifications to address the concerns raised in response to Order No. 1920.  Order No. 1920 recognized the important role that states will play in Long-Term Regional Transmission Planning and established various requirements to facilitate their participation in those processes, including requiring transmission providers to engage with states in developing cost allocation approaches for Long-Term Regional Transmission Facilities.  With this order, we

---

[7] *See infra* Introduction and Background section (defining "Long-Term Scenario").

[8] *See infra* Introduction and Background section (defining "Long-Term Regional Transmission Facility").

USCA4 Appeal: 24-1650   Doc: 224      Filed: 01/21/2025    Pg: 1385 of 2455
Document Accession #: 20241121-3139      Filed Date: 11/21/2024

Docket No.  RM21-17-001                                          - 9 -

reaffirm and enhance that finding by recognizing that meaningful engagement with states
is critical to the success of the Long-Term Regional Transmission Planning reforms
established in Order No. 1920.  Specifically, in response to rehearing and clarification
requests, we better integrate states' input into regional transmission planning and cost
allocation processes, both in the transmission providers' development of Order No. 1920
compliance filings and the ongoing implementation of these reforms in the future.  These
modifications and clarifications address many of the concerns raised in the rehearing
requests submitted in response to Order No. 1920, and they will increase the likelihood
that Long-Term Regional Transmission Planning results in efficient and cost-effective
transmission investment.

4.      In this order, we also clarify what this rule does, and does not, require.  Because
Order No. 1920 mandates only improvements to transmission planning *processes* which,
in turn, ensures foundational transparency about potential transmission development,
Order No. 1920 does not force or mandate the development of certain transmission
facilities.  A requirement to develop a structured process to analyze *whether* building
certain transmission facilities would yield benefits greater than their costs, over the long
term and based upon various future scenarios, will help transmission providers and states
to assess the value that those projects could bring.  However, such process-based
requirements are not the same as a requirement to build any particular transmission
facilities.  More precisely, Order No. 1920 does not require transmission providers to
select any particular transmission facility; does not automatically authorize transmission
developers to develop or construct any specific facilities; and does not mandate any

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1386 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No.  RM21-17-001                                                    - 10 -

specific set of transmission customers to pay for any particular transmission facilities. Instead, Order No. 1920 and this order together set out processes that direct transmission planning regions to systematically consider various drivers of transmission needs and develop cost allocation approaches that yield the development of cost-effective transmission projects and thereby yield just and reasonable rates for customers.

5.      As such, Long-Term Regional Transmission Planning as required by Order No. 1920 is a significant step forward in the Commission's responsibility to ensure just and reasonable and not unduly discriminatory or preferential rates.  By establishing minimum standards based on transmission planning best practices observed around the country for forecasting future scenarios and managing the uncertainty inherent in forward-looking planning, the Long-Term Regional Transmission Planning requirements established in this proceeding will lead transmission providers to re-direct investment toward more efficient or cost-effective regional transmission facilities, and ultimately produce greater benefits for transmission customers.

6.      Moreover, improving regional transmission planning practices is an urgent concern in light of the uncontroverted, rapidly changing circumstances on the grid, including load growth; the increased impacts of extreme weather; affordability concerns; and changing economics and policies that shape the resource mix and demand, which are increasing the need for transmission across the country.  To cost-effectively meet these needs, Order No. 1920 and this order set out systematic processes that transmission providers will use to identify and analyze transmission projects that bring benefits to consumers, while recognizing the need for flexibility to account for regional differences.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1387 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No. RM21-17-001                                                                - 11 -

7.    Order No. 1920 follows in the footsteps of Order Nos. 890 and 1000 when it comes to the requirements governing the selection of potential regional transmission facilities identified through Long-Term Regional Transmission Planning.  Consistent with the core theory of Order Nos. 890 and 1000, even though Order No. 1920 does not require the buildout of specific transmission facilities, it will reveal the benefits of designing and developing transmission projects and enable investment in those that yield great benefits for electricity customers across the country.  Ultimately, we expect Order No. 1920 to lead to the development of more efficient or cost-effective transmission facilities through improved analysis and transparency that empower the transmission planning regions with the information needed to make prudent investments in beneficial transmission infrastructure for customers.

8.    Order No. 1920's requirements for regional cost allocation practices are similarly well grounded in Commission and court precedent.  If more efficient or cost-effective Long-Term Regional Transmission Facilities are identified and determined to be worth developing as a result of the enhanced regional transmission planning required by Order No. 1920, customers will pay for these facilities *only to the extent that they benefit* from them.  That is because Order No. 1920 requires, consistent with well-established law and Orders No. 890 and 1000, that any cost allocation must comply with cost causation and the "beneficiary pays" principle.[9]  Thus, Order No. 1920 will not lead one group of

---

[9] *See PJM Interconnection, L.L.C.*, Opinion No. 494, 119 FERC ¶ 61,063, at P 66 (2007) (requiring PJM to set forth a "beneficiary pays" method in its tariff and consistently apply that approach each time a new regionally-planned transmission facility is approved), *on reh'g*, Opinion No. 494-A, 122 FERC ¶ 61,082 (2008), *remanded Ill.*

Docket No.  RM21-17-001                                                    - 12 -

customers to pay for more than their fair share of the costs of transmission development

because any proposal to charge customers for costs that are not "roughly commensurate"

with the benefits they are expected to receive from Long-Term Regional Transmission

Facilities would contravene the final rule.[10]

9.       Order No. 1920 builds on Order No. 1000's cost allocation requirements.  Order

No. 1000 required transmission providers to incorporate into their tariffs a default ("*ex

ante*") cost allocation approach that, *if* transmission facilities are determined to be worth

investing in based upon the results of the regional transmission planning process, would

provide a mechanism for those transmission customers that benefit to pay for those

projects.  Prior to Order No. 1000, transmission providers did not necessarily have the

means to charge transmission customers located within a particular transmission planning

region, but outside their individual service territories, for the costs of regional

transmission facilities that benefit customers throughout the region.  Thus, the

requirement to establish an *ex ante* cost allocation method in each OATT that would

apply if a regional transmission planning process resulted in the selection of more

---

*Com. Comm'n v. FERC*, 576 F.3d 470, 474-78 (7th Cir. 2009) (*ICC v. FERC I*)
(remanding Commission order for further proceedings in light of Commission's failure to
provide substantial evidence supporting Commission's approval of cost allocation
method as complying with "beneficiary pays" principle).

     [10] *See ICC v. FERC I*, 576 F.3d at 477 (holding that, if the Commission cannot
quantify the benefits of particular transmission facilities to a particular class of
transmission customers, it must have "an articulable and plausible reason to believe that
the benefits [of those facilities] are at least roughly commensurate with" the costs to be
paid by those customers).

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1389 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No.  RM21-17-001                                                    - 13 -

efficient or cost-effective transmission facilities was central to ensuring that those facilities could actually be developed.  Like Order No. 1000, Order No. 1920 requires each transmission provider to establish at least one *ex ante* cost allocation method through which the costs of Long-Term Regional Transmission Facilities will be allocated in a manner consistent with the "beneficiary pays" principle.  Just like in Order No. 1000, the requirement to establish a mechanism by which the costs of selected transmission facilities may be allocated to relevant benefitting transmission customers does not mandate any particular method that transmission providers or planning regions must adopt.

10.     Importantly, Order No. 1920 provides *additional flexibility* to transmission providers and states regarding cost allocation.  While transmission providers under Order No. 1000 must adopt a cost allocation method for each type of transmission facility, Order No. 1920 relaxes this requirement.  Furthermore, the modifications and clarifications granted on rehearing expand states' critical role in determining the cost allocation approach most suitable for each transmission planning region.  These modifications and clarifications are necessary because the Commission recognizes that states play a critical role in the successful planning of, the decision about how to pay for, and ultimately, the deployment of beneficial regional transmission facilities.

11.     For example, under Order No. 1920 as modified in this order, Relevant State Entities have an opportunity to negotiate their preferred *ex ante* cost allocation method(s) in the first instance, including being able to secure an extension of time if needed to continue those negotiations.  Upon reaching agreement, Relevant State Entities can

Docket No.  RM21-17-001                                                                      - 14 -

present their preferred approach to the transmission provider, which then will either propose that approach to the Commission in its compliance filing for this rule, or if the transmission provider submits a different proposal, will include in its compliance filing the states' preferred approach for the Commission to consider.

12.     This order further improves states' ability to negotiate cost allocation methods. Under Order No. 1920, states, through Relevant State Entities,[11] have an opportunity to secure the right to negotiate alternate cost allocation methods in the future, for either an individual transmission facility or a group of them, instead of using the *ex ante* cost allocation method on file in transmission providers' OATTs.  This State Agreement Process[12] allows Relevant State Entities to consider, for example, whether certain Long-Term Regional Transmission Facilities largely provide a unique set of benefits such that the costs of those facilities are appropriately paid for in a different manner than under the *ex ante* cost allocation method.  And, going forward, we require transmission providers to consult with Relevant State Entities regarding potential future changes to *ex ante* cost allocation methods and State Agreement Processes used in Long-Term Regional Transmission Planning.

13.     Order No. 1920 provides greater flexibility than Order No. 1000 to deviate from the *ex ante* cost allocation method or to establish more than one *ex ante* cost allocation

---

[11] *See infra* Introduction and Background section (defining "Relevant State Entity").

[12] *See infra* Introduction and Background section (defining "State Agreement Process").

USCA4 Appeal: 24-1650    Doc: 224      Filed: 01/21/2025    Pg: 1391 of 2455
Document Accession #: 20241121-3139      Filed Date: 11/21/2024

Docket No.  RM21-17-001                                                    - 15 -

method.  We also provide new opportunities for states to influence each of these choices
because better enabling state input into cost allocation choices helps to ensure that more
efficient or cost-effective Long-Term Regional Transmission Facilities that are likely to
be sited and constructed only with state regulatory approval are ultimately developed
successfully.  Given that Order No. 1920 continues to afford considerable flexibility to
transmission providers and Relevant State Entities to determine the cost allocation
methods appropriate for their transmission planning region and retains the core obligation
that any cost allocation method filed must be consistent with cost causation, the
beneficiary pays principle, and other statutory requirements, we believe that cost
allocation under this rule will result in just and reasonable rates.  Order No. 1920 requires
no more than Order No. 1000—that some mechanism for charging customers for more
efficient or cost-effective transmission facilities be available in case such facilities are
determined, after evaluation through Long-Term Regional Transmission Planning, to be
worth developing.  In fact, Order No. 1920 expands the opportunities for transmission
providers, state regulators, and stakeholders to ensure that the costs of Long-Term
Regional Transmission Facilities are allocated only "roughly commensurate" with the
benefits expected to result from those facilities.

14.     As noted above, we agree with certain arguments raised on rehearing and/or
clarification of Order No. 1920.  The instances where we modify the discussion in Order
No. 1920 and set aside the result of Order No. 1920 generally fall into three categories.
First, as discussed above, we further enhance the role of Relevant State Entities in Long-
Term Regional Transmission Planning, especially their role in shaping the development

of Long-Term Scenarios and cost allocation methods.  Second, we clarify that, when Relevant State Entities request, transmission providers must develop a reasonable number of additional scenarios to help inform the development or application of cost allocation methods.  And third, we remove the requirement that transmission providers include corporate commitments in Factor Category Seven.

15.     In the first category, Order No. 1920 provided an opportunity for states to influence how transmission is planned and ultimately paid for.  This order goes even farther by agreeing with the rehearing arguments advanced by several states seeking additional and expanded opportunities for states to engage.  Specifically, we require transmission providers to incorporate input from states about how Long-Term Scenarios used in Long-Term Regional Transmission Planning will be developed, particularly given that these scenarios will necessarily reflect how the states plan to meet their laws, policies, and regulations.  In addition, we require transmission providers to include in the transmittal or as an attachment to their Order No. 1920 compliance filings any *ex ante* cost allocation method and/or State Agreement Process agreed to by the Relevant State Entities (to the extent the transmission provider does not adopt such an agreed-to cost allocation method and/or process as its own proposal), along with any information related to the Engagement Period[13] requested by a Relevant State Entity to be included.  We are further persuaded by arguments on rehearing that Relevant State Entities may, in some cases, need time beyond the six-month Engagement Period allowed under Order

---

[13] *See infra* Introduction and Background section (defining "Engagement Period").

No. 1920. We therefore clarify that the Commission will grant extensions of time

requested by Relevant State Entities where there is a showing that additional time is

needed to resolve cost allocation discussions, up to a period of an additional six months.

We believe this clarification ensures states who are engaged in working toward agreed-

upon cost allocation methods and/or a State Agreement Process will have the time they

need to resolve those discussions.

16.     Furthermore, to ensure that Relevant State Entities have a role in cost allocation

for Long-Term Regional Transmission Facilities going forward, we require that

transmission providers consult with Relevant State Entities (1) prior to amending the

Long-Term Regional Transmission Cost Allocation Method(s) and/or State Agreement

Process(es), or (2) if Relevant State Entities seek, consistent with their chosen method to

reach agreement, to amend that method or process. Finally, we clarify that the flexibility

Order No. 1920 affords to transmission providers and Relevant State Entities to

determine cost allocation methods appropriate for their region does not preclude

proposed methods that allocate costs commensurate with reliability and economic

benefits region-wide, while allocating costs commensurate with additional benefits to a

subset of states that agree to such cost allocation, e.g., based on the incremental costs and

benefits of transmission needed to achieve state laws, policies, and regulations beyond

the cost of transmission needed in the absence of those laws, policies, and regulations.

17.     In the second category, we clarify in response to requests for rehearing that, while

transmission providers are obligated to develop three Long-Term Scenarios that meet all

of the requirements of the rule, Order No. 1920 permits transmission providers to develop

additional analyses, including other scenarios, to help inform who pays for those selected

facilities.  We further modify Order No. 1920 on rehearing to now require that

transmission providers develop a reasonable number of additional scenarios at Relevant

State Entities' request.  The aim of Order No. 1920 is to ensure that transmission

providers engage in the sufficiently long-term, forward-looking, and comprehensive

transmission planning that is essential to have the information necessary to determine

which investments are worth making.  As long as transmission providers engage in that

robust planning process and achieve the transparency required through that process,

transmission providers can develop and consider additional information beyond that

required as part of Long-Term Regional Transmission Planning.

18.     In the third category of changes, on rehearing we modify, in one respect, the

requirement to use seven categories of factors in the development of the three Long-Term

Scenarios that are used to identify Long-Term Transmission Needs, and potential

solutions to those needs.  Several parties raise concerns regarding the inclusion of

corporate commitments in Factor Category Seven, which they argue may elevate the

needs of particular transmission customers above those of others.  Upon further

consideration, we eliminate the requirement to incorporate corporate commitments from

Factor Category Seven into each Long-Term Scenario and thus we eliminate the potential

for confusion around the treatment of particular transmission customers, while enabling

transmission providers to give appropriate weight to corporate commitments as an

indicator of customer preference in a region where those preferences are known.

USCA4 Appeal: 24-1650     Doc: 224     Filed: 01/21/2025     Pg: 1395 of 2455
Document Accession #: 20241121-3139     Filed Date: 11/21/2024

Docket No.  RM21-17-001                                                                 - 19 -

19.     Taken together, we believe the requirements of Order No. 1920 with the

modifications and clarifications we make on rehearing will remedy the deficiencies of

current regional transmission planning processes, establish sufficiently long-term,

forward-looking, and comprehensive transmission planning, and ensure that transmission

providers and Relevant State Entities in each region have the flexibility to devise cost

allocation methods that reasonably and fairly assign the costs of Long-Term Regional

Transmission Facilities to those that benefit from such facilities.

## II.     Introduction and Background

20.     In Order No. 1920, the Commission found that existing regional transmission

planning and cost allocation processes are unjust, unreasonable, and unduly

discriminatory or preferential because the Commission's existing transmission planning

and cost allocation requirements do not require transmission providers to:[14]  (1) perform a

---

[14] Section 201(e) of the FPA, 16 U.S.C. 824(e), defines "public utility" to mean "any person who owns or operates facilities subject to the jurisdiction of the Commission under this subchapter."  As stated in the Order No. 888 *pro forma* Open Access Transmission Tariff (OATT), "transmission provider" is a "public utility (or its Designated Agent) that owns, controls, or operates facilities used for the transmission of electric energy in interstate commerce and provides transmission service under the Tariff."  *Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Servs. by Pub. Utils.; Recovery of Stranded Costs by Pub. Utils. & Transmitting Utils.*, Order No. 888, 61 FR 21540 (May 10, 1996), FERC Stats. & Regs. ¶ 31,036 (1996) (cross-referenced at 75 FERC ¶ 61,080), *order on reh'g*, Order No. 888-A, 62 FR 12274 (Mar. 14, 1997), FERC Stats. & Regs. ¶ 31,048 (cross-referenced at 78 FERC ¶ 61,220), *order on reh'g*, Order No. 888-B, 81 FERC ¶ 61,248 (1997), *order on reh'g*, Order No. 888-C, 82 FERC ¶ 61,046 (1998), *aff'd in relevant part sub nom. Transmission Access Pol'y Study Grp. v. FERC*, 225 F.3d 667 (D.C. Cir. 2000) (*TAPS*), *aff'd sub nom. N.Y. v. FERC*, 535 U.S. 1 (2002); *Pro forma* OATT section I.1 (Definitions).  The term "transmission provider" includes a public utility transmission owner when the transmission owner is separate from the transmission provider, as is the case in regional transmission organizations (RTO) and independent system operators

sufficiently long-term assessment of transmission needs that identifies Long-Term

Transmission Needs;[15] (2) adequately account on a forward-looking basis for known

determinants of Long-Term Transmission Needs; and (3) consider the broader set of

benefits of regional transmission facilities planned to meet those Long-Term

Transmission Needs.[16]

21.    Order No. 1920 therefore established requirements to ensure that Commission-

jurisdictional rates remain just and reasonable and not unduly discriminatory or

preferential.  First, Order No. 1920 required transmission providers in each transmission

planning region to participate in a regional transmission planning process that includes

Long-Term Regional Transmission Planning.[17]  Order No. 1920 established specific

───────────────

(ISO).

[15] For purposes of Order No. 1920, Long-Term Transmission Needs are transmission needs identified through Long-Term Regional Transmission Planning by, among other things and as discussed in Order No. 1920, running scenarios and considering the enumerated categories of factors.  Order No. 1920, 187 FERC ¶ 61,068 at P 299.

[16] Order No. 1920, 187 FERC ¶ 61,068 at P 1.

[17] *Id.* P 224.  Long-Term Regional Transmission Planning means regional transmission planning on a sufficiently long-term, forward-looking, and comprehensive basis to identify Long-Term Transmission Needs, identify transmission facilities that meet such needs, measure the benefits of those transmission facilities, and evaluate those transmission facilities for potential selection in the regional transmission plan for purposes of cost allocation as the more efficient or cost-effective regional transmission facilities to meet Long-Term Transmission Needs.  *Id.*  For purposes of Order No. 1920, and consistent with Order No. 1000, a transmission planning region is one in which transmission providers, in consultation with stakeholders and affected states, have agreed to participate for purposes of regional transmission planning and development of a single regional transmission plan.  *Id.* P 2 n.7; *see* Order No. 1000, 136 FERC ¶ 61,051 at

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1397 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No.  RM21-17-001                                                    - 21 -

requirements regarding how transmission providers must conduct Long-Term Regional

Transmission Planning, including, among other things, the use of Long-Term Scenarios

to identify Long-Term Transmission Needs and Long-Term Regional Transmission

Facilities[18] to meet those needs.[19]

22.    Order No. 1920 required transmission providers to measure and use at least seven

specified benefits to evaluate Long-Term Regional Transmission Facilities as part of

Long-Term Regional Transmission Planning.[20]  Order No. 1920 required transmission

providers to calculate the benefits of Long-Term Regional Transmission Facilities over a

time horizon that covers, at a minimum, 20 years starting from the estimated in-service

---

P 160.

[18] For purposes of Order No. 1920, a Long-Term Regional Transmission Facility
is a regional transmission facility that is identified as part of Long-Term Regional
Transmission Planning to address Long-Term Transmission Needs.  Order No. 1920, 187
FERC ¶ 61,068 at P 250.  For the purposes of Order No. 1920, and consistent with Order
No. 1000, a regional transmission facility is a transmission facility located entirely in one
transmission planning region.  An interregional transmission facility is a transmission
facility that is located in two or more transmission planning regions.  A local
transmission facility is a transmission facility located solely within a transmission
provider's retail distribution service territory or footprint that is not selected in the
regional transmission plan for purposes of cost allocation.  *Id.* P 41 n.58 (citing Order No.
1000, 136 FERC ¶ 61,051 at PP 63, 482 n.374).

[19] *Id.* P 298.  For purposes of Order No. 1920, Long-Term Scenarios are scenarios
that incorporate various assumptions using best available data inputs about the future
electric power system over a sufficiently long-term, forward-looking transmission
planning horizon to identify Long-Term Transmission Needs and enable the
identification and evaluation of transmission facilities to meet such transmission needs.
*Id.* P 302.

[20] *Id.* P 719.

date of the transmission facilities and required that this minimum 20-year benefit horizon

be used both for the evaluation and selection of Long-Term Regional Transmission

Facilities in the regional transmission plan for purposes of cost allocation.[21]

23.     Order No. 1920 required transmission providers to include in their OATTs an

evaluation process, including selection criteria, that they will use to identify and evaluate

Long-Term Regional Transmission Facilities for potential selection to address Long-

Term Transmission Needs.[22]  Further, Order No. 1920 required transmission providers to

include in their OATTs a process to provide Relevant State Entities[23] and interconnection

customers with the opportunity to voluntarily fund the cost of, or a portion of the cost of,

a Long-Term Regional Transmission Facility that otherwise would not meet transmission

providers' selection criteria.[24]  Order No. 1920 also required transmission providers to

include in their OATTs provisions that require transmission providers—in certain

---

[21] *Id.* P 859.  The Commission recognized that some transmission planning regions may include Long-Term Regional Transmission Facilities, or a portfolio of such Facilities, in a regional transmission plan, but may not necessarily include these Facilities for purposes of cost allocation.  *Id.* P 3 n.8 (citing Order No. 1000, 136 FERC ¶ 61,051 at P 63).  For purposes of Order No. 1920, unless otherwise noted, when referencing Long-Term Regional Transmission Facilities (or a portfolio of such Facilities) that are selected, we intend that the word "selected" mean that those Facilities are selected in the regional transmission plan for purposes of cost allocation.  *Id.*

[22] *Id.* P 911.

[23] For the purposes of Order No. 1920, a Relevant State Entity is any state entity responsible for electric utility regulation or siting electric transmission facilities within the state or portion of a state located in the transmission planning region, including any state entity as may be designated for that purpose by the law of such state.  *Id.* P 1355.

[24] *Id.* P 1012.

circumstances—to reevaluate Long-Term Regional Transmission Facilities that

previously were selected.[25]

24.      Order No. 1920 required transmission providers to file one or more *ex ante* Long-

Term Regional Transmission Cost Allocation Methods[26] to allocate the costs of Long-

Term Regional Transmission Facilities (or a portfolio of such Facilities) that are

selected.[27]  Order No. 1920 further allowed, but did not require, transmission providers to

adopt a State Agreement Process for allocating the costs of all, or a subset of, Long-Term

Regional Transmission Facilities.[28]  Where Relevant State Entities agree to such a State

Agreement Process, and transmission providers choose to file such a process, a State

Agreement Process would provide Relevant State Entities up to six months after selection

for its participants to determine, and transmission providers to file, a cost allocation

method for specific Long-Term Regional Transmission Facilities.[29]  Order No. 1920 also

established a six-month time period (Engagement Period), during which transmission

---

[25] *Id.* P 1048.

[26] For purposes of Order No. 1920, a Long-Term Regional Transmission Cost
Allocation Method is an *ex ante* regional cost allocation method for one or more Long-
Term Regional Transmission Facilities (or a portfolio of such Facilities) that are selected
in the regional transmission plan for purposes of cost allocation.  *Id.* P 1291.

[27] *Id.*

[28] *Id.* P 1402.  For purposes of Order No. 1920, a State Agreement Process is a
process by which one or more Relevant State Entities may voluntarily agree to a cost
allocation method for Long-Term Regional Transmission Facilities (or a portfolio of such
Facilities) before or no later than six months after they are selected.  *Id.*

[29] *Id.*

Docket No.  RM21-17-001                                                                                           - 24 -

providers must:  (1) provide notice of the starting and end dates for the six-month time period; (2) post contact information that Relevant State Entities may use to communicate with transmission providers about any agreement among Relevant State Entities on a Long-Term Regional Transmission Cost Allocation Method(s) and/or a State Agreement Process, as well as a deadline for communicating such agreement; and (3) provide a forum for negotiation of a Long-Term Regional Transmission Cost Allocation Method(s) and/or a State Agreement Process that enables robust participation by Relevant State Entities.[30]

25.    Order No. 1920 required transmission providers to evaluate for potential selection in their existing Order No. 1000 regional transmission planning processes regional transmission facilities that will address certain identified interconnection-related transmission needs associated with certain interconnection-related network upgrades originally identified through the generator interconnection process.[31]

26.    Order No. 1920 required transmission providers to consider more fully the alternative transmission technologies of dynamic line ratings, advanced power flow control devices, advanced conductors, and transmission switching in Long-Term Regional Transmission Planning and existing Order No. 1000 regional transmission planning and cost allocation processes.[32]

---

[30] *Id.* P 1354.

[31] *Id.* PP 1106-1107.

[32] *Id.* P 1198.

Docket No.  RM21-17-001                                                    - 25 -

27.    Order No. 1920 required transmission providers to adopt enhanced transparency requirements for local transmission planning processes and improve coordination between regional and local transmission planning with the aim of identifying potential opportunities to "right-size" replacement transmission facilities.[33]

28.    Order No. 1920 required transmission providers to revise their interregional transmission coordination procedures to reflect the Long-Term Regional Transmission Planning reforms adopted in Order No. 1920.[34]  Order No. 1920 also required transmission providers to meet additional information sharing and transparency requirements with respect to their interregional transmission coordination processes.[35]

---

[33] *Id.* PP 1625, 1677.

[34] *Id.* P 1751.

[35] *Id.*

29.     The Commission received 49 timely filed requests for rehearing and/or

clarification[36] and several additional filings.[37]  The rehearing requests raise issues related

to nearly all reforms adopted in Order No. 1920.

30.     Pursuant to *Allegheny Defense Project v. FERC*,[38] the rehearing requests filed in

this proceeding may be deemed denied by operation of law.  However, as permitted by

---

[36] Appendix A provides the short names of the entities that filed requests for rehearing or clarification.  To the extent that they intend to seek rehearing, the pleadings filed by Grid United, PJM States, Vermont Commission, and Virginia and North Carolina Commissions are deficient because they fail to include a separate section entitled "Statement of Issues" listing each issue presented to the Commission in a separately enumerated paragraph that includes representative precedent on which the participant is relying, as required by Rule 713(c)(2) of the Commission's Rules of Practice and Procedure (18 CFR 385.713(c)(2)).  Consistent with Rule 713, we deem these petitioners to have waived the issues for which they seek rehearing.  We consider petitioners' requests for clarification and, to provide clarity, address their arguments on rehearing below.  EEI, PJM States, and PJM Utilities filed answers to certain requests for rehearing.  Rule 713(d)(1) (18 CFR 385.713(d)(1)) prohibits an answer to a request for rehearing.  Accordingly, we deny EEI's, PJM States', and PJM Utilities' motions to answer and reject their answers.  Although PJM States style their July 3, 2024 pleading as comments, we treat the pleading as an answer to PJM's request for rehearing.  *See, e.g.*, *San Diego Gas & Elec. Co.*, 133 FERC ¶ 61,014, at P 15 (2010) ("[W]e are not obligated to accept a filing solely on the basis of its party-bestowed title.  Instead, we examine the substance of the pleading.").

[37] Susann Rizzo, Gary Andrews, and Cher Gilmore filed letters supporting Order No. 1920.  They also urged the Commission to require interregional transmission planning and establish environmental justice liaisons.  In addition, E. Andrews, Illinois Commission, and Minnesota Commission each submitted late-filed pleadings that are generally supportive of Order No. 1920.  Further, on June 12, 2024, Missouri Commission filed a letter addressing Order No. 1920.  On September 3, 2024, Chairman Willie Phillips responded to the Missouri Commission letter.  On July 22, 2024, State Regulatory Commissioners filed a letter expressing views on Order No. 1920.  On October 9, 2024, Chairman Willie Phillips responded to the State Regulatory Commissioners' letter.

[38] 964 F.3d 1 (D.C. Cir. 2020) (en banc).

Docket No.  RM21-17-001                                                     - 27 -

section 313(a) of the FPA,[39] we are modifying the discussion in Order No. 1920, setting

aside the order, in part, and clarifying the order, as discussed below.[40]

31.     Specifically, we set aside the order, in part, to specify that:  (1) transmission

providers are not required to use the set of seven required benefits to help inform their

identification of Long-Term Transmission Needs;[41] (2) Factor Category Seven no longer

includes corporate commitments;[42] (3) transmission providers must propose an effective

date for the OATT revisions necessary to comply with Order No. 1920 that is no later

than two years from the date on which they will commence the first Long-Term Regional

Transmission Planning cycle;[43] (4) when Relevant State Entities agree on a Long-Term

_____

[39] 16 U.S.C. 825*l*(a) ("Until the record in a proceeding shall have been filed in a
court of appeals, as provided in subsection (b), the Commission may at any time, upon
reasonable notice and in such manner as it shall deem proper, modify or set aside, in
whole or in part, any finding or order made or issued by it under the provisions of this
chapter.").

[40] *Allegheny Def. Project*, 964 F.3d at 16-17.  In Appendix B, we provide the
revisions to the provisions of Attachment K to the *pro forma* OATT made in this order on
rehearing and clarification.

[41] *See* Order No. 1920, 187 FERC ¶ 61,068 at P 301 ("Transmission providers
must use [the set of seven required benefits] to help to inform their identification of
Long-Term Transmission Needs.").

[42] *See id.* P 481 ("We adopt the NOPR proposal, with modification, to require
transmission providers in each transmission planning region to incorporate Factor
Category Seven: utility and corporate commitments and federal, federally-recognized
Tribal, state, and local policy goals that affect Long-Term Transmission Needs, in the
development of Long-Term Scenarios.").

[43] *See id.* P 1072 ("Thus, we require transmission providers in each transmission
planning region to propose on compliance a date, no later than one year from the date on
which initial filings to comply with this final rule are due, on which they will commence

USCA4 Appeal: 24-1650    Doc: 224      Filed: 01/21/2025    Pg: 1404 of 2455
Document Accession #: 20241121-3139      Filed Date: 11/21/2024

Docket No.  RM21-17-001                                                      - 28 -

Regional Transmission Cost Allocation Method or State Agreement Process resulting
from the Engagement Period, transmission providers must include that method or process
in the transmittal or as an attachment to their compliance filing, even if transmission
providers propose a different Long-Term Regional Transmission Cost Allocation method
or do not propose to adopt a State Agreement Process along with any information that
Relevant State Entities provide to transmission providers regarding the state negotiations
during the Engagement Period;[44] and (5) transmission providers shall consult with
Relevant State Entities prior to amending the Long-Term Regional Transmission Cost
Allocation Method(s) and/or State Agreement Process(es), or if Relevant State Entities
seek, consistent with their chosen method to reach agreement, for the transmission
provider to amend that method or process.

32.    Additionally, we grant multiple clarifications on most elements of Order No. 1920,
as further discussed below.  For example, among other clarifications, we clarify that
transmission providers may develop additional scenarios, beyond the three Long-Term
Scenarios that Order No. 1920 requires, to provide Relevant State Entities with
information that they can use to inform the application of Long-Term Regional Cost
Allocation Method(s) or the development of cost allocation methods through the State

---

the first Long-Term Regional Transmission Planning cycle.").

[44] *See id.* P 1359 ("We note, however, that the ultimate decision as to whether to
file a Long-Term Regional Transmission Cost Allocation Method(s) and/or State
Agreement Process to which Relevant State Entities have agreed will continue to lie with
the transmission providers.").

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1405 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No.  RM21-17-001                                                - 29 -

Agreement Process(es), and that Order No. 1920 does not prevent transmission providers from recognizing different types of benefits and using them to allocate costs in proportion to those benefits.

33.    Finally, we specify that the Commission will grant an extension of the required Engagement Period for up to an additional six months when Relevant State Entities request an extension and represent to the Commission that they agree, consistent with their chosen method to reach agreement, that they need additional time to finish cost allocation discussions.  If the Commission grants such an extension request, it will also, as appropriate, extend, *sua sponte*, the relevant Order No. 1920 compliance deadlines to ensure that any extension of the Engagement Period would not conflict with the required compliance deadlines.

## III.    The Overall Need for Reform

### A.    Order No. 1920

34.    In Order No. 1920, the Commission found substantial evidence to support the conclusion that the Commission's existing regional transmission planning and cost allocation requirements are unjust, unreasonable, and unduly discriminatory or preferential.  Specifically, the Commission explained that the absence of sufficiently long-term, forward-looking, and comprehensive transmission planning requirements causes transmission providers to fail to adequately anticipate and plan for future system conditions and to fail to appropriately evaluate the benefits of transmission

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1406 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No.  RM21-17-001                                                      - 30 -

infrastructure.[45]  The Commission found that this status quo results in piecemeal

transmission expansion to address relatively near-term needs and causes transmission

providers to make relatively inefficient investments in transmission infrastructure, the

costs of which are ultimately recovered through Commission-jurisdictional rates.  One

result of this dynamic, the Commission explained, is that transmission customers overpay

to meet their transmission needs and forgo benefits that outweigh their costs, which

results in less efficient or cost-effective transmission investments.  Such deficiencies, the

Commission found, render Commission-jurisdictional regional transmission planning and

cost allocation processes unjust, unreasonable, and unduly discriminatory or

preferential.[46]

35.     The Commission explained that it has the authority to issue Order No. 1920 under

FPA section 206, which "instructs the Commission to remedy 'any . . . practice' that

'affect[s]' a rate for interstate electricity service 'demanded' or 'charged' by 'any public

utility' if such practice 'is unjust, unreasonable, unduly discriminatory or preferential.'"[47]

The Commission concluded that the D.C. Circuit has recognized that regional

transmission planning and cost allocation processes are practices affecting rates subject to

---

[45] Order No. 1920, 187 FERC ¶ 61,068 at P 85.

[46] *Id.*

[47] *Id.* P 86 (citation omitted) (quoting *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d at
55).

Docket No.  RM21-17-001                                                                 - 31 -

the Commission's exclusive jurisdiction[48] and that transmission providers use those

processes to "determine which transmission facilities will more efficiently or cost-

effectively meet" transmission needs, the development of which directly impacts the

rates, terms, and conditions of Commission-jurisdictional service.[49]  The Commission

found that, because these processes identify, evaluate, and select the regional

transmission facilities whose costs will be recovered through transmission rates, they

directly affect those rates.[50]  The Commission found that, because such regional

transmission facilities lead to a more robust transmission system, regional transmission

planning and cost allocation processes, as well as "the rules and practices that determine

how those [processes] operate,"[51] directly affect rates that customers pay for *both*

transmission and sale of electric energy in interstate commerce.[52]  The Commission noted

that it may act pursuant to FPA section 206 if the Commission first establishes, through

substantial evidence,[53] that existing practices are unjust, unreasonable, or unduly

---

[48] *Id.* (citing *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d at 55-59, 84).

[49] *Id.* (quoting *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d at 56).

[50] *Id.*; *see also id*. P 86 n.186 (citing *Conn. Dep't of Pub. Util. Control v. FERC*, 569 F.3d 477, 485 (D.C. Cir. 2009)).

[51] *Id.* P 86 (quoting *FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 279 (2016) (*EPSA*)).

[52] *Id.* (citing 16 U.S.C. 824e(a)).

[53] *Id.* (citing *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d at 54).  The Commission explained that FPA section 206 empowers the Commission to address the mere *threat* of unjust and unreasonable rates and, in this context the Commission need not necessarily provide *empirical* evidence for every proposition to satisfy the substantial evidence

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1408 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No. RM21-17-001                                                    - 32 -

discriminatory or preferential and, second, establishes that the replacement practices are

just and reasonable.[54]

36.     Addressing whether existing rates, or practices affecting rates, remain just and

reasonable—i.e., the first prong under FPA section 206[55]—the Commission found that

existing Order No. 890 and Order No. 1000 transmission planning and cost allocation

requirements do not result in regional transmission planning that is conducted on a

sufficiently long-term, forward-looking, and comprehensive basis, and transmission

providers therefore often do not identify, evaluate, or select more efficient or cost-

effective regional transmission solutions to meet Long-Term Transmission Needs.[56]  The

Commission determined that this results in piecemeal, inefficient, and less cost-effective

transmission planning, which imposes real costs on customers[57] and renders the

Commission's existing transmission planning and cost allocation requirements unjust,

---

standard.  Order No. 1920, 187 FERC ¶ 61,068 at P 86 n.189 (citing *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d at 64-65, 85).

[54] *Id.* (citing 16 U.S.C. 824e(a); *EPSA*, 577 U.S. at 277).

[55] *See Pub. Serv. Elec. & Gas Co. v. FERC*, 989 F.3d 10, 13 (D.C. Cir. 2021) (explaining that section 206 "mandates a two–step procedure" whereby the Commission, on the first step, must make an explicit finding that the existing rate is unlawful and then, on the second step, must set a new rate. (quotation omitted)).

[56] Order No. 1920, 187 FERC ¶ 61,068 at P 87.

[57] *Id.*

unreasonable, and unduly discriminatory or preferential in violation of FPA section 206.[58]

37.     The Commission also found that existing transmission planning and cost allocation requirements are insufficient to ensure just and reasonable and not unduly discriminatory or preferential rates.  Thus, pursuant to FPA section 206, the Commission stated that it is now requiring transmission providers to engage in and conduct sufficiently long-term, forward-looking, and comprehensive transmission planning and cost allocation processes to identify and plan for Long-Term Transmission Needs.  The Commission found that such reforms will facilitate a process by which transmission providers can better identify, evaluate, and select more efficient or cost-effective transmission solutions to meet Long-Term Transmission Needs, which will ensure that Commission-jurisdictional rates are just and reasonable and not unduly discriminatory or preferential.[59]

### 1.     The Transmission Investment Landscape Today

38.     The Commission explained that due to continuing changes in the industry, ongoing investment in transmission facilities is necessary to ensure the transmission system remains reliable, affordable, and economically efficient.  More comprehensive transmission planning can enable transmission providers to proactively identify potential reliability problems and economic constraints and evaluate potential transmission

---

[58] *Id.* P 88.

[59] *Id.* P 89.

Docket No. RM21-17-001                                                      - 34 -

solutions, which can facilitate the selection of more efficient or cost-effective

transmission facilities to meet Long-Term Transmission Needs.[60]  Transmission

infrastructure can also increase competition among generators, which results in a host of

benefits for customers, including cost savings from greater access to low-cost power.[61]

39.     The Commission cited evidence demonstrating a nationwide increase in

transmission spending since the issuance of Order No. 1000 and explained that,

unsurprisingly, transmission costs have become an increasing share of customers' overall

electricity bills in regions that saw a significant increase in transmission expenditures.[62]

Further, the Commission highlighted several studies in the record demonstrating that

transmission investment is likely to increase substantially in coming years.[63]

40.     The Commission found that a number of factors are driving the growing need for

new transmission infrastructure.[64]  First, the Commission found that longer-term

reliability needs are changing and driving a significant shift in the demands placed on the

transmission system, and transmission system operators are increasingly depending on

regional transmission facilities to ensure operational stability and system reliability,

particularly due to the growing frequency of extreme weather events and increasing share

---

[60] *Id.* P 90 (citations omitted).

[61] *Id.* P 91.

[62] *Id.* P 92 (citations omitted).

[63] *Id.* P 93 (citations omitted).

[64] *Id.* P 94 (citations omitted).

of variable resources entering the resource mix.[65]  Second, after many years of flat or minimal load growth in regions across the country, the Commission found that both regional and national demand is projected to increase significantly in the coming decades, which will require an increasingly robust transmission system to serve this growing load reliably.  Third, the Commission found that supply is changing, driven by federal, federally-recognized Tribal, state, and local policies, customer demands, utility commitments, and the shifting economics of resources that comprise the resource mix.[66]

41.    The Commission also found that the record in this proceeding affirms the Commission's longstanding recognition that regional transmission planning that identifies more efficient or cost-effective transmission solutions helps to ensure cost-effective transmission development for customers and can yield better returns for every dollar spent than localized or piecemeal transmission solutions, while inadequate or poorly designed transmission planning processes can cause customers to foot the bill for piecemeal, inefficient, and less cost-effective transmission solutions.[67]

42.    Based on its experience implementing Order No. 1000, the Commission found that existing regional transmission planning processes are not of sufficient scope and duration to adequately or consistently identify transmission needs and associated opportunities to evaluate and select, on a more comprehensive basis, more efficient or cost-effective

---

[65] *Id.* (citations omitted).

[66] *Id.* PP 96-99 (citations omitted).

[67] *Id.* P 100 (citations omitted).

Docket No. RM21-17-001                                        - 36 -

transmission solutions to those needs.[68]  The Commission explained that, in some

regions, investment in regional transmission facilities has declined as compared to prior

to Order No. 1000 and that, across all non-RTO/ISO regions, not a single transmission

facility has been selected pursuant to the regional planning processes since

implementation of Order No. 1000.  The Commission noted that, within some RTO/ISO

regional transmission planning processes, even where investments through the regional

transmission planning process occur, much of that investment has been in transmission

projects that only address immediate reliability needs.[69]  The Commission also cited

evidence showing that, in the limited instances in which transmission providers have

followed processes that share many of the elements that Order No. 1920 requires,

customers have seen clear and quantifiable benefits.[70]

43.      Further, the Commission explained that a substantial amount of new transmission

investment is occurring in generator interconnection processes and local transmission

planning processes, which, unlike regional transmission planning processes, do not

comprehensively assess either broader transmission needs or solutions to those needs.

The Commission concluded that overreliance on those processes can result in relatively

---

[68] *Id.* P 101.

[69] *Id.* (citations omitted).

[70] *Id.* P 102.

inefficient or less cost-effective transmission development for customers, which contributes to rates for transmission that are unjust and unreasonable.[71]

44.    The Commission cited evidence showing a sharp growth in both the total cost of interconnection-related network upgrades and in the cost of such upgrades relative to generation project costs, as well as evidence showing that increases in interconnection costs are being driven, in many cases, by an expansion in the scope and complexity of interconnection-related network upgrades.[72]  The Commission noted that, unlike regional transmission planning processes, the generator interconnection process is not designed to consider how to address transmission needs more efficiently or cost-effectively beyond the discrete interconnection request (or requests) being studied.[73]  The Commission found that increasingly relying on interconnection customers' interconnection-related network upgrades to expand the capacity of the transmission system is inefficient and leads to less cost-effective transmission development than would result from long-term, forward-looking, and more comprehensive regional transmission planning, to the detriment of customers.[74]

45.    The Commission also cited evidence that, since the issuance of Order No. 1000, the majority of investment in transmission facilities has been in local transmission

---

[71] *Id.* P 103 (citations omitted).

[72] *Id.* PP 104-105 (citations omitted).

[73] *Id.* P 106.

[74] *Id.* P 108.

facilities, a trend that is accelerating across multiple regions.[75]  The Commission noted evidence that transmission expansion through local transmission planning and in-kind replacement processes is incremental and misses the potential to identify, evaluate, and select more efficient or cost-effective transmission facilities to solve transmission needs, as well as to afford system-wide benefits that may not be achieved through piecemeal, one-off local transmission facilities.[76]  Such transmission planning, the Commission stated, results in relatively inefficient or less cost-effective transmission development for customers, which contributes to rates for transmission that are unjust and unreasonable.[77]

> **2.    Unjust, Unreasonable, and Unduly Discriminatory or Preferential Commission-Jurisdictional Transmission Planning and Cost Allocation Processes**

46.    The Commission concluded that there is substantial evidence in the record to support the determination that sufficiently long-term, forward-looking, and comprehensive regional transmission planning and cost allocation to meet Long-Term Transmission Needs is not occurring on a consistent and sufficient basis.[78]  The Commission found that the absence of a sufficiently long-term, forward-looking, and

---

[75] *Id.* P 109.

[76] *Id.* P 110 (citations omitted).

[77] *Id.*  The Commission acknowledged the important roles played by generator interconnection processes and local transmission planning processes and underscored that the Commission's findings were not intended to call into question the justness and reasonableness of either process.  *Id.* P 111.

[78] *Id.* P 112.

comprehensive regional transmission planning process results in relatively unfavorable

outcomes, including:  piecemeal transmission expansion to address relatively near-term

transmission needs, transmission providers undertaking investments in relatively

inefficient or less cost-effective transmission infrastructure, and transmission customers

paying more than is necessary or appropriate to meet their transmission needs and/or

forgoing benefits that outweigh their costs.[79]

47.     The Commission determined that there is substantial evidence in the record to

support the conclusion that the Commission's regional transmission planning and cost

allocation requirements are deficient, thus rendering Commission-jurisdictional regional

transmission planning and cost allocation processes unjust and unreasonable.

Specifically, the Commission found that existing regional transmission planning and cost

allocation requirements fail to require transmission providers to:  (1) perform a

sufficiently long-term assessment of transmission needs that identifies Long-Term

Transmission Needs; (2) adequately account on a forward-looking basis for known

determinants of Long-Term Transmission Needs; and (3) consider the broader set of

benefits of regional transmission facilities planned to meet those Long-Term

Transmission Needs.[80]

48.     As to the first deficiency—the lack of sufficiently long-term planning—the

Commission cited evidence in the record demonstrating that, under the status quo, most

---

[79] *Id.*

[80] *Id.* P 114.

transmission planning regions do not plan beyond a 10-year transmission planning horizon.[81]  The Commission stated that the absence of any consistent and sufficient longer-term assessment of transmission needs prevents transmission providers from identifying Long-Term Transmission Needs and considering regional transmission facilities that may be more efficient or cost-effective solutions to address those needs.[82] The Commission added that short-term transmission planning fails to take advantage of the potential for efficiencies or economies of scale that regional transmission facilities can provide and fails to create opportunities to "right size" the replacement of aging transmission facilities to address multiple transmission needs over the longer term. Further, the Commission stated that the time horizon over which much transmission planning is often occurring is shorter than the time needed to plan and construct large (e.g., high voltage or long distance) transmission facilities[83] and much too short to capture all of the benefits that regional transmission facilities can provide.[84]

49.    The Commission noted that the likelihood that near-term assessments will fail to identify Long-Term Transmission Needs and more efficient or cost-effective regional transmission facilities to meet those needs is higher during periods of rapid change, as the

---

[81] *Id.* P 115.

[82] *Id.* (citations omitted).

[83] *Id.* P 116 (citations omitted).

[84] *Id.* (citations omitted).

Docket No.  RM21-17-001                                                                    - 41 -

electric sector is now experiencing, during which the need for transmission infrastructure is expected to grow considerably.[85]

50.      The second deficiency the Commission discussed is that the Commission's existing regional transmission planning and cost allocation requirements fail to require transmission providers to account adequately on a forward-looking basis for known determinants of Long-Term Transmission Needs; moreover, the Commission stated, transmission providers are not consistently or sufficiently doing so.[86]  The Commission further stated that the record demonstrates that there are numerous factors that increasingly shape Long-Term Transmission Needs, are known and identifiable, and have reasonably predictable effects, especially in the aggregate, such as reliability needs driven by the impact of extreme weather; trends in future generation additions and retirements; load growth; federal, federally-recognized Tribal, state, and local laws and regulations; and utility goals.[87]  The Commission determined, however, that existing regional transmission planning processes frequently undervalue or do not consider some or all of these factors, and that the Commission's existing regional transmission planning requirements do not ensure that such factors will be sufficiently accounted for in that planning.[88]  The Commission noted that the failure to adequately consider such factors

---

[85] *Id.* P 117 (citations omitted).

[86] *Id.* P 118.

[87] *Id.* P 119.

[88] *Id.* P 120.

Docket No. RM21-17-001                                                                      - 42 -

delays planning for the transmission system's changing operational needs until shortly

before those transmission needs manifest.  As a result, the Commission stated, existing

regional transmission planning processes are piecemeal and fail to take advantage of

economies of scale in transmission investment or opportunities to address multiple

transmission needs over multiple time horizons, which leads to transmission investment

that is not more efficient or cost-effective and renders Commission-jurisdictional regional

transmission planning and cost allocation processes unjust and unreasonable.[89]

51.     The third deficiency that the Commission identified is that the Commission's

regional transmission planning and cost allocation requirements fail to require

transmission providers to adequately consider the broader set of benefits of regional

transmission facilities planned to meet Long-Term Transmission Needs.  The

Commission pointed to evidence demonstrating that many regional transmission planning

processes focus too narrowly only on some benefits, while other regional transmission

planning processes fail entirely to consider cost savings associated with certain

transmission facilities.[90]  The Commission also explained that the cost-benefit analyses

that transmission providers often use provide an inaccurate portrayal of the comparative

benefits of different transmission facilities, which results in transmission customers

forgoing benefits that may significantly outweigh their costs and in less efficient or cost-

---

[89] *Id.* P 121 (citations omitted).

[90] *Id.* P 122 & n.312.

effective transmission investments, and ultimately contributes to Commission-
jurisdictional rates that are unjust and unreasonable.[91]

52.     The Commission determined that, given its findings concerning the deficiencies in
existing transmission planning requirements, and its conclusion that long-term, forward-
looking, and more comprehensive regional transmission planning is needed, existing cost
allocation requirements are also deficient and must be modified to properly account for
Long-Term Regional Transmission Planning.[92]

53.     The Commission determined that its current cost allocation requirements, which
were designed in the context of the Order No. 1000 regional transmission planning
process, are insufficient to appropriately allocate costs associated with regional
transmission facilities selected in accordance with Order No. 1920's Long-Term
Regional Transmission Planning requirements.[93]  The Commission's existing Order No.
1000 cost allocation requirements contemplate the application of differing cost allocation
methods to different types of transmission facilities, but Order No. 1920's approach to
Long-Term Regional Transmission Planning accounts for multiple drivers of Long-Term
Transmission Needs and results in Long-Term Regional Transmission Facilities that
produce a broader set of benefits and therefore warrants a different approach to cost

---

[91] *Id.* P 123.

[92] *Id.* P 124.

[93] *Id.* P 126.

allocation.[94]  The Commission also explained that existing Order No. 1000 regional

transmission planning processes do not mandate the consideration of specific benefits and

that information concerning these benefits may be relevant when allocating the costs of

Long-Term Regional Transmission Facilities in a manner that is at least roughly

commensurate with their benefits.[95]  Further, the Commission noted that under existing

cost allocation requirements, there is no dedicated process to engage states in the

development of regional cost allocation methods.  The Commission explained that

engaging states in cost allocation is particularly relevant to Long-Term Regional

Transmission Planning given the long lead times for construction of transmission

projects, which create uncertainty for Long-Term Regional Transmission Facilities and

increase the importance of ensuring that such facilities will obtain needed siting

approvals from the states and are thus timely and cost-effectively developed.  The

Commission therefore concluded that it is both necessary and appropriate to establish

specific cost allocation requirements tailored to the Long-Term Regional Transmission

Planning reforms.[96]

54.     The Commission found that there is substantial evidence in the record

demonstrating that Long-Term Regional Transmission Planning and cost allocation to

---

[94] *Id.*

[95] *Id.* (citing *ICC v. FERC I*, 576 F.3d at 477; Order No. 1000, 136 FERC ¶ 61,051 at PP 622, 639).

[96] *Id.*

identify and plan for Long-Term Transmission Needs does not occur on a consistent and sufficient basis.[97]  The Commission added that this is largely due to the deficiencies it identified regarding existing regional transmission planning and cost allocation requirements.[98]  The Commission also found that, under the status quo, transmission providers are meeting many transmission needs by identifying transmission solutions and developing transmission facilities outside of the regional transmission planning and cost allocation processes or in response to near-term reliability needs.[99]  The Commission stated that this approach may not identify more efficient or cost-effective transmission solutions and will saddle consumers with the costs of relatively inefficient or less cost-effective piecemeal transmission investment and expansion.[100]

55.    Moreover, the Commission found that transmission needs in most transmission planning regions are rapidly changing and exacerbating concerns arising from the absence of sufficiently long-term, forward-looking, and comprehensive regional transmission planning and cost allocation processes and the corresponding failure by transmission providers to identify and evaluate more efficient or cost-effective transmission solutions to Long-Term Transmission Needs.[101]  The Commission

---

[97] *Id.* P 127 (citations omitted).

[98] *Id.*

[99] *Id.* (citations omitted).

[100] *Id.* P 128 (citations omitted).

[101] *Id.* P 129.

Docket No. RM21-17-001                                                    - 46 -

emphasized that it is reacting to well-documented factors, which the record demonstrates are driven by exogenous forces beyond the Commission's jurisdiction or control, including, but not limited to, the increasing frequency of extreme weather events, customer preferences, demand growth, economic and technological trends, and federal, federally-recognized Tribal, state, and local policies.[102]

56.     The Commission stated that Order No. 1920 does not aim to affect—either facilitate or hinder—any changes or decisions that occur outside of the Commission's jurisdiction.[103]  Instead, the Commission explained, Order No. 1920 focuses on ensuring that Commission-jurisdictional processes associated with regional transmission planning and cost allocation result in rates that are just and reasonable and not unduly discriminatory or preferential; Order No. 1920 seeks to ensure that such regional transmission planning processes are adequately "*accounting for*" changes occurring outside of the Commission's jurisdiction, including the resource decisions that are the exclusive jurisdiction of states.[104]

57.     The Commission disagreed with arguments that it could not rely on general findings, rather than individualized analyses of each, specific transmission planning

---

[102] *Id.* (citation omitted).

[103] *Id.* P 130 (emphasis in original).

[104] *Id.* (citing *PJM Power Providers Grp. v. FERC*, 88 F.4th 250, 275 (3d Cir. 2023); *Elec. Power Supply Ass'n v. Star*, 904 F.3d 518, 524 (7th Cir. 2018)).

Docket No.  RM21-17-001                                          - 47 -

region, as the basis for Order No. 1920.[105]  The Commission explained that it was acting

pursuant to relevant precedent, which makes clear that the Commission need not make

findings that are region-specific in every case and is instead empowered to "rely on

'generic' or 'general' findings of a systemic problem to support imposition of an

industry-wide solution,"[106] notwithstanding regional variation among regional

transmission planning processes.  Moreover, the Commission acknowledged that, while

transmission planning practices vary considerably between transmission planning

regions, the record demonstrates that deficiencies in transmission planning processes

"reach well beyond 'isolated pockets'"[107] and instead pervade large swathes of the

country, including RTO/ISO and non-RTO/ISO planning regions.[108]  Thus, the

Commission added, Order No. 1920 does not present an "extreme 'disproportion of

remedy to ailment.'"[109]  The Commission also noted that it has discretion to decide the

most efficient approach for resolving industry-wide problems.[110]  Further, the

Commission reasoned, "region-specific solutions will lead to 'siloed and disjunctive

---

[105] *Id.* P 132 (citations omitted).

[106] *Id.* (quoting *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d at 67 (quoting *Interstate Nat. Gas Ass'n of Am. v. FERC*, 285 F.3d 18, 37 (D.C. Cir. 2002))).

[107] *Id.* (quoting *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d at 67) (alteration omitted).

[108] *Id.* (citations omitted).

[109] *Id.* (quoting *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d at 67) (alteration omitted).

[110] *Id.* (citing Order No. 1000, 136 FERC ¶ 61,051 at P 60).

Docket No.  RM21-17-001                                                    - 48 -

transmission planning policies [that] will not solve the problems facing the nation's electric grid.'"[111]

58.    The Commission stated that the record shows that significant changes in transmission needs are well underway nationwide and that failing to account for Long-Term Transmission Needs threatens just and reasonable rates across the country.[112]  The Commission also noted that significant investments in new transmission facilities are expected to occur and substantially affect Commission-jurisdictional rates that customers pay, which underscores the importance of addressing deficiencies in its regional transmission planning and cost allocation requirements now.[113]

### 3.    Benefits of Long-Term Regional Transmission Planning and Cost Allocation to Identify and Plan for Long-Term Transmission Needs

59.    Based on the record, the Commission found that Order No. 1920's requirements will help to ensure just and reasonable Commission-jurisdictional rates by addressing deficiencies in the existing regional transmission planning and cost allocation requirements and promoting enhanced reliability and more efficient or cost-effective transmission solutions.[114]  The Commission noted evidence in the record demonstrating that the kind of regional transmission planning required by Order No. 1920 will help

---

[111] *Id.* (quoting ACEG NOPR Reply Comments at 17).

[112] *Id.* P 133 (citation omitted).

[113] *Id.* (citing Order No. 1000, 136 FERC ¶ 61,051 at PP 46, 50).

[114] *Id.* P 134.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1425 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No.  RM21-17-001                                                    - 49 -

transmission providers to identify, evaluate, and select more efficient or cost-effective transmission solutions to Long-Term Transmission Needs.[115]

60.    The Commission found that Long-Term Regional Transmission Planning that expands the transmission planning horizon and considers factors affecting Long-Term Transmission Needs as well as a broader list of benefits will:  (1) reduce reliance on transmission solutions that are relatively inefficient or less cost-effective because they address only short-term transmission needs; (2) unlock the benefits of economies of scale in transmission investment;[116] (3) enable opportunities to "right size" replacement transmission facilities;[117] (4) facilitate the selection of regional transmission facilities that could address multiple transmission needs over different time horizons; and (5) provide states, utilities, customers, and other stakeholders with greater insight and transparency into the costs and benefits of particular transmission solutions to address Long-Term Transmission Needs.  The Commission concluded that these regional transmission planning and cost allocation reforms will help to ensure just and reasonable rates.[118]  The Commission added that sufficiently long-term, forward-looking, and comprehensive regional transmission planning and cost allocation processes will also enhance reliability because a robust, well-planned transmission system is foundational to ensuring an

---

[115] *Id.* P 135.

[116] *Id.* P 136 (citation omitted).

[117] *Id.* (citations omitted).

[118] *Id.* (citations omitted).

affordable, reliable supply of electricity.[119]  Additionally, the Commission cited evidence

demonstrating how long-term, forward-looking, and more comprehensive regional

transmission planning can better identify reliability needs and resolve those needs with

more efficient or cost-effective transmission solutions.[120]

### B. The Commission Adequately Demonstrated that Existing Rates, or Practices Affecting Rates, Are Unjust and Unreasonable

61.    We sustain the Commission's determination in Order No. 1920 that existing

regional transmission planning and cost allocation processes are unjust and unreasonable,

and unduly discriminatory or preferential.  We conclude that this finding, as well as the

Commission's finding that the identified deficiencies in transmission planning and cost

allocation processes render existing Commission-jurisdictional rates unjust and

unreasonable, was based on substantial record evidence, reflecting significant input from

nearly 200 stakeholders across the country, third-party reports and studies, and the

Commission's extensive knowledge of the industry and expert predictions regarding the

transmission planning processes and cost allocation requirements that the Commission

itself has established and oversees in carrying out its statutory responsibilities.  We

disagree with several rehearing parties who argue that the Commission failed to satisfy its

burden under the first prong of FPA section 206 to show that Order No. 1000 regional

transmission planning and cost allocation processes are unjust, unreasonable, or unduly

---

[119] *Id.* P 137.

[120] *Id.* P 138 (citations omitted).

USCA4 Appeal: 24-1650   Doc: 224   Filed: 01/21/2025   Pg: 1427 of 2455
Document Accession #: 20241121-3139   Filed Date: 11/21/2024

Docket No.  RM21-17-001                                             - 51 -

discriminatory and preferential.[121]  First, we disagree with certain rehearing parties as to

the nature of the Commission's evidentiary burden under FPA section 206.  Second, we

conclude that the Commission's factual findings and the substantial evidence supporting

those findings satisfies, and exceeds, the Commission's burden under FPA section 206.

Third, we find that the "deficiencies identified by the Commission" in Order No. 1920 do

not "'exist[] only in isolated pockets'" and such evidence is supported by the record.

Finally, we conclude that the Commission has authority to conduct a nationwide

rulemaking.  We address these points in turn.

### 1.    The Commission Correctly Characterized Its Statutory Burden

#### a.    Requests for Rehearing

62.    SERTP Sponsors contend that the Commission must demonstrate more than

theoretical deficiencies to support nationwide policies and that systemic problems must

be demonstrated beyond isolated issues.[122]  SERTP Sponsors argue that Order No. 1920's

findings, which are based on theory and supposition, are insufficient to carry the

applicable burden and are contradicted by substantial specific evidence about SERTP.[123]

SERTP Sponsors argue that *South Carolina Public Service Authority v. FERC* "does not

---

[121] Alabama Commission Rehearing Request at 3-4; Designated Retail Regulators Rehearing Request at 3, 7-8, 19-22; Industrial Customers Rehearing Request at 3-4, 6, 11-18; SERTP Sponsors Rehearing Request at 28-29, 31-37; Undersigned States Rehearing Request at 7, 19-21; Arizona Commission Rehearing Request at 19-20.

[122] SERTP Sponsors Rehearing Request at 34 (citing *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d at 71).

[123] *Id.*

Docket No.  RM21-17-001                                                        - 52 -

stand for the proposition that any assertion of any theoretical problem by FERC is enough

to satisfy the first step of the analysis under [s]ection 206."[124]  SERTP Sponsors contend

that except in limited circumstances—e.g., when there is a lack of empirical evidence—

the D.C. Circuit requires more than theoretical deficiencies to support nationwide

policies.[125]

63.     Relatedly, Industrial Customers claim that Order No. 1920 is "legally infirm"

because it does not make specific findings that rates and practices are unjust,

unreasonable, or unduly discriminatory or preferential and instead "proposes to amend

Order No. 1000 based upon mere concerns that Order No. 1000 *may not* be planning

transmission in a manner that comports with the FPA."[126]

### b.     Commission Determination

64.     We sustain our determination under the first prong of FPA section 206 and find

that the Commission relied on sufficient and appropriate evidence to support its

determination that existing rates are unjust and unreasonable.  We disagree with SERTP

Sponsors' and Industrial Customers' arguments that the Commission did not satisfy its

section 206 burden because its analysis under the first prong of FPA section 206 was

predicated "entirely on theory and supposition"[127] or on "mere concerns" that Order No.

---

[124] *Id.* at 31 (citing *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d at 65).

[125] *Id.* at 29, 31, 34.

[126] Industrial Customers Rehearing Request at 16-17 (emphasis in original).

[127] SERTP Sponsors Rehearing Request at 31.

1000 processes "*may not* be planning transmission in a manner that comports with the FPA."[128]  Setting aside that in making this determination the Commission did not rely solely on "supposition" or "mere concerns" about deficiencies in the Order No. 1000 regional transmission planning and cost allocation processes,[129] SERTP Sponsors' and Industrial Customers' arguments disregard well-established principles regarding the findings and type of evidence sufficient to support a conclusion that the Commission's burden under the first prong of FPA section 206 has been satisfied, as established by longstanding authority, including the D.C. Circuit's opinion in *South Carolina Public Service Authority v. FERC*.

65.     In *South Carolina Public Service Authority v. FERC*, the D.C. Circuit—reviewing Order No. 1000, which the Commission adopted to address the "theoretical threat" of unjust or unreasonable rates "stemm[ing] from the absence of [transmission] planning processes that take a sufficiently broad view of both the tasks involved and the means of addressing them"—rejected arguments similar to those made here by Industrial Customers.[130]  In particular, petitioners there, similar to Industrial Customers here, argued

---

[128] Industrial Customers Rehearing Request at 16-17.

[129] *See, e.g.*, Order No. 1920, 187 FERC ¶ 61,068 at PP 93-97, 114-123 (discussed below in The Commission Adequately Supported Its Determination on Step One of Section 206 section).

[130] *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d at 64 (alteration omitted) (quoting Order No. 1000, 136 FERC ¶ 61,051 at P 52).

that the "'theoretical threat' described by the Commission fail[ed] to satisfy its

evidentiary burden under [s]ection 206 . . . ."[131]

66.    The court squarely rejected that contention.[132]  It explained that the substantial

evidence required to support a finding that an existing practice affecting rates is "unjust,

unreasonable, unduly discriminatory or preferential" pursuant to FPA section 206

"requires 'more than a scintilla' but 'less than a preponderance' of evidence."[133]

Substantial evidence, however, "does not necessarily mean empirical evidence,"[134] and,

in satisfying the substantial evidence standard, the Commission may rely on its own

predictions as long as they are "'at least likely enough to be within the Commission's

authority' and [are] based on reasonable economic propositions."[135]  As the court

---

[131] *Id.*

[132] *Id.*

[133] *Id.* at 54 (quoting *Fla. Gas Transmission Co. v. FERC*, 604 F.3d 636, 645 (D.C. Cir. 2010)), 64-65 (citing 16 U.S.C. 824e(a)), 5 U.S.C. 706(2)(E)).

[134] *Id.* at 65 (citing 5 U.S.C. 706(2)(E)); *see also Xcel Energy Servs. Inc. v. FERC*, 41 F.4th 548, 560-61 (D.C. Cir. 2022) ("In making decisions, it is 'perfectly legitimate for the Commission to base its findings on basic economic theory,' including relying on 'generic factual predictions,' as long as the agency 'explains and applies the relevant economic principles in a reasonable manner.'" (cleaned up) (quoting *Sacramento Mun. Util. Dist. v. FERC*, 616 F.3d 520, 531 (D.C. Cir. 2010) (per curiam))); *id.* ("Where the 'promulgation of generic rate criteria clearly involves the determination of policy goals or objectives, and the selection of means to achieve them,' the 'courts reviewing an agency's selection of means are not entitled to insist on empirical data for every proposition on which the selection depends.'" (alterations omitted) (quoting *Associated Gas Distribs. v. FERC*, 824 F.2d 981, 1008 (D.C. Cir. 1987) (*Associated Gas Distributors*))).

[135] *Id.*; *see also id.* at 76 ("[A]t least in circumstances where it would be difficult or even impossible to marshal empirical evidence, the Commission is free to act based

Docket No. RM21-17-001                                              - 55 -

recognized, "[a]gencies do not need to conduct experiments in order to rely on the prediction that an unsupported stone will fall."[136]

67.    The court in reviewing Order No. 1000 determined that the Commission had satisfied its evidentiary burden under section 206. In particular, the Commission had identified "significant changes in the nation's electric power industry" that presented "significant challenges to the development and cost allocation of interstate transmission projects" and highlighted five deficiencies in Order No. 890's transmission planning and cost allocation processes.[137] Ultimately, the court held that the Commission's determination that the then-current transmission planning and cost allocation practices were unjust or unreasonable was based on substantial evidence.[138]

68.    By insisting that the Commission was required to demonstrate that rates or practices are, *in fact*, unjust, unreasonable, or unduly discriminatory or preferential,[139] SERTP Sponsors and Industrial Customers overlook principles articulated in *South*

---

upon reasonable predictions rooted in basic economic principles.").

[136] *Id.* at 65 (quoting *Associated Gas Distributors*, 824 F.2d at 1008); *see also Cent. Hudson Gas & Elec. Corp. v. FERC*, 783 F.3d 92, 109 (2d Cir. 2015) ("FERC may permissibly rely on economic theory alone to support its conclusions so long as it has applied the relevant economic principles in a reasonable manner and adequately explained its reasoning.").

[137] *Id.* at 66.

[138] *See id.* at 67.

[139] Industrial Customers Rehearing Request at 16-17; SERTP Sponsors Rehearing Request at 34.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1432 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No. RM21-17-001                                              - 56 -

*Carolina Public Service Authority v. FERC*, including that the Commission need not provide empirical evidence for every proposition and may instead rely upon the threat of unjust and unreasonable rates as a basis for taking action.[140]  Their argument is predicated on a faulty premise that, in a rulemaking setting, the Commission must wait for a threat to result in actual harm, and may not act where it anticipates harmful consequences.[141]  But in *South Carolina Public Service Authority v. FERC*, the court explicitly reached the opposite conclusion, holding that the Commission satisfied its evidentiary burden under section 206 by relying on the theoretical threat to just and reasonable rates even though the Commission acknowledged other evidence in the record.[142]  SERTP Sponsors are thus incorrect to suggest that the *South Carolina Public Service Authority v. FERC* court allowed the Commission to rely on generic factual findings only because the record lacked empirical evidence.[143]

69.     *South Carolina Public Service Authority v. FERC* makes clear that, because "substantial evidence" is not limited to empirical evidence and may include generic factual predictions, the Commission could have satisfied its evidentiary burden under the

---

[140] *See S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d at 64-65; *see also id.* at 85 ("[W]hether a threat of unjust or unreasonable rates derives from a practice or the absence thereof, Section 206 empowers the Commission to address it."); *Nat'l Fuel Gas Supply Corp. v. FERC*, 468 F.3d 831, 844 (D.C. Cir. 2006) (stating that the Commission could choose to "rely solely on a theoretical threat").

[141] *See* Industrial Customers Rehearing Request at 16-17.

[142] *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d at 64, 67.

[143] SERTP Sponsors Rehearing Request at 29.

Docket No. RM21-17-001                                                      - 57 -

first prong of FPA section 206 with analysis based on theoretical threats and predictions

regarding such threats based on reasonable economic propositions within the

Commission's expertise.[144]  Here, however, the Commission established a theoretical

threat and, as discussed below, also cited substantial empirical and other record evidence

to support its finding that the existing regional transmission planning processes and cost

allocation requirements—and the rates that have resulted from them—are unjust and

unreasonable.

> **2.    The Commission Adequately Supported Its Determination on
> Step One of Section 206**

> **a.    Requests for Rehearing**

70.    Designated Retail Regulators argue that, in its analysis under the first prong of

section 206 of the FPA, the Commission made conclusory, "blanket claims that are

unsupported by evidence."[145]  Undersigned States similarly assert that the Commission

does not "point to evidence in the record sufficient to support" a finding that existing

regional transmission planning and cost allocation processes are resulting in unjust,

unreasonable, unduly discriminatory, and preferential Commission-jurisdictional rates

because "such evidence does not exist."[146]  Arizona Commission contends that the

evidence in the record used to support Order No. 1920's section 206 finding consists

---

[144] *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d at 65 (quoting *Associated Gas Distributors*, 824 F.2d at 1008).

[145] Designated Retail Regulators Rehearing Request at 20-21.

[146] Undersigned States Rehearing Request at 21.

largely of comments from special interest groups that will profit from Order No. 1920 and not evidence specific to the Arizona Commission.[147]

71.    Industrial Customers claim that, rather than making specific findings that existing practices are unjust and unreasonable, the Commission made "several generic assertions . . . to reach very broad conclusions,"[148] and "generically assert[ed]" that the Commission satisfies its burden under the first prong of the FPA section 206 inquiry "based on the record."[149]  Industrial Customers assert that the failure to reach specific findings, supported by substantial evidence, under the first prong of FPA section 206 renders Order No. 1920 legally infirm.[150]  Industrial Customers claim that the absence of detailed and substantiated findings makes it "difficult, if not impossible" for transmission providers to file compliance filings because it will be challenging to develop and propose solutions without an understanding of the root problem the Commission is trying to fix.[151]

### b.    Commission Determination

72.    We continue to find that the Commission made adequate findings under the first prong of FPA section 206 and marshalled substantial evidence to support those findings. We are therefore not persuaded by rehearing parties' arguments to the contrary.  Below,

---

[147] Arizona Commission Rehearing Request at 19.

[148] Industrial Customers Rehearing Request at 16.

[149] *Id.* at 13 (alteration omitted).

[150] *Id.* at 17.

[151] *Id.* at 17-18.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1435 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No.  RM21-17-001                                                - 59 -

we first summarize the empirical and other record evidence the Commission cited to support its findings that Commission-jurisdictional regional transmission planning and cost allocation processes are unjust and unreasonable because they result in transmission providers failing to identify Long-Term Transmission Needs, to evaluate and select more efficient or cost-effective transmission solutions to meet those transmission needs, and to allocate the costs of transmission facilities selected to meet those transmission needs in a manner that is at least roughly commensurate with benefits.[152]  Next, we summarize the Commission's generic factual predictions.  We conclude that this evidence is more than sufficient to meet the Commission's evidentiary burden under section 206.

73.     Based on the robust record before it, the Commission concluded that transmission investment, which has increased nationwide since the Commission issued Order No. 1000,[153] is likely to grow substantially in coming years due to three factors that are driving a growing need for new transmission infrastructure.[154]  First, reports and

_____

[152] Order No. 1920, 187 FERC ¶ 61,068 at PP 114-122.

[153] *Id.* P 92 (referencing a study by the US DOE, which found that annual investment in transmission first exceeded $5 billion per year in 2006, doubled to more than $10 billion per year by 2010, doubled again by 2016, and has been between $18 billion and $22 billion annually since 2014 (quoting US DOE, *National Electric Transmission Congestion Study*, at 9-10 (Sept. 2020), https://www.energy.gov/sites/default/files/2020/10/f79/2020%20Congestion%20Study%20FINAL%2022Sept2020.pdf)); *id.* (citing estimates from The Brattle Group and Grid Strategies that transmission developers in the United States invested $20 to $25 billion annually in transmission facilities from 2013 to 2020 (citing Brattle-Grid Strategies Oct. 2021 Report at 2); Brattle Apr. 2019 Competition Report at 2-3 & fig.1)).

[154] *Id.* P 93 (citing a number of studies projecting sustained transmission spending through at least 2050, including one by Princeton University projecting that high voltage transmission capacity must expand by 60 percent by 2030 at a capital cost of $330 billion

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1436 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No.  RM21-17-001                                                            - 60 -

comments in the record demonstrated that longer-term reliability needs are changing as

transmission providers increasingly rely on regional transmission facilities to ensure

operational stability as extreme weather events become more frequent and variable

resources increasingly enter the resource mix.[155]  Based on evidence in the record, the

Commission concluded that transmission investment is likely to be more critical, and

produce more reliability benefits for customers, as extreme weather and other system

contingencies become more frequent.[156]  Second, the Commission noted evidence that

---

and must triple by 2050 at a capital cost of $2.2 trillion, as well as another by The Brattle
Group projecting $750 billion of new transmission investment between 2023 and 2050.
(citing Eric Larson et al., Princeton Univ., *Net-Zero America:  Potential Pathways,
Infrastructure, and Impacts*, at 108 (Oct. 2021), https://netzeroamerica.princeton.edu/the-
report; Jürgen Weiss et al., The Brattle Group, *The Coming Electrification of the North
American Economy*, at iii (2019), https://wiresgroup.com/wp-
content/uploads/2020/05/2019-03-06-Brattle-Group-The-Coming-Electrification-of-the-
NA-Economy.pdf)).

[155] The Commission cited comments and reports demonstrating that transmission
infrastructure can be critical to system reliability during extreme weather events such as
Winter Storm Uri.  *Id.* P 94 & n.209 (citing ACEG NOPR Initial Comments at 22 n.63
(stating that during Winter Storm Uri, "[a]n additional 1 gigawatt (GW) of transmission
ties between ERCOT and the Southeastern U.S. could have saved nearly $1 billion and
kept power flowing to hundreds of thousands of Texans."); Grid Strategies July 2021
Extreme Weather Report at 7-8 ("The value of transmission for resilience can be seen in
the drastically different outcomes of MISO and SPP relative to ERCOT during [Winter
Storm Uri]. . . . In contrast to the 13,000 MW MISO was importing during the peak of
[the] event, ERCOT was only able to import about 800 MW of power throughout the
event.")).  The Commission also cited research from US DOE's Lawrence Berkeley
National Laboratory suggesting that 50% of the value created by alleviating transmission
system congestion occurs during only 5% of the hours during which the transmission
system is used, further evidence of the significant value of transmission during
unanticipated events.  *Id.* P 94 (citing LBNL Aug. 2022 Transmission Value Study at 33).

[156] *Id.* P 94 (citing LBNL Aug. 2022 Transmission Value Study at 33; Clean
Energy Associations NOPR Initial Comments at 5).

Docket No. RM21-17-001                                        - 61 -

electric demand is projected to increase significantly in the coming decades due to

electrification trends and new large loads associated with evolving industrial and

commercial needs.[157]  Again, relying on record evidence, the Commission found that

these increases in aggregate electricity demand will have significant consequences for the

transmission system.[158]  Third, the Commission found that the resource mix is changing

due to federal, federally-recognized Tribal, state, and local policies,[159] customer demands

---

[157] *Id.* P 95 (citing Jürgen Weiss et al., The Brattle Group, *The Coming Electrification of the North American Economy* (Mar. 2019), https://wiresgroup.com/wp-content/uploads/2020/05/2019-03-06-Brattle-Group-The-Coming-Electrification-of-the-NA-Economy.pdf); John D. Wilson and Zach Zimmerman, Grid Strategies, *The Era of Flat Power Demand is Over*, at 3 (Dec. 2023), https://gridstrategiesllc.com/wp-content/uploads/2023/12/National-Load-Growth-Report-2023.pdf ("Over [2023], grid planners nearly doubled the 5-year load growth forecast.  The nationwide forecast of electricity demand shot up from 2.6% to 4.7% growth over the next five years, as reflected in 2023 FERC [Form 714] filings.  Grid planners forecast peak demand growth of 38 gigawatts (GW) through 2028."); N. Amer. Elec. Reliability Corp., *2023 Long-Term Reliability Assessment*, at 33 (Dec. 2023), https://www.nerc.com/pa/RAPA/ra/Reliability%20Assessments%20DL/NERC_LTRA_2023.pdf ("Electricity peak demand and energy growth forecasts over the 10-year assessment period are higher than at any point in the past decade.  The aggregated assessment area summer peak demand forecast is expected to rise by 79 GW, and aggregated winter peak demand forecasts are increasing by nearly 91 GW.  Furthermore, the growth rates of forecasted peak demand and energy have risen sharply since the *2022* [*Long-Term Reliability Assessment*], reversing a decades-long trend of falling or flat growth rates.")).

[158] *See id.* P 95 (citing National Grid NOPR Initial Comments at 6 (discussing preliminary findings of the ISO-NE 2050 Transmission Study, which show "significant new transmission will be needed to reliably serve" increased future loads assumed in the study (citing ISO-NE, 2050 Transmission Study (2023), https://www.iso-ne.com/static-assets/documents/2023/08/2050_study_ma_cetwg_2023_aug_final.pdf))).

[159] *Id.* P 96 & nn.223-227 (noting numerous jurisdictions that have adopted decarbonization, electrification, and renewable energy-related laws and policies); *id.* (citing ACORE NOPR Initial Comments at 1-2 & n.2; American Clean Power Ass'n, *It's a Big Deal for Job Growth and for a Clean Energy Future* (2022),

for clean energy,[160] utility emission commitments,[161] and the changing economics of

resources that comprise the resource mix.[162]

74.        Considering the changing transmission investment landscape, the Commission

then relied on substantial record evidence to find that the Commission's existing regional

transmission planning and cost allocation requirements are deficient in three ways and

therefore fail to require transmission providers to adequately plan on a sufficiently long-

term, forward-looking, and comprehensive basis.[163]

---

https://cleanpower.org/blog/its-a-big-deal-for-job-growth-and-for-a-clean-energy-future
("Analysis suggests that the [Inflation Reduction Act] could more than triple clean energy
production in the U.S. and lead to $600 billion in capital investment in clean energy
infrastructure."); Evergreen Action NOPR Initial Comments at 3-4; NextEra NOPR
Reply Comments at 5); *id.* P 99.

   [160] *Id.* P 97 ("Since 2014, for example, 'commercial and industrial customers have
contracted for more than 52 GW of clean energy.'" (alteration omitted) (quoting
Advanced Energy Buyers NOPR Initial Comments at 5)).

   [161] *Id.* P 97 & nn.233-37 (noting that Exelon, Dominion, AEP, Southern, Entergy,
Duke Energy, NextEra, and Tennessee Valley Authority have all announced some
version of a net-zero carbon emission plan or commitment).

   [162] *Id.* P 97 & n.239 (citing ACORE ANOPR NOPR Initial Comments at app. 1, p.
22 ("Wind and solar energy costs have fallen 70 and 89 percent, respectively, in the last
ten years, from 2009 through 2019.")); Order No. 1920, 187 FERC ¶ 61,068 at P 99
("[A]s of 2021, nearly 70% of capacity additions across the country were from new,
utility-scale wind and solar resources[,] . . . [and] those trends are projected to continue,
with over 1,300 GW of wind, solar, and storage resources in interconnection queues
across the country as of 2021." (citing SREA NOPR Initial Comments at 1-2; AEE
NOPR Initial Comments at 12-13; California Commission NOPR Initial Comments at 65;
Renewable Northwest NOPR Initial Comments at 36; FERC, State of the Markets 2020,
at 10, 12 (Mar. 2021); FERC, State of the Markets 2023, at 4 (Mar. 2024); US DOE
Initial Comments at app. B, PP. 8-9, 26).

   [163] *Id.* P 112.

75.    The first deficiency that the Commission identified is the lack of a sufficiently

long-term assessment of transmission needs.[164]  The Commission explained that most

transmission planning regions do not plan beyond a 10-year transmission planning

horizon,[165] which is shorter than the time needed to plan and construct large (e.g., high

voltage or long distance) transmission facilities[166] or to capture all of the benefits that

regional transmission facilities can provide.[167]  According to comments and studies in the

---

[164] Order No. 1920, 187 FERC ¶ 61,068 at P 115 (citing MISO ANOPR Reply
Comments at 5 ("[G]iven long-term needs of an evolving system, additional transmission
is necessary to reliably serve customers now and into the future.  These challenges
require immediate action and further delay only increases the risk that system
enhancements may not be in place in the timeframe needed."); PIOs NOPR Initial
Comments at 13 ("[A] short-term outlook under-forecasts longer-term transmission
needs, preventing the development of more cost-effective transmission facilities, and fails
to consider how the needs of the transmission system are shifting."); US DOE ANOPR
Initial Comments at 10 (stating that failure to plan transmission far enough ahead results
in "adverse implications for system reliability, resilience, consumers' electricity rates,
and the achievement of clean energy goals")).

[165] Id. (noting that commenters point out that ISO-NE, SERTP, and NorthernGrid
use a 10-year transmission planning horizon, while PJM uses a 5-year transmission
planning horizon for what it refers to as its short-term transmission planning process and
a 6-to-15-year transmission planning horizon for what it refers to as its intermediate-term
transmission planning process).

[166] Id. P 116 (citing AEP NOPR Initial Comments at 11; Nevada Commission
NOPR Initial Comments at 7 n.24; PIOs NOPR Initial Comments at 14; Renewable
Northwest NOPR Initial Comments at 5; SEIA NOPR Initial Comments at 6).  The
Commission discussed MISO's MVP initiative, which took a decade to move from
approval by the MISO Board of Directors in 2011 to completion of most of the projects
by 2021, a 10-year period that does not even account for the significant transmission
facility development efforts that occurred prior to the MISO Board of Directors'
approval.  Order No. 1920, 187 FERC ¶ 61,068 at P 116 (citing AESL Consulting, *A
Transmission Success Story:  The MISO MVP Transmission Portfolio*, at 39 (2021)).

[167] Id. (citing SEIA NOPR Initial Comments at 6; US DOE NOPR Initial

Docket No. RM21-17-001                                              - 64 -

record, short-term transmission planning also fails to take advantage of the potential for
efficiencies or economies of scale that regional transmission facilities can provide and
does not create opportunities to "right size" the replacement of aging transmission
facilities.[168] Based on this evidence, the Commission concluded that relying solely on
shorter-term transmission planning and studies fails to identify Long-Term Transmission
Needs and consequently undervalues or entirely ignores the benefits of transmission
investments to meet those needs.[169]

76.    The second deficiency that the Commission identified is that transmission
providers are not required to account adequately on a forward-looking basis for known

_____

Comments at 33).

    [168] *Id.* (citing ACORE NOPR Initial Comments at 4 ("The narrowly focused
current approaches [to transmission planning] do not identify opportunities to take
advantage of the large economies of scale in transmission that come from 'up-sizing'
reliability projects to capture additional benefits, such as congestion relief, reduced
transmission losses, and facilitating the more cost-effective interconnection of the
renewable and storage resources needed to meet public policy goals." (quoting Brattle-
Grid Strategies Oct. 2021 Report at 3)); PIOs ANOPR Initial Comments at 10-11; SEIA
ANOPR Initial Comments at 14).

    [169] *Id.* P 117 & n.290 ("Relying on successive small transmission expansion
projects to meet foreseeable long-term needs may lead to the need for expensive retrofits
(at customers' expense) at a later date. Economies of scale and network economies
suggest that an initial larger-scale buildout will often represent a lower-cost solution."
(quoting US DOE ANOPR Initial Comments at 10)); *id.* ("While the Tranche 1 Portfolio
is the result of MISO's long-range planning process being executed for only the second
time, the rapid change within the industry will require that it become a more routine
aspect of the MISO planning process going forward." (quoting Midcontinent Independent
System Operator, *MTEP21 Report Addendum:  Long Range Transmission Planning
Tranche 1 Portfolio Report*, at 6 (July 28, 2022),
https://cdn.misoenergy.org/MTEP21%20Addendum-
LRTP%20Tranche%201%20Report%20with%20Executive%20Summary625790.pdf)).

determinants of Long-Term Transmission Needs or to account for such known determinants in a manner that ensures the identification and evaluation of more efficient or cost-effective regional transmission facilities to meet Long-Term Transmission Needs.[170]  The Commission highlighted concrete evidence of this deficiency, including that some regional transmission planning processes ignore factors relevant to identifying transmission needs,[171] while others fail to account for factors that will shape future load.[172]  The Commission added that, while forecasting necessarily involves uncertainty, the record demonstrates that there are numerous factors that increasingly shape Long-Term Transmission Needs, that are known and identifiable, and have reasonably predictable effects, especially in the aggregate.[173]  These include, for example, reliability needs driven by the impact of extreme weather,[174] trends in future generation additions

---

[170] *Id.* P 118.

[171] *Id.* (discussing record evidence that some existing regional transmission planning processes ignore trends in future generation, the impact of extreme weather, state laws, and utility goals) (citing Acadia Center and CLF NOPR Initial Comments at 1; GridLab NOPR Initial Comments at 4-5; Brattle-Grid Strategies Oct. 2021 Report at 36; Grid Strategies July 2021 Extreme Weather Report at 5; SPP Market Monitor ANOPR Initial Comments at 3 & n.5; Renewable Northwest NOPR Initial Comments at 4, 8, 12; SREA NOPR Initial Comments at 25)).

[172] *Id.* (discussing record evidence that existing regional transmission planning processes fail to account for factors shaping electrification trends like electric vehicles and data centers (citing AEE ANOPR Initial Comments at 18; Clean Energy Buyers NOPR Initial Comments at 7-8; National Grid NOPR Initial Comments at 8; AEE ANOPR Initial Comments at 18; Rocky Mountain Institute NOPR Supplemental Comments at 1; WIRES NOPR Supplemental Comments at attach. 1, p. 36)).

[173] *Id.* P 119.

[174] *Id.* P 120 (citing ACEG NOPR Initial Comments at 63; NERC NOPR Initial

Docket No. RM21-17-001                                    - 66 -

and retirements,[175] load growth,[176] federal, federally-recognized Tribal, state, and local

laws and regulations,[177] and utility goals.[178] The Commission explained, however, that

existing regional transmission planning processes frequently undervalue or do not

consider some or all of these factors, and the Commission's existing regional

transmission planning requirements do not ensure otherwise.[179] The Commission found

that the failure to adequately consider such factors delays planning for the transmission

---

Comments at 6; Evergreen Action NOPR Initial Comments at 2 ("[A]dditional
transmission built under improved planning procedures would [] create large reliability
benefits. With increasing extreme weather events due to climate change—including
wildfires, winter storms, hurricanes, and more—additional transmission infrastructure
and grid improvements are increasingly necessary for resilience purposes."); WE ACT
NOPR Initial Comments at 2).

[175] *Id.* P 120 (citing Pattern Energy NOPR Initial Comments at 26; SEIA NOPR
Initial Comments at 9).

[176] *Id.* (citing Northwest and Intermountain NOPR Initial Comments at 5 n.12;
John Wilson and Zach Zimmerman, *The Era of Flat Demand is Over,* Grid Strategies, at
3, 6 (Dec. 2023), https://gridstrategiesllc.com/wp-content/uploads/ 2023/12/National-
Load-Growth-Report-2023.pdf (noting the 5-year load growth forecast has nearly
doubled from 2.6% to 4.7% and "transmission investments need to increase just to keep
up with demand")).

[177] *Id.* PP 119, 120 (citing Acadia Center and CLF NOPR Initial Comments at 8;
AEE NOPR Initial Comments at 10 (noting that "[a]s of September 2020, 38 states and
the District of Columbia had adopted renewable portfolio standards, and 21 states (plus
the District of Columbia and Puerto Rico) – representing more than half of the U.S.
population – include a target of 100% renewable energy by 2050 or sooner. Many of
these requirements have been enacted in statute and are binding on utilities and retail
energy providers.")).

[178] *Id.* P 120 (citing Renewable Northwest NOPR Initial Comments at 6; SREA
NOPR Initial Comments at 41-46).

[179] *Id.*

Docket No. RM21-17-001                                                                          - 67 -

system's changing operational needs until shortly before those transmission needs
manifest, resulting in transmission planning processes that are piecemeal and fail to take
advantage of economies of scale in transmission investment or opportunities to address
multiple transmission needs over multiple time horizons.[180]

77.    The Commission explained that the third deficiency is that transmission providers
are not required to adequately consider the broader set of benefits that accrue to regional
transmission facilities planned to meet Long-Term Transmission Needs.[181]  Relying on
record evidence, the Commission found that many current regional transmission planning
and cost allocation processes consider only a narrow subset of benefits that regional
transmission facilities provide[182] or fail entirely to consider cost savings associated with
certain transmission facilities.[183]

_____

[180] *Id.* P 121 (PIOs NOPR Initial Comments at 10-11; Renewable Northwest
NOPR Initial Comments at 8).

[181] *Id.* P 122 (citation omitted).

[182] *Id.* (citing Brattle-Grid Strategies Oct. 2021 Report at 2 ("[M]ost of [the
nation's recent transmission] investment addresses individual local asset replacement
needs, near-term reliability compliance, and generation-interconnection-related reliability
needs without considering a comprehensive set of multiple regional needs and system-
wide benefits."); Massachusetts Attorney General ANOPR Initial Comments at 22; PIOs
NOPR Initial Comments at 10-11).

[183] *Id.* (citing SREA NOPR Initial Comments at 24 ("SERTP participants
explained that SERTP is unable to conduct adjusted production cost savings, because
none of the utilities involved in SERTP have the software capable of doing so.  In effect,
the 'Economic Planning Studies' only evaluate the costs of potential upgrades to the
system, but none of the benefits.")).

78.     These deficiencies have concrete consequences that illustrate the deleterious

effects of inadequate regional transmission planning processes.  For instance, the

Commission cited evidence showing that investment in regional transmission facilities

has declined in some regions as compared to the investment that was occurring prior to

Order No. 1000 and that, across all non-RTO/ISO regions, not a single transmission

facility has been selected since implementation of Order No. 1000.[184]  Further, the

Commission noted that within some RTO/ISO regional transmission planning processes,

even where investments through the regional transmission planning process occur, much

of that investment has been in transmission projects that only address immediate

reliability needs.[185]

79.     At the same time, the Commission found, significant expansion of the

transmission system is occurring through one-off, piecemeal, interconnection-related

---

[184] *Id.* P 101 (citing Rob Gramlich and Jay Caspary, Americans for a Clean Energy Grid, Planning for the Future:  *FERC's Opportunity to Spur More Cost-Effective Transmission Infrastructure*, at 25 & fi. 8 (Jan. 2021), https://cleanenergygrid.org/wp-content/uploads/2021/01/ACEG_Planning-for-the-Future1.pdf; ACORE ANOPR Initial Comments at 4 ("Despite the potential benefits, regional transmission investment has not increased and in some regions even has declined over the past decade.") (citation omitted); State Agencies NOPR Initial Comments at 23 ("Regionally planned projects have [] declined in RTOs/ISOs . . . ." (citing John C. Gravan & Rob Gramlich, NRRI Insights, *A New State-Federal Cooperation Agenda for Regional and Interregional Transmission*, at 2 (Sept. 2021), https://pubs.naruc.org/pub/FF5D0E68-1866-DAAC-99FB-A31B360DC685); FERC, Staff Report, *2017 Transmission Metrics*, at 19 (Oct. 6, 2017), https://www.ferc.gov/sites/default/files/2020-05/transmission-investment-metrics.pdf).

[185] *Id.* P 101 (citing Southwestern Power Group NOPR Initial Comments at 15; PIOs ANOPR Initial Comments at 93 & n.276; Ari Peskoe, *Is the Utility Syndicate Forever?*, 42 Energy L.J. 1, 56-57 (2021)).

network upgrades constructed in response to individual generator interconnection
requests.[186]  The Commission noted the shortcomings of relying on the generator
interconnection process for addressing transmission needs, including that the generator
interconnection process does not look at time horizons beyond the specific
interconnection request(s) being studied, comprehensively assess any transmission needs
beyond those created by the specific interconnection request(s), or achieve the economies
of scale in transmission investment that long-term, forward-looking, and more
comprehensive regional transmission planning processes can provide.[187]

80.    The Commission also cited evidence that, since the issuance of Order No. 1000,
the majority of investment in transmission facilities has been in local transmission
facilities, a trend that is accelerating across multiple regions.[188]  The Commission pointed
out that in RTO/ISO regions one half of the nearly $70 billion in aggregate transmission
investments by Commission-jurisdictional transmission providers between 2013 and
2017 was approved outside of regional transmission planning processes.[189]

---

[186] *Id.* P 104 (citing Pine Gate NOPR Initial Comments at 6, 8-10; PIOs NOPR
Initial Comments at 9).

[187] *Id.* P 106 (citing Anbaric NOPR Initial Comments at 5; Clean Energy
Associations NOPR Initial Comments at 15; Exelon NOPR Initial Comments at 5; Pine
Gate NOPR Initial Comments at 9; PIOs NOPR Initial Comments at 10; SEIA NOPR
Initial Comments at 2; Southeast PIOs NOPR Initial Comments at 37).

[188] *Id.* P 109 (citing NOPR, 179 FERC ¶ 61,028 at PP 39-40 (2022)).

[189] *Id.* (citing PIOs NOPR Initial Comments at 9).

Docket No. RM21-17-001                                                                    - 70 -

81.    Relying on the foregoing record of empirical and other record evidence, the

Commission found that existing regional transmission planning requirements are

deficient and fail to require transmission providers to adequately plan on a sufficiently

long-term, forward-looking, and comprehensive basis.[190]  Substantial facts in the record

also supported the Commission's finding that the absence of sufficiently long-term,

forward-looking, and comprehensive regional transmission planning processes is

resulting in piecemeal transmission expansion to address relatively near-term

transmission needs,[191] a trend that reflects that existing regional transmission planning

requirements are leading to relatively inefficient or less cost-effective results.

---

[190] *Id.* P 127 (citing New Jersey Commission NOPR Initial Comments at 8 (explaining that, outside of limited circumstances, PJM, Florida, ISO-NE, Southeastern Regional, South Carolina Regional, WestConnect, NorthernGrid, NYISO, SPP, and CAISO do not conduct multi-driver or portfolio transmission planning, which has required ratepayers to pay for tens of billions of dollars in unnecessary transmission projects); NextEra ANOPR Initial Comments at 71 ("While there are examples of longer-term planning currently being utilized by some regions, such as MISO's annual 15-year Futures assessment or SPP's 20-year Integrated Transmission Plan run every five years, there is no standard as to what time horizon long-term planning must study, nor how often this planning should be done.  Further, no standards or guidelines exist as to what should be included in such long-term planning to ensure that customers are charged just and reasonable rates for the most efficient and cost-effective investments given the most comprehensive and up-to-date information available."); Western PIOs NOPR Initial Comments at 4-28 (arguing that in the Western United States transmission planning outside of CAISO is not developed and is ineffective); Brattle-Grid Strategies Oct. 2021 Report at 13-15 & tbl. 2 (documenting inconsistent "use of proactive, scenario-based, multi-value processes" across various planning authorities, including NYISO, CAISO, MISO, PJM, ISO-NE, Florida, Southeast Regional, and South Carolina")).

[191] *Id.* PP 127-128 (citing LS Power NOPR Initial Comments at 46-50; PIOs NOPR Initial Comments at 9-10 (explaining that about half of the approximately $70 billion in aggregate transmission investment by Commission-jurisdictional transmission owners in RTO/ISO regions was approved outside of regional transmission planning

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1447 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No.  RM21-17-001                                                    - 71 -

82.    Moreover, as courts have made clear, the Commission was also entitled to base its findings regarding the need for reform on generic factual predictions.[192]  In *Associated Gas Distributors*, the court explained that the Commission is permitted to act on predictions that are unsupported by record evidence when such predictions are "at least likely enough to be within the Commission's authority" and based on reasonable behavioral or economic assumptions.[193]  Indeed, "[a]gencies do not need to conduct experiments in order to rely on the prediction that an unsupported stone will fall."[194]  Thus, in *South Carolina Public Service Authority v. FERC*, the court held that the Commission satisfied its burden on the first prong of FPA section 206 analysis where "[t]he threat to just and reasonable rates arose, *in the Commission's judgment*, from existing planning and cost allocation practices that could thwart the identification of more efficient and cost-effective transmission solutions."[195]

83.    Here, relying on its expertise and knowledge of the industry, the Commission made several predictions that were fully consistent with the grounds for action that courts

---

processes)).

[192] *See Citadel FNGE Ltd. v. FERC*, 77 F.4th 842, 858 (D.C. Cir. 2023); *Xcel Energy Servs. Inc. v. FERC*, 41 F.4th at 560-61; *Associated Gas Distributors*, 824 F.2d at 1008.

[193] *Associated Gas Distributors*, 824 F.2d at 1008 (discussing *Wis. Gas Co. v. FERC*, 770 F.2d 1144 (D.C. Cir. 1985); *Elec. Consumers Res. Council v. FERC*, 747 F.2d 1511 (D.C. Cir. 1984)).

[194] *Associated Gas Distributors*, 824 F.2d at 1008.

[195] *S.C. Pub. Serv. Auth. v. FERC,* 762 F.3d at 66 (emphasis added).

have accepted in the past, including in *Associated Gas Distributors* and *South Carolina Public Service Authority v. FERC*.  First, the Commission made such predictions when it explained how observed deficiencies in existing regional transmission planning and cost allocation requirements are resulting in deleterious consequences and ultimately rendering rates unjust and unreasonable.[196]  Next, the Commission predicted that existing cost allocation requirements—which were designed and established in the context of existing shorter-term Order No. 1000 regional transmission planning processes and lack a dedicated process through which states have an opportunity to participate in the development of regional cost allocation methods—are insufficient to appropriately allocate costs associated in the context of the Long-Term Regional Transmission Planning requirements established in Order No. 1920.[197]  Finally, the Commission anticipated that, absent Order No. 1920's reforms, regional transmission planning processes will continue to fail to identify, evaluate, and select regional transmission facilities that can more efficiently or cost-effectively meet Long-Term Transmission Needs, requiring customers to pay for relatively inefficient or less cost-effective transmission development.[198]  Such predictions are precisely the type of evidence that courts have permitted the Commission to use as the basis for section 206 rulemaking.

---

[196] *See* Order No. 1920, 187 FERC ¶ 61,068 at PP 117, 121, 123.

[197] *Id.* P 126.

[198] *Id.* P 113.

USCA4 Appeal: 24-1650   Doc: 224   Filed: 01/21/2025   Pg: 1449 of 2455
Document Accession #: 20241121-3139   Filed Date: 11/21/2024

Docket No.  RM21-17-001                                              - 73 -

84.    Given both the empirical and other record evidence and the generic factual predictions on which the Commission relied, we are unpersuaded by Designated Retail Regulators' and Undersigned States' arguments[199] that the Commission's determination under the first prong of FPA section 206 was unsupported by substantial evidence. Indeed, the Commission's findings regarding ongoing changes to the nation's electric power industry and deficiencies in existing transmission planning and cost allocation processes, along with the evidence supporting those findings, are similar to, or the same as, the type of findings and evidence that formed the basis for action in Order No. 1000 and that the *South Carolina Public Service Authority v. FERC* court determined satisfied the Commission's burden under the first prong of FPA section 206.[200]

85.    For these same reasons, we disagree with Arizona Commission's unsubstantiated contention that the evidence in the record on which the Commission relied to satisfy its section 206 burden consists largely of comments from special interest groups that will profit from the final rule.[201]  The Commission's findings were based on an extensive record consisting of over 30,000 pages of comments from nearly 200 stakeholders, including industry participants such as transmission providers,[202] generation

---

[199] Designated Retail Regulators Rehearing Request at 20-21; Undersigned States Rehearing Request at 21.

[200] *See S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d at 65-67; *see also* Order No. 1000, 136 FERC ¶ 61,051 at PP 44-47, 78-83.

[201] *See* Arizona Commission Rehearing Request at 19.

[202] *See, e.g.*, Order No. 1920, 187 FERC ¶ 61,068 at P 115 (citing PJM NOPR Initial Comments; MISO ANOPR Reply Comments; ITC NOPR Initial Comments); *id*.

Docket No. RM21-17-001                                                    - 74 -

developers,[203] trade associations,[204] customer groups,[205] and governmental entities.[206]

The Commission's findings also relied upon many reports and studies in the record and

the Commission's expert predictions.[207] Arizona Commission disregards this substantial

evidence.

---

P 116 (citing AEP NOPR Initial Comments); *id.* P 118 (citing National Grid NOPR
Initial Comments); *id.* P 136 (citing Exelon NOPR Initial Comments.

[203] *See, e.g.*, *id.* P 120 (citing Pattern Energy NOPR Initial Comments); *id.* P 127
(citing NextEra ANOPR Initial Comments; LS Power NOPR Initial Comments).

[204] *See, e.g.*, *id.* P 116 (citing SEIA ANOPR Initial Comments); *id.* P 137 (citing
EEI NOPR Initial Comments).

[205] *See, e.g.*, *id.* P 118 (citing Clean Energy Buyers NOPR Initial Comments;
ELCON NOPR Initial Comments); *id.* PP 119-120 (citing Industrial Customers NOPR
Initial Comments).

[206] *See, e.g.*, *id.* P 115 (citing Massachusetts Attorney General NOPR Initial
Comments; US DOE ANOPR Initial Comments); *id.* P 116 (citing Nevada Commission
NOPR Initial Comments); *id.* P 120 (citing NERC NOPR Initial Comments); *id.* PP 121,
127, 135 (citing New Jersey Commission NOPR Initial Comments); *id.* P 128 (citing
Michigan State Entities NOPR Initial Comments).

[207] *See, e.g.*, *id.* P 92 (citing US DOE, *National Electric Transmission Congestion
Study*, (Sept. 2020),
https://www.energy.gov/sites/default/files/2020/10/f79/2020%20Congestion%20Study%
20FINAL%2022Sept2020.pdf); Brattle-Grid Strategies Oct. 2021 Report); *id.* P 101
(citing ACEG Jan. 2021 Planning Report; John C. Gravan & Rob Gramlich, NRRI
Insights, A New State-Federal Cooperation Agenda for Regional and Interregional
Transmission (Sept. 2021), https://pubs.naruc.org/pub/FF5D0E68-1866-DAAC-99FB-
A31B360DC685); FERC, Staff Report, *2017 Transmission Metrics* (Oct. 6, 2017),
https://www.ferc.gov/sites/default/files/2020-05/transmission-investment-metrics.pdf));
*id.* P 102 (citing Midcontinent Indep. Sys. Operator, *RGOS: Regional Generation Outlet
Study* (Nov. 2020)); MTEP2017 Review); *id.* P 116 (citing AESL Consulting, *A
Transmission Success Story: The MISO MVP Transmission Portfolio* (2021);
Midcontinent Independent System Operator, *MTEP21 Report Addendum: Long Range
Transmission Planning Tranche 1 Portfolio Report* (July 28, 2022),
https://cdn.misoenergy.org/MTEP21%20Addendum-

86.    We are also unpersuaded by Industrial Customers' assertion that the absence of

substantial evidence makes it "difficult if not impossible" for transmission providers to

submit compliance filings because it will be challenging to develop and propose solutions

without an understanding of the root problem that the Commission is trying to fix.[208]  As

discussed above, the Commission made detailed findings addressing the deficiencies of

existing transmission planning and cost allocation requirements and the processes related

to those requirements.[209]  Moreover, in developing their compliance filings, transmission

providers will rely on the Commission's specific identification of the new requirements

established under the second prong of FPA section 206, not on the deficiencies in

existing transmission planning and cost allocation processes and requirements identified

under the first prong of the Commission's section 206 analysis.  We are therefore not

---

LRTP%20Tranche%201%20Report%20with%20Executive%20Summary625790.pdf);
*id.* P 118 (citing Grid Strategies July 2021 Extreme Weather Report; Regulatory
Assistance Project, *FERC Transmission:  The Highest-Yield Reforms* (July 2022),
https://www.raponline.org/wp-content/uploads/2023/09/rap-littell-prause-weston-FERC-
transmission-highest-yield-reforms-2022-july.pdf; Rob Gramlich, et al., *Fostering
Collaboration Would Help Build Needed Transmission* (Feb. 2024)); *id.* P 120 (citing
BPA, *TSR Study and Expansion Process* (Dec. 7, 2021), https://www.bpa.gov/-
/media/Aep/transmission/atc-methodology/2021-22tsep-overview.pdf; John Wilson and
Zach Zimmerman, *The Era of Flat Demand is Over*, Grid Strategies (Dec. 2023),
https://gridstrategiesllc.com/wp-content/uploads/ 2023/12/National-Load-Growth-Report-
2023.pdf).

[208] Industrial Customers Rehearing Request at 17.

[209] *See supra* Unjust, Unreasonable, and Unduly Discriminatory or Preferential
Commission-Jurisdictional Transmission Planning and Cost Allocation Processes section.

persuaded that Order No. 1920's findings lack the requisite specificity to enable transmission providers to make compliance filings.

### 3. The Commission Identified Deficiencies that Exist beyond Isolated Pockets

#### a. Requests for Rehearing

87. Alabama Commission and SERTP Sponsors assert that Order No. 1920's generalized observations criticizing the effectiveness of existing transmission planning processes are based on examples from other parts of the country and do not apply to, or address evidence regarding, Alabama and the Southeast.[210] According to Alabama Commission, Alabama and SERTP already achieve many, if not most, of the goals of the final rule.[211] Alabama Commission contends that Alabama has a resource planning process that accounts for needed transmission buildout to maintain reliable service and proactively plans its transmission system to maintain deliveries from existing resources and accommodate generation additions.[212] Alabama Commission adds that the SERTP process ensures that there are no regional transmission solutions that are more efficient and cost-effective than the solutions identified through the underlying state-jurisdictional process.[213]

---

[210] Alabama Commission Rehearing Request at 3; SERTP Sponsors Rehearing Request at 28-29, 31.

[211] Alabama Commission Rehearing Request at 3.

[212] *Id.* at 3-4.

[213] *Id.* at 4.

Docket No. RM21-17-001                                                    - 77 -

88.     SERTP Sponsors allege that the SERTP process has been highly efficient, and that

its integrated resource plan and request for proposal-driven transmission planning and

other similar processes effectively address the Commission's concerns regarding siloed

planning, lack of scenario planning, and local versus regional project focus.  SERTP

Sponsors argue that, while the court in *South Carolina Public Service Authority v. FERC*

allowed the Commission to support a rulemaking by finding a systemic problem not

limited to isolated pockets, given SERTP's scale, scope, and that it does not suffer from

the theoretical deficiencies identified in Order No. 1920, the Commission has not

satisfied the standard set out in *South Carolina Public Service Authority v. FERC*.[214]

SERTP Sponsors claim that they ensure a comprehensive and proactive approach to

transmission system development by incorporating various factors into their planning,

including reliability, economic growth, environmental attributes, and public policy

requirements.[215]  According to SERTP Sponsors, the alternative projects identified

through its regional transmission planning analyses have not proved to be more efficient

or cost-effective than those identified through SERTP's integrated resource plan and

request for proposal-driven transmission planning.[216]

89.     SERTP Sponsors also disagree with Order No. 1920's finding that nationwide

transmission grid expansion is primarily driven through the generator interconnection

---

[214] SERTP Sponsors Rehearing Request at 34 n.100.

[215] *Id.* at 32.

[216] *Id.* at 33.

USCA4 Appeal: 24-1650   Doc: 224   Filed: 01/21/2025   Pg: 1454 of 2455
Document Accession #: 20241121-3139   Filed Date: 11/21/2024

Docket No. RM21-17-001                                                    - 78 -

process, because in the Southeast, transmission expansion is driven by the underlying

integrated resource plan/request for proposal and other similar planning processes.[217]

SERTP Sponsors state that Southern Companies added $5.3 billion in transmission

capital expenditures from 2017-2021, with only $57 million (just over 1%) related to

generation interconnection.[218]  Similarly, SERTP Sponsors explain that Duke Energy

added an estimated $503 million of transmission facilities to its transmission plan,

targeted at unlocking areas of its transmission system that were repeatedly identified in

past generator interconnection studies as constrained to more timely and cost-effectively

integrate needed generation resources.[219]  SERTP Sponsors contend that Order No. 1920

ignored this evidence.[220]

90.     Designated Retail Regulators and Undersigned States aver that, contrary to the

Commission's claims, the evidence in the record demonstrates that a substantial portion

of transmission providers have been and are engaging in long-term planning.[221]  For

example, Designated Retail Regulators and Undersigned States point to MISO's Multi-

Value Projects (MVP) process, which they claim includes most of the requirements of

---

[217] *Id.* at 36.

[218] *Id.* at 36-37.

[219] *Id.* at 37 (citing Duke NOPR Initial Comments at 8-9).

[220] *Id.* (citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983) (*State Farm*) (internal citation omitted)).

[221] Designated Retail Regulators Rehearing Request at 21-22; Undersigned States Rehearing Request at 22-23.

Docket No.  RM21-17-001                                                  - 79 -

Order No. 1920.[222]  Designated Retail Regulators and Undersigned States also contend

that CAISO, NYISO, Southern Companies, and other transmission planners also have

sufficient long-term planning and that SPP indicated in its NOPR comments that its

OATT requires planning processes that are sufficient to meet the intent and desired

outcomes of Order No. 1920.[223]

### b.    Commission Determination

91.    We disagree with rehearing parties who argue that the Commission did not satisfy

its burden under the first prong of FPA section 206 because certain transmission

providers may already engage in some form of long-term transmission planning.[224]  We

are satisfied that the Commission identified deficiencies in existing regional transmission

planning and cost allocation processes that exist beyond isolated pockets.

92.    First, "[t]hat some commenters may engage in sufficient transmission planning

processes 'is as unastonishing as it is irrelevant,'" where, as here, the deficiencies

identified by the Commission and supported by substantial evidence reach well beyond

---

[222] Designated Retail Regulators Rehearing Request at 21-22; Undersigned States Rehearing Request at 22.

[223] Designated Retail Regulators Rehearing Request at 22 (citing Order No. 1920, 187 FERC ¶ 61,068 (Christie, Comm'r, dissenting, at PP 65-66); SPP NOPR Initial Comments at 3); Undersigned States Rehearing Request at 22-23 (citing Order No. 1920, 187 FERC ¶ 61,068 (Christie, Comm'r, dissenting, at PP 65-66); SPP NOPR Initial Comments at 3).

[224] Alabama Commission at 3-4; Designated Retail Regulators Rehearing Request at 21-22; Undersigned States Rehearing Request at 22-23; SERTP Sponsors Rehearing Request at 28-37.

"isolated pockets."[225]  Record evidence demonstrates that transmission planning regions

across the country—including ISO-NE, SERTP, and NorthernGrid—do not plan beyond

a 10-year transmission planning horizon,[226] which is problematic for several reasons,

including that regional transmission facilities often have lead times that exceed 10

years[227] and that a 10-year transmission planning horizon is much too short to capture all

of the benefits that regional transmission facilities can provide.[228]  Further, comments and

reports in the record establish that transmission planning processes in several regions do

not account for known determinants of Long-Term Transmission Needs such as trends in

future generation[229] and extreme weather.[230]  The record demonstrates that many regional

---

[225] *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d at 67 (first quoting *Wis. Gas Co. v. FERC*, 770 F.2d at 1157; and then quoting *Associated Gas Distributors*, 824 F.2d at 1019).

[226] Order No. 1920, 187 FERC ¶ 61,068 at P 115 & n.282 (citing ITC NOPR Initial Comments at 9 (referring to the "broad use of a 10-year planning horizon in the existing transmission planning processes of many major planning regions")).

[227] *Id.* P 116 (citing AEP NOPR Initial Comments at 11; Nevada Commission NOPR Initial Comments at 7 n.24; PIOs NOPR Initial Comments at 14; Renewable Northwest NOPR Initial Comments at 5; SEIA NOPR Initial Comments at 6).  The Commission discussed MISO's MVP initiative, which took a decade to move from approval by the MISO Board of Directors in 2011 to completion of most of the projects by 2021, a 10-year period that does not even account for the significant transmission facility development efforts that occurred prior to the MISO Board of Directors' approval.  Order No. 1920, 187 FERC ¶ 61,068 at P 116 (citing AESL Consulting, *A Transmission Success Story:  The MISO MVP Transmission Portfolio*, at 39 (2021)).

[228] *Id.* (citing SEIA NOPR Initial Comments at 6; US DOE NOPR Initial Comments at 33).

[229] *Id.* P 118 & n.294.

[230] *Id.* P 118 & n.293.

Docket No.  RM21-17-001                                                      - 81 -

transmission planning processes also fail to adequately consider the range of benefits of

regional transmission facilities planned to meet Long-Term Transmission Needs.[231]  And

the Commission cited evidence showing that, except in limited cases, transmission

providers in many regions do not conduct multi-driver or portfolio transmission planning,

which has led to ratepayers paying for relatively inefficient or less cost-effective

transmission projects.[232]

---

[231] *Id.* P 122 & nn.309-12 (citing Massachusetts Attorney General ANOPR Initial
Comments at 22 ("New England's siloed approach to transmission planning inhibits
identification of multi-value solutions."); PIOs Initial Comments at 10 ("[T]he vast
majority of current transmission projects are focused solely either on network reliability
or connecting the next generator in the interconnection queue and ignore any other
potential benefits, possible economies of scale or other efficiencies that might occur by
considering multiple future needs . . . . [M]ultiple quantifiable benefits to transmission . .
. . are being ignored in the transmission planning process."); SREA Initial Comments at 24
("SERTP participants explained that SERTP is unable to conduct adjusted production
cost savings, because none of the utilities involved in SERTP have the software capable
of doing so.  In effect, the 'Economic Planning Studies' only evaluate the costs of
potential upgrades to the system, but none of the benefits.").

[232] *Id.* P 127 & n.318 (citing New Jersey Commission NOPR Initial Comments at
8 (explaining that, outside of limited circumstances, PJM, Florida, ISO-NE, Southeastern
Regional, South Carolina Regional, WestConnect, NorthernGrid, NYISO, SPP, and
CAISO do not conduct multi-driver or portfolio transmission planning, which has
required ratepayers to pay for tens of billions of dollars in unnecessary transmission
projects); NextEra ANOPR Initial Comments at 71 ("While there are examples of longer-
term planning currently being utilized by some regions, such as MISO's annual 15-year
Futures assessment or SPP's 20-year Integrated Transmission Plan run every five years,
there is no standard as to what time horizon long-term planning must study, nor how
often this planning should be done.  Further, no standards or guidelines exist as to what
should be included in such long-term planning to ensure that customers are charged just
and reasonable rates for the most efficient and cost-effective investments given the most
comprehensive and up-to-date information available."); Western PIOs NOPR Initial
Comments at 4-28 (arguing that in the Western United States transmission planning
outside of CAISO is not developed and is ineffective); Brattle-Grid Strategies Oct. 2021
Report at 13-15 & tbl. 2 (documenting inconsistent "use of proactive, scenario-based,
multi-value processes" across various planning authorities, including NYISO, CAISO,

Docket No. RM21-17-001                                                    - 82 -

93.     We are unpersuaded by SERTP Sponsors' argument that the Commission failed to

satisfy its burden under the first prong of FPA section 206 analysis because it ignored

evidence that transmission expansion in SERTP is driven by "planning processes that

proactively anticipate[] a changing resource mix and the use of firm 'physical'

transmission service—and not by interconnection requests."[233]  As Order No. 1920

makes clear, the deficiencies of existing transmission planning and cost allocation

processes result in various detrimental outcomes reflecting that existing requirements are

unjust and unreasonable.  Over-reliance on generator interconnection requests to expand

the transmission system is just one such example.  The Commission noted other existing

deficiencies as well, including that the majority of investments in transmission facilities

are occurring through local transmission planning processes and in-kind replacements,

which focus on the needs of individual transmission provider footprints and miss the

potential for more efficient or cost-effective regional transmission facilities.[234]

94.     Moreover, although SERTP Sponsors assert that SERTP "does not suffer from

[Order No. 1920's] theoretical deficiencies,"[235] and Alabama Commission asserts that

that the Commission ignored evidence that transmission planning in SERTP "achieves

---

MISO, PJM, ISO-NE, Florida, Southeast Regional, and South Carolina")).

        [233] SERTP Sponsors Rehearing Request at 36.

        [234] Order No. 1920, 187 FERC ¶ 61,068 at P 109-111.

        [235] SERTP Sponsors Rehearing Request at 34 & n.100.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1459 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No. RM21-17-001                                                              - 83 -

many, if not most, of the goals in the Final Rule,"[236] the Commission, in fact, cited

evidence that SERTP's transmission planning process suffers from each of the three

deficiencies that the Commission identified in Order No. 1920.  Record evidence

demonstrates that SERTP's regional transmission planning and cost allocation process (1)

does not perform a sufficiently long-term assessment of transmission needs;[237] (2) does

not adequately account on a forward-looking basis for known determinants of Long-Term

Transmission Needs;[238] and (3) fails to adequately consider the broader set of benefits of

regional transmission facilities planned to meet Long-Term Transmission Needs.[239]

95.    Further, Designated Retail Regulators and Undersigned States provide no support

for their claim that "a substantial portion of transmission providers" are currently

conducting "effective long-term planning."[240]  Instead, they assert that CAISO, NYISO,

---

[236] Alabama Commission Rehearing Request at 3.

[237] Order No. 1920, 187 FERC ¶ 61,068 at P 115 (noting that SERTP uses a 10-year transmission planning horizon (citing Southeast PIOs NOPR Initial Comments at 12)).

[238] *Id.* P 118 n.294 (explaining that in 2021, SERTP stated that because it did not receive any proposals for transmission needs driven by Public Policy Requirements for the 2021 planning cycle, it identified no possible transmission needs driven by Public Policy Requirements for further evaluation of potential transmission solutions in that planning cycle (citing SREA NOPR Initial Comment at 25)).

[239] *Id.* P 122 n.312 ("SERTP participants explained that SERTP is unable to conduct adjusted production cost savings, because none of the utilities involved in SERTP have the software capable of doing so.  In effect, the 'Economic Planning Studies' only evaluate the costs of potential upgrades to the system, but none of the benefits." (quoting SREA NOPR Initial Comments at 24)).

[240] *See* Designated Retail Regulators Rehearing Request at 21; Undersigned States

Southern Companies, and "[o]ther regions . . . have sufficient long-term planning"[241]

without explaining how the transmission planning processes in those regions do not

suffer from the deficiencies that the Commission identified in Order No. 1920 as

necessitating reform of its existing regional transmission planning and cost allocation

requirements. Similarly, Designated Retail Regulators' and Undersigned States'

conclusion that SPP's transmission planning processes are "sufficient to meet the

Commission's desired outcomes"[242] cites to a single sentence in comments SPP filed

nearly two years before the Commission adopted Order No. 1920, in which SPP stated

only that it "believe[d] its current study processes and initiatives [to be] sufficient to meet

the Commission's desired outcomes."[243] Such unsupported statements about the

sufficiency of transmission planning processes in various transmission planning regions

similarly fail to establish that those transmission providers' existing transmission

planning and cost allocation processes do not suffer the deficiencies that the Commission

identified in Order No. 1920. While MISO's regional transmission planning process may

---

Rehearing Request at 22.

[241] Designated Retail Regulators Rehearing Request at 22 (citing Order No. 1920, 187 FERC ¶ 61,068 (Christie, Comm'r, dissenting, at PP 65-66)); Undersigned States Rehearing Request at 23 (citing Order No. 1920, 187 FERC ¶ 61,068 (Christie, Comm'r, dissenting, at PP 65-66)).

[242] Designated Retail Regulators Rehearing Request at 22 (citing SPP NOPR Initial Comments at 3); Undersigned States Rehearing Request at 22 (citing SPP NOPR Initial Comments at 3).

[243] SPP NOPR Initial Comments at 3.

satisfy certain of Order No. 1920's requirements, this does not establish that deficiencies
in existing regional transmission planning and cost allocation processes are occurring
only in "isolated pockets."

96.     Moreover, SERTP Sponsors do not identify any authority supporting the
contention that the Commission cannot make a generic finding under section 206 unless
it shows that every transmission provider's OATT is unjust and unreasonable or unduly
discriminatory or preferential.  Nor are we convinced by SERTP Sponsors' attempts to
distinguish *South Carolina Public Service Authority v. FERC*, where the court held that
"the Commission may act by generic rule . . . without first finding that the rates charged
by individual utilities are unjust or unlawful when it concludes that any tariff violating
the rule would have such adverse effects on the interstate gas or energy market as to
render it unjust and unreasonable."[244]  SERTP Sponsors assert that, given "SERTP's
scale and scope and the fact that it does not suffer from [Order No. 1920's] theoretical
deficiencies," the reasoning of *South Carolina Public Service Authority v. FERC* is
inapplicable here.  However, while we do not need to make specific findings regarding
individual transmission providers, we note, as discussed above, that record evidence
demonstrates that SERTP does suffer from each of the theoretical deficiencies that the
Commission identified in Order No. 1920.  Significantly, in finding that existing regional
transmission planning and cost allocation requirements are not just and reasonable, the

---

[244] *See S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d at 86 (quoting *Associated Gas Distributors*, 824 F.2d at 1008).

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1462 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No. RM21-17-001                                                              - 86 -

Commission also recognized that "the present is not a prediction of the future"[245] in light
of the threat, documented by substantial evidence, that, absent Order No. 1920's reforms,
regional transmission planning processes will continue to fail to identify, evaluate, and
select regional transmission facilities that can more efficiently or cost-effectively meet
Long-Term Transmission Needs, requiring customers to pay for relatively inefficient or
less cost-effective transmission development.  That "the present is not a prediction of the
future" is especially true in a period of rapid change like the electric sector is now
experiencing.  Given industry trends that the Commission highlighted in Order
No. 1920—changing longer-term reliability needs due to more frequent extreme weather
events and the increasing share of variable resources entering the resource mix,[246]
significantly increasing demand,[247] and changes to the nation's resource mix[248]—even if
the identified deficiencies in existing regional transmission planning and cost allocation
requirements have yet to manifest clearly in every transmission planning region, we can

---

[245] *Id.* at 67 (quoting Order No. 1000-A, 139 FERC ¶ 61,132 at P 65); *see also*
Order No. 1000-A, 139 FERC ¶ 61,132 at P 65 ("The Commission is authorized to make
rules with prospective effect that will prevent situations that are inconsistent with the
FPA from occurring, which means that it is authorized to consider how the future may be
different from the present if the rules it proposes are not adopted.").

[246] Order No. 1920, 187 FERC ¶ 61,068 at P 94.

[247] *Id.* P 95.

[248] *Id.* P 96.

reasonably predict that they will in the near future.  The Commission acted within its

authority to prevent that eventuality from materializing.[249]

97.    Moreover, the Commission found that the existing regional transmission planning

and cost allocation *requirements* are unjust and unreasonable under of the first prong of

FPA section 206.[250]  While transmission planning regions vary in their specific

approaches, and some transmission providers, within their discretion, may have adopted

practices that satisfy some of Order No. 1920's requirements, there is no guarantee that

these practices will continue in the absence of Order No. 1920's requirements.  If

transmission providers believe that they already satisfy any of the requirements of Order

No. 1920, they may seek to demonstrate that they do so in their compliance filings.

### 4.    The Commission Has the Authority to Conduct a Generic Rulemaking

#### a.    Requests for Rehearing

98.    Undersigned States argue that the Commission lacks authority to make rate

determinations on a generic, national level.[251]  Undersigned States note that under section

---

[249] *See S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d at 64-65, 85 ("[W]hether a threat of unjust or unreasonable rates derives from a practice or the absence thereof, Section 206 empowers the Commission to address it.").

[250] Order No. 1920, 187 FERC ¶ 61,068 at P 114 ("Based on the record, including the comments submitted in response to the NOPR, we find that there is substantial evidence to support the conclusion that *deficiencies in the Commission's existing regional transmission planning and cost allocation requirements* are resulting in Commission-jurisdictional rates that are unjust, unreasonable, and unduly discriminatory or preferential.") (emphasis added)).

[251] Undersigned States Rehearing Request at 23.

Docket No.  RM21-17-001                                         - 88 -

206, the Commission has the power to determine, after a hearing held upon its own

motion or upon complaint, that the rates charged by a specific utility subject to

Commission jurisdiction are unjust, unreasonable, unduly discriminatory, or preferential,

and if so, to adjust that rate.[252]  Undersigned States claim that this does not authorize the

Commission to issue Order No. 1920.[253]

99.    Arizona Commission argues that there is no evidence that it has acted in a

discriminatory or unfair way while creating rates and processes.[254]  Therefore, Arizona

Commission argues, Order No. 1920's section 206 finding is unlawful when applied to

the Arizona Commission because there must be an individual finding as to the Arizona

Commission before section 206 can be applied to it.  Arizona Commission states that it is

arbitrary and capricious "to infer any evidence in the record supports the conclusion the

[Arizona Commission] has acted in a discriminatory or unfair way."[255]

### b.    Commission Determination

100.   We continue to find that the Commission has the authority to institute the reforms

adopted in Order No. 1920 and that it was not required to demonstrate that transmission

planning and cost allocation processes are unjust, unreasonable, or unduly discriminatory

or preferential with respect to specific transmission providers.  Rehearing parties'

---

[252] *Id.* at 23-24 (citing 16 U.S.C. 824e).

[253] *Id.* at 24.

[254] Arizona Commission Rehearing Request at 19.

[255] *Id.* at 19-20.

arguments to the contrary seem to rely on a misinterpretation of FPA section 206.

Section 206 delegates substantial responsibility to the Commission:

101.    Whenever the Commission, after a hearing held upon its own motion or upon

complaint, shall find that any rate, charge, or classification, demanded, observed,

charged, or collected by any public utility for any transmission or sale subject to the

jurisdiction of the Commission, or that any rule, regulation, practice, or contract affecting

such rate, charge, or classification is unjust, unreasonable, unduly discriminatory or

preferential, the Commission shall determine the just and reasonable rate, charge,

classification, rule, regulation, practice, or contract to be thereafter observed and in force,

and shall fix the same by order.[256]

102.    As the Commission explained in Order No. 1920, and as courts have confirmed,

transmission planning and cost allocation processes are "are practices affecting rates

subject to the Commission's exclusive jurisdiction."[257]  Rehearing parties cite no

precedent suggesting that section 206 requires the Commission to act on an individual,

utility-by-utility basis, and we are aware of none.

103.    Contrary to Undersigned States' argument that the Commission lacks authority to

make rate determinations on a generic, national level, courts have consistently interpreted

section 206 to allow the Commission to regulate on a national level, through notice-and-

---

[256] 16 U.S.C. 824e.

[257] Order No. 1920, 187 FERC ¶ 61,068 at P 86 (citing *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d at 55).

comment rulemakings, when the Commission finds systemic issues throughout the

industry that cause practices affecting rates charged by public utilities to be unjust,

unreasonable, or unduly discriminatory or preferential.[258]  Nearly 40 years of precedent

has consistently interpreted the Commission's FPA section 206 authority—and the

corresponding, nearly identical authority in the Natural Gas Act[259]—as providing the

Commission with the authority to "rely on 'generic' or 'general' findings of a systemic

problem to support imposition of an industry-wide solution."[260]  In fact, in interpreting

the nearly identical provision of the Natural Gas Act, the D.C. Circuit stated that "[t]he

Commission is not required to make individual findings, however, if it exercises its

Natural Gas Act § 5 authority by means of a generic rule."[261]  The Commission has, time

and time again, exercised section 206 authority through generic rulemakings that rely on

industry-wide findings rather than region-by-region or utility-specific findings.[262]

---

[258] *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d 41 (upholding Order No. 1000); *TAPS*, 225 F.3d 667, *aff'd sub nom. N.Y. v. FERC*, 535 U.S. 1 (upholding Order No. 888).

[259] 15 U.S.C. 717d(a).

[260] *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d at 67 (quoting *Interstate Nat. Gas of Am. v. FERC*, 285 F.3d at 37; *see also TAPS*, 225 F.3d at 687-88; *Associated Gas Distributors*, 824 F.2d 981; *Wis. Gas Co. v. FERC*, 770 F.2d at 1166 & n.36.

[261] *Associated Gas Distributors*, 824 F.2d at 1008.  It is "well settled that comparable provisions of the Natural Gas Act and [FPA] are to be construed *in pari materia*." *Ky. Utils. Co. v. FERC*, 760 F.2d 1321, 1325 n.6 (D.C. Cir. 1985).

[262] *See, e.g.*, *TAPS*, 225 F.3d 667 (upholding Order No. 888, which was promulgated under FPA section 206 and premised on general systemic conditions rather than evidence regarding individual utilities); *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d 41 (same for Order No. 1000); *Elec. Storage Participation in Mkts. Operated by Reg'l*

Indeed, Order No. 1920 itself builds upon existing transmission planning and cost

allocation requirements adopted by the Commission through other generally applicable,

nationwide rulemakings. Thus, the Commission was not required to make specific

findings as to the Arizona Commission or transmission planning and cost allocation

processes within Arizona or any given state. Moreover, Order No. 1920's reforms are

directed to transmission providers, consistent with the Commission's jurisdiction,[263] and

do not require any action by state regulatory authorities.[264] In light of the Commission's

authority to act on a generic basis to reform the practices of all transmission providers,

the Commission reasonably exercised its broad discretion to proceed by nationwide

rulemaking to remedy the deficiencies that it determined in Order No. 1920 render its

existing regional transmission planning and cost allocation requirements unjust and

unreasonable.[265]

---

*Transmission Organs. and Indep. Sys. Operators*, Order No. 841, 83 FR 9580 (Mar. 6, 2018), 162 FERC ¶ 61,127, at P 21 (2018), *order on reh'g*, Order No. 841-A, 167 FERC ¶ 61,154 (2019), *aff'd sub nom. Nat'l Ass'n of Regul. Util. Comm'rs v. FERC*, 964 F.3d 1177 (D.C. Cir 2020) (*NARUC*); Order No. 890, 118 FERC ¶ 61,119 at PP 41-43.

[263] Order No. 1920, 187 FERC ¶ 61,068 at PP 1 n.2, 253.

[264] *See* Order No. 1920, 187 FERC ¶ 61,068 at P 263 ("[T]his final rule directly regulates transmission planning and cost allocation processes, . . . directly regulates *only* those practices, and it *does not* directly regulate any matter reserved to the states by FPA section 201.").

[265] *See Wis. Gas Co. v. FERC*, 770 F.2d at 1157 ("An administrative agency must be equipped to act either by general rule or individual order. To insist upon one form of action to the exclusion of the other is to exalt form over necessity. The choice made between proceeding by general rule or by individual, *ad hoc* litigation is one that lies primarily in the informed discretion of the administrative agency." (alterations omitted)

### C. The Commission Demonstrated that the Replacement Rate is Just and Reasonable

#### 1. Requests for Rehearing

104.    Several rehearing parties argue that the Commission did not demonstrate that the replacement tariff and transmission planning requirements are just and reasonable.[266] According to Designated Retail Regulators, Order No. 1920 "requires the construction of transmission to socialize the costs of policies of some States and parties over others and shifts the costs caused by interconnecting remotely located generators to everyone," but provides "no analysis showing that the resulting rates are just and reasonable."[267] Industrial Customers contend that Order No. 1920 generically asserts, without "evidence, proof, or data," that its reforms "*should* provide cost savings."[268]

105.    Designated Retail Regulators also claim that Order No. 1920 contradicts Order Nos. 888 and 890, under which the cost of transmission is generally borne by load. Designated Retail Regulators argue that, in contrast, the final rule promotes the construction of long-haul transmission designed to move energy from remote resources located in one state to load located in another without any contractual or other assurance to the load-serving entity that the remotely located resource will provide firm energy.

---

(quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 202-03 (1947)).

[266] Designated Retail Regulators Rehearing Request at 22-23; Undersigned States Rehearing Request at 23.

[267] Designated Retail Regulators Rehearing Request at 22-23; *see also* Undersigned States Rehearing Request at 23 (similar).

[268] Industrial Customers Rehearing Request at 20.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1469 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No.  RM21-17-001                                                                - 93 -

Designated Retail Regulators contend that, in the absence of a contractual or regulatory requirement to supply firm energy, there is no reasonable rationale that would justify allocating the cost for this transmission to remotely located load.[269]  Designated Retail Regulators also argue that remotely located customers who are required to pay for transmission facilities without regulatory or contractual guarantees of receiving firm energy are not beneficiaries, must less cost causers.[270]

106.    Industrial Customers argue that Order No. 1920 is arbitrary and capricious and does not reflect reasoned decision-making because it fails to consider and address costs to consumers, which is an essential element of the problem of transmission planning and cost allocation.[271]  Arizona Commission echoes this argument and contends that Order No. 1920 fails to protect consumers and will saddle ratepayers with trillions of dollars in increased rates in coming years, resulting in unfair rates.[272]  Arizona Commission adds that the "several factors" that Order No. 1920 requires transmission providers to "consider[ ] in transmission planning and cost allocation" should have included fairness,

---

[269] Designated Retail Regulators Rehearing Request at 23.

[270] *Id.* at 23-24.

[271] Industrial Customers Rehearing Request at 19-20 (citing *State Farm*, 463 U.S. at 43).

[272] Arizona Commission Rehearing Request at 20.

Docket No. RM21-17-001                                                - 94 -

reasonableness of cost, or consideration of who caused the cost, as mandated by the

FPA.[273]

### 2.    Commission Determination

107.   We continue to find that the replacement regional transmission planning and cost

allocation requirements that the Commission adopted in Order No. 1920 are just and

reasonable.[274]  We disagree with rehearing parties' arguments that the Commission did

not demonstrate that the replacement rate is just and reasonable, as it appears that these

arguments may mischaracterize Order No. 1920.  Designated Retail Regulators argue that

Order No. 1920 "requires the construction of transmission to socialize the costs of the

policies of some States and parties over others and shifts the costs caused by

interconnecting remotely located generators to everyone."[275]  Like Order No. 1000, Order

No. 1920's "transmission planning reforms are concerned with process, and are not

intended to dictate substantive outcomes."[276]  Order No. 1920 specifically provided that

"[t]he regional transmission planning requirements and cost allocation requirements in

---

[273] *Id.* at 21.

[274] Order No. 1920, 187 FERC ¶ 61,068 at PP 134-138.

[275] Designated Retail Regulators Rehearing Request at 22-23; *see also*
Undersigned States Rehearing Requests at 23 (similar).

[276] *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d at 58 (quoting Order No. 1000-A, 139
FERC ¶ 61,132 at P 188); *see infra* Statutory Authority section.

this final rule, like those of Order Nos. 890 and 1000, are focused on the transmission

planning *process*, and do not require any substantive outcomes from this process."[277]

108.    Moreover, Order No. 1920 did not change the Commission's cost causation

requirements and does not contradict Order Nos. 888 and 890, under which the cost of

transmission is generally borne by load.[278]  Order No. 1920 reiterated that "any cost

allocation method applied to a Long-Term Regional Transmission Facility must ensure

that costs are allocated in a manner that is at least roughly commensurate with the

estimated benefits of the facility, consistent with cost causation and court precedent."[279]

Order No. 1920 further stated that "[n]othing in this final rule requires states to subsidize

other states' public policies and, indeed, this final rule requires, consistent with long-

established Commission and court precedent, that transmission customers within a

transmission planning region need only pay costs that are 'roughly commensurate' with

the benefits that transmission providers estimate they will receive from a regional

transmission facility."[280]  Thus, "even if one state's public policy is a driver of a Long-

---

[277] Order No. 1920, 187 FERC ¶ 61,068 at P 232.

[278] *See infra* Federal/State Division of Authority section.

[279] Order No. 1920, 187 FERC ¶ 61,068 at P 1305 (citing *S.C. Pub. Serv. Auth. v. FERC*, 762 F. 3d at 87; Order No 1000, 136 FERC ¶ 61,051 at P 10; *ICC v. FERC I*, 576 F.3d at 476); *see also* Order No. 1920, 187 FERC ¶ 61,068 at P 1297 ("Any cost allocation method(s) that transmission providers propose . . . must allocate costs in a manner that is at least roughly commensurate with estimated benefits . . . .").

[280] *Id.* P 267 (citing *Ill. Com. Comm'n v. FERC*, 756 F.3d 556, 562 (7th Cir. 2014) (*ICC v. FERC III*); *ICC v. FERC I*, 576 F.3d at 477; *Sw. Power Pool, Inc.*, 182 FERC ¶ 61,141, at P 12 (2023)); *see also* Order No. 1920, 187 FERC ¶ 61,068 at P 280 ("[T]he final rule categorically does not require states to subsidize other states' public policies or

Term Transmission Need, the costs of a Long-Term Regional Transmission Facility that transmission providers select will be allocated to transmission customers only to the extent that they benefit from that facility and only to a degree that is at least roughly commensurate with the benefits that facility provides to them."[281]  For these reasons, we also disagree with Designated Retail Regulators' argument that Order No. 1920 contradicts Order Nos. 888 and 890.  Nonetheless, we believe certain clarifications discussed further below will alleviate Designated Retail Regulators' and Undersigned States' concerns regarding Order No. 1920's impact on multi-state cost allocation.[282]

109.    We are similarly unpersuaded by Designated Retail Regulators' assertion that the Commission failed to satisfy its burden under the second prong of FPA section 206 because, under Order No. 1920, "there is no reasonable rationale that would justify . . . remotely located customers being required to pay for transmission facilities without regulatory or contractual guarantees of receiving firm energy."[283]  The physics of an interconnected electric transmission system are such that even customers distant from new Long-Term Regional Transmission Facilities and without specific contractual

---

generation decisions," but instead, "consistent with the cost causation principle, [the] final rule requires customers to pay for a share of the costs of new Long-Term Regional Transmission Facilities only to the extent that *they* benefit from those facilities and, even then, any share they pay must be roughly commensurate with the benefits they receive.").

[281]  *Id.* P 282.

[282]  *See supra* Concerns Regarding Cost Causation section.

[283]  Designated Retail Regulators Rehearing Request at 23-24.

arrangements with such facilities *may* benefit from those facilities.[284]  And any proposed

cost allocation method for Long-Term Regional Transmission Facilities *must* allocate the

costs of a new Long-Term Regional Transmission Facility in a manner at least roughly

commensurate with the estimated benefits of the facility.[285]  Beyond arguing that Order

No. 1920 contradicts Order Nos. 888 and 890, Designated Retail Regulators do not argue

that the Commission lacks authority to mandate the allocation of costs where there is no

contractual or regulatory requirement to supply firm energy, and we do not believe that

such a limitation exists.[286]

110.    Additionally, the Commission found that Order No. 1920's requirements—that

transmission providers conduct Long-Term Regional Transmission Planning that will

ensure the identification, evaluation, and selection, as well as the allocation of costs, of

more efficient or cost-effective regional transmission solutions to address Long-Term

Transmission Needs—will address the deficiencies in the existing regional transmission

planning and cost allocation requirements.  Furthermore, the Commission determined,

---

[284] *See S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d at 85 ("Entities that contract for
service on the transmission grid cannot choose to affect only the transmission facilities
for which they have entered into a contract and cannot claim that they are not using or
benefiting from such transmission facilities simply because they did not enter a contract
to use them." (quoting Order No. 1000-A, 139 FERC ¶ 61,132 at P 561 (cleaned up)).

[285] Order No. 1920, 187 FERC ¶ 61,068 at P 1305.

[286] *See S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d at 84 (reasoning that the text of
section 206 does not limit "cost allocation to entities with preexisting commercial
relationships," and instead "empowers the Commission to fix 'any rate' 'demanded,
observed, charged, or collected by any public utility for any transmission . . . subject to
the jurisdiction of the Commission,' and 'any . . . practice' 'affecting such rate.'").

USCA4 Appeal: 24-1650   Doc: 224        Filed: 01/21/2025    Pg: 1474 of 2455
Document Accession #: 20241121-3139      Filed Date: 11/21/2024

Docket No. RM21-17-001                                              - 98 -

these requirements will promote enhanced reliability and more efficient or cost-effective transmission solutions, which will help to ensure just and reasonable rates.[287]  The Commission's finding was based on consideration of the record and reasonable economic predictions, which indicate that long-term, forward-looking, and more comprehensive regional transmission planning that identifies Long-Term Transmission Needs helps transmission providers to identify, evaluate, and select more efficient or cost-effective transmission solutions to meet those needs.[288]  These points are especially true considering the clarifications we adopt below.

111.    For instance, the Commission was persuaded by empirical evidence demonstrating the success of MISO's Long-Range Transmission Plan in delivering more efficient or cost-effective transmission solutions.[289]  By addressing public policy, economic, and reliability transmission planning needs simultaneously through its MVP category, MISO eliminated the need for $300 million in future baseline reliability upgrades and provided production cost savings that exceeded the entire cost of the portfolio by $10 billion.[290]

---

[287] Order No. 1920, 187 FERC ¶ 61,068 at P 134.

[288] *Id.* PP 135-138 (citing ACEG NOPR Initial Comments 53-56; Brattle-Grid Strategies Oct. 2021 Report at 7 & nn.13-14; Clean Energy Associations NOPR Initial Comments at 25-27; Exelon NOPR Initial Comments 5; ITC NOPR Initial Comments at 44; MISO NOPR Initial Comments at 88; MTEP2017 Review at 6, 8; New Jersey Commission NOPR Initial Comments at 4; PIOs NOPR Initial Comments at 10, 35; SEIA NOPR Initial Comments 25-26).

[289] *Id.* P 135.

[290] *Id.* (MTEP2017 Review at 6).

Docket No. RM21-17-001                                                          - 99 -

The Commission noted that the cost savings that MISO experienced were the direct product of more comprehensive, longer-term regional transmission planning.[291]

112.    The Commission also made several reasonable economic predictions regarding the effects of Order No. 1920. It was, for instance, reasonable for the Commission to predict that the transmission planning reforms adopted in Order No. 1920, which bear many similarities to MISO's MVP process, will have similar results and that longer-term regional transmission planning that considers a wider array of relevant factors will yield a more efficient or cost-effective selection of regional transmission facilities to meet Long-Term Transmission Needs, thus saving customers money.[292] The Commission reasonably concluded, and we continue to find, that forgoing this type of planning and requiring customers to bear the costs of relatively inefficient and less cost-effective transmission development results in unjust and unreasonable Commission-jurisdictional rates.[293]

113.    We understand concerns raised by Arizona Commission and Industrial Customers that Order No. 1920 fails to protect consumers and will impose substantial costs on ratepayers.[294] However, in Order No. 1920, the Commission found that the *existing*

---

[291] *Id.* P 136.

[292] *See id.*

[293] *Id.* P 112.

[294] *See* Arizona Commission Rehearing Request at 20-21; Industrial Customers Rehearing Request at 19-20.

Docket No. RM21-17-001                                                           - 100 -

approach to regional transmission planning is resulting in customers paying more than

necessary or appropriate to meet their transmission needs, forgoing benefits that outweigh

their costs, or some combination thereof.[295]  Thus, the Commission adopted reforms in

Order No. 1920 that are necessary to ensure that regional transmission planning processes

identify, evaluate, and select regional transmission facilities that can more efficiently or

cost-effectively meet Long-Term Transmission Needs, so that customers do not continue

to pay for relatively inefficient or less cost-effective transmission development.[296]

Addressing costs to ratepayers was central to the reforms that the Commission adopted in

Order No. 1920, and the Commission cited evidence that more comprehensive, longer-

term regional transmission planning results in significant cost saving for customers.[297]

Further, we disagree with Industrial Customers' argument that Order No. 1920 states,

without "evidence, proof, or data," that its reforms "*should* provide cost savings."[298]  As

discussed above, the Commission cited robust and diverse evidence to support its finding

that the type of regional transmission planning required by the final rule will likely result

---

[295] Order No. 1920, 187 FERC ¶ 61,068 at P 117.

[296] *Id.* P 113; *see also id.* P 136 ("[R]egional transmission planning and cost allocation reforms [adopted in Order No. 1920] will benefit customers by leading to more efficient or cost-effective transmission investment, thereby helping to ensure just and reasonable rates." (citations omitted)).

[297] *E.g., Id.* P 135 (citing MTEP2017 Review at 6).

[298] Industrial Customers Rehearing Request at 20 (emphasis in original).

in cost savings to customers relative to the status quo approach.[299]  Nonetheless, we believe the clarifications adopted herein will alleviate Industrial Customers' concerns.

114.    We also recognize Arizona Commission's argument that the "several factors" that Order No. 1920 requires transmission providers to "consider[ ] in transmission planning and cost allocation" should have included fairness or reasonableness of cost or consideration of who caused the cost.[300]  We believe these factors are appropriately accounted for in other stages of the regional transmission planning and cost allocation process.  For example, the evaluation process considers reasonableness of costs by considering cost estimates for, as well as the benefits of, identified Long-Term Regional Transmission Facilities.[301]  The cost allocation process also considers fairness and cost causation, as "transmission customers within a transmission planning region need only pay costs that are 'roughly commensurate' with the benefits that transmission providers estimate they will receive from a regional transmission facility."[302]  However, we believe certain clarifications adopted herein will address the concerns underlying Arizona Commission's argument.

---

[299] *See supra* The Commission Adequately Supported Its Determination on Step One of Section 206 section; *see also* Order No. 1920, 187 FERC ¶ 61,068 at P 135 & n.346 (citing a projection that proactive, portfolio-based transmission planning in PJM could ultimately save ratepayers over $30 billion compared to the status quo).

[300] Arizona Commission Rehearing Request at 21.

[301] Order No. 1920, 187 FERC ¶ 61,068 at PP 955, 958.

[302] *Id.* P 267; *see BNP Paribas Energy Trading GP v. FERC*, 743 F.3d 264, 268-69 (D.C. Cir. 2014) ("[T]he cost causation principle itself manifests a kind of equity.").

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1478 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No.  RM21-17-001                                                    - 102 -

#### D.    The Commission's Section 206 Findings Were Not Circular

#### 1.    Requests for Rehearing

115.    Industrial Customers and SERTP Sponsors argue that the Commission's findings under the two prongs of section 206 are circular.[303]  According to Industrial Customers, rather than cite specific record evidence or specify the problems that the Commission seeks to address, the Commission relies on the benefits of Order No. 1920's remedy— e.g., longer-term, more comprehensive regional transmission planning—to support its threshold finding under the first prong of FPA section 206.[304]  Industrial Customers thus assert that Order No. 1920 relies on "circular reasoning," whereby the Commission develops a desired solution and then finds that the current absence of that desired solution renders the status quo unjust and unreasonable.[305]  This approach, Industrial Customers contend, does not reflect reasoned decision making.[306]  Further, Industrial Customers argue that proceeding in this fashion exceeds the Commission's authority under the FPA and could allow the Commission to "essentially legislate to achieve any desired outcome."[307]  Industrial Customers assert that the D.C. Circuit has previously determined that the Commission failed to meet its section 206 burden and therefore committed error

---

[303] Industrial Customers Rehearing Request at 13-15; SERTP Sponsors Rehearing Request at 29-32, 34-35.

[304] Industrial Customers Rehearing Request at 13.

[305] *Id.* at 14.

[306] *Id.* at 15.

[307] *Id.* at 14.

by "beg[inning] with the remedy to show that the *status quo* is not just and

reasonable."[308]

116.    SERTP Sponsors claim that Order No. 1920's broad conclusion that the regional

transmission planning processes conducted by all transmission providers in each

transmission planning region are unjust, unreasonable, unduly discriminatory, and

preferential is based on the absence of the unique form of long-term regional

transmission planning that meets the Commission's current view of what a regional

transmission planning process should be.[309]  SERTP Sponsors also contend that Order

No. 1920 assumes that all regions follow the same generic approach and, while the

Commission's *pro forma* transmission planning requirements may be subject to

improvement, the Commission has not satisfied its burden of showing that the SERTP

regional transmission planning process is unjust and unreasonable.[310]

117.    SERTP Sponsors assert that Order No. 1920 imposes its preferred solution in line

with the Commission's vision instead of addressing a real need for reform specific to the

SERTP regional transmission planning process, thereby imposing a "solution in search of

a problem."[311]  SERTP Sponsors argue that, in doing so, the Commission misapplied

section 206 by collapsing the two-step standard into one step, echoing the mistake

---

[308] *Id.* at 15 (citing *Emera Me. v. FERC*, 854 F.3d 9, 22, 25 (D.C. Cir. 2017)).

[309] SERTP Sponsors Rehearing Request at 30.

[310] *Id.* at 31-32.

[311] *Id.* at 30.

described in *Emera Maine*.[312]  SERTP Sponsors contend that Order No. 1920 does not demonstrate widespread failures in transmission planning practices, but rather theorizes potential inadequacies in meeting the Commission's desired outcomes.[313]  SERTP Sponsors aver that Order No. 1920's discussion of the growing need for transmission investments and perceived insufficiencies of current planning standards does not prove that existing processes fail to meet the evolving demands of the electric grid.[314]  SERTP Sponsors allege that the SERTP process has been highly efficient, and that its integrated resource plan and request for proposal-driven transmission planning and other similar processes effectively address the Commission's concerns regarding siloed planning, lack of scenario planning, and local versus regional project focus.[315]

118.    SERTP Sponsors argue that Order No. 1920 incorrectly characterizes SERTP's and other similar transmission planning regions' transmission planning processes as deficient due to the absence of alternative regional transmission facilities selected since the implementation of Order No. 1000.[316]  SERTP Sponsors contend that the fact that no regional transmission projects have been selected underscores the success of existing integrated resource plan/request for proposal-driven planning systems rather than a

---

[312] *Id.* (citing *Emera Me.*, 854 F.3d at 22-26).

[313] *Id.* at 34.

[314] *Id.*

[315] *Id.* at 32.

[316] *Id.* at 35.

failure or deficiency in the regional transmission planning process.[317]  SERTP Sponsors

also contend that the success of the Southeast's process has been confirmed by the

absence of a National Interest Electric Transmission Corridor (NIETC) designation in the

Southeast.[318]  SERTP Sponsors state that Order No. 1920's attempt to characterize this

success as a deficiency collapses the first and second steps of section 206 in the way that

the courts have struck down in the past and means that this aspect of the order is

unsupported by substantial evidence and is otherwise arbitrary and capricious.[319]

### 2.    Commission Determination

119.    We conclude that the Commission's section 206 findings, identifying specific

deficiencies in regional transmission planning and cost allocation requirements at prong

one and establishing specific new requirements at prong two, are – as they are required to

be – closely related, in contrast to rehearing parties' arguments.  Industrial Customers and

SERTP Sponsors' arguments on this point[320] both rely on *Emera Maine,* in which the

D.C. Circuit found that the Commission erred in basing its determination that the utility's

existing 11.14% base return on equity (ROE) was unjust and unreasonable because it

exceeded the 10.57% ROE that the Commission had concluded was the just and

---

[317] *Id.*

[318] *Id.* at 35-36 (citation omitted).

[319] *Id.* at 36 & n.104 (citations omitted).

[320] Industrial Customers Rehearing Request at 15 (citing *Emera Maine*, 854 F.3d at 9, 22, 25); SERTP Sponsors Rehearing Request at 30 (citing the same).

Docket No.  RM21-17-001                                                                 - 106 -

reasonable base ROE.[321]  The court explained that the Commission must first determine

that an existing rate is unjust and unreasonable (prong one) before it imposes a

replacement rate (prong two).[322]  Industrial Customers and SERTP Sponsors argue that,

like the Commission's error in *Emera Maine*, Order No. 1920 based its finding that the

status quo is unjust and unreasonable on the absence of the Commission's specific

desired replacement.[323]

120.    When acting under section 206, the Commission must make two findings:  (1) that

the existing rate, or a practice affecting a rate, is unjust, unreasonable, or unduly

discriminatory or preferential; and (2) that the Commission's replacement rate, or

practice affecting a rate, is just and reasonable and not unduly discriminatory or

preferential.[324]  As discussed above, the Commission appropriately made both findings in

Order No. 1920, so *Emera Maine* is inapposite.

121.    The Commission's findings under the first prong of section 206 do not rely on the

specific replacement rate that it created in Order No. 1920.  Rather, the Commission's

findings under the first prong of section 206 rest on deficiencies, identified based on

substantial record evidence, in existing regional transmission planning and cost allocation

---

[321] *Emera Maine*, 854 F.3d at 25-26.

[322] *Id.* at 25-26.

[323] Industrial Customers Rehearing Request at 15; SERTP Sponsors Rehearing
Request at 30.

[324] 16 U.S.C. 824e(a), (b); *Pub. Serv. Elec. & Gas Co. v. FERC*, 989 F.3d at 13.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1483 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No.  RM21-17-001                                                          - 107 -

requirements, specifically that they are insufficiently long-term, forward-looking, and comprehensive.  The fact that there is a relationship between the deficiencies identified in prong one and the new requirements established as the just and reasonable replacement under prong two of FPA section 206 demonstrates that the replacement regional transmission planning and cost allocation requirements are appropriately tailored toward remedying the deficiencies that the Commission identified in existing regional transmission planning and cost allocation requirements.

122.   Order No. 1920 made explicit findings that the Commission's existing regional transmission planning and cost allocation requirements are unjust, unreasonable, and unduly discriminatory or preferential in several respects.[325]  First, with regard to long-term regional transmission planning, the Commission noted that most transmission planning regions do not plan beyond a 10-year time horizon.[326]  The Commission's finding that a 10-year transmission planning horizon is insufficient does not rely on the Commission's finding that 20 years is the just and reasonable time horizon for Long-Term Regional Transmission Planning.  The reasoning underlying the finding that a 10-year transmission planning horizon is insufficient would hold true even if the Commission had determined a different number (e.g., 17 or 25 or 31 years) was the just

---

[325] *See supra* Unjust, Unreasonable, and Unduly Discriminatory or Preferential Commission-Jurisdictional Transmission Planning and Cost Allocation Processes section.

[326] Order No. 1920, 187 FERC ¶ 61,068 at P 115; *see supra* Unjust, Unreasonable, and Unduly Discriminatory or Preferential Commission-Jurisdictional Transmission Planning and Cost Allocation Processes section.

and reasonable replacement. This result is in stark contrast to *Emera Maine*, where the Commission's finding that the existing base ROE was unjust and unreasonable rested entirely on the finding that it did not equal the Commission's replacement ROE.[327] Second, the Commission found, based on substantial evidence, that existing regional transmission planning and cost allocation requirements fail to require transmission providers to adequately account for known determinants of Long Term Transmission Needs.[328] Third, the Commission found, also based on substantial evidence, that the Commission's regional transmission planning and cost allocation requirements fail to require transmission providers to adequately consider a sufficiently broad and standard set of benefits of regional transmission facilities.[329] These findings are not based on the precise list of determinants or benefits that the Commission identified in establishing the replacement under of the second prong under FPA section 206, but rather on the conclusion that most transmission providers focus too narrowly on only some determinants and benefits, ignoring other relevant factors, which leads to relatively inefficient or less cost-effective transmission development.[330] Lastly, the Commission's

---

[327] *Emera Maine*, 854 F.3d at 22.

[328] Order No. 1920, 187 FERC ¶ 61,068 at P 118; *see supra* Unjust, Unreasonable, and Unduly Discriminatory or Preferential Commission-Jurisdictional Transmission Planning and Cost Allocation Processes section.

[329] Order No. 1920, 187 FERC ¶ 61,068 at P 122; *see supra* Unjust, Unreasonable, and Unduly Discriminatory or Preferential Commission-Jurisdictional Transmission Planning and Cost Allocation Processes section.

[330] Order No. 1920, 187 FERC ¶ 61,068 at PP 122-123.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1485 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No. RM21-17-001                                                    - 109 -

findings that existing cost allocation requirements are deficient relied on the fact that the

Commission's previous cost allocation requirements were tailored to the Order No. 1000

regional transmission planning requirements, but Order No. 1920's new requirements for

Long-Term Regional Transmission Planning account for multiple drivers of Long-Term

Transmission Needs and result in Long-Term Regional Transmission Facilities that

produce a broader set of benefits, and therefore warrant a different approach to cost

allocation for such transmission facilities.[331]

123. We also disagree with SERTP Sponsors' contention that Order No. 1920 assumes

that all transmission planning regions follow the same generic approach.[332] To the

contrary, and as discussed above, Order No. 1920 highlights deficiencies in regional

transmission planning processes around the country.[333] Moreover, the Commission found

that its existing regional transmission planning and cost allocation *requirements* are

unjust and unreasonable.[334] While regions vary in specific approaches, those approaches

---

[331] *Id.* PP 124-126; *see supra* Unjust, Unreasonable, and Unduly Discriminatory or Preferential Commission-Jurisdictional Transmission Planning and Cost Allocation Processes section.

[332] SERTP Sponsors Rehearing Request at 28, 31-34.

[333] *See supra* Unjust, Unreasonable, and Unduly Discriminatory or Preferential Commission-Jurisdictional Transmission Planning and Cost Allocation Processes section.

[334] Order No. 1920, 187 FERC ¶ 61,068 at P 114 ("Based on the record, including the comments submitted in response to the NOPR, we find that there is substantial evidence to support the conclusion that *deficiencies in the Commission's existing regional transmission planning and cost allocation requirements* are resulting in Commission-jurisdictional rates that are unjust, unreasonable, and unduly discriminatory or preferential.") (emphasis added)).

Docket No.  RM21-17-001                                                              - 110 -

are all based on the same requirements.  It is those requirements that we continue to find

are unjust and unreasonable given the record before us.

124.    Additionally, although SERTP Sponsors contend that SERTP's process is highly

efficient,[335] the Commission is not required to make findings with respect to individual

transmission owners' transmission planning and cost allocation processes to remedy the

deficiencies that it determined in Order No. 1920 render its existing regional transmission

planning and cost allocation requirements unjust and unreasonable.[336]  We also are not

persuaded by SERTP Sponsors' argument that the absence of regional transmission

facilities selected since the implementation of Order No. 1000 necessarily demonstrates

the success of integrated resource plan/request for proposal-driven planning systems

instead of a deficiency in regional transmission planning processes.[337]  Integrated

---

[335] SERTP Sponsors Rehearing Request at 32.

[336] *See supra* The Commission Has the Authority to Conduct a Generic Rulemaking section.  Moreover, we note that the record reflects disagreement on this point.  *See* Order No. 1920, 187 FERC ¶ 61,068 at P 56 ("SREA argues that 'transmission planning in the Southeast has many holes and is threadbare."); *id.* P 115 ("[C]ommenters point out that . . . SERTP . . . plan[s] using a 10-year transmission planning horizon."); *id.* P 333 ("SERTP's 10-year transmission planning horizon prevented Georgia Power from using that process to plan for its long-term North Georgia Reliability & Resilience Plan and its goal to integrate 6,000 MW of renewable resources by 2035."); *id.* P 709 ("Kentucky Commission Chair Chandler argues against SERTP Sponsors' comments that suggest that integrated resource plan/request for proposal processes already consider four of the proposed categories of benefits . . . [and] contends that [those] process[es] can only address these four categories on a utility-by-utility basis and, thus, [are] unable to plan for transmission facilities across utilities or transmission planning regions by nature.").

[337] SERTP Sponsors Rehearing Request at 35.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1487 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No. RM21-17-001                                                           - 111 -

resource plan/request for proposal-driven planning systems do not replace the need for effective regional transmission planning, as only regional transmission planning ensures consideration of more efficient or cost-effective transmission facilities across utility footprints. We continue to find that "the absence of sufficiently long-term, forward-looking, and comprehensive regional transmission planning processes is resulting in piecemeal transmission expansion to address relatively near-term transmission needs," which results in "transmission providers undertaking investments in relatively inefficient or less cost-effective transmission infrastructure, the costs of which are ultimately recovered through Commission-jurisdictional rates."[338]

## IV.  Statutory Authority

### A.  Order No. 1920 Determination

125.  In Order No. 1920, the Commission reaffirmed its conclusion in the NOPR that it was acting within its legal authority under FPA section 206 by requiring transmission providers to participate in a regional transmission planning process that includes Long-Term Regional Transmission Planning.[339]  In doing so the Commission found—and noted that no commenter disputed—that transmission planning and cost allocation processes are practices affecting the rates charged by public utilities in connection with the Commission-jurisdictional transmission of electric energy in interstate commerce.[340]

---

[338] Order No. 1920, 187 FERC ¶ 61,068 at P 112.

[339] Order No. 1920, 187 FERC ¶ 61,068 at P 253.

[340] *Id.* (citing 16 U.S.C. 824e; *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d at 55-59;

Docket No. RM21-17-001                                                     - 112 -

126.    The Commission disagreed with arguments that the requirements adopted in Order

No. 1920 infringe on the authority reserved to the states by FPA section 201 or are

otherwise barred by certain prudential or constitutional principles.[341]  Noting that it

believed that these concerns mainly arose from misunderstandings regarding the

substance of Order No. 1920, the Commission explained that Order No. 1920 builds on

more than a quarter century of Commission action on transmission planning and cost

allocation, which courts have affirmed notwithstanding objections similar to those

presented to Order No. 1920, by addressing specific gaps in the existing framework.[342]  It

emphasized that Order No. 1920 "does not regulate, aim at, or otherwise attempt to

influence integrated resource planning, the generation mix, decisions related to the siting

and construction of transmission facilities or generation resources, or any other matters

reserved to states under FPA section 201."[343]  To the contrary, Order No. 1920 "directly

---

*Emera Me. v. FERC*, 854 F.3d at 673-74).

[341] *Id.* P 254.

[342] *Id.* PP 254-256.

[343] *Id.* P 254; *see also id.* P 257 ("[T]his rule does not mandate development of any
particular transmission facility."); *id.* P 258 ("[T]his final rule does not authorize or
require any entity to adopt a particular siting plan for Long-Term Regional Transmission
Facilities that transmission providers select; or to forego state-jurisdictional siting
proceedings where they are necessary; or to begin construction on such Long-Term
Regional Transmission Facilities."); *id.* P 259 (explaining that Order No. 1920 "does not
change existing mechanisms for cost-recovery through retail rates; authorize or require
states or state commissions to change the laws or regulations that govern the conduct of
integrated resource planning or request for proposal processes; authorize or require
transmission providers or transmission developers to bypass any applicable state-
regulated integrated resource planning or request for proposal processes; or authorize or
require states or public utilities to adopt a different mix of generation resources"); *id.*

Docket No.  RM21-17-001                                                      - 113 -

regulates transmission planning and cost allocation processes, . . . directly regulates *only* those practices, and it *does not* directly regulate any matter reserved to the states by FPA section 201."[344]  Moreover, Order No. 1920 "is not aiming to *indirectly* regulate any matter reserved to the states by FPA section 201" but, instead, only to improve existing transmission and cost allocation processes to address identified deficiencies with those processes.[345]

127.    The Commission explained that these considerations confirmed that Order No. 1920 was well within its authority under the FPA, particularly in light of U.S. Supreme Court precedent in *EPSA*.[346]  Applying that decision, the Commission stated that "what matters is that this final rule aims to regulate and, in fact, does regulate only practices that affect the transmission of electric energy in interstate commerce, which are squarely within the Commission's jurisdiction under the FPA."[347]  In Order No. 1920, the Commission "aim[ed] to improve Commission-regulated transmission planning *processes*, in this instance by ensuring that they are sufficiently long-term, forward-looking, and comprehensive such that they are capable of identifying and meeting Long-

---

P 266.

[344] *Id.* P 263.

[345] *Id.*; *see also id.* P 265 ("[T]his final rule aims to regulate and, in fact, does regulate only practices that affect the transmission of electric energy in interstate commerce, which are squarely within the Commission's jurisdiction under the FPA.").

[346] *See id.* PP 264-266.

[347] *Id.* P 265.

Docket No. RM21-17-001                                                      - 114 -

Term Transmission Needs."[348]  Likewise, and consistent with *EPSA*, the Commission

found that every aspect of Order No. 1920 "happens exclusively as part of a process that

is subject to the Commission's jurisdiction and governs exclusively how those processes

work."[349]  The Commission further explained that Order No. 1920 does not require that

transmission providers achieve any particular substantive outcome of the transmission

planning process, aim to alter states' or the nation's generation mix, or otherwise regulate

matters within state jurisdiction.[350]

128.    The Commission further explained that, applying *EPSA*, Order No. 1920 was

within its jurisdiction to regulate the practices affecting the rates for the transmission of

electric energy in interstate commerce, notwithstanding that the rule might have effects

on matters reserved to state jurisdiction under FPA section 201.[351]  The Commission

explained that such effects are inevitable—a "fact of economic life" as the Supreme

Court put it—given "Congress's decision in the FPA to divide jurisdiction over the

---

[348] *Id.*

[349] *Id.* P 266 (quotation marks omitted).

[350] *Id.*; *cf. id.* P 267 (also rejecting arguments that Order No. 1920 required states
to subsidize other state's public policies, explaining that Order No. 1920 required
following long-extant precedent that transmission customers need only pay costs that are
"roughly commensurate" with the benefits received from a regional transmission
facility).

[351] *Id.* P 264 (explaining that such effects are of "'no legal consequence'" (quoting
*EPSA*, 577 U.S. at 281)); *see id.* P 262 n.612 (quoting *EPSA*, 577 U.S. at 281-82 ("When
FERC regulates what takes place on the wholesale market, as part of carrying out its
charge to improve how that market runs, *then no matter the effect* on retail rates, [16
U.S.C.] 824(b) imposes no bar." (emphasis added))).

USCA4 Appeal: 24-1650   Doc: 224      Filed: 01/21/2025   Pg: 1491 of 2455
Document Accession #: 20241121-3139      Filed Date: 11/21/2024

Docket No.  RM21-17-001                                                    - 115 -

industry, including both generation and transmission, into spheres of Commission and

state jurisdiction that are not 'hermetically sealed' from one another."[352]

129.    The Commission therefore disagreed with arguments that Order No. 1920

unlawfully intruded on areas of reserved state authority under FPA section 201.[353]  The

Commission stated that Long-Term Regional Transmission Planning "necessarily

involves taking into account assumptions about the generation resources that will be

available, because transmission needs arise from the relative amounts, locations, and

timing of supply (i.e., generation) and of demand (i.e., load)."[354]  It stated that the effects

of such planning on areas of state authority, however, do not divest the Commission of

the jurisdiction Congress conferred on it to regulate the transmission of electric energy in

interstate commerce.[355]

130.    The Commission was also not persuaded by arguments that Order No. 1920 was

unlawful under the "major questions doctrine."[356]  It found that commenters were

misinterpreting the Supreme Court's decision in *West Virginia v. EPA* as suggesting that,

---

[352] *Id.* (quoting *EPSA*, 577 U.S. at 281); *see id.* P 272 ("We acknowledge that
Long-Term Regional Transmission Planning will affect matters that are within the states'
jurisdiction.  As stated, this is inevitable.").

[353] *See id.* PP 271-274.

[354] *Id.* P 272 (noting also that existing transmission planning processes already
take these assumptions into account, and that Order No. 1920 "simply modifies the scope
and duration of these assumptions" to ensure more effective transmission planning).

[355] *See id.* PP 264, 271-272.

[356] *See id.* PP 275-279.

in every instance, agency regulations affecting energy policy and the generation mix are "major questions" requiring direct authorization from Congress.[357]  Rather, the Commission stated that the Supreme Court in that decision considered a specific United States Environmental Protection Agency (EPA) action in light of a particular statutory provision and concluded that this action implicated the major questions doctrine based on a variety of factors specific to that context.[358]  The Commission noted that commenters had not analyzed whether Order No. 1920 would, based on the factors the Supreme Court examined, constitute a major question; when the Commission considered those factors, it concluded that Order No. 1920 would not implicate the major questions doctrine.[359]  Among other things, the Commission found that Order No. 1920, as an incremental improvement building on past regulation, did not represent a transformative expansion of the Commission's regulatory authority and did not have vast economic or political significance;[360] did not resemble EPA's assertion of authority related to the electric

---

[357] *Id.* PP 275-276.

[358] *Id.* P 276 (noting that these factors "include[d] whether the EPA's administrative action was a 'transformative' expansion of its power, whether the EPA had relevant technical and policy expertise, whether the relevant statutory provision was 'ancillary' to the broader statutory construct, and whether the EPA's administrative action implicated significant economic and political questions" (citing *W.V. v. EPA*, 597 U.S. 697, 710, 724-25, 729, 731-32 (2022) (*West Virginia*)).

[359] *See id.* PP 277-279.

[360] *See id.* PP 277-278.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1493 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No.  RM21-17-001                                                      - 117 -

system;[361] was not reliant on a "backwater" statutory provision; and was not promulgated notwithstanding Congress's repeated rejection of legislation to enact reforms similar to those in the rule.[362]

131.    The Commission also disagreed with arguments that Order No. 1920 effectively required certain states to subsidize other states' vision of what resources should be used in electricity generation and, therefore, violated the Constitution's "equal sovereignty doctrine."[363]  Here, the Commission again explained that Order No. 1920 "categorically does not require states to subsidize other states' public policies or generation decisions," but rather was consistent with longstanding cost-causation principles.[364]  Moreover, the Commission pointed out that no court has ever applied the equal sovereignty doctrine invoked by commenters as a limit on Congress's Article I powers, including legislation enacted under the Commerce Clause, such as the FPA.[365]

---

[361] *Id.* P 279.

[362] *See id.*

[363] *See id.* PP 280-282.

[364] *Id.* P 280.

[365] *See id.* P 281 (noting that the FPA, in turn, "empowers the Commission to regulate the rates and practices affecting rates for the transmission of electricity in interstate commerce").

Docket No.  RM21-17-001                                                                                - 118 -

### B.    Federal/State Division of Authority

### 1.    Requests for Rehearing

132.    Several of the requests for rehearing argue that Order No. 1920 exceeds the

Commission's statutory authority under FPA section 206 and is, therefore, unlawful.[366]

Many of these requests for rehearing acknowledge the Commission's authority under the

FPA over "the transmission of electric energy in interstate commerce and . . . the sale of

electric energy at wholesale in interstate commerce."[367]  However, rehearing parties argue

that the Commission's jurisdiction "extend[s] only to those matters which are not subject

to regulation by the States" and that the Commission, with certain exceptions, "shall not

have jurisdiction . . . over facilities used for the generation of electric energy or over

facilities used in local distribution or only for the transmission of electric energy in

intrastate commerce."[368]  Undersigned States and Designated Retail Regulators also state

---

[366] *See* Undersigned States Rehearing Request at 2-3, 6, 10-13, 17; Designated
Retail Regulators at 2-3, 6, 11-15, 18; Alabama Commission Rehearing Request at 5;
Georgia Commission Rehearing Request at 3-4; Arizona Commission Rehearing Request
at 2, 9-12, 15; Idaho Commission Rehearing Request at 2, 4-5; Montana Commission
Rehearing Request at 1-4; Wyoming Commission Rehearing Request at 1-4; Utah
Commission Rehearing Request at 1, 3-7; West Virginia Commission Rehearing Request
at 3-4, 10-12.

[367] 16 U.S.C. 824(b)(1); *see also* 16 U.S.C. 824d(a), 824e(a); Undersigned States
Rehearing Request at 10-11 (arguing that the FPA is "primarily, and perhaps exclusively,
an *economic* regulation statute"); Designated Retail Regulators at 12 (same); Alabama
Commission Rehearing Request at 5; Arizona Commission Rehearing Request at 10;
Utah Commission Rehearing Request at 3.

[368] 16 U.S.C. 824(a), (b)(1); *see* Undersigned States Rehearing Request at 11;
Designated Retail Regulators at 12-13; Alabama Commission Rehearing Request at 5
(asserting that the Commission's jurisdiction does not extend to "electric power
generation, transmission siting, distribution, retail supply, and service models," including

that FPA section 215(i)(3) reserves jurisdiction to the states over the "safety, adequacy, and reliability of electric service."[369]  Designated Retail Regulators aver that the Commission's authority is limited by the National Interest Electric Transmission Corridor process.[370]

133.    Several rehearing requests posit that Order No. 1920 exceeds the Commission's authority because it invades or undermines state authority over the choice of generating resources maintained or constructed within each state's jurisdiction.[371]  Undersigned States and Designated Retail Regulators argue that Order No. 1920 "puts into place planning processes that will favor renewables over other generation and ignore the

---

"oversight of the IRP process and the associated selection of resources to provide reliable retail service"); Arizona Commission Rehearing Request at 10-11; Idaho Commission Rehearing Request at 4; Montana Commission Rehearing Request at 2-3.

[369] 16 U.S.C. 824o(i)(3); Undersigned States Rehearing Request at 11; Designated Retail Regulators Rehearing Request at 13.

[370] Designated Retail Regulators Rehearing Request at 18-19 (citing 16 U.S.C. 824p).

[371] *See* Undersigned States Rehearing Request at 11-13 (citing *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 212 (1983); *Nw. Cent. Pipeline Corp. v. State Corp. Comm'n of Kan.*, 489 U.S. 493, 522 (1989); *Monongahela Power Co.*, 40 FERC ¶ 61,256, at 61,861 (1987); *Calpine Corp. v. PJM Interconnection, L.L.C.*, 171 FERC ¶ 61,035 (2020) (Glick, Comm'r, dissenting at P 5)); Designated Retail Regulators Rehearing Request at 13-14; Idaho Commission Rehearing Request at 4; Utah Commission Rehearing Request at 3-5; West Virginia Commission Rehearing Request at 11; Arizona Commission Rehearing Request at 10-11; *cf. id.* at 2-3 ("'The states have traditionally assumed all jurisdiction to approve or deny permits for the siting and construction of electric transmission facilities.'" (quoting *Piedmont Envt'l Council v. FERC*, 558 F.3d 304, 310 (4th Cir. 2009)).

USCA4 Appeal: 24-1650    Doc: 224        Filed: 01/21/2025    Pg: 1496 of 2455
Document Accession #: 20241121-3139        Filed Date: 11/21/2024

Docket No.  RM21-17-001                                                      - 120 -

combined generation/transmission benefits that other solutions could provide."[372]  They argue that this will result in "shift[ing] costs to deliver those renewables to customers that do not cause those costs to be incurred and that have selected other generation options with different transmission requirements."[373]  In this vein, Undersigned States and Designated Retail Regulators assert that "[r]equiring customers in states to pay for infrastructure to support the public policies and generation resource mixes chosen by other states, without demonstrable benefits to that load, would be a major intrusion on the States' right to choose the resources that best fit their public policies."[374]

134.    Many of the other arguments challenging the Commission's statutory authority proceed along similar lines.  Alabama Commission argues that the Commission in Order No. 1920 is "putting a 'thumb on the scale' and intruding on resource selection in

---

[372] Undersigned States Rehearing Request at 13; Designated Retail Regulators Rehearing Request at 14-15; *see also* Undersigned States Rehearing Request at 3-4 (arguing that Order No. 1920's "building-block concepts ('Sufficiently long-term,' 'Long-Term Transmission Needs,' 'known determinants of Long-Term Transmission Needs,' the 'broader set of benefits,' and particularly, the inputs to this elaborate scheme) mandate new planning processes for transmission facilities that are designed to (1) move remote renewables over long distances and (2) socialize their costs"); *id.* at 27-29; Designated Retail Regulators Rehearing Request at 3-4, 27-28 (similar).

[373] Undersigned States Rehearing Request at 13; Designated Retail Regulators Rehearing Request at 14-15; *see also* Undersigned States Rehearing Request at 33-34.

[374] Undersigned States Rehearing Request at 12-13; Designated Retail Regulators Rehearing Request at 14; *see also id.* at 38 ("FERC has no statutory authority to pick winners and losers among differing types of generation or use the cost allocation process as an alternative means to dilute financial responsibility for policy decisions.").

Alabama."[375]  Georgia Commission contends that in Order No. 1920 the Commission is

acting as a national integrated resource planner, attempting to change the future

generation mix,[376] and will require states to subsidize the renewable generation policies

of other states.[377]  Arizona Commission argues that the Commission lacks "jurisdiction to

impose mandated energy policies for intrastate distribution or to foist costs on rate payers

for costs created in other states."[378]  Idaho Commission asserts that certain of the

categories of factors that transmission providers must consider in developing Long-Term

Scenarios will "disproportionately favor certain projects in the planning process, provide

disparate treatment to states' policy goals, affect resource planning and selection at the

state level, and infringe on states' authority with respect to generation."[379]  Montana

Commission, Wyoming Commission, and West Virginia Commission argue that, absent a

voluntary State Agreement Process, the cost allocation approach in Order No. 1920

---

[375] Alabama Commission Rehearing Request at 5.

[376] Georgia Commission Rehearing Request at 3-4 (arguing that Order No. 1920 violates states' reserved decision-making power by requiring that they "measure their long-term transmission plans against seven factors identified in the Order," because these factors allegedly favor certain policies and projects).

[377] *Id.* at 5-6.

[378] Arizona Commission Rehearing Request at 11-12 (citing *Fed. Power Comm'n v. S. Cal. Edison Co.*, 376 U.S. 205, 210 (1964), for the proposition that Congress intended to draw an easily ascertained bright line between state and federal jurisdiction); *id.* at 13; *cf. id.* at 6-7 (arguing that "nothing in federal jurisprudence or the FPA allows FERC to usurp these traditional state functions of intrastate transmission and balancing such energy source costs with ratepayer fairness").

[379] Idaho Commission Rehearing Request at 4-5.

ensures that nonconsenting states will be swept up in their neighbors' preferred policy projects, invading the jurisdiction of states.[380]  Utah Commission argues that the Commission stated its intention in the ANOPR and NOPR to unlawfully influence the generation mix.[381]  It claims that Order No. 1920 "effectively rigs the planning and cost allocation process to ensure (i) FERC's preferred stakeholders' projects are selected in the planning process and (ii) these preferred stakeholders are not required to bear the full costs associated with their choices."[382]

## 2.    Commission Determination

135.    We appreciate these concerns articulated on rehearing and believe several clarifications that we adopt below will alleviate these concerns.  Nonetheless, we sustain the Commission's determination that Order No. 1920 is a valid exercise of our statutory authority under the FPA and does not unlawfully intrude into areas of reserved state

---

[380] Montana Commission Rehearing Request at 2-4 (citing *EPSA*, 577 U.S. at 295-96; *Pac. Gas & Elec. Co.*, 461 U.S. at 212; *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d at 56-59; Wyoming Commission Rehearing Request at 2-4 (similar); West Virginia Commission Rehearing Request at 3-4, 10-12 (similar, also arguing that "[w]ithout a meaningful voluntary state agreement process, the Commission erred by exceeding its jurisdiction and interfering with state decisions about generation resource planning and approval").

[381] Utah Commission Rehearing Request at 4-5.

[382] *Id.* at 5-6 (arguing that Order No. 1920 "precludes transmission planners and cost allocation from distinguishing between transmission projects that are necessary to resolve an identified reliability or economic concern from those that are only necessary because some state, local government, or corporation has unilaterally adopted a policy"); *see id.* at 8 ("[T]he FPA gives FERC no authority to regulate electricity generation and specifically reserves that power to the states.").

authority.[383]  In arguing to the contrary, the rehearing requests fail to meaningfully

address the substance of Order No. 1920 and fail to respond to the Commission's

explanation for why that rule falls within its jurisdiction.  Instead, they misconstrue that

rule as attempting to control or influence the generation mix in favor of allegedly

Commission-preferred resources.[384]  Moreover, the arguments on rehearing are

unjustified as a legal matter as they fail to apply *EPSA* to Order No. 1920 (and in many

cases, do not even acknowledge this controlling precedent).[385]  They also depend on the

mistaken view that the policies of one state may not have permissible extraterritorial

---

[383] Order No. 1920, 187 FERC ¶ 61,068 at PP 253-54.

[384] *See, e.g.*, Undersigned States Rehearing Request at 3-4, 12-13; Designated
Retail Regulators Rehearing Request at 11-15; Georgia Commission Rehearing Request
at 3-4; Idaho Commission Rehearing Request at 2, 4-5; Alabama Commission Rehearing
Request at 5; Arizona Commission Rehearing Request at 2, 11-12, 15; Montana
Commission Rehearing Request at 3-4; Wyoming Commission Rehearing Request at 3-4;
West Virginia Commission Rehearing Request at 12; Utah Commission Rehearing
Request at 1, 3-7.

[385] *See* Designated Retail Regulators Rehearing Request at 3-4, 6, 11-15 (no
citation of *EPSA*); Georgia Commission Rehearing Request at 3-4 (same); Idaho
Commission Rehearing Request at 2, 4-5 (same); Arizona Commission Rehearing
Request at 2, 9-12, 15 (same); Alabama Commission Rehearing Request at 5 (same);
Utah Commission Rehearing Request at 1, 3-7; Undersigned States Rehearing Request at
14 (citing *EPSA* as recognizing the steady flow of jurisdictional disputes under the FPA);
Montana Commission Rehearing Request at 3 (citing *EPSA* as establishing that "FERC
regulation of jurisdictional subject matters (wholesale sales and transmission) may
influence matters within the states' power to regulate"); Wyoming Commission
Rehearing Request at 2-3 (same); West Virginia Commission Rehearing Request at 11
(same).

Docket No.  RM21-17-001                                                    - 124 -

effects on other states through interstate commerce, including in the context of interstate

transmission of electricity as regulated under the FPA.[386]

> **a.    Order No. 1920 Does Not Attempt to Control the
> Generation Mix or Intrude in Areas of State Authority**

136.    We begin our discussion of the Commission's statutory authority to issue Order

No. 1920 with the substance of Order No. 1920.  In broad strokes, Order No. 1920

required transmission providers to "(1) perform a sufficiently long-term assessment of

transmission needs that identifies Long-Term Transmission Needs; (2) adequately

account on a forward-looking basis for known determinants of Long-Term Transmission

Needs; and (3) consider the broader set of benefits of regional transmission facilities

planned to meet those Long-Term Transmission Needs."[387]  As affirmed by the D.C.

Circuit, regional transmission planning and cost allocation processes are practices

directly affecting rates subject to the Commission's sole jurisdiction, as transmission

providers "use those processes to 'determine which transmission facilities will more

efficiently or cost-effectively meet' transmission needs."[388]

---

[386] *See, e.g.*, Undersigned States Rehearing Request at 12-13; Designated Retail
Regulators Rehearing Request at 11, 14; Utah Commission Rehearing Request at 12;
West Virginia Commission Rehearing Request at 12; *see also infra* Order No. 1920 Does
Not Require Unlawful Subsidization of State Policies section.

[387] Order No. 1920, 187 FERC ¶ 61,068 at P 1; *see also id.* PP 224-248.

[388] *Id.* P 86 (quoting *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d at 56); *id.* ("[T]hese
processes identify, evaluate, and select the regional transmission facilities whose costs
will be recovered through transmission rates . . . .").

Docket No.  RM21-17-001                                                          - 125 -

137.   In light of the direct effects that transmission planning processes have on

Commission-jurisdictional rates, "the Commission has taken multiple significant actions

on transmission planning and cost allocation, including issuing Order Nos. 888, 890, and

1000."[389]  Order No. 1920 thus does not stand in a vacuum, but rather "build[s] upon

more than a quarter century of significant actions taken by the Commission on

transmission planning and cost allocation,"[390] particularly by addressing specific gaps in

the existing regional transmission planning process set forth in Order No. 1000.[391]

138.   Order No. 1920 required transmission providers to conduct Long-Term Regional

Transmission Planning to identify Long-Term Transmission Needs, identify transmission

facilities that meet such needs, measure the benefits of those transmission facilities, and

evaluate those transmission facilities for potential selection in the regional transmission

plan for purposes of cost allocation.[392]  To identify these Long-Term Transmissions

Needs and transmission facilities that meet such needs, transmission providers must

develop a set of at least three plausible and diverse Long-Term Scenarios, using the best

available data inputs about the future electric power system, over a transmission planning

---

[389] *Id.* P 14; *see also id.* PP 15-19 (describing the reforms in Order No. 1000).

[390] *Id.* P 255.

[391] *Id.* P 256; *see also id.* PP 257-259 (describing how Order No. 1920 is consistent with the approach in Order No. 1000, including in that Order No. 1920 does not mandate the development of particular transmission facilities, intrude on siting processes for transmission facilities, or change existing mechanisms for cost recovery); *id.* P 266.

[392] *Id.* P 38; *see also id.* PP 1-13, 225.

Docket No.  RM21-17-001                                                  - 126 -

horizon of no less than 20 years.[393]   In developing such scenarios, transmission providers

must consider certain known determinants of transmission needs, which the Commission

identified in Order No. 1920 as falling within seven categories of factors that affect

Long-Term Transmission Needs.[394]

139.    The categories of factors the Commission identified were "(1) federal, federally-

recognized Tribal, state, and local laws and regulations affecting the resource mix and

demand; (2) federal, federally-recognized Tribal, state, and local laws and regulations on

decarbonization and electrification; (3) state-approved integrated resource plans and

expected supply obligations for load-serving entities; (4) trends in fuel costs and in the

cost, performance, and availability of generation, electric storage resources, and building

and transportation electrification technologies; (5) resource retirements; (6) generator

interconnection requests and withdrawals; and (7) utility and corporate commitments and

federal, federally-recognized Tribal, state, and local policy goals that affect Long-Term

Transmission Needs."[395]   The Commission identified these categories of factors because

they provide information about the drivers of Long-Term Transmission Needs, including

changes in reliability needs, demand, and supply (such as the generation resource mix)

---

[393] *See id.* PP 40, 248.

[394] *See id.* PP 248, 387-537.

[395] *Id.* P 409.  As discussed below, we are setting aside the requirement in Factor Category Seven to consider corporate commitments.  *See infra* Requests to Omit One or More Specific Categories of Factors section.  That change does not affect our conclusion as to the Commission's statutory authority, including our response to the arguments on rehearing addressing the federal/state division of authority under the FPA.

that, in turn, affect what transmission facilities will be required going forward.[396]  The Commission stated that transmission providers have discretion, however, to consider additional factors[397] and may, in developing their Long-Term Scenarios, find that any factor is not, in fact, likely to affect Long-Term Transmission Needs.[398]

140.    Under Order No. 1920, transmission providers must also identify and evaluate transmission facilities to meet such Long-Term Transmission Needs and for potential selection as Long-Term Regional Transmission Facilities in the regional transmission plan for purposes of cost allocation.[399]  Here, the Commission required that transmission providers measure and use at least seven specified benefits as part of that analysis,[400] which measurement reflects "the value that the transmission providers expect a particular Long-Term Regional Transmission Facility to provide to transmission customers in the transmission planning region."[401]  The Commission provided transmission providers with extensive flexibility in the measurement of such benefits.[402]

---

[396] *See* Order No. 1920, 187 FERC ¶ 61,068 at PP 90-111, 299-300, 432, 440, 447, 456, 463, 472, 481.

[397] *See id.* P 412.

[398] *See id.* PP 415, 417.

[399] *See id.* PP 1-3, 40, 225, 719-720.

[400] *See id.* P 3; *see also id.* PP 729, 737.

[401] *Id.* P 269; *see also id.* P 720 (identifying the benefits to be considered).

[402] *See, e.g.*, *id.* PP 728, 735, 839.

141.    The Commission also required transmission providers to "file one or more *ex ante*
Long-Term Regional Transmission Cost Allocation Methods to allocate the costs of
Long-Term Regional Transmission Facilities (or a portfolio of such Facilities) that are
selected."[403]   It provided a process for robust participation by Relevant State Entities to
seek to reach agreement on a Long-Term Regional Transmission Cost Allocation
Method(s) and/or a State Agreement Process.[404]   However, the Commission found that
"[w]hile we permit transmission providers to include a State Agreement Process in their
OATTs . . . it cannot be the sole method filed for cost allocation for Long-Term Regional
Transmission Facilities,"[405] and required that "the relevant Long-Term Regional
Transmission Cost Allocation Method on file would apply as a backstop."[406]

142.    The bases for the reforms in Order No. 1920 are entirely focused on improving
Commission-jurisdictional processes.  The Commission found that existing transmission
planning and cost allocation processes are inadequate, such that "transmission providers
are often not identifying, evaluating, or selecting more efficient or cost-effective regional

---

[403] *Id.* P 5; *see also id.* P 43 (defining Long-Term Regional Transmission Cost
Allocation Method); *id.* P 1291.

[404] *See id.* PP 5, 1291.

[405] *Id.* P 1292; *see id.* P 1293 (explaining that, if transmission providers were to
rely solely on a State Agreement Process, this gives rise to the possibility there would be
no cost allocation method for Long-Term Regional Transmission Facilities such that
selected facilities would be less likely to be developed and their benefits less likely to be
realized).

[406] *Id.* P 1292.

Docket No.  RM21-17-001                                                          - 129 -

transmission solutions to meet Long-Term Transmission Needs."[407]  Trends in

"economics, growing demand, and federal, federally-recognized Tribal, state, and local

policies [that] are already resulting in significant changes in the resource mix"[408] have

reinforced that more effective transmission planning "helps to ensure cost-effective

transmission development for customers and can yield better returns for every dollar

spent."[409]  In fact, "in the limited instances in which transmission providers have

followed processes that share many of the elements of the long-term, forward-looking,

and more comprehensive regional transmission planning this rule requires, customers

have seen clear and quantifiable benefits."[410]  In issuing Order No. 1920, the Commission

was thus acting in a responsive capacity to account for observable, large-scale, and

preexisting trends driven by external forces, which highlighted the need for improved

transmission planning and cost allocation processes.[411]

---

[407] *Id.* P 87.

[408] *Id.* P 99 (noting that "as of 2021, nearly 70% of capacity additions across the country were from new, utility-scale wind and solar resources" whereas most capacity retirements were from coal resources, with these trends projected to continue); *see also id.* PP 94-98 (discussing trends that shape transmission needs and reflect the need for more efficient and cost-effective transmission planning).

[409] *Id.* P 100 ("Conversely, inadequate or poorly designed transmission planning processes can lead to relatively inefficient or less cost-effective transmission investment, with customers footing the bill . . . ."); *see also, e.g., id.* PP 103-06, 121, 123, 236; *cf. id.* P 101 (discussing that existing transmission planning requirements have "yielded only limited investments in regional transmission projects").

[410] *Id.* P 102.

[411] *See, e.g., id.* P 129 ("[T]he Commission is reacting to well-documented factors, which the record demonstrates are driven by exogenous forces beyond the Commission's

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1506 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No. RM21-17-001                                                    - 130 -

143.    As this summary reflects,[412] Order No. 1920 directly regulates transmission

planning and cost allocation processes, effectuating one of the "core objects" of the FPA,

as identified by the Supreme Court: "ensur[ing] effective transmission of electric

power."[413]  And the parties arguing that Order No. 1920 unlawfully intrudes into reserved

areas of state authority do not identify any aspect of Order No. 1920 that is not, on its

face, directed toward these Commission-jurisdictional targets.[414]  Rather, they argue that

Order No. 1920 intrudes on state resource selection because, in regulating such

*transmission* planning and cost allocation, Order No. 1920 is purportedly biased toward

the construction of transmission facilities that will serve allegedly Commission-favored

resources, which will in turn affect the generation resource mix.[415]  Here, they focus on

---

jurisdiction or control . . . ."); *id.* P 130; *id.* P 261 ("[T]his final rule *responds* to changes
in the electric industry that have arisen in the years since the Commission's last
regulatory action related to transmission planning.").

    [412] This summary addresses aspects of Order No. 1920 as pertinent to the
challenges to the Commission's statutory authority raised on rehearing.

    [413] *EPSA*, 577 U.S. at 290; *see also S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d at 57
("Reforming the practices of failing to engage in regional planning and *ex ante* cost
allocation for development of new regional transmission facilities . . . involves a core
reason underlying Congress' instruction in Section 206.").

    [414] *See* Order No. 1920, 187 FERC ¶ 61,068 at PP 265-66.

    [415] *See* Undersigned States Rehearing Request at 13; Designated Retail Regulators
Rehearing Request at 14; Georgia Commission Rehearing Request at 3-4; Arizona
Commission Rehearing Request at 9-12, 15; Idaho Commission Rehearing Request at 4-
5; Utah Commission Rehearing Request at 4-5; Montana Commission Rehearing Request
at 3-4; West Virginia Commission Rehearing Request at 12; Wyoming Commission
Rehearing Request at 3-4; Alabama Commission Rehearing Request at 5; *cf.* Ohio
Commission Federal Advocate Rehearing Request at 18-20 (asserting that, in doing so,

the categories of factors that the Commission identified as reflecting known determinants of transmission needs, arguing that certain of these factors are not resource neutral.[416]

144.    The rhetoric in the rehearing requests suggesting that the Commission exceeded its statutory authority by directing reforms targeted at certain transmission planning outcomes demonstrates a misunderstanding of Order No. 1920, and particularly the categories of factors.[417]  The Commission found that the categories of factors set forth in Order No. 1920 reflect known determinants of transmission needs,[418] such that requiring that transmission providers consider these factors in Long-Term Regional Transmission Planning is appropriate and reasonable.  The substantive content of these factors (for example, a state law or policy implementing the state's reserved authority over resource

_____

the Commission is violating the Commerce Clause of the Constitution).

[416] *See* Undersigned States Rehearing Request at 10-13, 27-28 (arguing that Order No. 1920 and that the categories of factors, in particular, "are not resource neutral"); Designated Retail Regulators Rehearing Request at 14-15, 26-28 (same); Georgia Commission Rehearing Request at 4; Idaho Commission Rehearing Request at 4-5; Ohio Commission Federal Advocate Rehearing Request at 18-20; Utah Commission Rehearing Request at 4-5; Montana Commission Rehearing Request at 3-4; West Virginia Commission Rehearing Request at 12; Wyoming Commission Rehearing Request at 3-4.

[417] *See* Order No. 1920, 187 FERC ¶ 61,068 at P 260 ("In this final rule, the Commission neither aims to influence the resource mix, nor, as a practical matter, could the final rule achieve such an outcome."); *see also id.* PP 129-30, 254, 419; *cf. Dep't of Com. v. N.Y.*, 588 U.S. 752, 780–81 (2019) ("A court is ordinarily limited to evaluating the agency's contemporaneous explanation in light of the existing administrative record."); *Pharm. Rsch. & Mfrs. of Am. v. F.T.C.*, 790 F.3d 198, 212 (D.C. Cir. 2015) (noting the presumption of procedural regularity and substantive rationality that attaches to final agency action).

[418] *See* Order No. 1920, 187 FERC ¶ 61,068 at PP 119-120, 130, 412, 415; *see also id.* PP 422-84 (discussing the adoption of the specific categories of factors).

choices) and how they affect transmission providers' development of Long-Term

Scenarios (for example, the extent to which they may lead to the identification of specific

Long-Term Transmission Needs) will be attributable to exogenous forces independent of

Commission action.[419]  Indeed, these forces are drivers of the pre-existing trends,

discussed above, that have demonstrated the urgency of more effective transmission

planning.[420]  In other words, the Commission is not requiring consideration of these

factors in order to achieve particular outcomes in the transmission planning process, but

rather acting in a responsive capacity to identify and account for the most likely variables

that are relevant to effective Long-Term Regional Transmission Planning and ensure that

those variables are considered in such planning.[421]

145.    Factor Category One (federal, federally-recognized Tribal, state, and local laws

and regulations affecting the resource mix and demand) is illustrative,[422] although these

same points also apply to the other categories of factors.  Because such laws and

---

[419] *See id.* PP 129-130, 233, 261-62, 419, 436.

[420] *See supra* Unjust, Unreasonable, and Unduly Discriminatory or Preferential
Commission-Jurisdictional Transmission Planning and Cost Allocation Processes section.

[421] *See* Order No. 1920, 187 FERC ¶ 61,068 at PP 230, 266.

[422] *See id.* P 130 n.328 (citing *PJM Power Providers Grp. v. FERC*, 88 F.4th 250,
275 (3d Cir. 2023) (holding that the Commission is "unambiguously authorize[d] . . . to
take state policies into account to the extent that such policies affect [the Commission's]
statutorily prescribed area of focus . . . ."); *Elec. Power Supply Ass'n v. Star*, 904 F.3d at
524 (approving of the Commission's decision to take state zero-emissions credit systems
like that in Illinois "as givens and set out to make the best of the situation [these systems]
produce")).

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1509 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No.  RM21-17-001                                                              - 133 -

regulations, by definition, "affect[ ] the resource mix and demand" and, in turn, changes

in resource mix and demand can affect Long-Term Transmission Needs,[423] these laws

and regulations are relevant to determining such transmission needs.  The effect of such

laws and regulations on transmission needs is inevitable[424] and would be the same even in

the absence of Order No. 1920.[425]  Furthermore, the existence and content of such laws

and regulations are independent of any Commission action, as they are attributable

instead to the lawful exercise of the authority of the entities, including states, responsible

for enacting or promulgating such laws and regulations.  Order No. 1920 thus requires

Long-Term Regional Transmission Planning that *accounts* for the effects of these laws

and regulations on transmission needs, because failure to adequately do so has had, and

---

[423] We note that the arguments on rehearing require recognizing that different types of generating resources, located in different areas, may have different transmission needs.  *See, e.g.*, Undersigned States Rehearing Request at 10, 16.  In this respect, the rehearing requests tend to reinforce, rather than rebut, that the categories of factors set forth in Order No. 1920 are salient considerations for effective transmission planning.

[424] *See* Order No. 1920, 187 FERC ¶ 61,068 at P 435 ("Rather than a unique feature of Long-Term Regional Transmission Planning, transmission planning of any kind will inherently reflect the policy choices of multiple decisionmakers, because the quantity and location of generation and load are shaped by multiple decisionmakers.").

[425] *See id.* P 436 (explaining that "because . . . Long-Term Transmission Needs driven by disparate policy decisions would continue to exist, regardless of whether they were identified in Long-Term Regional Transmission Planning, failing to identify, evaluate, and select Long-Term Regional Transmission Facilities to address those needs will result in unjust and unreasonable rates").

Docket No. RM21-17-001                                           - 134 -

will continue to have, significant deleterious consequences.[426]  Order No. 1920 does not

create these effects or aim to influence them.

146.     Contrary to claims in the rehearing requests,[427] the categories of factors set forth in

Order No. 1920 are also resource-neutral.  Factor Category One is, again, illustrative.  To

the extent a law or regulation affects the resource mix or demand, transmission providers

must consider how that law or regulation may affect Long-Term Transmission Needs.

This requirement applies to all laws and regulations falling within Factor Category One,

irrespective of their substantive content.[428]  Thus, to the extent a state law may affect the

resource mix because, for example, it encourages or discourages the development of *any*

particular type of generation, that would be a relevant consideration in Long-Term

Regional Transmission Planning.[429]  This same point applies to all of the categories of

factors specified in Order No. 1920: transmission providers must consider those

---

[426] *See id.* PP 130, 233, 261-262.

[427] *See supra* P 143 n.416.

[428] *See* Order No. 1920, 187 FERC ¶ 61,068 at P 437 ("We are not endorsing the merits of any specific federal, federally-recognized Tribal, state, or local laws and regulations or of any specific state-approved integrated resource plans. We emphasize that the Commission's policies are technology neutral, and we are not establishing a preference for certain types of generation or energy end uses.").

[429] Similarly, where a state has laws or regulations that are, themselves, resource neutral or lacks laws or regulations affecting the generation mix or demand, the relevant transmission providers must conduct their Long-Term Regional Transmission Planning considering those considerations.

categories of factors in developing Long-Term Scenarios irrespective of the substantive content of any given factor in a category.

147.    In this respect, the categories of factors identified in Order No. 1920 are best understood as a non-exhaustive identification of essential inputs relevant to Long-Term Regional Transmission Planning.  To the extent that, in developing any Long-Term Scenarios, these inputs may point toward identification of particular Long-Term Transmission Needs, this will be the result of external forces that determine the substance of these inputs.  In fact, the evaluation of these inputs will be conducted by transmission providers in consultation with relevant stakeholders without the Commission imposing any requirements that dictate the substantive outcome of the transmission planning process.[430]  Indeed, all the requirements that the Commission has established for conducting Long-Term Regional Transmission Planning—such as the number of Long-Term Scenarios to be developed, the time horizon to be considered, that scenarios be "plausible and diverse," and that the best available data be used—are also process-focused and resource-neutral.[431]

148.    Moreover, the discretion afforded to transmission providers in conducting their analyses further precludes the Commission from attempting to "put a thumb on the scale"

---

[430] We further strengthen those consultation requirements in this order by requiring transmission providers to consult with and consider the positions of Relevant State Entities as to how to account for factors related to state public policies in Long-Term Regional Transmission Planning assumptions.

[431] *See id.* P 248 (summarizing those process-focused requirements).

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1512 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No.  RM21-17-001                                                    - 136 -

of the transmission planning process to favor certain generation resources.  Transmission

providers may consider additional factors, beyond those specified in the categories of

factors set forth in Order No. 1920, in developing Long-Term Scenarios and identifying

Long-Term Transmission Needs.[432]  Transmission providers also "have discretion to

determine whether specific factors must be accounted for within each category (i.e., if the

specific factor will likely affect Long-Term Transmission Needs)."[433]  Thus, the

categories of factors set forth in Order No. 1920 reflect minimum standards that

transmission providers may not ignore when developing Long-Term Scenarios.

However, as long as these scenarios otherwise meet the requirements of Order No. 1920

(e.g., they are plausible and diverse), Order No. 1920 ensures that transmission providers

may consider *all* of the relevant factors and may also determine, in any given case, that

any factor is *not* likely to affect such needs.  This construct is wholly consistent with

resource-neutral transmission planning.[434]

---

[432] *See id.* P 412.

[433] *See id.* P 417 (further providing that transmission providers must "assume that
the laws, regulations, state-approved integrated resource plans, and expected supply
obligations for load-serving entities identified in the first three categories of factors—that
transmission providers have determined are likely to affect Long-Term Transmission
Needs—are fully met"); *see also id.* P 415.

[434] Transmission providers also have discretion regarding "how to account for
specific factors in the development of Long-Term Scenarios (e.g., the method and data
used to forecast resource retirements), and how to vary the treatment of each category of
factors across Long-Term Scenarios (e.g., assume all forecasted resource retirements
materialize in some but not all Long-Term Scenarios)."  *Id.* P 417.

149.    Certain rehearing requests state that other aspects of Order No. 1920 (such as the

seven required benefits to evaluate Long-Term Regional Transmission Facilities) are

preferential toward allegedly Commission-favored resources.  These arguments are not

well developed.[435]  Nonetheless, based on our best understanding of these arguments, we

disagree with them for reasons similar to those articulated above and in Order No. 1920.

Requiring that transmission providers measure and use, at a minimum, the seven required

benefits in evaluating Long-Term Regional Transmission Facilities does not attempt to

influence the external forces driving the need for new transmission facilities or displace

the authority of other actors.  Rather, this requirement helps to ensure that transmission

providers conducting Long-Term Regional Transmission Planning have sufficient

information to make their decisions, including as to which Long-Term Regional

Transmission Facilities will "more efficiently or cost-effectively address Long-Term

Transmission Needs."[436]  Here, too, the Commission's approach has not been overly

prescriptive, as transmission providers may propose on compliance to measure additional

---

[435] *See, e.g.*, Undersigned States Rehearing Request at 3-4, 8, 27-29 (asserting that the "factors and benefit metrics" will "favor some resources over others"; arguing that particular factors are not "resource neutral" but no similar argument or explanation as to the benefits metrics); Designated Retail Regulators Rehearing Request at 3-4, 8, 26-29 (similar); Arizona Commission Rehearing Request at 15.

[436] Order No. 1920, 187 FERC ¶ 61,068 at PP 667, 721; *see also id.* P 722 ("[W]ithout consideration of such benefits, Long-Term Regional Transmission Planning cannot be reasonably expected to identify, evaluate, and select more efficient or cost-effective regional transmission solutions to address Long-Term Transmission Needs."); *id.* P 723.

benefits as part of Long-Term Regional Transmission Planning[437] and the Commission

has afforded transmission providers flexibility as to how to measure each required

benefit.[438]

150.    Thus, Order No. 1920 reflects a modest exercise of well-established Commission

authority.  To be sure, there is an urgent and growing need for new transmission

infrastructure, driven by a wide variety of factors, including those leading to changes in

the generation resource mix.[439]  Order No. 1920 identifies those factors, which are

occurring independent of Commission action, and gives transmission providers the tools

they need to respond to this need and these changes.[440]  The parties that argue that the

Commission is attempting to influence the generation resource mix by requiring

transmission providers to consider these factors to inform their Long-Term Regional

Transmission Planning are reversing cause and effect that necessitated the issuance of

Order No. 1920.[441]

---

[437] Order No. 1920, 187 FERC ¶ 61,068 at P 667.

[438] *Id.* P 728; *cf. id.* P 734 ("[W]hile this final rule requires the measurement and use of the required set of benefits, it is the evaluation process, including selection criteria, that transmission providers propose on compliance that will inform which Long-Term Regional Transmission Facilities are selected.").

[439] *See id.* PP 90-99.

[440] *See id.* P 233 ("These changes are occurring independent of any action that we take in this final rule, and they are being driven by a wide variety of factors. This final rule provides transmission providers with the tools that they need to respond to these factors . . . .").

[441] Claims that the Commission "advertised" its "unlawful purpose" in the ANOPR and NOPR, *see* Utah Commission Rehearing Request at 4-5, are erroneous for

Docket No.  RM21-17-001                                              - 139 -

### b.    Order No. 1920 Is Consistent with the FPA and Precedent Regarding the Commission's Authority

151.    As discussed above, in filling the discrete gaps in the Order No. 1000 regional

transmission planning and cost allocation process, the Commission carefully tailored the

reforms it adopted to avoid intruding on areas of reserved state authority.  But because

the spheres of federal and state authority over electricity are not "hermetically sealed"

from one another,[442] we recognize the possibility that Order No. 1920's requirements—

although entirely focused on addressing practices within the Commission's jurisdiction—

may have effects on areas of reserved state authority.

152.    While the rehearing requests discuss the text of the FPA and precedent reflecting

that states have reserved authority in certain areas, including over the selection and

approval of generation resources, they fail to discuss key Supreme Court precedent in

*EPSA* as it applies Order No. 1920.  Despite the Commission's lengthy discussion of

*EPSA* in Order No. 1920, on rehearing we are confronted with no argument that the

Commission erred in its analysis or misapplied that decision to the facts here.

153.    Under the FPA, the Commission has exclusive jurisdiction over "the transmission

of electric energy in interstate commerce," and "the sale of electric energy at wholesale in

---

much the same reason: they misconstrue statements in which the Commission discussed
the need for transmission reform to respond to changes in the resource mix driven by
external factors, including increased penetration of renewable resources, as indicative of
an intention to drive such changes.

[442] *EPSA*, 577 U.S. at 281.

interstate commerce."[443]  The Supreme Court has "construed broadly" this grant of

jurisdiction over interstate transmission of electricity.[444]  Under this grant of authority,

"ensur[ing] effective transmission of electric power" is one of the "core objects" of the

FPA.[445]  FPA section 206 is one of the principal tools Congress afforded the Commission

to exercise this authority, under which it may find that practices affecting Commission-

jurisdictional rates are "unjust, unreasonable, unduly discriminatory or preferential," and

determine the just and reasonable practice to be thereafter observed and in force.[446]  As

the D.C. Circuit has recognized, the authority afforded to the Commission under FPA

section 206 is "broadly stated" and not a "subtle device."[447]

154.    The Commission does not, however, have jurisdiction over "facilities used for the

generation of electric energy or over facilities used in local distribution or only for the

transmission of electric energy in intrastate commerce, or over facilities for the

transmission of electric energy consumed wholly by the transmitter," except as

---

[443] 16 U.S.C. 824(b)(1) ("The Commission shall have jurisdiction over all facilities
for such transmission or sale of electric energy . . . .").

[444] *N.Y. v. FERC*, 535 U.S. at 15.

[445] *EPSA*, 577 U.S. at 290.

[446] 16 U.S.C. 824e(a).

[447] *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d at 56 ("The authority and obligation
that Congress vested in the Commission to remedy certain practices is broadly stated and
the only question is what limits are fairly implied."); *see also id.* at 55 ("The text does not
define 'practice,' although use of the word 'any' amplifies the breadth of the delegation
to the Commission.").

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1517 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No.  RM21-17-001                                                    - 141 -

specifically provided.[448]  FPA section 201 also contains a policy statement recognizing

the need for Federal regulation in areas subject to the Commission's jurisdiction, but also

providing that "Federal regulation, however, [is] to extend only to those matters which

are not subject to regulation by the States."[449]  Thus, as the rehearing requests point out,

courts and the Commission have recognized certain reserved areas of state authority,

including over electricity generation.[450]

155.    Under *EPSA*, Order No. 1920 is a lawful exercise of the Commission's authority

because it regulates practices that directly affect the rates for the transmission of electric

energy in interstate commerce—transmission planning and cost allocation processes—

---

[448] 16 U.S.C. 824(b)(1).

[449] *Id.* 824(a).  This policy statement does not nullify the grant of authority to the
Commission in the FPA.  *See N.Y. v. FERC*, 535 U.S. at 22 ("Moreover, we have
described the precise reserved state powers language in [FPA section] 201(a) as a mere
policy declaration that cannot nullify a clear and specific grant of jurisdiction, even if the
particular grant seems inconsistent with the broadly expressed purpose." (quotation
marks omitted)).

[450] *See Pac. Gas & Elec. Co.*, 461 U.S. at 205 ("Need for new power facilities,
their economic feasibility, and rates and services, are areas that have been
characteristically governed by the States."); *Monongahela Power Co.*, 40 FERC ¶ 61,256
at 61,861 ("[J]urisdiction over the capacity planning, determination of power needs, plant
siting, 1icensing, construction, and the operations of coal-fired plants had been
deliberately withheld from our control or responsibility . . . ."); *cf. Nw. Cent. Pipeline
Corp.*, 489 U.S. at 522 ("Unless clear damage to federal goals would result, FERC's
exercise of its authority [under the Natural Gas Act] must accommodate a State's
regulation of production [of natural gas]."); *Piedmont Env't Council*, 558 F.3d at 310
("The states have traditionally assumed all jurisdiction to approve or deny permits for the
siting and construction of electric transmission facilities."); *Calpine Corp. v. PJM
Interconnection*, 171 FERC ¶ 61,035 (Glick, Comm'r, dissenting at P 5).

and directly regulates only those practices.[451]  These findings are not contested in the

rehearing requests challenging the Commission's authority.  As discussed in Order

No. 1920 and above, Order No. 1920 is also not aimed at and does not regulate any area

of reserved state authority, whether over electricity generation or otherwise, confirming

that the rule is within the Commission's authority.[452]  While it would be unlawful for the

Commission to regulate within reserved state areas of authority, even as a means of

accomplishing objectives within the Commission's statutorily granted authority,[453] a

Commission regulation does not run afoul of FPA section 201(b) just because it affects,

---

[451] Order No. 1920, 187 FERC ¶ 61,068 at P 263 (noting that "no commenter contests" this point); *see id.* P 265-66; *EPSA*, 577 U.S. at 278 (construing the text of FPA section 206 regarding the Commission's "'affecting' jurisdiction" as limited to rules or practices that "directly affect" the rates within the Commission's jurisdiction); *NARUC*, 964 F.3d at 1186-87  (applying *EPSA*, considering whether the practice at issue meets the "directly affects" test, whether the Commission directly regulates state areas of authority, and whether the Commission action does not conflict with the FPA's core purposes); *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d at 63 ("[B]ecause the orders' planning mandate is directed at ensuring the proper functioning of the interconnected grid spanning state lines, the mandate fits comfortably within Section 201(b)'s grant of jurisdiction over 'the transmission of electric energy in interstate commerce.'" (citation omitted)); *Conn. Dep't of Pub. Util. Control v. FERC*, 569 F.3d at 481-82 (where economic impact of FERC regulation would likely cause States to construct new generation facilities, such state response was not the result of a "direct regulation" of generation facilities but the product of a state's response to changed incentives and "has little relevance").

[452] *See NARUC*, 964 F.3d at 1186-87 (finding that Commission order did not unlawfully regulate matters left to the States; "States remain equipped with every tool they possessed prior to Order No. 841 to manage their facilities and systems.").

[453] *See EPSA*, 577 U.S. at 279-80 (positing a hypothetical in which the Commission "issued a regulation compelling every consumer to buy a certain amount of electricity on the retail market" as a means of altering wholesale prices falling with the Commission's jurisdiction and explaining that this would be unlawful "because it specifies terms of sale at retail—which is a job for the States alone").

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1519 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

even substantially, a reserved area of state authority.[454]  To the contrary, the rule is

exactly the opposite: when the Commission regulates within the areas set forth for its

authority in FPA sections 201 and 206 (here, practices directly affecting rates for

interstate transmission of electricity) as part of "carrying out its charge to improve how

that market runs . . . [FPA section 201(b)] imposes no bar" to such regulation, "no matter

the effect" on areas of state authority.[455]  *EPSA* is, therefore, fatal to the arguments

asserting that Order No. 1920 is unlawful on the theory that, by regulating transmission

planning processes and cost allocation, Order No. 1920 may affect state generation

resource planning or other areas of state authority.

156.    Furthermore, the rehearing requests disregard how Order No. 1920 ensures that

Long-Term Regional Transmission Planning processes facilitate and respect the lawful

authority of actors, including states, in areas such as generation resource planning,

electricity production, and electricity demand.  Factor Categories One, Two, and Three,

in particular, require transmission providers to consider "(1) federal, federally-recognized

Tribal, state, and local laws and regulations affecting the resource mix and demand; (2)

federal, federally-recognized Tribal, state, and local laws and regulations on

decarbonization and electrification; [and] (3) state-approved integrated resource plans

---

[454] *See id.* at 281 ("[A] FERC regulation does not run afoul of 824(b)'s
proscription just because it affects—even substantially—the quantity or terms of retail
sales."); *NARUC*, 964 F.3d at 1186-87; Order No. 1920, 187 FERC ¶ 61,068 at P 264;
*see also id.* PP 265-266.

[455] *EPSA*, 577 U.S. at 281-82 (such effects are "of no legal consequence"); Order
No. 1920, 187 FERC ¶ 61,068 at P 264; *see also id.* PP 265-66.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1520 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No.  RM21-17-001                                                                    - 144 -

and expected supply obligations for load-serving entities."[456]  Far from intruding on the authority of states in these domains, Order No. 1920 requires that in developing Long-Term Scenarios transmission providers account for that authority in Long-Term Regional Transmission Planning and, in fact, afford states *maximum* respect for that authority by assuming that these laws, regulations, integrated resource plans, and expected supply obligations will be fully met.[457]  If anything, the Commission has adopted a conservative approach to ensure that Order No. 1920 is consistent with the structure of federalism set forth in the FPA.[458]

---

[456] Order No. 1920, 187 FERC ¶ 61,068 at P 409.

[457] *See id.* PP 417, 507.  At the same time, the Commission in Order No. 1920 reasonably recognized that the first three categories of factors are not the only known determinants of transmission needs.

[458] FPA section 215(i)(3), 16 U.S.C. 824o(i)(3), and section 216, 16 U.S.C. 824p, which certain rehearing requests cite in passing, *see* Undersigned States Rehearing Request at 6, 11; Designated Retail Regulators Rehearing Request at 6-7, 13, 18-19, do not affect this conclusion.  Neither provision limits the Commission's authority over transmission planning processes or cost allocation under the FPA.  Rather, section 215(i)(3) establishes that "[n]othing in this section," relating to establishment of Electric Reliability Organizations, "shall be construed to preempt any authority of any State to take action to ensure the safety, adequacy, and reliability of electric service within that State, as long as such action is not inconsistent with any reliability standard."  The National Interest Electric Transmission Corridor process in section 216 affords the Commission, in certain circumstances, authority over siting of interstate electric transmission facilities; the siting of particular transmission facilities is not at issue in Order No. 1920.  *See* Order No. 1920, 187 FERC ¶ 61,068 at PP 254, 258.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1521 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No. RM21-17-001    - 145 -

### c.    Order No. 1920 Does Not Require Unlawful Subsidization of State Policies

157.    We also remain unpersuaded by arguments that Order No. 1920 exceeds the

Commission's authority because it will allegedly intrude into state authority by requiring

them to effectively subsidize the policies or generation resource mixes of other states.[459]

Nothing in Order No. 1920 requires a state to subsidize the policies of other states.[460]  In

particular, and among other requirements to ensure such subsidization will not occur,

Order No. 1920 mandates "consistent with long-established Commission and court

precedent, that transmission customers within a transmission planning region need only

pay costs that are 'roughly commensurate' with the benefits that transmission providers

estimate they will receive from a regional transmission facility."[461]

158.    No cost allocation method proposals have yet been submitted to the Commission

in response to Order No. 1920, let alone approved, and application of any such

hypothetical Commission-approved proposals to particular Long-Term Regional

---

[459] *See* Undersigned States Rehearing Request at 12-13; Designated Retail Regulators Rehearing Request at 14-15; Georgia Commission Rehearing Request at 5-6; Arizona Commission Rehearing Request at 11-12; Montana Commission Rehearing Request at 2-4; West Virginia Commission Rehearing Request at 2-4, 10-12.

[460] Order No. 1920, 187 FERC ¶ 61,068 at P 267; *see also, e.g.*, *id.* PP 232, 268-70, 280; *cf. id.* P 1419 ("[W]e reiterate that all cost allocation methods, including those resulting from a State Agreement Process, must allocate costs in a manner that is at least roughly commensurate with estimated benefits.").

[461] *Id.* P 267; *see id.* P 268 (discussing various requirements in Order No. 1920, including the beneficiary-pays cost allocation principle, that "provide robust assurance that the cost allocation methods ultimately proposed under the final rule will not result in improper cost subsidization."); *id.* P 280.

Docket No. RM21-17-001                                                      - 146 -

Transmission Facilities is even further in the future.  As a result, disputes about the

precise cost allocation method that transmission providers may file, the benefits

associated with particular transmission facilities, or how the costs of those particular

facilities may be allocated are necessarily theoretical and premature.  Regardless, Order

No. 1920's bedrock requirement that the cost allocation proposals that will eventually be

filed must comply with the beneficiary-pays cost allocation principle is inconsistent with

parties' claims that the Commission is unlawfully requiring consumers who do not

benefit from Long-Term Regional Transmission Facilities to subsidize such facilities.

This beneficiary-pays approach is a just and reasonable basis for allocating costs of

regional transmission projects.[462]  Indeed, courts and the Commission have explained that

---

[462] *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d at 84; *see id.* at 85 (noting that the court had "repeatedly embraced" the "basic tenet" of beneficiary-pays cost allocation as a logical extension of the cost causation principle and that the Commission has "reasonably identified the lack of beneficiary-based cost allocation as a practice likely to result in rates that are not just and reasonable or are unduly discriminatory or preferential" (citing Order No. 1000, 136 FERC ¶ 61,051 at P 487); *Neb. Pub. Power Dist. v. FERC*, 957 F.3d 932, 941 (8th Cir. 2020) ("[I]t is certain that to the extent that a utility benefits from the costs of new facilities, it may be said to have caused a part of those costs to be incurred. Because NPPD has greatly benefitted from Tri-State's facilities, it is likely that some of the costs have been caused by NPPD." (internal quotations and alterations omitted)); *ICC v. FERC I*, 576 F.3d at 476 ("Not surprisingly, we evaluate compliance with this unremarkable principle by comparing the costs assessed against a party to the burdens imposed or benefits drawn by that party.  To the extent that a utility benefits from the costs of new facilities, it may be said to have 'caused' a part of those costs to be incurred . . . ." (citations omitted)).

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1523 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No. RM21-17-001                                                          - 147 -

requiring that the costs imposed must be at least roughly commensurate to the benefits received[463] ensures that rates remain "just" by avoiding subsidization.[464]

159.    Furthermore, the requests for rehearing arguing that Order No. 1920 intrudes on their authority by requiring such subsidization place too much weight on the broad premise that states have reserved authority over generation resource planning and electricity production within their own borders.[465]  This, however, is a far cry from

---

[463] As discussed in greater detail below, Order No. 1920 recognized that Long-Term Regional Transmission Facilities are likely to provide a diverse array of benefits. The Commission specifically required that transmission providers consider seven economic and reliability benefits in Long-Term Regional Transmission Planning, but did not prohibit them from also considering public policy benefits. *See infra* Omission of Regional Cost Allocation Principle No. 6 and Ability to Allocate Costs by Type of Project section (reiterating the fundamental principle that costs will be allocated in a manner that is at least roughly commensurate with estimated benefits, ensuring that ratepayers will not pay for facilities from which they do not benefit).

[464] *El Paso Elec. Co. v. FERC*, 76 F.4th 352, 361-63 (5th Cir. 2023) ("The cost-causation principle, as understood by the courts and articulated in Order No. 1000, . . . ensure[s] that rates are 'just' . . . [by] prevent[ing] 'subsidization by ensuring that costs and benefits correspond to each other.'" (quoting Order No. 1000-A, 139 FERC ¶ 61,132 at P 578; citing *BNP Paribas Energy Trading GP v. FERC*, 743 F.3d at 268; *Nat'l Ass'n of Reg. Util. Comm'rs v. FERC*, 475 F.3d 1277, 1285 (D.C. Cir. 2007))).

[465] *See, e.g.*, Undersigned States Rehearing Request at 10-13; Designated Retail Regulators Rehearing Request at 11-14; Montana Commission Rehearing Request at 2-4 (arguing that Order No. 1920 intrudes on state authority because "without a voluntary state agreement process, the Final Rule's regional cost allocation scheme ensures that nonconsenting states will be swept up in their neighbors' preferred policy projects"); Wyoming Commission Rehearing Request at 2-4 (similar); West Virginia Commission Rehearing Request at 3-4, 10-12 (similar); Arizona Commission Rehearing Request at 13 ("[S]tates without renewable resource policy objectives will be forced to absorb costs generated by the transmission of (often rurally sited) renewable energy." (emphasis omitted)); Georgia Commission Rehearing Request at 5-6; Utah Commission Rehearing Request at 6-7.

establishing that state authority over generation within that state's own borders also includes a right to be free from the incidental effects of policies of other states (e.g., as to generation planning) as those effects may manifest through interstate commerce in electricity.  For example, Undersigned States and Designated Retail Regulators cite the federal/state division of authority set forth in the FPA, and argue that "[e]ach state has authority over the choice of which generating resources are maintained and constructed within its own jurisdiction."[466]  However, they then recast this as a broader "right to choose the resources that best fit their public policies," a framing that omits the geographic limitation that states' reserved authority over such resources applies only to resources within their own jurisdiction.[467]  As a consequence, they claim, it is "an over-reach into the traditional area of regulation reserved for the States" for their residents "to pay for infrastructure to support[ ] the public policies and resource mixes of other States, without demonstrable benefits to that load" as the costs of those policies manifest in interstate transmission facility cost allocations.[468]

---

[466] Undersigned States Rehearing Request at 11-12; Designated Retail Regulators Rehearing Request at 13.

[467] Undersigned States Rehearing Request at 12-13; Designated Retail Regulators Rehearing Request at 14.

[468] Undersigned States Rehearing Request at 12-13; Designated Retail Regulators Rehearing Request at 14.  This reference to "demonstrable benefits to load" appears to reflect the view that certain states may disagree with the choices of other states in terms of generation resource selection, particularly on the basis that "less-remote resources of any type might be less expensive, more reliable, and environmentally beneficial." Undersigned States Rehearing Request at 4-5; Designated Retail Regulators Rehearing Request at 4-5 (similar).

160. Neither statutory text in the FPA nor any of the precedent cited by the rehearing requests establishes that states' authority, when they participate in interstate commerce in electricity, includes a right to be free from the incidental extraterritorial effects of the policies of other states as they may manifest through such interstate commerce.[469] To the contrary, as the Supreme Court has recognized, "the production and transmission of energy is an activity particularly likely to affect more than one State."[470] The FPA is a congressional enactment authorizing the Commission to regulate in this area.[471]

161. In fact, the FPA was enacted in response to a Supreme Court decision holding that the Commerce Clause prevents states from regulating certain transactions between electric utilities located in other states—thereby creating the "*Attleboro* gap."[472]

---

[469] No such generic right to avoid the extraterritorial effects of the policies of other states as they may manifest through interstate commerce exists under the Constitution. *See Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 371-74 (2023) (rejecting arguments, under the dormant Commerce Clause, "invoking . . . an 'almost per se' rule forbidding enforcement of state laws that have the 'practical effect of controlling commerce outside the State,' even when those laws do not purposely discriminate against out-of-state economic interests").

[470] *Ark. Elec. Co-op. Corp. v. Ark. Pub. Serv. Comm'n*, 461 U.S. 375, 377 (1983) (explaining also that the effect of such production and transmission "on interstate commerce is often significant enough that uncontrolled regulation by the States can patently interfere with broader national interests"); *see* Order No. 1920, 187 FERC ¶ 61,068 at P 282 ("The nature of the interconnected transmission system is such that states naturally affect one another in pursuing policies available to them while exercising the authority reserved to them under FPA section 201.").

[471] *See* 16 U.S.C. 824(a), (b)(1), 824d, 824e.

[472] *EPSA*, 577 U.S. at 266 (citing *Pub. Util. Comm'n of R.I. v. Attleboro Steam & Elec. Co.*, 273 U.S. 83, 89-90 (1927)).

Congress responded by passing the FPA,[473] preventing the "creation of any regulatory 'no man's land.' Some entity must have jurisdiction to regulate each and every practice that takes place in the electricity markets."[474] *Attleboro* and Congress's enactment of the FPA thus reflect the authority vested in the Commission to regulate in these domains precisely because states are constitutionally incapable of doing so, including as to how the interaction of state policies may manifest in interstate commerce.[475] Moreover, the purported requirement that states must voluntarily agree to any cost allocation for interstate transmission facilities would run the risk of creating the sort of "regulatory void" that the FPA was designed to preclude. In particular, it would effectively assign to the states the regulatory responsibility for cost allocation of interstate transmission facilities (notwithstanding that this falls within an area Congress assigned to the Commission in the FPA), creating the possibility that this area goes entirely unregulated should states fail to reach agreement.[476] In other words, far from prohibiting any

---

[473] *Id.*

[474] *Id.* at 289 (citation omitted).

[475] *See Appalachian Power Co. v. Pub. Serv. Comm'n of W. Va.*, 812 F.2d 898, 905 (4th Cir. 1987) (enactment of the FPA reflects "the judgment embodied in the commerce clause that there are situations in which the broader perspective of federal authority is necessary"); *cf. id.* at 904 ("[S]tates are powerless to exert authority that potentially conflicts with FERC determinations regarding rates or agreements affecting rates.").

[476] Order No. 1920, 187 FERC ¶ 61,068 at P 1293 ("[I]f transmission providers were to rely solely on a State Agreement Process to determine the cost allocation for Long-Term Regional Transmission Facilities and that process fails to result in agreement, there would be no cost allocation method for Long-Term Regional Transmission Facilities selected as the more efficient or cost-effective solutions to Long-Term

Docket No. RM21-17-001                                                      - 151 -

extraterritorial effects, the FPA's statutory standard puts the Commission in charge of

regulating those effects pursuant to the just and reasonable standard, which includes the

cost causation principle.

162.    The argument that, particularly absent state agreement to cost allocation, Order

No. 1920 exceeds the Commission's authority is also ahistorical when viewed in the

regulatory context.[477]    In Order No. 1000, the Commission required that transmission

providers "devise methods for allocating the costs of certain new transmission facilities to

those entities that benefit from them."[478]    The D.C. Circuit held that this requirement fell

within the Commission's statutory authority to regulate practices affecting rates[479] and

otherwise rejected challenges to the Commission's authority to adopt these cost

allocation reforms under FPA section 206.[480]    In addition, Order No. 1000 also adopted

---

Transmission Needs."); *see also infra* Obligation to File an Ex Ante Long-Term Regional
Transmission Cost Allocation Method and Its Use as a Backstop section.

   [477] The Supreme Court has observed that "[i]n our interconnected national
marketplace, many (maybe most) state laws have the 'practical effect of controlling'
extraterritorial behavior" such that application of an "extraterritoriality doctrine" to
preclude such effects would lead to "strange places." *Nat'l Pork Producers Council*, 598
U.S. at 374-75 (citing examples and concluding that adopting this rule would "cast a
shadow over laws long understood to represent valid exercises of the States'
constitutionally reserved powers"); *id.* at 390 (noting that the Supreme Court has
"recognized since *Gibbons* [*v. Ogden*], 9 Wheat 1, 22 U.S. 1 (1824), that virtually all
state laws create ripple effects beyond their borders").

   [478] *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d at 81; *see id.* at 82-83 (discussing
these reforms in more detail).

   [479] *See id.* at 84.

   [480] *See id.* at 84-87.

Cost Allocation Principle 1, requiring (like Order No. 1920) that the cost of transmission facilities be allocated to those that will benefit from those facilities in a manner at least roughly commensurate with the estimated benefits of that facility.[481]  In doing so, the Commission neither required state agreement to *ex ante* cost allocation methods, nor that any such method ensure that costs be allocated based on whether a state agreed with the public policies of other states associated with the generating facilities connected to the relevant transmission facilities.[482]  Order No. 1920's approach of requiring an Engagement Period directed toward state agreement on cost allocation, with an *ex ante* cost allocation backstop,[483] thus reflects an expansion of states' ability to participate in the development of regional cost allocation methods as compared to the status quo ante, while recognizing the bounds of state authority.  And we take further steps in this order to ensure that states have a meaningful opportunity to inform both Long-Term Regional Transmission Planning and cost allocation for Long-Term Regional Transmission

---

[481] *See* Order No. 1000, 136 FERC ¶ 61,051 at P 622; *see S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d at 85 ("The Commission therefore reasonably identified the lack of beneficiary-based cost allocation as a practice likely to result in rates that are not just and reasonable or are unduly discriminatory or preferential." (citing Order No. 1000, 136 FERC ¶ 61,051 at P 487)).

[482] *Cf.* Order No. 1000, 136 FERC ¶ 61,051 at P 685 (permitting, but not requiring, transmission providers to use different types of cost allocation methods for different types of transmission facilities, "such as transmission facilities needed for reliability, congestion relief, or to achieve Public Policy Requirements").

[483] *See* Order No. 1920, 187 FERC ¶ 61,068 at PP 1291-1292.

Docket No.  RM21-17-001                                                    - 153 -

Facilities, particularly with respect to the implementation and effect of state public

policies.

163.    Order No. 1920 regulates within, and only within, Commission authority, while

ensuring that state policy choices in areas of reserved state authority are respected and

effectuated.  Order No. 1920 treats such choices evenhandedly and as antecedent to

Long-Term Regional Transmission Planning, requiring transmission providers to

consider those choices, among other factors, when they identify Long-Term Transmission

Needs and (ultimately) Long-Term Regional Transmission Facilities.[484]  Long-Term

Regional Transmission Planning is, in turn, focused on evaluating the Long-Term

Regional Transmission Facilities that will reliably and cost-effectively deliver the power

needed to serve the load that is expected given these (and other) drivers of transmission

needs.[485]  As to cost allocation, transmission providers have flexibility to propose specific

cost allocation methods for Long-Term Regional Transmission Facilities, but the

prospect of unlawful subsidization of such a transmission facility by customers that do

not benefit from it is foreclosed by the requirement that any such method must conform

to the beneficiary-pays cost allocation requirement.[486]  To be clear, that means that no

---

[484] *See supra* Requests to Omit One or More Categories of Factors section.

[485] *Id.*; *see also supra* Evaluation and Selection of Long-Term Regional
Transmission Facilities section.

[486] Similarly, we find that Undersigned States and Designated Retail Regulators
assertion that they may be required to pay for infrastructure "without demonstrable
benefits to that load," Undersigned States Rehearing Request at 12-13; Designated Retail
Regulators Rehearing Request at 14, is misplaced.  Under the beneficiary-pays principle,
costs are assigned to customers only to the extent that they receive demonstrable benefits

Docket No.  RM21-17-001                                                                 - 154 -

state or its customers will be required to pay for the costs of Long-Term Regional

Transmission Facilities unless they benefit from those transmission facilities and in a

manner that is at least roughly commensurate with those costs.  This approach toward the

interplay of federal and state regulation of electricity wholly comports with the

jurisdictional lines drawn in the FPA.[487]

164.    Contrast this with the rehearing requests challenging the Commission's authority

under the FPA.  By virtue of states' connection to the interstate transmission grid,

consumers in those states participate in interstate commerce.  However, certain parties

seeking rehearing object to the potential consequences of that connection, particularly the

amount that these ratepayers may be required to pay for the transmission facilities

connecting to those resources.  But where a ratepayer in one state benefits from a

transmission facility, it is appropriate that they bear costs at least roughly commensurate

with that benefit.[488]

_____

that are at least roughly commensurate with those costs.

   [487] *See EPSA*, 577 U.S. at 282 ("considering 'the *target* at which a law *aims*'" in
deciding whether FERC's wholesale market rule fell within its power to regulate
wholesale sales (quoting *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 385 (2015)); *cf.
Hughes v. Talen Energy Mktg., LLC,* 578 U.S. 150, 165 (2016) (holding that states may
not set retail rates, a power typically falling on the states' side of the FPA's jurisdictional
line, 16 U.S.C. 824(b)(1), in a way that fails to "give effect" to a wholesale rate); *Oneok*,
575 U.S. at 385–86 (contrasting a state policy properly aimed at its field of jurisdiction
with one aimed directly at the federal field).

   [488] Indeed, a contrary rule would arguably be inconsistent with judicial precedent
governing cost causation.  *See, e.g.*, *El Paso Elec. Co.*, 76 F.4th at 360-63 (finding that
the Commission impermissibly "prohibited the WestConnect region from imposing
binding cost allocation on the non-jurisdictional utilities although they will 'cause,' in
part, the costs of new grid improvements"); *id.* at 361-62 (explaining that it was of

165.    For the reasons stated above and in Order No. 1920, we disagree with arguments

that, under the FPA, the Commission's authority to regulate interstate transmission

planning processes and cost allocation is limited as these rehearing requests claim. We

find that the requirements of Order No. 1920 are within our authority over the

"transmission of electric energy in interstate commerce," and particularly to ensure that

practices affecting rates for such transmission are just and reasonable.[489]

### C.    Major Questions Doctrine

### 1.    Requests for Rehearing

166.    Several of the rehearing requests also invoke the "major questions" doctrine,

particularly the Supreme Court's decision in *West Virginia v. EPA*,[490] in connection with

their contention that Order No. 1920 exceeds the Commission's statutory authority.[491]

Undersigned States and Designated Retail Regulators argue that Order No. 1920 involves

a "major question" such that Order No. 1920 must be supported by clear congressional

authorization because the Commission is attempting to supplant state generation planning

---

fundamental legal importance that the non-jurisdictional utilities at issue were
specifically and intentionally designated as beneficiaries, rather than incidental,
unintended beneficiaries, such that they were impermissible "free riders" if not allocated
an appropriate share of costs).

[489] 16 U.S.C. 824(b)(1), 824d(a), 824e(a).

[490] 597 U.S. 697.

[491] *See* Undersigned States Rehearing Request at 7, 14-17; Designated Retail
Regulators Rehearing Request at 7, 15-19; Arizona Commission Rehearing Request at 2,
3-6 & n.8; Idaho Commission Rehearing Request at 2, 6-7; Utah Commission Rehearing
Request at 1, 7-8; Ohio Commission Federal Advocate Rehearing Request at 20.

USCA4 Appeal: 24-1650   Doc: 224   Filed: 01/21/2025   Pg: 1532 of 2455
Document Accession #: 20241121-3139   Filed Date: 11/21/2024

Docket No. RM21-17-001                                              - 156 -

authority in favor of promoting distantly located renewable energy.[492] They assert that *West Virginia* supports concluding that Order No. 1920 implicates the major questions doctrine.[493] Undersigned States and Designated Retail Regulators also point to the claimed economic consequences of Order No. 1920, citing alleged costs in the hundreds of billions or trillions of dollars; the breadth of the transmission grid; and the importance of electricity in everyday life.[494] They argue that Order No. 1920 is "blatantly preferential," will not ensure just and reasonable rates, and that attempting to influence the generation resource mix exceeds both the Commission's expertise and the scope of the FPA as a consumer-protection statute geared toward ensuring such just and reasonable rates.[495]

167.     Likewise, Arizona Commission argues that the Commission has "implemented a nationwide scheme, foisted on all 50 states, to adopt energy generation modes to *its*

---

[492] Undersigned States Rehearing Request at 14-15; Designated Retail Regulators Rehearing Request at 15-16; *see also id.* at 17-18 ("[T]here is no clear delegated authority allowing FERC to determine what type of generating resources should be transmitted from where in the United States.").

[493] Undersigned States Rehearing Request at 14-15 (also asserting that this is a major question because "it implicates a unique and complex jurisdictional divide between state and federal regulatory authority" (citing *Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 764 (2021); *EPSA*, 577 U.S. at 264-65)); Designated Retail Regulators Rehearing Request at 17.

[494] Undersigned States Rehearing Request at 15; Designated Retail Regulators Rehearing Request at 16-17.

[495] Undersigned States Rehearing Request at 16-17; Designated Retail Regulators Rehearing Request at 16-17, 18-19.

liking" even though "nothing in th[e FPA] authorizes the adoption of the Biden
Administration's renewable energy policy goals."[496]  Arizona Commission and Utah
Commission assert that in *West Virginia* the Supreme Court stated that it is highly
unlikely that Congress would leave to agency discretion how much coal-based generation
there should be over the coming decades, and assert that major policy changes must occur
pursuant to an express statement of Congress.[497]  Arizona Commission argues that
commenters have observed the breadth and consequences of Order No. 1920[498] and cites
a characterization of the Commission's approach as controversial,[499] asserts that the FPA
is a consumer protection statute,[500] and states that Congress has not enacted the "Green
New Deal."[501]  Utah Commission contends that "transitioning the grid away from fossil-
fueled generation and toward renewable resources" is a major question, pointing to its
social and political context and economic consequences.[502]

---

[496] Arizona Commission Rehearing Request at 4-6.

[497] *Id.* at 5-6; *see also id.* at 3-4 (arguing that Congress does not use oblique or elliptical language to empower fundamental changes to a statutory scheme); Utah Commission Rehearing Request at 7-8.

[498] *See* Arizona Commission Rehearing Request at 6; *cf. id.* at 16 (citing the cost of achieving net-zero on the transmission grid).

[499] *See id.* at 4-5.

[500] *See id.* at 20.

[501] *See id.* at 5.

[502] Utah Commission Rehearing Request at 8 & n.17 (arguing that Order No. 1920 "patently dictates outcomes and cost allocation and does so to discriminate and favor the policy preferences of certain preferred stakeholders"; citing Commissioner Christie's

Docket No. RM21-17-001                                      - 158 -

168.    In arguing that Order No. 1920 involves a major question, Idaho Commission

points to statements in the concurrence to Order No. 1920 that the nation's energy grid is

at a crossroads, with "'consequential action' . . . emphatically warranted" and

"proselytiz[ing] for states to join it in building an 'electric transmission grid for the 21st

century.'"[503]  It contends that the Commission has "gone to great lengths to enact a

sweeping policy agenda, in the absence of congressional authority, that infringes on

states' authority, and impermissibly attempts to expand the Commission's jurisdiction

under the FPA, in violation of the major questions doctrine."[504]

169.    Ohio Commission Federal Advocate argues, citing *West Virginia*, that the

Commission has not identified a clear congressional authorization to "use its power under

the FPA to facilitate federal, state, Tribal, local, and corporate policies, including

decarbonization and electrification policies, under the guise of building a robust

transmission system."[505]  It argues that the Commission lacks this authority.[506]

170.    SERTP Sponsors bring several requests for clarification of Order No. 1920, which

we summarize and address in detail below.  Focusing on the "respect afforded to state-

---

dissent claiming that Order No. 1920 is intended to cost consumers trillions of dollars).

[503] Idaho Commission Rehearing Request at 6 (quoting Order No. 1920, 187 FERC ¶ 61,068 (Phillips & Clements Comm'rs, concurring at PP 34-35)).

[504] *Id.* at 6-7.

[505] Ohio Commission Federal Advocate Rehearing Request at 20.

[506] *Id.*

Docket No.  RM21-17-001                                                          - 159 -

approved IRPs and LSE supply obligations," SERTP Sponsors state that, absent certain

of those clarifications, "particularly [in] Sections II.A.1 and II.C.3" of their argument,

Order No. 1920 could encroach on state jurisdiction.[507] They particularly contend that if

these clarifications are not granted "Order No. 1920 would be seeking to influence the

makeup of the nation's energy policy and generation mix, which would constitute a

'major question,' given the vast economic consequences that would result from an

exercise of such authority."[508]

### 2.    Commission Determination

171.    We continue to find that Order No. 1920 does not implicate the major questions

doctrine.  As the summary above reflects, the rehearing requests provide little to no

discussion of the scope of the Commission's authority under the FPA or the statutory

context and, as discussed in the preceding sections, they misinterpret Order No. 1920

itself.[509]  The Supreme Court has described the major questions doctrine as applicable

only in "extraordinary cases," which it has identified through a detailed analysis of the

---

[507] SERTP Sponsors Rehearing Request at 37-41; *see also id.* at 41-45.

[508] *Id.* at 39-40 (arguing that "the application or implementation of Order No. 1920 in a manner that would undercut or conflict with state-regulated IRPs and resource adequacy decisions would transform the regulatory paradigm from an electric system expansion process driven by state-regulated resource assumptions made in state-regulated IRPs to one driven by FERC-regulated resource assumptions made in the FERC-regulated LTRTP processes," exceeding the scope of the Commission's expertise and previous regulation of "practices affecting rates").

[509] *See supra* Federal/State Division of Authority section.

USCA4 Appeal: 24-1650     Doc: 224     Filed: 01/21/2025     Pg: 1536 of 2455
Document Accession #: 20241121-3139     Filed Date: 11/21/2024

Docket No.  RM21-17-001                                                      - 160 -

statutory context and agency action at issue.[510]  Specifically, that doctrine comes into play where, despite a "colorable textual basis" for the agency's claim of authority, the agency action was so extravagant when viewed in light of the statutory context that it was unlikely that Congress would have afforded this claimed authority to the agency, and particularly would not have done so in an oblique or subtle way.[511]  As a rule, Congress does not "hide 'elephants in mouseholes.'"[512]

172.     In *West Virginia*, the Supreme Court held that EPA claimed a "newfound," "transformative," "extravagant," and "unheralded"[513] authority to "substantially restructure the American energy market" by devising emission limitations that were based on EPA's judgment of how much coal-fired electricity generation should be in the overall mix of electricity generation.[514]  The Supreme Court concluded that this authority

---

[510] *See West Virginia*, 597 U.S. at 721.

[511] *Id.* at 722-23; *see also id.* at 721.

[512] *See id.* at 746 (Gorsuch, J., concurring) (quoting *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001)); *see also Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.,* 595 U.S. 109, 125 (2022) (Gorsuch, J., concurring).

[513] *West Virginia*, 597 U.S. at 724; *see also Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 323-24 (2014) (*UARG*) (rejecting EPA's "enormous and transformative expansion in EPA's regulatory authority" in "discover[ing] in a long-extant statute an unheralded power" to require certain permits for greenhouse gas emissions).

[514] *West Virginia*, 597 U.S. at 721, 724-25; *see also Nat'l Fed'n of Indep. Bus.*, 595 U.S. at 117 ("The Secretary has ordered 84 million Americans to either obtain a COVID–19 vaccine or undergo weekly medical testing at their own expense. This is no everyday exercise of federal power." (citation omitted)); *UARG*, 573 U.S. at 321-22 (explaining that EPA itself acknowledged the "calamitous consequences of interpreting the [Clean Air] Act in that way," thereby rendering the relevant provisions multiple

swept far beyond the ordinary understanding of EPA's purview, inserting the agency into

areas into which it lacked technical expertise and in which it was required to make "a

very different kind of policy judgment."[515]  EPA did so against the backdrop of the

significant policy questions involved that would ordinarily be addressed by Congress.[516]

In fact, the Supreme Court recognized that EPA's newly claimed authority enabled it to

enact a program addressing the dangers posed by greenhouse gas emissions even though

---

orders of magnitude more burdensome and expensive); *id.* at 324 ("[W]e confront a
singular situation: an agency laying claim to extravagant statutory power over the
national economy while at the same time strenuously asserting that the authority claimed
would render the statute 'unrecognizable to the Congress that designed' it." (citation
omitted)); *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120,
159-60 (2000) (explaining that "[t]his is hardly an ordinary case" given that the FDA was
now purporting to have authority that would allow it to outright ban tobacco products,
notwithstanding the unique place such products have in American history and the existing
regulatory scheme adopted by Congress).

[515] *West Virginia*, 597 U.S. at 728-29 (noting that, in this context, EPA was
required to make judgments as to the reliability of the energy grid and the effects of its
action on energy prices, such that EPA's exercise of authority required "technical and
policy expertise *not* traditionally needed in EPA regulatory development" (quotation
marks omitted)); *see also Nat'l Fed'n of Indep. Bus.*, 595 U.S. at 118 ("[N]o provision of
the Act addresses public health more generally, which falls outside of OSHA's sphere of
expertise."); *King v. Burwell*, 576 U.S. 473, 485-86 (2015) (declining to defer to the
Internal Revenue Service (IRS) interpretation of the Affordable Care Act's guarantee of
tax credits for health insurance purchases, noting that that decisions about "health
insurance policy" fell beyond the IRS's zone of "expertise," making it "especially
unlikely that Congress would have delegated th[e] decision" over tax credits "to the
*IRS*.").

[516] *West Virginia*, 597 U.S. at 729-30; *see also King*, 576 U.S. at 485-86 (noting
that the tax credits at issue "involv[e] billions of dollars in spending each year and
affect[ ] the price of health insurance for millions of people," the Court deemed their
provision "a question of deep economic and political significance" that Congress would
not have implicitly delegated to the agency (quotation marks omitted)).

Congress had considered (but rejected) legislative proposals to create such programs.[517]

Thus, in *West Virginia*, the Supreme Court confronted an EPA assertion of authority that

it concluded was elephantine—surprising not just in scope, but also in character vis-à-vis

EPA's ordinary regulatory role.

173.    The Supreme Court concluded that EPA purported to find that authority in a

statutory mousehole: the "ancillary," "backwater," "gap-filler" authority in section 111(d)

of the Clean Air Act, under which it was to identify the "best system of emission

reduction" for existing stationary sources of air pollutants.[518]  Reflecting the ancillary

nature of this provision, the Supreme Court noted that EPA had only used it a handful of

times over more than four decades,[519] and in doing so had uniformly based its regulatory

approach on identifying systems that would reduce pollution by causing the regulated

source to operate more cleanly.[520]  As a result, according to the Supreme Court, EPA's

---

[517] *West Virginia*, 597 U.S. at 731-32 ("Congress, however, has consistently rejected proposals to amend the Clean Air Act to create such a program."); *see also Brown & Williamson*, 529 U.S. at 160 (adopting FDA's statutory interpretation required ignoring "the plain implication of Congress' subsequent tobacco-specific legislation"); *id.* at 142-58.

[518] *West Virginia*, 597 U.S. at 709-710 (noting that the "thrust of Section 111 focuses on emissions limits for *new* and *modified* sources" rather than the existing sources that EPA was regulating under the challenged rule); *id.* at 730.

[519] *Id.* at 710-11 ("It was thus only a slight overstatement for one of the architects of the 1990 amendments to the Clean Air Act to refer to Section 111(d) as an 'obscure, never-used section of the law.'" (citation omitted)).

[520] *Id.* at 725-26 (citing EPA's view, in its inaugural rulemaking under this provision, that Congress in this provision intended a technology-based approach); *see also Nat'l Fed'n of Indep. Bus.*, 595 U.S. at 118-19 ("It is telling that OSHA, in its half century of existence, has never before adopted a broad public health regulation of this

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1539 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No.  RM21-17-001                                                    - 163 -

claim that it had authority to base emission limitations on its policy judgment regarding the appropriate generation resource mix "was not only unprecedented; it also effected a fundamental revision of the statute, changing it from [one sort of] scheme of . . . regulation into an entirely different kind."[521]  The Supreme Court held that, to justify this power, EPA offered only a "vague statutory grant" supported by such an expansive, acontextual reading of the "definitional possibilities" of the word "system" that accepting this construction would have rendered the statutory text an "empty vessel."[522]

---

kind . . . . [A] vaccine mandate is strikingly unlike the workplace regulations that OSHA has typically imposed."); *Brown & Williamson*, 529 U.S. at 144 (noting FDA's "consistent and repeated statements" that it lacked jurisdiction to regulate tobacco products).

[521] *West Virginia*, 597 U.S. at 728 (quotation marks omitted); *see also Nat'l Fed'n of Indep. Bus.*, 595 U.S. at 117-18 ("The Act empowers the Secretary to set workplace safety standards, not broad public health measures."); *UARG*, 573 U.S. at 322 (explaining that EPA itself recognized that the results of its statutory interpretation "would be so 'contrary to congressional intent,' and would so 'severely undermine what Congress sought to accomplish,' that they necessitated as much as a 1,000–fold increase in the permitting thresholds set forth in the statute"); *id.* at 322-23 (explaining how a "brief review of the relevant statutory provisions leaves no doubt that the PSD program and Title V are designed to apply to, and cannot rationally be extended beyond, a relative handful of large sources capable of shouldering heavy substantive and procedural burdens"); *MCI Telecomms. Corp. v. Am. Tel. & Telegraph Co.*, 512 U.S. 218, 234 (1994) ("[FCC's statutory interpretation] is effectively the introduction of a whole new regime of regulation (or of free-market competition), which may well be a better regime but is not the one that Congress established."); *cf. Brown & Williamson*, 529 U.S. at 156 ("Under these circumstances, it is clear that Congress' tobacco-specific legislation has effectively ratified the FDA's previous position that it lacks jurisdiction to regulate tobacco.").

[522] *West Virginia*, 597 U.S. at 732; *see also Brown & Williamson*, 529 U.S. at 160 (explaining that FDA's statutory interpretation required adopting "an extremely strained understanding of 'safety' as it is used throughout the Act" even though the concept is "central to the [Act's] regulatory scheme"); *MCI*, 512 U.S. at 229-34 (rejecting agency interpretation concluding that a statutory provision authorizing the FCC to "modify" the

Docket No. RM21-17-001                                                        - 164 -

174.    *West Virginia* thus reflects the sort of "extraordinary case" meriting application of the major questions doctrine and illustrating the factors relevant to that inquiry. Moreover, *West Virginia* and other cases in this area reflect that application of that doctrine does not boil down to a facile examination, divorced from the statutory context, of the agency action at issue.  The major questions doctrine does not provide, for example, that courts should find that an agency action requires express Congressional authorization based simply on the economic consequences of that action, the fact that the agency is addressing a significant problem, or the sector of industry that the agency is regulating.  As the Fourth Circuit recently explained, while the "doctrine applies only when the question at issue—*i.e.*, the authority the agency is claimed to have—is a major one," that is a necessary, not a sufficient, condition triggering the doctrine's application.[523]  "The [Supreme] Court has highlighted several other [relevant] hallmarks," such as (1) whether the statute's "structure indicates that Congress did not mean to regulate the issue in the way claimed,"[524] (2) whether a "'distinct regulatory scheme' [is] already in place to deal with the issue which would conflict with the agency's newly asserted authority,"[525] (3) where the agency has "fail[ed] to invoke the[] [asserted

_____

provisions of 47 U.S.C. 203 authorized the agency to make "radical or fundamental changes to the statutory requirements").

[523] *N.C. Coastal Fisheries Reform Grp. v. Capt. Gaston LLC*, 76 F.4th 291, 296-97 (4th Cir. 2023).

[524] *Id.*

[525] *Id.* (quoting *Brown & Williamson*, 529 U.S. at 143-46).

powers] previously," (4) where the "asserted authority falls outside the agency's traditional expertise," and (5) where the "asserted authority . . . is found in an 'ancillary provision.'"[526]  As discussed below, none of these "hallmarks" is present here.

175.    We continue to conclude that the major questions doctrine does not apply to Order No. 1920.[527]  The Commission's authority under FPA section 206 is no statutory "mousehole."  Far from being an "ancillary," "back-water," or "gap-filler" provision as the court referenced in *West Virginia*, FPA section 206 sets forth core Commission regulatory authority to remedy unjust and unreasonable rates, and practices affecting rates, for the transmission of electric energy in interstate commerce.[528]  As discussed above, the Commission's action in Order No. 1920 falls well within the ordinary understanding of its statutory authority under this provision, as it is regulating practices directly affecting such rates,[529] such that Order No. 1920 does not involve converting the

---

[526] *Id*. (quoting *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. at 468).

[527] Order No. 1920, 187 FERC ¶ 61,068 at PP 275-279.

[528] 16 U.S.C. 824e(a); *see S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d at 56 (explaining that the Commission's authority under FPA section 206 is "broadly stated and the only question is what limits are fairly implied"; this provision is not a "subtle device"); *id.* at 55 ("The text does not define 'practice,' although use of the word 'any' amplifies the breadth of the delegation to the Commission."); *cf. N.Y. v. FERC*, 535 U.S. at 15 (upholding Order No. 888, noting that the Supreme Court has "construed broadly" the Commission's jurisdiction under FPA section 201).

[529] *See supra* Order No. 1920 Is Consistent with the FPA and Precedent Regarding the Commission's Authority section (discussing the application of *EPSA* and related precedent to Order No. 1920 as confirming that the Commission is acting within its authority)

authority set forth to regulate such practices into a new kind of regulatory scheme.[530]  By the same token, since it is based on this core statutory authority, Order No. 1920 also does not involve invoking definitional possibilities to stretch a statutory term or phrase (e.g., "system" in *West Virginia*) to its limits, thereby stripping the relevant term of meaning.

176.    Also, unlike the provision at issue in *West Virginia*, FPA section 206 is not a rarely used provision; the Commission has acted under this authority countless times, including in significant rulemakings.  This includes the Commission's landmark Order No. 888, in which the Commission addressed fundamental shifts in the landscape of the electric industry by requiring functional unbundling of wholesale generation and transmission services and imposing a similar open access requirement on unbundled retail transmission in interstate commerce,[531] as well as oversight of those processes and cost allocation via more targeted FPA section 206 complaints and Commission-initiated FPA section 206 proceedings.[532]  The Supreme Court upheld Order No. 888 order,

---

[530] *See EPSA*, 577 U.S. at 290 ("ensur[ing] effective transmission of electric power" is one of the "core objects" of the FPA); *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d at 57.

[531] *See N.Y. v. FERC*, 535 U.S. at 11, 17.

[532] *See, e.g.*, *Pub. Serv. Elec. & Gas Co. v. FERC*, 989 F.3d 10, 15 (D.C. Cir. 2021) (denying petitions for review of Commission order, under FPA section 206, regarding cost allocation for the Artificial Island Project); *Coal. of MISO Transmission Customers v. Midcontinent Indep. Sys. Operator, Inc.*, 172 FERC ¶ 61,099, 61,770 (2020) (denying complaint, under FPA section 206, challenging MISO's location-based cost allocation method for Baseline Reliability Projects); *City Utilities of Springfield, Mo. v. Sw. Power Pool, Inc.*, 168 FERC ¶ 61,085, 61,467 (2019) (denying complaint, under FPA section 206, asserting that SPP's administration of the unintended consequences

USCA4 Appeal: 24-1650   Doc: 224   Filed: 01/21/2025   Pg: 1543 of 2455
Document Accession #: 20241121-3139   Filed Date: 11/21/2024

Docket No.  RM21-17-001                                              - 167 -

underscoring the breadth of the Commission's authority under FPA section 206.  The

Commission's exercise of this authority in the field of transmission planning processes

and cost allocation is, itself, far from unprecedented considering the Commission's

issuance of Order Nos. 890 and 1000, upon which Order No. 1920 now builds.[533]  In

Order No. 890, the Commission required—among other things—that public utility

transmission providers' local transmission planning processes satisfy nine transmission

planning principles to ensure that transmission planning processes were just and

reasonable and not unduly discriminatory and preferential.[534]  The Commission's next

step, Order No. 1000, sought to further ensure that transmission planning and cost

---

review process for SPP's allocation of the costs of transmission facilities was unjust,
unreasonable, unduly discriminatory, or preferential); *N. Ind. Pub. Serv. Co. v.
Midcontinent Indep. Sys. Operator, Inc.*, 155 FERC ¶ 61,058 (2016) (granting in part and
denying in part a complaint under FPA section 206 requesting that the Commission
reform the interregional transmission planning process of the Joint Operating Agreement
between MISO and PJM); *Monongahela Power Co.*, 156 FERC ¶ 61,134 (2016)
(instituting a proceeding under FPA section 206 to determine whether PJM transmission
owners are complying with their Order No. 890 transmission planning obligations), *order
accepting in part proposed tariff revisions and requiring tariff revisions*, 162 FERC ¶
61,129 (2018).

[533] *See* Order No. 1920, 187 FERC ¶ 61,068 at PP 14-19, 47-48, 255; *S.C. Pub.
Serv. Auth. v. FERC*, 762 F.3d at 58 ("Commission-mandated transmission planning is
not new.  [Order No. 1000] builds on Order No. 890's requirements in light of changed
circumstances and is simply the next step in a series of related reforms that began no later
than Order No. 888." (citation omitted)).

[534] *See* Order No. 890, 118 FERC ¶ 61,119 at PP 418-601 (requiring, among other
things, that local transmission planning processes satisfy nine transmission planning
principles: (1) coordination; (2) openness; (3) transparency; (4) information exchange; (5)
comparability; (6) dispute resolution; (7) regional participation; (8) economic planning
studies; and (9) cost allocation for new projects); Order No. 1920, 187 FERC ¶ 61,068 at
PP 14, 277.

allocation requirements embodied in the *pro forma* OATT could facilitate the development of more efficient or cost-effective regional transmission facilities.[535]  Order No. 1920 is a continuation of these prior efforts to ensure that transmission planning and cost allocation processes support the reliable and cost-effective operation of the transmission grid, by addressing identified deficiencies in those processes that render Commission-jurisdictional rates unjust and unreasonable.

177.    Turning to the agency action at issue, Order No. 1920 is not an "elephant":  while it addresses a significant problem, it does so through an improvement of the already existing Commission-jurisdictional regional transmission planning and cost allocation processes, building on and consistent with the Commission's exercise of authority in past actions,[536] and is not aimed at areas of reserved state authority.  Rehearing requests arguing to the contrary—and particularly those claiming that the Commission is attempting to control or influence the resource mix or install itself as a national integrated resource planner—are based on mischaracterizations or misunderstandings of Order No.

---

[535] Order No. 1000, 136 FERC ¶ 61,051 at PP 11-12, 42-44; Order No. 1000-A, 139 FERC ¶ 61,132 at PP 3-6; *see also* Order No. 1920, 187 FERC ¶ 61,068 at P 16 ("The reforms in Order No. 1000 included: (1) regional transmission planning; (2) transmission needs driven by Public Policy Requirements; (3) nonincumbent transmission developer reforms; (4) regional and interregional cost allocation, including a set of principles for each category of cost allocation; and (5) interregional transmission coordination. The reforms focused on the process by which transmission providers engage in regional transmission planning and the associated cost allocation rather than on the outcomes of the process.").

[536] *See* Order No. 1920, 187 FERC ¶ 61,068 at P 278 (describing the rule as implementing "incremental process improvements").

Docket No.  RM21-17-001                                                          - 169 -

1920, as discussed above.[537]  Order No. 1920 is well within the Commission's ordinary

remit and technical expertise of regulating practices affecting interstate transmission

rates, unlike the cases discussed above which involved agency forays into areas well

beyond their ordinary purview, such as EPA regulating the generation resource mix,

Occupational Safety and Health Administration (OSHA) regulating the general public

health, or the IRS addressing health insurance policy.  Nor is this an instance in which the

Commission has acted against a backdrop of contrary congressional action.[538]

178.    Moreover, the Commission in Order No. 1920 acted in a fundamentally *responsive*

capacity to require more effective transmission planning processes and cost allocation to

ensure cost-effective and reliable Long-Term Regional Transmission Planning in light of

preexisting forces beyond the Commission's control that give rise to transmission

needs.[539]  This stands in contrast to cases in which the Supreme Court has applied the

major questions doctrine, which involved agency actions that, in themselves,

affirmatively and proactively caused the transformative consequences that the Court

---

[537] *See supra* Federal/State Division of Authority section.

[538] Arguments to the contrary suggesting, for example, that the Commission is attempting to implement the "Green New Deal," rest on the incorrect premise that the Commission is attempting to preferentially favor renewable resources or influence the generation mix.  Moreover, even the references cited in the rehearing requests describe the "Green New Deal" as a broad set of goals aimed at achieving net zero carbon emissions, without specific policies, rather than a specific proposal to enact the sort of transmission planning process and cost allocation reforms at issue in Order No. 1920. *See, e.g.*, Arizona Commission Rehearing Request at 4-5.

[539] *See supra* Federal/State Division of Authority section (noting that these forces would continue to exist, driving transmission needs, even absent Commission action).

Docket No.  RM21-17-001                                              - 170 -

identified as demonstrative of extravagant exercises of agency power.[540]  For similar

reasons, it is incorrect to ascribe to Order No. 1920, which aims to ensure that Long-

Term Transmission Needs are met more efficiently and cost-effectively, the economic

consequences associated with the construction of new transmission infrastructure, as the

need for this infrastructure would still exist independent of Order No. 1920.[541]

179.    In particular, arguments asserting that Order No. 1920 will impose "billions or

trillions of dollars in transmission cost[s]"[542] claims that attempt to link the transmission

---

[540] *See, e.g.*, *West Virginia*, 597 U.S. at 721, 724-25 (addressing EPA rule seeking to "substantially restructure the American energy market"); *Nat'l Fed'n of Indep. Bus.*, 595 U.S. at 117 (addressing agency rule requiring vaccination or medical testing); *UARG*, 573 U.S. at 321-22 (addressing agency change in statutory interpretation subjecting millions of sources to permitting requirements).

[541] *See* Order No. 1920, 187 FERC ¶ 61,068 at P 278 ("The incremental process improvements required by the final rule, however, do not fundamentally change the economic or political stakes of ensuring that Commission-jurisdictional rates remain just and reasonable."); *id.* PP 92-93; *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d at 51 (noting the expense associated with construction of transmission infrastructure at the time of the promulgation of Order No. 1000).  No case applying the major questions doctrine has done so solely based on the economic consequences of the agency action at issue or suggested that agencies are not empowered to address significant problems falling within their general grants of statutory authority.  *Cf., e.g.*, *N.Y. v. FERC*, 535 U.S. at 11, 17 (affirming Commission order adopting reforms restructuring electricity markets); *Flyers Rts. Educ. Fund, Inc. v. U. S. Dep't of Transp.*, 810 F. App'x 1, 3 (D.C. Cir. 2020) (explaining that *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009) "permits, but does not require, an agency to act incrementally"); *WildEarth Guardians v. EPA*, 751 F.3d 649, 655-56 (D.C. Cir. 2014) (summarizing *Defs. of Wildlife v. Gutierrez*, 532 F.3d 913 (D.C. Cir. 2008), upholding a decision to focus on a comprehensive approach). Creating such a rule would be inconsistent with the Supreme Court's discussion of the history of the major questions doctrine reflecting its application only in extraordinary cases, and then only upon a detailed consideration of the statutory context.  *See West Virginia*, 597 U.S. at 721.

[542] Undersigned States Rehearing Request at 15; *see* Designated Retail Regulators

Docket No.  RM21-17-001                                                                    - 171 -

costs of achieving a "net zero" carbon emission policy as "caused by Order No. 1920"[543] are not supported by the record and, instead, depend entirely on an unfounded logical leap.  These arguments incorrectly portray the consequences of decisions made by other actors,[544] which represent preexisting and independent forces driving transmission needs that are outside of the Commission's control,[545] as attributable to Order No. 1920.  As noted above, such arguments fundamentally reverse cause and effect by mischaracterizing Order No. 1920's process-focused requirements that transmission providers adequately *plan* for these drivers of Long-Term Transmission Needs—which requirements do not seek to achieve any substantive outcome or direct the construction of any particular transmission facilities—as *causing* these transmission needs.[546]  This has no basis in fact.  The drivers of these transmission needs (including those that flow from the policy decisions of actors lawfully entitled to make such choices) and the costs associated with building transmission infrastructure to meet such needs will exist

---

Rehearing Request at 15-16.

[543] Arizona Commission Rehearing Request at 16.

[544] In particular, Order No. 1920 is neutral on the policy choices that may drive certain of these decisions, including whether "net zero" is an appropriate policy goal; these questions are not for the Commission to resolve.

[545] *See supra* Order No. 1920 Does Not Attempt to Control the Generation Mix or Intrude in Areas of State Authority section (explaining that Order No. 1920 is resource neutral, treating these exogenous forces that drive Long-Term Transmission Needs as inputs to Long-Term Regional Transmission Planning).

[546] *See supra* Order No. 1920 Does Not Attempt to Control the Generation Mix or Intrude in Areas of State Authority section.

independent of Order No. 1920's requirements.  Indeed, because a major focus of Order

No. 1920 is ensuring that more efficient or cost-effective transmission facilities are

evaluated and selected, not only would these needs still exist absent the Commission's

action but we expect that meeting these needs would impose *higher* costs on ratepayers.

180.    We therefore continue to conclude that Order No. 1920 is not a transformative

exercise of Commission authority, whether in magnitude or character, and FPA section

206 is not a surprising basis for the Commission's action, meaning that the major

questions doctrine does not apply here.[547]  The Supreme Court's decision in *EPSA* and

D.C. Circuit decisions in *California Independent System Operator v. FERC*[548] and *South*

*Carolina Public Service Authority v. FERC* further confirm the inapplicability of the

major questions doctrine to Order No. 1920.  Each of those cases addressed the scope of

the Commission's authority under FPA section 206 over "practice[s] . . . affecting" rates,

the same grant of statutory authority supporting issuance of Order No. 1920, and are thus

of particular significance here.[549]

181.    In *EPSA* and *CAISO*, the Courts' statutory construction limiting the Commission

to regulating practices "directly affecting" rates was motivated by the same concern

animating the major questions doctrine: effectuating congressional intent by ensuring that

---

[547] Order No. 1920, 187 FERC ¶ 61,068 at PP 278-279.

[548] 372 F.3d 395 (D.C. Cir. 2004) (*CAISO*).

[549] *See EPSA*, 577 U.S. at 277-78; *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d at 56-57; *CAISO*, 732 F.3d at 399-404.

Docket No.  RM21-17-001                                              - 173 -

the Commission's exercise of this authority was reasonably constrained by more than the definitional possibilities as to what constitutes a "practice . . . affecting" rates.[550]  *South Carolina Public Service Authority v. FERC* considered the scope of this authority as applied to the same context presented here, transmission planning and cost allocation processes, in reviewing the highly similar Order No. 1000.  The court held that "[r]eforming the practices of failing to engage in regional planning and *ex ante* cost allocation for development of new regional transmission facilities is not the kind of interpretive 'leap' that concerned the court in *CAISO* but rather involves a core reason underlying Congress' instruction in [FPA] Section 206."[551]  It likewise distinguished *MCI*—one of the cases the Supreme Court in *West Virginia* discussed as part of the lineage of the major questions doctrine—holding that FPA section 206 "cannot be fairly viewed as the type of 'subtle device' at issue" in that case.[552]

---

[550] *See EPSA*, 577 U.S. at 277-78 (adopting the "directly affecting" construction of FPA section 206(a) because "[t]aken for all it is worth, that statutory grant could extend FERC's power to some surprising places" given that markets in all of electricity's inputs might affect the supply of power and "markets in just about everything" might affect load-serving entities' demand); *CAISO*, 372 F.3d at 400 (explaining that ambiguity, in statutory construction, is not a creature of definitional possibilities but of statutory context); *id.* at 401 (rejecting the argument that there is an "infinitude of acceptable definitions for what constitutes a 'practice' to give [the Commission] the authority to regulate anything done by or connected with a regulated utility, as any act or aspect of such an entity's corporate existence could affect, in some sense, the rates").

[551] *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d at 57.

[552] *Id.* at 56.

Docket No.  RM21-17-001                                                  - 174 -

182.    Thus, *EPSA* and *CAISO* reflect that the Supreme Court and the D.C. Circuit already have construed the statutory grant of authority to the Commission over practices affecting rates in FPA section 206 as imposing guardrails to ensure consistency with congressional intent and to avoid the use of this authority in ways that would implicate the major questions doctrine.  *South Carolina Public Service Authority v. FERC*, in turn, applied these guardrails in the same context as Order No. 1920 and found that the Commission was acting within its statutory authority to address "a core reason underlying Congress' instruction in [FPA] Section 206."[553]  Particularly given the major questions doctrine's focus on discerning congressional intent as to the scope of a legislative delegation,[554] these cases further support our conclusion (in addition to the discussion already set forth) that the major questions doctrine does not require enhanced skepticism of Order No. 1920.[555]

183.    We are, therefore, unpersuaded by arguments that the major questions doctrine should apply to Order No. 1920.  Claims that Order No. 1920 presents a major question because the Commission has overstepped the jurisdictional boundaries set forth in the FPA and intruded into areas of state authority[556] are mistaken because the Commission

---

[553] *Id.* at 57.

[554] *See West Virginia*, 597 U.S. at 721-23.

[555] *See supra* Order No. 1920 Is Consistent with the FPA and Precedent Regarding the Commission's Authority section (explaining, as discussed in Order No. 1920 and not disputed on rehearing, that Order No. 1920 is consistent with the Supreme Court's decision in *EPSA*).

[556] *See* Undersigned States Rehearing Request at 14-15 (citing *Ala. Ass'n of*

has acted well within its authority to regulate practices affecting interstate transmission

rates, honoring the jurisdictional divide set forth by Congress in the FPA.**557**  Arguments

that the Commission is misusing the FPA to enact preferential policies**558** are misplaced

for the same reasons.  As already discussed, arguments invoking the purported economic

consequences of Order No. 1920**559** misattribute the costs of constructing transmission

---

*Realtors v. HHS*, 594 U.S. at 764 (finding that one consideration favoring application of the major questions doctrine was that the agency action "intrudes into an area that is the particular domain of state law: the landlord-tenant relationship")); *id.* at 16 (arguing that the Commission was attempting to determine "what resources should be powering the grid twenty years into the future"); Designated Retail Regulators Rehearing Request at 15-19 (similar); Arizona Commission Rehearing Request at 5-6; Utah Commission Rehearing Request at 7-8; *cf.* Ohio Commission Federal Advocate Rehearing Request at 20 ("FERC points to no 'clear congressional authorization' for it to use its power under the FPA to facilitate federal, state, Tribal, local, and corporate policies . . . .").

**557** *See supra* Federal/State Division of Authority section; Order No. 1920, 187 FERC ¶ 61,068 at PP 263-267.  We also reiterate, in response to arguments that the Supreme Court in *West Virginia* found it "'highly unlikely that Congress would leave to agency discretion the decision of how much . . . generation there should be over the coming decades' on a resource-by-resource basis," Undersigned States Rehearing Request at 15 (quoting *West Virginia*, 597 U.S. at 729; also citing "the breadth of the transmission grid [and] the importance of electricity in everyday life"), that "the Court did not determine that energy policy and the mix of generation resources are *in every instance* a major question."  Order No. 1920, 187 FERC ¶ 61,068 at P 276; *see also id.* PP 277-278.  In any event, Order No. 1920 still would not implicate the major questions doctrine because it is not aimed at this end.

**558** *See* Undersigned States Rehearing Request at 16-17; Designated Retail Regulators Rehearing Request at 16-17; Arizona Commission Rehearing Request at 3 n.2, 4, 20.

**559** *See* Undersigned States Rehearing Request at 14-15; Designated Retail Regulators Rehearing Request at 15-16; Utah Commission Rehearing Request at 8; *cf.* Arizona Commission Rehearing Request at 16 (citing the cost of achieving net-zero on the transmission grid).

USCA4 Appeal: 24-1650 Doc: 224 Filed: 01/21/2025 Pg: 1552 of 2455
Document Accession #: 20241121-3139 Filed Date: 11/21/2024

Docket No. RM21-17-001                                                    - 176 -

infrastructure to Order No. 1920. Regardless, while the economic impact is relevant to this inquiry, the major questions doctrine is a nuanced, context-specific doctrine that does not require clear congressional authorization for every agency action that may have significant economic consequences or addresses a significant problem.[560]

184. We also are not persuaded by SERTP Sponsors' arguments that, unless the Commission grants its requests for clarification, Order No. 1920 runs afoul of the major questions doctrine, encroaches on state jurisdiction, or otherwise exceeds the Commission's authority. SERTP Sponsors do not clearly set forth the basis for many of their purported concerns regarding the Commission's statutory authority or application of the major questions doctrine, or even which arguments raise these concerns. For instance, while SERTP Sponsors identify Sections II.A.1 and II.C.3 of their argument as particularly raising these concerns,[561] in their Statement of Issues they more broadly state that the clarifications in "Sections II.A and II.C" of their argument are necessary to avoid intruding into state jurisdiction or application of the major questions doctrine.[562] But it is far from clear, and SERTP Sponsors do not explain, why many of the requested clarifications in Sections II.A and II.C would be necessary to avoid SERTP Sponsors'

---

[560] *See id.*; *cf. also* Arizona Commission Rehearing Request at 6 ("Under *West Virginia*, a major doctrinal change in the law, and the making of a federal rule that fundamentally reshapes policy, has to be done pursuant to an express statement of Congress"); Idaho Commission Rehearing Request at 6.

[561] SERTP Sponsors Rehearing Request at 39; *see also id.* at 41, 43 (issue statements 1 and 15).

[562] *Id.* at 44-45.

Docket No. RM21-17-001                                                    - 177 -

stated concerns about the Commission failing to afford adequate respect to state-approved integrated resource plans and load-serving entities' supply obligations or otherwise implicate concerns that the Commission is intruding into state jurisdiction.[563] Certain of SERTP Sponsors' other claims that, absent clarification, other aspects of Order No. 1920 would exceed the Commission's authority, are single-sentence assertions that provide little or nothing to illuminate why they believe this is the case.[564]

185.   We address SERTP Sponsors' requests for clarification on their substance at various points in our discussion below.  In several instances, we find that SERTP Sponsors have failed to plead their arguments that, absent their requested clarification, the Commission has exceeded its authority with the specificity required on rehearing, and

---

[563] *See, e.g.*, *id.* at 7-8 (arguing that states should be allowed to lengthen the time, upon agreement or motion, to reach an agreement as to cost allocation method); *id.* at 8 (requesting clarification on voluntary funding opportunities); *id.* at 11-12 (arguing that Long Term Transmission Needs have been defined in a circular fashion and that transmission providers should have discretion to use their expertise where they lack certain information); *id.* at 12-17 (requesting clarification that the factors affecting a single assumption will not necessarily have an additive effect; clarification on how specific factors will be identified; clarification on whether the Commission has expanded what constitutes legally binding obligations; and rehearing regarding adoption of Factor Category Seven).

[564] *See id.* at 41 ("Absent the requested clarification in section II.A.2, the six-month period permitted for states to negotiate an extension of the time period [*sic*] for negotiating *ex ante* or *ex post* state agreements on cost allocation, Order No. 1920 is contrary to FPA section 201, is *ultra vires*, and arbitrary and capricious"); *id.* ("Absent the requested clarification in section II.A.3, Order No. 1920 is contrary to FPA section 201 because it effectively mandates selection and/or construction of an LTRTF."); *id.* at 43 ("Absent the clarifications requested in section II.C.2.d, requiring the utilization of Factor Category Seven intrudes into matters involving retail customers subject to state regulation, thereby being ultra vires and contrary to FPA section 201.").

Docket No.  RM21-17-001                                                      - 178 -

we reject them on that basis.[565]  Regardless, to the extent that we do not grant those

requests for clarification, whether in whole or in part, we find that the explanations in

Order No. 1920 and herein establishing that Order No. 1920 is within the Commission's

authority, does not unlawfully intrude into state areas of reserved authority, and does not

implicate the major questions doctrine render SERTP Sponsors' arguments to the

contrary unpersuasive.  Where we believe further additional explanation is warranted in

response to addressing a specific request for clarification made by SERTP Sponsors, we

provide that explanation in conjunction with addressing the relevant request for

clarification.

>    **D.    Other Issues**

>        **1.    Requests for Rehearing**

186.    Several of the parties seeking rehearing argue that Order No. 1920 is not supported

by the D.C. Circuit's decision in *South Carolina Public Service Authority v. FERC*,

asserting that the Commission has attempted to direct substantive outcomes affecting the

generation resource mix.  Arizona Commission contends that Order No. 1000 "confined

mandatory consideration [of factors affecting transmission needs] to pertinent laws and

regulations, whereas Order No. 1920 now mandates consideration of broader 'policy

goals,'" which are "more nebulous political agendas susceptible to significant

fluctuations."[566]  It contends that the Commission "is not authorized to compel Arizona to

---

[565] *See ZEP Grand Prairie Wind, LLC*, 183 FERC ¶ 61,150, at P 10 (2023); *see also Ind. Util. Regul. Comm'n v. FERC*, 668 F.3d 735, 736 (D.C. Cir. 2012)

[566] Arizona Commission Rehearing Request at 12-13 (arguing also that Arizona

use specific energy resources."[567]  Montana Commission, West Virginia Commission, and Wyoming Commission argue that Order No. 1000 was upheld in *South Carolina Public Service Authority v. FERC* because of its light touch, which did not mandate a "backstop" *ex ante* cost allocation method to a voluntary state agreement, whereas Order No. 1920 has placed states in the untenable position of either agreeing to unjust and unreasonable cost allocations or having that burden foisted on them by default.[568]  They further assert that Order No. 1920's "influence over the selection of transmission projects will inevitably affect resource planning and selection at the state level," invading the jurisdiction of the states.[569]  Utah Commission argues that Order No. 1920, unlike Order No. 1000, "patently dictates outcomes and cost allocation and does so to discriminate and favor the policy preferences of certain preferred stakeholders."[570]

---

law "does not allow the [Arizona Commission] to adopt, create, or mandate energy policy goals, and Order No. 1920's effort to compel the [Arizona Commission] to do so is unlawful" and that Order No. 1920's approach will lead to unjust cost allocations wherein states without renewable policy objectives must absorb costs generated by the transmission of renewable energy).

[567] *Id.* at 13.

[568] *See* Montana Commission Rehearing Request at 2-4; West Virginia Commission Rehearing Request at 10-12; Wyoming Commission Rehearing Request at 2-4.

[569] *See* Montana Commission Rehearing Request at 4; West Virginia Commission Rehearing Request at 12; Wyoming Commission Rehearing Request at 4.

[570] Utah Commission Rehearing Request at 8 n.17.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1556 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No.  RM21-17-001                                                    - 180 -

187.    Undersigned States and Designated Retail Regulators argue that Order No. 1920

"mandates transmission planning criteria that marginalize the input from Relevant

Electric Retail Regulatory Authorit[ies] [(RERRAs)] in transmission planning, instead

favoring selected generation."[571]  In particular, they argue that Order No. 1920 adopts

monolithic nationwide criteria that remove the states' role in planning and cost allocation,

and that those criteria are "designed to allow the preferred policy goals of certain states,

utilities, and corporate interests to dictate transmission planning for all," rather than

prioritizing reliability and consumer impacts.[572]  Similarly, Georgia Commission argues

that Order No. 1920 "violates the states' reserved decision-making power by requiring

that the states measure their long-term transmission plans against seven factors identified

in the Order."[573]

188.    Relatedly, Montana Commission, West Virginia Commission, and Wyoming

Commission argue that Order No. 1920 undermines states' role in transmission planning

and ratemaking, and does not result in just and reasonable rates.[574]  In particular, they

---

[571] Undersigned States Rehearing Request at 7-8; *see id.* at 24-26; Designated
Retail Regulators Rehearing Request at 8, 24-26.

[572] Undersigned States Rehearing Request at 24; *id.* at 26 ("With its rigid planning
and cost allocation criteria, the Rule will result in the imposition of massive transmission
costs necessary to accomplish certain states' policy goals upon other states."); Designated
Retail Regulators Rehearing Request at 24-26 (similar).

[573] Georgia Commission Rehearing Request at 4.

[574] *See* Montana Commission Rehearing Request at 6-7 (arguing that a significant
share of the costs of transmission facilities are allocated to retail customers, a question
which is best left to the expertise of the states); West Virginia Commission Rehearing

Docket No. RM21-17-001                                                      - 181 -

assert that under Order No. 1920, transmission providers would be required to plan

projects while considering the policy goals of various states (e.g., decarbonization), such

that "the leading transmission projects may not be the most economical, let alone

necessary, but for the policy goals of other states."[575]  They contend that the costs

allocated to retail customers may exceed the benefits that state policy recognizes from

regional transmission projects, such that state commissions "would be forced to either

assign unjust and unreasonable rates to retail customers, or deny the utility a potentially

significant portion of its expected cost recovery."[576]  Arizona Commission argues that

Order No. 1920 usurps state authority mandating that it "apply rates that are fair and

reasonable and not to cost share with rate payers who did not cause (and do not benefit

from) a particular cost."[577]

---

Request at 9-10; Wyoming Commission Rehearing Request at 6-8.

[575] *See* Montana Commission Rehearing Request at 6-7; West Virginia Commission Rehearing Request at 9-10; Wyoming Commission Rehearing Request at 7-8.

[576] Montana Commission Rehearing Request at 6-7 (noting that the Montana Commission typically conducts *post hoc* rather than *ex ante* rate reviews and that it is not clear that Order No. 1920 is designed to accommodate this process); West Virginia Commission Rehearing Request at 9-10; Wyoming Commission Rehearing Request at 7-8.

[577] Arizona Commission Rehearing Request at 20-22 (claiming that Order No. 1920 "usurps the Arizona Constitution and its methodology" because it "provides several factors that must be considered in transmission planning and cost allocation" which "include neither the fairness nor reasonableness of the costs nor any consideration of who causes the costs mandated by the FPA").

189.     Arizona Commission also states that it owes its existence to the Arizona

Constitution and that it has plenary power to set just and reasonable rates and charges

collected by public service corporations.[578]  It asserts that even the Arizona state

legislature is "precluded by state constitutional law from legislating rate making

decisions," and contends that, by the same token, the federal government "is certainly

precluded from directing Arizona utilities to adopt energy plans that could cost hundreds

of billions of dollars to Arizona consumers."[579]

190.     On rehearing, Undersigned States again argue that Order No. 1920 is beyond the

Commission's authority because, if the FPA were interpreted to authorize the rule, it

"would likely violate the Constitution's equal sovereignty doctrine."[580]  They argue that

Order No. 1920 "sets up a scheme where one state can effectively require other states to

subsidize their own public policy agenda—a core, sovereign state function."[581]

Undersigned States also now bring a single sentence argument that "even if the Rule were

supported by statutory authorization . . . then it would violate the nondelegation

---

[578] *Id.* at 7-9.

[579] *Id.* at 8-9.

[580] Undersigned States Rehearing Request at 18-19.

[581] *Id.* (arguing that Order No. 1920 subverts the democratic process, encroaches on state prerogatives, and is inconsistent with principles of cooperative federalism (citing *Coyle v. Smith*, 221 U.S. 559, 567 (1911); *Franchise Tax Bd. v. Hyatt*, 578 U.S. 171, 179 (2016); *Stearns v. Minn.*, 179 U.S. 223, 245 (1900); *Shelby Cnty. v. Holder*, 570 U.S. 529, 544 (2013)).

doctrine," on the theory that Congress is entirely precluded from delegating any "major policy question[s]" to agencies.[582]

191.    Ohio Commission Federal Advocate contends that in issuing Order No. 1920 the Commission has violated the Commerce Clause because Commission authority "does not reach . . . attempts to use it to assist utilities and corporations with meeting their goals and commitments."[583]  It particularly asserts that "[t]he U.S. Supreme Court has held that in the absence of federal legislation, commerce is generally open to control by states" and that Order No. 1920 will disproportionately benefit certain states, e.g., those with policies in favor of electrification of the transportation and building sectors.[584]

### 2.    Commission Determination

192.    We find that arguments that Order No. 1920 is not supported by the D.C. Circuit's decision in *South Carolina Public Service Authority v. FERC* upholding Order No. 1000 are erroneous because, as the court in that case put it, they "misperceive[ ] what the

---

[582] *Id.* at 17-18 (citing *Paul v. U.S.*, 140 S. Ct. 342, 342 (2019) (Mem.) (Kavanaugh, J., statement respecting denial of certiorari); *Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.*, 448 U.S. 607, 685-86 (1980) (Rehnquist, J., concurring in judgment); *A.L.A. Schechter Poultry Corp. v. U.S.*, 295 U.S. 495 (1935)).

[583] Ohio Commission Federal Advocate Rehearing Request at 18-19 (citing *City of Phila. v. N.J.*, 437 U.S. 617, 623 (1978); *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 300 (1997); *H. P. Hood & Sons, Inc. v. Du Mond*, 336 U.S. 525 (1949); *N.Y. v. U.S.,* 505 U.S. 144 (1992); *Printz v. United States*, 521 U.S. 898 (1997)).

[584] *Id.* (also arguing that Order No. 1920 will also benefit certain types of generation developers).

Commission has required in the Final Rule."[585]  Order No. 1920 is directed toward

ensuring just and reasonable rates by requiring Long-Term Regional Transmission

Planning, including requiring transmission providers to evaluate which Long-Term

Regional Transmission Facilities will more efficiently or cost-effectively address Long-

Term Transmission Needs.[586]  As in *South Carolina Public Service Authority v. FERC*,[587]

the Commission has declined to impose obligations to "mandate development of any

particular transmission facility,"[588] change applicable siting requirements and

processes,[589] or "change existing mechanisms for cost-recovery through retail rates."[590]

Order No. 1920 "does not regulate, aim at, or otherwise attempt to influence integrated

resource planning, the generation mix, decisions related to the siting and construction of

transmission facilities or generation resources, or any other matters reserved to states

---

[585] *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d at 57.

[586] Order No. 1920, 187 FERC ¶ 61,068 at PP 134, 667, 721-723.

[587] *See S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d at 57-58 (explaining that the Commission did not impose obligations to build or mandatory processes to construct transmission facilities in the regional transmission plan and disavowed that it was purporting to determine what needs to be built, where it needs to be built, and who needs to build it); *see id.* at 62 ("The orders neither require facility construction nor allow a party to build without securing necessary state approvals.").

[588] Order No. 1920, 187 FERC ¶ 61,068 at P 257; *see id.* P 419 ("We are not requiring that transmission providers select any particular Long-Term Regional Transmission Facility and therefore are not directing the development of any particular transmission facilities.").

[589] *See id.* P 258.

[590] *Id.* P 259.

under FPA section 201."[591]  Under Order No. 1920, like Order No. 1000, "the substance of a regional transmission plan and any subsequent formation of agreements to construct or operate regional transmission facilities remain within the discretion of the decision-makers in each planning region."[592]  The Commission also maintains Order No. 1000's light touch as to regional cost allocation: "[i]t does not dictate how costs are to be allocated.  Rather, the Rule provides for general cost allocation principles and leaves the details to transmission providers to determine in the planning processes."[593]

193.   We disagree with the arguments in the rehearing requests that Order No. 1920 attempts to direct substantive outcomes, including as to the generation resource mix.[594] As already explained, Order No. 1920 remains process-focused and does not seek to achieve particular substantive outcomes, influence or direct the generation mix, preferentially favor certain transmission facilities, or require unlawful subsidization of

---

[591] *Id.* P 254; *see also id.* P 256 ("[W]e direct reforms to close these gaps without otherwise disturbing the regional transmission planning structure required by Order No. 1000, which was fully affirmed on appeal in the face of similar objections to those raised here.").

[592] *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d at 58.

[593] *Id.* at 81; *see, e.g.*, Order No. 1920, 187 FERC ¶ 61,068 at PP 268-269, 723, 916, 954, 1291-1294.

[594] *See* Arizona Commission Rehearing Request at 12-13; Montana Commission Rehearing Request at 3-4; West Virginia Commission Rehearing Request at 10-12; Wyoming Commission Rehearing Request at 2-4; Utah Commission Rehearing Request at 8 n.17.

Docket No. RM21-17-001                                                    - 186 -

state policies.[595]  While it requires consideration of certain categories of factors in

assessing Long-Term Transmission Needs,[596] these factors are resource-neutral and,

within the broad parameters set by Order No. 1920, transmission providers have

significant discretion in developing Long-Term Scenarios that further precludes the

Commission from attempting to dictate outcomes.[597]  Moreover, as described,

transmission providers must consult with and consider the positions of the Relevant State

Entities as to how to account for factors related to state public policies in Long-Term

Regional Transmission Planning assumptions.

194.    We disagree with claims that Commission has departed from the "light touch" of

Order No. 1000 because Order No. 1000 did not mandate a "backstop" *ex ante* cost

allocation method to a voluntary State Agreement Process.[598]  As *South Carolina Public

Service Authority v. FERC* recognized and upheld, Order No. 1000 required transmission

providers to file an *ex ante* cost allocation method.[599]  Order No. 1920 did not diminish

---

[595] *See infra* Requirement to Incorporate Categories of Factors section.

[596] *See* Order No. 1920, 187 FERC ¶ 61,068 at P 300 ("Long-Term Transmission Needs are similar in kind to transmission needs identified through existing regional transmission planning processes established under Order No. 1000.  Where Long-Term Transmission Needs differ is their identification through the long-term, forward-looking, and more comprehensive regional transmission planning and cost allocation processes established in this final rule.").

[597] *See infra* Requirement to Incorporate Categories of Factors section.

[598] *See* Montana Commission Rehearing Request at 2-4; West Virginia Commission Rehearing Request at 10-12; Wyoming Commission Rehearing Request at 2-4.

[599] *See S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d at 53 ("The cost-allocation

USCA4 Appeal: 24-1650   Doc: 224   Filed: 01/21/2025   Pg: 1563 of 2455
Document Accession #: 20241121-3139   Filed Date: 11/21/2024

Docket No. RM21-17-001                                          - 187 -

states' role compared to Order No. 1000 but, instead, increased the available

opportunities for robust participation by Relevant State Entities to seek to reach

agreement on a Long-Term Regional Transmission Cost Allocation Method(s) and/or a

State Agreement Process.[600]  By virtue of these requirements, Order No. 1920 is more

solicitous of state input and uses an even lighter touch than Order No. 1000 in this

respect.  As discussed elsewhere,[601] we take further steps in this rehearing order to

strengthen states' role in Long-Term Regional Transmission Planning and cost allocation

for Long-Term Regional Transmission Facilities.

195.    We are also not persuaded by arguments that Order No. 1920 exceeds the

Commission's authority because it thwarts the role of RERRAs[602] or unlawfully intrudes

on the authority of state bodies that regulate retail rates.[603]  Order No. 1920 "does not

---

reforms in Order No. 1000 require each transmission provider to include in its OATT a method (or set of methods) for allocating *ex ante* the costs of new regional transmission facilities that complies with six regional cost allocation principles." (citing Order No. 1000, 136 FERC ¶ 61,051 at P 558)); *see id.* at 82-87 (rejecting challenges to the Commission's authority to adopt such reforms).

[600] *See id.* PP 5, 268, 1291.

[601] *Infra* Transmission Planning Horizon section; Obligation to File an *Ex Ante* Long-Term Regional Transmission Cost Allocation Method and Its Use as a Backstop section.

[602] *See* Undersigned States Rehearing Request at 7-8; Designated Retail Regulators Rehearing Request at 8, 24-26; Georgia PSC Rehearing Request at 4.

[603] *See* Montana Commission Rehearing Request at 6-7; West Virginia Commission Rehearing Request at 9-10; Wyoming Commission Rehearing Request at 6-8; Arizona Commission Rehearing Request at 20-22 (arguing that the primary focus of transmission planning and cost allocation has been reliability and low cost, and that

change existing mechanisms for cost-recovery through retail rates," but, instead,

regulates transmission planning and cost allocation processes falling within the

Commission's jurisdiction.[604]  To the extent that Order No. 1920 might affect retail rates

or other areas of state authority, this does not defeat the Commission's authority; as a

valid exercise of the Commission's jurisdiction over practices affecting interstate

transmission rates, Order No. 1920 is lawful notwithstanding such effects.[605]  Finally,

assertions that the Commission is attempting to dictate substantive outcomes or prefer

certain energy resources or policies or that Order No. 1920 does not comport with

principles of cost causation[606] are not convincing for the reasons already explained.[607]

---

Order No. 1920 introduces other considerations).

[604] Order No. 1920, 187 FERC ¶ 61,068 at P 259.

[605] *See supra* Federal/State Division of Authority section; *EPSA*, 577 U.S. at 281-82 ("When FERC regulates what takes place on the wholesale market, as part of carrying out its charge to improve how that market runs, *then no matter the effect* on retail rates, 824(b) imposes no bar." (emphasis added))); *see also* Arizona Commission Rehearing Request at 20-22 (claiming that Order No. 1920 "usurps the Arizona Constitution and its methodology" and otherwise conflicts with state law); U.S. Const. Art. VI ("This Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."); *NARUC*, 964 F.3d at 1186-88 (discussing the application of the Supremacy Clause in the context of the FPA in rejecting an argument that a Commission regulation unlawfully regulated matters falling within state authority).

[606] *See, e.g.*, States Rehearing Request at 7-8, 24; Designated Retail Regulators Rehearing Request at 8, 25-26; Georgia PSC Rehearing Request at 4; Arizona Commission Rehearing Request at 22; Utah Commission Rehearing Request at 9.

[607] *See supra* Federal/State Division of Authority section(explaining that Order No. 1920 is not directed at achieving substantive outcomes and that the categories of factors are resource-neutral); *supra* Order No. 1920 Does Not Require Unlawful

196.    We are also not persuaded by Undersigned States' argument[608] that if Order No.

1920 were authorized by the FPA, the FPA would violate equal sovereignty principles.

The Commission in Order No. 1920 explained at length its reasons for rejecting that

argument.[609]  On rehearing, Undersigned States repeat their arguments from their

comments on the NOPR while failing to engage with, let alone rebut, the Commission's

reasoning in Order No. 1920.[610]  We therefore sustain Order No. 1920's rejection of this

argument for the reasons stated therein.  We particularly note that Undersigned States

have pointed to no precedent applying the equal sovereignty doctrine in circumstances

comparable to those here.[611]

---

Subsidization of State Policies section (explaining that arguments that the Commission is
requiring subsidization of state policies are incorrect and unpersuasive).

[608] Undersigned States Rehearing Request at 18-19.

[609] Order No. 1920, 187 FERC ¶ 61,068 at PP 280-282 (explaining that this
argument was not supported by precedent and is incorrect because Order No. 1920 does
not require subsidization of other states policies or generation decisions).

[610] *See* Undersigned States Rehearing Request at 18-19; Order No. 1920, 187
FERC ¶ 61,068 at P 212 & n.535 (citing Undersigned States Reply Comments at 5-6).

[611] *See* Order No. 1920, 187 FERC ¶ 61,068 at PP 280-282.  In addition to the
discussion in Order No. 1920, we observe that, unlike here, the cases on which
Undersigned States rely addressed the validity of direct and *de jure* limitations of the
rights of certain states relative the rights provided to other states.  *See Franchise Tax Bd.
v. Hyatt,* 578 U.S. at 178 (explaining that Nevada "has applied a special rule of law
applicable only in lawsuits against its sister States"); *Shelby Cnty. v. Holder*, 570 U.S. at
544 ("And despite the tradition of equal sovereignty, the Act applies to only nine States
(and several additional counties)."); *Coyle v. Smith*, 221 U.S. at 579 ("Has Oklahoma
been admitted upon an equal footing with the original states?  If she has, she, by virtue of
her jurisdictional sovereignty as such a state, may determine for her own people the
proper location of the local seat of government."); *cf. Stearns v. Minn.*, 179 U.S. at 244-
45 (discussing the validity of certain provisions of the enabling act admitting Minnesota

Docket No.  RM21-17-001                                                                    - 190 -

197.   Also unpersuasive is Undersigned States' nondelegation argument.[612]  To begin

with, this argument was not raised prior to rehearing, as required by the Commission's

Rule of Practice and Procedure 713(c)(3).[613]  We typically do not consider arguments

raised for the first time on rehearing, unless those arguments could not have been

previously presented, e.g., claims based on information that only recently became

available or concerns prompted by a change in material circumstances.[614]  Commenters

had the opportunity to raise this argument, but did not do so.[615]

---

to the Union, as incorporated in the Minnesota Constitution, in noting that "a state
admitted into the Union enters therein in full equality with all the others").

[612] *See* Undersigned States Rehearing Request at 17-18.

[613] *See* 18 CFR 385.713(c)(3) (providing that any request for rehearing must "[s]et
forth the matters relied upon by the party requesting rehearing, if rehearing is sought
based on matters not available for consideration by the Commission at the time of the
final decision or final order").

[614] *See Ala. Power Co.*, 179 FERC ¶ 61,128, at P 15 (2022); *KEI (Me.) Power
Mgmt. (III) LLC*, 173 FERC ¶ 61,069, at P 38 n.77 (2020); *Tex. E. Transmission, LP*, 141
FERC ¶ 61,043, at P 19 (2012) ("We do so because (1) our regulations preclude other
parties from responding to a request for rehearing and (2) such behavior is disruptive to
the administrative process because it has the effect of moving the target for parties
seeking a final administrative decision." (quotation marks omitted)); *Calpine Oneta
Power v. Am. Elec. Power Serv. Corp.*, 114 FERC ¶ 61,030, at P 7 (2006); *Iroquois Gas
Transmission Sys., L.P.*, 86 FERC ¶ 61,261, at 61,949 (1999)); *Ocean State Power II*, 69
FERC ¶ 61,146, at 61,548 (1994); *NO Gas Pipeline v. FERC*, 756 F.3d 764, 770 ("We
finally note that Jersey City's alleged constitutional claim of actual bias is also barred as
untimely. Jersey City has shown us nothing of record to establish that it raised this issue
before FERC's issuance of the initial order.").

[615] *See U.S. v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37 (1952) ("Simple
fairness to those who are engaged in the tasks of administration, and to litigants, requires
as a general rule that courts should not topple over administrative decisions unless the
administrative body not only has erred but has erred against objection made at the time
appropriate under its practice."); *cf. Reytblatt v. U.S. Nuclear Regul. Comm'n*, 105 F.3d

198.   In any event, a statute does not violate the nondelegation doctrine so long as Congress has set forth an "intelligible principle" to guide the delegee's exercise of authority.[616]   Undersigned States fail to apply (or even acknowledge) this test, address the precedent setting it forth, or engage with the text of the FPA.[617]   Instead, distinct from their major questions doctrine argument, they assert a *per se* bar on Congress delegating "major policy questions" to agencies.[618]   They cite no case adopting this sweeping rule,[619] and we therefore decline to apply this approach here.[620]   Moreover, Undersigned States'

---

715, 723 (D.C. Cir. 1997) (agencies are not required to respond to untimely comments).

[616] *Whitman v. Am. Trucking Ass'ns*, 531 U.S. at 472 (citing *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928)); *see also Fox Television Stations, Inc.*, 556 U.S. at 536; *Nat'l Postal Pol'y Council v. Postal Regul. Comm'n*, 17 F.4th 1184, 1192 (D.C. Cir. 2021).

[617] *Cf. Gundy v. United States*, 588 U.S. 128, 146 (2019) (plurality opinion) ("We have sustained authorizations for agencies to set "fair and equitable" prices and "just and reasonable" rates." (citing *Yakus v. United States*, 321 U.S. 414, 422, 427 (1944); *FPC v. Hope Nat. Gas Co.*, 320 U.S. 591 (1944)).

[618] *See* Undersigned States Rehearing Request at 17-18.

[619] *See id.* (citing *Paul v. U.S.*, 140 S. Ct. at 342 (2019) (Mem.) (Kavanaugh, J., statement respecting denial of certiorari) (expressly recognizing that "the Court has not adopted a nondelegation principle for major questions"); *Union Dep't, AFL-CIO v. Am. Petroleum Inst.*, 448 U.S. at, 685-86 (Rehnquist, J., concurring in judgment) (similar); *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495).

[620] This argument is also in tension with the Court's articulation of the major questions doctrine in *West Virginia*. *See* 597 U.S. at 721, 723 (explaining that the major questions doctrine applied only in extraordinary cases, based on specific statutory context and a variety of factors, and that "delegation[s]" to address major questions were permissible with clear congressional authorization); *cf. Paul v. U.S.*, 140 S. Ct. at 342 (Mem.) (Kavanaugh, J., statement respecting denial of certiorari) (recognizing that application of this test would overturn the aspect of major questions doctrine allowing Congress to "delegate to the agency the authority both to decide the major policy

single-sentence argument fails to explain the parameters of this test or how we would apply it to the statutory text of the FPA or Order No. 1920.  And even were we to set aside the foregoing, we would still disagree that Order No. 1920 involves the delegation of such a "major policy question" for the reasons stated herein and in Order No. 1920.[621]

199.    Finally, Ohio Commission Federal Advocate incorrectly claims that Order No. 1920 "violates the federal Commerce Clause" on the theory that Order No. 1920 may disproportionately benefit commerce in certain states, which have implemented policies allegedly favored by the rule, as compared to other states.[622]  As discussed above, Order No. 1920 is a valid exercise of congressionally granted authority under the FPA.  It does not favor particular state policies or transmission planning outcomes, but rather takes state policies as inputs into Long-Term Regional Transmission Planning.[623]  Furthermore, the precedent that Ohio Commission Federal Advocate cites does not support concluding that a generally applicable Commission rule promulgated pursuant to its authority under the FPA (itself a valid exercise of Congress's Commerce Clause authority) violates the Commerce Clause if that rule may have disparate effects on commerce in various states.[624]

---

question and to regulate and enforce").

[621] *See supra* Major Questions Doctrine section; Order No. 1920, 187 FERC ¶ 61,068 at PP 253-62, 275-78.

[622] Ohio Commission Federal Advocate Rehearing Request at 18-19.

[623] *See supra* Federal/State Division of Authority section.

[624] *See* Ohio Commission Federal Advocate Rehearing Request at 18-19; *Gen.*

## V.    Long-Term Regional Transmission Planning

### A.    Requirement to Participate in Long-Term Regional Transmission Planning

#### 1.    Order No. 1920 Requirements

200.    In Order No. 1920, the Commission required transmission providers in each transmission planning region to participate in a regional transmission planning process that includes Long-Term Regional Transmission Planning, meaning regional transmission planning on a sufficiently long-term, forward-looking, and comprehensive basis to identify Long-Term Transmission Needs, identify transmission facilities that meet such needs, measure the benefits of those transmission facilities, and evaluate those transmission facilities for potential selection in the regional transmission plan for purposes of cost allocation as the more efficient or cost-effective transmission facilities to meet Long-Term Transmission Needs.  The Commission required that Long-Term

---

*Motors Corp. v. Tracy*, 519 U.S. at 281-82, 287-88, 311-12 (addressing whether state sales and use taxes were impermissible as discriminatory under dormant Commerce Clause or Equal Protection Clause jurisprudence; holding that the taxes violated neither provision of the Constitution); *City of Phila. v. N.J.*, 437 U.S. at 623 (similarly addressing issues arising under dormant Commerce Clause jurisprudence, in the absence of controlling federal legislation, particularly as to whether New Jersey could close its borders to importation of certain waste); *H. P. Hood & Sons, Inc. v. Du Mond*, 336 U.S. at 545 ("Since the [state] statute as applied violates the [dormant] Commerce Clause and is not authorized by federal legislation pursuant to that Clause, it cannot stand."); *cf. Printz v. United States,*, 521 U.S. at 935 ("We held in *New York* that Congress cannot compel the States to enact or enforce a federal regulatory program. Today we hold that Congress cannot circumvent that prohibition by conscripting the State's officers directly."); *New York v. U.S.* 505 U.S. at 161 ("This litigation . . . concerns the circumstances under which Congress may use the States as implements of regulation . . . .").

Regional Transmission Planning comply with the following Order Nos. 890 and 1000 transmission planning principles: (1) coordination; (2) openness; (3) transparency; (4) information exchange; (5) comparability; and (6) dispute resolution.[625]

201.    The Commission explained that Long-Term Regional Transmission Planning will enhance the existing regional transmission planning and cost allocation processes required by Order No. 1000. The Commission also stated that, except as set forth in Order No. 1920, it does not require any transmission provider to replace or otherwise make changes to its existing Order No. 1000-compliant regional transmission planning processes that plan for reliability or economic transmission needs, or the associated Order No. 1000-compliant regional cost allocation method(s). As such, the Commission explained, transmission providers may continue to rely on their existing regional transmission planning and cost allocation processes to comply with Order No. 1000's requirements related to transmission needs driven by reliability concerns or economic considerations.[626] The Commission also declined a request to mandate that the "base cases" used in Order No. 1000 regional transmission planning processes and the Long-Term Scenarios used in Long-Term Regional Transmission Planning be defined in the same process.[627]

---

[625] Order No. 1920, 187 FERC ¶ 61,068 at P 224.

[626] *Id.* P 241.

[627] *Id.* P 246.

202.    The Commission further explained that Order No. 1920 does not alter the existing

Order No. 1000 requirement to consider Public Policy Requirements in the regional

transmission planning process, and further stated that it will instead deem transmission

providers to be in compliance with this existing requirement by conducting Long-Term

Regional Transmission Planning in accordance with the requirements set for in Order

No. 1920.[628]  The Commission allowed transmission providers to propose in their Order

No. 1920 compliance filings to continue using some or all aspects of the existing regional

transmission planning and cost allocation processes that they use to consider transmission

needs driven by Public Policy Requirements.  The Commission held that transmission

providers nevertheless must comply with the Long-Term Regional Transmission

Planning requirements set forth in Order No. 1920, such that continued use of existing

regional transmission planning and cost allocation processes related to transmission needs

driven by Public Policy Requirements will not supplant transmission providers'

obligation to comply with Order No. 1920.  The Commission required that, in their Order

No. 1920 compliance filings, transmission providers that wish to continue to use some or

all of their existing regional transmission planning and cost allocation processes to

consider transmission needs driven by Public Policy Requirements must demonstrate that

continued use of any such processes does not interfere with or otherwise undermine

Long-Term Regional Transmission Planning as set forth in Order No. 1920.[629]

---

[628] *Id.* P 242.

[629] *Id.* P 243.

203.    The Commission also allowed transmission providers to propose a regional transmission planning process that simultaneously plans for shorter-term reliability and economic transmission needs, as well as Long-Term Transmission Needs as defined in Order No. 1920, through a combined process.  The Commission required transmission providers proposing to address all of these transmission needs in a single regional transmission planning process to demonstrate that such a unified regional transmission planning process continues to comply with Order No. 1000, as well as with the Long-Term Regional Transmission Planning requirements set forth in Order No. 1920, by demonstrating that such a combined process is consistent with or superior to the requirements of both Order Nos. 1000 and 1920.  The Commission explained that, in the case that the requirements of Order Nos. 1000 and 1920 conflict, the Order No. 1920 requirements will prevail, and transmission providers must demonstrate that their proposed regional transmission planning process is consistent with or superior to the applicable Order No. 1920 requirements.[630]

204.    As described further in the Implementation of Long-Term Regional Transmission Planning section below, in Order No. 1920, the Commission required transmission providers to explain on compliance how the initial timing sequence for Long-Term Regional Transmission Planning interacts with existing regional transmission planning processes.  The Commission required transmission providers to provide in their explanations any information necessary to ensure that stakeholders understand this

---

[630] *Id.* P 244.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1573 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No. RM21-17-001                                                  - 197 -

interaction, including at least the following two components. First, the Commission required transmission providers to address the possible interaction between the transmission planning cycle for Long-Term Regional Transmission Planning and existing Order No. 1000 regional transmission planning processes. The Commission recognized that there may be overlap in the time horizon for Long-Term Regional Transmission Planning and existing Order No. 1000 regional transmission planning processes and that these processes will likely inform each other.[631] Second, the Commission required transmission providers to address the possible displacement of regional transmission facilities from the existing regional transmission planning processes. The Commission recognized that it is possible that, in some cases, Long-Term Regional Transmission Facilities selected to address Long-Term Transmission Needs may provide near-term reliability or economic benefits, and thus could displace regional transmission facilities that are under consideration as part of existing regional transmission planning processes.[632]

## 2.    Requests for Rehearing and Clarification

205.    Multiple parties request rehearing and clarification on the requirement that, in their Order No. 1920 compliance filings, transmission providers that wish to continue to use some or all of their existing regional transmission planning and cost allocation processes to consider transmission needs driven by Public Policy Requirements must demonstrate

---

[631] *Id.* P 1071.

[632] *Id.* (citation omitted).

Docket No.  RM21-17-001                                                          - 198 -

that continued use of any such processes does not interfere with or otherwise undermine

Long-Term Regional Transmission Planning as set forth in Order No. 1920.  Large

Public Power requests clarification that the Commission will presume the existing

regional transmission planning and cost allocation processes that transmission providers

use to consider transmission needs driven by Public Policy Requirements to be just and

reasonable.  Large Public Power claims that this is an issue on which the Commission

was not clear in Order No. 1920, because the Commission stated that Order No. 1920

"do[es] not alter the existing Order No. 1000 requirement to consider transmission needs

driven by Public Policy Requirements in the regional transmission planning process," that

transmission providers may propose to continue using these processes, and that

transmission providers proposing to do so "must demonstrate that continued use of any

such processes does not interfere with or otherwise undermine Long-Term Regional

Transmission Planning as set forth in this final rule."[633]  Large Public Power contends

that its members see value in existing regional transmission planning processes that

transmission providers use to consider transmission needs driven by Public Policy

Requirements, and requests that the Commission not disrupt these processes—in

particular the process conducted by NYISO.  Large Public Power describes certain

aspects of NYISO's regional transmission planning process and explains that the New

---

[633] Large Public Power Rehearing Request at 4-6 (quoting Order No. 1920, 187
FERC ¶ 61,068 at PP 242-243).

Docket No. RM21-17-001          - 199 -

York Commission and the Commission each have approved these processes.[634]  Large Public Power therefore requests that, in reviewing transmission providers' Order No. 1920 compliance filings, the Commission presume that these existing processes are just and reasonable, and argues that the Commission should not require transmission providers and their stakeholders to face the burden of demonstrating that these processes are just and reasonable.[635]  If the Commission does not grant clarification, Large Public Power requests rehearing on the ground that the Commission did not advance in Order No. 1920 any "cogent rationale" for treating regional transmission planning processes that consider Public Policy Requirements differently from those that plan for reliability or economic transmission needs.[636]

206.   Similar to Large Public Power's rehearing request, Pennsylvania Commission argues that requiring transmission providers in Order No. 1920 to demonstrate that continued use of existing regional transmission planning and cost allocation processes to consider transmission needs driven by Public Policy Requirements does not interfere with or otherwise undermine Long-Term Regional Transmission Planning is an abuse of discretion, and that the Commission failed to engage in reasoned decision making.[637] Pennsylvania Commission further argues that this requirement is inconsistent with the

---

[634] *Id.* at 6-9.

[635] *Id.* at 4, 6, 9.

[636] *Id.* at 7.

[637] Pennsylvania Commission Rehearing Request at 2.

Docket No. RM21-17-001                                                     - 200 -

Commission's statements that, outside the context of Long-Term Regional Transmission

Planning, Order No. 1920 will not "otherwise disturb[] the regional transmission

planning structure required by Order No. 1000" or "inadvertently cause the re-litigation

of aspects of those existing processes."[638]  Pennsylvania Commission contends that Order

No. 1920 requires full re-litigation on compliance of all processes used to satisfy Public

Policy Requirements, including PJM's State Agreement Approach because it addresses

state Public Policy Requirements.[639]  Pennsylvania Commission argues that the

Commission should amend Order No. 1920 to either remove this compliance

requirement, explicitly limit it to processes used for Long-Term Regional Transmission

Planning, or to clarify that PJM's State Agreement Approach does not interfere with

Long-Term Regional Transmission Planning and therefore would not be subject to re-

litigation.[640]

207.    Similarly, PJM States request that the Commission clarify that PJM's State

Agreement Approach does not conflict with Order No. 1920, and that states within PJM

can continue to pursue public policies through the voluntary election of the State

---

[638] Order No. 1920, 187 FERC ¶ 61,068 at PP 252, 256; *see* Pennsylvania
Commission Rehearing Request at 2.

[639] Pennsylvania Commission Rehearing Request at 2-3 (citing Order No. 1920,
187 FERC ¶ 61,068 at P 243).

[640] *Id.*

Docket No. RM21-17-001                                                    - 201 -

Agreement Approach in its current form.[641]  Pennsylvania Commission also supports and

adopts the clarification request of PJM States.[642]

208.    PIOs argue that existing Order No. 1000 regional transmission planning processes

that plan for reliability or economic transmission needs are unjust, unreasonable, and

unduly discriminatory, and they request rehearing of various aspects of Order No. 1920

to ensure that these existing processes complement Long-Term Regional Transmission

Planning rather than conflict with and undermine it.[643]  Citing a number of statements in

Order No. 1920, PIOs contend that these existing regional transmission planning

processes threaten the reliability of the transmission system, fail to build transmission

infrastructure necessary to meet regional transmission needs over the long term, and

instead invest in transmission facilities addressing narrower, shorter-term needs, which

ultimately leads to transmission customers paying unjust and unreasonable rates.[644]  PIOs

contend that evidence in the record demonstrates that failing to address the "systemic

inadequacies" of existing regional transmission planning processes or aligning them with

Long-Term Regional Transmission Planning will perpetuate unjust and unreasonable

rates.[645]

---

[641] PJM States Rehearing Request at 6-7.

[642] Pennsylvania Commission Rehearing Request at 1.

[643] *See generally* PIOs Rehearing Request at 16-25.

[644] *Id.* at 16-18.

[645] *Id.* at 20.

Docket No. RM21-17-001                                                  - 202 -

209.    PIOs therefore request that the Commission amend Order No. 1920 in three ways.

First, PIOs argue that the Commission should require transmission providers either to

conduct a regional transmission planning process that simultaneously plans for shorter-

term reliability and economic transmission needs and Long-Term Transmission Needs

through a combined process or to align the methods of all regional transmission planning

processes, including Long-Term Regional Transmission Planning.[646]  Second, PIOs argue

that the Commission should delineate clear boundaries between and align the timing of

Long-Term Regional Transmission Planning and existing processes, such that

transmission providers would address only the limited regional transmission needs that

cannot be reasonably anticipated and cannot be addressed during a Long-Term Regional

Transmission Planning cycle.  Otherwise, PIOs contend, these processes all would

identify transmission facilities over the same planning periods despite different

underlying assumptions, benefits assessments, and cost allocation.[647]  Third, PIOs argue

that the Commission should require Long-Term Regional Transmission Planning and

existing processes to use the same "base case" embodying transmission providers' best

assessment of future system conditions.  Otherwise, PIOs contend, transmission providers

ultimately may identify redundant transmission facilities, fail to identify more efficient or

---

[646] *Id.* at 21-23.

[647] *Id.* at 23-24.

cost-effective Long-Term Regional Transmission Facilities, or be motivated to undermine Long-Term Regional Transmission Planning in favor of existing processes.[648]

### 3.    Commission Determination

210.    We decline to grant the clarification sought by Large Public Power that the Commission will presume the existing regional transmission planning and cost allocation processes that transmission providers use to consider transmission needs driven by Public Policy Requirements to be just and reasonable.  We disagree with Large Public Power that Order No. 1920 was unclear as to how the Commission will evaluate any proposals transmission providers may make in their compliance filings to continue using some or all aspects of the existing regional transmission planning and cost allocation processes that they use to consider transmission needs driven by Public Policy Requirements.  We also disagree with the Pennsylvania Commission that the Commission failed to engage in reasoned decision making.  The Commission stated clearly in Order No. 1920, and we continue to find, that, while transmission providers may propose to retain existing Order No. 1000 regional transmission planning and cost allocation processes related to transmission needs driven by Public Policy Requirements, transmission providers that do so must demonstrate that continued use of any such processes does not interfere with or otherwise undermine Long-Term Regional Transmission Planning as set forth in Order No. 1920.[649]  In other words, the Commission will not presume the existing regional

---

[648] *Id.* at 24-25.

[649] Order No. 1920, 187 FERC ¶ 61,068 at P 243; *see also id.* P 240 (declining to pre-judge whether any existing regional transmission planning processes meet the

transmission planning and cost allocation processes used to consider transmission needs

driven solely by Public Policy Requirements are just and reasonable.

211.    We also disagree with Large Public Power's argument that the Commission did

not justify the differential treatment of regional transmission planning processes that

consider transmission needs driven by Public Policy Requirements compared to those

that plan for reliability or economic transmission needs.  The Commission found that

conducting Long-Term Regional Transmission Planning as set forth in Order No. 1920 is

sufficient to comply with the Order No. 1000 requirement to consider Public Policy

Requirements in the regional transmission planning process.  In other words, Long-Term

Regional Transmission Planning may subsume the purpose of existing regional

transmission planning and cost allocation processes used to consider transmission needs

driven by Public Policy Requirements.  Given that potential, it is necessary and

appropriate to require transmission providers to demonstrate that continued use of Order

No. 1000 processes to consider transmission needs driven by Public Policy Requirements

does not interfere with or otherwise undermine Long-Term Regional Transmission

Planning under Order No. 1920.  We also note that Order No. 1920 allows transmission

providers to propose a regional transmission planning process that simultaneously plans

for shorter-term reliability and economic transmission needs, as well as Long-Term

Transmission Needs, through a combined process, and that transmission providers

proposing to address all of these transmission needs in a single regional transmission

_____

requirements of Order No. 1920).

planning process must demonstrate that the combined regional transmission planning

process continues to comply with Order No. 1000, as well as with the Long-Term

Regional Transmission Planning requirements set forth in Order No. 1920, by

demonstrating that such a combined process is consistent with or superior to the

requirements of both Order No. 1000 and Order No. 1920.[650]

212.    Similarly, we disagree with the Pennsylvania Commission that this requirement is

inconsistent with the Commission's statements that, except for Long-Term Regional

Transmission Planning, Order No. 1920 will not "otherwise disturb[] the regional

transmission planning structure required by Order No. 1000" or "inadvertently cause the

re-litigation of aspects of those existing processes."[651]  That said, we appreciate the

Pennsylvania Commission's concern that Order No. 1920 requires re-litigation of PJM's

State Agreement Approach and its request that the Commission limit the requirement to

processes used for Long-Term Regional Transmission Planning.  We also recognize PJM

States' request for clarification that PJM's State Agreement Approach does not interfere

or conflict with Long-Term Regional Transmission Planning.  As the Commission

explained in Order No. 1920, this requirement does not alter the existing Order No. 1000

requirement to consider transmission needs driven by Public Policy Requirements in the

regional transmission planning process, and transmission providers will be deemed to be

in compliance with this existing requirement by conducting Long-Term Regional

---

[650] *Id.* P 244.

[651] *Id.* PP 252, 256; *see* Pennsylvania Commission Rehearing Request at 2-3.

Transmission Planning in accordance with the requirements set forth in Order No. 1920.[652]  Thus, Order No. 1920 allows transmission providers to propose in their Order No. 1920 compliance filings to continue using some or all aspects of the existing Order No. 1000 regional transmission planning and cost allocation processes that they use to consider transmission needs driven by Public Policy Requirements, if they so choose. But the Commission held that transmission providers nevertheless must comply with the Long-Term Regional Transmission Planning requirements set forth in Order No. 1920 and that continued use of existing Order No. 1000 regional transmission planning and cost allocation processes related to transmission needs driven by Public Policy Requirements alone is insufficient to comply with Order No. 1920.  Stated differently, transmission providers that wish to continue to use some or all of their existing Order No. 1000 regional transmission planning and cost allocation processes to consider transmission needs driven by Public Policy Requirements must demonstrate that the continued use of any such processes does not interfere with or otherwise undermine Long-Term Regional Transmission Planning as set forth in Order No. 1920.[653]

213.    With respect to PJM's State Agreement Approach specifically, we note that it is separate and apart from PJM's compliance with the Order No. 1000 requirement to consider transmission needs driven by Public Policy Requirements.[654]  Therefore, PJM's

---

[652] Order No. 1920, 187 FERC ¶ 61,068 at P 242.

[653] *Id.* P 243.

[654] *See PJM Interconnection, L.L.C.*, 142 FERC ¶ 61,214, at P 142 (2013) ("We find PJM's proposed State Agreement Approach is not needed for PJM to comply with

Docket No. RM21-17-001                                                   - 207 -

State Agreement Approach is unaffected by Order No. 1920's requirement to justify
continued use of regional transmission planning and cost allocation processes to consider
transmission needs driven by Public Policy Requirements. In response to PJM States and
Pennsylvania Commission, we note that Order No. 1920 does not prohibit PJM from
continuing to use its existing State Agreement Approach. If the Relevant State Entities in
PJM agree to rely on PJM's existing State Agreement Approach as an Order No. 1920
State Agreement Process that applies to selected Long-Term Regional Transmission
Facilities, and PJM agrees, PJM must propose and demonstrate on compliance that its
State Agreement Approach complies with all of the State Agreement Process
requirements set forth in Order No. 1920.

214.    We also disagree with PIOs' rehearing arguments related to existing regional
transmission planning processes that plan for reliability and economic needs and the
relationship of these processes to Long-Term Regional Transmission Planning. First, we
decline PIOs' request that we require transmission providers to conduct a regional
transmission planning process that simultaneously plans for shorter-term reliability and
economic transmission needs and Long-Term Transmission Needs through a combined
process. We continue to find that transmission providers may propose on compliance

---

the provisions of Order No. 1000 addressing transmission needs driven by public policy
requirements. PJM's State Agreement Approach supplements, but does not conflict or
otherwise replace, PJM's process to consider transmission needs driven by public policy
requirements as required by Order No. 1000 . . . . Accordingly, the Commission need not
find that the State Agreement Approach and corresponding cost allocation method
comply with Order No. 1000.").

USCA4 Appeal: 24-1650   Doc: 224     Filed: 01/21/2025   Pg: 1584 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No. RM21-17-001                                                 - 208 -

such a combined process, but we do not require that transmission providers do so because
the difficulty of transitioning to this kind of combined regional transmission planning
process may outweigh any potential benefits of requiring such a process.[655]

215.    Furthermore, we find that requiring transmission providers to use a combined
process to plan for shorter-term reliability and economic transmission needs and Long-
Term Transmission Needs is unnecessary to address the deficiencies in existing regional
transmission planning and cost allocation requirements that the Commission identified in
Order No. 1920.  Specifically, the Commission found that existing regional transmission
planning and cost allocation requirements fail to require transmission providers to:
(1) perform a sufficiently long-term assessment of transmission needs that identifies
Long-Term Transmission Needs; (2) adequately account on a forward-looking basis for
known determinants of Long-Term Transmission Needs; and (3) consider the broader set
of benefits of regional transmission facilities planned to meet those Long-Term
Transmission Needs.[656]  Because we find that Order No. 1920's Long-Term Regional
Transmission Planning and cost allocation requirements adequately remedy these
deficiencies, we decline to impose the additional requirements that PIOs suggest.

216.    Second, we find premature PIOs' arguments as to the need to align methods and
timing between existing regional transmission planning processes and Long-Term
Regional Transmission Planning.  In Order No. 1920, the Commission required

---

[655] Order No. 1920, 187 FERC ¶ 61,068 at P 245.

[656] *Id.* P 114.

transmission providers to explain how Long-Term Regional Transmission Planning will interact with existing regional transmission planning processes to plan for transmission needs driven by reliability concerns or economic considerations, including their timing and the potential that Long-Term Regional Transmission Facilities may displace transmission facilities that are under consideration in those processes.[657]  The Commission will evaluate the interaction between these processes on compliance and address any potential issues with this interaction in the orders on transmission providers' compliance filings.

217.    Third, we disagree with PIOs as to the necessity of requiring that transmission providers use the same "base case" in existing regional transmission planning and in Long-Term Regional Transmission Planning.  The Commission neither proposed such a requirement in the NOPR nor adopted one in Order No. 1920, and we are not persuaded to adopt PIOs' suggestion in this order.  However, we note that nothing in Order No. 1920 precludes transmission providers from using the same base case in existing regional transmission planning and in Long-Term Regional Transmission Planning if they so choose.

---

[657] *Id.* PP 1071-1073.

USCA4 Appeal: 24-1650     Doc: 224     Filed: 01/21/2025     Pg: 1586 of 2455
Document Accession #: 20241121-3139     Filed Date: 11/21/2024

Docket No.  RM21-17-001                                               - 210 -

B.    **Long-Term Scenarios Requirements**

1.    **Requirement for Transmission Providers To Use the Seven Required Benefits To Help To Inform Their Identification of Long-Term Transmission Needs**

a.    **Order No. 1920 Requirements**

218.    Order No. 1920 required transmission providers to participate in a regional transmission planning process that includes Long-Term Regional Transmission Planning, which is defined as a multi-step process to:  (1) identify Long-Term Transmission Needs; (2) identify transmission facilities that meet such needs; (3) measure the benefits of those transmission facilities; and (4) evaluate those transmission facilities for potential selection in the regional transmission plan for purposes of cost allocation.[658]  Order No. 1920 defined Long-Term Transmission Needs as "transmission needs identified through Long-Term Regional Transmission Planning by, among other things and as discussed in this final rule, running scenarios and considering the enumerated categories of factors."[659]

219.    Order No. 1920 generally addressed the identification of Long-Term Transmission Needs and the measurement of the benefits of Long-Term Regional Transmission Facilities separately.[660]  The Commission stated, however, that transmission providers "must use [the seven required benefits] to help to inform their identification of Long-

---

[658] *Id.* P 224.

[659] *Id.* PP 39, 299.

[660] *E.g.*, *id.* P 224 (describing these two requirements as separate steps).

Docket No.  RM21-17-001                                                                          - 211 -

Term Transmission Needs."[661]  The Commission provided an example of how

transmission providers can use one of the required benefits (the production cost savings

benefit, Benefit 3) to help identify Long-Term Transmission Needs.[662]

### b.    Requests for Rehearing and Clarification

220.    PJM requests clarification that the Commission did not intend to require

transmission providers to use any of the seven benefits outlined in Order No. 1920 to help

inform the identification of Long-Term Transmission Needs.  If the Commission did

intend to require transmission providers to use the set of seven required benefits to help

inform the identification of Long-Term Transmission Needs, PJM requests that the

Commission grant rehearing, either to eliminate this requirement or to provide

transmission providers with flexibility as to this requirement to accommodate regional

differences.  PJM asserts that Order No. 1920 contains only one discussion of a

requirement for transmission providers to use the seven required benefits to help inform

their identification of Long-Term Transmission Needs, and, as such, PJM questions

whether the Commission intended to impose this requirement.[663]  PJM further asserts that

the Commission offered only one hypothetical example of how one of these seven

---

[661] *Id.* PP 301, 719; *see id.* P 667 n.1485, P 859 n.1910.

[662] *Id.* P 301 ("[W]hen transmission providers are working to identify Long-Term Transmission Needs, areas of significant congestion on the transmission system—where Long-Term Regional Transmission Facilities could reduce congestion and in turn facilitate production cost savings—may indicate a Long-Term Transmission Need.").

[663] PJM Rehearing Request at 24-26 (citing Order No. 1920, 187 FERC ¶ 61,068 at P 301).

benefits might help inform the identification of Long-Term Transmission Needs, and

PJM argues that the Commission did not provide any evidence, let alone substantial

evidence, to demonstrate why transmission providers should be required to use the seven

benefits to inform the identification of Long-Term Transmission Needs.[664]  PJM further

claims that requiring the use of all seven benefits outlined in Order No. 1920 to help

inform the identification of Long-Term Transmission Needs is inconsistent with PJM's

sponsorship model because, in such a model, transmission developers propose

transmission facilities after and in response to identified transmission needs, such that

using the benefits of such transmission facilities to identify transmission needs is

circular.[665]  PJM also asserts that the NOPR did not provide notice of the requirement that

transmission providers use the seven benefits to help inform the identification of Long-

Term Transmission Needs, and PJM therefore lacked opportunity to provide comments as

to why the requirement is inappropriate for the PJM region.[666]

221.    SERTP Sponsors argue that Order No. 1920 defines Long-Term Transmission

Needs in a circular fashion by describing them as "transmission needs identified through

Long-Term Regional Transmission Planning by, among other things and as discussed in

this final rule, running scenarios and considering the enumerated categories of factors,"[667]

---

[664] *Id.* at 25.

[665] *Id.* at 25-26.

[666] *Id.* at 25 n.103.

[667] SERTP Sponsors Rehearing Request at 11 (quoting Order No. 1920, 187 FERC

but also requiring that the seven required benefits should inform the identification of Long-Term Transmission Needs.[668]  SERTP Sponsors claim that this creates a potential chicken-or-egg conundrum, because Long-Term Transmission Needs are driven by factors and must be identified before the use and measurement of the seven required benefits to evaluate Long-Term Regional Transmission Facilities.[669]

222.    PIOs request three clarifications related to the requirement that transmission providers use the seven benefits to help to inform the identification of Long-Term Transmission Needs.[670]  First, PIOs request that the Commission clarify what "help to inform" means in this context, in order to avoid an outcome in which the seven benefits are only considered superficially rather than as meaningful determinants of Long-Term Transmission Needs.  Second, PIOs request that the Commission clarify that transmission providers may not identify Long-Term Transmission Needs solely on the basis of one of the Order No. 1000 "silos," e.g., reliability.  PIOs claim that, if a transmission provider were to identify Long-Term Transmission Needs solely based on reliability, for example, and then use the seven required benefits only to compare potential solutions, the resulting set of needs would be incomplete, and the resulting solutions would be inefficient.  Third,

---

¶ 61,068 at P 39).

[668] *Id.* (citing Order No. 1920, 187 FERC ¶ 61,068 at P 719).

[669] *Id.*

[670] PIOs Rehearing Request at 59 (citing Order No. 1920, 187 FERC ¶ 61,068 at PP 301, 719).

Docket No.  RM21-17-001                                           - 214 -

PIOs request clarification that the requirement to use the seven required benefits to help identify Long-Term Transmission Needs applies equally to transmission providers that use a competitive bidding process and to those that use a sponsorship model.  Regarding the sponsorship model in particular, PIOs also request clarification as to how the Commission envisions the process by which transmission providers could use the seven required benefits to help identify needs, without these needs being so granular that the transmission provider has effectively defined a specific project.[671]

### c.    Commission Determination

223.    We agree with certain of the rehearing arguments raised by PJM and SERTP Sponsors and therefore we set aside the requirement for transmission providers to use the set of seven required benefits to help inform their identification of Long-Term Transmission Needs.  Specifically, we find that PJM and SERTP Sponsors highlight potential challenges and difficulty transmission providers may have in implementing this requirement.  As further explained below, although we find that it is appropriate to set this requirement aside, we clarify and emphasize that the identification of Long-Term Transmission Needs should rely on economic and reliability drivers.

224.    In requiring transmission providers to use the set of seven required benefits to help to inform their identification of Long-Term Transmission Needs, the Commission intended in Order No. 1920 to ensure that transmission providers would use their experience evaluating both the reliability and economic benefits of transmission

---

[671] *Id.* at 59-60.

Docket No.  RM21-17-001                                                                - 215 -

facilities—as reflected in the seven required benefits—and technical expertise assessing

the transmission system to identify whether there are reliability issues or opportunities to

relieve constraints that could be resolved through Long-Term Regional Transmission

Facilities identified through Long-Term Regional Transmission Planning.  Upon further

consideration, we find that Order No. 1920's Long-Term Regional Transmission

Planning requirements, including the requirements to develop Long-Term Scenarios

using the minimum required Factor Categories,[672] to use the minimum required

transmission planning horizon,[673] and to develop Long-Term Scenarios that are plausible

and diverse,[674] taken together, will ensure that transmission providers identify Long-Term

Transmission Needs.

225.    Thus, we are clarifying here that the categories of factors will help transmission

providers identify Long-Term Transmission Needs, consistent with the Commission's

statements in Order No. 1920.[675]  Potential Long-Term Regional Transmission Facilities

that address Long-Term Transmission Needs, as identified by the Long-Term Scenarios

---

[672] Order No. 1920, 187 FERC ¶ 61,068 at P 409.

[673] *Id.* P 344.

[674] *Id.* P 414.

[675] *See id.* P 299 (stating that "the drivers of transmission needs are diverse and include, but are not limited to, evolving reliability concerns, changes in the resource mix, and changes in demand"); *id.* P 300 (stating that "Long-Term Transmission Needs are similar in kind to transmission needs identified through existing regional transmission planning processes established under Order No. 1000," which include both reliability and economic considerations).

and sensitivities, will then be evaluated for their economic and reliability benefits, which will ensure that Long-Term Regional Transmission Planning leads to transmission solutions that more efficiently or cost-effectively address reliability and economic transmission needs over the appropriate transmission planning horizon.[676]

226.    Finally, because we are setting aside the requirement for transmission providers to use the set of seven required benefits to help inform their identification of Long-Term Transmission Needs, we find moot PIOs' request for clarification concerning this requirement.

### 2.    Transmission Planning Horizon

### a.    Order No. 1920 Requirements

227.    In Order No. 1920, the Commission required transmission providers in each transmission planning region to develop Long-Term Scenarios as part of Long-Term Regional Transmission Planning using no less than a 20-year transmission planning horizon.  The Commission defined Long-Term Scenarios as scenarios that incorporate various assumptions using best available data inputs about the future electric power

---

[676] We note that this understanding that potential Long-Term Regional Transmission Facilities that address Long-Term Transmission Needs are evaluated for both reliability and economic benefits is consistent with the Commission's determination in Order No. 1920 that, while transmission providers have significant flexibility to determine a regionally appropriate *ex ante* cost allocation, such cost allocation may not be based on a siloed approach that assumes Long-Term Regional Transmission Planning addresses only reliability or only economic needs.  However, as also noted below, transmission providers and Relevant State Entities have broad flexibility to recognize the different types of benefits provided by Long-Term Regional Transmission Facilities and allocate costs in proportion to those benefits.  *See infra* General Benefits Requirements Related to Cost Allocation section.

Docket No. RM21-17-001                                                        - 217 -

system over a sufficiently long-term, forward-looking transmission planning horizon to identify Long-Term Transmission Needs and enable the identification and evaluation of transmission facilities to meet such transmission needs.[677]  The Commission defined best available data inputs as data inputs that are timely, developed using best practices and diverse and expert perspectives, adopted via a process that satisfies the transmission planning principles of Order Nos. 890 and 1000, and reflect the list of factors that transmission providers account for in their Long-Term Scenarios.[678]

228.    The Commission clarified that using a transmission planning horizon of no less than 20 years means that transmission providers must develop Long-Term Scenarios to identify Long-Term Transmission Needs that will materialize in the 20 years or more following the commencement of the Long-Term Regional Transmission Planning cycle.[679]  The Commission explained that requiring a transmission planning horizon of not less than 20 years strikes a balance.  On the one hand, the Commission stated, a 20-year transmission planning horizon extends far enough into the future that transmission providers can proactively identify Long-Term Transmission Needs that could be met with more efficient or cost-effective Long-Term Regional Transmission Facilities and allows sufficient time to identify, plan, obtain siting and permitting approval for, and construct more efficient or cost-effective Long-Term Regional Transmission Facilities.  On the

---

[677] Order No. 1920, 187 FERC ¶ 61,068 at P 302.

[678] *Id.* P 633.

[679] *Id.* P 344.

Docket No.  RM21-17-001                                                          - 218 -

other hand, the Commission found that there may be sufficient uncertainty regarding

system conditions and transmission needs beyond a 20-year transmission planning

horizon such that it may be challenging for transmission providers to forecast Long-Term

Transmission Needs across that time period.[680]

229.    In adopting the minimum 20-year transmission planning horizon requirement in

Order No. 1920, the Commission disagreed that a 20-year transmission planning horizon

could result in Long-Term Regional Transmission Planning based on speculative

transmission needs.  The Commission explained that the Long-Term Regional

Transmission Planning requirements adopted in Order No. 1920 are designed to avoid

over-building transmission in response to speculative transmission needs through a series

of tools and safeguards, which include the requirement that transmission providers

reevaluate Long-Term Regional Transmission Facilities in certain circumstances.[681]

230.    The Commission also disagreed with requests that it adopt a shorter transmission

planning horizon, reasoning that a shorter planning horizon would fail to sufficiently

capture Long-Term Transmission Needs given that some drivers of such needs extend up

to 20 years into the future.  The Commission added that a shorter minimum transmission

planning horizon might not allow for sufficient time to develop Long-Term Regional

Transmission Facilities with long lead-time requirements or to compare alternative

---

[680] *Id.* P 345.

[681] *Id.* P 348.

Docket No. RM21-17-001                                                          - 219 -

transmission solutions to identify more efficient or cost-effective transmission solutions to meet Long-Term Transmission Needs.[682]

### b.    Requests for Rehearing and Clarification

231.    Alabama Commission, Ohio Commission Federal Advocate, and Dominion seek rehearing of Order No. 1920's requirement that transmission providers in each transmission planning region develop Long-Term Scenarios as part of Long-Term Regional Transmission Planning using no less than a 20-year transmission planning horizon.[683]

232.    Dominion contends that Order No. 1920 is arbitrary and capricious because the Commission failed to address Dominion's concerns regarding the use of a 20-year transmission planning horizon.[684]  Dominion asserts that the Commission failed to address its NOPR comments, which argued that a 20-year transmission planning horizon runs the risk of essentially implementing a "transmission Integrated Resource Plan" that mandates potentially speculative transmission projects.  Dominion avers that integrated resource plans are snapshots in time that show potential pathways for meeting future needs and are not concrete, definitive plans.[685]  Dominion states that in its NOPR

---

[682] *Id.* P 349.

[683] Alabama Commission Rehearing Request at 4; Dominion Rehearing Request at 11-14; Ohio Commission Federal Advocate Rehearing Request at 20-21.

[684] Dominion Rehearing Request at 7, 12-15.

[685] *Id.* at 13-14 (citing Dominion NOPR Initial Comments at 18-19).

comments it explained that predicting the future resource mix is challenging and that numerous planning considerations that apply today could change over the next 20 years, which is why Dominion cautioned against requiring transmission providers to make investment and cost allocation decisions based on speculation 20 years into the future.[686]

233.    According to Dominion, its NOPR comments also asserted that a 20-year transmission planning horizon requires using less reliable assumptions, which can lead to stranded or misallocated costs,[687] especially because cost allocation under Order No. 1920 could occur much earlier than before.[688]  Dominion argues that planning further into the future decreases certainty, likely has diminishing returns, and requires transmission providers to deploy personnel with scarce planning expertise—a highly valuable resource—who could be used more efficiently by planning for likelier scenarios.[689]

234.    Further, Dominion argues that because Order No. 1920 would not necessarily permit reevaluation in certain circumstances that could render a transmission project unnecessary—e.g., where changes in technology or load growth obviate the need for a project in a particular location—the reevaluation process is insufficient to address concerns regarding the speculative nature of a 20-year planning horizon.[690]

---

[686] *Id.* at 14 (citing Dominion NOPR Initial Comments at 20).

[687] *Id.* (citing Dominion NOPR Initial Comments at 20).

[688] *Id.*

[689] *Id.* at 15.

[690] *Id.* at 16-18.

235.    Dominion also argues that the Commission arbitrarily dismissed its requests for

flexibility to adopt a timeline that is suited to a particular transmission planning region to

reduce the risk of selection of transmission projects that may not actually be needed.[691]

Dominion states that, if the Commission must prescribe a minimum transmission

planning horizon, it would be more reasonable to continue allowing PJM/Dominion

Energy Virginia to use a 15-year forecast horizon, which strikes a balance between long-

term needs and avoiding speculative projects, and to continue allowing South Carolina

Regional Transmission Planning/Dominion Energy South Carolina to use a 10-year

transmission planning horizon.  Such transmission planning horizons, Dominion claims,

would be more tailored to the transmission planning regions' needs.[692]

236.    Ohio Commission Federal Advocate also asserts that the Commission acted

arbitrarily and capriciously and violated the consumer protection provisions of the FPA

by adopting the 20-year transmission planning horizon requirement.  Ohio Commission

Federal Advocate argues that a 20-year transmission planning horizon puts transmission

planners in the "impossible position" of having to predict the resource mix and location

of resources 20 years in the future and will lead to inefficient and potentially unnecessary

investment decisions.[693]  In the alternative to seeking rehearing on the 20-year

transmission planning horizon requirement, Ohio Commission Federal Advocate requests

---

[691] *Id.* at 15.

[692] *Id.* at 12-13, 16.

[693] Ohio Commission Federal Advocate Rehearing Request at 20-21.

that the Commission clarify that the 20-year planning horizon should be informational only and should not be relied upon for investment decisions until the future can be better ascertained.[694]  Similarly, Alabama Commission contends that a 20-year transmission planning horizon is likely to produce speculative outputs that lack sufficient basis for actionable planning decisions and that action on these outputs should be determined at the state level to avoid costly transmission facilities that are not actually needed.[695]

### i.      Commission Determination

237.    We sustain the requirement that transmission providers in each transmission planning region develop Long-Term Scenarios as part of Long-Term Regional Transmission Planning using no less than a 20-year transmission planning horizon.  The Commission's adoption of a 20-year transmission planning horizon was reasonable and supported by record evidence,[696] and the Commission did not disregard arguments to the contrary.  As the Commission explained in Order No. 1920, a transmission planning horizon of less than 20 years would fail to sufficiently capture Long-Term Transmission Needs given that drivers of such needs can extend up to 20 years into the future, such as state laws that include requirements to be met 15 to 20 years in the future.[697]  In addition,

---

[694] *Id.* at 21.

[695] Alabama Commission Rehearing Request at 4.

[696] *See* Order No. 1920, 187 FERC ¶ 61,068 at PP 309-318 (describing support for a transmission planning horizon of at least 20 years).

[697] *Id.* P 349.

Docket No. RM21-17-001                                                          - 223 -

a 20-year transmission planning horizon allows for more time between when a

transmission facility is identified to meet a future transmission need and when the

transmission need materializes, allowing for sufficient time to identify, plan, obtain siting

and permitting approval for, and construct Long-Term Regional Transmission

Facilities.[698]

238.    Moreover, we continue to find that a shorter minimum transmission planning

horizon may not allow for sufficient time to develop Long-Term Regional Transmission

Facilities with long lead-time requirements or to compare alternative transmission

solutions to identify more efficient or cost-effective transmission solutions to meet Long-

Term Transmission Needs.[699]  We therefore are not convinced by arguments that the

Commission should have adopted a minimum transmission planning horizon shorter than

20 years.

239.    We disagree with arguments that the minimum 20-year transmission planning

horizon could result in the selection of speculative transmission projects or will lead to

inefficient and potentially unnecessary investment decisions,[700] including Dominion's

related argument that a 20-year transmission planning horizon runs the risk of

"essentially implementing a transmission Integrated Resource Plan [] that mandates

---

[698] *Id.* P 345; *see also id.* P 312 (describing arguments of commenters whose comments supported a 20-year transmission planning horizon).

[699] *Id.* P 349.

[700] Alabama Commission Rehearing Request at 4; Dominion Rehearing Request at 11-15; Ohio Commission Rehearing Request at 20-21.

investments in potentially speculative transmission projects" or may result in imprecision and could lead to stranded or misallocated costs.[701]  As the Commission found in Order No. 1920, the Long-Term Regional Transmission Planning requirements include tools and safeguards designed to avoid over-building transmission in response to speculative transmission needs.[702]  These tools and safeguards include:  (1) the requirement that transmission providers develop (and periodically update) multiple plausible and diverse Long-Term Scenarios based upon best available data; (2) transmission providers' flexibility to develop evaluation processes, including selection criteria, that will enable them to select Long-Term Regional Transmission Facilities in a way that maximizes benefits accounting for costs over time without over-building transmission facilities; and (3) the lack of a selection mandate.[703]  We continue to find that, by facilitating regional transmission planning that accounts for a range of potential futures, Order No. 1920 ensures that transmission providers will be able to manage uncertainty, which, in turn, mitigates the risk of speculative transmission development.[704]

240.    Although Dominion argues that the reevaluation process is insufficient to address concerns that a 20-year transmission planning horizon could lead to the selection of

---

[701] Dominion Rehearing Request at 13-14.

[702] Order No. 1920, 187 FERC ¶ 61,068 at P 348.

[703] *Id.* P 231.

[704] *Id.* P 229.

Docket No.  RM21-17-001                                                    - 225 -

speculative transmission projects,[705] Dominion does not demonstrate how Order No.

1920's other tools and safeguards beyond the reevaluation requirement are individually

or collectively insufficient to prevent over-building transmission in response to

speculative transmission needs.[706]  Moreover, robust scenario-planning allows

transmission providers to compare the costs and benefits of Long-Term Regional

Transmission Facilities under different future conditions, which informs selection and

consequently helps to mitigate uncertainty.

241.    In addition, as discussed later,[707] we also clarify that transmission providers must

consult with and consider the positions of the Relevant State Entities as to how to account

for factors related to states' laws, policies, and regulations in transmission planning

assumptions, which will ensure that such factors are effectively accounted for in the

development of Long-Term Scenarios.  We believe this clarification mitigates Ohio

Commission Federal Advocate's concerns that the 20-year transmission planning horizon

could result in unnecessary investment.[708]  With this clarification, Order No. 1920

---

[705] Dominion Rehearing Request at 16-18.

[706] For example, Order No. 1920 requires transmission providers to develop (and periodically update) multiple plausible and diverse Long-Term Scenarios based upon best available data, provides transmission providers with flexibility to develop evaluation processes, including selection criteria, that will enable them to select Long-Term Regional Transmission Facilities in a way that maximizes benefits accounting for costs over time without over-building transmission facilities, and lacks a selection mandate.

[707] *Infra* Stakeholder Process and Transparency section.

[708] We also note that the transparency requirements adopted herein, *see infra* Evaluation and Selection of Long-Term Regional Transmission Facilities, will provide states with additional insight into the efficiency and cost-effectiveness of any Long-Term

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1602 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No. RM21-17-001                                                    - 226 -

provides transmission providers with the tools and safeguards that they need to manage

uncertainty and mitigate the risk of speculative regional transmission development while

preserving the benefits of Long-Term Regional Transmission Planning.

242.    For the same reason, we are unpersuaded by Alabama Commission's related

argument that action on transmission plans should be determined at the state level to

avoid costly transmission facilities that may not be needed. Nonetheless, as further

discussed in this order, we clarify Order No. 1920 to require transmission providers to

include and consider the perspective of Relevant State Entities in multiple ways,

including: (1) to consult with and consider the positions of the Relevant State Entities

and any other entity authorized by a Relevant State Entity as its representative as to how

to account for factors related to states' laws, policies, and regulations when determining

the assumptions that will be used in the development of Long-Term Scenarios; (2) to

include any Long-Term Regional Transmission Cost Allocation Method and/or State

Agreement Process that Relevant State Entities agree to in the transmittal or as an

attachment to their compliance filings; (3) to consult with Relevant State Entities (a) prior

to amending the *ex ante* Long-Term Regional Transmission Cost Allocation Method(s)

and/or State Agreement Process(es) agreed to by Relevant State Entities or (b) if

Relevant State Entities seek for a transmission provider to amend the method on file; (4)

to develop a reasonable number of additional scenarios, when requested by Relevant

State Entities, for the purposes of informing the application of Long-Term Regional Cost

---

Regional Transmission Facilities that transmission providers select.

Docket No.  RM21-17-001                                                      - 227 -

Allocation Method(s) or the development of cost allocation methods through the State
Agreement Process(es); and (5) to make available, on a password-protected portion of
OASIS or other password-protected website, a breakdown of the allocated costs, by zone
(i.e., by transmission provider retail distribution service territory/footprint or RTO/ISO
transmission pricing zone), and a quantification of the benefits imputed to each zone, as
such benefits can be reasonably estimated, when a cost allocation method is agreed upon
under a State Agreement Process or, if no State Agreement Process is used, at the time
the transmission provider selects the Long-Term Regional Transmission Facility.  These
additional measures to involve states will resolve Alabama Commission's concern and
prevent costly transmission facilities that are not actually needed from being constructed.

243.    As to another argument raised by Alabama Commission, which we interpret to
argue that Long-Term Regional Transmission Planning should serve only to inform other
transmission planning processes, we continue to find that remedying the deficiencies in
the Commission's existing regional transmission planning requirements requires that
transmission providers adopt the requirements herein, which will allow them to identify
and have the opportunity to select more efficient or cost-effective Long-Term Regional
Transmission Facilities to meet Long-Term Transmission Needs.[709]

244.    We disagree with Dominion's argument that the Commission failed to address
commenters' request for flexibility regarding the length of the minimum transmission
planning horizon.  The Commission has already justified its decision not to adopt a

---

[709] Order No. 1920, 187 FERC ¶ 61,068 at P 914.

shorter transmission planning horizon, reasoning that a planning horizon of less than 20 years would be insufficient to capture Long-Term Transmission Needs, develop and construct Long-Term Regional Transmission Facilities with long lead-time requirements, and compare alternative transmission solutions to identify more efficient or cost-effective transmission solutions to meet Long-Term Transmission Needs.[710] The Commission explained why providing transmission providers with flexibility to choose a shorter transmission planning horizon would limit transmission providers' ability to adequately plan for Long-Term Transmission Needs and perpetuate the status quo, thus failing to address the deficiencies that the Commission identified in its existing regional transmission planning and cost allocation requirements.[711] Moreover, in adopting the 20-year minimum transmission planning horizon, the Commission struck a balance between, on the one hand, providing transmission providers with sufficient time to proactively identify Long-Term Transmission Needs and ultimately construct more efficient or cost-effective Long-Term Regional Transmission Facilities to meet those needs, and, on the

---

[710] *Id.* P 349.

[711] *See, e.g.*, *id.* PP 115-116 (finding that, under the status quo, most transmission planning regions do not plan beyond a 10-year transmission planning horizon, which prevents transmission providers from identifying Long-Term Transmission Needs and considering regional transmission facilities that may be more efficient or cost-effective solutions to address those needs and fails to take advantage of the potential for efficiencies or economies of scale that regional transmission facilities can provide).

USCA4 Appeal: 24-1650     Doc: 224          Filed: 01/21/2025     Pg: 1605 of 2455
Document Accession #: 20241121-3139     Filed Date: 11/21/2024

Docket No.  RM21-17-001                                              - 229 -

other hand, avoiding uncertainty regarding system conditions and transmission needs

beyond a 20-year horizon.[712]

245.    Finally, we reiterate that, in this order, the Commission clarifies Order No. 1920 to

increase the states' involvement in the Long-Term Transmission Planning Process to

provide them with a greater role in determining Long-Term Transmission Needs, and

ensuring that they are able to provide input into the method used to allocate the costs of

Long-Term Regional Transmission Facilities.

246.    For these reasons, we reject Dominion's request that the Commission allow

PJM/Dominion Energy Virginia to continue to use a 15-year transmission planning

horizon and South Carolina Regional Transmission Planning/Dominion Energy South

Carolina to continue to use a 10-year transmission planning horizon.[713]  Likewise, for

these same reasons, we decline Ohio Commission Federal Advocate's request that the

Commission clarify that Long-Term Scenarios resulting from a 20-year transmission

planning horizon will be used for informational purposes only.

247.    Further, we find unpersuasive Ohio Commission Federal Advocate's allegation

that the Commission contravened the consumer-protection requirements of the FPA by

adopting a 20-year minimum transmission planning horizon.[714]  Ohio Commission

Federal Advocate does not state how the 20-year minimum transmission planning

---

[712] *Id.* P 345.

[713] *See* Dominion Rehearing Request at 12-13, 16.

[714] *See* Ohio Commission Federal Advocate Rehearing Request at 20.

horizon contravenes the FPA nor does it specify which requirements of the FPA the

Commission allegedly transgressed by adopting the 20-year minimum transmission

planning horizon requirement.  To the extent that Ohio Commission Federal Advocate is

claiming that the 20-year minimum transmission planning horizon requirement will result

in unjust and unreasonable rates, as discussed above, we have provided a number of

flexibilities to increase the states' involvement in Long-Term Regional Transmission

Planning and to ensure that there is a significant degree of transparency in Long-Term

Regional Transmission Planning, both of which will ensure that rates are just and

reasonable.  Recognizing these additional flexibilities, we continue to find the required

20-year minimum transmission planning horizon is integral to the requirement that

transmission providers conduct long-term, forward-looking, and more comprehensive

regional transmission planning.[715]  The Commission found that such a requirement is

necessary to remedy the deficiencies that it identified in its existing regional transmission

planning and cost allocation requirements[716] and will help transmission providers to

identify, evaluate, and select more efficient or cost-effective transmission solutions to

Long-Term Transmission Needs, which will help ensure just and reasonable rates.[717]

---

[715] *See* Order No. 1920, 187 FERC ¶ 61,068 at PP 345, 349.

[716] *Id.* P 134.

[717]*See id.* PP 345, 349.

### 3. Frequency of Long-Term Scenario Revisions

### a. Order No. 1920 Requirements

248.    In Order No. 1920, the Commission modified the NOPR proposal and required transmission providers in each transmission planning region to reassess and revise the Long-Term Scenarios that they use in Long-Term Regional Transmission Planning at least once every five years,[718] rather than at least every three years as the NOPR proposed.[719]  The Commission explained that, in implementing this requirement, transmission providers in each transmission planning region must reassess whether the data inputs and factors incorporated in previously developed Long-Term Scenarios need to be updated and then revise those Long-Term Scenarios, as needed, to reflect updated data inputs and factors.[720]  The Commission clarified that a Long-Term Regional Transmission Planning cycle, which begins with the development of Long-Term Scenarios using best available data inputs,[721] and proceeds to identifying Long-Term Transmission Needs, measuring the benefits of Long-Term Regional Transmission Facilities to address those needs, and evaluating and deciding whether to select Long-Term Regional Transmission Facilities, must conclude no later than five years after the

---

[718] *Id.* P 377.

[719] NOPR, 179 FERC ¶ 61,028 at P 97.

[720] Order No. 1920, 187 FERC ¶ 61,068 at P 377.

[721] At the outset of a Long-Term Regional Transmission Planning cycle, transmission providers may develop the new Long-Term Scenarios either by crafting entirely new Long-Term Scenarios or by updating the data inputs and factors for previously developed Long-Term Scenarios.  *Id.*

Docket No.  RM21-17-001                                    - 232 -

date it began.[722]  Transmission providers must complete these steps of the Long-Term

Regional Transmission Planning cycle, including selection decisions, no later than three

years from the date that the Long-Term Regional Transmission Planning cycle began.[723]

249.    The Commission stated that nothing in Order No. 1920 prevents transmission

providers from evaluating and selecting *additional* Long-Term Regional Transmission

Facilities after year three of the Long-Term Regional Transmission Planning cycle and

before the next five-year Long-Term Regional Transmission Planning cycle begins.[724]

However, the Commission explained that, if Long-Term Regional Transmission Facilities

are selected at year three of the Long-Term Regional Transmission Planning cycle, those

same Long-Term Regional Transmission Facilities cannot be de-selected during the

remainder of the current five-year planning cycle.[725]

250.    The Commission found that, while three years provides sufficient time for

transmission providers to complete the steps of the Long-Term Regional Transmission

Planning cycle,[726] requiring the Long-Term Regional Transmission Planning cycle to

repeat at three-year intervals could be administratively burdensome and the benefit of

updating Long-Term Scenarios every three years may not outweigh those additional

---

[722] *Id.* P 378.

[723] *Id.* P 379.

[724] *Id.* P 379 n.873.

[725] *Id.*

[726] Order No. 1920, 187 FERC ¶ 61,068 at P 379 (citations omitted).

Docket No.  RM21-17-001                                                    - 233 -

burdens.[727]  Thus, the Commission found that requiring selection decisions to occur

within three years of commencing a Long-Term Regional Transmission Planning cycle,

while allowing as long as five years between the commencement of each planning cycle,

strikes an appropriate balance between various benefits and burdens.[728]  Order No. 1920

required that transmission providers conclude one Long-Term Regional Transmission

Planning cycle before developing Long-Term Scenarios at the beginning of the next

Long-Term Regional Transmission Planning cycle.[729]

251.   Order No. 1920 also required transmission providers to designate a point in the

evaluation process at which they will decide to either select or not select the relevant

Long-Term Regional Transmission Facility (or portfolio of such Facilities) along with a

point in time or action that concludes a Long-Term Regional Transmission Planning

cycle.[730]  The Commission further stated that transmission providers may propose on

compliance to conduct Long-Term Regional Transmission Planning more frequently than

every five years.[731]

---

[727] *Id.* (citations omitted).

[728] *Id.*

[729] *Id.* P 381.

[730] *Id.*

[731] *Id.* P 384.

Docket No.  RM21-17-001                                                          - 234 -

### b.    Requests for Rehearing and Clarification

252.    PIOs request rehearing of the Commission's decision to extend the Long-Term Regional Transmission Planning Cycle from three years to five years.  They request that the Commission reduce the Long-Term Regional Transmission Planning cycle to three years.[732]  PIOs argue that the Commission's decision to extend the Long-Term Regional Transmission Planning cycle from three years, as it proposed in the NOPR, to five years lacked support in the record, was not based on the Commission's findings, and was arbitrary and capricious given the urgency of the problem.[733]  PIOs assert that the faster transmission drivers change, the more frequently Long-Term Scenarios should be updated.[734]  PIOs contend that, in decreasing the frequency of Long-Term Regional Transmission Planning cycles, the Commission disregarded evidence that transmission drivers—e.g., reliability concerns, demand, interconnection request capacity—have changed at an accelerating pace, since the issuance of the NOPR.[735]

253.    PIOs aver that under Order No. 1920, transmission providers complete the entire substance of the planning cycle projects in the first three years, followed by a "fallow period" for up to two years.[736]  This structure, PIOs argue, fails to alleviate the purported

---

[732] PIOs Rehearing Request at 9-15.

[733] *Id.* at 6 (citations omitted).

[734] *Id.* at 10-11.

[735] *Id.* at 9-11 (citations omitted).

[736] *Id.* at 11 (citing Order No. 1920, 187 FERC ¶ 61,068 at PP 378-379).

Docket No. RM21-17-001                                                    - 235 -

administrative burdens associated with the NOPR's three-year proposal and undermines

Order No. 1920's essential purpose of requiring transmission providers to identify and

address rapidly-shifting and critical regional transmission needs with urgency.[737]  PIOs

assert that it is illogical for the Commission to claim that transmission providers need two

additional years at the end of each cycle to update model inputs in preparation for the

next transmission planning cycle when they initially assembled that same information,

from scratch, in three years.[738]

254.    In support of their request that the Commission grant rehearing and adopt the

NOPR's proposed three-year transmission planning cycle, PIOs also assert that the

structure of the five-year planning structure is unclear.  PIOs argue that Order No. 1920

nearly contradicts itself by stating that transmission providers must "determine whether

to select Long-Term Regional Transmission Facilities no later than three years" after the

cycle begins and then adding that "nothing in this final rule prevents transmission

providers from evaluating and selecting additional Long-Term Regional Transmission

Facilities after year three" of the cycle and before the next cycle begins.[739]  PIOs argue

that, while these and similar statements are facially irreconcilable, they could be

harmonized under a reading that would allow transmission providers to make final

selection decisions on any Long-Term Regional Transmission Facilities up until the end

---

[737] *Id.* at 12.

[738] *Id.* at 12-13.

[739] *Id.* at 13 (quoting Order No. 1920, 187 FERC ¶ 61,068 at PP 379, 381).

Docket No. RM21-17-001                                                      - 236 -

of the five-year transmission planning cycle as long as they make a selection decision on

at least one Long-Term Regional Transmission Facility before the end of year three.[740]

According to PIOs, however, such a structure would undermine stakeholder concerns

about changes to the planning process that occur mid-stream that would require re-

running an analysis and would encourage transmission providers to make decisions when

stakeholders are no longer at the table.[741]  PIOs request that the Commission grant

rehearing and adopt the NOPR's widely supported three-year transmission planning

cycle.[742]

255.    SERTP Sponsors request clarification as to what Order No. 1920 requires with

respect to the inclusion of previously selected Long-Term Regional Transmission

Facilities in updated base or reference cases that transmission providers use in the

subsequent Long-Term Regional Transmission Planning cycle.  SERTP Sponsors claim

that Order No. 1920 may be inconsistent on this question because one section of the rule

appears to require transmission providers to include such facilities in these updated base

or reference cases while another section of the rule appears to provide flexibility on this

issue.[743]

---

[740] *Id.* at 14.

[741] *Id.* at 13-14.

[742] *Id.* at 15.  PIOs also argue that, for the small minority of entities that need more
initial flexibility beyond the one-year period entities already have to file compliance
filings, the Commission could allow for case-by-case extensions.  *Id.*

[743] SERTP Sponsors Rehearing Request at 26-27 (citing Order No. 1920, 187

Docket No. RM21-17-001                                                      - 237 -

### c. Commission Determination

256.    We sustain the requirement that transmission providers in each transmission

planning region reassess and revise the Long-Term Scenarios that they use in Long-Term

Regional Transmission Planning at least once every five years.[744]  We disagree with PIOs

that the decision to extend the Long-Term Regional Transmission Planning cycle from

three years to five years lacked support in the record, was not based on the Commission's

findings, and was arbitrary and capricious.

257.    First, we are not persuaded by PIOs' argument that, by extending the Long-Term

Regional Transmission Planning cycle, the Commission acted inconsistently with its

findings in Order No. 1920 that transmission needs are changing at an increasingly rapid

pace.[745]  In Order No. 1920, the Commission addressed the pace at which transmission

drivers are changing, finding that transmission providers must reassess and revise their

Long-Term Scenarios at least once every five years to ensure that the Long-Term

Scenarios accurately reflect factors that may change over the five-year time span, such as

changes in technology, load forecasts, or federal, federally-recognized Tribal, state, or

local laws.[746]  While transmission needs, and the factors driving those needs, are indeed

changing rapidly, PIOs provide insufficient and unconvincing support for their argument

FERC ¶ 61,068 at PP 382, 1031).

[744] *See* Order No. 1920, 187 FERC ¶ 61,068 at P 377.

[745] PIOs Rehearing Request at 9-11.

[746] Order No. 1920, 187 FERC ¶ 61,068 at P 380.

USCA4 Appeal: 24-1650   Doc: 224     Filed: 01/21/2025     Pg: 1614 of 2455
Document Accession #: 20241121-3139     Filed Date: 11/21/2024

Docket No.  RM21-17-001                                                           - 238 -

that a five-year Long-Term Regional Transmission Planning cycle is incapable of

accounting for that pace of change.  Further, we underscore that Order No. 1920 provides

transmission providers with flexibility to address evolving transmission needs.  For

instance, nothing in Order No. 1920 prohibits transmission providers from updating the

assumptions, inputs, and factors, used to inform Long-Term Scenarios during a Long-

Term Regional Transmission Planning cycle,[747] and, to the extent that transmission

providers believe that a shorter Long-Term Regional Transmission Planning cycle is

necessary to account for the pace of change, they may propose on compliance to conduct

Long-Term Regional Transmission Planning more frequently than every five years.[748]

258.    Second, the Commission's decision to require that Long-Term Regional

Transmission Planning cycles occur at least every five years was guided by comments in

the record urging the Commission to address competing priorities, including:

(1) ensuring timely identification, evaluation, and selection of more efficient or cost-

effective Long-Term Regional Transmission Facilities; (2) providing transmission

providers with sufficient flexibility to address regional differences; and (3) limiting the

---

[747] *See id.* PP 380-381.  We also note that, consistent with Order No. 890's
transparency transmission planning principle, Order No. 1920 requires transmission
providers in each transmission planning region to publicly disclose (subject to any
applicable confidentiality protections) information and data inputs that they use to create
each Long-Term Scenario.  *See id.* P 560 (citing Order No. 890, 118 FERC ¶ 61,119 at
P 471).

[748] *See id.* P 384.

Docket No.  RM21-17-001                                                                    - 239 -

administrative burdens placed on transmission providers.[749]  Order No. 1920's

requirement that transmission providers reassess and revise the Long-Term Scenarios that

they use in Long-Term Regional Transmission Planning at least once every five years

strikes a reasonable balance between those priorities.  Further, we disagree with PIOs'

assertion that extending the Long-Term Regional Transmission Planning cycle from three

years to five years does not ease administrative burdens or improve planning accuracy.[750]

In Order No. 1920, the Commission decreased the frequency at which Long-Term

Regional Transmission Planning cycles must occur, meaning that transmission providers

have the option to develop fewer Long-Term Scenarios over a five-year period than they

would have been required to develop under the NOPR proposal, thus decreasing the

administrative burden associated with updating the Long-Term Scenarios that form the

basis for Long-Term Regional Planning during each planning cycle.

259.    Third, we are not persuaded by PIOs' argument that the structure of the Long-

Term Regional Transmission Planning cycle is unclear or that its implementation will

exclude meaningful stakeholder participation.[751]  Order No. 1920 requires transmission

providers to complete the steps of the Long-Term Regional Transmission Planning cycle

and make selection decisions no later than three years from the date when the Long-Term

---

[749] *See id.* P 379.

[750] PIOs Rehearing Request at 12-13.

[751] *Id.* at 13-15.

Regional Transmission Planning cycle began.[752]  To the extent that transmission

providers decide to evaluate additional Long-Term Regional Transmission Facilities after

year three but before the next Long-Term Regional Transmission Planning cycle begins,

Order No. 1920 gives them the flexibility to do so.[753]  One possible outcome of this

structure is that transmission providers may make selection decisions on additional Long-

Term Regional Transmission Facilities until the end of the five-year Long-Term Regional

Transmission Planning cycle.  But we disagree with PIOs' contention that Order

No. 1920 could be read to allow transmission providers to make "final" selection

decisions on "*any*" Long-Term Regional Transmission Facilities until the five-year Long-

Term Regional Transmission Planning cycle's end so long as they make a selection

decision on at least one Long-Term Regional Transmission Facility before the end of

year three.[754]

260.    Order No. 1920 requires that transmission providers complete their evaluation and

selection processes in the first three years of a Long-Term Regional Transmission

Planning cycle, including identifying Long-Term Regional Transmission Facilities that

address the Long-Term Transmission Needs that transmission providers identified,

estimating the costs and measuring the benefits of those facilities, and making a selection

decision on those facilities, including a determination that is sufficiently detailed for

---

[752] Order No. 1920, 187 FERC ¶ 61,068 at PP 379, 955.

[753] *Id.* P 379 n.873.

[754] PIOs Rehearing Request at 14.

stakeholders to understand why particular facilities or portfolios of facilities were selected or not selected.[755] After transmission providers have completed these steps, no later than three years after the beginning of the Long-Term Regional Transmission Planning cycle, transmission providers may select "*additional*" Long-Term Regional Transmission Facilities, but they may not deselect any Long-Term Regional Transmission Facilities selected earlier in that Long-Term Regional Transmission Planning cycle.[756]

261.    We therefore disagree with PIOs' argument that the five-year structure of the Long-Term Regional Transmission Planning cycle would encourage transmission providers to make planning decisions when stakeholders are "no longer at the table."[757] Such arguments are predicated on a misunderstanding of what Order No. 1920 requires. We emphasize that any Long-Term Regional Transmission Facilities selected after year three of the Long-Term Regional Transmission Planning cycle are selected in the Long-Term Regional Transmission Planning process. Thus, contrary to PIOs' suggestion, the requirements for selecting Long-Term Regional Facilities apply, including the transparency requirements adopted in Order No. 1920, should transmission providers

---

[755] *See* Order No. 1920, 187 FERC ¶ 61,068 at P 955.

[756] *Id.* P 379 n.873

[757] PIOs Rehearing Request at 14.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1618 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No.  RM21-17-001                                                    - 242 -

choose to evaluate and select additional Long-Term Regional Transmission Facilities

after year three of the Long-Term Regional Transmission Planning cycle.[758]

262.    Finally, we provide clarification to SERTP Sponsors as to the inclusion of

previously selected Long-Term Regional Transmission Facilities in the updated base or

reference cases that transmission providers will use in subsequent Long-Term Regional

Transmission Planning cycles.  In most circumstances, we expect that transmission

providers will include previously selected Long-Term Regional Transmission Facilities,

including those that are not yet in service, in these updated planning models, and we

continue to find that doing so will improve the accuracy of Long-Term Regional

Transmission Planning.[759]  We expect that if transmission providers conclude that

previously-selected Long-Term Regional Transmission Facilities are not appropriate to

use in a base case, they would provide an explanation to stakeholders who may be relying

on the base case in future transmission planning or generator interconnection studies as to

why these facilities are not included.  Nevertheless, we clarify that Order No. 1920 does

not *require* that transmission providers include previously selected Long-Term Regional

Transmission Facilities in the planning models that they use in a subsequent Long-Term

Regional Transmission Planning cycle, and we continue to find that it is appropriate to

provide flexibility to transmission providers on how they update their planning models.[760]

---

[758] *See* Order No. 1920, 187 FERC ¶ 61,068 at P 954.

[759] *See id.* P 382.

[760] *See id.* P 1031.

### 4.    Categories of Factors

### a.    Requirement to Incorporate Categories of Factors

### i.    Order No. 1920 Requirements

263.    In Order No. 1920, the Commission required transmission providers in each

transmission planning region to incorporate in the development of Long-Term Scenarios

seven specific categories of factors:  (1) federal, federally-recognized Tribal, state, and

local laws and regulations affecting the resource mix and demand; (2) federal, federally-

recognized Tribal, state, and local laws and regulations on decarbonization and

electrification; (3) state-approved integrated resource plans and expected supply

obligations for load-serving entities; (4) trends in fuel costs and in the cost, performance,

and availability of generation, electric storage resources, and building and transportation

electrification technologies; (5) resource retirements; (6) generator interconnection

requests and withdrawals; and (7) utility and corporate commitments and federal,

federally-recognized Tribal, state, and local policy goals that affect Long-Term

Transmission Needs.[761]  The Commission found that incorporating these categories of

factors in the development of Long-Term Scenarios is necessary because these categories

are essential to identifying Long-Term Transmission Needs, and that incorporating them

will ensure that transmission providers are accounting for known and identifiable drivers

of Long-Term Transmission Needs.[762]  The Commission stated that transmission

---

[761] *Id.* P 409.

[762] *Id.* P 410.

Docket No.  RM21-17-001                                                                - 244 -

providers may not exclude any of the proposed categories of factors from the development of Long-Term Scenarios because each category of factors includes important drivers of Long-Term Transmission Needs, and that not incorporating all of the categories of factors will increase the likelihood that transmission providers will continue to underestimate or omit certain drivers of Long-Term Transmission Needs.[763]

264.    The Commission explained that incorporating a category of factors in the development of Long-Term Scenarios requires transmission providers to use factors in the category, for each factor individually or collectively, to determine the assumptions that will be used in the development of Long-Term Scenarios.[764]  The Commission stated that it expects that similar factors (or groups of factors) affecting a single assumption used in the development of Long-Term Scenarios will have an additive effect on that assumption.[765]  Further, transmission providers must incorporate the categories of factors in the development of Long-Term Scenarios in a way that results in plausible and diverse Long-Term Scenarios.[766]

265.    With respect to factors within each category of factors, Order No. 1920 requires that transmission providers account for the factors that they have determined are likely to affect Long-Term Transmission Needs.  Order No. 1920 further requires transmission

---

[763] *Id.* P 411.

[764] *Id.* P 413.

[765] *Id.*

[766] *Id.* P 414.

providers, in coordination with stakeholders through an open and transparent process, to

determine how each of those factors (or group of similar factors) is likely to affect Long-

Term Transmission Needs.  Transmission providers must then account for the factors that

they have determined are likely to affect Long-Term Transmission Needs in the

development of Long-Term Scenarios but need not account for a factor that they

determine is unlikely to affect Long-Term Transmission Needs.[767]

266.    The Commission stated that requiring transmission providers to incorporate the

seven categories of factors into the development of Long-Term Scenarios strikes the right

balance between prescriptive requirements and flexibility.[768]  The Commission also stated

that the final rule does not direct the development of specific transmission facilities

because transmission providers retain discretion to determine how specific factors will

affect Long-Term Transmission Needs.[769]

### ii.    Requests for Rehearing and Clarification

267.    Arizona Commission argues that Order No. 1920's requirement that transmission

providers use a specific set of "planning criteria," i.e., that transmission providers

incorporate seven categories of factors in Long-Term Scenarios, is "simply a way of 'pre-

cooking' outcomes."[770]  Arizona Commission argues that this is inconsistent with the

---

[767] *Id.* P 415.

[768] *Id.* P 417.

[769] *Id.* P 419.

[770] Arizona Commission Rehearing Request at 18.

Docket No.  RM21-17-001                                                        - 246 -

NOPR, which required transmission providers to implement a process, not achieve specific outcomes.[771]

268.    SERTP Sponsors request that the Commission clarify or, in the alternative, grant rehearing to specify that Order No. 1920 does not require each factor to have an additive effect on a common assumption because, in their view, such a requirement would be arbitrary and capricious and not supported by substantial evidence.[772]  SERTP Sponsors assert that requiring each factor to have an additive effect would undermine transmission providers' discretion over how to account for different factors.[773]

269.    Further, SERTP Sponsors argue that the record does not demonstrate that each individual factor will have an additive effect, and a finding to this effect risks overstating the effect of each factor, which would render the resulting scenarios implausible and more likely to misidentify Long-Term Transmission Needs and Facilities.[774]

270.    Designated Retail Regulators and Undersigned States request that the Commission grant rehearing on the grounds that the Order No. 1920 requirement to use the seven categories of factors in Long Term Regional Transmission Planning will overvalue transmission benefits and will result in unjust, unreasonable, and unduly discriminatory

---

[771] *Id.*

[772] SERTP Sponsors Rehearing Request at 12-13.

[773] *Id.* at 13.

[774] *Id.*

rates.[775]  Designated Retail Regulators and Undersigned States argue that transmission planning assumptions should reflect regional differences, and that requiring transmission providers to develop Long-Term Scenarios that incorporate Order No. 1920's seven categories of factors will result in unjust and unreasonable rates because the categories of factors overlap and may result in double counting.[776]  Designated Retail Regulators and Undersigned States also assert that there is insufficient evidence and analysis to conclude that use of the factors will result in cost-effective solutions.[777]

### iii.     Commission Determination

271.    Regarding Arizona Commission's argument that Order No. 1920's requirement that transmission providers incorporate seven categories of factors into their development of Long-Term Scenarios predetermines outcomes in Long-Term Regional Transmission Planning, we reiterate that, in Order No. 1920, as clarified herein, the Commission gives transmission providers the tools necessary to respond to changing factors that drive Long-Term Transmission Needs.[778]  As discussed below in further detail,[779] transmission providers must consult with and consider the positions of the Relevant State Entities and

---

[775] Designated Retail Regulators Rehearing Request at 8, 26; Undersigned States Rehearing Request at 8, 26.

[776] Designated Retail Regulators Rehearing Request at 8, 26-29; Undersigned States Rehearing Request at 8, 26-29.

[777] Designated Retail Regulators Rehearing Request at 8; Undersigned States Rehearing Request at 8.

[778] Order No. 1920, 187 FERC ¶ 61,068 at P 233.

[779] *Infra* Stakeholder Process and Transparency section.

Docket No.  RM21-17-001                                                    - 248 -

any other entity authorized by a Relevant State Entity as its representative as to how to
account for factors related to states' laws, policies, and regulations when determining the
assumptions that will be used in the development of Long-Term Scenarios.  The
Commission also explained in both the NOPR and in Order No. 1920 that it is not
requiring that transmission providers achieve any particular outcome via Long-Term
Regional Transmission Planning,[780] and Order No. 1920 does not mandate selection of
any Long-Term Regional Transmission Facilities.[781]

272.    In response to SERTP Sponsors' request for clarification, we clarify that Order
No. 1920 does not require transmission providers, when determining the assumptions that
they will use when developing Long-Term Scenarios where similar factors (or groups of
factors) affect a single assumption, to assume that the factors have additive effects on the
relevant assumptions.  The Commission stated in Order No. 1920 that it expected that
similar factors (or groups of factors) affecting a single assumption used in the
development of Long-Term Scenarios will have an additive effect on that assumption,[782]
but we agree with SERTP Sponsors that this may not always be the case, and at times,
similar factors may not have an additive effect on assumptions used to develop Long-

---

[780] *See, e.g.*, NOPR, 179 FERC ¶ 61,028 at PP 9, 245; Order No. 1920, 187 FERC ¶ 61,068 at PP 232, 266.

[781] Order No. 1920, 187 FERC ¶ 61,068 at PP 1026-1027.

[782] *Id.* P 413.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1625 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No. RM21-17-001                                                           - 249 -

Term Scenarios. We also acknowledge that factors in different categories of factors may overlap.[783]

273.    We clarify that, where factors may have overlapping effects on the planning assumptions, transmission providers must avoid double counting the effect that those factors have on assumptions used to develop Long-Term Scenarios. Specifically, where there is overlap between factors in Factor Categories One through Three and factors in Factor Categories Four through Seven, or a factor could arguably be considered in a Factor Category in the first three categories or the last four categories, transmission providers must incorporate that factor in the appropriate Factor Category in the first three categories.[784] Because Relevant State Entities and their designated representatives will participate in developing Long-Term Scenarios by informing how transmission providers account for the impact of individual factors, we believe that Relevant State Entities, working in concert with transmission providers, will be able to identify and minimize instances where factors overlap. Further, to the extent that factors in Factor Categories

---

[783] *Id.* P 440 ("We acknowledge that there could be overlap between Factor Categories One and Two because a certain law or regulation could reasonably be considered to fit into both categories. In such a circumstance, transmission providers must account for the law or regulation in one of the two categories, not both, to avoid double-counting of that factor's anticipated effect on Long-Term Transmission Needs."). As another example, a utility commitment in Factor Category Seven would overlap with an integrated resource plan if the utility commitment was incorporated in the development of the integrated resource plan.

[784] For example, if a transmission provider determines that a factor will affect Long-Term Transmission Needs, but the factor could arguably be incorporated in Factor Category Three or Factor Category Seven, the transmission provider must incorporate this factor in Factor Category Three.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1626 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No.  RM21-17-001                                                     - 250 -

One through Three have overlapping effects on planning assumptions, transmission providers must ensure that each Long-Term Scenario accounts for the factors in Factor Categories One through Three without double counting their effects on planning assumptions.  Finally, although we agree with SERTP Sponsors that similar factors will not always have an additive effect on assumptions used to develop Long-Term Scenarios, where similar factors do not overlap, we clarify our expectation that similar factors (or groups of factors) affecting certain assumptions used in the development of Long-Term Scenarios will have a combined effect on those assumptions accordingly.

274.    In response to SERTP Sponsors' argument that the requirements in Order No. 1920 risk overstating the effect of each factor, which would render the resulting scenarios implausible and more likely to misidentify Long-Term Transmission Needs, we explain that Order No. 1920 addresses this issue by allowing transmission providers to exercise discretion in how they account for each factor, provided that each Long-Term Scenario account for and be consistent with factors in the first three categories of factors.[785]  As the Commission noted in Order No. 1920, incorporating a category of factors into the development of Long-Term Scenarios does not require exacting precision; transmission providers may generalize how all of the discrete factors in a category of factors will, in the aggregate, affect the development of Long-Term

---

[785] It is unclear whether SERTP Sponsors intended to argue that failure to grant clarification in this respect would result in Order No. 1920 exceeding the Commission's authority; to the extent they intended to do so, we find this argument has not been raised with the specificity required on rehearing. *See supra* Major Questions Doctrine section.

Docket No. RM21-17-001                                                    - 251 -

Scenarios.[786]  In addition, the Commission held in Order No. 1920 that transmission

providers have the discretion to determine whether specific factors must be accounted for

within each category, how to account for specific factors in the development of Long-

Term Scenarios, and how to vary the treatment of each category of factors across Long-

Term Scenarios, provided that transmission providers assume that the laws, regulations,

state-approved integrated resource plans, and expected supply obligations for load-

serving entities that transmission providers have determined are likely to affect Long-

Term Transmission Needs are fully met.[787]  Finally, we believe that the clarification

discussed below will mitigate SERTP Sponsors' concern by ensuring that the effects of

factors used to develop Long-Term Scenarios are not overstated.

275.    More specifically, Order No. 1920 states that transmission providers must give

states and stakeholders a meaningful opportunity to provide timely input on how and

what information to incorporate in Long-Term Scenarios, including how specific factors

may affect Long-Term Transmission Needs.[788]  We clarify below that, when

incorporating planning for states' laws, policies, and regulations' into the development of

Long-Term Scenarios, transmission providers must consult with and consider the

positions of the Relevant State Entities and their designated representatives as to how

---

[786] Order No. 1920, 187 FERC ¶ 61,068 at P 413.

[787] *Id.* P 417.

[788] *Id.* P 528.

Docket No. RM21-17-001                                                    - 252 -

those requirements will be realized.[789]  If, for example, states have laws regarding the future resource mix or decarbonization targets, the assumptions for how the power industry would need to evolve to meet those legal requirements should be developed in close consultation with the Relevant State Entities.  We clarify that, for a state that has required integrated resource planning processes, transmission providers should include one of the state's preferred power system trajectories, including both the supply and demand side resource trajectory as appropriate, in each Long-Term Scenario, or include different state-preferred power system trajectories in different Long-Term Scenarios.

276.    While we disagree with the rehearing arguments of Designated Retail Regulators and Undersigned States that the Order No. 1920 requirement to use the seven categories of factors in Long Term Regional Transmission Planning will result in overvaluing transmission benefits, we believe that the clarifications discussed herein will alleviate the concerns underlying their rehearing arguments.  As an initial matter, we find arguments that the categories of factors overlap to be moot because, as clarified above, transmission providers should avoid double counting the effects of overlapping factors when developing Long-Term Scenarios.  While these rehearing parties are correct that Order No. 1920 requires transmission providers to incorporate seven categories of factors, transmission providers retain specific discretion with respect to how they account for each individual factor within a category to develop the required Long-Term Scenarios.[790]

---

[789] *Infra* Stakeholder Process and Transparency section.

[790] *See, e.g.*, Order No. 1920, 187 FERC ¶ 61,068 at P 412 (allowing transmission providers to propose to use additional categories of factors); *id.* P 413 (clarifying that

Further, as discussed below,[791] we clarify that transmission providers must consult with and consider the positions of the Relevant State Entities and any other entity authorized by a Relevant State Entity as its representative as to how to account for factors related to states' laws, policies, and regulations when determining the assumptions that will be used in the development of Long-Term Scenarios, which will ensure that states have input into these factors and that these factors are not over or undervalued.  We further note the Commission's finding in Order No. 1920 that transmission providers have discretion to reflect regional differences in the development of Long-Term Scenarios.[792]

277.    We disagree with Designated Retail Regulators and with Undersigned States that Order No. 1920 provides insufficient evidence and analysis to conclude that use of the factors will result in cost-effective solutions.  As discussed above and below, we, in this order, adopt a number of clarifications to ensure that states are consulted regarding the use of factors to develop Long-Term Scenarios, which, in turn, affect which Long-Term Regional Transmission Facilities are selected.  We also emphasize that the states have a

---

incorporating categories of factors does not require exacting precision and allowing transmission providers to generalize how factors within the categories will, in the aggregate, affect the development of Long-Term Scenarios); *id.* P 415 (allowing transmission providers to determine whether specific factors will affect Long-Term Transmission Needs and allowing transmission providers not to account for specific factors that they determine do not affect such needs); *id.* P 417 (allowing transmission providers to determine how to account for specific factors within different Long-Term Scenarios).

[791] *Infra* Stakeholder Process and Transparency section.

[792] Order No. 1920, 187 FERC ¶ 61,068 at P 417.

Docket No.  RM21-17-001                                    - 254 -

significant role in working to create a cost allocation method that ensures any solutions
that are selected have costs allocated appropriately to beneficiaries.  Because of this
involvement, we find that the potential risk of the categories of factors leading to
solutions that are not cost-effective is diminished, particularly in light of the requirement
that selection criteria used in Long-Term Regional Transmission Planning must seek to
maximize benefits accounting for costs over time without over-building transmission
facilities.[793]  Finally, we add that Order No. 1920 included substantial evidence in the
record to demonstrate that existing transmission planning and cost allocation processes
were insufficient to ensure just and reasonable rates by inadequately accounting on a
forward-looking basis for known determinants of Long-Term Transmission Needs.[794]

> **b.    Specific Categories of Factors and the Treatment of
> Factors in the Development of Long-Term Scenarios**

> **i.    Order No. 1920 Requirements**

278.    As stated above, in Order No. 1920, the Commission found that incorporating the
seven categories of factors in the development of Long-Term Scenarios was necessary.
The Commission stated that transmission providers may not exclude any of the categories
of factors from being incorporated into the development of Long-Term Scenarios because
each category includes important determinants of Long-Term Transmission Needs, and
failing to incorporate all of the proposed categories of factors into Long-Term Scenarios

---

[793] *Id.* P 964.

[794] *Id.* PP 112-133.

Docket No.  RM21-17-001                                                    - 255 -

would increase the likelihood that transmission providers would continue to

underestimate or omit known determinants of Long-Term Transmission Needs.[795]  The

Commission considered category-specific record evidence in support of its determination

to adopt each of the seven categories of factors.[796]  The Commission declined to adopt

additional categories of factors proposed by commenters because of a lack of substantial

record evidence, or a finding that the commenter-proposed category of factors is already

accounted for in other parts of Long-Term Regional Transmission Planning.[797]

279.    The Commission in Order No. 1920 also required transmission providers in each

transmission planning region to assume that legally binding obligations (i.e., federal,

federally-recognized Tribal, state, and local laws and regulations) are followed, state-

approved integrated resource plans are followed, and expected supply obligations for

load-serving entities are fully met.[798]  The Commission therefore required each Long-

Term Scenario to account for and be consistent with, and not discount, factors in the first

three categories of factors (i.e., (1) federal, federally-recognized Tribal, state, and local

laws and regulations affecting the resource mix and demand; (2) federal, federally-

recognized Tribal, state, and local laws and regulations on decarbonization and

---

[795] *Id.* P 411.

[796] Order No. 1920, 187 FERC ¶ 61,068 at PP 448-449, 457-458, 464-466, 472-473, 481-484.

[797] *Id.* PP 492-494.

[798] *Id.* P 507.

Docket No.  RM21-17-001                                                           - 256 -

electrification; and (3) state-approved integrated resource plans and expected supply

obligations for load-serving entities) once transmission providers have determined that

such a factor is likely to affect Long-Term Transmission Needs.  The Commission found

that it is necessary to prohibit the discounting of factors in the first three categories of

factors because they are more certain drivers of Long-Term Transmission Needs, relative

to factors in other Factor Categories.[799]  Where two legally binding factors have

conflicting or opposite implications for Long-Term Transmission Needs, however,

transmission providers must reconcile this information while giving full effect to the

maximum extent possible to all legally binding factors.[800]

280.    The Commission allowed transmission providers to rely on the open and

transparent stakeholder process discussed below to identify the factors in the first three

required categories of factors.  Transmission providers may independently identify

factors in the first three categories of factors, but Order No. 1920 does not obligate

transmission providers to do so.[801]  Transmission providers retain the discretion to

determine whether and how particular factors, including those in the first three categories

of factors, are likely to affect Long-Term Transmission Needs.[802]  Further, the

Commission stated in Order No. 1920 that it expects that transmission providers will rely,

---

[799] *Id.*

[800] *Id.* P 515.

[801] *Id.* P 508.

[802] *Id.* PP 510, 512.

at least in part, on information that relevant federal, state, and local government entities,
federally-recognized Tribes, utilities, and load-serving entities provide during the
required open and transparent stakeholder process to determine if specific factors are
likely to affect Long-Term Transmission Needs and how to account for those specific
factors in Long-Term Scenarios.[803]

281.    The Commission provided transmission providers with additional discretion in
how they account for each factor in Factor Categories Four through Seven (i.e., (4) trends
in fuel costs and in the cost, performance, and availability of generation, electric storage
resources, and building and transportation electrification technologies; (5) resource
retirements; (6) generator interconnection requests and withdrawals; and (7) utility and
corporate commitments and federal, federally-recognized Tribal, state, and local policy
goals that affect Long-Term Transmission Needs) compared to how they account for each
factor in the first three categories.  For purposes of developing plausible and diverse
Long-Term Scenarios, Order No. 1920 requires transmission providers, after they have
determined that a specific factor in Factor Categories Four through Seven is likely to
affect Long-Term Transmission Needs over the transmission planning horizon, to assess
the extent to which the anticipated effects on Long-Term Transmission Needs due to that
factor are likely to be realized in part, in full, or exceeded.[804]  Transmission providers
may choose to discount or to put more weight on the effects of factors in Factor

---

[803] *Id.* P 511.

[804] *Id.* P 516.

Docket No. RM21-17-001                                                        - 258 -

Categories Four through Seven on Long-Term Transmission Needs, but only to the extent that each Long-Term Scenario remains plausible.[805]

282.   The Commission disagreed with concerns that the additional flexibility afforded to transmission providers in how they account for each factor in Factor Categories Four through Seven could allow transmission providers to ignore these categories of factors. The Commission explained that Order No. 1920 requires transmission providers to incorporate all categories of factors in each Long-Term Scenario, even if they discount specific factors within the category, and requires all Long-Term Scenarios to be plausible.[806]

283.   Further, the Commission explained that, because Order No. 1920 requires that all Long-Term Scenarios be consistent with and fully account for factors in Factor Category Three, which includes state-approved integrated resource plans and expected supply obligations of load-serving entities, the final rule does not ignore the Commission's fundamental responsibility under FPA section 217 to facilitate planning to meet the needs of load-serving entities.[807]

---

[805] *Id.* P 518.

[806] *Id.*

[807] *Id.* P 420.

### ii.   Requests to Omit One or More Specific Categories of Factors

### (a)     Requests for Rehearing and Clarification

284.   Designated Retail Regulators and Undersigned States request that the Commission grant rehearing on the grounds that Order No. 1920 requires transmission providers to consider several factors in Long-Term Regional Transmission Planning, and including these factors will result in rates that are unjust and unreasonable.[808]  Arizona Commission avers that through Order No. 1920, the Commission is promoting certain preferred "green" energy generation resources by requiring transmission providers to incorporate seven categories of factors.[809]  Arizona Commission states that these factors have political and policy considerations that do not belong in Arizona where the legislature has not mandated such costs, planning, or experimentation to the detriment of ratepayers.[810]

285.   Designated Retail Regulators and Undersigned States both argue that Order No. 1920 usurps the role of the states in transmission planning by requiring that the plans and goals of some states, tribes, local governments, and private companies override the plans and goals of other entities while also forcing these entities to bear the cost burden.[811]  Designated Retail Regulators and Undersigned States assert that Factor

---

[808] Designated Retail Regulators Rehearing Request at 7; Undersigned States Rehearing Request at 7.

[809] Arizona Commission Rehearing Request at 15.

[810] *Id.* at 22.

[811] Designated Retail Regulators Rehearing Request at 8; Undersigned States

Categories One, Two, Four, Six, and Seven unjustly involve the policy goals of state and

local governments and the commitments of utilities, and thus impose construction costs

upon ratepaying loads without sufficient and measurable benefits.[812]  Designated Retail

Regulators and Undersigned States both state that there is insufficient evidence and

analysis to support that use of these factors will result in cost-effective solutions.[813]

286.    Ohio Commission Federal Advocate requests that the Commission grant rehearing

on the grounds that the Commission acted arbitrarily and capriciously and abused its

discretion because Order No. 1920 requires transmission providers to incorporate

unreasonable categories of factors in the development of Long-Term Scenarios.[814]

Specifically, Ohio Commission Federal Advocate is concerned that several factors would

encourage a massive transmission build-out at unjust and unreasonable rates and requests

that the Commission grant rehearing to remove Factor Categories One, Two, Six, and

Seven as these factors are highly speculative and subject to change.[815]  Ohio Commission

Federal Advocate asserts that the Commission has not engaged in reasoned decision

making by asserting that a best-available-data requirement will ensure these factors are

---

Rehearing Request at 7-8.

[812] Designated Retail Regulators Rehearing Request at 28; Undersigned States
Rehearing Request at 27-28.

[813] Designated Retail Regulators Rehearing Request at 8 (citation omitted);
Undersigned States Rehearing Request at 8 (citation omitted).

[814] Ohio Commission Federal Advocate Rehearing Request at 15.

[815] *Id.* at 16-17.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1637 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No. RM21-17-001                                                    - 261 -

incorporated in a meaningful way because even the best available data for a corporate commitment still amounts to nothing more than a corporate commitment.[816]  Ohio Commission Federal Advocate claims that the Commission's attempt to mitigate the flaws of requiring transmission providers to incorporate factors in Factor Categories Four through Seven by allowing transmission providers to discount or give special weight to these factors is arbitrary and capricious.  Further, Ohio Commission Federal Advocate asserts that Factor Categories Three, Four, and Five may be problematic if transmission projects are chosen to satisfy state or federal policies and, due to the other provisions of Order No. 1920, may not be properly cost allocated.[817]

287.    Several petitioners request that the Commission grant rehearing on the grounds that the Order No. 1920 requirement to include Factor Category Seven (utility and corporate commitments and federal, federally-recognized Tribal, state, and local policy goals that affect long-term transmission needs) should be excluded from the development of Long-Term Scenarios.[818]

288.    SERTP Sponsors argue that Factor Category Seven does not demonstrate reasoned decision making, is not supported by substantial evidence, and could intrude into matters

---

[816] *Id.* at 17.

[817] *Id.*

[818] Alabama Commission Rehearing Request at 4-5; Industrial Customers Rehearing Request at 49-54; Northern Virginia Rehearing Request at 4-7; NRECA Rehearing Request at 55; SERTP Sponsors Rehearing Request at 15-17; Virginia and North Carolina Commissions Rehearing Request at 6-8.

Docket No. RM21-17-001                                                                - 262 -

involving retail customers subject to state regulation in an unduly discriminatory and

preferential manner.[819] SERTP Sponsors assert that utility or corporate commitments and

local policy goals are fundamentally retail concerns with arrangements subject to state-

regulated tariffs and proceedings, and that the other categories of factors already

encompass the transmission needs from these arrangements.[820] SERTP Sponsors also

request clarification that Factor Category Seven is not intended to give preferential

treatment to certain retail customers, like corporations, over others.[821]

289.   Industrial Customers state that the Commission did not satisfactorily explain in

Order No. 1920 why it found unpersuasive comments on the NOPR questioning the

inclusion of utility or corporate commitments in Factor Category Seven, given that such

commitments may not be firm or could change over the transmission planning horizon.[822]

Further, Industrial Customers assert that the Commission's attempt to alleviate concerns

by emphasizing in Order No. 1920 that transmission providers "have discretion" to

account for ambiguity concerning these commitments actually raises several additional

issues.[823] Industrial Customers argue that there are no clear rules to guide such discretion

and that there is an alleged contradiction with Order No. 1920's "earlier mandate to use

---

[819] SERTP Sponsors Rehearing Request at 16 (citations omitted).

[820] *Id.* at 15.

[821] *Id.* at 16.

[822] Industrial Customers Rehearing Request at 51 (citation omitted).

[823] *Id.* at 51-52 (quoting Order No. 1920, 187 FERC ¶ 61,068 at P 484).

publicly available information on *goals* and aspirations around corporate energy purchasing strategies."[824]  Industrial Customers add that one transmission provider, PJM, has publicly stated that it does not want such discretion due to the significant administrative burdens.[825]

290.    Industrial Customers additionally state that Order No. 1920's inclusion of Factor Category Seven unduly discriminates against load that may be served by generation that may not be considered "clean energy."[826]  Industrial Customers highlight the Commission's statement that Order No. 1920 responds to "corporate, governmental, and utility commitments to rely on *certain* generation resources" and argue that the word "certain" implies without definition or justification a limited subset within possible generation resources.[827]

291.    Industrial Customers contend that many companies consider corporate sustainability and clean energy strategies to be proprietary and sensitive, so utilizing known and available corporate commitments and information without also having the underpinning analytical evidence cannot be reasonably relied on to inform future transmission planning scenarios.[828]  Similarly, Industrial Customers state that Order

---

[824] *Id.* at 52 (citing Order No. 1920, 187 FERC ¶ 61,068 at P 413).

[825] *Id.* at 52-53 (citing PJM NOPR Initial Comments at 68).

[826] *Id.* at 54-55 (citations omitted).

[827] *Id.* at 55 (quoting Order No. 1920, 187 FERC ¶ 61,068 at P 261).

[828] *Id.* at 49-50.

No. 1920 does not demonstrate that corporate strategies and goals are known

determinants or representative and reliable anecdotes able to be utilized in Long-Term

Scenarios.[829]

292.    Northern Virginia argues that the inclusion of "corporate commitments" as an

independent factor in Category Factor Seven is arbitrary and capricious as this inclusion

circumvents the planning process utilized by load serving utilities and state regulators to

also meet these commitments.[830]  Additionally, Northern Virginia states that corporate

commitments are too ephemeral and uncertain to be included in Long-Term Scenarios,

and asserts that transmission planning processes should utilize best data from utilities and

state regulators that are required to plan to serve load.[831]  Northern Virginia also argues

that the Commission should not give special status to private corporations not charged

with planning for the greater good, and that corporate commitments are not comparable

to utility planning or governmental policy goals.[832]  Northern Virginia states that any

entities with corporate commitments can participate in existing stakeholder and customer

processes.[833]

---

[829] *Id.* at 50.

[830] Northern Virginia Rehearing Request at 4.

[831] *Id.* at 3-4.

[832] *Id.* at 4.

[833] *Id.* at 7-9.

293.    Virginia and North Carolina Commissions argue that the Commission should remove Factory Category Seven from the development of Long-Term Scenarios as transmission providers may not have the resources and should not be in a position to assess the reasonableness or accuracy of corporate or utility commitments.[834]  Similarly, Virginia and North Carolina Commissions contend that it would be unreasonable to expect state entities to use their limited resources to evaluate and opine on such commitments or policy goals and that many states may be constrained from doing so if these commitments impact filings before the state entity.[835]  Additionally, Virginia and North Carolina Commissions request that the Commission only permit the incorporation of public policy goals previously approved through a state regulatory process or, alternatively, clarify that transmission providers can fully discount any public policy factors that fall under Factor Category Seven.[836]

294.    NRECA states that the Commission expanded the concept of Long-Term Transmission Needs well beyond reliability, economic, and public policy issues by adopting seven categories of factors, including Factor Category Seven.[837]  NRECA

---

[834] Virginia and North Carolina Commissions Rehearing Request at 7.

[835] *Id.*

[836] *Id.* at 8 (citation omitted).

[837] NRECA Rehearing Request at 54-55.

Docket No.  RM21-17-001                                              - 266 -

asserts that the costs of facilities built to satisfy corporate commitments should be borne

by the relevant corporations, not by those who do not benefit from the facility.[838]

295.    Harvard ELI and PIOs request clarification to reframe Factor Category Seven.[839]

Harvard ELI requests that the Commission clarify whether Factor Category Seven

implements the existing requirement to plan for all transmission users on a comparable

basis and further clarify that all long-term planning rules are similarly rooted in the open

access comparability standard.[840]  PIOs request clarification on whether required scenario

factors additionally include city and consumer-side market preferences.[841]

### (b)    Commission Determination

296.    We are unpersuaded by parties that request that the Commission set aside the

requirement for transmission providers to incorporate the seven specified categories of

factors into the development of Long-Term Scenarios, including requests to set aside the

requirement to incorporate certain specific categories of factors.  Nevertheless, we

believe certain clarifications adopted herein will alleviate the concerns these parties raise

on rehearing.  Specifically, our clarification that transmission providers must consult with

and consider the positions of the Relevant State Entities and any other entity authorized

by a Relevant State Entity as its representative as to how to account for factors related to

---

[838] *Id.* at 55.

[839] Harvard ELI Rehearing Request at 9-11; PIOs Rehearing Request at 61.

[840] Harvard ELI Rehearing Request at 9-11.

[841] PIOs Rehearing Request at 61.

states' laws, policies, and regulations when determining the assumptions that will be used in the development of Long-Term Scenarios will help ensure that each Long-Term Scenario reflects states' preferences and future needs.  However, with respect to Factor Category Seven, we set aside the requirement to include corporate commitments, as discussed further below.

297.    We continue to find that existing regional transmission planning requirements fail to ensure that transmission providers adequately account on a forward-looking basis for known determinants of Long-Term Transmission Needs.  We reiterate that requiring transmission providers to incorporate the seven categories of factors into the development of Long-Term Scenarios is necessary because without doing so, transmission providers will fail to adequately consider drivers of Long-Term Transmission Needs.[842]

298.    With regard to Arizona Commission's claim that Order No. 1920 favors "green" energy,[843] we reiterate that nothing in Order No. 1920 favors, promotes, or subsidizes particular types of generation resources over others and that the Commission's policies are technology and fuel neutral.  Order No. 1920 does not endorse the merits of any laws and regulations or of any specific state-approved integrated resource plans.[844]  Rather, we reiterate that states play a vital role in identifying the factors, especially in Factor Categories One, Two, and Seven, that transmission providers account for in Long-Term

---

[842] Order No. 1920, 187 FERC ¶ 61,068 at P 410.

[843] Arizona Commission Rehearing Request at 15.

[844] Order No. 1920, 187 FERC ¶ 61,068 at PP 232, 437.

Regional Transmission Planning. We are unpersuaded by Arizona Commission and NRECA that the categories of factors requirements in Order No. 1920 include policy factors that have not been previously considered in regional transmission planning.[845] In Order No. 1000, the Commission required transmission providers to establish procedures that provide for the consideration of transmission needs driven by Public Policy Requirements in the local and regional transmission planning processes.[846]

299.     We are not persuaded by arguments that Factor Category One and Factor Category Two, which include state and local laws and regulations, will unjustly impose the policy goals of certain state and local governments on others.[847] We reiterate that transmission planning of any kind will inherently reflect the policy choices of multiple decisionmakers because the quantity and location of generation and load are shaped by multiple decisionmakers.[848] In this case, we expect transmission providers to work with states to ensure the way those state laws and regulations are incorporated into Long-Term Scenarios reflects states' preferred implementation of those laws and regulations. We also reiterate that transmission providers must appropriately value the effect of states'

---

[845] Arizona Commission Rehearing Request at 22; NRECA Rehearing Request at 54-55.

[846] Order No. 1000, 136 FERC ¶ 61,051 at P 203; *see also S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d at 89-92 (upholding this Order No. 1000 requirement).

[847] *E.g.*, Designated Retail Regulators Rehearing Request at 28; Ohio Commission Federal Advocate Rehearing Request at 16-17; Undersigned States Rehearing Request at 27-28.

[848] Order No. 1920, 187 FERC ¶ 61,068 at P 435.

USCA4 Appeal: 24-1650   Doc: 224       Filed: 01/21/2025   Pg: 1645 of 2455
Document Accession #: 20241121-3139      Filed Date: 11/21/2024

Docket No.  RM21-17-001                                        - 269 -

policy decisions in regional transmission planning in order to ensure just and reasonable rates.[849]

300.    Parties argue that the Commission's categories of factors requirements will impose formidable costs upon ratepaying loads that neither caused the need for the construction of additional transmission facilities nor measurably benefit from that construction and therefore are unjust and unreasonable and unduly discriminatory and preferential.[850]  We disagree.  The requirements of Order No. 1920, as clarified herein, ensure that Relevant States Entities, which represent consumers, have a voice in how factors within the categories of factors are accounted for, the development of Long-Term Scenarios that results from those factors, and the allocation of costs after a Long-Term Regional Transmission Facility is selected.[851]  Nothing in Order No. 1920 changed the Commission's policy that costs must be allocated in a manner that is at least roughly commensurate with benefits, which ensures that ratepayers are not paying unjust and unreasonable rates.[852]

---

[849] *Id.* P 436.

[850] *E.g.*, Designated Retail Regulators Rehearing Request at 28; Ohio Commission Federal Advocate Rehearing Request at 16-17; Undersigned States Rehearing Request at 27-28.

[851] *See infra* Stakeholder Process and Transparency section; Requests for Additional Flexibility Regarding Long-Term Scenarios Requirements section.

[852] *See, e.g.*, Order No. 1920, 187 FERC ¶ 61,068 at PP 419, 1419, 1471, 1513.

301.    We also disagree with arguments from Designated Retail Regulators and Undersigned States that there is insufficient evidence and analysis to support the conclusion that use of Factor Categories One, Two, Four, Six, and Seven will result in cost-effective solutions.[853]  We believe the collaboration between transmission providers and  Relevant State Entities, where relevant, will ensure that those categories of factors are incorporated into the development of Long-Term Scenarios that identify Long-Term Regional Transmission Facilities that both meet the needs of states and provide reliability and economic value.  At the same time, we believe that transmission providers cannot identify more efficient or cost-effective solutions to Long-Term Transmission Needs if they undervalue or entirely omit the consideration of some or all of the seven categories of factors.[854]  The Commission based its determination for each category of factors on record evidence specific to each category of factors indicating that each required category of factors is essential to identifying Long-Term Transmission Needs.[855]  To the extent states may be concerned about the resulting cost allocation, we note certain clarifications below that provide greater opportunities for input to Relevant State Entities with respect to cost allocation.[856]

---

[853] *E.g.*, Designated Retail Regulators Rehearing Request at 8; Undersigned States Rehearing Request at 8.

[854] *E.g.*, Order No. 1920, 187 FERC ¶ 61,068 at PP 120, 228.

[855] *Id.* P 410; *see also id.* PP 391-395, 423-424, 438, 443-445, 450-452, 459, 467, 474-477 (summarizing record evidence that indicates that the seven categories of factors are essential to identifying Long-Term Transmission Needs).

[856] *See infra* Requests for Additional Flexibility Regarding Long-Term Scenarios

Docket No.  RM21-17-001                                              - 271 -

302.    For this reason, we also disagree with Ohio Commission Federal Advocate that the categories of factors requirements are unreasonable, arbitrary, and capricious, and will encourage a massive transmission build-out at unjust and unreasonable rates.  We continue to find that the categories of factors that Order No. 1920 requires transmission providers to incorporate into the development of Long-Term Scenarios reflect the wide variety of drivers of Long-Term Transmission Needs and therefore are necessary to ensure the identification of more efficient or cost-effective transmission solutions to such needs.  We also note that, in Order No. 1920, the Commission responded to concerns that certain categories of factors are too speculative or subject to change and should not be incorporated into the development of Long-Term Scenarios.[857]  Further, the Commission justified the framework for treating different types of categories of factors differently in the development of Long-Term Scenarios.[858]

303.    However, we set aside, in part, the requirement for transmission providers to incorporate seven specific categories of factors in the development of Long-Term Scenarios.  Specifically, we set aside the requirement for transmission providers to incorporate corporate commitments[859] in Factor Category Seven when developing Long-

---

Requirements section.

[857] Order No. 1920, 187 FERC ¶ 61,068 at PP 229, 231, 473.

[858] *Id.* PP 484, 507.

[859] We clarify that we distinguish in this context between "corporate commitments" and utility commitments that are made by transmission providers and load-serving entities, regardless of their corporate form.

Docket No.  RM21-17-001                                              - 272 -

Term Scenarios.  We find that requiring transmission providers to consider corporate

commitments when developing Long-Term Scenarios may introduce the risk of one class

of transmission users cross-subsidizing another class of transmission users.  We clarify

that we continue to require transmission providers to consider corporate commitments

that are likely to affect Long-Term Transmission Needs as part of Long-Term Regional

Transmission Planning to the extent that these commitments affect transmission

customers' transmission needs, because transmission providers must plan for the needs of

all transmission customers on a comparable basis under Order Nos. 888, 890, and

1000.[860]  As such, we find that it is unnecessary to require transmission providers to

separately identify corporate commitments as a factor in their development of Long-Term

Scenarios given that the effects of such commitments will be sufficiently incorporated

into Long-Term Regional Transmission Planning through the incorporation of other

Factor Categories, such as Factor Category Three (state-approved integrated resource

plans and expected supply obligations for load-serving entities).

304.    We agree with Harvard ELI's argument that transmission providers must consider

how the contracts and purchasing plans of all transmission customers may affect Long-

Term Transmission Needs in a comparable way to how transmission providers must

consider utility purchasing plans and decisions.  However, we disagree with Harvard ELI

---

[860] *See, e.g.*, Order No. 890, 118 FERC ¶ 61,119 at P 435 ("The Commission has
broad authority to remedy undue discrimination by ensuring that transmission providers plan
for the needs of their customers on a comparable basis.  That fundamental
requirement was adopted in Order No. 888 and the reforms adopted herein should ensure
that it will be implemented properly." (footnote omitted)).

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1649 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

that the Commission's existing open access comparability standard requires transmission providers to plan for all transmission *users* on a comparable basis.  Instead, as noted above, the open access comparability standard requires planning for transmission *customers* on a comparable basis.  We emphasize this distinction because, in the context of Order No. 1920, transmission "users" could refer to retail customers of load-serving entities, and those load-serving entities are either transmission providers or transmission customers of transmission providers.  In focusing on transmission users, Harvard ELI's request would inappropriately expand scope of the open access comparability standard to include retail customers.  Therefore, we deny Harvard ELI's requested clarification.

305.    Finally, we deny Northern Virginia's request to assign transmission facility costs related to corporate commitments through the Large Generator Interconnection Procedures.  The Commission did not propose such a requirement in the NOPR and, as such, this request is beyond the scope of this proceeding.

306.    Aside from corporate commitments, we otherwise sustain the requirement for transmission providers in each transmission planning region to incorporate Factor Category Seven into the development of Long-Term Scenarios, while recognizing the role of states in the incorporation of this category.  Specifically, transmission providers must incorporate utility commitments and federal, federally-recognized Tribal, state, and local policy goals that affect Long-Term Transmission Needs into the development of Long-Term Scenarios.  While we require transmission providers to incorporate this category of factors into the development of Long-Term Scenarios, we emphasize that, where relevant, each of the factors within the category should be the subject of discussion

Docket No. RM21-17-001                                                    - 274 -

with the states who have the policy goals, and their preferences as far as how to integrate

these goals should be taken into account when developing Long-Term Scenarios. We

also find that utility commitments and federal, federally-recognized Tribal, state, and

local policy goals could be drivers of Long-Term Transmission Needs.

307.    We disagree with SERTP Sponsors and Industrial Customers that this requirement

does not constitute reasoned decision making or engage with counterarguments in Order

No. 1920 and note, as described above, that the requirement to incorporate Factor

Category Seven into the development of Long-Term Scenarios was based on record

evidence.[861] Further, the Commission acknowledged commenter concerns that utility,

federally-recognized Tribal, and governmental goals may be more likely to change over

the transmission planning horizon than factors in other required Factor Categories.[862]

However, the Commission did not find that these commitments and goals are so

speculative, amorphous, or unreliable that they should not be incorporated into Long-

Term Scenarios at all.[863]

308.    We also disagree with arguments that the inclusion of Factor Category Seven is

unduly discriminatory or preferential.[864] The Commission requires that transmission

---

[861] Order No. 1920, 187 FERC ¶ 61,068 at PP 474-477 (summarizing record
evidence indicating that Factor Category Seven is essential to identifying Long-Term
Transmission Needs).

[862] *Id.* P 484.

[863] *Id.*

[864] SERTP Sponsors Rehearing Request at 16; Industrial Customers Rehearing

Docket No. RM21-17-001                                              - 275 -

providers plan for all transmission customers' transmission needs on a comparable

basis.[865]  We clarify that Factor Category Seven, as modified above, is not intended to

single out certain utility commitments or federal, federally-recognized Tribal, state, and

local policy goals that affect Long-Term Transmission Needs; instead, Factor Category

Seven, as modified above, captures factors that are not fully represented in the other six

categories of factors and also affect Long-Term Transmission Needs.  As noted in Order

No. 1920, transmission providers have discretion to determine whether a proposed factor

in Factor Category Seven likely affects Long-Term Transmission Needs[866] and how such

factors in Factor Category Seven should be considered,[867] but we clarify such discretion

must be applied in a manner that ensures comparability among transmission customers.

We also clarify that "certain generation resources" in Order No. 1920's reference to

"corporate, governmental, and utility commitments to rely on certain generation

resources," which, as modified on rehearing, is now "governmental and utility

commitments," does not refer to a certain resource type, or limit consideration of such

government or utility commitments to only those commitments to rely on renewable

resources.[868]  Rather, this requirement means that transmission providers must consider

---

Request at 54.

[865] *See, e.g.*, Order No. 890, 118 FERC ¶ 61,119 at P 435.

[866] Order No. 1920, 187 FERC ¶ 61,068 at PP 415, 417.

[867] *Id.* P 516

[868] *Id.* P 261; Industrial Customers Rehearing Request at 55.

the generation resources that a federal, state, or local government entity, federally-recognized Tribe, or utility has chosen to rely on regardless of the resource type.

309.    In response to Virginia and North Carolina Commissions' request as to whether transmission providers may discount public policy factors within Factor Category Seven to zero, we reiterate that, with respect to Factor Category Seven, transmission providers have discretion as to how they account for these factors.  We also clarify that transmission providers may conclude that certain factors within Factor Category Seven do not affect Long-Term Transmission Needs and, therefore, do not need to account for them when incorporating Factor Category Seven into the development of Long-Term Scenarios.[869]

310.    Regarding Industrial Customers' concern that the quality of information on utility commitments make Factor Category Seven unworkable, we note the clarification below that transmission providers may rely on the open and transparent stakeholder process to identify the factors in Factor Category Seven, as modified above, in the same manner that they may rely on the open and transparent stakeholder process to identify the factors in Factor Categories One through Three.[870]  We continue to believe that federal, state, and local government entities, federally-recognized Tribes, utilities, load-serving entities, and

---

[869] Order No. 1920, 187 FERC ¶ 61,068 at P 415.

[870] *Supra infra* Stakeholder Process and Transparency section (clarifying that transmission providers have no independent obligation to identify factors in Factor Category Seven and may rely on stakeholders to identify factors in Factor Category Seven).

their retail regulators that participate in the stakeholder process are distinctly well-positioned to provide transmission providers with vital information regarding factors in Factor Category Seven, as modified above.[871]  In response to Industrial Customers' claim that the best information may be confidential,[872] we clarify that transmission providers may include what they believe to be appropriate confidentiality protections in their compliance proposals to account for proprietary commitments.  The Commission will evaluate those proposals by using the established principles in Order No. 890,[873] as well as precedent on existing confidentiality protections with respect to transmission planning that the Commission has previously found comply with the Order No. 890 transmission planning principles.

311.    We disagree with Industrial Customers' argument that the Commission's emphasis on transmission provider discretion is problematic.[874]  Order No. 1920, with Factor Category Seven as modified above, strikes the right balance by allowing transmission providers discretion as to the treatment of factors within Factor Category Seven when

---

[871] Order No. 1920, 187 FERC ¶ 61,068 at P 530.

[872] Industrial Customers Rehearing Request at 49-50.

[873] Order No. 890, 118 FERC ¶ 61,119 at PP 471-476; *see also* Order No. 1920, 187 FERC ¶ 61,068 at P 466 (clarifying that transmission providers may include what they believe to be appropriate confidentiality protections in their proposals to account for resource retirements that might take place over the transmission planning horizon).

[874] Industrial Customers Rehearing Request at 51-53.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1654 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No.  RM21-17-001                                                           - 278 -

developing Long-Term Scenarios.  In contrast to Industrial Customers' claim,[875] we do not believe that transmission providers need clear rules or standards for implementing their discretion over incorporating Factor Category Seven, as modified above, in the development of Long-Term Scenarios.  We find that transmission providers can rely on their expert judgement and the information provided to them through the open and transparent stakeholder process to develop three plausible Long-Term Scenarios for purposes of identifying Long-Term Transmission Needs.  Furthermore, we continue to find that concerns regarding the administrative burden of identifying specific factors are addressed by allowing transmission providers to rely on the open and transparent stakeholder process to identify factors.[876]  We find that our clarification that transmission providers may rely on the open and transparent stakeholder process to identify the factors in Factor Category Seven,[877] as well as our decision to exclude corporate commitments from that Factor Category, renders moot Industrial Customers' claim that Order No. 1920 forces transmission providers to account for corporate energy commitments and goals of "all potentially known or capable-of-being known energy commitments or contracts."[878]

312.    We recognize that utility commitments and federal, federally-recognized Tribal, state, and local policy goals in Factor Category Seven may initially surface as retail

---

[875] *Id.* at 52.

[876] Order No. 1920, 187 FERC ¶ 61,068 at P 508.

[877] *See infra* Stakeholder Process and Transparency section.

[878] Industrial Customers Rehearing Request at 53.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1655 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No. RM21-17-001                                                      - 279 -

concerns that are addressed through arrangements with retail providers;[879] however, this fact does not obviate the need for transmission providers to account for them in the development of Long-Term Scenarios.  We acknowledge that there could be an overlap between Factor Category Seven, as modified above, and other categories (e.g., integrated resource plans in Factor Category Three), because utility commitments and policy goals may be addressed through arrangements with retail providers.  As discussed above,[880] transmission providers should avoid double counting the anticipated effects that those factors have on assumptions used to develop Long-Term Scenarios where the impact of factors overlaps, such that transmission providers must incorporate those factors once in the appropriate Factor Categories One through Three, not Factor Categories Four through Seven.

313.    We disagree with NRECA's claim that the inclusion of Factor Category Seven expands the definition of Long-Term Transmission Needs beyond reliability, economic, or public policy issues.  The Commission was clear that the drivers of transmission needs are diverse and include, but are not limited to, evolving reliability concerns, changes in

---

[879] SERTP Sponsors Rehearing Request at 15.  In light of the discussion above, we continue to conclude that Order No. 1920—including Factor Category Seven, as modified—is within the Commission's authority notwithstanding that considerations relevant to Factor Category Seven may also arise in the context of retail transactions.  *See supra* Order No. 1920 Is Consistent with the FPA and Precedent Regarding the Commission's Authority section (explaining that where the Commission regulates within its statutory authority, that regulation does not run afoul of the jurisdictional lines drawn in the FPA irrespective of any effects on areas of reserved state authority).

[880] *Supra* Requirement to Incorporate Categories of Factors section.

the resource mix, and changes in demand.[881]  Foundationally, and consistent with our

clarification that economic drivers contribute to Long-Term Transmission Needs,[882] we

find that all seven categories of factors in Order No. 1920 pertain to Long-Term

Transmission Needs because they affect the reliable and economic operation of the

interconnected transmission system.  The categories of factors requirements are intended

to address certain deficiencies in the Commission's existing regional transmission

planning requirements, including the failure to ensure that transmission providers

adequately account on a forward-looking basis for known determinants of Long-Term

Transmission Needs.[883]

### iii.    Other Specific Required Categories of Factors

### (a)    Requests for Rehearing and Clarification

314.    NRECA requests rehearing of the Commission's holding in Order No. 1920 that

transmission providers have the discretion to determine that factors in Factor Category

Three (state-approved integrated resource plans and expected supply obligations for load-

serving entities) may not affect Long-Term Transmission Needs.[884]  NRECA argues that

---

[881] Order No. 1920, 187 FERC ¶ 61,068 at P 299.

[882] *See supra* Requirement for Transmission Providers To Use the Seven Required Benefits To Help To Inform Their Identification of Long-Term Transmission Needs section.

[883] Order No. 1920, 187 FERC ¶ 61,068 at P 418.

[884] NRECA Rehearing Request at 37-39 (citing Order No. 1920, 187 FERC ¶ 61,068 PP 507, 510); *see also* East Kentucky Rehearing Request at 2-3 (arguing that Order No. 1920 violates FPA section 217(b)(4) by treating state-approved integrated resource plans and expected supply obligations for load-serving entities as discretionary

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1657 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Order No. 1920 is in error because the Commission took action in this regard that is at odds with the needs of load-serving entities in violation of FPA section 217(b)(4).[885] NRECA acknowledges that the Commission explained in Order No. 1920 that the final rule is consistent with FPA section 217(b)(4) and the interpretation of that statute adopted when the D.C. Circuit upheld Order No. 1000 in *South Carolina Public Service Authority v. FERC*.[886] Nonetheless, NRECA claims that Order No. 1920 is different from Order No. 1000, and therefore that decision is not dispositive—particularly as to Order No. 1920's treatment of state-approved integrated resource plans and the expected supply obligations as discretionary.[887] NRECA further argues that the Commission should revisit its conclusion that *South Carolina Public Service Authority v. FERC* remains binding precedent, because the D.C. Circuit upheld Order No. 1000's compliance with section 217(b)(4) using the deferential standard of review in *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*,[888] which was under review by the U.S.

---

factors in Factor Category Three (citation omitted)); *id.* at 1 (stating that East Kentucky "specifically adopts the majority of issues identified by NRECA and incorporates the bases and arguments for rehearing set forth in the NRECA Rehearing Request for those issues").

[885] NRECA Rehearing Request at 39-40 (citing 16 U.S.C. 824q(b)(4)).

[886] *Id.* at 40-41 (citing Order No. 1920, 187 FERC ¶ 61,068 at P 283).

[887] *Id.* at 41.

[888] *Id.* (citing *Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984); *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d at 54).

Docket No.  RM21-17-001                                                                           - 282 -

Supreme Court at the time NRECA submitted its request for rehearing.[889]  NRECA

further argues that the Commission's decision in this regard was arbitrary and capricious

because Order No. 1920 was not "based on a consideration of the relevant factors" and

"entirely failed to consider an important aspect of the problem."[890]

315.    SERTP Sponsors request the following clarifications regarding specific categories

of factors.  With regard to Factor Categories One through Three, SERTP Sponsors

request that the Commission expressly clarify that the open and transparent stakeholder

process established by transmission providers is not intended to create an opportunity to

relitigate or dispute the underlying integrated resource plans, resource projections, or

laws and regulations, but instead, simply intends to create a forum in which such inputs

can be brought forth to examine the potential impact on Long-Term Transmission

Needs.[891]  Regarding Factor Category Three, SERTP Sponsors request that the resource

planning and procurement processes of non-jurisdictional transmission providers, such as

those of the non-jurisdictional SERTP Sponsors, that have been approved by their

respective governing authorities should be included in this Factor Category Three as

scenario inputs that are to be included without discount.[892]  SERTP Sponsors also request

---

[889] *Id.* (citing *Loper Bright Enters. v. Raimondo*, No. 22-451; *Relentless, Inc. v. Dep't of Commerce*, No. 22-1219 (U.S. argued Jan. 17, 2024)).

[890] *Id.* at 41-42 (quoting *State Farm*, 463 U.S. at 43).

[891] SERTP Sponsors Rehearing Request at 5.

[892] *Id.* at 6.

clarification that "federal, federally-recognized Tribal, state, and local laws and regulations" is intended to encompass only "enacted statutes (i.e., passed by the legislature and signed by the executive) and regulations promulgated by a relevant jurisdiction, whether within a state or at the federal level" as established in Order No. 1000, albeit with the addition of Tribal laws and regulations.[893]  Similarly, SERTP Sponsors request clarification that for Factor Category One, such legally binding obligations, incentives (e.g., tax credits), and/or restrictions must be enacted by legislatures or promulgated by the relevant agency or Tribal authority.[894]

316.    PIOs request rehearing of the Commission's findings regarding Factor Categories Four and Seven because they assert that the Commission erred when it failed to create specific guardrails to prevent transmission providers from minimizing these two categories of factors.[895]  PIOs argue that the Commission must provide specific guardrails for Factor Categories Four and Seven to ensure that transmission needs are accurately assessed.[896]  PIOs argue that Order No. 1920 allows "boundless discounting" of these categories, which "creates an opportunity for transmission providers to functionally ignore the Commission's mandate."[897]

---

[893] *Id.* at 14-15 (quoting Order No. 1000, 136 FERC ¶ 61,051 at P 2).

[894] *Id.*

[895] PIOs Rehearing Request at 33-35.

[896] *Id.* at 33.

[897] *Id.*

317.    PIOs contend that the evidence in the record does not substantiate the

Commission's dismissal of the concern that the additional discretion granted to

transmission providers regarding the last four categories of factors could functionally

minimize these categories.[898]  Regarding Factor Category Four, PIOs urge the

Commission to maintain a list of best available data.[899]  Regarding Factor Category

Seven, PIOs request that the Commission limit the discounting of utility and corporate

commitments by creating a presumption that transmission providers' discounting cannot

assume greater failure to reach utility and corporate commitments than has occurred in

the previous 10 years.[900]

### (b)    Commission Determination

318.    We disagree with NRECA's rehearing arguments and continue to find that, while

transmission providers must incorporate into the development of Long-Term Scenarios

all factors in Factor Category Three (state-approved integrated resource plans and

expected supply obligations for load-serving entities) that the transmission providers

determine are likely to affect Long-Term Transmission Needs, transmission providers

have the discretion as to whether they must account for a specific factor in Factor

Category Three in the development of Long-Term Scenarios by concluding it is likely to

---

[898] *Id.*

[899] *Id.* at 34.

[900] *Id.* at 35.

affect Long-Term Transmission Needs.[901]  We continue to believe that the framework

adopted in Order No. 1920 regarding categories of factors strikes the right balance

between prescriptive requirements and flexibility.[902]  Transmission providers determining

whether a particular factor is likely to affect Long-Term Transmission Needs does not

allow them to simply pick-and-choose one factor that they may prefer over another

factor.  Instead, allowing transmission providers to determine whether to account for a

specific factor by concluding it is likely to affect Long-Term Transmission Needs is

necessary to ensure that transmission providers develop accurate assumptions on which

to base their Long-Term Scenarios.[903]  Further, Order No. 1920 builds on the foundation

of Order No. 890, and specifically the comparability principle, which requires that

transmission providers treat similarly situated customers comparably in the transmission

planning process.[904]

319.   We believe that the vast majority of factors in Factor Category Three, which

represent state-approved integrated resource plans and expected supply obligations for

load-serving entities, will likely affect Long-Term Transmission Needs.  Nevertheless,

---

[901] Order No. 1920, 187 FERC ¶ 61,068 at PP 447, 510.

[902] *Id.* P 417.

[903] *Cf. id.* P 530 (discussing importance of transmission providers being able to develop more accurate assumptions to serve as the basis for their Long-Term Scenarios).

[904] *Id.* P 14 (citing Order No. 890, 118 FERC ¶ 61,119 at PP 418-601); *see also* Order No. 890, 118 FERC ¶ 61,119 at PP 494-495 (discussing the comparability principle).

we cannot foresee every potential factor that may be identified, and we therefore find it appropriate to preserve transmission providers' discretion to conclude that a specific factor (even in Factor Category Three) will have limited or no impact on Long-Term Transmission Needs. We also emphasize, as discussed below,[905] that transmission providers must consult with and consider the positions of the Relevant State Entities as to how to incorporate categories of factors into the development of Long-Term Scenarios in such a way that states will play an important role in ensuring that state-approved integrated resource plans are incorporated in the manner they are expected to be implemented.

320.    We also disagree with NRECA's argument that the Commission acted at odds with the needs of load-serving entities in violation of FPA section 217(b)(4) by providing transmission providers with the discretion to not account for factors in Factor Category Three that a transmission provider finds are unlikely to affect Long-Term Transmission Needs.  If a factor is unlikely to affect Long-Term Transmission Needs, excluding that factor in the transmission planning process is unlikely to negatively affect the needs of load-serving entities.  Contrary to NRECA's claims, FPA section 217(b)(4) does not require the Commission to require transmission providers to account for factors in the development of Long-Term Scenarios that do not affect Long-Term Transmission Needs. We continue to find that Order No. 1920 satisfies the Commission's obligation under FPA section 217(b)(4) because Order No. 1920 facilitates the planning and expansion of

---

[905] *Infra* Stakeholder Process and Transparency section.

Docket No. RM21-17-001                                                    - 287 -

transmission facilities to meet load-serving entities' needs.[906]  Long-Term Regional

Transmission Planning, as clarified herein, is intended to enhance the transmission

planning process for states, load-serving entities, and other interested parties, and, to that

end, requires transmission providers to account for factors (including load-serving

entities' expected supply obligations) that are likely to affect Long-Term Transmission

Needs in the development of Long-Term Scenarios.

321.    Further, we disagree with NRECA that the U.S. Supreme Court's decision in

*Loper Bright Enterprises v. Raimondo*[907]—in which the Court overruled *Chevron U.S.A.*

*Inc. v. Natural Resources Defense Council*, *Inc.*—requires us to reconsider the D.C.

Circuit's holding in *South Carolina Public Service Authority v. FERC* as to the meaning

of FPA section 217(b)(4).[908]  The D.C. Circuit interpreted section 217(b)(4) and

determined that this provision requires the Commission to "facilitate the planning of a

reliable grid" by "seek[ing] to ensure that adequate transmission capacity is built to allow

load-serving entities to meet their service obligations."[909]  Order No. 1920 did not

reinterpret FPA section 217(b)(4), but rather applied the interpretation adopted by the

---

[906] Order No. 1920, 187 FERC ¶ 61,068 PP 283, 420.

[907] 144 S.Ct. 2244 (2024).

[908] NRECA Rehearing Request at 41 (citing *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d at 54).

[909] *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d at 90.  Moreover, even if the D.C. Circuit had relied on *Chevron* in reaching this conclusion, the Supreme Court confirmed that "mere reliance" on *Chevron* is "not enough to justify overruling a statutory precedent."  *Loper Bright*, 144 S.Ct. at 2273.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1664 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No. RM21-17-001                                                    - 288 -

D.C. Circuit.  Moreover, we believe the interpretation set forth by the Commission in

Order No. 1000, endorsed by the D.C. Circuit in *South Carolina Public Service Authority*

*v. FERC* and applied in Order No. 1920, remains the most reasonable reading of this

statutory provision.[910]  Fundamentally, meeting the reasonable needs of load-serving

entities to satisfy their service obligations requires that sufficient transmission capacity is

available to deliver power when it is needed, and fostering a reliable transmission system

is the best way to ensure that such capacity is available.  Order No. 1920's requirements

are designed to achieve precisely that development of sufficient transmission capacity to

ensure reliable and affordable delivery of needed power to meet the reasonable needs of

load-serving entities, and therefore we find that it complies with FPA section 217(b)(4).

322.  We grant SERTP Sponsors' request for clarification regarding the first three

categories of factors and clarify that nothing in Long-Term Regional Transmission

Planning is intended to relitigate or dispute the outcomes of the underlying integrated

resource plans, resource projections, or laws and regulations that are (or are not)

incorporated into the development of Long-Term Scenarios.  The open and transparent

---

[910] *Compare* Order No. 1000, 136 FERC ¶ 61,051 at P 108 ("[T]his Final Rule is
consistent with section 217 because it supports the development of needed transmission
facilities, which ultimately benefits load-serving entities."), *with S.C. Pub. Serv. Auth. v.
FERC*, 762 F.3d at 90 ("Section 217 (b)(4) requires the Commission to facilitate the
planning of a reliable grid, which is exactly what the Commission has done in the
challenged orders."); Order No. 1920, 187 FERC ¶ 61,068 at P 283 ("As articulated in
*South Carolina Public Service Authority v. FERC*, FPA section 217(b)(4) requires the
Commission to 'facilitate the planning of a reliable grid,' and we do so by 'seek[ing] to
ensure that adequate transmission capacity is built to allow load-serving entities to meet
their service obligations.'" (alteration in original) (citation omitted)).

stakeholder process required in Order No. 1920 is a forum that provides stakeholders, including states, with a meaningful opportunity to propose potential factors and to provide timely input on how to account for specific factors in the development of Long-Term Scenarios.[911]  For purposes of identifying Long-Term Transmission Needs, every factor is an input that transmission providers consider when determining the assumptions to use in the development of Long-Term Scenarios.  Through the stakeholder process, states, transmission providers and stakeholders will have the opportunity to discuss how a factor would affect assumptions used to develop Long-Term Scenarios, if it does at all, and how the effect varies in different Long-Term Scenarios.

323.    In addition, we grant SERTP Sponsors' request for clarification regarding non-jurisdictional entities,[912] in part.  We clarify that, where a non-jurisdictional entity is a transmission customer of one or more transmission providers in a transmission planning region, the transmission providers must plan for the non-jurisdictional entity's needs as a transmission customer as it would for the needs of any other transmission customer, including any resource planning and procurement processes that have been approved by the respective governing authorities under Factor Category Three, for purposes of complying with the requirements of Order No. 1920.  For example, each Long-Term Scenario must account for and be consistent with these factors once the transmission providers have determined that such a factor is likely to affect Long-Term Transmission

---

[911] Order No. 1920, 187 FERC ¶ 61,068 at P 528.

[912] SERTP Sponsors Rehearing Request at 6.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1666 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No. RM21-17-001                                                      - 290 -

Needs.[913]  However, we further clarify that transmission providers may *not* plan for the needs of a non-jurisdictional utility transmission provider if that non-jurisdictional transmission provider has not enrolled in the transmission planning region and thereby has not agreed to any cost allocation method applicable to selected Long-Term Regional Transmission Facilities.[914]  If the transmission provider were to plan for and consider non-jurisdictional transmission providers' Long-Term Transmission Needs without a way to ensure the non-jurisdictional transmission provider contributes to the costs of the resulting Long-Term Regional Transmission Facilities, the resulting cost allocation could violate the cost causation principle and result in free-ridership.[915]

324.    In response to SERTP Sponsors' request for clarification regarding the meaning of "laws and regulations," we clarify that Order No. 1920 adopts the meaning of the terms used in the NOPR, namely "enacted statutes (i.e., passed by the legislature and signed by the executive) and regulations promulgated by a relevant jurisdiction."[916]  Order No. 1920 amended the term "statutes" used in the NOPR by adding the duly enacted and

---

[913] Order No. 1920, 187 FERC ¶ 61,068 at PP 507, 510.

[914] *Cf.* Order No. 1000-A, 139 FERC ¶ 61,132 at P 276 ("[T]he regional transmission planning process is *not required* to plan for the transmission needs of such a non-[jurisdictional] utility transmission provider that has not made the choice to join a transmission planning region." (emphasis added)).

[915] *El Paso Elec. Co. v. FERC*, 76 F.4th at 363-66.

[916] NOPR, 179 FERC ¶ 61,028 at P 104 n.189; *see also* Order No. 1000, 136 FERC ¶ 61,051 at P 2.  We clarify here that the definition of "laws and regulations" includes laws and regulations duly enacted by local jurisdictions, even where there are differences in how these jurisdictions enact laws or promulgate regulations.

Docket No. RM21-17-001                                                    - 291 -

legally binding obligations of federally-recognized Tribes.[917]  We reiterate that Factor

Categories One and Two include laws and regulations at the federal, federally-recognized

Tribal, state, and local level.[918]

325.    We disagree with PIOs' request for rehearing to create more prescriptive

requirements for Factor Category Four (trends in fuel costs and in the cost, performance,

and availability of generation, electric storage resources, and building and transportation

electrification technologies) and Factor Category Seven (utility and corporate

commitments and federal, federally-recognized Tribal, state, and local policy goals that

affect Long-Term Transmission Needs).[919]  We reiterate that the framework that the

Commission adopted in Order No. 1920 regarding the incorporation of categories of

factors into the development of Long-Term Scenarios strikes the right balance between

prescriptive requirements and flexibility.[920]  We believe that the requirements for

transmission providers to incorporate (i.e., more than merely consider) categories of

factors in the development of Long-Term Scenarios, as well as to develop plausible

---

[917] Order No. 1920, 187 FERC ¶ 61,068 at P 434.

[918] *Id.* P 409.  It is unclear whether SERTP Sponsors intended to argue that failure to grant clarification in this respect would result in Order No. 1920 exceeding the Commission's authority; to the extent they intended to do so, we find this argument has not been raised with the specificity required on rehearing.  *See supra* Major Questions Doctrine section.

[919] PIOs Rehearing Request at 33.

[920] Order No. 1920, 187 FERC ¶ 61,068 at P 417.

Long-Term Scenarios with the best available data,[921] are adequate to safeguard against "boundless discounting" and opportunities to "functionally ignore the Commission's mandate."[922]

326.    More specifically, we disagree with PIOs' request to require on rehearing that transmission providers incorporate certain factors from a Commission-maintained list of data sources for Factor Category Four. As an initial matter, we find that it is unnecessary to grant PIOs' request because transmission providers' technical expertise and the required open and transparent stakeholder process to identify factors are sufficient to ensure that transmission providers implement the requirements of Long-Term Regional Transmission Planning. In addition to the Commission's concerns regarding regional variation and stifled innovation identified in Order No. 1920,[923] we conclude that there are practical challenges associated with the Commission establishing and maintaining a list of data sources. For example, transmission providers already collect data similar to the data needed for these factors for other applications, and the Commission would be duplicating this data collection effort. We believe that transmission providers working with Relevant State Entities and other stakeholders in their regions are better equipped to

---

[921] *Id.* PP 413-414.

[922] PIOs Rehearing Request at 33.

[923] *See* Order No. 1920, 187 FERC ¶ 61,068 at P 639 (declining to impose further requirements as to data uniformity because regional variation may make uniformity challenging and because it could stifle innovation that may improve Long-Term Regional Transmission Planning).

Docket No.  RM21-17-001                                                                                    - 293 -

understand the unique circumstances of their regions and to compile data and inputs for the required categories of factors.

327.    With respect to Factor Category Seven, we decline to limit the discounting of utility and corporate commitments as proposed by PIOs.[924]  In this case, we find that transmission providers may face practical challenges in accurately quantifying the historical rate of failure for utility commitments; moreover, the historical rate of failure is not necessarily determinative of future achievement rates for such commitments.  In addition, limiting how transmission providers manage the uncertainty associated with utility commitments may have unintended consequences.  For example, such a limit would not allow transmission providers to adapt their treatment of utility commitments in response to, for example, industry-wide changes that make it more challenging for utilities to meet prior commitments.  We believe that the existing requirements in Order No. 1920[925] are adequate to safeguard against boundless discounting of factors in Factor Category Seven.[926]

---

[924] The issue of discounting corporate commitments is rendered moot by our decision to set aside the requirement to include these commitments in Factor Category Seven above.

[925] *Id.* PP 413-414.

[926] PIOs Rehearing Request at 33.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1670 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

### iv.    Requests for Additional Requirements

### (a)    Requests for Rehearing

328.    Invenergy requests rehearing, asserting that the Commission erred by not requiring transmission providers to include "advanced-stage" merchant high-voltage direct current (HVDC) transmission facilities in the list of factors to be considered when developing Long-Term Scenarios.[927]  Invenergy claims this omission is unduly discriminatory against advanced-stage merchant HVDC transmission.[928]  Invenergy also asserts that the Commission failed to consider significant evidence in Order No. 1920 because the Commission failed to address AEE's comments, which argued that merchant HVDC transmission facilities must be included in at least one Long-Term Scenario in order to address potential undue discrimination against merchant HVDC transmission facilities. According to Invenergy, AEE asserted that it is important to include merchant HVDC transmission facilities in at least one Long-Term Scenario because merchant HVDC transmission facilities are developed by nonincumbent transmission developers and this inclusion guards against potential undue discrimination.[929]  In addition, Invenergy claims that failure to utilize critical and readily available information will result in Long-Term Scenarios that do not accurately reflect the topography of the system, and that this information should be included to guard against potential undue discrimination from

---

[927] Invenergy Rehearing Request at 2, 6-7.

[928] *Id.* at 10.

[929] Invenergy Rehearing Request at 9 (citing AEE NOPR Reply Comments at 19).

Docket No. RM21-17-001                                                    - 295 -

incumbent transmission owners.[930]  Invenergy argues that the Commission ignored

significant evidence in the record from Invenergy and others on this issue.[931]

### (b)    Commission Determination

329.    In response to Invenergy's request for rehearing, we reiterate that the Commission

did not propose specific requirements in the NOPR regarding merchant HVDC

transmission facilities under development and was not persuaded by the evidence in the

record that it should include advanced-stage HVDC transmission facilities in the

minimum set of known determinants of Long-Term Transmission Needs.[932]  Invenergy

has not clearly articulated how merchant HVDC transmission facilities are essential to

identifying, or are known and identifiable drivers of, Long-Term Transmission Needs.

330.    In the NOPR, the Commission referenced merchant transmission facilities only

once,[933] and that reference was in the context of a larger proposed requirement that the

Commission declined to adopt in Order No. 1920.[934]  Order No. 1920 addressed specific

---

[930] *Id.* at 8-9.

[931] *Id.* at 9.

[932] *See* Order No. 1920, 187 FERC ¶ 61,068 at P 493.

[933] NOPR, 179 FERC ¶ 61,028 at P 150 (In the context of the NOPR proposal for the identification of geographic zones, the Commission proposed to include "any merchant or other entity commitments to build . . . transmission facilities" as one of seven mandatory considerations to assess generation developers' commercial interest in developing generation within each designated geographic zone.).

[934] Order No. 1920, 187 FERC ¶ 61,068 at P 665 (stating that "the [identification of geographic zones] NOPR proposal is not warranted at this time").

deficiencies with the Commission's existing regional transmission planning and cost allocation requirements but did not identify issues surrounding merchant transmission as one of those deficiencies.[935]

331. We disagree with Invenergy's claim that the exclusion of proposed but not yet built merchant HVDC transmission facilities from the required factors underlying the Long-Term Scenarios is unjust and unreasonable.[936] In Order No. 1920, the Commission described the seven specific categories of factors required by the Commission as "essential to identifying Long-Term Transmission Needs" and "known and identifiable drivers of Long-Term Transmission Needs."[937] Although Invenergy claimed that one of its merchant HVDC transmission facilities could *address* transmission needs,[938] Invenergy has failed to clearly articulate how proposed but not yet built merchant HVDC

---

[935] *Id.* P 139 ("[W]e find that the Commission's regional transmission planning and cost allocation requirements fail to require transmission providers to: (1) perform a sufficiently long-term assessment of transmission needs that identifies Long-Term Transmission Needs; (2) adequately account on a forward-looking basis for known determinants of Long-Term Transmission Needs; and (3) consider the broader set of benefits of regional transmission facilities planned to meet those Long-Term Transmission Needs. We find that reforms to those requirements are thus necessary to ensure that Commission-jurisdictional rates are just, reasonable, and not unduly discriminatory or preferential.").

[936] Invenergy Rehearing Request at 8.

[937] Order No. 1920, 187 FERC ¶ 61,068 at P 410.

[938] Invenergy Initial NOPR Comments at 7 ("A planned 5,000 MW HVDC line such as Grain Belt's would be a significant system addition, and could itself provide system benefits or even address transmission needs otherwise identified through the planning process . . . .").

USCA4 Appeal: 24-1650   Doc: 224      Filed: 01/21/2025   Pg: 1673 of 2455
Document Accession #: 20241121-3139      Filed Date: 11/21/2024

Docket No.  RM21-17-001                                              - 297 -

transmission facilities are essential to identifying, or are known and identifiable drivers

of, Long-Term Transmission Needs.  However, as indicated in Order No. 1920,

transmission providers may be aware of additional categories of factors beyond those

adopted in the final rule that drive Long-Term Transmission Needs and may incorporate

additional categories of factors into the development of Long-Term Scenarios.[939]  We

clarify that, if transmission providers elect to use additional categories of factors beyond

the required categories of factors in Order No. 1920 in the development of Long-Term

Scenarios, the transparency requirements set forth in Order No. 1920 also apply to the

additional categories of factors.[940]  Pursuant to this clarification, transmission providers

must publish on the public portion of an OASIS or other public website:  (1) the list of

each additional categories of factors, and the factors in each of the additional categories

of factors that they will account for in their Long-Term Scenarios; (2) a description of

each additional category of factors and a description of each factor that they will account

for in their Long-Term Scenarios; (3) a general statement explaining how they will

account for each additional category of factors and each of the additional factors in their

Long-Term Scenarios; (4) a description of the extent to which they will discount any

factors in each additional category of factors; and (5) a list of the factors that they

considered but did not incorporate in each additional category of factors in their Long-

Term Scenarios.  Consistent with Order No. 1920, we find that this transparency is

---

[939] Order No. 1920, 187 FERC ¶ 61,068 at P 493.

[940] *See id.* PP 528-533.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1674 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No.  RM21-17-001                                                          - 298 -

necessary to make clear to stakeholders which specific additional categories of factors and factors transmission providers incorporate into Long-Term Scenarios and how they are incorporated.  We believe this posting requirement for additional categories of factors will also provide greater transparency into how transmission providers develop Long-Term Scenarios, while still providing transmission providers with flexibility regarding whether, and if so, how they choose to incorporate relevant factors.[941]  Accordingly, in transmission planning regions where proposed HVDC transmission facilities may play a role in shaping Long-Term Transmission Needs, transmission providers have the flexibility to consider and incorporate such facilities into their Long-Term Scenarios.

332.    We also disagree with Invenergy's argument that the Commission has failed to direct transmission providers to use critical—and readily available—information related to the future electric power system, which renders the resulting Long-Term Scenarios unjust and unreasonable.[942]  Order No. 1920 requires transmission providers to develop Long-Term Scenarios with data inputs that are timely, developed using best practices and diverse and expert perspectives, and adopted via a process that satisfies the transmission planning principles of Order Nos. 890 and 1000.[943]  In addition, in Order No. 1920, the Commission found that transmission providers must use best available data when determining whether each factor is likely to affect Long-Term Transmission Needs.

---

[941] *Id.* P 534.

[942] Invenergy Rehearing Request at 9.

[943] Order No. 1920, 187 FERC ¶ 61,068 at P 633.

Docket No. RM21-17-001                                                      - 299 -

Once transmission providers have determined that a factor is likely to affect Long-Term

Transmission Needs, they must use the best available data when they then account for

that factor in the development of Long-Term Scenarios.[944]

333.    We also disagree with Invenergy's claim that the Commission ignored significant

evidence in the record.[945]  We remain unpersuaded by the evidence in the record that the

Commission should include advanced-stage HVDC transmission facilities in the

minimum set of known determinants of Long-Term Transmission Needs.[946]  Invenergy's

experience with its Grain Belt project in the MISO Long Range Transmission Plan

speaks to a separate issue currently before the Commission.[947]

334.    Finally, we disagree with Invenergy's argument that the Commission's inclusion

of a wide range of factors, including generation interconnections, but exclusion of

advanced-stage merchant HVDC facilities is unduly discriminatory and opens such

developers to further potential undue discrimination.[948]  The Commission found it

appropriate to require transmission providers to incorporate Factor Category Six

---

[944] *Id.*

[945] Invenergy Rehearing Request at 9 ("As demonstrated above, multiple
commenters, including Invenergy, the Clean Energy Associations, and others placed
evidence into the record explaining why merchant HVDC transmission facilities must be
included.").

[946] Order No. 1920, 187 FERC ¶ 61,068 at P 493.

[947] *Invenergy Transmission LLC v. Midcontinent Indep. Sys. Operator, Inc.*,
Complaint, Docket No. EL22-83-000 (filed Aug. 8, 2022).

[948] Invenergy Rehearing Request at 10.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1676 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No. RM21-17-001                                                    - 300 -

(generator interconnection requests and withdrawals) into the development of Long-Term

Scenarios because generation interconnection queues provide important information

about future generation development over the transmission planning horizon and

therefore affect Long-Term Transmission Needs.[949]  We cannot make a similar finding

for advanced-stage merchant HVDC transmission based on the record in this proceeding,

nor do we conclude (and Invenergy has not demonstrated) that the exclusion of

advanced-stage merchant HVDC facilities from the required categories of factors opens

merchant transmission developers to potential undue discrimination.  We also are not

persuaded by Invenergy's reference to AEE's comments claiming that being a

nonincumbent transmission developer rises to the level of potential undue discrimination

that must be remedied by requiring merchant HVDC to be included in Long-Term

Scenarios.  To the extent that similar potential undue discrimination claims for

nonincumbent merchant HVDC transmission developers are pending in other

proceedings, the Commission will address those claims based on the evidence in those

proceedings.  We note that AEE provides no evidence of potential undue discrimination

and that AEE itself has not filed a rehearing request on this issue.  Finally, we clarify that

transmission providers, in addressing interconnection requests and withdrawals under

Factor Category Six, must include merchant transmission developer interconnection

requests in the development of Long-Term Scenarios, and in a manner comparable to

other interconnection requests.

---

[949] Order No. 1920, 187 FERC ¶ 61,068 at P 472.

### c.        Stakeholder Process and Transparency

### i.        Order No. 1920 Requirements

335.    In Order No. 1920, the Commission required transmission providers in each

transmission planning region to revise the regional transmission planning process in their

OATTs to outline an open and transparent process that provides stakeholders, including

federally-recognized Tribes and states, with a meaningful opportunity to propose

potential factors and to provide timely input on how to account for specific factors in the

development of Long-Term Scenarios.  The Commission further required transmission

providers to publish on the public portion of an OASIS or other public website the

following information:  (1) the list of the factors in each of the seven required categories

of factors that they will account for in their Long-Term Scenarios; (2) a description of

each factor that they will account for in their Long-Term Scenarios; (3) a general

statement explaining how they will account for each of those factors in their Long-Term

Scenarios; (4) a description of the extent to which they will discount any factors in Factor

Categories Four through Seven in each Long-Term Scenario; and (5) a list of the factors

that they considered but did not incorporate in their Long-Term Scenarios.[950]  In addition,

the Commission required transmission providers to post this information after

stakeholders, including states, have had the meaningful opportunity to propose potential

factors and to provide input on how to account for specific factors in the development of

---

[950] *Id.* P 528.

Long-Term Scenarios.[951]  The Commission explained that this requirement will provide greater transparency into how transmission providers develop Long-Term Scenarios, while still providing transmission providers with flexibility regarding whether, and if so, how they choose to incorporate relevant factors,[952] and the Commission explained that this transparency also ensures that transmission providers review stakeholder-proposed factors in a fair and non-discriminatory manner.[953]

336.    The Commission also required transmission providers, consistent with Order No. 890's transparency transmission planning principle, to make transparent the methodology, criteria, assumptions, and data used to develop each Long-Term Scenario.[954]  Given the importance of a robust stakeholder process to developing more accurate assumptions to serve as the basis for Long-Term Scenarios, Order No. 1920 required transmission providers to give stakeholders a meaningful opportunity to provide timely input on how and what information to incorporate into the development of Long-Term Scenarios, including how to account for a specific factor in terms of how the factor may affect Long-Term Transmission Needs.  The Commission explained that this meaningful opportunity includes the opportunity to propose factors, provide information and identify sources of best available data, propose how a factor may affect Long-Term

---

[951] *Id.* P 533.

[952] *Id.* P 534.

[953] *Id.* P 535.

[954] *Id.* P 305 (citing Order No. 890, 118 FERC ¶ 61,119 at P 471).

Transmission Needs, and explain how that factor could be reflected in the development of Long-Term Scenarios, including the extent to which it is appropriate to discount the effects of certain factors on Long-Term Transmission Needs.[955]

337.    The Commission further found in Order No. 1920 that stakeholder input is particularly important for factors in the first three categories of factors, because federal, state, and local government entities, federally-recognized Tribes, and utilities, load-serving entities, and their retail regulators that participate in the stakeholder process are distinctly well-positioned to provide transmission providers with vital information on how the factors over which they have authority or that they govern are likely to influence Long-Term Transmission Needs over the transmission planning horizon.[956]  The Commission recognized that different stakeholders may provide information about the same factor that is contradictory and allowed transmission providers to weigh more heavily one source of information over another.[957]

### ii.    Requests for Rehearing and Clarification

338.    NESCOE requests clarification that transmission providers must rely on states in developing Long-Term Scenarios where state laws, regulations, and/or policies are driving Long-Term Transmission Needs.  If the Commission does not provide this

---

[955] *Id.* PP 529-530.

[956] *Id.* P 530.

[957] *Id.* P 531.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1680 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No.  RM21-17-001                                                           - 304 -

clarification, NESCOE requests rehearing.[958]  NESCOE explains that state officials have

expertise in connection with these matters such that transmission providers should rely on

states for input regarding the details of state requirements in Factor Categories One, Two,

and Seven.  NESCOE claims that, in the absence of this clarification, transmission

providers may devote resources to developing Long-Term Scenarios that are less useful

to transmission planning regions.[959]  Similarly, PJM States request clarification of the

degree to which transmission providers should defer to, weigh, or consider the input of

states as it relates specifically to state laws and integrated resource plans.  PJM States

argue that states have a unique role as to these subjects, and that transmission providers

should not treat state perspectives the same as those of any other stakeholder.[960]

339.    PIOs request rehearing such that the Commission would strengthen the

transparency provisions by requiring transmission providers to provide more detailed

explanations of the factors to be used and to justify any discounting of factors in Factor

Categories Four through Seven.  PIOs argue that stronger transparency provisions would

foster more meaningful stakeholder processes.[961]  Specifically, PIOs contend that, with

respect to the information that transmission providers must publish on the public portion

of an OASIS or other public website, the Commission should replace the third item, i.e.,

---

[958] NESCOE Rehearing Request at 11.

[959] *Id.* at 20-21.

[960] PJM States Rehearing Request at 4.

[961] PIOs Rehearing Request at 36.

Docket No. RM21-17-001                                                    - 305 -

"a general statement explaining how [transmission providers] will account for each of

[the factors that they will account for in their Long-Term Scenarios]," with "a detailed

description of the reasoning and methodology used to account for each factor, as well as

providing the actual data inputs when possible."[962]

340.    PIOs criticize the Commission's rationale for declining to include this

requirement, i.e., that the burden would not be justified by the benefit of such additional

information.  PIOs argue that requiring transmission providers to justify their discounting

decisions would help hold transmission providers accountable, incentivize more accurate

discounting assumptions, and guard against pressure from self-interested stakeholders to

excessively discount factors.[963]  PIOs contend that Order No. 1920 is arbitrary and

capricious because failing to require more detailed explanations of the factors to be used

or to justify any discounting of factors in Factor Categories Four through Seven does not

flow rationally from Order No. 1920's "more fundamental findings" as to the

requirements for transmission providers to provide meaningful opportunity for

stakeholder input and to make the development of Long-Term Scenarios transparent.[964]

341.    SERTP Sponsors request that the Commission clarify that transmission providers

have the discretion to include or to exclude an assumption from the development of a

Long-Term Scenario where stakeholders do not provide transmission providers with

---

[962] *Id.*

[963] *Id.* at 37-38.

[964] *Id.* at 38 (citing Order No. 1920, 187 FERC ¶ 61,068 at P 305).

Docket No.  RM21-17-001                                                    - 306 -

sufficient information as to whether a potential assumption or factor is likely to affect
Long-Term Transmission Needs.  SERTP Sponsors provide the example of a generator
whose point of interconnection is unknown and contend that transmission providers
should not be obligated to hypothesize arbitrarily as to that point of interconnection,
because doing so likely would yield implausible Long-Term Scenarios and would not
result in cost-effective or efficient transmission planning.[965]

342.    SERTP Sponsors request that the Commission clarify that transmission providers
may rely on stakeholders to identify factors in Factor Categories Four through Seven,
and, if stakeholders identify no such factors, that transmission providers may but need not
do so.  SERTP Sponsors contend that Order No. 1920 implies but does not clearly
provide for this requested clarification.[966]  SERTP Sponsors also request that the
Commission clarify that transmission providers may rely upon stakeholders to identify
factors that, unlike factors in Factor Categories One through Three, do not pertain
directly to a specific transmission provider in the relevant transmission planning
region.[967]  If the Commission does not so clarify, SERTP Sponsors request rehearing on
the grounds that requiring transmission providers to identify such factors would be
unduly burdensome.[968]

---

[965] SERTP Sponsors Rehearing Request at 13-14.

[966] *Id.* at 13 (citing Order No. 1920, 187 FERC ¶ 61,068 at P 516).

[967] *Id.* at 14 & n.33.

[968] *Id.* at 14.

343.    Finally, SERTP Sponsors request that the Commission clarify the required timing of when transmission providers must publish on the public portion of an OASIS or other public website the information about factors required by Order No. 1920.  SERTP Sponsors contend that Order No. 1920 does not make clear whether this information must be published in conjunction with transmission providers' compliance filings or by the start of the first Long-Term Regional Transmission Planning cycle.  SERTP Sponsors argue that the Commission should require transmission providers to post this information after the conclusion of the period during which stakeholders provide input into these matters.[969]

### iii.    Commission Determination

344.    In response to NESCOE's and PJM States' requested clarification that transmission providers must rely on states in developing Long-Term Scenarios where state laws, regulations, and/or policies are driving Long-Term Transmission Needs, we grant the following clarifications.  We clarify that states must have a meaningful opportunity to provide timely input on the development of Long-Term Scenarios, including factors and data inputs, and to explain how their own policies and planning affect Long-Term Transmission Needs.[970]  Furthermore, we clarify that transmission providers must consult with and consider the positions of the Relevant State Entities and any other entity authorized by a Relevant State Entity as its representative as to how to

---

[969] *Id.* at 26.

[970] Order No. 1920, 187 FERC ¶ 61,068 at PP 528-537, 560-562, 634.

account for factors related to states' laws, policies, and regulations when determining the assumptions that will be used in the development of Long-Term Scenarios.[971] Specifically, transmission providers shall consult with Relevant State Entities and any other authorized entities as to whether a specific state policy must be accounted for as a factor within each category (i.e., if the specific state policy will likely affect Long-Term Transmission Needs), how to account for the specific state policy in the development of Long-Term Scenarios (e.g., the method and data used to forecast generation resources added because of a specific state policy), and how to adjust the treatment of the specific state policy across Long-Term Scenarios (e.g., assume certain policy-related outcomes materialize in some but not all Long-Term Scenarios).[972]

345.   We further clarify that, where transmission providers determine that a factor based on a state's law, regulation, or policy is likely to affect Long-Term Transmission Needs, transmission providers should rely on the state in determining *how* to account for such a state-related factor when developing Long-Term Scenarios.  For example, for a state that has required integrated resource planning processes, transmission providers should include one of the state's preferred power system trajectories, including both the supply

---

[971] A Relevant State Entity may believe that a different state entity would be better situated to advise transmission providers as to how state policy may affect Long-Term Transmission Needs.  For example, the state entity responsible for electric utility regulation may believe that the state entity responsible for energy policy is in a better position to advise on state energy policy implementation.  In this case, the Relevant State Entity may authorize the other state entity as its representative in discussions with transmission providers.

[972] *See id.* P 417.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1685 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No. RM21-17-001                                                    - 309 -

and demand side resource trajectory as appropriate, in each of Long-Term Scenarios, or include different state-preferred power system trajectories in different Long-Term Scenarios. As such, transmission providers could include in the development of Long-Term Scenarios the set of resource capacity additions and/or retirements expected by a state based on the incentives or requirements in that state's law. If transmission providers determine, based on input provided by the state or their own judgment, that a factor based on a state's law, regulation, or policy is likely to affect Long-Term Transmission Needs, transmission providers should then determine whether and how to account for that factor in the development of Long-Term Scenarios.

346.    We disagree with PIOs that a more detailed explanation of the factors that transmission providers will account for in their Long-Term Scenarios and justification of the factors that they will discount is warranted. Broadly, we affirm that Order No. 1920 strikes the right balance between prescriptive requirements and flexibility with respect to the development of Long-Term Scenarios.[973] We also find that this is true with respect specifically to Order No. 1920's requirements on stakeholder process and transparency. PIOs request that we require "a detailed description of the reasoning and methodology used to account for each factor, as well as providing the actual data inputs when possible" and that we require transmission providers to justify their discounting decisions of factors in Factor Categories Four through Seven. We find that such requirements are not necessary to ensure that stakeholders have a meaningful opportunity to provide input.

---

[973] *Id.*

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1686 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No. RM21-17-001                                               - 310 -

We further find that the requirements of Order No. 1920 ensure that the development of
Long-Term Scenarios is sufficiently transparent,[974] and that PIOs' requested requirements
are not needed to ensure that transmission providers use accurate data.[975]

347.    We emphasize that Order No. 1920 sets minimum requirements with which all
transmission providers must comply, and we are not convinced that the level of
information that PIOs seek is necessary.  Further, we clarify that nothing in Order
No. 1920 prevents transmission providers from providing more than the minimum
amount of information that we require, including the level of detail requested by PIOs.
Moreover, we conclude that granting PIOs' request is unnecessary because the existing
transparency requirements in Order No. 1920[976] are sufficient to ensure that "the
methodology, criteria, assumptions, and data used to develop each Long-Term Scenario"
are transparent.[977]

_____

[974] *See id.* P 533 (requiring transmission providers to publicly post "(1) the list of
the factors in each of the seven required categories of factors that they will account for in
their Long-Term Scenarios; (2) a description of each factor that they will account for in
their Long-Term Scenarios; (3) a general statement explaining how they will account for
each of these factors in their Long-Term Scenarios; (4) a description of the extent to
which they will discount any factors in Factor Categories Four through Seven in each
Long-Term Scenario; and (5) a list of the factors that they considered but did not
incorporate in their Long-Term Scenarios.").

[975] PIOs Rehearing Request at 36-37.  *See* Order No. 1920, 187 FERC ¶ 61,068 at
P 636 ("We find that a requirement to use the best available data inputs is warranted to
ensure that transmission providers are regularly updating data inputs and using timely and
accurate data inputs to inform Long-Term Scenarios.").

[976] *Supra* P 346 n.975.

[977] Order No. 1920, 187 FERC ¶ 61,068 at P 305.

348.    We decline to provide clarification to SERTP Sponsors with respect to the

inclusion or exclusion of factors for which stakeholders provide insufficient information,

and we similarly decline to address SERTP Sponsors' hypothetical in the abstract.[978]

Generally, transmission providers can rely on stakeholders for input on the development

of Long-Term Scenarios, including factors and data inputs, and must consult with and

consider the positions of Relevant State Entities and any other entity authorized by a

Relevant State Entity as its representative regarding how their policies and planning

affect Long-Term Transmission Needs and the assumptions that will be used in the

development of Long-Term Scenarios.  Transmission providers implementing Long-

Term Regional Transmission Planning necessarily will balance competing interests from

within the transmission planning region when developing Long-Term Scenarios, and

Order No. 1920 provides transmission providers with sufficient flexibility to exercise

engineering judgment to ensure the reliable operation of the transmission system and

compliance with a variety of regulatory requirements.[979]

349.    In response to SERTP Sponsors' request for clarification regarding the

identification of factors in Factor Categories Four through Seven, we clarify that

transmission providers must identify factors in Factor Categories Four, Five, and Six but

---

[978] It is unclear whether SERTP Sponsors intended to argue that failure to grant
clarification in this respect would result in Order No. 1920 exceeding the Commission's
authority; to the extent they intended to do so, we find this argument has not been raised
with the specificity required on rehearing.  *See supra* Major Questions Doctrine section.

[979] Order No. 1920, 187 FERC ¶ 61,068 at P 1027.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1688 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No.  RM21-17-001                                                    - 312 -

need not independently identify factors in Factor Category Seven – rather, transmission providers may rely on stakeholders, including states, to bring such factors to their attention.  We believe that factors in Factor Categories One, Two, Three, and Seven arise from stakeholder decision-making and legal processes that generally are external to the transmission provider and are therefore suitable for identification by the states and other stakeholders that govern or have authority over those processes.  Therefore, as with factors in Factor Categories One, Two, and Three, transmission providers may rely on stakeholders to identify factors in Factor Category Seven in the development of Long-Term Scenarios, particularly through the open and transparent stakeholder process required by Order No. 1920.[980]  In contrast, we believe that factors in Factor Categories Four, Five, and Six relate to the expertise of transmission providers arising from their day-to-day operations.  For example, transmission providers manage processes for processing interconnection requests and withdrawals (Factor Category Six) and determining the impact of resource retirements (Factor Category Five).  In managing those processes and the day-to-day operations of the transmission system, transmission providers also gain information about trends in technology and fuel costs within and outside the electricity supply industry (Factor Category Four).  Therefore, we clarify that transmission providers have an independent obligation to identify factors in Factor

---

[980] *Id.* P 508.  We note, however, an exception to this general rule.  Where the transmission provider is the entity that has made a commitment that affects Long-Term Transmission Needs, the transmission provider may not rely on the identification by stakeholders of this factor or these factors.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1689 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No. RM21-17-001                                                    - 313 -

Categories Four, Five, and Six regardless of whether any such factors are identified by

stakeholders and must, where relevant, consult with and consider the positions of

Relevant State Entities and any entities authorized by the Relevant State Entities. In

response to SERTP Sponsors' argument that, if transmission providers must

independently identify factors in Factor Categories Four through Seven, the Commission

would be holding transmission providers to a burdensome unattainable standard, we

clarify that the independent obligation to identify factors in Factor Categories Four

through Six does not require transmission providers to identify every potentially

knowable factor within those categories. Transmission providers can use their prior

experience and professional judgement to independently identify factors in Factor

Categories Four, Five, and Six.

350.    Finally, in response to SERTP Sponsors' request for clarification regarding the

timing of transmission providers' publication of information regarding the factors to be

incorporated into the development of Long-Term Scenarios on the public portion of an

OASIS or other public website, we clarify that transmission providers do not need to

include this information with the filings that they submit to comply with Order No. 1920.

Rather, we clarify that Order No. 1920 requires transmission providers to post this

information as part of each Long-Term Regional Transmission Planning cycle after

stakeholders, including states, have had a meaningful opportunity to propose potential

factors and to provide input on how to account for specific factors in the development of

Long-Term Scenarios for that planning cycle.[981]  We further clarify that publication of

information regarding the factors to be incorporated into the development of Long-Term

Scenarios must occur before transmission providers finish developing Long-Term

Scenarios,[982] and, in any event, well before the transmission provider has identified Long-

Term Transmission Needs.

### 5.    Requests for Additional Flexibility Regarding Long-Term Scenarios Requirements

351.    This section responds to requests for rehearing or clarification to permit additional

flexibility with respect to multiple interrelated Long-Term Scenario requirements,

including transmission providers' incorporation of factors from seven categories of

factors; the treatment of factors in the first three categories of factors; and the number,

type, and plausibility of Long-Term Scenarios.

### a.    Order No. 1920 Requirements

352.    In Order No. 1920, the Commission required transmission providers in each

transmission planning region to develop, at least once during the five-year Long-Term

Regional Transmission Planning cycle, at least three distinct Long-Term Scenarios that,

at a minimum, incorporate the seven categories of factors listed in the Categories of

Factors section.[983]  The Commission adopted the NOPR proposals to require transmission

---

[981] *Id.* P 533.

[982] *See id.* P 534 (discussing the value of posting requirement in terms of the transparency into how transmission providers develop Long-Term Scenarios).

[983] *Id.* P 559.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1691 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No. RM21-17-001                                                    - 315 -

providers in each transmission planning region to publicly disclose information and data
inputs used to create each Long-Term Scenario and provide stakeholders an opportunity
to provide timely and meaningful input into how Long-Term Scenarios are developed.[984]

353.    The Commission required transmission providers in each transmission planning
region to develop a plausible and diverse set of at least three Long-Term Scenarios.[985]
The Commission also required that each individual Long-Term Scenario be plausible to
avoid resting on assumptions about factors and data inputs that do not reasonably capture
possible future outcomes.  The Commission clarified that the term "diverse" means that
the *set* of Long-Term Scenarios must represent a reasonable range of probable future
outcomes consistent with the requirement for plausibility, based on assumptions about the
factors and data inputs.[986]

354.    The Commission also required transmission providers in each transmission
planning region to develop at least one sensitivity, applied to each Long-Term Scenario,
to account for uncertain operational outcomes that determine the benefits of and/or need
for transmission facilities during multiple concurrent and sustained generation and/or
transmission outages due to an extreme weather event across a wide area.[987]  In Order
No. 1920, the Commission provided transmission providers with flexibility to conduct

---

[984] *Id.* P 560.

[985] *Id.* PP 575-577.

[986] *Id.* P 576.

[987] *Id.* P 593.

this sensitivity either before or after identifying potential regional transmission solutions

to the Long-Term Transmission Needs identified using those Long-Term Scenarios.[988]

Order No. 1920 did not preclude transmission providers from considering additional

sensitivities, and the Commission encouraged transmission providers to assess the need to

develop other sensitivities as part of Long-Term Regional Transmission Planning.[989]  The

Commission found that modeling extreme weather events as sensitivities is appropriate

for Long-Term Regional Transmission Planning.[990]

### b.    Requests for Rehearing and Clarification

355.    PJM requests rehearing such that the Commission either would consider requests

for flexibility or permit flexibility that PJM contends would be required for PJM to

develop Long-Term Scenarios and sensitivities consistent with a draft long-term

transmission planning process that PJM has developed.[991]  PJM argues that Order

---

[988] *Id.* P 594.

[989] *Id.* P 597.

[990] *Id.* P 598.

[991] *See* PJM Rehearing Request at 12 ("Granting rehearing and permitting
flexibility with respect to the issues identified below would allow PJM to use the PJM
Long Term Regional Transmission Planning process as the foundation for a long-term
planning process that achieves the objectives of the Final Rule, even though
implementation details may differ in some way from those the Final Rule prescribes."
(footnote omitted)); *id.* at 14 ("PJM urges the Commission to grant rehearing and confirm
that it will consider requests for flexibility to accommodate regional differences."); *id.*
at 19 ("[G]iven the diversity among regions, PJM believes it is appropriate to allow
transmission planners to work with states and stakeholders within their respective regions
to determine the appropriate number of and specific scenarios to be used in the Long-
Term Regional Transmission Planning process, as well as giving the transmission
provider flexibility to determine how to weigh specific factors used to develop the

No. 1920's requirements with respect to the development of Long-Term Scenarios are overly prescriptive, particularly with respect to the requirements that transmission providers develop three Long-Term Scenarios that each incorporate seven categories of factors and that transmission providers cannot discount factors in Factor Categories One through Three.[992] PJM contends that these requirements would "complicate" PJM's efforts to promote more efficient or cost-effective regional transmission planning and development.[993]

356.    PJM explains that, under the draft long-term transmission planning process that PJM developed, PJM would develop three distinct scenarios that would "generally account for the seven factors" required by Order No. 1920: the "Base Reliability Scenario," the "Medium Public Policy Scenario," and the "High Public Policy Scenario."[994]  The Base Reliability Scenario would include certain "categories of factors," including: the PJM Load Forecast Report; announced retirements and retirements required by Public Policy Requirements; in-service generation and generation that is not yet in service but with an executed service agreement or State Agreement

_____

assumptions upon which Long-Term Scenarios are based."); *id.* ("PJM urges the Commission to grant rehearing and confirm that it will consider requests for flexibility to develop Long-Term Scenarios and conduct sensitivity analyses in such a way as to accommodate regional differences.").

[992] *Id.* at 13 n.59, 16, 18.

[993] *Id.* at 16, 18.

[994] *Id.* at 16-18.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1694 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No.  RM21-17-001                                                                                        - 318 -

Approach reservation; and replacement generation taken mainly from the PJM Service

Request process.[995]  The Medium Public Policy Scenario would build on the Base

Reliability Scenario by including certain additional Public Policy Requirements that

otherwise would be brought to PJM as part of the State Agreement Approach process,

such as state renewable portfolio standards.[996]  The High Public Policy Scenario would in

turn build on the Medium Public Policy Scenario by modeling "Public Policy

Objectives," defined as Public Policy Requirements that are not yet in a statute or

regulation.[997]  PJM argues that this draft process would demonstrate a wide range of

possible transmission needs, and would be a prudent way to account for long-term needs

without overbuilding the transmission system.[998]

357.    PJM States and West Virginia Commission request that the Commission clarify

that—or, in the alternative, request rehearing such that—Order No. 1920 does not

prohibit the development by transmission providers of a fourth Long-Term Scenario or

additional sensitivities that are designed to provide information to states on the factors

driving the need for transmission facilities and on their costs and benefits.  PJM States

and West Virginia Commission explain that Order No. 1920 requires that transmission

providers assume that all legally binding obligations are followed, state-approved

---

[995] *Id.* at 16-17.

[996] *Id.* at 17-18.

[997] *Id.* at 18 & n.80.

[998] *Id.* at 19.

integrated resource plans are followed, and expected supply obligations for load-serving

entities are met and not discounted.  PJM States and West Virginia therefore express

concern that Order No. 1920 places "undue restrictions" on the development of scenarios

or sensitivities that can provide the information sought by states, which PJM States

contend would be necessary to assist in cost allocation determinations and in siting and

safety decisions.[999]

358.    Ohio Commission Federal Advocate argues that Order No. 1920 makes it

impossible to identify and evaluate transmission facilities that are required due to other

states' laws, as well as to "isolate the incremental costs" arising from those laws.  Ohio

Commission Federal Advocate states that this lack of transparency is not in the public

interest, and that the Commission should clarify that counterfactual scenarios that do not

reflect compliance with state law are permissible because they provide important insights

into the factors driving transmission needs.[1000]

359.    Virginia and North Carolina Commissions argue that the Commission should grant

rehearing such that Order No. 1920 would require or allow for one or more "baseline"

planning scenarios that exclude all or some policy-driven factors.  Virginia and North

Carolina Commissions explain that Order No. 1920 requires transmission providers to

incorporate seven categories of factors in each Long-Term Scenario, and that the

---

[999] PJM States Rehearing Request at 4-6; West Virginia Commission Rehearing
Request at 14-16.

[1000] Ohio Commission Federal Advocate Rehearing Request at 18.

Commission did not allow flexibility for additional scenarios that exclude some or all of these factors.  Virginia and North Carolina Commissions contend that, without a "baseline" scenario, Relevant State Entities and other stakeholders will not have adequate transparency regarding the critical drivers of transmission needs or the costs associated with a particular transmission facility, nor will they be able to evaluate whether cost allocation methods comply with the Commission's cost causation principles.[1001]

360.    Finally, in PJM's general request for additional flexibility in the development of Long-Term Scenarios, PJM identified the requirement in Order No. 1920 to conduct a specific sensitivity for each Long-Term Scenario as an example of a requirement that it believes to be overly burdensome.[1002]  PJM States and West Virginia Commission request that the Commission clarify that—or grant rehearing such that—transmission providers are required, or even permitted, to provide additional sensitivity analyses to the states that best inform them on required transmission facility needs, costs, and benefits based on variations or exclusions of specific factors or categories of factors, including those in the first three categories of factors.[1003]

---

[1001] Virginia and North Carolina Commissions Rehearing Request at 4-5.

[1002] PJM Rehearing Request at 16.

[1003] PJM States Rehearing Request at 4-5; West Virginia Commission Rehearing Request at 14-16.

c.      **Commission Determination**

361.    We disagree with PJM's rehearing arguments and deny its requested clarification

with respect to flexibility regarding the development of Long-Term Scenarios.

Specifically, we continue to find that transmission providers must develop at least three

distinct Long-Term Scenarios as defined in Order No. 1920, and that transmission

providers must incorporate the seven categories of factors set forth in Order No. 1920

into each of those Long-Term Scenarios,[1004] as also clarified above.[1005]  As the

Commission held in Order No. 1920, and as we continue to find here, the Commission's

regional transmission planning requirements currently fail to adequately account on a

forward-looking basis for known determinants of Long-Term Transmission Needs, and

the incorporation of the seven categories of factors is necessary because these categories

of factors are essential to identifying Long-Term Transmission Needs.[1006]  Failing to

require that transmission providers incorporate these categories of factors into the

development of each Long-Term Scenario would increase the likelihood that

transmission providers will continue to underestimate—or omit entirely—certain known

---

[1004] Order No. 1920, 187 FERC ¶ 61,068 at PP 409, 559.

[1005] *See supra* Long-Term Scenarios Requirements, Stakeholder Process and Transparency section.

[1006] Order No. 1920, 187 FERC ¶ 61,068 at P 410.

Docket No.  RM21-17-001                                                    - 322 -

determinants of Long-Term Transmission Needs in their regional transmission planning

processes.[1007]

362.    We also continue to find that transmission providers must assume that legally

binding obligations (i.e., federal, federally-recognized Tribal, state, and local laws and

regulations) are followed, state-approved integrated resource plans are followed, and

expected supply obligations for load-serving entities are fully met.[1008]  Each Long-Term

Scenario must account for and be consistent with factors in these first three categories of

factors, because these categories of factors are part of the primary drivers of Long-Term

Transmission Needs.[1009]

363.    We disagree with PJM's apparent contention that complying with Order No. 1920

requirements with respect to Long-Term Scenarios will "complicate" PJM's efforts to

conduct Long-Term Regional Transmission Planning[1010] as it is set forth in Order

No. 1920.[1011]  Instead, we reiterate that Order No. 1920's Long-Term Scenarios

---

[1007] *Id.* P 411.

[1008] We continue to find that it is appropriate for transmission providers to assume that legally binding obligations are met, unless and until there is a change in law.  *Id.* P 512.

[1009] *Id.* PP 507, 512.

[1010] PJM Rehearing Request at 18-19.

[1011] To the extent that PJM was requesting that the Commission address in this order PJM's proposed long-term transmission planning process, we decline to address such a request here because doing so would be premature and more properly the subject of compliance.

requirements strike a reasonable balance between, on the one hand, ensuring that
transmission providers identify Long-Term Transmission Needs and identify, evaluate,
and select Long-Term Regional Transmission Facilities that would meet those needs,
and, on the other hand, providing sufficient flexibility for transmission providers to
develop and use Long-Term Scenarios in a way that reflects the unique characteristics of
their respective transmission planning regions.[1012]  We continue to find that Order
No. 1920's categories of factors requirements strike the right balance between
prescriptive requirements and flexibility[1013] and that they are sufficiently detailed to
address the need for reform without limiting regional flexibility.[1014]  Further, we continue
to find that the requirement to develop at least three distinct Long-Term Scenarios that
meet Order No. 1920's requirements strikes the appropriate balance between establishing
a sufficient number of Long-Term Scenarios and the associated burden of developing and
using Long-Term Scenarios in Long-Term Regional Transmission Planning.[1015]

364.    In response to the requests for clarification and/or rehearing of various Order
No. 1920 requirements related to Long-Term Scenarios and sensitivities submitted by
PJM States, Virginia and North Carolina Commissions, Ohio Commission Federal
Advocate, and West Virginia Commission, we clarify that Order No. 1920 allows

---

[1012] Order No. 1920, 187 FERC ¶ 61,068 at P 298.

[1013] *Id.* P 417.

[1014] *Id.* P 421.

[1015] *Id.* P 559.

transmission providers to conduct analyses in addition to those required by Order

No. 1920—including additional scenarios or sensitivities[1016]—at the transmission

providers' discretion or at the request of the transmission planning region's Relevant

State Entities and/or other stakeholders.

365.    Specifically, we clarify that transmission providers may develop additional

scenarios, beyond the three Long-Term Scenarios that Order No. 1920 requires, to

provide Relevant State Entities with information that they can use to inform the

application of Long-Term Regional Cost Allocation Method(s) or the development of

cost allocation methods through the State Agreement Process(es).  We believe that

additional analyses may help transmission providers and stakeholders to better

understand the potential impact of Long-Term Regional Transmission Facilities on the

transmission system, as well as the costs and benefits of Long-Term Regional

Transmission Facilities.  Particularly, consistent with the flexibility the Commission

provided in Order No. 1920 as to cost allocation methods for Long-Term Regional

Transmission Facilities (or portfolios of such Facilities), we find that additional analyses

may help inform the application of *ex ante* Long-Term Regional Transmission Cost

Allocation Methods or the development of cost allocation methods through the State

Agreement Process.

---

[1016] The use of "scenarios" in this context indicates that these analyses are not required to meet Order No. 1920's requirements as to the development of Long-Term Scenarios and therefore are not "Long-Term Scenarios" within the meaning provided in Order No. 1920.

Docket No.  RM21-17-001                                                      - 325 -

366.    We further clarify that, when developing these additional analyses or scenarios

used to inform cost allocation, transmission providers have the flexibility to depart from

Order No. 1920's requirements related to the development of Long-Term Scenarios.  For

example, transmission providers may develop scenarios that consider the incremental

cost and benefits of Long-Term Regional Transmission Facilities needed to achieve state

laws, policies, and regulations beyond the cost and benefits of Long-Term Regional

Transmission Facilities needed in the absence of those laws, policies, and regulations.

Finally, as discussed below, we clarify that, if the Relevant State Entities wish for the

transmission provider to develop a reasonable number of additional scenarios for Long-

Term Regional Transmission Planning or Long-Term Regional Cost Allocation, then the

transmission providers will develop these scenarios.  While transmission providers may

conduct such additional analyses, additional analyses that do not meet Order No. 1920's

Long-Term Scenario requirements are not considered Long-Term Scenarios as defined in

Order No. 1920.[1017]  In other words, transmission providers may not use any such

additional analyses to identify Long-Term Transmission Needs, identify Long-Term

---

[1017] Generally, to comply with Order No. 1920, including as clarified herein, transmission providers must develop at least three Long-Term Scenarios and perform at least one sensitivity analysis for each such Long-Term Scenario; identify Long-Term Transmission Needs using those Long-Term Scenarios and sensitivities thereto; identify Long-Term Regional Transmission Facilities (or portfolios of Long-Term Regional Transmission Facilities) that meet the identified Long-Term Transmission Needs; use and measure the seven required benefits of Long-Term Regional Transmission Facilities within those Long-Term Scenarios and sensitivities; otherwise evaluate those Long-Term Regional Transmission Facilities in the manner prescribed by Order No. 1920; and make a selection decision as to the Long-Term Regional Transmission Facilities identified and evaluated by transmission providers.

Regional Transmission Facilities, or to meet the requirement that transmission providers estimate the costs and measure the benefits of Long-Term Regional Transmission Facilities for purposes of selection (i.e., to apply the transmission provider's selection criteria).  Transmission providers also may not, consistent with the requirement that transmission providers have the opportunity to select more efficient or cost-effective Long-Term Regional Transmission Facilities to meet Long-Term Transmission Needs, condition the selection of a Long-Term Regional Transmission Facility on the information provided in these additional analyses.

367.    Next, we clarify that, when requested by Relevant State Entities in a transmission planning region, transmission providers are required to conduct a reasonable number of additional analyses or scenarios.  On compliance, transmission providers may propose processes to determine when Relevant State Entities have requested additional analyses and how to determine what a reasonable number of additional analyses may be.[1018]  We reiterate that any cost allocation method—whether an *ex ante* Long-Term Regional Transmission Cost Allocation Method or a cost allocation method developed through the State Agreement Process for a specific Long-Term Regional Transmission Facility or

---

[1018] For example, in Order No. 890, the Commission required that stakeholders be given the right to request that transmission providers conduct a certain number of economic planning studies, to be determined on a regional basis, and the Commission offered the "merely illustrative" example of five to ten such studies.  Order No. 890, 118 FERC ¶ 61,119 at P 547 & n.323.

portfolio thereof— that results from such additional analyses or scenarios must satisfy the cost causation principle.[1019]

368.    Finally, in response to the request for rehearing from PJM related to sensitivity analyses required by Order No. 1920 to account for uncertain operational outcomes that determine the benefits of and/or need for transmission facilities during multiple concurrent and sustained generation and/or transmission outages due to an extreme weather event across a wide area, we disagree with the arguments on rehearing and decline to provide clarification.  We continue to find that Order No. 1920's requirements in this regard are necessary to ensure just and reasonable Commission-jurisdictional rates. In particular, extreme weather events have occurred more frequently in recent years, represent periods during which regional transmission facilities have particularly high value, and create stressed system conditions that transmission providers can readily compare with non-stressed scenarios to determine the value of specific transmission facilities under these types of conditions.[1020]  PJM did not provide adequate information to explain why additional flexibility in developing sensitivities for each Long-Term Scenario is necessary, and we are unconvinced that PJM's regional circumstances justify

---

[1019] Order No. 1920, 187 FERC ¶ 61,068 at PP 1472, 1477.

[1020] *Id.* P 596.  *See also Transmission Sys. Plan. Performance Requirements for Extreme Weather*, Order No. 896, 88 FR 41262 (June 23,2023), 183 FERC ¶ 61,191, at P 2 (2023) (explaining that extreme heat and cold weather events have occurred more frequently in recent years); *One-Time Informational Reps. on Extreme Weather Vulnerability Assessments Climate Change, Extreme Weather, & Elec. Sys. Reliability*, Order No. 897, 88 FR 41477 (June 27, 2023), 183 FERC ¶ 61,192, at P 2 (2023) (same).

flexibility on this issue. To the extent that PJM's regional circumstances require other specific sensitivities, we reiterate that we encourage transmission providers to assess the need to develop other sensitivities as part of Long-Term Regional Transmission Planning.[1021]

### C. Evaluation of the Benefits of Regional Transmission Facilities

#### 1. Requirement for Transmission Providers to Use and Measure a Set of Seven Required Benefits

##### a. Order No. 1920 Requirements

369. In Order No. 1920, the Commission required transmission providers in each transmission planning region to measure a set of seven required benefits (required benefits) for Long-Term Regional Transmission Facilities under each Long-Term Scenario and to use these measured benefits to evaluate Long-Term Regional Transmission Facilities.[1022] The Commission required transmission providers to measure and use the following required benefits in Long-Term Regional Transmission Planning: (1) avoided or deferred reliability transmission facilities and aging infrastructure replacement; (2) a benefit that can be characterized and measured as either reduced loss of load probability or reduced planning reserve margin; (3) production cost savings; (4) reduced transmission energy losses; (5) reduced congestion due to transmission outages;

---

[1021] Order No. 1920, 187 FERC ¶ 61,068 at P 597.

[1022] Order No. 1920, 187 FERC ¶ 61,068 at P 719.

Docket No. RM21-17-001                                                    - 329 -

(6) mitigation of extreme weather events and unexpected system conditions; and

(7) capacity cost benefits from reduced peak energy losses.[1023]

370.    The Commission found that the record demonstrated that, in order to ensure just

and reasonable Commission-jurisdictional transmission rates, it was necessary to require

transmission providers to measure and use in Long-Term Regional Transmission

Planning a set of particular benefits so that they may identify, evaluate, and select

regional transmission facilities that are more efficient or cost-effective transmission

solutions to Long-Term Transmission Needs.  Further, the Commission found that the

benefits that Long-Term Regional Transmission Facilities generally provide extend

beyond the benefits that transmission providers currently consider as part of their regional

transmission planning and cost allocation processes, and without consideration of such

benefits, Long-Term Regional Transmission Planning could not be reasonably expected

to identify, evaluate, and select more efficient or cost-effective regional transmission

solutions to address Long-Term Transmission Needs.[1024]  The Commission concluded

that requiring the measurement and use of the seven required benefits in Long-Term

Regional Transmission Planning ensured that transmission providers will consider a

sufficiently broad range of benefits when determining whether to select a Long-Term

Regional Transmission Facility as a more efficient or cost-effective regional transmission

solution to Long-Term Transmission Needs.  In contrast, the Commission found that not

---

[1023] *Id.* P 720.

[1024] *Id.* P 722.

requiring transmission providers to use any specific benefits in Long-Term Regional

Transmission Planning, as proposed in the NOPR, would fail to ensure that transmission

providers consider the broader set of benefits provided by, and the beneficiaries receiving

the benefits of, Long-Term Regional Transmission Facilities, and, thus, may fail to

identify the potentially more efficient or cost-effective regional transmission solution(s)

to specific Long-Term Transmission Needs.[1025]

371.    The requirement that transmission providers measure and use the required benefits

in Long-Term Regional Transmission Planning was a change from the NOPR

proposal.[1026]  In the NOPR, the Commission did not propose to require the use of any

specific benefits and instead acknowledged the benefits of regional flexibility, and

consistent with Order No. 1000, proposed to consider such matters on review of

compliance proposals.[1027]  The NOPR included a non-exhaustive list of 12 benefits[1028]

that the Commission stated could be considered by transmission providers in Long-Term

Regional Transmission Planning and cost allocation processes.[1029]  The Commission also

sought comment on "whether public utility transmission providers should be required to

---

[1025] *Id.* P 723.

[1026] *Id.*

[1027] NOPR, 179 FERC ¶ 61,028 at P 183 (citation omitted).

[1028] *Id.* P 185.

[1029] *Id.* P 184.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1707 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No.  RM21-17-001                                          - 331 -

use some or all of the Long-Term Regional Transmission Benefits as a minimum set of benefits for their Long-Term Regional Transmission Planning process."[1030]

### b.    Logical Outgrowth

### i.    Requests for Rehearing and Clarification

372.    East Kentucky and NRECA argue that Order No. 1920 violates the APA's notice-and-comment requirements because it mandates that transmission providers use a set of seven benefits for evaluating Long-Term Regional Transmission Facilities, a requirement that East Kentucky and NRECA argue is not a logical outgrowth of the NOPR, which proposed non-mandatory and non-exhaustive examples of benefits that transmission providers could use.[1031]  NRECA asserts that the NOPR made clear that the list of potential benefits was neither mandatory nor exhaustive and that transmission providers would have flexibility to determine what benefits they use in their Long-Term Regional Transmission Planning.[1032]  NRECA describes the final rule's seven required benefits as "nationwide, mandatory, [and] one-size-fits all" and the "exact opposite" of the proposed rule.[1033]

---

[1030] *Id.* P 188.

[1031] East Kentucky Rehearing Request at 1-2 (citing 5 U.S.C. 553(b)); NRECA Rehearing Request at 4, 10-13 (citing 5 U.S.C. 553(b)).

[1032] NRECA Rehearing Request at 10 (quoting NOPR, 179 FERC ¶ 61,028 at P 183).

[1033] *Id.* at 11.

Docket No.  RM21-17-001                                                      - 332 -

## ii.     Commission Determination

373.     We disagree with the argument that the Commission failed to provide adequate

notice and opportunity to comment on Order No. 1920's requirement that transmission

providers measure a set of seven required benefits for Long-Term Regional Transmission

Facilities under each Long-Term Scenario as part of Long-Term Regional Transmission

Planning and use these measured benefits to evaluate Long-Term Regional Transmission

Facilities.[1034]  As courts have explained, "[n]otice suffices when [an agency] has

'expressly asked for comments on a particular issue or otherwise made clear that the

agency was contemplating a particular change.'"[1035]  NRECA acknowledges that the

NOPR sought comment on whether transmission providers should be required to use

some or all of the potential benefits described in the NOPR as a minimum set of benefits

for their Long-Term Regional Transmission Planning process.[1036]  By requesting

comment on whether to make mandatory some or all of the benefits in the NOPR, the

Commission sufficiently put parties on notice that the Commission was considering *the*

*exact change* that East Kentucky and NRECA now argue was unanticipated and violated

the APA's notice-and-comment requirements.  Thus, in adopting the requirement that

transmission providers measure and use the set of seven required benefits in Long-Term

---

[1034] *See* Order No. 1920, 187 FERC ¶ 61,068 at P 719.

[1035] *Brennan v. Dickson*, 45 F.4th 48, 69 (D.C. Cir. 2022) (quoting *CSX Transp., Inc. v. Surface Transp. Bd.*, 584 F.3d 1076, 1081 (D.C. Cir. 2009)).

[1036] *See* NRECA Rehearing Request at 10 (citing NOPR, 179 FERC ¶ 61,028 at P 188).

Regional Transmission Planning, the Commission adhered to the APA's notice-and-comment requirements.

### c.    Flexibility Regarding Benefits Rather than a Minimum Set

### i.    Requests for Rehearing and Clarification

374.    Dominion requests rehearing and argues that the seven required benefits are not directly tied or correlated to the seven categories of factors establishing Long-Term Transmission Needs.[1037]  Dominion contends that the seven required benefits "are generic, almost inherent benefits of all transmission," whereas the seven categories of factors that transmission providers must incorporate in the development of Long-Term Scenarios "are mostly restatements of public policy driven needs for transmission facilities."[1038]  Dominion states that it "is not suggesting that Factor Category No. 1 must match Benefit No. 1, etc.; rather, individually, and as a whole, the[] seven Factor Categories do not correlate to any or all of the seven Benefits."[1039]  Dominion opines that, because the seven required benefits do not correspond to the seven categories of factors, regardless of the public policy issues driving the need for a transmission facility, Order No. 1920's requirement that transmission providers use the seven required benefits in determining whether to select a transmission facility will likely result in a public policy

---

[1037] Dominion Rehearing Request at 18.

[1038] *Id.* at 20.

[1039] *Id.* at 19 n.83.

Docket No. RM21-17-001                                                                      - 334 -

project always being selected.[1040]  Further, Dominion opines that, because the seven

required benefits do not correspond to the seven categories of factors, the seven required

benefits are "secondary or incidental" to the primary purpose of the Long-Term Regional

Transmission Facilities.  Dominion states that the United States Court of Appeals for the

Seventh Circuit "rejected the use of 'incidental' benefits because 'the incidental-benefits

tail mustn't be allowed to wag the primary-benefits dog.'"[1041]  Dominion contends that

Order No. 1920 should have required that Long-Term Transmission Needs and the

benefits of Long-Term Regional Transmission Facilities correspond to each other, and

failure to impose such a requirement was not reasoned decision making.[1042]  Dominion

states that the Commission should provide flexibility to transmission providers to allow

them to identify the benefits that they will measure in their compliance filings and ensure

that those benefits are tied to the underlying needs.[1043]

375.    PJM requests rehearing and argues that Order No. 1920 is arbitrary and capricious

because the requirement that transmission providers measure and use seven required

benefits to evaluate Long-Term Regional Transmission Facilities is an unexplained

departure from the NOPR's recognition of the value of allowing regional flexibility with

---

[1040] *Id.* at 20.

[1041] *Id.* (alteration omitted) (quoting *ICC v. FERC III*, 756 F.3d at 564).

[1042] *Id.*

[1043] *Id.* at 18-19, 21.

respect to benefits.[1044]  PJM argues that the Commission should provide flexibility to

transmission providers to allow them to identify the benefits that they will measure in

their compliance filings (except for Final Rule Benefits 1, 2, and 3, which PJM agrees

should be required).[1045]  PJM asserts that Final Rule Benefits 4 and 5 are additional

benefits that RTOs could add as they gain experience and determine to be quantitatively

important.  PJM also argues that Final Rule Benefit 6 has three different subcomponents

and could be very cumbersome to measure if each one of them must be quantified.[1046]

376.    Designated Retail Regulators and Undersigned States request rehearing and assert

that the benefit metrics used to evaluate Long-Term Regional Transmission Facilities

should be developed as part of RTO stakeholder processes, not mandated by the

Commission.[1047]  NRECA alleges that by prescribing the required benefits that

transmission providers must use for evaluation and selection of Long-Term Regional

Transmission Facilities, the final rule will likely change the results of the evaluation and

selection processes in unanticipated ways.[1048]

---

[1044] PJM Rehearing Request at 5, 26-27 & n.106.

[1045] *Id.* at 26-29, 42.

[1046] *Id.* at 29.

[1047] Designated Retail Regulators Rehearing Request at 29; Undersigned States
Rehearing Request at 29.

[1048] NRECA Rehearing Request at 11-12.

Docket No.  RM21-17-001                                                                    - 336 -

## ii.    Commission Determination

377.    We are not persuaded by arguments raised on rehearing that the Commission

should not require transmission providers to use and measure the seven required benefits.

We continue to find that allowing transmission providers to determine which benefits

they will use and measure, rather than requiring the measurement and use of a minimum

set of benefits, may result in transmission providers not measuring important potential

benefits of Long-Term Regional Transmission Facilities.[1049]  This, in turn, would not

resolve the deficiencies that the Commission identified in the final rule, such as

transmission providers failing to adequately consider the benefits of regional transmission

facilities and thereby not selecting the more efficient or cost-effective solutions, leading

to unjust and unreasonable Commission-jurisdictional rates.[1050]  Additionally, as the

Commission noted in Order No. 1920, requiring transmission providers to measure and

---

[1049] Order No. 1920, 187 FERC ¶ 61,068 at PP 723-724.

[1050] *See id.* P 123 ("Failing to adequately identify and consider the benefits of [Long-Term Regional Transmission Facilities] may lead to relatively inefficient or less cost-effective transmission development.  In particular, the cost-benefit analyses that transmission providers often use as part of the evaluation process may fail to identify more efficient or cost-effective regional transmission facilities for selection because they provide an inaccurate portrayal of the comparative benefits of different transmission facilities.  Thus, the failure to adequately consider the benefits of regional transmission facilities results in, among other things, transmission customers forgoing benefits that may significantly outweigh their costs, which results in less efficient or cost-effective transmission investments and, in turn, contributes to Commission-jurisdictional rates that are unjust and unreasonable."); *id.* P 723.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1713 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No. RM21-17-001                                                      - 337 -

use a required set of benefits will help improve interregional transmission coordination among different transmission planning regions.[1051]

378.    We disagree with Dominion's argument that Order No. 1920 does not constitute reasoned decision making or is arbitrary and capricious because the seven required benefits are not tied or correlated to the seven categories of factors that Order No. 1920 requires transmission providers to incorporate into the development of Long-Term Scenarios.  We understand Dominion's argument to be that, even though Long-Term Regional Transmission Facilities address Long-Term Transmission Needs that are driven primarily by the incorporation of certain categories of factors that Dominion considers to be "public policy issues," the required benefits, which Dominion contends are designed to measure a broader range of benefits of transmission facilities unrelated to public policy-related factors, will likely result in a public policy project always being selected. We disagree with this argument.  We first note that Dominion provides only speculation that such a result will occur.  As the Commission found in Order No. 1920, while state policies make up some of the drivers of Long-Term Transmission Needs, they do not comprise the entirety of those drivers.[1052]  Accordingly, Long-Term Transmission Needs will be driven by factors (e.g., resource retirements and trends in fuel costs) in addition to

---

[1051] *Id.* P 729 (citations omitted).

[1052] *Id.* P 1478.  The Commission recognized that state policy goals do not necessarily need to be given the same weight as state laws and regulations when determining the assumptions that will be used in the development of Long-Term Scenarios because government entities have an interest and ability to ensure that the requirements of state laws and regulations are fully achieved.  *Id*. PP 512, 516.

USCA4 Appeal: 24-1650   Doc: 224   Filed: 01/21/2025   Pg: 1714 of 2455
Document Accession #: 20241121-3139   Filed Date: 11/21/2024

Docket No. RM21-17-001                                                    - 338 -

and unrelated to "public policy issues," and Long-Term Transmission Facilities will likely be designed to address multiple Long-Term Transmission Needs. In any case, Order No. 1920 does not require that transmission providers select any particular Long-Term Regional Transmission Facility, even where it meets the transmission provider's selection criteria,[1053] which this order maintains on rehearing.[1054]

379. We disagree with Dominion's assertion that the seven required benefits are "secondary or incidental" to Long-Term Transmission Needs. As the Commission explained in Order No. 1920, the drivers of transmission needs are diverse and include, but are not limited to, grid reliability, changes in the resource mix, and increased demand for electricity.[1055] As discussed in the Requirement for Transmission Providers To Use the Seven Required Benefits To Help To Inform Their Identification of Long-Term Transmission Needs section above, we clarify in this order that Long-Term Transmission Needs as defined in Order No. 1920 are driven by both reliability and economic considerations and, as such, both reliability and economic considerations must inform transmission providers' identification of Long-Term Transmission Needs. The seven required benefits measure distinct, well-understood benefits of potential Long-Term

---

[1053] *Id.* P 1026 (citations omitted).

[1054] *See infra* No Selection Requirement section.

[1055] Order No. 1920, 187 FERC ¶ 61,068 at P 299. *See also id.* PP 39, 299 (defining Long-Term Transmission Needs as "transmission needs identified through Long-Term Regional Transmission Planning by, among other things . . . running scenarios and considering the enumerated categories of factors").

Regional Transmission Facilities and are well supported in the record.[1056]  Because the

seven required benefits reflect many of the reliability and economic benefits that Long-

Term Regional Transmission Facilities can provide, we disagree with Dominion that such

benefits are secondary or incidental to Long-Term Transmission Needs.  Further, the

Commission noted in Order No. 1920 that, "[w]e find that the benefits that Long-Term

Regional Transmission Facilities generally provide extend beyond the benefits that

transmission providers currently consider as part of their regional transmission planning

and cost allocation processes, and without consideration of such benefits, Long-Term

Regional Transmission Planning cannot be reasonably expected to identify, evaluate, and

select more efficient or cost-effective regional transmission solutions to address Long-

Term Transmission Needs."[1057]  The Commission also stated that "[b]y requiring the

measurement and use of the seven enumerated benefits in Long-Term Regional

Transmission Planning, we ensure that transmission providers will consider a sufficiently

broad range of benefits when determining whether to select a Long-Term Regional

---

[1056] *Id.* P 724 (noting that the seven required benefits "have a proven track record"); *id.* P 746 (Final Rule Benefit 1), PP 749-750 (Final Rule Benefit 2), P 761 (Final Rule Benefit 3), P 782 (Final Rule Benefit 4), P 784 (Final Rule Benefit 5), P 791 (Final Rule Benefit 6), P 812 (Final Rule Benefit 7); *see also id.* P 731 ("[A]ll seven required benefits have either been approved for use in regional transmission planning in at least one non-RTO/ISO transmission planning region or may be implemented by building upon the modeling or techniques used to measure benefits in RTO/ISO or non-RTO/ISO regions, or both."); *id.* P 732 (explaining that the Commission has accepted the use of several of the seven benefits to evaluate transmission facilities and projects).

[1057] *Id.* P 722.

Docket No.  RM21-17-001                                                      - 340 -

Transmission Facility as a more efficient or cost-effective regional transmission solution to Long-Term Transmission Needs."[1058]

380.    Finally, the Commission found in Order No. 1920, and we continue to find here, that transmission providers must measure, at a minimum, this set of seven required benefits and then use them to evaluate Long-Term Regional Transmission Facilities in order to ensure just and reasonable rates.[1059]  The Commission noted:

> The record in this proceeding shows that, in order to ensure just and reasonable Commission-jurisdictional transmission rates, it is necessary to require transmission providers to measure and use in Long-Term Regional Transmission Planning a set of particular benefits so that they may identify, evaluate, and select regional transmission facilities that are more efficient or cost-effective transmission solutions to Long-Term Transmission Needs.  We find that the benefits that Long-Term Regional Transmission Facilities generally provide extend beyond the benefits that transmission providers currently consider as part of their regional transmission planning and cost allocation processes, and without consideration of such benefits, Long-Term Regional Transmission Planning cannot be reasonably expected to identify, evaluate, and select more efficient or cost-effective regional transmission solutions to address Long-Term Transmission Needs.[1060]

---

[1058] *Id.* P 723.

[1059] *Id.* P 721.

[1060] *Id.* P 722.

381.    Indeed, as Dominion concedes, the seven benefits that Order No. 1920 requires transmission providers to use and measure when evaluating Long-Term Regional Transmission Facilities are "inherent benefits of all transmission."[1061]

382.    In addition, we disagree with PJM's assertion that Order No. 1920 is arbitrary and capricious because the requirement that transmission providers measure and use seven required benefits to evaluate Long-Term Regional Transmission Facilities is an unexplained departure from the NOPR's recognition of the value of allowing regional flexibility with respect to benefits. We continue to find that the requirement for transmission providers to measure and use the minimum set of seven required benefits in Long-Term Regional Transmission Planning is necessary to ensure that Commission-jurisdictional rates are just and reasonable.[1062] Specifically, absent a requirement that transmission providers measure and use a sufficiently broad range of the benefits of Long-Term Regional Transmission Facilities when evaluating them for potential selection, transmission providers may not identify, evaluate, and select more efficient or cost-effective regional transmission solutions to Long-Term Transmission Needs, which may lead to relatively inefficient or less cost-effective transmission development. Therefore, we find that allowing the regional flexibility that PJM suggests would fail to remedy the deficiencies in existing regional transmission planning and cost allocation processes – namely, the failure to require transmission providers to adequately consider

---

[1061] Dominion Rehearing Request at 20.

[1062] Order No. 1920, 187 FERC ¶ 61,068 at P 727.

the broader set of benefits of regional transmission facilities planned to meet Long-Term

Transmission Needs[1063] – that the Commission identified in the final rule.[1064]  We also

note that PJM itself previously recognized that certain benefits should be required; in its

comments on the NOPR, PJM called for the adoption of a nationwide consideration of

---

[1063] *Id.* P 122.

[1064] Contrary to PJM's assertion, in Order No. 1920 the Commission explained its reasons for not adopting the more flexible approach proposed in the NOPR.  The Commission found:

> [A]dopting the more flexible approach proposed in the NOPR would not address the identified deficiencies in existing regional transmission planning and cost allocation processes because such an approach would fail to ensure that transmission providers consider the broader set of benefits provided by, and the beneficiaries receiving the benefits of, Long-Term Regional Transmission Facilities, and thus, may fail to identify the potentially more efficient or cost-effective regional transmission solution.  We find that failing to use the set of benefits that we require in this final rule to evaluate Long-Term Regional Transmission Facilities for potential selection could render resulting Commission-jurisdictional rates unjust and unreasonable.  We find that not requiring transmission providers to use certain benefits to evaluate Long-Term Regional Transmission Facilities would be expected to lead to relatively inefficient and less cost-effective transmission development, as Long-Term Regional Transmission Facilities that provide significant net benefits may not be selected.

*Id.* P 723; *see also id.* P 728 ("We conclude that it would be inappropriate to provide flexibility not to consider this required set of benefits in Long-Term Regional Transmission Planning because . . . requiring the measurement and use of these benefits ensures that transmission providers are able to identify, evaluate, and select regional transmission solutions to more efficiently or cost-effectively address Long-Term Transmission Needs, and thereby ensures just and reasonable rates.").

benefits that are similar to certain benefits that the Commission adopted in Order No.

1920 as part of the set of seven required benefits that transmission providers must

measure and use in Long-Term Regional Transmission Planning.[1065]

383.    In response to Designated Retail Regulators' and Undersigned States' requests for

flexibility to establish the benefits for transmission providers to measure through

RTO/ISO stakeholder processes, we reiterate that the measurement and use of certain

benefits in Long-Term Regional Transmission Planning is essential to ensuring just and

reasonable Commission-jurisdictional rates.[1066]   As such, we find that it is necessary for

the Commission to mandate the measurement and use of these benefits – the required

benefits – in Long-Term Regional Transmission Planning rather than deferring to

RTO/ISO stakeholder processes.[1067]

384.    We also are not persuaded by NRECA's assertion that, by prescribing the required

benefits that transmission providers must use for evaluation and selection of Long-Term

Regional Transmission Facilities, the final rule will likely change the results of the

evaluation and selection processes in unanticipated ways.  NRECA does not explain what

---

[1065] PJM NOPR Initial Comments at 96 ("[T]he following benefit categories should be considered on a nationwide basis: (i) Enhanced Reliability; (ii) Avoided or Deferred Reliability Transmission Projects and Aging Infrastructure Replacement; (iii) Deferred Capacity Investment; and (iv) Production Cost Savings.").

[1066] *See* Order No. 1920, 187 FERC ¶ 61,068 at PP 722-723, 725, 727-728.

[1067] *Id.* PP 723, 728.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1720 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No.  RM21-17-001                                                    - 344 -

unanticipated consequences it foresees arising, and we find this assertion speculative and
unsupported.

### d.    Overlap and Double-Counting

### i.    Order No. 1920 Requirements

385.    In Order No. 1920, the Commission noted that, "rather than requiring transmission
providers to measure and use all 12 benefits enumerated in the NOPR, we only require
transmission providers to measure and use seven specific benefits that have a proven
track record, can be discretely measured, and are unlikely to cause duplication."[1068]  In
response to concerns raised by commenters regarding the potential for overlap and
double-counting, the Commission further noted:

> We believe that the seven benefits that we include in the
> required set of benefits that transmission providers must
> measure and use in Long-Term Regional Transmission
> Planning are distinct enough that they will not overlap in a
> way that results in double-counting.  Nonetheless, to the
> extent that transmission providers are concerned that any
> possibility of double-counting remains, we provide
> transmission providers with flexibility on the measurement of
> such benefits and expect that transmission providers can use
> such flexibility to develop methods for measuring each
> required benefit that address those concerns.[1069]

386.    With respect to Final Rule Benefit 3, Production Cost Savings, the Commission in
Order No. 1920 explained why it did not believe that this benefit would result in double-
counting of benefits merely because such benefits may also be considered in state

---

[1068] *Id.* P 724.

[1069] *Id.* P 735.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1721 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No.  RM21-17-001                                                    - 345 -

resource planning.[1070]  Specifically, the Commission found that while integrated resource planning processes, where they exist, may consider similar benefits compared to those required by Order No. 1920, the consideration of benefits in a state-jurisdictional process does not result in the double-counting of benefits within any Commission-jurisdictional transmission planning process.[1071]

387.    The Commission in Order No. 1920 also offered guidance regarding the manner of measurement of certain aspects of Final Rule Benefit 6, mitigation of extreme weather events and unexpected system conditions, to avoid double-counting.  The Commission noted, for example, that "to avoid double-counting of similar circumstances, transmission providers must account for extreme weather events and unexpected system conditions that are separate and distinct such that the benefits of mitigating each system condition can be combined into a single benefit measure."[1072]

### ii.    Requests for Rehearing and Clarification

388.    Designated Retail Regulators and Undersigned States request rehearing and assert that Order No. 1920's requirements to use seven required factors and seven required benefits will result in unjust and unreasonable rates.  They argue that the seven required factors and seven required benefits overlap and will double-count or exaggerate the

---

[1070] *Id.* P 770.

[1071] *Id.*

[1072] *Id.* P 804.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1722 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No.  RM21-17-001                                             - 346 -

potential benefits of Long-Term Regional Transmission Facilities, with Undersigned

States adding that this renders the rule arbitrary and capricious.[1073]

389.    Designated Retail Regulators and Undersigned States assert that with respect to

the seven required benefits, it is unclear whether these metrics will result in double-

counting of potential benefits.[1074]

### iii.    Commission Determination

390.    We disagree with Designated Retail Regulators and Undersigned States that the

seven required benefits will overlap and will double-count or exaggerate the potential

benefits of Long-Term Regional Transmission Facilities.  As an initial matter, the

Commission found in Order No. 1920, and we continue to find here, that "the seven

benefits that we include in the required set of benefits that transmission providers must

measure and use in Long-Term Regional Transmission Planning are distinct enough that

they will not overlap in a way that results in double-counting."[1075]  Designated Retail

Regulators and Undersigned States fail to provide evidence in support of their arguments

---

[1073] Designated Retail Regulators Rehearing Request at 8 (citation omitted);
Undersigned States Rehearing Request at 8 (citation omitted).

[1074] Designated Retail Regulators Rehearing Request at 29; Undersigned States
Rehearing Request at 29.

[1075] Order No. 1920, 187 FERC ¶ 61,068 at P 735.  As noted above, the
Commission also  addressed arguments relating to double-counting and/or overlap
between Final Rule Benefit 3 and integrated resource planning processes and provided
guidance regarding the manner of measurement of certain aspects of Final Rule Benefit 6,
mitigation of extreme weather events and unexpected system conditions, to avoid double-
counting.

USCA4 Appeal: 24-1650   Doc: 224      Filed: 01/21/2025    Pg: 1723 of 2455
Document Accession #: 20241121-3139      Filed Date: 11/21/2024

Docket No.  RM21-17-001                                                - 347 -

to the contrary, and they do not provide any specific examples of the alleged overlap.

Given the descriptions of the required benefits adopted in Order No. 1920,[1076] we

conclude that each of these required benefits captures a different type of benefit that

Long-Term Regional Transmission Facilities may provide.  However, we reiterate, as the

Commission stated in the final rule, that Order No. 1920 provides transmission providers

with flexibility on the measurement of the required benefits, and we expect that

transmission providers can use such flexibility to develop methods for measuring each

required benefit that address any concerns about the possibility of double-counting

benefits.[1077]

391.    Moreover, the Commission explained in Order No. 1920 that transmission

providers' evaluation of Long-Term Regional Transmission Facilities must culminate in a

determination that is sufficiently detailed for stakeholders to understand why a particular

Long-Term Regional Transmission Facility (or portfolio of Long-Term Regional

Transmission Facilities) was selected or not selected.[1078]  The Commission also explained

that this determination must include the estimated costs and measured benefits of each

alternative Long-Term Regional Transmission Facility (or portfolio of Long-Term

Regional Transmission Facilities) that transmission providers evaluated in the Long-

Term Regional Transmission Planning process, regardless of whether or not the Long-

---

[1076] *Id.* PP 745, 756, 758, 767, 781, 788, 800, 817.

[1077] *Id.* P 735.

[1078] *Id.* P 954.

USCA4 Appeal: 24-1650   Doc: 224      Filed: 01/21/2025    Pg: 1724 of 2455
Document Accession #: 20241121-3139      Filed Date: 11/21/2024

Docket No. RM21-17-001                                            - 348 -

Term Regional Transmission Facility (or portfolio of such Facilities) is selected.[1079]  We

find that these requirements will further safeguard against potential overlap and double-

counting of benefits.

392.   With respect to Undersigned States' and Designated Retail Regulators' concerns

regarding the relationship between benefits and factors, we address this issue in the

Requirement for Transmission Providers to Use the Seven Required Benefits to Help to

Inform Their Identification of Long-Term Transmission Needs section above.  As noted

there, we are setting aside Order No. 1920's requirement for transmission providers to

use the set of seven required benefits to help to inform their identification of Long-Term

Transmission Needs.  As such, we find that there is no overlap between the categories of

factors that transmission providers must incorporate into the development of Long-Term

Scenarios, which are developed prior to the identification of Long-Term Transmission

Needs and Long-Term Regional Transmission Facilities to address those needs, and the

required benefits, which are subsequently used to evaluate the identified Long-Term

Regional Transmission Facilities.

393.   With respect to Designated Retail Regulators' and Undersigned States' concerns

about potential overlaps between the seven required benefits and other benefits that

transmission providers may use and measure, we find that Order No. 1920 provides for

sufficient transparency to prevent any such overlap.  Specifically, Order No. 1920

requires transmission providers to describe how they will measure the seven required

---

[1079] *Id.* PP 954, 966.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1725 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No.  RM21-17-001                                                    - 349 -

benefits in OATT filings.[1080]  Additionally, it requires transmission providers to measure and use any additional benefits beyond those included in the required set of benefits, including on a transmission facility or plan-specific basis, in a manner that is consistent with their obligations under Order No. 890 and Order No. 1000 transmission planning principles to be open and transparent as to their transmission planning processes.[1081]  As such, stakeholders will have the information necessary to identify any potential double-counting of the required benefits and any other benefits that transmission providers choose to measure and use in Long-Term Regional Transmission Planning.

### e.    Conflicts with State Authority

### i.    Requests for Rehearing and Clarification

394.    Designated Retail Regulators assert that the seven required benefits conflict with the state authority reflected in both the transmission planning principles adopted by OMS that project metrics should be quantifiable, subject to accurate measurement, verifiable, non-duplicative, and forward looking and the Entergy Regional State Committee's adoption of "even more stringent requirements to ensure that any metrics adopted reflected actual, not hypothetical, value that would justify major transmission investment."[1082]  For instance, Designated Retail Regulators state that the Entergy

---

[1080] *Id.* P 837.

[1081] *Id.* P 822.

[1082] Designated Retail Regulators Rehearing Request at 31-33 (citing Organization of MISO States, Inc., *Organization of MISO States Statement of Principles: Cost Allocation for Long Range Transmission Planning Projects*, https://www.misostates.org/images/PositionStatements/OMS_Position_Statement_of_Pri

Regional State Committee (E-RSC) adopted stringent requirements to ensure that any

metrics adopted reflected actual, not hypothetical, value that would justify major

transmission investment:

> The cost-benefit and other analyses that are used to inform
> the business case and cost allocation for Tranche 3 shall be
> based only on accurate, objective, measurable, quantifiable,
> non-duplicative, forward-looking, and replicable metrics that
> are supported by data;
>
> Tranche 3 costs shall be allocated using an exclusive list of
> benefit metrics identified by the E-RSC, with advice from
> MISO and MISO South Stakeholders, that meet the criteria
> identified in Paragraph 3 above.  These metrics shall be
> memorialized after being approved by the E-RSC;
>
> Each Tranche 3 project must individually satisfy the cost-
> benefit analysis used for the business case and cost allocation
> on a stand-alone basis.  Where two or more transmission
> facility upgrades combine to address a specific transmission
> issue, they may be evaluated as a single project for the
> purpose of analysis and cost allocation.[1083]

395.    NESCOE requests that the Commission grant rehearing to require transmission

providers to defer to states in the identification of benefits that Long-Term Regional

Transmission Facilities may provide when the driver of the Long-Term Transmission

Need is related to satisfying state laws, regulations, or policies.[1084]

-------------------------------------------

nciples_Cost_Allocation_for_LRTPs.pdf).

[1083] Designated Retail Regulators Rehearing Request at 32-33 (quoting Entergy
Regional State Committee, *Resolution of the Entergy Regional State Committee*, 3
(adopted June 30, 2023), https://cdn.misoenergy.org/20230630%20-
%20ERSC%20Resolution%20re%20MISO%20South%20Cost%20Allocation%20for%2
0Tranche%203629421.pdf).

[1084] NESCOE Rehearing Request at 11 (citation omitted).

## ii.     Commission Determination

396.   We are not persuaded by requests for rehearing that argue that the Commission's establishment of a set of required benefits in Order No. 1920 impermissibly or improperly intrudes upon state authority.  We continue to find that, while the Long-Term Regional Transmission Planning required in Order No. 1920 may be more comprehensive than the status quo, as a matter of the Commission's jurisdiction, it is fundamentally no different than the regional transmission planning already required by the Commission and upheld by the appellate courts.[1085]  Using the required benefits to evaluate Long-Term Regional Transmission Facilities is an incremental improvement to the Commission's Order No. 890 and Order No. 1000 reforms requiring processes for evaluating the merits of proposed transmission solutions offered by potential developers.[1086]  The D.C. Circuit upheld the Commission's Order No. 1000 regional transmission planning reforms against challenges rooted in similar misunderstandings of the Commission's jurisdiction as those advanced by the rehearing parties.[1087]

---

[1085] Order No. 1920, 187 FERC ¶ 61,068 at P 277 (citing *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d at 68-69).

[1086] *See* Order No. 1000, 136 FERC ¶ 61,051 at P 315 (citing Order No. 890, 118 FERC ¶ 61,119 at P 494; Order No. 890-A, 121 FERC ¶ 61,297 at PP 215-216).

[1087] *See S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d at 63 ("Taken together, these points support the Commission's assertion of authority over transmission planning matters in the challenged orders, notwithstanding petitioners' contention that the orders intrude on the States' authority.").

397.    Further, we reiterate the Commission's finding in Order No. 1920 that some benefits are so essential to Long-Term Regional Transmission Planning that they must be required and not left to the discretion of stakeholders, whether RTOs/ISOs or state committees.[1088]  Order No. 1920, for example, found that requiring the measurement and use of Final Rule Benefit 1, Avoided or Deferred Reliability Transmission Facilities and Aging Transmission Infrastructure Replacement, as described, is necessary because Long-Term Regional Transmission Facilities may obviate or delay the need for reliability transmission facilities identified in the near term, or the need for later replacements of aging transmission infrastructure.[1089]  Moreover, as discussed in the Flexibility Regarding Benefits Rather than a Minimum Set section above, the Commission found in Order No. 1920 that the requirement for transmission providers to measure and use the seven required benefits in Long-Term Regional Transmission Planning is necessary to ensure that Commission-jurisdictional rates are just and reasonable.[1090]  We sustain this finding and, as a result, continue to find that the measurement and use of these minimum set of required benefits in Long-Term Regional Transmission Planning cannot be left to the discretion of transmission providers or stakeholders.

398.    We also question the degree of intrusion cited by certain rehearing parties.  We note, for example, that many of the OMS and Entergy Regional State Committee

---

[1088] *See* Order No. 1920, 187 FERC ¶ 61,068 at PP 722-723, 725, 728.

[1089] *Id.*  P 745.

[1090] *Id.*  P 727.

Docket No. RM21-17-001                                                    - 353 -

transmission planning principles cited by Designated Retail Regulators are similar to

provisions governing the measurement and use of the required benefits in Order No.

1920. For example, Order No. 1920's findings and requirements with respect to the

seven required benefits are consistent with the second of OMS's transmission planning

principles[1091] that benefit metrics be quantifiable,[1092] capable of replication,[1093] non-

duplicative,[1094] and forward-looking.[1095]

399. With respect to Designated Retail Regulators' assertions regarding the Entergy

Regional State Committee requirements, we note that many of the metrics for analysis

---

[1091] Organization of MISO States, Inc., *Organization of MISO States Statement of Principles: Cost Allocation for Long Range Transmission Planning Projects*, https://www.misostates.org/images/PositionStatements/OMS_Position_Statement_of_Principles_Cost_Allocation_for_LRTPs.pdf.

[1092] Order No. 1920, 187 FERC ¶ 61,068 at P 724 ("[W]e only require transmission providers to measure and use seven specific benefits that . . . can be discretely measured.").

[1093] *Id.* P 837 ("[We] require transmission providers in each transmission planning region to include in their OATTs a general description of how they will measure each of the seven benefits included in the required set of benefits . . . .").

[1094] *Id.* P 735 ("We believe that the seven benefits that we include in the required set of benefits that transmission providers must measure and use in Long-Term Regional Transmission Planning are distinct enough that they will not overlap in a way that results in double-counting.").

[1095] *Id.* P 859 ("[We] require transmission providers in each transmission planning region, as part of Long-Term Regional Transmission Planning, to calculate the benefits of Long-Term Regional Transmission Facilities over a time horizon that covers, at a minimum, 20 years starting from the estimated in-service date of the transmission facilities . . . .").

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1730 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No. RM21-17-001                                                    - 354 -

raised by the first cited requirement[1096] are similar to those required by the final rule and

by OMS. With respect to the second requirement ("Tranche 3 costs shall be allocated

using an exclusive list of benefit metrics identified by the E-RSC"), we note that

transmission providers are free to measure and use additional benefits in Long-Term

Regional Transmission Planning so long as they also measure and use the required

benefits and measure and use any other benefits in a manner that is consistent with their

obligations under Order No. 890 and Order No. 1000 transmission planning principles to

be open and transparent as to their transmission planning processes.[1097] With respect to

the third requirement,[1098] the final rule noted the potential to use cost-benefit metrics as a

means for evaluating and selecting Long-Term Regional Transmission Facilities.[1099]

---

[1096] Entergy Regional State Committee, *Resolution of the Entergy Regional State Committee*, at 3 (adopted June 30, 2023), https://cdn.misoenergy.org/20230630%20-%20ERSC%20Resolution%20re%20MISO%20South%20Cost%20Allocation%20for%20Tranche%203629421.pdf ("The cost-benefit and other analyses that are used to inform the business case and cost allocation for Tranche 3 shall be based only on accurate, objective, measurable, quantifiable, non-duplicative, forward-looking, and replicable metrics that are supported by data.").

[1097] Order No. 1920, 187 FERC ¶ 61,068 at P 822.

[1098] Entergy Regional State Committee, *Resolution of the Entergy Regional State Committee*, at 3 (adopted June 30, 2023), https://cdn.misoenergy.org/20230630%20-%20ERSC%20Resolution%20re%20MISO%20South%20Cost%20Allocation%20for%20Tranche%203629421.pdf ("Each Tranche 3 project must individually satisfy the cost-benefit analysis used for the business case and cost allocation on a stand-alone basis.")

[1099] Order No. 1920, 187 FERC ¶ 61,068 at P 966 (noting that transmission provider evaluation processes must result in determinations that "include the estimated costs and measured benefits of each alternative Long-Term Regional Transmission Facility (or portfolio of such Facilities) evaluated by the transmission providers, whether or not the Long-Term Regional Transmission Facility (or portfolio of such Facilities) is

Docket No. RM21-17-001                                                      - 355 -

400.    We are also unpersuaded by NESCOE's request that we defer to state preferences

regarding benefits when the driver of the Long-Term Transmission Need is related to

satisfying state laws, regulations, or policies.  As noted above, the measurement and use

of the required benefits in Long-Term Regional Transmission Planning is essential to

ensuring just and reasonable Commission-jurisdictional rates such that the Commission

cannot defer to states on this point.  However, we note that Order No. 1920 requires

consultation with the states regarding aspects of Long-Term Regional Transmission

Planning, including a requirement that transmission providers consult with and seek the

support of Relevant State Entities regarding the evaluation process, including selection

criteria, that transmission providers propose to use to identify and evaluate Long-Term

Regional Transmission Facilities and that provide transmission providers with the

opportunity to select Long-Term Regional Transmission Facilities to address Long-Term

Transmission Needs, including those related to satisfying state laws, regulations, or

policies.[1100]  Further, as clarified in this order in the Stakeholder Process and

Transparency section above, transmission providers must provide states with a

meaningful opportunity to provide timely input on the development of Long-Term

Scenarios, including factors and data inputs, and an opportunity to explain how their own

policies and planning affect Long-Term Transmission Needs.[1101]

---

selected").

    [1100] *See id.* PP 914, 994.

    [1101] Further, as discussed in the General Benefits Requirements Related to Cost
Allocation section below, transmission providers can consider additional benefits for cost

Docket No. RM21-17-001                                                    - 356 -

#### f.    Individual Benefits

##### i.    Final Rule Benefit 2(a):  Reduced Loss of Load Probability; or Final Rule Benefit 2(b):  Reduced Planning Reserve Margin

###### (a)    Order No. 1920 Requirements

401.   With respect to Final Rule Benefit 2, the Commission stated that this benefit can be characterized and measured as Final Rule Benefit 2(a), Reduced Loss of Load Probability, or as Final Rule Benefit 2(b), Reduced Planning Reserve Margin, two different methods for measuring the same underlying benefit.  The Commission found that because there is an overlap between the reduced loss of load probability benefits and reduced planning reserve margin benefits, for purposes of Long-Term Regional Transmission Planning, transmission providers must either measure reduced loss of load events by holding the planning reserve margin constant *or* measure the reduction in planning reserve margins by holding loss of load events constant but may not measure both simultaneously for purposes of using and measuring Final Rule Benefit 2(a) or 2(b).[1102]

###### (b)    Requests for Rehearing and Clarification

402.   SERTP Sponsors argue that the Commission should clarify that it does not intend to require transmission providers to establish a planning reserve margin other than the

---

allocation purposes, including, but not limited to, those agreed to by Relevant State Entities and described elsewhere in Order No. 1920, provided that costs are allocated in a way that is at least roughly commensurate with estimated benefits.

[1102] Order No. 1920, 187 FERC ¶ 61,068 at P 755.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1733 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

planning reserve margin established by the resource planners and load-serving entities on

that transmission provider's system.  SERTP Sponsors also assert that the Commission

should clarify that any analysis under Final Rule Benefit 2 should not be used as a basis

to challenge the planning reserve margin of a resource planner or load-serving entity

established through state resource planning processes, and that the use of such an analysis

is only intended for the purpose of evaluating potential Long-Term Regional

Transmission Facilities that may under certain planning scenarios suggest a potential

benefit.[1103]

### (c)    Commission Determination

403.    We clarify that Order No. 1920 does not require transmission providers to

establish a different planning reserve margin than the one established by resource

planners or load-serving entities in a particular transmission provider's system, including

in measuring Final Rule Benefit 2.  We underscore here that any calculation of this

benefit will only serve to support the benefits assessment of potential Long-Term

Regional Transmission Facilities during the Long-Term Regional Transmission Planning

process.  While the Commission described examples of how transmission providers could

measure certain benefits, the Commission did not require a specific measurement method

for any of the required benefits.[1104]  Further, the Commission noted that Final Rule

Benefit 2 can be measured in one of two ways: (a) using reduced loss of load probability

---

[1103] SERTP Sponsors Rehearing Request at 18.

[1104] Order No. 1920, 187 FERC ¶ 61,068 at P 727.

*or* (b) reduced planning reserve margin.[1105]  In light of this clarification, we need not reach SERTP Sponsors' alternative argument that, absent this clarification, Order No. 1920 would raise concerns that the Commission has exceeded its jurisdiction.[1106]

404.    In response to SERTP Sponsors' request to clarify that any analysis under Final Rule Benefit 2 should not be used as the basis for challenging a resource planner's or load-serving entity's planning reserve margin established through state resource planning processes, we clarify that any state resource planning process is a separate process subject to state jurisdiction and is beyond the scope of Order No. 1920.

### ii.    Final Rule Benefit 3:  Production Cost Savings

### (a)    Order No. 1920 Requirements

405.    In Order No. 1920, the Commission required transmission providers in each transmission planning region to measure and use Final Rule Benefit 3 in Long-Term Regional Transmission Planning.  The Commission described this benefit as savings in fuel and other variable operating costs of power generation that are realized when transmission facilities allow for displacement of higher-cost supplies through the increased dispatch of suppliers that have lower incremental costs of production, as well as a reduction in market prices as lower-cost suppliers set market clearing prices.[1107]

---

[1105] *Id.* P 748.

[1106] *See* SERTP Sponsors Rehearing Request at 18 n.46, 43 (Issue Statement 15) (citations omitted).

[1107] Order No. 1920, 187 FERC ¶ 61,068 at P 767.

406.    In Order No. 1920, the Commission disagreed with the assertion made in comments that production cost savings may not always be applicable, such as where financial transmission rights fully hedge the cost of congestion.  The Commission stated that financial transmission rights are required in RTO/ISO markets and allow the market participant that owns the right to mitigate the congestion charge along an existing transmission path for the capacity of that path.  The Commission further stated that a new transmission facility could reduce congestion and allow that market participant to purchase more electricity, exceeding the capacity of the transmission path for the financial transmission right, at a lower price.  The Commission observed that this reduced congestion allows load to access lower cost resources and results in more efficient dispatch of resources and, thus, provides avoided production cost benefits that are distinct from the avoided congestion charges associated with financial transmission rights.[1108]

### (b)    Requests for Rehearing and Clarification

407.    SERTP Sponsors argue that the Commission should clarify that production cost analysis from state-approved integrated resource plans may be used to the extent feasible to satisfy the requirement to consider Final Rule Benefit 3.  SERTP Sponsors further argue that, in the event of conflict, state-regulated integrated-resource-plan planning must control in accordance with FPA section 201.[1109]

---

[1108] *Id.* P 773 (citations omitted).

[1109] SERTP Sponsors Rehearing Request at 19.

408.    Designated Retail Regulators assert that the Commission was mistaken in stating that a load-serving entity may benefit from reduced production costs associated with transmission construction even when its congestion costs are fully hedged.  Designated Retail Regulators argue that as congestion is eliminated by transmission construction, the value of the load-serving entity's financial transmission rights decreases, and the load-serving entity incurs additional transmission charges associated with the new transmission facilities.  Designated Retail Regulators assert that any benefit based on adjusted production cost must therefore consider congestion to determine if a load-serving entity receives any benefit or harm from transmission construction.[1110]

### (c)    Commission Determination

409.    In response to SERTP Sponsors, we note that Order No. 1920 does not require a specific measurement method for any of the seven required benefits.  We clarify that if transmission providers in a transmission planning region believe they can use production cost savings from one or more state integrated resource plans as an appropriate method to measure the value of Final Rule Benefit 3, they may propose to do so on compliance.  As a general matter, we agree that states have authority over generation resource adequacy, which may include evaluation of production cost savings in state-regulated integrated resource plans.  Order No. 1920, however, addresses transmission planning practices directly affecting Commission-jurisdictional rates, including by requiring that transmission providers consider the broader set of benefits (such as Final Rule Benefit 3)

---

[1110] Designated Retail Regulators Rehearing Request at 30-31.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1737 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

associated with Long-Term Regional Transmission Facilities. We therefore decline SERTP Sponsors' request to clarify that transmission providers must, in all circumstances, rely on such state evaluations of production cost savings in assessing the benefits associated with such facilities.[1111]

410. We decline Designated Retail Regulators' request for clarification regarding Final Rule Benefit 3 with respect to financial transmission rights. We continue to find that financial transmission rights allow the market participant that owns the right to mitigate the congestion charge along an existing path for the capacity of that path and note that a new transmission facility could reduce congestion and allow that market participant to purchase more electricity, exceeding the capacity of the transmission path for the financial transmission right, at a lower price. While the extent of production cost savings from any Long-Term Regional Transmission Facility or portfolio of such Facilities may vary among representative transmission providers, and transmission providers may propose on compliance to consider the effects of financial transmission rights on Final Rule Benefit 3, we decline to prospectively determine how any load-serving entity may or may not benefit from a reduction in regional production costs, including whether the

---

[1111] In light of this clarification, we continue to conclude that Order No. 1920 is a lawful exercise of the Commission's statutory authority and does not intrude into areas of reserved state jurisdiction. *See supra* Statutory Authority section; SERTP Sponsors Rehearing Request at 18-19 nn.46 & 48, 43 (Issue Statement 15) (citations omitted). To the extent that transmission providers propose a different evaluation of production cost savings than reflected in state-regulated integrated resource plans, they will be doing so in the context of Order No. 1920's regulation of Commission-jurisdictional transmission planning processes.

degree to which a particular load-serving entity may have hedged against congestion would affect such benefits.

### 2. Measurement and Use of Other Benefits

### a. Order No. 1920 Requirements

411.   In Order No. 1920, the Commission declined to require transmission providers to measure and use the remaining five benefits described in the NOPR in Long-Term Regional Transmission Planning (i.e., mitigation of weather and load uncertainty, generation capacity investments, access to lower-cost generation, increased competition, and increased market liquidity), but permitted transmission providers to measure and use additional benefits beyond the set of seven required benefits (other benefits), including on a transmission facility or plan-specific basis, subject to the requirement that they do so in a manner that is consistent with their obligations under Order No. 890 and Order No. 1000 transmission planning principles to be open and transparent as to their transmission planning processes.[1112]  The Commission stated that, in particular, the evaluation process must result in a determination that is sufficiently detailed for stakeholders to understand why a particular Long-Term Regional Transmission Facility (or portfolio of such Facilities) was selected or not selected to address Long-Term Transmission Needs, which necessarily means that stakeholders must understand which benefits transmission providers considered in the evaluation process, including any

---

[1112] Order No. 1920, 187 FERC ¶ 61,068 at PP 821-822.

beyond the seven benefits that the Commission required transmission providers to include in their OATTs.[1113]

### b.      Requests for Rehearing and Clarification

412.    PIOs assert that the Commission erred by not requiring transmission providers to measure and use the five additional benefits identified in the NOPR.[1114]  PIOs assert that the Commission ignores its own evidence in the NOPR that the five additional proposed benefits have a proven track record, can be discretely measured, and are unlikely to cause duplication.[1115]

413.    TAPS asserts that Order No. 1920's lack of a requirement for transmission providers to fully explain and justify additional benefits used to evaluate Long-Term Regional Transmission Facilities is an unjustified departure from the NOPR and inconsistent with the final rule's directive requiring transmission providers to describe how they will measure each of the seven required benefits on compliance.  TAPS states that the final rule invites transmission providers to supplement Order No. 1920's required benefits, seemingly abandoning concerns about double-counting.  TAPS further argues that the flexibility regarding additional benefits also provides an opportunity to selectively apply additional benefits on a transmission facility or plant-specific basis,

---

[1113] *Id.* P 737.

[1114] PIOs Rehearing Request at 26-27.

[1115] *Id.* at 27 (citing NOPR, 179 FERC ¶ 61,028 at PP 208-209, 213-225).

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1740 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No.  RM21-17-001                                                        - 364 -

inviting discrimination.[1116]  TAPS also asserts that it is unclear whether the final rule's requirements for transmission providers to be "open and transparent" applies to the process of deciding whether to use and how to measure additional benefits or to the implementation of the additional benefits for specific projects.  TAPS contends that it should apply to both.[1117]

### c.    Commission Determination

414.    We are not persuaded by PIOs' rehearing request concerning the Commission's decision in Order No. 1920 to not require the measurement and use of benefits other than the seven required benefits, such as the five additional benefits identified by the Commission in the NOPR.  The Commission determined that measurement and use of the set of seven required benefits constituted the just and reasonable replacement rate.  Furthermore, the Commission explained its reasoning in Order No. 1920 for only requiring the measurement and use of seven required benefits and not other benefits, including recognizing commenters' concerns about duplication of certain benefits and the difficulty of measuring certain benefits.[1118]  The Commission also explained that the list of seven required benefits only requires transmission providers to measure and use seven

---

[1116] TAPS Rehearing Request at 12-13.

[1117] *Id.* at 11.

[1118] Order No. 1920, 187 FERC ¶ 61,068 at P 724.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1741 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No. RM21-17-001                                              - 365 -

specific benefits that have a proven track record, can be discretely measured, and are unlikely to cause duplication.[1119]

415.    With respect to TAPS' concerns regarding a lack of a requirement for transmission providers to explain and justify other benefits on compliance, we believe that the approach in the final rule is reasonable because it provides transmission providers with greater flexibility to consider potential additional benefits of Long-Term Regional Transmission Facilities beyond the seven required benefits.  We further find that, by providing transparency, the requirements of the final rule are sufficient to avoid undue discrimination.  Specifically, Order No. 1920 requires transmission providers that measure and use any other benefits beyond the set of seven required benefits to do so in a manner that is consistent with their obligations under Order No. 890 and Order No. 1000 transmission planning principles to be open and transparent as to their transmission planning processes.[1120]  Moreover, the Commission stated that the evaluation process must result in a determination that is sufficiently detailed for stakeholders to understand why a particular Long-Term Regional Transmission Facility (or portfolio of such Facilities) was selected or not selected to address Long-Term Transmission Needs, which necessarily means that stakeholders must understand which benefits transmission providers considered in the evaluation process, including any beyond the seven benefits

---

[1119] *Id.* P 724.

[1120] *Id.* PP 821-822.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1742 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No.  RM21-17-001                                                    - 366 -

that the Commission required transmission providers to include in their OATTs.[1121]  Such transparency will limit the opportunities for transmission providers to measure and use in Long-Term Regional Transmission Planning any benefits in addition to the required benefits in an unduly discriminatory manner.

416.    We therefore grant TAPS' request for clarification that the final rule's requirements for transmission providers to be "open and transparent" applies to the process of deciding whether to use and how to measure other benefits in addition to the required benefits as well as to the implementation of other benefits for specific Long-Term Regional Transmission Facilities, as discussed above.

### 3.    Identification, Measurement, and Evaluation of Benefits

#### a.    Order No. 1920 Requirements

417.    In Order No. 1920, the Commission required transmission providers in each transmission planning region to include in their OATTs a general description of how they will measure each of the set of seven required benefits, sufficient only to enable stakeholders to understand the manner by which transmission providers will measure these benefits.[1122]  Order No. 1920 provided flexibility to transmission planners to specify the method for measuring each of the seven required benefits,[1123] as well as discretion to measure and use additional benefits that go beyond the set of seven required benefits,

---

[1121] *Id.* P 737.

[1122] *Id.* PP 837, 840.

[1123] *Id.* P 839.

subject to the requirement that they do so in a manner that is consistent with their obligations under Order No. 890 and Order No. 1000 transmission planning principles to be open and transparent as to their transmission planning processes.[1124]

### b.    Requests for Rehearing and Clarification

418.    SERTP Sponsors request that the Commission clarify that it did not intend for transmission providers to engage in generation or resource planning as part of the Long-Term Regional Transmission Planning process, as doing so would violate FPA section 201 because it would intrude upon state-jurisdictional resource decisions.  SERTP Sponsors also request clarification that it is reasonable for transmission providers to establish protocols by which they can rely, to the extent available, on resource planners and load-serving entities for data in support of generation-based benefits.[1125]

### c.    Commission Determination

419.    In response to SERTP Sponsors' request, we clarify that Order No. 1920 does not require transmission providers to engage in generation or resource planning as part of Long-Term Regional Transmission Planning.  The requirement for transmission providers to measure and use the set of seven required benefits in Long-Term Regional Transmission Planning is necessary for transmission providers to consider a sufficiently broad range of benefits when evaluating and determining whether to select a Long-Term Regional Transmission Facility as the more efficient or cost-effective regional

---

[1124] *Id.* P 822.

[1125] SERTP Sponsors Rehearing Request at 17-18.

Docket No.  RM21-17-001                                                                      - 368 -

transmission solution to Long-Term Transmission Needs and for purposes of conducting

Long-Term Regional Transmission Planning, and not as a basis to cause transmission

providers to engage in resource planning.[1126]

420.     Further, as requested by SERTP Sponsors, we clarify that Order No. 1920 does not

prohibit transmission providers from proposing to establish protocols by which they can

rely, to the extent available, on resource planners and load-serving entities for generation-

based data and information in satisfying the requirement to measure the benefits of Long-

Term Regional Transmission Facilities.  In Order No. 1920, the Commission provided

flexibility to transmission providers to specify the method for measuring each of the

seven required benefits and did not mandate any specific method for measuring those

seven benefits.  Order No. 1920 also provided the flexibility for transmission providers to

establish protocols to obtain data, to the extent available,  from resource planners and

load-serving entities to measure the benefits of specific Long-Term Regional

Transmission Facilities.  However, we re-emphasize that, whether the transmission

providers themselves measure the benefits of Long-Term Regional Transmission

Facilities, or instead establish protocols by which they can rely on resource planners or

load-serving entities for generation-based data and information to measure the benefits,

the general description in the OATT of the method that the transmission provider uses to

---

[1126] In light of this clarification, we need not reach SERTP Sponsors' alternative argument that, absent this clarification, Order No. 1920 would raise concerns that the Commission has exceeded its jurisdiction.  *See id.* at 19 n.48, 43 (Issue Statement 15) (citations omitted).

Docket No. RM21-17-001                                                  - 369 -

measure each of the required benefits must be sufficient to enable stakeholders to understand the manner by which transmission providers will measure those benefits, as noted in Order No. 1920.[1127]

### 4. Benefits Horizon

#### a. Order No. 1920 Requirements

421. In Order No. 1920, the Commission required transmission providers in each transmission planning region, as part of Long-Term Regional Transmission Planning, to calculate the benefits of Long-Term Regional Transmission Facilities over a time horizon that covers, at a minimum, 20 years starting from the estimated in-service date of the transmission facilities, and the Commission stated that this minimum 20-year benefit horizon must be used both for the evaluation and selection of Long-Term Regional Transmission Facilities.[1128]  In addition, in Order No. 1920, the Commission stated that, while transmission providers may discount the benefits calculated for purposes of determining a present value of those benefits, they may not further discount those benefits to reflect uncertainty over the minimum 20-year time horizon for calculating benefits.[1129]

422. In prohibiting transmission providers from discounting benefits to reflect uncertainty over the 20-year benefits horizon, the Commission stated that Order No. 1920

---

[1127] Order No. 1920, 187 FERC ¶ 61,068 at P 840.

[1128] *Id.* P 859.

[1129] *Id.* P 865.

affords transmission providers with considerable flexibility in how to address uncertainty in Long-Term Regional Transmission Planning through the process to develop Long-Term Scenarios.[1130] In addition, the Commission noted that transmission providers have the flexibility to evaluate Long-Term Regional Transmission Facilities and their measured benefits across the different Long-Term Scenarios and sensitivities in a manner that addresses the inherent uncertainty in Long-Term Regional Transmission Planning, for example, through the use of a least-regrets or a weighted-benefits approach.[1131] As a result, the Commission determined that transmission providers have considerable flexibility in how to address uncertainty in Long-Term Regional Transmission Planning, including the calculation of benefits under different future scenarios, and that transmission providers did not need additional flexibility that would be realized by discounting benefits over time specifically due to future uncertainty.[1132]

### b.    Requests for Rehearing and Clarification

423.    SERTP Sponsors request rehearing of the Commission's determination in Order No. 1920 to prohibit discounting of the measured benefits of Long-Term Regional Transmission Facilities based on uncertainty over the minimum 20-year benefit horizon. According to SERTP Sponsors, by requiring a 20-year benefits estimation without permitting discounting to reflect uncertainty, while also allowing a weighted-benefits

---

[1130] *Id.* PP 861, 865.

[1131] *Id.* P 862.

[1132] *Id.* PP 862, 865.

approach to account for uncertainty, Order No. 1920's requirement and authorization are unclear and contradictory, and therefore arbitrary and capricious.[1133]  Similarly, Dominion states that the Commission must provide transmission providers with the flexibility to discount the measured benefits to reflect uncertainty over the minimum 20-year horizon for purposes of selection and evaluation of projects.[1134]

### c.      Commission Determination

424.   We sustain the finding in Order No. 1920 that, while transmission providers may discount the value of the benefits calculated for purposes of determining the present value of those benefits, they may not further reduce the estimates of those benefits to reflect uncertainty over the minimum 20-year time horizon for calculating benefits.  We disagree with SERTP Sponsors that Order No. 1920 is contradictory in allowing the use of a weighted-benefits approach for evaluating Long-Term Regional Transmission Facilities while also prohibiting the reduction in estimates of measured benefits based on uncertainty over the minimum 20-year horizon.  These two techniques are not the same, and allowing one but prohibiting the other is not contradictory.  Permitting transmission providers to use a weighted-benefits approach for Long-Term Regional Transmission Facilities allows transmission providers to measure the estimated total benefits that a

---

[1133] SERTP Sponsors Rehearing Request at 19-20, 43 (Issue Statement 16) (citations omitted); *see also id.* at 43 (Issue Statement 15) (citations omitted) (asserting that failure to grant clarification of the issues in Section II.C.3 of SERTP Sponsors' argument would result in the Commission intruding on state-jurisdictional resource decisions).

[1134] Dominion Rehearing Request at 21-25.

particular Long-Term Regional Transmission Facility may provide across a range of

Long-Term Scenarios, each with a different probability of occurrence.[1135]  This method

can help account for uncertainty in the total benefits that a Long-Term Regional

Transmission Facility may provide and help to balance an over-reliance on any particular

Long-Term Scenario.  While we understand that applying a probability to a Long-Term

Scenario, and its resulting benefits, may reduce the benefits measured for that particular

Long-Term Scenario, when aggregated, the probability-weighted benefits measured

across all Long-Term Scenarios results in a representative estimate of the total benefits of

the Long-Term Regional Transmission Facility as a whole while also accounting for

uncertainty regarding the likelihood of different Long-Term Scenarios being realized.

425.   On the other hand, we continue to find that allowing transmission providers to

reduce the estimates of certain  benefits based only on the relative certainty over the 20-

year benefits horizon is unnecessary given other flexibilities provided to transmission

providers to manage uncertainty in planning over a minimum of 20 years, for the reasons

discussed in Order No. 1920.[1136]  For example, in addition to the use of a weighted-

---

[1135] Under a weighted-benefits approach, transmission providers that use three Long-Term Scenarios with expected likelihoods of, for example, 30%, 30%, and 40%, would attribute these expected likelihoods to the benefits that the transmission provider measures under each Long-Term Scenario.  The total estimated benefits of the Long-Term Regional Transmission Facility would then be calculated by summing the probability-adjusted benefits across these three Long-Term Scenarios (i.e., the sum of the measured benefits in the first Long-Term Scenario multiplied by its 30% probability, plus the second Long-Term Scenario's benefits multiplied by 30%, plus the third Long-Term Scenario's benefits multiplied by 40%).

[1136] Order No. 1920, 187 FERC ¶ 61,068 at P 865.

benefits approach, transmission providers have flexibility in how they account for the factors that go into Long-Term Scenario development once, as discussed elsewhere in this rule, transmission providers consult with Relevant State Entities and their authorized representatives as to how to account for factors related to state policy when determining the assumptions that will be used in the development of Long-Term Scenarios, as well as in determining *how* to account for such a state-related factor when developing Long-Term Scenarios when such state input is available.[1137]

426.    As a result, we continue to believe that prohibiting the discounting of benefits based on relative certainty over the 20-year benefits horizon is reasonable and strikes an appropriate balance between preventing an excessive undercounting of benefits and allowing transmission providers to account for uncertainty in measuring benefits of Long-Term Regional Transmission Facilities across Long-Term Scenarios. For these reasons, we also disagree with Dominion that transmission providers must be afforded the flexibility to discount benefits based on the uncertainty in planning over a minimum 20-year horizon.

427.    SERTP Sponsors do not explain how, in the absence of their requested clarification regarding discounting the benefits of Long-Term Regional Transmission Facilities, Order No. 1920 would "intrude[ ] upon state-jurisdictional resource decisions."[1138]  Regardless, we would be unpersuaded by this argument on its merits

---

[1137] *See supra* Long-Term Scenarios Requirements, Stakeholder Process and Transparency section.

[1138] SERTP Sponsors Rehearing Request at 43 (Issue Statement 15) (citations

because, as described above, Order No. 1920 falls comfortably within the Commission's jurisdiction to regulate practices directly affecting Commission-jurisdictional rates.[1139] The manner in which benefits of Long-Term Regional Transmission Facilities are assessed is such a Commission-jurisdictional practice.

### 5. Evaluation of the Benefits of Portfolios of Transmission Facilities

#### a. Order No. 1920 Requirements

428.   In Order No. 1920, the Commission allowed, but not did not require, transmission providers in each transmission planning region to use a portfolio approach when evaluating the benefits of Long-Term Regional Transmission Facilities.  Further, the Commission required transmission providers that propose to use a portfolio approach when evaluating the benefits of Long-Term Regional Transmission Facilities to include provisions in their OATTs regarding their use of the portfolio approach.[1140]

#### b. Requests for Rehearing and Clarification

429.   PIOs request rehearing of the Commission's decision in Order No. 1920 to not require transmission providers to use a portfolio approach when evaluating the benefits of Long-Term Regional Transmission Facilities.[1141]  PIOs state that the record in this docket

---

omitted); *id.* at 37-41 (generic argument that failure to grant certain clarifications intrudes on state jurisdiction or may implicate the major questions doctrine, without discussion of discounting benefits).

[1139] *See supra* Statutory Authority section.

[1140] Order No. 1920, 187 FERC ¶ 61,068 at P 889.

[1141] PIOs Rehearing Request at 47 (citations omitted).

includes widespread commenter support and substantial evidence, ranging from expert reports to examples of existing processes, demonstrating the benefits of using a portfolio approach when evaluating the benefits of Long-Term Regional Transmission Facilities.[1142] PIOs argue that by allowing transmission providers to continue to evaluate the benefits of Long-Term Regional Transmission Facilities on a facility-by-facility basis, the Commission undermines Order No. 1920's central purpose of requiring planning for system-wide transmission needs on a comprehensive and regional basis and leaves in place unjust and unreasonable rates.[1143] PIOs state that the Commission could provide transmission providers with flexibility while meeting the goals of Order No. 1920 by establishing a rebuttable presumption that Long-Term Regional Transmission Facilities be assessed on a portfolio basis, which transmission providers could overcome by demonstrating that the portfolio approach is inapplicable in a particular instance.[1144]

430.    Undersigned States[1145] and Designated Retail Regulators request rehearing of Order No. 1920's decision to allow transmission providers to use a portfolio approach when evaluating the benefits of Long-Term Regional Transmission Facilities.[1146]

---

[1142] *Id.* at 44-46.

[1143] *Id.* at 47.

[1144] *Id.* 47-48 (citing US DOE NOPR Initial Comments at 34-35).

[1145] Undersigned States note that the state of North Dakota does not join in the portion of Undersigned States' request for rehearing that addresses the final rule's determinations concerning the portfolio approach. Undersigned States Rehearing Request at 29 n.19.

[1146] Designated Retail Regulators Rehearing Request at 33-34; Undersigned States

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1752 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No. RM21-17-001                                                    - 376 -

Designated Retail Regulators and Undersigned States opine that the Commission should prohibit transmission providers from using the portfolio approach because, by allowing the bundling of economic and uneconomic facilities such that all facilities in a portfolio appear economic on a collective basis, the portfolio approach spreads uneconomic project costs to non-beneficiaries.[1147]  Designated Retail Regulators and Undersigned States further argue that the portfolio approach results in the unjust and unreasonable recovery of costs exceeding benefits and that every facility approved for construction should be economic and meet the required benefits-to-cost ratio on a stand-alone basis.[1148]

### c.    Commission Determination

431.   We are unpersuaded by PIOs', Undersigned States', and Designated Retail Regulators' requests for rehearing of the Commission's decision to allow, but not require, transmission providers in each transmission planning region to use a portfolio approach when evaluating the benefits of Long-Term Regional Transmission Facilities.  We disagree with PIOs' arguments that the Commission's decision not to require transmission providers to use a portfolio approach undermines the goals or purpose of Order No. 1920 or leaves unjust and unreasonable rates in place.[1149]  We continue to find

---

Rehearing Request at 29-30.

[1147] Designated Retail Regulators Rehearing Request at 34; Undersigned States Rehearing Request at 30.

[1148] Designated Retail Regulators Rehearing Request at 34; Undersigned States Rehearing Request at 30.

[1149] *See* PIOs Rehearing Request at 47.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1753 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No.  RM21-17-001                                                                - 377 -

that the advantages of a portfolio approach to evaluating benefits must be balanced against other considerations and that it is appropriate to provide transmission providers in each transmission planning region with flexibility as to whether to use a portfolio approach, subject to the requirement that transmission providers that propose to use a portfolio approach include provisions in their OATTs regarding their use of the portfolio approach.[1150]

432.    Specifically, we find that the advantages of a portfolio approach to evaluating benefits—including administrative efficiencies related to economies of scale and a more stable or even distribution of benefits, which is likely to facilitate agreement on regional cost allocation—must be weighed against the fact that a portfolio approach may not be appropriate in all instances.  For example, a facility-by-facility approach may be more appropriate if Long-Term Scenarios reveal the same or nearly identical constraints in discrete and isolated areas of the transmission system where system upgrades would be beneficial.  We find that transmission providers are in the best position to determine in any given circumstance whether a portfolio or facility-by-facility approach to evaluate the benefits of Long-Term Regional Transmission Facilities is more appropriate.

---

[1150] Order No. 1920, 187 FERC ¶ 61,068 at PP 889-890.  Order No. 1920 requires transmission providers that propose to use a portfolio approach to indicate in their proposed OATTs that they will use a portfolio approach.  However, Order No. 1920 does not require transmission providers to indicate whether they will use a portfolio approach for all Long-Term Regional Transmission Facilities or only in certain specified instances, nor to describe how they will analyze the benefits of Long-Term Regional Transmission Facilities under a portfolio approach, as such requirements could impede transmission provider consideration and development of portfolio approaches.  *Id.* P 889.

Therefore, we sustain the determination in Order No. 1920 to provide transmission providers in each transmission planning region with flexibility as to whether to use a portfolio approach, subject to the requirement that transmission providers that propose to use a portfolio approach when evaluating the benefits of Long-Term Regional Transmission Facilities include provisions in their OATTs regarding their use of the portfolio approach.

433.    We are also unpersuaded by Designated Retail Regulators' and Undersigned States' requests that the Commission prohibit transmission providers from using a portfolio approach to evaluate the benefits of Long-Term Regional Transmission Facilities. We note that the Commission has previously accepted the use of the portfolio approach to the evaluation of transmission facilities.[1151] In response to Undersigned States' claim that the portfolio approach allocates uneconomic project costs to non-beneficiaries, we note that the measurement and use of the benefits of Long-Term Regional Transmission Facilities, whether on a portfolio or facility-by-facility basis, is a requirement for the evaluation of Long-Term Regional Transmission Facilities for the purposes of potential selection. Order No. 1920 provides transmission providers with flexibility as to the consideration of benefits in their cost allocation methods for Long-Term Regional Transmission Facilities, subject to the requirement that transmission

---

[1151] *Midwest Indep. Transmission Sys. Operator, Inc.*, 133 FERC ¶ 61,221, at PP 221-222 (2010), *order on reh'g and compliance filing*, 137 FERC ¶ 61,074 (2011), *aff'd in part, dismissed in part and remanded in part sub nom. Ill. Com. Comm'n v. FERC*, 721 F.3d 764, 780 (7th Cir. 2013).

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1755 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No.  RM21-17-001                                                    - 379 -

providers demonstrate that such cost allocation methods allocate costs in a manner that is at least roughly commensurate with estimated benefits.[1152]  Thus, Designated Retail Regulators' and Undersigned States' arguments that the portfolio approach to evaluation of benefits will result in the allocation of costs for uneconomic facilities are  unfounded.

### D.    Evaluation and Selection of Long-Term Regional Transmission Facilities

#### 1.    Minimum Requirements

##### a.    Order No. 1920 Requirements

434.    In Order No. 1920, the Commission required transmission providers in each transmission planning region to include in their OATTs an evaluation process, including selection criteria, that they will use to identify and evaluate Long-Term Regional Transmission Facilities for potential selection to address Long-Term Transmission Needs.[1153]  The Commission further held that the transmission developer of a selected Long-Term Regional Transmission Facility will be eligible to use the applicable cost allocation method for that Long-Term Regional Transmission Facility.

435.    The Commission provided flexibility to transmission providers to propose, after consultation with Relevant State Entities and other stakeholders, evaluation processes, including selection criteria,[1154] provided that they (1) are transparent and not unduly

---

[1152] *See* Order No. 1920, 187 FERC ¶ 61,068 at PP 1478, 1506 (citing *ICC v. FERC I*, 576 F.3d at 477; *ICC v. FERC III*, 756 F.3d at 564).

[1153] Order No. 1920, 187 FERC ¶ 61,068 at P 911.

[1154] *Id.* P 924.

discriminatory;[1155] (2) aim to ensure that more efficient or cost-effective Long-Term

Regional Transmission Facilities are selected to address Long-Term Transmission

Needs;[1156] and (3) seek to maximize benefits accounting for costs over time without over-

building transmission facilities.[1157]

436.    As to the requirement that transmission providers' evaluation processes, including

selection criteria, are transparent and not unduly discriminatory, the Commission

explained that transmission providers' evaluation of Long-Term Regional Transmission

Facilities must culminate in a determination that is sufficiently detailed for stakeholders

to understand why a particular Long-Term Regional Transmission Facility (or portfolio

of Long-Term Regional Transmission Facilities) was selected or not selected.[1158]  The

Commission also explained that this determination must include the estimated costs and

measured benefits of each Long-Term Regional Transmission Facility (or portfolio of

Long-Term Regional Transmission Facilities) that transmission providers evaluated in

the Long-Term Regional Transmission Planning process, regardless of whether the Long-

Term Regional Transmission Facility (or portfolio of such Facilities) is selected.[1159]  The

Commission further explained that, where transmission providers employ a portfolio

---

[1155] *Id.* P 954.

[1156] *Id.* P 955.

[1157] *Id.* P 964.

[1158] *Id.* P 954

[1159] *Id.* PP 954, 966.

approach to evaluating and selecting Long-Term Regional Transmission Facilities,

transmission providers may provide the measured benefits included in this determination

on an aggregate basis.[1160]

437.    As to the requirement that transmission providers' evaluation processes, including

selection criteria, must aim to ensure that more efficient or cost-effective Long-Term

Regional Transmission Facilities are selected to address Long-Term Transmission Needs,

the Commission explained that evaluation processes must:  (1) identify one or more

Long-Term Regional Transmission Facilities (or portfolio of Long-Term Regional

Transmission Facilities) that address the Long-Term Transmission Needs that

transmission providers identify in Long-Term Regional Transmission Planning;

(2) estimate the costs and measure the benefits of Long-Term Regional Transmission

Facilities that are identified or proposed for potential selection; (3) designate a point in

the evaluation process that is no later than three years following the beginning of the

Long-Term Regional Transmission Planning cycle at which transmission providers will

determine to select or not to select identified or proposed Long-Term Regional

Transmission Facilities; and (4) culminate in determinations that are sufficiently detailed

for stakeholders to understand why a particular Long-Term Regional Transmission

Facility (or portfolio of Long-Term Regional Transmission Facilities) was selected or not

selected.[1161]  The Commission also provided transmission providers with flexibility to

---

[1160] *Id.* P 966 n.2121.

[1161] *Id.* P 955.  As to the identification of Long-Term Regional Transmission
Facilities, Order No. 1920 requires, consistent with Order Nos. 890 and 1000, that

determine how they will evaluate whether Long-Term Regional Transmission Facilities

more efficiently or cost-effectively address Long-Term Transmission Needs, including by

using benefit-cost ratios, assessing their net benefits, and/or using some other method.

Consistent with cost allocation principle (3), however, the Commission prohibited

transmission providers from imposing as a selection criterion a minimum benefit-cost

ratio that is higher than 1.25-to-1.00.[1162]

438.    Finally, as to the requirement that transmission providers' evaluation processes,

including selection criteria, must seek to maximize benefits accounting for costs over

time without over-building transmission facilities, the Commission stated that

transmission providers could adopt evaluation processes and selection criteria that would

allow transmission providers to make selection decisions while addressing the uncertainty

inherent in Long-Term Regional Transmission Planning.  For example, transmission

providers could include features that minimize the future risk of developing a previously

selected Long-Term Regional Transmission Facility that is not the more efficient or cost-

effective regional transmission solution to Long-Term Transmission Needs, such as by

using a least-regrets or weighted-benefits approaches.[1163]  The Commission explained

---

nonincumbent transmission developers be able to propose transmission facilities in Long-Term Regional Transmission Planning, and that therefore transmission providers make clear in their OATTs the point in the Long-Term Regional Transmission Planning evaluation process at which they will accept Long-Term Regional Transmission Facility proposals from stakeholders, including nonincumbent transmission developers.  *Id.*

[1162] *Id.* P 958 (citation omitted).

[1163] *Id.* P 967.  The Commission explained that, under a least-regrets approach, transmission providers would select Long-Term Regional Transmission Facilities if those

that, consistent with this requirement, transmission providers may not disregard benefits that they are required to use and measure, and may not do so even where those benefits only are measured under certain transmission system conditions.[1164]  The Commission further explained that transmission providers may not adopt an approach under which a Long-Term Regional Transmission Facility would be required to meet the selection criteria in every Long-Term Scenario and sensitivity.[1165]

### b.    Requests for Rehearing and Clarification

439.    NRECA argues that the Commission violated the APA's notice-and-comment requirements because the NOPR did not propose the "prescriptive" requirements set forth in Order No. 1920 related to the evaluation of Long-Term Regional Transmission Facilities.[1166]  These include the requirement that transmission providers identify Long-Term Regional Transmission Facilities that address Long-Term Transmission Needs, estimate the costs and measure the benefits of such facilities, and designate a point in the evaluation process, no later than three years from the date when the Long-Term Regional

---

facilities are net beneficial in more than one Long-Term Scenario and sensitivity analysis even if other transmission facilities have a higher benefit-cost ratio or provide more net benefits in a single Long-Term Scenario or particular sensitivity.  Under a weighted-benefits approach, transmission providers would select a Long-Term Regional Transmission Facility based on its probability-weighted average benefits, where probabilities have been assigned to each Long-Term Scenario or sensitivity thereof that is studied.  *Id.*

[1164] *Id.* P 965.

[1165] *Id.* P 968.

[1166] NRECA Rehearing Request at 14.

Transmission Planning cycle begins, at which time the transmission provider will determine whether to select or not select those identified Long-Term Regional Transmission Facilities.[1167]

440.    NRECA also requests that the Commission grant rehearing and require that transmission providers' selection criteria ensure the selection of Long-Term Regional Transmission Facilities that meet the reasonable needs of load-serving entities, which NRECA argues that they must do under FPA section 217(b)(4).  Further, NRECA contends that FPA section 217(b)(4) requires that selection criteria enable load-serving entities to secure firm transmission rights (or equivalent tradable or financial rights) on a long-term basis for long-term power supply arrangements made, or planned, to meet such needs.[1168]

441.    PIOs request rehearing of the Commission's determination to allow transmission providers to adopt benefit-cost ratios as high as 1.25-to-1.00 and request that the Commission require benefit-cost ratios no higher than 1.00-to-1.00.  PIOs contend that a 1.25-to-1.00 benefit-cost ratio does not work in the context of scenario-based planning using a portfolio approach because some Long-Term Regional Transmission Facilities

---

[1167] NRECA Rehearing Request at 14-15 (citing Order No. 1920, 187 FERC ¶ 61,068 at PP 381, 955).

[1168] *See* NRECA Rehearing Request at 39-43.  As with its arguments related to the discretion provided under Order No. 1920 for transmission providers to determine that factors in Factor Category Three may not affect Long-Term Transmission Needs, NRECA also argues with respect to selection criteria that the Commission should revisit its conclusion that *South Carolina Public Service Authority v. FERC* remains good law on the meaning of FPA section 217(b)(4).  *Id.* at 40-41.

may, in isolation, be below 1.25-to-1.00 despite raising the value of a portfolio of Long-Term Regional Transmission Facilities above such a threshold.[1169]  PIOs also argue that the measured benefits of certain Long-Term Regional Transmission Facilities may depend on the Long-Term Scenario or sensitivity within which benefits are measured, and that it does not make sense to apply a benefit-cost ratio threshold to Long-Term Regional Transmission Facilities whose benefits are not fixed.[1170]

442.    ITC requests rehearing of the Commission's decision to allow, but not to require, transmission providers to adopt least-regrets approaches to selecting Long-Term Regional Transmission Facilities.  ITC argues that, given other requirements in Order No. 1920, a least-regrets approach would hedge against the inherent uncertainty of Long-Term Regional Transmission Planning by ensuring that selected Long-Term Regional Transmission Facilities provide robust benefits over a wide variety of future system conditions.[1171]

443.    Dominion states that Order No. 1920 is clear that transmission providers "*can* compare calculated benefits [of Long-Term Regional Transmission Facilities] to costs for purposes of project evaluation and selection."[1172]  Dominion requests that the

---

[1169] PIOs Rehearing Request at 48-49 (citing PIOs NOPR Initial Comments, ex. A at 12-17).

[1170] *Id.* at 48-49.

[1171] ITC Rehearing Request at 11-12.

[1172] Dominion Rehearing Request at 25 (emphasis added) (citing Order No. 1920, 187 FERC ¶ 61,068 at PP 955, 964-965).

Commission clarify that transmission providers may weigh measured benefits against

"other factors" and that transmission providers may propose "what factors will be

considered," provided that transmission providers' selection criteria are "sufficiently

detailed for stakeholders to understand why a particular Long-Term Regional

Transmission Facility was selected or not selected."[1173]  Dominion further requests that

the Commission clarify what different "costs" transmission providers can consider and

weigh against measured benefits beyond the direct costs of the construction and operation

of the specific Long-Term Regional Transmission Facility.  By way of example,

Dominion explains that some Long-Term Regional Transmission Facilities may allow for

the delivery of more generation to an area of high load demand, while also creating

reliability issues on another transmission facility.  If upgrades to that transmission facility

are made in response to those reliability issues, Dominion requests clarification that

transmission providers can consider the costs of those upgrades to be a "cost" of the

Long-Term Regional Transmission Facility.[1174]

444.    Finally, TAPS requests rehearing of the Commission's decision not to require that

transmission providers calculate and provide to the transmission planning region's

stakeholders TAPS's proposed "affordability metrics."  TAPS explains that this proposed

requirement would include the projected incremental transmission rate impact that each

---

[1173] *Id.* at 25-26 (punctuation omitted) (quoting Order No. 1920, 187 FERC
¶ 61,068 at P 737).

[1174] *Id.*

Long-Term Regional Transmission Facility would provide, if selected, and the projected

total transmission rate that transmission customers would pay if all selected Long-Term

Regional Transmission Facilities are placed in service.  TAPS explains that transmission

providers should make these calculations on the basis of the default *ex ante* Long-Term

Regional Transmission Cost Allocation Method (in the absence of any state agreement),

covering a period extending at least 20 years after the Long-Term Regional Transmission

Facility is expected to be in commercial operation, and would be required to share their

assumptions and calculations.  TAPS explains that transmission providers should also

provide a process for stakeholders to submit questions and verify information.  TAPS

argues that the Commission's rejection of affordability metrics was "conclusory" and did

not satisfy the Commission's obligation to engage with comments.[1175]

### c.    Commission Determination

445.   We disagree with the rehearing arguments submitted by NRECA.  First, the

Commission did not violate the APA's notice-and-comment requirements when it

modified the NOPR proposal to be more "prescriptive"[1176] by requiring that the

evaluation and selection processes that transmission providers propose must:  (1) identify

Long-Term Regional Transmission Facilities that address the Long-Term Transmission

---

[1175] TAPS Rehearing Request at 20-22 ("[T]he 'Commission cannot satisfy its mandate to engage with parties' comments by relying on conclusory statements that dismissed a party's concerns without providing reasoned analysis.'" (internal quotation and alteration omitted) (quoting *Cal. Pub. Utils. Comm'n v. FERC*, 20 F.4th 795, 804 (D.C. Cir. 2021)).

[1176] NRECA Rehearing Request at 14.

Needs they have identified;(2) estimate the costs and measure the benefits of such facilities; and (3) designate a point in the evaluation process when the transmission provider will determine whether to select or not select those facilities. Agency final rules need not be identical to proposed rules, and notice is sufficient if the final rule represents a "logical outgrowth" of the proposed rule.[1177]

446.    The final rule is a logical outgrowth of the NOPR in this regard. The Commission described Long-Term Regional Transmission Planning in the NOPR as regional transmission planning that: (1) identifies transmission needs driven by changes in the resource mix and demand; (2) evaluates transmission facilities that meet such needs; and (3) identifies and evaluates such transmission facilities for potential selection to meet those needs.[1178] The NOPR also proposed to require that transmission providers' selection criteria "aim to ensure that more efficient or cost-effective transmission facilities are selected in the regional transmission plan for purposes of cost allocation to address transmission needs driven by changes in the resource mix and demand."[1179] In

---

[1177] *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 174-75 (2007) (*Long Island Care*). *See also Am. Paper Inst. v. EPA*, 660 F.2d 954, 959 n.13 (4th Cir. 1981) ("An agency may make *even substantial changes* in its original proposed rule without a further comment period if the changes are in character with the original proposal and are a logical outgrowth of the notice and comments already given.") (emphasis added).

[1178] *See* NOPR, 179 FERC ¶ 61,028 at P 68. Order No. 1920 adopted a definition of Long-Term Transmission Needs that includes transmission needs driven by changes in the resource mix and demand. *See* Order No. 1920, 187 FERC ¶ 61,068 at P 299 (describing the drivers of Long-Term Transmission Needs as including changes in the resource mix and changes in demand).

[1179] NOPR, 179 FERC ¶ 61,028 at P 245.

Order No. 1920, the Commission modified the NOPR proposal "to provide additional clarity as to how transmission providers' evaluation processes must aim to ensure the selection of more efficient or cost-effective Long-Term Regional Transmission Facilities to address Long-Term Transmission Needs."[1180]  The Commission then set forth procedural requirements that require transmission providers to meet the NOPR definition of Long-Term Regional Transmission Planning by:  (1) identifying Long-Term Regional Transmission Facilities that address Long-Term Transmission Needs; (2) estimating the costs and measuring the benefits of such facilities as part of the evaluation process; and (3) designating a point when transmission providers will make a decision to select or not select such facilities.[1181]  These additional procedural clarifications satisfy the logical outgrowth test because the requirements in Order No. 1920 achieve the same ends using very similar means to those proposed in the NOPR.  Accordingly, we find that the evaluation requirements follow logically from the NOPR and that the NOPR adequately framed the subjects for discussion such that a reasonable member of the regulated class would anticipate the general aspects of the final rule.[1182]

447.    Second, we disagree with NRECA's rehearing argument that, in order to satisfy FPA section 217(b)(4), the Commission must impose a specific requirement that

---

[1180] Order No. 1920, 187 FERC ¶ 61,068 at P 955.

[1181] *Id.*

[1182] *Conn. Light & Power Co. v. Nuclear Regul. Comm'n*, 673 F.2d 525, 533 (D.C. Cir. 1982); *Telesat Canada v. FCC*, 999 F.3d 707, 713-14 (D.C. Cir. 2021).

transmission providers' selection criteria ensure the selection of Long-Term Regional Transmission Facilities that meet the reasonable needs of load-serving entities and enable load-serving entities to secure firm transmission rights (or equivalent tradable or financial rights) on a long-term basis for long-term power supply arrangements made, or planned, to meet such needs. Fulfilling the requirements of FPA section 217(b)(4) does not require that the Commission impose the selection criterion that NRECA prefers, and we find that the criteria that the Commission required represent a superior and, in any case, just and reasonable and not unduly discriminatory or preferential approach to this issue. Moreover, the Commission explained in Order No. 1920 that, "[t]hrough the requirements of this final rule, we seek to ensure that adequate transmission capacity is built to allow load-serving entities to meet their service obligations and facilitate the planning of a reliable grid, consistent with FPA section 217(b)(4)."[1183]

448. We further disagree with the rehearing arguments submitted by PIOs, and we sustain the Commission's holding that, consistent with Order No. 1000 regional cost allocation principle (3), transmission providers may not impose as a selection criterion a minimum benefit-cost ratio that is higher than 1.25-to-1.00.[1184] We do not agree with

---

[1183] Order No. 1920, 187 FERC ¶ 61,068 at P 1001. *See also id.* PP 283, 447 (discussing Commission's obligations under FPA section 217(b)(4) and its application to Order No. 1920). We also reject NRECA's argument that the Commission should revisit its conclusion that *South Carolina Public Service Authority v. FERC* remains good law for the same reasons provided in the Other Specific Required Categories of Factors section above.

[1184] *Id.* P 958.

Docket No. RM21-17-001                                          - 391 -

PIOs that this holding is inconsistent with the use of a portfolio approach to selecting

Long-Term Regional Transmission Facilities. While PIOs are correct that the benefits of

Long-Term Regional Transmission Facilities may depend on the Long-Term Scenario or

sensitivity in which they are measured, Order No. 1920 does not require transmission

providers to apply benefit-cost ratios within specific Long-Term Scenarios or

sensitivities.[1185] Further, the fact that the measured benefits of Long-Term Regional

Transmission Facilities may differ among the Long-Term Scenarios or sensitivities

studied does not render the use of benefit-cost ratios incompatible with Long-Term

Regional Transmission Planning. In fact, the least-regrets and weighted-benefits

approaches to selecting Long-Term Regional Transmission Facilities described in Order

No. 1920 are examples of how transmission providers may make selection decisions

notwithstanding the fact that the measured benefits of Long-Term Regional Transmission

Facilities may differ depending on the Long-Term Scenario or sensitivity in which they

are measured.[1186]

449.    We also disagree with the rehearing arguments advanced by ITC. While we agree

with ITC that a least-regrets approach to selecting Long-Term Regional Transmission

---

[1185] *See id.* P 956 (requiring transmission providers to make transparent the
methods that they used to analyze each individual Long-Term Scenario and the
sensitivity or sensitivities applied to each scenario to determine the Long-Term
Transmission Needs that exist in the transmission planning region, the Long-Term
Regional Transmission Facilities that would resolve those needs, and the benefits of those
Long-Term Regional Transmission Facilities for purposes of selection).

[1186] *Id.* P 967. *See infra* Benefits Horizon section.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1768 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No. RM21-17-001                                                    - 392 -

Facilities may allow transmission providers to address the inherent uncertainty of Long-

Term Regional Transmission Planning, we disagree that this is the only such

approach,[1187] and therefore we sustain the Commission's holding that transmission

providers are not required to use this approach.[1188]   Generally, the Commission attempted

in Order No. 1920 to ensure that transmission providers have the flexibility that they need

to develop evaluation processes, including selection criteria, that meet the minimum

requirements set forth in Order No. 1920, and we are not persuaded by PIOs or ITC to

limit that flexibility here, either by reducing the maximum benefit-cost ratio that

transmission providers may propose to use as a selection criterion in Long-Term

Regional Transmission Planning or by requiring a particular selection approach.

450.   We grant clarification, in part, to Dominion.  As an initial matter, we clarify that

transmission providers' evaluation processes must—not can—compare the measured

benefits of Long-Term Regional Transmission Facilities against their estimated costs.[1189]

---

[1187] *See id.* P 967 (describing least-regrets *and* weighted-benefits approaches to selecting Long-Term Regional Transmission Facilities as potential methods to manage uncertainty).

[1188] *Id.* P 968.

[1189] *See id.* P 955 ("Second, transmission providers' evaluation processes must estimate the costs and measure the benefits of the Long-Term Regional Transmission Facilities (or portfolio of such Facilities) that are identified or proposed for potential selection, *in addition* to evaluating the identified Long-Term Regional Transmission Facilities (or portfolio of such Facilities) using any qualitative or other quantitative selection criteria that the transmission providers in a transmission planning region propose to apply." (emphasis added)); *id.* P 964 (requiring transmission providers to propose evaluation processes, including selection criteria, that seek to *maximize benefits accounting for costs* over time without over-building transmission facilities) (emphasis

Docket No. RM21-17-001                                                    - 393 -

The purpose of such a comparison is for transmission providers to determine the benefits

of Long-Term Regional Transmission Facilities for purposes of applying the transmission

provider's selection criteria.[1190]  We further clarify that, once a transmission provider

makes a selection decision, i.e., for each selected Long-Term Regional Transmission

Facility (or portfolio of such Facilities), and, if a State Agreement Process is used, once a

cost allocation method is agreed upon, transmission providers must make available, on a

password-protected portion of OASIS or other password-protected website, a breakdown

of how those estimated costs will be allocated, by zone (i.e., by transmission provider

retail distribution service territory/footprint or RTO/ISO transmission pricing zone), and

a quantification of those estimated benefits as imputed to each zone, as such benefits can

be reasonably estimated.  The increase in transparency from this posting requirement

ensures that transmission providers make available information that is sufficiently

detailed for stakeholders to understand why a particular Long-Term Regional

Transmission Facility was selected or not selected.  As to Dominion's request that the

Commission clarify what—aside from project costs—transmission providers may

compare to measured benefits, we reiterate here that transmission providers may propose

qualitative measures in their evaluation processes or qualitative selection criteria,[1191]

_____

added).

[1190] *See id.* P 956 (holding that transmission providers must make clear the
methods they used to analyze the benefits of Long-Term Regional Transmission
Facilities for purposes of selection).

[1191] *Id.* P 961.

provided that they meet the minimum requirements set forth in Order No. 1920 with which transmission providers' evaluation processes, including selection criteria, must comply.[1192]  We further clarify that, contrary to Dominion's understanding,[1193] transmission providers' evaluation processes must culminate in a *determination*—not selection criteria—that is sufficiently detailed for stakeholders to understand why a particular Long-Term Regional Transmission Facility (or portfolio of such Facilities) was selected or not selected.[1194]  Finally, we clarify that the Commission generally provides transmission providers with the discretion to use engineering judgment in designing and conducting transmission planning studies, and we therefore decline to address Dominion's hypothetical in the abstract.

451.  Finally, we are not persuaded by the arguments raised on rehearing by TAPS regarding its proposed "affordability metrics."  We find that the potential benefits of requiring that transmission providers make these metrics available are outweighed by the potential burden on transmission providers, who would need to determine on a customer-by-customer basis the effect on incremental rates of a wide variety of rate design and cost recovery factors in order to produce a meaningful analysis.  Therefore, we decline to

---

[1192] *See id.* PP 954-971.

[1193] *See* Dominion Rehearing Request at 26 ("Dominion Energy understands that the Final Rule gives Transmission Providers an opportunity to propose what factors will be considered so long as the *selection criteria* is 'sufficiently detailed to understand why a particular Long-Term Regional Transmission Facility . . . was selected or not selected.") (quoting Order No. 1920, 187 FERC ¶ 61,068 at P 737) (emphasis added).

[1194] Order No. 1920, 187 FERC ¶ 61,068 at PP 737, 954-955, 966, 1214.

Docket No. RM21-17-001                                                    - 395 -

adopt any requirement to calculate and make available the "affordability metrics" as described by TAPS. However, even though we do not require transmission providers to calculate rate impacts, as discussed above, we do require transparency regarding the allocation of costs after Long-Term Transmission Facilities are selected.

### 2.    Role of Relevant State Entities

### a.    Order No. 1920 Requirements

452.    In Order No. 1920, the Commission required transmission providers in each transmission planning region to consult with and seek support from Relevant State Entities regarding the evaluation process, including selection criteria, that transmission providers propose to use to identify and evaluate Long-Term Regional Transmission Facilities for selection.[1195] The Commission declined to adopt the NOPR proposal to require that transmission providers include in their OATTs a process to coordinate with the transmission planning region's Relevant State Entities in developing selection criteria.[1196] Instead, the Commission required transmission providers to demonstrate on compliance that they made good faith efforts to consult with and seek support from Relevant State Entities in their transmission planning region's footprint when developing the evaluation processes and selection criteria that they propose to include in their OATTs.[1197] The Commission did not require transmission providers to obtain the support

---

[1195] *Id.* P 994.

[1196] *Id.* P 995.

[1197] *Id.* P 994.

Docket No. RM21-17-001                                          - 396 -

of Relevant State Entities before proposing evaluation processes and selection criteria on

compliance.[1198]

**b.      Requests for Rehearing and Clarification**

453.    Several parties request rehearing or clarification of Order No. 1920's requirements

related to the role that Relevant State Entities will play in developing the evaluation

processes, including selection criteria, that transmission providers will propose.[1199]

454.    Designated Retail Regulators claim that the Commission violated the APA's

notice-and-comment requirements because the NOPR required that states approve the

selection criteria that transmission providers will propose to use in Long-Term Regional

Transmission Planning, whereas the Commission did not require transmission providers

to obtain their support in Order No. 1920.  As such, Designated Retail Regulators

conclude that Order No. 1920 is not a logical outgrowth of the NOPR proposal because it

is "surprisingly distant" from the NOPR.[1200]  Similarly, NRECA argues that Order

No. 1920 is not a logical outgrowth of the NOPR because the Commission declined to

adopt the NOPR proposal that transmission providers include a formal tariff process for

---

[1198] *Id.* P 996.

[1199] Arizona Commission Rehearing Request at 16; Designated Retail Regulators
Rehearing Request at 48-50; NARUC Rehearing Request at 17-21; NESCOE Rehearing
Request at 12; NRECA Rehearing Request at 6, 17-19.

[1200] Designated Retail Regulators Rehearing Request at 48-50 (quoting *Int'l
Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*, 407 F.3d 1250,
1260 (D.C. Cir. 2005)).

Docket No. RM21-17-001                                              - 397 -

coordinating with Relevant State Entities regarding transmission providers' selection criteria.[1201]

455.    Arizona Commission argues that the Commission erred in not requiring transmission providers to obtain the agreement of the State of Arizona as to the evaluation processes, including selection criteria, that transmission providers will propose, and requests rehearing because the Commission did not offer any legitimate legal reason or sufficient justification for not requiring such state approval.  Arizona Commission asserts that states alone have the inherent police power to regulate the utilities within their states and that the final rule improperly eliminates the State of Arizona's role with respect to selection criteria.[1202]  NARUC requests that the Commission grant rehearing such that transmission providers would be required to include in their compliance filings any selection criteria that are "promulgated and supported" by Relevant State Entities.[1203]

456.    Finally, NESCOE requests that the Commission clarify Order No. 1920 to provide guidance as to what constitutes "good faith efforts" on the part of transmission providers as they consult with and seek support from Relevant State Entities.  NESCOE requests further clarification that the requirement that transmission providers "consult with" Relevant State Entities means that there is an "unambiguous pathway" for states'

---

[1201] NRECA Rehearing Request at 6, 17-19.

[1202] *See* Arizona Commission Rehearing Request at 16.

[1203] NARUC Rehearing Request at 17.

feedback to be heard and taken into account. Further, NESCOE observes that "consult with" can mean a range of things, from an offer of a one-hour meeting to preview potential selection criteria to interactive and substantive discussions, and it requests that the Commission confirm that the obligation to consult with Relevant State Entities means something more consequential than the former.[1204]

### c.    Commission Determination

457.    We disagree with the arguments raised on rehearing by Designated Retail Regulators and NRECA that Order No. 1920 is not a logical outgrowth of the NOPR proposal. In particular, we disagree with Designated Retail Regulators that the NOPR proposed to require that states approve transmission providers' selection criteria.[1205] Instead, the NOPR proposed to require that transmission providers "coordinate" with Relevant State Entities in developing selection criteria, and the Commission explained that this would mean that transmission providers "must consult with and seek support from" Relevant State Entities.[1206] Neither statement can be construed as imposing a requirement that states approve the selection criteria to be proposed by transmission providers on compliance. In any event, the Commission adopted the exact proposal from the NOPR, namely, that transmission providers must consult with and seek support from

---

[1204] NESCOE Rehearing Request at 12.

[1205] Designated Retail Regulators Rehearing Request at 48-49.

[1206] *See* NOPR, 179 FERC ¶ 61,028 at PP 241, 244.

Relevant State Entities, which was subject to a notice and comment period, as required under the APA.

458.    Further, while NRECA is correct that in Order No. 1920, the Commission declined to adopt the NOPR proposal for transmission providers to propose on compliance OATT provisions providing for a "process" to coordinate with Relevant State Entities in developing selection criteria,[1207] this does not mean that Order No. 1920 is not a logical outgrowth of the NOPR proposal in this regard.  As the D.C. Circuit has explained, "[o]ne logical outgrowth of a proposal is surely . . . to refrain from taking the proposed step."[1208]  The same is true here.  Further, the Commission required that transmission providers demonstrate good faith efforts as they consult with and seek support from Relevant State Entities.[1209]  We continue to believe that these requirements are sufficient to ensure that transmission providers benefit from Relevant State Entities' views.  Nevertheless, we note that Order No. 1920 does not prohibit transmission providers from adopting additional approaches for coordinating with Relevant State

---

[1207] NRECA Rehearing Request at 17-18.

[1208] *N.Y. v. EPA*, 413 F.3d 3, 44 (D.C. Cir. 2005) (per curiam) (quoting *Am. Iron & Steel Inst. v. EPA*, 886 F.2d 390, 400 (D.C. Cir. 1989)).  *See also Long Island Care*, 551 U.S. at 175 (stating, in the context of rejecting claims that an agency provided legally defective notice because it did not finalize a proposed rule, "[w]e do not understand why such a possibility was not reasonably foreseeable"); *Vanda Pharms., Inc. v. Ctrs. for Medicare & Medicaid Servs.*, 98 F.4th 483, 498 (4th Cir. 2024) (*Vanda Pharms*) (The APA's "notice-and-comment procedure is designed so that an agency can float a potential rule to the public without committing itself to enacting the proposed rule's content").

[1209] Order No. 1920, 187 FERC ¶ 61,068 at P 994.

Docket No. RM21-17-001                                          - 400 -

Entities regarding selection criteria and/or consulting with Relevant State Entities in the

selection of particular Long-Term Regional Transmission Facilities, and we encourage

transmission providers to do so.[1210]

459.    We also disagree with the rehearing arguments of Arizona Commission and

NARUC.  Arizona Commission incorrectly claims that the Commission did not offer any

"legitimate legal or sufficient justification" for not requiring state approval of evaluation

processes.[1211]  As the Commission explained, it is transmission providers who must

propose on compliance an evaluation process and selection criteria that comply with the

requirements of Order No. 1920, because Long-Term Regional Transmission Planning is

the tariff obligation of each transmission provider.[1212]  As the Commission further

explained, achieving consensus may not be possible in every instance, and transmission

providers nevertheless must submit compliance filings consistent with Order No. 1920

---

[1210] *Id.* PP 994, 996.  We reiterate, however, that transmission providers may not include in their evaluation process or selection criteria any prohibition on the selection of a Long-Term Regional Transmission Facility based on the transmission providers' anticipated response of a state public utility commission or consumer advocates to particular Long-Term Regional Transmission Facilities.  *Id.* P 962.  Doing so would deny transmission providers the opportunity to select more efficient or cost-effective Long-Term Regional Transmission Facilities to meet Long-Term Transmission Needs, and therefore may lead to failing to address the deficiencies in the Commission's existing regional transmission planning requirements identified in Order No. 1920.  *Id.* P 914.

[1211] *See* Arizona Commission Rehearing Request at 16.

[1212] Order No. 1920, 187 FERC ¶ 61,068 at P 996 (citing Order No. 1000, 136 FERC ¶ 61,051 at P 153 ("[T]he ultimate responsibility for transmission planning remains with . . . transmission providers.")).

and the compliance timelines set forth therein.[1213]  We deny NARUC's request to require

transmission providers to include in their compliance filings any selection criteria that are

"promulgated and supported" by Relevant State Entities.  That said, we continue to

believe that Long-Term Regional Transmission Planning is more likely to be successful

where transmission providers, Relevant State Entities, and other stakeholders collaborate

to develop an evaluation process and selection criteria.[1214]  As such, we strongly

encourage transmission providers to consider any selection criteria supported by Relevant

State Entities.

460.    Finally, we grant in part NESCOE's requests for clarification.  We believe that

"good faith efforts" is a reasonably well-understood standard that parties use in their

contractual dealings with one another.[1215]  We further believe that the good faith efforts

standard is similar to a "reasonable efforts" standard, which can be defined as "one or

more actions rationally calculated to achieve a usually stated objective, but not

---

[1213] *Id.* P 996.

[1214] *Id.* P 996.

[1215] *See Zady Natey, Inc. v. United Food & Comm. Workers Int'l Union, Loc. No. 27*, 995 F.2d 496, 499-500 (4th Cir. 1993) (determining whether contractual counterparty made good faith efforts to perform obligation on the basis of facts developed in adjudicating contractual dispute); *Creative Mktg. Assocs., Inc. v. AT&T*, 476 F.3d 536, 538-39 (8th Cir. 2007) (same); *Zinn v. Parrish*, 644 F.2d 360, 366 (7th Cir. 1981) (same); *Taco Bell Corp. v. Bloor Auto., Inc.*, No. 90-1442, 1991 WL 11618, at *6 (6th Cir. Feb. 5, 1991) (same); *Gulati v. Coyne Int'l Enters. Corp.*, 805 F.Supp. 365, 370-71 (E.D. Va. 1992) (same).

Docket No. RM21-17-001                                                    - 402 -

necessarily with the expectation that all possibilities are to be exhausted."[1216]  We expect that transmission providers can determine how to apply the "good faith efforts" standard as they consult with and seek support from Relevant State Entities as to the evaluation processes and selection criteria they will use in Long-Term Regional Transmission Planning.  Therefore, we find that Order No. 1920 requires transmission providers to provide opportunities for Relevant State Entities to provide input on those proposed processes and to consider that feedback.[1217]  We otherwise deny clarification and decline to address NESCOE's hypothetical interpretation of the standard.

### 3.    Voluntary Funding

### a.    Order No. 1920 Requirements

461.    In Order No. 1920, the Commission required transmission providers in each transmission planning region to include in their OATTs a process to provide Relevant State Entities and interconnection customers with the opportunity to voluntarily fund the cost of, or a portion of the cost of, a Long-Term Regional Transmission Facility that otherwise would not meet transmission providers' selection criteria.[1218]

---

[1216] *Reasonable Efforts*, Black's Law Dictionary (12th ed. 2024).

[1217] As the Commission explained in Order No. 1920, however, the transmission provider's failure to obtain Relevant State Entities' support is not necessarily evidence that transmission providers did not exercise good faith efforts to seek their support. Order No. 1920, 187 FERC ¶ 61,068 at P 997.

[1218] *Id.* P 1012.

462.    The Commission provided transmission providers with flexibility to propose

certain features of such a voluntary funding process in their compliance filings, provided

that: (1) the process is transparent and not unduly discriminatory or preferential; and

(2) they consult with and seek support from Relevant State Entities when developing

such processes.[1219]

463.    The Commission further required that transmission providers' proposed OATT

provisions must describe: (1) the process by which transmission providers will make

voluntary funding opportunities available to Relevant State Entities and interconnection

customers, which must ensure that they receive timely notice and a meaningful

opportunity; (2) the period during which Relevant State Entities and interconnection

customers may exercise the voluntary funding option; (3) the method that transmission

providers will use to determine the amount of voluntary funding required to ensure that

the Long-Term Regional Transmission Facility meets the transmission providers'

selection criteria; and (4) the mechanism through which transmission providers and

Relevant State Entities or interconnection customers will memorialize any voluntary

funding agreement.[1220]  Finally, the Commission explained that, for any portion of the

costs of a selected Long-Term Regional Transmission Facility that is not voluntarily

funded, such remaining costs must be allocated according to either the applicable Long-

---

[1219] *Id.*

[1220] *Id.* P 1013.

USCA4 Appeal: 24-1650     Doc: 224     Filed: 01/21/2025     Pg: 1780 of 2455
Document Accession #: 20241121-3139     Filed Date: 11/21/2024

Docket No.  RM21-17-001                                                    - 404 -

Term Regional Transmission Cost Allocation Method or a cost allocation method resulting from a State Agreement Process.[1221]

### b.     Requests for Rehearing and Clarification

464.    SERTP Sponsors request that the Commission clarify that the requirement in Order No. 1920 that transmission providers include in their OATTs a process to provide Relevant State Entities and interconnection customers with voluntary funding opportunities does not imply that the Commission otherwise is prohibiting voluntary funding in other circumstances.[1222]

### c.     Commission Determination

465.    In response to SERTP Sponsors' request for clarification, we reiterate that Order No. 1920 does not prohibit voluntary funding approaches that are not described therein.[1223]  Transmission providers may seek to demonstrate on compliance that other voluntary funding approaches are consistent with or superior to Order No. 1920's requirements, or they may submit a filing under FPA section 205 to propose such approaches.[1224]

---

[1221] *Id.*

[1222] SERTP Sponsors Rehearing Request at 8.  SERTP Sponsors further contend that, if the Commission fails to clarify that Order No. 1920 does not prohibit voluntary funding in other circumstances, Order No. 1920 would be arbitrary and capricious and exceed the Commission's authority.  *Id.*

[1223] Order No. 1920, 187 FERC ¶ 61,068 at P 1017.

[1224] *Id.*   It is unclear whether SERTP Sponsors intended to argue that failure to grant clarification in this respect would result in Order No. 1920 exceeding the Commission's authority; to the extent they intended to do so, we find this argument has

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1781 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

### 4.    No Selection Requirement

#### a.    Order No. 1920 Requirements

466.    In Order No. 1920, the Commission stated that it would not require transmission providers to select any particular Long-Term Regional Transmission Facility, even where it meets the transmission provider's selection criteria.[1225]  The Commission also prohibited transmission providers from adopting an approach under which they would not select a Long-Term Regional Transmission Facility unless it meets their selection criteria in every Long-Term Scenario and sensitivity.[1226]

#### b.    Requests for Rehearing and Clarification

467.    SERTP Sponsors request clarification that the Commission's statement, i.e., that "transmission providers may not adopt an approach under which they would not select a Long-Term Regional Transmission Facility unless it meets their selection criteria in every Long-Term Scenario and sensitivity," does not undercut the Commission's determination that Order No. 1920 does not require a transmission provider to select any Long-Term Regional Transmission Facility, even where it meets the transmission provider's selection criteria.[1227]  PJM also requests that the Commission clarify that PJM

---

not been raised with the specificity required on rehearing.  *See supra* Major Questions Doctrine section.

[1225] Order No. 1920, 187 FERC ¶ 61,068 at P 1026 (citations omitted).

[1226] *Id.* P 968.

[1227] SERTP Sponsors Rehearing Request at 9-10 (citing Order No. 1920, 187 FERC ¶ 61,068 at PP 968, 1026).

is not required to select Long-Term Regional Transmission Facilities under any of the

Long-Term Scenarios that it develops.[1228]

### c.      Commission Determination

468.    In response to SERTP Sponsors' and PJM's requests for clarification, we clarify

that Order No. 1920 does not require transmission providers to select any Long-Term

Regional Transmission Facility, even where it meets the transmission providers' selection

criteria.[1229]

### 5.      Reevaluation

### a.      NOPR Proposal

469.    The Commission proposed in the NOPR that, consistent with Order No. 1000, the

developer of a transmission facility selected through Long-Term Regional Transmission

Planning to address transmission needs driven by changes in the resource mix and

demand would be eligible to use the applicable cost allocation method for the Long-Term

Regional Transmission Facility.  The Commission proposed that the existing

transmission developer requirements would apply, including that the developer of the

selected regional transmission facility must submit a development schedule that indicates

the required steps, such as the granting of state approvals necessary to develop and

construct the transmission facility such that it meets the transmission needs of the

---

[1228] PJM Rehearing Request at 19.

[1229] Order No. 1920, 187 FERC ¶ 61,068 at P 1026.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1783 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No.  RM21-17-001                                                          - 407 -

transmission planning region.1230  The Commission proposed that, to the extent the

Relevant State Entities in a transmission planning region agree to a State Agreement

Process, the development schedule should also include relevant steps related to that

process.1231

470.    The Commission noted that, given the longer-term nature of transmission needs

driven by changes in the resource mix and demand, the required development schedule

for a transmission facility selected may make it unnecessary for the developer to take

actions or incur expenses in the near-term if the transmission facility will not need to be

in service in the near-term.  The Commission also noted that a transmission provider may

make that Long-Term Regional Transmission Facility's selection status subject to the

outcomes of subsequent Long-Term Regional Transmission Planning cycles, such that

the previously selected transmission facility is no longer needed.  The Commission

proposed that transmission providers include in their selection criteria how they will

---

**1230** NOPR, 179 FERC ¶ 61,028 at P 247 (citing Order No. 1000-A, 139 FERC ¶ 61,132 at P 442).  The Commission also stated in Order No. 1000-A that, as part of the ongoing monitoring of the progress of a transmission facility once it is selected, the transmission providers in a transmission planning region must establish a date by which state approvals to construct must have been achieved that is tied to when construction must begin to timely meet the need that the facility is selected to address.  The Commission stated that if such critical steps have not been achieved by that date, then the transmission providers in a transmission planning region may "remove the transmission project from the selected category and proceed with reevaluating the regional transmission plan to seek an alternative solution."  Order No. 1000-A, 139 FERC ¶ 61,132 at P 442.

**1231** NOPR, 179 FERC ¶ 61,028 at P 247.

Docket No. RM21-17-001                                                          - 408 -

address the selection status of a previously selected transmission facility based on the

outcomes of subsequent Long-Term Regional Transmission Planning cycles.1232

### b.      Order No. 1920 Requirements

471.    In Order No. 1920, the Commission required transmission providers to include in

their OATTs provisions that require them to reevaluate previously selected Long-Term

Regional Transmission Facilities in three situations, where: (1) delays in the

development of a previously selected Long-Term Regional Transmission Facility would

jeopardize a transmission provider's ability to meet its reliability needs or reliability-

related service obligations; (2) the actual or projected costs of a previously selected

Long-Term Regional Transmission Facility significantly exceed cost estimates used in

that Long-Term Regional Transmission Facility's selection; or (3) significant changes in

federal, federally-recognized Tribal, state, or local laws or regulations cause reasonable

concern that a previously selected Long-Term Regional Transmission Facility may no

longer meet the transmission provider's selection criteria.[1233]  The Commission further

required transmission providers to include in these reevaluation provisions the specific

criteria they will use to determine when one of these situations occurs.[1234]

472.    With respect to reevaluation on the basis of development delays, the Commission

explained that Order No. 1920's requirement is the same requirement as that set forth by

---

[1232] *Id.* P 248.

[1233] Order No. 1920, 187 FERC ¶ 61,068 at PP 1048-1049.

[1234] *Id.* P 1050.

Docket No. RM21-17-001                                                           - 409 -

the Commission in Order No. 1000.[1235]  The Commission explained that, as is required

for regional transmission planning processes under Order No. 1000, transmission

providers must have the ability to take action when delays in developing a Long-Term

Regional Transmission Facility risk jeopardizing a transmission provider's ability to meet

its reliability needs or reliability-related service obligations.[1236]

473.    The Commission provided transmission providers with the flexibility to develop

these reevaluation criteria1237 provided that, with respect to reevaluation on the basis of

significant changes in federal, federally-recognized Tribal, state, or local laws or

regulations, transmission providers may not reevaluate a previously selected Long-Term

Regional Transmission Facility unless its targeted in-service date was in the latter half of

the 20-year transmission planning horizon when it was selected.[1238]  The Commission

also required that the reevaluation criteria seek to maximize benefits accounting for costs

over time without over-building transmission facilities.  The Commission further

explained that it expected transmission providers to balance the need to provide

---

[1235] *Id.* P 1049 n.2250.  *See id.* P 1033 & n.2224 (explaining that the Commission proposed in the NOPR that existing transmission developer requirements would apply to Long-Term Regional Transmission Planning and that, if a transmission facility's developer did not achieve development milestones, transmission providers may remove that facility from the regional transmission plan and reevaluate the regional transmission plan to seek an alternative solution).

[1236] *Id.* P 1056.

[1237] *Id.*

[1238] *Id.* P 1051.

transmission developers with adequate investment certainty, absent which more efficient or cost-effective Long-Term Regional Transmission Facilities will not be developed, against the risk that, due to significant changes in circumstances, failing to reevaluate a selected Long-Term Regional Transmission Facility may result in the over-building of transmission.[1239]  The Commission also required transmission providers to designate a point after which all selected Long-Term Regional Transmission Facilities will no longer be subject to reevaluation—e.g., when the facility's transmission developer has secured all relevant permits and authorizations—such that the transmission developer of the selected Long-Term Regional Transmission Facility has adequate certainty to make investment decisions.[1240]

474.    The Commission further required transmission providers to include in their OATTs provisions detailing the process and procedures they will use to reevaluate a previously selected Long-Term Regional Transmission Facility, including the potential outcomes of reevaluation (e.g., taking no action, imposing a mitigation plan, reassigning the Long-Term Regional Transmission Facility to a different transmission developer, modifying the Long-Term Regional Transmission Facility, or removing the Long-Term Regional Transmission Facility from the regional transmission plan), and in particular the

---

[1239] *Id.* P 1050.

[1240] *Id.*

Docket No.  RM21-17-001                                                    - 411 -

conditions under which they would remove a previously selected Long-Term Regional Transmission Facility from the regional transmission plan.[1241]

475.    The Commission otherwise allowed flexibility as to the design of the reevaluation processes and procedures, subject to three requirements.[1242]  First, the Commission stated that any reevaluation on the basis of cost increases or of significant changes in federal, federally-recognized Tribal, state, or local laws or regulations must occur in a subsequent Long-Term Regional Transmission Planning cycle and must take into account not only the updated costs but also the updated benefits of the Long-Term Regional Transmission Facility.[1243]  The Commission stated that, when performing these reevaluations, it expected that transmission providers will use the updated Long-Term Scenarios and associated transmission system models that are developed for the Long-Term Regional Transmission Planning cycle in which the transmission provider reevaluates the selected Long-Term Regional Transmission Facility.[1244]  Second, the Commission required

---

[1241] *Id.* P 1052 (citing MISO, FERC Electric Tariff, MISO OATT, attach. FF (Transmission Expansion Planning Protocol) (90.0.0), § IX.E, which sets forth potential outcomes of MISO's variance analysis procedures).

[1242] *Id.*

[1243] *Id.*; *see also id.* P 1059 (explaining that the requirement that the reevaluation processes and procedures update not only actual and projected costs but also their calculation of the benefits of the selected Long-Term Regional Transmission Facility will ensure that transmission providers compare the updated costs and benefits when determining whether the Long-Term Regional Transmission Facility continues to be a more efficient or cost-effective regional transmission solution to Long-Term Transmission Needs).

[1244] *Id.* P 1052 n.2254.

Docket No.  RM21-17-001                                                    - 412 -

transmission providers to include in the reevaluation processes and procedures

mechanisms for tracking the costs of Long-Term Regional Transmission Facilities.[1245]

Third, the Commission required that the reevaluation processes and procedures seek to

maximize benefits accounting for costs over time without over-building transmission

facilities.1246

### c.     Requests for Rehearing and Clarification

### i.     Logical Outgrowth

476.    Several parties argue that the Commission did not provide sufficient notice of, and

opportunity to comment on, Order No. 1920's reevaluation requirements.1247  For

example, EEI claims that the Commission cannot require transmission providers to adopt

OATT provisions that require them to reevaluate previously selected Long-Term

Regional Transmission Facilities without providing notice of and an opportunity to

comment on these requirements.1248  EEI argues that Order No. 1920's reevaluation

requirements are not within the scope of the NOPR's reevaluation proposal and therefore

were not "reasonably foreseeable" by interested parties and that these requirements

---

[1245] *Id.* P 1052.

[1246] *Id.*

[1247] East Kentucky Rehearing Request at 1-2; EEI Rehearing Request at 4-11; ITC Rehearing Request at 16; MISO TOs Rehearing Request at 8, 19-22; NRECA Rehearing Request at 13-15, 22; WIRES Rehearing Request at 2-4, 6-16.

[1248] EEI Rehearing Request at 5.

Docket No.  RM21-17-001                                                                      - 413 -

cannot stand because they are not a logical outgrowth of the NOPR proposal.[1249]  EEI

notes that the Commission stated in Order No. 1920 that a number of parties expressed

support for the reevaluation requirements in their NOPR comments but contends that

applicable precedent makes clear that comments on the proposed rule are not a substitute

for the Commission itself providing notice of its intention to impose these

requirements.[1250]  EEI further notes that the Commission has invited consideration of

the reevaluation of previously selected transmission facilities in a different proceeding

and states that it would have been more appropriate for the Commission to have acted in

that proceeding rather than in Order No. 1920 because the NOPR lacked any description

of the range of reevaluation alternatives.[1251]  EEI states that it does not oppose

"reasonable mechanisms" to protect consumers from over-building Long-Term Regional

Transmission Facilities and from the possibility of building transmission facilities that

may not be cost-effective, but asserts that the appropriate remedy in this instance is to

return to the NOPR proposal.[1252]

477.    NRECA argues that Order No. 1920 departs from the NOPR proposal by adopting

"completely new" requirements for the reevaluation of previously selected Long-Term

---

[1249] *Id.* at 6-7 (citing *Brennan v. Dickson*, 45 F.4th at 69-70).

[1250] *Id.* (citing *Small Refiner Lead Phase-Down Task Force v. EPA*, 705 F.2d 506, 549 (D.C. Cir. 1983)).

[1251] *Id.* at 10 (citing Notice Inviting Post-Technical Conference Comments, *Transmission Planning and Cost Mgmt.*, Docket No. AD22-8-000, et al. (Dec. 23, 2022)).

[1252] *Id.* at 10-11.

Regional Transmission Facilities.1253  NRECA contends that the reevaluation

requirements result in an "inflexible, final selection of Long-Term Regional

Transmission Facilities for purposes of regional cost allocation in the first three years of

each Long-Term Regional Transmission Planning cycle."1254  NRECA recommends

that, to ensure compliance with the APA's notice-and-comment requirements, the

Commission withdraw the final rule and issue a supplemental NOPR.1255

478.    WIRES asserts that the NOPR did not provide notice to interested parties of Order

No. 1920's "detailed and prescriptive" reevaluation requirements and that these

requirements represent major changes from the NOPR proposal.1256  WIRES asserts that

the reevaluation requirements are significant because they could lead to modifying Long-

Term Regional Transmission Facilities or removing them from the regional transmission

plan, and, as such, the Commission should have clearly and unambiguously set forth a

proposal in the NOPR before adopting Order No. 1920's reevaluation requirements.1257

WIRES alleges that instead, the Commission adopted "almost word-for-word" a proposal

---

**1253** NRECA Rehearing Request at 4-6.

**1254** *Id.* at 14.

**1255** *Id.* at 4, 19.

**1256** WIRES Rehearing Request at 3-5.

**1257** *Id.* at 2-4.

Docket No.  RM21-17-001                                          - 415 -

submitted in comments by Large Public Power without first providing notice of and an

opportunity to comment on this proposal.1258

479.    Several rehearing parties contend that, while the NOPR proposed a structure that

would permit but not require transmission providers to reevaluate previously selected

Long-Term Regional Transmission Facilities, Order No. 1920 requires that transmission

providers do so and includes a number of prescriptive requirements that were not

included in the NOPR.1259  MISO TOs argue that Order No. 1920 states that it adopted

with modification the NOPR proposal, despite the fact that the NOPR proposed a

"flexible and open-ended opportunity" in accordance with which transmission providers

could have tailored their compliance proposals, whereas Order No. 1920's reevaluation

requirements are "a wholly new and tightly prescriptive process with new triggering

events and new requirements for reassessing facilities."1260  WIRES notes that the

NOPR did not use the term "reevaluate," that it proposed to provide flexibility for

transmission providers to propose their own processes, and did not include any relevant

details or requirements other than to propose that transmission providers "should include

in their selection criteria how they will address the selection status of a previously

---

**1258** *Id.* at 10.

**1259** *See, e.g.*, EEI Rehearing Request at 7-8; WIRES Rehearing Request at 7-8.

**1260** MISO TOs Rehearing Request at 21-22 (citing Order No. 1920, 187 FERC
¶ 61,068 at P 1048).

selected transmission facility based on the outcomes of subsequent Long-Term Regional Transmission Planning cycles."1261

480.    Several parties acknowledge that, in setting forth Order No. 1920's reevaluation requirements, the Commission cited the NOPR proposal that would have allowed transmission providers to make the selection status of previously selected Long-Term Regional Transmission Facilities subject to the outcome of subsequent Long-Term Regional Transmission Planning cycles,1262 but contend nonetheless that that notice was inadequate.  EEI states that the NOPR proposal contained none of the detail or the rationale regarding specific elements of Order No. 1920's reevaluation requirements, such as the specific situations in which reevaluation would be required or the requirement for transmission providers to include in their OATTs the potential outcomes of reevaluation.1263  EEI further argues that, whereas the NOPR proposal focused on how the outcome of subsequent Long-Term Regional Transmission Planning cycles could give rise to the need to reevaluate, the three situations in which Order No. 1920 requires reevaluation do not depend on the results of or actions in a subsequent Long-Term Regional Transmission Planning cycle.1264

---

1261 WIRES Rehearing Request at 6-7 (quoting NOPR, 179 FERC ¶ 61,028 at P 248).

1262 *See* NOPR, 179 FERC ¶ 61,028 at P 248.

1263 EEI Rehearing Request at 5-6.

1264 *Id.* at 8-9.

Docket No. RM21-17-001                                                    - 417 -

481.    NRECA states that it did not oppose the Commission's NOPR proposal to require

transmission providers to participate in a regional transmission planning process that

includes Long-Term Regional Transmission Planning—and particularly, the requirements

that transmission providers use a 20-year transmission planning horizon and measure the

benefits of transmission facilities over 20 years—because of the NOPR proposal to allow

transmission providers to subject the selection status of Long-Term Regional

Transmission Facilities to the outcome of subsequent Long-Term Regional Transmission

Planning cycles.1265  NRECA states that it interpreted the NOPR as allowing

transmission providers to develop selection criteria under which transmission providers

could conditionally select a Long-Term Regional Transmission Facility but delay

selecting that Facility for purposes of cost allocation until later.1266  NRECA states that

the Commission did not adopt the NOPR proposal and instead adopted "completely

different, prescriptive [reevaluation] requirements."1267

482.    MISO TOs and ITC each argue that the Commission did not provide adequate

notice of or an opportunity to comment on the requirement that transmission providers

update their measurement of the benefits of Long-Term Regional Transmission Facilities.

MISO TOs state that the NOPR proposed "the option of a routine review" and did not

---

**1265** NRECA Rehearing Request at 13 (citing NOPR, 179 FERC ¶ 61,028 at
P 248).

**1266** *Id.* at 24.

**1267** *Id.* at 25 (citing Order No. 1920, 187 FERC ¶ 61,068 at P 1055 & n.2257).

include any requirement for a "general reevaluation of benefits of the facilities," and that

this deprived regulated parties of the fair notice required by the APA.1268  ITC contends

that Order No. 1920's reevaluation requirements depart substantially from the original

reevaluation proposal, and that the Commission has not provided commenters a

meaningful opportunity to comment on the requirement "to perform a full update of the

calculation of the benefits" resulting in a factual record that does not address the relative

merits of this approach.1269

483.    MISO TOs and WIRES each argue that, had the Commission provided notice of

and an opportunity to comment, Order No. 1920's reevaluation requirements would

ultimately have been improved.  MISO TOs argue that Order No. 1920 is not as clear or

as workable as it might have been if MISO TOs and other commenters had fair notice,

and that the Commission instead could have adopted "a more nuanced and workable

requirement."1270  WIRES claims that the Commission did not have the benefit of

sufficient input from regulated parties.  WIRES contends that, while the Commission

stated that it set forth Order No. 1920's reevaluation requirements having "carefully

reviewed the record developed here and weighed commenters' countervailing

---

**1268** MISO TOs Rehearing Request at 19-21.

**1269** ITC Rehearing Request at 16.

**1270** MISO TOs Rehearing Request at 19, 22.

Docket No. RM21-17-001                                              - 419 -

arguments," the comments submitted were specific to the NOPR proposal that was not

adopted—not Order No. 1920's reevaluation requirements.[1271]

### ii.    Other Issues

484.    Several parties sought rehearing or clarification of the requirement to update the

measurement of benefits when reevaluating a previously selected Long-Term Regional

Transmission Facility or Facilities.[1272]  MISO TOs argued that the requirement for

transmission providers to update their measurement of the benefits of Long-Term

Regional Transmission Facilities risks significant disruption to the use of portfolio

approaches to selecting such facilities.  MISO TOs argued that the Commission had not

provided substantial evidence to support requiring transmission providers to update their

measurement of the benefits of Long-Term Regional Transmission Facilities during

reevaluations, as the Commission acknowledged that updating the measurement of

benefits is "not as straightforward as tracking costs," reassessing benefits is different than

reassessing costs, and reevaluation could create "unnecessary disruptions and potentially

impede the efficient conduct" of Long-Term Regional Transmission Planning.[1273]  MISO

TOs requested that, on rehearing, the Commission modify Order No. 1920's requirement

---

[1271] WIRES Rehearing Request at 14-16 (quoting Order No. 1920, 187 FERC ¶ 61,068 at P 1053).

[1272] MISO TOs Rehearing Request at 4; ITC Rehearing Request at 17; WIRES at 11-12.

[1273] MISO TOs Rehearing Request at 17-19 (citing Order No. 1920, 187 FERC ¶ 61,068 at P 1059).

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1796 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No.  RM21-17-001                                                                    - 420 -

such that transmission providers would "consider benefits and the broader needs of the region in the reevaluation process and choose an outcome based on that assessment."[1274]

485.    ITC argued that, while reevaluating a previously selected Long-Term Regional Transmission Facility on the basis of cost increases is reasonable, Order No. 1920's requirement for transmission providers to update their measurement of the benefits of Long-Term Regional Transmission Facilities will burden transmission providers and deter investment in such facilities.  ITC therefore requested that the Commission eliminate the requirement to update the measurement of the benefits or, in the alternative, clarify that transmission providers may adopt a more qualitative assessment that takes into account the benefits and costs of a Long-Term Regional Transmission Facility in the context of the transmission planning region's Long-Term Transmission Needs, and also that transmission providers may adopt flexible remedial measures such as those available under MISO's variance analysis process.[1275]  Similarly, WIRES requested clarification as to whether Order No. 1920 would allow transmission providers flexibility to determine how they will update their measurement of the benefits of Long-Term Regional Transmission Facilities, and argued that transmission providers should have the flexibility to address the concerns raised by the Commission in developing their reevaluation criteria in a manner compatible with their transmission planning process.[1276]

---

[1274] *Id.* at 13.

[1275] ITC Rehearing Request at 15-19.

[1276] WIRES Rehearing Request at 14.

486.    NRECA requested that the Commission eliminate the requirement for

transmission providers to designate a point after which all previously selected Long-Term

Regional Transmission Facilities will no longer be subject to reevaluation, i.e., a pencils-

down point, such that the transmission developer of the selected facility would have

adequate certainty to make investment decisions.[1277]

487.    Large Public Power and NRECA requested that the Commission require on

rehearing that transmission providers reevaluate previously selected Long-Term Regional

Transmission Facilities not only when there is a significant increase in costs, but also

when there is a significant decrease in the benefits of a particular facility.[1278]  Large

Public Power further requested that the Commission clarify that Order No. 1920 requires

transmission providers to track both the costs and the benefits of previously selected

Long-Term Regional Transmission Facilities.[1279]  In addition to reevaluation on the basis

of cost increases, NRECA argued that transmission providers should be required to

---

[1277] NRECA Rehearing Request at 33 (citing Order No. 1920, 187 FERC ¶ 61,068 at P 1050); *see also* East Kentucky Rehearing Request at 2 (arguing that Order No. 1920 permits arbitrary and unreasonable deadlines on reevaluations).

[1278] Large Public Power Rehearing Request at 17-19; NRECA Rehearing Request at 29-30; *see also* East Kentucky Rehearing Request at 2 (arguing that the Order No. 1920 requirement related to reevaluation on the basis of cost increases is "too narrowly drawn" and inconsistent with other aspects of Order No. 1920).

[1279] Large Public Power Rehearing Request at 17-18 (citing Order No. 1920, 187 FERC ¶ 61,068 at PP 1054, 1059).

reevaluate previously selected Long-Term Regional Transmission Facilities when the transmission planning region's Long-Term Transmission Needs have changed.[1280]

488.    ITC, Large Public Power, and NRECA argued that the Commission should grant rehearing and eliminate Order No. 1920's requirements to reevaluate on the basis of significant changes in federal, federally-recognized Tribal, state, or local laws or regulations, because these requirements are either too narrow or too broad.[1281]

489.    ITC stated that Order No. 1920 encourages the use of portfolio approaches to select Long-Term Regional Transmission Facilities, as they generate considerable interdependency among the various Long-Term Regional Transmission Facilities selected in a particular Long-Term Regional Transmission Planning cycle.  ITC therefore recommended that the Commission require periodic project portfolio reporting modeled after MISO's Multi-Value Project Triennial Reporting framework, which ITC contended provides a regular check to ensure transmission customers receive the benefits they are promised and allows for regional transmission planning process improvement.1282  If the Commission did not grant rehearing and eliminate reevaluations on the basis of significant changes in law or regulations, ITC requested that the Commission allow such

---

[1280] NRECA Rehearing Request at 30-32.

[1281] ITC Rehearing Request at 4-5; Large Public Power Rehearing Request at 19-20; NRECA Rehearing Request at 36; *see also* East Kentucky Rehearing Request at 2 (stating that Order No. 1920 "arbitrarily [and] unreasonably prohibits some reevaluations due to changes in laws or regulations").

[1282] ITC Rehearing Request at 13-14.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1799 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No.  RM21-17-001                                                                    - 423 -

reevaluation only for Long-Term Regional Transmission Facilities whose targeted in-service date is more than 10 years from the point at which the transmission provider conducts the reevaluation.

490.    In contrast, Large Public Power argued that the "blanket ten-year moratorium" is arbitrary and capricious.[1283]  NRECA argued that the Commission provided no rationale for this limitation, which it characterized as "so implausible that it could not be ascribed to a difference in view or the product of agency expertise."[1284]

491.    Several parties requested that the Commission provide transmission providers with more flexibility to reevaluate previously selected Long-Term Regional Transmission Facilities in other situations.  Dominion sought rehearing or, as applicable, clarification of the Commission's reevaluation process to allow transmission providers to reevaluate a previously selected Long-Term Regional Transmission Facility in situations other than those identified in Order No. 1920.[1285]  Similarly, SERTP Sponsors requested that the Commission clarify that the three situations described in Order No. 1920 in which reevaluation of previously selected Long-Term Regional Transmission Facilities is required are illustrative, arguing that Order No. 1920 grants transmission providers

---

[1283] Large Public Power Rehearing Request at 19-20.

[1284] NRECA Rehearing Request at 36 (quoting *State Farm*, 463 U.S. at 43).

[1285] Dominion Rehearing Request at 17.

Docket No. RM21-17-001                                                    - 424 -

inadequate flexibility in developing OATT provisions regarding the reevaluation of

previously selected Long-Term Regional Transmission Facilities.[1286]

### d.    Commission Determination

### i.    Logical Outgrowth

492.    We disagree with the argument that the Commission failed to provide adequate

notice of and opportunity to comment on Order No. 1920's requirement that transmission

providers include provisions in their OATTs that require them to reevaluate previously

selected Long-Term Regional Transmission Facilities in certain circumstances.  As the

D.C. Circuit explained recently, "the very premise of agencies' duty to solicit, consider,

and respond appropriately to comments is that rules evolve from conception to

completion."1287  Indeed, notice is sufficient if the final rule represents a "logical

outgrowth" of the proposed rule.[1288]  Order No. 1920's reevaluation requirements are

closely related to and fully in character with the NOPR proposal, and represent the kind

of reasonable evolution of an initial proposal in response to comments that rehearing

parties could have reasonably anticipated.

---

[1286] SERTP Sponsors Rehearing Request at 20-21.

[1287] *Brennan v. Dickson*, 45 F.4th at 69.

[1288] *Long Island Care*, 551 U.S. at 174-75.  *See also Am. Paper Inst. v. EPA*, 660
F.2d at 959 n.13 ("An agency may make *even substantial changes* in its original proposed
rule without a further comment period if the changes are in character with the original
proposal and are a logical outgrowth of the notice and comments already given.")
(emphasis added).

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1801 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No.  RM21-17-001                                                                      - 425 -

493.    As an initial matter, we note that the NOPR proposed to require the reevaluation of previously selected transmission facilities in certain circumstances.  Because Long-Term Regional Transmission Planning is a form of regional transmission planning,[1289] the Commission's regional transmission planning requirements apply.  This includes a requirement that transmission providers describe in their OATTs the circumstances in which and the procedures under which transmission providers will conduct a reevaluation.  This reevaluation is necessary to determine how a transmission provider will respond if development delays affecting a previously selected regional transmission facility jeopardize incumbent transmission owners' ability to meet their reliability needs or service obligations.1290  The Commission made this explicit in the NOPR when it proposed that Order No. 1000's transmission developer requirements would apply to Long-Term Regional Transmission Planning[1291] and noted that in the event of development delays, transmission providers may "remove the transmission facility from the selected category and proceed with reevaluating the regional transmission plan to seek an alternative solution."[1292]

---

[1289] NOPR, 179 FERC ¶ 61,028 at P 68; Order No. 1920, 187 FERC ¶ 61,068 at P 224.

[1290] Order No. 1000, 136 FERC ¶ 61,051 at P 329.

[1291] NOPR, 179 FERC ¶ 61,028 at P 247.

[1292] *Id.* P 247 n.395 (citing Order No. 1000-A, 139 FERC ¶ 61,132 at P 442).

494.    The Commission further proposed in the NOPR to allow transmission providers to make the selection status of a previously selected Long-Term Regional Transmission Facility "subject to the outcomes of subsequent Long-Term Regional Transmission Planning cycles," such that it "is no longer needed" and proposed that transmission providers "should include in their selection criteria how they will address the selection status of a previously selected transmission facility based on the outcomes of subsequent Long-Term Regional Transmission Planning cycles."[1293]  The Commission suggested that this proposal was warranted because the development schedule for a Long-Term Regional Transmission Facility may not require its developer to undertake actions or incur expenses in the near-term,[1294] and it explained that the NOPR's proposed reforms were intended to be responsive to "commenters' concerns about over-building [transmission facilities] due to uncertainties of future transmission system conditions."[1295] Therefore, although the Commission used other language, the Commission effectively proposed in the NOPR that transmission providers could reevaluate certain Long-Term Regional Transmission Facilities (i.e., those for which near-term development activities are not necessary) in light of changed circumstances apparent in the subsequent Long-

---

[1293] *Id.* P 248.

[1294] *Id.*

[1295] NOPR, 179 FERC ¶ 61,028 at P 245.

Docket No.  RM21-17-001                                                                            - 427 -

Term Regional Transmission Planning cycle to determine whether to continue developing

that facility or find that it was no longer needed.1296

495.    In other words, the NOPR provided adequate notice of and an opportunity to

comment on proposals to require reevaluation of previously selected Long-Term

Regional Transmission Facilities due to development delays and to permit reevaluation of

previously selected Long-Term Regional Transmission Facilities due to changed

circumstances from one Long-Term Regional Transmission Planning cycle to the next.

496.    Commenters objected to the NOPR proposal on the grounds that providing open-

ended allowance for reevaluation of previously selected Long-Term Regional

Transmission Facilities would undermine selection as a "reasonably final" step and create

too much uncertainty for transmission developers, which would impede the development

of the relevant transmission facilities and ultimately could raise concerns about reliability

impacts or other consequences.[1297]  Upon consideration of the record before it and these

comments in particular, the Commission modified the NOPR proposal to allow for the

reevaluation of previously selected Long-Term Regional Transmission Facilities due to

changed circumstances from one transmission planning cycle to the next.  Specifically,

Order No. 1920 required the reevaluation of Long-Term Regional Transmission Facilities

only in certain circumstances that could affect the need for the facility—i.e., where the

costs of the transmission facility significantly exceed estimates or where significant

---

[1296] *Id.* P 248.

[1297] Order No. 1920, 187 FERC ¶ 61,068 at P 1055 & n.2256.

changes in federal, federally-recognized Tribal, state, or local laws or regulations cause

reasonable concern that the facility no longer meets selection criteria.1298  Further,

consistent with the Commission's reasoning in the NOPR that reevaluation may be

appropriate where near-term development actions or expenditures are not needed in order

to meet the targeted in-service date, the Commission limited the availability of

reevaluation due to significant changes in laws or regulations to only those facilities that

are not needed to be in-service within 10 years (i.e., unless its targeted in-service date

was in the latter half of the 20-year transmission planning horizon during the Long-Term

Regional Transmission Planning cycle in which it was selected) and required a "pencils-

down" point in the development of a facility at which reevaluation would no longer be

permitted.1299  The Commission's modifications are not "surprisingly distant" from the

proposal so as to be wholly unexpected;1300 instead, the changes merely refine the

proposals included in the NOPR and are thus  precisely the kind of tailoring and fine-

tuning of a proposed rule in response to comments that is the *raison d'être* for APA

notice-and-comment requirements.1301

---

**1298** *Id.* PP 1048-1055.

**1299** *Id.* PP 1050-1051.

**1300** *Brennan v. Dickson*, 45 F.4th at 69.

**1301** We note that, while the reevaluation requirements are one tool to manage the inherent uncertainties of Long-Term Regional Transmission Planning and to limit the risk of over-building transmission in response to speculative transmission needs, we believe that other requirements in Order No. 1920 also address these concerns.  The inability to include reevaluation requirements would not have prevented the Commission from

## ii.    Other Issues

497.    We also disagree with rehearing parties' substantive objections to the reevaluation requirements.  While certain parties object to the reevaluation requirements as too lax,1302 and other parties object to them as too stringent,1303 we conclude that they strike a reasonable balance between providing adequate certainty to transmission developers to support capital investment, such that more efficient or cost-effective Long-Term Transmission Facilities actually may be developed, and mitigating the inherent uncertainty involved in Long-Term Regional Transmission Planning, given that continued selection of Long-Term Regional Transmission Facilities that no longer meet selection criteria could be costly to consumers.1304  Specifically, though several rehearing parties object that reevaluation should be required in additional circumstances, such as whenever there is a reduction in benefits,**1305** whenever there is a change in transmission needs,1306 or at points of time beyond the "pencils-down" date,**1307** and

---

issuing Order No. 1920.

**1302** *See e.g.*, East Kentucky Rehearing Request at 2; NRECA Rehearing Request at 33.

**1303** *See e.g.*, ITC Rehearing Request at 15-19; MISO TOs Rehearing Request at 17-19.

**1304** Order No. 1920, 187 FERC ¶ 61,068 at P 1054.

**1305** Large Public Power Rehearing Request at 17-19; NRECA Rehearing Request at 29-30.

**1306** NRECA Rehearing Request at 30-32.

**1307** *Id.* at 33.

Docket No.  RM21-17-001                                          - 430 -

others argue that the transmission provider should have more discretion to determine

when to reevaluate previously selected Long-Term Regional Transmission Facilities,**1308**

we continue to find that such open-ended allowance for reevaluation would fail to

account for the degree of certainty that is needed to support capital investment, and

would therefore fail to adequately ensure development of more efficient or cost-effective

Long-Term Regional Transmission Facilities.1309

498.    On the other hand, we also reject requests to eliminate the requirement to

reevaluate facilities where significant changes in laws or regulations cause reasonable

concern that a previously selected Long-Term Regional Transmission Facility may no

longer meet the transmission provider's selection criteria.1310  We remain concerned

that, absent an opportunity to determine whether selection of such a facility remains

warranted in light of a significant change in laws or regulations, transmission providers

may be reluctant to select certain Long-Term Regional Transmission Facilities,**1311** and

we find that requiring reevaluation in such a circumstance helps to mitigate the inherent

uncertainty of Long-Term Regional Transmission Planning and the risk of over-building

transmission facilities.  With the limitations we impose—i.e., that such reevaluation only

---

**1308** Dominion Rehearing Request at 17; SERTP Sponsors Rehearing Request at 20-21.

**1309** Order No. 1920, 187 FERC ¶ 61,068 at P 1053.

**1310** ITC Rehearing Request at 4-5.

**1311** Order No. 1920, 187 FERC ¶ 61,068 at P 1056.

occur for facilities with a targeted in-service date that is in the latter half of the Long-Term Regional Transmission Planning cycle in which it is selected and that reevaluation may only occur up to the "pencils-down" point in the facility's development—we are not persuaded that reevaluation under these circumstances will create such uncertainty for transmission developers as to significantly impede the development of more efficient of cost-effective Long-Term Regional Transmission Facilities.

499.    While we appreciate rehearing parties' concerns that assessing a change in a transmission facility's benefits is more complex than assessing a change in its costs, we decline requests to set aside the requirement to account for updated benefits when transmission providers reevaluate a Long-Term Regional Transmission Facility based on a significant increase in the facility's estimated costs.[1312]  We continue to find that such a requirement will help to ensure there is an opportunity to select more efficient or cost-effective Long-Term Regional Transmission Facilities, because otherwise the transmission provider would compare the facility's currently determined costs with its previously determined benefits.[1313]

500.    We further find that rehearing parties' concerns about the burdens of accounting for updated benefits are misplaced, as Order No. 1920 provided significant flexibility to transmission providers as to how to account for changes in benefits.  While Order No. 1920 requires that such reevaluations must only occur during a subsequent Long-Term

---

[1312] MISO TOs Rehearing Request at 17-19; ITC Rehearing Request at 15-19.

[1313] Order No. 1920, 187 FERC ¶ 61,068 at P 1059.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1808 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No.  RM21-17-001                                                    - 432 -

Regional Transmission Planning cycle (i.e., rather than in between such cycles) because doing so during such a cycle enables transmission providers to make use of updated assumptions, inputs, and the Long-Term Scenarios that must be developed in any event during the subsequent cycle, Order No. 1920 does not prescribe any particular method for assessing updated benefits.1314  We note that, because Order No. 1920 provides transmission providers the flexibility to propose qualitative measures in their evaluation processes and qualitative selection criteria, transmission providers will need flexibility to develop a process for determining if a previously selected Long-Term Regional Transmission Facility continues to meet those selection criteria.

501.    We are also not persuaded by rehearing parties' arguments that the reevaluation requirements will undermine the ability of transmission providers to use a portfolio approach to evaluating benefits or selecting Long-Term Regional Transmission Facilities.1315  As described above, transmission providers have significant flexibility to determine how to update benefits, and they may propose to use a method that accommodates Order No. 1920's reevaluation requirements in the context of portfolio approaches to selecting Long-Term Regional Transmission Facilities.  Likewise, provided the process seeks to maximize benefits accounting for costs over time without over-building transmission facilities, transmission providers have significant flexibility to

---

**1314** This clarification resolves WIRES's request for clarification regarding the flexibility allowed transmission providers to determine how to account for updated benefits.  *See* WIRES Rehearing Request at 14.

**1315** ITC Rehearing Request at 6-9; MISO TOs Rehearing Request at 17-19.

determine the appropriate outcomes that may result from reevaluation, including the

potential mitigation measures that may be regionally appropriate.1316  Thus,

transmission providers have scope to tailor both how reevaluation is conducted and the

outcomes of the reevaluation process to the portfolio approach.

> ### E.    Implementation of Long-Term Regional Transmission Planning

> #### 1.    Order No. 1920 Requirements

502.    In Order No. 1920, the Commission required transmission providers to explain on

compliance how the initial timing sequence for Long-Term Regional Transmission

Planning interacts with existing regional transmission planning processes.  The

Commission required transmission providers to provide in their explanations any

information necessary to ensure that stakeholders understand this interaction, including at

least the following two components.  First, the Commission required transmission

providers to address the possible interaction between the transmission planning cycles for

Long-Term Regional Transmission Planning and existing Order No. 1000 regional

transmission planning processes.  The Commission recognized that there may be overlap

in the time horizon for Long-Term Regional Transmission Planning and existing Order

No. 1000 regional transmission planning processes and that these processes will likely

inform each other.[1317]  Second, the Commission required transmission providers to

address the possible displacement of regional transmission facilities from the existing

---

[1316] Order No. 1920, 187 FERC ¶ 61,068 at P 1052.

[1317] *Id.* P 1071.

Docket No. RM21-17-001                                           - 434 -

regional transmission planning processes.  The Commission recognized that it is possible

that, in some cases, Long-Term Regional Transmission Facilities selected to address

Long-Term Transmission Needs may provide near-term reliability or economic benefits,

and thus could displace regional transmission facilities that are under consideration as

part of existing regional transmission planning processes.[1318]

503.    The Commission found that transmission providers should have the flexibility to

integrate the existing regional transmission planning processes with Long-Term Regional

Transmission Planning in a manner that mitigates the potential for disruption of the

existing regional transmission planning processes.  However, the Commission expressed

concern that too much flexibility for transmission providers with respect to the date by

which they must begin the first Long-Term Regional Transmission Planning cycle could

lead to unnecessary delay in realizing these beneficial reforms for customers.  Thus, the

Commission required transmission providers in each transmission planning region to

propose on compliance a date, no later than one year from the date on which initial filings

to comply with the final rule are due, on which they will commence the first Long-Term

Regional Transmission Planning cycle.  The Commission stated that transmission

providers in a transmission planning region may propose to start the first Long-Term

Regional Transmission Planning cycle on a date later than one year from the initial

compliance filing due date, only to the extent needed to align the Long-Term Regional

---

[1318] *Id.*

Docket No.  RM21-17-001                                                    - 435 -

Transmission Planning cycle with existing transmission planning cycles.[1319]  While the

Commission encouraged transmission providers to align transmission planning cycles if

useful, to ensure that there is no inappropriate delay to starting Long-Term Regional

Transmission Planning, the Commission stated that transmission providers in a

transmission planning region that propose a commencement date of later than one year

from the compliance due date must include adequate support explaining how the

proposed date to begin the first Long-Term Regional Transmission Planning cycle is

necessary and appropriately tailored for their transmission planning region.[1320]

504.    The Commission encouraged transmission providers to address in their

explanations how their proposed Long-Term Regional Transmission Planning would

facilitate moving beyond piecemeal transmission expansion to address relatively near-

term transmission needs and toward a more robust, well-planned transmission system.[1321]

## 2.    Requests for Rehearing and Clarification

505.    PJM states that it recognizes that the long-term transmission planning horizon can

and will inform Order No. 1000 processes but argues that it is imperative that these two

processes function effectively together so that PJM can respond to short-term needs

quickly and nimbly.[1322]  Accordingly, PJM requests flexibility in designing its Long-

---

[1319] *Id.* P 1072.

[1320] *Id.*

[1321] *Id.* P 1073.

[1322] PJM Rehearing Request at 41.

Docket No.  RM21-17-001                                                          - 436 -

Term Regional Transmission Planning process in a way that would minimize harmful

interaction from the overlap between Order No. 1000 and Order No. 1920 regional

transmission planning processes and would allow for the efficient use of PJM's

resources.[1323]

506.    TAPS asserts that Order No. 1920 does not adequately clarify how the Order

No. 1000 economic and reliability processes and the Long-Term Regional Transmission

Planning process will interact after the initial implementation phase.[1324]  TAPS argues

that Order No. 1920 does not address whether, or the circumstances under which,

transmission projects may be moved from an Order No. 1000 reliability or economic

planning process to the Long-Term Regional Transmission Planning process, or vice

versa.[1325]  As a result, TAPS requests that the Commission recognize that these regional

transmission planning processes will continue to interact after the initial implementation

of Long-Term Regional Transmission Planning and require that transmission providers

demonstrate how these processes will interact on an ongoing basis, including how and

when transmission projects may be moved between the two processes.[1326]

---

[1323] *Id.*

[1324] TAPS Rehearing Request at 6-9.

[1325] *Id.* at 8.

[1326] *Id.* at 6-9.

### 3.    Commission Determination

507.    As an initial matter, upon further consideration, we set aside, in part, Order No. 1920's requirement that transmission providers in each transmission planning region must propose on compliance a date, no later than one year from the date on which initial filings to comply with the final rule are due, on which they will commence the first Long-Term Regional Transmission Planning cycle.[1327]  Instead, we require that transmission providers must propose on compliance a date, no later than *two* years from the date on which initial filings to comply with Order No. 1920 are due, on which they will commence the first Long-Term Regional Transmission Planning cycle.  We find that this modification balances the need to ensure that transmission providers timely implement Order No. 1920's requirements to avoid unnecessary delay in realizing these beneficial reforms for customers, as explained in Order No. 1920,[1328] with the need to provide transmission providers with sufficient time to implement Long-Term Regional Transmission Planning and align the Long-Term Regional Transmission Planning cycle with existing transmission planning cycles, which may be longer than a single year.

508.    Moreover, we modify Order No. 1920's requirement that transmission providers that propose a commencement date of later than one year from the compliance due date must include adequate support explaining how the proposed date to begin the first Long-Term Regional Transmission Planning cycle is necessary and appropriately tailored for

---

[1327] Order No. 1920, 187 FERC ¶ 61,068 at P 1072.

[1328] *See id.*

their transmission planning region.[1329]   Instead, we require that regardless of the date that transmission providers propose on compliance, they must explain in their compliance filing why the proposed date on which they will commence the first Long-Term Regional Transmission Planning cycle is necessary and appropriately tailored for their transmission planning region.  We find that this modification will allow the Commission to ensure that the proposed date will not unnecessarily delay the realization of Order No. 1920's beneficial reforms for customers.

509.   We sustain the requirement that transmission providers must explain on compliance how the initial timing sequence for Long-Term Regional Transmission Planning will interact with the existing regional transmission planning processes under Order No. 1000.  As the Commission recognized in Order No. 1920, there may be overlap in the time horizons for these processes, and transmission providers should have the flexibility to integrate the existing regional transmission planning processes with Long-Term Regional Transmission Planning in a manner that mitigates the potential for disruption of the existing regional transmission planning processes.[1330]   While Long-Term Regional Transmission Planning processes must still meet all requirements set forth in Order No. 1920, we believe that this flexibility extends to and addresses concerns raised by PJM, including its request for flexibility to design its Long-Term Regional

---

[1329] *See id.*

[1330] *Id.*

Transmission Planning process in a way that minimizes potential harmful impacts to existing regional transmission planning processes.

510.    In response to TAPS' request for rehearing, we recognize that Long-Term Regional Transmission Planning and existing Order No. 1000 economic and reliability transmission planning processes may continue to interact after the initial implementation of Long-Term Regional Transmission Planning.  However, while this interaction is possible, we believe that, after the first Long-Term Regional Transmission Planning cycle concludes, the overlap between the existing Order No. 1000 regional transmission planning processes and Long-Term Regional Transmission Planning will likely diminish. As the Commission found in Order No. 1920, existing regional transmission planning processes that plan for reliability and economic transmission needs may in the future come to address only residual needs not already addressed through Long-Term Regional Transmission Planning.[1331]  As a result, the potential for overlap between Long-Term Regional Transmission Planning and the existing Order No. 1000 regional transmission planning process should decrease.  Further, we do not believe that it is necessary to require transmission providers to explain how a transmission facility selected in one regional transmission process may "move" to another regional transmission planning process.  Nevertheless, as the Commission stated in Order No. 1920, we encourage transmission providers to address in their explanation on compliance how their proposed Long-Term Regional Transmission Planning process will facilitate moving beyond

---

[1331] *Id.* P 245.

piecemeal transmission expansion to address relatively near-term transmission needs and

toward a more robust, well-planned transmission system.[1332]

## VI. Coordination of Regional Transmission Planning and Generator Interconnection Processes

### A. Need for Reform and Overall Requirement

#### 1. Order No. 1920 Requirements

511. In Order No. 1920, the Commission found that there is substantial evidence to

support the conclusion that the Commission's existing regional transmission planning

requirements are unjust, unreasonable, and unduly discriminatory or preferential because

they do not adequately consider certain interconnection-related transmission needs that

the transmission provider has identified multiple times in the generator interconnection

process but that have never been resolved due to the withdrawal of the underlying

interconnection request(s).[1333]  The Commission made this finding in response to

(among other things) evidence in the record that the level of spending on interconnection-

related network upgrades has dramatically increased in recent years and evidence that this

trend leads to more interconnection requests withdrawing in the face of significant costs

associated with interconnection-related network upgrades.[1334]  The Commission stated

that, while interconnection customers may choose to withdraw from the interconnection

queue for a number of reasons, in recent years, the deciding factor has increasingly

---

[1332] *Id.* P 1073.

[1333] Order No. 1920, 187 FERC ¶ 61,068 at P 1100.

[1334] *Id.* P 1101.

become the interconnection customer's sticker shock at its cost responsibility for interconnection-related network upgrades.1335  The Commission also based its finding on evidence that in many cases when an interconnection-related transmission need is not addressed via development of interconnection-related network upgrades in one interconnection queue cycle, the same interconnection-related transmission need—and oftentimes the same or a substantially similar interconnection-related network upgrade—will appear in subsequent interconnection queue cycles.1336

512.    Consequently, the Commission adopted requirements for transmission providers in each transmission planning region to revise their regional transmission planning processes in their OATTs to evaluate for selection regional transmission facilities that address certain interconnection-related transmission needs associated with specific interconnection-related network upgrades originally identified through the generator interconnection process.  In particular, the Commission adopted four qualifying criteria for when transmission providers must evaluate interconnection-related transmission needs in the regional transmission planning process.  The Commission found that this requirement will ensure that more efficient or cost-effective transmission expansion can be effectuated through regional transmission planning processes and will eliminate a potential barrier to entry for new generation resources, thereby enhancing competition in wholesale electricity markets and facilitating access to lower-cost generation.  The

---

[1335] *Id.*

[1336] *Id.* P 1102.

Commission stated that, as a result, this reform will ensure just and reasonable and not unduly discriminatory or preferential Commission-jurisdictional rates.[1337]

## 2. Requests for Rehearing

513.    SERTP Sponsors, Large Public Power, and Industrial Customers argue that this reform is premature in light of Order No. 2023, which is intended to, among other things, reduce speculative interconnection requests and withdrawals.[1338]  SERTP Sponsors argue that the Commission should grant rehearing and revisit this reform after experience is gained to determine whether interconnection withdrawals could "reasonably be expected to be indicative of a need for new regional transmission facilities that have 'a voltage of at least 200 kV and an estimated cost of at least $30 million.'"[1339]  SERTP Sponsors argue that accordingly, the Commission has not established a rational basis supported by substantial evidence for this requirement.[1340]

514.    PJM argues that the Commission failed to provide substantial evidence for its conclusion that, nationwide, the deciding factor for interconnection customers'

---

[1337] *Id.* PP 1106, 1145.

[1338] SERTP Sponsors Rehearing Request at 22; Large Public Power Rehearing Request at 23; Industrial Customers Rehearing Request at 46-47.

[1339] SERTP Sponsors Rehearing Request at 22 (citing Order No. 1920, 187 FERC ¶ 61,068 at P 1145).

[1340] *Id.* at 22-23 (citing *Samaritan Health Serv. v. Bowen*, 811 F.2d 1524, 1528 (D.C. Cir. 1987) (finding that agency's classification of costs had "no rational basis" and was, therefore, arbitrary and capricious)).

Docket No. RM21-17-001                                                      - 443 -

withdrawals is sticker shock at their assigned network upgrade costs.[1341]  PJM argues that

the Commission ignored its analysis of more than 700 interconnection requests in one

transmission zone over a six-year period that demonstrated that only 14 requests or 2%

would have likely met the voltage and cost thresholds in Order No. 1920 and that nine of

the 14 withdrew before a feasibility study was issued.  Additionally, PJM argues that, of

the remaining five, two were ultimately responsible for network upgrades of less than $30

million, thus leaving only three interconnection requests potentially withdrawing due to

the cost of network upgrades.[1342]  PJM argues that this data suggesting a withdrawal rate

of less than one half percent in a large sample indicates insignificant correlation between

network upgrade costs, voltage level, and business decisions to withdraw.[1343]

515.    PJM further argues that, on the other hand, over the past six years, several dozen

generation projects that executed interconnection agreements had associated network

upgrades of less than $5 million but nonetheless terminated their interconnection

agreements.  Thus, PJM argues that factors other than sticker shock are common reasons

for delay or failure to advance.[1344]  PJM argues that the Commission disregarded this

evidence and relied on studies in MISO and SPP to justify a one-size-fits-all approach,

---

[1341] PJM Rehearing Request at 31.

[1342] *Id.*

[1343] *Id.*

[1344] PJM Rehearing Request at 32.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1820 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No.  RM21-17-001                                                - 444 -

and it argues that this decision was arbitrary and capricious.[1345]  NRECA argues that if the Commission believes that its existing generator interconnection polices are unjust and unreasonable and impose barriers to generation development, it should develop the appropriate evidentiary record, make the required findings, and direct a just and reasonable replacement policy.[1346]

### 3.    Commission Determination

516.    We continue to find that this reform will ensure just and reasonable and not unduly discriminatory or preferential Commission-jurisdictional rates.[1347]  While SERTP Sponsors, Large Public Power, and Industrial Customers argue that this reform is premature in light of Order No. 2023, we find that the scope of the Order No. 1920 coordination reform operates independently of, and is more limited than, the Order No. 2023 reforms.  Order No. 2023 adopts reforms to the generator interconnection process through changes to the *pro forma* generation interconnection procedures and agreements. By comparison, Order No. 1920 adopts no changes to the generator interconnection process and instead implements the coordination reform through changes to the transmission planning process and the *pro forma* OATT.

---

[1345] *Id.* at 32 (citing 5 U.S.C. 706(2); 16 U.S.C. § 825l(b); *S.C. Pub. Serv. Auth.*, 762 F.3d at 66-67; *TAPS*, 225 F.3d at 687; *Env't Def. Fund*, 2 F.4th 953).

[1346] NRECA Rehearing Request at 48-49.

[1347] Order No. 1920, 187 FERC ¶ 61,068 at P 1106.

517.    Additionally, the purpose of the coordination reform in Order No. 1920 is to address a specific problem—insufficient coordination between the existing generator interconnection processes and regional transmission planning and cost allocation processes regarding interconnection-related transmission needs that are repeatedly identified in the generator interconnection process.[1348]  Order No. 1920 recognizes the generator interconnection process is unlikely to result in the construction of transmission facilities that resolve such interconnection-related transmission needs because of the rate of withdrawal from the interconnection queue, due at least in part to interconnection customers' cost responsibility for expensive interconnection-related network upgrades.[1349]  While Order No. 2023 aims to fix inefficiencies in the generator interconnection process, it does not direct any reforms regarding specific interconnection-related network upgrades that are unlikely to be developed.

518.    The Commission reasonably concluded that reforms regarding these types of network upgrades are better addressed through improvement of coordination between the generator interconnection and regional transmission planning processes.  The purpose of the Order No. 1920 coordination reform is to (1) require evaluation of regional transmission facilities that address certain (i.e., that qualify under the criteria established in Order No. 1920) interconnection-related transmission needs associated with specific interconnection-related network upgrades in existing Order No. 1000 regional

---

[1348] *Id.* P 1100.

[1349] *See id.* P 1108.

Docket No. RM21-17-001                                                              - 446 -

transmission planning and cost allocation processes to determine whether to select such

facilities in the regional transmission plan for purposes of cost allocation, and (2)

determine whether such facilities may address other regional transmission needs more

efficiently or cost-effectively.  For a limited set of interconnection-related transmission

needs, this reform will allow transmission providers to identify, evaluate, and select the

more efficient or cost-effective regional transmission solution independent of the success

or failure of a particular interconnection request in the generator interconnection process.

Additionally, if this requirement is triggered (i.e., because interconnection-related

network upgrades meet all of the established qualifying criteria), that is an indication of

the continued existence of the concerns described in Order No. 1920, namely a barrier to

entry in locations that, absent sticker shock, are "otherwise desirable for generators to

locate."[1350]  Moreover, it may be that eventually, as a result of Order No. 2023, fewer

withdrawals from the generator interconnection queue occur and that this provision is

triggered less often.  Further, there may be fewer instances of this requirement as the

Order No. 1920 Long-Term Regional Transmission Planning process proactively

addresses transmission needs related to generation additions on a forward-looking basis.

These developments would not, however, address the present concerns that necessitate

this coordination requirement.  Given the low administrative burden associated with this

reform,[1351] we conclude that its potential benefits outweigh the costs.

---

[1350] *Id.* P 1103.

[1351] *See id.* P 1113.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1823 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No. RM21-17-001                                                    - 447 -

519.    We disagree with PJM's claim that the Commission does not provide substantial

evidence to demonstrate that existing Order No. 1000 regional transmission planning and

cost allocation processes do not adequately address interconnection-related transmission

needs associated with withdrawn interconnection requests.  PJM's claim is unpersuasive

because, as explained above, the Commission has sufficiently demonstrated the need for

reform.

520.    The Commission in Order No. 1920 also explained why it is appropriate to

establish the coordination requirement in existing Order No. 1000 regional transmission

planning and cost allocation processes, stating that:

> Evaluation of interconnection-related transmission needs in
> the existing Order No. 1000 regional transmission planning
> and cost allocation processes is most appropriate because
> such evaluation would occur at shorter intervals and would
> likely result in more expeditious development of regional
> transmission facilities to address the nearer-term
> interconnection-related transmission needs identified through
> the generator interconnection process.[1352]

521.    Further, courts have recognized the Commission can rely on general findings of

systemic conditions to impose an industry-wide remedy under FPA section 206.[1353]  The

Commission found that there was substantial evidence to conclude that the Commission's

existing regional transmission planning requirements are unjust, unreasonable, and

unduly discriminatory or preferential because they do not adequately consider certain

---

[1352] *Id.* P 1126.

[1353] *See TAPS*, 225 F.3d at 687-88 *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d at 67
(citing *Interstate Nat. Gas Ass'n of Am. v. FERC*, 285 F.3d at 37).

USCA4 Appeal: 24-1650   Doc: 224      Filed: 01/21/2025   Pg: 1824 of 2455
Document Accession #: 20241121-3139      Filed Date: 11/21/2024

Docket No. RM21-17-001                                                    - 448 -

interconnection-related transmission needs that the transmission provider has identified

multiple times in the generator interconnection process but that have never been resolved

due to the withdrawal of the underlying interconnection request(s).[1354]

522.    We also are not persuaded by the evidence that PJM presented in this proceeding,

which it argues demonstrates that only a small fraction of network upgrades that are the

subject of its analysis would meet the voltage and cost thresholds established by Order

No. 1920.  We do not reach the same conclusions as PJM for multiple reasons.  To begin,

PJM's evidence pertains only to the Dominion zone in PJM from 2014 to 2020 and is not

necessarily reflective of circumstances across the region, or nationwide, or over different

time periods.  Further, in Order No. 1920, the Commission cited to evidence from the

record to support the conclusion that, in recent years, sticker shock over an

interconnection customer's assigned network upgrade costs is often the deciding factor

that leads to that interconnection customer's withdrawal of its interconnection request.[1355]

For instance, the Commission cited analysis from a report showing that between January

2016 and July 2020, 245 generation projects in advanced stages in the MISO generator

interconnection process withdrew from the queue, with the project developers citing high

---

[1354] *Id.* PP 1100-05.

[1355] *See, e.g.*, *id.* P 1101 (citing *See* ACORE ANOPR Comments at 12; DC and
Maryland Office of People's Counsel Initial Comments at 16; Invenergy Reply
Comments at 14; Northwest and Intermountain Initial Comments at 14; *see also
Improvements to Generator Interconnection Procs. & Agreements,* Order No. 2023, 88
FR 61014 (Sept. 6, 2023), 184 FERC ¶ 61,054, at 41, *order on reh'g,* Order No. 2023-A,
89 FR 27006 (Apr. 16, 2024), 186 FERC ¶ 61,199, at P 14 (2024).

interconnection-related network upgrade costs as the primary reason for their

withdrawal.[1356]

523. We also disagree with PJM's interpretation of its data, namely the claim that there

is no need for reform because the data shows that the number of withdrawals due to

sticker shock is small. PJM's reasoning suggests that the Commission found that sticker

shock is only ever a deciding factor for an interconnection request's withdrawal if the

withdrawn interconnection request was allocated interconnection-related network

upgrade costs of $30 million or more or has a voltage of at least 200 kV (i.e., the cost and

voltage thresholds established by Order No. 1920 to limit the applicability of this new

requirement). However, the Commission did not suggest that interconnection-related

network upgrades below this cost threshold or below the 200 kV voltage threshold do not

cause sticker shock. Instead, the established qualifying criteria are intended to strike a

reasonable balance between precision and workability.[1357] To accomplish this

workability, the Commission adopted requirements that do not require evaluation in the

existing Order No. 1000 regional transmission planning and cost allocation processes of

all interconnection-related transmission needs that were not addressed because the

corresponding interconnection request withdrew in part or entirely due to sticker shock.

---

[1356] *Id.* (citing Jay Caspary et al., ACEG, Disconnected: The Need for a New
Generator Interconnection Policy, 14 (2021)), https://cleanenergygrid.org/wp-
content/uploads/2021/01/Disconnected-The-Need-for-aNew-Generator-Interconnection-
Policy-1.pdf (ACEG 2021 Interconnection Report) at 17.

[1357] *See id.* P 1147.

Instead, as the Commission stated in Order No. 1920, the established criteria are necessary to limit the scope of the requirement to interconnection-related transmission needs associated with high-cost interconnection-related network upgrades "that are likely to persist, . . . not unique to a single interconnection request, and . . . that have the potential to provide more widespread benefits to transmission customers."[1358]  We again find that this targeted approach and criteria are "broad enough to capture interconnection-related network upgrades that are likely to produce benefits beyond the interconnection customer" while retaining flexibility for transmission providers.[1359]

524.    In response to NRECA, we note that the focus of Order No. 1920 is to remedy deficiencies in the regional transmission planning and cost allocation requirements and not the generator interconnection process.  Nonetheless, we reiterate the findings in Order No. 1920 that the repeated identification of interconnection-related network upgrades in the generator interconnection process is indicative of a "barrier to accessing the transmission system and [establishes] a known interconnection-related transmission need … [that] can hinder the timely development of new generation, thereby stifling competition in wholesale electricity markets and limiting access to lower-cost generation" and that by "failing to consider such interconnection-related transmission

---

[1358] *Id.* P 1148.

[1359] *Id.* P 1149.

needs, the regional transmission planning process is unable to identify the more efficient

or cost-effective regional transmission solutions."[1360]

### B.    Qualifying Criteria

#### 1.    Order No. 1920 Requirements

525.    In Order No. 1920, the Commission required transmission providers to evaluate

for selection in their existing Order No 1000 regional transmission planning processes

regional transmission facilities to address interconnection-related transmission needs that

have been identified in the generator interconnection process by meeting four qualifying

criteria.  Specifically, the Commission required transmission providers to evaluate

interconnection-related network upgrades where:  (1) the transmission provider has

identified interconnection-related network upgrades in interconnection studies to address

those interconnection-related transmission needs in at least two interconnection queue

cycles during the preceding five years (looking back from the effective date of the

Commission-accepted tariff provisions proposed to comply with this reform, and the

later-in-time withdrawn interconnection request occurring after the effective date of the

Commission-accepted tariff provisions);  (2) an interconnection-related network upgrade

identified to meet those interconnection-related transmission needs has a voltage of at

least 200 kV *and* an estimated cost of at least $30 million; (3) such interconnection-

related network upgrade(s) have not been developed and are not currently planned to be

developed because the interconnection request(s) driving the need for the network

---

[1360] *Id.* P 1103.

Docket No.  RM21-17-001                                                          - 452 -

upgrade(s) has been withdrawn; and (4) the transmission provider has not identified an

interconnection-related network upgrade to address the relevant interconnection-related

transmission need in an executed generator interconnection agreement or in a generator

interconnection agreement that the interconnection customer requested that the

transmission provider file unexecuted with the Commission.[1361]

526.    The Commission found it necessary to establish these criteria to limit the scope of

the requirement to those interconnection-related transmission needs that are likely to

persist, are not unique to a single interconnection request, and might be addressed by

regional transmission facilities that have the potential to provide more widespread

benefits to transmission customers.[1362]  The Commission found that these criteria strike a

reasonable balance between precision and workability, and that each of the four criteria is

necessary to identify the appropriate set of interconnection-related transmission needs.[1363]

The Commission further found that the purpose of the criteria established in Order

No. 1920 is to limit the number of interconnection-related transmission needs that

transmission providers must evaluate to those that merit consideration in the existing

Order No. 1000 regional transmission planning and cost allocation processes.[1364]

---

[1361] *Id.* P 1145.

[1362] *Id.* P 1146.

[1363] *Id.* PP 1146-1147.

[1364] *Id.* P 1150.

Docket No.  RM21-17-001                                                      - 453 -

527.    As relevant here, the Commission proposed in the NOPR that part of the criteria

regarding interconnection-related transmission needs is met where an interconnection-

related network upgrade identified to meet interconnection-related transmission needs in

the generator interconnection process has a voltage of at least 200 kV and/or an estimated

cost of at least $30 million.[1365]  In Order No. 1920, the Commission found it necessary

and just and reasonable to modify the NOPR proposal such that any interconnection-

related network upgrade identified to meet that interconnection-related transmission need

must have a voltage of at least 200 kV *and* an estimated cost of at least $30 million (the

cost-and-voltage criterion).[1366]  The Commission found it necessary to establish a cost

threshold that is stringent enough to capture those interconnection-related network

upgrades that are likely to have caused the underlying interconnection requests to

withdraw and a voltage threshold that is high enough that any regional transmission

facility evaluated to address the underlying interconnection-related transmission need(s)

is likely to produce benefits that extend beyond the interconnection customer.[1367]  The

Commission provided additional support for the voltage threshold in stating that the

Commission has also previously found, and the record demonstrates, that higher-voltage

---

[1365] *Id.* P 1130.

[1366] *Id.* PP 1145, 1150-1151.

[1367] *Id.* P 1151.

Docket No. RM21-17-001                                                      - 454 -

transmission facilities are more likely to provide widespread benefits to transmission

customers.[1368]

528.    The Commission stated that requiring an interconnection-related network upgrade

identified to meet an interconnection-related transmission need to satisfy both the cost

and voltage criteria will prevent transmission providers from evaluating interconnection-

related transmission needs associated with interconnection-related network upgrades that

are less likely to provide more widespread benefits to transmission customers.[1369]  The

Commission found that requiring both the cost threshold and the voltage threshold be met

better limits the scope of the reform compared to the NOPR proposal and thus the reform

is more likely to produce a smaller and more practicable set of interconnection-related

needs that transmission providers must evaluate in their existing Order No. 1000 regional

transmission planning processes.[1370]  The Commission also stated that the change to

require that both the cost threshold and the voltage threshold be met addresses

commenters' concerns that relying on only one threshold would identify interconnection-

related network upgrades that are less likely to provide more widespread benefits to

transmission customers.[1371]

---

[1368] *Id.* P 1146, n. 2433.

[1369] *Id.* P 1152.

[1370] *Id.* P 1146; *id.* P 1151; *id.* P 1153.

[1371] *Id.* P 1153 (citing Pine Gate Initial Comments at 32; SEIA Initial Comments at 15; US DOE Initial Comments at 28.).

Docket No.  RM21-17-001                                                           - 455 -

529.    In Order No. 1920, the Commission also established as another qualifying criterion that transmission providers must have identified interconnection-related network upgrades in interconnection studies to address the same interconnection-related transmission need in at least two interconnection queue cycles during the preceding five years (repeat identification criterion).[1372]  Like for the cost-and-voltage criterion, the Commission stated that the repeat identification criterion provides an important limit on the extent to which evaluation of regional transmission facilities to address interconnection-related transmission needs is required.[1373]  The Commission further explained that repeat identification indicates that the constraint that the interconnection-related network upgrades were identified to address is not unique to a single interconnection request at a single point in time and that the interconnection-related transmission need is likely to persist.[1374]  The Commission explained that, if it did not limit the requirements in this way, the burden of evaluation would be greater because transmission providers could have to evaluate more interconnection-related transmission needs.[1375]

530.    The Commission also clarified the timing of the requirement that transmission providers have identified interconnection-related network upgrades in interconnection

---

[1372] *Id.* P 1145.

[1373] *Id.* P 1150.

[1374] *Id.* PP 1150, 1158.

[1375] *Id.* P 1150.

studies to address those interconnection-related transmission needs in at least two

interconnection queue cycles during the preceding five years.[1376]  The Commission

explained that this five-year period means looking back from the effective date of the

Commission-accepted tariff provisions proposed to comply with this reform and the later-

in-time withdrawn interconnection request occurring after the effective date of the

Commission-accepted tariff provisions.[1377]  Separately, the Commission explained that

transmission providers must evaluate an interconnection-related transmission need that

has been previously identified multiple times within the five years prior to the effective

date of the Commission-accepted tariff provisions but never been resolved due to the

withdrawal of the underlying interconnection request(s).[1378]  The Commission also

clarified that if there are no "queue cycles" in the preceding five-year period because the

transmission provider uses a first-come, first-served serial interconnection process, then

this criterion will be met if the interconnection-related transmission need is identified in

at least two individual interconnection studies during the preceding five-year period for

interconnection customers that subsequently withdrew from the interconnection

queue.[1379]  Finally, the Commission stated that evaluation for selection of regional

---

[1376] *Id.* PP 1145, 1158-1160.

[1377] *Id.* P 1145.

[1378] *Id.* P 1159.

[1379] We note that this accommodation will eventually become moot because
transmission provides that do not already do so must transition to a cluster study rather
than a serial process pursuant to the requirements of Order No. 2023.  *See* Order No.

Docket No. RM21-17-001                                                                    - 457 -

transmission facilities that address certain (i.e., that qualify under the criteria established in Order No. 1920) identified interconnection-related transmission needs must occur in the first Order No. 1000 regional transmission planning and cost allocation processes cycle that commences after the later-in-time withdrawn interconnection request occurring after the effective date of the accepted tariff provisions.[1380]

531.    For both the cost-and-voltage criterion and the repeat identification criterion, the Commission disagreed with commenters that argued for the adoption of different criteria or for the elimination of one or both criteria and found that requiring both criteria is just and reasonable.[1381]

### 2.      Requests for Rehearing and Clarification

532.    Clean Energy Associations contend that the Commission acted arbitrarily and capriciously and failed to engage in reasoned decision-making by adopting the cost-and-voltage criterion and repeat identification criterion.[1382]  Clean Energy Associations ask that the Commission, at a minimum, only require either a voltage criterion *or* cost criterion, such that the eligibility threshold is met if an interconnection-related network upgrade has a voltage of at least 200 kV *or* an estimated cost of at least $30 million.[1383]

---

2023, 184 FERC ¶ 61,054 at P 223.

[1380] Order No. 1920, 187 FERC ¶ 61,068 at P 1159.

[1381] *Id.* P 1150 (citations omitted).

[1382] Clean Energy Associations Rehearing Request at 13-22.

[1383] *Id.* at 21-22.

Docket No.  RM21-17-001                                                          - 458 -

Clean Energy Associations also request that the Commission grant rehearing to change

the repeat identification criterion, such that the criterion is met if an interconnection-

related network upgrade was identified in at least one interconnection queue cycle.[1384]

Separately, Clean Energy Associations ask the Commission to clarify that the time period

transmission providers must use to identify interconnection-related network upgrades for

inclusion in the initial regional transmission planning cycle exceeds five years, or

alternatively, grant rehearing to require so.[1385]

533.    As to the cost-and-voltage criterion, Clean Energy Associations contend that the

Commission acted arbitrarily and capriciously because it failed to explain how

interconnection-related network upgrades that satisfy both the voltage threshold and cost

threshold (as required in Order No. 1920) are more likely to provide widespread benefits

to customers compared to interconnection-related network upgrades that meet only the

voltage threshold or only the cost threshold (as proposed in the NOPR).[1386]  Clean Energy

Associations claim that the Commission ignored record evidence and adopted eligibility

criteria that arbitrarily exclude lower voltage facilities that cost more than $30 million

from consideration in regional transmission planning processes regardless of the degree

to which those interconnection-related network upgrades benefit transmission

---

[1384] *Id.*

[1385] *Id.* at 22-26.

[1386] *Id.* at 13-14.

Docket No. RM21-17-001                                                                    - 459 -

customers.[1387]  Clean Energy Associations assert that the Commission ignored evidence

that requiring both the cost threshold and the voltage threshold to be met is even more

harmful in certain parts of the country.[1388]

534.    Clean Energy Associations also claim that the Commission mischaracterized

certain comments opposing the imposition of a requirement to meet both the cost

threshold and the voltage threshold as comments favoring "elimination of one or both

criteria" when many of such comments actually support what Clean Energy Associations

refer to as the "flexibility" in the NOPR that only required an interconnection-related

network upgrade to satisfy one of the thresholds to be eligible for evaluation.[1389]  Clean

Energy Associations further argue that the record shows that the NOPR's "flexibility" is

more likely to identify interconnection-related transmission needs that warrant evaluation

compared to the requirements in Order No. 1920, because Order No. 1920's requirement

to meet both the cost threshold and the voltage threshold unduly limits the universe of

transmission solutions in a manner that jeopardizes transmission providers' ability to

evaluate transmission solutions that might be more efficient or cost-effective than other

---

[1387] *Id.* at 15 (citing Order No. 1920, 187 FERC ¶ 61,068 at P 1137 (referencing comments of Pattern Energy, Pine Gate, and Shell)).

[1388] *Id.* (citing Order No. 1920, 187 FERC ¶ 61,068 at P 1140 (referencing comments of PJM)).

[1389] *Id.* at 16 (citing Pattern Energy Initial Comments at 28; Pine Gate Initial Comments at 32; Interwest Initial Comments at 3, 11).

options.[1390]  Clean Energy Associations claim that the Commission did not directly

address the record evidence and arguments on this issue, which renders this aspect of the

Order No. 1920 arbitrary and capricious.[1391]

535.    On the repeat identification criterion, Clean Energy Associations contend that this

criterion is arbitrary and inconsistent with Order No. 1920's goal of removing barriers to

entry, increasing competition, and promoting more efficient or cost-effective solutions to

interconnection-related transmission needs.[1392]  Clean Energy Associations believe that

the repeat identification criterion will render Order No. 1920's reforms to coordinate the

regional transmission planning and generator interconnection processes ineffective for

several reasons that the Commission failed to address, including the Commission's shift

to cluster-based studies, the self-defeating nature of the repeat identification criterion, and

the adverse effects of the repeat identification criterion in conjunction with the cost-and-

voltage criterion.[1393]  Clean Energy Associations claim that the Commission also ignored

substantial record evidence and arguments relevant to the eligibility criteria and that the

Commission's stated rationale for adopting its unduly restrictive criteria "does not hold

water."[1394]

---

[1390] *Id.* at 16-17.

[1391] *Id.* at 17.

[1392] *Id.* at 18.

[1393] *Id.* at 18-21.

[1394] *Id.* at 20-21 (quoting *e.g.*, Interwest Initial Comments at 11 ("the NOPR imposes so many procedural hurdles that . . . it could not be expected to produce results .

Docket No.  RM21-17-001                                                      - 461 -

536.    Clean Energy Associations also request clarification on two issues related to the

time period for the repeat identification criterion.  First, Clean Energy Associations

request that the Commission clarify that, for each transmission provider's initial regional

transmission planning cycle under an Order No. 1920-compliant tariff, the review

window for identifying interconnection-related network upgrades that are required to be

considered as interconnection-related transmission needs may span more than five years

in duration.[1395]  As an example, Clean Energy Associations state that:

> if a transmission provider's Order No. 1920-compliant tariff
> takes effect on August 1, 2025, [and] the first regional
> transmission planning cycle in which interconnection-related
> transmission needs must be considered commences on August
> 1, 2027, and the date on which the transmission provider will
> identify the transmission solutions to be evaluated in that
> planning cycle is April 1, 2028, then the transmission
> provider must include for evaluation any network upgrades
> that were identified in interconnection cycles between August
> 1, 2020 (i.e., five years before the effective date) and April 1,
> 2028 (i.e., the date on which transmission solutions are
> identified for inclusion in the transmission planning process)
> and that meet the eligibility criteria.  In that hypothetical
> example, the total time-period over which network upgrades
> could be identified for evaluation as interconnection-related
> transmission needs is seven years and nine months.[1396]

537.    Second, noting the requirement in Order No. 1920, Clean Energy Associations

request that the Commission clarify that any eligible interconnection-related network

---

. . requiring that the same interconnection upgrades be identified twice . . . is simply
impractical")).

[1395] *Id.* at 23-24.

[1396] *Id.* at 24.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1838 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No. RM21-17-001                                                          - 462 -

upgrade that is identified in any two interconnection cycles within the review window—even if both occurrences took place in the five years prior to the effective date—must be evaluated in the transmission providers' initial Order No. 1000 regional transmission planning cycle following the effective date of its Order No. 1920 compliance filing.[1397] Clean Energy Associations argue that there is no reason why the "later in time withdrawn interconnection request" must occur after the "effective date of the Commission-accepted tariff provisions" rather than at any point during the relevant lookback period. Clean Energy Associations claim that, absent the requested clarification, the Commission acted arbitrarily and capriciously and failed to engage in reasoned decision-making by failing to clearly identify the time period at which transmission providers must look to implement this reform.[1398]

### 3.    Commission Determination

538.    We disagree with Clean Energy Associations' requests for rehearing and decline to revise the cost-and-voltage criterion and the repeat identification criterion. We continue to find that it is necessary to limit the scope of the requirement to those interconnection-related transmission needs that are likely to persist, are not unique to a single interconnection request, and might be addressed by regional transmission facilities

---

[1397] *Id.* at 25 (citing Order No. 1920, 187 FERC ¶ 61,068 at P 1145 (establishing the requirement that the time period is "the preceding five years (looking back from the effective date of the Commission-accepted tariff provisions proposed to comply with this reform, and the later-in-time withdrawn interconnection request occurring after the effective date of the Commission-accepted tariff provisions)")).

[1398] *Id.* at 3, 25.

that have the potential to provide more widespread benefits to transmission customers.[1399]

We reiterate the Commission's stated purpose of this reform, which is to address the

narrow issue of interconnection-related transmission needs being repeatedly identified yet

continuing to go unresolved through the generator interconnection process, even though

more efficient or cost-effective regional transmission solutions could be achieved if such

needs were evaluated through the regional transmission planning and cost allocation

process.[1400]

539.    We disagree with Clean Energy Associations' argument that the Commission

acted arbitrarily and capriciously in adopting the requirement to meet both the cost

threshold and the voltage threshold. In Order No. 1920, the Commission explained how

the cost threshold is intended to capture interconnection-related network upgrades that

cause underlying interconnection requests to withdraw (i.e., are likely to persist), and the

voltage threshold is intended to capture interconnection-related transmission needs that

are likely to produce more widespread benefits.[1401] These explanations for requiring that

previously identified interconnection-related network upgrades meet both of these

thresholds for an interconnection-related transmission need to satisfy the cost-and-voltage

criterion are consistent with the Commission's stated purpose and the necessary scope of

this reform. Namely, the cost threshold identifies interconnection-related transmission

---

[1399] Order No. 1920, 187 FERC ¶ 61,068 at P 1146.

[1400] *Id.* P 1112.

[1401] *Id.* P 1151.

needs associated with prohibitive interconnection-related network upgrade costs that

contribute to a barrier to accessing the transmission system, and the voltage threshold

identifies interconnection-related transmission needs with the potential for transmission

benefits that extend beyond the interconnection customer.[1402]  We also disagree with

Clean Energy Associations' claim that the Commission ignored record evidence on this

issue.[1403]  As stated above, the Commission adopted this reform and the associated

qualifying criteria to address a narrow issue with limited scope, not to address an

expansive set of interconnection-related transmission needs as requested by some

commenters in response to the NOPR.

540.    We disagree with Clean Energy Associations that providing for the "flexibility" of

meeting either the cost threshold or the voltage threshold is more consistent with Order

No. 1920's objectives.  Allowing such flexibility places Clean Energy Associations'

preferred policy outcome in place of the need for reform articulated by the

Commission.[1404]  The Commission in Order No. 1920 explained that the coordination

reform is not intended to create an expansive set of interconnection-related transmission

needs that transmission providers must evaluate in the regional transmission planning and

cost allocation processes.  Instead, this reform is intended to identify a limited set of

---

[1402] *Id.* PP 1103-1104.

[1403] Clean Energy Associations Rehearing Request at 15 (citing Order No. 1920, 187 FERC ¶ 61,068 at P 1137 (referencing comments of Pattern Energy, Pine Gate, and Shell); Order No. 1920, 187 FERC ¶ 61,068 at P 1140 (referencing comments of PJM)).

[1404] Order No. 1920, 187 FERC ¶ 61,068 at PP 1106-1121.

interconnection-related transmission needs that are likely to persist, are not unique to a
single interconnection request, and might be addressed by regional transmission facilities
that have the potential to provide more widespread benefits to transmission customers.
We believe that requiring transmission providers to consider a more limited set of
interconnection-related transmission needs through their existing regional transmission
planning and cost allocation processes is warranted because a more expansive set could
include transmission needs associated with expensive but relatively low voltage
interconnection-related network upgrades (which are less likely to provide widespread
benefits to transmission customers compared to higher voltage transmission facilities)
and transmission needs associated with high voltage but relatively inexpensive network
upgrades (which are less likely to remain unbuilt by interconnection customers).

541.    As explained in Order No. 1920, in the context of the repeat identification
criterion, we are also concerned that relaxing the qualifying criteria would create greater
burdens on transmission providers by increasing the number of interconnection-related
transmission needs that transmission providers must evaluate in their Order No. 1000
regional transmission planning and cost allocation processes without widespread benefits
to transmission customers.[1405]  Additionally, the repeat identification criterion is meant to
refine the evaluation to apply to more actionable and valuable interconnection-related
transmission needs that may be better suited for evaluation and development in the
existing Order No. 1000 regional transmission planning and cost allocation processes.

---

[1405] *Id.* P 1150.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1842 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No. RM21-17-001                                                      - 466 -

542.    We disagree with Clean Energy Associations' claim that the requirement to meet both the cost threshold and the voltage threshold unduly limits the universe of transmission solutions in a manner that jeopardizes transmission providers' ability to evaluate transmission solutions that might be more efficient or cost-effective than other options.  Clean Energy Associations conflate transmission needs and transmission solutions to address those needs.  The purpose of the qualifying criteria adopted in Order No. 1920 is to limit the number of interconnection-related transmission needs that transmission providers must evaluate to those that merit consideration.[1406]  Contrary to Clean Energy Associations' claim, the qualifying criteria in Order No. 1920 do not limit the transmission solutions that transmission providers may evaluate to address the identified interconnection-related transmission needs.  Instead, the qualifying criteria in Order No. 1920 limit the set of interconnection-related transmission needs that transmission providers must evaluate.  We believe requiring transmission providers to evaluate this subset of transmission needs is justified because interconnection-related transmission needs that satisfy both the cost threshold and the voltage threshold can be solved with transmission facilities that are more likely to provide widespread benefits to the transmission system and be selected in the regional transmission for purposes of cost allocation as the more efficient and cost-effective transmission solution, compared to interconnection-related transmission needs that satisfy only the cost threshold, or only the voltage threshold.

---

[1406] *Id.*

543.    We also disagree with Clean Energy Associations' claim that the Commission's decision to adopt the repeat identification criterion is arbitrary and inconsistent with the goals of Order No 1920.  Clean Energy Associations' request for rehearing effectively asks the Commission to eliminate the repeat identification criterion to require the evaluation of more interconnection-related transmission needs in regional transmission planning processes, an argument that some commenters made in response to the NOPR and with which the Commission disagreed in Order No. 1920.[1407]  The Commission explained in Order No. 1920 that the purpose of this criterion is to indicate that an interconnection-related transmission need is likely to persist and to limit the extent to which evaluation of regional transmission facilities to address interconnection-related transmission needs is required.[1408]

544.    In response to Clean Energy Associations' request to clarify the timing requirements, and as more fully described below, we clarify that the time period that transmission providers use to identify interconnection-related transmission needs for potential consideration during any Order No. 1000 regional transmission planning and cost allocation process cycle will be longer than five calendar years.  Additionally, we modify the requirements adopted in Order No. 1920 to resolve ambiguity about timing. We find that these modifications are necessary for transmission providers to determine precisely when the coordination requirements are triggered.  Specifically, we modify

---

[1407] *Id.*

[1408] *Id.* PP 1150, 1158.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1844 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No.  RM21-17-001                                                    - 468 -

criterion (1), the repeat identification criterion, and criterion (3), which specifies the maximum time period between withdrawals of interconnection requests associated with the same interconnection-related transmission need (the double withdrawal criterion). We also adopt a new criterion (5), which specifies the timing for identifying withdrawn interconnection requests associated with the same interconnection-related transmission need in the initial and successive Order No. 1000 regional transmission planning and cost allocation cycles (the withdrawal window criterion).  The withdrawal window criterion clarifies the intent of the repeat identification criterion in Order No. 1920.[1409]

545.    In particular, we modify the repeat identification criterion to read (with additions in bold and italicized and deletions struck through):

> (1) Transmission Providers in the transmission planning region have identified the relevant interconnection-related transmission need in interconnection studies in at least two interconnection queue cycles ***(or in at least two individual interconnection studies for Transmission Providers that use a first-come, first-served serial generator interconnection process)*** ~~during the preceding five years (looking back from the effective date of the accepted tariff provisions proposed to comply with this reform in Order No. 1920, and the later-in-time withdrawn interconnection request occurring after the effective date of the accepted tariff provisions)~~;

We also modify the double withdrawal criterion in Attachment K to read (with additions in bold and italicized and deletions struck through):

> (3) ~~the interconnection-related Network Upgrade identified through the generator interconnection process to meet the~~

---

[1409] We also make a minor modification to criterion (4) to account for the fact that we are adopting an additional qualifying criterion.  All the revisions detailed below are reflected in the Attachment K Appendix to this order.

~~relevant interconnection-related transmission need is not currently planned to be developed because~~ the interconnection request~~(s)~~ that led to the identification of the interconnection-related transmission need *in two or more interconnection queue cycles (or two individual interconnection studies if the Transmission Provider uses a first-come, first-served serial generator interconnection process) have* ~~has~~ been withdrawn *and no more than five calendar years have passed between the date of an earlier interconnection request withdrawal and the date of a later interconnection request withdrawal*; ~~and~~

We make a slight modification to criterion (4) so that it reads (with additions in bold and italicized and deletions struck through):

the Transmission Providers have not identified a different interconnection-related Network Upgrade to meet the relevant interconnection-related transmission need in an executed Generator Interconnection Agreement or in a Generator Interconnection Agreement that the interconnection customer requested that the Transmission Provider file unexecuted with the Commission~~.~~*; and*

We also add a new criterion (5), the withdrawal window criterion, as follows (with additions in bold and italicized):

*(5) The interconnection request withdrawals associated with the repeatedly identified interconnection-related transmission need occurred no earlier than seven calendar years prior to the commencement date of the Order No. 1000 regional transmission planning and cost allocation cycle. The initial evaluation should occur in the first Order No. 1000 regional transmission planning and cost allocation cycle to occur after the effective date of the tariff revisions implementing this reform. The transmission provider need not evaluate an interconnection-related transmission need that has been evaluated in a previous Order No. 1000 regional transmission planning and cost allocation cycle.*

Docket No.  RM21-17-001                                                           - 470 -

546.    We make these modifications to resolve confusion about the timing requirements

for this reform.  The Commission's *pro forma* generator interconnection procedures

require an annual cluster request window for interconnection customers to submit

interconnection requests.[1410]  Over the span of the interconnection cycle, the transmission

provider studies the interconnection requests and provides more refined interconnection

study results.[1411]  The requirements of this reform provide an opportunity for transmission

providers to evaluate interconnection-related transmission needs associated with

repeatedly identified interconnection-related network upgrades that are not developed

through the generator interconnection process because the interconnection requests

associated with interconnection-related network upgrade withdraw from the

interconnection queue.[1412]

---

[1410] *See pro forma* LGIP § 3.4.1.  As Order No. 1920 recognizes, however, for a
transmission provider that operates a serial process and studies interconnection requests
on a first-come, first served basis, the criterion will be met if the interconnection-related
transmission need is identified in at least two individual interconnection studies during
the preceding five-year period for interconnection customers that subsequently withdrew
from the interconnection queue.  Order No. 1920, 187 FERC ¶ 61,068 at P 1160.  As
noted above, however, this intricacy will be rendered moot as transmission providers with
serial queues come into compliance with Order No. 2023, which requires them to
transition to a cluster study process.  *Supra* P 530 n.1380; *see* Order No. 2023, 184 FERC
¶ 61,054 at P 223.

[1411] *See*, *e.g.*, *pro forma* §§ LGIP 3.1.1 (Study Deposits), 7 (Cluster Study), 8
(Interconnection Facilities Study), 9 (Affected Systems Study), 10 (Option
Interconnection Study).

[1412] Order No. 1920, 187 FERC ¶ 61,068 at P 1108 (because "the high cost of
interconnection is increasing the rate at which generators withdraw from the
interconnection queue. . . . interconnection customers are unlikely to resolve these
interconnection-related transmission needs through the generator interconnection

547.    The modifications that we make here clarify that a transmission provider need not evaluate an interconnection-related transmission need if more than five calendar years separate the withdrawal of the earlier and later interconnection requests associated with an interconnection-related transmission need (the double withdrawal criterion). Additionally, the withdrawal window criterion makes clear that a transmission provider need only evaluate an interconnection-related transmission need in its Order No. 1000 regional transmission planning and cost allocation cycle if the withdrawal of the interconnection requests associated with the repeatedly identified interconnection-related transmission need occurred within the seven calendar years prior to the commencement date of the Order No. 1000 regional transmission planning and cost allocation cycle.

548.    We find that seven years is an appropriate period because it accounts for the time between withdrawn interconnection requests associated with otherwise eligible interconnection-related transmission needs (at most five years, as specified in the double withdrawal criterion) and accounts for the fact that the timing of generator interconnection queue cluster cycles likely does not coincide with the Order No. 1000 regional transmission planning and cost allocation cycle. Additionally, this seven-year period also accounts for the potential lag between the effective date of the Commission-approved tariff revisions and the initial Order No. 1000 regional transmission planning and cost allocation cycle (for the initial Order No. 1000 cycle) or the time between Order No. 1000 cycles (for subsequent Order No. 1000 cycles). Consequently, by establishing

process.")

USCA4 Appeal: 24-1650   Doc: 224      Filed: 01/21/2025   Pg: 1848 of 2455
Document Accession #: 20241121-3139      Filed Date: 11/21/2024

Docket No.  RM21-17-001                                           - 472 -

a seven-year withdrawal window period, we avoid the possibility of otherwise qualifying

interconnection-related transmission needs being ineligible for evaluation in an Order No.

1000 regional transmission planning and cost allocation cycle due to an inadequate

withdrawal window period that does not account for lags between processes.

549.    We also believe this seven-year period for the withdrawal window is simpler to

calculate than the language that the Commission previously adopted for the repeat

identification criterion in Order No. 1920 (before the modifications described here).  The

reason is that transmission providers will only need to look back seven calendar years

from a single date (the commencement date of the Order No. 1000 regional transmission

planning and cost allocation cycle).  Without the modifications adopted here, the first

qualifying criterion of the repeat identification criterion in Order No. 1920 established

several look-back periods in reference to multiple dates.[1413]

550.    As a result of the modifications above, there is no need to distinguish between the

initial Order No. 1000 regional transmission planning and cost allocation cycle and

subsequent No. 1000 regional transmission planning and cost allocation cycles.  Thus, for

the initial implementation of this reform, the transmission provider need only determine

if the qualifying criteria are satisfied for the period beginning seven calendar years before

---

[1413] *Id.* P 1145 ("(1) the transmission provider has identified interconnection-related network upgrades in interconnection studies to address those interconnection-related transmission needs in at least two interconnection queue cycles during the preceding five years (looking back from the effective date of the Commission-accepted tariff provisions proposed to comply with this reform, and the later-in-time withdrawn interconnection request occurring after the effective date of the Commission-accepted tariff provisions)").

Docket No. RM21-17-001                                                                          - 473 -

the initial Order No. 1000 regional transmission planning and cost allocation cycle

commencement date.  We acknowledge that, in implementation, this start date is likely to

be earlier than the start date established in Order No. 1920.[1414]  As a result, transmission

providers may need to consider one or two additional years of withdrawn interconnection

requests during the initial Order No. 1000 regional transmission planning and cost

allocation cycle.  However, we believe this departure from Order No. 1920 is necessary

to resolve the ambiguity raised on rehearing and to establish clear qualifying criteria for

transmission providers to implement going forward.

551.    In addition, the withdrawal window criterion makes clear that a transmission

provider need not evaluate an interconnection-related need that meets all the qualifying

criteria if it has already evaluated that interconnection-related transmission need in an

Order No. 1000 regional transmission planning and cost allocation cycle.  This

modification is necessary to prevent transmission providers from having to evaluate an

interconnection-related transmission need in more than one Order No. 1000 regional

transmission planning and cost allocation cycle.

552.    Consistent with the adoption of the withdrawal window criterion, we clarify for

Clean Energy Associations that the time period that transmission providers use to identify

interconnection withdrawals is longer than five calendar years.  In particular, the

withdrawal window criterion requires the transmission provider to determine if the

interconnection request withdrawals associated with the repeatedly identified

---

[1414] *Id.* P 1159.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1850 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No. RM21-17-001    - 474 -

interconnection-related transmission need occur within seven calendar years prior to the

commencement of the relevant Order No. 1000 regional transmission planning and cost

allocation cycle.

553.    To explain how this would work, consider the following hypothetical and assume

that the voltage-and-cost threshold criterion is satisfied:

- Transmission provider identifies interconnection-related transmission need A as
  necessary to interconnect interconnection request A in interconnection cluster
  cycle 1.

- Interconnection request A withdraws from interconnection cluster cycle 1 on
  August 1, 2035.

- In interconnection cluster cycle 2, transmission provider identifies
  interconnection-related transmission need A as necessary to interconnect
  interconnection request B.

- Interconnection request B withdraws from interconnection cluster cycle 2 on or
  before August 1, 2040.

- The first Order No. 1000 regional transmission planning and cost allocation cycle
  following the withdrawal of interconnection request B commences on January 1,
  2042.

In this example, the repeat identification criterion would be satisfied because the same

interconnection-related transmission need was identified for interconnection request A

and interconnection request B in interconnection cluster cycle 1 and interconnection

cluster cycle 2, respectively.  The double withdrawal criterion would be satisfied because

no more than five calendar years have passed between the withdrawal of interconnection request A and interconnection request B. The withdrawal window criterion would be satisfied because the withdrawals of interconnection request A and interconnection request B occurred within seven calendar years prior to the commencement date of the Order No. 1000 regional transmission planning and cost allocation cycle. Consequently, the transmission provider would be required to evaluate interconnection-related transmission need A in the Order No. 1000 regional transmission planning and cost allocation cycle that commences on January 1, 2042.

554.    We turn now back to Clean Energy Associations' first clarification request and explain these requirements using the dates provided in Clean Energy Associations' example, where the relevant tariff revisions would become effective August 1, 2025, the initial Order No. 1000 regional transmission planning and cost allocation cycle would commence on August 1, 2027, and the transmission solutions to be evaluated will be identified on April 1, 2028.

555.    We clarify that the April 1, 2028 date would not be relevant for determining whether a transmission provider must evaluate an interconnection-related transmission need. The relevant dates are the interconnection request withdrawal dates and the commencement date of the Order No. 1000 regional transmission planning and cost allocation cycle. In Clean Energy Associations' example, the transmission provider would identify interconnection request withdrawals between August 1, 2020 (seven calendar years prior to the commencement date of the Order No. 1000 regional transmission planning and cost allocation cycle provided in this example) and August 1,

Docket No.  RM21-17-001                                                    - 476 -

2027 (the commencement date of the Order No. 1000 regional transmission planning and

cost allocation cycle provided in this example).  Of those withdrawals, the repeat

identification criterion will be satisfied if no more than five calendar years elapsed

between the earlier and later interconnection request withdrawal dates for interconnection

requests associated with the same repeatedly identified interconnection-related

transmission need.  Thus, withdrawals of interconnection requests with the earlier

occurring on August 1, 2020 and the later occurring August 1, 2025 would satisfy the

double withdrawal criterion.  The same is true for withdrawals of interconnection

requests with the earlier occurring on August 1, 2022 and the later occurring August 1,

2027.  The double withdrawal criterion would not be satisfied, however, if the first

withdrawal occurred on August 1, 2020 and the later occurred on August 2, 2025 because

more than five calendar years occur between the earlier and later interconnection request

withdrawals.

556.    Additionally, in response to Clean Energy Associations' second request for

clarification, we note that the modifications to the repeat identification criterion adopted

here delete the Attachment K language adopted in Order No. 1920 that created

confusion.[1415]  Consistent with the modifications adopted here, we clarify that the double

withdrawal criterion requires that no more than five calendar years occur between the

earlier and later interconnection request withdrawals and that the withdrawal window

criterion makes clear that transmission providers need not evaluate an interconnection-

---

[1415] *See id.* P 1145.

related transmission need if the relevant interconnection request withdrawals do not occur within the seven calendar years prior to the commencement date of the Order No. 1000 regional transmission planning and cost allocation cycle.

### C. Cost Allocation

#### 1. Order No. 1920 Requirements

557.    In Order No. 1920, the Commission adopted new coordination requirements to require that transmission providers evaluate regional transmission facilities that address certain interconnection-related transmission needs identified by this reform in the existing Order No. 1000 regional transmission planning and cost allocation processes.[1416]  The Commission also stated that requests to modify existing cost allocation criteria were outside the scope of the proceeding.[1417]  Additionally, the Commission stated that transmission providers will still have to evaluate and select any regional transmission facilities that address the interconnection-related transmission needs as the more efficient or cost-effective regional transmission solution as part of the regional transmission planning process in order for any regional cost allocation method to apply.  Further, Order No. 1920 did not alter the existing cost allocation methods in either the generator interconnection or existing Order No. 1000 regional transmission planning process.[1418]  The Commission went on to explain that, to the extent that transmission providers wish to

---

[1416] *Id.* P 1111.

[1417] *Id.* P 1112.

[1418] *Id.* P 1117.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1854 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No.  RM21-17-001                                                    - 478 -

propose changes to their Order No. 1000 regional cost allocation method(s) because of this new requirement, they would need to do so in separate FPA section 205 filings rather than on compliance with Order No. 1920.[1419]

## 2.    Requests for Rehearing and Clarification

558.    Retail Regulators, Ohio Consumers, NRECA, Undersigned States, and West Virginia Commission argue that Order No. 1920's coordination reform shifts the costs of generator interconnection to load.[1420]  In particular, Retail Regulators and Undersigned States argue that this requirement is another means to transfer network upgrade costs necessitated by generator interconnection to load and they contend, along with West Virginia Commission, that shifting these costs is not just and reasonable.[1421] Undersigned States further argue that this shift violates the FPA, and that Order No. 1920's failure to account for these effects is arbitrary and capricious.1422  Relatedly, PJM argues that this reform is arbitrary and capricious because it reopens accepted cost allocation methods in Order Nos. 1000 and 2023 that were built on the premise that the cost causer pays for the interconnection costs.[1423]

---

[1419] *Id.* P 1118.

[1420] Retail Regulators Rehearing Request at 43-44; Ohio Consumers Rehearing Request at 8; NRECA Rehearing Request at 45; Undersigned States Rehearing Request at 37; West Virginia Commission Rehearing Request at 16.

[1421] Retail Regulators Rehearing Request at 43-44; Undersigned States Rehearing Request at 37; West Virginia Commission Rehearing Request at 16.

[1422] Undersigned States at 37.

[1423] PJM Rehearing Request at 36 (citing *Midwest ISO Transmission Owners*, 373

559.    NRECA states that the Commission has failed to consider that its policies governing interconnection-related network upgrades—particularly allowing participant funding in RTOs/ISOs—are intended to result in a just and reasonable allocation of the costs of interconnection-related network upgrades.[1424]  Industrial Customers argue that Order No. 1920 abruptly abandons participant funding, which it characterizes as a "longstanding" model that sends proper pricing signals for generation developers to select projects close to load while also protecting existing transmission customers from subsidizing interconnection of new generation.[1425]  East Kentucky argues that the Commission:

> has not provided a reasonable explanation of how this requirement does not result in unjust, unreasonable, and unduly discriminatory transmission rates in violation of Section 206 of the Federal Power Act, 16 U.S.C. § 824e, and does not alter, without adequate explanation or evidence, the Commission's existing interconnection pricing and participant funding polices.[1426]

560.    Industrial Customers state that the Commission ignored arguments that the Commission must rationally explain its decision to depart from the existing just and reasonable "but for" policy of Order No. 2003.[1427]  Industrial Customers argue that the

---

F.3d at 1368 (citing 5 U.S.C. § 706(2)(A)); *State Farm*, 463 U.S. at 43; *Wis. Gas Co. v. FERC*, 770 F.2d at 1156; *see also* Industrial Consumers Rehearing Request at 48.

[1424] NRECA Rehearing Request at 48.

[1425] Industrial Customers Rehearing Request at 41.

[1426] East Kentucky Rehearing Request at 3.

[1427] Industrial Customer Rehearing Request at 41.

Docket No. RM21-17-001                                                          - 480 -

Commission should not justify its "cost allocation techniques by arguing that interconnection costs for renewable energy resources are too high and should be socialized across all transmission customers."[1428]  Industrial Customers further argue that Order No. 1920 changes prior Commission policies without setting forth a reasonable and adequate explanation for resulting shifting of costs.[1429]

561.    Ohio Consumers argue that Order No. 1920 is inconsistent with Order No. 2003 incentives because it shifts network upgrade costs that would have incentivized generation developers to locate in "the right area."[1430]  NRECA argues that requiring evaluation and selection of unbuilt interconnection-related network upgrades in the existing Order No. 1000 regional transmission planning and cost allocation processes gives an undue preferential treatment to generation developers, a group that would ordinarily fund the network upgrades in the first instance.[1431]  Further, NRECA states that the Commission has made no finding that the Commission's policies allowing participant funding in RTOs/ISOs for interconnection-related network upgrades have become unjust and unreasonable and should be replaced.[1432]

---

[1428] *Id.* at 43.

[1429] *Id.* at 45.

[1430] Ohio Consumers Rehearing Request at 8-9; *see also* Industrial Consumers Rehearing Request at 42.

[1431] NRECA Rehearing Request at 46.

[1432] *Id.* at 48.

### 3.    Commission Determination

562.    We sustain Order No. 1920 and find that the coordination requirements in Order No. 1920 do not require changes to existing cost allocation methods that transmission providers have adopted in either the generator interconnection or existing Order No. 1000 regional transmission planning and cost allocation processes.  Therefore, those existing cost allocation methods adopted by transmission providers remain intact.

563.    To this point, in response to Retail Regulators, Ohio Consumers, NRECA, Undersigned States, West Virginia Commission, and PJM, we first note that the coordination reform does not alter existing cost allocation methods or create a new cost allocation method for generator interconnection processes.  Rather, the purpose of the coordination reform is to require transmission providers to *evaluate*, in the existing Order No. 1000 regional transmission planning and cost allocation processes, certain (i.e., that qualify under the criteria established in Order No. 1920) interconnection-related transmission needs that were not addressed through the generator interconnection process because the identified interconnection-related network upgrades were never constructed pursuant to that process.  If an interconnection customer enters into a generator interconnection agreement, the transmission provider will construct the identified interconnection-related network upgrades and allocate their costs in accordance with the transmission provider's Commission-accepted cost allocation approach for such interconnection-related network upgrades.  If an interconnection customer does not enter into a generator interconnection agreement for its interconnection request, however, the identified interconnection-related network upgrades will not be constructed pursuant to

Docket No.  RM21-17-001                                                      - 482 -

the generator interconnection process; thus, the generator interconnection cost allocation approach would not apply.

564.    Moreover, in response to NRECA and PJM, the coordination reform does not create a new regional cost allocation method for the existing Order No. 1000 regional transmission planning and cost allocation processes.  Instead, transmission providers must now, pursuant to this reform, *evaluate* certain interconnection-related transmission needs pursuant to their existing Order No. 1000 regional transmission planning and cost allocation processes.  The transmission provider may adopt the evaluation method and selection criteria from any of its existing Order No. 1000 regional transmission planning and cost allocation processes (e.g., economic or reliability process) to evaluate and potentially select transmission facilities that address these transmission needs.  To the extent that such a transmission facility is selected, it will have met the selection criteria for the applicable Order No. 1000 regional transmission planning process and be eligible for cost allocation pursuant to a regional cost allocation method that has been found to allocate costs of transmission facilities selected through that process in a manner that is at least roughly commensurate with benefits.

565.    We reiterate, however, that there is no obligation for transmission providers to select a transmission facility that addresses the interconnection-related transmission need that must be evaluated pursuant to this reform.[1433]  As the Commission stated in Order No. 1920, in order for the transmission facility associated with the relevant

---

[1433] *See* Order No. 1920, 187 FERC ¶ 61,068 at P 1156.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1859 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No.  RM21-17-001                                                   - 483 -

interconnection-related transmission need to be eligible for cost allocation pursuant to transmission providers' existing Order No. 1000 regional cost allocation method, the transmission provider "will still have to evaluate and select any regional transmission facilities that address the interconnection-related transmission needs as the more efficient or cost-effective regional transmission solution."[1434]  The Commission also stated that "if a regional transmission facility that addresses identified interconnection-related transmission needs is not selected as part of the regional transmission planning process, then the associated regional cost allocation method would not apply."[1435]  The Commission explained that, to the extent that the coordination reform results in transmission providers selecting a transmission facility that, among other things, addresses an interconnection-related transmission need in the existing Order No. 1000 regional transmission planning and cost allocation processes, they would have done so because the selected transmission facility was evaluated and determined by the transmission provider to be eligible for selection in the regional transmission plan for purposes of cost allocation and is the more efficient or cost-effective regional transmission solution.  Moreover, we reiterate that the reform adopted here does not compel transmission providers to adopt a new cost allocation method for transmission facilities that address interconnection-related transmission needs.

---

[1434] *Id.* P 1117.

[1435] *Id.*

Docket No. RM21-17-001                                                          - 484 -

### D.    Gaming

#### 1.    Order No. 1920 Requirements

566.    In Order No. 1920 the Commission did not adopt revisions to the proposed

coordination reform in response to assertions that the reform would lead to "gaming,"

resulting in spurious interconnection requests.  The Commission explained that

interconnection requests require significant financial commitments from interconnection

customers, which the Commission made more stringent in Order No. 2023.

Consequently, the Commission considered it unlikely that an interconnection customer

would submit multiple interconnection requests in multiple interconnection queue cycles

to trigger the requirement for transmission providers to evaluate, as part of their existing

Order No. 1000 regional transmission planning and cost allocation processes, regional

transmission facilities that may address certain interconnection-related transmission

needs.  The Commission noted that an interconnection customer would face various risks

pursuing such a strategy, including the risk that the regional transmission solution for the

interconnection-related transmission need is not selected, and the risk that the newly

created interconnection or transmission capacity is allocated to a different transmission or

interconnection customer.[1436]

#### 2.    Requests for Rehearing and Clarification

567.    PJM and NRECA argue that Order No. 1920 is arbitrary and capricious because it

creates perverse incentives for generation developers to game the interconnection process

---

[1436] *Id.* P 1119.

and shift interconnection-related network upgrade costs in an unduly discriminatory manner onto transmission customers.[1437]  PJM and NRECA argue that the evidence does not support the Commission's reasoning that the stringent financial commitments required in the interconnection process will prevent gaming.[1438]

568.    PJM states that, in its generator interconnection process, an interconnection customer's initial readiness deposit is only at risk prior to the interconnection customer learning its assigned network upgrade cost responsibility.[1439]  PJM further states that, for a hypothetical 300 MW project that would trigger the $30 million dollar threshold in the final rule,[1440] the interconnection customer would only risk its readiness deposit of $1.2 million prior to withdrawing and having to post an additional deposit.[1441]  PJM asserts that a sophisticated developer can leverage that low risk and enhance its chances of selection for PJM's Regional Transmission Expansion Plan (RTEP) by submitting well-formed and strategically positioned, but specious, interconnection requests.[1442]  PJM asserts that, as a result, such developers can flood the PJM interconnection process with speculative and larger than necessary interconnection requests and withdraw shortly after

---

[1437] PJM Rehearing Request at 33; NRECA Rehearing Request at 44, 46-47.

[1438] PJM Rehearing Request at 33; NRECA Rehearing Request at 46.

[1439] PJM Rehearing Request at 34.

[1440] Order No. 1920, 187 FERC ¶ 61,068 at P 1155.

[1441] PJM Rehearing Request at 35.

[1442] *Id.* at 36.

Docket No.  RM21-17-001                                                        - 486 -

the required network upgrade costs are identified.[1443]  PJM asserts that this would force it

to reconsider RTEP upgrades that would incorporate the needed network upgrades and

assign cost responsibility to load rather than to the generation developers.[1444]

569.    PJM asserts that the final rule discounts these concerns despite PJM's

demonstration that the risk-to-benefit ratio heavily favors the submission of speculative

interconnection requests for a relatively low at-risk deposit.  PJM argues that this risk-to-

benefit ratio justifies the potential risk of non-selection in RTEP that a developer may

face.[1445]

### 3.    Commission Determination

570.    We do not find persuasive arguments raised on rehearing and continue to find that

no revisions to Order No. 1920's coordination requirement are necessary to address the

speculative gaming concerns raised in this proceeding.[1446]  With respect to PJM's specific

generator interconnection process, we disagree with PJM that the risk an interconnection

customer faces of losing only its readiness deposit if it withdraws is too low a risk to

mitigate gaming concerns.  Specifically, PJM's own hypothetical example demonstrates

that an interconnection customer would risk losing $1.2 million for a single

interconnection request, a risk that that we do not consider inconsequential.  Moreover,

---

[1443] *Id.* at 35.

[1444] *Id.*

[1445] PJM Rehearing Request at 36.

[1446] Order No. 1920, 187 FERC ¶ 61,068 at P 1119.

for a single interconnection customer to attempt this gaming strategy, it would have to

put its study and readiness deposits at risk in at least two interconnection queue cycles,

and therefore would put at risk $2.4 million ($1.2 million per cycle) for the underlying

interconnection-related transmission need to trigger the repeat identification criterion to

qualify for evaluation in the Order No.1000 regional transmission planning and cost

allocation processes.[1447]  Therefore, the risk is higher than what PJM asserts.

571.    Additionally, we continue to find it unlikely that an interconnection customer

would submit multiple interconnection requests (in multiple interconnection queue

cycles) to trigger this requirement because the interconnection customer would face

additional uncertainty in that transmission providers may not select a transmission facility

that addresses the interconnection-related network upgrade in a regional transmission

plan for purposes of cost allocation.  We also reiterate that pursuing such a strategy

would entail other risks, including the risk that any of the five qualifying criteria will not

be met and the possibility that the newly created interconnection or transmission capacity

will not benefit the interconnection customer that submitted, and withdrew, the

interconnection requests in multiple interconnection queue cycles because the entity that

withdrew the interconnection requests has no preferential claim to that capacity.[1448]  For

these reasons, we believe the financial risks and process-related restrictions make it

unlikely that a generation developer would risk time and resources to "game" this process

---

[1447] *Id.* PP 1119, 1145.

[1448] *See id.* P 1119.

in the hope of benefiting from an uncertain process, which is highly unlikely to produce the generation developer's preferred result.

      E.    **Transmission Planning Process Evaluation**

      1.    **Order No. 1920 Requirements**

572.    In Order No. 1920, the Commission required transmission providers in each transmission planning region to evaluate regional transmission facilities that address certain interconnection-related transmission needs in their existing Order No. 1000 regional transmission planning and cost allocation processes instead of in Long-Term Regional Transmission Planning, as was proposed in the NOPR.  The Commission explained that by requiring transmission providers to evaluate identified interconnection-related transmission needs in existing Order No. 1000 regional transmission planning and cost allocation processes, such needs will be addressed within a timeframe that is relevant for identifying more efficient or cost-effective near-term regional transmission solutions.[1449]

573.    The Commission agreed with commenters that future interconnection-related transmission needs will be considered as part of Long-Term Regional Transmission Planning and incorporated in the development of Long-Term Scenarios.  The Commission disagreed with commenters that asserted that the Commission's coordination proposal is unnecessary because well-executed Long-Term Regional Transmission Planning will identify the transmission needed to support generator

---

[1449] *Id.* P 1126.

interconnections. The Commission anticipated that as transmission providers gain experience with Long-Term Regional Transmission Planning they will identify fewer interconnection-related transmission needs associated with certain interconnection-related network upgrades originally identified through the generator interconnection process because transmission providers will plan to address Long-Term Transmission Needs, including those driven by Factor Category One: federal, federally-recognized Tribal, state, and local laws and regulations that affect the future resource mix and demand; Factor Category Two: federal, federally-recognized Tribal, state, and local laws and regulations on decarbonization and electrification; Factor Category Six: generator interconnection requests and withdrawals, and Factory Category Seven: utility and corporate commitments and federal, federally-recognized Tribal, state, and local policy goals that affect Long-Term Transmission Needs, through Long-Term Regional Transmission Planning.[1450]

## 2. Requests for Rehearing and Clarification

574. NRECA and East Kentucky argue that the Commission did not provide sufficient notice and opportunity to comment on the final rule's requirement to evaluate for selection transmission facilities to address identified interconnection-related transmission needs in existing Order No. 1000 regional transmission planning and cost allocation

---

[1450] *Id.* P 1127.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1866 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No.  RM21-17-001                                                    - 490 -

processes rather than in Long Term-Regional Transmission Planning process, as the NOPR proposed.[1451]

575.    Clean Energy Associations claim that the Commission failed to engage in reasoned decision-making by not requiring transmission providers to evaluate network upgrades that address interconnection-related transmission needs in Long-Term Regional Transmission Planning.[1452]  Clean Energy Associations argue that if one assumes that the Order No. 1920 rationale is true, i.e., that the existing Order No. 1000 regional transmission planning and cost allocation processes are a faster and more effective means of getting these facilities built, then such rationale does not justify the Commission's failure to also require evaluation of those upgrades in Long-Term Regional Transmission Planning.[1453]  Clean Energy Associations allege that Order No. 1920, by limiting the mandatory consideration of interconnection-related network upgrades to the existing Order No. 1000 regional transmission planning and cost allocation processes, will necessarily fail to require transmission providers to evaluate benefits of transmission facilities that would result from their selection.  Clean Energy Associations allege that any transmission upgrade, including interconnection-related network upgrades, is more likely to be selected in the "more robust" Long-Term Regional Transmission Planning,

---

[1451] East Kentucky Rehearing Request at 1-2; NRECA Rehearing Request at 15-16.

[1452] Clean Energy Associations Rehearing Request at 4-6.

[1453] *Id.* at 6.

which they believe is consistent with the Commission's justifications of the reform and

supported by the record.[1454]

576.    Clean Energy Associations assert that the Commission's expectation that fewer

interconnection-related network upgrades would be identified over time, in part due to

transmission providers' consideration of Factor Category Six (Generator Interconnection

Requests and Withdrawals), is no grounds to deny a parallel path for transmission

providers to evaluate interconnection-related transmission needs through Long-Term

Regional Transmission Planning because the categories of factors apply to identifying

Long-Term Transmission Needs, rather than evaluating specific facilities for possible

selection.[1455]    Clean Energy Associations claim that the Commission's requirement to

evaluate interconnection-related transmission needs is more analogous to the evaluation

requirements than to the Long-Term Scenarios requirements of Long-Term Regional

Transmission Planning.    Clean Energy Associations argue, therefore, that it is not just and

reasonable, nor is it comparable, to assume that Factor Category Six is duplicative of

evaluating interconnection-related network upgrades in Long-Term Regional

Transmission Planning.

577.    Clean Energy Associations further argue that evaluating interconnection-related

transmission needs in Long-Term Regional Transmission Planning may serve as a needed

fail-safe for addressing current interconnection-related transmission needs if a particular

---

[1454] *Id.* at 7.

[1455] *Id.* at 7-8.

transmission provider's existing Order No. 1000 regional transmission planning and cost allocation processes prove to be ineffective for that purpose.[1456]  Clean Energy Associations assert that to maximize the chances that more efficient or cost-effective projects will be successfully developed, the Commission should require transmission providers to evaluate qualifying interconnection-related network upgrades in both Long-Term Regional Transmission Planning and the existing Order No. 1000 regional transmission planning and cost allocation processes.[1457]

578.    Clean Energy Associations claim that the record demonstrates that interconnection-related network upgrades provide transmission benefits beyond the interconnection customers triggering them, and it is therefore reasonable to require their evaluation with comparable high-voltage, high-cost facilities in Long-Term Regional Transmission Planning.[1458]  Clean Energy Associations also state that evaluation of interconnection-related network upgrades in Long-Term Regional Transmission Planning is the logical precedent for the voluntary funding option for interconnection customers because it will provide potential funders of the transmission facilities with a comparable way to evaluate the benefits of that facility.[1459]

---

[1456] *Id.* at 8.

[1457] *Id.* at 9.

[1458] *Id.* at 10-11.

[1459] *Id.* at 11-12.

579. Finally, Clean Energy Associations request that, at a minimum, the Commission clarify that Order No. 1920 does not prohibit transmission providers from evaluating interconnection-related transmission needs in Long-Term Regional Transmission Planning.[1460]

580. Large Public Power argues that by specifying that interconnection applications and withdrawals are the sole criterion for project selection in existing Order No. 1000 regional transmission planning and cost allocation processes, Order No. 1920 will dramatically skew the Order No. 1000 processes and is fundamentally at odds with the Commission's objective of not disrupting planning for reliability and economic needs put in place under Order No. 1000.[1461] Large Public Power also argues that specifying that interconnection applications and withdrawals are the sole criterion for project selection in existing Order No. 1000 regional transmission planning and cost allocation processes is inconsistent with the approach to developing Long-Term Scenarios, which "call[s] for a holistic analysis which enables system planners to make informed, balanced decisions to address the unique Long-Term Transmission Needs of each planning region."[1462] Large Public Power asserts that the Commission failed to explain why generation interconnection application withdrawals should be the only consideration to determine

---

[1460] *Id.* at 12-13.

[1461] Large Public Power Rehearing Request at 21.

[1462] *Id.* at 21-22.

Docket No. RM21-17-001                                                                - 494 -

transmission needs under existing Order No. 1000 regional transmission planning and cost allocation processes.[1463]

581.    PJM claims that the withdrawn and speculative interconnection requests, as potential drivers of regional transmission needs, would insert an unjustified level of uncertainty into its existing Order No. 1000 regional transmission planning and cost allocation processes.[1464]  PJM also asserts that the final rule is arbitrary and capricious because it requires consideration of withdrawn interconnection requests in its near-term RTEP and provides them undue preference over interconnection requests that have taken all required steps to obtain site control, permits, and regulatory approvals and have paid deposits.[1465]  PJM contends that under the final rule, the output of the RTEP process, which is used in the generator interconnection process, "would be inflated by the addition of questionable transmission upgrades."[1466]  Thus, PJM claims, the RTEP and generator interconnection processes, which are meant to work in tandem, would become unnecessarily separated and infused with dubious inputs and drivers.[1467]

---

[1463] Large Public Power Rehearing Request at 22.

[1464] PJM Rehearing Request at 37-38.

[1465] *Id.*

[1466] *Id.* at 38.

[1467] *Id.*

### 3.    Commission Determination

582.    We disagree with NRECA and East Kentucky that the Commission failed to provide adequate notice of and opportunity to comment on Order No. 1920's requirement that transmission providers in each transmission planning region evaluate for selection regional transmission facilities that address certain interconnection-related transmission needs in their existing Order No. 1000 regional transmission planning and cost allocation processes instead of in Long-Term Regional Transmission Planning.[1468]

583.    A final rule is a logical outgrowth of a proposed rule where "a reasonable member of the regulated class" could "anticipate the general aspects of the [final] rule."[1469]  Order No. 1920 satisfies this standard because the NOPR explicitly requested comment on how the proposed reform "should interact with existing regional transmission planning processes and the Long-Term Regional Transmission Planning proposed herein,"[1470] which put parties on notice that the Commission was contemplating the change that

---

[1468] East Kentucky Rehearing Request at 1-2; NRECA Rehearing Request at 15-16.

[1469] *Telesat Canada v. FCC*, 999 F.3d at 713-14 (quotations omitted).  We note that, while requiring transmission providers to evaluate identified interconnection-related transmission needs in existing Order No. 1000 regional transmission planning and cost allocation processes will allow such needs to be addressed within a timeframe that is relevant for identifying more efficient or cost-effective near-term regional transmission solutions, we believe that evaluating interconnection-related transmission needs in Long-Term Regional Transmission Planning would also be appropriate.  The inability to require that transmission providers consider regional transmission facilities to address interconnection-related transmission needs in Order No. 1000 processes would not have prevented the Commission from issuing Order No. 1920.

[1470] NOPR, 179 FERC ¶ 61,028 at P 174.

NRECA and East Kentucky now argue is not a logical outgrowth of the NOPR.  Courts have explained that "[n]otice suffices when [an agency] has 'expressly asked for comments on a particular issue or otherwise made clear that the agency was contemplating a particular change.'"[1471]  Here, by requesting comment on the issue, the Commission put parties on notice that it was continuing to contemplate how the proposed reform should interact with both proposed Long-Term Regional Transmission Planning and existing Order No. 1000 regional transmission planning processes.

584.    Agency final rules need not be identical to proposed rules, and notice is sufficient if the final rule represents a "logical outgrowth" of the proposed rule.[1472]  The final rule is a logical outgrowth of the NOPR in this regard.  In the NOPR, the Commission proposed to require that transmission providers evaluate for selection in the regional transmission plan for purposes of cost allocation regional transmission facilities to address certain interconnection-related needs that meet specific qualifying criteria established by the Commission.[1473]  Order No. 1920 adopted this requirement and mandated that such consideration occur in existing Order No. 1000 regional transmission planning and cost

---

[1471] *Brennan v. Dickson*, 45 F.4th at 69 (quoting *CSX Transp., Inc. v. Surface Transp. Bd.*, 584 F.3d at 1081).

[1472] *Long Island Care*, 551 U.S. at 174-75; *see also Am. Paper Inst. v. EPA*, 660 F.2d at 959 n.13 ("An agency may make *even substantial changes* in its original proposed rule without a further comment period if the changes are in character with the original proposal and are a logical outgrowth of the notice and comments already given." (emphasis added)).

[1473] NOPR, 179 FERC ¶ 61,028 at P 166.

USCA4 Appeal: 24-1650   Doc: 224      Filed: 01/21/2025   Pg: 1873 of 2455
Document Accession #: 20241121-3139      Filed Date: 11/21/2024

Docket No.  RM21-17-001                                                              - 497 -

allocation processes,[1474] rather than in Long-Term Regional Transmission Planning, as
the NOPR proposed.[1475]  The Commission explained that this change will allow
interconnection-related transmission needs to be addressed within a timeframe that is
relevant for identifying more efficient or cost-effective near-term regional transmission
solutions.  We find that this change satisfies the logical outgrowth test because while the
Commission modified the type of regional transmission planning and cost allocation
processes that would be subject to coordination with interconnection-related transmission
needs, it retained the underlying requirement that such coordination occur.  Thus, Order
No. 1920's requirement "follow[s] logically from" the NOPR because the NOPR
"adequately frame[d] the subjects for discussion."[1476]

585.   We are unpersuaded by Clean Energy Associations' assertion that the Commission
failed to engage in reasoned decision-making by not requiring transmission providers to
evaluate network upgrades that address interconnection-related transmission needs in
Long-Term Regional Transmission Planning.  We continue to find that evaluating
interconnection-related transmission needs associated with this coordination requirement
is more appropriate in the existing Order No. 1000 regional transmission planning and
cost allocation processes than in Long-Term Regional Transmission Planning because
such evaluation would occur at shorter intervals and would be more likely to result in

---

[1474] Order No. 1920, 187 FERC ¶ 61,068 at P 1126.

[1475] NOPR, 179 FERC ¶ 61,028 at P 167.

[1476] *Conn. Light & Power Co. v. Nuclear Regulatory Comm'n*, 673 F.2d at 533.

Docket No. RM21-17-001                                                                    - 498 -

expeditious development of regional transmission facilities to address the nearer-term

interconnection-related transmission needs identified through the generator

interconnection process.[1477]  We find that it is unnecessary to require transmission

providers to also evaluate interconnection-related transmission needs associated with this

coordination requirement in Long-Term Regional Transmission Planning because the

coordination requirement in Order No. 1920 is just and reasonable and sufficient to

address the need for reform.

586.    In addition, we reiterate that transmission providers must consider future

interconnection-related transmission needs as a driver of Long-Term Transmission Needs

in Long-Term Regional Transmission Planning through the development of Long-Term

Scenarios, which must incorporate generator interconnection withdrawals in Factor

Category Six (Generator Interconnection Requests and Withdrawals).[1478]  Factor

Category Six allows transmission providers to consider a broader range of potential

interconnection-related transmission needs compared to the interconnection-related

transmission needs that meet the coordination requirement's qualifying criteria.

Moreover, to the extent that an interconnection-related transmission need is not addressed

according to this coordination requirement, transmission providers may choose to

consider similar interconnection-related transmission needs as Long-Term Transmission

Needs and evaluate Long-Term Regional Transmission Facilities to address those needs

---

[1477] Order No. 1920, 187 FERC ¶ 61,068 at P 1126.

[1478] *Id.* PP 1127-1128.

in Long-Term Regional Transmission Planning.  Therefore, we believe that requiring

transmission providers to evaluate interconnection-related transmission needs identified

by this coordination requirement in Long-Term Regional Transmission Planning would

be redundant to existing Order No. 1920 requirements and could inappropriately limit the

scope of the interconnection-related transmission needs that transmission providers

consider in Long-Term Regional Transmission Planning.

587.    On this point, we disagree with Clean Energy Associations' claim that it is not just

and reasonable, nor is it comparable, to assume Factor Category Six is duplicative of

evaluating interconnection-related network upgrades in Long-Term Regional

Transmission Planning, and that this coordination requirement is more analogous to the

Long-Term Regional Transmission Planning evaluation requirements.  Both the

qualifying criteria of the coordination requirement and the categories of factors of the

Long-Term Scenarios requirements (in Long-Term Regional Transmission Planning)

establish how transmission providers identify transmission needs.  We recognize that the

coordination requirement mandates the evaluation of regional transmission facilities to

address interconnection-related transmission needs associated with this coordination

requirement, albeit allowing for flexibility in how transmission providers evaluate such

facilities for selection, but Long-Term Regional Transmission Planning does not mandate

evaluation of a specific type of transmission facility.[1479]  However, the requirement to

evaluate regional transmission facilities associated with the coordination requirement is

---

[1479] *Id.* P 1111.

Docket No.  RM21-17-001                                                      - 500 -

similar to the Long-Term Regional Transmission Planning requirement for transmission

providers to establish a process, including selection criteria, that they will use to identify

and evaluate Long-Term Regional Transmission Facilities for potential selection to

address Long-Term Transmission Needs (which, as discussed above, will include future

interconnection-related transmission needs).  This explanation addresses Clean Energy

Associations' concern that Order No. 1920 will necessarily fail to require transmission

providers to evaluate benefits of transmission facilities to address interconnection-related

transmission needs through Long-Term Regional Transmission Planning.

588.    In response to Clean Energy Associations' request for clarification that Order No.

1920 does not prohibit transmission providers from evaluating interconnection-related

transmission needs in Long-Term Regional Transmission Planning, we reiterate that

future interconnection-related transmission needs must be considered as part of Long-

Term Regional Transmission Planning and incorporated in the development of Long-

Term Scenarios.[1480]  We clarify that Order No. 1920 does not prohibit transmission

providers from proposing on compliance how they will identify and evaluate future

interconnection-related transmission needs in Long-Term Regional Transmission

Planning.  However, we will not prejudge Clean Energy Associations' proposal for a

"parallel path" for identifying and evaluating interconnection-related transmission needs

in Long-Term Regional Transmission Planning using the coordination requirement's

---

[1480] *Id.* P 1127.

qualification criteria.[1481]  If any transmission provider chooses to develop additional

processes to address interconnection-related transmission needs in Long-Term Regional

Transmission Planning, they must demonstrate that the proposal is consistent with or

superior to Order No. 1920's requirements.

589.    We are not persuaded by Large Public Power's argument that, in Order No. 1920,

the Commission is specifying that interconnection applications and withdrawals are the

sole criterion for project selection in existing Order No. 1000 regional transmission

planning and cost allocation processes.  To this point, we first note that Order No. 1920

adopts not one, but five, criteria for interconnection-related transmission needs to be

evaluated through existing Order No. 1000 regional transmission planning and cost

allocation processes.  That is, evaluation is only required when the interconnection-

related network upgrades driving interconnection-related transmission needs meets the

five qualification criteria established in Order No. 1920.[1482]

590.    Furthermore, the evaluation requirement only requires transmission providers to

*evaluate* interconnection-related transmission needs in the Order No. 1000 regional

transmission planning process.  It does not require that transmission providers use

interconnection-related transmission needs as a criterion to decide whether to select a

regional transmission facility in the Order No. 1000 regional transmission planning

process nor does it require that the interconnection-related transmission need be resolved.

---

[1481] *Id.* P 1145.

[1482] *Id.*

As the Commission explained, these requirements provide flexibility in how transmission providers evaluate transmission facilities for selection by allowing them to adopt the evaluation method and selection criteria from any of their existing Order No. 1000 regional transmission planning and cost allocation processes (e.g., economic or reliability processes) to evaluate and potentially select these types of transmission facilities.  The Commission thus permitted transmission providers to propose the best method to incorporate this new requirement for their transmission planning region and encouraged transmission providers to consider, as part of the evaluation process, whether regional transmission facilities that address certain identified interconnection-related transmission needs may also address other regional transmission needs more efficiently or cost-effectively.[1483]

591.   We also disagree with PJM's assertions that the Order No. 1920 requirement is arbitrary and capricious because the requirement would insert an unjustified level of uncertainty into its existing Order No. 1000 regional transmission planning and cost allocation processes by requiring consideration of withdrawn interconnection requests in its near-term RTEP.  As explained here and in Order No. 1920, we are not requiring that transmission providers develop transmission facilities through the Order No. 1000 regional transmission planning and cost allocation processes as transmission solutions to address interconnection-related transmission needs.  The coordination reform simply creates an avenue for evaluation of qualifying interconnection-related transmission needs

---

[1483] *Id.* P 1111.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1879 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

in the existing Order No. 1000 regional transmission planning and cost allocation

processes. Further, Order No. 1920 gives transmission providers flexibility to "adopt the

evaluation method and selection criteria from any of their existing Order No. 1000

regional transmission planning and cost allocation processes (e.g., economic or reliability

processes) to evaluate and potentially select these types of transmission facilities"[1484]

592. Additionally, we disagree with PJM that the Order No. 1920 requirement gives

undue preference to withdrawn interconnection requests. Instead, the requirement

addresses a barrier to entry for new generation resources, where repeated interconnection

requests are increasingly withdrawn due to sticker shock from the estimated costs of the

required interconnection-related network upgrades. The qualifying requirements,

however, disqualify from these requirements interconnection-related transmission needs

memorialized in generator interconnection agreements (i.e., that are ready to move

forward with project development in the generator interconnection process).

Consequently, pursuant to the coordination reformation requirements, no interconnection

customer would benefit from having the upgrade costs that it would otherwise pay

allocated instead through transmission rates. Rather, in the circumstance that Order No.

1920 addresses, no interconnection customer is willing to pay the estimated costs of the

interconnection-related network upgrades. Therefore, there would be no undue

preference because if the qualifying criteria are met, there is no longer an interconnection

---

[1484] *Id.*

request or interconnection customer associated with the qualifying interconnection-related transmission need.

593. Moreover, in response to PJM's assertion that the output of the RTEP process, which is used in its generator interconnection process, "would be inflated by the addition of questionable transmission upgrades," we again note that the Order No. 1920 requirement does not require that transmission providers resolve interconnection-related transmission needs, including resolving them through selection of transmission facilities; that is, Order No. 1920 neither requires nor guarantees a specific outcome. Rather, transmission providers must consider the interconnection-related transmission needs in their existing Order No. 1000 regional transmission planning and cost allocation processes and determine whether there is a more efficient or cost-effective transmission solution, under the existing evaluation and selection criteria in the existing Order No. 1000 regional transmission planning and cost allocation processes.

## VII. Consideration of Dynamic Line Ratings and Advanced Power Flow Control Devices

### A. Order No. 1920 Requirements

594. In Order No. 1920, the Commission required transmission providers in each transmission planning region to consider, in Long-Term Regional Transmission Planning and existing Order No. 1000 regional transmission planning processes, the following enumerated alternative transmission technologies for each identified transmission need: (1) dynamic line ratings; (2) advanced power flow control devices; (3) advanced

conductors; and (4) transmission switching.[1485]  This list of enumerated alternative

transmission technologies that the Commission required transmission providers in each

transmission planning region to consider expanded on the Commission's proposed list of

alternative transmission technologies, which only proposed to require the consideration

of dynamic line ratings and advanced power flow control devices.[1486]  The Commission

further required that transmission providers consider each of these enumerated

technologies when evaluating new regional transmission facilities, as well as upgrades to

existing transmission facilities.  Thus, the Commission required that for each identified

transmission need, when evaluating regional transmission facilities for potential

selection, transmission providers must consider whether regional transmission facilities

that incorporate, or solely consist of, any of the enumerated list of alternative

transmission technologies would be more efficient or cost-effective than selecting new

regional transmission facilities or upgrades to existing transmission facilities that do not

incorporate these technologies.[1487]

---

[1485] Order No. 1920, 187 FERC ¶ 61,068 at P 1198.  In Order No. 1920, the Commission defined advanced transmission technologies as "a range of permissible present and future technologies, and is defined relative to conventional aluminum conductor steel reinforced conductors."  *Id.* P 1243.  The Commission further clarified that "advanced conductors include, but are not limited to, superconducting cables, advanced composite conductors, advanced steel cores, high temperature low-sag conductors, fiber optic temperature sensing conductors, and advanced overhead conductors."  *Id.*

[1486] NOPR, 179 FERC ¶ 61,028 at P 272.

[1487] Order No. 1920, 187 FERC ¶ 61,068 at P 1198.

595.    The Commission further required that transmission providers' evaluation of the

enumerated alternative transmission technologies must be consistent with the

requirements in their OATTs for other transmission solutions.[1488]  In response to requests

for additional transparency, the Commission adopted the NOPR proposal to expand the

existing requirement established in Order No. 1000 for transmission providers'

evaluation processes to culminate in a determination that is sufficiently detailed for

stakeholders to understand why a particular transmission facility was selected or not

selected.  Specifically, the Commission required that the determination include an

explanation that is sufficiently detailed for stakeholders to understand why dynamic line

ratings, advanced power flow control devices, advanced conductors, and/or transmission

switching were or were not incorporated into selected regional transmission facilities.[1489]

### B.    Requests for Rehearing and Clarification

#### 1.    General Requests for Rehearing and Clarification

##### a.    Requests for Rehearing and Clarification

596.    Large Public Power requests clarification that transmission providers may use

engineering judgment in considering which transmission elements should be analyzed as

candidates for alternative transmission technologies.  Specifically, Large Public Power

explains that, while it does not challenge the Commission's general approach to

alternative transmission technologies, requiring transmission providers to conduct

---

[1488] *Id.* P 1199.

[1489] *Id.* P 1214.

resource intensive and detailed production cost simulations for each technology for each existing transmission element would be burdensome and expensive.  Large Public Power asks the Commission to clarify that planning engineers may exercise informed discretion regarding the planning horizon within which alternative transmission technologies are of value.  Finally, Large Public Power states that it understands that all relevant judgments must be supported and subject to examination and review.[1490]

597.    On rehearing, NESCOE argues that the Commission should require transmission providers to prioritize alternative transmission technologies to serve as the starting point for addressing identified transmission needs.[1491]  NESCOE states that, absent such prioritization of alternative transmission technologies, rates remain at risk of being unjust and unreasonable.[1492]  NESCOE asks the Commission to direct transmission providers to incorporate tariff procedures establishing a rebuttable presumption that the incorporation of alternative transmission technologies as a solution to an identified Long-Term Transmission Need or existing Order No. 1000 transmission need would result in a more efficient or cost-effective transmission solution.  NESCOE asserts that such a directive would both maintain the flexibility envisioned by Order No. 1920 and place the burden on transmission providers to demonstrate why alternative transmission technologies are

---

[1490] Large Public Power Request for Rehearing at 13-16.

[1491] NESCOE Request for Rehearing at 6, 22-25, 34.

[1492] *Id.* at 25.

Docket No.  RM21-17-001                                                    - 508 -

not, either alone or as a solution component, a more efficient or cost-effective solution.[1493]

### b.     Commission Determination

598.    We grant, in part, Large Public Power's request for clarification regarding "engineering judgment" in analyzing transmission elements for alternative transmission technologies.[1494]  In particular, we do not require detailed production cost simulations to demonstrate costs and benefits of each alternative transmission technology for each existing transmission element, and we clarify that transmission providers have flexibility to apply good engineering judgment to identify the specific transmission elements that are likely candidates for specific enumerated alternative transmission technologies.  We recognize that a transmission provider's consideration of alternative transmission technologies will likely depend on the particulars of the transmission provider's transmission system.  In that context, transmission providers may be able to rapidly determine if a certain alternative transmission technology is inappropriate for further study on a specific transmission element.[1495]

599.    We reiterate, however, that transmission providers in each transmission planning region must consider, as discussed above, dynamic line ratings, advanced power flow

---

[1493] *Id.* at 24-25.

[1494] Large Public Power Request for Rehearing at 13-16.

[1495] We note that this is consistent with the Commission's findings in Order No. 2023.  *See, e.g.*, Order No. 2023, 187 FERC ¶ 61,068 at P 1590.

Docket No. RM21-17-001                                                      - 509 -

control devices, advanced conductors, and transmission switching for each identified

transmission need during Long-Term Regional Transmission Planning and existing Order

No. 1000 regional transmission planning processes.  We further reiterate that

transmission providers must consider each of those alternative transmission technologies

when evaluating new regional transmission facilities, as well as upgrades to existing

transmission facilities.[1496]  Such consideration of the enumerated alternative transmission

technologies must be consistent with the requirements in their OATTs for other

transmission solutions and with the Commission's requirements established in Order No.

1920.[1497]  Finally, consistent with Large Public Power's understanding,[1498] nothing in this

clarification obviates the requirement for transmission providers to support their

determinations,[1499] the Commission's transparency requirements, or the potential to

challenge a transmission provider's consideration of the enumerated alternative

transmission technologies.[1500]

---

[1496] Order No. 1920, 187 FERC ¶ 61,068 at P 1198.

[1497] *Id.* P 1199.

[1498] Large Public Power Request for Rehearing at 16.

[1499] *See* Order No. 1920, 187 FERC ¶ 61,068 at P 1214.

[1500] *See, e.g.*, *id.* P 224.  The Order No. 890 transmission planning principles include transparency and obligate transmission providers to disclose to all customers and other stakeholders the basic criteria, assumptions, and data that underlie their transmission system plans.  *See* Order No. 890, 118 FERC ¶ 61,119 at PP 435, 471.  In Order No. 890, the transparency transmission planning principle also requires transmission providers to reduce to writing and make available the basic methodology, criteria, and processes they use to develop their transmission plans, including how they treat retail native loads, in order to ensure that standards are consistently applied.  Order

600.    We deny NESCOE's request that the Commission establish a rebuttable

presumption in favor of alternative transmission technologies.[1501]  Rather, it is the

Commission's longstanding policy to remain fuel and technology neutral.[1502]  As such,

and consistent with the Commission's finding in Order No. 2023,[1503] we decline to create

a presumption in favor of substituting alternative transmission technologies in either

Long-Term Regional Transmission Planning or the existing Order No. 1000 regional

transmission planning processes.  There is insufficient evidence in the record to presume

that an alternative transmission technology would be the more efficient or cost-effective

solution as a replacement for a traditional wires-based solution or that the addition of an

alternative transmission technology to a potential transmission solution would necessarily

result in a more efficient or cost-effective solution in all instances.  Consequently, Order

No. 1920 mandates a process for the consideration of alternative transmission

technologies, not specific outcomes.[1504]

---

No. 890, 118 FERC ¶ 61,119 at P 471.

[1501] NESCOE Request for Rehearing at 6, 22-25.

[1502] *See*, *e.g.*, Order No. 1920, 187 FERC ¶ 61,068 at P 437 ("We emphasize that
the Commission's policies are technology neutral, and we are not establishing a
preference for certain types of generation or energy end uses.").

[1503] Order No. 2023, 184 FERC ¶ 61,054 at P 1582 ("This final rule does not
create a presumption in favor of substituting alternative transmission technologies for
necessary traditional network upgrades, either categorically or in specific cases.").

[1504] *See id.*

## 2.    Technology Specific Requests for Rehearing and Clarification

### a.    Requests for Rehearing and Clarification

601.    Clean Energy Associations and PIOs assert that the Commission failed to engage in reasoned decision-making by not requiring transmission providers to evaluate storage resources that perform a transmission function as alternative transmission technologies.[1505]  Clean Energy Associations and PIOs disagree that the Commission's finding that "whether an electric storage resource performs a transmission function requires a case-by-case analysis" justifies its exclusion from the list of enumerated alternative transmission technologies because, they argue, all transmission solutions are studied on a case-by-case basis.[1506]  Clean Energy Associations further argue that whether a particular storage resource is performing a transmission function is completely separate and distinct from the issue of whether a storage resource that *has* been determined on a case-specific basis to be providing a transmission function should be included in the list of enumerated alternative transmission technologies.[1507]  Clean Energy Associations argue that the proper approach is to require storage resources that would be providing a

---

[1505] Clean Energy Associations Rehearing Request at 26-30; PIOs Rehearing Request at 7, 38-43 (citations omitted).

[1506] Clean Energy Associations Rehearing Request at 26 (quoting Order No. 1920, 187 FERC ¶ 61,068 at P 1245); PIOs Rehearing Request at 40.

[1507] Clean Energy Associations Rehearing Request at 26.

transmission function be included in the enumerated list of alternative transmission technologies.[1508]

602.    Clean Energy Associations assert that the Commission's decision to exclude storage providing a transmission function is not supported by substantial evidence and is unduly discriminatory.[1509]  Clean Energy Associations argue that the record evidence demonstrates that storage can provide efficient or cost-effective solutions and that the Commission did not cite evidence that considering storage in transmission planning is potentially detrimental or lacks stakeholder support.[1510]  Clean Energy Associations further argue that the Commission failed to distinguish storage resources providing a transmission function from advanced conductors and transmission switching technologies, which were added to the advanced technologies enumerated in the final rule.  Clean Energy Associations assert that there is no rational basis to exclude storage resources from the list and that it is unduly discriminatory to exclude storage.[1511]  Clean Energy Associations state that the Commission should grant rehearing and require

---

[1508] *Id.* at 27.

[1509] *Id.* at 26-30.

[1510] *Id.* at 27-28 (citing *Emera Me.*, 854 F.3d at 22).

[1511] *Id.* at 29-30 (citing *FPL Energy Marcus Hook, L.P. v. FERC*, 430 F.3d 441, 449 (D.C. Cir. 2005); *Emera Me.*, 854 F.3d at 22).

transmission providers to consider storage as a transmission asset in Long-Term Regional

Transmission Planning.[1512]

603.    PIOs assert that the Commission's omission of storage as a transmission asset

from the list of alternative transmission technologies that transmission providers must

consider in Long-Term Regional Transmission Planning and existing Order No. 1000

regional transmission planning processes was arbitrary and capricious because the

Commission did not meaningfully engage with commenters or provide a reasoned basis

for its decision.[1513]  PIOs urge the Commission to grant rehearing to require transmission

providers to evaluate storage as a part of Long-Term Regional Transmission Planning.[1514]

604.    PIOs observe that the Commission has identified considerations that, together,

ensure that a selected storage resource will serve a transmission function; nevertheless,

they argue the Commission failed to explain why it did not simply note that the use of

storage as a transmission asset will ultimately need to comply with these considerations,

rather than omitting it as an alternative transmission technology.[1515]  PIOs state that under

the Commission's approach in Order No. 1920, in which it explained that "transmission

providers are the appropriate entity to identify, evaluate, and select specific solutions to

---

[1512] *Id.* at 30.

[1513] PIOs Rehearing Request at 38, 42-43 (citations omitted).

[1514] *Id.* at 43.

[1515] *Id.* at 41-42 (citing Order No. 1920, 187 FERC ¶ 61,068 at P 1245, n.2671; *Sw. Power Pool, Inc.*, 183 FERC ¶ 61,153, at P 29 (2023)).

USCA4 Appeal: 24-1650   Doc: 224   Filed: 01/21/2025   Pg: 1890 of 2455
Document Accession #: 20241121-3139   Filed Date: 11/21/2024

Docket No. RM21-17-001                                                    - 514 -

specific transmission needs," it need not dictate how transmission providers evaluate storage as transmission.[1516]

605.  CTC Global states that the Commission's definition of advanced conductors allows for the consideration of advanced conductors that are not representative of the capabilities represented by the Commission.[1517]  CTC Global states that this may allow transmission providers to avoid consideration of the types of advanced conductors that Congress intended to be reviewed in the Energy Policy Act of 2005 and that the US DOE has described in reports.[1518]  For this reason, CTC Global requests clarification, or in the alternative rehearing, that the definition of advanced conductors will ensure that sufficiently advanced conductors—which at a given voltage increase power flow capabilities by at least 1.5 times, decrease losses by 20% or more, and improve conductor sag performance—are included in regional transmission planning processes.  CTC Global states that such a clarification is needed to ensure that the conditions that the Commission identified as leading to unjust and unreasonable rates are addressed and argues that failure to do so will continue to result in project identification that may not be more efficient or cost-effective than alternatives.[1519]

---

[1516] *Id.* at 41 (quoting Order No. 1920, 187 FERC ¶ 61,068 at P 1210).

[1517] CTC Global Rehearing Request at 2-3.

[1518] *Id.* (citing Energy Policy Act of 2005, Pub. L. No. 109-58, § 1223, 119 Stat. 594, 953-954 (2005)).

[1519] *Id.* at 2-5, 10-17.

Docket No. RM21-17-001                                                          - 515 -

606.    Invenergy argues that the Commission should clarify that HVDC is an alternative transmission technology that may be considered in long-term and nearer-term regional transmission planning processes.[1520]  Invenergy explains that the Commission did not specifically address the use of HVDC, despite PIOs arguing for its consideration as an alternative transmission technology.  Invenergy agrees with PIOs' comments and states that PIOs clearly demonstrated in their comments how HVDC can be beneficial.[1521]  In light of this demonstration, Invenergy asks the Commission to grant clarification that transmission providers are not precluded from considering HVDC like other alternative transmission technologies or other potential solutions that may be considered in long-term and nearer-term regional transmission planning processes.[1522]

### b.    Commission Determination

607.    We sustain the Commission's decision in Order No. 1920 to not include storage as a transmission asset in the enumerated list of alternative transmission technologies that transmission providers must consider.[1523]  We continue to find that the evaluation of whether an electric storage resource performs a transmission function requires a case-by-case analysis of how a particular electric storage resource would be operated as well as any requirements set forth in an OATT governing selection of such electric storage

---

[1520] Invenergy Rehearing Request at 10-13.

[1521] *Id.* at 11-12 (citing PIOs NOPR Initial Comments at 22, Ex. A at PP 20, 22,).

[1522] *Id.* at 13.

[1523] Order No. 1920, 187 FERC ¶ 61,068 at P 1245.

resources as transmission solutions.[1524]  Therefore, we continue to find that it is

inappropriate to require the consideration of storage that performs a transmission function

on a generic basis.  While Clean Energy Associations and PIOs argue that any

transmission solution requires a case-by-case analysis, electric storage resources require

an *additional* case-by-case analysis that distinguishes them from other transmission

solutions and from the enumerated list of alternative transmission technologies.[1525]

Namely, that type of analysis would require the transmission provider to determine,

among other considerations:  (1) that the electric storage resource would strictly act as a

transmission asset, connected to the transmission system as a transmission facility solely

to support that transmission provider's transmission system; (2) the electric storage

resource's cost recovery, by ensuring that the electric storage resource's participation in

markets is limited to only charging from, and discharging to, the transmission provider's

transmission system as necessary to provide the services for which it was selected based

on the cost of the maximum capacity needed to address the identified transmission issue;

and (3) that the electric storage resource's construction would not impact the generator

interconnection queue.[1526]  We reiterate, however, that Order No. 1920 does not preclude

---

[1524] *Id.*  In Order No. 2023, the Commission pointed to the process in SPP, which takes into account five considerations that, together, ensure that a selected electric storage resource will serve a transmission function.  Order No. 2023, 184 FERC ¶ 61,054 at P 1599 (citing *Sw. Power Pool, Inc.*, 183 FERC ¶ 61,153, at P 29 (2023)).

[1525] Order No. 2023, 184 FERC ¶ 61,054 at P 1599; Order No. 2023-A, 186 FERC ¶ 61,199 at P 640.

[1526] *Sw. Power Pool, Inc.*, 183 FERC ¶ 61,153, at P 29 (2023).

transmission providers from considering other alternative transmission technologies that were not included in the enumerated list of alternative transmission technologies, including storage as a transmission asset, in their Long-Term Regional Transmission Planning and existing Order No. 1000 regional transmission planning processes.[1527]

608.    In response to CTC Global, we clarify that the requirement to consider alternative transmission technologies necessitates that transmission providers consider the types of advanced conductors that Congress intended to be reviewed in the Energy Policy Act of 2005 and that the US DOE has described in its reports.[1528]  However, we decline to alter the definition of an advanced conductor.[1529]  We continue to find that advanced conductors include present and future transmission line technologies whose power flow capacities exceed the power flow capacities of conventional aluminum conductor steel

---

[1527] Order No. 1920, 187 FERC ¶ 61,068 at P 1247.

[1528] *See, e.g.*, U.S. Dep't of Energy, *Advanced Transmission Technologies* 25-28 (Dec. 2020), https://www.energy.gov/sites/prod/files/2021/02/f82/Advanced%20Transmission%20Technologies%20Report%20-%20final%20as%20of%2012.3%20-%20FOR%20PUBLIC.pdf; *see also* U.S. Dep't of Energy, *Pathways to Commercial Liftoff: Innovative Grid Deployment* 77 (2024), https://liftoff.energy.gov/wp-content/uploads/2024/05/Liftoff_Innovative-Grid-Deployment_Final_5.2-1.pdf; *see also* 42 U.S.C. § 16422(b) (directing the Commission to "encourage, as appropriate, the deployment of advanced transmission technologies"); *id.* § 16422(a) (defining "advanced transmission technology" as "a technology that increases the capacity, efficiency, or reliability of an existing or new transmission facility").

[1529] *See* CTC Global Rehearing Request at 4-5 (setting forth proposed modified definition).

Docket No.  RM21-17-001                                                                                      - 518 -

reinforced conductors,[1530] and that advanced conductors include, but are not limited to,

superconducting cables, advanced composite conductors, advanced steel cores, high

temperature low-sag conductors, fiber optic temperature sensing conductors, and

advanced overhead conductors.[1531]  However, we clarify that transmission providers,

rather than considering just one of the six advanced conductor examples listed, must

instead consider each of the six advanced conductor examples listed, and, as they

determine appropriate, any additional advanced conductor which that transmission

provider determines might be more efficient or cost-effective.  In doing so, transmission

providers must consider a range of advanced conductor options with a variety of

performance and cost attributes, including those with the performance capabilities

described by CTC Global.[1532]  We deny CTC Global's request to add performance

metrics to the definition of an advanced conductor because it would limit the scope of

advanced conductors required to be considered and thereby eliminate from required

consideration certain advanced conductors that may be more efficient or cost-effective in

specific circumstances.

---

[1530] Order No. 1920, 187 FERC ¶ 61,068 at P 1198 n.2553.

[1531] *Id.* P 1243.

[1532] CTC Global Rehearing Request at 2-5 (requesting that the Commission clarify that advanced conductors are those that have power flow capabilities that exceed those of conventional aluminum conductor steel reinforced conductors at a given voltage by a factor of at least 1.5 times while decreasing electrical losses by 20% or more, and improve conductor sag performance, at the same or reduced weight per foot).

Docket No.  RM21-17-001                                                                    - 519 -

609.    In response to Invenergy,[1533] we clarify that transmission providers are not precluded from considering HVDC facilities in Long-Term Regional Transmission Planning and existing Order No. 1000 regional transmission planning processes.  In Order No. 1920, the Commission clarified that transmission providers are not precluded from considering other alternative transmission technologies that are not included in the enumerated list of alternative transmission technologies or other potential solutions in their Long-Term Regional Transmission Planning and existing Order No. 1000 regional transmission planning processes.[1534]  That clarification applies to the consideration of HVDC technologies.

## VIII.   Regional Transmission Cost Allocation

### A.    Obligation to File an *Ex Ante* Long-Term Regional Transmission Cost Allocation Method and Its Use as a Backstop

#### 1.    Logical Outgrowth

##### a.    NOPR Proposals

610.    In the NOPR, the Commission proposed to require transmission providers in each transmission planning region to revise their OATTs to include one of the following:  (1) a Long-Term Regional Transmission Cost Allocation Method to allocate the costs of Long-Term Regional Transmission Facilities; (2) a State Agreement Process by which one or

---

[1533] Invenergy Rehearing Request at 10-13.

[1534] Order No. 1920, 187 FERC ¶ 61,068 at P 1247.

more Relevant State Entities may voluntarily agree to a cost allocation method; or (3) a combination thereof.[1535]

611.    The Commission noted that if states agree to a State Agreement Process instead of a Long-Term Regional Transmission Cost Allocation Method, certain Long-Term Regional Transmission Facilities selected in the regional transmission plan for purposes of cost allocation would lack a clear *ex ante* cost allocation method,[1536] and sought comment on whether the Commission should require transmission providers to include a Long-Term Regional Transmission Cost Allocation Method in their OATTs, in lieu of the proposed reform.[1537]  The Commission requested comment on the appropriate outcome when Relevant State Entities fail to agree on a cost allocation method for all or a portion of Long-Term Regional Transmission Facilities, including whether in such circumstances the transmission providers should be required to establish a Long-Term Regional Transmission Cost Allocation Method.[1538]

---

[1535] NOPR, 179 FERC ¶ 61,028 at P 302.  The Commission explained that, for example, a "combination" approach may entail (i) providing a Long-Term Regional Transmission Cost Allocation Method for certain types of Long-Term Regional Transmission Facilities and providing a State Agreement Process for others; or (ii) providing for cost allocation for a Long-Term Regional Transmission Facility, portfolio, or type of such facilities partially based on a Long-Term Regional Transmission Cost Allocation Method and partially based on funding contributions in accordance with a State Agreement Process.  *Id.* P 302 n.510.

[1536] *Id.* P 315.

[1537] *Id.* P 318.

[1538] *Id.* P 310.

Docket No.  RM21-17-001                                                    - 521 -

### b.    Order No. 1920 Requirements

612.    In Order No. 1920, the Commission required transmission providers in each

transmission planning region to revise their OATTs to include one or more Long-Term

Regional Transmission Cost Allocation Methods[1539] for Long-Term Regional

Transmission Facilities that are selected and permitted transmission providers to

additionally revise their OATTs to include a State Agreement Process, if Relevant State

Entities indicate that they have agreed to such a process.  The Commission required that a

State Agreement Process cannot be the sole method filed for cost allocation for Long-

Term Regional Transmission Facilities, and that if a State Agreement Process fails to

result in a cost allocation method agreed to by Relevant State Entities and any other

authorized entities, or if the Commission ultimately finds that the cost allocation method

that results from a State Agreement Process is unjust, unreasonable, or unduly

discriminatory or preferential, then the relevant Long-Term Regional Transmission Cost

Allocation Method on file would apply as a backstop.[1540]

613.    In Order No. 1920, the Commission stated that it was not imposing any obligation

on transmission providers to file a cost allocation method for Long-Term Regional

Transmission Facilities with which they disagree, even if such a method were proposed to

---

[1539] The Commission defined Long-Term Regional Transmission Cost Allocation
Method as an *ex ante* regional cost allocation method for one or more Long-Term
Regional Transmission Facilities (or a portfolio of such Facilities) that are selected in the
regional transmission plan for purposes of cost allocation.  Order No. 1920, 187 FERC
¶ 61,068 at P 1291.

[1540] *Id.* PP 1291-1292.

the transmission providers pursuant to a Commission-approved State Agreement Process,

unless the transmission providers have clearly indicated their assent to do so as part of a

Commission-approved State Agreement Process in their OATTs.[1541]

### c.    Requests for Rehearing and Clarification

614.    Several commenters argue that Order No. 1920 substantially departs from and is

not a logical outgrowth of the NOPR because Order No. 1920 does not require

transmission providers to adopt a State Agreement Process, consequently denying

Relevant State Entities any meaningful opportunity to determine regional cost

allocation.[1542]  Arizona Commission asserts that, contrary to the NOPR, Order No. 1920

"effectively eliminates the use of a voluntary State Agreement Process, such as the one

that has been used by PJM since Order No. 1000," which it asserts is "directly contrary to

comments filed by state regulators."[1543]  Idaho Commission argues that "[i]n a substantial

departure from the NOPR, Order No. 1920 allows, but does not require, transmission

providers in each transmission planning region to adopt a State Agreement Process for

allocating the costs of all, or a subset of, Long-Term Regional Transmission

Facilities."[1544]  Designated Retail Regulators similarly contend that Order No. 1920

---

[1541] *Id.* P 1429.

[1542] Arizona Commission Rehearing Request at 19; Idaho Commission Rehearing
Request at 2, 5-6.

[1543] Arizona Commission Rehearing Request at 19.

[1544] Idaho Commission Rehearing Request at 5 (quotation marks omitted).

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1899 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No.  RM21-17-001                                                      - 523 -

"drastically depart[s] from the NOPR" because it gives transmission providers complete

discretion to decide whether to file a State Agreement Process or Long-Term Regional

Transmission Cost Allocation method in its OATT, even if agreed to by the Relevant

State Entities, which would relegate states to a transmission planning role akin to any

other stakeholder.[1545]

615.    Designated Retail Regulators and Arizona Commission also contend that Order

No. 1920 violates the APA's notice-and-comment requirements because it requires

transmission providers to set an *ex ante* cost allocation method that would apply as a

backstop in certain circumstances, reducing states' bargaining power and setting up a

mechanism to impose a regional cost allocation for preferential policy and corporate-

driven projects when states do not consent.[1546]

### d.    Commission Determination

616.    We find that the Commission's decision in Order No. 1920 not to require that

transmission providers adopt a State Agreement Process is a logical outgrowth of the

NOPR, and we thus disagree with arguments to the contrary.  The NOPR did not propose

to require a State Agreement Process but rather proposed to require transmission

providers to include in their OATTs *either* a Long-Term Regional Transmission Cost

---

[1545] Designated Retail Regulators Rehearing Request at 47-50.

[1546] Arizona Commission Rehearing Request at 18; Designated Retail Regulators Rehearing Request at 47, 49-50.

Docket No. RM21-17-001                                                      - 524 -

Allocation Method, *or* a State Agreement Process, *or* a combination thereof.[1547]
Furthermore, contrary to Arizona Commission's arguments, Order No. 1920 did not
eliminate the State Agreement Process and instead permits transmission providers to
revise their OATTs to include a State Agreement Process, if Relevant State Entities
indicate that they have agreed to such a process.[1548]

617.    We also disagree with Arizona Commission's and Designated Retail Regulators'
argument that Order No. 1920's requirement for transmission providers to revise their
OATTs to include at least one *ex ante* Long-Term Regional Transmission Cost
Allocation Method is not a logical outgrowth of the NOPR proposal to allow
transmission providers to choose to include either an *ex ante* regional cost allocation
method, or a State Agreement Process, or a combination of both.  Although the
Commission in the NOPR proposed to allow transmission providers to choose between
filing an *ex ante* Long-Term Regional Transmission Cost Allocation Method, a State
Agreement Process, or some combination of both, the Commission also sought comment
on "whether the Commission should require, instead of the reforms proposed in this
section of the NOPR, public utility transmission providers to include a Long-Term
Regional Transmission Cost Allocation Method in their OATTs."[1549]  As courts have
explained, notice is sufficient when an agency has "expressly asked for comments on a

---

[1547] NOPR, 179 FERC ¶ 61,028 at P 302.

[1548] Order No. 1920, 187 FERC ¶ 61,068 at PP 1291-1292.

[1549] NOPR, 179 FERC ¶ 61,028 at P 318.

Docket No.  RM21-17-001                                              - 525 -

particular issue or otherwise made clear that the agency was contemplating a particular change."[1550]  By requesting comment on whether the Commission should require inclusion of an *ex ante* Long-Term Regional Transmission Cost Allocation Method, the Commission put parties on notice that the Commission was considering *the exact change* that it ultimately adopted in Order No. 1920.  Therefore, in adopting the requirement that transmission providers file at least one *ex ante* Long-Term Regional Transmission Cost Allocation Method, the Commission adhered to the APA's notice-and-comment requirements.[1551]  To the extent Arizona Commission's and Designated Retail Regulators' argument was based on concerns about the states' role more broadly in Long-Term Regional Transmission Planning and cost allocation processes, we note that we

---

[1550] *Brennan v. Dickson*, 45 F.4th at 69 (quoting *CSX Transp., Inc. v. Surface Transp. Bd.*, 584 F.3d at 1081).

[1551] Further, Order No. 1920's requirement that transmission providers revise their OATTs to include at least one *ex ante* Long-Term Regional Transmission Cost Allocation Method separately and independently satisfies the APA's notice-and-comment requirements because courts have indicated that a final rule is a logical outgrowth of a proposal where, as here, an agency adopts only part of a proposal such that "the final rule [is] not wholly unrelated or surprisingly distant" from what the agency initially suggested.  *Ariz. Pub. Serv. Co. v. EPA*, 211 F.3d 1280, 1297-1300 (D.C. Cir. 2000) (finding sufficient notice where agency first proposed that Indian tribes be required to meet the "same requirements" as states with respect to judicial review of permits issued pursuant to the Clean Air Act, but then adopted a final rule that exempted tribes from some, though not all, such requirements).  Order No. 1920 is a logical outgrowth of the NOPR in this respect because the Commission adopted one of three proposed methods for complying with the requirement—i.e., part of the NOPR proposal—and the challenged provision therefore hews closely to the NOPR proposal such that it is "not wholly unrelated or surprisingly distant" from the NOPR proposal.  *Id.*

adopt a number of modifications and clarifications herein to strengthen the states' role in those processes.[1552]

### 2.    Substantive Issues

### a.    Order No. 1920 Requirements

618.    In Order No. 1920, the Commission required transmission providers in each transmission planning region to revise their OATTs to include one or more *ex ante* cost allocation methods that apply to Long-Term Regional Transmission Facilities that are selected in the regional transmission plan for purposes of cost allocation (Long-Term Regional Transmission Cost Allocation Method).[1553]

619.    In addition to the required Long-Term Regional Transmission Cost Allocation Method, Order No. 1920 permits transmission providers to revise their OATTs to include a State Agreement Process.  However, the Commission found in Order No. 1920 that any State Agreement Process that transmission providers voluntarily propose to include in their OATTs would not comply with the requirements of Order No. 1920 unless Relevant State Entities indicate to the transmission provider that Relevant State Entities have agreed to that process during the Engagement Period.[1554]  The Commission also found in Order No. 1920 that a State Agreement Process cannot be the sole method filed for cost

---

[1552] *See supra* Stakeholder Process and Transparency section; Requests for Additional Flexibility Regarding Long-Term Scenarios Requirements section; *infra* Consultation with Relevant State Entities After the Engagement Period section.

[1553] Order No. 1920, 187 FERC ¶ 61,068 at P 1291.

[1554] *Id.*; *see also id.* PP 1292, 1403.

Docket No.  RM21-17-001                                                    - 527 -

allocation for Long-Term Regional Transmission Facilities.[1555]  The Commission

explained in Order No. 1920 that, if a State Agreement Process that transmission

providers voluntarily include in their OATTs fails to result in a cost allocation method

agreed to by Relevant State Entities and any other authorized entities, or if the

Commission ultimately finds the cost allocation method that results from a State

Agreement Process is unjust, unreasonable, or unduly discriminatory or preferential, then

the relevant Long-Term Regional Transmission Cost Allocation Method on file would

apply as a backstop.[1556]

620.    Order No. 1920 does not require transmission providers to obtain state agreement

to a cost allocation method for any Long-Term Regional Transmission Facilities and

states that the ultimate decision as to which Long-Term Regional Transmission Cost

Allocation Method(s) to file on compliance, and whether to file a State Agreement

Process to which Relevant State Entities have agreed, lies with transmission providers.[1557]

**b.    Requests for Rehearing and Clarification**

621.    On rehearing, a number of parties argue that the Commission's decision in Order

No. 1920 to require transmission providers to file an *ex ante* cost allocation method for

Long-Term Regional Transmission Facilities will undermine Relevant State Entities'

efforts to determine an alternative cost allocation method through a State Agreement

---

[1555] *Id.* PP 1292, 1361, 1404.

[1556] *Id.* PP 1291-1292.

[1557] *Id.* PP 1359, 1429; *see also id.* PP 1296, 1363.

Process.[1558]  NARUC requests that the Commission adopt the NOPR proposal of

mandatory agreement on filed method(s) and/or a State Agreement Process and eliminate

the backstop *ex ante* method.[1559]  NARUC argues that Order No. 1920's requirement that

transmission providers have a backstop Long-Term Regional Transmission Cost

Allocation Method in their OATTs undermines Relevant State Entities' negotiation of an

alternative cost allocation method and turns such negotiations into a "check the box"

exercise.[1560]  NARUC asserts that allowing transmission providers to ignore or not even

report on state input is the definition of an arbitrary and capricious action, and constitutes

unreasonable decision making.[1561]

622.    Ohio Commission Federal Advocate states that Order No. 1920 arbitrarily and

capriciously requires an Engagement Period for states to participate in reaching a cost

allocation agreement for Long-Term Regional Transmission Facilities while providing no

assurance that it will amount to anything since the final rule allows the transmission

provider to have the final say.[1562]  Ohio Commission Federal Advocate argues that,

---

[1558] Designated Retail Regulators Rehearing Request at 35-36; Idaho Commission Rehearing Request at 5-6; NARUC Rehearing Request at 12-17; Ohio Commission Federal Advocate Rehearing Request at 8; Undersigned States Rehearing Request at 31-32; Wyoming Commission Rehearing Request at 2-4.

[1559] NARUC Rehearing Request at 12-17.

[1560] *Id.* at 16.

[1561] *Id.* at 15.

[1562] Ohio Commission Federal Advocate Rehearing Request at 7-8.

Docket No. RM21-17-001                                                    - 529 -

because of this, states ultimately have no authority on cost allocation for Long-Term Regional Transmission Facilities.[1563]

623.    Designated Retail Regulators and Undersigned States state that Order No. 1920's requirement that transmission providers file one or more *ex ante* cost allocation methods that apply to selected Long-Term Regional Transmission Facilities eliminates the effectiveness of the State Agreement Process, as states are unlikely to agree to a negotiated cost allocation proposal under the State Agreement Process if the default *ex ante* cost allocation results in lower costs for those states.[1564]  Designated Retail Regulators and Undersigned States argue that if states jointly agree on a cost allocation process, the rules should require the transmission provider to accept those cost allocation processes, subject to Commission approval.[1565]

624.    Wyoming Commission states that the Commission's decision to remove the voluntary state agreement without a backstop reform in the final rule was a significant change from the NOPR, as the NOPR proposal would have allowed states to represent their public policy interests and, in the event of a conflict, prevent other states from exporting their policy decisions and an unreasonable share of related costs to nonconsenting neighbors.  Wyoming Commission argues, however, that as a result of

---

[1563] *Id.* at 8.

[1564] Designated Retail Regulators Rehearing Request at 35-36; Undersigned States Rehearing Request at 31-32.

[1565] Designated Retail Regulators Rehearing Request at 35; Undersigned States Rehearing Request at 31.

reducing states' roles to mere stakeholders in the final rule, the Commission has forced states into agreeing to unjust and unreasonable cost allocations by defaulting to an *ex ante* cost allocation in lieu of requiring a voluntary agreement of the states as a prerequisite.[1566] Wyoming Commission asserts that a voluntary state agreement process is essential to avoid interfering with states' rights with respect to transmission planning and selection, and to prevent nonconsenting states from being "swept up" in their neighbors' identified public policy transmission projects.[1567]

625.    Idaho Commission argues that by permitting, but not requiring, transmission providers to adopt a State Agreement Process in compliance with Order No. 1920, the states lack a meaningful opportunity to determine a reasonable cost allocation.[1568] Idaho Commission claims that the Commission's reasoning in not requiring a State Agreement Process is unsupported in the record and ignores that Relevant State Entities have statutory duties to ensure fair, just, and reasonable rates for customers.[1569] Idaho Commission further contends that requiring state agreement for cost allocation for Long-Term Regional Transmission Facilities, as the Commission proposed in the NOPR, would have allowed states to represent public policy interests and prevent other states from forcing policy decisions on nonconsenting neighbors. However, Idaho Commission

---

[1566] Wyoming Commission Rehearing Request at 2-3.

[1567] *Id.* at 3.

[1568] Idaho Commission Rehearing Request at 5-6.

[1569] *Id.*

Docket No.  RM21-17-001                                                                      - 531 -

asserts that as a result of Order No. 1920, states now have no meaningful opportunity to

determine reasonable cost allocation and will be faced with cost allocation that violates

the cost causation principle.[1570]

### c.    Commission Determination

626.    While we sustain the determination in Order No. 1920 that transmission providers

in each transmission planning region must file one or more *ex ante* cost allocation

methods that apply to selected Long-Term Regional Transmission Facilities, we believe

that certain modifications adopted in this order help address, at least in part, concerns

raised on rehearing by ensuring that the Commission may consider any Long-Term

Regional Transmission Cost Allocation Methods supported by Relevant State Entities.[1571]

We believe the balance struck in this order will assist the Commission, with the input of

Relevant State Entities, in establishing just and reasonable Long-Term Regional

Transmission Cost Allocation Methods that meet the requirements of Order No. 1920.

627.    In Order No. 1920, the Commission required that, if a State Agreement Process

fails to result in a cost allocation method agreed to by Relevant State Entities and any

other entities authorized by Relevant State Entities to participate in a State Agreement

Process,[1572] a transmission provider chooses not to file an agreed upon cost allocation

---

[1570] *Id.*

[1571] *See infra* Requirements Concerning Relevant State Entities' Preferred Cost
Allocation Methods section.

[1572] Order No. 1920, 187 FERC ¶ 61,068 at P 1402 (noting that Relevant State
Entities have the option to include the participation of other entities in a State Agreement

method, or if the Commission ultimately finds the cost allocation method that results

from a State Agreement Process is unjust, unreasonable, or unduly discriminatory or

preferential, then the relevant Long-Term Regional Transmission Cost Allocation

Method on file would apply as a backstop. While we sustain the requirement to have a

backstop Long-Term Regional Transmission Cost Allocation Method on file, we revise

the portion of this requirement related to the transmission providers' choice as to whether

to file Long-Term Regional Transmission Cost Allocation Methods and/or State

Agreement Processes agreed to by Relevant State Entities, as discussed in further detail

below.[1573]

628.    Turning to the rehearing requests challenging the requirement to have an *ex ante*

cost allocation method on file, we disagree with Wyoming Commission and Idaho

Commission that this requirement forces states into agreeing to unjust and unreasonable

cost allocations that allow states to foist the cost of their policy decisions on

nonconsenting neighbors.[1574] Under the NOPR proposal, the Commission proposed that

transmission providers in each transmission planning region file OATTs to include either

(1) a Long-Term Regional Transmission Cost Allocation Method to allocate the costs of

Long-Term Regional Transmission Facilities, or (2) a State Agreement Process by which

---

Process).

    [1573] *See infra* Requirements Concerning Relevant State Entities' Preferred Cost
Allocation Methods section.

    [1574] *See* Idaho Commission Rehearing Request at 5-6; Wyoming Commission
Rehearing Request at 3.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1909 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No. RM21-17-001                                                    - 533 -

one or more relevant state entities may voluntarily agree to a cost allocation method, or
(3) a combination thereof.[1575]  Pursuant to the FPA, the Commission may accept only
proposed rates, terms, and conditions that are just and reasonable.  Therefore, the
Commission could not accept a cost allocation method that would force states into
agreeing to unjust and unreasonable cost allocations, and any just and reasonable cost
allocation method must ensure that the costs of Long-Term Regional Transmission
Facilities are allocated in a manner that is at least roughly commensurate with the
estimated benefits.[1576]

629.    We also disagree with arguments that the State Agreement Process will ultimately
be a "check the box" exercise or that requiring an *ex ante* Long-Term Regional
Transmission Cost Allocation Method otherwise limits the effectiveness of a State
Agreement Process.[1577]  Order No. 1920 places an affirmative obligation on transmission

---

[1575] NOPR, 179 FERC ¶ 61,028 at P 302.

[1576] Order No. 1920, 187 FERC ¶ 61,068 at PP 1510, 1515; *see, e.g.*, *ICC v. FERC I*, 576 F.3d at 476 ("To the extent that a utility benefits from the costs of new facilities, it may be said to have 'caused' a part of those costs to be incurred, as without the expectation of its contributions the facilities might not have been built, or might have been delayed."); Order No. 1000, 136 FERC ¶ 61,051 at P 690 ("If a regional transmission plan determines that a transmission facility serves several functions, as many commenters point out it may, the regional cost allocation method must take the benefits of these functions of the transmission facility into account in allocating costs roughly commensurate with benefits.").

[1577] NARUC Rehearing Request at 16; Ohio Commission Federal Advocate Rehearing Request at 7-8; Designated Retail Regulators Rehearing Request at 35-36; Undersigned States Rehearing Request at 31-32.

providers to supply a forum for states to negotiate cost allocation,[1578] providing ample
room for states to allocate costs in a manner that they agree to,[1579] and, as discussed
below, in this order we require transmission providers to include in the transmittal or as
an attachment to their compliance filing any Long-Term Regional Transmission Cost
Allocation Method and/or State Agreement Process that Relevant State Entities agree
upon.[1580]  Relevant State Entities may structure the processes used to determine those
cost allocation methods in a manner that would require a level of agreement of their
choosing, including, as one potential option, unanimity.[1581]  In this order, we also
establish a requirement that transmission providers shall consult with Relevant State
Entities (1) prior to amending the Long-Term Regional Transmission Cost Allocation
Method(s) and/or State Agreement Process(es), or (2) if Relevant State Entities seek,
consistent with their chosen method to reach agreement, for the transmission provider to
amend that method or process.[1582]  And as we have already discussed, transmission

---

[1578] Order No. 1920, 187 FERC ¶ 61,068 at PP 1354, 1356-1357.

[1579] *Id.* PP 1415-1416.

[1580] *See infra* Requirements Concerning Relevant State Entities' Preferred Cost
Allocation Methods section.

[1581] Order No. 1920, 187 FERC ¶ 61,068 at P 1418 ("We will not specify the level
of agreement among Relevant State Entities or other entities that is necessary before a
transmission provider files a cost allocation method derived from a State Agreement
Process.  As a state-led process, we believe that Relevant State Entities should have the
ability to determine this important facet of their State Agreement Process.").

[1582] *See infra* Consultation with Relevant States Entities After the Engagement
Period section.

providers shall develop a reasonable number of additional scenarios, when requested by

Relevant State Entities, for the purposes of informing the application of Long-Term

Regional Transmission Cost Allocation Method(s) or the development of cost allocation

methods through the State Agreement Process(es).[1583]

630.    To the extent that Wyoming Commission argues that requiring an *ex ante* cost

allocation method for Long-Term Regional Transmission Facilities intrudes on states'

rights with respect to transmission planning and selection, we disagree.  We note that the

D.C. Circuit held that requiring *ex ante* cost allocation methods under Order No. 1000

regional transmission planning does not intrude on state authority.[1584]  We continue to

find that Long-Term Regional Transmission Planning is a subset of regional transmission

planning that closes specific gaps of the existing Order No. 1000 framework without

otherwise disturbing the regional transmission planning structure required by Order No.

1000, which was fully affirmed on appeal.[1585]

---

[1583] *See supra* Requests for Additional Flexibility Regarding Long-Term Scenarios Requirements section.

[1584] *See S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d at 55-59, 62-64, 82-89; *id.* at 64 (("[W]e hold that [Order No. 1000] does not interfere with the traditional state authority that is preserved by [FPA] Section 201 . . . .").

[1585] Order No. 1920, 187 FERC ¶ 61,068 at P 256 (citing *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d at 55-64 (rejecting arguments that the requirement to engage in regional transmission planning, as prescribed in Order No. 1000, exceeded the Commission's jurisdiction under FPA section 206, interfered with traditional state authority reserved under FPA section 201, or improperly interpreted and applied FPA section 202(a))).

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1912 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No. RM21-17-001                                                        - 536 -

631.    With respect to the assertion that states are unlikely to agree to a negotiated cost

allocation proposal under the State Agreement Process if the default *ex ante* cost

allocation results in lower costs for those states, we note that Order No. 1920 provides

Relevant State Entities with the opportunity to negotiate *ex ante* cost allocation methods

in the first instance, and we take steps in this order to further enable states to do so.[1586]

Further, states are likely to have an incentive to negotiate with other states in order to

ensure timely and efficient development of Long-Term Regional Transmission Facilities

that benefit their ratepayers, but would not be developed without the support of other

states.  We find that the opportunity for Relevant State Entities to negotiate *ex ante* cost

allocation methods in the first instance and agree to a State Agreement Process, coupled

with the benefits of certainty provided by a backstop *ex ante* cost allocation method,

strike a reasonable balance, and we otherwise sustain, as explained in greater detail

below, the Commission's finding in Order No. 1920 that requiring transmission providers

to include a Long-Term Regional Transmission Cost Allocation Method in their OATTs

is necessary to ensure that Commission-jurisdictional rates are just and reasonable.[1587]

632.    We disagree with Idaho Commission's contention that Order No. 1920 denies

Relevant State Entities any meaningful opportunity to determine reasonable cost

---

[1586] *See infra* Requirements Concerning Relevant State Entities' Preferred Cost
Allocation Methods section; Duration of the Engagement Period section.

[1587] Order No. 1920, 187 FERC ¶ 61,068 at P 1293.

Docket No.  RM21-17-001                                                      - 537 -

allocation methods.[1588]  We recognize the critical role that states play in regional

transmission planning and that Relevant State Entities have their own statutory

obligations.  As discussed in Order No. 1920, and expanded upon here,[1589] we are placing

an affirmative obligation on transmission providers to provide a meaningful opportunity

for Relevant State Entities to share their views on cost allocation during the Engagement

Period, during subsequent implementation of a State Agreement Process to which the

Relevant State Entities have agreed that has been filed by a transmission provider and

accepted by the Commission,[1590] and, as described herein, before future cost allocation

amendments.[1591]  Relevant State Entities therefore have a meaningful opportunity to

participate in cost allocation decisions related to Long-Term Regional Transmission

Facilities.

633.    We continue to find that if transmission providers were to rely solely on a State

Agreement Process to determine the cost allocation for Long-Term Regional

Transmission Facilities and that process did not result in agreement on a cost allocation

method, there would be no cost allocation method for Long-Term Regional Transmission

Facilities selected as the more efficient or cost-effective solutions to Long-Term

---

[1588] Idaho Commission Rehearing Request at 5-6.

[1589] *See infra* Requirements Concerning Relevant State Entities' Preferred Cost Allocation Methods section; Duration of the Engagement Period section.

[1590] Order No. 1920, 187 FERC ¶ 61,068 at P 1296.

[1591] *See infra* Consultation with Relevant State Entities After the Engagement Period section.

Transmission Needs.[1592]  As a result, these selected Long-Term Regional Transmission

Facilities would be less likely to be developed, and the benefits that these facilities would

provide would not be realized.[1593]  Furthermore, we continue to find that, if these selected

Long-Term Regional Transmission Facilities were not ultimately built, transmission

providers would likely rely on relatively inefficient or less cost-effective transmission

facilities to address the identified Long-Term Transmission Needs, or they may not even

address these needs at all, leading to unjust and unreasonable Commission-jurisdictional

rates.[1594]

634.    In addition, we are concerned that a state-agreement requirement could lead to a

situation in which a transmission project was planned based on benefits that it provides to

customers in several states, and that, if one or more of those states declined to voluntarily

agree to a cost allocation method, it would raise free-ridership concerns.[1595]  For that

reason, sole reliance on a State Agreement Process has the potential to suffer from the

---

[1592] Order No. 1920, 187 FERC ¶ 61,068 at P 1293.

[1593] *Id.*

[1594] *Id.*

[1595] *See El Paso Elec. Co. v. FERC*, 76 F.4th at 361-63 ("No amount of emphasizing other competing interests permits FERC to sacrifice the foundational principle of cost-causation by refusing to allocate costs to those who cause the costs to be incurred and who reap the resulting benefits." (citations omitted)); Order No. 1000, 136 FERC ¶ 61,051 at P 535 ("[If] the Commission could not address free rider problems associated with new transmission investment, [] it could not ensure that rates, terms and conditions of jurisdictional service are just and reasonable and not unduly discriminatory.").

same flaws that led the Commission to require *ex ante* cost allocation for selected

regional transmission facilities in Order No. 1000, as the allocation of transmission costs

can be contentious and prone to litigation in multi-state transmission planning regions.[1596]

The level of certainty for transmissions providers in having a Long-Term Regional

Transmission Cost Allocation Method on file, even when a State Agreement Process is

used, remains critical to the development of needed Long-Term Regional Transmission

Facilities.[1597]

### B.     Requirements Concerning Relevant State Entities

#### 1.     Requested Requirement to Obtain the Agreement of Relevant State Entities

##### a.     Order No. 1920 Requirements

635.    In Order No. 1920, the Commission declined to adopt the NOPR proposal to

require transmission providers to seek the agreement of Relevant State Entities within the

transmission planning region regarding the relevant cost allocation method to be applied

to Long-Term Regional Transmission Facilities.  Instead, the Commission modified the

NOPR proposal to establish a six-month time period (Engagement Period), during which

transmission providers must, among other requirements, provide a forum for negotiation

of a Long-Term Regional Transmission Cost Allocation Method(s) and/or a State

Agreement Process that enables meaningful participation by Relevant State Entities.[1598]

---

[1596] Order No. 1920, 187 FERC ¶ 61,068 at P 1293 (citation omitted).

[1597] *Id.*

[1598] *Id.* P 1354.

Docket No. RM21-17-001                                                          - 540 -

### b.        Requests for Rehearing and Clarification

636.    Undersigned States and Designated Retail Regulators argue that the Engagement
Period is not a "fair replacement of a requirement for regulator consent" because Order
No. 1920 does not require transmission providers to propose on compliance a Long-Term
Regional Transmission Cost Allocation Method agreed to by the states.[1599]  Undersigned
States and Designated Retail Regulators further argue that Order No. 1920's lack of a
requirement for transmission providers to obtain the consent of retail regulators on the
cost allocation method(s) that apply to Long-Term Regional Transmission Facilities
usurps state authority because it enables the ratepayers of non-consenting states to be
assessed the costs of the public policy projects of other states and speculative investment
based on conjecture about future resource trends.[1600]  Designated Retail Regulators argue
that existing regulator organizations such as OMS "may not be the best forums to confect
state agreements" because the "authority to reach agreement on cost allocation rests in
each State" and cannot be delegated to such organizations in order to reach general
consensus on issues.[1601]

---

[1599] Designated Retail Regulators Rehearing Request at 36; Undersigned States
Rehearing Request at 32.

[1600] Designated Retail Regulators Rehearing Request at 36-39; Undersigned States
Rehearing Request at 32-35.

[1601] Designated Retail Regulators Rehearing Request at 38.

c.      **Commission Determination**

637.    While we sustain our decision not to adopt the NOPR proposal and instead

establish the Engagement Period for cost allocation negotiations, we believe that certain

modifications in this order help address, at least in part, the concerns raised by

Designated Retail Regulators and Undersigned States by providing additional

opportunities for Relevant State Entities to help establish just and reasonable cost

allocation methods for Long-Term Regional Transmission Facilities.[1602]

638.    Turning to Designated Retail Regulators' and Undersigned States' arguments, the

Commission did not propose in the NOPR to require transmission providers to obtain the

consent of Relevant State Entities within the transmission planning region regarding the

relevant cost allocation method to be applied to Long-Term Regional Transmission

Facilities.  Rather, the Commission proposed to require transmission providers to seek the

agreement of Relevant States Entities within the transmission planning region regarding

the relevant cost allocation method to be applied to Long-Term Regional Transmission

Facilities.[1603]  In Order No. 1920, the Commission did not adopt the requirement for

---

[1602] *See infra* Requirements Concerning Relevant State Entities' Preferred Cost
Allocation Methods section; Duration of the Engagement Period section; Consultation
with Relevant State Entities After the Engagement Period section.

[1603] Order No. 1920, 187 FERC ¶ 61,068 at P 1354 ("We decline to adopt the
NOPR proposal to require transmission providers to *seek the agreement* of Relevant State
Entities within the transmission planning region regarding the relevant cost allocation
method to be applied to Long-Term Regional Transmission Facilities." (emphasis
added)).  We address arguments concerning the Commission's decision not to require
transmission providers to seek the agreement of Relevant State Entities in the Requests
Arguing the Engagement Period is Inferior to a Requirement that Transmission Providers

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1918 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No. RM21-17-001                                                    - 542 -

transmission providers to seek the agreement of Relevant State Entities (while affording

transmission providers flexibility in the process by which they seek agreement from the

Relevant State Entities) and instead adopted a requirement for transmission providers to

provide a forum for states to meaningfully participate in negotiating cost allocation

methods.[1604]

639.    With respect to requests that we *require* agreement of state regulators for any cost

allocation method for Long-Term Regional Transmission Facilities, we continue to find

that the views of state regulators regarding the appropriate cost allocation approach are

important, but ultimately the transmission provider is the public utility that must respond

and comply with Order No. 1920.[1605]  Furthermore, the Commission has a statutory

responsibility to review the compliance filings from transmission providers to ensure that

any proposed cost allocation is just and reasonable and not unduly discriminatory or

preferential, and Order No. 1920 recognizes these statutory roles.[1606]  Nonetheless, we

reiterate that robust state engagement can valuably inform a cost allocation approach and,

as discussed further below, we take steps in this order to further that engagement.

640.    In response to Designated Retail Regulators' and Undersigned States' argument

that Order No. 1920's lack of a requirement for transmission providers to obtain the

---

Seek the Agreement of Relevant State Entities section below.

[1604] *See id.* PP 1354, 1357.

[1605] *Id.* P 1363.

[1606] *Id.*

consent of states on the cost allocation method(s) that apply to Long-Term Regional Transmission Facilities enables the ratepayers of non-consenting states to be assessed the costs of other states' public policies and speculative investment,[1607] in addition to the steps to further state engagement taken herein, we note that all cost allocation methods for Long-Term Regional Transmission Facilities, including Long-Term Regional Transmission Cost Allocation Methods and cost allocation methods resulting from State Agreement Processes, must allocate the costs of Long-Term Regional Transmission Facilities in a manner that is at least roughly commensurate with the estimated benefits, consistent with legal precedent.[1608] We find that this requirement addresses Designated Retail Regulators' and Undersigned States' concern that Order No. 1920's requirements will result in non-consenting states paying for costs they did not cause.

641.    In response to Designated Retail Regulators' assertion that the "authority to reach agreement on cost allocation rests in each State" and that this authority cannot be "delegated to organizations that States participate in to attempt to reach general consensus on issues,"[1609] we note that Order No. 1920 did not require transmission providers to use existing mechanisms for state involvement in regional transmission planning and cost allocation processes, such as the SPP Regional State Committee and

---

[1607] Designated Retail Regulators Rehearing Request at 37-38; Undersigned States Rehearing Request at 33.

[1608] *See supra* P 628 n.1577.

[1609] *See* Designated Retail Regulators Rehearing Request at 38.

OMS, as a forum for negotiation of a Long-Term Regional Transmission Cost Allocation Method(s) and/or a State Agreement Process.[1610]  In fact, Order No. 1920 specified that it is Relevant State Entities – and not transmission providers – who may choose to use such an existing mechanism to negotiate a Long-Term Regional Transmission Cost Allocation Method(s) and/or a State Agreement Process.[1611]  Similarly, the Commission left to the Relevant State Entities participating in the Engagement Period matters including what constitutes agreement among Relevant State Entities, how such agreement is reached, and which Relevant State Entities must reach such agreement.[1612]

### 2.    Requirements Concerning Relevant State Entities' Preferred Cost Allocation Methods

### a.    Order No. 1920 Requirements

642.    In Order No. 1920, the Commission found that, if the Relevant State Entities participating in an Engagement Period agree on a Long-Term Regional Transmission Cost Allocation Method(s) and/or State Agreement Process and provide that Method(s) and/or State Agreement Process to the transmission providers no later than the deadline for communicating agreement, the transmission providers may file the agreed-to Long-Term Regional Transmission Cost Allocation Method(s) and/or State Agreement Process on compliance.  The Commission noted, however, that the ultimate decision as to

---

[1610] Order No. 1920, 187 FERC ¶ 61,068 at P 1357.

[1611] *Id.*

[1612] *Id.* P 1360.

Docket No. RM21-17-001                                                    - 545 -

whether to file a Long-Term Regional Transmission Cost Allocation Method(s) and/or

State Agreement Process to which Relevant State Entities have agreed will continue to lie

with the transmission providers.[1613]   In addition, the Commission found that its directives

in Order No. 1920 regarding the development of a State Agreement Process and any cost

allocation methods to which the Relevant State Entities agree pursuant to that process do

not alter existing FPA section 205 filing rights that would govern subsequent filings

regarding the cost allocation for Long-Term Regional Transmission Facilities.[1614]   The

Commission did not impose any obligation on transmission providers to file a cost

allocation method for Long-Term Regional Transmission Facilities with which they

disagree, even if such a method were proposed to the transmission providers pursuant to a

Commission-approved State Agreement Process, unless the transmission providers have

clearly indicated their assent to do so as part of a Commission-approved State Agreement

Process in their OATT.[1615]

### b.    Requests for Rehearing and Clarification

643.   NARUC, PJM States, Designated Retail Regulators, Undersigned States, and West

Virginia Commission request rehearing of Order No. 1920's decision not to require

---

[1613] *Id.* PP 1359, 1363.

[1614] *Id.* P 1430 ("We further clarify that unless voluntarily waived, a transmission
provider retains its FPA section 205 filing rights to submit an *ex ante* cost allocation
method for Long-Term Regional Transmission Facilities at any time, consistent with any
limitations a transmission provider may have agreed to, for example, as part of its
membership in an RTO/ISO.") (citation omitted).

[1615] *Id.* PP 1359, 1429.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1922 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No.  RM21-17-001                                                    - 546 -

transmission providers to adopt any cost allocation method that Relevant State Entities agree upon during the Engagement Period.[1616]  NARUC argues that Order No. 1920 "arbitrarily and without adequate explanation removes protections proposed in the NOPR for states and their ratepayers by not requiring [t]ransmission [providers] to incorporate state consensus to cost allocation methods for filing as part of the OATT."[1617]  PJM States argue that, absent such a requirement, state engagement in the development of cost allocation methods for Long-Term Regional Transmission Facilities is not likely to materialize.  PJM States argue that, by contrast, incenting state agreement (and the filing of that agreement) makes it more likely that Order No. 1920's goals are met, as a state-agreed upon cost allocation method has a lower burden of proof than a transmission provider filing without state agreement.[1618]  West Virginia Commission agrees with PJM States and argues that the Commission should either require transmission providers to adopt any cost allocation method that Relevant State Entities agree upon during the Engagement Period or "grant the States 205 filing rights as it pertains to State-agreed cost allocation methods."[1619]

---

[1616] NARUC Rehearing Request at 12; PJM States Rehearing Request at 2-3; Designated Retail Regulators Rehearing Request at 35; Undersigned States Rehearing Request at 31; West Virginia Commission Rehearing Request at 13-14.

[1617] NARUC Rehearing Request at 12.

[1618] PJM States Rehearing Request at 2-3 (citing Order No. 1920, 187 FERC ¶ 61,068 at PP 1469, 1472, 1476).

[1619] West Virginia Commission Rehearing Request at 13-14.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1923 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No. RM21-17-001                                                    - 547 -

644.    PIOs, PJM States, and NARUC request clarification that, where a particular cost allocation method garnered state support during the Engagement Period and the transmission provider elects not to adopt that method in its compliance filing, the transmission provider must include the states' preferred cost allocation method in its compliance filing and explain why that method was not used.[1620]  West Virginia Commission requests the same clarification in the alternative to its request that the Commission require transmission providers to adopt any cost allocation method that Relevant State Entities agree upon during the Engagement Period.[1621]  West Virginia Commission requests that the Commission require transmission providers to include the states' preferred cost allocation method "for informational purposes."[1622]  NARUC further requests that the Commission clarify that transmission providers' compliance filings must also include a general description of the discussions during the Engagement Period, including transmission providers' outreach to Relevant State Entities.[1623]  Similarly, NARUC, PJM States, and Virginia and North Carolina Commissions request that the Commission clarify that transmission providers must disclose the extent to which states agreed or disagreed with the filed cost allocation method.[1624]  PIOs also request that

---

[1620] NARUC Rehearing Request at 17-18; PIOs Rehearing Request at 55-57; PJM States Rehearing Request at 7-8.

[1621] West Virginia Commission Rehearing Request at 9.

[1622] *Id.*

[1623] NARUC Rehearing Request at 17-18.

[1624] *Id.* at 17; PJM States Rehearing Request at 7; Virginia and North Carolina

Docket No.  RM21-17-001                                                     - 548 -

the Commission clarify that:  (1) transmission providers must "clearly disclose and explain the outcome" of the Engagement Period; (2) the Commission will carefully evaluate the existence of a state agreement regarding cost allocation and any departure from that agreement in reviewing cost allocation methods proposed by transmission providers on compliance; and (3) transmission providers must explain how their chosen cost allocation methods are just and reasonable and not unduly discriminatory or preferential.  PIOs contend that their requested clarifications would offer states additional confidence that participation in the Engagement Period will be meaningful.[1625]

645.    NESCOE requests rehearing of Order No. 1920's decision to not require transmission providers to file states' preferred cost allocation method along with transmission providers' own preferred cost allocation method.  NESCOE argues that because states are not public utilities, absent language in the transmission providers' organizational documents or OATTs, states are unable to file cost allocation methods themselves.  NESCOE argues that "[r]elegating states to commenting on a transmission provider's cost allocation filing does not enable the states to put before the Commission their preferred cost allocation method; rather, it shifts the burden to states to show that the transmission provider's FPA section 205 filing is not just and reasonable."[1626]  NESCOE contends that Order No. 1920 envisions that the only path for states to have their

---

Commissions Rehearing Request at 10.

[1625] PIOs Rehearing Request at 54-57.

[1626] NESCOE Rehearing Request at 14-15.

preferred cost allocation method approved would be through a complaint proceeding in which states would bear the burden of first proving that a transmission provider's Commission-approved cost allocation method is unjust and unreasonable.[1627]  NESCOE argues that requiring each transmission provider to file states' preferred cost allocation method alongside its own would comport with precedent holding that the Commission may not require transmission providers "'to cede rights expressly given to them' in FPA section 205."[1628]  In the alternative, NESCOE requests that the Commission strongly encourage transmission providers to "voluntarily codify existing or new approaches on compliance" that would facilitate transmission providers' filing of alternative region-wide state agreement on cost allocation, such as the approaches used in the NYISO and SPP regions.[1629]  NESCOE opines that "[i]ncluding the state-agreed upon cost allocation method in a transmission provider's section 205 filing is a lawful and rational means to effectuate in a concrete way the respect for the state role the Commission articulates."[1630]

---

[1627] *Id.*  Vermont Commission states that it supports the NESCOE Rehearing Request, including strengthening the state role in all phases of Long-Term Regional Transmission Planning, and specifically cost allocation.  Vermont Commission Rehearing Request at 1-2.

[1628] NESCOE Rehearing Request at 15 (quoting *Atl. City Elec. Co. v. FERC*, 295 F.3d at 9).

[1629] *Id.* at 15-16 (citing NESCOE NOPR Initial Comments at 69-70 (citing *N.Y. Indep. Sys. Operator, Inc.*, 151 FERC ¶ 61,040, at P 119 (2015) (*NYISO*); SPP, Governing Documents Tariff, Bylaws, First Revised Volume No. 4 (0.0.0), § 7.2)).

[1630] *Id.* at 16.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1926 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No.  RM21-17-001                                                    - 550 -

646.    Harvard ELI requests that the Commission grant rehearing by requiring

transmission providers to revise their OATTs to include a process for filing all regional

cost allocation methods approved by Relevant State Entities.[1631]  Harvard ELI contends

that, by not requiring transmission providers to file all cost allocation methods agreed to

by Relevant State Entities, Order No. 1920 fails to remedy unjust and unreasonable cost

allocation processes.[1632]  Harvard ELI argues that such a requirement would not violate

the D.C. Circuit's holding in *Atlantic City* because it would neither "deny utilities their

right to unilaterally file rate and term changes" nor "force public utilities to file particular

rates."[1633]  Harvard ELI argues that, because the Commission "has authority to approve

utility filing rights arrangements under FPA section 205," it also has the authority under

FPA section 206 to order changes to filing processes and may do so here to require

transmission providers to file all cost allocation methods approved by the Relevant State

Entities.[1634]  In the alternative, Harvard ELI requests that the Commission clarify that it

did not intend to imply that it lacks authority under FPA section 206 to amend the *pro*

---

[1631] Harvard ELI Rehearing Request at 1-3.

[1632] *Id.* at 6 (stating that existing cost allocation requirements do not provide a "dedicated process through which states have an opportunity to participate in the development of regional cost allocation methods" (quoting Order No. 1920, 187 FERC ¶ 61,068 at P 126)).

[1633] *Id.* at 4-5 (alteration omitted) (quoting *Atl. City Elec. Co. v. FERC*, 295 F.3d at 10).

[1634] *Id.* at 4.

*forma* OATT to include a process for filing all regional cost allocation methods approved by Relevant State Entities.[1635]

647.    NARUC requests that the Commission provide a mechanism to ensure that transmission providers "remain in compliance with the requirement to include [R]elevant [S]tate [E]ntities in cost allocation for Long-Term Regional Transmission Facilities."[1636] NARUC asserts that the Commission should either require transmission providers to periodically open new Engagement Periods or require transmission providers to file a modification to their OATTs if states reach the requisite agreement on a different cost allocation method than that reflected in the transmission providers' OATTs.[1637]

648.    PIOs request clarification that transmission providers may, in their compliance filings, voluntarily commit to a process that will ensure that, where a state agreement on cost allocation exists, the agreed-upon cost allocation method will be put before the Commission for approval.[1638]

---

[1635] *Id.* at 1, 8-9.

[1636] NARUC Rehearing Request at 21-22.

[1637] *Id.*  In the Consultation with Relevant State Entities After the Engagement Period section below, we discuss NARUC's request that the Commission require transmission providers to periodically open a new negotiation period with Relevant State Entities concerning cost allocation for Long-Term Regional Transmission Facilities.

[1638] PIOs Rehearing Request at 55-56.

Docket No. RM21-17-001                                                    - 552 -

### c.    Commission Determination

649.    As the Commission recognized in Order No. 1920, and we reiterate in this order, it
is critical to the success of the Long-Term Regional Transmission Planning reforms that
states have an opportunity to have a significant role in the establishment of just and
reasonable Long-Term Regional Transmission Cost Allocation Methods and State
Agreement Processes.[1639]    At the same time, the Commission has an independent
responsibility to ensure that those cost allocation methods conform to the cost causation
principle and are otherwise just and reasonable and not unduly discriminatory or
preferential.

650.    To address these considerations and the concerns raised on rehearing, we
simultaneously (1) expand Relevant State Entities' opportunities to inform and provide
alternatives to the transmission providers' proposed Long-Term Regional Transmission
Cost Allocation Method, and (2) sustain Order No. 1920's determination that
transmission providers retain the right to determine which cost allocation methods for
Long-Term Regional Transmission Facilities they will propose on compliance.
Accordingly, while we decline rehearing parties' requests that the Commission require
transmission providers to adopt any cost allocation method that Relevant State Entities
agree upon during the Engagement Period, we take steps to ensure that the Commission
may consider the Relevant State Entities' preferred Long-Term Regional Transmission

---

[1639] *See, e.g.*, Order No. 1920, 187 FERC ¶ 61,068 at P 1415.

Docket No.  RM21-17-001                                                      - 553 -

Cost Allocation Method(s) and/or State Agreement Process, to the extent those differ

from the Method(s) filed by transmission providers on compliance.

651.    To that end, we set aside Order No. 1920, in part, and require that when Relevant

State Entities notify transmission providers by the deadline for communicating

agreement[1640] that they agree on a Long-Term Regional Transmission Cost Allocation

Method and/or State Agreement Process resulting from the Engagement Period, the

transmission providers must include that method or process in the transmittal or as an

attachment to their compliance filing, even if the transmission providers propose a

different Long-Term Regional Transmission Cost Allocation Method or do not propose

to adopt a State Agreement Process.  We further direct transmission providers to include

in the transmittal or as an attachment to their compliance filings any information that

Relevant State Entities provide to them regarding the state negotiations during the

Engagement Period.  We also set aside Order No. 1920, in part, to require that, upon the

request of Relevant State Entities, transmission providers must facilitate and participate

in a cost allocation discussion during the Engagement Period with Relevant State

Entities.

---

[1640] Order No. 1920 requires that transmission providers in each transmission
planning region provide notice, such as on its OASIS page or public website, of the
deadline for Relevant State Entities to communicate their agreement on a Long-Term
Regional Transmission Cost Allocation Method(s) and/or a State Agreement Process, and
this deadline must be no earlier than the end date of the Engagement Period.  *Id.* P 1356.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1930 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No.  RM21-17-001                                                              - 554 -

652.    At the outset, in response to arguments concerning the Commission's authority to impose the various cost allocation requirements proposed by parties on rehearing,[1641] we reiterate that the Commission in Order No. 1920 determined that the Commission's existing regional transmission planning and cost allocation requirements are unjust, unreasonable, and unduly discriminatory or preferential under FPA section 206.[1642]  The Commission thus had both the authority and responsibility to "determine the just and reasonable . . . practice . . . to be thereafter observed and in force,"[1643] consistent with Order No. 1920's findings.  Pursuant to its authority under FPA section 206, the Commission required transmission providers to submit on compliance an *ex ante* cost allocation method.  This compliance filing submitted pursuant to FPA section 206 is not an FPA section 205 filing,[1644] and is thus distinct from any FPA section 205 filing that a transmission provider might file in the future following compliance to propose a change to its cost allocation method(s) for Long-Term Regional Transmission Facilities.[1645]

---

[1641] *E.g.*, Harvard ELI Rehearing Request at 4; NESCOE Rehearing Request at 15.

[1642] Order No. 1920, 187 FERC ¶ 61,068 at PP 113-114; *supra* The Overall Need for Reform section.

[1643] 16 U.S.C. 824e(a).

[1644] *See ISO New England Inc.*, 165 FERC ¶ 61,202 (2018), *order on reh'g*, 173 FERC ¶ 61,204, at P 8 (2020) (clarifying that the Commission would review ISO-NE's proposed tariff revisions as a new FPA section 205 filing, rather than a compliance filing, because the Commission had not previously made "a finding that ISO-NE's tariff was unjust and unreasonable without such revisions, a necessary precursor to the Commission considering ISO-NE's tariff revisions as a compliance filing setting forth a proposed replacement rate").

[1645] *See* Order No. 1920, 187 FERC ¶ 61,068 at P 1430.  As discussed below in the

653.    We believe the balance struck herein should address, at least in part, the concerns

driving the rehearing requests of NARUC, PJM States, Designated Retail Regulators,

Undersigned States, and West Virginia Commission, who request that the Commission

require transmission providers to adopt any cost allocation method that Relevant State

Entities agree upon during the Engagement Period, and NESCOE, which argues that the

Commission should require transmission providers to propose on compliance Relevant

State Entities' preferred cost allocation method along with transmission providers'

preferred cost allocation method.[1646]  While we continue to find that robust state

engagement is valuable to informing cost allocation,[1647] we also recognize transmission

providers, subject to Commission oversight, remain ultimately responsible for

transmission planning,[1648] which we find is fundamentally linked with cost allocation.[1649]

---

Consultation with Relevant State Entities After the Engagement Period section, we adopt,
as part of this rule, a requirement that transmission providers revise their OATTs to add a
requirement that they consult with Relevant State Entities (1) prior to amending the
Long-Term Regional Transmission Cost Allocation Method(s) and/or State Agreement
Process(es), or (2) if Relevant State Entities seek, consistent with their chosen method to
reach agreement, for the transmission provider to amend that method or process.

[1646] NARUC Rehearing Request at 12; NESCOE Rehearing Request at 14-15;
PJM States Rehearing Request at 2-3; Designated Retail Regulators Rehearing Request at
35; Undersigned States Rehearing Request at 31; West Virginia Commission Rehearing
Request at 13-14.

[1647] Order No. 1920, 187 FERC ¶ 61,068 at P 1363.

[1648] Id.  See also Order No. 1000, 136 FERC ¶ 61,051 at P 153; Order No. 890,
118 FERC ¶ 61,119 at P 454.

[1649] Order No. 1000, 136 FERC ¶ 61,051 at P 559 ("[T]here is a fundamental link
between cost allocation and planning, as it is through the planning process that benefits,

USCA4 Appeal: 24-1650    Doc: 224         Filed: 01/21/2025    Pg: 1932 of 2455
Document Accession #: 20241121-3139      Filed Date: 11/21/2024

Docket No.  RM21-17-001                                                        - 556 -

Consistent with this responsibility, while reiterating the balance the Commission seeks to
strike in this order regarding the role of Relevant State Entities, we decline to require
transmission providers, on compliance, to propose to adopt a State Agreement Process or
Long-Term Regional Transmission Cost Allocation Method to which Relevant State
Entities agreed, particularly if transmission providers prefer an alternative approach to
cost allocation.

654.    However, we are persuaded by PIOs', PJM States', and NARUC's arguments that
the Commission should consider any Long-Term Regional Transmission Cost Allocation
Method and/or State Agreement process to which the Relevant State Entities agree.  We
agree that the Commission should require transmission providers to include in the
transmittal of their compliance filings any Long-Term Regional Transmission Cost
Allocation Method and/or State Agreement Process to which the Relevant State Entities
agreed but that transmission providers elect not to propose to comply with Order No.
1920.[1650]  Therefore, we set aside Order No. 1920, in part, and require that, when
Relevant State Entities communicate to transmission providers by the deadline for
communicating agreement that they agree on a Long-Term Regional Transmission Cost
Allocation Method and/or State Agreement Process resulting from the Engagement
Period, the transmission providers must include that method or process in the transmittal

_____

which are central to cost allocation, can be assessed.").

    [1650] *See* NARUC Rehearing Request at 17-18; PIOs Rehearing Request at 55-57;
PJM States Rehearing Request at 7-8.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1933 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No. RM21-17-001                                                  - 557 -

or as an attachment to their compliance filings, even if the transmission providers propose

to adopt a different Long-Term Regional Transmission Cost Allocation Method or do not

propose to revise their tariffs to include a State Agreement Process.[1651]  We continue to

decline to define what constitutes agreement among Relevant State Entities,[1652] but we

note that, at the choosing of the Relevant State Entities in a transmission planning region,

existing relevant state committee processes may guide Relevant State Entities in defining

what constitutes agreement, such as the processes of OMS and NESCOE.

655.    We are also persuaded by NARUC's, PIOs', PJM States', and Virginia and North

Carolina Commissions' arguments that the Commission should require transmission

providers to provide additional information related to Relevant State Entities'

participation in the Engagement Period even when transmission providers propose on

compliance a separate cost allocation method and/or decline to propose a State

Agreement Process,[1653] and we therefore further direct transmission providers to include

---

[1651] We clarify that, under this approach, the transmission providers decide what to submit as their actual Order No. 1920 compliance proposal, including relevant tariff language and supporting evidence or arguments, whether they decide to propose the Relevant State Entities' agreed-upon Long-Term Regional Transmission Cost Allocation Method and/or State Agreement Process or a different Long-Term Regional Transmission Cost Allocation Method.  The requirement to include Relevant State Entities' Long-Term Regional Transmission Cost Allocation Method and/or State Agreement Process as an addition to the compliance filing does not constitute a "proposal" from the transmission provider.

[1652] Order No. 1920, 187 FERC ¶ 61,068 at P 1360.

[1653] NARUC Rehearing Request at 17; PIOs Rehearing Request at 54-57; PJM States Rehearing Request at 7; Virginia and North Carolina Commission Rehearing Request at 10.

in the transmittal or as an attachment to their compliance filings any information that any Relevant State Entities provide to them regarding the state negotiations during the Engagement Period.  As part of this requirement, we clarify that transmission providers must include any and all supporting evidence and/or justification related to Relevant State Entities' agreed-upon Long-Term Regional Transmission Cost Allocation Method and/or State Agreement Process that Relevant State Entities request that transmission providers include in their compliance filing.  We expect that the information that Relevant State Entities provide to transmission providers could include, for example, a description of the discussions that took place at the Engagement Period forum for negotiation and whether each Relevant State Entity agreed or disagreed with the cost allocation method proposed on compliance.  However, we decline to require transmission providers to independently characterize this information.  For example, we do not require transmission providers to separately characterize Relevant State Entities' agreement or independently justify Relevant State Entities' preferred Long-Term Regional Transmission Cost Allocation Method and/or State Agreement Process.  We find that a requirement for transmission providers to include in the transmittal or as an attachment to their compliance filings the information received from any Relevant State Entities during the Engagement Period will sufficiently capture the results of the Engagement Period.

656.    Furthermore, upon review of the requests for rehearing and clarification about the Engagement Period, we also believe that Relevant State Entities would benefit from the assistance of transmission providers in some cases, as transmission providers may have more experience with the transmission providers' OATTs and with the Commission's

Docket No.  RM21-17-001                                          - 559 -

processes and precedent.  Therefore, we set aside Order No. 1920, in part, and now

include a requirement that upon the request of Relevant State Entities, transmission

providers must facilitate and participate in a cost allocation discussion during the

Engagement Period with Relevant State Entities.

657.   We find that these additional requirements will allow the Commission to better

evaluate whether transmission providers have complied with Order No. 1920's

requirement to provide a forum for negotiation that enables meaningful participation by

Relevant State Entities during the Engagement Period.[1654]  Furthermore, given that we

direct these facilitation and informational requirements on compliance pursuant to the

Commission's authority under FPA section 206, we find that these requirements do not

implicate or infringe upon transmission providers' filing rights under FPA section 205.

658.   When acting under FPA section 206, the Commission's statutory burden is to

establish *a* just and reasonable and not unduly discriminatory replacement rate that is

supported by substantial evidence.[1655]  The statute does not necessarily require the

Commission to adopt the transmission provider's proposal on compliance, even if that

proposal complies with the final rule's requirements.  Rather, the Commission need only

select a replacement rate that complies with the final rule and that is adequately supported

in the record, and then intelligibly explain the reasons for its choice.[1656]

---

[1654] Order No. 1920, 187 FERC ¶ 61,068 at P 1357.

[1655] 16 U.S.C. 824e; 16 U.S.C 825*l*(b).

[1656] *See Entergy Ark., LLC v. FERC*, 40 F.4th 689, 701–02 (D.C. Cir. 2022)
(noting that the Commission "is not required to choose the best solution, only a

659.    We recognize that the Commission generally does not consider alternate
compliance proposals other than those filed by the relevant public utility (here, the
transmission provider).[1657]  Nevertheless, as the Commission explained in Order No.
1920, and as we reiterate on rehearing, there are "good reasons" for considering such
alternatives here with respect to cost allocation under Order No. 1920.[1658]  States play a
unique role in Long-Term Regional Transmission Planning, as their laws, regulations,
and policies drive the need for Long-Term Regional Transmission Facilities,[1659] and they
typically will have responsibility to consider and approve the siting, permitting, and
construction of Long-Term Regional Transmission Facilities selected in a regional
transmission plan.  As such, states affect whether Long-Term Regional Transmission
Facilities are timely, efficiently, and cost-effectively developed such that customers
actually receive the benefits associated with the selection of more efficient or cost-
effective transmission solutions.[1660]  We further find that, given the inherent uncertainty

---

reasonable one") (first quoting *Petal Gas Storage, LLC v. FERC*, 496 F.3d 695, 703
(D.C. Cir. 2007); and then quoting *EPSA*, 577 U.S. at 295).

[1657] *See, e.g.*, *PJM Interconnection, L.L.C.*, 173 FERC ¶ 61,134, at P 117 n.175
(2020); *PJM Interconnection, L.L.C.*, 119 FERC ¶ 61,318, at P 115 (2007); *ANR Pipeline
Co.*, 110 FERC ¶ 61,069, at P 49 (2005).

[1658] *FCC v. Fox Television Stations, Inc.*, 556 U.S. at 515.

[1659] *Supra* Categories of Factors section.

[1660] Order No. 1920, 187 FERC ¶ 61,068 at PP 124, 126, 268, 1293, 1362-1364,
1404, 1407, 1410-1411, 1415, 1477, 1515.

involved in planning to meet Long-Term Transmission Needs,[1661] state-developed cost allocation methods and State Agreement Process take on heightened importance. This means that the Commission will consider the entire record – including the Relevant State Entities' agreed-upon Long-Term Regional Transmission Cost Allocation Method and/or State Agreement Process and the transmission provider's proposal – when setting the replacement rate. Specifically, when the Commission reviews transmission providers' compliance filings, the Commission is not required to accept a cost allocation proposal from a transmission provider simply because it may comply with Order No. 1920. Instead, the Commission may adopt any cost allocation method proposed by the Relevant State Entities and submitted on compliance so long as it complies with Order No. 1920.[1662]

660.    We believe Order No. 1920, as modified here on rehearing, strikes a reasonable balance between, on the one hand, recognizing the rights and responsibilities of the Commission and transmission providers over regional transmission planning and, on the other, the states' critical interests in the resulting Long-Term Regional Transmission Facilities and how the costs associated with those facilities will be allocated. We also believe that this balance, including the requirement that transmission providers consult

---

[1661] *Id.* P 227.

[1662] We believe that these findings address NESCOE's arguments that Order No. 1920's cost allocation requirements "[r]elegat[ed] states to commenting on a transmission provider's cost allocation filing," or that the "only path the Commission envision[ed] for approval of the states' cost allocation method would be through the vehicle of a complaint." NESCOE Rehearing Request at 14.

with Relevant State Entities (1) prior to amending the Long-Term Regional Transmission

Cost Allocation Method(s) and/or State Agreement Process(es), or (2) if Relevant State

Entities seek, consistent with their chosen method to reach agreement, for the

transmission provider to amend that method or process,[1663] addresses, at least in part,

concerns underlying arguments by Harvard ELI and NARUC that the Commission

should establish a prospective mechanism through which transmission providers would

be required to file for Commission approval any cost allocation methods approved by

Relevant State Entities[1664] or if states reach the requisite agreement on a different cost

allocation method than that reflected in the OATT then on file.[1665]

661.    Nonetheless, consistent with our findings above with respect to requests that the

Commission require transmission providers to adopt any cost allocation method that

Relevant State Entities agree upon during the Engagement Period, we decline to adopt

Harvard ELI's and NARUC's proposals.  Transmission planning is the tariff obligation of

each transmission provider and transmission providers retain, subject to Commission

oversight, responsibility for regional transmission planning, including Long-Term

---

[1663] *See infra* Consultation with Relevant State Entities After the Engagement Period section.

[1664] Harvard ELI Rehearing Request at 1-3.  Because we are unpersuaded by Harvard ELI's request for rehearing in this respect, we find it unnecessary to address Harvard ELI's request for clarification in the alternative that FPA section 206 provides the Commission the authority to amend the *pro forma* OATT to include a process for filing all cost allocation methods approved by Relevant State Entities. *Id.* at 8.

[1665] NARUC Rehearing Request at 21-22.

Docket No.  RM21-17-001                                                    - 563 -

Regional Transmission Planning, as well as complying with the obligations of Order No.

1920.[1666]  We disagree with Harvard ELI's contention that Order No. 1920's cost

allocation requirements fail to remedy unjust and unreasonable cost allocation processes

because Order No. 1920 does not require transmission providers to file all cost allocation

methods approved by Relevant State Entities.[1667]  As discussed below,[1668] we find that the

Engagement Period established in Order No. 1920 provides the "dedicated process

through which states have an opportunity to participate in the development of regional

cost allocation methods"[1669] that the Commission recognized was absent from existing

cost allocation requirements.  We further find that, combined with existing opportunities

for state engagement in the development of regional cost allocation methods along with

those established herein,[1670] Order No. 1920's cost allocation requirements remedy the

---

[1666] *See* Order No. 1920, 187 FERC ¶ 61,068 at PP 996 (citing Order No. 1000,
136 FERC ¶ 61,051 at P 153), 1363; *see also* Order No. 890, 118 FERC ¶ 61,119 at P
454 ("[T]ransmission planning is the tariff obligation of each transmission provider.").
To the extent that West Virginia Commission, in stating that the Commission should
"grant the States 205 filing rights as it pertains to State-agreed cost allocations," is
requesting that the Commission confer filing rights to states under FPA section 205, West
Virginia Commission does not explain the authority or legal theory upon which it
believes the Commission could do so.  West Virginia Commission Rehearing Request at
14.

[1667] Harvard ELI Rehearing Request at 6-7.

[1668] *See* Design and Operation of the Engagement Period section.

[1669] Order No. 1920, 187 FERC ¶ 61,068 at P 126.

[1670] *See supra* P 654; *infra* Duration of the Engagement Period section;
Consultation with Relevant State Entities After the Engagement Period section.

Docket No. RM21-17-001                                                        - 564 -

unjust, unreasonable, and unduly discriminatory or preferential existing regional cost

allocation requirements.

662.    In response to PIOs' request that the Commission clarify that transmission

providers may voluntarily commit to a process that will ensure that, where a state

agreement on cost allocation exists, the agreed-upon cost allocation will be put before the

Commission for approval,[1671] and NESCOE's request that the Commission strongly

encourage transmission providers to commit to such processes,[1672] we reiterate that

transmission providers may voluntarily adopt a process in their OATTs, whether it be a

State Agreement Process or another Commission-approved process, under which they

commit to file with the Commission pursuant to FPA section 205 any cost allocation

method that garners state agreement subsequent to the Commission's acceptance of

transmission providers' filings made in compliance with Order No. 1920.[1673]  We also

agree with NESCOE's request and strongly encourage transmission providers to commit

to a process that will ensure that, where a state agreement on cost allocation exists, the

agreed-upon cost allocation will be put before the Commission for approval.  As

discussed further below, such a process could satisfy the requirement we establish for

---

[1671] PIOs Rehearing Request at 55-56.

[1672] NESCOE Rehearing Request at 15-16.

[1673] *See* Order No. 1920, 187 FERC ¶ 61,068 at P 1412 n.3013 ("[T]ransmission providers may voluntarily agree as part of a State Agreement Process in their OATTs that transmission providers shall file any cost allocation method that meets the requirements of their State Agreement Process, even if those transmission providers do not agree with that method.").

transmission providers to consult with Relevant State Entities (1) prior to amending the Long-Term Regional Transmission Cost Allocation Method(s) and/or State Agreement Process(es), or (2) if Relevant State Entities seek, consistent with their chosen method to reach agreement, for the transmission provider to amend that method or process.[1674]

### C.    Design and Operation of the Engagement Period

#### 1.    Logical Outgrowth

##### a.    NOPR Proposals

663.    To implement the NOPR proposal to require transmission providers to include in their OATTs either a Long-Term Regional Transmission Cost Allocation Method or a State Agreement Process, or a combination thereof, the Commission proposed to require transmission providers to "seek the agreement" of relevant state entities regarding the cost allocation method or methods that will apply to transmission facilities selected in the regional transmission plan for purposes of cost allocation through Long-Term Regional Transmission Planning and to revise their OATTs to include the method or methods.[1675] The Commission additionally proposed to afford transmission providers flexibility in the process by which they seek agreement from the Relevant State Entities.[1676]  The Commission stated that the proposed reforms would enable Relevant State Entities who

---

[1674] *See Infra* Consultation with Relevant State Entities After the Engagement Period section.

[1675] NOPR, 179 FERC ¶ 61,028 at PP 278, 303, 305, 308.

[1676] *Id.* P 306.

Docket No.  RM21-17-001                                                      - 566 -

seek greater involvement in cost allocation for Long-Term Regional Transmission

Facilities an opportunity to do so.[1677]

664.    In the NOPR, the Commission also proposed to require transmission providers to

establish a process, detailed in their OATTs, to provide a state or states (in multi-state

transmission planning regions) a time period to negotiate a cost allocation method for a

transmission facility (or portfolio of facilities) selected for purposes of cost allocation

through Long-Term Regional Transmission Planning that is different than any *ex ante*

regional cost allocation method that would otherwise apply.  The Commission proposed

that, during that time period, if a state or all states within the transmission planning

region in which the selected regional transmission facility would be located unanimously

agree on an alternate cost allocation method, the transmission provider may elect to file it

with the Commission.[1678]  The Commission explained that providing states with a time

period to propose alternate cost allocation methods could help facilitate the timely

development of more efficient or cost-effective regional transmission facilities.[1679]

### b.    Order No. 1920 Requirements

665.    In Order No. 1920, the Commission declined to adopt the NOPR proposal to

require transmission providers to seek the agreement of Relevant State Entities regarding

the cost allocation method to be applied to Long-Term Regional Transmission

---

[1677] *Id.* P 314.

[1678] *Id.* P 319.

[1679] *Id.* P 321.

Facilities.[1680]  Instead, the Commission established a six-month Engagement Period,

during which transmission providers must, among other things, provide a forum for the

negotiation of a Long-Term Regional Transmission Cost Allocation Methods(s) and/or a

State Agreement Process that enables meaningful participation by Relevant State Entities,

and required transmission providers to explain on compliance how they complied with

the six-month Engagement Period requirements.[1681]  The Commission also declined to

adopt the NOPR proposal to require transmission providers to establish a process,

detailed in their OATTs, to provide a state or states (in multi-state transmission planning

regions) a time period to negotiate a cost allocation method for a transmission facility (or

portfolio of facilities) selected for purposes of cost allocation through Long-Term

Regional Transmission Planning that is different than any *ex ante* regional cost allocation

method that would otherwise apply.[1682]

### c.    Requests for Rehearing and Clarification

666.    NRECA asserts that the requirement in Order No. 1920 for transmission providers

to file a Long-Term Regional Transmission Cost Allocation Method with or without the

agreement of Relevant State Entities, and to conduct a six-month Engagement Period to

provide a forum for negotiation of Long-Term Regional Transmission Cost Allocation

Methods and/or a State Agreement Process, is not a logical outgrowth of the NOPR

---

[1680] Order No. 1920, 187 FERC ¶ 61,068 at P 1354.

[1681] *Id.* PP 1354, 1357.

[1682] *Id.* P 1456.

Docket No.  RM21-17-001                                                                    - 568 -

proposal to require the transmission providers in a transmission planning region to seek

agreement with Relevant State Entities as to a Long-Term Regional Transmission Cost

Allocation Method and/or State Agreement Process.[1683]  Undersigned States argue that

the NOPR "placed the states in a central role in the regulatory structure by requiring

transmission providers to seek the agreement of states for cost allocation," but that Order

No. 1920 "removed the requirement that states give their consent on cost allocation,"

which is "'surprisingly distant' from the states' role in the NOPR and is in essence a new

rule that requires new opportunities for comment and input."[1684]  West Virginia

Commission argues that Order No. 1920 "effectively exceeds the substantive notice of

the NOPR" by removing realistic opportunities for states to work cooperatively on cost

allocation agreements that will be proposed as *ex ante* cost allocation methods and adding

"an ineffective substitute for seeking state agreement for cost allocation" by establishing

the six-month Engagement Period.[1685]  Utah Commission similarly contends that the

elimination of any requirement that a state agree to a cost allocation that its residents

must bear, no matter how detached the states' residents are from causing the associated

---

[1683] NRECA Rehearing Request at 17-18.

[1684] Undersigned States Rehearing Request at 38 (quoting *Int'l Union, United Mine Workers of Am.*, 407 F.3d at 1259-60).

[1685] West Virginia Commission Rehearing Request at 3.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1945 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No.  RM21-17-001                                                    - 569 -

costs or from the associated policies, does not constitute a logical outgrowth of the NOPR.[1686]

### d.      Commission Determination

667.    As discussed elsewhere in this rule, we take steps in this order to expand Relevant State Entities' opportunities to inform and, as needed, provide alternatives to, transmission providers' proposed Long-Term Regional Transmission Cost Allocation Method(s).  Therefore, while we disagree with rehearing parties' arguments that the Engagement Period and associated reforms are not a logical outgrowth of the NOPR, we note that certain modifications in this order address, at least in part, concerns that Order No. 1920 diminished the role of states in contrast to the NOPR.[1687]

668.    In the NOPR, the Commission proposed to require transmission providers to "seek the agreement"[1688] of Relevant State Entities based upon its finding that "providing state regulators with a formal opportunity to develop a cost allocation method for regional transmission facilities selected through Long-Term Regional Transmission Planning could help increase . . . state[] support for those facilities,"[1689] thereby framing such a

---

[1686] Utah Commission Rehearing Request at 11-12.

[1687] *See supra* Requirement Concerning Relevant State Entities' Preferred Cost Allocation Methods section; *infra* Duration of the Engagement Period section; Consultation with Relevant State Entities After the Engagement Period section.

[1688] NOPR, 179 FERC ¶ 61,028 at PP 278, 303, 305, 308.

[1689] *Id.* P 299.

formal opportunity for state regulators as the subject for commenter discussion.[1690]

Although Order No. 1920 did not adopt the proposed requirement to "seek the

agreement" of Relevant State Entities, the Commission adopted a materially similar

requirement—the Engagement Period—for transmission providers to provide, over a six-

month period, a forum for negotiation of cost allocation methods for Long-Term

Regional Transmission Facilities that enables meaningful participation by Relevant State

Entities.[1691]  The Engagement Period "provide[s] state regulators with a formal

opportunity to develop a cost allocation method for regional transmission facilities

selected through Long-Term Regional Transmission Planning," precisely as

contemplated in the NOPR.[1692]  Indeed, as the Commission explained in Order No. 1920,

"requiring an Engagement Period provides the same opportunity for robust engagement

in the cost allocation process as the NOPR proposal, and thus has the potential to achieve

the same important benefits, but will reduce the practical challenges associated with

requiring transmission providers to seek the agreement of Relevant State Entities."[1693]

The Engagement Period, which facilitates the meaningful involvement of Relevant State

Entities in determining cost allocation methods for selected Long-Term Regional

---

[1690] *Conn. Light & Power Co. v. Nuclear Regul. Comm'n*, 673 F.2d at 533
(holding that an agency's proposed rule must "adequately frame the subjects for
discussion").

[1691] Order No. 1920, 187 FERC ¶ 61,068 at PP 1354, 1357.

[1692] *See* NOPR, 179 FERC ¶ 61,028 at P 299.

[1693] Order No. 1920, 187 FERC ¶ 61,068 at P 1362.

Transmission Facilities, is in character with, and consequently a logical outgrowth of, the proposal to require transmission providers to "seek the agreement" of Relevant State Entities for the applicable cost allocation method for selected transmission facilities.[1694]

### 2. Requests Arguing the Engagement Period is Inferior to a Requirement that Transmission Providers Seek the Agreement of Relevant State Entities

#### a. Order No. 1920 Requirements

669.   In Order No. 1920, the Commission established a six-month Engagement Period, during which transmission providers must:  (1) provide notice of the starting and end dates for the six-month time period; (2) post contact information that Relevant State Entities may use to communicate with transmission providers about any agreement among Relevant State Entities on a Long-Term Regional Transmission Cost Allocation Method(s) and/or a State Agreement Process, as well as a deadline for communicating such agreement; and (3) provide a forum for negotiation of a Long-Term Regional Transmission Cost Allocation Method(s) and/or a State Agreement Process that enables meaningful participation by Relevant State Entities.[1695]

---

[1694] *See, e.g.*, *Am. Paper Inst. v. EPA*, 660 F.2d at 959 n.13 ("An agency may make even substantial changes in its original proposed rule without a further comment period if the changes are in character with the original proposal and are a logical outgrowth of the notice and comments already given."); *accord Chocolate Mfrs. Ass'n of U.S. v. Block*, 755 F.2d 1098, 1105 (4th Cir. 1985).

[1695] Order No. 1920, 187 FERC ¶ 61,068 at P 1354.

### b.  Requests for Rehearing and Clarification

670.  Virginia and North Carolina Commissions and West Virginia Commission request rehearing of Order No. 1920's decision to not adopt the NOPR proposal to require transmission providers to seek the agreement of Relevant State Entities within the transmission planning region regarding the relevant cost allocation method to be applied to Long-Term Regional Transmission Facilities.[1696]  West Virginia Commission argues that the Engagement Period is an ineffective substitute for the NOPR proposal to require transmission providers to seek the agreement of Relevant State Entities within the transmission planning region regarding the relevant cost allocation method to be applied to Long-Term Regional Transmission Facilities.[1697]  Virginia and North Carolina Commissions argue that, to provide the robust engagement required by Order No. 1920, the Commission should specify and bolster transmission providers' requirements to meaningfully engage with and proactively seek (but not necessarily obtain) the agreement of Relevant State Entities concerning cost allocation issues during the Engagement Period.[1698]

---

[1696] West Virginia Commission Rehearing Request at 8; Virginia and North Carolina Commissions Rehearing Request at 8-10.

[1697] West Virginia Commission Rehearing Request at 8.

[1698] Virginia and North Carolina Commissions Rehearing Request at 9-10.

USCA4 Appeal: 24-1650    Doc: 224        Filed: 01/21/2025    Pg: 1949 of 2455
Document Accession #: 20241121-3139      Filed Date: 11/21/2024

Docket No.  RM21-17-001                                                        - 573 -

c.    **Commission Determination**

671.    As discussed in Order No. 1920 and reiterated in this order, it is critical to the

success of the Long-Term Regional Transmission Planning reforms that states have an

opportunity to have a significant role in the establishment of just and reasonable Long-

Term Regional Transmission Cost Allocation Methods and State Agreement Processes.

While we are unpersuaded by arguments that the Commission erred in declining to adopt

the NOPR proposal to require transmission providers to seek the agreement of Relevant

State Entities within the transmission planning region regarding the relevant cost

allocation method to be applied to Long-Term Regional Transmission Facilities and

instead establishing the Engagement Period,[1699]  we believe that the requirements related

to the Engagement Period, discussed below, that we adopt herein address the concerns

underlying those rehearing requests.

672.    In Order No. 1920, the Commission carefully weighed the appropriate level of

transmission providers' engagement with Relevant State Entities regarding the cost

allocation method to be applied to Long-Term Regional Transmission Facilities by

considering the potential challenges inherent in such engagement.  Specifically, the

Commission found that while "states play a critical role in transmission planning" and

"facilitating their engagement in cost allocation may minimize delays and additional

costs that can be associated with associated transmission siting proceedings," mandating

---

[1699] West Virginia Commission Rehearing Request at 8; Virginia and North
Carolina Commissions Rehearing Request at 8-10.

that transmission providers seek the agreement of Relevant State Entities on a Long-Term

Regional Transmission Cost Allocation Method(s) would present potential difficulties

that counseled against adoption of this proposed reform.[1700]  For example, the

Commission considered the possibility that requiring transmission providers to seek the

agreement of Relevant State Entities might create disputes over the rights and

responsibilities of individual states or state commissions to veto or otherwise hold up

needed region-wide transmission plans.[1701]  The Commission also considered the

challenges of adopting a definition for "agreement" that would be necessary under a

requirement for transmission providers to seek the agreement of Relevant States

Entities.[1702]

673.    We continue to find, as stated above, that states "play a critical role in

transmission planning" and "facilitating their engagement in cost allocation may

minimize delays and additional costs that can be associated with associated transmission

siting proceedings,"[1703] and we find that establishing an Engagement Period recognizes

that critical role while reducing the potential practical challenges discussed above, as

---

[1700] Order No. 1920, 187 FERC ¶ 61,068 at PP 124, 1362.

[1701] *See id.* P 1362 & n.2906 (citing Minnesota State Entities NOPR Initial
Comments).

[1702] *Id.* P 1361 (discussing commenter arguments that the Commission adopt
different criteria for "agreement," including a majority, a threshold of one-half of the
participating Relevant State Entities, or unanimity).

[1703] *Id.* PP 124, 1362.

USCA4 Appeal: 24-1650   Doc: 224   Filed: 01/21/2025   Pg: 1951 of 2455
Document Accession #: 20241121-3139   Filed Date: 11/21/2024

Docket No.  RM21-17-001                                         - 575 -

compared to requiring transmission providers to seek the agreement of Relevant State Entities.[1704]  We also continue to find that the Engagement Period provides the same opportunity for robust engagement in the cost allocation process as the NOPR proposal, and thus has the potential to achieve the same important benefits.[1705]  Beyond that, the modification we make here, to require transmission providers to submit any cost allocation methods agreed to by Relevant State Entities in the transmittal or as an attachment to their compliance filings, addresses the same concern and provides Relevant State Entities with additional means to demonstrate to the Commission any preferences around the cost allocation of Long-Term Regional Transmission Facilities.  We therefore are unpersuaded by arguments raised by West Virginia Commission on rehearing that the Engagement Period is "ineffective" compared to the NOPR proposal.[1706]  Similarly, with respect to Virginia and North Carolina Commissions' request that the Commission require transmission providers to "proactively seek" the agreement of Relevant State Entities to the transmission providers' preferred Long-Term Regional Transmission Cost Allocation Method,[1707] we find that Order No. 1920, as modified on rehearing, provides more opportunities for state engagement than a requirement to simply seek agreement with states for a Long-Term Regional Transmission Cost Allocation Method.

---

[1704] *Id.* P 1362.

[1705] *Id.*

[1706] West Virginia Commission Rehearing Request at 8.

[1707] Virginia and North Carolina Commissions Rehearing Request at 10.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1952 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No. RM21-17-001                                                    - 576 -

Specifically, transmission providers must (1) provide the opportunity for Relevant State Entities from all states in a transmission planning region to participate in the Engagement Period;[1708] (2) upon the request of Relevant State Entities, facilitate and participate in a cost allocation discussion during the Engagement Period with Relevant State Entities;[1709] and (3) include, in the transmittal or as an attachment to their compliance filings, any Long-Term Regional Transmission Cost Allocation Method and/or State Agreement Process agreed to by Relevant State Entities.[1710]

### 3. Duration of the Engagement Period

#### a. Order No. 1920 Requirements

674.    In Order No. 1920, the Commission found that limiting the Engagement Period to six months was necessary to ensure that transmission providers have sufficient time to prepare their compliance filings in advance of the compliance deadlines established in Order No. 1920.[1711]

#### b. Requests for Rehearing and Clarification

675.    Several rehearing parties request extension of the Engagement Period.[1712] PJM States and Pennsylvania Commission request that the Commission clarify that the six-

---

[1708] *See infra* Content of the Engagement Period section.

[1709] *See supra* Requirements Concerning Relevant State Entities' Preferred Cost Allocation Methods section.

[1710] *See supra* Requirements Concerning Relevant State Entities' Preferred Cost Allocation Methods section.

[1711] Order No. 1920, 187 FERC ¶ 61,068 at P 1358.

[1712] PJM States Rehearing Request at 3-4; Pennsylvania Commission Rehearing

month Engagement Period will be extended for up to 12 months if states file a unanimous

declaration that they are engaged in, but require additional time to complete, cost

allocation discussions.[1713]  West Virginia Commission requests that the Commission

extend the Engagement Period to a minimum of 12 months or, in the alternative,

authorize the extension of the Engagement Period if Relevant State Entities submit a

declaration stating that they are continuing to engage in cost allocation discussions.[1714]

SERTP Sponsors request that the Commission clarify that, upon unanimous consent of all

affected state commissions (and the governing authorities for non-jurisdictional

transmission providers), the Commission will allow (or, at a minimum, consider good-

cause motions for) an extension of time for the development of *ex ante* state agreements

to provide those entities with additional time to negotiate during the Engagement

Period.[1715]  PJM States, Pennsylvania Commission, and West Virginia Commission argue

that the Commission should permit an extension of the Engagement Period because there

are a large number of Relevant State Entities in PJM, there are highly diverse regulatory

models used in those Relevant State Entities in PJM, and there are a wide variety of state

---

Request at 1 (adopting PJM States' arguments); West Virginia Commission Rehearing
Request at 13; SERTP Sponsors Rehearing Request at 7-8; Virginia and North Carolina
Commissions Rehearing Request at 11 n.27.

[1713] PJM States Rehearing Request at 3-4; Pennsylvania Commission Rehearing
Request at 1.

[1714] West Virginia Commission Rehearing Request at 13.

[1715] SERTP Sponsors Rehearing Request at 7-8.

laws and procedures applicable to those Relevant State Entities.[1716]  Virginia and North Carolina Commissions argue that it would likely be beneficial to afford transmission providers greater flexibility with respect to the "timeline" of the Engagement Period, to the extent this flexibility would facilitate productive engagement with states without unduly delaying or impeding Order No. 1920's other requirements.[1717]

676.    Wyoming Commission asserts that providing states with six months "to reach agreement with the default cost allocation looming is an illusory acknowledgement of state authority."[1718]  Arizona Commission states that "the provision for states to negotiate acceptable cost allocations among them is limited to six months" and that "[s]ix months is not enough time for the states to establish rate cases."[1719]  Designated Retail Regulators and Undersigned States argue that "reaching an agreement in MISO within the six-month window" may be difficult given states' different goals and agendas,[1720] and that six months is an insufficient amount of time to provide the due process required to approve any State Agreement Process.[1721]

---

[1716] PJM States Rehearing Request at 3; Pennsylvania Commission Rehearing Request at 1; West Virginia Commission Rehearing Request at 13.

[1717] Virginia and North Carolina Commissions Rehearing Request at 11 n.27.

[1718] Wyoming Commission Rehearing Request at 7.

[1719] Arizona Commission Rehearing Request at 17 n.14.

[1720] Designated Retail Regulators Rehearing Request at 35; Undersigned States Rehearing Request at 31.

[1721] Designated Retail Regulators Rehearing Request at 9; Undersigned States Rehearing Request at 9.

c.    **Commission Determination**

677.    We set aside, in part, Order No. 1920's requirements on the duration of the

Engagement Period.  In Order No. 1920, the Commission noted that experience with

Order No. 1000 has reinforced the critical role that states play in the development of new

transmission infrastructure, particularly at the regional level, where transmission projects

may physically span, and their costs may be allocated across, multiple states.[1722]

Moreover, the Commission found that facilitating state involvement in the regional cost

allocation process could minimize delays and additional costs associated with state and

local siting proceedings.[1723]  In keeping with these findings, and upon further

consideration, we find that extending the Engagement Period may be appropriate when

Relevant State Entities represent to the Commission that they need additional time to

complete cost allocation discussions.

678.    Providing the opportunity for such an extension is consistent with the critical role

that states play in addressing these issues and ensuring that they have the time necessary

to adequately engage in these issues.  Therefore, in response to arguments raised by PJM

States, Pennsylvania Commission, and West Virginia Commission, we set aside Order

No. 1920's requirements, in part, to specify that the Commission will grant an extension

of the required Engagement Period for up to an additional six months when Relevant

State Entities, consistent with their chosen method to reach agreement, request additional

---

[1722] Order No. 1920, 187 FERC ¶ 61,068 at P 124.

[1723] *Id.*

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1956 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No.  RM21-17-001                                                    - 580 -

time to complete cost allocation discussions.  We find that such an extension is warranted

in that circumstance to ensure that Relevant State Entities have sufficient time to engage

in fulsome discussions.  We also clarify that in such circumstances, the Commission will

also, as appropriate, extend, *sua sponte*, the relevant Order No. 1920 compliance

deadlines to accommodate an extension of the Engagement Period and to ensure that any

such extension would not conflict with the required compliance deadlines.

### 4.    Content of the Engagement Period

### a.    Order No. 1920 Requirements

679.    In Order No. 1920, the Commission required the transmission providers in each

transmission planning region to provide notice, such as on their OASIS pages or public

websites, of the opportunity for any Relevant State Entity to participate in, and the

starting and end dates of, the Engagement Period.  The Commission required that such

notice include contact information for a single point of contact in the transmission

planning region that the Relevant State Entities can use to communicate any agreement

among Relevant State Entities on a Long-Term Regional Transmission Cost Allocation

Method(s) and/or a State Agreement Process, as well as a deadline for communicating

such agreement, which must be no earlier than the end date of the Engagement Period.[1724]

The Commission also required transmission providers in each transmission planning

---

[1724] *Id.* P 1356.  The Commission noted Relevant State Entities must indicate that
they have agreed to any State Agreement Process for any such process to be eligible for
acceptance by the Commission in compliance with Order No. 1920.  *Id.* P 1356 n.2895.

region to provide a forum for negotiation that enables meaningful participation by Relevant State Entities during the Engagement Period.[1725]

680.   The Commission required that transmission providers explain on compliance how they complied with the requirement to establish and provide notice of an Engagement Period for Relevant State Entities to negotiate a Long-Term Regional Transmission Cost Allocation Method(s) and/or State Agreement Process, as well as how they complied with the requirement to provide a forum for such negotiation.[1726]

681.   The Commission declined to define what constitutes agreement among Relevant State Entities, how such agreement is reached, and which Relevant State Entities must reach such agreement during the Engagement Period, or to establish a minimum set of criteria for a state agreement.  Instead, the Commission left such matters, including whether to use existing state processes as a forum for negotiations, to the Relevant State Entities participating in the Engagement Period to determine.[1727]  The Commission also declined to expand participation in the Engagement Period beyond Relevant State Entities, stating that it did not find it necessary to allow other stakeholders to participate in the Engagement Period.[1728]

---

[1725] *Id.* P 1357.

[1726] *Id.*

[1727] *Id.* PP 1360-1361 (citations omitted).

[1728] *Id.* P 1363.

### b.    Requests for Rehearing and Clarification

682.    PJM States and NARUC request that the Commission require transmission

providers to include in their compliance filings, at minimum, the setting and

communicating of deadlines and the general forum for transmission provider discussions

with and outreach to state entities concerning the Engagement Period.[1729]  PJM States

contend that these and other clarifications would demonstrate the extent to which

transmission providers engaged with states during the Engagement Period.[1730]

683.    PJM States request clarification that the Engagement Period is actually a "State

Engagement Period" and that "states are *the* stakeholder(s) to engage."[1731]  PJM States

explain that any such clarification should not prohibit states from inviting other entities

that might be helpful in assisting states in reaching agreement on cost allocation.  Rather,

PJM States argue that the Commission should make clear that the Engagement Period is

"not for the engagement of all stakeholders" but is instead intended to provide a forum

for transmission providers and states to attempt to reach agreement on cost allocation.[1732]

### c.    Commission Determination

684.    In response to the requests of PJM States and NARUC for clarification as to the

information that transmission providers must include in their compliance filings

---

[1729] NARUC Rehearing Request at 17; PJM States Rehearing Request at 7.

[1730] PJM States Rehearing Request at 8.

[1731] *Id.* (emphasis in original).

[1732] *Id.* at 8-9.

concerning the Engagement Period,[1733] we clarify that, in order to comply with the

requirement that transmission providers explain how they provided a forum for

negotiation of a Long-Term Regional Transmission Cost Allocation Method(s) and/or a

State Agreement Process during the Engagement Period that enables meaningful

participation by Relevant State Entities,[1734] transmission providers must at minimum

disclose any deadlines set by transmission providers during the Engagement Period and

how transmission providers communicated any such deadlines to Relevant State Entities,

and provide a general description of the forum for negotiation.[1735]

685.    With respect to PJM States' argument that the Commission should clarify that the

Engagement Period is "not for the engagement of all stakeholders,"[1736] we reiterate that

the Commission declined to expand participation in the Engagement Period beyond

Relevant State Entities, and did not find it necessary to allow other stakeholders to

participate in the Engagement Period.[1737]  However, we also reiterate that the

_____

[1733] *See id.* at 7; NARUC Rehearing Request at 17-18.

[1734] *See* Order No. 1920, 187 FERC ¶ 61,068 at P 1357.

[1735] We address the requests of PJM States, NARUC, and other parties that the Commission require transmission providers to include additional information related to the Engagement Period in their compliance filings—such as requests that the Commission require each transmission provider to include states' preferred cost allocation method in its compliance filing above in the Requirements Concerning Relevant State Entities' Preferred Cost Allocation Methods section.

[1736] PJM States Rehearing Request at 8-9.

[1737] Order No. 1920, 187 FERC ¶ 61,068 at P 1363.

Docket No.  RM21-17-001                                                                    - 584 -

Commission allowed Relevant State Entities to permit the participation of other entities
subsequently during implementations of a State Agreement Process.[1738]  We also reiterate
our determination in Order No. 1920 to define Relevant State Entities as any state entity
responsible for electric utility regulation or siting electric transmission facilities within
the state or portion of a state located in the transmission planning region, including any
state entity as may be designated for that purpose by the law of such state,[1739] and we
continue to find that this definition recognizes the important role of states while
providing sufficient regional flexibility for effective Engagement Period participation.[1740]

686.    With respect to PJM States' request for clarification that the Engagement Period is
actually a "State Engagement Period" and that the states are the stakeholders with which
transmission providers must engage during the Engagement Period,[1741] we grant
clarification, in part, and clarify that transmission providers must provide the opportunity
for Relevant State Entities from all states in each transmission planning region to
participate in the Engagement Period.

---

[1738] *Id.* P 1402.

[1739] *Id.* P 1355.

[1740] *Id.* P 1364.

[1741] PJM States Rehearing Request at 8.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1961 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No. RM21-17-001                                                          - 585 -

### 5.    Consultation with Relevant State Entities After the Engagement Period

#### a.    Order No. 1920 Requirements

687.    In Order No. 1920, the Commission declined to require future Engagement Periods, but noted that transmission providers may hold future Engagement Periods if they believe that such periods would be beneficial.[1742]

#### b.    Requests for Rehearing and Clarification

688.    NARUC and NESCOE request rehearing of Order No. 1920's decision not to require future Engagement Periods.[1743]    NESCOE argues that following the initial Engagement Period, any proposed modification to the transmission planning region's Long-Term Regional Transmission Cost Allocation Method should trigger an obligation to establish a new Engagement Period to provide a forum for Relevant State Entities to discuss the proposed Long-Term Regional Transmission Cost Allocation Method. NESCOE explains that absent this obligation, a transmission provider could undo the efforts of Relevant State Entities in agreeing to a Long-Term Regional Transmission Cost Allocation Method during the initial Engagement Period by filing a new Long-Term Regional Transmission Cost Allocation Method without consulting with Relevant State Entities.[1744]

---

[1742] Order No. 1920, 187 FERC ¶ 61,068 at P 1368.

[1743] NARUC Rehearing Request at 21-22; NESCOE Rehearing Request at 13-14.

[1744] NESCOE Rehearing Request at 13-14 (citing Order No. 1920, 187 FERC ¶ 61,068 at P 1430 ("We further clarify that unless voluntarily waived, a transmission provider retains its FPA section 205 filing rights to submit an *ex ante* cost allocation

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1962 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No.  RM21-17-001                                                          - 586 -

689.    NARUC requests that the Commission create a mechanism that ensures regular re-examination of the Long-Term Regional Transmission Cost Allocation Method(s) and any State Agreement Process in a transmission provider's OATT.  Specifically, NARUC argues that the Commission should require each transmission provider to periodically open a new negotiation period with Relevant State Entities.[1745]

690.    Virginia and North Carolina Commissions argue that it would likely be beneficial to afford transmission providers greater flexibility with respect to the "frequency" of the Engagement Period, to the extent this flexibility would facilitate productive engagement with states without unduly delaying or impeding Order No. 1920's other requirements.[1746]

### c.    Commission Determination

691.    We are persuaded by NARUC's and NESCOE's arguments raised on rehearing. Accordingly, we set aside Order No. 1920, in part, and require that, as part of transmission providers' obligations with respect to transmission planning and cost allocation, transmission providers shall consult with Relevant State Entities (1) prior to amending the Long-Term Regional Transmission Cost Allocation Method(s) and/or State

---

method for Long-Term Regional Transmission Facilities at any time, consistent with any limitations a transmission provider may have agreed to, for example, as part of its membership in an RTO/ISO." (citations omitted))).

[1745] NARUC Rehearing Request at 21-22.  In the Requirements Concerning Relevant State Entities' Preferred Cost Allocation Methods section above, we discuss NARUC's alternative request that the Commission require each transmission provider to file a modification to its OATT if states reach the requisite agreement on a different cost allocation method than that reflected in its OATT.

[1746] Virginia and North Carolina Commissions Rehearing Request at 11 n.27.

Agreement Process(es), or (2) if Relevant State Entities seek, consistent with their chosen method to reach agreement, for the transmission provider to amend that method or process.  The consultation requirement will provide a mechanism through which transmission providers and Relevant State Entities can engage regarding possible future changes via FPA section 205 to cost allocation methods accepted by the Commission in compliance with Order No. 1920.[1747]  We require transmission providers to include in their OATTs a description of how they will consult with Relevant State Entities in these circumstances.  Additionally, for a consultation initiated by the transmission providers, we require transmission providers to document publicly on their OASIS or other public website the results of their consultation with Relevant State Entities prior to filing their amendment.  For a consultation initiated by Relevant State Entities, if the transmission providers choose not to propose any amendments to the Long-Term Regional Transmission Cost Allocation Method(s) and/or State Agreement Process(es) preferred by Relevant State Entities during the required consultation, we also require transmission providers to document publicly on their OASIS or other public website the results of their consultation with Relevant State Entities, including an explanation for why they have chosen not to propose any amendments.

---

[1747] We clarify that this consultation requirement neither requires transmission providers to submit, nor prohibits transmission providers from submitting, FPA section 205 filings to modify cost allocation methods accepted in compliance with Order No. 1920, and transmission providers therefore retain their currently effective FPA section 205 rights.  That said, as noted below, transmission providers may satisfy the consultation requirement by voluntarily agreeing to submit FPA section 205 proposals supported by Relevant State Entities.  *Infra* P 692.

Docket No. RM21-17-001                                                    - 588 -

692.    We find that these requirements will ensure that states have the opportunity to be

involved in establishing cost allocation methods for Long-Term Regional Transmission

Facilities subsequent to the Commission's acceptance of transmission providers' filings

made in compliance with Order No. 1920, which has the potential to minimize additional

costs and delays in the siting process and to facilitate the development of Long-Term

Regional Transmission Facilities.[1748]  While we provide transmission providers flexibility

as to the form and duration of their required consultation with Relevant State Entities, we

note that one way transmission providers could satisfy the requirement to consult with

Relevant State Entities is by revising their OATTs to include a process under which the

transmission provider must present to the Commission, in addition to its own FPA section

205 proposal, an alternative cost allocation method proposed by Relevant State Entities

for evaluation by the Commission on equal footing.[1749]  Transmission providers could

---

[1748] *E.g.*, Order No. 1920, 187 FERC ¶ 61,068 at PP 124, 126.

[1749] *See, e.g.*, ISO New England Inc., FERC FPA Electric Tariff, ISO New England Inc. Agreements and Contracts, TOA, Transmission Operating Agreement (5.0.0), 3.04(h)(vi)(C); *see also The Governors of Conn., Me., Mass., N.H., R.I., Vt.*, 112 FERC ¶ 61,049, at P 25 (2005).

also satisfy the requirement to consult with Relevant State Entities by revising their

OATTs to include mechanisms similar to those used in SPP[1750] and MISO.[1751]

### D.    Design and Operation of State Agreement Processes

#### 1.    Definition of Relevant State Entities

##### a.    Order No. 1920 Requirements

693.    In Order No. 1920, the Commission defined Relevant State Entities as any state

entity responsible for electric utility regulation or siting electric transmission facilities

within the state or portion of a state located in the transmission planning region, including

any state entity as may be designated for that purpose by the law of such state.  The

Commission stated that it modified the NOPR proposal's definition to add the word

"electric" before "utility regulation" in order to make clear that Relevant State Entities

are those state agencies responsible for *electric* utility regulation, and not other types of

---

[1750] SPP, Governing Documents Tariff, Bylaws, First Revised Volume No. 4 (0.0.0), 7.2 (Regional State Committee) (providing that the Regional State Committee has primary responsibility for determining regional proposals regarding, among other things, "whether license plate or postage stamp rates will be used for the regional access charge," and that when the Regional State Committee "reaches decisions on the methodology that will be used to address any of these issues, SPP will file this methodology pursuant to Section 205 of the [FPA]"); *see also Sw. Power Pool, Inc.*, 106 FERC ¶ 61,110, at PP 218-220, *order on reh'g*, 109 FERC ¶ 61,010, at PP 92-94 (2004); *Sw. Power Pool, Inc.*, 108 FERC ¶ 61,003, at P 127 & n.90 (2004), *order on reh'g*, 110 FERC ¶ 61,138, at P 33 (2005).

[1751] MISO FERC Electric Tariff, MISO Rate Schedules, MISO Transmission Owner Agreement, app. K (Filing Rights Pursuant To Section 205 Of The FPA) (3.0.0), II.E.3.a.i-ii (providing the circumstances under which the OMS Committee "shall have the right to request and MISO shall file for a new or an amendment of any regional cost allocation methodology"); *see also Midwest Indep. Transmission Sys. Operator, Inc.*, 143 FERC ¶ 61,165, at PP 30, 32 (2013).

Docket No.  RM21-17-001                                                          - 590 -

utility regulation.[1752]  In Order No. 1920, the Commission declined requests to expand or

clarify the definition of Relevant State Entities and did not modify the definition beyond

adding the word "electric," but permitted other participants beyond Relevant State

Entities to participate in a State Agreement Process, if agreed to by Relevant State

Entities.[1753]

### b.        Requests for Rehearing and Clarification

694.    APPA contends that the Commission erred in excluding municipal electric

regulatory bodies from the Relevant State Entity definition.[1754]  APPA claims that

excluding public power utilities and municipal governing bodies is arbitrary and

capricious because:  (1) the Commission failed to justify excluding customers served by

municipal utilities during the Engagement Period, which is unduly discriminatory;[1755]

(2) the Commission gave no meaningful rationale for excluding self-regulated public

utilities from the Relevant State Entity definition, and inclusion would increase local

support and reduce uncertainty and risk for development of Long-Term Regional

Transmission Facilities; and (3) the definition of Relevant State Entity conflicts with the

FPA's definition of "state commission" as "the regulatory body of the State or

---

[1752] Order No. 1920, 187 FERC ¶ 61,068 at P 1355.

[1753] *Id.* PP 1364 & n.2914, 1402.

[1754] APPA Rehearing Request at 2.

[1755] *Id.* at 4.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1967 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No. RM21-17-001                                                      - 591 -

*municipality* having jurisdiction to regulate rates and charges for the sale of electric energy to consumers within the State or *municipality*."[1756]

695.     Large Public Power claims that non-jurisdictional self-regulating non-public utilities under FPA section 201(f) could be profoundly affected by the Engagement Period without representation, and their exclusion from the definition of Relevant State Entity is arbitrary and capricious.[1757]  Large Public Power states that its members are self-regulating entities that possess many of the same regulatory characteristics as state commissions, undertake retail ratemaking publicly, are not represented by state commissions, and in some states represent a market share larger than most individual investor-owned utilities.[1758]  Large Public Power states that the FPA explicitly recognizes political subdivisions' authority through exemptions.[1759]  Large Public Power argues that the Commission should provide an opportunity for municipal utilities to have a voice equal to that of state utility commissions to ensure that Long-Term Regional Transmission Facilities are not built and paid for by their customers unless such facilities are needed and wanted.[1760]  Large Public Power states that the most obvious solution to

---

[1756] *Id.* at 5 (citing 16 U.S.C. 796(15)) (emphasis in original).

[1757] Large Public Power Rehearing Request at 11.

[1758] *Id.*

[1759] *Id.* at 12.

[1760] *Id.* at 12-13.

this issue would be to grant municipal utilities representation on a load ratio share basis.[1761]

696.    City of New Orleans Council requests clarification to confirm that it meets the definition of a Relevant State Entity.[1762]  City of New Orleans Council states that it is designated and recognized by the State of Louisiana and the Home Rule Charter of the City of New Orleans as the governmental body that supervises, regulates, and controls public utilities within New Orleans.[1763]  City of New Orleans Council states that MISO recognizes the City of New Orleans Council's unique regulatory authority and status.[1764]  Noting that Order No. 1920 refers to OMS as an existing mechanism for state involvement, City of New Orleans Council states that it is a member of OMS that represents the collective interests of its members, which are state and local regulators within MISO's footprint.[1765]  City of New Orleans Council states that it is also a member of the Entergy Regional State Committee (ERSC), which is comprised of retail regulators from the MISO-South subregion and recognized in MISO stakeholder forums, and that the ERSC bylaws recognize that the City of New Orleans Council is included as a "state

---

[1761] *Id.* at 13.

[1762] City of New Orleans Council Rehearing Request at 4.

[1763] *Id.* (citing La. Const., art. IV, § 21(c); Home Rule Charter of the City of New Orleans, § 3-130).

[1764] *Id.* at 5.

[1765] *Id.* (citing Order No. 1920, 187 FERC ¶ 61,068 at P 1357).

regulatory agency."[1766]  City of New Orleans Council also argues that its recognition

within MISO is consistent with PJM's recognition of the District of Columbia.[1767]

697.    City of New Orleans Council requests rehearing in the event that the Commission

does not grant its request for clarification, noting that the Constitution of the State of

Louisiana and the Home Rule Charter of the City of New Orleans recognize City of New

Orleans Council's status as the governmental body with the power of supervision,

regulation, and control over public utilities, and noting MISO's recognition of the City of

New Orleans Council's status.[1768]  City of New Orleans Council states that finding that it

does not meet the definition of Relevant State Entity would be contrary to such legal and

regulatory recognition.[1769]

698.    NESCOE requests that the Commission clarify that Regional State Committees are

included in the definition of Relevant State Entities, or in the alternative, NESCOE seeks

rehearing.[1770]  NESCOE states that it is unclear that Regional State Committees, such as

NESCOE, which do not necessarily appear in state laws and are not necessarily state

---

[1766] *Id.* at 6 (citing Entergy Regional State Committee (ERSC),
https://www.misoenergy.org/engage/committees/entergy-regional-state-committee/
(ERSC Mission Statement); ERSC Bylaws,
https://cdn.misoenergy.org/ERSC%20Bylaws%20(Amended%202%2014%2022)%2021
7600.pdf (amended Feb. 14, 2022)).

[1767] *Id.* at 6-7.

[1768] *Id.* at 8.

[1769] *Id.* at 9.

[1770] NESCOE Rehearing Request at 17-20.

agencies, are Relevant State Entities.[1771]  NESCOE states that it appears that the

Commission did not deliberately exclude Regional State Committees from the definition

of Relevant State Entities, but that the Commission appears to have misapprehended

NESCOE's argument in its comments as solely concerned about its unique structure of

achieving consensus among the New England states.[1772]

699.    NRECA states that, even following its comments to the NOPR, the definition of

Relevant State Entity excludes cooperatives and public power utilities not subject to

regulation by a state utility commission and the Engagement Period includes only

Relevant State Entities.  NRECA argues that, as a result, Order No. 1920 allows a

Relevant State Entity to dictate cost allocation to electric utilities it does not regulate.[1773]

### c.    Commission Determination

700.    We deny the requests for clarification and disagree with APPA's and Large Public

Power's requests for rehearing asking to expand the definition of Relevant State

Entity.[1774]  As discussed in Order No. 1920, we continue to find that "regional

transmission facilities face significant uncertainty and risk of not reaching construction if

certain stakeholders – in particular, a state regulator responsible for permitting

---

[1771] *Id.* at 18-19.

[1772] *Id.* at 19.

[1773] NRECA Rehearing Request at 57-58.

[1774] APPA Rehearing Request at 2, 4-5; Large Public Power Rehearing Request at 11-13.

transmission facilities – do not perceive the regional transmission facilities' value as commensurate with their costs."[1775]

701.    Municipal electric regulatory bodies and non-public utility entities provide valuable insight as stakeholders in Commission-sanctioned processes.  But in defining Relevant State Entities for the purposes of Order No. 1920, we find that state entities responsible for electric utility regulation or siting electric transmission facilities within the state or portion of a state located in the transmission planning region are, as discussed above, uniquely situated to influence whether or not a Long-Term Regional Transmission Facility reaches completion.  On balance, while we recognize the important role that other stakeholders play in Long-Term Regional Transmission Planning, we continue to find that the definition of Relevant State Entities should encompass only any state entities responsible for electric utility regulation or siting electric transmission facilities within the state or portion of a state located in the transmission planning region, including any state entity as may be designated for that purpose by the law of such state.[1776]  In Order No. 1920, the Commission further stated, and we continue to believe, that:

> [P]roviding state regulators with a formal opportunity to
> develop a cost allocation method for Long-Term Regional
> Transmission Facilities selected through Long-Term Regional
> Transmission Planning could help increase stakeholder – and

---

[1775] Order No. 1920, 187 FERC ¶ 61,068 at P 1364 (quoting NOPR, 179 FERC ¶ 61,028 at P 297 (footnote omitted)).

[1776] As noted below, we make no findings here regarding whether any individual municipal electric regulatory body or non-public utility entity meets the definition of a Relevant State Entity, as those determinations properly rest with entities in a state, based upon their interpretation of their state laws.  *Infra* P 703.

USCA4 Appeal: 24-1650   Doc: 224   Filed: 01/21/2025   Pg: 1972 of 2455
Document Accession #: 20241121-3139   Filed Date: 11/21/2024

Docket No.  RM21-17-001                                                    - 596 -

state – support for those facilities, which, in turn, may increase the likelihood that those facilities are sited and ultimately developed with fewer costly delays and better ensure just and reasonable Commission-jurisdictional rates.[1777]

702.    For the same reasons, we also do not find it necessary to expand the definition of Relevant State Entities for the purposes of Order No. 1920.

703.    In response to City of New Orleans Council's and NESCOE's requests,[1778] we will not make a finding on whether an individual state's laws, regulations, and/or policies, or inclusion in a larger association of regulators, deem a certain entity to be a Relevant State Entity, though we note that state law may be a persuasive or dispositive factor in such determinations.[1779]  Instead, entities within a state must determine if they qualify as Relevant State Entities based on the definition the Commission provided in Order No. 1920 and based upon their interpretation of their state laws.  We also reiterate that Order No. 1920 permits other participants, including municipal electric regulatory bodies and non-public utility entities that do not otherwise meet the definition of a Relevant State Entity, to participate in a State Agreement Process, if agreed to by

---

[1777] Order No. 1920, 187 FERC ¶ 61,068 at P 1364 (alterations omitted) (citing NOPR, 179 FERC ¶ 61,028 at P 299).

[1778] City of New Orleans Council Rehearing Request at 4, 8; NESCOE Rehearing Request at 17-20.

[1779] Order No. 1920 also allows Relevant State Entities to participate in cost allocation negotiations through a regional body. *See, e.g.*, Order No. 1920, 187 FERC ¶ 61,068 at P 999 (declining to impose specific requirements regarding how consultation with Relevant State Entities will occur, and recognizing need for flexibility "based on the specific needs and makeup of their transmission planning region").

Relevant State Entities.[1780]  Finally, we disagree with NRECA's assertion that Order No.

1920 permits Relevant State Entities to dictate cost allocation to utilities they do not

regulate.[1781]  Order No. 1920, as modified here on rehearing, provides robust

opportunities for Relevant State Entities to participate in the development of Long-Term

Regional Transmission Cost Allocation Methods, given the critical role that states will

play in the success of Long-Term Regional Transmission Planning.  However, it is

ultimately the Commission that will determine whether cost allocation methods proposed

on compliance are just and reasonable and not unduly discriminatory or preferential, and

all interested parties will have a full and fair opportunity to participate both in regional

stakeholder proceedings and in compliance proceedings before the Commission.

704.    In response to APPA's contention that the definition of Relevant State Entity

conflicts with the FPA's definition of "state commission" as "the regulatory body of the

State or *municipality* having jurisdiction to regulate rates and charges for the sale of

electric energy to consumers within the State or *municipality*,"[1782] we find that the

definition of Relevant State Entity for purposes of Long-Term Regional Transmission

Facility cost allocation is distinct from the purpose of the definition of "state

commission" in the FPA and need not align with it.  We note, for example, that the FPA

---

[1780] *Id.* PP 1364 & n.2914, 1402.

[1781] NRECA Rehearing Request at 57-58.

[1782] APPA Rehearing Request at 5 (citing 16 U.S.C. 796(15)) (emphasis in
original).

Docket No.  RM21-17-001                                                        - 598 -

defines "state commission" and "state" separately, and in the final rule we use neither of these two definitions.[1783]

### 2.  Extensions of Time for Negotiation of Cost Allocation Methods Under State Agreement Processes

#### a.  Order No. 1920 Requirements

705.    In Order No. 1920, the Commission required that any State Agreement Process be completed, i.e., any resulting cost allocation method must be filed with the Commission, no later than six months after selection of the applicable Long-Term Regional Transmission Facility (or portfolio of such Facilities).[1784]  The Commission found that the State Agreement Process can only be effective if there is a limit on the time to reach agreement before defaulting to the Long-Term Regional Transmission Cost Allocation Method that the Commission required transmission providers to include in their OATTs, that the lack of such a deadline could cause delay and increase uncertainty regarding selected Long-Term Regional Transmission Facilities, and that a deadline, bolstered by a default Long-Term Regional Transmission Cost Allocation Method, may increase the incentive for Relevant State Entities to reach agreement on cost allocation for a particular Long-Term Regional Transmission Facility through a State Agreement Process.[1785]  The Commission found that six months is a reasonable period for State Agreement Process

---

[1783] *See* 16 U.S.C. 796(15)) and 16 U.S.C. 796(6), respectively.

[1784] Order No. 1920, 187 FERC ¶ 61,068 at P 1406.

[1785] *Id.* P 1413.

Docket No.  RM21-17-001                                                     - 599 -

deliberations on a cost allocation method because it balances the need for adequate time

for negotiations with transmission providers' need for finality in their Long-Term

Regional Transmission Planning.[1786]

### b.        Requests for Rehearing and Clarification

706.    Designated Retail Regulators and Undersigned States argue that the State

Agreement Process is unreasonable because Order No. 1920 does not provide adequate

time for the adoption of a cost allocation method that follows any approved State

Agreement Process.[1787]

707.    SERTP Sponsors request that the Commission clarify that upon unanimous

consent of state commissions and relevant governing authorities for SERTP Sponsors not

subject to the Commission's jurisdiction, the Commission will allow an extension of time

for the development of methods resulting from a State Agreement Process.[1788]  SERTP

Sponsors request that at a minimum, the Commission clarify that it will consider motions

for an extension of time for good cause.[1789]

### c.        Commission Determination

708.    We believe that the six-month deadline by which transmission providers must file

any cost allocation method that results from a State Agreement Process is reasonable and

---

[1786] *Id.* P 1414.

[1787] Designated Retail Regulators Rehearing Request at 9; Undersigned States Rehearing Request at 8.

[1788] SERTP Sponsors Rehearing Request at 7-8.

[1789] *Id.*

are thus unpersuaded by parties who challenge the sufficiency of this deadline.  While we emphasize the benefits of a State Agreement Process, we continue to find that this deadline balances the need for adequate time for Relevant State Entities to conduct negotiations with the need for finality in Long-Term Regional Transmission Planning.[1790] Consistent with Order No. 1920, we find that a deadline, coupled with a default Long-Term Regional Transmission Cost Allocation Method, may encourage Relevant State Entities to timely reach agreement on cost allocation for a particular Long-Term Regional Transmission Facility through a State Agreement Process.[1791]  While we grant SERTP Sponsors' request to clarify that transmission providers may file motions for an extension of time for good cause to the State Agreement Process beyond six months after selection of the applicable Long-Term Regional Transmission Facility (or portfolio of such Facilities), we decline at this time to categorically pre-approve extensions (even if unanimous), and thus we deny SERTP Sponsors' associated request for clarification. Instead, the Commission will consider any such requests on the record before it at that time.

---

[1790] Order No. 1920, 187 FERC ¶ 61,068 at P 1414.

[1791] *Id.* P 1413.

USCA4 Appeal: 24-1650   Doc: 224   Filed: 01/21/2025   Pg: 1977 of 2455
Document Accession #: 20241121-3139   Filed Date: 11/21/2024

Docket No.  RM21-17-001                                                    - 601 -

E.      **Use of Existing Cost Allocation Methods in Long-Term Regional Transmission Planning or Existing Regional Processes**

1.      **Order No. 1920 Requirements**

709.    In Order No. 1920, the Commission required that, to the extent transmission providers believe that their existing cost allocation methods comply with the requirements of Order No. 1920, they may demonstrate in their compliance filings that such methods, as applied to Long-Term Regional Transmission Facilities, would comply with the requirements of Order No. 1920.[1792]  The Commission also required that transmission providers that wish to continue using existing transmission planning and cost allocation processes to consider transmission needs driven by Public Policy Requirements must demonstrate that continued use of any such processes does not interfere with or otherwise undermine Long-Term Regional Transmission Planning.[1793]

2.      **Requests for Rehearing and Clarification**

710.    PJM requests that the Commission grant rehearing and confirm that it will consider requests to maintain existing cost allocation methods on compliance unless and until an alternative is filed.[1794]  PJM argues that the Commission has not justified why Order No. 1920 "categorically prohibit[s] existing cost allocation methodologies from remaining in place" in such circumstances.[1795]  PJM states that it is concerned that

---

[1792] *Id.* PP 1302-1303.

[1793] *Id.* P 243.

[1794] PJM Rehearing Request at 19-23.

[1795] *Id.* at 20.

requiring transmission owners to re-justify existing cost allocation methods will set back efforts to implement its Long-Term Regional Transmission Planning Process.[1796]  PJM argues that the requirement to renegotiate all cost allocation methods undercuts the longstanding and widely-accepted notion that knowing how costs for transmission facilities will be allocated is critical for their development.[1797]  PJM further states that its existing cost allocation method includes specific cost allocations for reliability-based projects, market efficiency projects, public policy projects addressing state-identified needs, and multi-driver projects.[1798]  PJM argues that requiring transmission owners to re-justify the existing cost allocation methods undermines the certainty regarding the development of transmission facilities PJM selects to be built.[1799]  PJM states that its existing cost allocation methods are the result of years of close consultation and extensive work among the states in the PJM region and litigation before the Commission.  PJM argues that Order No. 1920 effectively erases these efforts.[1800]

711.  Ohio Commission Federal Advocate asserts that Order No. 1920 arbitrarily and capriciously requires continued use of PJM's State Agreement Approach to be re-approved by the Commission.  Specifically, Ohio Commission Federal Advocate argues

---

[1796] *Id.* at 20-21.

[1797] *Id.* at 21 (citing Order No. 1920, 187 FERC ¶ 61,068 at P 124).

[1798] *Id.* at 22-23.

[1799] *Id.* at 21.

[1800] *Id.* at 22-23.

Docket No. RM21-17-001                                                    - 603 -

that the State Agreement Approach has long been approved and used in the PJM region

to ensure just and reasonable cost allocation for public policy projects and asks the

Commission to revise Order No. 1920 to explicitly allow the continued use of the State

Agreement Approach at least to the projects to which it currently applies.[1801]

### 3.    Commission Determination

712.    Upon consideration of the rehearing requests, we sustain Order No. 1920's

requirement that transmission providers that wish to continue using existing transmission

planning and cost allocation processes to consider transmission needs driven by Public

Policy Requirements must demonstrate that continued use of any such processes does not

interfere with or otherwise undermine Long-Term Regional Transmission Planning.  We

similarly decline to set aside Order No. 1920's requirement that to use an existing cost

allocation method as a Long-Term Regional Transmission Cost Allocation Method, a

transmission provider must demonstrate in its compliance filings that such methods, as

applied to Long-Term Regional Transmission Facilities, comply with Order No. 1920.

713.    We disagree with PJM's request to continue to use existing regional cost

allocation methods for Long-Term Regional Transmission Facilities without a showing

that such use complies with the requirements of Order No. 1920.[1802]  However, we note

that Order No. 1920 does not prohibit transmission providers from proposing to use

existing regional cost allocation methods to comply with the requirements for Long-Term

---

[1801] Ohio Commission Federal Advocate Rehearing Request at 12-13.

[1802] PJM Rehearing Request at 19-23.

Docket No. RM21-17-001                                                      - 604 -

Regional Transmission Cost Allocation Methods, so long as the transmission providers

demonstrate that the existing methods are just and reasonable and not unduly

discriminatory or preferential when applied to Long-Term Regional Transmission

Facilities and comply with the requirements of Order No. 1920 and the cost causation

principle.[1803]  Nevertheless, given the deficiencies identified in existing transmission

planning and cost allocation processes identified by the Commission in Order No. 1920

and the numerous reforms adopted in Order No. 1920 for Long-Term Regional

Transmission Planning to address those deficiencies, it would be unjust and unreasonable

for the Commission to accept existing cost allocation methods for Long-Term Regional

Transmission Facilities without ensuring that such methods are consistent with Order No.

1920.[1804]

714.   We recognize that it may be just and reasonable to apply existing regional cost

allocation methods to Long-Term Regional Transmission Facilities for many of the same

reasons that the Commission found these methods to be just and reasonable when initially

approving them.  For this reason, Order No. 1920 specifically provided that transmission

providers may demonstrate in their compliance filings that their existing regional cost

allocation methods, as applied to Long-Term Regional Transmission Facilities, would

comply with the requirements of Order No. 1920.[1805]  As such, we disagree with PJM's

---

[1803] Order No. 1920, 187 FERC ¶ 61,068 at PP 1302-1303.

[1804] *Id.* PP 124-125 (citations omitted), 1302-1303 (citing Order No. 1000, 136 FERC ¶ 61,051 at P 565; Order No. 1000-A, 139 FERC ¶ 61,132 at P 747).

[1805] *Id.* PP 1302-1303.  In Order No. 1000, in response to "concerns regarding

Docket No.  RM21-17-001                                                                    - 605 -

assertion that Order No. 1920 will ignore past efforts to facilitate consensus on cost

allocation methods.[1806]

715.    We disagree with Ohio Commission Federal Advocate's assertion that Order No.

1920 requires that the continued use of PJM's State Agreement Approach must be re-

approved by the Commission and that the final rule limits use of PJM's State Agreement

Approach.[1807]  We note that Order No. 1920 requires reapproval for existing cost

allocation methods' use in Long-Term Regional Transmission Planning only if those

---

relitigation of existing Commission-approved transmission cost allocation methods," the
Commission declined "to prejudge whether any such existing cost allocation methods
compl[ied] with the requirements of [Order No. 1000]," and noted that "[t]o the extent
[transmission providers] believe[d] that to be the case with their region, they [could] take
such positions during the development of compliance proposals and during Commission
review of compliance filings."  Order No. 1000, 136 FERC ¶ 61,051 at P 565.  On
compliance, the Commission found that SPP's existing Balanced Portfolio and
Highway/Byway regional cost allocation methods and MISO's existing regional cost
allocation methods for Multi-Value Projects (MVPs) and Market Efficiency Projects
(MEP) complied with the requirements of Order No. 1000.  *Sw. Power Pool, Inc.*, 144
FERC ¶ 61,059, at PP 336, 347 (2013), *order on reh'g and compliance*, 149 FERC ¶
61,048, at P 276 (2014), *order on reh'g and compliance*, 151 FERC ¶ 61,045, *order on
compliance*, 152 FERC ¶ 61,106 (2015); *Midwest Indep. Transmission Sys. Operator,
Inc.*, 142 FERC ¶ 61,215, at PP 420, 434 (2013), *order on reh'g and compliance*, 147
FERC ¶ 61,127, at P 404 (2014), *order on reh'g and compliance*, 150 FERC ¶ 61,037
(2015), *order on compliance*, Docket No. ER13-187-010 (Mar. 31, 2015) (delegated
order).

[1806] PJM Rehearing Request at 22-23.  With respect to PJM's request to continue
using its existing regional cost allocation method for public policy projects addressing
state-identified needs outside of Long-Term Regional Transmission Planning, we address
this issue above in the Requirement to Participate in Long-Term Regional Transmission
Planning section.

[1807] Ohio Commission Federal Advocate Rehearing Request at 12-13.

methods are to be used for compliance with Order No. 1920.[1808]  PJM's State Agreement

Approach is not a regional cost allocation method used to comply with the requirements

of Order No. 1000.  The Commission approved the existing PJM State Agreement

Approach in an order on compliance in the Order No. 1000 proceeding, but did not find

that the PJM State Agreement Approach was a regional cost allocation method compliant

with the requirements of Order No. 1000.[1809]  In addition, PJM's State Agreement

Approach is different than the "State Agreement Process" as discussed in Order No.

1920.  The State Agreement Process referenced in Order No. 1920 is a new construct

under which Relevant State Entities may agree to a different cost allocation method for

Long-Term Regional Transmission Facilities than the generally applicable Long-Term

Regional Transmission Cost Allocation Method on file.  Therefore, we clarify that Order

No. 1920 does not prohibit PJM from maintaining its existing State Agreement Approach

for transmission facilities that are not selected in either its Order No. 1000 regional

transmission planning process or through Long-Term Regional Transmission

---

[1808] Order No. 1920, 187 FERC ¶ 61,068 at PP 1302-1303.

[1809] *See PJM Interconnection, L.L.C.* 142 FERC ¶ 61,214, at P 142 (2013) ("We find PJM's proposed State Agreement Approach is not needed for PJM to comply with the provisions of Order No. 1000 addressing transmission needs driven by public policy requirements.  PJM's State Agreement Approach supplements, but does not conflict or otherwise replace, PJM's process to consider transmission needs driven by public policy requirements as required by Order No. 1000 addressed above.  Accordingly, the Commission need not find that the State Agreement Approach and corresponding cost allocation method comply with Order No. 1000."), *order on reh'g and compliance*, 147 FERC ¶ 61,128 (2014), *order on reh'g and compliance*, 150 FERC ¶ 61,038, *order on reh'g and compliance*, 151 FERC ¶ 61,250 (2015).

Planning.[1810]  To clarify further, PJM's State Agreement Approach is supplemental to PJM's existing regional transmission cost allocation method and, as a result, is not in any way affected by Order No. 1920.

716.    However, if the Relevant State Entities in PJM agree to rely on its existing PJM State Agreement Approach as an Order No. 1920 State Agreement Process that applies to selected Long-Term Regional Transmission Facilities, and if PJM agrees, PJM would have to propose and demonstrate on compliance that its State Agreement Approach complies with all of the State Agreement Process requirements set forth in Order No. 1920.  In addition, we reiterate that the *ex ante* Long-Term Regional Transmission Cost Allocation Method(s) that Order No. 1920 prescribes would be used to allocate the costs of selected Long-Term Regional Transmission Facilities if any Order No. 1920-compliant State Agreement Process does not result in a cost allocation method within six months after a project is selected, as described in the final rule.  As noted above, the Commission will consider the entire record – including the Relevant State Entities' agreed-upon Long-Term Regional Transmission Cost Allocation Method and/or State Agreement Process and the transmission provider's proposal – when setting the replacement rate.

---

[1810] *See supra* Requirement to Participate in Long-Term Regional Transmission Planning section (responding to Pennsylvania Commission's and PJM States' requests regarding the PJM State Agreement Approach).

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1984 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No. RM21-17-001                                              - 608 -

717.    In addition, more generally, we clarify that we permit continued use of other

existing state agreement approaches and similar voluntary measures under Order No.

1920, so long as they are consistent with the requirements stated above.

### F.    Regional Cost Allocation Principles for Long-Term Regional Transmission Facilities

#### 1.    Logical Outgrowth

##### a.    NOPR Proposals

718.    In the NOPR, the Commission proposed to require that the Long-Term Regional

Transmission Cost Allocation Method and any cost allocation method resulting from the

State Agreement Process for Long-Term Regional Transmission Facilities comply with

the existing six Order No. 1000 regional cost allocation principles.[1811]  The Commission

made a preliminary finding that compliance with such principles will help ensure that

Commission-jurisdictional rates resulting from any State Agreement Process will be just

and reasonable and not unduly discriminatory or preferential.[1812]  The six regional

transmission cost allocation principles adopted in Order No. 1000 are:  principle (1), the

costs of transmission facilities must be allocated to those within the transmission

planning region that benefit from those facilities in a manner that is at least roughly

commensurate with estimated benefits; principle (2), those that receive no benefit from

transmission facilities, either at present or in a likely future scenario, must not be

---

[1811] NOPR, 179 FERC ¶ 61,028 at PP 302, 312.

[1812] *Id.* P 312.

involuntarily allocated any of the costs of those transmission facilities; principle (3), a benefit to cost threshold ratio, if adopted, cannot exceed 1.25 to 1; principle (4), costs must be allocated solely within the transmission planning region unless another entity outside the region voluntarily assumes a portion of those costs; principle (5), the method for determining benefits and identifying beneficiaries must be transparent; and principle (6), there may be different regional cost allocation methods for different types of transmission facilities, such as those needed for reliability, congestion relief, or to achieve Public Policy Requirements.[1813]

### b.      Order No. 1920 Requirements

719.    In Order No. 1920, the Commission adopted the NOPR proposal, with modification, to require compliance with Order No. 1000 regional cost allocation principles (1) through (5) for Long-Term Regional Transmission Cost Allocation Methods that transmission providers propose but to which Relevant State Entities have not indicated their agreement.  The Commission explained that, because compliance with regional cost allocation principle (6) is not required, transmission providers cannot adopt different *ex ante* Long-Term Regional Transmission Cost Allocation Methods for different types of Long-Term Regional Transmission Facilities, such as those needed for reliability, congestion relief, or to achieve Public Policy Requirements.[1814]

---

[1813] Order No. 1000, 136 FERC ¶ 61,051 at PP 622, 637, 646, 657, 668, 685.

[1814] Order No. 1920, 187 FERC ¶ 61,068 at P 1469.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1986 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No. RM21-17-001                                                    - 610 -

720.    The Commission additionally determined that compliance with the Order

No. 1000 regional cost allocation principles is not required in two situations:  (1) Long-

Term Regional Transmission Cost Allocation Methods to which Relevant State Entities

have agreed as part of the Engagement Period; and (2) cost allocation methods resulting

from a State Agreement Process.[1815]  The Commission explained that this decision was

consistent with application of Order No. 1000 and past precedent, noting that the

Commission has previously found that "Order No. 1000 allows market participants,

including states, to negotiate voluntarily alternative cost sharing arrangements that are

distinct from the relevant regional cost allocation method(s)."[1816]  Additionally, the

Commission noted that where transmission providers have proposed cost allocation

methods corresponding to such voluntary arrangements, the Commission has held that it

need not find that those cost allocation methods comply with Order No. 1000.[1817]

### c.    Requests for Rehearing and Clarification

721.    Several commenters argue that Order No. 1920 violates the APA's notice-and-

comment requirements because, contrary to the NOPR proposal, it does not require cost

allocation methods to comply with Order No. 1000's regional cost allocation principle (6)

---

[1815] *Id.* P 1470.

[1816] *Id.* P 1476 (quoting *State Voluntary Agreements to Plan & Pay for Transmission Facilities*, 175 FERC ¶ 61,225, at P 3 (2021)).

[1817] *Id.* (citing *PJM Interconnection, L.L.C.*, 142 FERC ¶ 61,214 at PP 142-143, *order on reh'g and compliance*, 147 FERC ¶ 61,128 at P 92; *ISO New England Inc.*, 143 FERC ¶ 61,150, at P 121 (2013); *Consol. Edison Co. of N.Y., Inc.*, 180 FERC ¶ 61,106, at PP 48-50 (2022)).

Docket No.  RM21-17-001                                                          - 611 -

and prohibits transmission providers from adopting different cost allocation methods for
different types of transmission facilities.[1818]  NRECA characterizes the change as an
"about face" from both the NOPR and existing Commission policy.[1819]

722.    NRECA additionally argues that Order No. 1920 violates the APA's notice-and-
comment requirements because, contrary to the NOPR, Order No. 1920 does not require
a transmission provider's Long-Term Regional Transmission Cost Allocation Method to
comply with any of the Order No. 1000 regional cost allocation principles if Relevant
State Entities indicate that they agreed to that method as part of the required Engagement
Period, and does not require a cost allocation method resulting from the State Agreement
Process to comply with any of the Order No. 1000 regional cost allocation principles.[1820]
NRECA argues that the "Final Rule's flip-flops on these fundamental requirements for
Long-Term Regional Transmission Cost Allocation Methods and the cost allocation
methods resulting from a State Agreement Process are not a logical outgrowth of the
NOPR's exactly opposite proposals."[1821]

---

[1818] Arizona Commission Rehearing Request at 17-19; East Kentucky Rehearing
Request at 1-2; NRECA Rehearing Request at 6, 16-17.

[1819] NRECA Rehearing Request at 16-17.

[1820] *Id.* at 6, 17.

[1821] *Id.* at 16-17.

#### d.    Commission Determination

723.    We find, and disagree with rehearing requests to the contrary, that the Commission provided adequate notice of and opportunity to comment on the determination in Order No. 1920 to require transmission providers to demonstrate compliance with Order No. 1000 regional cost allocation principles (1) through (5) but not Order No. 1000 regional cost allocation principle (6) for Long-Term Regional Transmission Cost Allocation Methods to which Relevant State Entities have not agreed.

724.    Courts applying the logical outgrowth doctrine have permitted agencies to drop elements of proposed rules "even if a resulting final rule effectively abandons an agency's initial proposal" if the result is "reasonably foreseeable."[1822]   Order No. 1920 is a logical outgrowth of the NOPR in this regard, and the APA's notice-and-comment requirements are therefore satisfied.[1823]   In the NOPR, the Commission expressed concern that transmission providers are not engaging in long-term, more comprehensive regional transmission planning and cost allocation processes like MISO's MVP process, which identifies projects that are projected to provide *multiple* kinds of reliability and economic benefits.[1824]   The Commission proceeded to endorse this kind of transmission

---

[1822] *Mid Continent Nail Corp. v. U.S.*, 846 F.3d 1364, 1374 (Fed. Cir. 2017) (citing *Long Island Care*, 551 U.S. at 174-75).

[1823] *Id.* at 1373 ("The dispositive question in assessing the adequacy of notice under the APA is whether an agency's final rule is a 'logical outgrowth' of an earlier request for comment.").

[1824] NOPR, 179 FERC ¶ 61,028 at P 31.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1989 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No.  RM21-17-001                                                          - 613 -

planning.[1825]  The Commission also noted expressly that "we preliminarily find that the cost allocation requirements for transmission facilities identified and selected in the regional transmission plan through Long-Term Regional Transmission Planning proposed in this proceeding may differ in part from those established in Order No. 1000."[1826]

725.    But allowing transmission providers to establish reliability, economic, or public policy transmission facility types, which would have been possible under the NOPR proposal, reflects a more siloed approach to regional transmission planning and cost allocation that commenters argued is misaligned with the reforms in Order No. 1920 and urged the Commission to avoid.[1827]  Indeed, the Commission specifically noted its concern that using "only a subset of benefits in assigning the cost of Long-Term Regional Transmission Facilities may contribute to the risk of free rider problems that impede development of the more efficient or cost-effective regional transmission facilities."[1828] That observation, which was made in the context of benefits used as the basis to allocate

---

[1825] *Id.* P 33.

[1826] *Id.* P 299.  Although the Commission then gave the example of greater state involvement as one way that the cost allocation requirements might differ, that statement was sufficient to put commenters on notice that the Commission would not necessarily adopt in full Order No. 1000's requirements regarding cost allocation.  Indeed, as noted below, multiple commenters, including New Jersey Commission and PIOs, expressed support for modifying Order No. 1000's cost allocation principles, indicating their understanding that such potential modifications could be adopted in a final rule.

[1827] *See* Acadia Center and CLF NOPR Initial Comments at 16-17; Massachusetts Attorney General NOPR Initial Comments at 21; PIOs NOPR Initial Comments at 46, 60-62.

[1828] NOPR, 179 FERC ¶ 61,028 at P 325.

the costs of Long-Term Regional Transmission Facilities, further indicated the Commission's concerns with the siloed status quo approach and mirrored the rationale that the Commission adopted in eliminating regional cost allocation principle (6).  It was therefore reasonably foreseeable that Order No. 1920 would not require compliance with regional cost allocation principle (6), which allows for project-type-limited Long-Term Regional Transmission Cost Allocation Methods, because such an approach would be inconsistent with Order No. 1920's long-term, forward-looking, more comprehensive regional transmission planning.[1829]  However, as noted below, transmission providers and Relevant State Entities have broad flexibility to recognize the different types of benefits provided by Long-Term Regional Transmission Facilities and allocate costs in proportion to those benefits.

726.  Further, courts have held that a final rule satisfies the logical outgrowth standard where an agency either finalizes only part of a multi-segment proposal[1830] or chooses not to finalize a proposal.[1831]  Order No. 1920 is a logical outgrowth of the NOPR in this

---

[1829] Order No. 1920, 187 FERC ¶ 61,068 at P 1474.

[1830] *Ariz. Pub. Serv. Co. v. EPA*, 211 F.3d at 1297–1300 (finding sufficient notice where agency first proposed that Indian tribes be required to meet the "same requirements" as states with respect to judicial review of permits issued pursuant to the Clean Air Act, but then adopted a final rule that exempted tribes from some, though not all, such requirements).

[1831] *New York v. EPA*, 413 F.3d at 44 (per curiam) ("One logical outgrowth of a proposal is surely . . . to refrain from taking the proposed step." (quoting *Am. Iron & Steel Inst. v. EPA*, 886 F.2d at 400); *see also Long Island Care*, 551 U.S. at 175 (stating, in the context of rejecting claims that an agency provided legally defective notice because it did not finalize a proposed rule, "[w]e do not understand why such a possibility was not reasonably foreseeable"); *Vanda Pharms.*, 98 F.4th at 498 (finding that the APA's

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1991 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No.  RM21-17-001                                                - 615 -

regard.  Because the NOPR proposed to require compliance with the existing six Order

No. 1000 regional cost allocation principles, the Commission's decision to refrain from

requiring compliance with one of those principles—principle (6)—could have been

reasonably anticipated by commenters, especially given the Commission's frequently

stated concerns regarding the siloing of transmission facilities into different categories

under Order No. 1000.[1832]  Indeed, in NOPR comments, parties expressed support for

modifying Order No. 1000's cost allocation principles.[1833]  Such comments are evidence

that parties had adequate notice that the Commission might refrain from taking the

NOPR's proposed step—i.e., requiring compliance with all six regional cost allocation

principles.[1834]

727.    For similar reasons, we also disagree that the Commission failed to provide

adequate notice of and opportunity to comment on the determination in Order No. 1920

to not adopt the requirement that transmission providers demonstrate compliance with

---

"notice-and-comment procedure is designed so that an agency can float a potential rule to
the public without committing itself to enacting the proposed rule's content").

[1832] *See* NOPR, 179 FERC ¶ 61,028 at PP 67, 325.

[1833] New Jersey Commission NOPR Initial Comments at 18 (expressing support
for a requirement that any cost allocation method comply with the Order No. 1000
regional cost allocation principles except principle (4)); PIOs NOPR Initial Comments at
61 & n.172 (requesting "that the Commission specifically find that cost allocation of
public policy projects without consideration of economic and reliability benefits is unjust,
unreasonable, and unduly discriminatory").

[1834] *Miami-Dade Cnty. v. EPA*, 529 F.3d 1049, 1059 (11th Cir. 2008) ("[A]lthough
they may not provide the only basis upon which an agency claims to have satisfied the
notice requirement, comments may be adduced as evidence of the adequacy of notice.").

any of the six Order No. 1000 regional cost allocation principles for Long-Term Regional

Transmission Cost Allocation Methods to which Relevant State Entities have agreed as

part of the Engagement Period or for cost allocation methods resulting from a State

Agreement Process.  In the NOPR, the Commission proposed to require that the Long-

Term Regional Transmission Cost Allocation Method and any cost allocation method

resulting from the State Agreement Process comply with the six Order No. 1000 regional

cost allocation principles.[1835]  As noted above, because "[o]ne logical outgrowth of a

proposal is surely . . . to refrain from taking the proposed step,"[1836] the Commission's

decision to refrain from adopting the entire proposal as to Long-Term Regional

Transmission Cost Allocation Methods to which Relevant State Entities have agreed or

for cost allocation methods resulting from a State Agreement Process could have been

reasonably anticipated by commenters.  Moreover, the decision to refrain from adopting

the proposal was all the more foreseeable because, as a result of that decision, the cost

allocation requirements adopted in Order No. 1920 are more closely aligned with the

Commission's existing cost allocation requirements,[1837] which it had already articulated

at the time it issued the NOPR, and under which cost allocation methods corresponding

---

[1835] NOPR, 179 FERC ¶ 61,028 at P 302.

[1836] *New York v. EPA*, 413 F.3d at 44.

[1837] *Cf. New York v. EPA*, 413 F.3d at 44 (agency satisfied APA's notice-and-comment requirements where it adopted the approach of the "status quo ante" rather than the proposed approach).

to voluntarily negotiated alternative cost sharing arrangements that are distinct from the

relevant regional cost allocation method(s) need not comply with Order No. 1000.[1838]

### 2. Omission of Regional Cost Allocation Principle No. 6 and Ability to Allocate Costs by Type of Project

#### a. Order No. 1920 Requirements

728.   In Order No. 1920, the Commission declined to require transmission providers to

demonstrate that any Long-Term Regional Transmission Cost Allocation Methods that

they propose complies with Order No. 1000 regional cost allocation principle (6).[1839]  The

Commission explained that Order No. 1000 regional cost allocation principle (6) allows

for cost allocation methods based on different types of transmission facilities (i.e.,

reliability, economic, or public policy transmission facility types), but that there can be

only one cost allocation method for each type of facility, and that method must be

determined in advance.[1840]  The Commission found that project-type-limited Long-Term

Regional Transmission Cost Allocation Methods that would be permitted by applying

regional cost allocation principle (6) are inconsistent with the long-term, forward-

looking, more comprehensive regional transmission planning required in Order No.

1920.[1841]  As a result, unlike under Order No. 1000, transmission providers cannot adopt

---

[1838] Order No. 1920, 187 FERC ¶ 61,068 at P 1476 (citing *PJM Interconnection, L.L.C.*, 142 FERC ¶ 61,214 at PP 142-143, *order on reh'g and compliance*, 147 FERC ¶ 61,128 at P 92; *ISO New England Inc.*, 143 FERC ¶ 61,150 at P 121).

[1839] *Id.* P 1469.

[1840] *Id.* P 1474.

[1841] *Id.*

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1994 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No.  RM21-17-001                                                                - 618 -

different Long-Term Regional Transmission Cost Allocation Methods for different types

of Long-Term Regional Transmission Facilities, such as those needed for reliability,

congestion relief, or to achieve Public Policy Requirements.[1842]

### b.    Requests for Rehearing and Clarification

729.    Many parties argue that the Commission erred in not requiring the application of

Order No. 1000 regional cost allocation principle (6) and request that the Commission

implement such a requirement so that transmission providers may allocate the cost of

Long-Term Regional Transmission Facilities by project type.[1843]  Nearly all of these

parties argue that not requiring the application of regional cost allocation principle (6)

will result in cost allocation that violates cost causation or the "beneficiary pays"

principle.[1844]  Utah Commission asserts that the Commission not requiring the application

of regional cost allocation principle (6) in Order No. 1920 violates cost causation

---

[1842] *Id.* P 1469.

[1843] Arizona Commission Rehearing Request at 18-19; Dominion Rehearing Request at 28-31; East Kentucky Rehearing Request at 3; Idaho Commission Rehearing Request at 2-4; Indicated PJM TOs Rehearing Request at 2-3, 4-6; Montana Commission Rehearing Request at 1, 4-6; Northern Virginia Rehearing Request at 5, 9-13; NRECA Rehearing Request at 49-55; Ohio Commission Federal Advocate Rehearing Request at 13-15; Utah Commission Rehearing Request at 9-10; West Virginia Commission Rehearing Request at 6-8; Wyoming Commission Rehearing Request at 4-6.

[1844] Arizona Commission Rehearing Request at 18-19; Idaho Commission Rehearing Request at 2-4; Indicated PJM TOs Rehearing Request at 2-3, 4-6; Montana Commission Rehearing Request at 1, 4-6; Northern Virginia Rehearing Request at 5, 9-13; NRECA Rehearing Request at 53-54; Utah Commission Rehearing Request at 9-10; West Virginia Commission Rehearing Request at 6-8; Wyoming Commission Rehearing Request at 4-6.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 1995 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

principles by flatly enjoining any cost allocation method that distinguishes between projects that are based on economic or engineering necessity and those based on the "public policy" preferences of states, local governments, and corporations.[1845]  Several parties argue that Order No. 1920 will result in cost allocation that fails to reflect the role of state policy in causing costs and will shift the financial burden away from the cost-causing states that imposed those policies.[1846]  Idaho Commission argues that Order No. 1920 contradicts the Commission's position in Order No. 1000, which stresses the role of states in consideration of costs potentially allocated across multiple states with respect to transmission needs driven by states' individual Public Policy Requirements.[1847]

730.    Ohio Commission Federal Advocate argues that the prohibition against transmission providers allocating costs for Long-Term Regional Transmission Facilities based on reliability, economic, and Public Policy Requirement project types is not possible to reconcile with the principle that cost allocation ought to be roughly commensurate with benefits.  Ohio Commission Federal Advocate offers as an example a transmission facility that would not exist but for the policy of one or more states, does not affect the power flow in any neighboring states, and does not provide any tangible benefit

---

[1845] Utah Commission Rehearing Request at 9-10.

[1846] Idaho Commission Rehearing Request at 3-4; Montana Commission Rehearing Request 5-6; West Virginia Commission Rehearing Request at 7-8; Wyoming Commission Rehearing Request at 5-6.

[1847] Idaho Commission Rehearing Request at 3 (citing Order No. 1000, 136 FERC ¶ 61,051 at P 486).

to any other states, arguing that the Commission ought to clarify that, in this instance, it is wholly appropriate that the sponsoring state or states bear the full cost of the facility and that it would be an unjust and unreasonable result to assign any costs to any other state. Ohio Commission Federal Advocate argues that Ohioans were not afforded the opportunity to weigh in on the policies of other states, nor were they granted a vote on the politicians enacting them, and, as such, should not be assigned any costs associated with those policies.[1848]

731.    Some parties assert that the Commission's decision not to require the application of regional cost allocation principle (6) and the prohibition against Long-Term Regional Transmission Facility types and associated cost allocation methods is arbitrary and capricious[1849] because the Commission has not provided a reasonable explanation or any supporting evidence as to how, among other things, this policy will protect consumers from unjust, unreasonable, and unduly discriminatory transmission rates;[1850] the Commission did not explain how the rejection of project-type cost allocation is forward-looking or comprehensive;[1851] and the Commission did not meaningfully distinguish how Long-Term Regional Transmission Planning differs from regional transmission planning

---

[1848] Ohio Commission Federal Advocate Rehearing Request at 13-15.

[1849] *E.g.*, Northern Virginia Rehearing Request at 5.

[1850] East Kentucky Rehearing Request at 3.

[1851] Ohio Commission Federal Advocate Rehearing Request at 10.

Docket No.  RM21-17-001                                                    - 621 -

under Order No. 1000.[1852]  Dominion asserts that Order No. 1920 does not cite any record

evidence, nor is it clear whether any commenters to the NOPR requested this change to

Order No. 1000's cost allocation principles.[1853]

732.    Dominion argues that Order No. 1920 inappropriately treats all Long-Term

Regional Transmission Facilities as equal for cost allocation purposes under the guise of

the holistic transmission planning that Order No. 1920 seeks to foster.  Dominion further

argues that holistic transmission planning can acknowledge that certain projects provide

different types of benefits and serve different needs, but together, as a package, serve a

variety of needs.  Dominion asserts that, if cost allocation cannot be tied to an identified

underlying driver for the project, costs are more likely to be inappropriately socialized to

customers who did not cause the need and do not benefit from it.  Dominion states that

the Commission should continue to allow transmission providers to develop different

project types and associated cost allocations, but also require that transmission providers

have a category of projects to act as a backstop that accounts for all potential benefits.[1854]

733.    NRECA argues that the Commission's argument in support of its prohibition on

using different cost allocation methods for different types of Long-Term Regional

Transmission Facilities is essentially that the Commission can restrict cost allocation

---

[1852] Dominion Rehearing Request at 29-30.

[1853] *Id.* at 29.

[1854] *Id.* at 29-31.

methods by dictating planning methods.[1855]  NRECA contends that this prohibition and reasoning is contrary to precedent and the Order No. 1000 regional cost allocation principle (1) that Order No. 1920 adopts because it would result in the costs of transmission facilities being allocated in a manner that is not at least roughly commensurate with estimated benefits.[1856]  NRECA argues that, if Long-Term Regional Transmission Facilities produce multiple types of benefits that must be accounted for in Long-Term Regional Transmission Planning, this is an argument for a more flexible and more tailored approach to cost allocation with different cost allocation methods, not a more prescriptive and less tailored approach.[1857]

734.    NRECA contends that allocating costs of a Long-Term Regional Transmission Facility built to satisfy Public Policy Requirements or other expansive factors required by the rule, such as corporate commitments, in the same manner as a facility built for reliability or economic purposes also likely conflicts with Order No. 1000's regional cost allocation principle (2) because those that receive no benefits would likely be involuntarily allocated costs.[1858]  NRECA argues that costs associated with Long-Term Regional Transmission Facilities built to satisfy transmission needs driven by corporate

---

[1855] NRECA Rehearing Request at 53.

[1856] *Id.* (citing *ICC v. FERC I*, 576 F.3d at 477; Order No. 1000, 136 FERC ¶ 61,051 at P 622).

[1857] *Id.* at 54.

[1858] *Id.*

commitments should be borne by the relevant corporations, not by other transmission customers that do not benefit from the facility.[1859]

735.    NRECA further argues that the omission of principle (6) and prohibition on using different cost allocation methods for different types of Long-Term Regional Transmission Facilities violates Order No. 1000's regional cost allocation principle (4) because it will likely allow the costs of Long-Term Regional Transmission Facilities built to satisfy a state's Public Policy Requirements to be allocated to customers in other states.[1860]

736.    Arizona Commission, Ohio Commission Federal Advocate, and NRECA argue that the Commission's decision not to require the application of regional cost allocation principle (6) and the prohibition against Long-Term Regional Transmission Facility types and associated cost allocation methods replaces flexibility with a one-size-fits-all requirement.[1861]  Idaho Commission contends that Order No. 1920 strays from Order No. 1000's "light touch," highlighted in *South Carolina Public Service Authority v. FERC*, where the Commission did not "dictate how costs are to be allocated."[1862]

---

[1859] *Id.* at 55.

[1860] *Id.*  Order No. 1000 regional cost allocation principle (4) provides that costs must be allocated "solely within th[e] transmission planning region unless another entity outside the region or another transmission planning region voluntarily agrees to assume a portion of those costs." Order No. 1000, 136 FERC ¶ 61,051 at P 657.

[1861] Arizona Commission Rehearing Request at 18-19; Ohio Commission Federal Advocate Rehearing Request at 14; NRECA Rehearing Request at 52, 54.

[1862] Idaho Commission Rehearing Request at 3 (quoting *S.C. Pub. Serv. Auth. v.*

Docket No. RM21-17-001                                                    - 624 -

737.    Indicated PJM TOs request that the Commission clarify that, by precluding

transmission providers from adopting Long-Term Regional Transmission Cost Allocation

Methods for different project types, it did not intend to preclude transmission providers

from adopting cost allocation methods that allocate costs based on the different benefits

associated with a particular facility.  Indicated PJM TOs argue that such a clarification

would be consistent with the Commission's obligation to ensure that the transmission

provider allocates the cost in a manner that is at least roughly commensurate with

estimated benefits.  Indicated PJM TOs state that, if the Commission does not grant this

clarification, they seek rehearing of the decision to preclude transmission providers from

adopting different Long-Term Regional Transmission Cost Allocation Methods based on

a facility's benefits because this outcome is inconsistent with other statements in the

NOPR and Order No. 1920 and long-standing cost causation principles and nothing in

regional cost allocation principle (6) prevents transmission providers from having this

flexibility.[1863]

738.    Virginia and North Carolina Commissions argue that the Commission should

afford transmission providers, in coordination with Relevant State Entities and other

stakeholders, the maximum flexibility possible with respect to potential *ex ante* cost

allocation methods, so long as such methods are in compliance with the Commission's

cost-causation principles.  As a result, Virginia and North Carolina Commissions assert

---

*FERC*, 762 F.3d at 81).

[1863] Indicated PJM TOs Rehearing Request at 2-3, 4-6.

Docket No. RM21-17-001                                                      - 625 -

that the Commission should clarify on rehearing that Order No. 1920 does not expressly

preclude cost allocation methods that allocate costs based on the incremental costs

associated with the inclusion of one or more public policy factors.[1864]

### c.    Commission Determination

739.    We sustain Order No. 1920's decision to not require Long-Term Regional

Transmission Cost Allocation Methods to which Relevant State Entities do not agree to

comply with Order No. 1000 regional cost allocation principle (6), and also sustain the

prohibition of cost allocation methods that allocate costs based solely on one type of

benefit, such as reliability, economic, and public policy transmission facility types.

However, we note our clarification below that transmission providers and Relevant State

Entities may consider different types of benefits provided by Long-Term Regional

Transmission Facilities and allocate costs in proportion to those benefits.[1865]

Recognizing the flexibility to allocate costs in proportion to different types of benefits,

we disagree with arguments raised on rehearing that the Commission should require the

application of Order No. 1000 regional cost allocation principle (6) to Long-Term

Regional Transmission Cost Allocation Methods to which Relevant State Entities have

not agreed and arguments that the Commission's decision on this issue is arbitrary and

capricious.  First, because of the flexibility the Commission provided to transmission

providers to propose different cost allocation methods for Long-Term Regional

---

[1864] Virginia and North Carolina Commissions Rehearing Request at 5-6.

[1865] *See infra* Concerns Regarding Cost Causation section.

Docket No. RM21-17-001                                                    - 626 -

Transmission Facilities, we disagree that a requirement not to use cost allocation methods that allocate costs based on project types will result in adoption of cost allocation methods that violate the cost causation principle. We reiterate that, as stated in Order No. 1920, the Commission will evaluate each proposed Long-Term Regional Transmission Cost Allocation Method to ensure that it will allocate costs in a manner that is at least roughly commensurate with the estimated benefits that Long-Term Regional Transmission Facilities will provide, which will ensure compliance with the cost causation principle and the just and reasonable standard more broadly.[1866] To the extent that a party believes that any Long-Term Regional Transmission Cost Allocation Method submitted on compliance, including those discussed herein, violates the cost causation principle, it will have the opportunity to raise those concerns in response to the compliance filing.

740.    Additionally, as the Commission found in Order No. 1920, Long-Term Regional Transmission Facilities are likely to provide a diverse array of benefits,1867 and Order No. 1920 specifically required that transmission providers consider seven economic and

---

[1866] Order No. 1920, 187 FERC ¶ 61,068 at PP 1305 & n.2786, 1478; *see Old Dominion Elec. Coop. v. FERC*, 898 F.3d 1254, 1255 (D.C. Cir. 2018) ("Under the [FPA], electric utilities must charge 'just and reasonable' rates. For decades, the Commission and the courts have understood this requirement to incorporate a 'cost-causation principle'—the rates charged for electricity should reflect the costs of providing it." (internal citations omitted)); *K N Energy, Inc. v. FERC*, 968 F.2d 1295, 1300 (D.C. Cir. 1992) ("FERC and the courts have added flesh to these bare statutory bones [i.e., the just and reasonable standard], establishing what has become known in Commission parlance as the 'cost-causation' principle.").

[1867] Order No. 1920, 187 FERC ¶ 61,068 at PP 123, 126, 722.

Docket No. RM21-17-001                                                    - 627 -

reliability benefits,1868 while not prohibiting them from also considering public policy

benefits.1869  We conclude that Long-Term Regional Transmission Facilities will likely

have benefits beyond addressing transmission needs driven by Public Policy

Requirements and allowing transmission providers to allocate costs based solely on one

type of benefit, such as reliability, economic, or public policy transmission project types,

would likely underestimate the benefits provided by the project and, for that reason, be

inconsistent with the goals underlying long-term, forward-looking, more comprehensive

regional transmission planning required in Order No. 1920.[1870]

741.    Nevertheless, we emphasize the fundamental principle that costs must be allocated

in a manner that is at least roughly commensurate with estimated benefits, ensuring that

ratepayers will not pay for facilities from which they do not benefit.[1871]  Regardless of the

factors driving the need for that project, if a customer does not derive benefits from the

project or if they derive only trivial benefits in relation to the project's costs, the customer

cannot be forced to pay for the costs of the project without violating the cost causation

principle.[1872]

---

[1868] *See id.* PP 719-720.

[1869] *Id.* PP 737, 822; *see also id.* P 1515 & n.3220.

[1870] *Id.* P 1474.

[1871] *Id.* P 267.

[1872] *ICC v. FERC I*, 576 F.3d at 476-77; *ICC v. FERC III*, 756 F.3d at 564-65; *see Coal. of MISO Transmission Customers v. FERC*, 45 F.4th 1004, 1009 (D.C. Cir. 2022); *LSP Transmission Holdings II, LLC v. FERC*, 45 F.4th 979, 984 (D.C. Cir. 2022).

Docket No. RM21-17-001                                                          - 628 -

742.    Additionally, contrary to Dominion's argument,[1873] the long-term, forward-looking, more comprehensive nature of Long-Term Regional Transmission Planning distinguishes it from regional transmission planning under Order No. 1000.  Order No. 1000 did not establish similarly long-term, forward-looking, or comprehensive regional transmission planning requirements.  As a result, the Commission engaged in reasoned decision-making in relying on the different attributes of Long-Term Regional Transmission Planning when not adopting Order No. 1000 regional cost allocation principle (6).

743.    As the Commission also found in Order No. 1920, the application of Order No. 1000 regional cost allocation principles (1) through (5) safeguards against cost causation concerns.  Notably, the Commission explained:

> [P]rinciples (1) and (2) require that benefits received are at least roughly commensurate with costs paid and that costs may not be involuntarily allocated to those that do not benefit, respectively.  Further, Order No. 1000 regional cost allocation principle (5), as well as the requirements in this final rule to disclose estimates of the benefits of selected Long-Term Regional Transmission Facilities, ensures sufficient transparency for stakeholders to understand how the costs of selected Long-Term Regional Transmission Facilities will be allocated to transmission customers in relation to the benefits that they are forecasted to provide.[1874]

744.    Therefore, even if a Long-Term Regional Transmission Facility helps to address a transmission need driven by a state or states' Public Policy Requirements, the costs of

---

[1873] Dominion Rehearing Request at 30.

[1874] Order No. 1920, 187 FERC ¶ 61,068 at P 1478.

that transmission facility will only be allocated to ratepayers in states without those

Public Policy Requirements in relation to the benefits they receive.  We note that the

benefits of a transmission facility go beyond any particular need that it may address.[1875]

As noted below, where Relevant State Entities agree, one potential cost allocation method

that could be proposed to comply with Order No. 1920 would allocate costs

commensurate with reliability and economic benefits region-wide, while allocating costs

commensurate with additional benefits to a subset of states that agree to such cost

allocation.[1876]

745.    For these reasons, we disagree with rehearing arguments that seem to suggest that,

for any Long-Term Regional Transmission Cost Allocation Method to satisfy the cost

causation principle or, in NRECA's case, not contradict Order No. 1000 principles (1)

and (2),[1877] transmission providers must disaggregate all disparate drivers of Long-Term

Transmission Needs so that each identified Long-Term Regional Transmission Facility

may precisely be attributed to a particular policy goal or other driver of the transmission

---

[1875] *See ICC v. FERC I*, 576 at 476 ("To the extent that a utility benefits from the costs of new facilities, it may be said to have 'caused' a part of those costs to be incurred, as without the expectation of its contributions the facilities might not have been built, or might have been delayed.").  *See also* Order No. 1000, 136 FERC ¶ 61,051 at P 690 ("If a regional transmission plan determines that a transmission facility serves several functions, as many commenters point out it may, the regional cost allocation method must take the benefits of these functions of the transmission facility into account in allocating costs roughly commensurate with benefits.").

[1876] *See infra* Concerns Regarding Cost Causation section.

[1877] NRECA Rehearing Request at 53-55.

need.  As we emphasize throughout this section, transmission providers and Relevant

State Entities have broad flexibility to develop cost allocation approaches, provided such

approaches comply with the cost causation principle and are otherwise just and

reasonable.  Consistent with that flexibility, as we clarify below, transmission providers

and Relevant State Entities are not precluded from considering in their proposed cost

allocation methods the incremental cost of transmission needed to achieve state laws,

policies, and regulations beyond the cost of transmission needed in the absence of those

laws, policies, and regulations.  Nevertheless, we find that requiring transmission

providers to conduct Long-Term Regional Transmission Planning in the manner

suggested by NRECA might risk undermining the scaling of Long-Term Regional

Transmission Facilities to provide a more efficient or cost-effective solution to multiple

transmission needs by encouraging piecemeal transmission expansion (e.g., two separate

transmission facilities to address two separate transmission needs may be more expensive

than one facility meeting both needs) that caused the need for reform in the first place.[1878]

In addition, that exercise would likely stymie transmission providers' selection of more

efficient or cost-effective transmission solutions by leading them to ignore or otherwise

discount the diverse range of benefits that Long-Term Regional Transmission Facilities

can provide, likely leading them to underestimate the benefits that the facilities provide to

customers.

---

[1878] Order No. 1920, 187 FERC ¶ 61,068 at PP 85, 112.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 2007 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No. RM21-17-001                                                      - 631 -

746.    Moreover, we reiterate that Long-Term Regional Transmission Cost Allocation

Methods to which Relevant State Entities have not agreed must satisfy Order No. 1000

regional cost allocation principles (1) through (5), such that transmission customers will

only pay for Long-Term Regional Transmission Facilities (or portfolios of such

Facilities) when the transmission provider has determined that they meet the transmission

providers' selection criteria and transmission customers will only be allocated costs that

are at least roughly commensurate with the estimated benefits they receive.  As Order No.

1920 noted:

> [U]nder this final rule, customers pay for a more reliable and
> economic transmission system as identified through open and
> transparent Long-Term Regional Transmission Planning, and
> any state's ratepayers only fund the construction of Long-
> Term Regional Transmission Facilities that provide them with
> such benefits that are at least roughly commensurate with the
> costs of those facilities.[1879]

747.    Consequently, and contrary to certain parties' arguments,[1880] these requirements

will protect customers from unjust, unreasonable, and unduly discriminatory or

preferential transmission rates.

748.    Regarding NRECA's arguments that the cost allocation requirements of Order

No. 1920 violate Order No. 1000 regional cost allocation principle (4),[1881] we disagree.

NRECA's arguments are based on an incorrect interpretation of Order No. 1000 regional

---

[1879] *Id.* P 270.

[1880] *See e.g.*, East Kentucky Rehearing Request at 3.

[1881] NRECA Rehearing Request at 55.

cost allocation principle (4), which states that "[t]he allocation method for the cost of a

transmission facility selected in a regional transmission plan must allocate costs solely

within that *transmission planning region* unless another entity outside the region or

another transmission planning region voluntarily agrees to assume a portion of those

costs."[1882]  Order No. 1000 regional cost allocation principle (4) concerns transmission

planning regions, not individual states as contemplated by NRECA's arguments, and it

does not prohibit allocation of costs among customers in states within a single

transmission planning region.

749.    We disagree with rehearing parties who argue that the lack of a requirement to

apply regional cost allocation principle (6), with its prohibition against adopting different

Long-Term Regional Transmission Cost Allocation Methods for reliability, economic,

and public policy transmission project types, creates a one-size-fits-all approach,[1883]

inappropriately treats all Long-Term Regional Transmission Facilities as equal for cost

allocation purposes,[1884] or otherwise conflicts with the Commission's "light touch" in

Order No. 1000.[1885]  In particular, NRECA is incorrect that the prohibition against

adopting different Long-Term Regional Transmission Cost Allocation Methods for

---

[1882] Order No. 1000, 136 FERC ¶ 61,051 at P 657 (emphasis added).

[1883] *See* Arizona Commission Rehearing Request at 18-19; Ohio Commission Federal Advocate Rehearing Request at 14.

[1884] *See* Dominion Rehearing Request at 29-31.

[1885] *See* Idaho Commission Rehearing Request at 3; NRECA Rehearing Request at 52-53.

reliability, economic, and public policy transmission project types means that

"transmission providers must similarly use a single cost allocation method."[1886]

Rehearing parties' arguments focus on the prohibition against economic, reliability, and

public policy types, but do not recognize the broad flexibility otherwise afforded under

Order No. 1920's application of Order No. 1000 regional cost allocation principles (1)-

(5) and allowance of multiple cost allocation methods for Long-Term Regional

Transmission Facilities.[1887]  Under Order No. 1920, transmission providers may craft

different *ex ante* cost allocation methods to reflect the different proportion of benefits

provided by Long-Term Regional Facilities with different underlying drivers.[1888]  Thus,

we clarify that Order No. 1920's prohibition against types is a prohibition against the

allocation of costs based on a single category of benefits—whether reliability, economic,

public policy, or another category of benefits.  In other words, transmission providers

could *not* allocate *all* costs of Long-Term Regional Transmission Facilities on the basis

of public policy benefits, if doing so ignores economic and reliability benefits associated

with those facilities.  Allocating the costs of Long-Term Regional Transmission Facilities

---

[1886] NRECA Rehearing Request at 53.

[1887] Order No. 1920, 187 FERC ¶ 61,068 at P 1475 ("We clarify that this final rule does not preclude the adoption of multiple Long-Term Regional Transmission Cost Allocation Methods, provided that the Long-Term Regional Transmission Cost Allocation Method that will apply to a Long-Term Regional Transmission Facility (or portfolio of such Facilities) is known before selection, i.e., is an *ex ante* cost allocation method, and does not allocate costs by project type.").

[1888] *Infra* Concerns Regarding Cost Causation section.

entirely on a single category of benefits would likely ignore the diverse range of benefits those Facilities likely provide, as described above, and in doing so violate the cost causation principle.

750.    We reiterate the fact that Order No. 1920 provides flexibility previously unafforded in regional transmission planning both in the new types of compliant cost allocation methods (i.e., Long-Term Regional Transmission Cost Allocation Methods agreed to by Relevant State Entities during the Engagement Period and cost allocation methods resulting from a State Agreement Process) and in the lack of restrictions placed on these new state-agreed-to methods (i.e., the only requirement for such methods is compliance with the cost causation principle).  We believe the possibilities afforded by state agreement under Order No. 1920 may address the concerns underlying rehearing parties' arguments.

751.    Further, we grant Indicated PJM TOs' request for clarification that Order No. 1920 does not preclude transmission providers from adopting Long-Term Regional Transmission Cost Allocation Methods that allocate costs based on the different benefits associated with a particular Long-Term Regional Transmission Facility (or portfolio of Facilities).[1889]  Transmission providers may propose *ex ante* Long-Term Regional Transmission Cost Allocation Methods that, for example, assign a portion of the costs of a Long-Term Regional Transmission Facility that are associated with reliability benefits to one set of beneficiaries, a portion of the costs associated with economic benefits to

---

[1889] Indicated PJM TOs Rehearing Request at 2-3, 4-6.

Docket No. RM21-17-001                                                           - 635 -

another set of beneficiaries, and a portion of costs associated with public policy benefits

to a different set of beneficiaries.  Such a method would not violate the Commission's

decision to not apply regional cost allocation principle (6) because the Long-Term

Regional Transmission Cost Allocation Method would not create a cost allocation

method that is specific to, for example, a transmission facility that satisfies a transmission

need driven by economic benefits.  As such, elimination of Order No. 1000 regional cost

allocation principle (6) does not yield as inflexible an outcome as rehearing partis assert.

752.    In response to Virginia and North Carolina Commissions' request that the

Commission clarify that Order No. 1920 does not preclude cost allocation methods that

allocate costs based on the incremental costs associated with the inclusion of one or more

public policy factors,[1890] we clarify that Order No. 1920's cost allocation requirements

allow for, but do not require, transmission providers to account for the benefits associated

with addressing transmission needs driven by Public Policy Requirements in any *ex ante*

cost allocation method.[1891]

### 3.    Concerns Regarding Cost Causation

### a.    Order No 1920 Requirements

753.    In Order No. 1920, the Commission required Long-Term Regional Transmission

Cost Allocation Methods not agreed to by Relevant State Entities to comply with Order

No. 1000 regional cost allocation principles (1) through (5). The Commission found that

---

[1890] Virginia and North Carolina Commissions Rehearing Request at 5-6.

[1891] *See infra* Concerns Regarding Cost Causation section.

Docket No. RM21-17-001                                                    - 636 -

Order No. 1000 regional cost allocation principles (1) through (5) remain relevant for *ex ante* cost allocation methods for Long-Term Regional Transmission Facilities that transmission providers propose on compliance but for which Relevant State Entities have *not* indicated their agreement.[1892]

754.    In Order No. 1920, the Commission did not require transmission providers to demonstrate that Long-Term Regional Transmission Cost Allocation Methods that Relevant State Entities indicate they have agreed to or cost allocation methods resulting from a State Agreement Process comply with any of the Order No. 1000 regional cost allocation principles.[1893]  The Commission chose not to adopt the NOPR proposal to require adherence to the six Order No. 1000 regional cost allocation principles in these circumstances because cost allocation methods resulting from a State Agreement Process and Long-Term Regional Transmission Cost Allocation Methods that Relevant State Entities indicate that they have agreed to are likely to facilitate agreement over development of such Long-Term Regional Transmission Facilities by, for example, making the Relevant State Entities more confident that customers in the state are receiving benefits at least roughly commensurate with their share of the cost of such facilities and by reducing the likelihood that selected Long-Term Regional Transmission Facilities cannot be constructed because they do not receive necessary state regulatory

---

[1892] Order No. 1920, 187 FERC ¶ 61,068 at PP 1469, 1472-1473.

[1893] *Id.* PP 1470, 1476.

approvals.[1894]  The Commission further reasoned that affording additional flexibility for

these methods by not requiring the application of the six Order No. 1000 regional cost

allocation principles may encourage their use, and consequently facilitate the selection of

more efficient or cost-effective Long-Term Regional Transmission Facilities.[1895]  The

Commission noted, however, that such methods must still be just and reasonable and not

unduly discriminatory or preferential, and must allocate costs in a manner that is at least

roughly commensurate with estimated benefits.[1896]  The Commission further explained

that this decision was consistent with past precedent, noting that the Commission has

previously found that "Order No. 1000 allows market participants, including states, to

negotiate voluntarily alternative cost sharing arrangements that are distinct from the

relevant regional cost allocation method(s)."[1897]  Additionally, the Commission noted that

where transmission providers have proposed cost allocation methods corresponding to

such voluntary arrangements, the Commission has held that it need not find that those

cost allocation methods comply with Order No. 1000.[1898]  Consistent with this precedent,

---

[1894] *Id.* P 1477.

[1895] *Id.*

[1896] *Id.* (citation omitted).

[1897] *Id.* P 1476 (quoting *State Voluntary Agreements to Plan & Pay for Transmission Facilities*, 175 FERC ¶ 61,225 at P 3).

[1898] *Id.* (citing *PJM Interconnection, L.L.C.*, 142 FERC ¶ 61,214 at PP 142-143, *order on reh'g and compliance*, 147 FERC ¶ 61,128 at P 92; *ISO New England Inc.*, 143 FERC ¶ 61,150 at P 121; *Consol. Edison Co. of N.Y., Inc.*, 180 FERC ¶ 61,106 at PP 48-50).

the Commission found that cost allocation methods resulting from a State Agreement Process and Long-Term Regional Transmission Cost Allocation Methods that Relevant State Entities indicate they have agreed to and have asked transmission providers to file also qualify as voluntary alternative cost sharing arrangements and, accordingly, the Commission declined to require those methods to adhere to the six Order No. 1000 regional cost allocation principles.[1899]  However, the Commission did require that any voluntary alternative cost sharing arrangements still comply with the cost causation principle and any other legal requirements for cost allocation.[1900]

### b.        Requests for Rehearing and Clarification

755.   NRECA argues that Order No. 1920 does not provide a reasonable explanation for its decision not to require a Long-Term Regional Transmission Cost Allocation Method to comply with any of the Order No. 1000 regional cost allocation principles when Relevant State Entities indicate their agreement with such a method as part of the Engagement Period.[1901]  NRECA further argues that Order No. 1920 similarly does not provide a reasonable explanation as to why the Commission did not require a cost allocation method resulting from a State Agreement Process to comply with the Order No. 1000 regional cost allocation principles.[1902]  NRECA contends that neither Order No.

---

[1899] *Id.*

[1900] *Id.*

[1901] NRECA Rehearing Request at 55.

[1902] *Id.* at 55-56.

Docket No.  RM21-17-001                                                              - 639 -

1920's reliance on a 2021 Commission policy statement nor Order No. 1000 allows the

Commission to waive the Order No. 1000 regional cost allocation principles as NRECA

alleges the Commission does in the final rule.[1903]  NRECA asserts that Order No. 1920's

reference to prior instances where the Commission has approved voluntary agreements

on a case-by-case basis without finding that their cost allocation methods comply with

Order No. 1000 does not constitute precedent for a categorical waiver of Order No.

1000's requirements for future cost allocations methods reached under the State

Agreement Process.[1904]

756.    NRECA argues that Order No. 1920 adopts cost allocation requirements that are

more prescriptive in some respects (e.g., prohibiting transmission providers from using

different cost allocation methods for different project types) but less prescriptive in other

respects (e.g., not requiring compliance with any Order No. 1000 regional cost allocation

principles when states agree on a cost allocation method).  NRECA contends that this

results in opaque, lax, and inconsistent standards for cost allocation for Long-Term

Regional Transmission Facilities.  NRECA asserts that, as a result, the Commission will

be unable to enforce the FPA's requirements against unjust, unreasonable, or unduly

discriminatory or preferential rates.[1905]

---

[1903] *Id.* at 56 (citing Order No. 1920, 187 FERC ¶ 61,068 at P 1476; *State Voluntary Agreements to Plan and Pay for Transmission Facilities*, 175 FERC ¶ 61,225).

[1904] *Id.* at 56-57 (citing Order No. 1920, 187 FERC ¶ 61,068 at P 1476 n.3150).

[1905] *Id.* at 52.

Docket No.  RM21-17-001                                                      - 640 -

757.    Arizona Commission argues that Order No. 1920 usurps Arizona's constitutional

requirements that the Arizona Commission must apply rates that are fair and reasonable

and that it must not recover costs from ratepayers that do not cause, or benefit from, a

particular cost.[1906]  Arizona Commission further argues that the cost allocation methods

adopted in the final rule are contrary to existing ratemaking principles, which include

providing customers with reliable power at the least cost and allocating costs to the

entities that cause them.[1907]  Ohio Consumers similarly claim that Order No. 1920 is

arbitrary and capricious and violates policy and precedent that requires that costs be

allocated consistent with those who receive benefits.[1908]

758.    Virginia and North Carolina Commissions assert that the Commission must ensure

public policies considered in planning criteria and scenarios are also appropriately

accounted for in any *ex ante* cost allocation method to avoid cross-subsidization of state

public policy goals.  Virginia and North Carolina Commissions state that the Commission

should clarify on rehearing that to comport with the Commission's cost-causation

principles, any proposed *ex ante* cost allocation method must adequately account for not

only the benefits resulting from an identified transmission project, but also the cost

drivers (or cost causers) that contribute to the need for the transmission project.

Alternatively, Virginia and North Carolina Commissions argue that the Commission

---

[1906] Arizona Commission Rehearing Request at 20-21.

[1907] *Id.* at 20.

[1908] Ohio Consumers Rehearing Request at 9.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 2017 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No.  RM21-17-001                                              - 641 -

should expressly require the same public policy factors included in the Long-Term

Scenarios to be considered as potential benefits for cost allocation purposes.[1909]

759.    West Virginia Commission and Wyoming Commission argue that Order No.

1920's transmission planning and cost allocation requirements force transmission

providers within their states to plan projects based on decarbonization goals of other

states in the region.[1910]  West Virginia Commission and Wyoming Commission further

argue that this would require transmission providers in the state to account for abstract

assumed benefits for its retail customers.[1911]  West Virginia Commission and Wyoming

Commission contend that, in the event that the costs allocated to retail customers exceed

benefits that their respective state policies realize from regional transmission projects,

they will be forced to assign unjust and unreasonable costs to retail customers or deny a

utility a potentially significant portion of its expected cost recovery.[1912]  Wyoming

Commission argues that this result is contrary to core principles of utility regulation and

---

[1909] Virginia and North Carolina Commissions Rehearing Request at 3-4.

[1910] West Virginia Commission Rehearing Request at 10; Wyoming Commission Rehearing Request at 7.

[1911] West Virginia Commission Rehearing Request at 10; Wyoming Commission Rehearing Request at 7.

[1912] West Virginia Commission Rehearing Request at 10; Wyoming Commission Rehearing Request at 7-8.

wrongfully empowers states to exact the costs of their policy initiatives from ratepayers in other states.[1913]

### c.    Commission Determination

760.   We disagree with NRECA's arguments that the Commission did not provide a reasonable explanation for its decision not to require cost allocation methods resulting from a State Agreement Process or Long-Term Regional Transmission Cost Allocation Methods that Relevant State Entities indicate that they have agreed to and have asked transmission providers to file to comply with any of the Order No. 1000 regional cost allocation principles.[1914]  We continue to find that cost allocation methods resulting from a State Agreement Process and Long-Term Regional Transmission Cost Allocation Methods that Relevant State Entities indicate that they have agreed to are likely to facilitate agreement concerning development of such Long-Term Regional Transmission Facilities by, for example, making the Relevant State Entities more confident that customers in the state are receiving benefits at least roughly commensurate with their share of the costs of such facilities and by reducing the likelihood that selected Long-Term Regional Transmission Facilities cannot be constructed because they do not receive necessary state regulatory approvals.[1915]  Further, we continue to find that affording additional flexibility for these methods may encourage their use, which would facilitate

---

[1913] Wyoming Commission Rehearing Request at 8.

[1914] NRECA Rehearing Request at 55-56.

[1915] Order No. 1920, 187 FERC ¶ 61,068 at P 1477.

the selection of more efficient or cost-effective Long-Term Regional Transmission Facilities.[1916] In short, we find that the benefits of providing additional flexibility for state-agreed-upon cost allocation methods for Long-Term Regional Transmission Facilities outweigh NRECA's concerns regarding not applying the Order No. 1000 regional cost allocation principles, such that it represents a just and reasonable approach to these issues.

761.    Additionally, we highlight that the cost causation principle and Commission precedent require the Commission to evaluate each proposed cost allocation method to determine whether it will allocate costs in a manner that is at least roughly commensurate with estimated benefits and whether the proposed method is just and reasonable and not unduly discriminatory or preferential, as stated in Order No. 1920.[1917] This is the case whether or not we specifically require these cost allocation methods to comply with the Order No. 1000 regional cost allocation principles.

762.    For cost allocation methods resulting from a State Agreement Process or Long-Term Regional Transmission Cost Allocation Methods that Relevant State Entities indicate that they have agreed to and have asked transmission providers to file, we continue to find that such methods qualify as voluntary alternative cost sharing arrangements, consistent with the Commission's previous findings that "Order No. 1000

---

[1916] *Id.* (citation omitted).

[1917] *See, e.g.*, *id.* P 1506 (citing *ICC v. FERC I*, 576 F.3d at 477; *ICC v. FERC III*, 756 F.3d at 564).

Docket No. RM21-17-001                                                                    - 644 -

allows market participants, including states, to negotiate voluntarily alternative cost

sharing arrangements that are distinct from the relevant regional cost allocation

method(s)"**1918** and that the Commission need not find that cost allocation methods

corresponding to such voluntary agreements comply with Order No. 1000.**1919**  Therefore,

in response to NRECA, we continue to decline to require such cost allocation methods to

adhere to the six Order No. 1000 regional cost allocation principles.**1920**

763.    We further disagree with NRECA's arguments that the cost allocation

requirements adopted in Order No. 1920 will result in inconsistent standards for cost

allocation for Long-Term Regional Transmission Facilities and will result in the

Commission's inability to enforce the FPA's requirements against unjust, unreasonable,

and unduly discriminatory or preferential rates.**1921**  We recognize that there are different

requirements for cost allocation methods resulting from a State Agreement Process or

Long-Term Regional Transmission Cost Allocation Methods that Relevant State Entities

indicate that they have agreed to and have asked transmission providers to file as

compared to Long-Term Regional Transmission Cost Allocation Methods to which states

---

**1918** *Id.* P 1476 (quoting *State Voluntary Agreements to Plan & Pay for Transmission Facilities*, 175 FERC ¶ 61,225 at P 3).

**1919** *Id.* (citing *See PJM Interconnection, L.L.C.*, 142 FERC ¶ 61,214 at PP 142-143, *order on reh'g and compliance*, 147 FERC ¶ 61,128 at P 92; *ISO New England Inc.*, 143 FERC ¶ 61,150 at P 121; *Consol. Edison Co. of N.Y., Inc.*, 180 FERC ¶ 61,106 at PP 48-50).

**1920** *Id.*

**1921** NRECA Rehearing Request at 52.

USCA4 Appeal: 24-1650   Doc: 224   Filed: 01/21/2025   Pg: 2021 of 2455
Document Accession #: 20241121-3139      Filed Date: 11/21/2024

Docket No.  RM21-17-001                                          - 645 -

do not agree, but we find that the potential for differences is appropriate to give states flexibility.[1922]  Regardless, we reiterate that all cost allocation methods must comply with the cost causation principle, as required by the FPA.[1923]  Additionally, we note that nothing in FPA section 206 requires that transmission providers adopt the same or similar proposals on compliance provided that they comply with Order No. 1920.

764.    We also disagree with arguments raised by Arizona Commission and Ohio Consumers on rehearing that Order No. 1920's transmission planning and cost allocation requirements are inconsistent with cost causation principles.[1924]  All cost allocation methods for Long-Term Regional Transmission Facilities, including Long-Term Regional Transmission Cost Allocation Methods, regardless of whether they are agreed to by Relevant State Entities, and cost allocation methods resulting from Commission-approved State Agreement Processes, must comply with the cost causation principle and ensure that the costs of transmission facilities are allocated in a manner at least roughly commensurate with estimated benefits.[1925]

---

[1922] *See* Order No. 1920, 187 FERC ¶ 61,068 at P 1477.

[1923] *Id.* P 1305 & n.2786.

[1924] Arizona Commission Rehearing Request at 20; Ohio Consumers Rehearing Request at 9.

[1925] Order No. 1920, 187 FERC ¶ 61,068 at PP 1305 & n.2786, 1506 (citing *ICC v. FERC I*, 576 F.3d at 477; *ICC v. FERC III*, 756 F.3d at 564).

765.    In light of our clarification noted below, we find it unnecessary, as requested by Virginia and North Carolina Commissions,[1926] to require transmission providers to demonstrate on compliance how both the benefits resulting from an identified transmission project and the cost drivers contributing to the need for that project are appropriately accounted for in their proposed Long-Term Regional Transmission Cost Allocation Method, or alternatively to require that the same public policy factors included in Long-Term Scenarios be considered as potential benefits for the purposes of cost allocation.  Specifically, we note that our clarification regarding the recognition of benefits below in response to West Virginia Commission and Wyoming Commission's request may address Virginia and North Carolina Commissions' concerns regarding the consideration of public policy factors in cost allocation methods.  Further, we find that requiring transmission providers to show that the relevant cost allocation methods comply with cost causation by ensuring that costs are allocated in a manner roughly commensurate with benefits will provide flexibility and account for regional diversity while also ensuring that those cost allocation methods comply with the requirements of the FPA.[1927]

766.    We disagree with arguments raised on rehearing by West Virginia Commission and Wyoming Commission that Order No. 1920's transmission planning and cost allocation requirements force transmission providers within their states to plan

---

[1926] Virginia and North Carolina Commissions Rehearing Request at 3-4.

[1927] *See* Order No. 1920, 187 FERC ¶ 61,068 at 1510.

Docket No.  RM21-17-001                                                                      - 647 -

transmission projects based on decarbonization goals of other states in the transmission

planning region and require transmission providers to account for abstract assumed

benefits.[1928]   First, as discussed above, because of the flexibility provided by the

Commission regarding cost allocation, it is premature and speculative to assert that a

requirement not to use cost allocation methods based on project type will result in

adoption of cost allocation methods that violate cost causation principles.  We also

reiterate that, in the context of transmission facilities, the cost causation principle requires

the Commission to ensure that any cost allocation method allocates costs in a manner

roughly commensurate with estimated benefits, meaning that if consumers do not benefit

from a project they will not be required to pay for it nor will they be required to bear a

share of project costs that does not reflect their share of the project's benefits.[1929]

767.    Further, we clarify that Order No. 1920 does not prevent transmission providers

from recognizing different types of benefits and using them to allocate costs in proportion

---

[1928] West Virginia Commission Rehearing Request at 10; Wyoming Commission Rehearing Request at 7.

[1929] *See* Order No. 1920, 187 FERC ¶ 61,068 at P 1305 & n.2786 ("The cost causation principle requires costs to be allocated to those who cause the costs to be incurred and reap the resulting benefits.") (citation omitted)); *ICC v. FERC I*, 576 F.3d at 476 ("To the extent that a utility benefits from the costs of new facilities, it may be said to have 'caused' a part of those costs to be incurred, as without the expectation of its contributions the facilities might not have been built, or might have been delayed."); *see also* Order No. 1000, 136 FERC ¶ 61,051 at P 690 ("If a regional transmission plan determines that a transmission facility serves several functions, as many commenters point out it may, the regional cost allocation method must take the benefits of these functions of the transmission facility into account in allocating costs roughly commensurate with benefits.").

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 2024 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No.  RM21-17-001                                                    - 648 -

to those benefits.  As an example, one potential cost allocation method that could be

proposed to comply with Order No. 1920 would allocate costs commensurate with

reliability and economic benefits region-wide, while allocating costs commensurate with

additional benefits to a subset of states that agree to such cost allocation.  Under this

potential cost allocation method, these costs and benefits could be identified based on one

or more additional analyses, such as additional scenarios, run by the transmission

providers for the purposes of informing cost allocation, e.g., scenarios that consider the

incremental cost of transmission needed to achieve state laws, policies, and regulations

beyond the cost of transmission needed in the absence of those laws, policies, and

regulations.  For example, the cost allocation method agreed to by the Relevant State

Entities may allocate those incremental costs to states with those applicable laws,

policies, and regulations.

768.    Noting this clarification, and where Long-Term Regional Transmission Cost

Allocation Methods that Relevant State Entities agree to are concerned, at the request of

the Relevant State Entities in a multistate region, the following *ex ante* method for cost

allocation may be proposed.  In providing this example, we are not foreclosing other

approaches for allocating the costs of Long-Term Regional Transmission Facilities on

either an *ex ante* basis or through a State Agreement Process.  Nor are we suggesting that

cost allocation methods must adopt a similar approach to this framework in order to

comply with the requirements of Order No. 1920.  This example is as follows:

(1) For the purposes of cost allocation, transmission providers shall run an additional

scenario analysis to identify transmission needs using the same Long-Term Scenarios and

USCA4 Appeal: 24-1650   Doc: 224      Filed: 01/21/2025   Pg: 2025 of 2455
Document Accession #: 20241121-3139      Filed Date: 11/21/2024

Docket No.  RM21-17-001                                                    - 649 -

sensitivities used in its Long-Term Regional Transmission Planning process, except that the inputs to such additional scenarios shall not include state laws, policies and regulations.  Transmission providers shall identify transmission facilities to meet the needs identified in such additional scenario analysis and those facilities' costs. Transmission providers shall then determine the difference in costs between the set of Long-Term Regional Transmission Facilities selected in the regional transmission plan for purposes of cost allocation and the set of transmission facilities that would be selected based upon the additional scenario analysis.

(2) The portion of total selected Long-Term Regional Transmission Facility costs identified in (1) could be cost allocated according to an existing Commission-accepted cost allocation method that may be proposed on compliance with Order No. 1920.

(3) The amount representing the cost difference between the costs of projects selected pursuant to the Long-Term Regional Transmission Planning process and (1) shall be allocated as follows:

> a.  The transmission providers shall identify by state the specific state laws, policies, and regulations that were used to plan and select the Long-Term Regional Transmission Facilities and shall quantify *by state* the specific costs of such Facilities.

> b.  The costs identified in 3(a) shall be allocated solely to the state or states that are the sources of the policies used in planning and selection.  The total difference between the costs of Long-Term Regional Transmission Facilities selected pursuant to the Long-Term Regional Transmission Planning process and (1) would be fully accounted for using this method of allocating costs among the states.  For RTOs/ISOs, the cost allocation to transmission customers in a transmission pricing zone *within* a state would be developed by the applicable Transmission Owner(s).  For non-RTOs/ISOs, the costs allocated to transmission customers in a

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 2026 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No. RM21-17-001                                                      - 650 -

transmission provider's retail distribution service territory or footprint within a state would be developed by the applicable transmission provider.

### G.    General Benefits Requirements Related to Cost Allocation

#### 1.    Logical Outgrowth

##### a.    NOPR Proposals

769.    In the NOPR, the Commission proposed for consideration a list of Long-Term Regional Transmission Benefits for transmission providers to apply in Long-Term Regional Transmission Planning and cost allocation processes.[1930]  Additionally, the Commission proposed to require that transmission providers identify on compliance the benefits they will use in any *ex ante* cost allocation method, how they will calculate those benefits, and how the benefits will reasonably reflect the benefits of regional transmission facilities to meet identified transmission needs driven by changes in the resource mix and demand.[1931]  The NOPR also proposed to require transmission providers to explain the rationale for using the benefits identified.[1932]  Additionally, the Commission requested comment on the proposed requirements, whether the Commission should require that transmission providers account for the full list of benefits contained in the NOPR's Evaluation of the Benefits of Regional Transmission Facilities section, or whether no change to the benefits used in existing regional transmission processes was needed.[1933]

---

[1930] NOPR, 179 FERC ¶ 61,028 at PP 185, 326.

[1931] *Id.* P 326.

[1932] *Id.*

[1933] *Id.* P 327.

USCA4 Appeal: 24-1650     Doc: 224     Filed: 01/21/2025     Pg: 2027 of 2455
Document Accession #: 20241121-3139     Filed Date: 11/21/2024

### b.    Order No. 1920 Requirements

770.    In Order No. 1920, the Commission declined to adopt the NOPR proposal

regarding the use of benefits in Long-Term Regional Transmission Cost Allocation

Methods.[1934]  Instead, as discussed above in the Regional Cost Allocation Principles for

Long-Term Regional Transmission Facilities section, the Commission required

transmission providers in each transmission planning region to demonstrate that any

Long-Term Regional Transmission Cost Allocation Method(s) that Relevant State

Entities have *not* indicated that they agree to complies with Order No. 1000 regional cost

allocation principles (1) through (5).  The Commission did not require transmission

providers to demonstrate that Long-Term Regional Transmission Cost Allocation

Methods that Relevant State Entities indicate they have agreed to or cost allocation

methods resulting from a State Agreement Process comply with any of the Order

No. 1000 regional cost allocation principles, but the Commission noted that such methods

must still be just and reasonable and not unduly discriminatory or preferential, and must

allocate costs in a manner that is at least roughly commensurate with estimated

benefits.[1935]  The Commission did not require that any particular benefit used in the

evaluation and selection of Long-Term Regional Transmission Facilities be reflected in a

---

[1934] Order No. 1920, 187 FERC ¶ 61,068 at P 1505.

[1935] *Id.* PP 1470, 1476-1477.

Docket No. RM21-17-001                                                    - 652 -

Long-Term Regional Transmission Cost Allocation Method filed with the

Commission.[1936]

771.    The Commission explained that the modified approach to the relationship of

benefits used in Long-Term Regional Transmission Planning and Long-Term Regional

Transmission Cost Allocation Methods provides transmission providers with flexibility to

propose a Long-Term Regional Transmission Cost Allocation Method(s), allowing for

negotiation in the Engagement Period, which the Commission believed will increase the

likelihood that Long-Term Regional Transmission Facilities selected as the more efficient

or cost-effective regional transmission solution will be developed.  The Commission

additionally explained that the requirements in Order No. 1920 to disclose estimates of

the benefits of selected Long-Term Regional Transmission Facilities will provide

transparency and help to ensure cost allocation is just and reasonable.[1937]  Additionally,

the Commission reasoned that this flexible approach is consistent with the approach the

Commission took in Order No. 1000 and in subsequent orders on transmission providers'

Order No. 1000 compliance filings, where the Commission allowed a wide variety of cost

allocation methods and did not require that such methods specifically account for all

benefits used in evaluation and selection processes.[1938]

---

[1936] *Id.* P 1506.

[1937] *Id.*

[1938] *Id.* P 1507 (citing Order No. 1000, 136 FERC ¶ 61,051 at PP 560, 624).

Docket No. RM21-17-001                                                    - 653 -

### c.      Requests for Rehearing and Clarification

772.    NRECA contends that Order No. 1920's determination not to require transmission

providers to disclose which benefits, if any, they use in their regional cost allocation

proposals is not a logical outgrowth of the NOPR.[1939]   NRECA argues that the

requirement to use a stated set of benefits in evaluating and selecting Long-Term

Regional Transmission Facilities, without requiring transmission providers to disclose

which benefits were used in their regional cost allocation proposals, allows cost

allocation to be "completely opaque and divorced from the measured benefits."[1940]

### d.      Commission Determination

773.    In response to NRECA's argument that the Commission violated the APA's

notice-and-comment requirements by declining to adopt the NOPR proposal to require

transmission providers to disclose the benefits used in Long-Term Regional Transmission

Cost Allocation Methods, we note that certain clarifications adopted herein may alleviate

the concerns underlying NRECA's argument.  Specifically, as discussed in the Minimum

Requirements section above, we clarify in this order that, once transmission providers

make a selection decision, i.e., for each selected Long-Term Regional Transmission

Facility (or portfolio of such Facilities) and the applicable cost allocation method is

determined, transmission providers must make available, on a password-protected portion

of OASIS or other password-protected website, a breakdown of how those estimated

---

[1939] NRECA Rehearing Request at 12-13.

[1940] *Id.*

Docket No.  RM21-17-001                                                      - 654 -

costs will be allocated, by zone (i.e., by transmission provider retail distribution service territory/footprint or RTO/ISO transmission pricing zone), and a quantification of the estimated benefits as imputed to each zone, as such benefits can be reasonably estimated, when a cost allocation method is agreed upon under a State Agreement Process or, if no State Agreement Process is used, at the time of project selection.

774.    Noting this clarification, we nevertheless disagree with NRECA that the Commission violated the APA's notice-and-comment requirements.  Agency final rules need not be identical to proposed rules, and notice is sufficient if the final rule represents a "logical outgrowth" of the proposed rule.[1941]  Here, the NOPR proposed to require transmission providers to disclose the benefits used in Long-Term Regional Transmission Cost Allocation Methods after noting the Commission's concern that, among other things, the Commission's existing regional transmission planning and cost allocation requirements may result in transmission providers undervaluing the benefits of Long-Term Regional Transmission Facilities for purposes of allocating the costs of such facilities to beneficiaries in a manner that is roughly commensurate with estimated benefits.[1942]  While Order No. 1920 did not adopt the NOPR proposal, it included safeguards that will ensure an adequate accounting for benefits in cost allocation methods

---

[1941] *Long Island Care*, 551 U.S. at 174-75.  *See also Am. Paper Inst. v. EPA*, 660 F.2d at 959 n.13 ("An agency may make *even substantial changes* in its original proposed rule without a further comment period if the changes are in character with the original proposal and are a logical outgrowth of the notice and comments already given." (emphasis added)).

[1942] NOPR, 179 FERC ¶ 61,028 at PP 325-326.

for Long-Term Regional Transmission Facilities, in addition to the new safeguard we
adopt in this order, noted above. For instance, Order No. 1920 noted that any cost
allocation method for Long-Term Regional Transmission Facilities will be required to
comply with cost allocation precedent, including that costs be allocated in a manner at
least roughly commensurate with estimated benefits.[1943] That standard requires that
transmission providers show, on compliance, that their proposed cost allocation methods
match the allocation of costs associated with the project in a manner that is at least
roughly commensurate with the estimated benefits of the project. We find that this
approach is sufficiently similar, in practice, to the proposal in the NOPR that it can be
said to "follow logically from" the NOPR, that the NOPR "adequately frame[d] the
subjects for discussion,"[1944] and that "a reasonable member of the regulated class" could
"anticipate the general aspects of the [final] rule."[1945]

## 2. Substantive Issues

### a. Order No. 1920 Requirements

775. In Order No. 1920, the Commission required transmission providers in each
transmission planning region to demonstrate on compliance that the required Long-Term

---

[1943] Order No. 1920, 187 FERC ¶ 61,068 at P 1305 & n.2786 (citing *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d at 87; Order No. 1000, 136 FERC ¶ 61,051 at P 10; *ICC v. FERC I*, 576 F.3d at 476).

[1944] *Conn. Light & Power Co. v. Nuclear Regul. Comm'n*, 673 F.2d at 533.

[1945] *Telesat Canada v. FCC*, 999 F.3d 707, 713 (D.C. Cir. 2021) (quotations omitted).

Docket No. RM21-17-001                                    - 656 -

Regional Transmission Cost Allocation Method(s) that Relevant State Entities have *not*

indicated that they agree to comply with Order No. 1000 regional transmission cost

allocation principles (1) through (5) and do not allocate costs by project type (i.e.,

reliability, economic, or transmission needs driven by Public Policy Requirements).[1946]

###      b.      Requests for Rehearing and Clarification

776.    Clean Energy Associations assert that the Commission should clarify the rights,

obligations, and limits associated with transmission providers' adoption of multiple

Long-Term Regional Transmission Cost Allocation Methods for comparable

transmission facilities within its overall footprint.  Further, Clean Energy Associations

argue that the Commission should clarify that transmission providers must allocate the

costs of similarly situated transmission facilities similarly to avoid undue discrimination

and unjust and unreasonable rates.[1947]  Clean Energy Associations assert that, although

presently unclear, it seems plausible that under Order No. 1920, transmission providers

could attempt to allocate the costs of two comparable transmission facilities (similar in

costs and benefits) using entirely different methods if the transmission provider considers

them to be different "types" of projects, based on any categorization rubric other than

Order No. 1000's regional cost allocation principle (6).[1948]  Clean Energy Associations

---

[1946] Order No. 1920, 187 FERC ¶ 61,068 at PP 1505-1506.

[1947] Clean Energy Associations Rehearing Request at 30-32.

[1948] *Id.* at 31.

also request clarification that Order No. 1920 does not preclude transmission providers from adopting a cost allocation approach that seeks to maximize net benefits.[1949]

777.   Dominion seeks clarification on the consideration of the seven required benefits in cost allocation such that if a transmission provider opts to rely on all or some of the seven benefits in its cost allocation method, then it may apply different weighting to different benefits, e.g., based on probability of occurrence and certainty of benefit in later years.[1950]

### c.    Commission Determination

778.   We deny Clean Energy Association's request to clarify the rights, obligations, and limits associated with transmission providers' potential adoption of multiple Long-Term Regional Transmission Cost Allocation Methods for comparable transmission facilities within its overall footprint. Order No. 1920 provided guidance regarding transmission providers' use of multiple Long-Term Regional Transmission Cost Allocation Methods, including that transmission providers may adopt multiple Long-Term Regional Transmission Cost Allocation Methods, provided that the Long-Term Regional Transmission Cost Allocation Method that will apply to a Long-Term Regional Transmission Facility (or portfolio of such Facilities) is known before selection and does

---

[1949] *Id.* at 32-33.

[1950] Dominion Rehearing Request at 26-27.

Docket No.  RM21-17-001                                                      - 658 -

not allocate costs by project type (i.e., reliability, economic, or transmission needs driven by Public Policy Requirements).[1951]

779.    In response to Clean Energy Associations' concern that transmission providers could attempt to allocate the costs of two comparable transmission facilities (similar in costs and benefits) using entirely different cost allocation methods if the transmission provider considers them to be different "types" of projects (other than those delineated in Order No. 1000's regional cost allocation principle (6)), we note that even if the costs of similar facilities are allocated using different cost allocation methods, the fundamental requirements associated with a just and reasonable rate (i.e., adherence to the cost causation principle and the requirement that costs be allocated in a manner that is at least roughly commensurate with estimated benefits) remain the same.[1952]  Therefore, a transmission provider may allocate the costs of two similar transmission facilities using different cost allocation methods and meet the requirements of Order No. 1920.  In addition, we note that Order No. 1920 also does not preclude transmission providers from proposing on compliance a cost allocation approach that seeks to maximize net benefits.[1953]

---

[1951] Order No. 1920, 187 FERC ¶ 61,068 at PP 1475, 1506.  *See supra* P 749.

[1952] Order No. 1920, 187 FERC ¶ 61,068 at P 1305.

[1953] *See id.* P 964 ("We adopt the NOPR proposal, with modification, to require that transmission providers in each transmission planning region propose evaluation processes, including selection criteria, that seek to maximize benefits accounting for costs over time without over-building transmission facilities.").

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 2035 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No.  RM21-17-001                                          - 659 -

780.    Regarding Dominion's request for clarification that if a transmission provider opts to rely on all or some of the seven required benefits in its cost allocation method for Long-Term Regional Transmission Facilities, then it may apply different weighting to different benefits, we note that Order No. 1920 includes no limitation on weighting of the seven required benefits for purposes of accounting for such benefits in the cost allocation method for Long-Term Regional Transmission Facilities save that costs must be allocated in a manner that is at least roughly commensurate with estimated benefits.  Further, transmission providers can consider additional benefits for cost allocation purposes, including, but not limited to, those agreed to by Relevant State Entities and those described elsewhere in Order No. 1920, provided that costs are allocated in a way that is at least roughly commensurate with estimated benefits.

### H.    Additional Cost Allocation Issues

#### 1.    Order No. 1920 Requirements

781.    In Order No. 1920, the Commission declined to adopt a particular time frame for determining the cost allocation for a Long-Term Regional Transmission Facility.  The Commission stated that imposing a standardized time frame to determine cost allocation was unnecessary and could impede the regional flexibility that the Commission provided to transmission providers under Order No. 1920.  The Commission added, however, that the determination of the applicable cost allocation must occur by or before selection of a particular Long-Term Regional Transmission Facility (or portfolio of such Facilities) if

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 2036 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No.  RM21-17-001                                                                    - 660 -

only a Long-Term Regional Transmission Cost Allocation Method is available for that
Facility (or portfolio of such Facilities).[1954]

782.    Also in Order No. 1920, the Commission stated that, following the Engagement
Period, Relevant State Entities may agree to, and ask the transmission providers to file, a
State Agreement Process, which, if accepted by the Commission, would be the cost
allocation process used by the transmission providers in the transmission planning region
prior to using the relevant Long-Term Regional Transmission Cost Allocation Method as
a backstop.[1955]  Further, in response to NOPR comments requesting that a beneficiary-
pays approach be used rather than a postage stamp load ratio share model for cost
allocation methods, the Commission in Order No. 1920 found that any cost allocation
method applied to a Long-Term Regional Transmission Facility must ensure that costs
are allocated in a manner that is at least roughly commensurate with the estimated
benefits of the facility, consistent with cost causation and court precedent, and noted that
the Commission will evaluate whether a proposed cost allocation method satisfies this
standard on a fact-specific basis, relying on the record in a given proceeding.  The
Commission found that load ratio share, which charges transmission customers in
proportion to their use of the transmission system as measured by their relative share of

---

[1954] *Id.* P 1521.

[1955] *Id.* P 1296.

Docket No. RM21-17-001                                                    - 661 -

load, is a cost allocation method that may be consistent with the beneficiary-pays

approach.[1956]

783.    Separately, in Order No. 1920, the Commission found that commenters'

statements regarding cost containment were outside the scope of the proceeding.[1957]  The

Commission noted that it is examining issues related to transmission planning and cost

containment in other proceedings.[1958]

### 2.    Requests for Rehearing and Clarification

784.    Dominion seeks clarification regarding the deadline imposed by Order No. 1920's

requirement that "the determination of the applicable cost allocation must occur by or

before its selection."[1959]  Dominion avers that this requirement implies that there could be

situations "when a Long-Term Regional Transmission Facility Cost Allocation Method

would not be applied to a Long-Term Regional Transmission Facility."1960  Dominion

states that its understanding is that "a Long-Term Regional Transmission Facility Cost

---

[1956] *Id.* P 1305 (citations omitted).

[1957] *Id.* P 1523.  Specifically, the Commission was responding to comments by: (1) Joint Commenters in support of a cost management framework overseen by the Commission; and (2) State Water Contractors, who asserted that the need for cost containment is acute for consumers in California and an essential component of the justness and reasonableness of any final rule.  *Id.* P 1518.

[1958] *Id.* P 1523 (citing Supplemental Notice of Technical Conference, Transmission Planning and Cost Management, Docket No. AD22-8-000 (Oct. 4, 2022)).

[1959] Dominion Rehearing Request at 32 (quoting Order No. 1920, 187 FERC ¶ 61,068 at P 1521).

[1960] *Id.* (emphasis omitted).

Docket No.  RM21-17-001                                    - 662 -

Allocation Method must be used, and that method could be one of several methods:  the

Transmission Provider's default *ex ante* cost allocation method, some other approved *ex*

*ante* cost allocation method, or a State Agreement Process."1961  Dominion requests

that, to the extent the Commission was referring to the deadline of six months after

project selection for submission of cost allocation methods resulting from a State

Agreement Process, the Commission provide clarification.[1962]

785.   Dominion further asks the Commission to clarify whether only the cost allocation

method must be determined by project selection, or whether it must be applied (and costs

actually allocated) by project selection.  Dominion notes its understanding is that only the

method must be determined by selection and states that this clarification on timing would

help to alleviate the concern about the challenges transmission developers will face in

obtaining state regulatory approval for transmission projects designed to meet a predicted

need 20 years in the future.  Specifically, Dominion states that it is impossible to meet

even a "roughly commensurate" standard when projected beneficiaries subject to the cost

allocation decision are so far removed from the in-service date of the facilities,

particularly in the context of an RTO/ISO in which transmission owning entities are

permitted to leave and join.[1963]

---

[1961] *Id.*

[1962] *Id.* at 32-33.

[1963] *Id.* at 31, 33-34.

Docket No. RM21-17-001                                              - 663 -

786.    Designated Retail Regulators and Undersigned States argue that any Long-Term

Regional Transmission Cost Allocation Method should not include a postage-stamp-type

cost allocation, as the costs imposed on non-consenting states should be allocated to cost

causers and beneficiaries on as granular a basis as possible.  They further argue that

postage stamp-type cost allocation method should not be adopted merely to simplify the

work of an RTO and to facilitate the construction of such projects.[1964]

787.    Wyoming Commission asserts that if a portion of the costs of a Long-Term

Regional Transmission Facility are to be recovered from Wyoming retail customers, the

Wyoming Commission must evaluate the costs and benefits derived from the project on a

*post hoc* basis to determine that costs allocated to retail customers and rates designed to

recover those costs are just and reasonable.  Wyoming Commission avers that Order

No. 1920 does not accommodate this process.[1965]

788.    Industrial Customers request rehearing of Order No. 1920's finding that

commenters' statements regarding cost containment are outside the scope of this

proceeding, arguing that such a finding is arbitrary and capricious because the

Commission failed to meaningfully engage arguments and evidence supporting the

current need for cost management and cost containment.  According to Industrial

Customers, while the Commission in Order No. 1920 stated that it is examining issues

---

[1964] Designated Retail Regulators Rehearing Request at 39; Undersigned States Rehearing Request at 34.

[1965] Wyoming Commission Rehearing Request at 8.

related to transmission planning and cost containment in other proceedings, Order No.

1920 does not compel the Commission to act in the proceeding in Docket No. AD22-8-

000, which is the only pending proceeding that is sufficiently broad to complement Order

No. 1920.  Industrial Customers add that Order No. 1920 does not demonstrate that cost

containment and cost mitigation measures are unrelated to the cost issues at hand or are,

in fact, outside the scope of Order No. 1920.[1966]

### 3.    Commission Determination

789.    Regarding Dominion's request for clarification regarding the intent of the

requirement that "the determination of the applicable cost allocation must occur by or

before its selection,"[1967] we clarify that this requirement applies only to Long-Term

Regional Transmission Cost Allocation Methods.  We further clarify that Long-Term

Regional Transmission Cost Allocation Methods refer only to *ex ante* cost allocation

methods used to allocate the costs of selected Long-Term Regional Transmission

Facilities.[1968]

790.    Dominion requested clarification as to whether "the determination of the

applicable cost allocation must occur by or before its selection"[1969] means that only the

---

[1966] Industrial Customers Rehearing Request at 21-23 (citing *State Farm*, 463 U.S. at 43).

[1967] Order No. 1920, 187 FERC ¶ 61,068 at P 1521.

[1968] *Id.* P 1291.

[1969] *Id.* P 1521.

cost allocation method must be determined by a Long-Term Regional Transmission

Facility's selection or whether it must be applied (and costs actually allocated) by project

selection. Noting our clarification above that this requirement applies only to Long-Term

Regional Transmission Cost Allocation Methods, we clarify that Dominion is correct that

only the applicable cost allocation method must be determined by project selection.

While it is possible that certain Long-Term Regional Transmission Cost Allocation

Methods will be designed in a way that actual costs to be allocated may be known by

selection, such a requirement would needlessly limit the flexibility provided to

transmission providers and could, in particular, create unnecessary obstacles to

transmission providers' ability pursuant to Order No. 1920 to demonstrate that use of

existing cost allocation methods to allocate the cost of Long-Term Regional

Transmission Facilities would be compliant with Order No. 1920's requirements.[1970]

791. We are not persuaded by arguments raised by Designated Retail Regulators and

Undersigned States regarding postage-stamp cost allocation. As in Order No. 1920,[1971]

we continue to find that the record does not support a blanket prohibition on postage-

stamp-type cost allocation. We will evaluate whether a proposed cost allocation method

allocates costs in a manner that is at least roughly commensurate with estimated benefits

---

[1970] For example, requiring that actual costs be allocated would preclude
transmission providers from proposing that DFAX-based or postage-stamp cost
allocation methods comply with Order No. 1920 because the amounts each transmission
customer will pay are not known at the time of selection for those methods.

[1971] Order No. 1920, 187 FERC ¶ 61,068 at P 1305 (citing Certain TDUs NOPR
Initial Comments at 2, 7, 8-9; R Street NOPR Initial Comments at 4, 12).

on a case-specific basis, relying on the record to ensure that it complies with the cost-causation principle by allocating costs in a manner that is at least roughly commensurate with estimated benefits.  We continue to find that the flexibility that we provide to consider benefits in cost allocation does not prevent transmission providers in a particular transmission planning region from adopting a more granular approach.[1972]

792.    In response to Wyoming Commission, we reiterate that Order No. 1920 does not change existing mechanisms for cost-recovery through retail rates.[1973]  We also emphasize that Order No. 1920 neither aims at nor conflicts with state authority over retail rates.[1974]  However, we decline to modify Order No. 1920 to enable states to conduct a *post hoc* review of costs allocated to retail customers.  Order No. 1920 does not alter the requirement for states to pass through Commission-jurisdictional rates to retail customers.[1975]

793.    Finally, we disagree with Industrial Customers that the Commission failed to engage in reasoned decision making by determining that various NOPR comments regarding cost containment were outside the scope of the proceeding.  First, to the extent

---

[1972] *Id.* P 1512.

[1973] *Id.* P 259.

[1974] *Id.* P 998.

[1975] *See Narragansett Elec. Co. v. Burke,* 381 A.2d 1358, 1361-63 (R.I. 1977) (holding that the state could not inquire into the reasonableness of the Commission-approved wholesale rate and, consequently, must treat it as a reasonable operating expense in the company's retail cost of service).

that Industrial Customers are arguing that the Commission did not consider transmission-related costs to consumers, as noted above, addressing costs to ratepayers was central to the reforms the Commission adopted in Order No. 1920, and the Commission cited evidence that more comprehensive, longer-term regional transmission planning results in the selection of more efficient or cost-effective transmission solutions, which has significant benefits for customers.[1976]  Second, the NOPR did not propose to address cost containment reform per se, and we continue to find that certain comments regarding cost containment reform, including those proposing a specific cost management framework, are outside the scope of this proceeding.[1977]  Third, we are unpersuaded by Industrial Customers' unsupported argument that the Commission was required to make a binding commitment to finalize cost containment and cost mitigation measures in another docket—we are unaware of any such requirement.  Finally, we disagree that Order No. 1920 is arbitrary and capricious because it failed to meaningfully engage with arguments and evidence supporting the need for transmission cost management and cost containment, in contravention of *State Farm*.[1978]  *State Farm*, which held that rescission of a prior regulation was arbitrary and capricious because it was done without adequate

---

[1976] *See supra* The Overall Need for Reform section.

[1977] Order No. 1920, 187 FERC ¶ 61,068 at P 1523.

[1978] Industrial Customers Rehearing Request at 23 (citing *State Farm*, 463 U.S. at 43).

Docket No. RM21-17-001                                                      - 668 -

explanation,[1979] did not hold that every aspect of a problem within an agency's

jurisdiction must be addressed in a single rulemaking, or that a final rule must include

requirements that address comments that were outside the scope of the proceeding.[1980]

## IX.   Construction Work in Progress Incentive

### A.   CWIP

#### 1.   Order No. 1920

794.   In Order No. 1920, the Commission declined to act to finalize the NOPR proposal

to not permit transmission providers to take advantage of the allowance for inclusion of

100% of Construction Work in Progress (CWIP) costs in rate base (CWIP Incentive) for

Long-Term Regional Transmission Facilities.[1981]   The Commission concluded that any

action on the CWIP Incentive is more appropriately considered in a separate proceeding

to allow for a holistic approach to transmission incentives after the Commission has

finalized its Long-Term Regional Transmission Planning reforms.[1982]   The Commission

found that, in particular, whether the Commission's incentives are appropriately

"benefitting consumers by ensuring reliability and reducing the cost of delivered power"

---

[1979] *State Farm*, 463 U.S. at 34.

[1980] *See N.Y. v. FERC*, 535 U.S. at 27 (holding that "[b]ecause FERC determined that the remedy it ordered constituted a sufficient response to the problems FERC had identified in the wholesale market, FERC had no [FPA section] 206 obligation" to adopt further reforms).

[1981] Order No. 1920, 187 FERC ¶ 61,068 at PP 1524, 1547.

[1982] *Id.* P 1547.

is a question better evaluated by considering the Commission's transmission incentives

comprehensively for all regional transmission facilities.[1983]

## 2.      Requests for Rehearing and Clarification

795.    Several parties request rehearing on the grounds that the Commission failed to

conduct reasoned decision-making in declining to act to finalize the NOPR proposal to

limit the availability of the CWIP Incentive for Long-Term Regional Transmission

Facilities.[1984]  NARUC, for instance, states that the Commission not only failed to rebut

arguments that ratepayers will have to pay in advance for facilities that may not ever be

used, but also simply declined to finalize the NOPR proposal until the Commission can

address other incentives at the same time, which NARUC contends is not reasoned

decision-making.[1985]  Ohio Consumers agree, and argue that retaining the CWIP

Incentive for Long-Term Regional Transmission Facilities without an analysis on the

justness and reasonableness of rates of return is arbitrary and capricious.[1986]

796.    Some parties argue on rehearing that not adopting the NOPR proposal to limit the

availability of the CWIP Incentive for Long-Term Regional Transmission Facilities will

shift risks to ratepayers.[1987]  Ohio Consumers state that the failure of the Commission to

---

[1983] *Id.* (quoting 16 U.S.C. 824s(a)).

[1984] Industrial Customers Rehearing Request at 24, 26; NARUC Rehearing
Request at 5, 8, 10-11; Ohio Consumers Rehearing Request at 11-12.

[1985] NARUC Rehearing Request at 9-11.

[1986] Ohio Consumers Rehearing Request at 12.

[1987] NARUC Rehearing Request at 8-9; Ohio Consumers Rehearing Request at 11;

eliminate the CWIP Incentive for Long-Term Regional Transmission Facilities shifts the

risk of long-term transmission planning to consumers who may never benefit from a

project if it does not go into service, but who will still be required to pay for it.[1988]

797.    Certain parties request that, if the Commission does not grant rehearing in this

proceeding and eliminate the CWIP Incentive for Long-Term Regional Transmission

Facilities, the Commission should move quickly to address the CWIP Incentive in a

separate proceeding.[1989]  For instance, Virginia Attorney General implores the

Commission to act with expediency to scale back transmission incentives

comprehensively in Docket No. RM20-10-000, or another docket as appropriate, if the

Commission does not grant rehearing in this proceeding and limit the availability of the

CWIP Incentive for Long-Term Regional Transmission Facilities.[1990]

798.    Arizona Commission argues that "walk[ing] back" the proposal to disallow the

CWIP Incentive is not a logical outgrowth of the NOPR, and failure to provide for

---

Virginia Attorney General Rehearing Request at 4-5; West Virginia Commission
Rehearing Request at 16-17; *see* Designated Retail Regulators Rehearing Request at 42.

[1988] Ohio Consumers Rehearing Request at 11-12.

[1989] Designated Retail Regulators Rehearing Request at 42-43; Industrial
Customers Rehearing Request at 28; PJM States Rehearing Request at 9; Virginia
Attorney General Rehearing Request at 5; West Virginia Commission Rehearing Request
at 17; *see also* Identified Consumer Advocates Rehearing Request at 4, 8-9.

[1990] Virginia Attorney General Rehearing Request at 5.

Docket No. RM21-17-001                                                           - 671 -

additional notice and comment on this "fundamental" change is a direct violation of the

APA.[1991]

### 3.    Commission Determination

799.    We are unpersuaded by arguments raised on rehearing that the Commission erred

by failing to limit the availability of the CWIP Incentive for Long-Term Regional

Transmission Facilities.  We continue to find that any action on the CWIP Incentive is

more appropriately considered in a separate proceeding to allow for a holistic approach to

transmission incentives,[1992] and we disagree with parties that argue that the

Commission's decision in Order No. 1920 to defer acting on the CWIP Incentive was

arbitrary and capricious.  The Commission reviewed all of the comments received on this

proposal in response to the NOPR and concluded that whether the Commission's

transmission incentives, including the CWIP Incentive, are appropriately "benefitting

consumers by ensuring reliability and reducing the cost of delivered power" is a question

better evaluated by considering the Commission's transmission incentives

comprehensively for all regional transmission facilities.[1993]  We continue to reach this

conclusion and find that evaluating a single transmission incentive for a regional

---

[1991] Arizona Commission Rehearing Request at 17-19 (citing 5 U.S.C. 706(2)(A), (2)(C), (2)(D)).

[1992] Order No. 1920, 187 FERC ¶ 61,068 at P 1547.

[1993] *Id.* (quoting 16 U.S.C. 824s(a)).

USCA4 Appeal: 24-1650    Doc: 224      Filed: 01/21/2025    Pg: 2048 of 2455
Document Accession #: 20241121-3139      Filed Date: 11/21/2024

Docket No.  RM21-17-001                                                          - 672 -

transmission facility may fail to holistically consider benefits and risks to consumers from transmission incentives.

800.    Further, with respect to the argument that the Commission's decision declining to finalize the NOPR proposal to limit the availability of the CWIP Incentive for Long-Term Regional Transmission Facilities was not a logical outgrowth of the NOPR, we disagree.  As courts have explained, "[o]ne logical outgrowth of a proposal is surely . . . to refrain from taking the proposed step."[1994]  The same is true here.  We acknowledge the interest and support for evaluating the CWIP Incentive, particularly among several states, along with other transmission incentives, and note that the Commission will continue to evaluate the appropriate manner for considering transmission incentives, including the CWIP Incentive, for all regional transmission facilities.

## X.    Exercise of a Federal Right of First Refusal in Commission-Jurisdictional Tariffs and Agreements

### A.    Order No. 1920 Requirements

801.    In Order No. 1920, the Commission stated that, after careful consideration of the record, it was declining to finalize the NOPR proposal to amend Order No. 1000's findings and nonincumbent transmission developer reforms, in part, to permit the

---

[1994] *New York v. EPA*, 413 F.3d at 44 (quoting *Am. Iron & Steel Inst. v. EPA*, 886 F.2d at 400); *see also Long Island Care*, 551 U.S. at 175 (stating, in the context of rejecting a claim that an agency provided legally defective notice because it did not finalize a proposed rule, "[w]e do not understand why such a possibility was not reasonably foreseeable"); *Vanda Pharms.*, 98 F.4th at 498 (stating that the APA's "notice-and-comment procedure is designed so that an agency can float a potential rule to the public without committing itself to enacting the proposed rule's content").

USCA4 Appeal: 24-1650 Doc: 224 Filed: 01/21/2025 Pg: 2049 of 2455
Document Accession #: 20241121-3139 Filed Date: 11/21/2024

Docket No. RM21-17-001 - 673 -

exercise of federal rights of first refusal for selected regional transmission facilities, conditioned on the incumbent transmission provider with the federal right of first refusal for such regional transmission facilities establishing joint ownership of the transmission facilities consistent with certain proposed requirements described in the NOPR. The Commission stated that it will continue to consider potential federal right of first refusal reforms along with other transmission reforms in the future.[1995]

## B.    Request for Rehearing

802.    NRECA states that declining to adopt the NOPR's conditional federal right of first refusal proposal was a missed opportunity because it would have encouraged transmission providers to pursue planning and expanding transmission through joint ownership arrangements with load-serving entities.[1996]

## C.    Commission Determination

803.    The Commission explained in Order No. 1920 that it will continue to consider the NOPR proposal and potential federal rights of first refusal issues in other proceedings, a course of action we continue to find to be reasonable.[1997]  As noted in Order No. 1920, comments on the NOPR raised both concerns about whether incumbent transmission

---

[1995] Order No. 1920, 187 FERC ¶ 61,068 at PP 1548, 1563-1564.

[1996] NRECA Rehearing Request at 2.

[1997] Order No. 1920, 187 FERC ¶ 61,068 at PP 1563-1564.  NRECA did not request rehearing on this issue or include it in NRECA's Statement of Issues.  *See* 18 CFR 385.713(c)(2) (any issue not listed in the Statement of Issues will be deemed waived).  We nevertheless address NRECA's concern.

Docket No. RM21-17-001                                                      - 674 -

providers face perverse investment incentives due to Order No. 1000's reforms and

concerns about whether the NOPR proposal would adequately and appropriately address

those incentives.[1998]

## XI.    Local Transmission Planning Inputs in the Regional Transmission Planning Process

### A.    Need for Reform

#### 1.    Order No. 1920

804.    In Order No. 1920, the Commission found substantial evidence to support the

conclusion that existing requirements governing transparency in local transmission

planning processes and coordination between local and regional transmission planning

processes are unjust, unreasonable, and unduly discriminatory or preferential.[1999]

Therefore, the Commission adopted the NOPR findings that local transmission planning

processes may lack adequate provisions for transparency and meaningful input from

stakeholders, and that regional transmission planning processes may not adequately

coordinate with local transmission planning processes.[2000]

805.    The Commission explained that local and regional transmission planning

processes serve essential and complementary roles in ensuring that customers'

transmission needs are identified and met at a just and reasonable cost.[2001]  The

---

[1998] Order No. 1920, 187 FERC ¶ 61,068 at P 1564.

[1999] Order No. 1920, 187 FERC ¶ 61,068 at PP 1565, 1569.

[2000] *Id.* P 1569.

[2001] *Id.* P 1570.

Docket No.  RM21-17-001                                                    - 675 -

Commission added that information and transmission solutions developed through local

transmission planning serve as a foundation for regional transmission planning, and it is

therefore critical that the processes are appropriately designed and aligned to ensure that

transmission providers and stakeholders have the information needed, including from the

local transmission planning process, to conduct effective regional transmission

planning.[2002]   Additionally, the Commission stated that, while the broader reforms

directed in Order No. 1920 are focused on improving the regional transmission planning

process, there are discrete deficiencies in the local transmission planning process and its

coordination with the regional transmission planning process that must be addressed to

ensure Commission-jurisdictional rates are just and reasonable.[2003]

806.    The Commission first found that local transmission planning processes lack

adequate provisions for transparency and meaningful input from stakeholders.  The

Commission recognized the critical role stakeholders serve in effective transmission

planning,[2004] and noted prior reforms to facilitate their meaningful participation in both

local and regional transmission planning.[2005]   However, the Commission found that the

record demonstrates that existing transparency and coordination requirements in local

---

[2002] *Id.* P 1570.

[2003] *Id.* P 1570.

[2004] *Id.* P 1571 (citing Order No. 890, 118 FERC ¶ 61,119 at P 454; Order No.
1000, 136 FERC ¶ 61,051 at P 152).

[2005] *Id.* (citing Order No. 890, 118 FERC ¶ 61,119 at PP 454, 488, 557; Order
No. 1000, 136 FERC ¶ 61,051 at P 152.).

USCA4 Appeal: 24-1650   Doc: 224      Filed: 01/21/2025    Pg: 2052 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No. RM21-17-001                                                - 676 -

transmission planning do not consistently provide stakeholders with sufficient information regarding the development of local transmission plans.[2006]  The Commission found that the absence of minimal standards or specified procedures to implement the transmission planning principles required by Order No. 890 contributes to inadequate transparency and opportunities for stakeholders to engage in local transmission planning processes.[2007]  The Commission explained that the combined effect of these deficiencies is that stakeholders who wish to participate in transmission planning, at both the local and regional level, may not be able to effectively do so.  More specifically, the Commission found that, when engaging in the regional transmission planning process, stakeholders lack sufficient information about underlying local transmission needs and potential solutions that is necessary to ensure that the more efficient or cost-effective regional transmission solutions are identified, evaluated, and selected.[2008]  The Commission stated that, given the importance of stakeholder participation in effective transmission planning, reforms were needed to ensure that Commission-jurisdictional local and regional transmission planning processes remain just, reasonable, and not unduly discriminatory or preferential.[2009]

---

[2006] *Id.* (citations omitted).

[2007] *Id.*

[2008] P 1572.

[2009] *Id.*

USCA4 Appeal: 24-1650     Doc: 224     Filed: 01/21/2025     Pg: 2053 of 2455
Document Accession #: 20241121-3139     Filed Date: 11/21/2024

Docket No. RM21-17-001                                              - 677 -

807.     The Commission also concluded that additional coordination between the local

and regional transmission planning processes regarding the replacement of aging

infrastructure is needed.  The Commission found that the record showed that many

incumbent transmission providers are replacing aging transmission infrastructure as it

reaches the end of its useful life.  The Commission specifically noted that, in PJM and

NYISO, a significant portion of transmission assets either need to be replaced or will

soon need to be replaced.[2010]  The Commission stated that replacing these transmission

facilities will require substantial investment, which will directly affect Commission-

jurisdictional rates.[2011]

808.     The Commission stated, however, that because its existing requirements do not

obligate transmission providers to share sufficient information regarding these

replacement projects, transmission providers in the regional transmission planning

process are not consistently evaluating whether those replacement transmission facilities

could be modified (i.e., right-sized) to more efficiently or cost-effectively address

transmission system needs.[2012]  Therefore, the Commission concluded, the lack of a

requirement for transmission providers in each transmission planning region to evaluate

whether those replacement transmission facilities could be modified (i.e., right-sized) to

more efficiently or cost-effectively address Long-Term Transmission Needs results in a

---

[2010] *Id.* P 1573 (citations omitted).

[2011] *Id.*

[2012] *Id.* P 1574.

Docket No. RM21-17-001                                                    - 678 -

regional transmission planning process that fails to identify opportunities to right-size

planned in-kind replacement transmission facilities and may result in the development of

inefficiently sized or designed, duplicative, or unnecessary transmission facilities that

increase costs to customers and render Commission-jurisdictional rates unjust and

unreasonable.[2013]

809.    The Commission disagreed with claims from commenters that the Commission

lacked jurisdiction to impose the requirements in Order No. 1920 or that the Commission

did not justify those requirements.[2014]  The Commission explained that consistent with

Order Nos. 890 and 1000, the Commission has the authority to establish requirements

related to local transmission planning processes and the inputs to regional transmission

planning processes.[2015]

810.    In response to claims from commenters questioning whether the Commission

properly demonstrated under FPA section 206 that existing rates are unjust, unreasonable,

or unduly discriminatory or preferential in instituting a federal right of first refusal for

right-sized replacement transmission facilities, the Commission explained that it found

transmission providers' OATTs to be unjust and unreasonable due to the lack of right-

---

[2013] *Id.* P 1574.

[2014] *Id.* P 1575 (citations omitted).

[2015] *Id.* (citing Order No. 890, 118 FERC ¶ 61,119 at P 435; Order No. 1000, 136 FERC ¶ 61,051 at PP 68, 148, 1520).

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 2055 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No. RM21-17-001                                                    - 679 -

sizing requirements that may lead to the identification, evaluation, and selection of more efficient or cost-effective Long-Term Regional Transmission Facilities.[2016]

811.   Because the Commission found that existing requirements governing transparency in the local transmission planning process and coordination between local and regional transmission planning processes were insufficient to ensure just and reasonable and not unduly discriminatory or preferential rates, the Commission required, pursuant to FPA section 206, transmission providers to adopt, with modifications, the two reforms the Commission identified in the NOPR:  (1) enhance the transparency of the local transmission planning process; and (2) require transmission providers to evaluate whether transmission facilities that need replacing can be "right-sized" to more efficiently or cost-effectively address Long-Term Transmission Needs identified in Long-Term Regional Transmission Planning.[2017]  The Commission found that the first reform will result in transmission providers providing enhanced transparency for stakeholders while providing those same stakeholders with opportunities to more effectively engage in local and regional transmission planning processes.  The Commission found that the second reform will result in transmission providers identifying, evaluating, and selecting replacement transmission facilities that more efficiently or cost-effectively address Long-Term Transmission Needs.  Finally, the Commission found that, taken together, these reforms

---

[2016] *Id.* P 1576 (citations omitted).

[2017] *Id.* P 1577.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 2056 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No. RM21-17-001                                                    - 680 -

will ensure that Commission-jurisdictional rates are just and reasonable and not unduly
discriminatory or preferential.[2018]

812.    On rehearing, several parties challenge the Commission's findings.  We address
their arguments below.

### 2.    Analysis under FPA Section 206

### a.    Rehearing Requests

813.    Advanced Energy and Competition Coalition contend that the Commission failed
to engage in reasoned decision-making, in violation of the APA and the required analysis
under FPA section 206, by ignoring relevant considerations, failing to address applicable
precedent, and inadequately explaining its decision to grant incumbent transmission
providers a right of first refusal for right-sized replacement transmission facilities.[2019]
Competition Coalition adds that the Commission has failed to prove that the reform is
just and reasonable, supported by substantial evidence, the product of reasoned decision-
making, and consistent with the public interest.[2020]

814.    Competition Coalition, Industrial Customers, and Designated Retail Regulators
request rehearing on the grounds that, in adopting the reforms in Order No. 1920
regarding enhanced transparency of local transmission planning inputs and identifying

---

[2018] *Id.*

[2019] Advanced Energy Rehearing Request at 4; Competition Coalition Rehearing
Request at 8.

[2020] Competition Coalition Rehearing Request at 59-60.

opportunities to right-size replacement transmission facilities, the Commission failed to

satisfy the requirement to make a finding, supported by substantial evidence, that the

existing relevant tariff provisions result in rates that are unjust, unreasonable, or unduly

discriminatory.[2021]  Competition Coalition and Industrial Customers, for example, argue

that Order No. 1920 does not support with substantial evidence the Commission's claim

that the interrelationship between local and regional transmission planning yields unjust,

unreasonable, or unduly discriminatory rates, and therefore does not reflect reasoned

decision-making.[2022]  Similarly, Designated Retail Regulators argue that the Commission

failed to provide an analysis of the justness and reasonableness of the local transmission

planning processes as a prerequisite to adopting the local transmission planning and right-

sizing reforms in Order No. 1920.[2023]  Competition Coalition contends that Order No.

1920's findings on encouraging transmission providers to provide their best in-kind

replacement estimates and removing other disincentives do not provide a basis for

satisfying the first prong of FPA section 206.[2024]

---

[2021] Competition Coalition Rehearing Request at 14 (citing *Emera Maine v. FERC*, 854 F.3d 9 (D.C. Cir. 2017) (*Emera Maine*)); Industrial Customers Rehearing Request at 4-5; Designated Retail Regulators Rehearing Request at 7, 41.

[2022] Competition Coalition Rehearing Request at 14; Industrial Customers Rehearing Request at 4-5.

[2023] Designated Retail Regulators Rehearing Request at 7.

[2024] Competition Coalition Rehearing Request at 18.

815.    Several parties separately assert that the Commission failed to satisfy the first prong of FPA section 206 when it adopted the federal right of first refusal requirement for right-sized replacement transmission facilities.[2025]  Competition Coalition contends, and Industrial Customers agree, that Order No. 1920 fails to identify the specific regional transmission planning and cost allocation tariff requirements, particularly those that relate to in-kind replacement processes, that are unjust, unreasonable, or unduly discriminatory or preferential as a result of the lack of an incumbent preference.[2026]  Rather, Competition Coalition argues, the identified concern—lack of transparency in local transmission planning as an input to regional transmission planning—has nothing to do with the lack of a right of first refusal in the regional transmission planning process.[2027]  Competition Coalition further states that the absence of any nexus between the identified problem in Order No. 1920—that existing regional transmission planning processes are unjust and unreasonable—and the prescribed remedy is glaring as it concerns the federal right of first refusal for right-sized replacement transmission facilities.[2028]

816.    Competition Coalition also asserts that Order No. 1920 fails to provide substantial evidence that the existing regional transmission planning framework as it relates to

---

[2025] *Id.* at 6, 11-19, 36-37; Industrial Customers Rehearing Request at 13-15.

[2026] Competition Coalition Rehearing Request at 12-13; Industrial Customers Rehearing Request at 12-13.

[2027] Competition Coalition Rehearing Request at 13.

[2028] *Id.* at 13.

USCA4 Appeal: 24-1650   Doc: 224        Filed: 01/21/2025    Pg: 2059 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No. RM21-17-001                                          - 683 -

incumbent public utility preferences for regionally planned, regionally cost allocated

projects in existing transmission provider tariff provisions is unjust, unreasonable, or

unduly discriminatory or preferential.  Competition Coalition also contends that Order

No. 1920 does not elaborate on, or support with substantial evidence, the reference to

"coordination" in the context of its finding under the first prong of FPA section 206.[2029]

Competition Coalition states that substantial evidence is "relevant evidence that a

reasonable mind might accept as adequate to support a conclusion."[2030]

### b.      Commission Determination

817.    We sustain the finding in Order No. 1920 that existing requirements governing

transparency in local transmission planning processes and coordination between local and

regional transmission planning processes are unjust, unreasonable, and unduly

discriminatory or preferential.[2031]  We continue to find that Order No. 1920's reforms to

transparency in local transmission planning inputs and coordination between local and

regional transmission planning processes are necessary to ensure that Commission-

jurisdictional rates are just, reasonable, and not unduly discriminatory or preferential.

818.    We disagree with Competition Coalition and Advanced Energy that the

Commission failed to satisfy the required analysis of FPA section 206 in adopting the

reforms to enhance the transparency of local transmission planning inputs and

---

[2029] *Id.* at 13-14.

[2030] *Id.* at 9.

[2031] Order No. 1920, 187 FERC ¶ 61,068 at P 1569.

Docket No. RM21-17-001                                                    - 684 -

coordination between the local and regional transmission planning processes.  As the

Commission noted in Order No. 1920, reforms to better ensure more consistent

implementation of the Order No. 890 transmission planning principles are timely and

important in light of the significant investments in transmission infrastructure that now

occur through local transmission planning processes.[2032]  Further, we continue to find that

local and regional transmission planning processes serve essential and complementary

roles in ensuring that customers' transmission needs are identified and met at just and

reasonable rates, including through the identification, evaluation, and selection of more

efficient or cost-effective transmission solutions through regional transmission

planning.[2033]  As the Commission stated in Order No. 1920, information and transmission

solutions developed through local transmission planning serve as a foundation for

regional transmission planning.[2034]

819.    The Commission supported its findings in Order No. 1920 with comments and

studies in the record highlighting that the lack of transparency and coordination

requirements in local transmission planning do not consistently provide stakeholders with

sufficient information regarding the development of local transmission plans.[2035]

Specifically, the Commission also found that additional coordination between the local

---

[2032] *Id.* P 1572; *see also id.* P 109.

[2033] *Id.* P 1570.

[2034] *Id.*

[2035] *Id.* P 1571.

and regional transmission planning processes regarding the replacement of aging

infrastructure is needed, especially in light of the record evidence that incumbent

transmission providers across the country are replacing aging transmission infrastructure

as it reaches the end of its useful life[2036] without considering whether a regional

transmission solution could be more efficient or cost-effective. Ultimately, the

Commission concluded, based on these findings, that the existing requirements governing

transparency in local transmission planning processes and coordination between local and

regional transmission planning processes were unjust, unreasonable, and unduly

discriminatory or preferential.[2037]

820. We also disagree with arguments raised by Competition Coalition, Industrial

Customers, and Designated Retail Regulators that the Commission's findings under FPA

section 206 are not supported by substantial evidence and find that Competition

Coalition's reliance on *Emera Maine* is misplaced.[2038] Rehearing parties' arguments on

this issue ignore the Commission's extensive explanation of the circumstances that have

rendered the existing rates and practices affecting those rates unlawful.[2039] The

Commission first identified a lack of adequate provisions for transparency and

---

[2036] *Id.* P 1573, nn.3363-3365.

[2037] *Id.* PP 1573-1574, 1576.

[2038] *See Emera Maine v. FERC*, 854 F.3d 9 (D.C. Cir. 2017).

[2039] *Id.* PP 1571, 1572.

meaningful input from stakeholders within local transmission planning processes.[2040]  In support of this finding, the Commission:  (1) cited prior final rules recognizing stakeholders' critical role in effective transmission planning; and (2) found that those prior final rules required reforms to provide for stakeholders' meaningful participation in both local and regional transmission planning processes.[2041]

821.    The Commission next identified the lack of a requirement for transmission providers in each transmission planning region to evaluate whether replacement transmission facilities could be modified (i.e., right-sized) to more efficiently or cost-effectively address transmission needs.  As noted above, the Commission highlighted evidence from the record that, for example, PJM and NYISO anticipate soon replacing a substantial portion of their aging transmission infrastructure as it reaches the end of its useful life, which will directly affect Commission-jurisdictional rates.[2042]  Based on this evidence, the Commission concluded that existing requirements governing transparency in local transmission planning processes and coordination between local and regional transmission planning processes may result in the development of inefficiently sized or designed, duplicative, or unnecessary transmission facilities that increase costs to

---

[2040] *Id.* P 1571.

[2041] *Id.* P 1571 (citing Order No. 890, 118 FERC ¶ 61,119 at PP 454, 488, 557; Order No. 1000, 136 FERC ¶ 61,051 at P 152).

[2042] *Id.* P 1573, nn.3363-3365.

USCA4 Appeal: 24-1650   Doc: 224   Filed: 01/21/2025   Pg: 2063 of 2455
Document Accession #: 20241121-3139   Filed Date: 11/21/2024

Docket No. RM21-17-001                                                    - 687 -

customers and render Commission-jurisdictional rates unjust and unreasonable.[2043]  We therefore conclude that the Commission found, based on substantial evidence, that these requirements are unjust, unreasonable, or unduly discriminatory, and determined that the identified deficiencies must be addressed to ensure that Commission-jurisdictional rates are just and reasonable.

822.   Order No. 1920 also pointed out that the federal right of first refusal for selected right-sized replacement transmission facilities will provide transmission providers with certainty that they will not lose the opportunity to invest in any in-kind replacement transmission facility that is then selected as a right-sized replacement transmission facility, and this, in turn, will encourage transmission providers to provide their best in-kind replacement estimates.[2044]  Accordingly, the Commission found that that a federal right of first refusal will remove a disincentive for transmission providers to consider right-sizing in Long-Term Regional Transmission Planning.  The Commission added that this will help to ensure that transmission providers identify and select the more efficient or cost-effective regional transmission solution to Long-Term Transmission Needs.[2045]

---

[2043] *Id.* P 1574.

[2044] *Id.* P 1703; *see infra* Identifying Potential Opportunities to Right-Size Replacement Transmission Facilities section.  The Commission defined "in-kind replacement estimates" as "estimates of the transmission facilities operating at and above the specified kV threshold that an individual transmission provider that owns the transmission facility anticipates replacing in-kind with a new transmission facility during the next 10 years . . . ."  Order No. 1920, 187 FERC ¶ 61,068 at P 1677.  We clarify that these estimates include, at minimum, identification of the transmission facilities themselves.

[2045] *See infra* Right of First Refusal for Right-Sized Replacement Transmission

Docket No. RM21-17-001                                                      - 688 -

823.    As Competition Coalition points out in its rehearing request, substantial evidence

is "relevant evidence that a reasonable mind might accept as adequate to support a

conclusion."[2046]  The above discussion makes clear that the Commission examined the

relevant data and articulated a rational connection between the facts found and the

choices made in enacting the reforms in Order No. 1920.  We thus continue to find that

the Commission engaged in reasoned decision-making and considered all important

aspects of the problem and meaningfully responded to the arguments raised before it.

### 3.    Departure from Commission Precedent

### a.    Rehearing Requests

824.    Competition Coalition opines that no explanation can be offered for how the right-

sizing proposal is not in conflict with FPA section 206 because Order Nos. 1000 and

1000-A required the elimination of federal rights of first refusal.[2047]  Competition

Coalition also asserts that Order No. 1920 departs from Commission precedent without

explanation.[2048]

---

Facilities Selected to Meet Long-Term Transmission Needs section.

[2046] Competition Coalition Rehearing Request at 9 (citing *N.J. Bd. of Pub. Utils. v. FERC*, 744 F.3d 74, 94 (3d Cir. 2014)) (citing Mars Home for Youth v. NLRB, 666 F.3d 850, 853 (3rd Cir. 2011).

[2047] Competition Coalition Rehearing Request at 36-37 (citing *S. C. Pub. Serv. Auth. v. FERC*, 762 F.3d at 71-76).

[2048] *Id.* at 37 n.112, 40.

### b.    Commission Determination

825.    We are unpersuaded by Competition Coalition's argument that Order No. 1920 does not provide a reasoned explanation regarding Order No. 1920's departure from Order Nos. 1000 and 1000-A in establishing a federal right of first refusal for right-sized replacement transmission facilities.  In Order No. 1920, the Commission recognized that the establishment of a federal right of first refusal for right-sized replacement transmission facilities is an exception to Order No. 1000's general requirement for transmission providers to eliminate any federal right of first refusal for regional transmission facilities selected in a regional transmission plan.  The Commission then found that requiring a federal right of first refusal for right-sized replacement transmission facilities aligns with Order No. 1000.[2049]  The Commission explained that, in Order No. 1000, transmission providers were required to remove federal rights of first refusal from their OATTs because they undermined the consideration of more efficient or cost-effective potential transmission solutions proposed at the regional level, which could lead to unjust and unreasonable rates for Commission-jurisdictional services.[2050]  The Commission also explained that, in Order No. 1000, it found that federal rights of first refusal created a barrier to entry that discouraged nonincumbent transmission developers from proposing alternative solutions for consideration at the regional level.[2051]

---

[2049] Order No. 1920, 187 FERC ¶ 61,068 at P 1704.

[2050] *Id.* P 1705; *infra* Right of First Refusal for Right-Sized Replacement Transmission Facilities Selected to Meet Long-Term Transmission Needs section.

[2051] Order No. 1920, 187 FERC ¶ 61,068 at P 1705 (citing Order No. 1000, 136

Docket No. RM21-17-001                                                  - 690 -

826.    The Commission further explained that Order No. 1000 did not require the

elimination of federal rights of first refusal for local transmission facilities, nor did it alter

the rights of incumbent transmission providers to build, own, and recover costs for

upgrades to their own transmission facilities, regardless of whether the upgrade is

selected in the regional transmission plan for the purposes of cost allocation.[2052]  Because

a right-sized replacement transmission facility has the potential to both meet an

individual transmission provider's responsibility to maintain the reliability of its existing

transmission system and also address a Long-Term Transmission Need more efficiently

or cost-effectively than an in-kind replacement transmission facility or another Long-

Term Regional Transmission Facility, which includes the need for replacements of

existing transmission facilities via local transmission planning processes, the Commission

concluded that the reasons for removing federal rights of first refusal in Order No. 1000

do not apply to right-sized replacement transmission facilities.[2053]  Specifically, Order

No. 1920 found that requiring a federal right of first refusal for right-sized replacement

transmission facilities does not undermine the consideration of more efficient or cost-

effective potential transmission solutions proposed at the regional level.  Rather, the

Commission found that a federal right of first refusal will promote the consideration of

_____

FERC ¶ 61,051 at P 257).

    [2052] *See id.* P 1705 (citing Order No. 1000, 136 FERC ¶ 61,051 at P 319.)

    [2053] *Id.* P 1706; *see infra* Right of First Refusal for Right-Sized Replacement
Transmission Facilities Selected to Meet Long-Term Transmission Needs section.

more efficient or cost-effective potential regional transmission solutions to address Long-

Term Transmission Needs because it captures both an individual transmission provider's

responsibilities and a Long-Term Transmission Need, we believe the right-sizing reform

preserves transmission providers' ability to invest in replacements of their own

transmission facilities, even if such facilities are right-sized and selected in the regional

transmission plan for purposes of cost allocation.[2054]  Furthermore, the Commission noted

that the reasons for removing federal rights of first refusal in Order No. 1000 do not

apply to right-sized replacement transmission facilities because transmission providers

may have existing rights and responsibilities with respect to maintaining and, when

necessary, replacing their transmission facilities.[2055]

827.   We therefore continue to find that providing for a federal right of first refusal for

right-sized replacement transmission facilities aligns with the text and stated purpose of

Order No. 1000 by ensuring that transmission providers consider more efficient or cost-

effective regional transmission solutions.[2056]  We also reaffirm that the right-sizing

reform does not depart, without explanation, from Commission precedent related to an

individual transmission provider's ability to proceed with an in-kind replacement

---

[2054] *See infra* Right of First Refusal for Right-Sized Replacement Transmission Facilities Selected to Meet Long-Term Transmission Needs section.

[2055] Order No. 1920, 187 FERC ¶ 61,068 at PP 1706-1707; *see infra* Right of First Refusal for Right-Sized Replacement Transmission Facilities Selected to Meet Long-Term Transmission Needs section.

[2056] Order No. 1920, 187 FERC ¶ 61,068 at P 1704.

transmission facility. Further, we believe that, without a federal right of first refusal, the incumbent transmission provider whose in-kind replacement transmission facility is selected to be right-sized would likely opt to develop the less efficient or cost-effective in-kind replacement transmission facility rather than a right-sized replacement transmission facility.[2057] Therefore, we continue to find that the establishment of the federal right of first refusal for right-sized replacement transmission facilities that are evaluated and selected as part of Long-Term Regional Transmission Planning is necessary to effectuate this reform and ensure that Commission-jurisdictional rates are just and reasonable.[2058] As the Commission reasoned in Order No. 1920, by establishing a process that requires transmission providers to evaluate opportunities to right-size in-kind replacement transmission facilities to meet transmission needs, the right-sizing reform will encourage transmission providers to provide their best in-kind replacement estimates, as they will have certainty that they will not lose the opportunity to invest in any in-kind replacement transmission facility that is then selected as a right-sized replacement transmission facility. The Commission concluded that together, these reforms will enable transmission providers to ensure that the more efficient or cost-effective regional solution to transmission needs is identified, evaluated, and selected, and therefore that Commission-jurisdictional rates are just and reasonable.

---

[2057] *See infra* Right of First Refusal for Right-Sized Replacement Transmission Facilities Selected to Meet Long-Term Transmission Needs section

[2058] Order No. 1920, 187 FERC ¶ 61,068 at PP 1706-1707.

Docket No. RM21-17-001                                                    - 693 -

### 4.    Commission Authority Under the FPA

#### a.    Rehearing Requests

828.    Competition Coalition argues that FPA section 206 cannot support the
Commission's adoption of a monopoly preference when FPA section 206 mandates the
opposite result (prohibition on unduly discriminatory or preferential rates or practices
affected rates).[2059]  Advanced Energy argues that the FPA lacks a plausible textual basis
for the Commission to bestow on the incumbent utilities a "monopoly right" to develop
and own certain types of transmission infrastructure.[2060]  Thus, Advanced Energy and
Competition Coalition assert, the Commission exceeded its authority under FPA section
206.[2061]

829.    Both Advanced Energy and Competition Coalition assert that the Commission's
application of FPA section 206 is inconsistent with U.S. Supreme Court precedent.[2062]
Advanced Energy states that the Commission's reliance on FPA section 206 to bestow a
federal right of first refusal raises serious constitutional questions and, therefore, is
inconsistent with the constitutional-doubt canon of statutory construction.[2063]  Advanced

---

[2059] Competition Coalition Rehearing Request at 36.

[2060] Advanced Energy Rehearing Request at 5, 6-7 (citing 16 U.S.C. 824e(a)).

[2061] *Id.* at 5, 8; Competition Coalition Rehearing Request at 22-23.

[2062] Advanced Energy Rehearing Request at 8-10 (citing *West Virginia*, 597 U.S.
at 721, 723, 730; *Whitman v. Am. Trucking Ass'ns*, 531 U.S. at 468); Competition
Coalition Rehearing Request at 36 (citing *West Virginia*, 597 U.S. at 723).

[2063] Advanced Energy Rehearing Request at 10 (citing Antonin Scalia & Bryan A.
Garner, *Reading Law:  The Interpretation of Legal Texts* 247-48 (2012) (citing *Crowell v.*

Docket No.  RM21-17-001                                                                          - 694 -

Energy claims that since FPA section 206 contains no explicit language regarding development or ownership of transmission facilities or authorizing the establishment of a federal right of first refusal, relying on FPA section 206 to adopt the right-sizing reform calls into question whether Congress delegated such authority to the Commission and, if so, whether that delegation was proper.[2064]

830.    Advanced Energy states that, in enacting FPA section 216, Congress reinforced the FPA's longstanding jurisdictional framework that the Commission does not possess the authority to prevent "any person" from constructing or modifying a transmission facility.[2065]  Advanced Energy argues that, as a result, the Commission exceeded its authority under the FPA by granting incumbents a right of first refusal to develop and own right-sized replacement transmission facilities, to the exclusion of all others.[2066] Similarly, Competition Coalition attests that Order No. 1920 failed to demonstrate that the Commission has the legal authority under the FPA to mandate the federal right of first refusal of transmission facilities, and further argues that the FPA provides the

---

*Benson*, 285 U.S. 22, 62 (1932))).

[2064] *Id.* at 10, 21 (citing *West Virginia*, 597 U.S. 697).

[2065] *Id.* at 8 (citing 16 U.S.C. 824p(g)).

[2066] *Id.* at 5, 8.

Commission no authority to do so.[2067]  Undersigned States argue that right-sizing intrudes

upon state authority.2068

### b.    Commission Determination

831.    We disagree with Advanced Energy's, Competition Coalition's, and Undersigned

States' arguments that the reforms in this section, specifically the right-sizing reform and

the federal right of first refusal for right-sized replacement transmission facilities, exceed

the Commission's authority.[2069]  The Commission's authority under FPA section 201

includes "the transmission of electric energy in interstate commerce," and under FPA

section 206 the Commission's authority is to ensure that practices affecting Commission-

jurisdictional rates are just and reasonable.[2070]  As explained in *EPSA*, this jurisdiction

extends to practices that "directly affect" such rates.[2071]  The federal right of first refusal

acknowledges existing precedent recognizing state laws providing an individual

transmission provider's ability to proceed with an in-kind replacement transmission

facility and encourages transmission providers to provide their best in-kind replacement

estimates by preserving the transmission providers' ability to invest in facilities selected

---

[2067] Competition Coalition Rehearing Request at 7, 21-23.

[2068] Undersigned States Rehearing Request at 36.

[2069] *See* Advanced Energy Rehearing Request at 4-12; Competition Coalition Rehearing Request at 7, 20-40; Undersigned States Rehearing Request at 36.

[2070] *See supra* Federal/State Division of Authority section.

[2071] 577 U.S. at 278.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 2072 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No. RM21-17-001                                      - 696 -

as right-sized replacement transmission facilities.[2072]  The Commission explained that the establishment of a federal right of first refusal in this regard will result in transmission providers identifying, evaluating, and selecting replacement transmission facilities that more efficiently or cost-effectively address transmission needs.

832.    Indeed, rights of first refusal have generally been found to be practices affecting rates, thus confirming that they are within the Commission's jurisdiction—albeit in the context of their removal.[2073]  Thus, the Commission's action in Order No. 1920 is entirely consistent with Order No. 1000 in that respect.  Advanced Energy and Competition Coalition fail to recognize the inherent contradiction in their arguments.  When addressing our statutory authority, the relevant question is whether the Commission can regulate rights of first refusal, not how it chooses to regulate them.  The claim that the establishment of a federal right of first refusal for right-sized replacement transmission facilities is beyond the Commission's authority is squarely contrary to Order No. 1000 and *South Carolina*.[2074]

833.    We are unpersuaded by arguments that the Commission lacks authority under the FPA to require the right-sizing reform.  FPA section 206 provides the Commission with

---

[2072] Order No. 1920, 187 FERC ¶ 61,068 at P 1707.

[2073] *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d at 72.

[2074] *Id.* at 73-76 (finding that the Commission was authorized to regulate the right of first refusal provisions in Commission-jurisdictional tariffs and that the Commission correctly concluded that inclusion of rights of first refusal in tariffs and agreements was a "practice affecting a rate triggering the Commission's authority under FPA section 206.").

the authority to determine the just and reasonable rate following a finding that any rate, charge, regulation, or practice is unjust, unreasonable, unduly discriminatory or preferential. The D.C. Circuit has recognized that regional transmission planning and cost allocation processes are practices affecting rates subject to the Commission's exclusive jurisdiction[2075] and that transmission providers use those processes to "determine which transmission facilities will more efficiently or cost-effectively meet" transmission needs, the development of which directly impacts the rates, terms, and conditions of Commission-jurisdictional service.[2076]

834.    We also are unpersuaded by Advanced Energy's and Competition Coalition's claims that the right of first refusal for right-sized replacement transmission facilities requires explicit congressional authorization and find that, notwithstanding references to *West Virginia* in their rehearing requests, the major questions doctrine is not implicated here. As discussed in detail above,[2077] the major questions doctrine is a context-specific analysis that applies only in "extraordinary cases" where an agency action is so extravagant that it is akin to discovering an "elephant in a mousehole."[2078] More specifically, the major questions doctrine comes into play where, despite a "colorable

---

[2075] Order No. 1920, 187 FERC ¶ 61,068 at P 86 (citing *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d 41 at 55-59, 84; *see* Order No. 1000-A, 139 FERC ¶ 61,132 at P 577).

[2076] *Id.* (citing *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d at 56).

[2077] *See supra* Major Questions Doctrine section.

[2078] *See West Virginia*, 597 U.S. at 746.

textual basis" for the agency's claim of authority, the agency action was so extravagant when viewed in light of the statutory context that it was unlikely that Congress would have afforded this claimed authority to the agency, and particularly would not have done so in an oblique or subtle way.[2079]

835.    The Advanced Energy and Competition Coalition rehearing requests do not meaningfully engage with the context-specific factors associated with the application of the major questions doctrine.  Advanced Energy's theory that the doctrine applies boils down to its characterization of the federal right of first refusal as a "monopoly franchise right" and assertion that replacing transmission projects is extremely expensive.[2080] Competition Coalition similarly relies on a largely conclusory invocation of *West Virginia*, without analysis beyond asserting that this is an "extraordinary case" because the Commission has never previously asserted that Congress granted it this power.[2081]

836.    We continue to conclude that the major questions doctrine does not apply to Order No. 1920, which is a rulemaking under the Commission's broad authority over transmission planning processes affecting Commission-jurisdictional rates.  Specifically, here, Order No. 1920's inclusion of a federal right of first refusal for right-sized replacement transmission facilities falls well within the Commission's authority under FPA section 206 over "practice[s] . . . affecting" rates, the same grant of statutory

---

[2079] *Id.* at 722-23.

[2080] Advanced Energy Rehearing Request at 9-10

[2081] Competition Coalition Rehearing Request at 34, 36.

Docket No. RM21-17-001                                                    - 699 -

authority supporting issuance of Order No. 1920.[2082]  As a result, for all the reasons that

we find that the major questions doctrine is inapplicable to Order No. 1920 as a

whole,[2083] we likewise find that Advanced Energy and Competition Coalition have not

shown that the major questions doctrine applies to Order No. 1920's inclusion of a

federal right of first refusal for right-sized replacement transmission facilities.

837.    We are also unpersuaded by Advanced Energy's claims that Order No. 1920's

establishment of a federal right of first refusal for right-sized replacement transmission

facilities raises constitutional questions and is therefore inconsistent with the

constitutional-doubt canon of statutory construction.[2084]  Advanced Energy does not

discuss the substance of this doctrine, cite any authority that relates to this doctrine, or

explain how—by authorizing the Commission to regulate practices affecting rates, which

includes the local transparency improvements and the right-sizing reform—Congress

would have impermissibly delegated legislative power to the Commission.[2085]

838.    We also disagree with Advanced Energy that the Commission exceeded its

authority under FPA section 216 and find such arguments to be misplaced.  FPA section

---

[2082] *See EPSA*, 577 U.S. at 277-78; *S.C. Pub. Serv. Auth. v. FERC*, 762 at 56-57; *CAISO*, 372 F.3d at 399-404.

[2083] *See supra* Major Questions Doctrine section.

[2084] *See* Advanced Energy Rehearing Request at 10 (citing Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts*, at 247-48 (2012) (citing *Crowell v. Benson,* 285 U.S. at 62)).

[2085] *Id.*; *see also supra* Major Questions Doctrine section

Docket No.  RM21-17-001                                          - 700 -

216 governs the Commission's authority with respect to authorization of a construction

permit for a transmission facility located within a National Interest Electric Transmission

Corridor under certain circumstances.  FPA section 216 does not alter or restrict the

Commission's authority to identify a replacement rate under section 206 of the FPA,

including the provision for or the removal of a federal right of first refusal, to ensure

transmission providers' OATTs are just and reasonable and not unduly discriminatory or

preferential.  The federal right of first refusal for right-sized replacement transmission

facilities is not aimed at, nor does it directly regulate, an area of state authority.[2086]  As

discussed in Order No. 1920 and above, the Commission is not unlawfully supplanting

state authority, including siting and development processes.[2087]  States retain their

authority over those processes and the federal right of first refusal for right-sized

replacement transmission facilities is not directed at those practices nor does it divest

states of their authority.  As explained above, the right-sizing processes, including the

right of first refusal for right-sized replacement transmission facilities, are directed at

Commission-jurisdictional transmission planning processes.

---

[2086] *See supra* Federal/State Division of Authority section (explaining that Commission regulations are not unlawful even if they substantially affect areas of reserved state jurisdiction so long as the Commission is directly regulating within its areas of authority under the FPA, rather than attempting to directly regulate within state jurisdiction).

[2087] *See supra* Federal/State Division of Authority section; *See also* Order No. 1920, 187 FERC ¶ 61,068 at P 271.

839.    We are not persuaded by Advanced Energy's acontextual reading of FPA section

216(g) which posits that—in providing backstop siting authority to the Commission

under FPA section 216 and allowing the Commission, in certain circumstances, to grant

construction permits for transmission facilities within designated National-Interest

Electric Transmission Corridors—Congress was subtly intending to negate the

Commission's authority in FPA sections 205 or 206, particularly with respect to the right-

sizing rights of first refusal or rights of first refusal more generally.  The far more natural

interpretation of this provision is that it means what it says, clarifying the impact of "this

section" of the FPA: that despite creating such backstop permitting authority residing

with the Commission, FPA section 216 does not preclude the construction or

modification of transmission facilities in accordance with state law.[2088]

### 5.    Policy Against Anticompetitive Practices

#### a.    Rehearing Requests

840.    Both Competition Coalition and Advanced Energy claim that Order No. 1920's

establishment of a federal right of first refusal for right-sized replacement transmission

facilities is inconsistent with federal policy against anticompetitive practices.[2089]

Specifically, Advanced Energy asserts that the federal right of first refusal is inconsistent

---

[2088] We note, further, that Order No. 1920 is not a regulation under FPA section
216 and no part of the right-sizing right of first refusal relies on Commission authority
under FPA section 216.

[2089] Competition Coalition Rehearing Request at 67-68 (citing Exec. Order No.
14,036, 3 CFR 100.1); Advanced Energy Rehearing Request at 10-11.

Docket No. RM21-17-001                                                      - 702 -

with Supreme Court finding that "the history of Part II of the Federal Power Act indicates

an overriding policy of maintaining competition to the maximum extent possible

consistent with the public interest."[2090]  Competition Coalition contends that the reform is

contrary to appellate courts' affirmation that monopoly preferences are against the public

interest.

### b.    Commission Determination

841.    Order No. 1920's conclusion that the federal right of first refusal for right-sized

replacement transmission facilities is within the Commission's authority is further

supported by the history and context of the FPA broadly, and rights of first refusal

generally—contrary to the arguments in the rehearing requests.  As the Supreme Court

has recognized, electric utilities have historically been vertically integrated monopolies,

including as to transmission.[2091]

842.    When Congress enacted the FPA, it charged the Commission with ensuring that

rates and practices were "just and reasonable" and not unduly discriminatory or

preferential.  Within these parameters, the statutory text does not require a particular

approach.  Thus, Advanced Energy's and Competition Coalition's invocation of a policy

---

[2090] Advanced Energy Rehearing Request at 10-11 (citing *Otter Tail v. U.S.*, 410 U.S. 366, 374 (1973)).

[2091] *Morgan Stanley Cap. Grp. Inc. v. Pub. Util. Dist. No. 1 of Snohomish Cnty., Wash.*, 554 U.S. 527, 535–36 (2008) (finding that, historically, electric utilities have been monopolies).

against anticompetitive practices is unpersuasive.[2092]  The Commission's authority is defined and delineated by the FPA, not by reference to a general policy that may favor competition.  Notably, the case Advanced Energy cites in this context, *Otter Tail*, did not address the Commission's authority under FPA section 205 or 206, and instead considered whether provisions of the FPA implicitly repealed otherwise applicable antitrust laws.[2093]

### 6.    Other Arguments

#### a.    Rehearing Requests

843.   Competition Coalition asserts that Order No. 1920 fails to meaningfully engage with NOPR arguments and rebut arguments presented in those comments.  Competition Coalition also asserts that the phrase federal rights of first refusal is a "made-up phrase" that has no history in the FPA.[2094]  Competition Coalition adds that the federal right of first refusal for right-sized replacement transmission facilities is likely to encourage gaming.[2095]

#### b.    Commission Determination

844.   We also find that Competition Coalition's remaining arguments are unpersuasive as they fail to engage with the statutory text or context and, ultimately, have little to do

---

[2092] Advanced Energy Rehearing Request at 10-11.

[2093] *See id.* at 10 n.30.

[2094] Competition Coalition Rehearing Request at 24-29.

[2095] *Id.* at 61, 68-71.

with the Commission's statutory authority, notwithstanding how they are categorized in Competition Coalition's rehearing request.

845.    A large swath of Competition Coalition's arguments discuss the history of the phrase "federal right of first refusal," arguing that "the phrase was nothing more than a made-up general reference for clauses in [Commission]-jurisdictional contracts or tariffs implemented by existing transmission owners to impede independent transmission developers seeking to develop cost-of-service transmission."[2096]  We find that this discussion has little bearing on the issue of the Commission's authority, which is defined by the statutory text and relevant precedent construing this text.  As discussed above, we find that establishing the federal right of first refusal for right-sized replacement transmission facilities is within our authority and consistent with that history.  We also note that Order No. 1000 did not require the removal of all rights of first refusal.  Thus, Order No.1000 does not suggest that establishment of a federal right of first refusal for right-sized replacement transmission facilities is beyond the Commission's authority.

846.    We also find that most of Competition Coalition's other arguments—although housed in a portion of their request for rehearing contending that Order No. 1920 exceeds the Commission's statutory authority—are mislabeled.  On their substance, these arguments amount to disputes over whether the federal right of first refusal for right-sized replacement transmission facilities is just and reasonable and not unduly discriminatory

---

[2096] *Id.* at 24-29 (arguing that such provisions were not based on requirements of the FPA or rights inherent in the FPA).

or preferential and whether the Commission departed from its precedent without adequate explanation, albeit peppered with assertions that the federal right of first refusal for right-sized replacement transmission facilities is not supported by the FPA.[2097]  Throughout this order, we affirm that the replacement rate set by the Commission in Order No. 1920 is just and reasonable and not unduly discriminatory.[2098]  We find that the Commission's authority is plainly stated in FPA section 206 to evaluate rates and practices to determine whether they are unjust and unreasonable or unduly discriminatory or preferential, and, if so, prescribe a replacement rate that is just and reasonable and not unduly discriminatory or preferential.  On its face, the federal right of first refusal for right-sized replacement transmission facilities is an exercise of that authority, as discussed above.

---

[2097] *See id.* at 32-40 (arguing that Order No. 1920 departs from the approach of previous Commission orders seeking to curtail transmission provider self-interest and challenging the Commission's rationale for adopting the federal right of first refusal for right-sized replacement transmission facilities); *id.* at 35-36 (arguing that the rationale of *Orangeburg, S.C. v.* FERC, 862 F.3d 1071 (2017), and the Commission's findings in Order No. 1000, require the elimination of disparate treatment of nonincumbent transmission providers); *id.* at 36-40 (arguing that FPA section 206 requires "elimination of preferential rates or practices affecting rates" and that the federal right of first refusal for right-sized replacement transmission facilities is inconsistent with this requirement, that the Commission cannot "ignore its prior declaration that rights of first refusal are unduly discriminatory or preferential," and that Order No. 1920 is disingenuous in distinguishing precedent or claiming that it is not creating a "new preference"); *cf. id.* at 29-32 (discussing Order Nos. 1000 and 1000-A, arguing that because the Commission rejected "monopoly preference provisions" in those orders, even applying a heightened contract review, there is "no support for an assumption that the Commission enjoys Congressionally granted authority to simply create a federally sanctioned 'cartel-like' monopoly preference").

[2098] *See supra* The Commission Demonstrated that the Replacement Rate is Just and Reasonable section.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 2082 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

B.       **Enhanced Transparency of Local Transmission Planning Inputs in the Regional Transmission Planning Process**

1.       **Order No. 1920**

847.    In Order No. 1920, the Commission required transmission providers to revise the regional transmission planning process in their OATTs to enhance the transparency of: (1) the criteria, models, and assumptions that they use in their local transmission planning process; (2) the local transmission needs that they identify through the local transmission planning process; and (3) the potential local or regional transmission facilities that they will evaluate to address those local transmission needs.[2099]  Specifically, the Commission required that the regional transmission planning process include at least three publicly noticed stakeholder meetings per regional transmission planning cycle concerning the local transmission planning process of each transmission provider that is a member of the transmission planning region before each transmission provider's local transmission plan can be incorporated into the transmission planning region's planning models.[2100]  The Commission stated that the requirement to establish this process ensures that stakeholders have meaningful opportunities to participate in and provide feedback on local transmission planning throughout the regional transmission planning process.[2101]  The Commission also clarified that these requirements applied only to local transmission

---

[2099] Order No. 1920, 187 FERC ¶ 61,068 at P 1625.

[2100] *Id.* P 1626.

[2101] *Id.*

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 2083 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No. RM21-17-001                                                    - 707 -

planning that is within the scope of Order No. 890 and is therefore already subject to

Order No. 890 transparency requirements. As such, the Commission stated, this

requirement does not apply to asset management projects.[2102]

848.    The Commission required that prior to the submission of local transmission

planning information to the transmission planning region for inclusion in the regional

transmission planning process, transmission providers in each transmission planning

region must convene, collectively, as part of the regional transmission planning process, a

stakeholder meeting to review the criteria, assumptions, and models related to each

transmission provider's local transmission planning (Assumptions Meeting).[2103]

Furthermore, the Commission required that no fewer than 25 calendar days after the

Assumptions Meeting, transmission providers in each transmission planning region must

convene, collectively, as part of the regional transmission planning process a stakeholder

meeting to review identified reliability criteria violations and other transmission needs

that drive the need for local transmission facilities (Needs Meeting).[2104]  Finally, the

Commission required that, no fewer than 25 calendar days after the Needs Meeting,

transmission providers in each transmission planning region must convene, collectively,

---

[2102] *Id.* P 1625 (citing *S. Cal. Edison Co.*, 164 FERC ¶ 61,160, at PP 30-40 (2018); *Cal. Pub. Utils. Comm'n v. Pac. Gas. & Elec. Co.*, 164 FERC ¶ 61,161, at PP 65-74 (2018) (finding that Order No. 890's local transmission planning requirements do not apply to asset management projects that do not increase capacity or do so incidentally)).

[2103] *Id.* P 1627.

[2104] *Id.*

as part of the regional transmission planning process, a stakeholder meeting to review potential solutions to those reliability criteria violations and other transmission needs (Solutions Meeting).[2105]

849.    Additionally, the Commission required that the materials for stakeholder review during these three meetings be publicly posted and that stakeholders have opportunities before and after each meeting to submit comments.[2106]  Specifically, the Commission required transmission providers to publicly post the meeting materials no fewer than five calendar days prior to each of the three publicly noticed stakeholder meetings to allow time for stakeholders to review materials in advance of each meeting.[2107]  The Commission also required that transmission providers allow for a period of no fewer than 25 calendar days following the Solutions Meeting to review and consider stakeholder feedback on the local transmission solutions identified to meet the local transmission needs before the local transmission plan can be incorporated in the transmission planning region's planning models.[2108]  Lastly, the Commission required that transmission providers must respond to questions or comments from stakeholders such that it allows stakeholders to meaningfully participate in these three required stakeholder meetings.[2109]

---

[2105] *Id.*

[2106] *Id.*

[2107] *Id.* P 1628.

[2108] *Id.*

[2109] *Id.*

USCA4 Appeal: 24-1650   Doc: 224   Filed: 01/21/2025   Pg: 2085 of 2455
Document Accession #: 20241121-3139      Filed Date: 11/21/2024

Docket No.  RM21-17-001                                        - 709 -

850.   In Order No. 1920, the Commission declined to adopt alternatives requested by commenters to this set of reforms because such proposals were not included in the NOPR and, as a result, the requests were beyond the scope of the proceeding.[2110]  The Commission noted, however, that several of these issues may be examined in the Commission's ongoing Transmission Planning and Cost Management proceeding.[2111]

### 2.    Requests for Additional Reforms

### a.    Requests for Rehearing and Clarification

851.   Several parties request rehearing of the Commission's decision to exclude asset management projects from the local transmission planning transparency requirements in the final rule.[2112]  Old Dominion states that the Commission failed to address the lack of meaningful transparency in local transmission planning by deciding to exclude asset management projects from the local transmission planning transparency requirements, which it argues is an error that will perpetuate unjust and unreasonable rates.[2113]  Further, Old Dominion contends that the Commission's assertion that there is not sufficient record evidence or that it would be outside the scope of the proceeding to adopt reforms that were not proposed in the NOPR is unreasonable and inconsistent with other aspects of the

---

[2110] *Id.* P 1648.

[2111] Transmission Planning and Cost Management, Notice of Technical Conference, Docket No. AD22-8-000 (Apr. 21, 2022).

[2112] NESCOE Rehearing Request at 26-31; Ohio Commission Federal Advocate Rehearing Request at 21-24; Old Dominion Rehearing Request at 4, 5-9.

[2113] Old Dominion Rehearing Request at 5, 9.

final rule where the Commission adopted proposals that were neither supported by sufficient record evidence nor included in the NOPR.[2114]  Old Dominion states that if the Commission does not grant rehearing on this issue, then the Commission should undertake further reforms for local transmission planning, such as in Docket No. AD22-8-000.[2115]

852.    NESCOE states that the Commission's decision to exclude asset management projects[2116] from the scope of the local transmission planning transparency enhancements does not constitute reasoned decision-making, because the final rule does not sufficiently address concerns that asset condition projects are not subject to sufficient transparency, scrutiny, and review requirements.[2117]  NESCOE further argues that, despite the Commission's acknowledgement that reforms are needed to ensure regional transmission planning and cost allocation are just and reasonable, the Commission's failure to adopt such reforms based on a single-sentence rationale demonstrates that the Commission has not "made a reasoned decision based upon substantial evidence in the record," nor has it "articulate[d] a satisfactory explanation for its action including a rational connection

---

[2114] *Id.* at 5-6, 8 (contending that Order No. 1920 prohibits different cost allocation methods for economic, reliability, and public policy requirements, which the Commission did not propose in the NOPR).

[2115] *Id.* at 9.

[2116] NESCOE notes that these in-kind replacement projects are known as asset condition projects in New England.  NESCOE Rehearing Request at 6.

[2117] *Id.* at 26-33, 34.

between the facts found and the choice made."[2118] NESCOE argues that the exemption of asset management projects from the local transmission planning transparency requirements results in a regulatory gap where transmission costs are unreviewed at both the state and federal level.[2119] NESCOE contends that this is a particularly acute concern in New England where, since February 2023, transmission owners have brought $3.3 billion in asset management projects through ISO-NE's Planning Advisory Committee.[2120]

853. Ohio Commission Federal Advocate argues that the Commission's adoption of "perfunctory" transparency reforms for local planning processes was arbitrary and capricious, and will do nothing to close the regulatory gap or provide oversight for local projects.[2121] Ohio Commission Federal Advocate notes that given the increasing portion of transmission facilities that are considered "supplemental projects"[2122] in PJM, the reforms adopted in Order No. 1920 do little to shift the scales and the reforms may increase the portion of the transmission system built through a local transmission planning process.[2123] As such, Ohio Commission Federal Advocate contends that the

---

[2118] *Id.* at 30-31 (citing *Cal. Pub. Utils. Comm'n v. FERC*, 20 F.4th at 800).

[2119] *Id.* at 29.

[2120] *Id.* at 28.

[2121] Ohio Commission Federal Advocate Rehearing Request at 21-22.

[2122] In PJM, "supplemental projects" is the term used for local projects. *Id.* at 23.

[2123] *Id.* at 23-24.

Commission neglected its duty under the FPA to ensure just and reasonable rates by imposing reforms that will not curb rising transmission costs or result in holistic transmission planning.[2124]

854.    Industrial Customers request rehearing and argue the Commission failed to engage requests that call for implementation of an independent transmission monitor.  Given the increase in spending on transmission projects, Industrial Customers argue that clarifying or expanding existing independent market monitor functions or creating an independent transmission monitor would be a timely and appropriate exercise of the Commission's authority to remedy unjust and unreasonable rates.[2125]  Moreover, Industrial Customers contend that Order No. 1920 falls short of ensuring just and reasonable rates because it does not undertake reforms of transmission formula rates or the Commission's prudence standard.[2126]  Industrial Customers argue that since Order No. 1920 failed to implement any concrete reforms to protect consumers, rehearing is warranted.[2127]

855.    PIOs request rehearing arguing that the Commission has sidestepped evidence that they and other parties offered when the Commission concluded that certain suggestions regarding the local transmission planning process were outside the scope of the

---

[2124] *Id.* at 21, 23.

[2125] Industrial Customers Rehearing Request at 29-31.

[2126] *Id.* at 33-34.

[2127] *Id.* at 38.

Docket No. RM21-17-001                                                    - 713 -

proceeding.[2128]  PIOs argue that while Order No. 1920's reforms take some steps in the

right direction, Order No. 1920 does not actually require the kind of comprehensive

information transparency, scenario-based planning, multi-benefit analysis, and process

coordination necessary for stakeholders to verify whether local transmission projects are

prudent or whether a regional solution is more appropriate.[2129]  PIOs argue that the

Commission must require transmission providers to meet their burden under FPA section

205(e) to prove that their local transmission projects are the least-cost way to meet the

needs of the transmission system.  PIOs further argue the Commission should grant

rehearing to ensure that utilities only construct local transmission projects when they are

the best option for maintaining reliability and at least cost to consumers.[2130]

### b.    Commission Determination

856.    We sustain the determination in Order No. 1920 to exclude asset management

projects from the information on local transmission planning inputs that transmission

providers must include for stakeholder review as part of the Assumptions, Needs, and

Solutions Meetings.  We reiterate that planning for asset management projects, which do

not increase transmission capacity or only do so incidentally, is not required to be

included within the scope of local transmission planning that is subject to Order No. 890

---

[2128] PIOs Rehearing Request at 50.

[2129] *Id.* at 51-52.

[2130] *Id.* at 53-54 (citing *Ky. Mun. Energy Agency v. FERC*, 45 F.4th 162, 178 (D.C. Cir. 2022)) (other citations omitted).

transparency requirements,[2131] and as such, it was reasonable for the Commission to

exclude them from the requirements in Order No. 1920.[2132]  Moreover, the Commission

did not propose in the NOPR to require transmission providers to include information

related to asset management projects in the information that they provide as part of the

Assumptions, Needs, and Solutions Meetings.  Instead, to enhance stakeholders' visibility

into local transmission planning inputs as they are integrated into the regional

transmission planning process, the Commission proposed in the NOPR – and adopted in

the final rule – requirements to enhance the transparency of such inputs, which are

already subject to the local transmission planning transparency requirements of Order No.

890, in the regional transmission planning process.[2133]  We continue to expect these

---

[2131] Order No. 1920, 187 FERC ¶ 1625 (citing *S. Cal. Edison Co.*, 164 FERC ¶ 61,160 at PP 30-40; *Cal. Pub. Utils. Comm'n v. Pac. Gas. & Elec. Co.*, 164 FERC ¶ 61,161 at PP 65-74 (finding that Order No. 890's local transmission planning requirements do not apply to asset management projects that do not increase capacity or do so incidentally)).

[2132] *Id.* P 1625.

[2133] NOPR, 179 FERC ¶ 61,028 at P 398 (identifying the need for reform based in part on a finding that "implementation of [the Order No. 890 local transmission planning principles] in local transmission planning processes appears to remain uneven", and that "reforms to better ensure more consistent implementation of these principles may be timely"); *id*. P 400 (proposing to require transmission providers to revise their OATTs "to enhance transparency of:  (1) the criteria, models, and assumptions that they use in their local transmission planning process; (2) the local transmission needs that they identify through that process; and (3) the potential local or regional transmission facilities that they will evaluate to address those local transmission needs."); *id.* P 402 (stating that "requirements are needed to ensure just and reasonable Commission-jurisdictional rates because the information provided will better facilitate the identification of regional transmission facilities"); Order No. 1920, 187 FERC ¶ 61,068 at P 1625 (clarifying that the requirement "applies only to local transmission planning that is within the scope of Order No. 890 and is therefore already subject to Order No. 890 transparency

Docket No.  RM21-17-001                                                        - 715 -

reforms to enhance the transparency between the local and regional transmission

planning processes, which will help reduce the possibility that transmission providers will

develop local transmission facilities without adequately considering whether there is a

more efficient or cost-effective regional transmission solution that could address their

local transmission needs.[2134]   That said, we note that nothing in Order No. 1920 prevents

transmission providers from choosing to apply Order No. 1920's requirements to enhance

the transparency of local transmission planning inputs to asset management projects.

857.    We disagree with parties that request rehearing on the grounds that the

Commission's decision-making was arbitrary and capricious or failed to consider the

record evidence.  Further, we disagree with Ohio Commission Federal Advocate that the

Commission neglected its duty under the FPA to ensure just and reasonable rates.  We

continue to find, as we found in Order No. 1920, that the enhanced transparency

requirements are specifically designed to provide needed transparency to ensure that

Commission-jurisdictional rates are just and reasonable and not unduly discriminatory or

preferential.[2135]   As such, we find that the scope of the relevant reforms required by Order

No. 1920 is sufficient to remedy the deficiencies in local transmission planning that the

---

requirements" and does not apply to asset management projects)).

[2134] Order No. 1920, 187 FERC ¶ 61,068 at P 1629.

[2135] *Id.* P 1632.

Commission set out to resolve in Order No. 1920, even if some parties would have preferred that the Commission had gone further.[2136]

858.    For similar reasons, we are unpersuaded by Industrial Customers' and PIOs' requests for additional reforms to transmission planning processes generally.  The proposals raised by these parties in their rehearing requests were not included in either the NOPR or Order No. 1920 and, as noted above, we find that the relevant reforms required pursuant to Order No. 1920 are sufficient to remedy the problem that Order No. 1920 set out to solve.[2137]  The Commission will continue to consider potential additional local transmission planning reforms, such as independent transmission monitors, along with other transmission reforms in the future.[2138]

### 3.    Stakeholder Meeting Clarifications

### a.    Request for Rehearing and Clarification

859.    SERTP Sponsors request clarification that the standard for evaluating transmission providers' obligation to respond to stakeholder feedback is consistent with Order No. 890 and applies equally to local, regional, and Long-Term Regional Transmission

---

[2136] *See New York v. FERC*, 531 U.S. at 26-27 (affirming that the Commission did not have an obligation extend its open access remedy to bundled retail transmissions because the remedy it ordered constituted a sufficient response to the problems the Commission had identified in the wholesale market).

[2137] *See* Order No. 1920, 187 FERC ¶ 61,068 at PP 1648, 1737.

[2138] We note, for example, the ongoing proceeding in Docket No. AD22-8-000 on Transmission Planning and Cost Management.

Planning.[2139]  Specifically, SERTP Sponsors assert that further clarification is necessary with respect to the Commission's statement that transmission providers are encouraged "to be as responsive as possible to stakeholder comments and questions" because this statement could be read to go beyond standards previously established in Order No. 890 and expand transmission providers' obligation to respond beyond what is necessary to support meaningful participation in stakeholder meetings.[2140]  Thus, SERTP Sponsors request that the Commission clarify that transmission providers are not obligated to incorporate stakeholder proposals or comments into their transmission plans and that the ultimate transmission planning responsibility is with the transmission provider.[2141]

860.    Regarding the Assumptions Meeting, the Needs Meeting, and the Solutions Meeting, SERTP Sponsors also request that the Commission clarify that these meetings of different transmission providers do not need to be held as one.  SERTP Sponsors explain that their transmission planning region consists of multiple transmission providers over a 12-state footprint, and they contend that the Commission should clarify that this requirement can be satisfied by a single transmission provider holding separate meetings that include its own Assumptions, Needs, and Solutions Meetings.[2142]  SERTP

---

[2139] SERTP Sponsors Rehearing Request at 23-24.

[2140] *Id.* at 24 (citing Order No. 1920, 187 FERC ¶ 61,068 at P 1645) (emphasis omitted).

[2141] *Id.*

[2142] *Id.* at 24-25.

Sponsors assert that, in the event that the Commission does not so clarify, the

requirements for the Assumptions Meeting, the Needs Meeting, and the Solutions

Meeting may become unduly burdensome and inconsistent with Order No. 1920's

requirement, which is based on the model used by PJM's transmission owners to hold

separate meetings for different local transmission owners' local plans.[2143]  SERTP

Sponsors argue that holding "collective" Assumptions, Needs, and Solutions Meetings is

unnecessary to achieve the Commission's transparency objections, and further contends

that requiring so would be an unexplained departure from the PJM precedent and

otherwise arbitrary and capricious.[2144]

### b.    Commission Determination

861.    We clarify, in response to SERTP Sponsors' request, that transmission providers

are not obligated to incorporate stakeholder proposals or comments resulting from the

stakeholder meeting process into their transmission plans, and we agree with SERTP

Sponsors that the ultimate transmission planning responsibility remains with the

transmission provider.[2145]  In encouraging transmission providers to be as responsive as

possible to stakeholder comments and questions as part of the stakeholder meeting

process, the Commission in Order No. 1920 did not establish new requirements for

transmission providers that did not previously apply; rather, the description of the

---

[2143] *Id.* at 25.

[2144] *Id.* at 25 (citations omitted).

[2145] *Id.* at 24.

Docket No. RM21-17-001                                                                - 719 -

requirement that transmission providers respond to questions or comments in a manner that allows stakeholders to meaningfully participate in the stakeholder meetings explains existing requirements established under Order No. 890 and that apply to local transmission planning processes, existing Order No. 1000 regional transmission planning processes, and Long-Term Regional Transmission Planning processes.[2146]

862.    In response to SERTP Sponsors' request that the Commission clarify that the stakeholder meetings of the different transmission providers do not need to be held collectively as a single meeting,[2147] we agree and clarify that, provided that the transmission provider meets the requirements of Order No. 1920 with respect to public notices and opportunities for stakeholders to submit comments before and after each meeting, transmission providers need not hold a single stakeholder meeting among all transmission providers in a transmission planning region. We recognize that transmission planning regions often cover significant geographic range and are comprised of many diffuse transmission providers, such that imposing a requirement that each stakeholder meeting includes all transmission providers and stakeholders may create undue burden

---

[2146] *See* Order No. 890, 118 FERC ¶ 61,119 at P 452 ("Transmission providers are, however, required to craft a process that allows for a reasonable and meaningful opportunity to meet or otherwise interact meaningfully."); *id*. P 454 ("This means that customers must be included at the early stages of the development of the transmission plan and not merely given an opportunity to comment on transmission plans that were developed in the first instance without their input."); *id*. P 488 ("The transmission planning required by this Final Rule is intended to provide transmission customers and other stakeholders a meaningful opportunity to engage in planning along with their transmission providers.").

[2147] SERTP Sponsors Rehearing Request at 25.

and impede meaningful participation.  Instead, transmission providers may hold separate Assumptions Meetings, Needs Meetings, and Solutions Meetings for individual transmission providers within a transmission planning region, provided that the process ensures that stakeholders have meaningful opportunities to participate in and provide feedback on local transmission planning information throughout the regional transmission planning process and otherwise meets all the Order No. 1920 requirements described above.

## C.    Identifying Potential Opportunities to Right-Size Replacement Transmission Facilities

### 1.    Eligibility

#### a.    Order No. 1920

863.    In Order No. 1920, the Commission required transmission providers, as part of each Long-Term Regional Transmission Planning cycle, to evaluate whether transmission facilities (1) operating above a specified kV threshold and (2) that an individual transmission provider that owns the transmission facility anticipates replacing in-kind with a new transmission facility during the next 10 years, can be "right-sized" to more efficiently or cost-effectively address a Long-Term Transmission Need.[2148]  The Commission also required that each transmission provider submit its in-kind replacement estimates (i.e., estimates of the transmission facilities operating at and above the specified kV threshold that an individual transmission provider that owns the transmission facilities

---

[2148] Order No. 1920, 187 FERC ¶ 61,068 at P 1677.

anticipates replacing in-kind with a new transmission facility during the next 10 years)

for use in Long-Term Regional Transmission Planning sufficiently early in each Long-

Term Regional Transmission Planning cycle.[2149]

864.    The Commission further adopted the NOPR proposal to define "right-sizing" as

the process of modifying a transmission provider's in-kind replacement of an existing

transmission facility to increase that facility's transfer capability.[2150]  The Commission

clarified that, for the purposes of the right-sizing reform, an "in-kind replacement

transmission facility" is a new transmission facility that:  (1) would replace an existing

transmission facility that a transmission provider has identified in its in-kind replacement

estimate as needing to be replaced; (2) would result in no more than an incidental

increase in capacity over the existing transmission facility identified as needing to be

replaced; and (3) is located in the same general route as, and/or uses the existing rights-

of-way of, the existing transmission facility identified as needing to be replaced.[2151]

865.    Similarly, the Commission also clarified that, for the purposes of the right-sizing

reform, a "right-sized replacement transmission facility" is a new transmission facility

that:  (1) would meet the need to replace an existing transmission facility that a

transmission provider has identified in its in-kind replacement estimate as one that it

plans to replace with an in-kind replacement transmission facility while also addressing a

---

[2149] *Id.*

[2150] *Id.* P 1678 & n.3580.

[2151] *Id.* P 1678.

Docket No.  RM21-17-001                                              - 722 -

Long-Term Transmission Need; (2) results in more than an incidental increase in the

capacity of an existing transmission facility that a transmission provider has identified for

replacement in its in-kind replacement estimate; and (3) is located in the same general

route as, and/or uses or expands the existing rights-of-way of, the existing transmission

facility that a transmission provider has identified for replacement in its in-kind

replacement estimate.[2152]

866.    In Order No. 1920, the Commission also required transmission providers to

establish a multi-step process in their OATTs that provides for the implementation of the

right-sizing reform.  Specifically, the Commission required that transmission providers in

each transmission planning region must propose a point sufficiently early in each Long-

Term Regional Transmission Planning cycle at which each individual transmission

provider in the transmission planning region will submit its in-kind replacement estimates

for use in Long-Term Regional Transmission Planning.[2153]  Next, the Commission

required that, if transmission providers identify a right-sized replacement transmission

facility as a potential solution to a Long-Term Transmission Need as part of Long-Term

Regional Transmission Planning, that right-sized replacement transmission facility must

be evaluated in the same manner as any other proposed Long-Term Regional

Transmission Facility to determine whether it is the more efficient or cost-effective

---

[2152] *Id.* P 1679.

[2153] *Id.* P 1681.

transmission facility to address the transmission need.[2154]  The Commission clarified that it is at this stage that transmission providers must use the in-kind replacement estimates to determine if in-kind replacement transmission facilities could be right-sized to more efficiently or cost-effectively address a Long-Term Transmission Need(s).[2155]  Finally, the Commission required that, if a right-sized replacement transmission facility addresses the transmission provider's need to replace an existing transmission facility, meets the applicable selection criteria included in Long-Term Regional Transmission Planning, and is found to be the more efficient or cost-effective solution, then the right-sized replacement transmission facility must be considered for selection.[2156]

867.    The Commission further required that, for the purposes of implementing the right-sizing reform, transmission providers must propose on compliance a threshold that does not exceed 200 kV to be used in identifying transmission facilities that an individual transmission provider anticipates replacing in-kind with a new transmission facility during the next 10 years, which it must then include in its in-kind replacement estimates.[2157]  The Commission clarified that the 10-year timeframe for in-kind replacement estimates should reflect a transmission provider's estimates of the

---

[2154] *Id.*

[2155] *Id.*

[2156] *Id.*  As explained in the Right of First Refusal section below, the Commission required the establishment of a federal right of first refusal for a right-sized replacement transmission facility that is selected to meet Long-Term Transmission Needs.  *Id.* P 1702.

[2157] *Id.* PP 1677, 1683 & n.3584.

Docket No. RM21-17-001                                                  - 724 -

transmission facilities operating at and above the specified kV threshold that an

individual transmission provider that owns the transmission facility anticipates replacing

in-kind with a new transmission facility during the next 10 years beginning at the start of

each Long-Term Regional Transmission Planning cycle.[2158]

### b.    Requests for Rehearing and Clarification

868.    In its rehearing request, Advanced Energy argues that the term "right-sized

replacement facility" is too vague.[2159]  Competition Coalition argues that the definition of

the term ignores Order No. 1000-A because the Commission has already determined in

Order No. 1000-A that the replacement of an entire transmission facility is an entirely

new transmission facility.[2160]  Competition Coalition notes that, in Order No. 1000-A, the

Commission addressed the issue of granting a preference for an incumbent transmission

owner to build a transmission project for upgrades and not an entirely new transmission

facility, determining that an upgrade involves the replacement of only part of an existing

facility.[2161]  Competition Coalition argues that since Order No. 1920 fails to acknowledge

the justification for the Commission's departure from existing Commission precedent that

---

[2158] *Id.* at P 1685.

[2159] Advanced Energy Rehearing Request at 14-15 (citing Order No. 1920, 187
FERC ¶ 61,068 at P 1678).

[2160] Competition Coalition Rehearing Request at 51-57 (citing Order No. 1000-A,
139 FERC ¶ 61,132 at P 426; *NYISO*, 151 FERC ¶ 61,040 at P 96  (additional citation
omitted)).

[2161] Competition Coalition at 51-52 (citing Order No. 1000-A, 139 FERC ¶ 61,132
at P 426).

Docket No.  RM21-17-001                                              - 725 -

limits retention of a preference only for a regional transmission project that represents a

replacement of part of an existing transmission facility and not the replacement of an

entire transmission facility, Order No. 1920 is arbitrary and capricious.[2162]

869.    Similarly, some petitioners argue that Order No. 1920's findings regarding rights-

of-way are flawed or inconsistent with Commission precedent.[2163]  For example,

Advanced Energy highlights that language regarding the "same general route as, and/or

use [] the existing rights-of-way of, the existing transmission facility identified as

needing to be replaced" could require anything from zero land acquisition cost (if the

facility is entirely within a wholly owned right-of-way) to millions of dollars (if the

facility is entirely outside of an existing right-of-way but follows the same general

route).[2164]  Advanced Energy argues that, given such vagueness, to have the chance of

passing muster under the APA, the Commission should remove this ambiguity by

limiting any right of first refusal to a right-sized replacement facility that is entirely

within existing, permanent rights-of-way.[2165]  NESCOE similarly argues that the final

rule's lack of a definition of "general route" or discussion of why it is appropriate to use a

---

[2162] *Id.* at 52.

[2163] Advanced Energy Rehearing Request at 14-15 (citing Order No. 1920, 187 FERC ¶ 61,068 at P 1678); Competition Coalition Rehearing Request at 57-59 (citing Order No. 1920, 187 FERC ¶ 61,068 at P 1678; *MISO*, 147 FERC ¶ 61,127 at P 244; *NYISO*, 151 FERC ¶ 61,040 at P 96).

[2164] Advanced Energy Rehearing Request at 14 (citing Order No. 1920, 187 FERC ¶ 61,068 at P 1678).

[2165] *Id.* at 14-15.

vague term in place of the well-established "rights-of-way" necessitates the Commission

to act to fulfill its statutory duty under the FPA and that, as written, the right-sizing

reform could be interpreted to the detriment of consumers.[2166]

870.    Competition Coalition argues that the Commission's right-sizing reform

contravenes existing Commission precedent regarding the use of rights-of-way, noting

that, under Order No. 1000-A, the Commission found that the use of an existing right-of-

way is not determinative of whether the facility is a new transmission facility but rather

the relevant issue was "whether the new transmission facility is an upgrade to an

incumbent transmission provider's own facilities."[2167]   Competition Coalition further

points to Commission rejection of a proposal from MISO to give preference to

transmission owners for facilities built on the existing rights-of-way since the

Commission determined that issues surrounding rights-of-way is an issue for the

authority granting the rights-of-way.[2168]

871.    Competition Coalition argues that the OATT language associated with the right-

sizing reform is ambiguous, unworkable, and will cause confusion and litigation.[2169]

Competition Coalition highlights the terms "anticipates," "right-sizing," "as discussed in

---

[2166] NESCOE Rehearing Request at 32-33.

[2167] Competition Coalition Rehearing Request at 57-58 (citing Order No. 1000-A, 139 FERC ¶ 61,132 at P 427).

[2168] *Id.* (citing *MISO*, 147 FERC ¶ 61,127 at P 244).

[2169] *Id.* at 72.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 2103 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No. RM21-17-001                                                    - 727 -

Order No. 1920," "not to exceed 200 kV," "more efficiently," and "cost-effectively" as being undefined in the final rule.[2170]  Competition Coalition also contends that the absence of OATT language that gives an independent entity the responsibility to carry out and administer right-sizing opportunities or monitor against potential planning abuses confirms the need for an independent transmission system planner or monitor.2171

872.   In its rehearing request, Dominion requests clarification of the proposed 200 kV threshold for determining whether a transmission facility is eligible for right-sizing.[2172] Specifically, Dominion explains that while the Commission refers to a "maximum threshold," Dominion seeks clarification that the use of the word "maximum" does not foreclose evaluation of projects above and below that threshold.  Dominion explains that, in simpler terms, transmission providers must consider for right-sizing purposes all transmission facilities with projected in-kind replacements currently operating at or above 200 kV, but they may propose a lower threshold on compliance.[2173]

### c.    Commission Determination

873.   We sustain our findings in response to Advanced Energy's, Competition Coalition's, and NESCOE's rehearing requests pertaining to the term "right-sized replacement facility."  As the Commission explained in Order No. 1920, the right-sizing

---

[2170] *Id.* at 73-74.

[2171] *Id.* at 74.

[2172] Dominion Rehearing Request at 35.

[2173] *Id.* at 35-36.

reform was adopted, as modified from the NOPR proposal, with additional requirements to ensure that the use of the right-sizing reform addresses *replacement* transmission facilities and not entirely new transmission facilities.[2174]  As highlighted in Order No. 1920, a right-sized replacement transmission facility would replace the existing transmission facility that the transmission provider included in its in-kind replacement estimate, and extends to any portion of the right-sized replacement facility located within a given transmission provider's retail distribution service territory or footprint.[2175]  The Commission found that a right-sized replacement transmission facility has the potential to both meet an individual transmission provider's responsibility to maintain the reliability of its existing transmission system and address a Long-Term Transmission Need more efficiently or cost-effectively than an in-kind replacement transmission facility or another Long-Term Regional Transmission Facility.[2176]

874.    In response to Competition Coalition's argument that Order No. 1920 is inconsistent with Order No. 1000-A, which specified that upgrades do not include entirely new transmission facilities, we note that the Commission is entitled to change its approach and depart from prior precedent, provided that it acknowledges the change in policy and provides a reasoned explanation for the new approach.[2177]  We acknowledge

---

[2174] *Id.* P 1679.

[2175] *Id.* P 1702.

[2176] *Id.* P 1682.

[2177] *FCC v. Fox Television Stations, Inc.*, 556 U.S. at 515-516; *In re Permian Basin Area Rate Cases*, 390 U.S. 747, 784 (1968); *see also State Farm*, 463 U.S. at 42

that in Order No. 1920, the Commission, with explanation, departed from its precedent in

Order No. 1000-A, as well as in *MISO* and *NYISO*.[2178]  In Order No. 1920, the

Commission explicitly recognized that "the establishment of a federal right of first refusal

for right-sized replacement transmission facilities is an exception to Order No. 1000's

general requirement for transmission providers to eliminate any federal right of first

refusal for regional transmission facilities selected in a regional transmission plan."[2179]

However, the Commission found that the Commission's reasons for removing federal

rights of first refusal in Order No. 1000 do not apply to right-sized replacement

transmission facilities.[2180]  The Commission then explained at length why this is the case,

---

("[W]e fully recognize that regulatory agencies do not establish rules of conduct to last forever.") (internal quotations omitted); *Greater Bos. Television Corp. v. FCC*, 444 F.2d 841, 852 (D.C. Cir. 1970) (an agency may change its course as long as it "suppl[ies] a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored."), *cert. denied*, 403 U.S. 923 (1971).

[2178] *See MISO*, 147 FERC ¶ 61,127 at P 238; *NYISO*, 151 FERC ¶ 61,040 at P 96. In Order No. 1000-A, the Commission clarified that "the term upgrade means an improvement to, addition to, or replacement of a part of, an existing transmission facility. The term upgrades does not refer to an entirely new transmission facility."  Order No. 1000-A, 139 FERC ¶ 61,132 at P 426.

[2179] Order No. 1920, 187 FERC ¶ 61,068 at P 1704.

[2180] *Id.* P 1706; *see also* Order No. 1920, 187 FERC ¶ 61,068 at P 1705 (explaining that Order No. 1000 required transmission providers to remove federal rights of first refusal from their OATTs because they undermined the consideration of more efficient or cost-effective potential transmission solutions proposed at the regional level and created a barrier to entry that discouraged nonincumbent transmission developers from proposing alternative solutions at the regional level) (citations omitted).

satisfying the Commission's obligation to provide a reasoned explanation for its new policy.

875.    Specifically, the Commission found that requiring a federal right of first refusal for right-sized replacement transmission facilities does not undermine the consideration of more efficient or cost-effective potential transmission solutions at the regional level; instead, it will *promote* the consideration of potential regional transmission solutions to address Long-Term Transmission Needs.[2181]  When compared against the alternative of piecemeal development of in-kind replacement facilities, the right-sizing reform ensures that Long-Term Regional Transmission Planning considers a broader set of needs, including needs related to replacement of aging transmission infrastructure.[2182]  The Commission further stated that, absent a federal right of first refusal for right-sized replacement transmission facilities, the incumbent transmission provider whose in-kind replacement transmission facility is selected to be right-sized would likely proceed to develop the less efficient or cost-effective in-kind replacement transmission facility because it would prefer the assurance of a federal right of first refusal for the in-kind replacement transmission facility over the uncertainty of subjecting a right-sized replacement transmission facility to the Order No. 1000 competitive transmission development process.[2183]  Thus, the federal right of first refusal for right-sized

---

[2181] *Id.* P 1706.

[2182] *Id.*

[2183] *Id.*

Docket No. RM21-17-001                                                          - 731 -

replacement transmission facilities will remove a barrier to development of more efficient

or cost-effective regional solutions that could encompass both replacements of aging

transmission infrastructure and regional transmission solutions to address Long-Term

Transmission Needs. Similarly, the Commission found that requiring the establishment

of a federal right of first refusal for a right-sized replacement transmission facility that is

selected to meet Long-Term Transmission Needs will encourage transmission providers

to provide their best in-kind replacement estimates because they will have certainty that

they will not lose the opportunity to invest in any in-kind replacement transmission

facility that is then selected as a right-sized replacement transmission facility.[2184]

876.    The Commission found that, given this incentive structure and the fact that the

transmission provider holds the leverage as to whether to build a right-sized replacement

transmission facility or a less efficient in-kind replacement transmission facility, the

establishment of a federal right of first refusal for right-sized replacement transmission

facilities is necessary to effectuate the right-sizing reform and ensure that Commission

jurisdictional rates are just and reasonable.[2185] We sustain this finding, and we continue

to conclude that a federal right of first refusal for right-sized replacement transmission

facilities will remove a disincentive for transmission providers to consider right-sizing in

Long-Term Regional Transmission Planning, helping to ensure that the more efficient or

cost-effective regional transmission solution to Long-Term Transmission Needs is

---

[2184] *Id.* P 1703.

[2185] *Id.* P 1706.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 2108 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

selected and likely built, and therefore that the Commission-jurisdictional rates that customers pay are just and reasonable.[2186]  As such, we find that the Commission has provided a reasoned explanation for its decision to depart from prior precedent and require a federal right of first refusal for right-sized replacement transmission facilities.

877.    We are unpersuaded by Advanced Energy's, Competition Coalition's, and NESCOE's claims regarding the use of the term "rights-of-way" in defining a right-sized replacement transmission facility.  As in Order No. 1000, we find that the retention, modification, or transfer of rights-of-way remain subject to relevant law or regulation granting the rights-of-way,[2187] and nothing in the definition of "in-kind replacement transmission facility" or "right-sized replacement transmission facility" would affect the retention, modification, or transfer of rights-of-way.  While we recognize Advanced Energy's argument that a right-sized replacement transmission facility may require additional land for a right-of-way, we decline to speculate on land acquisition costs because land acquisition costs vary from transmission facility to transmission facility.  In any case, the fact that there may be additional land acquisition costs does not, as Advanced Energy argues, render the definition of a right-sized replacement transmission facility vague.  We note, however, that transmission providers could consider the potential for such costs when they are evaluating whether a particular right-sized

---

[2186] *See id.* P 1703.

[2187] *Id.* P 319.

replacement transmission facility is a more efficient or cost-effective regional

transmission solution to address Long-Term Transmission Needs.

878.    Moreover, we disagree that Order No. 1920's inclusion of the term "general route"

in the definition of "in-kind replacement transmission facility" and "right-sized

replacement transmission facility" renders those definitions vague.  Rather, we find the

term "general route," when read in the context of Order No. 1920's example detailing

which transmission facilities would be eligible for right-sizing,[2188] makes clear that the

right-sizing reform considers existing topology of the transmission system to ensure that

the right-sizing reform applies to *replacement* transmission facilities only.[2189]  We find

that it is important to include this term to provide a reasonable bound of the definition of

both in-kind replacement transmission facilities and right-sized replacement transmission

facilities.  Further, a right-sized replacement transmission facility may require changes to

or expansions of rights-of-way to accommodate that right-sized replacement transmission

facility, and it is not feasible to list every type or circumstance that may bear upon

existing rights-of-way.  Accordingly, we find that the requirement for a right-sized

replacement transmission facility to also be located in the same general route as the

existing transmission facility identified for replacement provides a reasonable limitation

on the location of such a right-sized replacement transmission facility.  For example, if a

transmission provider anticipates replacing an existing transmission facility because it has

---

[2188] *Id.* P 1680.

[2189] *Id.* PP 1678, 1679.

reached the end of its useful life and the replacement transmission facility (either in-kind or right-sized) requires modifications to that facility's rights-of-way to accommodate other infrastructure projects or avoid environmentally sensitive areas, those modifications to existing rights-of-way are permitted under the term "same general route."  We note that Order No. 1920's example relied on interconnection points to describe which in-kind replacement transmission facilities would be eligible for right-sizing,[2190] specifically, that a right-sized replacement transmission facility that connects the same interconnection points to which an in-kind replacement transmission facility connects qualifies under the term "same general route."  We reiterate that these limitations are appropriate to ensure that the right-sizing reform applies to *replacement* transmission facilities only.  For example, a new transmission facility would not qualify as a right-sized replacement transmission facility if it has significantly different interconnection points than the in-kind replacement facility.

879.    Furthermore, we find Competition Coalition's contention that the definition of "right-sized replacement transmission facility" is inconsistent with Order No. 1000 regarding the use of rights-of-way to be inapposite.  In Order No. 1000, the Commission stated that the requirement to "eliminate a federal right of first refusal does not apply to any upgrade, even where the upgrade requires the expansion of an existing right-of-way."[2191]  The Commission stated that "[t]he issue is not whether the upgrade would be

---

[2190] *Id.* P 1680.

[2191] Order 1000-A, 139 FERC ¶ 61,132 at P 427.

Docket No.  RM21-17-001                                                                      - 735 -

located in an existing right-of-way, but whether the new transmission facility is an

upgrade to an incumbent transmission provider's own facilities."[2192]  In other words, the

Commission found in Order No. 1000 that whether a regional transmission facility does

or does not require the expansion of an existing right-of-way is not relevant to whether

that facility is an upgrade.  In contrast, for the reasons discussed directly above, in Order

No. 1920 the Commission found it necessary that, to qualify as a right-sized replacement

transmission facility, a transmission facility must be located in the same general route as,

and/or use or expand the existing rights-of-way of, the existing transmission facility that a

transmission provider has identified for replacement in its in-kind replacement estimate.

880.   We are unpersuaded by Competition Coalition's arguments regarding specific

terminology in the right-sizing reform.  However, we provide additional context for

certain terms and phrases included in the right-sizing reform.  We sustain the definition

of "right-sizing" to mean "the process of modifying a transmission provider's in-kind

replacement of an existing transmission facility to increase that facility's transfer

capability."[2193]  The Commission noted that right-sizing could include, for example,

increasing the transmission facility's voltage level, adding circuits to the towers (e.g.,

redesigning a single-circuit line as a double circuit line), or incorporating advanced

technologies (such as advanced conductor technologies).[2194]  Regarding the other terms

---

[2192] *Id.*.

[2193] Order No. 1920, 187 FERC ¶ 61,068 at P 1678.

[2194] *Id.* P 1678 n.3580.

Docket No. RM21-17-001      - 736 -

highlighted by Competition Coalition, we find that, read in the context of the right-sizing reform, as well as Order No. 1920, these terms are clear, , and we disagree with Competition Coalition that the absence of independent transmission monitor language confirms the need for such an entity in the context of right-sizing.[2195]

881. We grant clarification to Dominion's requests regarding the 200 kV threshold for determining whether a transmission facility is eligible for right-sizing. We clarify that the Commission's finding in Order No. 1920 that the kV threshold must not exceed 200 kV means that transmission providers must include in their in-kind replacement estimates all transmission facilities operating at or above 200 kV that they anticipate replacing in-kind during the next 10 years. We also clarify that transmission providers may establish a threshold *lower* than 200 kV to ensure that a larger number of transmission facilities may be included. Put simply, transmission providers may propose a threshold for all transmission facilities that are eligible to be right-sized, so long as that threshold is under 200 kV.

---

[2195] The Commission will continue to consider potential additional local transmission planning reforms, such as independent transmission monitors, along with other transmission reforms in the future. *See supra* Enhanced Transparency of Local Transmission Planning Inputs in the Regional Transmission Planning Process section.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 2113 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No. RM21-17-001                                           - 737 -

## 2.   Right of First Refusal for Right-Sized Replacement Transmission Facilities Selected to Meet Long-Term Transmission Needs

### a.   Order No. 1920

882.   In Order No. 1920, the Commission required the establishment of a federal right of first refusal for a right-sized replacement transmission facility that is selected to meet Long-Term Transmission Needs.[2196]  In adopting a federal right of first refusal requirement for a right-sized replacement transmission facility, the Commission noted that a federal right of first refusal is an exception to Order No. 1000's general requirement for transmission providers to eliminate any federal right of first refusal for regional transmission facilities selected in a regional transmission plan.[2197]  The Commission explained that requiring a federal right of first refusal for right-sized replacement transmission facilities does not undermine the consideration of more efficient or cost-effective potential transmission solutions proposed at the regional level; rather, the Commission found that it will *promote* the consideration of more efficient or cost-effective potential regional transmission solutions to address Long-Term Transmission Needs.  Further, the Commission explained that, when compared against the alternative of piecemeal development of in-kind replacement transmission facilities, the right-sized replacement transmission facility represents the more efficient or cost-

---

[2196] Order No. 1920, 187 FERC ¶ 61,068 at P 1702; *see also supra* Analysis under Section 206 section.

[2197] *Id.* P 1704 (citing Order No. 1000, 136 FERC ¶ 61,051 at P 313).

Docket No. RM21-17-001                                                          - 738 -

effective regional transmission solution to address Long-Term Transmission Needs

(otherwise it would not be selected).[2198]

883.    Additionally, the Commission explained that, in requiring a federal right of first

refusal for a right-sized replacement transmission facility, Order No. 1000 did not alter

the rights of incumbent transmission providers to build, own, and recover costs for

upgrades to their own transmission facilities, regardless of whether the upgrade is

selected.[2199]

### b.    Requests for Rehearing and Clarification

884.    Certain parties request rehearing of Order No. 1920's establishment of a federal

right of first refusal for a right-sized replacement transmission facility that is selected to

meet Long-Term Transmission Needs, on the grounds that the Commission deviated from

prior precedent without reasoned explanation and, therefore, such requirements are

arbitrary and capricious.[2200]  For example, Advanced Energy states that the Commission

failed to explain how providing for a right of first refusal for right-sized replacement

transmission facilities in Order No. 1920 was consistent with prior Commission findings

---

[2198] *Id.* P 1706.

[2199] *Id.* P 1705 (citing Order No. 1000, 136 FERC ¶ 61,051 at P 319 (internal citation omitted)).

[2200] Advanced Energy Rehearing Request at 15-16; Competition Coalition Rehearing Request at 40-43; Designated Retail Regulators Rehearing Request at 41-42; Industrial Customers Rehearing Request at 9.

Docket No. RM21-17-001                                                      - 739 -

that granting an incumbent utility a federal right of first refusal can lead to rates that are

unjust and unreasonable.[2201]

885.    Advanced Energy further argues that the Commission's provision of a federal

right of first refusal for right-sized replacement transmission facilities is inconsistent with

the general federal policy against anticompetitive practices.[2202]

886.    Relatedly, Advanced Energy, Competition Coalition, and PIOs argue that the

inclusion of a federal right of first refusal as part of the right-sizing reform will create

incentives for incumbent transmission owners to use the local transmission planning

processes to undermine the regional transmission planning process, resulting in less

efficient or cost-effective solutions and, therefore, unjust and unreasonable rates.[2203]  For

instance, Competition Coalition argues that a profit-motivated incumbent transmission

owner will have incentives to add even more in-kind replacements into its local

transmission plan because of the possibility that the transmission planning region will

then right-size those projects into an even larger facility in which the incumbent utility

would be allowed to invest without any competition, thus preserving, reinforcing, and

expanding its monopoly position.[2204]

---

[2201] Advanced Energy Rehearing Request at 16 (citing Order No. 1000-A, 139 FERC ¶ 61,132 at P 360; *FCC v. Fox Television Stations*, 556 U.S. at 515).

[2202] *Id.* at 10-11; *see also* Competition Coalition Rehearing Request at 67-68.

[2203] Advanced Energy Rehearing Request at 13-14; Competition Coalition Rehearing Request at 69-71; PIOs Rehearing Request at 51-54.

[2204] Competition Coalition Rehearing Request at 69-70.

Docket No. RM21-17-001                                                    - 740 -

### c.     Commission Determination

887.    We are unpersuaded by rehearing requests arguing that Order No. 1920's

establishment of a federal right of first refusal for right-sized replacement transmission

facilities selected to meet Long-Term Transmission Needs is arbitrary and capricious.  In

Order No. 1000, the Commission required transmission providers to eliminate federal

rights of first refusal because those federal rights of first refusal allowed transmission

providers to undermine the consideration of more efficient or cost-effective potential

transmission solutions proposed at the regional level, which could lead to unjust and

unreasonable rates for Commission-jurisdictional services.[2205]  Moreover, in Order No.

1000 the Commission found that federal rights of first refusal created a barrier to entry

that discouraged nonincumbent transmission developers from proposing alternative

solutions at the regional level.[2206]

888.    In Order No. 1920, the Commission found that that a right-sized replacement

transmission facility has the potential to both meet an individual transmission provider's

responsibility to maintain the reliability of its existing transmission system and to address

a Long-Term Transmission Need more efficiently or cost-effectively than an in-kind

replacement transmission facility or another Long-Term Regional Transmission

Facility.[2207]  The Commission further explained that, compared to the alternative of

---

[2205] Order No. 1000, 136 FERC ¶ 61,051 at PP 253, 256, 313.

[2206] *Id.* P 257.

[2207] Order No. 1920, 187 FERC ¶ 61,068 at P 1682.

piecemeal development of in-kind replacement transmission facilities, a federal right of

first refusal for right-sized transmission facilities is appropriate because right-sized

replacement transmission facilities represent the more efficient or cost-effective regional

transmission solution to address Long-Term Transmission Needs (otherwise, they would

not be selected).[2208]

889.    We recognize that requiring the federal right of first refusal for right-sized

replacement transmission facilities is a departure from the Order No. 1000's requirement

that transmission providers eliminate federal rights of first refusal for transmission

facilities selected in a regional transmission plan for purposes of cost allocation.

However, we find the departure, in this instance, to be necessary in order to shift the

balance of transmission facility construction and remove a barrier to the selection of more

efficient or cost-effective regional transmission facilities.  As the Commission found, the

existing piecemeal approach to upgrading the transmission system results in

inefficiencies and increased rates for consumers.[2209]  The Commission is improving the

efficiency of the transmission planning process and ensuring rates are just and reasonable

by promoting the consideration of right-sized replacement transmission facilities, subject

to evaluation and selection processes in Long-Term Regional Transmission Planning, and

---

[2208] *Id.* P 1706.

[2209] *Id.* PP 1574, 1706.

by establishing the availability of the federal right of first refusal for such right-sized replacement transmission facilities.[2210]

890.    We sustain Order No. 1920's finding that the right-sizing reform will promote the consideration of more efficient or cost-effective potential regional transmission solutions to address Long-Term Transmission Needs.  Specifically, the federal right of first refusal will provide transmission providers with certainty that they will not lose the opportunity to invest in any in-kind replacement transmission facility that is then selected as a right-sized replacement transmission facility, and this, in turn, will encourage transmission providers to provide their best in-kind replacement estimates.[2211]  Accordingly, we continue to find that a federal right of first refusal will remove a disincentive for transmission providers to consider right-sizing in Long-Term Regional Transmission Planning, helping to ensure that the more efficient or cost-effective regional transmission solution to Long-Term Transmission Needs is identified and selected, and therefore that Commission-jurisdictional rates are just and reasonable.

891.    In Order No. 1920, the Commission explained that, in the context of the right-sizing reform, a federal right of first refusal will *promote* the consideration of more

---

[2210] Although we find that the Commission has supported the inclusion of the right-sizing reforms as a component of a just and reasonable replacement rate, we consider these reforms as an enhancement to, rather than essential to, the Long-Term Regional Transmission Planning process.  Absent the right-sizing reforms, the Commission would have established the other Long-Term Regional Transmission Planning requirements as a sufficient just and reasonable replacement rate.

[2211] Order No. 1920, 187 FERC ¶ 61,068 at P 1703.

efficient or cost-effective potential regional transmission solutions to address Long-Term

Transmission Needs because, absent the right-sizing reform, those needs would be

addressed in a piecemeal manner.[2212]  This will in turn benefit consumers by helping to

ensure that the rates that they pay are just and reasonable.  Furthermore, we believe that

providing a federal right of first refusal for selected right-sized replacement transmission

facilities is consistent with Order No. 1920's finding that the absence of sufficiently long-

term, forward-looking, and comprehensive transmission planning requirements causes

transmission providers to fail to appropriately evaluate the benefits of transmission

infrastructure, and results in piecemeal transmission expansion to address relatively near-

term transmission needs.[2213]  As such, as discussed in the Eligibility section above, we

find that it is appropriate to alter the Commission's policy regarding the removal of the

federal right of first refusal by  providing a federal right of first refusal for selected right-

sized replacement transmission facilities.  This is particularly true because the reforms

that we require here serve a similar purpose as removing the federal right of first refusal

for regional transmission facilities selected in the regional transmission plan for purposes

of cost allocation in Order No. 1000.  In each instance, the Commission's goal was to

ensure that the more efficient or cost-effective regional transmission facilities are

considered, thereby ensuring that Commission-jurisdictional rates are just and reasonable

– in Order No. 1000, that was accomplished by removing the federal right of first refusal

---

[2212] *Id.* P 1706.

[2213] *Id.* P 85.

for selected regional transmission facilities in certain instances, while in Order No. 1920, it was by establishing a federal right of first refusal in the limited instances where it incentivizes transmission providers to consider right-sized replacement transmission facilities as more efficient or cost-effective regional transmission solutions to Long-Term Transmission Needs. The reforms related to the federal right of first refusal in Order Nos. 1000 and 1920 each seek to ensure that more efficient or cost-effective regional transmission facilities are considered thereby resulting in just and reasonable rates. Protecting consumers and ensuring Commission-jurisdictional rates are just and reasonable are fundamental requirements of the Federal Power Act and we believe that the reforms in Order No. 1920 accomplish these mandates.

892. We also note that this federal right of first refusal applies only to selected right-sized replacement transmission facilities, which, absent the right-sizing reform, would likely not otherwise be identified for potential selection in either the existing Order No. 1000 regional transmission planning process or the Long-Term Regional Transmission Planning process. That is because there is currently no requirement for transmission providers to submit their in-kind replacement transmission facilities to the regional transmission planning process for potential right-sizing. In addition, as the Commission explained in Order No. 1920, the right-sizing reform does not alter existing laws related to an individual transmission provider's ability to proceed with an in-kind replacement transmission facility, and we continue to find that, absent a federal right of first refusal, the incumbent transmission provider whose in-kind replacement transmission facility is selected to be right-sized would likely proceed to develop the less efficient or cost-

effective in-kind replacement transmission facility.[2214]  This is because, absent the federal right of first refusal, the incumbent transmission provider would not be assured that it would have the opportunity to invest in the right-sized replacement transmission facility and therefore very likely would chose to build the less efficient or cost-effective in-kind replacement transmission facility.  Therefore, the right-sizing reform's federal right of first refusal provides the needed incentives to ensure that in-kind replacement transmission facilities are considered in the Long-Term Regional Transmission Planning process and selected when they are more efficient or cost-effective transmission solutions while also not substantially reducing the number of transmission facilities that would otherwise be subject to a competitive transmission development process.

893.    We are also unpersuaded by Advanced Energy's arguments that the federal right of first refusal associated with the right-sizing reform is inconsistent with federal policies against anticompetitive practices.  As we note above, given the existing federal rights of first refusal that transmission owners have and that we are not altering here, it is unlikely that right-sized replacement transmission facilities would ever be considered in competitive transmission development processes.  Therefore, we do not believe that the right-sizing reform will significantly decrease competition compared to the status quo.

894.    We are unpersuaded by rehearing requests that argue that the federal right of first refusal associated with the right-sizing reform will create incentives for incumbent transmission providers to use local transmission planning processes to undermine

---

[2214] *Id.* P 1706.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 2122 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No.  RM21-17-001                                                    - 746 -

regional transmission planning processes.  Under Order No. 1920's right-sizing reforms, incumbent transmission owners will have an incentive to identify in-kind replacement transmission facilities that could be right-sized to retain a federal right of first refusal over regional transmission facilities, but that incentive does not undermine the regional transmission planning process.  Instead, it will enhance regional transmission planning by expanding the range of potential regional transmission solutions to Long-Term Transmission Needs considered through Long-Term Regional Transmission Planning, facilitating the identification and selection of more efficient or cost-effective regional transmission facilities and helping to ensure just and reasonable Commission-jurisdictional rates.  Moreover, because Order No. 1920 requires that a right-sized replacement transmission facility be evaluated in the same manner as any other proposed Long-Term Regional Transmission Facility to determine whether it is the more efficient or cost-effective transmission facility to address the transmission need,[2215] a right-sized replacement transmission facility will be selected only where it is the more efficient or cost-effective transmission solution.  As such, there is no guarantee that an in-kind replacement transmission facility that a transmission provider identifies in its in-kind replacement estimates list will be right-sized and selected.  To the extent that the evaluation of a transmission provider's in-kind replacement transmission facility determines that the in-kind replacement transmission facility cannot be right-sized to

---

[2215] *Id.* P 1681.

more efficiently or cost-effectively address Long-Term Transmission Needs, then it will

not be selected as a right-sized replacement transmission facility.

### 3. Confidentiality of In-Kind Replacement Estimates

#### a. Order No. 1920

895.    In Order No. 1920, the Commission explained that to the extent customers or

stakeholders request access to a transmission provider's list of in-kind replacement

estimates, that transmission provider may subject access to that list of in-kind

replacement estimates to confidentiality provisions.  However, the Commission added

that, once transmission providers have determined, as part of Long-Term Regional

Transmission Planning, that an in-kind replacement transmission facility can be right-

sized to constitute a right-sized replacement transmission facility, the transmission

providers must make public the underlying in-kind replacement transmission facility.[2216]

#### b. Requests for Rehearing and Clarification

896.    In their rehearing requests, Dominion and Indicated PJM TOs argue that the

Commission's decision on confidentiality for in-kind replacement estimate lists fails to

adequately address concerns regarding the possible harm caused by release of the in-kind

replacement estimate lists.[2217]  Both Dominion and Indicated PJM TOs argue that

considering the Commission's determination that once a replacement transmission

---

[2216] Order No. 1920, 187 FERC ¶ 61,068 at P 1736.

[2217] Dominion Rehearing Request at 36-37; Indicated PJM TOs Rehearing Request
at 6-7.

USCA4 Appeal: 24-1650   Doc: 224      Filed: 01/21/2025    Pg: 2124 of 2455
Document Accession #: 20241121-3139     Filed Date: 11/21/2024

Docket No.  RM21-17-001                                           - 748 -

facility can be right-sized, that information will be made publicly available to
stakeholders, there is limited value in providing the in-kind replacement estimate list to
others.[2218]

897.    Further, Indicated PJM TOs argue that confidentiality agreements or provisions do
not provide adequate protection against the damage of disclosure of in-kind replacement
estimate lists since non-disclosure agreements do not impose any specific safeguards on
the information disclosed.[2219]  Indicated PJM TOs note that the Commission's general
Non-Disclosure Agreement for CEII provides that violations of that agreement "may
result in criminal or civil sanctions" against the recipient, and the Commission's Model
Protective Order provides that "[a]ny violation of this Protective Order and of any Non-
Disclosure Certificate executed hereunder shall constitute a violation of an order of the
Commission."[2220]  Indicated PJM TOs argue that the requirement that a transmission
owner make public 10-years' worth of replacement information before transmission plans
are made public as part of the Long-Term Regional Transmission Planning process gives

---

[2218] Dominion Rehearing Request at 36-37; Indicated PJM TOs Rehearing Request
at 7-8.

[2219] Indicated PJM TOs Rehearing Request at 8-9.

[2220] *Id.* at 9 (citing FERC, CEII General Non-Disclosure Agreement (Apr. 19,
2020), https://www.ferc.gov/media/1928; FERC, Model Protective Order (May 11,
2020), available at https://www.ferc.gov/administrative-litigation-0).

Docket No. RM21-17-001                                              - 749 -

competing developers a competitive advantage that is inconsistent with the FPA's

prohibition on undue discrimination and preferences.[2221]

### c.    Commission Determination

898.    In response to Dominion's and Indicated PJM TOs' arguments regarding the

possible harm caused by release of the in-kind replacement estimate lists, we continue to

find that existing rules governing confidential or commercially sensitive information

provide for the safekeeping of that information.  We note that Order No. 890 required

transmission providers, in consultation with affected parties, to develop mechanisms like

confidentiality agreements and password-protected access to information, in order to

manage confidentiality and CEII concerns.[2222]  To the extent that transmission providers

believe that existing provisions are inadequate, they may submit an FPA section 205

filing with additional protections, and the Commission will evaluate them to ensure they

are just and reasonable and otherwise comply with the applicable requirements.

Moreover, in determining that disclosure of in-kind replacement estimate lists may occur

subject to confidentiality provisions, the Commission balanced concerns about disclosure

against the importance of transparency and meaningful stakeholder participation in

regional transmission planning and cost allocation processes, as required under Order

Nos. 890 and 1000.  We continue to find, consistent with prior precedent, that disclosure

---

[2221] *Id.* at 10.

[2222] Order No. 890, 118 FERC ¶ 61,119 at P 460.

subject to appropriate mechanisms for confidentiality strikes an appropriate balance

between these interests.[2223]

## XII. Interregional Transmission Coordination

### A. Order No. 1920

899.    In Order No. 1920, the Commission required transmission providers in each

transmission planning region to revise their existing interregional transmission

coordination procedures to reflect the Long-Term Regional Transmission Planning

reforms adopted in Order No. 1920. More specifically, the Commission required

transmission providers in neighboring transmission planning regions to revise their

existing interregional transmission coordination procedures (and regional transmission

planning processes, as needed) to provide for: (1) the sharing of information regarding

their respective Long-Term Transmission Needs, as well as Long-Term Regional

Transmission Facilities to meet those needs; and (2) the identification and joint

evaluation of interregional transmission facilities that may be more efficient or cost-

effective transmission facilities to address Long-Term Transmission Needs.[2224]

---

[2223] *Tri-State Generation & Transmission Ass'n*, 170 FERC ¶ 61,222, at P 27 (2020); *see also Astoria Generating Co. v. N.Y. Indep. Sys. Operator, Inc.*, 136 FERC ¶ 61,155, at PP 21-25 (2011) (adopting protective order and directing respondent to file confidential information and simultaneously release the information to parties who signed non-disclosure certificate); *Pac. Gas Transmission Co.*, 44 FERC ¶ 61,209, at 61,766-67 (1988) (remanding matter to administrative law judge with direction to balance potential harm of disclosing confidential business information sought during discovery against the requesting parties' need for the information).

[2224] Order No. 1920, 187 FERC ¶ 61,068 at P 1751.

Additionally, the Commission required transmission providers in neighboring

transmission planning regions to revise their interregional transmission coordination

procedures (and regional transmission planning processes, as needed) to allow an entity

to propose an interregional transmission facility in the regional transmission planning

process as a potential solution to Long-Term Transmission Needs.[2225]

900.    The Commission also required transmission providers in each transmission

planning region to provide certain additional information concerning Long-Term

Regional Transmission Planning on their public websites or through the email list used

for communication of information related to interregional transmission coordination

procedures.[2226]

### B.    Comments

901.    In its comments, Grid United argues that Order No. 1920 does not solve the

challenges of developing transmission, including interregional transmission, and requests

that the Commission open a new proceeding focused on interregional transmission and its

challenges.[2227]

### C.    Commission Determination

902.    Although we acknowledge Grid United's request that the Commission continue to

build upon the progress in Order No. 1920 for regional transmission planning by

---

[2225] *Id.* P 1752.

[2226] Order No. 1920, 187 FERC ¶ 61,068 at P 1753.

[2227] Grid United June 12, 2024 Comments at 1-2.

USCA4 Appeal: 24-1650   Doc: 224   Filed: 01/21/2025   Pg: 2128 of 2455
Document Accession #: 20241121-3139      Filed Date: 11/21/2024

Docket No.  RM21-17-001                                                      - 752 -

addressing interregional transmission, we decline to open a new docket at this time, as requested by Grid United.[2228]  We find that Order No. 1920 adequately addressed the interregional transmission coordination reforms needed to account for the rule's Long-Term Regional Transmission Planning reforms.[2229]  In particular, we continue to find that the reforms in Order No. 1920, taken together, will ensure that Long-Term Transmission Needs identified through Long-Term Regional Transmission Planning can be considered in existing interregional transmission coordination and cost allocation processes, and that there is an opportunity for transmission providers in neighboring transmission planning regions to consider whether there are interregional transmission facilities that could more efficiently or cost-effectively address the identified Long-Term Transmission Needs, helping to ensure just and reasonable Commission-jurisdictional rates.[2230]  Furthermore, as the Commission found in Order No. 1920, and we reiterate here, the Commission currently has an open proceeding in Docket No. AD23-3-000 to consider whether and how to establish a minimum requirement for Interregional Transfer Capability including the transmission planning and cost allocation related to such a requirement.[2231]  To the

---

[2228] As noted above, the pleading filed by Grid United is deficient under 18 CFR 385.712(c)(2).  Nevertheless, we address Grid United's arguments to provide clarity.  *See infra* Introduction and Background section.

[2229] Order No. 1920, 187 FERC ¶ 61,068 at PP 1740-1758.

[2230] *Id.* P 1754.

[2231] *See* Supplemental Notice of Staff-Led Workshop, *Establishing Interregional Transfer Capability Transmission Planning and Cost Allocation Requirements*, Docket No. AD23-3-000 (Nov. 30, 2022).

extent that the Commission determines that further investigation of this issue is warranted, it can open a new docket at an appropriate time or consider such issues in pending proceedings,[2232] as appropriate.

## XIII. Compliance Procedures

### A. Order No. 1920

903. In Order No. 1920, the Commission required each transmission provider to submit a compliance filing revising its OATT and other document(s) subject to the Commission's jurisdiction as necessary to demonstrate that it meets all of the requirements adopted in Order No. 1920, except those adopted in the Interregional Transmission Coordination section above, within 10 months of the effective date of Order No. 1920. The Commission explained that a 10-month compliance period allows transmission providers to fully develop proposals to comply with Order No. 1920 and allows stakeholders, including Relevant State Entities, to meaningfully engage in the process of developing such proposals. Additionally, the Commission required transmission providers in each transmission planning region to propose an effective date for the OATT revisions necessary to comply with Order No. 1920 that is no later than the date on which they will commence the first Long-Term Regional Transmission Planning

---

[2232] *See* Order No. 1920, 187 FERC ¶ 61,068 at P 1758 ("[W]e note that the Commission currently has an open proceeding in Docket No. AD23-3-000 to consider whether and how to establish a minimum requirement for Interregional Transfer Capability, and may consider further reforms in other proceedings, as appropriate.").

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 2130 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No.  RM21-17-001                                                          - 754 -

cycle.[2233]  The Commission noted, however, that transmission providers may propose an earlier effective date for some or all parts of their revised OATTs to allow them to begin implementing any aspects of the required reforms sooner than the one-year deadline to commence the first Long-Term Regional Transmission Planning cycle.[2234]

904.    The Commission further required each transmission provider to submit a compliance filing revising its OATT and other document(s) subject to the Commission's jurisdiction as necessary to demonstrate that it meets the interregional transmission coordination requirements within 12 months of the effective date of Order No. 1920.  The Commission explained that a longer compliance timeframe will allow transmission providers to coordinate with the transmission providers in each of their neighboring transmission planning regions to develop interregional transmission coordination proposals.[2235]

905.    Additionally, the Commission required transmission providers that are not public utilities to adopt the requirements of Order No. 1920 as a condition of maintaining the

---

[2233] Order No. 1920, 187 FERC ¶ 61,068 at P 1768.  The Commission noted that Order No. 1920 required transmission providers in each transmission planning region to propose on compliance a date, no later than one year from the date on which initial filings to comply with Order No. 1920 are due, on which they will commence the first Long-Term Regional Transmission Planning cycle (unless additional time is needed to align the first Long-Term Regional Transmission Planning cycle with existing transmission planning cycles).  *Id.*

[2234] *Id.* P 1768.

[2235] *Id.* P 1770.

status of their safe harbor tariffs or otherwise satisfying the reciprocity requirement of Order No. 888.[2236]

906.    Finally, in Order No. 1920, the Commission explained that it made no changes to the standards used to judge requested variations, as described in Order Nos. 888, 2000, 890, and 1000 and, accordingly, declined a request to apply the independent entity variation standard, rather than the "consistent with or superior to" standard, for proposed deviations from the requirements of Order No. 1920.[2237]  The Commission stated that, consistent with findings in Order No. 890, the Commission will continue to apply the "consistent with or superior to" standard in the context of transmission planning.[2238]  The Commission explained that, to the extent that a transmission provider believes that it already complies with any of the requirements in Order No. 1920, it should describe in its compliance filing how the relevant requirements are satisfied, including by referencing specific tariff sheets already on file with the Commission.[2239]

---

[2236] *Id.* P 1771 (citing Order No. 888, FERC Stats. & Regs. ¶ 31,036 at 31,760-63).

[2237] *Id.* P 1772 (citing Order No. 888, FERC Stats. & Regs. ¶ 31,036, at 31,769-70; Order No. 2000, FERC Stats. & Regs. ¶ 31,089 at 31,164; Order No. 890, 118 FERC ¶ 61,119 at P 109; Order No. 1000, 136 FERC ¶ 61,051 at P 815).

[2238] *Id.* P 1772 (citing Order No. 890, 118 FERC ¶ 61,119 at P 160).

[2239] *Id.* P 1773.

### B.     Requests for Rehearing and Clarification

907.    Dominion and NARUC request rehearing of Order No. 1920's compliance

timeframes.[2240]   Dominion argues that the Commission failed to consider that many of the

same personnel responsible for implementing Order No. 2023 are also responsible for

managing the implementation of Order No. 1920's requirements.[2241]   NARUC asserts that

Order No. 1920's 10-month compliance deadline is insufficient to allow state entities to

meaningfully engage on developing cost allocation proposals given existing state retail

regulatory duties, the steep learning curve on issues related to Order No. 1920, and

internal legal and procedural issues they will need to sort through.   NARUC suggests that

the record justifies a 14-month compliance period.[2242]

908.    Dairyland and PJM request rehearing of Order No. 1920's requirement that

transmission providers demonstrate proposed deviations from the requirements of Order

No. 1920 are "consistent with or superior to" the requirements of Order No. 1920.[2243]

Both Dairyland and PJM request that the Commission adopt an independent entity

variation standard for compliance with the final rule.   Dairyland argues that the

Commission failed to consider information and arguments submitted in support of the

---

[2240] Dominion Rehearing Request at 37-39; NARUC Rehearing Request at 18-21.

[2241] Dominion Rehearing Request at 38 (citing *State Farm*, 463 U.S. at 43).

[2242] NARUC Rehearing Request at 20-21.

[2243] Dairyland Rehearing Request at 3-7; PJM Rehearing Request at 10-14.

independent entity variation[2244] and made no attempt to explain why the precedent of
Order No. 2003, which identified bases for a different compliance standard for
independent entities, is distinguishable or should not be used here.[2245]  Along similar
lines, PJM argues that aspects of Order No. 1920 are arbitrary and capricious
because:  (1) the final rule is internally inconsistent given the Commission's recognition
of the need for regional flexibility while also including "numerous prescriptive
requirements" and rejecting requests to apply an "independent entity variation" standard
of review and instead applying the "consistent with or superior to" standard for proposed
deviations from the final rule;[2246] and (2) the Commission failed to consider the evidence
offered by ISO/RTOs that they need flexibility to implement Long-Term Regional
Transmission Planning.[2247]

909.    APPA and TAPS request clarification of Order No. 1920's requirements for
consultation with stakeholders.[2248]  APPA requests that the Commission clarify that
transmission providers have an obligation to consult with stakeholders—including public
power entities and load-serving entities—in developing compliance filings.[2249]  TAPS

---

[2244] Dairyland Rehearing Request at 4.

[2245] *Id.* at 3-4, 6-7; *see also* PJM Rehearing Request at 13 n.60.

[2246] PJM Rehearing Request at 10-11, 41; *see also* Dairyland Rehearing Request at
7.

[2247] PJM Rehearing Request at 11-14, 42.

[2248] APPA Rehearing Request at 6-7; TAPS Rehearing Request at 14-19.

[2249] APPA Rehearing Request at 7.

Docket No.  RM21-17-001                                              - 758 -

requests the Commission to clarify that Order No. 1000's general obligation to consult with stakeholders in developing the associated transmission provider's compliance filing applies to all aspects of Order No. 1920 compliance filings, including the evaluation process, selection criteria, and the calculation of benefits.[2250]

910.    In its rehearing request, Large Public Power argues that the Commission should clarify that non-public utilities can satisfy the reciprocity requirement of Order No. 888 through one of three means: (1) providing service to a public utility transmission provider under a safe harbor tariff; (2) providing service under a bilateral agreement; or (3) seeking waiver.[2251]

911.    SPP requests clarification from the Commission that SPP can deviate from the specific requirements of Order No. 1920 and propose its own Consolidated Planning Process.  SPP requests that the Commission clarify that a transmission provider may propose on compliance a new transmission planning process and cost allocation method that deviates from the requirements of Order No. 1920, and that the Commission could issue an order approving such a cost allocation process as consistent with or superior to the requirements of Order No. 1920.[2252]

912.    WIRES states that the Commission should grant clarification or, in the alternative, rehearing, that transmission providers are not required to implement the proposed tariff

---

[2250] TAPS Rehearing Request at 18-19.

[2251] Large Public Power Rehearing Request at 23-24.

[2252] SPP Rehearing Request at 2-4.

revisions submitted in compliance with Order No. 1920 until the Commission issues "a final order on compliance."[2253]  WIRES states that Order No. 1920 could be read to create a scenario where transmission providers would be required to begin implementing their OATT provisions submitted in compliance with the requirements of Order No. 1920 *before* receiving a Commission order on compliance accepting such revised Tariff provisions.  WIRES argues that this would put transmission providers in the untenable position of expending a significant amount of time and resources in implementing Long-Term Regional Transmission Planning cycles that the Commission could find in a later order are not compliant with Order No. 1920.[2254]

913.    Versant Power requests that the Commission clarify, or in the alternative grant rehearing, regarding:  (1) what is generally required for a transmission provider to receive a waiver of Order No. 1920's requirements; and (2) whether and how waivers of previous, relevant orders affect Order No. 1920's requirements for transmission providers with those waivers.[2255]

### C.    Commission Determination

914.    We sustain Order No. 1920's requirement that each transmission provider submit a compliance filing within 10 months of the effective date of Order No. 1920 revising its

---

[2253] WIRES Rehearing Request at 5-6, 16-18.

[2254] WIRES Rehearing Request at 16-18.

[2255] Versant Power Rehearing Request at 9-16.  Versant Power notes that its request for clarification may be withdrawn because of a separate waiver filing.  *Id.* at 1 n.4.  Versant Power withdrew its rehearing request on September 10, 2024.

Docket No. RM21-17-001                                                    - 760 -

OATT and other document(s) subject to the Commission's jurisdiction as necessary to demonstrate that it meets the requirements adopted in Order No. 1920, except those requirements adopted in the Interregional Transmission Coordination section above. As we noted in Order No. 1920, we continue to find that a 10-month compliance period will allow transmission providers adequate time to fully develop proposals to comply with Order No. 1920.[2256]  We also sustain Order No. 1920's requirement that each transmission provider submit a separate compliance filing within 12 months of the effective date of Order No. 1920 revising its OATT and other document(s) subject to the Commission's jurisdiction as necessary to demonstrate that it meets the interregional transmission coordination requirements adopted in Order No. 1920.[2257]  Nevertheless, as noted above in the Duration of the Engagement Period section above, if we grant an extension of the required Engagement Period when Relevant State Entities make a showing that they require additional time to finalize cost allocation discussions, we will also, as appropriate, extend, *sua sponte*, the relevant Order No. 1920 compliance deadlines to ensure that any extension of the Engagement Period would not conflict with the required compliance deadlines.

915.    We clarify that the effective date associated with this order on rehearing and clarification does not extend the relevant compliance deadlines associated with Order No. 1920.  In calculating the required dates for compliance filings (e.g., 10 months for

---

[2256] Order No. 1920, 187 FERC ¶ 61,068 at P 1768.

[2257] *Id.* P 1770.

USCA4 Appeal: 24-1650   Doc: 224      Filed: 01/21/2025    Pg: 2137 of 2455
Document Accession #: 20241121-3139      Filed Date: 11/21/2024

Docket No.  RM21-17-001                                              - 761 -

revisions to a transmission provider's OATT and other document(s) subject to the
Commission's jurisdiction as necessary to demonstrate that it meets the requirements
adopted in Order No. 1920, and 12 months for revisions to a transmission provider's
OATT and other document(s) subject to the Commission's jurisdiction as necessary to
demonstrate that it meets the interregional transmission coordination requirements
adopted in Order No. 1920), transmission providers should use the effective date of Order
No. 1920 (i.e., August 12, 2024) and not the effective date for the changes to Order No.
1920 made in this order on rehearing and clarification.

916.    We are unpersuaded by Dominion's and NARUC's arguments that the
Commission should require a longer compliance period.  We note that in Order No. 1920
the Commission modified the NOPR proposal for an eight-month compliance period to
allow an additional two months.[2258]  While we appreciate Dominion's concerns regarding
personnel responsible for implementing both Order Nos. 1920 and 2023, we believe that
we have provided sufficient time for transmission providers to develop compliance
filings.

917.    We also sustain Order No. 1920's requirement that, consistent with the
Commission's findings in Order No. 890, transmission providers must demonstrate that
proposed deviations from the requirements of Order No. 1920 are "consistent with or
superior to" the requirements in Order No. 1920.[2259]

---

[2258] *Id.* P 1768.

[2259] *Id.* P 1772 (citing Order No. 890, 118 FERC ¶ 61,119 at P 160).

918.    We disagree with Dairyland's assertion that the Commission's use of the

"consistent with or superior to" standard in Order No. 1920 is an unexplained departure

from Commission precedent.[2260]  To the contrary, in Order No. 1920, the Commission

made no changes to the standard used to judge requested variations in the context of

transmission planning, including in Order Nos. 888, 2000, 890, and 1000,[2261] and instead

followed precedent in applying the "consistent with or superior to" standard of review to

proposed new and existing variations from its transmission planning and cost allocation

requirements.[2262]  Rather, allowing for the use of the independent entity variation

standard of review in this proceeding, as Dairyland and PJM request, would be a

departure from this line of precedent and an importation of the independent entity

variation standard from the interconnection context into the transmission planning

context that would require further explanation.[2263]  As discussed below, neither Dairyland

nor PJM justify such a departure.

919.    Further, we disagree with PJM's and Dairyland's claims that Order No. 1920 is

internally inconsistent because it recognizes the need for regional flexibility while also

including prescriptive requirements without allowing for independent entity

---

[2260] Dairyland Rehearing Request at 3, 6.

[2261] Order No. 1000, 136 FERC ¶ 61,051 at P 815; Order No. 890, 118 FERC ¶
61,119 at P 109; Order No. 2000, FERC Stats. & Regs. ¶ 31,089 at 31,164; Order No.
888, FERC Stats. & Regs. ¶ 31,036, at 31,769-70.

[2262] Order No. 1920, 187 FERC ¶ 61,068 at P 1772.

[2263] *See FCC v. Fox Television Stations, Inc.*, 556 U.S. at 515.

USCA4 Appeal: 24-1650    Doc: 224        Filed: 01/21/2025    Pg: 2139 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No.  RM21-17-001                                                              - 763 -

variations.[2264]  In a number of areas, Order No. 1920 provides transmission providers

with the flexibility to accommodate regional differences, and this flexibility can be

incorporated into the regional transmission planning requirements.[2265]  Although in other

areas the Commission provided less flexibility, we believe that the Commission struck a

reasonable overall balance in Order No. 1920 between, on the one hand, transmission

providers' need for flexibility in implementing Long-Term Regional Transmission

Planning in their transmission planning regions and, on the other hand, ensuring that

transmission providers adopt reforms that will result in transmission providers

identifying, evaluating, and selecting more efficient or cost-effective regional

transmission facilities to address Long-Term Transmission Needs and thus Commission-

jurisdictional rates that are just and reasonable and not unduly discriminatory or

preferential.[2266]

920.    We are unpersuaded by PJM's and Dairyland's arguments that the rationale for

application of the independent entity variation standard to RTOs/ISOs in the

---

[2264] PJM Rehearing Request at 11-12; Dairyland Rehearing Request at 7.

[2265] For example, Order No. 1920 provides for flexibility such as:  (1) allowing
transmission providers to measure and use additional benefits in Long-Term Regional
Transmission Planning; (2) allowing transmission providers to develop evaluation
processes and selection criteria that can accommodate regional differences; and (3)
declining to impose a selection requirement as transmission providers require the
flexibility to balance competing interests in the transmission planning region and to
exercise engineering judgment to ensure the reliable operation of the transmission system
and compliance with a variety of regulatory requirements.  *See* Order No. 1920, 187
FERC ¶ 61,068 at PP 729, 924, 1027.

[2266] Order No. 1920, 187 FERC ¶ 61,068 at P 237.

interconnection context in Order No. 2003 applies equally to the circumstances of Order No. 1920.[2267]   The requirements of Order No. 2003 were established to achieve greater standardization of interconnection terms and conditions and to address evidence of undue discrimination in interconnection processes.[2268]   The Commission granted independent entities greater flexibility to deviate from the provisions of the *pro forma* OATT on the basis that these entities do not own generation and therefore face fewer incentives to act in an unduly discriminatory or preferential manner toward certain generators.[2269]   That rationale does not apply to the requirements in Order No. 1920, which were adopted to address deficiencies in regional transmission planning processes, as those processes fail to identify, evaluate, and select regional transmission facilities that can more efficiently or cost-effectively meet Long-Term Transmission Needs and therefore to ensure just and

---

[2267] PJM Rehearing Request at 13 n.60 (citing *Standardization of Generator Interconnection Agreements & Procs.*, Order No. 2003, 68 FR 49846 (Aug. 19, 2003), 104 FERC ¶ 61,103 (2003), *order on reh'g*, Order No. 2003-A, 69 FR 15932 (Mar. 26, 2004), 106 FERC ¶ 61,220, at PP 756, 759, *order on reh'g*, Order No. 2003-B, 70 FR 265 (Jan. 4, 2005), 109 FERC ¶ 61,287 (2004), *order on reh'g*, Order No. 2003-C, 70 FR 37661 (June 30, 2005), 111 FERC ¶ 61,401 (2005), *aff'd sub nom. Nat'l Ass'n of Regul. Util. Comm'rs v. FERC*, 475 F.3d 1277; *Improvements to Generator Interconnection Procs. & Agreements*, Order No. 2023, 88 FR 61014 (Sept. 6, 2023), 184 FERC ¶ 61,054, at P 1764, *order on reh'g*, 185 FERC ¶ 61,063 (2023), *order on reh'g*, Order No. 2023-A, 89 FR 27006 (Apr. 16, 2024), 186 FERC ¶ 61,199, *errata notice*, 188 FERC ¶ 61,134 (2024)); Dairyland Rehearing Request at 5, 6 (citing MISO NOPR Reply Comments at 5-8).

[2268] Order No. 2003, 104 FERC ¶ 61,103 at PP 11-12.

[2269] *Id.* PP 822, 827; Order No. 2003-A, 106 FERC ¶ 61,220 at P 759.

reasonable rates.[2270]  The need for regional transmission planning processes that meet the Commission's requirements in Order No. 1920 applies to all transmission providers to the same extent regardless of their independence or complexity.  Beyond noting the independence and complexity of RTOs/ISOs, neither PJM nor Dairyland have justified or offered evidence of why RTOs/ISOs should be treated differently than other transmission providers for purposes of compliance with Order No. 1920's requirements.

921.    However, in light of PJM's and Dairyland's arguments, we clarify that, in analyzing Order No. 1920 compliance filings, we will apply the "consistent with or superior to" standard to proposed variations from *all* requirements of Order No. 1920 and not limit the standard to proposed variations from *pro forma* OATT provisions developed in Order No. 1920.  Consistent with Commission practice,[2271] it is appropriate to apply

---

[2270] *See* Order No. 1920, 187 FERC ¶ 61,068 at PP 87, 89.

[2271] *See, e.g.*, *Pub. Util. Transmission Rate Changes to Address Accumulated Deferred Income Taxes*, Order No. 864, 84 FR 65281 (Nov. 27, 2019), 169 FERC ¶ 61,139, at P 66 n.101 (2019), *order on reh'g*, Order No. 864-A, 85 FR 27681 (May 11, 2020), 171 FERC ¶ 61,033 (2020); *Uplift Cost Allocation & Transparency in Mkts. Operated by Reg'l Transmission Orgs. & Indep. Sys. Operators*, Order No. 844, 83 FR 18134 (Apr. 25, 2018), 163 FERC ¶ 61,041, at P 103 (2018); *Settlement Intervals & Shortage Pricing in Mkts. Operated by Reg'l Transmission Orgs. & Indep. Sys. Operators*, Order No. 825, 81 FR 42882 (June 30, 2016), 155 FERC ¶ 61,276, at PP 88, 90 (2016); Order No. 1000, 136 FERC ¶ 61,051 at P 583 n.452; *Demand Response Comp. in Organized Wholesale Energy Mkts.*, 76 FR 16658 (Mar. 24, 2011), Order No. 745, 134 FERC ¶ 61,187, at P 4 n.7; *order on reh'g & clarification*, Order No. 745-A, 137 FERC ¶ 61,215 (2011), *reh'g denied*, Order No. 745-B, 138 FERC ¶ 61,148 (2012), *vacated sub nom. Elec. Power Supply Ass'n v. FERC*, 753 F.3d 216 (D.C. Cir. 2014), *rev'd & remanded sub nom. EPSA*, 577 U.S. 260; *Regional Transmission Orgs.*, Order No. 2000, 65 FR 810 (Jan. 6, 2000), FERC Stats. & Regs. ¶ 31,089, at 31,164 (1999) (amending 18 CFR 35.34(k)(1)-(2), (k)(4), (k)(6)-(7)), *order on reh'g*, Order No. 2000-A, 65 FR 12088 (Mar. 8, 2000), FERC Stats. & Regs. ¶ 31,092 (2000), *aff'd sub*

the "consistent with or superior to" standard both to variations from *pro forma* OATT

provisions and to variations from requirements not accompanied by *pro forma* OATT

provisions (i.e., those requirements that transmission providers must satisfy by

developing or revising their own OATT provisions).  The "consistent with or superior to"

standard "is a tool for ensuring that a proposed tariff revision will still meet the standards

of the FPA" despite varying from the "minimum provisions necessary" to ensure just,

reasonable, and not unduly discriminatory or preferential Commission-jurisdictional

rates.[2272]  Both *pro forma* OATT provisions and requirements not accompanied by *pro*

*forma* OATT provisions set "common starting point[s]"[2273] to ensure that Commission-

jurisdictional rates satisfy the requirements of the FPA.  The Commission will review

proposed variations from requirements established in Order No. 1920 to ensure that they

continue to meet the requirements of FPA sections 205 and 206.

---

*nom. Pub. Util. Dist. No. 1 of Snohomish Cty. v. FERC*, 272 F.3d 607 (D.C. Cir. 2001).

[2272] *N.Y. State Elec. & Gas Corp.*, 78 FERC ¶ 61,114 (1997), *order on reh'g*, 82 FERC ¶ 61,209, at 61,822 n.4 (1998) (rejecting proposed deviations from the *pro forma* OATT and explaining that the "consistent with or superior to" inquiry does not impermissibly supplant or narrow the "just and reasonable" standard; rather, it evaluates whether a proposed deviation from the "common starting point" set out in a rule is consistent with or superior to that "common starting point" and therefore remains just and reasonable); *Commonwealth Edison Co.*, 83 FERC ¶ 61,274, at 62,143 (1998) (citing *N.Y. State Elec. & Gas Corp.*, 82 FERC at 61,822 & n.4).  *See also Xcel Energy Servs. Inc. v. FERC*, 41 F.4th 548, 557-58 (D.C. Cir. 2022) (explaining that the Commission has used its "broad discretion" to craft the "consistent with or superior to" standard to assess whether proposed deviations are just, reasonable, and not unduly discriminatory).

[2273] *N.Y. State Elec. & Gas Corp.*, 82 FERC at 61,822 n.4.

922.    In response to SPP's clarification request regarding its own Consolidated Planning

Process, we reiterate that Order No. 1920 requires transmission providers to demonstrate

that proposed deviations from Order No. 1920 are "consistent with or superior to" the

requirements in Order No. 1920.[2274]  To the extent that a transmission provider, like

SPP, believes that its existing practices or potential provisions submitted as part of its

compliance filing deviate from Order No. 1920's requirements, it must demonstrate that

any such deviations, including any existing processes or OATT provisions, are consistent

with or superior to the requirements of Order No. 1920.

923.    We grant APPA's and TAPS' requests for clarification on the role of stakeholders

in developing transmission providers' compliance filings.  Specifically, we clarify that

transmission providers must consult with their stakeholders to develop the processes,

procedures, and OATT revisions necessary to comply with Order No. 1920.[2275]  We

note that this requirement is consistent with the approach that the Commission took in

Order Nos. 890 and 1000.[2276]

924.    We grant Large Public Power's clarification request regarding reciprocity.  Order

No. 1920 required that transmission providers that are not public utilities must adopt the

---

[2274] Order No. 1920, 187 FERC ¶ 61,068 at P 1772.

[2275] We note that the requirement for transmission providers to consult with
stakeholders to develop their compliance filings is separate from and in addition to Order
No. 1920's requirement for transmission providers to conduct an Engagement Period for
Relevant State Entities, as discussed in the Cost Allocation section above.

[2276] *See., e.g.*, Order No. 890, 118 FERC ¶ 61,119 at P 582; Order No. 1000, 136
FERC ¶ 61,051 at PP 151, 206, 227, 336, 588, 793.

Docket No. RM21-17-001                                        - 768 -

requirements of Order No. 1920 as a condition of maintaining the status of their safe

harbor tariffs or otherwise satisfy the reciprocity requirement of Order No. 888.[2277]  As

relevant to Large Public Power's clarification request, Order No. 888 provides that a non-

public transmission provider may satisfy the reciprocity condition in one of three ways:

(1) it may provide service under a tariff that has been approved by the Commission under

the voluntary "safe harbor" provision of the *pro forma* OATT; (2) it may provide service

to a public utility transmission provider under a bilateral agreement; or (3) it may seek a

waiver of the reciprocity condition from the transmission provider.[2278]

925.    Issues concerning effective dates are most appropriately addressed in specific

compliance proceedings and, therefore, we decline to grant WIRES' clarification request.

However, as explained in the Implementation of Long-Term Regional Transmission

Planning section above, we set aside, in part, Order No. 1920's requirement that

transmission providers in each transmission planning region must propose on compliance

a date, no later than one year from the date on which initial filings to comply with the

final rule are due, on which they will commence the first Long-Term Regional

Transmission Planning cycle[2279] and instead require transmission providers to propose on

compliance a date, no later than *two* years from the date on which initial filings to comply

---

[2277] Order No. 1920, 187 FERC ¶ 61,068 at P 1771 (citing Order No. 888, FERC Stats. & Regs. ¶ 31,036 at 31,760-63).

[2278] Order No. 888, FERC Stats. & Regs. ¶ 31,036 at 31,760-63.

[2279] Order No. 1920, 187 FERC ¶ 61,068 at P 1072.

with Order No. 1920 are due, on which they will commence the first Long-Term

Regional Transmission Planning cycle.  Because we sustain Order No. 1920's

requirement that transmission providers must propose an effective date for the OATT

revisions necessary to comply with Order No. 1920 that is no later than the date on which

they will commence the first Long-Term Regional Transmission Planning cycle,[2280] we

note that this modification should help to address WIRES' concern.

926.    We note that Versant Power's rehearing request has been withdrawn.[2281]

Nevertheless, we clarify that, consistent with Order No. 890 and Order No. 1000, entities

that have existing waivers of the obligation to file an OATT or otherwise offer open

access transmission service in accordance with Order No. 888, as well as entities that

have been granted waiver of the regional transmission planning requirements of Order

No. 1000, do not also have to seek waiver of Order No. 1920.[2282]  This clarification,

---

[2280] Order No. 1920, 187 FERC ¶ 61,068 at P 1768.

[2281] *See* Versant Power September 10, 2024 Notice of Withdrawal.  Pursuant to Rule 216 of the Commission's Rules of Practice and Procedure, the withdrawal of any pleading is effective at the end of 15 days from the date of the filing if no motion in opposition to the notice of withdrawal is filed within that period and if the Commission takes no action disallowing withdrawal.  18 CFR 385.216.  No motion in opposition to Versant Power's Notice of Withdrawal has been filed, and its request for rehearing accordingly is withdrawn.

[2282] Order No. 1000-A, 139 FERC ¶ 61,132 at P 753 & n.880 (2012); *see also* Order No. 890, 118 FERC ¶ 61,119 at P 135 n.105 ("The Commission clarifies that existing waivers of the obligation to file an OATT or otherwise offer open access transmission service in accordance with Order No. 888 shall remain in place. The reforms to the pro forma OATT adopted in this Final Rule therefore do not apply to transmission providers with such waivers, although we expect those transmission providers to participate in the regional planning processes in place in their regions, as discussed in more detail in section V.B. Whether an existing waiver of OATT requirements should be

Docket No.  RM21-17-001                                                                    - 770 -

however, is not meant to affect the ability of an entity that does not have an existing

waiver to seek one.  The Commission will consider requests for waiver of Order No.

1920 on a case-by-case basis from any entity that believes it meets the criteria for such

waiver.

## XIV.  Overarching Logical Outgrowth Challenges

### A.    Requests for Rehearing

927.    Several rehearing parties argue broadly that Order No. 1920 is not a logical

outgrowth of the NOPR and therefore violates the notice-and-comment requirements of

the APA.[2283]  Arizona Commission asserts that the Commission failed to provide notice

of and opportunity to comment on six "fundamental" changes between the NOPR and

Order No. 1920 and that, because such changes are not logical outgrowths of the NOPR,

the Commission violated the APA's notice-and-comment requirements, rendering Order

No. 1920 unlawful.[2284]  Specifically, Arizona Commission alleges that Order No. 1920,

unlike the NOPR:  (1) imposed preferential and corporate-driven costs on consumers in

non-consenting states by requiring the filing of one or more *ex ante* cost allocation

methods to apply to selected Long-Term Transmission Facilities; (2) mandated a specific

---

revoked will be considered on a case-by-case basis in light of the circumstances
surrounding the particular transmission provider.").

[2283] Arizona Commission Rehearing Request at 18-19 (citing 5 U.S.C. 706(2)(A),
(C), (D)); Designated Retail Regulators Rehearing Request at 44, 49 (citing 5
U.S.C. 553); NRECA Rehearing Request at 6, 19 (citing 5 U.SC. 553).

[2284] Arizona Commission Rehearing Request at 18-19.

Docket No. RM21-17-001                                              - 771 -

set of "planning criteria" and purported benefits, which is "simply a way of 'pre-cooking'

outcomes"; (3) abandoned regional cost allocation principle (6); (4) effectively

eliminated the use of a voluntary State Agreement Process; (5) left the CWIP incentive

intact; and (6) made local transmission planning less transparent.[2285]

928.    NRECA alleges that Order No. 1920 violated the APA's notice-and-comment

requirements by:  (1) mandating that transmission providers use a set of seven required

benefits for evaluating and selecting Long-Term Regional Transmission Facilities;

(2) imposing specific requirements for limited reevaluation of previously selected Long-

Term Regional Transmission Facilities; (3) requiring that certain interconnection-related

transmission needs must be evaluated for selection in existing Order No. 1000 regional

transmission planning and cost allocation processes; (4) not requiring Long-Term

Regional Transmission Planning cost allocation methods to comply with all of the

Commission's six regional cost allocation principles; and (5) substantially diminishing

the proposed role of state regulators in Long-Term Regional Transmission Planning and

cost allocation.[2286]  NRECA requests that the Commission withdraw Order No. 1920 and

issue a supplemental NOPR because "so many of [Order No. 1920's] key provisions" are

"brand new" and were not subjected to public comment.[2287]

---

[2285] Arizona Commission Rehearing Request at 18-19. *Id.*

[2286] NRECA Rehearing Request at 6.

[2287] *Id.* at 19.

929.    Designated Retail Regulators contend that Order No. 1920 contains a number of

significant changes that drastically depart from the NOPR, rendering the final rule

"surprisingly distant" from and not a logical outgrowth of the NOPR, in violation of the

APA's notice-and-comment requirements.[2288]   Designated Retail Regulators add that

Order No. 1920 "is in essence a new rule that requires new opportunities for comment

and input."[2289]   Designated Retail Regulators claim that Order No. 1920 differs from the

NOPR because Order No. 1920:  (1) declined to adopt the NOPR proposal requiring

transmission providers to seek the agreement of Relevant State Entities and substantially

diminished Relevant State Entity involvement in cost allocation; (2) provided

transmission providers complete discretion to decide whether to file a State Agreement

Process or Long-Term Regional Transmission Cost Allocation Method in its tariff, even

if agreed to by Relevant State Entities; and (3) did not require transmission providers to

obtain the support of Relevant State Entities prior to proposing an evaluation process and

selection criteria on compliance.[2290]

### B.    Commission Determination

930.    We disagree with Arizona Commission's, Designated Retail Regulators', and

NRECA's arguments that Order No. 1920 violates the APA's notice-and-comment

---

[2288] Designated Retail Regulators Rehearing Request at 46-50 (quoting *Int'l Union, United Mine Workers of Am. v. Mine Safety and Health Admin.*, 407 F.3d 1250, 1260 (D.C. Cir. 2005)).

[2289] *Id.* at 10.

[2290] *Id.* at 46-50.

Docket No.  RM21-17-001                                              - 773 -

requirements and is not a logical outgrowth of the NOPR.  Relatedly, we decline to adopt

NRECA's suggestion that the Commission withdraw Order No. 1920 in its entirety and

issue a supplemental NOPR.  As an initial matter, rehearing parties' conclusory

arguments lack the specificity required to satisfy FPA section 313(a), which states that an

"application for rehearing shall set forth *specifically* the ground or grounds upon which

such application is based."[2291]  In claiming that Order No. 1920 violated the APA's

notice-and-comment requirements, rehearing parties merely point to sections or

provisions of Order No. 1920 that allegedly run afoul of those requirements and then

assert, without support or further explanation, that Order No. 1920, as a whole, violates

the APA's notice-and-comment provision.  Arizona Commission, Designated Retail

Regulators, and NRECA do not cite, and we are unaware of, any precedent supporting

what appears to be their claim that cumulative logical outgrowth challenges to individual

provisions would compel a finding that Order No. 1920, as a whole, is not a logical

outgrowth of the NOPR.  Accordingly, we reject this sweeping argument as lacking the

specificity required on rehearing.[2292]

931.    In any event, these arguments also lack merit.  As discussed throughout this order,

the individual provisions of Order No. 1920, which certain rehearing parties claim the

---

[2291] 16 U.S.C. 825*l*(a) (emphasis added).

[2292] A rehearing request must set forth with specificity the grounds on which the
request is based.  16 U.S.C. 825*l*(a); 18 CFR 385.713(c)(2) (2024); *see ZEP Grand
Prairie Wind, LLC*, 183 FERC ¶ 61,150, at P 10; *Ind. Util. Regul. Comm'n v. FERC*, 668
F.3d at 738-40.

Docket No.  RM21-17-001                                        - 774 -

Commission adopted without adequate notice and opportunity to comment, are, in fact,

logical outgrowths of the NOPR and otherwise satisfy the APA's notice-and-comment

requirements.[2293]  Thus, given that the constituent components of Order No. 1920 satisfy

the APA's notice-and-comment requirements, the sum of those components—i.e., Order

No. 1920 as a whole—necessarily also satisfies these requirements, and rehearing parties

have not shown otherwise.

## XV.    Information Collection Statement

932.    The Paperwork Reduction Act[2294] requires each Federal agency to seek and obtain

the Office of Management and Budget's (OMB) approval before undertaking a collection

of information directed to 10 or more persons or contained in a rule of general

applicability.  OMB regulations require approval of certain information collection

requirements contained in final rules published in the *Federal Register*.[2295]  Upon

approval of a collection of information, OMB will assign an OMB control number and an

expiration date.  Respondents subject to the filing requirements of this order on rehearing

---

[2293] *See supra* Requirement for Transmission Providers to Use and Measure a Set of Seven Required Benefits section; Minimum Requirements section; Role of Relevant State Entities section; Reevaluation section; Transmission Planning Process Evaluation section; Obligation to File an *Ex Ante* Long-Term Regional Transmission Cost Allocation Method and Its Use as a Backstop section; Design and Operation of the Engagement Period section; Regional Cost Allocation Principles for Long-Term Regional Transmission Facilities section; General Benefits Requirements Related to Cost Allocation section; CWIP section.

[2294] 44 U.S.C. 3501-3521.

[2295] *See* 5 CFR 1320.12 (2024).

Docket No. RM21-17-001                                              - 775 -

will not be penalized for failing to respond to the collection of information unless the

collection of information displays a valid OMB control number.

933.    **Summary:** On rehearing of Order No. 1920, the Commission is further revising

the *pro forma* OATT to remedy deficiencies in the Commission's existing regional

transmission planning and cost allocation and local transmission planning requirements.

This order on rehearing addresses arguments raised on rehearing, sets aside, in part, and

clarifies Order No. 1920.  The information collection requirements included in Order No.

1920 were previously approved by OMB under the FERC information collection number

FERC-917: *Electric Transmission Facilities* (OMB Control No. 1902-0233).  Order

No. 1920 required transmission providers to conduct Long-Term Regional Transmission

Planning to ensure the identification, evaluation, and selection, as well as the allocation

of the costs, of more efficient or cost-effective regional transmission solutions to address

Long-Term Transmission Needs.

934.    Previously, the Commission submitted to OMB the information collection

requirements arising from Order No. 1920, and OMB approved those requirements.  In

this order on rehearing, the Commission makes five substantive changes to those

requirements.  In Order No. 1920, the Commission required transmission providers in

each transmission planning region to incorporate seven specific categories of factors in

the development of Long-Term Scenarios.[2296]  Here, we set aside, in part, the requirement

for transmission providers to incorporate seven specific categories of factors in the

---

[2296] Order No. 1920, 187 FERC ¶ 61,068 at P 409.

Docket No. RM21-17-001                                                    - 776 -

development of Long-Term Scenarios by excluding corporate commitments from Factor

Category Seven. We no longer require transmission providers to separately identify

corporate commitments as a factor in their development of Long-Term Scenarios given

that the effects of such commitments will be sufficiently incorporated in Long-Term

Regional Transmission Planning through the incorporation of other Factor Categories.

935.    In Order No. 1920, the Commission required transmission providers in each

transmission planning region to develop, at least once during the five-year Long-Term

Regional Transmission Planning cycle, at least three distinct Long-Term Scenarios.[2297]

Here, we clarify that transmission providers, when requested by Relevant State Entities in

a transmission planning region, are required to conduct a reasonable number of additional

analyses or scenarios, to provide Relevant State Entities with information that they can

use to inform the application of Long-Term Regional Cost Allocation Method(s) or the

development of cost allocation methods through the State Agreement Process(es).

936.    In Order No. 1920, the Commission required transmission providers in each

transmission planning region to revise the regional transmission planning process in their

OATTs to outline an open and transparent process that provides stakeholders, including

federally-recognized Tribes and states, with a meaningful opportunity to propose

potential factors and to provide timely input on how to account for specific factors in the

development of Long-Term Scenarios.[2298]  In addition, the Commission required

---

[2297] *Id.* P 559.

[2298] *Id.* P 528.

USCA4 Appeal: 24-1650    Doc: 224        Filed: 01/21/2025      Pg: 2153 of 2455
Document Accession #: 20241121-3139      Filed Date: 11/21/2024

Docket No.  RM21-17-001                                                    - 777 -

transmission providers to post this information after stakeholders, including states, have had the meaningful opportunity to propose potential factors and to provide input on how to account for specific factors in the development of Long-Term Scenarios.[2299]  Here, we clarify that transmission providers must consult with and consider the positions of the Relevant State Entities and any other entity authorized by a Relevant State Entity as its representative as to how to account for factors related to states' laws, policies, and regulations when determining the assumptions that will be used in the development of Long-Term Scenarios.

937.    In Order No. 1920, the Commission required transmission providers' evaluation processes, including selection criteria, to be transparent and not unduly discriminatory, and the Commission explained that transmission providers' evaluation of Long-Term Regional Transmission Facilities must culminate in a determination that is sufficiently detailed for stakeholders to understand why a particular Long-Term Regional Transmission Facility (or portfolio of Long-Term Regional Transmission Facilities) was selected or not selected.[2300]  Here, we clarify that, once a transmission provider makes a selection decision, i.e., for each selected Long-Term Regional Transmission Facility (or portfolio of such Facilities), and, if a State Agreement Process is used, once a cost allocation method is agreed upon, transmission providers must make available, on a password-protected portion of OASIS or other password-protected website, a breakdown

---

[2299] *Id.* P 533.

[2300] *Id.* P 954

of how those estimated costs will be allocated, by zone (i.e., by transmission provider

retail distribution service territory/footprint or RTO/ISO transmission pricing zone), and

a quantification of those estimated benefits as imputed to each zone, as such benefits can

be reasonably estimated.

938.    In Order No. 1920, the Commission declined to require future Engagement

Periods, but noted that transmission providers may hold future Engagement Periods if

they believe that such periods would be beneficial.[2301]  Here, we set aside Order No.

1920, in part, and require that, as part of transmission providers' obligations with respect

to transmission planning and cost allocation, transmission providers shall consult with

Relevant State Entities (1) prior to amending the Long-Term Regional Transmission Cost

Allocation Method(s) and/or State Agreement Process(es), or (2) if Relevant State

Entities seek, consistent with their chosen method to reach agreement, for the

transmission provider to amend that method or process.

939.    **Public Reporting Burden:** The estimated burden and cost for the requirements

contained in this order on rehearing follow.

| Changes Due to Order on Rehearing in Docket No. RM21-17-001[2302] | | | | |
|---|---|---|---|---|
| **A.** <br> **Area of** <br> **Modification** | **B.** <br> **Annual** <br> **Number of** <br> **Respondents** | **C.** <br> **Total** <br> **Annual** <br> **Estimated** <br> **Number** | **D.** <br> **Average** <br> **Burden Hours** <br> **& Cost[2303] per** <br> **Response** | **E.** <br> **Total Estimated** <br> **Burden Hours &** <br> **Total Estimated** <br> **Cost** |

---

[2301] Order No. 1920, 187 FERC ¶ 61,068 at P 1368.

[2302] In the table, Year 1 figures are one-time implementation hours and cost. "Subsequent years" show ongoing burdens and costs starting in Year 2.

[2303] The hourly cost (for salary plus benefits) uses the figures from the Bureau of

Docket No. RM21-17-001                                                          - 779 -

| | | of Responses | | (Column C x Column D) |
|---|---|---|---|---|
| **FERC-917, Electric Transmission Facilities (OMB Control No. 1902-0233)** | | | | |
| Establish a six-month time period during which transmission providers must, among other things, provide a forum for negotiation that enables participation by Relevant State Entities and to discuss potential Long-Term Regional Transmission Cost Allocation Methods and/or a State Agreement Process. Also require transmission providers to consult with Relevant State Entities prior to amending Long-Term Regional Transmission Cost Allocation Methods and/or State Agreement Process on file with the Commission. | 48 transmission providers with OATTs | 48 | One Time: 390 hours; $36,307  Ongoing: 39 hours per year; $3,631 per year | One Time: 18,720 hours; $1,742,734  Ongoing: 1,872 hours per year; $174,274 per year |
| Participate in Long-Term Regional Transmission Planning, which | 48 transmission providers with OATTs | 48 | One Time: 0 hours; $0 | One Time: 0 hours; $0 |

Labor Statistics (BLS) for three positions involved in the reporting and recordkeeping requirements. These figures include salary (based on BLS data for May 2022, issued April 25, 2023, http://bls.gov/oes/current/naics2_22.htm) and benefits (based on BLS data for September 2023; issued December 15, 2023, http://www.bls.gov/news.release/ecec.nr0.htm) and are Manager (Occupation Code 11-0000, $122.48/hour), Electrical Engineer (Occupation Code 17-2071, $89.04/hour), and File Clerk (Occupation Code 43-4071, $42.43/hour). The hourly cost for the reporting requirements ($105.76) is an average of the hourly cost (wages plus benefits) of a manager and engineer. The hourly cost for recordkeeping requirements uses the cost of a file clerk.

Docket No. RM21-17-001                                                     - 780 -

| | | | | |
|---|---|---|---|---|
| includes creating and updating datasets, developing Long-Term Scenarios, evaluating the benefits of Long-Term Regional Transmission Facilities, and establishing criteria in consultation with Relevant State Entities and stakeholders to select Long-Term Regional Transmission Facilities in the regional transmission plan for purposes of cost allocation. | | | Ongoing: 4,995 hours per year; $465,010 per year | Ongoing: 239,760 hours per year; $22,320,457 per year |
| | 77 transmission providers without OATTs | 77 | One Time: 0 hours; $0<br><br>Ongoing: 202 hours per year; $18,805 per year | One Time: 0 hours; $0<br><br>Ongoing: 15,554 hours per year; $1,448,000 per year |
| **Total new burden for FERC 917 (due to Docket No. RM21-17-001)** | 48 transmission providers with OATTs | 48 | One Time: 1,113 hours; $103,614<br><br>Ongoing: 5,329 hours per year; $496,103 per year | One Time: 53,424 hours; $4,973,495<br><br>Ongoing: 255,792 hours per year; $23,812,956 per year |
| | 77 transmission providers without OATTs | 77 | One Time: 20 hours; $1,862<br><br>Ongoing: 262 hours per year; $24,391 per year | One Time: 1,540 hours; $143,366<br><br>Ongoing: 20,174 hours per year; $1,878,099 per year |
| | Totals for all 125 transmission providers | | | One Time: 54,964 hours; $5,116,861<br><br>Ongoing: 275,966 hours per year; $25,691,055 per year |

940.    Order No. 1920 estimated the ongoing total burden and cost for the 48

transmission providers with OATTS to be 230,160 total hours per year and $21,426,693

per year.  Similarly, Order No. 1920 estimated the ongoing total burden and cost for the

77 transmission providers without OATTs to be 20,020 total hours per year and

$1,863,757 per year.  Given the prior discussion regarding excluding corporate

Docket No.  RM21-17-001                                                    - 781 -

commitments from Factor Category Seven and clarifications related to the potential for

additional scenarios, additional consultation with Relevant State Entities, and posting or

making available certain details of a selection decision on OASIS or other password-

protected website, we estimate that these changes will result in an increase of burden

hours.  Therefore, we estimate that the ongoing total burden and cost, as revised herein,

for the 48 transmission providers with OATTs to be 255,792 total hours per year and

$23,812,956  per year.  Similarly, we estimate that the ongoing total burden and cost, as

revised herein, for the 77 transmission providers without OATTs to be 20,174 total hours

per year and $1,878,099 per year.  No other information collection requirements

contained in Order No. 1920 are affected by this order on rehearing.

941.    **Title:**  Electric Transmission Facilities (FERC-917).

942.    **Action:**  Revision of collections of information in accordance with Docket No.

RM21-17-001.

943.    **OMB Control No.:**  1902-0233 (FERC-917)

944.    **Respondents:**  Transmission providers, including RTOs/ISOs.

945.    **Frequency of Information Collection:**  One time during Year 1.  Occasional

times during subsequent years, at least once every five years.

946.    **Necessity of Information:**  The modifications in this order on rehearing will

correct deficiencies in the Commission's existing regional transmission planning and cost

allocation and local transmission planning requirements to ensure that Commission-

jurisdictional rates remain just and reasonable and not unduly discriminatory or

preferential.

947.    **Internal Review:**  We have reviewed the requirements set forth in this order on

rehearing that impose information collection burdens and have determined that such

requirements are necessary.  These requirements conform to the Commission's need for

efficient information collection, communication, and management within the energy

industry.  We have specific, objective support for the burden estimates associated with

the information collection requirements.

948.    Interested persons may obtain information on the reporting requirements by

contacting Kayla Williams, Office of the Executive Director, Federal Energy Regulatory

Commission, 888 First Street, NE, Washington, DC 20426 via email

(DataClearance@ferc.gov) or telephone (202) 502-6468.

949.    Comments concerning the collection of information and the associated burden

estimates may also be sent to:  Office of Information and Regulatory Affairs, Office of

Management and Budget, 725 17th Street, NW, Washington, DC  20503 [Attention: Desk

Officer for the Federal Energy Regulatory Commission].  Due to security concerns,

comments should be sent electronically to the following email address:

oira_submission@omb.eop.gov.  Comments submitted to OMB should refer to FERC-

917 (OMB Control No. 1902-0233).  Copies of the comments can be sent to the

Commission (identified by Docket No. RM21-17-001 and the specific FERC collection

number (FERC-917) electronically through https://www.ferc.gov.  For those unable to

file electronically, comment copies may be filed by USPS mail or by hand (including

courier) delivery: Mail via U.S. Postal Service Only: Addressed to: Federal Energy

Regulatory Commission, Secretary of the Commission, 888 First Street, NE, Washington,

DC 20426. Or hand (including courier) delivery: Deliver to: Federal Energy Regulatory Commission, 12225 Wilkins Avenue, Rockville, MD 20852.

## XVI. Environmental Analysis

950. The Commission is required to prepare an Environmental Assessment or an Environmental Impact Statement for any action that may have a significant adverse effect on the human environment.[2304] The Commission has categorically excluded certain actions from this requirement including approval of actions under FPA sections 205 and 206 relating to the filing of schedules containing all rates and charges for the transmission or sale of electric energy subject to the Commission's jurisdiction, plus the classification, practices, contracts and regulations that affect rates, charges, classifications, and services.[2305] Because the final rule promulgated by Order No. 1920, and revised herein, falls within this categorical exclusion, preparation of an environmental assessment or an environmental impact statement is not required.

## XVII. Regulatory Flexibility Act

951. The Regulatory Flexibility Act of 1980 (RFA)[2306] generally requires a description and analysis of final rules that will have significant economic impact on a substantial number of small entities. The Small Business Administration (SBA) sets the threshold

---

[2304] *Reguls. Implementing the Nat'l Env'l Pol'y Act*, Order No. 486, 52 FR 47897 (Dec. 17, 1987), FERC Stats. & Regs. ¶ 30,783 (1987) (cross-referenced at 41 FERC ¶ 61,284).

[2305] 18 CFR 380.4(a)(15).

[2306] 5 U.S.C. 601-612.

Docket No.  RM21-17-001                                                          - 784 -

for what constitutes a small business.  Under SBA's size standards,[2307] RTOs/ISOs,

transmission planning regions, and transmission owners all fall under the category of

Electric Bulk Power Transmission and Control (NAICS code 221121), with a size

threshold of 950 employees (including the entity and its associates).[2308]

952.    In Order No. 1920, the Commission, pursuant to RFA section 605(b), certified that

the final rule would not have a significant economic impact on a substantial number of

small entities.[2309]  This order on rehearing does not disturb that conclusion.  For the same

reasons cited in Order No. 1920,[2310] the final rule, as revised herein, would not have a

significant economic impact on a substantial number of small entities.

## XVIII.        Document Availability

953.    In addition to publishing the full text of this document in the *Federal Register*, the

Commission provides all interested persons an opportunity to view and/or print the

contents of this document via the Internet through the Commission's Home Page

(http://www.ferc.gov).

---

[2307] 13 CFR 121.201.

[2308] The RFA definition of "small entity" refers to the definition provided in the Small Business Act, which defines a "small business concern" as a business that is independently owned and operated and that is not dominant in its field of operation.  The SBA's regulations define the threshold for a small Electric Bulk Power Transmission and Control entity (NAICS code 221121) to be 950 employees.  13 CFR 121.201; *see* 5 U.S.C. 601(3) (citing section 3 of the Small Business Act, 15 U.S.C. 632).

[2309] Order No. 1920, 187 FERC ¶ 61,068 at P 1788.

[2310] *See id.*

Docket No. RM21-17-001                                                                 - 785 -

954.   From the Commission's Home Page on the Internet, this information is available

on eLibrary.  The full text of this document is available on eLibrary in PDF and

Microsoft Word format for viewing, printing, and/or downloading.  To access this

document in eLibrary, type the docket number excluding the last three digits of this

document in the docket number field.

955.   User assistance is available for eLibrary and the Commission's website during

normal business hours from FERC Online Support at 202-502-6652 (toll free at 1-866-

208-3676) or email at ferconlinesupport@ferc.gov, or the Public Reference Room at

(202) 502-8371, TTY (202)502-8659.  E-mail the Public Reference Room at

public.referenceroom@ferc.gov.

## XIX.  Effective Date

956.   The changes to Order No. 1920 made in this order on rehearing and clarification

are effective **[INSERT DATE 30 DAYS AFTER DATE OF PUBLICATION IN THE**

**FEDERAL REGISTER]**.

## List of Subjects in 18 CFR Part 35

Electric power rates, Electric utilities, Reporting and recordkeeping requirements.

By the Commission.  Commissioner Christie is concurring in part with a separate
                    statement attached.
                    Commissioner See is not participating.

( S E A L )


                                          Debbie-Anne A. Reese,
                                          Secretary.

NOTE:  The following appendices will not appear in the Code of Federal Regulations.

Appendix A:  Abbreviated Names of Parties

| Abbreviation | Rehearing Party(ies) |
|---|---|
| Advanced Energy | Advanced Energy United |
| Alabama Commission | Alabama Public Service Commission |
| APPA | American Public Power Association |
| Arizona Commission | Arizona Corporation Commission |
| Cher Gilmore | Cher Gilmore |
| City of New Orleans Council | Council of the City of New Orleans |
| Clean Energy Associations | Advanced Energy United; American Clean Power Association; American Council on Renewable Energy; Solar Energy Industries Association |
| Clean Energy Buyers | Clean Energy Buyers Association |
| Competition Coalition | Electricity Transmission Competition Coalition; Resale Power Group of Iowa; LS Power Grid, LLC |
| CTC Global | CTC Global Corporation |
| Dairyland | Dairyland Power Cooperative |
| Designated Retail Regulators | Louisiana Public Service Commission; Mississippi Public Service Commission; Arkansas Public Service Commission; South Dakota Public Utilities Commission |
| Dominion | Dominion Energy Services, Inc. |
| E. Andrews | E. Andrews |
| East Kentucky | East Kentucky Power Cooperative, Inc. |
| EEI | Edison Electric Institute |
| Gary Andrews | Gary Andrews |
| Georgia Commission | Georgia Public Service Commission |
| Grid United | Grid United LLC |
| Harvard ELI | Harvard Electricity Law Initiative |
| Idaho Commission | Idaho Public Utilities Commission |
| Identified Consumer Advocates | Office of the Massachusetts Attorney General; Connecticut Office of Consumer Counsel; Maine Office of Public Advocate; Maryland Office of People's Counsel; New Hampshire Office of Consumer Advocate; Rhode Island Division of Public Utilities and Carriers |
| Illinois Commission | Illinois Commerce Commission |
| Indicated PJM TOs | American Electric Power Service Corporation on behalf of its affiliates, Appalachian Power Company, Indiana |

Docket No.  RM21-17-001                                                    - 787 -

| Abbreviation | Rehearing Party(ies) |
|---|---|
|  | Michigan Power Company, Kentucky Power Company, Kingsport Power Company, Ohio Power Company, Wheeling Power Company, AEP Appalachian Transmission Company, Inc., AEP Indiana Michigan Transmission Company, Inc., AEP Kentucky Transmission Company, Inc., AEP Ohio Transmission Company, Inc., and AEP West Virginia Transmission Company, Inc.; Dayton Power and Light Company; Dominion Energy Services, Inc. on behalf of Virginia Electric and Power Company; Duke Energy Corporation on behalf of its affiliates Duke Energy Ohio, Inc., Duke Energy Kentucky, Inc., and Duke Energy Business Services LLC; Duquesne Light Company; East Kentucky Power Cooperative; Exelon Corporation on behalf of its affiliates Atlantic City Electric Company, Baltimore Gas and Electric Company, Commonwealth Edison Company, Delmarva Power & Light Company, PECO Energy Company, and Potomac Electric Power Company; FirstEnergy Service Company, on behalf of its affiliates American Transmission Systems, Incorporated, Jersey Central Power & Light Company, Mid-Atlantic Interstate Transmission LLC, West Penn Power Company, Potomac Edison Company, Monongahela Power Company, Keystone Appalachian Transmission Company, and Trans-Allegheny Interstate Line Company; PPL Electric Utilities Corporation; Public Service Electric and Gas Company; UGI Utilities Inc. |
| Industrial Customers | American Forest & Paper Association; Coalition of MISO Transmission Customers; Industrial Energy Customers of America; PJM Industrial Customer Coalition |
| Invenergy | Invenergy Solar Development North America LLC; Invenergy Thermal Development LLC; Invenergy Wind Development North America LLC; Invenergy Transmission LLC |
| ITC | International Transmission Company; Michigan Electric Transmission Company, LLC; ITC Midwest LLC; ITC Great Plains, LLC |
| Large Public Power | Large Public Power Council |
| MISO TOs | Ameren Services Company, as agent for Union Electric |

Docket No.  RM21-17-001                                                                 - 788 -

| Abbreviation | Rehearing Party(ies) |
|---|---|
| | Company, Ameren Illinois Company, and Ameren Transmission Company of Illinois; American Transmission Company LLC; Big Rivers Electric Corporation; Central Minnesota Municipal Power Agency; City Water, Light & Power (Springfield, IL); Cleco Power LLC; Cooperative Energy; Dairyland Power Cooperative; Duke Energy Business Services, LLC for Duke Energy Indiana, LLC; Great River Energy; Hoosier Energy Rural Electric Cooperative, Inc.; Indiana Municipal Power Agency; Indianapolis Power & Light Company; International Transmission Company; ITC Midwest LLC; Lafayette Utilities System; Michigan Electric Transmission Company, LLC; MidAmerican Energy Company; Minnesota Power (and its subsidiary Superior Water, L&P); Montana-Dakota Utilities Co.; Northern Indiana Public Service Company LLC; Northern States Power Company, a Minnesota corporation, and Northern States Power Company, a Wisconsin corporation, subsidiaries of Xcel Energy Inc.; Northwestern Wisconsin Electric Company; Otter Tail Power Company; Prairie Power, Inc.; Southern Illinois Power Cooperative; Southern Indiana Gas & Electric Company; Southern Minnesota Municipal Power Agency; Wabash Valley Power Association, Inc.; Wolverine Power Supply Cooperative, Inc. |
| Minnesota Commission | Minnesota Public Utilities Commission |
| Missouri Commission | Missouri Public Service Commission |
| Montana Commission | Montana Public Service Commission |
| NARUC | National Association of Regulatory Utility Commissioners |
| NESCOE | New England States Committee on Electricity |
| Northern Virginia | Northern Virginia Electric Cooperative, Inc. |
| NRECA | National Rural Electric Cooperative Association |
| Ohio Commission Federal Advocate | Public Utilities Commission of Ohio's Office of the Federal Energy Advocate |
| Ohio Consumers | Office of the Ohio Consumers Council |

Docket No.  RM21-17-001                                                      - 789 -

| Abbreviation | Rehearing Party(ies) |
|---|---|
| Old Dominion | Old Dominion Electric Cooperative |
| Pennsylvania Commission | Pennsylvania Public Utility Commission |
| PIOs | Appalachian Voices; Energy Alabama; Environmental Defense Fund; Environmental Law & Policy Center; Natural Resources Defense Council; North Carolina Sustainable Energy Association; Sierra Club; South Carolina Coastal Conservation League; Southern Alliance for Clean Energy; Southern Renewable Energy Association; Sustainable FERC Project |
| PJM | PJM Interconnection, L.L.C. |
| PJM States | Organization of PJM States, Inc. |
| PJM Utilities | East Kentucky Power Cooperative, Inc.; Buckeye Power, Inc.; Old Dominion Electric Cooperative; Wabash Valley Power Association |
| SERTP Sponsors | Associated Electric Cooperative, Inc.; Dalton Utilities; Duke Energy Carolinas, LLC and Duke Energy Progress, LLC; Georgia Transmission Corporation; Louisville Gas and Electric Company and Kentucky Utilities Company; Municipal Electric Authority of Georgia; PowerSouth Energy Cooperative; Southern Company Services, Inc., acting as agent for Alabama Power Company, Georgia Power Company, and Mississippi Power Company; Tennessee Valley Authority |
| SPP | Southwest Power Pool, Inc. |
| State Regulatory Commissioners | Riley Allen (Commissioner, State of Vermont Public Utility Commission); Philip L. Bartlett II (Chair, Maine Public Utilities Commission); Kumar P. Barve (Commissioner, Maryland Public Service Commission); Eric Blank (Chairman, Colorado Public Utilities Commission); Alessandra Carreon (Commissioner, Michigan Public Service Commission); Michael T. Carrigan (Commissioner, Illinois Commerce Commission); David W. Danner (Chair, Washington Utilities and Transportation Commission); Megan Decker (Chair, Oregon Public Utilities Commission); Milt Doumit (Commissioner, Washington Utilities and Transportation Commission); Sarah Freeman (Commissioner, Indiana Utility Regulatory Commission); Andrew French (Chairperson, Kansas Corporation Commission); Marissa P. Gillett (Chairman, Connecticut |

Docket No. RM21-17-001                                                    - 790 -

| Abbreviation | Rehearing Party(ies) |
|---|---|
| | Public Utilities Regulatory Authority); Hwikwon Ham (Commissioner, Minnesota Public Utilities Commission); Frederick H. Hoover (Chair, Maryland Public Service Commission); Darcie Houck (Commissioner, California Public Utilities Commission); Davante Lewis (Commissioner, Louisiana Public Service Commission); Ann McCabe (Commissioner, Illinois Commerce Commission); Valerie Means (Commissioner, Minnesota Public Utilities Commission); Stacey Paradis (Commissioner, Illinois Commerce Commission); Katherine Peretick (Commissioner, Michigan Public Service Commission); Les Perkins (Commissioner, Oregon Public Utilities Commission); Ann E. Rendahl (Commissioner, Washington Utilities and Transportation Commission); Alice Reynolds (President, California Public Utilities Commission); Michael T. Richard (Commissioner, Maryland Public Service Commission); Doug P. Scott (Chairman, Illinois Commerce Commission); Dan Scripps (Chair, Michigan Public Service Commission); Katie Sieben (Chair, Minnesota Public Utilities Commission); Bonnie A. Suchman (Commissioner, Maryland Public Service Commission); Joseph Sullivan (Vice Chair, Minnesota Public Utilities Commission); Letha Tawney (Commissioner, Oregon Public Utilities Commission); Emile C. Thompson (Chairman, District of Columbia Public Service Commission); Ted Trabue (Commissioner, District of Columbia Public Service Commission); John Tuma (Commissioner, Minnesota Public Utilities Commission) |
| Susann Rizzo | Susann Rizzo |
| TAPS | Transmission Access Policy Study Group |
| Undersigned States | Texas Attorney General; Alabama Attorney General; Arkansas Attorney General; Florida Attorney General; Georgia Attorney General; Idaho Attorney General; Iowa Attorney General; Kansas Attorney General; Kentucky Attorney General; Louisiana Attorney General; Mississippi Attorney General; Montana Attorney General; Nebraska Attorney General; North Dakota Attorney General; Oklahoma Attorney General; South Carolina Attorney General; South Dakota Attorney |

Docket No.  RM21-17-001                                                           - 791 -

| Abbreviation | Rehearing Party(ies) |
|---|---|
|  | General; Tennessee Attorney General; Utah Attorney General |
| Utah Commission | Utah Public Service Commission |
| Vermont Commission | Vermont Public Utility Commission |
| Versant Power | Versant Power |
| Virginia Attorney General | Virginia Office of the Attorney General, Division of Consumer Counsel |
| Virginia and North Carolina Commissions | Virginia State Corporation Commission; North Carolina Utilities Commission |
| West Virginia Commission | Public Service Commission of West Virginia |
| WIRES | WIRES |
| Wyoming Commission | Wyoming Public Service Commission |

<u>Appendix B:  Pro Forma Open Access Transmission Tariff Attachment K</u>

Note: Proposed deletions are in brackets and proposed additions are in italics.

ATTACHMENT K

Transmission Planning Process

Local Transmission Planning

The Transmission Provider shall establish a coordinated, open, and transparent local transmission planning process with its Network and Firm Point-to-Point Transmission Customers and other interested parties to ensure that the Transmission System is planned to meet the needs of both the Transmission Provider and its Network and Firm Point-to-Point Transmission Customers on a comparable and not unduly discriminatory basis.  The Transmission Provider's coordinated, open, and transparent local transmission planning process shall be provided as an attachment to the Transmission Provider's Tariff.  The Transmission Provider's local transmission planning process shall provide stakeholders with meaningful opportunities to participate and provide feedback, and shall satisfy the following nine principles, as defined in Order No. 890:  coordination, openness, transparency, information exchange, comparability, dispute resolution, regional participation, economic planning studies, and cost allocation for new transmission projects.  The local transmission planning process also shall include the procedures and mechanisms for considering transmission needs driven by Public Policy Requirements consistent with Order No. 1000.  The local transmission planning process also shall provide a mechanism for the recovery and allocation of transmission planning

costs consistent with Order No. 890. The description of the Transmission Provider's local transmission planning process must include sufficient detail to enable Transmission Customers to understand:

(i)     The process for consulting with customers;

(ii)    The notice procedures and anticipated frequency of meetings;

(iii)   The methodology, criteria, and processes used to develop a transmission plan;

(iv)    The method of disclosure of criteria, assumptions, and data underlying a transmission plan;

(v)     The obligations of and methods for Transmission Customers to submit data to the Transmission Provider;

(vi)    The dispute resolution process;

(vii)   The Transmission Provider's study procedures for economic upgrades to address congestion or the integration of new resources;

(viii)  The Transmission Provider's procedures and mechanisms for considering transmission needs driven by Public Policy Requirements, consistent with Order No. 1000; and

(ix)    The relevant cost allocation method or methods.

Regional Transmission Planning

The Transmission Provider shall participate in a regional transmission planning process through which transmission facilities and non-transmission alternatives may be proposed and evaluated. The regional transmission planning process also shall develop a regional transmission plan that identifies the transmission facilities necessary to meet the

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 2170 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No. RM21-17-001                                                    - 794 -

needs of transmission providers and transmission customers in the transmission planning region.  The regional transmission planning process must be consistent with the provision of Commission-jurisdictional services at rates, terms, and conditions that are just and reasonable and not unduly discriminatory or preferential, as described in Order Nos. 1000 and 1920.  The regional transmission planning process shall be described in an attachment to the Transmission Provider's Tariff.

The Transmission Provider's regional transmission planning process shall satisfy the following seven principles, as established in Order Nos. 890 and 1000:  coordination, openness, transparency, information exchange, comparability, dispute resolution, and economic planning studies.  The description of the regional transmission planning process in the Tariff also shall include the procedures and mechanisms for considering transmission needs driven by Public Policy Requirements, consistent with Order No. 1000.  The regional transmission planning process shall provide a mechanism for the recovery and allocation of "transmission planning costs" consistent with Order Nos. 890 and 1000.

The regional transmission planning process shall include a clear enrollment process for public and non-public utility transmission providers that make the choice to become part of a transmission planning region.  The regional transmission planning process shall be clear that enrollment will subject enrollees to cost allocation if they are found to be beneficiaries of new transmission facilities selected in the regional transmission plan for purposes of cost allocation.  Each Transmission Provider shall maintain a list of enrolled entities in the Transmission Provider's Tariff.

The regional transmission planning process must include at least three stakeholder meetings concerning the local transmission planning process of each Transmission Provider that is a member of the transmission planning region. The three meetings must occur before each Transmission Provider's local transmission planning information can be incorporated into the transmission planning region's transmission planning models. The three stakeholder meetings for local transmission planning information are the Assumptions Meeting, the Needs Meeting, and the Solutions Meeting, and the three stakeholder meetings must meet the requirements in Order No. 1920.

As part of the regional transmission planning process, the Transmission Providers in each transmission planning region shall conduct Long-Term Regional Transmission Planning, meaning regional transmission planning on a sufficiently long-term, forward-looking, and comprehensive basis to identify Long-Term Transmission Needs, identify transmission facilities that meet such needs, measure the benefits of those transmission facilities, and evaluate those transmission facilities for potential selection in the regional transmission plan for purposes of cost allocation as the more efficient or cost-effective regional transmission facilities to meet Long-Term Transmission Needs. As part of this Long-Term Regional Transmission Planning, the Transmission Providers in each transmission planning region shall meet the requirements set forth in Order No. 1920, including: (1) identifying Long-Term Transmission Needs and Long-Term Regional Transmission Facilities to meet those needs through the development of Long-Term Scenarios that satisfy the requirements set forth in Order No. 1920; (2) measuring the required seven benefits consistent with the requirements set forth in Order No. 1920;

(3) using the measured benefits to evaluate Long-Term Regional Transmission Facilities;

and (4) using selection criteria consistent with the requirements set forth in Order No.

1920 that provide the opportunity for Transmission Providers to select Long-Term

Regional Transmission Facilities in the regional transmission plan for purposes of cost

allocation that more efficiently or cost-effectively address Long-Term Transmission

Needs.

The process through which the Transmission Providers in each transmission

planning region develop Long-Term Scenarios must comply with the following six

transmission planning principles established in Order No. 890:  coordination; openness;

transparency; information exchange; comparability; and dispute resolution.  The

Transmission Providers in each transmission planning region shall outline in their Tariffs

an open and transparent process that provides stakeholders, including states, with a

meaningful opportunity to propose potential factors and to provide input on how to

account for specific factors in the development of Long-Term Scenarios.  The

Transmission Providers in each transmission planning region shall also outline in their

Tariffs an open and transparent process that provides stakeholders, including states, with

a meaningful opportunity to propose which future outcomes are probable and can be

captured through assumptions made in the development of Long-Term Scenarios.

*Transmission Providers shall consult with and consider the positions of the Relevant*

*State Entities, and any other entity authorized by a Relevant State Entity as its*

*representative, as to whether a specific state policy must be accounted for as a factor*

*within each category, how to account for the specific state policy in the development of*

*Long-Term Scenarios, and how to adjust the treatment of the specific state policy across*

*Long-Term Scenarios.  When requested by Relevant State Entities in a transmission*

*planning region, Transmission Providers shall conduct a reasonable number of*

*additional analyses or scenarios to inform the application of Long-Term Regional Cost*

*Allocation Method(s) or the development of cost allocation methods through the State*

*Agreement Process(es).  Transmission Providers shall not use any such additional*

*analyses to identify Long-Term Transmission Needs, identify Long-Term Regional*

*Transmission Facilities, or to meet the requirement that Transmission Providers estimate*

*the costs and measure the benefits of Long-Term Regional Transmission Facilities for*

*purposes of selection.  Transmission Providers also shall not condition the selection of a*

*Long-Term Regional Transmission Facility on the information provided in these*

*additional analyses.*

The Transmission Providers in each transmission planning region shall include in

their Tariffs a general description of how they will measure each of the seven required

benefits used to evaluate Long-Term Regional Transmission Facilities.  The

Transmission Providers in each transmission planning region shall measure and use the

seven benefits, as described in Order No. 1920, in Long-Term Regional Transmission

Planning.

As part of Long-Term Regional Transmission Planning, the Transmission

Providers in each transmission planning region shall include in their Tariffs an evaluation

process, including selection criteria, that:  (1) is transparent and not unduly

discriminatory; (2) aims to ensure that more efficient or cost-effective transmission

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 2174 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

facilities are selected in the regional transmission plan for purposes of cost allocation; (3) seeks to maximize benefits accounting for costs over time without over-building transmission facilities; and (4) otherwise satisfies the requirements set forth in Order No. 1920. *Once Transmission Providers make a selection decision ,and, if a State Agreement Process is used, once a cost allocation method is agreed upon, Transmission Providers shall make available, on a password-protected portion of OASIS or other password-protected website, a breakdown of how the estimated costs of a Long-Term Regional Transmission Facility will be allocated, by zone, and a quantification of the Long-Term Regional Transmission Facility's estimated benefits as imputed to each zone, as such benefits can be reasonably estimated.*

The Transmission Providers in each transmission planning region shall include in their Tariffs one or more Long-Term Regional Transmission Cost Allocation Methods, which is an ex ante regional cost allocation method for one or more Long-Term Regional Transmission Facilities (or portfolio of such Facilities) that are selected in the regional transmission plan for purposes of cost allocation and that complies with the requirements set forth in Order No. 1920. The Transmission Providers in each transmission planning region may also, subject to (1) the agreement of Relevant State Entities and (2) Commission acceptance, include in their Tariffs a State Agreement Process. A State Agreement Process is a process by which one or more Relevant State Entities may voluntarily agree to a cost allocation method for Long-Term Regional Transmission Facilities (or a portfolio of such Facilities) either before or no later than six months after the facilities are selected in the regional transmission plan for purposes of cost allocation.

The Tariff must describe how the State Agreement Process will result in a cost allocation being filed, including which entities can participate in the State Agreement Process; what constitutes an agreement on cost allocation in that process; how agreement is communicated to the *T*[t]ransmission *P*[p]rovider; and the circumstances under which, or the information necessary for, a *T*[t]ransmission *P*[p]rovider to file or to consider filing the agreed cost allocation.

*Transmission Providers shall include in their Tariffs a description of how they will consult with Relevant State Entities (1) prior to amending the Long-Term Regional Transmission Cost Allocation Method(s) and/or State Agreement Process(es), or (2) if Relevant State Entities seek, consistent with their chosen method to reach agreement, for the Transmission Provider to amend that method or process. For a consultation initiated by the Transmission Providers, Transmission Providers shall document publicly on their OASIS or other public website the results of their consultation with Relevant State Entities prior to filing their amendment. For a consultation initiated by Relevant State Entities, if the Transmission Providers choose not to propose any amendments to the Long-Term Regional Transmission Cost Allocation Method(s) and/or State Agreement Process(es) preferred by Relevant State Entities during the required consultation, Transmission Providers shall document publicly on their OASIS or other public website the results of their consultation with Relevant State Entities, including an explanation for why they have chosen not to propose any amendments.*

As part of evaluating new regional transmission facilities, as well as upgrades to existing transmission facilities, the Transmission Providers in each transmission planning

region shall consider in all of their regional transmission planning and cost allocation

processes whether selecting transmission facilities that incorporate the following

technologies would be more efficient or cost-effective than selecting new regional

transmission facilities or upgrades to existing transmission facilities that do not

incorporate these technologies: dynamic line ratings, as defined in 18 CFR §

35.28(b)(14), advanced power flow control devices, advanced conductors, and/or

transmission switching.  Specifically, such consideration must include both:  (1) whether

incorporating dynamic line ratings, advanced power flow control devices, advanced

conductors, and/or transmission switching into existing transmission facilities could meet

the same regional transmission need more efficiently or cost-effectively than other

potential transmission facilities; and (2) when evaluating transmission facilities for

potential selection in the regional transmission plan for purposes of cost allocation,

whether incorporating dynamic line ratings, advanced power flow control devices,

advanced conductors, and/or transmission switching as part of any potential regional

transmission facility would be more efficient or cost-effective.  Transmission

P[p]roviders must evaluate the benefits of incorporating the enumerated alternative

transmission technologies into Long-Term Regional Transmission Facilities in a manner

consistent with the requirements in the Evaluation of Benefits of Regional Transmission

Facilities and Evaluation and Selection of Long-Term Regional Transmission Facilities

sections of Order No. 1920.

The Transmission Providers in each transmission planning region shall evaluate

for potential selection in the regional transmission plan for purposes of cost allocation

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 2177 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No.  RM21-17-001                                                    - 801 -

regional transmission facilities that address interconnection-related transmission needs

originally identified through the generator interconnection process.  This requirement

applies in the existing Order No. 1000 regional transmission planning processes.  The

Transmission Providers must modify their Tariffs to include these requirements.  The

interconnection-related transmission needs that Transmission Providers must evaluate in

the existing Order No. 1000 regional transmission planning process are those for which:

(1) Transmission Providers in the transmission planning region have identified the

relevant interconnection-related transmission need in interconnection studies in

at least two interconnection queue cycles *(or in at least two individual

interconnection studies for Transmission Providers that use a first-come, first-

served serial generator interconnection process)* [during the preceding five

years (looking back from the effective date of the accepted tariff provisions

proposed to comply with this reform in Order No. 1920, and the later-in-time

withdrawn interconnection request occurring after the effective date of the

accepted tariff provisions)];

(2) the interconnection-related Network Upgrade identified through the generator

interconnection process to meet the relevant interconnection-related

transmission need has a voltage of at least 200 kV and an estimated cost of at

least $30 million;

(3) [the interconnection-related Network Upgrade identified through the generator

interconnection process to meet the relevant interconnection-related

transmission need is not currently planned to be developed because] the

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 2178 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No.  RM21-17-001                                                    - 802 -

interconnection request[(]s[)] that led to the identification of the

interconnection-related transmission need *in two or more interconnection*

*queue cycles (or two individual interconnection studies if the Transmission*

*Provider uses a first-come, first-served serial generator interconnection*

*process) have* [ has ]been withdrawn *and no more than five calendar years*

*have passed between the date of an earlier interconnection request withdrawal*

*and the date of a later interconnection request withdrawal*;[ and]

(4) the Transmission Providers have not identified a different interconnection-

related Network Upgrade to meet the relevant interconnection-related

transmission need in an executed Generator Interconnection Agreement or in a

Generator Interconnection Agreement that the interconnection customer

requested that the Transmission Provider file unexecuted with the

Commission[.]*; and*

(5) *The interconnection request withdrawals associated with the repeatedly*

*identified interconnection-related transmission need occurred no earlier than*

*seven calendar years prior to the commencement date of the Order No. 1000*

*regional transmission planning and cost allocation cycle.  The initial*

*evaluation should occur in the first Order No. 1000 regional transmission*

*planning and cost allocation cycle to occur after the effective date of the tariff*

*revisions implementing this reform.  The Transmission Provider need not*

*evaluate an interconnection-related transmission need that has been evaluated*

*in a previous Order No. 1000 regional transmission planning and cost*

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 2179 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No.  RM21-17-001                                                                  - 803 -

*allocation cycle.*

The description of the regional transmission planning process must include

sufficient detail to enable Transmission Customers to understand:

(i)     The process for enrollment in the regional transmission planning process;

(ii)    The process for consulting with customers;

(iii)   The notice procedures and anticipated frequency of meetings;

(iv)    The methodology, criteria, and processes used to develop a transmission plan;

(v)     The method of disclosure of criteria, assumptions, and data underlying a transmission plan;

(vi)    The obligations of and methods for transmission customers to submit data;

(vii)   The process for submission of data by nonincumbent developers of transmission projects that wish to participate in the regional transmission planning process and seek regional cost allocation;

(viii)  The process for submission of data by merchant transmission developers that wish to participate in the regional transmission planning process;

(ix)    The dispute resolution process;

(x)     The study procedures for economic upgrades to address congestion or the integration of new resources; and

(xi)    The relevant cost allocation method or methods.

The regional transmission planning process must include cost allocation methods that

satisfy the requirements set forth in Order Nos. 1000 and 1920.

Identifying Potential Opportunities to Right-Size Replacement Transmission Facilities

As part of each Long-Term Regional Transmission Planning cycle, Transmission

Providers in each transmission planning region shall evaluate whether transmission

facilities operating at or above a voltage threshold not to exceed 200 kV that an

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 2180 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

individual Transmission Provider that owns the transmission facility anticipates replacing

in-kind with a new transmission facility during the next 10 years can be "right-sized" to

more efficiently or cost-effectively address Long-Term Transmission Needs, as discussed

in Order No. 1920.  The process to identify potential opportunities to right-size

replacement transmission facilities must follow the process outlined in Order No. 1920.

The Transmission Providers in each transmission planning region shall include in their

Tariffs a cost allocation method for right-sized replacement transmission facilities that

are selected in the regional transmission plan for purposes of cost allocation.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 2181 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No.  RM21-17-001                                                              - 805 -

Interregional Transmission Coordination

The Transmission Provider, through its regional transmission planning process, must coordinate with the public utility transmission providers in each neighboring transmission planning region within its interconnection to address transmission planning coordination issues related to interregional transmission facilities.  The interregional transmission coordination procedures must include a detailed description of the process for coordination between public utility transmission providers in neighboring transmission planning regions (i) with respect to each interregional transmission facility that is proposed to be located in both transmission planning regions and (ii) to identify possible interregional transmission facilities that could address transmission needs more efficiently or cost-effectively than separate regional transmission facilities.  The interregional transmission coordination procedures shall be described in an attachment to the Transmission Provider's Tariff.

The Transmission Provider must ensure that the following requirements are included in any applicable interregional transmission coordination procedures:

(1) A commitment to coordinate and share the results of each transmission planning region's regional transmission plans (including information regarding the Long-Term Transmission Needs and potential transmission facilities to meet those needs) to identify possible interregional transmission facilities that could address transmission needs more efficiently or cost-effectively than separate regional transmission facilities, as well as a procedure for doing so;

(2) A formal procedure to identify and jointly evaluate transmission facilities that are

proposed to be located in both transmission planning regions, including those that may be more efficient or cost-effective transmission solutions to Long-Term Transmission Needs;

(3) An agreement to exchange, at least annually, planning data and information; and

(4) A commitment to maintain a website or e-mail list for the communication of information related to the coordinated planning process, including:

> (a) the Long-Term Transmission Needs discussed in the interregional transmission coordination meetings;

> (b) any interregional transmission facilities proposed or identified in response to the Long-Term Transmission Needs;

> (c) the voltage level, estimated cost, and estimated in-service date of the interregional transmission facilities proposed or identified as part of Long-Term Regional Transmission Planning;

> (d) the results of any cost-benefit evaluation of such interregional transmission facilities, with results including both any overall benefits identified, as well as any benefits particular to each transmission planning region; and

> (e) the interregional transmission facilities, if any, selected in the regional transmission plan for purposes of cost allocation to meet Long-Term Transmission Needs.

The Transmission Provider must work with transmission providers located in neighboring transmission planning regions to develop a mutually agreeable method or methods for allocating between the two transmission planning regions the costs of a new

interregional transmission facility that is located within both transmission planning

regions.  Such cost allocation method or methods must satisfy the six interregional cost

allocation principles set forth in Order No. 1000 and must be included in the

Transmission Provider's Tariff.

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Building for the Future Through Electric Regional              Docket No.  RM21-17-001
Transmission Planning and Cost Allocation

(Issued November 21, 2024)

CHRISTIE, Commissioner, *concurring in part*:

1.       Today's order makes major changes to Order No. 1920.  I am deeply grateful to my colleagues for their willingness to negotiate in good faith and ultimately to agree to these changes.

2.       Order No. 1920 was based on purported authority derived from section 206 of the Federal Power Act (FPA).[1]  Section 206 essentially requires that two prongs must be satisfied:  First, the complainant, here the Commission, bears the burden to prove that existing rates – in this case, the transmission planning procedures of every transmission provider in the country, both Regional Transmission Organization (RTO)/Independent System Operator (ISO) and non-RTO/ISO – are unjust, unreasonable and/or unduly discriminatory or preferential.  If the first prong (burden of proof) is met, in the second prong, the Commission must establish a just and reasonable replacement rate.[2]  I concur with this order solely as to specific changes made in Order No. 1920-A to the replacement rate established in Order No. 1920.[3]

3.       In my dissent to Order No. 1920, I made it clear that one of my major areas of disagreement was that it failed to fulfill the promise of a necessary and appropriate role for the states that was established in the Notice of Proposed Rulemaking (NOPR) that

---

[1] 16 U.S.C. § 824e.

[2] *Id.* ("Whenever the Commission, after a hearing held upon its own motion or upon complaint, shall find that any rate, charge, or classification, demanded, observed, charged, or collected by any public utility for any transmission or sale subject to the jurisdiction of the Commission, or that any rule, regulation, practice, or contract affecting such rate, charge, or classification is unjust, unreasonable, unduly discriminatory or preferential, *the Commission shall determine the just and reasonable rate, charge, classification, rule, regulation, practice, or contract to be thereafter observed and in force, and shall fix the same by order. . . .*" (emphasis added)).

[3] The specific changes which I support and to which I concur are described in the Appendix to this statement.

Docket No. RM21-17-001                                                              - 2 -

preceded Order No. 1920.[4]  This promised state role was the primary reason I voted for
the NOPR.  As I have said repeatedly, state utility regulators are the first line of defense
for their consumers and must have the authority to protect their consumers from
unwarranted or excessive transmission costs, which are the fastest rising part of most
consumers' monthly power bills and are reaching ever more burdensome levels.[5]  The
changes made today in Order No. 1920-A to the replacement rate set by Order No. 1920
go a *long* way towards restoring the state role to what the NOPR promised, and I am
pleased to support these changes.  Among them are the following positive and
fundamental changes:

4.      _Submission of State-Agreed Alternative_.  In contrast to Order No. 1920, Order No.
1920-A requires that, if the states in a region agree to a cost allocation proposal, the
transmission provider *must* include that agreement in its compliance filing.  Furthermore,
the Commission can choose the state agreement over the transmission provider's
proposal.[6]

5.      _Pre-Amendment State Consultation_.  In addition, states *must* be consulted before
the transmission provider considers any future changes to the cost allocation method or
state agreement processes or if the states seek to amend the cost allocation method or
state agreement processes.[7]

6.      _Cost Allocation Flexibility_.  In contrast to Order No. 1920, states are given far
more flexibility to develop and agree to cost allocation processes and *ex ante* formulae
that will suit their needs in diverse multistate regions such as PJM Interconnection,
L.L.C. (PJM), Midcontinent Independent System Operator, Inc., and the Southeastern
Regional Transmission Planning region.  For example, states in PJM will now have
explicit assurance that the PJM State Agreement Approach, in use for more than a
decade, is preserved as an option for allocating to the sponsoring states the costs of public

---

[4] *Bldg. for the Future Through Elec. Reg'l Transmission Planning & Cost
Allocation & Generator Interconnection*, NOPR, 179 FERC ¶ 61,028 (2022) (Christie,
Comm'r, concurring at PP 5, 11, 14).

[5] *Bldg. for the Future Through Elec. Reg'l Transmission Planning & Cost
Allocation*, Order No. 1920, 187 FERC ¶ 61,068 (2024) (Christie, Comm'r, dissenting at
P 15 & nn.49-54).

[6] *See* Appendix at P 1.

[7] *Id.* P 2.

Docket No. RM21-17-001                                                              - 3 -

policy-driven projects, such as New Jersey's offshore wind and others that would not be selected for regional cost allocation.[8]

7.    _State Input on Factors_.  As part of the planning process, transmission providers must consult with the states before running the scenarios required by Order No. 1920 and must consider the views of the states as to how to account for and weigh the factors related to, or derived from, state public policies.[9]

8.    _State Input on Baseline Scenarios_.  Order No. 1920-A also clarifies that, for purposes of cost allocation, states in PJM and other diverse multistate regions can now choose a new _ex ante_ process that will enable the states to request that the transmission provider run additional scenarios, including a baseline scenario that contains only optimal reliability or economic projects and excludes public policy-driven projects, so that states can compare the costs of the baseline scenario versus the larger, multi-driver scenarios that include public policy-driven projects.  Most importantly, states can agree that the difference in costs between the baseline scenario and the larger, multi-driver scenarios that include projects derived from state policies or other policy goals will be allocated to the states whose policies are the source of the added costs and will not be regionally cost allocated.[10]

9.    _Removal of Corporate Power Preferences and Cost-Shifting_.  The requirement in Order No. 1920 that large corporate power-purchasing preferences must be a factor in planning long-term scenarios is explicitly removed.[11]  That was one of the most unconscionable, special-interest driven features of Order No. 1920, directing transmission providers to plan hundreds of billions of dollars of transmission projects to subsidize the power-purchasing preferences of huge multinational corporations and shifting the costs to residential and small-business consumers already struggling to pay their monthly power bills.

10.   _New Required Transparency_.  Order No. 1920-A also emphasizes transparency and clarifies that the purported benefits of one or more states' public policies are clearly identified and quantified.  This will enable states to determine whether they are being

---

[8] _Id._ at P 7.

[9] _Id._ P 4.

[10] _Id._ PP 3, 8-11.

[11] _Id._ P 6.

Docket No. RM21-17-001                                                      - 4 -

charged for other states' public policies, which benefits they are paying for, and how much.[12]

11.     Collectively, these changes give the states a much bigger toolbox containing far more effective tools they can use to protect their consumers and the interests of their states.  I urge state regulators to use them aggressively.  Further, let me emphasize that, if the process of compliance – always complicated and challenging even with rulemakings of far smaller size and less complexity than this one – demonstrates that state flexibility and authority remain materially insufficient, further action by the Commission may become necessary.

12.     And on the issue of compliance, I would add that the broad purpose of these changes is to allow the states sufficient flexibility and authority to protect their consumers from paying unfair or unnecessary costs.  *That purpose should and must inform the compliance process.*

13.     For these reasons, I respectfully concur to these changes established in Order No. 1920-A that are listed specifically in the Appendix.  Again, I express my deep appreciation to my colleagues for their willingness to engage in good-faith negotiations leading to these important changes to the replacement rate.


         For these reasons I respectfully concur in part.



_____

Mark C. Christie
Commissioner




_____

[12] *Id.* P 10.

Docket No. RM21-17-001                                                                 - 5 -

**Appendix – Major Changes Incorporated in Order No. 1920-A**

1. **Require transmission providers to include in their filings state agreements on cost allocation, with enough detail so that any separate proposals can be considered and enable the Commission to adopt the states' agreement on compliance.**

The order directs transmission providers to include in the transmittal of their compliance filings any Long-Term Regional Transmission Cost Allocation Method(s), and/or State Agreement Process(es) agreed to by Relevant State Entities, during the Engagement Period. The order also clarifies that transmission providers must include such cost allocation methods and/or State Agreement Processes in the transmittal of their compliance filings even when transmission providers propose on compliance a separate cost allocation method and/or declined to propose a State Agreement Process.

As part of this requirement, the order clarifies that transmission providers must include any and all supporting evidence and/or justification related to Relevant State Entities' agreed-upon cost allocation method and/or State Agreement Process that Relevant State Entities request that transmission providers include in their compliance filing. However, the order clarifies that transmission providers are not required to separately characterize Relevant State Entities' agreement or independently justify Relevant State Entities' preferred cost allocation.

When acting under FPA section 206, the Commission's statutory burden is to establish a just and reasonable and not unduly discriminatory replacement rate that is supported by substantial evidence and is the product of reasoned decision making. In satisfying this burden with respect to cost allocation, it is not the case that the Commission necessarily must adopt the transmission provider's proposal if that proposal complies with the final rule's requirements; rather, the Commission need only weigh competing views (if they exist), select an approach with adequate support in the record, and then intelligibly explain the reasons for its choice.

To be clear, this means that the Commission will consider the entire record—including the Relevant State Entities' agreed-upon cost allocation and the transmission provider's proposal. Specifically, when the Commission reviews transmission providers' compliance filings, the Commission is not required to accept a cost allocation proposal from a transmission provider simply because it may comply with Order No. 1920. Instead, the Commission may accept any cost allocation method proposed by the Relevant State Entities and submitted on compliance so long as it complies with Order No. 1920.

USCA4 Appeal: 24-1650    Doc: 224    Filed: 01/21/2025    Pg: 2189 of 2455
Document Accession #: 20241121-3139    Filed Date: 11/21/2024

Docket No. RM21-17-001                                                    - 6 -

**2. Require transmission providers to revise their OATTs to add a requirement that they consult with Relevant State Entities before making a future filing under FPA section 205 to revise the Long-Term Regional Transmission Cost Allocation Method and/or State Agreement Process(es) that is on file.**

The order requires that, as part of transmission providers' obligations with respect to transmission planning and cost allocation, transmission providers shall consult with Relevant State Entities prior to amending the *ex ante* Long-Term Regional Transmission Cost Allocation Method and/or State Agreement Process(es) agreed to by Relevant State Entities, or if Relevant State Entities seek to amend that method or process. The order requires transmission providers to document publicly on their website the results of that consultation prior to submitting their amendment. In addition, transmission providers must describe their reasoning for not using the results of the consultation with the Relevant State Entities. As an example, a jumpball framework, such as exists in MISO, SPP, and ISO-NE, could satisfy these requirements.

**3. If Relevant State Entities request additional scenarios to inform their consideration of cost allocation methods, transmission providers shall develop those additional scenarios.**

The order clarifies that transmission providers may develop additional scenarios, beyond the three Long-Term Scenarios that Order No. 1920 requires, to provide Relevant State Entities with information that they can use to inform the development of Long-Term Regional Transmission Cost Allocation Method(s) and/or State Agreement Process(es). The order further clarifies that, when developing these additional scenarios used to inform cost allocation, transmission providers have the flexibility to depart from Order No. 1920's requirements related to the development of Long-Term Scenarios. For example, transmission providers may develop scenarios that consider the incremental cost of transmission needed to achieve state laws, policies, and regulations beyond the cost of transmission needed in the absence of those laws, policies, and regulations. The order further clarifies that, if the Relevant State Entities wish for the transmission provider to develop a reasonable number of additional scenarios for cost allocation, then the transmission providers will develop these scenarios.

**4. Clarify that, while transmission providers have discretion over how to consider the effects of factors, transmission providers must consult with Relevant State Entities regarding factors related to state public policies.**

The order clarifies that transmission providers must consult with and consider the positions of the Relevant State Entities as to how to account for factors related to state public policies in transmission planning assumptions. Specifically, the transmission provider shall consult with Relevant State Entities as to how to run the Long-Term

Scenarios mandated by the final rule, as they may incorporate planning for state laws, policies, and regulations, including assumptions of transmission needs that may be attributable to, or derived from, state or local policies, such as assumptions about changing generation resources.

**5. Allow states six additional months for the engagement period, upon request.**

The order clarifies that, if Relevant State Entities, consistent with their chosen method to reach agreement, request additional time to complete cost allocation discussions, the Commission will extend the Engagement Period for up to an additional six months. The order finds that such an extension is warranted in that circumstance to ensure that Relevant State Entities have sufficient time to engage in fulsome discussions. The order also clarifies that the Commission will extend the relevant compliance deadlines, as appropriate, to accommodate an extension to the Engagement Period.

**6. Exclude corporate commitments from Factor Category Seven.**

The order eliminates the requirement for transmission providers to incorporate corporate commitments in Factor Category Seven when developing Long-Term Scenarios. The order finds that requiring transmission providers to consider corporate commitments when developing Long-Term Scenarios may introduce the risk of one class of transmission users cross-subsidizing another class of transmission users.

**7. Expressly permit continued use of both new and/or existing state agreement approaches and similar voluntary measures.**

The order clarifies that Order No. 1920 does not require reapproval of PJM's State Agreement Approach. The order clarifies that the Commission interprets PJM's State Agreement Approach to be supplemental to PJM's existing regional transmission cost allocation method. As a result, it is not in any way affected by the final rule. The order further clarifies (see #1 above) that, in their compliance filings, transmission providers shall include any State Agreement Process(es) agreed to by Relevant State Entities.

**8. Transmission providers will allocate the costs of a Long-Term Regional Transmission Facility commensurate to its benefits.**

The order clarifies that Order No. 1920 does not prevent transmission providers from recognizing different types of benefits and using them to allocate costs in proportion to those benefits. One potential cost allocation method that could be proposed to comply with Order No. 1920 would allocate costs commensurate with reliability and economic benefits region-wide, while allocating costs commensurate with additional benefits to a subset of states that agree to such cost allocation. Under this potential cost allocation method, these costs and benefits could be identified based on one or more additional

scenarios run by the transmission planner for the purposes of informing cost allocation, e.g., scenarios that consider the incremental cost of transmission needed to achieve state laws, policies, and regulations beyond the cost of transmission needed in the absence of those laws, policies, and regulations.  For example, the cost allocation method agreed to by the Relevant State Entities may allocate those incremental costs to states with those applicable laws, policies, and regulations.

9. **Clarify that states and/or transmission providers may define additional benefits to those enumerated in Order No. 1920.**

Further, the order clarifies that costs borne by ratepayers must be roughly commensurate with benefits received.  Transmission providers can consider additional benefits for cost allocation purposes, including as agreed to by Relevant State Entities and described elsewhere in this rule, provided that costs are allocated in a way that is at least roughly commensurate with estimated benefits.

10. **Clarify that, for a selected project or tranche of projects, transmission providers shall, for each pricing zone, quantify the benefits and costs associated with such project or tranche.**

The order clarifies that, for each selected project or tranche of projects, each transmission provider is required to make publicly available, on OASIS or other password-protected website, a breakdown of the allocated costs, by transmission pricing zone, and a quantification of the benefits imputed to each zone, as such benefits can be reasonably estimated.

11. **Include, as an example of an approach that could be proposed to comply with Order No. 1920, the below *ex ante* cost allocation method language for Relevant State Entities.  The inclusion of this example does not foreclose states from agreeing to other cost allocation approaches, each of which shall be evaluated on its own merits.**

At the request of the Relevant State Entities in a multistate region, the following *ex ante* method for cost allocation may be proposed.  In providing this example, the order is not foreclosing other approaches for allocating the costs of Long-Term Regional Transmission Facilities on either an *ex ante* or project-specific basis.  Nor is the order suggesting that cost allocation methodologies must adopt a similar approach to this framework in order to comply with the requirements of this final rule:

(1) For purposes of cost allocation, the transmission providers shall run a scenario that otherwise complies with the Long-Term Regional Transmission Planning requirements of Order No. 1920 but does not include state laws, policies, and regulations and quantify the costs of the projects that would be selected from this

scenario.

(2) The costs identified in (1) could be cost allocated according to an alternative *ex ante* formula filed by the transmission owners for the region.

(3) The amount representing the cost difference between the costs of projects selected pursuant to the Long-Term Regional Transmission Planning process and (1) shall be allocated as follows:

    a. The transmission provider shall identify by state the specific state laws, policies, and regulations that were used to plan and select the facilities and shall quantify *by state* the specific costs of such facilities.

    b. The costs identified in 3(a) shall be allocated solely to the state or states that are the sources of the policies used in planning and selection. The total difference between the costs of projects selected pursuant to the Long-Term Regional Transmission Planning process and (1) would be fully accounted for using this method of allocating costs among the states. The costs by zone *within* a state (Intrastate Costs) would be developed and filed by the applicable Transmission Owner(s).

Document Content(s)

RM21-17-001.docx...................................................1

**ATTACHMENT 2**

Official Federal Energy Regulatory Commission Service List
in Docket No. RM21-17-000, *et al.*

**ATTACHMENT 2**

**OFFICIAL FERC SERVICE LIST IN DOCKET NOS. RM21-17-000 *ET AL.***

| Party | Primary Person or Counsel of Record to be Served | Other Contact to be Served |
|---|---|---|
| Tom Pike | Tom Pike<br>4703 STEWART CT<br>MURRYSVILLE,<br>PENNSYLVANIA 15668<br>UNITED STATES<br>tom.r.pike@gmail.com | |
| Elise Silvestri | Elise Silvestri<br>1000 N Negley Ave<br>Pittsburgh, PENNSYLVANIA 15206<br>UNITED STATES<br>elise.m.silvestri@gmail.com | |
| Amanda Waxman | Amanda Waxman<br>531 Mellon St<br>1R<br>Pittsburgh, PENNSYLVANIA 15206<br>UNITED STATES<br>aewaxman@gmail.com | |
| John Blau | John Blau<br>Mr<br>3 Bayard Road<br>Pittsburgh, PENNSYLVANIA 15213<br>UNITED STATES<br>johnpblau@gmail.com | |
| Christian Pelfrey | Christian Pelfrey<br>3223 Piedmont Ave<br>Pittsburgh, PENNSYLVANIA 15216<br>UNITED STATES<br>cpelfrey89@gmail.com | |

| | | |
|---|---|---|
| Danielle McGuire | Danielle McGuire<br>4107 Willow St<br>Pittsburgh, PENNSYLVANIA 15201<br>UNITED STATES<br>dcm678@gmail.com | |
| Ilyas Khan | Ilyas Khan<br>1219 Commercial Street<br>Pittsburgh, PENNSYLVANIA 15218<br>UNITED STATES<br>ilsomoshi@gmail.com | |
| Ronald Belval | Ronald Belval<br>6746 E Calle Cadena<br>Tucson, ARIZONA 85715<br>UNITED STATES<br>Ron@BelvalConnections.com | |
| Aaron Litz | Aaron Litz<br>856 Carroll Street<br>Baltimore, MARYLAND 21230<br>UNITED STATES<br>litz.progress@gmail.com | |
| Seth Handy | Seth Handy<br>Principal<br>42 Weybosset Street<br>Providence, RHODE ISLAND 02903<br>UNITED STATES<br>seth@handylawllc.com | |
| Brandon Crawford | Brandon Crawford<br>1948 Walnut Street<br>Lauderdale, MINNESOTA 55113<br>UNITED STATES<br>crawf560@umn.edu | |
| Seth Handy | Seth Handy<br>Principal | |

| | 42 Weybosset Street<br>Providence, RHODE ISLAND 02903<br>UNITED STATES<br>seth@handylawllc.com | |
| --- | --- | --- |
| Robert Cowles | Robert Cowles<br>PO BOX 7882<br>MADISON, WISCONSIN 53707<br>UNITED STATES<br>Sen.Cowles@legis.wisconsin.gov | |
| Jack Spencer | Jack Spencer<br>656 BUSBEES POINT RD<br>BUMPASS, VIRGINIA 23024<br>UNITED STATES<br>jack.spencer@heritage.org | |
| Julian Bradley | Julian Bradley<br>Senator<br>PO Box 7882<br>Madison, WISCONSIN 53707<br>UNITED STATES<br>sen.bradley@legis.wi.gov | |
| David Gardner | David Gardner<br>United States Senate Committee<br>304 Dirksen Senate Office Building<br>Washington, DISTRICT OF COLUMBIA 20510<br>UNITED STATES<br>david_gardner@energy.senate.gov | |
| Advanced Energy United | Caitlin Marquis<br>Advanced Energy United<br>1010 VERMONT AVE NW STE 1050<br>WASHINGTON, DISTRICT | |

| | | |
|---|---|---|
| | OF COLUMBIA 20005 UNITED STATES cmarquis@advancedenergyunited.org | |
| Advanced Power Alliance | Robert Gaw 1200 County Road 382 Holts Summit, MISSOURI 65043 UNITED STATES RSGaw1@gmail.com | |
| Alabama Public Service Commission | Chad Mason State of Alabama 100 N. Union St. Montgomery, ALABAMA 36104 UNITED STATES chad.mason@psc.alabama.gov | |
| Alabama Public Service Commission | | Luther D. Bentley, IV Attorney - Alabama Public Serv Alabama Public Service Commission 100 N UNION ST STE 836 MONTGOMERY, ALABAMA 36104 luke.bentley@psc.alabama.gov |
| ALLETE, Inc.,d.b.a. Minnesota Power | David Moeller Senior Regulatory Counsel Minnesota Power, Inc. 30 West Superior Street Duluth, MINNESOTA 55802-2093 UNITED STATES dmoeller@allete.com | |
| Alliance for Clean Energy New York | Anne Reynolds Executive Director Alliance for Clean Energy New York | |

| | 119 WASHINGTON AVE ALBANY, NEW YORK 12210 UNITED STATES areynolds@aceny.org | |
|---|---|---|
| Alliant Energy Corporate Services, Inc. | | Angela M Cavallucci Regulatory Relations Manager Alliant Energy Corporate Services, Inc. 801 Pennsylvania Ave NW Washington, DISTRICT OF COLUMBIA 20004 angelacavallucci@alliantenergy.com |
| Alliant Energy Corporate Services, Inc. | | Jane E. Rueger Perkins Coie LLP 700 Thirteenth Street, N.W. Suite 800 WASHINGTON, DISTRICT OF COLUMBIA 20005-3960 jrueger@perkinscoie.com |
| Alliant Energy Corporate Services, Inc. | Andrew Cardon Managing Counsel Alliant Energy Corporate Services, Inc. 200 First Street SE Cedar Rapids, IOWA 52401 UNITED STATES andrewcardon@alliantenergy.com | Mitchell Myhre Manager of Transmission Planni ALLIANT ENERGY 4902 N BILTMORE LN MADISON, WISCONSIN 53718 MitchellMyhre@alliantenergy.com |
| Amazon Energy LLC | Glenn Benson Partner Baker Hostetler LLP 1050 CONNECTICUT AVE NW STE 1100 WASHINGTON, DISTRICT OF COLUMBIA 20036 UNITED STATES gbenson@bakerlaw.com | |

| | | |
|---|---|---|
| Ameren Service Company, as agent for Union Electric Company d/b/a Ameren MS, Ameren IL Company d/b/a Ameren IL and Ameren Transmission Company of IL | Anne Dailey<br>Senior Corporate Counsel<br>Ameren Services Company<br>1331 Pennsylvania Avenue, NW<br>WASHINGTON, DISTRICT OF COLUMBIA 20004<br>UNITED STATES<br>adailey@ameren.com | |
| Ameren Services Company | Matthew Tomc<br>Director and Assistant General<br>Ameren Corporation<br>1901 Chouteau Ave<br>MC 1310<br>St. Louis, MISSOURI 63040<br>UNITED STATES<br>mtomc@ameren.com | Denice Simpson<br>Regulatory Affairs Specialist<br>Ameren Corporation<br>1331 Pennsylvania Ave, NW<br>Suite 550 South<br>Washington, DISTRICT OF<br>COLUMBIA 20004<br>dsimpson@ameren.com |
| Ameren Services Company | Anne Dailey<br>Senior Corporate Counsel<br>Ameren Services Company<br>1331 Pennsylvania Avenue, NW<br>WASHINGTON, DISTRICT OF COLUMBIA 20004<br>UNITED STATES<br>adailey@ameren.com | |
| American Chemistry Council | Charles Franklin<br>Senior Director, Energy, Clima<br>700 2ND ST NE<br>WASHINGTON, DISTRICT OF COLUMBIA 20002 | |

| | UNITED STATES<br>cfranklinindc@gmail.com | |
|---|---|---|
| American Clean Power Association | Gabriel Tabak<br>Counsel<br>American Clean Power Association<br>1501 M St NW<br>Washington, DISTRICT OF COLUMBIA 20005<br>UNITED STATES<br>gtabak@cleanpower.org | eugene grace<br>Regulatory Attorney<br>1501 M St NW, Ste 1000<br>washington, DISTRICT OF COLUMBIA 20005<br>ggrace@awea.org |
| American Clean Power Association | | Steven Shparber<br>Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.<br>555 12TH ST NW<br>STE 1100<br>WASHINGTON, DISTRICT OF COLUMBIA 20004<br>sshparber@mintz.com |
| American Clean Power Association | | Omar Bustami<br>Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.<br>3580 Carmel Mountain Road<br>Suite 300<br>San Diego, CALIFORNIA 92130<br>OBustami@mintz.com |
| American Clean Power Association | Andrew Kaplan<br>Partner<br>Pierce Atwood LLP<br>100 SUMMER ST<br>BOSTON, MASSACHUSETTS 02110<br>UNITED STATES<br>akaplan@pierceatwood.com | Sharon Thomas<br>9410 KINGSLEY AVE<br>BETHESDA, MARYLAND 20814<br>sharonmt93@gmail.com |

| | | |
|---|---|---|
| American Clean Power Association | | Jason Burwen<br>Vice President, Energy Storage<br>American Clean Power Association<br>1501 M ST NW STE 900<br>WASHINGTON, DISTRICT OF COLUMBIA 20005<br>jburwen@cleanpower.org |
| American Clean Power Association | | Jason Burwen<br>Vice President, Energy Storage<br>American Clean Power Association<br>1501 M ST NW STE 900<br>WASHINGTON, DISTRICT OF COLUMBIA 20005<br>jburwen@cleanpower.org |
| American Council on Renewable Energy | Larry Eisenstat<br>Partner<br>Crowell & Moring LLP<br>1001 Pennsylvania Ave. N.W.<br>Washington, DISTRICT OF COLUMBIA 20004<br>UNITED STATES<br>leisenstat@crowell.com | Tyler Stoff<br>American Council on Renewable Energy<br>1150 Connecticut Ave<br>Suite 401<br>Washington, DISTRICT OF COLUMBIA 20036<br>stoff@acore.org |
| American Council on Renewable Energy | | Patricia M Alexander<br>Advisor<br>Crowell & Moring LLP<br>1001 Pennsylvania Ave. N.W.<br>Washington, DISTRICT OF COLUMBIA 20004<br>palexander@crowell.com |
| American Council on Renewable Energy | | Diana Jeschke<br>Linklaters LLP<br>601 13TH ST NW<br>SUITE 400 SOUTH<br>WASHINGTON, DISTRICT OF COLUMBIA 20005<br>diana.jeschke@linklaters.com |

| | | |
|---|---|---|
| American Council on Renewable Energy | Larry Eisenstat<br>Partner<br>Crowell & Moring LLP<br>1001 Pennsylvania Ave. N.W.<br>Washington, DISTRICT OF COLUMBIA 20004<br>UNITED STATES<br>leisenstat@crowell.com | Patricia M Alexander<br>Advisor<br>Crowell & Moring LLP<br>1001 Pennsylvania Ave. N.W.<br>Washington, DISTRICT OF COLUMBIA 20004<br>palexander@crowell.com |
| American Council on Renewable Energy | | Diana Jeschke<br>Linklaters LLP<br>601 13TH ST NW<br>SUITE 400 SOUTH<br>WASHINGTON, DISTRICT OF COLUMBIA 20005<br>diana.jeschke@linklaters.com |
| American Council on Renewable Energy | Elise Caplan<br>Director of Electricity Policy<br>American Council on Renewable Energy<br>1150 CONNECTICUT AVE NW STE 401<br>WASHINGTON, DISTRICT OF COLUMBIA 20036<br>UNITED STATES<br>caplan@acore.org | |
| American Council on Renewable Energy | Barbara Tyran<br>Director of the Macro Grid Ini<br>Macro Grid Initiative<br>1150 Connecticut Ave NW Suite 401<br>Washington, DISTRICT OF COLUMBIA 20035<br>UNITED STATES<br>tyran@acore.org | |
| American Council on Renewable Energy | Elise Caplan<br>Director of Electricity Policy<br>American Council on Renewable Energy | |

| | | |
|---|---|---|
| | 1150 CONNECTICUT AVE NW STE 401 WASHINGTON, DISTRICT OF COLUMBIA 20036 UNITED STATES caplan@acore.org | |
| American Council on Renewable Energy | Elise Caplan Director of Electricity Policy American Council on Renewable Energy 1150 CONNECTICUT AVE NW STE 401 WASHINGTON, DISTRICT OF COLUMBIA 20036 UNITED STATES caplan@acore.org | |
| American Electric Power Service Corporation | Stacey Burbure American Electric Power Company 801 Pennsylvania Avenue, NW Washington DC, DISTRICT OF COLUMBIA 20004 UNITED STATES slburbure@aep.com | LaChon Turner AEP COMPANIES 801 PENNSYLVANIA AVE NW STE 735 WASHINGTON, DISTRICT OF COLUMBIA 20004 lturner@aep.com |
| American Electric Power Service Corporation | Amanda Conner Assistant General Counsel American Electric Power Service Corporation 1 RIVERSIDE PLZ COLUMBUS, OHIO 43215 UNITED STATES arconner@aep.com | |
| American Electric Power Service Corporation | Stacey Burbure American Electric Power Company 801 Pennsylvania Avenue, NW Washington DC, DISTRICT OF COLUMBIA 20004 | |

| | | |
|---|---|---|
| | UNITED STATES<br>slburbure@aep.com | |
| American Electric Power Service Corporation | Amanda Conner<br>Assistant General Counsel<br>American Electric Power<br>Service Corporation<br>1 RIVERSIDE PLZ<br>COLUMBUS, OHIO 43215<br>UNITED STATES<br>arconner@aep.com | |
| AMERICAN FARMLAND TRUST | Tim Fink<br>AMERICAN FARMLAND TRUST<br>1150 Connecticut Ave NW #600<br>Washington, DISTRICT OF COLUMBIA 20036<br>UNITED STATES<br>tfink@farmland.org | |
| American Municipal Power, Inc. | Lisa McAlister<br>Deputy General Counsel - FERC/<br>American Municipal Power, Inc.<br>1111 Schrock Road<br>Suite 100<br>Columbus, OHIO 43229<br>UNITED STATES<br>lmcalister@amppartners.org | |
| American Municipal Power, Inc. | Gerit Hull<br>Deputy General Counsel - Regul<br>American Municipal Power, Inc.<br>1111 SCHROCK RD STE 100<br>COLUMBUS, OHIO 43229<br>UNITED STATES<br>ghull@amppartners.org | |

| | | |
|---|---|---|
| American Municipal Power, Inc. | Gerit Hull<br>Deputy General Counsel - Regul<br>American Municipal Power, Inc.<br>1111 SCHROCK RD STE 100<br>COLUMBUS, OHIO 43229<br>UNITED STATES<br>ghull@amppartners.org | |
| American Municipal Power, Inc. | Lisa McAlister<br>Deputy General Counsel - FERC/<br>American Municipal Power, Inc.<br>1111 Schrock Road<br>Suite 100<br>Columbus, OHIO 43229<br>UNITED STATES<br>lmcalister@amppartners.org | Christopher J Norton<br>Director of Market Regulatory<br>American Municipal Power, Inc.<br>1111 Schrock Road<br>Suite 100<br>Columbus, OHIO 43229<br>cnorton@amppartners.org |
| American Municipal Power, Inc. | Gerit Hull<br>Deputy General Counsel - Regul<br>American Municipal Power, Inc.<br>1111 SCHROCK RD STE 100<br>COLUMBUS, OHIO 43229<br>UNITED STATES<br>ghull@amppartners.org | |
| American Municipal Power, Inc. | Lisa McAlister<br>Deputy General Counsel - FERC/<br>American Municipal Power, Inc.<br>1111 Schrock Road<br>Suite 100<br>Columbus, OHIO 43229<br>UNITED STATES<br>lmcalister@amppartners.org | |

| | | |
|---|---|---|
| American Municipal Power, Inc. | Gerit Hull<br>Deputy General Counsel - Regul<br>American Municipal Power, Inc.<br>1111 SCHROCK RD STE 100<br>COLUMBUS, OHIO 43229<br>UNITED STATES<br>ghull@amppartners.org | |
| American Public Power Association | Desmarie Waterhouse<br>American Public Power Association<br>2451 Crystal Drive<br>Suite 1000<br>Arlington, VIRGINIA 22202<br>UNITED STATES<br>dwaterhouse@publicpower.org | Delia D. Patterson, ESQ<br>SVP, Advocacy &<br>Communications<br>American Public Power Association<br>2451 Crystal Drive<br>Suite 1000<br>Arlinton, VIRGINIA 22202<br>dpatterson@publicpower.org |
| American Public Power Association | Jonathan Schneider<br>Stinson LLP<br>Stinson LLP<br>1775 Pennsylvania Avenue NW<br>Washington, DISTRICT OF COLUMBIA 20006<br>UNITED STATES<br>jonathan.schneider@stinson.com | |
| American Public Power Association | | Whit Williamson<br>Director - Power Supply<br>Thompson Coburn LLP<br>4201 Dominion Blvd<br>Glen Allen, VIRGINIA 23060<br>wwilliamson@odec.com |
| American Transmission Company LLC | Trevor Stiles<br>Manager, Reliability Standards<br>American Transmission Company LLC<br>PO Box 47<br>Waukesha, WISCONSIN 53187 | |

13

| | UNITED STATES<br>tstiles@atcllc.com | |
|---|---|---|
| American Transmission Company LLC | | Val Lehner<br>American Transmission Company LLC (ATC)<br>W234N2000 Ridgeview Parkway Court<br>Waukesha, WISCONSIN 53188<br>vlehner@atcllc.com |
| Americans for a Clean Energy Grid | Rob Gramlich<br>Grid Strategies LLC<br>9207 Kirkdale Rd<br>Bethesda, MARYLAND 20817<br>UNITED STATES<br>rgramlich@gridstrategiesllc.com | |
| Americans for a Clean Energy Grid | Rob Gramlich<br>Grid Strategies LLC<br>9207 Kirkdale Rd<br>Bethesda, MARYLAND 20817<br>UNITED STATES<br>rgramlich@gridstrategiesllc.com | |
| Americans for a Clean Energy Grid | Linda Walsh<br>Husch Blackwell LLP<br>750 17th Street NW<br>Washington DC, DISTRICT OF COLUMBIA 200067<br>UNITED STATES<br>linda.walsh@huschblackwell.com | Rob Gramlich<br>Grid Strategies LLC<br>9207 Kirkdale Rd<br>Bethesda, MARYLAND 20817<br>rgramlich@gridstrategiesllc.com |
| Americans for a Clean Energy Grid | | James Hoecker<br>Senior Counsel<br>Husch Blackwell LLP<br>1801 PENNSYLVANIA AVE NW STE 1000<br>WASHINGTON, DISTRICT |

14

| | | |
|---|---|---|
| | | OF COLUMBIA 20006 james.hoecker@huschblackwell.com |
| Americans for a Clean Energy Grid | | Sylvia J. S. Bartell Husch Blackwell Husch Blackwell LLP 750 17th Street, NW Suite 900 Washington, DISTRICT OF COLUMBIA 20006 sylvia.bartell@huschblackwell.com |
| Americans for a Clean Energy Grid | | Michael Blackwell Attorney Husch Blackwell LLP 10700 VALLEY DR CARMEL, INDIANA 46280 michael.blackwell@huschblackwell.com |
| Americans for a Clean Energy Grid | James Hoecker Senior Counsel Husch Blackwell LLP 1801 PENNSYLVANIA AVE NW STE 1000 WASHINGTON, DISTRICT OF COLUMBIA 20006 UNITED STATES james.hoecker@huschblackwell.com | Linda L Walsh, ESQ Husch Blackwell LLP 750 17th Street NW Washington DC, DISTRICT OF COLUMBIA 200067 linda.walsh@huschblackwell.com |
| Americans for a Clean Energy Grid | | Sylvia J. S. Bartell Husch Blackwell Husch Blackwell LLP 750 17th Street, NW Suite 900 Washington, DISTRICT OF COLUMBIA 20006 sylvia.bartell@huschblackwell.com |

| | | |
|---|---|---|
| Americans for a Clean Energy Grid | | Michael Blackwell<br>Attorney<br>Husch Blackwell LLP<br>10700 VALLEY DR<br>CARMEL, INDIANA 46280<br>michael.blackwell@huschblackwell.com |
| Americans for a Clean Energy Grid | | Rob Gramlich<br>Grid Strategies LLC<br>9207 Kirkdale Rd<br>Bethesda, MARYLAND 20817<br>rgramlich@gridstrategiesllc.com |
| Americans for a Clean Energy Grid | | Anjali G Patel<br>Vice President for Clean Energ<br>Americans for a Clean Energy Grid<br>3100 CLARENDON BLVD STE 800<br>ARLINGTON, VIRGINIA 22201<br>anjali@dgardiner.com |
| Americans for Fair Energy Prices, Inc. | Meagan Bolton<br>Of Counsel<br>Ice Miller, LLP<br>200 MASSACHUSETTS AVE NW STE 400<br>WASHINGTON, DISTRICT OF COLUMBIA 20001<br>UNITED STATES<br>Meagan.Bolton@Icemiller.com | |
| Ample, Inc. | Levi Tillemann<br>Vice President for Policy and<br>Ample, Inc.<br>100 Hooper St.<br>Suite 25<br>San Francisco, CALIFORNIA 94107 | |

16

| | UNITED STATES<br>ltillemann@ample.com | |
|---|---|---|
| Anbaric Development Partners, LLC | | Susan M Antonio<br>Santonio@anbaric.com |
| Anbaric Development Partners, LLC | Clarke Bruno<br>CEO<br>401 EDGEWATER PL STE 680<br>WAKEFIELD, MASSACHUSETTS 01880<br>UNITED STATES<br>cbruno@anbaric.com | |
| Anbaric Development Partners, LLC | Clarke Bruno<br>CEO<br>401 EDGEWATER PL STE 680<br>WAKEFIELD, MASSACHUSETTS 01880<br>UNITED STATES<br>cbruno@anbaric.com | |
| Appalachian Voices | Nicholas Guidi<br>Southern Environmental Law Center<br>122 C ST NW STE 325<br>WASHINGTON, DISTRICT OF COLUMBIA 20001<br>UNITED STATES<br>nguidi@selcdc.org | |
| Arizona Corporation Commission | Maureen Scott<br>Arizona Corporation Commission<br>1200 W WASHINGTON ST<br>PHOENIX, ARIZONA 85007<br>UNITED STATES<br>mscott@azcc.gov | Katherine L Kane<br>kkane@azcc.gov |

| | | |
|---|---|---|
| Arizona Corporation Commission | | Kathryn Ust<br>kust@azcc.gov |
| Arizona Corporation Commission | Maureen Scott<br>Arizona Corporation Commission<br>1200 W WASHINGTON ST<br>PHOENIX, ARIZONA 85007<br>UNITED STATES<br>mscott@azcc.gov | Maureen Scott<br>Arizona Corporation Commission<br>1200 W WASHINGTON ST<br>PHOENIX, ARIZONA 85007<br>mscott@azcc.gov |
| Arizona Corporation Commission | | Kathryn Ust<br>kust@azcc.gov |
| Arizona Public Service Company | Jennifer Spina<br>Associate General Counsel<br>Pinnacle West Capital Corporation<br>400 N 5TH ST<br>MAIL STATION 8695<br>PHOENIX, ARIZONA 85004<br>UNITED STATES<br>jennifer.spina@pinnaclewest.com | Thomas E McCall, III<br>Manager Federal Regulation<br>Arizona Public Service Company<br>400 N 5TH ST<br>PHOENIX, ARIZONA 85004<br>Thomas.McCall@aps.com |
| Arizona Public Service Company | Alyssa Koslow<br>Federal Regualtory Advisor<br>Arizona Public Service Company<br>400 5th Ave.<br>MB9712<br>Phoenix, ARIZONA 85004<br>UNITED STATES<br>alyssa.koslow@aps.com | |
| Arkansas Public Service Commission | Justin Craig<br>Commission Counsel<br>Arkansas Public Service Commission<br>1000 CENTER ST | Glen Ortman<br>glen.ortman@stinson.com |

| | | |
|---|---|---|
| | LITTLE ROCK, ARKANSAS 72201 UNITED STATES justin.craig@arkansas.gov | |
| Arkansas Public Service Commission | | Keith Berry 38 River Ridge Circle Little Rock, ARKANSAS 72227 berry@hendrix.edu |
| Arkansas Public Service Commission | William Booth Michael Best & Friedrich, LLP 1000 Maine Ave SW Suite 400 Washington, D.C., DISTRICT OF COLUMBIA 20024 UNITED STATES wdbooth@michaelbest.com | |
| Associated Electric Cooperative, Inc. | Brian Prestwood SVP General Counsel and CCO Associated Electric Cooperative, Inc. 2814 S. Golden Ave. Springfield, MISSOURI 65807 UNITED STATES bprestwood@aeci.org | |
| Associated Electric Cooperative, Inc. | Brian Prestwood SVP General Counsel and CCO Associated Electric Cooperative, Inc. 2814 S. Golden Ave. Springfield, MISSOURI 65807 UNITED STATES bprestwood@aeci.org | |
| Associated Electric Cooperative, Inc. | Brian Prestwood SVP General Counsel and CCO Associated Electric Cooperative, Inc. | |

| | | |
|---|---|---|
| | 2814 S. Golden Ave.<br>Springfield, MISSOURI 65807<br>UNITED STATES<br>bprestwood@aeci.org | |
| Associated Electric Cooperative, Inc. | Brian Prestwood<br>SVP General Counsel and CCO<br>Associated Electric Cooperative, Inc.<br>2814 S. Golden Ave.<br>Springfield, MISSOURI 65807<br>UNITED STATES<br>bprestwood@aeci.org | |
| Association of Fish and Wildlife Agencies | David Lind<br>Government Affairs Coordinator<br>Association of Fish and Wildlife Agencies<br>1100 First St NE<br>Suite 825<br>Washington, DISTRICT OF COLUMBIA 20002<br>UNITED STATES<br>dlind@fishwildlife.org | David Lind<br>Government Affairs Coordinator<br>Association of Fish and Wildlife Agencies<br>1100 First St NE<br>Suite 825<br>Washington, DISTRICT OF COLUMBIA 20002<br>dlind@fishwildlife.org |
| Attorney General of Kentucky | Joseph West<br>Assistant Attorney General<br>Kentucky Attorney General<br>1024 Capital Center Drive<br>Suite 200<br>Frankfort, KENTUCKY 40601<br>UNITED STATES<br>michael.west@ky.gov | |
| Attorney General of Kentucky | Larry Cook<br>Kentucky Attorney General<br>700 CAPITAL AVE<br>FRANKFORT, KENTUCKY 40601<br>UNITED STATES<br>larry.cook@ky.gov | |

| | | |
|---|---|---|
| Attorney General of Texas | John Hulme<br>Assistant Attorney General<br>Texas Attorney General's Office<br>PO Box 12548<br>Austin,TEXAS 78711-2548<br>UNITED STATES<br>john.hulme@oag.texas.gov | |
| Attorney General's Office | Jeff Roberson<br>Assistant Attorney General<br>PO Box 40128<br>Olympia, WASHINGTON 98504<br>UNITED STATES<br>jeff.roberson@utc.wa.gov | |
| Attorney General's Office | Jeff Roberson<br>Assistant Attorney General<br>PO Box 40128<br>Olympia, WASHINGTON 98504<br>UNITED STATES<br>jeff.roberson@utc.wa.gov | |
| Avangrid Service Company | Kenna Hagan<br>Sr. Counsel<br>Avangrid Networks, Inc.<br>180 Marsh Hill Road<br>Orange, CONNECTICUT 06477<br>UNITED STATES<br>kenna.hagan@avangrid.com | |
| Avangrid, Inc. | Scott Mahoney<br>Senior Vice President - Genera<br>Avangrid, Inc.<br>180 Marsh Hill Road<br>Orange, CONNECTICUT 06470<br>UNITED STATES<br>Scott.Mahoney@avangrid.com | Alan Trotta<br>United Illuminating Company, The<br>157 Church Street<br>New Haven, CONNECTICUT 06510<br>alan.trotta@uinet.com |

21

| | | |
|---|---|---|
| Avangrid, Inc. | | Kevin Kilgallen<br>Director, Market Structure & P<br>Avangrid, Inc.<br>411 OAKLAND DR<br>DOWNINGTOWN,<br>PENNSYLVANIA 19335<br>kevin.kilgallen@avangrid.com |
| Avangrid, Inc. | | Kenna Hagan<br>Sr. Counsel<br>Avangrid Networks, Inc.<br>180 Marsh Hill Road<br>Orange, CONNECTICUT<br>06477<br>kenna.hagan@avangrid.com |
| Avangrid, Inc. | | Toan-Hao Nguyen, ESQ<br>Deputy General Counsel<br>Avangrid Renewables, LLC<br>1125 NW Couch, Suite 700<br>Portland, OREGON 97209<br>toan.nguyen@avangrid.com |
| Avangrid, Inc. | Danielle Mechling<br>Avangrid Networks, Inc.<br>180 MARSH HILL RD<br>ORANGE, CONNECTICUT<br>06477<br>UNITED STATES<br>Danielle.Mechling@avangrid.com | Alan Trotta<br>United Illuminating Company,<br>The<br>157 Church Street<br>New Haven, CONNECTICUT<br>06510<br>alan.trotta@uinet.com |
| Avangrid, Inc. | | Toan-Hao Nguyen, ESQ<br>Deputy General Counsel<br>Avangrid Renewables, LLC<br>1125 NW Couch, Suite 700<br>Portland, OREGON 97209<br>toan.nguyen@avangrid.com |
| Avangrid, Inc. | | Kevin Kilgallen<br>Director, Market Structure & P<br>Avangrid, Inc. |

22

| | | |
|---|---|---|
| | | 411 OAKLAND DR DOWNINGTOWN, PENNSYLVANIA 19335 kevin.kilgallen@avangrid.com |
| Avangrid, Inc. | | Kevin Kilgallen Director, Market Structure & P Avangrid, Inc. 411 OAKLAND DR DOWNINGTOWN, PENNSYLVANIA 19335 kevin.kilgallen@avangrid.com |
| Avangrid, Inc. | | Toan-Hao Nguyen, ESQ Deputy General Counsel Avangrid Renewables, LLC 1125 NW Couch, Suite 700 Portland, OREGON 97209 toan.nguyen@avangrid.com |
| Avista Corporation | Greg Hesler Senior VP,General Counsel Avista Corporation Corporate Secretary and Chief Ethics/Compliance Officer 1411 E. Mission Avenue, MSC-10 Spokane, WASHINGTON 99202 UNITED STATES greg.hesler@avistacorp.com | |
| Avista Corporation | Jeff Schlect Manager, Transmission Services Avista Corporation 1411 E MISSION AVE # MSC-16 AVISTA CORPORATION SPOKANE, WASHINGTON 99202 UNITED STATES jeff.schlect@avistacorp.com | |

| | | |
|---|---|---|
| Bekaert | Daniel Berkowitz<br>Bekaert<br>1395 S MARIETTA PKWY SE<br>BLDG 500<br>MARIETTA, GEORGIA 30067<br>UNITED STATES<br>daniel.berkowitz@bekaert.com | |
| BELMONT MUNICIPAL LIGHT DEPARTMENT | John Coyle<br>Duncan & Allen LLP<br>Suite 700<br>1730 Rhode Island Avenue, N.W.<br>Washington, DISTRICT OF COLUMBIA 20036-3115<br>UNITED STATES<br>jpc@duncanallen.com | |
| BELMONT MUNICIPAL LIGHT DEPARTMENT | John Coyle<br>Duncan & Allen LLP<br>Suite 700<br>1730 Rhode Island Avenue, N.W.<br>Washington, DISTRICT OF COLUMBIA 20036-3115<br>UNITED STATES<br>jpc@duncanallen.com | |
| BELMONT MUNICIPAL LIGHT DEPARTMENT | John Coyle<br>Duncan & Allen LLP<br>Suite 700<br>1730 Rhode Island Avenue, N.W.<br>Washington, DISTRICT OF COLUMBIA 20036-3115<br>UNITED STATES<br>jpc@duncanallen.com | |
| Block Island Utility District | John Coyle<br>Duncan & Allen LLP<br>Suite 700<br>1730 Rhode Island Avenue, | |

| | | |
|---|---|---|
| | N.W.<br>Washington, DISTRICT OF COLUMBIA 20036-3115<br>UNITED STATES<br>jpc@duncanallen.com | |
| Block Island Utility District | John Coyle<br>Duncan & Allen LLP<br>Suite 700<br>1730 Rhode Island Avenue, N.W.<br>Washington, DISTRICT OF COLUMBIA 20036-3115<br>UNITED STATES<br>jpc@duncanallen.com | |
| Block Island Utility District | John Coyle<br>Duncan & Allen LLP<br>Suite 700<br>1730 Rhode Island Avenue, N.W.<br>Washington, DISTRICT OF COLUMBIA 20036-3115<br>UNITED STATES<br>jpc@duncanallen.com | |
| Bonneville Power Administration | Jennifer Gingrich<br>Attorney<br>Bonneville Power Administration<br>905 NE 11TH AVE<br>LT-7<br>PORTLAND, OREGON 97232<br>UNITED STATES<br>jagingrich@bpa.gov | |
| Bonneville Power Administration | Jennifer Gingrich<br>Attorney<br>Bonneville Power Administration<br>905 NE 11TH AVE<br>LT-7 | |

| | | |
|---|---|---|
| | PORTLAND, OREGON 97232 UNITED STATES jagingrich@bpa.gov | |
| BP America Inc. | | Isabel Mogstad BP America Inc. 1101 New York Avenue NW Suite 700 Washington, DISTRICT OF COLUMBIA 20005 isabel.mogstad@bp.com |
| BP America Inc. | | Hiba Abedrabo Manager - Policy Advocacy & Fe BP Energy Company 1101 New York Ave NW Washington, DISTRICT OF COLUMBIA 20005 Hiba.Abedrabo@bp.com |
| Braintree Electric Light Department | John Coyle Duncan & Allen LLP Suite 700 1730 Rhode Island Avenue, N.W. Washington, DISTRICT OF COLUMBIA 20036-3115 UNITED STATES jpc@duncanallen.com | |
| Braintree Electric Light Department | John Coyle Duncan & Allen LLP Suite 700 1730 Rhode Island Avenue, N.W. Washington, DISTRICT OF COLUMBIA 20036-3115 UNITED STATES jpc@duncanallen.com | |

| | | |
|---|---|---|
| Braintree Electric Light Department | John Coyle<br>Duncan & Allen LLP<br>Suite 700<br>1730 Rhode Island Avenue, N.W.<br>Washington, DISTRICT OF COLUMBIA 20036-3115<br>UNITED STATES<br>jpc@duncanallen.com | |
| Breakthroug h Energy | James Hewett<br>Breakthrough Energy<br>Breakthrough Energy<br>1333 H ST NW STE 520E<br>WASHINGTON, DISTRICT OF COLUMBIA 20005<br>UNITED STATES<br>james@breakthroughenergy.org | |
| Breakthroug h Energy | Daniel Wolf<br>Manager, U.S. Policy & Advocac<br>Breakthrough Energy<br>1333 H ST NW STE 520E<br>WASHINGTON, DISTRICT OF COLUMBIA 20005<br>UNITED STATES<br>daniel.wolf@breakthroughenerg y.org | |
| Breakthroug h Energy | Daniel Wolf<br>Manager, U.S. Policy & Advocac<br>Breakthrough Energy<br>1333 H ST NW STE 520E<br>WASHINGTON, DISTRICT OF COLUMBIA 20005<br>UNITED STATES<br>daniel.wolf@breakthroughenerg y.org | |

| | | |
|---|---|---|
| Bridgelink Investments | Justin Crossie<br>Director of Government and Pub<br>Bridgelink Investments<br>777 Main St.<br>Ft. Worth, TEXAS 76102<br>UNITED STATES<br>justin.crossie@bridgelinkinvestments.com | |
| Burbank Water & Power | Jon Stickman<br>Attorney<br>Duncan & Allen LLP<br>1730 RHODE ISLAND AVE NW STE 700<br>WASHINGTON, DISTRICT OF COLUMBIA 20036<br>UNITED STATES<br>jrs@duncanallen.com | |
| Business Council for Sustainable Energy | Lisa Jacobson<br>President<br>805 15TH ST NW STE 710<br>WASHINGTON, DISTRICT OF COLUMBIA 20005<br>UNITED STATES<br>ljacobson@bcse.org | |
| Business Council for Sustainable Energy | Lisa Jacobson<br>President<br>805 15TH ST NW STE 710<br>WASHINGTON, DISTRICT OF COLUMBIA 20005<br>UNITED STATES<br>ljacobson@bcse.org | |
| California Department of Water Resources State Water Project | | Lisa Dowden<br>Senior Counsel<br>Spiegel & McDiarmid LLP<br>1818 N Street, NW<br>8th Floor<br>WASHINGTON, DISTRICT |

| | | |
|---|---|---|
| | | OF COLUMBIA 20036<br>Lisa.Dowden@spiegelmcd.com |
| California Department of Water Resources State Water Project | | Amanda C. Drennen<br>Attorney<br>Spiegel & McDiarmid LLP<br>1818 N Street, NW<br>8th Floor<br>WASHINGTON, DISTRICT OF COLUMBIA 20036<br>amanda.drennen@spiegelmcd.com |
| California Department of Water Resources State Water Project | | E Service<br>Spiegel & McDiarmid LLP<br>1875 Eye St, NW<br>Suite 700<br>Washington, DISTRICT OF COLUMBIA 20006<br>eService@spiegelmcd.com |
| California Department of Water Resources State Water Project | Matthew Goldman<br>Deputy Attorney General<br>California Department of Justice<br>PO Box 944255<br>Sacramento,CALIFORNIA<br>UNITED STATES<br>matthew.goldman@doj.ca.gov | |
| California Energy Commission | Lisa DeCarlo<br>California Energy Commission<br>715 P ST<br>MS-14<br>SACRAMENTO, CALIFORNIA 95814<br>UNITED STATES<br>lisa.decarlo@energy.ca.gov | |
| California Energy Commission | Lisa DeCarlo<br>California Energy Commission<br>715 P ST<br>MS-14 | |

| | | |
|---|---|---|
| | SACRAMENTO, CALIFORNIA 95814 UNITED STATES lisa.decarlo@energy.ca.gov | |
| California Independent System Operator Corporation | Anthony Ivancovich Assistant General Counsel California Independent System Operator Corporation 250 Outcropping Way Folsom, CALIFORNIA 95630 UNITED STATES aivancovich@caiso.com | Andrew Ulmer Assistant General Counsel California Independent System Operator Corporation 250 Outcropping Way Folsom, CALIFORNIA 95630 aulmer@caiso.com |
| California Independent System Operator Corporation | | e-recipient Legal and Regulatory California Independent System Operator Corporation 250 Outcropping Way Folsom, CALIFORNIA 95630 e-recipient@caiso.com |
| California Independent System Operator Corporation | | William H Weaver Senior Counsel California Independent System Operator Corporation 250 Outcropping Way Washington, CALIFORNIA 20001 bweaver@caiso.com |
| California Independent System Operator Corporation | | Jordan Pinjuv California Independent System Operator Corporation 250 Outcropping Way Folsom, CALIFORNIA 95630 jpinjuv@caiso.com |
| California Independent System | | e-recipient Legal and Regulatory California Independent System Operator Corporation |

30

| Operator Corporation | | 250 Outcropping Way<br>Folsom, CALIFORNIA 95630<br>e-recipient@caiso.com |
|---|---|---|
| California Independent System Operator Corporation | | Jordan Pinjuv<br>California Independent System Operator Corporation<br>250 Outcropping Way<br>Folsom, CALIFORNIA 95630<br>jpinjuv@caiso.com |
| California Independent System Operator Corporation | | e-recipient Legal and Regulatory<br>California Independent System Operator Corporation<br>250 Outcropping Way<br>Folsom, CALIFORNIA 95630<br>e-recipient@caiso.com |
| California Independent System Operator Corporation | | Bradley R. Miliauskas<br>Davis Wright Tremaine LLP<br>1251 Avenue of the Americas<br>21st Floor<br>New York, NEW YORK 10020<br>bradleymiliauskas@dwt.com |
| California Independent System Operator Corporation | | Sean A Atkins, ESQ<br>Partner<br>Davis Wright Tremaine LLP<br>1301 K Street NW<br>Suite 500 East<br>Washington, DISTRICT OF COLUMBIA 20005<br>seanatkins@dwt.com |
| California Independent System Operator Corporation | | e-recipient Legal and Regulatory<br>California Independent System Operator Corporation<br>250 Outcropping Way<br>Folsom, CALIFORNIA 95630<br>e-recipient@caiso.com |

| | | |
|---|---|---|
| California Independent System Operator Corporation | | Sean A Atkins, ESQ<br>Partner<br>Davis Wright Tremaine LLP<br>1301 K Street NW<br>Suite 500 East<br>Washington, DISTRICT OF COLUMBIA 20005<br>seanatkins@dwt.com |
| California Independent System Operator Corporation | | Bradley R. Miliauskas<br>Davis Wright Tremaine LLP<br>1251 Avenue of the Americas<br>21st Floor<br>New York, NEW YORK 10020<br>bradleymiliauskas@dwt.com |
| California Independent System Operator Corporation | | Sarah Kozal<br>California Independent System Operator Corporation<br>250 Outcropping Way<br>Folsom, CALIFORNIA 95630<br>skozal@caiso.com |
| California Independent System Operator Corporation | | Sean A Atkins, ESQ<br>Partner<br>Davis Wright Tremaine LLP<br>1301 K Street NW<br>Suite 500 East<br>Washington, DISTRICT OF COLUMBIA 20005<br>seanatkins@dwt.com |
| California Independent System Operator Corporation | | Bradley R. Miliauskas<br>Davis Wright Tremaine LLP<br>1251 Avenue of the Americas<br>21st Floor<br>New York, NEW YORK 10020<br>bradleymiliauskas@dwt.com |
| California Municipal | C. Anthony Braun<br>Braun Blaising & Wynne, P.C.<br>555 Capitol Mall | Marissa Nava<br>Braun Blaising & Wynne, P.C.<br>555 CAPITOL MALL STE 570 |

| | | |
|---|---|---|
| Utilities Association | Suite 570<br>Sacramento, CALIFORNIA 95814<br>UNITED STATES<br>braun@braunlegal.com | SACRAMENTO, CALIFORNIA 95814<br>nava@braunlegal.com |
| California Municipal Utilities Association | C. Anthony Braun<br>Braun Blaising & Wynne, P.C.<br>555 Capitol Mall<br>Suite 570<br>Sacramento, CALIFORNIA 95814<br>UNITED STATES<br>braun@braunlegal.com | |
| California Municipal Utilities Association | C. Anthony Braun<br>Braun Blaising & Wynne, P.C.<br>555 Capitol Mall<br>Suite 570<br>Sacramento, CALIFORNIA 95814<br>UNITED STATES<br>braun@braunlegal.com | |
| California Public Utilities Commission | Anand Durvasula<br>California Public Utilities Commission<br>505 VAN NESS AVE<br>SAN FRANCISCO, CALIFORNIA 94102<br>UNITED STATES<br>anand.durvasula@cpuc.ca.gov | Christine Jun Hammond<br>Attorney- Legal Division<br>California Public Utilities Commission<br>505 Van Ness Ave.<br>San Francisco, CALIFORNIA 94102-3298<br>christine.hammond@cpuc.ca.gov |
| California Public Utilities Commission | | Christopher E Clay<br>Assistant Chief Counsel<br>Public Utilities Commission of The State of California<br>505 VAN NESS AVE<br>SAN FRANCISCO, CALIFORNIA 94102<br>christopher.clay@cpuc.ca.gov |

| | | |
|---|---|---|
| California Public Utilities Commission | | Elaine Sison-Lebrilla<br>elaine.sison-lebrilla@cpuc.ca.gov |
| California Public Utilities Commission | | Simon Hurd<br>California Public Utilities Commission<br>505 VAN NESS AVE<br>SAN FRANCISCO, CALIFORNIA 94102<br>Simon.Hurd@cpuc.ca.gov |
| California Public Utilities Commission | | Sushil C. Jacob<br>Staff Counsel<br>California Public Utilities Commission<br>505 Van Ness Ave.<br>San Francisco, CALIFORNIA 94102<br>sushil.jacob@cpuc.ca.gov |
| California Public Utilities Commission | | Marybelle C Ang, ESQ<br>Attorney<br>505 VAN NESS AVE<br>SAN FRANCISCO, CALIFORNIA 94102<br>marybelle.ang@cpuc.ca.gov |
| California Public Utilities Commission | Christofer Nolan<br>California Public Utilities Commission<br>505 Van Ness Avenue<br>SAN FRANCISCO, CALIFORNIA 94102<br>UNITED STATES<br>christofer.nolan@cpuc.ca.gov | |
| Center for Biological Diversity | Howard Crystal<br>Senior Attorney<br>Center for Biological Diversity<br>1411 K ST NW STE 1300 | |

| | WASHINGTON, DISTRICT OF COLUMBIA 20005 UNITED STATES hcrystal@biologicaldiversity.org | |
| --- | --- | --- |
| Center for Biological Diversity | Howard Crystal Senior Attorney Center for Biological Diversity 1411 K ST NW STE 1300 WASHINGTON, DISTRICT OF COLUMBIA 20005 UNITED STATES hcrystal@biologicaldiversity.org | |
| Center for Renewables Integration | Kerinia Cusick Center for Renewables Integration 107 S West St #731 Alexandria, VIRGINIA 22314 UNITED STATES kcusick@center4ri.org | |
| Center for Renewables Integration | Kerinia Cusick Center for Renewables Integration 107 S West St #731 Alexandria, VIRGINIA 22314 UNITED STATES kcusick@center4ri.org | |
| Center for Sustainable Energy | Kaily Wakefield Corporate Counsel Center for Sustainable Energy 3980 Sherman Street, Suite 170 San Diego, CALIFORNIA 92110 UNITED STATES | |

| | | |
|---|---|---|
| | kaily.wakefield@energycenter.org | |
| Central Hudson Gas & Electric Corporation | John Borchert<br>Sr Director Energy Policy & Tr<br>Central Hudson Gas & Electric Corporation<br>285 South Avenue<br>Poughkeepsie, NEW YORK 12601<br>UNITED STATES<br>jborchert@cenhud.com | |
| Central Hudson Gas & Electric Corporation | John Borchert<br>Sr Director Energy Policy & Tr<br>Central Hudson Gas & Electric Corporation<br>285 South Avenue<br>Poughkeepsie, NEW YORK 12601<br>UNITED STATES<br>jborchert@cenhud.com | |
| Ceres | Zach Friedman<br>Ceres<br>99 CHAUNCY ST FL 6<br>BOSTON, MASSACHUSETTS 02111<br>UNITED STATES<br>zfriedman@ceres.org | |
| CHAMBER OF COMMERCE OF THE UNITED STATES | Heath Knakmuhs<br>Vice President and Policy Coun<br>CHAMBER OF COMMERCE OF THE UNITED STATES<br>U.S. Chamber of Commerce<br>1615 H Street NW<br>Washington, DISTRICT OF COLUMBIA 20062<br>UNITED STATES<br>hknakmuhs@uschamber.com | |

| | | |
|---|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES | Heath Knakmuhs<br>Vice President and Policy Coun<br>CHAMBER OF COMMERCE OF THE UNITED STATES<br>U.S. Chamber of Commerce<br>1615 H Street NW<br>Washington, DISTRICT OF COLUMBIA 20062<br>UNITED STATES<br>hknakmuhs@uschamber.com | |
| CHICOPEE ELECTRIC LIGHT DEPARTMENT | John Coyle<br>Duncan & Allen LLP<br>Suite 700<br>1730 Rhode Island Avenue, N.W.<br>Washington, DISTRICT OF COLUMBIA 20036-3115<br>UNITED STATES<br>jpc@duncanallen.com | |
| CHICOPEE ELECTRIC LIGHT DEPARTMENT | John Coyle<br>Duncan & Allen LLP<br>Suite 700<br>1730 Rhode Island Avenue, N.W.<br>Washington, DISTRICT OF COLUMBIA 20036-3115<br>UNITED STATES<br>jpc@duncanallen.com | |
| CITIZENS ENERGY CORPORATION | Ashley Bond<br>Duncan & Allen LLP<br>Duncan & Allen LLP<br>1730 RHODE ISLAND AVE NW STE 700<br>WASHINGTON, DISTRICT OF COLUMBIA 20036<br>UNITED STATES<br>amb@duncanallen.com | Donald R. Allen<br>Duncan & Allen LLP<br>1575 Eye Street, N.W.<br>Suite 300<br>Washington, DISTRICT OF COLUMBIA 20005<br>dra@duncanallen.com |

| | | |
|---|---|---|
| CITIZENS ENERGY CORPORATION | | Amy E McDonnell<br>Counsel<br>Duncan & Allen LLP<br>1730 RHODE ISLAND AVE NW STE 700<br>WASHINGTON, DISTRICT OF COLUMBIA 20036<br>aem@duncanallen.com |
| Citizens Energy Corporation | Ashley Bond<br>Duncan & Allen LLP<br>Duncan & Allen LLP<br>1730 RHODE ISLAND AVE NW STE 700<br>WASHINGTON, DISTRICT OF COLUMBIA 20036<br>UNITED STATES<br>amb@duncanallen.com | Donald R. Allen<br>Duncan & Allen LLP<br>1575 Eye Street, N.W.<br>Suite 300<br>Washington, DISTRICT OF COLUMBIA 20005<br>dra@duncanallen.com |
| Citizens Enterprises Corporation | Brian Morrissey<br>Managing Director<br>CITIZENS ENERGY CORP (MA)<br>2 SEAPORT LN STE 5C<br>BOSTON, MASSACHUSETTS 02210<br>UNITED STATES<br>bmorrissey@citizensenergy.com | Brian Morrissey<br>Managing Director<br>CITIZENS ENERGY CORP (MA)<br>2 SEAPORT LN STE 5C<br>BOSTON, MASSACHUSETTS 02210<br>bmorrissey@citizensenergy.com |
| City of New York, New York | Jay Goodman<br>Partner<br>Couch White, LLP<br>PO Box 22222<br>Albany,NEW YORK 12201-2222<br>UNITED STATES<br>jgoodman@couchwhite.com | Julie A Yedowitz<br>Couch White, LLP<br>540 Broadway<br>P.O. Box 22222<br>Albany, NEW YORK 12207<br>jyedowitz@couchwhite.com |
| City of New York, New York | | Seth Berkman<br>Energy Policy Advisor<br>New York City Mayor's Office |

| | | |
|---|---|---|
| | | of Sustainability<br>253 Broadway<br>14th Floor<br>New York, NEW YORK 1007<br>sberkman@sustainability.nyc.gov |
| City of New York, New York | Jay Goodman<br>Partner<br>Couch White, LLP<br>PO Box 22222<br>Albany,NEW YORK 12201-2222<br>UNITED STATES<br>jgoodman@couchwhite.com | |
| City of New York, New York | Jay Goodman<br>Partner<br>Couch White, LLP<br>PO Box 22222<br>Albany,NEW YORK 12201-2222<br>UNITED STATES<br>jgoodman@couchwhite.com | |
| City of New York, New York | Jay Goodman<br>Partner<br>Couch White, LLP<br>PO Box 22222<br>Albany,NEW YORK 12201-2222<br>UNITED STATES<br>jgoodman@couchwhite.com | |
| Clean Coalition | Ben Schwartz<br>Policy Manager<br>1800 GARDEN ST<br>SANTA BARBARA, CALIFORNIA 93101<br>UNITED STATES<br>ben@clean-coalition.org | |

| | | |
|---|---|---|
| Clean Energy Buyers Association | | Brian Morgan<br>Clean Energy Buyers Association<br>1425 K ST NW STE 1110<br>WASHINGTON, DISTRICT OF COLUMBIA 20005<br>bmorgan@cebuyers.org |
| Clean Energy Buyers Association | Bryn Baker<br>Clean Energy Buyers Associatio<br>1425 K ST NW STE 1100<br>WASHINGTON, DISTRICT OF COLUMBIA 20005<br>UNITED STATES<br>bbaker@cebuyers.org | |
| Clean Energy Buyers Association | | Whit Williamson<br>Director - Power Supply<br>Thompson Coburn LLP<br>4201 Dominion Blvd<br>Glen Allen, VIRGINIA 23060<br>wwilliamson@odec.com |
| Clean Energy Buyers Association | | Jecoliah R. Williams<br>Thompson Coburn LLP<br>1909 K Street N.W.<br>Suite 600<br>WASHINGTON, DISTRICT OF COLUMBIA 20006<br>jwilliams@thompsoncoburn.com |
| Clean Energy Buyers Association | Bryn Baker<br>Clean Energy Buyers Associatio<br>1425 K ST NW STE 1100<br>WASHINGTON, DISTRICT OF COLUMBIA 20005<br>UNITED STATES<br>bbaker@cebuyers.org | |
| Clean Energy | Bryn Baker<br>Clean Energy Buyers Associatio | |

| Buyers Association | 1425 K ST NW STE 1100 WASHINGTON, DISTRICT OF COLUMBIA 20005 UNITED STATES bbaker@cebuyers.org | |
|---|---|---|
| Clean Energy States Alliance | Warren Leon Clean Energy States Alliance 613 ANNURSNAC HILL RD CONCORD, MASSACHUSETTS 01742 UNITED STATES wleon@cleanegroup.org | |
| Clean Grid Alliance | Natalie McIntire Clean Grid Alliance 20 N Wacker, Suite 1600 Chicago, ILLINOIS 60606 UNITED STATES nmcintire@nrdc.org | |
| Clean Grid Alliance | Natalie McIntire Clean Grid Alliance 20 N Wacker, Suite 1600 Chicago, ILLINOIS 60606 UNITED STATES nmcintire@nrdc.org | |
| Clean Grid Alliance | Rhonda Peters InterTran Energy Consulting 1610 S Valentine Way Lakewood, COLORADO 80228 UNITED STATES intertranec@gmail.com | |
| Clean Grid Alliance | Natalie McIntire Clean Grid Alliance 20 N Wacker, Suite 1600 Chicago, ILLINOIS 60606 UNITED STATES nmcintire@nrdc.org | |

| | | |
|---|---|---|
| Clean Wisconsin | Ciaran Gallagher<br>Clean Wisconsin<br>634 W Main St<br>#300<br>Madison, WISCONSIN 53703<br>UNITED STATES<br>cgallagher@cleanwisconsin.org | |
| Clenera, LLC | Michael Uda<br>Attorney<br>Uda Law Firm, PC<br>7 W 6th Ave<br>Power Block Suite 615<br>Helena, MONTANA 59601<br>UNITED STATES<br>michaeluda@udalaw.com | |
| Clenera, LLC | Michael Uda<br>Attorney<br>Uda Law Firm, PC<br>7 W 6th Ave<br>Power Block Suite 615<br>Helena, MONTANA 59601<br>UNITED STATES<br>michaeluda@udalaw.com | |
| Coastal Conservation League | Nicholas Guidi<br>Southern Environmental Law Center<br>122 C ST NW STE 325<br>WASHINGTON, DISTRICT OF COLUMBIA 20001<br>UNITED STATES<br>nguidi@selcdc.org | |
| Colorado Office of the Utility Consumer Advocate | Thomas Dixon<br>First Assistant Attorney Gener<br>Colorado Attorney General's Office<br>1300 N BROADWAY FL 7<br>COLORADO DEPARTMENT OF LAW | |

| | | |
|---|---|---|
| | DENVER, COLORADO 80203<br>UNITED STATES<br>thomas.dixon@coag.gov | |
| Competitive Energy Services, LLC | Richard Silkman<br>CEO, Competitive Energy Servic<br>Competitive Energy Services, LLC<br>148 Middle Street<br>Portland, MAINE 04101<br>UNITED STATES<br>rsilkman@competitive-energy.com | |
| Competitive Power Ventures, Inc. | Joel Gordon<br>Vice President, External & Reg<br>CPV Power Holdings, LP<br>7 Steeple Lane<br>Amherst, NEW HAMPSHIRE 03031<br>UNITED STATES<br>jgordon@cpv.com | |
| CONNECTICUT ATTORNEY GENERAL WILLIAM TONG | Robert Snook<br>Assistant Attorney General<br>Connecticut Department of Energy and Environmental Protection<br>10 Franklin Square<br>New Britain, CONNECTICUT 06106<br>UNITED STATES<br>robert.snook@ct.gov | |
| CONNECTICUT ATTORNEY GENERAL WILLIAM TONG | Robert Snook<br>Assistant Attorney General<br>Connecticut Department of Energy and Environmental Protection<br>10 Franklin Square<br>New Britain, CONNECTICUT | Seth A. Hollander<br>Assistant Attorney General<br>10 Franklin Square<br>New Britain, CONNECTICUT 06051<br>seth.hollander@ct.gov |

| | 06106<br>UNITED STATES<br>robert.snook@ct.gov | |
|---|---|---|
| CONNECTICUT ATTORNEY GENERAL WILLIAM TONG | | John S. Wright, ESQ<br>Assistant Attorney General<br>Connecticut Office of Attorney General<br>10 Franklin Square<br>New Britain, CONNECTICUT 06051<br>john.wright@ct.gov |
| CONNECTICUT ATTORNEY GENERAL WILLIAM TONG | | Lauren H Bidra<br>Office of Consumer Counsel<br>Office of Consumer Counsel<br>10 Franklin Square<br>New Britain, CONNECTICUT 06051<br>Lauren.Bidra@ct.gov |
| Connecticut Department of Energy & Environmental Protection | Robert Snook<br>Assistant Attorney General<br>Connecticut Department of Energy and Environmental Protection<br>10 Franklin Square<br>New Britain, CONNECTICUT 06106<br>UNITED STATES<br>robert.snook@ct.gov | Kirsten Rigney<br>Connecticut Department of Energy & Environmental Protection<br>10 Franklin Square<br>New Britain, CONNECTICUT 06051<br>Kirsten.Rigney@ct.gov |
| Connecticut Department of Energy and Environmental Protection | Robert Snook<br>Assistant Attorney General<br>Connecticut Department of Energy and Environmental Protection<br>10 Franklin Square<br>New Britain, CONNECTICUT 06106<br>UNITED STATES<br>robert.snook@ct.gov | Kirsten Rigney<br>Connecticut Department of Energy & Environmental Protection<br>10 Franklin Square<br>New Britain, CONNECTICUT 06051<br>Kirsten.Rigney@ct.gov |

| | | |
|---|---|---|
| Connecticut Department of Energy and Environmental Protection | Kirsten Rigney<br>Connecticut Department of Energy & Environmental Protection<br>10 Franklin Square<br>New Britain, CONNECTICUT 06051<br>UNITED STATES<br>Kirsten.Rigney@ct.gov | |
| Connecticut Department of Energy and Environmental Protection | Kirsten Rigney<br>Connecticut Department of Energy & Environmental Protection<br>10 Franklin Square<br>New Britain, CONNECTICUT 06051<br>UNITED STATES<br>Kirsten.Rigney@ct.gov | |
| Connecticut Department of Energy and Environmental Protection | Kirsten Rigney<br>Connecticut Department of Energy & Environmental Protection<br>10 Franklin Square<br>New Britain, CONNECTICUT 06051<br>UNITED STATES<br>Kirsten.Rigney@ct.gov | Robert Snook<br>Assistant Attorney General<br>Connecticut Department of Energy and Environmental Protection<br>10 Franklin Square<br>New Britain, CONNECTICUT 06106<br>robert.snook@ct.gov |
| Connecticut Municipal Electric Energy Cooperative | Scott Strauss<br>Spiegel & McDiarmid LLP<br>1818 N Street, NW<br>8th Floor<br>WASHINGTON, DISTRICT OF COLUMBIA 20036<br>UNITED STATES<br>Scott.Strauss@spiegelmcd.com | Jeffrey A Schwarz<br>Spiegel & McDiarmid LLP<br>1818 N Street, NW<br>8th Floor<br>WASHINGTON, DISTRICT OF COLUMBIA 20036<br>jeffrey.schwarz@spiegelmcd.com |
| Connecticut Municipal Electric | | E Service<br>Spiegel & McDiarmid LLP<br>1875 Eye St, NW |

| | | |
|---|---|---|
| Energy Cooperative | | Suite 700<br>Washington, DISTRICT OF COLUMBIA 20006<br>eService@spiegelmcd.com |
| Connecticut Municipal Electric Energy Cooperative | | Robin Kipnis<br>Assistant General Counsel<br>Connecticut Municipal Electric Energy Co<br>30 Stott Avenue<br>Norwich, CONNECTICUT 06360<br>rkipnis@cmeec.org |
| Connecticut Municipal Electric Energy Cooperative | Scott Strauss<br>Spiegel & McDiarmid LLP<br>1818 N Street, NW<br>8th Floor<br>WASHINGTON, DISTRICT OF COLUMBIA 20036<br>UNITED STATES<br>Scott.Strauss@spiegelmcd.com | |
| Connecticut Municipal Electric Energy Cooperative | Scott Strauss<br>Spiegel & McDiarmid LLP<br>1818 N Street, NW<br>8th Floor<br>WASHINGTON, DISTRICT OF COLUMBIA 20036<br>UNITED STATES<br>Scott.Strauss@spiegelmcd.com | |
| Connecticut Municipal Electric Energy Cooperative | | E Service<br>Spiegel & McDiarmid LLP<br>1875 Eye St, NW<br>Suite 700<br>Washington, DISTRICT OF COLUMBIA 20006<br>eService@spiegelmcd.com |
| Connecticut Office of | Andrew Minikowski<br>Andrew W. Minikowski, Esq. | Megan Sullo<br>Paralegal |

| | | |
|---|---|---|
| Consumer Counsel | Office of Consumer Counsel<br>10 FRANKLIN SQ<br>CONNECTICUT OFFICE OF CONSUMER COUNSEL<br>NEW BRITAIN, CONNECTICUT 06051<br>UNITED STATES<br>andrew.minikowski@ct.gov | Connecticut Office of Consumer Counsel<br>10 FRANKLIN SQ<br>NEW BRITAIN, CONNECTICUT 06051<br>megan.sullo@ct.gov |
| Connecticut Office of Consumer Counsel | James Talbert-Slagle<br>Connecticut Office of Consumer Counsel<br>Ten Franklin Square<br>NEW BRITAIN, CONNECTICUT 06051-2644<br>UNITED STATES<br>james.talbert-slagle@ct.gov | |
| Conservation Law Foundation | Phelps Turner<br>Senior Attorney<br>Conservation Law Foundation<br>Conservation Law Foundation<br>53 Exchange Street, Suite 200<br>Portland, MAINE 04101<br>UNITED STATES<br>pturner@clf.org | Phelps Turner<br>Senior Attorney<br>Conservation Law Foundation<br>Conservation Law Foundation<br>53 Exchange Street, Suite 200<br>Portland, MAINE 04101<br>pturner@clf.org |
| Conservation Law Foundation | | Shannon I Laun<br>Conservation Law Foundation<br>62 Summer St<br>Boston, MASSACHUSETTS 02110<br>slaun@clf.org |
| Conservation Law Foundation | Phelps Turner<br>Senior Attorney<br>Conservation Law Foundation<br>Conservation Law Foundation<br>53 Exchange Street, Suite 200<br>Portland, MAINE 04101<br>UNITED STATES<br>pturner@clf.org | |

| | | |
|---|---|---|
| Conservation Law Foundation | | Shannon I Laun<br>Conservation Law Foundation<br>62 Summer St<br>Boston, MASSACHUSETTS 02110<br>slaun@clf.org |
| Conservation Law Foundation | Phelps Turner<br>Senior Attorney<br>Conservation Law Foundation<br>Conservation Law Foundation<br>53 Exchange Street, Suite 200<br>Portland, MAINE 04101<br>UNITED STATES<br>pturner@clf.org | |
| Conservation Law Foundation | Phelps Turner<br>Senior Attorney<br>Conservation Law Foundation<br>Conservation Law Foundation<br>53 Exchange Street, Suite 200<br>Portland, MAINE 04101<br>UNITED STATES<br>pturner@clf.org | |
| Conservation Law Foundation | Phelps Turner<br>Senior Attorney<br>Conservation Law Foundation<br>Conservation Law Foundation<br>53 Exchange Street, Suite 200<br>Portland, MAINE 04101<br>UNITED STATES<br>pturner@clf.org | |
| Consolidated Edison Company of New York, Inc. | Susan LoFrumento<br>Consolidated Edison Company of New York, Inc.<br>4 Irving Place<br>New York, NEW YORK 10003<br>UNITED STATES<br>lofrumentos@coned.com | |

| | | |
|---|---|---|
| Consolidated Edison Company of New York, Inc. and Orange and Rockland Utilities, Inc. | Susan LoFrumento<br>Consolidated Edison Company of New York, Inc.<br>4 Irving Place<br>New York, NEW YORK 10003<br>UNITED STATES<br>lofrumentos@coned.com | |
| Consolidated Edison Development, Inc. | Jeff Dannels<br>Senior Manager Market Analytic<br>Con Edison Clean Energy Businesses, Inc.<br>100 Summit Lake Drive<br>Valhalla, NEW YORK 10595<br>UNITED STATES<br>dannelsj@conedceb.com | |
| Consumer Organizations | Keryn Newman<br>6 Ella Drive<br>Shepherdstown, WEST VIRGINIA 25443<br>UNITED STATES<br>keryn@stoppathwv.com | |
| Consumer Organizations | Keryn Newman<br>6 Ella Drive<br>Shepherdstown, WEST VIRGINIA 25443<br>UNITED STATES<br>keryn@stoppathwv.com | |
| Consumer Organizations | Keryn Newman<br>6 Ella Drive<br>Shepherdstown, WEST VIRGINIA 25443<br>UNITED STATES<br>keryn@stoppathwv.com | |

| | | |
|---|---|---|
| Consumers Energy Company | | Kevin J Van Oirschot<br>Electric Transmission and Mark Consumers Energy Company<br>1945 W. Parnall Rd.<br>Jackson, MICHIGAN 49201<br>kevin.vanoirschot@cmsenergy.com |
| Consumers Energy Company | Deborah Moss<br>Principal Attorney<br>1730 Rhode Island Avenue NW<br>Suite 1007<br>Washington, DISTRICT OF COLUMBIA 20002<br>UNITED STATES<br>deborah.moss@cmsenergy.com | Emerson Hilton<br>Assistant General Counsel<br>One Energy Plaza EP11-201<br>Jackson, MICHIGAN 49201<br>emerson.hilton@cmsenergy.com |
| Consumers Energy Company | Maxwell Multer<br>Counsel<br>Nixon Peabody LLP<br>799 9TH ST NW STE 500<br>WASHINGTON, DISTRICT OF COLUMBIA 20001<br>UNITED STATES<br>mmulter@nixonpeabody.com | Maxwell K Multer<br>Counsel<br>Nixon Peabody LLP<br>799 9TH ST NW STE 500<br>WASHINGTON, DISTRICT OF COLUMBIA 20001<br>mmulter@nixonpeabody.com |
| Consumers Energy Company | Emerson Hilton<br>Assistant General Counsel<br>Consumers Energy Company<br>One Energy Plaza EP11-201<br>Jackson, MICHIGAN 49201<br>UNITED STATES<br>emerson.hilton@cmsenergy.com | |
| Consumers Energy Company | Emerson Hilton<br>Assistant General Counsel<br>Consumers Energy Company<br>One Energy Plaza EP11-201<br>Jackson, MICHIGAN 49201<br>UNITED STATES | |

|  | emerson.hilton@cmsenergy.com |  |
|---|---|---|
| Council of the City New Orleans | William Booth<br>Michael Best & Friedrich, LLP<br>1000 Maine Ave SW<br>Suite 400<br>Washington, D.C., DISTRICT OF COLUMBIA 20024<br>UNITED STATES<br>wdbooth@michaelbest.com | David S Shaffer<br>Mr.<br>Dentons US LLP<br>1900 K ST NW<br>WASHINGTON, DISTRICT OF COLUMBIA 20006<br>david.shaffer@dentons.com |
| Council of the City New Orleans |  | Erin Spears<br>Chief of Staff, Council Utilit<br>Council of the City of New Orleans, Louisiana<br>1300 Perdido Street<br>Room 6E07<br>New Orleans, LOUISIANA 70112<br>espears@nola.gov |
| Council of the City New Orleans |  | Presley Reed, JR<br>Partner<br>Dentons US LLP<br>1900 K St. NW,<br>Washington, DISTRICT OF COLUMBIA 20006<br>presley.reedjr@dentons.com |
| Council of the City New Orleans |  | David S Shaffer<br>Mr.<br>Dentons US LLP<br>1900 K ST NW<br>WASHINGTON, DISTRICT OF COLUMBIA 20006<br>david.shaffer@dentons.com |
| Council of the City New Orleans |  | Cassandra Mastrostefano<br>Attorney<br>Dentons US LLP<br>1900 K St NW |

| | | |
|---|---|---|
| | | washington, DISTRICT OF COLUMBIA 20006 cassandra.mastrostefano@dentons.com |
| Council of the City New Orleans | | Erin Spears Chief of Staff, Council Utilit Council of the City of New Orleans, Louisiana 1300 Perdido Street Room 6E07 New Orleans, LOUISIANA 70112 espears@nola.gov |
| Cross-Sector Coalition | James Bixby Senior Counsel - Regulatory & ITC Holdings Corp. 601 13TH ST NW STE 710S WASHINGTON, DISTRICT OF COLUMBIA 20005 UNITED STATES jbixby@itctransco.com | |
| CTC Global Corporation | Maeve Tibbetts Associate Attorney Norton Rose Fulbright (US) LLP 799 9TH ST NW STE 1000 WASHINGTON, DISTRICT OF COLUMBIA 20001 UNITED STATES maeve.tibbetts@nortonrosefulbright.com | |
| CTC Global Corporation | Ruta Skucas Partner Crowell & Moring LLP 1001 PENNSYLVANIA AVE NW WASHINGTON, DISTRICT OF COLUMBIA 20004 | |

| | | |
|---|---|---|
| | UNITED STATES<br>rskucas@crowell.com | |
| CTC Global Corporation | Ruta Skucas<br>Partner<br>Crowell & Moring LLP<br>1001 PENNSYLVANIA AVE NW<br>WASHINGTON, DISTRICT OF COLUMBIA 20004<br>UNITED STATES<br>rskucas@crowell.com | |
| CTC Global Corporation | Theodore Paradise<br>Partner<br>94 CRESCENT ST<br>NORTHAMPTON, MASSACHUSETTS 01060<br>UNITED STATES<br>theodore.paradise@klgates.com | |
| Cypress Creek Renewables, LLC | Matthew Crosby<br>Cypress Creek Renewables, LLC<br>3402 PICO BLVD<br>SANTA MONICA, CALIFORNIA 90405<br>UNITED STATES<br>matthew.crosby@ccrenew.com | |
| Dalton Utilities | John Thomas<br>CEO<br>Dalton Utilities<br>PO BOX 869<br>DALTON, GEORGIA 30722<br>UNITED STATES<br>jthomas@dutil.com | |
| DC Public Service Commission | Brian Edmonds<br>DC Public Service Commission<br>1325 G ST NW STE 800<br>WASHINGTON, DISTRICT | Richard S Herskovitz<br>D.C. Public Service Commission<br>1333 H Street, N.W. |

| | OF COLUMBIA 20005<br>UNITED STATES<br>bedmonds@psc.dc.gov | 7th Floor, East Tower<br>Washington, DISTRICT OF<br>COLUMBIA 20005<br>rherskovitz@psc.dc.gov |
|---|---|---|
| DEFENDERS OF WILDLIFE | Justin Vickers<br>Attorney<br>ENVIRONMENTAL LAW &<br>POLICY CENTER<br>35 East Wacker Drive<br>Suite 1600<br>Chicago, ILLINOIS 60601<br>UNITED STATES<br>jvickers@elpc.org | |
| DEFENDERS OF WILDLIFE | Justin Vickers<br>Attorney<br>ENVIRONMENTAL LAW &<br>POLICY CENTER<br>35 East Wacker Drive<br>Suite 1600<br>Chicago, ILLINOIS 60601<br>UNITED STATES<br>jvickers@elpc.org | |
| DELAWARE ENERGY USERS GROUP | Samuel Coburn<br>CHRISTIAN & BARTON,<br>L.L.P.<br>901 EAST CARY STREET<br>SUITE 1800<br>RICHMOND, VIRGINIA<br>23219<br>UNITED STATES<br>pcoburn@cblaw.com | |
| DELAWARE ENERGY USERS GROUP | Christian Tucker<br>Attorney<br>Christian & Barton LLP<br>901 E Cary St.<br>Suite 1800<br>RICHMOND, VIRGINIA<br>23219 | |

| | | |
|---|---|---|
| | UNITED STATES<br>ctucker@cblaw.com | |
| Delaware Public Service Commission | Dimitar Kozhuharov<br>Public Utility Analyst<br>Delaware Public Service Commission<br>861 Silver Lake Blvd.<br>Suit 100<br>Dover, DELAWARE 19904<br>UNITED STATES<br>dimitar.kozhuharov@delaware.gov | |
| Department of Justice | Erica Mintzer<br>Senior Counsel<br>Department of Justice<br>950 PENNSYLVANIA AVE NW<br>WASHINGTON, DISTRICT OF COLUMBIA 20530<br>UNITED STATES<br>erica.mintzer@usdoj.gov | Erica Mintzer<br>Senior Counsel<br>Department of Justice<br>950 PENNSYLVANIA AVE NW<br>WASHINGTON, DISTRICT OF COLUMBIA 20530<br>erica.mintzer@usdoj.gov |
| Department of the Interior - OEPC | Stephen Tryon<br>stephen_tryon@ios.doi.gov | Shawn K. Alam<br>U.S. Department of Interior<br>1849 C Street, N.W.<br>Mail Stop 2629-MIB<br>Washington, DISTRICT OF COLUMBIA 20240<br>Shawn_Alam@ios.doi.gov |
| Developers Advocating Transmission Advancements | Lisa Luftig<br>901 F Street NW<br>Suite 602<br>Washington, DISTRICT OF COLUMBIA 20004<br>UNITED STATES<br>lisa.luftig@eversource.com | |
| Developers Advocating | James Bixby<br>Senior Counsel - Regulatory & | |

| | | |
|---|---|---|
| Transmission Advancements | ITC Holdings Corp.<br>601 13TH ST NW STE 710S<br>WASHINGTON, DISTRICT OF COLUMBIA 20005<br>UNITED STATES<br>jbixby@itctransco.com | |
| Developers Advocating Transmission Advancements | Matthew Tomc<br>Director and Assistant General<br>Ameren Corporation<br>1901 Chouteau Ave<br>MC 1310<br>St. Louis, MISSOURI 63040<br>UNITED STATES<br>mtomc@ameren.com | |
| Developers Advocating Transmission Advancements | Patrick Tarmey<br>Senior Counsel<br>National Grid<br>170 Data Drive<br>Waltham, MASSACHUSETTS 02451<br>UNITED STATES<br>patrick.tarmey@nationalgrid.com | |
| Developers Advocating Transmission Advancements | James Bixby<br>Senior Counsel - Regulatory &<br>ITC Holdings Corp.<br>601 13TH ST NW STE 710S<br>WASHINGTON, DISTRICT OF COLUMBIA 20005<br>UNITED STATES<br>jbixby@itctransco.com | |
| Developers Advocating Transmission Advancements | Lisa Luftig<br>Assistant General Counsel<br>Exelon BSC-Legal Regulatory<br>701 Ninth Street, NW<br>Washington, DISTRICT OF COLUMBIA 20001 | |

| | | |
|---|---|---|
| | UNITED STATES<br>lisa.luftig@exeloncorp.com | |
| Developers Advocating Transmission Advancements | James Bixby<br>Senior Counsel - Regulatory &<br>ITC Holdings Corp.<br>601 13TH ST NW STE 710S<br>WASHINGTON, DISTRICT<br>OF COLUMBIA 20005<br>UNITED STATES<br>jbixby@itctransco.com | |
| Developers Advocating Transmission Advancements | Cara Lewis<br>Managing Counsel - Federal<br>Reg<br>PSEG Companies<br>80 PARK PLZ # T5<br>NEWARK, NEW JERSEY<br>07102<br>UNITED STATES<br>cara.lewis@pseg.com | |
| Developers Advocating Transmission Advancements | Terri Eaton<br>Director, Regulatory Admin.<br>Xcel Energy Inc.<br>1800 LARIMER ST<br>DENVER, COLORADO 80202<br>UNITED STATES<br>terri.k.eaton@xcelenergy.com | |
| Developers Advocating Transmission Advancements | Mary Grover<br>Assistant General Counsel<br>Eversource Energy Service<br>Company<br>247 Station Drive<br>SE100<br>Westwood,<br>MASSACHUSETTS 02090-<br>2397<br>UNITED STATES<br>mary.grover@eversource.com | |

| | | |
|---|---|---|
| Developers Advocating Transmission Advancements | Daniel Galaburda<br>Senior Counsel<br>Niagara Mohawk Power Corporation<br>40 Sylvan Road<br>Waltham, MASSACHUSETTS 02451-1120<br>UNITED STATES<br>daniel.galaburda@nationalgrid.com | |
| Developers Advocating Transmission Advancements | Anne Dailey<br>Senior Corporate Counsel<br>Ameren Services Company<br>1331 Pennsylvania Avenue, NW<br>WASHINGTON, DISTRICT OF COLUMBIA 20004<br>UNITED STATES<br>adailey@ameren.com | |
| Developers Advocating Transmission Advancements | Lisa Luftig<br>Assistant General Counsel<br>Exelon BSC-Legal Regulatory<br>701 Ninth Street, NW<br>Washington, DISTRICT OF COLUMBIA 20001<br>UNITED STATES<br>lisa.luftig@exeloncorp.com | Viet H Ngo<br>Associate Counsel, Federal Reg<br>Public Service Enterprise Group Incorporated<br>601 New Jersey Ave, NW<br>Suite 310<br>WASHINGTON, DISTRICT OF COLUMBIA 20001<br>Viet.Ngo@pseg.com |
| Developers Advocating Transmission Advancements | | Terri K. Eaton<br>Director, Regulatory Admin.<br>Xcel Energy Inc.<br>1800 LARIMER ST<br>DENVER, COLORADO 80202<br>terri.k.eaton@xcelenergy.com |
| Developers Advocating Transmission Advancements | | Amber N Thornhill<br>Director, FERC & ISO Relations<br>National Grid<br>801 PENNSYLVANIA AVE |

| | | |
|---|---|---|
| | | NW STE 801<br>WASHINGTON, DISTRICT OF COLUMBIA 20004<br>Amber.Thornhill@nationalgrid.com |
| Developers Advocating Transmission Advancements | | Mary E Grover, ESQ<br>Assistant General Counsel<br>Eversource Energy Service Company<br>247 Station Drive<br>SE100<br>Westwood,<br>MASSACHUSETTS 02090-2397<br>mary.grover@eversource.com |
| Developers Advocating Transmission Advancements | | James Bixby<br>Senior Counsel - Regulatory & ITC Holdings Corp.<br>601 13TH ST NW STE 710S<br>WASHINGTON, DISTRICT OF COLUMBIA 20005<br>jbixby@itctransco.com |
| Developers Advocating Transmission Advancements | | Anne K. Dailey<br>Senior Corporate Counsel<br>Ameren Services Company<br>1331 Pennsylvania Avenue, NW<br>WASHINGTON, DISTRICT OF COLUMBIA 20004<br>adailey@ameren.com |
| Division of Public Utilities - Utah | Chris Parker<br>Director<br>UTAH DIVISION OF PUBLIC UTILITIES<br>160 E BROADWAY<br>SALT LAKE CITY, UTAH 84111<br>UNITED STATES<br>chrisparker@utah.gov | |

59

| | | |
|---|---|---|
| Dominion Energy Services, Inc. | Sara Weinberg<br>Dominion Energy, Inc.<br>Dominion Energy South Carolina, Inc.<br>220 Operation Way<br>C222<br>Cayce, SOUTH CAROLINA 29033<br>UNITED STATES<br>sara.weinberg@dominionenergy.com | |
| Dominion Energy Services, Inc. | Sara Weinberg<br>Dominion Energy, Inc.<br>Dominion Energy South Carolina, Inc.<br>220 Operation Way<br>C222<br>Cayce, SOUTH CAROLINA 29033<br>UNITED STATES<br>sara.weinberg@dominionenergy.com | |
| Dominion Energy Services, Inc. | Sara Weinberg<br>Dominion Energy, Inc.<br>Dominion Energy South Carolina, Inc.<br>220 Operation Way<br>C222<br>Cayce, SOUTH CAROLINA 29033<br>UNITED STATES<br>sara.weinberg@dominionenergy.com | |
| Dominion Energy Services, Inc. | Sara Weinberg<br>Dominion Energy, Inc.<br>Dominion Energy South Carolina, Inc.<br>220 Operation Way | |

|  |  |  |
|---|---|---|
|  | C222<br>Cayce, SOUTH CAROLINA 29033<br>UNITED STATES<br>sara.weinberg@dominionenergy.com |  |
| DTE Electric Company | Jane Rueger<br>Perkins Coie LLP<br>700 Thirteenth Street, N.W. Suite 800<br>WASHINGTON, DISTRICT OF COLUMBIA 20005-3960<br>UNITED STATES<br>jrueger@perkinscoie.com | Jane E. Rueger<br>Perkins Coie LLP<br>700 Thirteenth Street, N.W. Suite 800<br>WASHINGTON, DISTRICT OF COLUMBIA 20005-3960<br>jrueger@perkinscoie.com |
| DTE Electric Company |  | Mary Emerson<br>Corporate Counsel<br>Alliant Energy Corporation<br>801 Pennsylvania Avenue, NW<br>WASHINGTON, DISTRICT OF COLUMBIA 20004<br>maryemerson@alliantenergy.com |
| DTE Electric Company |  | Lauren D Donofrio<br>DTE Energy Company<br>215 S CASCADE ST<br>FERGUS FALLS, MINNESOTA 56537<br>lauren.donofrio@dteenergy.com |
| DTE Electric Company |  | Mary Emerson<br>Corporate Counsel<br>Alliant Energy Corporation<br>801 Pennsylvania Avenue, NW<br>WASHINGTON, DISTRICT OF COLUMBIA 20004<br>maryemerson@alliantenergy.com |

| | | |
|---|---|---|
| DTE Electric Company | Jane Rueger<br>Perkins Coie LLP<br>700 Thirteenth Street, N.W. Suite 800<br>WASHINGTON, DISTRICT OF COLUMBIA 20005-3960<br>UNITED STATES<br>jrueger@perkinscoie.com | Mary Emerson<br>Corporate Counsel<br>Alliant Energy Corporation<br>801 Pennsylvania Avenue, NW<br>WASHINGTON, DISTRICT OF COLUMBIA 20004<br>maryemerson@alliantenergy.com |
| DTE Electric Company | | Lauren D Donofrio<br>DTE Energy Company<br>215 S CASCADE ST<br>FERGUS FALLS, MINNESOTA 56537<br>lauren.donofrio@dteenergy.com |
| Duke Energy Carolinas, LLC | Jennifer Stenger<br>jennifer.stenger@duke-energy.com | |
| Duke Energy Carolinas, LLC and Duke Energy Progress, LLC | Jennifer Stenger<br>jennifer.stenger@duke-energy.com | |
| Duke Energy Carolinas, LLC and Duke Energy Progress, LLC | Jennifer Stenger<br>jennifer.stenger@duke-energy.com | |
| Duke Energy Carolinas, LLC and Duke Energy Progress, LLC | Jennifer Stenger<br>jennifer.stenger@duke-energy.com | |
| Duke Energy Corporation | Molly Suda<br>Associate General Counsel | William J Sauer<br>1301 PENNSYLVANIA AVE |

| | | |
|---|---|---|
| | Duke Energy Corporation<br>1301 PENNSYLVANIA AVE<br>NW STE 200<br>WASHINGTON, DISTRICT<br>OF COLUMBIA 20004<br>UNITED STATES<br>molly.suda@duke-energy.com | NW<br>WASHINGTON, DISTRICT<br>OF COLUMBIA 20004<br>william.sauer@duke-energy.com |
| Duke Energy Progress, LLC | Jennifer Stenger<br>jennifer.stenger@duke-energy.com | |
| Duquesne Light Company | Regina Speed-Bost<br>Founder and Managing Partner<br>SB Law, PLLC<br>200 Massachusetts Avenue, NW<br>7th Floor<br>Washington, DISTRICT OF<br>COLUMBIA 20001<br>UNITED STATES<br>rspeed-bost@sblawlegal.com | Tishekia E Williams<br>Director of External Affairs a<br>Duquesne Light Company<br>411 Seventh Avenue<br>15th Floor<br>Pittsburgh, PENNSYLVANIA<br>15219<br>twilliams@duqlight.com |
| Duquesne Light Company | | Christin Domian<br>Federal/RTO Specialist<br>Duquesne Light Company<br>411 Seventh Ave<br>Mail Stop 15-5<br>Pittsburgh, PENNSYLVANIA<br>15219<br>cdomian@duqlight.com |
| Duquesne Light Company | Regina Speed-Bost<br>Founder and Managing Partner<br>SB Law, PLLC<br>200 Massachusetts Avenue, NW<br>7th Floor<br>Washington, DISTRICT OF<br>COLUMBIA 20001<br>UNITED STATES<br>rspeed-bost@sblawlegal.com | Michael Zimmerman<br>Sr. Regulatory Counsel<br>Duquesne Light Company<br>411 Seventh Avenue<br>Pittsburgh, PENNSYLVANIA<br>15219<br>mzimmerman@duqlight.com |

| | | |
|---|---|---|
| Duquesne Light Company | | Christin Domian<br>Federal/RTO Specialist<br>Duquesne Light Company<br>411 Seventh Ave<br>Mail Stop 15-5<br>Pittsburgh, PENNSYLVANIA 15219<br>cdomian@duqlight.com |
| East Kentucky Power Cooperative, Inc. | Denise Foster Cronin<br>Vice President, Federal and RT<br>East Kentucky Power Cooperative, Inc.<br>4775 LEXINGTON ROAD 40391<br>LEXINGTON, KENTUCKY 40392<br>UNITED STATES<br>denise.cronin@ekpc.coop | |
| East Kentucky Power Cooperative, Inc. | Denise Foster Cronin<br>Vice President, Federal and RT<br>East Kentucky Power Cooperative, Inc.<br>4775 LEXINGTON ROAD 40391<br>LEXINGTON, KENTUCKY 40392<br>UNITED STATES<br>denise.cronin@ekpc.coop | |
| EDF Renewables, Inc. | Norman Bay<br>1875 K ST NW<br>WASHINGTON, DISTRICT OF COLUMBIA 20006<br>UNITED STATES<br>nbay@willkie.com | |
| Edison Electric Institute | Lopa Parikh<br>Edison Electric Institute<br>701 PENNSYLVANIA AVE NW | |

| | | |
|---|---|---|
| | WASHINGTON, DISTRICT OF COLUMBIA 20004 UNITED STATES lparikh@eei.org | |
| Edison Electric Institute | Lopa Parikh Edison Electric Institute 701 PENNSYLVANIA AVE NW WASHINGTON, DISTRICT OF COLUMBIA 20004 UNITED STATES lparikh@eei.org | |
| Edison Electric Institute | Lopa Parikh Edison Electric Institute 701 PENNSYLVANIA AVE NW WASHINGTON, DISTRICT OF COLUMBIA 20004 UNITED STATES lparikh@eei.org | |
| Edison Electric Institute | Douglas Green Steptoe LLP 1330 Connecticut Ave, NW Washington, DISTRICT OF COLUMBIA 20036 UNITED STATES dgreen@steptoe.com | Christopher M Randall Edison Electric Institute Edison Electric Institute 701 Pennsylvania Avenue, NW Washington, DISTRICT OF COLUMBIA 20004 crandall@eei.org |
| Edison Electric Institute | Philip Moeller Edison Electric Institute 701 PENNSYLVANIA AVE NW WASHINGTON, DISTRICT OF COLUMBIA 20004 UNITED STATES pmoeller@eei.org | Sandra Safro Edison Electric Institute 701 Pennsylvania Ave, NW Washington, DISTRICT OF COLUMBIA 20004 ssafro@eei.org |

| | | |
|---|---|---|
| Edison Electric Institute | Kevin Huyler<br>Managing Director, Edison Elec<br>Edison Electric Institute<br>701 PENNSYLVANIA AVE NW<br>WASHINGTON, DISTRICT OF COLUMBIA 20004<br>UNITED STATES<br>khuyler@eei.org | Christopher M Randall<br>Edison Electric Institute<br>Edison Electric Institute<br>701 Pennsylvania Avenue, NW<br>Washington, DISTRICT OF COLUMBIA 20004<br>crandall@eei.org |
| EDP Renewables North America LLC | Vincenzo Franco<br>Rock Creek Energy Group, LLP<br>1 Thomas Circle NW<br>Suite 700<br>Washington, DISTRICT OF COLUMBIA 20005<br>UNITED STATES<br>vfranco@rockcreekenergygroup.com | Erin K. Bartlett<br>Of Counsel<br>Foley & Lardner LLP<br>3000 K ST NW<br>WASHINGTON, DISTRICT OF COLUMBIA 20007<br>ebartlett@foley.com |
| EDP Renewables North America LLC | | Meredith Berger Chambers<br>Chief Legal Officer<br>EDP Renewables North America LLC<br>1501 McKinney Street<br>Houston, TEXAS 77010<br>meredith.chambers@edp.com |
| EDP Renewables North America LLC | | David Mindham<br>EDP Renewables North America LLC<br>51360 Knightsbridge Blvd<br>Novi, MICHIGAN 48374<br>david.mindham@edpr.com |
| El Paso Electric Company (EPE) | Matthew Loftus<br>Senior Transmission Attorney<br>El Paso Electric Company (EPE)<br>100 N Stanton St.<br>El Paso, TEXAS 79901 | |

| | | |
|---|---|---|
| | UNITED STATES<br>matthew.loftus@epelectric.com | |
| ELCON | Karen Onaran<br>Vice President<br>ELCON<br>1101 K Street NW<br>Suite 700<br>Washington, DISTRICT OF<br>COLUMBIA 20005<br>UNITED STATES<br>KOnaran@elcon.org | Travis Fisher<br>Electricity Consumers Resource<br>Council<br>1101 K St NW<br>Suite 700<br>Washington, DISTRICT OF<br>COLUMBIA 20005<br>tfisher@elcon.org |
| ELCON | Karen Onaran<br>Vice President<br>ELCON<br>1101 K Street NW<br>Suite 700<br>Washington, DISTRICT OF<br>COLUMBIA 20005<br>UNITED STATES<br>KOnaran@elcon.org | |
| Electric<br>Power<br>Supply<br>Association | Nancy Bagot<br>Vice President<br>Electric Power Supply<br>Association<br>1401 NEW YORK AVE NW<br>STE 950<br>WASHINGTON, DISTRICT<br>OF COLUMBIA 20005<br>UNITED STATES<br>NancyB@epsa.org | |
| Electric<br>Power<br>Supply<br>Association | Bill Zuretti<br>Electric Power Supply<br>Association<br>1401 New York Ave, NW, Suite<br>950<br>Washington, DISTRICT OF<br>COLUMBIA 20005 | |

| | | |
|---|---|---|
| | UNITED STATES<br>bzuretti@epsa.org | |
| Electric Power Supply Association | Nancy Bagot<br>Vice President<br>Electric Power Supply Association<br>1401 NEW YORK AVE NW STE 950<br>WASHINGTON, DISTRICT OF COLUMBIA 20005<br>UNITED STATES<br>NancyB@epsa.org | |
| Electricity Consumers Resource Council | Karen Onaran<br>Vice President<br>ELCON<br>1101 K Street NW<br>Suite 700<br>Washington, DISTRICT OF COLUMBIA 20005<br>UNITED STATES<br>KOnaran@elcon.org | Travis Fisher<br>Electricity Consumers Resource Council<br>1101 K St NW<br>Suite 700<br>Washington, DISTRICT OF COLUMBIA 20005<br>tfisher@elcon.org |
| Electricity Consumers Resource Council | Karen Onaran<br>Vice President<br>ELCON<br>1101 K Street NW<br>Suite 700<br>Washington, DISTRICT OF COLUMBIA 20005<br>UNITED STATES<br>KOnaran@elcon.org | |
| Electricity Consumers Resource Council | Karen Onaran<br>Vice President<br>ELCON<br>1101 K Street NW<br>Suite 700<br>Washington, DISTRICT OF COLUMBIA 20005 | |

| | UNITED STATES KOnaran@elcon.org | |
| Electricity Transmission Competition Coalition | Robert Weishaar McNees Wallace & Nurick LLC 1200 G Street, NW Suite 800 Washington, DISTRICT OF COLUMBIA 20005 UNITED STATES bweishaar@mcneeslaw.com | |
| Electricity Transmission Competition Coalition | | Kenneth R Stark McNees Wallace & Nurick LLC 100 PINE ST HARRISBURG, PENNSYLVANIA 17101 kstark@mcneeslaw.com |
| Electricity Transmission Competition Coalition | | Susan E Bruce McNees Wallace & Nurick LLC 100 Pine St Harrisburg, PENNSYLVANIA 17101 sbruce@mcneeslaw.com |
| Electricity Transmission Competition Coalition | | David S. Mabry McNees Wallace & Nurick LLC 100 Pine Street Harrisburg, PENNSYLVANIA 17101 dmabry@mwn.com |
| Electricity Transmission Competition Coalition | | Lauren Huff Paralegal McNees Wallace & Nurick LLC 100 Pine Street P.O. Box 1166 Harrisburg, PENNSYLVANIA 17108 lhuff@mwn.com |

| | | |
|---|---|---|
| Enel North America, Inc. | Adam Stern<br>12 Nicholson Street NW<br>Washington, DISTRICT OF<br>COLUMBIA 20011<br>UNITED STATES<br>adam.stern@enel.com | Betsy R Beck<br>Director, Organized Markets<br>Enel Green Power North<br>America, Inc.<br>100 Brickstone Square<br>Andover, MASSACHUSETTS<br>01810<br>betsy.beck@enel.com |
| Enel North America, Inc. | Adam Stern<br>12 Nicholson Street NW<br>Washington, DISTRICT OF<br>COLUMBIA 20011<br>UNITED STATES<br>adam.stern@enel.com | |
| Enel North America, Inc. | Adam Stern<br>12 Nicholson Street NW<br>Washington, DISTRICT OF<br>COLUMBIA 20011<br>UNITED STATES<br>adam.stern@enel.com | |
| Energy Alabama | Nicholas Guidi<br>Southern Environmental Law<br>Center<br>122 C ST NW STE 325<br>WASHINGTON, DISTRICT<br>OF COLUMBIA 20001<br>UNITED STATES<br>nguidi@selcdc.org | |
| Energy Alabama | Nicholas Guidi<br>Southern Environmental Law<br>Center<br>122 C ST NW STE 325<br>WASHINGTON, DISTRICT<br>OF COLUMBIA 20001<br>UNITED STATES<br>nguidi@selcdc.org | |

| | | |
|---|---|---|
| Energy Alabama | Nicholas Guidi<br>Southern Environmental Law Center<br>122 C ST NW STE 325<br>WASHINGTON, DISTRICT OF COLUMBIA 20001<br>UNITED STATES<br>nguidi@selcdc.org | |
| ENGIE North America Inc. | Sarah Bresolin Silver<br>Director Government and Regula<br>ENGIE North America Inc.<br>1360 Post Oak Blvd<br>Houston, TEXAS 77056<br>UNITED STATES<br>sarah.bresolin@engie.com | |
| ENGIE North America Inc. | Sarah Bresolin Silver<br>Director Government and Regula<br>ENGIE North America Inc.<br>1360 Post Oak Blvd<br>Houston, TEXAS 77056<br>UNITED STATES<br>sarah.bresolin@engie.com | |
| Entergy Arkansas, LLC | Gregory Camet<br>Assistant General Counsel<br>Entergy Services, Inc.<br>101 Constitution Avenue, N.W.<br>Suite 200 East<br>Washington, DISTRICT OF COLUMBIA 20001<br>UNITED STATES<br>gcamet@entergy.com | Andrea J Weinstein, ESQ<br>VP. Federal Regulatory Affairs<br>Entergy Services, LLC<br>101 CONSTITUTION AVE NW<br>SUITE 200 EAST<br>WASHINGTON, DISTRICT OF COLUMBIA 20001<br>aweinst@entergy.com |
| Entergy Arkansas, LLC | Jim Cunningham<br>Senior Counsel<br>Entergy Services, LLC<br>101 Constitution Avenue NW<br>Suite 200 East | |

71

| | | |
|---|---|---|
| | Washington, DISTRICT OF COLUMBIA 20001 UNITED STATES jcunni7@entergy.com | |
| Entergy Arkansas, LLC | Jim Cunningham Senior Counsel Entergy Services, LLC 101 Constitution Avenue NW Suite 200 East Washington, DISTRICT OF COLUMBIA 20001 UNITED STATES jcunni7@entergy.com | |
| Entergy Arkansas, LLC | Glen Bernstein Entergy Services, Inc. 101 CONSTITUTION AVE NW INC000000471985 WASHINGTON, DISTRICT OF COLUMBIA 20001 UNITED STATES gbernst@entergy.com | |
| Entergy Arkansas, LLC | Jim Cunningham Senior Counsel Entergy Services, LLC 101 Constitution Avenue NW Suite 200 East Washington, DISTRICT OF COLUMBIA 20001 UNITED STATES jcunni7@entergy.com | Andrea J Weinstein, ESQ VP. Federal Regulatory Affairs Entergy Services, LLC 101 CONSTITUTION AVE NW SUITE 200 EAST WASHINGTON, DISTRICT OF COLUMBIA 20001 aweinst@entergy.com |
| Entergy Louisiana, LLC | Gregory Camet Assistant General Counsel Entergy Services, Inc. 101 Constitution Avenue, N.W. Suite 200 East Washington, DISTRICT OF COLUMBIA 20001 | Andrea J Weinstein, ESQ VP. Federal Regulatory Affairs Entergy Services, LLC 101 CONSTITUTION AVE NW SUITE 200 EAST WASHINGTON, DISTRICT |

| | UNITED STATES<br>gcamet@entergy.com | OF COLUMBIA 20001<br>aweinst@entergy.com |
|---|---|---|
| Entergy Louisiana, LLC | Jim Cunningham<br>Senior Counsel<br>Entergy Services, LLC<br>101 Constitution Avenue NW<br>Suite 200 East<br>Washington, DISTRICT OF<br>COLUMBIA 20001<br>UNITED STATES<br>jcunni7@entergy.com | |
| Entergy Louisiana, LLC | Jim Cunningham<br>Senior Counsel<br>Entergy Services, LLC<br>101 Constitution Avenue NW<br>Suite 200 East<br>Washington, DISTRICT OF<br>COLUMBIA 20001<br>UNITED STATES<br>jcunni7@entergy.com | |
| Entergy Louisiana, LLC | Glen Bernstein<br>Entergy Services, Inc.<br>101 CONSTITUTION AVE<br>NW<br>INC000000471985<br>WASHINGTON, DISTRICT<br>OF COLUMBIA 20001<br>UNITED STATES<br>gbernst@entergy.com | |
| Entergy Louisiana, LLC | Jim Cunningham<br>Senior Counsel<br>Entergy Services, LLC<br>101 Constitution Avenue NW<br>Suite 200 East<br>Washington, DISTRICT OF<br>COLUMBIA 20001<br>UNITED STATES<br>jcunni7@entergy.com | Andrea J Weinstein, ESQ<br>VP. Federal Regulatory Affairs<br>Entergy Services, LLC<br>101 CONSTITUTION AVE<br>NW<br>SUITE 200 EAST<br>WASHINGTON, DISTRICT<br>OF COLUMBIA 20001<br>aweinst@entergy.com |

| | | |
|---|---|---|
| Entergy Mississippi, LLC | Gregory Camet<br>Assistant General Counsel<br>Entergy Services, Inc.<br>101 Constitution Avenue, N.W.<br>Suite 200 East<br>Washington, DISTRICT OF COLUMBIA 20001<br>UNITED STATES<br>gcamet@entergy.com | Andrea J Weinstein, ESQ<br>VP. Federal Regulatory Affairs<br>Entergy Services, LLC<br>101 CONSTITUTION AVE NW<br>SUITE 200 EAST<br>WASHINGTON, DISTRICT OF COLUMBIA 20001<br>aweinst@entergy.com |
| Entergy Mississippi, LLC | Jim Cunningham<br>Senior Counsel<br>Entergy Services, LLC<br>101 Constitution Avenue NW<br>Suite 200 East<br>Washington, DISTRICT OF COLUMBIA 20001<br>UNITED STATES<br>jcunni7@entergy.com | |
| Entergy Mississippi, LLC | Jim Cunningham<br>Senior Counsel<br>Entergy Services, LLC<br>101 Constitution Avenue NW<br>Suite 200 East<br>Washington, DISTRICT OF COLUMBIA 20001<br>UNITED STATES<br>jcunni7@entergy.com | |
| Entergy Mississippi, LLC | Glen Bernstein<br>Entergy Services, Inc.<br>101 CONSTITUTION AVE NW<br>INC000000471985<br>WASHINGTON, DISTRICT OF COLUMBIA 20001<br>UNITED STATES<br>gbernst@entergy.com | |

| | | |
|---|---|---|
| Entergy Mississippi, LLC | Jim Cunningham<br>Senior Counsel<br>Entergy Services, LLC<br>101 Constitution Avenue NW<br>Suite 200 East<br>Washington, DISTRICT OF COLUMBIA 20001<br>UNITED STATES<br>jcunni7@entergy.com | Andrea J Weinstein, ESQ<br>VP. Federal Regulatory Affairs<br>Entergy Services, LLC<br>101 CONSTITUTION AVE NW<br>SUITE 200 EAST<br>WASHINGTON, DISTRICT OF COLUMBIA 20001<br>aweinst@entergy.com |
| Entergy Mississippi, LLC | Jim Cunningham<br>Senior Counsel<br>Entergy Services, LLC<br>101 Constitution Avenue NW<br>Suite 200 East<br>Washington, DISTRICT OF COLUMBIA 20001<br>UNITED STATES<br>jcunni7@entergy.com | Andrea J Weinstein, ESQ<br>VP. Federal Regulatory Affairs<br>Entergy Services, LLC<br>101 CONSTITUTION AVE NW<br>SUITE 200 EAST<br>WASHINGTON, DISTRICT OF COLUMBIA 20001<br>aweinst@entergy.com |
| Entergy New Orleans, LLC | Gregory Camet<br>Assistant General Counsel<br>Entergy Services, Inc.<br>101 Constitution Avenue, N.W.<br>Suite 200 East<br>Washington, DISTRICT OF COLUMBIA 20001<br>UNITED STATES<br>gcamet@entergy.com | Andrea J Weinstein, ESQ<br>VP. Federal Regulatory Affairs<br>Entergy Services, LLC<br>101 CONSTITUTION AVE NW<br>SUITE 200 EAST<br>WASHINGTON, DISTRICT OF COLUMBIA 20001<br>aweinst@entergy.com |
| Entergy New Orleans, LLC | Jim Cunningham<br>Senior Counsel<br>Entergy Services, LLC<br>101 Constitution Avenue NW<br>Suite 200 East<br>Washington, DISTRICT OF COLUMBIA 20001<br>UNITED STATES<br>jcunni7@entergy.com | |

| | | |
|---|---|---|
| Entergy New Orleans, LLC | Jim Cunningham<br>Senior Counsel<br>Entergy Services, LLC<br>101 Constitution Avenue NW<br>Suite 200 East<br>Washington, DISTRICT OF COLUMBIA 20001<br>UNITED STATES<br>jcunni7@entergy.com | |
| Entergy New Orleans, LLC | Glen Bernstein<br>Entergy Services, Inc.<br>101 CONSTITUTION AVE NW<br>INC000000471985<br>WASHINGTON, DISTRICT OF COLUMBIA 20001<br>UNITED STATES<br>gbernst@entergy.com | |
| Entergy New Orleans, LLC | Jim Cunningham<br>Senior Counsel<br>Entergy Services, LLC<br>101 Constitution Avenue NW<br>Suite 200 East<br>Washington, DISTRICT OF COLUMBIA 20001<br>UNITED STATES<br>jcunni7@entergy.com | Andrea J Weinstein, ESQ<br>VP. Federal Regulatory Affairs<br>Entergy Services, LLC<br>101 CONSTITUTION AVE NW<br>SUITE 200 EAST<br>WASHINGTON, DISTRICT OF COLUMBIA 20001<br>aweinst@entergy.com |
| Entergy Services, LLC | Gregory Camet<br>Assistant General Counsel<br>Entergy Services, Inc.<br>101 Constitution Avenue, N.W.<br>Suite 200 East<br>Washington, DISTRICT OF COLUMBIA 20001<br>UNITED STATES<br>gcamet@entergy.com | Andrea J Weinstein, ESQ<br>VP. Federal Regulatory Affairs<br>Entergy Services, LLC<br>101 CONSTITUTION AVE NW<br>SUITE 200 EAST<br>WASHINGTON, DISTRICT OF COLUMBIA 20001<br>aweinst@entergy.com |

| | | |
|---|---|---|
| Entergy Services, LLC | Jim Cunningham<br>Senior Counsel<br>Entergy Services, LLC<br>101 Constitution Avenue NW<br>Suite 200 East<br>Washington, DISTRICT OF COLUMBIA 20001<br>UNITED STATES<br>jcunni7@entergy.com | |
| Entergy Services, LLC | Jim Cunningham<br>Senior Counsel<br>Entergy Services, LLC<br>101 Constitution Avenue NW<br>Suite 200 East<br>Washington, DISTRICT OF COLUMBIA 20001<br>UNITED STATES<br>jcunni7@entergy.com | |
| Entergy Services, LLC | Glen Bernstein<br>Entergy Services, Inc.<br>101 CONSTITUTION AVE NW<br>INC000000471985<br>WASHINGTON, DISTRICT OF COLUMBIA 20001<br>UNITED STATES<br>gbernst@entergy.com | |
| Entergy Services, LLC | Jim Cunningham<br>Senior Counsel<br>Entergy Services, LLC<br>101 Constitution Avenue NW<br>Suite 200 East<br>Washington, DISTRICT OF COLUMBIA 20001<br>UNITED STATES<br>jcunni7@entergy.com | Andrea J Weinstein, ESQ<br>VP. Federal Regulatory Affairs<br>Entergy Services, LLC<br>101 CONSTITUTION AVE NW<br>SUITE 200 EAST<br>WASHINGTON, DISTRICT OF COLUMBIA 20001<br>aweinst@entergy.com |
| Entergy Texas, Inc. | Gregory Camet<br>Assistant General Counsel | Andrea J Weinstein, ESQ<br>VP. Federal Regulatory Affairs |

| | | |
|---|---|---|
| | Entergy Services, Inc.<br>101 Constitution Avenue, N.W.<br>Suite 200 East<br>Washington, DISTRICT OF<br>COLUMBIA 20001<br>UNITED STATES<br>gcamet@entergy.com | Entergy Services, LLC<br>101 CONSTITUTION AVE<br>NW<br>SUITE 200 EAST<br>WASHINGTON, DISTRICT<br>OF COLUMBIA 20001<br>aweinst@entergy.com |
| Entergy<br>Texas, Inc. | Jim Cunningham<br>Senior Counsel<br>Entergy Services, LLC<br>101 Constitution Avenue NW<br>Suite 200 East<br>Washington, DISTRICT OF<br>COLUMBIA 20001<br>UNITED STATES<br>jcunni7@entergy.com | |
| Entergy<br>Texas, Inc. | Jim Cunningham<br>Senior Counsel<br>Entergy Services, LLC<br>101 Constitution Avenue NW<br>Suite 200 East<br>Washington, DISTRICT OF<br>COLUMBIA 20001<br>UNITED STATES<br>jcunni7@entergy.com | |
| Entergy<br>Texas, Inc. | Glen Bernstein<br>Entergy Services, Inc.<br>101 CONSTITUTION AVE<br>NW<br>INC000000471985<br>WASHINGTON, DISTRICT<br>OF COLUMBIA 20001<br>UNITED STATES<br>gbernst@entergy.com | |
| Entergy<br>Texas, Inc. | Jim Cunningham<br>Senior Counsel<br>Entergy Services, LLC<br>101 Constitution Avenue NW | Andrea J Weinstein, ESQ<br>VP. Federal Regulatory Affairs<br>Entergy Services, LLC<br>101 CONSTITUTION AVE |

78

| | | |
|---|---|---|
| | Suite 200 East<br>Washington, DISTRICT OF COLUMBIA 20001<br>UNITED STATES<br>jcunni7@entergy.com | NW<br>SUITE 200 EAST<br>WASHINGTON, DISTRICT OF COLUMBIA 20001<br>aweinst@entergy.com |
| Entergy Texas, Inc. | Jim Cunningham<br>Senior Counsel<br>Entergy Services, LLC<br>101 Constitution Avenue NW<br>Suite 200 East<br>Washington, DISTRICT OF COLUMBIA 20001<br>UNITED STATES<br>jcunni7@entergy.com | Andrea J Weinstein, ESQ<br>VP. Federal Regulatory Affairs<br>Entergy Services, LLC<br>101 CONSTITUTION AVE NW<br>SUITE 200 EAST<br>WASHINGTON, DISTRICT OF COLUMBIA 20001<br>aweinst@entergy.com |
| Environmental Defense Fund | Ted Kelly<br>Senior Attorney<br>Environmental Defense Fund<br>1875 Connecticut Ave NW<br>Suite 600<br>Washington, DISTRICT OF COLUMBIA 20012<br>UNITED STATES<br>tekelly@edf.org | |
| Environmental Defense Fund | Ted Kelly<br>Senior Attorney<br>Environmental Defense Fund<br>1875 Connecticut Ave NW<br>Suite 600<br>Washington, DISTRICT OF COLUMBIA 20012<br>UNITED STATES<br>tekelly@edf.org | |
| Environmental Defense Fund | Ted Kelly<br>Senior Attorney<br>Environmental Defense Fund<br>1875 Connecticut Ave NW<br>Suite 600<br>Washington, DISTRICT OF | |

| | | |
|---|---|---|
| | COLUMBIA 20012<br>UNITED STATES<br>tekelly@edf.org | |
| Environmental Defense Fund | Adam Kurland<br>ENVIRONMENTAL<br>DEFENSE FUND<br>1875 Connecticut Ave NW<br>Washington, DISTRICT OF<br>COLUMBIA 20009<br>UNITED STATES<br>akurland@edf.org | |
| ENVIRONMENTAL LAW & POLICY CENTER | Justin Vickers<br>Attorney<br>ENVIRONMENTAL LAW &<br>POLICY CENTER<br>35 East Wacker Drive<br>Suite 1600<br>Chicago, ILLINOIS 60601<br>UNITED STATES<br>jvickers@elpc.org | |
| ENVIRONMENTAL LAW & POLICY CENTER | Justin Vickers<br>Attorney<br>ENVIRONMENTAL LAW &<br>POLICY CENTER<br>35 East Wacker Drive<br>Suite 1600<br>Chicago, ILLINOIS 60601<br>UNITED STATES<br>jvickers@elpc.org | |
| ENVIRONMENTAL LAW & POLICY CENTER | Tanmay Shukla<br>Associate Attorney<br>Environmental Law and Policy<br>Center<br>35 E WACKER DR STE 1600<br>CHICAGO, ILLINOIS 60601<br>UNITED STATES<br>tshukla@elpc.org | |

| | | |
|---|---|---|
| ENVIRONMENTAL LAW & POLICY CENTER | Nicholas Wallace<br>ENVIRONMENTAL LAW & POLICY CENTER<br>35 E WACKER DR STE 1600<br>CHICAGO, ILLINOIS 60601<br>UNITED STATES<br>nwallace@elpc.org | |
| Environmental Law and Policy Center | Tanmay Shukla<br>Associate Attorney<br>Environmental Law and Policy Center<br>35 E WACKER DR STE 1600<br>CHICAGO, ILLINOIS 60601<br>UNITED STATES<br>tshukla@elpc.org | |
| Evergreen Action | Charles Harper<br>Evergreen Action<br>PO Box 21961<br>Seattle, WASHINGTON 98111<br>UNITED STATES<br>charles@evergreenaction.com | |
| Evergreen Action | Jessica Hamilton<br>1908 W LAKE ST<br>FORT COLLINS, COLORADO 80521<br>UNITED STATES<br>jessica@evergreenaction.com | |
| Eversource Energy | Mary Grover<br>Assistant General Counsel<br>Eversource Energy Service Company<br>247 Station Drive<br>SE100<br>Westwood, MASSACHUSETTS 02090-2397<br>UNITED STATES<br>mary.grover@eversource.com | |

| | | |
|---|---|---|
| Eversource Energy Service Company | | Mary E Grover, ESQ<br>Assistant General Counsel<br>247 Station Drive<br>SE100<br>Westwood,<br>MASSACHUSETTS 02090-2397<br>mary.grover@eversource.com |
| Eversource Energy Service Company | Mary Grover<br>Assistant General Counsel<br>Eversource Energy Service Company<br>247 Station Drive<br>SE100<br>Westwood,<br>MASSACHUSETTS 02090-2397<br>UNITED STATES<br>mary.grover@eversource.com | |
| Eversource Energy Service Company | Thomas Lemon<br>Senior Counsel<br>Eversource Energy<br>800 Boylston St, P1700<br>Boston, MASSACHUSETTS 02199<br>UNITED STATES<br>thomas.lemon@eversource.com | |
| Eversource Energy Service Company | Mary Grover<br>Assistant General Counsel<br>Eversource Energy Service Company<br>247 Station Drive<br>SE100<br>Westwood,<br>MASSACHUSETTS 02090-2397<br>UNITED STATES<br>mary.grover@eversource.com | |

| | | |
|---|---|---|
| Eversource Energy Service Company | Thomas Lemon<br>Senior Counsel<br>Eversource Energy<br>800 Boylston St, P1700<br>Boston, MASSACHUSETTS 02199<br>UNITED STATES<br>thomas.lemon@eversource.com | |
| Eversource Energy Service Company | David Burnham<br>56 PROSPECT ST<br>HARTFORD, CONNECTICUT 06103<br>UNITED STATES<br>david.burnham@eversource.com | |
| Exelon Corporation | Christopher Wilson<br>Director, Federal Regulatory A<br>Constellation Energy Generation, LLC<br>101 Constitution Ave, NW Suite 400E<br>Washington, DISTRICT OF COLUMBIA 20001<br>UNITED STATES<br>FERCe-filings1@Constellation.com | |
| Exelon Corporation | Gary Guy<br>Assistant General Counsel<br>Exelon Business Services Company<br>701 9th Street, N.W.<br>Washington, DISTRICT OF COLUMBIA 20068<br>UNITED STATES<br>gary.guy@exeloncorp.com | |
| Exelon Corporation | AMBER THOMAS<br>AMBER.THOMAS@EXELON CORP.COM | |

| | | |
|---|---|---|
| Exelon Corporation | Robert Taylor<br>Director of Transmission New M<br>Invenergy Transmission LLC<br>1 S Wacker Dr<br>Chicago, ILLINOIS 60606<br>UNITED STATES<br>rtaylor@invenergy.com | |
| Exelon Corporation | Jordan Kwok<br>Director, Federal Regulatory A<br>Exelon Business Services<br>701 9TH ST NW<br>WASHINGTON, DISTRICT OF COLUMBIA 20001<br>UNITED STATES<br>jordan.kwok@exeloncorp.com | |
| Exelon Corporation | Lisa Luftig<br>Assistant General Counsel<br>Exelon BSC-Legal Regulatory<br>701 Ninth Street, NW<br>Washington, DISTRICT OF COLUMBIA 20001<br>UNITED STATES<br>lisa.luftig@exeloncorp.com | |
| Exelon Corporation | Lisa Luftig<br>Assistant General Counsel<br>Exelon BSC-Legal Regulatory<br>701 Ninth Street, NW<br>Washington, DISTRICT OF COLUMBIA 20001<br>UNITED STATES<br>lisa.luftig@exeloncorp.com | Jordan Kwok<br>Director, Federal Regulatory A<br>Exelon Business Services<br>701 9TH ST NW<br>WASHINGTON, DISTRICT OF COLUMBIA 20001<br>jordan.kwok@exeloncorp.com |
| Fervo Energy | Laura Singer<br>Fervo Energy<br>609 MAIN ST FL 25<br>HOUSTON, TEXAS 77002<br>UNITED STATES<br>laura.singer@fervoenergy.com | Marc Reyes<br>Interconnection Director<br>910 Louisiana Street<br>Suite 4400<br>Houston, TEXAS 77002<br>marc.reyes@fervoenergy.com |

| | | |
|---|---|---|
| Fervo Energy Company | Marc Reyes<br>Interconnection Director<br>910 Louisiana Street<br>Suite 4400<br>Houston, TEXAS 77002<br>UNITED STATES<br>marc.reyes@fervoenergy.com | |
| Form Energy | Andrew Kaplan<br>Partner<br>Pierce Atwood LLP<br>100 SUMMER ST<br>BOSTON, MASSACHUSETTS 02110<br>UNITED STATES<br>akaplan@pierceatwood.com | |
| Form Energy | Andrew Kaplan<br>Partner<br>Pierce Atwood LLP<br>100 SUMMER ST<br>BOSTON, MASSACHUSETTS 02110<br>UNITED STATES<br>akaplan@pierceatwood.com | |
| Foundation for Resilient Societies | Foundation for Resilient Societies<br>Foundation for Resilient Socie<br>24 Front Street<br>Suite 203<br>Exeter, NEW HAMPSHIRE 03833<br>UNITED STATES<br>thomasp@resilientsocieties.org | |
| Foundation for Resilient Societies | Foundation for Resilient Societies<br>Foundation for Resilient Socie<br>24 Front Street<br>Suite 203<br>Exeter, NEW HAMPSHIRE | |

| | | |
|---|---|---|
| | 03833<br>UNITED STATES<br>thomasp@resilientsocieties.org | |
| Freeport-McMoran Copper & Gold Energy Services, LLC | Gregory Jones<br>Paul Hastings LLP<br>2050 M ST NW<br>WASHINGTON, DISTRICT OF COLUMBIA 20036<br>UNITED STATES<br>gregoryjones@paulhastings.com | William D DeGrandis<br>Partner<br>Paul Hastings LLP<br>2050 M Street, NW<br>Washington, DISTRICT OF COLUMBIA 2003<br>billdegrandis@paulhastings.com |
| Freeport-McMoran Copper & Gold Energy Services, LLC | | Sophia Faram<br>Paul Hastings LLP<br>2050 M St NW<br>Washington, DISTRICT OF COLUMBIA 20036<br>sophiafaram@paulhastings.com |
| Fresh Energy | Michael Schowalter<br>Senior Policy Associate<br>Fresh Energy<br>408 St. Peter St.<br>Suite 350<br>Saint Paul, MINNESOTA 55102<br>UNITED STATES<br>schowalter@fresh-energy.org | |
| Fresh Energy | Danielle Fidler<br>Senior Attorney<br>EARTHJUSTICE<br>48 WALL ST FL 15<br>NEW YORK, NEW YORK 10005<br>UNITED STATES<br>dfidler@earthjustice.org | |
| Fresh Energy | Michael Schowalter<br>Senior Policy Associate<br>Fresh Energy | |

| | | |
|---|---|---|
| | 408 St. Peter St.<br>Suite 350<br>Saint Paul, MINNESOTA 55102<br>UNITED STATES<br>schowalter@fresh-energy.org | |
| Fresh Energy | Michael Schowalter<br>Senior Policy Associate<br>Fresh Energy<br>408 St. Peter St.<br>Suite 350<br>Saint Paul, MINNESOTA 55102<br>UNITED STATES<br>schowalter@fresh-energy.org | |
| Fresh Energy | Michael Schowalter<br>Senior Policy Associate<br>Fresh Energy<br>408 St. Peter St.<br>Suite 350<br>Saint Paul, MINNESOTA 55102<br>UNITED STATES<br>schowalter@fresh-energy.org | |
| Geenex Solar LLC | Donna Robichaud<br>2180 Conner Cove Ln<br>Denver, NORTH CAROLINA 28037<br>UNITED STATES<br>drobichaud@qf-solutions-llc.com | |
| Georgetown Municipal Light Department | John Coyle<br>Duncan & Allen LLP<br>Suite 700<br>1730 Rhode Island Avenue, N.W.<br>Washington, DISTRICT OF COLUMBIA 20036-3115 | |

| | UNITED STATES jpc@duncanallen.com | |
|---|---|---|
| Georgetown Municipal Light Department | John Coyle<br>Duncan & Allen LLP<br>Suite 700<br>1730 Rhode Island Avenue, N.W.<br>Washington, DISTRICT OF COLUMBIA 20036-3115<br>UNITED STATES<br>jpc@duncanallen.com | |
| Georgetown Municipal Light Department | John Coyle<br>Duncan & Allen LLP<br>Suite 700<br>1730 Rhode Island Avenue, N.W.<br>Washington, DISTRICT OF COLUMBIA 20036-3115<br>UNITED STATES<br>jpc@duncanallen.com | |
| Georgia Public Service Commission | Alex Davis<br>Attorney<br>Georgia Public Service Commission<br>244 Washington Street, SW<br>Atlanta, GEORGIA 30334<br>UNITED STATES<br>adavis@psc.ga.gov | Robert Trokey<br>Direct, Electric Regulation Georgia Public Service Commission<br>Georgia Public Service Commission<br>244 Washington St SW<br>Atlanta, GEORGIA 30334<br>rtrokey@psc.state.ga.us |
| Georgia Public Service Commission | Preston Thomas<br>Attorney<br>Georgia Public Service Commission<br>244 Washington Street, SW<br>Atlanta, GEORGIA 30334<br>UNITED STATES<br>pthomas@psc.ga.gov | |

| | | |
|---|---|---|
| Georgia Transmission Corporation | William DeGrandis<br>Partner<br>Paul Hastings LLP<br>2050 M Street, NW<br>Washington, DISTRICT OF COLUMBIA 2003<br>UNITED STATES<br>billdegrandis@paulhastings.com | |
| Georgia Transmission Corporation | William DeGrandis<br>Partner<br>Paul Hastings LLP<br>2050 M Street, NW<br>Washington, DISTRICT OF COLUMBIA 2003<br>UNITED STATES<br>billdegrandis@paulhastings.com | |
| Georgia Transmission Corporation | William DeGrandis<br>Partner<br>Paul Hastings LLP<br>2050 M Street, NW<br>Washington, DISTRICT OF COLUMBIA 2003<br>UNITED STATES<br>billdegrandis@paulhastings.com | |
| Georgia Transmission Corporation | William DeGrandis<br>Partner<br>Paul Hastings LLP<br>2050 M Street, NW<br>Washington, DISTRICT OF COLUMBIA 2003<br>UNITED STATES<br>billdegrandis@paulhastings.com | |

| | | |
|---|---|---|
| Glendale Water & Power Dept. | Jon Stickman<br>Attorney<br>Duncan & Allen LLP<br>1730 RHODE ISLAND AVE NW STE 700<br>WASHINGTON, DISTRICT OF COLUMBIA 20036<br>UNITED STATES<br>jrs@duncanallen.com | |
| Golden State Clean Energy | Dan Kim<br>dan@westlandssolarpark.com | Nancy Saracino<br>Strategic Advisor<br>WESTERN ENERGY & WATER, PC<br>1020 Coronado Blvd<br>Sacramento, CALIFORNIA 95864<br>nsaracino@waterenergystrategies.com |
| Golden State Clean Energy | Dan Kim<br>dan@westlandssolarpark.com | Ian Kearney<br>Golden State Clean Energy<br>3962 BANCROFT ST UNIT 3<br>SAN DIEGO, CALIFORNIA 92104<br>ian@goldenstatecleanenergy.com |
| Great River Energy | Donna Stephenson<br>Associate General Counsel<br>Great River Energy<br>12300 Elm Creek Blvd N<br>Maple Grove, MINNESOTA 55369<br>UNITED STATES<br>dstephenson@grenergy.com | Mike Saer<br>Great River Energy<br>12300 Elm Creek Blvd<br>Maple Grove, MINNESOTA 55369<br>msaer@grenergy.com |
| Great River Energy | Mike Saer<br>Great River Energy<br>12300 Elm Creek Blvd<br>Maple Grove, MINNESOTA 55369 | |

| | | |
|---|---|---|
| | UNITED STATES<br>msaer@grenergy.com | |
| GREENFIELDS IRRIGATION DISTRICT | Michael Uda<br>Attorney<br>Uda Law Firm, PC<br>7 W 6th Ave<br>Power Block Suite 615<br>Helena, MONTANA 59601<br>UNITED STATES<br>michaeluda@udalaw.com | |
| GREENFIELDS IRRIGATION DISTRICT | Michael Uda<br>Attorney<br>Uda Law Firm, PC<br>7 W 6th Ave<br>Power Block Suite 615<br>Helena, MONTANA 59601<br>UNITED STATES<br>michaeluda@udalaw.com | |
| Grid Strategies LLC | Rob Gramlich<br>Grid Strategies LLC<br>9207 Kirkdale Rd<br>Bethesda, MARYLAND 20817<br>UNITED STATES<br>rgramlich@gridstrategiesllc.com | |
| Grid Strategies LLC | Jay Caspary<br>Grid Strategies LLC<br>P O Box 460<br>194 Tice Road<br>Higden, ARKANSAS 72067<br>UNITED STATES<br>jcaspary@gridstrategiesllc.com | |
| Grid United LLC | Kristen Golden<br>General Counsel<br>Grid United LLC<br>1717 West Loop South, Suite 1800 | |

| | | |
|---|---|---|
| | Houston, TEXAS 77027<br>UNITED STATES<br>Kristen.golden@gridunited.com | |
| Grid United LLC | Kristen Golden<br>General Counsel<br>Grid United LLC<br>1717 West Loop South, Suite 1800<br>Houston, TEXAS 77027<br>UNITED STATES<br>Kristen.golden@gridunited.com | |
| Grid United LLC | Kristen Golden<br>General Counsel<br>Grid United LLC<br>1717 West Loop South, Suite 1800<br>Houston, TEXAS 77027<br>UNITED STATES<br>Kristen.golden@gridunited.com | |
| Grid United LLC | Kristen Golden<br>General Counsel<br>Grid United LLC<br>1717 West Loop South, Suite 1800<br>Houston, TEXAS 77027<br>UNITED STATES<br>Kristen.golden@gridunited.com | |
| GridLab | Ric O'Connell<br>Executive Director<br>GridLab<br>2150 ALLSTON WAY STE 420<br>BERKELEY, CALIFORNIA 94704<br>UNITED STATES<br>ric@gridlab.org | |

| | | |
|---|---|---|
| Groveland Electric Light Department | John Coyle<br>Duncan & Allen LLP<br>Suite 700<br>1730 Rhode Island Avenue, N.W.<br>Washington, DISTRICT OF COLUMBIA 20036-3115<br>UNITED STATES<br>jpc@duncanallen.com | |
| Handy Law, LLC | Seth Handy<br>Principal<br>42 Weybosset Street<br>Providence, RHODE ISLAND 02903<br>UNITED STATES<br>seth@handylawllc.com | |
| Handy Law, LLC | Seth Handy<br>Principal<br>42 Weybosset Street<br>Providence, RHODE ISLAND 02903<br>UNITED STATES<br>seth@handylawllc.com | |
| Hannon Armstrong Sustainable Infrastructure Capital, Inc. | Susan Nickey<br>Hannon Armstrong Capital, LLC<br>1 PARK PL STE 200<br>ANNAPOLIS, MARYLAND 21401<br>UNITED STATES<br>snickey@hannonarmstrong.com | |
| Hannon Armstrong Sustainable Infrastructure Capital, Inc. | Susan Nickey<br>Hannon Armstrong Capital, LLC<br>1 PARK PL STE 200<br>ANNAPOLIS, MARYLAND 21401 | |

| | | |
|---|---|---|
| | UNITED STATES<br>snickey@hannonarmstrong.com | |
| Harvard Electricity Law Initiative | Ari Peskoe<br>Senior Fellow in Electricity L<br>Harvard Environmental Policy Initiative<br>6 Everett St<br>Suite 4119<br>Cambridge,<br>MASSACHUSETTS 02138<br>UNITED STATES<br>apeskoe@law.harvard.edu | |
| Harvard Electricity Law Initiative | Ari Peskoe<br>Senior Fellow in Electricity L<br>Harvard Environmental Policy Initiative<br>6 Everett St<br>Suite 4119<br>Cambridge,<br>MASSACHUSETTS 02138<br>UNITED STATES<br>apeskoe@law.harvard.edu | |
| Harvard Electricity Law Initiative | Ari Peskoe<br>Senior Fellow in Electricity L<br>Harvard Environmental Policy Initiative<br>6 Everett St<br>Suite 4119<br>Cambridge,<br>MASSACHUSETTS 02138<br>UNITED STATES<br>apeskoe@law.harvard.edu | |
| Harvard Electricity Law Initiative | Ari Peskoe<br>Senior Fellow in Electricity L<br>Harvard Environmental Policy Initiative<br>6 Everett St<br>Suite 4119 | |

| | | |
|---|---|---|
| | Cambridge, MASSACHUSETTS 02138 UNITED STATES apeskoe@law.harvard.edu | |
| Harvard Electricity Law Initiative | Ari Peskoe Senior Fellow in Electricity L Harvard Environmental Policy Initiative 6 Everett St Suite 4119 Cambridge, MASSACHUSETTS 02138 UNITED STATES apeskoe@law.harvard.edu | |
| HINGHAM MUNICIPA L LIGHTING PLANT | John Coyle Duncan & Allen LLP Suite 700 1730 Rhode Island Avenue, N.W. Washington, DISTRICT OF COLUMBIA 20036-3115 UNITED STATES jpc@duncanallen.com | |
| HINGHAM MUNICIPA L LIGHTING PLANT | John Coyle Duncan & Allen LLP Suite 700 1730 Rhode Island Avenue, N.W. Washington, DISTRICT OF COLUMBIA 20036-3115 UNITED STATES jpc@duncanallen.com | |
| HINGHAM MUNICIPA L LIGHTING PLANT | John Coyle Duncan & Allen LLP Suite 700 1730 Rhode Island Avenue, N.W. Washington, DISTRICT OF | |

| | | |
|---|---|---|
| | COLUMBIA 20036-3115<br>UNITED STATES<br>jpc@duncanallen.com | |
| Idaho Governor's Office of Energy and Mineral Resources | Marissa Warren<br>Energy Program Manager<br>Idaho Governor's Office of Energy and Mineral Resources<br>304 N 8TH ST STE 250<br>BOISE, IDAHO 83702<br>UNITED STATES<br>marissa.warren@oer.idaho.gov | |
| Idaho Power Company | Lisa O'Hara<br>Corporate Attorney<br>Idaho Power Company<br>1221 W IDAHO ST<br>BOISE, IDAHO 83702<br>UNITED STATES<br>lo'hara@idahopower.com | |
| Idaho Public Utilities Commission | Jan Noriyuki<br>Idaho Public Utilities Commiss<br>Idaho Public Utilities Commission<br>11331 W Chinden Blvd Ste 201A<br>Boise, IDAHO 83714<br>UNITED STATES<br>jan.noriyuki@puc.idaho.gov | |
| Idaho Public Utilities Commission | Monica Barrios-Sanchez<br>Commission Secretary<br>Idaho Public Utilities Commission<br>11331 W CHINDEN BLVD BLDG 8 STE 201-A<br>BOISE, IDAHO 83714<br>UNITED STATES<br>secretary@puc.idaho.gov | Monica Barrios-Sanchez<br>Commission Secretary<br>Idaho Public Utilities Commission<br>11331 W CHINDEN BLVD BLDG 8 STE 201-A<br>BOISE, IDAHO 83714<br>secretary@puc.idaho.gov |

| | | |
|---|---|---|
| IDHAO POWER COMPANY | Julia Hilton<br>Corporate Counsel<br>Idaho Power Company<br>1221 W Idaho St<br>Boise, IDAHO 83702-5627<br>UNITED STATES<br>jhilton@idahopower.com | |
| Illinois Attorney General's Office | Susan Satter<br>Chief, Public Utilities Bureau<br>Illinois Attorney General's Office<br>115 S LA SALLE ST<br>CHICAGO, ILLINOIS 60603<br>UNITED STATES<br>susan.satter@ilag.gov | Susan L. Satter<br>Chief, Public Utilities Bureau<br>Illinois Attorney General's Office<br>115 S LA SALLE ST<br>CHICAGO, ILLINOIS 60603<br>susan.satter@ilag.gov |
| Illinois Commerce Commission | Christine Ericson<br>Special Assistant Attorney Gen<br>Illinois Commerce Commission<br>160 N. LaSalle St.<br>Suite C-800<br>Chicago, ILLINOIS 60601<br>UNITED STATES<br>Christine.Ericson@illinois.gov | William VanderLaan<br>527 E CAPITOL AVE<br>SPRINGFIELD, ILLINOIS 62701<br>bill.vanderlaan@illinois.gov |
| Illinois Commerce Commission | Christine Ericson<br>Special Assistant Attorney Gen<br>Illinois Commerce Commission<br>160 N. LaSalle St.<br>Suite C-800<br>Chicago, ILLINOIS 60601<br>UNITED STATES<br>Christine.Ericson@illinois.gov | |
| Indiana Office of Utility Consumer Counselor | Arthur Iler<br>Deputy Consumer Counsel - Fede<br>Indiana Office of Utility Consumer Counselor<br>115 W Washington St<br>Ste 1500 South | |

97

| | | |
|---|---|---|
| | Indianapolis, INDIANA 46204<br>UNITED STATES<br>ailer@oucc.in.gov | |
| Indiana Utility Regulatory Commission | Beth Heline<br>General Counsel<br>Indiana Utility Regulatory Commission<br>Suite 1500 East<br>101 West Washington Street<br>Indianapolis, INDIANA 46204<br>UNITED STATES<br>BHeline@urc.in.gov | Steve L Davies<br>Assistant General Counsel<br>Indiana Utility Regulatory Commission<br>101 W. Washington Street, Suite 1500 E<br>Indianapolis, INDIANA 46204<br>sdavies@urc.in.gov |
| Indiana Utility Regulatory Commission | Steve Davies<br>Assistant General Counsel<br>Indiana Utility Regulatory Commission<br>101 W. Washington Street, Suite 1500 E<br>Indianapolis, INDIANA 46204<br>UNITED STATES<br>sdavies@urc.in.gov | Beth E Heline, ESQ<br>General Counsel<br>Indiana Utility Regulatory Commission<br>Suite 1500 East<br>101 West Washington Street<br>Indianapolis, INDIANA 46204<br>BHeline@urc.in.gov |
| Indiana Utility Regulatory Commission | | Elizabeth Walker<br>Assistant General Counsel<br>Indiana Utility Regulatory Commission<br>101 W WASHINGTON ST STE 1500E<br>INDIANAPOLIS, INDIANA 46204<br>ewalker1@urc.in.gov |
| Indicated PJM Transmission Owners | William Keyser<br>Steptoe LLP<br>1330 Connecticut Avenue, NW<br>Washington, DISTRICT OF COLUMBIA 20036-1795<br>UNITED STATES<br>wkeyser@steptoe.com | |

| | | |
|---|---|---|
| Indicated PJM Transmission Owners | Laura Swett<br>Of Counsel<br>Steptoe LLP<br>1330 Connecticut Ave NW<br>Washington, DISTRICT OF COLUMBIA 20036<br>UNITED STATES<br>lswett@steptoe.com | |
| Indicated PJM Transmission Owners | Donald Kaplan<br>K&L Gates LLP<br>1601 K Street, NW<br>Washington, DISTRICT OF COLUMBIA 20006<br>UNITED STATES<br>don.kaplan@klgates.com | |
| Indicated PJM Transmission Owners | William Keyser<br>Steptoe LLP<br>1330 Connecticut Avenue, NW<br>Washington, DISTRICT OF COLUMBIA 20036-1795<br>UNITED STATES<br>wkeyser@steptoe.com | |
| Indicated PJM Transmission Owners | Laura Swett<br>Of Counsel<br>Steptoe LLP<br>1330 Connecticut Ave NW<br>Washington, DISTRICT OF COLUMBIA 20036<br>UNITED STATES<br>lswett@steptoe.com | |
| Indicated PJM Transmission Owners | Donald Kaplan<br>K&L Gates LLP<br>1601 K Street, NW<br>Washington, DISTRICT OF COLUMBIA 20006<br>UNITED STATES<br>don.kaplan@klgates.com | |

| | | |
|---|---|---|
| Industrial Customer Organizations | Robert Weishaar<br>McNees Wallace & Nurick LLC<br>1200 G Street, NW<br>Suite 800<br>Washington, DISTRICT OF<br>COLUMBIA 20005<br>UNITED STATES<br>bweishaar@mcneeslaw.com | |
| Industrial Customer Organizations | | Susan E Bruce<br>McNees Wallace & Nurick LLC<br>100 Pine St<br>Harrisburg, PENNSYLVANIA 17101<br>sbruce@mcneeslaw.com |
| Industrial Customer Organizations | | Kenneth R Stark<br>McNees Wallace & Nurick LLC<br>100 PINE ST<br>HARRISBURG, PENNSYLVANIA 17101<br>kstark@mcneeslaw.com |
| Industrial Customer Organizations | | David S. Mabry<br>McNees Wallace & Nurick LLC<br>100 Pine Street<br>Harrisburg, PENNSYLVANIA 17101<br>dmabry@mwn.com |
| Industrial Customer Organizations | | Lauren Huff<br>Paralegal<br>McNees Wallace & Nurick LLC<br>100 Pine Street<br>P.O. Box 1166<br>Harrisburg, PENNSYLVANIA 17108<br>lhuff@mwn.com |
| Industrial Customer | | Kenneth R Stark<br>McNees Wallace & Nurick LLC<br>100 PINE ST |

| | | |
|---|---|---|
| Organizations | | HARRISBURG, PENNSYLVANIA 17101 kstark@mcneeslaw.com |
| Industrial Customer Organizations | | Susan E Bruce McNees Wallace & Nurick LLC 100 Pine St Harrisburg, PENNSYLVANIA 17101 sbruce@mcneeslaw.com |
| Industrial Customer Organizations | | David S. Mabry McNees Wallace & Nurick LLC 100 Pine Street Harrisburg, PENNSYLVANIA 17101 dmabry@mwn.com |
| Industrial Customer Organizations | | Lauren Huff Paralegal McNees Wallace & Nurick LLC 100 Pine Street P.O. Box 1166 Harrisburg, PENNSYLVANIA 17108 lhuff@mwn.com |
| Institute for Local Self-Reliance | John Farrell Institute for Local Self-Reliance 2720 E. 22nd St Minneapolis, MINNESOTA 55406 UNITED STATES jfarrell@ilsr.org | |
| Institute for Policy Integrity, New York University School of Law | | Jennifer Danis Institute for Policy Integrity 139 MACDOUGAL ST FL 3 INSTITUTE FOR POLICY INTEGRITY NEW YORK, NEW YORK |

| | | |
|---|---|---|
| | | 10012<br>Jennifer.danis@nyu.edu |
| Institute for Policy Integrity, New York University School of Law | Matthew Lifson<br>Institute for Policy Integrity, New York University School of Law<br>139 MACDOUGAL ST FL 3<br>NEW YORK, NEW YORK 10012<br>UNITED STATES<br>matthew.lifson@nyu.edu | |
| Institute for Policy Integrity, New York University School of Law | Jennifer Danis<br>Institute for Policy Integrity<br>Institute for Policy Integrity, New York University School of Law<br>139 MACDOUGAL ST FL 3<br>INSTITUTE FOR POLICY INTEGRITY<br>NEW YORK, NEW YORK 10012<br>UNITED STATES<br>Jennifer.danis@nyu.edu | Matthew Lifson<br>Institute for Policy Integrity, New York University School of Law<br>139 MACDOUGAL ST FL 3<br>NEW YORK, NEW YORK 10012<br>matthew.lifson@nyu.edu |
| International Transmission Company, et al. | James Bixby<br>Senior Counsel - Regulatory & ITC Holdings Corp.<br>601 13TH ST NW STE 710S<br>WASHINGTON, DISTRICT OF COLUMBIA 20005<br>UNITED STATES<br>jbixby@itctransco.com | |
| International Transmission Company, et al. | James Bixby<br>Senior Counsel - Regulatory & ITC Holdings Corp.<br>601 13TH ST NW STE 710S<br>WASHINGTON, DISTRICT OF COLUMBIA 20005 | |

| | | |
|---|---|---|
| | UNITED STATES jbixby@itctransco.com | |
| International Transmission Company, et al. | James Bixby Senior Counsel - Regulatory & ITC Holdings Corp. 601 13TH ST NW STE 710S WASHINGTON, DISTRICT OF COLUMBIA 20005 UNITED STATES jbixby@itctransco.com | |
| International Transmission Company, et al. | James Bixby Senior Counsel - Regulatory & ITC Holdings Corp. 601 13TH ST NW STE 710S WASHINGTON, DISTRICT OF COLUMBIA 20005 UNITED STATES jbixby@itctransco.com | |
| International Transmission Company, et al. | James Bixby Senior Counsel - Regulatory & ITC Holdings Corp. 601 13TH ST NW STE 710S WASHINGTON, DISTRICT OF COLUMBIA 20005 UNITED STATES jbixby@itctransco.com | |
| Interwest Energy Alliance | Larry Eisenstat Partner Crowell & Moring LLP 1001 Pennsylvania Ave. N.W. Washington, DISTRICT OF COLUMBIA 20004 UNITED STATES leisenstat@crowell.com | Lisa T Hickey Attorney Interwest Energy Alliance 3225 TEMPLETON GAP RD STE 217 STE 217 COLORADO SPRINGS, COLORADO 80907 Lisa@Interwest.org |
| Interwest Energy Alliance | | Diana Jeschke Linklaters LLP 601 13TH ST NW |

| | | |
|---|---|---|
| | | SUITE 400 SOUTH WASHINGTON, DISTRICT OF COLUMBIA 20005 diana.jeschke@linklaters.com |
| Interwest Energy Alliance | Larry Eisenstat Partner Crowell & Moring LLP 1001 Pennsylvania Ave. N.W. Washington, DISTRICT OF COLUMBIA 20004 UNITED STATES leisenstat@crowell.com | Diana Jeschke Linklaters LLP 601 13TH ST NW SUITE 400 SOUTH WASHINGTON, DISTRICT OF COLUMBIA 20005 diana.jeschke@linklaters.com |
| Invenergy Solar Development North America LLC | Larry Eisenstat Partner Crowell & Moring LLP 1001 Pennsylvania Ave. N.W. Washington, DISTRICT OF COLUMBIA 20004 UNITED STATES leisenstat@crowell.com | Patricia M Alexander Advisor Crowell & Moring LLP 1001 Pennsylvania Ave. N.W. Washington, DISTRICT OF COLUMBIA 20004 palexander@crowell.com |
| Invenergy Solar Development North America LLC | | Diana Jeschke Linklaters LLP 601 13TH ST NW SUITE 400 SOUTH WASHINGTON, DISTRICT OF COLUMBIA 20005 diana.jeschke@linklaters.com |
| Invenergy Solar Development North America LLC | Larry Eisenstat Partner Crowell & Moring LLP 1001 Pennsylvania Ave. N.W. Washington, DISTRICT OF COLUMBIA 20004 UNITED STATES leisenstat@crowell.com | Diana Jeschke Linklaters LLP 601 13TH ST NW SUITE 400 SOUTH WASHINGTON, DISTRICT OF COLUMBIA 20005 diana.jeschke@linklaters.com |
| Invenergy Solar | | Nicole Luckey Senior Vice President, Regulat |

| | | |
|---|---|---|
| Development North America LLC | | Invenergy LLC 1 S WACKER DR STE 1800 CHICAGO, ILLINOIS 60606 nluckey@invenergy.com |
| Invenergy Solar Development North America LLC | | Patricia M Alexander Advisor Crowell & Moring LLP 1001 Pennsylvania Ave. N.W. Washington, DISTRICT OF COLUMBIA 20004 palexander@crowell.com |
| Invenergy Solar Development North America LLC | | Diana Jeschke Linklaters LLP 601 13TH ST NW SUITE 400 SOUTH WASHINGTON, DISTRICT OF COLUMBIA 20005 diana.jeschke@linklaters.com |
| Invenergy Thermal Development LLC | Larry Eisenstat Partner Crowell & Moring LLP 1001 Pennsylvania Ave. N.W. Washington, DISTRICT OF COLUMBIA 20004 UNITED STATES leisenstat@crowell.com | Diana Jeschke Linklaters LLP 601 13TH ST NW SUITE 400 SOUTH WASHINGTON, DISTRICT OF COLUMBIA 20005 diana.jeschke@linklaters.com |
| Invenergy Thermal Development LLC | | Nicole Luckey Senior Vice President, Regulat Invenergy LLC 1 S WACKER DR STE 1800 CHICAGO, ILLINOIS 60606 nluckey@invenergy.com |
| Invenergy Thermal Development LLC | | Patricia M Alexander Advisor Crowell & Moring LLP 1001 Pennsylvania Ave. N.W. Washington, DISTRICT OF |

| | | COLUMBIA 20004<br>palexander@crowell.com |
|---|---|---|
| Invenergy Thermal Development LLC | Larry Eisenstat<br>Partner<br>Crowell & Moring LLP<br>1001 Pennsylvania Ave. N.W.<br>Washington, DISTRICT OF<br>COLUMBIA 20004<br>UNITED STATES<br>leisenstat@crowell.com | Patricia M Alexander<br>Advisor<br>Crowell & Moring LLP<br>1001 Pennsylvania Ave. N.W.<br>Washington, DISTRICT OF<br>COLUMBIA 20004<br>palexander@crowell.com |
| Invenergy Thermal Development LLC | | Diana Jeschke<br>Linklaters LLP<br>601 13TH ST NW<br>SUITE 400 SOUTH<br>WASHINGTON, DISTRICT<br>OF COLUMBIA 20005<br>diana.jeschke@linklaters.com |
| Invenergy Transmission LLC | Larry Eisenstat<br>Partner<br>Crowell & Moring LLP<br>1001 Pennsylvania Ave. N.W.<br>Washington, DISTRICT OF<br>COLUMBIA 20004<br>UNITED STATES<br>leisenstat@crowell.com | Patricia M Alexander<br>Advisor<br>Crowell & Moring LLP<br>1001 Pennsylvania Ave. N.W.<br>Washington, DISTRICT OF<br>COLUMBIA 20004<br>palexander@crowell.com |
| Invenergy Transmission LLC | | Diana Jeschke<br>Linklaters LLP<br>601 13TH ST NW<br>SUITE 400 SOUTH<br>WASHINGTON, DISTRICT<br>OF COLUMBIA 20005<br>diana.jeschke@linklaters.com |
| Invenergy Transmission LLC | Larry Eisenstat<br>Partner<br>Crowell & Moring LLP<br>1001 Pennsylvania Ave. N.W.<br>Washington, DISTRICT OF | Diana Jeschke<br>Linklaters LLP<br>601 13TH ST NW<br>SUITE 400 SOUTH<br>WASHINGTON, DISTRICT |

| | | |
|---|---|---|
| | COLUMBIA 20004<br>UNITED STATES<br>leisenstat@crowell.com | OF COLUMBIA 20005<br>diana.jeschke@linklaters.com |
| Invenergy<br>Transmission<br>LLC | | Nicole Luckey<br>Senior Vice President, Regulat<br>Invenergy LLC<br>1 S WACKER DR STE 1800<br>CHICAGO, ILLINOIS 60606<br>nluckey@invenergy.com |
| Invenergy<br>Transmission<br>LLC | | Patricia M Alexander<br>Advisor<br>Crowell & Moring LLP<br>1001 Pennsylvania Ave. N.W.<br>Washington, DISTRICT OF<br>COLUMBIA 20004<br>palexander@crowell.com |
| Invenergy<br>Transmission<br>LLC | | Diana Jeschke<br>Linklaters LLP<br>601 13TH ST NW<br>SUITE 400 SOUTH<br>WASHINGTON, DISTRICT<br>OF COLUMBIA 20005<br>diana.jeschke@linklaters.com |
| Invenergy<br>Wind<br>Development<br>North<br>America<br>LLC | Larry Eisenstat<br>Partner<br>Crowell & Moring LLP<br>1001 Pennsylvania Ave. N.W.<br>Washington, DISTRICT OF<br>COLUMBIA 20004<br>UNITED STATES<br>leisenstat@crowell.com | Patricia M Alexander<br>Advisor<br>Crowell & Moring LLP<br>1001 Pennsylvania Ave. N.W.<br>Washington, DISTRICT OF<br>COLUMBIA 20004<br>palexander@crowell.com |
| Invenergy<br>Wind<br>Development<br>North<br>America<br>LLC | | Diana Jeschke<br>Linklaters LLP<br>601 13TH ST NW<br>SUITE 400 SOUTH<br>WASHINGTON, DISTRICT |

| | | |
|---|---|---|
| | | OF COLUMBIA 20005<br>diana.jeschke@linklaters.com |
| Invenergy Wind Development North America LLC | Larry Eisenstat<br>Partner<br>Crowell & Moring LLP<br>1001 Pennsylvania Ave. N.W.<br>Washington, DISTRICT OF COLUMBIA 20004<br>UNITED STATES<br>leisenstat@crowell.com | Diana Jeschke<br>Linklaters LLP<br>601 13TH ST NW<br>SUITE 400 SOUTH<br>WASHINGTON, DISTRICT OF COLUMBIA 20005<br>diana.jeschke@linklaters.com |
| Invenergy Wind Development North America LLC | | Nicole Luckey<br>Senior Vice President, Regulat<br>Invenergy LLC<br>1 S WACKER DR STE 1800<br>CHICAGO, ILLINOIS 60606<br>nluckey@invenergy.com |
| Invenergy Wind Development North America LLC | | Patricia M Alexander<br>Advisor<br>Crowell & Moring LLP<br>1001 Pennsylvania Ave. N.W.<br>Washington, DISTRICT OF COLUMBIA 20004<br>palexander@crowell.com |
| Invenergy Wind Development North America LLC | | Diana Jeschke<br>Linklaters LLP<br>601 13TH ST NW<br>SUITE 400 SOUTH<br>WASHINGTON, DISTRICT OF COLUMBIA 20005<br>diana.jeschke@linklaters.com |
| Iowa Office of Consumer Advocate | John Crotty<br>Iowa Office of Consumer Advocate<br>1375 E. Court Ave<br>Des Moines, IOWA 50319<br>UNITED STATES<br>john.crotty@oca.iowa.gov | |

| | | |
|---|---|---|
| Iowa Office of Consumer Advocate | Jennifer Easler<br>Consumer Advocate<br>Iowa Office of Consumer Advocate<br>1375 E COURT AVE<br>DES MOINES, IOWA 50319<br>UNITED STATES<br>jennifer.easler@oca.iowa.gov | |
| Iowa Utilities Board | Venkata Bujimalla<br>Utility Attorney 2<br>Iowa Utilities Board<br>1375 E Court Ave<br>Des Moines, IOWA 50319<br>UNITED STATES<br>Venkata.Bujimalla@iub.iowa.gov | |
| Iowa Utilities Board | Venkata Bujimalla<br>Utility Attorney 2<br>Iowa Utilities Board<br>1375 E Court Ave<br>Des Moines, IOWA 50319<br>UNITED STATES<br>Venkata.Bujimalla@iub.iowa.gov | Jon Tack<br>General Counsel - Iowa Utiliti<br>Iowa Utilities Board<br>1375 E COURT AVE<br>DES MOINES, IOWA 50319<br>jon.tack@iub.iowa.gov |
| ISO New England Inc. | Monica Gonzalez<br>Assistant General Counsel - Op<br>INDIVIDUAL<br>One Sullivan Road<br>Holyoke, MASSACHUSETTS 01040<br>UNITED STATES<br>mgonzalez@iso-ne.com | Julie A Horgan<br>eTariff Coordinator<br>One Sullivan Road<br>Holyoke, MASSACHUSETTS 01040<br>jhorgan@iso-ne.com |
| ISO New England Inc. | | Linda M Morrison<br>Docket Administrator<br>ISO New England Inc.<br>One Sullivan Rd<br>Holyoke, MASSACHUSETTS |

| | | |
|---|---|---|
| | | 01040<br>LMorrison@iso-ne.com |
| ISO New England Inc. | | Linda Maile-Smith<br>Legal Administrative Assistant<br>ISO New England Inc.<br>1 SULLIVAN RD<br>HOLYOKE,<br>MASSACHUSETTS 01040<br>lmailesmith@iso-ne.com |
| ISO New England Inc. | | Linda M Morrison<br>Docket Administrator<br>ISO New England Inc.<br>One Sullivan Rd<br>Holyoke, MASSACHUSETTS<br>01040<br>LMorrison@iso-ne.com |
| ISO New England Inc. | | Linda Maile-Smith<br>Legal Administrative Assistant<br>ISO New England Inc.<br>1 SULLIVAN RD<br>HOLYOKE,<br>MASSACHUSETTS 01040<br>lmailesmith@iso-ne.com |
| ISO New England Inc. | | Linda M Morrison<br>Docket Administrator<br>ISO New England Inc.<br>One Sullivan Rd<br>Holyoke, MASSACHUSETTS<br>01040<br>LMorrison@iso-ne.com |
| ISO New England Inc. | | Linda Maile-Smith<br>Legal Administrative Assistant<br>ISO New England Inc.<br>1 SULLIVAN RD<br>HOLYOKE,<br>MASSACHUSETTS 01040<br>lmailesmith@iso-ne.com |

| | | |
|---|---|---|
| ISO/RTO Council (IRC) | Thomas DeVita<br>PJM Interconnection, L.L.C.<br>2750 Monroe Blvd.<br>Audubon, PENNSYLVANIA 19403<br>UNITED STATES<br>thomas.devita@pjm.com | Craig Glazer<br>V.P., Federal Gov't Policy<br>PJM Interconnection, L.L.C.<br>1200 G Street, N.W.<br>Suite 600<br>Washington, DISTRICT OF COLUMBIA 20005<br>craig.glazer@pjm.com |
| ISO/RTO Council (IRC) | Monica Gonzalez<br>Assistant General Counsel - Op<br>INDIVIDUAL<br>One Sullivan Road<br>Holyoke, MASSACHUSETTS 01040<br>UNITED STATES<br>mgonzalez@iso-ne.com | |
| ISO/RTO Council (IRC) | Andrew Ulmer<br>Assistant General Counsel<br>California Independent System Operator Corporation<br>250 Outcropping Way<br>Folsom, CALIFORNIA 95630<br>UNITED STATES<br>aulmer@caiso.com | |
| ISO/RTO Council (IRC) | Carl Patka<br>Senior Attorney<br>New York Independent System Operator, Inc.<br>10 Krey Boulevard<br>Rensselaer, NEW YORK 12144<br>UNITED STATES<br>cpatka@nyiso.com | |
| ISO/RTO Council (IRC) | Kari Valley<br>Managing Assistant General Cou<br>Midcontinent Independent System Operator, Inc.<br>2985 AMES CROSSING RD | |

| | | |
|---|---|---|
| | EAGAN, MINNESOTA 55121 UNITED STATES kvalley@misoenergy.org | |
| ISO/RTO Council (IRC) | Paul Suskie Sr. VP Regulatory Policy & Gen Southwest Power Pool, Inc. 415 N. McKinley, Ste 140 Little Rock, ARKANSAS 72205 UNITED STATES psuskie@spp.org | |
| ITC Holdings Corp. | James Bixby Senior Counsel - Regulatory & ITC Holdings Corp. 601 13TH ST NW STE 710S WASHINGTON, DISTRICT OF COLUMBIA 20005 UNITED STATES jbixby@itctransco.com | |
| Kansas Corporation Commission | Jason Gray Partner Duncan & Allen LLP 1730 Rhode Island Avenue, NW Suite 700 Washington, DISTRICT OF COLUMBIA 20036 UNITED STATES jtg@duncanallen.com | Cole Bailey Litigation Counsel Kansas Corporation Commission 1500 Arrowhead Road SW Arrowhead Road Topeka, KANSAS 66604 c.bailey@kcc.ks.gov |
| Kansas Corporation Commission | Jon Stickman Attorney Duncan & Allen LLP 1730 RHODE ISLAND AVE NW STE 700 WASHINGTON, DISTRICT OF COLUMBIA 20036 UNITED STATES jrs@duncanallen.com | Carly R Masenthin Senior Litigation Counsel 1500 SW ARROWHEAD RD TOPEKA, KANSAS 66604 Carly.Masenthin@ks.gov |

| | | |
|---|---|---|
| Kansas Corporation Commission | Jason Gray<br>Partner<br>Duncan & Allen LLP<br>1730 Rhode Island Avenue, NW Suite 700<br>Washington, DISTRICT OF COLUMBIA 20036<br>UNITED STATES<br>jtg@duncanallen.com | |
| Kansas Corporation Commission | Jason Gray<br>Partner<br>Duncan & Allen LLP<br>1730 Rhode Island Avenue, NW Suite 700<br>Washington, DISTRICT OF COLUMBIA 20036<br>UNITED STATES<br>jtg@duncanallen.com | Carly R Masenthin<br>Senior Litigation Counsel<br>Kansas Corporation Commission<br>1500 SW ARROWHEAD RD<br>TOPEKA, KANSAS 66604<br>Carly.Masenthin@ks.gov |
| Kansas Industrial Consumers Group, Inc. and Kansans for Lower Electric Rates, Inc. | James Zakoura<br>SMITHYMAN & ZAKOURA, CHARTERED<br>7500 COLLEGE BLVD STE 1400<br>OVERLAND PARK, KANSAS 66210<br>UNITED STATES<br>jzakoura@foulston.com | |
| Kansas Industrial Consumers Group, Inc. and Kansans for Lower Electric Rates, Inc. | James Zakoura<br>SMITHYMAN & ZAKOURA, CHARTERED<br>7500 COLLEGE BLVD STE 1400<br>OVERLAND PARK, KANSAS 66210<br>UNITED STATES<br>jzakoura@foulston.com | |

| | | |
|---|---|---|
| Kentucky Attorney General | Joseph West<br>Assistant Attorney General<br>Kentucky Attorney General<br>1024 Capital Center Drive<br>Suite 200<br>Frankfort, KENTUCKY 40601<br>UNITED STATES<br>michael.west@ky.gov | |
| Kentucky Attorney General | Larry Cook<br>Kentucky Attorney General<br>700 CAPITAL AVE<br>FRANKFORT, KENTUCKY 40601<br>UNITED STATES<br>larry.cook@ky.gov | |
| Kentucky Public Service Commission | Kent Chandler<br>Executive Staff Advisor<br>Kentucky Public Service Commission<br>211 Sower Blvd.<br>Frankfort, KENTUCKY 40601<br>UNITED STATES<br>kent.chandler@ky.gov | |
| Kentucky Public Service Commission | Kent Chandler<br>Executive Staff Advisor<br>Kentucky Public Service Commission<br>211 Sower Blvd.<br>Frankfort, KENTUCKY 40601<br>UNITED STATES<br>kent.chandler@ky.gov | |
| Kentucky Public Service Commission | Kent Chandler<br>Executive Staff Advisor<br>Kentucky Public Service Commission<br>211 Sower Blvd.<br>Frankfort, KENTUCKY 40601 | |

| | | |
|---|---|---|
| | UNITED STATES<br>kent.chandler@ky.gov | |
| Kentucky Utilities Company | Jennifer Keisling<br>Sr Corporate Attorney<br>220 West Main St<br>Louisville, KENTUCKY 40202<br>UNITED STATES<br>jennifer.keisling@lge-ku.com | |
| Kentucky Utilities Company | Jennifer Keisling<br>Sr. Director Federal Policy<br>PPL Services Corporation<br>220 W MAIN ST<br>LOUISVILLE, KENTUCKY 40202<br>UNITED STATES<br>jkeisling@pplweb.com | |
| Kentucky Utilities Company | Jennifer Keisling<br>Sr. Director Federal Policy<br>PPL Services Corporation<br>220 W MAIN ST<br>LOUISVILLE, KENTUCKY 40202<br>UNITED STATES<br>jkeisling@pplweb.com | |
| LADWP | | Scott Hirashima<br>LADWP<br>111 N Hope St<br>Rm 1246<br>Los Angeles, CALIFORNIA 90012<br>scott.hirashima@ladwp.com |
| LADWP | | Rockeish Mckenzie<br>LADWP<br>111 North Hope Street<br>Los Angeles, CALIFORNIA 90012<br>rockeish.mckenzie@ladwp.com |

| | | |
|---|---|---|
| LADWP | | Scott Hirashima<br>LADWP<br>111 N Hope St<br>Rm 1246<br>Los Angeles, CALIFORNIA 90012<br>scott.hirashima@ladwp.com |
| LADWP | | Rockeish Mckenzie<br>LADWP<br>111 North Hope Street<br>Los Angeles, CALIFORNIA 90012<br>rockeish.mckenzie@ladwp.com |
| Land Trust Alliance | Chelsea Welch<br>Land Trust Alliance<br>1250 H St NW<br>Suite 600<br>Washington, DISTRICT OF COLUMBIA 20005<br>UNITED STATES<br>cwelch@lta.org | Chelsea Welch<br>Land Trust Alliance<br>1250 H St NW<br>Suite 600<br>Washington, DISTRICT OF COLUMBIA 20005<br>cwelch@lta.org |
| Large Public Power Council | Jonathan Schneider<br>Stinson LLP<br>Stinson LLP<br>1775 Pennsylvania Avenue NW<br>Washington, DISTRICT OF COLUMBIA 20006<br>UNITED STATES<br>jonathan.schneider@stinson.com | Jonathan Trotta, ESQ<br>Davis Wright Tremaine LLP<br>Davis Wright Tremaine LLP<br>1301 K ST NW<br>SUITE 500 EAST<br>WASHINGTON, DISTRICT OF COLUMBIA 20005<br>jtrotta@dwt.com |
| Large Public Power Council | Jonathan Schneider<br>Stinson LLP<br>Stinson LLP<br>1775 Pennsylvania Avenue NW<br>Washington, DISTRICT OF COLUMBIA 20006<br>UNITED STATES | |

| | jonathan.schneider@stinson.com | |
|---|---|---|
| Large Public Power Council | Jonathan Schneider<br>Stinson LLP<br>Stinson LLP<br>1775 Pennsylvania Avenue NW<br>Washington, DISTRICT OF COLUMBIA 20006<br>UNITED STATES<br>jonathan.schneider@stinson.com | |
| Large Public Power Council | Jonathan Schneider<br>Stinson LLP<br>Stinson LLP<br>1775 Pennsylvania Avenue NW<br>Washington, DISTRICT OF COLUMBIA 20006<br>UNITED STATES<br>jonathan.schneider@stinson.com | Harvey L. Reiter<br>Partner<br>Stinson Leonard Street LLP<br>1775 Pennsylvania Ave., NW<br>Suite 800<br>Washington, DISTRICT OF COLUMBIA 20006<br>harvey.reiter@stinson.com |
| Large Public Power Council | | Jonathan Trotta, ESQ<br>Davis Wright Tremaine LLP<br>Davis Wright Tremaine LLP<br>1301 K ST NW<br>SUITE 500 EAST<br>WASHINGTON, DISTRICT OF COLUMBIA 20005<br>jtrotta@dwt.com |
| Large Public Power Council | | M. Denyse Zosa, ESQ<br>Stinson Leonard Street LLP<br>1775 Pennsylvania Avenue NW<br>Suite 800<br>Washington, DISTRICT OF COLUMBIA 20006<br>denyse.zosa@stinson.com |

117

| | | |
|---|---|---|
| Large Public Power Council | | M. Denyse Zosa, ESQ<br>Stinson Leonard Street LLP<br>1775 Pennsylvania Avenue NW<br>Suite 800<br>Washington, DISTRICT OF<br>COLUMBIA 20006<br>denyse.zosa@stinson.com |
| Large Public Power Council | Jonathan Schneider<br>Stinson LLP<br>Stinson LLP<br>1775 Pennsylvania Avenue NW<br>Washington, DISTRICT OF<br>COLUMBIA 20006<br>UNITED STATES<br>jonathan.schneider@stinson.com | |
| Littleton Electric Light & Water Department | John Coyle<br>Duncan & Allen LLP<br>Suite 700<br>1730 Rhode Island Avenue, N.W.<br>Washington, DISTRICT OF<br>COLUMBIA 20036-3115<br>UNITED STATES<br>jpc@duncanallen.com | |
| Littleton Electric Light & Water Department | John Coyle<br>Duncan & Allen LLP<br>Suite 700<br>1730 Rhode Island Avenue, N.W.<br>Washington, DISTRICT OF<br>COLUMBIA 20036-3115<br>UNITED STATES<br>jpc@duncanallen.com | |
| Littleton Electric Light & | John Coyle<br>Duncan & Allen LLP<br>Suite 700<br>1730 Rhode Island Avenue, | |

| | | |
|---|---|---|
| Water Department | N.W. Washington, DISTRICT OF COLUMBIA 20036-3115 UNITED STATES jpc@duncanallen.com | |
| Long Island Power Authority | Paul Ghosh-Roy Assistant General Counsel 333 Earle Ovington Boulevard Suite 403 Uniondale, NEW YORK 11553 UNITED STATES pghosh-roy@lipower.org | |
| Long Island Power Authority | Lisa Zafonte Assistant General Counsel LONG ISLAND POWER AUTHORITY 333 EARLE OVINGTON BLVD STE 403 UNIONDALE, NEW YORK 11553 UNITED STATES lzafonte@lipower.org | |
| Louisiana Public Service Commission | Justin Swaim Attorney Stone Pigman Walther Wittmann L.L.C. 909 POYDRAS ST STE 3150 NEW ORLEANS, LOUISIANA 70112 UNITED STATES jswaim@stonepigman.com | |
| Louisiana Public Service Commission | Michael Fontham 909 Poydras Street, Siute 3150 New Orleans, LOUISIANA 70112-4042 UNITED STATES mfontham@stonepigman.com | |

| | | |
|---|---|---|
| Louisiana Public Service Commission | Dana Shelton<br>Attorney<br>STONE, PIGMAN, WALTHER, ET AL.<br>909 Poydras Street,Suite 3150<br>New Orleans, LOUISIANA 70112-4042<br>UNITED STATES<br>dshelton@stonepigman.com | |
| Louisiana Public Service Commission | Dana Shelton<br>Attorney<br>STONE, PIGMAN, WALTHER, ET AL.<br>909 Poydras Street,Suite 3150<br>New Orleans, LOUISIANA 70112-4042<br>UNITED STATES<br>dshelton@stonepigman.com | |
| Louisiana Public Service Commission | Dana Shelton<br>Attorney<br>STONE, PIGMAN, WALTHER, ET AL.<br>909 Poydras Street,Suite 3150<br>New Orleans, LOUISIANA 70112-4042<br>UNITED STATES<br>dshelton@stonepigman.com | |
| Louisiana Public Service Commission | Justin Swaim<br>Attorney<br>Stone Pigman Walther Wittmann L.L.C.<br>909 POYDRAS ST STE 3150<br>NEW ORLEANS, LOUISIANA 70112<br>UNITED STATES<br>jswaim@stonepigman.com | |
| Louisiana Public | Dana Shelton<br>Attorney | |

| | | |
|---|---|---|
| Service Commission | STONE, PIGMAN, WALTHER, ET AL. 909 Poydras Street,Suite 3150 New Orleans, LOUISIANA 70112-4042 UNITED STATES dshelton@stonepigman.com | |
| Louisiana Public Service Commission | Justin Swaim Attorney Stone Pigman Walther Wittmann L.L.C. 909 POYDRAS ST STE 3150 NEW ORLEANS, LOUISIANA 70112 UNITED STATES jswaim@stonepigman.com | |
| Louisiana Public Service Commission | William Booth Michael Best & Friedrich, LLP 1000 Maine Ave SW Suite 400 Washington, D.C., DISTRICT OF COLUMBIA 20024 UNITED STATES wdbooth@michaelbest.com | Noel J Darce Attorney Stone Pigman Walther Wittmann L.L.C. 909 Poydras St. Suite 3150 New Orleans, LOUISIANA 70112-4042 ndarce@stonepigman.com |
| Louisiana Public Service Commission | | Dana Marie Shelton Attorney STONE, PIGMAN, WALTHER, ET AL. 909 Poydras Street,Suite 3150 New Orleans, LOUISIANA 70112-4042 dshelton@stonepigman.com |
| Louisiana Public Service Commission | | Kathryn H Bowman Executive Counsel Louisiana Public Service Commission 602 N 5TH ST BATON ROUGE, LOUISIANA |

| | | |
|---|---|---|
| | | 70802<br>kathryn.bowman@la.gov |
| Louisiana Public Service Commission | Dana Shelton<br>Attorney<br>STONE, PIGMAN, WALTHER, ET AL.<br>909 Poydras Street,Suite 3150<br>New Orleans, LOUISIANA 70112-4042<br>UNITED STATES<br>dshelton@stonepigman.com | |
| Louisiana Public Service Commission | Noel Darce<br>Attorney<br>Stone Pigman Walther Wittmann L.L.C.<br>909 Poydras St. Suite 3150<br>New Orleans, LOUISIANA 70112-4042<br>UNITED STATES<br>ndarce@stonepigman.com | Kathryn H Bowman<br>Executive Counsel<br>Louisiana Public Service Commission<br>602 N 5TH ST<br>BATON ROUGE, LOUISIANA 70802<br>kathryn.bowman@la.gov |
| Louisiana Public Service Commission | | Dana Marie Shelton<br>Attorney<br>STONE, PIGMAN, WALTHER, ET AL.<br>909 Poydras Street,Suite 3150<br>New Orleans, LOUISIANA 70112-4042<br>dshelton@stonepigman.com |
| Louisville Gas & Electric Company | Jennifer Keisling<br>Sr Corporate Attorney<br>220 West Main St<br>Louisville, KENTUCKY 40202<br>UNITED STATES<br>jennifer.keisling@lge-ku.com | |
| Louisville Gas and Electric Co./ | Kelsey Colvin<br>Senior Counsel<br>220 W MAIN ST | Jennifer Keisling<br>Sr Corporate Attorney<br>220 West Main St |

| Kentucky Utilities Co. | LOUISVILLE, KENTUCKY 40202 UNITED STATES kacolvin@pplweb.com | Louisville, KENTUCKY 40202 Jefferson jennifer.keisling@lge-ku.com |
|---|---|---|
| Louisville Gas and Electric Company | Jennifer Keisling Sr. Director Federal Policy PPL Services Corporation 220 W MAIN ST LOUISVILLE, KENTUCKY 40202 UNITED STATES jkeisling@pplweb.com | |
| Louisville Gas and Electric Company | Jennifer Keisling Sr. Director Federal Policy PPL Services Corporation 220 W MAIN ST LOUISVILLE, KENTUCKY 40202 UNITED STATES jkeisling@pplweb.com | |
| Louisville Gas and Electric Company and Kentucky Utilities Company | Jennifer Keisling Sr Corporate Attorney 220 West Main St Louisville, KENTUCKY 40202 UNITED STATES jennifer.keisling@lge-ku.com | |
| LS Power Grid, LLC | Michael Engleman Engleman Fallon, PLLC 1717 K Street NW Suite 900 Washington, DISTRICT OF COLUMBIA 20006 UNITED STATES mengleman@efenergylaw.com | Christina R. Switzer Engleman Fallon, PLLC 823 Congress Ave Suite 300-67 Austin, TEXAS 78701 cswitzer@efenergylaw.com |

| | | |
|---|---|---|
| LS Power Grid, LLC | | Sharon Segner<br>Vice President<br>LS Power Associates LP<br>1001 19th Street North<br>Suite 1200<br>Arlington, VIRGINIA 22209<br>ssegner@lspower.com |
| LS Power Grid, LLC | | Sharon Segner<br>Vice President<br>LS Power Associates LP<br>1001 19th Street North<br>Suite 1200<br>Arlington, VIRGINIA 22209<br>ssegner@lspower.com |
| LS Power Grid, LLC | | Sharon Segner<br>Vice President<br>LS Power Associates LP<br>1001 19th Street North<br>Suite 1200<br>Arlington, VIRGINIA 22209<br>ssegner@lspower.com |
| LS Power Grid, LLC | | Sharon Segner<br>Vice President<br>LS Power Associates LP<br>1001 19th Street North<br>Suite 1200<br>Arlington, VIRGINIA 22209<br>ssegner@lspower.com |
| LS Power Grid, LLC | | Sharon Segner<br>Vice President<br>LS Power Associates LP<br>1001 19th Street North<br>Suite 1200<br>Arlington, VIRGINIA 22209<br>ssegner@lspower.com |
| LS Power Grid, LLC | | Sharon Segner<br>Vice President |

| | | |
|---|---|---|
| | | LS Power Associates LP<br>1001 19th Street North<br>Suite 1200<br>Arlington, VIRGINIA 22209<br>ssegner@lspower.com |
| LS Power Grid, LLC | | Sharon Segner<br>Vice President<br>LS Power Associates LP<br>1001 19th Street North<br>Suite 1200<br>Arlington, VIRGINIA 22209<br>ssegner@lspower.com |
| LS Power Grid, LLC | | Sharon Segner<br>Vice President<br>LS Power Associates LP<br>1001 19th Street North<br>Suite 1200<br>Arlington, VIRGINIA 22209<br>ssegner@lspower.com |
| LS Power Grid, LLC | Sharon Segner<br>Vice President<br>LS Power Associates LP<br>1001 19th Street North<br>Suite 1200<br>Arlington, VIRGINIA 22209<br>UNITED STATES<br>ssegner@lspower.com | |
| LS Power Grid, LLC | Michael Engleman<br>Engleman Fallon, PLLC<br>1717 K Street NW<br>Suite 900<br>Washington, DISTRICT OF COLUMBIA 20006<br>UNITED STATES<br>mengleman@efenergylaw.com | |
| LS Power Grid, LLC | Christina Switzer<br>Engleman Fallon, PLLC | |

| | 823 Congress Ave<br>Suite 300-67<br>Austin, TEXAS 78701<br>UNITED STATES<br>cswitzer@efenergylaw.com | |
|---|---|---|
| LSP Transmission Holdings II, LLC | Christina Switzer<br>Engleman Fallon, PLLC<br>823 Congress Ave<br>Suite 300-67<br>Austin, TEXAS 78701<br>UNITED STATES<br>cswitzer@efenergylaw.com | Michael R Engleman<br>Engleman Fallon, PLLC<br>1717 K Street NW<br>Suite 900<br>Washington, DISTRICT OF COLUMBIA 20006<br>mengleman@efenergylaw.com |
| LSP Transmission Holdings II, LLC | | Sharon Segner<br>Vice President<br>LS Power Associates LP<br>1001 19th Street North<br>Suite 1200<br>Arlington, VIRGINIA 22209<br>ssegner@lspower.com |
| LSP Transmission Holdings II, LLC | Michael Engleman<br>Engleman Fallon, PLLC<br>1717 K Street NW<br>Suite 900<br>Washington, DISTRICT OF COLUMBIA 20006<br>UNITED STATES<br>mengleman@efenergylaw.com | |
| Macro Grid Initiative | Barbara Tyran<br>Director of the Macro Grid Ini<br>Macro Grid Initiative<br>1150 Connecticut Ave NW<br>Suite 401<br>Washington, DISTRICT OF COLUMBIA 20035<br>UNITED STATES<br>tyran@acore.org | |

| | | |
|---|---|---|
| Maine Governors Energy Office | Robert Snook<br>Transmission Policy Advisor<br>Maine Governors Energy Office<br>62 STATE HOUSE STA<br>AUGUSTA, MAINE 04333<br>UNITED STATES<br>Robert.Snook@Maine.Gov | |
| Maine Office of the Public Advocate | Andrew Landry<br>Deputy Public Advocate<br>Maine Office of the Public Advocate<br>103 Water St<br>Hallowell, MAINE 04347<br>UNITED STATES<br>andrew.landry@maine.gov | |
| Maine Office of the Public Advocate | Andrew Landry<br>Deputy Public Advocate<br>Maine Office of the Public Advocate<br>103 Water St<br>Hallowell, MAINE 04347<br>UNITED STATES<br>andrew.landry@maine.gov | |
| Market Monitoring Unit of Southwest Power Pool, Inc. | Keith Collins<br>Vice President, Market Mon<br>Southwest Power Pool Market Monitoring Unit<br>201 WORTHEN DR<br>LITTLE ROCK, ARKANSAS 72223<br>UNITED STATES<br>kcollins@spp.org | Jodi Woods<br>Director, Market Monitoring Un<br>Southwest Power Pool Inc.<br>201 WORTHEN DR<br>LITTLE ROCK, ARKANSAS 72223<br>jwoods@spp.org |
| Maryland Energy Administration | Michele Honick<br>Attorney General of Maryland<br>1800 Washington Blvd.<br>Suite 755<br>Baltimore, MARYLAND 21230 | Mary Beth Tung<br>Maryland Energy Administration<br>1800 Washington Blvd.<br>Suite 755 |

|  |  |  |
|---|---|---|
|  | UNITED STATES<br>michele.honick@maryland.gov | Baltimore, MARYLAND 21230<br>marybeth.tung@maryland.gov |
| Maryland Energy Administration |  | Ryan Opsal<br>Director of Energy Policy<br>Maryland Energy Administration<br>1800 Washington Blvd.<br>Suite 755<br>Baltimore, MARYLAND 21230<br>ryan.opsal@maryland.gov |
| Maryland Energy Administration | Steven Talson<br>Assistant Attorney General<br>Maryland Energy Administration<br>60 West Street<br>Suite 300<br>Annapolis, MARYLAND 21401<br>UNITED STATES<br>steven.talson@maryland.gov |  |
| Maryland Energy Administration | Michele Honick<br>Attorney General of Maryland<br>1800 Washington Blvd.<br>Suite 755<br>Baltimore, MARYLAND 21230<br>UNITED STATES<br>michele.honick@maryland.gov |  |
| Maryland Energy Administration | Michele Honick<br>Attorney General of Maryland<br>1800 Washington Blvd.<br>Suite 755<br>Baltimore, MARYLAND 21230<br>UNITED STATES<br>michele.honick@maryland.gov | Michele Honick<br>Attorney General of Maryland<br>1800 Washington Blvd.<br>Suite 755<br>Baltimore, MARYLAND 21230<br>michele.honick@maryland.gov |
| Maryland Energy |  | Ryan Opsal<br>Director of Energy Policy<br>Maryland Energy |

128

| Administration | | Administration<br>1800 Washington Blvd.<br>Suite 755<br>Baltimore, MARYLAND 21230<br>ryan.opsal@maryland.gov |
|---|---|---|
| Maryland Energy Administration | | Mary Beth Tung<br>Maryland Energy Administration<br>1800 Washington Blvd.<br>Suite 755<br>Baltimore, MARYLAND 21230<br>marybeth.tung@maryland.gov |
| Maryland Office of People's Counsel | William Fields<br>Deputy People's Counsel<br>6 SAINT PAUL ST STE 2102<br>BALTIMORE, MARYLAND 21202<br>UNITED STATES<br>william.fields@maryland.gov | Philip L Sussler<br>Assistant People's Counsel<br>Maryland Office of People's Counsel<br>6 SAINT PAUL ST STE 2102<br>BALTIMORE, MARYLAND 21202<br>philip.sussler@maryland.gov |
| Maryland Office of People's Counsel | Philip Sussler<br>Assistant People's Counsel<br>Maryland Office of People's Counsel<br>6 SAINT PAUL ST STE 2102<br>BALTIMORE, MARYLAND 21202<br>UNITED STATES<br>philip.sussler@maryland.gov | William F. Fields<br>Deputy People's Counsel<br>6 SAINT PAUL ST STE 2102<br>BALTIMORE, MARYLAND 21202<br>william.fields@maryland.gov |
| Maryland Office of People's Counsel | | Michael Sammartino<br>Assistant People's Counsel<br>Maryland Office of People's Counsel<br>6 SAINT PAUL ST STE 2102<br>BALTIMORE, MARYLAND 21202<br>michael.sammartino@maryland.gov |

| | | |
|---|---|---|
| Maryland People's Counsel | William Fields<br>Deputy People's Counsel<br>6 SAINT PAUL ST STE 2102<br>BALTIMORE, MARYLAND 21202<br>UNITED STATES<br>william.fields@maryland.gov | Philip L Sussler<br>Assistant People's Counsel<br>Maryland Office of People's Counsel<br>6 SAINT PAUL ST STE 2102<br>BALTIMORE, MARYLAND 21202<br>philip.sussler@maryland.gov |
| Massachusetts Attorney General | | Kelly Caiazzo<br>Assistant Attorney General<br>Massachusetts Attorney General<br>One Ashburton Place<br>BOSTON, MASSACHUSETTS 02108<br>kelly.caiazzo@mass.gov |
| Massachusetts Attorney General | Kelly Caiazzo<br>Assistant Attorney General<br>Massachusetts Attorney General<br>One Ashburton Place<br>BOSTON, MASSACHUSETTS 02108<br>UNITED STATES<br>kelly.caiazzo@mass.gov | |
| Massachusetts Department of Energy Resources | Colin Carroll<br>Massachusetts Department of Energy Resources<br>100 Cambridge Street<br>Boston, MASSACHUSETTS 02114<br>UNITED STATES<br>colin.carroll@mass.gov | |
| Massachusetts Department of Public Utilities | Greggory Wade<br>Massachusetts Department of Public Utilities<br>Massachusetts Department of Public Utilities<br>1 South Station<br>boston, MASSACHUSETTS | Krista L Hawley, ESQ<br>Hearing Officer, Dept. Public<br>Massachusetts Department of Public Utilities<br>One South Station<br>5th Floor<br>Boston, MASSACHUSETTS |

|  |  |  |
|---|---|---|
|  | 02110<br>UNITED STATES<br>greggory.wade@mass.gov | 02110<br>krista.hawley@mass.gov |
| Massachusetts Municipal Wholesale Electric Company | Scott Strauss<br>Spiegel & McDiarmid LLP<br>1818 N Street, NW<br>8th Floor<br>WASHINGTON, DISTRICT OF COLUMBIA 20036<br>UNITED STATES<br>Scott.Strauss@spiegelmcd.com | Jeffrey A Schwarz<br>Spiegel & McDiarmid LLP<br>1818 N Street, NW<br>8th Floor<br>WASHINGTON, DISTRICT OF COLUMBIA 20036<br>jeffrey.schwarz@spiegelmcd.com |
| Massachusetts Municipal Wholesale Electric Company |  | E Service<br>Spiegel & McDiarmid LLP<br>1875 Eye St, NW<br>Suite 700<br>Washington, DISTRICT OF COLUMBIA 20006<br>eService@spiegelmcd.com |
| Massachusetts Municipal Wholesale Electric Company |  | Brian K Thomson<br>bthomson@mmwec.org |
| Massachusetts Municipal Wholesale Electric Company | Scott Strauss<br>Spiegel & McDiarmid LLP<br>1818 N Street, NW<br>8th Floor<br>WASHINGTON, DISTRICT OF COLUMBIA 20036<br>UNITED STATES<br>Scott.Strauss@spiegelmcd.com |  |
| Massachusetts Municipal Wholesale Electric Company | Scott Strauss<br>Spiegel & McDiarmid LLP<br>1818 N Street, NW<br>8th Floor<br>WASHINGTON, DISTRICT OF COLUMBIA 20036 |  |

| | | |
|---|---|---|
| | UNITED STATES<br>Scott.Strauss@spiegelmcd.com | |
| Massachusetts Municipal Wholesale Electric Company | | E Service<br>Spiegel & McDiarmid LLP<br>1875 Eye St, NW<br>Suite 700<br>Washington, DISTRICT OF COLUMBIA 20006<br>eService@spiegelmcd.com |
| Michigan Attorney General | Michael Moody<br>Michigan Attorney General<br>Michigan Attorney General<br>525 West Ottawa<br>Lansing, MICHIGAN 48909<br>UNITED STATES<br>moodym2@michigan.gov | |
| Michigan Attorney General | Michael Moody<br>Michigan Attorney General<br>Michigan Attorney General<br>525 West Ottawa<br>Lansing, MICHIGAN 48909<br>UNITED STATES<br>moodym2@michigan.gov | |
| Michigan Public Service Commission | Spencer Sattler<br>Assistant Attorney General<br>Attorney General<br>7109 W. Saginaw Hwy.<br>3rd Floor<br>Lansing, MICHIGAN 48917<br>UNITED STATES<br>sattlers@michigan.gov | Nicholas P Abraham<br>Michigan Public Service Commission<br>7109 W SAGINAW HWY<br>LANSING, MICHIGAN 48917<br>AbrahamN1@michigan.gov |
| Michigan Public Service Commission | Spencer Sattler<br>Assistant Attorney General<br>Attorney General<br>7109 W. Saginaw Hwy.<br>3rd Floor<br>Lansing, MICHIGAN 48917 | |

| | UNITED STATES<br>sattlers@michigan.gov | |
|---|---|---|
| Michigan Public Service Commission | Benjamin Holwerda<br>Assistant Attorney General<br>Michigan Departement of Attorney General<br>7109 W Saginaw Hwy<br>Lansing, MICHIGAN 48917<br>UNITED STATES<br>holwerdab@michigan.gov | Steven D Hughey<br>Assistant Attorney General<br>Department of Attorney General<br>7109 W SAGINAW HWY FL 3<br>LANSING, MICHIGAN 48917<br>hugheys@michigan.gov |
| Microgrid Resources Coalition | Baird Brown<br>Principal<br>230 S BROAD ST FL 17<br>PHILADELPHIA, PENNSYLVANIA 19102<br>UNITED STATES<br>baird@eco-n-law.net | |
| Microgrid Resources Coalition | Baird Brown<br>Principal<br>230 S BROAD ST FL 17<br>PHILADELPHIA, PENNSYLVANIA 19102<br>UNITED STATES<br>baird@eco-n-law.net | |
| Mid-Atlantic Renewable Energy Coalition | Gabriel Tabak<br>Counsel<br>American Clean Power Association<br>1501 M St NW<br>Washington, DISTRICT OF COLUMBIA 20005<br>UNITED STATES<br>gtabak@cleanpower.org | |
| Mid-Atlantic Renewable Energy Coalition | Gabriel Tabak<br>Counsel<br>American Clean Power Association | |

|  |  |  |
|---|---|---|
|  | 1501 M St NW<br>Washington, DISTRICT OF<br>COLUMBIA 20005<br>UNITED STATES<br>gtabak@cleanpower.org |  |
| Mid-Atlantic Renewable Energy Coalition | Sari Fink<br>Mid-Atlantic Renewable Energy Coalition<br>7161 Ohio Ave<br>Hanover, MARYLAND 21076<br>UNITED STATES<br>sfink@marec.us |  |
| Midcontinent Independent System Operator, Inc. | Kari Valley<br>Managing Assistant General Cou<br>Midcontinent Independent System Operator, Inc.<br>2985 AMES CROSSING RD<br>EAGAN, MINNESOTA 55121<br>UNITED STATES<br>kvalley@misoenergy.org | Kandi Hahn<br>Legal Analyst II<br>MISO<br>720 City Center Drive<br>Carmel, INDIANA 46032<br>khahn@misoenergy.org |
| Midcontinent Independent System Operator, Inc. | Jackson Evans<br>MISO Senior Corporate Counsel<br>Midcontinent Independent System Operator, Inc.<br>2985 Ames Crossing Road<br>Eagan, MN, MINNESOTA 55121<br>UNITED STATES<br>jevans@misoenergy.org | Midwest ISO<br>Midcontinent Independent System Operator, Inc.<br>PO Box 4202<br>Carmel,MINNESOTA<br>misolegal@misoenergy.org |
| Midcontinent Independent System Operator, Inc. | Christopher Supino<br>Managing Senior Corp Counsel<br>Midcontinent Independent System Operator, Inc.<br>720 City Center Drive<br>Carmel, INDIANA 46032 | Adriana A Rodriguez<br>Legal Analyst I<br>Midcontinent Independent System Operator, Inc.<br>720 City Center Drive<br>Carmel, INDIANA 46032<br>arodriguez@misoenergy.org |

134

| | UNITED STATES<br>csupino@misoenergy.org | |
|---|---|---|
| Midcontinent Independent System Operator, Inc. | | Dawn Kaminski<br>Midcontinent Independent System Operator, Inc.<br>720 City Center Drive<br>Carmel, INDIANA 46032<br>dkaminski@misoenergy.org |
| Midcontinent Independent System Operator, Inc. | Christopher Supino<br>Managing Senior Corp Counsel<br>Midcontinent Independent System Operator, Inc.<br>720 City Center Drive<br>Carmel, INDIANA 46032<br>UNITED STATES<br>csupino@misoenergy.org | |
| Midcontinent Independent System Operator, Inc. | Kari Valley<br>Managing Assistant General Cou<br>Midcontinent Independent System Operator, Inc.<br>2985 AMES CROSSING RD<br>EAGAN, MINNESOTA 55121<br>UNITED STATES<br>kvalley@misoenergy.org | Cortney Sanders<br>Midcontinent Independent System Operator, Inc.<br>720 City Center Dr<br>Carmel, INDIANA 46032<br>csanders@misoenergy.org |
| Midcontinent Independent System Operator, Inc. | Jackson Evans<br>MISO Senior Corporate Counsel<br>Midcontinent Independent System Operator, Inc.<br>2985 Ames Crossing Road<br>Eagan, MN, MINNESOTA 55121<br>UNITED STATES<br>jevans@misoenergy.org | Midwest ISO<br>Midcontinent Independent System Operator, Inc.<br>PO Box 4202<br>Carmel,MINNESOTA<br>misolegal@misoenergy.org |
| Midcontinent Independent | Christopher Supino<br>Managing Senior Corp Counsel | |

| | | |
|---|---|---|
| System Operator, Inc. | Midcontinent Independent System Operator, Inc. 720 City Center Drive Carmel, INDIANA 46032 UNITED STATES csupino@misoenergy.org | |
| Midcontinent Independent System Operator, Inc. | Kari Valley Managing Assistant General Cou Midcontinent Independent System Operator, Inc. 2985 AMES CROSSING RD EAGAN, MINNESOTA 55121 UNITED STATES kvalley@misoenergy.org | Cortney Sanders Midcontinent Independent System Operator, Inc. 720 City Center Dr Carmel, INDIANA 46032 csanders@misoenergy.org |
| Midcontinent Independent System Operator, Inc. | | MISO Agreements 720 CITY CENTER DR CARMEL, INDIANA 46032 agreements@misoenergy.org |
| Midcontinent Independent System Operator, Inc. | | Midwest ISO Midcontinent Independent System Operator, Inc. PO Box 4202 Carmel, misolegal@misoenergy.org |
| Middle River Power, LLC | John McKinsey Attorney 241 W A ST MCKINSEY LAW OFFICE DIXON, CALIFORNIA 95620 UNITED STATES john@jmckinseylaw.com | |
| Middleborou gh Gas & Electric Department | John Coyle Duncan & Allen LLP Suite 700 1730 Rhode Island Avenue, | |

| | | |
|---|---|---|
| | N.W.<br>Washington, DISTRICT OF COLUMBIA 20036-3115<br>UNITED STATES<br>jpc@duncanallen.com | |
| Middleborough Gas & Electric Department | John Coyle<br>Duncan & Allen LLP<br>Suite 700<br>1730 Rhode Island Avenue, N.W.<br>Washington, DISTRICT OF COLUMBIA 20036-3115<br>UNITED STATES<br>jpc@duncanallen.com | |
| Middleborough Gas & Electric Department | John Coyle<br>Duncan & Allen LLP<br>Suite 700<br>1730 Rhode Island Avenue, N.W.<br>Washington, DISTRICT OF COLUMBIA 20036-3115<br>UNITED STATES<br>jpc@duncanallen.com | |
| Middleton Electric Light Department | John Coyle<br>Duncan & Allen LLP<br>Suite 700<br>1730 Rhode Island Avenue, N.W.<br>Washington, DISTRICT OF COLUMBIA 20036-3115<br>UNITED STATES<br>jpc@duncanallen.com | |
| Middleton Electric Light Department | John Coyle<br>Duncan & Allen LLP<br>Suite 700<br>1730 Rhode Island Avenue, N.W.<br>Washington, DISTRICT OF | |

| | | |
|---|---|---|
| | COLUMBIA 20036-3115<br>UNITED STATES<br>jpc@duncanallen.com | |
| Middleton<br>Electric<br>Light<br>Department | John Coyle<br>Duncan & Allen LLP<br>Suite 700<br>1730 Rhode Island Avenue,<br>N.W.<br>Washington, DISTRICT OF<br>COLUMBIA 20036-3115<br>UNITED STATES<br>jpc@duncanallen.com | |
| Midwest<br>Energy, Inc. | Richard Lorenzo<br>LOEB & LOEB<br>901 New York Ave., NW<br>Suite 300 East<br>Washington, DISTRICT OF<br>COLUMBIA 20001<br>UNITED STATES<br>rlorenzo@loeb.com | William Dowling<br>V.P. Energy Mgmt<br>Midwest Energy, Inc.<br>1330 CANTERBURY DR<br>HAYS, KANSAS 67601<br>bdowling@mwenergy.com |
| Midwest<br>Energy, Inc. | Nicole Travers<br>Associate<br>LOEB & LOEB<br>900 New York Avenue NW<br>Suite 300 E<br>Washington, DISTRICT OF<br>COLUMBIA 20001<br>UNITED STATES<br>ntravers@loeb.com | |
| Midwest<br>Energy, Inc. | | Nathan B McNeil<br>Transmission Planning Engineer<br>Midwest Energy, Inc.<br>1330 Canterbury Dr<br>Hays, KANSAS 67601<br>nmcneil@mwenergy.com |

138

| | | |
|---|---|---|
| Midwest Reliability Organization | Lisa Zell<br>lisa.zell@mro.net | |
| Midwest Reliability Organization | Lisa Zell<br>lisa.zell@mro.net | |
| Minnesota Department of Commerce | Aditya Ranade<br>aditya.ranade@state.mn.us | John N Wachtler<br>Energy Program Director<br>Minnesota Department of Commerce<br>85 7th Place East, Suite 280<br>Saint Paul, MINNESOTA 55101<br>john.wachtler@state.mn.us |
| Minnesota Department of Commerce | John Wachtler<br>Energy Program Director<br>Minnesota Department of Commerce<br>85 7th Place East, Suite 280<br>Saint Paul, MINNESOTA 55101<br>UNITED STATES<br>john.wachtler@state.mn.us | |
| MINNESOTA PUBLIC UTILITIES COMMISSION | Will Seuffert<br>Executive Secretary<br>MINNESOTA PUBLIC UTILITIES COMMISSION<br>121 7th Place East, Suite 350<br>St. Paul, MINNESOTA 55101<br>UNITED STATES<br>will.seuffert@state.mn.us | Hwikwon Ham<br>MINNESOTA PUBLIC UTILITIES COMMISSION<br>121 7TH PL E STE 350<br>SAINT PAUL, MINNESOTA 55101<br>hwikwon.ham@state.mn.us |
| MINNESOTA PUBLIC UTILITIES COMMISSION | Will Seuffert<br>Executive Secretary<br>MINNESOTA PUBLIC UTILITIES COMMISSION<br>121 7th Place East, Suite 350<br>St. Paul, MINNESOTA 55101 | Lauren Bethke<br>Staff Attorney<br>MINNESOTA PUBLIC UTILITIES COMMISSION<br>121 7TH PL E STE 350<br>SAINT PAUL, MINNESOTA |

| | UNITED STATES<br>will.seuffert@state.mn.us | 55101<br>lauren.bethke@state.mn.us |
|---|---|---|
| MINNESOTA PUBLIC UTILITIES COMMISSION | | Hwikwon Ham<br>MINNESOTA PUBLIC UTILITIES COMMISSION<br>121 7TH PL E STE 350<br>SAINT PAUL, MINNESOTA 55101<br>hwikwon.ham@state.mn.us |
| MINNESOTA PUBLIC UTILITIES COMMISSION | | Ryan Barlow<br>ryan.barlow@state.mn.us |
| MINNESOTA PUBLIC UTILITIES COMMISSION | | Lise B Trudeau<br>Regional Issues Planning Direc<br>MINNESOTA PUBLIC UTILITIES COMMISSION<br>121 7TH PL E STE 350<br>MINNESOTA PUBLIC UTILITIES COMMISSION<br>SAINT PAUL, MINNESOTA 55101<br>Lise.B.Trudeau@state.mn.us |
| MISO Transmission Owners | Matthew Binette<br>Attorney<br>Wright & Talisman, PC<br>1200 G Street, N.W.<br>Suite 600<br>Washington, DISTRICT OF COLUMBIA 20005-3898<br>UNITED STATES<br>binette@wrightlaw.com | Wendy N Reed<br>Wright & Talisman, PC<br>1200 G Street, N.W<br>Suite 600<br>Washington, DISTRICT OF COLUMBIA 20005<br>reed@wrightlaw.com |
| MISO Transmission Owners | Wendy Reed<br>Wright & Talisman, PC<br>1200 G Street, N.W<br>Suite 600 | Matthew J Binette<br>Attorney<br>Wright & Talisman, PC<br>1200 G Street, N.W. |

| | | |
|---|---|---|
| | Washington, DISTRICT OF COLUMBIA 20005 UNITED STATES reed@wrightlaw.com | Suite 600 Washington, DISTRICT OF COLUMBIA 20005-3898 binette@wrightlaw.com |
| MISO Transmission Owners | | Abraham Johns Associate Wright & Talisman, P.C. 1200 G St., N.W. Suite 600 Washington, DISTRICT OF COLUMBIA 20005-3898 johns@wrightlaw.com |
| MISO Transmission Owners | | Abraham Johns Associate Wright & Talisman, P.C. 1200 G St., N.W. Suite 600 Washington, DISTRICT OF COLUMBIA 20005-3898 johns@wrightlaw.com |
| MISO Transmission Owners | Wendy Reed Wright & Talisman, PC 1200 G Street, N.W Suite 600 Washington, DISTRICT OF COLUMBIA 20005 UNITED STATES reed@wrightlaw.com | |
| MISO Transmission Owners | Matthew Binette Attorney Wright & Talisman, PC 1200 G Street, N.W. Suite 600 Washington, DISTRICT OF COLUMBIA 20005-3898 UNITED STATES binette@wrightlaw.com | |

| | | |
|---|---|---|
| MISO Transmission Owners | Abraham Johns<br>Associate<br>Wright & Talisman, P.C.<br>1200 G St., N.W.<br>Suite 600<br>Washington, DISTRICT OF COLUMBIA 20005-3898<br>UNITED STATES<br>johns@wrightlaw.com | |
| MISO Transmission Owners | | Abraham Johns<br>Associate<br>Wright & Talisman, P.C.<br>1200 G St., N.W.<br>Suite 600<br>Washington, DISTRICT OF COLUMBIA 20005-3898<br>johns@wrightlaw.com |
| Mississippi Public Service Commission | William Booth<br>Michael Best & Friedrich, LLP<br>1000 Maine Ave SW<br>Suite 400<br>Washington, D.C., DISTRICT OF COLUMBIA 20024<br>UNITED STATES<br>wdbooth@michaelbest.com | Roxane E Maywalt, ESQ<br>Senior Counsel<br>Michael Best & Friedrich, LLP<br>1000 MAINE AVE SW STE 400<br>WASHINGTON, DISTRICT OF COLUMBIA 20024<br>remaywalt@michaelbest.com |
| Mississippi Public Service Commission | | Katherine Collier<br>Mississippi Public Service Commission And Public Utilities Staff<br>P.O. Box 1174<br>Jackson, MISSISSIPPI 39215<br>katherine.collier@psc.ms.gov |
| Mississippi Public Service Commission | | David N Carr<br>Special to the Commission for Mississippi Public Service Commission<br>501 N West St |

142

| | | |
|---|---|---|
| | | Jackson, MISSISSIPPI 39201<br>david.carr@psc.ms.gov |
| Mississippi Public Service Commission | | Katherine Collier<br>Mississippi Public Service Commission And Public Utilities Staff<br>P.O. Box 1174<br>Jackson, MISSISSIPPI 39215<br>katherine.collier@psc.ms.gov |
| Mississippi Public Service Commission | | David N Carr<br>Special to the Commission for Mississippi Public Service Commission<br>501 N West St<br>Jackson, MISSISSIPPI 39201<br>david.carr@psc.ms.gov |
| Mississippi Public Service Commission | | Katherine Collier<br>Mississippi Public Service Commission And Public Utilities Staff<br>P.O. Box 1174<br>Jackson, MISSISSIPPI 39215<br>katherine.collier@psc.ms.gov |
| Mississippi Public Service Commission | | Ross Hammons<br>Mississippi Public Service Commission<br>Woolfolk Building<br>501 North West Street, Suite 201A<br>Jackson, MISSISSIPPI 39201<br>ross.hammons@psc.ms.gov |
| Mississippi Public Service Commission | | David N Carr<br>Special to the Commission for Mississippi Public Service Commission<br>501 N West St |

| | | |
|---|---|---|
| | | Jackson, MISSISSIPPI 39201<br>david.carr@psc.ms.gov |
| Mississippi Public Service Commission | | Ross Hammons<br>Mississippi Public Service Commission<br>Woolfolk Building<br>501 North West Street, Suite 201A<br>Jackson, MISSISSIPPI 39201<br>ross.hammons@psc.ms.gov |
| Mississippi Public Service Commission | | David N Carr<br>Special to the Commission for Mississippi Public Service Commission<br>501 N West St<br>Jackson, MISSISSIPPI 39201<br>david.carr@psc.ms.gov |
| Mississippi Public Service Commission | | Ross Hammons<br>Mississippi Public Service Commission<br>Woolfolk Building<br>501 North West Street, Suite 201A<br>Jackson, MISSISSIPPI 39201<br>ross.hammons@psc.ms.gov |
| Mississippi Public Service Commission | | David N Carr<br>Special to the Commission for Mississippi Public Service Commission<br>501 N West St<br>Jackson, MISSISSIPPI 39201<br>david.carr@psc.ms.gov |
| Mississippi Public Utilities Staff | William Booth<br>Michael Best & Friedrich, LLP<br>1000 Maine Ave SW<br>Suite 400<br>Washington, D.C., DISTRICT | Roxane E Maywalt, ESQ<br>Senior Counsel<br>Michael Best & Friedrich, LLP<br>1000 MAINE AVE SW STE 400 |

| | | |
|---|---|---|
| | OF COLUMBIA 20024 UNITED STATES wdbooth@michaelbest.com | WASHINGTON, DISTRICT OF COLUMBIA 20024 remaywalt@michaelbest.com |
| Mississippi Public Utilities Staff | | Emily W Kruger General Counsel P.O. Box 1174 Jackson, MISSISSIPPI 39215-1174 Emily.Kruger@mpus.ms.gov |
| Mississippi Public Utilities Staff | William Booth Michael Best & Friedrich, LLP 1000 Maine Ave SW Suite 400 Washington, D.C., DISTRICT OF COLUMBIA 20024 UNITED STATES wdbooth@michaelbest.com | Emily W Kruger General Counsel P.O. Box 1174 Jackson, MISSISSIPPI 39215-1174 Emily.Kruger@mpus.ms.gov |
| Mississippi Public Utilities Staff | | Roxane E Maywalt, ESQ Senior Counsel Michael Best & Friedrich, LLP 1000 MAINE AVE SW STE 400 WASHINGTON, DISTRICT OF COLUMBIA 20024 remaywalt@michaelbest.com |
| Missouri Farm Bureau | Leslie Holloway Senior Director, Regulatory Af P.O. Box 658 Jefferson City, MISSOURI 65102 UNITED STATES leslie.holloway@mofb.org | Leslie E. Holloway Senior Director, Regulatory Af P.O. Box 658 Jefferson City, MISSOURI 65102 leslie.holloway@mofb.org |
| Missouri Public Service Commission | Rodney Massman Missouri Public Service Commission 200 Madison Street Jefferson City, MISSOURI | John D. Borgmeyer Litigation Attorney Missouri Public Service Commission PO BOX 360 |

145

| | 65101<br>UNITED STATES<br>Rodney.Massman@psc.mo.gov | JEFFERSON CITY,<br>MISSOURI 65102<br>john.borgmeyer@psc.mo.gov |
|---|---|---|
| Missouri Public Service Commission | | Shelley S Brueggemann<br>Missouri Bar No. 52173<br>Missouri Public Service Commission<br>PO Box 360<br>, 65102<br>shelley.brueggemann@psc.mo.gov |
| Missouri Public Service Commission | | Jennifer Heintz<br>Missouri Public Service Commission<br>PO Box 360<br>Jefferson City,<br>jennifer.heintz@psc.mo.gov |
| Missouri Public Service Commission | | Jennie Wells<br>Paralegal<br>Missouri Public Service Commission<br>200 Madison Street<br>Jefferson City, MISSOURI 65101<br>jennie.wells@psc.mo.gov |
| Missouri Public Service Commission | | Valerie Groose<br>200 Madison St<br>Jefferson City, MISSOURI 65109<br>valerie.groose@psc.mo.gov |
| Missouri Public Service Commission | Rodney Massman<br>Missouri Public Service Commission<br>200 Madison Street<br>Jefferson City, MISSOURI 65101 | Shelley S Brueggemann<br>Missouri Bar No. 52173<br>Missouri Public Service Commission<br>PO Box 360<br>,MISSOURI 65102 |

146

| | UNITED STATES Rodney.Massman@psc.mo.gov | shelley.brueggemann@psc.mo.gov |
|---|---|---|
| Missouri Public Service Commission | | John D. Borgmeyer Litigation Attorney Missouri Public Service Commission PO BOX 360 JEFFERSON CITY, MISSOURI 65102 john.borgmeyer@psc.mo.gov |
| Missouri Public Service Commission | | Jennifer Heintz Missouri Public Service Commission PO Box 360 Jefferson City, jennifer.heintz@psc.mo.gov |
| Missouri Public Service Commission | | Karolin walker, ESQ Attorney Missouri Public Service Commission 201 MADISON ST JEFFERSON CITY, MISSOURI 65101 karolin.walker@psc.mo.gov |
| Missouri Public Service Commission | | Jan Kay Davidson Utility Policy Analyst I Missouri Public Service Commission 200 Madison St Jefferson City, MISSOURI 65101 janette.davidson@psc.mo.gov |
| Missouri Public Service Commission | | Valerie Groose 200 Madison St Jefferson City, MISSOURI 65109 valerie.groose@psc.mo.gov |

| | | |
|---|---|---|
| Missouri Public Service Commission | | Jennie Wells<br>Paralegal<br>Missouri Public Service Commission<br>200 Madison Street<br>Jefferson City, MISSOURI 65101<br>jennie.wells@psc.mo.gov |
| Monitoring Analytics, LLC | Jeffrey Mayes<br>General Counsel<br>Monitoring Analytics, LLC<br>2621 Van Buren Avenue, Suite 160<br>Valley Forge Corporate Center<br>Eagleville, PENNSYLVANIA 19403<br>UNITED STATES<br>jeffrey.mayes@monitoringanalytics.com | Joseph Bowring<br>Monitoring Analytics, LLC<br>2621 Van Buren Avenue, Suite 160<br>Norristown, PENNSYLVANIA 19403<br>Joseph.Bowring@monitoringanalytics.com |
| Monitoring Analytics, LLC | | Suzette N Krausen<br>Executive Assistant<br>Monitoring Analytics, LLC<br>2621 Van Buren Ave Ste 160<br>Norristown, PENNSYLVANIA 19403<br>Suzette.Krausen@monitoringanalytics.com |
| Monitoring Analytics, LLC | | Suzette N Krausen<br>Executive Assistant<br>Monitoring Analytics, LLC<br>2621 Van Buren Ave Ste 160<br>Norristown, PENNSYLVANIA 19403<br>Suzette.Krausen@monitoringanalytics.com |
| Monitoring Analytics, LLC | | Suzette N Krausen<br>Executive Assistant<br>Monitoring Analytics, LLC |

| | | 2621 Van Buren Ave Ste 160 Norristown, PENNSYLVANIA 19403 Suzette.Krausen@monitoringan alytics.com |
|---|---|---|
| Montana Public Service Commission | Lucas Hamilton Montana Public Service Commiss Montana Public Service Commission 1701 Prospect Ave. PO Box 202601 Helena, MONTANA 59601-2601 UNITED STATES lucas.hamilton@mt.gov | |
| Municipal Electric Authority of Georgia | Peter Degnan Sr. V.P. & General Counsel 1470 Riveredge Pkwy. Atlanta, GEORGIA 30328 UNITED STATES pdegnan@meagpower.org | |
| Municipal Electric Authority of Georgia | Peter Degnan Sr. V.P. & General Counsel 1470 Riveredge Pkwy. Atlanta, GEORGIA 30328 UNITED STATES pdegnan@meagpower.org | |
| Municipal Electric Authority of Georgia | Peter Degnan Sr. V.P. & General Counsel 1470 Riveredge Pkwy. Atlanta, GEORGIA 30328 UNITED STATES pdegnan@meagpower.org | |
| Municipal Electric | Peter Degnan Sr. V.P. & General Counsel 1470 Riveredge Pkwy. | |

| | | |
|---|---|---|
| Authority of Georgia | Atlanta, GEORGIA 30328<br>UNITED STATES<br>pdegnan@meagpower.org | |
| NAACP Grand Rapids | Christine Powell<br>Deputy Managing Attorney, Clea<br>EARTHJUSTICE<br>50 CALIFORNIA ST STE 500<br>SAN FRANCISCO, CALIFORNIA 94111<br>UNITED STATES<br>cpowell@earthjustice.org | |
| NAACP Grand Rapids | Kareem Scales<br>Greater Grand Rapids NAACP<br>1530 MADISON AVE SE<br>GRAND RAPIDS, MICHIGAN 49507<br>UNITED STATES<br>kareem@naacpgr.com | |
| NAACP Grand Rapids | Christine Powell<br>Deputy Managing Attorney, Clea<br>EARTHJUSTICE<br>50 CALIFORNIA ST STE 500<br>SAN FRANCISCO, CALIFORNIA 94111<br>UNITED STATES<br>cpowell@earthjustice.org | |
| NASUCA | David Springe<br>National Association of State Utility Consumer Advocates<br>8380 Colesville Rd<br>Suite 101<br>Silver Spring, MARYLAND 20910<br>UNITED STATES<br>david.springe@nasuca.org | |

| | | |
|---|---|---|
| National Association of Regulatory Utility Commissioners | | James Bradford Ramsay, ESQ<br>General Counsel<br>1101 Vermont Ave NW<br>Suite 200<br>Washington, DISTRICT OF COLUMBIA 20005<br>jramsay@naruc.org |
| National Association of State Energy Officials | David Terry<br>Executive Director<br>Nastional Association of State Energy Officials<br>1300 North 17th Street<br>Suite 1275<br>Arlington, VIRGINIA 22209<br>UNITED STATES<br>dterry@naseo.org | Roberta Rothschild<br>Legal Assistant<br>Duncan Weinberg Genzer & Pembroke, PC<br>1667 K Street NW<br>Suite 700<br>Washington, DISTRICT OF COLUMBIA 20006<br>RR@dwgp.com |
| National Association of State Energy Officials | Jeffrey Genzer<br>Duncan, Weinberg, Genzer & Pembroke PC<br>1667 K Street, N.W.<br>Suite 700<br>Washington, DISTRICT OF COLUMBIA 20006<br>UNITED STATES<br>jcg@dwgp.com | |
| National Association of State Energy Officials | David Terry<br>Executive Director<br>Nastional Association of State Energy Officials<br>1300 North 17th Street<br>Suite 1275<br>Arlington, VIRGINIA 22209<br>UNITED STATES<br>dterry@naseo.org | |
| National Association of State | Kirsten Verclas<br>National Association of State Energy Officials<br>1300 North 17th Street | |

| | | |
|---|---|---|
| Energy Officials | Arlington, VIRGINIA 22209 UNITED STATES kverclas@naseo.org | |
| National Association of State Utility Consumer Advocates | Anjali Patel Vice President for Clean Energ Americans for a Clean Energy Grid 3100 CLARENDON BLVD STE 800 ARLINGTON, VIRGINIA 22201 UNITED STATES anjali@dgardiner.com | |
| National Audubon Society | Justin Vickers Attorney ENVIRONMENTAL LAW & POLICY CENTER 35 East Wacker Drive Suite 1600 Chicago, ILLINOIS 60601 UNITED STATES jvickers@elpc.org | |
| National Audubon Society | Justin Vickers Attorney ENVIRONMENTAL LAW & POLICY CENTER 35 East Wacker Drive Suite 1600 Chicago, ILLINOIS 60601 UNITED STATES jvickers@elpc.org | |
| National Caucus of Environment al Legislators | Ava Gallo National Caucus of Environmental Legislators 342 RODNEY ST APT 2 BROOKLYN, NEW YORK 11211 | |

| | UNITED STATES<br>ava.gallo@ncelenviro.org | |
|---|---|---|
| National Conference of State Legislatures | Benjamin Husch<br>Federal Affairs Advisor<br>National Conference of State Legislatures<br>444 North Capitol st NW suite 515<br>Washington, DISTRICT OF COLUMBIA 20001<br>UNITED STATES<br>ben.husch@ncsl.org | Benjamin Husch<br>Federal Affairs Advisor<br>National Conference of State Legislatures<br>444 North Capitol st NW suite 515<br>Washington, DISTRICT OF COLUMBIA 20001<br>ben.husch@ncsl.org |
| National Electrical Manufacturers Association | Peter Ferrell<br>National Electrical Manufactur<br>National Electrical Manufacturers Association<br>1300 17TH ST N STE 900<br>ROSSLYN, VIRGINIA 22209<br>UNITED STATES<br>peter.ferrell@nema.org | |
| National Grid | Christopher Novak<br>National Grid<br>National Grid<br>40 Sylvan Road<br>Waltham, MASSACHUSETTS 02541<br>UNITED STATES<br>chris.novak@nationalgrid.com | |
| National Grid USA | Daniel Galaburda<br>Senior Counsel<br>Niagara Mohawk Power Corporation<br>40 Sylvan Road<br>Waltham, MASSACHUSETTS 02451-1120<br>UNITED STATES<br>daniel.galaburda@nationalgrid.com | |

| | | |
|---|---|---|
| National Rural Electric Cooperative Association | Randolph Elliott<br>McCarter & English, LLP<br>1301 K Street, NW<br>Suite 1000 West<br>Washington, DISTRICT OF COLUMBIA 20005<br>UNITED STATES<br>relliott@mccarter.com | Mary Ann Ralls<br>INDIVIDUAL<br>4301 Wilson Blvd.<br>Arlington, VIRGINIA 22203<br>MaryAnn.Ralls@nreca.org |
| National Rural Electric Cooperative Association | Mary Ann Ralls<br>INDIVIDUAL<br>4301 Wilson Blvd.<br>Arlington, VIRGINIA 22203<br>UNITED STATES<br>MaryAnn.Ralls@nreca.org | Randolph L. Elliott<br>McCarter & English, LLP<br>1301 K Street, NW<br>Suite 1000 West<br>Washington, DISTRICT OF COLUMBIA 20005<br>relliott@mccarter.com |
| National Rural Electric Cooperative Association | Randolph Elliott<br>McCarter & English, LLP<br>1301 K Street, NW<br>Suite 1000 West<br>Washington, DISTRICT OF COLUMBIA 20005<br>UNITED STATES<br>relliott@mccarter.com | Priyanka Vashisht<br>Associate<br>Wright & Talisman, P.C.<br>1200 G ST NW STE 600<br>WASHINGTON, DISTRICT OF COLUMBIA 20005<br>vashisht@wrightlaw.com |
| National Rural Electric Cooperative Association | | Sean T. Beeny<br>McCarter & English, LLP<br>1301 K Street, NW<br>Suite 1000 West<br>Washington, DISTRICT OF COLUMBIA 20005<br>sbeeny@mccarter.com |
| National Rural Electric Cooperative Association | | Mary Ann Ralls<br>Senior Director, Regulatory Co<br>National Rural Electric Cooperative Association<br>4301 Wilson Blvd.<br>Arlington, VIRGINIA 22203<br>maryann.ralls@nreca.coop |

| | | |
|---|---|---|
| National Wildlife Federation | Justin Vickers<br>Attorney<br>ENVIRONMENTAL LAW & POLICY CENTER<br>35 East Wacker Drive<br>Suite 1600<br>Chicago, ILLINOIS 60601<br>UNITED STATES<br>jvickers@elpc.org | |
| National Wildlife Federation | Justin Vickers<br>Attorney<br>ENVIRONMENTAL LAW & POLICY CENTER<br>35 East Wacker Drive<br>Suite 1600<br>Chicago, ILLINOIS 60601<br>UNITED STATES<br>jvickers@elpc.org | |
| National Wildlife Federation | Portia Bharath<br>National Wildlife Federation<br>6503 Marlboro Pike<br>District Heights, MARYLAND 20747<br>UNITED STATES<br>bharathp@nwf.org | |
| National Wildlife Federation | David DeGennaro<br>National Wildlife Federation<br>1875 Mintwood Pl NW<br>#44<br>Washington, DISTRICT OF COLUMBIA 20009<br>UNITED STATES<br>degennarod@nwf.org | |
| Natural Resources Defense Council | Danielle Fidler<br>Senior Attorney<br>EARTHJUSTICE<br>48 WALL ST FL 15<br>NEW YORK, NEW YORK | |

| | | |
|---|---|---|
| | 10005<br>UNITED STATES<br>dfidler@earthjustice.org | |
| Natural Resources Defense Council | Cullen Howe<br>Attorney<br>Natural Resources Defense Council<br>40 West 20th Street<br>New York, NEW YORK 10011<br>UNITED STATES<br>chowe@nrdc.org | |
| Nebraska Power Review Board | Tim Texel<br>Executive Director & Gen. Coun<br>Nebraska Power Review Board<br>301 Centennial Mall South - LL<br>P.O. Box 94713<br>Lincoln, NEBRASKA 68509<br>UNITED STATES<br>tim.texel@nebraska.gov | |
| Nebraska Power Review Board | Tim Texel<br>Executive Director & Gen. Coun<br>Nebraska Power Review Board<br>301 Centennial Mall South - LL<br>P.O. Box 94713<br>Lincoln, NEBRASKA 68509<br>UNITED STATES<br>tim.texel@nebraska.gov | |
| New England for Offshore Wind | Susannah Hatch<br>Environmental League of MA<br>Environmental League of Massachusetts<br>15 Court Square, Suite 1000<br>Boston, MASSACHUSETTS 02108<br>UNITED STATES | |

156

| | | |
|---|---|---|
| | shatch@environmentalleague.org | |
| New England for Offshore Wind | Susannah Hatch<br>Environmental League of MA<br>Environmental League of Massachusetts<br>15 Court Square, Suite 1000<br>Boston, MASSACHUSETTS 02108<br>UNITED STATES<br>shatch@environmentalleague.org | |
| New England Power Pool Participants Committee | Eric Runge<br>Counsel<br>Day Pitney LLP<br>One International Place<br>Boston, MASSACHUSETTS 02110<br>UNITED STATES<br>ekrunge@daypitney.com | |
| New England Power Pool Participants Committee | Margaret Czepiel<br>Day Pitney LLP<br>555 11th Street NW<br>Suite 403<br>Washington, DISTRICT OF COLUMBIA 20004<br>UNITED STATES<br>mczepiel@daypitney.com | |
| New England Power Pool Participants Committee | Eric Runge<br>Counsel<br>Day Pitney LLP<br>One International Place<br>Boston, MASSACHUSETTS 02110<br>UNITED STATES<br>ekrunge@daypitney.com | |

| | | |
|---|---|---|
| New England Power Pool Participants Committee | Margaret Czepiel<br>Day Pitney LLP<br>555 11th Street NW<br>Suite 403<br>Washington, DISTRICT OF COLUMBIA 20004<br>UNITED STATES<br>mczepiel@daypitney.com | |
| New England States Committee on Electricity | Phyllis Kimmel<br>Phyllis G. Kimmel Law Office PLLC<br>1717 K Street, NW<br>Suite 900<br>Washington, DISTRICT OF COLUMBIA 20006<br>UNITED STATES<br>pkimmel@pgklawoffice.com | |
| New England States Committee on Electricity | Phyllis Kimmel<br>Phyllis G. Kimmel Law Office PLLC<br>1717 K Street, NW<br>Suite 900<br>Washington, DISTRICT OF COLUMBIA 20006<br>UNITED STATES<br>pkimmel@pgklawoffice.com | |
| New England States Committee on Electricity | | Shannon Beale<br>PO Box 322<br>Osterville, MASSACHUSETTS 02655<br>shannonbeale@nescoe.com |
| New Hampshire Electric Cooperative, Inc. | Scott Strauss<br>Spiegel & McDiarmid LLP<br>1818 N Street, NW<br>8th Floor<br>WASHINGTON, DISTRICT OF COLUMBIA 20036 | Jeffrey A Schwarz<br>Spiegel & McDiarmid LLP<br>1818 N Street, NW<br>8th Floor<br>WASHINGTON, DISTRICT OF COLUMBIA 20036 |

| | UNITED STATES<br>Scott.Strauss@spiegelmcd.com | jeffrey.schwarz@spiegelmcd.com |
|---|---|---|
| New Hampshire Electric Cooperative, Inc. | | E Service<br>Spiegel & McDiarmid LLP<br>1875 Eye St, NW<br>Suite 700<br>Washington, DISTRICT OF COLUMBIA 20006<br>eService@spiegelmcd.com |
| New Hampshire Electric Cooperative, Inc. | Scott Strauss<br>Spiegel & McDiarmid LLP<br>1818 N Street, NW<br>8th Floor<br>WASHINGTON, DISTRICT OF COLUMBIA 20036<br>UNITED STATES<br>Scott.Strauss@spiegelmcd.com | |
| New Hampshire Electric Cooperative, Inc. | Scott Strauss<br>Spiegel & McDiarmid LLP<br>1818 N Street, NW<br>8th Floor<br>WASHINGTON, DISTRICT OF COLUMBIA 20036<br>UNITED STATES<br>Scott.Strauss@spiegelmcd.com | |
| New Hampshire Electric Cooperative, Inc. | | E Service<br>Spiegel & McDiarmid LLP<br>1875 Eye St, NW<br>Suite 700<br>Washington, DISTRICT OF COLUMBIA 20006<br>eService@spiegelmcd.com |
| New Hampshire Office of the Consumer Advocate | Matthew Fossum<br>New Hampshire Office of the Consumer Advocate<br>21 S FRUIT ST STE 18<br>CONCORD, NEW | |

| | | |
|---|---|---|
| | HAMPSHIRE 03301<br>UNITED STATES<br>matthew.j.fossum@oca.nh.gov | |
| New Jersey Board of Public Utilities | Paul Youchak<br>New Jersey Department of Law and Public Safety<br>25 Market Street<br>Trenton, NEW JERSEY 08611<br>UNITED STATES<br>paul.youchak@law.njoag.gov | David S Schmitt<br>New Jersey Board of Public Uti<br>New Jersey Board of Public Utilities<br>44 S Clinton Ave<br>Trenton, NEW JERSEY 08625<br>David.schmitt@bpu.nj.gov |
| New Jersey Board of Public Utilities | Joseph DeLosa<br>Bureau Chief, Bureau Federal & New Jersey Board of Public Utilities<br>44 S CLINTON AVE<br>TRENTON, NEW JERSEY 08609<br>UNITED STATES<br>joedelosa29@gmail.com | Brandon C Simmons<br>Deputy Attorney General<br>New Jersey Board of Public Utilities<br>R.J. Hughes Justice Complex, 7th Floor West<br>25 Market Street, PO Box 112<br>Trenton, NEW JERSEY 08625<br>brandon.simmons@law.njoag.gov |
| New Jersey Board of Public Utilities | Ian Oxenham<br>New Jersey Board of Public Utilities<br>44 S CLINTON AVE FL 10<br>TRENTON, NEW JERSEY 08609<br>UNITED STATES<br>Ian.Oxenham@bpu.nj.gov | Ryann Reagan<br>Aide to the Commissioner<br>New Jersey Board of Public Utilities<br>44 S Clinton Ave<br>Trenton, NEW JERSEY 08638<br>ryann.reagan@bpu.nj.gov |
| New Jersey Board of Public Utilities | | Brandon C Simmons<br>Deputy Attorney General<br>New Jersey Board of Public Utilities<br>R.J. Hughes Justice Complex, 7th Floor West<br>25 Market Street, PO Box 112<br>Trenton, NEW JERSEY 08625<br>brandon.simmons@law.njoag.gov |

| | | |
|---|---|---|
| New Jersey Board of Public Utilities | Ian Oxenham<br>New Jersey Board of Public Utilities<br>44 S CLINTON AVE FL 10<br>TRENTON, NEW JERSEY 08609<br>UNITED STATES<br>Ian.Oxenham@bpu.nj.gov | Paul Youchak<br>New Jersey Department of Law and Public Safety<br>25 Market Street<br>Trenton, NEW JERSEY 08611<br>paul.youchak@law.njoag.gov |
| New Jersey Board of Public Utilities | | David S Schmitt<br>New Jersey Board of Public Uti<br>New Jersey Board of Public Utilities<br>44 S Clinton Ave<br>Trenton, NEW JERSEY 08625<br>David.schmitt@bpu.nj.gov |
| New Jersey Board of Public Utilities | | Ryann Reagan<br>Aide to the Commissioner<br>New Jersey Board of Public Utilities<br>44 S Clinton Ave<br>Trenton, NEW JERSEY 08638<br>ryann.reagan@bpu.nj.gov |
| New Jersey Board of Public Utilities | | Brandon C Simmons<br>Deputy Attorney General<br>New Jersey Board of Public Utilities<br>R.J. Hughes Justice Complex, 7th Floor West<br>25 Market Street, PO Box 112<br>Trenton, NEW JERSEY 08625<br>brandon.simmons@law.njoag.gov |
| New Jersey Division of Rate Counsel | Robert Glover<br>New Jersey Division of Rate Counsel<br>PO Box 003<br>Trenton,NEW JERSEY 08625 | T. David Wand<br>Division of Rate Counsel<br>New Jersey Division of Rate Counsel<br>140 E. Front St.<br>4th Flr. |

|  | UNITED STATES<br>rglover@rpa.nj.gov | Trenton, NEW JERSEY 08625<br>dwand@rpa.nj.gov |
|---|---|---|
| New Mexico Renewable Energy Transmission Authority | David Doot<br>Day Pitney LLP<br>242 Trumbull Street<br>Hartford, CONNECTICUT 06103<br>UNITED STATES<br>dtdoot@daypitney.com |  |
| New Mexico Renewable Energy Transmission Authority | Margaret Czepiel<br>Day Pitney LLP<br>555 11th Street NW<br>Suite 403<br>Washington, DISTRICT OF COLUMBIA 20004<br>UNITED STATES<br>mczepiel@daypitney.com |  |
| New Mexico Renewable Energy Transmission Authority | Teresa Chen<br>Day Pitney LLP<br>242 TRUMBULL ST<br>HARTFORD, CONNECTICUT 06103<br>UNITED STATES<br>tchen@daypitney.com |  |
| New York Independent System Operator, Inc. | Sara Keegan<br>Senior Attorney<br>New York Independent System Operator, Inc.<br>10 Krey Boulevard<br>Rensselaer, NEW YORK 12144<br>UNITED STATES<br>skeegan@nyiso.com | joy a zimberlin<br>regulatoryaffairs@nyiso.com |
| New York Independent System Operator, Inc. | Carl Patka<br>Senior Attorney<br>New York Independent System Operator, Inc.<br>10 Krey Boulevard | Ted J. Murphy<br>Hunton Andrews Kurth LLP<br>Hunton Andrews Kurth LLP<br>2200 Pennsylvania Ave., NW<br>Washington,, DISTRICT OF |

162

|  | Rensselaer, NEW YORK 12144 UNITED STATES cpatka@nyiso.com | COLUMBIA 20037 tmurphy@huntonak.com |
|---|---|---|
| New York Independent System Operator, Inc. | Brian Hodgdon New York Independent System Operator, Inc. 10 Krey Boulevard Rensselaer, NEW YORK 12144 UNITED STATES bhodgdon@nyiso.com | Michael Messonnier, JR Hunton Andrews Kurth LLP 951 East Byrd Street Richmond, VIRGINIA 23219 mmessonnier@huntonak.com |
| New York Independent System Operator, Inc. | Carl Patka Senior Attorney New York Independent System Operator, Inc. 10 Krey Boulevard Rensselaer, NEW YORK 12144 UNITED STATES cpatka@nyiso.com | Regulatory Affairs Regulatory Affairs New York Independent System Operator, Inc. 10 Krey Boulevard Rensselaer, NEW YORK 12144 Regulatory_Affairs@nyiso.com |
| New York Independent System Operator, Inc. | Ted Murphy Hunton Andrews Kurth LLP Hunton Andrews Kurth LLP 2200 Pennsylvania Ave., NW Washington,, DISTRICT OF COLUMBIA 20037 UNITED STATES tmurphy@huntonak.com |  |
| New York Independent System Operator, Inc. | Michael Messonnier Hunton Andrews Kurth LLP 951 East Byrd Street Richmond, VIRGINIA 23219 UNITED STATES mmessonnier@huntonak.com |  |
| New York Independent System Operator, Inc. |  | Brian R Hodgdon New York Independent System Operator, Inc. 10 Krey Boulevard |

163

| | | |
|---|---|---|
| | | Rensselaer, NEW YORK 12144<br>bhodgdon@nyiso.com |
| New York Independent System Operator, Inc. | | Ted J. Murphy<br>Hunton Andrews Kurth LLP<br>Hunton Andrews Kurth LLP<br>2200 Pennsylvania Ave., NW<br>Washington,, DISTRICT OF<br>COLUMBIA 20037<br>tmurphy@huntonak.com |
| New York Independent System Operator, Inc. | | Michael Messonnier, JR<br>Hunton Andrews Kurth LLP<br>951 East Byrd Street<br>Richmond, VIRGINIA 23219<br>mmessonnier@huntonak.com |
| New York Power Authority | Javier Bucobo<br>Assistant General Counsel<br>New York Power Authority<br>123 MAIN ST<br>WHITE PLAINS, NEW YORK 10601<br>UNITED STATES<br>javier.bucobo@nypa.gov | |
| New York Power Authority | Javier Bucobo<br>Assistant General Counsel<br>New York Power Authority<br>123 MAIN ST<br>WHITE PLAINS, NEW YORK 10601<br>UNITED STATES<br>javier.bucobo@nypa.gov | |
| New York Power Authority | Peter Casper<br>Peter Casper<br>30 South Pearl<br>Albany, NEW YORK 12207<br>UNITED STATES<br>peter.casper@nypa.gov | |

| | | |
|---|---|---|
| New York Power Authority | Javier Bucobo<br>Assistant General Counsel<br>New York Power Authority<br>123 MAIN ST<br>WHITE PLAINS, NEW YORK 10601<br>UNITED STATES<br>javier.bucobo@nypa.gov | |
| New York State Electric & Gas Corporation | Danielle Mechling<br>Avangrid Networks, Inc.<br>180 MARSH HILL RD<br>ORANGE, CONNECTICUT 06477<br>UNITED STATES<br>Danielle.Mechling@avangrid.com | |
| New York State Energy Research & Dev. Authority | Sarah Simpson<br>Senior Counsel II<br>New York State Energy Research and Development Authority<br>1359 Broadway<br>19th Floor<br>NEW YORK, NEW YORK 10018<br>UNITED STATES<br>sarah.simpson@nyserda.ny.gov | |
| New York State Energy Research & Dev. Authority | Peter Costello<br>New York State Energy Research and Development Authority<br>17 COLUMBIA CIR<br>ALBANY, NEW YORK 12203<br>UNITED STATES<br>peter.costello@nyserda.ny.gov | |
| New York State Public | Justin Fung<br>3 Empire State Plaza<br>Albany, NEW YORK 12223 | |

| | | |
|---|---|---|
| Service Commission | UNITED STATES<br>justin.fung@dps.ny.gov | |
| New York State Public Service Commission | Justin Fung<br>3 Empire State Plaza<br>Albany, NEW YORK 12223<br>UNITED STATES<br>justin.fung@dps.ny.gov | |
| New York State Public Service Commission | David Drexler<br>Assistant Counsel<br>New York Public Service Commission<br>Three Empire State Plaza<br>Albany, NEW YORK<br>UNITED STATES<br>david.drexler@dps.ny.gov | |
| New York Transco, LLC | Evan Reese<br>Partner<br>Day Pitney LLP<br>555 11th Street, NW<br>Washington, DISTRICT OF COLUMBIA 20004<br>UNITED STATES<br>ereese@daypitney.com | |
| New York Transco, LLC | Margaret Czepiel<br>Day Pitney LLP<br>555 11th Street NW<br>Suite 403<br>Washington, DISTRICT OF COLUMBIA 20004<br>UNITED STATES<br>mczepiel@daypitney.com | |
| New York Transco, LLC | Evan Reese<br>Partner<br>Day Pitney LLP<br>555 11th Street, NW<br>Washington, DISTRICT OF COLUMBIA 20004 | |

| | | |
|---|---|---|
| | UNITED STATES<br>ereese@daypitney.com | |
| New York Transmission Owners | Andrew Tunnell<br>Balch & Bingham LLP<br>Balch & Bingham LLP<br>1710 6TH AVE N<br>BIRMINGHAM, ALABAMA 35203<br>UNITED STATES<br>atunnell@balch.com | |
| New York Transmission Owners | Andrew Tunnell<br>Balch & Bingham LLP<br>Balch & Bingham LLP<br>1710 6TH AVE N<br>BIRMINGHAM, ALABAMA 35203<br>UNITED STATES<br>atunnell@balch.com | Abigail Fox<br>Balch & Bingham LLP<br>1710 6TH AVE N<br>BIRMINGHAM, ALABAMA 35203<br>afox@balch.com |
| New York Transmission Owners | | Lyle David Larson, ESQ<br>Partner, Balch & Bingham LLP<br>Balch & Bingham LLP<br>1710 6TH AVE N<br>BIRMINGHAM, ALABAMA 35203<br>llarson@balch.com |
| NewSun Energy | Jacob Stephens<br>Principal<br>NewSun Energy<br>2033 E SPEEDWAY BLVD STE 200<br>TUCSON, ARIZONA 85719<br>UNITED STATES<br>jstephens@newsunenergy.net | |
| NewSun Energy | Jacob Stephens<br>Principal<br>NewSun Energy<br>2033 E SPEEDWAY BLVD | |

| | | |
|---|---|---|
| | STE 200<br>TUCSON, ARIZONA 85719<br>UNITED STATES<br>jstephens@newsunenergy.net | |
| NextEra Energy, Inc. | Justin Moeller<br>Assistant General Counsel<br>Florida Power & Light Company<br>801 Pennsylvania Avenue, NW<br>Suite 220<br>Washington, DISTRICT OF COLUMBIA 20004<br>UNITED STATES<br>justin.moeller@fpl.com | |
| NextEra Energy, Inc. | Gunnar Birgisson<br>Senior Attorney<br>NextEra Energy Resources, LLC<br>801 Pennsylvania Ave., N.W.<br>Suite 220<br>Washington, DISTRICT OF COLUMBIA 20004<br>UNITED STATES<br>gunnar.birgisson@nee.com | |
| NextEra Energy, Inc. | Joel Newton<br>Senior Attorney<br>NextEra Energy Resources, LLC<br>801 Pennsylvania Ave NW<br>Suite 220<br>Washington, DISTRICT OF COLUMBIA 20004<br>UNITED STATES<br>joel.newton@nee.com | |
| NextEra Energy, Inc. | Justin Moeller<br>Assistant General Counsel<br>Florida Power & Light Company | |

| | | |
|---|---|---|
| | 801 Pennsylvania Avenue, NW Suite 220 Washington, DISTRICT OF COLUMBIA 20004 UNITED STATES justin.moeller@fpl.com | |
| NextEra Energy, Inc. | Gunnar Birgisson Senior Attorney NextEra Energy Resources, LLC 801 Pennsylvania Ave., N.W. Suite 220 Washington, DISTRICT OF COLUMBIA 20004 UNITED STATES gunnar.birgisson@nee.com | |
| NextEra Energy, Inc. | Joel Newton Senior Attorney NextEra Energy Resources, LLC 801 Pennsylvania Ave NW Suite 220 Washington, DISTRICT OF COLUMBIA 20004 UNITED STATES joel.newton@nee.com | |
| NextEra Energy, Inc. | Alona Sias alona.sias@nee.com | |
| NextEra Energy, Inc. | David Tewksbury Partner McDermott Will & Emery LLP 500 N CAPITOL ST NW WASHINGTON, DISTRICT OF COLUMBIA 20001 UNITED STATES dtewksbury@mwe.com | |

169

| | | |
|---|---|---|
| NextEra Energy, Inc. | Stephanie Lim<br>McDermott Will & Emery LLP<br>The McDermott Building<br>500 North Capitol Street, NW<br>Washington, DISTRICT OF COLUMBIA 20001<br>UNITED STATES<br>slim@mwe.com | |
| NextEra Energy, Inc. | Justin Moeller<br>Assistant General Counsel<br>Florida Power & Light Company<br>801 Pennsylvania Avenue, NW Suite 220<br>Washington, DISTRICT OF COLUMBIA 20004<br>UNITED STATES<br>justin.moeller@fpl.com | |
| NextEra Energy, Inc. | David Tewksbury<br>Partner<br>McDermott Will & Emery LLP<br>500 N CAPITOL ST NW<br>WASHINGTON, DISTRICT OF COLUMBIA 20001<br>UNITED STATES<br>dtewksbury@mwe.com | Justin Moeller<br>Assistant General Counsel<br>Florida Power & Light Company<br>801 Pennsylvania Avenue, NW Suite 220<br>Washington, DISTRICT OF COLUMBIA 20004<br>justin.moeller@fpl.com |
| NextEra Energy, Inc. | Stephanie Lim<br>McDermott Will & Emery LLP<br>The McDermott Building<br>500 North Capitol Street, NW<br>Washington, DISTRICT OF COLUMBIA 20001<br>UNITED STATES<br>slim@mwe.com | |
| Niagara Mohawk d/b/a/ | David Lodemore<br>Senior Counsel, National Grid<br>National Grid USA | |

| | | |
|---|---|---|
| National Grid | 40 Sylvan Road<br>Waltham, MASSACHUSETTS 02451<br>UNITED STATES<br>david.lodemore@nationalgrid.com | |
| Niagara Mohawk d/b/a/ National Grid | Christopher Novak<br>National Grid<br>National Grid<br>40 Sylvan Road<br>Waltham, MASSACHUSETTS 02541<br>UNITED STATES<br>chris.novak@nationalgrid.com | |
| NIPPC | Irion Sanger<br>Sanger Law, PC<br>1041 SE 58th PL<br>PORTLAND, OREGON 97215<br>UNITED STATES<br>irion@sanger-law.com | |
| Niskanen Center | Elizabeth Reed<br>Research Manager for Low Carbo<br>Niskanen Center<br>820 First St NE<br>Suite 600<br>Washington, DISTRICT OF COLUMBIA 20002<br>UNITED STATES<br>lreed@niskanencenter.org | |
| Niskanen Center | Megan Gibson<br>Niskanen Center<br>820 1ST ST NE<br>WASHINGTON, DISTRICT OF COLUMBIA 20002<br>UNITED STATES<br>mgibson@niskanencenter.org | |

| | | |
|---|---|---|
| North American Electric Reliability Corporation | Candice Castaneda<br>Senior Counsel<br>North American Electric Reliability Corporation<br>1325 G Street, NW<br>Suite 600<br>Washington, DISTRICT OF COLUMBIA 20005<br>UNITED STATES<br>candice.castaneda@nerc.net | |
| North American Electric Reliability Corporation | Candice Castaneda<br>Senior Counsel<br>North American Electric Reliability Corporation<br>1325 G Street, NW<br>Suite 600<br>Washington, DISTRICT OF COLUMBIA 20005<br>UNITED STATES<br>candice.castaneda@nerc.net | Amy E Engstrom<br>Associate Counsel<br>NERC<br>1401 H Street, NW<br>Suite 410<br>WASHINGTON, DISTRICT OF COLUMBIA 20005<br>amy.engstrom@nerc.net |
| North Attleborough Electric Department | John Coyle<br>Duncan & Allen LLP<br>Suite 700<br>1730 Rhode Island Avenue, N.W.<br>Washington, DISTRICT OF COLUMBIA 20036-3115<br>UNITED STATES<br>jpc@duncanallen.com | |
| North Attleborough Electric Department | John Coyle<br>Duncan & Allen LLP<br>Suite 700<br>1730 Rhode Island Avenue, N.W.<br>Washington, DISTRICT OF COLUMBIA 20036-3115<br>UNITED STATES<br>jpc@duncanallen.com | |

| | | |
|---|---|---|
| North Attleborough Electric Department | John Coyle<br>Duncan & Allen LLP<br>Suite 700<br>1730 Rhode Island Avenue, N.W.<br>Washington, DISTRICT OF COLUMBIA 20036-3115<br>UNITED STATES<br>jpc@duncanallen.com | |
| North Carolina Sustainable Energy Association | Nicholas Guidi<br>Southern Environmental Law Center<br>122 C ST NW STE 325<br>WASHINGTON, DISTRICT OF COLUMBIA 20001<br>UNITED STATES<br>nguidi@selcdc.org | |
| North Carolina Sustainable Energy Association | Nicholas Guidi<br>Southern Environmental Law Center<br>122 C ST NW STE 325<br>WASHINGTON, DISTRICT OF COLUMBIA 20001<br>UNITED STATES<br>nguidi@selcdc.org | |
| North Carolina Sustainable Energy Association | Nicholas Guidi<br>Southern Environmental Law Center<br>122 C ST NW STE 325<br>WASHINGTON, DISTRICT OF COLUMBIA 20001<br>UNITED STATES<br>nguidi@selcdc.org | |
| North Carolina Utilities Commission | Jennifer Harrod<br>Senior Counsel<br>North Carolina Utilities Commission<br>430 N SALISBURY ST | |

| | | |
|---|---|---|
| | RALEIGH, NORTH CAROLINA 27603 UNITED STATES jharrod@ncuc.net | |
| North Carolina Utilities Commission | Jennifer Harrod Senior Counsel North Carolina Utilities Commission 430 N SALISBURY ST RALEIGH, NORTH CAROLINA 27603 UNITED STATES jharrod@ncuc.net | |
| North Carolina Utilities Commission | Jennifer Harrod Senior Counsel North Carolina Utilities Commission 430 N SALISBURY ST RALEIGH, NORTH CAROLINA 27603 UNITED STATES jharrod@ncuc.net | |
| North Carolina Utilities Commission | Jennifer Harrod Senior Counsel North Carolina Utilities Commission 430 N SALISBURY ST RALEIGH, NORTH CAROLINA 27603 UNITED STATES jharrod@ncuc.net | |
| North Carolina Utilities Commission | Jennifer Harrod Senior Counsel North Carolina Utilities Commission 430 N SALISBURY ST RALEIGH, NORTH CAROLINA 27603 | |

| | UNITED STATES<br>jharrod@ncuc.net | |
|---|---|---|
| North Carolina Utilities Commission Public Staff | Robert Josey<br>North Carolina Utilities Commission Public Staff<br>430 N Salisbury St<br>Raleigh, NORTH CAROLINA 27699<br>UNITED STATES<br>robert.josey@psncuc.nc.gov | |
| North Carolina Utilities Commission Public Staff | Robert Josey<br>North Carolina Utilities Commission Public Staff<br>430 N Salisbury St<br>Raleigh, NORTH CAROLINA 27699<br>UNITED STATES<br>robert.josey@psncuc.nc.gov | Robert Josey<br>North Carolina Utilities Commission Public Staff<br>430 N Salisbury St<br>Raleigh, NORTH CAROLINA 27699<br>robert.josey@psncuc.nc.gov |
| North Carolina Utilities Commission Public Staff | | Layla Cummings<br>Staff Attorney<br>North Carolina Utilities Commission Public Staff<br>430 N Salsibury Street<br>RALEIGH, NORTH CAROLINA 27603<br>layla.cummings@psncuc.nc.gov |
| North Carolina Utilities Commission Public Staff | Robert Josey<br>North Carolina Utilities Commission Public Staff<br>430 N Salisbury St<br>Raleigh, NORTH CAROLINA 27699<br>UNITED STATES<br>robert.josey@psncuc.nc.gov | Layla Cummings<br>Staff Attorney<br>North Carolina Utilities Commission Public Staff<br>430 N Salsibury Street<br>RALEIGH, NORTH CAROLINA 27603<br>layla.cummings@psncuc.nc.gov |
| North Carolina Utilities | Robert Josey<br>North Carolina Utilities Commission Public Staff | |

| | | |
|---|---|---|
| Commission Public Staff | 430 N Salisbury St Raleigh, NORTH CAROLINA 27699 UNITED STATES robert.josey@psncuc.nc.gov | |
| North Carolina Utilities Commission Public Staff | Robert Josey North Carolina Utilities Commission Public Staff 430 N Salisbury St Raleigh, NORTH CAROLINA 27699 UNITED STATES robert.josey@psncuc.nc.gov | |
| North Dakota Public Service Commission | John Schuh North Dakota Public Service Commission 600 E Boulevard Ave #408 Bismarck, ND 58505 Bismarck, NORTH DAKOTA 58505 UNITED STATES jschuh@nd.gov | |
| North Dakota Public Service Commission | John Schuh North Dakota Public Service Commission 600 E Boulevard Ave #408 Bismarck, ND 58505 Bismarck, NORTH DAKOTA 58505 UNITED STATES jschuh@nd.gov | |
| North Dakota Public Service Commission | John Schuh North Dakota Public Service Commission 600 E Boulevard Ave #408 Bismarck, ND 58505 Bismarck, NORTH DAKOTA 58505 | |

| | | |
|---|---|---|
| | UNITED STATES<br>jschuh@nd.gov | |
| Northeast Power Coordinating Council, Inc. | Kristin McKeown<br>General Counsel<br>Northeast Power Coordinating Council, Inc.<br>1040 Avenue of the Americas<br>10th Floor<br>New York, NEW YORK 10018-3703<br>UNITED STATES<br>kmckeown@npcc.org | |
| Northeast Power Coordinating Council, Inc. | Damase Hebert<br>Associate General Counsel and Northeast Power Coordinating Council, Inc.<br>1040 AVENUE OF THE AMERICAS FL 10<br>NEW YORK, NEW YORK 10018<br>UNITED STATES<br>dhebert@npcc.org | |
| Northern Virginia Electric Cooperative, Inc. | Alan Robbins<br>Partner<br>Washington Energy Law LLP<br>900 17TH ST NW STE 500-A<br>WASHINGTON, DISTRICT OF COLUMBIA 20006<br>UNITED STATES<br>arobbins@washingtonenergylaw.com | Patrick Toulme<br>Northern Virginia Electric Cooperative,<br>10323 Lomond Drive<br>Manassas, VIRGINIA 20109<br>ptoulme@novec.com |
| Northern Virginia Electric Cooperative, Inc. | Debra Roby<br>Partner<br>Washington Energy Law LLP<br>900 17TH ST NW STE 500-A<br>WASHINGTON, DISTRICT OF COLUMBIA 20006<br>UNITED STATES | |

177

| | | |
|---|---|---|
| | droby@washingtonenergylaw.com | |
| Northern Virginia Electric Cooperative, Inc. | Andrea Sarmentero Garzon<br>Duncan, Weinberg, Genzer & Pembroke, P.C.<br>1655 Fort Myer Drive<br>#759<br>Arlington, VIRGINIA 22209<br>UNITED STATES<br>asg@dwgp.com | |
| Northwest & Intermountain Power Producers Coalition | Irion Sanger<br>Sanger Law, PC<br>1041 SE 58th PL<br>PORTLAND, OREGON 97215<br>UNITED STATES<br>irion@sanger-law.com | |
| Northwest & Intermountain Power Producers Coalition | Irion Sanger<br>Sanger Law, PC<br>1041 SE 58th PL<br>PORTLAND, OREGON 97215<br>UNITED STATES<br>irion@sanger-law.com | |
| Northwest & Intermountain Power Producers Coalition | Irion Sanger<br>Sanger Law, PC<br>1041 SE 58th PL<br>PORTLAND, OREGON 97215<br>UNITED STATES<br>irion@sanger-law.com | |
| Northwest Energy Coalition | Danielle Fidler<br>Senior Attorney<br>EARTHJUSTICE<br>48 WALL ST FL 15<br>NEW YORK, NEW YORK 10005<br>UNITED STATES<br>dfidler@earthjustice.org | |

| | | |
|---|---|---|
| Northwest Energy Coalition | Fred Heutte<br>313 SE 27th<br>Portland, OREGON 97214<br>UNITED STATES<br>fred@nwenergy.org | |
| Norwood Light & Broadband Department | John Coyle<br>Duncan & Allen LLP<br>Suite 700<br>1730 Rhode Island Avenue, N.W.<br>Washington, DISTRICT OF COLUMBIA 20036-3115<br>UNITED STATES<br>jpc@duncanallen.com | |
| Norwood Light & Broadband Department | John Coyle<br>Duncan & Allen LLP<br>Suite 700<br>1730 Rhode Island Avenue, N.W.<br>Washington, DISTRICT OF COLUMBIA 20036-3115<br>UNITED STATES<br>jpc@duncanallen.com | |
| Norwood Light & Broadband Department | John Coyle<br>Duncan & Allen LLP<br>Suite 700<br>1730 Rhode Island Avenue, N.W.<br>Washington, DISTRICT OF COLUMBIA 20036-3115<br>UNITED STATES<br>jpc@duncanallen.com | |
| NRDC/FERC Project | Cullen Howe<br>Attorney<br>Natural Resources Defense Council<br>40 West 20th Street<br>New York, NEW YORK 10011 | |

| | | |
|---|---|---|
| | UNITED STATES<br>chowe@nrdc.org | |
| NRDC/FERC Project | Cullen Howe<br>Attorney<br>Natural Resources Defense Council<br>40 West 20th Street<br>New York, NEW YORK 10011<br>UNITED STATES<br>chowe@nrdc.org | |
| NRDC/FERC Project | Danielle Fidler<br>Senior Attorney<br>EARTHJUSTICE<br>48 WALL ST FL 15<br>NEW YORK, NEW YORK 10005<br>UNITED STATES<br>dfidler@earthjustice.org | |
| NRG Energy, Inc. | Travis Kavulla<br>Vice President, Regulatory Aff<br>NRG Energy, Inc.<br>804 Carnegie Center<br>Princeton, NEW JERSEY 08540<br>UNITED STATES<br>travis.kavulla@nrg.com | |
| NRG Energy, Inc. | Travis Kavulla<br>Vice President, Regulatory Aff<br>NRG Energy, Inc.<br>804 Carnegie Center<br>Princeton, NEW JERSEY 08540<br>UNITED STATES<br>travis.kavulla@nrg.com | |
| NV Energy, Inc. | Christopher Jones<br>Troutman Pepper Hamilton Sanders LLP | Sidney Villanueva<br>Troutman Sanders LLP<br>100 SW Main St, Suite 1000 |

|  | 401 9th Street NW, Suite 1000<br>Washington, DISTRICT OF<br>COLUMBIA 20004<br>UNITED STATES<br>chris.jones@troutman.com | Portland, OREGON 97204<br>sidney.villanueva@troutman.com |
|---|---|---|
| NW Energy<br>Coalition | Fred Heutte<br>313 SE 27th<br>Portland, OREGON 97214<br>UNITED STATES<br>fred@nwenergy.org |  |
| NW Energy<br>Coalition | Fred Heutte<br>313 SE 27th<br>Portland, OREGON 97214<br>UNITED STATES<br>fred@nwenergy.org |  |
| Office of<br>Governor Jay<br>Inslee of<br>Washington<br>State | Geoffrey Potter<br>Deputy Director, Office of Fed<br>Office of Governor Jay Inslee of<br>Washington State<br>400 N. Capitol Street NW<br>Suite 372<br>Washington, DISTRICT OF<br>COLUMBIA 20001<br>UNITED STATES<br>geoff.potter@gov.wa.gov |  |
| Office of<br>Ohio<br>Consumers'<br>Counsel |  | Denise C Goulet<br>Partner<br>McCarter & English, LLP<br>1301 K ST NW<br>SUITE 1000 WEST<br>WASHINGTON, DISTRICT<br>OF COLUMBIA 20005<br>dgoulet@mccarter.com |
| Office of the<br>Attorney<br>General of<br>Virginia | John Farmer<br>Assistant Attorney General<br>Office of the Attorney General<br>of Virginia | Charles Meade Browder, JR<br>Senior Assistant Attorney Gene<br>Virginia Office of Attorney<br>General |

| | | |
|---|---|---|
| | 202 N NINTH ST<br>RICHMOND, VIRGINIA<br>23219<br>UNITED STATES<br>jfarmer@oag.state.va.us | 202 N 9TH ST<br>RICHMOND, VIRGINIA<br>23219<br>mbrowder@oag.state.va.us |
| Office of the Attorney General of Virginia | | Charles M Burton, JR<br>Charles Mitchell Burton, Jr.<br>Office of the Attorney General of Virginia<br>202 N. Ninth St.<br>Richmond, VIRGINIA 23219<br>cburtonjr@oag.state.va.us |
| Office of the People's Counsel for the District of Columbia | Frederick Heinle<br>Assistant People's Counsel<br>Office of the People's Counsel for the District of Columbia<br>1133 15th Street, N.W., Suite 500<br>Washington, DISTRICT OF COLUMBIA 20111<br>UNITED STATES<br>fheinle@opc-dc.gov | Ankush Nayar<br>Assistant People's Counsel<br>655 15TH ST NW<br>WASHINGTON, DISTRICT OF COLUMBIA 20005<br>anayar@opc-dc.gov |
| Office of the People's Counsel for the District of Columbia | Frederick Heinle<br>Assistant People's Counsel<br>Office of the People's Counsel for the District of Columbia<br>1133 15th Street, N.W., Suite 500<br>Washington, DISTRICT OF COLUMBIA 20111<br>UNITED STATES<br>fheinle@opc-dc.gov | Anjali G Patel<br>Vice President for Clean Energ<br>Americans for a Clean Energy Grid<br>3100 CLARENDON BLVD STE 800<br>ARLINGTON, VIRGINIA 22201<br>anjali@dgardiner.com |
| Ohio Federal Energy Advocate | Thomas Lindgren<br>Assistant Attorney General<br>Public Utilities Commission of Ohio<br>30 East Broad Street<br>16th Floor | Lori Sternisha<br>Public Utilities Commission of Ohio<br>180 East Broad Street<br>3rd Floor |

182

| | | |
|---|---|---|
| | Columbus, OHIO 43215-3793 UNITED STATES thomas.lindgren@ohioattorneygeneral.gov | Columbus, OHIO 43215 lori.sternisha@puco.ohio.gov |
| Ohio Federal Energy Advocate | Thomas Lindgren Assistant Attorney General Public Utilities Commission of Ohio 30 East Broad Street 16th Floor Columbus, OHIO 43215-3793 UNITED STATES thomas.lindgren@ohioattorneygeneral.gov | Sarah Parrot Federal Energy Advocate Public Utilities Commission of Ohio 180 E BROAD ST COLUMBUS, OHIO 43215 sarah.parrot@puco.ohio.gov |
| Oklahoma Corporation Commission | Jason Chaplin PUD Chief Oklahoma Corporation Commission 2101 North Lincoln Blvd Oklahoma City, OKLAHOMA 73105 UNITED STATES jason.chaplin@occ.ok.gov | |
| Oklahoma Corporation Commission | Jason Chaplin PUD Chief Oklahoma Corporation Commission 2101 North Lincoln Blvd Oklahoma City, OKLAHOMA 73105 UNITED STATES jason.chaplin@occ.ok.gov | |
| Oklahoma Gas and Electric Company | usha turner turnerum@oge.com | Robert J Tallman Sr. Manager RTO Policy Oklahoma Gas & Electric Company 321 N Harvey Avenue Oklahoma City, OKLAHOMA |

| | | |
|---|---|---|
| | | 73101<br>tallmarj@oge.com |
| Oklahoma Gas and Electric Company | | James C. Beh<br>Jones Day<br>51 Louisiana Ave., NW<br>Washington, DISTRICT OF COLUMBIA 20001<br>jcbeh@jonesday.com |
| Old Dominion Electric Cooperative | Whit Williamson<br>Director - Power Supply<br>Thompson Coburn LLP<br>4201 Dominion Blvd<br>Glen Allen, VIRGINIA 23060<br>UNITED STATES<br>wwilliamson@odec.com | Jecoliah R. Williams<br>Thompson Coburn LLP<br>1909 K Street N.W.<br>Suite 600<br>WASHINGTON, DISTRICT OF COLUMBIA 20006<br>jwilliams@thompsoncoburn.com |
| Omaha Public Power District | Joseph Lang<br>Manager, FERC & SPP Policy<br>Omaha Public Power District<br>4325 Jones Plaza<br>Omaha, NEBRASKA 68501<br>UNITED STATES<br>jelang@oppd.com | Luke Haner<br>RTO Policy Manager<br>Omaha Public Power District<br>444 S 16th Street Mall<br>Omaha, NEBRASKA 68102<br>lphaner@oppd.com |
| Omaha Public Power District | Joseph Lang<br>Manager, FERC & SPP Policy<br>Omaha Public Power District<br>4325 Jones Plaza<br>Omaha, NEBRASKA 68501<br>UNITED STATES<br>jelang@oppd.com | Collin J Sniff<br>Energy Regulatory Policy Manag<br>Omaha Public Power District<br>444 S 16TH STREET MALL<br>OMAHA, NEBRASKA 68102<br>cjsniff@oppd.com |
| Onward Energy Holdings, LLC | Jordan Pinjuv<br>Wilkinson Barker Knauer, LLP<br>2138 W 32ND AVE STE 300<br>DENVER, COLORADO 80211<br>UNITED STATES<br>jpinjuv@wbklaw.com | |

| | | |
|---|---|---|
| Open Markets Institute | Megan Gibson<br>Niskanen Center<br>820 1ST ST NE<br>WASHINGTON, DISTRICT OF COLUMBIA 20002<br>UNITED STATES<br>mgibson@niskanencenter.org | |
| Orange and Rockland Utilities, Inc. | Susan LoFrumento<br>Consolidated Edison Company of New York, Inc.<br>4 Irving Place<br>New York, NEW YORK 10003<br>UNITED STATES<br>lofrumentos@coned.com | |
| Organization of MISO States, Inc. | Brad Pope<br>Direct. of Legal and Reg. Affa<br>811 E. Washington Avenue<br>Suite 400<br>Madison, WISCONSIN 53703<br>UNITED STATES<br>brad@misostates.org | |
| Organization of MISO States, Inc. | Benjamin Sloan<br>Organization of MISO States, Inc.<br>811 E Washington<br>Suite 400<br>Madison, WISCONSIN 53703<br>UNITED STATES<br>ben@misostates.org | Tricia DeBleeckere<br>Executive Director<br>Organization of MISO States, Inc.<br>811 E. Washington, Suite 400<br>Madison, WISCONSIN 53703<br>tricia@misostates.org |
| Organization of MISO States, Inc. | | Brad Pope<br>Direct. of Legal and Reg. Affa<br>Organization of MISO States, Inc.<br>811 E. Washington Avenue<br>Suite 400<br>Madison, WISCONSIN 53703<br>brad@misostates.org |

| | | |
|---|---|---|
| Organization of PJM States, Inc. | Gregory Carmean<br>Executive Director<br>Organization of PJM States, Inc.<br>700 Barksdale Road<br>Suite 1<br>Newark, DELAWARE 19711<br>UNITED STATES<br>greg@opsi.us | |
| Organization of PJM States, Inc. | Gregory Carmean<br>Executive Director<br>Organization of PJM States, Inc.<br>700 Barksdale Road<br>Suite 1<br>Newark, DELAWARE 19711<br>UNITED STATES<br>greg@opsi.us | |
| Organization of PJM States, Inc. | Gregory Carmean<br>Executive Director<br>Organization of PJM States, Inc.<br>700 Barksdale Road<br>Suite 1<br>Newark, DELAWARE 19711<br>UNITED STATES<br>greg@opsi.us | |
| Organization of PJM States, Inc. | Gregory Carmean<br>Executive Director<br>Organization of PJM States, Inc.<br>700 Barksdale Road<br>Suite 1<br>Newark, DELAWARE 19711<br>UNITED STATES<br>greg@opsi.us | |
| Orsted North America Inc. | Eric Wilkinson<br>Orsted North America Inc.<br>20 Gray St.<br>Amherst, MASSACHUSETTS 01002 | Eric Wilkinson<br>Orsted North America Inc.<br>20 Gray St.<br>Amherst, MASSACHUSETTS 01002<br>erwil@orsted.com |

| | | |
|---|---|---|
| | UNITED STATES<br>erwil@orsted.com | |
| Orsted North America Inc. | Eric Wilkinson<br>Orsted North America Inc.<br>20 Gray St.<br>Amherst, MASSACHUSETTS 01002<br>UNITED STATES<br>erwil@orsted.com | |
| Pacific Gas & Electric Company | Charles Middlekauff<br>Chief Counsel<br>Pacific Gas and Electric Company<br>PO Box 1018<br>Oakland,CALIFORNIA 94604-1018<br>UNITED STATES<br>Charles.Middlekauff@pge.com | |
| Pacific Gas and Electric Company | Charles Middlekauff<br>Chief Counsel<br>Pacific Gas and Electric Company<br>PO Box 1018<br>Oakland,CALIFORNIA 94604-1018<br>UNITED STATES<br>Charles.Middlekauff@pge.com | |
| Pacific Gas and Electric Company | Charles Middlekauff<br>Chief Counsel<br>Pacific Gas and Electric Company<br>PO Box 1018<br>Oakland,CALIFORNIA 94604-1018<br>UNITED STATES<br>Charles.Middlekauff@pge.com | |

| | | |
|---|---|---|
| Pacific Gas and Electric Company | Charles Middlekauff<br>Chief Counsel<br>Pacific Gas and Electric Company<br>PO Box 1018<br>Oakland,CALIFORNIA 94604-1018<br>UNITED STATES<br>Charles.Middlekauff@pge.com | |
| PacifiCorp | Robert Eckenrod<br>Assistant General Counsel<br>PacifiCorp<br>825 N.E. Multnomah<br>Suite 2000<br>Portland, OREGON 97232<br>UNITED STATES<br>robert.eckenrod@pacificorp.com | Sidney Villanueva<br>Troutman Sanders LLP<br>100 SW Main St, Suite 1000<br>Portland, OREGON 97204<br>sidney.villanueva@troutman.com |
| Pascoag Utility District | John Coyle<br>Duncan & Allen LLP<br>Suite 700<br>1730 Rhode Island Avenue, N.W.<br>Washington, DISTRICT OF COLUMBIA 20036-3115<br>UNITED STATES<br>jpc@duncanallen.com | |
| Pascoag Utility District | John Coyle<br>Duncan & Allen LLP<br>Suite 700<br>1730 Rhode Island Avenue, N.W.<br>Washington, DISTRICT OF COLUMBIA 20036-3115<br>UNITED STATES<br>jpc@duncanallen.com | |

| | | |
|---|---|---|
| Pattern Energy Group LP | Deral Danis<br>Assist. V. P. Transmission<br>Pattern Energy Group LP<br>1088 Sansome Street<br>San Francisco, CALIFORNIA 94111<br>UNITED STATES<br>deral.danis@patternenergy.com | Sarah Merrick<br>Senior Paralegal<br>Eversheds-Sutherland (US)LLP<br>600 Congress Ave., Suite 2000<br>Austin, TEXAS 78701<br>sarahmerrick@eversheds-sutherland.us |
| Pattern Energy Group LP | Joseph Hall<br>Eversheds Sutherland (US) LLP<br>700 Sixth Street, NW<br>Ste. 700<br>Washington, DISTRICT OF COLUMBIA 20001-3980<br>UNITED STATES<br>joehall@eversheds-sutherland.com | |
| Pattern Energy Group LP | Alex Goldberg<br>Eversheds Sutherland (US) LLP<br>1196 S MONROE ST<br>DENVER, COLORADO 80210<br>UNITED STATES<br>alexgoldberg@eversheds-sutherland.us | |
| Pattern Energy Group LP | Joseph Hall<br>Eversheds Sutherland (US) LLP<br>700 Sixth Street, NW<br>Ste. 700<br>Washington, DISTRICT OF COLUMBIA 20001-3980<br>UNITED STATES<br>joehall@eversheds-sutherland.com | |
| Pattern Energy Group LP | Alex Goldberg<br>Eversheds Sutherland (US) LLP<br>1196 S MONROE ST<br>DENVER, COLORADO 80210<br>UNITED STATES | |

| | | |
|---|---|---|
| | alexgoldberg@eversheds-sutherland.us | |
| Pennsylvania Public Utility Commission | Kriss Brown<br>Deputy Chief Counsel<br>Pennsylvania Public Utility Commission<br>P.O. Box 3265<br>Harrisburg, PENNSYLVANIA 17105-3265<br>UNITED STATES<br>kribrown@pa.gov | |
| Pennsylvania Public Utility Commission | David Alexander<br>Assistant Counsel<br>Pennsylvania Public Utility Commission<br>PO BOX 3265<br>HARRISBURG, PENNSYLVANIA 17105<br>UNITED STATES<br>davalexand@pa.gov | Elizabeth H Barnes<br>Deputy Chief Counsel<br>Pennsylvania Public Utility Commission<br>PO BOX 3265<br>HARRISBURG, PENNSYLVANIA 17105<br>ebarnes@pa.gov |
| Pennsylvania Public Utility Commission | Tiffany Tran<br>Assistant Counsel<br>Pennsylvania Public Utility Commission<br>P.O. Box 3265<br>Harrisburg, PENNSYLVANIA 17105<br>UNITED STATES<br>tiftran@pa.gov | |
| Pine Gate Renewables, LLC | Brett White<br>VP, Regulatory Affairs<br>Pine Gate Renewables, LLC<br>130 Roberts Street<br>Asheville, NORTH CAROLINA 28801<br>UNITED STATES<br>bwhite@pgrenewables.com | |

| | | |
|---|---|---|
| Pine Gate Renewables, LLC | Brett White<br>VP, Regulatory Affairs<br>Pine Gate Renewables, LLC<br>130 Roberts Street<br>Asheville, NORTH CAROLINA 28801<br>UNITED STATES<br>bwhite@pgrenewables.com | |
| Pine Gate Renewables, LLC | christina bigelow<br>Sr. Director, ISO/RTO Affairs<br>Pine Gate Renewables, LLC<br>130 ROBERTS ST<br>ASHEVILLE, NORTH CAROLINA 28801<br>UNITED STATES<br>christinabigelow@pgrenewables.com | |
| PJM Interconnection, L.L.C. | Pauline Foley<br>Assistant General Counsel<br>PJM Interconnection, L.L.C.<br>2750 Monroe Blvd<br>Norristown, PENNSYLVANIA 19403<br>UNITED STATES<br>pauline.foley@pjm.com | Mark J Stanisz<br>Assistant General Counsel<br>PJM Interconnection, L.L.C.<br>2750 Monroe Blvd.<br>Audubon, PENNSYLVANIA 19403<br>mark.stanisz@pjm.com |
| PJM Interconnection, L.L.C. | Jessica Lynch<br>Assistant General Counsel<br>PJM Interconnection, L.L.C.<br>2750 Monroe Blvd.<br>Audubon, PENNSYLVANIA 19403<br>UNITED STATES<br>jessica.lynch@pjm.com | Craig Glazer<br>V.P., Federal Gov't Policy<br>PJM Interconnection, L.L.C.<br>1200 G Street, N.W.<br>Suite 600<br>Washington, DISTRICT OF COLUMBIA 20005<br>craig.glazer@pjm.com |
| PJM Interconnection, L.L.C. | Pauline Foley<br>Assistant General Counsel<br>PJM Interconnection, L.L.C.<br>2750 Monroe Blvd<br>Norristown, PENNSYLVANIA | Craig Glazer<br>V.P., Federal Gov't Policy<br>PJM Interconnection, L.L.C.<br>1200 G Street, N.W.<br>Suite 600 |

| | 19403<br>UNITED STATES<br>pauline.foley@pjm.com | Washington, DISTRICT OF COLUMBIA 20005<br>craig.glazer@pjm.com |
|---|---|---|
| PJM Interconnection, L.L.C. | Jessica Lynch<br>Assistant General Counsel<br>PJM Interconnection, L.L.C.<br>2750 Monroe Blvd.<br>Audubon, PENNSYLVANIA 19403<br>UNITED STATES<br>jessica.lynch@pjm.com | |
| PJM Interconnection, L.L.C. | Pauline Foley<br>Assistant General Counsel<br>PJM Interconnection, L.L.C.<br>2750 Monroe Blvd<br>Norristown, PENNSYLVANIA 19403<br>UNITED STATES<br>pauline.foley@pjm.com | |
| PJM Interconnection, L.L.C. | Jessica Lynch<br>Assistant General Counsel<br>PJM Interconnection, L.L.C.<br>2750 Monroe Blvd.<br>Audubon, PENNSYLVANIA 19403<br>UNITED STATES<br>jessica.lynch@pjm.com | Pauline Foley, ESQ<br>Assistant General Counsel<br>PJM Interconnection, L.L.C.<br>2750 Monroe Blvd<br>Norristown, PENNSYLVANIA 19403<br>pauline.foley@pjm.com |
| PJM Interconnection, L.L.C. | | Craig Glazer<br>V.P., Federal Gov't Policy<br>PJM Interconnection, L.L.C.<br>1200 G Street, N.W.<br>Suite 600<br>Washington, DISTRICT OF COLUMBIA 20005<br>craig.glazer@pjm.com |

| | | |
|---|---|---|
| PJM Interconnection, L.L.C. | Pauline Foley<br>Assistant General Counsel<br>PJM Interconnection, L.L.C.<br>2750 Monroe Blvd<br>Norristown, PENNSYLVANIA 19403<br>UNITED STATES<br>pauline.foley@pjm.com | |
| Portland General Electric Company | Donald Light<br>Assistant General Counsel<br>Portland General Electric Company<br>121 SW Salmon Street 1WTC1301<br>Portland, OREGON 97204<br>UNITED STATES<br>donald.light@pgn.com | Alexis A Campbell<br>Portland General Electric Company<br>121 SW SALMON ST # 3WTC04<br>PORTLAND, OREGON 97204<br>alexis.campbell@pgn.com |
| Portland General Electric Company | Cece Coleman<br>Sr. Assistant General Counsel<br>Portland General Electric Company<br>121 SW SALMON ST # 1WTC1301<br>PORTLAND, OREGON 97204<br>UNITED STATES<br>cece.coleman@pgn.com | Shaun Foster<br>Senior Analyst - Transmission, Portland General Electric Company<br>121 SW Salmon St 3WTC0409<br>Portland, OREGON 97204<br>shaun.foster@pgn.com |
| Potomac Economics, Ltd. | David Patton<br>Potomac Economics<br>9990 FAIRFAX BLVD STE 560<br>FAIRFAX, VIRGINIA 22030<br>UNITED STATES<br>dpatton@potomaceconomics.com | |
| Potomac Economics, Ltd. | David Patton<br>Potomac Economics<br>9990 FAIRFAX BLVD STE 560 | |

| | | |
|---|---|---|
| | FAIRFAX, VIRGINIA 22030 UNITED STATES dpatton@potomaceconomics.com | |
| PowerSouth Energy Cooperative | James Brew Stone Mattheis Xenopoulos & Brew, PC 1025 THOMAS JEFFERSON ST NW STE 800 WASHINGTON, DISTRICT OF COLUMBIA 20007 UNITED STATES jay.brew@smxblaw.com | |
| PowerSouth Energy Cooperative | James Brew Stone Mattheis Xenopoulos & Brew, PC 1025 THOMAS JEFFERSON ST NW STE 800 WASHINGTON, DISTRICT OF COLUMBIA 20007 UNITED STATES jay.brew@smxblaw.com | |
| PowerSouth Energy Cooperative | James Brew Stone Mattheis Xenopoulos & Brew, PC 1025 THOMAS JEFFERSON ST NW STE 800 WASHINGTON, DISTRICT OF COLUMBIA 20007 UNITED STATES jay.brew@smxblaw.com | |
| PowerSouth Energy Cooperative | James Brew Stone Mattheis Xenopoulos & Brew, PC 1025 THOMAS JEFFERSON ST NW STE 800 WASHINGTON, DISTRICT OF COLUMBIA 20007 | |

| | | |
|---|---|---|
| | UNITED STATES<br>jay.brew@smxblaw.com | |
| PPL Electric Utilities Corporation | Steven Nadel<br>PPL Services Corporation<br>2 North 9th St<br>Allentown, PENNSYLVANIA 18101<br>UNITED STATES<br>SMNadel@pplweb.com | |
| PPL Electric Utilities Corporation on behalf of the Indicated Transmission Owners | William Keyser<br>Steptoe LLP<br>1330 Connecticut Avenue, NW<br>Washington, DISTRICT OF COLUMBIA 20036-1795<br>UNITED STATES<br>wkeyser@steptoe.com | |
| PPL Electric Utilities Corporation on behalf of the Indicated Transmission Owners | Donald Kaplan<br>K&L Gates LLP<br>1601 K Street, NW<br>Washington, DISTRICT OF COLUMBIA 20006<br>UNITED STATES<br>don.kaplan@klgates.com | |
| PPL Electric Utilities Corporation on behalf of the Indicated Transmission Owners | Michelle Castaline<br>Steptoe LLP<br>Steptoe LLP<br>1300 CONNECTICUT AVE NW<br>WASHINGTON, DISTRICT OF COLUMBIA 20036<br>UNITED STATES<br>mcastaline@steptoe.com | |
| PPL Electric Utilities Corporation on Behalf of the PJM | Karen Bruni<br>Steptoe LLP<br>1330 CONNECTICUT AVE NW<br>WASHINGTON, DISTRICT | |

| | | |
|---|---|---|
| Transmission Owners | OF COLUMBIA 20036 UNITED STATES kbruni@steptoe.com | |
| PPL Electric Utilities Corporation on Behalf of the PJM Transmission Owners | Megan McDowell Steptoe LLP 1330 Connecticut Ave NW Washington, DISTRICT OF COLUMBIA 20036 UNITED STATES mmcdowell@steptoe.com | |
| PPL Services Corporation | Kelsey Colvin Senior Counsel LG&E and KU Services Company 220 W MAIN ST LOUISVILLE, KENTUCKY 40202 UNITED STATES kacolvin@pplweb.com | |
| Prysmian Group | Joseph Coffey Prysmian Group 9153 West Finland Drive Littleton, COLORADO 80127 UNITED STATES joseph.coffey@prysmiangroup.com | |
| PSEG Companies | Cara Lewis Managing Counsel - Federal Reg PSEG Companies 80 PARK PLZ # T5 NEWARK, NEW JERSEY 07102 UNITED STATES cara.lewis@pseg.com | Kyle H Henne Counsel - Regulatory & Legisla ITC Holdings Corp. 601 13TH ST NW STE 710S WASHINGTON, DISTRICT OF COLUMBIA 20005 khenne@itctransco.com |
| PSEG Companies | | Robert E. Gardinor Paralegal |

| | | |
|---|---|---|
| | | PSEG Services Corporation<br>80 Park Plaza, T5<br>Newark, NEW JERSEY 07102<br>Robert.Gardinor@pseg.com |
| PSEG Energy Resources & Trade LLC | Cara Lewis<br>Managing Counsel - Federal Reg<br>PSEG Companies<br>80 PARK PLZ # T5<br>NEWARK, NEW JERSEY 07102<br>UNITED STATES<br>cara.lewis@pseg.com | Kyle H Henne<br>Counsel - Regulatory & Legisla<br>ITC Holdings Corp.<br>601 13TH ST NW STE 710S<br>WASHINGTON, DISTRICT OF COLUMBIA 20005<br>khenne@itctransco.com |
| PSEG Energy Resources & Trade LLC | | Robert E. Gardinor<br>Paralegal<br>PSEG Services Corporation<br>80 Park Plaza, T5<br>Newark, NEW JERSEY 07102<br>Robert.Gardinor@pseg.com |
| PSEG Power LLC | Cara Lewis<br>Managing Counsel - Federal Reg<br>PSEG Companies<br>80 PARK PLZ # T5<br>NEWARK, NEW JERSEY 07102<br>UNITED STATES<br>cara.lewis@pseg.com | Kyle H Henne<br>Counsel - Regulatory & Legisla<br>ITC Holdings Corp.<br>601 13TH ST NW STE 710S<br>WASHINGTON, DISTRICT OF COLUMBIA 20005<br>khenne@itctransco.com |
| PSEG Power LLC | | Robert E. Gardinor<br>Paralegal<br>PSEG Services Corporation<br>80 Park Plaza, T5<br>Newark, NEW JERSEY 07102<br>Robert.Gardinor@pseg.com |
| PUBLIC CITIZEN | Tyson Slocum<br>Energy Program Director<br>Public Citizen's Energy Program | |

| | | |
|---|---|---|
| | 215 PENNSYLVANIA AVE SE<br>PUBLIC CITIZEN, INC.<br>WASHINGTON, DISTRICT OF COLUMBIA 20003<br>UNITED STATES<br>tslocum@citizen.org | |
| PUBLIC CITIZEN, INC | Tyson Slocum<br>Energy Program Director<br>Public Citizen's Energy Program<br>215 PENNSYLVANIA AVE SE<br>PUBLIC CITIZEN, INC.<br>WASHINGTON, DISTRICT OF COLUMBIA 20003<br>UNITED STATES<br>tslocum@citizen.org | |
| Public Interest Organizations | Frank Rambo<br>Southern Environmental Law Center<br>120 GARRETT ST STE 400<br>CHARLOTTESVILLE, VIRGINIA 22902<br>UNITED STATES<br>frambo@selcva.org | Katie Southworth<br>Southface Institute<br>ksouthworth@southface.org |
| Public Interest Organizations | Tom Rutigliano<br>Sr. Advocate<br>Sustainable FERC Project<br>1124 15th St. NW<br>Suite 300<br>Washington, DISTRICT OF COLUMBIA 20005<br>UNITED STATES<br>trutigliano@nrdc.org | Fred Heutte<br>Northwest Energy Coalition<br>313 SE 27th<br>Portland, OREGON 97214<br>fred@nwenergy.org |
| Public Service Commission | Jacqueline Roberts<br>Federal Policy Advisor, WV Pub<br>West Virginia Public Service | |

| | | |
|---|---|---|
| of West Virginia | Commission<br>201 Brooks Street<br>Charleston, WEST VIRGINIA 25301<br>UNITED STATES<br>jroberts@psc.state.wv.us | |
| Public Service Commission of West Virginia | Jacqueline Roberts<br>Federal Policy Advisor, WV Pub<br>West Virginia Public Service Commission<br>201 Brooks Street<br>Charleston, WEST VIRGINIA 25301<br>UNITED STATES<br>jroberts@psc.state.wv.us | |
| Public Service Commission of Wisconsin | Sophia Rogers<br>Assistant General Counsel<br>PO Box NA<br>MADISON,WISCONSIN 53705-7854<br>UNITED STATES<br>sophia.rogers1@wisconsin.gov | |
| Public Service Electric & Gas Company | Cara Lewis<br>Managing Counsel - Federal Reg<br>PSEG Companies<br>80 PARK PLZ # T5<br>NEWARK, NEW JERSEY 07102<br>UNITED STATES<br>cara.lewis@pseg.com | |
| Public Service Electric and Gas Company | Cara Lewis<br>Managing Counsel - Federal Reg<br>PSEG Companies<br>80 PARK PLZ # T5<br>NEWARK, NEW JERSEY | Kyle H Henne<br>Counsel - Regulatory & Legisla<br>ITC Holdings Corp.<br>601 13TH ST NW STE 710S<br>WASHINGTON, DISTRICT |

|  |  |  |
|---|---|---|
|  | 07102<br>UNITED STATES<br>cara.lewis@pseg.com | OF COLUMBIA 20005<br>khenne@itctransco.com |
| Public Service Electric and Gas Company |  | Robert E. Gardinor<br>Paralegal<br>PSEG Services Corporation<br>80 Park Plaza, T5<br>Newark, NEW JERSEY 07102<br>Robert.Gardinor@pseg.com |
| Public Systems | Scott Strauss<br>Spiegel & McDiarmid LLP<br>1818 N Street, NW<br>8th Floor<br>WASHINGTON, DISTRICT OF COLUMBIA 20036<br>UNITED STATES<br>Scott.Strauss@spiegelmcd.com | Jeffrey A Schwarz<br>Spiegel & McDiarmid LLP<br>1818 N Street, NW<br>8th Floor<br>WASHINGTON, DISTRICT OF COLUMBIA 20036<br>jeffrey.schwarz@spiegelmcd.com |
| Public Systems |  | E Service<br>Spiegel & McDiarmid LLP<br>1875 Eye St, NW<br>Suite 700<br>Washington, DISTRICT OF COLUMBIA 20006<br>eService@spiegelmcd.com |
| Public Systems |  | E Service<br>Spiegel & McDiarmid LLP<br>1875 Eye St, NW<br>Suite 700<br>Washington, DISTRICT OF COLUMBIA 20006<br>eService@spiegelmcd.com |
| Public Utilities Commission of Nevada | Cameron Dyer<br>Assistant General Counsel<br>Public Utilities Commission of Nevada<br>1150 E WILLIAM ST<br>CARSON CITY, NEVADA |  |

| | 89701<br>UNITED STATES<br>camerondyer@puc.nv.gov | |
|---|---|---|
| Public Utility Commission of Oregon | Jason Jones<br>jason.w.jones@doj.state.or.us | Jason W Jones<br>jason.w.jones@doj.state.or.us |
| Public Utility Commission of Oregon | | Pamela J Rojek<br>Legal Secretary<br>Dept of Justice - General Counsel Division<br>1162 COURT ST NE<br>DEPT OF JUSTICE - GENERAL COUNSEL DIVISION - BAS SECTIO<br>SALEM, OREGON 97301<br>pamela.rojek@doj.state.or.us |
| Public Utility Commission of Oregon | | Stephanie Andrus<br>Assistant Attorney General<br>Oregon Department of Justice<br>1162 Court Street, NE<br>Salem, OREGON 97301<br>stephanie.andrus@doj.state.or.us |
| Public Utility Commission of Texas | Debra Roby<br>Partner<br>Washington Energy Law LLP<br>900 17TH ST NW STE 500-A<br>WASHINGTON, DISTRICT OF COLUMBIA 20006<br>UNITED STATES<br>droby@washingtonenergylaw.com | |
| Public Utility Commission of Texas | Alan Robbins<br>Partner<br>Washington Energy Law LLP<br>900 17TH ST NW STE 500-A<br>WASHINGTON, DISTRICT | |

| | | |
|---|---|---|
| | OF COLUMBIA 20006<br>UNITED STATES<br>arobbins@washingtonenergyla<br>w.com | |
| Puget Sound Energy , Inc. | Robert Neate<br>Puget Sound Energy, Inc.<br>PO Box 97034<br>Bellevue,WASHINGTON<br>98009-9734<br>UNITED STATES<br>robert.neate@pse.com | Adam Bowler<br>Sr. Regulatory Compliance Anal<br>Puget Sound Energy<br>355 110th Ave NE, EST 10W<br>Bellevue, WASHINGTON<br>98004<br>adam.bowler@pse.com |
| Puget Sound Energy , Inc. | Shauna Tran<br>355 110th ave ne<br>bellevue, WASHINGTON<br>98009<br>UNITED STATES<br>Shauna.tran@pse.com | |
| Puget Sound Energy, Inc. | Robert Neate<br>Puget Sound Energy, Inc.<br>PO Box 97034<br>Bellevue,WASHINGTON<br>98009-9734<br>UNITED STATES<br>robert.neate@pse.com | Stephanie Imamovic<br>Puget Sound Energy<br>355 110th Ave NE<br>Bellevue, WASHINGTON<br>98004<br>stephanie.imamovic@pse.com |
| QCoefficient , Inc. | Vincent Cushing<br>310 South Michigan Avenue<br>#903<br>Chicago, ILLINOIS 60604<br>UNITED STATES<br>vince.cushing@buildingsasbatte<br>ries.com | William F Hederman<br>hederman@alum.mit.edu |
| QCoefficient , Inc. | Vincent Cushing<br>310 South Michigan Avenue<br>#903<br>Chicago, ILLINOIS 60604<br>UNITED STATES | |

| | vince.cushing@buildingsasbatteries.com | |
|---|---|---|
| R Street Institute | Devin Hartman<br>R Street Institute<br>1212 New York Ave NW #900<br>Washington, DISTRICT OF COLUMBIA 20005<br>UNITED STATES<br>dhartman@rstreet.org | |
| R Street Institute | Devin Hartman<br>R Street Institute<br>1212 New York Ave NW #900<br>Washington, DISTRICT OF COLUMBIA 20005<br>UNITED STATES<br>dhartman@rstreet.org | |
| R Street Institute | Devin Hartman<br>R Street Institute<br>1212 New York Ave NW #900<br>Washington, DISTRICT OF COLUMBIA 20005<br>UNITED STATES<br>dhartman@rstreet.org | |
| R Street Institute | Devin Hartman<br>R Street Institute<br>1212 New York Ave NW #900<br>Washington, DISTRICT OF COLUMBIA 20005<br>UNITED STATES<br>dhartman@rstreet.org | |
| Rail Electrification Council | James Hoecker<br>Senior Counsel<br>Husch Blackwell LLP | James Hoecker<br>Senior Counsel<br>Husch Blackwell LLP |

| | | |
|---|---|---|
| | 1801 PENNSYLVANIA AVE NW STE 1000 WASHINGTON, DISTRICT OF COLUMBIA 20006 UNITED STATES james.hoecker@huschblackwell.com | 1801 PENNSYLVANIA AVE NW STE 1000 WASHINGTON, DISTRICT OF COLUMBIA 20006 james.hoecker@huschblackwell.com |
| Rail Electrificatio n Council | James Hoecker Senior Counsel Husch Blackwell LLP 1801 PENNSYLVANIA AVE NW STE 1000 WASHINGTON, DISTRICT OF COLUMBIA 20006 UNITED STATES james.hoecker@huschblackwell.com | Leah Kaiser Husch Blackwell LLP 750 17th St. NW #900 Washington, DISTRICT OF COLUMBIA 20006 leah.kaiser@huschblackwell.com |
| Reading Municipal Light Department | John Coyle Duncan & Allen LLP Suite 700 1730 Rhode Island Avenue, N.W. Washington, DISTRICT OF COLUMBIA 20036-3115 UNITED STATES jpc@duncanallen.com | |
| Reading Municipal Light Department | John Coyle Duncan & Allen LLP Suite 700 1730 Rhode Island Avenue, N.W. Washington, DISTRICT OF COLUMBIA 20036-3115 UNITED STATES jpc@duncanallen.com | |
| Reading Municipal | John Coyle Duncan & Allen LLP Suite 700 | |

| | | |
|---|---|---|
| Light Department | 1730 Rhode Island Avenue, N.W.<br>Washington, DISTRICT OF COLUMBIA 20036-3115<br>UNITED STATES<br>jpc@duncanallen.com | |
| ReliabilityFirst Corporation | Megan Gambrel<br>Manager, Regulatory and Extern<br>3 SUMMIT PARK DR STE 600<br>CLEVELAND, OHIO 44131<br>UNITED STATES<br>megan.gambrel@rfirst.org | |
| ReliabilityFirst Corporation | Niki Schaefer<br>Vice President, General Counse<br>ReliabilityFirst Corporation<br>?3 Summit Park Drive<br>Suite 600<br>Cleveland, OHIO 44131<br>UNITED STATES<br>Niki.schaefer@rfirst.org | Megan E Gambrel, ESQ<br>Manager, Regulatory and Extern<br>3 SUMMIT PARK DR STE 600<br>CLEVELAND, OHIO 44131<br>megan.gambrel@rfirst.org |
| Renewable Northwest | Robin Arnold<br>Markets & Transmission Directo<br>Renewable Northwest<br>421 SW 6TH AVE STE 1400<br>PORTLAND, OREGON 97204<br>UNITED STATES<br>robin@renewablenw.org | |
| Resale Power Group of Iowa | David Crawford<br>Betts & Holt LLP<br>1101 Connecticut Avenue, N.W.<br>Suite 450<br>Washington, DISTRICT OF COLUMBIA 20036<br>UNITED STATES<br>dcrawford@bettsandholt.com | |

205

| | | |
|---|---|---|
| Resale Power Group of Iowa | Katherine Ann Wade<br>Betts & Holt LLP<br>1101 Connecticut Ave., N.W Ste. 450<br>WASHINGTON, DISTRICT OF COLUMBIA 20036<br>UNITED STATES<br>kaw@bettsandholt.com | |
| Rhode Island Division of Public Utilities and Carriers | Christy Hetherington<br>Rhode Island Division of Public Utilities and Carriers<br>89 JEFFERSON BLVD<br>WARWICK, RHODE ISLAND 02888<br>UNITED STATES<br>Christy.Hetherington@dpuc.ri.gov | Paul Roberti<br>Chief Economic and Policy Anal<br>Rhode Island Division of Public Utilities and Carriers<br>89 JEFFERSON BLVD<br>WARWICK, RHODE ISLAND 02888<br>Paul.Roberti@dpuc.ri.gov |
| Rhode Island Division of Public Utilities and Carriers | | Ellen Golde<br>Rhode Island Division of Public Utilities and Carriers<br>89 Jefferson Blvd<br>Warwick, RHODE ISLAND 02888<br>ellen.golde@dpuc.ri.gov |
| RMI | Charles Teplin<br>Principal<br>490 Junction Place #200<br>Boulder, COLORADO 80305<br>UNITED STATES<br>cteplin@rmi.org | |
| RMI | Charles Teplin<br>Principal<br>490 Junction Place #200<br>Boulder, COLORADO 80305<br>UNITED STATES<br>cteplin@rmi.org | |

206

| | | |
|---|---|---|
| RMI | Charles Teplin<br>Principal<br>490 Junction Place #200<br>Boulder, COLORADO 80305<br>UNITED STATES<br>cteplin@rmi.org | |
| RMI | Mathias Einberger<br>RMI<br>17 STATE ST FL 25 UNIT 2500<br>NEW YORK, NEW YORK 10004<br>UNITED STATES<br>meinberger@rmi.org | |
| Rochester Gas and Electric Corporation | Danielle Mechling<br>Avangrid Networks, Inc.<br>180 MARSH HILL RD<br>ORANGE, CONNECTICUT 06477<br>UNITED STATES<br>Danielle.Mechling@avangrid.com | |
| ROCKY MOUNTAIN INSTITUTE | Charles Teplin<br>Principal<br>490 Junction Place #200<br>Boulder, COLORADO 80305<br>UNITED STATES<br>cteplin@rmi.org | |
| ROWLEY MUNICIPAL LIGHTING PLANT | John Coyle<br>Duncan & Allen LLP<br>Suite 700<br>1730 Rhode Island Avenue, N.W.<br>Washington, DISTRICT OF COLUMBIA 20036-3115<br>UNITED STATES<br>jpc@duncanallen.com | |

| | | |
|---|---|---|
| RWE Renewables Americas, LLC | Paul Varnado<br>Assistant General Counsel<br>RWE Clean Energy, LLC<br>353 N. Clark Street<br>30th Floor<br>Chicago, ILLINOIS 60654<br>UNITED STATES<br>paul.varnado@rwe.com | |
| RWE Renewables Americas, LLC | Paul Varnado<br>Assistant General Counsel<br>RWE Clean Energy, LLC<br>353 N. Clark Street<br>30th Floor<br>Chicago, ILLINOIS 60654<br>UNITED STATES<br>paul.varnado@rwe.com | |
| Salt River Project Agricultural Improvement and Power District | Jonathan Schneider<br>Stinson LLP<br>Stinson LLP<br>1775 Pennsylvania Avenue NW<br>Washington, DISTRICT OF COLUMBIA 20006<br>UNITED STATES<br>jonathan.schneider@stinson.com | |
| San Diego Gas & Electric Company | Jonathan Newlander<br>Attorney<br>San Diego Gas & Electric Company<br>8330 Century Park Ct<br>San Diego, CALIFORNIA 92123<br>UNITED STATES<br>JNewlander@sdge.com | Pamela Mills<br>Regulatory Affairs Mgr<br>San Diego Gas & Electric<br>8330 Century Park<br>san diego, CALIFORNIA 92122<br>pmills@sdge.com |
| San Diego Gas and Electric Company | Jonathan Newlander<br>Attorney<br>San Diego Gas & Electric Company | Jonathan J. Newlander<br>Attorney<br>San Diego Gas & Electric Company |

| | | |
|---|---|---|
| | 8330 Century Park Ct<br>San Diego, CALIFORNIA 92123<br>UNITED STATES<br>JNewlander@sdge.com | 8330 Century Park Ct<br>San Diego, CALIFORNIA 92123<br>JNewlander@sdge.com |
| San Diego Gas and Electric Company | | Pamela Mills<br>Regulatory Affairs Mgr<br>San Diego Gas & Electric<br>8330 Century Park<br>san diego, CALIFORNIA 92122<br>pmills@sdge.com |
| San Diego Gas and Electric Company | Jonathan Newlander<br>Attorney<br>San Diego Gas & Electric Company<br>8330 Century Park Ct<br>San Diego, CALIFORNIA 92123<br>UNITED STATES<br>JNewlander@sdge.com | Pamela Mills<br>Regulatory Affairs Mgr<br>San Diego Gas & Electric<br>8330 Century Park<br>san diego, CALIFORNIA 92122<br>pmills@sdge.com |
| Schulte Associates LLC | Robert Schulte<br>Principal<br>Schulte Associates LLC<br>9504 Dellbrook Court<br>Raleigh, NORTH CAROLINA 27617<br>UNITED STATES<br>rhs@schulteassociates.com | |
| Securing America's Future Energy | Ladeene Freimuth<br>Consultant<br>The Freimuth Group<br>1750 16th Street NW<br>Unit 24<br>Washington, DISTRICT OF COLUMBIA 20009<br>UNITED STATES<br>ladeene@freimuthgroup.com | |

| | | |
|---|---|---|
| SERC Reliability Corporation | Holly Hawkins<br>General Counsel, SERC Reliabil<br>SERC Reliability Corporation<br>3701 Arco Corporate Drive<br>Suite 300<br>Charlotte, NORTH CAROLINA 28273<br>UNITED STATES<br>hhawkins@serc1.org | Drew R Slabaugh<br>Legal Counsel<br>SERC Reliability Corporation<br>2815 Coliseum Centre Dr.<br>Suite 500<br>Charlotte, NORTH CAROLINA 28217<br>dslabaugh@serc1.org |
| SERC Reliability Corporation | Drew Slabaugh<br>Legal Counsel<br>SERC Reliability Corporation<br>2815 Coliseum Centre Dr.<br>Suite 500<br>Charlotte, NORTH CAROLINA 28217<br>UNITED STATES<br>dslabaugh@serc1.org | |
| Shell Energy North America (U.S.), L.P. | Matthew Picardi<br>Vice President<br>Shell Energy North America (US), L.P.<br>36 Pinewood Ave.<br>Saratoga Springs, NEW YORK 12866<br>UNITED STATES<br>Matthew.Picardi@shell.com | |
| Shell Energy North America (U.S.), L.P. | Matthew Picardi<br>Vice President<br>Shell Energy North America (US), L.P.<br>36 Pinewood Ave.<br>Saratoga Springs, NEW YORK 12866<br>UNITED STATES<br>Matthew.Picardi@shell.com | |
| Shell Energy North | Matthew Picardi<br>Vice President | |

| | | |
|---|---|---|
| America (U.S.), L.P. | Shell Energy North America (US), L.P.<br>36 Pinewood Ave.<br>Saratoga Springs, NEW YORK 12866<br>UNITED STATES<br>Matthew.Picardi@shell.com | |
| Shell Energy North America (U.S.), LP | Matthew Picardi<br>Vice President<br>Shell Energy North America (US), L.P.<br>36 Pinewood Ave.<br>Saratoga Springs, NEW YORK 12866<br>UNITED STATES<br>Matthew.Picardi@shell.com | |
| Sierra Club | Danielle Fidler<br>Senior Attorney<br>EARTHJUSTICE<br>48 WALL ST FL 15<br>NEW YORK, NEW YORK 10005<br>UNITED STATES<br>dfidler@earthjustice.org | |
| Sierra Club | Gregory Wannier<br>Senior Attorney<br>Sierra Club<br>Environmental Law Program<br>2101 Webster Street<br>Oakland, CALIFORNIA 94612<br>UNITED STATES<br>greg.wannier@sierraclub.org | |
| Sierra Club | Danielle Fidler<br>Senior Attorney<br>EARTHJUSTICE<br>48 WALL ST FL 15<br>NEW YORK, NEW YORK 10005 | |

| | | |
|---|---|---|
| | UNITED STATES<br>dfidler@earthjustice.org | |
| Sierra Club | Gregory Wannier<br>Senior Attorney<br>Sierra Club<br>Environmental Law Program<br>2101 Webster Street<br>Oakland, CALIFORNIA 94612<br>UNITED STATES<br>greg.wannier@sierraclub.org | |
| Sierra Club | Justin Vickers<br>Senior Attorney<br>Sierra Club<br>Environmental Law Program<br>1229 W. Glenlake Ave.<br>Chicago, ILLINOIS 60660<br>UNITED STATES<br>justin.vickers@sierraclub.org | |
| Sierra Club | Justin Vickers<br>Senior Attorney<br>Sierra Club<br>Environmental Law Program<br>1229 W. Glenlake Ave.<br>Chicago, ILLINOIS 60660<br>UNITED STATES<br>justin.vickers@sierraclub.org | |
| Sierra Club | Justin Vickers<br>Senior Attorney<br>Sierra Club<br>Environmental Law Program<br>1229 W. Glenlake Ave.<br>Chicago, ILLINOIS 60660<br>UNITED STATES<br>justin.vickers@sierraclub.org | |
| Sierra Club | Justin Vickers<br>Senior Attorney<br>Sierra Club | |

| | | |
|---|---|---|
| | Environmental Law Program<br>1229 W. Glenlake Ave.<br>Chicago, ILLINOIS 60660<br>UNITED STATES<br>justin.vickers@sierraclub.org | |
| Six Cities CA | Margaret McNaul<br>Attorney<br>Thompson Coburn LLP<br>1909 K Street, N.W.<br>Suite 600<br>Washington, DISTRICT OF COLUMBIA 20006<br>UNITED STATES<br>mmcnaul@thompsoncoburn.com | Bonnie Susan Blair<br>Attorney<br>Thompson Coburn LLP<br>1909 K Street, N.W.<br>Suite 600<br>RTS-return to sender<br>Washington, DISTRICT OF COLUMBIA 20006<br>bblair@thompsoncoburn.com |
| Six Cities CA | | Rebecca L. Shelton<br>Thompson Coburn LLP<br>1909 K Street NW<br>Suite 600<br>Washington, DISTRICT OF COLUMBIA 20006<br>rshelton@thompsoncoburn.com |
| Six Cities CA | | Jecoliah R. Williams<br>Thompson Coburn LLP<br>1909 K Street N.W.<br>Suite 600<br>WASHINGTON, DISTRICT OF COLUMBIA 20006<br>jwilliams@thompsoncoburn.com |
| Six Cities CA | | Carrie A Thompson<br>Principal Integrated Resources<br>City of Anaheim, California<br>201 S ANAHEIM BLVD STE 802<br>ANAHEIM, CALIFORNIA 92805<br>cathompson@anaheim.net |

| | | |
|---|---|---|
| Six Cities CA | | Nicholas T Burki<br>Integrated Resources Planner I<br>ANAHEIM PUBLIC UTILITIES<br>201 S. Anaheim Blvd.<br>Suite 802<br>Anaheim, CALIFORNIA 92805<br>Nburki@anaheim.net |
| Six Cities CA | | Manny Robledo<br>Director of Utilities<br>Azusa Light and Water Department<br>729 N. Azusa Avenue<br>Azusa, CALIFORNIA 91702<br>mrobledo@azusaca.gov |
| Six Cities CA | | Thomas (Tom) A. Miller<br>176 East Lincoln<br>Banning, CALIFORNIA 92220<br>tmiller@ci.banning.ca.us |
| Six Cities CA | | Scott D Harding<br>Asst Director of Utility Opera<br>City of Colton, CA<br>650 N La Cadena Dr, Colton, CA 92324<br>Colton, CALIFORNIA 92324<br>sharding@coltonca.gov |
| Six Cities CA | | Susan Wilson<br>3901 Orange Street<br>Riverside, CALIFORNIA 92501<br>swilson@riversideca.gov |
| Six Cities CA | | Cindi Cohen<br>CITY OF RIVERSIDE PUBLIC UTIL DEPT<br>3901 Orange Street<br>Riverside, CALIFORNIA |

| | | |
|---|---|---|
| | | 92501<br>ccohen@riversideca.gov |
| Six Cities CA | | Neng Xu<br>Utility Principal Resource Anl<br>CITY OF RIVERSIDE PUBLIC UTIL DEPT<br>3435 14th Street<br>Riverside, CALIFORNIA 92501<br>nxu@riversideca.gov |
| Six Cities CA | Margaret McNaul<br>Attorney<br>Thompson Coburn LLP<br>1909 K Street, N.W.<br>Suite 600<br>Washington, DISTRICT OF COLUMBIA 20006<br>UNITED STATES<br>mmcnaul@thompsoncoburn.com | Jecoliah R. Williams<br>Thompson Coburn LLP<br>1909 K Street N.W.<br>Suite 600<br>WASHINGTON, DISTRICT OF COLUMBIA 20006<br>jwilliams@thompsoncoburn.com |
| Smart Electric Power Alliance | Smart Electric Power Alliance<br>Smart Electric Power Alliance<br>1800 M ST NW FRNT 1<br>WASHINGTON, DISTRICT OF COLUMBIA 20036<br>UNITED STATES<br>emathis@sepapower.org | |
| Smart Wires, Inc. | Ted Bloch-Rubin<br>Smart Wires, Inc.<br>1321 MINERVA RD<br>ANN ARBOR, MICHIGAN 48104-3926<br>UNITED STATES<br>ted.blochrubin@smartwires.com | |
| Solar Energy Industries Association | Melissa Alfano<br>Manager of Regulatory Affairs<br>Solar Energy Industries | Gizelle Wray<br>Manager of Regulatory Affairs<br>Solar Energy Industries |

215

| | Association 1425 K Street, N.W., Suite 1000 Washington, DISTRICT OF COLUMBIA 20005 UNITED STATES malfano@seia.org | Association 1425 K St NW Ste. 1000 Washington, DISTRICT OF COLUMBIA 20005 gwray@seia.org |
|---|---|---|
| Solar Energy Industries Association | | Sean Gallagher Solar Energy Industries Association 1425 K St NW Suite 1000 Washington, DISTRICT OF COLUMBIA 20005 sgallagher@seia.org |
| Solar Energy Industries Association | | Sean Gallagher Solar Energy Industries Association 1425 K St NW Suite 1000 Washington, DISTRICT OF COLUMBIA 20005 sgallagher@seia.org |
| Solar Energy Industries Association | | David DeSalle Potomac Law Group PLLC 1300 Pennsylvania Avenue, NW Suite 700 Washington, DISTRICT OF COLUMBIA 20004 ddesalle@potomaclaw.com |
| Solar Energy Industries Association | | Michael J. Rustum Partner Potomac Law Group, PLLC 1717 PENNSYLVANIA AVE NW STE 1025 WASHINGTON, DISTRICT OF COLUMBIA 20006 mrustum@potomaclaw.com |

| | | |
|---|---|---|
| Solar Energy Industries Association | David DeSalle<br>Potomac Law Group PLLC<br>1300 Pennsylvania Avenue, NW<br>Suite 700<br>Washington, DISTRICT OF COLUMBIA 20004<br>UNITED STATES<br>ddesalle@potomaclaw.com | Sean Gallagher<br>Solar Energy Industries Association<br>1425 K St NW<br>Suite 1000<br>Washington, DISTRICT OF COLUMBIA 20005<br>sgallagher@seia.org |
| Solar Energy Industries Association | Michael Rustum<br>Partner<br>Potomac Law Group, PLLC<br>1717 PENNSYLVANIA AVE NW STE 1025<br>WASHINGTON, DISTRICT OF COLUMBIA 20006<br>UNITED STATES<br>mrustum@potomaclaw.com | |
| Solar Energy Industries Association | | Sean Gallagher<br>Solar Energy Industries Association<br>1425 K St NW<br>Suite 1000<br>Washington, DISTRICT OF COLUMBIA 20005<br>sgallagher@seia.org |
| Solar Energy Industries Association | Melissa Alfano<br>Manager of Regulatory Affairs<br>Solar Energy Industries Association<br>1425 K Street, N.W., Suite 1000<br>Washington, DISTRICT OF COLUMBIA 20005<br>UNITED STATES<br>malfano@seia.org | Ben Norris<br>Manager of Federal Regulatory<br>Solar Energy Industries Association<br>1425 K St NW<br>Washington, DISTRICT OF COLUMBIA 20005<br>bnorris@seia.org |
| Solar Energy Industries Association | | Sean Gallagher<br>Solar Energy Industries Association<br>1425 K St NW |

217

| | | |
|---|---|---|
| | | Suite 1000<br>Washington, DISTRICT OF COLUMBIA 20005<br>sgallagher@seia.org |
| Solar Energy Industries Association | | Sean Gallagher<br>Solar Energy Industries Association<br>1425 K St NW<br>Suite 1000<br>Washington, DISTRICT OF COLUMBIA 20005<br>sgallagher@seia.org |
| Solar Energy Industries Association | | Sean Gallagher<br>Solar Energy Industries Association<br>1425 K St NW<br>Suite 1000<br>Washington, DISTRICT OF COLUMBIA 20005<br>sgallagher@seia.org |
| Solar Energy Industries Association | Melissa Alfano<br>Manager of Regulatory Affairs<br>Solar Energy Industries Association<br>1425 K Street, N.W., Suite 1000<br>Washington, DISTRICT OF COLUMBIA 20005<br>UNITED STATES<br>malfano@seia.org | |
| SOO Green HVDC Link ProjectCo, LLC | William Hollaway<br>1050 Connecticut Ave., NW<br>Washington, DISTRICT OF COLUMBIA 20036<br>UNITED STATES<br>WHollaway@gibsondunn.com | |
| SOO Green HVDC Link | Janine Durand<br>Senior Counsel | |

| | | |
|---|---|---|
| ProjectCo, LLC | 1050 CONNECTICUT AVE NW<br>WASHINGTON, DISTRICT OF COLUMBIA 20036<br>UNITED STATES<br>jdurand@gibsondunn.com | |
| SOO Green HVDC Link ProjectCo, LLC | Nicholas Cicale<br>Counsel<br>200 Park Avenue<br>New York, NEW YORK 10166-0193<br>UNITED STATES<br>ncicale@gibsondunn.com | |
| South Carolina Coastal Conservation League | Nicholas Guidi<br>Southern Environmental Law Center<br>122 C ST NW STE 325<br>WASHINGTON, DISTRICT OF COLUMBIA 20001<br>UNITED STATES<br>nguidi@selcdc.org | |
| South Carolina Coastal Conservation League | Nicholas Guidi<br>Southern Environmental Law Center<br>122 C ST NW STE 325<br>WASHINGTON, DISTRICT OF COLUMBIA 20001<br>UNITED STATES<br>nguidi@selcdc.org | |
| Southern Alliance for Clean Energy | Nicholas Guidi<br>Southern Environmental Law Center<br>122 C ST NW STE 325<br>WASHINGTON, DISTRICT OF COLUMBIA 20001<br>UNITED STATES<br>nguidi@selcdc.org | |

| | | |
|---|---|---|
| Southern Alliance for Clean Energy | Nicholas Guidi<br>Southern Environmental Law Center<br>122 C ST NW STE 325<br>WASHINGTON, DISTRICT OF COLUMBIA 20001<br>UNITED STATES<br>nguidi@selcdc.org | Maggie Shober<br>Southern Alliance for Clean Energy<br>PO Box 1842<br>Knoxville, TENNESSEE 37901<br>maggie@cleanenergy.org |
| Southern Alliance for Clean Energy | Nicholas Guidi<br>Southern Environmental Law Center<br>122 C ST NW STE 325<br>WASHINGTON, DISTRICT OF COLUMBIA 20001<br>UNITED STATES<br>nguidi@selcdc.org | |
| Southern California Edison Company | | Fernando E Cornejo<br>Project Manager<br>Southern California Edison Company<br>2244 Walnut Grove Ave.<br>Rosemead, CALIFORNIA 91770<br>fernando.cornejo@sce.com |
| Southern California Edison Company | Gerardo Huerta<br>Senior Attorney<br>Southern California Edison Company<br>PO Box 800<br>Rosemead,CALIFORNIA<br>UNITED STATES<br>jerry.huerta@sce.com | FERC Case Administration<br>FERC Case Administration<br>Southern California Edison Company<br>2244 WALNUT GROVE AVE<br>ROSEMEAD, CALIFORNIA 91770<br>ferccaseadmin@sce.com |
| Southern California Edison Company | | FERC Case Administration<br>FERC Case Administration<br>Southern California Edison Company<br>2244 WALNUT GROVE AVE<br>ROSEMEAD, CALIFORNIA |

| | | |
|---|---|---|
| | | 91770<br>ferccaseadmin@sce.com |
| Southern California Edison Company | Rebecca Furman<br>Director and Managing Attorney<br>Southern California Edison Company<br>PO Box 800<br>Rosemead,CALIFORNIA<br>UNITED STATES<br>rebecca.furman@sce.com | FERC Case Administration<br>FERC Case Administration<br>Southern California Edison Company<br>2244 WALNUT GROVE AVE<br>ROSEMEAD, CALIFORNIA 91770<br>ferccaseadmin@sce.com |
| Southern Company Services, Inc. | Andrew Tunnell<br>Balch & Bingham LLP<br>Balch & Bingham LLP<br>1710 6TH AVE N<br>BIRMINGHAM, ALABAMA 35203<br>UNITED STATES<br>atunnell@balch.com | Christopher H Demko<br>Associate General Counsel<br>Southern Company Services, Inc.<br>30 Ivan Allen Jr. Blvd, NW<br>Atlanta, GEORGIA 30308<br>chdemko@southernco.com |
| Southern Company Services, Inc. | Andrew Tunnell<br>Balch & Bingham LLP<br>Balch & Bingham LLP<br>1710 6TH AVE N<br>BIRMINGHAM, ALABAMA 35203<br>UNITED STATES<br>atunnell@balch.com | Lyle David Larson, ESQ<br>Partner, Balch & Bingham LLP<br>Balch & Bingham LLP<br>1710 6TH AVE N<br>BIRMINGHAM, ALABAMA 35203<br>llarson@balch.com |
| Southern Company Services, Inc. | | Christopher H Demko<br>Associate General Counsel<br>Southern Company Services, Inc.<br>30 Ivan Allen Jr. Blvd, NW<br>Atlanta, GEORGIA 30308<br>chdemko@southernco.com |
| Southern Company Services, Inc. | Andrew Tunnell<br>Balch & Bingham LLP<br>Balch & Bingham LLP | |

| | | |
|---|---|---|
| | 1710 6TH AVE N<br>BIRMINGHAM, ALABAMA 35203<br>UNITED STATES<br>atunnell@balch.com | |
| Southern Company Services, Inc. | Andrew Tunnell<br>Balch & Bingham LLP<br>Balch & Bingham LLP<br>1710 6TH AVE N<br>BIRMINGHAM, ALABAMA 35203<br>UNITED STATES<br>atunnell@balch.com | |
| Southern Company Services, Inc. | | Abigail Fox<br>Balch & Bingham LLP<br>1710 6TH AVE N<br>BIRMINGHAM, ALABAMA 35203<br>afox@balch.com |
| Southern Company Services, Inc. | Andrew Tunnell<br>Balch & Bingham LLP<br>Balch & Bingham LLP<br>1710 6TH AVE N<br>BIRMINGHAM, ALABAMA 35203<br>UNITED STATES<br>atunnell@balch.com | |
| Southern Company Services, Inc. | | Abigail Fox<br>Balch & Bingham LLP<br>1710 6TH AVE N<br>BIRMINGHAM, ALABAMA 35203<br>afox@balch.com |
| Southern Environment al Law Center | Danielle Fidler<br>Senior Attorney<br>EARTHJUSTICE<br>48 WALL ST FL 15 | |

| | | |
|---|---|---|
| | NEW YORK, NEW YORK 10005<br>UNITED STATES<br>dfidler@earthjustice.org | |
| Southern Environmental Law Center | Frank Rambo<br>Southern Environmental Law Center<br>120 GARRETT ST STE 400<br>CHARLOTTESVILLE, VIRGINIA 22902<br>UNITED STATES<br>frambo@selcva.org | |
| Southern Environmental Law Center | Nicholas Guidi<br>Southern Environmental Law Center<br>122 C ST NW STE 325<br>WASHINGTON, DISTRICT OF COLUMBIA 20001<br>UNITED STATES<br>nguidi@selcdc.org | |
| Southern Environmental Law Center | Nicholas Guidi<br>Southern Environmental Law Center<br>122 C ST NW STE 325<br>WASHINGTON, DISTRICT OF COLUMBIA 20001<br>UNITED STATES<br>nguidi@selcdc.org | |
| Southern Environmental Law Center | Nicholas Guidi<br>Southern Environmental Law Center<br>122 C ST NW STE 325<br>WASHINGTON, DISTRICT OF COLUMBIA 20001<br>UNITED STATES<br>nguidi@selcdc.org | |

| | | |
|---|---|---|
| Southern Environmental Law Center | Nicholas Guidi<br>Southern Environmental Law Center<br>122 C ST NW STE 325<br>WASHINGTON, DISTRICT OF COLUMBIA 20001<br>UNITED STATES<br>nguidi@selcdc.org | |
| Southern Maryland Electric Cooperative, Inc. | John Rohrbach<br>ED Regulatory<br>ACES POWER MARKETING<br>4140 W 99TH ST<br>CARMEL, INDIANA 46032<br>UNITED STATES<br>JRohrbach@acespower.com | Eugene Bradford<br>Vice President, Rates and Ener<br>SOUTHERN MARYLAND ELECTRIC COOP INC<br>15035 Burnt Store Rd.<br>Hughesville, MARYLAND 20637<br>Eugene.Bradford@smeco.coop |
| Southern Maryland Electric Cooperative, Inc. | | Mark MacDougall<br>Senior Vice President and Gene<br>Southern Maryland Electric Cooperative, Inc.<br>PO Box 1937<br>Hughesville, 20637-1937<br>mark.macdougall@smeco.coop |
| Southern Maryland Electric Cooperative, Inc. | | John Rohrbach<br>ED Regulatory<br>ACES POWER MARKETING<br>4140 W 99TH ST<br>CARMEL, INDIANA 46032<br>JRohrbach@acespower.com |
| Southern Maryland Electric Cooperative, Inc. | Damon Krieger<br>VP, Legal Affairs, Deputy Gen<br>Southern Maryland Electric Cooperative, Inc.<br>15035 Burnt Store Road<br>P.O. Box 1937<br>Hughesville, MARYLAND 20637-1937 | |

| | | |
|---|---|---|
| | UNITED STATES<br>Damon.Krieger@SMECO.coop | |
| Southern Renewable Energy Association | Simon Mahan<br>Southern Renewable Energy Association<br>5702 Old Hickory Rd<br>Little Rock, ARKANSAS 72204<br>UNITED STATES<br>simon@southernwind.org | |
| Southern Renewable Energy Association | Simon Mahan<br>Southern Renewable Energy Association<br>5702 Old Hickory Rd<br>Little Rock, ARKANSAS 72204<br>UNITED STATES<br>simon@southernwind.org | |
| Southern Renewable Energy Association | Simon Mahan<br>Southern Renewable Energy Association<br>5702 Old Hickory Rd<br>Little Rock, ARKANSAS 72204<br>UNITED STATES<br>simon@southernwind.org | |
| Southern Renewable Energy Association | Whit Cox<br>Southern Renewable Energy Association<br>3612 OAKWOOD RD<br>LITTLE ROCK, ARKANSAS 72202<br>UNITED STATES<br>whit@southernrenewable.org | |
| Southern Renewable | Simon Mahan<br>Southern Renewable Energy Association | Andrew Kowalczyk<br>Southern Renewable Energy Association |

| | | |
|---|---|---|
| Energy Association | 5702 Old Hickory Rd<br>Little Rock, ARKANSAS 72204<br>UNITED STATES<br>simon@southernwind.org | 819 SAINT ROCH AVE<br>NEW ORLEANS, LOUISIANA 70117<br>andy@southernrenewable.org |
| Southface Energy Institute, Inc. | Nicholas Guidi<br>Southern Environmental Law Center<br>122 C ST NW STE 325<br>WASHINGTON, DISTRICT OF COLUMBIA 20001<br>UNITED STATES<br>nguidi@selcdc.org | |
| Southface Energy Institute, Inc. | Nicholas Guidi<br>Southern Environmental Law Center<br>122 C ST NW STE 325<br>WASHINGTON, DISTRICT OF COLUMBIA 20001<br>UNITED STATES<br>nguidi@selcdc.org | Katie Southworth<br>ksouthworth@southface.org |
| Southface Institute | Danielle Fidler<br>Senior Attorney<br>EARTHJUSTICE<br>48 WALL ST FL 15<br>NEW YORK, NEW YORK 10005<br>UNITED STATES<br>dfidler@earthjustice.org | |
| Southface Institute | Katie Southworth<br>ksouthworth@southface.org | |
| Southface Institute | Katie Southworth<br>ksouthworth@southface.org | |
| Southface Institute | Katie Southworth<br>ksouthworth@southface.org | |

| | | |
|---|---|---|
| Southwest Power Pool Market Monitoring Unit | Keith Collins<br>Vice President, Market Mon<br>Southwest Power Pool Market Monitoring Unit<br>201 WORTHEN DR<br>LITTLE ROCK, ARKANSAS 72223<br>UNITED STATES<br>kcollins@spp.org | Jodi Woods<br>Director, Market Monitoring Un<br>Southwest Power Pool Inc.<br>201 WORTHEN DR<br>LITTLE ROCK, ARKANSAS 72223<br>jwoods@spp.org |
| Southwest Power Pool Regional State Committee | Kristie Fiegen<br>kristie.fiegen@state.sd.us | |
| Southwest Power Pool, Inc. | Justin Hinton<br>201 Worthen Drive<br>Little Rock, ARKANSAS 72212<br>UNITED STATES<br>jhinton@spp.org | Tessie Kentner<br>Director and Associate<br>Southwest Power Pool Inc.<br>General Counsel<br>201 Worthen Drive<br>LITTLE ROCK, ARKANSAS 72223<br>tkentner@spp.org |
| Southwest Power Pool, Inc. | | Paul Suskie<br>Sr. VP Regulatory Policy & Gen<br>Southwest Power Pool, Inc.<br>415 N. McKinley, Ste 140<br>Little Rock, ARKANSAS 72205<br>psuskie@spp.org |
| Southwest Power Pool, Inc. | | Antoine Lucas<br>alucas@spp.org |
| Southwest Power Pool, Inc. | | Michelle L Harris<br>Senior Paralegal<br>Southwest Power Pool Inc.<br>201 Worthen Drive<br>Little Rock, ARKANSAS |

227

| | | |
|---|---|---|
| | | 72223-4936<br>mharris@spp.org |
| Southwest Power Pool, Inc. | | Paul Suskie<br>Sr. VP Regulatory Policy & Gen<br>Southwest Power Pool, Inc.<br>415 N. McKinley, Ste 140<br>Little Rock, ARKANSAS 72205<br>psuskie@spp.org |
| Southwest Power Pool, Inc. | | Antoine Lucas<br>alucas@spp.org |
| Southwest Power Pool, Inc. | | Michelle L Harris<br>Senior Paralegal<br>Southwest Power Pool Inc.<br>201 Worthen Drive<br>Little Rock, ARKANSAS 72223-4936<br>mharris@spp.org |
| Southwest Power Pool, Inc. | Justin Hinton<br>201 Worthen Drive<br>Little Rock, ARKANSAS 72212<br>UNITED STATES<br>jhinton@spp.org | Michelle L Harris<br>Senior Paralegal<br>Southwest Power Pool Inc.<br>201 Worthen Drive<br>Little Rock, ARKANSAS 72223-4936<br>mharris@spp.org |
| State of New Hampshire Department of Energy | Andrew Harmon<br>State of New Hampshire Department of Energy<br>21 S FRUIT ST STE 10<br>CONCORD, NEW HAMPSHIRE 03301<br>UNITED STATES<br>andrew.j.harmon@energy.nh.gov | |
| State of Tennessee | James Urban<br>Deputy Attorney General | |

| | | |
|---|---|---|
| | Tennessee Attorney General's Office<br>P.O. Box 20207<br>Nashville, TENNESSEE 37202-0207<br>UNITED STATES<br>james.urban@ag.tn.gov | |
| State of Texas | John Hulme<br>Assistant Attorney General<br>Office of the Attorney General of Texas<br>PO Box 12548<br>Austin,TEXAS 78711-2548<br>UNITED STATES<br>john.hulme@oag.texas.gov | |
| State of Utah | PATRICIA SCHMID<br>Assistant Attorney General<br>State of Utah<br>160 E 300 S FL 5<br>SALT LAKE CITY, UTAH 84111<br>UNITED STATES<br>pschmid@agutah.gov | PATRICIA E SCHMID<br>Assistant Attorney General<br>State of Utah<br>160 E 300 S FL 5<br>SALT LAKE CITY, UTAH 84111<br>pschmid@agutah.gov |
| State of Utah | | Stanford Purser<br>Utah Solicitor General<br>Office of the Utah Attorney General<br>160 E 300 S FL 5<br>SALT LAKE CITY, UTAH 84111<br>spurser@agutah.gov |
| State Water Contractors | Bhaveeta Mody<br>Duncan, Weinberg, Genzer & Pembroke PC<br>1667 K Street, NW<br>Suite 700<br>WASHINGTON, DISTRICT OF COLUMBIA 20006 | Linda L. Murray-Kimball<br>Legal Assistant<br>Duncan, Weinberg, Genzer & Pembroke PC<br>1667 K Street, NW<br>Suite 700<br>Washington, DISTRICT OF |

| | UNITED STATES<br>bkm@dwgp.com | COLUMBIA 20006-1654<br>lmk@dwgp.com |
|---|---|---|
| State Water Contractors | Sean Neal<br>Attorney<br>Duncan, Weinberg, Genzer &<br>Pembroke PC<br>915 L ST STE 1410<br>SACRAMENTO,<br>CALIFORNIA 95814<br>UNITED STATES<br>smn@dwgp.com | |
| State Water Contractors | Sylwia Dakowicz<br>Duncan Weinberg Genzer &<br>Pembroke, PC<br>1036 Vanderbilt Way<br>Sacramento, CALIFORNIA<br>95825<br>UNITED STATES<br>sd@dwgp.com | |
| Stowe Electric Department | John Coyle<br>Duncan & Allen LLP<br>Suite 700<br>1730 Rhode Island Avenue,<br>N.W.<br>Washington, DISTRICT OF<br>COLUMBIA 20036-3115<br>UNITED STATES<br>jpc@duncanallen.com | |
| Stowe Electric Department | John Coyle<br>Duncan & Allen LLP<br>Suite 700<br>1730 Rhode Island Avenue,<br>N.W.<br>Washington, DISTRICT OF<br>COLUMBIA 20036-3115<br>UNITED STATES<br>jpc@duncanallen.com | |

| | | |
|---|---|---|
| Stowe Electric Department | John Coyle<br>Duncan & Allen LLP<br>Suite 700<br>1730 Rhode Island Avenue, N.W.<br>Washington, DISTRICT OF COLUMBIA 20036-3115<br>UNITED STATES<br>jpc@duncanallen.com | |
| Sunflower Electric Power Corporation | Whit Williamson<br>Director - Power Supply<br>Thompson Coburn LLP<br>4201 Dominion Blvd<br>Glen Allen, VIRGINIA 23060<br>UNITED STATES<br>wwilliamson@odec.com | Jecoliah R. Williams<br>Thompson Coburn LLP<br>1909 K Street N.W.<br>Suite 600<br>WASHINGTON, DISTRICT OF COLUMBIA 20006<br>jwilliams@thompsoncoburn.com |
| Sunflower Electric Power Corporation | | Ala Tamimi<br>Senior VP and Chief Operating<br>425 S 119th St. W<br>WICHITA, KANSAS 67235<br>ATamimi@sunflower.net |
| Sunflower Electric Power Corporation | | Ray Bergmeier<br>Manager of Transmission Policy<br>425 S 119th St. W<br>Wichita, KANSAS 67235<br>RBergmeier@sunflower.net |
| Sunflower Electric Power Corporation | Ala Tamimi<br>Senior VP and Chief Operating<br>425 S 119th St. W<br>WICHITA, KANSAS 67235<br>UNITED STATES<br>ATamimi@sunflower.net | Ala Tamimi<br>Senior VP and Chief Operating<br>425 S 119th St. W<br>WICHITA, KANSAS 67235<br>ATamimi@sunflower.net |
| Sunflower Electric Power Corporation | | Ray Bergmeier<br>Manager of Transmission Policy<br>425 S 119th St. W |

| | | |
|---|---|---|
| | | Wichita, KANSAS 67235<br>RBergmeier@sunflower.net |
| Sunflower Electric Power Corporation | | Whit Williamson<br>Director - Power Supply<br>Thompson Coburn LLP<br>4201 Dominion Blvd<br>Glen Allen, VIRGINIA 23060<br>wwilliamson@odec.com |
| Sunflower Electric Power Corporation | | Christine Aarnes<br>Sunflower Electric Power Corp<br>425 S 119th ST W<br>Wichita, KANSAS 67235<br>caarnes@sunflower.net |
| Sunflower Electric Power Corporation | Ala Tamimi<br>Senior VP and Chief Operating<br>SUNFLOWER ELECTRIC<br>COOP INC (KS)<br>425 S 119th St. W<br>WICHITA, KANSAS 67235<br>UNITED STATES<br>ATamimi@sunflower.net | |
| Sunflower Electric Power Corporation | Whit Williamson<br>Director - Power Supply<br>Thompson Coburn LLP<br>4201 Dominion Blvd<br>Glen Allen, VIRGINIA 23060<br>UNITED STATES<br>wwilliamson@odec.com | |
| Sustainable FERC Project | Danielle Fidler<br>Senior Attorney<br>EARTHJUSTICE<br>48 WALL ST FL 15<br>NEW YORK, NEW YORK<br>10005<br>UNITED STATES<br>dfidler@earthjustice.org | |

| | | |
|---|---|---|
| Sustainable FERC Project | John Moore<br>Senior Attorney<br>Sustainable FERC Project<br>2 N Riverside Plz Ste 2250<br>RTS-RETURN TO SENDER<br>Chicago, ILLINOIS 60606-2640<br>UNITED STATES<br>moore.fercproject@gmail.com | |
| Sustainable FERC Project | Tom Rutigliano<br>Sr. Advocate<br>NRDC/FERC Project<br>1124 15th St. NW<br>Suite 300<br>Washington, DISTRICT OF COLUMBIA 20005<br>UNITED STATES<br>trutigliano@nrdc.org | |
| Sustainable FERC Project | John Moore<br>Senior Attorney<br>Sustainable FERC Project<br>2 N Riverside Plz Ste 2250<br>RTS-RETURN TO SENDER<br>Chicago, ILLINOIS 60606-2640<br>UNITED STATES<br>moore.fercproject@gmail.com | |
| Sustainable FERC Project | Tom Rutigliano<br>Sr. Advocate<br>NRDC/FERC Project<br>1124 15th St. NW<br>Suite 300<br>Washington, DISTRICT OF COLUMBIA 20005<br>UNITED STATES<br>trutigliano@nrdc.org | |
| SWPG | David Getts<br>General Manager | Linda L Walsh, ESQ<br>Husch Blackwell LLP |

|  | Southwestern Power Group II, LLC<br>3610 N. 44th Street<br>Suite 250<br>Phoenix, ARIZONA 85018<br>UNITED STATES<br>dgetts@southwesternpower.com | 750 17th Street NW<br>Washington DC, DISTRICT OF COLUMBIA 200067<br>linda.walsh@huschblackwell.com |
| SWPG |  | Sylvia J. S. Bartell<br>Husch Blackwell<br>Husch Blackwell LLP<br>750 17th Street, NW<br>Suite 900<br>Washington, DISTRICT OF COLUMBIA 20006<br>sylvia.bartell@huschblackwell.com |
| Tabors Caramanis Rudkevich | Richard Tabors<br>President<br>Tabors Caramanis Rudkevich<br>300 Washington Street<br>Suite 402<br>Newton, MASSACHUSETTS 02458<br>UNITED STATES<br>rtabors@tcr-us.com |  |
| Taunton Municipal Lighting Plant | John Coyle<br>Duncan & Allen LLP<br>Suite 700<br>1730 Rhode Island Avenue, N.W.<br>Washington, DISTRICT OF COLUMBIA 20036-3115<br>UNITED STATES<br>jpc@duncanallen.com |  |
| Taunton Municipal Lighting Plant | John Coyle<br>Duncan & Allen LLP<br>Suite 700<br>1730 Rhode Island Avenue, |  |

234

| | | |
|---|---|---|
| | N.W.<br>Washington, DISTRICT OF COLUMBIA 20036-3115<br>UNITED STATES<br>jpc@duncanallen.com | |
| Taunton Municipal Lighting Plant | John Coyle<br>Duncan & Allen LLP<br>Suite 700<br>1730 Rhode Island Avenue, N.W.<br>Washington, DISTRICT OF COLUMBIA 20036-3115<br>UNITED STATES<br>jpc@duncanallen.com | |
| Tenaska, Inc. | Drew Fossum<br>VP and General Counsel<br>Tenaska Marketing Ventures<br>11718 Nicholas Street<br>Omaha, NEBRASKA 68154<br>UNITED STATES<br>dfossum@tenaska.com | |
| Tennessee Attorney General's Office | | James P Urban<br>Deputy Attorney General<br>P.O. Box 20207<br>Nashville, TENNESSEE 37202-0207<br>james.urban@ag.tn.gov |
| Tennessee Valley Authority | Richard Saas<br>Attorney<br>Tennessee Valley Authority<br>1100 MARKET ST<br>CHATTANOOGA, TENNESSEE 37402<br>UNITED STATES<br>rtsaas@tva.gov | |

| | | |
|---|---|---|
| Tennessee Valley Authority | Richard Saas<br>Attorney<br>Tennessee Valley Authority<br>1100 MARKET ST<br>CHATTANOOGA, TENNESSEE 37402<br>UNITED STATES<br>rtsaas@tva.gov | |
| Tennessee Valley Authority | Richard Saas<br>Attorney<br>Tennessee Valley Authority<br>1100 MARKET ST<br>CHATTANOOGA, TENNESSEE 37402<br>UNITED STATES<br>rtsaas@tva.gov | |
| Tennessee Valley Authority | Richard Saas<br>Attorney<br>Tennessee Valley Authority<br>1100 MARKET ST<br>CHATTANOOGA, TENNESSEE 37402<br>UNITED STATES<br>rtsaas@tva.gov | |
| Texas Reliability Entity, Inc. | Derrick Davis<br>General Counsel<br>Texas Reliability Entity, Inc.<br>8000 Metropolis Drive, Bldg. A, Suite 300<br>Austin, TEXAS 78744<br>UNITED STATES<br>derrick.davis@texasre.org | |
| The Dayton Power and Light Company | Randall Griffin<br>Chief Regulatory Counsel<br>The AES Corporation<br>1065 WOODMAN DR<br>DAYTON, OHIO 45432 | John W Horstmann<br>Sr. Director RTO Affairs<br>Dayton Power and Light Company, The<br>315 Buckwalter Rd<br>Phoenixville, |

| | UNITED STATES<br>randall.griffin@aes.com | PENNSYLVANIA 19460<br>john.horstmann@aes.com |
|---|---|---|
| The Freimuth Group | Ladeene Freimuth<br>Consultant<br>The Freimuth Group<br>1750 16th Street NW<br>Unit 24<br>Washington, DISTRICT OF COLUMBIA 20009<br>UNITED STATES<br>ladeene@freimuthgroup.com | |
| The ITM Coalition | Karen Onaran<br>Vice President<br>ELCON<br>1101 K Street NW<br>Suite 700<br>Washington, DISTRICT OF COLUMBIA 20005<br>UNITED STATES<br>KOnaran@elcon.org | |
| The Office of the Ohio Consumers' Counsel | | Denise C Goulet<br>Partner<br>McCarter & English, LLP<br>1301 K ST NW<br>SUITE 1000 WEST<br>WASHINGTON, DISTRICT OF COLUMBIA 20005<br>dgoulet@mccarter.com |
| The Western Way | | Greg Brophy<br>Colorado Director The Western The Western Way<br>26481 County Road 54<br>Holyoke, COLORADO 80734<br>Senatorbrophy@gmail.com |
| The Western Way | | George Riley<br>3724 Ivy Green Trail<br>Tallahassee, FLORIDA 32311 |

|  |  | george@cleanenergyconservatives.com |
|---|---|---|
| Transmission Access Policy Study Group | Cynthia Bogorad<br>Spiegel & McDiarmid LLP<br>1818 N Street, NW<br>8th Floor<br>WASHINGTON, DISTRICT OF COLUMBIA 20036<br>UNITED STATES<br>cynthia.bogorad@spiegelmcd.com | William Huang<br>Spiegel & McDiarmid LLP<br>1818 N ST NW FL 8<br>WASHINGTON, DISTRICT OF COLUMBIA 20036<br>william.huang@spiegelmcd.com |
| Transmission Access Policy Study Group |  | Lauren L. Springett<br>Counsel<br>PO Box NA<br>WASHINGTON, 20006<br>lauren.springett@spiegelmcd.com |
| Transmission Access Policy Study Group |  | E Service<br>Spiegel & McDiarmid LLP<br>1875 Eye St, NW<br>Suite 700<br>Washington, DISTRICT OF COLUMBIA 20006<br>eService@spiegelmcd.com |
| Transmission Access Policy Study Group |  | Terry Huval<br>TAPS Executive Director<br>136 Shelby Oaks Lane<br>Lafayette, LOUISIANA 70507<br>THUVAL@TAPSGROUP.ORG |
| Transmission Access Policy Study Group |  | David E Pomper, ESQ<br>Attorney<br>Spiegel & McDiarmid LLP<br>1875 Eye St. NW<br>Suite 700<br>Washington, DISTRICT OF |

| | | |
|---|---|---|
| | | COLUMBIA 20006<br>david.pomper@spiegelmcd.com |
| Transmission Access Policy Study Group | | Lauren L. Springett<br>Counsel<br>PO Box NA<br>WASHINGTON, 20006<br>lauren.springett@spiegelmcd.com |
| Transmission Access Policy Study Group | | E Service<br>Spiegel & McDiarmid LLP<br>1875 Eye St, NW<br>Suite 700<br>Washington, DISTRICT OF COLUMBIA 20006<br>eService@spiegelmcd.com |
| Transmission Access Policy Study Group | | David E Pomper, ESQ<br>Attorney<br>Spiegel & McDiarmid LLP<br>1875 Eye St. NW<br>Suite 700<br>Washington, DISTRICT OF COLUMBIA 20006<br>david.pomper@spiegelmcd.com |
| Transmission Access Policy Study Group | | Lauren L. Springett<br>Counsel<br>PO Box NA<br>WASHINGTON, 20006<br>lauren.springett@spiegelmcd.com |
| Transmission Access Policy Study Group | | E Service<br>Spiegel & McDiarmid LLP<br>1875 Eye St, NW<br>Suite 700<br>Washington, DISTRICT OF COLUMBIA 20006<br>eService@spiegelmcd.com |

| | | |
|---|---|---|
| Transmission Agency of Northern California | Bhaveeta Mody<br>Duncan, Weinberg, Genzer & Pembroke PC<br>1667 K Street, NW<br>Suite 700<br>WASHINGTON, DISTRICT OF COLUMBIA 20006<br>UNITED STATES<br>bkm@dwgp.com | Linda L. Murray-Kimball<br>Legal Assistant<br>Duncan, Weinberg, Genzer & Pembroke PC<br>1667 K Street, NW<br>Suite 700<br>Washington, DISTRICT OF COLUMBIA 20006-1654<br>lmk@dwgp.com |
| Transmission Agency of Northern California | Michael Postar<br>Attorney<br>Duncan, Weinberg, Genzer & Pembroke PC<br>1667 K Street, NW<br>Suite 700<br>Washington, DISTRICT OF COLUMBIA 20006<br>UNITED STATES<br>mrp@dwgp.com | |
| Transmission Agency of Northern California | Sylwia Dakowicz<br>Duncan Weinberg Genzer & Pembroke, PC<br>1036 Vanderbilt Way<br>Sacramento, CALIFORNIA 95825<br>UNITED STATES<br>sd@dwgp.com | |
| Transmission Agency of Northern California | Michael Postar<br>Attorney<br>Duncan, Weinberg, Genzer & Pembroke PC<br>1667 K Street, NW<br>Suite 700<br>Washington, DISTRICT OF COLUMBIA 20006<br>UNITED STATES<br>mrp@dwgp.com | |

| | | |
|---|---|---|
| Transmission Agency of Northern California | Bhaveeta Mody<br>Duncan, Weinberg, Genzer & Pembroke PC<br>1667 K Street, NW<br>Suite 700<br>WASHINGTON, DISTRICT OF COLUMBIA 20006<br>UNITED STATES<br>bkm@dwgp.com | |
| Transmission Agency of Northern California | Sylwia Dakowicz<br>Duncan Weinberg Genzer & Pembroke, PC<br>1036 Vanderbilt Way<br>Sacramento, CALIFORNIA 95825<br>UNITED STATES<br>sd@dwgp.com | |
| Transmission Dependent Utility Systems | Denise Goulet<br>Partner<br>McCarter & English, LLP<br>1301 K ST NW<br>SUITE 1000 WEST<br>WASHINGTON, DISTRICT OF COLUMBIA 20005<br>UNITED STATES<br>dgoulet@mccarter.com | |
| Transmission Dependent Utility Systems | Sean Beeny<br>McCarter & English, LLP<br>1301 K Street, NW<br>Suite 1000 West<br>Washington, DISTRICT OF COLUMBIA 20005<br>UNITED STATES<br>sbeeny@mccarter.com | |
| Transmission Dependent Utility Systems | Randolph Elliott<br>McCarter & English, LLP<br>1301 K Street, NW<br>Suite 1000 West | |

| | Washington, DISTRICT OF COLUMBIA 20005 UNITED STATES relliott@mccarter.com | |
|---|---|---|
| Transmission Dependent Utility Systems | Barry Cohen Special Counsel McCarter & English, LLP 1301 K Street, N.W. Suite 1000 West Washington, DISTRICT OF COLUMBIA 20005 UNITED STATES bcohen@mccarter.com | |
| Transmission Dependent Utility Systems | Sean Beeny McCarter & English, LLP 1301 K Street, NW Suite 1000 West Washington, DISTRICT OF COLUMBIA 20005 UNITED STATES sbeeny@mccarter.com | |
| Transmission Dependent Utility Systems | Randolph Elliott McCarter & English, LLP 1301 K Street, NW Suite 1000 West Washington, DISTRICT OF COLUMBIA 20005 UNITED STATES relliott@mccarter.com | |
| Transmission Dependent Utility Systems | Denise Goulet Partner McCarter & English, LLP 1301 K ST NW SUITE 1000 WEST WASHINGTON, DISTRICT OF COLUMBIA 20005 UNITED STATES dgoulet@mccarter.com | |

| | | |
|---|---|---|
| Transmission Dependent Utility Systems | Barry Cohen<br>Special Counsel<br>McCarter & English, LLP<br>1301 K Street, N.W.<br>Suite 1000 West<br>Washington, DISTRICT OF COLUMBIA 20005<br>UNITED STATES<br>bcohen@mccarter.com | |
| Transmission Dependent Utility Systems | Sean Beeny<br>McCarter & English, LLP<br>1301 K Street, NW<br>Suite 1000 West<br>Washington, DISTRICT OF COLUMBIA 20005<br>UNITED STATES<br>sbeeny@mccarter.com | |
| Transmission Dependent Utility Systems | Randolph Elliott<br>McCarter & English, LLP<br>1301 K Street, NW<br>Suite 1000 West<br>Washington, DISTRICT OF COLUMBIA 20005<br>UNITED STATES<br>relliott@mccarter.com | |
| Transmission Dependent Utility Systems | Denise Goulet<br>Partner<br>McCarter & English, LLP<br>1301 K ST NW<br>SUITE 1000 WEST<br>WASHINGTON, DISTRICT OF COLUMBIA 20005<br>UNITED STATES<br>dgoulet@mccarter.com | |
| Transmission Dependent Utility Systems | Barry Cohen<br>Special Counsel<br>McCarter & English, LLP<br>1301 K Street, N.W. | |

| | | |
|---|---|---|
| | Suite 1000 West<br>Washington, DISTRICT OF<br>COLUMBIA 20005<br>UNITED STATES<br>bcohen@mccarter.com | |
| Transmission<br>Dependent<br>Utility<br>Systems | Barry Cohen<br>Special Counsel<br>McCarter & English, LLP<br>1301 K Street, N.W.<br>Suite 1000 West<br>Washington, DISTRICT OF<br>COLUMBIA 20005<br>UNITED STATES<br>bcohen@mccarter.com | |
| Transource<br>Energy, LLC | Stacey Burbure<br>American Electric Power<br>Company<br>801 Pennsylvania Avenue, NW<br>Washington DC, DISTRICT OF<br>COLUMBIA 20004<br>UNITED STATES<br>slburbure@aep.com | |
| Transource<br>Energy, LLC | Chad Heitmeyer<br>Case Manager<br>American Electric Power<br>Service Corporation<br>1 Riverside Plaza<br>Columbus, OHIO 43215<br>UNITED STATES<br>caheitmeyer@aep.com | |
| Transource<br>Energy, LLC | Stacey Burbure<br>American Electric Power<br>Company<br>801 Pennsylvania Avenue, NW<br>Washington DC, DISTRICT OF<br>COLUMBIA 20004<br>UNITED STATES<br>slburbure@aep.com | |

| | | |
|---|---|---|
| Transource Energy, LLC | Chad Heitmeyer<br>Case Manager<br>American Electric Power Service Corporation<br>1 Riverside Plaza<br>Columbus, OHIO 43215<br>UNITED STATES<br>caheitmeyer@aep.com | |
| Tri-State Generation and Transmission Association, Inc. | Carl Steen<br>Partner<br>Dentons US LLP<br>601 South Figueroa Street, Suite 2500<br>Los Angeles, CALIFORNIA 90017-5704<br>UNITED STATES<br>carl.steen@dentons.com | Peter Thieman<br>Partner<br>Dentons US LLP<br>1900 K St., NW<br>Washington, DISTRICT OF COLUMBIA 20006<br>peter.thieman@dentons.com |
| Tri-State Generation and Transmission Association, Inc. | | David S Shaffer<br>Mr.<br>Dentons US LLP<br>1900 K ST NW<br>WASHINGTON, DISTRICT OF COLUMBIA 20006<br>david.shaffer@dentons.com |
| Tri-State Generation and Transmission Association, Inc. | Tyler Nemkov<br>Senior Regulatory Attorney<br>Tri-State Generation and Transmission Association, Inc.<br>1100 W 116TH AVE<br>WESTMINSTER, COLORADO 80234<br>UNITED STATES<br>tyler.nemkov@tristategt.org | Cassandra Mastrostefano<br>Attorney<br>Dentons US LLP<br>1900 K St NW<br>washington, DISTRICT OF COLUMBIA 20006<br>cassandra.mastrostefano@dentons.com |
| Tri-State Generation and Transmission | | Timothy B Woolley<br>Assistant General Counsel - Re<br>Tri-State Generation and Transmission Association, Inc.<br>1100 W 116TH AVE |

245

| | | |
|---|---|---|
| Association, Inc. | | WESTMINSTER, COLORADO 80234 twoolley@tristategt.org |
| Turlock Irrigation District | Jon Stickman Attorney Duncan & Allen LLP 1730 RHODE ISLAND AVE NW STE 700 WASHINGTON, DISTRICT OF COLUMBIA 20036 UNITED STATES jrs@duncanallen.com | |
| U.S. Climate Alliance | Andrew Sand 1750 Pennsylvania Avenue NW 300, Washington, DC DC, DISTRICT OF COLUMBIA 20006 UNITED STATES asand@usclimatealliance.org | |
| U.S. Climate Alliance | Hayden Flanery Manager, Federal and External 1750 Pennsylvania Avenue NW #300 Washington, DISTRICT OF COLUMBIA 20006 UNITED STATES hflanery@usclimatealliance.org | Hayden Flanery Manager, Federal and External 1750 Pennsylvania Avenue NW #300 Washington, DISTRICT OF COLUMBIA 20006 hflanery@usclimatealliance.org |
| U.S. Department of Energy | Peter Meier Attorney-Advisor, U.S. Departm United States Department of Energy - Headquarters 1000 Indepence Ave, SW Room 6D-033 Washington, DISTRICT OF COLUMBIA 20585 UNITED STATES peter.meier@hq.doe.gov | Peter Meier Attorney-Advisor, U.S. Departm United States Department of Energy - Headquarters 1000 Indepence Ave, SW Room 6D-033 Washington, DISTRICT OF COLUMBIA 20585 peter.meier@hq.doe.gov |

| | | |
|---|---|---|
| U.S. Department of Energy | Peter Meier<br>Attorney-Advisor, U.S. Departm<br>United States Department of Energy - Headquarters<br>1000 Indepence Ave, SW<br>Room 6D-033<br>Washington, DISTRICT OF COLUMBIA 20585<br>UNITED STATES<br>peter.meier@hq.doe.gov | |
| U.S. Department of Energy | Peter Meier<br>Attorney-Advisor, U.S. Departm<br>United States Department of Energy - Headquarters<br>1000 Indepence Ave, SW<br>Room 6D-033<br>Washington, DISTRICT OF COLUMBIA 20585<br>UNITED STATES<br>peter.meier@hq.doe.gov | |
| UNION OF CONCERNED SCIENTISTS | Samuel Gombeg<br>Senior Energy Analyst<br>UNION OF CONCERNED SCIENTISTS<br>1825 K St. NW<br>#800<br>Washington, DISTRICT OF COLUMBIA 20001<br>UNITED STATES<br>sgomberg@ucsusa.org | Michael Jacobs<br>Sr. Energy Analyst<br>UNION OF CONCERNED SCIENTISTS<br>2 BRATTLE SQ<br>CAMBRIDGE, MASSACHUSETTS 02138<br>mjacobs@ucsusa.org |
| UNION OF CONCERNED SCIENTISTS | Michael Jacobs<br>Sr. Energy Analyst<br>UNION OF CONCERNED SCIENTISTS<br>2 BRATTLE SQ<br>CAMBRIDGE, | |

| | | |
|---|---|---|
| | MASSACHUSETTS 02138<br>UNITED STATES<br>mjacobs@ucsusa.org | |
| UNION OF CONCERNED SCIENTISTS | Michael Jacobs<br>Sr. Energy Analyst<br>UNION OF CONCERNED SCIENTISTS<br>2 BRATTLE SQ<br>CAMBRIDGE, MASSACHUSETTS 02138<br>UNITED STATES<br>mjacobs@ucsusa.org | |
| UNION OF CONCERNED SCIENTISTS | Samuel Gombeg<br>Senior Energy Analyst<br>UNION OF CONCERNED SCIENTISTS<br>1825 K St. NW<br>#800<br>Washington, DISTRICT OF COLUMBIA 20001<br>UNITED STATES<br>sgomberg@ucsusa.org | |
| United States Department of Energy - Headquarters | Peter Meier<br>Attorney-Advisor, U.S. Departm<br>United States Department of Energy - Headquarters<br>1000 Indepence Ave, SW<br>Room 6D-033<br>Washington, DISTRICT OF COLUMBIA 20585<br>UNITED STATES<br>peter.meier@hq.doe.gov | |
| United States Department of Energy - Headquarters | Peter Meier<br>Attorney-Advisor, U.S. Departm<br>United States Department of Energy - Headquarters | |

| | | |
|---|---|---|
| | 1000 Indepence Ave, SW<br>Room 6D-033<br>Washington, DISTRICT OF<br>COLUMBIA 20585<br>UNITED STATES<br>peter.meier@hq.doe.gov | |
| Utah Attorney General's Office | PATRICIA SCHMID<br>Assistant Attorney General<br>State of Utah<br>160 E 300 S FL 5<br>SALT LAKE CITY, UTAH 84111<br>UNITED STATES<br>pschmid@agutah.gov | |
| Utah Division of Public Utilities | Chris Parker<br>Director<br>UTAH DIVISION OF PUBLIC UTILITIES<br>160 E BROADWAY<br>SALT LAKE CITY, UTAH 84111<br>UNITED STATES<br>chrisparker@utah.gov | |
| Utah Public Service Commission | Melissa Paschal<br>Lead Paralegal<br>Utah Public Service Commission<br>160 East 300 South, 4th Floor<br>Heber M. Wells Building<br>Salt Lake City, UTAH 84111<br>UNITED STATES<br>mpaschal@utah.gov | |
| Utah Public Service Commission | Thad LeVar<br>Utah Public Service Commission<br>Utah Public Service Commission<br>160 E 300 S FL 4 | |

249

| | | |
|---|---|---|
| | SALT LAKE CITY, UTAH 84111 UNITED STATES tlevar@utah.gov | |
| Utility Intervention Unit, New York State Department of State | Erin Hogan Director of Utility Interventi 99 WASHINGTON AVE STE 640 ALBANY, NEW YORK 12210 UNITED STATES erin.hogan@dos.ny.gov | Erin Hogan Director of Utility Interventi 99 WASHINGTON AVE STE 640 ALBANY, NEW YORK 12210 erin.hogan@dos.ny.gov |
| Utility Intervention Unit, New York State Department of State | | Jillian Kasow Lead Counsel, Utility Interven New York State Department of State NY Department of State 99 Washington Avenue, Ste 615 Albany, NEW YORK 12231-0001 jillian.kasow@dos.ny.gov |
| Utility Intervention Unit, New York State Department of State | Erin Hogan Director of Utility Interventi Utility Intervention Unit, New York State Department of State 99 WASHINGTON AVE STE 640 ALBANY, NEW YORK 12210 UNITED STATES erin.hogan@dos.ny.gov | |
| Valley Electric Association, Inc. | Brad Van Cleve 1750 S HARBOR WAY STE 450 PORTLAND, OREGON 97201 UNITED STATES bvc@dvclaw.com | |
| VEIR Inc. | Max Luke VEIR Inc. | |

| | | |
|---|---|---|
| | 250 Summer Street, 4th Floor ? Breakthrough Energy Ventures Boston, MASSACHUSETTS 02210 UNITED STATES max@veir.com | |
| VEIR Inc. | Max Luke VEIR Inc. 250 Summer Street, 4th Floor ? Breakthrough Energy Ventures Boston, MASSACHUSETTS 02210 UNITED STATES max@veir.com | |
| VEIR Inc. | Max Luke VEIR Inc. 250 Summer Street, 4th Floor ? Breakthrough Energy Ventures Boston, MASSACHUSETTS 02210 UNITED STATES max@veir.com | |
| Vermont Electric Power Company | Karin Stamy Vermont Electric Power Company 366 Pinnacle Ridge Road Rutland, VERMONT 05701 UNITED STATES kstamy@velco.com | |
| Vermont Electric Power Company | Karin Stamy Vermont Electric Power Company 366 Pinnacle Ridge Road Rutland, VERMONT 05701 | |

| | UNITED STATES<br>kstamy@velco.com | |
|---|---|---|
| Vermont Public Power Supply Authority | Scott Strauss<br>Spiegel & McDiarmid LLP<br>1818 N Street, NW<br>8th Floor<br>WASHINGTON, DISTRICT OF COLUMBIA 20036<br>UNITED STATES<br>Scott.Strauss@spiegelmcd.com | Jeffrey A Schwarz<br>Spiegel & McDiarmid LLP<br>1818 N Street, NW<br>8th Floor<br>WASHINGTON, DISTRICT OF COLUMBIA 20036<br>jeffrey.schwarz@spiegelmcd.com |
| Vermont Public Power Supply Authority | | E Service<br>Spiegel & McDiarmid LLP<br>1875 Eye St, NW<br>Suite 700<br>Washington, DISTRICT OF COLUMBIA 20006<br>eService@spiegelmcd.com |
| Vermont Public Power Supply Authority | | Kenneth A Nolan<br>General Manager<br>Vermont Public Power Supply Authority<br>5195 Waterbury-Stowe Road<br>PO Box 126<br>Waterbury Center, VERMONT 05677<br>knolan@vppsa.com |
| Vermont Public Power Supply Authority | Scott Strauss<br>Spiegel & McDiarmid LLP<br>1818 N Street, NW<br>8th Floor<br>WASHINGTON, DISTRICT OF COLUMBIA 20036<br>UNITED STATES<br>Scott.Strauss@spiegelmcd.com | |
| Vermont Public Power | Scott Strauss<br>Spiegel & McDiarmid LLP<br>1818 N Street, NW | |

| | | |
|---|---|---|
| Supply Authority | 8th Floor<br>WASHINGTON, DISTRICT OF COLUMBIA 20036<br>UNITED STATES<br>Scott.Strauss@spiegelmcd.com | |
| Vermont Public Power Supply Authority | | E Service<br>Spiegel & McDiarmid LLP<br>1875 Eye St, NW<br>Suite 700<br>Washington, DISTRICT OF COLUMBIA 20006<br>eService@spiegelmcd.com |
| Vermont Public Utility Commission | Mary Jo Krolewski<br>Utilities Analyst<br>Vermont Public Service Board<br>112 State Street<br>Montpelier, VERMONT 05602<br>UNITED STATES<br>mary-jo.krolewski@vermont.gov | |
| Vermont Public Utility Commission | Mary Jo Krolewski<br>Utilities Analyst<br>Vermont Public Service Board<br>112 State Street<br>Montpelier, VERMONT 05602<br>UNITED STATES<br>mary-jo.krolewski@vermont.gov | |
| Vermont Transco L.L.C | Karin Stamy<br>Vermont Electric Power Company<br>366 Pinnacle Ridge Road<br>Rutland, VERMONT 05701<br>UNITED STATES<br>kstamy@velco.com | |
| Virginia State | Frederick Ochsenhirt<br>Virginia State Corporation | |

| Corporation Commission Staff | Commission 1300 East Main Street Richmond, VIRGINIA 23219 UNITED STATES frederick.ochsenhirt@scc.virginia.gov | |
| --- | --- | --- |
| Vistra Energy Corp. | | James Quinn VP, FERC-jurisdictional market Vistra Energy Corp. 325 7th St NW Suite 520 Washington, DISTRICT OF COLUMBIA 20004 arnie.quinn@vistraenergy.com |
| Vistra Energy Corp. | | Jessica H. Miller Vistra Corp. 1005 Congress Ave. Suite 750 Austin, TEXAS 78701 VistraFERC@vistracorp.com |
| Vistra Energy Corp. | | Jessica H. Miller Vistra Corp. 1005 Congress Ave. Suite 750 Austin, TEXAS 78701 VistraFERC@vistracorp.com |
| Vistra Energy Corp. | | Jessica H. Miller Vistra Corp. 1005 Congress Ave. Suite 750 Austin, TEXAS 78701 VistraFERC@vistracorp.com |
| Vistra Energy Corp. | James Quinn VP, FERC-jurisdictional market Vistra Energy Corp. 325 7th St NW Suite 520 | |

| | | |
|---|---|---|
| | Washington, DISTRICT OF COLUMBIA 20004 UNITED STATES arnie.quinn@vistraenergy.com | |
| Wallingford Electric Division | John Coyle Duncan & Allen LLP Suite 700 1730 Rhode Island Avenue, N.W. Washington, DISTRICT OF COLUMBIA 20036-3115 UNITED STATES jpc@duncanallen.com | |
| Wallingford Electric Division | John Coyle Duncan & Allen LLP Suite 700 1730 Rhode Island Avenue, N.W. Washington, DISTRICT OF COLUMBIA 20036-3115 UNITED STATES jpc@duncanallen.com | |
| WATT Coalition | Ted Bloch-Rubin Smart Wires, Inc. 1321 MINERVA RD ANN ARBOR, MICHIGAN 48104-3926 UNITED STATES ted.blochrubin@smartwires.com | Rob Gramlich Grid Strategies LLC 9207 Kirkdale Rd Bethesda, MARYLAND 20817 rgramlich@gridstrategiesllc.com |
| WATT Coalition | Rob Gramlich Grid Strategies LLC 9207 Kirkdale Rd Bethesda, MARYLAND 20817 UNITED STATES rgramlich@gridstrategiesllc.com | |

| | | |
|---|---|---|
| WATT Coalition | Rob Gramlich<br>Grid Strategies LLC<br>9207 Kirkdale Rd<br>Bethesda, MARYLAND 20817<br>UNITED STATES<br>rgramlich@gridstrategiesllc.com | |
| WATT Coalition | Rob Gramlich<br>Grid Strategies LLC<br>9207 Kirkdale Rd<br>Bethesda, MARYLAND 20817<br>UNITED STATES<br>rgramlich@gridstrategiesllc.com | |
| WATT Coalition | Julia Selker<br>Grid Strategies LLC<br>WATT Coalition<br>9207 KIRKDALE RD<br>BETHESDA, MARYLAND 20817<br>UNITED STATES<br>jselker@gridstrategiesllc.com | |
| WE ACT for Environmental Justice | Anastasia Gordon<br>Energy and Transportation Poli<br>WE ACT for Environmental Justice<br>50 F ST NW STE 550<br>WASHINGTON, DISTRICT OF COLUMBIA 20001<br>UNITED STATES<br>anastasia@weact.org | |
| Wellesley Municipal Light Plant | John Coyle<br>Duncan & Allen LLP<br>Suite 700<br>1730 Rhode Island Avenue, N.W.<br>Washington, DISTRICT OF COLUMBIA 20036-3115 | |

| | UNITED STATES<br>jpc@duncanallen.com | |
|---|---|---|
| West Virginia Public Service Commission | Jacqueline Roberts<br>Federal Policy Advisor, WV Pub<br>West Virginia Public Service Commission<br>201 Brooks Street<br>Charleston, WEST VIRGINIA 25301<br>UNITED STATES<br>jroberts@psc.state.wv.us | |
| WestConnect | | Heidi Pacini<br>682 Kentons Run Avenue<br>Henderson, NEVADA 89052-2823<br>heidi@pacenergies.com |
| Western Electricity Coordinating Council | Steven Goodwill<br>SVP, General Counsel & Secreta<br>Western Electricity Coordinating Council<br>155 N 400 W<br>Suite 200<br>Salt Lake City, UTAH 84103<br>UNITED STATES<br>sgoodwill@wecc.org | |
| Western Electricity Coordinating Council | Chris Albrecht<br>Senior Counsel<br>Western Electricity Coordinating Council<br>155 N. 400 W., Suite 200<br>Salt Lake City, UTAH 84103<br>UNITED STATES<br>calbrecht@wecc.org | |
| Western Farmers | Daniel Frank<br>Partner | Matthew A. Caves<br>Senior Manager, Legal & |

| | | |
|---|---|---|
| Electric Cooperative | Eversheds Sutherland (US) LLP 700 Sixth Street, N.W. Suite 700 Washington, DISTRICT OF COLUMBIA 20001-3980 UNITED STATES DanielFrank@eversheds-sutherland.com | Regula Western Farmers Electric Cooperative 707 N.E. 7th St. Anadarko, OKLAHOMA 73005 matt.caves@wfec.com |
| Western Farmers Electric Cooperative | Allison Salvia Eversheds Sutherland (US) LLP 700 Sixth Street, NW Suite 700 Washington, DISTRICT OF COLUMBIA 20001 UNITED STATES AllisonSalvia@eversheds-sutherland.com | |
| Western Interstate Energy Board | | Eric Baran Program Manager - Electric Sys WESTERN INTERSTATE ENERGY BOARD 1600 BROADWAY STE 1020 DENVER, COLORADO 80202 ebaran@westernenergyboard.org |
| WESTERN INTERSTATE ENERGY BOARD | Gia Anguiano WESTERN INTERSTATE ENERGY BOARD 1600 BROADWAY STE 1020 DENVER, COLORADO 80202 UNITED STATES ganguiano@westernenergyboard.org | |
| Western Power Trading Forum | Daniel Douglass Owner Douglass & Liddell, an association of professional corporations | |

| | | |
|---|---|---|
| | 5737 KANAN RD STE 610 AGOURA HILLS, CALIFORNIA 91301 UNITED STATES douglass@energyattorney.com | |
| Western Resource Advocates | Vijay Satyal Sr. Market Policy Analyst 307 West 200 South Suite 200 Salt Lake City, UTAH 84101 UNITED STATES VIJAY.SATYAL@WESTERN RESOURCES.ORG | |
| Western Resource Advocates | Vijay Satyal Sr. Market Policy Analyst 307 West 200 South Suite 200 Salt Lake City, UTAH 84101 UNITED STATES VIJAY.SATYAL@WESTERN RESOURCES.ORG | |
| Western Resource Advocates | Ellen Kutzer Senior Staff Attorney Western Resource Advocates 2260 Baseline Rd. Suite 200 Boulder, COLORADO 80302 UNITED STATES ellen.kutzer@westernresources. org | |
| Western Resource Advocates | Hunter Holman Western Resource Advocates 307 W 200 S STE 2000 SALT LAKE CITY, UTAH 84101 UNITED STATES hunter.holman@westernresourc es.org | Vijay Satyal Sr. Market Policy Analyst 307 West 200 South Suite 200 Salt Lake City, UTAH 84101 VIJAY.SATYAL@WESTERN RESOURCES.ORG |

| | | |
|---|---|---|
| Western Resources Advocates | Vijay Satyal<br>Sr. Market Policy Analyst<br>307 West 200 South Suite 200<br>Salt Lake City, UTAH 84101<br>UNITED STATES<br>VIJAY.SATYAL@WESTERN RESOURCES.ORG | |
| Western Resources Advocates | Ken Wilson<br>Engineering Fellow<br>Western Resource Advocates<br>3904 GLENN EYRE DR<br>LONGMONT, COLORADO 80503<br>UNITED STATES<br>ken.wilson@westernresources.org | |
| Western Resources Advocates | Vijay Satyal<br>Sr. Market Policy Analyst<br>307 West 200 South Suite 200<br>Salt Lake City, UTAH 84101<br>UNITED STATES<br>VIJAY.SATYAL@WESTERN RESOURCES.ORG | |
| Westfield Gas & Electric Light Department | John Coyle<br>Duncan & Allen LLP<br>Suite 700<br>1730 Rhode Island Avenue, N.W.<br>Washington, DISTRICT OF COLUMBIA 20036-3115<br>UNITED STATES<br>jpc@duncanallen.com | |
| Whiteman Osterman & Hanna LLP | Paul Gioia<br>Mr. Paul L. Gioia<br>38 Loudon Parkway<br>Loudonville, NY, NEW YORK 12211 | |

| | | |
|---|---|---|
| | UNITED STATES pgioia@outlook.com | |
| WIRES | Larry Gasteiger Executive Director 529 14TH ST NW STE 1280 WASHINGTON, DISTRICT OF COLUMBIA 20045 UNITED STATES lgasteiger@exec.wiresgroup.com | |
| Xcel Energy Inc. | Terri Eaton Director, Regulatory Admin. Xcel Energy Inc. 1800 LARIMER ST DENVER, COLORADO 80202 UNITED STATES terri.k.eaton@xcelenergy.com | |
| Xcel Energy Services Inc. | Timothy Mastrogiacomo Area Vice President, Law Xcel Energy Services Inc. 701 PENNSYLVANIA AVE NW STE 250 WASHINGTON, DISTRICT OF COLUMBIA 20004 UNITED STATES tim.t.mastrogiacomo@xcelenergy.com | Terri K. Eaton Director, Regulatory Admin. Xcel Energy Inc. 1800 LARIMER ST DENVER, COLORADO 80202 terri.k.eaton@xcelenergy.com |