**No. 24-1650 (L)**

(consolidated with Nos. 24-1748, 24-1756, 24-1758, 24-1760, 24-1765, 24-1770, 24-1785, 24-1792, 24-1804, 24-1857, 24-1862, 24-1867, 24-1876, 24-1885, 24-1887, 24-1979, 24-1991, 24-2162, 24-2163, 25-1073, 25-1080, 25-1197, 25-1349)

# In the United States Court of Appeals for the Fourth Circuit

---

APPALACHIAN VOICES; ENERGY ALABAMA; NORTH CAROLINA SUSTAINABLE ENERGY ASSOCIATION; SOUTHERN ALLIANCE FOR CLEAN ENERGY; SOUTH CAROLINA COASTAL CONSERVATION LEAGUE; ET AL.,
*Petitioners*

*v.*

FEDERAL ENERGY REGULATORY COMMISSION,
*Respondent*

---

*On Petitions for Review of Orders of the
Federal Energy Regulatory Commission*

---

**CORRECTED OPENING BRIEF OF PETITIONERS ADVANCED ENERGY UNITED; ELECTRICITY TRANSMISSION COMPETITION COALITION; LS POWER GRID, LLC; AND ALLIED PETITIONERS OR INTERVENORS**

---

MICHAEL R. ENGLEMAN
 *Engleman Fallon, PLLC*
 *1717 K Street NW, Suite 900*
 *Washington DC 20006*
 *202-464-1332 (Office)*
 *202-253-6645 (Cell)*

*Counsel for LS Power Grid, LLC*

SEPTEMBER 8, 2025

NICHOLAS M. GLADD
 *Wilson Sonsini Goodrich & Rosati, P.C.*
 *1700 K Street, N.W.*
 *Washington, DC 20006*
 *(202) 973-8800*
 *ngladd@wsgr.com*

*Counsel for Advanced Energy United*

[*Additional Counsel Listed on Next Page*]

KENNETH R. STARK
  *McNees Wallace & Nurick LLC*
  *100 Pine Street*
  *Harrisburg, PA 17101*
  *Phone: (717) 237-8000*

*Counsel to the Electricity*
*Transmission Competition Coalition*

KATHERINE ANN WADE
  *Betts & Holt LLP*
  *1101 Connecticut Ave., N.W.*
  *Ste. 450*
  *Washington, D.C. 20036*
  *(202) 530-3380*

*Counsel for Resale Power Group of Iowa*

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

## DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __24-2162__    Caption: __Advanced Energy United v. FERC__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Advanced Energy United__
(name of party/amicus)

who is _____ __a petitioner__ _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?    ☐ YES ☑ NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO
      If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
   If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☑YES ☐NO
   If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

   EDF Renewables, Inc.

6. Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
   If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
   If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Nicholas M. Gladd          Date: _____8/29/25_____

Counsel for: Advanced Energy United

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

## DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __24-1857__     Caption: __The Electricity Transmission Competition Coalition, et al. v. FERC__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__The Electricity Transmission Competition Coalition (ETCC)__
(name of party/amicus)

_____

 who is _____Petitioner_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO

2.    Does party/amicus have any parent corporations?    ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐YES ☑NO
      If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question) ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Kenneth R. Stark          Date: _____08/29/2025_____

Counsel for: ___Electricity Transmission Competition Coalition (ETCC)___

Print to PDF for Filing

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

## DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. 24-1857      Caption: The Electricity Transmission Competition Coalition, et al v. FERC

Pursuant to FRAP 26.1 and Local Rule 26.1,

LS Power Grid, LLC
(name of party/amicus)


 who is _____ Petitioner _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.   Is party/amicus a publicly held corporation or other publicly held entity?   ☐ YES ☑ NO


2.   Does party/amicus have any parent corporations?                ☑ YES ☐ NO
     If yes, identify all parent corporations, including all generations of parent corporations:

     LS Power Grid Member, LLC; LS Power Transmission, LLC; LSP Generation IV, LLC; LS
     Power Generation III, LLC; LS Power Associates, LP.


3.   Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
     other publicly held entity?                                    ☐ YES ☑ NO
     If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: Michael R. Engleman                          Date:     August 29, 2025

Counsel for: LS Power Grid, LLC

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. <u>24-1650</u>      Caption: <u>Appalachian Voices, et al. v. Federal Energy Regulatory Comm'n</u>

Pursuant to FRAP 26.1 and Local Rule 26.1,

<u>Resale Power Group of Iowa</u>
(name of party/amicus)

_____

 who is _____<u>intervenor</u>_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.      Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO


2.      Does party/amicus have any parent corporations?                    ☐YES ☑NO
        If yes, identify all parent corporations, including all generations of parent corporations:




3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
        other publicly held entity?                                       ☐YES ☑NO
        If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Katherine Ann Wade          Date: ____August 28, 2025____

Counsel for: Resale Power Group of Iowa

Print to PDF for Filing

# TABLE OF CONTENTS

TABLE OF CONTENTS ......................................................................................... i

TABLE OF AUTHORITIES..................................................................................... ii

JURISDICTIONAL STATEMENT ...........................................................................1

STATEMENT ON STANDING................................................................................1

STATEMENT OF THE ISSUES ..............................................................................5

STATEMENT OF THE CASE...................................................................................6

    I.    Regulatory Background....................................................................................6

        A.    Transmission of Electricity ..........................................................................6

        B.    FERC's Authority Under the FPA.................................................................7

        C.    FERC's Prior Orders On Transmission........................................................9

    II.   Proceedings Below ........................................................................................20

        A.    Notice of Proposed Rulemaking ................................................................20

        B.    Order 1920......................................................................................................24

        C.    Order 1920-A .................................................................................................29

SUMMARY OF ARGUMENT................................................................................30

ARGUMENT ........................................................................................................33

    I.    Standard of Review........................................................................................33

    II.   FERC Has No Authority to Grant a Federal Right of First Refusal to Construct Transmission Facilities..........................................................................34

    III.  Order 1920 and the Related Orders Do Not Satisfy the First Prong of Section 206 of the FPA. ......................................................................................44

    IV.  FERC Unlawfully Ignored Evidence, Arguments, and Prior Precedent in Concluding that the Imposition of a ROFR Will Produce Just, Reasonable, and Not Unduly Discriminatory or Preferential Rates. ...............................................48

CONCLUSION.....................................................................................................57

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

## CASES

*Advanced Energy Mgmt. All. v. FERC*,
860 F.3d 656 (D.C. Cir. 2017)........................................................................41

*Atl. City Elec. Co. v. FERC*,
295 F.3d 1 (D.C. Cir. 2002)......................................................................35, 36

*Attleboro Steam & Elec. Co.*,
273 U.S. 83 (1927).....................................................................................7, 39

*Bldg. for the Future Through Elec. Reg'l Transm. Plan. & Cost
Allocation & Generator Interconnection*,
176 FERC ¶61,024 (2021)..............................................................................21

*City of Winnfield v. FERC*,
744 F.2d 871 (D.C. Cir. 1984)........................................................................45

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013)..........................................................................................1

*Del. Div. of Pub. Advocate v. FERC*,
3 F.4th 461 (D.C. Cir. 2021)...........................................................................43

*El Paso Elec. Co. v. FERC*,
832 F.3d 495 (5th Cir. 2016) ..........................................................................40

*Emera Maine v. FERC*,
854 F.3d 662 (D.C. Cir. 2017)............................................................18, 20, 49

*Emera Maine v. FERC*,
854 F.3d 9 (D.C. Cir. 2017).................................................................33, 44, 45

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009)........................................................................................49

*FERC v. Elec. Power Supply Ass'n*,
577 U.S. 260 (2016)........................................................................................34

*Fla. Gas Transmission Co. v. FERC*,
876 F.2d 42 (5th Cir. 1989) ............................................................................40

*FPC v. Sierra Pac. Power Co.*,
350 U.S. 348 (1956)................................................................................8, 9, 16

*Friends of the Earth, Inc. v. Laidlaw Env't. Servs.*,
528 U.S. 167 (2000)..........................................................................................2

*Gulf States Utils. Co. v. FPC*,
411 U.S. 747 (1973).............................................................................8, 31, 38

*ISO New Eng., Inc.*,
143 FERC ¶61,150 (2013) ................................................................................ 19

*ISO New Eng., Inc. v. New Eng. Power Pool*,
109 FERC ¶61,147 (2004) ................................................................................ 19

*La. Pub. Serv. Comm'n v. FCC*,
476 U.S. 355 (1986) ........................................................................................ 35

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) .................................................................................. 33, 34

*LSP Transmission Holdings II, LLC v. FERC*,
45 F.4th 979 (D.C. Cir. 2022) ........................................................................... 3

*Michigan v. EPA*,
268 F.3d 1075 (D.C. Cir. 2001) ...................................................................... 36

*Midwest Indep. Transmission Sys. Operator, Inc.*,
142 FERC ¶61,215 (2013) ............................................................................... 56

*Midwest Indep. Transmission Sys. Operator, Inc.*,
147 FERC ¶61,127 (2014) .......................................................................... 56, 57

*Midwest ISO Transmission Owners v. FERC*,
373 F.3d 1361 (D.C. Cir. 2004) ........................................................................ 9

*MISO Transmission Owners v. FERC*,
819 F.3d 329 (7th Cir. 2016) ..................................................................... 18, 49

*Mun. Light Bds. of Reading & Wakefield Mass. v. FPC*,
450 F.2d 1341 (D.C. Cir. 1971) ........................................................................ 8

*N.C. Coastal Fisheries Reform Grp. v. Capt. Gaston LLC*,
76 F.4th 291 (4th Cir. 2023) ........................................................................... 37

*NAACP v. FPC*,
425 U.S. 670 (1976) ........................................................................................ 38

*New York Indep. Sys. Operator, Inc.*,
175 FERC ¶61,038 (2021) ............................................................................... 56

*New York v. FERC*,
535 U.S. 1 (2002) ........................................................................... 8, 9, 10, 15

*Okla. Gas & Elect. Co. v. FERC*,
827 F.3d 75 (D.C. Cir. 2016) ..................................................................... 18, 19

*Otter Tail Power Co. v. United States*,
410 U.S. 366 (1973) ........................................................................................ 38

*Outdoor Amusement Bus. Ass'n, Inc. v. Dep't of Homeland Sec.*,
983 F.3d 671 (4th Cir. 2020) ......................................................................... 1, 2

iii

*Penn. Water & Power Co. v. FPC*,
343 U.S. 414 (1952)...................................................................................31

*Perez v. Mortg. Bankers Ass'n*,
575 U.S. 92 (2015)...................................................................................34

*Pub. Serv. Comm'n of the Commonwealth of Ky. v. FERC*,
397 F.3d 1004 (D.C. Cir. 2005)..................................................................47

*Pub. Serv. Elec. & Gas Co. v. FERC*,
989 F.3d 10 (D.C. Cir. 2021)......................................................................45

*S.C. Pub. Serv. Auth. v. FERC*,
762 F.3d 41 (D.C. Cir. 2014)....................................... 4, 13, 16, 17, 18, 49, 55

*Southwest Power Pool, Inc.*,
144 FERC ¶61,059 (2013)..........................................................................56

*TransCanada Power Mktg. Ltd. v. FERC*,
811 F.3d 1 (D.C. Cir. 2015)........................................................................47

*Transmission Access Pol'y Study Grp. v. FERC*,
225 F.3d 667 (D.C. Cir. 2000).....................................................................10

*United Gas PipeLine Co. v. Mobile Gas Serv. Corp.*,
350 U.S. 332 (1956)...................................................................................16

*Util. Air Regul. Grp. v. EPA*,
573 U.S. 302 (2014)...................................................................................32

*West Virginia v. EPA*,
597 U.S. 697 (2022)......................................................................32, 36, 37, 43

## STATUTES & CONSTITUTIONAL ARTICLE

5 U.S.C.
§706(2)...................................................................................33, 34
§706(2)(A) .............................................................................33, 34

15 U.S.C. §79.............................................................................................7

16 U.S.C. . §824e ........ 5, 8, 22, 29, 32, 33, 36, 38, 39, 40, 41, 42, 44, 45, 46, 47, 48

16 U.S.C.
§201 ..........................................................................................7
§824 ........................................................... 31, 35, 36, 37, 38, 39
§824d ..................................................................8, 22, 35, 41
§824p ...................................................................................36
§825*l* ......................................................................................1

35 U.S.C. . §154.........................................................................................37

U.S. Const. art. III.................................................................................1, 3

# RULES & REGULATIONS

Fed. R. App. P. 15(a) ................................................................................................1

*Preventing Undue Discrimination and Preference in Service*,
Order No. 890, 72 Fed. Reg. 12,266 (March 15, 2007) . 10, 11, 12, 13, 20, 27

*Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Services by Public Utilities, Recovery of Stranded Costs by Public Utilities*,
Order No. 888, 61 Fed. Reg. 21,540 (May 10, 1996) .......9, 10, 11, 19, 20, 39

*Regional Transmission Organizations*,
Order No. 2000, 65 Fed. Reg. 809 (Jan. 6, 2000) .........................................39

*Transmission Planning and Cost Allocation by Transmission Owning and Operating Public Utilities*,
Order No. 1000, 76 Fed. Reg. 49,842 (Aug. 11, 2011) 12, 13, 14, 15, 16, 17, 19, 20, 21, 22, 23, 24, 26, 27, 28, 31, 38, 42, 48, 49, 50, 51, 52, 53, 54, 55, 56, 57

*Transmission Planning and Cost Allocation by Transmission Owning and Operating Public Utilities*,
Order on Reh'g, Order No. 1000-A, 77 Fed. Reg. 32,184 (May 31, 2012) ....................................................................... 15, 16, 38, 51, 52, 56

# MISCELLANEOUS

Brown & Sedano, Electricity Transmission: A Primer, at 2 (Nat'l Council on Electricity Policy 2004) ................................................................7

Eric Hirst, *U.S. Transmission Capacity: Present Status and Future Prospects* (Aug. 2004)...................................................................................11

FERC, Energy Primer: A Handbook of Energy Market Basics, at 44 (Dec. 2023) .......................................................................................................6

Phillip E. Areeda, *Antitrust Law* 71 (3d ed. 2007) ...................................................17

## JURISDICTIONAL STATEMENT

The consolidated petitions for review of Electricity Transmission Competition Coalition ("ETCC"), LS Power Grid, LLC ("LS Power"), and Advanced Energy United ("AEU") ("Pro-Competition Petitioners") challenge portions of orders issued by the Federal Energy Regulatory Commission ("FERC" or "Commission"). Pro-Competition Petitioners timely sought administrative rehearing as required by Section 313(a) of the Federal Power Act ("FPA" or "Act"), *id.* §825*l*(a), and timely petitioned for review following issuance of FERC's orders, *see id.* §825*l*(b); Fed. R. App. P. 15(a). Resale Power Group of Iowa ("RPGI"), intervenor in support of Pro-Competition Petitioners, timely intervened. This Court has appellate jurisdiction pursuant to Section 313 of the FPA, 16 U.S.C. §825*l*.

## STATEMENT ON STANDING

"To establish Article III standing, the injury must be 'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling.'" *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). When membership organizations petition for review on behalf of their members, the organization must show (1) at least one of its members would have standing to sue in their own right; (2) the interests at stake are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested

requires the participation of individual members in the lawsuit. *Outdoor*
*Amusement Bus. Ass'n, Inc. v. Dep't of Homeland Sec.*, 983 F.3d 671, 683 (4th Cir.
2020) (citing *Friends of the Earth, Inc. v. Laidlaw Env't. Servs*., 528 U.S. 167, 181
(2000)). Pro-Competition Petitioners have standing to pursue appellate review as
they individually suffered injury as a direct result of those orders, which injuries
will be redressed by an order from this Court vacating relevant parts of Order
1920, namely removing the *requirement* that all tariffs grant existing transmission
owners a so-called federal right of first refusal ("ROFR") that enshrines an anti-
competitive right for incumbents to construct and own all future regional
transmission projects involving a so-called "right-sized" component.

Petitioner LS Power is a transmission development company, which, though
individual affiliate companies, competes for transmission projects across the
United States, including projects for which Order 1920 now establishes a ROFR,
thus prohibiting LS Power from competing for those projects. LS Power
participated fully in the proceedings below, filing nine pleadings with over seventy
exhibits.

Among LS Power's filings was an affidavit from Paul Thessen, President of
LS Power Development, the general partner of LS Power Grid, LLC. R.575,
Attachment 1. That affidavit demonstrates that LS Power has submitted dozens of
proposals for competitive transmission projects and was selected as the more

2

efficient or cost-effective developer for multiple such projects, (*id.* at 1-4); was selected to build a $750 million dollar project in New York precisely of the type that would now be subject to a ROFR (*id.*); testifying to the erroneous factual presumption on which FERC's ROFR proposal was based (*id.* at 17-19); testifying why, when competition is viable, FERC cannot meet its statutory mandate to establish just and reasonable transmission rates without that competition (*id.* at 26-30); and laying out the direct, immediate and irreparable harm a ROFR would have on LS Power by depriving LS Power of the opportunity to compete for projects. Those demonstrations clearly establish LS Power's standing. *See, e.g.*, *LSP Transmission Holdings II, LLC v. FERC*, 45 F.4th 979, 989 (D.C. Cir. 2022) (holding that Article III standing is established when an entity like LS Power shows that it is ready, willing, and able to perform but FERC's action "deprived the company of the opportunity to compete").

ETCC has 93 members including individual manufacturing companies, manufacturing groups, retail electric consumers, state consumer advocates, public power representatives, think tanks, and non-incumbent transmission developers. ETCC's manufacturing members are large energy intensive users that are particularly price-sensitive, meaning that small changes in energy costs can directly impact their competitiveness in the U.S. and world markets. ETCC's

smaller businesses and advocates for retail consumers are likewise significantly impacted by Order 1920 and the related orders.

AEU is a national non-profit industry association with over 100 member companies, which include developers of wind, solar, storage, and transmission projects that are subject to, or otherwise impacted by, the Order 1920 and the related orders. AEU and its members seek to promote lawful rates, terms, and conditions of service for clean energy, including those associated with transmission planning and cost allocation rules.

The interest in affordable, reliable electric power is germane to the core purposes of the ETCC and AEU. Participation of all individual members of the ETCC and AEU in this appeal is not necessary to advance Pro-Competition Petitioners' claims. FERC promulgated Order 1920 upon finding that transmission planning directly affects rates that consumers pay for electricity, R.813 at P86 (citing *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d 41, 55 (D.C. Cir. 2014) ("*South Carolina*")), and that "a robust, well-planned transmission system is foundational to ensuring an affordable, reliable supply of electricity," *id.* at P90. Pro-Competition Petitioners' members are harmed by reduced competition for transmission projects—both through lost opportunities to compete and through rate impacts of transmission developed by monopolistic incumbents—and that FERC's establishment of a ROFR will directly cause that very harm. A decision from this

4

Court vacating FERC's *ultra vires* ROFR requirement will redress that harm by permitting non-incumbents to compete to develop transmission projects that Order 1920 insulates from competition.

## STATEMENT OF THE ISSUES

1. Whether FERC exceeded its authority under the FPA by granting incumbent transmission owners a monopoly for "right-sized" regional transmission facilities.

2. Whether FERC violated the FPA and the Administrative Procedure Act ("APA") by imposing a ROFR for "right-sized" regional facilities without first finding—as required by FPA Section 206—that existing transmission provider tariffs are unjust, unreasonable, or unduly discriminatory or preferential because they do not include a ROFR for such projects.

3. Whether FERC violated the APA by unlawfully ignoring evidence and deviating from prior precedents in concluding that the imposition of a ROFR will produce just, reasonable, and not unduly discriminatory or preferential rates.

## I. Regulatory Background

### A. Transmission of Electricity

Electricity service to consumers "relies on a complex system of infrastructure that can be divided into two general categories: generation and delivery." FERC, Energy Primer: A Handbook of Energy Market Basics, at 44 (Dec. 2023), *available at* https://www.ferc.gov/media/energy-primer-handbook-energy-market-basics. Delivery infrastructure, commonly referred to as the "power grid," is subdivided into transmission and distribution infrastructure. *Id.* The nation's transmission infrastructure delivers electricity from generation resources to the distribution system, which then distributes that electricity to consumers. *Id.* Transmission lines are the backbone of the power grid, ensuring both reliability and affordability of electricity. *See* R.813 at P90. The "power grid operates like an interconnected web, where, with a few exceptions, the flow of power is not specifically controlled by the operators on a line-by-line basis"; rather, "power flows from sources of generation to consumers across any number of lines simultaneously, following the path of least resistance." FERC, Energy Primer at 52. When transmission capacity is constrained, a condition known as "congestion," it limits the boundaries of the generation market a system operator may access to meet consumer demand and increases the price of electricity. *See id.*

6

at 70.  Under extreme demand surges, insufficient transmission capacity can lead to line failure and blackouts.  R.813 at PP94, 773, 791.

## B.    FERC's Authority Under the FPA

The nation's earliest electricity transmission infrastructure, established in the 19th century, was developed by innovators competing to serve consumers.  *See* Brown & Sedano, Electricity Transmission: A Primer, at 2 (Nat'l Council on Electricity Policy 2004), *available at* https://www.energy.gov/oe/articles/electricity-transmission-primer.  As that infrastructure expanded and more consumers became reliant on it, the industry saw the "creation of the early electric monopolies."  *Id.* at 3.  State governments responded by "extending the jurisdiction of their regulatory commissions, originally designed to regulate railroads, to electric companies."  *Id.*

Eventually, a Constitutional limitation on State regulation surfaced in 1935, when the Supreme Court declared that the wholesale sale of electricity, and the transmission of electricity between states was an interstate endeavor subject to federal regulation.  *Pub. Utils. Comm'n of R.I. vs. Attleboro Steam & Elec. Co.*, 273 U.S. 83, 89 (1927).  Given the limited federal regulation of electricity at the time, Congress legislated to close the recently identified regulatory gap by enacting both the Public Utility Holding Company Act, 15 U.S.C. §79, *et seq* and the FPA, 16 U.S.C. §201, *et seq.*

7

The purpose of the FPA was "to curb abusive practices of public utility companies by bringing them under effective control, and to provide effective federal regulation of the expanding business of transmitting and selling electric power in interstate commerce." *Gulf States Utils.*, 411 U.S. at 758; *see also id.* ("The Act was passed in the context of, and in response to, great concentrations of economic and even political power vested in power trusts, and the absence of antitrust enforcement to restrain the growth and practices of public utility holding companies.") (citing S. Rep. No. 621, 74th Cong., 1st Sess., at 11-12; Utility Corporations—Summary Report, 70th Cong., 1st Sess., S. Doc. No. 92, Part 73-A, at 47-54; 79 Cong. Rec. 8392 (1935)).

The FPA's "primary aim is the protection of consumers from excessive rates and charges." *Mun. Light Bds. of Reading & Wakefield Mass. v. FPC*, 450 F.2d 1341, 1348 (D.C. Cir. 1971). As such, the substantive provisions of Part II of the FPA prohibit unjust or unreasonable rates, and undue discrimination "with respect to any transmission or sale subject to the jurisdiction of the Commission." 16 U.S.C. §824d(a), (b); *New York v. FERC*, 535 U.S. 1, 7 (2002). If FERC finds that a public utility's rate "for any transmission or sale subject to the jurisdiction of the Commission," or any practice "affect[ing] such rate," is "unjust, unreasonable, unduly discriminatory or preferential," FERC must prescribe a lawful rate or practice for the future. 16 U.S.C. §824e(a). FERC's purpose "is the protection of

8

the public interest, as distinguished from the private interests of the utilities." *FPC v. Sierra Pac. Power Co.*, 350 U.S. 348, 355 (1956).

"[T]he landscape of the electric industry has changed since the enactment of the FPA." *New York*, 535 U.S. at 16. "In the bad old days, utilities were vertically integrated monopolies; electricity generation, transmission, and distribution for a particular geographic area were generally provided by and under the control of a single regulated utility." *Midwest ISO Transmission Owners v. FERC*, 373 F.3d 1361, 1363 (D.C. Cir. 2004) (Roberts, J.); *see also id.* ("As the Supreme Court observed, with blithe understatement, '[c]ompetition among utilities was not prevalent.'") (quoting *New York*, 535 U.S. at 5). FERC and its predecessor, the Federal Power Commission, have made numerous efforts to rein in utilities' monopoly power and foster "a more competitive electricity marketplace." *Midwest ISO*, 373 F.3d at 1364.

## C. FERC's Prior Orders On Transmission

### 1. Order 888

FERC made significant progress in fostering competition in the electric industry in 1996, by issuing Order 888, which required the functional unbundling of transmission from the remainder of utility operations. *See* Order 888 at 21,546. FERC concluded that "[t]he most likely route to market power in today's electric utility industry lies through ownership or control of transmission facilities.

Usually, the source of market power is dominant or exclusive ownership of the facilities." *Id.* "Thus, market power through control of transmission is the single greatest impediment to competition." *New York*, 535 U.S. at 10 (quoting Order 888).

Accordingly, FERC determined that existing rates were unjust, unreasonable, and unduly discriminatory or preferential. Order 888 thus required all public utilities owning or operating transmission facilities to file tariffs conforming to a FERC *pro forma* open-access transmission tariff ("OATT") intended to provide non-discriminatory transmission service comparable to the public utility's use of its facilities to serve its own customers. *See generally Transmission Access Pol'y Study Grp. v. FERC*, 225 F.3d 667 (D.C. Cir. 2000). FERC referred to this as "functional unbundling." In *New York*, the Supreme Court upheld FERC's functional unbundling.[1]

### 2. Order 890

After requiring non-discriminatory access to the interstate transmission grid, FERC then began to address transmission owners' self-interested behavior in transmission planning. In 2007, FERC issued Order 890, finding that "legacy

---

[1] Justice Thomas partially dissented in *New York* because he believed FERC was obligated to address discriminatory conduct, so FERC should have gone further and undertaken a fulsome review of retail transactions that are bundled with transmission service. 535 U.S. at 34-35 (Thomas, J., dissenting).

systems constructed by vertically-integrated utilities prior to the adoption of Order 888 support 'only limited amounts of inter-regional power flows and transactions. Thus, existing systems [could not] fully support all of society's goals for a modern electric-power system.'" Order 890 at P58 (quoting Eric Hirst, *U.S. Transmission Capacity: Present Status and Future Prospects* at v (Aug. 2004)). FERC further concluded that "Order No. 888 does not contain sufficient protections to guard against undue discrimination in transmission system planning. Without adequate coordination and open participation, market participants have minimal input or insight into whether a particular transmission plan treats all loads and generators comparably." Order 890 at P84.

To address Order 888's deficiencies, FERC required transmission providers to amend "the *pro forma* OATT to require coordinated, open, and transparent transmission planning on both a sub-regional and regional level." *Id*. FERC found that Order 888 failed to address undue discrimination in transmission planning because it did not include mandatory planning requirements and contained no requirement that the planning process be open to customers, competitors and state commissions, thus allowing transmission owners to "develop transmission plans with limited or no input from customers or other stakeholders." Order 890 at P424.

FERC therefore required transmission owners to adopt "an open, transparent, and coordinated transmission planning process," *id*. at P3, concluding:

> [t]ransmission planning is a critical function under the *pro forma* OATT because it is the means by which customers consider and access new sources of energy and have an opportunity to explore the feasibility of non-transmission alternatives.  Despite this, the existing *pro forma* OATT provides limited guidance regarding how transmission customers are treated in the planning process and provides them very little information on how transmission plans are developed.  These deficiencies are serious, given the substantial need for new infrastructure in this Nation.  We act today to remedy these deficiencies by requiring transmission providers to open their transmission planning process to customers, coordinate with customers regarding future system plans, and share necessary planning information with customers.

*Id.*  FERC determined that "reforms are needed to ensure that transmission infrastructure is evaluated, and if needed, constructed on a nondiscriminatory basis and is otherwise sufficient to support reliable and economic service to all eligible customers."  *Id*. at P57.  FERC concluded that it was unable to "rely on the self-interest of transmission providers to expand the grid in a nondiscriminatory manner."  *Id.* at P422.

### 3.    **Order 1000**

In 2011, FERC issued Order 1000 to further address anti-competitive transmission planning practices by incumbent transmission owners.  FERC concluded that Order 890 was deficient because "[p]ublic utility transmission

providers are currently under no affirmative obligation to develop a regional transmission plan that reflects the evaluation of whether alternative regional solutions may be more efficient or cost-effective than solutions identified in local transmission planning processes."  Order 1000 at P3.  Although Order 890 brought some transparency to utilities' transmission planning processes, it imposed no obligation on the *type* of planning utilities were required to conduct.  To address the regional planning deficiencies, FERC required transmission providers to conduct regional planning, *id*. at PP6, 68, 80, 148, including evaluating whether it would be more efficient or cost-effective to address transmission needs using a regional project rather than a smaller project that would be more lucrative for an individual transmission owner.  *Id*. at PP6, 68.

In developing transmission plans, FERC required transmission planners to "consider" state and federal laws driving transmission needs and "identif[y] transmission facilities needed to meet reliability, economic, and Public Policy Requirements".  *Id.* at P47, 203, 146.  Although Order 1000 imposed these procedural mandates, it left transmission providers broad discretion on compliance.  *South Carolina*, 762 F.3d at 90-91.  Planners set their own methods to determine transmission needs and project benefits, including assumptions made, information considered or shared, and criteria for project selection and advancement.

Reliability, economic, and public policy transmission planning was permitted to occur in three entirely separate processes. *See* R.813 at P1474.

Although Order 1000 gave transmission planners discretion to identify transmission needs, FERC was much more prescriptive in how the identified needs must be satisfied in situations where the costs would be allocated to consumers on a regional basis. To ensure effective regional planning and harnessing competitive forces to develop regional transmission projects, FERC required the elimination of contract and OATT provisions that give incumbent transmission owners preferential treatment. FERC noted that "[n]onincumbent transmission developers seeking to invest in transmission can be discouraged from doing so as a result of federal rights of first refusal in tariffs and agreements subject to the Commission's jurisdiction." Order 1000 at P3. FERC explained that it "refers to 'federal rights of first refusal' in [Order 1000] because … this Final Rule addresses only rights of first refusal that are created by provisions in Commission-jurisdictional tariffs or agreements." *Id*. at P253 n.231. FERC found that:

[a]llowing federal rights of first refusal to remain in Commission-jurisdictional tariffs and agreements would undermine the consideration of potential transmission solutions proposed at the regional level. Just as it is not in the economic self-interest of public utility transmission providers to expand transmission capacity to allow access to competing suppliers, it is not in the economic self-interest of incumbent transmission providers to permit new entrants to develop transmission facilities, even if proposals submitted by new entrants would result in a more efficient or cost-effective solution to the region's needs.

*Id*. at P256.  FERC held that corrective action was needed because provisions

establishing "federal rights of first refusal in favor of incumbent transmission

providers deprive customers of the benefits of competition in transmission

development, and associated potential savings."  *Id*. at P285.

Although FERC required removal of incumbents' self-granted right to

develop regionally cost-allocated projects, it did not require removal of self-

granted preferences for transmission owner planned projects, including rebuilds of

existing facilities, when the owner chose not to seek regional cost allocation.  *Id*. at

258.[2]  In addition, FERC left in place incumbent preferences for regionally planned

transmission additions that were considered an "upgrade" of existing transmission

facilities.  Order 1000 at P226.  On rehearing, FERC clarified that an upgrade

referred to only a part of an existing transmission facility and did not "refer to an

---

[2] FERC refers to projects planned by an individual transmission owner as a "local transmission facility."  Order 1000 at P258.  Pro-Competition Petitioners consider that phrase a misnomer.  The FPA reflects no local or non-local distinction.  FERC-jurisdictional transmission facilities are part of the interconnected grid and, thus, are used for the transmission of electricity in interstate commerce.  *New York*, 535 U.S. at 16.  The regulatory nature of transmission facilities in interstate commerce does not change based on the way an individual transmission owner decides to plan or allocate costs for a particular FERC-jurisdictional transmission facility.  The distinction between so-called local transmission facilities and regional ones is false from the perspective of electrical engineering and the FPA.  *See, e.g.*, *Indus. Energy Consumers of Am. v. Avista Corp*., Docket No. EL25-44-000, Complaint of Consumers for Indep. Reg'l Transmission Plan. (Dec. 19, 2024).  As described below, Order 1920 also incorporates this false distinction. *See, e.g.*, R.813 at P1565.

entirely new transmission facility." Order 1000-A at P426. "The concept is that there should not be a federally established monopoly over the development of an entirely new transmission facility that is selected in a regional transmission plan for purposes of cost allocation to others." *Id*. FERC also clarified that the use of, and rights to, existing rights of way was an issue governed by state law. *Id*. at P427.

Numerous transmission owners challenged Order 1000's requirement to eliminate self-granted ROFRs from jurisdictional tariffs or agreements. Those challengers asserted that their division of the transmission market through provisions filed with FERC was protected by precedent supporting the sanctity of contract.[3] *See e.g.*, Order 1000-A at PP383-387. FERC deferred those claims, stating that they would be addressed as needed in the context of each transmission planner's required compliance filing. Order 1000 at P292; Order 1000-A at PP344, 388-391.

Order 1000 became one of the most heavily litigated FERC orders, as both Order 1000 itself and multiple compliance orders were challenged on review. Relevant to Pro-Competition Petitioners' narrow challenge to Order 1920, Order 1000's general requirement to eliminate ROFRs from FERC-jurisdictional tariffs

---

[3] *United Gas PipeLine Co. v. Mobile Gas Serv. Corp.*, 350 U.S. 332 (1956); *FPC v. Sierra Pac. Power Co.*, 350 U.S. 348 (1956).

and agreements was upheld. *South Carolina*, 762 F.3d at 76-81. The D.C. Circuit noted that "[t]he Federal Trade Commission submitted comments supporting the Commission's proposal, observing that rights of first refusal reduce investment opportunities for non-incumbents. Several state utility commissions and municipal utilities echoed that view." *Id.* at 72. The court explained that "basic economic principles make clear that rights of first refusal are likely to have a direct effect on the costs of transmission facilities because they erect a barrier to entry: namely, non-incumbents are unlikely to participate in the transmission development market because they will rarely be able to enjoy the fruits of their efforts." *Id.* at 74 (citing Phillip E. Areeda, *Antitrust Law* 71 (3d ed. 2007)). The court found that it was appropriate for FERC to rely on the theory that competition would lead to lower transmission rates. *See id.* at 65 ("Agencies do not need to conduct experiments in order to rely on the prediction that an unsupported stone will fall; nor need they do so for predictions that competition will normally lead to lower prices.").

On compliance with Order 1000, transmission owners in the Midcontinent Independent System Operator ("MISO"), Southwest Power Pool ("SPP"), and ISO New England, Inc. ("ISO New England") regions each asserted that their transmission owner agreements, including their ROFR provisions, warranted

*Mobile-Sierra* presumption,[4] thereby prohibiting FERC from interfering with the provisions without making a finding that the contract provisions seriously harm the public interest. FERC rejected those arguments, finding that the agreements in question were not entitled to the *Mobile-Sierra* presumption as they were not reflective of arms-length negotiations among parties with differing interests. Multiple judicial appeals ensued, in multiple Circuit Courts, and each challenge failed.

The Seventh Circuit addressed the MISO transmission owners' arguments on rights of first refusal:

> They want to retain their right of first refusal—they don't want to have to bid down the prices at which they will build new facilities in order to remain competitive. And so while legal challenges to the order eliminating rights of first refusal have already failed, *see South Carolina*, 762 F.3d at 48-49, 72-82, the MISO transmission owners are trying to prevent the order from applying to them by arguing that FERC must *presume* that their contractual right of first refusal is reasonable. But why? The owners have made no effort to show that the right is in the public interest. Neither in their briefs nor at oral argument were they able to articulate any benefit that such a right would … confer on consumers of electricity or on society as a whole under current conditions.

*MISO Transmission Owners v. FERC*, 819 F.3d 329, 333 (7th Cir. 2016). The

D.C. Circuit similarly rejected the SPP transmission owners' arguments. *Okla. Gas*

---

[4] The *Mobile-Sierra* presumption "requires the Commission to 'presume a contract rate for wholesale energy is just and reasonable' and prohibits the Commission from setting aside that rate unless the Commission finds that the rate 'seriously harm[s] the public interest.'" *Emera Maine v. FERC*, 854 F.3d 662, 665 (D.C. Cir. 2017) ("*Emera Maine II*").

18

*& Elect. Co. v. FERC*, 827 F.3d 75, 80-81 (D.C. Cir. 2016) ("As the Commission, in its expert judgment already determined, the rights of first refusal created 'a pre-existing barrier to entry for nonincumbent transmission owners.").

The ISO New England transmission owners perhaps had a stronger argument for why the *Mobile-Sierra* presumption should apply to their division of the ISO New England transmission market because, unlike transmission owners in other regions, FERC had explicitly granted the *Mobile-Sierra* presumption to their agreement. *See* Order 1000 at P292 (citing *ISO New Eng., Inc. v. New Eng. Power Pool*, 109 FERC ¶61,147 at P78 (2004)). Yet their challenge was also unsuccessful.

In the agency proceeding, FERC found that the ISO New England transmission owners' ROFR *seriously harms the public interest*. FERC held that, "[j]ust as the open access reforms of Order No. 888 were intended 'to remove impediments to competition in the wholesale bulk power marketplace and to bring more efficient, lower cost power to the Nation's electricity consumers,' the elimination of federal rights of first refusal in Order No. 1000 was intended to benefit customers by fostering competition in transmission development." *ISO New Eng., Inc.*, 143 FERC ¶61,150 at P182 (2013). FERC further held that:

> just as it was appropriate in Order No. 888 to modify … contracts on the grounds that they reflected incumbents' monopoly power, it is appropriate here to make a public interest finding on the grounds that the federal right of first refusal in the [ISO New England transmission

19

owners agreement] likewise reflects monopoly power.  In this regard, the Commission explained in Order No. 1000 that its actions there were a direct outgrowth of its reforms in Order No. 890, which, in turn, were an outgrowth of the reforms in Order No. 888.  In short, the requirement to eliminate rights of first refusal supports a competitive regulatory regime, much like those earlier efforts that justified the modification of contracts under a public interest standard.

*Id.* at P183.

FERC concluded that "removal of such barriers to participation by nonincumbent transmission developers in the regional transmission planning processes lies at the core of Order No. 1000 and is essential to meeting the demands of changing circumstances facing the electric industry.  This finding is the foundation for our conclusion that protecting the public interest requires removal from the [transmission owners agreement] of the provisions at issue here."  *Id*. at P188.

The D.C. Circuit upheld FERC's determination.  *Emera Maine II*, 854 F.3d 662.  In doing so, the court found that FERC had sufficiently shown that rights of first refusal severely harm the public interest.  *Id*.

## II.    Proceedings Below

### A.    Notice of Proposed Rulemaking

In 2022, FERC issued a Notice of Proposed Rulemaking ("NOPR") to revise the transmission-planning and cost-allocation provisions of its pro forma OATT.  *Bldg. for the Future Through Elec. Reg'l Transmission Plan. & Cost Allocation &*

*Generator Interconnection*, 87 Fed. Reg. 26,504 (May 4, 2022), R.388.[5]  In it,

FERC found that although regional transmission provides significant benefits to

consumers in terms of enhanced reliability, improved resource adequacy, and

access to lower cost and diverse resources, regional transmission infrastructure was

not being built, in part because "vertically-integrated utilities do not have an

incentive to expand the grid to accommodate new entries or to facilitate the

dispatch of more efficient competitors." R.388 at PP32.  Consequently, despite

spending over \$20 billion annually on transmission facilities between 2013-2020,

the vast majority of that investment occurred in so-called "local" transmission

facilities.  *Id.* at PP39-40.  To the extent regional transmission projects driven by

supply and demand were being developed, they were being addressed in piecemeal

projects outside of the Order 1000 process, "through mechanisms that are not

designed to consider regional transmission needs and identify and select the more

efficient or cost-effective transmission facility to meet those needs," and therefore

lead to "inefficient expansion of the transmission system."  *Id.* at PP41-42.

For the first time ever, the NOPR introduced the prospect that FERC itself

could create a ROFR.  Prior ROFRs were put in place by incumbent transmission

---

[5] The NOPR was preceded by an Advanced Notice of Proposed Rulemaking.  *Bldg. for the Future Through Elec. Reg'l Transm. Plan. & Cost Allocation & Generator Interconnection*, 176 FERC ¶61,024 (2021), 86 Fed. Reg. 40,266 (July 15, 2021), R.3.

owners via agreements among themselves to divide the market and then filed with

FERC under Section 205 of the FPA. The NOPR proposed FERC's use of

authority under FPA Section 206 to give incumbent transmission owners a ROFR

(1) for projects in which the incumbent partnered with another entity, *id.* at P354,

and (2) when the relevant transmission planner for a given region determines that

there is a more efficient or cost-effective regional project that can supplant an

individual transmission owner planned project, which FERC defined as a "right-

sized" transmission facility, *id.* at PP403-409.

FERC's proposed ROFR for "right-sized" projects was based on the fact

that, notwithstanding Order 1000's requirements, "many incumbent transmission

providers are replacing aging transmission infrastructure as it reaches the end of its

useful life without evaluating whether those replacement transmission facilities

could be modified (i.e., right sized) to more efficiently or cost-effectively address

regional transmission needs." *Id.* at P399. FERC asserted that it was necessary to

adopt different rules for these types of projects because absent a ROFR, the

regionally beneficial "transmission facility might then be subject to the

transmission planning region's competitive transmission development process …

[but] the public utility transmission provider would not necessarily be bound by

that right-sizing decision made by the region, unless the public utility transmission

provider was selected to develop the right-sized replacement transmission facility."
*Id.* at P408.

Many parties opposed FERC's creation of a ROFR, including Pro-Competition Petitioners[6] and multiple others.[7] Pro-Competition Petitioners rebutted the NOPR's assertion that Order 1000's elimination of incumbent-created rights of first refusal may have "inadvertently" discouraged incumbents from pursuing regional projects because it presented them "with perverse investment incentives that do not adequately encourage those incumbent transmission providers to develop and advocate for transmission facilities that benefit more than just their own local retail distribution service territory or footprint."  R.388 at

---

[6] Advanced Energy Economy ("AEE") Comments, R.530; AEE Reply Comments at 31, R.658; Advanced Energy Buyers Group Comments, R.533; ETCC ANOPR Comments, R.96; ETCC ANOPR Reply Comments, R.331; ETCC NOPR Comments, R.551; ETCC NOPR Reply Comments, R.690; LS Power ANOPR Comments, R.221; LS Power ANOPR Reply Comments, R.341; LS Power NOPR Comments, R.575; LS Power Partial NOPR Reply Comments, R.696; LS Power Supplemental NOPR Reply Comments, R.678.

[7] *See, e.g.*, Am. Mun. Power Comments, R.534 at 28-29; Anbaric Comments, R.446 at 7; Cal. Comm'n Comments, R.549 at 114-117; Cal. Water Comments, R.552 at 8-9; City of N.Y. Comments, R.539 at 11-13; Competition Coalition Comments, R.551 at 64-67; Competition Coalition Reply Comments, R.666 at 2; DC & MD Offices of People's Counsel Comments, R.573 at 47-48; Industrial Customers Comments, R.509 at 4; Ken. Comm'n Chair Chandler Comments, R.585 at 19; Mass. Att'y Gen. Comments, R.527 at 40, 51-53; NextEra Comments, R.557 at 54-61; Nw. & Intermountain Comments, R.522 at 21-22; Penn. Comm'n Comments, R.427 at 22-23; R St. Comments, R.526 at 3-6; RGPI Comments, R.521 at 8-9; State Agencies Comments, R.571 at 21-22; TAPS Comments, R.474 at 68.

P350.  LS Power provided a thorough rebuttal, explaining that incumbent transmission owners' actions in response to Order 1000 were a calculated attempt to counteract the order's effort to use competitive market forces to protect consumers from excessive rates.  *See* R.575 at 37-51.  In its affidavit, LS Power also rebutted the NOPR's statement that a ROFR would lead to more efficient or cost-effective transmission projects.  *See* R.575, Attachment 1 at 26-29.

Among other comments detailing the negative consumer impacts of rights of first refusal were Joint Comments of the Department of Justice Antitrust Division and the Federal Trade Commission.  R.581.

## B.    Order 1920

On May 13, 2024, FERC issued Order 1920.  The primary focus of Order 1920 was addressing shortcomings of status quo planning practices.  *See* R.813 at PP85, 112, 114-123.  The record established that the issues Order 1000 was intended to address—aging transmission infrastructure, generator retirements, increasingly extreme weather, energy market shifts and state policy requirements, along with federal and state investments in new generating resources often located outside the reach of existing transmission—had become more pressing, as regional transmission infrastructure had grown more congested and less able to meet evolving challenges.  *Id.* at PP94, 96, 99.

Transmission costs for customers have in many cases doubled (or more) in the last decade, and substantial investments in the hundreds of billions to trillions of dollars are expected to be needed over the next 25 years. *Id.* at P93. Therefore, FERC concluded that the current lack of long-term, forward-looking, and comprehensive regional transmission planning results in inefficient transmission infrastructure that requires customers to pay "more than is necessary or appropriate," forgoing projects with benefits in excess of costs, and "renders Commission-jurisdictional regional transmission planning and cost allocation processes unjust and unreasonable." *Id.* at P112.

Order 1920 therefore adopted a requirement for "Long-Term Regional Transmission Planning" that FERC found would "ensure the identification, evaluation, and selection, as well as the allocation of the costs, of more efficient or cost-effective regional transmission solutions to address Long-Term Transmission Needs." R.813 at P1.

The Order 1920 planning process requires transmission providers to (1) forecast transmission needs over a 20-year forward period based on a minimum set of seven "factors" or assumptions that drive transmission demand; (2) use this forecast to develop three "reasonably probable" scenarios of future supply and demand and identify the long-term transmission needs for each scenario, and (3) identify solutions to meet the needs of each scenario—considering the benefits

associated with those solutions—and adopt a project evaluation process and selection criteria that aim to maximize benefits accounting for costs over time without overbuilding. R.813 at PP284, 388, 575-578, 1242. Order 1920 requires providers to conduct this planning every five years but to complete each full planning cycle within three years. R.813 at PP379. While Order 1920 establishes this new planning rubric, FERC left in place existing Order 1000 planning processes. R.813 at PP241-245.

Additionally, Order 1920 dropped the NOPR's proposed ROFR for projects in which the utility partnered with another entity. FERC found that Order 1920 would "not adopt … any changes to Order No. 1000's nonincumbent transmission developer reforms." *Id.* at P1563.

Notwithstanding that holding, FERC adopted the ROFR for "right-sized" projects, which Pro-Competition Petitioners now challenge. *See* R.813 at §IX(C)(2)(c). FERC stated that it was "concerned that local transmission planning processes may lack adequate provisions for transparency and meaningful input from stakeholders, and that regional transmission planning processes may not adequately coordinate with local transmission planning processes." *Id.* at P1565. FERC explained that this lack of transparency allowed incumbent transmission providers to manage "in-kind replacements of existing transmission facilities" with "no requirement that transmission providers plan these in-kind replacement

26

transmission facilities through an Order No. 890-compliant transmission planning process."  *Id.* at P1566.

Notwithstanding Order 1000's requirements (PP6, 68), FERC concluded that the resulting "lack of coordination between regional transmission planning processes and in-kind replacement of existing transmission facilities … may result in a regional transmission planning process that fails to identify opportunities to right size planned in-kind replacement transmission facilities" which could "result in the development of duplicative or unnecessary transmission facilities that increase costs to customers and render Commission-jurisdictional rates unjust and unreasonable."  R.813 at P1566.

FERC made no assertion that transmission provider tariffs were unjust, unreasonable, unduly discriminatory or preferential specifically because the tariffs lacked a "right-sizing" ROFR.  *See id.*  Further, FERC identified no additional "need for reform" of existing tariffs in either the general right-sizing subsection, *see id.* at PP1649-1651, or the right of first refusal section, *see id.* at P1693.  FERC addressed some, but not all, of the comments opposing the ROFR.  *Compare id.* at PP1694-1701 (summarizing ROFR comments) *with id.* at PP1702-1709 (addressing only those ROFR comments summarized in Order 1920 at PP1695, 1698).

Notwithstanding the lack of an explicit finding that existing tariffs are unlawful without a ROFR, FERC mandated that transmission planners include in their tariffs a ROFR for any "right-sized replacement transmission facility that is selected to meet Long-Term Transmission Needs." *Id.* at P1702. In adopting the requirement, FERC found that "permitting a federal right of first refusal for right-sized replacement transmission facilities will encourage transmission providers to provide their best in-kind replacement estimates, because they will have certainty that they will not lose the opportunity to invest in any in kind replacement transmission facility that is then selected as a right-sized replacement transmission facility." *Id.* at P1703.

In responding to assertions that the ROFR is inconsistent with Order 1000's requirement for the removal of a federal ROFR for regionally cost allocated projects, fourteen years after issuing Order 1000, FERC declared that "establishment of a federal right of first refusal for right-sized replacement transmission facilities is an exception to Order No. 1000's general requirement for transmission providers to eliminate any federal right of first refusal for regional transmission facilities selected in a regional transmission plan." *Id.* at P1704. FERC asserted "that requiring a federal right of first refusal for right-sized replacement transmission facilities aligns with Order No. 1000." *Id.; see also id.* at PP1705-1706. FERC further found that due to "the fact that the transmission

provider holds the leverage as to whether to build a right-sized replacement transmission facility or a less efficient in-kind replacement transmission facility, the establishment of the federal right of first refusal is necessary to … ensure that Commission-jurisdictional rates are just and reasonable." *Id.* at P1706.

## C. Order 1920-A

In two separate filings, Pro-Competition Petitioners sought rehearing of Order 1920's requirement that all tariffs include a ROFR asserting that FERC failed to comply with the FPA and the APA. ETCC, LS Power, and RPGI Joint Reh'g Request at 10-71, R.841; AEU Reh'g Request at 5-17, R.877; *see also* Industrial Customer Reh'g Request at 4-5 (supporting ETCC Reh'g Request), R.852. On rehearing, Pro-Competition Petitioners asserted that FERC had no authority to create a ROFR, R.841 at 20-39; R.877 at 4-10, and, even assuming otherwise, FERC failed to meet the first prong of FPA Section 206 by failing to find existing tariffs unjust, unreasonable, unduly discriminatory or preferential due to their lack of a ROFR. R.841 at 10-20. Pro-Competition Petitioners also argued that, even if FERC met the first prong of Section 206, Order 1920's creation of the ROFR is inadequately reasoned, inconsistent with prior FERC precedent, and does not constitute a just, reasonable, nondiscriminatory or non-preferential replacement rate. R.841 at 20-75; R.877 at 12-17.

On November 21, 2024, FERC issued Order 1920-A, denying rehearing on the ROFR issue and purporting to address Pro-Competition Petitioner's arguments raised on rehearing. R.976. The above-captioned consolidated appeals ensued.[8]

## SUMMARY OF ARGUMENT

The question presented here is whether the FERC has the authority to grant owners of existing electricity transmission infrastructure a monopoly right to build the transmission grid of tomorrow. The answer is no. But FERC did just that—mandating a ROFR and enshrining a systemic preference for incumbents by insulating them from competition. *See* Order 1920 at PP1548-1563, R.813. That ROFR is *ultra vires* and must be vacated.

The FPA does not reference monopoly rights or the granting thereof. Nor does it contain any language identifying, much less restricting, the persons or entities that may develop or own transmission facilities. The FPA gives FERC authority over the rates and terms of interstate transmission service, including related contracts, while expressly providing that FERC's jurisdiction over "the business of transmitting and selling electric energy … extend[s] only to those matters which are not subject to regulation by the states." 16 U.S.C. §824(a).

---

[8] On April 11, 2025, FERC issued Order 1920-B, a further order on rehearing and clarification addressing arguments raised in response to Order 1920-A. R.1050. Order 1920-B does not concern the ROFR issue, so Pro-Competition Petitioners do not challenge that order.

Decades of Supreme Court precedent emphasize that FERC's obligation under the FPA is to "protect power consumers against excessive prices," *see, e.g.*, *Penn. Water & Power Co. v. FPC*, 343 U.S. 414, 418 (1952), which Congress deemed necessary "in response to, great concentrations of economic and even political power" in the hands of a few utility companies, *Gulf States Utils. Co. v. FPC*, 411 U.S. 747, 758 (1973). Recognizing that, FERC has spent decades advancing competition in order to erode monopolies and ensure that rates charged to consumers are lawful.

Approximately fifteen years ago, FERC took a significant step in that direction: it hunted down and eliminated ROFRs in transmission providers' FERC-jurisdictional tariffs and contracts. That effort was necessary because numerous transmission owners had entered contracts in which they agreed to divide up the transmission market in their region, accreting to themselves exclusive rights to develop transmission infrastructure within their respective territories. In a seminal order, Order 1000, FERC found such "federal rights of first refusal" unlawful and required their removal from jurisdictional tariffs and contracts.

Order 1920 takes a drastic step in the opposite direction—creating a ROFR from whole cloth and mandating its use in FERC-jurisdictional tariffs—on the flawed theory that the power to find a practice unlawful under the FPA necessarily entails the power to mandate that practice. Although FERC's motivation to

31

incentivize regional transmission investment may be well-intentioned, its chosen method is both misguided and unlawful. Giving incumbent transmission owners a monopoly right to build tomorrow's regional grid free from competition is a Faustian bargain. For the incumbent utilities, that deal is too good to be true. For consumers, it is a financial nightmare.

FERC's establishment of the ROFR violates both the FPA and the major questions doctrine. FERC attempts to create a monopoly right for incumbent entities to expand the world's largest machine under the guise of a statute that Congress enacted expressly to *rein in regulated utilities' monopoly power*. To take such an extraordinary action, FERC must "point to 'clear congressional authorization' for the power it claims." *West Virginia v. EPA*, 597 U.S. 697, 723 (2022) (quoting *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014)). But FERC cannot do so—the FPA's text is bereft of any language authorizing FERC's unprecedented action.

Even assuming *arguendo* that Congress granted FERC the power to bestow federal monopoly franchise rights on incumbent transmission owners (it did not), FERC's Order 1920 is unlawful for two additional reasons. First, FERC failed to make the requisite finding under the first of the two prongs required by Section 206, violating both the FPA and APA. Specifically, FERC did not find that the lack of a ROFR in an existing transmission tariff renders such a tariff unlawful. Absent

32

that threshold finding, FERC lacks authority to require revisions to existing tariffs. *Emera Maine v. FERC*, 854 F.3d 9, 22 (D.C. Cir. 2017) ("*Emera Maine I*"). FERC's deficient analysis of the first prong under Section 206 also renders Order 1920 unlawful under the APA, as failure to engage in reasoned decision-making.

Second, FERC's determination under the second prong of the required Section 206 analysis, *i.e.*, that mandating inclusion of a ROFR will produce a just, reasonable, and not unduly discriminatory or preferential replacement rate, constitutes a separate, independent violation of the APA.  FERC erroneously overlooked record evidence and arguments, failed to draw a rational connection between the facts found and the choice made, and erred in deviating from prior precedent without adequate explanation.  The orders below should be vacated in part, to eliminate the unlawful and wrongly adopted ROFR.

## ARGUMENT

### I.    Standard of Review

Under the APA, this Court must "hold unlawful and set aside agency action, findings, and conclusions found to be . not in accordance with law."  5 U.S.C. §706(2)(A); *see also Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 391 (2024). The Court may uphold FERC's findings of fact only if the agency has provided a reasoned decision by examining the relevant considerations and giving a satisfactory explanation for its action, "including a rational connection between the

facts found and the choice made." *FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 292 (2016). The agency's decision must be set aside if it is "arbitrary, capricious, an abuse of discretion," 5 U.S.C. §706(2)(A), or if it is "unsupported by substantial evidence," *id.* §706(2)(E). In reviewing an agency's statutory interpretation, this Court must "decide '*all* relevant questions of law'" and set aside any action "inconsistent with the law as [the Court] interpret[s] it." *Loper Bright*, 603 U.S. at 392. Because the APA "makes clear that agency interpretations of statutes—like agency interpretations of the Constitution—are *not* entitled to deference[,]" it is the Court's "responsibility … to decide whether the law means what the agency says." *Id.* (quoting *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 109 (2015)) (Scalia, J. concurring in judgment).

## II. FERC Has No Authority to Grant a Federal Right of First Refusal to Construct Transmission Facilities.

Order 1920 mandates creation of a "federal right of first refusal … [for] any portion of the right-sized replacement facility located within that transmission provider's retail distribution service territory or footprint." R.813 at P1702. While referred to as a "federal right of first refusal," the right that FERC established is, for the covered regional projects, effectively a federal franchise or federally granted monopoly right. The FPA does not authorize FERC to grant such rights.

"As a federal agency, FERC is a 'creature of statute,' having 'no constitutional or common law existence or authority, but *only* those authorities

conferred upon it by Congress.'" *Atl. City Elec. Co. v. FERC*, 295 F.3d 1, 8 (D.C.

Cir. 2002)); *see also La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986)

(recognizing that "an agency literally has no power to act ... unless and until

Congress confers power upon it").  Here, the operative question is whether

Congress granted FERC the authority to grant monopoly status to utilities for

future transmission needed in interstate commerce simply because they own

existing transmission?  The answer is no.

As relevant here, the FPA gives FERC jurisdiction over "the transmission of

electric energy in interstate commerce" and "all facilities for such transmission,"

but only to the extent such business is "not subject to regulation by the States."  16

U.S.C. §824(a)-(b)(1).  The FPA charges FERC with ensuring that rates and terms

of transmission service, together with all contracts relating thereto, shall be "just

and reasonable," *id.* §824d(a), and FERC shall not "make or grant any undue

preference or advantage to any person or subject any person to any undue prejudice

or disadvantage," *id.* §824d(b).

There is no provision of the FPA granting FERC the right to establish a

ROFR for any project, let alone mandate one nationwide.  The phrase has no root

or stem in the FPA.  To Pro-Competition Petitioners' knowledge, the phrase did not

exist for the first seventy-five years of the FPA's existence; FERC made up the

phrase in 2011 to describe contractual rights that transmission owners created for

themselves in FERC-jurisdictional documents.[9]  No evidence shows that Congress

intended to give FERC the ability to either establish a "federal right" to develop

transmission infrastructure or give FERC the authority to limit the persons or

entities that were permitted to compete for the right to develop such infrastructure.

*Accord* 16 U.S.C. §824p(g) (providing, in a section of the FPA that Congress

enacted in 2005, that "[n]othing in [Section 216] precludes *any person* from

constructing or modifying *any transmission facility* in accordance with State law")

(emphasis added).

FERC cannot glean such authority from the lack of statutory text prohibiting

FERC from establishing a ROFR.  *Atl. City*, 295 F.3d at 9 (FERC's authority may

not be presumed "based solely on the fact that there is not an express withholding

of such power.") (quoting *Michigan v. EPA*, 268 F.3d 1075, 1082 (D.C. Cir. 2001)).

Rather than point to a specific Congressional grant of authority under the

FPA to award what amounts to a federal franchise, FERC points to Sections 201

and 206 of the FPA as granting it the authority to declare a nationwide ROFR.

Neither section helps FERC here.

"The electric transmission grid is the backbone of the American economy

and essential to the national security of our country." Order 1920, Phillips Chair

concurring at P1.  In extraordinary cases like this one, where any agency asserts

---

[9] *See* R.841 at 24-29 (regarding the history of FERC's usage of the phrase).

36

authority that would have dramatic economic consequences for the nation, by *expanding monopoly power* under a statute that Congress enacted to *counter monopoly power*, the major questions doctrine requires FERC to identify a clear statement from Congress authorizing the claimed authority. *West Virginia*, 597 U.S. at 723, 746; *see also N.C. Coastal Fisheries Reform Grp. v. Capt. Gaston LLC*, 76 F.4th 291, 296 (4th Cir. 2023) (explaining that the major questions doctrine requires "clear congressional authorization for agency action in 'extraordinary cases'"). FERC cannot do so. *See id.* at 746 ("Oblique or elliptical language will not supply a clear statement. Nor may agencies seek to hide elephants in mouseholes.") (cleaned up). Section 201's grant of broad general authority to FERC to regulate transmission in interstate commerce does not suffice.

In the 90-year history of the FPA, Congress has never remotely suggested that the FPA's declaration of policy and the grant of general regulatory power over transmission in interstate commerce was intended to allow FERC to grant federal transmission territories. When Congress desires to empower an agency to confer monopoly rights or squelch competition, Congress knows how to write such authority into law. *See, e.g.*, 35 U.S.C. . §154 (granting to patentees "the right to exclude others from making, using, offering for sale, or selling" their invention). Nor has FERC sought to undertake that action in the first 90 years of the FPA,

despite the fact that most FERC-regulated transmission owners also have state granted franchises over retail service territories.

It is no surprise that, until now, FERC has not attempted to grant federal monopoly status. Congress's very purpose in enacting the FPA was "to curb abusive practices of public utility companies by bringing them under effective control, and to provide effective federal regulation of the expanding business of transmitting and selling electric power in interstate commerce." *Gulf States Utils.*, 411 U.S. at 758. The United States Supreme Court declared: "the history of Part II of the Federal Power Act indicates an overriding policy of maintaining competition to the maximum extent possible consistent with the public interest." *Otter Tail Power Co. v. United States*, 410 U.S. 366, 374 (1973); *see also NAACP v. FPC*, 425 U.S. 670 n.5 (1976) (in determining the scope of FERC's authority to regulate in the "public interest," a court reviews the statute's purpose, which includes protecting consumers from excessive rates).

In Order 1000-A FERC stated: "[w]e continue to believe, as the Commission found in Order No. 1000, that we have a duty to consider anticompetitive practices and to eliminate barriers to competition consistent with the FPA." Order 1000-A at P361. Had Congress intended for FERC to grant federal monopoly status as part of its role in "curb[ing] abusive practices" it would have certainly stated so unequivocally rather than rely on general regulation pronouncements in Sections

201 or 206.  In its Order 2000 rulemaking FERC stated: "[t]he inherent characteristics of monopolists make it inevitable that they will act in their own self-interest to the detriment of others … and it is our duty to eradicate unduly discriminatory practices."  Order 2000 at 35 (citing Order 888 at 31,682).  Order 1920 not only turns its back on that statutory duty, it rewards prior self-interested actions with a new federally mandated discriminatory monopoly.

While acknowledging that "[t]he Commission's authority is defined and delineated by the FPA,"  R.813 at P842, FERC argues that the new mandated ROFR is appropriate, not because Congress specified in the FPA that FERC should undertake such actions, but because the mandated ROFR "acknowledges existing precedent recognizing state laws providing an individual transmission provider's ability to proceed with an in-kind replacement transmission facility,"  R.976 at P831.  Order 1920 identified no applicable laws.  Regardless, the purpose of the FPA was to regulate transmission in interstate commerce at the federal level because such regulation was beyond the reach of the states.  *Pub. Util. Comm'n of R.I*, 273 U.S. at 89.

If the unidentified "existing state laws" are inconsistent with an existing tariff's lack of an ROFR, then they are either preempted by the FPA or FERC must make a finding that an existing tariff is unjust and unreasonable because of its failure to include an incumbent preference for regional projects because of an

inconsistency with state law. FERC did not identify a conflict with any unidentified state laws. Further, FERC specifically found that the lack of an incumbent preference for regional projects in existing tariffs was not unjust and unreasonable under Section 206. R.813 at P1576.

If the unidentified state laws are consistent with the federal jurisdictional landscape, then no change in the existing tariffs is needed to "acknowledge" those laws. In either event, Order 1920 failed to identify (i) a single state law "providing an individual transmission provider's ability to proceed with an in-kind replacement transmission facility," (ii) any understanding of the specific laws FERC felt a federal need to 'acknowledge' or (iii) where Congress authorized FERC to enforce the unidentified state laws through a federal proclamation akin to a federally franchised service territory (of apparent perpetual duration). FERC's actions cannot stand when it "has not substantiated the application of its policy, either through the development of specific facts or by making a reasoned explanation." *El Paso Elec. Co. v. FERC*, 832 F.3d 495, 503 (5th Cir. 2016) (quoting *Fla. Gas Transmission Co. v. FERC*, 876 F.2d 42, 45 (5th Cir. 1989)).

FERC's reference to Section 206, as providing a statutory basis for a mandated ROFR, fares no better. R.976 at P831. Before FERC implements a replacement rate under Section 206, FERC must find the existing rate unjust and unreasonable. Here, FERC specifically found the opposite. R.813 at P1576. But

even if FERC had cleared Section 206's first hurdle, the just and reasonable

replacement rate or practice that FERC can establish in the second prong of

Section 206 is not unfettered as FERC seems to assert.

FERC's basis for presuming that it can impose a federal right of first refusal

is that its authority to banish such claimed rights as unlawful under Section 206

was judicially upheld. *Id*. at P832. FERC's rationale twists like a pretzel, warping

Section 206 into something it is not: a general right to set rates. FERC's section

206 authority starts with an existing rate. Traced to their genesis, those existing

rates were filed by public utilities under Section 205 of the FPA. That is certainly

the case with what became known as in FERC parlance as "federal rights of first

refusal." Although FERC, in its passive role under Section 205, *Advanced Energy*

*Mgmt. All. v. FERC*, 860 F.3d 656, 10 (D.C. Cir. 2017), initially approved the self-

granted ROFR rights FERC ultimately determined that those provisions were

practices affecting rates and the preferences were inconsistent with the FPA's

requirement that all practices affecting rates be just, reasonable, nondiscriminatory

and non-preferential.

Courts upheld FERC's determination that self-granted preferences were

inconsistent with the FPA's requirement that practices affecting rates be just and

reasonable. FERC now argues that because Congress authorized it under Section

206 to remove any practice affecting a rate that it finds unjust and unreasonable,

41

Congress clearly intended that from that point forward the declared "practice affecting a rate" was fair game for FERC to implement under Section 206 as well. R.976 at PP832-833.  But FERC fails to cite a single precedent for the proposition that **any** practice found to be affecting rates and declared unjust, unreasonable, unduly discriminatory or preferential under the first prong of Section 206, necessarily opens an entire avenue of further potential practices that FERC can then implement at its whim—without any additional Congressional input—simply because it was, in the negative Section 206 context, found to be a practice affecting a rate.

FERC seeks solace in the fact that when it required elimination of most ROFRs for regional projects it left certain rights of first refusal in place.  FERC's failure in Order 1000 to eliminate all incumbent ROFRs does not establish that mandating ROFRs is acceptable exercise of FERC authority.  As noted above, all existing incumbent preferences written into tariff or contract provisions originated with incumbent transmission owner filings, granting themselves those rights.  The fact that FERC did not challenge every instance of such a self-granted preference, establishes no FERC authority under part two of Section 206.  In Order 1000, FERC did not make an affirmative finding that such preferences are just and reasonable under Section 206.  FERC merely stated that it was not addressing all barriers to entry.  Order 1000 at P257.

Order 1920 is the first time since Congress passed the FPA that FERC has sought to establish a federal franchise/monopoly. FERC's actions thus rise to the level of an "extraordinary case[]" as contemplated by *West Virginia v. EPA*. While acknowledging that AEU argued that the major questions doctrine applies because a ROFR is effectively a "monopoly franchise right" and that Pro-Competition Petitioners argued that this is an extraordinary case because FERC has never previously asserted that Congress granted FERC the right to establish a ROFR, R.813 at 835, FERC dispatches those arguments with a wave of the hand assertion that "the major questions doctrine does not apply to Order 1920, which is a rulemaking under the Commission's broad authority over transmission planning processes affecting Commission-jurisdictional rates." *Id.* at P836; *see also Del. Div. of Pub. Advocate v. FERC*, 3 F.4th 461, 469 (D.C. Cir. 2021) (disapproving of FERC's "response to contrary evidence" that was "little more than a hand wave").

Pro-Competition Petitioners did not challenge FERC's "broad authority over transmission planning processes"; they challenged FERC's authority to declare the winner of those processes by declaring a "federal right of first refusal" that finds no textual or other context in the FPA. If FERC had divided the country into exclusive transmission franchise service territories there would be little argument that the "agency action was so extravagant when viewed in light of the statutory context that it was unlikely that Congress would have afforded this claimed

43

authority to the agency, and particularly would not have done so in an oblique or subtle way." Granting such a monopoly right through a mandated ROFR for new regional transmission projects when the existing transmission owner first declares that it would have replaced existing facilities in that same location is no less "extravagant" when viewed in the history and context of the FPA and the billions of dollars in new transmission FERC's mandate will award to incumbent transmission owners.

Order 1920 failed to identify a textual statutory basis for FERC's authority to implement the ROFR. Granting a federal franchise for regional transmission facilities involves a major question that Congress should answer. Order 1920's failure to adequately grapple with the actual text of the FPA or the major questions doctrine arguments raised warrants vacatur of the ROFR mandate.

## III. Order 1920 and the Related Orders Do Not Satisfy the First Prong of Section 206 of the FPA.

Section 206 of the FPA sets a definitive two-step process for FERC. FERC may establish a new practice affecting a rate "[o]nly *after* having made the determination that the utility's existing rate fails that test may FERC exercise its section 206 authority to impose a new rate." *Emera Maine I*, 854 F.3d at 21. The Court held that "a finding that an existing rate is unjust and unreasonable is the 'condition precedent' to FERC's exercise of its section 206 authority to change that rate." *Id*. at 25. Further, before acting under Section 206 FERC must demonstrate

that the existing rates are "entirely outside the zone of reasonableness." *See e.g.*,

*City of Winnfield v. FERC*, 744 F.2d 871, 875 (D.C. Cir. 1984).

> FERC acknowledges that threshold requirement, stating in Order 1920-A:

>> When acting under section 206, the Commission must make two findings: (1) that the existing rate, or a practice affecting a rate, is unjust, unreasonable, or unduly discriminatory or preferential; and (2) that the Commission's replacement rate, or practice affecting a rate, is just and reasonable and not unduly discriminatory or preferential.

R.976 at P120 (citing 16 U.S.C. . §824e(a), (b); *Pub. Serv. Elec. & Gas Co. v. FERC*, 989 F.3d 10, 13 (D.C. Cir. 2021)). FERC also confirms, that its findings under the first prong of Section 206 and its proposed replacement under the second prong "are—as they are required to be—closely related." *Id.* at P119.

In Order 1920, FERC made a variety of findings related to supposed deficiencies in regional planning processes, and transparency deficiencies in individual transmission owner planning processes, along with the coordination of those individual plans with regional planning, but none of those deficiencies related in any way to the absence in existing tariffs of an ROFR for regional projects. For example, Order 1920 asserts that "[b]ased on the record, we find that there is substantial evidence to support the conclusion that existing requirements governing transparency in local transmission planning processes and coordination between local and regional transmission planning processes are unjust, unreasonable, and unduly discriminatory or preferential." R.813 at P.1569.

Paragraphs 1570-1575 embellish those transparency and coordination deficiencies, but do not state the lack of an incumbent preference for regional projects is unjust and unreasonable. In Paragraph 1577, FERC identified the two reforms necessary to address the identified deficiencies.

Most importantly, in between its identification of the unjust and unreasonable rate and its proposed remedy, FERC stated unequivocally that "**we clarify that the Commission is not finding that existing transmission planning processes are unjust, unreasonable, or unduly discriminatory or preferential due to a lack of a federal right of first refusal for these facilities**." R.813 at P1576 (emphasis added). This finding alone should end the Court's analysis and vacatur of the mandated ROFR. This is particularly true given that after stating that it did not identify the lack of a ROFR as unjust or unreasonable under Section 206, FERC specifically identified the imposition of a federal right of first refusal as a *replacement rate*, stating "Commission's proposed replacement rate, including our findings regarding a federal right of first refusal for right-sized replacement transmission facilities." *Id.* at P1576. In discussing its proposed replacement rate, FERC specifically explained that it was *not* finding that practice unjust, unreasonable, unduly discriminatory, or preferential, but it did not address the first prong of Section 206 any further. *Id.* at PP1702-1707.

On rehearing, FERC obfuscated the issue raised relating to the first prong of Section 206.  In the Joint Rehearing Request, ETCC, LS Power, and RPGI asserted "the Commission in the Final Rule does not support its finding (and the record does not contain any evidence) that existing regional transmission planning processes and tariff practices are resulting in unjust, unreasonable, unduly discriminatory, or preferential Commission-jurisdictional regional transmission rates because incumbent public utilities do not possess a right-sizing monopoly preference."  R.841 at 12.  The Joint Rehearing Request further stated: "Order No. 1920 failed to identify the specific regional transmission planning and cost allocation tariff requirements, particularly as they relate to in-kind replacement processes, that are unjust, unreasonable, unduly discriminatory or preferential **as a result of the lack of an incumbent preference**."  *Id.* at 12-13 (emphasis added), *see also id*. at 15-17.

Although FERC recounted the argument made, Order 1920-A at P815, FERC completely failed to respond to the argument raised, instead focusing on its analysis of the transparency and coordination issues.  R.976 at PP817-821. *TransCanada Power Mktg. Ltd. v. FERC*, 811 F.3d 1, 12 (D.C. Cir. 2015) (an agency must "respond meaningfully to the arguments raised before it") (quoting *Pub. Serv. Comm'n of the Commonwealth of Ky. v. FERC*, 397 F.3d 1004, 1008 (D.C. Cir. 2005)).  FERC's only reference to rights of first refusal was to the

47

"right-sizing" ROFR as a replacement practice, not to a Section 206 analysis, based on substantial evidence, that the lack of a ROFR was unjust, unreasonable, unduly discriminatory or preferential.

Based on its own explicit finding, FERC failed to meet the essential first prong of Section 206 and the portion of Order 1920 requiring the implementation of a right-sizing ROFR must be vacated.

## IV. FERC Unlawfully Ignored Evidence, Arguments, and Prior Precedent in Concluding that the Imposition of a ROFR Will Produce Just, Reasonable, and Not Unduly Discriminatory or Preferential Rates.

If FERC appropriately determined, through substantial evidence, that under Section 206 the existing practice regarding rights of first refusal for regionally cost allocated projects (their FERC-mandated absence) is unjust and unreasonable, then FERC must determine the just and reasonable replacement rate. FERC's adoption of a ROFR for regional transmission facilities is not a just or reasonable replacement practice for multiple reasons.

FERC cannot overcome the fact that ROFRs have been found to be unjust and unreasonable under the FPA. Order 1920 does not explain FERC's departure from those prior findings. In Order 1000, FERC held:

> [F]ederal rights of first refusal create opportunities for undue discrimination and preferential treatment against nonincumbent transmission developers within existing regional transmission planning processes. The Commission has long recognized that it has a responsibility to consider anticompetitive practices and to eliminate barriers to

48

> competition. Indeed, the Supreme Court has said that 'the history of Part II of the Federal Power Act indicates an overriding policy of maintaining competition to the maximum extent possible consistent with the public interest.' In requiring the elimination of federal rights of first refusal from Commission-jurisdictional tariffs and agreements, we are acting in accordance with our duty to maintain competition.

Order 1000 at P286. The D.C. Circuit and the Seventh Circuit affirmed that federal rights of first refusal are contrary to the public interest and thus inconsistent with the FPA. *South Carolina*, 762 F.3d at 77; *MISO Transmission*, 819 F.3d at 333; *Emera Maine II*, 854 F.3d at 665. Order 1920 ignores this past precedent entirely and appears to presume that a replacement rate is just and reasonable if FERC says it is. While that deference may be appropriate in certain cases, where, as here, FERC and the Courts have made prior definitive determinations that the proposed replacement rate is unjust, unreasonable, unduly discriminatory or preferential in violation of the FPA, FERC must do more to reach the reasoned decision-making threshold.

Although an agency may change its policies or rules it must "show … good reasons for the new policy" while providing "a reasoned explanation … for disregarding facts and circumstances that underlay or were engendered by [its] prior policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-16 (2009). Order 1920 fails to meet this requirement. Instead, Order 1920 seeks to rewrite Order 1000 to avoid the obvious conflicts.

Pro-Competition Petitioners outlined above the extensive litigation surrounding rights of first refusal when FERC declared rights of first refusal for most regionally cost allocated projects to be unlawful under the FPA.  Now, more than a decade after first finding in Order 1000 that rights of first refusal for regionally cost allocated projects are antithetical to just and reasonable rates under the FPA, rather that address head on the reversal in policy that Order 1920 mandates, Order 1920 disingenuously asserts "establishment of a federal right of first refusal for right-sized replacement transmission facilities is an **exception** to Order No. 1000's general **requirement** for transmission providers **to eliminate** any federal right of first refusal for regional transmission facilities selected in a regional transmission plan. … **we find that requiring a federal right of first refusal** for right-sized replacement transmission **aligns with Order No. 1000**." R.813 at P1704 (emphasis added).

Succinctly, FERC argues that an Order in 2025 *requiring* the addition of a nationwide FERC-mandated right of first refusal "aligns" with the intent of a 2011 Order mandating the removal of transmission owner self-granted rights of first refusal for regional projects wherever they exist.  And that a ROFR for regionally planned and regionally cost allocated projects aligns with Order 1000 allowing a transmission owner to maintain a limited ROFR for an individually planned project that is not submitted into the regional plan for cost allocation.  Finally, allowing a

preference for an entirely new transmission line "aligns" with Order 1000-A's determination that the limited retained preference for "upgrades" to existing facilities did not apply to entirely new transmission facilities. Order 1000 at P319. FERC's effort—to rewrite history to find alignment—fails.

The purpose of the regional planning process under Order 1000 was to identify more efficient or cost-effective regional solutions, and to displace the less efficient projects planned by individual transmission owners. Order 1000 at PP6, 68, 80, 148. Order 1000 further made clear that the regionally planned project was entitled to regional cost allocation, while the individually planned transmission owner project was not entitled to regional cost allocation unless submitted into the regional planning process for regional cost allocation and evaluated against alternatives. Order 1000 at P63. FERC stated: "[t]hese reforms work together to ensure that public utility transmission providers in every transmission planning region, in consultation with stakeholders, evaluate proposed alternative solutions at the regional level that may resolve the region's needs more efficiently or cost-effectively than solutions identified in the local transmission plans of individual public utility transmission providers." Order 1000 at P68. Thus, transmission providers are already required to conduct the regional analysis that FERC seeks to incentivize through the mandated ROFR.

The problem is that under Order 1000, notwithstanding that FERC required a regional analysis to determine the more efficient or cost-effective regional project, including the potential displacement of the individually planned project, FERC allowed the individual transmission owner to eschew the regional process and proceed on its own. *See, e.g.*, Order 1000-A at P368. And individual transmission owners did, in spades, to avoid having to compete. R.341 at 40-41; R.575 at 136 (quoting NARUC ANOPR Comments at 55, R.139); R.690 at 68; *see also* R.841 at 59 (citing R.96 at 15-19, 22-25, 34-39, for discussion "related to reining in abuses of individual transmission owner local planning"). The difference now is that, whereas Order 1000 was focused on process, Order 1920 appears focused on ensuring that the more efficient regional project is built. While a laudable goal, it is nevertheless outside FERC's authority to achieve that by mandating an ROFR and FERC's decision to do so is a clear departure from Order 1000, which found that elimination of incumbent preferences was necessary even if the incumbent transmission owner might choose to move forward with its less efficient individually planned transmission project. *See* Order 1000-A at P179 (acknowledging that a transmission owner may choose a local transmission project over a regional project, but that having the regional transmission process consider alternatives, including those proposed through competitive processes, would result in the identification of the more efficient or cost-effective solution).

Contrast with Order 1920 where FERC supports the mandated ROFR because "without a federal right of first refusal, the incumbent transmission provider whose in-kind replacement transmission facility is selected to be right-sized would likely opt to develop the less efficient or cost-effective in-kind replacement transmission facility rather than a right-sized replacement transmission facility." R.976 at p827. Notwithstanding these contradictions between the two orders, FERC asserts: "[w]e also reaffirm that the right-sizing reform does not depart, without explanation, from Commission precedent related to an individual transmission provider's ability to proceed with an in-kind replacement transmission facility." *Id*. This conclusion is further belied by Order 1920 itself where FERC acknowledges that because of choices FERC made in Order 1000 "the transmission provider holds the leverage as to whether to build a right-sized replacement transmission facility or a less efficient in-kind replacement transmission facility." R.813 at P1706.

Under Order 1000, if the transmission owner or regional planner identified a more efficient or cost-effective regional project, even if it would supplant a local project, the regional project was subject to competition. Order 1920 takes a different approach finding that because a transmission owner "would prefer the assurance of a federal right of first refusal … over the uncertainty of subjecting a [right-sized project] to the Order No. 1000 competitive transmission development

process" that transmission owner self-interest warrants establishing a mandated ROFR because if FERC did not the transmission owner could move forward with "less efficient in-kind replacement transmission facility," R.813 at P1706, and the more efficient regional facility may not move forward. Of course, prior to Order 1000 the transmission owners also preferred "the assurance of a federal right of first refusal" which is why they divided the market among themselves to begin with and why they fought vociferously to maintain the preferences they had granted themselves.

Contrary to FERC's assertion, there is simply no "alignment" between Order 1000 and Order 1920, as demonstrated by the multiple precedent cited upholding the required removal of ROFRs over transmission owner objection. FERC abject failure to address its change in policy leaves Order 1920 lacking.

FERC also claims alignment with Order 1000 by taking a single Order 1000 conclusion as the only relevant inquiry. FERC argues that the orders align because they both seek the evaluation of the more efficient or cost-effective regional alternative. But Order 1000 did much more—it focused not just on the evaluation of the more efficient or cost-effective project, but the role that non-incumbent developers' participation in the regional planning process played as a critical component of establishing just and reasonable FERC jurisdictional rates. Order 1000 at P226. If the only relevant inquiry from Order 1000 was the

"consideration" of the more efficient or cost-effective region project, there would have been no need for the exhaustive discussion of the requirement for the regional selection processes, which address both the more efficient or cost-effective project and the selection of the more efficient or cost effective developer. Order 1000 at PP313-331.

This is because FERC concluded in Order 1000 that the regional planning processes cannot determine the more efficient or cost-effective transmission project to address all identified needs without full participation by all prospective developers.  Order 1000 at P229; *see also South Carolina*, 762 F.3d at 77 ("Although petitioners are no doubt correct that the previous regime improved transmission planning, non-incumbent developers were not likely to participate in that regime because rights of first refusal left them with little to gain." (citing Order 1000 at P229)); *id.* (finding that Order 1000, "by removing a pre-existing barrier to entry, the orders make it more likely that those key parties will actually join that process, making the transmission development process more competitive, which, in the Commission's reasoned expert judgment, will help to ensure that rates are just and reasonable" (citing Order 1000 at PP256-57)).  As LS Power demonstrated, the ROFR for right-sized regional projects will remove the financial incentives for non-incumbent developer participation in the regional planning process that Order 1000 found critical.  R.575, Attachment 1 at 23-29.

In another effort to contrive alignment between Orders 1920 and 1000, FERC wrongly assumes that because Order 1000 allows a transmission owner to retain a ROFR for an "upgrade" to an existing system it aligns with the mandated ROFR for right-sized regional projects. FERC defined an upgrade as "an improvement to, addition to, or replacement of a part of, an existing transmission facility. The term upgrades does not refer to an entirely new transmission facility." Order 1000-A at P426. Order 1920, while citing the retention of an upgrade ROFR, mandates a federal ROFR for an entirely new regional transmission facility in direct contrast to Order 1000. In doing so, FERC ignored numerous cases since Order 1000 in which FERC reiterated and refined the finding that an "upgrade" under Order 1000 was not an entirely new line. *See, e.g.*, *Southwest Power Pool, Inc.*, 144 FERC ¶61,059 at P181 (2013); *Midwest Indep. Transmission Sys. Operator, Inc.*, 142 FERC ¶61,215 (2013); *New York Indep. Sys. Operator, Inc.*, 175 FERC ¶61,038 (2021); R.841 at 53-56.

Finally, Order 1920's misguided ROFR for new transmission facilities in existing rights-of-way contradicts Order 1000. On Order 1000 compliance, FERC rejected a proposal to give a ROFR to transmission owners for transmission facilities built on the transmission owner's right-of-way. *Midwest Indep. Transmission Sys. Operator, Inc.*, 147 FERC ¶61,127, at P240 (2014). This is because Order 1000 found that the "retention, modification, or transfer of rights-of-

way remain subject to relevant law or regulation granting the rights-of-way."

Order 1000 at P319. Order 1920 **requires** a ROFR for right-sizing projects in that

right-of-way.

## CONCLUSION

Pro-Competition Petitioners respectfully request that the Court grant their

petitions for review; vacate the portions of Order 1920, including Section IX.C.2,

PP1693-1709, that grant incumbent utilities a ROFR to develop "right-sized"

transmission facilities; and remand for further agency action.

Dated: September 8, 2025

*/s/ Katherine Ann Wade*
KATHERINE ANN WADE
 *Betts & Holt LLP*
 *1101 Connecticut Ave., N.W.*
 *Ste. 450*
 *Washington, D.C. 20036*
 *(202) 530-3380*

*Counsel for Resale Power Group of Iowa*

*/s/ Kenneth R. Stark*
KENNETH R. STARK
 *McNees Wallace & Nurick LLC*
 *100 Pine Street*
 *Harrisburg, PA 17101*
 *Phone: (717) 237-8000*

*Counsel to the Electricity Transmission Competition Coalition*

Respectfully submitted,

*/s/ Nicholas M. Gladd____*
NICHOLAS M. GLADD
 *Wilson Sonsini Goodrich & Rosati, P.C.*
 *1700 K Street, N.W.*
 *Washington, DC 20006*
 *(202) 973-8800*
 *ngladd@wsgr.com*

*Counsel for Advanced Energy United*

*/s/ Michael R. Engleman*
MICHAEL R. ENGLEMAN
 *Engleman Fallon, PLLC*
 *1717 K Street NW, Suite 900*
 *Washington DC 20006*
 *202-464-1332 (Office)*
 *202-253-6645 (Cell)*

*Counsel for LS Power Grid, LLC*

## CERTIFICATE OF COMPLIANCE

In accordance with Fed. R. App. P. 32(a)(7)(B) and the Court's July 28, 2025 Scheduling Order, I certify that the attached Opening Brief of Petitioners Advanced Energy United; Electricity Transmission Competition Coalition; LS Power Grid, LLC; and Allied Petitioners or Intervenors is proportionally spaced, has a typeface of 14 points or more, and contains 12,764 words.

/s/ *Nicholas M. Gladd*____
NICHOLAS M. GLADD

*Counsel for Advanced Energy United*

Dated: September 8, 2025

## CERTIFICATE OF SERVICE

I hereby certify that, on September 8, 2025, I electronically filed the

foregoing Opening Brief of Petitioners Advanced Energy United; Electricity

Transmission Competition Coalition; LS Power Grid, LLC; and Allied Petitioners

or Intervenors with the Clerk of Court for the United States Court of Appeals for

the Fourth Circuit using the appellate CM/ECF system. The participants in this

case are registered CM/ECF users and service will be accomplished by the

CM/ECF system.

/s/ *Nicholas M. Gladd*____
NICHOLAS M. GLADD

*Counsel for Advanced Energy United*

Dated: September 8, 2025

# Addendum

# GLOSSARY

| | |
|---|---|
| AEE | Advanced Energy Economy |
| AEU | Advanced Energy United |
| APA | Administrative Procedure Act |
| ETCC | Electricity Transmission Competition Coalition |
| ROFR | Federal right of first refusal |
| FERC or Commission | Federal Energy Regulatory Commission |
| FPA or Act | Federal Power Act |
| ISO New England | ISO New England, Inc. |
| JA | Denotes page number in Joint Appendix (deferred) |
| LS Power | LS Power Grid, LLC |
| MISO | Midcontinent Interconnection System Operator |
| NOPR | *Bldg. for the Future Through Elec. Reg'l Transmission Plan. & Cost Allocation*, Notice of Proposed Rulemaking, 179 FERC ¶61,028 (2022), 87 Fed. Reg. 26,504 (May 4, 2022), R.388. |
| OATT | Open-access transmission tariff |
| Order 888 | *Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Services by Public Utilities, Recovery of Stranded Costs by Public Utilities*, Order No. 888, 61 Fed. Reg. 21,540 (May 10, 1996). |
| Order 890 | *Preventing Undue Discrimination and Preference in Service*, Order No. 890, 72 Fed. Reg. 12,266 (March 15, 2007). |

| Order 1000 | *Transmission Planning and Cost Allocation by Transmission Owning and Operating Public Utilities*, Order No. 1000, 76 Fed. Reg. 49,842 (Aug. 11, 2011). |
|---|---|
| Order 1000-A | *Transmission Planning and Cost Allocation by Transmission Owning and Operating Public Utilities*, Order on Reh'g, Order No. 1000-A, 77 Fed. Reg. 32,184 (May 31, 2012). |
| Order 1920 or Final Rule | *Bldg. for the Future Through Elec. Reg'l Transmission Plan. & Cost Allocation*, Order No. 1920, 89 Fed. Reg. 49,280 (June 11, 2024), R.813. |
| Order 1920-A | *Bldg. for the Future Through Elec. Reg'l Transmission Plan. & Cost Allocation*, Order on Reh'g & Clarification, Order No. 1920-A, 89 Fed. Reg. 97,174 (Dec. 6, 2024), R.976. |
| Order 1920-B | *Bldg. for the Future Through Elec. Reg'l Transmission Plan. & Cost Allocation*, Order on Reh'g & Clarification, Order No. 1920-B, 90 Fed. Reg. 17,692 (April 28, 2025), R.1050. |
| Order 2000 | *Regional Transmission Organizations*, Order No. 2000, 65 Fed. Reg. 809 (Jan. 6, 2000). |
| P | Paragraph number in FERC Order |
| R. | Denotes Certified Index to the Record number |
| RPGI | Resale Power Group of Iowa |
| SPP | Southwest Power Pool |