No. 24-1650 (L)

Consolidated with Nos. 24-1756, 14-1758, 24-1760, 24-1770, 24-1785, 24-1792, 24-1804, 24-1857, 24-1862, 24-1867, 24-1876, 24-1885, 24-1887, 24-1979, 24-1991, 24-2162, 24-2163, 24-1073, 25-1080, 25-1197, 25-1349

## UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

APPALACHIAN VOICES, *et al.*,
*Petitioners*

v.

FEDERAL ENERGY REGULATORY COMMISSION,
*Respondent*

On Appeal From the Federal Energy Regulatory Commission

## CORRECTED OPENING BRIEF OF THE CONSUMER PETITIONERS

| | |
|---|---|
| */s/ Kenneth R. Stark* <br> Kenneth R. Stark <br> McNees Wallace & Nurick LLC <br> 100 Pine Street <br> Harrisburg, PA 17101 <br> Phone: (717) 237-8000 | Robert A. Weishaar, Jr. <br> McNees Wallace & Nurick LLC <br> 1200 G Street NW, Suite 800 <br> Washington, DC 20005 <br> Phone: (202) 898-5700 |

*Counsel for the American Forest & Paper Association, the Industrial Energy Consumers of America, the PJM Industrial Customer Coalition, and the Coalition of MISO Transmission Customers and on Behalf of the Consumer Petitioners*

| | |
|---|---|
| Randolph Lee Elliott <br> McCarter & English, LLP <br> 1301 K Street, NW, Suite 1000 West <br> Washington, DC 20005 <br> Phone: 202-753-3428 <br> *Counsel for the National Rural* <br> *Electric Cooperative Association* | Denise Goulet <br> McCarter & English, LLP <br> 1301 K Street, NW, Suite 1000 West <br> Washington, DC 20005 <br> Phone: 202-753-3439 <br> *Special Counsel for Office of the Ohio* <br> *Consumers' Counsel* |

| | |
|---|---|
| Phyllis G. Kimmel | Katherine Ann Wade |
| Phyllis G. Kimmel Law Office PLLC | Betts & Holt LLP |
| 1717 K Street, NW, Suite 900 | 1101 Connecticut Ave., NW, Suite 450 |
| Washington, DC 20006 | Washington, D.C. 20036 |
| Phone: (202) 787-5704 | *Counsel for the Resale Power Group of* |
| *Counsel for the New England States* | *Iowa* |
| *Committee on Electricity* | |

Dated: September 9, 2025

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. 24-1862        Caption: American Forest & Paper Association, et al. v. FERC

Pursuant to FRAP 26.1 and Local Rule 26.1,

American Forest & Paper Association (AF&PA)
(name of party/amicus)


who is _____ Petitioner _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO


2.    Does party/amicus have any parent corporations?                            ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:




3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                    ☐YES ☑NO
      If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☑YES ☐NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

    There are no publicly held AF&PA members whose stock or equity value could be affected substantially by the outcome of this litigation.

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Robert A. Weishaar, Jr.          Date:   August 29, 2025

Counsel for: American Forest & Paper Association

Print to PDF for Filing

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

## DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. <u>24-1862</u>      Caption: <u>American Forest & Paper Association, et al. v. FERC</u>

Pursuant to FRAP 26.1 and Local Rule 26.1,

<u>Industrial Energy Consumers of America</u>
(name of party/amicus)

_____

who is <u>          Petitioner          </u>, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO


2.    Does party/amicus have any parent corporations?                              ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:




3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                                    ☐YES ☑NO
      If yes, identify all such owners:

4.	Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?	☐YES ☑NO
	If yes, identify entity and nature of interest:

5.	Is party a trade association? (amici curiae do not complete this question)	☐YES ☑NO
	If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.	Does this case arise out of a bankruptcy proceeding?	☐YES ☑NO
	If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.	Is this a criminal case in which there was an organizational victim?	☐YES ☑NO
	If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Kenneth R. Stark II	Date: August 29, 2025

Counsel for: Industrial Energy Consumers of America

Print to PDF for Filing

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

## DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. __24-1862__        Caption: __American Forest & Paper Association, et al. v. FERC__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__PJM Industrial Customer Coalition__
(name of party/amicus)


who is _____ Petitioner _____ , makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.   Is party/amicus a publicly held corporation or other publicly held entity?   ☐ YES ☑ NO


2.   Does party/amicus have any parent corporations?                      ☐ YES ☑ NO
     If yes, identify all parent corporations, including all generations of parent corporations:




3.   Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                          ☐ YES ☑ NO
     If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?                          ☐YES ☑NO
      If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)      ☐YES ☑NO
      If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?                          ☐YES ☑NO
      If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.    Is this a criminal case in which there was an organizational victim?            ☐YES ☑NO
      If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Kenneth R. Stark II                          Date:    August 29, 2025

Counsel for: PJM Industrial Customer Coalition

- 2 -

Print to PDF for Filing

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

## DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __24-1862__    Caption: __American Forest & Paper Association, et al. v. FERC__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Coalition of MISO Transmission Customers__
(name of party/amicus)

_____

who is _____Petitioner_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.  Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO

2.  Does party/amicus have any parent corporations?  ☐YES ☑NO
    If yes, identify all parent corporations, including all generations of parent corporations:

3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐YES ☑NO
    If yes, identify all such owners:

4.     Is there any other publicly held corporation or other publicly held entity that has a direct
       financial interest in the outcome of the litigation?                          ☐YES ☑NO
       If yes, identify entity and nature of interest:

5.     Is party a trade association? (amici curiae do not complete this question)     ☐YES ☑NO
       If yes, identify any publicly held member whose stock or equity value could be affected
       substantially by the outcome of the proceeding or whose claims the trade association is
       pursuing in a representative capacity, or state that there is no such member:

6.     Does this case arise out of a bankruptcy proceeding?                           ☐YES ☑NO
       If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
       party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
       caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
       corporation that owns 10% or more of the stock of the debtor.

7.     Is this a criminal case in which there was an organizational victim?           ☐YES ☑NO
       If yes, the United States, absent good cause shown, must list (1) each organizational
       victim of the criminal activity and (2) if an organizational victim is a corporation, the
       parent corporation and any publicly held corporation that owns 10% or more of the stock
       of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Kenneth R. Stark II                          Date:    August 29, 2025

Counsel for: Coalition of MISO Transmission Customers

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. <u>24-1804</u>        Caption: <u>National Rural Electric Cooperative Association v. FERC</u>

Pursuant to FRAP 26.1 and Local Rule 26.1,

<u>National Rural Electric Cooperative Association</u>
(name of party/amicus)

_____

 who is <u>Petitioner</u>, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.      Is party/amicus a publicly held corporation or other publicly held entity?   ☐YES ☑NO


2.      Does party/amicus have any parent corporations?                      ☐YES ☑NO
        If yes, identify all parent corporations, including all generations of parent corporations:




3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
        other publicly held entity?                                         ☐YES ☑NO
        If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
   If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☑YES ☐NO
   If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:
   There is no such member.

6. Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
   If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
   If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Randolph Lee Elliott                    Date:        08-29-2025

Counsel for: National Rural Electric Coop. Ass'n

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. <u>24-2163</u>     Caption: <u>Office of the Ohio Consumers' Counsel v. FERC</u>

Pursuant to FRAP 26.1 and Local Rule 26.1,

<u>Office of the Ohio Consumers' Counsel</u>
(name of party/amicus)

_____

 who is _____<u>Petitioner</u>_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO

2.    Does party/amicus have any parent corporations?    ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:

      Office of the Ohio Consumers' Counsel is a state government agency and is the statutory representative of approximately 4.5 million Ohio residential utility customers in proceedings before state and federal administrative agencies and state and federal courts. No publicly-held company has any ownership interest in the Office of the Ohio Consumers' Counsel.

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐YES ☑NO
      If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?    ☑YES ☐NO
      If yes, identify entity and nature of interest:

       There are multiple, publicly-held entities that are parties to the proceedings before FERC below and in the appellate cases consolidated with OCC's Petition for Review before this Court. However, each of those entities will submit its own disclosure statement. None are affiliated with the Office of the Ohio Consumers' Counsel.


5.    Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
      If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:


6.    Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
      If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.


7.    Is this a criminal case in which there was an organizational victim?    ☐YES ☑NO
      If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.


Signature: Denise C. Goulet                          Date:              8/29/2025

Counsel for: Office of Ohio Consumers' Counsel

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. <u>24-1867</u>    Caption: <u>New England States Committee on Electricity v. FERC</u>

Pursuant to FRAP 26.1 and Local Rule 26.1,

<u>New England States Committe on Electricity</u>
(name of party/amicus)

_____

 who is _____petitioner_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.     Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2.     Does party/amicus have any parent corporations?                         ☐ YES ☑ NO
       If yes, identify all parent corporations, including all generations of parent corporations:

3.     Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                                    ☐ YES ☑ NO
       If yes, identify all such owners:

4.     Is there any other publicly held corporation or other publicly held entity that has a direct
       financial interest in the outcome of the litigation?                    ☐YES ☑NO
       If yes, identify entity and nature of interest:

5.     Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
       If yes, identify any publicly held member whose stock or equity value could be affected
       substantially by the outcome of the proceeding or whose claims the trade association is
       pursuing in a representative capacity, or state that there is no such member:

6.     Does this case arise out of a bankruptcy proceeding?                     ☐YES ☑NO
       If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
       party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
       caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
       corporation that owns 10% or more of the stock of the debtor.

7.     Is this a criminal case in which there was an organizational victim?    ☐YES ☑NO
       If yes, the United States, absent good cause shown, must list (1) each organizational
       victim of the criminal activity and (2) if an organizational victim is a corporation, the
       parent corporation and any publicly held corporation that owns 10% or more of the stock
       of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Phyllis G. Kimmel                            Date: _____8/28/2025_____

Counsel for: NE States Committee on Electricity

- 2 -

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __24-1650__    Caption: __Appalachian Voices, et al. v. Federal Energy Regulatory Comm'n__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Resale Power Group of Iowa__
(name of party/amicus)

_____

 who is _____intervenor_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO

2.    Does party/amicus have any parent corporations?                    ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                          ☐YES ☑NO
      If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Katherine Ann Wade          Date: August 28, 2025

Counsel for: Resale Power Group of Iowa

Print to PDF for Filing

<h1 style="text-align:center"><u>TABLE OF CONTENTS</u></h1>

STATEMENT OF JURISDICTION ........................................................................1

STATEMENT OF THE ISSUES ..........................................................................3

STATEMENT OF THE CASE...............................................................................4

    Statutory Background ...................................................................................4

    Regulatory Background ...............................................................................5

    Proceedings Below .....................................................................................5

SUMMARY OF THE ARGUMENT ....................................................................9

ARGUMENT .....................................................................................................12

I.      Standard of Review...................................................................................12

II.    Consumer Petitioners Have Standing .....................................................14

III.   FERC Failed to Meet Its Burden to Demonstrate Existing Transmission Planning Practices Are Unjust and Unreasonable**.** .......................................15

IV.   FERC's Failure to Implement Any Concrete Reforms to Mitigate Escalating Transmission Costs Is Arbitrary and Capricious**.** ........................................22

    a.   Order 1920 Arbitrarily and Capriciously Did Not Address Lucrative Transmission Owner Incentives ..............................................................24

    b.   Order 1920 Failed to Address the Need for Independent Transmission Project Planning and Monitoring ..........................................................28

    c.   Order 1920 Arbitrarily and Capriciously Failed to Reform the Existing Formula Rate and Prudence Review Framework to Control Increased Transmission Spending .......................................................................29

    d.   FERC's Decision to Exempt Asset Condition Projects from the Final Rule's Transparency Requirements Is Arbitrary and Capricious............30

V.    Order 1920 Unlawfully Shifted Generation Interconnection-Related Network‑Upgrade Costs to Consumers .........................................................36

    a.   FERC Did Not Reasonably Explain Its Departure from Its Policy Requiring Generators to Pay the Upfront Costs of Interconnection-Related Network Upgrades ...................................................................37

    b.   FERC's Action Also Violated Established Cost Allocation Requirements 44

i

VI.   FERC Violated FPA Section 217(b)(4) By Giving Transmission Providers Discretion to Disregard the Transmission Needs of Load-Serving Entities .45

VII.  FERC's Limitations on Facility Reevaluations Were Arbitrary and Capricious ................................................................................48

      a.   FERC Arbitrarily Prohibited Reevaluation When the Benefits from a Facility Decrease or Transmission Needs Change .................................49

      b.   FERC Arbitrarily Limited Reevaluation in Light of Significant Changes in Laws or Regulations .............................................................52

VIII. Excluding Electric Cooperatives from Mandatory Transmission-Planning and Cost-Allocation Discussions with Relevant State Entities Was Arbitrary, Capricious, and Unduly Discriminatory .......................................................52

CONCLUSION ........................................................................................59

STATEMENT REGARDING ORAL ARGUMENT ...........................................59

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

STATUTORY ADDENDUM

# TABLE OF AUTHORITIES

## Cases

*Appalachian Voices v. State Water Control Bd.,*
912 F.3d 746 (4th Cir. 2019)...................................................................... 13, 28

*Ark. La. Gas Co. v. Hall,*
453 U.S. 571 (1981) .........................................................................26

*Associated Gas Distributors v. FERC,*
824 F.2d 981 (D.C. Cir. 1987) .................................................... 19, 21

*Atl. Seaboard Corp. v. Fed. Power Com.,*
397 F.2d 753 (4th Cir. 1968)...........................................................26

*Atlantic Refing. Co. v. Pub. Serv. Comm'n of N.Y.,*
360 U.S. 378 (1959) .........................................................................26

*Baharon v. Holder,*
588 F.3d 228 (4th Cir. 2009)...........................................................21

*Baltimore Gas & Elec. Co. v. Heintz,*
760 F.2d 1408  (4th Cir. 1985)........................................................43

*Brennan v. Dickson,*
45 F.4th 48 (D.C. Cir. 2022) ...........................................................34

*Cal. Pub. Utils. Comm'n v. FERC,*
20 F.4th 795 (2021)..........................................................................34

*Clapper v. Amnesty Int'l USA,*
568 U.S. 398 (2013) .........................................................................14

*Del. Div. of Pub. Advocate v. FERC,*
3 F.4th 461 (D.C. Cir. 2021) ..................................................... 23, 42

*Duke Power Co. v. U.S. Nuclear Regul. Comm'n,*
770 F.2d 386 (4th Cir. 1985)...........................................................13

*Elec. Consumers Res. Council v. FERC,*
747 F.2d 1511 (D.C. Cir. 1984) ................................................. 20, 57

*Emera Maine v. FERC,*
854 F.3d 9 (D.C. Cir. 2017) ....................................................... 16, 17

*FCC v. Fox Television Stations, Inc.,*
556 U.S. 502 (2009) .........................................................................43

*FCC v. Prometheus Radio Project,*
141 S.Ct. 1150 (2021)......................................................................24

iii

*FERC v. Elec. Power Supply Ass'n,*
  577 U.S. 260 (2016) ................................................................... 13, 24, 42

*FPC v. Hope Nat. Gas Co.,*
  320 U.S. 591 (1944) ................................................................................27

*FPC v. Sierra Pac. Power Co.,*
  350 U.S. 348 (1956) ...........................................................................5, 26

*Friends of Buckingham v. State Air Pollution Control Bd.,*
  947 F.3d 68 (4th Cir. 2020)........................................................ 13, 22, 28

*Gulf States Utils. Co. v. FPC,*
  411 U.S. 747 (1973).................................................................................4

*Hughes River Watershed v. Johnson,*
  165 F.3d at 283 (4th Cir. 1999)..............................................................24

*Ill. Com. Comm'n v. FERC,*
  576 F.3d 470 (7th Cir. 2009)...................................................................44

*Ill. Com. Comm'n v. FERC,*
  756 F.3d 556 (7th Cir. 2014).............................................................. 41, 44

*Long Island Care at Home, Ltd. v. Coke,*
  551 U.S. 158 (2007) ...............................................................................34

*Loper Bright Enters. v. Raimondo,*
  603 U.S. 369 (2024) ......................................................................... 13, 48

*Md. Shall Issue, Inc. v. Hogan,*
  971 F.3d 199 (4th Cir. 2020)...................................................................14

*Molina Mondoza v. Sessions,*
  712 Fed. Appx. 240 (4th Cir. 2018).........................................................21

*Morgan Stanley v. Pub. Util. Dist. No.1,*
  554 U.S. 527 (2008) ...............................................................................27

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983) .......................................................................... 13, 22, 48

*Mountain Valley Pipeline, LLC v. N.C. Dep't of Env't Quality,*
  990 F.3d 818 (4th Cir. 2021)...................................................................17

*Mun. Light Bds. v. FPC,*
  450 F.2d 1341 (D.C. Cir. 1971) ................................................................4

*N.C. Dept. Env't Quality v. FERC,*
  3 F.4th 655 (4th Cir. 2021) .............................................................. 14, 18

*N.C. Utils. Comm'n v. FERC,*
  741 F.3d 439 (4th Cir. 2014)............................................................13

*NAACP v. FPC,*
  520 F.2d 432 (D.C. Cir. 1975) .......................................................24

*New York v. FERC,*
  535 U.S. 1 (2002) ............................................................................5

*Orangeburg v. FERC,*
  862 F.3d 1071 (D.C. Cir. 2017) .....................................................57

*Outdoor Amusement Bus. Ass'n v. Dep't of Homeland Security,*
  983 F.3d 671 (4th Cir. 2020)..........................................................14

*Pa. Water & Power Co. v. Fed. Power Comm'n.,*
  343 U.S. 414 (1952) .......................................................................33

*Piney Mt. Coal Co. v. Mays,*
  176 F.3d 753 (4th Cir. 1999)..........................................................18

*PPL Energyplus v. Nazarian,*
  753 F.3d 467 (4th Cir. 2014)..........................................................26

*Pub. Serv. Elec. & Gas Co. v. FERC,*
  989 F.3d 10 (D.C. Cir. 2021) .........................................................17

*Ren v. United States Citizenship & Immigr. Servs.,*
  60 F.4th 89 (4th Cir. 2023) ............................................................24

*S.C. Generating Co. v. FPC,*
  249 F.2d 755 (4th Cir. 1957)..........................................................22

*S.C. Pub. Serv. Auth. v. FERC,*
  762 F.3d 41 (D.C. Cir. 2014) ................................ 5, 19, 20, 21, 45, 48

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty.,*
  145 S.Ct. 1497(2025)......................................................................48

*Sierra Club v. State Water Control Bd.,*
  64 F.4th 187 (4th Cir. 2023) ..........................................................13

*TransCanada Power Mktg. Ltd. v. FERC,*
  811 F.3d 1 (D.C. Cir. 2015) ...........................................................21

*Transmission Access Pol'y Study Group v. FERC,*
  225 F.3d 667 (D.C. Cir. 2000) ............................................... 5, 43, 57

*Universal Camera Corp. v. N.L.R.B.,*
  340 U.S. 474 (1951) .......................................................................18

*Wild Va. v. U.S. Forest Serv.,*
   24 F.4th 915 (4th Cir. 2022) ...............................................................36
*Xcel Energy Services, Inc. v. FERC*,
   815 F.3d 947 (D.C. Cir. 2016) ..................................................... 22, 24

**Statutes**

5 U.S.C. § 706 ....................................................................................13
15 U.S.C. § 717 ...................................................................................19
16 U.S.C. § 824 .....................................................................................4
16 U.S.C. § 824a ....................................................................................1
16 U.S.C. § 824d ....................................................................................4
16 U.S.C. § 824e ........................................................................... 1, 4, 26
16 U.S.C. § 824q ..................................................................................45
16 U.S.C. § 824s ..................................................................................27
16 U.S.C. § 825*l* ....................................................................... 1, 14, 18

**Administrative Decisions**

*Improvements to Generator Interconnection Procedures & Agreements*,
   Order 2023, 184 FERC ¶ 61,054, P 467 (2023), *order on reh'g*,
   Order 2023-A, 186 FERC ¶ 61,188 (2024), *pet. for rev. pending sub nom.*
   *Advanced Energy United v. FERC*, Nos. 23-1282 *et al.* (D.C. Cir.) ...................38
*Midcontinent Indep. Syst. Operator*,
   182 FERC ¶ 61,039 (2023) ...............................................................26
*New Eng. Power Co.*,
   42 FERC ¶ 61,016, 61,078-61,083 (1988) ...................................... 26, 29
*Potomac-Appalachian Transmission Highline*,
   185 FERC ¶ 61,198 (2023) ...............................................................51
*Preventing Undue Discrimination & Preference in Transmission Serv.*,
   Order 890, 118 FERC ¶ 61,119 (2007) ...........................................5, 35
*Standardization of Generator Interconnection Agreements & Procedures*,
   Order 2003, 104 FERC ¶ 61,103, PP 693-703 (2003); *order on reh'g*,
   Order 2003-A, 106 FERC ¶ 61,220, *order on reh'g*,
   Order 2003-B, 109 FERC ¶ 61,287 (2004), *order on reh'g*,
   Order 2003-C, 111 FERC ¶ 61,401 (2005) .................................... 37, 38

*Wholesale Competition in Regions with Organized Electric Markets*,
   Order 719, 125 FERC ¶ 61,071, P 158 (2008) ....................................................56

*Williston Basin Interstate*,
   48 FERC ¶ 61,137, 61,541 (1989)........................................................................25

**Regulations**

18 C.F.R. § 35.28 (2025)...................................................................................5, 56

**Other Authorities**

Webster's Third New International Dictionary 812 (1993).....................................47

**STATEMENT OF JURISDICTION**

The Federal Energy Regulatory Commission ("FERC") had jurisdiction below under sections 201 and 206 of the Federal Power Act ("FPA"), 16 U.S.C. §§ 824a & 824e. This Court has jurisdiction under FPA section 313(b), 16 U.S.C. § 825*l*(b). The challenged orders are final and dispose of all of Consumer Petitioners' claims:

- R.813, *Bldg. for the Future Through Elec. Reg'l Transmission Plan. & Cost Allocation*, 187 FERC ¶ 61,068 (May 13, 2024), 89 Fed. Reg. 49280 (June 11, 2024) (Order 1920);

- R.899, Notice of Denial of Rehearing by Operation of Law and Providing for Further Consideration (July 15, 2024);

- R.976, *Bldg. for the Future Through Elec. Reg'l Transmission Plan. & Cost Allocation*, 189 FERC ¶ 61,126 (Nov. 21, 2024), 89 Fed. Reg. 97174 (Dec. 6, 2024) (Order 1920-A);

- R.1003, Notice of Denial of Rehearing by Operation of Law and Providing for Further Consideration (Jan. 23, 2025);

- R.1050, *Bldg. for the Future Through Elec. Reg'l Transmission Plan. & Cost Allocation*, 191 FERC ¶ 61,026 (Apr. 11, 2025), 90 Fed. Reg. 17692 (Apr. 28, 2025) (Order 1920-B).

Consumer Petitioners timely petitioned for review within 60 days after FERC denied rehearing, *see* 16 U.S.C. § 825*l*(b).

American Forest and Paper Association, Coalition of MISO Transmission Customers, Industrial Energy Consumers of America, and the PJM Industrial Customer Coalition ("Industrial Consumers") timely petitioned for review of Order

1920 on September 9, 2024, and timely amended their petition incorporating Order 1920-A on January 17, 2025 (Case No. 24-1862).

National Rural Electric Cooperative Association ("NRECA") timely petitioned for review of Order 1920 on August 21, 2024; timely amended its petition incorporating Order 1920-A on January 16, 2025; and timely amended its petition incorporating Order 1920-B on April 25, 2025 (Case No. 24-1804). NRECA joins all but Section IV of this brief.

New England States Committee on Electricity ("NESCOE") timely petitioned for review of Order 1920 on September 10, 2024, and timely amended its petition incorporating Order 1920-A on January 21, 2025 (Case No. 24-1867). NESCOE joins Sections I, II, and IV of this brief.

Office of the Ohio Consumer's Counsel ("OCC") timely petitioned for review of Order 1920 on September 10, 2024, and timely amended its petition incorporating Order 1920-A on January 21, 2025 (Case No. 24-2163, transferred from the D.C. Circuit). OCC does not join Section VIII of this brief.

Resale Power Group of Iowa ("RPGI"), an intervenor in support of Consumer Petitioners, intervened in Case No. 24-1650 on August 14, 2024.

Venue is proper in this Court. On August 8, 2024, the Judicial Panel on Multidistrict Litigation randomly selected this Court in which to consolidate the

petitions for review of the challenged orders. The Court consolidated Petitioners'
cases with Case No. 24-1650(L).

## STATEMENT OF THE ISSUES

1. Whether FERC failed to meet its burden to demonstrate existing transmission
   planning practices are unjust and unreasonable.

2. Whether FERC's action was arbitrary and capricious because it failed to
   ensure just and reasonable rates by not: limiting transmission owner
   incentives; requiring transparency for asset management projects;
   implementing independent transmission planning and/or monitoring; and
   instituting reforms to formula rates and the prudence standard.

3. Whether FERC's action was arbitrary, capricious, and contrary to law because
   it reallocated interconnection-related transmission costs from generators to
   consumers without first finding the existing cost-allocation policy was unjust
   and unreasonable.

4. Whether FERC's action was arbitrary, capricious, and contrary to law because
   it allowed transmission planners to disregard and not plan for the expected
   supply obligations of load-serving entities.

5. Whether FERC's action was arbitrary and capricious because it prohibited
   transmission planners from reevaluating transmission projects that become
   uneconomic or unneeded.

6. Whether FERC's action was arbitrary and capricious because it excluded many electric cooperatives from transmission-planning and cost-allocation engagement processes.

## STATEMENT OF THE CASE

### Statutory Background

In 1935 Congress amended the FPA "to provide effective federal regulation of the expanding business of transmitting and selling electric power in interstate commerce." *Gulf States Utils. Co. v. FPC*, 411 U.S. 747, 758 (1973). Section 201 gives FERC jurisdiction over the transmission and sale of electric energy at wholesale in interstate commerce; the facilities used for such transmission and sale; and the public utilities owning or operating such facilities. 16 U.S.C. § 824.

The FPA's "primary aim is the protection of consumers from excessive rates and charges." *Mun. Light Bds. v. FPC*, 450 F.2d 1341, 1348 (D.C. Cir. 1971). Section 205(a) requires all rates for transmission and sales to be "just and reasonable." 16 U.S.C. § 824d(a). Section 206(a) authorizes FERC to modify "any rate" or "regulation, practice, or contract affecting such rate" that it finds to be "unjust, unreasonable, unduly discriminatory or preferential," whereupon FERC "shall determine the just and reasonable rate, … regulation, practice, or contract to be thereafter observed and in force, and shall fix the same by order." 16 U.S.C. § 824e(a). "[T]he purpose of the power given [FERC] by § 206(a) is the protection of

the public interest, as distinguished from the private interests of the utilities …."
*FPC v. Sierra Pac. Power Co.*, 350 U.S. 348, 355 (1956).

### Regulatory Background

In 1996, FERC used its section 206 authority to adopt regulations requiring public utilities owning or operating transmission facilities to file tariffs conforming to a FERC *pro forma* open-access transmission tariff intended to provide non-discriminatory transmission service comparable to the public utility's use of its facilities to serve its own customers. *See Transmission Access Pol'y Study Group v. FERC*, 225 F.3d 667 (D.C. Cir. 2000), *aff'd sub nom. New York v. FERC*, 535 U.S. 1 (2002); 18 C.F.R. § 35.28 (2025). In 2007, FERC required that utilities' transmission-planning processes meet certain principles. *See Preventing Undue Discrimination & Preference in Transmission Serv.*, Order 890, 118 FERC ¶ 61,119 (2007), *order on reh'g*, 118 FERC ¶ 61,119, *order on reh'g*, 123 FERC ¶ 61,299 (2008), *order on reh'g*, 126 FERC ¶ 61,228, *order on clarification*, 129 FERC ¶ 61,126 (2009). And in 2011, it added a requirement to participate in regional transmission-planning and cost-allocation processes meeting certain principles. *See S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d 41 (D.C. Cir. 2014) (per curiam).

### Proceedings Below

FERC commenced the proceedings below in July 2021 by issuing an Advanced Notice of Proposed Rulemaking ("ANOPR") to revise its requirements

for transmission planning, cost allocation, and generator interconnection. R.3, ANOPR. In April 2022, FERC issued a Notice of Proposed Rulemaking ("NOPR") to revise the transmission-planning and cost-allocation provisions of its *pro forma* tariff. R.388, NOPR.

On May 13, 2024, FERC issued Order 1920, finalizing revisions to the *pro forma* tariff. R.813. Citing section 206, FERC found existing regional transmission-planning and cost-allocation processes were unjust, unreasonable, unduly discriminatory or preferential because FERC did not require transmission providers to (1) "perform a sufficiently long-term assessment of transmission needs"; (2) "adequately account on a forward-looking basis for known determinants of" long-term transmission needs; and (3) "consider a set of benefits of regional transmission facilities planned to meet those" needs. *Id.* P 1. FERC adopted requirements for "Long-Term Regional Transmission Planning" that it claimed "will ensure the identification, evaluation, and selection, as well as the allocation of the costs, of more efficient or cost-effective regional transmission solutions to address Long-Term Transmission Needs." *Id.* P 2. FERC required that transmission providers:

- Develop, and update every five years, "Long-Term Scenarios" incorporating 20 years' of "Long-Term Transmission Needs" driven by seven specified "categories of factors." *Id.* PP 298, 344, 377, 409, 447, 507, 510, 559.

- Evaluate whether proposed "Long-Term Regional Transmission Facilities" meet "Long-Term Transmission Needs" by measuring at least seven specified benefits over a minimum 20-year horizon after a facility's estimated in-service date, and use this benefit-horizon to select facilities for regional cost allocation. *Id.* PP 719-720, 859.

- Adopt an evaluation and selection process for such facilities. *Id.* PP 911-912, 954-957.

- Adopt a process for reevaluating selected facilities in limited circumstances. *Id.* PP 1048-1061.

- File "Long-Term Regional Transmission Cost Allocation Methods" to allocate costs of selected facilities and (optionally) a "State Agreement Process" where "Relevant State Entities" have a six-month "Engagement Period" to agree on allocation. *Id.* PP 1291-1292, 1354, 1402.

- Use existing regional transmission-planning processes to evaluate and select certain network upgrades identified in generator-interconnection processes but not built because the generators withdrew. *Id.* PP 1106-1121.

- Adopt enhanced transparency requirements for existing local transmission-planning processes and improve coordination between regional and local transmission planning to identify potential opportunities to "right-size" replacement transmission facilities. *Id.* PP 1625-1647.

But FERC declined to adopt any cost-management and customer-protection proposals, including the NOPR's proposal to bar transmission providers from recovering 100% of construction work in progress ("CWIP") for Long-Term Regional Transmission Facilities, *id.* P 1547,; requests to apply the enhanced transparency requirements to transmission providers' "asset-management" (*i.e.*, "in-kind replacement") processes, *id.* P 1625; requests for more independent monitoring of transmission planning; and requests for meaningful prudence reviews of costs incurred (instead of presuming the prudence of costs included in transmission rates), *id.* P 1648.

Many parties, including Consumer Petitioners, requested rehearing. On November 21, 2024, FERC issued Order 1920-A. R.976. FERC primarily denied rehearing but modified Order 1920 "with a particular focus on ensuring that states have a robust role in Long-Term Regional Transmission Planning and cost allocation processes …." *Id.* P 2. FERC required transmission providers to:

- Incorporate input from Relevant State Entities in developing Long-Term Scenarios. *Id.* P 344, 367.

- Conduct cost-allocation discussions with Relevant State Entities during the Engagement Period. *Id.* P 656.

- Include with their cost-allocation compliance proposals any agreed-upon cost-allocation method or State Agreement Process requested by Relevant State Entities. *Id.* PP 649-662.

- Consult Relevant State Entities before amending a Long-Term Regional Transmission Cost Allocation Method or State Agreement Process. *Id.* PP 691-692.

Several parties, including NRECA, requested clarification or rehearing. On April 11, 2025, FERC issued Order 1920-B, clarifying but sustaining the earlier orders. R.1050.

## SUMMARY OF THE ARGUMENT

FERC approved long-term planning reforms without demonstrating, consistent with its obligation under FPA section 206, that any specific existing transmission planning practices or tariff provisions are unjust and unreasonable. Order 1920 does not reflect reasoned decision-making because FERC is not permitted to advance a remedy and its desired solution without first determining that specific existing rates and practices are unjust and unreasonable.

Order 1920 arbitrarily and capriciously facilitates an escalation in transmission rates without implementing any cost controls and cost containment mechanisms to ensure rates remain just and reasonable. FERC's rejection of its initial proposal to eliminate certain transmission rate incentives for long-term

regional projects violated FPA section 206's requirement that FERC must remedy unjust and unreasonable rates and practices. FERC recognized that long-term planning would transfer substantial risk to consumers by foisting on them all risks and uncertainties associated with a 20-to-40-year process. However, rather than balance the needs of utilities and consumers, FERC left intact a financial incentive structure that allows utilities to charge consumers 100% of prudently incurred costs before projects go into service and even if projects never go into service.

Instead of confronting evidence demonstrating the need for more independent transmission planning and monitoring to protect consumers from inefficient building and from imprudent spending, FERC arbitrarily and capriciously referred consideration of independent planning and monitoring to a separate administrative docket where FERC has no obligation to act. FERC also failed to rebut arguments demonstrating that FERC's existing transmission ratemaking and prudency review procedures fail to protect consumers and instead insulate transmission developers from challenges to imprudent spending.

FERC adopted enhanced transparency requirements for local transmission projects, finding such reforms were necessary to ensure just and reasonable rates, but exempted in-kind replacement ("asset management") projects from these reforms. FERC ignored that such projects comprise the vast majority of transmission

projects and impose substantial costs on consumers outside of holistic, regional planning; accordingly, FERC's action was arbitrary and capricious.

FERC changed its long-standing policy for allocating costs of transmission-network upgrades required to interconnect new generators by shifting the planning from generator-interconnection processes (where generators pay the upfront costs of the upgrades) to regional transmission-planning processes (where consumers bear these costs). FERC's action was arbitrary, capricious, and contrary to law because it destroyed the price signals for efficient generator location sent by FERC's existing policy and—without acknowledging or reasonably explaining the policy change—shifted enormous upgrade costs from generators to consumers.

By statute, FERC must facilitate transmission planning to meet the reasonable needs of load-serving entities to meet their service obligations to consumers. But Order 1920 allowed transmission planners to disregard and not plan for the expected supply obligations of load-serving entities. Lacking any reasonable explanation, FERC's action was arbitrary, capricious, and contrary to law.

FERC imposed ambitious requirements to look 40 years ahead to select transmission projects and allocate their costs. Despite the attending uncertainties, however, FERC prohibited reevaluation of those selection and cost-allocation decisions except in limited situations. FERC prescribed reevaluation when a project's costs significantly increased. But absent a significant change in costs,

FERC prohibited reevaluation when a project's benefits changed or transmission needs changed, even significantly. And FERC did not allow a change in laws or regulations to trigger reevaluation unless the project, when selected, would go into service in the latter half of the (minimum 20-year) planning horizon. FERC did not reasonably explain these limitations, which expose consumers to excessive rates from uneconomic, even unneeded, facilities.

In Order 1920-A, FERC required transmission providers to engage with Relevant State Entities concerning transmission planning and cost allocation. It explained that engagement with state entities responsible for retail electric rate regulation would help ensure the development of more efficient and cost-effective transmission facilities. Under the laws of many states, elected boards of directors of electric cooperatives establish the rates for the cooperative's member-consumers independently of any other state regulator. But FERC excluded these cooperatives from the engagement processes it ordered, denying their member-consumers a comparable voice in these processes. FERC gave no reasonable explanation for this unduly discriminatory exclusion.

## ARGUMENT

### I.     Standard of Review

This Court must "hold unlawful and set aside agency action" found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

law." 5 U.S.C. § 706(2)(A); *see FERC v. Elec. Power Supply Ass'n,* 577 U.S. 260, 292 (2016) ("*EPSA*"); *N.C. Utils. Comm'n v. FERC*, 741 F.3d 439, 448 (4th Cir. 2014). Under that standard, FERC "must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (cleaned up); *see also Sierra Club v. State Water Control Bd.*, 64 F.4th 187, 194 (4th Cir. 2023). FERC's orders are arbitrary and capricious if it "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43; *see Friends of Buckingham v. State Air Pollution Control Bd.,* 947 F.3d 68, 80 (4th Cir. 2020); *Appalachian Voices v. State Water Control Bd.,* 912 F.3d 746, 753 (4th Cir. 2019). This requires "a searching and careful inquiry of the record in order to ascertain whether the agency decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Duke Power Co. v. U.S. Nuclear Regul. Comm'n,* 770 F.2d 386, 389-90 (4th Cir. 1985) (cleaned up).

The Court must "exercise independent judgment in determining the meaning of statutory provisions." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412-13

(2024). FERC's findings of facts must be supported by substantial evidence. 16 U.S.C. § 825*l*(b); *N.C. Dept. Env't Quality v. FERC*, 3 F.4th 655, 666 (4th Cir. 2021).

## II.    Consumer Petitioners Have Standing

"To establish Article III standing, the injury must be concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (cleaned up). A litigant must show "a personal, particularized injury" and "that it has (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Md. Shall Issue, Inc. v. Hogan*, 971 F.3d 199, 210 (4th Cir. 2020) (cleaned up). When membership organizations petition for review on behalf of their members, the organization must show (1) at least one of its members would have standing to sue in their own right; (2) the interests at stake are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *Outdoor Amusement Bus. Ass'n v. Dep't of Homeland Security*, 983 F.3d 671, 683 (4th Cir. 2020).

Consumer Petitioners challenge a rule of general applicability for which any of their members would have standing to sue in their own right. FERC promulgated Order 1920 upon finding that transmission planning directly affects rates that consumers pay for electricity and "is foundational to ensuring an affordable, reliable

supply of electricity." R.813, Order 1920, P 86; *see id.* P 90. By effectuating changes to transmission planning and cost allocation, Order 1920 directly affects rates consumers will pay for the transmission of electricity under FERC's jurisdiction. *Id.* Consumer Petitioners comprise trade groups, *ad hoc* associations, non-profits, and governmental entities representing the interests of states; retail, end-use consumers; and not-for-profit electric cooperatives that provide electric power to their end-use consumer-members.

The cost of electricity, including FERC-jurisdictional transmission, continues to increase for all customer classes, and electricity is a significant operating cost for energy-intensive customers and a significant living expense for residential consumers. The interest in affordable, reliable electric power is germane to the core purposes of Consumer Petitioners. Participation of their individual members in this appeal is unnecessary to advance the claims of Consumer Petitioners.

Consumer Petitioners believe their standing is self-evident because FERC, in Order 1920, authorized new transmission planning and cost allocation practices that directly affect the electricity rates paid by Consumer Petitioners and their members.

### III. FERC Failed to Meet Its Burden to Demonstrate Existing Transmission Planning Practices Are Unjust and Unreasonable.

Under FPA section 206, FERC may determine that an existing rate (or practice affecting a rate) is unjust, unreasonable, unduly discriminatory or preferential. However, "[o]nly *after* having made the determination that the utility's existing rate

fails that test may FERC exercise its section 206 authority to impose a new rate."

*Emera Maine v. FERC*, 854 F.3d 9, 21 (D.C. Cir. 2017) (emphasis original).

Consumer Petitioners challenge the absence of specific findings under the first prong

of section 206 (and challenge FERC's purported attempt to leverage generic

findings) as to the precise existing transmission provider tariff provisions and

practices that are unjust, unreasonable, unduly discriminatory or preferential under

section 206.

FERC found "that *the absence* of sufficiently long-term, forward-looking, and

comprehensive transmission planning requirements is causing transmission

providers to fail to adequately anticipate and plan for future system conditions."

R.813, Order 1920, P 85 (emphasis added); *see id.* P 112. Here, FERC engaged in

circular reasoning by leveraging a perceived absence of long-term planning to satisfy

the first prong in section 206 instead of deeply engaging any root problems in

existing transmission planning practices.  R.852, Industrial Consumers' Rehearing,

13-14.

A simple example highlights FERC's faulty logic. FERC could craft a desired

outcome – e.g., that all transmission lines should be painted red. Under FERC's

logic, FERC would determine that existing transmission planning practices, which

do not require that all transmission lines be painted red, are unjust and unreasonable

because they do not include FERC's desired outcome – painting all transmission

lines red. FERC needs to, independently from its desired outcome, find and demonstrate that some existing practice is unjust and unreasonable. It has not. In this hypothetical, FERC could legitimately find that existing transmission planning practices are not resulting in transmission lines that are easily identifiable by aircraft, and then determine that painting those lines red would resolve the problem. However, FERC cannot cut to a desired solution and then determine that the absence of its desired solution renders the *status quo* unjust and unreasonable. If that were the case, FERC's authority under section 206 would know no bounds, and FERC could essentially legislate to achieve any desired outcome.

Order 1920 does not reflect reasoned decision-making because FERC is not permitted to leverage a remedy to determine its section 206, prong one findings. When FERC begins with the remedy to show that the *status quo* is not just and reasonable, its reasoning is circular and "[does] not meet the first requirement of section 206…" *Emera Maine*, 854 F.3d at 22. The D.C. Circuit has explained:

> [A] finding that an existing rate is unjust and unreasonable is the "condition precedent" to FERC's exercise of its section 206 authority to change that rate. Section 206 therefore imposes a "dual burden" on FERC. Without a showing that the existing rate is unlawful, FERC has no authority to impose a new rate.

*Emera Maine*, 854.F3d at 25 (cleaned up); *see also Pub. Serv. Elec. & Gas Co. v. FERC*, 989 F.3d 10, 13 (D.C. Cir. 2021). A reviewing court "must not reduce itself to a rubber stamp of agency action." *Mountain Valley Pipeline, LLC v. N.C. Dep't of Env't Quality,* 990 F.3d 818, 826 (4th Cir. 2021) (cleaned up).

FERC's factual findings are determinative so long as they are supported by substantial evidence. 16 U.S.C. § 825l(b); *N.C. Dept. Env't Quality*, 3 F.4th at 666. Substantial evidence "must do more than create a suspicion of the existence of the fact to be established." *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 477 (1951) (cleaned up); *Piney Mt. Coal Co. v. Mays*, 176 F.3d 753, 756 (4th Cir. 1999). While the rulemaking record may be extensive, FERC's finding that existing regional transmission planning and cost allocation processes result in unjust, unreasonable, unduly discriminatory, or preferential FERC-jurisdictional rates is not supported with substantial evidence, facts, or data. Instead, FERC's "factfinding" amounts to several generic assertions (regarding the value of transmission and increases in transmission spending) to reach very broad conclusions. R.813, Order 1920, PP 90-111; R.1050, Order 1920-B, PP 72-86. Order 1920's reforms are also based on mere expressions of concern: existing processes "*may not* be planning transmission on a sufficiently long-term, forward-looking basis to meet transmission needs driven by changes in the resource mix and demand." R.831, Order 1920, P 48 (emphasis added). FPA section 206 requires FERC to definitively find that rates or practices affecting rates *are* unjust and unreasonable, not that existing practices "may" or "might be" unjust or unreasonable. *Id.*, P 86.

Instead of confronting its faulty logic, on rehearing, FERC reiterated generic assertions that it relied on to support its first prong determination under section 206

(R.976, Order 1920-A, PP 72-86) to reach the same circular conclusion that "the absence of sufficiently long-term, forward-looking, and comprehensive regional transmission planning processes" constitutes the specific root cause and problem under section 206. *Id.* P 124. In Order 1920-A FERC still failed to specify the existing tariff provisions or practices that are unjust and unreasonable. Instead, FERC continued to churn phrases like "the resource mix is changing" (*id.* P 73) and "the changing transmission investment landscape" (*id.* P 74). FERC invoked data and reports indicating increased transmission needs and investment but conceded it relied on "generic factual predictions" (*id.* P 72) and failed to tie investment needs to any root cause issues with any specific existing practices or tariff provisions (*id.* PP 72-74, n.153-159). FERC's argument remains circular – long term-planning reforms are needed due to an absence of long-term planning reforms. *Id.*, P 81.

FERC contends caselaw supports its reliance on generic factual predictions. *Id.*, PP 82-83 (citing *Associated Gas Distributors v. FERC*, 824 F.2d 981, 1008 (D.C. Cir. 1987) and *S.C. Pub. Serv. Auth.*, 762 F.3d at 66). In *Associated Gas*, the D.C. Circuit upheld FERC's promulgation of generic rate criteria under section 5 of the Natural Gas Act ("NGA"), 15 U.S.C. § 717d, because FERC reasonably concluded that the generic rule would prevent cost shifting and increase incentives for competition for the benefit of consumers. *Associated Gas,* 824 F.2d at 1008. The Court even noted that the petitioners in *Associated Gas* would have been able to

19

prevail under certain circumstances where FERC adopts new rate criteria "without 'factual' submissions tracing a relationship between rate practices formerly permitted and the evils that it sought to correct." *Id.* (citing *Elec. Consumers Res. Council v. FERC*, 747 F.2d 1511, 1514 (D.C. Cir. 1984) ("mere reliance on an economic theory cannot substitute for substantial record evidence and the articulation of a rational basis for an agency's decision"). This case is not analogous to *Associated Gas* because FERC did not trace "a relationship between rate practices formerly permitted and the evils that it sought to correct." *Elec. Consumers*, 747 F.2d at 1514.

Similarly, in *South Carolina Public Service Authority*, FERC did not simply address a threat to just and reasonable rates based on its judgment of a theoretical problem. The D.C. Circuit upheld FERC's 2011 transmission-planning requirements because it was self-evident that monopoly control over transmission projects hinders competition and prevents selection of the more cost-effective, cost-efficient transmission projects. *S.C. Pub. Serv. Auth.*, 762 F.3d at 65 ("Agencies do not need to conduct experiments in order to rely on the prediction that an unsupported stone will fall; nor need they do so for predictions that competition will normally lead to lower prices."). The prediction that competition will lead to lower prices is not analogous to FERC's purported factual predictions that a changing resource mix and increased transmission investment require FERC's specific long-term planning

reforms, which ironically include a substantial restriction on competition.[1] FERC did not show that its generic predictions in Order 1920 reflect reasoned decision-making and are consistent with appellate precedent. Indeed, the predictions and economic theory allowed in *Associated Gas* and *South Carolina Public Service Authority* were narrowly tailored and tied to the rate practices FERC sought to remedy, unlike in the proceeding below.

It is "well established that the Commission must 'respond meaningfully to the arguments raised before it.'" *TransCanada Power Mktg. Ltd. v. FERC*, 811 F.3d 1, 12 (D.C. Cir. 2015); *see also Molina Mondoza v. Sessions*, 712 Fed. Appx. 240, 244 (4th Cir. 2018) (agency "must meaningfully account for evidence that contradicts its key findings"); *Baharon v. Holder*, 588 F.3d 228, 233 (4th Cir. 2009) (Court ensures unrebutted, legally significant evidence is not arbitrarily ignored). In Order 1920-A, FERC did not acknowledge, let alone rebut Industrial Consumers' "paint all transmission lines red" example demonstrating FERC's circular reasoning. Because FERC's flawed reasoning would allow it to implement any unlimited set of reforms

---

[1] Order No. 1920 finalized a right of first refusal or monopoly preference for "right-sized" replacement transmission facilities that are selected to meet long-term transmission needs. R.813, Order 1920, P 1702. Industrial Consumers and RPGI support the brief of the Electricity Transmission Competition Coalition challenging Order No. 1920's implementation of this anti-competitive monopoly preference allowing incumbent utilities to "right-size" a project and avoid competition.

without meeting its burden under step prong of section 206, Order 1920 is arbitrary and capricious and does not reflect reasoned decision-making.

## IV. FERC's Failure to Implement Any Concrete Reforms to Mitigate Escalating Transmission Costs Is Arbitrary and Capricious.

Ratemaking is a core function of FERC. However, FERC did not implement any ratemaking reforms or consumer protections in Order 1920. FERC's duty is to "protect the public interest as distinguished from the private interest of the utilities," *S.C. Generating Co. v. FPC*, 249 F.2d 755, 762 (4th Cir. 1957) and to protect "consumers from excessive rates and charges.'" *Xcel Energy Services, Inc. v. FERC*, 815 F.3d 947, 952 (D.C. Cir. 2016). Order 1920 is arbitrary and capricious because FERC failed to consider "an important aspect of the problem" (*State Farm*, 463 U.S. at 43; *Friends of Buckingham*, 947 F.3d at 80) – the ratemaking ramifications of unleashing long-term planning reforms without implementing any cost control mechanisms to ensure that transmission rates remain just and reasonable.

This failure is incongruous with FERC's recognition of the recent escalation in transmission spending and cost exposure for customers via billions of dollars in planned investment. R.813, Order 1920, PP 92-93. As observed by Industrial Consumers:

> Multiple parties asked for transmission cost mitigation and cost containment, and suggested several different approaches, methods, and solutions to containing costs. Yet, Order 1920 looks the other way, failing to engage the hard issue and the Commission's core statutory function and reason for its existence – protecting consumers from monopolies charging excessive rates.

R.852, Industrial Consumers' Rehearing, 1. Instead of ensuring just and reasonable rates, FERC generically contended – without demonstrating – that long-term reforms should provide cost savings.  R.813, Order 1920, P 1.

In Order 1920-A, FERC dismissed the Industrial Consumers' Rehearing Request (R.852) "with little more than a handwave." *Del. Div. of Pub. Advocate v. FERC*, 3 F.4th 461, 469 (D.C. Cir. 2021). FERC reasserted that its long-term planning reforms will result "in the selection of more efficient or cost-effective transmission solutions," and to support that generic contention, it cited back to an unspecified portion of Order 1920's "Overall Need for Reform section."  R.976, Order 1920-A, P 793, n.1976. FERC claimed it did not violate *State Farm's* principle that an agency must consider an important aspect of a problem by asserting that it need not address all issues in a single rulemaking and declaring that transmission cost containment is out of scope. *Id.*, PP 788, 793. Given FERC's findings on escalation of transmission rates and investment, FERC's failure to demonstrate that Order 1920's reforms will ensure just and reasonable rates without any meaningful cost containment reforms was arbitrary and capricious.

FERC did not substantively respond to Industrial Consumers' argument that FERC has no obligation to address transmission cost management reforms in Docket No. AD22-8-000, which has been pending for over three years. *Id.*, P 858, n.2138. FERC arbitrarily and capriciously avoided addressing cost mitigation in Order 1920

and instead punted on hard ratemaking issues integral to transmission planning and cost allocation reforms. Because FERC has not "reasonably considered the relevant issues" and has flatly "ignore[d] a critical issue," this Court should reverse and remand Order 1920, and direct FERC to implement binding, concrete cost controls. *Ren v. U.S. Citizenship & Immigr. Servs.*, 60 F.4th 89, 93 (4th Cir. 2023) (quoting *FCC v. Prometheus Radio Project*, 141 S.Ct. 1150, 1158 (2021) and *Hughes River Watershed Conservancy v. Johnson*, 165 F.3d at 283, 287-88 (4th Cir. 1999)).

### a. Order 1920 Arbitrarily and Capriciously Did Not Address Lucrative Transmission Owner Incentives.

In rejecting proposals to eliminate CWIP and the abandoned plant transmission rate incentives for long-term regional transmission projects, FERC failed to engage in reasoned decision-making. R.865, OCC Rehearing, 11-12; R.852, Industrial Consumers' Rehearing, 24-27; *see also EPSA,* 577 U.S. at 292 (requiring agencies to provide reasoned explanations). FERC also reneged on its "primary task . . . to guard the consumer from exploitation . . ." *NAACP v. FPC*, 520 F.2d 432, 438 (D.C. Cir. 1975), *aff'd*, 425 U.S. 662 (1976). "It is long-established that the '[primary aim of the FPA] is the protection of consumers from excessive rates and charges.'" *Xcel Energy Services,* 815 F.3d at 952 (cleaned up).

In the NOPR, FERC recognized that for Long-Term Regional Transmission Planning processes to be fair, all financial risks of transmission projects cannot be foisted onto consumers. R.388, NOPR, P 331. Because FERC found that consumer

protections would be necessary to "reduce the risk to ratepayers of potentially financing over-investment in regional transmission facilities," FERC proposed to eliminate CWIP (consumer funding of construction before plant goes into service) for these projects, finding that the benefits of CWIP "mainly accrue to the public utility transmission providers and their shareholders during construction." *Id*. FERC explained that "[s]hould the regional transmission facilities not be placed in service, then ratepayers will have financed the construction of such facilities that were not used and useful, while ultimately receiving no benefits from such facilities." *Id.*

To remedy this concern, FERC proposed to require transmission providers to book costs incurred during pre-construction or construction to Allowance for Funds Used During Construction and only recover those costs plus interest once the facility is in service. *Id*. This solution is consistent with FERC's long-standing policy that costs can be included in rates only when the facilities are "used and useful" and placed in service. *Williston Basin Interstate*, 48 FERC ¶ 61,137, 61,541 (1989); *see also* R.852, Industrial Consumers' Rehearing, 26.

Order 1920 rejected FERC's initial proposal, but did not retract its finding of unfairness regarding the allocation of risk between consumer and utility. FERC also rejected alternative solutions that Consumer Petitioners proposed, such as elimination of the abandoned plant incentive, or modification of that incentive to ensure that costs for plant that is not used and useful would at least be equitably split

(50-50) between utility and consumer. *See New Eng. Power Co.*, 42 FERC ¶ 61,016, 61,078-61,083 (1988). The abandoned plant incentive forces consumers to absorb all project risks at the time of abandonment, serving as *de facto* insurance for cost recovery. R.852, Industrial Consumers' Rehearing, 27 (citing *Midcontinent Indep. Syst. Operator*, 182 FERC ¶ 61,039 (2023) (Comm'r Christie Concurrence, P 3)). Consequently, FERC did not fulfill its primary obligation to provide consumers a "complete, permanent and effective bond of protection from excessive rates and charges." *Atl. Seaboard Corp. v. FPC,* 397 F.2d 753, 756 (4th Cir. 1968) (quoting *Atl. Refining Co. v. Pub. Serv. Comm'n of N.Y.*, 360 U.S. 378, 388 (1959)). Because the NGA and FPA "are in all material respects substantially identical," *FPC v. Sierra Pac. Power*, 350 U.S. at 353, courts have an "established practice of citing interchangeably decisions interpreting the pertinent sections of the two statutes." *Ark. La. Gas Co. v. Hall,* 453 U.S. 571, 578 n.7 (1981); *see PPL Energyplus v. Nazarian,* 753 F.3d 467, 475 n.2 (4th Cir. 2014), ), *aff'd sub nom. Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150 (2016).

FERC's failure to remedy the unjustness and unreasonableness of allowing 100% cost recovery of CWIP and other lucrative transmission incentives for long-term regional transmission projects violates FERC's obligation to remedy unjust and unreasonable rates and practices. 16 U.S.C. § 824e. Order 1920 also violates the judicial mandate that "FERC must choose a method that entails an appropriate

'balancing of the investor and the consumer interests.'" *Morgan Stanley v. Pub. Util. Dist. No.1*, 554 U.S. 527, 532 (2008) (citing *FPC v. Hope Nat. Gas Co.*, 320 U.S. 591, 603 (1944)). FERC's refusal to eliminate transmission owners' access to transmission incentives that shield investors from *all* financial risk, while acknowledging the risk for consumers associated with an uncertain 20-year regional transmission planning process, fails to balance investor and consumer interests. R.865, OCC Rehearing, 12; R.852, Industrial Consumers' Rehearing, 26. Continuing to allow such incentives for uncertain long-term regional transmission projects unreasonably transfers all financial risk from investors to consumers. Order 1920 ignores FERC's statutory obligation to ensure that any incentives provided must benefit consumers. 16 U.S.C. § 824s(a). As noted in the dissent, "[b]y walking back the removal of the CWIP Incentive, today's final rule reveals, once again, its failure to protect consumers as required by the FPA." R.813, Order 1920, Christie, Comm'r, dissenting ("Christie Dissent"), P 121.

FERC failed to explain why cost mitigation for consumers is not needed in conjunction with the Long-Term Regional Transmission Planning rules. FERC simply deferred the issue without specifying any proceeding in which it will address incentives. R.813, Order 1920, P 1547; R.976, Order 1920-A, P 800. FERC further failed to address concerns that consumers could start paying the CWIP and abandonment incentives much sooner than the adoption of any remedy. R.865,

OCC's Rehearing, 12; R.852, Industrial Consumers' Rehearing, 26. Failure to address important aspects of the identified problem does not constitute reasoned decision-making. *Friends of Buckingham., 947* F.3d at 80 (quoting *Appalachian Voices,* 912 F.3d at 753). The Court should vacate and remand Order 1920 with directions to eliminate the CWIP and abandoned plant incentives for long-term regional transmission projects.

### b. Order 1920 Failed to Address the Need for Independent Transmission Project Planning and Monitoring.

FERC failed to engage requests to implement Independent Transmission Planners and/or Independent Transmission Monitors to ensure just and reasonable rates. Industrial Consumers emphasized the need for independent review and oversight of all transmission projects at 100 kilovolts and above because the current regulatory framework does not protect consumers from inefficient building and from imprudent spending. R.852, Industrial Consumers' Rehearing. Consumer Petitioners presented FERC with several options, including implementation of new entities to serve as independent planners and monitors or to require existing regional grid operators to ensure the most efficient, cost-effective grid is planned. Yet, FERC glossed over the need for more independent oversight, contending that proposals like independent transmission monitoring may be considered at some unknown point in the future. R.976, Order 1920-A, P 858. FERC is obligated to ensure that all rates

and practices affecting rates are just and reasonable now, not hope that uncommitted reforms at some point will resolve the problem.

### c. Order 1920 Arbitrarily and Capriciously Failed to Reform the Existing Formula Rate and Prudence Review Framework to Control Increased Transmission Spending.

FERC failed to meaningfully address arguments that if FERC did not require more independent oversight and scrutiny into transmission planning and monitoring processes, then FERC must ensure that these processes enable states, customers and stakeholders to challenge transmission costs. Industrial Consumers and others sought reforms to FERC's transmission formula ratemaking process and the prudency standard governing transmission cost incurrence. R.813, Order 1920, PP 1616, 1648, 1727. Under FERC's prudence standard, the utility enjoys broad discretion in conducting its business affairs and may incur costs so long as the costs incurred are "the costs which a reasonable utility management would have made, in good faith, under the same circumstances, and at the relevant point in time." *New England Power Co.*, 42 FERC ¶ 61,016, 61,078 (1988). The presumption of prudence FERC provides transmission owners is highly deferential and must be overcome by concrete evidence presented by consumers, who are operating from an information deficit and must provide serious doubt as to the prudency of any cost incurrence. Showing that project costs incurred are imprudent is highly fact-intensive and the burden of proof is nearly impossible to meet. R.852, Industrial

Consumers' Rehearing, 34-37. Moreover, it appears FERC has not rejected any transmission-related investment as imprudent in the past 20 years. *Id.*, 36.

In Order 1920-A, FERC recited Industrial Consumers' argument that Order 1920 does not ensure just and reasonable rates "because it does not undertake reforms of transmission formula rates or the Commission's prudence standard" or "implement any concrete reforms to protect consumers." R.976, Order 1920-A, P 854 (citing Industrial Consumers' Rehearing, 29-31). Yet, FERC failed to address Industrial Consumers' point regarding the ineffectiveness of FERC prudency reviews. FERC failed to engage any reforms parties contended were necessary to ensure just and reasonable rates, preferring to kick the can down the road. R.976, Order 1920-A, P 858; R.813, Order 1920, Christie Dissent, P 17 ("If FERC were seriously interested in saving consumers' money, it would be acting to rein in the wide array of transmission incentives regularly handed out to transmission developers…and acting to reform the automatic awarding of the presumption of prudence in formula rate proceedings. Literally *nothing* is being done about these forms of consumer exploitation in this final rule").

### d. FERC's Decision to Exempt Asset Condition Projects from the Final Rule's Transparency Requirements Is Arbitrary and Capricious.

Finally, FERC's exemption of asset condition projects from Order 1920's transparency requirements will have severe cost repercussions for consumers.

FERC concluded that "enhanced transparency and opportunities for stakeholder participation are needed to ensure just and reasonable Commission-jurisdictional rates." R.813, Order 1920, P 1635. Nonetheless, FERC exempted large swaths of FERC-jurisdictional local transmission projects from requirements for enhanced transparency and stakeholder participation. FERC's rationale was simply that this reform applies "only to local transmission planning that is within the scope of Order No. 890 and is therefore already subject to Order No. 890 transparency requirements." *Id.*, P 1625. In ignoring evidence raised by NESCOE regarding the scope and expense of such projects, FERC's decision was arbitrary and capricious.

The transmission projects FERC exempted from Order 1920's requirements, referred to interchangeably as "asset condition projects" (*id.*, P 1670), "asset management projects" (*id.* P 1625) and "in-kind replacements" (*id.* P 1566), are projects initiated by incumbent transmission owners to maintain reliability of assets on their systems, primarily due to aging, damaged or otherwise obsolete equipment. *See* R.456, NESCOE Comments, 76. In lieu of a well-reasoned explanation for why these transmission projects should be exempt from reforms deemed needed to ensure just and reasonable rates, FERC merely "reiterate[d] that planning for asset management projects, which do not increase transmission capacity or only do so incidentally, is not required to be included within the scope of local transmission planning that is subject to Order No. 890 transparency requirements, and as such, it

was reasonable for the Commission to exclude them from the requirements in Order 1920." R.976, Order 1920-A, P 856 (citations omitted).

FERC's conclusory statement failed to address NESCOE's concerns: while asset condition spending in New England represents the vast majority of regional transmission charges paid by customers, Order 1920 subjected such projects to far fewer requirements for transparency, scrutiny, and review. R.847, NESCOE Rehearing, 27-28. FERC ignored evidence regarding the rapid increase in spending in certain regions (New England and PJM Interconnection, L.L.C. ("PJM")) on asset condition projects over the past several years compared to reliability projects (which *are* subject to Order 1920's transparency requirements). In New England, as of June 2024, asset condition spending represented over 80% of the total expected future transmission investment in that region. *Id.* Such projects (called Supplemental Projects in PJM) comprise over 75% of the costs for proposed new transmission in Ohio, but escape regulatory review. R.553, OCC Comments, 25-26. By excluding asset condition projects from Order 1920's reforms, FERC exempted most FERC-jurisdictional "local" transmission projects, creating an exception that swallows the rule.

FERC's rationale was simply that because asset condition projects were not the subject of a prior rulemaking, they should be exempt from the reforms currently deemed necessary. This rationale cannot be squared with FERC's recognition that

reforms are needed to carry out its statutory obligation to ensure just and reasonable transmission rates. FPA section 206 does not obligate FERC to ensure just and reasonable rates for only *some* jurisdictional transmission rates. There is no "asset condition" exemption in the statutes. Rather, "[a] major purpose of the whole Act is to protect power consumers against excessive prices." *Pa. Water & Power Co. v. Fed. Power Comm'n.*, 343 U.S. 414, 418 (1952).

FERC failed to explain how it can ensure that FERC-jurisdictional rates for asset condition projects are just and reasonable when they are exempt from reforms "specifically designed to provide needed transparency to ensure that Commission-jurisdictional rates are just and reasonable and not unduly discriminatory or preferential." R.813, Order 1920, P 1632. FERC acknowledged that "the trends regarding use of…in-kind replacement processes, provide additional evidence to support our finding that existing regional transmission planning and cost allocation requirements are inadequate without reform." *Id*. P 111. Yet with no reasoned explanation, FERC declined to adopt reforms it recognized are needed to ensure rates are just and reasonable.

FPA section 206 requires that FERC develop a remedy once it finds a rate or practice unjust and unreasonable. Here, FERC can neither "demonstrate that it has made a reasoned decision based upon substantial evidence in the record," nor "articulate a satisfactory explanation for its action including a rational connection

between the facts found and the choice made." *Cal. Pub. Utils. Comm'n v. FERC*, 20 F.4th 795, 800 (D.C. Circ. 2021) (cleaned up).

On rehearing, FERC offered another rationale—that it had not proposed in the NOPR "to require transmission providers to include information related to asset management projects in the information that they provide as part of the Assumptions, Needs, and Solutions Meetings." R.976, Order 1920-A, P 856. This does not constitute a well-reasoned response, as the proposal to exclude asset management facilities from the final rule first arose in response to a request that FERC "*revise the NOPR proposal* to state that the proposed enhancements to the local transmission planning process should not apply to asset management projects, including in-kind replacements, that are outside the scope of Order No. 890." R.813, Order 1920, P 1595 (emphasis added).

FERC's rationale cannot be squared with its rejection of arguments that aspects of the final rule were outside the scope of the NOPR. FERC declared that "'the very premise of agencies' duty to solicit, consider, and respond appropriately to comments is that rules evolve from conception to completion.' Indeed, notice is sufficient if the final rule represents a 'logical outgrowth' of the proposed rule." R.976, Order 1920-A, P 492 (quoting *Brennan v. Dickson*, 45 F.4th 48, 69 (D.C. Cir. 2022), *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 174-75 (2007)). Requiring asset condition projects, like other transmission projects, to comply with

the reforms would "represent the kind of reasonable evolution of an initial proposal in response to comments that rehearing parties could have reasonably anticipated." *Id.*. Given that in New England and PJM most FERC-jurisdictional "local" transmission projects are asset management projects, FERC's claim that accounting for such projects was an unforeseeable outgrowth of the NOPR is arbitrary and capricious.

FERC's decision to exempt asset condition projects from Order 1920's transparency requirements cannot be reconciled with the finding that "there is substantial evidence to support the conclusion that existing requirements governing transparency in local transmission planning processes…are unjust, unreasonable, and unduly discriminatory or preferential." R.813, Order 1920, P 1569. Without adequate explanation, FERC leaves consumers without a fundamental understanding of how asset condition project evaluations translate into action and the cost ramifications of transmission-provider decisions. Order 1920 leaves FERC-jurisdictional transmission costs unreviewed, abdicating FERC's responsibility to protect consumers, despite evidence of insufficient asset condition project oversight. R.847, NESCOE Rehearing, 26-31; R.456, NESCOE Comments, 76, 79-80, _; R.553, OCC Comments, 25-26.

Finally, while declining to subject asset condition projects to transparency requirements based on a narrow view of Order 890 planning processes, FERC

simultaneously reversed a protection it adopted in Order 1000, the prohibition against transmission providers holding a "federal right of first refusal" ("ROFR"). R.813, Order 1920, P 1704. NESCOE pointed out that the premise for FERC's conclusion—granting a ROFR for right-sized asset condition projects "will *promote* the consideration of more efficient or cost-effective potential transmission solutions" (*id*. P 1706 (emphasis original))—cannot be true if asset condition processes are not transparent and if consumers have no way to verify the right-sized assets yield cost-effective, efficient investment. FERC subjected consumers to a double whammy: retreating from the price-lowering protection that competition can provide while allowing right-sizing asset condition projects to escape any scrutiny. FERC ignored NESCOE's request that FERC condition the ability to receive this ROFR on a showing by the transmission owner that its asset condition process provides adequate transparency and input from stakeholders, consistent with Order 1920's reforms. FERC's arbitrary and capricious decision-making warrants remand. *See, e.g., Wild Va. v. U.S. Forest Serv.,* 24 F.4th 915, 928 (4th Cir. 2022) (citations omitted) (remand required where agency "entirely failed to consider an important aspect of the problem").

## V.  Order 1920 Unlawfully Shifted Generation Interconnection-Related Network-Upgrade Costs to Consumers.

In Order 1920, FERC changed its long-standing policy for allocating the costs of transmission-network upgrades required to interconnect new generators to the

grid. It did this by shifting the planning for many of these network upgrades from generator-interconnection processes (where generators pay the upfront costs of the upgrades) to existing regional transmission-planning processes (where consumers bear these costs). R.813, Order 1920, PP 1106-1107. Although FERC never acknowledged it, the effect is an "enormous" and unjustified shift of transmission costs from generators to consumers. R.813, Order 1920, Christie Dissent, P 106.

FERC's action was arbitrary, capricious, and contrary to law because FERC made no section 206 findings, supported by reasonable explanation and substantial evidence, that its existing cost-allocation policy was unjust, unreasonable, unduly discriminatory or preferential, and that its replacement policy is just, reasonable, and not unduly discriminatory or preferential. Further, FERC departed from precedent without explanation.

### a. FERC Did Not Reasonably Explain Its Departure from Its Policy Requiring Generators to Pay the Upfront Costs of Interconnection-Related Network Upgrades.

For over 20 years, FERC has required generators to bear the upfront costs of interconnection-related network upgrades. *See Standardization of Generator Interconnection Agreements & Procedures*, Order 2003, 104 FERC ¶ 61,103, PP 693-703 (2003); *order on reh'g*, Order 2003-A, 106 FERC ¶ 61,220, *order on reh'g*, Order 2003-B, 109 FERC ¶ 61,287 (2004), *order on reh'g*, Order 2003-C, 111 FERC ¶ 61,401 (2005). Under this "but for" pricing policy, FERC requires an

interconnecting generator "to pay the initial full cost for Interconnection Facilities and Network Upgrades that would not be needed but for the interconnection." *Id.* P 694. FERC reasoned that this policy sends appropriate price signals and reasonably allocates risks and costs. "[B]y placing the [generator] initially at risk for the full cost of the Network Upgrades," requiring this upfront payment gives generators "a strong incentive to make efficient siting decisions, and in general, to make good faith requests for interconnection service." Order 2003-A, P 613. The policy also ensures that generators bear "an appropriate level of risk" if their projects became "commercially infeasible." *Id.* P 614. In regions with "independent" transmission providers, FERC protected consumers by approving "participant funding" cost-allocation methods that ensured generators bear an appropriate cost responsibility for the network upgrades not required "but for" their interconnection. *See id.* PP 587, 614, 677, 702. In 2023, FERC updated Order 2003's requirements and procedures but declined to change Order 2003's "but for" pricing policies, including participant funding. *See Improvements to Generator Interconnection Procedures & Agreements*, Order 2023, 184 FERC ¶ 61,054, P 467 (2023), *order on reh'g*, Order 2023-A, 186 FERC ¶ 61,188 (2024), *pet. for rev. pending sub nom. Advanced Energy United v. FERC*, Nos. 23-1282 *et al.* (D.C. Cir.).

With Order 1920, however, FERC abruptly departed from this policy. By transferring the planning of certain network upgrades from generator-

38

interconnection processes to regional transmission-planning processes, FERC shifted the costs of such network upgrades from generators to consumers. Indeed, this was FERC's avowed objective—to "provide an avenue to allocate these regional transmission facilities' costs more broadly." R.388, NOPR, P 168. Yet FERC refused to acknowledge Order 1920 caused any cost shift or that it was a relevant consideration. R.813, Order 1920, P 1117.

Order 1920 was not based on any determination that FERC's existing interconnection-related upgrade pricing policy was unjust, unreasonable, unduly discriminatory or preferential under section 206. Instead, FERC found its existing regional transmission-planning requirements were unlawful "because they do not adequately consider certain interconnection-related transmission needs that the transmission provider has identified multiple times in the generator interconnection process but that have never been resolved due to the withdrawal of the underlying interconnection request(s)." R.813, Order 1920, P 1100. FERC *assumed* that existing generator-interconnection processes were unjust and unreasonable because they were not producing FERC's desired results. FERC then found that existing transmission-planning processes were unjust and unreasonable because they were not reevaluating interconnection-related transmission needs and reallocating the costs of FERC's desired network upgrades. But there was no reason to reevaluate these needs and reallocate these costs, because FERC's existing generator-

interconnection pricing policy sends proper price signals to generators and properly allocates costs in the first place. Because FERC made no finding that its Order 2003 "but for" pricing policy for interconnection-related network upgrades was unjust and unreasonable, FERC had no basis for its finding that existing regional transmission-planning requirements were unlawful under section 206 because they failed to reevaluate whether to build certain unbuilt network upgrades.

FERC recognized that generators withdraw interconnection requests "for multiple reasons," *Id.*, P 1108, including project economics, insufficient site control or permitting delays, speculative projects, or other regulatory or economic factors. *Id.* P 1090. FERC found that "the deciding factor in many cases" was the generator's "cost responsibility for expensive interconnection-related network upgrades." *Id.* P 1108. But FERC relied on criteria that "only suggest that high costs were *likely* a factor prompting, or at least contributing to, the relevant withdrawals." *Id.* P 1116 (emphasis in original). Even if "high costs" were a factor prompting withdrawals, FERC did not find that generators' "cost responsibility" was unjust, unreasonable, or unduly discriminatory as section 206 requires.

FERC tried to justify its action by stating that "[w]here interconnection-related transmission needs are repeatedly identified but not constructed, the implication is that, despite the potentially prohibitive interconnection costs if borne by one or a small number of interconnection customers, there are compelling

reasons, such as proximity to fuel sources, why generators seek to locate a point of interconnection at a specific location or locations associated with transmission constraints." *Id.*, P 1109. However, implications must be based on facts. Without addressing the important pricing and cost-allocation objectives of its generator-interconnection pricing policy, FERC speculated that "it may be more efficient or cost effective to address such needs through the regional transmission planning and cost allocation process." *Id.,* P 1110. That was not a finding that FERC's Order 2003 "but for" pricing policy for interconnection-related network upgrades is unjust and unreasonable. FERC cannot justify the enormous cost shift by relying on assumptions, possibilities, and implications. These do not constitute substantial evidence—much less "compelling reasons"—for finding that FERC's existing transmission-planning requirements were unjust and unreasonable. *See, e.g., Ill. Com. Comm'n v. FER*C, 756 F.3d 556, 561 (7th Cir. 2014) (*ICC II*) (remanding FERC cost-allocation order where FERC "*assumes — it does not demonstrate —* that the benefits" of transmission lines are grid-wide) (emphasis original)).

FERC rooted Order 2003's "but for" generator-interconnection pricing policy in its determination that "while all Transmission Customers benefit generally from upgrades to the transmission network, all customers do not necessarily benefit equally from upgrades that may be required for a particular interconnection." Order 2003-A, P 614. FERC reasoned that this policy is "consistent with [its] policy of

promoting competitive wholesale markets because it causes the Interconnection Customer to face the same marginal cost price signal that it would face in an efficient, competitive market," and thus enables such markets "to achieve the desirable level of entry of new generating capacity." Order 2003, P 702. However, in Order 1920, FERC failed to find that these objectives no longer applied and its existing policy was unjust and unreasonable.

Instead, FERC stated it "[was] not persuaded to reject this reform based on commenters' assertions that this reform will shift the costs of interconnection-related network upgrades from interconnection customers to load." R.813, Order 1920, P 1117. Although changing the planning process for these network upgrades would necessarily change applicable cost-allocation rules, FERC's primary response to consumers' concerns was to avoid the cost-shifting issue with the circular argument that "this final order does not alter the existing cost allocation methods in either the generator interconnection or … transmission planning process." *Id.* P 1117.

In Order 1920-A, FERC did not provide the missing section 206 prong-one finding and denied it had changed its cost-allocation policy. R.976, Order 1920-A, PP 517-518, 557, 562-565.  FERC did not provide a reasoned explanation for its decision, "including a rational connection between the facts found and the choice made." *EPSA,* 577 U.S. 260, 292.  Disagreeing and dismissing evidence "with little more than a hand wave" is not reasoned decision-making. *Del. Div. of Pub.*

*Advocate*, 3 F.4th at 469. "An agency may not … depart from a prior policy *sub silentio* …." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). Moreover, "a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Id.* at 516. *See also Baltimore Gas & Elec. Co. v. Heintz*, 760 F.2d 1408, 1418 (4th Cir. 1985).

FERC also violated the second prong of section 206 by failing to demonstrate that its new policy is just, reasonable, and not unduly discriminatory or preferential. *See, e.g., Transmission Access Pol'y Study Group*, 225 F.3d at 688-89. FERC's remedy provides an unduly preferential reevaluation process for certain favored interconnection-related transmission needs. FERC asserted that it was "not requiring interconnection-related network upgrades associated with withdrawn interconnection requests to be given preferential treatment in regional transmission planning." R.813, Order 1920, P 1115. However, the problem is not that FERC explicitly required preferential treatment for these upgrades in regional transmission planning; it is the requirement to shift these interconnection-related network upgrades to regional transmission-planning processes that creates the preference. Requiring reevaluation of transmission needs met by certain unbuilt interconnection-related network upgrades via regional transmission-planning processes gives interconnecting generators an unduly preferential, backdoor route to escape paying the upfront costs of the upgrades under FERC's Order 2003 "but for" pricing

policies. R.876, NRECA Rehearing 44-46. But FERC did not even address this issue. R.976, Order 1920-A, PP 561-565.

### b. FERC's Action Also Violated Established Cost Allocation Requirements.

The Order 1920 approach to cost allocation also failed to comport with longstanding, established judicial precedent requiring FERC to allocate transmission costs in a manner "at least roughly commensurate with" the benefits derived from the facilities. *Ill. Com. Comm'n v. FERC*, 576 F.3d 470, 477 (7th Cir. 2009); *see ICC II*, 756 F.3d at 558-59. FERC's orders shifted the costs of certain interconnection-related network upgrades from generators to consumers without analyzing the commensurate benefits derived from these upgrades. FERC simply "*assumes* — it does not demonstrate — that the benefits" of these upgrades warrant reevaluating and reallocating the costs grid-wide. *See ICC II*, 756 F.3d at 561 (emphasis original). FERC violated that basic tenet of cost causation because FERC allows generators, who benefit from interconnecting to the grid, to avoid all risk and responsibility for the network-upgrade costs they cause. "[C]onsumers get stuck with the costs of interconnection, even though it is developers who profit from interconnection." R.813, Order 1920, Christie Dissent, P 20, n.65.

FERC did not find that its Order 2003 "but for" pricing policies must be changed or bypassed to realign costs with benefits. It did not consider benefits to generators or Order 2003's demonstrated need for the price signals. Order 1920

should be remanded to require FERC to eliminate this unjustified cost shift to consumers.

## VI. FERC Violated FPA Section 217(b)(4) By Giving Transmission Providers Discretion to Disregard the Transmission Needs of Load-Serving Entities.

FERC adopted Order 1920's transmission-planning requirements under section 206. But section 206 does not mention transmission planning. The only place the FPA expressly addresses it is in section 217(b)(4), which was added in 2005 to *limit* FERC's discretion when exercising any implied section 206 authority over transmission planning: FERC "shall exercise [its] authority … under [the FPA] in a manner that facilitates the planning and expansion of transmission facilities to meet the reasonable needs of load-serving entities to satisfy the service obligations of the load-serving entities…." 16 U.S.C. § 824q(b)(4). A "load-serving entity" is a utility with a legal service obligation to consumers or to a distribution utility. 16 U.S.C. § 824q(a). In upholding FERC's previous 2011 transmission-planning requirements, the D.C. Circuit held that "Section 217(b)(4) creates a requirement for [FERC], not for utilities," which FERC would violate if it "exercised its authority in a manner that was at odds with the needs of load-serving entities." *S.C. Pub. Serv. Auth.*, 762 F.3d at 90.

Given this precedent, one might think FERC would focus on Congress' requirement in a transmission-planning rulemaking. But the NOPR, R.388, nowhere

cited section 217(b)(4). After NRECA noted this deficiency, R.597, NRECA Comments 17-21, FERC assured that "the final rule is consistent with the Commission's obligation under FPA section 217(b)(4)." R.813, Order 1920, P 283. But FERC's actions belied that claim.

First, FERC's mandatory seven "categories of factors" for developing transmission-planning scenarios relegated "state-approved integrated resource plans and expected supply obligations for load-serving entities" to category three, after categories one ("future resource mix and demand") and two ("decarbonization and electrification"). R.813, Order 1920, P 409. Then, after noting section 217(b)(4), *see id.* P 447, and requiring transmission providers to "assume" that "expected supply obligations for load-serving entities are fully met," *id.* P 507, FERC stated that "transmission providers retain the discretion to determine whether particular factors, including those in the first three categories of factors, that stakeholders identify are likely to affect Long-Term Transmission Needs," *id.* P 510. FERC explained it would be burdensome for transmission providers to account for laws and regulations in categories one and two that are unlikely to affect transmission needs. *Id.*. FERC did not explain why it extended that same discretion to factor category three or why, given section 217(b)(4), it could confer discretion to disregard and not plan for power-supply needs of load-serving entities.

On rehearing, FERC argued that "allowing transmission providers to determine whether to account for a specific factor … is necessary to ensure that transmission providers develop accurate assumptions." R.976, Order 1920-A, P 318. That made it "appropriate to preserve transmission providers' discretion to conclude that a specific factor (even in Factor Category Three) will have limited or no impact on Long-Term Transmission Needs." *Id.* P 319. This action did not violate section 217(b)(4) because, "[i]f a factor is unlikely to affect Long-Term Transmission Needs, excluding that factor in the transmission planning process is unlikely to negatively affect the needs of load-serving entities," and the statute "does not require [FERC] to require transmission providers to account for factors … that do not affect Long-Term Transmission Needs." *Id.* P 320. FERC claimed it was applying the D.C. Circuit's interpretation and "the most reasonable reading" of the statute. *Id.* P 321.

FERC's rationale was circular: the statute did not require FERC to require transmission providers to plan for the expected supply obligations of load-serving entities if transmission providers determine they do not need to plan for those supply obligations. But Congress required FERC to "facilitate[]" transmission planning "to meet the reasonable needs of load-serving entities." "Facilitate" means "make easier or less difficult" or "free from difficulty or impediment." Webster's Third New International Dictionary 812 (1993). FERC cannot impede the statutory objective by

giving transmission planners discretion to disregard and not plan for the supply obligations of load-serving entities.

FERC must engage in "reasoned decisionmaking" within the "boundaries of [its] delegated authority." *Loper Bright*, 603 U.S. at 395 (cleaned up). Section 217(b)(4) is not a procedural box to check, but a substantive limit on FERC's discretion in transmission planning. While it does not dictate planning results, it constrains FERC from disregarding or deciding that other values outweigh the reasonable needs of load-serving entities. *Cf. Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 145 S.Ct. 1497, 1510 (2025). FERC violated the statute when it "exercised its authority in a manner that was at odds with the needs of load-serving entities." *S.C. Pub. Serv. Auth.*, 762 F.3d at 90. And FERC's action was arbitrary and capricious because it "entirely failed to consider an important aspect of the problem." *State Farm*, 463 U.S. at 43.

## VII.  FERC's Limitations on Facility Reevaluations Were Arbitrary and Capricious.

The FPA's primary purpose is to protect consumers from excessive rates. FERC claimed Order 1920 would ensure evaluation and selection of "more efficient or cost-effective regional transmission solutions to address Long-Term Transmission Needs." R.813, Order 1920, P 1. But FERC imposed arbitrary, unreasonable limits on reevaluating selected transmission facilities that expose consumers to excessive rates from uneconomic, even unneeded, facilities.

Reevaluation is critical because of FERC's ambitious and prescriptive transmission-planning and cost-allocation requirements. FERC required planning, in five-year cycles, for periods of at least 20 years. *Id.* P 344. It required that facilities be evaluated, selected, and their costs allocated by measuring their benefits over a minimum 20-year period after their expected in-service date. *Id.* P 859. Thus, transmission providers will be looking ahead 40 or more years.

Given the uncertainty in this unprecedented process, FERC reasonably proposed to allow planners to make a facility's selection status subject to the outcomes of subsequent planning cycles. R.388, NOPR, P 248. But FERC rejected that flexible proposal and instead prohibited reevaluation in later planning cycles except in three limited situations. R.813, Order 1920, PP 1048-1061.

The first situation is unchallenged: when delays in developing a facility "would jeopardize a transmission provider's ability to meet its reliability needs or reliability-related service obligations." *Id.* P 1049. But in the other two situations, FERC imposed arbitrary limitations that undercut the protection of consumers.

### a. FERC Arbitrarily Prohibited Reevaluation When the Benefits from a Facility Decrease or Transmission Needs Change.

FERC prescribed reevaluation when "the actual or projected costs of a previously selected" facility "significantly exceed cost estimates used in the selection of a" facility. *Id.* P 1049. But to adequately protect consumers, reevaluation also should be required when estimated *benefits* of a selected facility significantly

decrease and the facility no longer meets the transmission provider's selection criteria, or when *transmission needs* change and a facility is no longer needed.

FERC admitted the need to account for changes in benefits and needs, noting that "where transmission providers timely obtain updated information about significant changes to the costs *or benefits* of such facilities, we believe that transmission providers must, consistent with the requirements in this Final Rule, reevaluate a selected [facility] in order to ensure that the facility continues to meet the transmission providers' selection criteria." R.813, Order 1920, P 1054 (emphasis added). Moreover, reevaluation should include a "determination of whether a Long-Term Transmission Need continues to exist …." *Id.* P 1058.

Indeed, when a facility must be reevaluated because of a cost increase, planners "must take into account not only the updated costs but also the updated benefits" of the facility. *Id.* P 1052. FERC explained that this was necessary "to ensure that transmission providers are comparing the relevant costs and benefits, i.e., the updated costs and benefits of the selected [facility], to determine whether the [facility] continues to be a more efficient or cost-effective regional transmission solution to Long-Term Transmission Needs." *Id.* P 1059. Yet FERC did not explain why it prohibited reevaluation of the relevant costs and benefits when, apart from any change in costs, the facility's projected benefits or the region's transmission needs have significantly changed.

On rehearing, FERC defended this one-sided rule by attacking a strawman: an "open-ended allowance for reevaluation would fail to account for the degree of certainty that is needed to support capital investment, and would therefore fail to adequately ensure development of more efficient or cost-effective Long-Term Regional Transmission Facilities." R.976, Order 1920-A, P 497. But just as FERC required reasonable selection criteria, *see* R.813, Order 1920, PP 954-957, it could have required reasonable reevaluation criteria—e.g., a significant change in estimated benefits or transmission needs—without an "open-ended allowance for reevaluation."

Moreover, FERC did not dispute that estimated benefits from a facility can change independently of a change in costs. Indeed, a dissenting commissioner cited a well-documented example of a facility that proved to be unneeded. *See* R. 813, Order 1920 Christie Dissent, P 4 n.12 (citing *Potomac-Appalachian Transmission Highline*, 185 FERC ¶ 61,198 (2023) (Christie, Comm'r, concurring, P 3)).

Finally, FERC already required reevaluation of Long-Term Transmission Needs every planning cycle. Barring reevaluation of a selected facility despite significant changes in Long-Term Transmission Needs placed arbitrary blinders on transmission planners and subjected consumers to the risk of paying for a "bridge to nowhere." FERC's prohibition of reevaluation when benefits or needs change was arbitrary and capricious and failed to ensure just and reasonable rates for consumers.

### b. FERC Arbitrarily Limited Reevaluation in Light of Significant Changes in Laws or Regulations.

FERC also prescribed reevaluation of a selected facility when "significant changes in … laws or regulations cause reasonable concern that a previously selected [facility] may no longer meet the transmission providers' selection criteria." R.813, Order 1920, P 1049. But FERC only allowed such reevaluation if the facility, when it was selected, had a "targeted in-service date … in the latter half of the 20-year transmission planning horizon." *Id.* P 1051.

FERC did not explain the reason for that arbitrary limitation and made no effort to reconcile it with FERC's duty to protect consumers from paying excessive rates for unneeded facilities. On rehearing, FERC declined to eliminate the entire requirement for reevaluation in this situation, but also declined to explain why it was limiting reevaluation to facilities with targeted in-service dates in the latter half of the planning horizon. R.976, Order 1920-A, P 498. This aspect of Order 1920 should be set aside as arbitrary and capricious.

### VIII. Excluding Electric Cooperatives from Mandatory Transmission-Planning and Cost-Allocation Discussions with Relevant State Entities Was Arbitrary, Capricious, and Unduly Discriminatory.

Order 1920 provided "Relevant State Entities" a limited role in the transmission-planning and cost-allocation process. FERC defined a Relevant State Entity as "any state entity responsible for electric utility regulation or siting electric transmission facilities within the state or portion of a state located in the transmission

planning region, including any state entity as may be designated for that purpose by the law of such state." R.813, Order 1920, P 1355. FERC required transmission providers to consult with and seek (but not necessarily obtain) the support of Relevant State Entities for their evaluation process and selection criteria, *id.* PP 994-997, and allow Relevant State Entities to voluntarily fund the cost of transmission facilities that did not meet the transmission providers' selection criteria, *id.* P 1012. FERC also required transmission providers to establish a six-month "Engagement Period" for negotiating cost-allocation methods and/or "State Agreement Processes," although they were not required to reach agreement with Relevant State Entities on these matters. *Id.* PP 1354, 1402.

On rehearing, FERC modified the Final Rule with the goal of "ensuring that states have a robust role in Long-Term Regional Transmission Planning and cost allocation processes ...." R.976, Order 1920-A, P 2. FERC required that transmission providers:

- Incorporate input from Relevant State Entities in developing their planning scenarios. *Id.* PP 344, 367.

- Facilitate and participate in cost-allocation discussions with Relevant State Entities during the Engagement Period, *id.* P 656.

- Include with their own cost-allocation compliance proposals any agreed-upon alternative cost-allocation method or State Agreement

Process requested by Relevant State Entities, to enable FERC to decide which cost-allocation proposals to accept. *Id.* PP 649-662.

- Adopt a process to consult Relevant State Entities before amending a cost-allocation method or a State Agreement Process or if Relevant State Entities collectively request them to amend such a method or process. *Id.* P 691.

FERC explained that these changes to Order 1920 "expand states' critical role in determining the cost allocation approach most suitable for each transmission planning region," *id.* P 10, and will "ensure that Relevant States Entities, which represent consumers, have a voice in … the allocation of costs," *id.* P 300, and "perceive the regional transmission facilities' value as commensurate with their costs," *id*. P 700 (cleaned up).

NRECA does ***not*** challenge FERC's decision to give Relevant State Entities a greater role in transmission-planning and cost-allocation decisions. But FERC's refusal to include any electric cooperatives as Relevant State Entities or otherwise to ensure cooperatives a comparable voice in transmission-planning and cost-allocation decision-making processes was arbitrary and capricious, as well as unduly discriminatory in violation of FPA section 206. Electric cooperatives as a whole serve 42 million electric consumers—one of every eight—in 48 states across 56 percent of nation's landmass. R.597, NRECA Comments 1.

FERC's action in Order 1920-A was incomplete and inadequate to achieve its stated objectives of giving state-authorized entities, as representatives of retail consumers, a voice in transmission-planning and cost-allocation decisions. The paradigmatic Relevant State Entity is a state utility commission. Under many states' laws, however, state commissions do not regulate the retail rates of all electric utilities in the state. Only about a dozen state commissions are responsible for regulating the rates of electric cooperatives. Many state commissions lack authority to regulate rates of electric cooperatives; in these states, the member-elected boards of directors of electric cooperatives establish the cooperative's rates independently of their state's utility commission. NRECA cited numerous states' laws in its request for rehearing, R.986 at 9-10, and FERC did not dispute this fact. R.1050, Order 1920-B, P 138. Indeed, FERC acknowledged that "in certain states Relevant State Entities may not have the necessary authority to require all of that state's ratepayers to provide the funding needed to take advantage of voluntary funding opportunities" for regional transmission facilities. R.813, Order 1920, P 1015.

If a Relevant State Entity lacks authority under state law to regulate an electric cooperative's rates, it lacks authority to represent consumer-members of that cooperative and to be their "voice" in transmission-planning and cost-allocation decisions as FERC envisioned. Thus, FERC failed to ensure that all electric consumers in a state, including cooperative member-consumers no matter how their

rates are established and regulated under state law, have a comparable voice in the required engagement process.

In prior rulemakings involving the intersection of state and federal electric regulatory authority, FERC recognized this problem and used the term "relevant electric retail regulatory authority." 18 C.F.R. § 35.28 (g)(1)(iii) (2025) (demand response aggregation participation in organized markets); 18 C.F.R. § 35.28(g)(12)(iv) (2025) (distributed energy resource aggregation participation in organized markets). FERC defined that term as "the entity that establishes the retail electric prices and any retail competition policies for customers, such as the city council for a municipal utility, the governing board of a cooperative utility, or the state public utility commission." *Wholesale Competition in Regions with Organized Electric Markets*, Order 719, 125 FERC ¶ 61,071, P 158 (2008), *order on reh'g*, 128 FERC ¶ 61,059, *order on reh'g*, 129 FERC ¶ 61,252 (2009). FERC departed from this precedent in not defining Relevant State Entity similarly. Instead, FERC chose a narrower definition that was inadequate to ensure that electric cooperative member-consumers—no matter how their retail electric rates are established and regulated under state law—have a comparable "voice" in the transmission-planning and cost-allocation engagement processes it instituted. FERC denied rehearing without contesting that many electric cooperative boards are the relevant retail electric regulatory authorities for their member-consumers. R.1050, Order 1920-B,

P 138. FERC asserted that it did not "limit or inhibit" the ability of entities other than Relevant State Entities to participate. R.1050, Order 1920-B, P 140. But FERC allowed transmission providers to exclude electric cooperatives that establish or regulate their consumer-members' rates from Order 1920-A's enhanced transmission-planning and cost-allocation engagement processes.

Without a reasonable explanation, FERC's action was unlawful. Under the FPA, a rate "must be non-discriminatory and non-preferential as well as being just and reasonable." *Elec. Consumers Res. Council v. FERC*, 747 F.2d at 1515; *see also Orangeburg v. FERC*, 862 F.3d 1071, 1084-87 (D.C. Cir. 2017). When remedying unlawful transmission practices under section 206, FERC must demonstrate that its replacement practices are not unduly discriminatory or preferential. *See Transmission Access Pol'y Study Group*, 225 F.3d at 688-89. FERC did not make that demonstration here.

FERC claimed Order 1920-A was not unduly discriminatory because "allowing Relevant State Entities to better realize [facilities'] value through an enhanced role in the planning process greatly increases the likelihood of their support for those facilities," and such support "may increase the likelihood that facilities are sited and ultimately developed with fewer costly delays, and thus better ensures just and reasonable Commission-jurisdictional rates." R.1050, Order 1920-B, P 141. That realpolitik consideration sidestepped Order 1920-A's unduly

discriminatory requirements. Giving all entities that establish or regulate electric rates under state law this same "enhanced role" would be consistent with Order 1920-A's objective of ensuring just and reasonable rates.

While FERC was "not persuaded" that it should treat all entities responsible for retail electric utility regulation under state law on a non-discriminatory and non-preferential basis, it claimed that nothing in Order 1920 "diminishes the role of stakeholders that are not Relevant State Entities, nor absolves transmission providers of any existing obligations they may have to provide opportunities for stakeholder input." R.1050, Order 1920-B, P 142. But FERC *did* diminish the role of electric cooperatives whose boards of directors establish and regulate their consumer-members' electric rates in comparison to the "enhanced role" given to Relevant State Entities by Order 1920-A.

FERC provided no reasonable justification for unduly discriminating against and excluding electric cooperatives from the enhanced engagement procedures it mandated in Order 1920-A. This action should be set aside as arbitrary, capricious, and otherwise contrary to law, and remanded for reconsideration.

# CONCLUSION

Consumer Petitioners respectfully request that the Court vacate and remand the challenged orders, in part, consistent with the arguments raised herein.

# STATEMENT REGARDING ORAL ARGUMENT

Consumer Petitioners respectfully request that this Court hear oral argument in this case. This appeal is of nationwide importance and raises several issues pertaining to the FERC's application of the FPA to regulate the transmission of electricity in interstate commerce.

Respectfully submitted,

| | |
|---|---|
| */s/ Kenneth R. Stark*<br>Kenneth R. Stark<br>McNees Wallace & Nurick LLC<br>100 Pine Street<br>Harrisburg, PA 17101<br>Phone: (717) 237-8000 | Robert A. Weishaar, Jr.<br>McNees Wallace & Nurick LLC<br>1200 G Street NW, Suite 800<br>Washington, DC 20005<br>Phone: (202) 898-5700 |

*Counsel for the American Forest & Paper Association, the Industrial Energy Consumers of America, the PJM Industrial Customer Coalition, and the Coalition of MISO Transmission Customers and on Behalf of the Consumer Petitioners*

| | |
|---|---|
| */s/ Randolph Lee Elliott*<br>Randolph Lee Elliott<br>McCarter & English, LLP<br>1301 K Street, NW, Suite 1000 West<br>Washington, DC 20005<br>Phone: 202-753-3428<br>*Counsel for the National Rural Electric Cooperative Association* | */s/ Denise Goulet*<br>Denise Goulet<br>McCarter & English, LLP<br>1301 K Street, NW, Suite 1000 West<br>Washington, DC 20005<br>Phone: 202-753-3439<br>*Special Counsel to the Ohio Attorney General for Office of the Ohio Consumers' Counsel* |

| /s/ Phyllis G. Kimmel | /s/ Katherine Ann Wade |
|---|---|
| Phyllis G. Kimmel | Katherine Ann Wade |
| Phyllis G. Kimmel Law Office PLLC | Betts & Holt LLP |
| 1717 K Street, NW, Suite 900 | 1101 Connecticut Ave., NW, Suite 450 |
| Washington, DC 20006 | Washington, D.C. 20036 |
| Phone: (202) 787-5704 | *Counsel for the Resale Power Group of* |
| *Counsel for the New England States* | *Iowa* |
| *Committee on Electricity* | |

Dated: August 29, 2025 (Corrected September 9, 2025)

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No. 24-1650      **Caption:** Appalachian Voices, et al., v. FERC

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT
Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

**Type-Volume Limit for Briefs if Produced Using a Computer:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 13,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 15,300 words or 1,500 lines. A Reply or Amicus Brief may not exceed 6,500 words or 650 lines. Amicus Brief in support of an Opening/Response Brief may not exceed 7,650 words. Amicus Brief filed during consideration of petition for rehearing may not exceed 2,600 words. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include headings, footnotes, and quotes in the count. Line count is used only with monospaced type. See Fed. R. App. P. 28.1(e), 29(a)(5), 32(a)(7)(B) & 32(f).

**Type-Volume Limit for Other Documents if Produced Using a Computer:** Petition for permission to appeal and a motion or response thereto may not exceed 5,200 words. Reply to a motion may not exceed 2,600 words. Petition for writ of mandamus or prohibition or other extraordinary writ may not exceed 7,800 words. Petition for rehearing or rehearing en banc may not exceed 3,900 words. Fed. R. App. P. 5(c)(1), 21(d), 27(d)(2) & 40(d)(3).

**Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch). Fed. R. App. P. 32(a)(5), 32(a)(6). Sans-serif type, such as Arial, may not be used except in captions and headings.

This brief or other document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

[X]   this brief or other document contains __12,813__ [*state number of*] words

[ ]   this brief uses monospaced type and contains _____ [*state number of*] lines

This brief or other document complies with the typeface and type style requirements because:

[X]   this brief or other document has been prepared in a proportionally spaced typeface using
      Microsoft Word [*identify word processing program*] in
      Times New Roman, 14 pt., serif font [*identify font, size, and type style*];

**or**

[ ]   this brief or other document has been prepared in a monospaced typeface using
      _____ [*identify word processing program*] in
      _____ [*identify font, size, and type style*].

**NOTE: The Court's preferred typefaces are Times New Roman, Century Schoolbook, and Georgia. The Court discourages the use of Garamond.**

(s) Kenneth R. Stark II

Party Name   Consumer Petitioners          Date: September 9, 2025

# CERTIFICATE OF SERVICE

**Instructions for Electronic Filers:** For persons filing electronically, CM/ECF serves all registered CM/ECF users, and no certificate of service is required for such service. A certificate of service is required from an electronic filer, however, in the following circumstances:

- To certify that a non-user of CM/ECF has been served;
- To certify that a manual filing (not available in electronic form), has been served;
- To certify that a sealed document has been served;
- To certify that a case-initiating document, such as a petition for review, petition for permission to appeal, or petition for writ of mandamus, has been served.

**Instructions for Paper Filers:** For persons filing in paper form, service must be accomplished outside CM/ECF, and a certificate of service is required for all documents.

Case No. _24-1650_    Case Caption _Appalachian Voices, et al., v. FERC_

I certify that on _09/09/2025_ , the _Brief of the Consumer Petitioners_
        (date)                        (document title)
was served by [ ] personal delivery; [ ] mail; [ ] third-party commercial carrier; or [ x ] email/CM/ECF system

(with written consent) on the following persons at the addresses or email addresses shown:

(Name and Address or Email Address )

I hereby certify that, on September 9, 2025, all parties were served using the appellate CM/ECF system. The participants in this case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

_/s/ Kenneth R. Stark II_                    September 9, 2025
          Signature                             Date

# Statutory Provisions Addendum

Federal Power Act, section 201, 16 U.S.C. § 824 ............................................. A-1

Federal Power Act, section 205, 16 U.S.C. § 824d ........................................... A-4

Federal Power Act, section 206, 16 U.S.C. § 824e ........................................... A-8

Federal Power Act, section 217, 16 U.S.C. § 824q .......................................... A-12

Federal Power Act, section 219, 16 U.S.C. § 824s .......................................... A-16

**Federal Power Act, Section 201, 16 U.S.C. § 824. Declaration of policy; application of subchapter**

(a) Federal regulation of transmission and sale of electric energy

It is declared that the business of transmitting and selling electric energy for ultimate distribution to the public is affected with a public interest, and that Federal regulation of matters relating to generation to the extent provided in this subchapter and subchapter III of this chapter and of that part of such business which consists of the transmission of electric energy in interstate commerce and the sale of such energy at wholesale in interstate commerce is necessary in the public interest, such Federal regulation, however, to extend only to those matters which are not subject to regulation by the States.

(b) Use or sale of electric energy in interstate commerce

(1) The provisions of this subchapter shall apply to the transmission of electric energy in interstate commerce and to the sale of electric energy at wholesale in interstate commerce, but except as provided in paragraph (2) shall not apply to any other sale of electric energy or deprive a State or State commission of its lawful authority now exercised over the exportation of hydroelectric energy which is transmitted across a State line. The Commission shall have jurisdiction over all facilities for such transmission or sale of electric energy, but shall not have jurisdiction, except as specifically provided in this subchapter and subchapter III of this chapter, over facilities used for the generation of electric energy or over facilities used in local distribution or only for the transmission of electric energy in intrastate commerce, or over facilities for the transmission of electric energy consumed wholly by the transmitter.

(2) Notwithstanding subsection (f), the provisions of sections 824b(a)(2), 824e(e), 824i, 824j, 824j–1, 824k, 824o, 824o–1, 824p, 824q, 824r, 824s, 824t, 824u, and 824v of this title shall apply to the entities described in such provisions, and such entities shall be subject to the jurisdiction of the Commission for purposes of carrying out such provisions and for purposes of applying the enforcement authorities of this chapter with respect to such provisions. Compliance with any order or rule of the Commission under the provisions of section 824b(a)(2), 824e(e), 824i, 824j, 824j–1, 824k, 824o, 824o–1, 824p, 824q, 824r, 824s, 824t, 824u, or 824v of this title, shall not make an electric utility or other entity subject to the jurisdiction of the

Commission for any purposes other than the purposes specified in the preceding sentence.

(c) Electric energy in interstate commerce

For the purpose of this subchapter, electric energy shall be held to be transmitted in interstate commerce if transmitted from a State and consumed at any point outside thereof; but only insofar as such transmission takes place within the United States.

(d) "Sale of electric energy at wholesale" defined

The term "sale of electric energy at wholesale" when used in this subchapter, means a sale of electric energy to any person for resale.

(e) "Public utility" defined

The term "public utility" when used in this subchapter and subchapter III of this chapter means any person who owns or operates facilities subject to the jurisdiction of the Commission under this subchapter (other than facilities subject to such jurisdiction solely by reason of section 824e(e), 824e(f),[1] 824i, 824j, 824j–1, 824k, 824o, 824o–1, 824p, 824q, 824r, 824s, 824t, 824u, or 824v of this title).

(f) United States, State, political subdivision of a State, or agency or instrumentality thereof exempt

No provision in this subchapter shall apply to, or be deemed to include, the United States, a State or any political subdivision of a State, an electric cooperative that receives financing under the Rural Electrification Act of 1936 (7 U.S.C. 901 et seq.) or that sells less than 4,000,000 megawatt hours of electricity per year, or any agency, authority, or instrumentality of any one or more of the foregoing, or any corporation which is wholly owned, directly or indirectly, by any one or more of the foregoing, or any officer, agent, or employee of any of the foregoing acting as such in the course of his official duty, unless such provision makes specific reference thereto.

(g) Books and records

(1) Upon written order of a State commission, a State commission may examine the books, accounts, memoranda, contracts, and records of—

(A) an electric utility company subject to its regulatory authority under State law,

(B) any exempt wholesale generator selling energy at wholesale to such electric utility, and

(C) any electric utility company, or holding company thereof, which is an associate company or affiliate of an exempt wholesale generator which sells electric energy to an electric utility company referred to in subparagraph (A),

wherever located, if such examination is required for the effective discharge of the State commission's regulatory responsibilities affecting the provision of electric service.

(2) Where a State commission issues an order pursuant to paragraph (1), the State commission shall not publicly disclose trade secrets or sensitive commercial information.

(3) Any United States district court located in the State in which the State commission referred to in paragraph (1) is located shall have jurisdiction to enforce compliance with this subsection.

(4) Nothing in this section shall—

(A) preempt applicable State law concerning the provision of records and other information; or

(B) in any way limit rights to obtain records and other information under Federal law, contracts, or otherwise.

(5) As used in this subsection the terms "affiliate", "associate company", "electric utility company", "holding company", "subsidiary company", and "exempt wholesale generator" shall have the same meaning as when used in the Public Utility Holding Company Act of 2005 [42 U.S.C. 16451 et seq.].

**Federal Power Act, section 205, 16 U.S.C. § 824d. Rates and charges; schedules; suspension of new rates; automatic adjustment clauses**

(a) Just and reasonable rates

All rates and charges made, demanded, or received by any public utility for or in connection with the transmission or sale of electric energy subject to the jurisdiction of the Commission, and all rules and regulations affecting or pertaining to such rates or charges shall be just and reasonable, and any such rate or charge that is not just and reasonable is hereby declared to be unlawful.

(b) Preference or advantage unlawful

No public utility shall, with respect to any transmission or sale subject to the jurisdiction of the Commission, (1) make or grant any undue preference or advantage to any person or subject any person to any undue prejudice or disadvantage, or (2) maintain any unreasonable difference in rates, charges, service, facilities, or in any other respect, either as between localities or as between classes of service.

(c) Schedules

Under such rules and regulations as the Commission may prescribe, every public utility shall file with the Commission, within such time and in such form as the Commission may designate, and shall keep open in convenient form and place for public inspection schedules showing all rates and charges for any transmission or sale subject to the jurisdiction of the Commission, and the classifications, practices, and regulations affecting such rates and charges, together with all contracts which in any manner affect or relate to such rates, charges, classifications, and services.

(d) Notice required for rate changes

Unless the Commission otherwise orders, no change shall be made by any public utility in any such rate, charge, classification, or service, or in any rule, regulation, or contract relating thereto, except after sixty days' notice to the Commission and to the public. Such notice shall be given by filing with the Commission and keeping open for public inspection new schedules stating plainly the change or changes to be made in the schedule or schedules then in force and the time when the change or changes will go into effect. The Commission, for good cause shown, may allow changes to take effect without requiring the sixty days' notice herein

provided for by an order specifying the changes so to be made and the time when they shall take effect and the manner in which they shall be filed and published.

(e) Suspension of new rates; hearings; five-month period

Whenever any such new schedule is filed the Commission shall have authority, either upon complaint or upon its own initiative without complaint, at once, and, if it so orders, without answer or formal pleading by the public utility, but upon reasonable notice, to enter upon a hearing concerning the lawfulness of such rate, charge, classification, or service; and, pending such hearing and the decision thereon, the Commission, upon filing with such schedules and delivering to the public utility affected thereby a statement in writing of its reasons for such suspension, may suspend the operation of such schedule and defer the use of such rate, charge, classification, or service, but not for a longer period than five months beyond the time when it would otherwise go into effect; and after full hearings, either completed before or after the rate, charge, classification, or service goes into effect, the Commission may make such orders with reference thereto as would be proper in a proceeding initiated after it had become effective. If the proceeding has not been concluded and an order made at the expiration of such five months, the proposed change of rate, charge, classification, or service shall go into effect at the end of such period, but in case of a proposed increased rate or charge, the Commission may by order require the interested public utility or public utilities to keep accurate account in detail of all amounts received by reason of such increase, specifying by whom and in whose behalf such amounts are paid, and upon completion of the hearing and decision may by further order require such public utility or public utilities to refund, with interest, to the persons in whose behalf such amounts were paid, such portion of such increased rates or charges as by its decision shall be found not justified. At any hearing involving a rate or charge sought to be increased, the burden of proof to show that the increased rate or charge is just and reasonable shall be upon the public utility, and the Commission shall give to the hearing and decision of such questions preference over other questions pending before it and decide the same as speedily as possible.

(f) Review of automatic adjustment clauses and public utility practices; action by Commission; "automatic adjustment clause" defined

> (1) Not later than 2 years after November 9, 1978, and not less often than every 4 years thereafter, the Commission shall make a thorough review of automatic adjustment clauses in public utility rate schedules to examine—

(A) whether or not each such clause effectively provides incentives for efficient use of resources (including economical purchase and use of fuel and electric energy), and

(B) whether any such clause reflects any costs other than costs which are—

(i) subject to periodic fluctuations and

(ii) not susceptible to precise determinations in rate cases prior to the time such costs are incurred.

Such review may take place in individual rate proceedings or in generic or other separate proceedings applicable to one or more utilities.

(2) Not less frequently than every 2 years, in rate proceedings or in generic or other separate proceedings, the Commission shall review, with respect to each public utility, practices under any automatic adjustment clauses of such utility to insure efficient use of resources (including economical purchase and use of fuel and electric energy) under such clauses.

(3) The Commission may, on its own motion or upon complaint, after an opportunity for an evidentiary hearing, order a public utility to—

(A) modify the terms and provisions of any automatic adjustment clause, or

(B) cease any practice in connection with the clause,

if such clause or practice does not result in the economical purchase and use of fuel, electric energy, or other items, the cost of which is included in any rate schedule under an automatic adjustment clause.

(4) As used in this subsection, the term "automatic adjustment clause" means a provision of a rate schedule which provides for increases or decreases (or both), without prior hearing, in rates reflecting increases or decreases (or both) in costs incurred by an electric utility. Such term does not include any rate which takes effect subject to refund and subject to a later determination of the appropriate amount of such rate.

(g) Inaction of Commissioners

(1) In general. With respect to a change described in subsection (d), if the Commission permits the 60-day period established therein to expire without issuing an order accepting or denying the change because the Commissioners are divided two against two as to the lawfulness of the change, as a result of vacancy, incapacity, or recusal on the Commission, or if the Commission lacks a quorum—

> (A) the failure to issue an order accepting or denying the change by the Commission shall be considered to be an order issued by the Commission accepting the change for purposes of section 825l(a) of this title; and

> (B) each Commissioner shall add to the record of the Commission a written statement explaining the views of the Commissioner with respect to the change.

(2) Appeal

If, pursuant to this subsection, a person seeks a rehearing under section 825l(a) of this title, and the Commission fails to act on the merits of the rehearing request by the date that is 30 days after the date of the rehearing request because the Commissioners are divided two against two, as a result of vacancy, incapacity, or recusal on the Commission, or if the Commission lacks a quorum, such person may appeal under section 825l(b) of this title.

**Federal Power Act, section 206, 16 U.S.C. § 824e. Power of Commission to fix rates and charges; determination of cost of production or transmission**

(a) Unjust or preferential rates, etc.; statement of reasons for changes; hearing; specification of issues

Whenever the Commission, after a hearing held upon its own motion or upon complaint, shall find that any rate, charge, or classification, demanded, observed, charged, or collected by any public utility for any transmission or sale subject to the jurisdiction of the Commission, or that any rule, regulation, practice, or contract affecting such rate, charge, or classification is unjust, unreasonable, unduly discriminatory or preferential, the Commission shall determine the just and reasonable rate, charge, classification, rule, regulation, practice, or contract to be thereafter observed and in force, and shall fix the same by order. Any complaint or motion of the Commission to initiate a proceeding under this section shall state the change or changes to be made in the rate, charge, classification, rule, regulation, practice, or contract then in force, and the reasons for any proposed change or changes therein. If, after review of any motion or complaint and answer, the Commission shall decide to hold a hearing, it shall fix by order the time and place of such hearing and shall specify the issues to be adjudicated.

(b) Refund effective date; preferential proceedings; statement of reasons for delay; burden of proof; scope of refund order; refund orders in cases of dilatory behavior; interest

Whenever the Commission institutes a proceeding under this section, the Commission shall establish a refund effective date. In the case of a proceeding instituted on complaint, the refund effective date shall not be earlier than the date of the filing of such complaint nor later than 5 months after the filing of such complaint. In the case of a proceeding instituted by the Commission on its own motion, the refund effective date shall not be earlier than the date of the publication by the Commission of notice of its intention to initiate such proceeding nor later than 5 months after the publication date. Upon institution of a proceeding under this section, the Commission shall give to the decision of such proceeding the same preference as provided under section 824d of this title and otherwise act as speedily as possible. If no final decision is rendered by the conclusion of the 180-day period commencing upon initiation of a proceeding pursuant to this section, the Commission shall state the reasons why it has failed to do so and shall state its best estimate as to when it reasonably expects to make such decision. In any proceeding under this section, the burden of proof to show that any rate, charge, classification, rule, regulation, practice, or contract is unjust, unreasonable, unduly

discriminatory, or preferential shall be upon the Commission or the complainant. At the conclusion of any proceeding under this section, the Commission may order refunds of any amounts paid, for the period subsequent to the refund effective date through a date fifteen months after such refund effective date, in excess of those which would have been paid under the just and reasonable rate, charge, classification, rule, regulation, practice, or contract which the Commission orders to be thereafter observed and in force: Provided, That if the proceeding is not concluded within fifteen months after the refund effective date and if the Commission determines at the conclusion of the proceeding that the proceeding was not resolved within the fifteen-month period primarily because of dilatory behavior by the public utility, the Commission may order refunds of any or all amounts paid for the period subsequent to the refund effective date and prior to the conclusion of the proceeding. The refunds shall be made, with interest, to those persons who have paid those rates or charges which are the subject of the proceeding.

(c) Refund considerations; shifting costs; reduction in revenues; "electric utility companies" and "registered holding company" defined

Notwithstanding subsection (b), in a proceeding commenced under this section involving two or more electric utility companies of a registered holding company, refunds which might otherwise be payable under subsection (b) shall not be ordered to the extent that such refunds would result from any portion of a Commission order that (1) requires a decrease in system production or transmission costs to be paid by one or more of such electric companies; and (2) is based upon a determination that the amount of such decrease should be paid through an increase in the costs to be paid by other electric utility companies of such registered holding company: Provided, That refunds, in whole or in part, may be ordered by the Commission if it determines that the registered holding company would not experience any reduction in revenues which results from an inability of an electric utility company of the holding company to recover such increase in costs for the period between the refund effective date and the effective date of the Commission's order. For purposes of this subsection, the terms "electric utility companies" and "registered holding company" shall have the same meanings as provided in the Public Utility Holding Company Act of 1935, as amended.[1]

(d) Investigation of costs

The Commission upon its own motion, or upon the request of any State commission whenever it can do so without prejudice to the efficient and proper conduct of its affairs, may investigate and determine the cost of the production or

transmission of electric energy by means of facilities under the jurisdiction of the Commission in cases where the Commission has no authority to establish a rate governing the sale of such energy.

(e) Short-term sales

    (1) In this subsection:

        (A) The term "short-term sale" means an agreement for the sale of electric energy at wholesale in interstate commerce that is for a period of 31 days or less (excluding monthly contracts subject to automatic renewal).

        (B) The term "applicable Commission rule" means a Commission rule applicable to sales at wholesale by public utilities that the Commission determines after notice and comment should also be applicable to entities subject to this subsection.

    (2) If an entity described in section 824(f) of this title voluntarily makes a short-term sale of electric energy through an organized market in which the rates for the sale are established by Commission-approved tariff (rather than by contract) and the sale violates the terms of the tariff or applicable Commission rules in effect at the time of the sale, the entity shall be subject to the refund authority of the Commission under this section with respect to the violation.

    (3) This section shall not apply to—

        (A) any entity that sells in total (including affiliates of the entity) less than 8,000,000 megawatt hours of electricity per year; or

        (B) an electric cooperative.

    (4)

        (A) The Commission shall have refund authority under paragraph (2) with respect to a voluntary short term sale of electric energy by the Bonneville Power Administration only if the sale is at an unjust and unreasonable rate.

        (B) The Commission may order a refund under subparagraph (A) only for short-term sales made by the Bonneville Power Administration at rates that are higher than the highest just and reasonable rate charged

by any other entity for a short-term sale of electric energy in the same geographic market for the same, or most nearly comparable, period as the sale by the Bonneville Power Administration.

(C) In the case of any Federal power marketing agency or the Tennessee Valley Authority, the Commission shall not assert or exercise any regulatory authority or power under paragraph (2) other than the ordering of refunds to achieve a just and reasonable rate.

**Federal Power Act, section 217, 16 U.S.C § 824q. Native load service obligation**

(a) Definitions

In this section:

(1) The term "distribution utility" means an electric utility that has a service obligation to end-users or to a State utility or electric cooperative that, directly or indirectly, through one or more additional State utilities or electric cooperatives, provides electric service to end-users.

(2) The term "load-serving entity" means a distribution utility or an electric utility that has a service obligation.

(3) The term "service obligation" means a requirement applicable to, or the exercise of authority granted to, an electric utility under Federal, State, or local law or under long-term contracts to provide electric service to end-users or to a distribution utility.

(4) The term "State utility" means a State or any political subdivision of a State, or any agency, authority, or instrumentality of any one or more of the foregoing, or a corporation that is wholly owned, directly or indirectly, by any one or more of the foregoing, competent to carry on the business of developing, transmitting, utilizing, or distributing power.

(b) Meeting service obligations

(1) Paragraph (2) applies to any load-serving entity that, as of August 8, 2005-

(A) owns generation facilities, markets the output of Federal generation facilities, or holds rights under one or more wholesale contracts to purchase electric energy, for the purpose of meeting a service obligation; and

(B) by reason of ownership of transmission facilities, or one or more contracts or service agreements for firm transmission service, holds firm transmission rights for delivery of the output of the generation facilities or the purchased energy to meet the service obligation.

(2) Any load-serving entity described in paragraph (1) is entitled to use the firm transmission rights, or, equivalent tradable or financial transmission rights, in order to deliver the output or purchased energy, or the output of other generating facilities or purchased energy to the extent deliverable using the rights, to the extent required to meet the service obligation of the load-serving entity.

(3)     (A) To the extent that all or a portion of the service obligation covered by the firm transmission rights or equivalent tradable or financial transmission rights is transferred to another load-serving entity, the successor load-serving entity shall be entitled to use the firm transmission rights or equivalent tradable or financial transmission rights associated with the transferred service obligation.

> (B) Subsequent transfers to another load-serving entity, or back to the original load-serving entity, shall be entitled to the same rights.

(4) The Commission shall exercise the authority of the Commission under this chapter in a manner that facilitates the planning and expansion of transmission facilities to meet the reasonable needs of load-serving entities to satisfy the service obligations of the load-serving entities, and enables load-serving entities to secure firm transmission rights (or equivalent tradable or financial rights) on a long-term basis for long-term power supply arrangements made, or planned, to meet such needs.

(c) Allocation of transmission rights

Nothing in subsections (b)(1), (b)(2), and (b)(3) of this section shall affect any existing or future methodology employed by a Transmission Organization for allocating or auctioning transmission rights if such Transmission Organization was authorized by the Commission to allocate or auction financial transmission rights on its system as of January 1, 2005, and the Commission determines that any future allocation or auction is just, reasonable and not unduly discriminatory or preferential, provided, however, that if such a Transmission Organization never allocated financial transmission rights on its system that pertained to a period before January 1, 2005, with respect to any application by such Transmission Organization that would change its methodology the Commission shall exercise its authority in a manner consistent with the 1 chapter and that takes into account the

policies expressed in subsections (b)(1), (b)(2), and (b)(3) as applied to firm transmission rights held by a load-serving entity as of January 1, 2005, to the extent the associated generation ownership or power purchase arrangements remain in effect.

(d) Certain transmission rights

The Commission may exercise authority under this chapter to make transmission rights not used to meet an obligation covered by subsection (b) available to other entities in a manner determined by the Commission to be just, reasonable, and not unduly discriminatory or preferential.

(e) Obligation to build

Nothing in this chapter relieves a load-serving entity from any obligation under State or local law to build transmission or distribution facilities adequate to meet the service obligations of the load-serving entity.

(f) Contracts

Nothing in this section shall provide a basis for abrogating any contract or service agreement for firm transmission service or rights in effect as of August 8, 2005. If an ISO in the Western Interconnection had allocated financial transmission rights prior to August 8, 2005, but had not done so with respect to one or more load-serving entities' firm transmission rights held under contracts to which the preceding sentence applies (or held by reason of ownership or future ownership of transmission facilities), such load-serving entities may not be required, without their consent, to convert such firm transmission rights to tradable or financial rights, except where the load-serving entity has voluntarily joined the ISO as a participating transmission owner (or its successor) in accordance with the ISO tariff.

(g) Water pumping facilities

The Commission shall ensure that any entity described in section 824(f) of this title that owns transmission facilities used predominately to support its own water pumping facilities shall have, with respect to the facilities, protections for transmission service comparable to those provided to load-serving entities pursuant to this section.

(h) ERCOT

This section shall not apply within the area referred to in section 824k(k)(2)(A) of this title.

(i) Jurisdiction

This section does not authorize the Commission to take any action not otherwise within the jurisdiction of the Commission.

(j) TVA area

(1) Subject to paragraphs (2) and (3), for purposes of subsection (b)(1)(B), a load-serving entity that is located within the service area of the Tennessee Valley Authority and that has a firm wholesale power supply contract with the Tennessee Valley Authority shall be considered to hold firm transmission rights for the transmission of the power provided.

(2) Nothing in this subsection affects the requirements of section 824k(j) of this title.

(3) The Commission shall not issue an order on the basis of this subsection that is contrary to the purposes of section 824k(j) of this title.

(k) Effect of exercising rights

An entity that to the extent required to meet its service obligations exercises rights described in subsection (b) shall not be considered by such action as engaging in undue discrimination or preference under this chapter.

**Federal Power Act, section 219, 16 U.S.C. § 824s. Transmission infrastructure investment**

(a) Rulemaking requirement

Not later than 1 year after August 8, 2005, the Commission shall establish, by rule, incentive-based (including performance-based) rate treatments for the transmission of electric energy in interstate commerce by public utilities for the purpose of benefitting consumers by ensuring reliability and reducing the cost of delivered power by reducing transmission congestion.

(b) Contents

The rule shall-

> (1) promote reliable and economically efficient transmission and generation of electricity by promoting capital investment in the enlargement, improvement, maintenance, and operation of all facilities for the transmission of electric energy in interstate commerce, regardless of the ownership of the facilities;

> (2) provide a return on equity that attracts new investment in transmission facilities (including related transmission technologies);

> (3) encourage deployment of transmission technologies and other measures to increase the capacity and efficiency of existing transmission facilities and improve the operation of the facilities; and

> (4) allow recovery of-

>> (A) all prudently incurred costs necessary to comply with mandatory reliability standards issued pursuant to section 824o of this title; and

>> (B) all prudently incurred costs related to transmission infrastructure development pursuant to section 824p of this title.

(c) Incentives

In the rule issued under this section, the Commission shall, to the extent within its jurisdiction, provide for incentives to each transmitting utility or electric utility that

joins a Transmission Organization. The Commission shall ensure that any costs recoverable pursuant to this subsection may be recovered by such utility through the transmission rates charged by such utility or through the transmission rates charged by the Transmission Organization that provides transmission service to such utility.

(d) Just and reasonable rates

All rates approved under the rules adopted pursuant to this section, including any revisions to the rules, are subject to the requirements of sections 824d and 824e of this title that all rates, charges, terms, and conditions be just and reasonable and not unduly discriminatory or preferential.