IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

NOS. 24-1650, 24-1748, 24-1756, 24-1758, 24-1760, 24-1765, 24-1770,
24-1785, 24-1792, 24-1804, 24-1857, 24-1862, 24-1867, 24-1876, 24-1885,
24-1887, 24-1979, 24-1991, 24-2162, 24-2163, 25-1073, 25-1080, 25-1197,
25-1349 (CONSOLIDATED)

APPALACHIAN VOICES, ET AL.,
Petitioners,

v.

FEDERAL ENERGY REGULATORY COMMISSION,
Respondent

On Petitions for Review of Orders of the
Federal Energy Regulatory Commission

**BRIEF OF AMICUS CURIAE
ORGANIZATION OF PJM STATES (OPSI)
IN SUPPORT OF RESPONDENT**

Ari Peskoe
Harvard Law School
Electricity Law Initiative
6 Everett Street, Suite 4119
Cambridge, MA 02138
617.495.4425
apeskoe@law.harvard.edu
*Counsel for Amicus Curiae*

# TABLE OF CONTENTS

Interest of Amicus Curiae ........................................................................1

Summary of the Argument.......................................................................3

I.  Federal-State Collaboration Protects Consumers from High
    Electricity Prices...........................................................................7

    A. Cooperative Federalism Is Necessary to Comprehensively
       Protect Consumers from Utilities' Monopoly Power...........7

    B. PJM Achieves Federal and State Policy Goals by
       Countering the Monopoly Power of the Transmission-
       Owning Utilities ...............................................................12

II. By Creating a Partnership Between PJM and States,
    Order No. 1920 Remedies Unjust and Unreasonable
    Transmission Rates .....................................................................16

    A. Transmission Rates in PJM Were Unjust and
       Unreasonable Due to Flawed Planning Processes
       and Misaligned Cost Allocation Methods.........................17

    B. FERC Cannot Remedy Unjust and Unreasonable
       Transmission Rates without State Collaboration.............20

III. The Court Should Reject the Utilities' Invitations to Abandon
     Cooperative Federalism and Erect a Constitutional Barrier
     to Effective Utility Regulation....................................................25

    A. Section 205 Provides the FPA's Core Consumer
       Protections, and It Does Not Immunize Utilities from
       FERC's Procedures ..........................................................26

    B. Transmission-Owning Utilities' First Amendment
       Arguments Threaten Foundational State Authority
       over Utilities ...................................................................32

Conclusion .........................................................................................36

i

# TABLE OF AUTHORITIES

## Federal Cases

*American Power & Light Co. v. SEC*, 329 U.S. 90 (1946) ........................9

*Appalachian Power Co. v. FPC*, 328 F.2d 237 (4th Cir. 1964) ................9

*Arkansas Elec. Coop. v. Arkansas Pub. Serv. Comm'n*,
   461 U.S. 375 (1983) ...............................................................................7

*Atlantic City Elec. Co. v. FERC*, 295 F.3d 1 (D.C. Cir. 2002)...........28, 30

*Atlantic City Elec. Co. v. FERC*, 329 F.3d 856 (D.C. Cir. 2003).............29

*Burson v. Freeman*, 504 U.S. 191 (1992) .................................................36

*Central Iowa Power Coop. v. FERC*, 606 F.2d 1156 (D.C. Cir. 1979) ....11

*Coalition for Competitive Elec. v. Zibelman*,
   906 F.3d 41 (2d Cir. 2018) ...................................................................15

*Connecticut Power & Light Co. v. FPC*, 324 U.S. 515 (1945) ................10

*Consolidated Edison Co. v. FERC*, 45 F.4th 265 (D.C. Cir. 2022) .........20

*Duke Energy Carolinas v. NTE Carolinas II*,
   111 F.4th 337 (4th Cir. 2025) ..............................................................27

*FERC v. Electric Power Supply Ass'n*, 577 U.S. 260 (2016) ....................4

*FPC v. Sierra Pac. Power Co.*, 350 U.S. 348 (1956)................................32

*Hughes v. Talen*, 578 U.S. 150 (2016).......................................................3

*Illinois Com. Comm'n v. FERC*, 576 F.3d 470 (7th Cir. 2009) ...............19

*Illinois Com. Comm'n v. FERC*, 756 F.3d 556 (7th Cir. 2014) ...............20

*Long Island Power Auth. v. FERC*, 27 F.4th 705 (D.C. Cir. 2022) ........20

*Louisiana Pub. Serv. Comm'n v. FERC*,
   184 F.3d 892 (D.C. Cir. 1999) .............................................................31

*Maine Pub. Utils' Comm'n v. FERC*, 454 F.3d 278 (D.C. Cir. 2006)......30

*Municipal Light Bds. of Reading & Wakefield v. FPC*,
    450 F.2d 1341 (D.C. Cir. 1971) ............................................26

*Nantahala Power & Light v. Thornburg*, 476 U.S. 953 (1986) .............17

*NARUC v. FERC*, 475 F.3d 1277 (D.C. Cir. 2007) ...................................3

*New Jersey Bd. of Pub. Utils. v. FERC*, 744 F.3d 74 (3d Cir. 2014).......15

*New York, N.H. & H. R. Co. v. Interstate Com. Comm'n*,
    200 U. S. 361 (1906)..............................................................27

*North Am. Co. v. SEC*, 327 U.S. 686 (1946)...........................................9

*NRG Power Mktg. v. FERC*, 862 F.3d 108 (D.C. Cir. 2017) ..................26

*Old Dominion Elec. Coop. v. FERC*, 898 F.3d 1254 (D.C. Cir. 2018).....20

*Pennsylvania Power Co. v. FPC*, 343 U.S. 414 (1952) ...........................26

*PJM Power Providers Grp. v. FERC*, 88 F.4th 250 (3d Cir. 2023).........15

*PPL Energyplus v. Nazarian*, 753 F.3d 467 (4th Cir. 2014)..............3, 30

*Public Utils. Comm'n of R.I. v. Attleboro Steam & Elec. Co.*,
    273 U. S. 83 (1927)..................................................................8

*South Carolina Pub. Serv. Auth. v. FERC*,
    762 F.3d 41 (D.C. Cir. 2014) ...........................................32

*Transmission Access Policy Study Grp. v. FERC*,
    225 F.3d 667 (D.C. Cir. 2000) ...........................................13

## Federal Statutes

16 U.S.C. § 824(b)......................................................................10

16 U.S.C. § 824h(a)....................................................................11

16 U.S.C. § 824d........................................................................27

iii

**FERC Orders**

*American Electric Power Co.*, 90 FERC ¶ 61,242 (2000) ........................14

*Cost Recovery Mechanisms for Modernization of Natural Gas Facilities*, 151 FERC ¶ 61,047 (2015) ...................................................31

*Entergy Services*, 104 FERC ¶ 61,336 (2004)........................................31

*MISO, et al.*, 143 FERC ¶ 61,149 (2013).................................................31

*Order Establishing Task Force*, 175 FERC ¶ 61,224 (2021)...................24

Order No. 1000, 136 FERC ¶ 61,051 (2011) .....................................19, 20

Order No. 1920, 187 FERC ¶ 61,068 (2024) ............. 16, 18, 20, 21, 22, 24

Order No. 1920-A, 189 FERC ¶ 61,126 (2024) ..........................21, 22, 24

Order No. 2000-A, 65 Fed. Reg. 12,088 (Mar. 8, 2000) ........................28

Order No. 888, 61 Fed. Reg. 21,540 (May 10, 1996)........................12, 27

*PJM*, 105 FERC ¶ 61,294 (2003) ............................................................28

*PJM*, 81 FERC ¶ 61,257 (1997)...............................................................28

*PJM*, 96 FERC ¶ 61,061 (2001)...............................................................19

*Potomac-Appalachian Transmission Highline*, 185 FERC ¶ 61,198 (2023)....................................................................23

Proposed Rule, 179 FERC ¶ 61,028 (2022)............................................19

*Public Service Electric & Gas Co.*, 51 FPC 1813 (1974) ........................11

**Other Authorities**

18 C.F.R. § 50.4 ......................................................................................35

Independent Market Monitor, 2024 State of the Market Report...........18

N.Y. TIMES, *Biggest Power Pool to Serve Two States*, Sep. 17, 1927........8

PJM Statement, Feb. 28, 2011.................................................................23

## State Statutes, Cases, and Administrative Orders

1913 Ill. Laws 459 ...................................................................8

*Atlantic Coast Elec. Ry. Co. v. Board of Pub. Util. Comm'rs*,
92 N.J.L. 168, 175-76 (1918)...............................................8

Electric Discount and Energy Competition Act, ch. 23, sec 1,
1999 N.J. Laws 88................................................................13

Louisiana Pub. Serv. Comm'n, General Order No. 08-28-2024,
Aug. 28, 2024.....................................................................35

Maryland Pub. Serv. Comm'n, *Re Potomac Electric Power Company*,
Order No. 58067 (Apr. 29, 1970)........................................12

MD. CODE ANN., PUB. UTIL. § 7-207......................................34

MD. CODE REGS. 20.79.04.03 ...............................................34

MICH. COMP. LAWS ANN. § 460.6t ..................................34, 35

OHIO ADMIN. CODE 4901:1-10-26..........................................35

Ohio Annotated Code 1910, sec. 614.....................................33

OHIO REV. CODE § 4928.12 ...................................................14

Pennsylvania Pub. Util. Comm'n, *U.S. v. Pennsylvania Power
& Light Co.*, 46 Pa. PUC 33 (1972).....................................11

VA. CODE ANN. § 56-599.......................................................35

WASH. ADMIN CODE § 480-100-620 .......................................35

## INTEREST OF AMICUS CURIAE

OPSI is an inter-governmental organization of utility regulatory commissions from 13 States and the District of Columbia. These jurisdictions are wholly or partly within the territory served by PJM, a FERC-approved Regional Transmission Organization (RTO). PJM operates and plans the expansion of high-voltage facilities owned primarily by investor-owned electric utilities.

OPSI-member commissions set prices paid by consumers to investor-owned utilities for electricity service. Across OPSI states, charges for interstate wholesale energy sales and transmission service comprise about half of consumers' electric bills. Because states have no authority over interstate sales and services, OPSI commissions rely on FERC's regulation of PJM and the PJM utilities to deliver just and reasonable rates to consumers.

OPSI is concerned about rising transmission rates. OPSI believes that FERC Order No. 1920 can improve transmission planning and cost allocation, which will ultimately put downward pressure on rates and help ensure that consumers benefit from billions of dollars in annual transmission spending. OPSI supports Order No. 1920 in part because

1

it provides significant roles for states in regional transmission planning and cost allocation processes.

On November 20, 2025, the Court granted OPSI's motion for leave to file an amicus brief. ECF 436. No counsel for any party authored this brief in whole or in part and no entity or person other than *amicus curiae's* counsel made any monetary contribution intended to fund its preparation or submission.

The following OPSI-member commissions support this brief: Delaware, District of Columbia, Illinois, Indiana, Kentucky, Maryland, New Jersey, Tennessee, Virginia, and West Virginia. Commissions from North Carolina, Michigan, Ohio, and Pennsylvania abstained in the vote.

## SUMMARY OF THE ARGUMENT

By embedding cooperative federalism into each stage of regional transmission development, FERC Order No. 1920 remedies on-the-ground challenges facing efficient transmission development. OPSI submits this brief to explain its unique interest in transmission development in the PJM region and defend the partnership that Order No. 1920 creates between PJM and OPSI-member commissions. Order No. 1920 will advance beneficial transmission expansion and protect consumers from unjust and unreasonable transmission rates.

Petitioning utilities propose an expansive reading of Federal Power Act (FPA) section 205 that rejects cooperative federalism in order to cement their control over regional transmission rates. Their interpretation of the statute is incompatible with the purpose of federal oversight. Congress empowered FERC with "capacious substantive and remedial provisions" to counteract utilities' monopoly power. *PPL Energyplus v. Nazarian*, 753 F.3d 467, 475 (4th Cir. 2014), *aff'd Hughes v. Talen*, 578 U.S. 150 (2016); *NARUC v. FERC*, 475 F.3d 1277, 1280 (D.C. Cir. 2007) ("FERC's authority generally rests on the public interest in constraining exercises of market power."). The utilities'

3

assertion that their privileges under FPA section 205 supersede FERC's section 206 filing requirements subverts Congress's intent to protect consumers from utilities' monopoly power over interstate transmission.

History shows that coordinated actions by states and FERC best counterbalance utilities' monopoly power to ensure that electricity systems operate reliably and expand for the benefit of the public. In passing the FPA, Congress made "federal and state powers 'complementary' and 'comprehensive,'" with the aim of closing regulatory "gaps" that might allow "private [utility] interests to subvert the public welfare." *FERC v. Electric Power Supply Ass'n*, 577 U.S. 260, 289 (2016) (citation omitted). The FPA supplements state utility regulation by subjecting utility interstate transmission service and wholesale power sales to the same ratemaking standards that states apply to local distribution service and retail sales.

Drawing on their experience setting retail rates and regulating local distribution, OPSI's member commissions support Order No. 1920 as a reasonable response to unjust and unreasonable transmission rates. State commissions have a direct and unavoidable stake in transmission charges because, under settled law, they must flow

through into the retail rates paid by consumers. When regional planning is inefficient or costs are allocated unfairly, OPSI commissions cannot prevent the resulting unjust and unreasonable transmission charges from appearing on consumers' bills.

Based on an extensive record, FERC concluded that engaging states in regional planning and cost allocation processes will align transmission development with consumers' needs and remedy unjust and unreasonable transmission rates. FERC's orders accord with the FPA's cooperative federalism framework. To move forward, a proposed regional expansion project must be economically beneficial for the region *and* consistent with states' interests. This framework can facilitate efficient expansion of essential infrastructure while protecting the public from unjust and unreasonable prices and burdensome development. By providing states with opportunities to contribute to PJM's transmission planning and propose cost-sharing mechanisms, Order No. 1920 will promote projects that align with states' interests and are likely to be approved for construction by state officials.

Petitioning transmission-owning utilities would undermine FERC's remedy by denying OPSI commissions a voice in determining

how to pay for regional transmission. PJM-member utilities ask this court to confer on them unilateral authority to dictate the regional response to FERC's section 206 directive on cost allocation. Cutting out states would result in less efficient transmission development and would stray from the FPA's cooperative federalism framework that has protected consumers for nearly a century.

The utilities' First Amendment claims against FERC's remedies threaten OPSI commissions' authority. The utilities argue that requiring them to append state-supplied information to their Order No. 1920 compliance filings infringes on their free-speech rights. Accepting this claim would have staggering implications. States routinely demand that utilities "submit filings that express economic and policy views that they oppose." *Transmission Owner Pet'r. Br*. at 2. The Court should not invite litigation against state authority that is essential for protecting consumers.

Order No. 1920 promises to remedy PJM's flawed planning and cost allocation processes. OPSI urges the Court to uphold it.

## I.  FEDERAL-STATE COLLABORATION PROTECTS CONSUMERS FROM HIGH ELECTRICITY PRICES

While "the regulation of utilities is one of the most important of the functions traditionally associated with the police power of the States," the inherently interstate nature of electric utility systems brings aspects of the business under FERC's authority. *Arkansas Elec. Coop. v. Ark. Pub. Serv. Comm'n*, 461 U.S. 375, 377 (1983).

The history of PJM illustrates the interplay between federal and state utility regulation and validates FERC's decision to operationalize cooperative federalism in regional transmission development. Federal regulation best protects consumers when it complements state utility oversight and respects state policies. Order No. 1920 applies this key insight to PJM's transmission planning and cost allocation.

### A. Cooperative Federalism Is Necessary to Comprehensively Protect Consumers from Utilities' Monopoly Power

Petitioning utilities are creatures of the states. More than a century ago, states authorized public utility commissions to eliminate competition in the provision of electricity and sustain a single utility with steady revenue. Immune from ordinary business risks, state-backed utilities were designed to spread electricity service to the public.

7

State utility laws required commissions to ensure that rates, terms, and conditions of service were 'just and reasonable' and not 'unduly discriminatory,' standards that convey broad discretion to protect consumers while facilitating utility investment. Among their many powers, regulators can block corporate transactions, order construction of new facilities, and demand internal utility records. *See, e.g.*, 1913 Ill. Laws 459 (creating Illinois' commission). With this sweeping authority, commissions enjoyed "full control of [ ] public utilities." *Atlantic Coast Elec. Ry. Co. v. Board of Pub. Util. Comm'rs*, 92 N.J.L. 168, 175-76 (1918).

As capital flowed into nascent state-backed utilities, technology advances allowed high-voltage transmission links between neighboring utilities. In 1927, two Pennsylvania utilities and a New Jersey provider forged what evolved into PJM. N.Y. TIMES, *Biggest Power Pool to Serve Two States*, Sep. 17, 1927. The utilities promoted their "power pool" as a means for reducing costs. *Id.*

A Supreme Court decision earlier that year denied states jurisdiction to regulate such interstate utility contracts. *See Public Utils. Comm'n of R.I. v. Attleboro Steam & Elec. Co.*, 273 U. S. 83 (1927)

8

(holding that state regulation of interstate power sales violated the dormant Commerce Clause doctrine). The decision came as state commissions were already losing control over the industry. Out-of-state holding companies had acquired state-backed utilities and stitched them together into multi-state systems "gerrymandered in such ways as to bear no relation to economy of operation or to effective regulation." *North Am. Co. v. SEC*, 327 U.S. 686, 701 (1946). A seven-year federal investigation uncovered holding companies' "abuses" and "deceptions" and sparked Congressional action to contain electric utilities largely within state jurisdiction. *Appalachian Power Co. v. FPC*, 328 F.2d 237, 246-47 (4th Cir. 1964).

In passing the Public Utility Act of 1935, "Congress hoped to rejuvenate local utility management and to restore effective state regulation" of electric utilities. *North Am. Co.*, 327 U.S. at 704. The Act had two components. Part I empowered the Securities and Exchange Commission to "break[] up concentrations of financial power in the utility field too big to be effectively regulated." *American Power & Light Co. v. SEC*, 329 U.S. 90, 106 (1946). Part II, also known as the Federal Power Act, tasked the Federal Power Commission (FPC), FERC's

9

predecessor, with regulating electric utilities' sales and services that the Supreme Court held were beyond state jurisdiction.[1]

To underscore the breadth of states' authority over electric utilities following the FPA's enactment, Congress explicitly preserved state jurisdiction over retail sales, local distribution, and generation facilities. 16 U.S.C. § 824(b). Congress likewise withheld eminent domain authority from FERC, leaving most infrastructure permitting decisions with the states.

Beyond these jurisdictional limits, Congress repeatedly instructed FERC to "receive and consider the views of State commissions." *Connecticut Power & Light Co. v. FPC*, 324 U.S. 515, 526 (1945). The FPA also enhanced state commissions' authority. Congress allowed FERC to share its authority with state regulators through joint ratemaking boards that would oversee interstate rates and services. *See* 16 U.S.C. § 824h(a).

As applied to the PJM power pool, FERC had exclusive authority to approve or reject the contracts that governed the utilities' alliance. During PJM's early decades, FERC presumed that utility coordination

---

[1] For simplicity, the brief refers to the federal commission as FERC, even though it was known as the FPC until 1977.

agreements, such as the PJM contract, would result in just and reasonable rates. *See, e.g.*, *Central Iowa Power Coop. v. FERC*, 606 F.2d 1156, 1162-63 (D.C. Cir. 1979) (explaining that when FERC reviews power pool contracts it must be "guided" by FPA section 202(a), which tasks FERC with encouraging industry coordination).

Under FERC's light-touch approach, state commission regulation remained the primary means of financing new infrastructure and aligning utility service with the public interest. *See, e.g.*, *Public Service Electric & Gas Co.*, 51 FPC 1813 (1974) (stating that PJM member "Public Service's electric sales are nearly all retail"). As the PJM alliance expanded to Maryland and later Delaware, coordination between utilities became more sophisticated, and utilities' operations, planning, and investments were increasingly subject to FERC's jurisdiction. *See, e.g.*, Pennsylvania Pub. Util. Comm'n, *U.S. v. Pennsylvania Power & Light Co.*, 46 Pa. PUC 33 (1972) (noting a contract filed at the federal commission that shared costs of high-voltage transmission lines among PJM alliance member utilities).

State regulators believed in the value of the PJM alliance and supported utilities' participation. *See, e.g.*, Maryland Pub. Serv.

11

Comm'n, *Re Potomac Electric Power Company*, Order No. 58067 (Apr. 29, 1970) (stating its "firm opinion" that the PJM alliance benefits ratepayers). But by the 1980s, numerous factors, ranging from high interest rates to mismanaged nuclear projects, substantially increased utilities' costs and consumer rates. *See* Order No. 888, 61 Fed. Reg. 21,540, at pp. 21,543-46 (May 10, 1996) (summarizing industry history). Integrated operations and planning among the utilities in the then-four state PJM region complicated states' efforts to protect consumers, underscoring the value of coordinated federal-state utility regulation.

B. PJM Achieves Federal and State Policy Goals by Countering the Monopoly Power of the Transmission-Owning Utilities

In the 1990s, a consensus emerged among policymakers and industry in the four-state PJM region that competition in the generation and sale of power would benefit consumers. Complementary actions by FERC and states aligned utility regulation through a new regional utility, PJM Interconnection, LLC. As PJM expanded to surrounding states, FERC generally respected state policies, choosing to preserve regulatory space for state utility oversight within an interstate wholesale market and transmission planning region.

FERC's Open Access transmission mandate laid the foundation for the creation of a free-standing PJM. To address "mounting claims of undue discrimination in transmission access," FERC issued an FPA section 206 order that established national standards for transmission service over utility-owned lines. *See Transmission Access Policy Study Grp. v. FERC*, 225 F.3d 667, 683 (D.C. Cir. 2000) (upholding FERC Order No. 888). FERC required "comparable" service for all transmission users, including utility competitors in power generation.

In parallel with FERC's reforms, the four initial PJM states eliminated a financial advantage that utilities enjoyed in the emerging wholesale market. To level the playing field, the states barred utilities from including costs of new power plants in their retail rates and ordered or encouraged utilities to divest their power plants. *See, e.g.*, Electric Discount and Energy Competition Act, ch. 23, sec. 1, 1999 N.J. Laws 88. By removing state-backed cost recovery, the four states ensured that all generators, regardless of ownership, would have to compete for revenue in the wholesale market.

PJM was the essential link between the initial PJM states' policies and FERC's national transmission standards. By operating the

13

regional transmission system without any profit motive, PJM enabled

fair competition in the generation and sale of power. New power plant

companies could invest with confidence based on the impartial market

administration of a competitively neutral PJM.

In response to states' policies and with encouragement from

FERC, incumbent utilities transferred control of their transmission

facilities to the newly constituted PJM regional system operator. PJM's

service area grew rapidly. Some states forced utilities to cede control of

their transmission facilities to PJM. *See, e.g.*, OHIO REV. CODE

§ 4928.12. In other states, utilities voluntarily joined PJM while a few

utilities joined as a condition of FERC's approval of a corporate merger.

*See, e.g.*, *American Electric Power Co.*, 90 FERC ¶ 61,242, at p. 61,788

(2000) (stating that joining an RTO would be an "adequate remedy to

the market power concerns arising from the proposed merger"). By

2005, PJM's utility members had footprints in Virginia, West Virginia,

Ohio, Illinois, Indiana, Michigan, North Carolina, Kentucky, Tennessee,

and the District of Columbia.

As PJM's markets matured, FERC resolved a series of collisions

between PJM's rules and state utility regulation. *See New Jersey Bd. of*

14

*Pub. Utils. v. FERC*, 744 F.3d 74, 83-93 (3d Cir. 2014) (describing issues before FERC from 2006 to 2011). After more than a decade of controversies, PJM and FERC instituted market rules that accommodated states' policies. *See PJM Power Providers Grp. v. FERC*, 88 F.4th 250 (3d Cir. 2023) (upholding FERC's approval of PJM market rules). FERC's solution assures just and reasonable rates by "using [PJM] auctions to set wholesale prices [that] promote efficiency with the background assumption that the FPA establishes a dual regulatory system between the states and federal government and that the states engage in public policies that affect the wholesale markets." *Coalition for Competitive Elec. v. Zibelman*, 906 F.3d 41, 57 (2d Cir. 2018).

Order No. 1920 adopts a similar approach for transmission development that FERC and PJM embraced for markets. Rather than trying to quarantine regional planning and cost allocation from matters within state jurisdiction, FERC chose to harmonize its regulation with states' preferences. In Order No. 1920, FERC appreciated "the critical role that states play in the development of new transmission infrastructure, particularly at the regional level," and fashioned remedies that reflect states' unique sovereign responsibility to protect

15

consumers while meaningfully advancing FERC's goal of economically efficient transmission development. Order No. 1920 at P 124.

## II. BY CREATING A PARTNERSHIP BETWEEN PJM AND STATES, ORDER NO. 1920 REMEDIES UNJUST AND UNREASONABLE TRANSMISSION RATES

While OPSI states have different approaches to utility regulation, common across OPSI states is that the regional transmission network is owned predominantly by the utilities regulated by OPSI commissions. Utility bills go up when costs of delivering power increase, regardless of whether the costs are associated with state-regulated distribution or FERC-jurisdictional transmission. OPSI commissions therefore have a unique interest in cost-effective transmission spending.

OPSI agrees with FERC that "a robust, well-planned transmission system is foundational to ensuring an affordable, reliable supply of electricity." Order No. 1920 at P 90. PJM's processes for expanding its system have not been working. State involvement in regional planning and cost allocation processes will ensure that regional projects benefit local consumers and that consumers pay only for the benefits they receive from PJM's planning. OPSI supports the transmission development framework outlined in Order No. 1920 because state

16

engagement at PJM will align regional transmission benefits with the
transmission charges on consumers' utility bills.

### A. Transmission Rates in PJM Were Unjust and Unreasonable Due to Flawed Planning Processes and Misaligned Cost Allocation Methods

Consumers in PJM have been paying more for transmission, but
the value of their transmission dollars has been decreasing. There are
generally three components to a consumer's monthly utility bill. FERC
has authority over charges for: 1) energy and capacity procured through
PJM's markets and 2) transmission service over the PJM-planned
regional network and utilities' local systems. States set prices for
3) utilities' local distribution and must allow utilities to include all
FERC-regulated charges on consumers' bills. *See Nantahala Power &
Light v. Thornburg*, 476 U.S. 953, 962-67 (1986) (collecting cases that
hold state regulators must allow utilities to recover FERC-approved
charges in state-set retail rates).

From 2001 to 2015, transmission costs rarely exceeded ten percent
of the total FERC-regulated charges. Starting in 2015, transmission
spending accounted for 22 percent of PJM's total charges, on average,
and have steadily escalated to more than 30 percent. In absolute terms,

17

transmission charges nearly tripled, from $4.40 per megawatt-hour prior to 2015, to an average of $12.93 in the decade since. *See* Independent Market Monitor, 2024 State of the Market Report, Volume 2, Tbl. 1-11; Order No. 1920 at n.201 (providing a similar statistic).

This jump in total transmission spending coincided with a flip in the ratio of PJM-regional to utility-specific local spending. PJM selects regional projects based on their cost-effectiveness, and many regional projects must satisfy a FERC-approved benefit-cost test. Costs of PJM-planned projects are shared across the region. Consumers also pay for projects planned by each utility that are neither approved by PJM nor subject to any FERC-regulated economic analysis. These local projects are primarily paid for by in-state ratepayers who are captive to the utility's transmission service.

FERC has explained that "regional transmission planning . . . can yield better returns [for customers] for every dollar spent than localized or piecemeal transmission solutions." Order No. 1920 at P 100. Prior to 2014, PJM planned more than $2 of regional transmission expansion for each dollar utilities spent across their local service territories. From 2014 to 2020, the utilities spent nearly $3 for every dollar of new

18

regional transmission planned by PJM. Proposed Rule, 179 FERC

¶ 61,028, n.63 (2022).

When FERC approved PJM as an RTO, it emphasized that PJM's

planning "must be more than a collection of traditional expansion plans

developed by individual" utilities. *PJM*, 96 FERC ¶ 61,061, at p. 61,240

(2001). Ten years later, in a landmark nationwide rule, FERC placed an

"affirmative obligation" on PJM to produce regional plans "that reflect[]

the evaluation of whether alternative regional solutions may be more

efficient or cost-effective than solutions identified in [each utility's] local

transmission planning processes." Order No. 1000, 136 FERC ¶ 61,051

at P 3 (2011). The trends in PJM-regional and utility-local spending

show that PJM is not meeting its obligations.

Regional cost allocation is a throughline across the deficiencies in

PJM. As the parade of litigation demonstrates, regional cost allocation

is a persistently contentious issue. *See Illinois Com. Comm'n v. FERC*,

576 F.3d 470 (7th Cir. 2009) (holding that regional transmission costs

must be allocated in a manner commensurate with benefits received

and that FERC's approval of a cost allocation method failed to meet

that standard); *Illinois Com. Comm'n v. FERC*, 756 F.3d 556 (7th Cir.

19

2014) (same); *Old Dominion Elec. Coop. v. FERC*, 898 F.3d 1254 (D.C. Cir. 2018) (holding that exempting projects from regional cost allocation was arbitrary when there was evidence of regional benefits); *Consolidated Edison Co. v. FERC*, 45 F.4th 265 (D.C. Cir. 2022) (holding that approving different allocation methods for similar projects was arbitrary and that an allocation formula violated the cost-causation principle); *Long Island Power Auth. v. FERC*, 27 F.4th 705 (D.C. Cir. 2022) (upholding FERC's approval of a cost-allocation settlement).

OPSI believes that the surge in local spending and decline in regional projects have been driven in part by uncertainty and friction around regional cost allocation. As FERC explained, "cost allocation [ ] will often determine whether transmission providers and customers support the construction of new facilities." Order No. 1920 at P 124. *See also* Order No. 1000 at P 559 ("There is a fundamental link between cost allocation and planning, as it is through the planning process that benefits, which are central to cost allocation, can be assessed.").

## B. FERC Cannot Remedy Unjust and Unreasonable Transmission Rates without State Collaboration

Order No. 1920 draws from three decades of experience with RTO transmission planning and nearly a century of cooperative federalism

under the FPA. Because states have permitting authority, represent consumers' interests in transmission development, and are experts in utility procurements that are driving transmission needs, FERC rightly concluded that including states in planning and cost allocation processes will promote successful regional development. *See, e.g.*, Order No. 1920 at PP 996, 1000, 1364; Order No. 1920-A at PP 53, 241, 245, 277, 300-301, 344, 348, 459, 659, 673.

The overarching remedy in Order No. 1920 is an obligation that PJM plan for *long-term* shifts in supply and demand. Extending the time horizon will better align regional planning with industry trends and consumers' needs. Order No. 1920 at PP 299-300. FERC explained, however, that the longer planning term will increase uncertainty about transmission needs and therefore raise the risk that PJM will plan and consumers will pay for unneeded transmission projects. Order No. 1920 at PP 126, 1364; Order No. 1920-A at P 659.

State involvement is key to avoiding inaction in the face of this risk and advancing transmission projects that are consonant with just and reasonable rates. Order No. 1920 at P 1364. FERC envisioned states and PJM "working in concert" to create long-term development

21

scenarios and propose project evaluation and selection criteria. Order No. 1920-A at P 273. This collaboration, FERC concluded, would "diminish" the "potential risk of" transmission "solutions that are not cost-effective" because state regulators are best positioned to translate utility and consumer obligations and preferences into transmission needs. *Id.* at PP 277, 344-48, 459.

State involvement in cost allocation is "critical to the success" of long-term planning. Order No. 1920-A at P 671. FERC found that state participation in cost allocation processes would "minimize delays," "make it easier to construct needed transmission," and help ensure that "customers actually receive the benefits" of long-term planning. Order No. 1920 at PP 1293, 1299; Order No. 1920-A at P 659.

In PJM, state engagement is long overdue. The saga of a proposed 300-mile high-voltage line spanning three states illustrates the need for state input early and throughout the development timeline. The project, backed by two multi-state utility companies, was included by PJM in its 2007 regional plan. At the time, states had no role in PJM's regional planning. With permitting applications pending in the states, PJM suspended the project in 2011 and cancelled it in 2012.

22

Several factors drove PJM's decisions, including state policies that were changing regional power flows and affecting whether the project would be cost-effective. More than a decade of litigation followed about the project's development costs. Even though the line was never approved for construction by any state, consumers paid the utilities $250 million through FERC-approved rates for the failed project. *See Potomac-Appalachian Transmission Highline*, 185 FERC ¶ 61,198 (2023) (Comm'r Christie, concurring). This expensive mishap had enduring consequences. It is not a coincidence that regional development collapsed following the project's demise.

State engagement at PJM might have protected consumers. Cut off from PJM's planning, states' only opportunity to review the project was through their permitting processes. OPSI commissions' staff and intervening parties raised numerous objections to the applications, prompting the utilities to re-file in two states. Questions raised by state officials led PJM to reevaluate the project and ultimately conclude that it would not benefit consumers. *See* PJM Statement, Feb. 28, 2011, https://perma.cc/NK7L-B8CQ.

Throughout this rulemaking process, FERC has understood that to remedy transmission planning and cost allocation processes it must rebalance regional processes by engaging state officials. Just prior to issuing the Advanced Notice of Proposed Rulemaking that culminated in Order No. 1920, FERC acted under FPA section 209 to form a Task Force with state commissions that would "conduct joint hearings . . . on topics related to efficiently and fairly planning and paying for transmission." *Order Establishing Task Force*, 175 FERC ¶ 61,224 (2021). The record generated by the Task Force informed Order No. 1920. *See* Order No. 1920 at PP 22-25.

In the challenged orders, FERC recognizes that "States play a unique role in Long-Term Regional Transmission Planning" and emphasizes the "increased importance for state engagement regarding cost allocation." *See, e.g.*, Order No. 1920 at P 126; Order No. 1920-A at P 659. The petitioning utility transmission owners prefer to maintain the unjust and unreasonable status quo. Their challenge seeks to undermine cooperative federalism that is at the heart of the FPA, central to Order No. 1920, and essential for protecting consumers from high electricity prices.

24

## III.   THE COURT SHOULD REJECT THE UTILITIES' INVITATIONS TO ABANDON COOPERATIVE FEDERALISM AND ERECT A CONSTITUTIONAL BARRIER TO EFFECTIVE UTILITY REGULATION

Section 205 is the linchpin of Congress's statutory design that protects consumers from unjust and unreasonable and unduly discriminatory rates. OPSI urges the Court to resist the utilities' attempt to recast section 205's procedural safeguards into mechanisms that entrench their dominance over regional transmission rates. The utilities' section 205 privileges do not allow them to monopolize the regional response to FERC's section 206 orders that are at issue here.

OPSI also warns the Court about the catastrophic consequences of finding any First Amendment violation in Order No. 1920. Overcoming the information asymmetry between regulators and utilities is a core challenge for state commissions. To evaluate utility proposals, regulators often demand that utilities speak on the record about investment options they oppose. Such requirements help regulators appreciate the tradeoffs between potential investments, particularly where the utility's monopoly impedes fair competition.

In this proceeding, utilities argue that requiring them to "communicate content with which they disagree" infringes on their First

25

Amendment rights. *Pet'r. Br.* at 38. Utilities' theory would obstruct

information-gathering processes that are vital to protecting consumers.

### A. Section 205 Provides the FPA's Core Consumer Protections, and It Does Not Immunize Utilities from FERC's Procedures

Section 205 codifies the core safeguards that fulfill the FPA's

"major purpose . . . [of] protect[ing] power consumers against excessive

prices." *Pennsylvania Power Co. v. FPC*, 343 U.S. 414, 418 (1952). First,

and most importantly, section 205 requires that all rates be just and

reasonable and prohibits undue preferences and advantages in rates.

Second, section 205 empowers FERC to hold a hearing about a proposed

rate, suspend the new rate's effectiveness, and order refunds of

amounts later found to be excessive. Third, section 205 establishes the

"rights of interested parties" in utility rate cases and "protects the

utility's customers by ensuring early notice" of potential rate increases.

*Municipal Light Bds. of Reading & Wakefield v. FPC*, 450 F.2d 1341,

1354 (D.C. Cir. 1971); *NRG Power Mktg. v. FERC*, 862 F.3d 108, 116

(D.C. Cir. 2017) (citation omitted).

Section 205(d) links notice with the utility's obligation to publish

its tariff for public inspection. 16 U.S.C. § 824d(d). These two

requirements are common across Congress's several ratemaking

26

statutes that date back to the Interstate Commerce Act of 1887. They prevent price discrimination and otherwise protect consumers by ensuring that the utility charges only the rate on file with the Commission. *See, e.g.*, *New York, N.H. & H. R. Co. v. Interstate Com. Comm'n*, 200 U. S. 361, 391 (1906) (summarizing that Congress's "great purpose . . . was to secure equality of rates as to all" and it achieved this goal by prohibiting any "departure from the published rate"); *Duke Energy Carolinas v. NTE Carolinas II*, 111 F.4th 337, 361 (4th Cir. 2025) (explaining that "the idea behind filing rates is that it prevents regulated firms from deviating from their published rates, and thus prevents discriminatory rates.").

Since the advent of RTOs, utilities have argued that hidden among these foundational consumer protections is a sweeping utility entitlement to control regional transmission rates and terms of service. When FERC initially encouraged utilities to create RTOs in the 1990s, it emphasized that RTOs must operate pursuant to "rules of governance . . . [that] prevent control, and appearance of control, of decision-making by any class of participants." Order No. 888, 61 Fed. Reg. 21,540, at p. 21,596 (May 10, 1996). To insulate PJM and other RTOs from undue

27

influence and establish their independence from utilities, FERC determined that RTOs must hold unilateral authority to file changes to market and transmission rules under section 205. *PJM*, 81 FERC ¶ 61,257, at p. 62,279 (1997). FERC later explained that "for the RTO to provide transmission service independent from market participants, it must have the independent right to seek [ ] changes to its tariff." Order No. 2000-A, 65 Fed. Reg. 12,088, at p. 12,097 (Mar. 8, 2000).

The utilities protested, and the D.C. Circuit ultimately blocked FERC's attempt to force transmission owners to "cede their right under section 205 of the Act to file changes in rate design with the Commission." *Atlantic City Elec. Co. v. FERC*, 295 F.3d 1, 11 (D.C. Cir. 2002). To create the RTOs that it envisioned, FERC then had to rely on utilities "voluntarily giv[ing] up, by contract, some of their rate-filing freedom under section 205." *Id.* at 10. The next year, FERC approved a settlement between PJM and the utilities that divided their transmission system responsibilities. *PJM*, 105 FERC ¶ 61,294 (2003). Under the agreement, the utilities retained the privilege of filing changes under section 205 to regional cost allocation.

28

In this proceeding, the utilities cite the *Atlantic City* case to support their claim that Order No. 1920 forces "utilities to cede their section 205 rights" over regional cost allocation. *Pet'r. Br.* at 22. But Order No. 1920 imposes a very different requirement than FERC tried to apply in 1997 when it established a free-standing PJM. Then, FERC sought to permanently confiscate the utilities' opportunities to file rate design changes under section 205. Order No. 1920, by contrast, merely establishes a ***one-time*** obligation to append information supplied by the states when utilities propose a regional cost allocation method in compliance with FERC's section 206 orders at issue in this proceeding.

Subsequent decisions confirm that *Atlantic City* is a limited case with no relevance here. In 2003, the D.C. Circuit "reaffirm[ed] and clarif[ied] [its] prior decision that FERC has no jurisdiction to enter limitations requiring utilities to *surrender their rights under § 205* of the FPA to make filings to initiate rate changes." *Atlantic City Elec. Co. v. FERC*, 329 F.3d 856, 859 (D.C. Cir. 2003) (emphasis added). Three years later, that court reiterated that "the issue in *Atlantic City* was limited to the question of whether FERC had jurisdiction . . . to oblige public utilities *to cede their rights to make future filings under Section*

29

*205." Maine Pub. Utils' Comm'n v. FERC*, 454 F.3d 278, 284 (D.C. Cir. 2006) (emphasis added).

Order No. 1920 neither eliminates nor even diminishes the utilities' "rate-filing freedom" under *Atlantic City*. 295 F.3d at 10. All FERC has done here, as it has done in innumerable section 206 proceedings, is establish processes for compliance with its section 206 order and requirements for subsequent section 205 proceedings. FERC's mandates fit well within its "capacious substantive and remedial" authority. *Nazarian*, 753 F.3d at 475.

The utilities protest that section 206 does not allow FERC to impose pre-filing procedures, such as Order No. 1920's directive to consult with states on future section 205 cost allocation filings after the initial compliance process. But the utilities offer no textual basis for the limits they seek to impose on FERC's section 206 remedies. FERC's demand that utilities confer with states before filing under section 205 does not force utilities to "surrender" or "cede" any filing privilege or prevent them from filing whatever rate designs they prefer.

FERC has attached various information exchange, consultation, and related requirements to utility filings. For instance, prior to filing

30

transmission rate updates, utilities must "include all interested parties in information exchange and review processes." *MISO, et al.*, 143 FERC ¶ 61,149 at P 34 (2013). FERC determined that these pre-filing interactions are necessary elements of a just and reasonable rate. *Id.* at PP 16-18. FERC has also ordered utilities to participate in FERC-convened technical conferences before filing under section 205. *See, e.g.*, *Entergy Services*, 104 FERC ¶ 61,336 at P 45 (2004). FERC has gone further, requiring regulated companies to share proposed rates with customers and allow them to comment on draft tariff language prior to filing. *Cost Recovery Mechanisms for Modernization of Natural Gas Facilities*, 151 FERC ¶ 61,047 at P 93 (2015). These pre-filing requirements are far more burdensome than Order No. 1920's consultation requirement.

While utilities generally enjoy discretion under section 205 to propose rates, terms, and conditions of service, FERC "has the duty—not the option—to reform rates that by virtue of changed circumstances are no longer just and reasonable." *Louisiana Pub. Serv. Comm'n v. FERC*, 184 F.3d 892, 897 (D.C. Cir. 1999). FERC's section 206 orders are "in protection of the public interest, as distinguished from the

31

private interests of utilities" expressed through their section 205 filings. *FPC v. Sierra Pac. Power Co.*, 350 U.S. 348, 355 (1956). "The focus of the [challenged section 206] orders is on *improving the process*." *South Carolina Pub. Serv. Auth. v. FERC*, 762 F.3d 41, 77 (D.C. Cir. 2014) (upholding Order No. 1000) (emphasis added).

Decades of experience in PJM confirm states' indispensable roles in protecting consumers. FERC's section 206 orders challenged in this proceeding provide states with appropriate roles in PJM's transmission development processes.

### B. Transmission-Owning Utilities' First Amendment Arguments Threaten Foundational State Authority over Utilities

Accepting the utilities' Constitutional claims would invite attacks against foundational regulatory tools. When legislatures created state-backed electric utilities, they understood that monopolies can exploit informational advantages. State commissions may lack objective information to determine whether a utility-proposed project is needed, appropriately sized, and cost effective for consumers. In proceedings where they seek regulatory permission to invest in new facilities, utilities can strategically withhold information about their costs, operations, and assets that might be damaging to their interests.

32

To combat the information asymmetry that advantages utilities over regulators, states adopted two primary strategies. First, century-old utility laws endow commissions with sweeping authority to demand information from utilities. *See, e.g.*, Ohio Annotated Code 1910, sec. 614-7 (providing the utility commission with power "to examine all books, contracts, records, documents and papers of any public utility"); *id.* at sec. 614-35 (requiring each utility to "furnish to the commission in such form and at such times as the commission may require such accounts, reports and information as shall show completely and in detail the entire operation of the public utility"). Second, states force utilities to evaluate alternative projects that they would prefer not to pursue and to respond to public comments and third-party proposals that may reveal weaknesses in the utility's plans.

Finding a First Amendment violation when regulators "compel [utilities] to submit filings that express economic and policy views that they oppose" would undermine regulators' abilities to extract valuable information from utilities. *Pet'r. Br.* at 1-2. For instance, in transmission permitting proceedings, states require utilities to evaluate alternatives to their preferred project. *See, e.g.*, MD. CODE ANN., PUB.

UTIL. § 7-207(f); MD. CODE REGS. 20.79.04.03 (requiring an applicant to explain why it rejected alternative projects and instructing regulators to consider those reasons when it evaluates the permit application). Similarly, in regulated long-term planning exercises, states demand that utilities consider a range of potential project types, "even if a particular [investment] is ultimately not recommended by the Company." DEL. CODE REGS. § 3010-5.0; *see also* MICH. COMP. LAWS ANN. § 460.6t (requiring utilities to file analyses of "all reasonable options available to meet projected energy and capacity needs"). According to the utilities, these requirements should be subject to Constitutional scrutiny because they "force public utilities to put forward policy positions with which they disagree." *Pet'r. Br.* at 41.

A narrower reading of the utilities' claims that focuses on utility speech about information supplied by third parties would still threaten tried-and-true regulatory methods. In several contexts, states demand that utilities file and respond to complaints and proposals from utility customers and competitors. For instance, each Michigan utility must "include all of the submitted proposals [from market participants for new power plants] as attachments to its integrated resource plan."

MICH. COMP. LAWS ANN. § 460.6t. Ohio requires each utility to file "any quality, safety, and reliability complaints" it receives from specified entities and "report the specific actions the electric utility took to address these complaints." OHIO ADMIN. CODE 4901:1-10-26. Virginia law forces utilities to "report on any stakeholder meetings" prior to the utility filing its long-term resource plan. VA. CODE ANN. § 56-599.

States outside of the PJM region have similar requirements. *See, e.g.*, WASH. ADMIN CODE § 480-100-620 (requiring each utility to file its responses to public comments); Louisiana Pub. Serv. Comm'n, General Order No. 08-28-2024, Aug. 28, 2024 (requiring utilities to "include a section in the [long-term planning] Report documenting all of the stakeholders' recommendations and explaining the Company's reasons for accepting or rejecting each recommendation"). FERC similarly requires project developers to summarize public comments received through mandated outreach to certain affected communities. *See* 18 C.F.R. § 50.4(a)(4)-(5).

Utilities' First Amendment claims would erect a Constitutional obstacle to utility regulation that would negate widely adopted regulatory tools. Where there is such a "long history, a substantial

consensus, and simple common sense" supporting states' rules, courts should decline to find a First Amendment violation. *Burson v. Freeman*, 504 U.S. 191, 211 (1992).

## CONCLUSION

To remedy unjust and unreasonable rates, Order No. 1920 recalibrates regional transmission development processes to account for the unique sovereign interests and responsibilities of states. Petitioning utilities ask the Court to abandon cooperative federalism and erect a new Constitutional limit to state authority. OPSI urges the Court to uphold Order No. 1920 and reject the utilities' arguments that would enhance their monopoly power at the expense of the public.

Respectfully submitted,

*/s/ Ari Peskoe*
Ari Peskoe
Harvard Law School
Electricity Law Initiative
6 Everett Street, Suite 4119
Cambridge, MA 02138
617.495.4425
apeskoe@law.harvard.edu
*Counsel for Amicus Curiae*

Feb. 4, 2026

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g) and Circuit Rule 32(b), I certify that this brief complies with the type-volume limitation in Fed. R. App. P. 32(a)(7)(B) because this brief contains 6,493 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

I further certify that this brief complies with the type-face requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in Microsoft Word 365 using Century Schoolbook 14-point font.

Feb. 4, 2026

*/s/ Ari Peskoe*
Ari Peskoe

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system on February 4, 2026. Participants in the case will be served by the appellate CM/ECF system.


*/s/ Ari Peskoe*
Ari Peskoe