**Oral Argument Not Yet Scheduled**
**No. 24-1650 (L)**
(consolidated with Nos. 24-1748, 24-1756, 24-1758, 24-1760, 24-1765, 24-1770, 24-1785, 24-1804, 24-1857, 24-1862, 24-1867, 24-1876, 24-1885, 24-1887, 24-1979, 24-1991, 24-2162, 24-2163, 25-1073, 25-1080, 25-1197, 25-1349)

IN THE
# United States Court of Appeals for the Fourth Circuit

APPALACHIAN VOICES, ET AL.,

*Petitioners,*

– v. –

FEDERAL ENERGY REGULATORY COMMISSION,

*Respondent,*

– v. –

MARYLAND OFFICE OF PEOPLE'S COUNSEL, ET AL.,

*Intervenors.*

On Petitions for Review of Orders of the Federal Energy Regulatory Commission

## FINAL BRIEF OF THE INSTITUTE FOR POLICY INTEGRITY AT NEW YORK UNIVERSITY SCHOOL OF LAW AS *AMICUS CURIAE* IN SUPPORT OF RESPONDENT

Kelly C. McGee
Jennifer Danis
INSTITUTE FOR POLICY INTEGRITY
139 MacDougal Street, 3rd Floor
New York, NY 10012
(212) 998-6754
kelly.mcgee@nyu.edu

*Counsel for* Amicus Curiae
*Institute for Policy Integrity*

February 4, 2026

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __24-1650__          Caption: __Appalachian Voices et al. v. FERC__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Institute for Policy Integrity__
(name of party/amicus)

who is _____ amicus curiae _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.  Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO

2.  Does party/amicus have any parent corporations?  ☐YES ☑NO
    If yes, identify all parent corporations, including all generations of parent corporations:

3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐YES ☑NO
    If yes, identify all such owners:

12/01/2019 SCC                              - 1 -

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?    ☐YES ☑NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐YES ☐NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.    Is this a criminal case in which there was an organizational victim?    ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Kelly C. McGee                     Date:        02/04/2026

Counsel for: Institute for Policy Integrity

- 2 -

[Print to PDF for Filing]

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................iii

INTEREST OF *AMICUS CURIAE* ............................................................... 1

SUMMARY OF ARGUMENT ....................................................................... 3

ARGUMENT ................................................................................................... 6

I. Securing Just And Reasonable Rates Requires Transmission Planning That Accurately Models Projected Electricity Supply And Demand. ........................... 6

 A. Planners must fully account for all factors driving transmission needs, including state policies. ................ 8

 B. Planners must analyze a range of plausible future grid conditions to make decisions under uncertainty. ................................................................ 11

 C. Identifying more efficient or cost-effective transmission solutions requires measuring the full benefits of proposed projects, accounting for costs. ...... 13

II. Order 1920's Required Transmission-Planning Model Inputs Are Needed To Ensure Just And Reasonable Rates. ................................................................................. 16

 A. Order 1920 requires transmission planners to account for the effects of all state policies influencing electricity supply and demand. ................. 17

 B. Transmission-planning modeling demonstrates that state policies driving demand growth more consistently increase transmission needs than clean energy policies. ............................................... 20

 C. Order 1920's required factors are not unduly discriminatory and are necessary to ensure just and reasonable rates. ............................................... 27

 D. Order 1920's requirements fall within FERC's authority over just and reasonable rates and do not regulate generation. ................................................ 29

III. Order 1920's Required Benefits Are Just And Reasonable And Not Unduly Discriminatory. ...................... 32

  A. Fully accounting for all benefits of transmission projects is necessary to ensure just and reasonable rates. ............................................................................ 33

  B. Order 1920's required benefits do not interfere with state authority over generation. ......................... 35

CONCLUSION ................................................................................. 36

CERTIFICATES

ii

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Conn. Dep't of Pub. Util. Control v. FERC*, 569 F.3d 477 (D.C. Cir. 2009) ...................................................................................................31

*Consol. Edison Co. of N.Y., Inc. v. FERC*, 45 F.4th 265 (D.C. Cir. 2022) ...........................................................................................................27

*FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260 (2016) .................30, 31

*NextEra Energy Res., LLC v. FERC*, 118 F.4th 361 (D.C. Cir. 2024) ...30, 31

*S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d 41 (D.C. Cir. 2014) .........27, 29

*Transmission Access Pol'y Study Grp. v. FERC*, 225 F.3d 667 (D.C. Cir. 2000)...............................................................................................30

**FERC Orders**

*Building for the Future Through Electric Regional Transmission Planning and Cost Allocation*, Order No. 1920, 187 FERC ¶ 61,068 (2024)............................................................................................... passim

Order 1920-A, 189 FERC ¶ 61,126 (2024)...................................... passim

Order 1920-B, 191 FERC ¶ 61,026 (2025)...............................................2

**Statutes and Regulations**

16 U.S.C. § 824e(a) ...................................................................................5

5 U.S.C. § 706(2)(E) ...............................................................................32

Md. Code Ann., Pub. Util. § 7-704.1(a)(1)(i) ..........................................28

Ohio Admin. Code 5703-9-21 ..................................................................30

Va. Code Ann. § 56-585.5(C)(3) ..............................................................28

Va. Code Ann. § 58.1-609.3(18).............................................................30

**Other Authorities and Sources**

Arman Shehabi et al., Lawrence Berkeley Nat'l Lab'y, *2024 United States Data Center Energy Usage Report* (2024), https://perma.cc/H23B-3NTA...........................................................22

iii

Dev Millstein et al., Lawrence Berkeley Nat'l Lab'y, *Empirical Estimates of Transmission Value Using Locational Marginal Price* (2022), https://perma.cc/U977-FJU6.................................................17

FERC, *Order No. 1000 Transmission Planning Regions*, https://perma.cc/6AYF-ZKMT (last visited Nov. 25, 2025)....................8

Inst. for Pol'y Integrity, Comments on Notice of Proposed Rulemaking, FERC Docket No. RM21-17-000 (Aug. 17, 2022), https://perma.cc/ZN75-298U .................................................................3

Inst. for Pol'y Integrity, Comments on PJM Interconnection Compliance Filing for Order Nos. 1920, 1920-A, and 1920-B, FERC Docket No. ER26-751-000 (Jan. 21, 2026), https://perma.cc/4B7F-5WSV ...............4

Jennifer Danis et al., Inst. for Pol'y Integrity, *Guide to State Participation in PJM Long-Term Scenario Development Under FERC Order No. 1920* (2024), https://perma.cc/6MS9-F36W ..4, 12, 13, 14, 18, 24

Jennifer Danis et al., Inst. for Pol'y Integrity, *Transmission Planning for the Energy Transition: Rethinking Modeling Approaches* (2023), https://perma.cc/V6XZ-WWQH .................................................2, 10, 14

Joe DeLosa III & Johannes Pfeifenberger, Brattle Group, *Pathways to Coordination: Proactive, State-Led Transmission Development to Reduce Cost and Achieve Goals in PJM* (2024), https://perma.cc/KG73-N5K7 .......................................................................................................16

Maya Domeshek, Christoph Graf & Burçin Ünel, *Coordinated v. Sequential Transmission Planning* (arXiv Working Paper No. 2509.24959, 2025), https://perma.cc/NQP6-BD7A .................................1

Maya Domeshek, Christoph Graf & Burçin Ünel, *Drivers of Transmission: Examining Demand Growth and State Clean Energy Policies* (2025), https://perma.cc/K6XM-E6GB .12, 25, 26, 27, 28, 29, 30

Saroj Khanal et al., *Multi-Objective Transmission Expansion: An Offshore Wind Power Integration Case Study*, 2 IEEE Transactions on Energy Markets, Policy, and Regulation 519 (2024) .............................2

Scott Jell, *Coal Plants Installed Mercury Controls to Meet Compliance Deadlines*, U.S. Energy Info. Admin. (Sep. 18, 2017), https://perma.cc/8ED2-YN7E...........................................................21

iv

U.S. Dep't of Energy, *Energy, Economic, and Environmental Assessment of U.S. LNG Exports* (2024), https://perma.cc/6BWN-RX3T ............... 22

U.S. Dep't of Energy, *National Transmission Needs Study* (2023), https://perma.cc/WD4H-KQ33 ....................................... 9, 10, 18, 39, 40

U.S. Dep't of Energy, *National Transmission Planning Study Chapter 2: Long-Term U.S. Transmission Planning Scenarios* (2024), https://perma.cc/93KM-YZN6 ........................................................... 12

*U.S. Natural Gas Electric Power Price*, U.S. Energy Info. Admin. (Dec. 31, 2025), https://perma.cc/42ZQ-A5Z7 ............................................ 26

William W. Hogan, *A Primer on Transmission Benefits and Cost Allocation*, 7 Econ. Energy & Env't Pol'y 25 (2018) ............................ 18

## INTEREST OF *AMICUS CURIAE*

The Institute for Policy Integrity at New York University School of Law (Policy Integrity)[1] is a nonpartisan, not-for-profit think tank dedicated to improving the quality of government decisionmaking through advocacy and scholarship in the fields of administrative law, economics, and public policy.[2]

Policy Integrity's staff has published extensively on the optimal design of transmission-planning models and their key role supporting cost-effective, long-term transmission planning. *See, e.g.*, Maya Domeshek, Christoph Graf & Burçin Ünel, *Coordinated v. Sequential Transmission Planning* (arXiv Working Paper No. 2509.24959, 2025), https://perma.cc/NQP6-BD7A; Saroj Khanal et al., *Multi-Objective Transmission Expansion: An Offshore Wind Power Integration Case Study*, 2 IEEE Transactions on Energy Mkts., Pol'y & Regul. 519 (2024); Jennifer Danis et al., Inst. for Pol'y Integrity, *Transmission Planning for the Energy Transition: Rethinking Modeling Approaches* (2023),

---

[1] This brief does not purport to represent the views, if any, of New York University School of Law.

[2] Per Federal Rule of Appellate Procedure 29(a)(4)(E), no party's counsel authored this brief wholly or partly, and no person contributed money intended to fund its preparation or submission.

1

https://perma.cc/V6XZ-WWQH [hereinafter *Transmission Planning for the Energy Transition*].

Policy Integrity has also been actively involved in Federal Energy Regulatory Commission (FERC) Order 1920 proceedings, *Building for the Future Through Electric Regional Transmission Planning and Cost Allocation*, Order No. 1920, 187 FERC ¶ 61,068 (2024) [hereinafter Order 1920],[3] including by submitting comments to FERC, publishing guidance for state regulators seeking to participate in long-term transmission planning under Order 1920, and participating in ongoing compliance proceedings by PJM Interconnection, LLC (PJM), a regional transmission organization (RTO) encompassing 13 states (including several in the Fourth Circuit) and Washington, D.C. *See* Inst. for Pol'y Integrity, Comments on Notice of Proposed Rulemaking, FERC Docket No. RM21-17-000 (Aug. 17, 2022), https://perma.cc/ZN75-298U; Jennifer Danis et al., Inst. for Pol'y Integrity, *Guide to State Participation in PJM Long-Term Scenario Development Under FERC Order No. 1920* 1 n.3

---

[3] Where this brief refers to Order 1920, it incorporates any modifications or clarifications adopted in Order No. 1920-A, 189 FERC ¶ 61,126 (2024) [hereinafter Order 1920-A], and Order No. 1920-B, 191 FERC ¶ 61,026 (2025).

2

(2024), https://perma.cc/6MS9-F36W [hereinafter *Guide to State Participation*]; Inst. for Pol'y Integrity, Comments on PJM Interconnection Compliance Filing for Order Nos. 1920, 1920-A, and 1920-B, FERC Docket No. ER26-751-000 (Jan. 21, 2026), https://perma.cc/4B7F-5WSV.

Policy Integrity has an interest in the development and application of sound transmission-planning principles because they can yield cost-effective solutions for grid expansion. Policy Integrity submits this brief to aid the Court in understanding the fundamentals of transmission-planning modeling, so that it can better understand why and how Order 1920 requires transmission planners to account for state policies affecting electricity supply and demand.

## SUMMARY OF ARGUMENT

Transmission-planning modeling is fundamental to Order 1920. By explaining modeling principles, this brief assists the Court in understanding how Order 1920 works in practice, and why its requirements further FERC's mandate to ensure just and reasonable rates. 16 U.S.C. § 824e(a).

**I.** Careful, long-term transmission planning is essential for reliable and affordable electricity. The decades-long planning horizon, extended construction timeline, and substantial capital investment required to build new transmission lines make accurate modeling of future grid conditions essential.

To plan effectively, planners identify all relevant factors driving future electricity supply and demand, and construct modeling "scenarios" that reflect possible futures. Those scenarios comprise inputs to a transmission-planning model that ultimately identifies where, how much, and what type of new transmission should be built to ensure reliability while minimizing cost. Failing to account for relevant inputs can lead planners to overlook critical transmission needs or, conversely, to plan for transmission where none is needed. Over- or underestimating transmission needs will results in over- or underbuilding transmission, increasing costs for electricity customers and yielding unjust and unreasonable rates.

Transmission-planning models also allow planners to estimate the benefits and costs of potential solutions to identified needs. Failing to

4

account for all benefits can result in planners selecting transmission projects that do not maximize benefits relative to costs.

**II.** State policies are among the factors that grid planners incorporate into their models. Order 1920 requires planners to account for *all* state policies driving transmission needs—whether they concern a state's generation resource mix (supply) or affect electricity demand—not just the decarbonization policies that State Petitioners highlight. State Pet'rs' Br. 4–5. As Policy Integrity's modeling research demonstrates, state policies promoting renewable resources may increase transmission need under some circumstances, but not others. Policies stimulating electricity demand, however, likely increase transmission buildout across all future scenarios. Failing to account for all energy-related state policies would lead planners to overlook or misidentify transmission needs, and thus plan for less efficient transmission investments. Ultimately, such investments would result in unjust and unreasonable rates.

In addition to being essential for maintaining just and reasonable rates, FERC's requirement that planners *account* for the effects of existing policy choices does not *dictate* policy choices. Rather than intruding on state authority over generation, the Order supports it by

5

ensuring adequate transmission is built to meet all extant state requirements. *Contra* State Pet'rs Br. 22–30.

**III.** Order 1920 requires planners to consider seven benefits when evaluating transmission projects for selection. The required benefits capture transmission projects' reliability and economic effects—which may accrue to some or all states no matter where the need for additional transmission arises—and are not based on (or even related to) any state's policies. *Contra* State Pet'rs' Br. 25. FERC has provided substantial evidence that the required benefits help identify more efficient and cost-effective grid solutions, supporting just and reasonable rates. And Order 1920 gives transmission planners leeway to measure these benefits in a way consistent with state-jurisdictional decisions over generation resources.

## ARGUMENT

### I.    Securing Just And Reasonable Rates Requires Transmission Planning That Accurately Models Projected Electricity Supply And Demand.

The U.S. electric grid is subdivided into more than ten distinct planning regions, most of which are multistate. *See* FERC, *Order No. 1000 Transmission Planning Regions*, https://perma.cc/6AYF-ZKMT

(last visited Nov. 25, 2025). Transmission planners, including regional transmission organizations (RTOs), coordinate transmission grid expansion within their respective regions. Although transmission planning procedures differ by region, grid planners rely on many common approaches. Key among those is the use of transmission-planning models.

Grid planners use models to simulate grid conditions and identify where, how much, and what type of transmission investments are needed over time. Accurately accounting for electricity supply and demand drivers is critical to identifying those transmission needs. Models also allow planners to measure the benefits and costs of proposed transmission facilities, and thus identify the most cost-effective investments. Failing to account for all drivers, costs, and benefits leaves rate regulators to guess which projects would yield reliable and economic grid service and results in inefficient and unneeded investments for which electricity customers must bear the costs. Accurate and comprehensive planning is therefore necessary to prevent unjust and unreasonable rates.

### A.    Planners must fully account for all factors driving transmission needs, including state policies.

Transmission can serve a variety of needs. For example, it can improve reliability by connecting diverse resources to the grid and increasing the number of routes between generation and energy consumers. U.S. Dep't of Energy, *National Transmission Needs Study* 52–55 (2023), https://perma.cc/WD4H-KQ33 [hereinafter *Transmission Needs Study*]. It can improve resilience to extreme events by ensuring access to power during transmission or generation outages. *Id.* at 55–59. Transmission may alleviate physical bottlenecks (congestion) that prevent low-cost electricity from reaching demand centers. *Id.* at 10. And it can facilitate demand growth—including that driven by data centers, manufacturing, or electrification of buildings and vehicles—by connecting energy consumers to additional sources of power. *Id.* at 87–89. To identify projects that provide benefits across multiple dimensions, a grid planner must consider these influences holistically.

A computer model is a tool for doing so: Grid planners use models to simulate future grid conditions, identify needs, and optimize grid development. In simple terms, a transmission-planning model transforms inputs into outputs. *See Transmission Planning for the*

8

*Energy Transition*, *supra*, at 11, 23–28. The planner inputs collected data about future grid conditions, and the model optimizes the grid along a specified dimension—typically, to minimize the investment and operating costs of the future power system. The modeling outputs can include the location, size, and operating patterns of new transmission facilities needed to address future reliability gaps, reduce electricity costs resulting from grid congestion, and connect new generation or demand centers.

To ensure that the model's outputs accurately identify likely transmission needs, the model's inputs must accurately project future grid conditions. Planners must therefore identify and represent all factors that will plausibly contribute to the supply of and demand for electricity over the planning timeframe.

For example, grid planners must consider the layout and capacity of existing transmission facilities and generation, and how much electricity consumers currently use. They must anticipate a plausible range of future energy resources, factoring in the price to build and operate generators. And they must forecast changes in demand (i.e., energy consumption). Planners must also consider various constraints on

9

transmission, such as geographic limits on where facilities can be built, reliability standards set by regulatory bodies, and physical and engineering limits on how much electricity can flow along a given transmission line. *See* U.S. Dep't of Energy, *National Transmission Planning Study Chapter 2: Long-Term U.S. Transmission Planning Scenarios* 3–16 (2024), https://perma.cc/93KM-YZN6. These factors often interact in complex ways, and must be considered together. *See* Maya Domeshek, Christoph Graf & Burçin Ünel, Inst. for Pol'y Integrity, *Drivers of Transmission: Examining Demand Growth and State Clean Energy Policies* 3–4 (2026), https://perma.cc/K6XM-E6GB [hereinafter *Drivers of Transmission*] (examining how state policies interact with gas prices to produce different transmission needs).

State and federal policies are important modeling inputs. *See Guide to State Participation*, *supra*, at 21–25. Policies may take the form of electricity-generation mandates, such as renewable portfolio standards and resource targets (which require certain amounts and types of generation to be built within a region). *Id.* at 23. Performance objectives are another relevant type of policy: For example, an emissions limit may increase the cost of operating a polluting facility and thus contribute to

its retirement. *Id.* at 22. So are incentive programs: They decrease the cost of activities and spur investments, like in data centers and manufacturing facilities that increase electricity use. *Id.* at 24. To accurately model the future, planners must account for how these various policies will interact to affect electricity supply and demand.

Failing to account for factors that significantly affect future grid conditions causes planners to overlook future transmission needs, or alternatively, identify needs where none exist. In turn, inaccurately forecasting reliability risks and congestion leads to transmission plans that are mismatched in scale, location, or technology with future grid conditions.

**B. Planners must analyze a range of plausible future grid conditions to make decisions under uncertainty.**

Factors that drive electricity supply and demand—like technological development, interest rates, fuel and construction costs, and weather patterns—are often difficult to predict. *Transmission Planning for the Energy Transition, supra*, at 27–28. This difficulty increases when planning over the course of decades. Transmission planners must therefore account for significant uncertainty about the future when modeling.

11

To address uncertainty and ultimately select transmission projects that ensure reliability and affordability across a range of plausible futures, grid planners create scenarios. A scenario is a set of input data and parameters describing one plausible future grid system. In each scenario, the planner might select a different value for each model input. For example, one scenario might assume high fossil-fuel prices and low solar and wind investment costs, while a second scenario might assume the opposite. By observing transmission needs arising across multiple scenarios, planners can identify solutions that are likely to provide benefits regardless of which future materializes. *Guide to State Participation, supra*, at 5–6.

Sensitivity analyses are another method for planning under uncertainty. Sensitivity analyses allow grid planners to understand how changes in a particular input affect modeling results. *Id.* at 6. For example, to understand how sensitive outcomes are to changes in fuel prices, the planner might vary the fuel price across each scenario (including extremely high and extremely low values), holding all other inputs constant. If the model's output changes significantly in response

12

to those variations, then the planner can identify solutions providing benefits regardless of fuel price.

Scenario development and sensitivity analysis are essential modeling tools for designing a grid that operates effectively under a wide range of plausible conditions. By accounting for uncertainty, planners avoid the risk of planning for a single, unlikely future—an approach that can result in underutilized assets or unmet need and thus increase costs.

### C. Identifying more efficient or cost-effective transmission solutions requires measuring the full benefits of proposed projects, accounting for costs.

Planners measure benefits to identify transmission solutions that offer the greatest benefits relative to costs. New transmission facilities can offer a wide range of benefits. For example, new transmission can connect relatively low-cost generation to more consumers, displacing higher-cost generators and driving down energy prices. By providing additional routes for electricity to travel, new transmission can also prevent electricity demand from exceeding supply during times of grid stress. That redundancy makes the grid more resilient to transmission and generation outages, including those resulting from extreme weather events. Well-planned regional transmission can also obviate less cost-

13

effective local transmission facilities or costly new generation. *See, e.g.*, Joe DeLosa III & Johannes Pfeifenberger, Brattle Group, *Pathways to Coordination: Proactive, State-Led Transmission Development to Reduce Costs and Achieve Goals in PJM* 8–11 (2024), https://perma.cc/KG73-N5K7.

Transmission planners measure the benefits of a potential project (or portfolio of projects) by modeling the grid system with and without the project included, and comparing the results. For example, to assess how a transmission facility would affect the future cost of running the grid, planners can compare how the facility's addition affects the frequency with which generators (with different operating costs) run. Because the benefits of a transmission project can vary depending on grid conditions and are often greatest during infrequent but high-impact events, like extreme cold, planners perform this analysis across different scenarios. *See* Dev Millstein et al., Lawrence Berkeley Nat'l Lab'y, *Empirical Estimates of Transmission Value Using Locational Marginal Prices* 33 (2022), https://perma.cc/U977-FJU6.

Once planners have measured a potential project's benefits, they can use various criteria to select projects for inclusion in a long-term plan.

14

For example, planners might select projects that maximize the average benefits (accounting for costs) across all scenarios, even if in some scenarios the project has costs greater than benefits. Or they might select only those projects whose benefits exceed their costs by a certain threshold across all scenarios. A planner might alternatively choose to weight the expected benefits in each scenario according to the likelihood that the scenario will materialize. The goal in each case is to identify projects that will be net beneficial across a range of plausible futures. *See Guide to State Participation*, *supra*, at 6.

Planners also measure the distribution of benefits across different regions. Transmission facilities do not always benefit all regions equally. For example, when new transmission connects low-cost generation to more demand centers, regions that previously had exclusive access to that resource may experience higher energy costs, while areas that previously lacked access may see lower costs. William W. Hogan, *A Primer on Transmission Benefits and Cost Allocation*, 7 Econ. Energy & Env't Pol'y 25, 29–31 (2018). And because electricity flows across an interconnected system, regions far from where a transmission facility is built may experience significant benefits resulting from the improved

15

interconnectivity of the grid. *See Transmission Needs Study*, *supra*, at 110–11. Measuring all potential benefits allows a planner to accurately identify and plan for facilities that will provide the greatest benefits relative to their costs.

## II.    Order 1920's Required Transmission-Planning Model Inputs Are Needed To Ensure Just And Reasonable Rates.

Building on the transmission-modeling principles explained in Section I, this Section examines Order 1920's specific planning requirements for identifying model inputs and developing scenarios. Order 1920 requires planners to undertake long-term planning cycles every five years, applying the principles described in Section I, to identify "more efficient or cost-effective regional transmission solutions." Order 1920 at P 1. At the start of each planning cycle, planners must develop at least three long-term scenarios to identify transmission needs, and must test at least one extreme weather sensitivity. *Id.* at PP 559, 593.

These scenarios must represent a plausible and diverse range of conditions over the following 20 years, incorporating seven categories of factors that principally drive transmission needs. *Id.* at PP 344, 409. This Section demonstrates how those required factors (1) are necessary to effectuate the Federal Power Act's mandate to ensure just and reasonable

16

rates and are not unduly discriminatory; and (2) do not interfere with state authority over generation.

### A.    Order 1920 requires transmission planners to account for the effects of all state policies influencing electricity supply and demand.

Order 1920 requires planners to account for all policies driving electricity supply and demand, from those concerning decarbonization and clean energy to those incentivizing energy-intensive industry. *Contra* State Pet'rs' Br. 25–26. As described in Section I, to accurately project future transmission needs, transmission-planning models must include all inputs that will affect those needs.

To that end, Order 1920 requires a transmission planner to incorporate in its model seven categories of inputs (Factor Categories) that contribute to the need for new transmission: (1) laws and regulations affecting resource mix and demand; (2) laws and regulations concerning decarbonization and electrification; (3) utility resource plans and distributor supply obligations; (4) trends in the cost and availability of different fuels and technologies; (5) anticipated generator retirements; (6) anticipated generator additions; and (7) other policy goals. Order 1920 at P 409.

17

As this list makes clear, planners must account for "legally binding obligations, incentives (e.g., tax credits), and/or restrictions promulgated by policymakers that will affect new or existing generators[] or demand" (Factor Category One), not just laws and regulations concerning decarbonization and electrification (Factor Category Two). *Id.* at P 433; *see also id.* at P 440 (noting that Factor Category Two contains policies "that affect Long-Term Transmission Needs in different ways than Factor Category One"). Further, Order 1920 requires planners to "assume legally binding obligations are met, unless and until there is a change in law." *Id.* at P 512. That is, planners must assume that any incentives offered will be honored, and any regulations will be enforced— no matter what resources they are designed to promote.

A wide range of policies affect resource mix and demand, beyond those directly targeting carbon dioxide emissions. Regulations that limit other hazardous pollutants like mercury emissions, for example, similarly increase generators' production costs or reduce how often they operate, contributing to retirement. *See, e.g.*, Scott Jell, *Coal Plants Installed Mercury Controls to Meet Compliance Deadlines*, U.S. Energy Info. Admin. (Sep. 18, 2017), https://perma.cc/8ED2-YN7E. Tax

incentives encourage the growth of energy-intensive industries like data centers or manufacturing, which increase electricity demand. *See, e.g.*, Arman Shehabi et al., Lawrence Berkeley Nat'l Lab'y, *2024 United States Data Center Energy Usage Report* 5–7 (2024), https://perma.cc/H23B-3NTA. And policies promoting natural gas infrastructure expansion and exports influence the cost of natural gas, and in turn, gas-fired generation. *See, e.g.*, U.S. Dep't of Energy, *Energy, Economic, and Environmental Assessment of U.S. LNG Exports* S-4 (2024), https://perma.cc/6BWN-RX3T. The transmission planner must account for interactions between these myriad policies and identify transmission solutions that most efficiently address the resulting needs.

Far from limiting the universe of state policies that planners may account for, Order 1920 instead assigns states a "vital role" in identifying relevant state laws and regulations. Order 1920-A at P 298. Order 1920 "does not obligate transmission providers to independently identify" state laws and regulations, as it "would be unduly burdensome and potentially impractical for transmission providers" to do so. Order 1920 at P 508. Instead, transmission planners can rely on states to highlight relevant policies, which planners then must "account for" if they "are likely to

19

affect Long-Term Transmission Needs." *Id.* at P 415; *see also* Order 1920-A at P 349. And once states have identified policies, "transmission providers should rely on the state in determining *how* to account for such a state-related factor" in long-term scenarios, including "the method and data used" and "how to adjust the treatment of the specific state policy across" scenarios. *Id.* at PP 344–45.

Order 1920 therefore places states in the driver's seat, giving them the responsibility and the opportunity to guide how transmission modelers represent their policies. By accounting for all existing policies that affect future electricity supply and demand, Order 1920 requires transmission planners to act as policy takers, not policymakers.

**B.    Transmission-planning modeling demonstrates that state policies driving demand growth more consistently increase transmission needs than clean energy policies.**

As just established, because policies of all types drive electricity supply and demand and contribute to the need for new transmission, planners must account for them to guide cost-effective investments. Policy Integrity's analysis shows how planners can use transmission-planning modeling consistent with Order 1920 to account for two such policies: those concerning clean energy supply and those driving economic

20

development and, consequently, demand growth. This modeling demonstrates that demand growth policies are a more consistent driver of transmission need than clean energy policies.

Starting with policies affecting clean energy supply, Policy Integrity's modeling analyzed how two such common policies—renewable portfolio standards and capacity targets—contribute to transmission buildout. *Drivers of Transmission, supra,* at 1. Renewable portfolio standards generally require that a particular proportion of energy within a state or region be procured from low- or zero-carbon sources by a certain date. Capacity targets, meanwhile, specify the amount of a particular resource—such as batteries, offshore wind, or solar—that must be built. Policy Integrity modeled seven mandatory renewable portfolio standards and five storage and offshore wind capacity targets adopted by states within PJM, the country's largest RTO. *Id.* at 1–2 & nn.5–6. A planner may represent either policy by forcing the model to assume that the future generation mix will supply enough of the required energy type for states to meet their targets.

Using transmission-planning model inputs similar to PJM's, Policy Integrity compared transmission need—expressed as the least cost

21

cumulative grid buildout through 2045—under a scenario reflecting current state renewable portfolio standards and capacity targets to a scenario without those policies. *Id.* at 1–2. Policy Integrity also tested the effects of other factors—including reliability standards, demand growth, and gas prices—on transmission build. *Id.*

This exercise revealed that whether including existing clean energy policies in the model increases or decreases transmission need (relative to a scenario without those policies) depends heavily on the price of gas, which tends to fluctuate over time. *Id.* at 3–4; *see also U.S. Natural Gas Electric Power Price*, U.S. Energy Info. Admin. (Dec. 31, 2025), https://perma.cc/42ZQ-A5Z7. As Figure 1 shows, under a low gas price sensitivity, the cumulative transmission need is higher for a scenario with clean energy policies than without. *Drivers of Transmission*, *supra*, at 3–4. This result occurs because, with low gas prices, it is cheaper to build and operate gas plants absent the clean energy requirements. *Id.* at 3. The addition of clean energy policies therefore mandates the addition of some resources that otherwise would not have been built, requiring additional transmission to connect those resources to the grid.

Under a high gas price sensitivity, however, building and operating gas plants does not make as much economic sense. Therefore, market forces would result in the addition of cheaper renewable generation even without policies mandating that result. *Id.* The effect of those policies is that renewable generation is built closer to where electricity is consumed, allowing states to meet their in-state targets and requiring less transmission to transport it. In that case, transmission need is lower when clean energy policies are included.

**Figure 1: Transmission Need Without And With State Clean Energy Policies**



The degree to which clean energy policies contribute to transmission need also depends on whether the policies include locational constraints. Generally speaking, transmission need is lower

23

when a state encourages clean generation to be located near demand centers, *see id.* at 4, such as when a state sets a resource-specific target, *see, e.g.*, Md. Code Ann., Pub. Util. § 7-704.1(a)(1)(i), or requires generation to be located in-state to satisfy a renewable portfolio standard, *see, e.g.*, Va. Code Ann. § 56-585.5(C)(3). Conversely, policies that prohibit the construction of new generation facilities or require their closure within a state would likely increase the need for transmission to import energy from out-of-state. *Drivers of Transmission, supra*, at 4. Therefore, modeling reveals that clean energy policies can either increase or decrease the need for new transmission, depending on how states design their policies and depending on external conditions unrelated to policy design.

Policy Integrity's modeling also found that state policies that encourage demand growth *more consistently* affect transmission need than state policies increasing the supply of clean energy. *Id.* at 5–6. A planner depicts demand growth in the model by varying the system's total energy requirement, both on a temporal and geographic basis. A policy may affect when demand is highest and where in the system it

24

appears. The model will then identify where new transmission is needed to ensure that energy supply can meet anticipated demand.

Electricity demand projections have skyrocketed in recent years due to government policies and market developments. As part of its 2025 regional transmission planning process, PJM projected that peak electricity demand will reach 218 gigawatts (GW) in 2030, a dramatic increase over PJM's 2022 estimate of 165 GW. *Id.* at 5. In the short term, demand growth will be driven in large part by the addition of new data centers and manufacturing facilities. *Id.* at 2 n.7. States play a significant role in promoting these uses by offering tax incentives and relief from land use restrictions to data centers or manufacturing facilities that locate in-state. *See, e.g.*, Va. Code Ann. § 58.1-609.3(18) (sales tax exemption for data center equipment); Ohio Admin. Code 5703-9-21 (sales tax exemption for manufacturing inputs).

This increased demand greatly increases the need for new transmission. As Figure 2 depicts, Policy Integrity's model identified a much higher need for transmission when using PJM's 2025 demand projections than when using its lower 2022 demand projections. *Drivers of Transmission, supra*, at 5–6. This result occurred even when varying

25

other modeling inputs. Across all scenarios, state policy-driven demand growth contributes significantly to the need for new transmission. In other words, state policy-driven demand growth consistently drives the need for new transmission, while state clean energy supply policies may or may not depending on other inputs.

**Figure 2: Transmission Need With Low And High Energy Demand**



As this modeling helps illustrate, Order 1920's requirement to account for state policies is agnostic about policy content. It does not favor transmission built for clean energy resources over that built to connect demand centers, manufacturing facilities, or other generation types. Instead, it requires transmission planners to account for the effects of all drivers of electricity supply and demand, and to analyze the complex

26

interactions between them. Ultimately, planners identify the necessary transmission to support states' implementation of their policies in aggregate, regardless of those policies' objectives.

### C.    Order 1920's required factors are not unduly discriminatory and are necessary to ensure just and reasonable rates.

When FERC finds that an existing practice affecting rates is unjust and unreasonable, it must adopt a replacement rate it finds to be just and reasonable and not unduly discriminatory. FERC's findings must be supported by "substantial evidence." *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d 41, 65 (D.C. Cir. 2014) (per curiam) (quoting 5 U.S.C. § 706(2)(E)). A replacement rate may be discriminatory if it subjects "similarly situated" entities to "different rates for no discernable reason." *Consol. Edison Co. of N.Y., Inc. v. FERC*, 45 F.4th 265, 271 (D.C. Cir. 2022) (per curiam) (citation omitted).

Because Order 1920 requires planners to account for all policies affecting the need for transmission when developing long-term scenarios, Order 1920's requirements are nondiscriminatory. As discussed in Section II.A, Order 1920 requires planners to identify transmission needs driven by all state policies affecting electricity supply and demand, not

27

just those concerning clean energy. This requirement includes policies driving demand growth, which Policy Integrity's modeling shows can contribute significantly to new transmission need. It also includes a wide range of other policies unrelated to carbon dioxide emissions or renewables. Furthermore, all states can identify relevant policies and explain how the planner should account for the policy in its model. Order 1920's requirements therefore treat similarly situated states equally and are not discriminatory.

Omitting factors that drive the supply and demand of electricity when developing long-term scenarios would result in planners failing to identify the appropriate transmission needed to ensure reliability and reduce costs. For example, the modeling demonstration discussed above reveals that, if a planner were to exclude policies driving demand growth from the modeling inputs, the modeling outputs would wrongly identify significantly lower transmission needs than the demand forecast requires. *See supra* Figure 2; s*ee also* Order 1920 at P 436 (needs "driven by disparate policy decisions [will] continue to exist, regardless of whether they [are] identified" by planners). Those ignored policies would nevertheless stress the grid's ability to meet demand, requiring

28

transmission providers to build new facilities on an *ad hoc* basis, incurring greater costs than if they had been anticipated from the start.

Failing to account for all factors driving transmission needs causes planners to select less efficient and cost-effective transmission solutions, relying on piecemeal and uncoordinated transmission investments. Order 1920 at P 121. These costs ultimately result in higher ratepayer bills. Thus, "properly account[ing] for known determinants" of transmission needs "is necessary to ensure just and reasonable rates." *Id.* at P 436. Substantial evidence supports Order 1920's requirement that planners consider all factors driving electricity demand and supply in its scenarios.

**D.    Order 1920's requirements fall within FERC's authority over just and reasonable rates and do not regulate generation.**

In issuing Order 1920, FERC has properly invoked its mandate to ensure just and reasonable rates. 16 U.S.C. § 824e(a); *see also* Order 1920 at PP 85–89. This mandate provides authority extending to regulating practices affecting such rates, including transmission planning. *S.C. Pub. Serv. Auth.*, 762 F.3d at 55–59 (analyzing FERC's authority under 16 U.S.C. § 824e(a)).

As set out above, credible transmission planning requires modeling all factors driving transmission needs, including state policies driving increases or decreases in electricity demand and state policies shaping the supply of electricity generation. Order 1920's required factors allow planners to accurately assess future grid conditions and to identify transmission facilities that will most efficiently meet future needs, to ensure just and reasonable rates for interstate transmission. Order 1920 thus regulates practices that "directly affect" matters within FERC's jurisdiction. *FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 276 (2016); *see also NextEra Energy Res., LLC v. FERC*, 118 F.4th 361, 369 (D.C. Cir. 2024) (FERC's jurisdiction extends to actions directly affecting interstate transmission).

State Petitioners' contention that Order 1920 interferes with state authority over generation confuses the requirement for planners to *consider* the effects of policies for a directive to *make* policy. State Pet'rs' Br. 22–30. States retain authority over "facilities used for the generation of electric energy." 16 U.S.C. § 824(b)(1). *But see Transmission Access Pol'y Study Grp. v. FERC*, 225 F.3d 667, 718 (D.C. Cir. 2000) (per curiam), *aff'd sub nom. New York v. FERC*, 535 U.S. 1 (2002) ("FERC

may exercise jurisdiction over generation facilities to the extent necessary to regulate interstate transmission."). As detailed in Section II.A, Order 1920 supports states' authority by requiring transmission planning accommodating new generation for the grid. Accounting for the effects of existing state policies concerning generation (and planning to accommodate them) is not equivalent to directing those choices. *See NextEra*, 118 F.4th at 369 (affirming the Federal Power Act's "core statutory purpose of ensuring that different generators may safely and reliably connect to the interstate transmission system").

True, Order 1920's requirements for considering decarbonization policies means that transmission built under Order 1920's planning processes may allow more renewable resources to connect to the grid. But when resulting from FERC's proper exercise of its jurisdiction, incidental effects on matters within state control are "of no legal consequence." *Elec. Power Supply Ass'n*, 577 U.S. at 281; *see also Conn. Dep't of Pub. Util. Control v. FERC*, 569 F.3d 477, 482 (D.C. Cir. 2009) (holding that FERC acted within its authority when setting a target that incentivized the addition of new generation). And it is equally true that Order 1920 can

31

facilitate the interconnection of new *fossil-fuel* generation, by requiring planners to account for market forces or policies that promote them.

Order 1920 does not remotely mandate either result. It simply requires planners to take into account existing policies of all stripes. *See* Order 1920-A at P 144. Order 1920 therefore is a clear exercise of FERC's authority over just and reasonable rates, and does not intrude upon states' authority over generation.

### III.    Order 1920's Required Benefits Are Just And Reasonable And Not Unduly Discriminatory.

As discussed above, analyzing all known transmission need drivers holistically through scenario-based modeling is critical for forecasting what transmission investments will be needed to secure a reliable grid. Once planners have identified these needs, Order 1920 requires them to evaluate potential solutions using a specified set of seven benefits, across all modeled scenarios. Planners may then select projects for inclusion in a long-term plan, "seek[ing] to maximize benefits accounting for costs over time." Order 1920 at P 964.

Because all types of transmission projects may produce grid benefits, the Order's prescribed considerations are necessary to identify the most efficient or cost-effective transmission solutions and are not

unduly discriminatory. Furthermore, they do not interfere with state authority over generation.

### A. Fully accounting for all benefits of transmission projects is necessary to ensure just and reasonable rates.

Order 1920 identifies seven benefits that planners must measure when evaluating proposed facilities to determine if they "more efficiently or cost-effectively" address identified transmission needs. Order 1920 at P 721. The seven required benefits cover a wide range of reliability and economic effects of transmission investments. *See* FERC Br. 52–53. To measure each of the required benefits, the planner will compare a version of their model that includes the proposed facility (or facility portfolio) to one that does not, and identify any difference in operating, investment, and other costs. Order 1920 leaves significant discretion to transmission planners to determine how to measure the required benefits and whether to select any facility they evaluate for inclusion in the long-term plan. Order 1920 at PP 727, 966.

None of the required benefits preferences transmission serving renewable generation nor measures effects that are specific to—or even directly related to—state policies, contrary to State Petitioners'

33

assertions. State Pet'rs' Br. 45. Instead, they reflect economic and reliability benefits that any transmission lines might offer, regardless of whether they connect fossil-fuel resources or renewables to the grid.

Furthermore, states enjoy significant benefits when transmission connects them to out-of-state resources. For example, transmission built to connect wind generation in State A can provide reliability benefits to State B by providing access to additional generation capacity, particularly when facilities in State B experience outages. *See Transmission Needs Study*, *supra*, at 80. That transmission line might also reduce energy costs in State B by increasing access to lower-cost generation. *Id.* at 64–72. Similarly, State A may enjoy reliability or cost benefits from transmission that allows it to access gas generation located in State B. Order 1920's required benefits do not discriminate in favor or against any type of generation.

Accounting for a sufficiently broad range of benefits is necessary to ensure that planners select facilities that most cost-effectively address transmission needs. Order 1920 at P 721. When planners fail to measure all of the benefits of a proposed transmission project, they may forgo solutions whose benefits significantly outweigh their costs. *Id.* at P 123.

Ultimately, selecting less efficient and cost-effective projects causes ratepayers to pay unjust and unreasonable rates. Substantial evidence thus supports Order 1920's requirement that planners consider these seven benefits when assessing and selecting transmission facilities.

**B.    Order 1920's required benefits do not interfere with state authority over generation.**

Because the required benefits do not privilege any type of generation over another, they do not interfere with state jurisdictional matters. Simply measuring benefits produced by a particular project in no way interferes with state decisionmaking.

For example, measuring the degree to which a transmission project reduces the planning reserve margin—that is, extra electric capacity beyond expected demand needed to ensure reliability—under benefit two requires comparing the extra resources that a state might build in the absence of transmission that can connect far-away generation to consumers. *Id.* at P 755. That estimation in no way *controls* state resource planning decisions, which are "a separate process subject to state jurisdiction" and are already accounted for in scenario development. Order 1920-A at P 404; *see also* Order 1920 at P 447 (requiring planners to account for state-approved integrated resource plans). Similarly,

35

measuring the savings in operating costs and energy prices realized when transmission facilities allow generators with lower operating costs to displace those with higher costs under benefit three does not *require* states to build more low-cost generators. Order 1920 at PP 767, 772.

For all of the required benefits, Order 1920 simply directs the planner to compare the costs of operating the grid in a world with the proposed solution to one without. Thus, Order 1920's required benefits do not interfere with state jurisdictional matters.

## CONCLUSION

For the foregoing reasons, the Court should conclude that Order 1920's requirements are just and reasonable, not unduly discriminatory, and a proper exercise of FERC's authority under the Federal Power Act.

36

February 4, 2026                    Respectfully submitted,

/s/ Kelly C. McGee
Kelly C. McGee
Jennifer Danis
INSTITUTE FOR POLICY INTEGRITY
139 MacDougal Street, 3rd Floor
New York, NY 10012
(212) 998-6754
kelly.mcgee@nyu.edu

*Counsel for* Amicus Curiae
*Institute for Policy Integrity*

37

## CERTIFICATE OF COMPLIANCE

Counsel hereby certifies that, in accordance with Federal Rule of Appellate Procedure 29(a) and 32(a), the foregoing brief contains 6,429 words, as counted by counsel's word processing system. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

DATED:    February 4, 2026                Respectfully submitted,

                                          */s/ Kelly C. McGee*
                                          Kelly C. McGee

                                          *Counsel for* Amicus Curiae
                                          *Institute for Policy Integrity*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 4th day of February 2026, a true and correct copy of the foregoing Brief of the Institute for Policy Integrity at New York University School of Law as *Amicus Curiae* in Support of Respondent was filed with the Clerk of the United States Court of Appeals for the Fourth Circuit via the Court's CM/ECF system. Counsel for all parties are registered CM/ECF users and will be served by the appellate CM/ECF system.

DATED:    February 4, 2026          Respectfully submitted,

                                    */s/ Kelly C. McGee*
                                    Kelly C. McGee

                                    *Counsel for* Amicus Curiae
                                    *Institute for Policy Integrity*