IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

NOS. 24-1650, 24-1748, 24-1756, 24-1758, 24-1760, 24-1765, 24-1770, 24-1785, 24-1792, 24-1804, 24-1857, 24-1862, 24-1867, 24-1876, 24-1885, 24-1887, 24-1979, 24-1991, 24-2162, 24-2163, 25-1073, 25-1080, 25-1197, 25-1349
(CONSOLIDATED)

APPALACHIAN VOICES, ET AL.,
Petitioners,

v.

FEDERAL ENERGY REGULATORY COMMISSION,
Respondent

On Petitions for Review of Orders of the
Federal Energy Regulatory Commission

**BRIEF OF *AMICUS CURIAE*
PROFESSOR JOSHUA C. MACEY
IN SUPPORT OF RESPONDENT**

Stephanie L. Safdi
Jerome N. Frank Legal Services
Organization
Yale Law School
127 Wall Street
New Haven, CT 06511
Tel: (203) 432-4800
stephanie.safdi@ylsclinics.org
*Counsel for Amicus Curiae*

i

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ................................................................................iv

INTEREST OF AMICUS CURIAE ....................................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ...................................3

ARGUMENT ......................................................................................................5

I. Precedent and the FPA Itself Require Order No. 1920's Use of Beneficiary Pays Cost Allocation ...........................................................5

    A. Beneficiary Pays Cost Allocation Arose from a Need to Reframe Cost Causation Principles in Light of Market Changes .....................5

    B. Order No. 1000's Approach to Cost Allocation Was Based on the FPA's Requirement of "Just and Reasonable" Rates .........................8

    C. A Finding that Beneficiary Pays Cost Allocation is Contrary to the FPA Would Significantly Disrupt the Natural Gas Industry .............10

II. Beneficiary Pays Is the Only Way to Prevent Cross-Subsidization When States Have Different Energy Policies ...........................................12

    A. Order No. 1920's Beneficiary Pays Cost Allocation Approach Does Not Result in Cross-Subsidization Between States with Different Energy Policies ....................................................................13

    B. The Absence of Beneficiary Pays Cost Allocation Results in States Free Riding off Their Neighbors' Transmission Investments ..........17

    C. The Absence of Beneficiary Pays Cost Allocation May Paradoxically Cause Cross-Subsidization from States Without Clean Energy Policies to States with Such Policies .........................19

III. Utilities' Section 205 Filing Rights Do Not Constrain FERC's Remedial Authority Under Section 206 ................................................22

    A. The FPA Allocates Distinct Rate-Changing Authority Between Utilities and FERC Under Sections 205 and 206 .............................23

B.  Petitioners Improperly Seek to Extend Their Section 205 Filing Rights to Constrain FERC's Section 206 Authority ............................ 27

CONCLUSION ....................................................................................... 29

## TABLE OF AUTHORITIES

**Cases**

*Ala. Elec. Co-op., Inc. v. FERC,*
684 F.2d 20 (D.C. Cir. 1982) ...................................................................................6

*Antero Res. Corp. & MU Mktg. LLC v. FERC,*
156 F.4th 654 (D.C. Cir. 2025) .............................................................................11

*Atl. City Elec. Co. v. FERC,*
295 F.3d 1 (D.C. Cir. 2002) ..................................................................................25

*Battle Creek Gas Co. v. FPC,*
281 F.2d 42 (D.C. Cir. 1960) ............................................................................7, 10

*BNP Paribas Energy Trading GP v. FERC,*
743 F.3d 264 (D.C. Cir. 2014) ..............................................................................10

*City of Winnfield v. FERC,*
744 F.2d 871 (D.C. Cir. 1984) ..............................................................................24

*El Paso Elec. Co. v. FERC,*
832 F.3d 495 (5th Cir. 2016 ....................................................................................9

*Entergy Ark., LLC v. FERC,*
40 F.4th 689 (D.C. Cir. 2022) ...........................................................................9, 28

*FCC v. Prometheus Radio Project,*
592 U.S. 414 (2021) ..............................................................................................26

*FERC v. Elec. Power Supply Ass'n,*
577 U.S. 260 (2016) ..............................................................................................10

*FirstEnergy Serv. Co. v. FERC,* 758 F.3d 346 (D.C. Cir. 2014)..............................9

iv

*Ill. Commerce Comm'n v. FERC,*
576 F.3d 470 (7th Cir. 2009)....................................................................7, 9

*K N Energy, Inc. v. FERC*
968 F.2d 1295 (D.C. Cir. 1992) ............................................................ 7, 8

*Mich. Gas & Elec. Co. v. Fed. Power Comm'n*
290 F.2d 374 (D.C. Cir. 1961) ....................................................................7

*Minisink Residents for Env't Pres. & Safety v. FERC,*
762 F.3d 97 (D.C. Cir. 2014)...................................................................... 12

*Nat'l Ass'n of Regul. Util. Comm'rs v. FERC,*
475 F.3d 1277 (D.C. Cir. 2007) ...................................................................8

*NRG Power Mktg., LLC v. FERC,*
862 F.3d 108 (D.C. Cir. 2017) ...................................................................24

*Old Dominion Elec. Coop. v. FERC,*
898 F.3d 1254 (D.C. Cir. 2018) ............................................................. 7, 9

*S. C. Pub. Serv. Auth. v. FERC,*
762 F.3d 41 (D.C. Cir. 2014) ...............................................................8, 17

*Transcon. Gas Pipe Line Corp. v. FERC,*
518 F.3d 916 (D.C. Cir. 2008) ................................................................... 11

*W. Mass. Elec. Co. v. FERC*, 165 F.3d 922 (D.C. Cir. 1999) ..................................9

**Statutes**

15 U.S.C. § 717e .......................................................................................... 10

16 U.S.C. § 824d ........................................................................................23

16 U.S.C. § 824e ....................................................................3, 24, 25, 26

**FERC Orders**

Building for the Future Through Electric Regional Transmission
Planning and Cost Allocation, Order No. 1920,
187 FERC ¶ 61,068 (2024) ...........................................................*passim*

Building for the Future Through Electric Regional Transmission
Planning and Cost Allocation, Order No. 1920-A,
189 FERC ¶ 61,126 (2024) ........................................................................28

Building for the Future Through Electric Regional Transmission
Planning and Cost Allocation, Order No. 1920-B,
191 FERC ¶ 61,026 (2025) ........................................................................28

Certification of New Interstate Natural Gas Pipeline Facilities,
88 FERC ¶ 61,227 (Sept. 15, 1999) ....................................................11, 12

*Martha Coakley v. Bangor Hydro-Elec. Co.*,
165 FERC ¶ 61,030 (2018) .......................................................................26

Transmission Planning and Cost Allocation by Transmission Owning
 and Operating Public Utilities, Order No. 1000,
131 FERC ¶ 61,253 (2011) ...........................................3, 6, 8, 9, 17

**Other Authorities**

18 C.F.R. § 284.8 ......................................................................................11

Joshua Macey & Jacob Mays, The Law and Economics of
Transmission Planning and Cost Allocation,  45 Energy L.J. 209 (2024).........1, 14

Joshua C. Macey, Outsourcing Electricity Market Design,
91 U. Chi. L. Rev. 1243 (2024)...........................................................................1, 24

Matthew R. Christiansen & Joshua C. Macey, Long Live the Federal
Power Act's Bright Line, 134 Harv. L. Rev. 1360 (2021).......................................1

Transmission Planning Process Staff White Paper,
submitted Aug. 2, 2007 in FERC Docket No. RM05-25-000 ............................27

## INTEREST OF *AMICUS CURIAE*

*Amicus curiae* Joshua C. Macey, Professor of Law at Yale Law School, submits this brief to assist the Court by offering perspectives not provided by the parties or other amici in these consolidated cases challenging Federal Energy Regulatory Commission (FERC) Order 1920. Professor Macey is a leading scholar of energy law. His research and recent scholarship focus on the Federal Power Act's (FPA) distribution of jurisdiction, the history of utility regulation and filing rights, and the economic foundations of transmission planning and cost allocation. *See, e.g.*, Joshua Macey & Jacob Mays, *The Law and Economics of Transmission Planning and Cost Allocation*, 45 Energy L.J. 209 (2024); Joshua C. Macey, *Outsourcing Electricity Market Design*, 91 U. Chi. L. Rev. 1243 (2024); Matthew R. Christiansen & Joshua C. Macey, *Long Live The Federal Power Act's Bright Line*, 134 Harv. L. Rev. 1360 (2021). This knowledge and expertise enable Professor Macey to offer historical, legal, and economic perspectives relevant to the questions before the Court.

Drawing on this scholarship, this amicus brief addresses the economic principles of transmission cost allocation and provides a historical account of the role utility filing rights have played in the design and operation of federal power regulation. These perspectives differ from those offered by other amici, who primarily present the views of state agencies or region-specific stakeholders.

1

Professor Macey's brief instead offers a historical and economic analysis, grounded in academic research, which will assist the Court in evaluating the issues presented without duplicating arguments made elsewhere in the record.

Pursuant to Federal Rule of Appellate Procedure 29(a)(4), Amicus Professor Macey affirms that no party or counsel for any party authored this brief in whole or in part and that no one other than Professor Macey or his counsel contributed any money that was intended to fund the preparation or submission of this brief.

2

**INTRODUCTION AND SUMMARY OF ARGUMENT**

This case arises from the Federal Energy Regulatory Commission's (FERC) attempt to remedy problems with transmission planning through issuance of Order No. 1920. Amicus Professor Joshua C. Macey submits this brief to assist the Court with historical, legal, and economic analysis of four issues presented in this case.

First, what is the statutory basis of the "beneficiary pays" approach to cost allocation? State Petitioners claim that Order No. 1920's "beneficiary pays" approach relies on *Chevron* deference. State Pet'r Br. at 28-29. As this brief describes, FERC used this approach for decades before Order No. 1000. Both before and after Order No. 1000, courts held that the beneficiary pays approach follows from the FPA's mandate that FERC ensure "just and reasonable" rates. 16 U.S.C. § 824e.

Second, how would an adverse finding here affect other federal energy policies? Because FERC used the beneficiary pays approach to restructure natural gas markets, a judicial prohibition on the beneficiary pays approach would open the door for litigants to challenge FERC's policy for certificating and allocating the costs of natural gas pipelines. FERC's siting and cost allocation practices rest on the same jurisdictional and economic theory that supports beneficiary pays cost allocation for transmission.

Third, how does beneficiary pays cost allocation work when states adopt different energy policies? State Petitioners claim that the beneficiary pays cost allocation forces some states to subsidize other states' public policy choices. State Pet'r Br. at 16. That is incorrect. Beneficiary pays allocates costs to customers in proportion to the benefits they receive from transmission investment. It is the only approach that avoids cross-subsidization. Any alternative allows some customers to enjoy the benefits of congestion relief, improved reliability, or access to lower-cost resources without bearing their share of those costs. Order No. 1920 requires the beneficiary pays approach precisely to prevent such free riding. The case for beneficiary pays becomes even more apparent when states pursue different energy policies, because it ensures that each state pays only for benefits it actually receives. As described below, the beneficiary pays approach does not compel states to pay for other states' clean energy policies.

Fourth, Transmission Owner Petitioners argue that Order No. 1920 unlawfully impedes the exclusive filing rights granted to public utilities under Section 205 of the FPA. Transmission Owners Pet'r Br. at 34-35. This argument conflates Section 205, which permits utilities the right to file proposed tariff changes, with Section 206, which grants FERC independent remedial authority to modify existing rates, terms, and conditions when it finds them unjust, unreasonable, or unduly discriminatory. When FERC acts under Section 206, it is

4

not constrained by utilities' 205 filing rights; instead, the statute expressly authorizes the Commission to prescribe a new just and reasonable rate.

In Order No. 1920, FERC invoked Section 206 authority to remedy deficiencies in transmission planning and cost allocation practices it had found to be unjust and unreasonable. The Order is thus an exercise of the Commission's own ratemaking authority and does not infringe on utilities' filing rights.

## ARGUMENT

### I. Precedent and the FPA Itself Require Order No. 1920's Use of Beneficiary Pays Cost Allocation

Order No. 1920 requires that costs for transmission lines are allocated to beneficiaries. *Building for the Future Through Electric Regional Transmission Planning and Cost Allocation*, Order No. 1920, 187 FERC ¶ 61,068, P 8 ("Order No. 1920"). As this section describes, this approach to cost allocation is consistent with decades of precedent and was the basis of FERC's natural gas restructuring orders. Moreover, as noted here and in Order No. 1920, it has been consistently upheld by courts as the only approach that comports with the FPA. *Id.*

### A. Beneficiary Pays Cost Allocation Arose from a Need to Reframe Cost Causation Principles in Light of Market Changes

For much of the twentieth century, vertically integrated utilities operated self-contained service territories with few interconnections. When those utilities built pipelines or transmission lines within their monopoly service territories, they

were making investments to meet their customers' energy needs. It was therefore appropriate that their customers bore the costs. *See Ala. Elec. Co-op., Inc. v. FERC*, 684 F.2d 20, 27 (D.C. Cir. 1982). This gave rise to the cost causation principle: those responsible for "causing" costs must pay for them.

Increasing utility interconnection in the mid and late 20th century meant that the grid no longer contained individual islands of service. Electricity flowed freely between utility territories on transmission lines that connected to the rest of the grid. As a result, a utility building a line to another's territory would not just benefit the direct recipient, but also other utilities connected to it, those connected to them, and so on. Traditional notions of cost causation broke down as the non-planning utilities could free ride off of their neighbors, effectively avoiding costs that they would have otherwise incurred had the new line not been constructed. *See Transmission Planning and Cost Allocation by Transmission Owning and Operating Public Utilities*, Order No. 1000, 131 FERC ¶ 61,253, P 153 (2010) ("Order No. 1000") (describing how, before Order No. 1000, "any individual beneficiary ha[d] an incentive to defer investment in the hopes that other beneficiaries would value the project enough to fund its development"). To better reflect the realities of the new energy market, FERC (and the Federal Power Commission, its predecessor) reframed the cost causation principle: costs would be assigned not only to the party initiating the project, but to all of the parties

6

receiving its benefits. *See K N Energy, Inc. v. FERC*, 968 F.2d 1295, 1302 (D.C. Cir. 1992).

The solution was a cost allocation methodology fit for integrated systems: "rolled-in" pricing. Rather than simply assigning costs to the planning utility, this methodology acknowledged that the benefits of new transmission facilities were diffuse. Costs were rolled in across the entire system in proportion to the benefits received by each party. Rolled-in pricing was endorsed by courts in the context of both electricity and gas (for pipelines in similarly integrated systems) to ensure that equal rates would be paid by customers receiving broadly similar service. *See, e.g., Mich. Gas & Elec. Co. v. Fed. Power Comm'n*, 290 F.2d 374, 376 (D.C. Cir. 1961); *Battle Creek Gas Co. v. FPC*, 281 F.2d 42, 46 (D.C. Cir. 1960). The goal was ensuring that no class of customers was forced to pay for benefits that they did not receive. This is the beneficiary pays approach to cost allocation, in which costs of new lines and upgrades are allocated in a way that is at least "roughly commensurate" with their benefits. *See Ill. Commerce Comm'n v. FERC*, 576 F.3d 470, 477 (7th Cir. 2009). Crucially, as the following section explains, this approach is based on the text of the FPA, not deference to FERC. *See, e.g., Old Dominion Elec. Coop. v. FERC*, 898 F.3d 1254, 1263 (D.C. Cir. 2018); *Mich. Gas & Elec. Co.*, 290 F.2d at 376.

As courts have made clear, in an integrated system, but-for causation can result in cross-subsidization from customers of the utility that planned the line to customers of utilities that did not, but still benefit from it. *See Nat'l Ass'n of Regul. Util. Comm'rs v. FERC*, 475 F.3d 1277, 1285 (D.C. Cir. 2007); *K N Energy, Inc.*, 968 F.2d at 1302. For example, if a line provides reliability benefits to a utility's neighbors but is paid for by a single utility's customers, those customers are subsidizing their neighbors by paying for other customers' reliability benefits. Beneficiary pays avoids this outcome by recognizing that the benefits of a new infrastructure project are often dispersed across an interconnected system.

### B. Order No. 1000's Approach to Cost Allocation Was Based on the FPA's Requirement of "Just and Reasonable" Rates

Order No. 1000 institutionalized the beneficiary pays approach to prevent utilities from free riding on their neighbors' investments. Order No. 1000, P 10. The beneficiary pays approach appears to be required by the FPA. Even in *South Carolina Public Service Authority v. FERC*, 762 F.3d 41 (D.C. Cir. 2014), the first challenge to Order No. 1000, the D.C. Circuit referred to multiple decisions in which it had previously favored FERC's use of beneficiary pays cost allocation without employing *Chevron* deference. Each of those cases held that the beneficiary pays approach vindicated FERC's obligation to ensure rates be "just and reasonable" by preventing cross-subsidies. *Id.* at 84-85 (quoting *FirstEnergy*

8

*Serv. Co. v. FERC*, 758 F.3d 346, 354-55 (D.C. Cir. 2014); *W. Mass. Elec. Co. v. FERC*, 165 F.3d 922, 927 (D.C. Cir. 1999)).

After *South Carolina Public Service Authority*, courts have continued to hold that the beneficiary pays approach follows from the plain text of the FPA. *See e.g.*, *Entergy Arkansas, LLC v. FERC*, 40 F.4th 689, 692 (D.C. Cir. 2022); *Old Dominion Elec. Coop. v. FERC*, 898 F.3d 1254, 1263 (D.C. Cir. 2018); *El Paso Elec. Co. v. FERC,* 832 F.3d 495, 505 (5th Cir. 2016); *Ill. Commerce Comm'n v. FERC*, 721 F.3d 764, 779 (7th Cir. 2013). For instance, in *El Paso Electric Company*, 832 F.3d 495, the Fifth Circuit vacated FERC orders that approved transmission planning frameworks in which only FERC-jurisdictional utilities were assigned project costs, while other utilities were spared. The court noted that its decision was based on FERC's "statutory duty [under the FPA] to ensure just and reasonable rates." *Id*. at 505.

Similarly, the D.C. Circuit has held that the beneficiary pays approach is required even for lines that do not undergo regional planning processes. If a line results in cross-subsidization—if it does not follow the beneficiary pays approach—then it is inconsistent with the FPA even if it technically complies with Order No. 1000. *Old Dominion Elec. Coop. v. FERC*, 898 F.3d at 1263. Moreover, the court made clear that, in an interconnected grid, cost causation and beneficiary pays are essentially the same: the key question is who benefits from the project, not

9

how the planning criteria were developed. *Id*. at 1262; *See also BNP Paribas Energy Trading GP v. FERC*, 743 F.3d 264, 267-68 (D.C. Cir. 2014).

### C. A Finding that Beneficiary Pays Cost Allocation Is Contrary to the FPA Would Significantly Disrupt the Natural Gas Industry

An adverse cost-allocation finding here would have far-reaching consequences for the natural gas industry. The substantive and jurisdictional provisions of the FPA match those of the Natural Gas Act (NGA). *See* 15 U.S.C. § 717e(a) (prohibiting "unduly discriminatory" rates). Judicial precedents interpreting the FPA apply with equal force to the NGA and vice versa. *See, e.g.*, *FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 281 (2016), as revised (Jan. 28, 2016) (applying NGA precedents to a FPA case).

As discussed previously, FERC traditionally employed rolled-in pricing, which distributed the costs of new pipelines to both new and existing customers. *See Battle Creek Gas Co.*, 281 F.2d at 46. This was intended for situations when existing customers would benefit from new capacity, as forcing new customers to cover the entire cost of those pipelines would result in cross-subsidization of existing customers by new ones. However, when sufficient existing service means that current customers would not benefit from new pipelines, FERC has instead chosen to employ "incremental" pricing, wherein new customers would be primarily responsible for the cost of the new service they received. *Certification of*

10

*New Interstate Natural Gas Pipeline Facilities*, 88 FERC ¶ 61,227, 61,746 (Sept. 15, 1999) ("Policy Statement"). This pricing approach is also motivated by a desire to prevent cross-subsidization, but in the opposite direction, so as to ensure that existing users do not pay for benefits that only accrue to new customers.

This scenario arose when FERC restructured the natural gas industry in the 1990s. Rolled-in pricing was an improper fit for a new era of competition because it would "mask[] the real cost" of expansion, leading to overbuilding and excessive payments made by existing customers who would not see benefits due to sufficient existing service. *Id.* at ¶ 61,745.

FERC accordingly embraced incremental pricing as the most effective way to prevent cross-subsidies in cases where existing users would receive few benefits from new pipelines. *Id.*; *see also Transcon. Gas Pipe Line Corp. v. FERC*, 518 F.3d 916, 920 (D.C. Cir. 2008) (describing an instance in which rolled-in pricing would result in cross-subsidies due to insufficient systemwide benefits, but incremental pricing would not). Indeed, in the cases where existing customers genuinely would benefit from increased capacity, FERC simultaneously established a market for excess gas capacity to allow them to purchase it. *See* 18 C.F.R. § 284.8. Courts have accepted incremental pricing under these conditions. *See e.g., Antero Res. Corp. & MU Mktg. LLC v. FERC*, 156 F.4th 654, 662-63

11

(D.C. Cir. 2025); *Minisink Residents for Env't Pres. & Safety v. FERC*, 762 F.3d 97, 101-02 (D.C. Cir. 2014).

This discussion of the natural gas industry is crucial for two reasons. First, it shows that since at least the 1960s, courts have interpreted equivalent provisions of the NGA to require beneficiary pays cost allocation. Second, it underscores that a decision in this case undermining the beneficiary pays principle would disrupt decades of settled pricing policy in the gas industry. According to FERC, the "threshold question" it must consider before deciding whether to grant a certificate of public convenience and necessity to a pipeline applicant is whether the pipeline can succeed financially without subsidies from other market participants. Policy Statement, ¶ 61,745. To put this point bluntly: abandoning the beneficiary pays cost allocation method would have extraordinarily disruptive consequences for both the gas and electricity sectors, casting doubt on the legality of FERC's siting and cost allocation policies just as the country faces unprecedented affordability and reliability challenges.

## II. Beneficiary Pays Is the Only Way to Prevent Cross-Subsidization When States Have Different Energy Policies

Despite longstanding precedent requiring the beneficiary pays approach, the State Petitioners still argue that Order No. 1920's approach to cost allocation is "unjust, unreasonable, unduly discriminatory, and arbitrary and capricious"

12

because it "require[s] some states to subsidize public policy decisions of others."
State Pet'r Br. at 16. In Petitioners' view, when new transmission facilities aid
states in meeting clean-energy mandates that have not been adopted across the
region, transmission costs are "socializ[ed]" across the region, with non-
beneficiary states improperly forced to finance their neighbors' policy choices. *Id.*
at 4.

This argument is backwards: it is the *absence* of beneficiary pays in cost
allocation that results in some customers free riding off of their neighbors'
transmission investments. In contrast, the beneficiary pays approach ensures that
customers pay for—and only for—the benefits they receive, preventing states from
enjoying transmission benefits without bearing their fair share of costs.

**A. Order No. 1920's Beneficiary Pays Cost Allocation Approach does not Result in Cross-Subsidization Between States with Different Energy Policies**

A simple example shows how the beneficiary pays approach avoids forcing
states to subsidize their neighbors' clean energy programs. Assume a new
transmission line produces three types of benefits: lower energy costs, improved
reliability, and public policy benefits from compliance with a state's clean energy
goals. Each benefit can be quantified in dollar terms. For example, lower energy
costs translate directly into reduced electricity bills for customers. For states with

13

clean energy mandates, the public policy benefit is measured as the policy-driven cost difference—how much cheaper the new line makes it to meet state-mandated clean energy requirements compared to the alternatives. Joshua Macey & Jacob Mays, *The Law and Economics of Transmission Planning and Cost Allocation*, 45 Energy L.J. 209, 236 (2024); Order No. 1920, P 812. Without the line, a state might have to meet its clean energy mandate by building costlier local clean generation, resulting in higher production costs.

Assume a line crosses from Virginia to West Virginia. Virginia has various policies requiring clean energy generation, whereas West Virginia does not. The hypothetical new line would provide $15 in economic benefits to each state by reducing the price they pay for electricity. It would also provide $10 in reliability benefits to each state by reducing the amount of costly infrastructure the state must build to keep the lights on during hot summer days. In addition to those economic and reliability benefits, Virginia would experience $50 in public policy benefits. These costs are measured by comparing the cost to Virginia of meeting its clean energy requirements with the new transmission line to the costs of meeting those requirements without it. The line would cost $60.

In total, the two states would experience $100 in collective benefits, with Virginia experiencing $75 and West Virginia experiencing $25. Virginia's benefits are calculated by adding its economic, reliability, and clean energy benefits ($15 in

14

economic, $10 in reliability, and $50 in clean energy), whereas West Virginia's benefits are calculated by adding the economic and reliability benefits it receives ($15 in economic and $10 in reliability). Because Virginia receives a larger share of the total benefits, it is assigned a larger share of the costs: Virginia pays $45 (75% of the cost) while West Virginia pays $15 (25% of the cost). Notice that the $50 in public policy benefits is attributed *entirely to Virginia*, not divided between the two states, because only Virginia has state-wide clean energy policies. Critically, Virginia is not free riding: It pays for its own policy benefits and does not shift any costs to West Virginia. Both states are better off than they were before the new line. Table 1 illustrates the resulting cost allocation under this beneficiary pays approach.

**Table 1 - Beneficiary Pays Cost Allocation**

|  | Virginia | West Virginia | Total |
|---|---|---|---|
| Economic benefits | $15 | $15 | $30 |
| Reliability benefits | $10 | $10 | $20 |
| Public Policy benefits | $50 | $0 | $50 |
| **Total line benefits** | **$75** | **$25** | **$100** |
| Share of benefits/cost | **75%** | **25%** |  |
| Assigned costs | 75% * $60 = **$45** | 25% * $60 = **$15** | $60 |
| Net gain | $75-$45 = **$30** | $25-$15 = **$10** | $40 |

15

Critics of the beneficiary pays approach argue that some new transmission lines are only justified from a cost-benefit analysis when public policy benefits are included in the calculation of benefits—meaning state clean energy policies drive the construction of lines that would not otherwise be built. That's true in this example: Without Virginia's $50 public policy benefit, the line's total benefits would not exceed its $60 cost and it would not be built. But this does not mean cross-subsidization is occurring; West Virginia still only pays for the proportionate benefits it receives, while Virginia is assigned a higher proportion of the costs because of the public policy benefits it uniquely experiences. Nor does the new line harm West Virginia economically. Even though West Virginia experiences higher transmission costs from the new line, it still enjoys a total net economic benefit of $10 due to the new energy cost savings and reliability benefits it receives. Without the beneficiary pays approach, this mutually beneficial line would simply not be built—leaving both states worse off.

It is also worth noting that quantifying these avoided costs involves difficult and potentially contentious estimates about which policies to include and their projected costs. However, such implementation challenges should be addressed in compliance filings reviewing whether specific methodologies are arbitrary and capricious, not through facial challenges to the framework itself. If a specific cost allocation decision does in fact result in cross-subsidies, it would be inconsistent

16

with the FPA. But it does not make sense to prohibit the one approach that could avoid cross-subsidies before reviewing any specific allocation of costs.

### B. The *Absence* of Beneficiary Pays Cost Allocation Results in States Free Riding off Their Neighbors' Transmission Investments

Failure to follow the beneficiary pays approach also risks creating the very cross-subsidization that critics fear. If states with clean energy mandates are required to pay the entire cost of lines that help them meet their public policy requirements, then neighboring states will receive benefits from the line without paying anything.

FERC mandated the beneficiary pays approach in Order No. 1000 precisely to address this free rider problem. As the Commission explained, "the risk of the free rider problems associated with new transmission investment is particularly high for projects that affect multiple utilities' transmission systems and therefore may have multiple beneficiaries." *See* Order No. 1000, P 486. In upholding Order No. 1000, the D.C. Circuit similarly recognized that without beneficiary pays, "an entity that uses part of the transmission grid may obtain benefits from improvements to and expansion of transmission facilities on another part of that grid"—without paying for those benefits. *S. C. Pub. Serv. Auth.,* 762 F.3d at 85. Orders Nos. 1000 and 1920 both mandate beneficiary pays precisely because

17

allowing free riding would produce rates that are unjust, unreasonable, unduly discriminatory, or preferential.

The original numerical example illustrates how failure to follow the beneficiary pays approach leads to cross-subsidization. Even if Virginia was forced to pay for the entire line itself, it would choose to do so since its $75 in benefits exceed the $60 cost. But this results in Virginia subsidizing West Virginia: Virginia receives 75% of the benefits yet pays 100% of the costs, while West Virginia receives 25% of the benefits yet pays nothing—a clear case of free riding (shown below in Table 2). The Petitioners' argument thus inverts reality: Beneficiary pays does not create cross-subsidization—it's the only way to allocate the costs of transmission in a manner that avoids free riding.

**Table 2 - Free Rider Problem: VA Pays Disproportionate Costs**

|  | Virginia | West Virginia | Total |
|---|---|---|---|
| Economic benefits | $15 | $15 | $30 |
| Reliability benefits | $10 | $10 | $20 |
| Public Policy benefits | $50 | $0 | $50 |
| **Total line benefits** | **$75** | **$25** | **$100** |
| Share of benefits | **75%** | **25%** |  |
| Share of cost | **100%** | **0%** |  |
| Assigned costs | 100% * $60 = **$60** | 0% * $60 = **$0** | $60 |
| Net gain | $75-$60 = **$15** | $25-$0 = **$25** | $40 |

18

**C. The Absence of Beneficiary Pays Cost Allocation May Paradoxically Cause Cross-Subsidization from States Without Clean Energy Policies to States with Such Policies**

Finally, the absence of beneficiary pays cost allocation can also cause cross-subsidization from states without clean energy mandates to states with such policies. When clean energy benefits are ignored in cost allocation calculations, states with clean energy mandates are assigned fewer benefits and thus pay less of the line's cost, forcing other states to bear a higher proportion of project costs.

Consider another example where a new transmission line's economic and reliability benefits alone justify its cost, even without clean energy benefits. A line costing $60 provides both states $20 in economic benefits and $20 in reliability benefits. Virginia also receives $20 in public policy benefits from its clean energy mandate. The line produces $100 in total benefits between the two states. Because these benefits exceed the $60 cost, the line is built. Under beneficiary pays cost allocation, West Virginia receives 40% of total benefits and is thus assigned 40% of costs. As shown in Table 3 below, West Virginia pays $24—40% of $60—for the line and receives a net gain of $16.

**Table 3 - Revised Beneficiary Pays Example**

|  | Virginia | West Virginia | Total |
|---|---|---|---|
| Economic benefits | $20 | $20 | $40 |
| Reliability benefits | $20 | $20 | $40 |

19

| | Virginia | West Virginia | Total |
|---|---|---|---|
| Public Policy benefits | $20 | $0 | $20 |
| **Total line benefits** | **$60** | **$40** | **$100** |
| Share of benefits/costs | **60%** | **40%** | |
| Assigned costs | 60% * $60 = **$36** | 40% * $60 = **$24** | $60 |
| Net gain | $60-$36 = **$24** | $40-$24 = **$16** | $40 |

Now consider a scenario where transmission planners exclude Virginia's $20 public policy benefit from the cost allocation calculation. The line's remaining $80 in benefits still exceed the $60 cost, so the line is built. But now both states appear to receive identical benefits of $40 each, requiring a 50/50 cost split. West Virginia must now pay 50% rather than 40% of costs—rising from $24 to $30—even though its actual benefits remain unchanged. Its net gain drops from $16 to $10. Meanwhile, Virginia still experiences the $20 public policy benefit, even though it was excluded from the cost calculation. Virginia thus enjoys substantially higher net gains while paying a reduced share of costs.

**Table 4 - Free Rider Problem: WV Pays Disproportionate Costs**

| | Virginia | West Virginia | Total |
|---|---|---|---|
| Economic benefits | $20 | $20 | $40 |
| Reliability benefits | $20 | $20 | $40 |
| Public Policy benefits | $20 | $0 | $20 |
| **Total line benefits** | **$60** | **$40** | **$100** |

| Share of benefits | 60% | 40% | |
|---|---|---|---|
| Share of cost | 50% | 50% | |
| Assigned costs | 50% * $60 = $30 | 50% * $60 = $30 | $60 |
| Net gain | $60-$30 = $30 | $40-$30 = $10 | $40 |

As this example illustrates, a departure from the beneficiary pays approach results in inappropriate cross-subsidization: Because the public policy benefits Virginia experiences are not included in the cost allocation calculations, West Virginia effectively pays for Virginia's clean energy benefits, and Virginia receives benefits it does not fully pay for. West Virginia is left objectively worse off, paying a greater proportion of the line's costs than under a proper beneficiary pays allocation. This outcome violates the core principle of cost causation and demonstrates why all quantifiable benefits must be included in cost allocation. Ignoring certain categories of benefits does not eliminate cross-subsidization—it guarantees that some states will be able to free ride off their neighbors.

The alternative but-for causation cost allocation approach advocated by others also results in the type of cross-subsidization they claim to oppose. *See* Order No. 1920, Dissent of Commissioner Christie, P 90-91 (advocating a but-for cost causation approach). When West Virginia builds a transmission line designed primarily to support reliability in West Virginia, that line will often provide

21

reliability, economic, or clean energy benefits to Virginia. Petitioners appear to endorse a single-value approach in which lines are planned to meet one goal—say, reliability—and costs are assigned to the customers who experience reliability benefits. If a line provides reliability benefits to West Virginia, West Virginia customers pay the full cost even if Virginia customers receive benefits. That is precisely the free-riding problem that beneficiary pays is designed to prevent.

### III. Utilities' Section 205 Filing Rights Do Not Constrain FERC's Remedial Authority Under Section 206

The FPA allocates rate-changing authority between utilities and FERC through complementary but distinct procedural mechanisms. Section 205 grants utilities the exclusive statutory right to initiate rate changes, limiting FERC to the role of a passive reviewer. Section 206 inverts this arrangement, giving FERC remedial power to modify existing unjust or unreasonable rates or practices. In a Section 206 proceeding such as the one under review in this case, FERC—not the utility—has statutory authority to determine the replacement rate. This division of authority protects utilities' right to initiate rate changes while permitting FERC to remedy unlawful rates and practices.

This case involves a Section 206 proceeding in which FERC found that existing transmission planning and cost allocation practices were unjust and unreasonable. FERC issued the Inclusion Requirement in Order No. 1920, which

22

requires transmission providers to include in their compliance filings any cost allocation proposals agreed to by relevant state entities, even if those proposals differ from the transmission provider's preferred approach. But these compliance filings are not 205 filings. The Inclusion Requirement is instead a way for FERC—under its Section 206 authority—to assemble the evidentiary record necessary to determine the just and reasonable replacement practice.

Petitioners claim that Order No. 1920 violates Section 205 of the FPA by giving third-party state entities filing rights exclusively reserved for transmission providers. This argument confuses Sections 205 and 206. While Transmission Owners ("TOs") possess exclusive authority to initiate and determine Section 205 filings, Order No. 1920 is a Section 206 proceeding. In Section 206 proceedings, FERC—not TOs—determines what information is necessary to establish just and reasonable replacement rates. Utilities' Section 205 filing rights give them no authority to constrain FERC's remedial authority while conducting a Section 206 proceeding.

### A. The FPA Allocates Distinct Rate-Changing Authority Between Utilities and FERC Under Sections 205 and 206

Section 205 of the FPA gives utilities the exclusive right to initiate changes to their rates, charges, or services for wholesale power sales and transmission services by filing the proposed changes with FERC. *See* 16 U.S.C. § 824d. Section

23

205 filing rights are statutorily created property rights that the FPA grants to public utilities. The FPA defines "public utility" as "any person who owns or operates facilities subject to the jurisdiction of the Commission." *See* 16 U.S.C. § 824e. Thus, while FERC regulates wholesale sales and transmission, TOs are the entities charged with initially filing changes to transmission rates and practices. *See* Joshua C. Macey, *Outsourcing Electricity Market Design*, 91 U. Chi. L. Rev. 1243, 1260 (2024).

Section 205 confers two important advantages on public utilities. First, Section 205 gives utilities exclusive agenda-setting authority over rate and tariff changes; utilities alone may file rate proposals and determine the terms placed before FERC for review. FERC may review, accept, suspend, or reject proposed rate changes, but it cannot unilaterally impose a different rate on the utility. *See NRG Power Mktg., LLC v. FERC,* 862 F.3d 108 (D.C. Cir. 2017). Courts have therefore characterized Section 205 filing rights as a procedural entitlement that is "intended for the benefit of the utility," protecting it from involuntary rate changes. *City of Winnfield v. FERC,* 744 F.2d 871, 875 (D.C. Cir. 1984).

Second, utility filings are afforded substantial deference under Section 205. In a Section 205 filing, the utility need only show that the proposed changes are just, reasonable, and not unduly discriminatory. FERC must accept the filing if it

24

falls in this "zone of reasonableness," and FERC may not reject a filing simply because it prefers an alternative approach. *Id.*

The D.C. Circuit has also held that FERC lacks the authority to require utilities to surrender their Section 205 filing rights. *See Atl. City Elec. Co. v. FERC,* 295 F.3d 1, 8-10 (D.C. Cir. 2002). Because Section 205 filing rights are a "statutory right given to [the utilities] by Congress," no FERC regulation can override or eliminate them. *Id.* at 8. The court emphasized that Section 205 gives utilities the right to file rate changes at will, and FERC plays an "essentially passive and reactive" role. *Id.* FERC may review, suspend, and reject proposed rates if they are not just and reasonable, but it cannot prohibit utilities from filing changes in the first instance.

In contrast to Section 205, Section 206 of the FPA grants FERC remedial authority to change existing utility rates and practices. If FERC finds that any rate, charge, or practice affecting such rate or charge is unjust, unreasonable, unduly discriminatory or preferential, the Commission must determine and order the just and reasonable replacement rate or practice. *See* 16 U.S.C. § 824e. Section 206 thus imposes a dual burden on FERC: The Commission must first establish that the existing rate or practice is unjust, unreasonable, or unduly discriminatory; it must then demonstrate that its proposed replacement is itself just and reasonable. Section 206 does not require FERC to identify the single best replacement rate or

25

practice; FERC need only establish a replacement rate that falls into a "zone of reasonableness" and "reasonably explain the decision." See *FCC v. Prometheus Radio Project,* 592 U.S. 414, 423 (2021) (explaining that under arbitrary-and-capricious review, agencies may choose among multiple reasonable outcomes—a principle that likewise constrains FERC's evaluation of just and reasonable rates under Section 206).

Section 206 does not limit the Commission to relying solely on utility proposals when determining the just and reasonable replacement rate. FERC frequently develops a broad administrative record in Section 206 proceedings through supplemental briefing orders, open comment periods, paper hearings, and other Commission-directed procedures designed to solicit evidence from non-utility stakeholders. *See generally Martha Coakley v. Bangor Hydro-Elec. Co.*, 165 FERC ¶ 61,030 (2018) (issuing a supplemental briefing order in an active Section 206 complaint, proposing a new ROE methodology, and establishing a paper hearing to solicit briefs from non-utility participants). Section 206 also explicitly requires FERC to hold hearings before initiating any rate changes. *See* 16 U.S.C. § 824e(a). While Order No. 1920's Inclusion Requirement may be procedurally novel by requiring state cost allocation proposals to be submitted as an attachment to TO compliance filings, the practice of including third party stakeholder input and proposals to inform replacement rates is common in Section 206 proceedings.

26

*See generally* Transmission Planning Process Staff White Paper, submitted Aug. 2, 2007 in FERC Docket No. RM05-25-000 (urging transmission providers preparing their Order No. 890 Section 206 compliance tariff filings to coordinate with stakeholders through technical conferences).

The Federal Power Act thus divides rate-setting authority between utilities and the Commission through two distinct procedures. Under Section 205, utilities alone may propose rate changes, with FERC only serving as a deferential reviewer. Section 206, by contrast, empowers FERC to correct existing rates or practices it finds unjust or unreasonable. Together, these provisions preserve utilities' filing rights while ensuring FERC can remedy unlawful rates and practices.

### B. Petitioners Improperly Seek to Extend Their Section 205 Filing Rights to Constrain FERC's Section 206 Authority

The TOs' opposition to Order No. 1920 improperly attempts to instrumentalize their Section 205 filing rights to limit FERC's remedial authority under Section 206. The TOs argue that Order No. 1920's Inclusion Requirement "violates public utilities' rights under FPA Section 205 by requiring public utilities to include state-proposed changes with which they disagree." Transmission Owners Pet'r Br. at 15. They contend that FERC cannot force TOs "to include proposals from states or other third parties who have no authority to make Section 205 filings." *Id.*

27

Petitioners' Section 205 filing rights provide no legal basis to challenge Order No. 1920. While TOs possess exclusive authority to determine the contents of a Section 205 filing, Order No. 1920 is a Section 206 proceeding, not a Section 205 filing. In a Section 206 proceeding, FERC alone determines the just and reasonable replacement rate, and Petitioners lack any statutory authority to dictate or constrain that determination. Further, unlike in Section 205 proceedings, FERC is not required to accept a TO's proposed replacement simply because it is just and reasonable. Nor does Section 206 limit FERC to considering only TO proposals when establishing the replacement rate.

Moreover, Order No. 1920 does not eliminate Petitioners' Section 205 filing rights. A Petitioner "retains its FPA Section 205 filing rights" and may propose changes to any cost allocation method FERC establishes in this Section 206 proceeding through future Section 205 filings. Order 1920, P 1430; *See also Building for the Future Through Electric Regional Transmission Planning and Cost Allocation,* Order No. 1920-A, 189 FERC ¶ 61,126, at P 652 (2024); *Building for the Future Through Electric Regional Transmission Planning and Cost Allocation*, Order No. 1920-B, 191 FERC ¶ 61,026, at P 27 (2025); *Entergy Ark., LLC,* 40 F.4th at 701. FERC must accept such proposals if they are just and reasonable. Order No. 1920 therefore preserves Section 205's filing rights while allowing FERC to exercise its independent remedial authority under Section 206.

28

While Petitioners cannot invoke Section 205 rights to constrain FERC's Section 206 authority, the court must still address two key questions to determine Order No. 1920's lawfulness. First, has FERC met its Section 206 burden of proof by showing that TOs' existing transmission planning and cost allocation practices were unjust, unreasonable, or unduly discriminatory or preferential? This is a question of fact for the court to decide. If FERC has failed to meet this burden, then it has no statutory authority to impose a new replacement rate or practice.

Second, are Order No. 1920's procedures for assembling the evidentiary record arbitrary and capricious? Or are they reasonably designed to enable FERC to establish a just and reasonable replacement rate? Order No. 1920 does not itself impose a replacement rate; rather, it establishes the Inclusion Requirement and other procedural mechanisms to compile the record FERC needs before ordering any replacement. The court must therefore assess whether these procedural requirements constitute a lawful exercise of FERC's Section 206 authority to remedy unjust practices and establish just and reasonable replacements.

## CONCLUSION

For the foregoing reasons, the Court should find that Order No. 1920's beneficiary pays approach rests on solid statutory and precedential ground.

Respectfully submitted,

/s/ *Stephanie L. Safdi*
Stephanie L. Safdi
Jerome N. Frank Legal Services
Organization
Yale Law School[*]
127 Wall Street
New Haven, CT 06511
Tel: (203) 432-4800
stephanie.safdi@ylsclinics.org

Counsel for *Amicus Curiae*
Professor Joshua C. Macey

February 11, 2026

---

[*] This *Amicus Curiae* brief does not purport to state the views of Yale Law School, if any.

30

**CERTIFICATE OF COMPLIANCE**
**WITH TYPEFACE AND WORD COUNT LIMITATION**

I, Stephanie L. Safdi, counsel for *amicus curiae* Professor Joshua C. Macey and a member of the Bar of this Court, certify pursuant to Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B) that the attached brief of *amicus curiae* is proportionally spaced in plain, roman style; has a typeface of 14 points or more; and contains 6,304 words excluding the cover page, table of contents, table of authorities, and signature block.

/s/ *Stephanie L. Safdi*
Stephanie L. Safdi

Counsel for *Amicus Curiae*
Professor Joshua C. Macey

February 11, 2026

31

## CERTIFICATE OF SERVICE

I hereby certify that on February 11, 2026, I electronically filed this brief with the United States Court of Appeals for the Fourth Circuit using the CM/ECF system, which I understand to cause service on all counsel of record.

Respectfully submitted,

/s/ *Stephanie L. Safdi*
Stephanie L. Safdi
Jerome N. Frank Legal Services
Organization
127 Wall Street
New Haven, CT 06511
Tel: (203) 432-4800
stephanie.safdi@ylsclinics.org

32