No. 24-1650 (L)

(consolidated with Nos. 24-1748, 24-1756, 24-1758, 24-1760, 24-1765, 24-1770, 24-1785, 24-1792, 24-1804, 24-1857, 24-1862, 24-1867, 24-1876, 24-1885, 24-1887, 24-1979, 24-1991, 24-2162, 24-2163, 25-1073, 25-1080, 25-1197, 25-1349

# In the United States Court of Appeals for the Fourth Circuit

APPALACHIAN VOICES, ET AL.,
*Petitioners,*

*v.*

FEDERAL ENERGY REGULATORY COMMISSION,
*Respondent.*

ON PETITIONS FOR REVIEW OF ORDERS OF THE
FEDERAL ENERGY REGULATORY COMMISSION

**BRIEF OF INTERVENORS THE MICHIGAN PUBLIC SERVICE COMMISSION AND THE PENNSYLVANIA PUBLIC UTILITY COMMISSION IN SUPPORT OF RESPONDENT**

Elizabeth H. Barnes
Deputy Chief Counsel
400 North St., 3rd Floor
Harrisburg, PA 17120
Tel: (717) 787-5000
ebarnes@pa.gov

*Counsel for the Pennsylvania Public Utility Commission*

M. Denyse Zosa
John McCaffrey
STINSON LLP
1775 Pennsylvania Ave., N.W.
Suite 800
Washington, D.C. 20006
202-785-9100
denyse.zosa@stinson.com
john.mccaffrey@stinson.com

*Counsel for the Michigan Public Service Commission*

MARCH 13, 2026 – FINAL BRIEF

# CORPORATE DISCLOSURE STATEMENT

See the attached pages.

Respectfully submitted,

*/s/ Elizabeth H. Barnes*
Elizabeth H. Barnes
Deputy Chief Counsel
400 North St., 3rd Floor
Harrisburg, PA 17120
Tel: (717) 787-5000
ebarnes@pa.gov

*Counsel for the Pennsylvania Public Utility Commission*

*/s/ M. Denyse Zosa*
M. Denyse Zosa
John McCaffrey
STINSON LLP
1775 Pennsylvania Ave., N.W.
Suite 800
Washington, D.C. 20006
202-785-9100
denyse.zosa@stinson.com
john.mccaffrey@stinson.com

*Counsel for the Michigan Public Service Commission*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No.  24-1650,         Caption:  Appalachian Voices v. FERC

Pursuant to FRAP 26.1 and Local Rule 26.1,

Michigan Public Service Commission
(name of party/amicus)

_____

 who is _____intervenor_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.     Is party/amicus a publicly held corporation or other publicly held entity?   ☐ YES ☑ NO


2.     Does party/amicus have any parent corporations?                    ☐ YES ☑ NO
       If yes, identify all parent corporations, including all generations of parent corporations:




3.     Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                             ☐ YES ☑ NO
       If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: s/ M. Denyse Zosa            Date:        July 28, 2025

Counsel for: Michigan Public Service Commission

- 2 -

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. _____     Caption: _____

Pursuant to FRAP 26.1 and Local Rule 26.1,

_____
(name of party/amicus)


_____

who is _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.     Is party/amicus a publicly held corporation or other publicly held entity?     YES    NO


2.     Does party/amicus have any parent corporations?     YES    NO
        If yes, identify all parent corporations, including all generations of parent corporations:


3.     Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?     YES    NO
        If yes, identify all such owners:

4.   Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?                                    YES   NO
     If yes, identify entity and nature of interest:

5.   Is party a trade association? (amici curiae do not complete this question)     YES   NO
     If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.   Does this case arise out of a bankruptcy proceeding?                                    YES   NO
     If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.   Is this a criminal case in which there was an organizational victim?                YES   NO
     If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: _____     Date: _____

Counsel for: _____

- 2 -

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT ........................................................ ii

TABLE OF AUTHORITIES ................................................................................ iv

GLOSSARY ........................................................................................................ vii

STATEMENT OF JURISDICTION ...................................................................... 2

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ........................... 2

STATEMENT OF THE CASE ............................................................................... 2

STATEMENT OF THE STANDARD OF REVIEW ............................................ 12

SUMMARY OF ARGUMENT ............................................................................ 12

ARGUMENT ....................................................................................................... 13

    A.    The State Role in Transmission Planning and Cost Allocation Under Order No. 1920 Is Essential to Timely, Efficient Development and to Just and Reasonable Rates ............................................................... 13

    B.    The Inclusion Requirement Does Not Unlawfully Encumber Public Utility FPA Section 205 Filing Rights ........................................ 19

    C.    FERC Possesses Statutory Authority to Adopt the Consultation Requirement ............................................................................................... 23

    D.    The Inclusion and Consultation Requirements Do Not Violate the First Amendment Rights of Transmission Owners ............................ 25

CONCLUSION ..................................................................................................... 26

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

## Court Cases

*Advanced Energy Mgmt. All. v. FERC*,
860 F.3d 656 (D.C. Cir. 2017) ............................................................20

*Atlantic City Electric Co. v. FERC*,
295 F.3d 1 (D.C. Cir. 2002) ...................................................22, 23, 24

*City of Cleveland v. FERC*,
773 F.2d 1368 (D.C. Cir. 1985) .............................................21, 24, 25

*Electrical District No. 1 v. FERC*,
774 F.2d 490 (D.C. Cir. 1985) ............................................................21

*FERC v. Elec. Power Supply Ass'n.*,
577 U.S. 260 (2016) ..........................................................................2, 3

*Hughes v. Talen Energy Mktg, LLC*,
578 U.S. 150 (2016) ..........................................................................2, 3

*Interstate Natural Gas, Ass'n of Am. v. FERC*,
285 F.3d (D.C. Cir. 2002) ..................................................................23

*Md. Pub. Serv. Comm'n v. FERC*,
632 F.3d 1283 (D.C. Cir. 2011) .........................................................20

*NRG Power Mktg., LLC v. FERC*,
862 F.3d 108 (D.C. Cir. 2017) ...........................................................24

*N.Y. v. FERC*,
535 U.S. 1 (2002) .................................................................................2

*Piedmont Environmental Council v. FERC*,
558 F.3d 304 (4th Cir. 2009) ...............................................................3

*S.C. Pub. Serv. Auth. v. FERC*,
762 F.3d 41 (D.C. Cir. 2014) ......................................................2, 4, 23

iv

**Administrative Cases**

*Bldg. for the Future Through Elec. Reg'l Transmission Planning and Cost Allocation*, Order No. 1920,
187 FERC ¶ 61,068 (2024)........................................................3, 5, 6, 7, 8, 9, 17

*Bldg. for the Future Through Elec. Reg'l Transmission Planning and Cost Allocation*, Order No. 1920-A,
189 FERC ¶ 61,126 (2024) ........................... 3, 7, 10, 11, 13, 14, 15, 17, 22, 24

*Bldg. for the Future Through Elec. Reg'l Transmission Planning and Cost Allocation*, Order No. 1920-B,
191 FERC ¶ 61,026 (2025)........................ 3, 7, 10, 11, 13, 14, 19, 20, 21, 22, 24

*Kern River Gas Transmission Co.*,
142 FERC ¶ 61,132 (2013)..............................................................................21

*PJM Interconnection, L.L.C.*,
142 FERC ¶ 61,214 (2013)..............................................................................18

*PJM Interconnection, L.L.C.*,
117 FERC ¶ 61,331 (2006)..............................................................................21

*PJM Interconnection, L.L.C.*,
173 FERC ¶ 61,134 (2020)..............................................................................21

*State Voluntary Agreements to Plan and Pay for Transmission Facilities*,
175 FERC ¶ 61,225 (2021).........................................................................5, 16

*Transmission Planning and Cost Allocation by Transmission Owning and Operating Pub. Utils.,* Order No. 1000,
136 FERC ¶ 61,051 (2011).............................................................................4, 5

*Transmission Planning and Cost Allocation by Transmission Owning and Operating Pub. Utils,* Order No. 1000-A,
139 FERC ¶ 61,132 (2012).............................................................................4, 5

*Transmission Planning and Cost Allocation by Transmission Owning and Operating Pub. Utils.,* Order No. 1000-B,
141 FERC ¶ 61,044 (2012).............................................................................4, 5

## Statutes

16 U.S.C. § 824.................................................................................3

16 U.S.C. § 824(b)(1).....................................................................2, 3

16 U.S.C. § 824(d) ...........................................................................12

16 U.S.C. § 824d............................ 3, 12, 19, 20, 21, 22, 23, 24, 25, 26

16 U.S.C. § 824d(a) ............................................................................2

16 U.S.C. § 824d(c) ....................................................................13, 23

16 U.S.C. § 824e ............................... 6, 12, 19, 20, 21, 22, 26

16 U.S.C. § 824e(a)...........................................................................19

## Other Authorities

PJM Interconnection L.L.C., Operating Agreement, Sched. 6, § 1.5.9...................17

## GLOSSARY

| | |
|---|---|
| ANOPR | Advanced Notice of Proposed Rulemaking |
| FERC | Federal Energy Regulatory Commission |
| FPA | Federal Power Act |
| Michigan PSC | Michigan Public Service Commission |
| NERC | North American Electric Reliability Corporation |
| NOPR | Notice of Proposed Rulemaking |
| P | Paragraph in a FERC order |
| Pennsylvania PUC | Pennsylvania Public Utility Commission |
| State Intervenors | Michigan Public Service Commission and the Pennsylvania Public Utility Commission |

**No. 24-1650 (L)**
(consolidated with Nos. 24-1748, 24-1756, 24-1758, 24-1760, 24-1765, 24-1770, 24-1785, 24-1792, 24-1804, 24-1857, 24-1862, 24-1867, 24-1876, 24-1885, 24-1887, 24-1979, 24-1991, 24-2162, 24-2163, 25-1073, 25-1080, 25-1197, 25-1349

———————

# In the United States Court of Appeals for the Fourth Circuit

APPALACHIAN VOICES, ET AL.,
*Petitioners,*

*v.*

FEDERAL ENERGY REGULATORY COMMISSION,
*Respondent.*

———————

ON PETITIONS FOR REVIEW OF ORDERS OF THE
FEDERAL ENERGY REGULATORY COMMISSION

———————

**BRIEF OF INTERVENORS THE MICHIGAN PUBLIC SERVICE COMMISSION AND THE PENNSYLVANIA PUBLIC UTILITY COMMISSION IN SUPPORT OF RESPONDENT**

———————

The Michigan Public Service Commission (Michigan PSC) and the Pennsylvania Public Utility Commission (Pennsylvania PUC) (collectively State Intervenors) hereby submit this intervenor brief in support of Respondent Federal Energy Regulatory Commission (FERC).

## STATEMENT OF JURISDICTION

State Intervenors concur with the statement of jurisdiction in FERC's brief.

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

State Intervenors concur with the statement of issues presented by FERC. The State Intervenors' brief addresses Issue Nos. 5, 6 and 8 listed in FERC's brief. *See* FERC Br. at 8-9.

## STATEMENT OF THE CASE

State Intervenors incorporate the statement of the case contained in FERC's brief, as supplemented below.

The Federal Power Act (FPA) gives FERC authority to regulate rates for the transmission and wholesale sale of electricity by public utilities in interstate commerce, along with practices affecting such rates. *See* 16 U.S.C. §§ 824(b)(1), 824d(a); *see also, e.g.*, *Hughes v. Talen Energy Mktg, LLC*, 578 U.S. 150, 154 (2016); *FERC v. Elec. Power Supply Ass'n.*, 577 U.S. 260, 264-67 (2016) ("*EPSA*"); *N.Y. v. FERC*, 535 U.S. 1, 5-7 (2002). At the same time, the FPA "maintains a zone of exclusive state jurisdiction," *EPSA*, 577 U.S. at 266, that encompasses retail sales of electricity. *Id.* at 267. The rules governing regional transmission planning by public utilities are practices affecting rates over which FERC has authority. *See, e.g.*, *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d 41, 56 (D.C. Cir. 2014).

Although FERC has authority to establish rules for planning interstate transmission facilities, jurisdiction over siting and construction of these facilities

2

generally still resides with the states. *See, e.g.*, *Piedmont Env't Council v. FERC*, 558 F.3d 304, 310 (4th Cir. 2009); JA0824-JA0825.[1]  In addition, whereas FERC has authority to regulate the rates for wholesale sales (*i.e.*, sales for resale) of electricity, states retain authority over the rates, terms, and conditions for retail electric sales, through which the costs of transmission facilities are ultimately recovered. 16 U.S.C. §§ 824, 824d; *see also, e.g.*, *EPSA*, 577 U.S. at 267. Further, the need for new transmission is heavily influenced by the plans for new electric generating facilities, authority over which the FPA also reserves to the states. 16 U.S.C. § 824(b)(1); *Hughes*, 578 U.S. at 154. Accordingly, the planning, siting, construction, and cost recovery for new electric transmission facilities inevitably implicates both state and federal spheres of regulatory authority.

As wholesale electric power markets have become more competitive and regionalized over the last 30 years (as a product of both federal and state legislative and regulatory reforms), FERC has engaged in an ongoing, iterative effort to establish rules for transmission planning that will identify efficient and cost-effective facilities through transparent and collaborative regional processes. *See generally*. JA0631-JA0635. Recognizing that efficient transmission planning needs clarity

---

[1] *Bldg. for the Future Through Elec. Reg'l Transmission Planning and Cost Allocation*, Order No. 1920, 187 FERC ¶ 61,068, *order on reh'g*, Order No. 1920-A, 189 FERC ¶ 61,126 (2024), *reh'g denied,* Order No. 1920-B, 191 FERC ¶ 61,026 (2025).

regarding who will pay for new facilities, FERC's transmission planning reforms have also required that public utility transmission providers establish prescribed "*ex ante*" cost allocation methods or processes for the costs of new transmission infrastructure recovered under FERC interstate transmission tariffs. *See, e.g.*, *S.C. Pub. Serv. Auth*, 762 F.3d at 53, 82-83 (discussing cost allocation requirements in FERC Order No. 1000[2]).

In its last major transmission reform effort, Order No. 1000 issued in 2011, FERC required public utility transmission providers to establish and engage in a mandatory regional transmission planning process aimed at identifying the most efficient and cost-effective transmission facilities to address regional needs. Order No. 1000 at PP 6, 151. Order No. 1000 also required the regional transmission planning process to reflect *ex ante* cost allocation methods for new transmission facilities included in the regional plan. *See, e.g.*, *S.C. Pub. Serv. Auth*, 762 F.3d at 53, 82-83. In establishing these cost allocation rules, FERC made clear that any cost allocation method must comply with the bedrock "cost causation" ratemaking

---

[2] *Transmission Planning and Cost Allocation by Transmission Owning and Operating Public Utilities*, Order No. 1000, 136 FERC ¶ 61,051 (2011), *order on reh'g & clarification,* Order No. 1000-A, 139 FERC ¶ 61,132, *order on reh'g & clarification,* Order No. 1000-B, 141 FERC ¶ 61,044 (2012), *aff'd sub nom. S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d 41 (D.C. Cir. 2014).

4

principle, which requires that customers only be allocated facility costs roughly commensurate with the benefits they derive from the facilities. *See id.* at 53, 83.

Order No. 1000 recognized the important role played by states in transmission planning – particularly as to projects driven by "public policy" needs. Order No. 1000 at P 209 n.189 ("[W]e strongly encourage states to participate actively in the identification of transmission needs driven by Public Policy Requirements."). And while Order No. 1000 required planning regions to have *ex ante* cost allocation methods, FERC also allowed states and other entities to negotiate voluntary cost allocation arrangements for public policy projects. *See id.* at PP 561, 724; Order No. 1000-A at PP 728-729. This option, for example, has been formalized in the PJM Interconnection, L.L.C. (PJM Interconnection) region as the "State Agreement Approach" allowing a single state or group of states to agree to pay the costs of a particular project. *See, e.g.*, *State Voluntary Agreements to Plan and Pay for Transmission Facilities*, 175 FERC ¶ 61,225, at PP 2-5 (2021).

Order No. 1920, which various petitioners challenge here, builds on Order No. 1000 and FERC's previous transmission planning reforms in recognition of the electric industry's continued evolution and current challenges. More than a decade after Order No. 1000, FERC found deficiencies in existing regional planning requirements, particularly that they "do not result in regional transmission planning that is conducted on a sufficiently long-term, forward-looking, and comprehensive

basis to plan for Long-Term Transmission Needs." JA0683.  FERC concluded that "these deficiencies in the Commission's existing transmission planning and cost allocation requirements render those requirements unjust, unreasonable, and unduly discriminatory or preferential in violation of FPA section 206." JA0683.

In finding existing regional transmission planning requirements inadequate, FERC emphasized the need for new transmission infrastructure in the coming years to ensure reliability in the face of an evolving electric generation resource mix, more extreme weather events, and growing electric demand, including from "new and emerging industrial needs, like data centers." JA0693; *see also* JA0689-JA0699. The industry challenges identified in Order No. 1920 – and the need for transmission infrastructure to address these challenges – have only become more acute since Order No. 1920 was issued in May 2024. In particular, the explosive growth of data centers to support artificial intelligence applications is putting demands on the electric grid that were not anticipated even two years ago – and these demands are only expected to increase. States, FERC, regional grid operators, the North American Electric Reliability Corporation (NERC), and other stakeholders have all cited the expected growth in electricity demand as driving the need for properly-sited new transmission infrastructure.[3]

---

[3] *See, e.g.*, NERC, Characteristics and Risks of Emerging Large Loads, Large Loads Task Force White Paper (July 2025). Available at: https://www.nerc.com/globalassets/who-we-are/standing-

The core requirement adopted by FERC in Order No. 1920 in response to these pressures was that public utilities transmission providers engage in long-term, scenario-based regional planning to identify and address long-term transmission needs. *See generally* JA0802-JA0804; JA2105-JA2106; JA2801-2803. FERC also required transmission providers in each region to submit one or more *ex ante* cost allocation methods that would apply to "Long-Term Regional Transmission Facilities" identified through the planning process. *See, e.g.*, JA2511.

In recognition of the important functions that states play in the transmission planning, siting, and cost recovery processes, Order No. 1920 defined prominent roles for state regulators in the long-term regional planning process and associated cost allocation. For example, FERC required transmission providers to consult with and seek support from state entities regarding the evaluation process that would be

---

committees/rstc/whitepaper-characteristics-and-risks-of-emerging-large-loads.pdf (accessed February 1, 2026); MPSC improves siting process for high-voltage transmission lines, strengthening public engagement and urging more flexibility in route options (Jan. 29, 2026). Available at: https://www.michigan.gov/mpsc/commission/news-releases/2026/01/29/mpsc-improves-siting-process-for-high-voltage-transmission-lines (accessed Feb. 1, 2026); FERC upholds MISO, SPP fast-track generator reviews (Jan. 23, 2026) Available at: https://insidelines.pjm.com/2025-year-in-review-planning-prepares-for-burgeoning-electricity-demand/   (accessed Feb. 1, 2026); PUC 2025 Electric Power Outlook Report Underscores Planning for Pennsylvania's Changing Energy Landscape https://www.puc.pa.gov/press-release/2025/puc-2025-electric-power-outlook-report-underscores-planning-for-pennsylvania-s-changing-energy-landscape-09122025 (accessed Feb. 1, 2026).

used to select transmission projects in the long-term planning process. JA1324-JA1325.

Order No. 1920 also afforded state regulators meaningful input into cost allocation for new Long-Term Regional Transmission Facilities. FERC required transmission providers to establish a one-time "Engagement Period" for "Relevant State Entities"[4] in the region to engage on cost allocation matters, including the opportunity to agree on a "Long-Term Regional Transmission Cost Allocation Method(s)" and/or "State Agreement Process" and provide any such approaches to the transmission providers.  JA1563, JA1564-JA1567. As the name suggests, a State Agreement Process would not be a specific cost allocation method, but a defined process for determining the cost allocation for particular Long-Term Regional Transmission Facilities.  JA1525-JA1528.

Transmission providers in each planning region were also required to include in their Tariffs a process to provide Relevant State Entities and interconnection customers with the opportunity to voluntarily fund the cost of, or a portion of the cost of, a Long-Term Regional Transmission Facility that otherwise would not meet the planning selection criteria.  JA1336-JA1338.  Order No. 1920 required

---

[4] Order No. 1920 defined Relevant State Entities as "any state entity responsible for electric utility regulation or siting electric transmission facilities within the state or portion of a state located in the transmission planning region, including any state entity as may be designated for that purpose by the law of such state." JA1564.

8

transmission providers to consult with and seek support from state entities when developing the process to provide for voluntary funding. JA1336-JA1338.

In Order No. 1920, FERC specified that, if the Relevant State Entities participating in the Engagement Period agree on a Long-Term Regional Transmission Cost Allocation Method(s) and/or State Agreement Process and provide any such approaches to the transmission providers by the close of the Engagement Period, the transmission providers could – but were not required to – file the agreed-to Long-Term Regional Transmission Cost Allocation Method(s) and/or State Agreement Process on compliance. JA1566-JA1567, JA1569-JA1570. This represented a departure from FERC's proposed rule, in which it had proposed to require transmission providers to seek the agreement of Relevant State Entities regarding the relevant cost allocation method to be applied to Long-Term Regional Transmission Facilities. JA1563. In a sharp dissent, then Commissioner Mark Christie argued that Order No. 1920 forced states to pay for neighboring states' clean energy programs. Order No. 1920, Christie, Comm'r, dissenting, at JA1944.

In acting on requests for rehearing of Order No. 1920, FERC made several revisions to the final rule to expand the cost allocation role for state regulators, including two changes that the Transmission Owner Petitioners (Transmission Owners) challenge here. First, FERC revised Order No. 1920 to provide that when Relevant State Entities timely notify transmission providers that they agree on a

Long-Term Regional Transmission Cost Allocation Method and/or State Agreement Process resulting from the Engagement Period, transmission providers *must* include that method or process in the compliance filing transmittal letter or as an attachment to their compliance filing (the "Inclusion Requirement"), even if transmission providers propose a different Long-Term Regional Transmission Cost Allocation Method or do not propose to adopt a State Agreement Process. JA2533, JA2536-JA2538.

Second, FERC required transmission providers to consult with Relevant State Entities before amending the Long-Term Regional Transmission Cost Allocation Method(s) and/or State Agreement Process (the "Consultation Requirement"), or if Relevant State Entities seek for the transmission provider to amend that method or process. JA2566-JA2567. Commissioner Christie noted that Order No. 1920-A restored and enhanced the role of states and represented a significant improvement over Order No. 1920. Order No. 1920-A, Christie, Comm'r, concurring in part, at JA2788-JA2789. He further noted that these changes provide the states a much bigger toolbox containing far more effective tools which they can use to protect their consumers and the interests of their states. JA2791.

In Order No. 1920-B, FERC noted its conclusion in Order No. 1920-A that the Consultation Requirement "will provide a mechanism through which transmission providers and Relevant State Entities can engage with each other

10

regarding possible future" amendments to accepted cost allocation frameworks, thereby reducing downstream controversy that may delay the transmission siting process. JA2915-JA2917. The Commission emphasized that the Consultation Requirement neither compels a filing nor prohibits one; it simply ensures that utilities hear and consider state input before seeking to alter accepted frameworks. JA2926-JA2928.

In giving states a prominent, up-front role in planning and cost allocation for long-term transmission projects, FERC recognized that, absent meaningful state engagement, projects selected through long-term regional planning processes may face siting delays, contested cost allocations, and other challenges in state proceedings – outcomes that undermine the efficiency and timeliness of needed transmission development. *See* JA2923-JA2926. A framework ensuring opportunities for state involvement in planning and in establishing cost allocation methods, in contrast, "would help to address any such concerns on the part of state regulators, increasing the likelihood that Long-Term Regional Transmission Facilities are actually developed, and without delay." JA2923-JA2924 (internal quotes and citation omitted). FERC reasoned that it would be "critical to the success of the Long-Term Regional Transmission Planning reforms that states have an opportunity to have a significant role in the establishment of just and reasonable

11

Long-Term Regional Transmission Cost Allocation Methods and State Agreement Processes." JA2826-JA2827 (citing JA2532).

## STATEMENT OF THE STANDARD OF REVIEW

State Intervenors concur with the standard of review as set forth in FERC's brief.

## SUMMARY OF ARGUMENT

In giving state regulators a prominent role in the Long-Term Regional Transmission Planning process and associated cost allocation methods required under Order No. 1920, FERC correctly recognized the critical importance of state participation to those endeavors. Absent meaningful state engagement, FERC reasonably concluded, projects selected through Long-Term Regional Transmission Planning processes may face siting delays, contested cost allocations, and other challenges in state proceedings – outcomes that undermine the efficiency and timeliness of needed transmission development. The role provided state regulators under Order No. 1920 is well within FERC's authority, and the Court should reject the arguments to the contrary presented by the Transmission Owner Petitioners.

The adoption of the one-time Inclusion Requirement to facilitate FERC's establishment of just and reasonable replacement rates under FPA section 206 does not tread on public utility filing rights under FPA section 205, and the Transmission Owners cite no governing precedent that would support a finding to the contrary.

12

Nor does the Consultation Requirement unlawfully impinge upon public utility transmission owners' FPA section 205 rights. The statutory text specifically provides that section 205 filings must be made "[u]nder such rules and regulations as the Commission may prescribe," 16 U.S.C. § 824d(c), and a requirement to consult with state regulators and explain the result as part of demonstrating that a proposal is just and reasonable falls comfortably within FERC's section 205 authority. As with the Inclusion Requirement, the Transmission Owners offer no applicable precedent supporting a conclusion that the Consultation Requirement unlawfully encumbers their statutory rights. Further, the Consultation Requirement does not violate the First Amendment rights of public utilities for the reasons explained in FERC's brief.

## ARGUMENT

**A. The State Role in Transmission Planning and Cost Allocation Under Order No. 1920 Is Essential to Timely, Efficient Development and to Just and Reasonable Rates**

In objecting to Order No. 1920's Inclusion and Consultation Requirements, the Transmission Owner Petitioners assert that "Congress did not design a regime in which utilities serve merely as conduits for the policy preference of others." Transmission Owner Br. at 18. While, as discussed below, adoption of the Inclusion and Consultation Requirements was well within FERC's authority, it is important to emphasize that those requirements do not simply concern the "policy preferences"

13

of states, but are part of a transmission planning and cost allocation framework intended by FERC to promote efficient and cost-effective transmission development that includes state engagement, while preserving public utilities' statutory filing rights and First Amendment protections.

State laws, policies, and siting regimes influence long-term transmission needs and the ability to permit and build new facilities. *See* JA2540-JA2541; JA2888-JA2889. It is states that "affect whether Long-Term Regional Transmission Facilities are timely, efficiently, and cost-effectively developed such that customers actually receive the benefits associated with the selection of more efficient or cost-effective transmission solutions." JA2888-JA2889. Similarly, state regulators' perception of whether costs of new Long-Term Regional Transmission Facilities will be allocated in accordance with cost causation principles, particularly in multi-state planning regions, will impact the ability to get transmission built, which is why "it is therefore reasonable to require that transmission providers provide the Commission with any Long-Term Regional Transmission Cost Allocation Method(s) and/or State Agreement Process that Relevant State Entities have agreed upon." JA2889; *see also* JA2923-JA2924.

FERC reasonably found that enhancing state participation in developing cost allocation methods, through the initial Engagement Period, the one-time Inclusion Requirement, and the procedural Consultation Requirement, would reduce

14

controversy, improve perceived fairness, and minimize delays, thereby advancing the Commission's duty to ensure just and reasonable rates. *See, e.g.*, JA2539-JA2542.

Participation of Relevant State Entities in developing cost allocation mechanisms can promote consensus and reduce the likelihood that states will oppose new facilities at the permitting stage. The Michigan PSC, for example, has emphasized the unique characteristics of transmission service in the state that make robust state engagement especially important. Most of the electric transmission assets in Michigan were divested to independent transmission companies that are not directly regulated by the Michigan PSC. JA3306, JA3308[5]; JA4523-JA4525, JA4527.[6]    Further, Michigan has extensive seams with the Midcontinent Independent System Operator and PJM Interconnection regions, as well as international borders with Ontario. JA3308; JA4524. Michigan's peninsular geography limits the physical network for transmission of electric energy flowing into and out of the state. JA3306, JA3308; JA4524. These characteristics make

---

[5] Comments of the Michigan Public Service Commission, *Bldg. for the Future Through Elec. Reg'l Transmission Planning and Cost Allocation,* Advance Notice of Proposed Rulemaking Proceeding, Docket No. RM12-17-000 (filed October 12, 2021) (Michigan PSC ANOPR Comments).

[6] Comments of the Michigan Public Service Commission, *Bldg. for the Future Through Elec. Reg'l Transmission Planning and Cost Allocation,* Docket No. RM21-17-000 (filed August 17, 2022) (Michigan PSC Initial NOPR Comments).

transparent benefit metrics and cost allocation alignment indispensable for protecting Michigan ratepayers from bearing costs not commensurate with benefits they receive. JA3309-JA3314; JA4526-JA4527. Order No. 1920's Inclusion and Consultation Requirements provide opportunities for the Michigan PSC to raise this perspective in a productive way.

The opportunity for states to develop a State Agreement Process (as defined in Order No. 1920) and the allowance for voluntary funding of projects that do not meet long-term planning criteria or are opposed by other states due to cost allocation concerns also hold great potential to facilitate efficient transmission development. The voluntary "State Agreement Approach" for allocating the costs of particular projects in PJM Interconnection, for example, has helped promote development of transmission projects that were driven by a particular state's needs but which may have been opposed by other states for that very reason. *See, e.g.*, *State Voluntary Agreements to Plan and Pay for Transmission Facilities*, 175 FERC ¶ 61,225 at PP 2-5.

The State Agreement Approach, by the terms of the PJM Interconnection Operating Agreement, allows "State governmental entities authorized by their respective states, individually or jointly, [to] agree voluntarily to be responsible for the allocation of all costs of a proposed transmission expansion or enhancement that addresses state Public Policy Requirements identified or accepted by the state(s) in

16

the PJM Region."[7] Because the State Agreement Approach is targeted at addressing state Public Policy Requirements, it would have been subject to potential re-litigation under Order No. 1920, which required transmission providers to demonstrate that the continued use of existing cost allocation processes accounting for transmission needs driven by Public Policy Requirements would not interfere with Order No. 1920's long-term planning requirements. JA0817-0818. FERC clarified in Order No. 1920-A that, while the existing PJM Interconnection State Agreement Approach would be unaffected by Order No. 1920's requirements, if Relevant State Entities in PJM wished to rely on the State Agreement Approach as an Order No. 1920 State Agreement Process applicable to Long-Term Regional Transmission Facilities under Order No. 1920, the adoption of the State Agreement Approach would need to comply with Order No. 1920. *See* JA2186-JA2187, JA2585-JA2587. The adoption of the Inclusion and Consultation Requirements would facilitate, therefore, the consideration of extending the State Agreement Approach to long-term transmission projects.

The option of applying the State Agreement Approach in PJM Interconnection could be particularly beneficial. The PJM Interconnection footprint has grown from three member states (Pennsylvania, New Jersey and Maryland) to 13 states and the

---

[7] PJM Interconnection, L.L.C. Operating Agreement, Schedule 6, Section 1.5.9.

17

District of Columbia, all of which are highly diverse. The states have different siting authorities as well as generation and load goals and requirements to employ in determining transmission needs. The PJM State Agreement Approach allows state governmental entities to voluntarily agree to be responsible for the costs of transmission projects that help them satisfy their public policy requirements. It also ensures cost allocation rules do not inadvertently and unreasonably force neighboring states to shoulder the costs of other states' public policy choices. FERC recognized the comments saying as much when it originally approved the State Agreement Approach. *PJM Interconnection, L.L.C.*, 142 FERC ¶ 61,214 at PP 142-43 (2013).

Further, there is a rapidly growing demand for energy in the PJM Interconnection region driven by the data center boom and the reshoring of industrial manufacturing, including but not limited to Pennsylvania and Michigan. Geographically, Pennsylvania shares borders with six states, including: New York, New Jersey, Delaware, Maryland, West Virginia, and Ohio. Pennsylvania has attracted substantial interest from companies seeking to locate data centers within its border. These industries rely upon the availability of reasonably priced and reliable electricity. In this time of tight reserve margins in PJM Interconnection, which cannot be fixed merely through transmission projects, electrons must be produced. Without the preservation of the State Agreement Approach, efforts by individual

18

states to incentivize generation within their state could face challenges from competing state programs.

PJM Interconnection's State Agreement Approach is a fair and important tool used by states in the PJM region to effectuate their policy goals. The State Agreement Approach avoids interstate fights over transmission planning, and facilitates regional cooperation across a variety of issues, even those unrelated to transmission. The Inclusion and Consultation Requirements could facilitate use of the State Agreement Approach under Order No. 1920.

**B.      The Inclusion Requirement Does Not Unlawfully Encumber Public Utility FPA Section 205 Filing Rights**

The Transmission Owners claim that the Inclusion Requirement unlawfully infringes upon their exclusive filing rights under FPA section 205. Transmission Owner Br. at 18-22. This argument fails at the outset because the filings to which the Inclusion Requirement applies are not FPA section 205 filings. *See* JA2845-JA2851, JA2867.

Where, as it did here, FERC finds that an existing tariff is unjust, unreasonable, unduly discriminatory or preferential under section 206 of the FPA, "[FERC] shall determine the just and reasonable rate, charge, classification, rule, regulation, practice, or contract to be thereafter observed and in force, and shall fix the same by order." 16 U.S.C. § 824e(a). Thus, it is not the obligation of either a public utility whose rate is under investigation or a complainant challenging the rate

19

to establish a prospective just and reasonable rate – that job belongs to FERC under the statute. *Advanced Energy Mgmt. All. v. FERC*, 860 F.3d 656, 663 (D.C. Cir. 2017) ("When the Commission changes an existing filed rate under section 206, it is the Commission's burden to prove the reasonableness of its change in methodology" (citation modified)); *Md. Pub. Serv. Comm'n v. FERC*, 632 F.3d 1283, 1285 n.1 (D.C. Cir. 2011).

As FERC explained in Order No. 1920-A, once it found existing public utility regional transmission planning tariffs to be unjust and unreasonable, the compliance filings to revise existing rates would not be submissions under FPA section 205, but FPA section 206 compliance filings. JA2846-JA2847 (explaining "these aspects of Order No. 1920-A arise from FPA section 206, which sets forth the Commission's authority to determine and fix by order a replacement rate after appropriate findings."). The Inclusion Requirement is an informational requirement for these FPA section 206 compliance filings designed to inform FERC in its statutory duty of establishing a just and reasonable replacement rate by allowing FERC to compare transmission providers' proposal with a Long-Term Regional Transmission Cost Allocation Method(s) and/or State Agreement Process endorsed by Relevant State Entities when setting the replacement rate. JA2845-JA2846, JA2861-JA2863.

The Transmission Owners erroneously contend that FERC must give precedence to just and reasonable compliance proposals submitted by public utility

20

transmission providers over other potential replacement rates. Transmission Owner Br. at 23-30. The FPA, however, does not provide such a privileged position to public utilities under FPA section 206, and the authorities principally relied upon by the Transmission Owners do not establish such a rule. Neither *Electrical District No. 1 v. FERC*, 774 F.2d 490 (D.C. Cir. 1985) nor *City of Cleveland v. FERC*, 773 F.2d 1368 (D.C. Cir. 1985) address the question of whether FERC must accept a public utility's position to the exclusion of all others in the context of a proceeding to establish a just and reasonable replacement rate under FPA section 206. *See* FERC Br. at 196-97.

To be sure, FERC has suggested in several cases cited by Transmission Owners that it will accept a just and reasonable compliance proposal from a public utility over potential alternatives. *See* Transmission Owner Br. at 28-30 (citing *PJM Interconnection, L.L.C.*, 173 FERC ¶ 61,134, at P 117 n.175 (2020); *Kern River Gas Transmission Co.*, 142 FERC ¶ 61,132, at P 37 & n.51 (2013); *PJM Interconnection, L.L.C.*, 117 FERC ¶ 61,331, at P 85 (2006)). As FERC explained in Order No. 1920-B, however, FERC's pragmatic approach to compliance in these cases did not – and could not – eliminate FERC's statutory duty to fix just and reasonable replacement rates under FPA section 206. *See* JA2869-JA2870, JA2874-JA2875. FERC correctly observed that the interpretation promoted by the Transmission Owners here "renders meaningless this aspect of the statutory divide of FPA sections 205 and section 206

21

and would impermissibly convert the Commission's statutory authority to determine the replacement rate into a substantive statutory right for the public utilities." JA2875.

Even if transmission providers' cost allocation compliance filings under Order No. 1920 are regarded as FPA section 205 submissions, the Inclusion Requirement does not unlawfully impinge upon public utility filing rights under section 205. Public utility transmission providers retain full authority to make any proposal they wish in an effort to comply with the requirements of Order No. 1920. Unlike the situation in *Atlantic City Electric Company v. FERC*, 295 F.3d 1 (D.C. Cir. 2002), cited by Transmission Owners, nothing in Order No. 1920 purports to deprive public utilities of the right to make section 205 filings. FERC made clear that the inclusion of any state-agreed cost allocation method or process in the compliance filing "does not constitute a 'proposal' from the transmission provider," JA2537; JA2889-JA2890; rather, transmission providers retain discretion over what they actually propose as their compliance position, including relevant tariff language and supporting evidence or arguments.

Finally, there is no merit to Transmission Owners' argument that FERC lacked authority to adopt the Inclusion Requirement because it did not make an adequate finding that existing cost allocation methods were unjust and unreasonable under the first step of the FPA section 206 framework. *See* Transmission Owner Br.

22

at 31-33. FERC has authority to impose an "industry-wide solution" to remedy a "systemic problem." *S.C. Pub. Serv. Auth.*, 762 F.3d at 67 (citing *Interstate Natural Gas Ass'n of Am. v. FERC*, 285 F.3d 18, 37 (D.C. Cir. 2002) ("The Commission may rely on 'generic' or 'general' findings of a systemic problem to support imposition of an industry-wide solution.")).

## C.   FERC Possesses Statutory Authority to Adopt the Consultation Requirement

The Transmission Owners launch a legal broadside against the Consultation Requirement, erroneously characterizing this reasonable "meet and confer" obligation as a violation of the FPA and a deprivation of rights guaranteed by the First Amendment to the Constitution. The Court should reject these arguments.

Section 205 of the FPA states that filings submitted pursuant to that section must be made "[u]nder such rules and regulations as the Commission may prescribe." 16 U.S.C. § 824d(c). The Consultation Requirement – which serves to provide information to help the Commission evaluate any proposed changes by a transmission provider to a cost allocation method or State Agreement Process for Long Term Regional Transmission Facilities – is a procedural prescription within FERC's section 205 authority. *See* FERC Br. at 206.

The Transmission Owners yet again invoke *Atlantic City* to argue that the Consultation Requirement unlawfully "encumbers" their FPA section 205 rights. *See* Transmission Owner Br. at 34-35 (citing *Atlantic City Elec. Co.*, 295 F.3d at 9).

23

The procedural Consultation Requirement, however, is nothing like the situation in *Atlantic City*, which involved a FERC directive that public utility transmission owners in PJM Interconnection cede altogether their right to file certain rate changes under FPA section 205. *See Atlantic City Elec. Co.*, 295 F.3d at 7. The Consultation Requirement does not deprive transmission providers of the right to make future FPA section 205 filings, as Order Nos. 1920-A and 1920-B make abundantly clear. JA2567; JA2927-JA2928, JA2932-JA2934.

The Transmission Owners' reliance (Br. at 34-35) on *NRG Power Marketing, LLC v. FERC*, 862 F.3d 108 (D.C. Cir. 2017), is similarly misplaced. The D.C. Circuit's ruling in *NRG* held that FERC cannot unilaterally modify a public utility's proposal under FPA section 205 in a way that "create[s] a new rate scheme . . . significantly different" from the utility's original proposal. *Id.* at 110. The Consultation Requirement imposes no substantive restrictions upon public utility proposals under FPA section 205, let alone *modifications* to those proposals in contravention of *NRG*.

Finally, while the Transmission Owners point to dicta in *City of Cleveland v. FERC*, 525 F.2d 845, 855 (D.C. Cir. 1975), stating that a public utility "may, without negotiation or consultation with anyone, set the rates it will charge prospective customers, and change them at will," Transmission Owner Brief at 34, the holding in that case focused on whether a public utility might be held to an agreed-upon rate

with a customer that was not reflected in the utility's filing at FERC – not the adoption of a consultation obligation. In any case, the language relied upon by the Transmission Owners from *City of Cleveland* does not have the meaning they ascribe to it. The court was simply observing that submitting a FPA section 205 filing without consultation or negotiation is one permissible approach to making a filing; the court was not purporting to describe a rule that a consultation or negotiation obligation would be *unlawful* under FPA section 205. *See City of Cleveland*, 525 F.2d at 855.

**D.    The Inclusion and Consultation Requirements Do Not Violate the First Amendment Rights of Transmission Owners**

The Transmission Owners maintain that the Inclusion and Consultation Requirements violate the First Amendment to the U.S. Constitution by allegedly compelling them to "carry and promote state-designed policy proposals – including those with which utilities disagree – and to explain why they have not adopted state proposals to change the existing cost allocation." Transmission Owner Br. at 37; *see also id.* at 36-48. As described at length in FERC's brief – upon which the State Intervenors rely – the requirements of Order No. 1920 do not violate the requirements of the First Amendment, and the Transmission Owners' arguments should be rejected.

25

## CONCLUSION

For the foregoing reasons, and the reasons set forth in FERC's brief, the Court should uphold FERC's Inclusion and Consultation requirements and find that FERC acted within its Federal Power Act section 206 authority and did not infringe on Transmission Owners' Federal Power Act section 205 filings rights or their First Amendment protections.

Respectfully submitted,

/s/ Elizabeth H. Barnes
Elizabeth H. Barnes
Deputy Chief Counsel
400 North St., 3rd Floor
Harrisburg, PA 17120
Tel: (717) 787-5000
ebarnes@pa.gov

*Counsel for the Pennsylvania Public Utility Commission*

/s/ M. Denyse Zosa
M. Denyse Zosa
John McCaffrey
STINSON LLP
1775 Pennsylvania Ave., N.W.
Suite 800
Washington, D.C. 20006
202-785-9100
denyse.zosa@stinson.com
john.mccaffrey@stinson.com

*Counsel for the Michigan Public Service Commission*

**CERTIFICATE OF COMPLIANCE**

Pursuant to Fed. R. App. P. 32(g) and Circuit Rule 32(b), I certify that this brief complies with the type-volume limitation in Fed. R. App. P. 32(a)(7)(B), as modified by this Court's July 28, 2025 order (Doc. 327-1), because this brief contains 5,474 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

I further certify that this brief complies with the type-face requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in Times New Roman 14-point font using Microsoft Word 365.

/s/ M. Denyse Zosa
M. Denyse Zosa
STINSON LLP
1775 Pennsylvania Ave., N.W.
Suite 800
Washington, D.C. 20006
202-785-9100
denyse.zosa@stinson.com

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system on March 13, 2026. Participants in the case will be served by the appellate CM/ECF system.

/s/ M. Denyse Zosa
M. Denyse Zosa
STINSON LLP
1775 Pennsylvania Ave., N.W.
Suite 800
Washington, D.C. 20006
202-785-9100
denyse.zosa@stinson.com