**ORAL ARGUMENT HAS NOT YET BEEN SCHEDULED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

Nos. 24-1650, 24-1748, 24-1756, 24-1758, 24-1760, 24-1765, 24-1770, 24-1785, 24-1792, 24-1804, 24-1857, 24-1862, 24-1867, 24-1876, 24-1885, 24-1887, 24-1979, 24-1991, 24-2162, 24-2163, 25-1073, 25-1080, 25-1197, 25-1349
(consolidated)

APPALACHIAN VOICES, ET AL.,
*Petitioners*,

v.

FEDERAL ENERGY REGULATORY COMMISSION,
*Respondent*,

ENTERGY OPERATING COMPANIES and ENTERGY SERVICES, LLC, ET AL.,
*Intervenors*.

ON PETITION FOR REVIEW OF ORDERS OF THE
FEDERAL ENERGY REGULATORY COMMISSION, DKT. NO. RM21-17

_____

# FINAL BRIEF OF TRANSMISSION OWNER INTERVENORS
# IN SUPPORT OF RESPONDENT
# FEDERAL ENERGY REGULATORY COMMISSION

_____

John Lee Shepherd, Jr.
Blake Grow
Hunton Andrews Kurth LLP
2200 Pennsylvania Ave, NW
Suite 900
Washington, DC 20037
(202) 955-1500
jshepherd@hunton.com
bgrow@hunton.com

*Counsel for the Southwest Power Pool Transmission Owner Group*

Denise Buffington
Senior Director Federal Regulatory Affairs
Evergy, Inc.
1200 Main Street
Kansas City, MO 64105
(816) 556-2683
denise.buffington@evergy.com

*On behalf of the Evergy Companies*

Timothy T. Mastrogiacomo
Vice President, Federal Regulatory, Legal, and Policy
Xcel Energy Services Inc.
701 Pennsylvania Avenue, NW, Ste. 250
Washington, DC 20006
(202) 661-4481
tim.t.mastrogiacomo@xcelenergy.com

*On behalf of Southwestern Public Service Company*

ii

Steven M. Nadel
Senior Counsel
PPL Services Corporation
645 Hamilton Street, Suite 700
Allentown, PA 18101
(610) 774-4775
SMNadel@pplweb.com

John Longstreth
Donald A. Kaplan
Chimera N. Thompson
K&L Gates LLP
1601 K Street, N.W.
Washington, DC  20006
(202) 778-9000
john.longstreth@klgates.com
don.kaplan@klgates.com
chimera.thompson@klgates.com

Michelle S. Kallen
William M. Keyser
Steptoe LLP
1330 Connecticut Avenue N.W.
Washington, DC 20036
(202) 429-8186
mkallen@steptoe.com
wkeyser@steptoe.com

*Counsel for PPL Electric Utilities Corporation*

Molly Suda
Associate General Counsel
Duke Energy Corporation
1301 Pennsylvania Ave. NW,
Suite 200
Washington, DC 20004
(202) 824-8011
molly.suda@duke-energy.com

*Counsel for Duke Energy*

iii

William M. Rappolt
Assistant General Counsel, FERC
AES US Services LLC
4300 Wilson Blvd
Arlington, VA 22203
(703) 682-6337
william.rappolt@aes.com

*Counsel for The Dayton Power and Light Co.*

Gary E. Guy
Assistant General Counsel
Exelon Corporation
701 Ninth Street, N.W., Suite 9426
Washington, DC 20068
(301) 956-6754
gary.guy@exeloncorp.com

*Counsel for Exelon Corporation, Atlantic City Electric Company, Baltimore Gas and Electric Company, Commonwealth Edison Company, Delmarva Power & Light Company, PECO Energy Company, and Potomac Electric Power Company*

William H. Baxter II
Cheri Yochelson
Assistant General Counsel
Dominion Energy Services, Inc.
120 Tredegar Street, Riverside 6th Floor
Richmond, VA 23219
(804) 819-2458
william.h.baxter@dominionenergy.com
cheri.m.yochelson@dominionenergy.com

*Counsel for Dominion Energy Services, Inc., on behalf of its affiliate Virginia Electric and Power Company*

iv

David M. Gossett
Davis Wright Tremaine LLP
1301 K Street, NW
Suite 500 East
Washington, DC 20005
(202) 973-4200
davidgossett@dwt.com

Sanford I. Weisburst
Quinn Emanuel Urquhart &
Sullivan, LLP
295 Fifth Avenue
New York, NY 10016
(212) 849-7000
sandyweisburst@quinnemanuel.com

*Counsel for the FirstEnergy Transmission Companies*

Carrie L. Bumgarner
Senior Counsel
American Electric Power Service Corporation
1 Riverside Plaza
Columbus, OH 43215
(614) 716-2941
clbumgarner@aep.com

*Counsel for American Electric Power Service Corporation on behalf of its affiliates Appalachian Power Company, Indiana Michigan Power Company, Kentucky Power Company, Kingsport Power Company, Ohio Power Company, Wheeling Power Company, AEP Appalachian Transmission Company, Inc., AEP Indiana Michigan Transmission Company, Inc., AEP Kentucky Transmission Company, Inc., and AEP Ohio Transmission Company, Inc.*

Daniel E. Frank
Allison E.S. Salvia
Eversheds Sutherland (US) LLP
700 Sixth St., N.W., Suite 700
Washington, DC  20001-3980
(202) 383-0100
danielfrank@eversheds-sutherland.com
allisonsalvia@eversheds-sutherland.com

*Counsel for East Kentucky Power Cooperative, Inc.*

v

Donald A. Kaplan
K&L Gates LLP
1601 K Street, N.W.
Washington, DC  20006
(202) 778-9000
don.kaplan@klgates.com

*Counsel for Duquesne Light Company*

Joshua A. Kirstein
Senior Attorney
Paul Savage
Associate Counsel
Consolidated Edison Company of
New York, Inc.
4 Irving Place, 18th Floor
New York, NY 10003
(929) 656-5971
(212) 460-2764
kirsteinj@coned.com
savagep@coned.com

*Counsel for Rockland Electric Company*

Wendy N. Reed
Matthew J. Binette
Abraham F. Johns III
WRIGHT & TALISMAN, P.C.
1200 G Street N.W., Suite 600
Washington, DC  20005-3898
(202) 393-1200
reed@wrightlaw.com
binette@wrightlaw.com
johns@wrightlaw.com

*Counsel for the MISO Transmission Owners:*
*Ameren Services Company, as agent for Union Electric Company d/b/a Ameren Missouri, Ameren Illinois Company d/b/a Ameren Illinois and Ameren Transmission Company of Illinois; American Transmission Company LLC; Central Minnesota Municipal Power Agency; Cooperative Energy; Dairyland Power Cooperative; Duke*

vi

*Energy Business Services, LLC for Duke Energy Indiana, LLC; Great River Energy; Indiana Municipal Power Agency; Indianapolis Power & Light Company d/b/a AES Indiana; Lafayette Utilities System; MidAmerican Energy Company; Minnesota Power (and its subsidiary Superior Water, L&P); Montana-Dakota Utilities Co.; Northern Indiana Public Service Company LLC; Northern States Power Company, a Minnesota corporation, and Northern States Power Company, a Wisconsin corporation, subsidiaries of Xcel Energy Inc.; Northwestern Wisconsin Electric Company; Otter Tail Power Company; Prairie Power, Inc.; Southern Indiana Gas & Electric Company (d/b/a CenterPoint Energy Indiana South); Southern Minnesota Municipal Power Agency; and Wolverine Power Supply Cooperative, Inc.*

Final Brief:  March 13, 2026

vii

## CORPORATE DISCLOSURE STATEMENT

Respondent-intervenors are Federal Energy Regulatory Commission ("FERC")-jurisdictional investor-owned transmission companies and utilities, cooperative utilities, and municipal utilities that own electric transmission facilities and participate in FERC-authorized regional transmission organizations. Unless otherwise specified below, no publicly-traded entity owns 10% or more of a Respondent-intervenor or a Respondent-intervenor's ultimate parent, if any; no other publicly held corporation has a direct financial interest in the outcome of the litigation by reason of a franchise, lease, other profit sharing agreement, insurance, or indemnity agreement; and there is no affiliated master limited partnership, real estate investment trust, or other similarly situated legal entity whose shares are publicly held or traded.

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1, Respondent-intervenors make the following disclosures:

1. **American Electric Power Service Corporation on behalf of its affiliates, Appalachian Power Company, Indiana Michigan Power Company, Kentucky Power Company, Kingsport Power Company, Ohio Power Company, Wheeling Power Company, AEP Appalachian Transmission Company, Inc., AEP Indiana Michigan Transmission Company, Inc., AEP Kentucky Transmission Company, Inc., and AEP Ohio Transmission Company, Inc., Southwestern Electric Power Co., Public Service Co. of Oklahoma, AEP Oklahoma Transmission Co., Inc., and AEP Southwestern Transmission Co., Inc.**

American Electric Power Service Corp. ("AEPSC") is a wholly-owned subsidiary of American Electric Power Company, Inc. ("AEP"), a New York corporation whose common stock is held by the public and traded on the Nasdaq Exchange. AEPSC is a service company that provides management and professional services to AEP. AEP has no parent company. Certain institutional investors including Vanguard Group Inc. ("Vanguard"), which is not publicly traded, may from time to time hold 10 percent or more of the outstanding shares of AEP – but to AEP's knowledge, no publicly-held company has a 10% or greater ownership interest in AEP.

2. **Ameren Services Company, as agent for Union Electric Company d/b/a Ameren Missouri, Ameren Illinois Company d/b/a Ameren Illinois, and Ameren Transmission Company of Illinois**

Ameren Services Company is a centralized services company that provides administrative support services to Ameren Corporation and its operating companies, subsidiaries, and affiliates, including the following public utility affiliates: Union Electric Company d/b/a Ameren Missouri, Ameren Illinois Company d/b/a Ameren

ix

Illinois, and Ameren Transmission Company of Illinois ("Ameren Companies"). The Ameren Companies are wholly-owned subsidiaries of Ameren Corporation, a publicly traded holding company.  At this time, Ameren Services Company believes that T. Rowe Price (which is publicly traded) and Vanguard (which is not publicly traded) each own more than 10% of the outstanding shares of Ameren Corporation.

### 3.      American Transmission Company LLC

American Transmission Company LLC ("American Transmission") is governed by its corporate manager, ATC Management Inc.  American Transmission's owners include utilities, municipalities, municipal electric companies, and electric cooperatives from Wisconsin, Michigan, Minnesota, and Illinois.  Two publicly-held corporations (through wholly-owned subsidiaries) own 10% or more of American Transmission's ownership interests:  WEC Energy Group, Inc. and Alliant Energy Corporation.

### 4.      Central Minnesota Municipal Power Agency

Central Minnesota Municipal Power Agency is a non-stock, joint-action agency organized under the laws of the State of Minnesota.  Central Minnesota Municipal Power Agency has no corporate parent.

### 5.      Cooperative Energy

Cooperative Energy is an incorporated, not-for-profit, cooperative electric power association that is owned and controlled by its eleven members, which are

x

distribution rural electric power associations. Cooperative Energy has no corporate parent, and no publicly-held corporations have a 10% or greater ownership interest in Cooperative Energy.

### 6. Dairyland Power Cooperative

Dairyland Power Cooperative ("Dairyland") is an electric generating and transmitting non-stock cooperative association comprised of twenty-four Class-A distribution cooperative members. Dairyland has no corporate parent.

### 7. The Dayton Power and Light Co. d/b/a AES Ohio

The Dayton Power and Light Co. d/b/a AES Ohio ("Dayton") is a corporation organized and existing under the laws of the State of Ohio, with its principal place of business in Dayton, Ohio. Dayton is a public utility company subject to the jurisdiction of FERC. Dayton is an owner of transmission and distribution facilities located within PJM Interconnection, L.L.C. ("PJM").

Dayton is a subsidiary of DPL, Inc., which is a subsidiary of AES DPL Holdings, LLC. AES DPL Holdings, LLC is a subsidiary of The AES Corporation ("AES"). AES is a Delaware corporation with its principal place of business in Arlington, Virginia. AES has issued shares of stock and debt securities to the public. Investment funds owned by Vanguard hold over ten percent of the publicly-traded shares of AES. Vanguard is not publicly traded and is investor-owned by its fund shareholders.

xi

8. **Duke Energy Business Services, LLC for Duke Energy Indiana, LLC**

Duke Energy Business Services, LLC for Duke Energy Indiana, LLC ("Duke Indiana") is owned 100% by Duke Energy Indiana Holdco, LLC ("Duke Indiana Holdco"). Duke Indiana Holdco is owned 80.1% by Cinergy Corp. and 19.9% by Epsom Investment Pte. Ltd., ("Epsom Investment"). Cinergy Corp. is owned 100% by Duke Energy Corporation, a publicly-traded energy holding company. Epsom Investment is a wholly-owned subsidiary of GIC Infra Holdings Pte. Ltd. ("GIC"). GIC is a direct, wholly-owned subsidiary of GIC (Ventures) Pte. Ltd. ("GIC Ventures"). GIC Ventures is wholly-owned by the Government of Singapore through the Minister for Finance, a statutory corporation set up by the Government of Singapore to own and administer government assets.

9. **Duke Energy Corporation on behalf of its affiliates Duke Energy Business Services LLC, Duke Energy Ohio, Inc. and Duke Energy Kentucky, Inc.**

Duke Energy Business Services LLC ("DEBS"), Duke Energy Kentucky, Inc. ("DEK"), and Duke Energy Ohio, Inc. ("DEO") (collectively, "Duke Energy") provide the following:

DEBS certifies that it is a Delaware limited liability company. DEBS is a direct, wholly-owned subsidiary of Duke Energy Corporate Services, Inc., which is a direct, wholly-owned subsidiary of Duke Energy Corporation (NYSE: DUK).

xii

DEK certifies that it is a non-governmental corporation organized and existing under the laws of Kentucky. DEK is a direct, wholly-owned subsidiary of DEO. DEO certifies that it is a non-governmental corporation organized and existing under the laws of Ohio. DEO is a direct, wholly-owned subsidiary of Cinergy Corp., which is a direct, wholly-owned subsidiary of Duke Energy Corporation (NYSE: DUK).

Duke Energy Corporation is publicly traded on the New York Stock Exchange. There is no company that has a 10% or greater ownership interest in Duke Energy Corporation.

**10.   Duquesne Light Company**

Duquesne Light Company ("Duquesne Light") is engaged in the transmission, distribution, and sale of electricity to retail and wholesale customers in Pennsylvania within the footprint of the PJM regional transmission organization. Duquesne Light is a Market Participant in PJM and is a wholly owned subsidiary of Duquesne Light Holdings.

In May 2007, Duquesne Light was acquired by a consortium of private equity investors. The consortium consists of several institutional investors which own all of the common equity of Duquesne Light's parent company, DQE Holdings LLC. The members of the consortium are: GIC Pte. Ltd., John Hancock Financial/PGGM Infrastructure Fund, and APG Americans Infrastructure/CalSTRS/Argo Infrastructure Partners.

No publicly held company owns more than 10% of Duquesne Light.

**11.    East Kentucky Power Cooperative, Inc.**

East Kentucky Power Cooperative, Inc. ("EKPC") is a not-for-profit generation and transmission cooperative that provides wholesale electric power to 16 owner-member cooperatives in Kentucky. EKPC's principal place of business is in Winchester, Kentucky. EKPC is owned by its 16 retail electric distribution cooperative members. None of EKPC's members own 10% or more of EKPC.

**12.    Evergy Kansas Central, Inc., Evergy Metro, Inc., and Evergy Missouri West, Inc.**

Evergy Kansas Central, Inc. Evergy Metro. Inc and Evergy Missouri West, Inc. ("The Evergy Companies") are wholly-owned subsidiaries of Evergy, Inc., a publicly-traded company. Vanguard may own more than a 10% interest in Evergy's publicly-traded stock as of the date of this filing.

**13.    Exelon Corporation on behalf of its affiliates Atlantic City Electric Company, Baltimore Gas and Electric Company, Commonwealth Edison Company, Delmarva Power & Light Company, PECO Energy Company, and Potomac Electric Power Company**

Exelon Corporation ("Exelon") is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania and has its principal offices at 10 South Dearborn Street, Chicago, Illinois 60603. Exelon has no parent company, and no publicly-held company has a 10% or greater ownership interest in Exelon.

xiv

Vanguard is believed, based on the Schedule 13G/A it most recently filed with the Securities and Exchange Commission, to hold a greater than 10% voting interest in Exelon pursuant to FERC blanket authorization under Federal Power Act Section 203, 16 U.S.C. § 824b.

**14.　The FirstEnergy Transmission Companies**

The respondent-intervenors referred to as the "FirstEnergy Transmission Companies" comprise two related sets of entities:

1.　Respondent-intervenors Jersey Central Power & Light Co., The Potomac Edison Co., and Monongahela Power Co. are wholly owned subsidiaries of FirstEnergy Corporation, a publicly held company (ticker symbol FE on the New York Stock Exchange). No publicly-held company owns more than 10% of FirstEnergy Corporation.

2.　Respondent-intervenors American Transmission Systems, Inc., Mid-Atlantic Interstate Transmission LLC, Keystone Appalachian Transmission Co., and Trans-Allegheny Interstate Line Co. are wholly-owned subsidiaries of FirstEnergy Transmission, LLC ("FET"). The majority of FET is in turn owned by FirstEnergy Corporation and 49.9% of FET is owned by North American Transmission Company II L.P., a controlled investment vehicle entity of Brookfield Infrastructure Partners (NYSE: BIP).

xv

No other publicly-held corporation has a direct financial interest in the outcome of the litigation through the FirstEnergy Transmission Companies by reason of a franchise, lease, other profit sharing agreement, insurance, or indemnity agreement – and there is no affiliated master limited partnership, real estate investment trust, or other similarly situated legal entity whose shares are publicly held or traded.

### 15.    Great River Energy

Great River Energy is a generation and transmission cooperative corporation that is wholly-owned by its 26 member distribution cooperatives.  Great River Energy does not have a parent corporation and has not issued shares to the public.

### 16.    Indiana Municipal Power Agency

The Indiana Municipal Power Agency ("IMPA") is a joint action agency providing wholesale power to sixty-one municipal members in Indiana and Ohio, and is a body corporate and politic and political subdivision of the State of Indiana. IMPA does not have a parent corporation and has not issued stock.

### 17.    Indianapolis Power & Light Company d/b/a AES Indiana

AES Indiana is a subsidiary of IPALCO Enterprises, Inc. ("IPALCO"). IPALCO is majority-owned (82.35%) by AES U.S. Investments, Inc., which is majority-owned (85%) by AES U.S. Holdings, LLC (IPALCO and AES U.S. Holdings' minority ownership is described immediately below). AES U.S. Holdings

is wholly-owned by AES. AES has issued shares of stock and debt securities to the public. Investment funds owned by Vanguard hold over 10% of the publicly-traded shares of AES. Vanguard is investor-owned by its fund shareholders.

IPALCO is minority owned (17.65%) by CDP Infrastructures Fund L.P. ("CDP Fund"), and AES U.S. Investments is also minority-owned by CDP Fund (15%). CDP Fund is an indirect, minority investor having certain investor protection rights, while AES has majority ownership and control over both AES U.S. Investments and IPALCO. CDP Fund is wholly-owned by Caisse de dépôt et placement du Québec, a Canadian institutional investor that manages public and private pension plans and insurance programs in Quebec.

### 18.   Lafayette Utilities System

Lafayette Utilities System ("Lafayette") is a municipal utility organized under the laws of the State of Louisiana. The governing authority of Lafayette is the Lafayette City Council. Lafayette has no corporate parent and issues no stock.

### 19.   MidAmerican Energy Company

MidAmerican Energy Company (" MidAmerican") is an indirect subsidiary of Berkshire Hathaway Energy Company ("BHEC"). Intermediate parent entities of MidAmerican are MHC Inc. and MidAmerican Funding, LLC. Neither MHC Inc., which is 100% owned by MidAmerican Funding, LLC, nor MidAmerican Funding, LLC, which is owned 100% by BHEC, has publicly-traded equity securities. BHEC

is a consolidated subsidiary of Berkshire Hathaway Inc., a publicly traded entity, which owns approximately 100% of the voting equity of BHEC.

**20.    Minnesota Power (and its subsidiary Superior Water, Light & Power Company)**

ALLETE, Inc., d/b/a Minnesota Power, which owns Superior Water, Light & Power Company, is owned jointly by the Canada Pension Plan Investment Board and Global Infrastructure Management, LLC.  Both the Canada Pension Plan Investment Board and Global Infrastructure Management, LLC are not publicly traded.

**21.    Montana-Dakota Utilities Co.**

Montana-Dakota Utilities Co. is a subsidiary of MDU Resources Group, Inc. MDU Resources Group, Inc. is a publicly-held company whose common stock is publicly traded on the New York Stock Exchange.  Based on a review of institutional investors' filings with the Securities and Exchange Commission ("SEC"), Vanguard (which is not publicly traded) and BlackRock, Inc. (which is publicly traded) each own more than 10% of the outstanding shares of MDU Resources Group, Inc.

**22.    Northern Indiana Public Service Company LLC**

Northern Indiana Public Service Company LLC is a wholly-owned subsidiary of NIPSCO Holdings II LLC.  NIPSCO Holdings II LLC is owned 80.1% by NIPSCO Holdings I LLC, 15.945% by BIP Blue Buyer L.L.C., and 4.505% by BIP Blue Buyer VCOC L.L.C.  NIPSCO Holdings I LLC is a wholly-owned subsidiary

of NiSource Inc.  NiSource Inc. is a public utility holding company whose common stock is publicly traded on the New York Stock Exchange.  Vanguard (which is not publicly traded) and BlackRock, Inc. and T. Rowe Price (which are publicly traded) each own more than 10% of the outstanding shares of NiSource Inc.

**23.    Northern States Power Company, a Minnesota corporation, and Northern States Power Company, a Wisconsin corporation, subsidiaries of Xcel Energy Inc.**

Northern States Power Company, a Minnesota corporation, and Northern States Power Company, a Wisconsin corporation, are wholly-owned utility operating company subsidiaries of Xcel Energy Inc.  The securities of Xcel Energy Inc. are publicly traded.  Based on a review of institutional investors' filings with the SEC, Vanguard (which is not publicly traded) owns 13.0% of the outstanding shares of Xcel Energy Inc.  Certain operating company subsidiaries of Xcel Energy Inc., including Northern States Power Company, a Minnesota corporation, and Northern States Power Company, a Wisconsin corporation, have issued first mortgage bonds and other debt securities.  A complete list of all debt securities of Xcel Energy Inc. subsidiaries is available at the Xcel Energy Inc. website (www.xcelenergy.com) under Investor Relations.

**24.  Northwestern Wisconsin Electric Company**

Northwestern Wisconsin Electric Company is an investor-owned utility.  No corporation, partnership, or business trust owns a controlling interest in Northwestern Wisconsin Electric Company.

**25.  Otter Tail Power Company**

Otter Tail Power Company is a wholly-owned subsidiary of Otter Tail Corporation.  BlackRock, Inc. and Vanguard each own more than 10% of the shares outstanding of Otter Tail Corporation.  BlackRock, Inc. is a publicly traded entity, while Vanguard is not.

**26.  PPL Electric Utilities Corporation**

PPL Electric Utilities Corporation ("PPL Electric") is a wholly-owned indirect subsidiary of PPL Corporation.  Vanguard has a 10% or greater ownership interest in PPL Corporation.  No other publicly held company has a 10% or greater ownership interest in PPL Corporation.

PPL Electric is a Pennsylvania corporation and owner of transmission and distribution facilities located within PJM.  PPL Electric is a provider of last resort in central and eastern Pennsylvania under Pennsylvania's Electric Generation Customer Choice and Competition Act, 66 Pa. C. S. § 2801, *et seq.*

**27.    Prairie Power, Inc.**

Prairie Power, Inc. is a wholesale generation and transmission electric cooperative that is wholly-owned by its member electric cooperatives, none of which is publicly traded. Prairie Power, Inc. does not have a parent corporation, and no publicly-held corporation owns 10% or more of its stock.

**28.    Rockland Electric Company**

Rockland Electric Company is a wholly-owned subsidiary of Orange and Rockland Utilities, Inc., which is a wholly-owned subsidiary of Consolidated Edison, Inc. Consolidated Edison, Inc. is publicly traded on the New York Stock Exchange. Vanguard, a non-publicly-held company, is believed, based on the Schedule 13G/A it has most recently filed with the SEC, to hold greater than 10% of the voting equity interests in Consolidated Edison, Inc. BlackRock, Inc., a publicly-traded company, is believed, based on the Schedule 13G/A it has most recently filed with the Securities and Exchange Commission, to hold greater than 10 percent of the voting equity interests in Consolidated Edison, Inc.

**29.    Southern Indiana Gas & Electric Company (d/b/a CenterPoint Energy Indiana South)**

Southern Indiana Gas & Electric Company's parent is Vectren, LLC, with Vectren Utility Holdings, LLC as the intermediate parent. Vectren Utility Holdings, LLC is the holder of interest in Southern Indiana Gas & Electric Company. Vectren,

LLC is an indirect, wholly-owned subsidiary of CenterPoint Energy, Inc., a publicly held company.

### 30. Southern Minnesota Municipal Power Agency

Southern Minnesota Municipal Power Agency is a joint-action agency comprised of 17 member municipalities. Southern Minnesota Municipal Power Agency is a non-profit political subdivision of the State of Minnesota.

### 31. Virginia Electric and Power Company d/b/a Dominion Energy Virginia

Dominion Energy Services, Inc., on behalf of its affiliate Virginia Electric and Power Company d/b/a Dominion Energy Virginia ("Dominion"), hereby provides the following Corporate Disclosure Statement:

Dominion is a Virginia corporation, and is regulated by FERC as a "public utility" under the Federal Power Act. Dominion generates, transmits, and distributes electricity for sale in Virginia and North Carolina. Dominion is a wholly-owned subsidiary of Dominion Energy, Inc. ("Dominion Energy") (NYSE: D), which is a publicly-held company incorporated in the Commonwealth of Virginia. To Dominion's knowledge, no publicly-held corporation owns 10% or greater ownership interest in Dominion Energy. However, from time to time pursuant to FERC blanket authorizations, certain non-publicly held institutional investors may hold 10% or more of the outstanding shares of Dominion Energy, and Dominion

currently understands that affiliates of Vanguard may hold more than 10% of Dominion Energy's outstanding shares.

### 32.     Wolverine Power Supply Cooperative, Inc.

Wolverine Power Supply Cooperative, Inc ("Wolverine") is a not-for-profit, generation and transmission cooperative made up of six distribution cooperative members.  Wolverine has two other members, one of which operates a Michigan alternative retail electric supplier, and the other of which operates as a FERC-jurisdictional entity.  Wolverine's members are its customers and its owners. Wolverine has no publicly-issued stock.

### 33.     Xcel Energy Services Inc. on behalf of Southwestern Public Service Company

Xcel Energy Services Inc. is the centralized service company that provides administrative and general services to Xcel Energy Inc., a corporation whose common stock is publicly-held and -traded.  Xcel Energy has no parent company. No publicly-traded entity holds 10% or more of the stock of Xcel Energy. Southwestern Public Service Company is a wholly-owned, vertically integrated electric utility subsidiary of Xcel Energy.

Respectfully submitted,

*/s/ John Lee Shepherd, Jr.*
John Lee Shepherd, Jr.
Hunton Andrews Kurth LLP
2200 Pennsylvania Ave, NW
Suite 900
Washington, DC 20037
(202) 955-1500
jshepherd@hunton.com

*On behalf of Transmission Owner Respondent-intervenors*

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................1

JURISDICTIONAL STATEMENT ........................................................3

STATUTES AND REGULATIONS........................................................3

SUMMARY OF THE ARGUMENT ......................................................3

ARGUMENT ...........................................................................................5

I.       Non-Transmission Owner Petitioners Lack Standing To Assert
         Generalized and Unripe Hypothetical Future Injuries ...................5

II.      FERC's Policy Determination That The Right-Sizing ROFR Will
         Further The Rule's Goal Of Assuring Just and Reasonable Rates Is
         Reasonable And Well Within Its Authority .....................................9

         A.       The Rule's Right-Sizing ROFR Is A Reasonable
                  Accommodation Within FERC's General ROFR Policy....................11

         B.       The Right-Sizing ROFR Is Well Within FERC's Authority
                  Under FPA Section 206........................................................15

         C.       The Major Questions Doctrine Does Not Apply ...............................18

         D.       The Right-Sizing ROFR Cannot be Severed from Right-Sizing
                  Reform..........................................................................21

III.     FERC Reasonably Declined to Mandate Independent Monitoring of
         New Transmission Projects and a Revamped Prudence Standard ...............22

IV.      FERC's Decision Not to Act on the Construction Work in Progress
         Incentive Was Reasonable and Reasonably Explained................................28

CONCLUSION......................................................................................33

# TABLE OF AUTHORITIES

**Page(s)**

**Court Cases**

*American Municipal Power, Inc. v. FERC*,
   86 F.4th 922 (D.C. Cir. 2023)...............................................................9, 10

*Atlantic City Elec. Co. v. FERC*,
   295 F.3d 1 (D.C. Cir. 2002).....................................................................16

*Biden v. Nebraska*,
   600 U.S. 477 (2023)..................................................................................18

*Bradford v. U.S. Dep't of Labor*,
   101 F.4th 707 (10th Cir. 2024) ................................................................19

*Buscemi v. Bell*,
   964 F.3d 252 (4th Cir. 2020) ................................................................6, 8

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013)....................................................................................6

*Coal. for Renewable Nat. Gas v. EPA*,
   108 F.4th 846 (D.C. Cir. 2024)................................................................19

*Elec. Priv. Info. Ctr. v. Fed. Aviation Admin.*,
   821 F.3d 39 (D.C. Cir. 2016)..............................................................24, 28

*Epsilon Elecs., Inc. v. United States Dep't of Treasury, Off. of Foreign
   Assets Control*,
   857 F.3d 913 (D.C. Cir. 2017)..................................................................21

*FERC v. Elec. Power Supply Ass'n*,
   577 U.S. 260 (2016)....................................................................15, 16, 17

*Gulf Restoration Network v. McCarthy*,
   783 F.3d 227 (5th Cir. 2015) ...................................................................20

*Long Island Care at Home, Ltd. v. Coke*,
   551 U.S. 158 (2007)..................................................................................23

*LSP Transmission Holdings II, LLC v. FERC*,
　28 F.4th 1285 (D.C. Cir. 2022)...................................................................17

*Mayor of Baltimore v. Azar*,
　973 F.3d 258 (4th Cir. 2020) .............................................................21, 22

*Mid Continent Nail Corp. v. United States*,
　846 F.3d 1364 (Fed. Cir. 2017) .................................................................23

*Mobil Oil Expl. & Producing Se. Inc. v. United Distrib. Cos.*,
　498 U.S. 211 (1991).......................................................................24, 27, 28

*In re Murray Energy Corp.*,
　788 F.3d 330 (D.C. Cir. 2015)....................................................................24

*N.C. Coastal Fisheries Reform Grp. v. Capt. Gaston LLC*,
　76 F.4th 291 (4th Cir. 2023) ................................................................18, 19

*NAACP v. FPC*,
　425 U.S. 662 (1976).....................................................................................20

*North Carolina v. EPA*,
　531 F.3d 896 (D.C. Cir. 2008).....................................................................21

*Public Utility District No. 1 of Snohomish County v. FERC*,
　272 F.3d 607 (D.C. Cir. 2001)...................................................................7, 8

*San Diego Gas & Elec. Co. v. FERC*,
　913 F.3d 127 (D.C. Cir. 2019).....................................................................31

*Skidmore v. Swift & Co.*,
　323 U.S. 134 (1944).....................................................................................32

*South Carolina Pub. Serv. Auth. v. FERC*,
　762 F.3d 41 (D.C. Cir. 2014).................................................................15, 16

*United States v. Cal. Stem Cell Treatment Ctr., Inc.*,
　117 F.4th 1213 (9th Cir. 2024) ...................................................................20

*Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*,
　435 U.S. 519 (1978).....................................................................................27

*West Virginia v. EPA*,
597 U.S. 697 (2022)..................................................................................18

**Administrative Cases**

*Building for the Future Through Elec. Reg'l Transmission Planning &
Cost Allocation*, Advanced Notice of Proposed Rulemaking, 176
FERC ¶ 61,024 (2021) ........................................................................25, 26

*Building for the Future Through Elec. Reg'l Transmission Planning &
Cost Allocation*, Notice of Proposed Rulemaking, 179 FERC ¶
61,028 (2022).................................................................4, 11, 23, 27, 28

*Building for the Future Through Elec. Reg'l Transmission Planning &
Cost Allocation*, Order No. 1920, 187 FERC ¶ 61,068 (2024) ...................*passim*

*Building for the Future Through Elec. Reg'l Transmission Planning &
Cost Allocation*, Order No. 1920-A, 189 FERC ¶ 61,126 (2024) ..........22, 28, 32

*California Public Utility Commission*, 164 FERC ¶ 61,161 (2018)........................12

*Southern California Edison Company*, 164 FERC ¶ 61,160, (2018) ......................12

*Promoting Transmission Investment through Pricing Reform*, Order
No. 679, 116 FERC ¶ 61,057 (2006)......................................................29, 30, 31

*Regional Transmission Organizations*, Order No. 2000, 89 FERC ¶
61,285 (1999)..........................................................................................8

*Transmission Plan. & Cost Allocation by Transmisison Owning &
Operating Public Utilities,* Order No. 1000, 136 FERC ¶ 61,051
(1999) ................................................................10, 11, 13, 15, 17

*Williston Basis Interstate*,
48 FERC ¶ 61,137 (1989)..............................................................................31

**Statutes**

16 U.S.C. § 824d.............................................................................................7

16 U.S.C. § 824e(a)..........................................................................................7

16 U.S.C. § 824s(a)-(b)...................................................................................30

**INTRODUCTION**

Respondent-Intervenors (the "Transmission Owners") are investor-owned utilities, electric cooperatives, municipal utilities, other public power entities, and transmission-only utilities that collectively own the majority of the high-voltage transmission grid across multiple regions of the United States. Their systems operate across thirty states and the District of Columbia through the footprints of three Federal Energy Regulatory Commission ("FERC")-authorized regional transmission organizations ("RTOs"): PJM Interconnection, L.L.C. ("PJM") (spanning thirteen states and the District of Columbia), the Midcontinent Independent System Operator, Inc. ("MISO") (spanning fifteen states), and Southwest Power Pool, Inc. ("SPP") (spanning fourteen states). The Transmission Owners have transferred functional or operational control of hundreds of billions of dollars in transmission assets to the RTO to which they belong, but retain ownership and the legal, financial, and operational responsibility for maintaining, managing, and replacing those assets.

As entities that will implement, comply with, and bear the direct obligations and costs of the requirements of Order Nos. 1920, 1920-A, and 1920-B (collectively, "the Rule"), the Transmission Owners submit this brief in support of FERC with respect to three aspects of the Rule challenged by other parties. First, the Transmission Owners support FERC's determination that the right of first refusal

("ROFR") that allows a transmission owner priority to build a right-sized replacement for its existing facility is necessary to effectuate the Rule's long-term planning reforms and to promote more efficient or cost-effective transmission solutions. Second, the Transmission Owners support FERC's decision not to mandate independent transmission monitors or to overhaul FERC's long-standing prudence standard—matters that FERC properly determined were beyond the scope of the proceedings below. Third, the Transmission Owners support FERC's decision to retain the Construction Work in Progress ("CWIP") incentive for transmission facilities developed through the long-term planning process.

In each of these areas, FERC made a reasonable policy judgment, reasonably explained its decision based on the extensive administrative record, and acted well within the authority Congress delegated to it under the Federal Power Act ("FPA"). Petitioners do not identify any statutory or constitutional limitations on these policy determinations (as the Transmission Owners have in the narrow but important aspects of the Rule that they challenge as petitioners), but instead ask this Court to second-guess those determinations or to compel FERC to adopt different regulatory priorities. The Court should decline those invitations and uphold the challenged aspects of the Rule addressed in this brief.

## JURISDICTIONAL STATEMENT

Respondent-Intervenors adopt the Jurisdictional Statement in the brief of Respondent FERC filed on January 5, 2026.  FERC Br. 9-14, including FERC's statement that the non-Transmission Owner petitioner arguments listed in FERC's Brief at 14 do not raise the concrete and particularized injuries necessary to establish standing.  *See* pp. 5-9, *infra*.

## STATUTES AND REGULATIONS

Respondent-Intervenors adopt the Statutes and Regulations contained in FERC's brief.

## SUMMARY OF THE ARGUMENT

As FERC notes, many of the arguments presented by the non-Transmission Owner petitioners that have challenged certain aspects of the Rule are not properly before the Court because those petitioners have not established the "concrete, particularized, and actual or imminent" injury required to establish standing, and because they remain free to seek relief from FERC should they find themselves actually aggrieved by the selection, rejection, or costs of transmission projects under the Rule.  FERC Br. 9-14.  Parties concerned about such potential future harms must defer their challenges until specific cases arise.  *See* pp. 5-9, *infra*.

The challenges fail on the merits as well.  The "right-sizing" ROFR recognized in the Rule allows incumbent utilities who possess the right to replace their own aging facilities to construct and own a replacement facility that has been

3

selected for "right-sizing" and is consistent with prior FERC policy respecting such replacement rights and recognizing that ROFRs remain appropriate in certain circumstances. FERC's authority to regulate in this area has been repeatedly upheld, and this case is not one of the "exceptional" cases in which the rarely-invoked "major questions" doctrine is appropriate. The non-Transmission Owner petitioners' argument that FERC has this authority only if it regulates in the manner they prefer is illogical and unsupported. The "right-sizing" ROFR is an integral part of the right-sizing reform in the Rule and cannot be severed from the rest of it. *See* pp. 9-22, *infra.*

FERC's decision not to expand the scope of the Rule beyond the long-term planning procedures set out in its Notice of Proposed Rulemaking ("NOPR") to mandate the creation of independent transmission monitors or to discard its long-established prudence standard was reasonable and reasonably explained. FERC could not have done so without violating the principle that a final rule must be a "logical outgrowth" of the proposed rule, and its decision not to include these matters in the proposed rule is not reviewable. The challenging petitioners are not cognizably injured by FERC's decision to consider the matters in other proceedings, and are simply incorrect that FERC did not engage with their argument; FERC explained itself and had abundant record support for its position. *See* pp. 22-27, *infra.*

4

Finally, FERC properly declined to eliminate the allowance for inclusion of 100% of CWIP costs in a public utility's rate base ("CWIP Incentive"), a decades-old incentive that allows transmission owners to include in their rates costs related to the construction of approved transmission facilities before those facilities enter service.  FERC recognized and relied on record evidence detailing the benefits to customers created by the incentive, including lowering capital costs and maintaining rate stability.  Retention is also consistent with a statutory directive to FERC to increase transmission development through financial incentives.  The decision was well within FERC's reasoned authority and discretion.  *See* pp. 28-32, *infra.*

## ARGUMENT

### I.     Non-Transmission Owner Petitioners Lack Standing To Assert Generalized and Unripe Hypothetical Future Injuries

The Rule's requirements are targeted at Transmission Owners, the entities charged with implementing the long-term regional planning reforms the Rule prescribes.  Where, as here, a rule's operative requirements apply to a defined class of regulated utilities, the standing doctrine excludes parties whose interest consists solely of abstract policy disagreement.  FERC is correct that the non-Transmission Owner petitioners have not established standing to challenge the Rule.  *See* FERC Br. 9-14 (discussing three petitioner groups: Consumers, Public Interest Organizations, and States).  The Transmission Owner Petitioners write separately to emphasize three points.

First, the Transmission Owner Petitioners "are the objects of the Rule's planning requirements" and bear "directly associated compliance burdens and costs." FERC Br. 12-13 (citing Order No. 1920 PP 1759-74, JA1838-1846). The Rule does not impose such "concrete and particularized" injuries on other petitioners, who instead raise what courts have described as generalized "conjectural or hypothetical" grievances about potential future harms that are insufficient to confer standing. *Buscemi v. Bell*, 964 F.3d 252, 258-59 (4th Cir. 2020) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). Those concerns fail to show these petitioners have suffered the "concrete, particularized, and actual or imminent" injury. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (citations omitted). The Supreme Court has "repeatedly reiterated that 'threatened injury must be *certainly impending* to constitute injury in fact,'" and that "'[a]llegations of *possible* future injury' are not sufficient." *Id.* at 410 (citations omitted).

Second, the Rule creates a *planning* process that is aimed at *lowering* costs through efficient forward planning to evaluate and select "more efficient or cost-effective regional transmission solutions to address Long-Term Transmission Needs." Order No. 1920 P 136, JA0744-0745. That planning process does not address "the merits of specific future Projects," FERC Br. 12, and does not compel or foreclose any particular transmission project, route, or cost allocation. It is therefore premature and entirely speculative for certain petitioners to claim that the

6

Rule will harm them on the basis that it may permit "hypothetically unlawful cost shifts under cost allocation tariffs that have yet to be enacted" for transmission projects that will not be identified, much less selected or rejected, for many years. *Id*. at 14.

For example, Consumer Petitioners concede that Order No. 1920 "does not dictate planning results." Consumers' Br. 47. Instead, they argue that the Rule "constrains FERC from disregarding or deciding that other values outweigh the reasonable needs of load serving entities," and that these constraints may "expose consumers to excessive rates from uneconomic, even unneeded, facilities." *Id*. at 47-48. Purely hypothetical future injury cannot sustain a facial challenge to FERC's rule, and the Consumer Petitioners' claim that FERC cannot remedy unjust outcomes in particular future cases, if they even occur, is simply wrong. Aggrieved parties remain free to dispute the selection, rejection, and costs of future transmission projects by protest under FPA section 205, 16 U.S.C. § 824d, or in response to a complaint or on FERC's own motion under FPA section 206, 16 U.S.C. § 824e(a).

Third, courts have refused to entertain petitions for review of major FERC rulemaking orders where petitioners' harms were rooted in speculation about uncertain future outcomes. For example, in *Public Utility District No. 1 of Snohomish County v. FERC*, 272 F.3d 607 (D.C. Cir. 2001), the court held that

petitioners lacked standing to challenge a FERC rule that created RTOs.[1]   The petitioners there lacked standing to challenge FERC's "assessment that RTOs will be cost-effective." *Id*. at 617-18.  The D.C. Circuit reasoned that cost-efficiency concerns should instead be addressed in region-specific RTO proceedings, noting the absence of "any particular hardship [a petitioner] will suffer from having to wait to make its case in that forum." *Id*. at 619.  The court similarly dismissed claims that the order was defective because it did not include a ban on passive ownership, holding that "the possibility of passive ownership, by itself, causes the Authority no injury, and because case-by-case adjudications present a better forum in which to challenge the effectiveness of passive ownership safeguards." *Id.* at 620-21.

In sum, non-Transmission Owner petitioners cannot establish standing through "[a]llegations of possible future injury" that "rel[y] on a highly attenuated chain of possibilities." *Buscemi*, 964 F.3d at 259 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990) and *Clapper*, 568 U.S. at 410).  The Rule does not prevent or prejudge future disputes about specific transmission projects, and the precedent cited above requires parties concerned about such potential future harms to defer their challenges until specific cases arise.  Because the Rule's planning requirements

---

[1] *See Regional Transmission Organizations*, Order No. 2000, 89 FERC ¶ 61,285 (1999), *on reh'g*, Order No. 2000–A, 90 FERC ¶ 61,201 (2000) (codified at 18 C.F.R. § 35.34).

operate on identifiable entities with clear compliance obligations, the Court's jurisdiction cannot be stretched beyond those entities to accommodate parties whose asserted harms are hypothetical and remote. The Court should therefore dismiss the petitioner arguments listed in FERC's Brief at 14 for lack of jurisdiction.

## II. FERC's Policy Determination That The Right-Sizing ROFR Will Further The Rule's Goal Of Assuring Just and Reasonable Rates Is Reasonable And Well Within Its Authority

The Rule establishes a ROFR for "right-sizing" facilities. Order No. 1920 PP 1577, 1693, 1702, JA1715, JA1798-1799, JA1801-1802. A facility selected for "right-sizing" is an aging facility identified by a utility for potential replacement that a region's transmission planner pinpoints to replace with a larger regional facility that will more efficiently or cost-effectively address long-term transmission needs while also addressing the replacement need of the individual owner of the facility. *Id.* PP 1577, 1678-79, JA1715, JA1785-1786. The Rule establishes that owners of transmission facilities that have been selected for "right-sizing" have a ROFR to construct and own the replacement facility. *Id.* PP 1693, 1702, JA1798-1799, JA1801-1802. The self-named "Pro-Competition Petitioners" paint this right-sizing ROFR as a drastic departure from previous FERC policy. Competition Petitioners' Br. 31-33. Not so. FERC has recognized that incumbent utilities retain the right to replace their own aging facilities. *See Am. Mun. Power, Inc. v. FERC*, 86 F.4th 922, 932-36 (D.C. Cir. 2023) (affirming that the right to replace facilities remained with

9

the transmission owners because the right had not been ceded to another entity). The right-sizing ROFR fits comfortably within this framework.

The Competition Petitioners frame FERC's right-sizing ROFR as a "monopoly franchise right" that triggers the "major questions doctrine." Competition Petitioners' Br. 42. It is not. Rather, it is the type of economic regulatory decision that falls well within FERC's authority, and not the kind of extraordinary action that would implicate that very infrequently-used doctrine. Far from raising some kind of "major question," FERC simply recognized that incumbent transmission owners have a right to determine what happens to their facilities and adopted a rule that encourages them to address that question in a way that also promotes more efficient or cost-effective regional transmission.

Incumbent transmission owners are obligated to replace existing facilities when they reach the end of their useful lives and the FPA allows them to do so. *See Am. Mun. Power, Inc.*, 86 F.4th at 932-37 (affirming FERC's finding that this long-standing right is consistent with Order Nos. 890, 1000, and 2000, as well as the relevant regional agreement and other FERC precedent). The Rule aims to facilitate replacement of these end-of-life transmission facilities with new, more efficient or cost-effective regional facilities that provide broader regional benefits to customers. This limited modification to FERC's general policy in Order No. 1000 that certain regional projects are subject to competitive transmission development processes is

10

critical for FERC's right-sizing policy to achieve this goal and to ensure just and reasonable rates, is well within FERC's section 206 authority, and is consistent with FERC's determination in Order No. 1000 that not all federal ROFRs need to be eliminated to ensure just and reasonable rates.[2]

### A. The Rule's Right-Sizing ROFR Is A Reasonable Accommodation Within FERC's General ROFR Policy

The right-sizing ROFR rests squarely on the long-standing recognition that transmission owners have a right and responsibility to operate their systems reliably, which includes maintaining, managing, and replacing their existing transmission facilities. *See* NOPR P 411, JA0464-0465; Order No. 1920 P 1706, JA1804-1806; RM21-17 Indicated PJM Transmission Owner Comments on NOPR at 32-33 (filed Aug. 17, 2022) ("[Transmission Owners] do not have discretion, nor would they seek it, to ignore the need to maintain facilities necessary to provide safe, secure and reliable service to their customers and their growing needs."), JA3849-3850. These

---

[2] Order No. 1000 retained ROFRs for a host of projects that affect jurisdictional transmission rates, including upgrades to existing facilities, projects that are not regionally allocated, and projects that address "immediate need" reliability. *Transmission Plan. & Cost Allocation by Transmission Owning & Operating Pub. Utils.*, Order No. 1000, 136 FERC ¶ 61,051 P 319 (2011). That Order No. 1000 did not eliminate all ROFRs further undercuts Competition Petitioners' arguments that adding a limited ROFR for a discrete type of project— i.e., right-sized replacement projects—violates Order No. 1000; Order No. 1000's mandate to eliminate ROFRs was far narrower than Competition Petitioners would have the Court believe.

11

replacement projects—"in-kind" replacement facilities that replace aging infrastructure to meet current design standards and regulations—have always been carried out exclusively by the utility owner, without a requirement for competitive transmission development processes, and without any FERC intervention.[3]  In the Rule, however, FERC found that existing regional planning processes fail to evaluate sufficiently whether "in-kind" replacement facilities can be modified or right-sized to more efficiently or cost-effectively address long-term regional transmission needs alongside the need for replacement.  Order No. 1920 PP 1573-74, JA1716-1718.  FERC concluded this failure may result in inefficiently-sized or designed, duplicative, or unnecessary facilities.  JA1716-1720 (Order No. 1920 PP 1573-77).  To address this problem, the Rule requires transmission providers to consider, as part of their long-term planning process, whether facilities set for replacement might benefit customers by being right-sized to address broader long-term regional transmission needs, as well as the replacement need.  JA1720 (Order No. 1920 P 1577).

---

[3] The Commission has found that transmission projects that "do not expand the capacity of the grid" and are intended to "maintain [the] existing electric transmission system and meet regulatory compliance requirements," including end-of-life projects, are "asset management" projects that are not subject to competitive bidding.  *S. Cal. Edison Co.*, 164 FERC ¶ 61,160, PP 6, 31-33 (2018); *see also Cal. Pub. Util. Comm'n.*, 164 FERC ¶ 61,161, P 68 (2018).

Allowing transmission owners to retain the right to construct the replacement facility, including if it is right-sized, is consistent with transmission owner obligations to replace aging facilities. It is also consistent with the manner in which transmission owners efficiently and cost-effectively served customers before FERC imposed competitive transmission development processes, supports the ability of transmission owners to propose projects that provide broad benefits to customers, and aligns with FERC's reasoning across both Order Nos. 1000 and 1920 in support of more efficient transmission projects. JA1803 (Order No. 1920 P 1704). For example, Order No. 1000 eliminated the federal ROFR for certain regional projects because FERC held that the ROFR undermined the identification of more efficient or cost-effective projects in the regional planning process. Order No. 1000 PP 225-27. That reasoning does not apply to right-sized facilities, which are scaled up or modified replacement facilities, the construction of which has, as noted above, always been entrusted to the incumbent transmission owner. To the contrary, as FERC properly found, the right-sizing ROFR in the Rule is consistent with the incentives to "*promote* the consideration of more efficient or cost-effective" solutions. Order No. 1920 P 1706, JA1804-1805.

Subjecting the right-sizing of the replacement of existing facilities to Order No. 1000 bidding actually undermines efficient long-term planning and creates uncertainty. Because transmission owners could lose the ability to develop, own,

13

and construct replacement facilities to replace aging facilities they are obligated to replace if such facilities must be evaluated and then put out for bid, providing a ROFR for such facilities not only re-establishes the efficient development of facilities, it aids in the identification of facilities that can be expanded to provide broader regional benefits. *See* JA1786-1787 (noting that right-sizing relies on transmission owners to identify facilities nearing end-of-life and the timeline for replacement); FERC Br. 243.

As FERC found, the Rule helps ensure the right-sizing process achieves its goals. Order No. 1920 P 1678, JA1785. FERC can require more efficient and cost-effective transmission planning via the right-sizing process without upsetting the property, state right-of-way, ability to satisfy obligations to replace aging infrastructure, and retained FPA rights of incumbent transmission owners. This is achieved by permitting the utility that already owns—and must replace—the aging facility to retain the ability to build its improved successor if the right-sized facility is selected to meet long-term regional needs. *See* Order No. 1920 P 1706 ("[T]he right-sized replacement transmission facility represents the more efficient or cost-effective regional transmission solution to address Long-Term Transmission Needs (otherwise it would not be selected)."), JA1804-1805.

As FERC recognized, the right-sized facility must still be selected in the long-term regional plan and thus must be the project that best meets the long-term needs

14

of the plan. The right-sizing ROFR simply recognizes that opening such projects to a competitive transmission development process threatens inefficiencies in the process that outweigh any presumed benefits of such process. *Id*. The right-sizing ROFR conforms the Order No. 1000 rule to the overall policies of both Order Nos. 1000 and 1920 in the specific circumstance it addresses. As noted at n.2, *supra,* the right-sizing ROFR is also consistent with, rather than contrary to, Order No. 1000, which did not categorically eliminate all ROFRs. *See* FERC Br. 241-44.

## B.    The Right-Sizing ROFR Is Well Within FERC's Authority Under FPA Section 206

The Competition Petitioners misstate the law by suggesting that the right-sizing ROFR violates the core purpose of the FPA (which they claim is "counter[ing] monopoly power") and wrongly claiming that the right-sizing ROFR is unsupported by case law and Order No. 1000. Competition Petitioners' Br. 35-44. The Rule's right-sizing ROFR policy is well within FERC's authority under the FPA.

The proposed ROFR falls within FERC's authority to address "rules or practices that directly affect" jurisdictional rates. *FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 278 (2016). The D.C. Circuit confirmed this very point in Order No. 1000, holding that ROFRs were practices affecting transmission rates within FERC's jurisdiction. *South Carolina Pub. Serv. Auth. v. FERC*, 762 F.3d 41, 48-49 (D.C. Cir. 2014) ("*South Carolina*"). The Competition Petitioners argue that FERC lacks statutory authority to implement the limited ROFR because the FPA

15

does not grant FERC permission to require any kind of ROFR or to "expand[] monopoly power" and that the major questions doctrine applies. Competition Petitioners' Br. 34–44. None of these arguments are sound.

The single case Competition Petitioners cite to support their argument that FERC lacks statutory authority, *Atlantic City Elec. Co. v. FERC*, 295 F.3d 1 (D.C. Cir. 2002) ("*Atlantic City*"), is entirely inapposite. That case focused on the rights that incumbent transmission owners retained to establish their rates and to contract freely. *Atlantic City* does not discuss monopoly power at all, much less stand for the proposition that FERC lacks power to address ROFR-related practices. It held that FERC may not force public utilities to relinquish statutory rights, but Competition Petitioners point to no statutory rights they have to demand that FERC eliminate all ROFRs.

FERC's authority to provide the ROFR falls under its authority to regulate practices affecting rates. *South Carolina*, 762 F.3d at 72; *see FERC v. Elec. Power Supply Ass'n*, 577 U.S. at 278 (explaining that FERC has authority over rules that "directly affect" jurisdictional rates). Here, FERC is exercising that authority to accommodate the specific circumstance of right-sized facilities (to replace facilities that transmission owners have always been able to replace themselves), and to balance the interests of transmission owners in preserving their obligation to replace with the interests of customers in seeking to maximize the development of right-

16

sized more efficient or cost-effective regional transmission facilities through competition. Courts have not questioned FERC's authority to regulate in this area, and to retain a ROFR where circumstances warrant. *See FERC v. Elec. Power Supply Ass'n*, 577 U.S. at 278.; FERC Br. 245 (collecting cases). The Competition Petitioners charge that FERC has hidden an "elephant" in a "mousehole," Competition Petitioners' Br. 37, but this mouse has been in plain view all along. *See* pp. 11-12 & n.2, *supra*.

The Competition Petitioners suggest, without any support in the statutory text, legislative history, or otherwise, that the FPA requires FERC to exercise its regulatory authority solely as a mandatory one-way ratchet towards ever-greater competition. Competition Petitioners' Br. 34-36. Courts have held that FERC's decision to continue to allow a ROFR for certain projects to "appropriate[ly] balance" between competition and other goals "is the sort of policy judgment left to [FERC]." *LSP Transmission Holdings II, LLC v. FERC*, 28 F.4th 1285, 1291 (D.C. Cir. 2022). FERC's policy choice to course-correct its establishment of competitive transmission development processes in Order No. 1000 in order to avoid potentially adverse consequences is fully permissible under the FPA. The Competition Petitioners do not come close to establishing the contrary.

17

### C.    The Major Questions Doctrine Does Not Apply

Implicitly acknowledging the weakness of any direct argument based on the text of the FPA that FERC lacked statutory authority to regulate competitive bidding and ROFRs, the Competition Petitioners fall back on the major questions doctrine. *See* Competition Petitioners' Br. 37-44. FERC's policy decision to accommodate the specific circumstances of right-sizing replacements to its broader (but not unlimited) policy of competitive transmission development processes for regionally cost-allocated projects is not a major question. Competition Petitioners' invocation of the major questions doctrine rests on a fundamental mischaracterization of both the doctrine and the ROFR.

The major questions doctrine applies only in the "extraordinary cases" where an agency asserts newfound, transformative, and economically volatile power lacking clear congressional authorization. The Supreme Court invoked it to strike down the Environmental Protection Agency's attempt to reshape the nation's power generation mix in *West Virginia v. EPA*, 597 U.S. 697 (2022), and the Department of Education's attempt to invoke a broad emergency statute to cancel more than $430 billion in federal student-loan obligations in *Biden v. Nebraska*, 600 U.S. 477 (2023). Use of the doctrine is so "extraordinary" that this Court has applied it only once in the three and a half years since it was announced. *See N.C. Coastal Fisheries Reform*

18

*Grp. v. Capt. Gaston LLC*, 76 F.4th 291, 296 (4th Cir. 2023) (noting the doctrine is limited to "extraordinary cases").[4]

Cases recognizing the major questions doctrine involved sweeping assertions of authority with vast political and economic significance. By contrast, the Rule's right-sizing ROFR provision neither restructures an industry nor expands FERC's regulatory mission. It applies only in the specific circumstance where an incumbent transmission owner—which already possesses the unquestioned right and obligation to replace its own aging facilities in-kind—chooses to participate in a long-term planning process to identify a more efficient or cost-effective "right-sized" replacement that provides broader regional benefits. This is the kind of adjustment that courts have repeatedly held do not trigger the major questions doctrine. *See Coal. for Renewable Nat. Gas v. EPA*, 108 F.4th 846, 853 (D.C. Cir. 2024) (declining to apply major questions doctrine when EPA action was "essential to meeting Congress's mandate"); *Bradford v. U.S. Dep't of Labor*, 101 F.4th 707, 724–28 (10th Cir. 2024) (finding no major question where statutory authority is expansive,

---

[4] Competition Petitioners attempt to rely on *N.C. Coastal Fisheries*, but it is easily distinguishable. *See* Competition Petitioners' Br. 36-37. In that case, the federal agency claiming regulatory authority had declined to do so for a half-century, and the activities it sought to regulate were already subject to another regulatory structure. *N.C. Coastal Fisheries*, 76 F.4th 291, 297-299. Here, by contrast, Congress has given FERC the power to regulate transmission planning, and FERC has been so doing for decades with its power upheld by the courts, including in the specific area of ROFRs. *See also* FERC Br. 99, 103.

19

government had long regulated working conditions of contractors, and agency had substantial expertise); *United States v. Cal. Stem Cell Treatment Ctr., Inc.*, 117 F.4th 1213, 1220–21 (9th Cir. 2024) (finding no major question where FDA action was not a "sudden assertion or 'transformative expansion' of authority," and no mismatch between agency action and the statutory scheme). The doctrine has no role to play where, as here, FERC addresses planning rules well within its FPA mandate.

The Competition Petitioners' argument that the Rule violates the major questions doctrine by working at cross-purposes with the FPA's intent also fails. Competition Petitioners' Br. 34-44. The FPA does not require FERC to encourage competition when it has determined there is a better way to achieve just and reasonable rates. The FPA calls on FERC to balance a range of complementary and competing purposes when making policy decisions consistent with the public interest, such as "encourag[ing] the orderly development of plentiful supplies of electricity . . . at reasonable prices." *NAACP v. FPC*, 425 U.S. 662, 669-70 (1976). "[W]hen a statute sets out competing considerations, agencies are generally given discretion to choose how to best give effect to those mandates." *Gulf Restoration Network v. McCarthy*, 783 F.3d 227, 244 (5th Cir. 2015). The Competition Petitioners' preference for maximizing competition in no way obligates FERC to adopt that same priority when fulfilling its broader statutory mandate. FERC has the

20

authority to make its own policy judgments in this regard and does not lose that authority simply because Competition Petitioners disagree with the choice it has made.

## D.  The Right-Sizing ROFR Cannot be Severed from Right-Sizing Reform

The Competition Petitioners request that, if their position is adopted, only the right-sizing ROFR be vacated, not all right-sizing reforms in the Rule.  Competition Petitioners' Br. 57.  That is not possible.

"Severance and affirmance of a portion of an administrative regulation is improper if there is substantial doubt that the agency would have adopted the severed portion on its own." *North Carolina v. EPA*, 531 F.3d 896, 929 (D.C. Cir. 2008) (internal quotation marks omitted) (refusing to sever a program in a rulemaking when the court found the EPA had been consistent in the rulemaking that the program was "one, integral action"); *Epsilon Elecs., Inc. v. United States Dep't of Treasury, Off. of Foreign Assets Control*, 857 F.3d 913, 929 (D.C. Cir. 2017) (refusing to sever "intertwined" aspects of an agency order).

This Court has not hesitated to reject a demand for severability when it was evident the agency desired a single, coherent policy and this Court had "substantial doubt" the agency would have adopted other portions of the final rule without the challenged provisions.  *Mayor of Baltimore v. Azar*, 973 F.3d 258, 292 (4th Cir. 2020) (rejecting severability notwithstanding severability clause in agency rule).  As

21

in *Mayor of Baltimore*, where this Court looked to the language of the final rule to make its determination, severability is improper here. Indeed, the issue is even more straightforward here than in *Mayor of Baltimore* because, in that case, the rule contained a severability clause and the Rule does not.

FERC stated expressly that the ROFR is "*necessary* to effectuate the right-sizing reform." Order No. 1920 P 1706 (emphasis added), JA1804-1805; Order No. 1920-A P 876, JA2711-2712; *see* FERC Br. 263. This provides more than "substantial doubt" that FERC would not have adopted the right-sizing reform without the ROFR. To vacate only the ROFR, as Competition Petitioners request, effectively vacates all right-sizing reform. *See* Order No. 1920 P 1703, JA1802-1803 (discussed at pp. 11-15, *supra*). FERC found that the right-sizing reform was critical to developing efficient or cost-effective long-term planning. *Id.* Without the ROFR, there is no right-sizing reform, and the ROFR cannot be severed.

## III.  FERC Reasonably Declined to Mandate Independent Monitoring of New Transmission Projects and a Revamped Prudence Standard

Consumer Petitioners claim that FERC's orders violated reasoned decision-making requirements under the Administrative Procedure Act ("APA") because, in their view, FERC did not adequately explain why it declined to expand the scope of the Rule beyond long-term planning procedures to mandate two more sweeping new policy proposals: first, forcing the creation of independent transmission monitors,

22

and second, discarding FERC's long-established prudence standard.  *See* Consumers' Br. 28-30.  Neither argument is developed nor has any merit.

FERC properly determined that those two proposals were "beyond the scope" of the Rule because it did not include them in its NOPR.  Order No. 1920 P 1648, JA1766-1768.  That decision was correct.  "The [APA] requires an agency conducting notice-and-comment rulemaking to publish in its notice of proposed rulemaking 'either the terms or substance of the proposed rule or a description of the subjects and issues involved.'"  *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 174 (2007) (quoting 5 U.S.C. § 553(b)(3)).  The Rule could not have adopted the proposals on Consumers' regulatory "wish list" because federal agencies may not issue final rules that are not a "logical outgrowth" of the agency's NOPR.  *Id.* (citing cases).  "The logical outgrowth doctrine does not extend to a final rule that finds no roots in the agency's proposal because something is not a logical outgrowth of nothing."  *Mid Continent Nail Corp. v. United States*, 846 F.3d 1364, 1374 (Fed. Cir. 2017) (quoting *Envtl. Integrity Project v. EPA*, 425 F.3d 992, 996 (D.C. Cir. 2005)).

Consumer Petitioners' real grievance is that FERC did not propose the institution of independent market monitors or radical revisions of its long-standing prudence standards *in its NOPR*, not that FERC failed to explain why those proposals were not included in its *final rule*.  But the exclusion of Consumers' desired

23

proposals from the NOPR is not a grievance this Court has jurisdiction to address. A NOPR is not a final order under the APA, and appellate courts "do not have authority to review proposed agency rules." *In re Murray Energy Corp.*, 788 F.3d 330, 334 (D.C. Cir. 2015); *accord, e.g.*, *Elec. Priv. Info. Ctr. v. Fed. Aviation Admin.*, 821 F.3d 39, 43-44 (D.C. Cir. 2016) ("*EPIC*") (rejecting claim that an agency's determination to exclude an issue from its NOPR "is *itself* a final reviewable 'order'").

Moreover, Consumer Petitioners were not cognizably injured by FERC's decision to divert their desired reforms for further examination in other proceedings, including the "ongoing Transmission Planning and Cost Management proceeding" in Docket No. AD22-8. Order No. 1920 P 1648, JA1766-1768; *accord* Order No 1920-A P 858, JA2696 ("The Commission will continue to consider potential additional local transmission planning reforms, such as independent transmission monitors, along with other transmission reforms in the future."). It is concretely established that "an agency need not solve every problem before it in the same proceeding," and that rule "applies even where the initial solution to one problem has adverse consequences for another area that the agency was addressing." *Mobil Oil Expl. & Producing Se. Inc. v. United Distrib. Cos.*, 498 U.S. 211, 231 (1991).

These critical defects in Consumer Petitioners' arguments are more than sufficient to reject them, but two more fundamental flaws also warrant discussion.

First, it is patently false that "FERC failed to engage" with proposals to create a new independent transmission monitor function beyond the extensive market monitoring requirements that FERC has already required in prior orders. Consumers' Br. 28.  On the contrary, FERC raised this question *sua sponte* in its Advance Notice of Proposed Rulemaking ("ANOPR") in 2021, requesting comments on whether "it would be appropriate for the Commission to require that transmission providers in each RTO/ISO, or more broadly, in non-RTO/ISO transmission planning regions, establish an independent entity to monitor the planning and cost of transmission facilities in the region."  ANOPR P 163, JA0112; *see id.* PP 164-175 (detailing FERC's specific questions), JA0112-0119.

FERC's ANOPR inquiry about independent transmission monitors drew considerable comment from all sides and was strongly resisted by a wide variety of stakeholders, particularly transmission owners and System Operators, who were "unanimous in their opposition" because it added "an unnecessary layer" of bureaucracy that would override and disrupt "existing RTO transmission planning provisions" and "hamper the ability of RTOs and ISOs to facilitate building needed transmission."  PJM Transmission Owner ANOPR Reply Comments at 28-29 &

25

n.93 (collecting System Operator comments),[5] JA3570-3571; *accord, e.g.*, MISO

Transmission Owner ANOPR Reply Comments at 28 & n.95 ("As many

commenters agree, creation of significant, new transmission oversight is an

unnecessary, costly, and likely ineffective means of meeting the Commission's goals

of greater transparency, cost containment, and efficiency in transmission

development.") (collecting comments from utilities, state regulators, and other

parties),[6] JA3752.

---

[5] *See* PJM Comments at 75-76, JA3059-3060; MISO Comments at 117-18, JA3460-3461; SPP Comments at 22, JA3466; NYISO Comments at 51-52, JA3430-3431; CAISO Comments at 114-17, JA3331-3334.

[6] *See, e.g.*, Ameren Comments at 23, 25-28, JA3237-3241; American Electric Power Service Corporation Comments at 42, JA2967; Berkshire Hathaway Energy Comments at 14-16, JA3443-3445; CAISO Comments at 117-22, JA3334-3339; Comments of The Dayton Power and Light Company dba AES Ohio at 14-15, JA3300-3301; Comments of Dominion Energy Services, Inc. at 33-34, JA3012-3013; EEI Comments at 39-44, JA3324-3329; Entergy Comments at 24-27, JA3494-3497; Eversource Comments at 14-16, JA3435-3437; Exelon Comments at 35, JA3439; ITC Comments at 50-57, JA3084-3091; Initial Comments of the Kansas Corporation Commission at 22, JA3499; Large PPC Comments at 34, JA3303; MISO Comments at 119, 122-23, JA3461, JA3463-3464; Initial Comments of the Minnesota Department of Commerce at 7, JA3250; Mississippi PSC Comments at 15-16, JA3457-3458; NYISO Comments at 51-54, JA3430-3433; Comments of the New York Transmission Owners at 26-29, JA3068-3071; Comments of Oklahoma Gas & Electric Company, at 18-19, JA3234-3244; Comments of the Omaha Public Power District at 7, JA3441; PPL Comments at 23, JA3246; Ohio FEA Comments at 23-25, JA3252-3254; Comments of the Sponsors of the Southeastern Regional Transmission Planning Process at 4, JA3248; Comments of the Southern California Edison Company at 9, JA3447.

26

FERC appropriately responded to these criticisms by dropping the ANOPR's independent transmission monitor proposal when FERC published the NOPR and diverted the issue to other proceedings. Consumer Petitioners do not even begin to demonstrate the "extremely compelling circumstances" required to overturn FERC's decision as to the contours of its rulemaking proceeding. *E.g.*, *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 543 (1978) ("[T]his much is absolutely clear. Absent constitutional constraints or extremely compelling circumstances, the administrative agencies should be free to fashion their own rules of procedure and to pursue methods of inquiry capable of permitting them to discharge their multitudinous duties.") (cleaned up) (citations omitted).

Second, and finally, Consumer Petitioners concede that FERC accurately "recited" their broad demand to "undertake reforms of transmission formula rates [and] the Commission's prudence standard," but nevertheless complain that "FERC failed to address Industrial Consumers' point regarding the ineffectiveness of FERC prudency reviews." Consumers' Br. 30. That complaint has no merit. FERC had no duty under the APA to further burden the complex long-term planning guidance in the Rule with a comprehensive reexamination of long-standing prudence precedent after FERC exercised its considerable discretion to find that issue beyond the scope of its rulemaking effort in the NOPR. *See, e.g.*, *Mobil Oil*, 498 U.S. at 230 (finding that the court of appeals "clearly overshot the mark" to the extent it ordered

27

FERC to resolve an issue in one proceeding, rather than another, because "[a]n agency enjoys broad discretion in determining how best to handle related, yet discrete, issues in terms of procedures and priorities" (citing *Vt. Yankee*, 435 U.S. 519; *Heckler v. Chaney*, 470 U.S. 821, 831-32 (1985); *FPC v. Sunray DX Oil Co.*, 391 U.S. 9, 49-51 (1968)); *EPIC*, 821 F.3d at 43-44 (rejecting theory that an agency's exclusion of an issue as "beyond the scope" from its NOPR "is *itself* a final reviewable 'order'").

## IV.    FERC's Decision Not to Act on the Construction Work in Progress Incentive Was Reasonable and Reasonably Explained

The Consumer Petitioners assert that FERC inappropriately declined to eliminate the CWIP Incentive as applied to transmission facilities developed through the final rule's long-term regional planning.  Consumers' Br. 22-28.  The CWIP Incentive, which FERC notes is "decades old," allows transmission owners to include in their rates costs related to the construction of transmission facilities before those facilities enter service.  *See* FERC Br. 149.  As FERC explains, its decision to retain the incentive pending a "holistic" consideration of all transmission incentives was reasonable and reasonably explained, and consistent with statutory direction that it afford incentive-based rate treatment to promote the development of much-needed interstate transmission.  *Id*. at 146-49; *see* Order No. 1920 P 1547, JA1693; Order No. 1920-A  PP 799-800, JA2651-2652; FERC Br. 146-47; *see also* NOPR P 333,

28

JA0400.  Consumer Petitioners provide no basis for this Court to replace FERC's policy judgment with theirs.

Consumer Petitioners claim that FERC's decision not to eliminate the CWIP Incentive is unreasonable because it failed to balance the interests of utility customers and investors.  Consumers' Br. 24-27.  This argument entirely ignores the real benefits to customers created by the incentive that was demonstrated on the record compiled in the proceeding.  *See* Order No. 1920 PP 1532-40 (summarizing comments supporting retention of the CWIP Incentive), JA1682-1688.  FERC properly relied on record comments that the CWIP Incentive eliminates significant regulatory and financial risks associated with multi-million- or -billion-dollar long-term investment in transmission development with lengthy lead times.  *See id.* PP 1532-33, 1535-37, JA1682-1683, JA1684-1686; *accord Promoting Transmission Investment through Pricing Reform*, Order No. 679, 116 FERC ¶ 61,057, PP 103-04, 115-17 (2006).  By mitigating these risks, the CWIP Incentive saves consumers money over time by lowering capital costs that accrue through lower cost-based transmission rates.  *See, e.g.*, MISO Transmission Owners' Initial Comments at 68 n.206 (highlighting a FERC proceeding where the CWIP Incentive saved MidAmerican Energy Company's customers "nearly $31 million in present value terms over the life of the projects"), JA4633; Comments of New York Transco, LLC, at 13 ("The CWIP Incentive results in lower overall costs to stakeholders."), JA4095.

29

The CWIP Incentive also stabilizes customer rates by allowing utilities to collect costs during the construction process, avoiding rate shock, *i.e.*, a significant increase in cost-based transmission rates when all the accumulated financing costs of a finished project reach the utility's transmission rates. *See* Order No. 1920 PP 1535, 1540 (highlighting stakeholder comments that discuss how the incentive avoids rate shock among other things), JA1684-1685, JA1688. These real consumer benefits support FERC's decision not to eliminate the CWIP Incentive based on the record compiled in this proceeding.

Additionally, statutory mandates and long-standing FERC policy support incentivizing transmission development via the CWIP Incentive because it benefits consumers. 16 U.S.C. § 824s(a)-(b); FERC Br. 148. FPA section 219, added as part of the Energy Policy Act of 2005, explicitly mandates that FERC adopt incentives to "promot[e] capital investment" in the development of electric transmission facilities. 16 U.S.C. § 824s(a). Congress acted to increase transmission development through financial incentives like the CWIP Incentive precisely because such development "benefit[s] consumers" by assuring reliability and reducing costs through lower transmission congestion. *Id.*; FERC Br. 148.

In Order No. 679, FERC followed the statute's directive when it adopted the current CWIP Incentive, anticipating that it would lead to "a higher credit rating [for transmission developers] and lower cost of capital, thus benefiting customers."

30

Order No. 679 P 115. Moreover, leaving the incentive as-is means that utilities planning projects under the Rule's framework are *eligible* for the incentive, but transmission developers still must demonstrate they satisfy the Order No. 679 requirements to receive FERC approval. *See San Diego Gas & Elec. Co. v. FERC*, 913 F.3d 127, 141 (D.C. Cir. 2019) ("[T]he Commission grants incentive rate authority 'when justified' on a 'case-by-case basis' in orders tailored to the demonstrated needs of each project."); Comments of National Grid at 29-30, JA3813-3814. This addresses the concern that the incentive might be granted inappropriately.

Consumer Petitioners argue the CWIP Incentive is inconsistent with FERC's policy that costs in rates must only be for facilities that are "used and useful." Consumers' Br. 25. However, the precedent on which Consumer Petitioners rely does not help their cause. Consumer Petitioners cite *Williston Basis Interstate*, 48 FERC ¶ 61,137, 61,541 (1989), Consumers' Br. 25, to support their "used and useful" argument, but as FERC explained there, it "has departed from the used and useful standard . . . [for] overriding policy concerns," and has "departed from the used and useful standard in its treatment of [CWIP]." *Williston Basin Interstate*, 48 FERC ¶ 61,137, 61,541 (1989); *accord, e.g.,* Order No. 679 P 117 (finding "the 'used and useful' ratemaking principle is not a sufficient basis to deny adoption of" the current CWIP Incentive and allowing 100 percent of CWIP where justified as an

31

incentive rate). FERC's decision here is thus consistent with decades of precedent finding that the benefits of the CWIP Incentive override FERC's general used and useful policy, undermining Consumer Petitioners' suggestion that the Rule departs from FERC policy. *See Skidmore v. Swift & Co.*, 323 U.S. 134, 139-40 (1944) (noting that agency decisions provide useful guidance where "consisten[t] with earlier and later pronouncements").

Rather than failing "to balance investor and consumer interests," as Consumer Petitioners claim, Consumers' Br. 27, FERC's decision was reasonable because it considered the record as a whole when deciding not to adopt its earlier, misguided proposal to eliminate the incentive for long-term facilities. *See* Order No. 1920-A P 799, JA2651-2652; FERC Br. 146-47. Consumer Petitioners provide this Court no basis to disturb that conclusion, which is squarely within FERC's reasoned authority and discretion.

32

**CONCLUSION**

For the reasons set forth above, the Court should deny the petitions for review

to the extent that they challenge the aspects of FERC's orders discussed herein.

Respectfully submitted,

/s/ *John Lee Shepherd, Jr.*
John Lee Shepherd, Jr.
Blake Grow
Hunton Andrews Kurth LLP
2200 Pennsylvania Ave, NW
Suite 900
Washington, DC 20037
(202) 955-1500
jshepherd@hunton.com
bgrow@hunton.com

*Counsel for the Southwest Power Pool Transmission Owner Group*

Denise Buffington
Senior Director Federal Regulatory Affairs
Evergy, Inc.
1200 Main Street
Kansas City, MO 64105
(816) 556-2683
denise.buffington@evergy.com

*On behalf of the Evergy Companies*

Timothy T. Mastrogiacomo
Vice President, Federal Regulatory, Legal, and Policy
Xcel Energy Services Inc.
701 Pennsylvania Avenue, NW, Ste. 250
Washington, DC 20006
(202) 661-4481
tim.t.mastrogiacomo@xcelenergy.com

*On behalf of Southwestern Public Service Company*

33

Steven M. Nadel
Senior Counsel
PPL Services Corporation
645 Hamilton Street, Suite 700
Allentown, PA 18101
(610) 774-4775
SMNadel@pplweb.com

John Longstreth
Donald A. Kaplan
Chimera N. Thompson
K&L Gates LLP
1601 K Street, N.W.
Washington, D.C.  20006
(202) 778-9000
john.longstreth@klgates.com
don.kaplan@klgates.com
chimera.thompson@klgates.com

Michelle S. Kallen
William M. Keyser
Steptoe LLP
1330 Connecticut Avenue N.W.
Washington, D.C. 20036
(202) 429-8186
mkallen@steptoe.com
wkeyser@steptoe.com

*Counsel for PPL Electric Utilities Corporation*

Molly Suda
Associate General Counsel
Duke Energy Corporation
1301 Pennsylvania Ave. NW,
Suite 200
Washington, D.C. 20004
(202) 824-8011
molly.suda@duke-energy.com

*Counsel for Duke Energy*

34

William M. Rappolt
Assistant General Counsel, FERC
AES US Services LLC
4300 Wilson Blvd
Arlington, VA 22203
(703) 682-6337
william.rappolt@aes.com

*Counsel for The Dayton Power and Light Co.*

Gary E. Guy
Assistant General Counsel
Exelon Corporation
701 Ninth Street, N.W., Suite 9426
Washington, D.C. 20068
(301) 956-6754
gary.guy@exeloncorp.com

*Counsel for Exelon Corporation, Atlantic City Electric Company, Baltimore Gas and Electric Company, Commonwealth Edison Company, Delmarva Power & Light Company, PECO Energy Company, and Potomac Electric Power Company*

William H. Baxter II
Cheri Yochelson
Dominion Energy Services, Inc.
120 Tredegar Street, Riverside 6th Floor
Richmond, VA 23219
(804) 819-2458
william.h.baxter@dominionenergy.com
cheri.m.yochelson@dominionenergy.com

*Counsel for Dominion Energy Services, Inc., on behalf of its affiliate Virginia Electric and Power Company*

35

David M. Gossett
Davis Wright Tremaine LLP
1301 K Street, NW
Suite 500 East
Washington, D.C. 20005
(202) 973-4200
davidgossett@dwt.com

Sanford I. Weisburst
Quinn Emanuel Urquhart &
Sullivan, LLP
295 Fifth Avenue
New York, NY 10016
(212) 849-7000
sandyweisburst@quinnemanuel.com

*Counsel for the FirstEnergy Transmission Companies*

Carrie L. Bumgarner
Senior Counsel
American Electric Power Service Corporation
1 Riverside Plaza
Columbus, OH 43215
(614) 716-2941
clbumgarner@aep.com

*Counsel for American Electric Power Service Corporation on behalf of its affiliates Appalachian Power Company, Indiana Michigan Power Company, Kentucky Power Company, Kingsport Power Company, Ohio Power Company, Wheeling Power Company, AEP Appalachian Transmission Company, Inc., AEP Indiana Michigan Transmission Company, Inc., AEP Kentucky Transmission Company, Inc., and AEP Ohio Transmission Company, Inc.*

Daniel E. Frank
Allison E.S. Salvia
Eversheds Sutherland (US) LLP
700 Sixth St., N.W., Suite 700
Washington, D.C.  20001-3980
(202) 383-0100
danielfrank@eversheds-sutherland.com
allisonsalvia@eversheds-sutherland.com

*Counsel for East Kentucky Power Cooperative, Inc.*

36

Donald A. Kaplan
K&L Gates LLP
1601 K Street, N.W.
Washington, DC  20006
(202) 778-9000
don.kaplan@klgates.com

*Counsel for Duquesne Light Company*

Joshua A. Kirstein
Senior Attorney
Paul Savage
Associate Counsel
Consolidated Edison Company of New York, Inc.
4 Irving Place, 18th Floor
New York, NY 10003
(929) 656-5971
(212) 460-2764
kirsteinj@coned.com
savagep@coned.com

*Counsel for Rockland Electric Company*

Wendy N. Reed
Matthew J. Binette
Abraham F. Johns III
WRIGHT & TALISMAN, P.C.
1200 G Street N.W., Suite 600
Washington, DC  20005-3898
(202) 393-1200
reed@wrightlaw.com
binette@wrightlaw.com
johns@wrightlaw.com

*Counsel for the MISO Transmission Owners:*
*Ameren Services Company, as agent for Union Electric Company d/b/a Ameren*
*Missouri, Ameren Illinois Company d/b/a Ameren Illinois and Ameren Transmission*
*Company of Illinois; American Transmission Company LLC; Central Minnesota*
*Municipal Power Agency; Cooperative Energy; Dairyland Power Cooperative; Duke*
*Energy Business Services, LLC for Duke Energy Indiana, LLC; Great River Energy;*

37

*Indiana Municipal Power Agency; Indianapolis Power & Light Company d/b/a AES Indiana; Lafayette Utilities System; MidAmerican Energy Company; Minnesota Power (and its subsidiary Superior Water, L&P); Montana-Dakota Utilities Co.; Northern Indiana Public Service Company LLC; Northern States Power Company, a Minnesota corporation, and Northern States Power Company, a Wisconsin corporation, subsidiaries of Xcel Energy Inc.; Northwestern Wisconsin Electric Company; Otter Tail Power Company; Prairie Power, Inc.; Southern Indiana Gas & Electric Company (d/b/a CenterPoint Energy Indiana South); Southern Minnesota Municipal Power Agency; and Wolverine Power Supply Cooperative, Inc.*

Dated:  March 13, 2026

## **CERTIFICATE OF COMPLIANCE**

I certify that this brief complies with the requirements of Rules 32(a)(5) and 32(a)(6) of the Federal Rules of Appellate Procedure because it has been prepared in 14-point Times New Roman, a proportionally spaced font.  I further certify that this brief complies with the type-volume limitations of Circuit Rule 32(b) because it contains 7234 words, excluding the parts exempted by Federal Rule of Appellate Procedure 32(f), according to the count of Microsoft Word.

/s/ *John Longstreth*
John Longstreth

## **CERTIFICATE OF SERVICE**

I hereby certify that on March 13, 2026, I caused this brief to be electronically filed with the Clerk of this Court by using the appellate CM/ECF system. The participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

/s/ *John Longstreth*
John Longstreth