ORAL ARGUMENT HAS NOT BEEN SCHEDULED

No. 24-1650 (L)

(consolidated with Nos. 24-1748, 24-1756, 24-1758, 24-1760, 24-1765, 24-1770, 24-1785, 24-1792, 24-1804, 24-1857, 24-1862, 24-1867, 24-1876, 24-1885, 24-1887, 24-1979, 24-1991, 24-2162, 24-2163, 25-1073, 25-1080, 25-1197, 25-1349)

IN THE

# United States Court of Appeals for the Fourth Circuit

_____

APPALACHIAN VOICES, *et al*.,

*Petitioners*,

*v*.

FEDERAL ENERGY REGULATORY COMMISSION,

*Respondent*.

_____

On Petitions for Review of Orders of the
Federal Energy Regulatory Commission

_____

## FINAL INTERVENOR–RESPONDENT BRIEF OF ITC MIDWEST LLC IN SUPPORT OF THE FEDERAL ENERGY REGULATORY COMMISSION

_____

Jay Ryan
BAKER BOTTS L.L.P.
700 K Street NW
Washington, D.C. 20001
(202) 639-7789
jay.ryan@bakerbotts.com

Aaron M. Streett
Beau Carter
BAKER BOTTS L.L.P.
910 Louisiana Street
Houston, Texas 77002
(713) 229-1855
aaron.streett@bakerbotts.com
beau.carter@bakerbotts.com

*Counsel for ITC Midwest LLC*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

## DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __24-1650__      Caption: __Appalachian Voices, et al. v. Federal Energy Regulatory Commission__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__ITC Midwest LLC__
(name of party/amicus)

_____

who is _____intervenor-respondent_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity? ☐ YES ☑ NO

2. Does party/amicus have any parent corporations? ☑ YES ☐ NO
   If yes, identify all parent corporations, including all generations of parent corporations:

   See addendum.

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? ☑ YES ☐ NO
   If yes, identify all such owners:

   See addendum.

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?    ☐YES ☑NO
      If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
      If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
      If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.    Is this a criminal case in which there was an organizational victim?    ☐YES ☑NO
      If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Aaron M. Streett          Date:    March 13, 2026

Counsel for: ITC Midwest LLC

- 2 -

Print to PDF for Filing

**No. 24-1650 (L)**

(consolidated with Nos. 24-1748, 24-1756, 24-1758, 24-1760, 24-1765, 24-1770, 24-1785, 24-1792, 24-1804, 24-1857, 24-1862, 24-1867, 24-1876, 24-1885, 24-1887, 24-1979, 24-1991, 24-2162, 24-2163, 25-1073, 25-1080, 25-1197, 25-1349)

IN THE

# United States Court of Appeals for the Fourth Circuit

—————————————————————

APPALACHIAN VOICES, *et al.*,

*Petitioners*,

*v.*

FEDERAL ENERGY REGULATORY COMMISSION,

*Respondent*.

—————————————————————

On Petitions for Review of Orders of the
Federal Energy Regulatory Commission

## ADDENDUM TO CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Local Rule 26.1, Intervenor–Respondent ITC Midwest LLC states as follows:

ITC Midwest LLC is a direct wholly owned subsidiary company of ITC Holdings Corp. ("ITC Holdings"). ITC Investment Holdings Inc. is the sole shareholder of ITC Holdings.

FortisUS Inc. owns 80.1 percent of ITC Investment Holdings. FortisUS Holdings Nova Scotia Limited wholly owns FortisUS Inc. Fortis Inc. ("Fortis")

wholly owns FortisUS Holdings Nova Scotia Limited. Fortis has no parent company, and no publicly held company has a 10 percent or greater ownership interest in Fortis.

Eiffel Investment Pte. Ltd. ("Eiffel") indirectly owns the other 19.9 percent of ITC Investment Holdings. Eiffel is wholly owned by GIC (Ventures) Pte. Ltd. ("GIC Ventures"). GIC Ventures is affiliated with GIC Private Limited ("GIC"), an investment company that manages the Government of Singapore's foreign reserves, and GIC Special Investments Pte. Ltd., the private equity and infrastructure arm of GIC. GIC and GIC Ventures are each wholly owned by the Government of Singapore through the Ministry for Finance, a statutory corporation set up by the Government of Singapore to own and administer government assets. The Ministry for Finance has no parent company, and no publicly held company has a 10 percent or greater ownership interest in the Ministry for Finance.

*/s/ Aaron M. Streett*
Aaron M. Streett
*Counsel for ITC Midwest LLC*

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ................................................................................i

TABLE OF AUTHORITIES ........................................................................ ii

GLOSSARY ...............................................................................................iv

INTRODUCTION ......................................................................................1

ARGUMENT ..............................................................................................3

I.     Order 1920's long-term planning framework is necessary, just, and reasonable. .................................................................................................3

     A.     The 20-year horizon corrects short-sightedness and aligns evaluation with asset lives and benefit accrual. ...................................4

     B.     The five-year planning cycle and three-year selection period balance a reasonable planning cadence with the need for adaptability. ........................................................................................8

     C.     The seven mandatory benefits set a reasonable minimum to ensure cost-justified selection and beneficiary-aligned allocation. ........................................................................................10

II.     Order 1920's cost-allocation architecture lawfully implements cost-causation principles while allowing for structured state input. ....................15

     A.     Requiring ex-ante methods as backstops promotes cost-causation principles and planning certainty. ...................................................16

     B.     Order 1920 respects the interests of states in long-term transmission planning..........................................................................19

CONCLUSION .........................................................................................21

CERTIFICATE OF COMPLIANCE ..........................................................22

CERTIFICATE OF SERVICE ...................................................................22

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Gas Ass'n v. FERC*,
593 F.3d 14 (D.C. Cir. 2010)..................................................................8

*Citadel FNGE Ltd. v. FERC*,
77 F.4th 842 (D.C. Cir. 2023)................................................................12

*ExxonMobil Gas Mktg. Co. v. FERC*,
297 F.3d 1071 (D.C. Cir. 2002)..............................................................10

*FERC v. Elec. Power Supply Ass'n*,
577 U.S. 260 (2016)...............................................................................18

*Ill. Com. Comm'n v. FERC*,
721 F.3d 764 (7th Cir. 2013) ................................................................18

*K N Energy, Inc. v. FERC*,
968 F.2d 1295 (D.C. Cir. 1992)..............................................................18

*Pub. Serv. Elec. & Gas Co. v. FERC*,
989 F.3d 10 (D.C. Cir. 2021)..................................................................5

*S.C. Pub. Serv. Auth. v. FERC*,
762 F.3d 41 (D.C. Cir. 2014)................................................................17

**Statutes**

16 U.S.C. § 824(b)(1)..............................................................................19

16 U.S.C. § 824d(a) ................................................................................18

16 U.S.C. § 824e(a)................................................................................19

**Other Authorities**

*Building for the Future Through Elec. Reg'l Transmission Planning &
Cost Allocation*, Order No. 1920,
187 FERC ¶ 61,068 (May 13, 2024)................................. 1, 4, 5, 6, 8, 9, 10, 11,
12, 13, 14, 15, 16, 17, 18, 19, 20

ii

*Building for the Future Through Elec. Reg'l Transmission Planning &*
*Cost Allocation*, Order No. 1920-A,
189 FERC ¶ 61,126 (Nov. 21, 2024)..............................................1, 4, 5, 7, 9, 10,
11, 13, 14, 15, 18, 19, 20

*Building for the Future Through Elec. Reg'l Transmission Planning &*
*Cost Allocation*, Order No. 1920-B,
191 FERC ¶ 61,026 (Apr. 11, 2025)....................................................................1

*Midwest Indep. Transmission Sys. Operator, Inc.*,
133 FERC ¶ 61,221 (2010)...............................................................................15

*Transmission Planning & Cost Allocation by Transmission Owning &*
*Operating Pub. Utils.*, Order No. 1000,
136 FERC ¶ 61,051 (2011)...............................................................................17

iii

# GLOSSARY

| | |
|---|---|
| ITC NOPR Initial Comments | Comments of International Transmission Company d/b/a ITC*Transmission*, Michigan Electric Transmission Company, LLC, ITC Midwest LLC, and ITC Great Plains, LLC, No. RM21-17-000 (Aug. 17, 2022), R.504 (J.A.3929-3962) |
| Order 1920 | Order No. 1920, 187 FERC ¶ 61,068 (May 13, 2024), R.813 (J.A.615-1978) |
| Order 1920-A | Order No. 1920-A, 189 FERC ¶ 61,126 (Nov. 21, 2024), R.976 (J.A.1979-2797) |
| Order 1920-B | Order No. 1920-B, 191 FERC ¶ 61,026 (Apr. 11, 2025), R.1050 (J.A.2798-2965) |

iv

## INTRODUCTION

America's electric grid is "the backbone of the American economy and essential to the national security of our country."[1]  Yet increasingly, it is in a bind. Unprecedented demands are straining aging transmission infrastructure.  Energy demand forecasts over the next decade are higher than at any point in the last ten years, driven by electrification of cars and buildings, the explosive growth of data centers, and the advent of renewable energy in the generation mix.  Running parallel to these forces, the grid faces increasingly severe weather events that jeopardize reliability and cost consumers billions each year.  This predicament is the product of a historical focus on short-term fixes and piecemeal improvements to the electric grid.  Order 1920 set out to fix that.

ITC Midwest LLC is part of the largest independent electricity transmission company in the United States,[2] meaning ITC has no generation investments to protect, no fuel preferences to advance, and no market positions to hedge.  ITC's singular mission is to provide transmission grid solutions that improve reliability,

---

[1] J.A.1886, *Building for the Future Through Elec. Reg'l Transmission Planning & Cost Allocation*, Order No. 1920, 187 FERC ¶ 61,068 (Phillips and Clements, Comm'rs, concurring at P 1) (May 13, 2024), *on reh'g and clarification*, Order No. 1020-A, 189 FERC ¶ 61,126 (Nov. 21, 2024), *on reh'g and clarification*, Order No. 1020-B, 191 FERC ¶ 61,026 (Apr. 11, 2025).

[2] ITC Midwest, along with International Transmission Company, d/b/a ITC*Transmission*, Michigan Electric Transmission Company, and ITC Great Plains, LLC, are all subsidiaries of ITC Holdings Corp.

1

expand access to markets, allow new generating resources to interconnect efficiently, and lower the overall cost of delivered energy for customers.

With that perspective, ITC supports Order 1920 and urges the Court to uphold in full the Commission's much-needed reforms. Order 1920's mechanisms are neither novel nor untested. They are, in large part, codifications of approaches that have already been proven to work in the regions where ITC operates. The success of MISO's Multi-Value Project ("MVP") and Long-Range Transmission Planning ("LRTP") processes provides the proof of concept for Order 1920. Order 1920 addresses real deficiencies in existing transmission planning that ITC has experienced firsthand. And ITC's experience—recounted in its comments to the Commission—demonstrates that proactive, scenario-based, multi-value planning yields infrastructure that lowers system-wide costs while enhancing reliability and resilience.

The objections to Order 1920 reduce largely to policy disagreements cloaked in jurisdictional garb. The Federal Power Act empowers the Commission to regulate transmission planning and cost-allocation practices, and with that power comes the line-drawing responsibility to craft the right features for that process. The reforms at issue do not mandate the construction of any particular transmission facility, do not prescribe any particular generation mix, and do not intrude upon state authority over siting, retail ratemaking, or resource planning. They require only that

2

transmission providers engage in *long-term* planning that accounts for plausible future conditions and that costs be allocated roughly commensurate with benefits.

This Court should deny the petitions for review and affirm Order 1920 as a reasonable, well-supported exercise of the Commission's statutory authority to ensure just and reasonable rates for transmission service.

**ARGUMENT**

**I.     Order 1920's long-term planning framework is necessary, just, and reasonable.**

Order 1920's long-term planning framework requires transmission-planning organizations to forecast at least 20 years into the future and develop at least three plausible and diverse long-term scenarios for the transmission needs that will face the region. The framework accounts for changing needs by proceeding in five-year planning cycles. After developing the first long-term plan based on the three long-term scenarios, the organization must select new long-term transmission projects within three years. At the five-year mark, organizations must update the scenarios, ensure their predictions of long-term needs are still accurate, then forecast another five years forward in rolling fashion.

This approach strikes an appropriate balance: ensuring timely selection of long-term solutions within three years of each cycle while limiting the administrative burdens of reassessing and reevaluating long-term scenarios to every five years. Order 1920 requires the organizations to consider a set of seven reliability and

3

economic benefits while evaluating long-term solutions, setting a neutral baseline that captures the value of regional transmission infrastructure. MISO's successes in administering its MVP and LRTP processes with these features proves that this framework is effective.

### A. The 20-year horizon corrects short-sightedness and aligns evaluation with asset lives and benefit accrual.

The minimum 20-year transmission planning horizon is a direct and necessary solution to a critical problem in regional transmission planning processes: the failure of transmission providers to plan far enough into the future.

The Commission found that most transmission-planning regions were not planning beyond a ten-year horizon. J.A.2043-2044. But ten years is too short-sighted for determining long-term transmission needs, and it provides too little time for planning, permitting, and constructing significant transmission facilities. *See* J.A.2043-2044. This results in reactive, piecemeal transmission development that defeats the potential efficiencies inherent in coordinated regional planning. Higher costs for consumers ensue.

The 20-year horizon strikes the right balance. Large-scale transmission projects require substantial lead times (often a decade or more) to move from initial planning through siting, permitting, and construction. J.A.0719-0721. A planning horizon of only ten years is thus insufficient to identify needs that will materialize in the medium and long term and to develop solutions that can be operational when

4

those needs arise. *See* J.A.2043 (noting that a ten-year transmission planning horizon "is shorter than the time needed to plan and construct large (e.g., high voltage or long distance) transmission facilities"). By extending the planning horizon to at least 20 years, Order 1920 ensures that transmission providers can identify emerging transmission needs with sufficient advance notice to develop and implement efficient solutions before reliability is compromised or customers are forced to bear the costs of sub-optimal alternatives. J.A.2196-2199.

Equally important, the 20-year horizon aligns the evaluation of transmission facilities with the period over which those facilities actually deliver benefits. J.A.1240-1241. Transmission infrastructure often features useful lives of 40 years or more. J.A.1241-1242. A planning process that evaluates benefits over only a 10-year period undervalues transmission investments by ignoring substantial benefits that accrue in subsequent decades. Order 1920 addresses this misalignment by requiring that organizations evaluating project selection and cost allocation consider a proposed facility's benefits over a minimum 20-year period. J.A.1240-1242. This approach strengthens the link between benefits and cost responsibility, reinforcing the cost-causation principles that govern just and reasonable rate design. *See Pub. Serv. Elec. & Gas Co. v. FERC*, 989 F.3d 10, 14 (D.C. Cir. 2021) (costs must be "allocated in a way that is roughly commensurate with benefits" (citation omitted)).

5

ITC's experience in the MISO region confirms both the value and feasibility of longer-term planning horizons. The original MISO MVP portfolio used a 20-year time horizon to evaluate benefits. J.A.3946. The current MISO LRTP process similarly employs a 20-year horizon. J.A.3946. ITC participated in both and can attest that this benefit evaluation period has proven to be "feasible, accurate, and appropriately" calibrated—"balanc[ing] the need to consider the benefits" over a transmission facility's "useful life" against the practical "limits" of transmission providers' "ability" to "project benefits in the far future." J.A.3947. The MVP portfolio has delivered benefits far exceeding initial projections, including the elimination of roughly $300 million in future baseline reliability upgrades, while facilitating access to low-cost generation resources across the MISO footprint. *See* J.A.3936; J.A.0743-0744. These results demonstrate that 20-year planning produces tangible benefits that can be measured and verified.

The Commission also adopted appropriate safeguards to ensure that its approach will not lead to speculative or unnecessary investment. Order 1920's scenario-based planning requirements require transmission planners to develop at least three plausible and diverse "Long-Term Scenarios," incorporating enumerated factor categories and using best available data. J.A.1029-1030; FERC Br. 50-52, 141. Replacing the current ad hoc, short-term assumption sets, scenario-based planning requires that long-term planning is grounded in reasonable assumptions

6

rather than speculation. J.A.2203-2204 (describing "tools and safeguards" to prevent misallocation and overbuild while preserving needed long-range visibility). This, in turn, ensures that the 20-year horizon promotes efficient investment without encouraging transmission providers to build unnecessary infrastructure.

FERC correctly emphasizes that this 20-year planning requirement supplements, not supplants, existing *near*-term planning processes required under Order 1000. FERC Br. 49-51, 139-40. Order 1920 adds a long-term planning layer to Order 1000 to address needs that would otherwise be ignored until they become urgent—and thus more expensive and inefficient to solve. FERC's layered approach reflects a sound regulatory judgment: short-term planning addresses immediate operational needs, while long-term planning positions the grid to meet future demands reliably and cost-effectively.

Petitioners' concerns that the 20-year horizon is speculative or will lead to overbuilding are thus unfounded. The Commission considered these objections and adopted the scenario-based approach, best-available-data requirements, and reevaluation provisions precisely to address them. J.A.2203-2206; FERC Br. 140-42. Plus, petitioners' arguments ignore the harms from their position: A grid planned only ten years into the future will inevitably face needs that near-term fixes cannot address, forcing either reliability compromises or rushed, suboptimal investments. ITC's experience with the MVP and LRTP processes demonstrates that the risks of

7

underbuilding due to short planning horizons are real and consequential, while the risks of overbuilding under a disciplined 20-year planning framework are manageable and have not materialized in practice.

For these reasons, the 20-year planning horizon is a reasonable, well-supported element of Order 1920 that corrects deficiencies in existing transmission planning processes and aligns the evaluation of transmission facilities with the period over which they deliver benefits to customers.

**B.     The five-year planning cycle and three-year selection period balance a reasonable planning cadence with the need for adaptability.**

Order 1920 establishes a carefully structured workflow that requires transmission providers to complete the key steps of long-term planning—including scenario development, needs identification, benefits quantification, evaluation, and selection of long-term facilities—within three years of commencing a long-term planning cycle. J.A.0910-0912.  The Commission simultaneously requires that transmission providers reassess and revise the long-term scenarios they use in this process at least once every five years.  J.A.0909. This cadence reflects the Commission's balancing of competing priorities and constitutes a reasonable exercise of the Commission's line-drawing discretion. *See Am. Gas Ass'n v. FERC*, 593 F.3d 14, 19 (D.C. Cir. 2010) ("[FERC] enjoys broad discretion to invoke its expertise in balancing competing interests and drawing administrative lines.").

The five-year scenario refresh requires updating long-term predictions as time goes on. The Commission explained that requiring transmission providers to reassess and revise long-term scenarios at least once every five years is necessary to ensure they accurately reflect factors that may change over the five-year cycle, "such as changes in technology, load forecasts, or [relevant] laws." J.A.0912. The Commission also preserved flexibility by permitting interim updates of these inputs in the middle of the planning cycle. J.A.2217-2218. Transmission providers are therefore empowered to respond to material developments as they arise. FERC Br. 157-58.

Balancing out the five-year scenario refresh, Order 1920 requires providers to select long-term projects within three years of the beginning of each five-year planning cycle. This ensures that new long-term projects are "timely identifi[ed], evaluat[ed], and select[ed]" as early as possible in the process. J.A.0910-0912. The resulting structure—selection decisions within three years, scenario revision every five—strikes an appropriate balance, ensuring early development while limiting the administrative burden associated with frequently updating the long-term scenarios. J.A.2218.

Petitioners' objections to this cadence fall flat. The Public Interest Organizations argue that the Commission should have required more frequent (every three years) planning cycles, contending that five-year planning cycles reduces the

9

responsiveness of the planning process and "slows the pace of long-term planning." PIO Br. 31, 33. But as the Commission explained, the Organizations "provide insufficient and unconvincing support for their argument that a five-year [planning cycle] is incapable of accounting for" changing circumstances in real time. J.A.2217-2218. Indeed, the Commission elected a five-year cycle after ITC (and others) showed that planning every three years would exceed the resources and capabilities of transmission providers. *See* J.A.3938; J.A.2218; FERC Br. 157 (FERC reasonably "rel[ied] on the more-than-a-dozen comments" making this point). The Organizations' complaints also ignore that transmission providers can (and should) update assumptions mid-cycle if necessary to meet changing demands. J.A.0915.

The five-year cadence, with its nested three-year selection requirement, reflects a reasonable balancing of the Commission's stated goals and falls well within the zone of reasonableness that courts afford to agency line-drawing. *See ExxonMobil Gas Mktg. Co. v. FERC*, 297 F.3d 1071, 1085 (D.C. Cir. 2002) (courts "are generally unwilling to review [FERC's] line-drawing" unless decision was "patently unreasonable" (citation omitted)).

### C. The seven mandatory benefits set a reasonable minimum to ensure cost-justified selection and beneficiary-aligned allocation.

Order 1920 requires transmission providers in each transmission planning region to consider seven benefits when evaluating long-term facilities for potential

10

selection. These benefits encompass distinct, measurable values covering reliability, economics, and resilience: (1) avoided or deferred reliability transmission facilities and aging infrastructure replacement; (2) reduced loss of load probability or reduced planning reserve margin; (3) production cost savings; (4) reduced transmission energy losses; (5) reduced congestion due to transmission outages; (6) mitigation of extreme weather events and unexpected system conditions; and (7) capacity cost benefits from reduced peak energy losses.  J.A.1137-1138.

1.     The Commission determined that requiring transmission providers to use this minimum set of benefits is necessary to ensure just and reasonable rates. Without consideration of a sufficiently broad range of benefits, long-term transmission planning cannot identify, evaluate, and select more efficient or cost-effective regional transmission solutions to address long-term needs. J.A.2320. These seven required benefits "have a proven track record, can be discretely measured, and are unlikely to cause duplication." J.A.1141.

The Commission's approach in Order 1920 represents a significant (and welcome) departure from Order 1000's lack of specificity regarding benefits. As the Commission recognized, under the existing framework, many regions may systematically fail to identify the full range of benefits that long-term transmission facilities provide. *See* J.A.1140 ("[F]ailing to use the set of benefits that we require in this final rule to evaluate Long-Term Regional Transmission Facilities for

11

potential selection could render resulting Commission-jurisdictional rates unjust and unreasonable."). The seven required benefits ensure that transmission providers will consider a sufficiently broad range of benefits when determining whether to select long-term facilities as more efficient or cost-effective solutions. *See Citadel FNGE Ltd. v. FERC*, 77 F.4th 842, 863-64 (D.C. Cir. 2023) (FERC's revision of a rate that was "functioning in an unanticipated and counter-productive manner" was reasonable where it "appropriately responded in a calibrated manner to bring stability and reason to rates").

ITC supported the Commission's adoption of a mandatory benefits floor. J.A.3942-3943. ITC explained that Order 1000's lack of specificity had led many planning regions to adopt narrow benefit criteria—"distinct, siloed project classifications for economic benefit based on adjusted production costs, reliability benefits attributable only to the resolution of impending NERC Reliability Standards violations, and 'Public Policy Projects' which have failed to materialize outside of single-state RTOs." J.A.3942. This "lowest common denominator" approach means that "broadly beneficial transmission projects cannot obtain approval, the costs of approved projects are not accurately allocated to the beneficiaries thereof, and the needs of the transmission system and its customers are not being met." J.A.3942.

The seven required benefits in Order 1920 closely align with the benefit criteria that ITC recommended based on its MISO LRTP experience. The LRTP process evaluates possible transmission solutions using benefit categories that include production cost savings, capacity losses savings, capacity savings from reduced planning reserve margins, long-term cost savings from avoided or deferred transmission projects, avoided risk of load shed, and decarbonization. J.A.3944-3945; J.A.3961 (listing the benefit components evaluated for the MISO portfolio). The MISO LRTP portfolio demonstrates the effectiveness of this multi-benefit evaluation approach: The portfolio has a benefit-to-cost ratio of between 2.6 to 3.8, and MISO studies show benefits of at least 2.2 for every Cost Allocation Zone. J.A.3959.

**2.** The Commission also reasonably permitted, but did not require, transmission providers to use a portfolio approach when evaluating the benefits of long-term transmission facilities. J.A.1259-1260. Under the portfolio approach, transmission providers may evaluate the aggregate benefits of multiple transmission facilities rather than on a facility-by-facility basis. J.A.1249-1250. The Commission credited substantial record evidence showing that a portfolio approach produces administrative and economic efficiencies, better distribution of benefits, and a greater likelihood of achieving agreement on regional cost allocation. J.A.2357-2358.

13

ITC endorsed the portfolio approach based on its experience in MISO. ITC urged the Commission to mandate portfolio-based evaluation in planning regions because the approach "ensures that the greatest number of states and subregions within a planning region receive benefits from each long-range planning cycle." J.A.3947. This method "facilitates greater stakeholder ability to select a group of projects which are the most efficient and cost-effective among candidate projects, and which are collectively balanced." J.A.3947. The MISO MVP Triennial Reports have demonstrated that "the use of a portfolio approach in that process resulted in the realization of considerably more benefits relative to costs than were originally anticipated when the original MVP portfolio was approved." J.A.3947. FERC correctly defends these policy choices as reasonable exercises of the Commission's line-drawing discretion. FERC Br. 137-38.

Petitioners' objections to the benefits requirements and portfolio approach are unpersuasive. The Public Interest Organizations argue that the Commission erred by not requiring transmission providers to use the additional benefits identified in the NOPR. PIOs Br. 49-57. But the Commission reasonably explained that it adopted only the seven benefits that "have a proven track record, can be discretely measured, and are unlikely to cause duplication," while declining to mandate other benefits that were overlapping or difficult to measure. J.A.1141; J.A.2344-2345. Moreover, the Commission reasonably permitted transmission providers to

14

consider additional benefits beyond the required set, subject to transparency requirements. J.A.1218-1219.

The States argue that the portfolio approach improperly allows "bundling of economic projects with public policy and other projects that are uneconomic, which makes all projects appear economic on a collective basis." States Br. 45-46. This argument misunderstands the relationship between benefit evaluation and cost allocation. As the Commission explained, transmission planners must always allocate costs in a manner at least roughly commensurate with estimated benefits, regardless of the more abstract benefits for one or many projects. J.A.2358-2359. The Commission has previously accepted the use of the portfolio approach for the evaluation of transmission facilities, and the portfolio approach does not excuse transmission providers from demonstrating that their cost-allocation methods satisfy cost-causation requirements. J.A.2358-2359 (citing *Midwest Indep. Transmission Sys. Operator, Inc.*, 133 FERC ¶ 61,221, PP 221-22 (2010)).

For these reasons, the Commission's choices to mandate consideration of seven benefits and to allow portfolio evaluation are reasonable, well-supported elements of Order 1920.

## II.    Order 1920's cost-allocation architecture lawfully implements cost-causation principles while allowing for structured state input.

Determining who will bear the cost of a given project is fraught with controversy and can imperil necessary transmission improvements. Order 1920's

cost-allocation architecture sets ex ante cost allocation as a backstop—*i.e.*, it determines who will bear the costs of a project *before* the projects are pursued. This promotes adherence to the fundamental precept of cost causation, meaning that those who benefit from a project bear a roughly commensurate cost. Order 1920's federalism and cost-causation guardrails give states an important role without letting cost-allocation disagreements lead to stalemate. Each of these elements reflects lessons learned from ITC's real-world experience and corrects deficiencies that have historically plagued long-term transmission planning.

### A.    Requiring ex-ante methods as backstops promotes cost-causation principles and planning certainty.

Order 1920 requires transmission providers in each planning region to specify at least one ex-ante cost-allocation method that will apply to long-term transmission facilities selected in the Order 1920 process. J.A.1524-1525. This requirement ensures that even absent state agreement, costs are allocated in accordance with established methods, preventing the stalemate that could otherwise result when multi-state negotiations fail to yield consensus. As the Commission explained, mandating such an ex-ante backstop "provides a level of certainty critical to the development of needed" long-term facilities. J.A.1526-1528. That is because, without a backstop, transmission providers unable to secure agreement from states would be stalled indefinitely, frustrating development and hampering investment. J.A.1526-1528.

16

The ex-ante backstop requirement stems from Order 1000. There, the Commission "require[d] *ex ante* cost allocation for selected regional transmission facilities" because "the allocation of transmission costs can be contentious and prone to litigation in multi-state transmission planning regions." J.A.1526-1528 (citing *Transmission Planning & Cost Allocation by Transmission Owning & Operating Pub. Utils.*, Order No. 1000, 136 FERC ¶ 61,051, PP 498-99 (2011)). The D.C. Circuit blessed this approach, finding that the Commission "reasonably balanced" the benefits and claimed burdens of Order 1000's reforms in concluding that ex-ante backstops "would reduce conflicts and aid in the development and construction of new transmission." *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d 41, 70 (D.C. Cir. 2014) (citations and quotation marks omitted). Order 1920 appropriately extends this approach to planning for long-term transmission facilities. FERC Br. 54-55.

As ITC urged before the Commission, "[t]his backstop methodology is crucially necessary to ensure that long-range transmission planning does not founder on the rocks of cost allocation." J.A.3951-3952. ITC offered the existing MISO MVP cost-allocation process as an example of a Commission-approved methodology that could serve as such a backstop: "[T]he MISO region could elect to specify that the MISO MVP cost allocation process provided in the MISO Tariff will apply to a Long-Term Regional Transmission Planning portfolio if the State

17

Agreement Process does not select an alternative methodology by a defined point in MISO's planning cycle." J.A.3952.

Ex-ante cost-allocation backstops also assure compliance with the cost-causation principle—the governing constraint for all cost-allocation methods under Order 1920. J.A.2522-2523. This standard is the "flesh to the[] bare statutory bones" of the Federal Power Act, 16 U.S.C. § 824d(a), which requires that rates be "just and reasonable." *K N Energy, Inc. v. FERC*, 968 F.2d 1295, 1300 (D.C. Cir. 1992). Applying that principle, the Seventh Circuit upheld the MISO MVP cost-allocation methodology because its load-ratio share allocation was roughly commensurate with region-wide benefits. *See Ill. Com. Comm'n v. FERC*, 721 F.3d 764, 774-75 (7th Cir. 2013).

State Petitioners argue that requiring an ex-ante backstop will allow transmission organizations to socialize costs for public-policy projects and local decarbonization goals, thereby imposing costs on states that object to such projects. States Br. 50-53. This is a public-policy argument, not a legal one. FERC, not states, establish cost-allocation methods for interstate transmission projects. FERC Br. 143-44 (citing *FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 277-78 & n.5 (2016)). In any event, the Commission and federal courts are dutybound to ensure that any selected ex-ante method fairly allocates benefits and burdens. J.A.1531 ("[a]ny cost allocation method(s) that transmission providers propose, be it as a

18

result of a State Agreement Process or a Long-Term Regional Transmission Cost Allocation Method, must allocate costs in a manner that is at least roughly commensurate with estimated benefits"). This solves the supposed concern: those who benefit must pay, and those who do not benefit will not. J.A.2097; J.A.2125; J.A.2133-2134; FERC Br. 138-39.

**B.    Order 1920 respects the interests of states in long-term transmission planning.**

Order 1920 provides a forum for states to protect their interests in long-term planning. It establishes a six-month engagement period during which transmission providers must create a forum for Relevant State Entities to negotiate a cost-allocation method with other stakeholders. J.A.1563; J.A.1565-1566. Absent agreement during the engagement period, the transmission organization's selected ex-ante methods apply. J.A.2501. The Commission also permits, but does not mandate, adoption of a State Agreement Process for allocating the costs of all or a subset of long-term transmission facilities. J.A.1594-1597. This architecture respects federal–state roles: Transmission planning and cost allocation for interstate facilities are within FERC's exclusive domain under the Federal Power Act, while resource decisions, siting, and retail ratemaking remain with the states. FERC Br. 142-43; 16 U.S.C. §§ 824(b)(1), 824e(a).

The State Agreement Process affords states significant flexibility. Under this process, one or more Relevant State Entities may agree with the transmission

organization to establish a cost-allocation method for long-term facilities within six months after the facilities are selected in the regional transmission plan. J.A.2003. This framework accommodates state preferences: States can agree to an ex-ante formula for regional cost allocation, such as the "highway-byway" formula approved by the SPP Regional State Committee, or states can agree to a process for project-by-project agreement on cost allocation, such as the State Agreement Approach in PJM. J.A.1594-1597.

ITC supports Order 1920's approach based on its extensive first-hand experience with state participation in cost-allocation development. J.A.3949-3950. ITC highlighted the integral role played by the Organization of MISO States in successfully developing cost-allocation procedures for the LRTP portfolio, which the Commission has accepted. J.A.3950. When MISO stakeholders propose to alter the cost-allocation method, the Organization of MISO States can propose an alternative (subject to certain conditions), and MISO must then file this alternative with the Commission. J.A.3952-3953 (citing MISO Tariff, Schedule A, MISO Rate Schedule 01, Appendix K § II.E.3). Similarly, in SPP, the Regional State Committee has primary responsibility for determining regional proposals for cost allocation matters. J.A.3953 (citing SPP Bylaws § 7.2). These mechanisms show that meaningful state participation in cost allocation is both feasible and effective.

Building on this experience, the Commission struck an appropriate balance in Order 1920. Its state-engagement architecture "gives states a 'robust role' in the cost allocation process," FERC Br. 55-56, and gives transmission organizations the ability to accept or reject the states' preferred approach in proposing plans to the Commission. The Commission, in turn, must review the proposals for compliance with the Federal Power Act's "just and reasonable" standard. FERC's approach balances states' interests with the need for certainty in cost allocation and long-term planning. Order 1920's rubric is reasonable and within the Commission's discretion.

**CONCLUSION**

The Court should deny the petitions for review.

Dated: March 13, 2026

Respectfully submitted,

*/s/ Aaron M. Streett*

Jay Ryan
BAKER BOTTS L.L.P.
700 K Street NW
Washington, D.C. 20001
(202) 639-7789
jay.ryan@bakerbotts.com

Aaron M. Streett
Beau Carter
BAKER BOTTS L.L.P.
910 Louisiana Street
Houston, Texas 77002
(713) 229-1855
aaron.streett@bakerbotts.com
beau.carter@bakerbotts.com

*Counsel for ITC Midwest LLC*

21

## CERTIFICATE OF COMPLIANCE

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and this Court's July 28, 2025 Scheduling Order because this brief contains 4,379 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2010 in 14-point Times New Roman font.  This brief was scanned for viruses and none were present.

*/s/ Aaron M. Streett*
Aaron M. Streett

## CERTIFICATE OF SERVICE

I certify that on March 13, 2026, the foregoing was electronically filed through this Court's CM/ECF system, which will send a notice of filing to all registered users.

*/s/ Aaron M. Streett*
Aaron M. Streett

22