**No. 24-1650 (L)**

Consolidated with Nos. 24-1756, 14-1758, 24-1760, 24-1770, 24-1785, 24-1792, 24-1804, 24-1857, 24-1862, 24-1867, 24-1876, 24-1885, 24-1887, 24-1979, 24-1991, 24-2162, 24-2163, 24-1073, 25-1080, 25-1197, 25-1349

---

## UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

---

APPALACHIAN VOICES, *et al.,*
*Petitioners*

v.

FEDERAL ENERGY REGULATORY COMMISSION,
*Respondent*

---

On Appeal from the Federal Energy Regulatory Commission

---

## REPLY BRIEF OF THE CONSUMER PETITIONERS

*/s/ Kenneth R. Stark*
Kenneth R. Stark
McNees Wallace & Nurick LLC
100 Pine Street
Harrisburg, PA 17101
Phone: (717) 237-8000

*Counsel for the American Forest & Paper Association, the Industrial Energy Consumers of America, the PJM Industrial Customer Coalition, and the Coalition of MISO Transmission Customers and on Behalf of the Consumer Petitioners*

| | |
|---|---|
| Randolph Lee Elliott | Denise Goulet |
| McCarter & English, LLP | McCarter & English, LLP |
| 1301 K Street, NW, Suite 1000 West | 1301 K Street, NW, Suite 1000 West |
| Washington, DC 20005 | Washington, DC 20005 |
| Phone: 202-753-3428 | Phone: 202-753-3439 |
| *Counsel for the National Rural Electric Cooperative Association* | *Special Counsel for Office of the Ohio Consumers' Counsel* |

| | |
|---|---|
| Phyllis G. Kimmel<br>Phyllis G. Kimmel Law Office PLLC<br>1717 K Street, NW, Suite 900<br>Washington, DC 20006<br>Phone: (202) 787-5704<br>*Counsel for the New England States Committee on Electricity* | Katherine Ann Wade<br>Betts & Holt LLP<br>1101 Connecticut Ave., NW, Suite 450<br>Washington, D.C. 20036<br>*Counsel for the Resale Power Group of Iowa* |

Dated: March 13, 2026 (final)

ii

**TABLE OF CONTENTS**

SUMMARY OF ARGUMENT ........................................................................1

ARGUMENT ...............................................................................................4

    I.    Consumer Petitioners Have Standing .........................................................4

    II.   FERC Did Not Meet Its Burden to Demonstrate Existing Transmission Planning Practices Are Unjust and Unreasonable ...................................10

    III.  FERC Arbitrarily and Capriciously Failed to Consider an Important Aspect of the Problem – Measures to Mitigate Escalating Transmission Costs ........................................................................................................12

        a.  FERC Does Not Provide a Reasoned Decision for Failing to Remedy Incentives Concerns Raised by Consumers .............................................14

        b.  FERC Does Not Provide a Reasoned Basis for Failing to Implement Independent Transmission Project Planning and Monitoring ................16

        c.  FERC Does Not Provide a Reasoned Basis for Failing to Reform Existing Formula Ratemaking and Prudence Review Processes ...........17

        d.  FERC's Decision to Exempt Asset Management Projects from the Rule's Transparency Requirements Is Arbitrary and Capricious ..........18

    IV.  FERC Does Not Provide a Reasoned Decision for Departing From Order 2003's Pricing Policy Regarding Cost Allocation for Generation Interconnection Network Upgrades .......................................................21

        a.  Order 1920's Generation Interconnection Backstop Provision Represents a Fundamental Departure without Reasoned Explanation from Order 2003 ...............................................................................................21

        b.  FERC Did Not Provide a Reasoned Explanation for Failing to Consider the Preferential Effects of Order 1920's Backstop Policy ......................23

        c.  FERC Provided No Evidence That Network Upgrades Associated with Failed Generation Interconnection Projects Provide Benefits to Consumers Roughly Commensurate with the Costs Imposed ...............23

i

V.   Order 1920 Violates FPA Section 217(b)(4)...............................................24

VI.  FERC Has Not Justified Its Arbitrary Prohibitions on Reevaluating
     Facility Selection ....................................................................................25

VII. FERC Has Not Justified Excluding Electric Cooperatives from Cost-
     Allocation Consultations .........................................................................27

CONCLUSION ...................................................................................................29

## TABLE OF AUTHORITIES

**Cases**

*Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*,
No. 25-1411 (4th Cir. Apr. 30, 2025)....................................................................9

*ANR Pipeline Co. v. FERC*,
771 F.2d 507 (D.C. Cir. 1985) .............................................................................7

*Babbitt v. Farm Workers*,
442 U.S. 289 (1979) ..............................................................................................7

*Baharon v. Holder*,
588 F.3d 228 (4th Cir. 2009).............................................................................11

*Beck v. McDonald*,
848 F.3d 262 (4th Cir. 2017)...............................................................................8

*Citizens for Allegan County, Inc. v. FPC*,
414 F.2d 1125 (D.C. Cir. 1969) .........................................................................10

*Clapper v. Amnesty International USA*,
568 U.S. 398 (2013) ..............................................................................................6

*Emera Maine v. FERC*,
854 F.3d 9 (D.C. Cir. 2017) ........................................................................ 10, 12

*Entergy Services Inc. v. FERC*,
391 F.3d 1240 (D.C. Cir. 2004) .........................................................................23

*Federal Power Comm'n v. Hope Natural Gas*,
320 U.S. 591 (1944) .............................................................................................13

*Friends of Buckingham v. State Air Pollution Control Bd*,
947 F.3d 68 (4th Cir. 2020)................................................................................14

*Ill. Com. Comm'n v. FERC*,
576 F.3d 470 (7th Cir. 2009)..............................................................................24

*Ky. Mun. Energy Agency v. FERC*,
45 F 4th 162 (D.C. Cir. 2022)............................................................................16

*Long v. Bondi*,
151 F.4th 503 (4th Cir. 2025) ..............................................................................9

*Mobil Oil Expl. & Producing Se. v. United Distribution Cos.*,
498 U.S. 211 (1991)............................................................................................20

*Morgan Stanley Capital Grp. v. Pub. Util. Dist.* No. 1,
544 U.S. 527 (2008) ............................................................................................12

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ............................................................................ 14, 20
*Nat'l Ass'n of Reg. Util. Commissioners v. FERC*,
   964 F.3d 1177 (D.C. Cir. 2020) ...................................................................5
*Pac. Gas & Elec. Co. v. FERC*,
   533 F.3d 820 (D.C. Cir. 2008) ...................................................................9
*Pub. Util. Dist. No. 1 of Snohomish County v. FERC*,
   272 F.3d 607 (D.C. Cir. 2001) ...................................................................5
*S.C. Generating Co. v. FPC*,
   249 F.2d 755 (4th Cir. 1957)....................................................................12
*S.C. Pub. Serv. Auth. v. FERC*,
   762 F.3d 41 (D.C. Cir. 2014) ................................................... 5, 24, 25
*SEC v. Chenery Corp.*,
   318 U.S. 80 (1943) ....................................................................................16
*Sommerville v. Union Carbide Corp.*,
   149 F.4th 408 (4th Cir. 2025) ...................................................................9
*TransCanada Power Mktg. Ltd. v. FERC*,
   811 F.3d 1 (D.C. Cir. 2015) ....................................................................11
*Transwestern Pipeline Co. v. FERC*,
   747 F.2d 781 (D.C. Cir. 1984) ...................................................................8
*United Distrib. Cos. v. FERC*,
   88 F.3d 1105 (D.C. Cir. 1996) ...................................................................7
*Wild Virginia v. Council on Env't Quality*,
   56 F.4th 281 (4th Cir. 2022) .....................................................................8
*Xcel Energy Services v. FERC*,
   815 F.3d 947 (D.C. Cir. 2016) .................................................................12

**Statutes**

16 U.S.C. § 824e ..............................................................................................1
16 U.S.C. § 824q(b)(4)................................................................................2, 24
16 U.S.C. § 824s .............................................................................................14

**Administrative Decisions**

*Preventing Undue Discrimination and Preference in Transmission Service*,
   Order 890, 118 FERC ¶ 61,119, (2007)..................................................19

iv

*Promoting Transmission Investment Through Pricing Reform*,
Order No. 679, 116 FERC ¶ 61,057, *reh'g granted in part & denied in part*,
Order No. 679-A, 117 FERC 61,345 (2006)............................................................14
*Standardization of Generator Interconnection Agreements & Procs*,
Order 2003, 104 FERC ¶ 61,103, PP 693-703 (2003); *order on reh'g*,
Order 2003-A, 106 FERC ¶ 61,220, *order on reh'g*,
Order 2003-B, 109 FERC ¶ 61,287 (2004), *order on reh'g*,
Order 2003-C, 111 FERC ¶ 61,401 (2005) ............................. 6, 10, 21, 22, 23, 24

## SUMMARY OF ARGUMENT

In their opening brief, Consumer Petitioners ("Consumers") demonstrated their standing to raise their challenges. They demonstrated that Order 1920 will cause them harm that cannot be remedied years from now by challenging the selection of or imposition of costs associated with specific transmission facilities.

Contrary to its obligation in section 206 of the Federal Power Act ("FPA"), 16 U.S.C. § 824e, FERC advances its desired solution without first demonstrating that specific existing practices are unjust and unreasonable.

At a time when electricity affordability is paramount, Order 1920 arbitrarily and capriciously facilitates an escalation in transmission rates without implementing any cost containment mechanisms to ensure rates remain just and reasonable. Instead of confronting its failure to consider an important part of the problem – rising jurisdictional transmission rates – FERC deflects by claiming that it reasonably balanced competing interests and properly exercised its broad discretion. But FERC cannot articulate with any specificity how Order 1920 protects consumers from unreasonable transmission rates. FERC's sweeping rejection of all ratemaking reforms, including some even proposed by FERC, includes the failure to (1) eliminate the Construction Work in Progress ("CWIP") incentive for regional, long-term transmission projects; (2) implement independent transmission monitoring, (3) consider transmission formula rate reforms, and (4) ensure transparency

1

requirements for asset management projects.  Order 1920 fails to balance the needs of utilities and consumers, as evidenced by FERC allowing utilities to charge consumers 100% of construction costs before long-term projects go into service, if they ever do, and 100% of prudently incurred costs for abandoned plants for projects that never go into service.  FERC's actions insulate utilities from challenges to imprudent spending.  FERC's exclusion of asset management projects from the Rule ignores consumer interests by insulating a significant portion of transmission spending, to the utilities' sole benefit.

Order 1920 unreasonably changes FERC's long-standing policy for allocating costs of transmission-network upgrades required to interconnect new generators by shifting their planning from generator-interconnection processes (where generators pay the upfront costs of the upgrades) to regional transmission-planning processes (where consumers bear these costs). Order 1920 destroys price signals for efficient generator location and shifts enormous upgrade costs from generators to consumers.

Order 1920 violates FPA section 217(b)(4), 16 U.S.C. § 824q(b)(4), which requires FERC to facilitate transmission planning to meet the reasonable needs of load-serving entities. FERC claims that Order 1920 satisfies the statute because the D.C. Circuit held that FERC's prior transmission-planning rule (Order 1000) did. But FERC ignores a fundamental difference between the two rules: unlike Order

2

1000, Order 1920 gives transmission planners discretion to *exclude* the needs of load-serving entities from the transmission-planning process.

Order 1920 unreasonably prohibits transmission planners from reevaluating the selection of transmission facilities later found to offer no benefits or be no longer needed. FERC defends this prohibition as preferable to "a broad reevaluation requirement." But FERC faced no such binary policy choice, and barring reevaluation in the face of known, significant changes in facts is unreasonable on its face. Order 1920 also prohibits reevaluating in light of changes in law if a facility's targeted in-service date is in the first half of the 20-year planning horizon. FERC does not point to any justification in its orders for ignoring significant changes in law.

Order 1920-A requires transmission planners to consult with Relevant State Entities in determining appropriate cost allocation for regional transmission facilities, but unreasonably allows them to exclude electric cooperatives from these discussions, even when the state entities do not regulate cooperatives' rates. FERC defends that exclusion by arguing that states, unlike cooperatives, are responsible for permitting and siting of electric transmission facilities. But FERC required consultations about the appropriate cost allocation, not facility permitting or siting, and thus FERC's justification falls flat.

3

# ARGUMENT[1]

## I.     Consumer Petitioners Have Standing.

FERC (Br. 9-14) suggests Consumers may lack standing to challenge some (although not all) aspects of Order 1920 because they are not harmed by a rule "that will take years to fully implement and years more to feel the full effects of." FERC Br. 10. Respondent-Intervenor Transmission Owners (Br. 5-9) echo this sentiment. But Order 1920 is a final rule of general applicability, and each of the Consumers' members has standing to sue in their own right. Consumers Br. 14-15.

Order 1920 affects consumer rates both in the near- and long-term. For example, FERC refused to make long-term projects ineligible for the CWIP incentive, which allows utilities to start charging consumers <u>now</u> during the planning process, before transmission projects are completed. *See* FERC Br. 146 (CWIP "allows transmission owners to include their [construction] rates costs…before those facilities enter service"); JA5173; JA4892. Even though FERC's primary job is to protect consumers from unjust and unreasonable rates, FERC asks this Court to find Consumers lack standing to challenge a comprehensive rule that effectuates increased electric transmission investment (and thus increased rates) without correspondingly implementing any measures to mitigate or contain costs.

---

[1] New England States Committee on Electricity joins in Sections I and III; Ohio Consumers' Counsel ("OCC") joins in all but Section VII; National Rural Electric Cooperative Association ("NRECA") joins in Sections I and IV to VII.

FERC fails to cite any authority demonstrating that parties are precluded from challenging "a big-picture administrative Rule about long-term future transmission development." FERC Br. 11.  Neither FERC nor the D.C. Circuit questioned the standing of the 45 utility and customer petitioners who challenged FERC's predecessor regional transmission-planning rule, Order 1000, as contrary to law, arbitrary and capricious, and unsupported by substantial evidence.  *See S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d 41 (D.C. Cir. 2014).  Moreover, the court held that Order 1000's transmission-planning reforms constituted practices affecting rates under the FPA.  FERC Br. 34 (citing *South Carolina*, 762 F.3d at 84-85).  The D.C. Circuit adjudicated challenges to several other landmark FERC transmission rulemaking orders without dismissal on standing grounds.  *See* FERC Br. 21-22 (Order 888), 125 (Order 2003).  *See also Nat'l Ass'n of Reg. Util. Commissioners v. FERC*, 964 F.3d 1177, 1184-85 (D.C. Cir. 2020) (facial challenge to FERC rulemaking order with future impacts is fit for judicial review).

FERC invokes *Pub. Util. Dist. No. 1 of Snohomish County v. FERC*, 272 F.3d 607 (D.C. Cir. 2001) to question Consumers' standing.  FERC Br. 12.  But *Snohomish* is inapposite because the court found the petitioners lacked standing because their "injuries only come to pass, however, if a public utility opts to participate in [a regional transmission organization]; Order 2000 does not mandate this."  272 F.3d at 617.  Here, paying for transmission costs resulting from Order

5

1920's challenged requirements is, unfortunately, not voluntary for Consumers.

FERC argues that the alleged harms are not concrete and imminent because Consumers "merely state that 'Order 1920 directly affects rates'" and "express concern that rates may someday go up instead of down." FERC Br. 10. This argument is belied by FERC's acknowledgement that the Rule regulates transmission-planning practices, which directly affect rates, and that costs incurred by transmission owners under the Rule will be recovered from consumers. FERC Br. 81-82, 85-86, 95, 117. Harm is concrete when it is not abstract and it is the type of harm that has traditionally provided a basis for suit. *Clapper v. Amnesty International USA*, 568 U.S. 398, 340-41 (2013).

FERC (Br. 14) mischaracterizes Consumers' challenges to Order 1920's requirements for interconnection-related upgrades (Consumers Br. 36-44) and facility reevaluations (*id.* at 49-52). Both are "processed-based objections" that FERC (Br. 14) concedes are properly raised now. As discussed below in Section IV, Consumers argue that Order 1920's revision to planning and cost-allocation processes for interconnection-related upgrades will immediately destroy the existing price signals for efficient generation siting and construction established by FERC Order 2003.[2] The loss of those price signals will have an immediate effect on

---

[2] *Standardization of Generator Interconnection Agreements & Procs*, Order 2003, 104 FERC ¶ 61,103, PP 693-703 (2003); *order on reh'g*, Order 2003-A, 106 FERC ¶ 61,220, *order on reh'g*, Order 2003-B, 109 FERC ¶ 61,287 (2004), *order on*

parties' conduct that inevitably will affect transmission rates. Additionally, Consumers challenge Order 1920's evaluation-and-reevaluation process on its face, which poses an unavoidable threat of harm from overinvestment in uneconomic or unneeded transmission facilities that Order 1920 prohibits from being reevaluated in later planning cycles.

FERC conflates "imminent" harm with "immediate" harm by arguing that consumers will only be harmed by specific projects that may or may not be approved. But courts do not require certain, immediate injury. Instead, a plaintiff must "demonstrate a realistic danger of sustaining a direct injury as a result of [a policy's] operation or enforcement," but "does not have to await the consummation of threatened injury to obtain preventive relief. If the injury is certainly impending, that is enough." *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979) (cleaned up)).

Present injury-in-fact does not require a party to wait for a rulemaking to be implemented. *See United Distrib. Cos. v. FERC*, 88 F.3d 1105, 1182-83 (D.C. Cir. 1996) (finding FERC's treatment of gas supply realignment cost recovery in Order 636 ripe for review because the policy caused "a direct and immediate effect" on petitioners' primary conduct). Injury-in-fact includes "not only present and immediate harm, but also a looming unavoidable threat of harm." *ANR Pipeline Co. v. FERC*, 771 F.2d 507 515-16 (D.C. Cir. 1985) (quotation omitted). Thus, an

---

*reh'g*, Order 2003-C, 111 FERC ¶ 61,401 (2005).

"immediate prospect of future injury" satisfies standing. *Id.* at 516 (quoting *Transwestern Pipeline Co. v. FERC*, 747 F.2d 781, 785 (D.C. Cir. 1984)). Order 1920 establishes the immediate prospect of consumers paying excessive transmission costs now and in the future.

Notably, FERC fails to confront this Court's decisions undercutting FERC's assertion that Order 1920 does not harm Consumers. Standing may be based on "substantial risk that the harm will occur, which in turn may prompt a party to reasonably incur costs to mitigate or avoid that harm." *Beck v. McDonald*, 848 F.3d 262, 275 (4th Cir. 2017). Order 1920's validation of CWIP, its reversal of generation interconnection price signals, and exemption of asset management projects from transparency requirements create a substantial risk that harms will occur (if not already occurring). Order 1920 facilitates a glidepath for utilities to spend and recover costs from consumers both now and in the future without any meaningful cost-containment rules or consumer protections in place.

Although not articulated as such, FERC's standing arguments question whether Order 1920 is ripe for review. This Court does not require the consummation of a threatened injury to demonstrate ripeness, but instead finds ripeness is satisfied by a future injury so long as that future injury is "not dependent on future uncertainties." *Wild Virginia v. Council on Env't Quality*, 56 F.4th 281, 303 (4th Cir. 2022). There is no "future uncertainty" here. Order 1920 allows FERC-

8

jurisdictional transmission projects to be planned and their costs to be recovered, thus affecting consumer rates in the near-term and in the future.

This Court's standing inquiry asks "whether a plaintiff has the requisite stake in the outcome of a case." *Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*, No. 25-1411 (4th Cir. Apr. 30, 2025). Such requisite stake must not rest on an attenuated chain of possibilities, nor on an unknown third party's actions. *Sommerville v. Union Carbide Corp*., 149 F.4th 408, 421 (4th Cir. 2025). Consumers have sufficiently explained the harms occurring and set to occur. FERC seems to require Consumers to acquire, contrary to clear precedent, "some sort of magic eight ball capable of divining the future" to present an adequate injury. *Long v. Bondi*, 151 F.4th 503, 521 (4th Cir. 2025) (Gregory, J., concurring).

The ratemaking and process harms associated with Order 1920's failures are unavoidable for Consumers. FERC has already adopted Order 1920; its implementation and attendant harms are inescapable. If Consumers must wait until a project is built to challenge Order 1920's planning process, such challenge would be too little, too late; the cake is already baked. Indeed, if Consumers did not challenge Order 1920 now, they would be putting themselves at risk of an argument that they failed to act within the statutory period to challenge aspects of the Rule with which they disagree. *See, e.g., Pac. Gas & Elec. Co. v. FERC*, 533 F.3d 820, 827 (D.C. Cir. 2008) (agreeing with FERC that challenges to orders that

implemented Order 2003-B compliance requirements were "an impermissible collateral attack on the earlier Order No. 2003 series" and dismissing petition for lack of jurisdiction).

The FPA is a consumer-protection statute. *See* FERC Br. 209-10. Decades of appellate precedent "recognize the broad principles of standing applicable to consumers of a service under regulatory control." *Citizens for Allegan County, Inc. v. FPC*, 414 F.2d 1125, 1134 (D.C. Cir. 1969). These principles are central to this case and support Consumers' standing.

## II. FERC Did Not Meet Its Burden to Demonstrate Existing Transmission Planning Practices Are Unjust and Unreasonable.

FERC approved long-term planning reforms without demonstrating that any specific existing transmission planning practices or tariff provisions are unjust and unreasonable under FPA section 206. *See* FERC Br. 110-22 (failing to cite any specific unjust and unreasonable tariff rules or practices). Instead, FERC relied on generic trends like more frequent extreme weather events to advance its desired solution. *See* FERC Br. 111, 114. But FERC can only implement new rules after having first supported, with substantial evidence, that existing practices are unjust and unreasonable. *See Emera Maine v. FERC*, 854 F.3d 9, 21 (D.C. Cir. 2017).

FERC fails to overcome Consumers' demonstration that Order 1920 erred by leveraging generic findings around "*the absence* of sufficiently long-term, forward-looking, and comprehensive transmission planning requirements." *See* JA0716

10

(emphasis added). Instead, FERC asks this Court to authorize FERC's circular reasoning – leveraging a perceived absence or inadequacy of certain long-term planning rules to satisfy its FPA section 206 burden. *See* FERC Br. 121-22. Doubling-down on its discretionary power to use predictive judgments and generic findings, FERC refers back to Order 1920-A's rationale to respond to rehearing requests – including generic findings on extreme weather events, increased electric demand, and the changing resource mix. FERC Br. 114-15 (citing JA2039-2042). Yet, none of those generic trends are explained in the context of FERC's finding that specific transmission planning practices are unjust and unreasonable.

FERC argues that Consumers' hypothetical example about "painting all transmission lines red" is insignificant; thus, FERC was entitled to ignore it. FERC Br. 121-22. Instead of rebutting the hypothetical – which demonstrated FERC's use of circular reasoning – FERC ignores altogether that it was an analogy, blithely asserting that determining the color of a transmission line is not a core object of FERC's charge. *See* FERC Br. 120-21.

It is "well established that the Commission must 'respond meaningfully to the arguments raised before it.'" *TransCanada Power Mktg. Ltd. v. FERC*, 811 F.3d 1, 12 (D.C. Cir. 2015); *see also Baharon v. Holder*, 588 F.3d 228, 233 (4th Cir. 2009). Below and in briefing, FERC fails to meaningfully respond to the argument <u>behind</u> the "paint all transmission lines red" example. Because FERC's flawed reasoning

11

would allow it to implement any unlimited set of reforms without meeting its burden under FPA section 206, Order 1920 is arbitrary and capricious and does not reflect reasoned decision-making.

### III. FERC Arbitrarily and Capriciously Failed to Consider an Important Aspect of the Problem – Measures to Mitigate Escalating Transmission Costs.

Instead of confronting its failure to consider an important part of the problem – rising transmission rates – FERC claims it reasonably balanced competing interests and properly exercised its "broad discretion." FERC Br. 145 (citing *Morgan Stanley Capital Grp. v. Pub. Util. Dist.* No. 1, 544 U.S. 527 (2008), and *Emera Me.*, 854 F.3d at 23). But none of FERC's arguments (FERC Br. 145-50) support its failure to provide adequate consumer protections from known adverse consequences of the 20- to 40-year transmission planning rule. FERC pays lip service to the phrase "balancing interests," but the orders do not contain any specific evidence showing that FERC engaged in a balancing analysis or meaningfully grappled with protecting consumers from excessive rates. Instead, FERC continued allowing 100% cost recovery for utilities under the CWIP and abandonment incentives, thereby imposing 100% financial risk of long-term projects on consumers. This Court should require FERC to honor its obligations to "protect the public interest as distinguished from the private interest of the utilities," *S.C. Generating Co. v. FPC*, 249 F.2d 755, 762 (4th Cir. 1957), and to protect "consumers from excessive rates and charges.'" *Xcel*

12

*Energy Services v. FERC*, 815 F.3d 947, 952 (D.C. Cir. 2016); *see also Federal Power Comm'n v. Hope Natural Gas*, 320 U.S. 591, 603 (1944) ("[T]he fixing of 'just and reasonable rates' involves the balancing of the investor and the consumer interests.").

Affordable, reliable electric power is vital to Consumers. Electricity is a significant operating cost for energy-intensive customers and a significant living expense for residential consumers, and its costs are rising for all. FERC is aware of the growing affordability crisis, having found that developers invested $20-$25 billion annually in U.S. transmission facilities from 2013-2020, with transmission costs becoming an increasing share of a customer's all-in electric bill. JA0624-0626, JA0687-0688. FERC found that "transmission investment is likely to substantially increase in coming years" and there will be "sustained transmission spending through at least 2050." JA0688-0689. But FERC did nothing to address the affordability problem. *See* JA1910-1911, Christie, Comm'r, dissenting ("it is emblematic of the entire final rule that it did *not* include 'saves retail customers money' as one of its mandatory benefits for evaluating projects."). Further, "transmission rate base nearly tripled in a decade" and "the timing of this rule could not be worse. American residential customers will pay about 16.23 cents per kWh next year [2025], the *highest retail power cost for consumers in almost three decades*." JA1917-1918 (citations omitted). Order 1920 arbitrarily and capriciously

13

fails to address the sustained escalation in transmission rates.  *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *Friends of Buckingham v. State Air Pollution Control Bd.*, 947 F.3d 68, 80 (4th Cir. 2020).

### a. FERC Does Not Provide a Reasoned Decision for Failing to Remedy Incentives Concerns Raised by Consumers.

FERC relies on FPA section 219 for the premise that Congress determined that CWIP and abandonment incentives benefit consumers.  FERC Br. 148.  Congress made no such finding.  It simply required FERC to implement transmission incentives that will increase reliability or reduce power costs.  16 U.S.C. § 824s.  Neither FPA section 219, 16 U.S.C. § 824s, nor Order 679[3] provides a reasoned excuse for failing to address the significant, known imbalance in consumer and investor interests created by Order 1920.  *Contra* FERC Br. 146, 148.  FERC failed to demonstrate that allowing regional, long-term transmission projects to use these incentives increases reliability or reduces power costs for consumers, especially considering FERC's practice of routinely doling out incentives.  *See* Order 1920, Christie, Comm'r, dissenting, JA1919-1920 (citing FERC orders granting incentives).

---

[3] *Promoting Transmission Investment Through Pricing Reform*, Order No. 679, 116 FERC ¶ 61,057, *reh'g granted in part & denied in part*, Order No. 679-A, 117 FERC 61,345 (2006).

Moreover, FERC knew that extending CWIP and abandonment incentives beyond Order 679's five-year transmission planning period fundamentally alters the balance of risks between consumers and utilities. FERC acknowledged that CWIP benefits "mainly accrue to the public utility transmission providers," and that "[s]hould the regional transmission facilities not be placed in service, then ratepayers will have financed the construction of such facilities that were not used and useful, while ultimately receiving no benefits." Notice of Proposed Rulemaking, JA0399-0400. Yet FERC did nothing in the Rule to address these problems.

FERC's reliance on the discretion it has in managing its calendar cannot overcome its failure to consider a remedy. FERC argues (Br. 147) that agencies have discretion to determine the timeline for rules of procedure and can defer some problems to future cases. But Order 1920 is not a procedural rule. It imposes substantive obligations and consequences, requiring consumers to begin paying immediately for CWIP on costs associated with planned projects that may never go into service. FERC's statement that it will address this issue in a future rulemaking does not constitute reasoned decision-making, especially given FERC's failure to address transmission cost containment reforms in a proceeding it established nearly four years ago for this purpose (Docket No. AD22-8-000). *See* JA1675, JA1767-1768.

15

While an agency may defer some issues to a future rulemaking, it must address all factors relevant to whether the rule under review is just and reasonable. *Ky. Mun. Energy Agency v. FERC*, 45 F 4th 162, 179 (D.C. Cir. 2022) (FERC "must address rates when they are an important aspect of the problem before it"). FERC recognizes the Rule will impact consumer rates (Br. 81-82, 85-86) but fails to provide a remedy for this consequential problem; this failure is arbitrary and capricious.

Finally, Respondent-Intervenor Transmission Owners provide no support for FERC's action. They argue that FERC's decision is justified by the evidence in the record summarizing the benefits of the CWIP incentive. Respondent-Intervenor Transmission Owners Br. 2832. But FERC never considered competing interests. It declined to act on its proposal by punting the issue to a future case. JA1693; JA2651-2652. The Court cannot rely on arguments that FERC itself did not consider. *SEC v. Chenery Corp.,* 318 U.S. 80, 93-94 (1943) (an agency's "action must be measured by what the Commission did, not by what it might have done.").

### b. FERC Does Not Provide a Reasoned Basis for Failing to Implement Independent Transmission Project Planning and Monitoring.

FERC contends that Consumers' demand for independent monitoring of new transmission projects amounts to a "policy disagreement with FERC." FERC Br. 149. However, the issue of independent transmission monitoring was raised by FERC itself at the beginning of the rulemaking proceeding. JA0112 (whether FERC

16

should "establish an independent entity to monitor the planning and cost of transmission facilities in the region"). Several parties expressed an interest in independent monitoring to ensure more efficient, cost-effective planning. *See* JA4894-4899. Having recognized the potential benefits of independent monitoring, FERC's failure to implement any independent monitoring in the final rule to protect consumers from excessive costs is arbitrary and capricious.

### c. FERC Does Not Provide a Reasoned Basis for Failing to Reform Existing Formula Ratemaking and Prudence Review Processes.

Instead of substantively responding to Consumers' argument that FERC's formula rate and prudence review framework fails to protect customers, FERC claims that enhancing transparency requirements in local transmission planning was enough to satisfy consumer concerns. FERC Br. 150. But FERC did not actually direct that any enhanced transparency requirements or protections be incorporated into actual ratemaking processes or the prudency standard governing transmission cost incurrence. JA1744, JA1766-1768, JA1818. FERC's point about transparency requirements is a red herring.

Conceding it did nothing to improve formula ratemaking processes, FERC merely reasserts Order 1920's finding that "'[N]othing in the reforms we adopt here alters existing Commission policy on cost recovery for transmission facilities' or the scrutiny applied in so-called 'prudence' reviews.'" FERC Br. 150 (quoting JA1823-1824). And that is exactly Consumers' point – FERC did nothing to reform its

ratemaking processes or implement measures to adequately protect customers at a time of substantial electricity rate inflation and substantial infrastructure planning, under a regime where the financial risk for long-term, large-scale projects rests primarily, if not solely, with consumers.

### d. FERC's Decision to Exempt Asset Management Projects from the Rule's Transparency Requirements Is Arbitrary and Capricious.

FERC's explanation for why it exempted large swaths of transmission projects from the Rule's transparency requirements is arbitrary and capricious. FERC points to the distinction Order 1920 made between local transmission projects that expand the grid, and in-kind replacements/asset management projects that do not necessarily expand the grid but are required because existing transmission facilities are aging and need to be replaced. FERC Br. 229-31. FERC's view is that because such projects "might only incidentally increase transmission capacity by replacing old equipment with new[,]" the fundamental concerns addressed in Order 890 of "coordination, openness, and transparency" are not present. FERC Br. 230-31.

FERC has not coherently articulated why concerns about coordination, openness, and transparency are not present in "projects that maintain but do not expand the grid." FERC Br. 231. Indeed, the primary goal of Order 890 was not expansion in itself, but preventing undue discrimination:

> [T]here is no requirement that the overall transmission planning process be open to customers, competitors, and state commissions. Rather, transmission providers may develop

18

transmission plans with limited or no input from customers or other stakeholders. There also is no requirement that the key assumptions and data that underlie transmission plans be made available to customers. Taken together, this lack of coordination, openness, and transparency results in opportunities for undue discrimination in transmission planning.

*Preventing Undue Discrimination and Preference in Transmission Service*, Order 890, 118 FERC ¶ 61,119, PP 424-25 (2007) (subsequent history omitted).

FERC states that the "upshot" of "existing transmission processes" "was an aging electric grid that transmission providers have updated in a piecemeal, siloed fashion, resulting in inefficient and costly transmission investments and rates that fail to meet the Federal Power Act's 'just and reasonable' standard." FERC Br. 59. To address "problems that incentive localized or piecemeal transmission solutions" (*id*. at 58), the Rule "mandates increased transparency" (*id*.). FERC's reforms were "specifically designed to provide needed transparency to ensure that Commission-jurisdictional rates are just and reasonable and not unduly discriminatory or preferential." JA1754.

Yet, FERC exempted asset management projects – which in some regions are upwards of 75% of total local transmission investment – from the transparency requirements. *See* Consumers Br. 32 (citing JA4858-4859, JA4153-4154). A transparency mandate cannot meet the FPA's "just and reasonable" standard if it exempts "aging infrastructure [which] represents a large portion of the grid and

19

[whose] eventual replacement will likely cost billions of dollars." FERC Br. 228 (citing JA1716-1717).

Whether an upgrade wholly or "incidentally" expands the capacity of the transmission system has no bearing on the harm to consumers from having no transparency into the upgrade's proposed costs. Without transparency, consumers cannot meaningfully question, let alone challenge, billions of dollars being spent on in-kind replacements and recovered in FERC-jurisdictional rates. This harm is exacerbated by FERC's grant of a right-of-first-refusal to incumbent transmission owners for the expansion of right-sized in-kind replacements. *See*, e.g., JA1804-1805. The lack of competitive pressures for in-kind replacement projects makes transparency even more important, not less.

FERC argues it need not address this problem in this rulemaking. FERC Br. 232. While an "agency need not solve every problem before it in the same proceeding," *Mobil Oil Expl. & Producing Se. v. United Distrib. Cos.*, 498 U.S. 211, 231 (1991), it must still "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43. Here, FERC's decision to exempt most local transmission upgrades from transparency requirements because their capacity increases are "incidental" is not a satisfactory explanation for consumers who must pay for the associated billions of dollars in transmission rates.

IV.   **FERC Does Not Provide a Reasoned Decision for Departing From Order 2003's Pricing Policy Regarding Cost Allocation for Generation Interconnection Network Upgrades.**

a. **Order 1920's Generation Interconnection Backstop Provision Represents a Fundamental Departure without Reasoned Explanation from Order 2003.**

FERC (Br. 167-71) argues that Order 1920's shifting of costs of network upgrades associated with failed interconnection projects to consumers is not a departure from Order 2003, but rather serves as a "backstop" for failed projects (Br. 169). A better metaphor is "backdoor." FERC does not explain why Order 1920's "alternative process" (Br. 169) is necessary or even reasonable. Allowing failed network upgrades to move forward destroys the price signals that lie at the heart of Order 2003's pricing policy, which FERC designed to weed out uneconomic interconnection projects. FERC failed to explain and show that Order 2003 no longer sends the correct pricing signals.

Order 2003 allocated the upfront costs of network upgrades needed for generation interconnection to the developer because by placing the interconnection developer "initially at risk for the full cost of the Network Upgrades," the developer would have "a strong incentive to make efficient siting decisions and, in general, to make good faith requests for Interconnection Service." Order 2003-A, P 613. This rule subjects the developer to "the same marginal cost price signal that it would face in an efficient, competitive market," and thus aims "to achieve the desirable level of

21

entry of new generating capacity." Order 2003, P 702; *see also* P 694 (FERC found the policy "consistent" with its "long-held view that competitive wholesale markets" provide the best means by which to meet its statutory responsibility).

Order 1920 reverses this economically efficient outcome by allowing such projects a second bite-at-the-apple where consumers rather than generators provide the upfront funding for the associated network upgrades. Nowhere in Order 1920 or its progeny does FERC reasonably explain why the Order 2003 competitive price signals should be overridden.

Instead, FERC theorizes that Order 2003 projects fail "due to the generator's cost responsibility for expensive interconnection-related network upgrades." FERC Br. 168. However, this "reasoning" relies solely on unproven assumptions that "high costs were *likely* a factor" prompting withdrawal. JA1402. FERC's acknowledgement that generators withdraw interconnection requests "for multiple reasons" (JA1397), including project economics, insufficient site control or permitting delays, speculative projects, and other regulatory or economic factors (JA1384-1385) casts serious doubt on FERC's assumption that high costs are the likely factor prompting a project's withdrawal.

More importantly, as Consumers demonstrated, "[e]ven if 'high costs' were a factor prompting withdrawals, FERC did not find that generators' 'cost responsibility' was unjust, unreasonable, or unduly discriminatory as section 206

22

requires." Consumers Br. 40. FERC has not reasonably explained why a backstop is necessary for the Order 2003 policy it affirmed just one year ago. FERC Br. 167.

### b. FERC Did Not Provide a Reasoned Explanation for Failing to Consider the Preferential Effects of Order 1920's Backstop Policy.

FERC argues that its backstop policy is not unduly preferential because the network upgrades associated with these projects will only be selected under the Order 1920 policy if they are "the more efficient or cost-effective regional transmission solution." FERC Br. 169-70 (citing JA2462-2463). But FERC ignores the core issue: failed projects receive a second chance to avoid upfront costs, a preferential backdoor route unavailable under Order 2003. Order 1920's policy invites generation developers to engage in strategic gaming – creating sham withdrawals of interconnection requests from the Order 2003 process – to escape that Order's policies governing cost allocation for interconnected-related network upgrades. JA5288.

### c. FERC Provided No Evidence That Network Upgrades Associated with Failed Generation Interconnection Projects Provide Benefits to Consumers Roughly Commensurate with the Costs Imposed.

FERC relies on dicta in *Entergy Services Inc. v. FERC*, 391 F.3d 1240, 1247-48 (D.C. Cir. 2004), for the proposition that it "*did* make the requisite finding that allocating these transmission costs to consumers is 'at least roughly commensurate with the benefits derived from the facilities.'" FERC Br. 170. In *Entergy Services*, the Court recognized that "system expansion is a "'benefit' sufficient to support

23

FERC's pricing policy." 391 F.3d at 1248.  A statement that consumers benefit from system expansion does not satisfy the "required" weighting of *relative benefits* and costs to ensure that allocated costs are "roughly commensurate" with benefits received. *Ill. Com. Comm'n v. FERC*, 576 F.3d 470, 477 (7th Cir. 2009).  Order 2003 acknowledges that "while all Transmission Customers benefit generally from upgrades to the transmission network, all customers do not necessarily benefit equally from upgrades that may be required for a particular interconnection." Order 2003-A, P 614.  Nowhere in Order 1920 does FERC find that the costs to be imposed on consumers from the policy shift are roughly commensurate with the "benefits" consumers will receive.

## V.    Order 1920 Violates FPA Section 217(b)(4).

FPA section 217(b)(4) requires FERC to use its authority "in a manner that facilitates" transmission planning and expansion "to meet the reasonable needs of load-serving entities to satisfy [their] service obligations." 16 U.S.C. § 824q(b)(4). FERC does not dispute that this statute constrained its discretion when it fashioned Order 1920. But FERC argues that the D.C. Circuit's "analysis" affirming Order 1000 is "conclusive" that Order 1920 satisfies the statute. FERC Br. 172 (citing *South Carolina*, 762 F.3d at 90).

That argument fails for two reasons. First, FERC adopted Order 1920 to "remedy deficiencies" in Order 1000's planning requirements. JA0624. The D.C.

24

Circuit's analysis did not apply to Order 1920's different planning requirements. Second, FERC ignores Order 1920's actual language. The court held that Order 1000 satisfied the statute because it requires the planning of a reliable grid that meets the needs of load-serving entities. *See* 762 F.3d at 90. But Order 1920 gives transmission planners "the discretion to not account for" and "exclude[e]" the power-supply obligations of load-serving entities in the planning process by finding they "will have limited or no impact on Long-Term Transmission Needs." JA2266. FERC quotes Order 1920's conclusory statement that the order satisfies the statute. *See* Br. at 173 (citing JA0847). But that paragraph of the order does not address the challenged language in Order 1920 (JA0997) or Order 1920-A (JA2266) authorizing transmission planners to exclude load-serving entities' power-supply needs from the planning process. FERC violated the statute by "exercis[ing] its authority in a manner that was at odds with the needs of load-serving entities." *South Carolina*, 762 F.3d at 90.

## VI. FERC Has Not Justified Its Arbitrary Prohibitions on Reevaluating Facility Selection.

Acknowledging uncertainties involved in evaluating and selecting transmission facilities over 20-year planning and benefit horizons, FERC required a facility's selection to be reevaluated in later planning cycles if certain triggering events occurred. JA1356-1357. In two respects, however, FERC arbitrarily and unreasonably prohibited such reevaluations.

25

First, FERC prohibited transmission planners from reevaluating a facility's selection if the expected benefits for consumers have significantly diminished or the facility has become unneeded—deeming that "an open-ended allowance for reevaluation." JA2410. FERC claims it considered "the risks that consumers would be saddled with the cost of transmission facilities that are no longer warranted," and defends its rejection of "a broad reevaluation requirement" as a "rational balancing of consumer and investor interests." Br. 174. But FERC paints a false, binary choice between permitting "broad" or "open-ended" reevaluations and prohibiting any reevaluation based on a change in expected benefits. FERC arbitrarily rejected middle-ground alternatives such as requiring a facility's selection to be reevaluated if the change in benefits or needs exceeds some threshold of significance (e.g., size or cost). FERC's additional point that it requires benefits to be reevaluated if a significant increase in costs triggers reevaluation (Br. 175) does not fix the larger infirmity in Order 1920's requirements. By prohibiting even known, significant changes in facts from triggering a reevaluation, Order 1920 forces consumers to pay for the veritable "transmission line to nowhere"—for example, if a large data-center or generator project is cancelled, obviating the need for a planned transmission facility.

Second, FERC prohibited transmission planners from reevaluating a facility's selection in light of a change in law or regulations if the facility's targeted in-service

26

date was in the first half of the 20-year planning period when it was selected, yet it *required* such reevaluation if the facility's in-service date was later. JA1358. As support, FERC (Br. 175-76) cites to paragraph 497 of Order 1920-A (JA2409-2410), but that paragraph does not address this arbitrary prohibition. FERC's orders did not explain what factors led it to conclude that even significant changes in law affecting the benefits or lawfulness of nearer-term facilities (such as tax incentives or environmental requirements) must be ignored.

## VII. FERC Has Not Justified Excluding Electric Cooperatives from Cost-Allocation Consultations.

In Order 1920-A, FERC required transmission planners to consult with Relevant State Entities "in determining the cost allocation approach most suitable for each transmission planning region." JA1993. FERC does not dispute that transmission planners and state entities can exclude electric cooperatives from their deliberations. And FERC does not dispute that, under many state laws, these state entities do not regulate electric cooperative rates.

FERC defends leaving these electric cooperatives (and by extension, the consumers they serve) unrepresented in these cost-allocation consultations by arguing that "states, unlike cooperatives, are responsible for, among other things, the permitting and siting of electric transmission facilities." FERC Br. 178. But FERC required transmission planners to consult with state entities about cost allocation, not permitting and siting. Thus, FERC defined Relevant State Entities to include

27

entities responsible either for "electric utility regulation *or* siting electric transmission facilities." JA1564 (emphasis added). FERC (Br. 178) acknowledges that it required transmission planners to consult with the states about transmission cost allocation in the hope that it may result in more favorable (from FERC's view) state decisions on facility permitting and siting. But that hope does not justify creating a facially discriminatory process for "determining the cost allocation approach most suitable for each transmission planning region." JA1993.

FERC (Br. 178) brushes off as "inapposite" NRECA's "comparisons to other FERC rulemakings" but fails to explain why they are inapposite. NRECA's point—that FERC departed without a reasonable explanation from prior rulemakings recognizing that electric-cooperative boards of directors may be the "relevant" electric retail regulatory authority under state law—remains unanswered.

## CONCLUSION

Consumer Petitioners respectfully request that the Court vacate and remand the challenged orders, in part, as discussed herein and in Consumer Petitioners' Opening Brief.

Respectfully submitted,

/s/ Kenneth R. Stark
Kenneth R. Stark
McNees Wallace & Nurick LLC
100 Pine Street
Harrisburg, PA 17101
Phone: (717) 237-8000

*Counsel for the American Forest & Paper Association, the Industrial Energy Consumers of America, the PJM Industrial Customer Coalition, and the Coalition of MISO Transmission Customers and on Behalf of the Consumer Petitioners*

| | |
|---|---|
| /s/ Randolph Lee Elliott<br>Randolph Lee Elliott<br>McCarter & English, LLP<br>1301 K Street, NW, Suite 1000 West<br>Washington, DC 20005<br>Phone: 202-753-3428<br>*Counsel for the National Rural Electric Cooperative Association* | /s/ Denise Goulet<br>Denise Goulet<br>McCarter & English, LLP<br>1301 K Street, NW, Suite 1000 West<br>Washington, DC 20005<br>Phone: 202-753-3439<br>*Special Counsel to the Ohio Attorney General for Office of the Ohio Consumers' Counsel* |
| /s/ Phyllis G. Kimmel<br>Phyllis G. Kimmel<br>Phyllis G. Kimmel Law Office PLLC<br>1717 K Street, NW, Suite 900<br>Washington, DC 20006<br>Phone: (202) 787-5704<br>*Counsel for the New England States Committee on Electricity* | /s/ Kate Wade<br>Katherine Ann Wade<br>Betts & Holt LLP<br>1101 Connecticut Ave., NW, Suite 450<br>Washington, D.C. 20036<br>*Counsel for the Resale Power Group of Iowa* |

Dated: March 13, 2026 (final)

29

**UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT**

No. 24-1650     Caption: Appalachian Voices, et al. v. FERC

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT**
Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

---

**Type-Volume Limit for Briefs if Produced Using a Computer:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 13,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 15,300 words or 1,500 lines. A Reply or Amicus Brief may not exceed 6,500 words or 650 lines. Amicus Brief in support of an Opening/Response Brief may not exceed 7,650 words. Amicus Brief filed during consideration of petition for rehearing may not exceed 2,600 words. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include headings, footnotes, and quotes in the count. Line count is used only with monospaced type. See Fed. R. App. P. 28.1(e), 29(a)(5), 32(a)(7)(B) & 32(f).

---

**Type-Volume Limit for Other Documents if Produced Using a Computer:** Petition for permission to appeal and a motion or response thereto may not exceed 5,200 words. Reply to a motion may not exceed 2,600 words. Petition for writ of mandamus or prohibition or other extraordinary writ may not exceed 7,800 words. Petition for rehearing or rehearing en banc may not exceed 3,900 words. Fed. R. App. P. 5(c)(1), 21(d), 27(d)(2) & 40(d)(3).

---

**Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch). Fed. R. App. P. 32(a)(5), 32(a)(6). Sans-serif type, such as Arial, may not be used except in captions and headings.

---

This brief or other document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

[✔] this brief or other document contains   6,228   [*state number of*] words

[ ] this brief uses monospaced type and contains _____ [*state number of*] lines

This brief or other document complies with the typeface and type style requirements because:

[✔] this brief or other document has been prepared in a proportionally spaced typeface using
Microsoft Word   [*identify word processing program*] in
Times New Roman, 14 pt. serif font   [*identify font, size, and type style*];

**or**

[ ] this brief or other document has been prepared in a monospaced typeface using
_____ [*identify word processing program*] in
_____ [*identify font, size, and type style*].

**NOTE: The Court's preferred typefaces are Times New Roman, Century Schoolbook, and Georgia. The Court discourages the use of Garamond.**

(s) Kenneth R. Stark II

Party Name Consumer Petitioners     Date: March 13, 2026

# CERTIFICATE OF SERVICE

**Instructions for Electronic Filers:** For persons filing electronically, CM/ECF serves all registered CM/ECF users, and no certificate of service is required for such service.  A certificate of service is required from an electronic filer, however, in the following circumstances:

- To certify that a non-user of CM/ECF has been served;
- To certify that a manual filing (not available in electronic form), has been served;
- To certify that a sealed document has been served;
- To certify that a case-initiating document, such as a petition for review, petition for permission to appeal, or petition for writ of mandamus, has been served.

**Instructions for Paper Filers:** For persons filing in paper form, service must be accomplished outside CM/ECF, and a certificate of service is required for all documents.

Case No. ___24-1650___      Case Caption Appalachian Voices, et al. v. FERC_____

I certify that on ___03/13/2026___, the Reply Brief of the Consumer Petitioners_____
                        (date)                              (document title)
was served by [  ] personal delivery; [  ] mail; [  ] third-party commercial carrier; or [ x ] email

(with written consent) on the following persons at the addresses or email addresses shown:

(Name and Address or Email Address )

I hereby certify that on, March 13, 2026, all parties were served using the appellate CM/ECF. The participants in this case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

_____/s/ Kenneth R. Stark II_____          _____March 13, 2026_____
                Signature                                                Date

01/28/2020 SCC