# CASE NO. 24-1650(L)

## IN THE
## UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

APPALACHIAN VOICES, *et al.*,
*Petitioners*

v.

FEDERAL ENERGY REGULATORY COMMISSION,
*Respondent*

ON APPEAL FROM THE
FEDERAL ENERGY REGULATORY COMMISSION

## FINAL OPENING BRIEF OF PUBLIC INTEREST ORGANIZATIONS AND INVENERGY PETITIONERS

*/s/ Danielle Fidler*
Danielle Fidler
Veronica Saltzman
Clean Air Task Force
114 State Street, 6th Floor
Boston, MA 02109
Phone: 617-624-0234
Email: dfidler@catf.us

Alexander Tom
Ada Statler
Earthjustice
180 Steuart Street, #194330
San Francisco, CA 94105
Phone: 415-217-2111
Email: atom@earthjustice.org

*Counsel for Natural Resources Defense Council (additional counsel listed on the following pages)*

Linnet Davis-Stermitz
Earthjustice
810 Third Avenue, Suite 610
Seattle, WA 98104
Phone: 206-343-7340
Email:
ldavisstermitz@earthjustice.org

Caroline Reiser
Natural Resources Defense Council
1152 15th Street NW, Suite 300
Washington, DC 20005
Phone: 202-717-8341
Email: creiser@nrdc.org

*Counsel for Natural Resources Defense Council*

William S. Scherman
Jeremy C. Marwell
Jeffrey M. Jakubiak
Vinson & Elkins LLP
2200 Pennsylvania Avenue, NW
Suite 500 West
Washington, DC  20037
Phone: 202-639-6507
Email: jmarwell@velaw.com

Garrett T. Meisman
845 Texas Avenue
Suite 4700
Houston, Texas 77002
Phone: 713-758-2559
Email: gmeisman@velaw.com

*Counsel for Invenergy Solar Development North America LLC, Invenergy Thermal Development LLC, Invenergy Wind Development North America LLC, and Invenergy Transmission LLC*

Nicholas J. Guidi
Southern Environmental Law Center
122 C Street NW, Suite 325
Washington, DC 20001
Phone: 202-573-8136
Email: nguidi@selc.org

*Counsel for Appalachian Voices, Energy Alabama, North Carolina Sustainable Energy Association, Southern Alliance for Clean Energy, and South Carolina Coastal Conservation League*

Justin Vickers
Sierra Club
1229 W Glenlake Ave
Chicago, IL 60660
Phone: 224-420-0614
Email: justin.vickers@sierraclub.org

*Counsel for Sierra Club*

Ted Kelly
Adam Kurland
Environmental Defense Fund
555 12th Street, N.W., Suite 400
Washington, DC 20004
Phone: 202-572-3317
Email: tekelly@edf.org

*Counsel for Environmental Defense Fund*

Dated: March 13, 2026

# TABLE OF CONTENTS

JURISDICTIONAL STATEMENT ..................................................................1

STATEMENT OF ISSUES ............................................................................3

INTRODUCTION AND SUMMARY OF ARGUMENT ...................................3

STATEMENT OF THE CASE........................................................................8

STANDING................................................................................................10

STANDARD OF REVIEW ..........................................................................19

ARGUMENT ..............................................................................................20

    I.    The Design and Timing of FERC's Long-Term Planning Process Conflict with Its Own Findings and Fail to Fully Remedy the Excessive Costs and Inadequate Buildout from Current Planning Processes. .....................................20

        A.    It was arbitrary and capricious for FERC to allow Order 1000 processes to continue after finding those processes led to unjust and unreasonable rates. ...................................................................................21

            1.    FERC's decision to retain Order 1000 processes was logically inconsistent with its findings that those processes led to unjust and unreasonable rates. .....................................................................................22

            2.    FERC failed to offer a reasoned explanation for leaving deficient Order 1000 processes in place. .................................................................24

                a.    FERC offered no explanation to support its assertion that transitioning to an integrated transmission planning process would be too difficult. ....................................................................................................25

                b.    FERC offered no explanation to support its assertion that Order 1000 planning would come to address only residual transmission needs. ...................................................................................................................27

                c.    FERC may not point to future compliance orders to excuse unreasoned decision-making in this Order. ...........................................29

        B.    FERC erred in departing from its proposed three-year planning frequency and adopting a five-year cadence....................................................31

i

II.   FERC Arbitrarily Authorized Transmission Planners to Exclude Key Factors That are Necessary to Ensure Just Rates and Reasonable Cost Allocation. ..................................................................................................37

   A.   FERC arbitrarily allowed transmission providers to ignore high-voltage, direct current lines and other merchant transmission facilities when developing scenarios. ...............................................................37

   B.   FERC's omission of energy storage from the alternative transmission technologies that planners must consider arbitrarily ignores its established use and substantial benefits. ....................................................45

   C.   FERC failed to rationally justify its decision to narrow the required benefits analysis, which will result in costly and inefficient transmission that fails to comply with bedrock utility law. ..........................................49

     1.   Substantial evidence supports mandating assessment of the four excluded benefits. ................................................................50

      a.   Access to lower-cost generation ....................................51

      b.   Deferred generation capacity investments. ....................53

      c.   Increased competition ....................................................54

      d.   Increased market liquidity .............................................55

     2.   FERC arbitrarily allowed transmission providers to ignore these four benefits. .....................................................................56

III.   This Court Should Remedy the Specific Errors Addressed Herein, Without Undercutting Order 1920's Beneficial Improvements. ...........................57

CONCLUSION ...................................................................................................60

STATEMENT REGARDING ORAL ARGUMENT ...............................................60

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ANR Storage Co. v. FERC*,
 904 F.3d 1020 (D.C. Cir. 2018).....................................................21, 23, 28, 36

*Ark. La. Gas Co. v. Hall*,
 453 U.S. 571 (1981)......................................................................................58

*Belmont Mun. Light Dep't v. FERC*,
 38 F.4th 173 (D.C. Cir. 2022)......................................................................59

*Bus. Roundtable v. SEC*,
 647 F.3d 1144 (D.C. Cir. 2011).....................................................................47

*Cleveland v. FERC*,
 773 F.2d 1368 (D.C. Cir. 1985).....................................................................29

*Constellation Mystic Power, LLC v. FERC*,
 45 F.4th 1028 (D.C. Cir. 2022).....................................................................27

*Ctr. for Food Safety v. Regan*,
 56 F.4th 648 (9th Cir. 2022) ........................................................................59

*Czyzewski v. Jevic Holding Corp.*,
 580 U.S. 451 (2017).......................................................................................11

*Defs. of Wildlife v. U.S. Dep't of the Interior*,
 931 F.3d 339 (4th Cir. 2019) ...........................................................24, 28, 36, 50

*Del. Div. of Pub. Advoc. v. FERC*,
 3 F.4th 461 (D.C. Cir. 2021)..........................................................................59

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
 591 U.S. 1 (2020)...........................................................................................30

*Diamond Alternative Energy, LLC v. Env't Prot. Agency*,
 145 S. Ct. 2121 (2025).............................................................10, 14, 15, 16, 19

*Encino Motorcars, LLC v. Navarro*,
  579 U.S. 211 (2016)................................................................25

*Env't Action v. FERC*,
  996 F.2d 401 (D.C. Cir. 1993)...............................................10

*Env't Def. Fund, Inc. v. EPA*,
  898 F.2d 183 (D.C. Cir. 1990)...............................................59

*Evergreen Shipping Agency (Am.) Corp. v. Fed. Mar. Comm'n*,
  106 F.4th 1113 (D.C. Cir. 2024).............................................23

*FCC v. Prometheus Radio Project*,
  592 U.S. 414 (2021)................................................................20

*FDA v. R. J. Reynolds Vapor Co.*,
  145 S. Ct. 1984 (2025)............................................................19

*FERC v. Elec. Power Supply Ass'n*,
  577 U.S. 260 (2016)................................................................22

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
  561 U.S. 477 (2010)...........................................................59, 60

*Friends of the Earth, Inc. v. Laidlaw Env't Servs., Inc.*,
  528 U.S. 167 (2000).....................................................10, 14, 17

*Ill. Commerce Comm'n v. FERC*,
  576 F.3d 470 (7th Cir. 2009)..................................................50

*Kirk v. Comm'r of Soc. Sec. Admin.*,
  987 F.3d 314 (4th Cir. 2021)..............................................46, 47

*Lancaster v. Sec'y of Navy*,
  109 F.4th 283 (4th Cir. 2024).................................................58

*Leaf Tobacco Exporters Ass'n, Inc. v. Block*,
  749 F.2d 1106 (4th Cir. 1984)............................................18, 19

*Manufactured Hous. Inst. v. EPA*,
  467 F.3d 391 (4th Cir. 2006)..................................................43

iv

*Mayor of Baltimore v. Azar*,
    973 F.3d 258 (4th Cir. 2020) ................................................................60

*Minyard Enters., Inc. v. Se. Chem. & Solvent Co.*,
    184 F.3d 373 (4th Cir. 1999) ...............................................................58

*Mobil Oil Corp. v. FPC*,
    417 U.S. 283 (1974)..............................................................................58

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto.*
    *Ins. Co.*,
    463 U.S. 29 (1983)...........................................................20, 21, 36, 44, 56

*N.C. Dep't of Env't Quality v. FERC*,
    3 F.4th 655 (4th Cir. 2021) ......................................................19, 20, 44

*NACS v. Bd. of Governors of Fed. Rsrv. Sys.*,
    746 F.3d 474 (D.C. Cir. 2014)..............................................................59

*NRDC v. United States Forest Serv.*,
    421 F.3d 797 (9th Cir, 2005) ...............................................................36

*Ohio River Valley Env't Coal., Inc. v. Kempthorne*,
    473 F.3d 94 (4th Cir. 2006) .................................................................29

*Pye v. United States*,
    269 F.3d 459 (4th Cir. 2001) ...............................................................19

*Sierra Club v. DOI*,
    899 F.3d 260 (4th Cir. 2018) ...............................................................47

*Sierra Club v. W. Va. Dep't of Env't Prot.*,
    64 F.4th 487 (4th Cir. 2023) ...........................................................35, 49

*St. Michaels Util. Comm'n v. Fed. Power Comm'n*,
    377 F.2d 912 (4th Cir. 1967) ...............................................................40

*Texas Ass'n of Mfrs. v. CPSC*,
    989 F.3d 368 (5th Cir. 2021) ...............................................................59

*Transmission Agency of N. Cal. v. FERC*,
    495 F.3d 663 (D.C. Cir. 2007)..............................................................19

v

*United States v. Curry*,
965 F.3d 313 (4th Cir. 2020) ...................................................................40

*United States v. Texas*,
599 U.S. 670 (2023).................................................................................18

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council*,
435 U.S. 519 (1978).................................................................................29

*Westar Energy, Inc. v. FERC*,
473 F.3d 1239 (D.C. Cir. 2007)...............................................................46

*Xcel Energy Servs. Inc. v. FERC*,
815 F.3d 947 (D.C. Cir. 2016).................................................................19

*Zeneca, Inc. v. Shalala*,
213 F.3d 161 (4th Cir. 2000) ...................................................................18

**Statutes**

5 U.S.C. § 706........................................................................................19

16 U.S.C. § 824e .................................................................................1, 22

16 U.S.C. § 824e(a)...........................................................................19, 40

16 U.S.C. § 825*l*(a) ...................................................................................1

16 U.S.C. § 825*l*(b) ...............................................................1, 2, 19, 58

28 U.S.C. § 2112(a) ..................................................................................2

**FERC Orders**

*Allocation of Capacity on New Merch. Transmission Projects and
New Cost-Based, Participant-Funded Transmission Projects*,
142 FERC ¶ 61,038 (2013)......................................................................39

*Notice of Denial of Rehearing by Operation of Law and Providing for
Further Consideration*, 188 FERC ¶ 62,025 (2024) .................................1

*Notice of Proposed Rulemaking*, *Building for the Future Through Electric Regional Transmission Planning and Cost Allocation and Generator Interconnection*, 179 FERC ¶ 61,028 (2022) .......................................................
................................................... 5, 14, 16, 27, 31, 32, 45, 50, 51, 52, 53, 54, 55

Order 1920-A, *Order Addressing Arguments Raised on Rehearing, Setting Aside Prior Order, in Part, and Granting Clarification*, 189 FERC ¶ 61,126 (2024) ………………2, 9, 22, 23, 25, 26, 28, 29, 30, 35, 41, 42, 43, 44, 47, 49, 56, 57

Order 1920, *Building for the Future Through Electric Regional Transmission Planning and Cost Allocation*, 187 FERC ¶ 61,068 (2024)...................................
………………………...1, 8, 9, 10, 11, 12, 13, 14, 15, 16, 23, 25, 26, 27, 29, 30, 31, 32, 33, 35, 36, 37, 38, 40, 42, 45, 46, 47, 48, 49, 50, 51, 56, 57, 58, 60

Order 890, *Preventing Undue Discrimination and Preference in Transmission Service*, 118 FERC ¶ 61,119 (2007) .............................................16

**Miscellaneous**

ACORE, Enabling Low-Cost Clean Energy and Reliable Service Through Better Transmission Benefits Analysis: A Case Study of MISO's Long Range Transmission Planning (Aug. 2022) .................................53

Johannes Pfeifenberger et al., The Brattle Group & Grid Strategies, Transmission Planning for the 21st Century: Proven Practices that Increase Value and Reduce Costs (Oct. 2021) .................... 12, 16, 52, 53, 54, 55

Joshua Macey & Jacob Mays, *The Law and Economics of Transmission Planning and Cost Allocation*, 45 Energy L. J. 209 (2024).................................................42

## JURISDICTIONAL STATEMENT

This Court has jurisdiction over these petitions for review of final orders issued by the Federal Energy Regulatory Commission ("FERC" or "Commission") under Federal Power Act section 313(b), 16 U.S.C. § 825*l*(b).  In addition, Petitioners meet Article III standing requirements, as detailed further in the Standing section below.

On May 13, 2024, FERC issued Order 1920, *Building for the Future Through Electric Regional Transmission Planning and Cost Allocation*, 187 FERC ¶ 61,068 (May 13, 2024) (JA615).  Order 1920 exercises FERC's authority under Federal Power Act section 206 to remedy unjust, unreasonable, or unduly discriminatory or preferential rates, 16 U.S.C. § 824e, by adopting reforms to FERC's regional transmission planning and cost allocation requirements, *see* JA624-626 (Order 1920 P1).

Public Interest Organizations ("PIOs") and Invenergy (collectively, "Petitioners") filed timely rehearing requests on June 12, 2024.  *See* JA5071 (PIOs Rehearing Request); JA5139 (Invenergy Rehearing Request); 16 U.S.C. § 825*l*(a) (thirty-day deadline).  The requests were denied by operation of law after FERC failed to act within 30 days.  *See* JA5386 (*Notice of Denial of Rehearing by Operation of Law and Providing for Further Consideration*, 188 FERC ¶ 62,025 (July 15, 2024)); 16 U.S.C. § 825*l*(a).

1

Within sixty days, Petitioners filed timely petitions for review in the D.C. Circuit and several other circuits where a "public utility to which [Order 1920] relates is located or has its principal place of business." 16 U.S.C. § 825*l*(b); *see Env't Def. Fund v. FERC*, No. 24-1659 (1st Cir. July 16, 2024); *Nat. Res. Def. Council v. FERC*, No. 24-1932 (2d Cir. July 17, 2024); *Appalachian Voices v. FERC*, No. 24-1650 (4th Cir. July 16, 2024); *Sierra Club v. FERC*, No. 24-4388 (9th Cir. July 17, 2024); *Invenergy Solar Dev. N. Am. LLC v. FERC*, No. 24-1255 (D.C. Cir. July 19, 2024). After this Court was randomly selected for consolidation of petitions for review of Order 1920, petitions filed elsewhere were transferred here. *See* Consolidation Order, MCP No. 190 (J.P.M.L. Aug. 8, 2024), ECF No. 5; Consolidation Order, *Appalachian Voices v. FERC,* No. 24-1650, ECF. No. 17 (4th Cir. Aug. 9, 2024); 28 U.S.C. § 2112(a)(3).

On November 21, 2024, FERC issued Order 1920-A, *Order Addressing Arguments Raised on Rehearing, Setting Aside Prior Order, in Part, and Granting Clarification*, 189 FERC ¶ 61,126 (Nov. 21, 2024) (JA1979). As relevant here, FERC addressed and rejected Petitioners' rehearing requests on the merits. On January 21, 2025, Petitioners timely updated their petitions for review to include Order 1920-A. *See Appalachian Voices v. FERC*, No. 24-1650 (4th Cir.), ECF Nos. 220 (Natural Resources Defense Council), 221 (Environmental Defense Fund), 222 (Sierra Club), 225 (Appalachian Voices et al.), 227 (Sierra Club);

2

*Invenergy Solar Dev. N. Am. LLC v. FERC*, No. 24-1756 (4th Cir.), ECF No. 133

(Invenergy).

## STATEMENT OF ISSUES

1. Whether FERC erred by failing to end or align the Order 1000 transmission planning process, notwithstanding FERC's own findings that that process causes unjust and unreasonable rates.

2. Whether FERC erred by requiring transmission planning cycles every five years, despite its findings and evidence supporting the three-year cadence it originally proposed.

3. Whether FERC erred by authorizing transmission planners to ignore or exclude important factors at key stages of the long-term planning process, specifically:

   (a) high-voltage, direct current ("HVDC") and other merchant transmission facilities from the long-term planning scenarios;

   (b) energy storage from the kinds of alternate technologies that planners must consider; and

   (c) key benefits from the list that transmission providers are required to evaluate.

## INTRODUCTION AND SUMMARY OF ARGUMENT

America's transmission system is broken. The regional electric grid that serves as the nation's economic backbone has been neglected over the last two decades by the incumbent transmission owners and operators charged with planning and building it. Overwhelming record evidence documents these problems. The existing regional grid has experienced catastrophic and deadly

3

failures during extreme weather events. It lacks the infrastructure necessary to adapt to acute changes to electricity supply and demand. And cheaper, cleaner resources wait years to connect to the grid while aging, uneconomic plants are unable to retire, costing consumers billions of dollars every year. As a result, our transmission system is completely unprepared to meet current—let alone future— needs.

None of this is new. Over the last several decades, FERC has issued iterative and increasingly specific transmission planning and cost allocation rules intended to ensure that the transmission system serves the public interest. These reform efforts have demonstrated that, where FERC mandates compliance with specific requirements, systemic improvements occur; but where FERC pairs a choose-your-own-compliance adventure with a generalized set of planning principles, nothing changes. This is unsurprising; incumbent transmission owners tasked with transmission planning and development have financial incentives to *avoid* the most cost-effective projects, since truly efficient regional transmission introduces competition and reduces profits for them and their affiliated generating resources.

In Order 1920, FERC determined that flaws in status quo transmission planning result in inefficient and costly investments, imposing unjust and unreasonable rates on consumers. FERC addressed these issues by establishing a

4

long-term regional transmission planning process to identify and build needed transmission at reasonable rates.  Petitioners generally support FERC's framework of reforms, including requiring transmission providers[1] to conduct scenario-based analyses of transmission needs over at least a 20-year period, measure a mandatory set of benefits to evaluate the full value of potential transmission projects, and consider less expensive alternative transmission technologies as part of the project evaluation and selection process.  Yet within each of these reforms, FERC omitted requirements necessary to fully remedy the problems that it found.

FERC made several critical mistakes.  *First,* despite finding that existing planning processes resulted in the building of inefficient and costly infrastructure, FERC left these processes in place for the most common types of projects.  Failure to address this error will allow providers to continue the very practices Order 1920 aimed to stop: building inefficient projects through a piecemeal, short-term process when comprehensive, longer-term planning would be more cost-effective.

*Second*, FERC originally proposed requiring transmission providers to conduct long-term planning every three years to ensure providers adapted to

---

[1] Petitioners use the terms "provider" and "planner" interchangeably in this brief to refer to a public utility that owns, controls, or operates transmission facilities, including when the transmission owner is separate from the transmission providers (as is the case in regional transmission organizations and independent system operators).  *See Notice of Proposed Rulemaking, Building for the Future Through Electric Regional Transmission Planning and Cost Allocation and Generator Interconnection*, 179 FERC ¶ 61,028, P3 n.5 (Apr. 21, 2022) ("NOPR") (JA139).

5

changes in the energy sector with efficient, cost-effective solutions. Two years later, the case was even stronger. FERC acknowledged that the pace of demand growth, extreme weather events, and power generation supply trends had only increased. Yet the Final Rule lengthened the planning frequency to five years while still requiring providers to complete the planning steps within three years. This design unnecessarily slows the pace of comprehensive planning that FERC found necessary to efficiently address systemic needs, both now and for the future. And it incentivizes providers to revert to short-term, piecemeal transmission planning practices FERC found inadequate for addressing systemic needs.

*Third*, FERC allowed providers to ignore important substantive factors during the planning process. Order 1920 allows providers to ignore merchant HVDC lines when developing long-term planning scenarios. That allowance was arbitrary. Order 1920 requires providers to evaluate specific, enumerated factors in this process precisely because they inform whether more transmission is needed— or not. By authorizing providers to ignore high-capacity resources designed to solve multiple transmission needs, FERC arbitrarily green-lit them to approve duplicative or less efficient projects, chilling private investment, inviting undue discrimination by incumbent providers, and leading to excessive costs for consumers.

*Fourth*, FERC omitted energy storage from the alternative transmission technologies that providers must consider. Here, too, the omission was arbitrary. Order 1920 required transmission providers to consider several low-cost alternative transmission technologies that can often address transmission needs more efficiently and cost effectively than traditional facilities. FERC included that requirement for a good reason: Precisely because these technologies would be less profitable to build, they will go unconsidered and undeveloped without such a requirement, leading to unjust and unreasonable rates for consumers paying the bill. Energy storage is a particularly versatile and valuable technology, yet Order 1920 allows transmission providers to ignore it, despite substantial record support for mandating its consideration.

*Finally*, FERC unjustifiably narrowed the list of benefits that providers must evaluate when selecting transmission projects. Because transmission providers are not properly assessing the benefits of potential projects, FERC proposed a specified set for them to evaluate. Yet the Final Rule narrowed the list, allowing transmission providers to ignore four benefits: (1) access to lower-cost generation, (2) deferred generation capacity investments, (3) increased competition, and (4) increased market liquidity. FERC's own evidence demonstrates that these four benefits are measurable, non-duplicative, and could result in *billions of dollars* of consumer savings. Excluding these benefits would result in unjust and

unreasonable rates for consumers.  FERC moved the needle in the right direction by requiring the mandatory assessment of several known benefits.  But because it narrowed its list to exclude others, it failed to fully fix the problem, leaving consumers to face inflated rates that do not comply with fundamental cost allocation principles.

The Court should remand for FERC to address these errors, but craft a remedy that leaves intact Order 1920's planning process, to allow its critically-needed reforms to get underway while FERC corrects these shortcomings.

## STATEMENT OF THE CASE

To avoid repetition, pursuant to Federal Rule of Appellate Procedure 28(i), Petitioners adopt by reference the Statement of the Case in the Opening Brief of Petitioners Advanced Energy United, Electricity Transmission Competition Coalition, and LS Power Grid, LLC, which sets out the regulatory background and this proceeding's history.  In addition, Petitioners provide an overview of Order 1920's planning process, as relevant to their claims.

Order 1920 establishes a comprehensive, long-term transmission planning process designed to identify and address systemic needs with holistic solutions based on the full benefits of potential projects.  *See, e.g.*, JA684-702, JA717-718, JA802-803 (Order 1920 PP90-100, 114, 224).  To start, Order 1920 requires transmission providers to forecast transmission needs over the next 20 years based

on a minimum set of seven "factors" that drive transmission demand, including economic conditions, technological advancements, and political changes. JA848, JA917 (Order 1920 PP284, 388). Transmission providers use this forecast to develop three "reasonably probable" scenarios of future supply and demand and identify the transmission needs for each scenario. JA1041-1042 (Order 1920 PP575-77). Providers then identify transmission projects that could meet those needs, including alternatives that do not require building new lines. JA1274-1275, JA1461-1463 (Order 1920 PP916, 1198). Transmission providers evaluate and decide whether to "select" these solutions based on their costs and a minimum set of "benefits" that attempt to capture the full value a project would provide. JA1139-1140, JA1274-1275 (Order 1920 PP722-23, 916). Once selected, a separate process begins to ensure transmission project costs are allocated roughly commensurate with benefits. *See, e.g.,* JA1991-1997 (Order 1920-A PP8-16). Transmission providers must conduct this comprehensive, long-term planning at least every five years, but complete the full cycle of steps outlined above within the first three years. JA909-912 (Order 1920 PP377-79). Petitioners generally refer to this cumulative process as the "Order 1920 process."

While Order 1920 establishes a new planning process, it does not eliminate the old ones. FERC declined to require any changes to annual Order 1000

9

processes, which continue to separately consider reliability or economic needs over a shorter timeframe. JA816-817 (Order 1920 P241).

## STANDING

1. PIOs are membership-based organizations that satisfy the test for associational standing. *See Friends of the Earth, Inc. v. Laidlaw Env't Servs., Inc.*, 528 U.S. 167, 181 (2000).

PIOs' members would "have standing to sue in their own right" because they meet Article III's requirements for injury-in-fact, causation, and redressability. *Id.* at 180-81. These members pay unnecessarily high electricity rates due to the gaps Order 1920 identified in FERC's prior regional transmission planning requirements. And they will continue to pay excessive rates because while Order 1920 fixes some of these problems, it leaves key ones in place. These "[m]onetary costs are of course an injury." *Diamond Alternative Energy, LLC v. Env't Prot. Agency*, 145 S. Ct. 2121, 2133 (2025) (citation omitted); *see also Env't Action v. FERC*, 996 F.2d 401, 406 (D.C. Cir. 1993) (organization's members injured by higher electricity costs).

As FERC documented, gaps in its regional planning requirements result in "customers footing the bill for piecemeal, inefficient, and less cost-effective transmission solutions" that address "short-term or small-scale transmission needs." JA701-702 (Order 1920 P100). Left to their own devices, transmission

10

providers use a "relatively near-term transmission planning horizon," which leads them to plan and build smaller, more expensive projects rather than identifying larger regional projects that could meet the varied needs that emerge over a longer planning horizon. JA718-721 (Order 1920 PP115-16). Even in these shorter-term planning processes, transmission providers ignore significant drivers of future needs, such as extreme weather, state laws, and new sources of demand (e.g., data centers). JA722-726 (Order 1920 PP118-19). These processes also fail to "adequately consider the broader set of benefits" that regional projects could provide, leading to inefficient investments based on "an inaccurate portrayal of [different projects'] comparative benefits." JA729-731 (Order 1920 PP122-23).

These planning failures drive up costs for consumers like PIOs[2] and their members.[3] While "even a small amount of money is ordinarily an 'injury,'" *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 464 (2017), these costs are substantial. Consumers are captive ratepayers who must fund billions of dollars in transmission investments each year, with significant increases projected. *See, e.g.*, JA687-689 (Order 1920 PP92-93) (estimating, among others, $16-26 billion in

---

[2] Like their members, PIOs also satisfy the test for standing directly by paying for electricity in their offices. *See* Alfred Decl. ¶¶ 6-10, 12-13; Attas Decl. ¶¶ 7-11; Shober Decl. ¶ 4; Wasson Decl. ¶ 4; Kim Decl. ¶¶ 25.

[3] *See, e.g.*, Bratton Decl. ¶¶ 6-7; Ramsey Decl. ¶¶ 5-6; Caffrey Decl. ¶¶ 4, 8; Arieff Decl. ¶ 8; Friedman Decl. ¶ 4; Freeman Decl. ¶ 5; Burrell Decl. ¶¶ 7-8; Williams Decl. ¶¶ 4-10; Carillon Decl. ¶¶ 6-9; Slack Decl. ¶¶ 5-7; Moore Decl. ¶¶ 4-5; Macfarlane Decl. ¶ 10; Wilson Decl. ¶¶ 8-9.

11

ISO-New England region alone from 2024-2050); JA687-688 (Order 1920 P92 & n.201) (noting that increased transmission spending has made those costs "an increasing share of customers' overall electricity bills" in regions like ISO-New England); Freeman Decl. ¶ 5 (ratepayer within ISO-New England).  In the absence of an effective regional transmission planning process, those investments are funneled into inefficient, piecemeal transmission projects that cost consumers more and deliver fewer benefits.  *See, e.g.*, JA701-715 (Order 1920 PP100-11).  For example, transmission providers in the ISO-New England region spent $2.5 billion on in-kind replacement projects from 2016-2022, with another $3.1 billion in the works.  JA712-714 (Order 1920 P109) *see also* JA3179 (PIOs ANOPR Comments, Exhibit A at 3 (in-kind replacement "misses opportunities" for larger projects that could also "meet multiple other needs and provide additional benefits")) (hereinafter "Brattle-Grid Strategies Oct. 2021 Report").

Although transmission spending has increased significantly, investment in regional projects has not increased since Order 1000—and has even declined in some regions.  JA702-704 (Order 1920 P101).  In fact, some regional planning processes have not produced a single regional project during that time.  JA702-704 (Order 1920 P101).  That includes the Southeastern Regional Transmission Planning process, which covers a region "fac[ing] the highest energy burden in the country" and includes multiple monopoly utilities serving PIOs and their members.

JA3963-3964, JA3974 (Southeast PIOs Initial Comments 1-2 n.3, 16); *see, e.g.*, Shober Decl. ¶ 15; Tait Decl. ¶¶ 5, 9, 11; Abele Decl. ¶ 9; Allred Decl. ¶ 7; Wasson Decl. ¶ 9. These planning failures force PIOs and their members to pay excessive costs for inefficient transmission investments.

These failures also result in an underdeveloped transmission system that inefficiently restricts energy flows within and across regions, thwarting competition and raising prices that PIOs and their members must pay for electricity. When regional transmission is non-existent or at capacity, it prevents lower-cost generators located outside constrained areas from transferring electricity to areas with more expensive generation. Consumers within those areas are essentially trapped by local generators who can use transmission congestion to their economic advantage. For instance, transmission congestion prevents "low-cost energy resources in upstate and western New York from reaching consumers downstate," costing those consumers $551 million in 2021 alone. Howe Decl. ¶ 15 (nationwide congestion costs of $13 billion nationwide in 2021); *see* U.S. Dep't of Energy Initial Comments 3 (finding congestion "persistent and . . . widespread in all regions of the country"); Arieff Decl. ¶¶ 5-8 (New York City ratepayer); Friedman Decl. ¶¶ 3-7 (same). Compounding this problem, a lack of spare transmission capacity keeps these prices high by impairing new, cheaper generation from even interconnecting to the grid to sell power. *See* JA706-714

13

(Order 1920 PP104-09).[4]  Underdeveloped regional transmission also makes consumers pay for unnecessary investments in generation to meet projected future needs—for example, building a new large power plant—that could be avoided by instead investing in less-expensive transmission capacity to import electricity from neighboring regions.  *See, e.g.*, JA316-317 (NOPR P214).

These injuries are "fairly traceable" to FERC's action and would likely "be redressed by a favorable decision" correcting FERC's errors.  *Laidlaw*, 528 U.S. at 180-81.  FERC's findings show how.  Order 1920's core premise is that insufficiently "long-term, forward-looking, and comprehensive transmission planning requirements" are "causing" planning failures and "relatively inefficient [transmission] investments" to consumers' detriment.  JA680 (Order 1920 P85).  FERC adopted Order 1920 to address these gaps, but it did not remedy all the issues it identified.  That makes this the "familiar circumstance" where an agency's "under-regulation" causes downstream economic injuries to consumers like PIOs and their members.  *Diamond Alternative Energy*, 145 S. Ct. at 2136 (cleaned up).

---

[4] These planning failures thus harm the business activities of commercial entities developing new clean energy resources or seeking to purchase clean energy, including many of Petitioner North Carolina Sustainable Energy Association's members.  *See* Abele Decl. ¶¶ 10-11; Malkin-Weber Decl. ¶¶ 5-9.  That harm is traceable to FERC's errors in formulating Order 1920, and it will persist absent judicial relief.

14

PIOs and their members will continue to pay excessive rates because several aspects of Order 1920 fell short of solving the problems FERC sought to address. FERC recognized that shorter-term, siloed Order 1000 and local planning processes were not designed for a long-term, comprehensive assessment and thus result in inefficient and less cost-effective transmission investments. *See, e.g.,* JA702-704, JA714-715 (Order 1920 PP101, 110). Yet it allowed them to persist. As explained below, FERC enabled transmission providers to continue channeling investments to these processes by declining to limit their use, *infra*, Section I.A., and reducing the frequency of Order 1920 planning, *infra*, Section I.B. Similarly, FERC mandated consideration of specific alternative transmission technologies because transmission providers otherwise "overlook or undervalue" such alternatives and "in turn, undertake relatively inefficient and less cost-effective investments." JA1458-1459 (Order 1920 P1194). And FERC likewise found it "necessary" to require evaluation of specific project benefits because transmission providers were selecting "relatively inefficient and less cost-effective" projects without accurate cost-benefit analyses. JA1139-1140 (Order 1920 PP722-23). But FERC refused to extend those requirements to a key alternative transmission technology or to four crucial benefits. *See infra*, Sections II.B., II.C.

PIOs' and their members' injuries are the "predictable" outcome of transmission providers' likely behavior without these requirements. *See Diamond*

15

*Alternative Energy*, 145 S. Ct. at 2136.  Under "commonsense economic principles," *id.,* self-interested transmission providers have strong incentives to minimize use of regional transmission planning processes.  Transmission owners earn lucrative, guaranteed rates of return on their transmission lines.  *See, e.g.*, JA3104-3105 (PIOs ANOPR Comments 7-8).  Outside of the regional process— which opens projects up to competitive bidding—nothing stops transmission providers from selecting their own, relatively expensive projects and passing the bill on to consumers.  JA3196 (Brattle-Grid Strategies Oct. 2021 Report 20).  Moreover, as FERC has "long recognized," transmission providers benefit from an underdeveloped grid, which elevates prices for scarce transmission service and inhibits new generation from coming online to compete.  JA168-169 (NOPR P32 (citing Order 890, 118 FERC ¶ 61,119, P57 (2007)); *accord* JA3198-3199 (Brattle-Grid Strategies Oct. 2021 Report 22-23).

Order 1000's track record corroborates these commonsense economic inferences.  Left unchecked, these incentives will continue to result in a stark disparity between limited or nonexistent investments through the regional process and substantial increases in transmission spending elsewhere.  *See* JA687-688, JA702-704, JA712-714 (Order 1920 PP92, 101, 109).  In short, FERC's own findings, economic principles, and past experience all demonstrate that PIOs and

16

their members are likely to continue paying excessive rates due to FERC's errors, absent a remand for FERC to fix them.

PIOs also satisfy the remaining requirements for associational standing. "[T]he interests at stake" are "germane" to PIOs' organizational purposes of promoting clean, affordable energy. *See Laidlaw*, 528 U.S. at 181; Allred Decl. ¶¶ 4-5; Paul Decl. ¶ 5; Stith Decl. ¶ 6; Fashho Decl. ¶ 4; Shober Decl. ¶ 3; Wasson Decl. ¶ 3; Tait Decl. ¶¶ 3, 17; Abele Decl. ¶¶ 5-6. Indeed, PIOs regularly participate as formal stakeholders in transmission planning processes to further those interests. *See, e.g.*, Abele Decl. ¶¶ 7-9; Howe Decl. ¶¶ 17-24; Shober Decl. ¶ 7; Tait Decl. ¶ 11. And neither the claims nor relief requested require their individual members' participation. *See Laidlaw*, 528 U.S. at 181.

2. As entities with a stake in a company currently engaged in developing a large, advanced-stage merchant HVDC transmission project, *see* JA5141-5142 (Invenergy Rehearing Request 3-4), the Invenergy Petitioners suffer a concrete injury-in-fact from FERC's decision to authorize planners to exclude projects like Invenergy's from the scenario planning process. Without FERC mandating evaluation of merchant HVDC facilities in the scenarios, transmission providers are free to make and implement plans—including decisions about what transmission facilities to build—based on flawed assumptions about transmission needs that might otherwise be satisfied by merchant facilities that already exist or

17

are in advanced development stages. Sane Decl. ¶¶ 8-10, 14 (Invenergy). The result will be incumbent transmission providers overbuilding their own transmission facilities, impeding the development of, or drawing demand away from, competing merchant HVDC facilities. Sane Decl. ¶¶ 11-14; *see infra* pp.39-41; *Zeneca, Inc. v. Shalala*, 213 F.3d 161, 170 n.10 (4th Cir. 2000); *Leaf Tobacco Exporters Ass'n, Inc. v. Block*, 749 F.2d 1106, 1112 (4th Cir. 1984). The resulting pocketbook injury to Invenergy also includes increased monetary costs and delays in the development of Invenergy's project. Sane Decl. ¶¶ 11-14; *see United States v. Texas*, 599 U.S. 670, 676 (2023). Incumbent utilities' development of excess transmission infrastructure could also weaken the "business case" for Invenergy's upcoming projects, making it more difficult for Invenergy to obtain investment. Sane Decl. ¶¶ 11, 14.

The exclusion of merchant transmission facilities from mandatory consideration also harms the Invenergy Petitioners involved in power *generation* projects. Sane Decl. ¶ 15. By impeding the development of merchant transmission facilities, FERC's decision constrains these entities' ability to sell power into adjacent regions. Sane Decl. ¶ 15.

These injuries are traceable to FERC's orders here, which authorize transmission providers to exclude projects like Invenergy's from the initial scenarios, thereby creating the risk that excess transmission facilities will be built.

18

*See infra* pp.40-41; *Diamond Alternative Energy*, 145 S. Ct. at 2136

("commonsense economic realities" and "predictable" "third party behavior" mean

that under-regulation of a business "may cause downstream ... economic injuries to

others in the chain" (cleaned up)).

Invenergy's harms would be remedied by a decision remanding for FERC to

address its legal errors, including to consider whether to require transmission

planners to include merchant facilities like Invenergy's in the process of

developing scenarios.  *See Leaf Tobacco Exporters Ass'n*, 749 F.2d at 1112; *Pye v.*

*United States*, 269 F.3d 459, 471 (4th Cir. 2001).[5]

<div align="center">

**STANDARD OF REVIEW**

</div>

The Court reviews Petitioners' challenges under the "arbitrary and

capricious" and "substantial evidence" standards of review.  *See N.C. Dep't of*

*Env't Quality v. FERC*, 3 F.4th 655, 671 (4th Cir. 2021) (citing 5 U.S.C. § 706; 16

---

[5] Petitioners' interests—as consumers paying excessive rates and entities facing obstacles to transmission and generation development—also satisfy the non-jurisdictional zone-of-interests test for parties "aggrieved" by FERC orders.  16 U.S.C. § 825*l*(b).  Petitioners more than "arguably" fall "within the interests that the [Federal Power Act] sought to protect."  *FDA v. R. J. Reynolds Vapor Co.*, 145 S. Ct. 1984, 1992 (2025).  The Act prohibits "unjust, unreasonable, unduly discriminatory or preferential" rates, 16 U.S.C. § 824e(a), with the "primary aim" of "protect[ing] consumers from excessive rates and charges." *Xcel Energy Servs. Inc. v. FERC*, 815 F.3d 947, 952 (D.C. Cir. 2016) (citation omitted); *see also Transmission Agency of N. Cal. v. FERC*, 495 F.3d 663, 670 (D.C. Cir. 2007) ("no trouble finding" that entity seeking to become participating transmission owner within regional organization fell within zone of interests).

U.S.C. § 825*l*(b)).  The arbitrary and capricious standard requires that FERC orders "be reasonable and reasonably explained."  *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).  FERC must "examine the relevant data and articulate a satisfactory explanation for its action," including "a rational connection between the facts found and the choice made."  *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (cleaned up).  FERC may not, among other things, ignore "an important aspect of the problem" or provide "an explanation for its decision that runs counter to the evidence before the agency."  *Id.*

FERC must also support its findings with substantial evidence, meaning "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *N.C. Dep't of Env't Quality*, 3 F.4th at 671 (cleaned up).  To make this determination, the Court conducts "an objective assessment of the sufficiency of the evidence" based on "the whole record," including "whatever in the record fairly detracts from the agency's factual findings."  *Id.* (cleaned up).

## ARGUMENT

**I.  The Design and Timing of FERC's Long-Term Planning Process Conflict with Its Own Findings and Fail to Fully Remedy the Excessive Costs and Inadequate Buildout from Current Planning Processes.**

FERC erred by stopping short of remedying all the problems that it found. Despite finding that comprehensive, long-term planning was necessary because

existing processes result in ineffective and inefficient transmission build-out,
FERC allowed those same processes to persist.  Moreover, FERC only required the
Order 1920 process to occur every five years, hampering its ability to address the
substantial and rapidly changing transmission needs the rule was designed to
address.  FERC thus channeled more planning into existing processes that it found
were particularly ill-suited to these circumstances.  These counterintuitive
decisions lacked reasoned explanation.

### A. It was arbitrary and capricious for FERC to allow Order 1000 processes to continue after finding those processes led to unjust and unreasonable rates.

The core premise of Order 1920 was that Order 1000 processes led to unjust
and unreasonable rates.  Yet FERC opted to allow those processes to remain in
place anyway—and it offered no reasoned explanation for this choice.  Agencies
must articulate a "rational connection between the facts found and the choice
made," *State Farm*, 463 U.S. at 43 (citation omitted), and they cannot draw
conclusions that are "inconsistent with most of [their] analysis" on the very same
point, *ANR Storage Co. v. FERC*, 904 F.3d 1020, 1028 (D.C. Cir. 2018).  Because
FERC's logic was internally inconsistent and lacked reasoned explanation, it was
arbitrary and capricious.

21

**1. FERC's decision to retain Order 1000 processes was logically inconsistent with its findings that those processes led to unjust and unreasonable rates.**

Section 206 of the Federal Power Act involves two steps: if at step one FERC finds a rate to be unjust and unreasonable, at step two FERC must fix a just and reasonable rate in its place. 16 U.S.C. § 824e; *FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 277 (2016). In Order 1920, at step one, FERC found that Order 1000 processes produce unjust and unreasonable rates. Yet, at step two, FERC nonetheless permitted those planning processes to remain in place. Allowing the continuation of the very process that FERC concluded produced unjust and unreasonable rates was arbitrary and capricious.

Order 1920's central finding is that the transmission planning processes required by Order 1000 do not produce just and reasonable rates. FERC identified three deficiencies in Order 1000 processes. *First*, they lack "a sufficiently long-term assessment of transmission needs" to take advantage of the "efficiencies or economies of scale" promised by regional transmission facilities. JA2043-2044 (Order 1920-A P75). *Second*, they do not require transmission providers to "account adequately" for "known and identifiable" determinants of long-term transmission needs, such as extreme weather or demand growth. JA2044-2047 (Order 1920-A P76) (citations omitted). *Third*, they often ignore the multiple benefits that transmission solutions provide, including accessing lower-cost power

22

and lowering the risk of blackouts. *See* JA2044-2047 (Order 1920-A PP76-77); JA719-722, JA1393-1394 (Order 1920 PP116-17, 1103). These deficiencies cause "siloed" and "piecemeal" decision-making. Transmission providers prioritize near-term needs without adequately assessing future demand growth, supply changes, and other economic drivers, with ratepayers paying the price for "inefficient investments." *See* JA680-681, JA702-704, JA729-731, JA734-736, JA1642-1643 (Order 1920 PP85, 101, 122-23, 127-28, 1474). FERC thus had little trouble concluding that these deficiencies rendered Order 1000 planning processes unjust and unreasonable. JA680-681 (Order 1920 P85).

Yet FERC inexplicably left those processes in place. *See* JA816-817 (Order 1920 P241). Indeed, FERC declined to impose any measure that prevents transmission providers from continuing to use their Order 1000 processes to engage in the very practice Order 1920 was predicated on stopping: building inefficient projects through a piecemeal process when comprehensive, longer-term planning would be more cost-effective. JA816-817 (Order 1920 P241); *see* JA2187-2189 (Order 1920-A PP214-17).

By issuing a rule that contradicted its own findings, and thus was "illogical on its own terms," FERC acted arbitrarily and capriciously. *Evergreen Shipping Agency (Am.) Corp. v. Fed. Mar. Comm'n*, 106 F.4th 1113, 1118 (D.C. Cir. 2024) (citation omitted); *see also, e.g.*, *ANR Storage*, 904 F.3d at 1028 ("internally

23

inconsistent" decisions are "arbitrary and capricious"); *Defs. of Wildlife v. U.S. Dep't of the Interior*, 931 F.3d 339, 352-53 (4th Cir. 2019) (similar).

### 2. FERC failed to offer a reasoned explanation for leaving deficient Order 1000 processes in place.

That decision was especially arbitrary because FERC offered no reasoned explanation for its approach. It had good options for preventing or limiting the continued use of Order 1000 planning from producing unjust and unreasonable rates. PIOs suggested three. Preferably, FERC could have required each transmission provider to file a single, integrated planning process that meets its obligations under *both* Order 1000 and Order 1920. JA4214-4215 (PIOs Initial Comments 45-46); JA5094 (PIOs Rehearing Request 21). Failing that, FERC could have limited the continued use of Order 1000 processes to "urgent transmission needs that could not have been reasonably anticipated" or addressed within a current long-term planning cycle. JA5093 (PIOs Rehearing Request 20) (providing example of "sudden transmission failure that could not have been planned for"). Or, at the very least, FERC could have required transmission providers to use the same "base case" for planning under both Order 1000 and Order 1920 processes. The "base case" is the planner's assessment of the most likely future conditions and the assumption upon which decision-making is based. Because Order 1000 base cases fail to identify the full range of future needs and generate inefficient transmission solutions, aligning the Order 1000 base case

24

assumptions with the more comprehensive scenarios generated under Order 1920 would have reduced conflict between the two processes.  JA5097-5098 (PIOs Rehearing Request 24-25).

FERC rejected these suggestions.  Instead, FERC offered a series of disjointed responses that either claim that solving this problem would be too difficult or downplay the possibility that Order 1000 processes will continue to function as inefficiently as they have in the past.  JA818-820 (Order 1920 PP244-45); JA2187-2189 (Order 1920-A PP214-17).  None of FERC's objections supplies a reasoned explanation for its failure to resolve the inconsistency between its finding that Order 1000 planning produced unjust and unreasonable rates and allowing it to continue unchanged.

### a. FERC offered no explanation to support its assertion that transitioning to an integrated transmission planning process would be too difficult.

FERC's claim that the benefits of requiring a single, integrated planning process "may be outweighed by the difficulty of transitioning to such a process," JA819-820 (Order 1920 P245); *accord* JA2187-2188 (Order 1920-A P214), lacks even the "minimal level of analysis" needed to withstand arbitrary and capricious review. *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016).  FERC did not explain what it meant by the "difficulty of transitioning" to a combined process, nor why that difficulty outweighs the value of preventing transmission

25

providers from continuing to use a process that produces unjust and unreasonable rates.

If the "difficulty" FERC contemplated is the difficulty transmission providers might have developing tariff provisions for a combined process, FERC failed to explain any incremental burden. Order 1920-A already requires that transmission providers create an entirely new planning process and provided a multi-year compliance process to fulfill its requirements. JA2417, JA2739-2741 (Order 1920-A PP507, 914-15). And, in Order 1920, FERC required transmission providers to "address the possible interaction between the transmission planning cycle for Long-Term Regional Transmission Planning and existing Order 1000 regional transmission planning processes" in their compliance filings. JA1372-1373 (Order 1920 P1071). Thus, having required a restructuring of transmission planning, along with a directive to address the interaction between the Order 1000 and Order 1920 processes, it is unclear what additional burden would come from a directive to combine the two processes. If anything, leaving questions about the relationship between the processes unresolved and forcing transmission providers to guess at what terms FERC will accept poses the greater difficulty.

If instead FERC meant the difficulty of *administering* a combined process, it also failed to offer any reasoning. As PIOs observed, administering a combined process would seem less burdensome than "running two entirely different planning

26

processes, one of which [FERC] already found to be unjust and unreasonable." JA5094 (PIOs Rehearing Request 21).

### b. FERC offered no explanation to support its assertion that Order 1000 planning would come to address only residual transmission needs.

FERC's optimistic speculation that the Order 1920 process's longer time horizon and broader consideration of benefits would leave existing Order 1000 processes "to address only residual needs" fares no better. JA819-820 (Order 1920 P245).

FERC offered no credible basis to expect that outcome. PIOs offered FERC reasons why Order 1000 planning will continue to produce inefficient investments absent clear rules to prevent it. JA5089-5098 (PIOs Rehearing Request 16-25); *see also Constellation Mystic Power, LLC v. FERC*, 45 F.4th 1028, 1055 (D.C. Cir. 2022) (faulting FERC's failure to respond meaningfully to party's objections and reliance on apparent contradictions regarding a dispositive issue).

*First*, so long as Order 1000 processes remain available, some transmission providers will seek advantages from them. For example, Order 1000 permits utilities to build certain "reliability" projects on a non-competitive basis. JA403-404 (NOPR P339). And they have eagerly taken advantage of that option. As FERC found, recent transmission investment has been "concentrated" in projects that are exempt from competition. JA408-409 (NOPR P344). Retaining Order

27

1000 processes preserves that incentive—indeed, it even enhances it, because long-term transmission planning may reduce the need for such projects.  JA5092-5093 (PIOs Rehearing Request 19-20).  *Second*, the timing of the two processes is not aligned in a way that limits Order 1000 processes to "residual" needs.  FERC refused to require transmission providers to sync the timing of their Order 1920 and Order 1000 processes.  JA2188-2189 (Order 1920-A P216).  In fact, it extended the frequency of long-term planning cycles from three to five years—thereby expanding transmission providers' opportunities to select inefficient investments through Order 1000 processes. *See infra* Section I.B.

FERC's related assertion that Order 1920's "Long-Term Regional Transmission Planning and cost allocation requirements adequately remedy" the deficiencies of Order 1000 processes is similarly unavailing.  JA2188 (Order 1920-A P215).  FERC apparently meant that because Order 1920 requires transmission providers to create a long-term planning process that lacks the deficiencies of Order 1000, it is irrelevant whether transmission providers continue to use Order 1000 processes as well.  But this conclusion flatly contradicts the rest of Order 1920 and is therefore arbitrary and capricious.  *See ANR Storage*, 904 F.3d at 1028; *Defs. of Wildlife*, 931 F.3d at 352-55.  The purpose of Order 1920 was not simply to require transmission providers to make transmission investments based on long-term planning, but also to require them to avoid or minimize inefficient

28

investments based on short-term planning. JA701-702 (Order 1920 P100). FERC's suggestion that it could somehow remedy the deficiencies of the existing process, while leaving transmission providers free to use that process to make inefficient investment decisions, is unreasoned and thus arbitrary and capricious. *See Ohio River Valley Env't Coal., Inc. v. Kempthorne*, 473 F.3d 94, 103 (4th Cir. 2006).

### c. FERC may not point to future compliance orders to excuse unreasoned decision-making in this Order.

Finally, FERC claims that requiring alignment between Order 1000 and Order 1920 processes is "premature," pointing to its ability to evaluate the interaction in transmission providers' compliance filings. *See* JA2188-2189 (Order 1920-A P216). That bare assertion does not satisfy FERC's obligation to reasonably explain its decision and respond to the specific concerns regarding misalignment that PIOs detailed. *See, e.g.*, JA5095-5097 (PIOs Rehearing Request 22-24) (highlighting potential for Order 1000 projects to "repeatedly disrupt[]" Order 1920 planning assumptions and for "inconsistent assumptions and uncoordinated project identification"). While FERC has broad discretion to control its decision-making process, *see Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council*, 435 U.S. 519, 543 (1978), and to defer issues to compliance proceedings, *see Cleveland v. FERC*, 773 F.2d 1368, 1375 (D.C. Cir. 1985), it may not promulgate a rule that is incoherent on its face and point to future compliance proceedings in the

29

hope they resolve the incoherence. "It is a foundational principle of administrative law that judicial review of agency action is limited to the grounds that the agency invoked when it took the action." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 20 (2020) (cleaned up). This rule, which applies both to post-hoc rationalizations of counsel and of the agency itself, frees courts and litigants from having to "chase a moving target." *Id*. at 23. Yet that is precisely what would occur were FERC permitted to gesture at the compliance process to brush aside significant concerns regarding a fundamentally incoherent aspect of its order.

That is particularly true where, as here, FERC provided no clear principle for how, on compliance, it will "evaluate the interaction between these processes . . . and address any potential issues." JA2188-2189 (Order 1920-A P216). FERC stated that Order 1920 would prevail in case of conflict between the two rules. JA818-819 (Order 1920 P244). But this statement is of no help when FERC has not said what it would mean for the continued use of Order 1000 processes to conflict with Order 1920. After all, FERC stated in Order 1920 that it would "not require that any transmission provider replace or otherwise make changes to its existing Order 1000-compliant regional transmission planning processes." JA816-817 (Order 1920 P241). With that statement, what basis could there be to conclude that an existing Order 1000 process conflicts with Order 1920? Absent clear principles to be applied on compliance, FERC cannot reasonably rely on that

process to resolve the incoherence between what it has required in Order 1920 and the Order 1000 processes it left in place.

### B. FERC erred in departing from its proposed three-year planning frequency and adopting a five-year cadence.

When FERC set out to establish a required frequency for long-term planning, three years was the obvious choice. FERC found that rapid changes in the energy sector required nimble planning processes. And FERC determined—both in the NOPR and the Final Rule—that three years provided "sufficient time for transmission providers" to complete the required steps. JA910-912 (Order 1920 P379); *see also* JA230-231 (NOPR P99). Despite this finding and widespread support for three-year cycles,[6] the Final Rule unveiled a half-measure that no one requested: it required providers to undertake long-term planning once every *five* years, while nevertheless requiring completion of the planning cycle within the first three years. JA910-912 (Order 1920 P379). That design unnecessarily slows the pace of long-term planning, running contrary to Order 1920's purpose.

As FERC explained, critical investments in regional transmission solutions are needed now and in the future for an "already oversubscribed transmission system" facing multiple growing demands. JA689-695 (Order 1920 PP94-95). The

---

[6] *See* JA896-901 (Order 1920 P354-60); JA5084-5085 (PIOs Rehearing Request 11-12 n.43).

31

generation fleet is changing rapidly, with increasing resource capacity waiting in interconnection queues. JA180-183 (NOPR P45); JA696-701 (Order 1920 PP96-99 & n.242).  Electrification and "new large loads associated with evolving industrial and commercial needs" are boosting demand, while antiquated resource retirements and increasingly extreme weather impact supply are forcing rapid system evolution to maintain grid reliability.  JA180-183 (NOPR P45); JA689-692 (Order 1920 P94).

This pace of change is only increasing.  Estimates predict accelerating growth from data centers.  JA692-695 (Order 1920 P95 nn.214-21).  Extreme weather events are occurring with greater frequency, with three catastrophic post-NOPR winter storms demonstrating the urgent importance of regional transmission to ensuring system reliability.  *See* JA689-692, JA811 (Order 1920 PP94, 234 n.585); JA5083 (PIOs Rehearing Request 10).

These dynamic changes led FERC to conclude a few things.  The billions of dollars already spent by ratepayers annually on transmission was "likely to substantially increase" to meet this "growing need for new transmission infrastructure."  JA688-692 (Order 1920 PP93-94).  The magnitude of investment needed made comprehensive, long-term planning "essential" to ensure that "customers' money is well-spent" on efficient and cost-effective projects, rather than the piecemeal development of the status quo. JA701-702 (Order 1920

32

P100). And the pace of change means new needs emerge quickly, heightening the importance of proactively identifying them and developing efficient solutions "well in advance of these issues affecting the transmission system." JA684-685, JA689-692, JA806 (Order 1920 PP90, 94, 228).

As FERC saw it, status quo processes are particularly ill-suited for addressing these needs efficiently, because they do not identify long-term needs or assess the holistic benefits of projects that could address multiple needs over various time horizons. JA719-721 (Order 1920 P116). The likelihood that near-term assessments "will fail to identify Long-Term Transmission Needs and more efficient or cost-effective regional transmission facilities to meet those needs is *higher during periods of rapid change*"—like those "the electric sector is now experiencing." JA721-722 (Order 1920 P117) (emphasis added).

Logically, that reasoning called for decisive action to decrease reliance on near-term processes. Instead, Order 1920 did the opposite. By requiring that long-term planning occur only every five years, JA909 (Order 1920 P377), FERC *increased* dependence on existing processes and limited the ability of long-term planning to address periods of turbulent change.

That is because a provider will conduct *five* annual Order 1000 planning cycles in parallel with one Order 1920 cycle. As conditions change during that cycle and new transmission needs emerge—as FERC has found they will—near-

33

term planning cycles will be providers' preferred recourse.  In that case, providers can select less efficient solutions that meet singular needs.  If, by contrast, transmission providers were required to update their long-term outlooks and expansion plans as frequently as FERC determined was feasible, those processes would capture emerging needs and develop more efficient solutions that address needs in *both* the short and long terms.

For example, if three years into a long-term planning cycle, a utility's demand forecast spikes due to a new state or federal energy policy or unexpected data center development, the annual Order 1000 planning process will treat the resulting transmission need as a reliability need and identify a solution to meet that individual need.  At the same time, new generation units seeking to meet data center demand may request interconnection to the grid, while others retire, creating transmission needs of their own.  Yet the limited focus of the Order 1000 reliability processes will ignore the relationship between these and other needs, relying on separate interconnection processes to build piecemeal grid upgrades instead of using Order 1920 planning to solve both immediate and anticipated longer-term needs more efficiently and cost-effectively.

In dismissing these concerns, FERC relied on a flawed premise that providers could, if they wanted, incorporate emerging needs into the Order 1920 process later by "updating the assumptions, inputs, and factors used to inform

34

Long-Term Scenarios" during those five years.  JA2217-2218 (Order 1920-A

P257).

That reasoning is doubly flawed.  First, FERC did not explain how, exactly,

providers would surmount the practical difficulties of updating those scenarios and

reopening the planning analysis.  Updating inputs and assumptions is the *first step*

of building scenarios—a process that can take over a year.  JA896 (Order 1920

P353).  Planners then use those scenarios to identify transmission needs, use those

needs to identify potential project solutions and measure their benefits, and use

those benefits to select projects.  JA910-912 (Order 1920 P379).  FERC's assumed

fix effectively restarts the planning process at square one.  *See* JA3995 (NYISO

Comments 19).

Second, FERC's speculation that providers would go out of their way to

address emerging needs through the Order 1920 process flies in the face of Order

1920's rationale.  Order 1920 is built on FERC's recognition that providers do not

engage in long-term, comprehensive planning unless required to do so.  *See, e.g.*,

JA722-726, JA814-815, JA1139-1140, JA1459 (Order 1920 PP118-19, 238, 723,

1195); *see also supra* Section I.A.  FERC "failed to provide a reasoned

explanation" why this "past [behavior] will not continue to occur going forward."

*See Sierra Club v. W. Va. Dep't of Env't Prot.*, 64 F.4th 487, 501 (4th Cir. 2023).

By allowing providers to use the very planning processes it sought to displace

35

without a rational justification, FERC acted contrary to both its goals and its findings. That was arbitrary and capricious. *See ANR Storage*, 904 F.3d at 1028; *Defs. of Wildlife*, 931 F.3d at 352-53.

Finally, FERC attempted to justify the switch to five years by claiming to "balanc[e]" the benefits of requiring cycles every three years against the "administrative burdens" of doing so. JA910-912 (Order 1920 P379). But as explained above, FERC both underestimated the benefits of a three-year planning cycle and further minimized them by erroneously assuming that transmission providers could—and would—address emerging needs by incorporating them mid-cycle into the Order 1920 process. *See NRDC v. United States Forest Serv.*, 421 F.3d 797, 816 (9th Cir, 2005) (agency's "error in assessing market demand fatally infected its balance of economic and environmental considerations, rendering [its action] arbitrary and capricious in violation of the APA."). On the other side of its balancing, FERC did not actually find that the planning process was too burdensome to complete in three years; it found that "three years provides sufficient time" to complete the entire process. JA910-912 (Order 1920 P379). FERC thus "offered an explanation for its decision that runs counter to the evidence before the agency," rendering it arbitrary and capricious. *State Farm*, 463 U.S. at 43.

36

## II. FERC Arbitrarily Authorized Transmission Planners to Exclude Key Factors That are Necessary to Ensure Just Rates and Reasonable Cost Allocation.

Order 1920 also fell short of FERC's goals by authorizing transmission providers to ignore important factors in the long-term planning process. Specifically, FERC invited them to artificially exclude advanced-stage merchant transmission projects in developing the long-term scenarios that form the basis for the entire planning process. FERC also allowed planners to overlook key means of satisfying the transmission needs identified in those scenarios. And FERC improperly narrowed the range of benefits that planners must consider in evaluating potential transmission projects.

### A. FERC arbitrarily allowed transmission providers to ignore high-voltage, direct current lines and other merchant transmission facilities when developing scenarios.

Order 1920 requires that transmission planners develop three future scenarios to serve as a cornerstone for the transmission planning process. JA1029-1030 (Order 1920 P559). These scenarios must be based on the best available inputs about "the future electric power system" over a twenty-year horizon and be used to identify long-term transmission needs. The scenarios are thus essential to identifying and evaluating potential facilities to meet those needs. JA646, JA890-891 (Order 1920 PP40, 344).

37

Order 1920 correctly requires planners to consider a range of enumerated factors when developing these scenarios. JA929-930 (Order 1920 P409). As FERC explained, it was appropriate to require planners to consider those factors because each is "essential to identifying Long-Term Transmission Needs," and failing to incorporate those factors "would increase the likelihood" that transmission will "underestimate—or omit entirely—…known determinants" of such needs. JA930-932 (Order 1920 PP410-11). FERC determined that it must *require* (rather than simply recommend) that planners consider these factors because transmission providers had previously "ignore[d]" them. JA722-726 (Order 1920 PP118-19).

Despite acknowledging this track record, FERC arbitrarily declined to mandate, and thus invited transmission planners to ignore, consideration of a key factor—merchant HVDC transmission facilities. JA985-986 (Order 1920 P493). This aspect of the orders will likely lead to transmission plans that needlessly increase consumer costs and distort the selection of projects for ultimate construction.

Invenergy urged FERC to include merchant HVDC transmission facilities that are at an advanced stage of development among the factors that transmission planners must consider when formulating scenarios. JA5140 (Invenergy Rehearing Request 2). Merchant facilities are funded by private investors who assume the

38

market risk of development, rather than through the traditional utility process in which risk is underwritten by captive retail ratepayers. JA5140 (Invenergy Rehearing Request 2 n.4); *Allocation of Capacity on New Merch. Transmission Projects and New Cost-Based, Participant-Funded Transmission Projects*, 142 FERC ¶ 61,038, P2 (2013). Merchant transmission facilities create beneficial market competition, bring private investment to a sector with enormous capital needs, and promote efficiency by offering additional means of transporting electricity toward end users.

HVDC lines carry electricity over long distances using direct current (as opposed to the alternating current predominantly used in the U.S. grid). These facilities offer distinct benefits that can make them superior, in certain respects, to traditional lines using alternating current. These advantages include the ability to connect transmission systems that operate at different frequencies, greater efficiency over long distances, greater and more flexible connectivity between regional grids, quicker development timeframes, enhanced control over power flows, and improved grid reliability. JA5149-5151 (Invenergy Rehearing Request 11-13); JA3893-3894 (Invenergy Initial Comments 21-22); JA4741 (Policy Integrity Supplemental Rulemaking Comment, App. A 25); *see generally* Andre Pereira, U.S. Dep't of Energy, *Connecting the Country with HVDC* (Sept. 27, 2023), https://perma.cc/N26A-28ZD.

39

Accounting for the existence of advanced-stage merchant transmission infrastructure, particularly HVDC facilities, is essential to an accurate understanding of the future electric power system, and thus to an accurate, comprehensive transmission planning process.  JA5141-5142, JA5146 (Invenergy Rehearing Request 3-4, 8); *see* JA646 (Order 1920 P40).  A long-term transmission plan that ignores such facilities will most likely lead to unnecessary and inefficient overbuilding, leading to undue discrimination against merchant developers, and causing unjust and unreasonable rates for ratepayers.  *Cf.* 16 U.S.C. § 824e(a); *St. Michaels Util. Comm'n v. Fed. Power Comm'n*, 377 F.2d 912, 915 (4th Cir. 1967).

That is because a plan developed without considering merchant transmission would naturally have to include *other* facilities to address needs the merchant facilities could meet.  JA5141-5142 (Invenergy Rehearing Request 3-4).  That would allow traditional utility transmission providers to charge captive ratepayers for duplicative new projects.  The prospect of such projects (developed with the tailwinds of assured ratepayer funding) might chill the development of competing merchant lines.  *See* JA5141-5142 (Invenergy Rehearing Request 3-4).  A planning process that relies on incomplete data *inputs* cannot be expected to generate non-arbitrary *outputs*.  *Cf. United States v. Curry*, 965 F.3d 313, 345 (4th Cir. 2020) (en banc) (Thacker, J., concurring) ("Any . . . algorithm is only as good as the data that

goes into it."). Here, that process will encourage inefficient projects while discouraging projects that foster beneficial competition.

To take one concrete example, the long-range transmission planning initiative recently conducted by the Midcontinent Independent System Operator, Inc. ("MISO") ignored outright an 800-mile merchant HVDC transmission line that is being developed by Invenergy's affiliate, Grain Belt Express LLC. JA5141-5142 (Invenergy Rehearing Request 3-4); JA3890-3892 (Invenergy Initial Comments 5-7). That planning process resulted in MISO approving billions of dollars of new transmission projects, selected without considering potential benefits from Invenergy's project.[7] Unless transmission providers are required to account for merchant HVDC, similar omissions are likely to continue.

Invenergy's experience demonstrates that it is not enough for FERC merely to *allow* transmission planners to consider merchant HVDC facilities. *See* JA2276-2278 (Order 1920-A P331) (clarifying that planners "may incorporate additional categories of factors" into scenarios). History, logic, and an extensive record demonstrate that planners will give outsized weight to traditional, incumbent transmission facilities while downplaying or excluding merchant facilities.

---

[7] *See generally* MISO, *MISO Board Approves $10.3B in Transmission Projects* (July 25, 2022), https://tinyurl.com/ycvzbtkv .

Multiple parties underscored these problems during the agency proceedings. *See* JA5142-5148 (Invenergy Rehearing Request 4-10); JA4699-4700 (AEE Reply Comments 18-19); JA3724 (SOO Green ANOPR Reply Comments 4).  As explained in those submissions, merchant developers have historically "face[d] barriers" to participation in the transmission market, given incumbent utilities' strong incentives to plan and build their own transmission and collect guaranteed, ratepayer-funded returns.  JA3724 (SOO Green ANOPR Reply Comments 4).  If given flexibility, planners will inevitably structure scenarios in "too narrow" a way that overlooks merchant technologies that can "provide more cost effective or efficient solutions."  JA4699-4700 (AEE Reply Comments 18-19).  After all, incumbent utilities typically "earn a return on capital investments," so "their profits increase when they spend more" on their own infrastructure.[8]  Requiring planners to *at least consider* merchant transmission assets is thus a necessary check against utilities' natural incentive to favor their own facilities.

FERC disregarded these concerns, authorizing transmission planners to ignore merchant HVDC facilities when developing scenarios.  JA929-930, JA985-986 (Order 1920 PP409, 493); JA2275-2280 (Order 1920-A PP329-34).  As its primary justification for that decision, FERC said merchant HVDC facilities are a

---

[8] Joshua Macey & Jacob Mays, *The Law and Economics of Transmission Planning and Cost Allocation*, 45 Energy L. J. 209, 221 (2024).

42

means of "*address[ing]*" transmission needs but are not essential for "*identifying*"

such needs.[9]  JA2276-2277 (Order 1920-A P331) (emphasis added).  This

distinction does not withstand scrutiny.

Any rational process of anticipating future transmission needs obviously

depends on understanding *both* (1) demand for transmission service over time and

(2) the supply of transmission facilities that will exist to fulfill that demand.

Looking only to *demand* without considering the *supply* of transmission facilities

will overestimate long-term need for new transmission projects.[10]  FERC offered

no reasoned explanation for the wrongheaded notion that a meaningful assessment

---

[9] FERC also mentioned that it had "not propose[d] specific requirements in the NOPR regarding merchant HVDC transmission facilities under development." JA985-986 (Order 1920 P493).  To the extent FERC meant to suggest that it was procedurally barred from requiring consideration of merchant HVDC, any such concern was unwarranted.  The NOPR invited comments regarding "whether and how" the proposed categories "adequately capture factors expected to drive changes in the resource mix and demand."  JA243 (NOPR P112).  By "ask[ing] for comments on" its proposed factors, FERC provided notice that factors might evolve, and opportunity for comment.  *See Manufactured Hous. Inst. v. EPA*, 467 F.3d 391, 399-400 (4th Cir. 2006).

[10] "[A]dvanced-stage" merchant HVDC projects that would foreseeably be completed during applicable time horizons would be relevant to an accurate understanding of the future electric system, even if they are "not yet built" when the planning process begins. JA5140-5142 (Invenergy Rehearing Request 2-4 & n.5); JA3891-3892 (Invenergy Initial Comments 6-7); *contra* JA2276-2278 (Order 1920-A P331).

43

of transmission needs can occur without an accurate understanding of the expected baseline of transmission assets.  *See State Farm*, 463 U.S. at 43.

FERC offered conclusory justifications when dismissing Invenergy's concerns, falling short of its obligation of reasoned decisionmaking.  For example, FERC said that it was "unpersuaded" by record evidence that allowing planners to ignore merchant HVDC would result in undue discrimination against non-incumbent developers. JA2279-2280 (Order 1920-A PP333-34).  But it never adequately explained *why*, beyond a bare *ipse dixit*, it found the abundant record evidence unpersuasive.  *See State Farm*, 463 U.S. at 43; *see also N.C. Dep't of Env't Quality*, 3 F.4th at 672 (FERC cannot "arbitrarily ignore unrebutted, legally significant evidence" (cleaned up)).

FERC also suggested that any discrimination against merchant providers could be addressed in "other proceedings." JA2279-2280 (Order 1920-A PP333-34).  But the possibility of addressing undue discrimination *ex post* does not justify establishing an *ex ante* system that enables discrimination.[11]  Indeed, one of Order 1920's stated goals is to prospectively "remedy deficiencies" in transmission

---

[11] Invenergy filed a complaint against MISO in 2022 for its failure to account for merchant HVDC in its long-range planning initiative. Three years later, FERC has taken no substantive action on it.  *See* Complaint, *Invenergy Transmission LLC v. Midcontinent Indep. Sys. Operator, Inc.*, Docket No. EL22-83-000 (Aug 8. 2022), Accession No. 20220808-5195.

44

planning requirements, "to ensure that the rates, terms, and conditions for transmission service . . . [are] not unduly discriminatory or preferential." JA624-626 (Order 1920 P1). Preventing discrimination against merchant developers is essential to achieving that salutary purpose.

A remand is necessary for FERC to remedy these errors and strengthen the planning process by mandating inclusion of merchant transmission facilities in the scenarios.

### B. FERC's omission of energy storage from the alternative transmission technologies that planners must consider arbitrarily ignores its established use and substantial benefits.

FERC similarly erred by allowing transmission providers to ignore energy storage projects as an alternative to building new transmission lines. As FERC recognized, new technologies have developed over the last decade that can "improve the operation of new and existing transmission facilities and defer new transmission investments." JA354 (NOPR P267). Because these "alternative transmission technologies" are often cheaper and easier to build than transmission lines, they have great potential to improve the grid at least cost. *See, e.g.*, JA1460, JA1466-1467 (Order 1920 PP1196, 1201). But the more transmission providers spend, the more they earn. *See* JA3104 (PIOs ANOPR Comments 7). Unsurprisingly, then, FERC found that regional planning processes "overlook or undervalue" these technologies, absent any requirement to consider them.

45

JA1458-1459 (Order 1920 P1194).  Accordingly, FERC mandated that transmission providers evaluate four alternative transmission technologies. JA1461-1463 (Order 1920 P1198).  FERC selected these technologies because it found that their "potential advantages" in "identifying more efficient or cost-effective regional transmission" would "outweigh the potential administrative and analytical burden."  JA1472-1474 (Order 1920 P1208); *see also* JA1494-1499 (Order 1920 PP1240-45) (detailing benefits of each selected technology).

Yet when FERC declined to include storage on this list, *see* JA1499 (Order 1920 P1245), it did not balance storage's potential benefits against potential burdens, contrary to the "fundamental norm of administrative procedure" that agencies "treat like cases alike."  *Kirk v. Comm'r of Soc. Sec. Admin.*, 987 F.3d 314, 321 (4th Cir. 2021) (quoting *Westar Energy, Inc. v. FERC*, 473 F.3d 1239, 1241 (D.C. Cir. 2007)).  FERC simply ignored storage's benefits, despite evidence provided by the many commenters supporting it.  *See* JA1488 (Order 1920 P1230 n.2632) (providing a diverse list of 23 commenters).  As these commentors explained, storage can provide a cost-effective and flexible alternative to building expensive traditional transmission lines by maintaining safe voltage levels, controlling the timing of power flows, and reducing demand on the system at peak hours.  *See, e.g.,* JA4116-4117 (AEP Initial Comments 33-34); JA4089 (Clean Energy Associations Initial Comments 30); JA5112 (PIOs Rehearing Request 39).

46

Nowhere did FERC "grapple with contrary evidence" to dispute the value that storage provides or properly weigh its benefits. *Sierra Club v. DOI*, 899 F.3d 260, 293 (4th Cir. 2018) (citation omitted). This failure arbitrarily treats like cases differently. *See Kirk*, 987 F. 3d at 321; *cf. Bus. Roundtable v. SEC*, 647 F.3d 1144, 1148-49 (D.C. Cir. 2011) (agency "inconsistently and opportunistically framed the costs and benefits" of its action).

Even if FERC could rely solely on the burden of identifying storage that can serve as transmission, its flimsy rationale still lacks support. FERC initially gestured at potential burdens, distinguishing storage as requiring "a case-by-case analysis." JA1499 (Order 1920 P1245). When PIOs pointed out that "*any* transmission solution requires a case-by-case analysis," JA5113 (PIOs Rehearing Request 40), FERC did not argue otherwise. Instead, it simply moved the goalposts, claiming that storage requires "an *additional* case-by-case analysis." JA2495-2496 (Order 1920-A P607) (emphasis in original). Specifically, FERC found storage requires transmission providers to determine whether (1) a storage facility would act exclusively as a transmission asset; (2) it would get paid like any other transmission resource; and (3) building the facility would not affect the generator interconnection queue. JA2495-2497 (Order 1920-A P607).

But these kinds of criteria—does it qualify? how would it be paid? what effect would it have on other resources?—go into the evaluation of *any* alternative

47

transmission technology (and most facilities in general).  They are hardly reasons to exclude the evaluation of such a valuable resource.  Indeed, storage differs from other technologies FERC omitted—such as topology optimization—that pose detailed technical challenges that could render that technology ineffective and even harm grid reliability.  JA1500-1501 (Order 1920 P1246).

Moreover, FERC's own guidance solved the problem it claimed prevented mandatory consideration of energy storage.  FERC's enumerated criteria for assessing whether storage could meet a specific transmission need provided sufficient guidance for transmission planners to consider storage in regional transmission planning.  This is precisely the kind of guidance PIOs and other parties identified in their requests for rehearing when they explained that FERC could require the use of storage in transmission planning to comply with some set of factors.  *See* JA5115 (PIOs Rehearing Request 42); JA5062 (Clean Energy Associations Rehearing Request 27). Moreover, use of storage as a transmission asset is not a new concept, and some providers already permit the use of storage for transmission services.[12]  FERC thus failed to demonstrate that storage has an undue administrative burden outweighing its benefits in contributing to more efficient transmission planning.

---

[12] For example, California Independent System Operator, MISO, ISO-New England, and Southwest Power Pool all have tariff provisions allowing for storage as transmission. JA5112 (PIOs Rehearing Request 39).

Finally, FERC's observation that transmission planners *may* consider storage is cold comfort. *See* JA2495-2497 (Order 1920-A P607). FERC required transmission planners to consider alternative transmission technologies because it found that they were not doing so. JA1459 (Order 1920 P1195). And it offered no "reasoned explanation" to expect a different result for storage going forward. *See Sierra Club*, 64 F.4th at 502. Without required consideration of storage, consumers will suffer as transmission providers continue to leave this valuable alternative on the table in favor of more costly solutions.

### C. FERC failed to rationally justify its decision to narrow the required benefits analysis, which will result in costly and inefficient transmission that fails to comply with bedrock utility law.

One of the most critical functions of transmission planning—and one of the biggest failures of the Order 1000 process—is the proper assessment of transmission projects' benefits compared to their costs. This assessment plays two essential roles in the Order 1920 process: the project selection process relies on it to maximize bang for the buck; and the cost allocation process relies on it to determine who pays and how much. Underestimating project benefits thus leads to inefficient choices and inaccurate cost allocation. FERC found that without an accurate assessment of benefits, providers "cannot be reasonably expected to identify, evaluate, and select more efficient or cost-effective regional transmission," necessary for just and reasonable rates. JA1139-1140 (Order 1920

49

PP722-23).  It also found that mandatory benefit analysis aids cost allocation.

JA1139-1140 (Order 1920 PP722-23).  Yet, in defiance of its own logic and

without meaningful explanation, Order 1920 permits planners to ignore significant

benefits FERC itself had earlier said should be considered.  *Defs. of Wildlife*, 931

F.3d at 352 ("Absent a reasoned discussion of the agency's apparently

contradictory positions . . ., we can only conclude . . . [it] acted arbitrarily").

FERC's decision also violates bedrock utility law requiring transmission costs to

be allocated roughly commensurate with the estimated benefits of the transmission

facility.  *See Ill. Commerce Comm'n v. FERC*, 576 F.3d 470, 477 (7th Cir. 2009).

### 1. Substantial evidence supports mandating assessment of the four excluded benefits.

FERC has been clear: transmission providers are not properly assessing the

benefits of potential projects, because Order 1000 does not require them to do so.

JA722-725 (Order 1920 P118); JA193-194, JA291-292 (NOPR PP53, 176).  As a

result, less efficient and cost-effective projects get built, and consumers pay more

but get less.

To remedy this, FERC proposed twelve benefits for providers to evaluate

when selecting transmission facilities.[13]  FERC described how each benefit was

uniquely useful in the project selection process and provided detailed analysis on

---

[13] JA299-301 (NOPR P185).

50

how providers could measure the benefits. *See* JA302-325 (NOPR PP189-225).

While FERC did not initially mandate benefit assessment, JA298-299 (NOPR

P184), the Final Rule determined that transmission providers are unlikely to

consider relevant benefits unless required to do so. JA1139-1140 (Order 1920

P723).

But FERC narrowed the list to seven, JA1137-1138 (Order 1920 P720),

allowing providers to ignore four benefits the NOPR had already determined

should be evaluated: (1) access to lower-cost generation, (2) deferred generation

capacity investments, (3) increased competition, and (4) increased market

liquidity.[14] FERC asserted it was only mandating assessment of benefits that:

"have a proven track record, can be discretely measured, and are unlikely to cause

duplication." JA1141 (Order 1920 P724). Yet FERC neither applied these three

criteria to the omitted benefits, nor refuted the overwhelming evidence in its own

proposal that all four benefits *meet these criteria*.

### a. Access to lower-cost generation

Benefits from access to lower-cost generation refers to savings to consumers

who can access distant, cheaper electricity generation sources that they could not

---

[14] Petitioners do not challenge FERC's exclusion of the "mitigation of weather and load uncertainty" benefit, given FERC's addition of elements of this proposed benefit to the "mitigation of extreme events and system contingencies" benefit in the Final Rule. *See* JA1199-1200, JA1217 (Order 1920 PP800, 820 n.1820).

51

otherwise access without the proposed transmission project.  JA317-318 (NOPR P216).  Such benefits easily meet FERC's criteria.

Lower-cost generation benefits can be discretely measured by comparing status quo higher-cost local generation to future lower-cost distant generation in areas where the new project will be built.  JA318-319 (NOPR P217).

These benefits also are not duplicative.  FERC explained why: although similar to production cost savings—which FERC *did* include in the Final Rule— that methodology does "not adequately capture" the benefits from accessing lower- cost generation.  JA319 (NOPR P218).  Specifically, there are distinct savings from opening access to cheaper, more distant generation to maintain reliability during times of high demand, transmission or generator outages, and other operational issues like forecasting errors.  JA319-320 (NOPR P218).  And FERC cited additional evidence in the proposal that further explains that production cost savings simulations will "not capture the lower overall generation investment costs." JA3221-3222 (Brattle-Grid Strategies Oct. 2021 Report 46-47); JA320 (NOPR P218 n.351).

Finally, access to lower-cost generation has a proven track record of providing particularly significant savings. One estimate found that savings from this benefit alone would exceed the entire $14-17 billion cost of a portfolio of proposed transmission projects.  *See* JA5079 (PIOs Rehearing Request 6 n.17 (citing

52

ACORE, Enabling Low-Cost Clean Energy and Reliable Service Through Better Transmission Benefits Analysis: A Case Study of MISO's Long Range Transmission Planning, at 8 (Aug. 2022), https://perma.cc/GN2K-6NBF)). Another found savings of $12 million per year for a single project that allowed California to meet reliability requirements by importing low-cost generation from Arizona. Half of these savings would go directly to consumers. JA3222 (Brattle-Grid Strategies Oct. 2021 Report 47); JA317-318 (NOPR P216).

### b. Deferred generation capacity investments.

Benefits from deferred generation capacity investments meet FERC's criteria, too. These benefits capture the way new transmission facilities can increase the value of *existing* generation by enabling resource-constrained areas to import more power from neighboring regions. *See* JA316-317 (NOPR P214). Transmission and generation are often substitute products, such that new transmission facilities can defer (or sometimes, eliminate) the need for additional investments into generation capacity in resource-constrained areas. *See* JA316-317 (NOPR P214).

Here too, FERC found this benefit to be quantifiable, with a track record of consumer savings. *See* JA317 (NOPR P215). One study found that transmission facilities used to import electricity from Arkansas and Louisiana into eastern Texas meant that "additional generation capacity investments were not needed" there,

53

JA317 (NOPR P214), enabling existing power plants to shift focus to serving more resource-constrained portions of the state. JA3219-3220 (Brattle-Grid Strategies Oct. 2021 Report 44-45). These transmission facilities resulted in economy-wide benefits of an estimated $320 million, split evenly between Texas customers and out-of-state merchant generators. JA3219-3220 (Brattle-Grid Strategies Oct. 2021 Report 44-45). Another analysis found that a transmission project that increased transfer capability would create approximately $400 million in economy-wide benefits. JA3220 (Brattle-Grid Strategies Oct. 2021 Report 45).

### c. Increased competition

Nor was there a basis to exclude benefits from increased competition, which are "reduced bid prices in wholesale electricity markets due to increased competition among generators and reduced overall market concentration." JA320 (NOPR P219). As FERC outlined, there are multiple established methods for calculating increased competition benefits, all of which transmission providers have used to estimate what are often enormous monetary savings. JA321-324 (NOPR PP221-24). For instance, one provider estimated that the increased competition supplied by just one proposed transmission project would provide $28 million in additional annual benefits, offsetting approximately 40% of the annual project costs. JA3224 (Brattle-Grid Strategies Oct. 2021 Report 49). Another set

54

of transmission projects had estimated competitiveness benefits offsetting 50 to 100% of project costs.  JA3224 (Brattle-Grid Strategies Oct. 2021 Report 49).

### d.  Increased market liquidity

Increased market liquidity—which "enabl[es] a larger number of entities, both buyers and sellers, to participate in a market"—warrants the same treatment.  JA324-325 (NOPR P225).  Increasing market participants provides several benefits, including reducing transaction costs and increasing pricing transparency.  JA324-325 (NOPR P225).  FERC explained that these benefits are quantifiable and help drive down energy prices for consumers.  JA324-325 (NOPR P225).  For example, "bid-ask spreads for bilateral trades at less liquid hubs have been found to be between $0.50 to $1.50 [per megawatt hour] higher than the bid-ask spreads at more liquid hubs."  JA324-325 (NOPR P225).  Even a small reduction in these bid-ask spreads—such as $0.10 per megawatt hour—could save up to $40 million dollars per year for a single trading hub, or $500 million annually nation-wide.  *See* JA3225 (Brattle-Grid Strategies Oct. 2021 Report 50).

### 2. FERC arbitrarily allowed transmission providers to ignore these four benefits.

FERC decreed that the seven benefits it mandated were "sufficiently broad" to ensure more efficient or cost-effective transmission solutions.[15] JA1218 (Order 1920 P821).  FERC stated that it only mandated benefits that "have a proven track record of cost savings, can be measured, and are unlikely to cause duplication," insinuating that the four omitted benefits do not meet these criteria.  *See* JA1141 (Order 1920 P724).  But FERC never engaged with its own findings and evidence to the contrary.  JA2344-2345 (Order 1920-A P414); *cf.* Section II.C.1 *infra*.  FERC thus failed to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  *State Farm*, 463 U.S. at 43 (cleaned up).  Based on FERC's own evidence, the list of seven benefits is too narrow to fully achieve the remedial promise of Order 1920.

If anything, FERC's findings in the Final Rule only undermine its decision to exclude the four benefits.  FERC required consideration of specific benefits because it expected that transmission providers would not otherwise consider a sufficiently broad set of benefits when evaluating potential transmission projects.

---

[15] Unlike its decision to expand one benefit to include benefits from mitigation of weather and load uncertainty—which FERC explained in detail, *see* JA1199-1206 (Order 1920 PP800-05)—FERC does nothing to explain how the remaining seven benefits cover the other four benefits it excluded.

56

JA1139-1140, JA1141-1142, JA1143-1145 (Order 1920 PP723, 725, 727-28); JA2316-2317 (Order 1920-A P377).  Indeed, FERC explained that the benefits of regional transmission projects generally "extend beyond the benefits that transmission providers currently consider as part of their regional transmission planning and cost allocation processes."  JA1139 (Order 1920 P722).  If transmission providers are not required to consider certain benefits, their track record demonstrates they will not do so.  Given FERC's own analysis of the four benefits, its decision to allow providers to ignore them could result in billions of dollars in lost cost savings, seriously undermining the remedy FERC has determined is necessary to secure just and reasonable rates.

### III.  This Court Should Remedy the Specific Errors Addressed Herein, Without Undercutting Order 1920's Beneficial Improvements.

Petitioners request that the Court remand for FERC to correct the shortcomings in its orders explained above, but craft a remedy that does not jeopardize progress in the interim toward Order 1920's significant and beneficial transmission planning reforms.  The record shows that these reforms are necessary to fix a broken status quo, in which systemic failures to properly plan transmission infrastructure stifle competition, undermine grid reliability, and impose significant and excessive costs on consumers.  JA680-681, JA683, JA716 (Order 1920 PP85, 87, 112); *see, e.g.*, JA3127-JA3154 (PIOs ANOPR Comments 30-57).  Although

Order 1920 should be strengthened, the need to implement its existing requirements is particularly urgent, given rapidly increasing energy demands from economic development, electrification, and industrial growth. JA692-695 (Order 1920 P95).

When granting relief, appellate courts appropriately tailor their remedies in light of the relief sought by the petitioner. *See Minyard Enters., Inc. v. Se. Chem. & Solvent Co.*, 184 F.3d 373, 386 n.14 (4th Cir. 1999) ("[A] remedy desired by none of the parties should not be forced upon them."); *cf. Lancaster v. Sec'y of Navy*, 109 F.4th 283, 289 (4th Cir. 2024) (complainant may choose "which remedies to pursue"). Petitioners' request for a remand—without setting aside Order 1920's existing requirements—is consistent with the Court's discretion over the form of remedy. *See* 16 U.S.C. § 825*l*(b) (authorizing Court "to affirm, modify, or set aside such order in whole or in part"); *cf. Mobil Oil Corp. v. FPC*, 417 U.S. 283, 311-12 (1974) (holding that an appellate court did not exceed its statutory authority "'to affirm, modify, or set aside an order in whole or in part'" and "[]properly exercised" its "equity powers" when it authorized FERC to partially revisit its order).[16]

---

[16] Courts construe the Natural Gas Act's and Federal Power Act's "substantially identical" judicial review provisions in parallel. *See Ark. La. Gas Co. v. Hall*, 453 U.S. 571, 577 n.7 (1981).

Other courts have appropriately recognized that in some situations, the proper remedy is to remand without setting aside the agency order on review. *E.g.*, *Ctr. for Food Safety v. Regan*, 56 F.4th 648, 663 (9th Cir. 2022); *Texas Ass'n of Mfrs. v. CPSC*, 989 F.3d 368, 389-90 (5th Cir. 2021). This is particularly true when the petitioner itself seeks that form of relief. *See Del. Div. of Pub. Advoc. v. FERC*, 3 F.4th 461, 469 (D.C. Cir. 2021) (not vacating where petitioners "expressly abjure[d]" that remedy); *Env't Def. Fund, Inc. v. EPA*, 898 F.2d 183, 190 (D.C. Cir. 1990) (same, where vacatur "would at least temporarily defeat petitioner's purpose"); *cf. NACS v. Bd. of Governors of Fed. Rsrv. Sys.*, 746 F.3d 474, 493 (D.C. Cir. 2014) (declining to vacate where it "would lead to an entirely unregulated market," and complainants sought stronger restrictions). As in those cases, setting aside Order 1920 during remand would frustrate the improved transmission planning Petitioners seek to protect. *See Env't Def. Fund*, 898 F.2d at 190.

Petitioners' requested remedy also comports with severability principles. Courts confronting flawed statutes or regulations "try to limit the solution to the problem" by "severing any problematic portions while leaving the remainder intact." *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 508 (2010) (cleaned up). Severability is often appropriate where parties challenge a requirement adopted as part of a broader rule. *See, e.g., Belmont Mun. Light Dep't*

59

*v. FERC*, 38 F.4th 173, 187-90 (D.C. Cir. 2022) (finding erroneous inclusion of certain generators severable from overall reliability program).  Here, Petitioners generally support Order 1920's planning process and do not seek to remove specific requirements.  The "problem[s]" they challenge, *see Free Enter. Fund*, 561 U.S. at 508, are FERC's failures to include *additional* requirements.  Petitioners therefore seek a remedy limited to those problems: a remand for FERC to fix those omissions.  In the interim, leaving intact Order 1920's existing requirements effectuates FERC's intent by retaining the planning process it promulgated.  *See Mayor of Baltimore v. Azar*, 973 F.3d 258, 292 (4th Cir. 2020) (en banc) (severability turns on "agency intent" (cleaned up)).  And Petitioners' requested remedy maintains Order 1920's "primary purpose," *id.* at 293, namely, redressing the absence of long-term regional transmission planning and excessive costs.  *See* JA680-681 (Order 1920 P85).

## CONCLUSION

For the foregoing reasons, the Court should grant the petitions and remand to FERC.

## STATEMENT REGARDING ORAL ARGUMENT

Petitioners respectfully request oral argument given the complex nature of the case and its significant ramifications for the public, and that the Court hold

argument during its 2025-2026 term if practicable.  *See* ECF No. 315-1 at 10.

Respectfully submitted,

*/s/ Danielle C. Fidler*
Danielle C. Fidler
Veronica Saltzman
Clean Air Task Force
114 State Street, 6th Floor
Boston, MA 02109
Phone: 202-285-0926
Email: dfidler@catf.us

Alexander Tom
Ada Statler
Earthjustice
180 Steuart St. #194330
San Francisco, CA 94105
Phone: 415-217-2111
Email: atom@earthjustice.org

Linnet Davis-Stermitz
Earthjustice
810 Third Avenue, Suite 610
Seattle, WA 98104
Phone: 206-343-7340
Email: ldavisstermitz@earthjustice.org

Caroline Reiser
Natural Resources Defense Council
1152 15th Street NW, Suite 300
Washington, DC 20005
Phone: 202-717-8341
Email: creiser@nrdc.org

*Counsel for Natural Resources Defense Council*

William S. Scherman
Jeremy C. Marwell
Jeffrey M. Jakubiak
Vinson & Elkins LLP
2200 Pennsylvania Avenue, NW
Suite 500 West
Washington, DC  20037
Phone: 202-639-6507
Email: jmarwell@velaw.com

Garrett T. Meisman
845 Texas Avenue
Suite 4700
Houston, Texas 77002
Phone: 713-758-2559
Email: gmeisman@velaw.com

*Counsel for Invenergy Solar Development North America LLC, Invenergy Thermal Development LLC, Invenergy Wind Development North America LLC, and Invenergy Transmission LLC*

Nicholas J. Guidi
Southern Environmental Law Center
122 C Street NW, Suite 325
Washington, DC 20001
Phone: 202-573-8136
Email: nguidi@selc.org

*Counsel for Appalachian Voices, Energy Alabama, North Carolina Sustainable Energy Association, Southern Alliance for Clean Energy, and South Carolina Coastal Conservation League*

Justin Vickers
Sierra Club
1229 W Glenlake Ave
Chicago, IL 60660
Phone: 224-420-0614
justin.vickers@sierraclub.org

*Counsel for Sierra Club*


Ted Kelly
Adam Kurland
Environmental Defense Fund
555 12th Street, N.W., Suite 400
Washington, DC 20004
Phone: 202-572-3317
Email: tekelly@edf.org

*Counsel for Environmental Defense Fund*

Dated: March 13, 2026

**CERTIFICATE OF COMPLIANCE**

Pursuant to Fed. R. App. P. 32(g), I certify that this filing complies with the type-volume limitation of this Court's July 28, 2025 Order because this document contains 12,899 words, excluding the parts exempted by Fed. R. App. P. 32(f).

I further certify that this filing complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this filing has been prepared using a proportionally spaced typeface in Microsoft Word 365 using Times New Roman 14-point.

/s/ Danielle C. Fidler
Danielle C. Fidler
Clean Air Task Force
114 State Street, 6th Floor
Boston, MA 02109
Phone: 617-624-0234
Email: dfidler@catf.us

Dated: March 13, 2026

## CERTIFICATE OF SERVICE

I hereby certify that on March 13, 2026, I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the District of Columbia Circuit through this Court's CM/ECF system, which will serve a copy of the on all registered users.

/s/ *Alexander Tom*
Alexander Tom
Earthjustice
180 Steuart St. #194330
San Francisco, CA 94105
Phone: 415-217-2111
Email: atom@earthjustice.org

Dated: March 13, 2026

65

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __24-1650__      Caption: __Appalachian Voices et al. v. Federal Energy Regulatory Commission__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Appalachian Voices__
(name of party/amicus)

_____

who is _____Petitioner_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.  Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2.  Does party/amicus have any parent corporations?  ☐ YES ☑ NO
    If yes, identify all parent corporations, including all generations of parent corporations:

3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO
    If yes, identify all such owners:

12/01/2019 SCC                          - 1 -

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Nicholas J. Guidi                          Date:        08/29/2025

Counsel for: Appalachian Voices

- 2 -

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. _24-1650_        Caption:  Appalachian Voices et al. v. Federal Energy Regulatory Commission

Pursuant to FRAP 26.1 and Local Rule 26.1,

Energy Alabama
(name of party/amicus)

who is _____Petitioner_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO

2.    Does party/amicus have any parent corporations?                                       ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                                                       ☐YES ☑NO
      If yes, identify all such owners:

12/01/2019 SCC                                    - 1 -

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question) ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Nicholas J. Guidi                          Date: 08/29/2025

Counsel for: Energy Alabama

- 2 -

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __24-1650__      Caption: __Appalachian Voices v. FERC (consolidated)__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Environmental Defense Fund__
(name of party/amicus)

_____

 who is _____Petitioner_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO

2. Does party/amicus have any parent corporations?  ☐YES ☑NO
   If yes, identify all parent corporations, including all generations of parent corporations:

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐YES ☑NO
   If yes, identify all such owners:

12/01/2019 SCC                                                    - 1 -

4.     Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?     ☐YES ☑NO
If yes, identify entity and nature of interest:

5.     Is party a trade association? (amici curiae do not complete this question)     ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.     Does this case arise out of a bankruptcy proceeding?     ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.     Is this a criminal case in which there was an organizational victim?     ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: __Theodore Kelly_____     Date: _____8/28/2025_____

Counsel for: __Environmental Defense Fund_____

- 2 -

<div style="border:1px solid;display:inline-block;padding:4px;">**Print to PDF for Filing**</div>

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __24-1756__      Caption: __Invenergy Solar Development North America LLC v. FERC__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Invenergy Solar Development North America LLC__
(name of party/amicus)

_____

 who is _____Petitioner_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity? ☐ YES ☑ NO

2. Does party/amicus have any parent corporations? ☑ YES ☐ NO
   If yes, identify all parent corporations, including all generations of parent corporations:

   > Invenergy Solar Development North America LLC is a privately held subsidiary of Invenergy Renewables LLC, Invenergy Renewables Holdings LLC, Invenergy IRH Holdings LLC, IIC Renewables Holdings LLC, Invenergy Investment Company LLC, Invenergy Investment Holdings LLC, Polsky Energy Investments LLC, and Polsky Energy Holdings LLC.

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? ☐ YES ☑ NO
   If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Jeremy C. Marwell                    Date:          8/29/2025

Counsel for: Invenergy Solar Development North America LLC

- 2 -

[ Print to PDF for Filing ]

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __24-1756__     Caption: __Invenergy Solar Development North America LLC v. FERC__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Invenergy Thermal Development LLC__
(name of party/amicus)

_____

 who is _____Petitioner_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO

2.    Does party/amicus have any parent corporations?                ☑YES ☐NO
      If yes, identify all parent corporations, including all generations of parent corporations:

      Invenergy Thermal Development LLC is a privately held limited liability company with parent entities Invenergy Thermal Global LLC, Invenergy Energy Transition LLC, Invenergy Investment Company LLC, Invenergy Investment Holdings LLC, Polsky Energy Investments LLC, and Polsky Energy Holdings LLC.

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                         ☐YES ☑NO
      If yes, identify all such owners:

12/01/2019 SCC                        - 1 -

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Jeremy C. Marwell          Date:          8/29/2025

Counsel for: Invenergy Thermal Development LLC

- 2 -

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __24-1756__         Caption: __Invenergy Solar Development North America LLC v. FERC__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Invenergy Transmission LLC__
(name of party/amicus)

_____

 who is _____Petitioner_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.     Is party/amicus a publicly held corporation or other publicly held entity?     ☐YES ☑NO

2.     Does party/amicus have any parent corporations?     ☑YES ☐NO
       If yes, identify all parent corporations, including all generations of parent corporations:

       Invenergy Transmission LLC is a privately held subsidiary of Invenergy Renewables LLC, Invenergy Renewables Holdings LLC, Invenergy IRH Holdings LLC, IIC Renewables Holdings LLC, Invenergy Investment Company LLC, Invenergy Investment Holdings LLC, Polsky Energy Investments LLC, and Polsky Energy Holdings LLC.

3.     Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?     ☐YES ☑NO
       If yes, identify all such owners:

12/01/2019 SCC                                    - 1 -

4.   Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?   ☐YES ☑NO
     If yes, identify entity and nature of interest:

5.   Is party a trade association? (amici curiae do not complete this question)   ☐YES ☑NO
     If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.   Does this case arise out of a bankruptcy proceeding?   ☐YES ☑NO
     If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.   Is this a criminal case in which there was an organizational victim?   ☐YES ☑NO
     If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Jeremy C. Marwell     Date: 8/29/2025

Counsel for: Invenergy Transmission LLC

- 2 -

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __24-1756__        Caption: __Invenergy Solar Development North America LLC v. FERC__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Invenergy Wind Development North America LLC__
(name of party/amicus)

_____

 who is _____Petitioner_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?    ☑ YES ☐ NO
      If yes, identify all parent corporations, including all generations of parent corporations:

      Invenergy Wind Development North America LLC is a privately held subsidiary of Invenergy Renewables LLC, Invenergy Renewables Holdings LLC, Invenergy IRH Holdings LLC, IIC Renewables Holdings LLC, Invenergy Investment Company LLC, Invenergy Investment Holdings LLC, Polsky Energy Investments LLC, and Polsky Energy Holdings LLC.

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO
      If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?    ☐ YES ☑ NO
      If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐ YES ☑ NO
      If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    ☐ YES ☑ NO
      If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.    Is this a criminal case in which there was an organizational victim?    ☐ YES ☑ NO
      If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Jeremy C. Marwell                           Date:          8/29/2025

Counsel for: Invenergy Wind Development North America LLC

- 2 -

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __24-1650__        Caption: __Appalachian Voices, et al v. FERC__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Natural Resources Defense Council__
(name of party/amicus)

_____

who is _____petitioner_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO

2.    Does party/amicus have any parent corporations?                    ☐YES ☑NO
       If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                    ☐YES ☑NO
       If yes, identify all such owners:

12/01/2019 SCC                                - 1 -

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature:  /s/ Veronica Saltzman                Date:          08/27/2025

Counsel for:  Natural Resources Defense Council

- 2 -

[ Print to PDF for Filing ]    [ Reset Form ]

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __24-1650__      Caption: __Appalachian Voices et al. v. Federal Energy Regulatory Commission__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__North Carolina Sustainable Energy Association__
(name of party/amicus)

_____

who is _____Petitioner_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.  Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO

2.  Does party/amicus have any parent corporations?  ☐YES ☑NO
    If yes, identify all parent corporations, including all generations of parent corporations:

3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐YES ☑NO
    If yes, identify all such owners:

12/01/2019 SCC                    - 1 -

4.     Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
If yes, identify entity and nature of interest:

5.     Is party a trade association? (amici curiae do not complete this question) ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.     Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.     Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Nicholas J. Guidi        Date: 08/29/2025

Counsel for: NC Sustainable Energy Association

- 2 -

[ **Print to PDF for Filing** ]

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

## DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 24-1650          Caption: Appalachian Voices v. FERC et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Sierra Club
(name of party/amicus)


who is _____ petitioner _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.   Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2.   Does party/amicus have any parent corporations?                              ☐ YES ☑ NO
     If yes, identify all parent corporations, including all generations of parent corporations:




3.   Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
     other publicly held entity?                                                  ☐ YES ☑ NO
     If yes, identify all such owners:




12/01/2019 SCC                          - 1 -

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐ YES ☑ NO
If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐ YES ☑ NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐ YES ☑ NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? ☐ YES ☑ NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Justin Vickers

Date: August 26, 2025

Counsel for: Sierra Club

- 2 -

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. __24-1650__          Caption:  Appalachian Voices et al. v. Federal Energy Regulatory Commission

Pursuant to FRAP 26.1 and Local Rule 26.1,

Southern Alliance for Clean Energy
(name of party/amicus)


who is _____Petitioner_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.      Is party/amicus a publicly held corporation or other publicly held entity?   ☐YES ☑NO


2.      Does party/amicus have any parent corporations?                              ☐YES ☑NO
        If yes, identify all parent corporations, including all generations of parent corporations:


3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                                        ☐YES ☑NO
        If yes, identify all such owners:


12/01/2019 SCC                              - 1 -

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Nicholas J. Guidi                Date: 08/29/2025

Counsel for: Southern Alliance for Clean Energy

- 2 -

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __24-1650__      Caption: Appalachian Voices et al. v. Federal Energy Regulatory Commission

Pursuant to FRAP 26.1 and Local Rule 26.1,

South Carolina Coastal Conservation League
(name of party/amicus)


who is _____Petitioner_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.  Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO


2.  Does party/amicus have any parent corporations?  ☐YES ☑NO
    If yes, identify all parent corporations, including all generations of parent corporations:


3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐YES ☑NO
    If yes, identify all such owners:


12/01/2019 SCC                          - 1 -

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Nicholas J. Guidi                    Date:        08/29/2025

Counsel for: SC Coastal Conservation League

- 2 -

[ Print to PDF for Filing ]

# ADDENDUM

## GLOSSARY AND STATUTES

# TABLE OF CONTENTS

**GLOSSARY**…………………………………..…..………………………….……A-01

**STATUTES**

    5 U.S.C. § 706…………………………………..………..……………………...A-03

    16 U.S.C. § 824e…..………………………………………………………A-04

    16 U.S.C. § 825*l*………...……………………………………………………A-07

    28 U.S.C. § 2112……..………………………………………………………A-09

## Glossary

| | |
|---|---|
| **FERC** | Federal Energy Regulatory Commission |
| **HVDC** | High-voltage, direct current transmission facilities |
| **Invenergy or Invenergy Petitioners** | Invenergy Solar Development North America LLC, Invenergy Thermal Development LLC, Invenergy Wind Development North America LLC, and Invenergy Transmission LLC |
| **NOPR** | JA139, *Building for the Future Through Electric Regional Transmission Planning and Cost Allocation and Generator Interconnection*, 179 FERC ¶ 61,028 (2022) |
| **Order 1000** | *Transmission Planning and Cost Allocation by Transmission Owning and Operating Public Utilities*, 136 FERC ¶ 61,051 (2011) |
| **Order 1920** | JA615, *Building for the Future Through Electric Regional Transmission Planning and Cost Allocation*, 187 FERC ¶ 61,068 (2024) |
| **Order 1920-A** | JA1979, *Order Addressing Arguments Raised on Rehearing, Setting Aside Prior Order, in Part, and Granting Clarification*, 189 FERC ¶ 61,126 (2024) |
| **Order 1920 Planning** | Multi-step planning process that requires transmission providers to (1) forecast transmission needs over a 20-year forward period based on a minimum set of seven "factors" or assumptions that drive transmission demand, including economic conditions, technological advancements, or political changes, (2) use this forecast to develop three "reasonably probable" scenarios of future supply and demand that also reflect "uncertain operational outcomes," such as extreme weather or security events, and identify the |

A-01

longterm transmission needs for each scenario; (3) identify transmission solutions to meet the needs of each scenario by considering the multiple benefits associated with those solutions over a minimum 20-year period, (4) select projects that aim to maximize benefits over time without overbuilding transmission facilities; and (5) allocate the costs for chosen projects in coordination with state entities.

| | |
|---|---|
| **Petitioners** | Public Interest Organizations and Invenergy Petitioners |
| **PIOs** | Public Interest Organizations, including Appalachian Voices, Energy Alabama, Environmental Defense Fund, Natural Resources Defense Council, North Carolina Sustainable Energy Association, Sierra Club, Southern Alliance for Clean Energy, and South Carolina Coastal Conservation League |
| **Transmission Providers** | A public utility (including regional grid operators) that owns, controls, or operates facilities used for the transmission of electric energy in interstate commerce and provides transmission service |

A-02

vides that the action meanwhile is inoperative, for an appeal to superior agency authority.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 392.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ................. | 5 U.S.C. 1009(c). | June 11, 1946, ch. 324, §10(c), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

## § 705. Relief pending review

When an agency finds that justice so requires, it may postpone the effective date of action taken by it, pending judicial review. On such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court, including the court to which a case may be taken on appeal from or on application for certiorari or other writ to a reviewing court, may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 393.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ................. | 5 U.S.C. 1009(d). | June 11, 1946, ch. 324, §10(d), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

## § 706. Scope of review

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 393.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ................. | 5 U.S.C. 1009(e). | June 11, 1946, ch. 324, §10(e), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

### Statutory Notes and Related Subsidiaries

ABBREVIATION OF RECORD

Pub. L. 85–791, Aug. 28, 1958, 72 Stat. 941, which authorized abbreviation of record on review or enforcement of orders of administrative agencies and review on the original papers, provided, in section 35 thereof, that: "This Act [see Tables for classification] shall not be construed to repeal or modify any provision of the Administrative Procedure Act [see Short Title note set out preceding section 551 of this title]."

## CHAPTER 8—CONGRESSIONAL REVIEW OF AGENCY RULEMAKING

Sec.
801. Congressional review.
802. Congressional disapproval procedure.
803. Special rule on statutory, regulatory, and judicial deadlines.
804. Definitions.
805. Judicial review.
806. Applicability; severability.
807. Exemption for monetary policy.
808. Effective date of certain rules.

## § 801. Congressional review

(a)(1)(A) Before a rule can take effect, the Federal agency promulgating such rule shall submit to each House of the Congress and to the Comptroller General a report containing—

(i) a copy of the rule;

(ii) a concise general statement relating to the rule, including whether it is a major rule; and

(iii) the proposed effective date of the rule.

(B) On the date of the submission of the report under subparagraph (A), the Federal agency promulgating the rule shall submit to the Comptroller General and make available to each House of Congress—

(i) a complete copy of the cost-benefit analysis of the rule, if any;

(ii) the agency's actions relevant to sections 603, 604, 605, 607, and 609;

(iii) the agency's actions relevant to sections 202, 203, 204, and 205 of the Unfunded Mandates Reform Act of 1995; and

(iv) any other relevant information or requirements under any other Act and any relevant Executive orders.

(C) Upon receipt of a report submitted under subparagraph (A), each House shall provide copies of the report to the chairman and ranking member of each standing committee with jurisdiction under the rules of the House of Representatives or the Senate to report a bill to amend the provision of law under which the rule is issued.

(D) For any rule submitted under subparagraph (A), if the Federal agency promulgating

(B) cease any practice in connection with the clause,

if such clause or practice does not result in the economical purchase and use of fuel, electric energy, or other items, the cost of which is included in any rate schedule under an automatic adjustment clause.

(4) As used in this subsection, the term "automatic adjustment clause" means a provision of a rate schedule which provides for increases or decreases (or both), without prior hearing, in rates reflecting increases or decreases (or both) in costs incurred by an electric utility. Such term does not include any rate which takes effect subject to refund and subject to a later determination of the appropriate amount of such rate.

(June 10, 1920, ch. 285, pt. II, § 205, as added Aug. 26, 1935, ch. 687, title II, § 213, 49 Stat. 851; amended Pub. L. 95–617, title II, §§ 207(a), 208, Nov. 9, 1978, 92 Stat. 3142.)

AMENDMENTS

1978—Subsec. (d). Pub. L. 95–617, § 207(a), substituted "sixty" for "thirty" in two places.

Subsec. (f). Pub. L. 95–617, § 208, added subsec. (f).

STUDY OF ELECTRIC RATE INCREASES UNDER FEDERAL POWER ACT

Section 207(b) of Pub. L. 95–617 directed chairman of Federal Energy Regulatory Commission, in consultation with Secretary, to conduct a study of legal requirements and administrative procedures involved in consideration and resolution of proposed wholesale electric rate increases under Federal Power Act, section 791a et seq. of this title, for purposes of providing for expeditious handling of hearings consistent with due process, preventing imposition of successive rate increases before they have been determined by Commission to be just and reasonable and otherwise lawful, and improving procedures designed to prohibit anti-competitive or unreasonable differences in wholesale and retail rates, or both, and that chairman report to Congress within nine months from Nov. 9, 1978, on results of study, on administrative actions taken as a result of this study, and on any recommendations for changes in existing law that will aid purposes of this section.

## § 824e. Power of Commission to fix rates and charges; determination of cost of production or transmission

### (a) Unjust or preferential rates, etc.; statement of reasons for changes; hearing; specification of issues

Whenever the Commission, after a hearing held upon its own motion or upon complaint, shall find that any rate, charge, or classification, demanded, observed, charged, or collected by any public utility for any transmission or sale subject to the jurisdiction of the Commission, or that any rule, regulation, practice, or contract affecting such rate, charge, or classification is unjust, unreasonable, unduly discriminatory or preferential, the Commission shall determine the just and reasonable rate, charge, classification, rule, regulation, practice, or contract to be thereafter observed and in force, and shall fix the same by order. Any complaint or motion of the Commission to initiate a proceeding under this section shall state the change or changes to be made in the rate, charge, classification, rule, regulation, practice, or contract then in force, and the reasons for any proposed change or changes therein. If, after review of any motion or complaint and answer, the Commission shall decide to hold a hearing, it shall fix by order the time and place of such hearing and shall specify the issues to be adjudicated.

### (b) Refund effective date; preferential proceedings; statement of reasons for delay; burden of proof; scope of refund order; refund orders in cases of dilatory behavior; interest

Whenever the Commission institutes a proceeding under this section, the Commission shall establish a refund effective date. In the case of a proceeding instituted on complaint, the refund effective date shall not be earlier than the date of the filing of such complaint nor later than 5 months after the filing of such complaint. In the case of a proceeding instituted by the Commission on its own motion, the refund effective date shall not be earlier than the date of the publication by the Commission of notice of its intention to initiate such proceeding nor later than 5 months after the publication date. Upon institution of a proceeding under this section, the Commission shall give to the decision of such proceeding the same preference as provided under section 824d of this title and otherwise act as speedily as possible. If no final decision is rendered by the conclusion of the 180-day period commencing upon initiation of a proceeding pursuant to this section, the Commission shall state the reasons why it has failed to do so and shall state its best estimate as to when it reasonably expects to make such decision. In any proceeding under this section, the burden of proof to show that any rate, charge, classification, rule, regulation, practice, or contract is unjust, unreasonable, unduly discriminatory, or preferential shall be upon the Commission or the complainant. At the conclusion of any proceeding under this section, the Commission may order refunds of any amounts paid, for the period subsequent to the refund effective date through a date fifteen months after such refund effective date, in excess of those which would have been paid under the just and reasonable rate, charge, classification, rule, regulation, practice, or contract which the Commission orders to be thereafter observed and in force: *Provided*, That if the proceeding is not concluded within fifteen months after the refund effective date and if the Commission determines at the conclusion of the proceeding that the proceeding was not resolved within the fifteen-month period primarily because of dilatory behavior by the public utility, the Commission may order refunds of any or all amounts paid for the period subsequent to the refund effective date and prior to the conclusion of the proceeding. The refunds shall be made, with interest, to those persons who have paid those rates or charges which are the subject of the proceeding.

### (c) Refund considerations; shifting costs; reduction in revenues; "electric utility companies" and "registered holding company" defined

Notwithstanding subsection (b) of this section, in a proceeding commenced under this section involving two or more electric utility companies

of a registered holding company, refunds which might otherwise be payable under subsection (b) of this section shall not be ordered to the extent that such refunds would result from any portion of a Commission order that (1) requires a decrease in system production or transmission costs to be paid by one or more of such electric companies; and (2) is based upon a determination that the amount of such decrease should be paid through an increase in the costs to be paid by other electric utility companies of such registered holding company: *Provided*, That refunds, in whole or in part, may be ordered by the Commission if it determines that the registered holding company would not experience any reduction in revenues which results from an inability of an electric utility company of the holding company to recover such increase in costs for the period between the refund effective date and the effective date of the Commission's order. For purposes of this subsection, the terms ''electric utility companies'' and ''registered holding company'' shall have the same meanings as provided in the Public Utility Holding Company Act of 1935, as amended.[1]

**(d) Investigation of costs**

The Commission upon its own motion, or upon the request of any State commission whenever it can do so without prejudice to the efficient and proper conduct of its affairs, may investigate and determine the cost of the production or transmission of electric energy by means of facilities under the jurisdiction of the Commission in cases where the Commission has no authority to establish a rate governing the sale of such energy.

**(e) Short-term sales**

(1) In this subsection:

(A) The term ''short-term sale'' means an agreement for the sale of electric energy at wholesale in interstate commerce that is for a period of 31 days or less (excluding monthly contracts subject to automatic renewal).

(B) The term ''applicable Commission rule'' means a Commission rule applicable to sales at wholesale by public utilities that the Commission determines after notice and comment should also be applicable to entities subject to this subsection.

(2) If an entity described in section 824(f) of this title voluntarily makes a short-term sale of electric energy through an organized market in which the rates for the sale are established by Commission-approved tariff (rather than by contract) and the sale violates the terms of the tariff or applicable Commission rules in effect at the time of the sale, the entity shall be subject to the refund authority of the Commission under this section with respect to the violation.

(3) This section shall not apply to—

(A) any entity that sells in total (including affiliates of the entity) less than 8,000,000 megawatt hours of electricity per year; or

(B) an electric cooperative.

(4)(A) The Commission shall have refund authority under paragraph (2) with respect to a voluntary short term sale of electric energy by

_____
[1] See References in Text note below.

the Bonneville Power Administration only if the sale is at an unjust and unreasonable rate.

(B) The Commission may order a refund under subparagraph (A) only for short-term sales made by the Bonneville Power Administration at rates that are higher than the highest just and reasonable rate charged by any other entity for a short-term sale of electric energy in the same geographic market for the same, or most nearly comparable, period as the sale by the Bonneville Power Administration.

(C) In the case of any Federal power marketing agency or the Tennessee Valley Authority, the Commission shall not assert or exercise any regulatory authority or power under paragraph (2) other than the ordering of refunds to achieve a just and reasonable rate.

(June 10, 1920, ch. 285, pt. II, § 206, as added Aug. 26, 1935, ch. 687, title II, § 213, 49 Stat. 852; amended Pub. L. 100–473, § 2, Oct. 6, 1988, 102 Stat. 2299; Pub. L. 109–58, title XII, §§ 1285, 1286, 1295(b), Aug. 8, 2005, 119 Stat. 980, 981, 985.)

REFERENCES IN TEXT

The Public Utility Holding Company Act of 1935, referred to in subsec. (c), is title I of act Aug. 26, 1935, ch. 687, 49 Stat. 803, as amended, which was classified generally to chapter 2C (§ 79 et seq.) of Title 15, Commerce and Trade, prior to repeal by Pub. L. 109–58, title XII, § 1263, Aug. 8, 2005, 119 Stat. 974. For complete classification of this Act to the Code, see Tables.

AMENDMENTS

2005—Subsec. (a). Pub. L. 109–58, § 1295(b)(1), substituted ''hearing held'' for ''hearing had'' in first sentence.

Subsec. (b). Pub. L. 109–58, § 1295(b)(2), struck out ''the public utility to make'' before ''refunds of any amounts paid'' in seventh sentence.

Pub. L. 109–58, § 1285, in second sentence, substituted ''the date of the filing of such complaint nor later than 5 months after the filing of such complaint'' for ''the date 60 days after the filing of such complaint nor later than 5 months after the expiration of such 60-day period'', in third sentence, substituted ''the date of the publication'' for ''the date 60 days after the publication'' and ''5 months after the publication date'' for ''5 months after the expiration of such 60-day period'', and in fifth sentence, substituted ''If no final decision is rendered by the conclusion of the 180-day period commencing upon initiation of a proceeding pursuant to this section, the Commission shall state the reasons why it has failed to do so and shall state its best estimate as to when it reasonably expects to make such decision'' for ''If no final decision is rendered by the refund effective date or by the conclusion of the 180-day period commencing upon initiation of a proceeding pursuant to this section, whichever is earlier, the Commission shall state the reasons why it has failed to do so and shall state its best estimate as to when it reasonably expects to make such decision''.

Subsec. (e). Pub. L. 109–58, § 1286, added subsec. (e).

1988—Subsec. (a). Pub. L. 100–473, § 2(1), inserted provisions for a statement of reasons for listed changes, hearings, and specification of issues.

Subsecs. (b) to (d). Pub. L. 100–473, § 2(2), added subsecs. (b) and (c) and redesignated former subsec. (b) as (d).

EFFECTIVE DATE OF 1988 AMENDMENT

Section 4 of Pub. L. 100–473 provided that: ''The amendments made by this Act [amending this section] are not applicable to complaints filed or motions initiated before the date of enactment of this Act [Oct. 6, 1988] pursuant to section 206 of the Federal Power Act [this section]: *Provided, however*, That such complaints may be withdrawn and refiled without prejudice.''

A-05

LIMITATION ON AUTHORITY PROVIDED

Section 3 of Pub. L. 100–473 provided that: ''Nothing in subsection (c) of section 206 of the Federal Power Act, as amended (16 U.S.C. 824e(c)) shall be interpreted to confer upon the Federal Energy Regulatory Commission any authority not granted to it elsewhere in such Act [16 U.S.C. 791a et seq.] to issue an order that (1) requires a decrease in system production or transmission costs to be paid by one or more electric utility companies of a registered holding company; and (2) is based upon a determination that the amount of such decrease should be paid through an increase in the costs to be paid by other electric utility companies of such registered holding company. For purposes of this section, the terms 'electric utility companies' and 'registered holding company' shall have the same meanings as provided in the Public Utility Holding Company Act of 1935, as amended [15 U.S.C. 79 et seq.].''

STUDY

Section 5 of Pub. L. 100–473 directed that, no earlier than three years and no later than four years after Oct. 6, 1988, Federal Energy Regulatory Commission perform a study of effect of amendments to this section, analyzing (1) impact, if any, of such amendments on cost of capital paid by public utilities, (2) any change in average time taken to resolve proceedings under this section, and (3) such other matters as Commission may deem appropriate in public interest, with study to be sent to Committee on Energy and Natural Resources of Senate and Committee on Energy and Commerce of House of Representatives.

### § 824f. Ordering furnishing of adequate service

Whenever the Commission, upon complaint of a State commission, after notice to each State commission and public utility affected and after opportunity for hearing, shall find that any interstate service of any public utility is inadequate or insufficient, the Commission shall determine the proper, adequate, or sufficient service to be furnished, and shall fix the same by its order, rule, or regulation: *Provided*, That the Commission shall have no authority to compel the enlargement of generating facilities for such purposes, nor to compel the public utility to sell or exchange energy when to do so would impair its ability to render adequate service to its customers.

(June 10, 1920, ch. 285, pt. II, § 207, as added Aug. 26, 1935, ch. 687, title II, § 213, 49 Stat. 853.)

### § 824g. Ascertainment of cost of property and depreciation

#### (a) Investigation of property costs

The Commission may investigate and ascertain the actual legitimate cost of the property of every public utility, the depreciation therein, and, when found necessary for rate-making purposes, other facts which bear on the determination of such cost or depreciation, and the fair value of such property.

#### (b) Request for inventory and cost statements

Every public utility upon request shall file with the Commission an inventory of all or any part of its property and a statement of the original cost thereof, and shall keep the Commission informed regarding the cost of all additions, betterments, extensions, and new construction.

(June 10, 1920, ch. 285, pt. II, § 208, as added Aug. 26, 1935, ch. 687, title II, § 213, 49 Stat. 853.)

### § 824h. References to State boards by Commission

#### (a) Composition of boards; force and effect of proceedings

The Commission may refer any matter arising in the administration of this subchapter to a board to be composed of a member or members, as determined by the Commission, from the State or each of the States affected or to be affected by such matter. Any such board shall be vested with the same power and be subject to the same duties and liabilities as in the case of a member of the Commission when designated by the Commission to hold any hearings. The action of such board shall have such force and effect and its proceedings shall be conducted in such manner as the Commission shall by regulations prescribe. The board shall be appointed by the Commission from persons nominated by the State commission of each State affected or by the Governor of such State if there is no State commission. Each State affected shall be entitled to the same number of representatives on the board unless the nominating power of such State waives such right. The Commission shall have discretion to reject the nominee from any State, but shall thereupon invite a new nomination from that State. The members of a board shall receive such allowances for expenses as the Commission shall provide. The Commission may, when in its discretion sufficient reason exists therefor, revoke any reference to such a board.

#### (b) Cooperation with State commissions

The Commission may confer with any State commission regarding the relationship between rate structures, costs, accounts, charges, practices, classifications, and regulations of public utilities subject to the jurisdiction of such State commission and of the Commission; and the Commission is authorized, under such rules and regulations as it shall prescribe, to hold joint hearings with any State commission in connection with any matter with respect to which the Commission is authorized to act. The Commission is authorized in the administration of this chapter to avail itself of such cooperation, services, records, and facilities as may be afforded by any State commission.

#### (c) Availability of information and reports to State commissions; Commission experts

The Commission shall make available to the several State commissions such information and reports as may be of assistance in State regulation of public utilities. Whenever the Commission can do so without prejudice to the efficient and proper conduct of its affairs, it may upon request from a State make available to such State as witnesses any of its trained rate, valuation, or other experts, subject to reimbursement to the Commission by such State of the compensation and traveling expenses of such witnesses. All sums collected hereunder shall be credited to the appropriation from which the amounts were expended in carrying out the provisions of this subsection.

(June 10, 1920, ch. 285, pt. II, § 209, as added Aug. 26, 1935, ch. 687, title II, § 213, 49 Stat. 853.)

A-06

not otherwise subject to the jurisdiction of the Commission, including the generation, transmission, distribution, and sale of electric energy by any agency, authority, or instrumentality of the United States, or of any State or municipality or other political subdivision of a State. It shall, so far as practicable, secure and keep current information regarding the ownership, operation, management, and control of all facilities for such generation, transmission, distribution, and sale; the capacity and output thereof and the relationship between the two; the cost of generation, transmission, and distribution; the rates, charges, and contracts in respect of the sale of electric energy and its service to residential, rural, commercial, and industrial consumers and other purchasers by private and public agencies; and the relation of any or all such facts to the development of navigation, industry, commerce, and the national defense. The Commission shall report to Congress the results of investigations made under authority of this section.

(June 10, 1920, ch. 285, pt. III, § 311, as added Aug. 26, 1935, ch. 687, title II, § 213, 49 Stat. 859.)

## § 825k. Publication and sale of reports

The Commission may provide for the publication of its reports and decisions in such form and manner as may be best adapted for public information and use, and is authorized to sell at reasonable prices copies of all maps, atlases, and reports as it may from time to time publish. Such reasonable prices may include the cost of compilation, composition, and reproduction. The Commission is also authorized to make such charges as it deems reasonable for special statistical services and other special or periodic services. The amounts collected under this section shall be deposited in the Treasury to the credit of miscellaneous receipts. All printing for the Federal Power Commission making use of engraving, lithography, and photolithography, together with the plates for the same, shall be contracted for and performed under the direction of the Commission, under such limitations and conditions as the Joint Committee on Printing may from time to time prescribe, and all other printing for the Commission shall be done by the Director of the Government Publishing Office under such limitations and conditions as the Joint Committee on Printing may from time to time prescribe. The entire work may be done at, or ordered through, the Government Publishing Office whenever, in the judgment of the Joint Committee on Printing, the same would be to the interest of the Government: *Provided*, That when the exigencies of the public service so require, the Joint Committee on Printing may authorize the Commission to make immediate contracts for engraving, lithographing, and photolithographing, without advertisement for proposals: *Provided further*, That nothing contained in this chapter or any other Act shall prevent the Federal Power Commission from placing orders with other departments or establishments for engraving, lithographing, and photolithographing, in accordance with the provisions of sections 1535 and 1536 of title 31, providing for interdepartmental work.

(June 10, 1920, ch. 285, pt. III, § 312, as added Aug. 26, 1935, ch. 687, title II, § 213, 49 Stat. 859; amended Pub. L. 113–235, div. H, title I, § 1301(b), (d), Dec. 16, 2014, 128 Stat. 2537.)

### Editorial Notes

#### CODIFICATION

"Sections 1535 and 1536 of title 31" substituted in text for "sections 601 and 602 of the Act of June 30, 1932 (47 Stat. 417 [31 U.S.C. 686, 686b])" on authority of Pub. L. 97–258, § 4(b), Sept. 13, 1982, 96 Stat. 1067, the first section of which enacted Title 31, Money and Finance.

### Statutory Notes and Related Subsidiaries

#### CHANGE OF NAME

"Director of the Government Publishing Office" substituted for "Public Printer" in text on authority of section 1301(d) of Pub. L. 113–235, set out as a note under section 301 of Title 44, Public Printing and Documents.

"Government Publishing Office" substituted for "Government Printing Office" in text on authority of section 1301(b) of Pub. L. 113–235, set out as a note preceding section 301 of Title 44, Public Printing and Documents.

## § 825*l*. Review of orders

### (a) Application for rehearing; time periods; modification of order

Any person, electric utility, State, municipality, or State commission aggrieved by an order issued by the Commission in a proceeding under this chapter to which such person, electric utility, State, municipality, or State commission is a party may apply for a rehearing within thirty days after the issuance of such order. The application for rehearing shall set forth specifically the ground or grounds upon which such application is based. Upon such application the Commission shall have power to grant or deny rehearing or to abrogate or modify its order without further hearing. Unless the Commission acts upon the application for rehearing within thirty days after it is filed, such application may be deemed to have been denied. No proceeding to review any order of the Commission shall be brought by any entity unless such entity shall have made application to the Commission for a rehearing thereon. Until the record in a proceeding shall have been filed in a court of appeals, as provided in subsection (b), the Commission may at any time, upon reasonable notice and in such manner as it shall deem proper, modify or set aside, in whole or in part, any finding or order made or issued by it under the provisions of this chapter.

### (b) Judicial review

Any party to a proceeding under this chapter aggrieved by an order issued by the Commission in such proceeding may obtain a review of such order in the United States court of appeals for any circuit wherein the licensee or public utility to which the order relates is located or has its principal place of business, or in the United States Court of Appeals for the District of Columbia, by filing in such court, within sixty days after the order of the Commission upon the application for rehearing, a written petition praying that the order of the Commission be

modified or set aside in whole or in part. A copy of such petition shall forthwith be transmitted by the clerk of the court to any member of the Commission and thereupon the Commission shall file with the court the record upon which the order complained of was entered, as provided in section 2112 of title 28. Upon the filing of such petition such court shall have jurisdiction, which upon the filing of the record with it shall be exclusive, to affirm, modify, or set aside such order in whole or in part. No objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission in the application for rehearing unless there is reasonable ground for failure so to do. The finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive. If any party shall apply to the court for leave to adduce additional evidence, and shall show to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for failure to adduce such evidence in the proceedings before the Commission, the court may order such additional evidence to be taken before the Commission and to be adduced upon the hearing in such manner and upon such terms and conditions as to the court may seem proper. The Commission may modify its findings as to the facts by reason of the additional evidence so taken, and it shall file with the court such modified or new findings which, if supported by substantial evidence, shall be conclusive, and its recommendation, if any, for the modification or setting aside of the original order. The judgment and decree of the court, affirming, modifying, or setting aside, in whole or in part, any such order of the Commission, shall be final, subject to review by the Supreme Court of the United States upon certiorari or certification as provided in section 1254 of title 28.

**(c) Stay of Commission's order**

The filing of an application for rehearing under subsection (a) shall not, unless specifically ordered by the Commission, operate as a stay of the Commission's order. The commencement of proceedings under subsection (b) of this section shall not, unless specifically ordered by the court, operate as a stay of the Commission's order.

(June 10, 1920, ch. 285, pt. III, § 313, as added Aug. 26, 1935, ch. 687, title II, § 213, 49 Stat. 860; amended June 25, 1948, ch. 646, § 32(a), 62 Stat. 991; May 24, 1949, ch. 139, § 127, 63 Stat. 107; Pub. L. 85–791, § 16, Aug. 28, 1958, 72 Stat. 947; Pub. L. 109–58, title XII, § 1284(c), Aug. 8, 2005, 119 Stat. 980.)

### Editorial Notes

#### CODIFICATION

In subsec. (b), "section 1254 of title 28" substituted for "sections 239 and 240 of the Judicial Code, as amended (U.S.C., title 28, secs. 346 and 347)" on authority of act June 25, 1948, ch. 646, 62 Stat. 869, the first section of which enacted Title 28, Judiciary and Judicial Procedure.

#### AMENDMENTS

2005—Subsec. (a). Pub. L. 109–58 inserted "electric utility," after "Any person," and "to which such person," and substituted "brought by any entity unless

such entity" for "brought by any person unless such person".

1958—Subsec. (a). Pub. L. 85–791, § 16(a), inserted sentence to provide that Commission may modify or set aside findings or orders until record has been filed in court of appeals.

Subsec. (b). Pub. L. 85–791, § 16(b), in second sentence, substituted "transmitted by the clerk of the court to" for "served upon", substituted "file with the court" for "certify and file with the court a transcript of", and inserted "as provided in section 2112 of title 28", and in third sentence, substituted "jurisdiction, which upon the filing of the record with it shall be exclusive" for "exclusive jurisdiction".

### Statutory Notes and Related Subsidiaries

#### CHANGE OF NAME

Act June 25, 1948, eff. Sept. 1, 1948, as amended by act May 24, 1949, substituted "court of appeals" for "circuit court of appeals".

### § 825m. Enforcement provisions

**(a) Enjoining and restraining violations**

Whenever it shall appear to the Commission that any person is engaged or about to engage in any acts or practices which constitute or will constitute a violation of the provisions of this chapter, or of any rule, regulation, or order thereunder, it may in its discretion bring an action in the proper District Court of the United States or the United States courts of any Territory or other place subject to the jurisdiction of the United States, to enjoin such acts or practices and to enforce compliance with this chapter or any rule, regulation, or order thereunder, and upon a proper showing a permanent or temporary injunction or decree or restraining order shall be granted without bond. The Commission may transmit such evidence as may be available concerning such acts or practices to the Attorney General, who, in his discretion, may institute the necessary criminal proceedings under this chapter.

**(b) Writs of mandamus**

Upon application of the Commission the district courts of the United States and the United States courts of any Territory or other place subject to the jurisdiction of the United States shall have jurisdiction to issue writs of mandamus commanding any person to comply with the provisions of this chapter or any rule, regulation, or order of the Commission thereunder.

**(c) Employment of attorneys**

The Commission may employ such attorneys as it finds necessary for proper legal aid and service of the Commission or its members in the conduct of their work, or for proper representation of the public interests in investigations made by it or cases or proceedings pending before it, whether at the Commission's own instance or upon complaint, or to appear for or represent the Commission in any case in court; and the expenses of such employment shall be paid out of the appropriation for the Commission.

**(d) Prohibitions on violators**

In any proceedings under subsection (a), the court may prohibit, conditionally or unconditionally, and permanently or for such period of

hear the case in banc or by means of a specially constituted court of appeals composed of the three circuit judges senior in commission who are able to sit. In case of disqualification or disability, the court shall be filled by designation and assignment as provided in chapter 15 of this title.

The provisions of section 29 of title 15, U.S.C., 1940 ed., and section 45 of title 49, U.S.C., 1940 ed., relating to time for appeal are incorporated in section 2101 of this title. The provisions of said sections for direct appeal to the Supreme Court are retained in said titles 15 and 49.

The second paragraph of the revised section is new. It recognizes the necessity of final disposition of litigation in which appellate review has been had and further review by the Supreme Court is impossible for lack of a quorum of qualified justices.

## [§ 2110. Repealed. Pub. L. 97–164, title I, § 136, Apr. 2, 1982, 96 Stat. 41]

Section, acts June 25, 1948, ch. 646, 62 Stat. 964; May 24, 1949, ch. 139, § 109, 63 Stat. 105, provided that appeals to the Court of Claims in tort claims cases, as provided in section 1504 of this title, be taken within 90 days after the entry of the final judgment of the district court.

### Statutory Notes and Related Subsidiaries

#### EFFECTIVE DATE OF REPEAL

Repeal effective Oct. 1, 1982, see section 402 of Pub. L. 97–164, set out as an Effective Date of 1982 Amendment note under section 171 of this title.

## § 2111. Harmless error

On the hearing of any appeal or writ of certiorari in any case, the court shall give judgment after an examination of the record without regard to errors or defects which do not affect the substantial rights of the parties.

(Added May 24, 1949, ch. 139, § 110, 63 Stat. 105.)

#### HISTORICAL AND REVISION NOTES
#### 1949 ACT

Incorporates in title 28, U.S.C., as section 2111 thereof, the harmless error provisions of section 269 of the Judicial Code (now repealed), which applied to all courts of the United States and to all cases therein and therefore was superseded only in part by the Federal Procedural Rules, which apply only to the United States district courts.

## § 2112. Record on review and enforcement of agency orders

(a) The rules prescribed under the authority of section 2072 of this title may provide for the time and manner of filing and the contents of the record in all proceedings instituted in the courts of appeals to enjoin, set aside, suspend, modify, or otherwise review or enforce orders of administrative agencies, boards, commissions, and officers. Such rules may authorize the agency, board, commission, or officer to file in the court a certified list of the materials comprising the record and retain and hold for the court all such materials and transmit the same or any part thereof to the court, when and as required by it, at any time prior to the final determination of the proceeding, and such filing of such certified list of the materials comprising the record and such subsequent transmittal of any such materials when and as required shall be deemed full compliance with any provision of law requiring the filing of the record in the court. The record in such proceedings shall be certified and filed in or held for and transmitted to the court of appeals by the agency, board, commission, or officer concerned within the time and in the manner prescribed by such rules. If proceedings are instituted in two or more courts of appeals with respect to the same order, the following shall apply:

(1) If within ten days after issuance of the order the agency, board, commission, or officer concerned receives, from the persons instituting the proceedings, the petition for review with respect to proceedings in at least two courts of appeals, the agency, board, commission, or officer shall proceed in accordance with paragraph (3) of this subsection. If within ten days after the issuance of the order the agency, board, commission, or officer concerned receives, from the persons instituting the proceedings, the petition for review with respect to proceedings in only one court of appeals, the agency, board, commission, or officer shall file the record in that court notwithstanding the institution in any other court of appeals of proceedings for review of that order. In all other cases in which proceedings have been instituted in two or more courts of appeals with respect to the same order, the agency, board, commission, or officer concerned shall file the record in the court in which proceedings with respect to the order were first instituted.

(2) For purposes of paragraph (1) of this subsection, a copy of the petition or other pleading which institutes proceedings in a court of appeals and which is stamped by the court with the date of filing shall constitute the petition for review. Each agency, board, commission, or officer, as the case may be, shall designate by rule the office and the officer who must receive petitions for review under paragraph (1).

(3) If an agency, board, commission, or officer receives two or more petitions for review of an order in accordance with the first sentence of paragraph (1) of this subsection, the agency, board, commission, or officer shall, promptly after the expiration of the ten-day period specified in that sentence, so notify the judicial panel on multidistrict litigation authorized by section 1407 of this title, in such form as that panel shall prescribe. The judicial panel on multidistrict litigation shall, by means of random selection, designate one court of appeals, from among the courts of appeals in which petitions for review have been filed and received within the ten-day period specified in the first sentence of paragraph (1), in which the record is to be filed, and shall issue an order consolidating the petitions for review in that court of appeals. The judicial panel on multidistrict litigation shall, after providing notice to the public and an opportunity for the submission of comments, prescribe rules with respect to the consolidation of proceedings under this paragraph. The agency, board, commission, or officer concerned shall file the record in the court of appeals designated pursuant to this paragraph.

(4) Any court of appeals in which proceedings with respect to an order of an agency,

§ 2112                 TITLE 28—JUDICIARY AND JUDICIAL PROCEDURE                 Page 514

board, commission, or officer have been instituted may, to the extent authorized by law, stay the effective date of the order. Any such stay may thereafter be modified, revoked, or extended by a court of appeals designated pursuant to paragraph (3) with respect to that order or by any other court of appeals to which the proceedings are transferred.

(5) All courts in which proceedings are instituted with respect to the same order, other than the court in which the record is filed pursuant to this subsection, shall transfer those proceedings to the court in which the record is so filed. For the convenience of the parties in the interest of justice, the court in which the record is filed may thereafter transfer all the proceedings with respect to that order to any other court of appeals.

(b) The record to be filed in the court of appeals in such a proceeding shall consist of the order sought to be reviewed or enforced, the findings or report upon which it is based, and the pleadings, evidence, and proceedings before the agency, board, commission, or officer concerned, or such portions thereof (1) as the rules prescribed under the authority of section 2072 of this title may require to be included therein, or (2) as the agency, board, commission, or officer concerned, the petitioner for review or respondent in enforcement, as the case may be, and any intervenor in the court proceeding by written stipulation filed with the agency, board, commission, or officer concerned or in the court in any such proceeding may consistently with the rules prescribed under the authority of section 2072 of this title designate to be included therein, or (3) as the court upon motion of a party or, after a prehearing conference, upon its own motion may by order in any such proceeding designate to be included therein. Such a stipulation or order may provide in an appropriate case that no record need be filed in the court of appeals. If, however, the correctness of a finding of fact by the agency, board, commission, or officer is in question all of the evidence before the agency, board, commission, or officer shall be included in the record except such as the agency, board, commission, or officer concerned, the petitioner for review or respondent in enforcement, as the case may be, and any intervenor in the court proceeding by written stipulation filed with the agency, board, commission, or officer concerned or in the court agree to omit as wholly immaterial to the questioned finding. If there is omitted from the record any portion of the proceedings before the agency, board, commission, or officer which the court subsequently determines to be proper for it to consider to enable it to review or enforce the order in question the court may direct that such additional portion of the proceedings be filed as a supplement to the record. The agency, board, commission, or officer concerned may, at its option and without regard to the foregoing provisions of this subsection, and if so requested by the petitioner for review or respondent in enforcement shall, file in the court the entire record of the proceedings before it without abbreviation.

(c) The agency, board, commission, or officer concerned may transmit to the court of appeals the original papers comprising the whole or any part of the record or any supplemental record, otherwise true copies of such papers certified by an authorized officer or deputy of the agency, board, commission, or officer concerned shall be transmitted. Any original papers thus transmitted to the court of appeals shall be returned to the agency, board, commission, or officer concerned upon the final determination of the review or enforcement proceeding. Pending such final determination any such papers may be returned by the court temporarily to the custody of the agency, board, commission, or officer concerned if needed for the transaction of the public business. Certified copies of any papers included in the record or any supplemental record may also be returned to the agency, board, commission, or officer concerned upon the final determination of review or enforcement proceedings.

(d) The provisions of this section are not applicable to proceedings to review decisions of the Tax Court of the United States or to proceedings to review or enforce those orders of administrative agencies, boards, commissions, or officers which are by law reviewable or enforceable by the district courts.

(Added Pub. L. 85–791, § 2, Aug. 28, 1958, 72 Stat. 941; amended Pub. L. 89–773, § 5(a), (b), Nov. 6, 1966, 80 Stat. 1323; Pub. L. 100–236, § 1, Jan. 8, 1988, 101 Stat. 1731.)

### Editorial Notes

#### AMENDMENTS

1988—Subsec. (a). Pub. L. 100–236 substituted "If proceedings are instituted in two or more courts of appeals with respect to the same order, the following shall apply:" and pars. (1) to (5) for "If proceedings have been instituted in two or more courts of appeals with respect to the same order the agency, board, commission, or officer concerned shall file the record in that one of such courts in which a proceeding with respect to such order was first instituted. The other courts in which such proceedings are pending shall thereupon transfer them to the court of appeals in which the record has been filed. For the convenience of the parties in the interest of justice such court may thereafter transfer all the proceedings with respect to such order to any other court of appeals."

1966—Subsec. (a). Pub. L. 89–773, § 5(a), substituted "The rules prescribed under the authority of section 2072 of this title may provide for the time and manner of filing" for "The several courts of appeal shall have power to adopt, with the approval of the Judicial Conference of the United States, rules, which so far as practicable shall be uniform in all such courts prescribing the time and manner of filing." See section 2072 of this title.

Subsec. (b). Pub. L. 89–773, § 5(b), substituted "the rules prescribed under the authority of section 2072 of this title" for "the said rules of the court of appeals" and for "the rules of such court".

### Statutory Notes and Related Subsidiaries

#### EFFECTIVE DATE OF 1988 AMENDMENT

Pub. L. 100–236, § 3, Jan. 8, 1988, 101 Stat. 1732, provided that: "The amendments made by this Act [amending this section and section 1369 of Title 33, Navigation and Navigable Waters] take effect 180 days after the date of the enactment of this Act [Jan 8, 1988], except that the judicial panel on multidistrict litigation may issue rules pursuant to subsection (a)(3) of section 2112 of title 28, United States Code (as added by section 1), on or after such date of enactment."

SAVINGS PROVISION

Pub. L. 89–773, §5(c), Nov. 6, 1966, 80 Stat. 1323, provided that: "The amendments of section 2112 of title 28 of the United States Code made by this Act shall not operate to invalidate or repeal rules adopted under the authority of that section prior to the enactment of this Act [Nov. 6, 1966], which rules shall remain in effect until superseded by rules prescribed under the authority of section 2072 of title 28 of the United States Code as amended by this Act.''

### § 2113. Definition

For purposes of this chapter, the terms "State court", "State courts", and "highest court of a State" include the District of Columbia Court of Appeals.

(Added Pub. L. 91–358, title I, §172(a)(2)(A), July 29, 1970, 84 Stat. 590.)

#### Statutory Notes and Related Subsidiaries

EFFECTIVE DATE

Section effective the first day of the seventh calendar month which begins after July 29, 1970, see section 199(a) of Pub. L. 91–358, set out as an Effective Date of 1970 Amendment note under section 1257 of this title.

# PART VI—PARTICULAR PROCEEDINGS

| Chap. | | Sec. |
|---|---|---|
| 151. | Declaratory Judgments | 2201 |
| 153. | Habeas Corpus | 2241 |
| 154. | Special habeas corpus procedures in capital cases | 2261.[1] |
| 155. | Injunctions; Three-Judge Courts | 2281 |
| 157. | Surface Transportation Board Orders; Enforcement and Review | 2321 |
| 158. | Orders of Federal Agencies; Review | 2341 |
| 159. | Interpleader | 2361 |
| 161. | United States as Party Generally | 2401 |
| 163. | Fines, Penalties and Forfeitures | 2461 |
| 165. | United States Court of Federal Claims Procedure | 2501 |
| [167. | Repealed.] | |
| 169. | Court of International Trade Procedure | 2631 |
| 171. | Tort Claims Procedure | 2671 |
| 173. | Attachment in Postal Suits | 2710 |
| [175. | Repealed.] | |
| 176. | Federal Debt Collection Procedure | 3001 |
| 178. | Professional and Amateur Sports Protection | 3701 |
| 179. | Judicial Review of Certain Actions by Presidential Offices | 3901 |
| 180. | Assumption of Certain Contractual Obligations | 4001 |
| 181. | Foreign judgments[2] | 4101.[1] |
| 190. | Miscellaneous | 5001 |

SENATE REVISION AMENDMENT

Chapters 169, 171 and 173 were renumbered "167", "169" and "171", respectively, without change in their section numbers, by Senate amendment. See 80th Congress Senate Report No. 1559.

#### Editorial Notes

AMENDMENTS

2014—Pub. L. 113–287, §4(b)(2), Dec. 19, 2014, 128 Stat. 3261, added item for chapter 190.

---

[1] So in original.
[2] So in original. Probably should be capitalized.

2010—Pub. L. 111–223, §3(c), Aug. 10, 2010, 124 Stat. 2384, added item for chapter 181.

2000—Pub. L. 106–310, div. B, title XXXIV, §3405(c)(2), Oct. 17, 2000, 114 Stat. 1221, struck out item for chapter 175 "Civil Commitment and Rehabilitation of Narcotic Addicts".

1998—Pub. L. 105–304, title IV, §406(b), Oct. 28, 1998, 112 Stat. 2905, added item for chapter 180.

1996—Pub. L. 104–331, §3(e), Oct. 26, 1996, 110 Stat. 4071, added item for chapter 179.

Pub. L. 104–132, title I, §107(b), Apr. 24, 1996, 110 Stat. 1226, as amended Pub. L. 104–294, title VI, §605(k), Oct. 11, 1996, 110 Stat. 3510, added item for chapter 154.

1995—Pub. L. 104–88, title III, §305(c)(2), Dec. 29, 1995, 109 Stat. 945, which directed amendment of the item for chapter 157 in the table of chapters of this title by substituting "Surface Transportation Board" for "Interstate Commerce Commission", was executed by making the substitution in the table of chapters for this part to reflect the probable intent of Congress.

1992—Pub. L. 102–572, title IX, §902(b)(1), Oct. 29, 1992, 106 Stat. 4516, substituted "United States Court of Federal Claims" for "United States Claims Court" in item for chapter 165.

Pub. L. 102–559, §2(b), Oct. 28, 1992, 106 Stat. 4228, substituted "Procedure" for "Procedures" in item for chapter 176 and added item for chapter 178.

1990—Pub. L. 101–647, title XXXVI, §3302 [3612], Nov. 29, 1990, 104 Stat. 4964, added item for chapter 176.

1982—Pub. L. 97–164, title I, §§139(o)(1), 140, Apr. 2, 1982, 96 Stat. 44, substituted "United States Claims Court Procedure" for "Court of Claims Procedure" in item for chapter 165 and struck out item for chapter 167 "Court of Customs and Patent Appeals Procedure".

1980—Pub. L. 96–417, title V, §501(25), Oct. 10, 1980, 94 Stat. 1742, substituted "Court of International Trade Procedure" for "Customs Court Procedure" in item for chapter 169.

1966—Pub. L. 89–793, title VI, §603, Nov. 8, 1966, 80 Stat. 1450, added item for chapter 175.

Pub. L. 89–554, §4(d), Sept. 6, 1966, 80 Stat. 621, added item for chapter 158.

1960—Pub. L. 86–682, §10, Sept. 2, 1960, 74 Stat. 708, added item for chapter 173.

## CHAPTER 151—DECLARATORY JUDGMENTS

| Sec. | |
|---|---|
| 2201. | Creation of remedy. |
| 2202. | Further relief. |

### § 2201. Creation of remedy

(a) In a case of actual controversy within its jurisdiction, except with respect to Federal taxes other than actions brought under section 7428 of the Internal Revenue Code of 1986, a proceeding under section 505 or 1146 of title 11, or in any civil action involving an antidumping or countervailing duty proceeding regarding a class or kind of merchandise of a free trade area country (as defined in section 516A(f)(9) of the Tariff Act of 1930), as determined by the administering authority, any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

(b) For limitations on actions brought with respect to drug patents see section 505 or 512 of the Federal Food, Drug, and Cosmetic Act, or section 351 of the Public Health Service Act.

(June 25, 1948, ch. 646, 62 Stat. 964; May 24, 1949, ch. 139, §111, 63 Stat. 105; Aug. 28, 1954, ch. 1033,