# CASE NO. 24-1650(L)

## IN THE
## UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

APPALACHIAN VOICES, *et al.*,
*Petitioners*

v.

FEDERAL ENERGY REGULATORY COMMISSION,
*Respondent*

ON APPEAL FROM THE
FEDERAL ENERGY REGULATORY COMMISSION

## ATTACHMENT OF PUBLIC INTEREST
## ORGANIZATIONS AND INVENERGY PETITIONERS

| | |
|---|---|
| */s/ Danielle Fidler*<br>Danielle Fidler<br>Veronica Saltzman<br>Clean Air Task Force<br>114 State Street, 6th Floor<br>Boston, MA 02109<br>Phone: 617-624-0234<br>Email: dfidler@catf.us | Alexander Tom<br>Ada Statler<br>Earthjustice<br>180 Steuart Street, #194330<br>San Francisco, CA 94105<br>Phone: 415-217-2111<br>Email: atom@earthjustice.org |

*Counsel for Natural Resources Defense Council (additional counsel listed on the following pages)*

| Linnet Davis-Stermitz | Caroline Reiser |
|---|---|
| Earthjustice | Natural Resources Defense Council |
| 810 Third Avenue, Suite 610 | 1152 15th Street NW, Suite 300 |
| Seattle, WA 98104 | Washington, DC 20005 |
| Phone: 206-343-7340 | Phone: 202-717-8341 |
| Email: | Email: creiser@nrdc.org |
| ldavisstermitz@earthjustice.org | |

*Counsel for Natural Resources Defense Council*

| William S. Scherman | Garrett T. Meisman |
|---|---|
| Jeremy C. Marwell | 845 Texas Avenue |
| Jeffrey M. Jakubiak | Suite 4700 |
| Vinson & Elkins LLP | Houston, Texas 77002 |
| 2200 Pennsylvania Avenue, NW | Phone: 713-758-2559 |
| Suite 500 West | Email: gmeisman@velaw.com |
| Washington, DC  20037 | |
| Phone: 202-639-6507 | |
| Email: jmarwell@velaw.com | |

*Counsel for Invenergy Solar Development North America LLC, Invenergy Thermal Development LLC, Invenergy Wind Development North America LLC, and Invenergy Transmission LLC*

| Nicholas J. Guidi |
|---|
| Southern Environmental Law Center |
| 122 C Street NW, Suite 325 |
| Washington, DC 20001 |
| Phone: 202-573-8136 |
| Email: nguidi@selc.org |

*Counsel for Appalachian Voices, Energy Alabama, North Carolina Sustainable Energy Association, Southern Alliance for Clean Energy, and South Carolina Coastal Conservation League*

Justin Vickers
Sierra Club
1229 W Glenlake Ave
Chicago, IL 60660
Phone: 224-420-0614
Email: justin.vickers@sierraclub.org

*Counsel for Sierra Club*

Ted Kelly
Adam Kurland
Environmental Defense Fund
555 12th Street, N.W., Suite 400
Washington, DC 20004
Phone: 202-572-3317
Email: tekelly@edf.org

*Counsel for Environmental Defense Fund*

Dated: March 13, 2026

# TABLE OF CONTENTS

**ABELE DECLARATION** ................................................................................**ATT-001**

**ALFRED DECLARATION** ..............................................................................**ATT-010**

**ALLRED DECLARATION** ..............................................................................**ATT-017**

**ARIEFF DECLARATION** ...............................................................................**ATT-026**

**ATTAS DECLARATION** .................................................................................**ATT-031**

**BRATTON DECLARATION** ...........................................................................**ATT-037**

**BURRELL DECLARATION** ...........................................................................**ATT-044**

**CAFFREY DECLARATION** ...........................................................................**ATT-051**

**CARILLON DECLARATION** .........................................................................**ATT-056**

**FASHHO DECLARATION** .............................................................................**ATT-062**

**FREEMAN DECLARATION** ..........................................................................**ATT-064**

**FRIEDMAN DECLARATION** ........................................................................**ATT-075**

**HOWE DECLARATION** .................................................................................**ATT-082**

**KIM DECLARATION** .....................................................................................**ATT-098**

**MACFARLANE DECLARATION** ..................................................................**ATT-100**

**MALKIN-WEBER DECLARATION** ...............................................................**ATT-105**

**MOORE DECLARATION** ...............................................................................**ATT-111**

**PAUL DECLARATION** ...................................................................................**ATT-116**

**RAMSEY DECLARATION** .............................................................................**ATT-119**

**SANE DECLARATION** ...................................................................................**ATT-124**

**SHOBER DECLARATION** .............................................................................**ATT-134**

**SLACK DECLARATION** .................................................................................**ATT-143**

**STITH DECLARATION** ..................................................................................**ATT-148**

**TAIT DECLARATION** ....................................................................................**ATT-153**

**WASSON DECLARATION** .............................................................................**ATT-161**

**WILLIAMS DECLARATION** .........................................................................**ATT-169**

**WILSON DECLARATION** ..............................................................................**ATT-175**

**Abele Declaration**

# <u>DECLARATION OF MATT ABELE</u>

I, Matt Abele, hereby declare as follows:

1. My name is Matt Abele.  This declaration is based on my personal knowledge.  I am more than 18 years of age.

2. I am the Executive Director at the North Carolina Sustainable Energy Association ("NCSEA").  I have been at NCSEA since November 2021.

3. In my role, I help to drive the internal and external strategies necessary to implement successful policy solutions to transform North Carolina's energy market. I work with members, partners, and staff to align priorities and build collective momentum around pathways designed to decarbonize the electricity, transportation, and building sectors.

4. NCSEA has over 300 members, which include individuals, businesses, non-profit organizations, government agencies, and utilities.  Our membership ranges from individuals interested in the clean energy transition to Fortune 100 companies with sustainability goals.  Many of our members are clean energy developers who fund, construct, and/or operate independent clean energy generation such as solar or wind.  Some of our members are

interested in adopting or have already adopted clean energy by installing solar or participating in green tariff offerings.

5. NCSEA's mission is to transform the state and region's energy system through market innovation and policy advocacy. NCSEA advances policies that support clean energy, create market opportunities for clean energy, and create space for clean energy to compete against existing generation sources in a manner that is beneficial to all North Carolinians. We largely focus on advocacy before the North Carolina Utilities Commission ("NCUC"), but we also work to advance policies that support clean energy before the Federal Energy Regulatory Commission ("FERC" or "the Commission") and other federal agencies.

6. NCSEA's core belief is that clean energy will outcompete fossil fuel generation if given a level playing field. We work to advance policies that open markets and create competition, which includes expanding the state's transmission grid in a manner that efficiently allocates costs and recognizes benefits. In furtherance of these efforts, we frequently appear before the NCUC in net metering, avoided cost, and integrated resource planning dockets, as well as other matters related to markets and opportunities for clean energy deployment, adoption, and sales.

7. NCSEA also engages in the state's transmission planning processes. NCSEA staff regularly attend and actively participate in the Southeastern Regional Transmission Planning ("SERTP") process's quarterly meetings. Last year, an NCSEA representative served as a voting representative of the Municipal Utility sector in SERTP's Regional Planning Stakeholder Group. In this capacity, NCSEA helped select and scope the Economic Planning Studies the SERTP Sponsors studied during the planning cycle. NCSEA is also a voting member of the Transmission Advisory Group in the Carolinas Transmission Planning Collaborative, Duke Energy's local transmission planning process.

8. In light of our experience participating in these forums, NCSEA engaged in the rulemaking process at FERC that resulted in Order No. 1920. NCSEA intervened, submitted initial and reply comments, and sought rehearing of the final rule. NCSEA strongly supports many of Order No. 1920's requirements. Foremost among them, NCSEA supports the requirement that transmission providers conduct Long-Term Regional Transmission Planning that looks at least 20 years into the future and considers at least three scenarios that reflect the factors driving transmission needs, such as clean energy goals and the changing resource mix. We also appreciate that Order No. 1920 requires planners to evaluate a mandatory set of reliability and

ATT-004

economic benefits so that the full value of potential transmission solutions is captured.

9. In our experience, SERTP conducts short-sighted transmission planning that exclusively accounts for reliability needs, evaluates one type of benefit, and incorporates inconsistent generation assumptions. For example, in last year's SERTP meetings, Duke Energy relied on outdated generation assumptions that did not reflect its most up-to-date plans. Taken together, these practices have created a bias toward small-scale transmission solutions, a complete lack of any regional transmission facilities, and a segmented grid that cannot keep up with increasing demand.

10. Our independent power producer members need to access transmission to sell the energy they generate. Transmission capacity in North Carolina is already very limited. If the grid continues to expand in a costly, piecemeal manner, their transmission costs will continue to increase, making connecting to the grid financially infeasible. This undermines the viability of planned and potential clean energy projects in North Carolina.

11. The current transmission planning processes also negatively impact our members who seek to purchase clean energy. Many of NCSEA's members are large corporations or municipalities with sustainability goals that can only be met through purchasing clean energy. The current planning

processes have prevented a sufficient quantity of clean energy resources from interconnecting in a cost-effective manner, which has made it nearly impossible for our members to meet their clean energy goals.

12. NCSEA is confident that Order No. 1920's proactive, multi-value planning that accounts for the diverse benefits of transmission will result in a more efficient and cost-effective expansion of the transmission grid. It will also more equitably allocate costs, ensuring that renewable resources can feasibly connect to the grid. This will benefit both our independent power producer members and our clean energy buyer customers.

13. NCSEA also supports Order No. 1920's requirement that the Long-Term Regional Transmission Planning study sensitivities that account for extreme weather events. NCSEA's members reside and do business in areas served by Duke Energy, which experienced rolling blackouts during Winter Storm Elliott in late 2022. It became clear over that holiday season that the state's grid is unequipped to endure extreme weather events, which have become increasingly common. Moreover, in our experience participating in the SERTP planning process, we have never seen Duke Energy and the other SERTP utilities plan for extreme weather.

14. Despite our broad support for Order No. 1920, NCSEA believes that certain aspects of Order No. 1920 will allow the deficiencies in the region's

ATT-006

planning processes to remain.  For one, the final rule's requirement that transmission providers conduct Long-Term Regional Transmission Planning every 5 years will not allow utilities to account for the rapidly changing energy landscape, which includes a larger share of renewable resources, increasing demand due to economic development, and more frequent extreme weather events.  Additionally, in our experience participating in the NCUC's Carbon Plan/Integrated Resource Planning processes for Duke Energy, five years will not adequately capture the results of that process, which occurs every two years.  NCSEA supported the three-year frequency that FERC originally proposed, which would better enable the fluid transmission planning that current conditions require.

15. Second, Order No. 1920 does not require transmission providers to account for many additional benefits that regional transmission provides.  For example, the final rule does not require utilities to assess whether transmission solutions might enable access to lower-cost generation.  Given the high solar potential in the region combined with its comparatively low cost, regional transmission could unlock many of these resources, providing significant cost savings to NCSEA's members.  A comprehensive planning process would capture these benefits.

ATT-007

16. Order No. 1920 is necessary for ensuring that North Carolina's utilities plan transmission in an efficient, proactive manner that maintains reliability and keeps electricity bills low. However, without modification, certain aspects of Order No. 1920 threaten to restrain NCSEA's efforts on these fronts.

17. An order from this Court upholding the majority of Order No. 1920 but directing that FERC address these specific flaws would address NCSEA's concerns. It would mandate a robust, proactive transmission planning process that would more readily allow for the interconnection of clean energy resources than if SERTP were allowed to keep its current, ineffective processes. NCSEA's generating members would be able to access transmission more readily, making cost-effective clean energy more widely available to our members interested in buying clean energy. This would further NCSEA's goals and benefit our members.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 5_ day of __August___ 2025.


_____

Matt Abele

ATT-009

**Alfred Declaration**

## DECLARATION OF TISHA ALFRED

I, TISHA ALFRED, state and declare as follows:

1.      I am an employee of the Natural Resources Defense Council ("NRDC"). I am the Chief Real Estate & Workplace Strategy Officer for NRDC.

2.      As the Chief Real Estate & Workplace Strategy Officer, I am responsible for overseeing many aspects of the operations of NRDC offices, including the New York office, which is located at 40 West 20th Street, 11th Floor; the Chicago office, which is located at 20 North Wacker Drive, Suite 1600; the D.C. office, which is located at 1152 15th Street, NW, Suite 300; the San Francisco office, which is located at 111 Sutter Street, 21st Floor; and the Santa Monica office, which is located at 1314 Second Street. My responsibilities include managing our Workplace Strategy Senior Managers, who pay the utility bills, including electricity bills, for the New York, Chicago, D.C., San Francisco, and Santa Monica offices.

3.      I am also responsible for ensuring that NRDC has a master plan for sustainable operations, that our facilities operate efficiently, and that we provide a safe and healthy environment for our employees. NRDC has a sustainable operations plan. Our goals include reducing the net creation of carbon emissions derived from our building operational activity to zero, using less water from

1

ATT-011

municipal sources, sending virtually no waste to the landfill, and inspiring and guiding others to do the same.

4. Specifically, we plan to eliminate greenhouse gas emissions from NRDC facilities' energy use by reducing our energy consumption and increasing the share of our energy that comes from renewable sources.

5. NRDC advocates for a transition to cleaner forms of electric generation, while maintaining affordable electric rates and implementing policies that increase the levels of clean energy resources. NRDC and its members have a strong interest in promoting actions that displace less cost-effective fossil generation with more cost-effective clean energy.

6. NRDC uses electricity in our New York office. Each month, our property manager, George Comfort & Sons, sends NRDC an invoice for our electricity and maintenance fees. This bill includes the amount owed to Consolidated Edison, Inc. ("ConEd"). The New York office also partners with a locally based solar energy company and uses 100 percent solar energy to power consumption, and any excess energy not used will be fed back into the electrical grid. ConEd allocates Remote Net Metering Generation credits to our account in each billing period for which the kilowatt-hours generated by the System. Sometimes our New York office's energy use is not fully covered by the locally based solar energy company, and the office uses additional energy.

2

ATT-012

7.      NRDC uses electricity in our Chicago office. Each month, our property management company, Transwestern, sends NRDC an invoice for rent, real estate taxes, operating expenses, and electricity. This bill includes the amount owed to Commonwealth Edison ("ComEd") for the electricity we use. NRDC pays the amount due to Transwestern, and Transwestern pays ComEd.

8.      NRDC also uses electricity in our D.C. office. Each month, our property management company, Carr Properties, sends NRDC an invoice for the amount owed to Potomac Electric Power Company ("Pepco") for the electricity we use. NRDC pays the amount due to Carr Properties, and Carr Properties pays Pepco.

9.      NRDC also uses electricity in our San Francisco office. Each month, our property management company, Paramount Group, Inc., sends NRDC an invoice for the amount owed to Direct Energy for the electricity we use. NRDC pays the amount due to Paramount Group, Inc., and Paramount Group, Inc. pays Direct Energy.

10.     NRDC also uses electricity in our Santa Monica office. Each month NRDC receives two invoices from Southern California Edison for the electricity we use and for the electricity we generate from our onsite solar panels. Our accounts are enrolled in the Clean Power Alliance, sourcing 100% Green Power from the grid.

3

ATT-013

11. Many of the states in which NRDC has offices have clean energy standards. New York's Clean Energy Standard sets a goal of generating 70% of New York's electricity from renewable resources by 2030 and a zero-emission electric grid by 2040. Illinois' Climate and Equitable Jobs Act requires Illinois to be at 100% clean energy by 2050, with deadlines for 40% by 2030 and 50% by 2040. Washington, D.C. has a Renewable Portfolio Standard that requires 100% renewable energy by 2032. And California's Renewable Portfolio Standard requires 60% renewable energy by 2030 and 100% by 2045. NRDC supports each of these goals. But these state requirements to replace dirty, overpriced fossil fuel resources with cheaper, cleaner resources are being thwarted by the lack of transmission.

12. NRDC has two offices within the PJM region – the Chicago and Washington, D.C., offices – and, as for all ratepayers in this region, the price of electricity for these offices has increased rapidly in recent years. In 2022, NRDC paid an average of $131.64/mwh for electricity in the Chicago office and $178.23/mwh for electricity in the Washington office. By 2024, NRDC paid an average of $227.06/mwh for the Chicago office and $195.93/mwh for the Washington office. If PJM continues to fail to connect renewable resources and storage to the grid and continues to fail to conduct long term transmission planning, NRDC's electric bills for its Chicago and Washington offices will

4

ATT-014

continue to increase.

13.     NRDC does not want to pay more for electricity for our offices. This is particularly so because, as a nonprofit organization, one of our goals is to minimize our operating costs, including the costs of paying our electricity bills.

**Remainder of this page intentionally left blank.**

5

ATT-015

I declare under penalty of perjury that the foregoing is true and correct.

Executed in New York, NY, on this 27th day of August, 2025.

Tisha Alfred

6

ATT-016

**Allred Declaration**

## DECLARATION OF TAYLOR ALLRED

I, Taylor Allred, hereby declare as follows:

1. My name is Taylor Allred. This declaration is based on my personal knowledge. I am more than 18 years of age.

2. I live in Mount Pleasant, South Carolina.

3. I am employed by the South Carolina Coastal Conservation League ("CCL") as Energy & Climate Program Director. I have been in this position since April 2024.

4. CCL is a nonprofit organization based in Charleston, South Carolina, whose mission is to protect the natural environment of the South Carolina coastal plain and to enhance the quality of life in coastal plain communities by working with individuals, businesses, and government to ensure balanced solutions. CCL works to promote the implementation of comprehensive local, state, and federal policies related to renewable energy, energy efficiency, and climate change. CCL supports the development of renewable energy policy that is in the public interest of South Carolinians.

5. Among other aims, CCL works to transition South Carolina away from fossil fuel-based electricity generation to less polluting forms of electricity

ATT-018

generation, including renewable energy like solar power. CCL invests considerable time and resources towards this goal. For example, CCL worked to advance Act 236, the Distributed Energy Resources Act, in 2014 and the Energy Freedom Act in 2019 at the South Carolina General Assembly. CCL also regularly intervenes in South Carolina Public Service Commission proceedings—such as integrated resource planning, PURPA avoided cost, and net energy metering dockets—to advocate for policies that speed the state's transition towards affordable renewable energy.

6. CCL has 1,900 members who have contributed donations within the past 12 months, 1,533 of whom reside in South Carolina. Since our founding in 1989, we have received donations from 20,668 members. Our active mailing list currently includes 49,813 contacts, of whom 39,406 reside in South Carolina.

7. I am also a CCL member. I became a member of CCL in 2024. Like many of CCL's members, I pay for electricity service from Dominion Energy South Carolina. My electricity bills have increased in recent years, and I would prefer to pay lower bills.

8. In my capacity as Energy & Climate Program Director, my responsibilities include overseeing CCL's involvement in energy-related litigation, including before the South Carolina Public Service Commission, and

ATT-019

advocating for energy policy that is in the public interest of South Carolinians.

9. In furtherance of these duties, I also engage in the transmission planning processes that affect South Carolina. Somewhat unique for its size, South Carolina has two regional transmission planning processes: (1) the Southeastern Regional Transmission Planning ("SERTP") process, of which Duke Energy is a member, and (2) the South Carolina Regional Transmission Planning ("SCRTP") process, which is comprised of Dominion Energy South Carolina and the Public Service Authority of South Carolina ("Santee Cooper"). I regularly attend and actively participate in SERTP and SCRTP meetings as a stakeholder. SERTP holds quarterly meetings each annual planning cycle. SCRTP has a two-year planning cycle with six total meetings.

10. In light of our experience participating in these forums, CCL engaged in the rulemaking process at the Federal Energy Regulatory Commission ("FERC" or "the Commission") that resulted in Order No. 1920. CCL intervened, submitted initial and reply comments, and sought rehearing of the final rule. CCL strongly supports many of Order No. 1920's requirements. For instance, CCL approves of the rule's requirement that transmission providers conduct Long-Term Regional Transmission Planning that looks at least 20

years into the future, considers at least three scenarios that reflect known factors driving transmission needs, and evaluates a mandatory set of reliability and economic benefits.

11. In CCL's experience, SERTP and SCRTP conduct myopic transmission planning that only addresses short-term reliability needs, evaluates a single benefit metric, and utilizes wildly inconsistent generation assumptions across their member utilities. This has led to a focus on small-scale transmission solutions, an utter lack of any regional transmission facilities, and a balkanized grid that cannot keep up with increasing demand.

12. CCL strongly believes that Order No. 1920's proactive, multi-value planning that accounts for the numerous benefits of transmission will result in a more efficient and cost-effective expansion of the transmission grid. Among other things, this will lower the exorbitant interconnection costs that utility-scale solar developers have experienced in recent years, which will ensure more clean energy resources can connect to the grid. This, in turn, will lower the electricity bills of CCL's members by limiting reliance on volatile natural gas prices. By exploring expanded regional ties and generation sources, it will also help South Carolina's utilities avoid making long-term investments in large combined-cycle gas plants that could become stranded assets before the end of their useful lives.

ATT-021

13. CCL also supports Order No. 1920's requirement that the Long-Term Regional Transmission Planning study extreme weather events when planning upgrades to the grid. In late 2022, each of the state's three utilities resorted to rolling blackouts in response to Winter Storm Elliott. It became clear that the state's grid cannot stand up to the extreme weather events that are becoming more frequent. Moreover, in my experience participating in the SERTP and SCRTP planning processes, I have not seen them once plan for such extreme weather events.

14. Despite our general support for Order No. 1920, CCL believes that certain aspects of the rule will not fix the region's poor planning practices. For instance, the rule's requirement that utilities conduct Long-Term Regional Transmission Planning every 5 years will make it nearly impossible for them to account for the rapidly changing energy landscape. This includes an increasing number of solar resources, growing demand due to data centers and other industrial development, and more frequent extreme weather events. Additionally, in my experience participating in the Integrated Resource Planning processes for the utilities in our state, which determine the utilities' generation plans, five years will not adequately capture the results of those processes. They occur every three years in South Carolina, which does not sync up with the rule's required process. To this end, CCL

ATT-022

supported the three-year frequency that FERC originally proposed, which would better enable the utilities to adapt to their state regulatory requirements as well as changing conditions.

15. Second, Order No. 1920 does not require transmission providers to account for many proven benefits that regional transmission provides. For example, the final rule does not require utilities to evaluate whether transmission solutions might allow them to access lower-cost generation. Given the high solar potential in the region, combined with the lower cost of solar compared to fossil-fuel resources, regional transmission could reach many of these resources, providing significant cost savings to CCL's members and a cleaner resource mix. A truly comprehensive planning process would capture these benefits.

16. Order No. 1920 is crucial to ensuring that South Carolina's utilities plan transmission in an efficient, proactive manner that maintains reliability, accommodates clean energy resources, and keeps electricity bills low. However, without modification, certain aspects of Order No. 1920 will obstruct CCL's progress on these fronts.

17. An order from this Court upholding the majority of Order No. 1920 but directing FERC to fix these significant flaws would address CCL's concerns. It would mandate a robust, proactive transmission planning process that

ATT-023

would keep electricity bills for our members lower than they would be if SERTP and SCRTP kept their current, ineffective processes. An order along these lines would also facilitate CCL's organizational efforts to promote development of renewable energy in the public interest of South Carolinians.

ATT-024

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 11th day of ___August___ 2025.


_A. Taylor Allred_
Taylor Allred

**Arieff Declaration**

## DECLARATION OF IRWIN ARIEFF

I, IRWIN ARIEFF, state and declare as follows:

1.      I am a member of Natural Resources Defense Council ("NRDC") and have been a member since 2019.

2.      I became a member of NRDC because my wife and I are long time environmentalists who care about a variety of environmental issues. I care about air and water pollution, as well as climate change, and think that NRDC is effective at addressing these issues.

3.      I understand that NRDC is part of a lawsuit addressing the Federal Energy Regulatory Commission's Order No. 1920. This Order requires improved transmission planning, which will help with energy reliability and resilience, and also will help connect me and others to cheaper, cleaner energy.

4.      The electricity rates I pay and the electric service I receive will be affected by Order No. 1920.

5.      I live in New York, New York. My home address is 139 East 36th Street, Apartment 4, New York, NY 10016. I have lived at this address since 1999 with my wife. We do not plan to move from this location.

6.      I live less than a mile and a half from Con Edison's East River Power Plant, an oil and gas plant. My home is also about 6 miles from the Gowanus Generating Station, a peaker plant that burns dirty oil and gas to make

ATT-027

energy for New York. I understand that this plant would have closed next year but for a lack of transmission. I am concerned about the impacts of these plants on my health and the environment.

7. Every month I pay Con Edison for electricity in my home. Con Edison controls what energy resources provide my electricity.

8. I pay between $57 and $105 per month for electricity, and I do not want to see an increase in my bill. I already pay more than the national and state average because I live in a congested area of the grid. Being retired and on a fixed budget, my wife and I do everything we can to limit our electricity usage to keep costs manageable.

9. I would prefer my electricity to come from renewable resources because they are cleaner, cheaper, and more reliable than fossil resources. As a member of the Con Ed Advisory Community, I regularly communicate with Con Ed employees about the importance of renewable energy and advocate for the utility to procure as much renewable energy as possible. I know that we need more transmission to be able to have more clean energy, and to build these transmission projects we need long term regional transmission planning.

10. I have been personally affected by climate change, particularly during Hurricane Sandy in 2012. When the power was out for several days, I realized how crucial electricity is. Living in a seven-story building, it was difficult to navigate

ATT-028

the stairs; grocery stores were closed, leaving us without food for several days; and the crippled New York City transit system made it nearly impossible to get around and carry on with our lives. I am worried that storms exacerbated by climate change will cause more power outages, and that the lack of reliable electricity due to a lack of transmission will harm me or my wife.

11.     I am especially nervous about a blackout occurring during a heat wave. At 79 years old, I do not handle heat as well as I used to, and it's very difficult to go outside on extremely hot days. Without air conditioning, enduring very hot days is nearly impossible. I do not recover as quickly when I get overheated, and I am concerned that if a blackout occurs during a heatwave, heat stress could seriously harm me and my wife.

12.     It is clear that climate change is happening and worsening. Therefore, carbon-based fuels must be phased out as quickly as possible. Continuing burning fossil fuels exacerbates climate change. The only viable solution is to transition to renewable energy sources like wind and solar and to ensure that we have enough transmission infrastructure to deliver this renewable energy to where it is needed.

13.     I support NRDC's lawsuit relating to defending and improving Order No. 1920.

**Remainder of this page intentionally left blank.**

ATT-029

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 25th day of August 2025.

IRWIN ARIEFF

ATT-030

**Attas Declaration**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT**

| | | |
|---|---|---|
| Appalachian Voices, et al. | ) | |
| | ) | |
| *Petitioners*, | ) | |
| | ) | |
| v. | ) | Case No. 24-1650 |
| | ) | and consolidated cases |
| Federal Energy Regulatory Commission, | ) | |
| | ) | |
| *Respondent*. | ) | |
| | ) | |

**DECLARATION OF BRIAN ATTAS
Submitted in Support of Environmental Defense Fund**

1.   I am an employee of the Environmental Defense Fund (EDF). I am the Vice President of Enterprise Compliance, Legal, & Services for EDF.

2.   As Vice President of Enterprise Compliance, Legal, & Services for EDF, I am responsible for overseeing office management services and corporate sustainability for all EDF offices, including the New York office, which is located at 257 Park Ave. South, the Boston office, which is located at 18 Tremont St., Suite 900, the San Francisco office, which is located at 123 Mission St., Suite 1800 and the D.C. office, which is currently located at 555 12th St. NW, Suite 400. My responsibilities include reviewing the consumption of energy in our workplaces and overseeing the processing of all energy related invoices by the individual building managers, who pay the

1

ATT-032

utility bills, including electricity bills, for the New York, Boston, D.C., and San Francisco offices.

3. I am also responsible for ensuring that EDF has a master plan for sustainable operations, that our facilities operate efficiently, and that we provide a safe and healthy environment for our employees. EDF has a Sustainability Council and a sustainable operations plan. Our sustainability goals include reducing our energy consumption and the net creation of carbon emissions derived from our building operational activity over the next five years.

4. Specifically, we seek to reduce energy consumption within EDF facilities' by limiting the use of HVAC, prohibiting the use of personal space heaters, and regularly auditing our existing systems and equipment for their energy efficiency, and updating accordingly.

5. Many of our offices have sub-meters installed that allow us to measure our usage, which is then tracked to determine our energy consumption per site year-over-year. We then mitigate this usage accordingly with other scope 1, scope 2 and scope 3 emissions.

6. EDF, as part of our work, also advocates for a transition to cleaner forms of electric generation, while maintaining affordable electric rates and implementing policies that increase the levels of clean energy resources. EDF and its members have a strong interest in promoting actions that

2

ATT-033

displace less cost-effective fossil generation with more cost-effective clean energy.

7. EDF uses electricity in our New York office. Each month, the owner, Feil Organization, through its property management company, Jeffrey Management Corporation ("Jeffrey Management"), sends an invoice for rent, real estate taxes and electricity. The bill includes EDF's sub-meter numbers, present and previous readings, total KWH and KWD, and the total amount owed to Jeffrey Management. Jeffrey Management then pays Consolidated Edison ("Con Ed"). Con Ed is a member of the New York Independent System Operator.

8. EDF uses electricity in our Boston office. Each month, EDF receives an invoice from Eversource for our electricity use based on the readings of the Two sub-meters connected to our office. EDF pays Eversource directly. Eversource is a member of Independent System Operator – New England.

9. EDF uses electricity in Washington, D.C. office at 555 12th Street. NW, Suite 400. EDF officially moved into the new space on November 20, 2023. As part of our agreement, the cost of utilities like electricity is included in our operating expenses and not specifically listed as a line item. However, EDF is charged an additional fee for our supplemental air unit for our large conference room. The bill includes EDF's sub-metered numbers, date range,

3

previous reading and current reading to determine the associated costs. EDF pays JLL, the building manager, who in turn pays Pepco, the utility provider.

10. EDF uses electricity in our San Francisco office. Each month, the owner, Juul Labs dba Main Mission LLC ("Main Mission"), through their property management company, Newmark, sends an invoice for rent, real estate taxes, and electricity. The bill includes EDF's sub-meter numbers, time period KWH, rate and total charges for energy use and demand charges for KW owed to Main Mission. EDF pays the amount due to Main Mission. Main Mission then pays Pacific Gas & Electric ("PG&E") for our electric use. PG&E is a member of the California Independent System Operator.

11. EDF is a nonprofit organization, and it is very important to us to minimize our operating costs, including the costs of paying our electricity bills, so that the money from our members can be spent efficiently pursuing the goals they support. Consistent with that, over the past year EDF has reduced space in all of our locations. Specifically in NYC we reduced our footprint by 60%, Boston by 23%, San Francisco by 75% and Washington, D.C. by 16% which translate to not only a reduction in rent but also utility bills.

12. The ability to purchase affordable clean energy is also crucial to meeting our organizational sustainability goals. Regulations that support the addition of clean energy resources to the grid more quickly and at lower costs directly

ATT-035

support EDF's interest in accessing clean energy while minimizing operating costs.

I declare under penalty of perjury that the foregoing is true and correct. Executed in New York, NY, on this Twentieth day of August, 2025

*Brian J Attas*
_____
**Brian Attas**

5

ATT-036

**Bratton Declaration**

## DECLARATION OF CHRISTINE BRATTON

I, CHRISTINE BRATTON, state and declare as follows:

1.  I am a member of Natural Resources Defense Council ("NRDC") and have been a member for more than a decade.

2.  I became a member of NRDC because I have been an environmentalist for a long time. I believe NRDC addresses the intersectionality of environmental issues in a way that is very galvanizing, and that the organization is nimble enough to deal with modern environmental issues, including climate change caused by burning dirty fossil fuels.

3.  I understand that NRDC is part of a lawsuit addressing the Federal Energy Regulatory Commission's Order No. 1920. Order No. 1920 will involve the transmission planning necessary to increase energy reliability and unlock cheaper, clean energy resources. I understand that we need more transmission to replace fossil fuel generators with cheaper and more reliable clean energy. The electricity rates I pay and electric service I receive will be affected by Order No. 1920.

4.  I live in Brooklyn, New York. My home address is 155 Hicks Street, Apt 5B, Brooklyn, New York, 11201. My home is part of a 14-unit apartment cooperative. I have lived at this address since 2006 and do not intend to move.

5.  My home is less than two and a half miles from the Gowanus Generating Station. Gowanus is a gas and oil burning peaker plant. Under New

ATT-038

York law, Gowanus should retire in 2025. However, now this will not happen because there is not enough transmission to replace the dirty energy it provides with a clean resource. A lack of regional transmission planning caused this problem.

6. Every month I pay Con Edison for electricity in my home. Con Edison controls what energy resources provide my electricity.

7. I pay between $50 and $80 per month during the winter and $150 to $200 per month during the summer for electricity. I live in a congested energy area which means that I pay higher energy rates than other areas because of the congestion. This is not fair. I do not want to pay more for electricity.

8. I would prefer for my electricity to come from renewable resources because they are cleaner, cheaper, and more reliable than fossil resources. I tried for years to find a way to get renewable energy through Con Edison.

9. I am really nervous about a blackout occurring during a heat wave.

10. I am 72 years old and do not deal with heat as well as I used to. I especially do not recover as quickly when I get hot.

11. My home is on the top floor of my building. I can tell that my unit gets hotter than it did when I first moved in twenty years ago because climate change is causing average temperatures to increase overall. Approximately five years ago I started putting a curtain over my skylight to limit the sun from heating my apartment. I feel as though I will be cooked alive if my home gets much hotter.

ATT-039

12.     My husband lives in unit 4B of my building, downstairs from my unit. My husband's unit does not have the amperage for an air conditioning unit. I have dropped a line down to his unit. I therefore supply his air conditioning.

13.     My husband is ten years older than I am. He has had a heart attack and does not deal with heat well. I am concerned that heat stress could harm my husband.

14.     My building's biggest expense is the oil used for our heating boiler. I know that oil is a very dirty heat source. I have persuaded my fellow cooperative owners to ensure that our next heat source will be an energy efficient, fossil-fuel- free heat pump. I want a heat pump because it will save me and the other residents of the building money and it is the right thing to do. But it will only save us money if electricity rates do not increase due to poor transmission planning that limits new, cheap, renewable resources from supplying our electricity.

15.     Brooklyn Heights does not currently have the energy capacity to transition all buildings to electric appliances. However, the goal is to make it possible by 2030. I encourage an incremental change within the building from relying on oil and gas to relying exclusively on electricity.

ATT-040

16.     Since fossil fuel plants are a main source of greenhouse gases, I believe it is pretty clear that we have to make changes to our energy system to address climate change. Climate change and the unbridled power of the fossil fuel industry is the consuming issue of our age. I believe we have to work as a collective to solve this problem, and that all the small things we do to solve it are

important. I support New York's Climate Leadership and Community Protection Act that sets a goal of 100% zero-emission electricity by 2040.

17.     I have been personally affected by climate change. During the 1980s through the 2000s, I would spend my vacation weeks every year on environmental service trips. Just about every place I have done a service trip has since had a wildfire that I believe climate change contributed to. I also would not be able to do many of those trips now due to the changing climate.

18.     I am a backcountry backpacker and go on camping bike trips with my husband. I cannot go to a lot of places I used to go backpacking and biking twenty years ago because the changing climate means that they are too hot. I hope to continue backpacking and biking, but I have already had to adjust where and when I go due to increased

ATT-041

heat, high winds, and more unpredictable weather caused by climate change.

19.    Even with adjusting where and when I go on biking trips, climate related unpredictable weather still affects my ability to enjoy the trips. The following photograph is from my most recent experience. On July 11, 2024, I was in Waterbury, Vermont on a multiday biking and camping trip with my husband. We got caught in a flood caused by heavy rainfall from remnants of Hurricane Beryl. Climate change is fueling stronger storms, including Beryl, because a warmer atmosphere holds more moisture, which results in storms dumping more rain. We encountered flooding on our path that was knee deep.



ATT-043

20.     It is clear that climate change is happening and worsening. Therefore, carbon-based fuels must be phased out as quickly as possible because continuing to burn fossil fuels exacerbates climate change. The only viable solution is to transition to renewable energy sources like wind and solar and to ensure that we have enough transmission infrastructure to deliver this renewable energy to where it is needed.

21.     I support NRDC's lawsuit relating to defending and improving Order No. 1920.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 21st day of August 2025.

_____
CHRISTINE BRATTON

ATT-043

**Burrell Declaration**

ATT-044

## DECLARATION OF BENJI BURRELL

I, Benji Burrell, hereby declare as follows:

1. My name is Joseph Benjamin Burrell. I am over 18 years of age. This declaration is based on my personal knowledge.

2. I live in the City of Asheville, which is located in Buncombe County, North Carolina.

3. I am a small business owner. I own a business technology engineering company called Good People Technologies. We bring together various technology solutions to boost our clients' businesses, primarily by integrating software and operations. I operate the company out of my home.

4. I first became a member of Appalachian Voices in 2005. I was also on staff from 2006 to 2012, and have been a member for much of the time since. I was drawn to Appalachian Voices because it brings together the people and resources necessary to tackle the greatest human health and environmental problems in the Southeast mountain region. It does so effectively, efficiently, and with integrity. I saw firsthand during my time there that Appalachian Voices constantly looks after the people and land it's dedicated to serving.

ATT-045

5. I continue to be an Appalachian Voices member because it works on the front lines to bring a cleaner and more equitable power system to the region. I strongly believe that prioritizing renewable energy is a fundamentally conservative action. It is the ultimate "pick yourself up by your bootstraps" means of generating electricity. It allows you to produce your own energy, while conserving both dollars and the surrounding land and water. All of these things have economic value to us and future generations and must be preserved. I know that Appalachian Voices shares these sentiments and, for that reason, they continue to have my support.

6. I have also taken these matters into my own hands to some degree. I've installed a solar system on my property that is comprised of 18 solar panels. I have open space and would gladly add more panels, but our local utility, Duke Energy ("Duke"), does not compensate excess power sent to the grid in a manner that would allow me to fund that investment. Initially, my solar system covered approximately 85-90% of my power needs, but I've since added new electric load. Even still, I routinely pay only the base electric fee in the summer.

7. I rely on utility electric service more heavily in the winter months. For this service, I pay electricity bills to Duke. Our electric bills have increased in recent years, and I would prefer to pay a lower electricity bill.

8. I am concerned that my electricity bills will continue to rise if Duke does not add low-cost clean energy to its generation fleet and instead continues to rely on new and existing gas plants. As I understand it, it will be cost-prohibitive for Duke to add these types of clean energy resources if it does not expand its transmission grid to connect them. This would unfortunately ensure that we continue to have an electric system powered by dirty fossil fuels. That said, I am also concerned that expanding the transmission grid in a reactive, piecemeal manner will also result in higher electricity bills.

9. We have had spotty reliability with our electric service for as long as I can remember. Some of the power outages are related to severe weather, but other times, the power goes out without warning. As the owner of a web-based business that I operate out of my home, power outages directly affect my work. Chronically unreliable electric service can have severe financial implications for my business. If my power goes out, I have to take on the additional expense of leaving the property and renting out extra space. More importantly, poor electric service hurts our capacity to serve our clients to the best of our ability. If our core client service is unreliable or sporadic, it harms our reputation and ability to build the business.

10. In addition to Good People Technologies, I also utilize parts of my property for short-term rentals. People come from all over to visit Asheville, and we

ATT-047

have had substantial interest in renting out our extra living space. When the power goes out for extended periods of time, I have to ask them to leave. This harms our rating as renters and makes it much more difficult to attract guests.

11. With the increasing frequency of extreme weather, especially in the winter when we most rely on electricity service from Duke, it is crucial to my business that Duke plan its electric grid to maintain reliable service. Just last fall, Hurricane Helene devastated the Asheville area. We had to leave our home for a week due to the loss of electricity. During that time, we had to serve clients remotely through Good People Technologies and cancelled multiple property rental reservations. Once service was finally restored, we were able to return to normal business operations and even hosted emergency workers, insurance agents, and folks displaced by the hurricane. But interruptions like these are not sustainable.

12. For these reasons, I support Appalachian Voices' engagement in this case to defend certain parts of the Federal Energy Regulatory Commission's Order No. 1920. I support the rule's requirements that regional transmission planning processes like those Duke participates in plan for extreme weather and a changing generation mix, but that they also do so in an efficient way.

ATT-048

13. However, I am concerned that the rule will have limited effect if it fails to require transmission providers like Duke to engage in these planning processes frequently enough to adapt to increasingly common extreme weather events, like Hurricane Helene.  My business cannot sustain the severe interruptions that an unreliable transmission grid would cause, and severe weather is causing extended power outages to occur more and more frequently.  If Duke can engage in business-as-usual planning for most of its transmission needs, which Order No. 1920 seems to allow, my electric service will become less reliable and far more expensive.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this __5th__ day of ____August____ 2025.

J B Burrell
_____
Benji Burrell

ATT-050

**Caffrey Declaration**

# DECLARATION OF DR. THOMAS CAFFREY

I, THOMAS CAFFREY, state and declare as follows:

1.     I am a member of Natural Resources Defense Council ("NRDC") and have been a member since 2003.

2.     I am a member of NRDC because it tackles the big issues, including climate change, which is the most pressing challenge facing humanity today. I am drawn to organizations that make a significant impact, and NRDC exemplifies this through its dedicated efforts to address and mitigate climate change.

3.     I understand that NRDC is part of a lawsuit addressing the Federal Energy Regulatory Commission's Order No. 1920. I understand that Order No. 1920 will require improved transmission planning. I believe that Order No. 1920 will help improve energy resilience and reliability, and that it will help connect me and others to cheaper, cleaner energy.

4.     The electricity rates I pay and the electric service I receive will be affected by Order No. 1920.

5.     I live in New York, New York. My home address is 263 West End Avenue, Apt. 18C, New York, NY 10023-2617. I have lived at this address since 1981 with my wife.

ATT-052

6. I live less than a mile from Con Edison's 59th Street station, which burns oil and gas, and I am concerned about the impacts of this plant's emissions on my health.

7. Every month I pay Con Edison for electricity in my home.

8. I pay between $95 and $135 per month for electricity, and I do not want to see an increase in my bill. As a retired individual on a fixed income, relying on Social Security and my private retirement account to cover my apartment's monthly maintenance bills, any additional costs for electricity would be difficult to manage.

9. I would prefer my and others' electricity to come from renewable resources. Utilizing renewable energy sources like wind and solar reduces our dependence on fossil fuels and helps mitigate the impacts of climate change. Renewable resources are also cheaper than fossil resources. I know that my access to renewable energy is limited by a lack of transmission. For example, I understand that there are especially dirty fossil fuel peaker plants in New York that cannot retire because there isn't enough transmission to replace them with clean energy resources. The failure to do transmission planning in a comprehensive way caused this problem.

ATT-053

10.     I am concerned about the resilience of our power grid, especially during major storms and extreme weather that is being exacerbated by climate change. I experienced the power outage in New York City in 2003, which was particularly challenging since I live on the 18th floor and had to walk up and down many flights of stairs. Since then, I have had a heart stent put in, and it would be very difficult for me to manage the stairs in the event of another blackout.

11.     I am especially nervous about a blackout occurring during a heat wave or winter storm, and climate change is causing more and extremer weather to happen every year. At 85 years old, and with my wife being 84, we do not handle the heat as well as we used to, and it is extremely difficult to go outside on very hot days. I typically exercise 5-6 days a week including walking in Riverside Park. However, when it's hot, I have to cut back significantly because I don't have the same energy and initiative in such conditions.

12.     It is clear that climate change is happening and worsening. Therefore, carbon-based fuels must be phased out as quickly as possible. Continuing to burn fossil fuels only exacerbates climate change. The only viable solution is to transition to renewable energy sources like wind and solar, and we need more transmission to achieve that goal.

13.     I support NRDC's lawsuit relating to defending and improving Order No. 1920.

ATT-055

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 21st day of August 2025.

THOMAS CAFFREY

**Carillon Declaration**

## DECLARATION OF JIM CARILLON

I, Jim Carillon, hereby declare as follows:

1. My name is James William Carillon. I am over 18 years of age. This declaration is based on my personal knowledge.

2. I live in Asheville, North Carolina. I moved here from a property I still own in Fairview, North Carolina.

3. I have been a member of the Southern Alliance for Clean Energy ("SACE") for roughly six years.

4. I first got involved with SACE after taking coursework through the University of North Carolina – Asheville's Osher Lifelong Learning Institute, which focused on climate issues. Through that coursework and my own background investigation, I discovered SACE was working on similar issues and had an office right here in Asheville. I was intrigued that their office had a large ground-based solar array on site. It also didn't hurt that they offered access to charging facilities for my electric vehicle.

5. SACE no longer has the Asheville office, but I remain a committed member. As a SACE member, I follow their newsletters and participate in discussion

ATT-057

groups on clean energy issues. I care passionately about generating as much electricity from solar energy resources as possible.

6. I currently live in a retirement community in Asheville. I also own a property in Fairview, North Carolina. About seven years ago, I installed a solar system on my Fairview property. I designed the system to meet 80% of my electricity usage. The system has worked even better than that in recent years, as it has covered the entirety of our electricity needs for eight months of the year. It generally does not meet all of our power needs in the winter months. I'm proud that installing the solar system has allowed me to do my small part in reducing reliance on gas power plants, which otherwise serve the Asheville area.

7. Since I moved to the retirement community, I've joined a local residents' committee, called "Energy Matters," and have used my experience with solar systems to work toward increasing our community's use of solar generation and reducing our electric usage.

8. For the remainder of our electricity needs, both at our Fairview property and in the retirement community, I pay electricity bills to Duke Energy ("Duke"). I would prefer to have a lower electricity bill.

9. I am concerned that my electricity bills will rise if Duke does not add low-cost renewable energy to its power plant fleet and instead continues to rely

ATT-058

on new and existing gas plants in the Asheville area. As I understand it, it will be difficult for Duke to add these types of clean energy resources if it does not expand its transmission grid to connect them. That said, I am also concerned that expanding the transmission grid in a reactive, piecemeal manner will also result in higher electricity bills.

10. We have experienced sporadic reliability issues with our electric service. Every now and then, our power goes out. This is significant because our solar system has a safety switch that causes it to trip off whenever we lose power. During that time, the system cannot generate electricity. With the increasing frequency of extreme weather, especially in the winter, when we rely on electricity service from Duke, it is important that Duke plan its electric grid to endure these types of storms.

11. For these reasons, I support SACE's engagement in this case to defend certain aspects of the Federal Energy Regulatory Commission's Order No. 1920. I support the rule's requirements that regional transmission planning processes like those Duke participates in plan for extreme weather and a changing generation mix, but that they also do so in an efficient way.

12. However, I am concerned that the rule will be unable to accomplish these goals if it fails to require Duke and other utilities in the area to plan their transmission expansion frequently enough to adapt to changing conditions

ATT-059

like extreme weather, more electricity demand on the system, and a changing power plant fleet.  If Duke can continue its current practices, which I understand Order No. 1920 allows, my electric service will continue to come from dirty fossil fuel plants, will become even less reliable, and will increase my power bills.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on this 5th day of August, 2025.

*James Carillon*
James Carillon

**Fashho Declaration**

## DECLARATION OF HUDA FASHHO

I, Huda Fashho, hereby declare as follows:

1. I am the Member Care Senior Managing Director at the Sierra Club. I have held a supervisory position in Member Care for 14 years.

2. In my role, I manage aspects of Sierra Club's customer service functions related to members, including maintaining an accurate list of members and managing the organization's member databases.

3. Sierra Club currently has 617,141 members in the United States. There are members residing in each of the fifty United States and in the District of Columbia.

4. Sierra Club's mission statement declares that the purpose of the Sierra Club is to practice and promote the responsible use of the earth's ecosystems and resources. Further, Sierra Club works across the United States to promote the development of clean energy and transition away from fossil fuels to protect the environment, reduce consumer energy costs, meet U.S. carbon reduction goals, and ensure that safe, low-cost clean energy is available to all.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 11 day of August, 2025.

Huda Fashho

ATT-063

**Freeman Declaration**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT**

| | | |
|---|---|---|
| Appalachian Voices, et al. | ) | |
| | ) | |
| *Petitioners*, | ) | |
| | ) | |
| v. | ) | Case No. 24-1650 |
| | ) | and consolidated cases |
| Federal Energy Regulatory Commission, | ) | |
| | ) | |
| *Respondent*. | ) | |
| | ) | |

**DECLARATION OF JENNIFER FREEMAN**

I, Jennifer Freeman, under the penalties of perjury declare as follows:

1.  I respectfully submit this declaration on behalf of Environmental Defense Fund. I have been a member of Environmental Defense Fund ("EDF") since December 2013. I share EDF's belief that we as a society can and should do more to transition to clean energy and away from fossil fuel generation to protect our environment and the public from harmful air pollution and the impacts from climate change, and that a crucial piece of this work is ensuring that the wholesale electric markets are just and reasonable and do not unduly discriminate against new renewable and clean energy resources.

2.  I am also a Senior Manager, Climate Legal Impact and Partnerships for EDF and have worked at EDF for over eleven years. I have personal knowledge of the matters set forth herein and, if called to testify, I could and would testify to

ATT-065

the truth of these facts. I submit this declaration in support of EDF's motion to intervene.

3. EDF has long sought to promote its members' interest in reducing greenhouse gas emissions by advocating in support of an electricity sector that allows cost-effective clean energy resources commensurate access to the market structures and the ability to compete alongside other resources. In support of this, EDF regularly advocates before the Federal Energy Regulatory Commission ("FERC" or "Commission"). EDF filed comments to the FERC in support of Order 1920 during the Commission's rulemaking process.[1]

4. I understand from my involvement with EDF that the FERC issued Order 1920 in response to the absence of sufficiently long-term forward-looking and comprehensive transmission planning requirements which is causing transmission providers to fail to adequately anticipate and plan for future system conditions, which has resulted in a piecemeal and reactive transmission planning process that has prioritized the near-term and individual needs of a specific utility provider and not adequately accounted for regional needs or the shifting energy landscape towards renewable generation sources and long term storage. Current planning processes do not sufficiently account for increasing

---

[1] Comments of Public Interest Organizations, *Building for the Future Through Electric Regional Transmission Planning and Cost Allocation and Generator Interconnection*, Docket No. RM21-17 (Aug. 17, 2024), https://elibrary.ferc.gov/eLibrary/filedownload?fileid=EC9F5C6F-BF90-C3C6-B018-82AD72F00001.

electrification of buildings and vehicles, and for increased extreme weather events. I am aware that this may have resulted in utilities investing in capital expenditures that were either unnecessary or where the same results could have been achieved for lower cost. While Order 1920 seeks to wrap up some of the other transmission planning, and account for many of these benefits, it unfortunately falls short, creating opportunities to transmission to be developed in several overlapping and uncoordinated processes, and with several core benefits uncalculated. I am aware that a rule that does not a require transmission planners to consider the full suite of benefits of transmission and to sync all of the regional and local planning processes together could cause transmission customers, such as myself, to pay more than necessary or appropriate.

5. I currently live in Windsor, Vermont. I use electricity in my home and pay my electric bills each month to the utility company, Green Mountain Power. Green Mountain Power's service to Windsor, Vermont is located within the territory of an Independent System Operator ("ISO") in the United States. Specifically, it is within ISO New England ("ISO-NE"). Order 1920 is binding on ISO-NE, and as a result the electricity rates that I pay are affected. I do not wish to pay a higher electric rate for less reliable electricity that is less resilient against extreme weather conditions -- like the flooding that has battered Vermont regularly in recent years -- and that will result in further air pollution and

ATT-067

greenhouse gas emissions. Order 1920 would require that ISO-NE plan transmission in the region consistent with a suite of public benefits, including an evaluation of how new or upgraded transmission could replace high fuel costs for generators currently serving transmission customers, help mitigate outages and high costs from extreme weather events, and reduce costs associated with the use of "peaker" plants to meet periods of high energy demand. The Order will, over time, ensure that more reasonable and lower investments are made to build a transmission system that can handle additional demand from electrification, that has the capacity to handle new renewable generation resources, and that is resilient in the face of more frequent extreme weather events. Right-sized investment, guided by Order 1920, will result in more cost-effective rates, and I will directly benefit in the form of lower electric utility rates into the future.

6. As part of my work at EDF, I am aware that we have engaged at NEPOOL since 2017 as a governance-only member of the End User Sector. I also understand that as a member EDF has the right to attend meetings, vote on key transmission planning issues, and advise the ISO-NE Board on clean energy and affordability matters vital to the organization. This voting role provides EDF with a powerful position to help shape decisions consistent with our organizational interest in supporting the integration of clean energy resources in

ATT-068

New England. If the timing for the FERC Order 1920 planning cycle is extended from three years to five years, EDF's ability to engage and exercise these rights would be substantively constrained. The increase in the planning interval would delay the opportunity to review, evaluate, and advocate for vital transmission projects—projects that are necessary for ensuring regional reliability, resilience against extreme weather, and access to renewable energy resources. A five-year cycle would mean that NEPOOL members, including EDF, would have fewer instances to shape transmission planning, cost allocation, and project selection, thereby diminishing our influence in the stakeholder process and potentially leading to missed opportunities for timely development of infrastructure that supports clean energy goals. Restricting EDF's engagement to less frequent planning cycles undermines our ability to ensure that transmission investment keeps pace with the rapid changes in energy demand, electrification, and climate resilience needs across New England.

7. I also understand that Order 1920 significantly limits the range of mandatory benefits ISO-NE must consider when selecting transmission facilities, as compared to what was in the NOPR and what was advocated for by EDF. Order 1920 excludes (1) access to lower-cost generation, (2) deferred generation capacity investments, (3) increased competition, and (4) increased market

ATT-069

liquidity. Without mandatory consideration of these benefits, EDF's ability to advocate for transmission infrastructure that supports lower cost electricity, which is also exceedingly clean, is hamstrung. Projects may be selected that do not reflect the full value that robust transmission investment can provide, leading to higher costs for ratepayers and a less dynamic, efficient grid. This restriction undermines EDF's mission to protect consumers and weakens the long-term public interest in affordable, reliable electricity.

8. I am aware of the FERC's responsibility to ensure that its rules and regulations are just and reasonable and do not unduly discriminate. I understand that the Commission found that the existing process in place for transmission operators to plan transmission resulted in an inefficient and unnecessarily costly process, leading to few regional projects being built in favor of a piecemeal process favoring short, near term reliability focused projects, which in aggregate were found to be more expensive than transmission reflective of projects built to address shared regional and interregional needs, ultimately resulting in rates that are unjust and unreasonable, and unduly discriminatory and preferential. I am concerned that further delay, or failure to implement Order 1920, would lead me to pay higher electricity rates for a less reliable and resilient electrical grid.

ATT-070

9.  I also understand that EDF has filed a Petition for Review of Order 1920 to better ensure that Order 1920 does not result in unnecessary delays or in inaccurate planning. I strongly support this effort. I am specifically aware that Order 1920 requires that transmission planners undergo planning every five years, which is two years longer than was required under FERC's initial notice of proposed rulemaking. I have been informed that FERC did not provide a substantive reason for allowing an extra two years to go by between plans, and that under the current rule, that the extra two years does not give transmission planners more time to plan, but merely serves as a sort of buffer time. I also understand that FERC declined to require transmission planners to plan for a "portfolio" of transmission projects, and instead left it to the transmission developer to decide. I have been informed that such an approach could risk unnecessary infrastructure being built, which might not otherwise be required when considering the harmony created by coinciding transmission projects. I am concerned that extra delays to the planning process would result in delays to transmission projects being built that could provide me and my region with greater access to clean energy resources. I am also concerned that an approach that evaluates single transmission lines instead of multiple projects risks inflating overall costs, and may impact my electric rates.

ATT-071

10. I have long been concerned about the impact of air pollution on my and my family's health. I work and live in Windsor, Vermont, within ISO-NE's footprint. I spend a lot of time outdoors gardening, and plan to continue spending time outdoors in the future for as long as it is safe and healthy to do so. I am also concerned about friends and family who live in other places within ISO-New England with even more polluted air. When implemented, Order 1920 will help to enable the increased deployment of renewable and clean energy projects within ISO-NE, resulting in reduced pollution from fossil-fuel resources, not limited to particulate matter, ozone, mercury and climate change-causing greenhouse gases including carbon dioxide and methane.

11. As a result of my work, I am also keenly aware of the scientific consensus that greenhouse gas emissions contribute to climate change. Climate change is directly linked to increases in severe weather events, the frequency and severity of heat waves and extremely hot days, wildfires and sea level rise. On July 2, 2024, according to the National Hurricane Center, Hurricane Beryl became the earliest Category 5 hurricane observed in the Atlantic on record and only the second Category 5 hurricane to occur in July after Hurricane Emily in 2005.[2] The National Oceanic and Atmospheric Association attributed Beryl's early

---

[2] NOAA, NWS National Hurricane Center, Hurricane Beryl Discussion Number 14 (Jul. 1, 2024), https://www.nhc.noaa.gov/archive/2024/al02/al022024.discus.014.shtml?.

development and extreme wind speed to climate change.[3] After making landfall in the Gulf of Mexico, remnants of Beryl made their way to Vermont, causing devastating flooding and the deaths of two individuals. Beryl came almost exactly one year after the Great Vermont Flood of 2023, which was supposed to have been a 100-year storm. Increases in extreme weather, including intense rains, heat waves, and warmer winters, threaten Vermont's economy and ecology and directly affects my safety.

12. I am worried that if Order 1920 is not implemented effectively, my health, well-being, and quality of life will be impacted. I therefore strongly support FERC's Order 1920 for the economic and environmental benefits that it provides to me and my family, and support EDF in representing my interests to make sure that the rule does not lead to unnecessary costs or delays.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

---

[3] Haley Thiem, *Category 5 Hurricane Beryl Makes Explosive Start to 2024 Atlantic Season*, CLIMATE.GOV (Jul. 3, 2024), https://www.climate.gov/news-features/event-tracker/category-5-hurricane-beryl-makes-explosive-start-2024-atlantic-season.

ATT-073

Date: August 20, 2025

Jennifer Freeman

ATT-074

**Friedman Declaration**

ATT-075

## DECLARATION OF SALLY FRIEDMAN

I, Sally Friedman, declare as follows:

1.     I am a member of Natural Resources Defense Council ("NRDC"). I have great respect for the people doing the work at NRDC and for NRDC's ability to address environmental issues across the board.

2.     I understand that NRDC is part of a lawsuit addressing the Federal Energy Regulatory Commission's Order No. 1920. This Order requires improved transmission planning, which will help with energy reliability and resilience, and also will help connect me and others to cheaper, cleaner energy. I know how much resistance there is to building anything in the United States, but I also know that it is important to build the energy infrastructure necessary to get us off of fossil fuels as quickly as possible to address climate change. I believe Order No. 1920 will help build the transmission grid needed to achieve a clean energy future and help avoid the worst potential impacts of climate change.

3.     My home address is 75 Prospect Park West, Apartment #6D, Brooklyn, New York, 11215-3059. I have lived here since 1996 and have no plans to move.

4.     The electricity rates I pay and the electric service I receive will be affected by Order No. 1920. Every month I pay Con Edison for electricity in my home. I have noticed a substantial increase in my electricity over the last year or so and now pay roughly $100 a month for electricity even in the winter. I was

ATT-076

not surprised to learn that I pay more than average for electricity because of grid congestion, because it feels like New Yorkers pay more for everything. While I could manage an increase in my energy bill, I would not like my bill to go up.

5.    The importance of a functioning energy infrastructure system hit home for me when I lived through the Northeast Blackout of 2003. When the blackout started, I was at work in Manhattan and had stepped out to buy a chocolate chip cookie. Suddenly the lights in the café went out and the cash register wouldn't open. I had to walk up eight flights of stairs to my office before learning what had happened. Then, like thousands of others, I walked several miles home across the Brooklyn Bridge, well into Brooklyn. Sidewalks were packed with pedestrians, and the vehicles on the streets were practically at a standstill. Cellphones were jammed and you couldn't make calls. It was a surreal scene.

6.    The blackout was a very nerve-wracking experience that I hope to not experience again. I had three very young children at the time and felt that my family was very vulnerable, particularly because we lived in an apartment building. I feared getting up and down the six flights of steps with small children, given that the elevator was not functioning. I was also very concerned that we would eventually run out of water (for drinking and toilets) because the pumps required to get water up to our sixth-floor apartment do not work without electricity. I also

ATT-077

feared our food would go bad in the refrigerator. This experience made me keenly aware of how vulnerable we can be to an entire system collapsing in a second.

7. I still worry about big blackouts occurring. I especially worry about what would happen if there was a climate-change-caused extreme weather event at the same time as a blackout. I understand that we have come close before and, without a change to the infrastructure, likely would come close again. For example, I have heard that in 2022, Winter Storm Elliot caused gas infrastructure to freeze, leading to power and heat outages during single digit temperatures, which meant that Brooklyn was hours away from being stuck without power for months. I also lived through Superstorm Irene in 2011, which left many parts of New York City under water and without electricity. Winter Storm Elliot and Super Storm Irene are examples of how climate change is already making weather more sudden and severe.

8. Climate change causes me great anxiety. I worry about whether New York will be habitable in the future, especially for my kids who are now young adults. We have to address human activities causing the climate to change. One of the most important ways to do this is to end our reliance on fossil fuels, which are a primary source of greenhouse gas emissions. I would like my energy to come from renewable resources because renewable resources are less polluting and will cause less global warming. They are also less expensive.

ATT-078

9.      This is why I support efforts to transition our energy system off fossil fuels and onto more renewable energy resources. I support New York State's Climate Leadership and Community Protection Act, which sets a goal of 70% clean energy by 2030 and 100% clean energy by 2040. And I support planning and building the transmission infrastructure necessary to meet this goal.

10.      I know there are fossil fuel generating stations near my home. I can see Ravenswood Generating Station from my roof. I am glad to know that, while Ravenswood currently burns oil and gas, it is transitioning to a green energy hub. However, I also learned that I live approximately a mile and a half from the Gowanus Generating Station. I learned that this gas peaker plant is especially polluting because it emits more air pollution than similar plants, including both greenhouse gases as well as pollutants harmful to human health. I learned it was supposed to close last year, but that it will now likely stay open longer because there is not enough transmission to bring clean energy to replace the energy supplied by Gowanus. I am concerned by this change. We need to transition off fossil fuels as soon as possible to limit the change to the climate. Closing dirty plants like Gowanus also will improve the health of my family and community by decreasing air pollution. Air pollution is a massive killer that should not be shrugged off.

11.      In addition to being concerned about climate change, I also strongly believe that we need to transition off fossil fuels because they cause air pollution

ATT-079

like smog. I am keenly aware of smog because I grew up in the San Fernando Valley of Los Angeles in the 1960s and 1970s where the air quality was often terrible. Some people did not even notice the pollution, but I was always aware of it and despised it. Every morning, I looked outside – not to see if it was sunny or cloudy, but to see how brown the sky was from pollution. Its brown haze hung over the entire valley, literally hid the surrounding mountains from view, and when it was really bad, burned my eyes and made my lungs hurt. I have always felt the smog before most people I know. Unfortunately, the air quality in New York City is often bad too. When it's smoggy, I still feel my eyes burn and my lungs ache. On those days, I spend a lot more time indoors. For example, I will either exercise early in the morning or inside in the air conditioning to avoid the bad air. I also will close the blinds just to avoid looking at the smog. I often check the Air Quality Index with anxiety. I wish I didn't have to do this.

12.    I also have experienced climate-related natural disasters. In 2021, I traveled to Lake Tahoe, California, with my family to attend a wedding. As we drove to Lake Tahoe, the Caldor Fire broke out. The next morning, I woke up to a black cloud of smoke moving across the mountain right behind where my family and I were staying, and ash was falling from the sky. I knew we had to get out, and I made sure we did that morning. It was very scary driving away because we could see dark grey and orange smoke everywhere, and I was afraid that we would get

ATT-080

stalled in traffic, with fire approaching the road. The wedding was rescheduled to the San Francisco bay area, but even there, I could see and feel some of the wildfire smoke that had traveled down from the Lake Tahoe area. I feel traumatized by this experience, and it makes me want to avoid vacationing in the California mountains. I grew up in California and remember having fires as we grew up, but this was different. The fires now are bigger and occur more often because of the climate crisis.

13.    Since 2023, smoke from fires in the western United States and Canada has blown all the way to my home in New York. This has really upset me. After my experience with the fire in Lake Tahoe, I thought I was lucky to live in the Northeast where it is green and we have bright blue skies much of the summer. But the smoke from the fires in Canada has made me feel like there is no escaping climate impacts anywhere and that we must speed the transition to clean energy as quickly as possible.

14.    I support NRDC's lawsuit defending and improving Order No. 1920.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 22nd day of August 2025.

_____
SALLY FRIEDMAN

ATT-081

**Howe Declaration**

# DECLARATION OF CULLEN HOWE

I, Cullen Howe, declare as follows:

1. I have been a resident of New York for the past 25 years and currently reside in New York, New York.

2. I am an employee of the New York office of the Natural Resources Defense Council ("NRDC") and have been employed with NRDC since 2019. I work as a Senior Advocate specializing in improving transmission systems to decarbonize the power sector. NRDC employs approximately 700 scientists, lawyers, and environmental specialists to ensure the rights of all people to clean air, clean water, and healthy communities.

3. I am also a member of NRDC and have been a member since 2020. I became a member to support NRDC's efforts that safeguard my personal and family interests, as well as the well-being of my community. I am particularly committed to NRDC's work advocating for energy policies that ensure just and reasonable electricity rates, promote conservation and energy efficiency, advance renewable energy resources, and reduce environmental pollution, including the emission of greenhouse gases.

4. NRDC is a nonprofit membership organization founded in 1970, with a mission to address the world's most pressing environmental challenges using law, science, and the collective power of people. Over its more than fifty years of

ATT-083

advocacy, NRDC has played a pivotal role in representing the public interest in major environmental, public health, and energy issues. Its impactful work includes contributing to the development of the Clean Water Act, aiding in the recovery of the ozone layer, and securing lead pipe replacements for residents.

5.      NRDC's advocacy is deeply rooted in rigorous research and scientific integrity. Every NRDC report and issue brief undergoes a thorough peer review process conducted by our Science Office, a process which includes evaluations by external experts. Our advocates are highly knowledgeable in their respective fields, with NRDC employing scientists to guide and support its advocacy and economists to develop strategies that foster global prosperity while enhancing environmental and community well-being. NRDC leverages the expertise of its science, law, and economic teams to help pass and enforce critical environmental, health, and energy laws. Operating at local, state, national, and international levels, NRDC collaborates with decision-makers to craft innovative, enduring environmental solutions. Moreover, NRDC ensures these laws are upheld by taking legal action to hold polluters accountable and protect environmental gains.

6.      Chief among the wide range of environmental issues NRDC works on is global climate change and air pollution. This advocacy covers a broad range of policy areas including a transmission grid that is not only cleaner but also more resilient and affordable. Simply put, a grid resilient in the face of increasingly

extreme weather driven by climate change is vital to protect human health and the economy.  Increasingly extreme weather events have already caused deaths and billions of dollars in damage because of grid failures caused by the lack of transmission and lack of resource diversity. For example, both Winter Storm Uri in 2021 and Elliot in 2022 froze gas and coal systems, causing blackouts for millions of people and tragically leading to hundreds of deaths. Extreme heat and wildfires routinely cause power outages during summer months that often disproportionately impact the most vulnerable communities. In each of these cases, inadequate transmission played a major role in compounding the crisis, limiting the ability to move power from regions with surplus supply to those in desperate need. And inadequate interregional transfer capability played a significant role in the August 2020 California heat wave, where excess energy in the north could have alleviated the blackouts in the south. Simply put, increased transmission allows a greater diversity of resources to deliver energy at a more competitive price across a broader region, saving lives and billions of dollars.

7.    As part of its efforts to establish an affordable, resilient, and decarbonized electric grid, NRDC has for many years advocated before the Federal Energy Regulatory Commission ("FERC") concerning regulation of electricity transmission and also before regional transmission planning entities and state siting and regulatory authorities. Starting in the mid-1990s, NRDC has coordinated a

ATT-085

coalition called the Sustainable FERC Project, comprised of national and regional environmental, energy policy, and other public interest organizations, in advocating for regulations that ensure a non-discriminatory transmission grid that levels the playing field for all types of interconnecting resources.

8. NRDC's Sustainable FERC Project is powered by a dedicated team of 18 full-time attorneys and advocates, including myself, who serve as a vital resource for the broader community engaged with FERC. This team represents and coordinates a network of groups interfacing with FERC, regional transmission organizations ("RTOs"), emerging market regions in the West and Southeast, Congress, federal agencies, state utility commissions, and courts. We work closely with consumers, community groups, clean energy businesses, producers of clean energy, and scientific experts to advance our mission. Our activities include meeting with FERC commissioners and staff, organizing and coordinating meetings with allied groups, submitting comments, testifying at technical conferences, and rallying support for these initiatives. Additionally, the Sustainable FERC Project actively engages with federal administration leaders to influence FERC policy and federal priorities.

9. One of NRDC's top federal electric regulatory priorities has been advocacy around Order No. 1920, which reforms existing transmission planning and cost allocation processes across the nation's transmission owners and operators

ATT-086

in order to promote efficient and cost-effective transmission solutions, prevent undue discrimination by public utility transmission providers, and ensure just and reasonable rates for transmission services.[1] Order No. 1920 requires all transmission providers to participate in a long-term regional transmission planning process that meets threshold requirements designed to accurately identify future transmission needs and facilities that would most efficiently and effectively meet those needs, to incentivize the selection of transmission projects with the greatest benefits to consumers, to establish cost allocation processes to pay for those projects, and to increase transparency and stakeholder participation in transmission planning. Order No. 1920's planning provisions are designed to ensure that transmission service is provided at just and reasonable rates and without undue discrimination or preference. Order No. 1920 requires that transmission providers nationwide regularly engage in long-term transmission planning, taking into account the known drivers of system-wide transmission needs, including market cost and technology trends, planned retirements, and state, local, and Tribal public policies. Because regional transmission infrastructure often takes up to a decade to plan and build, it is impossible to meet system needs without this kind of long-term, system- wide planning.

---

[1] *Bldg. for the Future Through Elec. Reg'l Transmission Planning and Cost Allocation*, 89 Fed. Reg. 49,280 (June 11, 2024), 187 FERC ¶ 61,068 (2024).

ATT-087

10.    The Commission's requirement that transmission providers and operators plan to meet public policy needs is also crucial because, under the Federal Power Act, states—not the federal government—hold the authority to determine what types of energy generation resources can be developed and where they can be located. States can use this power to mandate resources that provide more affordable energy or protect citizens from environmental and health harms.

11.    However, this state authority can be undermined if transmission operators fail to build the infrastructure necessary to deliver energy from state-designated resources to residents. Unfortunately, transmission providers generally have strong economic disincentives against constructing any transmission that eases grid access to resources that threaten the market power or profits of affiliated resources. Therefore, many state energy requirements and efforts of private competitors to enter the wholesale energy market are being thwarted by a lack of transmission infrastructure necessary to connect new resources to the grid. And transmission operator policies often discriminate against such resources and systematically fail to proactively plan holistically for foreseeable changes in supply and demand. Order 1000 did not fix this problem, as it left transmission providers with broad discretion that has continued to allow discriminatory and piecemeal planning practices to persist. Order No. 1920's emphasis on forward-looking and long-term regional transmission planning aims to correct these issues,

ATT-088

ensuring that the nation's electric grid meets current and future needs reliably, fairly, and affordably.

12.    NRDC has been instrumental in shaping and advancing critical climate policies and energy-related programs at the state level. For example, in New York, NRDC played a key role in the development and implementation of the Climate Leadership and Community Protection Act ("CLCPA"), which sets ambitious goals for reducing greenhouse gas emissions, expanding renewable energy, and advancing environmental justice. Additionally, NRDC advocated for the adoption and implementation of New York's "Peaker Rule," which was adopted in 2019 and mandates that highly polluting and aging power plants, which typically operate only during peak demand periods, must either meet strict emissions limits or be shut down.[2]

13.    The failure to plan for adequate transmission, however, has hindered these vital state laws.  In 2023, the New York Independent System Operator ("NYISO"), New York's grid operator, highlight a critical challenge in the transition to cleaner energy. In compliance with the Peaker Rule, four super-polluting gas generating facilities—Gowanus 2 & 3 and Narrows 1 & 2—were required to retire in May 2025 as they are unable to meet the Peaker Rule's pollution limits. The neighborhood where Gowanus and Narrows are located already experiences high concentrations of air pollution and rates of respiratory

---

[2] 6 NYCRR Subpart 227-3.

disease. However, NYISO reported that Gowanus and Narrows were still deemed essential for maintaining grid reliability. Despite having several years to plan for the known need to replace these harmful, costly plants with cleaner, affordable alternatives, NYISO did not announce that an alternative transmission or generation solution was necessary until it was too late for one to be built in a timely manner. As a result, NYISO has mandated that these high-emission resources remain operational beyond their planned retirement date, delaying their phase-out until at least 2026 when a more substantial transmission solution is expected to be completed. Without implementing the kind of transmission planning requirements established in Order No. 1920, it is likely that these planning failures will continue.

14.    The climate outcome of this situation is a delay in the transition from fossil fuels to cleaner energy sources, as the continued operation of super-polluting generating facilities results in ongoing high emissions of greenhouse gases and other pollutants. This delay hampers progress toward the state's climate goals that NRDC helped fight for and prolongs the harmful environmental and public health impacts associated with these outdated power plants. It also highlights the critical need to plan for and build transmission solutions to enable the swift replacement of polluting energy sources with renewable alternatives, thereby reducing emissions and mitigating climate change. Implementation of Order No. 1920 will help

achieve this goal.

15.    In addition to the human health harms associated with these plants, New Yorkers continue to bear the burden of unnecessarily high energy prices. In 2021 alone, transmission congestion preventing low-cost energy resources in upstate and western New York from reaching consumers downstate cost consumers $551 million.[3] Nationwide, transmission congestion preventing access to cheaper energy is estimated to have cost U.S. consumers over $13 billion in 2021 alone.[4] Well-planned regional transmission can alleviate these costs by enabling low-cost generators to participate more fully in wholesale markets. Transmission constraints frequently lead to significant electricity price disparities, even between neighboring regions, limiting the ability of affordable power sources to supply electricity to areas with higher prices. Moreover, increased transmission capacity and better interregional connections can reduce the market power of generators. In transmission-constrained areas, generators often exploit bottlenecks to set uncompetitively high wholesale prices, further driving up costs for consumers. Implementation of Order No. 1920 will help to alleviate these problems by ensuring significant advances in planning and cost allocation in a manner that will directly achieve the goal of NRDC and its members to attain a resilient and cost-

---

[3] Grid Strategies, *Transmission Congestion Costs in the U.S. RTOs* at 2 (Mar. 2023), https://gridstrategiesllc.com/wp-content/uploads/transmission-congestion-costs-in-the-us-2021-update.pdf.
[4] *See id.*

ATT-091

effective clean energy grid that serves the public interest.

16. In light of Order No. 1920's importance to our transmission, renewable energy deployment, and air quality goals, NRDC has dedicated significant effort to participate in the development of Order No. 1920. NRDC has invested significant monetary and staff resources to provide record evidence demonstrating the current problems with transmission planning nationwide and worked collaboratively with a wide array of stakeholders to propose effective and efficient regulatory solutions. Following the Commission's 2021 Advanced Notice of Proposed Rulemaking[5] and the 2022 Notice of Proposed Rulemaking,[6] NRDC drafted, reviewed, and sign on to NGO initial and reply comments about the rule.[7] And, following issuance of Order No. 1920, NRDC helped draft and signed into a request for rehearing and clarification on a number of discrete findings to provide clarity for all stakeholders and ensure that Order No. 1920 achieves its aim of ensuring that all transmission providers comply with baseline requirements necessary to ensure open access to a reliable, affordable, and just transmission system.

---

[5] *Building for the Future Through Electric Regional Transmission Planning and Cost Allocation and Generator Interconnection*, 176 FERC ¶ 61,024 (2021), 86 Fed. Reg. 40266 (July 27, 2021).
[6] *Building for the Future Through Electric Regional Transmission Planning and Cost Allocation and Generator Interconnection*, 179 FERC ¶ 61,028 (2022), 87 Fed. Reg. 26,504 (May 4, 2022).
[7] *See* Comments of Public Interest Organizations (Oct. 12, 2021), Accession No. 20211012-5519; Reply Comments of Public Interest Organizations (Nov. 30, 2021), Accession No. 20211130- 5284; Comments of Public Interest Organizations, Docket No. RM21-17-000 (Aug. 17, 2022), Accession No. 20220817-5270; Reply Comments of Public Interest Organizations, Docket No. RM21-17-000 (Sept. 19, 2022), Accession No. 20220919-6534.

17.    As part of its core mission, NRDC actively participates in RTO planning processes across the country to ensure the grid evolves in ways that support reliability, affordability, and the transition to clean energy.

18.    In New York, through NYISO, NRDC is a formal stakeholder. This means NRDC is a party to the ISO Agreement[8] and has voting rights on key committees, including the Management Committee (responsibility includes "supervision and review of the work of the other ISO Committees"[9]), Operations Committee (responsible for planning oversite and includes the Transmission Planning Advisory Subcommittee), and Business Issues Committee (includes the Electric System Planning Working Group).[10] This gives us a meaningful role in shaping how transmission needs are identified and addressed. Our work in NYISO involves engaging at multiple levels of the planning process—from high-level management and business committees to technical working groups. This structure allows us to bring environmental and consumer perspectives directly into decision-making. Specifically, we are part of the review process for transmission plans and proposed system expansions, including those designed to meet public policy needs. This means we have a seat at the table when the state and NYISO consider projects that will shape New York's grid for decades to come. For

---

[8] Agreement Between New York Indep. Sys. Operator, Inc. & Transmission Owners, §§ 1.34, 2.02 (1999) (hereinafter "NYISO/TO Agreement").
[9] *Id.* at 7.02(a)
[10] *Id.* at 7.01, 7.04, 8.03. 9.02.

example, the Public Policy Transmission Planning Report[11] must be submitted to both the Transmission Planning Advisory Subcommittee and Electric System Planning Working Group for review and comment. The Report then goes to the Operations Committee and Business Issues Committee for discussion and an advisory vote.[12] Only then is the Report, along with the input from the Committees, sent to the ISO Board for review and action. Similar processes are required for the Reliability Needs Assessment[13] and the Comprehensive Reliability Plan.[14] The Board thus relies on information NRDC provides as a voting member of these Committees in making its transmission decisions.

19.     NRDC's engagement in NYISO is just one example of how we work within RTOs nationwide. Across every region, we push to make sure transmission planning serves the public interest—by fairly weighing the long-term benefits of new infrastructure, advancing renewable energy, improving reliability, and ultimately lowering costs for consumers. These processes are often complex and technical, requiring extensive oversight, coordination with multiple stakeholders, and sustained advocacy to make sure public interest values are not overlooked.

20.     The improvements to regional planning required under FERC's Order 1920 are essential to making this work effective. Without stronger

---

[11] *See* Article 31.4 of Attachment Y.
[12] *Id.* at 31.4.11.1.
[13] *Id.* at 31.2.3.
[14] *Id.* at 31.2.6.1.

requirements for long-term planning, transparency, and cost allocation, it is difficult for stakeholders like NRDC to push for the kinds of projects the grid actually needs.

21. At the same time, improvements in Order 1920 are necessary. For example, despite acknowledging that Order 1000 had produced inefficient and costly outcomes, FERC left those processes in place for economic and reliability projects, forcing them to run alongside the new long-term process in an uncertain and overlapping way. This makes our job harder and more costly, as we must engage in duplicative and resource-intensive proceedings while providers continue pursuing piecemeal projects instead of more cost-effective long-term solutions.

22. Keeping the Order 1000 process alongside Order 1920 will significantly increase the burden on advocates. Instead of one unified framework, we will be forced to engage in duplicative proceedings, track multiple stakeholder forums, and navigate conflicting modeling assumptions. Staff will be required to spend additional time analyzing separate benefit metrics, responding to overlapping comment cycles, and intervening against piecemeal projects that conflict with long-term solutions. On top of this, maintaining parallel processes requires additional legal filings and compliance monitoring, stretching limited resources and perpetuating the very inefficiencies and costly outcomes that Order 1000 created in the first place.

ATT-095

23.    Without these and other changes that NRDC is advocating for in this proceeding, Order 1920 will not be as effective as intended. The rule's promise depends on regions moving beyond business-as-usual and embedding its requirements into their planning frameworks. If they fail to do so, we risk falling back into fragmented, inefficient processes that undercut renewable buildout and drive up costs, making our advocacy harder and stretching our resources across duplicative and ineffective planning efforts.

24.    NRDC is also now actively engaged in efforts to ensure that planning authorities around the country effectively implement Order No. 1920's reforms. This includes coordination of national and regional NGOs involved in Order No. 1920 compliance proceedings in regions across the country, development of comments in these regional processes, and meetings with FERC and Commissioners' staff on Order No. 1920 compliance. Implementation of Order No. 1920 will help NRDC gain access to information necessary to oversee utility transmission planning and implementation in the future. It will also provide greater opportunities for NRDC, members, coalition partners, and the public to participate in the transmission decision-making and cost allocation processes.

25.    NRDC's interest in fair and cost-effective implementation of new transmission that allows renewable energy resources to be connected to the electricity grid will be harmed if Order No. 1920 were to be struck down.

ATT-096

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 25th of August 2025.

CULLEN HOWE

15

**Kim Declaration**

ATT-098

## DECLARATION OF GINA KIM

I, Gina Kim, hereby declare as follows:

1. I am a Sierra Club employee. II am the Deputy Chief Operations Officer.

2. As the Deputy Chief Operations Officer, I am responsible for overseeing many aspects of the operations of the Sierra Club offices. Our offices are located at 2101 Webster Street, Suite 1300, Oakland, CA 94612 and 50 F St NW, Washington, DC. My responsibilities include paying in accordance with the lease agreement the utility bills, including electricity bills, for the Oakland and Washington DC offices.

3. Sierra Club uses electricity in our offices. We pay electricity each month to our landlord. Our landlord then transmits this payment to the local electric utilities.

4. Sierra Club would prefer to pay less for electricity in our offices.

5. I understand that the Oakland Office is in CAISO's footprint and the Washington DC Office is in PJM's footprint.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in California on this 22nd day of August, 2025.

*Gina Kim*

Gina Kim
Deputy Chief Operations Officer

ATT-099

**Macfarlane Declaration**

## DECLARATION OF ROSS MACFARLANE

I, Ross Macfarlane, hereby declare as follows:

1. My name is Ross Macfarlane. I have been a resident of Washington for the past 44 years, and I currently live in Seattle, WA.

2. I have been a member of Sierra Club for approximately 40 years. I became a member of Sierra Club initially to support its work promoting conservation and the environment. Over the years, I have become increasingly involved with Sierra Club's leading role in cleaning up the energy sector and fighting against the climate crisis.

3. In 2011, I became a leader in the Power Past Coal campaign, which was a Sierra Club led coalition opposing the construction of coal export terminals in the Pacific Northwest. My volunteer contributions reached their apex when I was elected as a Director on the Sierra Club National Board in 2018 and was re-elected in 2021.  I served on the National Board until May, 2024.. I have held many leadership positions at Sierra Club, including serving for three years as the Vice President of Conservation, chair of the Conservation Policy Committee, chair of the Business Partnership Committee, and chair of a working group that developed Sierra Club's policies on renewable energy and transmission siting.

4. In my role on renewable and transmission siting policies, I helped guide Sierra Club's policies  supporting the responsible development and siting of transmission as a critical element of meeting Sierra Club's climate and clean energy goals. Without robust transmission, Sierra Club cannot meet its clean energy and climate change goals. And without improved transmission planning, it will not be possible to get the right transmission in the right places.

ATT-101

5. With its Beyond Coal Campaign, Sierra Club has run the single most effective and influential climate campaign in United States history. It has been a driving force in transitioning the nation away from fossil fuels and toward clean energy from renewables, storage, demand-side resources, and other emission-free resources. Without reforms to transmission planning, however, Sierra Club and its members cannot realize the transition to an energy sector truly free from fossil fuels. The current transmission planning processes lead to too many one-off transmission projects that maintain the status quo rather than robust regional and interregional projects needed to facilitate the energy transition. Sierra Club has been a leading voice in changing the transmission planning process and Order No. 1920 is an important step in that process.

6. Without improved transmission planning that considers a wide variety of benefits, the United States cannot ensure that electric ratepayers such as myself and neighbors can see the energy transition at least cost. Congestion problems throughout the country, including in Washington, increase the cost of electricity and risk making the energy transition unnecessarily and unfairly expensive.

7. A lack of robust transmission planning threatens to undermine much of the work that Sierra Club and its members value the most. In Maryland, for example, the owner of the Brandon Shores coal plant entered into an agreement with Sierra Club to stop burning coal by the end of 2025. When the owner notified PJM of its intent to retire the plant, however, PJM determined that the aging, uneconomic Brandon Shores coal plant cannot shut down in 2025 because there is insufficient transmission infrastructure in the area. Instead, Maryland ratepayers - including Sierra Club members - must pay hundreds of millions of dollars to keep the uneconomic coal plant online while PJM plans and

ATT-102

oversees construction of a transmission solution in the area. PJM expects that Brandon Shores will continue burning coal until the end of 2028 at the earliest. This is exactly the kind of situation that Order No. 1920 will help avoid.

8. Not only does Sierra Club seek to ensure that the right transmission is built in the right places, but it also works tirelessly to help individual states meet their clean energy goals. Sierra Club has been critical in passing clean energy and climate legislation across the country, including recently in Washington, Michigan, Minnesota, New York, Illinois, and Massachusetts. Transmission is necessary to ensure that these and other states can meet these goals. Order No. 1920's requirement that transmission planners consider these state mandates is vitally important to the success of their success.

9. There is also room for improvement of Order No. 1920 by requiring FERC to modify the rule to reach our clean energy goals faster and at least cost. For example, Order No. 1920 should have shorter planning cycles, should account for even more benefits of transmission, and should require the use of portfolios in the transmission planning process.

10. In addition to supporting the goals of Sierra Club, I use electricity in my home in Seattle and my cabin in Yodelin, Washington. I pay an electric bill each month to Seattle City Light and Chelan County Public Utility District. Order No. 1920 will help reduce my electric bills and provide me better access to electricity from clean energy sources.

11. The improvements to Order No. 1920 that the Sierra Club is advocating for will further reduce my electric bill and provide greater access to electricity from clean energy sources.

I declare under penalty of perjury that the foregoing is true and correct.

ATT-103

Executed in Washington State on this 22nd day of August, 2025.

Ross Macfarlane

ATT-104

**Malkin-Weber Declaration**

**DECLARATION OF MELISSA MALKIN-WEBER**

I, Melissa Malkin-Weber, hereby declare as follows:

1. My name is Melissa Malkin-Weber. I am over 18 years of age. This declaration is based on my personal knowledge.

2. I am Co-Director of the North Carolina Clean Energy Fund ("NCCEF").

3. NCCEF is a nonprofit that operates on a "Green Bank" model. Our mission is to accelerate investment in clean and efficient energy solutions and increase climate resilience in North Carolina, particularly to benefit underserved populations. NCCEF partners with public and private investors, foundations and other non-profit organizations to deploy sustainable financing solutions that will create long-lasting environmental, economic and social benefits.

4. NCCEF is a member of the North Carolina Sustainable Energy Association ("NCSEA"). NCSEA was the fiscal sponsor of NCCEF during its development phase, and NCCEF has been an official member since May 2023. As an NCSEA member, NCCEF participates in biweekly member meetings and other discussions with NCSEA staff. We also receive

ATT-106

additional perks, like priority access to NCSEA events and members-only webinars, meetings, and resources, among other things.

5. As a Green Bank, NCCEF's primary function is to connect capital with clean energy projects. We offer financial products including direct loans for clean energy and credit enhancements to support other lenders to make clean energy loans. We also work to develop the market for clean energy investments by sharing information, standardizing lending documents and processes, coordinating government resources, and delivering turn-key solutions to consumers.

6. For any type of utility-scale clean energy investment, the lack of available transmission capacity jeopardizes project economics. That is because expanding the transmission grid to accommodate a new resource costs a substantial amount of money and takes a long and uncertain amount of time. Together, these create barriers to financing that lenders like us cannot often overcome.

7. North Carolina currently suffers from insufficient transmission capacity. A primary reason is the region's ineffective transmission planning processes. Contrary to best practices, these processes separately address needs created by reliability violations, economic need, and public policy requirements, all

on a relatively short time horizon.  This results in small-scale, band-aid solutions that grow the grid in a piecemeal, inefficient, and costly fashion. Proactive planning practices that consider these diverse needs together over a longer time period, like those required by Order No. 1920, have been proven to expand the grid in a more cost-effective way.

8. For these reasons, NCCEF supports NCSEA's involvement in this case to defend certain aspects of the Federal Energy Regulatory Commission's Order No. 1920.  We support many of the rule's requirements, including that regional transmission planning processes look at least 20 years ahead and consider multiple scenarios that reflect a changing resource mix, demand, and extreme weather. An order upholding these positive aspects of the rule would put the necessary planning infrastructure in place to allow NCCEF to finance grid-scale clean energy projects.

9. However, I am concerned that the rule will have limited value if it effectively allows transmission providers like Duke Energy to continue their siloed, business-as-usual grid planning practices.  Likewise, failure to conduct proactive transmission planning on a similar interval to the state-regulated utility generation planning process (i.e., every 2-3 years) will prevent Duke Energy from expanding its grid in a manner that promptly and

ATT-108

economically allows for the interconnection of new, utility-scale generation resources.  Finally, if the planning process does not account for transmission's ability to unlock low-cost resources like solar and battery storage, it may be hard justify building new lines. Taken together, these planning flaws will cause the state's transmission shortage and high costs to interconnect to continue.  This will stymie investment and severely complicate our operations.

ATT-110

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 21day of August, 2025.

_____

Melissa Malkin-Weber

ATT-110

**Moore Declaration**

## DECLARATION OF EDDY MOORE

I, Eddy Moore, hereby declare as follows:

1. My name is Lawrence E. "Eddy" Moore, III.  I am over 18 years of age. This declaration is based on my personal knowledge.

2. I live in Charleston, South Carolina.

3. I have been a member of the South Carolina Coastal Conservation League (CCL) since 2022.  Previously, I was employed by CCL as its Energy & Climate Program Director.  I have since moved on, but have maintained my membership in CCL and have continued making financial contributions to the organization.

4. I pay for electric service from Dominion Energy South Carolina ("Dominion").  I have been a Dominion electricity customer since approximately 2016.  My electricity rates have increased in recent years, and I would prefer to have lower rates.

5. I am concerned that my electricity rates will be higher than necessary if Dominion does not add low-cost renewable energy resources to its generation fleet and instead directs hundreds of millions of dollars of ratepayer funds towards a significantly-increased reliance on new gas-fired

ATT-112

power plants. An efficient, well-planned expansion of Dominion's transmission grid is necessary to add clean energy resources at an adequate scale to hedge volatile gas costs and avoid increased reliance on gas-fired power. At the same time, I am concerned that expanding the transmission grid in an inefficient, piecemeal manner will also result in higher electricity rates.

6. I am also concerned that Dominion's transmission grid is vulnerable to disruption and also does not enable optimal regional generation dispatch during increasingly frequent extreme weather events. A couple years ago, some Dominion customers experienced rolling blackouts during a major winter storm. I was fortunate to avoid any outages that time, but such storms are becoming much more common, and I may not be so lucky next time. Dominion should have to plan its electric grid for this type of weather and should promote transparent regional planning to strengthen the ability for utilities across the region to avoid disruption during extreme weather events.

7. For these reasons, I support CCL's engagement in this case to defend certain aspects of the Federal Energy Regulatory Commission's Order No. 1920. I support the rule's requirements that regional transmission planning

ATT-113

processes like those Dominion participates in plan for extreme weather and a changing generation mix, but that they also do so in an efficient way.

8.  However, I am concerned that the rule will be unable to accomplish these goals if it fails to require Dominion and other utilities in the area to plan their transmission expansion frequently enough to adapt to changing conditions like extreme weather, more electricity demand from data centers and manufacturing facilities, and a changing power plant fleet.  If Dominion can effectively continue its current planning practices, which I understand Order No. 1920 to allow, my electric service will continue to come from dirty fossil fuel plants, will become even less reliable, and will increase my power bills.

ATT-114

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this <u>14th</u> day of <u>August</u> 2025.

                                             Lawrence E. "Eddy" Moore III

ATT-115

**Paul Declaration**

## DECLARATION OF GENEVIEVE PAUL

I, GENEVIEVE PAUL, state and declare as follows:

1.      I am the Senior Director of Membership Marketing and Mid-Level Programming at the Natural Resources Defense Council ("NRDC"). I have been in this position since January 13, 2025. I have worked in the membership department of NRDC for approximately 8 months. I submit this declaration in support of NRDC's lawsuit related to the Federal Energy Commissions ("FERC") Order No. 1920.

2.      My duties include supervising the preparation of materials that NRDC distributes to members and prospective members. Those materials describe NRDC and identify its mission.

3.      NRDC is a membership organization incorporated under the laws of the State of New York. It is recognized as a not-for-profit corporation under section 501(c)(3) of the United States Internal Revenue Code.

4.      NRDC currently has approximately 477,000 members. There are NRDC members residing in each of the fifty United States and in the District of Columbia.

5.      NRDC's mission statement declares that the Natural Resources Defense Council's purpose is to safeguard the Earth: its people, its plants and animals, and the natural systems on which all life depends. Furthermore,

ATT-117

NRDC strives to protect nature in ways that advance the long-term welfare of present and future generations, and works to foster the fundamental right of all people to have a voice in decisions that affect their environment. Additionally, NRDC works to achieve clean energy solutions that will lower consumer energy bills, meet U.S. carbon reduction goals, accelerate the use of energy efficiency, renewable energy, and ensure that clean energy is affordable and accessible to all.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 26th day of August, 2025.

GENEVIEVE PAUL

ATT-118

**Ramsey Declaration**

## DECLARATION OF KATHERINE RAMSEY

I, Katherine Ramsey, hereby declare as follows:

1. My name is Katherine Ramsey. I have been a resident of California for the past ten years, and I currently live in Palo Alto, CA.

2. I am a Senior Attorney in the Environmental Law Program of the Sierra Club and have been employed with Sierra Club since September 2017. Sierra Club is national, non-profit organization whose purpose is to explore, enjoy, and protect the wild places of the earth; to practice and promote the responsible use of the earth's ecosystems and resources; and to educate and enlist humanity to protect and restore the quality of the natural and human environments. An important part of the Sierra Club's current work at both the national and chapter levels focuses on environmental and public health problems associated with energy generation and transmission. To promote affordable and clean energy, we frequently advocate for improvements to transmission planning and cost allocation. To further these goals, Sierra Club undertakes litigation and other advocacy on behalf of its members' interests.

3. I am a member of the Sierra Club and have been since 2017. I joined Sierra Club as an employee and became a member because I believe in and support Sierra Club's work. That work protects my personal interests, the interests of my family, and my community's interest in a healthy climate and safe air quality. I am most interested in Sierra Club's advocacy for energy policies that reduce greenhouse gas emissions and other pollution, result in just and reasonable electricity rates, and make efficient use of electricity and the electric grid.

ATT-120

4. Among my current roles at the Sierra Club, I work as an attorney representing Sierra Club's Beyond Coal Campaign. The Beyond Coal Campaign seeks move the United States away from coal and fossil fuel-based generation toward renewable and other clean energy resources.

5. I use electricity in my home, and I pay an electric bill each month to my utility, the City of Palo Alto Utility. Order No. 1920 will likely help reduce my electric bills and provide me and other ratepayers better access electricity from clean energy sources.

6. The improvements to Order No. 1920 that the Sierra Club is advocating for will further reduce my electric bill and provide greater access to electricity from clean energy sources.

7. The Sierra Club has been instrumental in the replacement of fossil fuel generation with renewable and other sources of clean energy. It has accomplished those goals through, among other tools, the enforcement of laws and regulations, wholesale electricity system market improvements, and regional electric system planning. The Sierra Club also supports improvements to state energy policies that drive the transition away from fossil fuels toward renewable sources of energy.

8. Order No. 1920 largely supports the Sierra Club's efforts in California and across the country to transition away from fossil fuels at least cost by improving transmission planning. These improvements will require transmission planners in California and across the country to develop transmission projects that reduce congestion and allow renewable energy resources to come online at least cost while maintaining reliability. The Sierra Club was active in the development of Order No. 1920, filing multiple sets of public comments recommending improvements to the rule, but was largely supportive of the

ATT-121

following aspects of the rule that were adopted as requirements in Order No. 1920: (a) transmission planning must include a 20-year forward-looking planning horizon that incorporates changes to state and federal policies; (b) transmission planning must include the consideration of a minimum set of benefits that transmission projects bring beyond reliability; and (c) transmission planners must create a cost allocation methodology for new transmission projects. These aspects of the Order No. 1920 are necessary for the Siera Club to meet its clean energy goals.

9. Sierra Club is active in supporting California's clean energy goals. For example, Sierra Club has long advocated for more ambitious greenhouse gas targets across multiple industries and particularly in the electric sector through its participation in the California Air Resources Board's Assembly Bill ("AB") 32 Climate Change Scoping Plan. Additionally, Sierra Club has pushed for decreased greenhouse gas emissions and planning to displace gas plant generation in environmental justice communities in utility planning through many years of advocacy in the California Public Utilities Commission Integrated Resources Planning proceeding. Additionally, Sierra Club supported Order No. 1920 to advance California's clean energy goals by requiring long-term planning to ensure that the shift from fossil fuels to clean energy is done at least cost.

10. While the Sierra Club is generally supportive of Order No. 1920, it has and continues to advocate for improvements to Order No. 1920 where it believes that the final order does not reach its full potential. For example, Sierra Club has recommended expanding Order No. 1920's planning cycle from three to five years, expanding the list of minimum benefits, and requiring a portfolio approach for the planning process.

ATT-122

11. The Sierra Club's efforts to transition the United States away from fossil fuels are directly and substantially impacted by Order No. 1920. The reforms required by Order No. 1920 are crucial for fixing the faulty transmission planning process in California and across the country in ways that facilitate the integration of cleaner, renewable, and cost-effective generation to replace fossil fuels. If a challenge to Order No. 1920 is successful, the Sierra Club's interests in transitioning from fossil fuels to clean, renewable generation will be significantly and adversely impacted. There are also ways in which Order No. 1920 fails to sufficiently improve the transmission planning process and should be expanded to better support the transition from fossil fuel to renewable sources of electricity.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in California on this 22nd day of August, 2025.


_____

Katherine Ramsey

ATT-123

**Sane Declaration**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

| | |
|---|---|
| INVENERGY SOLAR DEVELOPMENT NORTH AMERICA LLC; INVENERGY THERMAL DEVELOPMENT LLC; INVENERGY WIND DEVELOPMENT NORTH AMERICA LLC; and INVENERGY TRANSMISSION LLC,<br><br>*Petitioners,*<br><br>v.<br><br>FEDERAL ENERGY REGULATORY COMMISSION,<br><br>*Respondent.* | Case No. 24-1756 |

## DECLARATION OF SHASHANK SANE

I, Shashank Sane, swear or affirm under penalty of perjury, the following:

1. I am the Executive Vice President of Transmission at Invenergy LLC, which is an affiliate of the Invenergy entities that are listed above as petitioners in this case. In that role, I lead the company's development of long-distance, high-voltage transmission facilities in the United States. I have served in my current position since 2021, and have been employed by Invenergy LLC in other capacities since 2013. I base this Declaration upon my first-hand knowledge of the matters described herein. I am over the age of 21 and am competent to make this Declaration.

USCA4 Appeal: 24-1650    Doc: 499    Filed: 03/13/2026    Pg: 130 of 184

2.      I submit this declaration in connection with the above-captioned case, in which several Invenergy entities seek judicial review of Orders 1920 and 1920-A, issued by the Federal Energy Regulatory Commission and relating to long-term planning of electric transmission infrastructure. The Invenergy petitioners identified above are involved in the development, financing, construction, and operation of electric transmission infrastructure and conventional and renewable electric generation facilities. As a result, those entities have a direct and concrete interest in the orders under review.

3.      Specifically, several Invenergy entities are involved in development of merchant transmission facilities. Unlike traditional utilities, merchant developers finance their projects independently, without the guaranteed cost recovery that traditional utilities enjoy from captive retail ratepayers. Merchant transmission projects often connect power grids with electric generation resources or other infrastructure in separate regions, and earn revenue by reaching voluntary agreements with users, such as generators or large consumers, for access to transmission capacity.

4.      Merchant transmission facilities play an especially important role in meeting inter-regional transmission needs. No robust process is currently in place to facilitate inter-regional transmission planning. The vast majority of inter-regional transmission projects currently under development in the U.S. today are merchant projects. Without the inclusion of merchant transmission projects in long-term

transmission planning, power generators in adjacent regions will be severely constrained in their ability to sell power into adjacent regions, even if there is a substantial need for that power in the market in question.

5. One entity involved in the development of merchant transmission infrastructure is Grain Belt Express LLC ("Grain Belt Express"), a subsidiary of Petitioner Invenergy Transmission LLC ("Invenergy Transmission"). Grain Belt Express is in the advanced stages of developing an $11 billion, 800-mile, high-voltage, direct current ("HVDC") transmission line that will cross four states and connect three independently operated power grid regions of the United States. This line—one of the largest transmission projects in U.S. history—will begin in Kansas, extend through Missouri and Illinois, and interconnect with existing facilities in Indiana. When completed, Grain Belt Express will strengthen overall U.S. grid security and enhance reliability, facilitating the delivery of power from both new-build renewable and conventional generation, as well as existing dispatchable generation, from facilities near the line's converter stations.

6. As a merchant transmission facility, Grain Belt Express will provide delivery for all energy sources based on competitively-sourced contracts between electricity buyers and sellers. Grain Belt Express is anticipated to save U.S. consumers $52 billion in energy cost-savings over 15 years, as well as creating and supporting thousands of well-paying jobs.

USCA4 Appeal: 24-1650    Doc: 499    Filed: 03/13/2026    Pg: 132 of 184

7.     The Grain Belt Express project has obtained the necessary regulatory approvals from all four states through which the transmission line will pass.  It has also executed interconnection agreements with neighboring electric systems and secured a Transmission Service Agreement with a group of 39 Missouri municipal utilities. Over 95% of Phase 1 HVDC land acquisition is complete, and purchase option agreements for all Phase 1 optical regeneration and repeater sites have been secured. Additionally, $1.7 billion in engineering, procurement, and construction contractor agreements have been awarded, alongside supply deals sourcing major equipment from Missouri, South Carolina, Alabama, and Pennsylvania. Construction on the project is projected to commence in 2026.  On July 23, 2025, the U.S. Department of Energy cancelled a $4.9 billion loan guarantee for the project, but Grain Belt Express plans to continue with development.

8.     Merchant transmission developers like Grain Belt Express have historically faced, and continue to face today, significant barriers to participation in the transmission market and in the planning process undertaken by incumbent transmission providers and independent system operators.  In particular, under the existing regulatory and legal framework, incumbent transmission providers and planners are prone to overlook the benefits offered by merchant transmission facilities when evaluating transmission needs and determining whether additional transmission facilities should be constructed.   That is because incumbent transmission providers (e.g., monopoly utilities) have a direct financial incentive to

design and build their own transmission infrastructure, because they can obtain guaranteed cost-recovery plus a rate of return on those investments, under the regulated utility model. Those financial incentives have tended to favor localized projects focused on near-term reliability needs—not the broader set of benefits that can come from larger inter-regional projects such as Grain Belt Express.

9. For example, the Midcontinent Independent System Operator, Inc. ("MISO")—the organization that coordinates the electrical grid in portions of Missouri, Illinois, and Indiana, along with several other states—recently conducted a long-range transmission planning initiative. A central purpose of that initiative was to assess the need for new transmission facilities in the region. MISO evaluated such facilities in multiple sequential "tranches"—i.e., distinct groups of potential projects.

10. Invenergy Transmission raised concerns with MISO that, unless the planning process adequately accounted for the impending construction and future operation of the Grain Belt Express line, it could lead to an inaccurate assessment of need for other new transmission projects. Ignoring these concerns, MISO chose to exclude the Grain Belt Express line from the base assumptions that informed its selection of the first and second tranches of new transmission projects, which are projected to cost $10.3 billion and $21.8 billion, respectively. Because the selection of these projects took place without regard for the ability of the Grain Belt Express line to satisfy transmission needs, it will result in the construction of some redundant

USCA4 Appeal: 24-1650    Doc: 499    Filed: 03/13/2026    Pg: 133 of 184

transmission facilities that could impede the development, operation, and commercial success of the Grain Belt Express project.

11. The exclusion of merchant facilities like the Grain Belt Express line from long-term transmission planning processes—and the resultant expected overbuilding of other transmission facilities—creates concrete, near-term and long-term harms for Invenergy. Specifically, the construction of excess transmission facilities can create unanticipated congestion at grid interconnection points, thereby impeding the operations of Grain Belt Express, as well as creating unanticipated impacts on the upgrades that the Grain Belt Express line is assigned to operate. Those duplicative facilities will also create competition that could draw demand for transmission services away from the Grain Belt Express line. These effects cause tangible, near-term harms to Invenergy by undermining the prospective business case for the Grain Belt Express project, thus making it more difficult to obtain the investment needed to finance, construct, and operate the project.

12. MISO is not alone in excluding important merchant transmission infrastructure from its long-term planning process. As the Federal Energy Regulatory Commission ("FERC") recognized in Order No. 1920, the existing regulatory framework for transmission planning has resulted in transmission providers persistently "underestimat[ing]—or omit[ting] entirely—certain known determinants of Long-Term Transmission needs in their regional transmission planning processes." *Building for the Future Through Electric Regional*

USCA4 Appeal: 24-1650    Doc: 499    Filed: 03/13/2026    Pg: 135 of 184

*Transmission Planning and Cost Allocation*, 187 FERC ¶ 61,068, P 411 (2024) ("Order No. 1920"). FERC's finding in this regard is consistent with Invenergy's experience. I understand that Order No. 1920 was directed in part toward ensuring that planners "account[] on a forward-looking basis" for such factors "in a manner that ensures the identification and evaluation of more efficient or cost-effective regional transmission facilities." *Id.* at P 118.

13. In Order No. 1920, FERC required that, when formulating the "Long-Term Scenarios" that will guide the assessment of long-term transmission needs, transmission planners must account for a set of specified factors in order to accurately understand the future electric power system. Order No. 1920 PP 40, 409. The scenarios developed in reliance on those factors will serve as a cornerstone for transmission providers' selection and evaluation of new transmission projects to meet expected transmission needs. *Id.* at PP 38-41.

14. In the Order No. 1920 process, Invenergy urged FERC to require that transmission providers account for advanced-stage merchant facilities, including HVDC lines, in formulating their scenarios. I understand that FERC declined to do so. As a result, planners will be free to continue their longstanding practice of ignoring those facilities when assessing the need for additional transmission infrastructure—just as MISO did during its recent transmission planning process. The upshot will be repeated instances of planners approving the development of potentially duplicative and unnecessary transmission facilities, ostensibly directed

toward satisfying transmission needs that may already be satisfied by merchant infrastructure. In short, the Commission has perpetuated a regulatory structure that invites the financial, operational, and competitive injuries to Invenergy described above. *See supra* ¶¶ 10-12.

15. The exclusion of HVDC and other merchant transmission assets from the Order No. 1920 long-term planning process not only harms transmission developers such as Grain Belt Express (and its parent entity Invenergy Transmission), it also harms the developers of power *generation* projects. Petitioners Invenergy Thermal Development LLC, Invenergy Solar Development North America LLC, and Invenergy Wind Development North America LLC are all engaged in the development, construction, financing, and operation of power generation facilities, including natural gas, solar, and wind. As noted above, most inter-regional transmission projects under development in the United States today are merchant projects. The exclusion of HVDC and other merchant transmission facilities from the long-term transmission planning process will constrain generation projects in adjacent regions, including projects being developed or operated by the above-mentioned Invenergy petitioners, from selling power into adjacent regions, even if those regions have a substantial need for that power. Order No. 1920 thus causes concrete, near-term harms to all four of the Invenergy entities participating in this case.

\* \* \* \*

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 25, 2025.

_____
Shashank Sane

USCA4 Appeal: 24-1650    Doc: 499    Filed: 03/13/2026    Pg: 137 of 184

**Shober Declaration**

## DECLARATION OF MARGARET SHOBER

I, Margaret Shober, hereby declare as follows:

1.  My name is Margaret Shober.  This declaration is based on my personal knowledge.  I am more than 18 years of age.

2.  I am the Research Director at the Southern Alliance for Clean Energy ("SACE").  I have been in this position since October 2019.  Before that, I was the Director of Power System Analytics at SACE.

3.  SACE is a non-profit organization founded in 1985 to promote responsible and equitable energy choices in order to ensure clean, safe, and healthy communities throughout the Southeast. In furtherance of this mission, SACE engages in technical, regulatory, and community work in North Carolina, South Carolina, Tennessee, Georgia, and Florida. SACE works with regulators and utilities to further clean energy technologies in order to promote equitable outcomes that help our region's communities harness the environmental and economic opportunities presented by energy efficiency, renewable energy, and electrification. SACE also works directly with communities to mobilize concerned citizens and elevate the conversation

ATT-135

about the dangers of climate change and the importance of clean energy choices.

4. SACE is headquartered in Knoxville, Tennessee, and has staff in Georgia, Florida, North Carolina, South Carolina, and Tennessee. SACE pays electricity bills to Knoxville Utilities Board, a customer of the Tennessee Valley Authority ("TVA").

5. SACE has 34,151 individual members across the Southeast. Members receive regular newsletters, issue-specific communications, action alerts, and may attend in-person events. Some members financially support SACE through donations.

6. As SACE's Research Director, I lead the team responsible for conducting technical and regulatory work. My team and I write reports and white papers highlighting the progress made by utilities, states, and cities on clean energy development. I also lead SACE's regulatory interventions. SACE participates in resource planning, avoided cost, energy efficiency, and rate case dockets in state utility commissions across the Southeast.

7. In furtherance of both of these duties, I also engage in most of the region's transmission planning processes.  I regularly attend and actively participate in the Southeastern Regional Transmission Planning ("SERTP") process's quarterly meetings.  For the last three years, I have served as a voting

representative of the Demand-Side Management/Demand-Side Response sector in SERTP's Regional Planning Stakeholder Group.  In this capacity, I help select and scope the Economic Planning Studies the SERTP Sponsors study each cycle.  I have also proposed Public Policy Requirements studies in the last three planning cycles.  Similarly, I regularly attend and actively participate in the South Carolina Regional Transmission Planning ("SCRTP") process's stakeholder meetings, where I have proposed Economic Planning Studies for the SCRTP utilities to study.  Finally, I serve as a voting member of the Transmission Advisory Group in the Carolinas Transmission Planning Collaborative, Duke Energy's local transmission planning process.

8. In light of our experience participating in these forums, SACE engaged in the rulemaking process at the Federal Energy Regulatory Commission ("FERC" or "the Commission") that resulted in Order No. 1920.  SACE intervened, submitted initial and reply comments, and sought rehearing of the final rule.  SACE strongly supports many of Order No. 1920's requirements.  For instance, SACE commends the Commission for requiring that transmission providers conduct Long-Term Regional Transmission Planning that looks at least 20 years into the future, considers at least three

ATT-137

scenarios that reflect known drivers of transmission needs, and evaluates a mandatory set of reliability and economic benefits.

9. In SACE's experience, SERTP and SCRTP conduct short-sighted transmission planning that exclusively accounts for reliability needs, evaluates a single benefit metric, and incorporates inconsistent generation assumptions that vary drastically across their utility members.  This has created a bias toward small-scale transmission solutions that cost more in the aggregate than regional transmission facilities, which both processes have failed to produce. These processes have also resulted in a balkanized electric grid that cannot keep up with increasing demand.

10. SACE is confident that Order No. 1920's proactive, multi-value planning that accounts for the broad benefits of transmission will result in a more efficient and cost-effective expansion of the transmission grid.  This will lower the electricity bills of SACE's members, which have been rising dramatically in recent years. It will also make connecting to the grid more financially feasible for solar developers, which will result in a cleaner resource mix.

11. SACE also supports Order No. 1920's requirement that the Long-Term Regional Transmission Planning study sensitivities that account for extreme weather events.  Many of SACE's members that reside in areas served by

Duke Energy and TVA experienced rolling blackouts during Winter Storm Elliott in late 2022. It became apparent during that ordeal that the region's grid is ill-equipped to withstand increasingly frequent extreme weather events. Moreover, in my experience participating in the SERTP and SCRTP planning processes, I have never seen them plan for extreme weather.

12. Despite our broad support for Order No. 1920, SACE believes that certain aspects of Order No. 1920 will allow the deficiencies in the region's planning processes to persist, or perhaps even intensify. For one, the final rule's requirement that transmission providers conduct Long-Term Regional Transmission Planning every 5 years will not allow utilities to account for the rapidly changing energy landscape, which includes increasing demand due to economic development, more frequent extreme weather events, and a larger share of renewable resources. Additionally, in my experience participating in the Integrated Resource Planning processes for the utilities in our region, five years will not adequately capture the results of those processes, which typically occur every two or three years. SACE supported the three-year cadence that FERC originally proposed, which would better enable the nimble transmission planning that shifting conditions require.

13. Second, Order No. 1920 does not require transmission providers to account for many additional benefits that regional transmission provides. For

ATT-139

example, the final rule does not require utilities to assess whether transmission solutions might enable access to lower-cost generation. Given the high solar potential in the region combined with its comparatively low cost, regional transmission could unlock many of these resources, providing significant cost savings to SACE's members. A comprehensive planning process would capture these benefits.

14. Order No. 1920 is essential to ensuring that the Southeast's utilities plan transmission in an efficient, proactive manner that maintains reliability and stops electricity bills from continuing to rise. The region currently faces some of the highest electricity bills in the country. Alabama, Mississippi, and Florida all rank in the top 10 states with the highest monthly electric bills in May of this year.[1] South Carolina, Georgia, and Tennessee are not too far behind. Inefficient transmission expansion has contributed to these bills, as the annual amount spent on transmission by Southeast utilities has increased by a factor of four in the last 20 years, with much of that escalation taking place since 2019.[2] This trend will only increase further, as

---

[1] Kelly Bedrich, *Average Electricity Bill, Usage and Price per kWh by State (August 2025)*, Electricity Plans (Aug. 1, 2025), https://electricityplans.com/average-electricity-bill-usage-rate-by-state/.
[2] J. Michael Hagerty et al., *Modernizing Southeast Grid Investments: How Enhanced Regional Transmission Planning Supports a Growing Economy*, Brattle, at 11 (Apr. 2, 2025), https://www.brattle.com/wp-content/uploads/2025/04/Modernizing-Southeast-Grid-Investments-How-

the region's utilities are projecting unprecedent load growth to meet new data center and manufacturing demand in the coming years.[3]  Yet throughout its existence, SERTP has never produced a more efficient, cost-effective regional line, as the region's utilities have instead relied entirely on piecemeal grid expansion through small-scale local projects.  While I firmly believe that Order No. 1920 has the potential to address these issues, I fear that it may fail to change the status quo without modification along the lines described above, further impeding SACE's progress on these fronts.

15. An order from this Court upholding Order No. 1920's framework but instructing FERC to fix these discrete flaws would address SACE's concerns. It would mandate a robust, proactive transmission planning process that would keep electricity bills for our members lower than they would be if SERTP and SCRTP were permitted to maintain their current, ineffective processes. An order along these lines would measurably advance SACE's organizational efforts to promote the environmental and economic opportunities presented by clean energy.

---

Enhanced-Regional-Transmission-Planning-Supports-a-Growing-Economy.pdf (at 11).

[3] Grid Strategies, *Strategic Industries Surging: Driving US Power and Demand*, at 24 (Dec. 2024), https://gridstrategiesllc.com/wp-content/uploads/National-Load-Growth-Report-2024.pdf.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 19 day of ___August___ 2025.


MES Shober
Margaret Shober

ATT-142

**Slack Declaration**

Docusign Envelope ID: 5B347E0D-58C6-4078-9047-C50A2BED4292

# DECLARATION OF HENRY SLACK

I, Henry Slack, hereby declare as follows:

1. My name is Henry Hazen Slack. I am over 18 years of age. This declaration is based on my personal knowledge.

2. I live in Decatur, Georgia.

3. I am a member of the Southern Alliance for Clean Energy ("SACE"). I first joined the SACE mailing list in 2018 and made at least one donation to the organization in December 2022.

4. I first got involved with SACE due to my concern that industrial and utility reliance on oil and gas has resulted in pollution, overheating, and the acceleration of climate change in the Southeast. I believe we need action from all levels of government, including Congress, in order to reduce oil and gas usage and pollution, and SACE shares that aim. To that end, my SACE membership entails supporting the organization's mission and goals through financial donations and attendance at SACE events.

5. I pay my electricity bill to Georgia Power Company ("Georgia Power"). My electricity bills have increased in recent years, and I would prefer to have lower bills.

ATT-144

DocuSign Envelope ID: 5B347E0D-58C6-4078-9047-C50A2BED4292

6. I've also experienced spotty reliability in my electricity service. On one memorable occasion, a wind storm knocked down power lines throughout the Georgia Power service area, which resulted in us losing power. I had to go searching for ice just to keep food cold. I decided then and there that I would not go through that again and installed a solar system with battery backup on our property.

7. I am concerned that my electricity bills will keep rising if Georgia Power does not add cheaper clean energy to its power plant fleet and instead depends on new and existing gas and coal power plants. As I understand it, it will be very difficult for Georgia Power to add renewable energy resources if it does not expand its transmission grid to connect them. Even so, I am concerned that expanding the transmission grid in an inefficient manner will also result in higher electricity bills.

8. Likewise, I am concerned that Georgia Power's transmission grid cannot withstand extreme winter weather. Winter storms have hit the region with greater frequency in recent years. Georgia Power should have to plan its electric grid for this type of weather to maintain reliable service.

9. For these reasons, I support SACE's participation in this case to defend parts of the Federal Energy Regulatory Commission's Order No. 1920. I support the rule's requirements that regional transmission planning processes like

ATT-145

Docusign Envelope ID: 5B347E0D-58C6-4078-9047-C80A2BED4292

those Georgia Power participates in plan for extreme weather and a changing power plant fleet, but that they also do so in an efficient way.

10. However, I am concerned that the rule will be unable to accomplish these aims if it fails to require Georgia Power and other utilities in the area to plan their transmission expansion frequently enough to adapt to changing conditions like extreme weather, more electricity demand from data centers and manufacturing facilities, and a changing power plant fleet.  If Georgia Power can effectively continue using its current planning practices, which I understand Order No. 1920 to allow, my electric service will continue to come from dirty fossil fuel plants, will become even less reliable, and will increase my power bills.

Docusign Envelope ID: 5B347E0D-A8C6-4078-9047-C50A2BED4292

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this ⎯18⎯ day of ⎯August⎯ 2025.

Signed by:

*Henry Slack*

387272CA801F4AE...

Henry Slack

ATT-147

**Stith Declaration**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

| | | |
|---|---|---|
| Appalachian Voices, et al. | ) | |
| | ) | |
| *Petitioners*, | ) | |
| | ) | |
| v. | ) | Case No. 24-1650 |
| | ) | and consolidated cases |
| Federal Energy Regulatory Commission, | ) | |
| | ) | |
| *Respondent*. | ) | |
| | ) | |

**DECLARATION OF JOHN STITH**
**Submitted in Support of Environmental Defense Fund**

I, John Stith, declare as follows:

1.  I am the Senior Director for Performance Analytics and CRM Operations at the Environmental Defense Fund (EDF). I have held this position for more than a year, and I have worked at EDF for over eighteen years.

2.  My duties include maintaining an accurate list of EDF members. My colleagues and I provide information to members, acknowledge gifts and volunteer actions, and manage the organization's member databases. My

1
ATT-149

work requires me to be familiar with EDF's purposes, staffing, activities, and membership.

3. EDF is a membership organization incorporated under the laws of the State of New York. It is recognized as a not-for-profit corporation under section 501(c)(3) of the United States Internal Revenue Code.

4. EDF relies on science, economics, and law to protect and restore the quality of our air, water and other natural resources. EDF employs scientists, economists, engineers, business school graduates, lawyers, and other experts to help solve challenging environmental problems in a scientifically sound and cost-effective way.

5. I understand from my involvement with EDF that the Federal Energy Regulatory Commission (FERC) oversees the planning of the electric grid by Regional Transmission Organizations (RTOs) and transmission-owning electric utilities. I understand that FERC has issued Order 1920 to help ensure that interstate electric transmission lines that are needed for reliability, resilience, and to ensure that low cost clean energy reaches customers, can get built. I also understand that Order 1920 requires utilities to look decades into the future when planning transmission, which would directly impact our members, particularly our younger members, who could

2

see long term benefits of overall electricity cost reductions, and cleaner air and water from reduced use of fossil fuel powered generation.

6. EDF has a strong organizational interest—and a strong interest that is based in its members' recreational, aesthetic, professional, educational, public health, environmental, and economic interests—in reducing harmful air pollution including climate change-causing greenhouse gas emissions, decreasing utility rates, and increasing the reliability and the resilience of the electric grid, all of which are implicated in Order 1920.

7. When an individual becomes a member of EDF, his or her current residential address is recorded in our membership database. The database entry reflecting the member's residential address is verified or updated as needed.

8. EDF currently has 318,397 members in the United States. These members have a strong interest in protecting human health and the environment from air pollution, including greenhouse gas pollution, and enabling the benefits that clean energy resources can provide. While some of the benefits of Order 1920, such as reduced climate pollution, will benefit all EDF members, I understand that some benefits may apply specifically to members who live in areas where Order 1920 applies. I understand that Order 1920 will apply in most of the country but will not directly apply in Alaska, Hawaii, or much

3

ATT-151

of Texas. Excluding those three states, EDF has 304,420 members in the remaining 47 states.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct. Executed in Takoma Park, MD on this Twentieth day of August, 2025.

John Stith

4

**Tait Declaration**

## <u>DECLARATION OF DANIEL TAIT</u>

I, Daniel Tait, hereby declare as follows:

1. My name is Daniel Tait. This declaration is based on my personal knowledge. I am more than 18 years of age.

2. I am the Executive Director of Energy Alabama. I helped found the organization in 2014.

3. Energy Alabama is a non-profit organization that advocates for a transition to clean, sustainable energy in Alabama. Energy Alabama works to accelerate this transition by engaging in public education at all levels, informing smart energy policy, and providing technical assistance to deploy more sustainable energy in homes and businesses throughout the state of Alabama.

4. Energy Alabama is based in Huntsville, Alabama. We do not have a physical office; the Board of Directors, employees, and contractors work remotely. I work remotely as well.

5. Energy Alabama has more than 50 members. Some of Energy Alabama's members purchase electricity from municipal utilities or electric membership cooperatives that purchase power at wholesale from the

ATT-154

Tennessee Valley Authority ("TVA"). Others are served directly by Alabama Power Company ("Alabama Power") or rural cooperative utilities that purchase power at wholesale from PowerSouth Energy Cooperative.

6. Energy Alabama and its members regularly speak with and submit comments to state actors, local energy distributors, and local governments in order to advocate for sustainable energy. Energy Alabama also advocates before the Alabama Public Service Commission and the Federal Energy Regulatory Commission ("FERC" or "the Commission") in favor of policies that promote sustainable energy development.

7. In my role as Executive Director, I manage most of Energy Alabama's programs, direct its activities, and guide its mission of accelerating Alabama's transition to sustainable energy.

8. Personally, my interest in and desire to transition to a clean energy economy stems from my educational and professional experience, including time spent at several clean energy and environmental non-profits. When a tornado hit North Alabama in 2011, I was motivated to get involved with local efforts to build a more resilient and sustainable energy infrastructure and have been working towards this goal ever since.

ATT-155

9. I am also a consumer of TVA electricity because I buy electric power for my home from Huntsville Utilities, which buys electricity at wholesale from TVA.

10. Over the last few years, Energy Alabama has engaged in the rulemaking process at FERC that resulted in Order No. 1920. Energy Alabama intervened, submitted initial and reply comments, and sought rehearing of the final rule. Energy Alabama supports many of Order No. 1920's requirements as necessary to transition Alabama to more sustainable energy sources. For one, Energy Alabama supports Order No. 1920's requirement that utilities conduct Long-Term Regional Transmission Planning that looks at least 20 years into the future, considers at least three scenarios that reflect proven transmission needs, and evaluates a mandatory set of reliability and economic benefits.

11. Both Alabama Power and TVA participate in the Southeast Regional Transmission Planning ("SERTP") process. It is my understanding that SERTP currently engages in short-sighted transmission planning that only accounts for near-term reliability needs, evaluates minimal benefits, and uses very different generation assumptions across its member utilities. This has led the SERTP utilities to favor small-scale transmission solutions that cost a lot more in the aggregate than larger regional lines that meet multiple needs.

ATT-156

It has also led to a balkanized grid that cannot keep up with increasing demand.

12. Order No. 1920's proactive, multi-value planning that accounts for the many benefits of transmission will result in a more efficient expansion of the transmission grid.  This will lower the electricity bills of Energy Alabama's members, which have been rising dramatically in recent years. It will also make interconnecting to the transmission system more economically feasible for new renewable resources, which should speed up their development. Both TVA and Alabama Power lag behind the rest of the region in the amount of solar power they have online, and the lack of existing transmission capacity is a big part of that.

13. Energy Alabama also supports Order No. 1920's requirement that the Long-Term Regional Transmission Planning process study sensitivities around extreme weather events.  In late 2022, TVA experienced rolling blackouts during Winter Storm Elliott, which, combined with similar outages in the Carolinas, showed that the region's grid cannot withstand more frequent extreme weather events.

14. Despite our general support for Order No. 1920, Energy Alabama believes that certain aspects of the rule will fail to fix the flaws in the region's planning processes.  For one, the rule's requirement that utilities conduct

ATT-157

Long-Term Regional Transmission Planning every 5 years will make it nearly impossible for them to account for the rapidly changing energy landscape. This includes a larger share of renewable resources, increasing demand due to data centers and new factories, and more common extreme weather events. Energy Alabama supported the three-year frequency that FERC originally proposed, which would better allow utilities to adapt to changing conditions.

15. Second, Order No. 1920 does not require transmission providers to account for certain benefits that regional transmission lines provide. For example, the rule does not require utilities to gauge whether a proposed transmission line might enable access to lower-cost generation. Given the abundant solar potential we have in the region, combined with the falling cost of utility-scale solar panels, regional transmission could access many of these resources, which would net significant cost savings to Energy Alabama's members. A comprehensive planning process needs to capture these types of benefits.

16. Long-term regional transmission planning is essential to making sure that the Southeast's utilities plan transmission in an efficient, proactive manner that maintains reliability and keeps electricity bills low. However, without

ATT-158

modification, certain aspects of Order No. 1920 threaten to hold back Energy Alabama's progress on these fronts.

17. An order from this Court upholding the majority of Order No. 1920 but directing FERC to fix these specific flaws would address Energy Alabama's concerns. It would inaugurate a strong, proactive transmission planning process that would keep electricity bills lower for our members than they would be if SERTP kept its current, ineffective processes. An order along these lines would also expedite Alabama's transition to clean energy, a central part of Energy Alabama's mission.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 8th day of August 2025.


_____
Daniel Tait

ATT-160

**Wasson Declaration**

## DECLARATION OF MATT WASSON

I, Matt Wasson, hereby declare as follows:

1.  My name is Matt Wasson. This declaration is based on my personal knowledge. I am more than 18 years of age.

2.  I am the Director of Programs at Appalachian Voices. I have been with Appalachian Voices since 2001.

3.  Appalachian Voices is a non-profit organization dedicated to bringing people together to solve the environmental problems having the greatest impact on the central and southern Appalachian Mountains. As part of its mission, Appalachian Voices advocates for solutions that not only protect the land, air, and water of this region, but that also foster resilient local economies and help ensure a just and equitable transition to a clean energy economy. This advocacy includes cost-effective energy efficiency programs, conservation, and renewable energy resources as alternatives to heavily polluting coal-fired power. Among other venues, Appalachian Voices advances these causes before the Virginia State Corporation Commission and the North Carolina Utilities Commission.

ATT-162

4. Appalachian Voices has offices located in Boone, North Carolina; Charlottesville, Virginia; Norton, Virginia; and Knoxville, Tennessee. Appalachian Voices is a retail electricity customer of Duke Energy, Dominion Energy Virginia, and Knoxville Utilities Board, a wholesale customer of the Tennessee Valley Authority ("TVA"), among others.

5. Appalachian Voices has 1,093 dues-paying members across our region. Members gain exclusive access to Appalachian Voices' newsletters and community events, as well as the opportunity to engage with environmental experts, scientists, and community leaders through interactive webinars and panel discussions.

6. As Appalachian Voices' Director of Programs, I provide the long-range vision and direction for Appalachian Voices' work to shift our region to clean, 21st-century energy sources and stand up to monopoly utility practices that put profits over people and harm the health of our mountain forests, streams, and communities. I also supervise and advise state program managers that lead all of Appalachian Voices' regulatory interventions such as our current participation in Duke Energy's biennial Carbon Plan/Integrated Resource Plan proceedings before the North Carolina Utilities Commission.

ATT-163

7. In support of these activities, I serve as a voting member of the Transmission Advisory Group in the Carolinas Transmission Planning Collaborative, Duke Energy's local transmission planning process. This experience has given me an in-depth perspective into the importance of a strong transmission planning process to ensuring an efficient and equitable expansion of the grid.

8. In light of our experience participating in these forums, Appalachian Voices engaged in the rulemaking process at the Federal Energy Regulatory Commission ("FERC" or "the Commission") that resulted in Order No. 1920. Appalachian Voices intervened in the proceeding and sought rehearing of the final rule. Appalachian Voices strongly supports many of Order No. 1920's mandates. First and foremost, Appalachian Voices supports the rule's requirement that transmission providers conduct Long-Term Regional Transmission Planning that looks at least 20 years into the future, reviews at least three scenarios that reflect the factors driving transmission needs, and quantifies a mandatory set of reliability and economic benefits.

9. In my understanding, the primary regional transmission planning process in our region, the Southeastern Regional Transmission Planning ("SERTP") process, engages in transmission planning that only accounts for short-term

ATT-164

reliability needs, assesses one benefit metric, and factors in generation assumptions with no rhyme or reason across its member utilities.  This has resulted in a proliferation of small-scale transmission solutions that cost more in the aggregate than a regional transmission facility that meets multiple needs would. It also requires that the utilities constantly upgrade the same lines to meet rapidly growing demand, which only increases customer bills.

10. Appalachian Voices is confident that Order No. 1920's proactive, multi-value planning process that accounts for the many benefits of transmission will result in a more efficient expansion of the transmission grid.  This will lower the electricity bills of Appalachian Voices' members, which have gotten much higher in recent years.  It will also make it easier for renewable generation to connect to the system.  The need to upgrade the grid to accommodate new power plants has made interconnection prohibitively expensive for many renewable developers in recent years and has held the region back from reaching its solar potential.

11. Appalachian Voices also supports Order No. 1920's requirement that the Long-Term Regional Transmission Planning incorporate extreme weather events.  Appalachian Voices has offices and many of its members reside in areas served by Duke Energy and TVA, both of which experienced rolling

ATT-165

blackouts during Winter Storm Elliott in late 2022. It became clear during the storm and its aftermath that the region's grid simply cannot handle increasingly frequent extreme weather events.

12. Despite our broad support for Order No. 1920, Appalachian Voices believes that certain aspects of Order No. 1920 will allow the failures of the region's planning processes to continue. For example, the rule's requirement that transmission providers conduct Long-Term Regional Transmission Planning every 5 years will not allow utilities to adapt to rapidly shifting conditions. These include a larger share of renewable resources, increasing demand due to data centers and other economic development projects, and increasingly frequent extreme weather events. Additionally, in my experience participating in the Integrated Resource Planning processes for the utilities in our region, a five-year process will not capture the results of those processes, which typically occur every two or three years. Since these processes dictate the generation resource mix that utilities must plan for, it's important that they be in sync. The every-three-year process that FERC originally proposed would better allow our utilities to plan their grids to meet these changing conditions.

13. Second, Order No. 1920 does not require transmission providers to account for some of the clear benefits that regional transmission provides. For one,

ATT-166

the rule does not require utilities to assess whether transmission solutions might access lower-cost generation. Given the high solar potential in the region combined with its comparatively low cost, regional transmission could bring many of these resources into play, which would provide significant cost savings to our members. A comprehensive planning process should capture these benefits.

14. Order No. 1920 is essential to ensuring that the region's utilities plan transmission in an efficient, proactive manner that maintains reliability and keeps electricity bills low. However, without modification, certain aspects of the rule threaten to impede Appalachian Voices' progress on these fronts.

15. An order from this Court upholding the majority of Order No. 1920 but directing FERC to fix these glaring flaws would address Appalachian Voices' concerns. It would mandate a strong, proactive transmission planning process that would keep electricity bills for our members lower than they would be if SERTP kept its current, ineffective process in place. An order along these lines would also measurably advance Appalachian Voices' organizational efforts to ensure a just and equitable transition to a clean energy economy.

ATT-167

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this <u>18</u> day of <u>August</u> 2025.


_____

Matt Wasson

**Williams Declaration**

## <u>DECLARATION OF RICHARD WILLIAMS</u>

I, Richard Williams, hereby declare as follows:

1. My name is Richard Burton Williams, Jr.  I am over 18 years of age.  This declaration is based on my personal knowledge.

2. I live in Huntsville, Alabama.

3. I have been a member of Energy Alabama for roughly seven years.  I have also been on Energy Alabama's Board of Directors for seven years.

4. I first got involved with Energy Alabama when I was exploring the possibility of adding solar panels to my business.  Through that process, I realized how difficult it is to obtain solar power in Alabama.  Now that the solar system is installed and paid for, I often pay nothing for my business's electricity bill.  I joined Energy Alabama because I believe all businesses should have that option, which they currently lack due to the many obstacles for solar power in the state.

5. When my solar system does not meet all of my business's electricity needs, it receives electric service from Huntsville Utilities.  Our office is two stories and approximately 8,000 square feet.  We use electricity to power our air conditioning, lights, and computers, among other things.

ATT-170

6. As previously noted, for most months of the year, our office pays no electricity bill because our solar system generates more electricity than we use. We typically only pay an electricity bill during the dead of winter. Even so, I would prefer to have a smaller electricity bill for the office in the winter months when we do pay Huntsville Utilities.

7. I personally use electricity in my home to power my lights, appliances, and for other standard home electricity needs. I also pay my electricity bill to Huntsville Utilities. My electricity bills have increased in recent years, and I would prefer to have a lower bill.

8. I understand that Huntsville Utilities purchases electricity at wholesale from the Tennessee Valley Authority ("TVA"). I also understand that TVA both owns its own power plants and also buys and sells electricity from other utilities at wholesale. These actions affect the retail electricity bills I pay at my home and business.

9. I am concerned that my electricity bills will keep rising if TVA does not add low-cost renewable energy to its power plant fleet and instead continues to rely on new and existing fossil fuel power plants. As I understand it, it will be cost-prohibitive for TVA to add clean energy resources if it does not expand its transmission grid to connect them. At the same time, I am

ATT-171

concerned that expanding the transmission grid in an inefficient manner will also result in higher electricity bills.

10. As a business owner, I have to make smart financial decisions when operating my business. Having alternative energy sources available is important because business owners otherwise lose the potential advantages that come with increased electricity options, such as having a lower electricity bill.

11. I am also concerned that TVA's transmission grid cannot withstand extreme winter weather. A couple years ago, parts of the TVA's territory experienced rolling blackouts during a major winter storm. We were luckily spared from outages that time, but these storms are becoming much more common. As a business owner who depends on TVA-supplied power in the winter, I'm concerned that unreliable electricity service could financially harm my business. TVA should have to plan its electric grid for this type of weather.

12. For these reasons, I support Energy Alabama's involvement in this case to defend certain parts of the Federal Energy Regulatory Commission's Order No. 1920. I support the rule's requirements that regional transmission planning processes like those TVA participates in plan for extreme weather and a changing generation mix, but that they also do so in an efficient way.

ATT-172

13. However, I am concerned that the rule will be unable to achieve these goals if it fails to require TVA and other utilities in the region to plan their transmission expansion frequently enough to adapt to rapidly changing conditions like extreme weather, more electricity demand on the system, and a changing power plant fleet.  If TVA continues its current practices, which I understand Order No. 1920 allows, my electric service will become less reliable and will increase my power bills, both of which will harm my business.

ATT-173

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this __6__ day of _August_ 2025.

_Richard Williams_
_____
Richard Williams

**Wilson Declaration**

## DECLARATION OF JOHN WILSON

I, John Wilson, hereby declare as follows:

1.  My name is John Bernhardt Wilson, Jr.  I am over 18 years of age.  This declaration is based on my personal knowledge.

2.  I live just outside the city limits of Chapel Hill, North Carolina, in Orange County.

3.  I have financially supported Appalachian Voices since 2015 and have been a voting member since 2020.

4.  I first became aware of Appalachian Voices through their publication, the Appalachian Voice, in the 2014/2015 time frame.  I was drawn to their leadership in advocating for wilderness protections in North Carolina, which I frequently read about.  I have particular interest in this topic because I have a personal connection to one of their priorities, preservation of the Harper Creek and Lost Cove Wilderness Study Area designations.  These two areas abut 282 acres of land my family has owned since 1949.  Appalachian Voices has been a lonely voice in advocating to protect the hard-earned Wilderness Study Area designations and protections for these areas and to obtain permanent Wilderness status for them as well.  Appalachian Voices'

ATT-176

commitment to the conservation of land that holds a dear place in my heart led me to partner with the organization, and I have been supporting them ever since.

5. In addition to this work, I've followed Appalachian Voices' campaigns to promote cleaner sources of energy in North Carolina. I have seen firsthand the effects that climate change caused by burning fossil fuels has had on the natural environment. We have a fishing cabin near Edgemont, North Carolina, and I have noticed that the rising water temperatures have significantly decreased the trout population. We have also seen increasing extremes in precipitation, with long droughts followed by flash floods. We had to replace a bridge on our property that had stood for my entire life after it was destroyed by a flood. Although we put upwards of $100,000 into a new bridge, it was damaged by another flood within a year, requiring additional repairs.

6. I have sought to tell similar stories of the changing climate's effects on North Carolinians in my capacity as a professional documentary filmmaker. I collaborated with the University of North Carolina Institute for the Environment to develop the Climate Stories NC video series, which chronicled farmers, beekeepers, fishermen, hunters, apple growers, and others whose lives and livelihoods have changed along with the climate.

7. I firmly believe that moving to cleaner sources of energy is the most important thing we can do as a state, country, and planet. It's the lowest-hanging fruit in terms of reducing carbon emissions, and makes even more sense when you consider the benefits to the economy. I've tried to do my part on this front by founding the Earth Care team at my church, which now has an official "Earth Care Congregation" designation by Presbyterian Church U.S.A. As part of this program, I have led Sunday School classes on clean energy and conservation, where I taught the importance of getting involved with the state utility commission to ensure the local utility, Duke Energy ("Duke"), is adopting cleaner sources of energy.

8. For my personal electricity needs, I pay electricity bills to Duke. Our electric bills have increased in recent years, and I would prefer to pay a lower electricity bill.

9. I am concerned that my electricity bills will continue to rise if Duke does not add more low-cost clean energy to its generation fleet and instead continues to rely on new and existing fossil fuel plants. As I understand it, it will be cost-prohibitive for Duke to add these types of clean energy resources if it does not expand its transmission grid to connect them. This would only guarantee that Duke continues to power its electric system with dirty fossil fuels and furthers the degradation of the natural environment. That said, I

ATT-178

am also concerned that expanding the transmission grid in a reactive, piecemeal manner will also result in higher electricity bills.

10. Lastly, I am concerned that we are experiencing increasingly frequent extreme weather, especially in the winter, as a result of climate change. We lose power every now and then and I am concerned this will occur more frequently if Duke doesn't plan its electric grid to withstand extreme weather.

11. For these reasons, I support Appalachian Voices' engagement in this case to defend certain aspects of the Federal Energy Regulatory Commission's Order No. 1920. I support the rule's requirements that regional transmission planning processes like those Duke participates in plan for extreme weather and a changing generation mix, but that they also do so in an efficient way.

12. However, I am concerned that the rule will be unable to achieve these goals if it fails to require Duke and other utilities to plan their transmission expansion frequently enough to adapt to changing conditions like extreme weather, more electricity demand on the system, and a changing power plant fleet. If Duke can continue its current practices, which I understand Order No. 1920 to allow, my electric service will continue to come from dirty fossil fuel plants, will become even less reliable, and will certainly increase my power bills.

ATT-179

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 6th day of August 2025.

_John Wilson_

John Wilson

ATT-180