## CASE NO. 24-1650(L)

# IN THE
# UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

APPALACHIAN VOICES, *et al.*,
*Petitioners*

v.

FEDERAL ENERGY REGULATORY COMMISSION,
*Respondent*

ON PETITIONS FOR REVIEW OF ORDERS OF THE
FEDERAL ENERGY REGULATORY COMMISSION

# BRIEF OF RESPONDENT-INTERVENORS PUBLIC INTEREST ORGANIZATIONS, CLEAN ENERGY ASSOCIATIONS, AND PUBLIC POWER ASSOCIATION

Danielle Fidler
Veronica Saltzman
Clean Air Task Force
114 State Street, 6th Floor
Boston, MA 02109
Phone: 202-285-0926
Email: dfidler@catf.us

*/s/ Alexander Tom*
Alexander Tom
Ada Statler
Earthjustice
180 Steuart Street #194330
San Francisco, CA 94105
Phone: 415-217-2111
Email: atom@earthjustice.org

*Counsel for Natural Resources Defense Council (additional counsel listed on the following pages)*

Caroline Reiser
Natural Resources Defense Council
1152 15th Street NW, Suite 300
Washington, DC 20005
Phone: 202-717-8341
Email: creiser@nrdc.org

Linnet Davis-Stermitz
Earthjustice
810 Third Avenue, Suite 610
Seattle, WA 98104
Phone: 206-343-7340
Email: ldavisstermitz@earthjustice.org

*Counsel for Natural Resources Defense Council*

Nicholas J. Guidi
Southern Environmental Law Center
122 C Street NW, Suite 325
Washington, DC 20001
Phone: 202-573-8136
Email: nguidi@selc.org

*Counsel for Appalachian Voices, Energy Alabama, North Carolina Sustainable Energy Association, Southern Alliance for Clean Energy, and South Carolina Coastal Conservation League*

Cynthia S. Bogorad
William S. Huang
Lauren L. Springett
Spiegel & McDiarmid LLP
1818 N Street NW, 8th Floor
Washington, DC 20036
Phone: (202) 879-4000
Email: cynthia.bogorad@spiegelmcd.com
william.huang@spiegelmcd.com
lauren.springett@spiegelmcd.com

*Counsel for Transmission Access Policy Study Group*

Justin Vickers
Sierra Club
1229 W Glenlake Avenue
Chicago, IL 60660
Phone: 224-420-0614
Email: justin.vickers@sierraclub.org

*Counsel for Sierra Club*

Ted Kelly
Adam Kurland
Environmental Defense Fund
555 12th Street NW, Suite 400
Washington, DC 20004
Phone: 202-572-3317
Email: tekelly@edf.org

*Counsel for Environmental Defense Fund*

Nicholas M. Gladd
Wilson Sonsini Goodrich & Rosati, P.C.
1700 K Street, NW
Washington, DC 20006
Phone: (202) 973-8800
Email: ngladd@wsgr.com

*Counsel for Advanced Energy United, Inc.*

Gabriel Tabak
American Clean Power Association
1299 Pennsylvania Avenue NW
13th Floor
Washington, DC 20004
Phone: (202) 383-2500
Email: gtabak@cleanpower.org

*Counsel for American Clean Power Association*[*]

Melissa Alfano
Solar Energy Industries Association
1425 K Street NW, Suite 1000
Washington, DC 20005
Phone: (202) 566-2873
Email: malfano@seia.org

*Counsel for Solar Energy Industries Association*[†]

Dated: March 13, 2026

---

[*] The views and opinions expressed in this filing do not necessarily reflect the official position of each of American Clean Power Association's individual members.

[†] The comments contained in this filing represent the position of Solar Energy Industries Association as a trade organization on behalf of the solar industry, but do not necessarily reflect the views of any particular member with respect to any issue.

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................1

STATEMENT OF THE CASE........................................................................3

I.      Large scale transmission is essential to reliable and affordable
        electricity, but transmission owners lack incentives to build it. ...................4

II.     Inadequate and piecemeal transmission development threatens
        reliability, raises prices, and blocks generation...............................6

SUMMARY OF ARGUMENT .......................................................................9

ARGUMENT ................................................................................................12

I.      FERC relied on a robust record of systemic problems that demanded
        reforms. .....................................................................................................12

        A.      FERC identified short-sighted and overly narrow planning as
                widespread flaws in existing processes...............................14

        B.      Extensive record evidence supported FERC's determinations
                that these systemic defects result in unjust and unreasonable
                outcomes..........................................................................16

                1.      Defective regional planning inflates transmission costs............16

                2.      Defective regional planning results in an underbuilt grid
                        that does not deliver electricity reliably or affordably..............20

        C.      State Petitioners' examples are exaggerated and do not
                undermine FERC's findings...............................................24

II.     Properly understood, Order 1920 falls well within FERC's statutory
        jurisdiction. ..............................................................................................25

        A.      Order 1920's purpose is to efficiently solve multiple
                interconnected transmission needs, not favor particular ones. ...........27

        B.      Order 1920's scenario development reacts to all States' laws
                and resource plans, rather than dictating them.................................28

        C.      Order 1920's mandatory benefits metrics concern economics
                and reliability, not States' policy requirements...............................33

        D.      Order 1920's cost-allocation process is designed to avoid
                free-riding, not subsidize States' policies. ...................................35

i

E.     State Petitioners show no effect on their authority over generation. ...................................................................37

F.     Order 1000 also incorporated the effects of States' policies. .............39

III.     FERC's reforms to its longstanding transmission-planning rules do not implicate the major questions doctrine...................................................42

IV.     FERC reasonably imposed a right-sizing requirement on existing higher-voltage transmission facilities..........................................................46

CONCLUSION ..................................................................................................51

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ala. Ass'n of Realtors v. Dep't of Health & Human Servs.*,
594 U.S. 758 (2021)..............................................................45, 46

*Biden v. Nebraska*,
600 U.S. 477 (2023)..............................................................42, 46

*Conn. Dep't of Pub. Util. Control v. FERC*,
569 F.3d 477 (D.C. Cir. 2009) ............................................38, 39

*FERC v. Elec. Power Supply Ass'n*,
577 U.S. 260 (2016)................................................12, 13, 25, 38

*Ill. Com. Comm'n v. FERC*,
576 F.3d 470 (7th Cir. 2009).......................................................35

*Ill. Com. Comm'n v. FERC*,
721 F.3d 764 (7th Cir. 2013).................................................35, 36

*Ill. Com. Comm'n v. FERC*,
756 F.3d 556 (7th Cir. 2014).......................................................35

*In re Permian Basin Area Rate Cases*,
390 U.S. 747 (1968).....................................................................13

*Municipalities of Groton v. FERC*,
587 F.2d 1296 (D.C. Cir. 1978) ..................................................38

*Nat'l Ass'n of Regul. Util. Comm'rs v. FERC*,
964 F.3d 1177 (D.C. Cir. 2020)...................................................25

*N.C. Coastal Fisheries Reform Grp. v. Capt. Gaston LLC*,
76 F.4th 291 (4th Cir. 2023)........................................................42

*New York v. FERC*,
535 U.S. 1 (2002)..........................................................................46

iii

*N.J. Bd. of Pub. Utils. v. FERC*,
   744 F.3d 74 (3d Cir. 2014) ..................................................................38

*Old Dominion Elec. Coop. v. FERC*,
   898 F.3d 1254 (D.C. Cir. 2018) .........................................................35

*Penn. Water & Power Co. v. FPC*,
   343 U.S. 414 (1952)...........................................................................12

*Pub. Utils. Comm'n v. FERC*,
   462 F.3d 1027 (9th Cir. 2006).............................................................14

*South Carolina Pub. Serv. Auth. v. FERC*,
   762 F.3d 41 (D.C. Cir. 2014) ......................................24, 40, 41, 42

*West Virginia v. EPA*,
   597 U.S. 697 (2022)...............................................................42, 44

**Statutes**

15 U.S.C. § 717d....................................................................................13

16 U.S.C. § 824.......................................................................................12

16 U.S.C. § 824e.....................................................................................12

16 U.S.C. § 825*l*.....................................................................................13

Ind. Code §§ 8-1-8.2-1 to 10 (2025)......................................................30

Ky. Rev. Stat. Ann. § 278.264 (2024) ...................................................29

Minn. Stat. § 216B.243 (2025) ..............................................................30

Va. Code Ann. § 56-585.5 (2025) ..........................................................33

Va. Code Ann. § 58.1-609.3 (2023) .......................................................30

W. Va. Code § 24-2-1d (2025) ...............................................................29

iv

**Court Rules**

Fed. R. App. P. 28........................................................................................3

**FERC Orders**

Notice of Proposed Rulemaking, 179 FERC ¶ 61,028 (2022) ...................5, 6, 8, 16, 18, 22, 29, 30, 32

Order 890, 118 FERC ¶ 61,119 (2007).............................................................5, 36

Order 1000, 136 FERC ¶ 61,051 (2011).......................................................6, 36, 40

Order 1920, 187 FERC ¶ 61,068 (2024) .......................................2, 4, 5, 6, 7, 8, 9, 14, 15, 16, 17, 18, 19, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 39, 42, 43, 45, 46, 47, 48, 49

Order 1920-A, 189 FERC ¶ 61,126 (2024) ................................2, 14, 25, 35, 37, 46

Order 1920-B, 191 FERC ¶ 61,026 (2025)..........................................................2

**Other Authorities**

AEP, *Wolfe Utilities, Midstream, & Clean Energy Conference*
(Sept. 30, 2021), https://perma.cc/VEU2-ZGLF ...............................................47

Ari Peskoe, *Is the Utility Transmission Syndicate Forever?*, 42 Energy L.J. 1
(2021) ...........................................................................................................6

Dev Millstein et al., *Empirical Estimates of Transmission Value Using
Locational Marginal Prices*, Lawrence Berkeley Nat'l Lab'y
(Aug. 2022), https://perma.cc/3UXC-SYND ..............................................7, 22

Johannes Pfeifenberger et al., *Transmission Planning for the 21st Century:
Proven Practices that Increase Value and Reduce Costs*, The Brattle
Group & Grid Strategies (Oct. 2021) ........................... 4, 7, 8, 15, 18, 19, 21, 25

Joseph Rand et al., *Queued Up: Characteristics of Power Plants Seeking Transmission Interconnection As of the End of 2022*, Lawrence Berkeley Nat'l Lab'y (Apr. 2023), https://perma.cc/S2KV-JBLB......................................22

Joshua Macey & Jacob Mays, *The Law and Economics of Transmission Planning and Cost Allocation*, 45 Energy L.J. 209 (2024) ...............................36

Michael Goggin, *Transmission Makes The Power System Resilient To Extreme Weather*, Grid Strategies LLC (July 2021)...........................4, 7, 15, 21

MISO, *MISO Futures Report* (Dec. 2021), https://perma.cc/H84H-KWLW..........32

Nat'l Conf. of State Legislatures, *Policy Snapshot: Data Center Incentives*, https://www.ncsl.org/fiscal/policy-snapshot-data-center-incentives (last updated Nov. 17, 2025)....................................................................30

Nat'l Conf. of State Legislatures, *States Restrictions on New Nuclear Power Facility Construction*, https://www.ncsl.org/environment-and-natural-resources/states-restrictions-on-new-nuclear-power-facility-construction (last updated Dec. 19, 2025) ....................................................................30

PJM Interconnection, L.L.C., *The Benefits of the PJM Transmission System* (2019)..............................................................................................47

Rob Gramlich, et al., *Fostering Collaboration Would Help Build Needed Transmission* (Feb. 2024) ...................................................................50

Rob Gramlich & Jay Caspary, *Planning For The Future: FERC's Opportunity To Spur More Cost-Effective Transmission Infrastructure*, Americans for a Clean Energy Grid (Jan. 2021) ...........................................17, 19

**INTRODUCTION**

This country depends on a steady supply of electricity.  In the Federal Power Act, Congress tasked the Federal Energy Regulatory Commission ("FERC") with ensuring a transmission system that reliably delivers electricity to consumers at a fair price.  To that end, FERC has iteratively established transmission planning processes designed to overcome transmission owners' incentives to maintain balkanized grids that protect their own economic interests, rather than cooperatively building an interconnected grid that provides affordable, reliable power nationwide.

Unfortunately, those processes have fallen short.  Transmission bottlenecks prevent available power from alleviating widespread and sometimes deadly outages.  Systemwide transmission shortages prevent lowest-cost power from reaching consumers and exacerbate years-long backlogs for bringing cheaper, cleaner generators online.  Looming challenges, including an aging grid and escalating electricity demand, will further stress an already-inadequate system.

In this proceeding, FERC documented exactly how we got here.  Transmission has been planned myopically.  Transmission projects are primarily built in piecemeal fashion, responding to individual transmission owners' near-term "local" needs or individual generators' requests to connect to the grid.  Regional processes still use short-term analyses and incomplete assumptions that

1

overlook foreseeable long-term conditions. And with siloed processes for assessing reliability, economic, and public policy needs, planners fail to advance efficient projects that solve multiple problems. The result? Consumers must fund a patchwork of smaller transmission band-aids that far exceed the cost of preventative care.

Order 1920[1] responded accordingly, establishing a long-term, comprehensive regional planning process. There is no reasonable dispute that the Federal Power Act authorized that action.[2] Ample evidence of systemic problems triggered FERC's Section 206 obligation to reform existing processes, which it appropriately did on an industry-wide basis. Those reforms—improvements to transmission planning and cost allocation requirements—sit at the core of FERC's Section 201 jurisdiction over transmission and wholesale electricity sales in interstate commerce.

---

[1] Order 1920, 187 FERC ¶ 61,068 (2024) (JA615), *on reh'g & clarification*, Order 1920-A, 189 FERC ¶ 61,126 (2024) (JA1979), *on reh'g & clarification*, Order 1920-B, 191 FERC ¶ 61,026 (2025) (JA2798). For simplicity, Respondent-Intervenors refer to Order 1920 and Order 1920-A collectively as "Order 1920."

[2] Respondent-Intervenor Advanced Energy United challenges the Right of First Refusal that FERC adopted in connection with the right-sizing requirement. *See* Pro-Competition Pet'rs Opening Br. The remaining undersigned Respondent-Intervenors take no position on the Right of First Refusal, which Pro-Competition Petitioners indicate (at 57) is severable in any event. Advanced Energy United joins all but Part III of this brief.

2

State and Consumer Petitioners resist this conclusion, claiming that FERC could not exercise its authority to remedy unjust and unreasonable rates because it did not specify flaws in existing processes or demonstrate their nationwide scope. Alternatively, State Petitioners argue, Order 1920 exceeds FERC's authority by "effectively" regulating generation facilities within States' jurisdiction. As FERC's brief thoroughly explains, these challenges lack merit. Respondent-Intervenors supply additional record evidence confirming that Order 1920 falls squarely within FERC's jurisdiction and is urgently needed to repair a broken status quo.[3] Relatedly, Respondent-Intervenors detail how Petitioners' objections distort Order 1920, the record, and the law. All told, Petitioners provide no basis to discard a Rule that makes necessary strides towards reliable and affordable electricity.

## STATEMENT OF THE CASE

Respondent-Intervenors adopt by reference FERC's Statement of the Case (at 15-59), *see* Fed. R. App. P. 28(i), and provide additional relevant background.

---

[3] Indeed, some undersigned Respondent-Intervenors contend that FERC should have strengthened certain requirements in the Rule. *See* PIOs & Invenergy Pet'rs Opening Br.

3

**I.      Large-scale transmission is essential to reliable and affordable electricity, but transmission owners lack incentives to build it.**

High-voltage transmission lines serve as the grid's arteries, moving large amounts of electricity efficiently over long distances. They raise system-wide capacity, allowing more generators to supply increased power to meet greater demand for electricity. And they enable different generators to serve demand in more locations, facilitating competition and driving down prices. *See, e.g.*, JA685-686 (Order 1920 P91).

Relatedly, transmitting power on a regional scale takes advantage of geographic variations. Electricity demand for cooling or heating changes with temperature. Energy production varies across a region as weather conditions shift. Regional transmission more efficiently balances supply and demand, moderating prices and requiring less overall generation to meet the same demand. *See, e.g.*, JA3215-3216 (PIOs ANOPR Initial Comments, Ex. A, at 40-41 ("Brattle-Grid Strategies Oct. 2021 Report")).

This flexibility is critical during extreme weather, which can simultaneously spike demand and knock local generators and transmission offline. Areas with sufficient transmission can import excess power from less-affected neighbors. But those lacking regional or inter-regional connectivity often fare much worse. *See, e.g.*, JA3041-3046 (ACORE ANOPR Initial Comments, Ex. 4, at 1-6 ("Grid Strategies July 2021 Extreme Weather Report")).

Transmission planning identifies projects that maximize these values. Planners can identify persistent gaps in transmission capacity serving high-demand areas, or parts of the grid that are vulnerable to outages because they depend on limited generators or transmission lines. Planning for multiple needs across a broader area also achieves economies of scale. A large-scale regional project might be overkill for an individual need yet be the most cost-effective solution to multiple needs within a region. *See, e.g.*, JA3080-3081 (US DOE ANOPR Initial Comments 9-10).

Proactive planning is critical. Large projects can take over a decade to plan and construct and, once built, operate for decades more. JA720-721 (Order 1920 P116 & n.289). To identify where projects will provide the greatest value on those timelines, planners must consider likely future supply and demand, rather than designing tomorrow's grid for today's conditions.

Despite the established benefits of planning and developing large-scale transmission, there are "often substantial barriers" to doing so. JA168 (Notice of Proposed Rulemaking, 179 FERC ¶ 61,028, P32 (2022) ("NOPR")). Transmission owners—especially those that own or are affiliated with generation—lack "an incentive to expand the grid to accommodate new entries or to facilitate the dispatch of more efficient competitors." JA168 (NOPR P32) (quoting Order 890, 118 FERC ¶ 61,119, P57 (2007)); *see also* JA3483-3486 (Harvard ELI ANOPR

5

Initial Comments 17-20) (detailing transmission owners' incentives to avoid competition-enabling transmission); FERC Br. 24-25 & n.3.  Where transmission owners do build more transmission, their incentives favor unilaterally building smaller projects solely within their territories—on which they earn lucrative, guaranteed rates of return—rather than planning larger regional projects that they must compete to construct.  *See* JA3104-3106 (PIOs ANOPR Initial Comments 7-9); JA703-704 (Order 1920 P101 n.247) (citing Ari Peskoe, *Is the Utility Transmission Syndicate Forever?*, 42 Energy L.J. 1, 56-57 (2021) (documenting extensive use of competition exemption for near-term reliability-only projects)).  Meanwhile, because large-scale projects are "costly and tend to produce widespread benefits," "free ridership problems inhibit their development."  JA168 (NOPR P32).

## II.    Inadequate and piecemeal transmission development threatens reliability, raises prices, and blocks generation.

Over the last three decades, FERC has issued multiple industry-wide rules intended to overcome these barriers—most recently, Order 1000, 136 FERC ¶ 61,051 (2011).  FERC Br. 19-35.  But Order 1000's framework of local and regional transmission planning processes, *see* FERC Br. 36-44, has fallen short.  Siloed regional processes have "yielded only limited investments."  JA703 (Order 1920 P101); *see* JA206-207 (NOPR P67).  Piecemeal processes predominate, with billions spent annually on local transmission projects, in-kind replacements, and

6

one-off upgrades triggered by generator requests.  JA706-709, JA712-715 (Order 1920 PP104-06, 109-10).

This piecemeal development has made consumers pay too much for too little transmission.  Weather-related power outages currently cost the economy $25-70 billion annually, and limited supply can raise electricity prices by tens of millions of dollars during a single event.  JA690 (Order 1920 P94 n.207); JA3041-3044 (Grid Strategies July 2021 Extreme Weather Report 1-4).  And hard-hit areas often lack the large-scale transmission to import available power that would prevent dangerous outages and avoid exorbitant price spikes.  JA3047-3057 (Grid Strategies July 2021 Extreme Weather Report 7-17).

Consumers nationwide also face "persistent" and "widespread" congestion, preventing the sale of cheaper energy across distances.  JA3787-3788 (US DOE NOPR Initial Comments 3-4) (citing Dev Millstein et al., Lawrence Berkeley Nat'l Lab'y, *Empirical Estimates of Transmission Value Using Locational Marginal Prices* (Aug. 2022), https://perma.cc/3UXC-SYND ("LBNL Aug. 2022 Transmission Value Study")).  But most transmission is built through processes that do not attempt to reduce regional congestion, and they leave many more economic benefits on the table too.  JA3211-3225 (Brattle-Grid Strategies Oct. 2021 Report 36-50) (reviewing benefits such as reduced need to invest in new generation).

Transmission shortages—and the failure to proactively alleviate them—are also a "root cause" of years-long generator "interconnection backlogs and delays" that deter new market entrants and raise prices. JA711 (Order 1920 P107). Scarce transmission headroom requires generators to front the costs for, and await the construction of, increasingly expensive and complex transmission projects to safely interconnect to the grid. JA706-709 (Order 1920 PP104-05). Steep upgrade costs kill projects, shifting their expenses to the next generator in line and further delaying new supply. JA278-279 (NOPR P162). And aging, uneconomic generators cannot retire without enough new generation or transmission to replace them—forcing consumers to pay extra to keep more expensive units online. *See* JA747-748 (Order 1920 P138).

Additionally, transmission needs are evolving and increasing. *First*, extreme weather is "occurring with greater frequency," making transmission "increasingly critical to ensuring system reliability." JA690 (Order 1920 P94). *Second*, the supply mix is changing, driven by such factors as the plummeting costs of generating wind and solar energy and many jurisdictions requiring their utilities to use certain amounts of energy from specific types of generation—often wind, solar, or battery storage. JA696-697, JA699, JA727 (Order 1920 PP96, 98 & n.230, 120 n.303); *see also* JA3220 (Brattle-Grid Strategies Oct. 2021 Report 45) (benefits of transmission connecting geographically diverse wind and solar).

8

*Third*, demand is surging, driven by energy-intensive data centers and increased use of electricity for industrial, transportation, and household purposes. JA692-695 (Order 1920 P95). That growth is accelerating, requiring an increase in "the capacity of the already-oversubscribed transmission system." JA695 (Order 1920 P95).

Faced with overwhelming evidence of this broken status quo, FERC issued Order 1920, strengthening its transmission planning requirements to require long-term, holistic regional planning. FERC Br. 45-59.

## SUMMARY OF ARGUMENT

**I.** Contrary to State and Consumer Petitioners' challenges, ample evidence supported FERC's findings under Federal Power Act Section 206 that systemic problems with regional transmission planning warranted the industry-wide rule FERC supplied in Order 1920. Respondent-Intervenors supplement FERC's thorough rebuttal with three points. *First*, FERC identified three serious flaws in existing regional processes that impair them from identifying cost-effective projects. *Second*, FERC detailed how these defects result in concrete consequences: Leaving significant savings on the table; forcing consumers to fund billions in piecemeal, inefficient transmission projects instead; and saddling consumers with an underbuilt grid that cannot deliver electricity reliably or affordably. *Finally*, State Petitioners' largely overstated examples of "successful"

9

transmission planning do not undermine FERC's findings of systemic problems; any limited exceptions merely prove that most processes are wasting consumers' money.

**II.**   State Petitioners are likewise mistaken that Order 1920 exceeds FERC's jurisdiction under Federal Power Act Section 201 by effectively regulating the generation that States oversee.  Respondent-Intervenors detail one core flaw with their argument: It is untethered from the record.

Order 1920's purpose is to identify more cost-effective solutions to all transmission needs.  That process starts with scenario development, which incorporates factors influencing electricity supply and demand—including *all* States' laws, no matter which generation they might favor—to accurately plan transmission for future conditions.  The process turns next to project evaluation and selection, where planners must evaluate projects using seven economic and reliability benefits—none of which weigh state generation policies—and apply selection criteria designed to maximize those benefits against projects' costs. Finally, selected projects—which remain subject to state siting and permitting processes—must have their costs allocated roughly commensurate with their benefits, avoiding free riders and preventing one State's ratepayers from subsidizing policy benefits in other States.

10

The Rule thus operates at the heartland of FERC's jurisdiction over transmission. State Petitioners show no impairment of their reserved authority to regulate generation. Nor can they distinguish Order 1000's provisions for incorporating effects of state policies on regional transmission plans, which were upheld against similarly misplaced challenges.

**III.** Order 1920 does not run afoul of the major questions doctrine, either, because State Petitioners cannot meet any of the criteria the Supreme Court has invoked in every major questions case to come before it. Respondent-Intervenors focus on just one: State Petitioners cannot establish that Order 1920 possesses sufficient "economic and political significance" as to present a major question, because their arguments are premised on misconceptions about the Rule. *First*, Order 1920 was adopted not to "transform[]" the energy industry, but to respond to changes already ongoing within it. *Second*, Order 1920 will not cause hundreds of billions of dollars in additional, excess spending, but will rather redirect spending to more efficient projects. *Third*, Order 1920 does not intrude on States' authority: It solely regulates regional transmission planning, leaving States to exercise their traditional authority over generation.

**IV.** FERC also reasonably imposed a right-sizing requirement on existing higher-voltage transmission facilities. That measure was amply supported by the record. FERC found that providers are expending enormous sums to replace aging

11

facilities without consistently evaluating whether those facilities could be modified to better address transmission needs, threatening consumers with unjust and unreasonable rates. The Rule therefore requires, as part of the long-term regional planning process, that transmission owners submit a list of existing higher-voltage facilities that the owner plans to replace in-kind, so that regional planners can evaluate opportunities to expand or "right-size" those facilities to meet multiple needs. Applied systematically, these right-sizing analyses will ensure that opportunities to cost-effectively build the right facilities are evaluated before consumer dollars are spent.

## ARGUMENT

### I.      FERC relied on a robust record of systemic problems that demanded reforms.

The Federal Power Act's "core objects" are to "protect 'against excessive prices' and ensure effective transmission of electric power." *FERC v. Elec. Power Supply Ass'n ("EPSA")*, 577 U.S. 260, 290 (2016) (quoting *Penn. Water & Power Co. v. FPC*, 343 U.S. 414, 418 (1952)). Congress accordingly gave FERC exclusive jurisdiction over the "transmission of electric energy in interstate commerce" and the "sale of electric energy at wholesale in interstate commerce." 16 U.S.C. § 824(b)(1).

Under Section 206, FERC safeguards transmission and wholesale electricity rates through a two-step process. *See id.* § 824e(a). Whenever FERC (1) finds that

12

a practice affecting a rate is unjust, unreasonable, or unduly discriminatory, (2) it "must rectify the problem" by setting a new "just and reasonable" rate. *EPSA*, 577 U.S. at 266. These findings must be "supported by substantial evidence." 16 U.S.C. § 825*l*(b).

Some Petitioners challenge FERC's step one findings. State Petitioners contend that FERC had no authority to issue a generally applicable rule, and, alternatively, lacked the necessary evidence of systemic regional planning deficiencies. State Pet'rs Opening Br. 40-44. Consumer Petitioners, for their part, insist that FERC did not demonstrate problems in existing practices, and relied solely on the absence of long-term planning and vague assertions about general transmission needs. Consumer Pet'rs Opening Br. 15-20. These arguments fail.

At the outset, State Petitioners' first argument (at 41) gets the law wrong. Agencies have broad discretion to act via general rule or case-by-case adjudication, and the Federal Power Act's text and decades of precedent confirm that FERC may choose either remedy for unlawful rates. *See* FERC Br. 122-26; *In re Permian Basin Area Rate Cases,* 390 U.S. 747, 768, 774-76 (1968) (rejecting challenge to generic rate-setting under parallel Natural Gas Act provision, 15 U.S.C. § 717d(a)). Recognizing that discretion, courts have repeatedly affirmed that FERC may issue industry-wide rules based on findings of systemic problems, unless those problems

13

are confined to "isolated pockets." *See* FERC Br. 127-28; *Pub. Utils. Comm'n v. FERC*, 462 F.3d 1027, 1054-55 (9th Cir. 2006).

State Petitioners' alternative argument that planning problems are limited to "isolated pockets" (at 42), fails on the record. *See* FERC Br. 128-30. So does Consumer Petitioners' argument that FERC relied solely on broad or circular conclusions; FERC clearly connected the dots from specific flaws to unjust results. FERC Br. 113-17. As detailed below, FERC identified discrete flaws in existing practices—like short-sighted and siloed planning. And it relied on an extensive record—including over 30,000 pages of stakeholder comments, JA2053-2054 (Order 1920-A P85), amassing far more detail than even FERC's lengthy orders could recount—demonstrating that those planning flaws cause unjust and unreasonable outcomes. Those include systemic failures to build cost-saving projects in favor of inefficient ones and an underbuilt grid incapable of meeting today's transmission challenges, let alone future ones.

A.    **FERC identified short-sighted and overly narrow planning as widespread flaws in existing processes.**

As an initial matter, FERC "specif[ied]"—in detail—which existing practices were unjust and unreasonable, *contra* Consumer Pet'rs Opening Br. 19, and did so on a nationwide rather than an "isolated" basis, *contra* State Pet'rs Opening Br. 42. Specifically, it highlighted three defects that plague regional planning processes. JA717-718 (Order 1920 P114); FERC Br. 116-17.

14

*First*, regions do not plan far enough in advance, with most using a ten-year planning horizon. JA718-719 (Order 1920 P115). And while mid-Atlantic grid operator PJM Interconnection, LLC "ostensibly uses a 15-year" horizon, it improbably assumes no "changes to the generation mix beyond a 5-year period." JA720 (Order 1920 P116 n.286) (citing JA3066 (Concerned Scientists ANOPR Initial Comments 10 & n.11)). Such cramped horizons neither align with timelines for large-scale transmission projects nor identify consolidated projects that address multiple longer-term needs. JA719-721 (Order 1920 P116).

*Second*, planning processes routinely ignore factors that will drive future transmission needs, undermining forward-looking planning. JA722-725 (Order 1920 P118). For instance, planning processes "typically assume normal electricity supply and demand," without accounting for extreme weather. JA723 (Order 1920 P118 n.293) (quoting JA3045 (Grid Strategies July 2021 Extreme Weather Report 5)). Further, processes in some regions generally ignore state-approved integrated resource plans, which detail utilities' specific plans to add and retire different types of generation. JA723 (Order 1920 P118 n.293); JA3777-3778, JA3781-3784 (Renewable Northwest Initial Comments 4-5, 33-36).

*Third*, many processes ignore important benefits of transmission projects, masking their true value. JA729-730 (Order 1920 P122) (citing JA3178 (Brattle-Grid Strategies Oct. 2021 Report 2)). Regional processes—which generally

15

account *separately* for reliability, economic, and public policy needs—"only calculate the set of benefits specific to" each category.  JA206 (NOPR P67).  Reliability evaluations thus exclude economic benefits, and vice versa.  Even within those silos, there are notable gaps.  Economic planning in the Southeastern Regional Transmission Planning ("SERTP") process, FERC found, "fail[s] entirely to consider cost savings" because transmission owners have not obtained the software to model them.  JA730 (Order 1920 P122) (citing JA4017 (SREA Initial Comments 24)).

> **B.    Extensive record evidence supported FERC's determinations that these systemic defects result in unjust and unreasonable outcomes.**

Nor did FERC rely on circular reasoning that "long-term planning reforms are needed due to the absence of long-term planning reforms."  *Contra* Consumer Pet'rs Opening Br. 19.  FERC thoroughly detailed how the three systemic defects it identified result in on-the-ground unjust and unreasonable outcomes.

> **1.    Defective regional planning inflates transmission costs.**

Each of these flaws causes regional processes to miss projects that meet needs more efficiently and cost-effectively, forcing consumers to bear significant and unnecessary costs instead.  JA719-721, JA728-729, JA730-731 (Order 1920 PP116, 121, 123).

16

At a basic engineering level, larger projects that address multiple needs save money. For example, building a 230-kilovolt line "may address a specific reliability or generation-interconnection need within the next ten years," but a "larger-scale 345 [kilovolt] transmission investment may be more cost effective" by also "address[ing] multiple needs that would likely arise in the [following] decade." JA4225 (PIOs Initial Comments, Ex. A, P26); JA3081 (US DOE ANOPR Initial Comments 10) ("[A]n initial larger-scale buildout will often represent a lower-cost solution."). Moreover, larger lines deliver power more efficiently. *See* JA3037-3038 (ACORE ANOPR Initial Comments, Ex. 1, at 93-94 ("ACEG Jan. 2021 Planning Report")) (showing 230-kilovolt line's cost per unit of capacity is more than four times that of a 765-kilovolt line).

In practice, those savings can be massive. To illustrate, FERC highlighted Midcontinent Independent System Operator, Inc.'s ("MISO") Multi-Value Project initiative, which avoided the defects that generally impaired existing processes. Using a longer planning horizon (twenty years) and incorporating drivers of future needs (like changing state laws and more generators seeking interconnection), MISO addressed needs proactively and efficiently rather than through short-sighted reliability and interconnection processes. JA704-705 (Order 1920 P102). For one, it addressed reliability needs that would have otherwise required building "approximately $300 million in [separate] reliability transmission facilities."

17

JA165 (NOPR P28 n.37). Moreover, relying instead on one-off projects from the standard interconnection process would have "cost 80% more" to "integrate the same amount of generation." JA744 (Order 1920 P135) (quoting JA4233-4234 (N.J. Comm'n Initial Comments 4-5)). And holistic planning maximized a broader range of benefits, with production cost savings alone "exceed[ing] the entire cost of the portfolio by $10 billion." JA744 (Order 1920 P135).

Missing similar opportunities can—and is—costing consumers billions. One study, for example, found that PJM could "save customers more than $30 billion" through holistic planning. JA744 (Order 1920 P135). And the record showed many more opportunities left on the table. *See* JA734 (Order 1920 P127 n.318) (lack of multi-value planning across regions "has required ratepayers to pay for tens of billions of dollars in unnecessary transmission projects" (citing JA4237 (N.J. Comm'n Initial Comments 8))); JA3229-3233 (Brattle-Grid Strategies Oct. 2021 Report 73-77) (reviewing additional studies).

Yet the money keeps flowing to piecemeal development, rather than cost-saving regionally-planned projects. Following Order 1000's issuance, transmission providers made only limited investments in regional projects. Investment declined in some regions and never occurred in others. FERC Br. 46-47. When regional investment did happen, it typically addressed only "near-term reliability compliance" for discrete needs, without evaluating more comprehensive

18

solutions to "multiple regional needs" or their "system-wide benefits." JA3178

(Brattle-Grid Strategies Oct. 2021 Report 2); *see also* JA703-704 (Order 1920

P101 & n.247) (detailing reliability-focused spending); JA3029-3030 (ACEG Jan.

2021 Planning Report 25-26).

Instead, transmission providers spent billions on local projects that

"focus[ed] on the needs of individual utility footprints," even if regional solutions

would be more efficient. JA712-715 (Order 1920 PP109-10). In regions serving

roughly two-thirds of national electricity demand, "one half of the nearly $70

billion" spent between 2013 and 2017 occurred outside of regional planning

processes. JA713 (Order 1920 P109); FERC Br. 23-24 (describing regions). That

trend was "continuing and accelerating," with some regions approving primarily

local projects. JA712-714 (Order 1920 P109 & n.274) (citing JA3128-3141 (PIOs

ANOPR Initial Comments 31-44) (detailing region-by-region spending)).

Similarly, FERC documented an increase in spending through the generator

interconnection process, which does not look beyond the needs or time horizon of

the "specific interconnection request(s) being studied." JA709 (Order 1920 P106).

Increases in the "total and average cost of interconnection" indicated "heav[y]"

reliance on this piecemeal process to build transmission. JA711 (Order 1920

P108).

19

That the most investment went to the least efficient processes is perhaps unsurprising, given transmission owners' incentives to avoid competition. *See supra* pp.5-6; JA3488-3490 (Harvard ELI ANOPR Initial Comments 22-24) (describing how one Southeast utility joined MISO despite more extensive transmission connections to an adjacent grid operator, apparently "to minimize trading opportunities," and proceeded to "maintain[] its local control, in part by subverting MISO transmission planning functions"); JA4008-4012 (SREA Initial Comments 9-13) (detailing how utilities avoided importing competitive generation and defeated proposals for two regional transmission lines costing $108 million and $115 million by instead spending $870 million and $1 billion on two power plants, at their ratepayers' expense); JA4025 (R Street Initial Comments 16) (describing these tactics as "pervasive"); JA3969-3978 (Southeast PIOs NOPR Initial Comments 11-20) (detailing systematic obstacles to stakeholder participation in SERTP). That dynamic reinforced the need for FERC to strengthen requirements on planning horizons, drivers, and benefits, thereby constraining opportunities to circumvent more efficient regional planning.

### 2. Defective regional planning results in an underbuilt grid that does not deliver electricity reliably or affordably.

FERC likewise linked the identified planning failures to systemic grid inadequacies.

Critically, the transmission system is not performing its fundamental job of maintaining reliable service. During extreme weather outages, available power is routinely stuck on the sidelines. In Winter Storm Uri, grid operator Electric Reliability Council of Texas ("ERCOT") suffered prolonged and deadly outages; one additional gigawatt of transmission capacity with the Southeast could have maintained heat for hundreds of thousands of Texans and paid for itself in four days. JA3051-3052 (Grid Strategies July 2021 Extreme Weather Report 11-12). Meanwhile, regions with more robust transmission connections largely kept the lights on by importing "more than 15 times [more] power" than ERCOT could. JA3047 (Grid Strategies July 2021 Extreme Weather Report 7); JA690-691 (Order 1920 P94 n.209) (summarizing analyses). Similarly, one gigawatt of "stronger transmission ties between eastern and western PJM" could have saved $40 million during the 2017-2018 Bomb Cyclone. JA3054 (Grid Strategies July 2021 Extreme Weather Report 14); *see also* JA3186 (Brattle-Grid Strategies Oct. 2021 Report 10) (excess energy could not reach California during blackout-inducing heat wave). Yet regional processes typically plan transmission without considering extreme weather. JA723 (Order 1920 P118); *supra* p.15.

Next, transmission constraints create persistent and costly congestion in many regions. *See* JA3787-3789 (US DOE NOPR Initial Comments 3-5); *supra* p.7. Regional projects have "significant potential economic value" to reduce this

congestion; historical pricing patterns indicate that an additional gigawatt of regional transmission between many trading points could have saved $130-300 million annually.  LBNL Aug. 2022 Transmission Value Study 3, 19, 33.  But reliability-only regional processes generally ignore these kinds of economic benefits.  *Supra* pp.15-16, 18-19; JA703-704 (Order 1920 P101); JA206-207 (NOPR P67).

In addition, planning shortfalls impede bringing online new generation that would reduce prices by boosting overall supply.  Limited transmission capacity holds back over 1,900 gigawatts of new generation requests—far exceeding the nation's approximately 1,250 gigawatts of existing generating capacity.  JA700-701 (Order 1920 P99 n.242) (citing Lawrence Berkeley Nat'l Lab'y, *Queued Up: Characteristics of Power Plants Seeking Transmission Interconnection As of the End of 2022* 35 (Apr. 2023), https://perma.cc/S2KV-JBLB); JA1397 (Order 1920 P1108) (noting that limited capacity and resulting upgrade costs are often "deciding factor" for interconnection withdrawals).  This new generation is critical for serving rising demand and meeting state generation requirements.  *See, e.g.,* JA724 (Order 1920 P118 n.296); JA4284-4285 (DC & Md. Office of People's Counsel Initial Comments 16-17).

A lack of replacement generation also inflates costs by impeding the retirement of aging, expensive generators.  Relatedly, failing to plan transmission

22

for those retirements can keep those generators operating until upgrades are complete—charging customers extra costs the whole time.  FERC and state utility regulators highlighted one example: PJM delayed retirement of the Indian River Unit 4 plant in Delaware for up to five years pending transmission upgrades.  *See* JA747-748 (Order 1920 P138) (better planning may have averted that outcome); JA4169-4170 (NARUC Initial Comments 14-15) (need for extension was "lamentable" because "the plant has been uneconomic for years, its significant air emissions are inconsistent with numerous state policies, and its continued use may" cost ratepayers "several hundred million dollars").

Finally, ongoing trends threaten to exacerbate these defects, further entrenching unjust and unreasonable outcomes.  FERC found that pressures from multiple sources—increasingly frequent extreme weather, rising electricity demand, and a shifting generation mix—will further strain an aging grid.  FERC Br. 114-16; *infra* pp.46-51; JA1716-1717 (Order 1920 P1573) (summarizing looming need to replace majority of transmission in some regions).  These factors are likely to substantially increase transmission investment, heightening the need for regional processes to direct consumers' dollars to cost-effective projects that bolster the grid.  JA688-689, JA701-702 (Order 1920 PP93, 100).

23

### C.      State Petitioners' examples are exaggerated and do not undermine FERC's findings.

This mountain of evidence rebuts State Petitioners' alternative claim that any problems exist only in isolated pockets.  *See* JA741 (Order 1920 P132) (finding that "these deficiencies pervade large swaths of the country").  Rather than engage with any of that evidence, State Petitioners point (at 42-44) to a few specific instances of "successful" transmission planning in MISO, New York Independent System Operator ("NYISO"), California Independent System Operator ("CAISO"), and Southeast regions.  That argument fails twice over.

Initially, State Petitioners invert the relevant standard.  Courts have cautioned against using an industry-wide rule where there are isolated *problems*— not isolated successes.  *See supra* pp.13-14; FERC Br. 127-28; *South Carolina Pub. Serv. Auth. v. FERC*, 762 F.3d 41, 67 (D.C. Cir. 2014) ("some" examples of "sufficient transmission planning processes" were "as unastonishing as they were irrelevant" (cleaned up)).  Otherwise, FERC could not address systemic problems through minimum standards whenever a handful of utilities made improvements.  So when MISO's Multi-Value Projects demonstrated that departing from the standard practice of short-term, siloed planning could save consumers billions, it supported—rather than undermined—FERC's decision to remedy those systemic flaws.  *Supra* pp.17-18; JA704 (Order 1920 P102) (citing Multi-Value Projects as "limited instance[]" showing "clear and quantifiable benefits" of fixing defects).

24

And on the facts, State Petitioners overstate their case. NYISO and CAISO, for example, use multi-value planning processes only for public policy-driven projects, but not reliability or interconnection needs. JA3189, JA3191-3192 (Brattle-Grid Strategies Oct. 2021 Report 13, 15-16). And the SERTP process, in which Southern Companies participate, suffers from all three defects that FERC identified. JA2062-2063 (Order 1920-A P94); JA3969-3974 (Southeast PIOs NOPR Initial Comments 11-16). Indeed, that is one of the regions that has never selected a regional project under Order 1000. JA703 (Order 1920 P101).

State Petitioners thus provide no basis for requiring FERC to let widespread unjust and unreasonable outcomes persist.

## II.    Properly understood, Order 1920 falls well within FERC's statutory jurisdiction.

The record likewise rebuts State Petitioners' claim (at 22-30) that Order 1920—FERC's fix for these systemic problems—exceeds FERC's statutory authority. As FERC explains (at 75-81), courts follow three steps to evaluate FERC's jurisdiction: (1) FERC must address practices that directly affect matters within its exclusive jurisdiction, like transmission in interstate commerce; (2) FERC cannot regulate a matter reserved to the States, like generation facilities; and (3) courts' determinations cannot conflict with the Federal Power Act's core purposes. *EPSA*, 577 U.S. at 276-77; *Nat'l Ass'n of Regul. Util. Comm'rs v. FERC*, 964 F.3d 1177, 1185-86 (D.C. Cir. 2020).

25

FERC explains (at 81-95) why all three steps confirm its authority to issue Order 1920. State Petitioners address only the second, arguing that Order 1920 regulates generation. Their argument fails for multiple reasons, but Respondent-Intervenors focus on one: Order 1920 simply does not operate as they claim.

Order 1920 strengthens existing requirements in discrete and sensible ways, establishing a long-term, comprehensive regional planning process. FERC Br. 49-58. Seizing on one sub-component of the Rule—incorporating laws and regulations affecting electricity supply and demand into future forecasts—State Petitioners recast Order 1920 as "effectively" regulating the generation they oversee by requiring construction of transmission to serve favored types of generation and making their constituents pay for it. State Pet'rs Opening Br. 4-5, 24-26, 28. Further, they suggest, paying for that transmission will impede State Petitioners' efforts to shape the generation mix in their own States. *Id.* at 26-27. Not even close.

As a threshold matter, Order 1920 does not mandate the construction of any transmission. *Contra* State Pet'rs Opening Br. 25. Transmission providers need not "select" any transmission project, even if it meets their selection criteria. JA1344 (Order 1920 P1026). And selected projects still must go through permitting and siting proceedings—many within States' jurisdiction—to obtain construction approval. JA826-827 (Order 1920 P258).

26

In addition to this threshold misconception, State Petitioners' claim suffers from multiple errors detailed below. To start, State Petitioners misunderstand Order 1920's purpose, which is to meet all transmission needs more efficiently, not pick winners and losers. And on the details, their story unravels further—each phase of Order 1920's process refutes their claims of FERC-favored generation and subsidization of other States' policies. Nor can State Petitioners show an impermissible effect on generation they oversee, when Order 1920 leaves their regulatory tools fully intact. Finally, their claim echoes failed challenges to Order 1000's incorporation of the effects of state generation policies.

### A. Order 1920's purpose is to efficiently solve multiple interconnected transmission needs, not favor particular ones.

State Petitioners err at the outset by mistaking Order 1920's purpose. They imagine a zero-sum game whereby transmission projects exist either to meet other States' renewable energy goals or to serve reliability and economic purposes. State Pet'rs Opening Br. 3-5, 11, 24-25. But rather than prioritizing some needs at the expense of others, Order 1920 seeks to identify the most cost-effective transmission options to solve *multiple* interconnected needs—including those triggered by State Petitioners' own resource plans and laws. *See* JA857 (Order 1920 P299) (relevant needs arise from "diverse" drivers including "evolving reliability concerns, changes in the resource mix, and changes in demand"); *infra* pp.28-33. Order 1920 likewise seeks to maximize the many benefits that

27

transmission can provide, no matter the underlying needs prompting a project. *Infra* pp.33-34.

Nor does Order 1920 mandate an expensive transmission buildout that drives up costs. *Contra* State Pet'rs Opening Br. 4, 35. As detailed above, *supra* pp.16-23, the record demonstrates that it is the status quo that imposes staggering and unnecessary costs. Without Order 1920's reforms, consumers will fund billions more in inefficient, piecemeal development, *see* JA687-689 (Order 1920 PP92-93), and continue bearing the costs of higher prices and decreased reliability.

### B. Order 1920's scenario development reacts to all States' laws and resource plans, rather than dictating them.

Turning to Order 1920's scenario development phase, State Petitioners miss the point again. They contend (at 24-26) that FERC has mandated transmission to serve its preferred generation by requiring that scenarios include certain factors, relying on two false premises.

*First*, State Petitioners reverse the relationship between Order 1920's scenario-based planning and generation development. Under the Rule, transmission providers develop multiple, plausible scenarios of future electricity supply and demand as a first step to identifying the most cost-effective transmission given future conditions. JA848, JA859-860 (Order 1920 PP284, 302). These scenarios require "forecasts" of both "the level and pattern (i.e., hourly and seasonal variability) of future electricity demand" and "the quantity,

28

location, and type of resource additions and retirements." JA848 (Order 1920 P284). Transmission providers thereby predict where electricity will be needed and what generation could meet that demand. Scenario-based planning then *reacts* to these projections by identifying the most efficient and cost-effective transmission for those conditions.

*Second*, FERC has no preferred generation. To ensure accurate scenarios, FERC established categories of factors that influence supply and demand. *See* JA930-931 (Order 1920 P410); JA204-205 (NOPR P65). But any of these factors may result in planners forecasting more or less of any type of generation, depending on decisions made by legislatures, other regulators, and utilities themselves, as well as technological and economic trends—none of which FERC controls. The categories thus are both content-neutral and far more comprehensive than State Petitioners let on.

Critically, Order 1920 requires consideration of *all* States' policies, regardless of which generation they promote (if any). Start with Factor Category One, which includes state laws and regulations "affecting the resource mix and demand." JA944 (Order 1920 P432). Some state laws increase the share of renewable energy, *supra* p.8, while others promote fossil fuel-powered generation, *see, e.g.*, Ky. Rev. Stat. Ann. § 278.264 (2024) (rebuttable presumption against retirement of coal and gas plants); W. Va. Code § 24-2-1d(a) (2025) (provisions to

29

"maximize the use of electricity generated within the state by using coal or natural gas produced within the state" in developing future generating capacity); Ind. Code §§ 8-1-8.2-1 to 10 (2025) (authorizing "energy production zones" that exempt fossil fueled-powered generation from local permitting).  Some States restrict nuclear power, while others have reversed course.  *See, e.g.*, Minn. Stat. § 216B.243, subdiv. 3b(a) (2025); Nat'l Conf. of State Legislatures, *States Restrictions on New Nuclear Power Facility Construction*, https://www.ncsl.org/environment-and-natural-resources/states-restrictions-on-new-nuclear-power-facility-construction (last updated Dec. 19, 2025) (noting West Virginia and other repeals).  Many state laws and regulations affect demand instead.  *See*, *e.g.*, Va. Code Ann. § 58.1-609.3.18-19 (2023) (data center tax incentive); Nat'l Conf. of State Legislatures, *Policy Snapshot: Data Center Incentives*, https://www.ncsl.org/fiscal/policy-snapshot-data-center-incentives (last updated Nov. 17, 2025) (collecting examples).  Factor Category One does not distinguish among these laws, but rather requires consideration of them all.

Factor Category Three operates similarly.  It incorporates "state-approved integrated resource plans" that determine the generation that utilities will deploy to serve future demand—whatever those resources may be.  JA954 (Order 1920 P447); *see, e.g.*, JA237 (NOPR P104 n.191) (noting North Carolina's 15-year "forecast of load, supply-side resources, and demand-side resources"); JA700

30

(Order 1920 P99 n.241) (plans showing retirement amounts of coal, natural gas, wind, and solar by 2040).

Factor Category Two does not implement a FERC policy preference either. Including laws on "decarbonization and electrification" only ensures consideration of commonplace policies that indisputably affect electricity supply (by "limiting the carbon intensity of electricity generation") and demand (by "significantly increasing electricity use in certain sectors"). JA949-950 (Order 1920 P440); FERC Br. 87-88. Considering these laws under a separate category gives them no more weight than any other law affecting the resource mix and demand. And to the extent Factor Categories One and Two "overlap," FERC explained, laws cannot be "double-count[ed]." *See* JA950 (Order 1920 P440). In any case, transmission providers must determine how much each law will actually alter demand or supply.

Moreover, government policies are just one piece of the scenario puzzle. Transmission providers must consider "the relative cost of constructing and operating different types of generation," an economic question that influences which generators will come—and stay—online. JA960 (Order 1920 P456). That category may include projected changes in fuel costs or technological developments like longer-lasting batteries that "mitigat[e] some new transmission needs." JA961-962 (Order 1920 P458). Order 1920 also requires incorporating

31

likely retirements as maintaining aging, expensive power plants becomes unprofitable.  JA964-967 (Order 1920 PP463-66).

In sum, FERC is not "determining what resources should be powering the grid."  *Contra* State Pet'rs Opening Br. 25.  Order 1920 requires transmission providers to react to specified factors by identifying what resources are most likely to power the grid and where that energy needs to go, then planning efficient and reliable transmission for that future.  All state laws, regulations, and resource plans receive equal treatment in that process.  And that treatment respects state authority by requiring scenarios to assume full compliance with state requirements.  JA995, JA999-1000 (Order 1920 PP507, 513).  Order 1920 thus does precisely what State Petitioners claim (at 3) FERC *should* do: "[A]ccept, rather than seek to dictate, States' power generation choices."

Nor would it make any sense to ignore those choices.  Rather than assessing each individual factor in a vacuum, planners combine the factors' effects into a single set of assumptions (with variations for different scenarios) regarding future supply and demand.  *See, e.g.*, JA932-933 (Order 1920 P413); MISO, *MISO Futures Report*, at 55, 67, 79 (Dec. 2021) (cited at JA244 (NOPR P115)), https://perma.cc/H84H-KWLW.  For example, a scenario can forecast a region's future generation mix by considering likely retirements based on generator age, plus how changing costs and technological capabilities will influence new

32

generation investment decisions. *See, e.g.*, JA699, JA966 (Order 1920 PP98, 465 n.1030). But an accurate forecast also requires considering a region's state-approved integrated resource plans and relevant state laws, such as that Kentucky is more likely to retain existing coal plants, West Virginia has reversed its nuclear ban, and Virginia requires its utilities to obtain increasing amounts of renewable energy through 2045-2050. *See supra* pp.29-30; Va. Code Ann. § 56-585.5(C)(1) (2025). Ignoring those laws does not erase their on-the-ground effects; instead, it renders scenarios inaccurate and impedes efficient planning.

### C. Order 1920's mandatory benefits metrics concern economics and reliability, not States' policy requirements.

State Petitioners next contend (at 25) that Order 1920 incorporates "seven benefits metrics into a cost allocation process" that favors other States' preferred generation. Their claim makes several errors.

For starters, they conflate separate requirements. At the project evaluation phase, transmission providers must measure the dollar value of a project's costs and seven types of benefits, then apply criteria designed to select more efficient projects, such as a minimum benefit-cost ratio. JA1137-1138, JA1298-1300, JA1302-1303 (Order 1920 PP719-20, 955, 958). At the next phase, *if* a project is selected, its costs must be allocated roughly commensurate with its benefits; however, the cost allocation method need not use the seven benefits that State Petitioners attack. JA1663-1664 (Order 1920 P1506).

33

Moreover, project evaluation, where those seven benefits actually apply, does not favor any State's preferred generation. Each benefit concerns economics or reliability. FERC Br. 52-53, 88. For instance, transmission projects may reduce outages or price spikes during extreme weather and avoid "transmission investment otherwise required to address reliability needs." JA1157-1158, JA1199-1201 (Order 1920 PP745, 800-01). Other economic benefits include reducing electricity market prices and transmitting power with fewer "energy losses." JA1176, JA1184-1185 (Order 1920 PP767, 781). These benefits give no weight to the "achievement of state public policies." JA835 (Order 1920 P270).

Finally, selection criteria must "maximize benefits accounting for costs," JA1306 (Order 1920 P964), refuting State Petitioners' suggestion (at 3-4, 26-27) that the process is biased towards building longer, more expensive transmission lines. If projects are more expensive, they must deliver correspondingly greater economic and reliability benefits to clear thresholds for selection. And nothing in Order 1920 requires selecting any regional project, let alone one where better options exist; indeed, planners must evaluate alternative technologies that can be more cost-effective than building a line. JA1460, JA1466-1467 (Order 1920 PP1196, 1201).

34

**D.     Order 1920's cost-allocation process is designed to avoid free-riding, not subsidize States' policies.**

The next link of State Petitioners' theory (at 25-26) fares no better.  Order 1920's cost allocation process does not force State Petitioners to subsidize other States' generation choices.  Rather, the Federal Power Act and Order 1920 require that customers pay for the benefits that they receive—but only for *their share* of benefits.

Well-established principles dictate that costs must be allocated "roughly commensurate" with the benefits received.  *Ill. Com. Comm'n v. FERC*, 576 F.3d 470, 477 (7th Cir. 2009); *accord Old Dominion Elec. Coop. v. FERC*, 898 F.3d 1254, 1263 (D.C. Cir. 2018) (invoking "general rule" that "just and reasonable rates" require "match[ing] costs to benefits").  Thus, courts have upheld regionwide cost allocation for transmission projects whose benefits "would be spread almost evenly across all the [region's] utilities," and rejected it where projects appeared to primarily benefit one subregion.  *Ill. Com. Comm'n v. FERC*, 756 F.3d 556, 562-65 (7th Cir. 2014) (discussing *Ill. Com. Comm'n v. FERC* ("*ICC 2*"), 721 F.3d 764, 774-75 (7th Cir. 2013)).

Order 1920 therefore requires that State Petitioners' ratepayers pay a share of costs reflecting benefits they receive, not benefits received by ratepayers in other States.  *See, e.g.*, JA833, JA844, JA846-847 (Order 1920 PP267, 280, 282); JA2125, JA2607 (Order 1920-A PP157, 741).  But where ratepayers benefit, they

35

must pay their share. Otherwise, as FERC and the courts have long recognized, free-rider problems can derail transmission development: Across an interconnected grid, "customers who do not agree to support a particular project may nonetheless receive substantial benefits from it." Order 1000, 136 FERC ¶ 61,051, P534 (quoting Order 890, 118 FERC ¶ 61,119, P561); *see generally* Joshua Macey & Jacob Mays, *The Law and Economics of Transmission Planning and Cost Allocation*, 45 Energy L.J. 209, 239-48 (2024) (summarizing cases). That free-riding leaves the rest of the region to either pay more than their fair share or forgo development of much-needed projects.

Take MISO's set of Multi-Value Projects. As discussed above, MISO planned for the effects of several States' laws on the resource mix, identifying high-voltage, backbone lines that would more efficiently serve forecasted future generation. JA704-705 (Order 1920 P102); *supra* pp.17-18. But, as the Seventh Circuit reinforced in affirming regional cost allocation, MISO chose projects that delivered economic benefits "spread almost evenly across" all States in MISO and reliability benefits for "utilities and consumers in all of MISO's subregions." *ICC 2*, 721 F.3d at 774-75 (citation omitted). If only States with renewable energy requirements had to fund these projects, the rest of MISO would have reaped substantial benefits for free.

36

State Petitioners do not just ignore these controlling principles; they ignore how Order 1920 specifically accounted for their concerns. Compliance processes, where States play a "critical role in determining the cost allocation approach," are still underway. JA1993 (Order 1920-A P10); *see also* FERC Br. 36-39 (describing compliance process generally). States may develop their preferred default cost allocation method to propose, and they can establish procedures to negotiate alternate methods for specific projects as they arise. JA1993-1994 (Order 1920-A PP11-12); FERC Br. 54-57. And all methods must comply with the "bedrock requirement" of allocating costs roughly commensurate with benefits. JA2126 (Order 1920-A P158); *see also* JA2625 (Order 1920-A P764).[4]

### E. State Petitioners show no effect on their authority over generation.

State Petitioners are thus mistaken that Order 1920 mandates transmission that favors preferred generation in other States or requires their constituents to subsidize it. But their theory suffers from another flaw as well: They never explain how Order 1920 impairs their authority to manage generation within their own jurisdictions.

---

[4] Further rebutting State Petitioners' cross-subsidization complaint, FERC clarified that a method may allocate "costs commensurate with reliability and economic benefits region-wide," while allocating "costs commensurate with additional benefits"—such as state laws—to the appropriate "subset of states." JA2627-2628 (Order 1920-A P767).

As an initial matter, FERC may "substantially" affect a matter within States' jurisdiction without impermissibly regulating it. *EPSA*, 577 U.S. at 281. Indeed, courts have upheld FERC actions that significantly impact state-level generation decisions. For example, FERC acted well within its authority in repeatedly blessing the New England grid operator's efforts to incentivize development of generation capacity, because those efforts had direct effects on FERC-jurisdictional wholesale power prices. *See Municipalities of Groton v. FERC*, 587 F.2d 1296, 1302 (D.C. Cir. 1978) (upholding FERC's approval of penalty charge intended to "motivate participants to develop sufficient [generation] capacity"); *Conn. Dep't of Pub. Util. Control v. FERC*, 569 F.3d 477, 481-82 (D.C. Cir. 2009) (upholding FERC's approval of regionwide capacity target). Even where FERC's actions would likely spur generation development, States retained full authority to determine the character of that generation by, for example, forbidding new generation types or requiring existing generators to retire. *See Connecticut*, 569 F.3d at 481; *see also N.J. Bd. of Pub. Utils. v. FERC*, 744 F.3d 74, 98 (3d Cir. 2014) (upholding as "squarely within FERC's jurisdiction" application of wholesale market rule to state-supported generation that preserved States' ability "to develop whatever capacity resources they wish, and to use those resources to any extent that they wish").

Here, State Petitioners cannot identify even a substantial effect on generation they oversee. All they can muster is the claim (at 26-27) that Order 1920 will divert "finite resources" in the "State budget" away from funding their own generation choices and toward subsidizing transmission that supports other States' generation. But Order 1920 does not require such subsidies. *Supra* pp.27-37. And State Petitioners have identified no provision that compels state governments to pay one. Nor have they identified any authority suggesting that indirect budgetary impacts constitute federal regulation, such that merely by causing such an impact, FERC regulates whatever arena where States would otherwise spend their funds.

In short, this is not a close case. Order 1920 leaves fully intact States' tools to manage generation. *See Connecticut*, 569 F.3d at 481. States may adopt laws or policies that require or prohibit any generation types. They may further regulate their utilities' generation choices through integrated resource planning and other state commission proceedings. JA824-825 (Order 1920 P254). Order 1920 simply requires transmission planning to accept and respond to States' use of those tools. *See supra* pp.28-33. In doing so, it neither regulates generation nor has a substantial effect on state generation decisions.

### F.     Order 1000 also incorporated the effects of States' policies.

Finally, considering the effects of state policies in transmission planning is not new. State Petitioners cannot distinguish Order 1000, which likewise required

39

transmission planning processes to consider the effect of state policies. *See* FERC Br. 29, 31.

Under Order 1000, transmission providers must establish procedures in their planning processes to identify transmission needs driven by "Public Policy Requirements"—that is, "state or federal laws or regulations"—and evaluate potential solutions. Order 1000, 136 FERC ¶ 61,051, PP2, 203-06. While Order 1000 did not specify particular laws or regulations that planners must consider, FERC expected that generation-specific policies like state renewable energy standards would fit this bill. *South Carolina*, 762 F.3d at 89. This requirement thus resembles Order 1920's mandatory consideration of Factor Categories One and Two, which similarly consist of governmental laws and regulations.

State Petitioners' attempt to distinguish persuasive precedent upholding Order 1000 falls flat. *See South Carolina*, 762 F.3d at 48-49; *see also* FERC Br. 32-35 (describing case). State Petitioners focus (at 28-29) on the failure of a different jurisdictional challenge, but omit the most instructive part of the analysis: Without applying *Chevron* deference, the D.C. Circuit held that consideration of Public Policy Requirements "fits comfortably within the Commission's authority under Section 206," as it appropriately acknowledges the impact state and federal legislation may have on transmission needs. *South Carolina*, 762 F.3d at 89-90. The court also corrected the same misconceptions underlying State Petitioners'

40

argument here, reasoning that Order 1000's requirement (1) "does not promote any particular public policy," (2) "simply recognizes that state and federal policies might affect the transmission market," and (3) "is no different from other facets of the planning process," whereby "providers assess what transmission capacity is required to fulfill a variety of needs" and "then plan how to develop that capacity." *Id.*; *compare supra* pp.28-33.

Order 1920 applies that same logic—namely, that effective transmission planning requires considering the effects of state policies. Order 1920 integrates those effects into a new, longer-term process that responds to deficiencies in status quo planning. *Supra* pp.14-16. Planners now must incorporate state policies' effects into scenarios—along with other factors they previously ignored—and consider multiple economic and reliability benefits for all evaluated projects. But like its predecessor, Order 1920 remains neutral regarding the content of state policies and facilitates planning a more efficient grid that accounts for those state decisions. *See South Carolina*, 762 F.3d at 89-90. State Petitioners' contention (at 29-30) that Order 1920 "materially differ[s]" because the factors and benefits "effectively compel[] a generator preference policy," merely reprises their misunderstandings of the Rule. *Supra* pp.27-37. Indeed, like Order 1000, Order 1920 neither "mandate[s] development of any particular transmission facility" nor circumvents state-jurisdictional resource planning, siting, or permitting

41

proceedings.  JA826-828 (Order 1920 PP257-59); *South Carolina*, 762 F.3d at 57-58 (rejecting nearly identical mischaracterizations).

**III.    FERC's reforms to its longstanding transmission-planning rules do not implicate the major questions doctrine.**

The major questions doctrine does not help State Petitioners, either.  The Supreme Court has emphasized three criteria in every major questions case to come before it.  The doctrine only applies, the Court has explained, in "extraordinary cases" where each of the (1) "history," (2) "breadth," and (3) "economic and political significance" of an agency action provides a court with "reason to hesitate" before concluding that Congress authorized it.  *West Virginia v. EPA*, 597 U.S. 697, 721 (2022) (quotation omitted).  And even then, the doctrine is not an end-run around plain statutory text, but simply requires "clear congressional authorization" for the agency's action.  *Biden v. Nebraska*, 600 U.S. 477, 506 (2023) (quotation omitted).

State Petitioners cannot meet even one of these criteria.  They do not try to meet the first two, and with good reason: As FERC explains (at 100-02), Order 1920 is a straightforward outgrowth of FERC's long-running efforts to further regional transmission planning—not an "unheralded power" that represents a "transformative expansion" of FERC's regulatory authority.  *West Virginia*, 597 U.S. at 724 (quotations omitted); *see also, e.g.*, *N.C. Coastal Fisheries Reform Grp. v. Capt. Gaston LLC*, 76 F.4th 291, 299-300 (4th Cir. 2023) ("agency itself

42

ha[d] never" even asserted the authority the citizen-suit plaintiff sought to "foist" upon it). And even if those shortcomings were overlooked, that would get State Petitioners nowhere. As FERC explains (at 97-99), the Federal Power Act clearly and unambiguously empowers FERC to do exactly what it did in Order 1920.

And as Respondent-Intervenors explain below, State Petitioners fail to establish the only prong they *do* discuss—that Order 1920 is so economically or politically significant as to present a major question. The problem is by now a familiar one: State Petitioners mischaracterize the Rule and its effects. To hear them tell it (at 34-36), Order 1920 implicates the major questions doctrine because, they claim, it will cause an aggressive transformation of the electricity sector, hundreds of billions of dollars in transmission spending, and generally intrude on States' authority. These claims are false.

*First*, Order 1920 will not "transform[]" the energy industry. That argument gets things exactly backwards. As detailed above, *supra* pp.8-9, 23, FERC adopted Order 1920 in response to changes the industry is already experiencing—including not just a shifting resource mix, but also increasingly frequent extreme weather events and surging demand. JA829 (Order 1920 P261). Order 1920 itself is agnostic on these changes and simply demands that transmission providers "account for the[ir] effects" in the planning process. JA830 (Order 1920 P262).

43

In this respect, Order 1920 is easily distinguishable from the Clean Power Plan to which State Petitioners compare it (at 34-35). The Clean Power Plan—the Environmental Protection Agency ("EPA") rule at issue in *West Virginia*, 597 U.S. at 697—was an ambitious regulation that attempted a new strategy to address carbon emissions from existing coal and gas plants. The most cost-effective means of achieving pollution reductions, EPA reasoned, was not to adopt improvements at those plants, but rather to engineer a "sector-wide shift in electricity production from coal to natural gas and renewables." *Id.* at 713. So, EPA adopted measures to encourage operators to build or invest in their own lower-carbon facilities or, alternatively, to purchase allowances as part of a cap-and-trade regime. *Id.* at 711-13.

Nothing in that effort resembles Order 1920. The whole "point" of EPA's rule was "to substantially restructure the American energy market"—that is, to "compel the transfer of power generating capacity from existing sources to wind and solar." *Id.* at 714, 724. And EPA claimed for itself the role of determining how much the sector should change, informing utilities and States "how much of a switch from coal to natural gas is practically feasible" before "the grid collapses, and how high energy prices can go as a result." *Id.* at 729. Order 1920 does the opposite. It instructs transmission planners to react to utilities' and States' decisions regarding the generation mix and ensure that long-term transmission

44

planning accounts for future generation that is clearly foreseeable, whatever form it may take.

*Second*, Order 1920 will not cause hundreds of billions of dollars in excess spending. Quite the opposite. As explained above, *supra* pp.16-23, it is the "status quo" that generates wasteful transmission spending, JA680-681, JA687-702, JA706, JA709 (Order 1920 PP85, 92-100, 104, 106), and Order 1920 that provides means to curtail it, *see* JA743-749 (Order 1920 PP134-39).

*Third*, Order 1920 does not intrude on States' authority. As detailed *supra* pp.27-37, Order 1920 directly regulates a matter squarely within FERC's jurisdiction—regional transmission planning processes and cost allocation. That arena has never been "the particular domain of state law." *Ala. Ass'n of Realtors v. Dep't of Health & Human Servs.*, 594 U.S. 758, 764 (2021). And it leaves States to exercise their traditional roles planning, permitting, and siting whatever generation they please. *See supra* pp.27-33, 37-39. The Rule thus does not alter the traditional balance of federal and state power in this sphere.

Shorn of these misunderstandings, Order 1920 is not so economically or politically significant as to implicate the major questions doctrine. To be sure, Order 1920 addresses a significant problem. And the sector it concerns is a significant part of the American economy. But that hardly distinguishes Order 1920 from other FERC interventions into the electricity industry—some far more

45

dramatic than Order 1920. *See, e.g.*, *New York v. FERC*, 535 U.S. 1, 10-12, 16-23 (2002) (upholding Order 888's "functional unbundling" of transmission and generation service and its novel open-access requirements, which required monopoly utilities to offer transmission services to customers on terms comparable to those utilities provide themselves). Rather, the doctrine is reserved for actions of *extraordinary* significance—like an eviction moratorium that regulated how some 80% of landlords nationwide could dispose of their property, *Ala. Ass'n of Realtors*, 594 U.S. at 764, or a memorandum cancelling loans for 43 million Americans at the stroke of a pen, *Nebraska*, 600 U.S. at 501-02. It has no bearing on an action that, like Order 1920, builds on longstanding agency authority to establish a framework to improve utility decisionmaking.

## IV.    FERC reasonably imposed a right-sizing requirement on existing higher-voltage transmission facilities.

As FERC's Brief explains, the arguments of State Petitioners and Transmission Owner Petitioners opposing Order 1920's right-sizing requirement are without merit.[5] In fact, the requirement is a commonsense measure that is

---

[5] Although State Petitioners make a passing statement (at 46-47) that the Rule's right-sizing requirement somehow intrudes upon state authority, Respondent-Intervenors agree with FERC that State Petitioners, by failing to develop that argument, have abandoned it. FERC Br. 233 n.19. In any event, FERC explained how its right-sizing reforms respected existing utility requirements, *id.* at 233 n.19 (citing JA1793 (Order 1920 P1689), JA2679-2680 (Order 1920-A P838)); *id.* at 241-44, and that the Rule does not regulate state-jurisdictional matters, *id.* at 84-95.

amply supported by the record.  Order 1920 documented high levels of ongoing

and expected investment to replace aging transmission facilities:

- "PJM estimated that roughly two-thirds of all PJM transmission system assets are more than 40 years old, with some transmission facilities approaching 90 years old."  JA1717 (Order 1920 P1573) (citing PJM Interconnection, L.L.C., *The Benefits of the PJM Transmission System* 5 (2019)).

- "80 percent of transmission lines in NYISO's footprint are at least 50 years old."  JA1717 (Order 1920 P1573) (citing JA3996 (NYISO Initial Comments 58)).

- Pacific Gas & Electric Company, a utility that serves parts of Northern California, "anticipates spending roughly $11 billion between 2022 and 2027 to address aging transmission infrastructure."  JA1717 (Order 1920 P1573) (citing JA4127 (Cal. Comm'n Initial Comments 110)).

- "[American Electric Power Service Corporation] estimates that approximately 30 percent of its line miles and circuit breakers will need to be replaced over the next 10 years."  JA1717 (Order 1920 P1573 n.3363) (citing AEP, *Wolfe Utilities, Midstream, & Clean Energy Conference* 40 (Sept. 30, 2021), https://perma.cc/VEU2-ZGLF).

The Rule found that, notwithstanding the enormous expenditures being

made to replace aging facilities, transmission providers are not consistently

evaluating whether those facilities could be modified to more efficiently and cost-

effectively address existing and future transmission needs.  JA1717-1718 (Order

---

Transmission Owner Petitioners expressly concede FERC's authority to require right-sizing (at 48) but argue that the Rule's specific disclosure requirement related to right-sizing is unreasonable (at 48-54).  FERC (at 233-36) fully rebuts those claims.

1920 P1574). FERC concluded that this failure could increase the costs borne by consumers, rendering FERC-jurisdictional rates unjust and unreasonable. JA1787-1788 (Order 1920 P1682).

To address this problem, the Rule requires, as part of the long-term regional planning process, that transmission owners submit a list of each existing higher-voltage transmission facility that the transmission owner estimates may need replacement during the next ten years.[6] Regional planners would then evaluate opportunities to expand or "right-size" those facilities to meet multiple needs. JA1786-1791 (Order 1920 PP1681-85). If a region determines that a right-sized alternative project meets the region's selection criteria and is the more efficient or cost-effective solution to transmission needs, the region may select the alternative in the regional plan for regional cost allocation. JA1786-1787 (Order 1920 P1681). The Rule, however, does not require the construction of the selected alternative project. JA826 (Order 1920 P257). And it recognizes and preserves state jurisdiction over facility siting and construction, JA824-825, JA826-827 (Order 1920 PP254, 258), as well as any existing rights and responsibilities of an individual transmission owner to maintain and replace its transmission facilities in-kind, *see, e.g.*, JA1792-1793, JA1804-1805 (Order 1920 PP1687, 1689, 1706).

---

[6] The Rule gives regions flexibility to set the voltage-level cutoff above which facilities will be subject to the right-sizing requirement, provided the cutoff is no higher than 200 kilovolts. JA1784 (Order 1920 P1677).

48

FERC structured the Rule's right-sizing to yield significant cost-savings. JA1719, JA1787-1791 (Order 1920 PP1576, 1682-85). And comments on FERC's Notice of Proposed Rulemaking illustrated the types of consumer benefits that the right-sizing requirement could produce.

For example, Vermont's grid operator and the owner of the State's high-voltage electric transmission system described a project where existing wood poles were replaced with double conductor on new steel structures. They explained that "[w]hile the new line design [was] modestly more than needed to meet current needs," it "addresse[d] current generation constraints and properly anticipate[d] where new resources (or curtailed resources) and new load are likely to be located." JA3764 (Vermont Electric and Vermont Transco Initial Comments 5).

In another example, a public utility serving customers in Connecticut, Massachusetts, and New Hampshire described the New England grid operator's decision to address identified transmission needs through a mix of substation upgrades and the reconstruction of aging 69-kilovolt lines to operate at 115 kilovolts. This choice was slightly more expensive than an alternative that consisted primarily of the addition of new substation equipment. However, it both addressed the need to eventually replace the old 69-kilovolt lines *and* provided better capacity for longer-term system needs. JA4202 (Eversource Initial Comments 38); *see also* JA3810-3811 (Developers Advocating Transmission

49

Advancements Initial Comments, Ex. 1, Aff. of William J. Quinlan ¶ 13); JA4757

(WIRES Supplemental Comments, Attach., Rob Gramlich, et al., *Fostering*

*Collaboration Would Help Build Needed Transmission* 24 (Feb. 2024)).

The ability of right-sizing to facilitate siting and permitting of future

expansions, reducing future delays and associated cost, was highlighted in a further

example pertaining to a large transmission project in the MISO footprint.  JA3989-

3990 (Transmission Access Policy Study Group Initial Comments 65-66).  While

that particular example involved a new transmission line, rather than an in-kind

replacement of an existing line, it showed how right-sizing replacement structures

at river crossings could create valuable flexibility for future expansions.  Instead of

replacing aging existing structures with identical ones, replacements could be sized

to accommodate future double- or triple-circuit configurations, could carry

conductor standard for 345-kilovolt lines, and could be insulated for 345-kilovolt

operation.  This right-sizing would create flexibility for multiple possible future

line routes to and from the river crossing, greatly reducing the cost and burden of

siting and permitting the future facilities since neither the river crossing nor the

immediate approaches to and from it—often the most difficult and time-consuming

elements to permit and build—would have to be disturbed.

Such right-sizing analyses, applied systematically to planned in-kind

replacements of the Nation's aging transmission infrastructure, are crucial to

50

constructing a grid that meets existing and future needs at a cost consistent with FERC's obligation to ensure just and reasonable rates.  Mindlessly rebuilding elements of the grid of 50 or 100 years ago will burden consumers with the costs of brand-new facilities that may be rendered redundant or require expensive after-the-fact modifications to meet current and future needs.  While the Rule's right-sizing requirement will not mandate the construction of right-sized alternatives, it ensures that opportunities to efficiently and cost-effectively build the right facilities are identified and evaluated before consumer dollars are spent.

## CONCLUSION

For the foregoing reasons, the Court should deny the petitions as to the claims discussed herein.

Respectfully submitted,

*/s/ Alexander Tom*

| | |
|---|---|
| Danielle Fidler | Alexander Tom |
| Veronica Saltzman | Ada Statler |
| Clean Air Task Force | Earthjustice |
| 114 State Street, 6th Floor | 180 Steuart Street #194330 |
| Boston, MA 02109 | San Francisco, CA 94105 |
| Phone: 202-285-0926 | Phone: 415-217-2111 |
| Email: dfidler@catf.us | Email: atom@earthjustice.org |

Caroline Reiser
Natural Resources Defense Council
1152 15th Street NW, Suite 300
Washington, DC 20005
Phone: 202-717-8341
Email: creiser@nrdc.org

Linnet Davis-Stermitz
Earthjustice
810 Third Avenue, Suite 610
Seattle, WA 98104
Phone: 206-343-7340
Email: ldavisstermitz@earthjustice.org

*Counsel for Natural Resources Defense Council*

Nicholas J. Guidi
Southern Environmental Law Center
122 C Street NW, Suite 325
Washington, DC 20001
Phone: 202-573-8136
Email: nguidi@selc.org

Justin Vickers
Sierra Club
1229 W Glenlake Avenue
Chicago, IL 60660
Phone: 224-420-0614
Email: justin.vickers@sierraclub.org

*Counsel for Appalachian Voices, Energy Alabama, North Carolina Sustainable Energy Association, Southern Alliance for Clean Energy, and South Carolina Coastal Conservation League*

*Counsel for Sierra Club*

Cynthia S. Bogorad
William S. Huang
Lauren L. Springett
Spiegel & McDiarmid LLP
1818 N Street NW, 8th Floor
Washington, DC 20036
Phone: (202) 879-4000
Email: cynthia.bogorad@spiegelmcd.com
william.huang@spiegelmcd.com
lauren.springett@spiegelmcd.com

Ted Kelly
Adam Kurland
Environmental Defense Fund
555 12th Street NW, Suite 400
Washington, DC 20004
Phone: 202-572-3317
Email: tekelly@edf.org

*Counsel for Transmission Access Policy Study Group*

*Counsel for Environmental Defense Fund*

Nicholas M. Gladd
Wilson Sonsini Goodrich & Rosati, P.C.
1700 K Street, NW
Washington, DC 20006
Phone: (202) 973-8800
Email: ngladd@wsgr.com

*Counsel for Advanced Energy United, Inc.*

Gabriel Tabak
American Clean Power Association
1299 Pennsylvania Avenue NW
13th Floor
Washington, DC 20004
Phone: (202) 383-2500
Email: gtabak@cleanpower.org

*Counsel for American Clean Power Association** *

Dated: March 13, 2026

Melissa Alfano
Solar Energy Industries Association
1425 K Street NW, Suite 1000
Washington, DC 20005
Phone: (202) 566-2873
Email: malfano@seia.org

*Counsel for Solar Energy Industries Association*†

---

\* The views and opinions expressed in this filing do not necessarily reflect the official position of each of American Clean Power Association's individual members.

† The comments contained in this filing represent the position of Solar Energy Industries Association as a trade organization on behalf of the solar industry, but do not necessarily reflect the views of any particular member with respect to any issue.

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of Rule 32(a)(7)(B)(i) of the Federal Rules of Appellate Procedure and the Court's July 28, 2025 briefing order, ECF No. 327-1, because it contains 10,586 words, excluding the parts exempted by Rule 32(f).  I further certify that the brief complies with the typeface and type-style requirements of Rule 32(a)(5)-(6) because it has been prepared in a proportionally spaced typeface using Times New Roman 14-point font.

/s/ Alexander Tom
Alexander Tom
Earthjustice
180 Steuart St. #194330
San Francisco, CA 94105
Phone: 415-217-2111
Email: atom@earthjustice.org

*Counsel for Natural Resources Defense Council*

Dated: March 13, 2026

## CERTIFICATE OF SERVICE

I hereby certify that on March 13, 2026, I electronically filed the foregoing brief via the Court's CM/ECF system, which effected service on all registered parties to this case and the consolidated proceedings.

/s/ Alexander Tom
Alexander Tom
Earthjustice
180 Steuart St. #194330
San Francisco, CA 94105
Phone: 415-217-2111
Email: atom@earthjustice.org

*Counsel for Natural Resources
Defense Council*

Dated: March 13, 2026

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __24-1650__     Caption: __Appalachian Voices, et al. v. Federal Energy Regulatory Commission__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Advanced Energy United, Inc.__
(name of party/amicus)


who is __a petitioner and intervenor__, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.   Is party/amicus a publicly held corporation or other publicly held entity?   ☐YES ☑NO

2.   Does party/amicus have any parent corporations?   ☐YES ☑NO
     If yes, identify all parent corporations, including all generations of parent corporations:

3.   Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?   ☐YES ☑NO
     If yes, identify all such owners:

12/01/2019 SCC                                    - 1 -

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?     ☐YES ☑NO
      If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)     ☑YES ☐NO
      If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

      EDF Power Solutions North America

6.    Does this case arise out of a bankruptcy proceeding?     ☐YES ☑NO
      If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.    Is this a criminal case in which there was an organizational victim?     ☐YES ☑NO
      If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Nicholas Gladd                    Date:        2/3/2026

Counsel for: Advanced Energy United, Inc.

- 2 -

| Print to PDF for Filing |

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __24-1650__      Caption: __Appalachian Voices, et al. v. Federal Energy Regulatory Comm'n__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__the American Clean Power Association__
(name of party/amicus)

who is ____respondent-intervenor____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2. Does party/amicus have any parent corporations?  ☐ YES ☑ NO
   If yes, identify all parent corporations, including all generations of parent corporations:

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO
   If yes, identify all such owners:

12/01/2019 SCC                         - 1 -

4.   Is there any other publicly held corporation or other publicly held entity that has a direct
     financial interest in the outcome of the litigation?                    ☐YES ☑NO
     If yes, identify entity and nature of interest:

5.   Is party a trade association? (amici curiae do not complete this question)    ☑YES ☐NO
     If yes, identify any publicly held member whose stock or equity value could be affected
     substantially by the outcome of the proceeding or whose claims the trade association is
     pursuing in a representative capacity, or state that there is no such member:

     No such member.

6.   Does this case arise out of a bankruptcy proceeding?                    ☐YES ☑NO
     If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
     party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
     caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
     corporation that owns 10% or more of the stock of the debtor.

7.   Is this a criminal case in which there was an organizational victim?    ☐YES ☑NO
     If yes, the United States, absent good cause shown, must list (1) each organizational
     victim of the criminal activity and (2) if an organizational victim is a corporation, the
     parent corporation and any publicly held corporation that owns 10% or more of the stock
     of victim, to the extent that information can be obtained through due diligence.

Signature: __Gabriel Tabak_____     Date: _____1/29/2026_____

Counsel for: __American Clean Power Association_____

- 2 -                    **Print to PDF for Filing**

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __24-1650__         Caption: _Appalachian Voices et al. v. Federal Energy Regulatory Commission_

Pursuant to FRAP 26.1 and Local Rule 26.1,

_Appalachian Voices_____
(name of party/amicus)

_____

 who is _____Intervenor_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?    ☐ YES ☑ NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO
      If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Nicholas J. Guidi                          Date: 2/2/2026

Counsel for: Appalachian Voices

- 2 -

**Print o PDF for Filing**

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __24-1650__      Caption: __Appalachian Voices et al. v. Federal Energy Regulatory Commission__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Energy Alabama__
(name of party/amicus)

_____

 who is _____Intervenor_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO

2.    Does party/amicus have any parent corporations?                           ☐YES ☑NO
       If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                              ☐YES ☑NO
       If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐ YES ☑ NO
If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐ YES ☑ NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐ YES ☑ NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? ☐ YES ☑ NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Nicholas J. Guidi      Date: 2/2/2026

Counsel for: Energy Alabama

- 2 -

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __24-1650__        Caption: __Appalachian Voices v. FERC__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Environmental Defense Fund__
(name of party/amicus)

who is ____Respondent-Intervenor____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.  Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO

2.  Does party/amicus have any parent corporations?  ☐YES ☑NO
    If yes, identify all parent corporations, including all generations of parent corporations:

3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐YES ☑NO
    If yes, identify all such owners:

12/01/2019 SCC                          - 1 -

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: Ted Kelly                                    Date:          2/2/2026

Counsel for: Environmental Defense Fund

- 2 -

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No.  24-1650          Caption:  Appalachian Voices, et al v. FERC

Pursuant to FRAP 26.1 and Local Rule 26.1,

Natural Resources Defense Council
(name of party/amicus)


who is ____ respondent intervenor ____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO

2.    Does party/amicus have any parent corporations?                    ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                    ☐YES ☑NO
      If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Veronica Saltzman                    Date:        02/02/2026

Counsel for: Natural Resources Defense Council

- 2 -

[Print to PDF for Filing]   [Reset Form]

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. __24-1650__         Caption:  Appalachian Voices et al. v. Federal Energy Regulatory Commission

Pursuant to FRAP 26.1 and Local Rule 26.1,

North Carolina Sustainable Energy Association
(name of party/amicus)

who is _____Intervenor_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.     Is party/amicus a publicly held corporation or other publicly held entity?     ☐YES ☑NO


2.     Does party/amicus have any parent corporations?                     ☐YES ☑NO
       If yes, identify all parent corporations, including all generations of parent corporations:


3.     Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                          ☐YES ☑NO
       If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?    ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?    ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Nicholas J. Guidi                    Date:            2/2/2026

Counsel for: NC Sustainable Energy Assn.

- 2 -

Print o PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __24-1650__          Caption: __Appalachian Voices v. FERC et al.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Sierra Club__
(name of party/amicus)

_____

 who is _____Intervenor_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.   Is party/amicus a publicly held corporation or other publicly held entity?   ☐YES ☑NO

2.   Does party/amicus have any parent corporations?   ☐YES ☑NO
     If yes, identify all parent corporations, including all generations of parent corporations:

3.   Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?   ☐YES ☑NO
     If yes, identify all such owners:

12/01/2019 SCC                                - 1 -

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
      If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
      If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
      If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.    Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
      If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Justin Vickers                          Date:    February 2, 2026

Counsel for: Sierra Club

- 2 -

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**Corporate Disclosure Statement**

Pursuant to Federal Rule of Appellate Procedure 26.1, the Solar Energy Industries Association ("SEIA") hereby submits the following corporate disclosure statement:

SEIA is a tax-exempt trade association pursuant to 26 U.S.C. § 501(c)(6) that represents nearly 1,000 member companies nationwide.  SEIA represents the entire solar industry, including installers, project developers, manufacturers, contractors, financiers and non-profits. SEIA's member companies develop, manufacture, finance, and build solar projects both domestically and abroad. SEIA has no parent corporation and no publicly held company owns 10% or more of its stock.

Date: 2/2/2026

*/s/ Melissa A. Alfano*
Melissa Alfano
Senior Director of Energy Markets and Counsel
Solar Energy Industries Association
1425 K St NW Ste. 1000
Washington, DC 20005
(202) 566-2873
malfano@seia.org

*Counsel for Solar Energy Industries Association*[†]

---

[†] The comments contained in this filing represent the position of SEIA as a trade organization on behalf of the solar industry, but do not necessarily reflect the views of any particular member with respect to any issue.

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No.  24-1650          Caption:  Appalachian Voices et al. v. Federal Energy Regulatory Commission

Pursuant to FRAP 26.1 and Local Rule 26.1,

Southern Alliance for Clean Energy
(name of party/amicus)


who is _____Intervenor_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.     Is party/amicus a publicly held corporation or other publicly held entity?   ☐YES ☑NO


2.     Does party/amicus have any parent corporations?                    ☐YES ☑NO
       If yes, identify all parent corporations, including all generations of parent corporations:


3.     Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                          ☐YES ☑NO
       If yes, identify all such owners:


12/01/2019 SCC                          - 1 -

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
   If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐YES ☑NO
   If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
   If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
   If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Nicholas J. Guidi          Date: 2/2/2026

Counsel for: Southern Alliance for Clean Energy

- 2 -

Print o PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __24-1650__    Caption: _Appalachian Voices et al. v. Federal Energy Regulatory Commission_

Pursuant to FRAP 26.1 and Local Rule 26.1,

_South Carolina Coastal Conservation League_
(name of party/amicus)

_____

 who is _____Intervenor_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?    ☐ YES ☑ NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO
      If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Nicholas J. Guidi          Date: 2/2/2026

Counsel for: SC Coastal Conservation League

- 2 -

**Print o PDF for Filing**

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __24-1650__      Caption: __Appalachian Voices, et al. v. FERC__

Pursuant to FRAP 26.1 and Local Rule 26.1,

_____
(name of party/amicus)

Transmission Access Policy Study Group ("TAPS")
_____

who is _____an intervenor_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO

2.    Does party/amicus have any parent corporations?    ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐YES ☑NO
      If yes, identify all such owners:

12/01/2019 SCC                            - 1 -

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☑YES ☐NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

    There is no such member.

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Cynthia S. Bogorad                    Date:          02/02/2026

Counsel for: TAPS

- 2 -

Print to PDF for Filing

# ADDENDUM


## GLOSSARY AND STATUTES

# TABLE OF CONTENTS

**GLOSSARY**………………………………..………..………………......….……. A-01

**FEDERAL STATUTES**

15 U.S.C. § 717d ………………………………………………….….. A-02

16 U.S.C. § 824 .....………………………………......………………………. A-04

16 U.S.C. § 824e …....……………………………………………..……....…... A-08

16 U.S.C. § 825*l* ………………………………………………………… A-12

**STATE STATUTES**

Ind. Code §§ 8-1-8.2-1 to 10 (2025) ……………………………………..…… A-15

Ky. Rev. Stat. Ann. § 278.264 (2024) ....................................................... A-20

Minn. Stat. § 216B.243 (2025) …………………………………..………… A-24

Va. Code Ann. § 56-585.5 (2025) …………………………………..………… A-29

Va. Code Ann. § 58.1-609.3 (2023) …………………………………..……. A-42

W. Va. Code § 24-2-1d (2025) …………………………………..………… A-49

# Glossary

| | |
|---|---|
| **ANOPR** | JA1, Advance Notice of Proposed Rulemaking, *Building for the Future Through Electric Regional Transmission Planning and Cost Allocation and Generator Interconnection*, 176 FERC ¶ 61,024 (2021) |
| **CAISO** | California Independent System Operator |
| **EPA** | Environmental Protection Agency |
| **ERCOT** | Electric Reliability Council of Texas |
| **FERC** | Federal Energy Regulatory Commission |
| **MISO** | Midcontinent Independent System Operator, Inc. |
| **NOPR** | JA139, Notice of Proposed Rulemaking, *Building for the Future Through Electric Regional Transmission Planning and Cost Allocation and Generator Interconnection*, 179 FERC ¶ 61,028 (2022) |
| **NYISO** | New York Independent System Operator |
| **Order 1000** | Final Rule, *Transmission Planning and Cost Allocation by Transmission Owning and Operating Public Utilities*, 136 FERC ¶ 61,051 (2011) |
| **Order 1920** | JA615, Final Rule, *Building for the Future Through Electric Regional Transmission Planning and Cost Allocation*, 187 FERC ¶ 61,068 (2024) |
| **Order 1920-A** | JA1979, *Order Addressing Arguments Raised on Rehearing, Setting Aside Prior Order, in Part, and Granting Clarification*, 189 FERC ¶ 61,126 (2024) |
| **PJM** | PJM Interconnection, LLC (Mid-Atlantic grid operator) |
| **SERTP** | Southeastern Regional Transmission Planning |

A-01

# 15 U.S.C. § 717d

those terms are used in section 78j(b) of this title) in contravention of such rules and regulations as the Commission may prescribe as necessary in the public interest or for the protection of natural gas ratepayers. Nothing in this section shall be construed to create a private right of action.

(June 21, 1938, ch. 556, §4A, as added Pub. L. 109–58, title III, §315, Aug. 8, 2005, 119 Stat. 691.)

### § 717d. Fixing rates and charges; determination of cost of production or transportation

#### (a) Decreases in rates

Whenever the Commission, after a hearing had upon its own motion or upon complaint of any State, municipality, State commission, or gas distributing company, shall find that any rate, charge, or classification demanded, observed, charged, or collected by any natural-gas company in connection with any transportation or sale of natural gas, subject to the jurisdiction of the Commission, or that any rule, regulation, practice, or contract affecting such rate, charge, or classification is unjust, unreasonable, unduly discriminatory, or preferential, the Commission shall determine the just and reasonable rate, charge, classification, rule, regulation, practice, or contract to be thereafter observed and in force, and shall fix the same by order: *Provided, however,* That the Commission shall have no power to order any increase in any rate contained in the currently effective schedule of such natural gas company on file with the Commission, unless such increase is in accordance with a new schedule filed by such natural gas company; but the Commission may order a decrease where existing rates are unjust, unduly discriminatory, preferential, otherwise unlawful, or are not the lowest reasonable rates.

#### (b) Costs of production and transportation

The Commission upon its own motion, or upon the request of any State commission, whenever it can do so without prejudice to the efficient and proper conduct of its affairs, may investigate and determine the cost of the production or transportation of natural gas by a natural-gas company in cases where the Commission has no authority to establish a rate governing the transportation or sale of such natural gas.

(June 21, 1938, ch. 556, §5, 52 Stat. 823.)

### § 717e. Ascertainment of cost of property

#### (a) Cost of property

The Commission may investigate and ascertain the actual legitimate cost of the property of every natural-gas company, the depreciation therein, and, when found necessary for rate-making purposes, other facts which bear on the determination of such cost or depreciation and the fair value of such property.

#### (b) Inventory of property; statements of costs

Every natural-gas company upon request shall file with the Commission an inventory of all or any part of its property and a statement of the original cost thereof, and shall keep the Commission informed regarding the cost of all additions, betterments, extensions, and new construction.

(June 21, 1938, ch. 556, §6, 52 Stat. 824.)

### § 717f. Construction, extension, or abandonment of facilities

#### (a) Extension or improvement of facilities on order of court; notice and hearing

Whenever the Commission, after notice and opportunity for hearing, finds such action necessary or desirable in the public interest, it may by order direct a natural-gas company to extend or improve its transportation facilities, to establish physical connection of its transportation facilities with the facilities of, and sell natural gas to, any person or municipality engaged or legally authorized to engage in the local distribution of natural or artificial gas to the public, and for such purpose to extend its transportation facilities to communities immediately adjacent to such facilities or to territory served by such natural-gas company, if the Commission finds that no undue burden will be placed upon such natural-gas company thereby: *Provided,* That the Commission shall have no authority to compel the enlargement of transportation facilities for such purposes, or to compel such natural-gas company to establish physical connection or sell natural gas when to do so would impair its ability to render adequate service to its customers.

#### (b) Abandonment of facilities or services; approval of Commission

No natural-gas company shall abandon all or any portion of its facilities subject to the jurisdiction of the Commission, or any service rendered by means of such facilities, without the permission and approval of the Commission first had and obtained, after due hearing, and a finding by the Commission that the available supply of natural gas is depleted to the extent that the continuance of service is unwarranted, or that the present or future public convenience or necessity permit such abandonment.

#### (c) Certificate of public convenience and necessity

(1)(A) No natural-gas company or person which will be a natural-gas company upon completion of any proposed construction or extension shall engage in the transportation or sale of natural gas, subject to the jurisdiction of the Commission, or undertake the construction or extension of any facilities therefor, or acquire or operate any such facilities or extensions thereof, unless there is in force with respect to such natural-gas company a certificate of public convenience and necessity issued by the Commission authorizing such acts or operations: *Provided, however,* That if any such natural-gas company or predecessor in interest was bona fide engaged in transportation or sale of natural gas, subject to the jurisdiction of the Commission, on February 7, 1942, over the route or routes or within the area for which application is made and has so operated since that time, the Commission shall issue such certificate without requiring further proof that public convenience and necessity will be served by such operation, and without further proceedings, if application for such certificate is made to the Commission within ninety days after February 7, 1942. Pending the

# 16 U.S.C. § 824

§ 823g    TITLE 16—CONSERVATION    Page 1398

**(g) Qualifying criteria for closed-loop pumped storage projects**

**(1) In general**

The Commission shall establish criteria that a pumped storage project shall meet in order to qualify as a closed-loop pumped storage project eligible for the expedited process established under this section.

**(2) Inclusions**

In establishing the criteria under paragraph (1), the Commission shall include criteria requiring that the pumped storage project—

(A) cause little to no change to existing surface and ground water flows and uses; and

(B) is unlikely to adversely affect species listed as a threatened species or endangered species under the Endangered Species Act of 1973 [16 U.S.C. 1531 et seq.].

**(h) Savings clause**

Nothing in this section affects any authority of the Commission to license a closed-loop pumped storage project under this subchapter.

(June 10, 1920, ch. 285, pt. I, § 35, as added Pub. L. 115–270, title III, § 3004, Oct. 23, 2018, 132 Stat. 3865.)

### Editorial Notes

#### REFERENCES IN TEXT

The Fish and Wildlife Coordination Act, referred to in subsec. (c)(2), (3)(A), is act Mar. 10, 1934, ch. 55, 48 Stat. 401, which is classified generally to sections 661 to 666c–1 of this title. For complete classification of this Act to the Code, see section 661(a) of this title, Short Title note set out under section 661 of this title, and Tables.

The National Environmental Policy Act of 1969, referred to in subsec. (e), is Pub. L. 91–190, Jan. 1, 1970, 83 Stat. 852, which is classified generally to chapter 55 (§ 4321 et seq.) of Title 42, The Public Health and Welfare. For complete classification of this Act to the Code, see Short Title note set out under section 4321 of Title 42 and Tables.

The Endangered Species Act of 1973, referred to in subsec. (g)(2)(B), is Pub. L. 93–205, Dec. 28, 1973, 87 Stat. 884, which is classified principally to chapter 35 (§ 1531 et seq.) of this title. For complete classification of this Act to the Code, see Short Title note set out under section 1531 of this title and Tables.

**§ 823g. Considerations for relicensing terms**

**(a) In general**

In determining the term of a new license issued when an existing license under this subchapter expires, the Commission shall take into consideration, among other things—

(1) project-related investments by the licensee under the new license; and

(2) project-related investments by the licensee over the term of the existing license.

**(b) Equal weight**

The determination of the Commission under subsection (a) shall give equal weight to—

(1) investments by the licensee to implement the new license under this subchapter, including investments relating to redevelopment, new construction, new capacity, efficiency, modernization, rehabilitation or replacement of major equipment, safety improvements, or environmental, recreation, or other protection, mitigation, or enhancement measures required or authorized by the new license; and

(2) investments by the licensee over the term of the existing license (including any terms under annual licenses) that—

(A) resulted in redevelopment, new construction, new capacity, efficiency, modernization, rehabilitation or replacement of major equipment, safety improvements, or environmental, recreation, or other protection, mitigation, or enhancement measures conducted over the term of the existing license; and

(B) were not expressly considered by the Commission as contributing to the length of the existing license term in any order establishing or extending the existing license term.

**(c) Commission determination**

At the request of the licensee, the Commission shall make a determination as to whether any planned, ongoing, or completed investment meets the criteria under subsection (b)(2). Any determination under this subsection shall be issued within 60 days following receipt of the licensee's request. When issuing its determination under this subsection, the Commission shall not assess the incremental number of years that the investment may add to the new license term. All such assessment shall occur only as provided in subsection (a).

(June 10, 1920, ch. 285, pt. I, § 36, as added Pub. L. 115–270, title III, § 3005, Oct. 23, 2018, 132 Stat. 3867.)

## SUBCHAPTER II—REGULATION OF ELECTRIC UTILITY COMPANIES ENGAGED IN INTERSTATE COMMERCE

**§ 824. Declaration of policy; application of subchapter**

**(a) Federal regulation of transmission and sale of electric energy**

It is declared that the business of transmitting and selling electric energy for ultimate distribution to the public is affected with a public interest, and that Federal regulation of matters relating to generation to the extent provided in this subchapter and subchapter III of this chapter and of that part of such business which consists of the transmission of electric energy in interstate commerce and the sale of such energy at wholesale in interstate commerce is necessary in the public interest, such Federal regulation, however, to extend only to those matters which are not subject to regulation by the States.

**(b) Use or sale of electric energy in interstate commerce**

(1) The provisions of this subchapter shall apply to the transmission of electric energy in interstate commerce and to the sale of electric energy at wholesale in interstate commerce, but except as provided in paragraph (2) shall not apply to any other sale of electric energy or deprive a State or State commission of its lawful authority now exercised over the exportation of hydroelectric energy which is transmitted

across a State line. The Commission shall have jurisdiction over all facilities for such transmission or sale of electric energy, but shall not have jurisdiction, except as specifically provided in this subchapter and subchapter III of this chapter, over facilities used for the generation of electric energy or over facilities used in local distribution or only for the transmission of electric energy in intrastate commerce, or over facilities for the transmission of electric energy consumed wholly by the transmitter.

(2) Notwithstanding subsection (f), the provisions of sections 824b(a)(2), 824e(e), 824i, 824j, 824j–1, 824k, 824o, 824o–1, 824p, 824q, 824r, 824s, 824t, 824u, and 824v of this title shall apply to the entities described in such provisions, and such entities shall be subject to the jurisdiction of the Commission for purposes of carrying out such provisions and for purposes of applying the enforcement authorities of this chapter with respect to such provisions. Compliance with any order or rule of the Commission under the provisions of section 824b(a)(2), 824e(e), 824i, 824j, 824j–1, 824k, 824o, 824o–1, 824p, 824q, 824r, 824s, 824t, 824u, or 824v of this title, shall not make an electric utility or other entity subject to the jurisdiction of the Commission for any purposes other than the purposes specified in the preceding sentence.

**(c) Electric energy in interstate commerce**

For the purpose of this subchapter, electric energy shall be held to be transmitted in interstate commerce if transmitted from a State and consumed at any point outside thereof; but only insofar as such transmission takes place within the United States.

**(d) "Sale of electric energy at wholesale" defined**

The term "sale of electric energy at wholesale" when used in this subchapter, means a sale of electric energy to any person for resale.

**(e) "Public utility" defined**

The term "public utility" when used in this subchapter and subchapter III of this chapter means any person who owns or operates facilities subject to the jurisdiction of the Commission under this subchapter (other than facilities subject to such jurisdiction solely by reason of section 824e(e), 824e(f),[1] 824i, 824j, 824j–1, 824k, 824o, 824o–1, 824p, 824q, 824r, 824s, 824t, 824u, or 824v of this title).

**(f) United States, State, political subdivision of a State, or agency or instrumentality thereof exempt**

No provision in this subchapter shall apply to, or be deemed to include, the United States, a State or any political subdivision of a State, an electric cooperative that receives financing under the Rural Electrification Act of 1936 (7 U.S.C. 901 et seq.) or that sells less than 4,000,000 megawatt hours of electricity per year, or any agency, authority, or instrumentality of any one or more of the foregoing, or any corporation which is wholly owned, directly or indirectly, by any one or more of the foregoing, or any officer, agent, or employee of any of the foregoing acting as such in the course of his official duty, unless such provision makes specific reference thereto.

**(g) Books and records**

(1) Upon written order of a State commission, a State commission may examine the books, accounts, memoranda, contracts, and records of—

(A) an electric utility company subject to its regulatory authority under State law,

(B) any exempt wholesale generator selling energy at wholesale to such electric utility, and

(C) any electric utility company, or holding company thereof, which is an associate company or affiliate of an exempt wholesale generator which sells electric energy to an electric utility company referred to in subparagraph (A),

wherever located, if such examination is required for the effective discharge of the State commission's regulatory responsibilities affecting the provision of electric service.

(2) Where a State commission issues an order pursuant to paragraph (1), the State commission shall not publicly disclose trade secrets or sensitive commercial information.

(3) Any United States district court located in the State in which the State commission referred to in paragraph (1) is located shall have jurisdiction to enforce compliance with this subsection.

(4) Nothing in this section shall—

(A) preempt applicable State law concerning the provision of records and other information; or

(B) in any way limit rights to obtain records and other information under Federal law, contracts, or otherwise.

(5) As used in this subsection the terms "affiliate", "associate company", "electric utility company", "holding company", "subsidiary company", and "exempt wholesale generator" shall have the same meaning as when used in the Public Utility Holding Company Act of 2005 [42 U.S.C. 16451 et seq.].

(June 10, 1920, ch. 285, pt. II, §201, as added Aug. 26, 1935, ch. 687, title II, §213, 49 Stat. 847; amended Pub. L. 95–617, title II, §204(b), Nov. 9, 1978, 92 Stat. 3140; Pub. L. 102–486, title VII, §714, Oct. 24, 1992, 106 Stat. 2911; Pub. L. 109–58, title XII, §§1277(b)(1), 1291(c), 1295(a), Aug. 8, 2005, 119 Stat. 978, 985; Pub. L. 114–94, div. F, §61003(b), Dec. 4, 2015, 129 Stat. 1778.)

### Editorial Notes

#### REFERENCES IN TEXT

The Rural Electrification Act of 1936, referred to in subsec. (f), is act May 20, 1936, ch. 432, 49 Stat. 1363, which is classified generally to chapter 31 (§901 et seq.) of Title 7, Agriculture. For complete classification of this Act to the Code, see section 901 of Title 7 and Tables.

The Public Utility Holding Company Act of 2005, referred to in subsec. (g)(5), is subtitle F of title XII of Pub. L. 109–58, Aug. 8, 2005, 119 Stat. 972, which is classified principally to part D (§16451 et seq.) of subchapter XII of chapter 149 of Title 42, The Public Health and Welfare. For complete classification of this Act to the Code, see Short Title note set out under section 15801 of Title 42 and Tables.

---

[1] So in original. Section 824e of this title does not contain a subsec. (f).

AMENDMENTS

2015—Subsec. (b)(2). Pub. L. 114–94, §61003(b)(1), inserted ''824o–1,'' after ''824o,'' in two places.

Subsec. (e). Pub. L. 114–94, §61003(b)(2), inserted ''824o–1,'' after ''824o,''.

2005—Subsec. (b)(2). Pub. L. 109–58, §1295(a)(1), substituted ''Notwithstanding subsection (f), the provisions of sections 824b(a)(2), 824e(e), 824i, 824j, 824j–1, 824k, 824o, 824p, 824q, 824r, 824s, 824t, 824u, and 824v of this title'' for ''The provisions of sections 824i, 824j, and 824k of this title'' and ''Compliance with any order or rule of the Commission under the provisions of section 824b(a)(2), 824e(e), 824i, 824j, 824j–1, 824k, 824o, 824p, 824q, 824r, 824s, 824t, 824u, or 824v of this title'' for ''Compliance with any order of the Commission under the provisions of section 824i or 824j of this title''.

Subsec. (e). Pub. L. 109–58, §1295(a)(2), substituted ''section 824e(e), 824e(f), 824i, 824j, 824j–1, 824k, 824o, 824p, 824q, 824r, 824s, 824t, 824u, or 824v of this title'' for ''section 824i, 824j, or 824k of this title''.

Subsec. (f). Pub. L. 109–58, §1291(c), which directed amendment of subsec. (f) by substituting ''political subdivision of a State, an electric cooperative that receives financing under the Rural Electrification Act of 1936 (7 U.S.C. 901 et seq.) or that sells less than 4,000,000 megawatt hours of electricity per year,'' for ''political subdivision of a state,'', was executed by making the substitution for ''political subdivision of a State,'' to reflect the probable intent of Congress.

Subsec. (g)(5). Pub. L. 109–58, §1277(b)(1), substituted ''2005'' for ''1935''.

1992—Subsec. (g). Pub. L. 102–486 added subsec. (g).

1978—Subsec. (b). Pub. L. 95–617, §204(b)(1), designated existing provisions as par. (1), inserted ''except as provided in paragraph (2)'' after ''in interstate commerce, but'', and added par. (2).

Subsec. (e). Pub. L. 95–617, §204(b)(2), inserted ''(other than facilities subject to such jurisdiction solely by reason of section 824i, 824j, or 824k of this title)'' after ''under this subchapter''.

**Statutory Notes and Related Subsidiaries**

EFFECTIVE DATE OF 2005 AMENDMENT

Amendment by section 1277(b)(1) of Pub. L. 109–58 effective 6 months after Aug. 8, 2005, with provisions relating to effect of compliance with certain regulations approved and made effective prior to such date, see section 1274 of Pub. L. 109–58, set out as an Effective Date note under section 16451 of Title 42, The Public Health and Welfare.

STATE AUTHORITIES; CONSTRUCTION

Nothing in amendment by Pub. L. 102–486 to be construed as affecting or intending to affect, or in any way to interfere with, authority of any State or local government relating to environmental protection or siting of facilities, see section 731 of Pub. L. 102–486, set out as a note under section 796 of this title.

PRIOR ACTIONS; EFFECT ON OTHER AUTHORITIES

Pub. L. 95–617, title II, §214, Nov. 9, 1978, 92 Stat. 3149, provided that:

''(a) PRIOR ACTIONS.—No provision of this title [enacting sections 823a, 824i to 824k, 824a–1 to 824a–3 and 825q–1 of this title, amending sections 796, 824, 824a, 824d, and 825d of this title and enacting provisions set out as notes under sections 824a, 824d, and 825d of this title] or of any amendment made by this title shall apply to, or affect, any action taken by the Commission [Federal Energy Regulatory Commission] before the date of the enactment of this Act [Nov. 9, 1978].

''(b) OTHER AUTHORITIES.—No provision of this title [enacting sections 823a, 824i to 824k, 824a–1 to 824a–3 and 825q–1 of this title, amending sections 796, 824, 824a, 824d, and 825d of this title and enacting provisions set out as notes under sections 824a, 824d, and 825d of this title] or of any amendment made by this title shall

limit, impair or otherwise affect any authority of the Commission or any other agency or instrumentality of the United States under any other provision of law except as specifically provided in this title.''

### § 824a. Interconnection and coordination of facilities; emergencies; transmission to foreign countries

#### (a) Regional districts; establishment; notice to State commissions

For the purpose of assuring an abundant supply of electric energy throughout the United States with the greatest possible economy and with regard to the proper utilization and conservation of natural resources, the Commission is empowered and directed to divide the country into regional districts for the voluntary interconnection and coordination of facilities for the generation, transmission, and sale of electric energy, and it may at any time thereafter, upon its own motion or upon application, make such modifications thereof as in its judgment will promote the public interest. Each such district shall embrace an area which, in the judgment of the Commission, can economically be served by such interconnection and coordinated electric facilities. It shall be the duty of the Commission to promote and encourage such interconnection and coordination within each such district and between such districts. Before establishing any such district and fixing or modifying the boundaries thereof the Commission shall give notice to the State commission of each State situated wholly or in part within such district, and shall afford each such State commission reasonable opportunity to present its views and recommendations, and shall receive and consider such views and recommendations.

#### (b) Sale or exchange of energy; establishing physical connections

Whenever the Commission, upon application of any State commission or of any person engaged in the transmission or sale of electric energy, and after notice to each State commission and public utility affected and after opportunity for hearing, finds such action necessary or appropriate in the public interest it may by order direct a public utility (if the Commission finds that no undue burden will be placed upon such public utility thereby) to establish physical connection of its transmission facilities with the facilities of one or more other persons engaged in the transmission or sale of electric energy, to sell energy to or exchange energy with such persons: *Provided*, That the Commission shall have no authority to compel the enlargement of generating facilities for such purposes, nor to compel such public utility to sell or exchange energy when to do so would impair its ability to render adequate service to its customers. The Commission may prescribe the terms and conditions of the arrangement to be made between the persons affected by any such order, including the apportionment of cost between them and the compensation or reimbursement reasonably due to any of them.

#### (c) Temporary connection and exchange of facilities during emergency

(1) During the continuance of any war in which the United States is engaged, or whenever

# 16 U.S.C. § 824e

§ 824e                                    TITLE 16—CONSERVATION                                    Page 1414

**Editorial Notes**

AMENDMENTS

2018—Subsec. (g). Pub. L. 115–270 added subsec. (g).
1978—Subsec. (d). Pub. L. 95–617, § 207(a), substituted ''sixty'' for ''thirty'' in two places.
Subsec. (f). Pub. L. 95–617, § 208, added subsec. (f).

**Statutory Notes and Related Subsidiaries**

STUDY OF ELECTRIC RATE INCREASES UNDER FEDERAL POWER ACT

Section 207(b) of Pub. L. 95–617 directed chairman of Federal Energy Regulatory Commission, in consultation with Secretary, to conduct a study of legal requirements and administrative procedures involved in consideration and resolution of proposed wholesale electric rate increases under Federal Power Act, section 791a et seq. of this title, for purposes of providing for expeditious handling of hearings consistent with due process, preventing imposition of successive rate increases before they have been determined by Commission to be just and reasonable and otherwise lawful, and improving procedures designed to prohibit anticompetitive or unreasonable differences in wholesale and retail rates, or both, and that chairman report to Congress within nine months from Nov. 9, 1978, on results of study, on administrative actions taken as a result of this study, and on any recommendations for changes in existing law that will aid purposes of this section.

## § 824e. Power of Commission to fix rates and charges; determination of cost of production or transmission

### (a) Unjust or preferential rates, etc.; statement of reasons for changes; hearing; specification of issues

Whenever the Commission, after a hearing held upon its own motion or upon complaint, shall find that any rate, charge, or classification, demanded, observed, charged, or collected by any public utility for any transmission or sale subject to the jurisdiction of the Commission, or that any rule, regulation, practice, or contract affecting such rate, charge, or classification is unjust, unreasonable, unduly discriminatory or preferential, the Commission shall determine the just and reasonable rate, charge, classification, rule, regulation, practice, or contract to be thereafter observed and in force, and shall fix the same by order. Any complaint or motion of the Commission to initiate a proceeding under this section shall state the change or changes to be made in the rate, charge, classification, rule, regulation, practice, or contract then in force, and the reasons for any proposed change or changes therein. If, after review of any motion or complaint and answer, the Commission shall decide to hold a hearing, it shall fix by order the time and place of such hearing and shall specify the issues to be adjudicated.

### (b) Refund effective date; preferential proceedings; statement of reasons for delay; burden of proof; scope of refund order; refund orders in cases of dilatory behavior; interest

Whenever the Commission institutes a proceeding under this section, the Commission shall establish a refund effective date. In the case of a proceeding instituted on complaint, the refund effective date shall not be earlier than the date of the filing of such complaint nor later than 5 months after the filing of such complaint. In the case of a proceeding instituted by the Commission on its own motion, the refund effective date shall not be earlier than the date of the publication by the Commission of notice of its intention to initiate such proceeding nor later than 5 months after the publication date. Upon institution of a proceeding under this section, the Commission shall give to the decision of such proceeding the same preference as provided under section 824d of this title and otherwise act as speedily as possible. If no final decision is rendered by the conclusion of the 180-day period commencing upon initiation of a proceeding pursuant to this section, the Commission shall state the reasons why it has failed to do so and shall state its best estimate as to when it reasonably expects to make such decision. In any proceeding under this section, the burden of proof to show that any rate, charge, classification, rule, regulation, practice, or contract is unjust, unreasonable, unduly discriminatory, or preferential shall be upon the Commission or the complainant. At the conclusion of any proceeding under this section, the Commission may order refunds of any amounts paid, for the period subsequent to the refund effective date through a date fifteen months after such refund effective date, in excess of those which would have been paid under the just and reasonable rate, charge, classification, rule, regulation, practice, or contract which the Commission orders to be thereafter observed and in force: *Provided*, That if the proceeding is not concluded within fifteen months after the refund effective date and if the Commission determines at the conclusion of the proceeding that the proceeding was not resolved within the fifteen-month period primarily because of dilatory behavior by the public utility, the Commission may order refunds of any or all amounts paid for the period subsequent to the refund effective date and prior to the conclusion of the proceeding. The refunds shall be made, with interest, to those persons who have paid those rates or charges which are the subject of the proceeding.

### (c) Refund considerations; shifting costs; reduction in revenues; "electric utility companies" and "registered holding company" defined

Notwithstanding subsection (b), in a proceeding commenced under this section involving two or more electric utility companies of a registered holding company, refunds which might otherwise be payable under subsection (b) shall not be ordered to the extent that such refunds would result from any portion of a Commission order that (1) requires a decrease in system production or transmission costs to be paid by one or more of such electric companies; and (2) is based upon a determination that the amount of such decrease should be paid through an increase in the costs to be paid by other electric utility companies of such registered holding company: *Provided*, That refunds, in whole or in part, may be ordered by the Commission if it determines that the registered holding company would not experience any reduction in revenues which results from an inability of an electric

utility company of the holding company to recover such increase in costs for the period between the refund effective date and the effective date of the Commission's order. For purposes of this subsection, the terms "electric utility companies" and "registered holding company" shall have the same meanings as provided in the Public Utility Holding Company Act of 1935, as amended.[1]

**(d) Investigation of costs**

The Commission upon its own motion, or upon the request of any State commission whenever it can do so without prejudice to the efficient and proper conduct of its affairs, may investigate and determine the cost of the production or transmission of electric energy by means of facilities under the jurisdiction of the Commission in cases where the Commission has no authority to establish a rate governing the sale of such energy.

**(e) Short-term sales**

(1) In this subsection:

(A) The term "short-term sale" means an agreement for the sale of electric energy at wholesale in interstate commerce that is for a period of 31 days or less (excluding monthly contracts subject to automatic renewal).

(B) The term "applicable Commission rule" means a Commission rule applicable to sales at wholesale by public utilities that the Commission determines after notice and comment should also be applicable to entities subject to this subsection.

(2) If an entity described in section 824(f) of this title voluntarily makes a short-term sale of electric energy through an organized market in which the rates for the sale are established by Commission-approved tariff (rather than by contract) and the sale violates the terms of the tariff or applicable Commission rules in effect at the time of the sale, the entity shall be subject to the refund authority of the Commission under this section with respect to the violation.

(3) This section shall not apply to—

(A) any entity that sells in total (including affiliates of the entity) less than 8,000,000 megawatt hours of electricity per year; or

(B) an electric cooperative.

(4)(A) The Commission shall have refund authority under paragraph (2) with respect to a voluntary short term sale of electric energy by the Bonneville Power Administration only if the sale is at an unjust and unreasonable rate.

(B) The Commission may order a refund under subparagraph (A) only for short-term sales made by the Bonneville Power Administration at rates that are higher than the highest just and reasonable rate charged by any other entity for a short-term sale of electric energy in the same geographic market for the same, or most nearly comparable, period as the sale by the Bonneville Power Administration.

(C) In the case of any Federal power marketing agency or the Tennessee Valley Authority, the Commission shall not assert or exercise any regulatory authority or power under paragraph (2) other than the ordering of refunds to achieve a just and reasonable rate.

[1] See References in Text note below.

(June 10, 1920, ch. 285, pt. II, § 206, as added Aug. 26, 1935, ch. 687, title II, § 213, 49 Stat. 852; amended Pub. L. 100–473, § 2, Oct. 6, 1988, 102 Stat. 2299; Pub. L. 109–58, title XII, §§ 1285, 1286, 1295(b), Aug. 8, 2005, 119 Stat. 980, 981, 985.)

### Editorial Notes

#### REFERENCES IN TEXT

The Public Utility Holding Company Act of 1935, referred to in subsec. (c), is title I of act Aug. 26, 1935, ch. 687, 49 Stat. 803, which was classified generally to chapter 2C (§ 79 et seq.) of Title 15, Commerce and Trade, prior to repeal by Pub. L. 109–58, title XII, § 1263, Aug. 8, 2005, 119 Stat. 974. For complete classification of this Act to the Code, see Tables.

#### AMENDMENTS

2005—Subsec. (a). Pub. L. 109–58, § 1295(b)(1), substituted "hearing held" for "hearing had" in first sentence.

Subsec. (b). Pub. L. 109–58, § 1295(b)(2), struck out "the public utility to make" before "refunds of any amounts paid" in seventh sentence.

Pub. L. 109–58, § 1285, in second sentence, substituted "the date of the filing of such complaint nor later than 5 months after the filing of such complaint" for "the date 60 days after the filing of such complaint nor later than 5 months after the expiration of such 60-day period", in third sentence, substituted "the date of the publication" for "the date 60 days after the publication" and "5 months after the publication date" for "5 months after the expiration of such 60-day period", and in fifth sentence, substituted "If no final decision is rendered by the conclusion of the 180-day period commencing upon initiation of a proceeding pursuant to this section, the Commission shall state the reasons why it has failed to do so and shall state its best estimate as to when it reasonably expects to make such decision" for "If no final decision is rendered by the refund effective date or by the conclusion of the 180-day period commencing upon initiation of a proceeding pursuant to this section, whichever is earlier, the Commission shall state the reasons why it has failed to do so and shall state its best estimate as to when it reasonably expects to make such decision".

Subsec. (e). Pub. L. 109–58, § 1286, added subsec. (e).

1988—Subsec. (a). Pub. L. 100–473, § 2(1), inserted provisions for a statement of reasons for listed changes, hearings, and specification of issues.

Subsecs. (b) to (d). Pub. L. 100–473, § 2(2), added subsecs. (b) and (c) and redesignated former subsec. (b) as (d).

### Statutory Notes and Related Subsidiaries

#### EFFECTIVE DATE OF 1988 AMENDMENT

Pub. L. 100–473, § 4, Oct. 6, 1988, 102 Stat. 2300, provided that: "The amendments made by this Act [amending this section] are not applicable to complaints filed or motions initiated before the date of enactment of this Act [Oct. 6, 1988] pursuant to section 206 of the Federal Power Act [this section]: *Provided, however*, That such complaints may be withdrawn and refiled without prejudice."

#### LIMITATION ON AUTHORITY PROVIDED

Pub. L. 100–473, § 3, Oct. 6, 1988, 102 Stat. 2300, provided that: "Nothing in subsection (c) of section 206 of the Federal Power Act, as amended (16 U.S.C. 824e(c)) shall be interpreted to confer upon the Federal Energy Regulatory Commission any authority not granted to it elsewhere in such Act [16 U.S.C. 791a et seq.] to issue an order that (1) requires a decrease in system production or transmission costs to be paid by one or more electric utility companies of a registered holding company; and (2) is based upon a determination that the amount of such decrease should be paid through an increase in the

costs to be paid by other electric utility companies of such registered holding company. For purposes of this section, the terms 'electric utility companies' and 'registered holding company' shall have the same meanings as provided in the Public Utility Holding Company Act of 1935, as amended [15 U.S.C. 79 et seq.].''

### STUDY

Pub. L. 100–473, §5, Oct. 6, 1988, 102 Stat. 2301, directed that, no earlier than three years and no later than four years after Oct. 6, 1988, Federal Energy Regulatory Commission perform a study of effect of amendments to this section, analyzing (1) impact, if any, of such amendments on cost of capital paid by public utilities, (2) any change in average time taken to resolve proceedings under this section, and (3) such other matters as Commission may deem appropriate in public interest, with study to be sent to Committee on Energy and Natural Resources of Senate and Committee on Energy and Commerce of House of Representatives.

### § 824f. Ordering furnishing of adequate service

Whenever the Commission, upon complaint of a State commission, after notice to each State commission and public utility affected and after opportunity for hearing, shall find that any interstate service of any public utility is inadequate or insufficient, the Commission shall determine the proper, adequate, or sufficient service to be furnished, and shall fix the same by its order, rule, or regulation: *Provided*, That the Commission shall have no authority to compel the enlargement of generating facilities for such purposes, nor to compel the public utility to sell or exchange energy when to do so would impair its ability to render adequate service to its customers.

(June 10, 1920, ch. 285, pt. II, §207, as added Aug. 26, 1935, ch. 687, title II, §213, 49 Stat. 853.)

### § 824g. Ascertainment of cost of property and depreciation

#### (a) Investigation of property costs

The Commission may investigate and ascertain the actual legitimate cost of the property of every public utility, the depreciation therein, and, when found necessary for rate-making purposes, other facts which bear on the determination of such cost or depreciation, and the fair value of such property.

#### (b) Request for inventory and cost statements

Every public utility upon request shall file with the Commission an inventory of all or any part of its property and a statement of the original cost thereof, and shall keep the Commission informed regarding the cost of all additions, betterments, extensions, and new construction.

(June 10, 1920, ch. 285, pt. II, §208, as added Aug. 26, 1935, ch. 687, title II, §213, 49 Stat. 853.)

### § 824h. References to State boards by Commission

#### (a) Composition of boards; force and effect of proceedings

The Commission may refer any matter arising in the administration of this subchapter to a board to be composed of a member or members, as determined by the Commission, from the State or each of the States affected or to be affected by such matter. Any such board shall be vested with the same power and be subject to the same duties and liabilities as in the case of a member of the Commission when designated by the Commission to hold any hearings. The action of such board shall have such force and effect and its proceedings shall be conducted in such manner as the Commission shall by regulations prescribe. The board shall be appointed by the Commission from persons nominated by the State commission of each State affected or by the Governor of such State if there is no State commission. Each State affected shall be entitled to the same number of representatives on the board unless the nominating power of such State waives such right. The Commission shall have discretion to reject the nominee from any State, but shall thereupon invite a new nomination from that State. The members of a board shall receive such allowances for expenses as the Commission shall provide. The Commission may, when in its discretion sufficient reason exists therefor, revoke any reference to such a board.

#### (b) Cooperation with State commissions

The Commission may confer with any State commission regarding the relationship between rate structures, costs, accounts, charges, practices, classifications, and regulations of public utilities subject to the jurisdiction of such State commission and of the Commission; and the Commission is authorized, under such rules and regulations as it shall prescribe, to hold joint hearings with any State commission in connection with any matter with respect to which the Commission is authorized to act. The Commission is authorized in the administration of this chapter to avail itself of such cooperation, services, records, and facilities as may be afforded by any State commission.

#### (c) Availability of information and reports to State commissions; Commission experts

The Commission shall make available to the several State commissions such information and reports as may be of assistance in State regulation of public utilities. Whenever the Commission can do so without prejudice to the efficient and proper conduct of its affairs, it may upon request from a State make available to such State as witnesses any of its trained rate, valuation, or other experts, subject to reimbursement to the Commission by such State of the compensation and traveling expenses of such witnesses. All sums collected hereunder shall be credited to the appropriation from which the amounts were expended in carrying out the provisions of this subsection.

(June 10, 1920, ch. 285, pt. II, §209, as added Aug. 26, 1935, ch. 687, title II, §213, 49 Stat. 853.)

### § 824i. Interconnection authority

#### (a) Powers of Commission; application by State regulatory authority

(1) Upon application of any electric utility, Federal power marketing agency, geothermal power producer (including a producer which is not an electric utility), qualifying cogenerator, or qualifying small power producer, the Commission may issue an order requiring—

(A) the physical connection of any cogeneration facility, any small power production fa-

A-12

# 16 U.S.C. § 825*l*

ices. The amounts collected under this section shall be deposited in the Treasury to the credit of miscellaneous receipts. All printing for the Federal Power Commission making use of engraving, lithography, and photolithography, together with the plates for the same, shall be contracted for and performed under the direction of the Commission, under such limitations and conditions as the Joint Committee on Printing may from time to time prescribe, and all other printing for the Commission shall be done by the Director of the Government Publishing Office under such limitations and conditions as the Joint Committee on Printing may from time to time prescribe. The entire work may be done at, or ordered through, the Government Publishing Office whenever, in the judgment of the Joint Committee on Printing, the same would be to the interest of the Government: *Provided*, That when the exigencies of the public service so require, the Joint Committee on Printing may authorize the Commission to make immediate contracts for engraving, lithographing, and photolithographing, without advertisement for proposals: *Provided further*, That nothing contained in this chapter or any other Act shall prevent the Federal Power Commission from placing orders with other departments or establishments for engraving, lithographing, and photolithographing, in accordance with the provisions of sections 1535 and 1536 of title 31, providing for interdepartmental work.

(June 10, 1920, ch. 285, pt. III, §312, as added Aug. 26, 1935, ch. 687, title II, §213, 49 Stat. 859; amended Pub. L. 113–235, div. H, title I, §1301(b), (d), Dec. 16, 2014, 128 Stat. 2537.)

### Editorial Notes

#### CODIFICATION

''Sections 1535 and 1536 of title 31'' substituted in text for ''sections 601 and 602 of the Act of June 30, 1932 (47 Stat. 417 [31 U.S.C. 686, 686b])'' on authority of Pub. L. 97–258, §4(b), Sept. 13, 1982, 96 Stat. 1067, the first section of which enacted Title 31, Money and Finance.

### Statutory Notes and Related Subsidiaries

#### CHANGE OF NAME

''Director of the Government Publishing Office'' substituted for ''Public Printer'' in text on authority of section 1301(d) of Pub. L. 113–235, set out as a note under section 301 of Title 44, Public Printing and Documents.

''Government Publishing Office'' substituted for ''Government Printing Office'' in text on authority of section 1301(b) of Pub. L. 113–235, set out as a note preceding section 301 of Title 44, Public Printing and Documents.

### § 825*l*. Review of orders

#### (a) Application for rehearing; time periods; modification of order

Any person, electric utility, State, municipality, or State commission aggrieved by an order issued by the Commission in a proceeding under this chapter to which such person, electric utility, State, municipality, or State commission is a party may apply for a rehearing within thirty days after the issuance of such order. The application for rehearing shall set forth specifically the ground or grounds upon which such application is based. Upon such application the Commission shall have power to grant or deny rehearing or to abrogate or modify its order without further hearing. Unless the Commission acts upon the application for rehearing within thirty days after it is filed, such application may be deemed to have been denied. No proceeding to review any order of the Commission shall be brought by any entity unless such entity shall have made application to the Commission for a rehearing thereon. Until the record in a proceeding shall have been filed in a court of appeals, as provided in subsection (b), the Commission may at any time, upon reasonable notice and in such manner as it shall deem proper, modify or set aside, in whole or in part, any finding or order made or issued by it under the provisions of this chapter.

#### (b) Judicial review

Any party to a proceeding under this chapter aggrieved by an order issued by the Commission in such proceeding may obtain a review of such order in the United States court of appeals for any circuit wherein the licensee or public utility to which the order relates is located or has its principal place of business, or in the United States Court of Appeals for the District of Columbia, by filing in such court, within sixty days after the order of the Commission upon the application for rehearing, a written petition praying that the order of the Commission be modified or set aside in whole or in part. A copy of such petition shall forthwith be transmitted by the clerk of the court to any member of the Commission and thereupon the Commission shall file with the court the record upon which the order complained of was entered, as provided in section 2112 of title 28. Upon the filing of such petition such court shall have jurisdiction, which upon the filing of the record with it shall be exclusive, to affirm, modify, or set aside such order in whole or in part. No objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission in the application for rehearing unless there is reasonable ground for failure so to do. The finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive. If any party shall apply to the court for leave to adduce additional evidence, and shall show to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for failure to adduce such evidence in the proceedings before the Commission, the court may order such additional evidence to be taken before the Commission and to be adduced upon the hearing in such manner and upon such terms and conditions as to the court may seem proper. The Commission may modify its findings as to the facts by reason of the additional evidence so taken, and it shall file with the court such modified or new findings which, if supported by substantial evidence, shall be conclusive, and its recommendation, if any, for the modification or setting aside of the original order. The judgment and decree of the court, affirming, modifying, or setting aside, in whole or in part, any such order of the Commission, shall be final, subject to review by the Supreme Court of the United States

upon certiorari or certification as provided in section 1254 of title 28.

### (c) Stay of Commission's order

The filing of an application for rehearing under subsection (a) shall not, unless specifically ordered by the Commission, operate as a stay of the Commission's order. The commencement of proceedings under subsection (b) of this section shall not, unless specifically ordered by the court, operate as a stay of the Commission's order.

(June 10, 1920, ch. 285, pt. III, § 313, as added Aug. 26, 1935, ch. 687, title II, § 213, 49 Stat. 860; amended June 25, 1948, ch. 646, § 32(a), 62 Stat. 991; May 24, 1949, ch. 139, § 127, 63 Stat. 107; Pub. L. 85–791, § 16, Aug. 28, 1958, 72 Stat. 947; Pub. L. 109–58, title XII, § 1284(c), Aug. 8, 2005, 119 Stat. 980.)

#### EDITORIAL NOTES

##### CODIFICATION

In subsec. (b), "section 1254 of title 28" substituted for "sections 239 and 240 of the Judicial Code, as amended (U.S.C., title 28, secs. 346 and 347)" on authority of act June 25, 1948, ch. 646, 62 Stat. 869, the first section of which enacted Title 28, Judiciary and Judicial Procedure.

##### AMENDMENTS

2005—Subsec. (a). Pub. L. 109–58 inserted "electric utility," after "Any person," and "to which such person," and substituted "brought by any entity unless such entity" for "brought by any person unless such person".

1958—Subsec. (a). Pub. L. 85–791, § 16(a), inserted sentence to provide that Commission may modify or set aside findings or orders until record has been filed in court of appeals.

Subsec. (b). Pub. L. 85–791, § 16(b), in second sentence, substituted "transmitted by the clerk of the court to" for "served upon", substituted "file with the court" for "certify and file with the court a transcript of", and inserted "as provided in section 2112 of title 28", and in third sentence, substituted "jurisdiction, which upon the filing of the record with it shall be exclusive" for "exclusive jurisdiction".

#### STATUTORY NOTES AND RELATED SUBSIDIARIES

##### CHANGE OF NAME

Act June 25, 1948, eff. Sept. 1, 1948, as amended by act May 24, 1949, substituted "court of appeals" for "circuit court of appeals".

### § 825m. Enforcement provisions

#### (a) Enjoining and restraining violations

Whenever it shall appear to the Commission that any person is engaged or about to engage in any acts or practices which constitute or will constitute a violation of the provisions of this chapter, or of any rule, regulation, or order thereunder, it may in its discretion bring an action in the proper District Court of the United States or the United States courts of any Territory or other place subject to the jurisdiction of the United States, to enjoin such acts or practices and to enforce compliance with this chapter or any rule, regulation, or order thereunder, and upon a proper showing a permanent or temporary injunction or decree or restraining order shall be granted without bond. The Commission may transmit such evidence as may be available

concerning such acts or practices to the Attorney General, who, in his discretion, may institute the necessary criminal proceedings under this chapter.

#### (b) Writs of mandamus

Upon application of the Commission the district courts of the United States and the United States courts of any Territory or other place subject to the jurisdiction of the United States shall have jurisdiction to issue writs of mandamus commanding any person to comply with the provisions of this chapter or any rule, regulation, or order of the Commission thereunder.

#### (c) Employment of attorneys

The Commission may employ such attorneys as it finds necessary for proper legal aid and service of the Commission or its members in the conduct of their work, or for proper representation of the public interests in investigations made by it or cases or proceedings pending before it, whether at the Commission's own instance or upon complaint, or to appear for or represent the Commission in any case in court; and the expenses of such employment shall be paid out of the appropriation for the Commission.

#### (d) Prohibitions on violators

In any proceedings under subsection (a), the court may prohibit, conditionally or unconditionally, and permanently or for such period of time as the court determines, any individual who is engaged or has engaged in practices constituting a violation of section 824u of this title (and related rules and regulations) from—

    (1) acting as an officer or director of an electric utility; or

    (2) engaging in the business of purchasing or selling—

        (A) electric energy; or

        (B) transmission services subject to the jurisdiction of the Commission.

(June 10, 1920, ch. 285, pt. III, § 314, as added Aug. 26, 1935, ch. 687, title II, § 213, 49 Stat. 861; amended June 25, 1936, ch. 804, 49 Stat. 1921; June 25, 1948, ch. 646, § 32(b), 62 Stat. 991; May 24, 1949, ch. 139, § 127, 63 Stat. 107; Pub. L. 109–58, title XII, § 1288, Aug. 8, 2005, 119 Stat. 982.)

#### EDITORIAL NOTES

##### CODIFICATION

As originally enacted subsecs. (a) and (b) contained references to the Supreme Court of the District of Columbia. Act June 25, 1936, substituted "the district court of the United States for the District of Columbia" for "the Supreme Court of the District of Columbia", and act June 25, 1948, as amended by act May 24, 1949, substituted "United States District Court for the District of Columbia" for "district court of the United States for the District of Columbia". However, the words "United States District Court for the District of Columbia" have been deleted entirely as superfluous in view of section 132(a) of Title 28, Judiciary and Judicial Procedure, which states that "There shall be in each judicial district a district court which shall be a court of record known as the United States District Court for the district", and section 88 of Title 28 which states that "the District of Columbia constitutes one judicial district".

##### AMENDMENTS

2005—Subsec. (d). Pub. L. 109–58 added subsec. (d).

# Ind. Code §§8–1–8.2–1 to 10 (2025)

**(reproduced from iga.in.gov)**

| IC 8-1-8.2 | Chapter 8.2. Energy Production Zones |
|---|---|
| 8-1-8.2-1 | "Electric generation facility" |
| 8-1-8.2-2 | "Energy production zone" |
| 8-1-8.2-3 | "Local authority" |
| 8-1-8.2-4 | "Permit" |
| 8-1-8.2-5 | "Premise of land" |
| 8-1-8.2-6 | "Project owner" |
| 8-1-8.2-7 | "Retail electric service" |
| 8-1-8.2-8 | "Unit" |
| 8-1-8.2-9 | "Wholesale electric service" |
| 8-1-8.2-10 | Construction of electric generation facility on energy production zone; exemption from permitting requirements or zoning approval; notice to local authority; required information; public hearing; notice of change |
| 8-1-8.2-11 | Authority of local authority or unit to regulate siting, construction, of deployment of electric generation facility not located in energy production zone |

**IC 8-1-8.2-1        "Electric generation facility"**
Sec. 1. (a) As used in this chapter, "electric generation facility" means:
(1) a facility; or
(2) infrastructure associated with a facility;
for the generation of electricity.
(b) The term does not include the following:
(1) A wind power device (as defined in IC 8-1-41-7).
(2) A commercial solar energy system (as defined in IC 8-1-42-2).
*As added by P.L.202-2025, SEC.1.*

**IC 8-1-8.2-2        "Energy production zone"**
Sec. 2. (a) As used in this chapter, "energy production zone" means a premise of land on which any of the following was located as of January 1, 2025:
(1) An electric generation facility with a generating capacity of at least eighty (80) megawatts, regardless of whether the electric generation facility is operational.
(2) A surface or underground mine at which mining operations are no longer occurring.
(b) The term does not include a premise of land on which either of the following was located as of January 1, 2025:
(1) One (1) or more wind power devices (as defined in IC 8-1-41-7) that are integrated into an electric generation facility.
(2) One (1) or more commercial solar energy systems (as defined in IC 8-1-42-2).
*As added by P.L.202-2025, SEC.1.*

**IC 8-1-8.2-3        "Local authority"**
Sec. 3. As used in this chapter, "local authority" has the meaning set forth in IC 36-7-4-1109.
*As added by P.L.202-2025, SEC.1.*

**IC 8-1-8.2-4        "Permit"**
Sec. 4. As used in this chapter, "permit" has the meaning set forth in IC 36-7-4-1109.
*As added by P.L.202-2025, SEC.1.*

**IC 8-1-8.2-5        "Premise of land"**
Sec. 5. As used in this chapter, "premise of land" means property comprising a tract of land on which a project owner proposes to construct an electric generation facility, including land within the perimeter of the tract of land that was not owned by the project owner as of January 1, 2025.

Indiana Code 2025

**A-16**

*As added by P.L.202-2025, SEC.1.*

**IC 8-1-8.2-6          "Project owner"**
Sec. 6. As used in this chapter, "project owner" means a person that proposes to construct an electric generation facility.
*As added by P.L.202-2025, SEC.1.*

**IC 8-1-8.2-7          "Retail electric service"**
Sec. 7. As used in this chapter, "retail electric service":
(1) means electric service furnished to a customer, including a residential, commercial, or industrial customer, for consumption by the customer; and
(2) does not include wholesale electric service.
*As added by P.L.202-2025, SEC.1.*

**IC 8-1-8.2-8          "Unit"**
Sec. 8. As used in this chapter, "unit" has the meaning set forth in IC 36-1-2-23.
*As added by P.L.202-2025, SEC.1.*

**IC 8-1-8.2-9          "Wholesale electric service"**
Sec. 9. As used in this chapter, "wholesale electric service" means provision of electricity to another person for resale, including in wholesale markets.
*As added by P.L.202-2025, SEC.1.*

**IC 8-1-8.2-10          Construction of electric generation facility on energy production zone; exemption from permitting requirements or zoning approval; notice to local authority; required information; public hearing; notice of change**
Sec. 10. (a) A project owner is not required to obtain a permit, or any other land use or zoning approval, from a local authority for the construction of an electric generation facility if:
(1) the commission:
(A) grants the project owner a certificate under IC 8-1-8.5-2 for the construction; or
(B) declines jurisdiction over the construction under IC 8-1-2.5-5;
(2) the electric generating facility will be located on a premise of land that is an energy production zone; and
(3) the project owner complies with subsections (b) and (c).
(b) Not later than two hundred seventy (270) days before beginning construction to which subsection (a) applies, a project owner shall provide notice of the construction to the local authority with planning authority under IC 36-7 for the premise of land on which the construction will occur. The notice must include the following information with regard to the construction and the electric generation facility to be constructed:
(1) A comprehensive description of the electric generation facility, including the following:
(A) The planned generation capacity of the electric generation facility, expressed in megawatts.
(B) The energy source or technology that will be used by the electric generation facility to generate electricity.
(C) The expected operational lifespan of the electric generation facility.
(2) The expected date on which the construction will begin.
(3) The expected date on which the electric generation facility will begin operation.
(4) Whether the electric generation facility will provide retail electric service, wholesale electric service, or both.
(5) The project owner's plan for eventual decommissioning of the electric generation

Indiana Code 2025

**A-17**

facility.

(6) If construction of the electric generation facility will entail decommissioning an existing electric generation facility that is located on the premise of land on which the electric generation facility will be located, the project owner's plan for decommissioning the existing electric generation facility, including financial assurances for the decommissioning.

(7) A detailed site plan that includes the location of the following within or adjacent to the premise of land on which the electric generation facility will be constructed:

(A) The structures associated with the electric generation facility.

(B) The:

(i) existing electric generation facility, and any structures associated with the existing electric generation facility; or

(ii) surface or underground mine, and any structures associated with the surface or underground mine;

located on the premise of land on which the electric generation facility will be located.

(C) Existing and proposed access roads.

(D) Regulated drains or ditches.

(E) Flood plains.

(F) Wetlands.

(G) Historic sites or other areas of cultural or environmental significance.

(8) An economic development plan detailing the expected economic effect of the electric generation facility on the unit within which the electric generation facility will be located, including the following:

(A) The anticipated number and types of jobs to be created:

(i) during the construction of the electric generation facility; and

(ii) in the operation of the electric generation facility.

(B) The estimated property tax revenue the electric generation facility will produce for the unit.

(C) An estimate of the overall:

(i) cost to the unit; and

(ii) effect on the unit's revenue;

associated with the electric generation facility.

(9) A safety, security, and emergency response plan describing measures to ensure:

(A) site security and safety;

(B) coordination with the unit's services; and

(C) safeguarding of the public;

with regard to the construction and operation of the electric generation facility.

(c) Not later than sixty (60) days after a project owner's provision of the notice under subsection (b), the project owner shall hold a public hearing in the unit in which the electric generation facility will be located, during which the project owner shall:

(1) provide information to the public; and

(2) receive public comment;

regarding the electric generation facility and the construction of the electric generation facility. The project owner shall publish notice of the date, time, location, and subject of the public hearing in accordance with IC 5-3-1-2(b).

(d) After providing notice to a local authority under subsection (b), a project owner shall notify the local authority regarding any substantive changes in the information provided by the project owner under subsection (b) that occur before construction begins on the electric generation facility to which the notice pertains.

*As added by P.L.202-2025, SEC.1.*

**IC 8-1-8.2-11        Authority of local authority or unit to regulate siting,**

Indiana Code 2025

**A-18**

**construction, of deployment of electric generation facility not located in energy production zone**

Sec. 11. This chapter may not be construed to increase or modify the authority of a local authority or a unit to regulate the siting, construction, or deployment of an electric generation facility that is not located in an energy production zone.
*As added by P.L.202-2025, SEC.1.*

Indiana Code 2025

# Ky. Rev. Stat. Ann. § 278.264 (2024)

**(reproduced from legislature.ky.gov)**

**278.264  Commission's approval or denial of retirement of electric generating unit - - Rebuttable presumption against retiring fossil fuel-fired generating unit -- Evidence of costs -- Report -- Definitions.**

(1)    Notwithstanding any provision of law to the contrary, the commission shall have the authority to approve or deny the retirement of an electric generating unit owned by a utility. Prior to retiring an electric generating unit, a utility shall apply to the commission for an order approving the retirement, and shall give the commission thirty (30) days' notice of the application. The application shall include a statement certifying the applicant's compliance with the requirements of KRS 164.2807. The commission shall enter an order approving, approving with conditions, or denying the application within one hundred eighty (180) days of receiving an administratively complete application.

(2)    There shall be a rebuttable presumption against the retirement of a fossil fuel-fired electric generating unit. The commission shall not approve the retirement of an electric generating unit, authorize a surcharge for the decommissioning of the unit, or take any other action which authorizes or allows for the recovery of costs for the retirement of an electric generating unit, including any stranded asset recovery, unless the presumption created by this section is rebutted by evidence sufficient for the commission to find that:

(a)    The utility will replace the retired electric generating unit with new electric generating capacity that:

1.    Is dispatchable by either the utility or the regional transmission organization or independent system operator responsible for balancing load within the utility's service area;

2.    Maintains or improves the reliability and resilience of the electric transmission grid;

3.    Maintains the minimum reserve capacity requirement established by the utility's reliability coordinator; and

4.    Has the same or higher capacity value and net capability, unless the utility can demonstrate that such capacity value and net capability is not necessary to provide reliable service;

(b)    The retirement will not harm the utility's ratepayers by causing the utility to incur any net incremental costs to be recovered from ratepayers that could be avoided by continuing to operate the electric generating unit proposed for retirement in compliance with applicable law;

(c)    The decision to retire the fossil fuel-fired electric generating unit is not the result of any financial incentives or benefits offered by any federal agency; and

(d)    The utility shall not commence retirement or decommissioning of the electric generating unit until the replacement generating capacity meeting the requirements of paragraph (a) of this subsection is fully constructed, permitted, and in operation, unless the utility can demonstrate that it is necessary under the circumstances to commence retirement or decommissioning of the existing unit earlier.

**A-21**

(3)   The utility shall at a minimum provide the commission with evidence of all known direct and indirect costs of retiring the electric generating unit and demonstrate that cost savings will result to customers as a result of the retirement of the electric generating unit.

(4)   The commission shall prepare and submit an annual report to the Legislative Research Commission by December 1 of each year detailing:

(a)   The number of requests by utilities to retire electric generating units in the Commonwealth, the nameplate capacity of each of those units, and whether the request was approved or denied by the commission;

(b)   The impact of any commission-approved retirement of an electric generating unit on the:

    1.   Commonwealth's generation fuel mix;

    2.   Required capacity reserve margins for the utility;

    3.   Need for capacity additions or expansions at new or existing facilities as a result of the retirement; and

    4.   Need for additional purchase power or capacity reserve arrangements; and

(c)   Whether the retirement resulted in stranded costs for the ratepayer that will be recovered by the utility through a surcharge or some other separate charge on the customer bill.

(5)   As used in this section:

(a)   "Dispatchable" means a source of electric power generation that is available on demand, that is not intermittent, and that can be adjusted to increase or decrease its power output upon request of a power grid operator or otherwise upon demand or request, or that can have its power output adjusted in response to market or system needs; and

(b)   "Intermittent" means:

    1.   A source of electric power generation from a solar photovoltaic, solar thermal heating, concentrating solar thermal collector, or other solar energy collection or generation system;

    2.   A source of electric power that generates energy by harnessing wind power or energy, whether through a turbine or other device;

    3.   Geothermal energy, biomass energy, anaerobic digestion, or combined heat and power from solar, wind, geothermal, or anaerobic digestion sources;

    4.   Any short duration energy storage, which includes any method of storing generated electricity for later dispatch to the grid, whether alone or in conjunction with any other intermittent sources described in this paragraph, that is equivalent to less than forty-eight (48) hours of the average peak generation of the unit it is used to offset; or

    5.   Conventional hydropower and pumped storage hydropower, unless they are capable of providing energy on demand, in which case they shall be deemed to be dispatchable.

A-22

**Effective:** April 12, 2024

**History:**  Amended 2024 Ky. Acts ch. 172, sec. 4, effective April 12, 2024. -- Created 2023 Ky. Acts ch. 118, sec. 2, effective March 29, 2023.

# Minn. Stat. § 216B.243 (2025)

**(reproduced from revisor.mn.gov)**

**216B.243 CERTIFICATE OF NEED FOR LARGE ENERGY FACILITY.**

Subdivision 1. **Assessment of need criteria.** The commission shall, pursuant to chapter 14 and sections 216C.05 to 216C.30 and this section, adopt assessment of need criteria to be used in the determination of need for large energy facilities pursuant to this section.

Subd. 2. **Certificate required.** No large energy facility shall be sited or constructed in Minnesota without the issuance of a certificate of need by the commission pursuant to sections 216C.05 to 216C.30 and this section and consistent with the criteria for assessment of need.

Subd. 3. **Showing required for construction.** No proposed large energy facility shall be certified for construction unless the applicant can show that demand for electricity cannot be met more cost effectively through energy conservation and load-management measures and unless the applicant has otherwise justified its need. In assessing need, the commission shall evaluate:

(1) the accuracy of the long-range energy demand forecasts on which the necessity for the facility is based;

(2) the effect of existing or possible energy conservation programs under sections 216C.05 to 216C.30 and this section or other federal or state legislation on long-term energy demand;

(3) the relationship of the proposed facility to overall state energy needs, as described in the most recent state energy policy and conservation report prepared under section 216C.18, or, in the case of a high-voltage transmission line, the relationship of the proposed line to regional energy needs, as presented in the transmission plan submitted under section 216B.2425;

(4) promotional activities that may have given rise to the demand for this facility;

(5) benefits of this facility, including its uses to protect or enhance environmental quality, and to increase reliability of energy supply in Minnesota and the region;

(6) possible alternatives for satisfying the energy demand or transmission needs including but not limited to potential for increased efficiency and upgrading of existing energy generation and transmission facilities, load-management programs, and distributed generation, except that the commission must not require evaluation of alternative end points for a high-voltage transmission line qualifying as a large energy facility unless the alternative end points are (i) consistent with end points identified in a federally registered planning authority transmission plan, or (ii) otherwise agreed to for further evaluation by the applicant;

(7) the policies, rules, and regulations of other state and federal agencies and local governments;

(8) any feasible combination of energy conservation improvements, required under section 216B.241, that can (i) replace part or all of the energy to be provided by the proposed facility, and (ii) compete with it economically;

(9) with respect to a high-voltage transmission line, the benefits of enhanced regional reliability, access, or deliverability to the extent these factors improve the robustness of the transmission system or lower costs for electric consumers in Minnesota;

(10) whether the applicant or applicants are in compliance with applicable provisions of sections 216B.1691 and 216B.2425, subdivision 7, and have filed or will file by a date certain an application for certificate of need under this section or for certification as a priority electric transmission project under section 216B.2425 for any transmission facilities or upgrades identified under section 216B.2425, subdivision 7;

(11) whether the applicant has made the demonstrations required under subdivision 3a; and

(12) if the applicant is proposing a nonrenewable generating plant, the applicant's assessment of the risk of environmental costs and regulation on that proposed facility over the expected useful life of the plant, including a proposed means of allocating costs associated with that risk.

Subd. 3a. **Use of renewable resource.** The commission may not issue a certificate of need under this section for a large energy facility that generates electric power by means of a nonrenewable energy source, unless the applicant for the certificate has demonstrated to the commission's satisfaction that it has explored the possibility of generating power by means of renewable energy sources and has demonstrated that the alternative selected is less expensive, including environmental costs, than power generated by a renewable energy source. For purposes of this subdivision, "renewable energy source" includes hydro, wind, solar, and geothermal energy and the use of trees or other vegetation as fuel.

Subd. 3b. **Nuclear power plant; new construction prohibited; relicensing.** (a) The commission may not issue a certificate of need for the construction of a new nuclear-powered electric generating plant.

(b) Any certificate of need for additional storage of spent nuclear fuel for a facility seeking a license extension shall address the impacts of continued operations over the period for which approval is sought.

Subd. 4. **Application for certificate; hearing.** Any person proposing to construct a large energy facility shall apply for a certificate of need and for a site or route permit under chapter 216I prior to construction of the facility. The application shall be on forms and in a manner established by the commission. In reviewing each application the commission shall hold at least one public hearing pursuant to chapter 14. The public hearing shall be held at a location and hour reasonably calculated to be convenient for the public. An objective of the public hearing shall be to obtain public opinion on the necessity of granting a certificate of need and, if a joint hearing is held, a site or route permit. The commission shall designate a commission employee whose duty shall be to facilitate citizen participation in the hearing process. Unless the commission determines that a joint hearing on siting and need under this subdivision and chapter 216I is not feasible or more efficient, or otherwise not in the public interest, a joint hearing under this subdivision and chapter 216I must be held.

Subd. 5. **Approval, denial, or modification.** Within 12 months of the submission of an application, the commission shall approve or deny a certificate of need for the facility. Approval or denial of the certificate shall be accompanied by a statement of the reasons for the decision. Issuance of the certificate may be made contingent upon modifications required by the commission. If the commission has not issued an order on the application within the 12 months provided, the commission may extend the time period upon receiving the consent of the parties or on its own motion, for good cause, by issuing an order explaining the good cause justification for extension.

Subd. 6. **Application fees; rules.** Any application for a certificate of need shall be accompanied by the application fee required pursuant to this subdivision. The application fee is to be applied toward the total costs reasonably necessary to complete the evaluation of need for the proposed facility. The maximum application fee shall be $50,000, except for an application for an electric power generating plant as defined in section 216B.2421, subdivision 2, clause (1), or a high-voltage transmission line as defined in section 216B.2421, subdivision 2, clause (2), for which the maximum application fee shall be $100,000. Costs exceeding the application fee and reasonably necessary to complete the evaluation of need for the proposed facility shall be recovered from the applicant. If the applicant is a public utility, a cooperative electric association, a generation and transmission cooperative electric association, a municipal power agency, a municipal electric utility, or a transmission company, the recovery shall be done pursuant to section 216B.62. The commission shall establish by rule pursuant to chapter 14 and sections 216C.05 to 216C.30 and this

section, a schedule of fees based on the output or capacity of the facility and the difficulty of assessment of need. Money collected in this manner shall be credited to the general fund of the state treasury.

Subd. 7. **Participation by other agency or political subdivision.** (a) Other state agencies authorized to issue permits for siting, construction or operation of large energy facilities, and those state agencies authorized to participate in matters before the commission involving utility rates and adequacy of utility services, shall present their position regarding need and participate in the public hearing process prior to the issuance or denial of a certificate of need. Issuance or denial of certificates of need shall be the sole and exclusive prerogative of the commission and these determinations and certificates shall be binding upon other state departments and agencies, regional, county, and local governments and special purpose government districts except as provided in sections 116C.01 to 116C.08 and 116D.04, subdivision 9.

(b) An applicant for a certificate of need shall notify the commissioner of agriculture if the proposed project will impact cultivated agricultural land, as that term is defined in section 216G.01, subdivision 4. The commissioner may participate in any proceeding on the application and advise the commission as to whether to grant the certificate of need, and the best options for mitigating adverse impacts to agricultural lands if the certificate is granted. The Department of Agriculture shall be the lead agency on the development of any agricultural mitigation plan required for the project.

Subd. 8. **Exemptions.** (a) This section does not apply to:

(1) cogeneration or small power production facilities as defined in the Federal Power Act, United States Code, title 16, section 796, paragraph (17), subparagraph (A), and paragraph (18), subparagraph (A), and having a combined capacity at a single site of less than 80,000 kilowatts; plants or facilities for the production of ethanol or fuel alcohol; or any case where the commission has determined after being advised by the attorney general that its application has been preempted by federal law;

(2) a high-voltage transmission line proposed primarily to distribute electricity to serve the demand of a single customer at a single location, unless the applicant opts to request that the commission determine need under this section or section 216B.2425;

(3) the upgrade to a higher voltage of an existing transmission line that serves the demand of a single customer that primarily uses existing rights-of-way, unless the applicant opts to request that the commission determine need under this section or section 216B.2425;

(4) a high-voltage transmission line of one mile or less required to connect a new or upgraded substation to an existing, new, or upgraded high-voltage transmission line;

(5) conversion of the fuel source of an existing electric generating plant to using natural gas;

(6) the modification of an existing electric generating plant to increase efficiency, as long as the capacity of the plant is not increased more than ten percent or more than 100 megawatts, whichever is greater;

(7) a large wind energy conversion system, as defined in section 216I.02, subdivision 12, or a solar energy generating system, as defined in section 216I.02, subdivision 18, for which a site permit application is submitted by an independent power producer under chapter 216I;

(8) a large wind energy conversion system, as defined in section 216I.02, subdivision 12, or a solar energy generating system, as defined in section 216I.02, subdivision 18, engaging in a repowering project that:

(i) will not result in the system exceeding the nameplate capacity under its most recent interconnection agreement; or

(ii) will result in the system exceeding the nameplate capacity under its most recent interconnection agreement, provided that the Midcontinent Independent System Operator has provided a signed generator interconnection agreement that reflects the expected net power increase;

(9) energy storage systems, as defined in section 216I.02, subdivision 6;

(10) transmission lines that directly interconnect large wind energy conversion systems, solar energy generating systems, or energy storage systems to the transmission system; or

(11) relocation of an existing high voltage transmission line to new right-of-way, provided that any new structures that are installed are not designed for and capable of operation at higher voltage.

(b) For the purpose of this subdivision, "repowering project" means:

(1) modifying a large wind energy conversion system or a solar energy generating system that is a large energy facility to increase its efficiency without increasing its nameplate capacity;

(2) replacing turbines in a large wind energy conversion system without increasing the nameplate capacity of the system; or

(3) increasing the nameplate capacity of a large wind energy conversion system.

Subd. 9. **Renewable energy standard and carbon-free energy standard facilities.** This section does not apply to a wind energy conversion system or a solar electric generation facility that is intended to be used to meet the obligations of section 216B.1691, subdivision 2a or 2g; provided that, after notice and comment, the commission determines that the facility is a reasonable and prudent approach to meeting a utility's obligations under that section. When making this determination, the commission must consider:

(1) the size of the facility relative to a utility's total need for renewable resources;

(2) alternative approaches for supplying the renewable energy to be supplied by the proposed facility;

(3) the facility's ability to promote economic development, as required under section 216B.1691, subdivision 9;

(4) the facility's ability to maintain electric system reliability;

(5) impacts on ratepayers; and

(6) other criteria as the commission may determine are relevant.

**History:** *1974 c 307 s 13; 1975 c 170 s 3,4; 1977 c 381 s 19; Ex1979 c 2 s 32; 1980 c 579 s 10,11; 1980 c 614 s 123; 1981 c 356 s 159,248; 1982 c 424 s 130; 1982 c 561 s 2; 1983 c 289 s 46,115 subd 2; 1984 c 558 art 4 s 10; 1984 c 655 art 1 s 22,23; 1985 c 304 s 1; 1987 c 312 art 1 s 10 subd 1; 1991 c 235 art 4 s 1; art 6 s 2; 1994 c 641 art 2 s 2; 2001 c 212 art 7 s 31-33; 2002 c 398 s 4; 1Sp2003 c 11 art 1 s 4; 2005 c 97 art 1 s 5,6; art 2 s 4; art 3 s 13-15; 2008 c 296 art 1 s 13; 2009 c 110 s 23,24; 2014 c 254 s 13; 2016 c 189 art 6 s 8; 2023 c 7 s 23; 2023 c 60 art 12 s 22; 2024 c 126 art 8 s 2-6; 2024 c 127 art 44 s 2-6*

# Va. Code Ann. § 56–585.5 (2025)

**(reproduced from law.lis.virginia.gov)**

Code of Virginia
Title 56. Public Service Companies
Chapter 23. Virginia Electric Utility Regulation Act

# § 56-585.5. Generation of electricity from renewable and zero carbon sources

A. As used in this section:

"Accelerated renewable energy buyer" means a commercial or industrial customer of a Phase I or Phase II Utility, irrespective of generation supplier, with an aggregate load over 25 megawatts in the prior calendar year, that enters into arrangements pursuant to subsection G, as certified by the Commission.

"Aggregate load" means the combined electrical load associated with selected accounts of an accelerated renewable energy buyer with the same legal entity name as, or in the names of affiliated entities that control, are controlled by, or are under common control of, such legal entity or are the names of affiliated entities under a common parent.

"Control" has the same meaning as provided in § 56-585.1:11.

"Elementary or secondary" has the same meaning as provided in § 22.1-1.

"Falling water" means hydroelectric resources, including run-of-river generation from a combined pumped-storage and run-of-river facility. "Falling water" does not include electricity generated from pumped-storage facilities.

"Low-income qualifying projects" means a project that provides a minimum of 50 percent of the respective electric output to low-income utility customers as that term is defined in § 56-576.

"Phase I Utility" has the same meaning as provided in subdivision A 1 of § 56-585.1.

"Phase II Utility" has the same meaning as provided in subdivision A 1 of § 56-585.1.

"Previously developed project site" means any property, including related buffer areas, if any, that has been previously disturbed or developed for non-single-family residential, nonagricultural, or nonsilvicultural use, regardless of whether such property currently is being used for any purpose. "Previously developed project site" includes a brownfield as defined in § 10.1-1230 or any parcel that has been previously used (i) for a retail, commercial, or industrial purpose; (ii) as a parking lot; (iii) as the site of a parking lot canopy or structure; (iv) for mining, which is any lands affected by coal mining that took place before August 3, 1977, or any lands upon which extraction activities have been permitted by the Department of Energy under Title 45.2; (v) for quarrying; or (vi) as a landfill.

"Total electric energy" means total electric energy sold to retail customers in the Commonwealth service territory of a Phase I or Phase II Utility, other than accelerated renewable energy buyers, by the incumbent electric utility or other retail supplier of electric energy in the previous calendar year, excluding an amount equivalent to the annual percentages of the electric energy that was supplied to such customer from nuclear generating plants located within the Commonwealth in the previous calendar year, provided such nuclear units were operating by July 1, 2020, or from any zero-carbon electric generating facilities not otherwise RPS eligible sources

and placed into service in the Commonwealth after July 1, 2030.

"Zero-carbon electricity" means electricity generated by any generating unit that does not emit carbon dioxide as a by-product of combusting fuel to generate electricity.

B. 1. By December 31, 2024, except for any coal-fired electric generating units (i) jointly owned with a cooperative utility or (ii) owned and operated by a Phase II Utility located in the coalfield region of the Commonwealth that co-fires with biomass, any Phase I and Phase II Utility shall retire all generating units principally fueled by oil with a rated capacity in excess of 500 megawatts and all coal-fired electric generating units operating in the Commonwealth.

2. By December 31, 2045, except for biomass-fired electric generating units that do not co-fire with coal, each Phase I and II Utility shall retire all other electric generating units located in the Commonwealth that emit carbon as a by-product of combusting fuel to generate electricity.

3. A Phase I or Phase II Utility may petition the Commission for relief from the requirements of this subsection on the basis that the requirement would threaten the reliability or security of electric service to customers. The Commission shall consider in-state and regional transmission entity resources and shall evaluate the reliability of each proposed retirement on a case-by-case basis in ruling upon any such petition.

C. Each Phase I and Phase II Utility shall participate in a renewable energy portfolio standard program (RPS Program) that establishes annual goals for the sale of renewable energy to all retail customers in the utility's service territory, other than accelerated renewable energy buyers pursuant to subsection G, regardless of whether such customers purchase electric supply service from the utility or from suppliers other than the utility. To comply with the RPS Program, each Phase I and Phase II Utility shall procure and retire Renewable Energy Certificates (RECs) originating from renewable energy standard eligible sources (RPS eligible sources). For purposes of complying with the RPS Program from 2021 to 2024, a Phase I and Phase II Utility may use RECs from any renewable energy facility, as defined in § 56-576, provided that such facilities are located in the Commonwealth or are physically located within the PJM Interconnection, LLC (PJM) region. However, at no time during this period or thereafter may any Phase I or Phase II Utility use RECs from (i) renewable thermal energy, (ii) renewable thermal energy equivalent, or (iii) biomass-fired facilities that are outside the Commonwealth. From compliance year 2025 and all years after, each Phase I and Phase II Utility may only use RECs from RPS eligible sources for compliance with the RPS Program.

In order to qualify as RPS eligible sources, such sources must be (a) electric-generating resources that generate electric energy derived from solar or wind located in the Commonwealth or off the Commonwealth's Atlantic shoreline or in federal waters and interconnected directly into the Commonwealth or physically located within the PJM region; (b) falling water resources located in the Commonwealth or physically located within the PJM region that were in operation as of January 1, 2020, that are owned by a Phase I or Phase II Utility or for which a Phase I or Phase II Utility has entered into a contract prior to January 1, 2020, to purchase the energy, capacity, and renewable attributes of such falling water resources; (c) non-utility-owned resources from falling water that (1) are less than 65 megawatts, (2) began commercial operation after December 31, 1979, or (3) added incremental generation representing greater than 50 percent of the original nameplate capacity after December 31, 1979, provided that such resources are located in the Commonwealth or are physically located within the PJM region; (d) waste-to-energy or landfill gas-fired generating resources located in the Commonwealth and in operation as of January 1,

2020, provided that such resources do not use waste heat from fossil fuel combustion; (e) geothermal heating and cooling systems located in the Commonwealth; (f) geothermal electric generating resources located in the Commonwealth or physically located within the PJM region; or (g) biomass-fired facilities in operation in the Commonwealth and in operation as of January 1, 2023, that (1) supply no more than 10 percent of their annual net electrical generation to the electric grid or no more than 15 percent of their annual total useful energy to any entity other than the manufacturing facility to which the generating source is interconnected and are fueled by forest-product manufacturing residuals, including pulping liquor, bark, paper recycling residuals, biowastes, or biomass, as described in subdivisions A 1, 2, and 4 of § 10.1-1308.1, provided that biomass as described in subdivision A 1 of § 10.1-1308.1 results from harvesting in accordance with best management practices for the sustainable harvesting of biomass developed and enforced by the State Forester pursuant to § 10.1-1105, or (2) are owned by a Phase I or Phase II Utility, have less than 52 megawatts capacity, and are fueled by forest-product manufacturing residuals, biowastes, or biomass, as described in subdivisions A 1, 2, and 4 of § 10.1-1308.1, provided that biomass as described in subdivision A 1 of § 10.1-1308.1 results from harvesting in accordance with best management practices for the sustainable harvesting of biomass developed and enforced by the State Forester pursuant to § 10.1-1105. Regardless of any future maintenance, expansion, or refurbishment activities, the total amount of RECs that may be sold by any RPS eligible source using biomass in any year shall be no more than the number of megawatt hours of electricity produced by that facility in 2022; however, in no year may any RPS eligible source using biomass sell RECs in excess of the actual megawatt-hours of electricity generated by such facility that year. In order to comply with the RPS Program, each Phase I and Phase II Utility may use and retire the environmental attributes associated with any existing owned or contracted solar, wind, falling water, or biomass electric generating resources in operation, or proposed for operation, in the Commonwealth or solar, wind, or falling water resources physically located within the PJM region, with such resource qualifying as a Commonwealth-located resource for purposes of this subsection, as of January 1, 2020, provided that such renewable attributes are verified as RECs consistent with the PJM-EIS Generation Attribute Tracking System.

1. The RPS Program requirements shall be a percentage of the total electric energy sold in the previous calendar year and shall be implemented in accordance with the following schedule:

| | Phase I Utilities | | Phase II Utilities | |
|---|---|---|---|---|
| a | | | | |
| b | Year | RPS Program Requirement | Year | RPS Program Requirement |
| c | 2021 | 6% | 2021 | 14% |
| d | 2022 | 7% | 2022 | 17% |
| e | 2023 | 8% | 2023 | 20% |
| f | 2024 | 10% | 2024 | 23% |

| | | | | |
|---|---|---|---|---|
| g | 2025 | 14% | 2025 | 26% |
| h | 2026 | 17% | 2026 | 29% |
| i | 2027 | 20% | 2027 | 32% |
| j | 2028 | 24% | 2028 | 35% |
| k | 2029 | 27% | 2029 | 38% |
| l | 2030 | 30% | 2030 | 41% |
| m | 2031 | 33% | 2031 | 45% |
| n | 2032 | 36% | 2032 | 49% |
| o | 2033 | 39% | 2033 | 52% |
| p | 2034 | 42% | 2034 | 55% |
| q | 2035 | 45% | 2035 | 59% |
| r | 2036 | 53% | 2036 | 63% |
| s | 2037 | 53% | 2037 | 67% |
| t | 2038 | 57% | 2038 | 71% |
| u | 2039 | 61% | 2039 | 75% |
| v | 2040 | 65% | 2040 | 79% |
| w | 2041 | 68% | 2041 | 83% |
| x | 2042 | 71% | 2042 | 87% |
| y | 2043 | 74% | 2043 | 91% |
| z | 2044 | 77% | 2044 | 95% |

2/2/2026 12:00:00

| aa | 2045 | 80% | 2045 and thereafter | 100% |
|----|------|-----|---------------------|------|
| ab | 2046 | 84% | | |
| ac | 2047 | 88% | | |
| ad | 2048 | 92% | | |
| ae | 2049 | 96% | | |
| af | 2050 and thereafter | 100% | | |

2. A Phase II Utility shall meet one percent of the RPS Program requirements in any given compliance year with solar, wind, or anaerobic digestion resources of one megawatt or less located in the Commonwealth, with not more than 3,000 kilowatts at any single location or at contiguous locations owned by the same entity or affiliated entities and, to the extent that low-income qualifying projects are available, then no less than 25 percent of such one percent shall be composed of low-income qualifying projects. To the extent that low-income qualifying projects are not available and projects located on or adjacent to public elementary or secondary schools are available, the remainder of no less than 25 percent of such one percent shall be composed of projects located on or adjacent to public elementary or secondary schools. A project located on or adjacent to a public elementary or secondary school shall have a contractual relationship with such school in order to qualify for the provisions of this section.

3. Beginning with the 2025 compliance year and thereafter, at least 75 percent of all RECs used by a Phase II Utility in a compliance period shall come from RPS eligible resources located in the Commonwealth.

4. Any Phase I or Phase II Utility may apply renewable energy sales achieved or RECs acquired in excess of the sales requirement for that RPS Program to the sales requirements for RPS Program requirements in the year in which it was generated and the five calendar years after the renewable energy was generated or the RECs were created. To the extent that a Phase I or Phase II Utility procures RECs for RPS Program compliance from resources the utility does not own, the utility shall be entitled to recover the costs of such certificates at its election pursuant to § 56-249.6 or subdivision A 5 d of § 56-585.1.

5. Energy from a geothermal heating and cooling system is eligible for inclusion in meeting the requirements of the RPS Program. RECs from a geothermal heating and cooling system are created based on the amount of energy, converted from BTUs to kilowatt-hours, that is generated by a geothermal heating and cooling system for space heating and cooling or water heating. The Commission shall determine the form and manner in which such RECs are verified.

D. Each Phase I or Phase II Utility shall petition the Commission for necessary approvals to procure zero-carbon electricity generating capacity as set forth in this subsection and energy storage resources as set forth in subsection E. To the extent that a Phase I or Phase II Utility

constructs or acquires new zero-carbon generating facilities or energy storage resources, the utility shall petition the Commission for the recovery of the costs of such facilities, at the utility's election, either through its rates for generation and distribution services or through a rate adjustment clause pursuant to subdivision A 6 of § 56-585.1. All costs not sought for recovery through a rate adjustment clause pursuant to subdivision A 6 of § 56-585.1 associated with generating facilities provided by sunlight or onshore or offshore wind are also eligible to be applied by the utility as a customer credit reinvestment offset as provided in subdivision A 8 of § 56-585.1. Costs associated with the purchase of energy, capacity, or environmental attributes from facilities owned by the persons other than the utility required by this subsection shall be recovered by the utility either through its rates for generation and distribution services or pursuant to § 56-249.6.

1. Each Phase I Utility shall petition the Commission for necessary approvals to construct, acquire, or enter into agreements to purchase the energy, capacity, and environmental attributes of 600 megawatts of generating capacity using energy derived from sunlight or onshore wind.

a. By December 31, 2023, each Phase I Utility shall petition the Commission for necessary approvals to construct, acquire, or enter into agreements to purchase the energy, capacity, and environmental attributes of at least 200 megawatts of generating capacity located in the Commonwealth using energy derived from sunlight or onshore wind, and 35 percent of such generating capacity procured shall be from the purchase of energy, capacity, and environmental attributes from solar or onshore wind facilities owned by persons other than the utility, with the remainder, in the aggregate, being from construction or acquisition by such Phase I Utility.

b. By December 31, 2027, each Phase I Utility shall petition the Commission for necessary approvals to construct, acquire, or enter into agreements to purchase the energy, capacity, and environmental attributes of at least 200 megawatts of additional generating capacity located in the Commonwealth using energy derived from sunlight or onshore wind, and 35 percent of such generating capacity procured shall be from the purchase of energy, capacity, and environmental attributes from solar or onshore wind facilities owned by persons other than the utility, with the remainder, in the aggregate, being from construction or acquisition by such Phase I Utility.

c. By December 31, 2030, each Phase I Utility shall petition the Commission for necessary approvals to construct, acquire, or enter into agreements to purchase the energy, capacity, and environmental attributes of at least 200 megawatts of additional generating capacity located in the Commonwealth using energy derived from sunlight or onshore wind, and 35 percent of such generating capacity procured shall be from the purchase of energy, capacity, and environmental attributes from solar or onshore wind facilities owned by persons other than the utility, with the remainder, in the aggregate, being from construction or acquisition by such Phase I Utility.

d. Nothing in this subdivision 1 shall prohibit such Phase I Utility from constructing, acquiring, or entering into agreements to purchase the energy, capacity, and environmental attributes of more than 600 megawatts of generating capacity located in the Commonwealth using energy derived from sunlight or onshore wind, provided the utility receives approval from the Commission pursuant to §§ 56-580 and 56-585.1.

2. By December 31, 2035, each Phase II Utility shall petition the Commission for necessary approvals to (i) construct, acquire, or enter into agreements to purchase the energy, capacity, and environmental attributes of 16,100 megawatts of generating capacity located in the Commonwealth using energy derived from sunlight or onshore wind, which shall include 1,100

2/2/2026 12:00:00 /

megawatts of solar generation of a nameplate capacity not to exceed three megawatts per individual project and 35 percent of such generating capacity procured shall be from the purchase of energy, capacity, and environmental attributes from solar facilities owned by persons other than a utility, including utility affiliates and deregulated affiliates and (ii) pursuant to § 56-585.1:11, construct or purchase one or more offshore wind generation facilities located off the Commonwealth's Atlantic shoreline or in federal waters and interconnected directly into the Commonwealth with an aggregate capacity of up to 5,200 megawatts. At least 200 megawatts of the 16,100 megawatts shall be placed on previously developed project sites.

a. By December 31, 2024, each Phase II Utility shall petition the Commission for necessary approvals to construct, acquire, or enter into agreements to purchase the energy, capacity, and environmental attributes of at least 3,000 megawatts of generating capacity located in the Commonwealth using energy derived from sunlight or onshore wind, and 35 percent of such generating capacity procured shall be from the purchase of energy, capacity, and environmental attributes from solar or onshore wind facilities owned by persons other than the utility, with the remainder, in the aggregate, being from construction or acquisition by such Phase II Utility.

b. By December 31, 2027, each Phase II Utility shall petition the Commission for necessary approvals to construct, acquire, or enter into agreements to purchase the energy, capacity, and environmental attributes of at least 3,000 megawatts of additional generating capacity located in the Commonwealth using energy derived from sunlight or onshore wind, and 35 percent of such generating capacity procured shall be from the purchase of energy, capacity, and environmental attributes from solar or onshore wind facilities owned by persons other than the utility, with the remainder, in the aggregate, being from construction or acquisition by such Phase II Utility.

c. By December 31, 2030, each Phase II Utility shall petition the Commission for necessary approvals to construct, acquire, or enter into agreements to purchase the energy, capacity, and environmental attributes of at least 4,000 megawatts of additional generating capacity located in the Commonwealth using energy derived from sunlight or onshore wind, and 35 percent of such generating capacity procured shall be from the purchase of energy, capacity, and environmental attributes from solar or onshore wind facilities owned by persons other than the utility, with the remainder, in the aggregate, being from construction or acquisition by such Phase II Utility.

d. By December 31, 2035, each Phase II Utility shall petition the Commission for necessary approvals to construct, acquire, or enter into agreements to purchase the energy, capacity, and environmental attributes of at least 6,100 megawatts of additional generating capacity located in the Commonwealth using energy derived from sunlight or onshore wind, and 35 percent of such generating capacity procured shall be from the purchase of energy, capacity, and environmental attributes from solar or onshore wind facilities owned by persons other than the utility, with the remainder, in the aggregate, being from construction or acquisition by such Phase II Utility.

e. Nothing in this subdivision 2 shall prohibit such Phase II Utility from constructing, acquiring, or entering into agreements to purchase the energy, capacity, and environmental attributes of more than 16,100 megawatts of generating capacity located in the Commonwealth using energy derived from sunlight or onshore wind, provided the utility receives approval from the Commission pursuant to §§ 56-580 and 56-585.1.

3. Nothing in this section shall prohibit a utility from petitioning the Commission to construct or acquire zero-carbon electricity or from entering into contracts to procure the energy, capacity, and environmental attributes of zero-carbon electricity generating resources in excess of the

requirements in subsection B. The Commission shall determine whether to approve such petitions on a stand-alone basis pursuant to §§ 56-580 and 56-585.1, provided that the Commission's review shall also consider whether the proposed generating capacity (i) is necessary to meet the utility's native load, (ii) is likely to lower customer fuel costs, (iii) will provide economic development opportunities in the Commonwealth, and (iv) serves a need that cannot be more affordably met with demand-side or energy storage resources.

Each Phase I and Phase II Utility shall, at least once every year, conduct a request for proposals for new solar and wind resources. Such requests shall quantify and describe the utility's need for energy, capacity, or renewable energy certificates. The requests for proposals shall be publicly announced and made available for public review on the utility's website at least 45 days prior to the closing of such request for proposals. The requests for proposals shall provide, at a minimum, the following information: (a) the size, type, and timing of resources for which the utility anticipates contracting; (b) any minimum thresholds that must be met by respondents; (c) major assumptions to be used by the utility in the bid evaluation process, including environmental emission standards; (d) detailed instructions for preparing bids so that bids can be evaluated on a consistent basis; (e) the preferred general location of additional capacity; and (f) specific information concerning the factors involved in determining the price and non-price criteria used for selecting winning bids. A utility may evaluate responses to requests for proposals based on any criteria that it deems reasonable but shall at a minimum consider the following in its selection process: (1) the status of a particular project's development; (2) the age of existing generation facilities; (3) the demonstrated financial viability of a project and the developer; (4) a developer's prior experience in the field; (5) the location and effect on the transmission grid of a generation facility; (6) benefits to the Commonwealth that are associated with particular projects, including regional economic development and the use of goods and services from Virginia businesses; and (7) the environmental impacts of particular resources, including impacts on air quality within the Commonwealth and the carbon intensity of the utility's generation portfolio.

4. In connection with the requirements of this subsection, each Phase I and Phase II Utility shall, commencing in 2020 and concluding in 2035, submit annually a plan and petition for approval for the development of new solar and onshore wind generation capacity. Such plan shall reflect, in the aggregate and over its duration, the requirements of subsection D concerning the allocation percentages for construction or purchase of such capacity. Such petition shall contain any request for approval to construct such facilities pursuant to subsection D of § 56-580 and a request for approval or update of a rate adjustment clause pursuant to subdivision A 6 of § 56-585.1 to recover the costs of such facilities. Such plan shall also include the utility's plan to meet the energy storage project targets of subsection E, including the goal of installing at least 10 percent of such energy storage projects behind the meter. In determining whether to approve the utility's plan and any associated petition requests, the Commission shall determine whether they are reasonable and prudent and shall give due consideration to (i) the RPS and carbon dioxide reduction requirements in this section; (ii) the promotion of new renewable generation and energy storage resources within the Commonwealth, and associated economic development; and (iii) fuel savings projected to be achieved by the plan. Notwithstanding any other provision of this title, the Commission's final order regarding any such petition and associated requests shall be entered by the Commission not more than six months after the date of the filing of such petition.

5. If, in any year, a Phase I or Phase II Utility is unable to meet the compliance obligation of the

RPS Program requirements or if the cost of RECs necessary to comply with RPS Program requirements exceeds $45 per megawatt hour, such supplier shall be obligated to make a deficiency payment equal to $45 for each megawatt-hour shortfall for the year of noncompliance, except that the deficiency payment for any shortfall in procuring RECs for solar, wind, or anaerobic digesters located in the Commonwealth shall be $75 per megawatts hour for resources one megawatt and lower. The amount of any deficiency payment shall increase by one percent annually after 2021. A Phase I or Phase II Utility shall be entitled to recover the costs of such payments as a cost of compliance with the requirements of this subsection pursuant to subdivision A 5 d of § 56-585.1. All proceeds from the deficiency payments shall be deposited into an interest-bearing account administered by the Department of Energy. In administering this account, the Department of Energy shall manage the account as follows: (i) 50 percent of total revenue shall be directed to job training programs in historically economically disadvantaged communities; (ii) 16 percent of total revenue shall be directed to energy efficiency measures for public facilities; (iii) 30 percent of total revenue shall be directed to renewable energy programs located in historically economically disadvantaged communities; and (iv) four percent of total revenue shall be directed to administrative costs.

For any project constructed pursuant to this subsection or subsection E, a utility shall, subject to a competitive procurement process, procure equipment from a Virginia-based or United States-based manufacturer using materials or product components made in Virginia or the United States, if reasonably available and competitively priced.

E. To enhance reliability and performance of the utility's generation and distribution system, each Phase I and Phase II Utility shall petition the Commission for necessary approvals to construct or acquire new, utility-owned energy storage resources.

1. By December 31, 2035, each Phase I Utility shall petition the Commission for necessary approvals to construct or acquire 400 megawatts of energy storage capacity. Nothing in this subdivision shall prohibit a Phase I Utility from constructing or acquiring more than 400 megawatts of energy storage, provided that the utility receives approval from the Commission pursuant to §§ 56-580 and 56-585.1.

2. By December 31, 2035, each Phase II Utility shall petition the Commission for necessary approvals to construct or acquire 2,700 megawatts of energy storage capacity. Nothing in this subdivision shall prohibit a Phase II Utility from constructing or acquiring more than 2,700 megawatts of energy storage, provided that the utility receives approval from the Commission pursuant to §§ 56-580 and 56-585.1.

3. No single energy storage project shall exceed 500 megawatts in size, except that a Phase II Utility may procure a single energy storage project up to 800 megawatts.

4. All energy storage projects procured pursuant to this subsection shall meet the competitive procurement protocols established in subdivision D 3.

5. After July 1, 2020, at least 35 percent of the energy storage facilities placed into service shall be (i) purchased by the public utility from a party other than the public utility or (ii) owned by a party other than a public utility, with the capacity from such facilities sold to the public utility. By January 1, 2021, the Commission shall adopt regulations to achieve the deployment of energy storage for the Commonwealth required in subdivisions 1 and 2, including regulations that set interim targets and update existing utility planning and procurement rules. The regulations shall

include programs and mechanisms to deploy energy storage, including competitive solicitations, behind-the-meter incentives, non-wires alternatives programs, and peak demand reduction programs.

F. All costs incurred by a Phase I or Phase II Utility related to compliance with the requirements of this section or pursuant to § 56-585.1:11, including (i) costs of generation facilities powered by sunlight or onshore or offshore wind, or energy storage facilities, that are constructed or acquired by a Phase I or Phase II Utility after July 1, 2020, (ii) costs of capacity, energy, or environmental attributes from generation facilities powered by sunlight or onshore or offshore wind, or falling water, or energy storage facilities purchased by the utility from persons other than the utility through agreements after July 1, 2020, and (iii) all other costs of compliance, including costs associated with the purchase of RECs associated with RPS Program requirements pursuant to this section shall be recovered from all retail customers in the service territory of a Phase I or Phase II Utility as a non-bypassable charge, irrespective of the generation supplier of such customer, except (a) as provided in subsection G for an accelerated renewable energy buyer or (b) as provided in subdivision C 3 of § 56-585.1:11, with respect to the costs of an offshore wind generation facility, for a PIPP eligible utility customer or an advanced clean energy buyer or qualifying large general service customer, as those terms are defined in § 56-585.1:11. If a Phase I or Phase II Utility serves customers in more than one jurisdiction, such utility shall recover all of the costs of compliance with the RPS Program requirements from its Virginia customers through the applicable cost recovery mechanism, and all associated energy, capacity, and environmental attributes shall be assigned to Virginia to the extent that such costs are requested but not recovered from any system customers outside the Commonwealth.

By September 1, 2020, the Commission shall direct the initiation of a proceeding for each Phase I and Phase II Utility to review and determine the amount of such costs, net of benefits, that should be allocated to retail customers within the utility's service territory which have elected to receive electric supply service from a supplier of electric energy other than the utility, and shall direct that tariff provisions be implemented to recover those costs from such customers beginning no later than January 1, 2021. Thereafter, such charges and tariff provisions shall be updated and trued up by the utility on an annual basis, subject to continuing review and approval by the Commission.

G. 1. An accelerated renewable energy buyer may contract with a Phase I or Phase II Utility, or a person other than a Phase I or Phase II Utility, to obtain (i) RECs from RPS eligible resources or (ii) bundled capacity, energy, and RECs from solar or, wind, or zero-carbon electricity generation resources located within the PJM region and initially placed in commercial operation after January 1, 2015, including any contract with a utility for such generation resources that does not allocate the cost of such resources to or recover the cost of such resources from any other customers of the utility that have not voluntarily agreed to pay such cost. Such an accelerated renewable energy buyer may offset all or a portion of its electric load for purposes of RPS compliance through such arrangements. An accelerated renewable energy buyer shall be exempt from the assignment of non-bypassable RPS compliance costs pursuant to subsection F, with the exception of the costs of an offshore wind generating facility pursuant to § 56-585.1:11, based on the amount of RECs obtained pursuant to this subsection in proportion to the customer's total electric energy consumption, on an annual basis. An accelerated renewable energy buyer may also contract with a Phase I or Phase II Utility, or a person other than a Phase I or Phase II Utility, to obtain capacity from energy storage facilities located within the network service area of the utility pursuant to this subsection, provided that the costs of such resources are not recovered

from any of the utility's customers who have not voluntarily agreed to pay for such costs. Such accelerated renewable energy buyer shall be exempt from the assignment of non-bypassable RPS Program compliance costs specifically associated with energy storage facilities pursuant to this subsection in proportion to the customer's total capacity demand on an annual basis. An accelerated renewable energy buyer obtaining RECs only shall not be exempt from costs related to procurement of new solar or onshore wind generation capacity, energy, or environmental attributes, or energy storage facilities, by the utility pursuant to subsections D and E, however, an accelerated renewable energy buyer that is a customer of a Phase II Utility and was subscribed, as of March 1, 2020, to a voluntary companion experimental tariff offering of the utility for the purchase of renewable attributes from renewable energy facilities that requires a renewable facilities agreement and the purchase of a minimum of 2,000 renewable attributes annually, shall be exempt from allocation of the net costs related to procurement of new solar or onshore wind generation capacity, energy, or environmental attributes, or energy storage facilities, by the utility pursuant to subsections D and E, based on the amount of RECs associated with the customer's renewable facilities agreements associated with such tariff offering as of that date in proportion to the customer's total electric energy consumption, on an annual basis. To the extent that an accelerated renewable energy buyer contracts for the capacity of new solar or wind generation resources or energy storage facilities pursuant to this subsection, the aggregate amount of such nameplate capacity shall be offset from the utility's procurement requirements pursuant to subsection D. All RECs associated with contracts entered into by an accelerated renewable energy buyer with the utility, or a person other than the utility, for an RPS Program shall not be credited to the utility's compliance with its RPS requirements, and the calculation of the utility's RPS Program requirements shall not include the electric load covered by customers certified as accelerated renewable energy buyers.

2. Each Phase I or Phase II Utility shall certify, and verify as necessary, to the Commission that the accelerated renewable energy buyer has satisfied the exemption requirements of this subsection for each year, or an accelerated renewable energy buyer may choose to certify satisfaction of this exemption by reporting to the Commission individually. The Commission may promulgate such rules and regulations as may be necessary to implement the provisions of this subsection.

3. Provided that no incremental costs associated with any contract between a Phase I or Phase II Utility and an accelerated renewable energy buyer is allocated to or recovered from any other customer of the utility, any such contract with an accelerated renewable energy buyer that is a jurisdictional customer of the utility shall not be deemed a special rate or contract requiring Commission approval pursuant to § 56-235.2.

4. The State Corporation Commission shall ensure that any distribution and transmission costs associated with new energy generation resources procured pursuant to subsection G of § 56-585.5 of the Code of Virginia, as amended by this act, are justly and reasonably allocated.

H. No customer of a Phase II Utility with a peak demand in excess of 100 megawatts in 2019 that elected pursuant to subdivision A 3 of § 56-577 to purchase electric energy from a competitive service provider prior to April 1, 2019, shall be allocated any non-bypassable charges pursuant to subsection F for such period that the customer is not purchasing electric energy from the utility, and such customer's electric load shall not be included in the utility's RPS Program requirements. No customer of a Phase I Utility that elected pursuant to subdivision A 3 of § 56-577 to purchase electric energy from a competitive service provider prior to February 1, 2019, shall be allocated

any non-bypassable charges pursuant to subsection F for such period that the customer is not purchasing electric energy from the utility, and such customer's electric load shall not be included in the utility's RPS Program requirements.

I. In any petition by a Phase I or Phase II Utility for a certificate of public convenience and necessity to construct and operate an electrical generating facility that generates electric energy derived from sunlight submitted pursuant to § 56-580, such utility shall demonstrate that the proposed facility was subject to competitive procurement or solicitation as set forth in subdivision D 3.

J. Notwithstanding any contrary provision of law, for the purposes of this section, any falling water generation facility located in the Commonwealth and commencing commercial operations prior to July 1, 2024, shall be considered a renewable energy portfolio standard (RPS) eligible source.

K. Nothing in this section shall apply to any entity organized under Chapter 9.1 (§ 56-231.15 et seq.).

L. The Commission shall adopt such rules and regulations as may be necessary to implement the provisions of this section, including a requirement that participants verify whether the RPS Program requirements are met in accordance with this section.

2020, cc. 1193, 1194;2021, Sp. Sess. I, cc. 140, 328, 532;2023, cc. 732, 803, 804;2024, cc. 596, 597; 2025, cc. 707, 708, 713, 714.

The chapters of the acts of assembly referenced in the historical citation at the end of this section(s) may not constitute a comprehensive list of such chapters and may exclude chapters whose provisions have expired.

# Va. Code Ann. § 58.1–609.3 (2023)

**(reproduced from law.lis.virginia.gov)**

Code of Virginia
Title 58.1. Taxation
Subtitle I. Taxes Administered by the Department of Taxation
Chapter 6. Retail Sales and Use Tax

# § 58.1-609.3. Commercial and industrial exemptions

The tax imposed by this chapter or pursuant to the authority granted in §§ 58.1-605 and 58.1-606 shall not apply to the following:

1. Personal property purchased by a contractor which is used solely in another state or in a foreign country, which could be purchased by such contractor for such use free from sales tax in such other state or foreign country, and which is stored temporarily in Virginia pending shipment to such state or country.

2. (i) Industrial materials for future processing, manufacturing, refining, or conversion into articles of tangible personal property for resale where such industrial materials either enter into the production of or become a component part of the finished product; (ii) industrial materials that are coated upon or impregnated into the product at any stage of its being processed, manufactured, refined, or converted for resale; (iii) machinery or tools or repair parts therefor or replacements thereof, fuel, power, energy, or supplies, used directly in processing, manufacturing, refining, mining or converting products for sale or resale; (iv) materials, containers, labels, sacks, cans, boxes, drums or bags for future use for packaging tangible personal property for shipment or sale; or (v) equipment, printing or supplies used directly to produce a publication described in subdivision 3 of § 58.1-609.6 whether it is ultimately sold at retail or for resale or distribution at no cost. Machinery, tools and equipment, or repair parts therefor or replacements thereof, shall be exempt if the preponderance of their use is directly in processing, manufacturing, refining, mining or converting products for sale or resale. The provisions of this subsection do not apply to the drilling or extraction of oil, gas, natural gas and coalbed methane gas. In addition, the exemption provided herein shall not be applicable to any machinery, tools, and equipment, or any other tangible personal property used by a public service corporation in the generation of electric power, except for raw materials that are inputs to production of electricity, including fuel, or for machinery, tools, and equipment used to generate energy derived from sunlight or wind. The exemption for machinery, tools, and equipment used to generate energy derived from sunlight or wind shall expire June 30, 2027.

3. Tangible personal property sold or leased to a public service corporation engaged in business as a common carrier of property or passengers by railway, for use or consumption by such common carrier directly in the rendition of its public service.

4. Ships or vessels, or repairs and alterations thereof, used or to be used exclusively or principally in interstate or foreign commerce; fuel and supplies for use or consumption aboard ships or vessels plying the high seas, either in intercoastal trade between ports in the Commonwealth and ports in other states of the United States or its territories or possessions, or in foreign commerce between ports in the Commonwealth and ports in foreign countries, when delivered directly to such ships or vessels; or tangible personal property used directly in the building, conversion or repair of the ships or vessels covered by this subdivision. This exemption shall include dredges, their supporting equipment, attendant vessels, and fuel and supplies for use or consumption aboard such vessels, provided the dredges are used exclusively or principally in interstate or

foreign commerce.

5. Tangible personal property purchased for use or consumption directly and exclusively in basic research or research and development in the experimental or laboratory sense.

6. Notwithstanding the provisions of subdivision 20 of § 58.1-609.10, all tangible personal property sold or leased to an airline operating in intrastate, interstate or foreign commerce as a common carrier providing scheduled air service on a continuing basis to one or more Virginia airports at least one day per week, for use or consumption by such airline directly in the rendition of its common carrier service.

7. Meals furnished by restaurants or food service operators to employees as a part of wages.

8. Tangible personal property including machinery and tools, repair parts or replacements thereof, and supplies and materials used directly in maintaining and preparing textile products for rental or leasing by an industrial processor engaged in the commercial leasing or renting of laundered textile products.

9. Certified pollution control equipment and facilities as defined in § 58.1-3660, except for any equipment that has not been certified to the Department of Taxation by a state certifying authority or subdivision certifying authority pursuant to such section.

10. Parts, tires, meters and dispatch radios sold or leased to taxicab operators for use or consumption directly in the rendition of their services.

11. High speed electrostatic duplicators or any other duplicators which have a printing capacity of 4,000 impressions or more per hour purchased or leased by persons engaged primarily in the printing or photocopying of products for sale or resale.

12. From July 1, 1994, and ending July 1, 2024, raw materials, fuel, power, energy, supplies, machinery or tools or repair parts therefor or replacements thereof, used directly in the drilling, extraction, or processing of natural gas or oil and the reclamation of the well area. For the purposes of this section, the term "natural gas" shall mean "gas," "natural gas," and "coalbed methane gas" as defined in § 45.2-1600. For the purposes of this section, "drilling," "extraction," and "processing" shall include production, inspection, testing, dewatering, dehydration, or distillation of raw natural gas into a usable condition consistent with commercial practices, and the gathering and transportation of raw natural gas to a facility wherein the gas is converted into such a usable condition. Machinery, tools and equipment, or repair parts therefor or replacements thereof, shall be exempt if the preponderance of their use is directly in the drilling, extraction, refining, or processing of natural gas or oil for sale or resale, or in well area reclamation activities required by state or federal law.

13. Beginning July 1, 1997, (i) the sale, lease, use, storage, consumption, or distribution of an orbital or suborbital space facility, space propulsion system, space vehicle, satellite, or space station of any kind possessing space flight capability, including the components thereof, irrespective of whether such facility, system, vehicle, satellite, or station is returned to this Commonwealth for subsequent use, storage or consumption in any manner when used to conduct spaceport activities; (ii) the sale, lease, use, storage, consumption or distribution of tangible personal property placed on or used aboard any orbital or suborbital space facility, space propulsion system, space vehicle, satellite or space station of any kind, irrespective of whether such tangible personal property is returned to this Commonwealth for subsequent use, storage or

consumption in any manner when used to conduct spaceport activities; (iii) fuels of such quality not adapted for use in ordinary vehicles, being produced for, sold and exclusively used for space flight when used to conduct spaceport activities; (iv) the sale, lease, use, storage, consumption or distribution of machinery and equipment purchased, sold, leased, rented or used exclusively for spaceport activities and the sale of goods and services provided to operate and maintain launch facilities, launch equipment, payload processing facilities and payload processing equipment used to conduct spaceport activities.

For purposes of this subdivision, "spaceport activities" means activities directed or sponsored at a facility owned, leased, or operated by or on behalf of the Virginia Commercial Space Flight Authority.

The exemptions provided by this subdivision shall not be denied by reason of a failure, postponement or cancellation of a launch of any orbital or suborbital space facility, space propulsion system, space vehicle, satellite or space station of any kind or the destruction of any launch vehicle or any components thereof.

14. Semiconductor cleanrooms or equipment, fuel, power, energy, supplies, or other tangible personal property used primarily in the integrated process of designing, developing, manufacturing, or testing a semiconductor product, a semiconductor manufacturing process or subprocess, or semiconductor equipment without regard to whether the property is actually contained in or used in a cleanroom environment, touches the product, is used before or after production, or is affixed to or incorporated into real estate.

15. Semiconductor wafers for use or consumption by a semiconductor manufacturer.

16. Railroad rolling stock when sold or leased by the manufacturer thereof.

17. Computer equipment purchased or leased on or before June 30, 2011, used in data centers located in a Virginia locality having an unemployment rate above 4.9 percent for the calendar quarter ending November 2007, for the processing, storage, retrieval, or communication of data, including but not limited to servers, routers, connections, and other enabling hardware when part of a new investment of at least $75 million in such exempt property, when such investment results in the creation of at least 100 new jobs paying at least twice the prevailing average wage in that locality, so long as such investment was made in accordance with a memorandum of understanding with the Virginia Economic Development Partnership Authority entered into or amended between January 1, 2008, and December 31, 2008. The exemption shall also apply to any such computer equipment purchased or leased to upgrade, add to, or replace computer equipment purchased or leased in the initial investment. The exemption shall not apply to any computer software sold separately from the computer equipment, nor shall it apply to general building improvements or fixtures.

18. a. Beginning July 1, 2010, and ending June 30, 2035, except as provided in subdivision 19, computer equipment or enabling software purchased or leased for the processing, storage, retrieval, or communication of data, including but not limited to servers, routers, connections, and other enabling hardware, including chillers and backup generators used or to be used in the operation of the equipment exempted in this paragraph, provided that such computer equipment or enabling software is purchased or leased for use in a data center, which includes any data center facilities located in the same locality as the data center that are under common ownership or affiliation of the data center operator, that (i) is located in a Virginia locality; (ii) results in a

new capital investment on or after January 1, 2009, of at least $150 million; and (iii) results in the creation on or after July 1, 2009, of at least 50 new jobs by the data center operator and the tenants of the data center, collectively, associated with the operation or maintenance of the data center provided that such jobs pay at least one and one-half times the prevailing average wage in that locality. The requirement of at least 50 new jobs is reduced to 10 new jobs if the data center is located in a distressed locality at the time of the execution of a memorandum of understanding with the Virginia Economic Development Partnership Authority. Additionally, the requirement of a $150 million capital investment shall be reduced to $70 million for data centers that qualify for the reduced jobs requirement.

This exemption applies to the data center operator and the tenants of the data center if they collectively meet the requirements listed in this section. Prior to claiming such exemption, any qualifying person claiming the exemption, including a data center operator on behalf of itself and its tenants, must enter into a memorandum of understanding with the Virginia Economic Development Partnership Authority that at a minimum provides the details for determining the amount of capital investment made and the number of new jobs created, the timeline for achieving the capital investment and new job goals, the repayment obligations should those goals not be achieved, and any conditions under which repayment by the qualifying data center or data center tenant claiming the exemption may be required. In addition, the exemption shall apply to any such computer equipment or enabling software purchased or leased to upgrade, supplement, or replace computer equipment or enabling software purchased or leased in the initial investment. The exemption shall not apply to any other computer software otherwise taxable under Chapter 6 of Title 58.1 that is sold or leased separately from the computer equipment, nor shall it apply to general building improvements or other fixtures.

b. For purposes of this subdivision 18, "distressed locality" means:

(1) From July 1, 2021, until July 1, 2023, any locality that had (i) an annual unemployment rate for calendar year 2019 that was greater than the final statewide average unemployment rate for that calendar year and (ii) a poverty rate for calendar year 2019 that exceeded the statewide average poverty rate for that year; and

(2) From and after July 1, 2023, any locality that has (i) an annual unemployment rate for the most recent calendar year for which such data is available that is greater than the final statewide average unemployment rate for that calendar year and (ii) a poverty rate for the most recent calendar year for which such data is available that exceeds the statewide average poverty rate for that year.

c. For so long as a data center operator is claiming an exemption pursuant to this subdivision 18, such operator shall be required to submit an annual report to the Virginia Economic Development Partnership Authority on behalf of itself and, if applicable, its participating tenants that includes their employment levels, capital investments, average annual wages, qualifying expenses, and tax benefit, and such other information as the Virginia Economic Development Partnership Authority determines is relevant, pursuant to procedures developed by the Virginia Economic Development Partnership Authority. The annual report shall be submitted by the data center operator in a format prescribed by the Virginia Economic Development Partnership Authority. The Virginia Economic Development Partnership Authority shall share all information collected with the Department.

The Department, in collaboration with the Virginia Economic Development Partnership

2/2/2026 12:00:00

Authority, shall publish a biennial report on the exemption that shall include aggregate information on qualifying expenses claimed under this exemption, the total value of the tax benefit, a return on investment analysis that includes direct and indirect jobs created by data center investment, state and local tax revenues generated, and any other information the Department and the Virginia Economic Development Partnership Authority deem appropriate to demonstrate the costs and benefits of the exemption. The report shall not include, and the Department and the Virginia Economic Development Partnership Authority shall not publish or disclose, any such information if it is unaggregated or if such report or publication could be used to identify a business or individual. The Department shall submit the report to the Chairmen of the Senate Committee on Finance and Appropriations and the House Committees on Appropriations and Finance. The Virginia Economic Development Partnership Authority may publish on its website and distribute annual information indicating the job creation and ranges of capital investments made by a data center operator and, if applicable, its participating tenants, in a format to be developed in consultation with data center operators.

19. a. Notwithstanding any provision of subdivision 18 to the contrary, the exemption set forth in subdivision 18 may be extended for the purchase or lease of computer equipment or enabling software by or on behalf of data center operators for use in data centers in the Commonwealth that are under common ownership or affiliation with the data center operator as set forth in this subdivision 19. For purposes of this subdivision 19, a data center operator shall be considered to own a data center if it is operated on behalf of the data center operator pursuant to a long-term lease of at least ten years.

b. To qualify for an extension pursuant to this subdivision 19, a data center operator shall enter into a memorandum of understanding with the Virginia Economic Development Partnership Authority on or after January 1, 2023, that at a minimum provides the details for determining the amount of capital investment made and the number of new jobs created; the locality or localities in which the capital investment shall be made and new jobs shall be created in order to qualify for the extension; and the timeline for making the capital investment and creating the new jobs in each specified locality. A data center operator shall only be required to enter into one memorandum of understanding pursuant to this subdivision 19 in order to qualify for the extension pursuant to both subdivisions c and d.

c. If on or after January 1, 2023, but before July 1, 2035, a data center operator that has entered into a memorandum of understanding pursuant to subdivision b (i) makes or causes to be made a capital investment of at least $35 billion in data centers in localities identified in a memorandum of understanding and (ii) creates at least 1,000 new full-time jobs, as defined in § 59.1-284.42, at such data centers, of which at least 100 of such jobs shall pay at least one and one-half times the prevailing average wage in the Commonwealth, the data center operator shall be eligible to continue to utilize the exemption set forth in subdivision 18 through June 30, 2040.

d. If on or after January 1, 2023, but before July 1, 2040, a data center operator that has entered into a memorandum of understanding pursuant to subdivision b (i) makes a total capital investment of at least $100 billion, inclusive of any investment made pursuant to subdivision c, in data centers in the localities identified in such memorandum of understanding and (ii) creates a total of at least 2,500 new full-time jobs, as defined in § 59.1-284.42, at such data centers, of which at least 100 of such jobs shall pay at least one and one-half times the prevailing average wage in the Commonwealth, inclusive of any new full-time jobs created pursuant to subdivision c, the data center operator shall be eligible to utilize the exemption set forth in subdivision 18

through June 30, 2050.

e. The extension provided in this subdivision 19 shall apply to the computer equipment or enabling software purchased or leased for use in the data centers subject to the capital investment and job requirements set forth herein, as well as to any such computer equipment or enabling software purchased or leased to upgrade, supplement, or replace computer equipment or enabling software purchased or leased in the initial investment. The extension shall also apply to any computer equipment or software purchased or leased in data centers under common ownership or affiliation with the data center operator for which the data center operator entered into a memorandum of understanding with the Virginia Economic Development Partnership Authority to qualify for the exemption set forth in subdivision 18.

f. The reporting requirements set forth in subdivision 18 shall continue to apply to a data center operator for the duration of any extension granted pursuant to this subdivision 19.

20. If the preponderance of their use is in the manufacture of beer by a brewer licensed pursuant to subdivision 3 or 4 of § 4.1-206.1, (i) machinery, tools, and equipment, or repair parts therefor or replacements thereof, fuel, power, energy, or supplies; (ii) materials for future processing, manufacturing, or conversion into beer where such materials either enter into the production of or become a component part of the beer; and (iii) materials, including containers, labels, sacks, cans, bottles, kegs, boxes, drums, or bags for future use, for packaging the beer for shipment or sale.

21. If the preponderance of their use is in advanced recycling, as defined in § 58.1-439.7, (i) machinery, tools, and equipment, or repair parts therefor or replacements thereof, fuel, power, energy, or supplies; (ii) materials for processing, manufacturing, or conversion for resale where such materials either are recycled or recovered; and (iii) materials, including containers, labels, sacks, cans, boxes, drums, or bags used for packaging recycled or recovered material for shipment or resale.

1993, c. 310; 1994, cc. 365, 381;1995, cc. 101, 204, 719;1996, c. 816;1997, c. 834;2001, cc. 429, 468, 769;2003, c. 859;2004, Sp. Sess. I, c. 3;2006, cc. 385, 519, 524, 541, 618;2007, c. 751;2008, cc. 558, 764;2010, cc. 784, 826;2011, cc. 183, 286;2012, cc. 613, 655;2013, c. 10;2016, cc. 343, 346, 673, 709, 712;2017, c. 714;2020, cc. 789, 1113, 1114;2021, Sp. Sess. I, cc. 367, 368;2022, cc. 14, 501; 2023, cc. 144, 671, 678.

The chapters of the acts of assembly referenced in the historical citation at the end of this section(s) may not constitute a comprehensive list of such chapters and may exclude chapters whose provisions have expired.

2/2/2026 12:00:00 A

# W. Va. Code § 24–2–1d (2025)

**(reproduced from code.wvlegislature.gov)**

# WEST VIRGINIA CODE: §24-2-1D

**§24-2-1d. Future electric generating capacity requirements.**

(a) In order to maximize the use of electricity generated within the state by using coal or natural gas produced within the state, the Public Service Commission shall by order, no later than December 31, 1989, establish the schedule and amount of future electric generating capacity additions required by each West Virginia electric utility, for the next ten years, taking into account: (i) Projected load growth; (ii) existing generating capacity; (iii) existing contractual commitments to sell or purchase capacity; (iv) planned retirement and life extensions of existing capacity; (v) planned construction of capacity; (vi) availability of capacity from generating units of affiliated companies; (vii) capacity factors for existing generation; and (viii) such other reasonable factors as the commission may deem relevant and appropriate to consider. For purposes of this section, "capacity factor" shall mean the ratio of the actual energy produced by a power plant over a specific period to the maximum possible energy it could have produced if running at full capacity during that same period.

(b) If the commission determines after considering all such named and other relevant and appropriate factors that a utility will be required to purchase electric generating capacity beyond those agreements approved by the Federal Energy Regulatory Commission or the West Virginia Public Service Commission in order to serve its West Virginia customers, the amount of such required additional purchased capacity so identified by the commission will for purposes of this section be referred to as the utility's "projected deficient capacity": *Provided*, That this subsection shall not include power generating facilities whose total production of electricity is sold outside the State of West Virginia.

(c) In the interests of: Keeping utility rates of residential customers as low as possible; keeping utility rates for commercial and industrial customers competitive with those of other states; attracting new industry for which electric power costs are a major factor in location determinations; and of not placing any greater cost burden on government than is absolutely necessary for its electric power needs, each utility shall acquire, if reasonable, its projected deficient capacity from electric generation situated in West Virginia which burns coal or gas produced in West Virginia and which will provide the most reliable supply of capacity and energy at the least cost to those customers of the utility who will be served by such electric generation: *Provided*, That all power purchase contracts executed prior to the effective date of this section which satisfy the following requirements, regardless of location, shall be considered, for the purposes of this subsection, as electric generation situated in West Virginia: (1) Said contracts were negotiated in accordance with procedures and priced according to methodologies of other contracts which the commission has ordered approved; (2) said contracts either guarantee or are substantially amended to guarantee for the life of the contract the use of an amount of West Virginia fuel which equals or exceeds the amount which would be required, on a percentage of output basis, to produce the amount of electric power to be consumed in West Virginia; and (3) said contracts meet the requirements for a

qualifying facility established by the Federal Energy Regulatory Commission pursuant to the Public Utility Regulatory Policies Act of 1978.

(d) The commission shall evaluate each capacity auction conducted by PJM Interconnection, LLC, or its successor and, to the maximum extent permitted by law, encourage the coordination of the voluntary participation of every electric generating unit in the state in each capacity auction for the benefit of ratepayers in the state.

(e) In order to ensure the state's existing generating units can continue to meet future generation needs, the commission shall conduct a review of each generating unit's current consumer economic dispatch. Factors to be considered by the commission in reviewing consumer economic dispatch shall include, but not be limited to: (1) current capacity factors; (2) management of fuel supplies and contracts; (3) overall plant operation and maintenance; (4) placement of bids in the PJM Interconnection, LLC, or its successor's day-ahead and real-time energy markets; (5) utilization of the PJM Interconnection, LLC, or its successor's Reliability Pricing Model (RPM) or Fixed Resource Requirement (FRR); and (6) the utilization of automatic adjustment clauses, price indexes, or fuel adjustment clauses by the utilities. For purposes of this section, "consumer economic dispatch" shall mean the process of operating generation facilities to produce electricity at the lowest cost while reliably meeting consumer demand, considering the operational limits of generation and transmission facilities.

(f) Electric utilities shall be prepared to maximize the production of electricity from their generating units when such self-generation will result in reduced energy costs for West Virginia ratepayers. The commission shall require the utilities to maintain their thermal baseload generating units in a manner to allow them to be able to self-generate and achieve at least a sixty-nine percent capacity factor. Nothing herein shall require a utility to operate a generating unit at a sixty-nine percent capacity if doing so will cause an increase in the charge or charges for electric energy over and above the established and published tariff, rate, joint rate, charge, toll or schedule. The commission shall propose rules for legislative approval in accordance with the provisions of §29A-3-1 *et seq.* of this code to carry out its duties and obligations as set forth herein.