# CASE NO. 24-1650(L)

## IN THE
## UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

APPALACHIAN VOICES, *et al.*,
*Petitioners*

v.

FEDERAL ENERGY REGULATORY COMMISSION,
*Respondent*

ON APPEAL FROM THE
FEDERAL ENERGY REGULATORY COMMISSION

## FINAL REPLY BRIEF OF PUBLIC INTEREST ORGANIZATIONS AND INVENERGY PETITIONERS

<u>*/s/ Danielle Fidler*</u>
Danielle Fidler
Veronica Saltzman
Clean Air Task Force
114 State Street, 6th Floor
Boston, MA 02109
Phone: 617-624-0234
Email: dfidler@catf.us

Alexander Tom
Ada Statler
Earthjustice
180 Steuart Street, #194330
San Francisco, CA 94105
Phone: 415-217-2111
Email: atom@earthjustice.org

*Counsel for Natural Resources Defense Council (additional counsel listed on the following pages)*

Caroline Reiser
Natural Resources Defense Council
1152 15th Street NW, Suite 300
Washington, DC 20005
Phone: 202-717-8341
Email: creiser@nrdc.org

Linnet Davis-Stermitz
Earthjustice
810 Third Avenue, Suite 610
Seattle, WA 98104
Phone: 206-343-7340
Email:
ldavisstermitz@earthjustice.org

*Counsel for Natural Resources Defense Council*

William S. Scherman
Jeremy C. Marwell
Jeffrey M. Jakubiak
Vinson & Elkins LLP
2200 Pennsylvania  Avenue, NW
Suite 500 West
Washington, DC 20037
Phone: 202-639-6507
Email: jmarwell@velaw.com

Garrett T. Meisman
845 Texas Avenue
Suite 4700
Houston, Texas 77002
Phone: 713-758-2559
Email: gmeisman@velaw.com

*Counsel for Invenergy Solar Development North America LLC, Invenergy Thermal Development LLC, Invenergy Wind Development North America LLC, and Invenergy Transmission LLC*

Nicholas J. Guidi
Southern Environmental Law Center
122 C Street NW, Suite 325
Washington, DC 20001
Phone: 202-573-8136
Email: nguidi@selc.org

*Counsel for Appalachian Voices, Energy Alabama, North Carolina Sustainable Energy Association, Southern Alliance for Clean Energy, and South Carolina Coastal Conservation League*

Justin Vickers
Sierra Club
1229 W Glenlake Avenue
Chicago, IL 60660
Phone: 224-420-0614
Email: justin.vickers@sierraclub.org

*Counsel for Sierra Club*

Ted Kelly
Adam Kurland
Environmental Defense Fund
555 12th Street NW, Suite 400
Washington, DC 20004
Phone: 202-572-3317
Email: tekelly@edf.org

*Counsel for Environmental Defense Fund*

Dated: March 13, 2026

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................1

ARGUMENT ......................................................................................................3

  I.   PIO Petitioners Have Standing. ...............................................................3

     A.  PIOs' injuries are not speculative. .............................................5

     B.  FERC's arguments do not defeat PIOs' standing. ....................9

  II.  FERC's Overarching Defenses Fall Short........................................13

     A.  FERC does not have discretion to ignore identified problems. .................14

     B.  FERC cannot kick the can down the road.................................17

     C.  Transmission providers will not voluntarily fix these problems. ..............18

III.   FERC Unreasonably Left Open Paths for Harm to Ratepayers and Competitors. ...................................................................................19

     A.  FERC fails to meaningfully engage with Petitioners regarding the problematic interaction between Orders 1000 and 1920. ................................20

     B.  FERC cannot justify allowing planners to exclude merchant high-voltage, direct current ("HVDC") facilities when developing scenarios. ......................25

     C.  FERC failed to explain why it acted contrary to its own evidence on required benefits.........................................................................28

CONCLUSION ...............................................................................................30

i

# TABLE OF AUTHORITIES

**Cases**

*520 Mich. Ave. Assocs. v. Devine*,
433 F.3d 961 (7th Cir. 2006) ..................................................................9

*Babbitt v. United Farm Workers Nat'l Union*,
442 U.S. 289 (1979) .......................................................................... 5, 11

*City & Cnty. of San Francisco v. FERC*,
24 F.4th 652 (D.C. Cir. 2022) ...............................................................23

*Coal. of MISO Transmission Customers v. FERC*,
45 F.4th 1004 (D.C. Cir. 2022) .............................................................11

*Competitive Enter. Inst. v. Nat'l Highway Traffic Safety Admin.*,
901 F.2d 107 (D.C. Cir. 1990)..................................................................3

*Curtis v. Propel Prop. Tax Funding, LLC*,
915 F.3d 234 (4th Cir. 2019) ........................................................... 5, 11

*Dep't of Com. v. New York*,
588 U.S. 752 (2019) ..............................................................................5, 9

*Diamond Alternative Energy, LLC v. EPA*,
606 U.S. 100 (2025) ....................................................................... 3, 7, 12

*Edison Mission Energy, Inc. v. FERC*,
394 F.3d 964 (D.C. Cir. 2005)...............................................................18

*Elec. Consumers Res. Council v. FERC*,
747 F.2d 1511 (D.C. Cir. 1984)....................................................... 14, 17

*Emera Me. v. FERC*,
854 F.3d 9 (D.C. Cir. 2017)............................................................. 14, 15

*Flo. State Conference of the NAACP v. Browning*,
522 F.3d 1153 (11th Cir. 2008) ...............................................................9

*In re Navy Chaplaincy*,
697 F.3d 1171 (D.C. Cir. 2012)...............................................................5

*Island Creek Coal Co. v. Henline*,
456 F.3d 421 (4th Cir. 2006)......................................................................29

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) ............................................................................ 9, 10

*Mobil Oil Expl. & Producing Se. Inc. v. United Distrib. Cos.*,
498 U.S. 211 (1991) ........................................................................... 17, 18

*NEPCO Mun. Rate Comm. v. FERC*,
668 F.2d 1327 (D.C. Cir. 1981)....................................................................8

*Newdow v. Roberts*,
603 F.3d 1002 (D.C. Cir. 2010)............................................................ 9, 10

*Okla. Dep't of Env't Quality v. EPA*,
740 F.3d 185 (D.C. Cir. 2014)....................................................................12

*Orangeburg, S.C. v. FERC*,
862 F.3d 1071 (D.C. Cir. 2017)....................................................................9

*Outdoor Amusement Bus. Ass'n, Inc. v. Dep't of Homeland Sec.*,
983 F.3d 671 (4th Cir. 2020).....................................................................5, 7

*Pub. Serv. Elec. & Gas Co. v. FERC*,
989 F.3d 10 (D.C. Cir. 2021)......................................................................11

*Pub. Util. Dist. No. 1 of Snohomish Cnty., Washington v. FERC*,
272 F.3d 607 (D.C. Cir. 2001)......................................................................8

*S.C. Pub. Serv. Auth. v. FERC*,
762 F.3d 41 (D.C. Cir. 2014)........................................................................8

*SEC v. Chenery Corp.*,
318 U.S. 80 (1943) .....................................................................................29

*Sierra Club v. EPA*,
60 F.4th 1008 (6th Cir. 2023)....................................................................12

*Susan B. Anthony List v. Driehaus*,
573 U.S. 149 (2014) .....................................................................................5

iii

*Texas Corn Producers v. EPA*,
141 F.4th 687 (5th Cir. 2025)..............................................................................7

*TransCanada Power Mktg, Ltd. v. FERC*,
811 F.3d 1 (D.C. Cir. 2015)........................................................... 15, 16

*Vill. of Bensenville v. F.A.A.*,
376 F.3d 1114 (D.C. Cir. 2004)................................................................10

**Statutes**

16 U.S.C. § 824e. ................................................................................14

**FERC Orders**

*Notice of Proposed Rulemaking, Building for the Future Through Electric
Regional Transmission Planning and Cost Allocation and Generator
Interconnection*, 179 FERC ¶ 61,028 (2022) ........................................... 5, 11, 24

Order 1920, *Building for the Future Through Electric Regional Transmission
Planning and Cost Allocation*, 187 FERC ¶ 61,068 (2024)....................................
.................................. 5, 6, 10, 11, 12, 15, 16, 17, 19, 22, 24, 25, 26, 27, 28, 29, 30

Order 1920-A, *Order Addressing Arguments Raised on Rehearing, Setting Aside
Prior Order, in Part, and Granting Clarification*, 189 FERC ¶ 61,126 (2024) ......

.......................................................................................................... 23, 26

**Miscellaneous**

Affidavit of Johannes P. Pfeifenberger (Aug. 2022) ................................. 21, 22, 23

Johannes Pfeifenberger et al., The Brattle Group & Grid Strategies, Transmission
Planning for the 21st Century: Proven Practices that Increase Value and Reduce
Costs (Oct. 2021).................................................................................. 6, 16

MISO Compliance Filing, FERC Docket ER26-1040 (Jan. 14, 2026) ....................27

PJM, 2021 Regional Transmission Planning Expansion Plan (Mar. 2022),
https://perma.cc/N85V-NUKZ ................................................................ 10, 24

PJM, 2024 Regional Transmission Planning Expansion Plan (Apr.
2025), https://perma.cc/BDE3-28H4........................................................25

# INTRODUCTION

As Public Interest Organizations ("PIOs") and Invenergy (collectively, "Petitioners") explained in their Opening Brief, the regional electric grid is aging, congested, and increasingly unable to meet current—much less future—demand. Existing transmission planning practices and economic disincentives are to blame. Regional planning under Order 1000 has been short-term, reactive, and myopic. Planners routinely fail to assess the whole picture of foreseeable needs and the full benefits and savings that regional transmission projects and low-cost alternative technologies would provide. Order 1000 processes also allow local transmission projects to be incorporated into regional plans, often without determining whether the needs those local projects address could be met more efficiently with regional projects. Existing planning has thus generated little regional investment, while spending on local transmission has ballooned—leaving ratepayers paying excessive rates for an inefficient and unreliable grid.

FERC does not dispute this. Nor could it: As FERC's brief details, these issues were the basis for Order 1920, which was a critical step in the right direction. But Petitioners demonstrated that Order 1920 fell short of remedying the problems FERC identified in five key ways, by: (1) allowing short-sighted, inefficient, and inaccurate analyses under Order 1000 planning processes to continue unmitigated; (2) requiring transmission providers to conduct holistic,

1

cost-effective planning only twice per decade; (3) failing to require planners to fully assess known transmission benefits; (4) failing to require analysis of storage as a low-cost transmission technology; and (5) failing to include high-voltage direct current ("HVDC") and other merchant transmission facilities in planning scenarios.

FERC spends little energy defending any of these decisions on the merits. It begins with a half-hearted attack on PIOs' standing, but PIOs assert a familiar economic injury. It then appeals to a sweeping account of its own unreviewable discretion or, alternatively, invites the Court to save the problems Petitioners identified for another day—or to leave transmission providers to fix them. But FERC overstates its own discretion, and its efforts to delay addressing these problems—or ask those causing them to fix them—defy the Federal Power Act's remedial requirements and a century of evidence.

On the merits, FERC mostly repeats Order 1920's conclusory treatment of these issues. It fails to connect the dots between its determinations in Order 1920 and the contrary evidence before it—or explain why it now rejects strategies it initially deemed essential to cutting off the pathways by which transmission providers overcharge ratepayers and shut out competitors. Instead, FERC writes off its change of course as "balancing" between correcting demonstrated injustices borne by captive ratepayers and imposing unverified administrative burdens on

transmission providers with every incentive to do as little as possible. This is not a bargain the Federal Power Act permits FERC to strike. FERC's responses fall short of reasonable decision-making and should be rejected.

## ARGUMENT

### I. PIO Petitioners Have Standing.

PIOs detailed in their Opening Brief why they have standing. Final Opening Br. of PIOs and Invenergy Petitioners ("Pet'rs Br.") 10-17. They allege economic injuries: PIOs and their members (collectively, "PIOs") already pay unnecessarily high electricity rates due to shortcomings in existing transmission planning requirements, *see* Pet'rs Br. 11-14, and they will continue to do so because Order 1920 leaves several of those problems in place, *id.* at 15. Those monetary injuries are fairly traceable to FERC's "under-regulat[ion]" of transmission providers, *Diamond Alternative Energy, LLC v. EPA*, 606 U.S. 100, 116 (2025) (cleaned up), as shown in both FERC's "own factfinding," *Competitive Enter. Inst. v. Nat'l Highway Traffic Safety Admin.*, 901 F.2d 107, 114 (D.C. Cir. 1990), and the voluminous record, *see* Pet'rs Br. 14-16.

In response to this showing, FERC challenges only injury-in-fact. Even there, it does not contest that PIOs currently pay excessive rates due to shortfalls in transmission planning. Instead, FERC argues that whether those injuries will continue under Order 1920 is too "speculative." Brief of Respondent Federal

3

Energy Regulatory Commission ("FERC Br.") 14.  Transmission Owners echo FERC's argument and focus.[1]

But there is nothing speculative about PIOs' injuries.  To start, transmission providers' past behavior shows how they will act in the future if left unchecked:  When given the opportunity, transmission providers overlook alternative transmission technologies, ignore benefits, and take advantage of the Order 1000 process to build expensive, piecemeal local projects.  They have every economic incentive to continue this behavior.  And it is no wonder: unlike ordinary customers, PIOs are captive ratepayers at the mercy of transmission providers that can simply pass off costs to them.

FERC offers no meaningful rejoinder to any of this.  Nor could it:  FERC's rule is based on the same underlying commonsense economic principles as PIOs' injuries.  And as explained below, FERC's arguments that PIOs' injuries are too distant and that they must wait to seek relief in future proceedings do not defeat standing, either.  PIOs have demonstrated a substantial risk that their injuries will

---

[1] Both rightly do not challenge Invenergy's standing.  *See* FERC Br. 14 (omitting pages 37-44 of Petitioners' Opening Brief, which contain Invenergy's argument, from standing challenge); Final Brief of Transmission Owner Intervenors in Support of Respondent Federal Energy Regulatory Commission ("Transmission Owner Interv'rs. Br.") 5-6 (citing FERC's brief).  Invenergy's standing follows, among other things, from financial harms caused by FERC authorizing planners to exclude HVDC projects like Invenergy's from the scenario planning process, impeding development of such projects.  Pet'rs Br. 17-19.

occur at predictable intervals, and they need not await harm to befall them to obtain preventive relief.

**A. PIOs' injuries are not speculative.**

A future injury may supply Article III standing so long as Petitioners demonstrate that there is a "substantial risk that the harm will occur." *Dep't of Com. v. New York*, 588 U.S. 752, 767 (2019) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)). That is, they must show a "realistic danger" of injury. *Curtis v. Propel Prop. Tax Funding, LLC*, 915 F.3d 234, 241 (4th Cir. 2019) (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)). Several specific features of this case—and the voluminous record before FERC—make out that showing here.

*First,* transmission providers' track record makes "[t]he prospect of future injury . . . significantly less speculative." *See Outdoor Amusement Bus. Ass'n, Inc. v. Dep't of Homeland Sec.*, 983 F.3d 671, 680 (4th Cir. 2020) (quoting *In re Navy Chaplaincy*, 697 F.3d 1171, 1176-77 (D.C. Cir. 2012)). As FERC's own factfinding demonstrated, past Order 1000 implementation shows that, when given the opportunity, transmission providers default to near-term, reliability-only planning focused overwhelmingly on non-competitive local transmission. JA175-177 (NOPR PP39-40); JA702-704, JA712-715, JA734-736 (Order 1920 PP101, 109-10, 127-28). This practice has forced ratepayers to fund "relatively inefficient

or less cost-effective transmission development," JA715 (Order 1920 P110), at particularly high rates in regions where PIOs are located. *See, e.g.*, JA3135-3137 (PIOs ANOPR Initial Comments at 38-40) (Describing multiple instances of reliability-only and non-competitive planning in ISO-NE); Freeman Decl. ¶ 5 (New England ratepayer); JA713 (Order 1920 P109) (PJM local "supplemental" projects vastly outnumbered and outspent regional projects in 2019 and 2020); Alfred Decl. ¶ 12 (PJM ratepayer).

Transmission providers likewise historically "overlook or undervalue" certain alternative transmission technologies, JA1458 (Order 1920 P1194), and fail to consider the full range of benefits associated with regional transmission facilities, JA729-731, JA1139-1140 (Order 1920 PP122-23, 722-23); *see, e.g.*, JA3201 (PIOs ANOPR Initial Comments, Ex. A ("Brattle-Grid Strategies Report") at 25) ("while PJM . . . has experience quantifying a wide range of benefits for transmission projects, it has not been utilizing any of this experience in its transmission planning process"); Alfred Decl. ¶ 12 (PJM ratepayer). These tendencies already inflate the rates PIOs pay. *See, e.g.*, JA3189, JA3191, JA3193 (Brattle-Grid Strategies Report at 13, 15, 17) (PJM has "never" used its multi-value planning option, instead relying on generation interconnection and reliability planning processes that are "much more costly than a comprehensive and proactive approach" (at JA3189)); Kim Decl. ¶¶ 3, 5 (PJM ratepayer). Because FERC left in

6

place the planning practices that "facilitate" that harm, "this past exposure evidences a non-speculative threat of future injury." *Outdoor Amusement*, 983 F.3d at 681.

*Second*, transmission providers have every financial incentive to continue their past behavior, and FERC's errors allow them to do so. *See Diamond Alternative Energy*, 606 U.S. at 116 (relying on "commonsense economic principles" from "predictable" behavior to show standing); *see also Texas Corn Producers v. EPA*, 141 F.4th 687, 697 (5th Cir. 2025) ("basic economic incentives [can] show that there is a 'substantial risk' of the predicted harm."); Pet'rs Br. 15-17.  For example, Order 1000 enables transmission providers to prioritize short-term, noncompetitive local lines.  Retaining this policy thus allows providers to pursue these more lucrative projects whenever they can, and decreasing the frequency of long-term planning cycles gives them more opportunities to do so.  And their "commonsense" economic incentives make it "predictable" they will exploit those opportunities. *Diamond Alternative Energy*, 606 U.S. at 116.  Similarly, transmission providers have financial incentives to ignore benefits and alternative technologies that would save ratepayer dollars but jeopardize transmission provider profits.

*Finally*, there is no doubt that ratepayers will foot the bill for this inefficient and costly transmission.  Unlike normal customers who may choose among sellers,

ratepayers are held captive to transmission providers, who are "allowed to recover from ratepayers all of [their] expenses, including income taxes, plus a reasonable return on capital invested in the enterprise and allocated to public use." *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d 41, 74 (D.C. Cir. 2014) (quoting *NEPCO Mun. Rate Comm. v. FERC,* 668 F.2d 1327, 1335 (D.C. Cir. 1981)); *contra* Transmission Owner Interv'rs. Br. 6 (contending that only transmission owners are impacted because they bear the cost of compliance).

PIOs already face high electricity costs due to insufficient transmission. They are located in regions plagued by congestion, Pet'rs Br. 13, with poor regional transmission planning, *id*. at 11-13, and facing rapidly increasing transmission costs, *id.* at 11-12.  With no plans to leave, PIOs will be forced to continue incurring excessive rates in these regions.  *See, e.g.*, Arieff Decl. ¶¶ 5, 8; Bratton Decl. ¶¶ 4, 7; Friedman Decl. ¶¶ 3-4.  That ratepayers cannot avoid paying these excessive rates distinguishes the cases on which FERC and Transmission Owners rely.  *See, e.g.*, *Pub. Util. Dist. No. 1 of Snohomish Cnty., Washington v. FERC*, 272 F.3d 607, 617 (D.C. Cir. 2001) (utilities lacked standing because rule encouraged *voluntary* regional transmission organization formation, so "none of the Utilities' injuries" would "come to fruition" if they declined to join one).

8

### B. FERC's arguments do not defeat PIOs' standing.

Apart from the general charge that PIOs' injuries are too speculative, all FERC says is that transmission planning timelines under Order 1920 make PIOs' injuries too far away to support standing, and that they should wait to challenge specific projects. Neither of these arguments defeat PIOs' standing.

*First*, it is no answer that these injuries will arise in the future. For one thing, "standing depends on the probability of harm, not its temporal proximity." *Orangeburg, S.C. v. FERC*, 862 F.3d 1071, 1077-78 (D.C. Cir. 2017) (quoting *520 Mich. Ave. Assocs. v. Devine*, 433 F.3d 961, 962 (7th Cir. 2006)). To be "imminent," an anticipated injury need not occur "in the colloquial sense of soon or precisely within a certain number of days, weeks, or months." *Newdow v. Roberts*, 603 F.3d 1002, 1015 (D.C. Cir. 2010) (Kavanaugh, J., concurring) (quoting *Flo. State Conference of the NAACP v. Browning,* 522 F.3d 1153, 1161 (11th Cir. 2008)). Instead, the purpose of the imminence requirement is to "ensure that the alleged injury is not too speculative," *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 564 n.2 (1992), meaning that there is at least a "substantial risk" it will occur, *Dep't of Com.*, 588 U.S. at 767. PIOs have demonstrated a substantial risk here. *See supra*, Sec. I.A.

That those injuries may occur "years" down the road, FERC Br. 10, 13, does not undermine that showing. While injuries that depend on yet-to-be-determined

eventualities arising at some "indefinite future time" are too speculative for Article III, *Lujan*, 504 U.S. at 564 n.2, parties may demonstrate imminence when "the anticipated injury [will] occur" in a predictable fashion "with[in] some fixed period of time in the future," *Newdow*, 603 F.3d at 1015 (Kavanaugh, J., concurring); *see also Vill. of Bensenville v. F.A.A.*, 376 F.3d 1114, 1119 (D.C. Cir. 2004) ("impending threat of injury" was "sufficiently real to constitute injury-in-fact" even where fee would not be collected from plaintiffs for *13 years*) (cleaned up).

PIOs' injuries belong in the second bucket, as they will occur on a predictable timetable.  Transmission providers make significant investment decisions at fixed and definite intervals that lock in costs to ratepayers.  For example, FERC's errors create a substantial risk that, every year, transmission providers will funnel investments to flawed local Order 1000 processes, *supra* Sec. I.A; Pet'rs Br. 15-17, 33-35, the costs of which will be passed through to ratepayers at predictable (and often, rapid) junctures.  *See, e.g.,* PJM, 2021 Regional Transmission Planning Expansion Plan 241-48 (Mar. 2022),[2] https://perma.cc/N85V-NUKZ (listing approved local "supplemental" projects for the 2021 year in Virginia, many with projected in-service dates within 1-3 years, after which providers may recoup costs); Wasson Decl. ¶ 4 (Virginia ratepayer).  Additionally, transmission providers often use the Construction Work in Progress Incentive to recover costs

---

[2] Cited at JA1739 (Order 1920 P1607 n.3437).

before the relevant facility goes into service.  *See* JA397-398 (NOPR P329);

JA1693 (Order 1920 P1547).

Second, having demonstrated imminent injuries, PIOs need not "await [their]

consummation . . . to obtain preventative relief."  *Curtis*, 915 F.3d at 242 (quoting

*Babbitt*, 442 U.S. at 298).  That principle alone dispenses with suggestions that the

possibility of a later challenge affects PIOs' standing.  *Contra* FERC Br. 13-14;

Transmission Owner Interv'rs. Br. 7.

But even if that possibility could foreclose standing, the only proceedings

FERC (and Transmission Owners, at 7) identify—disputing the types or costs of

projects selected in Order 1920 processes—misapprehend the threatened injuries.

PIOs' injuries are not based only on the projects that get selected.  *Cf.* FERC Br. 13

(citing *Pub. Serv. Elec. & Gas Co. v. FERC*, 989 F.3d 10, 13-16 (D.C. Cir. 2021)

(challenging allocation of project's costs); *Coal. of MISO Transmission Customers*

*v. FERC*, 45 F.4th 1004, 1008 (D.C. Cir. 2022) (injury from inability to compete to

construct, and profit from, category of selected projects)).  Rather, they are also

based on the failure to identify and select cost-effective projects in the first

instance.  And the consequences of FERC's errors manifest beyond the bounds of a

project-specific proceeding.  Gaps in Order 1920 processes leave transmission

providers to build local or reliability-only projects under Order 1000 that can then

preclude identification of more effective solutions under Order 1920.  JA719-721,

11

JA728-729, JA730-731 (Order 1920 PP116, 121, 123). The project-specific, after-the-fact challenge that FERC and Transmission Owners contemplate is not suited to unwinding consequences that, like these, are produced by the interplay of multiple flawed planning processes. In this context, the mere "possibility of an alternative remedy, of uncertain availability and effect," does not deprive PIOs of standing. *Sierra Club v. EPA*, 60 F.4th 1008, 1017 (6th Cir. 2023) (quoting *Okla. Dep't of Env't Quality v. EPA*, 740 F.3d 185, 190 (D.C. Cir. 2014)).

*Finally*, FERC cannot seriously rely on the notion that Order 1920 is "purely about 'transmission planning *processes*,'" such that the outcomes of those processes are too speculative to support Article III standing. FERC Br. 12; *see also* Transmission Owner Interv'rs. Br. 6-7. The entire basis for the Rule is that fixing flawed processes avoids unjust and unreasonable results. *See, e.g.*, JA681-682 (Order 1920 P86) (transmission planning processes "directly affect" consumer rates). And "[w]hen as here a government seeks to justify its regulatory actions by, on the one hand, touting [their] consequences . . . while, on the other, maintaining that those same regulations are unreviewable because there are no consequences, courts can appropriately be skeptical." *Diamond Alternative Energy*, 606 U.S. at 122. Ratepayers should not have to risk these predictable consequences.

\* \* \* \*

12

PIOs have demonstrated a substantial risk that they will be forced to incur traditional pocketbook injuries if FERC does not fix its final rule. Together with the unchallenged arguments in their Opening Brief, that suffices for standing.

## II. FERC's Overarching Defenses Fall Short.

Despite finding that existing planning practices are unlawful because they underassess transmission needs, undervalue project benefits, and fail to include low-cost technologies, FERC stopped short of requiring transmission providers to fully address these problems. Instead, FERC allowed the unfettered use of the Order 1000 process it deemed unlawful, slowed the holistic planning process meant to cure it, and failed to require planners to fully evaluate transmission needs or project benefits. Pet'rs Br. 3-8.

FERC offers three overarching defenses, but none succeed. While FERC insists (at 131-32, 151, 154-55, 165-66) that it has no obligation to fully remedy every unlawful practice, the Federal Power Act does not tolerate half-measures. FERC cannot shield its unreasoned choices behind overly broad assertions of discretion that ignore the Federal Power Act's remedial mandate and rely on inapposite case law. Further, it may not delay action based on the possibility of future resolution or altruistic repair by the parties benefiting from the status quo.

13

**A. FERC does not have discretion to ignore identified problems.**

First, FERC's appeal to its own discretion as a basis to leave identified harms unaddressed misunderstands both the Federal Power Act and Order 1920. FERC is required to redress unlawful rates, practices, and rules identified as part of the Order 1920 proceeding. *See* Pet'rs Br. 22-24; 16 U.S.C. § 824e. Nowhere does the Federal Power Act give FERC discretion to sidestep those basic obligations. FERC's argument makes particularly little sense given its determination that providers overcharge consumers and thwart competition by avoiding regional transmission planning. *See, e.g.,* FERC Br. 111-18.

**1.** In FERC's telling, it enjoys broad, nearly unreviewable discretion to make choices between competing consumer and investor interests in rate-setting that only require the ensuing rate to fall within a range of reasonableness. FERC Br. 131 (citing *Emera Me. v. FERC*, 854 F.3d 9, 20, 23, 25 (D.C. Cir. 2017)). FERC asserts that substantial improvements in long-term planning are all that is required to make Order 1920 just and reasonable. FERC Br. 132. That is not the law.

Courts have never given agencies carte blanche, nor is the just and reasonable standard as "abstract" and discretionary as FERC implies (at 131). Like standard Administrative Procedure Act inquiries, the just and reasonable standard requires FERC's rationale to be clearly explained and supported by substantial evidence. *See Elec. Consumers Res. Council v. FERC*, 747 F.2d 1511, 1514 (D.C.

14

Cir. 1984). *Emera Maine*, on which FERC relies, underscores these points, finding that even if a final rate falls within the zone of reasonableness, it is not necessarily *the* just and reasonable rate given the circumstances of the case. 854 F.3d at 23. Rather, determining whether a rate is just and reasonable requires examination of several factors, including the methodology used. *Id.* at 22-23. And where that methodology fails to address prior concerns, is contrary to substantial evidence, or lacks a rational connection between the evidence and FERC's rationale, the Court must remand. *Id*. at 23, 27, 30.

**2.** FERC next understates its Federal Power Act obligations to remedy identified harms. FERC asserts (at 131-32, 165-66) that Section 206 contains no remedial promise and that even if it did, FERC would be entitled to weigh consumer and investor interests to decide which values will be sacrificed in crafting the remedy. But FERC's analysis of competing interests only goes one way: FERC cites vague administrative burdens on transmission providers as a reason to pull back relief without examining the potential impact on consumers. *See* FERC Br. 154, 157, 163. This is unreasonable, *see TransCanada Power Mktg, Ltd. v. FERC*, 811 F.3d 1, 11-13 (D.C. Cir. 2015), especially since cumulative costs to all the nation's transmission providers for compliance with the entirety of Order 1920 are in the millions of dollars, whereas lost savings from inefficient transmission practices cost consumers billions. *Compare* JA1850-1853 (Order

15

1920 P1781) *with* JA701-715 (Order 1920 PP100-10) and JA3229-3233 (Brattle-Grid Strategies Report at 73-77).

More importantly, FERC mischaracterizes the issues at stake, reframing the choice between action and omission as balancing "competing values" (at 165), when really, FERC is choosing between tolerating unjust and unreasonable practices or ending them. The former is not a value, and the measures necessary to end them are not burdens.

FERC's argument makes particularly little sense in this context. By FERC's own logic, the purpose of Order 1920 was to redress transmission providers' incentives to build transmission inefficiently and thereby stop them from jeopardizing grid reliability and overcharging ratepayers. Within this context, partial measures that "substantially improve" some known planning inefficiencies while allowing others to continue do not warrant deference. When FERC finds that consumers are being overcharged by an arm and a leg, FERC cannot reasonably order return of just the arm, but not the leg. *See TransCanada*, 811 F.3d at 12 ("It is indisputable that, under established ratemaking principles, rates that permit excessive profits are not just and reasonable"). Because captive ratepayers are being charged excessive rates through the very practices to which Petitioners object, leaving them in place cannot be averaged out by "substantial improvements" elsewhere, as FERC suggests (at 132, 152). Accordingly, Order

16

1920's improvements alone do not suffice. *Cf.* Pet'rs Br. 57-60. FERC was required to stop the ways in which it found transmission providers persistently overcharge consumers and discriminate against competitors, not just chip away at them.

Finally, Order 1920's record does not stand in isolation; it draws upon thirty years of largely ineffective efforts to compel transmission providers to meet system needs in an efficient, effective, and affordable manner—including most recently with Order 1000 itself. JA631-635 (Order 1920 PP14-19); JA3483-3487 (Harvard ELI ANOPR Initial Comments 17-21). Considering this extensive history and the economic incentives involved, the rule must ensure planners account for all reasonably foreseeable system needs and fully assess applicable benefits from potential solutions. *See Elec. Consumers Res. Council*, 747 F.2d at 1518 (Agencies must make "conscientious effort" to account for "what is known as to past experience and what is reasonably predictable about the future" to monitor whether agency's economic theories work in practice) (citations omitted).

### B.  FERC cannot kick the can down the road.

The prospect of future FERC action cannot forestall scrutiny of Order 1920's present flaws. Citing *Mobil Oil Expl. & Producing Se. Inc. v. United Distrib. Cos.*, 498 U.S. 211 (1991), FERC asserts (at 154-55, 157-58, 166) that it has "flexibility" to address Petitioners' concerns in future proceedings. But *Mobil*

17

*Oil* did not hand FERC unfettered discretion to defer acting on unjust and unreasonable rates. Rather, the Supreme Court found that FERC acted reasonably in declining to address a tangentially related issue because *FERC was already doing so* in another ongoing proceeding. *Mobil Oil*, 498 U.S. at 229-31. FERC points to no other rulemakings in process that might address the issues Petitioners raise here. Moreover, while FERC may always reconsider an issue in the future, this does not justify the imposition of unjust and unreasonable rates, even if temporarily, until FERC may choose to act again. *See Edison Mission Energy, Inc. v. FERC*, 394 F.3d 964, 969-70 (D.C. Cir. 2005) (dismissing FERC's defense that it could revise its orders following a post-implementation informational filing).

### C. Transmission providers will not voluntarily fix these problems.

FERC's final defense is strangest of all: FERC leans on the flexibility it left transmission providers to voluntarily exceed minimum requirements (at 157, 161-62, 163-64, 166), but FERC should know better. As already established, incumbent transmission owners have every incentive to avoid effective regional planning and leave ratepayers with the bill. *See supra* Sec. I.A and Pet'rs Br. 15-16, 41-42; Brief of Respondent-Intervenors Public Interest Organizations, Clean Energy Associations, and Public Power Association 5-6. The Federal Power Act was enacted specifically to protect consumers from such practices, and evidence in multiple FERC proceedings—including this one—has shown that unless forced to

18

do otherwise, transmission providers find ways to maximize profit at ratepayer expense. JA712-715 (Order 1920 PP109-10); JA3475-3492 (Harvard ELI ANOPR Initial Comments 9-26). There is no basis to expect them to behave differently without a mandate from FERC.

## III. FERC Unreasonably Left Open Paths for Harm to Ratepayers and Competitors.

FERC's efforts to defend the merits of its rationales fare no better. For each of Petitioners' concerns, FERC responds with conclusory assertions that talk past Petitioners and fail to meaningfully engage with FERC's own contrary evidence. FERC incorrectly asserts that long-term planning cannot address short-term needs such that Order 1000 processes must continue, and it wrongly insists that allowing those processes to continue unchanged will complement Order 1920 processes. And because transmission providers will take advantage of Order 1000 processes whenever they can, decreased frequency of Order 1920 planning is a major stumbling block. Additionally, FERC ignores how requiring planners to include HVDC facilities in their scenarios would reduce the need for additional infrastructure. Meanwhile, FERC's response to Petitioners' benefits arguments invokes analysis that FERC did not actually include in the final rule. Finally, FERC's response on storage adds nothing Petitioners have not already addressed in

19

their Opening Brief.  On each issue, FERC failed to rationally connect its decision-making to substantial evidence in the record.

### A. FERC fails to meaningfully engage with Petitioners regarding the problematic interaction between Orders 1000 and 1920.

As Petitioners' Opening Brief explained (at 22-23), FERC's decision to retain Order 1000 processes contradicted its own findings.  FERC cannot rely on unsupported assertions that implementing safeguards would be too burdensome, that transmission providers will use Order 1000 processes sparingly, or that FERC could resolve any conflicts in future compliance orders.  *Id.* at 24-31.  Moreover, FERC's unsupported extension of Order 1920's planning cycle to only twice per decade allows transmission providers to use Order 1000 processes for issues that would be more efficiently handled using long-term, comprehensive planning.  *Id.* at 31-36.  Ultimately, for Order 1920 reforms to succeed, FERC cannot permit transmission providers to evade them through still-siloed, still-piecemeal, and still-inaccurate Order 1000 planning.  FERC's decision is particularly unreasonable given that these flaws can be mitigated through mandatory alignment of Order 1920 planning results with Order 1000 planning assumptions.  Moreover, requiring a shorter Order 1920 planning cycle would allow providers to use Order 1000 when it is truly appropriate but not misuse it to earn extra profit.

Apart from FERC's ineffective overarching arguments, *see supra* Sec. II, FERC (at 151-58) and Respondent-Intervenors ITC Midwest ("ITC") (at 8-10)

largely recycle arguments Petitioners addressed in their Opening Brief (at 20-36). Petitioners focus here on four fundamental errors in their reasoning.

*First*, FERC incorrectly asserts (at 151) that retaining Order 1000 processes for short-term reliability and economic needs is necessary because not all transmission projects are suited for Order 1920's twenty-year planning horizon. While the Order 1920 process uses twenty-year planning horizons for assessing transmission needs and project benefits, that does not mean all projects selected under that process will be built that far in the future. Rather, the twenty-year horizon helps identify better options for addressing shorter-term needs by accounting for both anticipated future needs and the long-term benefits certain short-term projects can provide. This comprehensive evaluation is necessary to accurately calculate the value of solutions to shorter-term needs and identify projects whose return on investment may extend beyond the five-to-ten-year limits of most Order 1000 planning, but whose benefits exceed their costs. *See* JA4221, JA4224-4225 (PIOs Initial Comments, Ex. A, Affidavit of Johannes P. Pfeifenberger ("Pfeifenberger Aff.") PP17, 25-26). For example, if a short-term reliability-only need requires replacing an aging 115 kV line, but there is also a long-term or holistic (reliability, economic, and public policy-driven) need to double the line's capacity, it may be cheaper to build a 345 kV line but initially

21

operate it at 115 kV rather than building the line twice.  JA4224-4225, JA4228-4229 (Pfeifenberger Aff. PP26, 46).

*Second,* FERC wrongly maintains (at 153-54) that allowing Order 1000 processes to continue as-is will complement long-term planning and thus will not create unjust and unreasonable rates.  FERC does not explain how these processes will be merely "complement[ary]," *id.* at 153, or "residual," JA819-820 (Order 1920 P245).  Instead, it ignores transmission providers' incentives to maximize their use.  Pet'rs Br. 27-28.  And it disregards expert analysis explaining how doing so without changes to the Order 1000 process will interfere with long-term transmission planning.  *See* JA4226-4229 (Pfeifenberger Aff. PP42-48).

Yet despite having mechanisms to prevent this outcome—and to ensure that Order 1000 and Order 1920 truly complement each other—FERC did not adopt them.  For instance, Order 1000's base assumptions should include projects approved as part of Order 1920's planning cycle so that short-term planning is limited to unexpected needs that could not be addressed in an earlier long-term planning round.  Additionally, long-term transmission needs that have been identified but not yet met should be incorporated into Order 1000 project selection analyses to ensure these projects can be designed to meet present and future needs most efficiently, as illustrated in the above line-building example.  Finally, Order 1000 processes must be required to examine multiple needs and values at once in

22

order to select the most cost-effective solutions for shorter-term needs. JA4229 (Pfeifenberger Aff. P47).

FERC has no rejoinder, insisting (at 151-52) only that it struck "a reasonable balance between reforming the pre-Rule system and preserving facets of that system that meet tailored goals." But there is nothing "reasonable" about preserving—with no limits or updates—the very process FERC sought to reform. FERC's conclusory treatment of this issue lacks meaningful analysis and fails to engage with contrary evidence.

*Third*, FERC claims (at 154) that alignment of the two processes "would introduce administrative difficulties" and that this conclusion was a product of balancing that is owed considerable deference. But FERC never explains *which competing interests* it balanced and only cites two conclusory paragraphs in Order 1920-A. *Id.* (citing JA2187-2188 (Order 1920-A PP214-15)). Such conclusory findings do not constitute reasoned analysis. *See City & Cnty. of San Francisco v. FERC,* 24 F.4th 652, 658 (D.C. Cir. 2022) (passing reference to relevant factors without explaining risks or examining counterarguments is not reasoned decision-making).

*Finally*, FERC cannot justify the aggravation of these issues caused by unnecessarily extending the Order 1920 planning cycle. FERC proposed a three-year planning cycle, and ITC supported this frequency at the ANOPR stage. *See*

23

JA230-231 (NOPR P99); JA3084 (ITC Initial ANOPR Comments at 12).  Yet both unreasonably changed course based on unverified and generalized "administrative burdens," *see* FERC Br. 157; ITC Br. 9-10, while failing to respond to Petitioners' arguments or account for any potential impacts on consumers, *see* Pet'rs Br. 31-36; *supra* Sec. II.A.

Apart from this, FERC fails to rebut Petitioners' argument (at 33-34) that less frequent Order 1920 planning cycles mean transmission providers will rely on Order 1000 processes more often.  FERC merely contends (at 156-57) that it is unclear whether they will do so.  Petitioners explained why transmission providers have incentives to continue using Order 1000 processes whenever possible.  Pet'rs Br. 27-28.  And FERC found that transmission providers have acted in line with those incentives in the past.  JA702-704, JA712-715, JA734-736 (Order 1920 PP101, 109-10, 127-28).  FERC does not explain how, with Order 1920 in place, these incentives will suddenly disappear.  To the contrary, there is little reason to believe transmission providers will turn away from processes that continue to benefit them.  And a few extra years of those processes can make "all the difference," *contra* FERC Br. 155.  *See, e.g.*, JA693-694 (Order 1920 P95 n.216) (noting significant increases in demand growth forecasts in PJM between 2023 and 2024); *compare* PJM, 2021 Regional Transmission Planning Expansion Plan 61 (Mar. 2022), https://perma.cc/N85V-NUKZ (cited at JA1739 (Order 1920

24

P1607 n.3437)) (PJM included approximately $3.3 billion of local "supplemental"

projects in 2021) *with* PJM, 2024 Regional Transmission Planning Expansion Plan

75 (Apr. 2025), https://perma.cc/BDE3-28H4 (PJM included *over $9 billion* of

local "supplemental" projects in 2024).  FERC therefore fails to justify five-year

Order 1920 cycles.

### B. FERC cannot justify allowing planners to exclude merchant high-voltage, direct current ("HVDC") facilities when developing scenarios.

By allowing transmission planners to blind their scenarios to the future

impact of merchant HVDC facilities, particularly advanced-stage projects, JA985-

986 (Order 1920 P493), FERC contravened its own requirements that the scenarios

must be "plausible" and "capture probable future outcomes," JA1041 (Order 1920

P575), and rely on the "best available data inputs about the future electric power

system," JA859-860 (Order 1920 P302); Pet'rs Br. 37-45.  In attempting to defend

its decision, FERC largely parrots the reasoning of its orders without engaging

with Invenergy's arguments challenging that reasoning.  Each of FERC's

arguments fails.

FERC's lead position (at 159) is that the seven mandated factors, used when

developing scenarios, concern "drivers of transmission *need*," but merchant HVDC

is a means of "*address[ing]*" such needs.  Yet as Petitioners explained (at 40-44),

and FERC ignores, the reality is that future needs for *more* transmission cannot be

accurately assessed without understanding what transmission facilities will likely

already exist, including facilities to be developed by companies seeking to compete with traditional transmission providers. Indeed, FERC gives the game away by conceding that merchant HVDC can "play a role in shaping long-term needs." FERC Br. 161-62 (quoting JA2278 (Order 1920-A P331)) (citation modified).

FERC next asserts that the sixth factor (for "generator interconnection requests and withdrawals" already in the interconnection queue, JA970 (Order 1920 P472)) *does* require planners to account for merchant HVDC. FERC Br. 159-60 (citing JA2279-2280 (Order 1920-A P334)). FERC does not attempt to reconcile this reading with its lead position that merchant HVDC is irrelevant to assessing needs. Regardless, this factor does not properly account for merchant HVDC. By focusing only on the interconnection itself—and treating HVDC transmission as akin to a generator putting power onto the grid—this factor fails to require planners to account for merchant HVDC's ability to provide *transmission services*. *See* Pet'rs Br. 38-39 (discussing advantages of merchant HVDC). By capturing only a narrow facet of merchant HVDC's role in the transmission system (i.e., viewing it as only adding power to be transmitted by other facilities), FERC invites the creation of inaccurate scenarios.

Indeed, FERC acknowledges "concrete [record] evidence" that planners exclude HVDC lines from their long-term planning. FERC Br. 160-61; *see* Pet'rs Br. 40-42. But in dismissing Invenergy's specific example about discriminatory

26

treatment by MISO as a "separate issue," FERC misses the point: MISO's

defective planning process is proof of a broader pattern where transmission

planners "ignore" considerations they are not required to address when it serves

their self-interest or the interest of their transmission-owning members. *See*

JA722-726 (Order 1920 PP118-19); FERC Br. 111.

FERC notes that, in a separate proceeding postdating the orders on review, it

found MISO's tariff unjust and unreasonable for failing to specify when and "how

[merchant HVDC] projects are incorporated into [MISO's] transmission planning

models." FERC Br. 161 (citation omitted). But that finding only *reinforces* the

need for standardized planning requirements that prevent such omissions

beforehand, and that address concerns not only in MISO but nationwide. *See*

Pet'rs Br. 44-45; FERC Br. 124-25 ("industry-wide solution[s]" obviate the need

for "case-by-case adjudication" (citations omitted)).[3]

Finally, FERC falls back on the refrain (at 161-62) that transmission

providers have "flexibility" to consider merchant HVDC facilities voluntarily.

This is no comfort, because the whole point of Order 1920—built on

---

[3] In response to FERC's order, MISO doubled down on its historical position that it will only consider HVDC lines that have "executed Transmission Connection Agreements." MISO Compliance Filing at 2, FERC Docket ER26-1040 (Jan. 14, 2026) at: https://tinyurl.com/ye9yjtfs. Because those agreements are signed only with the consent of transmission owners and providers, this perpetuates a regime in which planners can unilaterally exclude HVDC lines from consideration.

overwhelming record evidence, and specific findings by FERC—is that transmission providers must be required to improve their planning processes in ways they have historically refused to undertake voluntarily.  Pet'rs Br. 37-38, 41-43; JA722-726 (Order 1920 PP118-19).  That pattern will continue, absent FERC imposing requirements to stop it, given incumbent utilities' strong incentives to build more of their own infrastructure, even if more cost-effective or efficient solutions are available.  Pet'rs Br. 41-42.

### C. FERC failed to explain why it acted contrary to its own evidence on required benefits.

Petitioners argued in their Opening Brief (at 49-57) that FERC excluded four benefits it previously determined in the NOPR were measurable, non-duplicative, and could result in billions of dollars of ratepayer savings.  Shorn of appeals to its own discretion (which, as explained *supra* Sec. II.A., cannot excuse arbitrary decision-making), FERC offers only two responses, both of which fail.

*First*, FERC asserts (at 166) that Petitioners cited no evidence for the statement that the exclusion of four benefits could result in billions of dollars in lost cost savings.  But Petitioners explained that (1) the excluded benefits have track records of large cost savings, Pet'rs Br. 52-55, and (2) if transmission providers are not required to evaluate those benefits, they will not do so, *id.* at 56-57.  Evaluations of potential transmission projects could thus be inaccurate (since

they may not reflect the full benefits certain projects would provide), leading to inefficient projects that forgo large cost savings.

*Second*, FERC's counsel points to a paragraph in the final rule that merely describes the positions of two commenters who noted concerns about double-counting benefits. FERC Br. 165-66 (citing JA1132-1133 (Order 1920 P711)). But the final rule does not evaluate those concerns or explain how they rebut FERC's own analysis in the NOPR that these benefits are distinct from the other benefits. FERC's counsel cannot now supply what the agency's rulemaking did not. *See Island Creek Coal Co. v. Henline*, 456 F.3d 421, 426 (4th Cir. 2006) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 95, (1943)). And even if FERC were not so constrained, the comments it gestures to raise only high-level concerns about double-counting; neither counters the detailed record evidence that the four excluded benefits are distinct from the final seven mandatory benefits. *See* JA4110-4112 (AEP Initial Comments at 23-25); JA3772 (GridLab Initial Comments at 27).

To the extent double-counting *was* FERC's concern, it disregarded the obvious solution: clarify that the four excluded benefits would be considered under other mandatory benefits. FERC did exactly that for the other ultimately excluded benefit: mitigation of weather and load uncertainty. JA1199-1200 (Order 1920 P800). Little wonder: As FERC itself explained, if transmission providers are not

29

required to consider known benefits, they likely will not do so. JA1139-1140 (Order 1920 P723). All Petitioners ask is that FERC either add these benefits back to the list *or else clarify* how they will be accounted for under the included benefits to ensure the distinct cost savings they offer will not be lost.

## CONCLUSION

Petitioners respectfully request the Court grant the petition and remand to FERC.

Respectfully submitted,

*/s/ Danielle C. Fidler*
Danielle C. Fidler
Veronica Saltzman
Clean Air Task Force
114 State Street, 6th Floor
Boston, MA 02109
Phone: 617-624-0234
Email: dfidler@catf.us

Alexander Tom
Ada Statler
Earthjustice
180 Steuart St. #194330
San Francisco, CA 94105
Phone: 415-217-2111
Email: atom@earthjustice.org

Linnet Davis-Stermitz
Earthjustice
810 Third Avenue, Suite 610
Seattle, WA 98104
Phone: 206-343-7340
Email: ldavisstermitz@earthjustice.org

Caroline Reiser
Natural Resources Defense Council
1152 15th Street NW, Suite 300
Washington, DC 20005
Phone: 202-717-8341
Email: creiser@nrdc.org

*Counsel for Natural Resources Defense Council*

William S. Scherman
Jeremy C. Marwell
Jeffrey M. Jakubiak
Vinson & Elkins LLP
2200 Pennsylvania Avenue, NW
Suite 500 West
Washington, DC  20037
Phone: 202-639-6507
Email: jmarwell@velaw.com

Garrett T. Meisman
845 Texas Avenue
Suite 4700
Houston, Texas 77002
Phone: 713-758-2559
Email: gmeisman@velaw.com

*Counsel for Invenergy Solar Development North America LLC, Invenergy
Thermal Development LLC, Invenergy Wind Development North America
LLC, and Invenergy Transmission LLC*

Nicholas J. Guidi
Southern Environmental Law Center
122 C Street NW, Suite 325
Washington, DC 20001
Phone: 202-573-8136
Email: nguidi@selc.org

*Counsel for Appalachian Voices, Energy Alabama, North Carolina Sustainable Energy Association, Southern Alliance for Clean Energy, and South Carolina Coastal Conservation League*

Justin Vickers
Sierra Club
1229 W Glenlake Ave
Chicago, IL 60660
Phone: 224-420-0614
justin.vickers@sierraclub.org

*Counsel for Sierra Club*

Ted Kelly
Adam Kurland
Environmental Defense Fund
555 12th Street, N.W., Suite 400
Washington, DC 20004
Phone: 202-572-3317
Email: tekelly@edf.org

*Counsel for Environmental Defense Fund*

Dated: March 13, 2026

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g), I certify that this filing complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(ii) and this Court's July 28, 2025 Order because this document contains 6,488 words, excluding the parts exempted by Fed. R. App. P. 32(f).

I further certify that this filing complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this filing has been prepared using a proportionally spaced typeface in Microsoft Word 365 using Times New Roman 14-point.

*/s/ Danielle C. Fidler*
Danielle C. Fidler
Clean Air Task Force
114 State Street, 6th Floor
Boston, MA 02109
Phone: 617-624-0234
Email: dfidler@catf.us

Dated: March 13, 2026

# CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit through this Court's CM/ECF system on March 13, 2026. Participants in the case will be served by the appellate CM/ECF system.

*/s/ Alexander Tom*
Alexander Tom
Earthjustice
180 Steuart St. #194330
San Francisco, CA 94105
Phone: 415-217-2111
Email: atom@earthjustice.org

*Counsel for Natural Resources Defense Council*

Dated: March 13, 2026