## ORAL ARGUMENT HAS NOT YET BEEN SCHEDULED

# UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

Nos. 24-1650, 24-1748, 24-1756, 24-1758, 24-1760, 24-1765, 24-1770, 24-1785, 24-1792, 24-1804, 24-1857, 24-1862, 24-1867, 24-1876, 24-1885, 24-1887, 24-1979, 24-1991, 24-2162, 24-2163, 25-1073, 25-1080, 25-1197, 25-1349
(consolidated)

APPALACHIAN VOICES, ET AL.,
*Petitioners*,

v.

FEDERAL ENERGY REGULATORY COMMISSION,
*Respondent*,

ENTERGY OPERATING COMPANIES and ENTERGY SERVICES, LLC, ET AL.,
*Intervenors*.

ON PETITION FOR REVIEW OF ORDERS OF THE
FEDERAL ENERGY REGULATORY COMMISSION, DKT. NO. RM21-17

_____

# FINAL BRIEF OF THE TRANSMISSION OWNER
# PETITIONERS

_____

**(counsel listed inside)**

Final Brief: March 13, 2026

John Lee Shepherd, Jr.
Blake Grow
Hunton Andrews Kurth LLP
2200 Pennsylvania Ave, NW
Suite 900
Washington, DC 20037
(202) 955-1500
jshepherd@hunton.com
bgrow@hunton.com

*Counsel for the Southwest Power Pool Transmission Owner Group*

Carrie L. Bumgarner
Senior Counsel
American Electric Power Service Corporation
1 Riverside Plaza
Columbus, OH 43215
(614) 716-2941
clbumgarner@aep.com

*On behalf of American Electric Power Service Corporation*

Denise Buffington
Senior Director Federal Regulatory Affairs
Evergy, Inc.
1200 Main Street
Kansas City, MO 64105
(816) 556-2683
denise.buffington@evergy.com

*On behalf of the Evergy Companies*

Timothy T. Mastrogiacomo
Vice President, Federal Regulatory, Legal, and Policy
Xcel Energy Services Inc.
701 Pennsylvania Avenue, NW, Ste. 250
Washington, DC 20006
(202) 661-4481
tim.t.mastrogiacomo@xcelenergy.com

*On behalf of Southwestern Public Service Company*

Steven M. Nadel
Senior Counsel
PPL Services Corporation
645 Hamilton Street, Suite 700
Allentown, PA 18101
(610) 774-4775
SMNadel@pplweb.com

John Longstreth
Donald A. Kaplan
Chimera N. Thompson
K&L Gates LLP
1601 K Street, N.W.
Washington, DC  20006
(202) 778-9000
john.longstreth@klgates.com
don.kaplan@klgates.com
chimera.thompson@klgates.com

Michelle S. Kallen
William M. Keyser
Steptoe LLP
1330 Connecticut Avenue N.W.
Washington, DC 20036
(202) 429-8186
mkallen@steptoe.com
wkeyser@steptoe.com

*Counsel for PPL Electric Utilities Corporation*

iii

Molly Suda
Associate General Counsel
Duke Energy Corporation
1301 Pennsylvania Ave. NW,
Suite 200
Washington, DC 20004
(202) 824-8011
molly.suda@duke-energy.com

*Counsel for Duke Energy*

William M. Rappolt
Assistant General Counsel, FERC
AES US Services LLC
4300 Wilson Blvd
Arlington, VA 22203
(703) 682-6337
william.rappolt@aes.com

*Counsel for The Dayton Power and Light Co.*

Gary E. Guy
Assistant General Counsel
Exelon Corporation
701 Ninth Street, N.W., Suite 9426
Washington, DC 20068
(301) 956-6754
gary.guy@exeloncorp.com

*Counsel for Exelon Corporation, Atlantic City Electric Company, Baltimore Gas and Electric Company, Commonwealth Edison Company, Delmarva Power & Light Company, PECO Energy Company, and Potomac Electric Power Company*

iv

William H. Baxter II
Assistant General Counsel
Dominion Energy Services, Inc.
120 Tredegar Street, Riverside 6th Floor
Richmond, VA 23219
(804) 819-2458
william.h.baxter@dominionenergy.com

*Counsel for Dominion Energy Services, Inc., on behalf of its affiliate Virginia Electric and Power Company*

David M. Gossett
Davis Wright Tremaine LLP
1301 K Street, NW
Suite 500 East
Washington, DC 20005
(202) 973-4200
davidgossett@dwt.com

Sanford I. Weisburst
Quinn Emanuel Urquhart &
Sullivan, LLP
295 Fifth Avenue
New York, NY 10016
(212) 849-7000
sandyweisburst@quinnemanuel.com

*Counsel for the FirstEnergy Transmission Companies*

Carrie L. Bumgarner
Senior Counsel
American Electric Power Service Corporation
1 Riverside Plaza
Columbus, OH 43215
(614) 716-2941
clbumgarner@aep.com

*Counsel for American Electric Power Service Corporation on behalf of its affiliates Appalachian Power Company, Indiana Michigan Power Company, Kentucky Power Company, Kingsport Power Company, Ohio Power Company, Wheeling Power Company, AEP Appalachian Transmission Company, Inc., AEP Indiana Michigan Transmission Company, Inc., AEP Kentucky Transmission Company, Inc., and AEP Ohio Transmission Company, Inc.*

Daniel E. Frank
Allison E.S. Salvia
Eversheds Sutherland (US) LLP
700 Sixth St., N.W., Suite 700
Washington, DC  20001-3980
(202) 383-0100
danielfrank@eversheds-sutherland.com
allisonsalvia@eversheds-sutherland.com

*Counsel for East Kentucky Power Cooperative, Inc.*

Regina Y. Speed-Bost
Founder and Managing Partner
SB Law, PLLC
200 Massachusetts Ave., N.W.
7th Floor
Washington, DC  20001
(202) 963-2700
rspeed-bost@sblawlegal.com

*Counsel for Duquesne Light Company*

Joshua A. Kirstein
Paul Savage
Consolidated Edison Company of
New York, Inc.
4 Irving Place, 18th Floor
New York, NY 10003
(929) 656-5971
kirsteinj@coned.com
savagep@coned.com

*Counsel for Rockland Electric Company*

Wendy N. Reed
Matthew J. Binette
Abraham F. Johns III
WRIGHT & TALISMAN, P.C.
1200 G Street N.W., Suite 600
Washington, DC  20005-3898
(202) 393-1200
reed@wrightlaw.com
binette@wrightlaw.com
johns@wrightlaw.com

*Counsel for the MISO Transmission Owners:*
*Ameren Services Company, as agent for Union Electric Company d/b/a Ameren Missouri, Ameren Illinois Company d/b/a Ameren Illinois and Ameren Transmission Company of Illinois; American Transmission Company LLC; Central Minnesota Municipal Power Agency; Cooperative Energy; Dairyland Power Cooperative; Duke Energy Business Services, LLC for Duke Energy Indiana, LLC; Great River Energy; Indiana Municipal Power Agency; Indianapolis Power & Light Company d/b/a AES Indiana; Lafayette Utilities System; MidAmerican Energy Company; Minnesota Power (and its subsidiary Superior Water, L&P); Montana-Dakota Utilities Co.; Northern Indiana Public Service Company LLC; Northern States Power Company, a Minnesota corporation, and Northern States Power Company, a Wisconsin corporation, subsidiaries of Xcel Energy Inc.; Northwestern Wisconsin Electric Company; Otter Tail Power Company; Prairie Power, Inc.; Southern Indiana Gas & Electric Company (d/b/a CenterPoint Energy Indiana South); Southern Minnesota Municipal Power Agency; and Wolverine Power Supply Cooperative, Inc.*

March 13, 2026

## CORPORATE DISCLOSURE STATEMENT

Petitioners consist of FERC-jurisdictional investor-owned transmission companies, cooperative utilities, and municipal utilities that own electric transmission facilities and participate in Federal Energy Regulatory Commission ("FERC")-authorized regional transmission organizations.  Unless otherwise specified below, no publicly-traded entity owns 10% or more of a Petitioner or a Petitioner's ultimate parent, if any, no other publicly held corporation has a direct financial interest in the outcome of the litigation by reason of a franchise, lease, other profit sharing agreement, insurance, or indemnity agreement, and there is no affiliated master limited partnership, real estate investment trust, or other similarly situated legal entity whose shares are publicly held or traded.

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1, Petitioners make the following disclosures:

1. **American Electric Power Service Corporation on behalf of its affiliates, Appalachian Power Company, Indiana Michigan Power Company, Kentucky Power Company, Kingsport Power Company, Ohio Power Company, Wheeling Power Company, AEP Appalachian Transmission Company, Inc., AEP Indiana Michigan Transmission Company, Inc., AEP Kentucky Transmission Company, Inc., and AEP Ohio Transmission Company, Inc**

American Electric Power Service Corp. ("AEPSC") is a wholly-owned subsidiary of American Electric Power Company, Inc. ("AEP"), a New York corporation whose common stock is held by the public and traded on the Nasdaq

Exchange.  AEPSC is a service company that provides management and professional services to AEP.  AEP has no parent company.  Certain institutional investors including Vanguard Group Inc. ("Vanguard") may from time to time hold 10 percent or more of the outstanding shares of AEP but to AEP's knowledge no publicly-held company has a 10 percent or greater ownership interest in AEP.

2.    **American Electric Power Service Corp., on behalf of its affiliates Southwestern Electric Power Co., Public Service Co. of Oklahoma, AEP Oklahoma Transmission Co., Inc., and AEP Southwestern Transmission Co., Inc.**

AEPSC is a wholly-owned subsidiary of AEP, a New York corporation whose common stock is held by the public and traded on the Nasdaq Exchange.  AEPSC is a service company that provides management and professional services to AEP.  AEP has no parent company.  Certain institutional investors including Vanguard may from time to time hold 10 percent or more of the outstanding shares of AEP but to AEP's knowledge no publicly-held company has a 10 percent or greater ownership interest in AEP.

3.    **Ameren Services Company, as agent for Union Electric Company d/b/a Ameren Missouri, Ameren Illinois Company d/b/a Ameren Illinois, and Ameren Transmission Company of Illinois**

Ameren Services Company is a centralized services company that provides administrative support services to Ameren Corporation and its operating companies, subsidiaries, and affiliates, including the following public utility affiliates:  Union Electric Company d/b/a Ameren Missouri, Ameren Illinois Company d/b/a Ameren

ix

Illinois, and Ameren Transmission Company of Illinois ("Ameren Companies"). The Ameren Companies are wholly-owned subsidiaries of Ameren Corporation, a publicly traded holding company. At this time, Ameren Services Company believes that T. Rowe Price and Vanguard (which is not publicly traded) each own more than 10% of the outstanding shares of Ameren Corporation.

**4.      American   Transmission   Company   LLC   ("American Transmission")**

American Transmission is governed by its corporate manager, ATC Management Inc. American Transmission's owners include utilities, municipalities, municipal electric companies, and electric cooperatives from Wisconsin, Michigan, Minnesota, and Illinois. Two publicly-held corporations (through wholly-owned subsidiaries) own 10% or more of American Transmission's ownership interests: WEC Energy Group, Inc. and Alliant Energy Corporation.

**5.      Central Minnesota Municipal Power Agency**

Central Minnesota Municipal Power Agency is a non-stock, joint-action agency organized under the laws of the State of Minnesota. Central Minnesota Municipal Power Agency has no corporate parent.

**6.      Cooperative Energy**

Cooperative Energy is an incorporated, not-for-profit, cooperative electric power association that is owned and controlled by its eleven members, which are distribution rural electric power associations. Cooperative Energy has no corporate

parent, and no publicly held corporations have a 10% or greater ownership interest in Cooperative Energy.

### 7. Dairyland Power Cooperative ("Dairyland")

Dairyland is a non-stock cooperative association made up of twenty-four distribution cooperatives. Dairyland has no corporate parent.

### 8. The Dayton Power and Light Co. d/b/a AES Ohio

The Dayton Power and Light Co. d/b/a AES Ohio ("Dayton") is a corporation organized and existing under the laws of the State of Ohio, with its principal place of business in Dayton, Ohio. Dayton is a public utility company subject to the jurisdiction of FERC. Dayton is an owner of transmission and distribution facilities located within PJM Interconnection, L.L.C. ("PJM").

Dayton is a subsidiary of DPL, Inc., which is a subsidiary of AES DPL Holdings, LLC. AES DPL Holdings, LLC is a subsidiary of The AES Corporation ("AES"). AES is a Delaware corporation with its principal place of business in Arlington, Virginia. AES has issued shares of stock and debt securities to the public. Investment funds owned by Vanguard hold over ten percent of the publicly-traded shares of AES. Vanguard is investor-owned by its fund shareholders.

### 9. Duke Energy Business Services, LLC for Duke Energy Indiana, LLC ("Duke Indiana")

Duke Indiana is owned 100% by Duke Energy Indiana Holdco, LLC ("Duke Indiana Holdco"). Duke Indiana Holdco is owned 80.1% by Cinergy Corp. and

19.9% by Epsom Investment Pte. Ltd., ("Epsom Investment"). Cinergy Corp. is owned 100% by Duke Energy Corporation, a publicly-traded energy holding company. Epsom Investment is a wholly-owned subsidiary of GIC Infra Holdings Pte. Ltd. ("GIC"). GIC is a direct, wholly-owned subsidiary of GIC (Ventures) Pte. Ltd. ("GIC Ventures"). GIC Ventures is wholly-owned by the Government of Singapore through the Minister for Finance, a statutory corporation set up by the Government of Singapore to own and administer government assets.

**10.** **Duke Energy Corporation on behalf of its affiliates Duke Energy Business Services LLC, Duke Energy Ohio, Inc. and Duke Energy Kentucky, Inc.**

Duke Energy Business Services LLC ("DEBS"), Duke Energy Kentucky, Inc. ("DEK"), and Duke Energy Ohio, Inc. ("DEO") (collectively, "Duke Energy") provide the following:

DEBS certifies that it is a Delaware limited liability company. DEBS is a direct, wholly-owned subsidiary of Duke Energy Corporate Services, Inc., which is a direct, wholly-owned subsidiary of Duke Energy Corporation (NYSE: DUK).

DEK certifies that it is a non-governmental corporation organized and existing under the laws of Kentucky. DEK is a direct, wholly-owned subsidiary of DEO. DEO certifies that it is a non-governmental corporation organized and existing under the laws of Ohio. DEO is a direct, wholly-owned subsidiary of Cinergy Corp.

Cinergy Corp. is a direct, wholly-owned subsidiary of Duke Energy Corporation (NYSE: DUK).

Duke Energy Corporation is publicly traded on the New York Stock Exchange. There is no company that has a 10 percent or greater ownership interest in Duke Energy Corporation.

**11.    Duquesne Light Company**

Duquesne Light Company ("Duquesne Light") is engaged in the transmission, distribution, and sale of electricity to retail and wholesale customers in Pennsylvania within the footprint of the PJM regional transmission organization ("PJM RTO" or "PJM"). Duquesne Light is a Market Participant in PJM and is a wholly owned subsidiary of Duquesne Light Holdings.

In May 2007, Duquesne Light was acquired by a consortium of private equity investors. The consortium consists of several institutional investors which own all of the common equity of Duquesne Light's parent company, DQE Holdings LLC. The members of the consortium are: GIC Pte. Ltd., John Hancock Financial/PGGM Infrastructure Fund, and APG Americans Infrastructure/CalSTRS/Argo Infrastructure Partners.

No publicly held company owns more than 10% of Duquesne Light.

**12.    East Kentucky Power Cooperative, Inc.**

East Kentucky Power Cooperative, Inc. ("EKPC") is a not-for-profit generation and transmission cooperative that provides wholesale electric power to 16 owner-member cooperatives in Kentucky. EKPC's principal place of business is in Winchester, Kentucky. EKPC is owned by its 16 retail electric distribution cooperative members. None of EKPC's members owns 10% or more of EKPC.

**13.    Evergy Kansas Central, Inc., Evergy Metro, Inc., and Evergy Missouri West, Inc. ("Evergy Companies")**

The Evergy Companies are wholly-owned subsidiaries of Evergy, Inc., a publicly-traded company. Vanguard may own more than a 10% interest in Evergy's publicly traded stock as of the date of this filing.

**14.    Exelon Corporation on behalf of its affiliates Atlantic City Electric Company, Baltimore Gas and Electric Company, Commonwealth Edison Company, Delmarva Power & Light Company, PECO Energy Company, and Potomac Electric Power Company**

Exelon Corporation ("Exelon") is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania and has its principal offices at 10 South Dearborn Street, Chicago, Illinois 60603. Exelon has no parent company, and no publicly-held company has a 10 percent or greater ownership interest in Exelon. Vanguard is believed, based on the Schedule 13G/A it most recently filed with the Securities and Exchange Commission, to hold a greater than 10 percent voting

xiv

interest in Exelon pursuant to FERC blanket authorization under Federal Power Act Section 203, 16 U.S.C. § 824b.

**15.    The FirstEnergy Transmission Companies**

The petitioners referred to as the "FirstEnergy Transmission Companies" comprise two related sets of entities:

1.    Petitioners Jersey Central Power & Light Co., The Potomac Edison Co., and Monongahela Power Co. are wholly owned subsidiaries of FirstEnergy Corporation, a publicly held company (ticker symbol FE on the New York Stock Exchange). No publicly held company owns more than 10% of FirstEnergy Corporation.

2.    Petitioners American Transmission Systems, Inc., Mid-Atlantic Interstate Transmission LLC, Keystone Appalachian Transmission Co., and Trans-Allegheny Interstate Line Co. are wholly owned subsidiaries of FirstEnergy Transmission, LLC ("FET"). The majority of FET is in turn owned by FirstEnergy Corporation. 49.9% of FET is owned by North American Transmission Company II L.P., a controlled investment vehicle entity of Brookfield Infrastructure Partners (ticker symbol BIP on the New York Stock Exchange).

No other publicly held corporation has a direct financial interest in the outcome of the litigation through the FirstEnergy Transmission Companies by

reason of a franchise, lease, other profit sharing agreement, insurance, or indemnity agreement, and there is no affiliated master limited partnership, real estate investment trust, or other similarly situated legal entity whose shares are publicly held or traded.

### 16.    Great River Energy

Great River Energy is a non-stock, generation and transmission cooperative corporation made up of twenty-six member distribution cooperatives.  Great River Energy does not have a parent corporation and has not issued shares to the public.

### 17.    Indiana Municipal Power Agency

The Indiana Municipal Power Agency is a body corporate and politic and political subdivision of the State of Indiana.

### 18.    Indianapolis Power & Light Company d/b/a AES Indiana

AES Indiana is a subsidiary of IPALCO Enterprises, Inc. ("IPALCO"). IPALCO is majority owned (82.35%) by AES U.S. Investments, Inc., which is majority owned (85%) by AES U.S. Holdings, LLC (IPALCO and AES U.S. Holdings' minority ownership is described immediately below).  AES U.S. Holdings is wholly-owned by AES.  AES has issued shares of stock and debt securities to the public.  Investment funds owned by Vanguard hold over ten percent of the publicly-traded shares of AES.  Vanguard is investor-owned by its fund shareholders.

IPALCO is minority owned (17.65%) by CDP Infrastructures Fund L.P. ("CDP Fund"), and AES U.S. Investments is also minority owned by CDP Fund (15%). CDP Fund is an indirect, minority investor having certain investor protection rights, while AES has majority ownership and control over both AES U.S. Investments and IPALCO. CDP Fund is wholly-owned by Caisse de dépôt et placement du Québec, a Canadian institutional investor that manages public and private pension plans and insurance programs in Quebec.

### 19.    Lafayette Utilities System ("Lafayette")

Lafayette is a municipal utility organized under the laws of the State of Louisiana. The governing authority of Lafayette is the Lafayette City Council. Lafayette has no corporate parent and issues no stock.

### 20.    MidAmerican Energy Company ("MidAmerican")

MidAmerican is an indirect subsidiary of Berkshire Hathaway Energy Company ("BHEC"). Intermediate parent entities of MidAmerican are MHC Inc. and MidAmerican Funding, LLC. Neither MHC Inc., which is 100% owned by MidAmerican Funding, LLC, nor MidAmerican Funding, LLC, which is owned 100% by BHEC, has publicly traded equity securities. BHEC is a consolidated subsidiary of Berkshire Hathaway Inc., a publicly traded entity, which owns approximately 100% of the voting equity of BHEC.

**21.    Minnesota Power (and its subsidiary Superior Water, Light & Power Company)**

ALLETE, Inc., d/b/a Minnesota Power, which owns Superior Water, Light & Power Company, is a publicly traded company.  BlackRock, Inc. and Vanguard each own more than 10% of the shares outstanding of ALLETE, Inc.  BlackRock, Inc. is a publicly traded entity, while Vanguard is not.

**22.    Montana-Dakota Utilities Co.**

Montana-Dakota Utilities Co. is a subsidiary of MDU Resources Group, Inc. MDU Resources Group, Inc. is a publicly-held company whose common stock is publicly traded on the New York Stock Exchange.  Based on a review of institutional investors' filings with the Securities and Exchange Commission, Vanguard (which is not publicly traded) and BlackRock, Inc. (which is publicly traded) each own more than 10% of the outstanding shares of MDU Resources Group, Inc.

**23.    Northern Indiana Public Service Company LLC**

Northern Indiana Public Service Company LLC is a wholly-owned subsidiary of NIPSCO Holdings II LLC.  NIPSCO Holdings II LLC is owned 80.1% by NIPSCO Holdings I LLC, 15.3841% by BIP Blue Buyer L.L.C., and 4.5159% by BIP Blue Buyer VCOC L.L.C.  NIPSCO Holdings I LLC is a wholly-owned subsidiary of NiSource Inc.  NiSource Inc. is a public utility holding company whose common stock is publicly traded on the New York Stock Exchange.  As of March 31,

2025, Vanguard (which is not publicly traded) and BlackRock, Inc. (which is publicly traded) each own more than 10% of the outstanding shares of NiSource Inc.

**24.    Northern States Power Company, a Minnesota corporation, and Northern States Power Company, a Wisconsin corporation, subsidiaries of Xcel Energy Inc.**

Northern States Power Company, a Minnesota corporation, and Northern States Power Company, a Wisconsin corporation, are wholly-owned utility operating company subsidiaries of Xcel Energy Inc.  The securities of Xcel Energy Inc. are publicly traded.  Based on a review of institutional investors' filings with the Securities and Exchange Commission, Vanguard (which is not publicly traded) owns 13.0% of the outstanding shares of Xcel Energy Inc.  Certain operating company subsidiaries of Xcel Energy Inc., including Northern States Power Company, a Minnesota corporation, and Northern States Power Company, a Wisconsin corporation, have issued first mortgage bonds and other debt securities. A complete list of all debt securities of Xcel Energy Inc. subsidiaries is available at the Xcel Energy Inc. website (www.xcelenergy.com) under Investor Relations.

**25.    Northwestern Wisconsin Electric Company**

Northwestern Wisconsin Electric Company is an investor-owned utility.  No corporation, partnership, or business trust owns a controlling interest in Northwestern Wisconsin Electric Company.

### 26. Otter Tail Power Company

Otter Tail Power Company is a wholly-owned subsidiary of Otter Tail Corporation. As of July 29, 2025, BlackRock, Inc. and Vanguard each owned more than 10% of the shares outstanding of Otter Tail Corporation. BlackRock, Inc. is a publicly traded entity, while Vanguard is not.

### 27. PPL Electric Utilities Corporation

PPL Electric Utilities Corporation ("PPL Electric") is a wholly owned indirect subsidiary of PPL Corporation. Vanguard has a 10% or greater ownership interest in PPL Corporation. No other publicly held company has a 10% or greater ownership interest in PPL Corporation.

PPL Electric is a Pennsylvania Corporation and owner of transmission and distribution facilities located within PJM. PPL Electric is a provider of last resort in central and eastern Pennsylvania under Pennsylvania's Electric Generation Customer Choice and Competition Act, 66 Pa. C. S. § 2801, *et seq.*

### 28. Prairie Power, Inc.

Prairie Power, Inc. is a wholesale generation and transmission electric cooperative that is wholly-owned by its member electric cooperatives, none of which is publicly traded. Prairie Power, Inc. does not have a parent corporation, and no publicly-held corporation owns 10% or more of its stock.

### 29.  Rockland Electric Company

Rockland Electric Company is a wholly-owned subsidiary of Orange and Rockland Utilities, Inc., which is a wholly-owned subsidiary of Consolidated Edison, Inc.  Consolidated Edison, Inc. is publicly traded on the New York Stock Exchange.  Vanguard, a non-publicly-held company, is believed, based on the Schedule 13G/A it has most recently filed with the Securities and Exchange Commission, to hold greater than 10 percent of the voting equity interests in Consolidated Edison, Inc.

### 30.  Southern Indiana Gas & Electric Company (d/b/a CenterPoint Energy Indiana South)

Southern Indiana Gas & Electric Company's parent is Vectren, LLC, with Vectren Utility Holdings, LLC as the intermediate parent.  Vectren Utility Holdings, LLC is the holder of interest in Southern Indiana Gas & Electric Company.  Vectren, LLC is an indirect wholly owned subsidiary of CenterPoint Energy, Inc.  CenterPoint Energy, Inc. is a publicly held company.

### 31.  Southern Minnesota Municipal Power Agency

Southern Minnesota Municipal Power Agency is a joint-action agency comprised of seventeen member municipalities.  Southern Minnesota Municipal Power Agency is a non-profit political subdivision of the State of Minnesota.

**32.   Virginia Electric and Power Company d/b/a Dominion Energy Virginia**

Dominion Energy Services, Inc., on behalf of its affiliate Virginia Electric and Power Company d/b/a Dominion Energy Virginia ("Dominion"), hereby provides the following Corporate Disclosure Statement:

Dominion is a Virginia corporation, and is regulated by FERC as a "public utility" under the Federal Power Act. Dominion generates, transmits, and distributes electricity for sale in Virginia and North Carolina. Dominion Energy Virginia is a wholly-owned subsidiary of Dominion Energy, Inc. ("Dominion Energy") (NYSE: D), which is a publicly-held company incorporated in the Commonwealth of Virginia.  To Dominion's knowledge, no publicly-held corporation owns 10 percent or greater ownership interest in Dominion Energy.  However, from time to time pursuant to FERC blanket authorizations, certain institutional investors may hold 10 percent or more of the outstanding shares of Dominion Energy, and Dominion currently understands that affiliates of Vanguard may hold more than 10 percent of Dominion Energy's outstanding shares.

**33.   Wolverine Power Supply Cooperative, Inc. ("Wolverine")**

Wolverine is a not-for-profit, generation and transmission electric cooperative made up of five distribution cooperative members.  Wolverine has two other members, one of which operates solely as a Michigan alternative retail electric supplier and the other of which operates both as a Michigan alternative retail electric

xxii

supplier and as a FERC-jurisdictional entity. Wolverine's members are its customers and its owners. Wolverine has no publicly issued stock.

**34.  Xcel Energy Services Inc. on behalf of Southwestern Public Service Company**

Xcel Energy Services Inc. is the centralized service company that provides administrative and general services to Xcel Energy Inc., a corporation whose common stock is publicly held and traded. The securities of Xcel Energy Inc. are publicly traded. Based on a review of institutional investors' filings with the Securities and Exchange Commission, Vanguard (which is not publicly traded) owns 13.0% of the outstanding shares of Xcel Energy Inc. Southwestern Public Service Company is a wholly-owned, vertically integrated electric utility subsidiary of Xcel Energy.

Respectfully submitted,

*/s/ John Lee Shepherd, Jr.*
John Lee Shepherd, Jr.
Hunton Andrews Kurth LLP
2200 Pennsylvania Ave, NW
Suite 900
Washington, DC 20037
(202) 955-1500
jshepherd@hunton.com

*On behalf of Transmission Owner Petitioners*

xxiii

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................1

JURISDICTIONAL STATEMENT .........................................................................3

STATEMENT OF ISSUES .......................................................................................4

STATUTES AND REGULATIONS .........................................................................5

STATEMENT OF THE CASE...................................................................................5

    I.    STATUTORY AND REGULATORY BACKGROUND...................5

        A.    FPA Sections 205 and 206 ...............................................5

        B.    Regional Transmission Planning Under FERC Orders 888, 890, and 1000 ...............................................................7

    II.    PROCEEDINGS BELOW .................................................................10

SUMMARY OF THE ARGUMENT ......................................................................15

STANDING ..............................................................................................................17

STANDARD OF REVIEW .....................................................................................17

ARGUMENT ............................................................................................................18

    I.    THE INCLUSION REQUIREMENT VIOLATES FPA SECTION 205 BY INFRINGING ON TRANSMISSION PROVIDERS' RATE AND TARIFF FILING RIGHTS...................18

        A.    FERC's Authority to Regulate Transmission Rates Is Limited by the Text and Structure of FPA Sections 205 and 206 ......................................................................................19

        B.    Order 1920-A Violates the FPA by Requiring Transmission Providers to File Another Party's Rate Proposal and Supporting Documents ..........................................21

    II.    SECTION 206 DOES NOT AUTHORIZE FERC TO IMPOSE THE INCLUSION REQUIREMENT .................................................23

        A.    FERC Cannot Compel Utilities to Make Rate Filings for State Entities Under Section 206...............................................25

            1.    FERC Cannot Ignore the Statutory Scheme ....................26

            2.    FERC's Decision to Place State Rate Proposals on Equal Footing with Public Utility Proposals Is an Unnecessary Departure from Long-Standing Precedent.................................................................28

xxiv

3.     FERC Cannot Avoid Section 205's Limitations on Its Authority Simply by Calling It a "Compliance Process." ...............................................30

B.     Order 1920-A Fails the First Step of the FPA Section 206 Analysis ...............................................31

III.     FERC LACKS AUTHORITY TO IMPOSE THE CONSULTATION REQUIREMENT ...............................................33

A.     Requiring a Transmission Provider to Consult with State Entities Before Amending Its Tariff Violates FPA Section 205 ...............................................34

B.     The Requirement that Public Utilities Explain Why They Have Not Adopted States' Proposed Changes Also Violates FPA Section 205 ...............................................35

IV.     THE INCLUSION AND CONSULTATION REQUIREMENTS VIOLATE PETITIONERS' FIRST AMENDMENT RIGHTS BY COMPELLING THEM TO EXPRESS VIEWS THAT THEY OPPOSE ...............................................36

A.     The Inclusion and Consultation Requirements Implicate Petitioners' First Amendment Rights ...............................................37

B.     Strict Scrutiny Applies ...............................................40

1.     The Inclusion and Consultation Requirements Are Not Content-Neutral ...............................................41

2.     The Inclusion and Consultation Requirements Are Not Commercial Speech ...............................................41

C.     Under Strict Scrutiny, the Inclusion and Consultation Requirements Are Unconstitutional ...............................................42

D.     Even Under Intermediate Scrutiny, the Inclusion and Consultation Requirements Are Unconstitutional ...............................................46

V.     ORDER 1920 IMPROPERLY REQUIRES TRANSMISSION PROVIDERS TO DISCLOSE HIGHLY SENSITIVE CONFIDENTIAL INFORMATION ON FACILITIES TO BE REPLACED ...............................................48

A.     Order 1920 Fails to Justify Requiring Transmission Owners to Make Their Right-Sizing Facilities List Available to Anyone Other than the Relevant Planning Organization ...............................................52

xxv

B.     The Requirement to Disclose Potential Opportunities for Development and Right-Sizing Is Anticompetitive and Unduly Discriminatory...............................................................55

CONCLUSION.................................................................................................58

# TABLE OF AUTHORITIES

**CASES**                                                                    **PAGE(S)**

*American Column & Lumber Co. v. United States*,
   257 U.S. 377 (1921) ............................................................... 56

*American Entertainers, L.L.C. v. City of Rocky Mount*,
   888 F.3d 707 (4th Cir. 2018) ................................................ 40

*American Municipal Power, Inc. v. FERC*,
   86 F.4th 922 (D.C. Cir. 2023) ......................................... 49, 53

*Americans for Prosperity Foundation v. Bonta*,
   594 U.S. 595 (2021) ............................................................. 43

*Atlantic City Electric Co. v. FERC*,
   295 F.3d 1 (D.C. Cir. 2002) ............... 2, 6, 19, 21, 22, 23, 27, 31, 34, 35, 36, 56

*Atlantic City Electric Co. v. FERC*,
   329 F.3d 856 (D.C. Cir. 2003) .............................................. 2

*Billups v. City of Charleston*,
   961 F.3d 673 (4th Cir. 2020) .......................................... 40, 44

*Billups v. City of Charleston*,
   194 F.Supp.3d 452 (D.S.C. 2016), *aff'd*,
   961 F.3d 673 (4th Cir. 2020) .............................................. 44

*Book People, Inc. v. Wong*,
   91 F.4th 318 (5th Cir. 2024), *reh'g denied en banc*,
   98 F.4th 657 (5th Cir. 2024). .............................................. 42

*Burson v. Freeman*,
   504 U.S. 191 (1992) ............................................................. 43

*California Motor Transport Co. v. Trucking Unlimited*,
   404 U.S. 508 (1972) ............................................................. 37

xxvii

*Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*,
447 U.S. 557 (1980)................................................................................ 41

*Central Illinois Light Co. v. Citizens Utility Board*,
827 F.2d 1169 (7th Cir. 1987) ....................................................... 39, 47

*Cities of Bethany v. FERC*,
727 F.2d 1131 (D.C. Cir. 1984)............................................................ 23

*City of Cleveland v. FERC*,
773 F.2d 1368 (D.C. Cir. 1985)...................................................... 25, 27

*City of Cleveland v. Federal Power Commission*,
525 F.2d 845 (D.C. Cir. 1975)............................................................. 34

*City of Winnfield v. FERC*,
744 F.2d 871 (D.C. Cir. 1984)............................................................... 6

*Clark v. Community for Creative Non-Violence*,
468 U.S. 288 (1984)............................................................................. 41

*De Leon v. Holder*,
761 F.3d 336 (4th Cir. 2014) ........................................................ 17-18

*Diamond Alternative Energy, LLC v. EPA*,
606 U.S. 100 (2025).............................................................................. 17

*Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*,
365 U.S. 127 (1961)............................................................................. 37

*Education Media Co. at Virginia Tech., Inc. v. Insley*,
731 F.3d 291 (4th Cir. 2013) ............................................................... 40

*Electric District No. 1 v. FERC*,
774 F.2d 490 (D.C. Cir. 1985)...................................................... 26, 31

*Emera Maine v. FERC*,
854 F.3d 9 (D.C. Cir. 2017)............................... 6, 7, 18, 21, 31, 33

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009)............................................................ 17, 28, 30

*Federal Power Commission v. Sierra Pacific Power Co.*,
  350 U.S. 348 (1956)........................................................................ 24

*FERC v. Electric Power Supply Ass'n*,
  577 U.S. 260 (2016)...................................................................... 6

*Frontiero v. Richardson*,
  411 U.S. 677 (1973)...................................................................... 44

*Gulf States Utilities Co. v. Federal Power Commission*,
  411 U.S. 747 (1973)...................................................................... 56

*In re Louisiana Public Service Commission*,
  58 F.4th 191 (5th Cir. 2023) ........................................................ 21

*International Transmission Co. v. FERC*,
  988 F.3d 471 (D.C. Cir. 2021)..................................................... 7

*Kottle v. Northwest Kidney Centers*,
  146 F.3d 1056 (9th Cir. 1998) .................................................. 37-38

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992)...................................................................... 17

*Mayor of Baltimore v. Azar*,
  973 F.3d 258 (4th Cir. 2020) ...................................................... 28

*Massachusetts Department of Public Utilities v. FERC*,
  729 F.2d 886 (1st Cir. 1984)........................................ 7, 18-19, 20, 26

*Michigan v. EPA*,
  268 F.3d 1075 (D.C. Cir. 2001).................................................... 2

*Moody v. NetChoice, LLC*,
  603 U.S. 707 (2024)................................................ 38, 39, 46, 47

*Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Insurance Co.*,
463 U.S. 29 (1983)................................................................. 17, 29, 52

*New England Power Generators Ass'n v. FERC*,
879 F.3d 1192 (D.C. Cir. 2018).......................................................... 31

*New York v. FERC*,
535 U.S. 1 (2002)......................................................................... 8

*North Carolina Department of Environmental Quality v. FERC*,
3 F.4th 655 (4th Cir. 2021) ............................................................ 17

*NRG Power Marketing, LLC v. FERC*,
862 F.3d 108 (D.C. Cir. 2017).......................................................... 34

*Oklahoma Gas & Electric Co. v. FERC*,
11 F.4th 821 (D.C. Cir. 2021)........................................................... 27

*Pacific Gas & Electric Co. v. Public Utility Commission of California*,
475 U.S. 1 (1986)............................................................ 38, 39, 41, 47

*Papago Tribal Utility Authority v. FERC*,
610 F.2d 914 (D.C. Cir. 1979).......................................................... 21

*People for the Ethical Treatment of Animals, Inc. v. North Carolina Farm Bureau Federation, Inc.*,
60 F.4th 815 (4th Cir. 2023) ........................................................... 45

*Permian Basin Area Rate Cases*,
390 U.S. 747 (1968).................................................................... 34

*Posadas de Puerto Rico Associates v. Tourism Co. of Puerto Rico*,
478 U.S. 328 (1986).................................................................... 41

*PPL Wallingford Energy LLC v. FERC*,
419 F.3d 1194 (D.C. Cir. 2005)......................................................... 51

xxx

*PSEG Long Island LLC v. Town of North Hempstead*,
  158 F.Supp.3d 149 (E.D.N.Y. 2016) ....................................................... 39, 40, 47

*Public Service Electric & Gas Co. v. FERC*,
  989 F.3d 10 (D.C. Cir. 2021) .................................................................... 22, 45

*Reed v. Town of Gilbert*,
  576 U.S. 155 (2015) .................................................................................. 18, 42

*Sierra Club v. West Virginia Department of Environmental
  Protection*,
  64 F.4th 487 (4th Cir. 2023) ........................................................................ 18

*Soderberg v. Carrión*,
  645 F.Supp.3d 460 (D. Md. 2022) ................................................................ 43

*South Carolina Generating Co. v. Federal Power Commission*,
  249 F.2d 755 (4th Cir. 1957) .................................................................. 23, 26

*South Carolina Public Service Authority v. FERC*,
  762 F.3d 41 (D.C. Cir. 2014) ..................................................................... 9, 32

*Spencer v. Herdesty*,
  571 F.Supp. 444 (S.D. Ohio 1983) ............................................................... 43

*Stuart v. Camnitz*,
  774 F.3d 238 (4th Cir. 2014) ........................................................................ 46

*Tashjian v. Republican Party of Connecticut*,
  479 U.S. 208 (1986) ...................................................................................... 43

*TNA Merchant Projects, Inc. v. FERC*,
  857 F.3d 354 (D.C. Cir. 2017) ...................................................................... 31

*Todd v. Exxon Corp.*,
  275 F.3d 191 (2d Cir. 2001) .......................................................................... 50

*Transmission Access Policy Study Group v. FERC*,
  225 F.3d 667 (D.C. Cir. 2000) ........................................................................ 8

*Turner Broadcasting System, Inc. v. FCC*,
520 U.S. 180 (1997).................................................................. 18, 46

*United States v. O'Brien*,
391 U.S. 367 (1968).......................................................................... 46

*United Gas Pipe Line Co. v. Mobile Gas Service Corp.*,
350 U.S. 332 (1956)................................................. 7, 19, 30, 34

*United States v. Container Corp. of America*,
393 U.S. 333 (1969).......................................................................... 50

*United States v. Playboy Entertainment Group, Inc.*,
529 U.S. 803 (2000).......................................................................... 45

*United States v. United States Gypsum Co.*,
438 U.S. 422 (1978).......................................................................... 50

*Venetian Casino Resort, L.L.C. v. NLRB*,
793 F.3d 85 (D.C. Cir. 2015)........................................................ 37

*Washington Post v. McManus*,
944 F.3d 506 (4th Cir. 2019) ....................................................... 43

*Western Resources, Inc. v. FERC*,
9 F.3d 1568 (D.C. Cir. 1993).................................................... 24, 29

*Wooley v. Maynard*,
430 U.S. 705 (1977)......................................................................... 38

## ADMINISTRATIVE CASES

*Appalachian Power Co.*,
170 FERC ¶ 61,196 (2020)............................................................ 54

*Building for the Future Through Electric Regional Transmission
Planning and Cost Allocation and Generator Interconnection*,
179 FERC ¶ 61,028 (2022),  .................................................... 9, 10, 11

*Building for the Future Through Electric Regional Transmission
    Planning and Cost Allocation*,
    Order No. 1920,
    187 FERC ¶ 61,068 (2024), ............................. 1, 11, 12, 22, 30, 32, 48, 49, 52

*Building for the Future Through Electric Regional Transmission
    Planning and Cost Allocation*,
    Order No. 1920-A,
    189 FERC ¶ 61,126 (2024)............... 1, 3, 13, 21, 22, 23, 24, 27, 28, 30, 32, 33,
                                                                    36, 44, 47, 51, 52, 56

*Building for the Future Through Electric Regional Transmission
    Planning and Cost Allocation*,
    Order No. 1920-B,
    191 FERC ¶ 61,026 (2025),.............................................. 1, 4, 14, 22, 40, 44, 48

*Kern River Gas Transmission Co.*,
    142 FERC ¶ 61,132 (2013)................................................................. 24, 29, 30

*PJM Interconnection, L.L.C.*,
    117 FERC ¶ 61,331 (2006), *order on reh'g & clarification*,
    119 FERC ¶ 61,318 (2007), *aff'd sub nom. Public Service Electric
    & Gas Co. v. FERC*, 324 F. App'x 1 (D.C. Cir. 2009) ............................... 29, 30

*PJM Interconnection, L.L.C.*,
    172 FERC ¶ 61,136, *reh'g denied*,
    173 FERC ¶ 61,225 (2020)............................................................................. 53

*PJM Interconnection, L.L.C.*,
    173 FERC ¶ 61,134 (2020), *order addressing arguments raised on reh'g*,
    174 FERC ¶ 61,180 (2021)...................................................................... 24, 29

*PJM Interconnection, L.L.C.*,
    178 FERC ¶ 61,083 (2022)............................................................................ 31

*Preventing Undue Discrimination and Preference in Transmission Service*,
Order No. 890, 118 FERC ¶ 61,119 (2007), *order on reh'g,* Order No. 890-A, 121 FERC ¶ 61,297, *order on reh'g & clarification*, Order No. 890-B, 123 FERC ¶ 61,299 (2008), *order on reh'g*, Order No. 890-C, 126 FERC ¶ 61,228, *order on clarification*, Order No. 890-D, 129 FERC ¶ 61,126 (2009) ................................................ 8, 9

*Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Services by Public Utilities; Recovery of Stranded Costs by Public Utilities and Transmitting Utilities*,
Order No. 888, 75 FERC ¶ 61,080 (1996), *order on reh'g*, Order No. 888-A, 78 FERC ¶ 61,220, *order on reh'g*, Order No. 888-B, 81 FERC ¶ 61,248 (1997), *order on reh'g*, Order No. 888-C, 82 FERC ¶ 61,046 (1998)..................................................... 7, 8

*Transmission Planning and Cost Allocation by Transmission Owning and Operating Public Utilities*,
Order No. 1000, 136 FERC ¶ 61,051 (2011), Order No. 1000-A, 139 FERC ¶ 61,132, *order on reh'g & clarification*, Order No. 1000-B, 141 FERC ¶ 61,044 (2012), *aff'd sub nom. South Carolina Public Service Authority v. FERC*, 762 F.3d 41 (D.C. Cir. 2014)........................................................ 9, 10, 25, 56

*Western Massachusetts Electric Co.*,
23 FERC ¶ 61,025 (1983) .......................................................................... 19-20

**STATUTES**

5 U.S.C. § 706.................................................................................................... 17

Federal Power Act (FPA), 16 U.S.C. §§ 791-825r

    FPA section 205, 16 U.S.C. § 824d........................ 1, 6, 19, 21, 30, 35, 50, 55

    FPA section 206, 16 U.S.C. § 824e ........................ 1, 7, 19, 21, 31, 32, 37, 52

    FPA section 313, 16 U.S.C. § 825*l*................................................................ 4

**OTHER**

U.S. Constitution, amend. I.............................................................................. 2, 37

18 C.F.R. § 385.211 ...................................................................................... 26, 31

## INTRODUCTION

The Transmission Owner Petitioners own the bulk of the electric transmission assets in regional transmission systems operating in thirty states and the District of Columbia, and are responsible for maintaining, replacing, and upgrading these assets. They are, respectively, members of three Federal Energy Regulatory Commission ("FERC" or "Commission") authorized regional transmission organizations ("RTOs")—Midcontinent Independent System Operator, Inc. ("MISO TOs"), PJM Interconnection, L.L.C. ("PJM TOs"), and Southwest Power Pool, Inc. ("SPP TOs"). They challenge the lawfulness of several aspects of FERC rulemaking orders addressing long-term transmission planning.[1]

FERC's new rules exceed its authority under the Federal Power Act ("FPA") by impairing the rights of the Petitioners as public utilities to voluntarily file the rates and conditions for transmission service they provide with their assets, in violation of FPA section 205, 16 U.S.C. § 824d. The rules were imposed as an involuntary rate change without meeting the requirements of FPA section 206, 16 U.S.C. § 824e, and also violate Petitioners' First Amendment rights by compelling them to submit

---

[1] *Building for the Future Through Electric Regional Transmission Planning and Cost Allocation*, Order 1920, 187 FERC ¶ 61,068, JA0615-1978, *order on reh'g*, Order 1920-A, 189 FERC ¶ 61,126 (2024), JA1979-2797, *reh'g denied*, Order 1920-B, 191 FERC ¶ 61,026 (2025), JA2798-2965 (collectively, "Orders").

filings that express economic and policy views that they oppose.  U.S. Const. amend. I.  Finally, the rules unduly discriminate against Petitioners by requiring them to disclose confidential information that competing transmission providers are not required to submit.

"As a federal agency, FERC is a 'creature of statute,' having 'no constitutional or common law existence or authority, but *only* those authorities conferred upon it by Congress.'" *Atl. City Elec. Co. v. FERC*, 295 F.3d 1, 8 (D.C. Cir. 2002) ("*Atlantic City*") (quoting *Mich. v. EPA*, 268 F.3d 1075, 1081 (D.C. Cir. 2001), *enforced*, 329 F.3d 856 (D.C. Cir. 2003).  FPA sections 205 and 206 grant FERC limited oversight of public utility rates, triggered only when existing or proposed rates or terms are outside the broad range of "just and reasonable" rates.  In limiting FERC's role, "[s]ection 205 of the [FPA] gives a utility the right to file rates and terms for services rendered with its assets" and "FERC lacks the authority to require the utility owners to give up their statutory rights under section 205." *Atlantic City*, 295 F.3d at 9.

FERC's Orders on review attempt to deny public utilities these statutory rights.  FERC compels public utilities to include and promote state-designed utility tariff provisions, including those with which utilities disagree, which FERC would then be free to adopt even though the utility's proposal was just and reasonable (the "Inclusion Requirement").  FERC also requires public utilities to consult with states before exercising their statutory right to amend their long-term transmission cost

2

allocation, and to explain why they reject contrary state proposals (the "Consultation Requirement"). This violates both the FPA and the First Amendment. The rules also violate the Administrative Procedure Act ("APA") because FERC did not explain: (a) its reversal of prior positions and departure from precedent; (b) why existing processes are insufficient or new mandates are necessary; or (c) why transmission providers must publicly disclose highly sensitive internal data (the "Disclosure Requirement").

The petitions for review should be granted, and the unlawful Inclusion, Consultation, and Disclosure Requirements should be vacated.

## JURISDICTIONAL STATEMENT

FERC issued Order 1920 on May 13, 2024. The PJM TOs and the MISO TOs timely requested rehearing on or before June 12, 2024. PJM TOs First Rehearing Request, JA4758-4770; MISO TOs First Rehearing Request, JA5312-5336. FERC denied rehearing by operation of law on July 15, 2024. First Notice of Denial, JA5386. Petitions for review were timely filed in several circuits; those petitions were consolidated in this Court.

On November 21, 2024, FERC issued Order 1920-A and modified its determinations in response to numerous rehearing requests. Order 1920-A, JA1979-2797. Transmission Owner Petitioners, now including the SPP TOs, timely sought rehearing of Order 1920-A on or before December 23, 2024. SPP TOs Rehearing

3

Request, JA5410-5446; MISO TOs Second Rehearing Request, JA5447-5489; PJM TOs Second Rehearing Request, JA5490-5526. FERC denied those rehearing requests by operation of law on January 23, 2025. Second Notice of Denial, JA5527. Transmission Owner Petitioners timely filed new or amended petitions for review to add Order 1920-A on or before February 21, 2025.

FERC then issued Order 1920-B on April 11, 2025. Order 1920-B, JA2798-2965. Transmission Owner Petitioners again timely amended their petitions for review to include Order 1920-B. FERC's orders are final and this Court has jurisdiction under FPA section 313(b), 16 U.S.C. § 825*l*(b).

## STATEMENT OF ISSUES

1.     Whether Order 1920-A exceeds FERC's jurisdiction and violates FPA sections 205 and 206 and FERC precedent, is arbitrary and capricious, and is not supported by substantial evidence because it compels public utilities to include state cost-allocation proposals in public utility compliance filings, which FERC will then consider on par with the utility's own proposal.

2.     Whether Order 1920-A unlawfully burdens public utilities' FPA section 205 filing rights and contradicts precedent by requiring public utilities to engage in consultations before amending their cost allocations for long-term transmission projects and justify their decisions not to adopt state-proposed cost allocations.

4

3.      Whether Order 1920 is arbitrary and capricious and not the product of reasoned decision-making because FERC:

(i)      failed to find under FPA section 206's two-step analysis that public utilities' existing cost-allocation methodologies are unjust and unreasonable before adding new requirements for each cost-allocation filing; and

(ii)      failed to address the harms that result when transmission owners are required to disclose their confidential information for use in the right-sizing process without adequate protection.

4.      Whether Order 1920-A violates the First Amendment to the United States Constitution by compelling public utilities to submit cost-allocation proposals they do not accept and explain why they do not accept contrary cost allocations preferred by state regulators.

**STATUTES AND REGULATIONS**

Relevant statutes are available in publicly accessible databases and sources.

**STATEMENT OF THE CASE**

## I.      STATUTORY AND REGULATORY BACKGROUND

### A.      FPA Sections 205 and 206

FPA section 205 provides that "[a]ll rates and charges made, demanded, or received by any public utility for or in connection with the transmission or sale of electric energy … and all rules and regulations affecting or pertaining to such rates

5

or charges shall be just and reasonable." 16 U.S.C. § 824d(a). "Section 205 enables a utility to propose changes in its own rates." *Emera Me. v. FERC*, 854 F.3d 9, 24 (D.C. Cir. 2017) ("*Emera Maine*"). Public utilities do so by filing their rates, terms, and conditions for FERC-jurisdictional service with FERC, and they may file any subsequent rate changes they deem necessary upon 60 days' prior notice. *See* 16 U.S.C. §§ 824d(c)-(d). A public utility's individual statutory filing rights can only be ceded voluntarily. *See Atlantic City*, 295 F.3d 1.

FERC reviews the new rates or practices, "but it can reject them only if it finds that the changes proposed by the public utility are not 'just and reasonable.'" *Id.* at 9 (quoting 16 U.S.C. § 824d(e)). Given FERC's reactive posture, section 205 "is intended for the benefit of the utility." *Emera Maine*, 854 F.3d at 24 (quoting *City of Winnfield v. FERC*, 744 F.2d 871, 875 (D.C. Cir. 1984)).

Section 206 allows FERC to modify public utilities' existing filed rates and tariffs, but only if it finds that "any rule, regulation, practice, or contract affecting [a jurisdictional] rate, charge, or classification is unjust, unreasonable, unduly discriminatory or preferential," 16 U.S.C. § 824e(a), and only if those "rules or practices [] '*directly* affect the [wholesale] rate.'" *FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 278 (2016). Section 206 requires FERC to proceed in two steps. FERC must first determine that the existing rate or practice is unjust, unreasonable, unduly discriminatory or preferential. "Only *after* having made the

6

determination that the utility's existing rate fails that test may FERC exercise its section 206 authority to impose a new rate." *Emera Maine*, 854 F.3d at 21 (listing cases). FERC then must also satisfy a separate burden to show that its replacement rate is just and reasonable and not unduly discriminatory or preferential. *Id.* at 24-25; *accord Int'l Transmission Co. v. FERC*, 988 F.3d 471, 485 (D.C. Cir. 2021).

Sections 205 and 206 "together allow the utility the choice among various reasonable rate practices." *Mass. Dep't of Pub. Utils. v. FERC*, 729 F.2d 886, 888 (1st Cir. 1984). They "are simply parts of a single statutory scheme under which all rates are established initially by [public utilities], by contract or otherwise, and all rates are subject to being modified by the Commission upon a finding that they are unlawful." *United Gas Pipe Line Co. v. Mobile Gas Serv. Corp.*, 350 U.S. 332, 341 (1956) ("*Mobile*").

### B. Regional Transmission Planning Under FERC Orders 888, 890, and 1000

FERC Order 888 transformed the electric industry by requiring transmission-owning utilities to make their transmission facilities available to other customers under nondiscriminatory Open Access Transmission Tariffs.[2] Among other things,

---

[2] *Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Services by Public Utilities; Recovery of Stranded Costs by Public Utilities and Transmitting Utilities*, Order 888, 75 FERC ¶ 61,080 (1996), *order on reh'g*, Order 888-A, 78 FERC ¶ 61,220, *order on reh'g*, Order 888-B, 81 FERC ¶ 61,248 (1997), *order on reh'g*, Order 888-C, 82 FERC ¶ 61,046 (1998), *aff'd in part & remanded in part sub nom.*

7

Order 888 encouraged utilities to form voluntary "independent system operators" "to efficiently coordinate transmission planning (and expansion), operation and use on a regional (and interregional) basis."  Order 888, Attach. I, § I.1.38.

Order 888 established minimum requirements for transmission planning, Order 888, *pro forma* Open Access Transmission Tariff § 28.2, which FERC expanded in 2007 in Order 890 to "require[e] transmission providers to open their transmission planning process to customers, coordinate with customers regarding future system plans, and share necessary planning information with customers."[3]

Although Order 890 "strongly encourage[d] state participation in the transmission planning process and expect[ed] that all transmission providers will respect states' concerns" by "coordinat[ing] with relevant state regulators (including city councils, local siting boards, and other agencies) that wish to participate," FERC did not prescribe a particular level of participation.  Order 890 at P 574.  While states had been involved in transmission planning since before the enactment of the FPA,

---

*Transmission Access Policy Study Grp. v. FERC*, 225 F.3d 667 (D.C. Cir. 2000), *aff'd sub nom. New York v. FERC*, 535 U.S. 1 (2002).

[3]  *Preventing Undue Discrimination and Preference in Transmission Service*, Order 890, 118 FERC ¶ 61,119, at P 3, *order on reh'g,* Order 890-A, 121 FERC ¶ 61,297 (2007), *order on reh'g & clarification*, Order 890-B, 123 FERC ¶ 61,299 (2008), *order on reh'g & clarification*, Order 890-C, 126 FERC ¶ 61,228, *order on clarification*, Order 890-D, 129 FERC ¶ 61,126 (2009).

8

FERC emphasized their newly heightened role in the planning process should they "wish to participate." *Id.*; *see Building for the Future Through Electric Regional Transmission Planning and Cost Allocation and Generator Interconnection*, Notice of Proposed Rulemaking, 179 FERC ¶ 61,028, at P 314 (2022) ("NOPR") ("[S]tates retain siting authority over transmission facilities …."), JA0390.

Four years later, FERC created a mandatory regional planning process in Order 1000, which required transmission providers to participate in regional planning, eliminated their federal rights of first refusal for transmission facilities selected in a regional transmission plan, and required them to develop procedures for joint evaluation of regional transmission needs.[4]  Order 1000 was intended to "(1) ensure that transmission planning processes at the regional level consider and evaluate, on a non-discriminatory basis, possible transmission alternatives and produce a transmission plan that can meet transmission needs more efficiently and cost-effectively; and (2) ensure that the costs of transmission solutions chosen to meet regional transmission needs are allocated fairly to those who receive benefits from them." Order 1000 at P 4.  FERC "strongly encourage[d] states to participate

---

[4]    *Transmission Planning and Cost Allocation by Transmission Owning and Operating Public Utilities*, Order 1000, 136 FERC ¶ 61,051 (2011), *order on reh'g & clarification*, Order 1000-A, 139 FERC ¶ 61,132, *order on reh'g & clarification*, Order 1000-B, 141 FERC ¶ 61,044 (2012), *aff'd sub nom. S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d 41 (D.C. Cir. 2014).

actively in both the identification of transmission needs driven by Public Policy Requirements and the evaluation of potential solutions to the identified needs," but did not suggest that the encouraged participation could impact utilities' section 205 filing rights. *Id.* P 212.

## II.      PROCEEDINGS BELOW

In April 2022, FERC issued the NOPR, which proposed that transmission providers in every planning region engage in Long-Term Regional Transmission Planning and develop Long-Term Scenarios as part of that process. *See* NOPR at PP 64, 68, 84, JA0203-0204, JA0207-0208, JA0218-0219. As relevant here, FERC proposed to require transmission providers to revise their tariffs to include: (1) a Long-Term Regional Transmission Cost Allocation Method to allocate the costs of Long-Term Regional Transmission Facilities; (2) a State Agreement Process by which one or more state regulatory bodies that FERC termed "Relevant State Entities" ("RSEs"), could voluntarily agree to a cost-allocation method; or (3) a combination of the two. *See id.* P 302, JA0381-0382. FERC proposed that transmission providers be required to seek agreement of state entities regarding the Long-Term Regional Transmission Cost Allocation Method, State Agreement Process, or both. *Id.* P 303, JA0382-0383.

FERC also proposed that transmission providers evaluate whether their transmission replacement projects can be "right-sized" to "more efficiently or cost-

10

effectively address regional transmission needs identified in Long-Term Regional Transmission Planning." *Id.* P 403, JA0457-0458. FERC proposed that transmission providers submit a list of existing transmission facilities at or above 230 kV that they believe may need replacement over the next decade. *Id.* P 404, JA0458. Comments on the NOPR were filed by 196 parties and exceeded 15,000 pages. Order 1920 at P 36, JA0645.

Order 1920, issued on May 13, 2024, did not adopt the NOPR's proposal that transmission providers must seek agreement from state regulators regarding the cost-allocation method for Long-Term Regional Transmission Facilities. *See id.* P 1354, JA1563. Instead, FERC required only that transmission providers provide a "forum for negotiation that enables meaningful participation" of state entities and explain how they had complied with the requirement to establish a six-month Engagement Period to negotiate Long-Term Regional Transmission Cost Allocation Methods and/or a State Agreement Process. *Id.* P 1357, JA1565-1566. FERC declined requests to require transmission providers to submit state-preferred cost-allocation methods that transmission owners did not accept. *See id.* P 1363, JA1569-1570. As FERC stated:

> [W]e do not impose any obligation on transmission providers to file a cost allocation method for Long-Term Regional Transmission Facilities with which they disagree, even if such a method were proposed to the transmission providers pursuant to a Commission-approved State Agreement Process, unless the transmission providers have clearly indicated their assent to do

11

> so as part of a Commission-approved State Agreement Process in their [tariffs].

*Id.* P 1429, JA1614.

FERC also largely adopted the NOPR's "right-sizing" requirements. However, FERC declined to adopt additional confidentiality safeguards for transmission providers' lists of in-kind replacement estimates. *See id.* P 1736, JA1822-1823. Per FERC, "once the transmission providers have determined … that an in-kind replacement transmission facility can be right-sized …, we find that the transmission providers must make public the underlying in-kind replacement transmission facility." *Id.*, JA1823.

The MISO TOs and PJM TOs sought rehearing of Order 1920, with the PJM TOs challenging Order 1920's lack of right-sizing confidentiality protections. *See* PJM TOs First Rehearing Request at 4, JA4761.

FERC denied all rehearing requests by operation of law on July 15, 2024. First Notice of Denial, JA5386. Numerous parties petitioned for review in several circuits, which were consolidated here. The Court granted FERC's motion to hold the pending appeals in abeyance and a subsequent extension to allow FERC to issue a substantive rehearing order.

In Order 1920-A, FERC reversed itself in part, now allowing state entities to infringe on transmission providers' filing rights. Specifically, the order sets forth a new Inclusion Requirement that:

12

> [W]hen [RSEs] notify transmission providers by the deadline for communicating agreement that they agree on a Long-Term Regional Transmission Cost Allocation Method and/or State Agreement Process resulting from the Engagement Period, *the transmission providers must include that method or process in the transmittal or as an attachment to their compliance filing, even if the transmission providers propose a different Long-Term Regional Transmission Cost Allocation Method or do not propose to adopt a State Agreement Process.* We further direct transmission providers to include in the transmittal or as an attachment to their compliance filings any information that [RSEs] provide to them regarding the state negotiations during the Engagement Period.

Order 1920-A at P 651, JA2533 (emphasis added) (citation omitted). FERC stated that it would not give any preference to the transmission providers' proposed compliance filing, but instead "may adopt any cost allocation method proposed by the [RSEs] and submitted on compliance so long as it complies with Order No. 1920." *Id.* P 659, JA2541.

Order 1920-A also imposed a Consultation Requirement, which compels transmission providers to consult with state entities "prior to amending the Long-Term Regional Transmission Cost Allocation Method(s) and/or State Agreement Process(es)." Separately, "if [RSEs] seek, consistent with their chosen method to reach agreement, for the transmission provider to amend that method or process," the provider must explain on its website why it has chosen not to propose state-offered amendments. *Id.* P 691, JA2567. FERC also affirmed its decision to require

13

transmission providers to make public their "right-sized" in-kind replacement transmission facilities. *See id*. P 898, JA2729-2730.

Each Transmission Owner Petitioner timely sought rehearing of Order 1920-A, asserting that FERC's Inclusion and Consultation Requirements violate: (1) FPA sections 205 and 206 by unlawfully burdening public utility filing rights and giving "preferential filing privileges to states that the FPA does not authorize," SPP TOs Rehearing Request at 13, JA5422; *see* MISO TOs Second Rehearing Request at 8-9, JA5454-5455; PJM TOs Second Rehearing Request at 6-7, JA5495-5496; and (2) the APA by failing to support the requirements with substantial evidence and reasonably explain FERC's policy reversal and diversion from precedents, *see, e.g.*, SPP TOs Rehearing Request at 7-8, 24-27, JA5416-5417, JA5433-5436; MISO TOs Second Rehearing Request at 8-9, JA5454-5455; PJM TOs Second Rehearing Request at 7-8, JA5496-5497. The PJM TOs also argued that Order 1920-A violates the First Amendment. *See* PJM TOs Second Rehearing Request at 8, JA5497.

Following FERC's denial of Order 1920-A rehearing requests by operation of law on January 23, 2025, Second Notice of Denial, JA5527, FERC denied those requests in substance in Order 1920-B, on May 30, 2025. Order 1920-B at P 3, JA2806-2807. FERC denied or ignored the Transmission Owner Petitioners' arguments, including that: (1) FERC may not lawfully require public utilities to include states' preferred cost-allocation methodologies in public utility compliance

14

filings, *id.* PP 52-53, JA2853-2855; (2) states already have adequate opportunities to provide their input to regional transmission plans and the Consultation Requirement is unlawful, *id.* PP 58-65, JA2860-2868; (3) FERC's findings at the first step of FPA section 206 analysis were insufficient to support its exercise of authority to override existing procedures, *id.* P 4, JA2807-2808; and (4) Order 1920-A violated utilities' First Amendment rights by compelling them to submit state proposals that they oppose and explain why they oppose them, *id.* P 94, JA2900-2901.

No party requested rehearing of Order 1920-B, and Transmission Owner Petitioners amended their petitions to include review of that order.

## SUMMARY OF THE ARGUMENT

FERC's Orders exceed its statutory authority, trespass on constitutional rights, and violate the APA:

*First*, the Inclusion Requirement violates public utilities' rights under FPA section 205 by requiring public utilities to include state-proposed changes with which they disagree. Section 205 is for the benefit of public utilities, who cannot lawfully be forced to include proposals from states or other third parties who have no authority to make section 205 filings.

*Second*, FERC declared it will consider such state proposals on a par with the transmission utility's own section 205 filing, contrary to FERC's duty to accept the

15

utility's section 205 filing if it is within a broad zone of just and reasonable rates, and even if FERC or some third party might prefer a different rate. FERC also improperly compelled transmission providers to explain not only why their proposals are just and reasonable, but also why their proposals are superior to alternative state proposals.

*Third*, FERC's Consultation Requirement unlawfully conditions transmission providers' FPA section 205 rights and violates the APA by requiring utilities to engage in prefiling consultations with states and explain why they have not adopted state-proposed cost allocation changes, contrary to judicial precedent holding that constraining utility filing rights unlawfully burdens their statutory rights. The Inclusion Requirement and Consultation Requirement also violate the First Amendment because they compel noncommercial speech.

*Fourth*, FERC has failed to justify its requirement that transmission providers publicly disclose confidential internal data. This injury is compounded by FERC's asymmetric determination that putative transmission owners who wish to compete with public utilities are excused from this requirement, giving those competitors a significant and unjustified commercial advantage.

These unlawful provisions of the Orders must be set aside as arbitrary and capricious and contrary to law and constitutional right.

16

**STANDING**

Petitioners' standing is apparent from the record because they are the direct objects of the FERC Orders they challenge.  FERC's rules directly impair their statutory filing rights, compel their speech in violation of the First Amendment, and force them to disclose competitively sensitive information.  There is thus "'little question' that the regulation causes injury to [them] and that invalidating the regulation would redress [their] injuries." *Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100, 112 (2025) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).

**STANDARD OF REVIEW**

The Court must "set aside" agency orders that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," including agency actions "contrary to constitutional right … ; in excess of statutory jurisdiction … ; without observance of procedure required by law;" and those "unsupported by substantial evidence ...." 5 U.S.C. § 706(2); *accord, e.g.*, *N.C. Dep't of Envt. Quality v. FERC*, 3 F.4th 655, 666 (4th Cir. 2021).  FERC must therefore "examine the relevant data and articulate a satisfactory explanation for its action." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  Agencies must also acknowledge and reasonably explain any departures from precedent.  *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-16 (2009); *De Leon v.*

17

*Holder*, 761 F.3d 336, 344 (4th Cir. 2014). The Court does not "rubber stamp" agency decisions. *Sierra Club v. W. Va. Dep't of Env't Prot.*, 64 F.4th 487, 501 (4th Cir. 2023).

Attempts to limit First Amendment rights are subject to either strict scrutiny, which requires FERC to prove that its action "furthers a compelling interest and is narrowly tailored to achieve that interest," *Reed v. Town of Gilbert*, 576 U.S. 155, 171 (2015), or intermediate scrutiny, under which FERC must show that its requirement "does not burden substantially more speech than necessary to further [FERC's] interests." *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 189 (1997).

## ARGUMENT

### I. THE INCLUSION REQUIREMENT VIOLATES FPA SECTION 205 BY INFRINGING ON TRANSMISSION PROVIDERS' RATE AND TARIFF FILING RIGHTS

Section 205, which allows utilities to file proposed rates or changes to rates and provides that FERC may reject them only if it finds they are not just and reasonable, is "intended for the benefit of the utility." *Emera Maine*, 854 F.3d at 24. This statutory structure respects the operational expertise, financial accountability, and governance responsibilities of utilities, while maintaining measured regulatory oversight. Congress did not design a regime in which utilities serve merely as conduits for the policy preferences of others. The utility, not FERC or any third party, is given "the choice among various reasonable rate practices." *Mass. v. FERC*,

18

729 F.2d at 888. The Inclusion Requirement of Order 1920-A unlawfully undermines the utility's role in the statutory structure.

### A. FERC's Authority to Regulate Transmission Rates Is Limited by the Text and Structure of FPA Sections 205 and 206

FERC has "*only* those authorities conferred upon it by Congress." *Atlantic City*, 295 F.3d at 8 (internal quotation marks omitted). FERC's authority to regulate transmission rates, including tariff provisions that allocate the cost of transmission projects, comes solely from FPA sections 205 and 206. 16 U.S.C. §§ 824d, 824e. All rates are "*established initially*" by public utilities, and FERC can modify them only upon a finding that they are unlawful. *Atlantic City*, 295 F.3d at 10 (quoting *Mobile*, 350 U.S. at 341).

The right to propose or modify rates under section 205 is given exclusively to public utilities. *See* 16 U.S.C. § 824d(c) (requiring "every public utility" to file its rates for FERC-jurisdictional services); *accord, e.g.*, *id.* § 824d(d) ("[N]o change shall be made by any public utility in any such rate … except after sixty days' notice"). The decision whether or what to file is inherent in the statutory filing rights reserved exclusively for public utilities. "FERC lacks the authority to require the petitioners to cede their right under section 205 of the Act to file changes in rate design with the Commission." *Atlantic City*, 295 F.3d at 9.

FERC itself has previously recognized that utilities *alone* possess the right to decide what to file under FPA section 205. *W. Mass. Elec. Co.*, 23 FERC ¶ 61,025,

19

at 61,063 (1983) ("The statutory scheme of the FPA is therefore designed to balance the interests of utilities and their ratepayers by permitting the utilities to voluntarily change their jurisdictional rates, subject only to contractual limitations and review by [FERC] …. This statutory scheme would clearly be greatly altered if a state commission through its orders could control the timing and content of wholesale rate filings made by utilities."), *aff'd sub nom. Mass. v. FERC*, 729 F.2d 886 (rejecting "Massachusetts' claim that § 205 includes 'regulator-compelled' utility-proposed changes" because that "would prevent the utility from choosing among reasonable rate-practice alternatives" and because "the accompanying uncertainty could raise capital costs to the detriment of the very consumer whom the regulatory statute seeks to protect").

Nothing in section 205 authorizes FERC to force public utilities to file another entity's rate proposal. FERC may change existing rates, but it may only do so under FPA section 206, 16 U.S.C. § 824e. Courts have firmly rebuffed FERC attempts to blur the statutory distinction between sections 205 and 206, especially when FERC's purpose was to weaken public utilities' unilateral ability to exercise their statutory filing rights. *Atlantic City* squarely rejected FERC's attempt to use its authority under section 206 to require utilities to cede their section 205 rights, finding that "FERC [was] attempting to deny the utility petitioners the very statutory rights given

20

to them by Congress" and that "nothing in section 206" permitted FERC to deny utilities this right. *Atlantic City*, 295 F.3d at 9-11; *Emera Maine*, 854 F.3d at 24-25.

### B. Order 1920-A Violates the FPA by Requiring Transmission Providers to File Another Party's Rate Proposal and Supporting Documents

Order 1920-A requires utilities to include with their compliance filings any cost-allocation methodologies (i.e., rate proposals) preferred by state regulators. Order 1920-A at P 651, JA2533. It effectively allows state entities to make section 205 filings on an equal footing with public utilities. This violates FPA section 205, which explicitly provides that only public utilities can propose a rate or rate change. 16 U.S.C. § 824d(c) ("[E]very *public utility* shall file with the Commission … schedules showing all rates and charges for any transmission or sale subject to the jurisdiction of the Commission." (emphasis added)); *In re La. Pub. Serv. Comm'n*, 58 F.4th 191, 192 (5th Cir. 2023) ("Public utilities may file a new rate at any time under Section 205 of the [FPA], and other parties—such as retail regulators—may then assert that the rate is 'unjust, unreasonable, unduly discriminatory or preferential' in a Section 206 complaint." (citation omitted)); *accord Papago Tribal Util. Auth. v. FERC*, 610 F.2d 914, 928 (D.C. Cir. 1979) (rate alterations under section 205 are "utility-made" and FERC can only change rates through a section 206 proceeding).

States are not public utilities.  16 U.S.C. § 824(e) ("The term 'public utility' when used in [the FPA] means any person who owns or operates facilities subject to the jurisdiction of [FERC] under [the FPA].").  Rather, they are governmental entities with the authority to regulate retail sales and siting of facilities by electric utilities in their state.  Order 1920 at P 44, JA0647 ("[A] Relevant State Entity is any state entity responsible for electric utility regulation or siting electric transmission facilities within the state or portion of a state located in the transmission planning region.").

FERC cannot circumvent statutory limitations by creating a rule that trumps the FPA's plain meaning and confers on state entities filing rights that Congress withheld.  *Atlantic City*, 295 F.3d at 11.  A regulation "cannot be the basis for denying [utilities] their rights provided by a statute enacted by both houses of Congress and signed into law by the president." *Id.*; *accord Pub. Serv. Elec. & Gas Co. v. FERC*, 989 F.3d 10, 19 (D.C. Cir. 2021).  In the Orders, FERC unlawfully compels public utilities to cede to state entities their statutory rights to make filings under the FPA by requiring utilities to submit state proposals and declaring that FERC could accept those proposals even if the transmission provider's proposed rate is just and reasonable.  Order 1920-A at P 659, JA2540-2541; Order 1920-B at P 45, JA2845-2846.

22

## II.　SECTION 206 DOES NOT AUTHORIZE FERC TO IMPOSE THE INCLUSION REQUIREMENT

FERC attempts to justify the Inclusion Requirement by referencing section 206, Order 1920-A at P 61, JA2030-2031. But "nothing in section 206 sanctions denying petitioners their right to unilaterally file rate and term changes." *Atlantic City*, 295 F.3d at 10. "The basic powers conferred upon the Commission by 4(e) and 5(a) of the [Natural Gas Act ("NGA")] (and 205(e) and 206(a) of the [FPA]) are to review the rates and contracts *made in the first instance* by the utilities and, if they are found to be unlawful, to determining a just and reasonable rate to be thereafter observed." *S.C. Generating Co. v. Fed. Power Comm'n*, 249 F.2d 755, 760 (4th Cir. 1957) (emphasis added).

Under section 206, if FERC finds an existing rate unjust and unreasonable, it has two options. It can either (a) set the rate under section 206, *or* (b) require the utility to file a new rate that addresses the deficiencies that make the existing rate unjust or unreasonable. It cannot designate a third party, in place of the utility, to propose or file a new rate. Even when FERC sets a rate under section 206, the public utility retains its right under section 205 to respond by setting its own preferred rate, which FERC must accept as long as that utility-set rate is just and reasonable. *See Cities of Bethany v. FERC*, 727 F.2d 1131, 1136 (D.C. Cir. 1984) (finding that FERC is not required to evaluate protestors' alternatives to a rate proposal under section 205, but only whether the public utility's proposed changes are just and

23

reasonable); *Kern River Gas Transmission Co.*, 142 FERC ¶ 61,132, at PP 36-45 (2013) ("*Kern River*") (acting under NGA section 5, the parallel provision to FPA section 206,[5] and finding "[i]f the pipeline's proposal is just and reasonable, the Commission must accept it, regardless of whether other just and reasonable rates, terms, and conditions of service may exist" (citing *W. Res., Inc. v. FERC*, 9 F.3d 1568, 1578-79 (D.C. Cir. 1993))); *PJM Interconnection, L.L.C.*, 173 FERC ¶ 61,134, at P 117 n.175 (2020) ("Because PJM may make a section 205 filing to revise these Tariff provisions, we find it reasonable to accept PJM's proposal over alternatives if PJM's proposal is just and reasonable"), *order addressing arguments raised on reh'g*, 174 FERC ¶ 61,180 (2021).

FERC did not fix a cost-allocation methodology for long-term regional transmission projects in its Orders. Rather, it established a set of requirements that any cost-allocation methodology must meet and ordered the utilities in each region to submit a regional cost-allocation methodology that complies with those requirements. Order 1920-A at PP 914, 917, JA2739-2740, JA2741. The Transmission Owner Petitioners do not contest those substantive requirements or their obligation to comply with them. But they do contest FERC's unlawful process

---

[5]    Courts, like FERC, routinely cite precedent concerning the parallel provisions of the FPA and the NGA interchangeably. *See, e.g.*, *Fed. Power Comm'n v. Sierra Pac. Power Co.*, 350 U.S. 348 (1956).

under which state proposals must also be included with a utility's proposals. The only entities with the right to make such rate filings and determine their content are public utilities.

## A. FERC Cannot Compel Utilities to Make Rate Filings for State Entities Under Section 206

If, after finding a rate unjust and unreasonable under section 206, FERC does not fix the rate but instead provides requirements for designing a new just and reasonable replacement rate, the utility must then propose a replacement that complies with the requirements outlined by FERC. *See, e.g., Elec. Dist. No. 1 v. FERC*, 774 F.2d 490, 494 (D.C. Cir. 1985) ("*Electric District*"); Order 1000 at P 603 (requiring "each public utility transmission provider to show on compliance that its cost allocation method or methods for regional cost allocation and its cost allocation method or methods for interregional cost allocation are just and reasonable and not unduly discriminatory or preferential").

When FERC orders a compliance filing in these circumstances, it has left the "process initially to the utility, subject to subsequent agency approval." *Electric District*, 774 F.2d at 494. If the utility's proposed replacement rate is consistent with the underlying order's requirements and is just and reasonable, FERC must accept it. *See City of Cleveland v. FERC*, 773 F.2d 1368, 1374 (D.C. Cir. 1985) (holding that if the underlying order does not precisely determine the proscribed rate, FERC's analysis is whether the proposal is just and reasonable and supported by substantial

25

evidence). To do otherwise would violate the statutory scheme Congress established in sections 205 and 206. Section 206 does not authorize FERC to decide that the existing rate is not just and reasonable, decline to fix a replacement rate, and then solicit proposals from all interested parties to determine the just and reasonable replacement rate. Other parties may comment on or protest the utility's proposed replacement rate, 18 C.F.R. § 385.211(a), but elevating third-party rate proposals to equal weight with a utility's proposed replacement rate violates sections 205 and 206.

### 1. FERC Cannot Ignore the Statutory Scheme

FERC's reasoning that section 206 authorizes the Inclusion Requirement is incorrect for two reasons. First, requiring a public utility to submit another entity's proposal with which it disagrees, and would not file absent the requirement, violates the public utility's right to initiate rate changes governing its own facilities. Section 205 provides public utilities, not states, the autonomy to decide what rates to propose to govern service rendered on its facilities. *Mass. v. FERC*, 729 F.2d at 886-87 (affirming FERC finding that states cannot force utilities to make FPA section 205 filings); *S.C. Generating Co.*, 249 F.2d at 760 ("Under the statutory scheme all rates are established initially by the utilities …."). Requiring a public utility to submit another entity's rate proposal violates that autonomy.

26

Section 206 does not authorize FERC to override utilities' section 205 rights. *Atlantic City*, 295 F.3d at 10 ("[N]othing in section 206 sanctions denying petitioners their right to unilaterally file rate and term changes."). When remedying a rate that it finds no longer just and reasonable under section 206, FERC must stay within the statutory limits of its power, just as in any other remedial context. *See, e.g.*, *Okla. Gas & Elec. Co. v. FERC*, 11 F.4th 821, 832 (D.C. Cir. 2021) (holding that FERC "may craft a variety of remedies," but "[t]he filed rate doctrine … limits that remedial authority"). Section 206 does not allow FERC to rewrite the statute to mandate that utilities facilitate filings by parties not authorized to file under section 205.

Second, allowing FERC to pick winners and losers among competing proposals exceeds FERC's authority under section 206, which allows FERC to establish a new rate only after FERC explicitly finds that an existing rate is unjust and unreasonable. If FERC does not establish a new rate, but simply pronounces requirements that a new rate must satisfy and directs the utility to propose a compliant rate, FERC's role becomes passive. *See City of Cleveland*, 773 F.2d at 1374 (compliance filing can be accepted as just and reasonable even if it does not strictly comply with FERC's underlying order). If the proposed replacement rate complies with those requirements and is just and reasonable, FERC must accept it.

27

FERC could have chosen—and did choose in Order 1920 before reversing itself—to abide by its lawful, "passive" role of first reviewing whether a utility's submission is consistent with Order 1920 and otherwise just and reasonable after considering the comments or protests that any interested person, including state entities, may file. Order 1920-A, in contrast, strayed beyond FERC's statutory role, setting up a mechanism that grants the states' rate proposal equal weight to the public utilities' rate proposal. FERC stated it "is not required to accept a cost allocation proposal from a transmission provider simply because it may comply with Order No. 1920," but that "[FERC] may adopt any cost allocation method proposed by the [RSEs] and submitted on compliance so long as it complies with Order No. 1920." Order 1920-A at P 659, JA2541. This conclusion ignores utilities' statutory right to determine themselves what rates to file among just and reasonable alternatives.

> ### 2. *FERC's Decision to Place State Rate Proposals on Equal Footing with Public Utility Proposals Is an Unnecessary Departure from Long-Standing Precedent*

Order 1920 unlawfully departs from FERC precedent without a reasoned explanation. *See Fox Television Stations*, 556 U.S. at 515-16 (requiring agencies to acknowledge and explain departures from precedent); *Mayor of Balt. v. Azar*, 973 F.3d 258, 275 (4th Cir. 2020) (agencies must "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection

28

between the facts found and the choice made.'" (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43)).

FERC has repeatedly upheld the principle that it must accept public utility compliance filings if they are just and reasonable even if FERC might prefer competing proposals. *See, e.g.*, *Kern River*, 142 FERC ¶ 61,132, at P 37 & n.51 ("If the pipeline's proposal is just and reasonable, [FERC] must accept it, regardless of whether other just and reasonable rates, terms, and conditions of service may exist." (citing *W. Res., Inc.*, 9 F.3d at 1578-79)); *PJM Interconnection*, 173 FERC ¶ 61,134, at P 117 n.175 ("Because PJM may make a section 205 filing to revise these Tariff provisions, we find it reasonable to accept PJM's proposal over alternatives if PJM's proposal is just and reasonable."); *PJM Interconnection, L.L.C.*, 117 FERC ¶ 61,331, at P 85 (2006) ("[W]hen choosing between competing just and reasonable options, [FERC] has previously stated that it will accept the proposal of a utility if it is just and reasonable, rather than other competing just and reasonable proposals"), *order on reh'g & clarification*, 119 FERC ¶ 61,318 (2007), *aff'd sub nom. Pub. Serv. Elec. & Gas Co. v. FERC*, 324 F. App'x 1 (D.C. Cir. 2009).

FERC precedent further holds that, to accept rate proposals by third parties "on compliance," those third parties must first demonstrate that the public utilities' proposed rate is unjust and unreasonable, and not merely assert that their proposal is preferable. *See, e.g.*, *PJM Interconnection*, 117 FERC ¶ 61,331, at P 85

29

("[Protestors] do not, however, demonstrate that the [compliance proposal] is *not* just and reasonable, which is the burden it would have to meet to justify rejecting PJM's proposal here."); *accord, e.g.*, *Kern River*, 142 FERC ¶ 61,132, at P 37 (same under the parallel provisions of the NGA). FERC's contrary decision in Order 1920-A violates the FPA's statutory structure.

Order 1920-A acknowledges this precedent, but provides no explanation for abruptly departing from it. Order 1920-A at P 659, JA2540-2541 (stating FERC "generally does not consider alternate compliance proposals other than those filed by the relevant public utility"). This alone is sufficient to set aside the Orders below. *See, e.g.*, *Fox Television Stations*, 556 U.S. at 515-16.

FERC's unprecedented departure from its accepted compliance process is also unnecessary. States already have numerous ways to participate in cost allocation development, including the explicit "Engagement Period" dictated by Order 1920. Order 1920 at P 5, JA0628. States, like all other interested stakeholders, may protest any compliance filing submitted by the public utility. *See* 18 C.F.R. § 385.211(a)(1).

3.  *FERC Cannot Avoid Section 205's Limitations on Its Authority Simply by Calling It a "Compliance Process"*

Sections 205 and 206 provide that all rates are proposed initially by the public utility and subject to review by FERC. 16 U.S.C. §§ 824d, 824e; *Mobile*, 350 U.S. at 340-41. A compliance filing, on the other hand, is a construct FERC developed. *See generally Electric District*, 774 F.2d at 492 (observing that FERC's current

30

compliance filing "practice" is not contemplated in the statute). FERC cannot, by requiring a compliance filing, deny public utilities their right to file rates under section 205 or to propose a replacement rate (absent FERC fixing one) under section 206.

FERC has previously rejected attempts to use compliance filings to bypass the FPA's filing requirements. *See PJM Interconnection, L.L.C.*, 178 FERC ¶ 61,083, at PP 25-27 (2022). FERC has also recognized that it could not invoke any other FPA authority, "to circumvent the notice and filing requirements of FPA sections 205 and 206." *Id.* P 29 (citing *TNA Merch. Projects, Inc. v. FERC*, 857 F.3d 354, 359 (D.C. Cir. 2017)). Order 1920-A points to nothing in the text of the FPA that supports the requirement for public utilities to file the states' contrary rate proposals.

### B. Order 1920-A Fails the First Step of the FPA Section 206 Analysis

The Inclusion Requirement is contrary to law for the separate reason that FERC must demonstrate that an existing rate is in fact unjust and unreasonable before it acts under section 206. *Emera Maine*, 854 F.3d at 21 (citing 16 U.S.C. § 824e(b)); *New Eng. Power Generators Ass'n v. FERC*, 879 F.3d 1192, 1200 (D.C. Cir. 2018) ("In a proceeding under FPA § 206, … the challenging party, whether the Commission or a complainant, carries the burden of proving a rate is unjust and unreasonable."); *Atlantic City*, 295 F.3d at 10. FERC must specify the "substantial

evidence" on which it relies, and must explain how that evidence supports its conclusion. *S.C. Pub. Serv. Auth.*, 762 F.3d at 54.

Despite extending over 2,000 combined pages, FERC's Orders do not provide any evidence that existing regional cost-allocation methodologies are unjust and unreasonable—let alone that each specific one is unjust and unreasonable. FERC's finding that the existing rates are unjust and unreasonable is solely confined to the transmission planning process, specifically the absence of a long-term planning component in the regional planning process. Order 1920 at PP 114-23, 125, JA0717-0731, JA0732-0733; Order 1920-A at PP 61, 72-86, JA2030-2031, JA2038-2056. Rather than independently demonstrating with substantial evidence that any existing cost-allocation methodologies are unjust and unreasonable, FERC merely assumed that, because the long-term planning process will consider a wider array of benefits than is typically the case for short-term regional planning, it necessarily follows that cost-allocation methodologies must also change. Order 1920 at P 125, JA0732-0733. But FERC undermined its assumption by specifically acknowledging that "it may be just and reasonable to apply existing regional cost allocation methods" to the transmission facilities resulting from the long-term regional planning process. Order 1920-A at P 714, JA2584.

Courts have rejected such flimsy analysis to support a finding under the first step of the section 206 analysis. Without making the explicit and necessary finding

that the original regional cost allocation is unjust and unreasonable, FERC fails to meet section 206's statutory requirement. *Emera Maine*, 854 F.3d at 26-27. Accordingly, not only did FERC proceed improperly under step two of section 206 in establishing the Inclusion Requirement, *see supra* Argument Section II.A, it failed to make the proper findings at step one in the first place. The Inclusion Requirement must be set aside.

## III. FERC LACKS AUTHORITY TO IMPOSE THE CONSULTATION REQUIREMENT

Order 1920-A imposes a new Consultation Requirement that public utilities must consult with state entities before amending their existing tariff-based cost-allocation provisions. *See* Order 1920-A at P 691, JA2566-2567. Furthermore, if the states agree upon a proposed change to an existing cost-allocation methodology for long-term regional transmission projects and the utility disagrees, Order 1920-A requires the utility to explain its decision to reject the state's proposal. *See id.*, JA2566-2567. This new Consultation Requirement unlawfully violates transmission providers' section 205 rights. FERC lacks statutory authority to impose pre-filing consultation requirements or to compel transmission providers to justify their disagreement with state proposals.

33

### A.    Requiring a Transmission Provider to Consult with State Entities Before Amending Its Tariff Violates FPA Section 205

FERC's requirement that transmission providers consult with state entities before seeking any further amendments to their tariffs encumbers transmission providers' FPA section 205 rights to amend their tariffs "at any time," *Atlantic City*, 295 F.3d at 9, and without condition or prohibition, *see City of Cleveland v. Fed. Power Comm'n*, 525 F.2d 845, 855 (D.C. Cir. 1975) (citing *Mobile*, 350 U.S. at 338-44; *Permian Basin Area Rate Cases*, 390 U.S. 747, 822 (1968)). Judicial precedent confirms that a "utility may, *without negotiation or consultation with anyone*, set the rates it will charge prospective customers, *and change them at will*, so long as they have not been set aside by [FERC] on grounds of inconsistency with the Act." *City of Cleveland v. Fed. Power Comm'n*, 525 F.2d at 855 & n.72 (emphasis added); *accord Atlantic City*, 295 F.3d at 9-11. Requiring consultation with states imposes a precondition that unlawfully encumbers this statutory right.

FERC may not alter a filing under FPA section 205; it may impose only minor conditions and only with the filing utility's consent. *See NRG Power Mktg., LLC v. FERC*, 862 F.3d 108 (D.C. Cir. 2017). The Consultation Requirement delays and obstructs the filing process, particularly if disagreements arise between the utility and states. This undermines regulatory certainty and efficiency and risks politicizing tariff development by elevating states to a quasi-gatekeeping role. In any event, it

34

violates utilities' statutory right to initiate tariff changes "at any time" without external interference. *Atlantic City*, 295 F.3d at 9.

It is irrelevant that some transmission owners have voluntarily chosen to include notice and consultation as steps in the different context of formulating section 205 filings made by their RTOs. *See id.* at 10-11 ("Of course, utilities may choose to voluntarily give up, by contract, some of their rate-filing freedom under section 205."). For example, the PJM TOs' agreement requires consultation with RTO members (but not states) as a precondition to section 205 filings concerning regional rate design, but that voluntary agreement does not grant FERC the authority to impose the additional consultation requirements set forth in Order 1920-A.

**B.     The Requirement that Public Utilities Explain Why They Have Not Adopted States' Proposed Changes Also Violates FPA Section 205**

FERC cannot require public utilities to justify their decision not to adopt a third party's proposed change to their filed rate. Section 205 grants public utilities the exclusive authority to determine whether, when, and how to propose changes to the filed rate. *See* 16 U.S.C. § 824d. Inherent in a public utility's right to change its own rates under section 205 is its right *not* to change its own just and reasonable rates. *See Atlantic City*, 295 F.3d at 10. While a public utility must show that any proposed rate changes it *chooses to file* are just and reasonable, nothing in section 205 requires a utility to explain why it has elected not to propose a rate change, or why its existing rate remains just and reasonable. FERC's attempt to

35

impose such requirements exceeds its statutory authority and violates the utility's exclusive section 205 filing rights. If a state or other third party claims that a utility's existing rate is not just and reasonable, the proper avenue under the FPA is a section 206 complaint—in which the complainant bears the burden of pleading and proof. 16 U.S.C. § 824e(b) (stating the burden of proof "shall be upon the Commission or the complainant").

FERC's stated purpose for adopting the requirement that a utility must explain why it does not agree to an RSE's changes is to ensure that a transmission provider cannot "undo the efforts of [RSEs]" agreeing to a cost-allocation methodology through the Engagement Period and to "facilitate productive engagement with states." Order 1920-A at PP 688, 690-91, JA2565, JA2566-2567. But even if the requirement supports such a goal—and the record contains only FERC's bare assertion that it does—it "cannot be the basis for denying the petitioners their rights provided by a statute enacted by both houses of Congress and signed into law by the president." *Atlantic City*, 295 F.3d at 11. While utilities may voluntarily agree to consultation requirements, FERC cannot involuntarily impose one. *See id*.

## IV.  THE INCLUSION AND CONSULTATION REQUIREMENTS VIOLATE PETITIONERS' FIRST AMENDMENT RIGHTS BY COMPELLING THEM TO EXPRESS VIEWS THAT THEY OPPOSE

The Inclusion and Consultation Requirements violate not only the FPA and the APA; they also violate the First Amendment, which prohibits FERC from

36

compelling utilities to carry and promote state-designed policy proposals—including those with which utilities disagree—and to explain why they have not adopted state proposals to change the existing cost allocation. Strict scrutiny applies because these requirements are not content neutral and do not involve commercial speech. But under either strict- or intermediate-scrutiny, Order 1920's requirement that Petitioners include state proposals alongside their own constitutes unconstitutionally compelled speech.

### A. The Inclusion and Consultation Requirements Implicate Petitioners' First Amendment Rights

The First Amendment protects the right to free speech and to petition the government. U.S. Const. amend. I ("Congress shall make no law … abridging the freedom of speech … or the right of the people … to petition the Government for a redress of grievances."). Because this protection applies to "all departments of the Government," *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972), including FERC, a public utility's rate proposal filed with FERC is protected First Amendment activity, *see E. R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 138 (1961) (regulatory filing is protected First Amendment activity); *Venetian Casino Resort, L.L.C. v. NLRB*, 793 F.3d 85, 90 (D.C. Cir. 2015) (right to petition found where speakers "advocate their causes and points of view respecting resolution of their business and economic interests[, or] attempt to influence the passage or enforcement of laws" (internal citation omitted)); *Kottle v. Nw. Kidney*

37

*Ctrs.*, 146 F.3d 1056, 1059-60 (9th Cir. 1998) (lobbying efforts to prevent competitor from receiving license protected by Petition Clause).

"[T]he First Amendment offers protection when an entity engaging in expressive activity," such as petitioning the government, "is directed to accommodate messages it would prefer to exclude." *Moody v. NetChoice, LLC*, 603 U.S. 707, 731 (2024). The First Amendment also protects the "right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977).

FERC's Inclusion and Consultation Requirements violate both aspects of Petitioners' First Amendment rights because they: (i) direct public utilities to include a state-designed proposal in the utility's rate filing, even when the utility disagrees with the states' proposal; and (ii) compel the utility to explain why it declined to agree to the states' proposal to change an existing cost allocation. While FERC may impose certain informational requirements in public utility filings that support or underlie the utility's own proposal, it cannot compel a utility to file a competing state-designed policy proposal as part of the utility's own filing.

The Supreme Court directly applied this principle to government regulation of utility communications in *Pacific Gas & Electric Co. v. Public Utility Commission of California*, 475 U.S. 1, 9-12 (1986) ("*PG&E*"). In *PG&E*, the utility regularly included and distributed a newsletter in its billing envelopes to customers expressing its views of energy policy. The California Public Utilities Commission

38

directed the utility to also include material from a consumer-advocacy group giving a different perspective.  The Supreme Court held that the interest in "offer[ing] the public a greater variety of views" could not overcome the utility's First Amendment rights.  *Id*. at 12.  Subsequent decisions have invalidated mandates requiring utilities to distribute third-party messages, *see Cent. Ill. Light Co. v. Citizens Util. Bd.*, 827 F.2d 1169, 1173-74 (7th Cir. 1987), or post government-authored warnings on their property, *see PSEG Long Isl. LLC v. Town of N. Hempstead*, 158 F.Supp.3d 149, 166-67 (E.D.N.Y. 2016) ("*PSEG*")).

As in the above cases, the Inclusion and Consultation Requirements "force[] speakers [the utilities] to alter their speech to conform with an agenda they do not set." *PG&E*, 475 U.S. at 9.  Under the Inclusion Requirement, utilities are required to communicate content with which they disagree, and either speak out against the state proposal they are compelled to include with their filing or say nothing about it, risking the perception that they agree with or do not oppose the state's policy approach.  The Consultation Requirement, in turn, forces utilities to explain themselves publicly if they disagree with their states' proposal to change the existing cost-allocation policy.  Both requirements thus "profoundly alter[]" utilities' "choices about the views they will, and will not, convey.  And [the Supreme Court] ha[s] time and again held that type of regulation to interfere with protected speech." *Moody*, 603 U.S. at 737-38.

39

It is no response to argue that utilities are required to submit compliance filings as one of their regular interactions with FERC. Those filings are a necessary part of the utilities' operation in a highly regulated sector. The argument was thus directly rejected in *PSEG*, on the basis that "[t]o accept that premise would allow the [government] to circumvent the First Amendment rights of non-government speakers simply by regulating their business activities." 158 F.Supp.3d at 167. The bill inserts in *PG&E* were likewise sent in a highly regulated environment. FERC protests that it is not requiring the utilities to "independently characterize this material," Order 1920-B at P 59, JA2861, but the same was true of the requirement invalidated in *PG&E*.

### B.      Strict Scrutiny Applies

Where First Amendment rights are limited, including the rights to petition the government and to refrain from speech, courts apply either strict or intermediate scrutiny. Strict scrutiny applies unless regulations are content-neutral and unrelated to the suppression or compulsion of speech. *Billups v. City of Charleston*, 961 F.3d 673, 685 (4th Cir. 2020); *Am. Entertainers, L.L.C. v. City of Rocky Mount*, 888 F.3d 707, 715 (4th Cir. 2018). Intermediate scrutiny applies when the speech being regulated is commercial, rather than non-commercial, speech. *Educ. Media Co. at Va. Tech., Inc. v. Insley*, 731 F.3d 291, 297 (4th Cir. 2013).

40

1.    *The Inclusion and Consultation Requirements Are Not Content-Neutral*

Content-neutral regulations are those that can be "justified without reference to the content of the regulated speech." *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984). That is not the case here. Both the Inclusion and Consultation Requirements hinge on the content of the public utility's filing (or its refusal to make a filing) because it only applies when there is no consensus on cost allocation among the utility and the states—if consensus existed, the utility would file the consensus proposal as its own. FERC's requirement that utilities must only convey the states' *contrary* opinions thus can only be justified by reference to the content of the utility's filing.

2.    *The Inclusion and Consultation Requirements Are Not Commercial Speech*

Commercial speech is "speech which does 'no more than propose a commercial transaction.'" *Posadas de P.R. Assocs. v. Tourism Co. of P.R.*, 478 U.S. 328, 340 (1986); *see Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 561 (1980) (commercial speech is "expression related solely to the economic interests of the speaker and its audience"). A regulated party's opinions about public policy, even where the policy impacts their bottom line, are not commercial speech. *See PG&E*, 475 U.S. at 9-12 (utility communications about energy policy are non-commercial speech).

41

Cost allocation filings are core political and regulatory speech submitted to a government agency in a formal filing. They are not commercial proposals directed to consumers. Instead, they are policy positions advocated by utilities to a governmental decisional body, FERC, that involve value judgments about which entities should be responsible for certain costs in the context of long-term transmission planning. FERC's effort to force public utilities to put forward policy positions with which they disagree—and only those with which they disagree—is a content-based regulation subject to strict scrutiny. *See Book People, Inc. v. Wong*, 91 F.4th 318, 324-40 (5th Cir. 2024) (state law requiring book vendors to issue sexual-content rating and submit assessment lists to state agency for publication on agency website under vendor's name was not content-neutral commercial speech because "[b]alancing a myriad of factors that depend on community standards is anything but the mere disclosure of factual information"), *reh'g denied en banc*, 98 F.4th 657 (5th Cir. 2024).

### C. Under Strict Scrutiny, the Inclusion and Consultation Requirements Are Unconstitutional

Under strict scrutiny, FERC must prove that the Order 1920-A requirements "further[] a compelling interest and [are] narrowly tailored to achieve that interest." *Reed*, 576 U.S. at 171. The Inclusion and Consultation Requirements neither further a compelling governmental interest nor are narrowly tailored to achieve their goals.

42

"[W]hen free speech values are at stake, states must supply rationales that are 'far stronger than mere speculation about serious harms.'" *Wash. Post v. McManus*, 944 F.3d 506, 522 (4th Cir. 2019). "To survive strict scrutiny, the [government] must do more than assert a compelling state interest—it must demonstrate that its law is necessary to serve the asserted interest." *Soderberg v. Carrión*, 645 F.Supp.3d 460, 481 (D. Md. 2022) (quoting *Burson v. Freeman*, 504 U.S. 191, 199 (1992) (citation modified)). Courts routinely hold that administrative efficiency is not sufficiently compelling to abrogate First Amendment rights. *See, e.g.*, *Americans for Prosperity Found. v. Bonta*, 594 U.S. 595, 614-15 (2021) (rejecting "administrative efficiency" as a sufficient interest to require charities to file IRS forms disclosing the names and addresses of major donors); *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 218 (1986) ("[T]he possibility of future increases in the cost of administering the election system is not a sufficient basis here for infringing appellees' First Amendment rights."); *Spencer v. Herdesty*, 571 F.Supp. 444, 452 (S.D. Ohio 1983) (finding "no cases holding administrative efficiency sufficiently compelling to justify the abridgement of a First Amendment right").

FERC's Orders fail to articulate a compelling governmental interest, much less demonstrate that its compelled speech requirement is necessary to achieve that interest. FERC's asserted interest underlying the requirement boils down to

43

administrative convenience.  According to FERC, requiring this compelled speech will:

> [A]ssist[] [FERC] in monitoring compliance with the requirements related to the Engagement Period, allow[] [FERC] to *efficiently consider* the views of both [RSEs] and transmission providers, and help[] ensure that [FERC] has a sufficient record on compliance to set a just and reasonable replacement rate.

Order 1920-B at P 98, JA2903-2904 (emphasis added); *see* Order 1920-A at PP 653-55, JA2535-2538 (identifying no specific interest served in adopting the requirement, merely a desire to strike a "balance" to "address, at least in part, the concerns driving the rehearing requests of" certain state and state-aligned entities).

This is a long-winded way of saying that it would be administratively convenient for utilities to include this material in their filings.  States and other interested parties already have many other channels to protest the utility's proposal and even to advocate their cost-allocation proposals, and FERC already can consider those views in the rate-setting process.

That is fatal under the First Amendment.  It is well established that administrative convenience is not a substantial interest even for the purpose of intermediate scrutiny, let alone strict scrutiny.  *See Billups v. City of Charleston*, 194 F.Supp.3d 452, 467-68 (D.S.C. 2016), *aff'd*, 961 F.3d 673; *see also Frontiero v. Richardson*, 411 U.S. 677, 690 (1973) (stating in Fifth Amendment context, "when we enter the realm of 'strict judicial scrutiny,' there can be no doubt that

44

'administrative convenience' is not a shibboleth, the mere recitation of which dictates constitutionality").

But even if the Inclusion and Consultation Requirements advanced a compelling government interest, it is not narrowly tailored. When a less-restrictive alternative would serve the government's purpose, the government "must use that alternative." *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 813 (2000). And this Court has stressed that it is a "nonnegotiable requirement" that "'actual evidence' in the legislative record [demonstrate] that lesser restrictions will not do." *People for the Ethical Treatment of Animals, Inc. v. N.C. Farm Bureau Fed'n, Inc.*, 60 F.4th 815, 831 (4th Cir. 2023). FERC has not demonstrated (and cannot demonstrate) that approaches other than requiring utilities to include material in their filings with which they disagree will fail to achieve FERC's purpose of being able to consider state positions. Such approaches are readily available. As discussed above, states can advance, and have routinely advanced, their preferred cost-allocation methodologies under existing law and regulation by, for example, stating their views on the utility's proposal on compliance. States can, and have, filed section 206 complaints through which they can seek to change utility tariffs. *See, e.g.*, *Pub. Serv. Elec. & Gas Co.*, 989 F.3d at 15 (affirming FERC's grant of relief on a section 206 complaint filed by Delaware and Maryland). Nothing in the record suggests, nor could it, that state entities have been reticent in taking advantage of

45

these opportunities or that there is an impediment to their doing so. There is thus nothing approaching the required findings that the content-based burden on utilities' speech is necessary to achieve a compelling government interest and narrowly tailored to meet that need.

### D. Even Under Intermediate Scrutiny, the Inclusion and Consultation Requirements Are Unconstitutional

The Inclusion and Consultation Requirements would not withstand intermediate scrutiny even if that lesser standard were applicable. Under intermediate scrutiny, the government must demonstrate that its order "directly advances a substantial governmental interest and that the measure is drawn to achieve that interest." *Stuart v. Camnitz*, 774 F.3d 238, 250 (4th Cir. 2014). Moreover, the government's command "must further a 'substantial governmental interest' that is 'unrelated to the suppression of free expression.'" *Moody*, 603 U.S. at 740 (quoting *United States v. O'Brien*, 391 U.S. 367, 377 (1968)). Thus, FERC must show that the Inclusion Requirement "does not burden substantially more speech than necessary to further [FERC's] interests." *Turner Broad. Sys.*, 520 U.S. at 189.

As discussed above, *see supra* Argument Section IV.C, FERC has no substantial or compelling governmental interest to require utilities to petition the government with RSE proposals that utilities oppose and place those contrary RSE proposals on equal footing with their own. The Inclusion and Consultation

46

Requirements also impose a substantially higher burden on the speech rights of the utilities than is necessary to achieve FERC's goal of administrative efficiency.

FERC explicitly limited the obligation to file the RSEs' proposal to filing supporting material, rather than separately characterizing a state proposal or independently justifying it, *see* Order 1920-A at P 655, JA2537-2538, but this limitation is insufficient to comply with the First Amendment. A public utility's First Amendment right to refrain from government-compelled speech does not turn on whether the compelled speech could be misperceived as being endorsed by the utility. *See PG&E*, 475 U.S. at 7 (requiring utility to include message of third party in its billing envelopes violated First Amendment even where message was required to state it was not that of the utility). Similarly, a public utility does not lose First Amendment protections simply because it operates in a "highly regulated" sector. *PSEG*, 158 F.Supp.3d at 167 (rejecting view that speech by utility was "quasi-governmental" and thus "the Town [could] lawfully speak on or through it"). Compelling a utility to distribute speech it disagrees with—and thus either stay silent and appear neutral or actively oppose said speech—violates the First Amendment. *See Cent. Ill. Light Co.*, 827 F.2d at 1173-74.

The government may not "stop *private actors* from speaking as they wish and preferring some views over others. And that is so even when those actors possess 'enviable vehicle[s]' for expression." *Moody*, 603 U.S. at 741 (citation omitted).

47

FERC protests that it "requires nothing more from transmission providers than attaching one or more additional documents" from a third party to their filings, Order 1920-B at P 59, JA2862; *see id*. P 97, JA2903 (same), but in *PG&E*, the government required nothing more than inserting a third party's material into a billing envelope, and that violated utilities' First Amendment rights.  FERC likewise tries to wave off the matter as "a one-time filing requirement," *id.* P 59, JA2862, but cites no precedent for the notion that it gets one free pass at violating the Constitution.  In any event, the Consultation Requirement forces utilities to speak every time they refuse to adopt a state proposal to change rates.

In sum, the Inclusion and Consultation Requirements cannot withstand any level of First Amendment scrutiny.

## V.   ORDER 1920 IMPROPERLY REQUIRES TRANSMISSION PROVIDERS TO DISCLOSE HIGHLY SENSITIVE CONFIDENTIAL INFORMATION ON FACILITIES TO BE REPLACED

Order 1920 requires public utilities to evaluate whether transmission facilities that need replacing can be "right-sized" to address Long-Term Transmission Needs identified in Long-Term Regional Transmission Planning more efficiently or cost-effectively.  *See* Order 1920 at P 1677, JA1784.  Transmission Owner Petitioners do not challenge this requirement; it is consistent with existing transmission protocols. PJM as a regional planning organization reviews transmission replacement needs to determine if a single project could address both a replacement need and a regional

48

need.  *See Am. Mun. Power, Inc. v. FERC*, 86 F.4th 922, 936 (D.C. Cir. 2023) (discussing Attachment M-3 of the PJM Tariff and noting that PJM may "determine that a single project resolves both the PJM Planning Criteria and the end of life criteria").

However, Order 1920 imposes a requirement not necessary to this process that creates considerable risk—both commercial risk to transmission owners and security and reliability risks to the overall electric system.  Under existing planning practice, a replacement project is only identified publicly at the time the RTO determines it should be part of the regional plan.  Order 1920, by contrast, requires utilities to submit a list of facilities operating at or above a specified kilovolt threshold they anticipate replacing in-kind with new transmission facilities during the next ten years with no or inadequate protection against public disclosure.  *See* Order 1920 at PP 1677, 1683, JA1784, JA1788-1789.  That would require utilities to disclose highly sensitive, internal data about vulnerable and aging facilities well before any project is actually included in the planning stage, and even if the RTO never determines that the project is subject to regional planning.

PJM TOs explained the reliability, security, and anticompetitive risks of disclosing this highly sensitive information.  *See, e.g.*, *id.* P 1723, JA1816-1817 (citing to comments by American Electric Power Service Corporation ("AEP"), Exelon Corporation ("Exelon"), the Indicated PJM TOs); Dominion Rehearing

49

Request at 36-37, JA5157-5158. They also urged FERC to limit the recipients of those potential replacement project plans to the RTO in which they participate. *See, e.g.*, Indicated PJM TOs Initial Comments at 45-46, JA3862-3863; Indicated PJM TOs Rehearing Request at 6-10, JA4763-4767; AEP Initial Comments at 46, JA4119; Exelon Initial Comments at 57, JA3927. Recent, current, or future price or output information has long been viewed as particularly competitively sensitive, and its disclosure to others has often been strictly limited and even subjected to antitrust liability. *See, e.g.*, *United States v. U.S. Gypsum Co.,* 438 U.S. 422, 441 n.16, 446-47 n.22 (1978); *United States v. Container Corp. of Am.*, 393 U.S. 333, 334-38 (1969); *Todd v. Exxon Corp.*, 275 F.3d 191, 211-12 (2d Cir. 2001).

PJM TOs also explained that the competitive harm of such disclosure was heightened by the asymmetry of the requirement: utilities are required to disclose their long-term potential opportunities for development and right-sizing, while competing developers can keep their plans hidden. *See, e.g.*, AEP Initial Comments at 46, JA4119; Indicated PJM TOs Rehearing Request at 7-8, JA4764-4765. Exposing the 10-year potential replacement list reveals to an incumbent transmission owner's competitors a substantial part of that transmission owner's development plans. No equivalent requirement is imposed on competing developers, providing them with an undue advantage or preference. *See* 16 U.S.C. §§ 824d(b), 824e(a); Indicated PJM TOs Initial Comments at 7, JA3824.

FERC's response to all of this was simply to assert that it "balanced concerns about disclosure against the importance of transparency and meaningful stakeholder participation in regional transmission planning and cost allocation processes," and that transmission owners could seek protection under confidentiality agreements. Order 1920-A at P 898, JA2729. FERC disregarded PJM TOs' emphasis on the real-time risks posed by public or stakeholder access to sensitive infrastructure data even if confidentiality agreements are in place. *E.g.*, Indicated PJM TOs Initial Comments at 45-46, JA3862-3863; AEP Initial Comments at 46, JA4119; Indicated PJM TOs Rehearing Request at 6-10, JA4763-4767. As PJM TOs pointed out, confidentiality agreements by definition do not prevent disclosure; they simply attempt to manage it. *See* Indicated PJM TOs Rehearing Request at 8-9, JA4765-4766; Dominion Rehearing Request at 37, JA5158. Nor can they mitigate the reliability and security risks that could result from targeted attacks on vulnerable equipment. *See* Indicated PJM TOs Rehearing Request at 8-9, JA4765-4766.

FERC made no effort to address these points, or to show the inadequacy of existing processes in which disclosure is made at the time the RTO identifies a project as requiring a replacement to serve a regional need. "An agency's failure to respond meaningfully to objections raised by a party renders its decision arbitrary and capricious." *PPL Wallingford Energy LLC v. FERC*, 419 F.3d 1194, 1198 (D.C. Cir. 2005). FERC's failure to provide any explanation as to why the broad disclosure

of this information was necessary and appropriate is arbitrary and capricious. *See*

*Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (an agency must "examine the relevant

data and articulate a satisfactory explanation for its action including a 'rational

connection between the facts found and the choice made'"). FERC's decision must

be set aside.

A. **Order 1920 Fails to Justify Requiring Transmission Owners to Make Their Right-Sizing Facilities List Available to Anyone Other than the Relevant Planning Organization**

Nothing in the record justifies FERC's decision to require utilities to disclose

their long-term potential replacement facility lists to persons outside of the

independent RTOs in which they participate prior to project identification.[6] FERC

has not explained the value in requiring utilities to share the speculative list of

potential replacement projects to anyone other than the RTO in which they

participate.

FERC offered no explanation as to why disclosure of right-sizing opportunities

at the time the regional plan identifies such opportunities is not sufficiently open and

transparent to prevent discrimination or to permit selection of the most efficient or

---

[6]     FERC noted that right-sizing opportunities must be, and are, publicly disclosed once identified, Order 1920 at P 1736, JA1822-1823; Order 1920-A at P 895, JA2727, and the Transmission Owner Petitioners have not challenged making the replacement need public when the planning cycle starts and the right-sized replacement will be evaluated.

cost-effective long-term development opportunity. Once a right-sizing opportunity is identified, disclosure of the project information to potential transmission developers provides them with the information necessary to plan right-sized projects on a non-discriminatory basis without creating security and reliability concerns. Indeed, that very process is what FERC approved in PJM when it accepted the PJM Tariff Attachment M-3 amendments. *PJM Interconnection, L.L.C.*, 172 FERC ¶ 61,136, at PP 80, 88-89, *reh'g denied*, 173 FERC ¶ 61,225 (2020), *aff'd*, *Am. Mun. Power, Inc*., 86 F.4th 922.

FERC also failed to respond meaningfully to arguments concerning the potential harm of releasing such information outside of transmission planning organizations. As the PJM TOs explained in the proceeding below, end-of-life or asset management projects represent a list of aging and potentially vulnerable assets that could be deliberately leveraged by threat actors to compromise system operations, and dissemination of that list to entities other than the relevant regional organization can create significant security risks for such organizations and downstream reliability risks for customers. Indicated PJM TO Initial Comments at 43-45, JA3860-3862.

Confidentiality agreements are grossly inadequate to protect against this potential security and reliability damage. Most non-disclosure agreements do not impose any specific safeguards on the information disclosed, but merely shift

53

liability for disclosure to the signing party or provide avenues for injunctions after-the-fact. For example, FERC's general Non-Disclosure Agreement for Critical Energy/Electric Infrastructure Information and its Model Protective Order likewise provide only after-the-fact sanctions that do not avoid harm in the first instance.[7]

That reactive framework does little to prevent the actual harm that could result from disclosure of such highly sensitive information and will not protect against the true cost of a reliability violation or system failure that results from disclosure of data or information by a third party. *See Appalachian Power Co.*, 170 FERC ¶ 61,196, at P 65 (2020) (finding that standard non-disclosure agreements upon which transmission owners typically rely to protect confidential information in the transmission planning process provided insufficient protection against potential security concerns).

---

[7]  *See Critical Energy/Electric Infrastructure Information General Non-Disclosure Agreement*, Federal Energy Regulatory Commission, P 14 (Apr. 19, 2020), https://www.ferc.gov/sites/default/files/2020-04/gen-nda.pdf; *Model Protective Order*, Federal Energy Regulatory Commission, P 20 (May 11, 2020), https://ferc.gov/sites/default/files/2020-06/Model%20Protective%20Order%20%28Revised%20May%2011%2C%202020%29.docx.

54

**B.    The Requirement to Disclose Potential Opportunities for Development and Right-Sizing Is Anticompetitive and Unduly Discriminatory**

Order 1920 also discriminates against incumbent transmission owners by imposing disclosure obligations that do not apply equally to other entities involved in transmission development.  For example, nonincumbent transmission developers are not required to disclose their speculative plans or commercial strategies, yet they would benefit from access to lists of potential replacement projects.  Requiring incumbent utilities to publicize ten years of redevelopment plans gives competing developers a competitive advantage that is inconsistent with the FPA's prohibition on undue discrimination and preferences.  *See* 16 U.S.C. § 824d(b).

By mandating early disclosure of speculative redevelopment plans, FERC effectively grants nonincumbent transmission developers and equipment suppliers privileged access to forward-looking investment strategies, allowing them to position themselves preemptively in the market, fine-tune their proposals, and influence planning outcomes based on proprietary information that would otherwise remain confidential until a right-sizing opportunity is formally identified.  Such asymmetrical access distorts the competitive landscape and disadvantages incumbent utilities who are required to disclose sensitive planning data without reciprocal transparency from other transmission developers.

55

FERC seeks to justify bestowing this preferential advantage on non-incumbent developers by citing the importance of transparency and meaningful stakeholder participation in regional planning. Order 1920-A at P 895, JA2727. But it is not transparent with respect to all players, because non-incumbent transmission developers do not need to disclose anything. FERC's questionable policy goal cannot overcome the FPA's direct prohibition against undue preference and advantage. FERC's policy goals must be achieved within the bounds of its statutory authority. "FERC cannot rely on one of its own regulations to trump the plain meaning of a statute." *Atlantic City*, 295 F.3d at 11.

Moreover, by forcing incumbent utilities to expose proprietary and highly sensitive information regarding their development plans, FERC is ignoring its impact on the competitive transmission process it introduced in Order 1000, *see* Order 1000 at PP 225-337, and ignoring its responsibility to consider the anticompetitive effects of its actions, *see Gulf States Utils. Co. v. Fed. Power Comm'n*, 411 U.S. 747, 758-59 (1973). Courts have long recognized that information sharing can, by itself, corrupt the competitive process. *See* cases cited *supra* p. 49; *see also Am. Column & Lumber Co. v. United States*, 257 U.S. 377, 409 (1921) (the exchange of competitively sensitive information can be "inconsistent with that free and unrestricted trade which the [Sherman Act] contemplates shall be maintained").

Order 1920's disclosure requirement undermines fair competition, violating both the FPA and foundational competitive principles. The Order distorts market dynamics and imposes discriminatory burdens on transmission owners in contravention of the FPA's prohibition of undue discrimination and preferential treatment. Mandated disclosure creates an anticompetitive dynamic by allowing market participants to gain insight into transmission owners' future investment plans, as well as FERC's obligations to consider the competitive effects of its actions. The disclosure requirement must accordingly be set aside.

# CONCLUSION

For the reasons set forth above, the petitions for review should be granted and

FERC's Orders should be vacated.

Respectfully submitted,

/s/ *John Lee Shepherd, Jr.*
John Lee Shepherd, Jr.
Blake Grow
Hunton Andrews Kurth LLP
2200 Pennsylvania Ave, NW
Suite 900
Washington, DC 20037
(202) 955-1500
jshepherd@hunton.com
bgrow@hunton.com

*Counsel for the Southwest Power Pool Transmission Owner Group*

Carrie L. Bumgarner
Senior Counsel
American Electric Power Service Corporation
1 Riverside Plaza
Columbus, OH 43215
(614) 716-2941
clbumgarner@aep.com

*On behalf of American Electric Power Service Corporation*

Denise Buffington
Senior Director Federal Regulatory Affairs
Evergy, Inc.
1200 Main Street
Kansas City, MO 64105
(816) 556-2683
denise.buffington@evergy.com

*On behalf of the Evergy* Companies

58

Timothy T. Mastrogiacomo
Vice President, Federal Regulatory, Legal, and Policy
Xcel Energy Services Inc.
701 Pennsylvania Avenue, NW, Ste. 250
Washington, DC 20006
(202) 661-4481
tim.t.mastrogiacomo@xcelenergy.com

*On behalf of Southwestern Public Service Company*

Steven M. Nadel
Senior Counsel
PPL Services Corporation
645 Hamilton Street, Suite 700
Allentown, PA 18101
(610) 774-4775
SMNadel@pplweb.com

John Longstreth
Donald A. Kaplan
Chimera N. Thompson
K&L Gates LLP
1601 K Street, N.W.
Washington, D.C.  20006
(202) 778-9000
john.longstreth@klgates.com
don.kaplan@klgates.com
chimera.thompson@klgates.com

Michelle S. Kallen
William M. Keyser
Steptoe LLP
1330 Connecticut Avenue N.W.
Washington, D.C. 20036
(202) 429-8186
mkallen@steptoe.com
wkeyser@steptoe.com

*Counsel for PPL Electric Utilities Corporation*

Molly Suda
Associate General Counsel
Duke Energy Corporation
1301 Pennsylvania Ave. NW,
Suite 200
Washington, D.C. 20004
(202) 824-8011
molly.suda@duke-energy.com

*Counsel for Duke Energy*

William M. Rappolt
Assistant General Counsel, FERC
AES US Services LLC
4300 Wilson Blvd
Arlington, VA 22203
(703) 682-6337
william.rappolt@aes.com

*Counsel for The Dayton Power and Light Co.*

Gary E. Guy
Assistant General Counsel
Exelon Corporation
701 Ninth Street, N.W., Suite 9426
Washington, D.C. 20068
(301) 956-6754
gary.guy@exeloncorp.com

*Counsel for Exelon Corporation, Atlantic City Electric Company, Baltimore Gas and Electric Company, Commonwealth Edison Company, Delmarva Power & Light Company, PECO Energy Company, and Potomac Electric Power Company*

William H. Baxter II
Dominion Energy Services, Inc.
120 Tredegar Street, Riverside 6th Floor
Richmond, VA 23219
(804) 819-2458
william.h.baxter@dominionenergy.com

*Counsel for Dominion Energy Services, Inc., on behalf of its affiliate Virginia Electric and Power Company*

David M. Gossett
Davis Wright Tremaine LLP
1301 K Street, NW
Suite 500 East
Washington, D.C. 20005
(202) 973-4200
davidgossett@dwt.com

Sanford I. Weisburst
Quinn Emanuel Urquhart &
Sullivan, LLP
295 Fifth Avenue
New York, NY 10016
(212) 849-7000
sandyweisburst@quinnemanuel.com

*Counsel for the FirstEnergy Transmission Companies*

Carrie L. Bumgarner
Senior Counsel
American Electric Power Service Corporation
1 Riverside Plaza
Columbus, OH 43215
(614) 716-2941
clbumgarner@aep.com

*Counsel for American Electric Power Service Corporation on behalf of its affiliates Appalachian Power Company, Indiana Michigan Power Company, Kentucky Power Company, Kingsport Power Company, Ohio Power Company, Wheeling Power Company, AEP Appalachian Transmission Company, Inc., AEP Indiana Michigan Transmission Company, Inc., AEP Kentucky Transmission Company, Inc., and AEP Ohio Transmission Company, Inc.*

61

Daniel E. Frank
Allison E.S. Salvia
Eversheds Sutherland (US) LLP
700 Sixth St., N.W., Suite 700
Washington, D.C.  20001-3980
(202) 383-0100
danielfrank@eversheds-sutherland.com
allisonsalvia@eversheds-sutherland.com

*Counsel for East Kentucky Power Cooperative, Inc.*

Regina Y. Speed-Bost
Founder and Managing Partner
SB Law, PLLC
200 Massachusetts Ave., N.W.
7th Floor
Washington, D.C.  20001
(202) 963-2700
rspeed-bost@sblawlegal.com

*Counsel for Duquesne Light Company*

Joshua A. Kirstein
Paul Savage
Consolidated Edison Company of New York, Inc.
4 Irving Place, 18th Floor
New York, NY 10003
(929) 656-5971
kirsteinj@coned.com
savagep@coned.com

*Counsel for Rockland Electric Company*

Wendy N. Reed
Matthew J. Binette
Abraham F. Johns III
WRIGHT & TALISMAN, P.C.
1200 G Street N.W., Suite 600
Washington, DC  20005-3898
(202) 393-1200
reed@wrightlaw.com
binette@wrightlaw.com
johns@wrightlaw.com

*Counsel for the MISO Transmission Owners:*
*Ameren Services Company, as agent for Union Electric Company d/b/a Ameren Missouri, Ameren Illinois Company d/b/a Ameren Illinois and Ameren Transmission Company of Illinois; American Transmission Company LLC; Central Minnesota Municipal Power Agency; Cooperative Energy; Dairyland Power Cooperative; Duke Energy Business Services, LLC for Duke Energy Indiana, LLC; Great River Energy; Indiana Municipal Power Agency; Indianapolis Power & Light Company d/b/a AES Indiana; Lafayette Utilities System; MidAmerican Energy Company; Minnesota Power (and its subsidiary Superior Water, L&P); Montana-Dakota Utilities Co.; Northern Indiana Public Service Company LLC; Northern States Power Company, a Minnesota corporation, and Northern States Power Company, a Wisconsin corporation, subsidiaries of Xcel Energy Inc.; Northwestern Wisconsin Electric Company; Otter Tail Power Company; Prairie Power, Inc.; Southern Indiana Gas & Electric Company (d/b/a CenterPoint Energy Indiana South); Southern Minnesota Municipal Power Agency; and Wolverine Power Supply Cooperative, Inc.*

March 13, 2026

## **<u>CERTIFICATE OF COMPLIANCE</u>**

I certify that this brief complies with the requirements of Rules 32(a)(5) and 32(a)(6) of the Federal Rules of Appellate Procedure because it has been prepared in 14-point Times New Roman, a proportionally spaced font.  I further certify that this brief complies with the type-volume limitations of Circuit Rule 32(b) because it contains 12,844 words, excluding the parts exempted by Federal Rule of Appellate Procedure 32(f), according to the count of Microsoft Word 365.

/s/ *Wendy N. Reed*
Wendy N. Reed
Matthew J. Binette
Abraham F. Johns III
WRIGHT & TALISMAN, P.C.
1200 G Street N.W., Suite 600
Washington, DC  20005-3898
(202) 393-1200
reed@wrightlaw.com
binette@wrightlaw.com
johns@wrightlaw.com

*Counsel for the MISO Transmission Owners on behalf of the Transmission Owner Petitioners*

## CERTIFICATE OF SERVICE

I hereby certify that on March 13, 2026, I caused this brief to be electronically filed with the Clerk of this Court by using the appellate CM/ECF system.  The participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

/s/ *Wendy N. Reed*
Wendy N. Reed
Matthew J. Binette
Abraham F. Johns III
WRIGHT & TALISMAN, P.C.
1200 G Street N.W., Suite 600
Washington, DC  20005-3898
(202) 393-1200
reed@wrightlaw.com
binette@wrightlaw.com
johns@wrightlaw.com

*Counsel for the MISO Transmission Owners on behalf of the Transmission Owner Petitioners*