**No. 24-1650 (L)**

**(consolidated with Nos. 24-1748, 24-1756, 24-1758, 24-1760, 24-1765, 24-1770, 24-1785, 24-1804, 24-1857, 24-1862, 24-1867, 24-1876, 24-1885, 24-1887, 24-1979, 24-1991, 24-2162, 24-2163, 25-1073, 25-1080, 25-1197, 25-1349)**

# In the United States Court of Appeals for the Fourth Circuit

———————

APPALACHIAN VOICES; ENERGY ALABAMA; NORTH CAROLINA SUSTAINABLE ENERGY ASSOCIATION; SOUTHERN ALLIANCE FOR CLEAN ENERGY; SOUTH CAROLINA COASTAL CONSERVATION LEAGUE; ET AL., PETITIONERS

*v.*

FEDERAL ENERGY REGULATORY COMMISSION, RESPONDENT

———————

*ON PETITIONS FOR REVIEW OF ORDERS OF THE*
*FEDERAL ENERGY REGULATORY COMMISSION*

———————

**REPLY BRIEF FOR PETITIONERS ADVANCED ENERGY UNITED; ELECTRICITY TRANSMISSION COMPETITION COALITION; LS POWER GRID, LLC; AND ALLIED PETITIONERS OR INTERVENORS**

———————

KENNETH R. STARK
  *McNees Wallace & Nurick LLC*
  *100 Pine Street*
  *Harrisburg, PA 17101*
  *Phone: (717) 237-8000*
  *kstark@mcneeslaw.com*

*Counsel for Electricity Transmission Competition Coalition*

FINAL BRIEF: MARCH 13, 2026

STEFFEN N. JOHNSON
NICHOLAS M. GLADD
  *Wilson Sonsini*
  *Goodrich & Rosati, P.C.*
  *1700 K Street, N.W.*
  *Washington, DC 20006*
  *(202) 973-8800*
  *sjohnson@wsgr.com*
  *ngladd@wsgr.com*

*Counsel for Advanced Energy United*

[ADDITIONAL COUNSEL LISTED ON NEXT PAGE]

KATHERINE ANN WADE
  *Betts & Holt LLP*
  *1101 Connecticut Ave., N.W.*
  *Suite 450*
  *Washington, D.C. 20036*
  *(202) 530-3380*

*Counsel for Resale Power Group of Iowa*

MICHAEL R. ENGLEMAN
  *Engleman Fallon, PLLC*
  *1717 K Street NW, Suite 900*
  *Washington DC 20006*
  *202-464-1332 (Office)*
  *202-253-6645 (Cell)*

*Counsel for LS Power Grid, LLC*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................. ii

INTRODUCTION ............................................................................................1

ARGUMENT ...................................................................................................5

I.    **FERC's attempt to bestow monopoly rights on incumbents to upgrade the nation's transmission system violates the Federal Power Act.** ...........................................................................5

    A.    FERC's reading of Section 206(a) rewrites the phrase "practices affecting rates," in direct conflict with Supreme Court precedent. ..........................................................6

    B.    FERC's grant of monopolies to incumbent transmission owners violates Section 206(a)'s bar on regulations that are unduly discriminatory or preferential or produce unjust or unreasonable rates. .............................................9

    C.    FERC's grant of monopolies to incumbent transmission owners conflicts with the broader structure of the Federal Power Act. ...............................................................13

    D.    The major questions doctrine confirms that FERC exceeded its authority in granting monopoly rights to incumbent transmission owners. ..............................16

    E.    The precedents cited by FERC and the Incumbent Transmission Owners do not support FERC's grant of monopoly rights to incumbents. .............................17

II.    **Even if the Court finds that FERC has authority to grant incumbents monopoly rights, FERC violated Section 206 of the Federal Power Act and the APA in exercising that authority.** ............................................................................21

    A.    FERC violated Section 206 and the APA by failing to find that the existing "practice" (i.e., allowing competition) is unlawful. .............................................22

    B.    FERC violated Section 206 and the APA in failing to demonstrate that granting incumbents a ROFR is just, reasonable, and not unduly discriminatory or preferential. ......25

CONCLUSION ...............................................................................................28

i

# TABLE OF AUTHORITIES

## CASES

*Am. Mun. Power v. FERC*,
86 F.4th 922 (D.C. Cir. 2023)......................................................................21

*Balt. Gas & Elec. Co. v. NRDC*,
462 U.S. 87 (1983)......................................................................................24

*Biden v. Nebraska*,
600 U.S. 477 (2023)....................................................................................17

*Cal. Indep. Sys. Operator Corp. v. FERC*,
372 F.3d 395 (D.C. Cir. 2004)......................................................................7

*Davis v. Mich. Dep't of Treasury*,
489 U.S. 803 (1989)....................................................................................13

*Emera Maine*,
854 F.3d 9 (D.C. Cir. 2017)........................................................................22

*Emera Maine v. FERC*,
854 F.3d 662 (D.C. Cir. 2017)....................................................................18

*FERC v. Elec. Power Supply Ass'n*,
577 U.S. 260 (2016).............................................................................3, 7, 9

*FPC v. Conway Corp.*,
426 U.S. 271 (1976)..............................................................................11, 12

*FPC v. Sierra Pac. Power Co.*,
350 U.S. 348 (1956)....................................................................................22

*Guidry* v. *Sheet Metal Workers Nat'l Pension Fund*,
493 U.S. 365 (1990)....................................................................................10

*ISO New England, Inc.*,
143 FERC ¶ 61,150 P192 (2013) .........................................2, 8, 9, 12, 19, 26

*Learning Resources, Inc. v. Trump*,
2026 WL 477534 (Feb. 20, 2026) ........................................................16, 17

*LSP Transmission Holdings II, LLC v. FERC*,
28 F.4th 1285 (D.C. Cir. 2022).................................................................20, 21

*LSP Transmission Holdings II, LLC v. FERC*,
45 F.4th 979 (D.C. Cir. 2022)....................................................................20

*Massachusetts v. EPA*,
  549 U.S. 497 (2007).................................................................19

*MISO Transmission Owners v. FERC*,
  819 F.3d 329 (7th Cir. 2016) .......................................7, 18, 19, 20, 27

*N.Y. Indep. Sys. Operator, Inc.*,
  175 FERC ¶ 61,038 (2021)..........................................................27

*NAACP v. FPC*,
  520 F.2d 432 (D.C. Cir. 1975)......................................................15

*NLRB v. SW Gen., Inc.*,
  580 U.S. 288 (2017).................................................................10

*Okla. Gas & Elect. Co. v. FERC*,
  827 F.3d 75 (D.C. Cir. 2016)........................................................18

*Otter Tail Power Co. v. United States*,
  410 U.S. 366 (1973).................................................................14

*Pub. Serv. Elec. & Gas Co. v. FERC*,
  989 F.3d 10 (D.C. Cir. 2021).......................................................22

*S. C. Pub. Serv. Auth. v. FERC*,
  762 F.3d 41 (D.C. Cir. 2014).................................2, 9, 12, 18, 19

*Students for Fair Admissions, Inc. v. President and Fellows of
    Harvard Coll.*,
  600 U.S. 181 (2023).............................................................10, 11

*United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*,
  484 U.S. 365 (1988).................................................................13

*West Virginia v. EPA*,
  597 U.S. 697 (2022).................................................................16

## STATUTES

16 U.S.C. § 824e(a)........................................ 1, 2, 6, 10, 12, 21, 22, 23

16 U.S.C. § 824p ...........................................................................3

16 U.S.C. § 824p(a) ................................................................13, 14

16 U.S.C. § 824p(b) ..................................................................13

## RULES

*Bldg. for the Future Through Elec. Reg'l Transmission Plan. & Cost Allocation*, Order No. 1920, 187 FERC ¶ 61,068 (2024)..................16, 23, 27

*Bldg. for the Future Through Elec. Reg'l Transmission Plan. & Cost Allocation*, Order No. 1920-A, 189 FERC ¶ 61,126 (2024) ........................27

*Transmission Plan. & Cost Allocation by Transmission Owning & Operating Pub. Utils.*, Order No. 1000, 136 FERC ¶ 61,051 (2011)..................................................................................8, 9, 14, 18, 26

*Transmission Plan. & Cost Allocation by Transmission Owning & Operating Pub. Utils.*, Order No. 1000-A, 139 FERC ¶ 61,132 (2012)...............................................................................................8, 9, 26

## MISCELLANEOUS

A. Scalia & B. Garner, *Reading Law* (2012) .........................................................13

*Shorter Oxford English Dictionary* (1933)..............................................................10

*Webster's New Int'l Dictionary of the English Language* (1934).....................10, 11

**INTRODUCTION**

This appeal involves FERC's rules governing opportunities for transmission developers to expand the nation's electric transmission system, by developing entirely new lines that provide regional rather than just local benefits. Before Order 1920, it was settled that such opportunities had to be awarded by competitive bidding. As a matter of Economics 101, prices will be lower—and consumers will benefit—when transmission companies compete on a level playing field for the opportunity to develop infrastructure. Indeed, FERC itself repeatedly recognized as much in earlier orders.

In Order 1920, however, FERC veered sharply in the opposite direction. It granted incumbent transmission owners a *monopoly right*—a right of first refusal, or "ROFR"—to replace existing infrastructure with facilities that are "right-sized" to serve regional transmission needs (*i.e.*, sized to increase the system's transfer capability so it addresses regional, not just local, needs). The problem is, FERC has only the specific authority granted by the Federal Power Act, which was designed to promote competition and does not authorize FERC to confer such monopolies.

Indeed, granting monopoly rights violates the plain terms of Section 206(a), which bars FERC from regulating in any "unduly discriminatory or preferential" manner and further mandates that FERC-approved rates must be "just and reasonable." 16 U.S.C. § 824e(a). Granting a monopoly both is "unduly discriminatory"

and "preferential" and fosters anti-competitive behavior that produces unjust rates. As the D.C. Circuit has explained, as a matter of "basic economic principles," "rights of first refusal . . . erect a barrier to entry"—"non-incumbents are unlikely to participate in the transmission development market because they will rarely be able to enjoy the fruits of their efforts"—and the "direct effect" is higher prices. *S. C. Pub. Serv. Auth. v. FERC*, 762 F.3d 41, 74 (D.C. Cir. 2014) ("*South Carolina*").

The Court need not take our word for it, however, or even the D.C. Circuit's. As FERC itself has stated, rights of first refusal in favor of incumbent transmission providers "deprive customers of the benefits of competition in transmission development, and associated potential savings." *ISO New England, Inc.*, 143 FERC ¶ 61,150 P192 (2013). In fact, FERC has admitted that "removal of such barriers . . . is *essential* to meeting the demands of changing circumstances facing the electric industry," and that "protecting the public interest *requires removal*" of ROFRs. *Id.* at P188 (emphasis added).

Protecting consumers from ROFRs is no less "essential" or "required" today. In arguing otherwise, FERC says a ROFR is a "practice . . . affecting . . . rate[s]" of utilities under its jurisdiction, 16 U.S.C. § 824e(a), and that it has no less authority to *mandate* such monopolies than to *ban* them—that its rule is but a policy choice whose "wisdom" may not be questioned. But that stretches the word "practice" beyond the breaking point, and FERC cannot trade Congress's wisdom for its own.

2

As to the text, binding Supreme Court authority holds that the phrase "practice[s] . . . affecting rate[s]" is limited to a utility's practices that "*directly* affect" its rates, *FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 277-78 (2016) ("*EPSA*"), not the ability of *other* entities to *enter the market in the first place*.  Moreover, even if FERC were correctly reading that general phrase, the same section of the Act independently prohibits rules that are "unduly discriminatory or preferential" or foster anti-competitive behavior, producing unjust rates.  To boot, Congress knows how to confer monopoly power, and it does so judiciously.  But the only provision of the Act that authorizes FERC to confer exclusive rights to develop transmission infrastructure is Section 216, which strictly limits FERC's authority to geographic corridors that the Department of Energy identifies as involving a specific "national interest."  16 U.S.C. § 824p.  FERC's reading of the Act, by contrast, permits it to grant monopolies to develop transmission infrastructure anywhere and everywhere—in a given state or, for that matter, the whole nation.  That is not the law.

If any doubt remained, the major questions doctrine would confirm that FERC may not rely on such a thin reed to reshape the entire regulatory landscape.  Whereas the stakes in most major questions cases are measured in billions of dollars, the price tag of expanding current transmission capabilities is between $750 billion and $12 trillion, with the Justice Department and Federal Trade Commission pegging it at $2.2 trillion.  If FERC wishes to grant incumbents monopoly power—thus upending

3

competitive markets and longstanding bidding processes that unquestionably benefit consumers—such a sea change in policy requires clear statutory authority from Congress that is utterly lacking in the ambiguous provisions that FERC invokes here.

Finally, even if the Court were somehow to find that FERC has authority to grant a right-sizing ROFR, FERC's action would nonetheless fail to satisfy either of Section 206's mandatory prongs. According to FERC, it can satisfy the first prong by finding that existing tariffs are unreasonable because they lack "right-sizing requirements." But the question of whether and how existing facilities should be replaced with expanded facilities that provide regional benefits is entirely separate from the question of which entities should be eligible to construct the facilities identified in that regional planning process. FERC's theory that incumbent transmission owners lack the incentive to allow "right-sized" transmission solutions in the regional planning process is, at most, an acknowledgment that the existing rules for when and how incumbents identify replacement solutions are loosey-goosey. *See, e.g.*, JA3235. It is not a finding that the lack of a ROFR renders the existing tariff unlawful.

As to Section 206's second prong, FERC says it properly found that establishing the ROFR would produce just and reasonable rates. Not so. FERC says its grant of monopoly rights for regional projects is a routine policy change, the outcome of which is just and reasonable. But FERC's "policy change" is anything but routine;

4

it is a 180-degree reversal of course. And critically, FERC has neither addressed the rate impacts of giving incumbent utilities monopoly market power nor compared those rate impacts with the rates that consumers would pay if the regional transmission facilities at issue were open to competition. Absent such analysis, FERC's bare assertion that the policy change will get transmission built is insufficient.

Accordingly, this Court should vacate the portion of FERC's orders on review that mandate a ROFR for "right-sized" regional transmission facilities.[1]

## ARGUMENT

### I. FERC's attempt to bestow monopoly rights on incumbents to upgrade the nation's transmission system violates the Federal Power Act.

FERC has only the powers specifically granted by the Federal Power Act. And its view that Section 206(a)—which authorizes it to regulate utility "practice[s] . . . affecting rates"—permits it to bar non-incumbents from entering the relevant market cannot be reconciled with the statute's ordinary meaning or binding Supreme Court precedent limiting the phrase to practices that affect rates directly.

Even if the phrase otherwise supported FERC's position, moreover, conferring federal monopolies on incumbents both is "unduly discriminatory" and "preferential" and fosters anti-competitive behavior that produces unjust rates, in

---

[1] Pro-Competition Petitioners are authorized to represent that the American Forest & Paper Association, Industrial Energy Consumers of America, PJM Industrial Customer Coalition, and Coalition of MISO Transmission Customers (*see* Dkt. No. 420) support this brief.

violation of other express limitations in Section 206(a). Further, Section 216 of the Act strictly limits FERC's grant of exclusive licenses for transmission projects to geographic corridors identified by the Department of Energy as involving a specific "national interest." And if all these hurdles were somehow surmountable (they are not), the major questions doctrine would confirm that FERC may not grant incumbents monopoly power—a complete reversal of its prior view, and one potentially affecting trillions of dollars of economic investment—without clear statutory warrant found nowhere in the statutory language that FERC invokes.

## A. FERC's reading of Section 206(a) rewrites the phrase "practices affecting rates," in direct conflict with Supreme Court precedent.

Under Section 206(a) of the Federal Power Act, if FERC finds that a transmission "rate, charge, or classification" within its jurisdiction, or "any rule, regulation, practice or contract affecting such rate, charge, or classification is unjust, unreasonable, unduly discriminatory or preferential," FERC is to "determine the just and reasonable rate, charge, classification, rule, regulation, practice, or contract to be thereafter observed and in force." 16 U.S.C. § 824e(a). FERC contends that, because transmission owners' anti-competitive tariff provisions were earlier held to be unlawful "practices affecting rates" that FERC could *prohibit* under Section 206(a), FERC necessarily can *require* the same practice. Br. 244-48. But even assuming that ROFRs in *an incumbent utility's tariff* are "practices affecting rates" that FERC may ban, both the statutory text and binding precedent—not to mention the Act's

6

purpose—bar *FERC itself* from *requiring* that anti-competitive practice, thereby barring new entrants from the market. Contrary to FERC's assertions, that is not just a matter of the "wisdom" or "desirability" of its "policy." Br. 246-48.

Beginning with the immediate text, the phrase "practice . . . affecting [a] rate" has been "repeatedly defined . . . as a 'consistent and predictable course of conduct of *the supplier* that affects *the utilities'* financial relationship with the consumer.'" *Cal. Indep. Sys. Operator Corp. v. FERC*, 372 F.3d 395, 403 (D.C. Cir. 2004) (emphasis added; citation and brackets omitted). Where the utility itself places "the right of first refusal" in its contracts, and thereby becomes a "cartel" that "seek[s] to protect [itself] from competition from third parties," *MISO Transmission Owners v. FERC*, 819 F.3d 329, 335 (7th Cir. 2016), it is the utility's "practice" that affects rates. But the same "practice affecting rates" language cannot be stretched to cover would-be developers that wish to compete for these projects, and thus to create a new financial relationship with the consumer. That is especially clear after the Supreme Court's decision in *EPSA*, which squarely held that FERC's "affecting" jurisdiction is strictly limited to practices that "*directly* affect" rates. *EPSA*, 577 U.S. at 278. Absent such a limitation, FERC's authority to regulate practices "affecting" rates "could extend . . . to some surprising places." *Id*. at 277-78 (citing the markets for "steel, fuel, and labor" as the "most prominent" examples). This case is a prime example.

7

As our opening brief explained (at 18, 21-22, 40-41) and FERC acknowledges (Br. 238-239), ROFRs first appeared in FERC jurisdictional contracts when incumbent transmission owners enshrined such anti-competitive rights in cartel-like contracts among themselves. In response, FERC Order 1000 banned ROFRs for transmission projects that provide regional benefits, explaining that "[ROFRs] in favor of incumbent transmission providers deprive customers of the benefits of competition in transmission development, and associated potential savings." *Transmission Plan. & Cost Allocation by Transmission Owning & Operating Pub. Utils.*, Order No. 1000 ("Order 1000"), 136 FERC ¶ 61,051, P285 (2011), *order on reh'g*, Order No. 1000-A, 139 FERC ¶ 61,132 (2012) ("Order 1000-A"); *accord* Order 1000-A at P426 ("[T]here should not be a federally established monopoly over the development of an entirely new transmission facility that is selected in a regional transmission plan for purposes of cost allocation to others."). FERC has since emphasized that removing such ROFRs from utility tariffs "is *essential* to meeting the demands of changing circumstances facing the electric industry," and that "protecting the public interest *requires removal*" of ROFRs. *ISO New England*, 143 FERC ¶ 61,150 P188 (emphasis added).

In affirming Order 1000, the D.C. Circuit agreed, explaining that, as a matter of "basic economic principles," "rights of first refusal … erect a barrier to entry"—"non-incumbents are unlikely to participate in the transmission development market

because they will rarely be able to enjoy the fruits of their efforts"—and the "direct effect" is higher prices. *South Carolina*, 762 F.3d at 67. The court thus explained that "[b]y removing a pre-existing barrier to entry, [Order 1000] make[s] it more likely that" non-incumbent developers "will actually join [the transmission planning process], making the transmission development process more competitive, which, in [FERC's] expert judgment will help to ensure that rates are just and reasonable." *Id.* at 77 (citing Order 1000 at PP256-57 and Order 1000-A at PP76-90).

Now, however, FERC has abandoned its position that eliminating ROFRs "is essential" and "require[d]" (*ISO New England*, 143 FERC ¶ 61,150 P188) and says the foregoing precedents support its about-face on the importance of competition in developing regional transmission. Br. 244-249. But the fact that *a utility's anti-competitive ROFR* may directly affect rates does not mean *the government's* nation-wide regulation *mandating* such ROFRs—which altogether bar competing transmission developers from the regional market for right-sized facilities—is likewise a "practice affecting rates." That is exactly the kind of "surprising" result that *EPSA* precludes. *See* 577 U.S. at 277-78.

> **B.    FERC's grant of monopolies to incumbent transmission owners violates Section 206(a)'s bar on regulations that are unduly discriminatory or preferential or produce unjust or unreasonable rates.**

Were it otherwise plausible to read the phrase "practices affecting rates" to cover FERC's anticompetitive grant of monopolies to incumbents, the surrounding

terms of Section 206(a) would independently foreclose that interpretation. It is axiomatic that "general" statutory language cannot overcome "express, specific congressional directive[s]." *Guidry* v. *Sheet Metal Workers Nat'l Pension Fund*, 493 U.S. 365, 376 (1990). And when one pans out to "the entire section" at issue here, the other requirements of Section 206(a) powerfully "clarif[y]" that FERC's reading cannot be right. *NLRB v. SW Gen., Inc.*, 580 U.S. 288, 300 (2017).

1.      For starters, Section 206(a) prohibits FERC from adopting rules that are "unduly discriminatory or preferential." 16 U.S.C. § 824e(a); *see* Opening Br. 38-42. Although the incumbents insist the Act does not create "a mandatory one-way ratchet towards ever-greater competition," *see* Respondent-Intervenor Transmission Owners Br. 17, that is precisely what the prohibition on "unduly discriminatory or preferential" rules requires where monopoly power is concerned.

To "discriminat[e]" against a party is simply "to differentiate" it from others in "an adverse" way, *Shorter Oxford English Dictionary* 523 (1933); and to accord a party "preferential" treatment is simply to grant it a "preference" or advantage, *Webster's New Int'l Dictionary of the English Language* 1948 (1934) (unabridged). Naturally, these are flip sides of the same coin: "A benefit provided to some applicants but not to others necessarily advantages the former group at the expense of the latter." *Students for Fair Admissions, Inc. v. President and Fellows of Harvard Coll.*, 600 U.S. 181, 218-19 (2023) ("*SFFA*").

10

There can be no question that, by conferring on incumbent transmission owners the benefit of monopolies on building "right-sized" regional transmission facilities, FERC's rule is both "discriminatory" against new market entrants and "preferential" toward existing utilities. The rule does not ask which entity will provide more efficient or cost-effective service, much less conduct a "balanc[ing] of interests" or demonstrate that giving incumbents a monopoly will "maximize the development of right-sized" regional transmission facilities. Respondent-Intervenor Transmission Owners Br. 16-17. A new entrant might be *better* situated to serve consumers by *every* other measure, yet the incumbent alone is eligible for the opportunity, and solely by virtue of its incumbency. That is plainly "discriminatory and anticompetitive in effect." *FPC v. Conway Corp.*, 426 U.S. 271, 279 (1976).

Nor can there be any question that FERC's rule is "unduly" discriminatory or preferential. *See Webster's New Int'l Dictionary of the English Language* 2772 (1934) (unabridged) (defining "unduly" in relevant part as "unjustly; irregularly" or as "beyond a proper degree; more than is due; excessively"). FERC's rule does not simply put a thumb on the scale favoring incumbents, or give them a "plus factor" or tie-breaking advantage. FERC has outright barred placing *anything* on the other side of the scale. Whether the transmission developer is an incumbent "is determinative" over all other qualifications; the merits are irrelevant, as such developers "obtain preferences on the basis of [incumbency] alone." *SFFA*, 600 U.S. at 219,

11

220. Would-be market entrants need not apply, even if they would provide far more cost-effective service. Such discrimination against new market entrants, or preferential treatment of incumbents, is plainly "undue."

2. Congress also barred "any rule, [or] regulation" affecting jurisdictional rates that "is unjust, [or] unreasonable," providing that FERC "shall determine" and "fix" the just and reasonable rate" that applies. 16 U.S.C. § 824e(a). Whether a rate is unreasonable is assessed by "its relation to" other rates. *Conway*, 426 U.S. at 278. Where ROFRs govern, the proper comparison is rates produced by market competition. Just as FERC has no "power to remedy an alleged discriminatory or anticompetitive relationship between wholesale and retail rates by ordering the company to increase its retail rates," *id.* at 276-77, it cannot effectively mandate a rate increase by insulating incumbents from all competition at the wholesale level. Indeed, as a matter of "basic economic[s]," ROFRs "erect a barrier to entry," and the "direct effect" is higher prices. *South Carolina*, 762 F.3d at 74. As FERC once put it, ROFRs in favor of incumbent transmission providers "deprive customers of the benefits of competition," including "potential [cost] savings," and "protecting the public interest requires [their] removal." *ISO New England*, 143 FERC ¶ 61,150 PP188, 285.

In sum, conferring monopoly rights on incumbents violates the plain terms of Section 206(a), which bars "unduly discriminatory or preferential" regulations and requires that FERC-approved rates be "just and reasonable." 16 U.S.C. § 824e(a).

**C.    FERC's grant of monopolies to incumbent transmission owners conflicts with the broader structure of the Federal Power Act.**

Reading Section 206(a) of the Act to permit FERC to grant ROFRs to incumbent transmission owners conflicts not only with the surrounding language of *that* section, but with the Act's structure as a whole. "It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Ibid.*; *see generally* A. Scalia & B. Garner, *Reading Law* 167 (2012). Accordingly, Section 206's "practices affecting rates" phrase "cannot be construed in a vacuum." *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989). And FERC's interpretation thereof plainly is not "compatible with the rest of the law." *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988).

Specifically, Section 216 of the Act allows transmission developers to apply for "permits" to build or expand "transmission facilities in national interest electric transmission corridor[s]." 16 U.S.C. § 824p(b); Opening Br. 35-38; JA5042-5043. If issued by FERC, such permits grant the permittee an exclusive right to develop transmission facilities in specific locations where the Secretary of Energy determines that such a right would serve the "national interest." 16 U.S.C. § 824p(a)-(b). To "designate a national interest electric transmission corridor," the Secretary must consider myriad factors, including (among others) the corridor's "economic vitality," whether it is "constrained by lack of adequate or reasonably priced electricity," and

13

whether the designation would serve "the energy independence or energy security of the United States," "enhance national defense and homeland security," or "result in [savings] for consumers." *Id*. § 824p(a)(4)(A)-(H).

Section 216 thus confirms that Congress knows how to grant exclusive rights, and indeed did so—in a tightly constrained way—in another provision of the very same Act. But if FERC's reading of Section 206(a)'s "practices affecting rates" language were correct, Section 216 would be superfluous. FERC could simply confer monopoly rights on the utility of its choice, whether inside or outside "national interest" corridors, *without* complying with Section 216's detailed requirements. Put another way, why would Congress go to the trouble of adopting a later provision (Section 216) that so tightly circumscribes when the government can grant exclusive transmission rights in specific geographic corridors if an existing provision (Section 206) already allowed FERC to do just that, and more, in any region of the country, without complying with any of the same requirements. FERC has no answer.

Indeed, FERC's position flouts the Federal Power Act's "overriding policy of maintaining competition to the maximum extent possible consistent with the public interest," *Otter Tail Power Co. v. United States*, 410 U.S. 366, 374 (1973)—a policy that FERC expressly embraced in Order 1000. Order 1000 at P286. "By doing whatever is within its power to enhance that competition," the D.C. Circuit has explained, FERC "serves the same objective as it does by direct regulation of price;

14

indeed, Commission decisions affecting the structure of the power industry could scarcely be made rationally without regard to the impact they will have on the competitive climate." *See NAACP v. FPC*, 520 F.2d 432, 439-41, 443-44 (D.C. Cir. 1975) (holding that FERC's predecessor, the Federal Power Commission, could not regulate employment discrimination beyond ensuring that costs associated with such discrimination were not borne by consumers). Yet FERC is upending that principle here. By restructuring the industry to give incumbents an anti-competitive advantage, FERC is acting "without regard to" its mandate to "enhance" competition and benefit "price." *Id.*

Making matters worse, FERC's theory has no limiting principle. If Section 206(a) authorizes FERC to confer monopoly rights to "right-sized" regional facilities today, there is no reason to think it cannot confer monopoly rights to develop all infrastructure tomorrow. For that matter, FERC's theory would permit it to consolidate monopoly power in an even smaller universe of transmission owners, say by permitting a "practice" that allows one entity to develop all transmission infrastructure in a given state or, for that matter, nationwide. Yet Congress legislated to require FERC to check, not create, monopoly power. This Court should intervene.

15

**D.      The major questions doctrine confirms that FERC exceeded its authority in granting monopoly rights to incumbent transmission owners.**

As explained above, ordinary principles of statutory construction demonstrate that FERC has exceeded its authority here.  But if any doubt remained, the major questions doctrine would powerfully confirm as much.  Courts "have long expressed reluctance to read into ambiguous statutory text extraordinary delegations of Congress's powers." *Learning Resources, Inc. v. Trump*, 2026 WL 477534, *2 (Feb. 20, 2026) (quoting *West Virginia v. EPA*, 597 U.S. 697, 723 (2022) (internal quotations and brackets omitted)).  Yet FERC's position here presumes just such an "extraordinary" delegation, and one based on vague language—"practices affecting rates."

The issue here has tremendous economic and political significance.  As the record demonstrates, expanding the nation's transmission system is projected to cost between $750 billion and $12 trillion over the next two decades alone.  JA0688-0689; JA1903-1909 (Christie, dissenting).  The Justice Department and Federal Trade Commission place the price tag at $330 billion by 2030 and $2.2 trillion by 2050.  *See* JA0688; JA4518.

In the Federal Power Act's 90-year history, moreover, FERC has never mandated a ROFR or similar monopoly franchise, and nothing in the Act suggests that Congress intended that FERC would create a federal transmission franchise.  Opening Br. 34-44.  Neither FERC nor Respondent-Intervenor Transmission Owners have

16

shown otherwise. Yet, as discussed, FERC's view of its "affecting" jurisdiction would require that, wherever existing transmission facilities can be replaced with "right-sized" facilities that provide regional benefits, incumbents get the job.

Had Congress intended for FERC to expand monopoly power under a statute heretofore understood to require the opposite, it would have said so in no uncertain terms. The electric transmission system lies at the heart of the American economy, and it is critical to national security and global competitiveness. It also needs major expansion, requiring substantial capital investment. To conduct that expansion cost-effectively, harnessing market forces is essential. FERC's decision to trade competition for government-conferred monopolies is a decision of extraordinary economic and political significance. And FERC's inability to "point to a clear congressional authorization," *Learning Resources*, 2026 WL 477534, *3 (quoting *Biden v. Nebraska*, 600 U.S. 477, 506 (2023))—only a strained reading of "practices affecting rates"—to justify its extraordinary assertion of power dooms its attempt to grant incumbents nationwide monopoly rights.

### E. The precedents cited by FERC and the Incumbent Transmission Owners do not support FERC's grant of monopoly rights to incumbents.

Neither FERC's nor the Incumbent Transmission Owners' cases support FERC's authority to grant ROFRs. All involve challenges to ROFRs that Order 1000 did *not* eliminate. But FERC's decision not to eliminate certain transmission owner-

17

created ROFRs does not mean FERC can create them, and none of the cases address whether the statutory provisions discussed above authorize FERC to do the latter.

Every incumbent preference in a FERC jurisdictional tariff or agreement prior to Order 1920 was created by transmission owners agreeing to divide the market and entrench their rights by including ROFRs in Section 205 filings. *See MISO*, 819 F.3d at 333; *Okla. Gas & Elect. Co. v. FERC*, 827 F.3d 75, 80-81 (D.C. Cir. 2016); *Emera Maine v. FERC*, 854 F.3d 662, 665 (D.C. Cir. 2017). Those bootstrapped ROFRs hindered non-incumbent transmission developers from proposing needed infrastructure, thereby "imped[ing] the identification of some cost-efficient projects" and "resulting in … higher cost[s] than necessary." *South Carolina*, 762 F.3d at 72 (quoting Order 1000 at PP228-30) (internal quotations omitted). As the Seventh Circuit explained, when an incumbent "has a right of first refusal an outsider will have little incentive to explore the need for a new transmission facility because the local firm would be likely to say to the outsider (*sotto voce*) 'thank you very much for identifying, at no cost to me, a lucrative opportunity for me to exploit,' and thus the outsider would be unable to recoup the cost of his research into the need for the new facility." *MISO*, 819 F.3d at 333.

Order 1000 responded by eliminating those ROFRs for all projects whose costs would be allocated on a regional basis under FERC-mandated principles. *South Carolina*, 762 F.3d at 73. FERC chose not to go further, leaving intact certain

18

ROFRs, such as those pertaining to "facilities located wholly within the service territory of an incumbent whose development costs would not be spread to other parties." *Id.* In addressing utilities' Order 1000 compliance filings, FERC accepted some utilities' inclusion of a time-limited "exception" for "immediate need" projects, whereby FERC permitted retention of existing ROFRs for reliability-related transmission additions needed within three years. *E.g.*, *ISO New England*, 143 FERC ¶ 61,150 P236.

That Order 1000 did not seek-and-destroy every ROFR does not mean FERC can affirmatively create such monopolies. Rather, it reflects the reality that FERC "has broad discretion to choose how best to marshal its limited resources" to fulfill "its delegated responsibilities," particularly when it "decides not to bring an enforcement action." *Massachusetts v. EPA*, 549 U.S. 497, 527 (2007); *see also id.* at 524 ("Agencies, like legislatures, do not generally resolve massive problems in one fell regulatory swoop."). And none of appellees' four cases is apposite.

*MISO* involved a challenge to FERC's approval of a Section 205 filing that changed the cost allocation rules for one class of regional transmission projects, such that costs would no longer be allocated regionally, but rather as "local projects" to which existing ROFRs applied. 819 F.3d at 335. The Seventh Circuit affirmed FERC's decision. *See id.* at 336 (explaining that treating the projects as local, subject to a pre-existing ROFR, would be problematic only if the project's benefits "were

largely or entirely realized in pricing zones other than the one in which the project was to be built"). Thus, *MISO* merely demonstrates that, consistent with Order 1000, FERC permitted a pre-existing ROFR to remain in place for "local" projects. FERC did not create a right of first refusal under Section 206. And the court most certainly did *not* say (even in dictum) that FERC was authorized to do so. *See id.* at 333 ("Until Order 1000 was promulgated, every member of MISO had a protected monopoly, *created by the right of first refusal*, regarding the construction of new facilities in its service area.") (emphasis added).

*LSP I* involved the question of what voltage threshold applied to a category of MISO transmission projects called Market Efficiency Projects. *LSP Transmission Holdings II, LLC v. FERC*, 45 F.4th 979, 986 (D.C. Cir. 2022) ("*LSP I*"). Challengers pressed FERC to reduce the voltage threshold to 100 kV from the 230 kV threshold proposed in MISO's Section 205 filing. FERC rejected that request. *Id.* at 987. But although the Court upheld FERC's decision, thus leaving in place the incumbents' pre-existing ROFR, *id.* at 993-994, the Court did not address a FERC-created ROFR.

*LSP II* involved FERC's decision to close a Section 206 investigation concerning three Regional Transmission Organizations' potential abuse of the "immediate need" exception to the competitive bidding requirements for regionally cost-allocated projects, without reaching the merits. *LSP Transmission Holdings II, LLC v. FERC*, 28 F.4th 1285, 1288 (D.C. Cir. 2022) ("*LSP II*"). That decision was

20

challenged as to one Organization, and the court affirmed. *Id*. at 1289-91. Yet the case involved no FERC-created ROFR—only FERC's narrow decision to close the investigation into a pre-existing ROFR's implementation, thus leaving it in place.

*American Municipal Power* involved the question of which parties—PJM's transmission owners or its stakeholders—held control over rules governing PJM's regional transmission planning. *Am. Mun. Power v. FERC*, 86 F.4th 922, 927-28 (D.C. Cir. 2023). Each side proposed competing amendments to that process to govern when existing facilities wound down. *Id*. FERC rejected the stakeholder proposal, finding that PJM's governing agreements gave the owners control over the planning process. *Id*. at 930. In so doing, FERC expressly rejected the suggestion that the PJM transmission owners' proposal "created a new federal right of first refusal in violation of [Order 1000]." *Id*. at 929. Thus, FERC merely left intact the pre-existing ROFRs that Order 1000 preserved. Neither FERC's order nor the court's opinion directly addressed competition at all, let alone suggested that Section 206 authorizes FERC to mandate ROFRs.

**II.    Even if the Court finds that FERC has authority to grant incumbents monopoly rights, FERC violated Section 206 of the Federal Power Act and the APA in exercising that authority.**

To mandate changes to practices affecting rates, FERC must first determine that the practice "is unjust, unreasonable, unduly discriminatory or preferential." 16 U.S.C. § 824e(a). Only then can FERC establish "the just and reasonable rate" or

21

"practice to be thereafter observed." *Id.* In other words, "a finding that an existing rate is unjust and unreasonable is the 'condition precedent' to FERC's exercise of its section 206 authority to change *that* rate." *Emera Maine*, 854 F.3d 9, 25 (D.C. Cir. 2017) (quoting *FPC v. Sierra Pac. Power Co.*, 350 U.S. 348, 353 (1956)) (emphasis added). After FERC satisfies that "condition precedent"—*i.e.*, the first prong of Section 206—FERC must then satisfy its second prong by establishing the lawful replacement rate. *Id.* Here, FERC satisfied neither. Opening Br. 44-56.

### A.     FERC violated Section 206 and the APA by failing to find that the existing "practice" (i.e., allowing competition) is unlawful.

Under the status quo ante, transmission projects that meet Order 1920's definition of "right-sized" replacement facilities were subject to competition under Order 1000. Because such facilities would, by definition, provide regional benefits, incumbent utilities had no ROFR to build them.

To change that default rule, Section 206's first prong requires that FERC first find that the existing practice of allowing non-incumbents to compete for such projects is unjust, unreasonable, or unduly discriminatory or preferential. "'Without a showing that the existing rate is unlawful,' the Commission 'has no authority to impose a new rate.'" *Pub. Serv. Elec. & Gas Co. v. FERC*, 989 F.3d 10, 13 (D.C. Cir. 2021) (quoting *Emera Maine*, 854 F.3d at 25) (emphasis added).

FERC openly admits that it made no such finding here, stating: "Competition was addressed at *the second step of the statutory Section 206 analysis, not the first.*"

Br. 249 (emphasis added). That candid concession that FERC proceeded to grant ROFRs to incumbents for "right-sized" projects without first making the requisite finding that the lack of a ROFR for such projects was unlawful confirms that FERC violated Section 206 here.

FERC offers two unpersuasive responses. First, it says the basis for granting a ROFR for right-sized facilities is the existing rules' "lack of *right-sizing require-ments*." Br. 250. But that simply proves our point. "Right-sizing requirements" refers to different "practices affecting rates" than the lack of a ROFR. The "right-sizing requirements" that FERC refers to describe a particular *process*—namely, "coordination between the local and regional transmission planning process, includ-ing evaluation of whether replacement transmission facilities could be modified (i.e., right-sized) to more efficiently or cost-effectively address transmission needs." JA1713-1714. That process represents the practice of identifying regional transmis-sion projects, which is entirely separate from the practice of allowing non-incum-bents to compete to develop such projects. FERC's finding that the former is un-lawful does not permit it to mandate a change in the latter. If FERC wants to require a change to the practice of requiring competition for such facilities, it must find *that specific requirement* to be unjust and unreasonable. *See* 16 U.S.C. § 824e(a) (when FERC rules a particular "practice" unlawful, FERC "shall determine the just and reasonable . . . practice . . . to be thereafter observed").

23

Second, FERC says Petitioners want FERC to "work backwards from the solution it envisions."  Br. 252.  Yet that, ironically, is exactly what FERC has done.  As discussed, FERC addressed competition "at the second step of the statutory Section 206 analysis, not the first."  Br. 249.  FERC identified—at step *two*—a new practice that it wanted to impose (i.e., the ROFR), and now "works backward" to argue that its right-sizing discussion at that step satisfied step *one*.  As explained above, however, FERC *cannot* work backwards, but rather must first find that the existing practice at issue (allowing non-incumbents to compete for "right-sized" projects) is unlawful before it can impose the new practice (granting incumbents a federal monopoly for such projects).

In addition to violating Section 206, FERC's failure to address the legality of the existing practice—requiring competition for "right-sized" transmission projects —likewise violates the APA.  Under binding precedent, the agency must have "considered the relevant factors and articulated a rational connection between the facts found and the choice made."  *Balt. Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 105 (1983).  Having failed to engage in the relevant step one analysis, FERC cannot satisfy that requirement.

24

**B.**     **FERC violated Section 206 and the APA in failing to demonstrate that granting incumbents a ROFR is just, reasonable, and not unduly discriminatory or preferential.**

Even if FERC could satisfy Section 206's first prong, it would still need to establish that mandating ROFRs is a just, reasonable, and not unduly discriminatory or preferential replacement rate.  For reasons discussed above (at 9-12) and below, FERC cannot do so.

FERC's main claim is that granting incumbents a ROFR "aligns" with Order 1000.  Br. 254.  Nothing could be further from the truth.  Order 1000 held that allowing incumbents to put in place a ROFR for regional transmission projects is illegal and harmful to competition.  FERC makes much of the fact that "the overarching point of Order 1000 was not to open up every transmission development opportunity to competition between utilities."  Br. 254.  But that misses the point: although FERC did not end every single ROFR provision in jurisdictional tariffs, Order 1000 specifically eliminated ROFRs, and required competition for, the very transmission development opportunity that Order 1920 now grants to government-created monopolists—new transmission facilities providing regional benefits.

FERC cannot explain how a practice that it declared unlawful when implemented by incumbent transmission owners under Section 205 is nevertheless just, reasonable, and not unduly discriminatory or preferential when mandated

25

nationwide by the agency.  FERC makes two attempts to show that Order 1920 and Order 1000 are sympatico in this regard.  Neither is persuasive.

First, FERC asserts that because the overarching goal of both orders is to identify "more efficient or cost-effective" transmission solutions, and each order found that its reforms would achieve that end, the orders are of a piece.  Br. 254.  But FERC can assert this only by framing the orders at an unreasonably high level of generality.  When one zooms in, the orders directly conflict.  Order 1000 declared it unlawful for transmission owners to bootstrap monopoly rights over regional transmission projects (which includes those that meet the "right-sized" definition in Order 1920), explaining that "there should not be a federally established monopoly over the development of an entirely new transmission facility," Order 1000-A at P426, as ROFRs "deprive customers of the benefits of competition" and "associated potential savings,"  Order 1000 at P285.  Yet Order 1920 found it lawful to mandate the grant of monopoly rights for those same projects.  FERC's failure to acknowledge, must less explain, that 180-degree shift, is a textbook APA violation.  *See also ISO New England*, 143 FERC ¶ 61,150 P188 ("protecting the public interest *requires removal*" of ROFR provisions (emphasis added)).

Finally, FERC says granting incumbent transmission owners a monopoly over "right-sized" facilities will not "significantly decrease competition compared to the status quo," as it is "unlikely that right-sized replacement facilities would ever be

26

considered in competitive transmission development processes."  Br. 256 (quoting JA2724-2725).  That assertion is conclusory, directly contradicted by the rationale for eliminating ROFRs in the first place, and inconsistent with FERC's rejection of efforts to extend ROFRs for rebuilds into regional projects.  *See MISO*, 819 F.3d at 333 (outlining the economic theory for how eliminating ROFRs increases competition and benefits consumers); *N.Y. Indep. Sys. Operator, Inc.*, 175 FERC ¶ 61,038 PP40-47 (2021) (denying New York transmission owners' efforts to expand local ROFRs into regional projects).

Ultimately, FERC's rationale for granting incumbent transmission owners a monopoly for new system improvements through "right-sized" facilities is that those incumbents would not otherwise be motivated to allow regional solutions.  Br. 256-257; *see also* JA1804-1805 (the "transmission provider holds the leverage as to whether to build a right-sized replacement transmission facility or a less efficient in-kind replacement transmission facility").  In other words, because incumbents have market power and are reluctant to allow regional facilities that would require them to compete for development rights, the solution is not to check that market power or require them to compete—but rather to give them a monopoly on developing such projects.

FERC's view cannot be squared with the text or purpose of the Federal Power Act, the uniform body of precedent on transmission competition, basic economics,

27

or FERC's own prior statements.  FERC's failure to explain itself—including by detailing how this dramatic change in policy will impact the cost of "right-sized" facilities—exhibits a lack of reasoned decision-making, as required by the APA, and flunks Section 206's requirement that FERC establish a just and reasonable practice to replace its prior policy.  This Court should refuse to endorse FERC's novel and misguided 180-degree swing toward unchecked monopoly power.

## CONCLUSION

The Court should grant Pro-Competition Petitioners' petitions for review and vacate the portions of Order 1920, including Section IX.C.2, PP1693-1709 (JA1794-1807), that grant incumbent utilities a ROFR to develop "right-sized" transmission facilities.

Respectfully submitted,

/s/ Steffen N. Johnson

| | |
|---|---|
| MICHAEL R. ENGLEMAN | STEFFEN N. JOHNSON |
| *Engleman Fallon, PLLC* | NICHOLAS M. GLADD |
| *1717 K Street NW, Suite 900* | *Wilson Sonsini* |
| *Washington DC 20006* | *Goodrich & Rosati, P.C.* |
| *202-464-1332 (Office)* | *1700 K Street, N.W.* |
| *202-253-6645 (Cell)* | *Washington, DC 20006* |
| | *(202) 973-8800* |
| *Counsel for LS Power Grid, LLC* | *sjohnson@wsgr.com* |
| | *ngladd@wsgr.com* |
| | |
| | *Counsel for Advanced Energy United* |

28

KENNETH R. STARK
  *McNees Wallace & Nurick LLC*
  *100 Pine Street*
  *Harrisburg, PA 17101*
  *Phone: (717) 237-8000*

*Counsel to the Electricity Transmission*
*Competition Coalition*

DATED:  FEBRUARY 25, 2025

KATHERINE ANN WADE
  *Betts & Holt LLP*
  *1101 Connecticut Ave., N.W.*
  *Suite 450*
  *Washington, D.C. 20036*
  *(202) 530-3380*

*Counsel for Resale Power Group of Iowa*

29

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

I certify that this brief complies with the requirements of Rules 32(a)(5) and 32(a)(6) of the Federal Rules of Appellate Procedure because it has been prepared in 14-point Times New Roman, a proportionally spaced font.  I further certify that this brief complies with the type-volume limitations of Circuit Rule 32(b) because it contains 6,464 words, excluding the parts exempted by Federal Rule of Appellate Procedure 32(f), according to the count of Microsoft Word.

*/s/ Steffen N. Johnson*
Steffen N. Johnson

*Counsel for Advanced Energy United*

**CERTIFICATE OF SERVICE**

I hereby certify that, on March 13, 2026, I electronically filed the foregoing Reply Brief of Petitioners Advanced Energy United; Electricity Transmission Competition Coalition; LS Power Grid, LLC; and Allied Petitioners or Intervenors with the Clerk of Court for the United States Court of Appeals for the Fourth Circuit using the appellate CM/ECF system. The participants in this case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

/s/ Steffen N. Johnson
Steffen N. Johnson

*Counsel for Advanced Energy United*