# CASE NO. 24-1650(L)

**(RM21-17-000), (RM21-17-001), (RM21-17-002)**
**(consolidated with Nos. 24-1756, 24-1758, 24-1760, 24-1770, 24-1785,**
**24-1792, 24-1804, 24-1857, 24-1862, 24-1867, 24-1876, 24-1885, 24-1887,**
**24-1979, 24-1991, 24-2162, 24-2163, 25-1073, 25-1080, 25-1197, 25-1349)**

## IN THE

## UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

APPALACHIAN VOICES, ET AL.,

*PETITIONERS,*

V.

FEDERAL ENERGY REGULATORY COMMISSION,

*RESPONDENT,*

ENTERGY OPERATING COMPANIES AND ENTERGY
SERVICES, LLC, ET AL.,

*INTERVENORS.*

ON PETITION FOR REVIEW OF AN ORDER OF THE FEDERAL
ENERGY REGULATORY COMMISSION

## OPENING BRIEF OF STATE PETITIONERS

*cover continued next page*

i

Ken Paxton
Attorney General of Texas

Brent Webster
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

William R. Peterson
Solicitor General

William F. Cole
Principal Deputy Solicitor General

/s/ Dimitri N. Rocha
Dimitri N. Rocha
Assistant Solicitor General
Dimitri.Rocha@oag.texas.gov

***Counsel for the State of Texas***

Thomas Van Flein
General Counsel

Sean Bodkin
Senior Associate General Counsel

Maureen A. Scott
Senior Associate General Counsel

Chief of Litigation & Appeals
Office of the General Counsel
Arizona Corporation Commission
1200 West Washington Street
Phoenix, Arizona 85007
(602) 542-3402
tvanflein@azcc.gov
mscott@azcc.gov

***Counsel for the State of Arizona Corporation Commission***

Russell Coleman
Attorney General

Matthew F. Kuhn
Solicitor General

John H. Heyburn
Principal Deputy Solicitor General

Jacob M. Abrahamson
Deputy Solicitor General

Office of the Kentucky Attorney General
1024 Capital Center Drive, Suite 200
Frankfort, Kentucky 40601
(502) 696-5300
Matt.Kuhn@ky.gov
Jack.Heyburn@ky.gov
Jacob.Abrahamson@ky.gov

***Counsel for the Commonwealth of Kentucky***

*Additional counsel on next page*

ii

William D. Booth
Alex Peterson

Michael Best & Friedrich LLP
1000 Maine Avenue, S.W. Suite 400
Washington, D.C. 20024
(202) 747-9560
wdbooth@michaelbest.com
alpeterson@michaelbest.com

*Counsel for the State of Mississippi
Public Service Commission*

Stanford Purser
Utah Solicitor General

Office of the Utah Attorney General
160 E. 300 S., 5th floor
Salt Lake City, Utah 84111
(801) 366-0100
spurser@agutah.gov

*Counsel for the State of Utah*

Christopher M. Carr
Attorney General

John Henry Thompson
Solicitor General

Elijah O'Kelley
Deputy Solicitor General

Office of the Attorney General
40 Capitol Square, SW
Atlanta, Georgia 30334
(404) 458-3373
jhthompson@law.ga.gov

*Counsel for the State of Georgia &
Georgia Public Service Commission*

Mathura J. Sridharan*
Solicitor General
*Counsel of Record

Zachery P. Keller
Deputy Solicitor General

Thomas G. Lindgren
Assistant Attorney General

30 East Broad Street, 17th Floor
Columbus, Ohio 43215
(614) 466-8980
Mathura.Sridharan@OhioAGO.gov

*Counsel for the Public Utilities
Commission of Ohio's Office of the
Federal Energy Advocate*

*Additional counsel on next page*

Kathryn Bowman
Executive Counsel

Louisiana Public Service Commission
Galvez Building - 12th Floor
602 N. Fifth Street
Baton Rouge, Louisiana 70802
(225) 342-9888

Noel J. Darce
Dana M. Shelton
Justin A. Swaim

Fishman Haygood, LLP
201 St. Charles Ave., Suite 4600
New Orleans, Louisiana 70170
(504) 586-5252

***Counsel for the State of the
Louisiana Public Service
Commission***

# TABLE OF CONTENTS

Table Of Authorities ........................................................................................ vii

Introduction ......................................................................................................1

Jurisdictional Statement ...................................................................................5

Statement Of Issues...........................................................................................6

Statement Of Case.............................................................................................7

   I.    Pre-Order 1920 ......................................................................................7

   II.    Notice of Proposed Rulemaking for Order 1920 .........................................8

   III.    Order 1920...........................................................................................9

      A.    Transmission Planning and Cost Allocation .....................................10

      B.    State Agreement Process ................................................................13

      C.    Order 1920 Dissent ......................................................................14

   IV.    Petitions for Rehearing of Order 1920.......................................................16

   V.    Order 1920-A and Order 1920-B ...............................................................18

Summary Of Argument....................................................................................19

Standard Of Review ........................................................................................21

Argument.........................................................................................................22

   I.    Order 1920 exceeds FERC's statutory authority and intrudes into States' authority over generation under the FPA. .................................................22

      A.    The FPA grants the States, not FERC, authority over generation..........22

      B.    Order 1920 exceeds FERC's statutory authority by regulating generation. ....................................................................................24

         1.    Order 1920 imposes requirements that are not resource neutral and subsidize generation in certain States..........................................24

         2.    FERC's Response to Rehearing Petitions ............................................27

   II.    The major-questions doctrine, non-delegation doctrine, and equal sovereignty doctrine bar Order 1920....................................................30

      A.    Major-Questions Doctrine ..............................................................31

      B.    Non-Delegation Doctrine.................................................................37

      C.    Equal Sovereignty Doctrine.............................................................38

   III.    Order 1920 fails under both prongs of FPA Section 206.........................40

      A.    FERC failed to adequately support its finding that existing regional transmission planning and cost allocation is unjust, unreasonable, unduly discriminatory or preferential...............................................................40

      B.    Order 1920's replacement is unjust and unreasonable. .........................44

1.   Required Factors and Benefit Metrics ......................................................44
2.   Planning Timeline.........................................................................................47
3.   Local Planning ..............................................................................................48
4.   State Agreement............................................................................................50
IV.   Order 1920 violates the APA's notice and comment requirement. ...........53
Conclusion ........................................................................................................56
Statement Regarding Oral Argument .................................................................56

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*A.L.A. Schechter Poultry Corp. v. United States,*
295 U.S. 495 (1935)..................................................................38

*Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.,*
594 U.S. 758 (2021)..................................................................34

*Am. Gas Ass'n. v. FERC,*
912 F.2d 1496 (D.C. Cir. 1990)................................................26

*Appomattox River Water Auth. v. FERC,*
736 F.2d 1000 (4th Cir. 1984) ..................................................22

*Ark. Elec. Coop. Corp. v. Ark. Pub. Serv. Comm'n,*
461 U.S. 375 (1983)..............................................................1, 33

*Atl. City Elec. Co. v. FERC,*
295 F.3d 1 (D.C. Cir. 2002).......................................................32

*Biden v. Nebraska,*
600 U.S. 477 (2023)..................................................................31

*Chocolate Mfrs. Ass'n of U.S. v. Block,*
755 F.2d 1098 (4th Cir. 1985) ............................................54, 55

*Coyle v. Smith,*
221 U.S. 559 (1911).............................................................38, 39

*FDA v. Brown & Williamson,*
529 U.S. 120 (2000)..................................................................35

*FERC v. EPSA,*
577 U.S. 260 (2016)..................................................................28

*Franchise Tax Bd. v. Hyatt,*
578 U.S. 171 (2016)..................................................................38

*Gundy v. United States,*
588 U.S. 128 (2019)..................................................................37

*Ill. Com. Comm'n v. FERC,*
721 F.3d 764 (7th Cir. 2013) ......................................................3

*Indus. Union Dep't AFL-CIO v. Am. Petroleum Inst.,*
448 U.S. 607 (1980)..................................................................38

*Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*,
407 F.3d 1250 (D.C. Cir. 2005)..................................................................54

*La. Pub. Serv. Comm'n v. FCC*,
476 U.S. 355 (1986)..................................................................................32

*Loper Bright Enterprises v. Raimondo*,
603 U.S. 369 (2024)..............................................................22, 29, 42, 47

*Mfr. Hous. Inst. v. EPA*,
467 F.3d 391 (4th Cir. 2006) ....................................................................54

*Michigan v. EPA*,
268 F.3d 1075 (D.C. Cir. 2001)................................................................32

*Miller v. Arizona Corp. Comm'n*,
251 P.3d 400 (Ariz. Ct. App. 2011)..........................................................26

*N.C. Coastal Fisheries Reform Grp. v. Capt. Gaston LLC*,
76 F.4th 291 (4th Cir. 2023) ........................................................31, 33, 35

*N.C. Util. Comm'n v. FERC*,
741 F.3d 439 (4th Cir. 2014) ....................................................................22

*Nw. Cent. Pipeline Corp. v. State Corp. Comm'n of Kan.*,
489 U.S. 493 (1989)............................................................................24, 26

*Ohio v. EPA*,
603 U.S. 279 (2024)..................................................................................50

*Old Dominion Elec. Coop. v. FERC*,
898 F.3d 1254 (D.C. Cir. 2018)................................................................50

*Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*,
461 U.S. 190 (1983)...................................................................2, 16, 23, 36

*Paul v. United States*,
140 S. Ct. 342 (2019)................................................................................37

*Shelby Cnty. v. Holder*,
570 U.S. 529 (2013)..................................................................................39

*Solid Waste Agency of N. Cook Cnty v. U.S. Army Corps of Eng'rs*,
531 U.S. 159 (2001)..................................................................................33

*South Carolina Public Service Authority v. FERC*,
762 F.3d 41 (D.C. Cir. 2014)........................................................28, 29, 40

*Stearns v. Minnesota*,
179 U.S. 223 (1900)..................................................................................39

viii

*T-Mobile Ne. LCC v. City Council of Newport News*,
674 F.3d 380 (4th Cir. 2012) ...............................................................22

*Util. Air Regul. Grp. v. EPA*,
573 U.S. 302 (2014).......................................................................31, 32

*West Virginia v. EPA*,
597 U.S. 697 (2022)......................... 16, 20, 31-32, 33, 34, 35, 36, 37

**Statutes:**

5 U.S.C.:
§ 553(b)(3) ................................................................................21, 53
§ 553(c) .....................................................................................21, 53
§ 706(2)(E)................................................................................40, 44

16 U.S.C.:
§ 824(a) .....................................................................................22, 23
§ 824(b)(1) .............................................................2, 5, 19, 22, 23, 29
§ 824a(a) ...........................................................................................2
§ 824d..............................................................................................41
§ 824d(a) ...................................................................................23, 48

§ 824d(a)-(b) ....................................................................................2
§ 824e............................................................................................9, 41
§ 824e(a) ............................................................... 2, 20, 40, 41, 44-45
§ 824o(i)(3) ....................................................................................23
§ 825*l*(b)..................................................................................5, 6, 22

28 U.S.C. § 2112(a) ...............................................................................6

42 U.S.C.:
§ 7134.................................................................................................2
§ 7171(a) .......................................................................................2, 32

**Other Authorities:**

84 Fed. Reg. 32520 (2019) ...................................................................32

40 F.E.R.C. 61,256 (1987)....................................................................24

179 FERC 61028 (Apr. 21, 2022)...........................................................9

Ariz. Corp. Comm'n Docket No. RE-00000A-24-0026,
https://edocket.azcc.gov/search/docket-search/item-detail/28090 ....................26

*Bldg. for the Future Through Elec. Reg'l Transmission Plan & Cost
Allocation,* Order 1920, 89 Fed. Reg. 49280 (June 11, 2024), 187
FERC 61,068 (2024)...............................................................................7

C. Boyden Gray, *American Energy, Chinese Ambition, and Climate Realism*, American Affairs (Winter 2021), https://perma.cc/7CAC-SADP ...................................................................................47

Daniel Yergin, The New Map: Energy, Climate, and the Clash of Nations, at 11 (Penguin 2020) ...............................................................48

Order 1920-A, 89 Fed. Reg. 97174 (Dec. 6, 2024), 189 FERC 61,126 (2024)...................................................................................7, 10

Order 1920-B, 90 Fed. Reg. 17692 (Apr. 28, 2025), 191 FERC 61,026 (2025)...................................................................................7, 10

PJM, RTEP 2022 Report, at 64 (March 14, 2023), https://www.pjm.com/-/media/DotCom/library/reports-notices/2022-rtep/2022-rtep-report.pdf .........................................................49

PJM, RTEP 2023 Report, at 34 (March 7, 2024), https://www.pjm.com/-/media/DotCom/library/reports-notices/2023-rtep/2023-rtep-report.pdf .........................................................48

*Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Services by Pub. Utils.,* Order 888, 61 Fed. Reg. 21,540 (1996) ............................................................... 7-8

*Transmission Planning and Cost Allocation by Transmission Owning and Operating Pub. Utils.,* Order 1000, 76 Fed. Reg. 49,842 (2011) ...................................................................................8

x

# INTRODUCTION

Regulation of the electric industry is "one of the most important of the functions traditionally associated with the police power of the States." *Ark. Elec. Coop. Corp. v. Ark. Pub. Serv. Comm'n*, 461 U.S. 375, 377 (1983).

This case involves challenges to rules regarding long-term regional electric transmission planning and cost allocation adopted by the Federal Energy Regulatory Commission (the "FERC" or "Commission"). Rather than serving its statutory duties of achieving reliability and just and reasonable rates, FERC's sweeping rules ("Order 1920" or "the Final Rule") seek instead to influence environmental public policy choices by favoring transmission designed to move remote renewable resources to distant load centers (consumers). Order 1920 exceeds FERC's narrow authority and intrudes on the State's authority over generation.

Electricity production and sale consists of three parts: generation, transmission, and distribution. Electricity is delivered to consumers on-demand, and it must be placed on the grid once it is generated. Building and maintaining the necessary infrastructure is critical to the stability and reliability of the grid. The traditional business structure in the electricity sector was the vertically-integrated utility—wherein one utility provides generation, transmission, and distribution within a defined service area. Some jurisdictions have decoupled these three stages.

1

State and federal regulation of electricity occupy separate spheres. The federal government, under the Federal Power Act ("FPA"), regulates rates and services of interstate transmission of electricity and electricity sale at wholesale. 16 U.S.C. § 824(b)(1). FERC, as an independent agency, administers these responsibilities. 42 U.S.C. §§ 7134, 7171(a). States retain jurisdiction over "facilities used for the generation of electric energy." 16 U.S.C. § 824(b)(1); *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 212 (1983) ("States exercise their traditional authority over the need for additional generating capacity, the type of generating facilities to be licensed, land use, ratemaking, and the like.").

Congress directed that "[a]ll rates and charges made, demanded, or received by any public utility for or in connection with the [jurisdictional] transmission or sale of electric energy . . . shall be just and reasonable." 16 U.S.C. § 824d(a)-(b). Additionally, Congress empowered FERC to ensure that such rates, charges, and classifications, as well as "any rule, regulation, practice, or contract affecting such rate, charge, or classification," are not "unjust, reasonable, unduly discriminatory or preferential." 16 U.S.C. § 824e(a).

To promote competitive markets, FERC was directed to divide the country into regional districts for the interconnection and coordination of facilities to manage wholesale markets on a regional basis. 16 U.S.C. § 824a(a). These associations or transmission providers, called regional transmission organizations ("RTOs") and

independent system operators ("ISOs"), now control most of the electric grid. *Ill. Com. Comm'n v. FERC*, 721 F.3d 764, 769 (7th Cir. 2013).

Order 1920 regulates transmission and cost allocation among the transmission providers. It will impact virtually all aspects of transmission planning, and it effectively transforms the transmission planning process into a tool to subsidize transmission facilities that support a specific set of favored generation resources.

Different methods of power generation impose different transmission requirements. Traditional fossil-fuel energy sources impose relatively minimal transmission costs. These methods of power generation can quickly increase or decrease the amount of power generated in response to demand. Renewable power generation methods, in contrast, are generally sited where environmental conditions are favorable and thus require the power to be transmitted across vast distances to serve load (consumers).

Different forms of power generation have different costs and benefits, and Congress left the choice between these methods of power generation up to the States. FERC, in regulating transmission, should accept, rather than seek to dictate, States' power generation choices.

But Order 1920 favors high-transmission-demand remote resources by requiring transmission providers to build the transmission and infrastructure necessary to support them.

3

How does it do this? Order 1920 requires transmission providers to use seven specific categories of factors in developing planning scenarios that lead to the construction of transmission facilities to support certain favored generation choices. These factors include state or local public policy, including "decarbonization" laws and regulations (including renewable) goals of some States over the choices of others.

Then, FERC lists seven benefit metrics for transmission providers to weigh in determining project selection and cost allocation. With cost allocation, transmission providers set their rates that consumers will pay based on costs of transmission, including the building of transmission. Transmission providers create the planning scenarios and rates while weighing these benefit metrics and allocate costs based on the benefits. Given that "green energy" generation requires higher transmission costs (longer transmission lines to connect to customers), and the seven factors promote this type of generation, Order 1920 raises the costs of energy overall. Once these scenarios and cost allocation are developed, the transmission facilities will be built.

The effect of this process is to socialize costs of transmission. If a city passes an ordinance requiring that all its energy must be solar (without regard to the cost), the transmission provider for the entire region must now account for that policy in its planning and thus build the infrastructure necessary to support the city's power

generation goals. The transmission providers cannot disregard the policy as unreasonable.

Put simply, the net effect of Order 1920 is that States that favor traditional methods of power generation are required to subsidize the development of the infrastructure required to support States (and localities) that favor other methods of power generation.

Order 1920 fails to recognize regional differences, and the record does not support the scope and profundity of change that the Commission seeks to impose. States did not join RTOs and ISOs to pay for other States' public policies.

## JURISDICTIONAL STATEMENT

FERC has subject matter jurisdiction over "the transmission of electric energy in interstate commerce" and "all facilities for such transmission or sale of electric energy, but shall not have jurisdiction . . . over facilities used for the generation of electric energy or over facilities used in local distribution or only for the transmission of electric energy in intrastate commerce, or over facilities for the transmission of electric energy consumed wholly by the transmitter", pursuant to Section 201(b)(1) of the FPA. 16 U.S.C. § 824(b)(1).

Pursuant to 16 U.S.C. § 825*l*(b), this Court has appellate jurisdiction to review a final order of FERC. A petitioner must file a petition for review "within sixty days after the order . . . upon the application for rehearing." 16 U.S.C. § 825*l*(b). The State

Petitioners[1] filed timely petitions for review for Order 1920, Order 1920-A, and Order 1920-B. 16 U.S.C. § 825*l*(b) ("Any party to a proceeding under [the FPA] aggrieved by an order issued by [FERC] . . . may obtain a review of such order in the United States court of appeals for any circuit wherein the licensee or public utility to which the order relates is located or has its principal place of business . . . ."). Venue is proper in this Court because the United States Judicial Panel on Multidistrict Litigation consolidated multiple challenges to Order 1920 in this Circuit. *See* 28 U.S.C. § 2112(a).

## STATEMENT OF ISSUES

1. Whether FERC has authority under the FPA to regulate the States' generation through Order 1920's transmission planning and cost allocation proposals.

2. a. Whether Order 1920 implicates the major-questions doctrine, and, if so, whether Congress provided "clear authorization" for FERC to order the transmission planning and cost allocation requirements.

   b. Whether Order 1920 violates the non-delegation doctrine.

   c. Whether Order 1920 implicates the equal sovereignty doctrine through its cost allocation requirements that require States to pay for transmission projects.

---

[1] For this case, the State Petitioners are the following: Texas, Arizona Corporation Commission, Georgia, Georgia Public Service Commission, Kentucky, Louisiana Public Service Commission, Mississippi Public Service Commission, Public Utilities Commission of Ohio's Office of the Federal Energy Advocate, and Utah.

3. a. Whether substantial evidence supports FERC's finding that the existing transmission planning and cost allocation, on a nationwide scope, is unjust, unreasonable, unduly discriminatory, or preferential.

   b. Whether substantial evidence supports FERC's finding that the replacement rate is just, reasonable, and not unduly discriminatory or preferential.

4. Whether FERC violated the Administrative Procedure Act ("APA") through its changes from the Notice of Proposed Rulemaking ("NOPR") to the Final Rule.

## STATEMENT OF CASE

The challenged rule (Order 1920, Order 1920-A, Order 1920-B)[2] adopts industry-wide long-term regional transmission planning and cost allocation standards that represent a major new policy, intrude on State authority, and subsidize transmission facilities based on public policy decisions on generation.

### I.  Pre-Order 1920

In Order 888, FERC aimed to promote competition between vertically-integrated utilities and smaller, lower-cost power plants due to the increased interconnectedness of electric systems through long-distance transmission. *See* Order 888, *Promoting Wholesale Competition Through Open Access Non-*

---

[2] *Bldg. for the Future Through Elec. Reg'l Transmission Plan & Cost Allocation,* Order 1920, 89 Fed. Reg. 49280 (June 11, 2024), 187 FERC 61,068 (2024); *order on reh'g & clarification*, Order 1920-A, 89 Fed. Reg. 97174 (Dec. 6, 2024), 189 FERC 61,126 (2024); *order on reh'g and clarification*, Order 1920-B, 90 Fed. Reg. 17692 (Apr. 28, 2025), 191 FERC 61,026 (2025).

*Discriminatory Transmission Services by Pub. Utils.,* Order 888, <u>61 Fed. Reg. 21,540</u>, 21,543-46 (1996). That order required transmission providers to unbundle their services and file an open access transmission tariff containing minimum terms of non-discriminatory transmission service. <u>61 Fed. Reg. 21,541</u>, 21,551-52.

In August 2011, in Order 1000, FERC required transmission providers to participate in a transmission planning process, produce a regional transmission plan for development of new regional transmission facilities, and include procedures to identify transmission needs by federal, State, or local laws or regulations, and evaluate potential solutions. *Transmission Planning and Cost Allocation by Transmission Owning and Operating Pub. Utils.,* Order 1000, <u>76 Fed. Reg. 49,842</u>, 49,867, 49,876-77 (2011). As further explained below, while Order 1000 mandated consideration of these public policies, Order 1920 went far beyond with the specific seven factors and benefit metrics.

## II.  Notice of Proposed Rulemaking for Order 1920

In July 2021, FERC issued an Advanced Notice of Proposed Rulemaking ("ANOPR") seeking comments on proposed rules related to regional transmission planning, cost allocation, and generator interconnection processes to determine the reforms needed to address generation fleet shifts from resources located near load centers to remote resources. <u>JA635-636</u> ¶ 20. FERC also created a Task Force

consisting of sitting FERC Commissioners and representatives from ten State regulators. JA637-638 ¶ 22.

In April 2022, FERC issued a NOPR[3] regarding a rule that would require RTOs and other transmission providers to conduct Long-Term Regional Transmission Planning that includes planning scenarios and evaluation of transmission facilities "that address transmission needs driven by changes in the resource mix," and cost allocation. JA640-642 ¶¶ 26-31. FERC proposed a set of benefit metrics to evaluate those potential projects. *Id.* at ¶ 28. On May 13, 2024, FERC issued Order 1920.

## III. Order 1920

Order 1920 is a 1269-page rule that includes a concurring opinion and a dissenting opinion. Purporting to act under Section 206 of the FPA, FERC makes sweeping changes to the existing regional electric transmission planning and cost allocation requirements. 16 U.S.C. § 824e.

FERC found that existing regional transmission planning and cost allocation processes were unjust, unreasonable, and unduly discriminatory or preferential. JA624-626 ¶ 1. It rooted these findings in a claim that FERC's existing transmission planning and cost allocation requirements do not require transmission providers[4] to:

---

[3] *Notice of Proposed Rulemaking*, 179 FERC 61028 (Apr. 21, 2022).
[4] A "transmission provider" includes a public utility transmission owner when the transmission owner is separate from the transmission provider, as is the case in RTOs and ISOs. JA1986 ¶ 1 n.3.

(1) perform a sufficiently long-term assessment of transmission needs that identify Long-Term Transmission Needs[5]; (2) adequately account on a forward-looking basis for known determinants of these needs; and (3) consider a broader set of benefits of regional transmission facilities planned to meet those needs. JA624-626 ¶ 1. With these findings, Order 1920 provided a planning process that would determine the development of transmission facilities and the allocation of costs to consumers as beneficiaries of these facilities.

## A. Transmission Planning and Cost Allocation

Order 1920's first step requires transmission providers to conduct long-term transmission planning to identify needs and transmission facilities to meet those needs.[6] JA856-857 ¶ 298. The planning eventually leads to the selection and construction of facilities by transmission providers. This shift to long-term

---

[5] Long-Term Transmission Needs are transmission needs identified through Long-Term Regional Transmission Planning by running scenarios and considering the enumerated categories of factors. JA857 ¶ 299; JA2000 ¶ 20 n.16.

[6] Transmission providers must develop a set of at least three plausible and diverse Long-Term Scenarios, each of which must: (1) incorporate seven specific categories of factors that represent future needs; and (2) account for factors likely to affect those needs. JA929-930 ¶ 409; JA934-935 ¶ 415. Particularly, FERC required transmission providers to participate in a regional transmission planning process on a sufficiently long-term, forward-looking, and comprehensive basis to:

- identify future transmission needs;
- identify transmission facilities that meet transmission needs;
- measure the benefits of those transmission facilities; and
- evaluate those transmission facilities for future construction and cost allocation (recovery) as more efficient or cost-effective transmission facilities to meet transmission needs.
  JA802-803 ¶ 224; JA2105 ¶ 138.

transmission planning represents a significant departure from the existing system. These planning obligations change FERC's focus from satisfying current transmission needs to predicting future ones, which necessarily requires predicting States' future generation choices.

Order 1920 requires *all* transmission projects to be evaluated and cost allocated together whether the projects solve reliability problems, reduce congestion costs, or promote public policy preferences, such as "green energy" wind generation. JA821-822 ¶¶ 250-251; JA1642-1643 ¶ 1474 (transmission providers may not establish transmission facility types or cost allocation methods based upon siloed reliability, economic, or public policy facility types). This first step lumps together all reliability projects with public policy projects.

Second, Order 1920 then mandates planning criteria in determining which transmission projects get selected for development within regional plans. Transmission providers must incorporate the seven specific categories of factors in the development of scenarios—no category may be excluded.[7] JA930-931 ¶ 410. The mandatory categories of factors include some that involve generation sources,

---

[7] The seven factors include: "(1) federal, . . . state, and local laws and regulations affecting resource mix and demand; (2) federal, . . . state, and local laws and regulations on decarbonization and electrification; (3) state-approved integrated resource plans and expected supply obligations for load-serving entities; (4) trends in fuel costs and in the cost, performance, and availability of generation, electric storage resources, and building and transportation electrification technologies; (5) resource retirements; (6) generator interconnection requests and withdrawals; and (7) utility … commitments and federal, . . . state, and local policy goals that affect Long-Term Transmission Needs." JA929-930 ¶ 409.

11

such as State and local laws affecting the resource mix, State and local laws on decarbonization, generator interconnection requests and withdrawals, and State and local policy goals. JA929-930 ¶ 409.

Next, Order 1920 requires transmission providers to measure a set of seven required benefits under each scenario to evaluate potential transmission projects.[8] JA1137-1138 ¶ 720. Some of these benefits overlap and may result in double-counting. Order 1920 does not require transmission providers to identify benefits used (other than those mandated), or to explain how those benefits are calculated for cost allocation purposes. JA1663-1667 ¶¶ 1505-1511. Transmission providers build transmission and set rates based on the scenarios. By including the mandatory benefits at the planning stage, Order 1920 allocates costs to more consumers by making them involuntary "beneficiaries," even if those consumers (or elected policymakers) do not share the transmission providers' assessments. Those involuntary beneficiaries may view the transmission build as unnecessary to meet system needs, unnecessary to meet their location's specific needs, or unreasonable based on cost.

---

[8] The benefits are: (1) avoided or deferred reliability transmission facilities and aging infrastructure replacement; (2) a benefit that can be characterized and measured as either reduced loss of load probability or reduced planning reserve margin; (3) production cost savings; (4) reduced transmission energy losses; (5) reduced congestion due to transmission outages; (6) mitigation of extreme weather events and unexpected system conditions; and (7) capacity cost benefits from reduced peak energy losses. JA1145 ¶ 729; JA1152-1216 ¶¶ 740-819.

Finally, Order 1920 requires transmission providers to develop and file a cost allocation formula that includes all selected transmission projects. JA1524-1525 ¶ 1291. The transmission providers set their rates that consumers will pay, which is based on the transmission costs and the seven benefits. Transmission providers then submit their rates and cost allocation to FERC. All projects are included whether they increase reliability or reduce congestion costs, or, alternatively, decrease reliability or increase congestion costs.

## B. State Agreement Process

The Commission established a six-month engagement period, during which transmission providers must provide a forum for negotiation of an alternative cost allocation method agreed among the States. JA1563 ¶ 1354; JA1565-1566 ¶ 1357; JA2003-2004 ¶ 24. And if the States agreed to an approach, transmission providers have the option, but not an obligation, to file the State approach with FERC. JA1566-1567 ¶ 1359; JA1569-1570 ¶ 1363. The process does not allow sufficient time for multiple States to reach agreement.

The State Agreement Process cannot be the sole method for cost allocation if it fails to result in an agreed-to cost allocation method or if FERC finds that the cost allocation method from the process is unjust, unreasonable, or unduly discriminatory or preferential. JA1524-1526 ¶¶ 1291-1292.

## C. Order 1920 Dissent

Commissioner Christie dissented, explaining that Order 1920 fails to protect consumers from public utility rates that are unjust, unreasonable, unduly discriminatory or preferential. [9] JA1900 ¶ 1. He instead called Order 1920 "a pretext to enact, through administrative action, a sweeping legislative and policy agenda that Congress never passed." JA1900 ¶ 1. It "claims statutory authority FERC does not have to issue an absurdly complex bureaucratic blizzard of mandates and micromanagement to be imposed on every transmission provider in the United States for the transparent goal of spending trillions of consumers' dollars on transmission *not* to serve consumers in accordance with the FPA, but instead to serve political, corporate, and other special-interest agendas that were never enacted into law." JA1900 ¶ 1 (emphasis added).

The Dissent covers several substantive issues. First, it lists fundamental differences between Order 1920 and the NOPR, showing that FERC did not provide adequate notice and an opportunity to be heard. JA1922-1924 ¶¶ 22-29. The Dissent also explains how Order 1920 exceeds FERC's statutory authority under the FPA. JA1925-1935 ¶¶ 30-49. Particularly, Order 1920 seeks to recast FERC as a national Integrated Resource Planner to dictate that all public utility transmission providers

---

[9] Commissioner Phillips, joined by Commissioner Clements, filed a concurring opinion to address the Dissent. JA1886-1899 ¶¶ 1-36.

14

build the types of generation it wants to build, which would impose on consumers trillions in transmission costs. JA1925 ¶ 30; *see also* JA1903 ¶ 3 n.7 ($3.6 trillion relying on Princeton Net Zero study).

Second, the Dissent explains why Order 1920 violates the major-questions doctrine. JA1935-1939 ¶¶ 50-56. Order 1920 is an "extraordinary case[]" of economic and political significance where there is a reason to hesitate before concluding that Congress meant to confer such authority. JA1935 ¶ 50. Indeed, by leaving transmission siting and the development of generation to the States in the FPA, Congress did not intend for FERC to be a national Integrated Resource Planner. JA1937 ¶ 54.

Third, the Dissent also demonstrates how Order 1920 did not satisfy the first prong of FPA Section 206 because it failed to establish that the existing rule is no longer just, reasonable, and not unduly discriminatory or preferential. Dissent at JA1939-1944 ¶¶ 57-66. And even if it had made that showing, Order 1920's proposed replacement rate is unjust, unreasonable, and unduly discriminatory or preferential. JA1939 ¶¶ 57; JA1944-1973 ¶¶ 67-116.

## IV. Petitions for Rehearing of Order 1920

Following Order 1920, FERC received forty-nine requests for rehearing and clarification. Texas, along with eighteen other States, filed a petition for rehearing.[10] JA5337-5385. The petition raised the following ten issues:

1. Order 1920 intrudes upon the primary jurisdiction of the states over the selection and approval of generation resources. Generating resources choice is within the states' authority. *Pac. Gas & Elec. Co.*, 461 U.S. at 212. Its planning requirements dictate the choice of generating resources by requiring planning and benefit metrics that result in transmission build-out to support those resources.

2. Order 1920 violates the major-questions doctrine that reserves major changes in public policy to congressional action and does not allow administrative agencies, like FERC, to make by an agency rulemaking a major change to generation types that should be favored over others in transmission-decision making. *West Virginia v. EPA*, 597 U.S. 697, 729-30 (2022). FERC exceeds its statutory authority by favoring the transmission of one type of energy generation over others. Furthermore, even if Order 1920 were statutorily authorized, it would violate the non-delegation doctrine because Congress may not delegate its authority to decide major policy questions to an agency. In addition, Order 1920 violates the equal sovereignty doctrine because it socializes costs among states by requiring some states to subsidize public policy decisions of others.

3. Order 1920 exceeds FERC's authority under the FPA because it failed to establish by substantial evidence that the current transmission planning

---

[10] Among the State Petitioners, the Louisiana Public Service Commission and Mississippi Public Service Commission filed a separate petition for rehearing, which raised many of the same arguments raised in the States' petition. JA5202-5255. In addition, the Public Utilities Commission of Ohio's Office of the Federal Energy Advocate filed a petition, which raised many of the same issues. JA5006-5035. Ohio's petition also explained how Order 1920 violated the FPA because it was unjust and unreasonable by requiring transmission providers to use an unreasonable planning timeframe. *Id.* Ohio also described how Order 1920's local-planning reforms were ineffective because they allowed transmission owners to decide whether benefits of their local projects justify costs to customers. *Id.*

processes for all transmission providers are unjust and unreasonable. Nor has FERC demonstrated that the replacement processes are just and reasonable and not unduly discriminatory, as required by the FPA.

4. Order 1920 erroneously mandated transmission planning criteria that marginalized input from the Relevant Electric Retail Regulatory Authority, instead favoring selected generation. The order's seven categories of factors for the selection of transmission facilities will require some states to plan, build, and allocate costs to accommodate other states and local laws and policy goals. By requiring some states to subsidize the policies of others, Order 1920 is unjust, unreasonable, unduly discriminatory, and arbitrary and capricious.

5. Order 1920 will result in unjust and unreasonable rates by adopting seven required factors and seven benefit metrics to evaluate proposed transmission facilities. Mandatory use of these factors and benefit metrics favors some generation resources over others. The metrics are unjust and unreasonable because they overlap and double-count or exaggerate potential benefits.

6. Order 1920 is unjust and unreasonable because it allows transmission providers to utilize a portfolio approach in evaluating transmission facilities. Portfolios allow for transmission projects with positive benefit/cost ratios to blend with and justify projects with negative benefits.

7. Order 1920 is unjust and unreasonable because it adopts a cost allocation process that does not provide an adequate state agreement process. The six-month engagement period to establish a state agreement process is insufficient, and transmission providers are not required to adopt the state agreement.

8. Order 1920 is unjust and unreasonable because it requires the evaluation of local transmission for "right-sizing", which will allow groups to force local transmission to be higher voltage. The increased voltage will result in greater expense for local ratepayers.

9. Order 1920 is unjust and unreasonable because its requirement to coordinate interconnection and regional planning shifts generator interconnection costs from generators to load.

17

10. Order 1920 violates the APA's notice and comment requirement because there are fundamental changes between the NOPR and Order 1920, and the Commission did not republish the rule.

## V. Order 1920-A and Order 1920-B

In November 2024, FERC clarified and reaffirmed, in many respects, Order 1920 in Order 1920-A. Order 1920 remains the binding rule while incorporating changes and clarifications in Order 1920-A and later Order 1920-B.

Commissioner Christie listed the specific changes between Order 1920 and Order 1920-A in his partial concurrence. JA2788-2796 ¶¶ 1-13 (and appendix). First, he noted that Order 1920-A requires transmission providers to include in their compliance filings any agreement by States in a region. JA2789 ¶ 4. Second, transmission providers must consult with States before filing changes to the cost allocation method or State agreement processes. JA2789 ¶ 5. Third, transmission providers must consult with States before developing scenarios to consider their views and factors derived from public policies. JA2790 ¶ 7. And Order 1920-A eliminates the need to consider "corporate" commitments in long-term planning in factor seven. JA2790 ¶ 9.

In April 2025, FERC issued Order 1920-B, which does not affect the arguments raised by State Petitioners. JA2798-2965.

The State Petitioners filed timely petitions for review in various courts of appeals, which were consolidated into this case.

18

## SUMMARY OF ARGUMENT

The Final Rule (including the clarifications and amendments in Order 1920-A and Order 1920-B) is unlawful and should be vacated. The order adopts transmission planning requirements designed to prefer certain generation resources over others to achieve environmental policy objectives; it does not address legitimate requirements under the FPA like ensuring just and reasonable rates or reliability. By issuing Order 1920, the Commission exceeds its statutory authority and invades the States' authority over generation.

1.      Under the FPA, FERC does not have jurisdiction over facilities used for the generation of electric power. 16 U.S.C. § 824(b)(1). Long-standing Supreme Court precedent demonstrates this absence of authority. Order 1920 violates the FPA because it requires utilities to focus on some State and local laws and policy goals affecting resource mix and transmission needs while ignoring those of other States. By requiring consideration and subsidization of attributes particular to certain types of generation (*e.g.*, decarbonization, clean energy goals, renewable requirements) in transmission design, FERC regulates generation, thus encroaching on the authority over generation left to the States.

2.      Order 1920's economic and political significance implicates the major-questions doctrine. The order would "substantially restructure the American energy market" and enact an "aggressive transformation in the domestic energy industry."

19

*West Virginia*, 597 U.S. at 714, 724. Indeed, the Dissent to Order 1920 emphasizes that the order would impose a mandate on every transmission provider in the nation to spend trillions of consumers' dollars on transmission. Given its significance, FERC could enact Order 1920 only with clear authorization from Congress—authorization which does not exist.

Even assuming congressional authorization, Order 1920 violates the non-delegation doctrine that bars Congress from transferring its legislative power to another branch of the government, including an agency within the executive branch. Order 1920 addresses major questions of social policy without authorization.

Likewise, Order 1920 is beyond FERC's authority because it violates the Constitution's equal sovereignty doctrine by subjecting different States to unequal burdens with some States subsidizing the policy decisions of others.

3.      Even if FERC had authority to adopt Order 1920, it violates the FPA because FERC failed to establish by substantial evidence that the existing rates are unjust, unreasonable, unduly discriminatory, or preferential. 16 U.S.C. § 824e(a). Assuming FERC met this FPA requirement, it then must show that the proposed rate is just and reasonable. *Id.*

Yet, significant evidence shows that regions across the country are successfully planning transmission and allocating costs, rendering Order 1920

20

unnecessary. Therefore, FERC failed to satisfy the FPA's threshold requirement by substantial evidence that the existing rate is unjust or unreasonable.

In any event, Order 1920's replacement rate is unjust, unreasonable, or unduly discriminatory because it would establish policies designed to encourage massive transmission build-out that transitions to an aspirational renewable future and socializes costs of transmission across all customers to accommodate some State and local laws and policies mandating the use of renewable generation. Order 1920 is also unjust and unreasonable because it requires transmission providers to use an unreasonable planning time frame. Same for Order 1920's local-planning reforms, which allows transmission owners to use local project benefits to justify the costs to customers. Finally, Order 1920 established a mechanism to abandon the State agreement process that would have helped protect State interests.

**4.** Finally, Order 1920 violates the APA's notice-and-comment requirement because it did not provide notice and a fair opportunity to be heard. 5 U.S.C. § 553(b)(3), (c). FERC made fundamental changes to the NOPR, and the Final Rule was not a "logical outgrowth" of the notice and comments already given.

## STANDARD OF REVIEW

This Court should vacate FERC's conclusions if they are "'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, or unsupported by substantial evidence.'" *N.C. Util. Comm'n v. FERC*, 741 F.3d 439,

21

448 (4th Cir. 2014) (quoting *Appomattox River Water Auth. v. FERC*, 736 F.2d 1000, 1002 (4th Cir. 1984) (citations omitted); citing 16 U.S.C. § 825*l*(b)). Substantial evidence is "more than a mere scintilla, but less than a preponderance. *Id.* (quoting *T-Mobile Ne. LCC v. City Council of Newport News*, 674 F.3d 380, 385 (4th Cir. 2012)).

Following the Supreme Court's decision in *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), courts now draw their own conclusions with respect to agency interpretation of ambiguous statutes.

## ARGUMENT

### I. Order 1920 exceeds FERC's statutory authority and intrudes into States' authority over generation under the FPA.

### A. The FPA grants the States, not FERC, authority over generation.

Congress's grant of authority to FERC in the FPA is tightly limited. Congress provided for federal regulation of "the transmission of electric energy in interstate commerce and the sale of such energy at wholesale in interstate commerce" but extended this authority "only to those matters which are not subject to regulation by the States." 16 U.S.C. § 824(a). The FPA also provides FERC with jurisdiction to regulate "the transmission of electric energy in interstate commerce" and "the sale of electric energy at wholesale in interstate commerce" provided by public utilities. 16 U.S.C. § 824(b)(1).

The FPA is primarily, and perhaps exclusively, a consumer-protection statute. Section 205 requires FERC to ensure that "[a]ll rates and charges made, demanded, or received by any public utility for or in connection with the transmission or sale of electric energy subject to the jurisdiction of the Commission" be "just and reasonable." 16 U.S.C. § 824d(a). Included in that grant of power, FERC is also responsible for ensuring that "all rules and regulations affecting or pertaining to such rates or charges" be "just and reasonable." *Id.*

Although the agency may have jurisdiction to regulate the cost of transmission of electric energy in interstate commerce, FERC has jurisdiction over "only to those matters which are not subject to regulation by the States." 16 U.S.C. § 824(a). Section 201 specifically provides that FERC does not have jurisdiction "over facilities used for the generation of electric energy." 16 U.S.C. § 824(b)(1). In addition, Section 215(i)(3) of the FPA further reserves jurisdiction over the "safety, adequacy, and reliability of electric service" to the States. 16 U.S.C. § 824o(i)(3).

Each State has authority over which generating resources are maintained and constructed within its own jurisdiction. The Supreme Court acknowledged this authority in discussing the Atomic Energy Act in *Pac. Gas & Elec. Co.* where it held that "states exercise their traditional authority over the need for additional generating capacity, the type of generating facilities to be licensed, land use, ratemaking, and the like." 461 U.S. at 212. Similarly, in the context of natural gas production,

23

"[u]nless clear damage to federal goals would result, FERC's exercise of its authority must accommodate a state's regulation of production." *Nw. Cent. Pipeline Corp. v. State Corp. Comm'n of Kan.*, 489 U.S. 493, 522 (1989).

FERC itself has recognized this jurisdictional bar to its ability to regulate in areas reserved to the States. In *Monongahela Power Co.*, FERC stated:

> In our June 25 order, we concluded that we could not, pursuant to NEPA, regulate the environmental effects of the operations of the OE system's plants if the FPA does not independently grant us operational authority over such plants. We found no such authority to exist in the FPA because jurisdiction over the capacity planning, determination of power needs, plant siting, licensing, construction, and the operations of coal-fired plants have been deliberately withheld from our control or responsibility when Congress specifically preserved the States' authority over such matters in section 201(b) of the FPA.

40 F.E.R.C. 61,256, 61,861 (1987) (footnotes omitted).

## B. Order 1920 exceeds FERC's statutory authority by regulating generation.

Order 1920 exceeds FERC's statutory authority because, through its imposition of requirements that are not resource neutral, it invades and undermines state authority over generation.

### 1. Order 1920 imposes requirements that are not resource neutral and subsidize generation in certain States.

Order 1920 promotes the development of transmission to meet public policy goals of some States at the expense of others. The transmission providers develop the scenarios that lead to the construction of transmission facilities. The required

24

seven factors incorporated into the scenarios promote particular types of generation by mandating new transmission necessary for its potential development. It requires the construction of new transmission based on factors, such as State and local laws affecting resource mix and decarbonization, generator interconnection requests and withdrawals, and State and local policy goals. JA929-930 ¶ 409. Order 1920 then incorporates the seven benefit metrics into a cost allocation process for transmission facilities. JA1137-1138 ¶ 719-720. With these factors and benefit metrics, Order 1920's cost allocation process subsidizes generation in certain States by effectively mandating expensive transmission to serve that generation. Order 1920 shifts costs from some States to others without demonstrable benefits to other States' energy consumers. While the transmission providers set the rates for cost allocation, Order 1920 sets the guidelines for the factors and benefits that subsidize remote "green energy" generation. This subsidization intrudes on States' rights to choose the resources that best fit their own needs and public policies while overreaching into the traditional area of regulation reserved for the States.

Congress has assigned FERC *only* the task of regulating rates charged for interstate transmission service; it has *not* assigned FERC the task of determining what resources should be powering the grid nationwide either now or twenty years in the future. FERC has no authority to circumvent the FPA's limitation through the back door of regional transmission planning because it may not use regional

25

transmission planning to accomplish "indirectly" the "things that it cannot do at all." *Am. Gas Ass'n. v. FERC*, 912 F.2d 1496, 1510 (D.C. Cir. 1990); *cf. Nw. Cent. Pipeline Corp.,* 489 U.S. at 514 (when a State regulates within its sphere of authority, the regulation's incidental effect on interstate commerce does not render the regulation invalid). States can prefer, mandate, or subsidize preferred types of generation resources, but FERC cannot use its authority over the transmission to pressure, steer, or require regional planning entities to act as the Commissioners' agents and do indirectly what FERC cannot do directly—that is, promote particular types of generation.

Finally, given finite resources in any State budget, a State's subsidization of another State's generation will limit resources available for that State to choose its own generation, particularly when remote "green energy" requires longer and more costly transmission. Order 1920's transmission planning effectively dictates current planning policy on generation by subsidizing certain transmission lines.[11] And given

---

[11] Petitioner Arizona Corporation Commission points out that it has set its own policy mix of renewable and non-renewable generation sources under Article 15, Section 3 of the Arizona Constitution. *Miller v. Arizona Corp. Comm'n*, 251 P.3d 400, 406 (Ariz. Ct. App. 2011) ("According to the Commission, promulgation of the REST rules falls within its plenary power over ratemaking under Article 15, Section 3 . . . Because we agree with the Commission's assertion of plenary power, we need not determine whether the rules are permissible pursuant to the concurrent authority with the legislature or legislative authorization."). And, exercising its supervisory powers granted by the Arizona Constitution, those rules are under consideration for revision. Ariz. Corp. Comm'n Docket No. RE-00000A-24-0026, https://edocket.azcc.gov/search/docket-search/item-detail/28090. Order 1920 purports to federalize these state powers.

26

policy preferences of federal and State governments (which may vary by administration), Order 1920 will shift costs to build transmission infrastructure to support "green energy" to States and customers that did not vote for their own States to incur those costs and that have selected other generation options with different transmission requirements.

## 2. FERC's Response to Rehearing Petitions

In Order 1920-A, FERC responded to the petitions for rehearing that argued that the Commission lacks statutory authority to regulate transmission providers as set forth in Order 1920. JA2091-2135 ¶ 125-165. FERC claimed that Order 1920 "directly regulates transmission planning and cost allocation processes, . . . directly regulates *only* those practices, and it *does not* directly regulate any matter reserved to the states by FPA section 201." JA2091-2092 ¶ 126 (quoting JA830 ¶ 263) (emphasis added). FERC further stated that Order 1920 "is not aiming to indirectly regulate any matter reserved to the states by FPA section 201" but instead, only to improve existing transmission cost allocation processes to address identified deficiencies with those processes. JA2092 ¶ 126 n.343 (citing JA825 ¶ 254; JA826 ¶ 257, JA827 ¶ 25; JA832 ¶ 266). FERC heavily relies on *FERC v. EPSA*, 577 U.S. 260 (2016), to claim that "what matters is that this final rule aims to regulate, and in fact, does regulate only practices that affect the transmission of electric energy in

27

interstate commerce, which are squarely within the Commission's jurisdiction under the FPA." JA2093 ¶ 127.

However, Order 1920 does much more. While FERC claims that it is not regulating generation, it is effectively regulating generation through the factors and benefit metrics that dictate and subsidize transmission facilities that support particular forms of generation.

Further, FERC misconstrues the limits of its statutory authority to regulate practices "affecting" the transmission of energy. A faithful application of that text compels the conclusion that FERC may not enact regulations that affect subjects outside its authority under the FPA. Yet, Order 1920's factors and benefit metrics do, in practice, regulate generation by dictating and subsidizing transmission for certain types of generation. Those choices are indisputably a matter "subject to regulation by the States" and therefore off limits to FERC.

FERC also mistakenly relies on *South Carolina Public Service Authority v. FERC*, 762 F.3d 41 (D.C. Cir. 2014), to support Order 1920's authority. In *South Carolina*, the D.C. Circuit denied petitions challenging FERC's Order 1000, a prior regional transmission order. But there are significant differences between Order 1000 and Order 1920.

As an initial matter, the legal landscape today is different. In *South Carolina*, the D.C. Circuit applied *Chevron* deference to the Commission's interpretation of

28

the FPA when affirming many aspects of Order 1000, including its planning mandates. 762 F.3d at 54, 58-59, 76. But the Supreme Court has since rejected *Chevron* deference in *Loper Bright*. Now courts need not, and under the APA may not, defer to an agency's interpretation of an allegedly ambiguous statute.

In any event, the petitioners' challenges to Order 1000's planning requirements differ than those raised here. In *South Carolina*, the petitioners claimed that the Commission lacked authority to mandate transmission planning in the first instance under Section 205 and 206 of the FPA. 762 F.3d at 55. Specifically, the petitioners argued that the absence of transmission planning does not constitute an "*existing*" practice subject to the Commission's regulation under the FPA, and the decision to coordinate planning is first left to the utilities. *Id.* at 56. Unlike Order 1920, *South Carolina* did not involve the States' authority over generation, pursuant to 16 U.S.C. § 824(b)(1).

Furthermore, the substance of Order 1000 and Order 1920 are fundamentally different. Order 1000 mandated neutral processes, while Order 1920 effectively adopts processes that mandates outcomes. While both orders require transmission providers to participate in regional planning processes and develop cost allocation methods for new transmission facilities, the required factors and benefit metrics in Order 1920 materially differ from Order 1000. The seven categories of factors shape the identification of transmission needs and effectively control the outcome. Indeed,

29

Order 1920 lists "decarbonization" as one of the factors. Similarly, Order 1920 mandates minimum benefits that transmission providers must use to evaluate potential transmission facilities. Unlike Order 1000, which simply mandated the procedural consideration of public policies in transmission planning, Order 1920 effectively compels a generator preference policy.

FERC, an independent agency, cannot promote policies that go far beyond its legal authority under the FPA to protect consumers. Order 1920 transforms the Commission into a national planner to promote the construction of transmission lines based on predictions about future need, resulting in development of the preferred generation resources in violation of the FPA.

## II. The major-questions doctrine, non-delegation doctrine, and equal sovereignty doctrine bar Order 1920.

Not only does Order 1920 intrude into an area traditionally regulated by the States, but the order also involves significant political and economic issues regulating the nationwide grid. When an agency, like FERC, issues a rule of significance, the major-questions doctrine requires clear congressional authorization. Relatedly, the non-delegation doctrine bars the transfer of legislative power to another branch of the government, including an agency within the executive branch. FERC lacks congressional authorization to issue a regulation like Order 1920 that mandates transmission to support certain generation, which causes an aggressive transformation of the domestic energy industry. In addition, the equal

30

sovereignty doctrine provides for constitutional equality among the States, and Order 1920's cost allocation requirements would compel a State to subsidize public policy decisions by other States on generation.

## A. Major-Questions Doctrine

The major-questions doctrine applies to economically and politically significant actions by an agency. This doctrine requires clear congressional authorization for agency action in "extraordinary cases" when the "history and [the] breadth" and "economic and political significance" of the action at issue gives reason to hesitate before concluding that Congress meant to confer such authority to the agency. *N.C. Coastal Fisheries Reform Grp. v. Capt. Gaston LLC*, 76 F.4th 291 (4th Cir. 2023) (citing *West Virginia*, 597 U.S. at 700 (citing *Biden v. Nebraska*, 600 U.S. 477 (2023)). In such "extraordinary cases," "both separation of powers principles and a practical understanding of legislative intent make [courts] 'reluctant to read into ambiguous statutory text' the delegation claimed to be lurking there." *West Virginia*, 597 U.S. at 723 (quoting *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014)). The doctrine addresses "a particular and recurring problem: agencies asserting highly consequential power beyond what Congress could reasonably be understood to have granted." *Id.* at 724 (Gorsuch, J., concurring).

As explained above, Congress limits the authority delegated to agencies: "Agencies have only those powers given to them by Congress[.]" *West Virginia*, 597

U.S. at 723. FERC is an administrative agency created by statute. 42 U.S.C. § 7171(a) ("There is established within the Department [of Energy] an independent regulatory commission to be known as the Federal Energy Regulatory Commission"). As a "'creature of statute,'" it has "'no constitutional or common law existence or authority, but only those authorities conferred upon it by Congress.'" *Atl. City Elec. Co. v. FERC*, 295 F.3d 1, 8 (D.C. Cir. 2002) (quoting *Michigan v. EPA*, 268 F.3d 1075, 1081 (D.C. Cir. 2001)). "[A]n agency literally has no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986).

Courts thus "expect Congress to speak clearly if it wishes to assign to an agency decisions of vast economic and political significance." *West Virginia*, 597 U.S at 716 (citing 84 Fed. Reg. 32520, 32529 (2019) (quoting *Util. Air Regul. Grp.*, 573 U.S. at 324 (internal quotation marks omitted)).

In this context, the Supreme Court in *West Virginia* found that Congress's supposed delegation to the EPA of policymaking authority under the Clean Air Act to regulate coal and gas-fired power plants throughout the country was a "major questions case" because that authority would "substantially restructure the American energy market" and enact an "aggressive transformation in the domestic energy industry." 597 U.S. at 714, 724. While there is no set threshold for economic or

32

political significance, agency authority that seeks to regulate a significant portion of the American economy qualifies as a "major questions case".

In concurrence, Justice Gorsuch highlighted that the doctrine may apply when an agency seeks to "intrud[e] into an area that is the particular domain of state law." *Id.* at 744 (Gorsuch, J., concurring). In fact, the concurring opinion emphasized that "[t]he electric power sector is among the largest in the U.S. economy, with links to every other sector," which unquestionably has an impact on federalism because "the regulation of utilities is one of the most important of the functions traditionally associated with the police power of the States." *Id.* at 745-46 (citing *Ark. Elec. Coop. Corp.* 461 U.S. at 377).

Similarly, in *North Carolina Coastal Fisheries Reform Group*, this Court held that the major-questions doctrine applied where the agency asserted consequential power beyond congressional authorization. The EPA construed the Clean Water Act ("CWA") to require shrimpers to obtain a CWA permit to return their bycatch to the water. After finding that the major-questions doctrine applied, this Court found that the EPA did not have clear congressional authorization to enforce the CWA in this manner. This Court also stated that it is hesitant to recognize new-found powers in old statutes against a backdrop of an agency failing to invoke them when this asserted power raises federalism concerns. *N.C. Coastal Fisheries Reform Grp.*, 76 F.4th at 297 (citing *Solid Waste Agency of N. Cook Cnty v. U.S. Army Corps of*

33

*Eng'rs*, 531 U.S. 159, 172-73 (2001); *see also Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 594 U.S. 758 (2021)). A question of significant political and economic consequences includes an "aggressive transformation in the domestic energy industry." *N.C. Coastal Fisheries Reform Grp.*, 76 F.4th at 296-97 (quoting *West Virginia*, 597 U.S. at 714).

Under the Supreme Court and this Court's precedent, this is a major-questions doctrine case. The authority that FERC claims would create an "aggressive transformation in the domestic energy industry" and have significant political and economic consequences. Interpreting the FPA to allow FERC to regulate transmission and generation of the entire nation's energy market would give it power over a "significant portion of the American economy." Indeed, Commissioner Christie cautioned that the order would impose its mandate on "every transmission provider in the United States for the transparent goal of spending trillions of consumers' dollars on transmission." JA1901 ¶ 1; *see also* JA1903 ¶ 3 n.7; JA1911-1912 ¶ 9 n.30.

Although FERC criticizes the Dissent's citation of the Princeton Net Zero Study, which provided a figure of $3.6 trillion through 2050 to institute green energy goals[12], there is no doubt that, as Justice Gorsuch pointed out in *West Virginia*, the

---

[12] In addition, the Dissent pointed out other green energy decarbonization goals that require additional transmission lines, such as the 2035 Net Zero goal, which was promoted by the former Biden administration. To achieve the 2035 Net Zero goal, studies estimated that high-voltage

34

electric power sector is among the largest in the U.S. economy with links to every other sector.

Order 1920 makes sweeping policy changes that will require spending at least hundreds of billions of dollars to build expensive transmission infrastructure necessary for the most transmission-intensive forms of generation. Thus, Order 1920 is of significant economic and political significance that creates an aggressive transformation of the domestic energy industry that would give FERC power over "a significant portion of the American economy." *N.C. Carolina Coastal Fisheries Reform Grp.*, 76 F.4th at 299 (quoting *FDA v. Brown & Williamson*, 529 U.S. 120, 159 (2000)). Whether FERC can supplant the States' role in generation, transmission, and cost allocation is particularly major considering the enormous breadth of the transmission grid, the importance of electricity in everyday life, and the billions or trillions of dollars in transmission costs that Order 1920 will impose.

Because the major-questions doctrine applies, FERC must then identify "clear congressional authorization" for its action. *West Virginia*, 597 U.S. at 723, 732. Congress did not authorize Order 1920, and FERC has not identified clear authorization from Congress to interpret the FPA to allow FERC to favor certain

---

transmission line construction must double to deliver the necessary new wind and solar energy. JA1901-1902 ¶ 1 n.5 ("You can't get around the fact that you're going to need tens of thousands of miles of new transmission lines if you want to build the hundreds of gigawatts of wind and solar and batteries that many of us predict are needed to achieve decarbonization goals," said former Obama energy secretary Ernest Moniz).

35

generation sources or certain States' policy choices over others. And clear congressional authorization requires "something more than a merely plausible textual basis." *Id.* at 723. FERC's view of its authority under the FPA is unprecedented and "effected a fundamental revision of the statute," *Id.* at 728, with significant political and economic consequences. FERC is seizing the power of the legislature in an area where Congress has chosen not to act and imposing obligations like those imposed by EPA in *West Virginia*.

As explained above, not only has Congress not authorized the FERC's Order 1920, but it has also spoken on this question and precluded FERC's regulation of generation and other energy authority traditionally and statutorily reserved to the States under the FPA. FERC is seeking to expand its regulatory authority in a way that would upset the federal-state balance by intruding on States' authority over generation, rather than transmission, of power. As the Supreme Court emphasized, the "[n]eed for new power facilities, their economic feasibility, and rates and services, are areas that have been characteristically governed by the States." *Pac. Gas and Elec. Co.*, 461 U.S. at 205.

Without clear congressional authorization, FERC may not usurp the powers of the States in this manner. No statute, including the FPA, gives FERC the far-reaching authority it asserts in Order 1920. If the nation is to shift to particular renewable generating resources, that decision should be made by legislators who can

36

be held accountable for any sweeping policy choices. These policy choices should not be hidden in a complex administrative transmission planning and cost allocation rule. Any policy shifting to renewable generation, or more particularly, to distant renewable power generation with costs shifted away from cost-causers and beneficiaries should come from Congress. Order 1920 falls short of the clear congressional authorization needed when the major-questions doctrine applies, and a decision of this magnitude and consequence rests with Congress. *West Virginia*, 597 U.S. at 735.

## B. Non-Delegation Doctrine

Even if Order 1920 were supported by statutory authorization, it would violate the non-delegation doctrine, which bars Congress from transferring its legislative power to another branch of the government. *Gundy v. United States*, 588 U.S. 128, 132 (2019) (plurality op.). Given Order 1920's major question of political and economic importance, a non-delegation principle for major questions should apply to this case.

Congress may not delegate its authority to decide major policy questions to an agency. *See, e.g., Paul v. United States*, 140 S. Ct. 342, 342 (2019) (Kavanaugh, J., statement respecting denial of certiorari) (suggesting that it may be unconstitutional "for an executive or independent agency to exercise regulatory authority over a major policy question of great economic and political importance"

37

is unconstitutional even if Congress "expressly and specifically delegate[s] to the agency the authority"); *Indus. Union Dep't AFL-CIO v. Am. Petroleum Inst.*, 448 U.S. 607, 685-86 (1980) (Rehnquist, J., concurring in judgment) (similar); *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 551 (1935) (holding that regulatory action violated non-delegation doctrine). Order 1920's economic impact and political significance is a major policy question that implicates separation of powers and federalism consequences even if it were authorized by Congress. Because this authorization would delegate major questions of social policy to politically unresponsive administrators, it violates the non-delegation doctrine.

## C. Equal Sovereignty Doctrine

Order 1920 is also beyond FERC's authority because, if the statute were interpreted to have the sweeping authority the agency seeks to exercise, it would violate the Constitution's equal sovereignty doctrine.

The United States "was and is a union of States, equal in power, dignity, and authority, each competent to exert that residuum of sovereignty not delegated to the United States by the Constitution itself." *Coyle v. Smith*, 221 U.S. 559, 567 (1911). This "constitutional equality among the States" derives from the Constitution's text and structure. *Franchise Tax Bd. v. Hyatt*, 578 U.S. 171, 179 (2016) (internal quotations omitted). And "the constitutional equality of the states is essential to the

38

harmonious operation of the scheme upon which the Republic was organized." *Coyle*, 221 U.S. at 580.

An advantage of equal sovereignty is that "a state admitted into the Union enters therein in full equality with all the others, and such equality may forbid any agreement or compact limiting or qualifying political rights and obligations." *Stearns v. Minnesota*, 179 U.S. 223, 245 (1900). And "the fundamental principle of equal sovereignty remains highly pertinent in assessing subsequent disparate treatment of States" after their admission. *Shelby Cnty. v. Holder*, 570 U.S. 529, 544 (2013).

Order 1920 creates a scheme where one State can effectively force other States to subsidize its own public policy agenda–a core, sovereign State function. Its socialization of costs among the States would subvert the democratic process that grants authority to citizens to impact their State public policies through elections.

And as previously explained, Order 1920 would encroach on the traditional prerogatives of transmission siting and generation that Congress left to the States in the FPA. The erosion of State authority is inconsistent with the FPA's principle of cooperative federalism and invites FERC to impose unjust, unreasonable, and unduly discriminatory rates among the States.

*    *    *

39

This Court should vacate Order 1920 because it violates significant federalism and separation of powers principles that underlie the major-questions doctrine, non-delegation doctrine, and equal sovereignty doctrine.

## III. Order 1920 fails under both prongs of FPA Section 206.

Even if the FPA provided FERC the authority it asserts, it failed to comply with its requirements. To regulate a practice affecting rates pursuant to Section 206, FERC must find that the existing practice is "unjust, unreasonable, unduly discriminatory or preferential," and that the remedial practice it imposes is "just and reasonable." 16 U.S.C. § 824e(a). In other words, FERC must first find that the rate on file is no longer just and reasonable and not unduly discriminatory or preferential. Then, FERC must find that the particular replacement rate would be just and reasonable and not unduly discriminatory or preferential. These findings must be supported by "substantial evidence." 5 U.S.C. § 706(2)(E); *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d 41, 54 (D.C. Cir. 2014) (per curiam). Order 1920 fails both requirements.

### A. FERC failed to adequately support its finding that existing regional transmission planning and cost allocation is unjust, unreasonable, unduly discriminatory or preferential.

In Order 1920, FERC found that the existing regional transmission planning and cost allocation processes result in unjust, unreasonable or unduly discriminatory rates. JA680-681 ¶ 85. However, FERC lacks statutory authority to make this

40

conclusion on a generic nationwide basis, and, in any event, it failed to identify the unreasonableness of the existing rate with substantial evidence, as required by the FPA. 16 U.S.C. § 824e(a).

As an initial matter, FERC has no statutory authority to make rate determinations on a generic, national level. FERC has power under Section 205 to review the filed rates of individual "utilit[ies]" to determine if those rates are just and reasonable. 16 U.S.C. § 824d. FERC also has authority under Section 206 to determine "after a hearing held upon its own motion or upon complaint" that the rates charged by a specific utility subject to FERC jurisdiction are "unjust, unreasonable, unduly discriminatory or preferential," and, if so, to adjust such rate. 16 U.S.C. § 824e.

Neither source of authority authorizes Order 1920, which purports to make nationwide findings about rates across the entire country, rather than the specific findings about the rates charge by specific utilities.

Furthermore, Order 1920 cites no factual findings supported by substantial evidence for acting against *all* the filed transmission rates nationwide. The record, while consisting of thousands of pages comments, does not contain substantial evidence to make a generic showing that the existing filed rates of *all* transmission providers are unjust, unreasonable, unduly discriminatory or preferential. Indeed, the comments in the record largely derive from special interest groups that will profit

41

from Order 1920, such as generation developers, transmission developers, and corporate purchasers of preferred power. JA696-697 ¶ 96.

At most, the record evidence shows that regional planning deficiencies exist in isolated pockets. But these deficiencies did not exist nationwide. Order 1920 cited several comments in response to the NOPR that provided examples of regional transmission planning successes among several regions representing substantial consumers. JA670-680 ¶¶ 71-84 (cataloging comments to the NOPR). Indeed, the Commission celebrated the Midcontinent Independent System Operator's ("MISO") Multi-Value Projects, claiming that these projects resulted in "clear and quantifiable benefits." JA704 ¶ 102. MISO has in place a Long-Term Transmission Planning that includes most of Order 1920's requirements. JA704-705 ¶ 102.

The Dissent highlighted several examples of long-term planning success since 2010, including MISO. JA1943 ¶ 65 (citing JA3867-3888 Organization of MISO States Initial Comments ("[I]t is critically important to note at the outset that MISO's regional planning process already reflects many of the elements and features contained in the [NOPR], and it should be looked to as a model for other regions to emulate."); *see also* Order 1920 JA921 ¶ 395 (MISO already includes categories of factors in NOPR). For additional perspective, MISO does not manage a remote corner of the United States; in fact, it is the electrical grid operator for the central United States, transmitting energy among fifteen States and even a Canadian

42

province. MISO's success is sufficient to defeat FERC's generic finding that existing rates are unjust.

Furthermore, the record provides additional examples of success throughout the United States. The Dissent pointed out that the California Independent System Operator ("CAISO"), New York, Southern Companies, and others have sufficient long-term planning. JA1943 ¶ 65 nn.161-163 (citing JA4272 CAISO Initial Comments ("The CAISO already engages in long-term planning, and its existing transmission planning process is consistent with the direction of the NOPR."); JA4707-4708 CAISO Reply Comments ("the Commission should not unduly disrupt or undo existing planning processes and approaches that are functioning well and enabling transmission providers to plan for system needs efficiently and cost-effectively."); JA4175-4178 New York Commission and NYSERDA Initial Comments; JA3262-3269 Southern Companies Initial Comments (IRP/RFP-driven transmission planning is successfully expanding their electric grid to address the changing resource mix and load); Undersigned States Reply Comments at 6-7).

Also, the National Rural Electric Cooperative Association ("NRECA"), an organization that represents both transmission providers and transmission-dependent entities, highlights that its members have observed successful and unsuccessful regional transmission planning processes among RTOs. JA679-680 ¶ 84 (citing NRECA Initial Comments at 14-16). In summary, FERC failed to meet its burden

of proof; the record proves the opposite. Substantial regions across the country are successfully engaged in long-term transmission planning.

FERC's finding that the existing regional transmission planning and cost allocation processes of every RTO/ISO and non-RTO/ISO transmission providers across the country is unreasonable or unjust is unsupported by substantial evidence.

## B. Order 1920's replacement is unjust and unreasonable.

Even assuming FERC established that the existing rate is unjust and unreasonable, it must establish by substantial evidence that the replacement rate is just and reasonable and not unduly discriminatory or preferential. 16 U.S.C. § 824e(a); 5 U.S.C. § 706(2)(E). Order 1920 fails to include analysis finding that the required changes will result in just and reasonable rates.

### 1. Required Factors and Benefit Metrics

Order 1920's required factors and benefit metrics will result in unjust, unreasonable, and unduly discriminatory rates. The assumptions used in the transmission planning should reflect the policy preferences, economic conditions, and geographic particularities of each region. Instead, FERC mandated a single set of transmission planning assumptions that does not reflect the diversity of each planning region, which will lead to discriminatory rates.

As previously addressed, Order 1920 mandates that transmission providers consider seven factors and seven benefit metrics for transmission planning that

44

subsidize transmission facilities that align with certain generation. These requirements are not only unduly discriminatory to some States versus others but also unjust and unreasonable because they will impose significant costs on ratepaying loads by customers without sufficient and measurable benefits to those customers.

In addition, FERC's seven benefit metrics are unclear and provide no guidance on how they will be measured, weighed, and evaluated. Without any predictability regarding the application of the benefit metrics, FERC necessarily cannot find that these benefits will result in rates that are just and reasonable and not unduly discriminatory or preferential.

Also, Order 1920's authorization of portfolios obstructs the measurement of benefits and is arbitrary and capricious. Order 1920 allows, but does not require, transmission providers to use portfolios when evaluating the benefits of transmission facilities. JA1104-1260 ¶¶ 669-890. The approach improperly allows the bundling of economic projects with public policy and other projects that are uneconomic, which makes all projects appear economic on a collective basis. As a result, the portfolio approach should be prohibited entirely.

Grouping qualified projects (i.e., those that independently satisfy tariff criteria) with non-qualified projects (together, a "portfolio") should be prohibited because it is unjust, unreasonable, and unduly discriminatory against some States.

45

Each individual project that is approved for construction should be economically sufficient and meet the required benefit-to-cost ratios on a stand-alone basis. For example, a project should not proceed if it is deemed to have positive benefits only because its negative benefits are averaged with other projects with positive net benefits. The portfolio approach makes socializing costs appear more equitable by allocating project costs over a broader geographic area. The approach spreads uneconomic project costs and requires non-beneficiaries to pay project costs. Therefore, the portfolio approach is unjust and unreasonable under the FPA because it shifts costs for some jurisdictions that allow for the recovery of costs that exceed benefits.

Another example of Order 1920's unreasonableness is its requirement for the evaluation of local transmission projects for "right sizing" to increase transfer capability. Specifically, the order requires transmission providers to evaluate whether an in-kind replacement can be "right-sized" for long-term cost effectiveness and compliance. JA1784 ¶ 1677. The "right-sizing" requirement should be eliminated because it unreasonably intrudes upon State authority and will result in unjust and unreasonable rates when local projects are turned into transmission

highways to satisfy the interests of developers and other States with different policy interests.[13]

## 2. Planning Timeline

FERC also chose an unreasonable timeline for transmission planning by requiring transmission providers to use "no less than a 20-year transmission planning horizon." JA2202-2203 ¶ 237. That timeline will lead to imprudent and unnecessary investment decisions. And the problem only grows when one combines the timeline with the planning factors FERC says transmission providers must consider—factors that, again, promote certain generation choices over others. *See supra* III.B.1.; *see also* C. Boyden Gray, *American Energy, Chinese Ambition, and Climate Realism*, American Affairs (Winter 2021), https://perma.cc/7CAC-SADP.

Requiring a 20-year-plus outlook for every region makes little sense given the way technology and the location of resources rapidly change. Take one notable illustration. Twenty years ago, few if any would have predicted that technological improvements in horizontal drilling and hydraulic fracturing would spark a massive uptick in natural-gas resources from the Marcellus and Utica shale formations. *See* Daniel Yergin, The New Map: Energy, Climate, and the Clash of Nations, at 11 (Penguin 2020). A 20-year plan in 2005 would not have accurately predicted the mix

---

[13] FERC admitted that factor seven even encompassed wide-ranging policy goals, including "energy equity and justice goals", JA978 ¶ 482, which is unjust and unreasonable since those goals are unrelated to energy reliability or costs.

of energy resources in the PJM Interconnection ("PJM") region or the location of those resources and an allocation of costs based on such a plan would have led to unjust and unreasonable rates in light of actual needs in 2025.

At bottom, FERC behaved unreasonably by imposing a mandatory timeline when more flexibility was necessary. Order 1920's timeline forcing transmission providers to project two decades out is just another sign that its goal was favoring certain generation choices, *not* ensuring that rates remain "just and reasonable." *Contra* 16 U.S.C. §824d(a).

### 3. Local Planning

FERC's approach to local transmission projects presents another lapse in reasoned decision making. Transmission projects come in different forms. Some projects—called "baseline" projects in PJM—are necessary to ensure the continued reliability of a region's transmission system. PJM, RTEP 2023 Report, at 34 (March 7, 2024), https://www.pjm.com/-/media/DotCom/library/reports-notices/2023-rtep/2023-rtep-report.pdf. Other projects are more localized in nature, arising from "transmission owner-identified needs" that do not threaten a region's overall "operational performance." *Id.* Such local projects—or "supplemental projects" in PJM—result in "significant investments," the costs of which transmission providers pass along to consumers. *See* JA712-715 ¶¶ 109–10, JA1710 ¶ 1565. In 2022, for instance, transmission owners undertook roughly 250 supplemental projects in the

48

PJM region, leading to approximately $3.6 billion in costs. PJM, RTEP 2022 Report, at 64 (March 14, 2023), https://www.pjm.com/-/media/DotCom/library/reports-notices/2022-rtep/2022-rtep-report.pdf.

Given the billions of dollars at stake, one would expect regulators to carefully monitor local projects. But the reality falls woefully short of expectations. At least in the PJM region, "supplemental projects are not subject to [PJM's] approval." PJM, RTEP 2023 Report, at 5. Consequently, transmission owners may effectively decide for themselves whether the benefits of local projects (to their operations) justify the costs (to consumers).

With that oversight gap in mind, consider FERC's local-planning reforms. With Order 1920, FERC decided that reforms were needed to protect consumers from "unjust and unreasonable" rates resulting from "inefficient or less cost-effective" local projects. JA714-715 ¶ 110. Even so, FERC left the sizable regulatory void just discussed. True, FERC adopted transparency measures, borrowing from how PJM presently approaches local projects. JA1729-1730 ¶ 1591; JA1749-1750 ¶ 1625; JA1757-1758 ¶ 1636. But FERC's reforms failed to address the hole in PJM's approach—the lack of a meaningful check on transmission owners' local-project decisions. Given that failure, FERC's transparency reforms are of little value.

And, when explaining its reforms, FERC never seriously engaged with the oversight gap. *E.g.,* JA2691-2692 ¶ 853; JA2695-2696 ¶857. It instead avoided the

49

issue, claiming that because it did not propose an oversight solution within its NOPR, its hands were tied. JA1766-1768 ¶ 1648. That dodge does not work. When regulators decide to reform an area (here, local planning), they must consider important aspects of the problem that are identified in proceedings before them. *See Ohio v. EPA*, 603 U.S. 279, 294 (2024).

All told, FERC behaved arbitrarily by choosing to undertake reform but then reforming half-heartedly. At minimum, it did not adequately explain through its various orders why it failed to do more. *See id.*; *Old Dominion Elec. Coop. v. FERC*, 898 F.3d 1254, 1260 (D.C. Cir. 2018).

### 4. State Agreement

Order 1920 abandoned many important aspects of the NOPR's cost allocation proposal, including the proposal for either an *ex ante* long-term process or an *ex post* State agreement process, both of which required the States' agreement. However, the order requires a default *ex ante* allocation method and provides State entities a six-month engagement period to develop the *ex ante* process and/or State agreement process. The *ex ante* process requires a cost allocation formula that includes public policy projects, generation interconnection requests, and local decarbonization goals. The process then socializes these costs to all States and regions, including those that object to the projects by treating those consumers as cost causers or beneficiaries. A default *ex ante* cost allocation will broadly allocate costs among

50

States with differing policy objectives, resulting in no incentive for the States to reach an agreement. Further, Order 1920 does not require the transmission provider to follow an allocation methodology developed by regulators during the engagement period, which makes the engagement period meaningless. If States jointly agree on a cost allocation process, it is just and reasonable that the rules should require the transmission provider to accept those cost allocations, subject to the Commission's approval.

Importantly, Order 1920, unlike the NOPR, does not require regulator consent on cost allocation. JA1563 ¶ 1354. Thus, a state agreement process has no practical value because the States are effectively removed from the cost allocation process.

First, the six-month engagement period is not a just replacement of a requirement for regulator consent. Even if there were an agreed upon *ex ante* method developed during the engagement period, the transmission provider may ignore it and file a competing proposal with the Commission.

Second, Order 1920 shifts the cost of public policy projects in some States to ratepayers of non-consenting States, which is beyond FERC's authority and arbitrary and capricious. State retail regulators should have an effective voice on cost allocation because the retail ratepayers will ultimately pay for the transmission costs. Because retail regulators represent retail ratepayers, they are familiar with the needs

51

and policies of their respective jurisdictions, particularly since many exercise authority over certification and siting of transmission facilities in those areas. Retail regulator acceptance of any long-term transmission projects is a crucial factor regarding whether and how transmission projects will be built. In fact, the retail regulators' decisions and views should be the primary determinant of the cost allocation methodologies adopted by FERC.

And as previously explained, the cost allocation process should not allow costs associated with environmental and public policy goals of some States to be allocated to other States that do not share those same goals. Those costs should be allocated only to those States that share those goals or paid by those States in an agreed-upon amount. FERC has no statutory authority to give preferential treatment among differing types of generation or use the cost allocation process to advance FERC's preferred types of generation.

While Order 1920-A made some changes regarding State input, the changes do not provide the States with any meaningful authority. For example, Order 1920-A requires a transmission provider to include in its compliance filing any State agreement to a cost allocation proposal. JA2519-2545 ¶¶ 635-62. Transmission providers must consult with States before running planning scenarios mandated by Order 1920 and consider States' views to account for the factors related to State public policies. JA2519 ¶ 635. In addition, transmission providers must consult

52

States before any changes to cost allocation method or State agreement processes or if the States seek to amend the cost allocation method or State agreement processes. JA2565-2577 ¶¶ 687-704. Order 1920-A also provides that States in PJM and other diverse multistate regions can choose a new *ex ante* process that allows States to request that transmission providers run additional scenarios. JA2536-2538 ¶¶ 654-55. While laudatory for FERC to allow States to have a greater voice through the changes mentioned above, these changes provide no actual binding authority for a State's preference to be incorporated into a planning decision.

Therefore, Order 1920 is unjust and unreasonable and in violation of the FPA because it usurps State regulator authority over important cost allocation issues. Further, the order is discriminatory because it creates a methodology to socialize the costs of generation construction and interconnection and the public policy goals of other States and local jurisdictions.

## IV. Order 1920 violates the APA's notice and comment requirement.

FERC contravened the APA's notice-and-comment requirement. The APA establishes procedures on how agencies must create, amend, or repeal rules, including a notice of proposed rulemaking to notify interested parties of "either the terms or substance of the proposed rule or a description of the subjects and issues involved." 5 U.S.C. § 553(b)(3). "After notice," interested parties must have "an opportunity to participate" by explaining their positions. 5 U.S.C. § 553(c). The

53

requirement of notice and a fair opportunity to be heard is basic to administrative law. *Chocolate Mfrs. Ass'n of U.S. v. Block*, 755 F.2d 1098, 1102 (4th Cir. 1985).

Under the APA, an agency is permitted to revise a final rule after initial notice of the proposed rule "if the changes in the original rule 'are in character with the original scheme,' and a 'logical outgrowth' of the notice and comments already given." *Chocolate Mfrs. Ass'n*, 755 F.2d at 1105. The proposed rule must enable the public "to discern what [is] at stake." *Mfr. Hous. Inst. v. EPA,* 467 F.3d 391, 400 (4th Cir. 2006). But "if the final rule 'substantially departs from the terms or substance of the proposed rule,' the notice is inadequate." *Chocolate Mfrs. Ass'n*, 755 F.2d at 1105 (citation omitted). Changes to the proposed rule are not considered a logical outgrowth when they render "the final rule more expansive, more specific, and having a different emphasis in the regulatory structure." *Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.,* 407 F.3d 1250, 1260 (D.C. Cir. 2005).

Order 1920 is not a logical outgrowth of the NOPR because it fundamentally changed the cost allocation requirements, and these changes were never published for additional public comment.[14] First, the NOPR only *permitted* transmission providers to file one or more *ex ante* cost allocation methods to apply to selected

---

[14] The Dissent listed "fundamental" differences between the NOPR and the Final Rule. JA1922-1924 ¶¶ 22-29.

transmission facilities, while Order 1920 *requires* the filing while dropping State consent requirements. *Compare* NOPR JA361 ¶ 278; JA361 ¶ 279*;* JA381 ¶ 302; JA382-383 ¶ 303 *with* Order 1920 JA1524-1525 ¶ 1291. Relatedly, the order requires specified criteria and benefits for cost allocation, unlike the NOPR. *Compare* NOPR JA338-339 ¶ 245 *with* Order 1920 JA1137 ¶ 719; JA1137-1138 ¶ 720. As previously demonstrated, the order's specified planning metrics (inputs) lead to an unjust and unreasonable cost allocation that socializes costs for specific generation. On the other hand, the NOPR only required transmission providers to consider criteria that were transparent and not unduly discriminatory.

In another change, Order 1920 abandoned cost allocation principle number 6 from the NOPR, which was previously incorporated into Order 1000. *Compare* NOPR JA381-382 ¶ 302 *with* Order 1920 JA1638-1639 ¶ 1469. This principle allowed for different long-term regional transmission cost allocation methods for different types of long-term regional transmission facilities, such as those needed for reliability, congestion relief, or to achieve public policy requirements. Therefore, compared to the NOPR, Order 1920 provided RTOs less flexibility to consider regional differences for cost allocation.

In another example, the NOPR proposed to eliminate the Construction Work in Progress ("CWIP") incentive, while Order 1920 left it intact. *Compare* NOPR JA400 ¶ 332; JA400 ¶ 333 *with* Order 1920 JA1693 ¶ 1547. In the NOPR, FERC

acknowledged that offering the CWIP incentive to transmission providers may shift risk to consumers to the benefit of the transmission providers. JA400 ¶ 332; JA400 ¶ 333. Nevertheless, FERC deleted this consumer-protection provision in the order. JA1693 ¶ 1547. Also, Order 1920 failed to expand the transparency goals in local transmission planning for asset management projects, which the NOPR covered. *Compare* NOPR JA451-455 ¶¶ 398-99; JA455-466 ¶¶ 400-413 *with* Order 1920 JA1749-1750 ¶ 1625.

Therefore, these fundamental changes between the NOPR and Order 1920 essentially created a new rule that requires new opportunities for comment and input. Order 1920 violates the APA's notice and comment requirements because the parties did not have an opportunity to provide comment on the changes.

## CONCLUSION

The State Petitioners respectfully request that the Court grant their petition and vacate Order 1920.

## STATEMENT REGARDING ORAL ARGUMENT

The State Petitioners respectfully request oral argument. Oral argument will assist the Court with the complex issues this case presents.

Respectfully submitted.

Ken Paxton
Attorney General of Texas

William R. Peterson
Solicitor General

Brent Webster
First Assistant Attorney General

William F. Cole
Principal Deputy Solicitor General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

/s/ Dimitri N. Rocha
Dimitri N. Rocha
Assistant Solicitor General
Dimitri.Rocha@oag.texas.gov

*Counsel for the State of Texas*

Thomas Van Flein
General Counsel

Russell Coleman
Attorney General

Sean Bodkin
Senior Associate General Counsel

Matthew F. Kuhn
Solicitor General

Maureen A. Scott
Senior Associate General Counsel

John H. Heyburn
Principal Deputy Solicitor General

Chief of Litigation & Appeals
Office of the General Counsel
Arizona Corporation Commission
1200 West Washington Street
Phoenix, Arizona 85007
(602) 542-3402
tvanflein@azcc.gov
mscott@azcc.gov

Jacob M. Abrahamson
Deputy Solicitor General

Office of the Kentucky Attorney
General
1024 Capital Center Drive, Suite 200
Frankfort, Kentucky 40601
(502) 696-5300
Matt.Kuhn@ky.gov
Jack.Heyburn@ky.gov
Jacob.Abrahamson@ky.gov

*Counsel for the State of Arizona Corporation Commission*

*Counsel for the Commonwealth of Kentucky*

*Additional counsel on next page*

57

William D. Booth
Alex Peterson

Michael Best & Friedrich LLP
1000 Maine Avenue, S.W. Suite 400
Washington, D.C. 20024
(202) 747-9560
wdbooth@michaelbest.com
alpeterson@michaelbest.com

***Counsel for the State of Mississippi
Public Service Commission***

Christopher M. Carr
Attorney General

John Henry Thompson
Solicitor General

Elijah O'Kelley
Deputy Solicitor General

Office of the Attorney General
40 Capitol Square, SW
Atlanta, Georgia 30334
(404) 458-3373
jhthompson@law.ga.gov

***Counsel for the State of Georgia &
Georgia Public Service Commission***

Stanford Purser
Utah Solicitor General

Office of the Utah Attorney General
160 E. 300 S., 5th floor
Salt Lake City, Utah 84111
(801) 366-0100
spurser@agutah.gov

***Counsel for the State of Utah***

Mathura J. Sridharan*
Solicitor General
*Counsel of Record

Zachery P. Keller
Deputy Solicitor General

Thomas G. Lindgren
Assistant Attorney General

30 East Broad Street, 17th Floor
Columbus, Ohio 43215
(614) 466-8980
Mathura.Sridharan@OhioAGO.gov

***Counsel for the Public Utilities
Commission of Ohio's Office of the
Federal Energy Advocate***

*Additional counsel on next page*

58

Kathryn Bowman
Executive Counsel

Louisiana Public Service Commission
Galvez Building - 12th Floor
602 N. Fifth Street
Baton Rouge, Louisiana 70802
(225) 342-9888

Noel J. Darce
Dana M. Shelton
Justin A. Swaim

Fishman Haygood, LLP
201 St. Charles Ave., Suite 4600
New Orleans, Louisiana 70170
(504) 586-5252

***Counsel for the State of the
Louisiana Public Service
Commission***

## UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No. __24-1650(L)__    Caption: __APPALACHIAN VOICES, ET AL v. FERC__

### CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT
Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

**Type-Volume Limit for Briefs if Produced Using a Computer:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 13,000 words or 1,300 lines.  Appellee's Opening/Response Brief  may not exceed 15,300 words or 1,500 lines.  A Reply or Amicus Brief may not exceed 6,500 words or 650 lines. Amicus Brief in support of an Opening/Response Brief may not exceed 7,650 words. Amicus Brief filed during consideration of petition for rehearing may not exceed 2,600 words. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include headings, footnotes, and quotes in the count. Line count is used only with monospaced type.  See Fed. R. App. P. 28.1(e), 29(a)(5), 32(a)(7)(B) & 32(f).

**Type-Volume Limit for Other Documents if Produced Using a Computer:** Petition for permission to appeal and a motion or response thereto may not exceed 5,200 words. Reply to a motion may not exceed 2,600 words. Petition for writ of mandamus or prohibition or other extraordinary writ may not exceed 7,800 words. Petition for rehearing or rehearing en banc may not exceed 3,900 words.  Fed. R. App. P. 5(c)(1), 21(d), 27(d)(2) & 40(d)(3).

**Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch). Fed. R. App. P. 32(a)(5), 32(a)(6). Sans-serif type, such as Arial, may not be used except in captions and headings.

This brief or other document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

[✓]    this brief or other document contains _____12,698_____ [*state number of*] words

[ ]    this brief uses monospaced type and contains _____ [*state number of*] lines

This brief or other document complies with the typeface and type style requirements because:

[✓]    this brief or other document has been prepared in a proportionally spaced typeface using
__Microsoft Word_____ [*identify word processing program*] in
__Times New Roman_____ [*identify font, size, and type style*];

**or**

[ ]    this brief or other document has been prepared in a monospaced typeface using
_____ [*identify word processing program*] in
_____ [*identify font, size, and type style*].

**NOTE: The Court's preferred typefaces are Times New Roman, Century Schoolbook, and Georgia. The Court discourages the use of Garamond.**

(s) __Dimitri N. Rocha_____

Party Name __STATE PETITIONERS_____    Date: __3/13/2026_____

12/09/2024  NA/MEO

# CERTIFICATE OF SERVICE

**Instructions for Electronic Filers:** For persons filing electronically, CM/ECF serves all registered CM/ECF users, and no certificate of service is required for such service.  A certificate of service is required from an electronic filer, however, in the following circumstances:

- To certify that a non-user of CM/ECF has been served;
- To certify that a manual filing (not available in electronic form), has been served;
- To certify that a sealed document has been served;
- To certify that a case-initiating document, such as a petition for review, petition for permission to appeal, or petition for writ of mandamus, has been served.

**Instructions for Paper Filers:** For persons filing in paper form, service must be accomplished outside CM/ECF, and a certificate of service is required for all documents.

Case No.  24-1650(L)     Case Caption  APPALACHIAN VOICES, ET AL v. FERC

I certify that on ____3/13/2026____, the OPENING BRIEF FOR STATE PETITIONERS
               (date)                        (document title)
was served by [  ] personal delivery; [  ] mail; [  ] third-party commercial carrier; or [  ] email

(with written consent) on the following persons at the addresses or email addresses shown:

(Name and Address or Email Address )
 Service provided electronically by CM/ECF


Dimitri N. Rocha                                    3/13/2026
_____              _____
Signature                                                Date


01/28/2020 SCC

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __24-1758__        Caption: __State of Texas v. Federal Energy Regulatory Commission__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__State of Texas__
(name of party/amicus)

_____

 who is _____Petitioner_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO

2.    Does party/amicus have any parent corporations?    ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐YES ☑NO
      If yes, identify all such owners:

12/01/2019 SCC                                - 1 -

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?    ☐YES ☑NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.    Is this a criminal case in which there was an organizational victim?    ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Dimitri N. Rocha                          Date:        08/29/2025

Counsel for: State of Texas

- 2 -

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. 24-1876          Caption: Arizona Corporation Commission v. FERC

Pursuant to FRAP 26.1 and Local Rule 26.1,

Arizona Corporation Commission
(name of party/amicus)


 who is _____ Petitioner _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.     Is party/amicus a publicly held corporation or other publicly held entity?     ☐ YES ☑ NO


2.     Does party/amicus have any parent corporations?     ☐ YES ☑ NO
       If yes, identify all parent corporations, including all generations of parent corporations:


3.     Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?     ☐ YES ☑ NO
       If yes, identify all such owners:


12/01/2019 SCC                              - 1 -

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: Kurt M. Rozelsky                    Date:        10/03/24

Counsel for: Arizona Corporation Commission

- 2 -

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No.  24-1650          Caption:  Appalachian Voices et al. v. Federal Energy Regulatory Comm'n

Pursuant to FRAP 26.1 and Local Rule 26.1,

State of Georgia, Georgia Public Service Commission
(name of party/amicus)

who is _____ Petitioner _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.     Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO

2.     Does party/amicus have any parent corporations?    ☐YES ☑NO
       If yes, identify all parent corporations, including all generations of parent corporations:

3.     Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐YES ☑NO
       If yes, identify all such owners:

12/01/2019 SCC                              - 1 -

4.     Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?    ☐YES ☑NO
       If yes, identify entity and nature of interest:

5.     Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
       If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.     Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
       If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.     Is this a criminal case in which there was an organizational victim?    ☐YES ☑NO
       If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Elijah J. O'Kelley        Date:    August 29, 2025

Counsel for: State of Ga.; Ga. Pub. Serv. Comm'n

- 2 -

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __24-1650__    Caption: __Appalachian Voices, et al. v. FERC__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Commonwealth of Kentucky__
(name of party/amicus)

_____

who is _____Petitioner_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO

2. Does party/amicus have any parent corporations?    ☐ YES ☑ NO
   If yes, identify all parent corporations, including all generations of parent corporations:

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO
   If yes, identify all such owners:

12/01/2019 SCC                                    - 1 -

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?    ☐YES ☑NO
      If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
      If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
      If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.    Is this a criminal case in which there was an organizational victim?    ☐YES ☑NO
      If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: __Jacob M. Abrahamson_____    Date: _____08/29/2025_____

Counsel for: __Commonwealth of Kentucky_____

- 2 -

[Print to PDF for Filing]

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __24-1770__          Caption: Louisiana Public Service Commission, et al. v. FERC

Pursuant to FRAP 26.1 and Local Rule 26.1,

Louisiana Public Service Commission
(name of party/amicus)

who is          __petitioner__          , makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?    ☐ YES ☑ NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO
      If yes, identify all such owners:

12/01/2019 SCC                          - 1 -

4.　　Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?　☑YES☐NO
　　　If yes, identify entity and nature of interest:

There are multiple, publicly-held entities that are parties to the proceedings before FERC below and in the appellate cases consolidated with the LPSC's Petition for Review before this Court. However, each of those entities will submit its own disclosure statement. None are affiliated with the Louisiana Public Service Commission.

5.　　Is party a trade association? (amici curiae do not complete this question)　☐YES☑NO
　　　If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.　　Does this case arise out of a bankruptcy proceeding?　☐YES☑NO
　　　If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.　　Is this a criminal case in which there was an organizational victim?　☐YES☑NO
　　　If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Noel Darce　　　　　　　　　　　　Date:　　　2/4/2025

Counsel for: Louisiana Public Service Commission

- 2 -

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __24-1770__        Caption: Louisiana Public Service Commission, et. al., v. FERC

Pursuant to FRAP 26.1 and Local Rule 26.1,

Mississippi Public Service Commission
(name of party/amicus)


who is _____Petitioner_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity?   ☐YES ☑NO


2.    Does party/amicus have any parent corporations?                              ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:




3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
      other publicly held entity?                                         ☐YES ☑NO
      If yes, identify all such owners:




12/01/2019 SCC                               - 1 -

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☑YES☐NO
    If yes, identify entity and nature of interest:

    There are multiple, publicly-held entities that are parties to the proceedings before FERC below and in the appellate cases consolidated with MPSC's Petition for Review before this Court. However, each of those entities will submit its own disclosure statement. None are affiliated with the Mississippi Public Service Commission

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?  ☐YES☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: William D. Booth _____    Date: _____ 2/4/2025 _____

Counsel for: Miss. Public Service Commission _____

- 2 -

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. __25-1349, 24-1785__Caption: __PUCO's Office of the Federal Energy Advocate v. FERC__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Public Utilities Commission of Ohio's Office of the Federal Energy Advocate__
(name of party/amicus)


who is _____Petitioner_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.     Is party/amicus a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO


2.     Does party/amicus have any parent corporations?    ☐ YES ☑ NO
   If yes, identify all parent corporations, including all generations of parent corporations:


3.     Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO
   If yes, identify all such owners:

4.   Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
If yes, identify entity and nature of interest:

5.   Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.   Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.   Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ T. Elliot Gaiser                    Date:          4/21/25

Counsel for: Petitioner

- 2 -

**Print to PDF for Filing**

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __24-1979__        Caption: __State of Utah v. FERC__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__State of Utah__
(name of party/amicus)

_____

 who is _____Petitioner_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO

2.    Does party/amicus have any parent corporations?    ☐YES ☑NO
       If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐YES ☑NO
       If yes, identify all such owners:

12/01/2019 SCC                                            - 1 -

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: _/s/ Stanford Purser_____     Date: ___10/23/2024_____

Counsel for: _State of Utah_____

- 2 -

[ Print to PDF for Filing ]