Nos. 24-1650, 24-1748, 24-1756, 24-1758, 24-1760, 24-1765, 24-1770, 24-1785, 24-1804, 24-1857, 24-1862, 24-1867, 24-1876, 24-1885, 24-1887, 24-1979, 24-1991, 24-2162, 24-2163, 25-1073, 25-1080, 25-1197, 25-1349 (CONSOLIDATED)

---

# UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

---

APPALACHIAN VOICES, ET AL.,

*Petitioners,*

*v.*

FEDERAL ENERGY REGULATORY COMMISSION,

*Respondent.*

_____

ON PETITIONS FOR REVIEW OF ORDERS OF THE
FEDERAL ENERGY REGULATORY COMMISSION

---

## BRIEF OF AMICI CURIAE STATES IN SUPPORT OF RESPONDENT

---

ANDREA JOY CAMPBELL
Attorney General
Commonwealth of Massachusetts

TURNER SMITH
Deputy Chief
JULIA JONAS-DAY
JACQUELYN BIHRLE
Assistant Attorneys General
Energy & Environment Bureau
One Ashburton Pl.
Boston, MA 02108
Julia.jonas-day@mass.gov
617-963-2021

*Additional Counsel for Amici Curiae*
*Listed on Signature Page*

ROB BONTA
Attorney General
State of California

DAVID ZAFT
Supervising Deputy Attorney General
JINA KIM
Deputy Attorney General
Env't Justice & Protection Section
THEODORE MCCOMBS
Deputy Attorney General
Natural Resources Law Section
300 S. Spring St., Suite 1702
Los Angeles, CA 90013
David.Zaft@doj.ca.gov
213-269-6372

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................... ii

INTRODUCTION & INTERESTS OF AMICI ........................................................ 1

SUMMARY OF ARGUMENT ............................................................................ 4

ARGUMENT ............................................................................................ 5

I.   The Rule is a Proper Exercise of FERC's Authority ......................................... 5

    A.   The Rule Remedies Existing Practices that Cause Unjust and
       Unreasonable Rates .................................................................. 6

    B.   The Rule Will Promote, Not Impede, State Authority Over Generation ... 11

II.  Order 1920's Requirement that Transmission Providers Consult Relevant State
    Entities is Just and Reasonable and Consistent with the Federal Power Act .... 15

III. Order 1920 Does Not Implicate the Major Questions Doctrine, the
    Nondelegation Doctrine, or Equal Sovereignty Principles ........................... 20

    A.   Order 1920 Does Not Implicate the Major Questions Doctrine ............... 20

    B.   State Petitioners Have Not Shown that Order 1920 Violates the
       Nondelegation Doctrine ........................................................ 24

    C.   Order 1920 Does Not Implicate Equal Sovereignty Principles ................. 27

CONCLUSION ....................................................................................... 29

i

**TABLE OF AUTHORITIES**

**CASES**

*Atlantic City Electric Co. v. FERC*,
    295 F.3d 1 (D.C. Cir. 2002)............................................................19

*Biden v. Nebraska*,
    600 U.S. 477 (2023).............................................................................21

*City of Cleveland v. FERC*,
    773 F.2d 1368 (D.C. Cir. 1985)....................................................19

*Connecticut Dep't of Pub. Util. Control v. FERC*,
    569 F.3d 477 (D.C. Cir. 2009).......................................................14

*Diamond Alternative Energy LLC v. EPA*,
    145 S. Ct. 2121 (2025)...................................................................28

*FCC v. Consumers' Rsch.*,
    606 U.S. 658 (2025)............................................................. 26, 27

*Federal Power Commission v. Hope Natural Gas Co.*,
    320 U.S. 591 (1944).....................................................................27

*FERC v. Elec. Power Supply Ass'n*,
    577 U.S. 260 (2016)....................................................... 6, 13, 14

*Gundy v. United States*,
    588 U.S. 128 (2019)........................................................... 25, 26

*N.C. Coastal Fisheries Reform Grp. v. Capt. Gaston LLC*,
    76 F.4th 291 (4th Cir. 2023) ............................................. 21, 22

*Nat'l Pork Producers Council v. Ross*,

598 U.S. 356 (2023).................................................................................28

*New York v. FERC*,
   535 U.S. 1 (2002)..............................................................................6

*NRG Power Mktg., LLC v. FERC*,
   862 F.3d 108 (D.C. Cir. 2017)......................................................20

*Ohio v. EPA*,
   98 F. 4th 288 (D.C. Cir. 2024)......................................................28

*Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*,
   461 U.S. 190 (1983).......................................................................14

*Paul v. United States*,
   589 U.S. 1087 (2019).....................................................................25

*Piedmont Env't Council v. FERC*,
   558 F.3d 304 (4th Cir. 2009) .......................................................15

*S.C. Pub. Serv. Auth. v. FERC*,
   762 F.3d 41 (D.C. Cir. 2014)................................... 6, 13, 14, 17, 26

*Save Jobs USA v. Dep't of Homeland Sec'y*,
   111 F.4th 76 (D.C. Cir. 2024).......................................................21

*Shelby County v. Holder*,
   570 U.S. 529 (2013)........................................................... 27, 28

*West Virginia v. EPA*,
   597 U.S. 697 (2022)........................................................... 21, 23

iii

**FEDERAL STATUTES**

16 U.S.C. § 824(a) ............................................................................ 23, 26

16 U.S.C. § 824(b)(1)..........................................................................6, 26

16 U.S.C. § 824d ...................................................................................5

16 U.S.C. § 824d(a) ..............................................................................6

16 U.S.C. § 824d(b) ..............................................................................6

16 U.S.C. § 824e(a)........................................................... 6, 18, 22, 26

16 U.S.C. § 825l(b) ...............................................................................6

42 U.S.C. § 1311(a) .............................................................................21

42 U.S.C. § 1342(a)(1)........................................................................21

42 U.S.C. § 1362(6) ............................................................................21

Electricity Modernization Act of 2005,
    Pub. L. No. 109-58, 119 Stat. 594 (2005)................................. 26, 27

Inflation Reduction Act,
    Pub. L. No. 117-169, 136 Stat. 1818 (2022)..................................23

Infrastructure Investment and Jobs Act,
    Pub. L. No. 117-58, 135 Stat. 429 (2021)......................................23

**OTHER AUTHORITIES**

187 FERC ¶ 61,068 (May 13, 2024)...................... 2, 6, 7, 10, 11, 12, 13, 15, 16, 24

iv

189 FERC ¶ 61,126 (Nov. 21, 2024) ............................... 2, 9, 11, 12, 13, 15, 16, 17

191 FERC ¶ 61,026 (Apr. 11, 2025) ........................................ 2, 16, 17, 18, 19, 20

*PJM Interconnection, L.L.C.*, 185 FERC 61,107 (2023) ............................................8

## INTRODUCTION & INTERESTS OF AMICI

With the proliferation of energy-hungry data centers and the electrification of buildings, transportation, and other industries, electricity demand is soaring. It is likely to keep climbing. More supply and competition in the power market will help keep electricity prices from climbing alongside demand, while also ensuring reliability. But simply generating more electricity cannot achieve these benefits if power cannot reach those who need it. This is why transmission infrastructure is critical.

Electricity transmission is like an interstate highway system that connects generation sources to load; it must have sufficient capacity along the corridors where it is needed. And it must be resilient in the face of catastrophic events such as hurricanes and wildfires. The Federal Energy Regulatory Commission ("FERC" or "the Commission") regulates the interstate transmission system to maintain nondiscriminatory access and to ensure that the rates charged to utilities and their ratepayers are just and reasonable.

FERC properly identified that the past model of transmission planning was overly reliant on individual interconnection requests to identify upgrade needs and did not sufficiently consider the evolving demands and capabilities of the system. As a result, the past model inhibited the smooth interstate transfer of badly needed power and led to excess ratepayer costs.

1

In FERC's Order No. 1920, as amended by Order Nos. 1920-A and 1920-B (collectively, the "Rule") [1], FERC carefully responded to these problems. The Rule requires transmission providers to account for real-world considerations like projected demand, new generation and retirements, and utility resource planning on a forward-looking basis when planning grid development.

Massachusetts, California, Connecticut, Illinois, Maine, Maryland, Minnesota, New Jersey, Oregon, Rhode Island, Washington, and the District of Columbia ("Amici States") submit this brief as amici curiae in support of FERC, pursuant to Federal Rule of Appellate Procedure 29(a)(2). Amici States seek to promote their economies and their residents' health and welfare, all of which require an ample supply of affordable and reliable electricity. Amici States also seek to protect ratepayers from excess costs associated with the inefficient buildout of energy infrastructure. Amici States submit this brief because the Rule's transmission planning reforms are critical to unlocking competition and enhancing reliability in the power market, without overburdening ratepayers.[2]

---

[1] 187 FERC ¶ 61,068 (May 13, 2024), JA0615-1978; 189 FERC ¶ 61,126 (Nov. 21, 2024), JA1979-2797; 191 FERC ¶ 61,026 (Apr. 11, 2025), JA2798-2965.

[2] Amici States submitted multiple comments to the Commission throughout the rulemaking that resulted in the Rule. *See, e.g*., State Agencies ANOPR Comments (FERC Oct. 12, 2021), JA3340-3390; Massachusetts Attorney General ANOPR Comments (Oct. 12, 2021), JA3391-3428; State Agencies ANOPR Reply Comments (Nov. 26, 2021), JA3500-3522; Massachusetts Attorney General ANOPR Reply Comments (Nov. 30, 2021), JA3523-3542; Comments of

Piecemeal transmission upgrades and inadequate interregional coordination have increased costs and delayed the connection of new electricity generation facilities to serve demand.[3] Indeed, transmission-related delays and uncertainty as well as the cost of transmission upgrades often prompt new generators to withdraw projects.[4] At the same time, persistent congestion on transmission lines harms Amici States by keeping ratepayers from obtaining the lowest-cost power available and preventing some generators from producing their maximum potential output.[5]

---

Washington and Oregon State Agencies (Aug. 17, 2022), JA3895-3925; Massachusetts Attorney General NOPR Comments (FERC Aug. 17, 2022), JA4028-4083; State Agencies NOPR Comments (Aug. 17, 2022), JA4239-4270; State Agencies NOPR Reply Comments (Sept. 19, 2022), JA4644-4656; Massachusetts Attorney General NOPR Reply Comments (Sept. 19, 2022), JA4657-4692.

[3] *See* Abraham Silverman et al., Ctr. on Glob. Energy Pol'y, *Outlook for Pending Generation in the PJM Interconnection Queue* 9 (May 2024), https://perma.cc/U2UU-WVTY (describing a "severe" "backlog of new generation" inhibiting projects from coming online "in the quantities necessary to satisfy demand"); Joseph Rand et al., Lawrence Berkeley Nat'l Lab., *Queued Up: Characteristics of Power Plants Seeking Transmission Interconnection As of the End of 2022* 35 (Apr. 2023), https://perma.cc/9P9L-5AP5 (describing significant generation capacity in interconnection queues across the country and finding increasing time spent in queues before commercial operation).

[4] *See* John D. Wilson et al., Grid Strategies, *Generator Interconnection Scorecard* 36 (Feb. 2024), https://perma.cc/UZ7M-LXR3 ("most interconnection customers withdraw projects that trigger a network upgrade"); Silverman, *Outlook for Pending Generation*, *supra* note 3, at 34.

[5] *See* Ryan Wiser et al., U.S. Dept. of Energy, *Transmission Impact Assessment: Power Sector Infrastructure Deployment to Reduce Costs, Improve Reliability, and Lower Pollution* 3 (Oct. 2024) (finding that regional and interregional transmission buildout will lead to savings for electricity consumers of up to $320 billion through 2050 due to increased access to low-cost generation and sharing of reliability resources).

Transmission infrastructure is also expensive and has a long operational life. Amici States are committed to ensuring that sizeable investments of consumer dollars in transmission infrastructure are made with attention to the anticipated future needs of the system, as well as risks that could disrupt it.

Representing a range of experiences with transmission planning, Amici States understand that holistic, forward-looking transmission planning will mitigate congestion and facilitate the speedy addition of low-cost generation to the grid. The Court should uphold the Rule, which will promote the availability of reliable, affordable energy necessary to allow economies to flourish, provide lifesaving services, and help communities thrive.

## SUMMARY OF ARGUMENT

FERC properly found, based on substantial evidence, that practices in existing transmission planning were leading to unjust, unreasonable, and unduly preferential or discriminatory rates. The Rule is a proper exercise of FERC's authority to provide a framework for just and reasonable replacement rates. Record evidence from Amici States support these findings.

The Rule also respects relevant actors'—including states'—spheres of authority. Its requirement that transmission providers consider laws and regulations that will affect future electricity supply and demand honors, rather than intrudes upon, states' traditional authority over generation. Likewise, the requirement that

4

transmission providers consult with states at various stages in the cost-allocation process promotes collaboration and transparency, while protecting transmission providers' rights to propose their own rates and terms. *See* 16 U.S.C. § 824d.

Finally, contrary to Petitioners' claims, the Rule raises no constitutional concerns. Petitioners identify no interpretive question to which the major doctrine could apply, and, besides, transmission planning is not a major question. Nor does the statutory scheme lack intelligible principles guiding this exercise of FERC's authority. Finally, Petitioners' equal sovereignty claim fails as they fail to identify any way in which the Rule treats one state differently from others.

## ARGUMENT

### I. The Rule is a Proper Exercise of FERC's Authority

State Petitioners erroneously contend that the Rule exceeds FERC's authority "by regulating generation." Opening Br. of State Pet'rs at 22-30, ECF No. 398 (hereinafter, "Texas Br."). To the contrary, the Rule falls squarely within FERC's power to regulate interstate *transmission* by remedying practices that cause unjust and unreasonable rates. Record evidence from Amici States reinforces FERC's finding that existing short-term, piecemeal transmission planning leads to unjust and unreasonable rates and that the Rule's reforms, requiring long-term, holistic regional transmission planning, will remedy its failures. Moreover, far from impeding states' reserved authority to regulate generation, *contra* Texas Br.

5

22-30, the Rule advances state autonomy to select and manage sources of generation.

## A. The Rule Remedies Existing Practices that Cause Unjust and Unreasonable Rates

The Federal Power Act authorizes—and indeed, requires—FERC to correct unjust and unreasonable rates and undue discrimination in the power market. 16 U.S.C. §§ 824d(a)-(b), 824e(a); *New York v. FERC*, 535 U.S. 1, 7 (2002) (recognizing FERC's broad remedial authority). With this remedial obligation comes a "duty [. . .] to ensure that rules or practices 'affecting' wholesale rates are just and reasonable." *FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 277 (2016). Transmission planning is unequivocally a practice that affects "the transmission of electric energy in interstate commerce," 16 U.S.C. § 824(b)(1), and is therefore squarely within FERC's regulatory authority. *See S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d 41, 56-57 (D.C. Cir. 2014) (upholding FERC Order No. 1000, which—like the Rule—requires regional transmission planning).

Substantial evidence supports FERC's findings that existing transmission planning results in rates that are unjust, unreasonable, and unduly discriminatory or preferential, and that the long-term regional planning that the Rule requires will remedy those deficiencies. Order 1920 ¶¶ 85-89, JA0690-0684; *see* 16 U.S.C. § 825l(b) (Commission's factual findings evaluated under substantial evidence standard). The record before FERC reflects that existing transmission planning

6

processes have made it challenging for new generators to enter the market and for low-cost generation to reach load centers. The record also shows that existing transmission planning processes have failed to prevent congestion and to anticipate necessary transmission infrastructure improvements. These failures have perpetuated piecemeal and inefficient investment in transmission, resulting in unjust and unreasonable transmission rates. Record evidence shows that holistic, long-term regional planning, as required by the Rule, leads to more efficient transmission investments.

First, existing transmission system constraints create obstacles to new generation. Prior to the Rule, most of the nation's transmission providers identified transmission needs based on individual interconnections of new generation to the grid and individual unit retirements, as opposed to holistically examining future generation and demand and planning a grid to serve those needs. As a result, many regions face a significant backlog of new, lower-cost generation that has not been able to enter the market—or has been unable to bring its full generation capacity online—due, in part, to insufficient transmission capacity. Order 1920 ¶¶ 54-55, 107, JA0656-0657, JA0710-0711. Often, transmission upgrade needs are not identified until interconnection requests are submitted, delaying those necessary

7

upgrades and thereby also delaying the interconnection of new power.[6] As the Department of Energy commented, "if transmission is not planned far enough ahead to take the needs of likely new generation into account, the lack of appropriately sited and sized transmission capacity will impede the timely development of needed new generation and lead to higher costs."[7]

Long-term, forward-looking planning—as the Rule requires—will ensure that transmission providers identify and address transmission needs in advance. Consequently, the transmission system will be ready to take advantage of new capacity, easing tight supply and exerting procompetitive, downward pressure on wholesale electricity prices.[8]

A well-planned grid that takes into consideration regional needs over time, as the Rule mandates, will create transmission capacity—like new lanes on these

---

[6] *See* State Agencies ANOPR Comments *supra* note 2, at 37-38, JA3376-3377; Chairman Glick, concurring, ANOPR ¶ 10 (July, 15, 2021), JA0132.

[7] U.S. Dep't of Energy ANOPR Comments 10 (Oct. 12, 2021), JA3081.

[8] A lack of advance planning for transmission needs has also led to uneconomic plants being forced to remain online, at significant costs to ratepayers. *See, e.g.*, *PJM Interconnection, L.L.C.*, 185 FERC 61,107, Clements Concurrence ¶ 2 (Nov. 8, 2023) (keeping uneconomic generator online four years past intended retirement date cost consumers $785 million); Jennifer Danis et al., Inst. for Pol'y Integrity, *Transmission Planning for the Energy Transition* 26 n.72 (2023), cited in Institute for Policy Integrity Supplemental Comments, app. A (Dec. 14, 2023), JA4742 (explaining that transmission provider had not been able to plan for this retirement); *see also* NARUC NOPR Comments 14-15 (Aug. 17, 2022), JA4169-4170 (delayed transmission upgrades meant uneconomic power plant in Delaware had to operate for years beyond planned retirement).

"interstate highways"—where it is needed. This capacity will incentivize and accommodate lower cost electricity generation.[9] For example, new onshore wind resources in Maine could lower prices and improve reliability for electricity consumers across New England, but these resources' ability to serve New England load has been limited due to insufficient transmission capacity.[10] New England states expect long-term transmission planning to lead to an improved grid that will allow power from these resources in Maine to break through to load centers,[11] lowering energy prices and improving reliability.

Second, ratepayers pay the price of congestion caused by failures in transmission planning. Congestion occurs on transmission lines when the lines are overloaded, like highways at rush hour. In such circumstances, lower cost generation may be unable to reach the homes and businesses that need it, and ratepayers may be forced to pay higher costs. *See* Order 1920-A ¶ 73, JA2039-2042. Congestion costs are increasing across multiple regions.[12] Investments in transmission capacity resulting from the Rule will alleviate this type of congestion,

---

[9] *See, e.g.*, Michigan Attorney General and the Citizens Utility Board NOPR Comments 3 (Aug. 17, 2022), JA4530 (describing curtailed energy generation due to transmission constraints).

[10] ISO-NE ANOPR Comments 3-4 (Oct. 12, 2021), JA3317-3318.

[11] *See id.* at 3, 14-17, JA3317.

[12] *See* U.S. Dep't of Energy, National Transmission Needs Study 66-69 (2023), cited in Institute for Policy Integrity Supplemental Comments, app. A at 2 n.3, JA4718.

as shown by successes in ISO-NE over the last 20 years that have significantly reduced congestion costs in the region.[13]

Finally, Amici States have experienced the impacts of wildfires, droughts, and extreme heat and cold on the grid, illustrating the necessity of planning for high-impact, low-frequency events.[14]

Experiences in Amici States demonstrate the value of long-term transmission planning. For example, one regional transmission organization's "Multi-Value Project" planning looks forward over a 20-year time horizon and considers factors like those required by the Rule to respond to projected changing load and demand needs across fifteen states. *See* Order 1920 ¶ 102, JA0704-0705. As FERC found, the transmission facilities selected to move forward through this process will generate ratepayer benefits of between $2.20 and $3.40 per dollar invested—a significant return on investment from long-term planning alone. *Id.* Independent analyses found, by contrast, that piecemeal transmission upgrades would have cost ratepayers over 80% more to achieve the same result. *Id.* ¶ 135, JA0743-0744.

---

[13] New England's experience investing in transmission infrastructure in recent years shows that transmission upgrades alleviate congestion costs. Transmission upgrades have brought down congestion costs in Massachusetts from $266 million in 2005 to a low of $29 million in 2020. Massachusetts Attorney General ANOPR Comments, *supra* note 2, at 8 n.23, JA3398.

[14] *See* Comments of Washington and Oregon State Agencies, *supra* note 2, at 14, JA3908.

Together, these examples encompass only a small sample of the substantial record evidence that supports FERC's finding that transmission planning practices were leading to unjust and unreasonable rates.

### B. The Rule Will Promote, Not Impede, State Authority Over Generation

State Petitioners characterize the Rule as regulating generation, a role the Federal Power Act reserves for states. Texas Br. 25-29. But the Rule does not directly regulate generation, and any incidental effect is plainly permissible.

First, State Petitioners' claim that the Rule regulates generation rests on their erroneous assertion that it imposes "requirements that are not resource neutral." Texas Br. 25. But the Rule is explicitly and consistently resource neutral. In the Rule, FERC repeatedly "emphasize[d] that the Commission's policies are technology neutral, and [it is] not establishing a preference for certain types of generation . . .." Order 1920 ¶ 437, JA0947; *see also* Order 1920-A ¶¶ 136-50, 298, JA2104-2118, JA2247-2248. State Petitioners do not—and cannot—explain how FERC's resource-neutral requirements operate to favor some generation resources over others. Instead, State Petitioners simply repeatedly assert that the Rule "subsidizes" clean energy generation, without ever explaining how the Rule's requirements actually produce such an effect. *See* Texas Br. 25-27.

For example, State Petitioners make much of the fact that the word 'decarbonization' appears in one of the factors that transmission providers must

11

consider, *see* Texas Br. 25, 30, but they mischaracterize the context. The Rule does not instruct transmission providers to prioritize transmission upgrades that will promote decarbonization, as State Petitioners suggest. *See id.* Instead, the Rule requires transmission providers to consider seven categories of factors when developing long-term scenarios for transmission needs. The first two categories of factors concern "federal, federally-recognized Tribal, state, and local laws and regulations." Order 1920 ¶¶ 432, 440, JA0944-0945, JA0949-0950; Order 1920-A ¶ 303, JA2251-2252. The first requires consideration of such laws and regulations "affecting the resource mix and demand," Order 1920 ¶ 432, JA0944-0945, and the second requires consideration of such laws and regulations "on decarbonization and electrification"—as decarbonization and electrification are "key drivers" of transmission needs, *id.* ¶ 440, JA0949-0950. Both factors ensure that transmission providers accurately anticipate the future generation mix and demand to provide transmission at just and reasonable rates. As a result, under the Rule, transmission providers are no less free to ignore a state mandate to develop new natural gas-fired power plants than one that authorizes construction of electric vehicle charging stations. *See* Opening Br. of FERC at 3-4, 52, 87-88, ECF No. 446-1 (hereinafter, "FERC Br.").

It is well within FERC's authority to require that transmission providers plan for existing laws and regulations that are likely to affect the future needs of the

transmission system, and State Petitioners identify no benefit in hamstringing transmission providers from accurately predicting such needs. *See S.C. Pub. Serv. Auth.*, 762 F.3d at 62-64, 89 (upholding Order 1000's requirement to account for federal, state, and local laws and regulations, reasoning that this requirement "does not promote any particular public policy" and "simply recognizes that state and federal policies might affect the transmission market"). State Petitioners do not even mention the other five categories of factors, all of which are also generation-neutral and none of which put a thumb on the scale of clean energy generation. *See* Order 1920 ¶¶ 409, 458, JA0929-0930, JA0961-0962, as modified by Order 1920-A ¶ 303, JA2251-2252 (other categories of factors include resource retirements and generator interconnection requests and withdrawals).

Second, to the extent the Rule may have an incidental effect on the resource mix (by facilitating interconnection of new sources, including renewable sources), such an effect is permissible. In *FERC v. Electric Power Supply Ass'n*, the Supreme Court analyzed a FERC regulation of transactions on the wholesale market (FERC's jurisdiction) that, in turn, affected the retail market (the states' unique jurisdiction). 577 U.S. 260. Recognizing that the realms of state and federal authority in the electricity market are not "hermetically sealed," the Court held that the regulation did not run afoul of the Federal Power Act's division of authority because it "regulates what takes place on the wholesale market . . . no matter the

13

effect on retail rates." *Id.* at 281-82. Likewise, the Rule here "regulates" interstate transmission, and does not improperly tread on states' generation authority even if it also has downstream effects on the generation mix. *Id.*; *see also S.C. Pub. Serv. Auth.*, 762 F.3d at 63 (describing breadth of FERC's authority over transmission planning). Only FERC's "direct regulation of generation facilities" violates the Federal Power Act's division of authority. *Connecticut Dep't of Pub. Util. Control v. FERC*, 569 F.3d 477, 482 (D.C. Cir. 2009); *see* FERC Br. 83-95.

Indeed, forward-looking regional transmission planning as required by the Rule empowers states to "exercise their traditional authority over the need for additional generating capacity, the type of generating facilities to be licensed, . . . and the like." *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 212 (1983). Contrary to State Petitioners' contentions, piecemeal investment in transmission planning is what limits states from fully implementing their generation policies. For example, for reasons including state policies, load growth, and evolving consumer preferences, Massachusetts has been striving to bring online new generation sources.[15] But even when these new generators are sited and licensed, many languish in long interconnection queues, preventing them from entering the market and lowering costs and boosting

---

[15] *See* Massachusetts Attorney General NOPR Comments at 9, JA4036.

reliability as the Commonwealth had planned.[16] The Rule's reforms requiring long-term regional transmission planning that accounts for evolving system needs will actually bolster state control over this critical piece of their authority.[17]

II. **Order 1920's Requirement that Transmission Providers Consult Relevant State Entities is Just and Reasonable and Consistent with the Federal Power Act**

FERC acted consistently with the Federal Power Act by requiring transmission providers to consult with relevant state entities as part of a long-term transmission cost allocation process. *Contra* Br. of the Transmission Owner Pet'rs at 18-48, ECF No. 400 (hereinafter, "TO Br."). The Federal Power Act preserves state authority over the siting of transmission and generation facilities. *See Piedmont Env't Council v. FERC*, 558 F.3d 304, 310 (4th Cir. 2009). Providing a role for states in the allocation of costs for long-term transmission projects respects their important role in transmission planning and is aligned with the Federal Power Act's core consumer protection orientation. Order 1920 ¶ 1362, JA1569; Order 1920-A, Christie Concurrence ¶ 3, JA2788-2789.

The Rule introduces three points during the transmission planning process when transmission providers must engage with states. First, transmission providers must engage in discussion with relevant state entities for a six-month period in

---

[16] *See, e.g.*, ISO-NE ANOPR Comments, *supra* note 10, at 3-4, JA3317-3318.
[17] *Id.* at 9-10.

advance of the transmission providers' compliance filings for Order 1920. Order 1920 ¶ 1358, JA1566. Second, if relevant state entities agree on a cost allocation method, the transmission providers must attach it to their compliance filing even if it is different than the method proposed by the transmission provider. Order 1920-A ¶¶ 651-55, JA2533-2538. Third, transmission providers must revise their open access transmission tariff to include a description of how they will consult with relevant state entities on cost allocation prior to future Federal Power Act section 205 rate filings. Order 1920-A ¶¶ 691-92, JA2566-2569.

FERC reasonably found that "facilitating [state] engagement in cost allocation may minimize delays and additional costs that can be associated with associated transmission siting proceedings," given that "states play a critical role in transmission planning." Order 1920 ¶ 1362, JA1569; *see also* FERC Br. 189-211. As FERC noted, "state entities charged with siting transmission facilities within their state may, at least in certain circumstances, take a more skeptical approach to evaluating applications to site Long-Term Regional Transmission Facilities." Order 1920-B ¶ 115, JA2923-2924; *see also id.* ¶ 107, JA2916-2917 (including state consultation in cost allocation "has the potential to minimize additional costs and delays in the siting process and to facilitate the development of Long-Term Regional Transmission Facilities"). Thus, state input on cost allocations will likely

16

reduce the "practical challenges" to siting transmission facilities. Order 1920-A ¶ 673, JA2554-2556.

As then-Commissioner Christie's concurrence to Order 1920-A explained, states also serve a critically important role in protecting consumers. Order 1920-A, Christie Concurrence ¶ 3, JA2788-2789. "[S]tate utility regulators are the first line of defense for their consumers and must have the authority to protect their consumers from unwarranted or excessive transmission costs." *Id*. Thus, "the broad purpose of [requiring state consultation] is to allow the states sufficient flexibility and authority to protect their consumers from paying unfair or unnecessary costs." *Id*. ¶ 12, JA2791.

The Rule's state consultation requirement is similar to FERC Order 1000's requirement, upheld by the D.C. Circuit, that transmission providers have a FERC-approved cost allocation process. *See* Order 1920-B ¶ 114, JA2922-2923; *S.C. Pub. Serv. Auth.*, 762 F.3d at 57-58, 84-87. Order 1000 required transmission providers to have a method for calculating costs among beneficiaries of transmission facilities that satisfies six regional cost allocation principles. Order 1920-B ¶ 114, JA2922-2923. The Rule builds upon Order 1000 by introducing more cost allocation principles, one of which is Order 1920-A's requirement to consult with affected states on cost allocation. Like Order 1000, the Rule's state consultation requirement "aims to ensure the development and application of cost

17

allocation methods that will themselves facilitate the timely, efficient development of Long-Term Regional Transmission Facilities, through states' critical role in that process." Order 1920-B ¶ 114, JA2922-2923.

Transmission Owner Petitioners suggest that FERC lacks authority under Federal Power Act section 206 to require state consultation on cost allocation. TO Br. 22-32. But that argument confuses the role of section 205, which carefully circumscribes FERC's role in reviewing transmission providers' proposed rate changes, with section 206, which gives FERC discretion in the exercise of its remedial authority to set a replacement rate. *See* FERC Br. 192-200; Order 1920-B ¶¶ 46-65, JA2846-2868; 16 U.S.C. § 824e(a). Here, FERC reasonably concluded that—given the important role that states play in the siting, permitting, and construction of transmission facilities and in setting policies that drive transmission needs—consideration of state proposals would assist the Commission in setting a just and reasonable replacement rate under section 206. *See* FERC Br. 195-200.

Transmission Owner Petitioners also object to state consultation as a prerequisite for future Federal Power Act Section 205 proceedings, arguing that it violates their rights under the Federal Power Act to make changes to their rates and creates a "gatekeeping" role for states. TO Br. 30-36. As FERC explained on rehearing, however, the consultation requirement does not "regulate transmission providers' filing rights under FPA section 205," but rather "addresses the practices

18

through which cost allocation methods for Long-Term Regional Transmission Facilities are developed." Order 1920-B ¶ 113, JA2922. Thus, "[t]ransmission providers retain their full and exclusive discretion as to whether to file—or not file—proposed changes to Long-Term Regional Transmission Cost Allocation Method(s) and/or State Agreement Process under FPA section 205." Order 1920-B ¶ 118, JA2927-2928; *see also* FERC Br. 204-06.

Transmission Owner Petitioners rely heavily on *Atlantic City Electric Co. v. FERC*, 295 F.3d 1 (D.C. Cir. 2002), to argue that FERC cannot use its Federal Power Act section 206 authority to impose procedural requirements on transmission providers. TO Br. 18-20, 31-33. But *Atlantic City* concerned FERC's attempt to require public utilities to cede their Federal Power Act section 205 filing rights to regional transmission organizations or independent system operators. Order 1920-B ¶ 55, JA2857-2858; *see also* FERC Br. 201. Here, FERC explicitly disclaims any restriction on transmission providers' substantive section 205 rights. Order 1920-B ¶ 55, JA2857-2858. Transmission Owner Petitioners' reliance on *City of Cleveland v. FERC*, 773 F.2d 1368 (D.C. Cir. 1985), TO Br. 25, 27, is similarly misplaced. There, the court denied a challenge to the adequacy of process when FERC approved a compliance filing, and thus it has nothing to do with the "Commission's authority, under FPA section 206, to regulate transmission

19

providers' practices for developing cost allocation methods." Order 1920-B ¶ 120, JA2929-2930; *see also* FERC Br. 208-09.

Nor does the Rule overstep the limitation on FERC's authority articulated in *NRG Power Mktg., LLC v. FERC*, 862 F.3d 108 (D.C. Cir. 2017). *Contra* TO Br. 34. In that case, the court held that FERC cannot "impose[] an entirely new rate scheme" when it determines that the proposed rate in a transmission provider's section 205 filing is not just and reasonable. 862 F.3d at 116. The court reasoned that imposing a new rate at this stage prevents utility customers from having sufficient notice. *Id.* Conversely, here, the Rule's procedural state consultation requirement occurs prior to a section 205 filing. Order 1920-B ¶ 55, JA2857-2858; *see also* FERC Br. 209. It thus provides *more* notice and opportunity for pre-filing engagement with stakeholders in pursuit of just and reasonable rates, bolstering the purpose of section 205 to protect utility customers.

Thus, the Rule's opportunities for state involvement in cost allocation are aligned with state authority over generation and transmission as well as the Federal Power Act's protections for the public interest in utility ratemaking.

III.    **Order 1920 Does Not Implicate the Major Questions Doctrine, the Nondelegation Doctrine, or Equal Sovereignty Principles**

**A. Order 1920 Does Not Implicate the Major Questions Doctrine**

First, the State Petitioners misconstrue the major questions doctrine in arguing that it "bar[s] Order 1920." Texas Br. 30. The doctrine is not a "bar," but a

"tool of statutory interpretation" to "help courts figure out what a statute means." *Save Jobs USA v. Dep't of Homeland Sec'y*, 111 F.4th 76, 80 (D.C. Cir. 2024); *see West Virginia v. EPA*, 597 U.S. 697, 723 (2022). The doctrine applies "common sense" principles "as to the manner in which Congress [is] likely to delegate" authority to an agency. *West Virginia*, 597 U.S. at 722-23; *Biden v. Nebraska*, 600 U.S. 477, 511 (2023) (Barrett, J., concurring). Only "in 'extraordinary cases,' when the 'history and breadth' and 'economic and political significance' of the action at issue gives [a court] 'reason to hesitate before concluding that Congress meant to confer such authority,'" is "clear congressional authorization" required. *N.C. Coastal Fisheries Reform Grp. v. Capt. Gaston LLC* (*N.C. Fisheries*), 76 F.4th 291, 296 (4th Cir. 2023) (quoting *West Virginia*, 597 U.S. at 721).

Here, State Petitioners do not present any interpretive question to which the major questions doctrine might lend weight. In fact, State Petitioners do not identify any statutory text at all to which to apply the doctrine. The contrast with *N.C. Fisheries* is instructive: there, the major questions doctrine helped this Court resolve whether local shrimpers' dumping of bycatch into the sound was a "discharge" of "pollutants" (in particular, "biological materials") under the Clean Water Act's definitions. 76 F.4th at 295 (quoting 42 U.S.C. §§ 1311(a), 1342(a)(1), 1362(6)). While such a reading of the statute was plausible, this Court found that "[a]dopting [that] interpretation" would transform Congress's regulatory scheme,

21

with enormous social and economic consequences. *Id.* at 298-301. Accordingly, the major questions doctrine disfavored that reading. *See id.* Here, there is no debate over the meaning of any term in Congress's delegation to FERC: while the parties dispute whether the conditions of 16 U.S.C. § 824e(a) are satisfied, State Petitioners do not offer any competing reading of those conditions.

Second, even if State Petitioners could identify an interpretive question on which the major questions doctrine might bear, transmission planning is not a major question meriting judicial skepticism. State Petitioners' essential theory is that: (1) Order 1920's planning factors and minimum benefits favor the approval of long-distance transmission lines necessary for certain remote wind and solar generation resources, (2) such transmission lines "will require spending at least hundreds of billions of dollars," Texas Br. 35, and (3) the expense of these transmission lines and electricity's overall importance to society establish Order 1920's "economic and political significance," *id.* at 35-36. They fail to support these premises. *See supra* I.B. But even assuming their theory holds, State Petitioners' logic would make suspect nearly every nationally applicable FERC action on transmission.

Transmission lines are by nature expensive, and electricity is always important to the nation. Transmission infrastructure that connects new generation or demand inherently changes the economics of procuring and dispatching power

22

on a grid. But the Supreme Court made clear that actions that simply change the economics of generation are *not* akin to "controlling the mix of energy sources." *West Virginia*, 597 U.S. at 731 n.4. It defies common sense to subject any FERC action that promotes transmission to the special scrutiny of the major questions doctrine. Indeed, the Federal Power Act gives *plenary* authority over interstate electricity transmission to FERC, 16 U.S.C. § 824(a), and Congress recently augmented FERC's authority to issue permits for interstate transmission facilities in the face of state inaction, Infrastructure Investment and Jobs Act, Pub. L. No. 117-58, § 40105(b), 135 Stat. 429, 934 (2021) (*codified at* 16 U.S.C. § 824p(b)).

FERC is the undisputed expert agency in regulating transmission providers. FERC Br. 15-19. And Congress recently directed $2.86 billion toward expanding transmission infrastructure, including to serve the renewable resources on which State Petitioners focus. Inflation Reduction Act, Pub. L. No. 117-169, §§ 50151-53, 136 Stat. 1818, 2046-49 (2022) (*codified at* 42 U.S.C. §§ 18175, 18175a, 18175b).

Nor is FERC's regulation of long-term transmission planning unheralded, as shown by numerous comparisons to previous transmission planning actions like Orders 888, 890, and 1000. *See* Texas Br. 8, 29-30; TO Br. 8-10; FERC Br. 19-22, 24-32. In short, State Petitioners wholly fail to identify anything different about Order 1920 to take it out of FERC's normal regulatory wheelhouse.

23

Third, State Petitioners' characterizations of Order 1920 are unsupportable. For one, Order 1920 is likely to *reduce* the huge transmission-related expenditures transmission providers will certainly make to meet growing energy needs, because improved regional planning will help providers meet those needs more efficiently. *See* Order 1920 ¶¶ 1, 89, 112-33, JA0624-0626, JA0684, JA0716-0743. Moreover, a set of planning factors and required benefits is simply not a construction mandate. Order 1920 requires long-term transmission planning that may favor or disfavor certain future transmission projects, but does not require—or come close to requiring—any specific project or category of projects. *See* FERC Br. 86-95; *supra* I.B. While state decarbonization laws and regulations are one factor that informs the required planning process, other factors may outweigh—or reinforce—those policies in any given planning cycle. Thus, a Louisiana utility's integrated resource plan anticipating new wind or solar resources would be considered alongside an Illinois renewable portfolio standard. So, too, would a Kentucky state policy favoring coal generation. None of this brings Order 1920 into the realm of "effectively regulating generation" or "dictating and subsidizing transmission for certain types of generation." Texas Br. 28.

### B. State Petitioners Have Not Shown that Order 1920 Violates the Nondelegation Doctrine

State Petitioners argue that Order 1920 violates the "non-delegation principle for major questions" because it involves "major question[s] of political

24

and economic importance," Texas Br. 37-38, but that misstates the nondelegation doctrine in multiple ways.

As a threshold matter, there is no "non-delegation principle for major questions." Indeed, although Justice Kavanaugh has stated that this theory "may warrant further consideration in future cases," he expressly acknowledged that, to date, "the Court has not adopted a nondelegation principle for major questions." *Paul v. United States*, 589 U.S. 1087, 1087 (2019) (statement of Kavanaugh, J., respecting denial of certiorari).

And State Petitioners fail to state any violation of the nondelegation doctrine as it is traditionally understood. First, the State Petitioners' perfunctory argument omits any discussion or analysis of the Federal Power Act. But "a nondelegation inquiry always begins (and often almost ends) with statutory interpretation." *Gundy v. United States*, 588 U.S. 128, 135 (2019). Statutory analysis is necessary because "[t]he constitutional question" invoked by the nondelegation doctrine "is whether Congress has supplied an intelligible principle to guide the delegee's use of discretion." *Id*. at 135-36. By omitting any such statutory analysis, the State Petitioners' nondelegation presentation falters before leaving the starting gate.

Second, even had the State Petitioners properly discussed the Federal Power Act, their argument would still fail. It is well established that Congress "may confer substantial discretion on executive agencies to implement and enforce the

25

laws." *Id.* at 129. So long as Congress supplies an intelligible principle to guide the agency in exercising its authority, one that "enable[s] both the courts and the public to ascertain whether the agency has followed the law," courts "will not disturb its grant of authority." *FCC v. Consumers' Rsch.*, 606 U.S. 658, 673 (2025) (cleaned up).

Here, Congress has provided FERC with such intelligible principles. As FERC explains in its opening brief, FERC Br. 15-19, 107-08, in enacting the Federal Power Act, Congress determined that federal regulation of interstate electric energy transmission and its sale at wholesale is "necessary in the public interest," 16 U.S.C. § 824(a), and vested FERC with "jurisdiction over all facilities for such transmission or sale," *Id.* § 824(b)(1). *See S.C. Pub. Serv. Auth.*, 762 F.3d at 50-51. Congress also empowered the agency to take action to ensure that public utility rates, charges, and classifications, as well as "any rule, regulation, practice, or contract affecting such rate, charge, or classification," are not "unjust, unreasonable, unduly discriminatory or preferential." 16 U.S.C. § 824e(a).

Congress has supplemented and clarified FERC's statutory authority on numerous occasions since then, including when it enacted the Electricity Modernization Act of 2005, enacted as Title XII of the Energy Policy Act of 2005, Pub. L. No. 109-58, 119 Stat. 594, 941. In that legislation, Congress instructed FERC to exercise its authority under the Federal Power Act "in a manner that

26

facilitates the planning and expansion of transmission facilities to meet the reasonable needs of load-serving entities." *Id.* § 1233 (codified at 16 U.S.C. § 824q(b)(4)).

These and other provisions in the Federal Power Act sufficiently supply the intelligible principles for the Federal Power Act to pass Constitutional muster. *See Consumers' Rsch.*, 606 U.S. at 683-84 (citing with approval the Supreme Court's earlier decision upholding the Federal Power Act's authorization to FERC's predecessor "to set 'just and reasonable' rates" in *Federal Power Commission v. Hope Natural Gas Co.*, 320 U.S. 591, 600 (1944)). The State Petitioners' nondelegation claim therefore fails.

### C. Order 1920 Does Not Implicate Equal Sovereignty Principles

The State Petitioners' cursory invocation of "equal sovereignty" principles as a limit on the "disparate treatment of States" is irrelevant to Order 1920, which does not treat the states disparately. *See* Texas Br. 38-40 (quoting *Shelby County v. Holder*, 570 U.S. 529, 544 (2013)). Indeed, the State Petitioners never attempt to identify any way in which Order 1920 treats any one state worse or better than its sister states. Rather, their "subsidization" argument—i.e., that Order 1920 "creates a scheme where one State can effectively force other States to subsidize its own public policy agenda," Texas Br. 39—is simply the cost causation principle at work: you pay for what you use. And it works in either direction. That is, whether

27

transmission is built to serve a data center in Kentucky or to connect a new power plant in Illinois, if Illinois or Kentucky ratepayers use electricity transmitted over those lines, they are charged a fair portion of those infrastructure costs. *See* FERC Br. 85. The State Petitioners may dispute the wisdom of that policy, but it does not constitute any differential treatment of one state over any other.[18]

Accordingly, none of *Shelby County*'s case-specific rationale applies here. The Supreme Court and federal appellate courts have never applied its principles to strike down provisions of Commerce Clause legislation like the Federal Power Act. *Ohio v. EPA*, 98 F. 4th 288, 307 (D.C. Cir. 2024), *rev'd on other grounds*, *Diamond Alternative Energy LLC v. EPA*, 145 S. Ct. 2121 (2025). Nor do the State Petitioners identify any way in which Order 1920 prevents them from adopting the energy policies they prefer to adopt—unlike Section 5 of the Voting Rights Act, which impeded certain states' enactment of laws controlling their elections while allowing other states to enact the same laws. *Shelby County*, 570 U.S. at 544-45. The most they can argue is that Order 1920 will support implementation of all states' electricity policies, including those they have not themselves adopted. But

---

[18] In essence, State Petitioners' "equal sovereignty" argument reduces to a complaint that one state's ratepayers may pay a portion of costs for infrastructure favored by another state's energy policy. But the Supreme Court has recognized that, "[i]n our interconnected national marketplace, many (maybe most) state laws" have "practical effect[s]" that spill over borders. *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 374-75 (2023). None of this rises to a constitutional violation.

that is not an "erosion of State authority," Texas Br. 40, and the Court should deny the State Petitioners' equal sovereignty challenge.

## CONCLUSION

For the foregoing reasons, Amici States respectfully request that the Court deny the petitions for review and uphold the Rule.

Respectfully submitted,

ANDREA JOY CAMPBELL
Attorney General
Commonwealth of Massachusetts

/s/ Julia Jonas-Day
TURNER SMITH
Deputy Chief
JULIA JONAS-DAY
JACQUELYN BIHRLE
Assistant Attorneys General
Energy and Environment Bureau
1 Ashburton Pl.
Boston, MA  02108
(617) 963-2021
Julia.Jonas-Day@mass.gov
Turner.Smith@mass.gov
Jacquelyn.Bihrle@mass.gov

ROB BONTA
Attorney General
State of California

/s/ David Zaft
DAVID ZAFT
Supervising Deputy Attorney General
JINA KIM
Deputy Attorney General
Env'l Justice & Protection Section
THEODORE MCCOMBS
Deputy Attorney General
Natural Resources Law Section
300 S. Spring St., Suite 1702
Los Angeles, CA 90013
213-269-6372
David.Zaft@doj.ca.gov

CHRISTINE JUN HAMMOND
General Counsel
California Public Utilities Commission
505 Van Ness Avenue
San Francisco, CA 94102
Christine.Hammond@cpuc.ca.gov

29

WILLIAM TONG
Attorney General
State of Connecticut

*/s/ Jill Lacedonia*
JILL LACEDONIA
Assistant Attorney General
165 Capitol Avenue
Hartford, CT 06106
(860) 808-5250
Jill.Lacedonia@ct.gov


KWAME RAOUL
Attorney General
State of Illinois

*/s/ Jason E. James*
JASON E. JAMES
Assistant Attorney General
Joanna Brinkman
Complex Litigation Counsel
Illinois Attorney General's Office
201 W. Pointe Drive, Suite 7
Belleville, IL 62226
(217) 843-0322
jason.james@ilag.gov

BRIAN L. SCHWALB
Attorney General
District of Columbia

*/s/ Caroline S. Van Zile*
Caroline S. Van Zile
Solicitor General
Brian Caldwell
Lauren Cullum
Special Assistant Attorneys General
400 6th Street, NW, Suite 8100
Washington, D.C. 20001
(202) 724-6609
caroline.vanzile@dc.gov
brian.caldwell@dc.gov
lauren.cullum@dc.gov


AARON M. FREY
Attorney General
State of Maine

*s/ Caleb Elwell*
CALEB ELWELL
Assistant Attorney General
6 State House Station
Augusta, Maine 04333
(207) 626-8545
Caleb.Elwell@Maine.gov

30

ANTHONY G. BROWN
Attorney General
State of Maryland

/s/ Steven J. Goldstein
STEVEN J. GOLDSTEIN
Assistant Attorney General
200 Saint Paul Place
Baltimore, Maryland 21202
410-576-6414
sgoldstein@oag.maryland.gov

SUNDEEP IYER
Executive Assistant Attorney General
State of New Jersey

/s/ Elizabeth Van Winkle
ELIZABETH VAN WINKLE
Deputy Attorney General
25 Market St., 7th Floor
West Wing
Trenton, NJ 08625
(609) 376-2818
Elizabeth.Vanwinkle@law.njoag.gov

PETER F. NERONHA
Attorney General
State of Rhode Island

/s/ C. Joshua Lee
C. JOSHUA LEE
Special Assistant Attorney General
150 South Main Street
Providence, RI 02903
(401) 274-4400 (Ext: 2040)
jlee@riag.ri.gov

KEITH ELLISON
Attorney General
State of Minnesota

/s/ Peter N. Surdo
PETER N. SURDO
Special Assistant Attorney General
445 Minnesota Street
Saint Paul, MN 55101
(651) 757-1061
peter.surdo@ag.state.mn.us

DAN RAYFIELD
Attorney General
State of Oregon

/s/ Paul L. Smith
PAUL L. SMITH
Solicitor General
1162 Court St. NE
Salem, OR 97301
(503) 378-4402
paul.l.smith@doj.oregon.gov

NICHOLAS W. BROWN
Attorney General
State of Washington

/s/ Megan Sallomi
MEGAN SALLOMI
Assistant Attorney General
800 5th Ave Suite 2000,
Seattle, WA 98104-3188
(206) 389-2437
Megan.sallomi@atg.wa.gov

31

## CERTIFICATE OF SERVICE

I certify that on March 13, 2026, this brief was served on all parties via this

Court's CM/ECF system.

/s/ Julia Jonas-Day
JULIA JONAS-DAY
Assistant Attorney General
Office of the Attorney General
Commonwealth of Massachusetts
1 Ashburton Pl.
Boston, MA, 02108
(617) 963-2021
Julia.Jonas-Day@mass.gov


March 13, 2026

32

**CERTIFICATE OF COMPLIANCE**

I certify that this brief complies with the type-volume limitation in Federal Rule of Appellate Procedure 29(a)(5) because it contains 6,486 words, excluding exempted parts. This brief complies with the typeface and type style requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 365 in Times New Roman 14-point font.

/s/ Julia Jonas-Day
JULIA JONAS-DAY
Assistant Attorney General
Office of the Attorney General
Commonwealth of Massachusetts
1 Ashburton Pl.
Boston, MA, 02108
(617) 963-2021
Julia.Jonas-Day@mass.gov

March 13, 2026