ORAL ARGUMENT HAS NOT BEEN SCHEDULED

# In the United States Court of Appeals for the Fourth Circuit

Nos. 24-1650, 24-1748, 24-1756, 24-1758, 24-1760, 24-1765, 24-1770, 24-1785, 24-1804, 24-1857, 24-1862, 24-1867, 24-1876, 24-1885, 24-1887, 24-1979, 24-1991, 24-2162, 24-2163, 25-1073, 25-1080, 25-1197, 25-1349

(CONSOLIDATED)

———————

APPALACHIAN VOICES, *et al.*,
*Petitioners,*

*v.*

FEDERAL ENERGY REGULATORY COMMISSION,
*Respondent.*

———————

ON PETITIONS FOR REVIEW OF ORDERS OF THE
FEDERAL ENERGY REGULATORY COMMISSION

———————

## BRIEF OF RESPONDENT
## FEDERAL ENERGY REGULATORY COMMISSION

———————

ROBERT H. SOLOMON
  SOLICITOR

KARIN HERZFELD
  SPECIAL COUNSEL

JARED B. FISH
SUSANNA Y. CHU
  SENIOR ATTORNEYS

JASON T. PERKINS
  ATTORNEY

FOR RESPONDENT
FEDERAL ENERGY REGULATORY
  COMMISSION
WASHINGTON, D.C. 20426
(202) 502-8101

FINAL BRIEF: MARCH 13, 2026

# TABLE OF CONTENTS

**PAGE**

INTRODUCTION ................................................................................................... 1

ADMINISTRATIVE ORDERS UNDER REVIEW .......................................... 6

STATEMENT OF ISSUES PRESENTED FOR REVIEW ............................. 7

JURISDICTIONAL STATEMENT .................................................................... 9

STATUTES AND REGULATIONS ................................................................. 15

STATEMENT OF THE CASE .......................................................................... 15

I.      FERC's statutory authority under the Federal Power Act ..................... 15

II.     Regulatory background: the rules that guide how the electric grid
        expands to meet new and changing needs ............................................. 19

      A.      Order 888: FERC's 1996 rulemaking ensures open access to
              interstate transmission service ..................................................... 19

      B.      Order 2000: FERC encourages formation of Regional
              Transmission Organizations to further increase access to
              transmission service ...................................................................... 22

      C.      Orders 890 and 1000: FERC establishes a comprehensive
              approach to transmission planning and associated utility cost
              allocation ......................................................................................... 24

            1.      Order 890 establishes nine transmission planning
                    principles guiding grid expansion ..................................... 26

            2.      Order 1000 requires more efficient or cost-effective
                    transmission planning and alignment of customer costs
                    with benefits in every region ............................................. 27

3. Order 1000 declines to mandate any substantive outcomes or interfere with reserved state regulatory authority.................................................................30

4. Order 1000 and multiple subsequent compliance orders are affirmed on judicial review...........................................32

    a. The *South Carolina* court rejects all challenges to Order 1000................................................................32

    b. Multiple courts largely affirm subsequent regional compliance orders .......................................................35

III. How FERC-jurisdictional transmission planning works......................36

A. Compliance processes for FERC transmission rules...................36

B. How transmission planning works in practice under Order 1000 ........................................................................................39

IV. FERC's Order 1920 rulemaking .............................................................45

A. FERC responds to widespread concerns about short-sighted transmission planning and takes public comment ....................45

B. After compiling the most expansive record in agency history, FERC reforms transmission planning and cost allocation rules in Order 1920 ........................................................................48

    1. Transmission providers' lack of forward-looking analysis undermines just and reasonable rates ...............................48

    2. Order 1920 requires an additional long-term process that plans for future transmission needs...........................49

SUMMARY OF ARGUMENT...........................................................................59

ARGUMENT.....................................................................................................71

I. Standard of review .................................................................................71

II.    The Rule reflects a lawful exercise of Congress' constitutionally delegated powers to FERC ........................................................ 74

    A.    The Order 1920 rulemaking reflects an exercise of FERC's core Federal Power Act authority and responsibility to regulate interstate transmission .................................................. 75

        1.    The Rule regulates interstate transmission and practices that directly affect transmission rates ................................. 81

        2.    The Rule does not regulate state-jurisdictional matters .. 84

        3.    The Rule effectuates FERC's core responsibilities under the Federal Power Act .......................................................... 95

    B.    The major questions doctrine does not apply ............................ 95

    C.    The Rule does not betray an unconstitutional delegation of Congress' legislative power ......................................................... 105

    D.    The Rule is consistent with the equal sovereignty doctrine ..... 108

III.    FERC reasonably determined that existing transmission planning rules are unjust and unreasonable, and thus violate the Federal Power Act ........................................................................................ 110

    A.    Substantial record evidence supports FERC's determination that pre-Rule transmission planning processes were deficient  111

    B.    FERC properly exercised its Federal Power Act authority to make "just and reasonable" determinations on a generic, nationwide scale ..................................................................... 122

        1.    The text of Federal Power Act Section 206 supports FERC's decision to engage in a nationally applicable rulemaking ..................................................................... 122

        2.    Judicial precedent confirms FERC's authority to engage in nationwide rulemakings ................................................. 124

3.      FERC reasonably exercised its discretion to impose a nationwide rule notwithstanding variations in transmission providers' status quo ante practices............127

IV.   FERC reasonably determined that the Rule is a "just and reasonable" replacement ........................................................................131

A.      The Rule is resource neutral and does not unduly discriminate against certain states' generation choices .................................. 132

B.      The States' contention that the Rule's seven benefits metrics lack the requisite clarity is jurisdictionally forfeited and is, in any event, meritless ..................................................................... 133

C.      The Rule reasonably permits transmission providers to adopt a portfolio approach to assessing the benefits of long-term transmission facilities................................................................. 136

D.      FERC reasonably chose a 20-year transmission planning time horizon...................................................................................... 139

E.      The States lack a statutory prerogative to require transmission providers to accept *their* preferred cost allocation schemes .... 142

F.      The claims of Consumers and Public Interest Organizations that the Rule unlawfully declines to impose more stringent requirements fail to defeat FERC's reasoned alternative policy choices .....................................................................................145

1.      FERC reasonably deferred consideration of the Construction Work in Progress incentive to another proceeding ........................................................................ 146

2.      FERC reasonably declined to mandate independent monitoring of new transmission projects and a revamped prudence standard ........................................... 149

3.      FERC reasonably preserved the Order 1000 transmission planning process in certain circumstances ........................................................151

4.  FERC reasonably established five-year, rather than three-year, planning cycles .................................................155

5.  FERC reasonably declined to add an eighth long-term planning factor specific to advanced-stage, merchant high-voltage direct current transmission facilities ..........158

6.  FERC reasonably declined to include energy storage as an alternative transmission technology that transmission planners must consider ..............................162

7.  FERC rationally imposed a set of seven benefits that transmission providers must consider in evaluating transmission facilities ........................................164

G.  The Rule reasonably allocates interconnection-related network upgrade costs...............................................167

H.  The Rule is consistent with Federal Power Act Section 217(b)(4)................................................................171

I.  FERC reasonably required transmission providers to reevaluate the merits of certain selected transmission facilities ..................................................................173

J.  FERC reasonably declined to define electric cooperatives as Relevant State Entities...............................................176

V.  The Rule is a logical outgrowth of FERC's original proposal..............179

VI.  The Commission reasonably adopted the inclusion and consultation requirements to ensure state participation in developing new "just and reasonable" cost allocation methods .............................................188

A.  FERC acted within its Federal Power Act Section 206 authority and did not infringe transmission owners' Section 205 filing rights in adopting the inclusion requirement ..........189

1.  Federal Power Act Section 206 permits the inclusion requirement......................................................192

v

a.    FERC enjoys broad authority to fix a "just and reasonable" replacement rate under Section 206 . 192

b.    Transmission provider proposals on compliance with a rule issued pursuant to Section 206 are not entitled to preferential consideration over proposals by state entities ........................................ 195

2.    The inclusion requirement does not infringe transmission owners' statutory filing rights under Federal Power Act Section 205 ........................................ 200

B.    The consultation requirement preserves transmission owners' statutory filing rights ................................................................... 204

C.    The inclusion and consultation requirements do not violate Transmission Owners' First Amendment rights ......................... 210

1.    The inclusion and consultation requirements do not implicate the First Amendment ........................................... 211

2.    To the extent these requirements implicate the First Amendment, they fall within the commercial speech doctrine ............................................................................. 218

3.    Assuming that strict scrutiny applies, the Rule still passes constitutional muster ............................................ 222

VII.  FERC reasonably adopted transparency and right-sizing reforms ... 224

A.    FERC reasonably increased transparency regarding regional planning inputs while protecting sensitive information .......... 225

1.    FERC provided for increased transparency for local system expansion ............................................................... 225

2.    FERC required submission of in-kind facility replacement estimates to regional planners .................... 227

vi

3.    Consumers and the States ask for more onerous local planning requirements that are inconsistent with existing rules.......................................................................229

4.    Transmission Owners' limited concerns about stakeholder disclosure are misplaced ...............................233

B.    FERC reasonably provided certainty regarding transmission project assignments for right-sized replacement facilities.......236

1.    Order 1920 reasonably adds another limited exception to Order 1000's transmission competition rules.............237

2.    Competition Petitioners misunderstand the statutory basis for this policy and the Rule's mechanics.................243

    a.    Competition rules are practices affecting rates.....244

    b.    Competition was addressed at the second step of the statutory Section 206 analysis, not the first....249

3.    Competition Petitioners overlook the Commission's reasonable explanation for this policy ..............................254

    a.    Order 1920 aligns with Order 1000 ........................254

    b.    Any potential policy change was acknowledged and explained...........................................................257

C.    The Rule's lawful right-sizing reforms enhance, but are separate from, the Rule's other long-term planning requirements...............................................................................261

CONCLUSION ..........................................................................................265

# TABLE OF AUTHORITIES

**COURT CASES:**                                                    **PAGE(S)**

*ACLU Found. v. Stirling,*
    123 F.4th 170 (4th Cir. 2024) ..........................................................211–212

*ALLTEL Corp. v. FCC,*
    838 F.2d 551 (D.C. Cir. 1988) ...................................................................181

*Am. Mun. Power, Inc. v. FERC,*
    86 F.4th 922 (D.C. Cir. 2023) ..........................................................230, 245

*Am. Paper Inst. v. EPA,*
    660 F.2d 954 (4th Cir. 1981) ...................................................180-181, 184

*Am. Power & Light Co. v. SEC,*
    329 U.S. 90 (1946) ..................................................................................... 107

*Am. Transmission Sys. Inc. v. FERC,*
    No. 14-1085, 2016 WL 3615443 (D.C. Cir. July 1, 2016) ....................... 35

*Ameren Servs. Co. v. FERC,*
    893 F.3d 786 (D.C. Cir. 2018) ................................................................. 134

*Appalachian Voices v. State Water Control Bd.,*
    912 F.3d 746 (4th Cir. 2019) .................................................................249

*Ariz. Pub. Serv. Co. v. EPA,*
    211 F.3d 1280 (D.C. Cir. 2000) ...................................................... 183, 185

*Ark. La. Gas Co. v. Hall,*
    453 U.S. 571 (1981).................................................................................208

*ASARCO, Inc. v. FERC,*
    777 F.2d 764 (D.C. Cir. 1985) ................................................................. 134

*Assoc. Gas Distributors v. FERC,*
    824 F.2d 981 (D.C. Cir. 1987) ........................................................ 124, 127

# TABLE OF AUTHORITIES

**COURT CASES:**                                          **PAGE(S)**

*Atl. City Elec. Co. v. FERC,*
    295 F.3d 1 (D.C. Cir. 2002) ................................................ 200–202

*Atl. Seaboard Corp. v. FPC,*
    397 F.2d 753 (4th Cir. 1968) ....................................................147

*Balt. Gas & Elec. Co. v. FERC,*
    954 F.3d 279 (D.C. Cir. 2020).....................................17, 177–178

*BASF Wyandotte Corp. v. Costle,*
    598 F.2d 637 (1st Cir. 1979).....................................................187

*Belmont Mun. Light Dep't v. FERC,*
    38 F.4th 173 (D.C. Cir. 2022) .................................................263

*Biden v. Nebraska,*
    600 U.S. 477 (2023)....................................................................99

*Biestek v. Berryhill,*
    587 U.S. 97 (2019) ............................................................. 74, 111

*Biggerstaff v. FCC,*
    511 F.3d 178 (D.C. Cir. 2007)................................................ 231

*Bolger v. Youngs Drug Prods. Corp.,*
    463 U.S. 60 (1983) ................................................................ 218

*Book People, Inc. v. Wong,*
    91 F.4th 318 (5th Cir. 2024) .................................................222

*Borough of Duryea v. Guarnieri,*
    564 U.S. 379 (2011)............................................................... 215

*Brennan v. Dickson,*
    45 F.4th 48 (D.C. Cir. 2022)................................... 181, 183–184

ix

## TABLE OF AUTHORITIES

**COURT CASES:**                                                                 **PAGE(S)**

*Bridgeport Hosp. v. Becerra,*
    108 F.4th 882 (D.C. Cir. 2024)...................................................... 74

*Cal. Indep. Sys. Operator Corp. v. FERC,*
    372 F.3d 395 (D.C. Cir. 2004)................................................ 77, 246–247

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n,*
    447 U.S. 557 (1980) ....................................................... 218

*Cent. Ill. Light Co. v. Citizens Util. Bd.,*
    827 F.2d 1169 (7th Cir. 1987) .................................................. 216

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.,*
    467 U.S. 837 (1984)...........................................................80

*Chocolate Mfrs. Ass'n of U.S. v. Block,*
    755 F.2d 1098 (4th Cir. 1985)..........................................181, 187

*Cities of Bethany v. FERC*
    727 F.2d 1131 (D.C. Cir. 1984) .............................. 128, 193, 197, 202, 261

*City of Cleveland v. Fed. Power Comm'n,*
    525 F.2d 845 (D.C. Cir. 1976)..............................................208

*City of Cleveland v. FERC,*
    773 F.2d 1368 (D.C. Cir. 1985) ............................................. 155, 196–197

*City of Cleveland v. FPC,*
    525 F.2d 845 (D.C. Cir. 1976)..............................................208

*Clark v. Cmty. for Creative Non-Violence,*
    468 U.S. 288, (1984) .......................................................... 212

*Coal. of MISO Transmission Customers v. FERC,*
    45 F.4th 1004 (D.C. Cir. 2022) ...............................................13, 184, 245

**TABLE OF AUTHORITIES**

**COURT CASES:**                                                    **PAGE(S)**

*Conn. Dep't of Pub. Util. Control v. FERC,*
    569 F.3d 477 (D.C. Cir. 2009) ................................................ 16, 90–91, 93

*Consol. Gas Supply Corp. v. FERC,*
    653 F.2d 129 (4th Cir. 1981) ........................................................ 72, 253

*Cornelius v. NAACP Legal Def. & Educ. Fund,*
    473 U.S. 788 (1985) ............................................................................ 212

*Coyle v. Smith,*
    221 U.S. 559 (1911) .................................................................... 108–109

*Diaz-Hernandez v. Garland,*
    104 F.4th 465 (4th Cir. 2024) ............................................................ 73

*E. Ky. Power Coop., Inc. v. FERC,*
    489 F.3d 1299 (D.C. Cir. 2007) ......................................................... 23

*El Paso Elec. Co. v. FERC,*
    76 F.4th 352 (5th Cir. 2023) ............................................................. 35

*El Paso Elec. v. FERC,*
    832 F.3d 495 (5th Cir. 2016) ............................................................. 35

*Elec. Dist. No. 1 v. FERC,*
    774 F.2d 490 (D.C. Cir. 1985) ................................................. 196–197

*Emera Me. v. FERC,*
    854 F.3d 9 (D.C. Cir. 2017) ................. 18, 35, 49, 131, 145, 193, 202, 253

*Entergy Ark., LLC v. FERC,*
    134 F.4th 576 (D.C. Cir. 2025) ...................................................... 10, 14

*Entergy Ark., LLC v. FERC,*
    40 F.4th 689 (D.C. Cir. 2022) .................................................... 200, 202

# TABLE OF AUTHORITIES

**COURT CASES:**                                                 **PAGE(S)**

*Entergy Servs., Inc. v. FERC,*
    391 F.3d 1240 (D.C. Cir. 2004)................................................ 134, 170, 187

*FCC v. Consumers' Research,*
    606 U.S. 656 (2025).......................................................................105–107

*FCC v. Fox Television Stations, Inc.,*
    556 U.S. 502 (2009).......................................................................198, 257

*FCC v. Prometheus Radio Project,*
    592 U.S. 414 (2021).....................72, 110, 131, 140–141, 149, 151, 165, 251

*FDA v. Brown & Williamson Tobacco Corp.,*
    529 U.S. 120 (2000)...............................................................................101

*FERC v. Elec. Power Supply Ass'n v. FERC,*
    577 U.S. 260 (2016)................................18, 22–23, 49, 71–72, 76, 77–83,
                                88, 89–90, 92–93, 95, 97, 101–102,
                   110, 122, 132, 140, 144, 171, 246, 247–248

*FERC v. Powhatan Energy Fund, LLC,*
    949 F.3d 891 (4th Cir. 2020) .................................................................253

*Fla. Mun. Power v. FERC,*
    602 F.3d 454 (D.C. Cir. 2010).......................................................139, 175

*FPC v. Conway Corp.,*
    426 U.S. 271 (1976) ..............................................................................131

*FPC v. Hope Nat. Gas Co.,*
    320 U.S. 591 (1944)................................................................ 107, 210, 249

*FPC v. Sierra Pac. Power Co.,*
    350 U.S. 348 (1956) ..............................................................193, 197, 209

# TABLE OF AUTHORITIES

**COURT CASES:**                                                    **PAGE(S)**

*FPC v. Transcon. Gas Pipe Line Corp.,*
    423 U.S. 326 (1976)..................................................................147

*Full Value Advisors, LLC v. SEC,*
    633 F.3d 1101 (D.C. Cir. 2011).............................................. 221

*Gonzales v. Oregon,*
    546 U.S. 243 (2006)............................................................... 102

*Grayson O Co. v. Agadir Int'l LLC,*
    856 F.3d 307 (4th Cir. 2017) ................................................ 183

*Gulf States Util. Co. v. FPC,*
    411 U.S. 747 (1973) ................................................................ 76

*Hughes v. Talen Energy Mktg., LLC,*
    578 U.S. 150 (2016) ........................................ 22, 73, 86, 93–94

*Ill. Com. Comm'n v. FERC,*
    721 F.3d 764 (7th Cir. 2013)...................................... 78, 84, 119

*Indus. Energy Consumers of Am. v. FERC,*
    125 F.4th 1156 (D.C. Cir. 2025)......................................9, 11, 13

*Int'l Transmission Co. v. FERC,*
    988 F.3d 471 (D.C. Cir. 2021)....................................... 179, 200

*J.W. Hampton, Jr., & Co. v. United States,*
    276 U.S. 394 (1928)........................................................105–106

*Jersey Cent. Power & Light Co. v. FPC,*
    319 U.S. 61 (1943)...................................................................15

*Kan. Corp. Comm'n v. FERC,*
    881 F.3d 924 (D.C. Cir. 2018).................................................9, 11

xiii

# TABLE OF AUTHORITIES

**COURT CASES:**                                                    **PAGE(S)**

*Keating v. FERC,*
    569 F.3d 427 (D.C. Cir. 2009).................................................140–141, 235

*La. Pub. Serv. Comm'n v. FERC,*
    522 F.3d 378 (D.C. Cir. 2008)...............................................73, 78, 90, 175

*Lomax v. Ortiz-Marquez,*
    140 S. Ct. 1721 (2020) ...................................................................... 123

*Long Island Care at Home, Ltd. v. Coke,*
    551 U.S. 158 (2007) ................................................... 180–181, 186

*Loper Bright Enters. v. Raimondo,*
    603 U.S. 369 (2024) ..................................................... 74, 80, 97

*LSP Transmission Holdings II, LLC v. FERC,*
    28 F.4th 1285 (D.C. Cir. 2022).......................................................241, 245

*LSP Transmission Holdings II, LLC v. FERC,*
    45 F.4th 979 (D.C. Cir. 2022)..............................................................238

*LSP Transmission Holdings, LLC v. FERC,*
    700 F. App'x 1 (D.C. Cir. 2017)................................................... 35

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992).............................................................................12

*MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.,*
    512 U.S. 218 (1994)................................................................99, 101–102

*McMunn v. Hertz Equip. Rental Corp.,*
    791 F.2d 88 (7th Cir. 1986).................................................... 76

*Md. Shall Issue, Inc. v. Anne Arundel Cnty.,*
    91 F.4th 238 (4th Cir. 2024)................................................ 218, 220–222

xiv

# TABLE OF AUTHORITIES

**COURT CASES:**                                                    **PAGE(S)**

*Md. Shall Issue, Inc. v. Hogan,*
   971 F.3d 199 (4th Cir. 2020)................................................................ 10

*Me. Pub. Utils. Comm'n v. FERC,*
   454 F.3d 278 (D.C. Cir. 2006)..........................................................17, 193

*Miami–Dade Cnty. v. EPA,*
   529 F.3d 1049 (11th Cir. 2008)..........................................................185

*MISO Transmission Owners v. FERC,*
   819 F.3d 329 (7th Cir. 2016) ....................................................35, 239, 245

*Miss. Power & Light Co. v. Mississippi ex rel. Moore,*
   487 U.S. 354 (1988)..........................................................................94

*Mobil Oil Expl. & Producing Se. Inc. v. United Distrib. Cos.,*
   498 U.S. 211 (1991)......................................... 147, 151, 155, 166, 231–232

*Montana Consumer Counsel v. FERC,*
   659 F.3d 910 (9th Cir. 2011)..............................................................207

*Montana-Dakota Utils. Co. v. Nw. Pub. Serv. Co.,*
   341 U.S. 246 (1951).......................................................................73–74

*Moody v. NetChoice, LLC,*
   603 U.S. 707 (2024)....................................................................211, 216

*Morgan Stanley Cap. Grp. Inc. v. Pub. Util. Dist. No. 1 of Snohomish Cnty.,*
   554 U.S. 527 (2008) ........................................ 17, 20–21, 23, 73, 119, 131,
                                  145, 148–149, 153, 158, 165, 174, 176

*N. Nat. Gas Co. v. State Corp. Comm'n of Kan.,*
   372 U.S. 84 (1963)...........................................................................95

xv

# TABLE OF AUTHORITIES

**COURT CASES:**                                              **PAGE(S)**

*N.C. Coastal Fisheries Reform Grp. v. Capt. Gaston LLC,*
76 F.4th 291 (4th Cir. 2023) ................................................99, 103

*N.C. Utils. Comm'n v. FERC,*
741 F.3d 439 (4th Cir. 2014) ...................................................256

*N.J. Bd. of Pub. Utils. v. FERC,*
744 F.3d 74 (3d Cir. 2014) ...................................................91, 93

*N.Y. State Rest. Ass'n v. N.Y. City Bd. of Health,*
556 F.3d 114 (2d Cir. 2009) .....................................................220

*Nantahala Power & Light Co. v. FERC,*
727 F.2d 1342 (4th Cir. 1984) ................................ 132, 193, 197, 202, 261

*Nantahala Power & Light Co. v. Thornburg,*
476 U.S. 953 (1986) ..................................................................94

*Nat'l Ass'n for Rational Sexual Offense Laws v. Stein,*
112 F.4th 196 (4th Cir. 2024) ..................................................182

*Nat'l Ass'n of Regul. Util. Comm'rs v. FERC,*
475 F.3d 1277 (D.C. Cir. 2007) ................................... 88, 121, 125

*Nat'l Ass'n of Regul. Util. Comm'rs v. FERC,*
964 F.3d 1177 (D.C. Cir. 2020) ................... 77–78, 80–82, 88, 93–95, 162

*Nat'l Audubon Soc'y v. U.S. Army Corps of Eng'rs,*
991 F.3d 577 (4th Cir. 2021) ...................................................257

*New York v. EPA,*
413 F.3d 3 (D.C. Cir. 2005) ...............................................185–186

*New York v. FERC,*
535 U.S. 1 (2002) ....................................... 15–16, 18, 20–21, 41,
76–77, 79–80, 82–83, 97, 125, 231, 248

# TABLE OF AUTHORITIES

**COURT CASES:**                                           **PAGE(S)**

*NextEra Energy Res., LLC v. FERC,*
    118 F.4th 361 (D.C. Cir. 2024).................................. 19–21, 78, 86, 88–90

*NICOR Expl. Co. v. FERC,*
    50 F.3d 1341 (5th Cir. 1995) ...................................................... 134

*NRG Power Mktg., LLC v. FERC,*
    862 F.3d 108 (D.C. Cir. 2017)................................................ 17, 209

*Nuclear Energy Inst., Inc. v. EPA,*
    373 F.3d 1251 (D.C. Cir. 2004) ...........................................153, 176

*Nw. Cent. Pipeline Corp. v. State Corp. Comm'n of Kan.,*
    489 U.S. 493 (1989) ...................................................................93

*Nw. Pipeline Corp. v. FERC,*
    863 F.2d 73 (D.C. Cir. 1988)...................................................... 134

*Ohralik v. Ohio State Bar Ass'n,*
    436 U.S. 447 (1978)................................................................... 213

*Okla. Gas & Elec. Co. v. FERC,*
    827 F.3d 75 (D.C. Cir. 2016).................................................... 35

*Oklahoma v. Castro-Huerta,*
    597 U.S. 629 (2022)...................................................................103

*Oneok, Inc. v. Learjet, Inc.,*
    575 U.S. 373 (2015) ................................................................. 79

*OPP Cotton Mills, Inc. v. Adm'r of Wage and Hour Div., Dep't of Labor,*
    312 U.S. 126 (1941)................................................................ 107

*Pac. Gas & Elec. Co. v. FERC,*
    533 F.3d 820 (D.C. Cir. 2008) .................................................21

# TABLE OF AUTHORITIES

**COURT CASES:**                                                    **PAGE(S)**

*PACEM Sols. Int'l, LLC v. U.S. Small Bus. Admin.,*
148 F.4th 258 (4th Cir. 2025)......................................... 72, 151, 235

*Philip Morris USA, Inc. v. Vilsack,*
736 F.3d 284 (4th Cir. 2013).................................................259

*Piedmont Env't Council v. FERC,*
558 F.3d 304 (4th Cir. 2009)....................................... 16, 78, 84, 119, 125

*PJM Power Providers Grp. v. FERC,*
88 F.4th 25 (3d Cir. 2023)....................................................262

*PPL EnergyPlus, LLC v. Nazarian,*
753 F.3d 467 (4th Cir. 2014) ...........................................22, 93

*Pub. Serv. Elec. & Gas Co. v. FERC,*
989 F.3d 10 (D.C. Cir. 2021)............................................. 13, 39

*Pub. Util. Dist. No. 1 of Snohomish Cnty. v. FERC,*
272 F.3d 607 (D.C. Cir. 2001) ........................................... 12, 23

*Rodriguez v. United States,*
480 U.S. 522 (1987)........................................................ 165

*S.C. Pub. Serv. Auth. v. FERC,*
762 F.3d 41 (D.C. Cir. 2014) .....12, 25–26, 32–35, 86, 102, 104, 112, 119,
120, 124–128, 130, 139, 143,
155, 157, 166, 170–173, 238–240, 246, 248, 252

*Sacramento Mun. Util. Dist. v. FERC,*
474 F.3d 797 (D.C. Cir. 2007) .............................................177

*Sacramento Mun. Util. Dist. v. FERC,*
616 F.3d 520 (D.C. Cir. 2010) ....................................... 119, 130

# TABLE OF AUTHORITIES

**COURT CASES:** **PAGE(S)**

*San Diego Gas & Elec. Co. v. FERC,*
    913 F.3d 127 (D.C. Cir. 2019) .................................................... 148

*Scahill v. District of Columbia,*
    909 F.3d 1177 (D.C. Cir. 2018) ................................... 212, 214, 217

*SEC v. Chenery Corp.,*
    332 U.S. 194 (1947) ..................................................................... 124

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty.,*
    605 U.S. 168 (2025) ......................................................................... 72

*Shelby Cnty. v. Holder,*
    570 U.S. 529 (2013).................................................................... 109

*Sierra Club v. U.S. Army Corps of Eng'rs,*
    909 F.3d 635 (4th Cir. 2018)....................................................262

*Solar Energy Indus. Ass'n v. FERC,*
    80 F.4th 956 (9th Cir. 2023).................................................... 125

*Spartan Radiocasting Co. v. FCC,*
    619 F.2d 314 (4th Cir. 1980).................................................... 180

*State of N.C. v. FAA,*
    957 F.2d 1125 (4th Cir. 1992) ...................................................121

*Suarez-Valenzuela v. Holder,*
    714 F.3d 241 (4th Cir. 2013)...................................135–136, 140, 150, 233

*TC Ravenswood, LLC v. FERC,*
    741 F.3d 112 (D.C. Cir. 2013)...................................152, 256, 261

*Transcon. Gas Pipe Line Corp. v. FERC,*
    518 F.3d 916 (D.C. Cir. 2008) ................................................... 149

# TABLE OF AUTHORITIES

**COURT CASES:**                                                    **PAGE(S)**

*Transmission Access Policy Study Grp. v. FERC,*
225 F.3d 667 (D.C. Cir. 2000) ................................................................21

*Transmission Agency of N. Cal. v. FERC,*
628 F.3d 538 (D.C. Cir. 2010) ..............................................................177

*TransUnion LLC v. Ramirez,*
594 U.S. 413 (2021) .................................................................................9

*United States v. Fla. E. Coast Ry. Co.,*
410 U.S. 224 (1973) .............................................................................126

*United States v. Perkins,*
67 F.4th 583 (4th Cir. 2023) ...............................................................103

*United States v. Sindel,*
53 F.3d 874 (8th Cir. 1995) ..................................................................212

*Util. Air Regul. Grp. v. EPA,*
573 U.S. 302 (2014) ..........................................................................96, 98

*Virginia ex rel. Cuccinelli v. Sebelius,*
656 F.3d 253 (4th Cir. 2011) .................................................................12

*Vistra Corp. v. FERC,*
80 F.4th 302 (D.C. Cir. 2023) .......................................................139, 163

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.,*
435 U.S. 519 (1978) ..............................................................................147

*W. Mass. v. FERC,*
729 F.2d 886 (1st Cir. 1984) .......................................................203–204

*W. Va. State Bd. of Educ. v. Barnette,*
319 U.S. 624 (1943) ..............................................................................214

# TABLE OF AUTHORITIES

**COURT CASES:**                                                          **PAGE(S)**

*West Virginia v. EPA,*
       597 U.S. 697 (2022) ......................................................96, 98, 100–103, 106

*Whitman v. Am. Trucking Ass'ns,*
       531 U.S. 457 (2001) ...................................................................... 105

*Wis. Gas Co. v. FERC,*
       770 F.2d 1144 (D.C. Cir. 1985) ...................................................124, 126–127

*Wooley v. Maynard,*
       430 U.S. 705 (1977) ......................................................................211

*Xcel Energy Servs. Inc. v. FERC,*
       41 F.4th 548 (D.C. Cir. 2022) ..............................................38, 112, 170, 210

*Xcel Energy Servs. Inc. v. FERC,*
       815 F.3d 947 (D.C. Cir. 2016) ...............................................................209

*Zauderer v. Off. of Disciplinary Counsel,*
       471 U.S. 626 (1985) ...................................................................219–221

**ADMINISTRATIVE CASES:**

Advanced Notice of Proposed Rulemaking,
       176 FERC ¶ 61,024 (July, 15, 2021) ............................................. 6, 42, 45

*Appalachian Power Co.,*
       170 FERC ¶ 61,196 (2020)................................................................235

*Building for the Future Through Elec. Reg'l Transmission Planning &*
       *Cost Allocation,*
       **Order No. 1920**, 187 FERC ¶ 61,068 (May 13, 2024)......................6, 26,
                      37, 41, 43, 45, 48–50, 53, 55–56, 58–59, 118, 127–129,
                             137–139, 142–143, 147, 150, 154, 162, 178, 182, 185,
                      226–229, 232–233, 235–236, 239–243, 249–251, 256, 259, 261

# TABLE OF AUTHORITIES

**ADMINISTRATIVE  CASES:**                                                    **PAGE(S)**

*Building for the Future Through Elec. Reg'l Transmission Planning &*
    *Cost Allocation,*
        **Order No. 1920-A**, 189 FERC ¶ 61,126 (Nov. 21, 2024)................. 6, 37,
            44, 48, 49–50, 52–58, 85, 87, 93, 103, 111, 116–117, 123, 125–126,
    128–130, 133, 135, 138, 141–143, 146–147, 149, 159, 163, 176, 183–186, 192,
       225–227, 229–231, 234, 243, 245–248, 250–251, 253–260, 263–264

*Building for the Future Through Elec. Reg'l Transmission Planning &*
    *Cost Allocation,*
        **Order No. 1920-B**, 191 FERC ¶ 61,026 (Apr. 11, 2025)......6, 35, 55–57,
                     145, 151, 177–179, 192, 194, 208, 217

*Improvements to Generator Interconnection Procedures & Agreements,*
    Order No. 2023, 184 FERC ¶ 61,054 (2023) ....................................... 128

*Invenergy Transmission LLC v. Midcontinent Indep. Sys. Operator, Inc.,*
    193 FERC § 61,033 (2025) .............................................................159, 161

*Kern River,*
    142 FERC ¶ 61,132 (2013) ....................................................................197

*New York Indep. Sys. Operator, Inc.,*
    151 FERC ¶ 61,040 (2015) ...................................................................258

Notice of Proposed Rulemaking (NOPR),
    179 FERC ¶ 61,028 (Apr. 21, 2022)...... 6, 42, 46–47, 146, 182–183, 185,
                           235, 237, 239, 251

*PJM Interconnection, L.L.C.,*
    117 FERC ¶ 61,331 (2006) ....................................................................197

*PJM Interconnection, L.L.C.,*
    173 FERC ¶ 61,134 (2020)....................................................................197

# TABLE OF AUTHORITIES

**ADMINISTRATIVE CASES:** **PAGE(S)**

*PJM Interconnection, L.L.C.*,
178 FERC ¶ 61,083 (2022) ..............................................................37–38

*Preventing Undue Discrimination & Preference in Transmission Serv.*,
Order No. 890, 118 FERC ¶ 61,119 (2007) ..............................24–27, 231

*Preventing Undue Discrimination & Preference in Transmission Serv.*,
Order No. 890-B, 123 FERC ¶ 61,299 (2008) ........................................ 26

*Promoting Transmission Investment Through Pricing Reform*,
Order No. 679, 116 FERC ¶ 61,057 (2006)............................................ 146

*Promoting Wholesale Competition Through Open Access
Non-discriminatory Transmission Services by Public Utilities*,
Order No. 888, 61 Fed. Reg. 21,540 (May 10, 1996).........................20–21

*Promoting Wholesale Competition Through Open Access
Non-discriminatory Transmission Services by Public Utilities*,
Order No. 888-A, 78 FERC ¶ 61,220 (1997) ..........................................20

*Promoting Wholesale Competition Through Open Access
Non-discriminatory Transmission Services by Public Utilities*,
Order No. 888-B, 81 FERC ¶ 61,248 (1997)...........................................20

*Promoting Wholesale Competition Through Open Access
Non-discriminatory Transmission Services by Public Utilities*,
Order No. 888-C, 82 FERC ¶ 61,046 (1998)............................................21

*Regional Transmission Organizations*,
Order No. 2000, 89 FERC ¶ 61,285 (1999)............................................ 23

*S. Cal. Edison Co.*,
164 FERC ¶ 61,160 (2018) ...................................................................230

*S. Cal. Edison*,
168 FERC ¶ 61,170 (2019).....................................................150, 230–231

# TABLE OF AUTHORITIES

**ADMINISTRATIVE CASES:**                                    **PAGE(S)**

*Transmission Planning & Cost Allocation by Transmission Owning &*
    *Operating Pub. Utils.,*
    Order No. 1000, 136 FERC ¶ 61,051 (2011) .............................. 25, 27–32,
                                      36, 42–44, 172, 237, 239, 255, 258, 260

*Transmission Planning & Cost Allocation by Transmission Owning &*
    *Operating Pub. Utils.,*
    Order No. 1000-A, 139 FERC ¶ 61,132 (2012) ............ 25, 240, 257–258

*Transmission Transmission Planning & Cost Allocation by*
    *Transmission Owning & Operating Pub. Utils.,*
    Order No. 1000-B, 141 FERC ¶ 61,044 (2012) ...................................... 26

*W. Mass. Elec. Co.,*
    23 FERC ¶ 61,025 (1983)...................................................................203

*W. Mass. Elec. Co.,*
    23 FERC ¶ 61,345 (1983).....................................................................203

**CONSTITUTIONAL PROVISIONS**

U.S. Const. art. I, § 1.................................................................... 105

U.S. Const. art. VI ...........................................................................93

**STATUTES:**

ADMINISTRATIVE PROCEDURE ACT

    5 U.S.C. § 553(b)(3).................................................................. 180

    5 U.S.C. § 706(2)(A)......................................................................71

    5 U.S.C. § 706(2)(E).......................................................................33

**TABLE OF AUTHORITIES**

**STATUTES:**                                                   **PAGE(S)**

DEPARTMENT OF ENERGY ORGANIZATION ACT

42 U.S.C. § 7171(f)..............................................................................18

FEDERAL POWER ACT

Section 4, 16 U.S.C. § 797(e) ........................................................ 85

Section 201, 16 U.S.C. § 824 ....................1, 33, 78, 83, 89, 222–223, 244

Section 201(a), 16 U.S.C. § 824(a) ...........................................15, 89, 210

Section 201(b)(1), 16 U.S.C. § 824(b)(1)................................... 15–16, 76, 78–79, 81–82, 84, 87, 94, 97, 99, 103, 143

Section 202, 16 U.S.C. § 824a...............................................................33

Section 205, 16 U.S.C. § 824d...............................................144, 222–223

Section 205(a), 16 U.S.C. § 824d(a)...........................................17, 72, 74

Section 205(b), 16 U.S.C. § 824d(b) .........................................................17

Section 205(d), 16 U.S.C. § 824d(d) .................................................17, 193

Section 206, 16 U.S.C. § 824e...................................200, 222–223, 244

Section 206(a), 16 U.S.C. § 824e(a).............................. 17–18, 33–34, 49, 56, 72, 76, 78–79, 81–82, 94, 97, 110, 123, 131, 136, 143, 169, 171, 177, 189, 201, 245, 247, 252

Section 216, 16 U.S.C. § 824p ............................................................ 125

Section 217(b)(4), 16 U.S.C. § 824q(b)(4)................................................171

Section 219, 16 U.S.C. § 824s.............................................................. 148

# TABLE OF AUTHORITIES

**STATUTES:** **PAGE(S)**

Section 219(a), 16 U.S.C. § 824s(a) ......................................................... 148

Section 304(a), 16 U.S.C. § 825c(a) ......................................................... 215

Section 306, 16 U.S.C. § 825e ...................................................................13

Section 313(b), 16 U.S.C. § 825*l*(b) ..................................9, 73, 136, 262

OTHER STATUTORY AUTHORITY

28 U.S.C. § 2112(a)(3) ...............................................................................7

**REGULATION:**

18 C.F.R. Part 35..................................................................................207

**RULE:**

Fed. R. App. P 28(a)(9) ........................................................................ 136

**OTHER AUTHORITIES:**

FERC Office of Energy Policy and Innovation, *FERC Energy Primer: A Handbook for Energy Market Basics* (Dec. 2023), *available at* https://perma.cc/Q4ZZ7WR7 .............................................. 22, 24, 39, 41

FERC Office of Public Participation, *Explainer: Transmission Planning and Cost Allocation Final Rule* (May 2025), *available at* https://perma.cc/BGX9-VGMZ............................................................ 53

John D. Wilson and Zach Zimmerman, *The Era of Flat Power Demand is Over*, Grid Strategies (Dec. 2023), *available at* https://perma.cc/HHD6-4D8G............................................................115

**TABLE OF AUTHORITIES**

**OTHER AUTHORITIES:**                                    **PAGE(S)**

Marc Chupka & Pearl Donohoo-Vallett, *Recognizing the Role of Transmission in Electric System Resilience*, The Brattle Group (May 2018), *available at* https://perma.cc/8BBC-DDLF ...................114

Mark Bolinger, *et al.*, *Utility-Scale Solar Data Update: 2020 Edition*, Lawrence Berkeley Nat'l Laboratory (Nov. 2020), *available at* https://perma.cc/2PFG-V46F ..............................................................116

U.S. Energy Info. Admin. (EIA), *Incentives and Lower Costs Drive Electric Vehicle Adoption in Our Annual Energy Outlook* (May 15, 2023), *available at* https://perma.cc/Q749-EXD5..............................114

## GLOSSARY

| | |
|---|---|
| ANOPR | Advance Notice of Proposed Rulemaking, 176 FERC ¶ 61,024 (July 15, 2021) (FERC Docket No. RM21-17-000) (located at JA1) |
| Commission or FERC | Respondent Federal Energy Regulatory Commission |
| Long-term planning or process | The Long-Term Regional Transmission Planning process, and associated transmission Needs and Facilities, as defined in the Rule |
| Market operator or regional market operator | A regional transmission organization that operates the electric transmission system and manages wholesale power markets for the sale of electric energy and often the sale of electric capacity |
| NOPR, proposed rule, or proposal | Notice of Proposed Rulemaking, 179 FERC ¶ 61,028 (Apr. 21, 2022) (FERC Docket No. RM21-17-000) (located at JA139) |
| Order 1920 | Order No. 1920, 187 FERC ¶ 61,068 (May 13, 2024) (located at JA615), the first in the sequence of Orders on review |
| Order 1920-A | Order No. 1920-A, 189 FERC ¶ 61,126 (Nov. 21, 2024) (located at JA1979), the second in the sequence of Orders on review, issued on rehearing and clarification of Order 1920 |
| Order 1920-B | Order No. 1920-B, 191 FERC ¶ 61,026 (Apr. 11, 2025) (located at JA2798), the third in the sequence of Orders on review, issued on rehearing and clarification of Order 1920-A |

xxviii

| | |
|---|---|
| Orders 888, 890, 1000, and 2000 | Landmark rulemaking Orders of the Commission on open-access electric transmission issues |
| P | Internal paragraph number in a FERC order |
| Regional planning organization | An entity that conducts regional transmission planning activities for multiple utilities across a contiguous geographic area, typically either a FERC-approved regional transmission organization (i.e., market operator), or a compact between neighboring member utilities |
| Regional vs. local projects | A distinction between two types of electric transmission facility grid expansion projects based on the identity of the customers who will pay for them, either more than one utility's customers (regional) or only one utility's customers (local) |
| Right of first refusal | A term in a utility tariff or contract that assigns a new grid expansion project opportunity to the relevant existing incumbent utility in that project area, without competition among potential project developers |
| Right-sizing | The process mandated by the Rule whereby regional planning organizations study potential size increases to certain replacement project intentions submitted by member utilities |

xxix

| Relevant State Entity | As defined in the Rule, any State entity responsible for electric utility regulation or siting electric transmission facilities within the State or portion of a State located in a particular transmission planning region |
|---|---|
| The Rule | The collection of Orders comprising the final rule on review, Orders 1920, 1920-A and 1920-B, or its requirements or determinations |

xxx

# In the United States Court of Appeals for the Fourth Circuit

Nos. 24-1650, 24-1748, 24-1756, 24-1758, 24-1760, 24-1765, 24-1770, 24-1785, 24-1804, 24-1857, 24-1862, 24-1867, 24-1876, 24-1885, 24-1887, 24-1979, 24-1991, 24-2162, 24-2163, 25-1073, 25-1080, 25-1197, 25-1349 (CONSOLIDATED)

APPALACHIAN VOICES, *et al.*,
*Petitioners,*

*v.*

FEDERAL ENERGY REGULATORY COMMISSION,
*Respondent.*

ON PETITIONS FOR REVIEW OF ORDERS OF THE
FEDERAL ENERGY REGULATORY COMMISSION

**BRIEF OF RESPONDENT
FEDERAL ENERGY REGULATORY COMMISSION**

## INTRODUCTION

This case is about an administrative rule issued in 2024 by the Federal Energy Regulatory Commission (Commission or FERC) concerning the Nation's high-voltage electric transmission grid. Issued pursuant to the statutory requirements of Part II of the Federal Power Act, 16 U.S.C. §§ 824 *et seq.*, which apply to electric transmission grid-operating "public utilities," the rule on review follows in the footsteps of at least four major rulemakings

the Commission has conducted since 1996 to ensure open access to electric transmission service that serves the public interest.

As with those pathbreaking rulemakings (known as Order Nos. 888, 890, 1000, and 2000), the Commission assigned this new rule an Order number—No. 1920 (hereafter, the Rule), named for the year when Congress first created the Federal Power Act, and with it, FERC's predecessor agency. To the extent these prior rulemakings were subject to judicial review, courts universally upheld them in relevant part or dismissed the appeals. Order 1920 builds on their foundation and is similarly lawful.

The Rule's title explains its purpose—*Building for the Future Through Electric Regional Transmission Planning and Cost Allocation.* The Rule responds to an extensively documented, pervasive problem left unsolved by prior efforts: In recent years, FERC-jurisdictional transmission utilities have too often pursued inefficient and unnecessarily costly expansions to the Nation's electric grid that are short-term and parochial in focus.

Over the last decade, utilities have frequently proposed and built individualized or "piecemeal" transmission-grid expansion projects that incrementally meet the immediate needs of their own specific service territories. In the matter on review, FERC determined that this disjointed

2

approach to transmission planning is woefully inadequate to meeting present and rapidly evolving electric market conditions.  Indeed, the need for efficient, cost-effective transmission development has never been greater. Energy-hungry data centers and electrification (think gasoline-to-electric cars) have proliferated in recent years and are driving accelerating increases in energy demand, whose overall growth will likely necessitate scores of new power plants and billions of dollars in new investments by the year 2050. For their part, states have directed their utilities to procure power for their residents from particular sources, which could be within the state or farther away and require transmission lines to transport that power to consumers. And extreme weather events have—and will continue to—stress an aging electric grid.

The Commission reasonably determined that a failure to account for these and other factors in transmission planning results in rates and practices that are not "just and reasonable," thus violating the Federal Power Act and requiring FERC's intervention.  If states are mandating the construction of new nuclear facilities (or natural gas-fired power plants or zero-emitting sources), then it is not "just and reasonable," FERC concluded, to ignore these trends.  Jurisdictional utilities must ensure that power

reliably flows to market at a reasonable cost, and that requires understanding the drivers of future transmission needs.

Taking a commonsense approach to transmission planning, the Rule on review requires utilities that operate transmission facilities (hereafter, transmission providers) to assess several factors influencing transmission needs over a long-term, two-decade timeframe. In this way, the Rule reacts to, but does not dictate, government and utility policies and market factors that affect regional transmission. Further, to encourage the selection of efficient, cost-effective new facilities to meet long-term transmission needs, the Rule requires transmission providers to assess proposed facilities against a set of reliability and economic benefits. The upshot is a Rule that produces "just and reasonable" results by saving consumers money and ensuring a reliable electric grid.

Of course, even efficient, cost-effective transmission can be expensive. Consistent with longstanding, judicially affirmed cost allocation principles, the Rule requires transmission providers to distribute the costs of transmission facilities to consumers in a manner roughly commensurate with the benefits enjoyed *by* those consumers. And in a nod to states' authority to permit and site transmission lines, the Rule requires

4

transmission providers to consult with states on an appropriate cost allocation process.

The Rule accommodates state interests in other ways too. When submitting their cost allocation proposals to FERC for approval, transmission providers must include any competing state-developed methods for FERC's consideration. Thus, the Rule maximizes the prospect that needed transmission will be built by giving the entities with authority to approve (or disapprove) particular transmission infrastructure (the states) a robust role in the long-term transmission planning process.

After two rounds of required administrative rehearing, five petitioner groups now seek judicial review of the Rule (comprising Orders 1920, 1920-A, and 1920-B) in this Court, challenging the Rule's determinations from all sides. Some Petitioners raise close to pure policy disputes that should not long detain the Court. Others misapprehend the nature of the Commission's statutory authorities. Still others attempt to fashion constitutional challenges from these well-defined and frequently used authorities.[1]

---

[1] This Brief refers to the five petitioner groups here, in the order mentioned in this Court's briefing order (Doc. 327) as follows: States (initial opening

While these challenges variously claim that the Rule did too much, too little, or simply the wrong thing, the Rule itself answered all these concerns. It balanced the interests of customers, utilities, generators, states, and others in following the precedents and requirements of the Federal Power Act and Administrative Procedure Act. Accordingly, Order 1920 should be affirmed in all respects.

## ADMINISTRATIVE ORDERS UNDER REVIEW

The Commission Orders under review here are:

*Building for the Future Through Elec. Reg'l Transmission Planning & Cost Allocation*, Order No. 1920, 187 FERC ¶ 61,068 (May 13, 2024) (located at JA615), *on reh'g & clarification*, Order No. 1920-A, 189 FERC ¶ 61,126 (Nov. 21, 2024) (located at JA1979), *on reh'g & clarification*, Order No. 1920-B, 191 FERC ¶ 61,026 (Apr. 11, 2025) (located at JA2798).

They were preceded in FERC Docket No. RM21-17-000 by: Advance Notice of Proposed Rulemaking, 176 FERC ¶ 61,024 (July 15, 2021) (located at JA1), and Notice of Proposed Rulemaking (NOPR), 179 FERC ¶ 61,028 (Apr. 21, 2022) (located at JA139). The petitions for review of these Orders

---

brief at Doc. 421), Transmission Owners (Doc. 425), Consumers (Doc. 420), Competition Petitioners (Doc. 416), and Public Interest Organizations (or simply Organizations) (Doc. 417).

filed in nine courts of appeal were consolidated in this Court following random selection by the Judicial Panel on Multidistrict Litigation, pursuant to 28 U.S.C. § 2112(a)(3). Doc. 17.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

(**1**) Does the Rule, which regulates interstate electric transmission, as well as practices that directly affect the rates for such transmission, fall within FERC's Federal Power Act-conferred jurisdiction over precisely these subjects? (States Brief)

(**2**) Does the Rule, which builds upon prior nationwide transmission planning rulemakings and implements FERC's statutory authority over interstate electric transmission and practices that directly affect rates for such transmission, avoid triggering the major questions doctrine? (States Brief)

(**3**) Did Congress, in delegating to FERC the power and responsibility to ensure "just and reasonable" rates, set forth an "intelligible principle" to guide FERC's discretion, such that the Federal Power Act does not run afoul of the non-delegation doctrine? (States Brief)

(**4**) Is the Rule, which imposes no obligations on states, consistent with the equal sovereignty doctrine? (States Brief)

(**5**) Did FERC act within its discretion in determining that current transmission planning practices result in unjust and unreasonable rates, thus violating the Federal Power Act, because, among other things, they fail to adequately account for long-term transmission needs, thus resulting in unnecessarily costly and inefficient transmission solutions? (Consumers, States, and Transmission Owners Briefs)

(**6**) Did FERC act within its discretion in setting a "just and reasonable" replacement rate—a standard that requires FERC to act within a broad range of reasonableness—by enacting the Rule? (States and Public Interest Organizations Briefs)

(**7**) Is the Rule consistent with the Administrative Procedure Act's public-notice-and-comment requirement? (States Brief)

(**8**) Did FERC act consistent with its statutory authority and the First Amendment, in adopting inclusion and consultation requirements to ensure state participation in the development of

8

"just and reasonable" cost allocation methods for new regional transmission facilities? (Transmission Owners Brief)

(**9**) Did FERC act reasonably in adopting transparency and right-sizing reforms as part of the Rule? (Consumers, States, Transmission Owners, and Competition Petitioners Briefs)

## JURISDICTIONAL STATEMENT

To obtain judicial review of Commission orders, a petitioner must satisfy the requirements of both Article III of the U.S. Constitution and the applicable review statute, Section 313(b) of the Federal Power Act, 16 U.S.C. § 825*l*(b). This means that petitioners "must affirmatively demonstrate how [they are] adversely affected by [the Commission]'s orders" to establish Article III standing as "'aggrieved persons" under the Act. *Indus. Energy Consumers v. FERC*, 125 F.4th 1156, 1161 (D.C. Cir. 2025) (quoting, in part, *Kan. Corp. Comm'n v. FERC*, 881 F.3d 924, 929 (D.C. Cir. 2018)). And because "standing is not dispensed in gross," petitioners "must demonstrate standing for each claim that they press and for each form of relief that they seek." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021) (collecting cases).

9

Given these requirements, a reader of the opening briefs here should be able to discern how each group of petitioners is "immediately in danger of sustaining some direct injury as the result of the challenged official conduct." *Md. Shall Issue, Inc. v. Hogan*, 971 F.3d 199, 220 (4th Cir. 2020). The facts supporting jurisdiction should be specifically alleged, as courts are not inclined "to repackage merits arguments as support for a petitioner's standing." *Entergy Ark., LLC v. FERC*, 134 F.4th 576, 581–583 (D.C. Cir. 2025) (dismissing petitions for review for failure to establish standing in opening brief).

But several petitioner groups—namely the Consumers and most of the Public Interest Organizations—fail to explain how a new rule about long-term transmission planning (a rule that will take years to fully implement and years more to feel the full effects of) concretely and imminently harms their interests today. Consumers merely state that "Order 1920 directly affects rates consumers will pay for the transmission of electricity under FERC's jurisdiction" and express concern that rates may someday go up instead of down. Consumers Br. 14–15. The Organizations provide more detail, including in member affidavits, but also base several of their claims on consumers allegedly paying "excessive rates because several aspects of

10

Order 1920 fell short of solving the problems" that concern the Organizations. Organizations Br. 14–15, 16–17. For their part, the States do not specifically identify any particular basis for their Article III standing at all, but at times also appear to be concerned about potential long-run costs that could follow from the Rule, including for consumers or perhaps for power generators. *See* States Br. 3–5 (introduction); *id.* 5–6 (jurisdictional statement).

If these concerns about potential "overcharges on rates" had "immediate impact" on identified parties or party-members—as Commission ratemaking orders sometimes do in resolving specific disputes between adverse parties—perhaps such allegations could support standing. *See Indus. Energy Consumers*, 125 F.4th at 1161–1162 (contrasting cases). But especially as to a big-picture administrative Rule about long-term future transmission development, petitioners must do more than simply cite "unfavorable rulings on the issues on appeal" or recite allegations that "FERC violated the Federal Power Act"—after all, a "petitioner that asserts a harm that may occur 'some day,' with no 'specification of *when* the some day will be,' does not establish its standing." *Kan. Corp. Comm'n*, 881 F.3d at 929–931 (quoting, in part, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 564

11

(1992)). "The presence of a disagreement, however sharp and acrimonious it may be, is insufficient by itself to meet Art. III's requirements." *Virginia ex rel. Cuccinelli v. Sebelius*, 656 F.3d 253, 271 (4th Cir. 2011). Indeed, an entire appeal of one major Commission rulemaking (brought by a group of petitioners, plus two others) was once dismissed for lack of jurisdiction— even where the leading group of petitioners was comprised of regulated utilities, not other stakeholders. *See generally Pub. Util. Dist. No. 1 of Snohomish Cnty. v. FERC*, 272 F.3d 607 (D.C. Cir. 2001) (on review of FERC Order 2000 rule regarding regional transmission organizations); *see also S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d 41 (D.C. Cir. 2014) (not explicitly addressing Art. III jurisdiction on review of FERC Order 1000 regional transmission planning rule where regulated utilities and other petitioners had jointly briefed standing and threshold issues (in Case Nos. 12-1232 *et al.*, *see* ECF Nos. 1470513, 1470528)).

Furthermore, as explained below, the Rule here does not mandate the development of any particular transmission facilities; it is purely about "transmission planning *processes*" and not the merits of specific future projects. *See infra* p.44, 54–55; JA1989. Transmission planning and owning utilities are the objects of the Rule's planning requirements, and so those

entities (not customers) have directly associated compliance burdens and costs. *See* JA1838–1846 (Compliance Procedures). As for possible indirect costs, including those eventually charged to customers, as the nature of the Rule itself suggests, it may be years before transmission facilities intended to meet long-run needs will even be proposed and considered, let alone proposed, considered, selected, designed, and then built, with resulting costs charged to customers. *See infra* pp.40–46, 51–55 (providing general overview of how transmission planning works in practice and the Rule's new requirements); *Indus. Energy Consumers*, 125 F.4th at 1162–1163 (discussing one example of transmission project planning).

Should those long-run processes produce particular results that customers believe are unjust, as-applied statutory challenges to the costs of particular projects or types of projects can be (and often are) brought before the Commission via administrative complaint. *See* 16 U.S.C. §§ 824e, 825e; *see also, e.g., Coal. of MISO Transmission Customers v. FERC*, 45 F.4th 1004, 1012–1014, 1022 (D.C. Cir. 2022) (reviewing orders denying one such complaint); *Pub. Serv. Elec. & Gas Co. v. FERC*, 989 F.3d 10, 13–16 (D.C. Cir. 2021) (reviewing orders granting another such complaint). Those

processes will continue to exist here to protect consumers' interests in appropriate, just and reasonable transmission development.

Without more specificity from the Consumers, Organizations, and States, it is uncertain which of their particular claims are premised on the likelihood of future customer injury. However, the Commission suggests as a dividing line that any claims chiefly concerned about the possible future economic *results* of particular transmission planning cycles or project cost allocations (as opposed to process-based objections) are likely speculative, and thus infirm. Those claims include hypothetically unlawful cost shifts under cost allocation tariffs that have yet to be enacted (*see, e.g.*, Consumers Br. 36–44; States Br. 25–27, 35–37, 39, 46–47, 52), the failure to adopt additional substantive reforms not pursued by the Rule (*see, e.g.*, Consumers Br. 9, 22–30, 49–52; Organizations Br. 20–36, 45–57; States Br. 48–53), and perhaps also generalized claims that the Rule failed to comply with legal requirements (*see, e.g.*, Consumers Br. 15–22). While this answering Brief responds to all claims out of an abundance of caution, the Commission urges the Court to dismiss any objections that rely on jurisdictional allegations not specifically presented in Petitioners' opening briefs. *See Entergy*, 134 F.4th at 580–583.

14

## STATUTES AND REGULATIONS

Pertinent statutes and regulations are reproduced in the Addendum to this brief.

## STATEMENT OF THE CASE

### I.     FERC's statutory authority under the Federal Power Act

The Federal Power Act (Act) directs the Commission "to provide effective federal regulation of the expanding business of transmitting and selling electric power in interstate commerce." *New York v. FERC*, 535 U.S. 1, 6 (2002). The Commission is thus the "federal agency" with "power to regulate the sale of electric energy across state lines." *Jersey Cent. Power & Light Co. v. FPC*, 319 U.S. 61, 67–68 & n.7 (1943).

Section 201 of the Federal Power Act declares that "the business of transmitting and selling electric energy for ultimate distribution to the public is affected with a public interest." 16 U.S.C. § 824(a). Accordingly, the Act grants FERC jurisdiction over the "transmission of electric energy in interstate commerce," the "sale of electric energy at wholesale in interstate commerce," and "all facilities for such transmission or sale." § 824(b)(1).

Meanwhile, states retain jurisdiction over "facilities used in local distribution or only for the transmission of electric energy in intrastate

15

commerce." *See* § 824(b)(1).  They also retain jurisdiction over "any other sale of electric energy" (e.g., sales to end-use customers at retail) and over "facilities used for the generation of electric energy," except where the Act "specifically provide[s]" otherwise.  *Id.*; *New York*, 535 U.S. at 12 & n.9, 23.  In general, as explained below, this means that states exercise jurisdiction over the siting and permitting of particular electric transmission facilities, *see Piedmont Env't Council v. FERC*, 558 F.3d 304, 310 (4th Cir. 2009) ("[S]tates have traditionally assumed all jurisdiction to approve or deny permits for the siting and construction of electric transmission facilities."), and also may decide what generation resources their in-state utilities should build and what power those in-state utilities should purchase, *see Conn. Dep't of Pub. Util. Control v. FERC*, 569 F.3d 477 (D.C. Cir. 2009); *infra* pp.77–78.

Regarding federal ratemaking authority, the Act gives FERC two primary mechanisms to ensure that jurisdictional electric transmission rates are just, reasonable, and in the public interest—one that is utility-driven and one that requires FERC to abate unlawful rates:

1.  Section 205 allows utilities to alter their own FERC-jurisdictional rates (as well as "any rule[s], regulation[s], or contract[s] relating thereto")

16

as set forth in a FERC-approved tariff, by proposing new rates to FERC. 16 U.S.C. § 824d(d); *see also Morgan Stanley Cap. Grp. Inc. v. Pub. Util. Dist. No. 1 of Snohomish Cnty.*, 554 U.S. 527, 531 (2008) (explaining that "compilations of … rate schedules" are sometimes known as "tariffs" and must be filed under Section 205(c), § 824d(c)).

That new rate takes automatic effect after 60 days unless FERC affirmatively rejects the rate as not "just and reasonable." *Balt. Gas & Elec. Co. v. FERC*, 954 F.3d 279, 284 n.2 (D.C. Cir. 2020) (citing § 824d(d)); § 824d(a), (d). FERC may also affirmatively approve the rate filing. *See* § 824d(c)–(d); *NRG Power Mktg., LLC v. FERC*, 862 F.3d 108, 114 (D.C. Cir. 2017). All FERC-jurisdictional rates must be "just and reasonable" and not "undu[ly] preferen[tial]," § 824d(a)–(b), and it is the filing utility's burden to make such a showing, *e.g.*, *Me. Pub. Utils. Comm'n v. FERC*, 454 F.3d 278, 283 (D.C. Cir. 2006).

2. Alternatively, under Federal Power Act Section 206 (§ 824e), the Commission, on its own initiative or upon third-party complaint, may impose a new rate on a public utility. *Morgan Stanley*, 554 U.S. at 532 (citing § 824e(a)). The Section 206 inquiry proceeds in two steps. At step one, FERC must determine whether a public utility's existing electric rate for

17

interstate transmission or wholesale sales is unjust, unreasonable, or unduly discriminatory. *Emera Me. v. FERC*, 854 F.3d 9, 24–25 (D.C. Cir. 2017). If it is, then, at step two, FERC "must rectify the problem" by fixing—i.e., setting—a new "just and reasonable" rate "by order." *FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 266 (2016) (citing § 824e(a)). Similar to Section 205, this review authority extends not only to rates but also to any regulated utility's "rule, regulation, practice, or contract affecting" such rates. *Id.* at 277 (citing § 824e(a)). Unlike Section 205, however, Section 206 places the burden on the challenging utility or FERC—depending on who brings the rate challenge—to show that an existing rate is unjust, unreasonable, or unduly discriminatory, and that any replacement is just and reasonable. *Emera Me.*, 854 F.3d at 24–25.

Administratively, FERC may execute its ratemaking authority either through utility-specific adjudications or by way of generally-applicable rulemakings, as Congress has provided the Commission with both administrative tools. *See, e.g.*, 42 U.S.C. § 7171(f)–(g) (authorizing FERC to establish rules and hold hearings as "necessary to … its functions"); *New York*, 535 U.S. at 21–24, 27–28 (affirming judgments made in nationwide rulemaking). Indeed, as explained below, the Commission's process for

18

implementing broad reforms to transmission rules and practices typically involves nationwide rulemakings followed by region-specific compliance adjudications. *See infra* pp.35–39.

## II.     Regulatory background: the rules that guide how the electric grid expands to meet new and changing needs

"Supplying electricity to consumers requires three principal kinds of facilities—generators produce the electricity, transmission facilities move it over long distances, and distribution facilities move it over short distances to individual customers." *NextEra Energy Res., LLC v. FERC*, 118 F.4th 361, 365 (D.C. Cir. 2024). This case concerns the second, middle category: high-voltage transmission lines, substations, and supporting equipment that, operating as an integrated whole, facilitate the long-distance interstate travel of electricity. Specifically, it concerns the forward-looking planning process that utilities use for identifying and developing new or upgraded electric transmission facilities.

### A.     Order 888: FERC's 1996 rulemaking ensures open access to interstate transmission service

The Order 1920 rulemaking on review (the Rule) builds upon a 30-year-old rulemaking that infused competition into the generation and transmission of electric energy. "In the bad old days, power grids were run

19

by vertically integrated monopolies that owned generation, transmission, and distribution facilities." *NextEra*, 118 F.4th at 365 (cleaned up). These vertically integrated utilities sold power in "bundled packages to customers in limited geographic areas," *id.*, which limited competition among electric suppliers, *New York*, 535 U.S. at 5.

Since 1996, "the Commission has attempted to break down regulatory and economic barriers that hinder a free market in wholesale electricity." *Morgan Stanley* 554 U.S. at 536. "It has sought to promote competition in those areas of the industry amenable to competition, such as the segment that generates electric power, while ensuring that the segment of the industry characterized by natural monopoly—namely, the transmission grid that conveys the generated electricity—cannot exert monopolistic influence over other areas." *Id.*

"To that end," in 1996, the Commission issued Order 888,[2] which required transmission providers to "offer transmission service to all

---

[2] Order 888 was followed by four orders on rehearing or clarification and two judicial opinions: *Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Services by Public Utilities*, Order No. 888, 61 Fed. Reg. 21,540 (May 10, 1996) (75 FERC ¶ 61,080), *on reh'g*, Order No. 888-A, 78 FERC ¶ 61,220, *clarified*, 79 FERC ¶ 61,182, *on reh'g*, Order No. 888-B, 81 FERC ¶ 61,248 (1997), *on reh'g*, Order No. 888-C, 82

customers on an equal basis" pursuant to an "open access transmission tariff" specified by FERC. *Id.* In effect, Order 888 "required transmission owners to give other generators equal access to interstate transmission facilities." *NextEra*, 118 F.4th at 365–366. This "laid the foundation for the development of competitive wholesale power markets by requiring public utilities to offer" service to others "in the interstate market on the same terms as the utilities use their own lines." *Pac. Gas & Elec. Co. v. FERC*, 533 F.3d 820, 822 (D.C. Cir. 2008).

As relevant here, Order 888 also required transmission providers to account for the addition of new customers in transmission system planning, and to "endeavor to construct and place into service sufficient transmission capacity" to deliver power to new network customers from generation resources of their choosing. 61 Fed. Reg. at 21,718.

The D.C. Circuit upheld Order 888 "in nearly all respects" in *Transmission Access*, 225 F.3d at 681, 683, and the Supreme Court subsequently affirmed the Commission's authority to impose open access requirements in *New York*, 535 U.S. at 16–24. And, over the years, FERC's

---

FERC ¶ 61,046 (1998), *aff'd in relevant part sub nom. Transmission Access Policy Study Grp. v. FERC*, 225 F.3d 667, 683 (D.C. Cir. 2000), *aff'd sub nom. New York v. FERC*, 535 U.S. 1.

21

transmission and market reform efforts have unlocked considerable benefits and savings for customers, and new opportunities for sellers, in wholesale electricity markets. *See FERC v. Elec. Power Supply Ass'n*, 577 U.S. at 267–272; *see also* FERC Office of Energy Policy and Innovation, *FERC Energy Primer: A Handbook for Energy Market Basics* at 33–45 (Dec. 2023), *available at* https://perma.cc/Q4ZZ7WR7; *PPL EnergyPlus, LLC v. Nazarian*, 753 F.3d 467, 472–473 (4th Cir. 2014) ("Federal regulation has become increasingly prominent as the energy market has shifted away from local monopolies to a system of interstate competition."), *aff'd sub nom. Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150 (2016).

**B.      Order 2000: FERC encourages formation of Regional Transmission Organizations to further increase access to transmission service**

As part of its market reform effort, "FERC encouraged the creation of nonprofit entities to manage wholesale markets on a regional basis," known today as regional transmission organizations or independent system operators (hereafter termed regional market operators). *FERC v. Elec. Power Supply Ass'n*, 577 U.S. at 267; FERC Energy Primer at 37, 66. These market operators exercise "operational control of [transmission] facilities for the purpose of efficient coordination" and market integration, as well as

transmission planning. *Morgan Stanley*, 554 U.S. at 536–537; *E. Ky. Power Coop., Inc. v. FERC*, 489 F.3d 1299, 1302, 1307 (D.C. Cir. 2007).

But importantly, these market operators are considered "[i]ndependent" actors because they themselves do not own or profit from generation or transmission facilities; rather, their "collectively run transmission facilities" remain owned by member utilities. *East Kentucky*, 489 F.3d at 1302. Freed from incentives to favor certain resources over others, these operators thus manage the grid to serve the regulatory "goals of efficiency, competition, and improved reliability." *Id.*

The Commission spurred the widespread formation of regional market operators with its Order 2000 rulemaking, which "direct[ed] transmission-owning utilities either to participate in a[] [regional transmission organization] or to explain their refusal to do so." *Id.* (citing *Regional Transmission Organizations*, Order No. 2000, 65 Fed. Reg. 810 (2000) (89 FERC ¶ 61,285)); *see also Pub. Util. Dist. No. 1*, 272 F.3d 607 (dismissing petitions for review of Order 2000 for failure to establish jurisdiction). Within 15 years, such market operators grew to serve areas amounting to "roughly two-thirds of the country's electricity 'load' (an industry term for the amount of electricity used)." *FERC v. Elec. Power Supply Ass'n*, 577 U.S.

23

at 267–268.  Today, six FERC-jurisdictional market operators located across the country have "system-wide or regional planning processes that identify transmission system additions and improvements that are needed to keep electricity flowing." *See* FERC Energy Primer at 66–68; *see also* Figure 1 *infra* p.41 (indicating which regions are organized into regional market operators).

### C.    Orders 890 and 1000: FERC establishes a comprehensive approach to transmission planning and associated utility cost allocation

While the Order 888 and Order 2000 reforms were pathbreaking, within a few years, the Commission recognized that the "substantial need for new [transmission] infrastructure in this Nation" to serve customer demand would require utilities to be more proactive—"an open, transparent, and coordinated transmission planning process" was needed.  *Preventing Undue Discrimination & Preference in Transmission Service*, Order No. 890, 118 FERC ¶ 61,119, P 3, *on reh'g and clarification*, Order No. 890-A, 121 FERC ¶ 61,297 (2007).  Because "transmission providers lacked incentives to plan and develop new transmission facilities in a manner consistent with the public interest," customers could not be sure that future system plans were being developed to serve the market generally, instead of merely serving

individual utilities' more narrow self-interests. *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d 41, 51 (D.C. Cir. 2014) (*South Carolina*).[3]  Meanwhile, "the electric industry was reporting that an estimated $298 billion of investment in new electric transmission facilities would be needed between 2010 and 2030 to maintain current levels of reliable electric service across the United States." *Id.*

FERC therefore adopted two landmark transmission planning reforms within the span of only a few years—Order 890 in 2007, followed by Order 1000 in 2011.  *Id.* at 52–53 (citing, *inter alia*, *Transmission Planning & Cost Allocation by Transmission Owning & Operating Pub. Utils.*, Order No. 1000, 136 FERC ¶ 61,051 (2011) (Order 1000)); *see also South Carolina*, 762 F.3d at 48–49, 97 (denying all petitions for review of Order 1000).[4]  These reforms are summarized below.

---

[3] *E.g.*, Order 890 PP 421–422, 524 (explaining that while the evidence indicated that "[t]ransmission constraints plague most regions of the country," causing service interruptions and higher costs, utilities may not want to "remedy transmission congestion when doing so reduces the value of their generation or otherwise" encourages greater competition).

[4] Order 1000 was followed by two rehearing orders and was affirmed on judicial review. *Transmission Planning & Cost Allocation by Transmission Owning & Operating Pub. Utils.*, Order No. 1000, 136 FERC ¶ 61,051 (2011), *on reh'g*, Order No. 1000-A, 139 FERC ¶ 61,132, *on reh'g*, Order No.

### 1. Order 890 establishes nine transmission planning principles guiding grid expansion

In Order 890, the Commission explained that utility transmission planning serves a "critical function," because it is "the means by which customers … access new sources of energy and have an opportunity to explore the feasibility of non-transmission alternatives." Order 890 P 3. But then-existing rules provided "limited guidance regarding how transmission customers are treated in the planning process and provide[d] them very little information" on how utilities develop transmission plans. *Id.*

Thus, Order 890 established nine principles for "coordinated, open and transparent transmission planning" by "all public utility transmission providers, including" regional market operators. *Id.* P 84.[5] Transmission

---

1000-B, 141 FERC ¶ 61,044 (2012), *aff'd sub nom. South Carolina*, 762 F.3d 41.

[5] These can be summarized as: (1) coordination with affected parties; (2) openness of meetings; (3) transparency of criteria, assumptions, and data; (4) information exchange with customers; (5) comparability of treatment for similarly-situated customers; (6) dispute resolution; (7) regional participation and coordination between interconnected utilities; (8) planning studies involving both reliability and economic considerations; and (9) cost allocation procedures based on regional experience and needs. *See* JA631–632 (summarizing Order 890 PP 418–601); Order 890-A P 181; *see also id.* P 178 & *id.* at App. C (*Pro Forma* Tariff sections 28.2 and Att. K–Transmission Planning Process).

26

providers were also required to provide sufficient detail in their information disclosures such that customers could understand the planning decisions made. *See id.* P 602. But the Commission's focus was "on the process leading to the transmission plan and not the construction of specific facilities." Order 890-A P 178. No court reviewed Order 890.

> **2.  Order 1000 requires more efficient or cost-effective transmission planning and alignment of customer costs with benefits in every region**

Experience in implementing Order 890 revealed one of its key shortcomings—"the lack of an affirmative obligation" on transmission providers "to develop a transmission plan evaluating if a regional transmission facility 'may be more efficient or cost-effective than solutions identified in local transmission planning processes.'" JA632–633 (quoting Order 1000 P 3). While Order 890 in part addressed regional participation and coordination between interconnected utilities, it did not affirmatively require that transmission providers look beyond the system needs of individual utilities in planning grid expansions; the focus remained largely "local" for participating utilities. *See* Order 1000 PP 3, 6. That lack of a "regional" perspective regarding grid expansion, as well as uncertainty regarding which customers should pay for new network improvements ("cost

27

allocation methods"), led to the adoption of Order 1000 under Section 206 of the Act. *Id.* PP 1, 3–4.

**Regional planning**. Order 1000 was "intended to achieve two primary objectives: [*First*, to] ensure that transmission planning processes at the regional level consider and evaluate, on a non-discriminatory basis, possible transmission alternatives and produce a transmission plan that can meet transmission needs more efficiently and cost-effectively." *Id.* PP 4, 11. That is, Order 1000 required efficiency-driven regional transmission planning to facilitate "the identification and evaluation of a more efficient or cost-effective solution to regional transmission needs" than utility-by-utility planning would yield. *Id.* PP 4, 6–7; *see also id.* PP 646–647 (providing that planning processes could include consideration of "a ratio of benefits to costs" that "determine which transmission facilities have sufficient net benefits" to customers).

**Cost allocation**. *Second*, Order 1000 sought to "ensure that the costs of transmission solutions chosen to meet regional transmission needs are allocated fairly to those who receive benefits from them." *Id.* P 4. FERC thus required "public utility transmission providers to have in place a method, or set of methods, for allocating the costs of new transmission facilities selected

28

in a regional transmission plan for purposes of cost allocation." *Id.* P 9.
These methods—which are also known as "*ex ante* cost allocation methods"
because they are specified *before* specific proposed projects are pursued—are
intended to allocate facility costs in a manner that aligns with the expected
benefits of those facilities. *Id.* P 499; *see also id.* P 10 (striving to "allocate
costs for new transmission facilities in a manner that is at least roughly
commensurate with the benefits received by" ratepayers).

Other related reforms. Order 1000 also contained other supporting
reforms. Similar to the Order 1920 rulemaking here on review, it required
consideration of "transmission needs driven by public policy requirements
established by state or federal laws or regulations" (or "Public Policy
Requirements" for short). *Id.* PP 2–3, 6, 83; *see infra* pp.31, 54.

Furthermore, Order 1000 sought to support "more efficient or
cost-effective solution[s]" by enabling greater participation in planning
processes by new entrant companies, or "nonincumbent transmission
developers." *Id.* PP 3, 7, 255; *see also id.* P 11 (requiring "fair consideration of
transmission facilities proposed by nonincumbents"). These new entrants
were, in at least some parts of the country, able to propose ideas for new
transmission facilities, but were not able to construct and own those regional

29

facilities themselves. *See, e.g., Xcel Energy Servs. Inc. v. Am. Transmission Co.*, 147 FERC ¶ 61,089, PP 2–8, 23, 26 & nn.36–37 (2014) (noting pre-Order 1000 differences between two market operator tariffs regarding potential new entrant ownership). That was because existing utility rules often assigned new project construction opportunities exclusively to existing companies and did not open up new opportunities to other qualified developers. *See* Order 1000 PP 3, 7, 225, 228. Such "rights of first refusal" that limited competition for new regional transmission facility construction opportunities were largely eliminated in Order 1000, encouraging "new entrants" to "propos[e] new transmission projects in the regional transmission planning process" that it created. *Id.* PP 7, 256–257, 284–286, 313, 332.

### 3. Order 1000 declines to mandate any substantive outcomes or interfere with reserved state regulatory authority

Order 1000 gave transmission providers flexibility to select or reject particular projects by "focus[ing] on the transmission planning *process*, and not on any substantive outcomes that may result from this process." *Id.* P 12. Thus, it did not require the selection or construction of any particular facilities in any region; it required consideration and evaluation of ideas and

30

alternatives instead. *Id.* PP 13, 66, 217, 331; *see also id.* P 328 (requiring a public "determination that is sufficiently detailed for stakeholders to understand why a particular transmission project was selected or not selected"). Order 1000 similarly did not favor particular "energy resources over other types of resources" in generally requiring "consideration of transmission[] needs driven by any Public Policy Requirement." *Id.* PP 214–215.

Order 1000 also did not address "matters reserved to the states, such as transmission construction, ownership or siting. The reforms [were] focused solely on public utility transmission provider tariffs and agreements subject to the Commission's jurisdiction." *Id.* P 287; *see also id.* P 107 (explaining that "simply requiring that certain processes be instituted" is not "an exercise of siting, permitting, and construction authority" regarding or authorizing particular projects). Accordingly, in instituting more detailed planning processes, Order 1000 did not "limit, preempt, or otherwise affect state or local laws or regulations with respect to construction of transmission facilities"—including "siting or permitting" rules under which state actors could authorize (or decline to authorize) physical construction of particular projects. *Id.* PP 227, 287.

31

States remained free to exercise their "authority over those specific substantive matters traditionally reserved to the states, including integrated resource planning" for generation sources. *Id.* PP 107, 156. Rather than restrict state authority, the Commission further enabled—and even encouraged—the participation of "states or state committees" in the newly mandated "open and transparent transmission planning processes." *Id.* P 502.

### 4. Order 1000 and multiple subsequent compliance orders are affirmed on judicial review

#### a. The *South Carolina* court rejects all challenges to Order 1000

Forty-five petitioners sought judicial review of the Order 1000 rulemaking, raising numerous statutory and administrative law claims. All were rejected by the D.C. Circuit in *South Carolina Public Service Authority*, 762 F.3d at 48–49, 97, and no party sought certiorari. *South Carolina* reached three primary legal conclusions regarding the scope of the Commission's authority under Section 206 of the Act.

**Regional planning**. *First*, the *South Carolina* court determined that the Act permitted FERC to require transmission providers to participate in regional planning processes, rejecting arguments that Congress had not

specifically authorized the Commission to mandate regional transmission planning between utilities. *See* 762 F.3d at 55–71 (Parts II, III); *see also id.* at 55–59 (finding regional transmission planning reforms consistent with FERC's authority to regulate "practice[s]" "affecting … rates" under Section 206); *id.* at 58 (Order 1000 appropriately "buil[t] on Order No. 890's requirements in light of changed circumstances and [was] simply the next step in a series of related reforms that began no later than Order No. 888").

Similar threshold arguments likewise failed. A reference in Section 202 of the Act to "voluntary interconnection and coordination of facilities" did not overrule the Commission's broad Section 206 authority to mandate transmission planning. *Id.* at 49, 59–62 (interpreting §§ 824a, 824e). Nor did FERC's further specification of regional planning processes infringe States' reserved powers. *Id.* at 62–64 (interpreting §§ 824, 824e). The Commission met its evidentiary burden under Section 206 by identifying the "well-understood" deficiencies in existing planning practices and the "theoretical threat" to future "just and reasonable" rates that poor planning represented, especially given that transmission investment increases and "changes in the mix of generation resources" were expected. *Id.* at 64–71 (applying 5 U.S.C. § 706(2)(E) and 16 U.S.C. § 824e(a)). The Act did not

require the Commission to "wait for systemic problems to undermine transmission planning" and impose unreasonable costs before acting. *Id.* at 70.

**Cost allocation**. *Second*, the Federal Power Act permitted the Commission to require the *ex ante* specification of cost allocation methods. *Id.* at 81–89 (Part V, rejecting two "nearly opposite" petitioner challenges). The court concluded that, as with Order 1000's regional planning reforms, "cost allocation constitutes a 'practice' 'affecting … rates.'" *Id.* at 84–85 (quoting § 824e(a)). And the court affirmed FERC's methodology, which required any approved cost allocation proposals to follow the "cost causation principle," whereby "costs are to be allocated to those who cause the costs to be incurred and reap the resulting benefits." *Id.* at 85 (cleaned up).

**Non-incumbent developers**. *Third*, the Act permitted the Commission to remove federal rights of first refusal from utility tariffs and agreements, as they were found to be practices affecting transmission rates. *Id.* at 71–81 (Part IV). Because those rights "are likely to have a direct effect on the costs of transmission facilities because they erect a barrier to entry" for non-incumbents, the court found that they were a practice directly tied to FERC-jurisdictional rates. *Id.* at 74–75. And since "the challenged orders

34

take great pains to avoid intrusion on the traditional role of the States," no

federal-state jurisdictional concern was presented either. *Id.* at 76.

### b.  Multiple courts largely affirm subsequent regional compliance orders

As predicted in *South Carolina*, *see id.* at 81, the Commission went on

to implement its Order 1000 rulemaking via a series of nearly a dozen

region-specific Federal Power Act compliance proceedings producing revised

tariffs. *See* JA3326 (collecting citations). These compliance processes led to

multiple appeals to Circuit courts, nearly all of which resulted in dismissal or

denial of petitions for review, including on federal right of first refusal

(transmission competition) issues.[6]

---

[6] *See, e.g.*, *MISO Transmission Owners v. FERC*, 819 F.3d 329 (7th Cir. 2016) (denying petitions for review regarding Midcontinent Independent System Operator); *Okla. Gas & Elec. Co. v. FERC*, 827 F.3d 75 (D.C. Cir. 2016) (same regarding Southwest Power Pool); *Emera Maine v. FERC*, 854 F.3d 662 (D.C. Cir. 2017) (same regarding ISO New England Inc.); *Am. Transmission Sys. Inc. v. FERC*, No. 14-1085, 2016 WL 3615443, at *1 (D.C. Cir. July 1, 2016) (dismissing petitions for review regarding PJM Interconnection, L.L.C.); *LSP Transmission Holdings, LLC v. FERC*, 700 F. App'x 1 (D.C. Cir. 2017) (same regarding Southwest Power Pool). *But see El Paso Elec. Co. v. FERC*, 832 F.3d 495 (5th Cir. 2016) (vacating, in part, portions of compliance orders regarding non-jurisdictional utility participation in the WestConnect region of the Western U.S., over a dissent); *El Paso Elec. Co. v. FERC*, 76 F.4th 352 (5th Cir. 2023) (again granting petition on that issue over a dissent). The Rule here addressed the role of non-jurisdictional utilities, *see* JA2820–2823, but no party challenges those determinations on appeal.

### III.   How FERC-jurisdictional transmission planning works

#### A.     Compliance processes for FERC transmission rules

In compliance proceedings of this kind, the Commission and regulated transmission providers translate the Commission's rulemaking orders into region-specific tariff language that more precisely defines the duties and practices that a particular region's transmission providers will follow.  *See, e.g., Duke Energy Carolinas, LLC*, 151 FERC ¶ 61,021 (2015) (the third in a series of orders refining the tariffs of utilities in the Southeastern Regional Transmission Planning region).  In such proceedings, the Commission does not relitigate the substance of the underlying rule itself.  *See id.* P 140.

Rather, FERC reviews compliance proposals submitted by regulated utilities (and the responsive filings of other parties) to determine whether proposed tariffs comply with the just and reasonable policies established in the rule, with variations permitted if they are "consistent with or superior to" the rule's requirements.  *See* Order 1000 PP 792–798 (describing compliance process issues); JA2735 (describing the "consistent with or superior to" standard used in the context of transmission planning rule compliance).  This way, transmission providers have significant flexibility to design a

36

region-specific tariff and terms of service proposals that will meet overall compliance mandates. *See* JA2735, JA2741–2747.

For rules that direct mandatory tariff changes for public utility transmission providers, such as Order 1000 (and now Order 1920), this process unfolds under the Commission's Federal Power Act Section 206 authority through one or more rounds of compliance filings and resulting orders. *See PJM Interconnection, L.L.C.*, 178 FERC ¶ 61,083, PP 25–28 (2022). After a transmission provider has established tariff language that fully complies with the rule, the compliance process is finished. *See id.* PP 25–26, 28 (rejecting a 2021 proposal styled "as a compliance filing" when the issue addressed "was final and required no compliance," having been settled by order in 2015).[7]

But, as always, transmission providers may still propose further revisions to their transmission planning tariffs after that point, invoking the procedures of "section 205 (or section 206, if appropriate)," and explaining

---

[7] As relevant here, the compliance process for Order 1920 is now formally underway in at least two regions (California and the Mid-Atlantic), as some initial compliance filings have been made by those regional market operators or their member utilities. *See* FERC Docket Nos. ER26-704, ER26-751, and ER26-744 (all initiated in Dec. 2025), https://elibrary.ferc.gov/eLibrary/search.

how their proposals "meet the requisite evidentiary burdens." *Id.* P 27; *see also supra* pp.16–18 (explaining statutory processes). In those later-arising cases, the Commission "has broad discretion in assessing tariff proposals under Section 205," and "wide discretion to determine what constitutes undue discrimination" where relevant, in judging whether new ideas align with the "broad … goals" of relevant rulemakings. *See, e.g., Xcel Energy Servs. Inc. v. FERC*, 41 F.4th 548, 557–558 (D.C. Cir. 2022) (explaining how FERC approached a later-arising tariff change proposal years after its foundational generator interconnection rulemaking).

Therefore, as relevant here, transmission providers retain significant flexibility after Order 1000 (and now, after Order 1920), in that regions are permitted to change policies within permissible bounds. For example, FERC has explained that Order 1000 does not "prohibit the use of other cost allocation methods" besides the originally chosen *ex ante* approach that was accepted on compliance. *See Southwest Power Pool, Inc.*, 189 FERC ¶ 61,128, PP 10, 58 (2024). And thus, where utilities propose later changes, including to cost allocation methods, it is possible to make later adjustments to continue to ensure that the costs imposed via transmission rates are "at least roughly commensurate with their benefits." *Pub. Serv. Elec. & Gas Co.*,

989 F.3d at 18–19 (affirming Commission's change in cost allocation method after it found that prior method "violated section 206" of the Act).

### B.    How transmission planning works in practice under Order 1000

In carrying out their tariffed responsibilities, FERC-jurisdictional utilities typically conduct transmission planning as a cyclical process, which is usually repeated every year or every few years.[8]

Each transmission planning cycle typically includes individual utilities in a region identifying the projects in their own service territories that they plan to pursue over the ensuing few years to meet reliability needs and service obligations (often referred to as "local" projects or plans). These local project intentions are communicated by the utility to the entity that conducts regional transmission planning for its respective region (the region, or the regional planning organization, for short). The regional planning organization is usually a market operator (a FERC-jurisdictional public utility that also operates transmission facilities and wholesale

---

[8] Except where specifically noted, for more detail on the points explained in the next few paragraphs, *see generally* JA12–28; JA153–156, JA196–200, JA408; FERC Energy Primer at 45, 56, 66–95; *see also* California ISO 2024-2025 Transmission Plan (Board Approved May 30, 2025) at pp. 21–27 (section 1.3  The Transmission Planning Process), *available at* https://perma.cc/HG38-TDAV.

markets, *see supra* pp.22–24), or a compact between neighboring utilities that specifically exists for those utilities to plan transmission together (but typically does not have such ongoing operational responsibilities over transmission or markets).  Below is an illustrative, high-level map of the electric utility market regions of the lower 48 U.S. states.[9] *See infra*, Figure 1.

---

[9]  Generally speaking, as Figure 1 indicates, the regions of the country organized into regional market operators are located in the Northeast, Mid-Atlantic, Midwest/Great Plains, and California, while the regions where transmission planning is conducted by one or more utility compacts are in the Southeast, Southwest, and Northwest.  *See* Figure 1 (labeling so-called "RTO/ISO regions" by their system operator acronym and utility compact regions by geographic region), *available at* https://perma.cc/25HH-PQUU; FERC, *Order No. 1000 Transmission Planning Regions* (last updated Nov. 9, 2021) (more detailed map identifying each particular planning region), *available at* https://perma.cc/BTJ8-XTFS.



*Figure 1. See* note 9; FERC Energy Primer at 37. The acronyms reflect the regional market operators: California ISO (CAISO), Electric Reliability Council of Texas (ERCOT), ISO-New England (ISO-NE), Midcontinent ISO (MISO), New York ISO (NYISO), PJM Interconnection (PJM), and Southwest Power Pool (SPP). *See* Energy Primer at 67 *et seq.*[10]

With the intended projects of its member utilities in hand, the regional planning organization conducts a series of analyses to identify projected

---

[10] In addition to Alaska and Hawaii, whose electric grids are not interconnected to other U.S. states, the Texas intrastate grid, operated by the Electric Reliability Council of Texas (ERCOT), is likewise not subject to Commission jurisdiction under Sections 205 and 206 of the Federal Power Act. *See New York*, 535 U.S. at 6–8; FERC, *ERCOT* (last updated Jan. 27, 2025), *available at* https://perma.cc/C8S3-KDMF. Therefore, despite being in the lower 48 States, most of Texas is not subject to the transmission planning rules set forth in Order 1920.

future electric demand and expected generation resources in its region. The organization then models how those demands and resources will affect electricity flows over the existing electric grid in its region, looking for constraints or bottlenecks that will impede flows, and for system vulnerabilities like essential must-run generators or irreplaceable transmission lines that are needed to maintain overall system reliability. These models aim to detect: (1) future violations of reliability standards and (2) higher power prices that will likely occur, absent upgrades to and expansions of the grid. These concerns are generally known as "reliability needs" and "economic needs" for future transmission expansion. *See generally* JA16–19; JA153–156, JA196–200.

Having identified those "regional" needs, the planning organization turns to identifying potential solutions, i.e., transmission expansion projects that will increase grid capacity to ensure reliability and reasonable prices. The planning organization applies various economic and technical criteria to determine which solution (i.e., which combination of new or upgraded transmission facilities) presents the more efficient or cost-effective solution to a particular regional transmission need and should proceed forward. *See generally* JA154–156, JA196–200; Order 1000 P 11.

42

The end result of each process cycle is a "regional transmission plan" identifying which grid expansion projects will be pursued to meet future local and regional needs and—either at that time or later—which utility or developer is expected to develop which projects. Projects submitted at the outset of the process by individual utilities to meet local needs are typically "rolled up" into and listed in the region's plan with minimal further study (i.e., "included" in the plan but not "selected"). Projects identified by the planning organization itself through its Order 1000-compliant regional reliability, economic, and public policy-driven processes are considered "selected" in that plan and would thus have their costs regionally allocated (i.e., spread amongst the customers of more than one utility in the transmission planning region) pursuant to a specified cost allocation method. *See generally* JA634–635; Order 1000 PP 5, 11, 47, 63–66, 318–323.

Importantly, Order 1000 does not dictate selection or development of particular transmission facilities or otherwise exempt them from applicable state or local siting or construction requirements. *See* Order 1000 PP 12, 66, 331; JA1989–1990 (same). The selection of a project and its assignment to a particular utility or developer instead means that *if* that entity is able to

43

build that project and put it into service for the region's use, the entity may then use the associated regional cost allocation method in the planning organization's tariff to recover project costs from the region's customers. *See* Order 1000 PP 331–332 (discussing "eligibility … to use a regional cost allocation method"); JA421–422 (discussing "access to … the regional cost allocation method(s)"). Thus, as Order 1920-A explained, Commission requirements in this area are only about "transmission planning *processes*"—not the merits of specific projects—and do not "force or mandate the development of certain transmission facilities." JA1989.

The projects themselves vary significantly in scope and cost, ranging from replacements of substation equipment that may cost thousands or millions of dollars, to rebuilding old transmission lines or building new high-voltage lines at a capital cost of tens (or even hundreds) of millions of dollars. *See*, *e.g.*, PJM 2024 Regional Transmission Expansion Plan at pp.268, 271–273 (at Virginia Map ID Nos. 39, 40, 49, 66), *available at* https://perma.cc/7QBF-CDU6; California ISO 2024-2025 Transmission Plan at 9–13. Collectively, a single regional transmission plan may include and select project plans that—if built—could eventually cost billions of dollars to fully implement.

44

## IV.   FERC's Order 1920 rulemaking

### A.     FERC responds to widespread concerns about short-sighted transmission planning and takes public comment

Approximately 10 years after issuing Order 1000, in July 2021, the Commission determined that it needed to review its regulations governing regional transmission planning and cost allocation. *See* JA635–636 (citing JA6–7). Experience showed that transmission development was proceeding too often in piecemeal fashion, rather than proceeding according to a comprehensive and forward-looking approach. JA649; JA8–10, JA28, JA31. In particular, FERC was concerned that the combined effect of new trends in the industry and gaps in existing processes were undermining transmission development, thus rendering transmission rates unjust and unreasonable under the Act—a problem FERC anticipated would only grow over time. *See* JA6–10, JA28–37.

The Commission therefore opened a rulemaking proceeding by issuing an advance notice of proposed rulemaking and inviting public comment. JA6–10. In response, 175 parties from across the industry, government, and non-profit sectors filed initial comments totaling over 4,000 pages (without attachments), leading to 95 reply comments totaling nearly 2,000 pages. JA160–161. In addition, FERC convened a technical conference on regional

transmission planning issues in November 2021 and established a Joint Federal-State Task Force on Electric Transmission with state regulators which met eight times during the rulemaking process.  JA636–640.

Armed with a bevy of public comments, the Commission in April 2022 proceeded with a notice of proposed rulemaking identifying particular rule change proposals aiming to improve transmission planning and cost allocation.  FERC found that, although Order 1000 was an important first step towards improved transmission planning, significant expansion of the transmission grid was occurring through specific interconnection-related network upgrades, or in "incremental," "piecemeal, one-off" fashion.  JA162–163, JA171–172.  Despite a dramatic increase in the cost of interconnection-related network upgrades (which signals a need for efficient transmission system expansion), the vast majority of investment in transmission facilities was occurring locally within individual utility service territories.  *See* JA172–177, JA178.  In fact, in some regions, investment in regional transmission facilities that connect multiple utilities had actually *declined* since Order 1000, contrary to expectations.  JA175–178.  Further, at the time of the proposal's issuance, "across all the non-[regional market operator] regions, there ha[d] not yet been a single transmission facility selected in a regional

46

transmission plan for purposes of cost allocation since implementation of Order No. 1000." JA176. Even where some regional needs were being met by some planning organizations' processes, as much as two-thirds to four-fifths of investment was concentrated in "resolving local needs" rather than regional ones. JA176–177 (discussing Mid-Atlantic and Midwest figures, respectively).

All this meant that transmission customers were likely "paying more than necessary to meet their transmission needs, … forgoing benefits that outweigh their costs, or some combination thereof—either or both of which could potentially render Commission-jurisdictional rates unjust and unreasonable or unduly discriminatory or preferential" under the Act. JA162, JA178–179.

To address these inadequacies, FERC proposed a set of reforms that would require each transmission provider to participate in a Long-Term Regional Transmission Planning process (hereafter termed a long-term process) looking 20 years or more into the future. JA147–148, JA163, JA207–208. This process would largely operate in addition to, rather than instead of, "existing reliability and economic planning requirements." JA148.

47

**B.    After compiling the most expansive record in agency history, FERC reforms transmission planning and cost allocation rules in Order 1920**

In response to the April 2022 proposal, 196 parties representing many different interests filed initial comments totaling over 15,000 pages with attachments, followed by 92 reply comments totaling nearly 1,900 pages. JA645.  On the basis of that unprecedented record—"the largest record ever considered by the Commission"[11]—FERC developed a final rule, Order 1920, in May 2024 (the Rule).  JA624.  A brief summary of the Rule's relevant findings and reforms, as adjusted in some respects on agency rehearing, follows.

**1.    Transmission providers' lack of forward-looking analysis undermines just and reasonable rates**

Invoking its Federal Power Act Section 206 authority and obligation to remedy unlawful rates, FERC began by determining that existing transmission planning practices were unjust and unreasonable due to their overly narrow focus.  JA624–626, JA1985–1987(same on rehearing); *see* *supra* pp.17–18 (detailing statutory framework).  Specifically, FERC determined that transmission providers' failure to perform sufficiently long-

---

[11] *See* FERC, *Staff Presentation* (May 13, 2024), *available at* https://perma.cc/264Q-P6DW.

48

term assessments of transmission needs, and to consider the benefits of certain transmission solutions over others, meant that consumers were saddled with unreasonably high costs that were not even guaranteeing a reliable grid. JA624–626, JA679–680, JA689–692, JA1990. FERC thus determined that the *status quo ante* was falling short of meeting the Federal Power Act's "core objects" of "protect[ing] against excessive prices and ensur[ing] effective transmission of electric power." *FERC v. Elec. Power Supply Ass'n*, 577 U.S. at 290 (cleaned up).

### 2. Order 1920 requires an additional long-term process that plans for future transmission needs

Having made the requisite Section 206 step one determination that then-existing rules and practices were unjust and unreasonable, FERC proceeded to step two by "fix[ing]"—i.e., setting—a replacement "just and reasonable" remedy. *See Emera Me.*, 854 F.3d at 23–24; 16 U.S.C. § 824e(a). To that end, FERC retained the Order 1000 framework—and its near-term reliability and economic transmission planning requirements—but

49

implemented reforms that supplemented those nearsighted existing processes.[12]  *See* JA816–817, JA1991–1993, JA2007, JA2093–2094.

**Long-term transmission planning.**  In addressing the overly short-term nature of existing processes, the Rule requires transmission providers to take a more comprehensive and forward-looking approach to identifying future transmission needs and evaluating potential solutions.  *See* JA1986–1987.  Specifically, the Rule required transmission providers to plan out at least 20 years to identify long-term needs and the facilities needed to meet them, and to conduct this long-term process at least once every five years.  JA1987–1988.

*First*, transmission providers must develop at least three future scenarios of likely transmission needs within their regions.  JA1029–1030.  Providers develop these scenarios based on their analyses of at least seven categories of factors that FERC found are likely to drive long-term transmission needs.  JA626–627, JA916–918, JA929–930, JA995, JA1001.  These categories are:

---

[12] While not published in the Code of Federal Regulations, the updated processes ordered by the Rule were codified into Attachment K of the Commission's *pro forma* open-access transmission tariff as indicated in the orders.  *See* Order 1920 pp. 1256–1269 (Appendix B); Order 1920-A pp.792–807 (Appendix B), Addendum at A-122–A-151.

(1) federal, federally-recognized Tribal, state, and local laws and regulations affecting the resource mix and demand;

(2) federal, federally-recognized Tribal, state, and local laws and regulations on decarbonization and electrification;

(3) state-approved integrated resource plans and expected supply obligations for load-serving entities;

(4) trends in fuel costs and in the cost, performance, and availability of generation, electric storage resources, and technologies that allow buildings and vehicles to operate on electricity rather than other fuels (e.g., natural gas);

(5) resource retirements;

(6) generator interconnection requests and withdrawals; and

(7) utility ... commitments and federal, federally-recognized Tribal, state, and local policy goals that affect Long-Term Transmission Needs.

JA929–930, JA961–962, *as modified by* JA2251–2252 (eliminating from category number seven an assessment of corporate commitments, but clarifying that such commitments must still be accounted for to the extent they "affect transmission customers' transmission needs").

Even so, transmission providers have substantial flexibility in applying these seven categories and will specify how they plan to do so in the Rule's compliance process.  For example, they may determine, in any given case, that a particular factor is not likely to affect long-term transmission needs.

JA2115–2116.  They also have discretion in deciding *how* to account for these factors in developing long-term scenarios, and how to vary their treatment across those scenarios.  JA2116 (citing JA935–936).

Moreover, the categories of factors are resource-neutral.  Similar to Order 1000's requirement that transmission providers consider different states' public policies, the Rule requires providers to decide how to take into account, for example, different states' policies promoting different types of generation (e.g., nuclear, natural gas, solar, or wind).  *See* JA2247–2248.  To the extent that utilities conclude that transmission is needed to transport certain types of state-supported generation to load (consumers), that is a utility decision that may "meet the needs of states and provide reliability and economic value."  *See* JA2247–2251.  The Rule, however, does not "endorse the merits of any laws or regulations or of any specific-state approved integrated resource plans."  JA2247.

*Second*, in evaluating long-term transmission solutions, the Rule requires transmission providers to assess proposed long-term facilities against a set of seven categories of reliability and economic benefits associated with transmission expansion.  JA2308–2309, JA2326–2327.  Specifically, transmission providers must consider whether the facility will:

52

(1) avoid or defer the need to replace aging infrastructure or develop facilities needed for reliability;

(2) reduce the frequency of power outages ("loss of load probability") or reduce capital costs of generation that is needed to meet planning reserve margins;

(3) reduce the costs of fuel (e.g., coal or natural gas) and other operating costs of generation by facilitating the transport of lower-cost generation to serve demand ("production cost savings");

(4) reduce energy losses that occur during the transmission of power;

(5) reduce production costs by avoiding grid congestion that occurs during transmission outages;

(6) reduce production costs during extreme weather events and unexpected system conditions (e.g., fuel shortages or multiple or sustained transmission outages); and

(7) reduce the need to build new power plants to meet peak electric demand, for example, on very hot days.

*See* JA2308–2309; *see also* JA299–301; FERC Office of Public Participation, *Explainer: Transmission Planning and Cost Allocation Final Rule* at 6–7 (May 2025), *available at* https://perma.cc/BGX9-VGMZ.

The long-term facility selection process mirrors the Order 1000 approach in fundamental ways. For example, neither rulemaking requires transmission providers to select any particular transmission facility proposal. JA2385–2386 (No Selection Requirement); *see also* JA826–828

53

(explaining that the Rule does not change otherwise applicable processes for transmission siting, retail rate recovery, or state-regulated integrated resource planning).  Indeed, in implementing a new long-term planning process, transmission providers are not required to dramatically change their existing reliability, economic, and public-policy-focused processes— and so the new long-term process functions more as an add-on to existing procedures than as a substitute for them.  *See*, *e.g.*, JA2002–2004 (differentiating between "Long-Term" reforms and those to "existing Order No. 1000" processes);  JA2185–2186 (explaining that transmission providers may propose "to continue using some or all aspects of [their] existing Order No. 1000" process as well as comply with new long-term planning requirements).  The Rule also provides that transmission providers are to reevaluate already-selected long-term facilities in certain circumstances, to ensure they remain efficient, cost-effective solutions.  JA2388–2392, JA2407–2411.

**Cost allocation**.  The Rule similarly tracks Order 1000's approach to cost allocation in a key way: Both rules require transmission providers to propose a default, *ex ante* method or methods for determining which

customers will pay for a selected long-term facility. JA1524, JA1994–1995, JA2002–2004.

But the Rule on review gives states a "robust role" in the cost allocation process. JA1987. As part of the compliance process, a transmission provider must undertake a six-month engagement period with Relevant State Entities[13] for voluntary development of possible cost allocation methods that are agreed-to by affected states. JA1530, JA1563, JA1566–1567. These entities include state regulatory agencies like public utility commissions.

Given the "unique role" of the states in regulating generation, retail rates, and transmission siting, *see* JA2829, JA2888–2889, on agency rehearing, FERC provided that the compliance consultation with Relevant State Entities would culminate in an informational filing requirement: Transmission providers must include in their Order 1920, Federal Power Act Section 206 compliance filings facts regarding any *ex ante* cost allocation method or (potentially *ex post*) voluntary cost allocation process (referred to as a State Agreement Process) agreed to by Relevant State Entities, even if the transmission provider chooses not to specifically propose that method or

---

[13] A Relevant State Entity means any state entity responsible for electric utility regulation or siting electric transmission facilities within a state's borders. JA2002.

process as its preferred compliance option. JA1996–1997, JA2003–2004, JA2513–2515, JA2532–2533; *see infra* p.188–190.[14]

Importantly, Section 206 directs "*the Commission*" to "fix" a new "just and reasonable rate" "to be thereafter observed." 16 U.S.C. § 824e(a) (emphasis added). Thus, the Rule contemplates that FERC may choose the cost allocation method proposed by a transmission provider, or by Relevant State Entities (if it differs), or FERC may choose a different method altogether—so long as the end result complies with the Rule and the Act's cost causation principle. *See* JA2522–2523, JA2539–2541, JA2576–2577, JA2845–2846, JA2848–2849; § 824e(a). Even so, notwithstanding the Rule's Section 206 compliance process, transmission providers may, of course, exercise their filing rights under Federal Power Act Section 205 to propose to change the initial, FERC-chosen cost allocation method. *See* JA2827–2828, JA2854–2855, JA2857–2858, JA2927–2928.

Beyond immediate compliance, the Rule highlights the importance of state regulatory judgments on cost allocation in other ways. Transmission

---

[14] A State Agreement Process means a process by which one or more Relevant State Entities may voluntarily agree to a cost allocation method before (or no later than six months after) a long-term facility or portfolio of facilities is selected by a transmission provider. JA2003.

56

providers may codify a State Agreement Process in their tariffs, the results of which—assuming FERC approval is obtained—could apply in lieu of the default, *ex ante* method.  JA1594–1597, JA1994.  Transmission providers must consider state input on future scenario planning (which necessarily reflects expected state policy implementation), and may need to produce analyses that identify the incremental costs and benefits of long-term facilities required to achieve particular state policies or regulations.  JA1996–1997, JA1997–1998, JA2205–2207, JA2227–2228, JA2231–2233, JA2305–2307.

Further, rather than require subsequent or successive engagement periods at recurring intervals, the Rule requires transmission providers to consult with Relevant State Entities before either group seeks to amend the long-term regional cost allocation methods on file with the Commission.  JA1997, JA2566–2567; *see also* JA2915–2917; *infra* pp.206–207 (referring to the "consultation requirement").  Should transmission providers decline to propose any cost allocation methods sought by Relevant State Entities, they must explain why not on a publicly-accessible website.  JA2566–2567.  (With these changes on agency rehearing, intended to better accommodate state perspectives, the one Commissioner who dissented from Order 1920

57

concurred in Order 1920-A's enhancement of the states' role in cost allocation. *See* JA2788–2791 (concurring statement of Commissioner Christie).)

**Transparency and right-sizing**. The Commission also sought to address related problems that incentivize localized or piecemeal transmission solutions. These included a lack of transparency regarding the criteria, assumptions, data, and models that individual utilities use in developing local transmission solutions that are typically "rolled up" into the wider-scale regional plans. JA635, JA1749–1752. Responding to this problem, the Rule mandates increased transparency for affected stakeholders, including data disclosures and required stakeholder meetings. *See* JA1749–1752.

FERC also sought to ensure that full replacements of old facilities—so called "in-kind replacement[s]," which occur outside of regional transmission planning processes—are at least disclosed to the regional planning organization, thus enabling the regional planning organization to decide whether to "right-size" or expand those solutions as part of long-term planning (thus meeting multiple transmission needs at once). JA1784–1794. Relatedly, FERC sought to resolve potential uncertainty about right-sizing

project assignments to utilities and developers (and resulting inefficiencies) by providing that incumbent utilities who submit in-kind replacement estimates under the Rule will have the opportunity to be assigned development responsibility for any resulting facilities selected for right-sizing. JA1801–1807.

After Order 1920-B resolved all remaining requests for agency rehearing, these petitions for review followed and were consolidated in this Court.

## SUMMARY OF ARGUMENT

The Commission issued the Order 1920 rulemaking (the Rule) to correct an urgent, pervasive, and growing problem. Based on substantial record evidence—supported by more than 30,000 pages of public comments—FERC found that existing transmission processes were failing to produce new transmission infrastructure to meet long-term transmission needs in a cost-effective manner. The upshot was an aging electric grid that transmission providers have updated in a piecemeal, siloed fashion, resulting in inefficient and costly transmission investments and rates that fail to meet the Federal Power Act's "just and reasonable" standard.

59

The Commission deemed the situation particularly intolerable given emerging and substantial stressors on the grid—for example, extreme weather events and burgeoning new sources of electric demand such as data centers.  Accordingly, FERC issued the Rule to better guide industry in efficiently and cost-effectively meeting current and future needs of the Nation's electric system.  In so doing, FERC exercised the same (judicially upheld) authority it has used on several prior occasions to issue national-in-scope transmission planning rules: the authority to regulate interstate electric transmission and practices that directly affect rates for such transmission.

Dozens of entities challenge the Rule.  None of their claims have merit.

(**1**).[15] A consortium of aligned States dispute FERC's authority to issue the Rule.  They begin with a statutory argument, claiming that the Rule infringes states' powers under the Federal Power Act to regulate electric generation.  The States reason that because the Rule requires transmission providers to consider states' public policies *regarding* generation (e.g., promoting natural gas or zero-emitting- power production), the Rule, in

---

[15] These numbers in the Summary of Argument correspond to the designated issue numbers in the Statement of Issues, *supra* pp.7–9.

60

their words, "effectively" regulates generation. This argument fails, however, because the Rule steers clear of regulating *any* state's generation decisions; it prescribes policies that govern only interstate transmission. That the Rule accounts for, or might even impact, state generation policies does not divest FERC of its exclusive authority over interstate transmission and practices that directly affect rates for such transmission. Put another way, that FERC's actions taken within its jurisdictional field might affect matters within the states' own is of no legal consequence.

(**2**) Notwithstanding that FERC acted consistent with its statutorily-conferred powers, the States contend that, given its national scope and impact, the Rule runs afoul of the major questions doctrine. But that doctrine does not apply where, as here, Congress plainly conferred the asserted authority. In fact, the Supreme Court has repeatedly recognized the Federal Power Act's conferral of unambiguously broad powers to FERC to regulate interstate transmission and rules and practices affecting wholesale rates. FERC exercised those exact powers here—just as it has done for decades through rulemakings that were upheld on judicial review.

(**3**) No matter, the States continue, because Congress could not have granted FERC the asserted power to issue the Rule even if it wanted to.

61

They claim the Rule betrays an unconstitutional delegation of Congress' legislative authority to FERC, thus revealing Congress' violation of the non-delegation doctrine. But just last year the Supreme Court confirmed the constitutionality of Congress' delegation to agencies such as FERC to exercise authority to ensure "just and reasonable" rates—exactly what FERC set out to accomplish in enacting the Rule.

(**4**) Veering further off course, the States contend that the Rule violates the Constitution's equal sovereignty doctrine because, in their view, the Rule might benefit some states over others, depending on a particular state's generation preferences. But the equal sovereignty doctrine has no relevance where, as here, a federal agency merely requires regulated entities to account for different states' policies in implementing a generic rulemaking.

(**5**) Three sets of Petitioners—Consumers, Transmission Owners, and the States—challenge FERC's determination that existing transmission practices are unjust and unreasonable (and thus in violation of the Federal Power Act). But substantial evidence supports FERC's finding that the *status quo ante* failed to produce robust transmission planning, did not adequately account for cost savings and other benefits associated with regional transmission facilities that meet long-term transmission needs, and

62

fell short of allocating costs for new transmission facilities in an efficient and cost-effective way.

The States in particular also contest FERC's authority to proceed via generally applicable rulemaking. They argue FERC was instead limited to altering the particular transmission practices of every transmission provider across the country on a case-by-case basis. But it is well established that FERC may exercise its Federal Power Act Section 206 authority either through case-by-case adjudication *or* generic rulemaking. Here, FERC reasonably chose the latter option.

(**6**) The States, Public Interest Organizations, and Consumers also challenge FERC's fixing of a replacement "rate"—i.e., the Rule on review.

**a.** For their part, the States argue that the Rule is unlawfully discriminatory because, they contend, it subsidizes certain states' generation policies at the expense of other states' policies. But the Rule's transmission planning provisions—which require only that transmission providers *consider* how states' policies might affect transmission needs—include no subsidies at all. Nor do they otherwise preference some states' generation choices; the Rule is resource neutral.

The States similarly make no headway asserting that the seven categories of benefits that transmission providers must consider lack the requisite clarity. As a first matter, the States failed to press this objection in their rehearing application to FERC; it is thus jurisdictionally forfeited. In any event, the Commission provided the requisite guidance in establishing the benefits metrics.

Contrary to still more of the States' assertions, the Rule also reasonably allows transmission providers to consider the combined benefits of multiple transmission facilities (called the portfolio approach to facility selection), and to establish a 20-year transmission planning horizon. These determinations fall well within FERC's ratemaking discretion and expert understanding, and are anchored in substantial record evidence.

Finally, the States are wrong as a matter of law that individual states have a right to implement their preferred approaches to allocating costs for new interstate transmission facilities. The Federal Power Act commits wholesale cost allocation to FERC, not the states.

**b.** Contesting the Rule from the other direction, Consumers and the Organizations complain that FERC did not go further and impose more stringent regulations. But their various rebukes amount to a wish list of

*their* favored policies that do not defeat the Commission's reasonable contrary determinations. For example, the Organizations fail to show that requiring transmission providers to engage in long-term planning every five years, rather than their preferred three-year interval, is unreasonable. So too with the Organizations' demand that FERC require transmission providers to consider additional benefits metrics in the transmission facility selection process—a policy option that FERC rejected because, among other things, it could result in double-counting.

The Organizations similarly gain no traction demanding that FERC include a particular emerging technology—energy storage—as an alternative to transmission facilities in transmission providers' long-term planning. FERC reasonably found that, unlike other alternatives to transmission facilities that *are* covered by the Rule, energy storage technologies do not necessarily provide a transmission-supporting function.

The Commission also reasonably declined to add to the seven long-term planning factors used to measure transmission *need* (e.g., generator retirements) an eighth factor that better gauges whether a particular facility—here, merchant high-voltage transmission lines—can *meet* such need. Further, these types of transmission lines are already

65

covered under the long-term planning factor that requires consideration of grid interconnection requests.

**c.** For their part, Consumers contend that the Rule unreasonably overhauls the cost allocation policy—which FERC separately affirmed in 2023—for infrastructure upgrades that are needed to interconnect generators to the grid. But the Rule does no such thing; Consumers' contention is untethered to the facts.

Nor are Consumers correct that the Rule violates Federal Power Act Section 217(b)(4), which Congress enacted in 2005 to promote transmission planning to benefit consumers. FERC reasonably found that the Rule fulfills this congressional charge and, in any event, the D.C. Circuit in *South Carolina* already rejected Consumers' contrary claim.

FERC also acted reasonably in declining Consumers' demand that transmission providers reevaluate the merits of selected transmission facilities under more scenarios than set forth in the Rule. The Commission reasonably settled on three scenarios in which selected facilities must be reassessed—an accommodation that FERC found balances consumer and investor interests.

66

Finally, the Commission reasonably declined to define the term Relevant State Entity to include non-state actors like electric cooperatives. FERC recognized that bona fide state entities in particular play an integral role in transmission development—e.g., through states' authority to site and permit transmission infrastructure—that sets them apart from other entities that might share some state functions (e.g., setting retail rates). Thus, FERC reasonably vested only Relevant State Entities with particular prerogatives in the cost allocation process, in the hope that state buy-in on cost considerations might motivate state siting and permitting approvals.

(**7**) Part of notice-and-comment rulemaking under the Administrative Procedure Act is ensuring that the public has a reasonable opportunity to offer input on a proposal before it is finalized. The touchstone of whether a final rule reflects such opportunity, and thus constitutes a logical outgrowth of the proposal, is whether the proposal provided fair notice of the final version's scope and contours. The States complain that the final Rule (i.e., Orders 1920, 1920-A, and 1920-B) differs from FERC's earlier proposal in several ways. But they do not even attempt to show that any of these changes violate the logical outgrowth doctrine. Such a claim would fail in

67

any event because all the States' targeted changes were reasonably foreseeable based on FERC's proposal.

(**8**) Transmission Owners attack the Rule from still more angles, lodging both statutory and constitutional objections.

**a.** Asserting that FERC exceeded its statutory authority, Transmission Owners challenge two narrow aspects of the Commission's replacement "rate" that are designed to ensure state participation in determining the cost allocation approach most suitable for each transmission planning region: (1) the requirement that transmission providers transmit information to the Commission concerning state-developed cost allocation methods in compliance filings (in Transmission Owners' brief, the "inclusion requirement"), and (2) the requirement that transmission providers consult with relevant states prior to requesting a change to a cost allocation method accepted by FERC in compliance with Order 1920 (the "consultation requirement").

Contrary to Transmission Owners' contentions, these requirements are consistent with FERC's Federal Power Act Section 206 authority, and do not violate either Transmission Owners' Section 205 filing rights or their First Amendment rights. The inclusion requirement, added in Order 1920-A,

68

merely requires transmission providers to convey to the Commission (as an attachment to their compliance filing, or in the filing itself) any cost allocation method and/or state agreement process agreed to by Relevant State Entities during the engagement period, even if contrary to a transmission provider's preferred approach. Similarly, the consultation requirement requires only that transmission providers meet and confer with Relevant State Entities prior to formally filing to change a cost allocation method previously accepted by the Commission as just and reasonable on compliance with Order 1920.

Transmission Owners' statutory arguments rest on a misapprehension of FERC's Federal Power Act authority and an outsized view of their Section 205 filing rights. The Commission has an independent responsibility to ensure that cost allocation methods adopted under the Rule are, as the Act requires, just and reasonable and not unduly discriminatory or preferential. No support exists for Transmission Owners' proposition that FERC is confined to passively reviewing transmission provider cost allocation proposals when determining a just and reasonable replacement rate under Federal Power Act Section 206.

69

**b.** Transmission Owners' contention that the inclusion and consultation requirements somehow violate their First Amendment rights is also meritless. The inclusion and consultation requirements are grounded in FERC's Federal Power Act authority and reflect procedures applicable to regulatory filings that do not implicate First Amendment concerns at all. The requirements at issue fall under the same category as numerous other FERC disclosure and reporting requirements in areas regulated by the Commission.  To the extent they implicate speech protected by the First Amendment, they meet the standards for reasonable disclosure requirements in connection with commercial speech.  Even assuming that the requirements trigger strict scrutiny review, they would easily pass muster as a narrowly tailored means of serving the Commission's compelling statutory interest in ensuring just and reasonable rates in the public interest.

(**9**) Finally, with the exception of the Organizations, Petitioners challenge some aspects of the Rule's transparency and right-sizing reforms. These reforms were designed to ensure more productive interactions between transmission providers' local planning activities and the broader regional process, including giving customers and regional planning organizations more and better information.  While Customers, the States,

70

and Transmission Owners challenge certain line-drawing decisions about the scope and timing of these reforms, they fail to show that the Commission's judgment was unreasonable.

Competition Petitioners, meanwhile, challenge the competition policy adopted as part of the Rule's right-sizing reforms. But their various statutory and administrative procedure claims are at odds with the court's determinations in *South Carolina* (affirming Order 1000) regarding federal rights of first refusal and the history and goals of this area of transmission planning policy. The Commission can reasonably adjust the rules regarding which transmission projects are open to competition between developers and do so consistent with Order 1000's goals. FERC reasonably did so here in adopting a new reform for a particular kind of transmission expansion project.

## ARGUMENT

### I.    Standard of review

Courts review Commission orders under the Administrative Procedure Act's narrow arbitrary-and-capricious standard. *See FERC v. Elec. Power Supply Ass'n*, 577 U.S. at 275, 292 (citing, in part, 5 U.S.C. § 706(2)(A)). Under that standard, the question is not "whether a

71

regulatory decision is the best one possible or even whether it is better than the alternatives." *Id.* at 292. The "court asks ... only whether the agency action was reasonable and reasonably explained." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168, 180 (2025).

Thus, "[d]eference is due where the agency has examined the relevant data and provided an explanation of its decision that includes a rational connection between the facts found and the choice made." *PACEM Sols. Int'l, LLC v. U.S. Small Bus. Admin.*, 148 F.4th 258, 263 (4th Cir. 2025) (cleaned up). That includes when an agency uses its "predictive judgment" regarding matters assigned to it by statute. *FCC v. Prometheus Radio Project*, 592 U.S. 414, 422–423, 427 (2021).

As a general matter, FERC's electric rate decisions are afforded "great deference." *FERC v. Elec. Power Supply Ass'n*, 577 U.S. at 292 (cleaned up). That is at least in part because "(s)tatutory reasonableness"—the operative standard here, *see* 16 U.S.C. §§ 824d(a), 824e(a)—"is an abstract quality represented by an area rather than a pinpoint." *Consol. Gas Supply Corp. v. FERC*, 653 F.2d 129, 134 (4th Cir. 1981) (addressing similar provisions of the Natural Gas Act while quoting Supreme Court's discussion of Federal Power Act Section 205(a) in *Montana-Dakota Utils. Co. v. Nw. Pub. Serv. Co.*, 341

72

U.S. 246, 251 (1951)).[16]  "The statutory requirement that rates be 'just and reasonable' is obviously incapable of precise judicial definition," and so reviewing courts "afford great deference to the Commission in its rate decisions," which are not "bound to any one ratemaking formula." *Morgan Stanley*, 554 U.S. at 532.

Similarly, the Federal Power Act provides that on review, the "finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive." 16 U.S.C. § 825*l*(b).  This means that to the extent substantial evidence may support several possible conclusions, "it is the agency's choice that governs." *La. Pub. Serv. Comm'n v. FERC*, 522 F.3d 378, 395 (D.C. Cir. 2008); *see also Diaz-Hernandez v. Garland*, 104 F.4th 465, 472 (4th Cir. 2024) (even where "the record plausibly could support two results—the one the agency chose and the one the petitioner advances—we must defer to the agency").  All the Commission must do is identify "more than a mere scintilla" of evidence supporting its conclusion.  *Biestek v. Berryhill*, 587 U.S.

---

[16] Because it is well-established that "the relevant provisions of the [Federal Power Act and Natural Gas Act] are analogous," the Supreme Court "has routinely relied on [Natural Gas Act] cases in determining the scope of the [Federal Power Act], and vice versa." *Hughes*, 578 U.S. at 164 n.10.

73

97, 103 (2019); *see also id.* ("[W]hatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high.").

Deference does not extend, of course, to the agency's statutory interpretations. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394–395, 413 (2024). But where a statutory "term or phrase" "leaves agencies with flexibility"—or where Congress asks agencies to "fill up the details of a statutory scheme"—the Court's review focuses on whether "the agency has engaged in reasoned decisionmaking within those boundaries." *Id.* at 395 (cleaned up); *see also id.* at 395 (statutory terms "such as 'appropriate' or 'reasonable'" provide "flexibility"). And here, the responsibility "[t]o reduce the abstract concept of reasonableness to concrete expression ... is the function of the Commission." *Montana-Dakota Utils.*, 341 U.S. at 251; *see also Bridgeport Hosp. v. Becerra*, 108 F.4th 882, 884 (D.C. Cir. 2024) ("Parts of the United States Code are notoriously short on details. .... What can FERC allow companies to charge for electricity transmission? Rates that are 'just and reasonable.' 16 U.S.C. § 824d(a).").

## II. The Rule reflects a lawful exercise of Congress' constitutionally delegated powers to FERC

Petitioner States challenge FERC's statutory and constitutional authority to enact the Rule on several grounds. *First*, they argue that the

Rule regulates generation resources, which falls on the states' side of the Federal Power Act's jurisdictional line. *Second*, because the Rule has national impacts, they argue that it runs afoul of the major questions doctrine absent clear congressional authorization for FERC's regulatory action, which they assert is absent. *Third*, they argue that Congress lacks the authority to vest FERC with the power to enact the Rule even *if* Congress provided clear authorization. And *fourth*, the States espy a violation of the equal sovereignty doctrine.

All these claims fail. They are based on a misunderstanding of the Federal Power Act's cooperative federalism framework, misstatements about the Rule's contents, misapprehensions concerning Congress' delegation to FERC, and misconstructions of constitutional principles. This is not a close call. Decades of binding case law squarely foreclose the States' assorted claims.

## A.  The Order 1920 rulemaking reflects an exercise of FERC's core Federal Power Act authority and responsibility to regulate interstate transmission

1.  In enacting the Federal Power Act, Congress "charged the Federal Power Commission (FPC), the predecessor of FERC, 'to provide effective federal regulation of the expanding business of transmitting and selling

electric power in interstate commerce.'" *New York*, 535 U.S. at 6 (quoting *Gulf States Util. Co. v. FPC*, 411 U.S. 747, 758 (1973)). To that end, Section 201(b)(1) of the Act endows FERC with "broad[]" powers over "'the transmission of electric energy in interstate commerce' and 'the sale of electric energy at wholesale in interstate commerce.'" *See New York*, 535 U.S. at 6–7, 15–17 (quoting 16 U.S.C. § 824(b)(1)); JA2119–2120. And the Act obliges FERC to effectuate these jurisdictional grants to ensure that "any rate [or] charge ... for any [interstate] transmission or [interstate] wholesale] sale"—as well as "'any rule, regulation, practice, or contract affecting [such] rate or charge'"—is "'just and reasonable.'" *FERC v. Elec. Power Supply Ass'n*, 577 U.S. at 266, 277 (quoting Section 206(a), § 824e(a)) (cleaned up); § 824e(a). FERC must remedy the above items if they are unjust, unreasonable, or unduly discriminatory or preferential, by "'determin[ing] the just and reasonable rate, charge, rule, regulation, practice or contract' and impose 'the same by order.'" *FERC v. Elec. Power Supply Ass'n*, 577 U.S. at 277 (quoting § 824e(a)) (cleaned up).

To be sure, because "[i]n an interrelated economy almost everything affects everything else," *McMunn v. Hertz Equip. Rental Corp.*, 791 F.2d 88, 92 (7th Cir. 1986), taking FERC's "affecting" jurisdiction to its literal limit

76

"could extend FERC's power to some surprising places," *FERC v. Elec. Power Supply Ass'n*, 577 U.S. at 277. Thus, the Supreme Court has disciplined Congress' jurisdictional grant with "a common-sense construction of the [Federal Power Act's] language, limiting FERC's 'affecting' jurisdiction to rules or practices that '*directly* affect the wholesale rate'" (relevant to wholesale sales), or that directly affect the rate (wholesale or retail) for interstate transmission. *See id.* at 278 (quoting *Cal. Indep. Sys. Operator Corp. v. FERC*, 372 F.3d 395, 403 (D.C. Cir. 2004)); *New York*, 535 U.S. at 17 (explaining that Federal Power Act Section 201(b)(1) confers upon FERC jurisdiction over *all* interstate transmission, both wholesale and retail).

2. The Federal Power Act also reserves certain powers to the states. "Section [201](b)(1) preserve[s] States' jurisdiction in three categories: (1) within-state wholesale sales (i.e., sales for resale), (2) retail sales of electricity (i.e., sales directly to end users), and (3) facilities used in local distribution, electric generation, only for the transmission of electric energy in intrastate commerce, or for the transmission of electric energy consumed wholly by the transmitter." *Nat'l Ass'n of Regul. Util. Comm'rs v. FERC*, 964 F.3d 1177, 1186 n.5 (D.C. Cir. 2020). It is also generally understood that states retain their traditional physical siting and permitting authority over

77

even interstate transmission lines.  *See Ill. Com. Comm'n v. FERC*, 721 F.3d 764, 773 (7th Cir. 2013); *Piedmont*, 558 F.3d at 310.

Even so, Congress qualified state powers in favor of the Commission's own.  For example, "State authority over that third category [above] is limited when the Act 'specifically provide[s]' otherwise" in, for example, Section 206.  *Nat'l Ass'n*, 964 F.3d at 1186 n.5 (quoting § 824(b)(1)).  Thus, the Commission "may exercise jurisdiction over generation facilities to the extent necessary to regulate interstate transmission," *NextEra*, 118 F.4th at 369 (cleaned up), or to otherwise "ensure that rules or practices 'affecting' [FERC-jurisdictional] rates are just and reasonable," *FERC v. Elec. Power Supply Ass'n*, 577 U.S. at 277 (citing 16 U.S.C. §§824(b)(1), 824e(a)); *Nat'l Ass'n*, 964 F.3d at 1186 n.5; *La. Pub. Serv. Comm'n*, 522 F.3d at 390.

Relatedly, FERC actions properly aimed at its field of jurisdiction are lawful notwithstanding effects on states' areas of reserved powers.  *FERC v. Elec. Power Supply Ass'n*, 577 U.S. at 281–282.  "It is a fact of economic life" that because the federal and state zones of authority "are not hermetically sealed from each other," FERC actions targeting interstate electric transmission and wholesale sales will affect state-regulated electric generation and retail sales, and vice versa.  *Id.*  Such federal effects on states'

78

zone of reserved powers are "of no legal consequence." *Id.* at 281. *Cf. Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 385 (2015) (deciding if a state law is preempted, notwithstanding its impacts on FERC's zone of jurisdiction, requires "considering the *target* at which the state law *aims*"—i.e., whether the state law aims to regulate a matter on the states' side of the jurisdictional line (permitted), or rather aims to regulate federal matters through ostensibly state-jurisdictional means (preempted)).

3. The scope of the Commission's powers under Section 201(b)(1) and Section 206(a) is plain. The Supreme Court has held that the Federal Power Act's vesting in FERC the authority and obligation to regulate "the transmission of electric energy in interstate commerce," § 824(b)(1), is "clear" and "unambiguous[]," *New York*, 535 U.S. at 17, 19; *accord id.* at 22 ("[T]he [Federal Power Act] contains … a clear and specific grant of jurisdiction to FERC over interstate transmissions[.]" (cleaned up)); JA2145–2146. And the Court has similarly deemed FERC's power over "any rule, regulation, practice, or contract affecting [FERC-jurisdictional] rate[s]," § 824e(a), to be "clear," *FERC v. Elec. Power Supply Ass'n*, 577 U.S. at 277–278 & n.5; *see also* JA2152–2153. Given the plain meaning of the relevant provisions of the Federal Power Act, neither *New York* nor *FERC v.*

79

*Electric Power Supply Ass'n* applied the now-overruled *Chevron* deference doctrine. *See FERC v. Elec. Power Supply Ass'n*, 577 U.S. at 277 n.5; *New York*, 535 U.S. at 17, 19; *see also Loper Bright*, 603 U.S. at 412 (overruling *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984)). *Cf.* States Br. 28–29 (observing that the court in *South Carolina* invoked *Chevron* deference for certain propositions, but failing to note that *South Carolina*—which, like *FERC v. Electric Power Supply Ass'n*, also concerned FERC's Section 206 authority—predated *Electric Power* and is, in any event, a lower court decision).

4.  Putting it all together, deciding if FERC has acted within its broad statutory powers in enacting the Rule on review proceeds in three parts. *First*, the Court asks whether the Rule regulates interstate transmission and practices that directly affect FERC-jurisdictional rates. *See New York*, 535 U.S. at 16–17; *see also Nat'l Ass'n*, 964 F.3d at 1186. *Second*, the Court considers whether FERC has avoided directly regulating any state-regulated facilities (e.g., electric generators) or services (e.g., retail rates). *Nat'l Ass'n*, 964 F.3d at 1186. And *third*, the Court "ensure[s] that [its] determinations do not 'conflict with the [Federal Power] Act's core purposes' of 'curbing

80

prices and enhancing reliability in the wholesale electricity market.'" *Id.* (quoting *FERC v. Elec. Power Supply Ass'n*, 577 U.S. at 277) (cleaned up).

The answer to all three considerations in the matter on review is "yes." The Rule is plainly a lawful exercise of FERC's statutory authority.

### 1. The Rule regulates interstate transmission and practices that directly affect transmission rates

The Court should "swiftly conclude" that the Order 1920 rulemaking regulates interstate transmission, *see* § 824(b)(1), and practices that directly affect the rates for such transmission (i.e., transmission planning and cost allocation processes), *see* § 824e(a)—points that no party disputes, *see Nat'l Ass'n*, 964 F.3d at 1186; *see also* JA2121–2123 (observing that no party on rehearing contested FERC's finding that the Rule "regulates practices that directly affect the rates for the transmission of electric energy in interstate commerce"). Indeed, the Rule is *all about* interstate transmission and rate-related practices. It sets standards that FERC-jurisdictional transmission providers must meet in evaluating transmission facilities that interconnect to the interstate grid. JA1999–2005. And better long-term transmission planning—the whole point of the Rule—will generate recoverable costs that must be allocated. *See* JA2010–2012 (Regional transmission planning and cost allocation processes pertain to

81

"identify[ing], evaluat[ing], and select[ing] the regional transmission facilities whose costs will be recovered through transmission rates," thus "directly affect[ing] those rates."); JA2121–2123, JA2145–2148, JA2152–2153. Given that the Federal Power Act vests FERC with exclusive authority over interstate transmission, *see New York*, 535 U.S. at 16–17 (citing § 824(b)(1)), as well as over practices directly affecting rates for such transmission, *see Nat'l Ass'n*, 964 F.3d at 1181 (citing §§ 824(b)(1), 824e(a)), it is beyond reasonable dispute that the Rule falls securely within FERC's jurisdictional field.

Courts have upheld prior FERC actions that fell somewhat closer to the boundary of FERC's authority. In *New York*, the Supreme Court considered a FERC rulemaking (Order 888) in which the Commission asserted authority over interstate transmission implicating *retail* transactions. 535 U.S. at 16. Recall that the Federal Power Act reserves to states authority over setting retail rates. *FERC v. Elec. Power Supply Ass'n*, 577 U.S. at 279. The Court held that the Act's "clear statutory language" plainly endowed FERC with the asserted power: The Commission has jurisdiction over "'the transmission of electric energy in interstate commerce,'" and that authority is not "limit[ed] … to the wholesale market,"

82

*New York*, 535 U.S. at 16–17 (quoting § 824(b)(1)).  Here, the Rule regulates *interstate* transmission of electric energy to "enhanc[e] competition in *wholesale* electricity markets"—i.e., it operates at the center of FERC's regulatory domain.  JA2421–2422 (emphasis added).

Similarly, in *FERC v. Electric Power Supply Ass'n*, the Court considered another Commission rulemaking (Order 745), in which the Commission required certain transmission providers—i.e., regional market operators like PJM and Midcontinent—to allow *retail* consumers to place aggregated offers into organized *wholesale* electric markets to withhold energy consumption during periods of peak electricity demand.  577 U.S. at 270–271, 273, 286–287.  The rule thus encouraged retail consumers to curb their energy consumption under certain conditions.  *Id*. at 270–273.  And if electricity demand fell, so would wholesale rates for electricity (and, by extension, retail rates too).  *Id*. at 279, 285.  Notwithstanding this "demand response" rule's impacts on retail customers and retail rates, the Court held that it fell squarely ("with room to spare") within FERC's Federal Power Act Section 206 authority to regulate "rules or practices that directly affect the wholesale rate."  *Id*. at 278 (emphasis omitted) (cleaned up).

The Rule on review falls even closer to the heartland of FERC's authority: It directly regulates interstate electric transmission. JA2121–2123, JA2145–2148, JA2152–2153, JA2421–2422. And unlike the rule before the Supreme Court in *FERC v. Electric Power Supply Ass'n*, the Rule does not regulate any actions of retail customers.

### 2. The Rule does not regulate state-jurisdictional matters

The Rule also avoids regulating any matter on the states' side of the Federal Power Act's jurisdictional line. JA2114–2115, JA2119, JA2121–2123. The Rule contains no provisions governing generation facilities, intrastate distribution facilities, retail sales for electricity, or the siting and permitting of transmission lines. *See* 16 U.S.C. § 824(b)(1) (describing states' reserved powers); *see also Ill. Com. Comm'n*, 721 F.3d at 773; *Piedmont*, 558 F.3d at 310.

The States resist this conclusion, insisting that the Rule "undermines State authority over generation." States Br. 24, 28. But their argument rests on fundamental misunderstandings of FERC's statutory authority and misstatements of the Rule's provisions. The States are, of course, correct that they generally retain "authority over which generating resources are maintained and constructed within [their]" borders (*id.* at 23), at least aside

84

from federally licensed facilities. *See, e.g.*, 16 U.S.C. § 797(e) (governing FERC-jurisdictional hydroelectric facilities). Yet the fact remains that the Rule does not trench on this state prerogative. JA2121–2124, JA2133–2134 (explaining that "[the Rule] is … not aimed at and does not regulate any area of reserved state authority, whether over electricity generation or otherwise," and instead "facilitate[s] and respect[s] the lawful authority of … states[] in areas such as generation resource planning, electricity production, and electricity demand").

The States' attempts to reason away this reality are unpersuasive. *First*, they argue that, by requiring transmission providers to consider states' generation policies in transmission planning, the Rule requires ratepayers to "subsidize[] generation in certain States." Br. 25, 27. This contention fails right off the bat because the Rule includes no subsidies for anyone. JA2097, JA2125. At most, it requires transmission customers to pay for only those costs that are roughly commensurate with the benefits that transmission providers estimate those customers will receive from a selected regional transmission facility. JA2097, JA2125, JA2133–2134. Such cost allocation for interstate transmission facilities falls comfortably within FERC's jurisdiction to regulate practices "directly affecting" FERC-jurisdictional

rates.  *See South Carolina*, 762 F.3d at 57, 84 (holding that "cost allocation" is "a practice affecting rates"); *see also NextEra*, 118 F.4th at 368 (explaining that FERC's jurisdiction extends to practices that "directly affect[] the transmission of electricity in interstate commerce").

*Second*, the States claim that the Rule will unlawfully "shift costs to build transmission infrastructure to support 'green energy' to States and customers that did not vote for their own States to incur those costs[.]" Br. 27.  But the Federal Power Act includes no carve-out for states—let alone for individual ratepayers—to veto transmission-related cost allocation decisions just because they did not vote for those decisions.  A contrary conclusion would allow states to second-guess such federal cost allocation policy choices—precisely the type of incursion into FERC's jurisdictional field that the Supreme Court has deemed preempted.  *See, e.g., Hughes*, 578 U.S. at 164–165 (holding that a state's regulation of generation in a way that disregarded FERC-determined wholesale rates was preempted).

*Third*, the States argue that FERC has exercised "its authority over … transmission" in a way that unlawfully "mandat[es]" certain interstate transmission solutions and also "pressure[s]" States into adopting "particular types of generation"—all in service of promoting "green energy

86

goals" and "decarbonization." Br. 25–26, 29–30, 34–35. None of this is correct. Putting aside that FERC *does* have jurisdiction over interstate transmission, 16 U.S.C. § 824(b)(1), the Rule does not include the provisions the States attribute to it. The Rule requires only that transmission providers reactively *consider* states' energy policies—whatever they may be—in deciding what (and where) future transmission facilities might be needed. JA2111–2112, JA2114–2115, JA2149–2150 (explaining that, in enacting the Rule, FERC "acted in a fundamentally *responsive* capacity"); JA947. Accounting for a source of transmission need does not, contrary to the States' characterizations, "mandate[]" any particular transmission "outcomes." *Cf.* Br. 29–30.

For example, transmission providers must assess, among the seven listed factors relevant to determining transmission need (*see supra* p.51), state laws "affecting the resource mix and demand." JA2106–2107. So a state law requiring construction of more natural gas facilities might be relevant to deciding where transmission lines will be needed.

Another factor requires assessing state laws on "decarbonization and electrification." *Id.* So if a state requires its electric utilities to purchase energy from low- or zero-carbon-emitting generators, and such generators

87

are located out-of-state, then that state's policy might indicate a demand for new transmission to transport such electricity *into* the state. Given the record evidence that such policies have proliferated in recent years, the Commission reasonably deemed it a relevant consideration in transmission planning. JA696–697; *see also* JA2039–2042.

Nowhere, however, does the Rule dictate transmission decisions, much less generation policies. In fact, none of the seven benefits metrics transmission providers must consider in evaluating proposed transmission facilities (*see supra* p.53)—i.e., facilities to meet previously identified transmission needs—say *anything* about decarbonization or electrification. *See* JA2308–2309. And even if they did, that would not evince an invasion of the states' jurisdictional turf: FERC would still be regulating only interstate transmission, meaning any potential effects on states' generation policies would be "of no legal consequence." *E.g.*, *FERC v. Elec. Power Supply Ass'n*, 577 U.S. at 281; *NextEra*, 118 F.4th at 369; *see also Nat'l Ass'n*, 964 F.3d at 1187; *Nat'l Ass'n of Regul. Util. Comm'rs v. FERC*, 475 F.3d 1277, 1280, 1282 (D.C. Cir. 2007) (approving FERC jurisdiction over "the engineering and construction of [State-jurisdictional] facilities" that were "needed for the relevant transmissions").

88

Put another way, "[w]hen FERC regulates" within its own jurisdictional field, "then no matter the effect on" matters within the states' own field, "[Federal Power Act Section 201(b), § 824(b)] imposes no bar." *FERC v. Elec. Power Supply Ass'n*, 577 U.S. at 281–282; Order JA2119, JA2121–2123. Thus, the States get the law precisely backwards in asserting that "the Commission may not enact regulations that affect subjects outside its authority under the [Federal Power Act]." Br. 28. *Cf. id.* at 23 (erroneously relying on Federal Power Act Section 201(a), which restricts FERC to regulating only matters "not subject to regulation by the States," § 824(a), but which the Supreme Court has discounted as "merely a policy declaration" that is not an "operative provision" and "adds nothing to the analysis," *FERC v. Elec. Power Supply Ass'n*, 577 U.S. at 280 n.6 (cleaned up)).

As with the first inquiry above, courts have upheld the Commission's assertion of authority in closer cases. The recent *NextEra* decision involved FERC's order to a nuclear power plant to upgrade a piece of equipment (a circuit breaker) that "was part of the … generation facility." 118 F.4th at 367. The upgrade was necessary to shore up reliability on the "interstate grid"— i.e., "the upgrade directly affect[ed] the transmission of electricity in

89

interstate commerce." *Id.* at 369.  Because "FERC may exercise jurisdiction over generation facilities to the extent necessary to regulate interstate transmission," the court confirmed FERC's authority to issue the order.  *Id.* (citing cases construing FERC's Section 201(b) authorizations) (cleaned up); *see also La. Pub. Serv. Comm'n*, 522 F.3d at 389–390 (holding that FERC properly exercised jurisdiction over "the allocation of capacity costs" of a power plant—even though doing so involved regulating "a generating facility"—because those costs "affected ... interstate wholesale rates").  Here, the Commission is not regulating generation facilities *at all.*  JA2121–2123.

Or consider *Connecticut.*  There, the court confronted a FERC action regulating a wholesale electric market that "incentivize[d] the ... creation of additional capacity"—i.e., more electric generation—"to ensure [interstate grid] reliability," but which did not require any specific capacity installations. 569 F.3d at 481; *see also FERC v. Elec. Power Supply Ass'n*, 577 U.S. at 290 (noting that establishing rules and programs for "effective transmission" without "service interruptions" is a "core" FERC power).  Under the States' approach, such an action would breach the bounds FERC's jurisdiction because it seeks to influence an area of state regulation.  *See* Br. 25–26.  But even the state petitioning for review in *Connecticut* conceded that FERC

90

*may* seek to incentivize the creation of more (state-regulated) generation capacity. *Connecticut*, 569 F.3d at 481.

Driving home the point, the court explained that, no matter what "incentive[s]" FERC's action engendered, the states retained their ultimate authority over generation: "State and municipal authorities retain[ed] the right to," for example, "require retirement of existing generators, to limit new construction to more expensive, environmentally-friendly units, or to take any other action in their role as regulators of generation facilities without direct interference from the Commission." *Connecticut*, 569 F.3d at 481; *accord N.J. Bd. of Pub. Utils. v. FERC*, 744 F.3d 74, 97–98 (3d Cir. 2014) (upholding FERC's order, governing the wholesale market entry of generation resources, notwithstanding that the order was a direct response to states' policies—namely, subsidies—regarding certain generation resources).

So too here. The Rule "ensure[s] that state policy choices" over states' preferred generation mixes "are respected and effectuated," and it does nothing to direct states' generation decisions. JA2114–2115, JA2121–2123, JA2133–2134. In fact, the Rule is even further removed from the states' jurisdictional field than the Commission actions in *NextEra* and

91

*Connecticut*. Whereas those cases involved FERC orders directing changes to a generation facility (*NextEra*) or spurring states to build more power plants (*Connecticut*), the Rule on review requires only that transmission providers *react* to policies—again, whatever they may be—that states already have enacted by accounting for those policies in transmission planning. JA2106–2114.

Undeterred, the States enlist an adverb in their cause, characterizing the Rule as "*effectively* regulating generation" by requiring transmission providers to account for state generation policies. Br. 28 (emphasis added). But the notion that the Rule is an "effective," rather than a direct, regulation of generation gives the game away. *E.g., id.* at 28, 30, 39. It simply reclothes the inconsequential point that FERC's lawful actions aimed at its jurisdictional field might affect matters within the states' own. *FERC v. Elec. Power Supply Ass'n*, 577 U.S. at 281–282.

The Supreme Court made quick work of a materially identical claim. Challengers in *FERC v. Electric Power Supply Ass'n* argued that the Commission "usurped state power" by "*effectively* … regulat[ing] retail prices." 577 U.S. at 283 (emphasis added). Recall that, there, the Commission regulated wholesale transactions, which indirectly lowered, and

thereby affected, retail rates. *Id.* at 285. The Court found that "[t]he modifier 'effective' is doing quite a lot of work in th[e] argument." *Id.* at 284. And to no avail for the challengers. Because FERC's rule did not actually "set a retail electricity rate," but merely "alter[ed] ... incentives," any "effective" regulation of retail rates was of no legal significance. *Id.*

Same here. Perhaps the Rule on review will alter states' incentives in regulating generation within their borders. Or perhaps not. In all events, however, the relevant *legal* point is that states retain the full array of regulatory tools to *make* those decisions. *See* JA2121–2123; *see also New Jersey*, 744 F.3d at 97–98; *Connecticut*, 569 F.3d at 481–482.

Finally, the States' federal-intrusion claim implicates the Constitution's Supremacy Clause. *See* U.S. Const. art. VI. Where a state's action, taken within its field, "conflict[s] with[] FERC's authority over interstate transportation and rates," federal "pre-emption *is* to be applied." *Nat'l Ass'n*, 964 F.3d at 1187–1188 (quoting *Nw. Cent. Pipeline Corp. v. State Corp. Comm'n of Kan.*, 489 U.S. 493, 515–516 & n.12 (1989)) (cleaned up); *see also Hughes*, 578 U.S. at 161–162, 165 ("[S]tate laws are preempted when they 'deny full effect to the rates set by FERC[.]'" (quoting *PPL EnergyPlus*, 753 F.3d at 476) (cleaned up)). For example, a state may not, in exercising its

93

authority to promote certain types of generation, disregard the FERC-set wholesale rate for that generation's capacity. *Hughes*, 578 U.S. at 164–165; *accord Miss. Power & Light Co. v. Mississippi ex rel. Moore*, 487 U.S. 354, 365, 370–373 (1988) (same principle in the context of state regulation of retail rates); *Nantahala Power & Light Co. v. Thornburg*, 476 U.S. 953, 959–961 (1986) (same). *Cf. Hughes*, 578 U.S. at 166 (suggesting that state policies aimed at generation but merely affecting FERC-regulated wholesale markets—e.g., direct subsidies to "new or clean generation"—are not preempted).

By demanding that FERC refrain from regulating interstate transmission in a way that affects states' generation decisions, the States seek to hobble FERC's ability to fully regulate such transmission and practices directly affecting transmission rates—areas that fall squarely on FERC's side of the jurisdictional line. *See* 16 U.S.C. §§ 824(b)(1), 824e(a). That outcome would implicate the Supremacy Clause because "States may not seek to achieve ends, however legitimate, through regulatory means that intrude on FERC's authority over interstate [FERC-jurisdictional] rates." *Hughes*, 578 U.S. at 164; *see also Nat'l Ass'n*, 964 F.3d at 1187. Indeed, "[a]ny State effort that aims directly at destroying FERC's jurisdiction by

'necessarily dealing with matters which directly affect the ability of the Commission to regulate comprehensively and effectively' over that which it has exclusive jurisdiction" is preempted. *Nat'l Ass'n*, 964 F.3d at 1187–1188 (quoting *N. Nat. Gas Co. v. State Corp. Comm'n of Kan.*, 372 U.S. 84, 91–92 (1963)) (cleaned up). The States' attempt to obstruct FERC's efforts to remedy deficiencies in long-term interstate transmission planning constitutes just such an effort.

### 3. The Rule effectuates FERC's core responsibilities under the Federal Power Act

Finally, the Rule does not "'conflict with the [Federal Power] Act's core purposes' of 'curbing prices and enhancing reliability'" in FERC-regulated markets. *Nat'l Ass'n*, 964 F.3d at 1186 (quoting *FERC v. Elec. Power Supply Ass'n*, 577 U.S. at 277) (cleaned up). The Rule "aims" at—indeed, is "all about"—promoting more efficient, cost-effective interstate transmission solutions in a way that saves consumers money and promotes grid reliability. *See FERC v. Elec. Power Supply Ass'n*, 577 U.S. at 282 (emphasis omitted) (cleaned up); JA2108–2109.

### B. The major questions doctrine does not apply

Unable to defeat the Rule under the plain terms of the Federal Power Act, the States resort to invoking the major questions doctrine. They reason

that "the [Rule] involves significant political and economic issues regulating the nationwide grid," meaning Congress needed to clearly authorize the Rule for it to be lawful.  States Br. 30.

The States' simplistic view of the major questions doctrine finds no support in Supreme Court or this Court's precedents.  And, in any event, even properly construed the major questions doctrine is inapplicable to the matter on review because Congress granted broad authority to FERC to act in precisely the way it did here.

The major questions doctrine applies in "certain extraordinary cases" involving an agency's assertion of "'extravagant,'" "highly consequential power" that effects a "'transformative expansion in [the agency's] regulatory authority.'" *West Virginia v. EPA*, 597 U.S. 697, 723–724 (2022) (quoting *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014)).  In such cases, courts should be "'reluctant to read into ambiguous statutory text' the delegation claimed to be lurking there." *Id.* (quoting *Utility Air*, 573 U.S. at 324).  The doctrine does not apply—and the agency's action falls within its congressionally-conferred powers—where the agency acts pursuant to Congress' "clear delegation" of authority to enact "[a] decision of … magnitude and consequence." *See id.* at 735.  Indeed, "when a particular

96

statute delegates authority to an agency consistent with constitutional limits, courts *must respect the delegation*, while ensuring that the agency acts within it." *Loper Bright*, 603 U.S. at 413 (emphasis added).

1.  This is not a major questions case; the Federal Power Act unambiguously grants FERC the power it exercised in enacting the Rule. *See supra* p.79 (discussing Supreme Court case law deeming FERC's Section 201(b) and 206(a) powers to be "clear" and "unambiguous"). Congress vested in FERC the authority and responsibility to regulate interstate electric transmission spanning the Nation, as well as "any rule" and "any … practice" that directly "affect[s]" such transmission "rate[s]," in order to ensure "just and reasonable" rates. 16 U.S.C. §§ 824(b)(1); 824d(a); 824e(a). These are inherently "broad[]" powers. *See New York*, 535 U.S. at 15; *see also FERC v. Elec. Power Supply Ass'n*, 577 U.S. at 278–279 (broadly construing FERC's "affecting rates" authority).

It is beyond reasonable dispute—and no party does, *see* JA2121–2123— that the Rule constitutes an exercise of precisely this authority: The Rule promotes "the reliable and cost-effective operation of the transmission grid" by addressing deficiencies in regional transmission planning and cost allocation processes, thereby directly affecting FERC-jurisdictional rates for

97

electricity. JA2145–2148, JA2152–2153, JA2421–2422. Even the petitioning States seem to agree. A central premise of their varied claims is that the Rule, in promoting new transmission development, *affects costs for interstate transmission*, which will ultimately be borne by retail ratepayers. *See, e.g.*, Br. 34, 35 (alleging that the Rule will impose "transmission costs" that will impact consumers' rates).

These features of the Federal Power Act and of FERC's exercise of authority *under* the Act distinguish this matter from the quintessential major questions cases. Those cases involved, for example, an agency's interpretation of an ambiguous statutory provision in a way that vastly expanded its regulatory powers beyond what Congress reasonably could have intended. *See West Virginia*, 597 U.S. at 713, 723–725, 727–729 (holding that the Clean Air Act's reference to the "best system of emission reduction" for stationary sources could not reasonably include a nationwide effort to reform which types of energy power the electric grid); *Utility Air*, 573 U.S. at 309–310, 321, 324 (holding that the Clean Air Act's reference to air pollutants for purposes of a particular clean air program could not reasonably cover a pollutant that would result in "overthrow[ing] the [statute's] structure and design"). *Cf. N.C. Coastal Fisheries Reform Grp. v.*

98

*Capt. Gaston LLC*, 76 F.4th 291, 298–300 (4th Cir. 2023) (applying the major questions doctrine to an EPA action that departed from 50 years of agency practice and which precipitated a federal encroachment on traditional state powers).

Other major questions cases concerned an agency's erroneous interpretation of a clear but minor grant of authority as imbuing it with massive power. *See Biden v. Nebraska*, 600 U.S. 477, 494, 506–507 (2023) (holding that an agency's congressionally-conferred authority to "waive or modify any statutory … provision" did not permit it to "completely rewrite" such provision); *MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 225, 230–231 (1994) (similar).

Here, by contrast, the Commission's interpretation of Congress' unambiguous grants of authority to regulate "rule[s] [and] practice[s] … affecting [FERC-jurisdictional] rate[s]" for "the transmission of electric energy in interstate commerce" are literal descriptions of what FERC did in enacting the Rule. *See* 16 U.S.C. §§ 824(b)(1), 824e(a); JA2010–2012, JA2121–2124, JA2145–2146. Accordingly, FERC acted within its congressionally-conferred powers.

99

2. The lack of statutory ambiguity and the Commission's fidelity to judicially-recognized, broad grants of congressionally-delegated authority suffice to render the major questions doctrine inapplicable. But even were the Court to conclude that it should evaluate the various warning indicators of majorness that the Supreme Court has articulated, *see North Carolina*, 76 F.4th at 296–297, the major questions doctrine would still not apply. That is because all but one of those indicators are absent.

*First*, this is not a matter involving an agency's radical reimagining of its long-held interpretation of a statute *a la MCI*, *Utility Air*, or *West Virginia*. *See West Virginia*, 597 U.S. at 725 (finding that an agency's failure to invoke the asserted power in the past indicates that the major questions doctrine might apply). Unlike in those cases, the Rule on review has a long pedigree. It stands atop the shoulders of similar rulemakings (e.g., Orders 888, 890, and 1000)—which were affirmed on judicial review where challenged—that also regulated interstate transmission and transmission planning nationwide. *See* JA2069–2071, JA2074–2076, JA2146–2148; *see also* JA2119 (explaining that the Rule "fill[s] ... discrete gaps in the Order No. 1000 regional transmission planning and cost allocation process"); JA2145–2146 ("Order No. 1920 does not involve converting the authority set

100

forth to regulate such practices into a new kind of regulatory scheme."); *see also South Carolina*, 762 F.3d at 58 (explaining that "Commission-mandated transmission planning is not new," and finding that the Order 1000 transmission planning rulemaking at issue there built on prior such rulemakings beginning with the 1996-issued Order 888).

*Second*, whereas the implicated statutory provision in *West Virginia* was an "ancillary," "little-used backwater," 597 U.S. at 724, 730 (cleaned up), Federal Power Act Sections 201 and 206—FERC's invoked authorities in issuing the Rule, JA2121–2123—are the heart and lungs of FERC's "core" authority to ensure "just and reasonable" rates. *Compare FERC v. Elec. Power Supply Ass'n*, 577 U.S. at 276–277 (explaining that "[t]he [Federal Power Act] delegates responsibility to FERC to regulate the interstate wholesale market for electricity—both wholesale rates and the panoply of rules and practices affecting them"), *with FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159–160 (2000) (holding that Congress implausibly intended to grant the Food and Drug Administration power to ban tobacco products through a "cryptic" delegation of authority to regulate product "safety"), *and MCI*, 512 U.S. at 231 (rejecting the notion that Congress intended to permit the agency's elimination of the core, rate-filing

component of a statutory scheme through the "subtle device" of "permi[tting]" the agency to "'modify' rate-filing requirements"); *see also* JA2146–2148 (collecting numerous examples of FERC's exercise of its Section 206 authority). As the court in *South Carolina* recognized, Section 206 is "broadly stated" and is not "the type of 'subtle device' at issue in *MCI*." 762 F.3d at 56 (quoting *MCI*, 512 U.S. at 231).

*Third*, whereas EPA's regulation of the national energy system in *West Virginia* fell beyond that agency's area of environmental expertise, 597 U.S. at 729, the Commission's regulation of interstate electric transmission and practices affecting rates for such transmission are archetypal applications *of* its expertise in the energy field. *Compare FERC v. Elec. Power Supply Ass'n*, 577 U.S. at 292 (explaining that FERC enjoys "great deference" in setting "just and reasonable" electric rates, including in issuing a broadly applicable rule regulating a practice that affects such rates (cleaned up)), *with Gonzales v. Oregon*, 546 U.S. 243, 262, 266–267 (2006) (concluding that Congress could not reasonably have intended to afford the U.S. Attorney General— who "lacks medical expertise"—the power to "determine appropriate medical standards" through his statutory authority to act in the "public interest").

102

To be sure, courts also consider the "economic and political significance" of an agency action in conducting the major questions inquiry. *See West Virginia*, 597 U.S. at 721 (cleaned up). "But" as this Court has explained, "that [factor] is not all" that the Court assesses—far from it. *North Carolina*, 76 F.4th at 297; JA2144–2145. Given that the other indicators of majorness are absent, the Rule's national import does not reflexively trigger the doctrine. And more to the point, as already discussed, because Congress plainly authorized the Commission to issue orders at scale—e.g., to regulate "the transmission of electric energy in interstate commerce," § 824(b)(1)—applying the major questions doctrine here would disregard Congress' explicitly stated intent. *Cf. West Virginia*, 597 U.S. at 724 (explaining that the doctrine applies only where an agency's "assert[ion] [of] highly consequential power" ventures "beyond what Congress could reasonably be understood to have granted"); *see also United States v. Perkins*, 67 F.4th 583, 609 (4th Cir. 2023) (observing that a court's "interpretive task" is always to determine "'Congress' intent,'" as expressed through "statutory text" (quoting *Oklahoma v. Castro-Huerta*, 597 U.S. 629, 642 (2022)) (cleaned up)).

103

3.  Even if, despite all this, the Court were *still* inclined to conduct a major questions inquiry, the Supreme Court has already done that work in a way that confirms the Rule's lawfulness.  In *FERC v. Electric Power Supply Ass'n*, the Court's statutory construction "limiting the Commission to regulating practices '*directly* affecting' rates was motivated by the same concern animating the major questions doctrine: effectuating congressional intent by ensuring that the Commission's exercise of this authority was reasonably constrained by more than the definitional possibilities as to what constitutes a 'practice ... affecting' rates." JA2152–2153 (emphasis added).  And *South Carolina* held, in affirming Order 1920's predecessor (Order 1000), that "[r]eforming the practices of failing to engage in regional planning and *ex ante* cost allocation for development of new regional transmission facilities" falls within FERC's "directly affect[ing] rates" jurisdiction.  762 F.3d at 56–57; JA2152–2153.  That is the exact power FERC exercised in enacting the Rule on review.  Thus, viewed from any angle, the Commission's Rule constitutes a lawful application of its well-established statutory authority.

### C.     The Rule does not betray an unconstitutional delegation of Congress' legislative power

"Article I of the Constitution provides that 'all legislative Powers herein granted shall be vested in a Congress of the United States.'" *FCC v. Consumers' Research*, 606 U.S. 656, 672 (2025) (quoting U.S. Const. art. I, § 1) (cleaned up). The Supreme Court has interpreted "that assignment of power to Congress [as] a bar on its further delegation: Legislative power, [the Court] ha[s] held, belongs to the legislative branch, and to no other." *Id.* (citing *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472 (2001)). Nevertheless, "Congress may 'seek assistance' from its coordinate branches to secure the 'effect intended by its acts of legislation.'" *Id.* (quoting *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 406 (1928)) (cleaned up). "And in particular, Congress may 'vest discretion' in executive agencies to implement and apply the laws it has enacted—for example, by deciding on 'the details of their execution.'" *Id.* (quoting *J.W. Hampton*, 276 U.S. at 406) (cleaned up). Indeed, "[a] 'degree of policy judgment' can 'be left to those executing or applying the law.'" *Id.* (quoting *Whitman*, 531 U.S. at 474–475).

After arguing at length that the Rule runs afoul of the major questions doctrine because, the States assert, Congress did not provide "clear congressional authorization for [the Commission's] action" (Br. 30–37

105

(cleaned up)), the States shift gears, arguing in two undeveloped paragraphs that Congress could not have authorized the Rule even if it wanted to. Br. 37–38. They reason that the Rule reflects an unconstitutional delegation of Congress' power to FERC because, they reason, "Congress may not delegate its authority to decide major policy questions to an agency." *Id*. at 37.

The States cite no apposite authority for their articulation of the non-delegation doctrine and it contradicts binding Supreme Court precedent. In *West Virginia*, the Court held that, where the major questions doctrine applies, agencies *may* exercise policy authority of great "magnitude and consequence" so long as Congress provides "a clear delegation" of such power. 597 U.S. at 734; *see also* JA2171–2172.

Anyhow, Congress plainly acted within its constitutional powers in delegating to FERC authority over interstate electric transmission, as well as rules and practices that affect rates for such transmission, in service of ensuring "just and reasonable" rates. *See* JA2171–2172. The operative non-delegation inquiry is whether "Congress has set out an 'intelligible principle' to guide what it has given the agency to do." *Consumers' Research*, 606 U.S. at 673 (citing *J.W. Hampton*, 276 U.S. at 409). This is a forgiving standard. Congress need only "ma[k]e clear both 'the general policy' that

106

the agency must pursue and 'the boundaries of its delegated authority.'" *Id.* (quoting *Am. Power & Light Co. v. SEC*, 329 U.S. 90, 105 (1946)) (cleaned up). The Court asks whether "Congress has provided sufficient standards to enable both 'the courts and the public to ascertain whether the agency' has followed the law." *Id.* (quoting *OPP Cotton Mills, Inc. v. Adm'r of Wage and Hour Div., Dep't of Labor*, 312 U.S. 126, 144 (1941)) (cleaned up). If Congress has done so—as the Court has always found except on two occasions in 1935—then the Court will "not disturb its grant of authority." *Id.* at 673, 683.

Congress' grant of authority to FERC under the Federal Power Act includes the requisite intelligible principle to guide the Commission's exercise of its discretion. *See* JA2171–2172. This Court need look no further than the Supreme Court's recent decision in *Consumers' Research*. There, the Court confirmed its prior, 1944 holding that an "authorization[]" to FERC's predecessor agency, the Federal Power Commission (FPC), "to set 'just and reasonable' rates'" sets forth the required "intelligible principle[]." 606 U.S. at 683–684 (quoting *FPC v. Hope Nat. Gas Co.*, 320 U.S. 591, 600 (1944)); *see also id.* at 739–741 & n.18 (Gorsuch, J., dissenting) (indicating agreement with the majority that the "just and reasonable" standard is a

107

constitutional delegation when applied "to setting rates for regulated monopolies like public utilities," given "context" and a "long history at common law" (cleaned up)).

### D.    The Rule is consistent with the equal sovereignty doctrine

Pressing ahead on constitutional grounds, the States complain that the Rule violates the equal sovereignty doctrine by allowing "one State [to] effectively force other States to subsidize its own public policy agenda." States Br. 39. From this premise the States conclude that the Rule "subverts" citizens' democratic right to "impact their State public policies through elections." *Id.*

The States' equal sovereignty claim is baseless. The equal sovereignty doctrine derives from the constitutional principle that States must be admitted to the Union on an equal footing, meaning Congress may not place limits on new States as a condition of their admission. *See, e.g., Coyle v. Smith*, 221 U.S. 559, 567–568 (1911). In *Coyle*, the Court held that Congress could not prohibit Oklahoma from moving its state capital as a condition of its admission to the Union. *Id.* at 567–568, 574. The Court reasoned that it fell beyond Congress' enumerated powers to require a new State to relinquish an aspect of its sovereignty that the 13 original States retained.

108

*Id. Cf. Shelby Cnty. v. Holder*, 570 U.S. 529, 544, 557 (2013) (invoking equal sovereignty principles in holding that Congress had failed to supply adequate evidence to justify imposing burdens on only some states that required those states to preclear voting-related laws with federal authorities).

The States' assertion that the Rule on review violates the equal sovereignty doctrine fails at the threshold because the Rule does not impose different requirements on different states. At most, the Rule requires transmission providers to react *to* and account *for* states' varying policies. *See* JA2106–2107, JA2123–2124 (explaining that the Rule "afford[s] states *maximum* respect for [their] authority by assuming that [state] laws, regulations, integrated resource plans, and expected supply obligations will be fully met"). That is nothing like imposing conditions on states' entry into the Union or imposing restrictions on certain states' ability to regulate generation within their Federal Power Act-reserved authority. *See* JA2097. *Cf.* JA2114–2115, JA2121–2123, JA2149–2150 (explaining that the Rule is resource neutral and requires transmission providers to respond to state policies; the Rule does not impinge on states' ability to enact whatever policies they wish within their jurisdictional authority). And to the extent

109

the Commission's proper exercise of federal authority in enacting the Rule might *affect* certain states' costs based on their own generation decisions, "[t]hat is of no legal consequence." *FERC v. Elec. Power Supply Ass'n*, 577 U.S. at 281.

## III. FERC reasonably determined that existing transmission planning rules are unjust and unreasonable, and thus violate the Federal Power Act

The Commission adhered to the Federal Power Act's two-step inquiry for setting a new "just and reasonable" rate. FERC made the requisite step one determination that the pre-Rule regulatory landscape failed to adequately anticipate and respond to long-term transmission needs, thus resulting in unjust and unreasonable rates. JA2038–2053. And it reasonably established a "just and reasonable" replacement rate, as it was required to do, *see FERC v. Elec. Power Supply Ass'n*, 577 U.S. at 277 (citing 16 U.S.C. § 824e(a)), that falls within the statutory "zone of reasonableness," *see Prometheus*, 592 U.S. at 423.

Some Petitioners contest FERC's step one determination. *See* Consumers Br. 15–22; Transmission Owners Br. 31–33; States Br. 41. Their challenges fail because they misapprehend FERC's statutory obligations and do not defeat the Commission's reasonable determinations.

110

A.    **Substantial record evidence supports FERC's determination that pre-Rule transmission planning processes were deficient**

1. The Rule on review is borne of FERC's determination that the pre-Rule regulatory landscape governing transmission planning failed to identify long-term transmission needs, resulting in inadequate and unnecessarily costly transmission solutions. JA2038–2056. That finding is rooted in both evidence that current transmission planning is deficient to address long-term needs, as well as FERC's predictive judgment that growing stressors on the electric grid rendered the *status quo ante* unjust and unreasonable. *See* JA2036–2054.

That satisfies the deferential substantial evidence standard of review. *See Biestek*, 587 U.S. at 103. As a first matter, the Commission relied on ample data evincing deficient transmission planning under the pre-Rule landscape. Record evidence shows that transmission planning time horizons were too short to plan and construct large transmission facilities, JA2043–2044; transmission providers were ignoring factors relevant to identifying transmission needs—e.g., extreme weather events, trends in generation additions and retirements, and electricity demand growth, JA2044–2047; and transmission development has been occurring largely

111

through local projects or one-off, piecemeal upgrades that do not "comprehensively assess any transmission needs beyond those created by [a] specific interconnection request[]" by an interconnecting generator, JA2048–2050.

But FERC was also entitled to, and did, rely on non-empirical, predictive judgments about future, "theoretical threat[s]" to "just and reasonable rates." *South Carolina*, 762 F.3d at 64, 66. As the court in *South Carolina* explained, a Commission determination, based on "reasonable economic propositions," is compelling evidence supporting a Section 206 unjust-and-unreasonable finding. *South Carolina*, 762 F.3d at 65–66; *accord Xcel*, 41 F.4th at 560–561; JA2034–2037, JA2051–2053. In fact, in affirming the Rule's predecessor (Order 1000), *South Carolina* already confirmed as rational the *same predictions* FERC made in the Rule on review. *Compare South Carolina*, 762 F.3d at 66 ("The threat to just and reasonable rates arose, in the Commission's judgment, from existing planning and cost allocation practices that could thwart the identification of more efficient and cost-effective transmission solutions," including a changing resource mix (toward renewable energy) and a failure to account for, among other things, "transmission needs driven by public policy

requirements (*e.g.*, State renewable energy standards)"), *with* JA2038–2042 (materially identical: "Commission-jurisdictional regional transmission planning and cost allocation processes are unjust and unreasonable because they result in transmission providers failing to identify Long-Term Transmission Needs[] [and] to evaluate and select more efficient or cost-effective transmission solutions," due to, among other things, a "resource mix [that] is changing," given, for example, "federal, federally-recognized Tribal, state, and local policies").

2.  Still, Consumers and Transmission Owners contend that the Commission did not make the requisite Section 206 step one determination that the *status quo ante* resulted in unjust and unreasonable rates. Consumers Br. 16–17; Transmission Owners Br. 31–33.  To begin, Consumers claim that FERC skipped that step in favor of imposing, at Section 206 step two, its desired outcome of improved long-term transmission planning. Consumers Br. 17.  But that is incorrect.  The Commission explicitly determined that the *status quo ante* was unjust and unreasonable because transmission providers have failed to engage in robust long-term transmission planning, and because existing rules do not account for cost

savings and other benefits associated with regional transmission facilities that meet long-term transmission needs. *See* JA2038–2054.

The Commission's analysis proceeded in several stages. To begin, FERC found that numerous evolving factors demand robust long-term transmission planning processes. For one thing, increasingly frequent extreme weather events necessitate transmission investment in regional transmission facilities to bolster grid reliability. JA2039–2042; Marc Chupka & Pearl Donohoo-Vallett, *Recognizing the Role of Transmission in Electric System Resilience*, THE BRATTLE GROUP at 7–9 (May 2018) (cited at JA685), *available at* https://perma.cc/8BBC-DDLF (discussing the need to "[h]arden[]" grid infrastructure to make it less vulnerable to extreme weather). For another thing, electric demand is projected to increase dramatically in the coming decades due to electrification trends (e.g., electric vehicles) and new large loads (e.g., data centers), rendering critical the provision of adequate transmission capacity to transmit electric supply to customer load. *See* JA2039–2042; *see also* U.S. Energy Info. Admin. (EIA), *Incentives and Lower Costs Drive Electric Vehicle Adoption in Our Annual Energy Outlook* (May 15, 2023) (cited at JA692–695), *available at* https://perma.cc/Q749-EXD5 (explaining that, by 2050, electric vehicles

will account for between 13% and 29% of new light-duty vehicle sales in the United States).  Indeed, "[e]lectricity peak demand and energy growth forecasts over the 10-year assessment period are higher than at any point in the past decade," N. Am. Elec. Reliability Corp., *2023 Long-Term Reliability Assessment,* at 33 (Dec. 2023) (cited at JA694), *available at* https://perma.cc/NT4R-EJ4F, and the five-year load growth forecast (measured from 2023) *nearly doubled* from an original 2.6% growth rate to a revised 4.7%, John D. Wilson and Zach Zimmerman, *The Era of Flat Power Demand is Over*, GRID STRATEGIES, at 3 (Dec. 2023) (cited at JA694), *available at* https://perma.cc/HHD6-4D8G.

Moreover, the resource mix is evolving due to policy changes at all levels of government, customer demands for clean energy, utility emission commitments, and the changing economics of resources that comprise the resource mix.  JA2039–2042.  Indeed, the levelized cost of wind and solar power, in particular, have plummeted (e.g., for solar power, from an approximate $160-per-megawatt-hour purchase price in 2009 to approximately $40 per megawatt-hour in 2020), *see, e.g.*, Mark Bolinger, *et al.*, *Utility-Scale Solar Data Update: 2020 Edition*, LAWRENCE BERKELEY

115

NAT'L LABORATORY, at 32 (Nov. 2020) (cited at JA699), *available at*

https://perma.cc/2PFG-V46F.

Given the manifold challenges confronting the electric grid, FERC

determined that existing regional transmission planning and cost allocation

requirements were deficient in three ways. JA2042; *see also* JA684–685

(citing U.S. Senate Testimony of James B. Robb that more transmission

infrastructure is required to ensure the reliability and resilience of the

electric power system due to changing conditions). Those deficiencies are

both current and predicted. JA2036–2037, JA2043–2053.

*First*, the Commission found that transmission providers were failing

to assess long-term transmission needs. JA2043–2044. For example, most

transmission planning regions do not plan beyond a 10-year time horizon,

which (1) is shorter than necessary to plan and construct large transmission

facilities, (2) deprives customers of the benefits that such facilities can

provide, and (3) does not create opportunities to "right size" the replacement

of aging facilities. *Id.*

*Second*, the Commission found that transmission providers were not

adequately accounting for known determinants of long-term transmission

needs, much less addressing those needs in a way that ensures the provision

of more efficient or cost-effective transmission facilities. JA2044–2047. For example, transmission providers were omitting from their transmission planning changes in the generation mix and government and utility policies that affect future generation decisions. JA2044–2047. The upshot was an unjust and unreasonable outcome: Transmission providers would delay planning decisions until shortly before a particular need manifested, resulting in inefficient, piecemeal transmission development. JA2044–2047.

*Third*, the Commission found that transmission providers were not required to adequately consider the broader set of benefits that regional, long-term transmission facilities offer. JA2047. Specifically, many current planning regimes have not accounted for the full cost savings and other benefits associated with certain transmission facilities, thus consigning customers to paying higher-than-necessary rates and rendering the pre-Order 1920 landscape "unjust and unreasonable." JA730–731; *see also* JA2047.

3. Attacking the Rule's cost allocation provisions specifically, Transmission Owners argue that FERC did not furnish "any evidence that existing regional cost-allocation methodologies are unjust and

unreasonable." Transmission Owners Br. 32. But the record belies this claim. In fact, the Commission made the reasonable, substantiated prediction that the prior, Order 1000 cost allocation requirements were "insufficient to appropriately allocate costs associated with regional transmission facilities that are selected in accordance with the new [long-term] [p]lanning requirements that [FERC] establish[ed] in [Order 1920]." JA733–734. For example, given that the Rule contemplates long-term transmission facilities "that produce a broader set of benefits" than Order 1000-selected projects, FERC found that "a different approach" to cost allocation was needed to properly align costs with such benefits. *Id.*

The Commission also explained that deficiencies in the Order 1000 cost allocation process are intertwined with its determination that pre-Rule transmission planning was inadequate (as discussed above). Indeed, the pre-Rule regime's failure to endow states with a meaningful role in deciding how new facility costs should be allocated diminished, in FERC's estimation, the likelihood that states would grant transmission facilities the requisite siting and permitting approvals to make those facilities a reality. *Id.* That circumstance, FERC predicted, would hamper the Rule's ability to remedy unjust and unreasonable outcomes in transmission planning. *Id.*; JA2051–

118

2052; *see also Ill. Com. Comm'n*, 721 F.3d at 773 (articulating the understanding that states retain authority over siting and permitting of interstate transmission facilities); *Piedmont*, 558 F.3d at 310 (same).

4. Fatally, Consumers and Transmission Owners do not contest any of FERC's substantive findings—a fact that would doom their claims even if FERC did not receive the "substantial deference" it is owed in making rate-related decisions, *see, e.g.*, *South Carolina*, 762 F.3d at 67 (cleaned up); *accord Morgan Stanley*, 554 U.S. at 532 (explaining that reviewing courts "afford great deference to the Commission in its rate decisions"); *Sacramento Mun. Util. Dist. v. FERC*, 616 F.3d 520, 533 (D.C. Cir. 2010) (providing that FERC receives "substantial deference" in areas "involving regulatory policy at the core of FERC's mission" to ensure "just and reasonable" rates). That is particularly so given that the court in *South Carolina* already deemed sufficient materially identical predictive judgments. JA2053; *see supra* pp.112–113.

Nevertheless, Consumers try to drive a wedge between this matter and *South Carolina*. They reason that *South Carolina* was about FERC's prediction "that competition will lead to lower prices," whereas here the Commission identified "a changing resource mix and increased transmission

119

investment" as indicating a need for reform. Consumers Br. 20. But that is factually incorrect. Just as with the Rule now on review, FERC justified its Section 206 step one finding in its earlier Order 1000 rulemaking based largely on the future threat of rising rates due to an evolving resource mix ("proliferation of renewable energy resources" and "natural gas"), such changes' impacts on "cost allocation," and "recent increase[s] in transmission investment." *Compare South Carolina*, 762 F.3d at 66, *with* JA2038–2042, JA2048 (citing studies indicating a need for dramatically increased transmission investment in the amount of $330 billion by 2030 and in an amount ranging from $750 billion to $2.2 *trillion* by 2050, yet noting that transmission investment has been *declining* in certain regions). The *South Carolina* court found reasonable FERC's conclusion that, based on these factors, "the threat to just and reasonable rates was acute." 762 F.3d at 66.

So too here. The Commission exercised its prerogative to make reasonable predictions that current transmission planning is failing to meet both present and projected future needs. *See* JA2035–2037, JA2048–2049, JA2051–2053. Consumers offer no basis for deciding that FERC's exact findings upheld in *South Carolina* as reasonable predictive judgments—

120

bolstered by identified *current* exigencies—can no longer form the basis for a determination that the *status quo ante* was unacceptable.

Finally, Consumers complain that FERC did not acknowledge their hypothetical scenario in which FERC decides it wants to "paint all transmission lines red" and then concludes, at Section 206 step one, that current rules are unlawful because they include no such mandate. Consumers Br. 16–17, 21–22.  FERC need only respond to "significant" objections raised on rehearing, however, and may "ignore insignificant ones." *See Nat'l Ass'n*, 475 F.3d at 1285 (upholding FERC rulemaking governing generation interconnections to the interstate transmission network); *see also State of N.C. v. FAA*, 957 F.2d 1125, 1135 (4th Cir. 1992) (explaining that "[a]n agency establishing a rule need not respond to every comment," but only "those comments that raise significant problems").

Consumers' hypothetical is "insignificant."  Whether a transmission line is painted red has no rational relationship to whether electric rates are "just and reasonable"—the statutory North Star governing FERC's decisions. Here, the Commission rationally concluded, based on substantial record evidence, that inadequacies in long-term transmission planning result in unjust and unreasonable rates by threatening grid reliability and hiking

121

consumer costs. *See supra* pp.111–118. Indeed, unlike the color of transmission lines, ensuring grid reliability and saving consumers money are the "core objects" of FERC's charge under the Federal Power Act to ensure "just and reasonable" rates. *FERC v. Elec. Power Supply Ass'n*, 577 U.S. at 290.

**B.     FERC properly exercised its Federal Power Act authority to make "just and reasonable" determinations on a generic, nationwide scale**

The States contest FERC's Section 206 step one determination from a different direction. They argue that FERC lacks authority to promulgate a generic, nationwide rulemaking to resolve unjust and unreasonable rates. States Br. 41. In their view, the Commission is restricted to making "specific findings about the rates charge[d] by specific utilities." *Id.*

No authority supports the States' meager view of FERC's Section 206 powers and it is profoundly ahistorical.

**1.     The text of Federal Power Act Section 206 supports FERC's decision to engage in a nationally applicable rulemaking**

The plain text of Section 206 accommodates generic, nationwide rulemakings. That provision states that,

> [w]henever the Commission, after a hearing held upon its own motion or upon complaint, shall find that *any rate*, charge, or

classification, demanded, observed, charged, or collected by any public utility for any transmission or sale subject to the jurisdiction of the Commission, or that *any rule, regulation, practice, or contract* affecting such rate, charge, or classification is unjust, unreasonable, unduly discriminatory or preferential, *the Commission shall determine the just and reasonable rate, charge, classification, rule, regulation, practice, or contract* to be thereafter observed and in force, and shall fix the same by order.

16 U.S.C. § 824e(a) (emphases added). Nothing in this statutory text requires FERC to make findings on a utility-by-utility basis. Section 206(a) requires that FERC determine if "any ... practice ... affecting [a FERC-jurisdictional] rate" is unlawful. *Id.*; JA2068–2069. Put another way, the States urge the Court to rewrite the statute by adding words that do not exist—i.e., by reinventing Section 206(a) to vest the Commission with authority only to determine if "any ... practice *by a particular public utility* ... affecting [a FERC-jurisdictional] rate" is unlawful (italicized text added). Of course, "this [C]ourt may not narrow a provision's reach by inserting words Congress chose to omit." *Lomax v. Ortiz-Marquez*, 140 S. Ct. 1721, 1725 (2020). And nowhere did Congress restrict FERC's ability to redress a nationwide problem by requiring the Commission to engage in the make-work task of conducting individualized, utility-specific investigations.

123

### 2. Judicial precedent confirms FERC's authority to engage in nationwide rulemakings

1.  Decades of judicial precedent confirm what is evident from the statutory text.  As courts have explained, "an administrative agency must be equipped to act either by general rule or individual order.  To insist upon one form of action to the exclusion of the other is to exalt form over necessity." *Wis. Gas Co. v. FERC*, 770 F.2d 1144, 1166 (D.C. Cir. 1985)[17] (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 202–203 (1947)).  FERC's prerogative to engage in rulemaking is no different.  In issuing a rulemaking pursuant to Federal Power Act Section 206, "the Commission may rely on 'generic' or 'general' findings of a systemic problem to support imposition of an industry-wide solution." *South Carolina*, 762 F.3d at 67 (quoting *Interstate Nat. Gas Ass'n of Am. v. FERC*, 285 F.3d 18, 37 (D.C. Cir. 2002)) (cleaned up); *accord Assoc. Gas Distributors v. FERC*, 824 F.2d 981, 1008 (D.C. Cir. 1987) (in interpreting the nearly identical provision of the Natural Gas Act, explaining that "[t]he Commission is not required to make individual

---

[17]     *Wisconsin Gas* concerned Section 5 of the Natural Gas Act, *see* 770 F.2d at 1168 n.41, but "[Federal Power Act] §206 [is] the equivalent of [Natural Gas Act] §5," *Interstate Nat. Gas Ass'n of Am. v. FERC*, 285 F.3d 18, 34 (D.C. Cir. 2002) (cleaned up).

findings, however, if it exercises its [National Gas Act] § 5 authority by means of a generic rule"); *see also* JA2069–2071.

No surprise, then, that courts have routinely upheld FERC's Section 206 rulemakings. *See, e.g.*, *South Carolina*, 762 F.3d at 67 (affirming FERC's decision to "proceed by a nationwide rule rather than case-by-case adjudication," even where the Commission acknowledged that practices in some regions might already satisfy the minimum requirements of the new rule); *see also New York*, 535 U.S. at 5 (upholding FERC's Order 888 rulemaking implicating interstate electric transmission nationwide); *Nat'l Ass'n*, 475 F.3d at 1279 (upholding FERC's Order 2003 rulemaking governing generation interconnections to the grid). *Cf. Solar Energy Indus. Ass'n v. FERC*, 80 F.4th 956, 969–989 (9th Cir. 2023) (upholding, in most respects, a FERC rulemaking concerning small renewable generation resources); *Piedmont*, 558 F.3d at 313–315 (remanding a FERC rulemaking for misinterpreting the plain text of an entirely different provision of the Federal Power Act, 16 U.S.C. § 824p (regarding transmission facility siting), but not involving any challenge to FERC's authority to act generically through a rulemaking of national applicability).

The list goes on.  In fact, the Rule in this litigation builds on other rulemakings that also govern nationally applicable transmission planning and cost allocation requirements, specifically Orders 890 and 1000.  *See* JA2069–2071, JA2074–2076, JA2105.  Order 890 was never judicially challenged but Order 1000 was upheld in *South Carolina*, 762 F.3d 41.  *See supra* pp.32–35.

2.  Proceeding by rulemaking rather than individual adjudication where FERC is implementing broadly applicable policy objectives is particularly rational given that it avoids producing an uneven playing field among regulated entities.  In fact, it may be "entirely *in*appropriate" to proceed via "case-by-case adjudication" in certain circumstances.  *Wis. Gas*, 770 F.2d at 1166 n.36 (emphasis added) (cited at JA2070).  A utility that is currently the target of a Section 206 proceeding might suffer unfair competition from utilities that are awaiting FERC's call to run the same Section 206 course.  *Id.  Cf. United States v. Fla. E. Coast Ry. Co.*, 410 U.S. 224, 244–245 (1973) (explaining that nationwide rulemaking is generally more appropriate for issuing broad policies as opposed to case-by-case adjudication).

### 3. FERC reasonably exercised its discretion to impose a nationwide rule notwithstanding variations in transmission providers' *status quo ante* practices

Trying a different tack, the States argue that notwithstanding FERC's authority to promulgate a nationwide rule, doing so here was irrational. They point to some transmission providers that have already achieved a degree of transmission planning success as a legal basis for restricting FERC to utility-by-utility adjudication. *See* States Br. 42–44.

The States' argument lacks merit. The Commission does not lose its ability to enact baseline policy standards just because certain utilities might already be meeting those standards. "That some [utilities] may engage in sufficient transmission planning processes 'is as unastonishing as it is irrelevant," *South Carolina*, 762 F.3d at 67 (quoting *Wis. Gas*, 770 F.2d at 1157), "because [the States] have not shown that the deficiencies identified by the Commission 'exist only in isolated pockets,'" *id.* (quoting *Assoc. Gas Distribs.*, 824 F.2d at 1019 (cleaned up)); JA740–742. Indeed, in a companion rulemaking addressing generator interconnections, the Commission likewise adopted a final rule representing a "broad suite of reforms," including individual reforms that had been implemented in one or more regions. *See Improvements to Generator Interconnection Procedures &*

127

*Agreements*, Order No. 2023, 184 FERC ¶ 61,054, P 59 (2023), *on review,*

*Advanced Energy United, et al. v. FERC*, D.C. Cir. Nos. 23-1282, *et al.* (fully

briefed; argued Sept. 26, 2025).

FERC is due "substantial deference" in assessing whether "current

planning and cost allocation practices [are] unjust or unreasonable." *South*

*Carolina*, 762 F.3d at 67 (quoting *Cities of Bethany v. FERC*, 727 F.2d 1131,

1137 (D.C. Cir. 1984)).  Thus, "[a]bsent … an extreme 'disproportion of

remedy to ailment,' the Commission could reasonably proceed to address a

systemic problem with an industry-wide solution." *Id.* (quoting *Assoc. Gas*

*Distribs.*, 824 F.2d at 1019).

The Rule is a reasonable "remedy" for the "ailment" of unreasonable

rates resulting from inadequate long-term transmission planning.  JA2026–

2028.  The Commission found, based on substantial record evidence, that

"deficiencies in transmission planning processes 'reach well beyond isolated

pockets' and instead pervade large swathes of the country, including

[regional market operator] and non-[regional market operator] planning

regions." JA2027 (quoting JA741) (cleaned up).  And it also predicted that

approaching transmission planning inadequacies piecemeal,

region-by-region, "will lead to 'siloed and disjunctive transmission planning

128

policies that will not solve the problems facing the nation's electric grid.'" JA2027–2028 (quoting JA742) (cleaned up).

The Commission backed up these findings with record evidence. It explained that "significant changes in transmission needs are well underway nationwide and that failing to account for Long-Term Transmission Needs threatens just and reasonable rates across the country." JA2028; JA742–743. As commenters observed, numerous factors are driving the need for new transmission across the Nation, and prior planning processes have not been meeting those needs. *See, e.g.*, JA3716–3717 (Nov. 30, 2021) (discussing cross-state factors including, for example, electricity demand due to broader electrification of transportation and buildings) (discussed and cited at JA742). And while "some transmission planning regions account for a wider range of the factors that drive Long-Term Transmission Needs" than others, FERC concluded that, as a general matter, transmission providers were not adequately "accounting for the known determinants" of long-term transmission needs. JA722–725. Against this backdrop, the Commission acted rationally in seeking to ensure, at a nationwide scale, that transmission investments are made in a more "efficient" and "cost-effective" manner than occurred previously. *See* JA742–743.

That more than suffices to uphold FERC's choice to proceed via rulemaking. Notwithstanding variations in transmission providers' current transmission planning processes, the Commission identified current deficiencies—e.g., failures to account for state and local laws related to energy generation and data center growth—that "pervade large swathes of the country." JA2027. And in deciding that current practices were, as a whole, unjust and unreasonable, FERC made reasonable predictions about factors that will continue to drive transmission needs. *See South Carolina*, 762 F.3d at 76 (explaining that a reasonable "prediction" may support a finding that FERC-regulated "practices were unjust or unreasonable"). The Commission's decision to institute a nationwide rulemaking, in an area "involving regulatory policy at the core of FERC's mission" to ensure "just and reasonable" rates, is "entitled to substantial deference." *Sacramento*, 616 F.3d at 533; *accord South Carolina*, 762 F.3d at 67.

130

**IV.  FERC reasonably determined that the Rule is a "just and reasonable" replacement**

Several petitioner groups challenge FERC's Federal Power Act Section 206 step-two determination that the Rule falls within the requisite "zone of reasonableness." *See Prometheus*, 592 U.S. at 423.  For their part, the States insist that the Rule is, among other things, inadequately clear and also discriminatory against state interests.  From a different perspective, Consumers and the Public Interest Organizations (the Organizations) argue that FERC was required to impose more, and more frequent, transmission planning mandates on transmission providers.

Both sets of arguments fail.  FERC enjoys broad discretion in "fixing"— i.e., setting—"just and reasonable" rates.  *See* 16 U.S.C. § 824e(a).  That means the replacement rate need only fall within a range of reasonableness. *Emera Me.*, 854 F.3d at 20, 23, 25 (citing cases).  Indeed, "'[s]tatutory reasonableness is an abstract quality' that 'allows a substantial spread between what is unreasonable because too low and what is unreasonable because too high.'"  *Id.* at 20 (quoting *FPC v. Conway Corp.*, 426 U.S. 271, 278 (1976)).  Whether a rate is "just and reasonable" is a product of FERC's weighing of competing investor and consumer interests, and its conclusion receives "great deference."  *Morgan Stanley*, 554 U.S. at 532; *FERC v. Elec.*

131

*Power Supply Ass'n*, 577 U.S. at 292; *see also Nantahala Power & Light Co. v. FERC*, 727 F.2d 1342, 1345 (4th Cir. 1984) (explaining that courts may not "reweigh the evidence and draw inferences therefrom" in reviewing FERC actions).

Here, FERC rationally weighed a mountain of record evidence and commentary to arrive at a Rule that, in its reasoned estimation, would produce substantial improvements in long-term transmission planning, thus resulting in "just and reasonable" rates.

### A.      The Rule is resource neutral and does not unduly discriminate against certain states' generation choices

The States first contend that the Rule is unlawfully discriminatory for establishing a single set of transmission planning assumptions that do not reflect states' differing generation policies. States Br. 45. This argument stumbles straight out of the gate because, as discussed *supra* pp.85–86, it is anchored in a false premise: that the Rule "subsidize[s] transmission facilities that align with certain generation." *Id.* Again, the Rule provides no subsidies to anyone. JA2097, JA2125.

From that false start the States insist that the Rule includes planning "requirements [that are] unduly discriminatory to some States versus others." Br. 45. But, also as discussed *supra* pp.87–88, 109, the Rule is

resource neutral; it includes no preference for some states' policies over the policies of other states. JA2114–2116, JA2247–2248. Instead, the Rule is reactive *to* states' policies. JA2111–2112, JA2149–2150. It requires transmission providers to acknowledge such policies (whatever they may be) and, if relevant, to consider how those policies impact transmission needs. JA2114–2115. Indeed, if a state or local policy promoting coal-fired power production, or alternatively solar energy, does not materially affect transmission needs, then the Rule allows transmission providers to deem consideration of such policy irrelevant. JA2116.

**B.    The States' contention that the Rule's seven benefits metrics lack the requisite clarity is jurisdictionally forfeited and is, in any event, meritless**

In evaluating transmission facilities, the Rule requires transmission providers to consider at least seven categories of benefits. JA2308–2309. Specifically, after identifying long-term transmission needs in a planning region, *see supra* p.51, transmission providers must weigh transmission facilities that are proposed to meet those regional needs against seven benefits criteria, JA2308–2309, which are listed *supra* p.53.

133

The States contend that these seven benefits metrics are unclear and that the Rule provides inadequate guidance as to how these metrics will be measured, weighed, and evaluated.  States Br. 45.

The States' argument is jurisdictionally forfeited because they did not press it with specificity in their rehearing application filed with FERC; the Court may not consider it.  Federal Power Act Section 313(b), 16 U.S.C. § 825*l*(b), requires that, to preserve an objection for appeal, a petitioner must comply with the statute's "unusually strict exhaustion requirement." *Ameren Servs. Co. v. FERC*, 893 F.3d 786, 793 (D.C. Cir. 2018) (cleaned up).  This obligation is of "virtually unheard-of" strictness, *ASARCO, Inc. v. FERC*, 777 F.2d 764, 774 (D.C. Cir. 1985), and is applied "punctiliously," *Nw. Pipeline Corp. v. FERC*, 863 F.2d 73, 78 (D.C. Cir. 1988) (cleaned up); *see also NICOR Expl. Co. v. FERC*, 50 F.3d 1341, 1346–1347 (5th Cir. 1995) (explaining that the rehearing requirement's "waiver provision is construed as a strict jurisdictional limitation on this court's power to review the Commission's orders").  A petitioner must have raised an objection in its own rehearing application to press it on appeal. *Entergy Servs., Inc. v. FERC*, 391 F.3d 1240, 1247 (D.C. Cir. 2004).  Further, a petitioner must "raise each

134

argument with specificity; objections may not be preserved either indirectly or implicitly." *Ameren*, 893 F.3d at 793 (cleaned up).

The States' rehearing application did not specifically object to the benefits metrics for any perceived lack of clarity or direction on how they would be "measured, weighed, and evaluated." *Cf.* States Br. 45. At most, the States mused that the "metrics will result in double-counting of potential benefits." States' Req. for Reh'g JA5365. FERC did respond to *that* complaint—which the States now abandon and thus waive on appeal. *Suarez-Valenzuela v. Holder*, 714 F.3d 241, 248–249 (4th Cir. 2013). In response to the complaint the States advanced on rehearing, FERC deemed the seven categories of benefits to be "distinct enough that they will not overlap in a way that results in double-counting." JA2324 (quoting JA1149); JA2326–2328. Further, to the extent double-counting concerns lingered, the Commission noted that the Rule "provide[s] transmission providers with flexibility on the measurement of such benefits" to avoid double counting. JA2324 (quoting JA1149); JA2326–2327. And, in any event, FERC found that the States had failed to substantiate their claim of potential double counting. Indeed, the States provided no "specific examples of the alleged overlap." JA2327.

Even if the States' newfound objection on appeal *were* preserved, it would fail twice over. *First*, the argument is underdeveloped and thus waived. Nowhere do the States explain *why* the benefits metrics are unclear or provide any citations to the record or any authority. *See Suarez-Valenzuela*, 714 F.3d at 248 (citing Fed. R. App. P 28(a)(9)).

*Second*, the Commission *did* provide guidance, expounding that transmission providers' compliance filings should include "a general description of how they will measure each of the seven benefits." JA1228. If the States deem transmission providers' method of measuring benefits opaque in their future compliance filings, and if the Commission nevertheless accepts those filings in its future compliance orders, states will have an opportunity to object at *that* time based on a concrete set of facts. *See* 16 U.S.C. § 824e(a); *see also* § 825*l*(b) (providing for judicial review of final FERC orders following rehearing).

### C. The Rule reasonably permits transmission providers to adopt a portfolio approach to assessing the benefits of long-term transmission facilities

The States also criticize the Rule as impermissibly allowing transmission providers to assess the benefits of long-term transmission facilities under a portfolio approach. States Br. 45–46. Rather than

136

evaluating such facilities on an individual basis, the portfolio approach permits transmission providers to consider multiple facilities in an aggregated, integrated fashion.  JA1249–1250.

The Commission reasonably deemed a portfolio approach to be "just and reasonable" after weighing competing views elicited through comments. On the one hand, reviewing several proposed facilities together leverages administrative efficiencies and economies of scale that could result in more widely distributed benefits.  *See id.*  For example, commenters observed that facility-specific reviews often fail to identify the most cost-effective and efficient investments, resulting in a patchwork of transmission projects rather than a cohesive, integrated network.  JA1250–1254.  Indeed, the Midcontinent regional market operator has implemented a portfolio approach in its region that, commenters explained, produces "lower interconnection costs for generators" and overall "benefits that exceed costs." JA1251–1252.

Other commenters disagreed, arguing that a facility-by-facility approach can be preferable in order to avoid, for example, unnecessary delays in individual projects, and to allow beneficial projects to be built that might not otherwise be constructed under a one-size-fits-all approach.

JA1254–1256.  Still others argued that a portfolio approach could "mask bad individual transmission projects in a portfolio or result in good transmission projects not being approved because of difficulties in obtaining multiple state approvals that may be necessary for a portfolio."  JA1258–1259; *see also* JA2355–2356.

FERC considered all these comments and ultimately decided to allow, but not to mandate, incorporation of a portfolio approach into transmission providers' long-term planning.  JA2357–2358.  The Commission credited substantial record evidence showing that the portfolio approach produces administrative and economic efficiencies, better distribution of benefits, and a greater likelihood of achieving agreement on regional cost allocation.  JA1260; JA2357–2358.  But the Commission also acknowledged evidence that facility-by-facility assessments could have advantages.  JA1260; JA2357–2358.

That said, FERC did reject the States' assertion that a portfolio approach unlawfully allocates uneconomic project costs to non-beneficiaries.  *See* Br. 46.  The Commission explained that, regardless of the assessment method used, transmission providers must "demonstrate that [any] cost allocation methods allocate costs in a manner that is at least roughly

138

commensurate with estimated benefits." JA2358–2359. The States offer nothing of substance in response, except to make the bald assertion that the portfolio approach "is unjust, unreasonable, and unduly discriminatory against some States." Br. 46. *Cf. Fla. Mun. Power v. FERC*, 602 F.3d 454, 461 (D.C. Cir. 2010) (The question on substantial evidence review "is not whether record evidence supports [petitioner's] version of events, but whether it supports FERC's.").

In short, the Commission reasonably decided that transmission providers may use a facility-by-facility approach, a portfolio approach, or both, within the same long-term planning process. JA1259–1260. That conclusion deserves "substantial deference" both because it concerns a matter falling squarely within FERC's ratemaking expertise, *South Carolina*, 762 F.3d at 67, and because it reflects FERC's "intelligibly explained" "weigh[ing of] competing views," grounded in record evidence, *Vistra Corp. v. FERC*, 80 F.4th 302, 313 (D.C. Cir. 2023).

## D.  FERC reasonably chose a 20-year transmission planning time horizon

For each long-term planning cycle—which occur at least every five years—the Rule requires transmission providers to anticipate transmission needs at least 20 years into the future. JA2202–2203, JA2211–2212. The

139

States argue that FERC "behaved unreasonably" in setting a 20-year period rather than affording transmission providers greater forecasting flexibility. States Br. 48.

The States fail to show that the Commission behaved unreasonably. Their argument amounts to a policy disagreement with FERC over a reasonable length of time to project transmission needs. *See FERC v. Elec. Power Supply Ass'n*, 577 U.S. at 292 (explaining that a court "may not substitute [its] own judgment for that of the Commission"). The question for purposes of judicial review is not whether FERC chose the best policy, but whether its *choice* of policy is "reasonable and reasonably explained" and falls "within a zone of reasonableness." *Prometheus*, 592 U.S. at 423. That is particularly so where the Commission is charged with drawing administrative lines—here, a 20-year planning period—in which event the Court will not upset FERC's determination unless the "line-drawing" is "patently unreasonable." *Keating v. FERC*, 569 F.3d 427, 433 (D.C. Cir. 2009) (cleaned up).

The States do not even attempt to argue that the Commission fell short in this endeavor; any such argument is waived. *Suarez-Valenzuela*, 714 F.3d at 248–249. It would fail in any event. FERC reasonably weighed various

140

considerations in arriving at the 20-year timeframe. It explained that planning 20 years into the future accounts for state laws that include requirements to be met 15-to-20 years hence, while also allowing sufficient time to identify, plan, obtain siting and permitting approval for, and to construct, long-term facilities. JA2202–2203. Further, the Commission found that a shorter period may not provide adequate time to develop long-term facilities that have long lead-time requirements. JA2203.

The Commission also considered the concern that a 20-year time horizon could result in potentially speculative transmission projects, thus misallocating costs. JA2203–2204. It explained that any such concerns are addressed by the Rule's "tools and safeguards designed to avoid over-building transmission in response to speculative transmission needs"— e.g., the requirement that transmission providers develop and periodically update multiple plausible and diverse long-term planning scenarios based on best available data, and the requirement that transmission providers consult with states on how best to account for states' laws, policies, and regulations in making planning assumptions. JA2204–2206. The States contest none of these "reasonable and reasonably explained" findings. *See Prometheus*, 592 U.S. at 423; *see also Keating*, 569 F.3d at 433.

141

### E.    The States lack a statutory prerogative to require transmission providers to accept *their* preferred cost allocation schemes

1. The Rule grants transmission providers several options for allocating the costs of future-selected transmission facilities chosen through the long-term planning process.  In all circumstances transmission providers must propose to FERC, in their compliance filings, a default, *ex ante* cost allocation method for future-selected regional transmission facilities. JA1994–1995, JA2003, JA2108.  But transmission providers may also propose a State Agreement Process, whereby implicated states voluntarily agree to a cost allocation method for specific long-term facilities (or portfolio of such facilities) that would apply instead of the default method.  JA1594–1597; *see also* JA2499–2501.  Development of both types of cost allocation schemes occurs during a six-month engagement period.  JA1563, JA1565–1566.  During that period transmission providers must, among other things, provide a forum for negotiating the *ex ante* cost allocation method and a State Agreement Process.  JA1563, JA1565–1566; *accord* JA2003–2004, JA2537–2538.

Even if the State Agreement Process is pursued, FERC required the filing of an *ex ante* default method to serve as a backstop.  If transmission

142

providers otherwise agree to file a State Agreement Process, but states do *not* ultimately agree to such cost allocation for certain facilities, then the *ex ante* default kicks in and ensures that *some* cost allocation method is applied. JA2501; *accord* JA1525–1528.

2.  The States contend that this process infringes their perceived cost allocation rights.  They argue that an *ex ante* scheme does not grant states sufficient power to implement *their* preferred cost allocation approaches. States Br. 50–51.  The States reason that, because state-regulated retail customers will ultimately pay the downstream costs of interstate transmission development, "a State's [cost allocation] preference" should "be incorporated into [a transmission provider's] planning decision." *Id*. at 52–53.

The States' contention finds no footing in law or fact.  Legally and dispositively, regulating cost allocation for interstate transmission projects falls within the exclusive jurisdiction of FERC.  *See South Carolina*, 762 F.3d at 84 (holding that "cost allocation" reforms in transmission planning constitute a "'practice' affecting rates" under Federal Power Act Section 206(a)); 16 U.S.C. §§ 824(b)(1), 824e(a) (providing that FERC has exclusive jurisdiction over interstate transmission and practices affecting rates *for*

143

such transmission); *see also FERC v. Elec. Power Supply Ass'n*, 577 U.S. at 277 n.5, 278 (explaining that Federal Power Act Section 206(a) unambiguously confers upon FERC authority to regulate "rules or practices that directly affect the [FERC-jurisdictional] rate" (emphasis omitted) (cleaned up)).  Contrary to the States' misapprehension, the Federal Power Act does not require FERC-regulated transmission providers to file *states'* preferred cost allocation proposals in lieu of their own.  *Cf.* Br. 51–53 (lamenting that a "transmission provider may ignore" a state's preferred cost allocation method under the Rule).  The Rule regulates transmission providers, not states.  *See* 16 U.S.C. § 824d (providing that FERC regulates "public utilit[ies]" like transmission providers).

The States are also wrong on the facts.  Beyond their charged rhetoric criticizing the Rule for "socializ[ing] ... costs" and "preferen[cing] ... differing types of generation" (Br. 50, 52), which is also erroneous, *see supra* pp.85–87, the States miss the mark in arguing that they lack an "effective voice on cost allocation."  Br. 51–52.  Actually, the Rule—as modified on rehearing by Order 1920-A—requires transmission providers to include competing state-developed cost allocation methods in their compliance filings with FERC.  JA2829–2830, JA2882–2887, JA2888–2889, JA2891–

144

2892. And FERC expressly retains discretion to choose states' cost allocation schemes *over* those preferred by transmission providers. JA2892–2893, JA2903–2905; *see also infra* pp.195–197. The States' opposite contention that "[they] are effectively removed from the cost allocation process" is baseless. *Cf.* Br. 51.

### F.    The claims of Consumers and Public Interest Organizations that the Rule unlawfully declines to impose more stringent requirements fail to defeat FERC's reasoned alternative policy choices

Attacking the Rule from the opposite direction, Consumers and the Organizations argue that FERC unlawfully failed to impose stricter regulations than it did. Consumers insist that the Rule is not "just and reasonable" because it does not "implement binding, concrete cost controls" that Consumers believe would result in necessary "cost savings." Consumers Br. 23–24. For their part, the Organizations complain that the Rule does not "fully achieve the remedial promise of Order 1920." Organizations Br. 56.

Both sets of claims fail. The Commission reasonably balanced competing arguments and objectives and properly exercised its "broad discretion" to choose a rate that falls within a range of reasonableness. *See Morgan Stanley*, 554 U.S. at 532; *Emera Me.*, 854 F.3d at 23.

1.    **FERC reasonably deferred consideration of the Construction Work in Progress incentive to another proceeding**

Consumers contend that the Commission's decision not to eliminate a particular financial incentive for transmission owners means consumers will continue to shoulder the financial risk of transmission facilities that might not enter service. *See* Consumers Br. 24–26. The incentive, called Construction Work in Progress (Construction Incentive), allows transmission owners to include in their rates costs related to the construction of transmission facilities before those facilities enter service. *See* JA397–398, JA1675–1676, JA2648–2649. In a prior order, FERC determined that the Construction Incentive "reasonably balances consumers' interest in fair rates against investors' interest in maintaining financial integrity and access to capital markets." JA398 (quoting *Promoting Transmission Investment Through Pricing Reform*, Order No. 679, 116 FERC ¶ 61,057, P 117 (2006)).

The Notice of Proposed Rulemaking or NOPR (i.e., the proposal that preceded the Rule) made a "preliminar[y]" finding that the Construction Incentive "may shift too much risk to consumers" and solicited comments. JA399–400. After considering stakeholders' views, FERC ultimately

decided not to eliminate the Incentive in the final Rule. *See* JA1676–1693.
The Commission agreed with commenters that any action on the
Construction Incentive was more appropriately taken in a separate
proceeding to ensure a "holistic approach" to all transmission incentives—
i.e., not just the Construction Incentive. JA1693, JA2651–2652. FERC acted
within its discretion to decide how best to order its proceedings and was
entitled to defer consideration of the Construction Incentive to a later
proceeding. *See Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council,
Inc.*, 435 U.S. 519, 543 (1978) (explaining that an agency enjoys
"administrative discretion in deciding how, in light of internal organization
considerations, it may best proceed to develop the needed evidence"
(quoting *FPC v. Transcon. Gas Pipe Line Corp.*, 423 U.S. 326, 333 (1976));
*see also Mobil Oil Expl. & Producing Se. Inc. v. United Distrib. Cos.*, 498 U.S.
211, 231 (1991) ("[A]n agency need not solve every problem before it in the
same proceeding.").

Consumers insist that the Commission's deferral here fails to "provide
consumers a 'complete, permanent and effective bond of protection from
excessive rates and charges.'" Br. 26 (quoting *Atl. Seaboard Corp. v. FPC*, 397
F.2d 753, 756 (4th Cir. 1968)). From this premise they reason that FERC

147

unlawfully refused to eliminate the Construction Incentive in this proceeding because the Incentive, they argue, "shield[s] investors" from financial risk. *Id.* at 27. But ensuring protection against excessive rates and charges still involves, as Consumers correctly acknowledge, "balancing of the investor and consumer interests." *Id.* (quoting *Morgan Stanley*, 554 U.S. at 532). That is acutely so in the context of transmission incentives given that, in 2005, Congress *required* FERC to afford incentive-based rate treatment to promote the development of much-needed interstate transmission. *See San Diego Gas & Elec. Co. v. FERC*, 913 F.3d 127, 130 (D.C. Cir. 2019) (citing 16 U.S.C. § 824s). Indeed, in adding Section 219 to the Federal Power Act, Congress decided that granting incentives to transmission owners—i.e., incentives petitioning Consumers challenge here as harming consumers— would ultimately "*benefit* consumers by ensuring reliability and reducing the cost of delivered power by reducing transmission congestion." *Id.* (emphasis added) (quoting § 824s(a)) (cleaned up).

In short, Consumers' urging that FERC must eliminate consumers' financial risk distills to a disagreement with *Congress'* determination that such risks can be worth the cost. *See id.* (explaining that, "[i]n Congress's view," incentives "would ultimately benefit consumers, even as it also cost

148

them"). And more to the point, Consumers fail to explain why a final Rule that does not eliminate the decades-old Construction Incentive falls outside the "zone of reasonableness." *See Prometheus*, 592 U.S. at 423; *Morgan Stanley*, 554 U.S. at 532.

### 2. FERC reasonably declined to mandate independent monitoring of new transmission projects and a revamped prudence standard

1. Consumers make a passing contention that the Commission unlawfully failed to mandate the installation of independent monitors to review new transmission projects. Consumers Br. 28. But they offer no explanation, much less a reasoned one, why such measures are necessary for the Rule to be "just and reasonable" (and thus acceptable under the Federal Power Act). *Cf. id.*; *see also* JA2696 (explaining that FERC will consider whether there is a need for independent transmission monitors in the future). Their dispute amounts to a policy disagreement with FERC, which falls far short of the showing needed to reject FERC's determination. *See, e.g., Transcon. Gas Pipe Line Corp. v. FERC*, 518 F.3d 916, 920 (D.C. Cir. 2008) (explaining that courts defer to FERC's "policy choice[s]," particularly "when FERC is involved in the highly technical process of ratemaking").

149

2.  In a similar vein, Consumers argue that FERC's preexisting prudence standard is inadequate to ensure that consumers are charged only reasonable costs for transmission facilities.  Br. 29–30.  Under that standard, the Commission considers whether costs incurred "are costs which a reasonable utility management … would have made, in good faith, under the circumstances, and at the relevant point in time."  *New England Power Co.*, 31 FERC ¶ 61,047, at p.61,084 (1985).  But the Commission found, in its judgment, that enhanced transparency requirements (discussed *infra* pp.225–227) are "sufficient to remedy the deficiencies in local transmission planning," even if Consumers "would have preferred that the Commission had gone further."  JA2695–2696.  And, in any event, costs incurred for transmission investments are "subject to review in the ratemaking process" that operates separately from transmission planning for future needs.  *S. Cal. Edison Co.*, 168 FERC ¶ 61,170, P 36 (2019); *see also* JA1823–1824 ("[N]othing in the reforms we adopt here alters existing Commission policy on cost recovery for transmission facilities" or the scrutiny applied in so-called "prudence" reviews.).  Consumers fail to mount any challenge to FERC's determination, which is fatal to their claim.  *See Suarez-Valenzuela*, 714 F.3d at 248–249.

150

### 3. FERC reasonably preserved the Order 1000 transmission planning process in certain circumstances

The Organizations challenge the Rule as unlawfully lenient on numerous discrete grounds. All their claims stem from the Organizations' fundamental objection that FERC "stopp[ed] short of remedying all the problems that it found." Organizations Br. 20. Given that FERC did not need to "solve every problem before it in the same proceeding," *Mobil Oil*, 498 U.S. at 231, the pertinent question is whether the Commission provided reasonable explanations for the reforms it adopted, under a deferential standard of review, *see Prometheus*, 592 U.S. at 423; *PACEM*, 148 F.4th at 263. FERC's lengthy orders do just that.

The Rule focuses on enhancing long-term transmission planning. JA2801–2803. But not all transmission projects are suited to the Rule's 20-year planning horizon. *See* JA2187–2188 (distinguishing projects that address "shorter-term reliability and economic transmission needs"). The Order 1000 transmission planning process, for instance, serves shorter-term needs. *See* JA816–819. Thus, the Rule allows transmission providers to preserve their Order 1000-compliant planning processes "for shorter-term reliability and economic transmission needs." JA2188, JA816–817. This

151

accommodation strikes a reasonable balance between reforming the pre-Rule system and preserving facets of that system that meet tailored goals. *Cf. TC Ravenswood, LLC v. FERC*, 741 F.3d 112, 119 (D.C. Cir. 2013) (explaining that courts "defer to [FERC's] reasonable choice" in the Commission's "weigh[ing] competing record evidence").

The Organizations decry FERC's weighing of divergent interests as a wholesale disavowal of the Rule's very purpose. *See* Br. 21–22. But their various objections misstate the record evidence or otherwise amount to mere policy disagreements with FERC. For example, the Organizations argue that the Commission inconsistently criticized the Order 1000 process as resulting in unjust and unreasonable rates, while nevertheless preserving that process in certain contexts. *Id.* at 22–23. That contention, however, ignores the substantial reforms FERC *did* enact in the new Rule. In fact, the Organizations themselves acknowledge the Rule's substantial planning improvements over the *status quo ante*: They "generally support Order 1920's planning process" because it effectuates "significant and beneficial transmission planning reforms." *Id.* at 57, 60. And they go further, averring that "these reforms are necessary to fix a broken status quo … [that] impose[s] significant and excessive costs on consumers." *Id.* at 57. Yet in

152

criticizing FERC for not dispensing altogether with the Order 1000 planning process, the Organizations contend that FERC "contradicted its own findings" that the Order 1000 process is inadequate. *See id.* at 22–23.

The Organizations cannot have it both ways, arguing in some places that the Rule will result in much-needed reforms while insisting in others that the Rule abandons FERC's promise *of* meaningful reform. In any event, the Organizations' former position is correct. The Rule *requires* transmission providers to implement long-term planning processes, and those processes in turn *require* transmission providers to evaluate proposed transmission facilities against new, binding criteria. JA817–818, JA929–930, JA2251–2252, JA2308–2309; *see also* JA2801–2806. The Commission reasonably concluded that preserving Order 1000's planning process for shorter-term projects complements rather than topples the Rule's reforms. *See* JA2187–2188. Such balancing falls comfortably within FERC's "broad discretion" to weigh competing interests, and its determination where to strike the balance is accorded "great deference." *Morgan Stanley*, 554 U.S. at 532; *see also Nuclear Energy Inst., Inc. v. EPA*, 373 F.3d 1251, 1276 (D.C. Cir. 2004) (Where a determination involves a "not easily defined area[]" of law, not precisely defined by statute or regulation, the court's "review is

considerably more deferential, according broad leeway to the [Commission's] line-drawing determinations." (cleaned up)).

But, the Organizations protest, the Commission should have at least required transmission providers to engage in a combined process for planning short-term and long-term transmission projects. Br. 25–26. Given FERC's finding that preserving Order 1000 planning for shorter-term projects does not destroy the Rule's "just and reasonable" outcomes, FERC reasonably did not impose such a mandate. *Cf.* JA2188. The Commission also made the obvious point that merging two sets of planning processes would introduce administrative difficulties otherwise absent. JA2187–2188, JA819–820. In any event, FERC did not reject a combined process; transmission providers may propose such an approach in their compliance filings. JA818–819.

Finally, the Organizations fault the Commission for deferring any analysis of conflicts between the Order 1920 and Order 1000 processes to FERC proceedings reviewing individual transmission providers' Order 1920 compliance filings. Br. 29–31. But until transmission providers make those filings, which will detail their long-term planning and cost allocation processes, *see* JA1842–1843, JA1845, the emergence of conflicts remains

154

speculative, *see* JA2188–2189; *see also South Carolina*, 762 F.3d at 79 n.10 (explaining that FERC need not respond to speculative concerns). And as the Organizations correctly point out (Br. 29), the Commission retains discretion to defer such issues to compliance proceedings. *See City of Cleveland v. FERC*, 773 F.2d 1368, 1374–1375 (D.C. Cir. 1985); *see also Mobil Oil*, 498 U.S. at 231 (explaining that an agency need not solve all problems in a single proceeding).

### 4. FERC reasonably established five-year, rather than three-year, planning cycles

The Rule provides that transmission planning occurs for "no less than a 20-year transmission planning horizon" in five-year cycles. JA890–891, JA909; *see supra* pp.139–140. Transmission providers must therefore reassess their long-term planning scenarios—used to conduct long-term transmission planning—at least once every five years. JA909.

In the NOPR, the Commission initially proposed a shorter three-year cycle. *See* JA895. The Organizations argue that this two-year delta makes all the difference. They reason that a three-year timeframe fulfills the imperative to take "decisive action" to spur long-term transmission planning, but a five-year cycle will impermissibly "slow[] the pace of long-term planning." Organizations Br. 31, 33.

155

The Organizations fail to show that the Commission's statutory responsibilities compel the selection of their preferred timeframe. *See* JA2217–2218 ("[The Organizations] provide insufficient and unconvincing support for their argument that a five-year [long-term] [p]lanning cycle is incapable of accounting for that pace of change."). Instead of furnishing the requisite evidence, the Organizations recite reasons why improved long-term transmission planning is needed—e.g., the dramatic growth of data centers and anticipated increases in transmission investments. Br. 31–32. But the Commission agrees with all these points; they undergird the Commission's finding that the Rule's reforms are needed.

At most, the Organizations observe that five annual Order 1000 planning cycles might fit into one, five-year Order 1920 planning cycle. *Id.* at 33–34. The implication, apparently, is that as regulatory and market conditions change, transmission providers might not wait for the next five-year planning cycle to address those changes. Instead, they could find a way to squeeze a project prompted by changed conditions into the next, sooner Order 1000 planning cycle. *See id.*

This contention is entirely speculative. And, at any rate, FERC provided a reasoned explanation for choosing five years over three. It

156

explained that its chosen timeframe strikes a balance between ensuring timely selection of long-term transmission facilities on the one hand and limiting administrative burdens placed on transmission providers on the other. JA2218–2219. Indeed, FERC chose five years in direct response to parties' comments that a three-year interval would impose unreasonable administrative duties. *See* JA910–912. The Organizations chide FERC for not verifying transmission providers' claims of administrative burden (*see* Br. 36), but the Commission was entitled to rely on the more-than-a-dozen comments supporting this assertion. *See, e.g., South Carolina*, 762 F.3d at 69, 80 (relying upon comments filed in the Order 1000 rulemaking that supported FERC's determination).

Finally, the Commission *did* afford transmission providers the compressed timeline the Organizations insist upon. The Rule preserves providers' flexibility to update assumptions, inputs, and factors used to inform long-term scenarios *during* each five-year period. Thus, transmission providers need not wait for each new five-year cycle to commence before addressing changed market conditions. JA2217–2218, JA912. The Organizations complain that such updates would themselves take significant time (Br. 34–35), but then so would the Organizations'

157

demanded approach of commencing an entirely new planning cycle every three years. In short, the Organizations do not come close to showing that FERC abused its discretion in settling on the balance it did. *See Morgan Stanley*, 554 U.S. at 532.

> **5.  FERC reasonably declined to add an eighth long-term planning factor specific to advanced-stage, merchant high-voltage direct current transmission facilities**

To decide what long-term transmission facilities will efficiently and cost-effectively meet future demand, transmission providers must develop three future scenarios to guide the long-term planning process. JA1029–1030. Each five-year planning cycle must include at least one set of these three scenarios. JA1029–1030. And the scenarios must incorporate the already discussed (*see supra* p.51) seven categories of factors indicating transmission need—e.g., laws affecting the resource mix, resource retirements, and utility commitments. JA929–930, JA1029–1030. The group of Invenergy petitioners urged FERC to add an eighth factor specific to their business model—the existence of advanced-stage, merchant-owned, high-voltage direct current transmission facilities (hereafter, "merchant high-voltage lines"). Organizations Br. 37–45.

The Commission reasonably declined to do so. *First*, the seven categories of factors all address drivers of transmission *need*. *See* JA2276–2278. A proposed data center or a state law promoting more nuclear plants might influence the need for transmission line construction near those facilities. *See* JA929–930 (listing the seven factors). But a merchant high-voltage line differs qualitatively because it constitutes a "transmission facilit[y] [that] could *address* transmission needs." JA2276–2278. As the Commission explained, Invenergy "failed to clearly articulate how proposed but not yet built merchant [high-voltage lines] are essential to *identifying*, or are known and identifiable *drivers of*, [long-term] [n]eeds." JA2276–2278 (emphases added).

*Second*, contrary to Invenergy's claim, the Rule *does* require transmission providers to consider merchant high-voltage lines in the long-term planning process. Merchant high-voltage lines are generally treated as external to the transmission provider's system and thus must submit an interconnection request to the relevant transmission provider to interconnect to the grid. *See, e.g., Invenergy Transmission LLC v. Midcontinent Indep. Sys. Operator, Inc.*, 193 FERC ¶ 61,033, P 2 n.5 (2025) (citing Midcontinent, FERC Electric Tariff, att. GGG (32.0.0), § 1

(Definitions)).  In Order 1920-A, the Commission clarified that transmission providers, in addressing interconnection requests and withdrawals under long-term planning Factor Category Six, must include merchant transmission developer interconnection requests—e.g., requests to interconnect high-voltage lines—in the development of long-term scenarios, and in a manner comparable to other interconnection requests.  JA2279–2280.

Invenergy's only concrete evidence that merchant high-voltage lines are not assessed in the transmission planning process is inapposite.  It argues that the planning process followed by the regional market operator Midcontinent excluded from transmission planning consideration of Invenergy's Grain Belt Express LLC high-voltage line.  Organizations Br. 41.  But as the Commission explained, the dispute over Invenergy's Grain Belt project "speaks to a separate issue currently before the Commission" in a separate FERC proceeding—i.e., it says nothing about whether Midcontinent must consider merchant high-voltage lines going forward to comply with the Rule on review.  *See* JA2279.  More relevant is Order 1920-A's clarification in *this* proceeding that merchant high-voltage lines

160

*should* be considered in long-term planning under planning Factor Category Six. JA2279–2280.

Regardless, recent events diminish the value of the Grain Belt example to Invenergy's claim. After the Organizations filed their brief in this matter, on October 16, 2025, the Commission granted in part Invenergy's Federal Power Act Section 206 complaint that Midcontinent unlawfully excluded the Grain Belt project from its transmission planning process. *See Invenergy*, 193 FERC ¶ 61,033, P 53 (deeming Midcontinent's tariff "unjust, unreasonable, or unduly discriminatory or preferential insofar as it does not address when and how [merchant high-voltage] transmission projects are incorporated into [Midcontinent's] transmission planning models").

*Finally*, consistent with FERC's sensible approach throughout the Rule of vesting transmission providers with flexibility to tailor solutions to regional needs, the Rule allows transmission providers to incorporate additional categories of planning factors into their development of long-term scenarios. JA2276–2278. Thus, "in transmission planning regions where proposed [high-voltage direct current] transmission facilities may play a role in shaping [long-term] [n]eeds, transmission providers have the flexibility to consider and incorporate such facilities into their

[l]ong-[t]erm [s]cenarios," *id.*—e.g., by creating a standalone planning category focusing on such facilities, *see* JA2276–2278.

### 6. FERC reasonably declined to include energy storage as an alternative transmission technology that transmission planners must consider

Transmission lines are not the only facilities that can efficiently and cost-effectively meet long-term transmission needs. New and emerging technologies make transmission lines more efficient and also displace the need for new transmission investments. JA354. Thus, the Rule requires transmission providers to assess four alternative transmission technologies in their long-term and existing Order 1000 planning processes. JA1461–1463. Those technologies are: (1) dynamic line ratings, (2) advanced power flow control devices, (3) advanced conductors, and (4) transmission switching. JA1461–1463. The Organizations argue (Br. 45–49) that the Commission was required to add one more technology to the list: energy storage resources. *See Nat'l Ass'n*, 964 F.3d at 1182–1183 (explaining that energy storage resources refer to resources that may receive electric energy from the grid and store it for later injection of electric energy back to the grid—e.g., batteries).

FERC reasonably declined to do so.  While the Commission acknowledged that energy storage resources *might*, in certain circumstances, perform a transmission-supporting function, it found a lack of record evidence that this is true on a "generic basis."  *See* JA2495–2497.  The four selected technologies, by contrast, are specifically geared at transmission optimization.  *See* JA1461–1463.  As the Commission explained, energy storage is materially different because that technology does not necessarily serve a transmission-enhancing purpose.  JA2495–2497.  Thus, an energy storage proposal would require a transmission provider to engage in substantially greater and more time-consuming analysis to determine, for example: (1) whether a particular "electric storage resource would strictly act as a transmission asset," (2) whether it would recover costs specifically aligned with solving transmission issues, and (3) whether its construction would impact the generator interconnection queue.  JA2495–2497.  The Commission reasonably decided not to impose this burden on transmission providers.  *See Vistra*, 80 F.4th at 313 (explaining that the court upholds FERC decisions that "weigh[] competing views," have "adequate support in the record," and are "intelligibly explained" (cleaned up)).  Even so—and continuing with a theme—while the Rule does not include an energy storage

163

mandate, it preserves transmission providers' flexibility to consider energy storage in their long-term plans.  JA2495–2497.

### 7.    FERC rationally imposed a set of seven benefits that transmission providers must consider in evaluating transmission facilities

As discussed *supra* p.53, transmission providers must assess new, long-term transmission facilities against seven specified benefits metrics. JA2308–2309.  The Organizations argue that FERC was required to add four additional metrics to the bunch.  Organizations Br. 51.

FERC reasonably decided otherwise.  The Commission explained that the seven adopted metrics are "sufficiently broad" to ensure that the Rule improves long-term transmission planning.  JA1218; *see also* JA1141.  Thus, FERC concluded that mandating "additional benefits in [long-term] [p]lanning is not necessary to ensure that rates remain just and reasonable." JA1218.

The Organizations muster no serious argument otherwise.  At most they allege—without citing any evidence—that "the list of seven benefits is too narrow to fully achieve the remedial promise of Order 1920."  Br. 56.  But satisfying a "remedial promise" is not the governing legal standard.  The

question is whether the Rule is "just and reasonable." *Morgan Stanley*, 554 U.S. at 532.

Even if the Rule's putative "remedial promise" *were* the proper yardstick, the Organizations' assertion suffers from two fundamental defects. *First*, assuming without conceding that the Rule does not "fully achieve" some vague conception of FERC's "promise," that does not constitute evidence of unreasoned decisionmaking. The Commission is entitled to "decid[e] what competing values will or will not be sacrificed in the achievement of a particular objective," *Rodriguez v. United States*, 480 U.S. 522, 525–526 (1987) (per curiam), and need only act within a "zone of reasonableness," *Prometheus*, 592 U.S. at 423. Here, FERC reasonably opted for a set of seven benefits that achieve a "just and reasonable" rate.

Drawing the line at seven is particularly rational given commenters' concerns that the Organizations' proposed additional benefits metrics overlap with other metrics in the list, thus raising the specter of double-counting. *See* JA1132–1133, 1141. For example, the benefits categories "production cost savings" (ultimately included) and "access to lower-cost generation" (ultimately excluded) both involve considering whether a transmission line will increase the dispatch of lower-cost

generators. *See* JA1132–1133.  Similarly, the categories "capacity cost benefits from reduced peak energy losses" (ultimately included) and "deferred generation capacity investments" (ultimately excluded) both measure whether a transmission line can obviate the need for building new power plants.  *See* JA1132–1133.

*Second*, contrary to the Organizations' insistence, the Commission was not required to "fully achieve" any objective besides providing for "just and reasonable" rates, nor was it required to "solve every problem before it in the same proceeding." *E.g.*, *Mobil Oil*, 498 U.S. at 231.  The Organizations cannot overcome these principles simply by asserting (Br. 57), without citing any evidence, that forgoing imposition of four additional benefits "could result in billions of dollars in lost cost savings." *Cf. South Carolina*, 762 F.3d at 71 (rejecting petitioners' unsupported "*ipse dixit*").

In any event, FERC (again) preserved transmission providers' flexibility—as relevant here, to measure and use additional benefits metrics (including those urged by the Organizations) in their long-term transmission planning.  JA1219.

166

### G.  The Rule reasonably allocates interconnection-related network upgrade costs

Consumers press various other challenges to the Rule, none of which hold water.  Taking aim at transmission projects that support generator interconnections, Consumers accuse the Commission of *sub silentio* overruling the cost allocation policy for transmission upgrades—set forth, more than 20 years ago, in Order 2003—that are required to interconnect electric generators to the grid.  Consumers Br. 37–38.  In their view, FERC discarded that policy with the 2024-issued Rule, even though FERC recently *affirmed* that policy in another rulemaking (Order 2023) in 2023.  *See id.* at 38.

1. Consumers' claim is as implausible as it is incorrect.  The Rule leaves the Order 2003 and Order 2023 interconnection cost allocation policy—affirmed by the agency just one year before it issued the Rule on review—intact.  JA2461–2462.  Instead, the Rule addresses cost allocation for grid upgrades that address interconnection-related transmission needs that were never addressed under the Order 2003/2023 interconnection process.  JA2461–2462.  If an upgrade identified through the Order 2003/2023 process *is* constructed through that process—i.e., if an interconnecting generator signs an "interconnection agreement" with the

transmission provider—then costs for that upgrade will be allocated pursuant to that method, just as Consumers urge. JA2461–2462; Consumers Br. 38 (arguing that the Order 2003/2023 framework allocates such costs to generators, not consumers). But if the Order 2003/2023 interconnection process never results in an interconnection agreement (meaning the upgrade will not be built under the Order 2003/2023 method and the generator may not be able to interconnect), the Rule provides a backup means to evaluate that transmission need—specifically, through the existing Order 1000 regional transmission planning and cost allocation process. JA2461–2462; *see also* JA1391–1392, JA1397 (recognizing that Order 2003/2023 interconnection requests often break down due to the generator's cost responsibility for expensive interconnection-related network upgrades). And even then, the transmission project that addresses such need will only be selected—and its costs allocated according to the Order 1000 process—if it is deemed "the more efficient or cost-effective regional transmission solution." JA2457–2458, JA2462–2463.

In short, contrary to the Consumers' contention (Br. 38–42), the Rule supplements rather than supplants the Order 2003/2023 network upgrade process. *See* JA2461–2462; *see also* JA1403–1404. Consumers thus err in

168

arguing that FERC acted unlawfully in not finding that the Order 2003/2023 cost allocation process was unjust and unreasonable—as required to satisfy step one of the Federal Power Act Section 206 inquiry—before *replacing* it with an alternative process. *Cf.* Br. 42; *see supra* pp.17–18. In fact, FERC did *not replace* the Order 2003/2023 process; it simply provided a backstop where that method is not addressing certain transmission needs. *See* JA2461–2462.

2. Nor are Consumers correct that the Commission failed to demonstrate, at step two of the Section 206 inquiry, *see supra* p.18, that its reform is "just and reasonable" and not unduly discriminatory or preferential. *Cf.* Br. 43. Consumers first reason that shifting certain interconnection-related upgrades to the regional transmission planning process "creates [a] preference" for upgrades because it allows generators to "escape" paying the upgrade costs through the Order 2003/2023 process. *Id.* But Consumers cite nothing for the proposition that placing certain interconnection-related transmission needs on equal footing with other regional transmission needs is somehow unduly preferential. *See* 16 U.S.C. § 824e(a). And, in any event, FERC reasonably determined that considering such needs through the Order 1000 process is "just and reasonable" because

169

that process requires any selected transmission project to be "the more efficient or cost-effective regional transmission solution." JA2462–2463. As the court in *South Carolina* already confirmed, that Order 1000 process is "just and reasonable" and otherwise lawful. *See* 762 F.3d at 48–49, 55.

Approaching their Section 206 step two claim from a different angle, Consumers complain that including interconnection-related transmission costs in the Order 1000 regional transmission planning process means consumers unlawfully pay for interconnections that benefit generators. Br. 43–44. But as FERC explained, and as courts have confirmed, interconnection-related transmission upgrades provide broad benefits to consumers—i.e., not just to generators. *See* JA1398–1399; *Entergy*, 391 F.3d at 1247–1248 (affirming FERC's determination that interconnection-related transmission upgrades "benefit the entire [grid] network"). Accordingly, the Commission *did* make the requisite finding that allocating these transmission costs to consumers is "at least roughly commensurate with the benefits derived from the facilities." *Cf.* Br. 43–44 (cleaned up). That conclusion, which constitutes a reasonable prediction tethered to past practice and the rulemaking record here, is accorded deference. *See Xcel*, 41 F.4th at 561 (explaining that courts "defer" to FERC's "'reasonable

170

prediction[s]' about 'the market it regulates'" (quoting *South Carolina*, 762 F.3d at 96)).

### H. The Rule is consistent with Federal Power Act Section 217(b)(4)

Consumers do not dispute that FERC's Order 1920 rulemaking constitutes a "rule" that directly "affects ... [FERC-jurisdictional] rates," and thus falls squarely within the ambit of FERC's Federal Power Act Section 206 authority. *See FERC v. Elec. Power Supply Ass'n*, 577 U.S. at 278 (citing 16 U.S.C. § 824e(a)); *see supra* pp.76–77. Instead, they contend that the Rule runs afoul of the 2005-enacted Federal Power Act Section 217(b)(4), 16 U.S.C. § 824q(b)(4). *See* Consumers Br. 44–45. Consumers' claim lacks merit because FERC explained how the Rule is consistent with Section 217(b)(4).

Congress enacted Section 217(b)(4) as part of a package of reforms intended to promote greater transmission development. *See South Carolina*, 762 F.3d at 71. "That provision, in pertinent part, requires the Commission to exercise its authority 'in a manner that facilitates the planning and expansion of transmission facilities to meet the reasonable needs of load-serving entities to satisfy their service obligations.'" *Id*. at 71 (quoting § 824q(b)(4) (cleaned up)). As *South Carolina* confirmed, a transmission

171

planning rule satisfies Section 217(b)(4) if it "enabl[es] more efficient or cost-effective deliveries by load serving entities and increased access to resources." *Id.* (quoting Order 1000 P 291). *South Carolina* also held that such a rule need not require *transmission providers* to consider the interests of load-serving entities, so long as *the Commission* has done so through the provisions of its rule. *Id.* at 90. Indeed, Section 217(b)(4) "creates a requirement for the Commission, not for utilities." *Id.*

Consumers err in criticizing the Rule's seven categories of factors that *transmission providers* must consider in developing long-term planning scenarios. *Cf.* Br. 45–48. Instead, Section 217(b)(4) "would only be violated if the Commission exercised its authority in a manner that was at odds with the needs of load-serving entities." *South Carolina*, 762 F.3d at 90. FERC "did no such thing" in enacting the Rule and Consumers marshal no argument otherwise. *See id.*

*South Carolina*'s analysis on this issue is conclusive. As that court explained, local load-serving entities must "deliver power when it is needed"—i.e., they require a reliable grid. *Id.* Because Order 1000 "facilitate[d] the planning of a reliable grid" by aiming "to ensure that

172

adequate transmission capacity is built," FERC "complied with the dictates of Section 217(b)(4)." *Id.*

So too here. "[T]h[e] final [R]ule seeks to ensure precisely the same goal [as Order 1000], and it therefore satisfies the Commission's obligation under … section 217(b)(4)." JA847.

## I.    FERC reasonably required transmission providers to reevaluate the merits of certain selected transmission facilities

The Rule's transmission planning provisions require transmission providers to, in certain situations, reassess whether a planned transmission facility remains warranted. JA1356. Again, long-term transmission planning occurs in five-year cycles, for "no less than a 20-year transmission planning horizon." JA890–891, JA909; *see supra* pp.139–140. The Rule requires reevaluation of a previously selected transmission facility in three situations, only the latter two of which are at issue in this appeal: (1) where delays in facility development would jeopardize grid reliability; (2) where the actual or projected costs of a previously selected facility significantly exceed prior cost estimates; and (3) where "significant changes in federal, federally-recognized Tribal, state, or local laws or regulations cause reasonable concern that a previously selected [long-term facility] may no

longer meet the transmission providers' selection criteria." JA1356–1357, JA2409–2410.

The Commission's decision to require reevaluation under only certain conditions reflects its rational balancing of consumer and investor interests. *See Morgan Stanley*, 554 U.S. at 532; JA1360–1363, 1366. On the one hand, the Commission recognized that transmission developers' ability to secure necessary capital depends on a degree of regulatory certainty that a selected project will be built and placed into service. JA2409–2410, JA1360–1361. On the other hand, FERC sought to reduce the risk that consumers would be saddled with the costs of transmission facilities that are no longer warranted. JA2409–2410, JA1361. Accordingly, the Commission rejected a request for a broad reevaluation requirement that might stymie "development of more efficient or cost-effective [long-term facilities]." JA2409–2410.

Consumers rejoin that FERC struck the balance too far in favor of supporting a predictable development environment. *See* Consumers Br. 48–51. For example, in targeting the second reevaluation category (projected cost overruns), Consumers insist that FERC should have required reevaluation not just due to cost considerations, but also where the "facility's

174

projected benefits or the region's transmission needs have significantly changed." *Id.* at 50.

Consumers' dispute boils down to a policy disagreement over where FERC should have drawn the line. As a first matter, FERC *did* retain consideration of changes to benefits. If cost overruns trigger reevaluation, then transmission providers must, during the reevaluation process, "take into account not only the updated costs *but also the updated benefits* of the [long-term facility]." JA1358–1360 (emphasis added). *Cf.* Br. 50. But more to the relevant legal point, the Commission acted within its discretion in declining to expand the universe of situations in which reevaluation must occur in light of countervailing investor interests. *See La. Pub. Serv. Comm'n*, 522 F.3d at 395 (explaining that, even where substantial evidence could support multiple conclusions, "it is the agency's choice that governs"); *Fla. Mun. Power*, 602 F.3d at 461 (same).

Similarly, as concerns the third reevaluation category (legal changes), Consumers take issue with FERC's decision to limit such reevaluations to facilities slated for in-service dates falling in the latter half of the long-term planning process. Br. 51–52. But the Commission provided a reasoned explanation for this limitation—specifically, that it would guard against

175

uncertainty for transmission developers, who might otherwise be reluctant to develop "more efficient or cost-effective [long-term facilities]." JA2409–2410.  Indeed, a facility scheduled to switch online in the relatively distant future will presumably not have progressed as far in the planning process as a facility that has reached the "'pencils-down' point in [its] development." *See* JA2409–2410.

In short, the Commission satisfied its obligation to engage in reasoned decisionmaking.  FERC expressly acknowledged competing stakeholder views on the reevaluation issue and "str[uck] a reasonable balance" between competing interests, *see*  JA2409–2410, JA1360–1361—a decision that is accorded "great deference," *Morgan Stanley*, 554 U.S. at 532; *see also Nuclear Energy Inst.*, 373 F.3d at 1276.

### J.    FERC reasonably declined to define electric cooperatives as Relevant State Entities

One of the Consumer Petitioners, the National Rural Electric Cooperative Association ("Association"), contends that FERC unlawfully excluded electric cooperatives from the definition of "Relevant State Entity." Consumers Br. 54.  As discussed *supra* pp.55–56, the Rule requires transmission providers to consult with Relevant State Entities in developing long-term transmission plans and cost allocation methods.  *See* JA2944–

2945. Because, like state agencies, many electric cooperatives regulate consumers' retail electric rates, the Association argues it is unduly discriminatory not to include them in the definition of "Relevant State Entity." Br. 56–58. The Association's claim lacks merit because FERC provided a reasoned explanation for denying the Association's request.

The Federal Power Act bars rates and practices that are "unduly discriminatory or preferential." 16 U.S.C. § 824e(a). *Undue* discrimination might occur where two entities are similarly situated yet are treated differently. *Sacramento Mun. Util. Dist. v. FERC*, 474 F.3d 797, 802 (D.C. Cir. 2007). Even then, such differential treatment is lawful if FERC "can justify the disparate effect." *See Transmission Agency of N. Cal. v. FERC*, 628 F.3d 538, 549 (D.C. Cir. 2010) (cleaned up); *Balt. Gas & Elec. Co. v. FERC*, 954 F.3d 279, 283 (D.C. Cir. 2020) ("To determine whether an agency must justify a prior contrary decision, … we ask whether the regulated parties at issue are similarly situated." (cleaned up)).

Here, the Commission justified treating *bona fide* "state entit[ies]" differently from non-state actors like electric cooperatives. *See* JA647, JA1564 (defining "Relevant State Entity" as "any state entity responsible for electric utility regulation or siting electric transmission facilities within the

177

state or portion of a state located in the transmission planning region, including any state entity as may be designated for that purpose by the law of such state"). The Commission explained that, unlike cooperatives, state entities play a distinct regulatory role that determines whether transmission facilities will be built and brought on-line. Specifically, states, unlike cooperatives, are responsible for, among other things, the permitting and siting of electric transmission facilities. JA2945–2946, JA2948–2949; *see supra* pp.77–78. Thus, states are "uniquely situated to influence whether or not a [long-term facility] reaches completion." JA2945–2946; *accord* JA2950–2951.

The Association does not confront this reasoned distinction except to make inapposite comparisons to other FERC rulemakings (Br. 55–56) involving distinct issues concerning retail rate regulators. *See Balt. Gas*, 954 F.3d at 283 (D.C. Cir. 2020) (requiring FERC to explain differential treatment *if* a prior decision involved similarly situated parties). "In view of the deference that [the Court] owe[s] FERC in rate-related matters," the Court should not decide that FERC's "finding [here is] undermined by other cases in which [the Commission] faced different claims in procedurally

178

distinct proceedings and reached different results based on distinct records."

*Int'l Transmission Co. v. FERC*, 988 F.3d 471, 484 (D.C. Cir. 2021).

All this suffices to uphold the Commission's definition of "Relevant

State Entity." It is worth noting, however, that electric cooperatives remain

part of the cost allocation process. The Rule allows these cooperatives and

other non-governmental entities to participate in a State Agreement Process

(which results in a state-determined cost allocation method for certain

facilities, *see* JA1594–1595, *supra* pp.55–56) to the extent allowed by

Relevant State Entities. JA2949–2950. And beyond that, electric

cooperatives retain their authority to participate in transmission planning

and cost allocation discussions through "the Commission's or state's

standard procedures for public participation." JA2949–2950.

## V.     The Rule is a logical outgrowth of FERC's original proposal

Irrespective of the justness and reasonableness of the Rule, the States

argue that several aspects of the Rule differ from FERC's original proposal—

the Notice of Proposed Rulemaking (NOPR)—to such an extent that those

parts of the Rule violate the Administrative Procedure Act's

notice-and-comment requirement. States Br. 53–56. The States' claim is

179

meritless because all aspects of the Rule are logical outgrowths of the NOPR. *See* JA2312–2313, JA2504–2506, JA2521–2522, JA2592–2593, JA2652.

1. "The Administrative Procedure Act requires an agency conducting notice-and-comment rulemaking to publish in its notice of proposed rulemaking 'either the terms or substance of the proposed rule or a description of the subjects and issues involved.'" *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 174 (2007) (quoting 5 U.S.C. § 553(b)(3)). This means "the final rule the agency adopts must be a logical outgrowth of the rule proposed"—i.e., the proposal must provide the public with "fair notice" of what may or may not be adopted as the final rule. *Id.* (cleaned up). "This notice requirement encourages participation in the proceeding and helps ensure informed agency decisionmaking." *Spartan Radiocasting Co. v. FCC*, 619 F.2d 314, 321 (4th Cir. 1980).

Still, an agency enjoys broad latitude to revise a proposal. The logical outgrowth doctrine permits a final rule to depart even "substantial[ly]" from the proposed version. *Am. Paper Inst. v. EPA*, 660 F.2d 954, 959 n.13 (4th Cir. 1981). After all, a core purpose of notice-and-comment is to ensure that an agency's final rule is the best possible resolution—i.e., one that accounts for stakeholders' views. *See Brennan v. Dickson*, 45 F.4th 48, 69 (D.C. Cir.

180

2022). The Administrative Procedure Act thus encourages agencies to make changes in response to public comments, not to double down on a flawed proposal just to avoid triggering another round of notice-and-comment. *See Am. Paper Inst.*, 660 F.2d at 959 n.13.

The logical outgrowth doctrine strikes a balance between liberating an agency to issue a final rule that could not reasonably have been anticipated by the public (forbidden), *see Long Island*, 551 U.S. at 174, and restricting the agency to simply finalizing its proposal (also forbidden if it means ignoring comments seeking changes, *cf. ALLTEL Corp. v. FCC*, 838 F.2d 551, 558 (D.C. Cir. 1988)). *See Chocolate Mfrs. Ass'n of U.S. v. Block*, 755 F.2d 1098, 1105 (4th Cir. 1985). So long as the final rule's scope and contours are "reasonably foreseeable" from the proposal, *Long Island*, 551 U.S. at 175—i.e., so long as the proposal "fairly apprise[s] interested parties of the potential scope and substance of a substantially revised final rule," *Chocolate Mfrs.*, 755 F.2d at 1105—the agency's final version is a logical outgrowth of the proposed rule, *Long Island*, 551 U.S. at 175; *Chocolate Mfrs.*, 755 F.2d at 1105.

2. The States offer up a laundry list of differences between the NOPR and the final Rule. But, dispositively, they fail to explain why any of those

181

changes are not logical outgrowths of the NOPR. *See* Br. 54–56. The Court can simply reject all the States' logical outgrowth arguments as forfeited for underdevelopment on this basis alone. *See Nat'l Ass'n for Rational Sexual Offense Laws v. Stein*, 112 F.4th 196, 210 (4th Cir. 2024) (deeming an argument forfeited where a party asserted First Amendment violations yet "offer[ed] no analysis of these claims").

In any event, the changes the States identify in the Rule (i.e., Orders 1920, 1920-A, and 1920-B) easily qualify as logical outgrowths of the NOPR, as they reflect reasonably foreseeable modifications.

*First*, the States observe that the NOPR *permitted* transmission providers to file one or more *ex ante* cost allocation methods, whereas the final Rule *requires* such a filing. Br. 54–55; *see* JA1524–1525. But the Commission expressly sought comment on whether it should adopt the requirement it ultimately *did* adopt—specifically, "whether the Commission should *require*, instead of the reforms proposed in this section of the NOPR, public utility transmission providers to include [an *ex ante*] Long-Term Regional Transmission Cost Allocation Method." JA2504–2505 (quoting JA392) (emphasis added). "Notice suffices when [the agency] has expressly asked for comments on a particular issue or otherwise made clear that the

182

agency was contemplating a particular change." *Brennan*, 45 F.4th at 69 (cleaned up).

*Second*, the States vaguely assert that the Rule "drop[s] State consent requirements." Br. 55. This mere "passing shot at [an] issue" renders the argument forfeited. *See Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307, 316 (4th Cir. 2017). It is also factually incorrect. "[T]he NOPR [did not] require transmission providers to obtain the consent of [States] … regarding the relevant cost allocation method to be applied to [long-term facilities]." JA2521; *see also* JA382–383. Instead, the NOPR required transmission providers to "seek" agreement with states. JA2521; *see also* JA382–383. The final Rule replaced the requirement to "seek" agreement with the engagement period, during which transmission providers must provide a forum for "States to meaningfully participate in negotiating cost allocation methods." JA2521–2522. In other words, the NOPR suggested one form of state participation and the final Rule adopted a different form of state participation. That does not render the final Rule "wholly unrelated or surprisingly distant from what [FERC] initially suggested" such that it might not be a logical outgrowth of the proposed rule. *See Ariz. Pub. Serv. Co. v. EPA*, 211 F.3d 1280, 1299 (D.C. Cir. 2000); *see also Am. Paper Inst.*,

660 F.2d at 959 n.13 (explaining that even "substantial changes" from a proposal may be lawful).

*Third*, the States complain that the Rule "requires specified criteria and benefits for cost allocation, unlike the NOPR." Br. 55. True but beside the point. The NOPR requested comment on *this precise issue*: It "sought comment on whether transmission providers should be required to use some or all of the potential benefits described in the NOPR as a minimum set of benefits for their [long-term process]." JA2312 (citing JA302). "By requesting comment on whether to make mandatory some or all of the benefits in the NOPR, the Commission sufficiently put parties on notice that the Commission was considering *the exact change* that [the States] now argue was unanticipated[.]" JA2312–2313; *see also Brennan*, 45 F.4th at 69.

*Fourth*, the States observe that the Rule "abandoned cost allocation principle number 6 from the NOPR," which was previously part of Order 1000. Br. 55; *see also* JA2588–2589. That principle allowed for different regional cost allocation methods for different types of transmission facilities. JA2588–2589. The logical outgrowth doctrine, however, permits an agency to forego elements of a proposed rule given that "[o]ne logical outgrowth of a proposal is surely … to refrain from taking the proposed step." *New York v.*

*EPA*, 413 F.3d 3, 44 (D.C. Cir. 2005) (per curiam) (cleaned up); *see also Ariz. Pub. Serv.*, 211 F.3d at 1299–1300 (finding sufficient notice where the agency dropped some requirements initially proposed).  Accordingly, FERC's decision not to finalize part of the NOPR complies, without more, with the logical outgrowth doctrine.

But there *is* much more.  For one thing, the NOPR gave notice that the Order 1000 approach was inadequate and articulated FERC's "preliminary find[ing]" that finalized cost allocation requirements "may differ in part from those established in Order No. 1000"—e.g., Order 1000 holdovers like principle number six.  *See* JA2592–2593 (quoting JA378).  For another thing, the NOPR expressed concern that a "siloed" approach to transmission planning—i.e., one that allowed different cost allocation methods for different types of facilities set forth in principle number six—could contribute to "free rider problems" that impede "more efficient or cost-effective regional transmission facilities."  JA2593 (quoting JA395–396).  Piling on are commenters' explicit requests that cost allocation methodologies recognize the full breadth of benefits, JA1642–1643—which itself is evidence of adequate notice that such a change might be in the offing, *see Miami-Dade Cnty. v. EPA*, 529 F.3d 1049, 1059 (11th Cir. 2008);

*see also* JA2595. Given all this, it was "reasonably foreseeable that [the final Rule] would not require compliance with regional cost allocation principle (6)[.]" JA2593–2594; *see also Long Island*, 551 U.S. at 175 (providing that reasonable foreseeability is the touchstone of the logical outgrowth analysis).

*Fifth*, the States take issue with the final Rule's decision to leave the preexisting Construction Incentive intact, where the agency initially proposed its elimination. Br. 55–56. Again, the incentive allows transmission providers to include costs classified as Construction Work in Progress in their rate base for long-term facilities. JA2648–2649; *see also supra* p.146. FERC determined that any action on the incentive was "more appropriately considered in a separate proceeding to allow for a holistic approach to transmission incentives." JA2651–2652.

The Commission's proposal to eliminate a facet of the preexisting regulatory regime gave adequate notice that FERC might *not* follow through on such elimination. Again, "[o]ne logical outgrowth of a proposal is surely … to refrain from taking the proposed step." *New York v. EPA*, 413 F.3d at 44 (cleaned up); JA2652. The States cannot seriously contend that "commentators [did not] have … a fair opportunity to present their views on the contents of [a] final plan" where the specific issue addressed *in* the final

186

plan was expressly raised in the proposal. *See Chocolate Mfrs.*, 755 F.2d at 1104–1105 (cleaned up).

*Finally,* the States briefly observe that the final Rule does not "expand the transparency goals in local transmission planning for asset management projects, which the NOPR covered." Br. 56. Again, the States make no effort to analyze why such a change was not a logical outgrowth of the NOPR. Nor did the States raise this issue in their rehearing application, meaning any argument on this point is jurisdictionally forfeited. *See Entergy*, 391 F.3d at 1247 (citing 16 U.S.C. §825*l*(b)). And anyway, contrary to the States' assertion, the NOPR did not propose applying local transparency reforms to cover asset management projects. *Cf.* JA463–JA465 (erroneously relied upon by the States (Br. 56); the cited paragraphs pertain to right-sizing reforms, *see infra* pp.233–243, not to local transparency reforms); *see also* JA1750 (clarifying that the Rule's transparency requirements apply only to local transmission planning that falls within the scope of Order 890, which excludes asset management projects).

## VI. The Commission reasonably adopted the inclusion and consultation requirements to ensure state participation in developing new "just and reasonable" cost allocation methods

Transmission Owners challenge two narrow aspects of the Order 1920 rulemaking.  On rehearing before the agency, Transmission Owners generally expressed support for the Commission's efforts to promote collaboration between state entities and transmission providers in the transmission planning process.  *See* JA5491 ("Indicated PJM Transmission Owners support the Commission's desire to promote the development of more efficient and cost-effective regional transmission … [and] also support the cost allocation compliance process …, which is designed to foster collaboration between the regional transmission providers and the states in their regions."); JA5410 ("The SPP [Transmission Owners] Group embraces the Commission's recognition of the critical role states play in the development of transmission infrastructure."); JA5447–5448 ("The MISO Transmission Owners … support the Commission's efforts …, and agree that state entities should have an important perspective and role to play in regional transmission planning and cost allocation.").

Now, on brief, Transmission Owners challenge two process requirements that enable state participation in the regional transmission

188

planning process: (1) the requirement that transmission providers transmit information to the Commission concerning state-developed cost allocation methods in compliance filings (in Transmission Owners' brief, the "inclusion requirement"), and (2) the requirement that transmission providers consult with Relevant State Entities prior to requesting a change to a cost allocation method accepted by the Commission in compliance with Order 1920 (in Transmission Owners' brief, the "consultation requirement"). *See* JA2823–2830, JA2845–2846, JA2915–2917, JA2922 (summarizing these requirements in denying rehearing). According to Transmission Owners, these requirements violate both their statutory and constitutional rights. *See* Transmission Owners Br. 18–48. There is no basis for these claims.

A.     **FERC acted within its Federal Power Act Section 206 authority and did not infringe transmission owners' Section 205 filing rights in adopting the inclusion requirement**

Having determined, under Federal Power Act Section 206, that existing transmission planning and cost allocation processes are not "just and reasonable," the Commission proceeded to determine a "just and reasonable" replacement rate. *See* 16 U.S.C. § 824e(a). To that end, Order 1920 requires transmission providers to file, on compliance with the Rule, a proposed default cost allocation method for distributing the costs of a

189

selected long-term regional transmission facility. *See supra* pp.142–143.

This requirement reflects the fact that, as the Commission has made clear,

"efforts to plan the transmission system to meet the needs of the changing

resource mix will succeed only if the associated cost allocation methods are

transparent, equitable, and practicable." JA 52. Transmission Owners do

not challenge this baseline requirement. *See* Br. 24 ("Transmission Owner

Petitioners do not contest ... substantive requirements [concerning

submission of proposed default cost-allocation methods in compliance with

the Rule] or their obligation to comply with them.").

The inclusion requirement, added in Order 1920-A, merely requires

transmission providers to also convey to the Commission (as an attachment

to their compliance filing, or in the filing itself) any competing cost

allocation method and/or state agreement process agreed to by Relevant

State Entities during the engagement period (along with supporting

information), even if it is contrary to the transmission provider's own

proposal. *See* JA2532–2542, JA2861–2863 (explaining that the inclusion

requirement involves "nothing more ... than attaching one or more

additional documents, produced by parties other than transmission

providers, to a compliance filing made under [Federal Power Act] section

190

206, to assist in building the record for the Commission's exercise of its own authority to determine and fix the just and reasonable rate under that statutory provision").

As the Commission explained, the inclusion requirement strikes a balance between state and transmission provider interests. *See* JA2535–2536 (noting proposals—not accepted by the Commission on rehearing—that the Rule should *require* transmission providers to adopt any cost allocation method agreed upon by relevant state entities during the engagement period). The balance struck by the Commission expands states' "opportunities to inform and provide alternatives" to transmission providers' proposed cost allocation methods, while "sustain[ing] transmission providers' ... right to determine which cost allocation methods for Long-Term Regional Transmission Facilities they will propose on compliance." JA2532–2533. In particular, the inclusion requirement ensures that FERC may consider state entities' preferred cost allocation methods, consistent with the Commission's "independent responsibility to ensure that ... cost allocation methods [adopted under the Rule] conform to the cost causation principle and are otherwise just and reasonable and not unduly discriminatory or preferential." JA2532. The Commission acted well within

191

its Federal Power Act Section 206 authority in adopting this requirement, which in no way encroaches on transmission providers' Section 205 filing rights.

### 1. Federal Power Act Section 206 permits the inclusion requirement

#### a. FERC enjoys broad authority to fix a "just and reasonable" replacement rate under Section 206

Transmission Owners challenge the requirement that transmission providers also include in their Order 1920 compliance filing—as an attachment or in the filing itself—cost allocation methods developed by states, to the extent they differ from transmission providers' own proposals. *See* JA2532–2537, JA2861–2863. Specifically, Transmission Owners contend that Section 206 does not permit the Commission to require that transmission providers submit state-developed cost allocation methods in Order 1920 compliance filings. *See* Transmission Owners Br. 23–30. According to Transmission Owners, the Commission is effectively confined to considering a transmission provider's proposed cost allocation methods on compliance. *See id.* Transmission Owners are wrong; nothing in the Federal Power Act constrains the Commission's authority in such a manner.

Transmission Owners' argument confuses the requirements of Federal Power Act Section 206 with Section 205. These provisions are "related but distinct." *See Emera Me.*, 854 F.3d at 24. "Under section 205, a utility may unilaterally file a rate change with FERC, which rate takes effect immediately after a sixty days' notice requirement[.]" *Cities of Bethany*, 727 F.2d at 1143; 16 U.S.C. § 824d(d). "Alternatively, under section 206, FERC itself may establish the just and reasonable rate, provided that it first determines that a rate set by a public utility is unjust, unreasonable, or unduly discriminatory." *Id.*; *see also FPC v. Sierra Pac. Power Co.*, 350 U.S. 348, 353 (1956) ("The Commission has undoubted power under [section] 206(a) to prescribe a change in contract rates whenever it determines such rates to be unlawful."); *Me. Pub. Utilities Comm'n*, 454 F.3d at 283 (FERC has an "indefeasible right … under [Section] 206 to replace rates that are contrary to the public interest" (cleaned up)).

As the Commission explained, the inclusion requirement is "a one-time filing requirement associated with this [Federal Power Act] section 206 proceeding—not an ongoing obligation affecting any future filings by transmission providers under section 205 or any other section of the [Federal Power Act]." JA2861–2863. The purpose of the requirement that

193

transmission providers provide materials related to state-developed cost allocation methods is to "assist in building the record for the Commission's exercise of its own authority to determine and fix the just and reasonable rate under [Section 206], as well as monitoring compliance with the requirements related to the Engagement Period and efficiently considering the views of both Relevant State Entities and transmission providers." *Id.*

In other words, the requirement that transmission providers include or attach state-developed cost allocation methods to their Order 1920 compliance filings under Federal Power Act Section 206 simply does not implicate transmission providers' Federal Power Act Section 205 rights. *See id.*; *see also* JA2846–2847 ("The compliance filings required by [Order 1920] are a tool to implement the Commission's authority under [Federal Power Act] section 206, and do not implicate public utilities' rights and obligations under [Federal Power Act] section 205."); JA2534 (explaining that Order 1920 compliance filings under Section 206 are "distinct from any [Federal Power Act] section 205 filing that a transmission provider might file in the future following compliance to propose a change to its cost allocation method(s) for Long-Term Regional Transmission Facilities"). (As discussed further below, transmission providers' ability to file a future

194

proposal—under Federal Power Act Section 205—to change any cost-allocation method accepted by the Commission on compliance with Order 1920 demonstrates that their Section 205 filing rights remain unimpaired by the inclusion requirement. *See infra* pp.201–203.)

> **b.      Transmission provider proposals on compliance with a rule issued pursuant to Section 206 are not entitled to preferential consideration over proposals by state entities**

Transmission Owners are dissatisfied that, in exercising its statutory Section 206 authority to establish a new rate in this Order 1920 proceeding, the Commission intends to consider both transmission provider cost allocation proposals and state-developed cost allocation methods, without according any preference to transmission providers. *See* Transmission Owners Br. 28–30. Transmission Owners rely on an erroneous interpretation of the Federal Power Act, and prior agency precedent, to argue that their proposals are entitled to privileged status in the Commission's Order 1920 compliance review.

Nothing in the Federal Power Act limits the Commission's authority to consider relevant evidence before it in determining a replacement rate under Section 206. Nor is there any requirement that the Commission grant a preference to transmission provider proposals under Section 206. *See*

JA2539 ("When acting under [Federal Power Act] section 206, the Commission's statutory burden is to establish *a* just and reasonable ... replacement rate that is supported by substantial evidence. The statute does not ... require the Commission to adopt the transmission provider's proposal on compliance[.]"); JA2869–2870 ("[S]ection 206 does not specify that the Commission may only consider public utilities' proposals for a replacement rate; rather, [it] merely requires a hearing prior to finding the existing rate unjust and reasonable, and then empowers the Commission to determine and fix the replacement rate by order.").

Transmission Owners first erroneously suggest that, when the Commission has determined an existing rate to be unjust and unreasonable under Section 206 and directed a compliance filing, it thereafter adopts a "passive" role with respect to review of the compliance filing. *See* Br. 27–28 (citing *City of Cleveland*, 773 F.2d at 1374); *id.* at 25–26 (citing *Elec. Dist. No. 1 v. FERC*, 774 F.2d 490, 494 (D.C. Cir. 1985), and *City of Cleveland*, 773 F.2d at 1374). Again, Transmission Owners confuse the "passive" role the Commission adopts in reviewing utility-initiated filings under Section 205 with the Commission's independent authority to establish a new "just and

196

reasonable" replacement rate under Section 206. *See Sierra Pac. Power Co.*, 350 U.S. at 353; *Cities of Bethany*, 727 F.2d at 1143.

In any event, the cases cited do not help Transmission Owners. In *Electrical District*, the court explained only that FERC is empowered to establish a replacement rate at the same time it finds an existing rate to be unjust and unreasonable under Section 206. *Elec. Dist.*, 774 F.2d at 494; *see also* JA2869–2870 (citing *Electrical District*). *City of Cleveland* is likewise inapposite, involving the Commission's discretion to accept a utility's compliance filing under Section 205 that did not fully comport with a prior FERC order. *See* 773 F.2d at 1372–1373.

Transmission Owners also cite agency precedents where the Commission has stated that it generally will accept a public utility compliance filing if "just and reasonable," even if alternative "just and reasonable" proposals exist. *See* Br. 29–30 (citing *PJM Interconnection, L.L.C.*, 173 FERC ¶ 61,134, P 117 n.175 (2020); *Kern River*, 142 FERC ¶ 61,132, P 37 & n.51 (2013); *PJM Interconnection, L.L.C.*, 117 FERC ¶ 61,331, P 85 (2006)). The Commission's prior practice does not preclude it from considering additional material here. As the Commission explained, "[a]lthough [it] has historically identified prudential and policy reasons for

197

adopting public utilities' proposals in compliance filings if they are compliant with the requirements of a final rule issued pursuant to … section 206, these prudential and policy reasons are not statutory commands." JA2874–2875.  Rather, such "pragmatic considerations" merely represent an exercise of the Commission's "authority and discretion to determine and fix a just and reasonable rate" under Section 206.  JA2869–2870; *see also* JA2874–2875 (interpreting the Commission's prior practice as a statutory command would "render[] meaningless … the statutory divide [between] sections 205 and section 206 and would impermissibly convert the Commission's statutory authority to determine the replacement rate into a substantive statutory right for the public utilities").

Contrary to Transmission Owners' claim that the Commission "provide[d] no explanation" for allegedly "departing" from its prior practice, FERC explained that its practice in other cases did not preclude its determination now to consider state-developed cost allocation methods alongside transmission provider proposals here.  *See*  JA2869–2870, JA2874–2875, JA2891–2892; *see also FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (explaining that, where an agency changes position, "it suffices that the new policy is permissible under the statute, that

198

there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates").

Here, the Commission explained that there are "good reasons" for considering state-developed cost allocation methods alongside transmission provider proposals. JA2890–2892 (citing JA2540–2541) (discussing the "unique role" of states in long-term transmission planning, "as their laws, regulations, and policies drive the need for Long-Term Regional Transmission Facilities, and they typically will have responsibility to consider and approve the siting, permitting, and construction of Long-Term Regional Transmission Facilities selected in a regional transmission plan").

Given these "good reasons," the Commission concluded that consideration of state-developed cost allocation methods alongside transmission provider proposals "is not simply warranted, but better than considering the transmission provider's proposal alone and to the exclusion of alternatives." JA2892 (cleaned up). The Commission's determination to "consider the entire record," including any state-developed cost allocation method—rather than accord preferential treatment to transmission provider proposals over those of state entities as Transmission Owners propose—is consistent with its Section 206 responsibility and relevant precedent. *See* 16

199

U.S.C. § 824e; *Entergy Ark., LLC v. FERC*, 40 F.4th 689, 701–702 (D.C. Cir. 2022) (upholding the Commission's rejection of a transmission provider's compliance filing—and imposition of a new cost allocation method not proposed by transmission provider—pursuant to the Commission's Section 206 authority); *see also Int'l Transmission*, 988 F.3d at 484 (explaining that, once FERC finds an existing rate to be unjust and unreasonable under Section 206, it is "*required* to 'determine the just and reasonable rate … [and] fix the same by order'" (quoting 16 U.S.C. § 824e) (emphasis added)).

### 2. The inclusion requirement does not infringe transmission owners' statutory filing rights under Federal Power Act Section 205

Transmission Owners hyperfocus on their Section 205 "filing rights," asserting that the inclusion requirement (adopted under Section 206) impinges on their "exclusive" right to initially propose rates under Section 205. *See* Transmission Owners Br. 18–22. Transmission Owners' reliance on Section 205 is misplaced.

*Atlantic City Electric Co. v. FERC*, 295 F.3d 1 (D.C. Cir. 2002), does not support Transmission Owners' position and is not relevant here. The court in *Atlantic City* rejected a FERC order directing that, upon formation of a new regional transmission organization (i.e., a regional market

200

operator), utilities involuntarily cede their Federal Power Act Section 205 filing rights to the newly created entity, thus "giv[ing] up all authority to make unilateral changes to rate design." *Id.* at 9; *see also id.* at 7 ("[A]s FERC would have it, only the [new regional transmission organization] could propose changes in rate design.").

The Rule is nothing like the FERC decision at issue in *Atlantic City.* To begin, *Atlantic City* itself recognized the Commission's Section 206 authority to "initiate changes to existing utility rates and practices" after "first prov[ing] that the existing rates or practices are 'unjust, unreasonable, unduly discriminatory or preferential'"—the basis for the Commission's action here. *Atl. City,* 295 F.3d at 10 (quoting 16 U.S.C. § 824e(a)) (cleaned up). In this proceeding—contrary to the circumstances in *Atlantic City*—transmission providers alone "decide what to submit as their actual Order No. 1920 compliance proposal, including relevant tariff language and supporting evidence or arguments." *See* JA2861–2863.

Moreover, in the event the Commission adopts a state-developed cost allocation method in their Order 1920 compliance filing, transmission providers retain the ability to make a future Section 205 filing to propose changes to that previously-accepted cost allocation method—again, unlike

201

*Atlantic City*, where FERC proposed to cut off the future filing rights of utilities joining the new regional transmission organization. *See Atlantic City*, 295 F.3d at 7, 9; JA2827–2828; JA2534 (citing JA1614–1615); *see also Entergy Ark.*, 40 F.4th at 701–702 (explaining that, after FERC's acceptance of a cost allocation method under Section 206, the transmission provider "still has the right to propose its own cost allocation method [under Section 205] for FERC to review, and if found to be just and reasonable, to approve").

Here, as in *Entergy Arkansas*, Transmission Owners retain the full scope of their Federal Power Section 205 filing rights to propose a different cost allocation method, independent of the Rule's compliance filing requirements (under Section 206). *See supra* pp.37–38. Accordingly, the Rule does not impair Transmission Owners' Section 205 filing rights. *See Emera Maine*, 854 F.3d at 24–25; *Cities of Bethany*, 727 F.2d at 1143; *see also* JA2827–2828, JA2861–2863.

Further, contrary to Transmission Owners' contention, the Rule does not effectively allow states to make Section 205 filings "on an equal footing with public utilities." *Cf.* Br. 21–22. As discussed above, compliance filings under the Rule are not Section 205 filings that the Commission is

202

duty-bound to accept if "just and reasonable" (*supra* pp.192–195), and thus do not implicate transmission providers' statutory filing rights. *See* JA2848–2849 ("[T]he express text of [Federal Power Act] section 206 does not provide public utilities with statutory filing rights with respect to the just and reasonable replacement rate following a finding that existing rates are unjust, unreasonable, or unduly discriminatory or preferential[.]"); JA2846–2847 (explaining that an Order 1920 compliance filing is a "tool" to assist the Commission in exercising its Section 206 responsibility to establish a "just and reasonable" replacement rate).

Transmission Owners' reliance on *Western Massachusetts Electric Co.*, 23 FERC ¶ 61,025 (1983), is misplaced. *See* Br. 19–20 (citing *W. Mass. Elec. Co.*, 23 FERC ¶ 61,025, *reh'g denied*, 23 FERC ¶ 61,345 (1983), *upheld in Mass. v. FERC*, 729 F.2d 886 (1st Cir. 1984)). In *Massachusetts*, a state regulatory commission, dissatisfied with aspects of a utility's rate, directed the utility to make a Section 205 filing with the Commission to change the rate. *See* 729 F.2d at 886–887. The utility made the filing with FERC under protest, and the Commission rejected the state-directed filing. *See id.* The court and FERC agreed that Massachusetts was not entitled to direct the

utility to make a Section 205 filing, but the state agency could file a Section 206 complaint to challenge the utility's rate if it desired. *See id.*

Unlike in *Massachusetts*, the Commission here directed, pursuant to its Section 206 authority, that state-developed information be included with compliance filings. *See supra* pp.192–195. The Commission acted well within its Section 206 authority—and without infringing Transmission Owners' Section 205 filing rights—in setting compliance filing parameters to ensure that it will be setting statutory "just and reasonable" rates based on a complete record that includes state input regarding transmission cost-allocation.

### B. The consultation requirement preserves transmission owners' statutory filing rights

As discussed above, transmission providers retain their right to make a Federal Power Act Section 205 rate filing to change a cost allocation method or state agreement process accepted by the Commission in compliance with Order 1920. *See supra* pp.202–203. Order 1920's "consultation requirement" is essentially a pre-filing meet-and-confer that ensures transmission providers engage with Relevant State Entities prior to formally filing to change a cost allocation method previously accepted by the Commission as "just and reasonable." *See* JA2566–2567, JA2915–2916.

204

The consultation requirement is designed to provide states "the opportunity to be involved in establishing cost allocation methods for Long-Term Regional Transmission Facilities subsequent to the Commission's acceptance of transmission providers' filings made in compliance with Order No. 1920, which has the potential to minimize additional costs and delays in the siting process and to facilitate the development of Long-Term Regional Transmission Facilities." JA2916–2917.

The Commission acted well within its statutory authority in adopting this pre-filing consultation requirement. The requirement preserves in full transmission providers' Section 205 filing rights, and nothing in the Federal Power Act or relevant precedent precludes the Commission from requiring consultation in this context. *See* 16 U.S.C. § 824d(c). As FERC explained, transmission providers "retain their full and exclusive discretion as to whether to file—or not file—proposed changes" to cost allocation methods or state agreement processes, once accepted by the Commission as "just and reasonable" on compliance with the Rule. JA2927–2928. And transmission providers "retain their full and exclusive discretion to determine the content of any such proposal, notwithstanding that transmission providers are required to engage in this consultation process." JA2927–2928.

205

Before the Commission, some Transmission Owners admitted that the consultation requirement, while an added burden, does not limit the exercise of their Section 205 filing rights. *See* JA5483–5484 (asserting that the consultation requirement "adds a layer of bureaucratic delay," but does not preclude transmission providers from exercising their "statutory right under [Federal Power Act] section 205 … to file [a] just and reasonable Cost Allocation Method … to displace the one the Commission originally accept[ed] pursuant to [Federal Power Act] section 206").

Yet now the Transmission Owners challenge the consultation requirement as an "unlawful[] encumber[ance]" on their Federal Power Act Section 205 filing rights. Transmission Owners Br. 34. But Federal Power Act Section 205's plain text recognizes that utility filings are made subject to parameters prescribed by the Commission: "*Under such rules and regulations as the Commission may prescribe*, every public utility shall file with the Commission, *within such time and in such form as the Commission may designate*, … schedules showing all rates and charges for any transmission or sale subject to the jurisdiction of the Commission[.]"). 16 U.S.C. § 824d(c) (emphases added); *see also* § 824d(d) (providing that FERC may allow utility rate changes to take effect without requiring the

statutory 60 days' notice "by an order specifying … the manner in which they shall be filed and published").

A procedural consultation requirement—that does not dictate the content of a utility's Section 205 filing—falls comfortably within the Commission's authority to "prescribe" "rules and regulations," and to "designate" the time, form, and manner of utility filings. *See* §§ 824d(c), 824d(d); 18 C.F.R. Part 35 (setting forth regulations for how rate and tariff filings are to be made under the Federal Power Act); *see also Montana Consumer Counsel v. FERC*, 659 F.3d 910, 921 (9th Cir. 2011) ("FERC has broad discretion to construe the [Federal Power Act]'s notice and filing requirements, as evidenced by the restrictive preface to § 824d(d)'s notice requirement: 'Unless the Commission otherwise orders….'") (quoting § 824d(d)); *id.* at 921–922 (noting the "flexibility afforded FERC by the statute's express terms").

Transmission Owners contend that a "utility may, without negotiation or consultation with anyone, set the rates it will charge prospective customers, and change them at will, so long as they have not been set aside by [FERC] on grounds of inconsistency with the [Federal Power] Act." Br. 34 (quoting *City of Cleveland v. FPC*, 525 F.2d 845, 855 & n.72 (D.C. Cir.

1976)). *City of Cleveland* does not support Transmission Owners' position. That case involved a dispute between a utility and its customer over the terms of a contract filed with the Commission, and did not concern the filing rights of utilities in the context of the Federal Power Act's broad grant of authority to the Commission to establish parameters on filings under Section 205. *See* 525 F.2d at 853–856.

In *City of Cleveland*, the court found that the "filed rate doctrine" did not prevent the Commission from investigating claims by a utility's customer that the contract filed by the utility contained a disputed term that the city previously rejected in negotiations with the utility. *See id.* at 854 (recognizing FERC's "primary jurisdiction over reasonableness of rates and the need to insure that regulated companies charge only those rates of which the agency has been made cognizant"). The court then went on to note, in passing, that "the utility may, without negotiation or consultation with anyone, set the rates it will charge prospective customers, and change them at will[.]" *Id.* at 854–855. But the court's decision does not rest on this *dictum*, and, in any event, the Supreme Court later cast doubt on the decision. *See Ark. La. Gas Co. v. Hall*, 453 U.S. 571, 582 n.12 (1981).

Likewise, *NRG*, also cited by Transmission Owners (*see* Br. 34), is inapposite. Invoking that decision, Transmission Owners assert that the Commission may not alter a utility's filing under Federal Power Act Section 205, and may impose only minor conditions. *See NRG*, 862 F.3d at 114–115. But *NRG* concerned substantive modifications by the Commission to a market operator's proposal that "created a new rate scheme that was significantly different" from the original proposal. *See id.* at 110. In contrast, here, the consultation requirement is merely a procedural pre-filing requirement that does not dictate the substance of any Section 205 filing. JA2927–2928.

Ultimately, Transmission Owners' arguments rest on a fundamental misunderstanding of the Federal Power Act. The primary purpose of the Act is not the protection of utilities and their "filing rights." Rather, the Commission's fundamental mandate is to ensure "just and reasonable" rates in furtherance of the public interest. *See Xcel Energy Servs. Inc. v. FERC*, 815 F.3d 947, 952–953 (D.C. Cir. 2016) ("It is long-established that the primary aim of the [Federal Power Act] is the protection of consumers from excessive rates and charges." (cleaned up)); *see also Sierra Pac. Power*, 350 U.S. at 355 ("[T]he purpose of the power given the Commission by [Section]

209

206(a) is the protection of the public interest, as distinguished from the private interests of the utilities, [a]s evidenced by the recital in [Section] 201 of the Act that the scheme of regulation imposed 'is necessary in the public interest.'" (quoting 16 U.S.C. § 824(a)); *Xcel*, 41 F.4th at 551 (explaining that the purpose of the Commission's regulatory authority is "to protect the public interest").

The Commission's mandate to ensure "just and reasonable" rates involves balancing the interests of numerous stakeholders, including utilities, investors, consumers, and states. *See Hope Nat. Gas*, 320 U.S. at 603 ("[T]he fixing of 'just and reasonable' rates ... involves a balancing of ... interests."). The Commission here struck a "reasonable balance between, on the one hand, recognizing the rights and responsibilities of the Commission and transmission providers over regional transmission planning and, on the other, the states' critical interests in the resulting Long-Term Regional Transmission Facilities and how the costs associated with those facilities will be allocated." JA2826–2827.

### C.    The inclusion and consultation requirements do not violate Transmission Owners' First Amendment rights

Transmission Owners next contend that the inclusion and consultation requirements constitute "unconstitutionally compelled speech"

in violation of their First Amendment rights.  Transmission Owners Br. 37–48.  Transmission Owners challenge these requirements to the extent they "(i) direct public utilities to include a state-designed proposal in the utility's rate filing, even when the utility disagrees with the states' proposal; and (ii) compel the utility to explain why it declined to agree to the states' proposal to change an existing cost allocation."  *Id.* at 38.  As the Commission explained in the Rule, these procedural disclosure requirements do not implicate First Amendment concerns, and even if they did, the Rule satisfies any level of constitutional scrutiny.  *See* JA2902–2914.

### 1. The inclusion and consultation requirements do not implicate the First Amendment

The First Amendment protects "both the right to speak freely and the right to refrain from speaking at all."  *Wooley v. Maynard*, 430 U.S. 705, 714 (1977); *see also Moody v. NetChoice, LLC*, 603 U.S. 707, 731–733 (2024) (explaining that "the First Amendment offers protection when an entity engag[es] in expressive activity," in furtherance of "a well-functioning sphere of expression, in which citizens have access to information from many sources").  Transmission Owners "bear[] the initial burden to 'demonstrate that the First Amendment even applies.'"  *ACLU Found. v. Stirling*, 123 F.4th 170, 174 (4th Cir. 2024) (quoting *Clark v. Cmty. for Creative Non-Violence*,

468 U.S. 288, 293 n.5 (1984)). "If the First Amendment does not apply, [the Court] 'need go no further.'" *ACLU Found.*, 123 F.4th at 174 (quoting *Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 797 (1985)).

Transmission Owners fail, at the threshold, to demonstrate that their FERC filings constitute expressive activity warranting First Amendment protection. As discussed above, the challenged requirements are rooted in the Commission's Federal Power Act authority to supervise filings governed by that statute—i.e., they establish procedural parameters for regulated filings by regulated entities to a regulatory agency. The Commission adopted the inclusion and consultation requirements to ensure that it has sufficient information to determine a "just and reasonable" rate under the Federal Power Act. Such regulatory compliance requirements do not implicate protected speech. *See e.g.*, *Scahill v. District of Columbia*, 909 F.3d 1177, 1185 (D.C. Cir. 2018) ("First Amendment concerns are not implicated where the government requires disclosures for its operations[.]"); *United States v. Sindel*, 53 F.3d 874, 878 (8th Cir. 1995) (finding that disclosures required by the Internal Revenue Service did not implicate the First Amendment because "[t]here is no right to refrain from speaking when essential operations of government may require it" (cleaned up)); *see also Ohralik v.*

212

*Ohio State Bar Ass'n*, 436 U.S. 447, 456 (1978) ("Numerous examples could be cited of communications that are regulated without offending the First Amendment[.]").

For their part, Transmission Owners concede that the Commission may direct certain types of disclosures by regulated utilities without implicating the First Amendment. Notably, they do not challenge, on First Amendment grounds, the requirement that transmission providers make public lists of transmission facilities they anticipate replacing within the next 10 years. *See* Transmission Owners Br. 48–57 (challenging disclosure requirement as unjustified, "anticompetitive," and "unduly discriminatory," but not challenging the requirement on First Amendment grounds).[18]

This concession undermines Transmission Owners' First Amendment claim. As relevant here, the challenged provisions "require[] nothing more than the attachment of one or more files" (containing state-developed cost allocation methods) to transmission providers' mandatory Section 206 compliance filings, and an explanation of any disagreement with competing state views when making a Section 205 filing to change a cost allocation

---

[18] Argument Section VII responds to Transmission Owners' competitive concerns regarding the disclosure requirement.

method approved by the Commission on compliance with the Rule. *See* JA2902–2903, JA2907–2909. Given that such filings are regulatory disclosures provided to assist the Commission's operations, they do not implicate—much less infringe—First Amendment rights. *See Scahill*, 909 F.3d at 1185; *see also* JA2904 (explaining that transmission providers must furnish only the "necessary record evidence" for FERC to make an informed decision on cost allocation).

That the filings must include cost-allocation information from states does not somehow transform a regulatory requirement into a protected First Amendment activity. *See* JA2906 (explaining that "the Commission regularly requires public utilities to submit information relevant to other entities' proposals or positions on issues," and listing examples); *see also W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 645 (1943) (Murphy, J., concurring) (explaining that the Government "may require," without infringing First Amendment interests, speech that assists its "essential operations"). Indeed, transmission providers remain free to advocate for their preferred cost-allocation methods in both their FERC filings and through non-regulatory means. *See* JA2907–2909 (explaining that the Rule "does not prevent transmission providers from 'express[ing] their ideas' to

214

the Commission or 'request[ing] action by the [Commission] to address

[their] concerns'" (quoting *Borough of Duryea v. Guarnieri*, 564 U.S. 379,

388–389 (2011)).

Such regulatory requirements are nothing new. The Commission

identified, in a non-exhaustive list, three such requirements issued pursuant

to its Federal Power Act authority—none of which have been challenged on

First Amendment grounds:

> (1) a requirement that, if negotiations between a transmission provider and interconnection customer reach an impasse over the terms of a generator interconnection agreement, the transmission provider must file with the Commission an unexecuted generator interconnection agreement, "together with [an] explanation" regarding the disagreement;
>
> (2) a rulemaking requirement that grid operators submit compliance filings identifying other parties' views regarding barriers that existed to treating FERC-jurisdictional demand response resources comparably; and
>
> (3) a document and data request to a grid operator to provide certain information.

JA2906; *see also* JA2934 (discussing "authority under [16 U.S.C. § 825c(a)]

to require the disclosure of information as necessary or appropriate to assist

the Commission in the administration of its duties …, in the 'manner or

form' as the Commission may prescribe and providing 'specific answers to all

questions upon which the Commission may need information'").

The provisions at issue here (and similar FERC requirements) are nothing like the state-directed disclosures that courts have found to violate the First Amendment. In Transmission Owners' flagship case, a California state agency required a public utility to periodically disseminate, along with its published monthly newsletter expressing the utility's policy views, the contrary views of a consumer-advocacy group. *See* Br. 38–39 (discussing *Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n*, 475 U.S. 1, 5–6 (1986)). A plurality of the Court in *Pacific Gas* held that the state agency's directive burdened the utility's expression in violation of the First Amendment. 475 U.S. at 12–17.

In so holding, the Court found that the utility's newsletter—which was "[i]n appearance no different from a small newspaper," and reached three million utility customers in billing envelopes containing monthly electric bills—was entitled to "the full protection of the First Amendment." *Id.* at 5, 8–9; *accord Moody*, 603 U.S. at 731 (explaining that the First Amendment is implicated where an entity is "exercis[ing] editorial discretion in the selection and presentation of content" (cleaned up)); *see also Cent. Ill. Light Co. v. Citizens Util. Bd.*, 827 F.2d 1169, 1170–1174 (7th Cir. 1987) (following *Pacific Gas*, finding First Amendment violation where a state compelled a

216

utility, under threat of criminal prosecution, to include messages prepared by a consumer-advocacy group in billing envelopes transmitted to utility customers).

In contrast, the Rule on review requires entities like Transmission Owners to submit information to FERC to comply with a regulatory mandate. *See Scahill*, 909 F.3d at 1185; JA2902–2905 (explaining that requirements "help[] ensure that the Commission has a sufficient record on compliance to set a just and reasonable replacement rate"; further noting that the Commission has directed public utilities, "following a finding that an existing rate is unjust, unreasonable, and unduly discriminatory, to submit information they otherwise would not submit"); JA2909–2911 (distinguishing cases cited by Transmission Owners).

In sum, the provisions at issue are procedural requirements governing filings submitted to the Commission in a particularized regulatory context. No basis exists, in these circumstances, for Transmission Owners' contention that the Federal Power Act regulatory filings at issue warrant First Amendment protection.

217

### 2. To the extent these requirements implicate the First Amendment, they fall within the commercial speech doctrine

Even if the inclusion and consultation requirements *did* trigger First Amendment scrutiny (they do not), they would constitute permissible disclosure requirements under the commercial speech doctrine. Commercial speech is "speech that proposes a commercial transaction," or speech "related solely to the economic interests of the speakers and its audience." *Md. Shall Issue, Inc. v. Anne Arundel Cnty.*, 91 F.4th 238, 248 (4th Cir. 2024) (cleaned up), *cert. denied*, 145 S. Ct. 152 (2024); *see also Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66 (1983) (same); *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 561 (1980) (same).

The Supreme Court has long recognized that "the Constitution … accords a lesser protection to commercial speech than to other constitutionally guaranteed expression." *See Cent. Hudson*, 447 U.S. at 562–563; *Bolger*, 463 U.S. at 65–66 (1983) (same). "The protection available for particular commercial expression turns on the nature both of the expression and of the governmental interests served by its regulation." *Cent. Hudson*, 447 U.S. at 562–563.

218

As relevant here, there are "material differences between disclosure requirements and outright prohibitions on speech." *Zauderer v. Off. of Disciplinary Counsel*, 471 U.S. 626, 650 (1985)); *see also id.* at 651 n.14 (rejecting contention that disclosure requirements should be reviewed under a "strict least restrictive means analysis under which they must be struck down if there are other means by which the State's purposes may be served," given that "First Amendment interests implicated by disclosure requirements are substantially weaker than those at stake when speech is actually suppressed" (cleaned up)).

Thus, in *Zauderer*, a state permissibly required attorneys to disclose information regarding litigation costs in advertisements because the state "ha[d] not attempted to prevent attorneys from conveying information to the public; it ha[d] only required them to provide somewhat more information than they might otherwise be inclined to present." 471 U.S. at 650. In contrast, a state agency's blanket prohibition on utility advertisements promoting the use of electricity violated the First Amendment. *See Cent. Hudson Gas*, 447 U.S. at 570–571.

Disclosure requirements related to commercial speech are constitutional so long as they are: (1) "factual and uncontroversial,"

219

(2) "reasonably related" to governmental interests, and (3) "not unjustified or unduly burdensome." *Md. Shall Issue*, 91 F.4th at 247–251 (applying *Zauderer*, 471 U.S. 626). In *Maryland Shall Issue*, this Court had "no trouble" concluding that a local ordinance requiring gun sellers to distribute pamphlets regarding gun safety and training (among other things) did not run afoul of the First Amendment. 91 F.4th at 247–251 (holding that mandated literature "falls squarely in the scope of ... commercial speech" as factual information "reasonably related" to the county's interest in the "health and safety" of its residents); *see also N.Y. State Rest. Ass'n v. N.Y. City Bd. of Health*, 556 F.3d 114, 134–136 (2d Cir. 2009) (applying "rational basis" review and commercial speech doctrine, upholding district court denial of preliminary injunction against city requirement that restaurants disclose caloric information as "reasonably related to New York City's goals of combating obesity").

As in the above cases, the requirements here do not suppress constitutionally protected speech, but require only that Transmission Owners "provide somewhat more information than they might otherwise be inclined to present" to the Commission in regulatory filings. *See Zauderer*, 471 U.S. at 650. In this context, Transmission Owners have no

constitutionally protected interest in refusing to disclose relevant, factual information concerning state-developed cost allocation methods. *See id.* at 651.

Transmission Owners rejoin that "[c]ost allocation filings are core political and regulatory speech" and "not commercial proposals directed to consumers." Transmission Owners Br. 42 (citing no authority for this proposition, but apparently relying on *Pacific Gas*, 475 U.S. at 9–12). As described above, *supra* p.216, *Pacific Gas* found a First Amendment violation where a state agency interfered with a utility's policy views, as expressed in a newsletter publicly transmitted to millions of customers. In contrast, the Federal Power Act filings at issue here involve "disclosure of information … not to influence public debate, but instead as a means to fulfilling [the Commission]'s statutory mandate[]." JA2909–2911 (citing *Full Value Advisors, LLC v. SEC*, 633 F.3d 1101, 1108–1109 (D.C. Cir. 2011)).

Finally, Transmission Owners do not even claim that the Rule's contested requirements are "unduly burdensome." *See Md. Shall Issue*, 91 F.4th at 251 (holding that "compelled display and distribution of [state-mandated] pamphlet and flyer" were not "unduly burdensome" because the pamphlet and flyer "d[id] not commandeer or overwhelm any message that

221

the gun dealers would wish to make to gun purchasers" and compliance was "simple"); *see also* JA2861–2863 (explaining that the inclusion requirement involves "nothing more … than attaching one or more additional documents … to a compliance filing"), JA2902–2903 (Order 1920 "imposes no actual burden or limitation on transmission providers' speech.").

On the other hand, the disclosures at issue directly support FERC's statutory obligation to ensure "just and reasonable" rates in the public interest. *See* 16 U.S.C. §§ 824, 824d, 824e; JA2829–2830, JA2888–2889, JA2891–2892 (discussing importance of state input on long-term transmission planning and cost allocation and the value of considering state-developed cost allocation methods alongside transmission provider proposals). Accordingly, to the extent the disputed Rule provisions implicate the commercial speech doctrine, they do not run afoul of the First Amendment.

### 3. Assuming that strict scrutiny applies, the Rule still passes constitutional muster

No authority supports Transmission Owners' contention that "[c]ost allocation filings are core political and regulatory speech" subject to strict scrutiny review (Br. 42). *Book People, Inc. v. Wong*, 91 F.4th 318 (5th Cir. 2024) (cited at Br. 42), involved a state law requiring book vendors to issue

sexual-content ratings for sales to school libraries.  That is a far cry from the regulatory disclosure requirements at issue here.

Even assuming that the challenged provisions burden constitutionally protected speech in a manner that trigger strict scrutiny review, they would still be lawful.  As the Commission explained, state-developed cost allocation methods are an important element of its consideration of a "just and reasonable" replacement rate under Federal Power Act Section 206.  *See, e.g.*, JA2829–2830, JA2888–2889, JA2891–2892.  As such, they are "a narrowly tailored means of serving a compelling [government] interest."  *See Pac. Gas*, 475 U.S. at 19.  This is not a matter of simple "administrative efficiency" (as Transmission Owners contend at Br. 43–44), but rather, a compelling governmental interest in ensuring "just and reasonable" rates in the public interest.  *See* 16 U.S.C. §§ 824, 824d, 824e.

Transmission Owners contend that the challenged provisions are "not narrowly tailored" because states have other opportunities to advance their preferred cost allocation methods.  Br. 45–46.  But as the Commission explained, it has a "substantial interest" in developing a record that includes states' views on the appropriate allocation of the costs of long-term transmission facilities, an interest that the Commission "directly and

223

materially advances" via the inclusion and consultation requirements. JA2914 (also explaining that Rule is "not more extensive than is necessary to serve the Commission's substantial interest"). The Commission's compelling, statutory interest in ensuring "just and reasonable" rates in the public interest amply justifies the challenged provisions under any degree of scrutiny.

## VII.  FERC reasonably adopted transparency and right-sizing reforms

Beyond the regional transmission planning and cost allocation reforms adopted in the Rule, the Commission also developed new requirements that promote transparency in local transmission planning and seek to ensure that certain utility construction projects are studied for potential "right-sizing" on a regional level. These are generally known as the rule's transparency and right-sizing requirements. *See supra* pp.58–59. The right-sizing reform, in particular, was explicitly adopted as a separate enhancement supporting the Rule's primary long-term planning and cost allocation reforms. *See infra* pp.261–264.

Several petitioners challenge these aspects of the Rule. Both Consumers and the States contest one detail of these reforms as, in their view, not going far enough in promoting transparency and regulatory

scrutiny.  Consumers Br. 30–36; States Br. 48–50. Transmission Owners object to one transparency-oriented facet of the Rule, arguing that incumbent utilities should not be required to disclose lists of anticipated facility replacements to their region's stakeholders.  Transmission Owners Br. 48–57.  Competition Petitioners challenge a subsequent portion of the Rule addressing which utilities will build any "right-sized" replacement facilities that may eventually result from transmission owner submissions. Competition Br. 29–57.  These contentions are addressed below, after a brief summary of the relevant aspects of the Rule.

### A. FERC reasonably increased transparency regarding regional planning inputs while protecting sensitive information

#### 1. FERC provided for increased transparency for local system expansion

As explained above, in Order 1920, the Commission found that a significant proportion of new transmission development occurs within individual utility service territories.  These so-called "local" projects are facilities that are "located solely within" a single utility's territory and are paid for by that utility's customers.  JA2001.  Although such transmission facility expansions are subject to Order 890's transparency requirements, local planning processes often consider just the needs of that individual

225

utility; they do not comprehensively address broader transmission needs. JA2016–2017, JA2686–2687. If used in isolation, local processes tend to produce "localized or piecemeal transmission solutions" that address issues on an "incremental" basis, an approach that would miss potentially more efficient or cost-effective broader regional solutions. *See* JA2015, JA2016–2017, JA2017–2018.

To address this myopia, in addition to the long-term planning reforms referenced above, the Commission adopted reforms to so-called "local" transmission planning. Under the Rule, transmission providers must now engage in a structured set of meetings and disclosures to better ensure the sharing of important local planning criteria, assumptions, data and models with affected stakeholders. JA1749–1751. These requirements must be met before local projects are incorporated into regional transmission planning models. JA1750–1751; *see also supra* pp.39–40 (describing how planning processes unfold). Stakeholders, including customers, thus would receive "a standard baseline of transparency" about the process a utility uses to plan local projects before regional transmission plans are developed. JA1752–1753, JA1756. But, building on Order 890, this new process focuses on affirmative expansions of system capacity, not the mere replacement of old

facilities—an issue addressed by the Rule's right-sizing reforms.

*See* JA2693–2695, JA2701.

### 2. FERC required submission of in-kind facility replacement estimates to regional planners

Indeed, Order 1920 separately required transmission providers to identify certain facilities that they anticipate replacing within the next ten years. These so-called "in-kind replacement estimates" document the (typically deteriorating or aged) transmission facilities that transmission owning utilities seek to replace with a new transmission facility of the same kind in the same general location. JA1784–1785 (articulating three-part definition of an in-kind replacement transmission facility). For example, this would include the replacement of an existing decades-old 230 kilovolt transmission line nearing the end of its useful life with a brand new 230 kilovolt line on the same path of land. *See* JA1785, JA1786. (And, as discussed below, since these projects typically involve deteriorating or aged transmission assets, in-kind replacements are sometimes also known as "asset condition" or "asset management" projects. *See infra* pp.229–232.)

The point of these projects is to meet existing service needs and continue operation of today's transmission system, and so facility in-kind replacements are generally not subject to Order 890's expansion-oriented

227

requirements if they only incidentally increase transmission capacity by replacing old equipment with new. *See* JA1750, JA1785.

Proceeding ahead with such replacements, however, could sometimes leave an important system expansion opportunity unexplored. *See* JA714–715. (In fact, aging infrastructure represents a large portion of the existing grid and its eventual replacement will likely cost billions of dollars. *See* JA1716–1717.) Because regional planners could conceivably identify ways to increase a proposed in-kind replacement facility's transmission capacity to *also* serve additional needs—including by increasing voltage levels or by adding an additional circuit or new technologies—submitting in-kind replacement estimates to regional planners could reveal opportunities to "right-size" transmission projects to meet multiple needs. *See* JA1785–1788. And so, under the Rule, in-kind replacement estimates must be submitted and right-sizing considered as part of the new long-term planning process, which is subject to stakeholder input. *See* JA1084, JA1087–1088, JA1716–1718, JA1786–1787, JA1791–1792.

But this requirement was not designed to apply to every replacement of every facility—the Commission imposed this information submission requirement only on anticipated replacement facilities operating above a

228

regionally-proposed transmission voltage threshold (e.g., 115 kilovolts and above), since such higher-voltage replacements are more likely to yield regional benefits. JA1788–1789. And the requirement was adopted in recognition (and not derogation) of transmission providers' existing rights and responsibilities under law to maintain—and, when necessary, replace—their transmission facilities in meeting mandatory service obligations. *See* JA1793.

### 3. Consumers and the States ask for more onerous local planning requirements that are inconsistent with existing rules

1. Consumers allege that the Commission failed to protect customer interests by declining to extend the Rule's new transparency requirements to "asset condition" or "asset management" projects. *See* Consumers Br. 31–32. Though the terminology occasionally varies in the administrative record, *see id.* at 31, the Commission understood Consumers to be referring to projects that "do not increase transmission capacity or only do so incidentally"—i.e., the same kind of projects addressed by the in-kind replacement estimates policy. JA2693–2695, JA2690–2691("in-kind replacement projects are known as asset condition projects in New England" (citing the relevant agency rehearing request, JA4855, JA4857–4865)); *see also Am. Mun. Power,*

229

*Inc. v. FERC*, 86 F.4th 922, 929, 932–934 (D.C. Cir. 2023) (explaining that "asset management" projects in the Mid-Atlantic region "maintain the existing infrastructure by repairing or replacing equipment" and, at most, "incidental[ly] increase" transmission capacity).

The Commission explained why it drew a reasonable distinction between local system expansion projects (which are subject to the Rule's additional transparency requirements) and in-kind replacements / asset management projects (which are not). Specifically, the latter category is a different kind of undertaking; such projects are replacements of existing transmission equipment and might only incidentally increase transmission capacity by replacing old equipment with new. JA2693–2695; *see also S. Cal. Edison Co.*, 164 FERC ¶ 61,160, PP 31–33 (2018) (explaining how replacing a degraded electric transformer from the 1940s with a "modern" one from the present day would incidentally increase efficiency), *reh'g denied*, 168 FERC ¶ 61,170. Thus, these projects are not considered affirmative expansions of the transmission system subject to the baseline requirements of Order 890 that the Rule here built upon. JA2693–2694, JA1750.

Indeed, the "specific problem that necessitated [Order 890] … was grid congestion and the associated need for grid *expansion* that would ensure non-discriminatory transmission access." *S. Cal. Edison*, 168 FERC ¶ 61,170 at PP 24–25 (emphasis added); *see also* Order 890, 118 FERC ¶ 61,119, PP 57–61, 421–425 (explaining these concerns and their relationship to "coordination, openness, and transparency"). Those concerns are not present here, where the subject is projects that maintain but do not expand the grid. FERC was not required to go further and add to the scope of its task here. *See* JA2695–2696 (citing *New York*, 535 U.S. at 26–27); *see also Biggerstaff v. FCC*, 511 F.3d 178, 186 (D.C. Cir. 2007) (declining to address merits of issue that went beyond the rulemaking's scope). And, in any event, to the extent the Rule's increased transparency provisions promote "just and reasonable" rates—a proposition with which Consumers appear to agree, *see* Consumers Br. 30–31—FERC acted within its discretion in declining to apply those provisions across the board in *this* proceeding. *See Mobil Oil*, 498 U.S. at 231 ("[A]n agency need not solve every problem before it in the same proceeding.").

2. For their part, the States focus on local projects in particular, and appear to want something more than transparency regarding local project

231

decision-making by utilities. *See* States Br. 48–50. The Rule, in their view, at least regarding the PJM (Mid-Atlantic) region, perpetuates an "oversight gap" regarding local projects by stopping at "transparency measures." *Id.* at 49–50.

The States are mistaken. FERC reasonably determined that the new transparency measures—e.g., requiring transmission providers to disclose and discuss the needs served by a proposed local facility with stakeholders, JA1749–1752—would "ensure that Commission-jurisdictional rates are just and reasonable and not unduly discriminatory or preferential." JA1754; *accord* JA2695–2696. The States do not seriously contest this conclusion, advancing only their opinion that the "transparency reforms are of little value." Br. 49.

In any event, FERC also noted that it was considering local transmission issues in a related proceeding (JA1755), which might produce additional accountability mechanisms. FERC is entitled to proceed incrementally in instituting changes and to reserve consideration of further reforms for such other proceedings, or region-specific proceedings. *See, e.g.,* *Mobil Oil*, 498 U.S. at 231.

#### 4.    Transmission Owners' limited concerns about stakeholder disclosure are misplaced

The Commission did, of course, address in-kind replacements in a neighboring portion of the Rule; it found that, because they represent a potential opportunity for "right-sizing" facilities, in-kind replacements should be identified as part of long-term planning. *See supra* pp.227–231; JA1720. Thus, utilities are to submit their (effectively non-binding) estimates, looking out 10 years into the future, and may update them in each transmission cycle. *See* JA1790, JA1791, JA1822–1823.

Transmission Owners present a very limited objection to this portion of the Rule—they do not object to the right-sizing reforms generally, or to disclosure of their utilities' in-kind replacement estimates to the relevant regional planning organization, or even to the public identification of (at least some of) their estimates. *See* Transmission Owners Br. 48–53 & n.6.[19]

Rather, Transmission Owners object to the disclosure of ten years' worth of

[19] The States make a passing reference to the right-sizing requirements, but do not develop their argument that regional evaluation of potential right-sized solutions (a FERC-jurisdictional activity) somehow intrudes upon state authority. *See* States Br. 46–47; *Suarez-Valenzuela*, 714 F.3d at 248–249 (undeveloped arguments are deemed abandoned). In any event, the Commission explained how its right-sizing reforms respected existing utility requirements. *See* JA1793, JA2679; *infra* pp.242–244.

their in-kind replacement estimates to other *stakeholders* before the right-sized replacement facility will be evaluated.  In particular, Transmission Owners object to early disclosure of their replacement lists to potential competitors (known as non-incumbent transmission developers, or simply "nonincumbents").  *Id.* at 48–52, 55–57; *see also infra* pp.236–243.

Transmission Owners complain that the Rule's disclosure requirement is asymmetrical since it only applies to existing incumbent utilities, and not to non-incumbents.  Br. 50–51, 55–57.  They further contend that confidentiality agreements are insufficient to ward against information security risks or competitive sensitivities.  *Id.* at 50–51, 53–54.

The Commission addressed these concerns head-on: the use of existing confidentiality rules and agreements, including "password-protected access to information," would address information security concerns; they could be further supplemented, if desired, by individual transmission provider proposals.  JA2729–2730.  Some degree of information sharing is necessary for "meaningful stakeholder participation," and so, consistent with longstanding agency and industry practice for sensitive information, the Commission found that "disclosure subject to appropriate mechanisms for confidentiality strikes an appropriate balance" here.  JA2729–2730, JA1822–

234

1823. This exercise of agency line-drawing judgment was reasonable. *See PACEM*, 148 F.4th at 263–264 (deferring to agency explanation of a "rational connection between the facts found and the choice made"); *see also Keating*, 569 F.3d at 433 (declining "to review line-drawing performed by the Commission unless" the lines drawn "are patently unreasonable").

Furthermore, Transmission Owners' argument entirely ignores two other important pieces of context. *First*, non-incumbents are (by definition) new entrants, *see* JA1706–1707, JA1803–1804, JA402–403, JA404–405, and so they may not own any transmission facilities at all, let alone the particular species of facilities at issue here—older facilities needing replacement. Despite Transmission Owners' characterizations, the disclosure requirement applies just to the "list of in-kind replacement estimates" itself, JA1822–1823, not to "long-term potential opportunities for development" and investment generally. Transmission Owners Br. 50.[20]

*Second*, the Commission devoted an entire subsection of the Rule to the interaction between its right-sizing reform and competitive dynamics

---

[20] Orders involving facilities that must be protected "against physical attacks" pursuant to a particular industry reliability standard are no help here either. *See* Br. 54; *Appalachian Power Co.*, 170 FERC ¶ 61,196, PP 2, 65 (2020).

235

between incumbents and non-incumbents (addressed fully below in response to Competition Petitioners), which ensured that incumbent transmission providers "will not lose the opportunity to invest" in their systems as a result of the Rule. *See* JA1802–1803; *infra* pp.236–243. When viewed in full, the Commission's reforms reasonably included modest disclosure requirements, despite these concerns.

**B.     FERC reasonably provided certainty regarding transmission project assignments for right-sized replacement facilities**

Competition Petitioners challenge a different, discrete aspect of the Commission's right-sizing reform, where the Commission decided that development responsibility for "right-sized" replacement facilities should lie with the incumbent transmission owner whose in-kind replacement was right-sized. Competition Petitioners believe this part of the reform exceeded the Commission's statutory authority and was not reasonably explained. *See* Competition Br. 29–57. As explained below—after an introduction of key terms and background from this niche of transmission planning policy— Competition Petitioners' arguments are inconsistent with longstanding precedent and the administrative record here.

### 1. Order 1920 reasonably adds another limited exception to Order 1000's transmission competition rules

As described above, in addition to its transmission planning and cost allocation reforms, Order 1000 also enacted a suite of reforms to "facilitate competition for transmission development." JA401 (citing Order 1000 PP 225–344). These reforms distinguished between two types of companies that may seek to build new transmission facilities—existing incumbent utilities on the one hand, and non-incumbent new entrants on the other. *See* JA402–403 (defining the FERC terms "incumbent transmission providers" and "nonincumbent transmission developers").[21] One goal of Order 1000 was to foster competition between these two general types of utilities where possible, so that regional transmission planning processes consider a wider range of potential cost-effective solutions to regional transmission needs. Order 1000 PP 228–230, 253–256. And so Order 1000 removed barriers to participation by non-incumbents, to ensure they were not "categorically excluded" from transmission development opportunities. *Id.* P 260.

---

[21] Both types of companies are before the Court here, as Transmission Owners are a group of mostly investor-owned incumbent utilities located in various regions, Br. viii–xxiii, 1, while LS Power Grid, LLC is a non-incumbent transmission developer, *see* Competition Br. 2–3.

Thus, at a high level, "Order No. 1000 requires transmission planning regions to adopt a competitive process for determining which companies will develop the projects for which the region's ratepayers will be charged." *LSP Transmission Holdings II, LLC v. FERC*, 45 F.4th 979, 984 (D.C. Cir. 2022). But not all projects must "be competitively bid"—some may simply be "assigned to the incumbent" utility for various reasons identified below. *Id.* at 984–985. The transmission planning rules in each region, in short, determine which utilities will be asked to build which projects, a question that typically depends on the nature of the project in question. *See id.* at 992–993.

Though Order 1000 ushered in a new era in transmission development, some of the terminology from the period before those reforms is still relevant today, including the term "right of first refusal." Before Order 1000, some regions "gave incumbent utilities the option to construct any new transmission facilities in their particular service areas, even if the proposal for new construction came from a third party." *South Carolina*, 762 F.3d at 72. And since some of these construction options were structured as a right of first refusal for an incumbent utility to choose to build (or, alternatively, decline to build) particular facilities, *see, e.g.*, Order 1000

238

P 251, the Commission has described such project assignment/construction responsibility options as a "federal right of first refusal" for incumbent utilities, where such options are set forth in a Commission-jurisdictional tariff or agreement. *See* JA403–407; *see also* Competition Br. 2 *et seq.* (frequently using the acronym "ROFR").[22]

In short, then, Commission orders and judicial precedent in this area refer to a "federal right of first refusal" as shorthand for a transmission planning policy that assigns a new project development opportunity to an incumbent utility. *See, e.g., South Carolina*, 762 F.3d at 72; *MISO Transmission Owners*, 819 F.3d at 332–333; JA1697–1701.[23] (Whether a selected project is actually built, of course, also depends on state-granted permits and other factors subject to state jurisdiction. *See supra* pp.44–45.)

---

[22] Rights of first refusal that may be created by States, and those that may exist under local laws, were not at issue in either Order 1000 or (now) Order 1920. *See MISO Transmission Owners v. FERC*, 819 F.3d 329, 336 (7th Cir. 2016); JA1674–1675.

[23] Although substantively important, the mechanics of a right of first refusal provision in a utility tariff may be as simple as an acknowledgement that "the owner of the existing asset ... shall be designated to construct and own or finance any facilities identified and selected as a Right-Sized Replacement Facility[.]" *See, e.g.*, Proposed Subsection (c)(4) to Attachment M-5 of PJM's Tariff, submitted Dec. 12, 2025 in FERC Docket No. ER26-744-000 (agency review pending), FERC Accession No. 20251212-5181.

The lack of such refusal rights, or their "elimination" under Order 1000, connotes competition for a particular new transmission facility development opportunity that is open to incumbents and non-incumbents alike.

As noted above, some types of projects are subject to competition, while others are not. On balance, Order 1000 adopted a middle-ground policy whereby the Commission required the elimination of such rights for "an entirely new transmission facility" that is regionally cost allocated—thus opening those opportunities to competition. Order 1000-A, 139 FERC ¶ 61,132, P 426. But, to respect existing incumbent utility responsibilities and obligations, the Commission allowed such rights to continue for upgrades to or replacements of a part of an existing incumbent-owned facility, and for projects that are not regionally cost allocated—thereby excluding those opportunities from competition. *See id.*; *South Carolina,* 762 F.3d at 73; JA1467. (Other exceptions to competition, such as for so-called "immediate need reliability projects" to be constructed within time constraints that do not allow for competitive bidding (e.g., within three years), have also been lawfully implemented after Order 1000. *See, e.g., LSP Transmission Holdings II, LLC v. FERC,* 28 F.4th 1285, 1287–1288 (D.C. Cir.

240

2022).)  The right-sizing reforms of Order 1920 were adopted against this backdrop.

**Right-Sized Project Assignments**. As detailed above, to help identify ways to meet multiple transmission needs, the Commission in Order 1920 required transmission owners to submit in-kind replacement estimates to regional planners, who may then propose to expand or "right-size" transmission projects to meet multiple needs.  *See* JA1785–1788.  But the Commission recognized that incumbent transmission owners "may have existing rights and responsibilities with respect to maintaining and, when necessary, replacing existing transmission facilities."  JA1784.

In other words, incumbent transmission owners may sometimes need to proceed with an in-kind replacement to meet their service obligations in a timely manner, even though, in theory, a (potentially bigger) right-sized solution composed of new, expanded facilities may be possible.  *See* JA1793.  These "replacement decisions" are a function of more than just regional transmission planning possibilities, and so the Commission respected "existing processes" for facility replacement—the processes that transmission owners in the regular course use to meet their service obligations in their existing service territories.  *See id.*; *see also* JA1804–1805 (noting that "the

241

right-sizing reform does not alter existing laws related to an individual transmission provider's ability to proceed with an in-kind replacement transmission facility"). Moreover, as explained above (*supra* pp.231–232), in-kind replacements themselves are not expansions of the transmission system and occur outside of the transmission planning process.

But to make sure that this new right-sizing process has a reasonable chance of producing successful results, the Commission addressed in its new Rule the potential for misaligned incentives. *See* JA1804–1805. If the right-sizing reform did not address project assignments—i.e., if it did not answer the question of who will be tasked with building the resulting right-sized project—incumbent utilities would be faced with a choice between (potentially) pursuing a right-sized replacement transmission facility through the regional process, or pursuing "a less efficient in-kind replacement transmission facility" outside of it instead. *See* JA1804–1806. Only in the latter case would there be certainty over development responsibility, since, absent a new policy, a right-sized replacement facility opportunity may be assigned away to other developers through competitive processes. *See id.* And so, absent a new policy, the utility may "lose the

242

opportunity to invest in [the] in-kind replacement transmission facility that is then selected" for right-sizing. JA1805–1806.

The Commission solved this inefficient uncertainty problem by clarifying that competitive bidding will not apply to right-sized transmission facilities—incumbent utilities will build any projects resulting from their in-kind replacement estimates. JA1805–1806. Under that policy, development certainty is provided and a potential disincentive to pursuing regional solutions eliminated. *Id.*; JA2667 (this policy "will remove a disincentive for transmission providers to consider right-sizing"). To align terminology with Order 1000, the Commission explained that it was "establishing a federal right of first refusal for such right-sized replacement transmission facilities," which was "necessary to effectuate [the right-sizing] reform and ensure that Commission-jurisdictional rates are just and reasonable." JA1804–1806.

### 2. Competition Petitioners misunderstand the statutory basis for this policy and the Rule's mechanics

Competition Petitioners—including LS Power Grid, LLC (LS Power), a non-incumbent transmission developer seeking to build right-sized transmission facilities—contend that assigning project responsibility to incumbent utilities is inconsistent with the Commission's statutory mandate. *See* Competition Br. 1–3, 5, 29–33. Their principal argument is that the

Commission's "power to find a practice unlawful" under Federal Power Act section 206 (16 U.S.C. § 824e) does not extend to "the power to mandate that practice." *Id.* at 31. Competition Petitioners appear to believe that the Commission must only act to "*counter monopoly power*" (i.e., support petitioners' preferred objective here) when prescribing the terms of utility tariffs that support the public interest. *See id.* at 34–36. They also assert that the Commission failed to make a required threshold finding under the Act and failed to engage in reasoned decision-making. *Id.* at 32–33. These contentions are meritless.

### a.    Competition rules are practices affecting rates

According to Competition Petitioners, the mission of Section 206 of the Act is to "*rein in regulated utilities' monopoly power.*" Competition Br. 31–32. "There is no provision of the [Act] granting FERC the right to establish a [right of first refusal] for any project, let alone mandate one nationwide." *Id.* at 35. And the "general regulation pronouncements" of authority "in Sections 201 or 206" (16 U.S.C. §§ 824, 824e) do not grant this authority either, they contend. *Id.* at 36, 38.

Competition Petitioners are wrong. Their contentions about the Commission's statutory authority do not survive either the text of the Act, or

244

relevant court precedents. *See* JA2675–2677 (collecting citations). On multiple occasions, regarding multiple transmission regions, courts have confirmed that the Commission may either expressly or effectively determine that certain types of transmission projects are not subject to competitive bidding open to non-incumbents. *See, e.g., MISO Transmission Owners*, 819 F.3d at 335–337 (rejecting LS Power's arguments and upholding Commission determination that certain categories of Midcontinent transmission projects are not subject to competitive bidding); *LSP Transmission*, 45 F.4th at 994 (same regarding another type of Midcontinent transmission project); *LSP Transmission*, 28 F.4th at 1287–1288, 1291 (same regarding certain New England projects); *Am. Mun. Power*, 86 F.4th at 932–937 (affirming Commission interpretation of utility's tariff that effectively excluded certain mid-Atlantic projects from competition).

Statutory text and precedent strongly support these conclusions. Section 206 extends Commission authority to "any rate, charge, or classification" and "any rule, regulation," or "practice … affecting such rate" of a jurisdictional utility. 16 U.S.C. § 824e(a). These terms are so broad that they could "assum[e] near-infinite breadth," but, importantly, the Supreme

245

Court has adopted the D.C. Circuit's "common-sense construction of the [Act]'s language" that limits the Commission's authority to "rules or practices that *directly* affect" jurisdictional rates. *FERC v. Elec. Power Supply Ass'n*, 577 U.S. at 278 (approving *California*, 372 F.3d at 403); *see also* JA2675, JA2678–2679 (citing these cases on rehearing). This standard is met, as the D.C. Circuit squarely held in affirming Order 1000, when the Commission regulates transmission competition tariffs and substitutes one competition policy for another. JA2676. "Indeed, rights of first refusal have generally been found to be practices affecting rates, thus confirming that they are within the Commission's jurisdiction[.]" JA2676 (citing *South Carolina*, 762 F.3d at 72).

Although *South Carolina* dealt with "the context of … removal" of rights of first refusal, the Commission explained here that the distinction does not matter to this question—in "addressing our statutory authority, the relevant question is whether the Commission can regulate rights of first refusal, not how it chooses to regulate them." *Id.* In other words, the question is whether the "rule, regulation, practice, or contract" in question directly affects FERC-jurisdictional rates, not the desirability of the substantive policy adopted by the Commission in the individual case. *See*

246

§ 824e(a) (using generic terms); *California*, 372 F.3d at 403–404 (finding as a general matter that the "corporate governance" practices of utilities do not "directly affect the rate or are closely related to the rate" they charge).

Competition Petitioners respond by claiming that this view of the statute is capricious, and that Congress could not have meant "that *any* practice found to be affecting rates" is subject to Commission authority. Br. 41 (emphasis modified). But that issue was put to rest by Congress's word choice in the Act (e.g., "all rules" and "any rate," §§ 824d(a), 824e(a)), and further confirmed by the Supreme Court—the Commission's authority extends to all practices that "directly affect" rates. JA2675 (discussing 577 U.S. at 278). Under that standard, the direct tie between competition policy and transmission rates means that establishing *or* eliminating federal rights of first refusal are "well within the Commission's authority" as practices affecting rates. JA2678–2679. (And thus, given this history and direct connection to rates, the major questions doctrine does not apply here either. *See id.*; *supra* pp.97–105; Competition Br. 36–37, 42–44.)

Indeed, in the context of major Commission rulemakings alone, the courts that affirmed Commission Orders 745 (demand response), 888 (open access transmission), and 1000 (regional transmission planning) all

247

emphasized the link between the challenged new rules and practices on one hand and FERC-jurisdictional rates on the other—they did not base their authority-related findings on the perceived wisdom of the policy being adopted. *See FERC v. Elec. Power Supply Ass'n*, 577 U.S. at 278–279; *New York*, 535 U.S. at 28; *South Carolina*, 762 F.3d at 57, 74.

Moreover, as the Commission explained, there is an "inherent contradiction" in Competition Petitioners' statutory arguments. JA2676. The *South Carolina* court concluded that the Commission "was authorized to regulate rights of first refusal" under Federal Power Act Section 206 standards as the "relationship between rights of first refusal and rates is far more direct than the relationship between corporate governance and rates." 762 F.3d at 74, 76. The Competition Petitioners fully agree with that analysis. Indeed, LS Power itself supplied record evidence that the *South Carolina* court relied on regarding transmission competition's connection to rates, at least when the question was whether competition should be *expanded. See id.* at 68–69.[24] But Competition Petitioners now disagree with a later policy choice the Commission made here on a different record.

---

[24] So too here. *See, e.g.*, JA1775–1776, JA1821 (explaining that, before the agency, Competition Coalition and LS Power advocated for expanding

248

Just because the Commission *could* "take additional steps to increase the protection of" petitioners' interests does not mean that the agency "clearly made an error of judgment" in deciding to proceed differently. *Appalachian Voices v. State Water Control Bd.*, 912 F.3d 746, 759 (4th Cir. 2019) (denying petition for review); *see also Hope Nat. Gas*, 320 U.S. at 602 ("the Commission's order does not become suspect by reason of the fact that it is challenged" by a party).

> **b.      Competition was addressed at the second step of the statutory Section 206 analysis, not the first**

Competition Petitioners next allege that the Commission failed to properly invoke and apply its Section 206 authority.  Br. 44–47.  Noting that the Commission must first "find[] that an existing rate is unjust and unreasonable" under the Act before specifying a replacement, Competition Petitioners argue that "none of [the] deficiencies" Order 1920 identified were "related in any way" to federal rights of first refusal, i.e. competition policy.  *Id.* at 44–45.  In Competition Petitioners' reading, the Commission must specifically identify the *lack* of a right of first refusal as unjust or

---

"competition to all transmission projects" above 100 kilovolts); JA1825 (rejecting idea as outside the scope of the right-sizing reform).

unreasonable under Section 206 before imposing one as part of a replacement rate. *See id.* at 45–46 (citing JA1714–1718, JA1719).

This misunderstands the basis for the Commission's action here. In the Rule, the Commission found existing tariffs to be unjust and unreasonable under the Act "due to the lack of *right-sizing requirements* that may lead to the identification, evaluation, and selection of more efficient or cost-effective" long-term facilities. JA2658–2659 (emphasis added). The fact that transmission providers may replace aging infrastructure "without evaluating" potentially sensible larger modifications is what motivated this reform. JA1719.

After identifying this problem, consistent with the two-step process under the Act, the Commission then prescribed the right-sizing process that transmission providers must follow. *See* JA1720 (providing overview); *supra* pp.242–243 (same). In so doing, the Commission also acted to "remove a disincentive" to pursuing right-sizing in practice: uncertainty regarding right-sizing project assignment responsibility. JA2666–2667. Indeed, beginning in the proposed rule, the Commission identified the possibility of "duplicative or inefficient transmission development" that could occur if right-sized replacement transmission facilities were made subject to

competitive bidding processes. JA461–462. After taking robust public comment, *see* JA1795–1801 (summarizing comments), the Commission found that establishing a right of first refusal was "necessary to effectuate the right-sizing reform" and to ensure that rates are "just and reasonable" under the Act when this reform is implemented in the real world. JA2711–2712 (citing JA1804–1805). All this, the Commission found, will help to ensure that transmission providers identify and select the more efficient or cost-effective regional transmission solution to long-term needs, the goal of the right-sizing reform. JA2711–2712.[25]

This discussion also demonstrates a reasonable connection between the facts found and choices made, and thus a reasonable explanation for the Commission's forward-looking exercise of statutory authority. *See Prometheus*, 592 U.S. at 422–423 (upholding exercise of agency's "predictive judgment" where it "reasonably considered the relevant issues and

---

[25] Meanwhile, Consumers attempt to find some problem or connection between the transparency reform and the competition aspect of the right-sizing reform (*see* Br. 35–36), but are simply wrong that "right-sizing asset condition projects … escape any scrutiny." Br. 36. The point of this reform is that such projects *will* be regionally analyzed in practice. *See* JA2707–2708, JA2710–2712. And the underlying rehearing request simply reiterated concerns about desired transparency. *See* JA4862–4863.

reasonably explained the decision"); *infra* pp.254–261 (addressing alignment with Order 1000's goals).

In contending otherwise, Competition Petitioners' argument takes an artificially narrow view of when the Commission's Section 206 authority may be applied.  To create a new policy, under this view, the Commission must first find that the specific "absence in existing tariffs of" that same policy is unjust and unreasonable.  *See* Br. 45–46, 47.  In other words, Competition Petitioners contend that FERC must always work backwards from the solution it envisions, or it will misapply its statutory authority. *See id.* at 46, 47 (lamenting that FERC "did not identify the lack of a [right of first refusal] as unjust or unreasonable under Section 206").

But Competition Petitioners offer no precedent that reads Section 206's broad grant of statutory authority in such rigid fashion.  *See id.* at 44–47.  *South Carolina* is to the contrary.  *See* 762 F.3d at 56 (the power to "remedy certain practices is broadly stated" in § 824e(a)).  Worse, the lead precedent Competition Petitioners rely on (Br. 44) *reversed* Commission orders for exactly the kind of backwards-induction reasoning they call for here.  In *Emera Maine*, regarding regulated profit margins in cost-of-service transmission rates, "FERC began by determining that 10.57 percent would

252

be a just and reasonable [rate] and only then found the existing 11.14 percent [rate] to be unlawful because it was not equivalent to 10.57 percent." 854 F.3d at 22. That working-backwards approach was overturned because "FERC … never actually explained how the existing [rate] was unjust and unreasonable," only that the existing rate did not match what the Commission would unilaterally have imposed. *Id.* at 26.

In contrast here, the Commission did not conflate the two inquiries (at step one and two). The "specific replacement rate" adopted did not drive the analysis, though there was a reasonable relationship between the deficiencies identified and the new requirements established such that the new requirements "are appropriately tailored toward remedying the deficiencies that the Commission identified." JA2086–2087; *supra* pp.250–252 (detailing the statutory analysis regarding right-sizing); *see also Consol. Gas*, 653 F.2d at 134 (emphasizing that "(s)tatutory reasonableness is an abstract quality represented by an area rather than a pinpoint").

As this Court has explained, "FERC must have the tools to act when markets fail, and it must use those tools to ensure that customers pay only just and reasonable rates." *FERC v. Powhatan Energy Fund, LLC*, 949 F.3d 891, 904 (4th Cir. 2020). It did so here in reforming the "existing piecemeal

253

approach to upgrading the transmission system," which "result[ed] in inefficiencies and increased rates for consumers." JA2721–2722.

### 3. Competition Petitioners overlook the Commission's reasonable explanation for this policy

The balance of Competition Petitioners' arguments target the explanation the Commission gave for instituting a federal right of first refusal for right-sized facilities as "a just and reasonable replacement practice." Competition Br. 48. This argument is primarily concerned with whether there is "alignment between Order 1000 and Order 1920," as the Commission said, or whether that explanation instead seeks "to rewrite history," as petitioners contend. *Id.* at 50, 54.

### a. Order 1920 aligns with Order 1000

The Commission addressed this subject at length in both Order 1920 and again on rehearing. *See* JA1801–1806, JA2720–2727. The overarching point of Order 1000 was not to open up every transmission development opportunity to competition between utilities (which, indeed, it did not do, *see supra* p.242). Rather, Order 1000's goal was to promote "the consideration of more efficient or cost-effective potential transmission solutions proposed at the regional level" and thereby ensure just and reasonable rates. JA2720. The right-sizing reform here shares the same

goal—"promoting the consideration of right-sized replacement transmission facilities" and "helping to ensure that the more efficient or cost-effective" solution "is identified and selected" in practice.  JA2721–2722.  As the Commission explained, the reforms in both Order 1000 and Order 1920 "seek to ensure that more efficient or cost-effective regional transmission facilities are considered thereby resulting in just and reasonable rates."  JA2723–2724.

That goal is undermined, the Commission explained, by the "existing piecemeal approach to upgrading the transmission system," which would likely persist if incumbent transmission owners stood to lose the opportunity to invest in facilities selected as a right-sized replacement project.  JA2721–2722; *see supra* pp.250–255.

Of course, Order 1000 was also concerned that nonincumbent transmission developers could be "categorically excluded" from transmission development opportunities.  Order 1000 P 260; *see also* Competition Br. 54–55.  And so Order 1000 sought to allow non-incumbents to "propos[e] alternative solutions at the regional level" for planning consideration.  JA2720.

But the Commission explained here on rehearing that "we do not believe that the right-sizing reform will significantly decrease competition compared to the status quo." JA2725. That is because it is "unlikely that right-sized replacement transmission facilities would ever be considered in competitive transmission development processes" on their own, without advance certainty regarding project assignment responsibility. JA2724–2725. An incumbent utility would likely proceed ahead with a piecemeal solution regardless, rendering any such right-sizing inquiry fruitlessly academic. *See id.* Thus, without a new policy on competition, the old lines would likely be rebuilt in the same place (wholly outside of transmission planning processes), and the additional opportunity for grid expansion would be left unexplored. *See id.*; *supra* pp.242–244.

Resolving the uncertainty that would otherwise fuel inefficient efforts would increase the number of regional solutions actually considered and pursued in practice and therefore "*promote* the consideration" of such regional solutions. JA1804–1805; JA2710–2711, JA2722–2723 (same). This conclusion was reasonable and merits respect. *See N.C. Utils. Comm'n v. FERC*, 741 F.3d 439, 448 (4th Cir. 2014) (affirming agency's "complex predictions based on special expertise," for which judicial review "is at its

256

most deferential" (cleaned up)); *Nat'l Audubon Soc'y v. U.S. Army Corps of Eng'rs*, 991 F.3d 577, 583, 589 (4th Cir. 2021) (same).

### b.      Any potential policy change was acknowledged and explained

Competition Petitioners stress however, that the Commission must explain any change in its policies or rules under the Administrative Procedure Act. *See* Br. 49 (citing *Fox Television*, 556 U.S. at 515–516). In particular, they point to alleged discrepancies in how the Commission has defined a transmission "upgrade" and how it approached transmission facilities built on existing rights-of-way. *Id.* at 55–56.

In addition to addressing the broader above points in detail, *see, e.g.*, JA2721–2722, the Commission also addressed these more specific claims that it had changed policies. In response to Order 1000, parties asked the Commission to define a transmission "upgrade" for purposes of its competition reform. *See* Order No. 1000-A, 139 FERC ¶ 61,132, P 426. The Commission responded that "the term upgrade means an improvement to, addition to, or replacement *of a part of*, an existing transmission facility. The term upgrade[] does not refer to an entirely new transmission facility." *Id.* (emphasis added).

257

This mattered since "the requirement to eliminate a federal right of first refusal" under Order 1000 "does not apply to any upgrade, even where the upgrade requires the expansion of an existing right-of-way"—in part because those competition "reforms were not intended to alter an incumbent transmission provider's use and control of its existing rights-of-way under state law." *Id.* P 427. Control of physical rights-of-way on land used for transmission infrastructure was to remain subject to laws outside FERC's jurisdiction. *See* Order 1000 P 319.

In Order 1920-A, the Commission acknowledged that, to the extent a right-size replacement facility is a new facility that *also* replaces the *entirety* of an existing facility on the same general route, its exclusion from competition under this reform may amount to a new policy. JA2708–2709, JA2721–2722 (contrasting, *inter alia*, *New York Indep. Sys. Operator, Inc.*, 151 FERC ¶ 61,040, P 96 (2015)); *see also* Competition Coalition Reh'g Request JA4825–4826 (citing *New York Indep. Sys. Operator, Inc.*, 175 FERC ¶ 61,038, P 45 (2021)). Indeed, right-sized replacement facilities may serve both purposes—addressing the need for new equipment *and* expanding the capacity of that same segment of the transmission system—which is part of

258

such projects' appeal in the first place. JA2710–2711, JA1787–1788, JA1802–1803, JA1804–1805.

But to the extent that excluding this particular type of new project from competition amounted to a departure from past policies, the Commission explicitly acknowledged that change and, as detailed above, explained why the new policy nevertheless still promoted more detailed consideration of potentially desirable regional solutions, the overall goal of Order 1000. JA2708–2712, JA2721–2722; *supra* pp.255–258.

This too was reasonable. Agencies "do not establish rules of conduct to last forever" and may change approaches or provide for "an exception" in a new reform if that new policy direction is reasonably explained, as it was here. JA2708–2709 (citing cases). Indeed, for administrative flexibility to even be possible, "agencies must be given ample latitude to adapt their rules and policies to the demands of changing circumstances," and to that end, "a change in an agency's position in itself is not even subject to a heightened level of scrutiny." *Philip Morris USA, Inc. v. Vilsack*, 736 F.3d 284, 294, 295 (4th Cir. 2013) (cleaned up). The Commission's Administrative Procedure Act duty was met here. *See* JA2708–2712.

259

The Commission also specifically discussed land rights-of-way, explaining that, as in Order 1000, its new policy here would not affect "the retention, modification, or transfer of rights-of-way" under state or other relevant laws and regulations. JA2712–2713 (citing Order 1000 P 319). Important here is that the definition of a right-sized replacement transmission facility includes the requirement that it "be located [on] the same general route as the existing transmission facility identified for replacement" and not have "significantly different interconnection points than the in-kind replacement facility." JA2713–2714. Therefore, even if tearing down an old line and building a bigger, newer one on the same or expanded right-of-way may once have been considered an entirely *new* transmission facility under past Commission competition policies, a right-sized *replacement* transmission facility under the Rule is limited to that context—facilities meeting a need for existing facility replacements, not interconnection of significantly different portions of the grid. *See* JA2712–2715.

It is reasonable, in adopting a new grid reform, for the Commission to adjust the line between what is considered "new" and what is an "upgrade" to the existing grid. Indeed, even where there may be "a basis for the

260

Commission to order" a particular rate-related result, that "does not compel the conclusion that the Commission must, as a matter of law," order that result. *See Nantahala*, 727 F.2d at 1348. Its method of implementing sensible line-drawing in a complex area is "essentially a matter of Commission discretion" reviewed only for reasonableness. *Id.*

Here, as with the other reforms detailed above, all that matters is that the Commission made a reasonable adjustment to its competition policy, and that the adjustment was reasonably explained. *See, e.g., North Carolina*, 741 F.3d at 450 (declining to "second guess" the "reasonable conclusions" of a regulatory agency decision).

### C. The Rule's lawful right-sizing reforms enhance, but are separate from, the Rule's other long-term planning requirements

Finally, regarding requested remedies, Competition Petitioners specifically request that only the portion of Order 1920 that establishes a right of first refusal for right-sized facilities be vacated, not the whole right-sizing reform. Competition Br. 57 (specifically citing Section IX.C.2 of Order 1920 JA1794–1807). These Petitioners do not challenge (and some may even

261

explicitly support) other aspects of the Rule. *See* Br. 57; Advanced Energy United Reh'g Request JA5292, JA5294.[26]

For the reasons already stated, the Rule's right-sizing right of first refusal reform is lawful. But should the Court grant Competition Petitioners' petitions, it need not vacate the right-sizing reform since "vacatur is never a foregone conclusion," *PJM Power Providers Grp. v. FERC*, 88 F.4th 250, 268 n.102 (3d Cir. 2023), especially under the review statute here, where a court may "affirm, modify, *or* set aside" the orders on review, and furthermore may do so "in whole *or* in part." 16 U.S.C. § 825*l*(b) (emphasis added). *See also Sierra Club v. U.S. Army Corps of Eng'rs*, 909 F.3d 635, 655 (4th Cir. 2018) (discussing the possibility of "remand without vacatur" as "relevant" where an agency action is merely "insufficiently supported").

If, however, the Court decides that it must vacate the challenged right-sizing right of first refusal portion of Order 1920, the Commission partially agrees with an implied premise in Competition Petitioners' request: that the

---

[26] For their part, the Organizations request a limited remand that does not set aside the Rule during additional agency proceedings, and support other parts of the Rule not affected by their challenges on appeal. *See* Organizations Br. 5, 8, 57–60.

right-sizing reforms (as a package) are independent of, and thus severable from, the Rule's *other* long-term planning and cost allocation reforms. "On judicial review, whether an agency order is severable turns on the agency's intent," and the "heart of the inquiry" also includes whether "the remainder of the regulation could function sensibly without the stricken provision." *Belmont Mun. Light Dep't v. FERC*, 38 F.4th 173, 187–188 (D.C. Cir. 2022) (cleaned up).

No doubt exists that the Commission would have adopted the balance of the Rule absent the right-sizing reform. FERC made plain on agency rehearing that it considers the "right-sizing reforms … as an enhancement to, rather than essential to, the Long-Term Regional Transmission Planning process." JA2722. Eliminating any doubt, the Commission elaborated that, even "[a]bsent the right-sizing reforms, the Commission would have established the other Long-Term Regional Transmission Planning requirements as a sufficient just and reasonable replacement rate." *Id.* It also made clear that establishing a right of first refusal was "necessary to effectuate the right-sizing reform." JA2711. Therefore, the Commission drew a line between the right-sizing reforms (in their entirety, section IX.C of Order 1920) and the rest of the Rule. While the various aspects of the

263

new right-sizing process are interdependent, *see* JA2711–2712, that process

is not integral to (and is therefore severable from) the remainder of the

Rule's "just and reasonable" transmission planning and cost allocation

reforms.

# CONCLUSION

For the foregoing reasons, the Court should dismiss the petitions for review, presented by the five groups of Petitioners, to the extent the Court lacks jurisdiction to consider them, and should otherwise deny the petitions for review on the merits.

Respectfully submitted,

Robert H. Solomon
Solicitor

Karin Herzfeld
Special Counsel

*/s/ Jared B. Fish*
Jared B. Fish
Susanna Y. Chu
Senior Attorneys

Jason T. Perkins
Attorney

Federal Energy Regulatory Commission
Washington, D.C. 20426
Tel: (202) 502-8101
jared.fish@ferc.gov

March 13, 2026

265

**CERTIFICATE OF COMPLIANCE**

Pursuant to Fed. R. App. P. 32(g) and Circuit Rule 32(b), I certify that this brief complies with the type-volume limitation in Fed. R. App. P. 32(a)(7)(B), as modified by this Court's July 28, 2025 order (Doc. 327-1), because this brief contains 51,411 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

I further certify that this brief complies with the type-face requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in Miller Text 14-point font using Microsoft Word 365.

/s/ Jared B. Fish
Jared B. Fish
Senior Attorney

Federal Energy Regulatory Commission
Washington, DC 20426
Tel.: (202) 502-8101
E-mail: Jared.Fish@ferc.gov

March 13, 2026

USCA4 Appeal: 24-1650    Doc: 510-1    Filed: 03/13/2026    Pg: 298 of 298

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system on March 13, 2026.  Participants in the case will be served by the appellate CM/ECF system.

*/s/ Jared B. Fish*
Jared B. Fish
Senior Attorney